SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973-639-9100
Fax:  973-584-9393
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

Local Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | No. 2:19-cv-15382-BRM-JAD |
| ) | CLASS ACTION |
| Plaintiff, ) ) | |
| vs.  ) ) | |
| RECKITT BENCKISER GROUP PLC, et al., ) ) ) | |
| Defendants.  ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................................1

II.   FACTUAL BACKGROUND.....................................................................4

III.  ARGUMENT............................................................................................9

    A.    Legal Standard.................................................................................9

    B.    The Court Should Not Transfer the Federal-law Claims of the
          ADS Purchasers...............................................................................14

          1.    The Public Interest Factors Overwhelmingly Weigh in
                Favor of Plaintiffs ................................................................14

    C.    The Court Should Not Transfer the English-law Claims of the
          Ordinary Share Purchasers .............................................................20

          1.    The Private Interests Favor Litigation in This District.............21

          2.    Defendants' Arguments Concerning Mandatory
                Arbitration of the English-law Claims Should Not Be
                Considered on This Motion .....................................................25

IV.   CONCLUSION.......................................................................................27

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex.*,
571 U.S. 49 (2013)..............................................................................*passim*

*Cadapult Graphic Sys., Inc. v. Tektronix, Inc.*,
98 F. Supp. 2d 560 (D.N.J. 2000) ......................................................15

*Celgene Corp. v. Abrika Pharms., Inc.*,
2007 WL 1456156
(D.N.J. May 17, 2007) .......................................................................24

*Clark v. Burger King Corp.*,
255 F. Supp. 2d 334 (D.N.J. 2003)......................................................18

*EVCO Tech. & Dev. Co., LLC v. Precision Shooting Equip., Inc.*,
379 F. Supp. 2d 728 (E.D. Pa. 2005)..................................................22

*Fernandes v. Deutsche Bank Nat'l Tr. Co.*,
157 F. Supp. 3d 383 (D.N.J. 2015).....................................................14

*Franklin U.S. Rising Dividends Fund v. Am. Int'l Grp.*,
2014 WL 1555133
(D.N.J. Apr. 14, 2014) .......................................................................15

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947)...........................................................11, 16, 18

*Hardney v. ABC Phones of N.C., Inc.*,
2020 WL 948817
(D.N.J. Feb. 27, 2020) ...................................................................16, 23

*In re Howmedica Osteonics Corp.*,
867 F.3d 390 (3d Cir. 2017) .......................................................*passim*

*In re TCW/Camil Holding L.L.C.*,
2004 WL 1043193
(D. Del. Apr. 30, 2004)........................................................................21

**Page**

*Jumara v. State Farm Insurance Co.*,
55 F.3d 873 (3d Cir. 1995) ........................................................................*passim*

*Kane v. Ollie's Bargain Outlet Holdings, Inc.*,
2018 WL 6168085
(D.N.J. Nov. 26, 2018)....................................................................16, 21, 23

*Malek v. Chef's Roll, Inc.*,
2019 WL 3854303
(D.N.J. Aug. 16, 2019)...........................................................................14, 15

*Manopla v. Raymours Furniture Co., Inc.*,
2018 WL 3201800
(D.N.J. June 29, 2018) ....................................................................9, 10, 11, 21

*Microsoft Mobile v Sony Europe*
[2017] EWHC 374 (Ch)................................................................................26

*On-Time Staffing, LLC v. Flexible Staffing Sols., Inc.*,
2007 WL 1234978
(D.N.J. April 25, 2007) ...............................................................................24

*Panella v. United States*,
2018 WL 5630591
(D.N.J. Oct. 31, 2018)) ...............................................................................14

*Ryanair v Esso Italiana*
[2013] 2 C.L.C. 950.....................................................................................26

*Selective Way Ins. Co. v. Glasstech, Inc.*,
2014 WL 6629629
(D.N.J. Nov. 21, 2014).................................................................................14

*Shutte v. Armco Steel Corp.*,
431 F.2d 22 (3d Cir. 1970) .........................................................................21

*Silvis v. Ambit Energy, L.P.*,
90 F. Supp. 3d 393 (E.D. Pa. 2015)................................................9, 11, 15, 16

*Spack v. Trans World Entm't Corp.*,
2017 WL 6209218
(D.N.J. Dec. 8, 2017) ..................................................................................23

**Page**

*Union Steel Am. Co. v. M/V Sanko Spruce*,
  14 F. Supp. 2d 682 (D.N.J. 1998) ..........................................................................15

*Weidner Commc'ns, Inc. v. H.R.H. Prince Bandar Al Faisal*,
  859 F.2d 1302 (7th Cir. 1988) ...............................................................................19

*Yang v. Odom*,
  409 F. Supp. 2d 599 (D.N.J. 2006) .........................................................................15

*Yocham v. Novartis Pharms. Corp.*,
  565 F. Supp. 2d 554 (D.N.J. 2008) ...................................................................16, 18

*Zazzali v. Swenson*,
  852 F. Supp. 2d 438 (D. Del. 2012).........................................................................22

## STATUTES, RULES AND REGULATIONS

28 U.S.C.
  §1404.........................................................................................................................1
  §1404(a) .............................................................................................................*passim*

Plaintiffs respectfully submit this Memorandum of Law in opposition to the Motion to Transfer pursuant to 28 U.S.C. §1404 (ECF No. 43, the "Motion") filed by defendants Reckitt Benckiser Group plc ("Reckitt"), Shaun Thaxter ("Thaxter"), Rakesh Kapoor, Adrian Hennah, and Adrian Bellamy (collectively, "Defendants").[1]

## I.    INTRODUCTION

Defendants are in an unusual posture with respect to their motion to transfer this action to the Southern District of New York ("SDNY").  Reckitt's United States headquarters is in New Jersey, and the relevant conduct relates largely to the activities of personnel here.  One of the Defendants who made a substantial number of alleged misstatements – Thaxter, the CEO of Reckitt's former subsidiary Reckitt Benckiser Pharmaceuticals ("RBP") – was based in New Jersey and created and/or approved many of the misstatements here.  The pharmaceutical product around which this action revolves, Suboxone Film, was manufactured in New Jersey.  And the U.S. Attorney's Office for the District of New Jersey started the fraud investigation into

---

[1]     Plaintiffs represent a putative class consisting of purchasers of: (i) Reckitt ADSs on the over-the-counter market during the Class Period pursuing remedies under the Exchange Act; and (ii) Reckitt ordinary shares on the London Stock Exchange during the Class Period pursuing remedies under English common law and U.K. statutory law (the "English-law claims").  *See* Amended Complaint ¶1 (ECF No. 37), cited herein as "¶__."  Capitalized terms not defined herein have the definitions ascribed to them in the Amended Complaint.  Emphasis is added unless otherwise noted, and internal citations and quotation marks are omitted unless otherwise specified.  Defendants' Brief in Support of Motion to Transfer (ECF No. 43-1) is referenced as "Def. Br."

Reckitt that ultimately led to Reckitt paying $1.4 billion to the U.S. Department of Justice ("DOJ") to resolve its criminal and civil liability. Yet Reckitt, unhappy with this forum, seeks to transfer this proceeding to the SDNY. But Reckitt did not maintain its headquarters in the SDNY. No misstatements were created or approved there. Nor did any conduct relevant to this action take place there. In fact, the SDNY's only connection to this action is a forum selection clause buried in the Deposit Agreement between Reckitt and JPMorgan Chase Bank ("JPMorgan"), the depositary of the American Depositary Receipts underlying Reckitt's ADSs.

The Motion should be denied. Defendants seek to have this matter transferred to the SDNY pursuant to 28 U.S.C. §1404(a), arguing that the ADS purchasers' claims are subject to the forum selection clause specifying the SDNY. Defendants also assert that transfer of the claims on behalf of ordinary shareholders, which are not even subject to a forum selection clause, is warranted under the standard specified in *In re Howmedica Osteonics Corp.*, 867 F.3d 390 (3d Cir. 2017) ("*Howmedica*"). Defendants' arguments fail.

Assuming that the forum selection clause is applicable to the ADS purchasers, the public interest factors outlined in *Jumara v. State Farm Insurance Co.*, 55 F.3d 873 (3d Cir. 1995), weigh overwhelmingly in favor of maintaining the action in New Jersey. For example, the center of gravity of this case leans towards New Jersey due to the locus of Thaxter's statements, and this District has a strong local interest in

resolving a dispute against a company with its U.S. headquarters in New Jersey.  The SDNY, on the other hand, has no connection to the litigation aside from the forum selection clause.  Moreover, Reckitt's forum selection clause should not be given the same weight as an agreement openly negotiated between sophisticated parties because Reckitt ADS purchasers did not bargain for the Deposit Agreement nor formally agree to the forum selection clause therein.  In addition, Defendants delayed bringing their motion to transfer until eight months after the first complaint was filed against them, underscoring the lack of urgency to Defendants of transfer.  For these reasons, the inquiry should end there, and the Court should deny the Motion.

If, however, the Court disagrees, the English-law claims of Reckitt ordinary share purchasers, which are not subject to a forum selection clause, should nevertheless remain in this Court.  Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]"  28 U.S.C. §1404(a).  Yet Defendants do not – because they cannot – claim any conveniences to themselves by transferring this action to the SDNY.  Both the public and private interest factors overwhelmingly favor maintaining all of Plaintiffs' claims in New Jersey.  Accordingly, Defendants' Motion should be denied.

- 3 -

## II.    FACTUAL BACKGROUND

Opioid addiction and abuse is a public health crisis in the United States (¶2), with an acute impact in New Jersey.[2]  As the manufacturer of Suboxone Tablets, a drug that was intended to help opioid-addicted patients overcome their addiction, Reckitt was poised to ease this crisis.  *Id.*  Defendants, however, devised a scheme that sought to fraudulently deny patients a lower-cost generic alternative in order to maintain Reckitt's lucrative monopoly on the branded drug and deceive investors about the drug's profitability.  *Id.*

Reckitt investors were defrauded by Defendants' false and misleading statements and omissions concerning the profitability and health and safety risks of Suboxone Film, Reckitt's new, reformulated Suboxone drug.[3]  ¶3.  Defendants

---

[2]    In 2019, the deaths of more than 3,000 New Jersey citizens were linked to suspected opioid overdoses.  *See* Governor Murphy Announces Preliminary 2019 Year-End Opioid Statistics and Highlights Administration-Wide Efforts to Combat the Opioid Epidemic in New Jersey (Jan. 8, 2020), https://www.state.nj.us/humanservices/news/press/2019/approved/20200108.html (last visited June 15, 2020).  In January 2020, New Jersey announced $7.8 million in funding to county jails to support opioid addiction treatment for inmates.  *See id.*; *see also* Joe Hernandez, N.J. Infuses Some Counties With Cash For 'Local Solutions' To The Opioid Crisis (Feb. 4, 2020) (covering Governor Murphy's announcement that 12 counties across the state will receive nearly $1.7 million in grant funding for programs to combat the opioid crisis), https://whyy.org/articles/n-j-infuses-some-counties-with-cash-for-local-solutions-to-the-opioid-crisis/ (last visited June 15, 2020).

[3]    Suboxone Film was manufactured in New Jersey by a company called MonoSol Rx.  *See* https://aquestive.com/suboxone-sublingual-film-opioid-dependence/# (last visited June 15, 2020).

- 4 -

engaged in a fraudulent campaign to induce physicians and patients to switch from Suboxone Tablets, which would be subject to generic competition in October 2009 that could wipe out 80% of Reckitt's Tablet sales, to Suboxone Film, a new formulation with patent protection until 2023. ¶5. Defendants deceived investors, physicians, patients, and healthcare benefit programs into believing that Suboxone Film was safer and less susceptible to accidental child exposure (*i.e.*, children taking the drug by accident) and diversion (*e.g.*, illegal selling, sharing, and smuggling of the drug) than Suboxone Tablets.[4] *Id.* Defendants, however, knew that Suboxone Film was neither safer nor less susceptible to diversion and misuse than Suboxone Tablets – because the FDA expressly told them so. *Id.* In fact, the FDA informed Defendants that Film could be ***more dangerous*** than Tablets. ¶72.

Many of the alleged misstatements at the center of this action were created in New Jersey by Thaxter, the CEO of RBP (now a separate company called Indivior), which was Reckitt's pharmaceutical division until December 23, 2014.[5] RBP was

---

[4]    To fraudulently promote the Film, Reckitt and RBP prepared written marketing materials with various false claims about the benefits of the Film. ¶92. Defendants mailed copies of these marketing materials from a contractor in New Jersey to RBP sales representatives throughout the United States. ¶93.

[5]    Thaxter's alleged misstatements are described in nine paragraphs of the Amended Complaint. *See* ¶¶144, 146, 148, 150, 152, 154, 156, 165, 167. Alleged misstatements made by other defendants are described in 17 paragraphs of the Amended Complaint. *See* ¶¶131, 132, 134, 137, 139, 141, 158, 160, 162, 164, 169-175.

headquartered in New Jersey, *see* Def. Br. at 12 n.4, at least during a portion of the Class Period. During the Class Period and through the present, Reckitt, a United Kingdom-headquartered company, has maintained its U.S. headquarters in Parsippany, New Jersey. ¶24.

The U.S. Attorney's Office for the District of New Jersey began an investigation into Reckitt and RBP concerning Suboxone Film in 2011. ¶11. The DOJ indicted RBP in April 2019. ¶184. In July 2019, Reckitt paid $1.4 billion to resolve its own potential criminal and civil liability, which the DOJ described as the "largest opioid settlement in US history." ¶185. The U.S. Attorney's Office for the District of New Jersey handled, in part, the civil settlement with Reckitt.[6]

The Indictment alleges in detail Defendants' fraud. According to the Indictment, in order to increase prescriptions of Suboxone Film before Reckitt's exclusivity on Suboxone Tablets ran out, Defendants engineered an anticompetitive scheme to coerce patients and physicians to switch from Tablets to Film under false pretenses. ¶8. As part of this scheme, Defendants announced a "discontinuance" of the Tablet form of Suboxone based on supposed "concerns regarding pediatric exposure" to Tablets. *Id.* The only reason for the discontinuance, however, was to delay the FDA's approval of generic tablet forms of the drug. Defendants falsely told

---

[6]  *See*  https://www.justice.gov/opa/pr/justice-department-obtains-14-billion-reckitt-benckiser-group-largest-recovery-case (last visited June 15, 2020).

investors that the success of Suboxone Film was due to patients, physicians, and payers (*i.e.*, Medicare and Medicaid) preferring Suboxone Film over Tablets, rather than Defendants' coercive conduct. *Id.*

Defendants also misled investors and the public in an attempt to game the drug-approval process to delay generic competition for the lucrative Suboxone franchise. ¶9. Reckitt filed a sham citizen petition with the FDA claiming its own Tablets, which it had been selling for years, were so unsafe as to require a voluntary withdrawal from the U.S. – but not from foreign markets. Defendants knew that by filing a citizen petition, the FDA would be required to take at least another five months to consider its merits (or the lack thereof), thereby further delaying entrance of generic Suboxone Tablets into the market and giving Reckitt more time to convert patients and physicians from Tablets to Film. *Id.*

The scheme was highly successful, blocking lower-cost generic competition to Suboxone Tablets and causing patients to pay more for the reformulated Suboxone Film. ¶10. Defendants fraudulently converted thousands of opioid-addicted patients over to Suboxone Film and caused state Medicaid programs to expand and maintain coverage of the Film, instead of much less-expensive Tablets, at a substantial cost to the government. Between 2010 and 2014, Reckitt received approximately $3 billion in revenues from sales of Suboxone Film. *Id.*

The Indictment exposed Defendants' scheme, citing internal emails and documents that demonstrate actual knowledge of the scheme by Thaxter and multiple Reckitt CEOs and CFOs. According to the Indictment, in 2012, Reckitt's investor relations director emailed Thaxter, Reckitt's CEO Rakesh Kapoor, and others, referencing "our plans" to withdraw Suboxone Tablet's FDA approval in order to delay FDA approval of generic versions of the Tablet. ¶15. Reckitt's General Counsel responded to them and other Reckitt and RBP senior executives, stating, "please do not create any emails or other documents suggesting that we would consider" attempting to delay FDA approval of generic versions of Suboxone Tablet in this way, and "any decision we make will be based on consumer safety." *Id*. The Indictment, however, quotes an RBP manager as stating, in the same year, "Under no circumstances can we make the claim that Suboxone Film is safer or better at reducing pediatric exposures," and "Saying Suboxone Film is safer than any tablet on the market because Film has less ability to be snorted/injected [is an] unsubstantiated superiority claim." *Id*. The Indictment also details how Thaxter and Kapoor approved the submission of the citizen petition to the FDA even though it had been secretly altered to delete the statement that "any results related to the original packaging should be interpreted with considerable caution." *Id*.

On October 24, 2019, the State of New Jersey announced its own settlement with Reckitt. The settlement provided New Jersey's Medicaid program with more

than $15 million and provided the state itself with more than $5.7 million.[7] Emphasizing Reckitt's manipulation of opioid-addicted patients and New Jersey taxpayers, the Attorney General of New Jersey stated, "Reckitt Benckiser took advantage of individuals already suffering from opioid addiction to increase its own profits at the taxpayer's expense. This settlement holds one company accountable, and we will continue to work to hold accountable others who have contributed to the opioid epidemic through their conduct in the board room or anywhere else." *Id.*

## III.   ARGUMENT

### A.   Legal Standard

A district court may transfer an action to any other district "'where it might have been brought,' so long as the transfer is '[f]or the convenience of parties and witnesses' and 'in the interest of justice.'" *Silvis v. Ambit Energy, L.P.*, 90 F. Supp. 3d 393, 396 (E.D. Pa. 2015) (quoting 28 U.S.C. §1404(a) and denying motion to transfer because public interest factors strongly favored overriding the parties' forum selection clause). When a plaintiff has laid a proper venue, "[t]he decision whether to transfer falls in the sound discretion of the trial court." *Manopla v. Raymours Furniture Co., Inc.*, 2018 WL 3201800, at *2 (D.N.J. June 29, 2018) (Martinotti, J.).

---

[7]   *See* Settlement with Pharmaceutical Company Recovers over $15 Million for N.J. Medicaid Program After Allegations the Company Improperly Marketed Opioid Addiction Treatment (Oct. 24, 2019), https://www.nj.gov/oag/newsreleases19/pr20191024d.html (last visited June 15, 2020).

In exercising this discretion and ruling on such a motion, "courts implement a balancing test and take into account the factors enumerated in §1404(a) – namely, the convenience of the parties, the convenience of the witnesses, and the interests of justice – as well as a variety of private and public interest factors based on their relevancy to and effect on the litigation." *Id*. (citing *Jumara*, 55 F.3d at 879).

The existence of a forum selection clause alters the traditional §1404(a) analysis. Where a motion to transfer venue is based on a valid forum selection clause, the Court must assume the parties' private interests "weigh entirely in favor of the preselected forum." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 64 (2013). "While a valid forum-selection clause is not dispositive, it is entitled to substantial consideration." *Manopla*, 2018 WL 3201800, at *2. If a forum selection clause is valid,[8] the plaintiffs bear the burden of "demonstrating why they should not be bound by their contractual choice of forum." *Id*. While existence of a forum selection clause resolves the private factors in favor of the designated forum, the public interest factors must still be considered and weighed.

---

[8] For purposes of this motion, Plaintiffs do not dispute the validity of the forum selection clause in Reckitt's ADS Deposit Agreement. However, the Court should not give this forum selection clause the amount of consideration given to forum selection clauses that are bargained-for by the parties because this clause was neither freely negotiated between Reckitt and its ADS purchasers, nor explicitly agreed to by ADS purchasers. *See infra* at §III(B)(1). In addition, Defendants waited to bring their motion to transfer eight months after the first complaint was filed against them, underscoring Defendants' lack of urgency in trying to enforce the forum selection clause.

*See Atl. Marine*, 571 U.S. at 64 (noting the continued importance of the public interest factors in the analysis).  Thus, while a forum selection clause is deemed important, it is not a trump card.  *See id.*

Counter balancing the weight of a forum selection clause are the following public interest factors:  (1) the enforceability of the judgment;  (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; (6) the familiarity of the trial judge with the applicable state law in diversity cases; and (7) the avoidance of imposing jury duty on residents of a jurisdiction having little relationship to the controversy.  *See Manopla*, 2018 WL 3201800, at *2 (quoting *Jumara*, 55 F.3d at 879-80); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947).

The Third Circuit in *Howmedica* set forth four steps for courts to consider in cases involving claims both subject to forum selection clauses and not subject to forum selection clauses.  *See* 867 F.3d at 404-05.  At the first step, the court analyzes the claims that are subject to the forum selection clause to determine whether transferring them is warranted under *Atlantic Marine*.  *See id*. at 404.  If the public interests "overwhelmingly" disfavor a transfer, the Court should deny the transfer motion.  *Atl. Marine*, 571 U.S. at 67; *see also Silvis*, 90 F. Supp. 3d at 400 (denying

transfer motion because public interests "strongly favor[ed] overriding the parties' forum-selection clause").  If they do not, and the court decides to transfer the claims subject to the forum selection clause, the analysis does not end.

With respect to the claims not subject to a forum selection clause, the second *Howmedica* step requires the Court to consider whether both the public and private interests (described below) relevant to Section 1404(a) favor transfer of those claims. *See* 867 F.3d at 404.  If they do, then the Court transfers the entire case.  If the public and private interests do not favor transfer of the claims not subject to a forum selection clause, the Court must decide whether to transfer the entire case or sever the claims not subject to the forum selection clause.  *See id*.

Pursuant to the third *Howmedica* step, the Court examines any threshold issues concerning the impact of severance on jurisdiction, venue, or joinder.  If no such issues weigh for or against severance, the Court proceeds to step four.  *See id*. at 404-05.

At the fourth *Howmedica* step, the Court determines whether transfer in full or severance best promotes judicial efficiency while minimizing prejudice to non-contracting parties' private interests.  The Court is required to "measure[] its decision against two key sets of interests.  On the one hand, the court considers efficiency interests in avoiding duplicative litigation, taking into account case management techniques that can reduce inefficiencies accompanying severance, as well as any

- 12 -

other public interests that may weigh against enforcing a forum selection clause.  On the other hand, the court also considers the non-contracting parties' private interests and any prejudice that a particular transfer decision would cause with respect to those interests."  *Id*.  In exercising its discretion to determine whether it should retain the case in its entirety, transfer the case in its entirety, or sever certain parties or claims in favor of another forum, the Court considers "the nature of any interests weighing against enforcement of any forum-selection clause; the relative number of non-contracting parties to contracting parties; and the non-contacting parties' relative resources, keeping in mind any jurisdiction, venue, or joinder defects that the court must resolve."  *Id*.  If the Court determines that the interest in enforcing the forum selection clause is "'overwhelmingly' outweighed by the countervailing interests," the Court can, "at this fourth step, decline to enforce a valid forum-selection clause."  *Id*. (quoting *Atl. Marine*, 571 U.S. at 62, 65).

The public and private interests overwhelmingly favor the District of New Jersey over the SDNY, and strongly support litigating the entirety of the action in New Jersey.

- 13 -

**B.    The Court Should Not Transfer the Federal-law Claims of the ADS Purchasers**

**1.    The Public Interest Factors Overwhelmingly Weigh in Favor of Plaintiffs**

The public interest factors overwhelmingly outweigh the Deposit Agreement's forum selection clause. Defendants do not argue that the SDNY has *any* interest in adjudicating this controversy aside from the clause. New Jersey, on the other hand, has several important interests at stake.

New Jersey has a "significant public policy" in resolving disputes concerning tortious conduct that occurred within its borders. *Fernandes v. Deutsche Bank Nat'l Tr. Co.*, 157 F. Supp. 3d 383, 391 (D.N.J. 2015); *see also Panella v. United States*, 2018 WL 5630591, at *4 (D.N.J. Oct. 31, 2018) (Martinotti, J.) ("Regarding public factors, [a state's] strong interest in adjudicating disputes transpiring within its own borders must be respected."); *Selective Way Ins. Co. v. Glasstech, Inc.*, 2014 WL 6629629, at *7 (D.N.J. Nov. 21, 2014) (noting New Jersey's "significant public policy" in resolving such disputes). To determine where the tortious conduct occurred, the court examines where the claims arose, which "may be best understood as a consideration of which forum constitutes the 'center of gravity' of the dispute, its events, and transactions." *Malek v. Chef's Roll, Inc.*, 2019 WL 3854303, at *14 (D.N.J. Aug. 16, 2019) (Martinotti, J.) (denying motion to transfer because center of gravity was in New Jersey). "[T]he center of gravity analysis is a fact sensitive

- 14 -

inquiry that seeks to identify the forum in which the operative facts giving rise to the litigation occurred." *Id*. This action is about Defendants' false and misleading statements and omissions to investors regarding the profitability and health and safety risks of Suboxone Film. The "center of gravity" of a securities fraud action is where the alleged misstatements and/or omissions were created and transmitted. *See Franklin U.S. Rising Dividends Fund v. Am. Int'l Grp*., 2014 WL 1555133, at *6 (D.N.J. Apr. 14, 2014); *Yang v. Odom*, 409 F. Supp. 2d 599, 606 (D.N.J. 2006). Here, nearly one-third of the alleged misstatements were made by Thaxter, *see supra* at §II n.5, the CEO of RBP, which was based in New Jersey at the time his statements were made. *See* Def. Br. at 12 n.4. Therefore, a center – if not the center – of gravity of this action is New Jersey. Although the United Kingdom is also a center of gravity because certain defendants made statements from there, Defendants make no such claim about the SDNY. *See Silvis*, 90 F. Supp. 3d at 399 (denying transfer motion because Pennsylvania "has a decisive interest in this case—certainly a much stronger interest than fora in other states, including the Northern District of Texas.").[9]

---

[9] The only public policy that Defendants claim favors transfer is New Jersey's "public policy favoring the enforcement of, and giving favorable treatment to, forum selection clauses." Def. Br. at 10 (citing *Cadapult Graphic Sys., Inc. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 566 (D.N.J. 2000), and *Union Steel Am. Co. v. M/V Sanko Spruce*, 14 F. Supp. 2d 682, 686 (D.N.J. 1998)). *Atlantic Marine* accounts for that public policy, however, and provides that where the public interests "overwhelmingly" disfavor a transfer, the motion must be denied. 571 U.S. at 67. As explained herein, Plaintiffs meet that standard due to the exceptional circumstances of this action, which overwhelmingly favor New Jersey over the SDNY.

The public interest in assuring that "localized controversies [are] decided at home" also strongly favors New Jersey. *Gulf Oil*, 330 U.S. at 509. Reckitt maintains its U.S. headquarters in New Jersey. Courts typically transfer actions to the district where the defendant company is headquartered, as that is frequently the center of gravity where the plaintiff's claims arose. *See, e.g., Hardney v. ABC Phones of N.C., Inc.*, 2020 WL 948817, at *4 (D.N.J. Feb. 27, 2020) (Martinotti, J.) (defendant's "headquarters, where company-wide policies and practices were instituted, is the center of gravity of Plaintiffs' claims."); *Kane v. Ollie's Bargain Outlet Holdings, Inc.*, 2018 WL 6168085, at *6 (D.N.J. Nov. 26, 2018) (Martinotti, J.) (same). Here, however, Defendants seek transfer ***from*** the district in which they maintain their U.S. headquarters to a district in which ***none*** of the parties reside. Defendants do not cite any cases where a company whose U.S. headquarters is in the forum state sought to transfer the action out of that forum. And the one such case that Plaintiffs have found resulted in denial of the transfer motion. *See Yocham v. Novartis Pharms. Corp.*, 565 F. Supp. 2d 554, 560 (D.N.J. 2008) (denying motion of defendant, a New Jersey corporation, to transfer action to Texas, where plaintiff resided).

Additional facts underscore the centrality of New Jersey to this action, and "courts have given preference to fora that have deeper ties to the allegations[.]" *Silvis*, 90 F. Supp. 3d at 399. Suboxone Film was manufactured in New Jersey (*see supra* at §II n.3); Reckitt's false marketing materials were created in New Jersey (*see supra*

at §II n.4); and the U.S. Attorney's Office for the District of New Jersey started the investigation into Defendants' fraud that ultimately led to Reckitt's $1.4 billion settlement with the DOJ. *See supra* at §II. On the other hand, the SDNY has no connection to this action. Indeed, Reckitt ADSs do not even trade on an exchange in New York. *See* ¶1.

New Jersey also has a strong interest in regulating and promoting the integrity of pharmaceutical companies based in the state. *See* NJ Trying to Keep Hold on Pharmaceutical Industry, NJTV News (Nov. 29, 2013) (describing the bio-pharmaceutical and medical technology industries as the "crown jewel of the New Jersey economy" and "New Jersey's premier industry"), https://www.njtvonline. org/news/video/nj-trying-to-keep-hold-on-pharmaceutical-industry/ (last visited June 15, 2020). According to the State of New Jersey's official Business Portal website, "New Jersey is respected globally for its strength in the biopharmaceutical and medical device industry. The State is home to 14 of the world's 20 largest pharmaceutical companies[.]" *See* https://www.nj.gov/njbusiness/industry/ pharmaceutical/ (last visited June 15, 2020). Maintaining the action in this District will ensure that a New Jersey federal court applies the securities fraud laws to a New Jersey-based pharmaceutical company's actions.

In addition, New Jersey has long recognized opioid abuse as a major public health crisis in the state, and has been particularly focused on combating it. *See supra*

- 17 -

at §II n.2.  The increasing statewide effort to curb opioid addiction demonstrates New Jersey's interest in and commitment to the national opioid crisis, highlighting the propriety of deciding this fraud action concerning an opioid-addiction treatment in this Court.  Further, the adverse impact of Defendants' fraud on New Jersey's Medicaid program properly situates this action in a New Jersey court.  For these reasons, a New Jersey jury should consider the legality of the alleged claims, as opposed to a New York jury with no connection whatsoever to the claims.  *See Gulf Oil*, 330 U.S. at 508-09.

Each of the remaining public interest factors weighs toward keeping the action in this Court or is neutral.  Trial would be more efficient in this Court because Reckitt's U.S. headquarters is located in this District, and potential witnesses such as Suboxone Film-maker MonoSol Rx and the contractor who prepared false marketing materials about Suboxone Film are located in this District.  *See supra* at §II n.3 & n.4. Judgment obtained in either the SDNY or this Court would be as easily enforced, and is a neutral factor.  Similarly, each court is equally able to handle the additional burdens of another civil trial on their busy dockets.[10]  With respect to the familiarity of the trial judge with applicable state law in diversity cases, this too is a neutral factor as

---

[10]     Defendants do not argue that the SDNY is less congested than this District.  In any case, "[r]elative congestion of the respective courts' dockets is not a factor of great importance in this type of motion."  *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 339 (D.N.J. 2003); *see also Yocham*, 565 F. Supp. 2d at 560.

this Court and the judges in the SDNY are equally capable of applying English law to the ordinary share-purchasers' claims.[11]

Additionally, Reckitt ADS purchasers did not negotiate the Deposit Agreement between Reckitt and JPMorgan nor formally agree to the forum selection clause therein, and, therefore, the forum selection clause should not be given the same weight as an agreement openly negotiated between sophisticated parties. *See Weidner Commc'ns, Inc. v. H.R.H. Prince Bandar Al Faisal*, 859 F.2d 1302, 1309 (7th Cir. 1988) ("The presence in *Bremen* [*v. Zapata*, 407 U.S. 1 (1972)] of a 'freely negotiated' agreement between parties of relatively equal bargaining power contrasts with the [facts] presented here."). Courts that provide substantial weight to forum selection clauses often do so because they were bargained-for by the parties and represent their agreement, which is not the case here, as the ADS purchasers had no bargaining power nor did they expressly consent to the forum selection clause. *Cf. Atl. Marine*, 571 U.S. at 66 ("A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place."); *Jumara*, 55 F.3d at 882 ("There is no claim of unequal bargaining that might invalidate the clause."). Because Reckitt's ADS

---

[11]    The ADS purchasers' federal-law claims are not based on diversity jurisdiction, while the ordinary share purchasers' English-law claims are. *See* ¶18.

purchasers did not freely negotiate the Deposit Agreement or the forum selection clause with Reckitt, the weight of the clause should be further discounted.

The public interest factors weigh overwhelmingly in favor of New Jersey. The SDNY has no connection to this litigation. Accordingly, Plaintiffs have demonstrated exceptional circumstances sufficient to deny transfer.

### C.    The Court Should Not Transfer the English-law Claims of the Ordinary Share Purchasers

Plaintiffs have demonstrated that the first *Howmedica* step favors maintaining all of Plaintiffs' claims in this Court and, as a result, Defendants' motion should be denied in its entirety. If, however, the Court disagrees, the second *Howmedica* step is applied with respect to the ordinary share purchasers' English-law claims, which are not subject to a forum selection clause. The second *Howmedica* step requires the Court to consider whether both the public and private interests relevant to Section 1404(a) favor transfer of those claims. *See* 867 F.3d at 404. In addition to the public interests discussed above, the private interests of the parties strongly support litigation in this District. The private interests include: (1) plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of

- 20 -

the fora; and (6) the location of books and records.  *See Manopla*, 2018 WL 3201800, at *2 (quoting *Jumara*, 55 F.3d at 879).

If necessary, the Court should sever the English-law claims and maintain them in this District.

**1.    The Private Interests Favor Litigation in This District**

Plaintiffs logically chose this forum because Reckitt's U.S. headquarters is here, RBP was based here, and New Jersey has other deep ties to this litigation.  *See generally supra* at §II.  This choice should be accorded substantial weight.  In most cases, "a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice [] should not be lightly disturbed." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).  "A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in character." *In re TCW/Camil Holding L.L.C.*, 2004 WL 1043193, at *1 (D. Del. Apr. 30, 2004); *but see Kane*, 2018 WL 6168085, at *3 (plaintiffs' choice of forum afforded less deference in a class action "because potential members are scattered throughout several states").  Reckitt is a multinational corporation operating on a global scale, not a small regional company.  *See* Reckitt 2019 Annual Report at 117 (Reckitt "strives for leading global performance.  Our management team is multinational, and we compete for talent against a peer group of

global companies.").[12]  "When transfer is sought by a defendant with operations on a national or international scale, that defendant 'must prove that litigating in [the forum state] would pose a unique or unusual burden on [its] operations.'"  *Zazzali v. Swenson*, 852 F. Supp. 2d 438, 447 (D. Del. 2012).  Defendants have not demonstrated such a burden to litigate in New Jersey.  In fact, Defendants have not articulated any burden at all, focusing instead on their preference for litigating this action in the SDNY based solely on the forum selection clause in the Deposit Agreement.  *Jumara* requires analysis of "the convenience of the parties as indicated by their relative physical and financial condition," 55 F.3d. at 879, but Defendants make no effort to explain how a massive global corporation with U.S. headquarters in New Jersey would have any difficulty participating in litigation in this District.

Defendants' preference to litigate in the SDNY should receive little, if any, consideration because none of the parties reside in New York.  Generally, a "[d]efendant's preference is entitled to considerably less weight than Plaintiff's, as the purpose of a venue transfer is not to shift inconvenience from one party to another." *EVCO Tech. & Dev. Co., LLC v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D. Pa. 2005).  In at least three recent cases, this Court addressed the reverse scenario than the one at bar and found the lack of parties in New Jersey to be a

---

[12]    Available at https://www.rb.com/media/5852/annual-report-2019.pdf  (last visited June 15, 2020).

critical factor. After weighing the plaintiffs' choice of this District in those cases, the Court found that "where potential plaintiffs reside in both districts but no defendant is located in the District of New Jersey, the [transferee forum] is the more favorable venue." *Hardney*, 2020 WL 948817, at *4; *see also Kane*, 2018 WL 6168085, at *3 (same); *Spack v. Trans World Entm't Corp.*, 2017 WL 6209218, at *7 (D.N.J. Dec. 8, 2017) (Martinotti, J.) (same). Conversely here, no party is located in the SDNY but Reckitt's U.S. headquarters is located in New Jersey, and the same rationale of *Hardney*, *Kane*, and *Spack* militates against transfer. Defendants' preference for the SDNY, or their displeasure with litigation in this District, is not enough to overcome the deference accorded to Plaintiffs' choice of forum.

The third private interest factor, whether plaintiffs' claims arose elsewhere, also favors New Jersey. Where the claims arose "may be best understood as a consideration of which constitutes the 'center of gravity' of the dispute, its events, and transactions." *Hardney*, 2020 WL 948817, at *4. As discussed above, the center of gravity of this action is New Jersey (as well as the United Kingdom); it certainly is not the SDNY. *See supra* at §III(B)(1).

Regarding the convenience of the parties, Defendants would not face any practical inconveniences litigating a case in the same state as their U.S. headquarters. This is underscored by the glaring absence of any argument by Defendants that

- 23 -

transfer to the SDNY is for their own convenience.[13]  The convenience of third-party witnesses in New Jersey, such as Suboxone Film-maker MonoSol Rx and the contractor who prepared false marketing materials about Suboxone Film, also favors this District.  Concerning the final private interest factor, Reckitt's books and records relating to Suboxone Film are likely located at the Company's Parsippany headquarters.  In addition, many courts have held that Section 1404(a) should not be invoked for transfer if, like here, there is only a relatively short distance between the original forum and the proposed transferee forum, and the distance can be traveled easily.  *See, e.g., Celgene Corp. v. Abrika Pharms., Inc.*, 2007 WL 1456156, at *5 n.4 (D.N.J. May 17, 2007); *On-Time Staffing, LLC v. Flexible Staffing Sols., Inc.*, 2007 WL 1234978, at *7 (D.N.J. April 25, 2007).

The weight of these private interest factors, along with the public interest factors discussed above, overwhelmingly outweigh any purported inconveniences to Defendants – inconveniences that Defendants failed to even raise in their motion. Defendants simply do not want to be before this Court.  Therefore, Plaintiffs' choice of forum should not be disrupted.

---

[13]    Rather than sever the claims and litigate in two districts, Defendants cynically argue that it would be more convenient for witnesses to participate in just one proceeding in the SDNY.  *See* Def. Br. at 13.  To the contrary, it would be more convenient for Reckitt, with U.S. headquarters in Parsippany, to litigate this entire action in New Jersey.

**2.    Defendants' Arguments Concerning Mandatory Arbitration of the English-law Claims Should Not Be Considered on This Motion**

If a court determines that steps one and two of *Howmedica* point to different venues, then it analyzes steps three and four to decide whether to transfer the entire case or to sever the claims. Step three, involving threshold issues that severance would create or address, *see Howmedica*, 867 F.3d at 409, is neutral here because severance would not create any jurisdictional, procedural, or joinder issues. At step four, a court balances judicial efficiency with the private interests of the parties not subject to the forum selection clause. *See id.* Here, the ordinary share purchasers' private interests outweigh the purported efficiencies claimed by Defendants, and step four favors severing these claims if necessary.

Defendants argue that the ordinary share purchasers' English-law claims should be transferred because they are unlikely to be litigated in any U.S. court. *See* Def. Br. at 13. Defendants assert that the English-law claims are subject to mandatory arbitration and, even if the arbitration is deemed invalid, an exclusive forum provision mandates that any shareholder claims must be litigated in the U.K. *See id.* at 13-14. But as Defendants themselves acknowledge, *see id.*, this issue is not before the Court, and instead they raise it prematurely and in a perfunctory manner. Such an argument should not be a basis for transfer.

In any case, Defendants are incorrect that Plaintiffs' English-law claims will be subject to arbitration or an exclusive forum provision. These provisions, located in Reckitt's Articles of Association, are inapplicable to shareholders pursuing tort claims because these claims do not arise out of the Articles of Association or relate to internal corporate governance. *See Microsoft Mobile v Sony Europe* [2017] EWHC 374 (Ch) at 53 (applying an arbitration clause to tort claims requires that they be "sufficiently closely related" to contract claims "so as to render rational businessmen likely to have intended such a dispute to be decided by arbitration"); *Ryanair v Esso Italiana* [2013] 2 C.L.C. 950 at 46 (finding arbitration clause inapplicable to tort claims that were not "so closely knitted together with the contractual claims that a rational or sensible businessman would expect them to be subject to determination by a single tribunal."). In *Microsoft Mobile*, the court explained that the party seeking to enforce the arbitration provision had to show a "sufficiently close connection" – either that the resolution of the contractual issue was necessary for a decision on the tort claim, or that the contractual and tort disputes were so closely tied together that an agreement to arbitrate on one could properly be construed as covering the other. [2017] EWHC 374 [H6]. That is not the case here, as the parties do not need to refer to or reference Reckitt's Articles of Association to resolve Plaintiffs' fraud claims. The claims for deceit at English common law and under U.K. statute that relate to the acquisition of Reckitt shares are claims that cannot be brought in contract. There is no parallel

- 26 -

contractual claim nor is there an alleged breach of Reckitt's Articles of Association. Therefore, Defendants will not prevail on this argument when they properly raise it before the Court.

Because the public and private interests "overwhelmingly" outweigh the interest in enforcing the forum selection clause, the Court can, "at this fourth step, decline to enforce a valid forum-selection clause." *Howmedica*, 867 F.3d at 405. Accordingly, the Court should maintain all of Plaintiffs' claims in this District.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion and permit this action to proceed in this District.

DATED:  June 15, 2020

Respectfully submitted,

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
CHRISTOPHER L. AYERS

_/s/ Christopher A. Seeger_
CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/584-9393 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

*Local Counsel*

- 27 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN (admitted *pro hac vice*)
CHRISTOPHER T. GILROY (admitted *pro hac vice*)
SARAH E. DELANEY (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
cgilroy@rgrdlaw.com
sdelaney@rgrdlaw.com

*Lead Counsel for Plaintiffs and the Class*

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)

*Attorneys for Plaintiffs*

- 28 -

<u>CERTIFICATE OF SERVICE</u>

I, Christopher A. Seeger, hereby certify that on June 15, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Christopher A. Seeger*
CHRISTOPHER A. SEEGER
