WILMERHALE

**Michael G. Bongiorno**

+1 212 937 7220 (t)
+1 212 230 8888 (f)
michael.bongiorno@wilmerhale.com

April 9, 2021

Via ECF

The Honorable P. Kevin Castel
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

**Re:   *City of Sterling Heights Police & Fire Retirement System v. Reckitt Benckiser Group PLC, et al.*, 1:20-cv-10041-PKC (S.D.N.Y.)**

Dear Judge Castel:

We write on behalf of Reckitt Benckiser Group PLC ("Reckitt"), Rakesh Kapoor, Adrian Hennah, Adrian Bellamy, and Shaun Thaxter ("Individual Defendants," and collectively, "Defendants") in the above-referenced action. Defendants previously filed pre-motion letters, identifying defects in Plaintiffs' Second Amended Complaint. (Dkts. 72, 73). Plaintiffs responded to those letters and the Court granted them leave to amend their complaint. (Dkts. 76, 77). In doing so, Plaintiffs have not remedied the defects that Defendants earlier identified. Accordingly, pursuant to Rule 3(A) of Your Honor's Individual Practices, Defendants submit this pre-motion letter summarizing the legal and factual bases for Defendants' anticipated motion to dismiss Plaintiffs' Third Amended Complaint ("TAC").[1] (Dkt. 82). The next conference is scheduled for April 26, 2021 at 10:30 a.m.

---

[1] City of Sterling Heights initially filed this action on behalf of a putative class of Reckitt American Depositary Share ("ADS") purchasers ("ADS Plaintiffs"). (Dkt. 1). City of Birmingham then moved for (and obtained) lead plaintiff status by filing a false certification under the Private Securities Litigation Reform Act ("PSLRA") omitting numerous appointments as lead plaintiff, which place Birmingham over the "professional plaintiff" threshold for lead plaintiff appointment. (Dkts. 20, 28); 15 U.S.C. § 78u–4(a)(3)(B)(vi). Birmingham then filed an Amended Complaint adding City of Pontiac as a plaintiff (without moving to intervene) asserting English law claims on behalf of purchasers of Reckitt ordinary shares ("Ordinary Share Plaintiffs"). (Dkt. 37). Unless otherwise specified, "Plaintiffs" refers to City of Birmingham and City of Pontiac.

WILMERHALE

April 9, 2021
Page 2

## Introduction

The TAC reflects Plaintiffs' fourth failed effort to plead securities claims based on long-public information challenging the alleged "anticompetitive" conduct of a former Reckitt subsidiary. Yet, in their attempt to resurrect stale claims, Plaintiffs have pled themselves into a corner, challenging statements made in 2014 and later based on information that was publicly available by 2013 and earlier. As a result, their claims suffer from numerous defects and are ripe for dismissal. *First*, the TAC fails to establish that Defendants made a false statement. None of the challenged statements can be rendered false by information of which the market was already aware. Regardless, each is independently inactionable under Second Circuit law. *Second*, Plaintiffs' scienter allegations fare no better as they place nearly all their weight on a publicly available discussion with the FDA in 2012 and 2013 and otherwise lean on highly generic theories that are routinely rejected in the Second Circuit. Plaintiffs' allegations regarding RBG executives' access to general marketing strategies and information at least four years before Defendants' allegedly misleading statements cannot cure this defect. *Third*, unsurprisingly given the public nature of the alleged conduct, the TAC fails to allege loss causation. The stock price declined in 2013 when investors learned of the allegations that Plaintiffs assert in support of their claims and, accordingly, Plaintiffs' alleged corrective disclosures do not reveal any new information to the market. *Fourth*, given the staleness of their allegations, the Securities Exchange Act of 1934's ("Exchange Act") two-year statute of limitations bars Plaintiffs' Exchange Act claims. *Finally*, the TAC's claims under English law must be dismissed as subject to mandatory arbitration and for failures to plead falsity, reliance, and intent.

## Background

As set forth in Defendants' prior letter, Reckitt is a U.K. company that offers a wide array of health, hygiene, and home consumer goods. (Dkt. 72 at 2-5). Prior to December 2014, Reckitt Benckiser Pharmaceuticals ("RBP") was a Reckitt subsidiary. RBP's products included Suboxone, the only opioid addiction treatment that patients can receive in an office setting. The FDA approved RBP's Suboxone tablet (the "Tablet") in 2002 and granted orphan drug exclusivity through 2009. TAC ¶¶ 93-95.

In 2006, RBP began developing Suboxone film (the "Film"). *Id.* ¶ 97. In doing so, RBP sought to create a form of Suboxone that could be individually packaged and barcoded for tracking, which could make it safer in terms of accidental pediatric exposure (*i.e.*, a child would have to open the packaging and, even then, could only obtain at most one dose) and diversion (*i.e.*, each dose could be tracked). *Id.* ¶ 127. During the development process, RBP commissioned studies to investigate

WilmerHale

April 9, 2021
Page 3

the Film's safety.[2]  RBP also engaged in significant public discourse with the FDA regarding RBP's views of the Film's safety profile, *id.* ¶¶ 8-9, and in its application for approval for the Film, relied on studies that were specific to the Film.[3]  The FDA approved the Film in August 2010, *id.* ¶ 103, concluding, among other things, that a safety study for the Film identified "no major safety concerns," and noting that, as RBP had posited, "the unit-dose packaging [wa]s likely to be an effective deterrent to accidental pediatric exposure." *Cross-Discipline Review* at 6, 15.  In its 2010 Annual Report, Reckitt acknowledged that it was "well known" that the Tablet could "become subject to generic competition at any time," and that the Film, by offering a "variant on the [T]ablet" that "dissolve[d] faster and taste[d] much better, and as a result ke[pt] patients in treatment longer," could serve to "mitigate the impact" of the forthcoming generic competition. Reckitt 2010 Annual Report, March 11, 2011, at 2, 5; TAC ¶ 98.

In 2012, RBP announced that it was discontinuing the Tablet.  TAC ¶ 160.  That same year, RBP submitted a Citizen Petition to the FDA detailing its safety concerns about the Tablet relative to the Film.  *Id.* ¶ 157.  In the Petition, RBP included the data on which it based its concerns and requested that the FDA decline to approve new generics before evaluating whether additional safeguards were required.  *See* Exhibit A, Timothy Baxter, Safety Concerns Regarding Buprenorphine For Opioid Dependence 2-3, 24-26 (Sept. 25, 2012) [hereinafter "*Citizen Petition*"]; TAC ¶¶ 8, 157.  The Citizen Petition process is subject to public notice and comment. *See* Exhibit B, Janet Woodcock, FDA, Docket No. FDA-2012-P-1028 15-16 (Feb. 22, 2013) [hereinafter "*FDA Citizen Petition Response*"].  The FDA received several comments in connection with RBP's submission, one of which was from a competitor that claimed that the Citizen Petition was the "latest chapter" in a "strategic campaign to preserve RBP's multi-billion-dollar Suboxone monopoly." *Id.* at 16 n.57.

In February 2013, the FDA denied RBP's Citizen Petition.  TAC ¶ 164.  In doing so, the FDA publicly expressed concern related to the potential for anticompetitive conduct.  *Id.* ¶ 167; *FDA Citizen Petition Response* at 16 (stating that the "FDA is not denying [RBP]'s Petition pursuant to

---

[2] *See* Celia Winchell, FDA, Cross-Discipline Team Leader Review 3 (August 20, 2010) [hereinafter "*Cross-Discipline Review*"] (explaining that Reckitt's New Drug Application ("NDA") for the Film included "a program of Phase 1 pharmacokinetic (PK) studies evaluating bioavailability, dose proportionality, and *comparisons to Suboxone tablets*, and [] previous Reckitt Benckiser data submitted to the NDAs for Suboxone and Subutex tablets, encompassing data on safety and efficacy of buprenorphine sublingual solution, Suboxone and Subutex.") (emphasis added).  The Court may consider this document as "[w]hen ruling on Rule 12(b)(6) motions to dismiss," courts must consider "documents incorporated into the complaint by reference," or any other documents integral to the pleading. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[3] *Cross-Discipline Review* at 3.

WILMERHALE

April 9, 2021
Page 4

. . . the FD&C Act," which permits denial when a petition is submitted with the primary purpose of delaying the approval of an application, while noting that the FDA "has, however, referred this matter to the Federal Trade Commission [("FTC")]" to "investigate and address" any "anticompetitive business practices"). Upon this news, Reckitt's stock price dropped 4.2% and its ADR price declined 3.6%.[4]

The FDA's response to RBP's Citizen Petition also led to a flurry of news articles, announcements of governmental investigations, and private antitrust class actions, all of which were disclosed publicly. *See e.g.*, TAC ¶ 167; Deborah Sontag, *Addiction Treatment With a Dark Side*, N.Y. Times, Nov. 16, 2013, at A1 [hereinafter "*N.Y. Times Article*"] (describing FDA concerns related to the pediatric safety of the Film, noting that the FDA asked the FTC to "investigate potentially anticompetitive business practices by the company"); *Pharmaceutical company on Midlothian Turnpike raided by Federal agents*, NBC, Dec. 3, 2013 [hereinafter "*Pharmaceutical Company Raided Article*"] (stating that the FDA had asked the FTC "to investigate potentially anti-competitive business practices by the company," reporting on federal agents executing a search warrant on RBP's office);[5] *In re: Suboxone Antitrust Litig.*, 949 F. Supp. 2d 1365, 1366 (J.P.M.L. 2013) (consolidating actions that "share factual questions arising out of . . . [Reckitt]'s alleged anticompetitive conduct"). In the following years, Reckitt repeatedly disclosed that RBP was subject to numerous governmental investigations. *See, e.g.*, Reckitt 2014 Annual Report, March 19, 2015, at 45.

On December 23, 2014, RBP demerged from Reckitt and became Indivior, a standalone company with no corporate affiliation with Reckitt. TAC ¶ 214. On July 24, 2017, as part of a quarterly earnings announcement, Reckitt noted the recording of a £318 million accounting charge related to the government investigations into its former RBP operations. *Id.* ¶ 275. Reckitt announced a supplemental accounting charge on February 19, 2018. *Id.* ¶ 278. On April 9, 2019, Indivior was indicted in connection with the alleged anticompetitive conduct. *Id.* ¶ 279. On July 11, 2019, Reckitt settled with the DOJ and FTC without admitting wrongdoing. *Id.* ¶ 280.

---

[4] Yahoo Finance, Reckitt Benckiser Group PLC (RBGPF),
https://finance.yahoo.com/quote/RBGPF/ (Reckitt stock price) (last visited Feb. 25, 2021);
Yahoo Finance, Reckitt Benckiser Group PLC ADR (RBGLY),
https://finance.yahoo.com/quote/RBGLY/ (Reckitt ADR share price) (last visited Feb. 25, 2021).
"[T]he district court may take judicial notice of well-publicized stock prices…." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[5] Reckitt's stock price dropped another 0.31% and its ADS price another 1.43% on news of the execution of a search warrant on RBP's Virginia offices on December 3, 2013. *See supra* note 4; TAC ¶ 300.

April 9, 2021
Page 5

On July 15, 2019, Plaintiffs sued in the District of New Jersey under the Exchange Act on behalf of a putative class of Reckitt ADS purchasers between July 28, 2014 and April 9, 2019 ("Exchange Act Claims"). (Dkt. 1). Plaintiffs allege that Reckitt made false and misleading statements about its business just before, and following, the Indivior demerger. Plaintiffs allege that the statements were false and misleading because, notwithstanding the ample public record noted above, Reckitt somehow failed to disclose that RBP's development and marketing of the Film was part of an anticompetitive "scheme" to thwart generic competition with the Tablet. Plaintiffs filed their first Amended Complaint on January 16, 2020, asserting English law claims based on the same allegations on behalf of purchasers of Reckitt ordinary shares ("English Law Claims"). (Dkt. 37).

On March 16, 2020, Defendants moved to transfer to the Southern District of New York pursuant to a forum selection clause in the ADS contractual documents. (Dkt. 43). On November 30, 2020, the District of New Jersey granted Defendants' motion, finding that the forum selection clause merited transfer of the Exchange Act Claims and noting that the English Law Claims were "unlikely to be litigated in any United States court system" because the Ordinary Share Plaintiffs are bound by the arbitration clause in Reckitt's Articles of Association. Opinion in Support of Order to Transfer, Dkt. 57 ("Transfer Order"). Upon transfer to this Court, Plaintiffs sought leave to file a second amended complaint, which Defendants did not oppose. (Dkt. 65). Plaintiffs subsequently filed a Second Amended Complaint. (Dkt. 68).[6] Defendants then filed pre-motion letters, identifying defects in Plaintiffs' Second Amended Complaint. (Dkts. 72, 73). Plaintiffs responded to those letters and the Court granted them leave to amend and file a third amended complaint. (Dkts. 76). On March 26, 2021, Plaintiffs filed a Third Amended Complaint.[7] (Dkt. 82).

---

[6] The SAC did not allege any new misstatements or omissions and instead, the additions primarily concerned plea agreements from June and August 2020, in which former RBP Global Medical Director Timothy Baxter and former RBP CEO Shaun Thaxter each pled guilty to a strict liability misdemeanor related to the introduction of the Film into interstate commerce, SAC ¶¶ 235-36, and a July 24, 2020 settlement between Indivior and the DOJ and FTC related to the same alleged "scheme," and which did not contain any admissions that relate to communications with investors, to Reckitt's SEC filings, or to its earnings calls, id. ¶ 238.

[7] The TAC did not allege any new misstatements or omissions and instead, the allegations primarily concerned additional pre-2010 events extracted from Mr. Baxter and Mr. Thaxter's sentencing materials for strict liability misdemeanors, see, e.g., TAC ¶¶ 106, 116, 126, 131, as well as generic information and conclusory statements regarding the ADS and Ordinary Share transactions, id. ¶¶ 54-82, 343, 349, 354-55, and the de-merger, id. ¶¶ 217, 219, 293, 294, 336. These new allegations do nothing to cure Plaintiffs' failure to plead a claim.

WilmerHale

April 9, 2021
Page 6

Defendants intend to move to dismiss both the Exchange Act Claims and the English Law Claims on the following grounds.

## Defendants' Anticipated Motion to Dismiss

### I.    Exchange Act Claims

As set forth in Defendants' prior letter, the Exchange Act Claims rest on an insolvable paradox: that RBP's development and marketing of the Film constituted an anticompetitive "scheme" that was concealed from investors before *July 2017*, even though the very FDA documents, news articles, and private antitrust lawsuits on which Plaintiffs base their claims were publicly available by *2013*. (Dkt. 72 at 5-10).  It is not surprising then, that Plaintiffs fail to allege falsity, scienter, and loss causation, and have run afoul of the Exchange Act's two-year statute of limitations.

***First***, Plaintiffs do not adequately allege that Reckitt made a false or misleading statement by failing to disclose a purported anticompetitive "scheme."  As an initial matter, none of the challenged statements can be rendered false by alleged anticompetitive conduct of which the market was aware.  *Compare e.g.*, TAC ¶ 167 ("[T]he FDA referred Reckitt to the FTC to investigate and address Reckitt's anticompetitive business practices" in February 2013) *with* TAC ¶¶ 222-49 (alleging statements in July 28, 2014 press release and conference call were misleading for failure to disclose anticompetitive conduct); ¶¶ 263-65 (alleging statements in February 11, 2015 press release and conference call were misleading for failure to disclose anticompetitive conduct).[8]  *See Shah v. Stanley*, WL 2346716, at *10 (S.D.N.Y. Oct. 19, 2004), *aff'd sub nom. Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) (dismissing securities fraud class action where "the findings of the report and the exhibits on which plaintiff relies. . . simply provide examples of and support for facts already reported in the press.").

Moreover, each category of alleged misstatements is inactionable under Second Circuit law.  The challenged statements concern:

> (1) accurate reports of revenue and associated commentary about growth prospects, and the rationale and expectations behind the demerger of RBP, which did not give rise to a duty to disclose any purportedly anticompetitive conduct.[9]  *E.g.*, TAC ¶¶ 222-33, 250-267.

---

[8] The TAC cites various statements made prior to July 15, 2014 (*see, e.g.*, ¶¶ 107-69).  It is unclear whether Plaintiffs base claims on them.  If so, they are barred by the five-year statute of repose, which runs from the date of misrepresentation.  *See* 28 U.S.C. § 1658(b)(2).

[9] Plaintiffs' allegations regarding Reckitt's rationale for the demerger, even if credited, have nothing to do with whether Defendants had a duty to disclose any alleged anticompetitive "scheme."  TAC ¶¶ 217, 219, 293-94, 336.  They add nothing.  *Altimeo Asset Mgmt. v. WuXi*

WILMERHALE

April 9, 2021
Page 7

> *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (accurate reports of revenue, even if "'alleged to have been, in part, improperly obtained'" are insufficient to impose Exchange Act liability); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 241 (S.D.N.Y. 2015) (finding that "media reports show[ing] that the [product was] not selling well in foreign markets ... [do] not contradict generally optimistic sentiments that the [] devices were being 'embraced' by customers and marked a 'transition' for the company");

> (2) general statements about the Suboxone Film rollout, *E.g.*, TAC ¶¶ 235-43, 250-51, which are inactionable opinions. *See In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004) (general statements about company product or confidence in growth are inactionable "expressions of the corporate stewards' optimistic opinions"); and

> (3) high-level descriptions of governance and compliance, which are routinely rejected as puffery. *E.g.*, TAC ¶¶ 225-26, 245-46, 268-70, *Singh v. Cigna Corp*., 918 F.3d 57, 63 (2d Cir. 2019) (general statements about internal policies and compliance are "inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them").[10]

Furthermore, particularly where the outcome of the investigations was merely speculative, Reckitt had no duty to condemn its subsidiary while those investigations were ongoing. *See Richman v.*

---

*PharmaTech (Cayman) Inc.*, No. 19-CV-1654 (AJN), 2020 WL 6063539, at *4 (S.D.N.Y. Oct. 14, 2020) (finding plaintiffs' allegations that defendant's "statements concerning the reasons for the merger" were "false because the primary reason for the merger was actually" something else could not support 10(b) claim).

[10] Unable successfully to identify a false statement, Plaintiffs allege that Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 by failing to disclose a known "trend" or "uncertainty." *See* TAC ¶¶ 296-300. This fails for the obvious reason that Reckitt's inability to prophesize that it would be subject to "criminal and/or civil governmental prosecution" does not constitute a failure to disclose a known "trend" or "uncertainty" under Item 303. TAC ¶ 299; *see In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016) (rejecting Item 303 claim based on failure to disclose regulatory investigation and settlement). Moreover, Reckitt disclosed numerous governmental investigations, contradicting any assertion of a failure to disclose a known "uncertainty." *See supra* Background at 2-4. Further, this argument fails because violations of Item 303 are not actionable absent an adequately pleaded 10(b) claim, *In re Fedex Corp. Sec. Litig.*, 2021 WL 396423, at *16 (S.D.N.Y. Feb. 4, 2021), and, as Plaintiffs are aware, Regulation S-K applies only to specified SEC filings, not the U.K. filings at issue in the TAC. *See* 17 CFR § 229.10; *see e.g.*, *City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1060 (E.D. Wis. 2020) ("SEC Regulation S-K . . . identifies information that a public company must disclose in *its periodic SEC filings*") (emphasis added).

April 9, 2021
Page 8

*Goldman Sachs*, 868 F. Supp. 2d 261, 273 (S.D.N.Y 2012) ("'[D]efendants [a]re not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of [the company] and its chief officer[s] would follow'"); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) ("Assuming, arguendo, that an anticompetitive scheme was adequately pled, defendants were under no duty to disclose the risk[s]" associated with the possible outcome).

**Second**, Plaintiffs have failed to allege that Defendants acted with scienter. As an initial matter, the TAC conspicuously lacks *any* confidential witness statements or internal reports. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 797 (S.D.N.Y. 2020) (to plead scienter, "plaintiffs often rely, at least in part, 'on information attributed to confidential witnesses,'" but dismissing complaint despite such allegations); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008), aff'd, 347 F. App'x 665 (2d Cir. 2009) (no scienter where "[p]laintiffs identif[ed] no internal reports of which defendants were aware and failed to disclose, and do not indicate specific data used by defendants in their fraud.").

Instead, at its core, Plaintiffs' theory of scienter is based on RBP's public discourse with the FDA about the Film in which RBP asserted its view of the Film's superior safety profile and the FDA, in some respects, disagreed. TAC ¶ 8 (describing October 2009 letter from RBP to FDA stating RBP's views that the Film increased pediatric safety); *id.* ¶ 9 (describing March 2010 FDA response); *id.* ¶ 103 (describing FDA approval of the Film in August 2010). The Second Circuit has routinely held that such disagreements of opinion with the FDA cannot support the required strong showing of scienter. *See, e.g., In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 546 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (no scienter where defendants "believed their descriptions of the data" despite FDA's adoption of a different view).[11] Further, Plaintiffs' argument that the Individual Defendants had access to contradictory information that show they knew their statements were misleading still fails. Plaintiffs now generally allege that Defendants received certain "marketing plans" and surveys, were forwarded emails, attended meetings, and were "generally aware" of certain sales messaging. They still fail, however, to adequately identify any contradictory information regarding the Film's safety or even any specific information regarding the data about the Film's safety or RBP's strategy that was available to the Defendants *at the time of the alleged misstatements*. *See, e.g.*, TAC ¶ 116 (regarding marketing plans from between 2009 and 2010); *id.* ¶ 131 (regarding marketing messages in 2010); *id.* ¶ 142

---

[11] Plaintiffs also gain no ground by tacking on allegations that unidentified RBP personnel, who appear to have no connection whatsoever to any of the Individual Defendants, made comments from 2009 to 2012 that the Film did not decrease pediatric exposure, TAC ¶¶ 142, 200. The presence of differing views within a large company is not evidence of fraud. *In re Vertex Pharm. Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 355 (D. Mass. 2005) ("existence of scientific disagreement [even] within a company as to the potential viability of a drug … cannot provide the necessary strong showing of scienter.").

WILMERHALE

April 9, 2021
Page 9

(regarding physician surveys in 2011); *id.* ¶ (regarding meeting in 2010) *id.* ¶ 190 (regarding email received in 2011), *id.* ¶ 201 (regarding meeting in 2010); *see Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) (no finding of scienter for individual defendant who made challenged statements without allegations that he was aware of issues related to FDA approval); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011) (no finding of scienter as to defendants who made challenged statements without specifying the "which reports revealed the [fraud], what information those reports contained, and whether the reports contradicted the public declarations of Defendants"). On the facts pled, there is no basis to plausibly infer that Individual Defendants knew or recklessly disregarded any anticompetitive "scheme." The alternative inference—that they believed that the study results showed that the Film had a superior safety profile —is the only plausible one.

Plaintiffs cannot salvage their scienter allegations through generic assertions that the Individual Defendants held certain positions, received compensation, or desired the corporation to succeed. TAC ¶ 45 (alleging individual defendants, "as senior executive officers and/or directors of Reckitt, were privy to . . . information concerning Reckitt. . ."); *id.* ¶ 303 (alleging individual defendants "received millions of dollars in performance compensation, bonuses and other remuneration for their role in the fraudulent scheme"); *id.* ¶ 306 (alleging individual defendants were "motivated to engage in a fraudulent course of conduct in order to find a new source of profitability for Suboxone. . ."). Courts routinely reject such allegations as not supporting scienter. *See City of Brockton Retirement Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, at *19 (S.D.N.Y. 2014) ("[A]ccusations founded on nothing more than a defendant's corporate position are entitled to no weight."); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive.'").

Nor does Plaintiffs' allegation that two former Reckitt officers who are not Defendants here sold stock in 2009 and 2010—years before the challenged statements allegedly inflated the stock price—have any relevance to any issue here.[12]

***Third,*** Plaintiffs have failed to allege loss causation. Any loss caused by the alleged anticompetitive conduct would have necessarily been experienced in 2013, when investors learned of allegations concerning the "scheme" and the stock price declined. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (finding plaintiffs' belated attempt to cast an alleged corrective disclosure that resulted from a price drop "at a time when [defendant's] stock had already lost a large portion of its value . . . [was] unavailing"). *See*

---

[12] It is also unclear why Plaintiffs believe a 2011 proceeding in which Reckitt allegedly considered engaging in "product hopping" with respect to antacid products *before deciding not to do so* has any relevance to this case. TAC ¶¶ 308-09.

WilmerHale

April 9, 2021
Page 10

*supra* Background at 3-4 and notes 4, 5.

Nor can Plaintiffs allege the taking of two accounting reserves and an indictment of Indivior based on the same allegations already in the public domain constitute "corrective" disclosures for the simple reason that Reckitt could not "reveal" something that was already publicly known.  TAC ¶¶ 275, 278-79; *see In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (finding that a news article was not a corrective disclosure because it did not reveal "any new information . . . regarding [the defendant's] alleged fraud").  Here, not only did the front page of the New York Times and private antitrust lawsuits detail in 2013 what are now Plaintiffs' core allegations, but Reckitt itself immediately confirmed the DOJ's December 2013 raid on RBP's headquarters, *see Pharmaceutical Company Raided Article*, and repeatedly disclosed that RBP was subject to governmental investigations—including in the same 2014 Annual Report Plaintiffs challenge— years before Plaintiffs' alleged "corrective disclosures."  TAC ¶¶ 266-72 (challenging statements in Reckitt's 2014 Annual Report); Reckitt 2014 Annual Report, March 19, 2015, at 45.[13]

***Finally***, Plaintiffs' claim is barred by the statute of limitations.  Exchange Act claims must be brought within two years after (i) the "actual purchase or sale of a security" and (ii) either the "actual discovery" of misrepresentation or scienter, or the "possibility" of discovery by a "hypothetical, reasonably diligent plaintiff." *Fogel v. Wal-Mat de Mexico SAB de CV*, 2017 WL 751155, at *8 (S.D.N.Y. Feb. 27, 2017), aff'd sub nom. *Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018); *see* 28 U.S.C. § 1658(b); *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010).

Here, an application of the *Merck* factors highlights the absurdity as well as the staleness of Plaintiffs' allegations.  Unlike in most cases, by their own terms, Plaintiffs could have discovered the facts constituting any securities fraud "violation," satisfying the second *Merck* factor, *before* their initial purchases.  The TAC itself relies almost exclusively on public events from 2010 through 2013, *see e.g.*, FDA Citizen Petition Response, *Suboxone Antitrust Litig.*, 949 F. Supp. 2d at 1366, *supra* Background at 2-4, and the flurry of public news reports detailing the same conduct as alleged in the TAC eliminates any doubt that such conduct had long been made public.  *See e.g.*, *N.Y. Times Article*; *Pharmaceutical Company Raided Article*.  Only *after* these facts were made public did Plaintiffs purchase Reckitt securities.  These purchases satisfied the first *Merck* factor and triggered the statute of limitations, requiring Plaintiffs to file their claim within two years from

---

[13] To the extent that Plaintiffs rely on a "materialization of the risk" theory as opposed to "corrective disclosures," this approach gets them no further.  *See Omnicom*, 597 F.3d at 513 (to plead loss causation by materialization of risk, a plaintiff must plead facts to show that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.").  Such a theory requires identifying a *particular* risk that was allegedly concealed and which then materialized to cause a market loss.  Plaintiffs have not done so.  *See DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. 2019).

April 9, 2021
Page 11

their respective dates of purchase.[14]  Plaintiffs missed this window and therefore, by the SAC's own terms, their claim is time-barred.  *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 379 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ("Courts in this district routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where, as here, the facts necessary to trigger inquiry notice are apparent from the face of the complaint, the documents cited therein and other public documents").[15]

## II.  The Court Should Stay or Dismiss the English Law Claims

As explained in Defendants' prior letter, the English Law Claims are both: (i) subject to mandatory arbitration and U.K. forum selection contractual agreements, and (ii) otherwise subject to dismissal because falsity, intent, and reliance are lacking. (Dkt. 72 at 10-12).

***First***, as Judge Martinotti of the transferor court found, the Ordinary Share Plaintiffs are contractually bound by an arbitration clause in Reckitt's Articles of Association.  *See* Transfer Order (indicating that the English Law Claims were "unlikely to be litigated in any court in the United States" as "[t]he shareholders of the U.K. claims are subject to a clause in Reckitt's Articles of Association requiring shareholder claims be arbitrated" and rejecting Plaintiffs' alternative interpretation as being "contrary to the plain text in the Articles of Association[.]").  Specifically, Article 135 of Reckitt's Articles of Association requires arbitration in all disputes between a shareholder in that shareholder's capacity and Reckitt or its directors.  Ex. C at 59.[16]  The Article further selects London as the place of arbitration, and states that English law governs.  *Id.* at 59-60.  This Article is enforceable under English law as a contractual agreement to arbitrate, regardless of whether the English Law Claims "form part of the same case or controversy" as the Exchange Act Claims.  TAC ¶ 29; *see* 28 U.S.C. §1367; *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 386–87 (S.D.N.Y. 2015) (holding arbitration clause in Brazilian company's bylaws was contractually binding on plaintiffs who purchased company's shares on a Brazilian stock exchange).

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, mandates the enforceability of

---

[14] Plaintiffs' dates of first purchase were September 26, 2014 (City of Birmingham, Dkt. No. 20-4), April 19, 2016 (City of Pontiac, Dkt. No. 68-3), April 5, 2017 (City of Sterling Heights, Dkt. No. 1-2).

[15] Because the TAC fails to state a claim under Section 10(b), it also fails to state a claim for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

[16] Reckitt's Articles of Association were amended.  Both versions are before the Court at Exhibits C and D.  The relevant text is identical but appears in Article 132 of the newer version in Exhibit D.

April 9, 2021
Page 12

agreements to arbitrate and provides that doubts concerning the scope of an arbitration clause are to be resolved in favor of arbitration. *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989). Whenever a party is subjected to litigation on any issue and is found to be entitled to arbitrate that issue, Section 3 of the FAA mandates that a stay be entered by the District Court. *See China Media Express Holdings, Inc. v. Nexus Exec. Risks, Ltd.*, 182 F. Supp. 3d 42, 52-3 (S.D.N.Y. 2016) (staying case in favor of mandatory arbitration clause pointing to foreign jurisdiction). Here, because they are required to arbitrate the English Law Claims, the FAA mandates that the Court stay Ordinary Share Plaintiffs' claims in favor of arbitration.[17]

***Second***, if the Court reaches the substance of the English Law Claims, it should dismiss them for failure to state a claim as they suffer from all of the same infirmities as the Exchange Act Claims (and more) and would fare no better under English law. For example, the English Law Claims all require a misrepresentation, which Plaintiffs have failed to allege. Further, the English Law Claims require actual reliance and do not recognize a presumption akin to "fraud on the market," which the Ordinary Share Plaintiffs have not adequately alleged. The Third Amended Complaint adds generic allegations that the Ordinary Share Plaintiffs "did rely on the aforesaid misrepresentations" but fails to allege Plaintiffs actually read and relied on each challenged statement. TAC ¶¶ 343, 354-55 (containing no allegations that Plaintiff Pontiac actually read and relied on an enumerated challenged statement). Additionally, Plaintiffs have failed to plead the required mental state for fraudulent misrepresentation (Count III, akin to scienter) and negligent misrepresentation (Count V, negligence). Finally, the Financial Services and Markets Act claim (Count IV) only applies to statements made in specified corporate filings that the TAC does not challenge. Should the Court reach the English Law Claims, Defendants anticipate submitting an

---

[17] If this Court finds the arbitration clause unenforceable, then it should dismiss the English Law Claims based on *forum non conveniens*. Dismissal based on *forum non conveniens* and as a matter of comity is appropriate without more because this case raises *English* law issues concerning an *English* company and a class of *London* stock purchasers. *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 76 (2d Cir. 2003) (affirming as proper exercise of discretion judge's determination that application of English law favored adjudication in England); *Church v. Glencore PLC*, No. CV1811477SDWCLW, 2020 WL 4382280, at *4 (D.N.J. July 31, 2020) (dismissing Exchange Act claims against Swiss company on *forum non conveniens* grounds when Swiss judicial system permitted adjudication of subject matter of claims). More importantly, the Articles provide that, if arbitration is unenforceable, then any action between a shareholder in their capacity as such and Reckitt and/or a director arising from the Articles should be brought in the courts of England or Wales. This is an enforceable forum selection agreement under English law. *See* Transfer Order at 11 (stating that Reckitt's Articles include "an exclusive forum provision stating that if arbitration is deemed invalid, claims must be litigated in the United Kingdom."). The appropriate way to enforce such a clause is dismissal pursuant to *forum non conveniens*. *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013).

WILMERHALE

April 9, 2021
Page 13

English law affidavit in support of these arguments.

\*        \*        \*

For the foregoing reasons, Defendants intend to move to dismiss the claims that Plaintiffs have brought against them.  Because Plaintiffs amended their complaint for the third time last month, Defendants respectfully request that Plaintiffs be afforded no further opportunity to amend.  If Plaintiffs do not seek leave to amend the TAC, we respectfully request that the Court set the following schedule, the dates for which are calculated from the date of the  April 26, 2021 prehearing conference: (1) Defendants shall file their motion to dismiss on or before June 25, 2021; (2) Plaintiffs shall file their opposition to Defendants' motion on or before August 24, 2021; and (3) Defendants shall file their reply in support of their motion on or before September 23, 2021.[18]

Thank you for your consideration.

---

[18] Defendants conferred with Plaintiffs' counsel who agreed to a briefing schedule in which Defendants have 60 days to move, answer, or otherwise respond to the operative complaint; Plaintiffs have 60 days to file an opposition to a motion to dismiss; and Defendants have 30 days to file a reply in support of their motion.

WILMERHALE

April 9, 2021
Page 14

Respectfully submitted,

Dated: April 9, 2021

*/s/ Michael G. Bongiorno*
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
Michael G. Bongiorno
7 World Trade Center
250 Greenwich Street
New York, New York 10007
212 295 6425 (t)
212 230 8888 (f)
michael.bongiorno@wilmerhale.com

Timothy J. Perla
Jessica L. Lewis
60 State Street
Boston, MA 02109
617 526 6000 (t)
617 526 5000 (f)
timothy.perla@wilmerhale.com
jessica.lewis@wilmerhale.com

*Counsel for Defendants Reckitt*
*Benckiser Group plc.,*
*Rakesh Kapoor, Adrian Hennah, and*
*Adrian Bellamy*