## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:20-cv-10041-PKC |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | **MEMORANDUM OF LAW IN SUPPORT** |
| vs. | ) ) | **OF MOTION TO STAY AND/OR DISMISS** |
| RECKITT BENCKISER GROUP PLC, et al., | ) ) | **Oral Argument Requested** |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(B)(6) AND/OR STAY COUNTS III-V BY DEFENDANTS RECKITT BENCKISER GROUP PLC, RAKESH KAPOOR, ADRIAN HENNAH, AND ADRIAN BELLAMY**

# Table of Contents

Table of Authorities ............................................................................................................ ii

Introduction........................................................................................................................ 1

Background ......................................................................................................................... 2

Argument............................................................................................................................ 6

I. The Exchange Act Claims Fail (Counts I and II)......................................................... 6

    A. The TAC Fails to Plead a False or Misleading Statement .................................. 6

        1. Statements Concerning Financial Results............................................... 8

        2. Statements Describing Film Rollout ....................................................... 9

        3. Statements Describing the Demerger .................................................... 10

        4. Statements About Compliance and Controls ........................................ 11

        5. Plaintiffs Cannot Establish an Item 303 Violation ............................... 12

    B. The TAC Fails to Plead Scienter...................................................................... 13

    C. The TAC Fails to Plead Loss Causation .......................................................... 18

    D. The Two-Year Statute of Limitations Bars the Claims..................................... 20

II. The Court Should Stay or Dismiss the English Claims (Counts III-V).......................... 22

    A. This Court Should Stay the Claims in Favor of Arbitration .............................. 23

    B. Alternatively, This Court Should Dismiss the English Claims Pursuant to *Forum Non Conveniens* ................................................................................... 24

    C. The English Law Counts Fail to State a Claim ................................................ 25

Conclusion ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Adolor*,
616 F. Supp. 2d 551 (E.D. Pa 2009)....................................................................... 15

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................................... 16

*Altimeo Asset Management v. WuXi PharmaTech (Cayman) Inc.*,
2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) ........................................................ 11

*In re Aratana Therapeutics Inc. Seurities. Litigation*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)........................................................................ 9

*Arco Capital Corps. Ltd. v. Deutsche Bank AG*,
949 F. Supp. 2d 532 (S.D.N.Y. 2013)...................................................................... 21

*In re AstraZeneca Securities Litigation*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008)...................................................................... 14

*Atlantic Marine Construction Co. v. U.S. District Court for Western District of Texas*,
571 U.S. 49 (2013).................................................................................................... 24

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir.2007)....................................................................................5, 22

*In re Axis Capital Holdings Ltd. Securities Litigation*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006).................................................................12, 17

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)...................................................................... 10

*Chill v. General Electric Co.*,
101 F.3d 263 (2d Cir. 1996)..................................................................................... 14

*China Media Express Holdings, Inc. by Barth v. Nexus Executive Risks, Ltd.*,
182 F. Supp. 3d 42 (S.D.N.Y. 2016)........................................................................ 23

*In re Citigroup, Inc.*,
2011 WL 744745 (S.D.N.Y. Mar. 1, 2011) ............................................................... 5

*City of Brockton Retirement System v. Avon Products, Inc.*,
2014 WL 4832321 (S.D.N.Y. 2014)........................................................................ 16

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ............................................................................................. 11, 20

*In re Cognizant Technology Solutions Corp. Securities Litigation*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ......................................................................... 8

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
   413 F. Supp. 3d 187 (S.D.N.Y. 2019) ............................................................................. 18

*In re Dynagas LNG Partners LP Securities Litigation*, 2020 WL 6947521
   (S.D.N.Y. Nov. 25, 2020) .................................................................................................. 12

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) .............................................................................................. 17

*In re Federated Department Stores, Inc. Securities Litigation*,
   2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) ................................................................. 16

*In re Fedex Corp. Securities Litigation*,
   2021 WL 396423 (S.D.N.Y. Feb. 4, 2021) .................................................................... 13

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015) ............................................................................................. 8

*Fogel v. Wal-Mat de Mexico SAB de CV*,
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ............................................................... 20, 21

*Fort Worth Employers' Retirement Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009) ............................................................................. 21

*Frederick v. Mechel OAO*,
   475 F. App'x 353 (2d Cir. 2012) ...................................................................................... 17

*Freedman v. Value Health, Inc.*,
   34 F. App'x 408 (2d Cir. 2002) ........................................................................................ 10

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) .............................................................................................. 19

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
   68 F. Supp. 3d 530 (S.D.N.Y. 2014) ............................................................................... 21

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016) ........................................................................... 7, 15

*In re JP Morgan Auction Rate Securities (ARS) Marketing Litigation*,
   2014 WL 4953554 (S.D.N.Y. Sept. 30, 2014) .............................................................. 7

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ....................................................................................13, 17

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .................................................................................... 18

*In re Lions Gate Entertainment Corp. Securities Litigation*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ....................................................................... 12

*Lipow v. Net1 UEPS Technologies, Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015) .................................................................. 17

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) ...........................................................................................20, 21

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) .................................................................. 19

*In re MF Glob. Holdings Ltd. Securities Litigation*,
    982 F.Supp.2d 277 (S.D.N.Y. 2013) ...................................................................... 9

*In re Moody's Corp. Securities Litigation*,
    274 F.R.D. 480 (S.D. N. Y. 2011) ......................................................................... 19

*Nadoff v. Duane Reade, Inc.*,
    107 F. App'x 250 (2d Cir. 2004) ............................................................................ 8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .................................................................................. 17

*In re Omnicom Group., Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010) ..............................................................................18, 19

*In re Petrobras Securities Litigation*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) .................................................................. 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ............................................................................................ 9

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007) .................................................................................. 25

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003) .................................................................................... 24

*In re QLT Inc. Securities Litigation*,
    312 F. Supp. 2d 526 (S.D.N.Y. 2004) .................................................................... 9

*Richman v. Goldman Sachs,*
   868 F. Supp. 2d 261 (S.D.N.Y 2012) .................................................................. 12

*Sanders v. AVEO Pharm., Inc.,*
   2015 WL 1276824 (D. Mass. Mar. 20, 2015) ...................................................... 13

*In re Sanofi Securities Litigation,*
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...........................................................10, 11

*In re Sanofi Securities Litigation,*
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) ...............................................................9, 14

*Schiro v. Cemex, S.A.B. de C.V.,*
   438 F. Supp. 3d 194 (S.D.N.Y. 2020) ................................................................ 22

*Schiro v. Cemex, S.A.B. de CV,*
   396 F. Supp. 3d 283 (S.D.N.Y. 2019) ........................................................8, 11, 14

*Shah v. Stanley,*
   2014 WL 2346716 (S.D.N.Y. Oct. 19, 2004) ........................................................ 7

*Shearson/Am. Exp., Inc. v. McMahon,*
   482 U.S. 220 (1987) ............................................................................................. 23

*Singh v. Cigna Corp.,*
   918 F.3d 57 (2d Cir. 2019) ................................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) .........................................................................................3, 22

*Thomas v. Shiloh Industries, Inc.,*
   2017 WL 2937620 (S.D.N.Y. July 7, 2017) ........................................................ 16

*In re UBS AG Securities Litigation,*
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ..................................................... 20

*In re UBS Auction Rate Securities Litigation,*
   2010 WL 2541166 (S.D.N.Y. June 10, 2010) ........................................................ 7

*In re Vertex Pharmaceuticals Inc. Securities Litigation,*
   357 F. Supp. 2d 343 (D. Mass. 2005) .................................................................. 16

**Federal Statutes**

9 U.S.C. § 1 *et seq.* ...................................................................................................... 23

15 U.S.C. § 78u-4 ....................................................................................................6, 13

28 U.S.C. § 1658 .......................................................................................................... 20

Fed. R. Civ. P. 44.1 ................................................................................................ 23

**Regulations**

17 C.F.R. § 229.303 ................................................................................................ 12

**Other Authorities**

Winchell, Celia, FDA, Cross-Discipline Team Leader Review, App.
    #022410Orig1s000 (Aug. 20, 2010),
    https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022410Orig1s000
    CrossR.pdf ........................................................................................................ 3

Yahoo Finance, Reckitt Benckiser Group PLC (RBGPF),
    https://finance.yahoo.com/quote/RBGLY/ ...................................................... 19

Yahoo Finance, Reckitt Benckiser Group PLC ADR (RBGLY),
    https://finance.yahoo.com/quote/RBGPF/ ...................................................... 19

Reckitt Benckiser Group PLC ("Reckitt Group"), Rakesh Kapoor, Adrian Hennah, and Adrian Bellamy ("Reckitt Group Individual Defendants," and collectively, "Reckitt Group Defendants")[1] respectfully submit: (i) this Memorandum of Law in Support of their Motion to Stay and Dismiss the Third Amended Complaint (the "TAC"); (ii) the Declaration of Stephen Midwinter QC ("Midwinter Dec.") addressing English law; and (iii) the Declaration of Timothy Perla ("Perla Dec.") attaching all exhibits cited herein (cited as "Ex.").

## Introduction

Reckitt Group is a U.K. multinational consumer goods company offering home, health, and hygiene products. Plaintiffs' allegations concern Reckitt Benckiser Pharmaceuticals ("RBP") which, until December 2014, was a pharmaceutical subsidiary of Reckitt Group. In December 2014, Reckitt Group and RBP "demerged" and RBP became a standalone public company named Indivior. Indivior initially offered Suboxone tablet ("Tablet"), an opioid treatment that has helped countless patients overcome addiction. Suboxone was the first opioid treatment administered outside a clinical setting, free from the associated stigma. Beginning in 2006, RBP began developing a new product, Suboxone film ("Film"). Before demerging, RBP comprised only 7% of Reckitt Group's net revenue.

Plaintiffs allege that RBP developed and marketed Film as part of an effort to stall generic competition. Plaintiffs assert: (i) Securities Exchange Act claims on behalf of purchasers of American Depository Shares ("ADS") (Counts I-II) and (ii) English law claims on behalf of purchasers of Reckitt Group ordinary shares on the London Stock Exchange (Counts III-V).

Plaintiffs' Exchange Act claims fail for four independent reasons. *First*, the TAC fails to establish that the Reckitt Group Defendants made a false or misleading statement. Plaintiffs

---

[1] The Reckitt Group Defendants together with Shaun Thaxter are referred to herein as "Defendants."

challenge Reckitt Group's accurate reports of revenue, high-level descriptions of governance and general statements about Film. None of these statements carried any duty to discuss alleged anticompetitive conduct—much less to self-accuse on behalf of a subsidiary. This is particularly true where, as here, the conduct had been well-publicized years before.

*Second,* Plaintiffs also fail to plead a strong inference of scienter for a variety of reasons, including that the TAC relies on generalities and flawed assumptions instead of specific facts from confidential witnesses or documents and routinely rejected generic allegations such as the receipt of compensation or the desire for the corporation to succeed. Most fatally, however, Plaintiffs fail to tie RBP's purported knowledge to the *Reckitt Group* Defendants and case law is clear that, absent more, knowledge is not imputed from a subsidiary to a parent company.

*Third,* the TAC fails properly to allege loss causation. The corrective disclosures that Plaintiffs cite—the taking of two accounting reserves and the indictment of Indivior based on long-since public information—occurred well after the market reacted to the alleged misconduct.

*Fourth*, the Exchange Act claims are time barred. By 2013—*six years* before this case—a whirlwind of antitrust lawsuits, news reports, announcements of investigations, and public FDA proceedings showed investors that RBP's conduct was challenged as anticompetitive.

Plaintiffs' English law claims also fail for two independent reasons. First, they are subject to mandatory arbitration and U.K. forum selection contractual agreements. Second, the TAC does not adequately plead falsity, intent, or reliance.

## Background

Reckitt Group is a multi-national conglomerate focusing on hygiene, home care products,

and over-the-counter health products. Ex. A (2014 Reckitt Group Annual Report) at 3-7.[2] RBP, now Indivior, was a pharmaceutical subsidiary of Reckitt Group that developed a schizophrenia treatment, an opioid overdose treatment, and addiction treatments, including for cocaine, alcohol, and opioid addictions. Ex. B (Jul. 28, 2014 Earnings Tr.) at 24. The TAC focuses only on the opioid addiction treatment, Suboxone. The FDA approved RBP's Suboxone Tablet in 2002 and granted orphan drug exclusivity through 2009. TAC ¶¶ 93-94.

In 2006, RBP began developing Suboxone Film. TAC ¶ 97. RBP wanted to develop a delivery system that could be individually packaged and barcoded for tracking, which could help to avoid accidental pediatric exposure (*i.e.,* a child would have to open packaging and, even then, could at most obtain one dose) and diversion (*i.e.*, each dose could be tracked). TAC ¶ 127. Reckitt Group also publicly disclosed that patent protection for Tablet was expiring and a purpose of Film was to "mitigate the impact" of forthcoming generic competition. *See* TAC ¶ 98 (quoting 2010 Annual Report); *see also* ¶ 163.

During development, RBP commissioned studies to investigate Film safety. *See* Winchell, FDA, App. #022410Orig1s000, Cross-Discipline Team Leader Review 3 (August 20, 2010), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022410Orig1s000CrossR.pdf. The New Drug Application ("NDA") submitted for Film included "a program of Phase 1 pharmacokinetic [] studies evaluating bioavailability, dose proportionality, and comparisons to Suboxone tablets, and [] previous [RBP] data submitted to the NDAs for Suboxone and Subutex tablets, encompassing data on safety and efficacy of buprenorphine sublingual solution [.]" *Id.*

On October 5, 2009, RBP sent a letter to the FDA asking whether it agreed that Film

---

[2] The FDA correspondence, earnings transcripts, and corporate filings cited herein are properly before the Court both because they are incorporated into the TAC and otherwise appropriate for consideration on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

increased pediatric safety and was less subject to diversion. TAC ¶ 102. After further

correspondence (*id.* ¶¶ 118, 119), on March 29, 2010, the FDA stated that it could not comment

on diversion and did not agree RBP had shown that Film had a greater pediatric safety profile

based on the "data [] provided." *Id.* ¶ 123. Nonetheless, on August 30, 2010, the FDA approved

Film, concluding that Film had "no major safety concerns," and that "the unit-dose packaging is

likely to be an effective deterrent to accidental pediatric exposure." *Id.* ¶ 127.

 Plaintiffs allege that RBP then embarked on a campaign of anticompetitive conduct to

switch patients from Tablet to Film, which supposedly involved emphasizing the safety benefits

of Film to patients and physicians, discontinuing Tablet and, on September 25, 2012, submitting

a Citizen Petition to the FDA asserting safety concerns with Tablet (the "Citizen Petition"). TAC

¶¶ 204, 157. On February 22, 2013, the FDA rejected the Citizen Petition. *Id.* ¶ 164. Plaintiffs,

improperly conflating the UK parent Reckitt Group and the US subsidiary RBP, characterize the

rejection as exposing "that Reckitt [Group]'s Citizen petition was a thinly veiled attempt to delay

the entrance of generic Suboxone Tablets into the market" and "[r]evealing its true view [that]

Reckitt [Group]'s [C]itizen petition [w]as a sham." *Id.* ¶¶ 164, 167.

 After the FDA's public rejection of the Citizen Petition, private plaintiffs sued Reckitt

Group in antitrust class actions filed on August 15, 2013, which were consolidated into a

multidistrict litigation. The consolidated complaint cited the same theories, events, and evidence

that the TAC now cites. *See* Ex. C ¶ 4 (*In re: Suboxone Antitrust Litig.*, MDL No. 2445 (E.D. Pa.

Aug. 15, 2013), Dkt. 47) (antitrust complaint asserting, "Reckitt [Group] engaged in … scheme

to [] coerce a switch of the Suboxone market from Suboxone Tablets to Suboxone Film …and []

delay the market entry of less-expensive generic versions of Suboxone Tablets."); *compare* TAC

¶¶ 112, 118, 119, 123, 127 *with* Antitrust Compl. ¶¶ 10, 81-87, 123, 131, 139.

On November 16, 2013, the New York Times published an article describing FDA concerns related to the pediatric safety of Film. Ex. D (Deborah Sontag, *Addiction Treatment With a Dark Side*, N.Y. Times (Nov. 16, 2013)). On December 3, 2013, the U.S. Attorney for the Western District of Virginia executed a search warrant on RBP's U.S. headquarters. Ex. E *(UPDATE: Pharmaceutical Company on Midlothian Turnpike Raided by Federal Agents*, NBC12 (Dec. 14, 2013 5:10 AM)). In the following years, Reckitt Group repeatedly disclosed that RBP was subject to numerous governmental investigations. *See, e.g.*, Ex. A at 45.

On December 24, 2014, RBP demerged from Reckitt Group and became Indivior—a standalone company with no corporate affiliation with Reckitt Group—so that both businesses could focus on their core competencies. Prior to the demerger, RBP contributed only 7% of Reckitt Group's revenue. TAC ¶ 222 (Ex. B); *see also* Ex. A at 1, 2, 7 (citing revenue figures).

On July 24, 2017, as part of a quarterly earnings announcement, Reckitt Group in one sentence noted the recording of a £318 million accounting charge related to government investigations into former RBP operations. Reckitt Group announced a supplemental accounting charge on February 19, 2018. TAC ¶ 278. Accordingly, Suboxone contributed only around 5% of Reckitt Group revenue. *See Id.* ¶¶ 90, 222. On April 9, 2019, Indivior was indicted. *Id.* ¶ 279. On July 11, 2019, Reckitt Group settled with the DOJ and FTC to resolve a number of investigations into RBP's former activities on the basis that Reckitt Group made *no* admission of any violation of law or any wrongdoing by it or any of its employees. *Id.* ¶ 280. *See also* Ex. F (July 11, 2019 Reckitt Group Press Release).[3]

On July 15, 2019, Plaintiff Sterling Heights filed this lawsuit under the Exchange Act on

---

[3] The antitrust complaint (Ex. C), news articles (Exs. D and E), and press release (Ex. F) are matters of public record and subject to judicial notice, which this Court may consider. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007); *In re Citigroup, Inc.*, 2011 WL 744745, at *5 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).

behalf of a putative class of Reckitt Group ADS purchasers between July 28, 2014 through April 9, 2019. City of Birmingham then moved for (and obtained) lead plaintiff status by filing a false certification under the Private Securities Litigation Reform Act ("PSLRA").[4] Birmingham then filed an amended complaint adding City of Pontiac (without moving to intervene) asserting English law claims on behalf of purchasers of Reckitt Group ordinary shares.

On March 16, 2020, defendants moved to transfer to the Southern District of New York pursuant to a forum selection clause in the ADS contractual documents. (Dkt. 43). On November 30, 2020, the District of New Jersey granted Defendants' motion noting that the English law claims were "unlikely to be litigated in any United States court system" because the ordinary share Plaintiffs are bound by the arbitration clause in Reckitt Group's Articles of Association. Dkt. 57. Plaintiffs have since filed two subsequent amended complaints.[5] (Dkts. 68, 82).

## Argument

## I.    The Exchange Act Claims Fail (Counts I and II)

### A.    The TAC Fails to Plead a False or Misleading Statement

The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). Here, the TAC challenges only a handful of public statements, falling on each side of the Indivior demerger. TAC ¶¶ 222-249 (July 28, 2014 press release and earnings call); *Id.* ¶¶ 250-256) (October 21, 2014 press release and earnings call); *id.* ¶¶ 259-262 (November 17, 2014 press release); *id.* ¶¶ 263-265 (February 11, 2015 press release and earnings call); *id.* ¶¶

---

[4] Birmingham's certification (Dkt. No. 20-4) omitted numerous appointments and concealed that it was over the "professional plaintiff" threshold for lead plaintiff appointment in this case. 15 U.S.C. § 78u–4(a)(3)(B)(vi).

[5] The TAC did not allege any new misstatements or omissions. The new allegations primarily concerned additional pre-2010 events extracted from Timothy Baxter, RBP Global Medical Director, and Shaun Thaxter's, RBP Chief Executive Officer, sentencing materials for strict liability misdemeanors, *see, e.g.*, TAC ¶¶ 106, 116, 126, 131, as well as generic information and conclusory statements regarding the ADS and ordinary share transactions, *id.* ¶¶ 54-82, 343, 349, 354-55, and the de-merger, *id.* ¶¶ 217, 219, 293, 294, 336.

266-270 (March 19, 2015 Annual Report for 2014). Within those documents, the TAC

challenges statements about: (a) Reckitt Group's financial results; (b) the performance of Film;

(c) the demerger; and (d) Reckitt Group compliance and controls. *Id.* The TAC asserts that these

statements somehow were misleading because Reckitt Group failed to disclose that it was

engaged in alleged anticompetitive conduct. *Id.* ¶ 272. Plaintiffs also allege that Reckitt Group

violated Item 303 of Regulation S-K by failing to confess misconduct.

As an initial matter, the market was already aware of the alleged anticompetitive conduct

at the time of each challenged statement. *Compare e.g.*, TAC ¶ 167 ("[T]he FDA referred Reckitt

Group to the FTC to investigate and address Reckitt [Group's] anticompetitive business

practices" in February 2013) *with* TAC ¶¶ 222-249, 263-265 (alleging statements in 2014 and

2015 were misleading for failure to disclose alleged anticompetitive conduct). *See Gillis v. QRX*

*Pharma Ltd.*, 197 F. Supp. 3d 557, 581 (S.D.N.Y. 2016) (statements not misleading for failure to

disclose specific FDA requirement where public was "well aware" that the FDA had declined

company's NDA); *Shah v. Stanley*, 2014 WL 2346716, at *10 (S.D.N.Y. Oct. 19, 2004), *aff'd*

*sub nom. Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) (dismissing securities fraud class action

where the documents relied on by plaintiff "simply provide[d] examples of and support for facts

already reported in the press."); *In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*, 2014 WL

4953554, at *8 (S.D.N.Y. Sept. 30, 2014) (similar); *In re UBS Auction Rate Sec. Litig.*, 2010 WL

2541166, at *18 (S.D.N.Y. June 10, 2010) (similar). The TAC proves the point—the "evidence"

Plaintiffs cite to establish the alleged anticompetitive conduct consists of *public documents that*

*pre-date the challenged statements.*[6] Given that this information was already in the market,

---

[6] *See, e.g.,* TAC ¶ 102 (describing Reckitt Group's 2008 NDA submission for Film); *id.* ¶ 118 (describing initial
FDA denial of NDA for Film in August 2009, requesting improvement to risk evaluation and mitigation strategy); *id*
.¶ 119 (describing October 2009 RBP letter to FDA); *id.* ¶ 120 (describing November 2009 resubmission of NDA
for Film); ¶ 123 (describing March 2010 FDA response to October 2009 letter); *id.* ¶ 127 (describing August 2010

investors could not have misunderstood any of Reckitt Group's statements as an implicit assertion that its Film marketing practices were unchallenged.

### 1.    Statements Concerning Financial Results

The TAC challenges Reckitt Group's July 2014, October 2014, and February 2015 reports of net revenue and associated descriptions of growth.[7] Plaintiffs do not allege that the financials themselves were false, but rather allege that they were rendered misleading by failure to disclose that anticompetitive conduct had contributed to the results. *See* TAC ¶ 272. Under controlling law, "[a]ccurate statements about past performance are self-evidently not actionable under the securities laws." *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004). This is true even if reported earnings were attributable to wrongdoing, which Plaintiffs have not demonstrated here.[8] *Id.* (recitations of past earnings not misleading even when driven in part by criminal acts); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *22 (D.N.J. Aug. 8, 2018).

Moreover, to the extent the challenged statements express Defendants' associated commentary about growth prospects, *see, e.g.*, TAC ¶ 228 ("Looking forward to the rest of the

---

FDA approval of Film); *id.* ¶ 156 (September 2012 "Notice of Discontinuance" of tablet sent to FDA); *id.* ¶ 157 (September 2012 Citizen Petition submitted to FDA); *id.* ¶ 164 (February 2013 FDA Response to Citizen Petition).

[7] TAC ¶ 222 (reporting net revenue); *id.* ¶ 132 (reporting net revenue and noting, "[t]he underlying volume growth in prescriptions in the USA throughout the first six months continued to be strong with low double digit growth in this undertreated area of addiction . . . . There has also been some pressure on pricing, particularly in the second quarter, due to the competitive environment.); *id.* ¶ 228 (reporting net revenue decline and noting that it was "determined by a combination of continuing strong market growth, most notably continuing low double-digit growth and buprenorphine prescription volume in the United States; by a modest reduction in market share in the United States Suboxone market; and by some price pressure."); *id.* ¶¶ 263-66 (financial results reported after demerger).

[8] The TAC pleads no specific factual basis for the proposition that positive financial results (or patient, physician, or payer preference, discussed *infra*) were due to allegedly anticompetitive conduct as opposed to other factors (*e.g.*, convenience of individually packaged Film). *See Schiro v. Cemex, SAB de CV*, 396 F. Supp. 3d 283, 297 (S.D.N.Y 2019) (declining to find falsity regarding financial statements where it was "not at all clear whether the alleged bribe scheme played a role in the Company's growth or success"); *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 243 (1st Cir. 2015) (no liability for failure to disclose illegal marketing where plaintiffs failed to allege "what proportion of sales were made as a result of [alleged fraudulent scheme], or the significance of the contribution of those sales to [defendant's] stock price").

year, we expect continuing strong market growth."), they are inactionable statements of opinion.

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) *aff'd sub nom. Tongue v.*

*Sanofi,* 816 F.3d 199 (2d Cir. 2016) (expressions of "expectations for the future" are opinions).

Such subjective statements of opinion or belief "are inactionable so long as the speaker actually

held the belief professed, did not supply an untrue supporting fact, and did not omit information

rendering the statement misleading." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d

737, 758 (S.D.N.Y. 2018) (*citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

*Pension Fund*, 135 S. Ct. 1318, 1326-27 (2015)). Plaintiffs have not plead specific facts meeting

any of those exceptions. In addition, these statements are inactionable corporate optimism as

they are not subject to objective verification. *See In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526,

532 (S.D.N.Y. 2004).

### 2.    Statements Describing Film Rollout

Plaintiffs next challenge various statements describing the success of Film rollout[9] and

patient, physician, and payer (*i.e.*, Medicare and Medicaid) preference for Film.[10] Similar to

statements concerning financial results, these statements were opinions and/or generic product

puffing; none supplied detailed (or new) information about Film, the rollout, or otherwise. *See In*

*re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 312 (S.D.N.Y. 2013) (classifying

---

[9] *See* TAC ¶ 243 ("So the film is being rolled out around the world"); *id.* ¶ 235 ("focus on the patient is absolutely essential" and "leadership model that focuses on partnership with … all stakeholders to bring better quality treatments to patients is what's driven the success of our business."); *id.* ¶ 237 ("We've maintained our double-digit market growth. This is something we're very good at."); *id.* ¶ 235 (Film showed "level of resilience" in face of generic competition).

[10] TAC ¶ 235 ("we continue to drive conversion of patients from tablets onto the film driven by the preference of the patient for the film. They liked it, they preferred it. We presented data previously. The physicians were observing a superior treatment outcome … film share had grown to 70% [by March]"); *id.* ¶ 237 ("the data has already demonstrated that it is very clearly the preferred product, not only by patients, not only by physicians, but also by payers"); *id.* ¶ 239 ("We know that patients prefer the medication experience. Physicians are very happy that their patients are stable and doing well …", etc.); *id.* ¶ 248 ("I think that we put the film proposition out there for patients and physicians, and we stated our case as to why we thought it was a better technology."); *id.* ¶ 250 ("[w]hilst there continues to be clear patient and physician preference for Suboxone Film … this increased competition in the US market place is expected to drive continued pricing pressure").

defendants' statements as non-actionable puffery due to a lack of a verifiable "objective standard"). In any case, these generic statements about Film carried no duty to disclose an anticompetitive scheme even if one had existed because the alleged anticompetitive conduct had no connection to these generic statements. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (disclosure required only if information is "sufficiently connected to defendants' existing disclosures to make those public statements misleading").

### 3.    Statements Describing the Demerger

Plaintiffs next challenge various statements describing the demerger, including the Board's rationale for it.[11] Several of these statements merely constitute accurate recitations of how the demerger would proceed, or the fact that it closed. The statements describing the Board's view of the demerger are both: (i) statements of opinion that the TAC does not allege were objectively false, not honestly held, or omitted facts that rendered the statement misleading, *see supra* Sec. I.A.1; and (ii) so generic as to be immaterial puffery. *See Freedman v. Value Health, Inc.*, 34 F. App'x 408, 411 (2d Cir. 2002) (Chairman's statements that his board made a "full review" of the merger proposal were not misleading); *Barilli v. Sky Solar Holdings, Ltd.*,

---

[11] TAC ¶¶ 214-220; *see also id.* ¶ 222 (Indivior has "the potential to deliver significant long term value creation as a stand-alone business" and a "stand-alone business will be best placed to create value for shareholders as it manages the challenges and seizes the opportunities within the field of addiction."); *id.* ¶ 230 ("RBP is not core to [Reckitt Group]. We do not want to be a prescription pharmaceutical company . . . we now know nearly 12 months after the launch of the film, of the generic tablet, that RBP has actually created a global leadership position in the world of addiction treatment … It has also got substantial, I would say, near-term cash flows, mainly from its Suboxone franchise'); *id.* ¶ 232 ("We believe we have demonstrated strong medium and long-term growth opportunities for this business… I believe RP has created a sustainable business on the back of which it can find its true potential"); *id.* ¶ 256 ("Preparations financially, with all the accounts and those things you've got to do … they've all gone well. And we want to get on with things, so why wait? It's as simple as that really."); *id.* ¶ 259 (citing demerger release, describing the Film's market share); *id.* ¶ 261 ("Our full team … is energised by the opportunity to continue leveraging our unique patient-focused leadership model to expand availability of addiction treatment and improve patient lives across the globe."); *id.* ¶ 266 ("It was the Board's view that a stand-alone business will be best placed to create value for Shareholders as it manages the challenges and seizes the opportunities within the field of addiction."); *id.* ¶ 267 (Reckitt Group "delivered on our promise to demerge the pharmaceutical business," which had the "potential to deliver significant long-term value to Shareholders.").

389 F. Supp. 3d 232, 265-66 (S.D.N.Y. 2019) (company's generic statements related to "strong" and "rigorous" evaluation and approval of transactions were "non-actionable puffery").

Moreover, Plaintiffs identify no specific facts suggesting Reckitt Group's "real" reasons for the demerger had anything to do with the alleged scheme or were false or pretextual in any way. *See Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, 2020 WL 6063539, at *4 (S.D.N.Y. Oct. 14, 2020) (dismissing plaintiffs' allegations that defendant's "statements concerning the reasons for the merger" were false without evidence of an ulterior motive for the merger). Accordingly, the alleged scheme concerns a completely different subject matter than the statement at issue and could not have rendered them misleading. *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019) ("[T]here must be a 'direct nexus' between the alleged wrongdoing and the company's statements."); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 403.

### 4.     Statements About Compliance and Controls

As a threshold matter, there is no allegation that Reckitt Group engaged in wrongdoing or that any deficiency existed in its internal controls. Instead, the TAC challenges various general statements about Reckitt Group's compliance and controls, including statements such as "We have processes. We've got compliance." as supposedly failing to disclose the long-public anticompetitive allegations.[12] Courts routinely reject generic compliance statements as too vague to cause a reasonable investor to rely on them. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 401.

Finally, Plaintiffs' challenge to *post demerger* statements about Reckitt Group's

---

[12] TAC ¶ 225 ("The Group maintains and continues to improve a robust compliance training programme"); *id.* ¶ 245 ("So we have systems. We have processes. We've got compliance.").

compliance (*see* TAC ¶¶ 268-69) is illogical because Indivior was then a separate entity and any of its alleged misconduct could not impact statements about Reckitt Group's compliance.

### 5.     Plaintiffs Cannot Establish an Item 303 Violation

Unable to successfully identify a false statement, Plaintiffs allege that Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 by failing to disclose a known "trend[]" or "uncertaint[y]," including that it would be subject to "criminal and/or civil government prosecution." *See* TAC ¶¶ 296-300. But Reckitt Group cannot have violated Item 303 because as a foreign issuer, it is not subject to Regulation S-K. See TAC ¶ 62 (conceding Reckitt Group is a "foreign issuer[]"); *In re Dynagas LNG Partners LP Sec. Litig.*, 2020 WL 6947521, at *9 (S.D.N.Y. Nov. 25, 2020) ("[A]s multiple courts in this Circuit have found, 'foreign private issuers are not subject to SEC Regulation S-K.'").

This claim also fails because Reckitt Group's inability to prophesize that its subsidiary would be subject to prosecution is not a failure to disclose a known "trend" or "uncertainty" under Item 303. TAC ¶ 299; *see In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016) (rejecting Item 303 claim based on failure to disclose regulatory investigation and settlement); *Richman v. Goldman Sachs*, 868 F. Supp. 2d 261, 273 (S.D.N.Y 2012) ("[D]efendants [a]re not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of [the company] and its chief officer[s] would follow.") (alterations in original); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) ("Assuming, arguendo, that an anticompetitive scheme was adequately pled, defendants were under no duty to disclose the risk[s]" associated with the possible outcome). Moreover, Reckitt Group disclosed numerous governmental investigations, contradicting any assertion of nondisclosure. *See supra* Background at 5. Further, this argument fails because

violations of Item 303 are not actionable absent an adequately pleaded 10(b) claim. *In re Fedex Corp. Sec. Litig.*, 2021 WL 396423, at *16 (S.D.N.Y. Feb. 4, 2021).

**B.     The TAC Fails to Plead Scienter**

Plaintiffs must establish scienter in accordance with the "exacting pleading requirements" of the PSLRA. 15 U.S.C. § 78u-4(b)(3). It is not enough to allege that the Defendants knew or should have known the omitted facts—here, the alleged anticompetitive scheme. Plaintiffs must create a strong inference that the omission was *intended* to mislead investors. *See Kalnit v. Eichler*, 264 F.3d 131, 138-140, 143 (2d Cir. 2001) (rejecting argument that defendants' knowledge of omitted release pleaded scienter, because duty to disclose was "not so clear" in light of what public already knew); *see also Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (scienter allegations must be particularly compelling when the "nature of the false and misleading statements" is "debatable"). Even if Plaintiffs pleaded that the *Reckitt Group* executives knew the Company's *subsidiary* was engaging in anticompetitive activity—which they have not—it is not plausible that those executives were somehow using the unrelated vanilla statements at issue as a vehicle to commit securities fraud or were reckless in not knowing the market would be misled. This is even more implausible given that the market already knew about the alleged activity. *See Kalnit*, 264 F.3d at 138-140, 143.

Moreover, the TAC's scienter allegations (TAC ¶¶ 301-10), purporting to establish that the Reckitt Group Individual Defendants—Rakesh Kapoor, Adrian Hennah,[13] and Adrian Bellamy—knew there was an anticompetitive scheme supposedly executed by its subsidiary, RBP, are entirely speculative. Securities plaintiffs routinely support scienter with statements by confidential witnesses or internal documents, insider trading, factual showings that executives

---

[13] Mr. Hennah did not join Reckitt Group until January 2013, following the bulk of the purportedly anticompetitive conduct Plaintiffs allege. *See* Ex. G (2013 Reckitt Group Annual Report) at 20.

had a financial incentive to commit fraud, or similar evidence. Plaintiffs offer none of this. Instead, at its core, Plaintiffs try to use a shortcut theory of scienter for the Reckitt Group Defendants that is based on *RBP's* public disagreement with the FDA about Film's superior safety profile.[14] But the "mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate." *Schiro*, 396 F. Supp. 3d at 301 (internal quotations omitted); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270-71 (2d Cir. 1996) (scienter cannot be presumed from a subsidiary's conduct). The Court in *Schiro* declined to impute the knowledge of officers of Cemex Latam, a subsidiary comprising 13% of total net sales to its parent Company, Cemex, a "multinational building-materials company," reasoning that, "[g]iven the tiny share of Cemex's business that Cemex Latam comprises, the scienter of officers of Cemex Latam cannot, without more, be fairly attributed to Cemex." 396 F. Supp. 3d at 292, 302. By comparison, RBP comprised only 7% of Reckitt Group's net sales. TAC ¶ 222 (citing Ex. B). Even if Plaintiffs could establish scienter for RBP or Indivior, they must then allege that the Reckitt Group "possessed some degree of control over, or awareness about, the fraud." *Schiro,* 396 F. Supp. 3d at 302.

Assuming *arguendo* that RBP's knowledge could be imputed to its former parent company, Plaintiffs' scienter allegations do not suffice. Even if the FDA's views of the benefits of Film were as negative as Plaintiffs portray, scienter would not follow. It is of course common to disagree in good faith with the FDA. *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008), *aff'd sub nom. State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009); *In re Sanofi Sec. Litig.,* 87 F. Supp. 3d at 544 (dismissing case where "the most logical inference" is that defendants "sincerely held their optimistic views" and

---

[14] TAC ¶ 8 (describing October 2009 letter from RBP to FDA stating view that the Film increased pediatric safety); *id.* ¶ 9 (describing March 2010 FDA response); *id.* ¶ 103 (describing FDA approval of the Film in August 2010).

"were surprised and disappointed by" the FDA's differing view); *Gillis v. QRX Pharma Ltd.*, 197

F. Supp. 3d 557, 603 n.36 (S.D.N.Y. 2016) ("researchers may well differ over … the

interpretation of test results.") (internal quotations omitted) (alteration in original); *In re Adolor*,

616 F. Supp. 2d 551, 567 (E.D. Pa 2009) (similar). The various materials cited by Plaintiffs—

"marketing plans," emails, meetings, and sales messaging[15] of which the Defendants were

purportedly "generally aware"—at most show that *RBP* genuinely disagreed with the FDA.[16]

Plaintiffs do not plead that the Reckitt Group Defendants were even aware of these materials.

Plaintiffs make even less headway alleging that an unidentified "RBP contractor" (TAC

¶ 143) and "managers" (*id.* ¶ 145) said during 2011-2013 to the effect that Film did not decrease

pediatric exposure.[17] Plaintiffs make no attempt to link these unidentified RBP contractors and

employees, or their alleged statements made in 2011 and 2012, to Reckitt Group's statements in

2014 or 2015 that are challenged in this case. There is no showing that these individuals even

still worked for RBP—let alone Reckitt Group—in 2014, still held the asserted views,[18] or ever

communicated them to any Reckitt Group Individual Defendant or even Mr. Thaxter.

Moreover, the TAC acknowledges the existence of other genuinely held and logical

views within RBP that "Film addresses child safety and abuse and diversion" and was a "safer

product." TAC ¶ 136 (views of RBP's Vice President for Clinical Affairs); s*ee In re Vertex*

---

[15] TAC ¶ 116 (marketing plans from between 2009 and 2010); *id.* ¶ 131 (marketing messages in 2010); *id.* ¶ 142 (physician surveys in 2011); *id.* ¶ 190 (email received in 2011), *id.* ¶ 201 (meeting in 2010).

[16] The same is true of the 2007 handwritten notes of Mr. Baxter, RBP Global Medical Director, stating that RBP needed clinical data to prove the superior safety of a yet-unnamed new version of Suboxone. TAC ¶ 109.

[17] Similarly, the comments of an unidentified "Medical Affairs Managers" in 2013 that the data provided to MassHealth had "flipped" does not show scienter. TAC ¶ 186. Plaintiffs do not tie this statement to the named defendants or the challenged statements in this case. As a result, the supposed "correct[ive] letter" in 2015 regarding this data does not suggest that Mr. Thaxter or any other defendant believed that statements made to MassHealth were false or misleading at the time the statements were made. *Id.* ¶ 187.

[18] In that regard, the TAC acknowledges that the unidentified contractor "retracted these findings" (¶ 143) and that the contractor's 2011 "interim report" was "insufficient to make any final conclusions" (*Id.* ¶ 151). There is no basis to conclude that an "interim" report had any relevance more than three years later.

*Pharm. Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 355 (D. Mass. 2005) ("existence of scientific disagreement [even] within a company as to the potential viability of a drug … cannot provide the necessary strong showing of scienter").

Plaintiffs' additional generic scienter allegations add nothing. *First,* generic assertions that individuals held certain positions within the company and had access to information routinely fail. TAC ¶¶ 45, 303, 306. *See City of Brockton Retirement Sys. v. Avon Prod., Inc*., 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014). Suggesting the Reckitt Group Individual Defendants—who were among the highest executives at the parent company—would have had this information for a small subsidiary is even less convincing. In the scienter context, the officer of a subsidiary cannot serve as a proxy for the subsidiary's parent corporation unless the officer is sufficiently senior in the *parent's* management. *Thomas v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) (no scienter imputed to parent company for subsidiary officer's intentional fraudulent accounting). Plaintiffs do not allege that Mr. Thaxter or other RBP officers had *any* role in Reckitt Group's management.

*Second*, it is of no significance that Suboxone supposedly was "by far the largest part of the Pharmaceuticals business" and among "the Company's most important revenue streams …." TAC ¶¶ 90[19], 302. Suboxone was not a "core operation" for *Reckitt Group*; it was one product made by a subsidiary, RBP. RBP comprised only 7% of Reckitt Group's large and varied business portfolio. TAC ¶ 222 (citing Ex. B); *In re Alstom SA*, 406 F. Supp. 2d 433, 473 (S.D.N.Y. 2005) (subsidiary's service was not a "core operation" of its parent where subsidiary constituted 2.6% of the parent's net sales); *In re Federated Dep't Stores, Inc. Sec. Litig.*, 2004

---

[19] At paragraph 90 of the TAC, Plaintiffs mistakenly state that "[i]n 2013, Suboxone accounted for 20% of Reckitt [Group]'s total profits." In fact, *RBP* itself only generated 16% of Reckitt Group's operating profit before exceptional items in 2013, with Suboxone accounting for an even smaller percentage of Reckitt Group's total profits. *See* Reckitt Benckiser Group plc, Annual Report and Financial Statements 2013 at 94. Plaintiffs' self-serving carelessness with regard to the distinction between RBP and Reckitt Group is inexcusable.

WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (subsidiary worth ten percent of parent's business'
assets insufficiently core because it was "not 'essential to the survival'" of the parent). In any
event, the core operations doctrine is itself of dubious application and typically does not, alone,
supply scienter where direct allegations are lacking. *See Frederick v. Mechel OAO*, 475 F. App'x
353, 356-57 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form,
the 'core operations' doctrine survives as a viable theory of scienter."); *Lipow v. Net1 UEPS
Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (at most core operations constitutes
"supplemental support for alleging scienter but does not independently establish scienter").

 *Third*, Plaintiffs allege that the Reckitt Group Defendants were "motivated to engage in a
fraudulent course of conduct in order to find a new source of profitability for Suboxone before
generic versions of Suboxone Tablets entered the market." TAC ¶ 306; *see also id.* ¶ 129. This
sort of generic corporate motive allegation is legally insufficient. *ECA, Local 134 IBEW Joint
Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Kalnit*, 264
F.3d at 139. And, in any event, sales incentives for RBP's sales associates do nothing to establish
a concrete personal benefit from the alleged fraud to those employees, let alone to Reckitt Group
Individual Defendants. *See Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000).

 *Fourth*, generic allegations of being motivated by compensation are universally rejected
as pleading scienter. TAC ¶ 303. *In re Axis Capital Holdings*, 456 F. Supp. 2d at 593–94.

 *Fifth,* Plaintiffs allege that two former Reckitt Group officers (Bart Becht and Colin Day)
sold stock in 2009 and 2010. TAC ¶ 304-05. These allegations make no sense. Messrs. Becht and
Day left Reckitt Group by 2011, so their state of mind has no bearing on challenged statements
made by others in 2014 and 2015. Plaintiffs' theory is otherwise illogical because, to profit from
stock sales based on fraudulent statements, *it is necessary to make the statements (inflating the*

*price) and then trade, not vice versa*. By Plaintiffs' allegations, Day and Becht sold stock *years before* the challenged statements inflated the stock price.

*Finally,* Plaintiffs vaguely refer to a 2011 proceeding in which Reckitt Group allegedly considered engaging in "product-hop[ping]" with respect to antacid products *before deciding not to do so*. TAC ¶ 308-09. This is not relevant to scienter in this case. Even if considering product hopping showed a pattern of anticompetitive conduct—and it in fact shows the opposite—it has nothing to do with securities fraud.

### C.   The TAC Fails to Plead Loss Causation

Plaintiffs also fail to adequately allege loss causation. To establish loss causation, "a plaintiff must allege … that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (alteration in original). Plaintiffs claim to have suffered loss caused by disclosures on July 24, 2017, "when Reckitt [Group] announced, in connection with its second quarter 2017 financial results, that it had recorded a £318 million charge related to ongoing DOJ and FTC investigations into its former RBP operations." TAC ¶ 275. Plaintiffs also rely on disclosures on February 19, 2018 when "Reckitt [Group] announced … that it had recorded an exceptional charge of £296 million due to the investigations, and that the investigation now also involved the California Department of Insurance." TAC ¶ 278. And Plaintiffs point to April 9, 2019, when "the DOJ filed a criminal indictment against [Indivior]."[20] TAC ¶ 279.

The investigations and, more broadly, the fact that there were claims RBP had engaged in

---

[20] To the extent that Plaintiffs rely on a "materialization of the risk" theory as opposed to "corrective disclosures," this approach gets them no further. *See Omnicom*, 597 F.3d at 513 (to plead loss causation by materialization of risk, a plaintiff must plead facts to show that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."). Such a theory requires identifying a *particular* risk that was allegedly concealed and which then materialized to cause a market loss. Plaintiffs have not done so. *See DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. 2019). To the contrary the investigations and lawsuits, as well as the attendant risks, all were disclosed.

anticompetitive activity, were robustly disclosed well in advance of July 2017, and thus did not reveal new information to the market. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 488 (S.D.N.Y. 2011); *see supra* Background and *infra* Sec. I.D. Any loss caused by the alleged anticompetitive conduct would have necessarily been experienced in 2013, when investors first learned of allegations concerning the "scheme" and the stock price declined. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (finding plaintiffs' belated attempt to cast an alleged corrective disclosure that resulted from a price drop "at a time when [defendant's] stock had already lost a large portion of its value … [was] unavailing"); *see supra* Background and *infra* Sec. I.D. For example, in February 2013, the FDA denied RBP's Citizen Petition, TAC ¶ 164 and publicly expressed concern related to the potential for anticompetitive conduct. *Id.* ¶ 167; Ex. H (Feb. 22, 2013 FDA Citizen Petition Response) at 16 (stating that the FDA had "referred this matter to the Federal Trade Commission [("FTC")]" to "investigate and address" any "anticompetitive business practices"). Upon this news, Reckitt Group's stock price dropped 4.2% and its ADR price declined 3.6%.[21]  And on July 11, 2019, when Reckitt Group settled with the DOJ and FTC, those stock prices increased.[22]

Thus, the subsequent taking of two accounting reserves and indictment of Indivior based on the same allegations already in the public domain do not constitute "corrective" disclosures for the simple reason that Reckitt Group could not "reveal" something that was already publicly known. TAC ¶¶ 275, 278-279; *see In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d

---

[21] Yahoo Finance, Reckitt Benckiser Group PLC (RBGPF), https://finance.yahoo.com/quote/RBGPF/history (last visited June 24, 2021) (Reckitt Group stock price on February 21 and 22, 2013); Yahoo Finance, Reckitt Benckiser Group PLC ADR (RBGLY), https://finance.yahoo.com/quote/RBGLY/history (last visited June 24, 2021) (Reckitt Group ADR share price on February 21 and 22, 2013). "[T]he district court may take judicial notice of well-publicized stock prices …." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[22] Yahoo Finance, Reckitt Benckiser Group PLC (RBGPF) (Reckitt Group stock price on July 10 and 11, 2019); Yahoo Finance, Reckitt Benckiser Group PLC ADR (RBGLY) (Reckitt Group ADR share price on July 10 and 11, 2019).

Cir. 2010) (finding that a news article was not a corrective disclosure because it did not reveal "any new information … regarding [the defendant's] alleged fraud").[23]

### D.     The Two-Year Statute of Limitations Bars the Claims

Exchange Act claims "must be brought within "[two] years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The limitations period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first … irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (first alteration in original). This requires "(i) the actual purchase or sale of a security and (ii) either the actual discovery of scienter, or the possibility of scienter discovery by a hypothetical, reasonably diligent plaintiff." *Fogel v. Wal-Mat de Mexico SAB de CV*, 2017 WL 751155, at *8 (S.D.N.Y. Feb. 27, 2017), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018). Under this standard, accrual occurred before July 15, 2017—two years prior to suit.

As for the first *Merck* element (a stock transaction), Plaintiffs' PSLRA Certifications (Dkt. Nos. 1-2, 20-4) reflect purchases before July 15, 2017.

The second *Merck* element (discovery of facts supporting misrepresentation and scienter) is also easily met. Although Defendants dispute that Plaintiffs have adequately pleaded their claim at all, the matters the TAC cites in support of misrepresentation and scienter were well-publicized years before July 15, 2017. As detailed above, in 2012 and 2013, a flood of litigation, news articles, investigations, and public FDA proceedings included all underlying material information that Plaintiffs now cite as the basis for their claims. Each of these events would be

---

[23] Indeed, even if the investigations had not previously been revealed, mere announcement of the indictment would not establish loss causation. *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *5 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014 (no loss causation based on indictment of a senior executive which revealed nothing more than that the government was "investigating [the company's] conduct" rather than the truth of the indictments' claims).

enough to trigger accrual of the statute of limitations—together, they put beyond debate that the claims are time-barred. *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016) ("[A] reasonably diligent plaintiff would undertake an investigation based on '[t]he filing of related lawsuits, news articles and analyst's reports, and prospectuses, quarterly reports, and other information related to their investments.'"); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 545–46 (S.D.N.Y. 2013) (dismissing 10(b) claims because "the allegations in the [c]omplaint relevant to scienter, as pled, demonstrate that [plaintiff] could have discovered 'the facts constituting the violation'" within the two year statute of limitations.'"); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 221 (S.D.N.Y. 2009) ("The supposedly damning letter on which plaintiff's theory rests was publicly available on the FDA's website throughout the putative class period, where it could have been read and assessed by any investor."); *Fogel*, 2017 WL 751155, at *9 (securities fraud claims untimely where brought more than two years after New York Times article addressing bribery scheme and internal investigation).

Notwithstanding this, the TAC suggests Plaintiffs may argue that their claims are timely because: (i) they could not plead the loss causation element of a Section 10(b) claim prior to the first alleged corrective disclosure on July 24, 2017 (conveniently just less than two years prior to suit) when a Reckitt Group earnings release included an accounting charge related to the investigation; and (ii) while Defendants' purported misstatements may have been discoverable, scienter was not.

However, loss causation is not required for statute of limitations accrual. Although *Merck* left that question open (559 U.S. at 649), well-reasoned opinions since have held that accrual does not require loss causation. *Fogel*, 2017 WL 751155 at *8 ("[a]ccrual [] requires two things: (i) the actual purchase or sale of a security and (ii) either the actual discovery of scienter, or the

possibility of scienter discovery by a hypothetical, reasonably diligent plaintiff"); *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 202 n.5 (S.D.N.Y. 2020) ("Plaintiffs' opposition also suggests that the statute of limitations was not triggered until March 14, 2018 because it was not until that date that Plaintiffs could plead loss causation. This argument fails."). This Court should follow these cases because they are consistent with the statutory text and the rationale of *Merck.*

Similarly, any claim that the 2013 antitrust lawsuit did not put Plaintiffs on notice of scienter because "scienter" is not an element of an antitrust claim is unpersuasive. Scienter is an "intent to deceive, manipulate or defraud." *Tellabs Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 319 & n.3 (2007). The antitrust complaint repeatedly accuses Reckitt Group of intentional fraud. *See, e.g.*, Ex. C ¶ 193 ("Reckitt [Group]'s conduct in intentionally and fraudulently delaying the filing of the Citizen Petition") and ¶ 195 (same). In any event, most of the scienter allegations in the TAC are based on inference and supposition from the underlying alleged anticompetitive scheme, not any "new" direct evidence of the Reckitt Group Defendants' knowledge that could not have been pleaded until 2017 or later. *See, e.g.*, TAC ¶ 306 ("Defendants were further motivated … to find a new source of profitability for Suboxone before generic versions of Suboxone Tablets entered the market.") and *id.* ¶ 307 ("Defendants were further motivated … to artificially inflate the value of RBP before demerging it."). Accordingly, this Court should find that the statute of limitations has expired.[24]

## II.      The Court Should Stay or Dismiss the English Claims (Counts III-V)

The Court should stay the English law claims—brought on behalf of London Stock Exchange purchasers of ordinary shares—because they are subject to mandatory arbitration.

---

[24] Count II (control person liability) also fails to state a claim because the TAC fails to state a claim under Section 10(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Alternatively, the Court should dismiss for *forum non conveniens* or failure to state a claim.

### A.  This Court Should Stay the Claims in Favor of Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, mandates the enforceability of agreements to arbitrate and resolves doubts concerning the scope of an arbitration clause in favor of arbitration. *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). Further, whenever a party is subject to litigation on any issue and is found to be entitled to arbitrate that issue, § 3 of the FAA, mandates a stay. 9 U.S.C. § 3; *China Media Express Holdings, Inc. by Barth v. Nexus Exec. Risks, Ltd.*, 182 F. Supp. 3d 42, 53 (S.D.N.Y. 2016) (staying case in favor of mandatory arbitration clause pointing to foreign jurisdiction).

Here, Reckitt Group and plaintiff Pontiac, which purchased ordinary shares of Reckitt Group, have an agreement to arbitrate. Article 132 of Reckitt Group's Articles of Association provides that all disputes "[B]etween a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise … will be exclusively and finally resolved under [ICC Rules]." (Ex. I).[25] The Article further states that it "evidences an express submission to arbitration by each shareholder, the company, its directors" and states that London is the place of arbitration and English law governs. *Id.*

In addressing issues of foreign law, the Court may consult guidance from experts submitted via Declaration. Fed. R. Civ. P. 44.1. Defendants have submitted a declaration (with a resume) by Stephen Midwinter QC, a Barrister with expertise in English law, in which he explains that this Article is enforceable under English law as a contractual agreement to arbitrate. Midwinter Dec. ¶¶ 9-18. Thus, the FAA mandates that the Court stay Pontiac's claims in favor of

---

[25] Reckitt Group's Articles of Association were amended. Both versions are before the Court at Ex. I and J. The relevant text is identical but appears in Article 135 of the older version. Public corporate records are subject to judicial notice. *See Weiss v. Sherloq Rev. Solutions, Inc.*, 2021 WL 965810, at *5 (S.D.N.Y. Mar. 12, 2021).

arbitration.

**B.     Alternatively, This Court Should Dismiss the English Claims Pursuant to
       *Forum Non Conveniens***

If this Court somehow finds the arbitration clause unenforceable, then it should dismiss

the English claims based on *forum non conveniens*. *First,* dismissal based on *forum non*

*conveniens* is appropriate because this case concerns the conduct of an English company, raises

complicated issues of English law, and is brought by a class of stock purchasers who purchased

on the London Stock Exchange—the vast majority of which undoubtedly are foreign. *See Pollux*

*Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 76 (2d Cir. 2003) (affirming as proper

exercise of discretion judge's determination that application of English law favored adjudication

in England). This is a particularly important consideration with respect to Count IV (violation of

the Financial Services and Markets Act), which is a new and important enactment in the U.K.

that even English courts have yet to interpret extensively. *See* Midwinter Dec. ¶ 38.

*Second*, Reckitt Group's Articles of Association provide that, if for any reason arbitration

(discussed above) is unenforceable, then:

> Any proceeding, suit or action … between a shareholder in that shareholder's
> capacity as such and the company and/or its directors arising out of or in
> connection with these articles or otherwise … can only be brought in the courts of
> England and Wales.

 Ex. I at Art. 133(C)(i). As Barrister Midwinter explains, this clause is an enforceable forum

selection agreement under English law. Midwinter Dec. ¶¶ 19-21. Such a forum selection clause

in favor of a forum to which transfer is not possible is enforced by dismissal pursuant to *forum*

*non conveniens*. *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60

(2013); *see In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 386-89 (S.D.N.Y. 2015) (dismissing

foreign securities law claims subject to foreign arbitration clause).[26]

### C. The English Law Counts Fail to State a Claim

Finally, if the Court reaches the substance of the English claims, it should dismiss them for failure to state a claim. *First*, the English law claims all require a misrepresentation. Midwinter Dec. ¶¶ 27-28. That element is lacking for reasons set forth above.

*Second*, the English law claims require actual reliance and do not recognize a presumption akin to "fraud on the market." Midwinter Dec. ¶¶ 32-35. Thus, Pontiac needs to plead (but has not) that it actually read and relied on each challenged statement. *Id.*

*Third,* fraudulent misrepresentation (Count III) requires a mental state akin to scienter. *Id.* ¶¶ 29-30. Plaintiffs have not pleaded that element as set forth above. Similarly, negligent misrepresentation (Count V) requires a mental state of negligence (*id.* ¶ 60), which Plaintiffs at best plead in a conclusory manner. *See* TAC ¶ 354.

*Finally,* the Financial Services and Markets Act claim (Count IV) only applies to statements made in specified corporate filings and the TAC does not challenge any such filings. Midwinter Dec. ¶ 43.

### Conclusion

This Court should dismiss Counts I-II with prejudice, and either stay Counts III-V in favor of arbitration or else dismiss them with prejudice.

---

[26] It is of no moment that *forum non conveniens* would not apply to the Exchange Act claims. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 393 (2d Cir. 2007) (severing claims and dismissing those subject to forum selection clause prescribing English court jurisdiction).

Dated: June 25, 2021                    Respectfully submitted,

                                        */s/ Michael G. Bongiorno*

                                        **WILMER CUTLER PICKERING**
                                        **HALE AND DORR LLP**
                                        Michael G. Bongiorno
                                        7 World Trade Center
                                        250 Greenwich Street
                                        New York, New York 10007
                                        212 295 6425 (t)
                                        212 230 8888 (f)
                                        michael.bongiorno@wilmerhale.com

                                        Timothy J. Perla
                                        Jessica L. Lewis
                                        60 State Street
                                        Boston, MA 02109
                                        617 526 6000 (t)
                                        617 526 5000 (f)
                                        timothy.perla@wilmerhale.com
                                        jessica.lewis@wilmerhale.com

                                        *Counsel for Defendants Reckitt*
                                        *Benckiser Group plc.,*
                                        *Rakesh Kapoor, Adrian Hennah, and*
                                        *Adrian Bellamy*