**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. 1:20-cv-10041-PKC |
| ) | CLASS ACTION |
| Plaintiff, ) | |
| ) | **DECLARATION OF STEPHEN** |
| ) | **MIDWINTER, Q.C.  IN SUPPORT OF** |
| vs. ) | **DEFENDANTS' MOTIONS TO STAY** |
| ) | **AND DISMISS** |
| RECKITT BENCKISER GROUP PLC, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ───────────────────────────── ) | |
| ) | |

**DECLARATION OF STEPHEN MIDWINTER, Q.C.**

I, STEPHEN MIDWINTER QC, of Brick Court Chambers, 7-8 Essex St, London WC2R 3LD,

England, state as follows:

1.      I am a self-employed barrister in independent practice at the English Bar and am a member

of chambers at Brick Court Chambers, 7-8 Essex St, London. I was called to the Bar in

England and Wales in 2002 and appointed Queen's Counsel in 2017 in recognition of my

experience and expertise in the areas of law in which I practise. In 2019, I was appointed

as a Deputy District Judge and a Recorder (i.e. a deputy Circuit Judge), a role that I combine

with my continued practice at the Bar. I was also called to the Bar in the British Virgin

Islands in 2005. I have throughout my career practised in commercial law, which includes

insurance, banking and financial services, professional negligence, civil fraud, corporate

and shareholder disputes and domestic and international trade and commercial disputes of

every kind.

1

2. I have been asked by Wilmer Hale LLP, attorneys acting on behalf of Reckitt Benckiser Group plc ("**Reckitt**") to provide an opinion in the form of an affidavit for use in US Court proceedings addressing certain questions of English law as follows:

    a.    Whether, as a matter of English law, holders of Reckitt ordinary shares traded on the London Stock Exchange are required by Article 132 of Reckitt's Articles of Association to arbitrate their claims against Reckitt and its directors and officers.

    b.    Whether, under English law, should the arbitration clause in Article 132 be declared invalid or unenforceable, Article 133 of Reckitt's Articles of Association provides an exclusive forum selection clause providing England and Wales as the only forum in which holders of Reckitt ordinary shareholders may bring suit against Reckitt and its directors and officers.

    c.    Specify and describe the legal elements, required proof, and damages for each of the following causes of action: (i) English Common Law fraudulent misrepresentation and deceit; (ii) Section 90A of the Financial Services and Markets Act of the United Kingdom; and (iii) English Common Law negligent misrepresentation and misstatement.

3. I have approached this task on the basis that my duty is to provide to the Court such assistance as I am able on matters falling within my area of expertise, which is English law, and that this duty to the Court overrides any obligation I may owe to those instructing me. My compensation for providing this report is entirely independent of the outcome of the dispute.

4.      As a matter of English law, the answer to each of questions (a) and (b) is a straightforward "yes". I set out the reasoning that leads to that conclusion further below, followed by the answers to questions (c)(i) – (iii).

5.      As an initial matter, I have been asked to address the fact that Article 133 in Reckitt's Articles of Association ("**Articles**") states that the forum selection clause that it contains applies if "Article 135" is treated as invalid or unenforceable. The reference to Article 135 is an obvious error: the reference should be to Article 132. It is also reasonably obvious how the error has occurred: in an earlier version of the Articles (those adopted on 28 August 2007) the arbitration clause that is now Article 132 was numbered Article 135 (and the relevant cross-reference in what is now Article 133 was correct). When the Articles were amended on 6 May 2010, the provisions were renumbered such that what had been Article 135 became Article 132, but the cross-reference in what is now Article 133 was not amended. That is an obvious mistake which English law would certainly treat as being silently corrected as a matter of interpretation.[1]

**Background**

6.      The questions that I am asked arise in the context of a claim filed in US District Court in New Jersey against Reckitt and certain of its directors by (a) holders of American Depositary Shares ("**ADSs**") issued by Reckitt and (b) shareholders who acquired ordinary shares in Reckitt on the London Stock Exchange, in the period 28 July 2014 to 9 April 2019 ("the **Class Period**").

7.      Put shortly, the Plaintiffs allege that Reckitt (and the defendant directors) made a number of misstatements in press releases and accompanying conference calls in the period 28 July

---

[1] See Lewison, *The Interpretation of Contracts* (6th Ed) at paragraph 9.01 and the authorities there cited.

3

2014 – 11 February 2015 and in its 2014 annual report released on 19 March 2015 concerning the financial performance of the company and/or concealing allegedly wrongful conduct by Reckitt in connection with a product called Suboxone Sublingual Film. The Plaintiffs allege that those misstatements caused them to buy ADSs or ordinary shares in Reckitt at 'inflated' prices and/or to hold those ADSs or ordinary shares rather than sell them, leading to the Plaintiffs suffering a loss when the share price later fell.

8.      It is not my role to express any views on the merits of the Plaintiffs' claims and nothing that I say in this declaration should be taken as intended to express any such view.

**The Application of Article 132**

9.      Those who acquired ordinary shares in Reckitt became parties to the Articles as in force at the date that they acquired the shares and as amended from time to time thereafter. As a matter of English law, the articles of association of a company constitute a contract between the shareholders and the company by which they are all bound and which they can all enforce. This is a basic provision of English company law that has been well established for many years (see e.g. *Hickman v Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch 881) and which is now reflected in s.33(1) of the Companies Act 2006.[2]

10.     The Articles contain an arbitration agreement at Article 132,[3] which provides in relevant part as follows:

*132 Arbitration*

*(C)      Unless article 133 applies:*

*All disputes:*

---

[2] See, e.g. *Palmer's Company Law* (one of the leading texts on English company law) at paragraphs 2.1117 – 2.1118
[3] I refer to the Articles as in force from 28 August 2007 as amended on various dates up to 7 May 2015. The amendments do not affect the substance of the provisions with which this declaration is concerned.

       *(i)     between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise;*

*(...)*

*will be exclusively and finally resolved under the Rules of Arbitration of the International Chamber of Commerce ("ICC") (the "ICC Rules"), as amended from time to time.*

  *(D)    The tribunal will consist of three arbitrators to be appointed in accordance with the ICC Rules.*

  *(E)    The chairman of the tribunal must have at least 20 years' experience as a lawyer qualified to practice in a common law jurisdiction within the Commonwealth (as constituted on the date of adoption of this article) and each other arbitrator must have at least 20 years' experience as a qualified lawyer.*

  *(F)    The place of arbitration will be London, England.*

  *(G)    The language of the arbitration will be English.*

  *(H)    These articles are a contract between the company and its shareholders and between the company's shareholders amongst themselves. This article...also contains or evidences an express submission to arbitration by each shareholder, the company, its directors and professional service providers and such submissions will be treated as a written arbitration agreement under the Arbitration Act 1996 of England and Wales and Article II of the [New York Convention].*

  *(I)    Each person to whom this article applies waives, as far as permitted by law: (i) any right under the laws of any jurisdiction to apply to any court of law or other judicial*

5

*authority to determine any preliminary point of law, and/or (ii) any right he or she may otherwise have under the laws of any jurisdiction to appeal or otherwise challenge the award, ruling or decision of the tribunal.*

11.    Article 132 is supplemented by Article 134 which provides in relevant part (at Article 134(B) - (C)):

(B)    *The governing law of these articles, including the submissions to arbitration and written arbitration agreement contained in or evidenced by Article 132, is the substantive law of England.*

(C)    *The company is entitled to enforce Articles 132 and 133 for its own benefit, and that of its directors, subsidiary undertakings and professional service providers.*

12.    In accordance with the general position that the terms of the Articles form a contract between the shareholders and the company by which they are bound and which they can enforce, the arbitration agreement in Article 132 is enforceable by Reckitt against the shareholders. Any shareholder who wishes to pursue a dispute against Reckitt falling within Article 132 is contractually required to submit that dispute to arbitration.

13.    The *Hickman* case itself concerned a reference to arbitration. The plaintiff was a shareholder in the defendant sheepbreeders' association. He issued court proceedings seeking various declaratory and injunctive relief concerning the administration of the company and decisions that it had taken not to register his sheep and to expel him. The company's articles contained a clause requiring disputes to be submitted to arbitration. The judge (Astbury J) held that the articles constituted a contract to which the company and the shareholders were parties, and that shareholders were therefore contractually required to

6

submit any claims they might have against the company to arbitration. The court proceedings were accordingly stayed.

14. This straightforward analysis has been applied on many occasions since. A relatively recent example is the decision of the Court of Appeal in *Fulham Football Club (1987) Ltd v Richards* [2012] Ch 333 in which it was held that a claim brought by a football club that was a shareholder in the football league alleging 'unfair prejudice'[4] in the management of the league fell within the arbitration agreement in the league's articles of association, notwithstanding the statutory nature of the claim and remedy sought, and so had to be submitted to arbitration.

15. It is clear that all of the claims brought against Reckitt by Plaintiffs who acquired ordinary shares in Reckitt, including those alleging violations of the US Exchange Act, deceit/fraudulent misrepresentation, breach of s.90A of the UK Financial Services and Markets Act 2000 and common law negligent misrepresentation, fall within Article 132. The pursuit of those claims otherwise than in arbitration in accordance with Article 132 is therefore a breach of contract, which entitles Reckitt to damages and/or injunctive relief.

16. I cannot see any realistic scope for dispute that the claims in the present case fall within the scope of the arbitration agreement. However, in case it assists and for completeness, I note that:

   a. In general, as a matter of English law arbitration agreements are to be interpreted broadly. The reason for this is given in the judgment of Lord Hoffmann in the leading case of *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40 at paragraphs 6 – 10: rational people ordinarily want all of their disputes relating to a

---

[4] This is a remedy available under statute in the UK to protect minority shareholders from oppressive or unfair conduct by the majority

particular relationship to be determined by a single tribunal. If they have provided for disputes between them to be referred to arbitration, the appropriate inference is ordinarily that they intended all disputes connected with their relationship to be referred to arbitration. This includes disputes relating to the formation of the contract containing the arbitration agreement itself – including (as in *Fiona Trust* itself) arguments that the contract was obtained by fraud.

b.  Consistently with that approach, disputes relating to the circumstances in which the Plaintiffs acquired their shares in Reckitt and so became parties to the Articles would certainly fall within the arbitration agreement in Article 132. This is reinforced by the fact that one of the claims made by the Plaintiffs is that the allegedly wrongful actions of Reckitt caused them to <u>retain</u> their shares rather than dispose of them. That claim is obviously brought in the capacity of shareholder: it is the fact that the Plaintiff continued to hold (and did not dispose of) shares that is said to have given rise to loss. It is impossible to see any argument that that claim falls outside the arbitration agreement. Applying the *Fiona Trust* analysis, it would be irrational for the parties to have intended that dispute to be determined in arbitration, but a dispute relating to the acquisition of shareholder status to be determined in a different forum. The court should presume that the parties intended to act rationally, and that both types of claim should be submitted to arbitration.

c.  The reference in Article 132 to a claim "*between a shareholder in that shareholder's capacity as such and the company*" is likely to be intended to reflect and give effect to a line of authority (starting with the *Hickman* case itself) holding that claims brought by a <u>director</u> of a company or a <u>third party</u> such as a lawyer or

other professional service provider do not fall within an arbitration agreement in the articles merely because that person happens also to be a shareholder in the company. In other words, if a lawyer providing services to the company wanted to sue for an unpaid bill, he could not submit that dispute to arbitration merely because he happened to hold shares in Reckitt (if that were the case). That is obviously very far indeed from the facts of this case, and there is nothing in that line of authority to support any suggestion that claims made by a shareholder relating to the circumstances in which he or she acquired or retained shares fall outside the arbitration agreement. As set out above, it would be very surprising if they did.

17.    As to injunctive relief, I note that English law has a strong policy in favour of enforcing arbitration agreements, and English courts will readily grant injunctions to restrain the pursuit of proceedings brought in breach of them. The court's attitude that compliance with arbitration agreements should be enforced by injunction "without diffidence" was made clear by Lord Millett in *The Angelic Grace* [1995] 1 Lloyd's Rep 87:

> "In my judgment, the time has come to lay aside the ritual incantation that this is a jurisdiction which should only be exercised sparingly and with great caution. There have been many statements of great authority warning of the danger of giving an appearance of undue interference with the proceedings of a foreign Court. Such sensitivity to the feelings of a foreign Court has much to commend it where the injunction is sought on the ground of forum non conveniens or on the general ground that the foreign proceedings are vexatious or oppressive but where no breach of contract is involved. In the former case, great care may be needed to avoid casting doubt on the fairness or adequacy of the procedures of the foreign Court. In

the latter case, the question whether proceedings are vexatious or oppressive is primarily a matter for the Court before which they are pending. But in my judgment there is no good reason for diffidence in granting an injunction to restrain foreign proceedings on the clear and simple ground that the defendant has promised not to bring them."

18.    The answer to question (a) (whether, as a matter of English law, holders of Reckitt ordinary shares traded on the London Stock Exchange are required by Article 132 of Reckitt's Articles of Association to arbitrate their claims against Reckitt and its directors and officers) is therefore in my view a clear and unambiguous "yes".

**The Application of Article 133**

19.    Article 133 sets out a fallback position in the event that the arbitration agreement is held to be invalid or unenforceable for any reason. It provides (in relevant part) as follows:

*133. Exclusive Jurisdiction*

(A)    *This article applies to (i) a dispute (which would otherwise be subject to Article 132) in any jurisdiction if a court in that jurisdiction determines that Article [132]*[5] *is invalid or unenforceable in relation to that dispute in that jurisdiction; any (ii) any derivative claim under the legislation.*

(B)    *For the purposes of this paragraph (A), "court" means any court of competent jurisdiction or other competent authority including for the avoidance of doubt, a court or authority in any jurisdiction which is not a signatory to the New York Convention.*

(C)    *Any proceeding, suit or action:*

---

[5] The text says Article 135, but as set out above that is an obvious typo that would be treated as corrected without fuss as a matter of English law.

> *(i)   between a shareholder in that shareholder's capacity as such and the company and/or is directors arising out of or in connection with these articles or otherwise;*
>
> *(...)*
>
> *can only be brought in the courts of England and Wales.*
>
> *Damages alone may not be an adequate remedy for any breach of this article, so that in the event of a breach or anticipated breach, the remedies of injunction and/or an order for specific performance would in appropriate circumstances be available.*

20. This provision equally forms part of the contract between the company and the shareholders and so is enforceable by the company in the same way as any contractual agreement. The effect is that if, for any reason, the arbitration agreement in Article 132 were held to be invalid or ineffective, there would be an exclusive jurisdiction agreement in favour of the courts of England and Wales. It is clear to me, for essentially the same reasons as are set out above, that the claims brought against Reckitt by Plaintiffs who acquired ordinary shares in Reckitt would fall within Article 133 if Article 132 were to be held invalid or unenforceable. The result of that is that the commencement or continuation of proceedings in any forum other than England and Wales would be a breach of contract, entitling Reckitt to claim damages and/or injunctive relief so as restrain further breach.

21. The answer to question (b) (whether, under English law, should the arbitration clause in Article 132 be declared invalid or unenforceable, Article 133 of Reckitt's Articles of Association provides an exclusive forum selection clause providing England and Wales as

the only forum in which holders of Reckitt ordinary shareholders may bring suit against Reckitt and its directors and officers) is therefore also an unambiguous "yes".

**The Requirements of Fraudulent Misrepresentation/Deceit[6]**

22.     In order to found an action for fraudulent misrepresentation (more usually referred to in English law as 'deceit') a plaintiff[7] must plead and prove that:

a.      A representation of fact (or law) was made by the defendant to the plaintiff;

b.      The representation was false;

c.      The defendant acted dishonestly – i.e. the defendant knew that the representation was false (or was reckless, not caring whether it was true or false);

d.      The defendant intended the plaintiff to rely on the representation;

e.      The plaintiff in fact relied on the representation; and

f.      The plaintiff has suffered loss as a result.

23.     I address each of these requirements below. As a matter of English procedure, in order to prove each of the required elements, the plaintiff must meet the civil standard of proof, i.e. the 'balance of probabilities' or that what it alleges is, on the evidence, more likely than not to be correct. Because an allegation of fraud is a serious matter "fraud must be distinctly alleged and as distinctly proved."[8] Or, as the Court of Appeal put it in *Kazakhstan Kagazy v Arip* [2014] EWCA Civ 381 at paragraph 61:

"an allegation of fraud should not be made without cogent evidence. This is not simply a professional obligation of lawyers; nobody should allege dishonesty lightly. The court

---

[6] See generally *Clerk & Lindsell on Torts* (22nd Ed) (the leading work used by practitioners and often referenced by judges) at paragraphs 18-001 – 18-051

[7] In England, since procedural reforms undertaken in 1998 that (among other things) attempted to modernise some of the language used by lawyers, 'plaintiffs' are now referred to as 'claimants'. I use the term 'plaintiff' in this affidavit for the sake of clarity for a US audience.

[8] *Davy v Garrett* [1877] 7 Ch D 473 at 489 per Thesiger LJ

should not readily conclude that fraud ought to have been apparent unless it is satisfied that the evidence would plainly justify the allegation. That is always a high hurdle…"

24. This does not mean that the standard of proof is different for a fraud claim, but rather that, because of the seriousness of the allegation and because we do not ordinarily expect people to act fraudulently, more powerful evidence is likely to be required in practice in order to establish that a person has, on the balance of probabilities, acted fraudulently than would be required to show that a person has been careless.[9]

*Representation of fact or law made by the Defendant to the Plaintiff*

25. An actionable representation is a statement of present fact (or law) about something material. The plaintiff must plead and prove that a relevant statement of fact or law was made by the defendant and that it meant what the plaintiff says it meant. Some points by way of guidance as to the English law approach:

a. There is a distinction between a statement of present fact and a statement of intention or expectation. The statement that "I am going to New York tomorrow" or "the business will double in size this year" is not a statement of present fact: if I do not go to New York tomorrow or if the business does not double in size I am not guilty of misrepresentation. However, a statement of intention does contain within it an implied representation of fact that the intention is actually held.[10] If in fact I have no intention of going to New York or growing the business when I make the statement, I may be guilty of misrepresentation.

---

[9] *Re H (Minors)* [1996] AC 563 at 586–587 per Lord Nicholls
[10] *Edgington v Fitzmaurice* (1885) 29 Ch D 459 at 483, where Bowen LJ famously said "The state of a man's mind is as much a fact as the state of his digestion."

13

b.       The same is true of a statement of opinion or belief. If I say that "I believe that the business earned US$100 million last year" that is not a representation that the business in fact earned that sum: it is only a representation that that is indeed my belief.[11] It is not necessary that the statement includes the phrase "I believe that" in order to be a statement of opinion or belief: whether or not a statement is to be understood as a statement of belief or of fact will depend on an assessment of what was said and the circumstances in which it was said.

c.       A statement that merely extols the virtues of a person, business or thing in a general or exaggerated way is "mere puffery" and is not an actionable representation. This reflects the old adage that "self-praise is no recommendation" - general statements by a person (including a company) as to their own excellent qualities and prospects or that their business is "good" or "strong" or "the finest in London" or that their products are "unique" or "effective" or "world-famous" are not representations – they are not statements that are understood by any sensible person as carrying any real weight. Thus a statement made by the vendor of a farm that it was "fertile and improvable…at moderate cost" was held to be too vague and general to amount to a representation,[12] as was a statement that a particular individual "had lengthy personal meetings with Baron Rothschild" to discuss an investment scheme[13] and statements in share prospectuses that were described as presenting a mining business in "glowing and exaggerated colours".[14]

---

[11] See e.g. *New Brunswick and Canada Railway and Land Co v Conybeare* (1862) 9 HL Cas 711
[12] *Dimmock v Hallett* (1866) 2 Ch App 21
[13] *Carney v NM Rothschild & Sons Ltd* [2018] EWHC 958 (Comm)
[14] *Jennings v Broughton* (1854) 5 DeGM&G 126

d.  A statement of present fact may be express or implied. Thus, as set out above, an express statement that "I am going to New York tomorrow" carries with it an implied statement that I actually intend to go to New York tomorrow. A person who orders a meal in a restaurant impliedly represents that he or she has the means to pay for the meal being ordered.[15] Whether an implied representation that is alleged arises out of the express words used is a matter for the court to determine by reference to what a reasonable person receiving the express representation would understand it to mean.[16]

26.  A representation is only actionable if it is made *to the plaintiff*. This again will be something that the plaintiff must plead and prove. A statement may be made to a plaintiff directly or indirectly (i.e. where the statement is made to a third party in the knowledge that it is likely to be passed on to the plaintiff). A statement may be made to a class of people (e.g. shareholders in a company) in which case it will be held to have been made to the plaintiff if he forms part of the class.[17]

*Falsity*

27.  The plaintiff must prove that the representation is substantially false (an error in unimportant details does not suffice if the statement is true in substance).[18] This again is obviously a question of fact to be determined by the court. The court will need first to decide what the representation means, and then whether the representation, accorded that meaning, was false when made.

---

[15] *DPP v Ray* [1974] AC 370 at 382
[16] *Property Alliance Group Ltd v Royal Bank of Scotland plc* [2016] EWHC 3342 (Ch)
[17] *Bedford v Bagshaw* (1859) 4 H&N 538
[18] *Seddon v North-eastern Salt Co* [1905] 1 Ch 326; *Avon Insurance plc v Swire Fraser Ltd* [2000] CLC 665 at paragraph 17

28.    Note that a representation may be false if it is a half-truth that conceals important information that would affect the way that a reasonable person receiving it would understand it.[19] On the other hand, a statement that appears false when viewed in isolation and out of context may not be false when read together with other information that the recipient held: everything will depend on the facts of a given case.

*Dishonesty*

29.    The plaintiff must plead and prove that the defendant acted dishonestly. The test for dishonesty was set out by the House of Lords in *Derry v Peek* (1889) 14 App. Cas. 337 and has not changed:

"First, in order to sustain an action of deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (i) knowingly, (ii) without belief in its truth, or (iii) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement from being fraudulent, there must, I think, always be an honest belief in its truth."

30.    The key distinction is between knowledge of falsity and recklessness on the one hand, and mere negligence on the other. A person who makes a statement not caring whether it is true or false is reckless and therefore dishonest. A person who makes a statement believing it to be true, but without properly checking the position or having any proper foundation for that belief, may be negligent but is not dishonest.

---

[19] *Peeks v Gurney* (1873) LR 6 HL 377 at 403 per Lord Cairns

*Intention that the Plaintiff would Rely on the Representation*

31.    The plaintiff must plead and prove that the defendant made the statement with intent to deceive, i.e. that the defendant intended that the false representation would be relied upon. Intention for this purpose means not only *desire* but also knowledge that the plaintiff is likely to rely on the representation.[20]

*Reliance*

32.    The plaintiff must plead and prove that its conduct was in fact influenced by the representation. This has two elements:

   a.    The Plaintiff has to show that it actually gave thought to the representation and that it formed part of its decision-making process when acting (or choosing not to act). If it did not in fact take the representation into account when deciding how to act, it cannot have relied on it and there is no claim. The *Property Alliance Group* case referred to above is an illustration of this: there the plaintiff borrowers contended that they had relied on implied representations by the defendant lending bank as to the way in which LIBOR interest rates were calculated. The claim was rejected on the grounds (among others) that the relevant individuals at the plaintiffs had not actually given thought to the way the interest rates were calculated and so had not taken the alleged representations into account when deciding how to act.[21] In order to succeed in the present case, the Plaintiffs will thus have to plead and prove that they in fact took the alleged misrepresentations into account when making a relevant investment or share retention decision.

---

[20] See *Clerk & Lindsell* at paragraph 18-30
[21] [2016] EWHC 3342 at paragraph 419, upheld on appeal at [2018] 1 WLR 3529

b.    If the plaintiff would have acted in the same way had the representation not been made, or had the plaintiff not received it, the claim will fail. It is important to be clear: what is relevant is what the plaintiff would have done *had no representation been made to him at all*. It is not appropriate or necessary to consider what the plaintiff would have done had he known the truth.[22] The question for the present case is therefore not what the Plaintiffs would have done if Reckitt had said something different in the press reports, conference calls and annual report referred to, but rather what the Plaintiffs would have done had they not read the statements in those documents or had they not contained the statements to which the Plaintiffs now object.

33.    To be clear, it is enough for the plaintiff to show that the misrepresentation was *an influence* on its decision making: the claim will not fail merely because there were other factors that also influenced its thinking.[23]

34.    As a matter of English procedure, in a deceit claim a plaintiff is entitled to rely on a rebuttable factual presumption of reliance – i.e. the court will start by making a factual assumption that it is likely that a plaintiff will have relied on an actionable misrepresentation by which it was intended he should be deceived. However, it is important to be clear that this is merely a matter of the court applying common sense: the burden of proof to plead and prove reliance in fact remains always on the plaintiff. If the defendant can point to some evidence or reason why the court should doubt whether the plaintiff did in fact rely on the misrepresentations alleged, the presumption will be rebutted and the

---

[22] *Downs v Chappell* [1997] 1 WLR 426
[23] *Clerk & Lindsell* at paragraph 18-35.

plaintiff will have to plead and prove a case to persuade the court that it did in fact rely on the misrepresentation.[24]

35.    It will ordinarily be impossible for a plaintiff to show that he relied on a misrepresentation when he in fact knew or suspected the truth. There is a recent case[25] in which a plaintiff was able to rely on a fraudulent misrepresentation to set aside a settlement agreement, despite it being clear that the plaintiff suspected fraud when the settlement was entered into, but the case was very unusual: it was held to be sufficient that the plaintiff acted in the belief that a *third party* (the judge due to try the claim) would rely on the misrepresentation and enter judgment for the other party. The more usual and orthodox position (as pointed out by the Supreme Court in that case) will be that a person who knows or suspects the truth will not be able to say that he relied on the representation.

*Loss*

36.    Finally, the plaintiff must prove that it has suffered a loss as a result of the misrepresentation (and what the amount of that loss is). There is no claim without loss.[26] The measure of damages is the sum which is necessary to put the plaintiff back into the position it would have been in had the representation not been made. In a case involving the acquisition of shares which it is said would not have been acquired but for the misrepresentation, that means putting the plaintiff in the position it would have been in had it not acquired the shares. Damages in an acquisition case will ordinarily be measured by reference to the difference between the price that the plaintiff paid for the shares and the true market value of the shares as at the date they were acquired.[27] If the plaintiff paid no

---

[24] Ibid at footnote 183
[25] *Hayward v Zurich Insurance plc* [2017] AC 142
[26] Ibid, paragraph 18-39
[27] *Clerk & Lindsell* at paragraph 18-44

more than the market price for liquid shares there will *prima facie* be no loss and no claim. However, if the value of the shares has fallen since the date of acquisition then in fraud cases (but not negligence cases) the plaintiff *may* be entitled to recover the loss arising out of the fall if the plaintiff can show that he or she was for some reason 'locked in' to the investment, i.e. the effect of the fraud was ongoing and continued to influence the plaintiff's actions and/or that they could not reasonably have been expected to dispose of the shares at a higher price earlier.[28]

37. Damages in English law are nearly always awarded on a purely compensatory basis. 'Punitive' or 'exemplary' damages are only available at common law in two highly unusual situations: (a) where the claim is against the government and alleges "*oppressive, arbitrary or unconstitutional action by the servants of the government*" and (b) where the defendant's conduct can be shown to have been calculated to make a profit for himself that exceeds the amount of compensation that would be awarded, such that it is appropriate to strip the defendant of that profit.[29] The chance of an English court applying English law awarding punitive or exemplary damages in a shareholder dispute of the kind with which the parties here are concerned is nil.

**The Requirements of a Claim under FSMA s.90A**

38. Section 90A of the Financial Services and Markets Act 2000 ("**FSMA**") was introduced in 2007 and created a new, standalone and heavily circumscribed remedy for a person misled by an untrue statement or omission in a document that a company publishes via a recognised information service pursuant to Articles 4 – 6 of the EU Transparency Directive

---

[28] *Smith New Court v Scrimgeour Vickers* [1997] AC 254 and *Parabola Investments v Browallia Cal Ltd* [2011] QB 477
[29] *Rookes v Barnard* [1964] AC 1129

2004/109/EC (as amended). In 2010, the substance of the provision was moved and amended to become FSMA Schedule 10A, with section 90A now containing only a cross-reference to Schedule 10A. It is a little-used provision – I do not believe there to be any reported decision in which it has been successfully relied on in the 13 years since it was introduced.[30] The absence of authority means that there are several issues as to its meaning that have never been tested or resolved.[31]

39.  In order to found a claim under (what is now) Schedule 10A of the Financial Services and Markets Act 2000 a plaintiff must prove:

a.  That an issuer of securities has published through a "recognised information service" a yearly or half-yearly report or other document required to be published by the EU Transparency Directive ("the **Published Report**") which contains an untrue or misleading statement or omits something it was required to include;

b.  That a person holding managerial responsibility in the issuer knew the statement to be untrue or misleading (or was reckless as to whether it was untrue or misleading) or knew the omission to be a dishonest concealment of a material fact;

c.  The plaintiff acquired, continued to hold or disposed of securities in reliance on the Published Report and that it was reasonable for the plaintiff to rely on the Published Report at the time and in the circumstances.

---

[30] A case under Schedule 10A brought by shareholders in the supermarket chain Tesco was due to go to trial commencing in October 2020. I do not know whether the trial went ahead as planned. An application to strike the claim out on technical grounds (concerning whether or not the claimants had standing under the Act) was dismissed: *SL Claimants v Tesco plc* [2019] EWHC 2858 (Ch)

[31] See generally *Palmer's Company Law* at paragraphs 5.363 – 5.372, setting out and discussing some of the uncertainties

40. The remedy in Schedule 10A lies against the issuer only.[32] Moreover, it is the <u>exclusive</u> remedy for any untrue or misleading statement or omission in the documents to which it applies. This means that a plaintiff <u>cannot</u> bring proceedings under English law based on alleged misstatements or omissions in such documents (a) against a director or (b) otherwise than in accordance with the requirements of Schedule 10A.[33] (This is subject to savings in respect of criminal liability, civil penalties, breach of contract and a number of statutory causes of action set out in paragraph 7(3) which do not appear to be relevant to the current dispute).

41. The standard of proof for a claim under Schedule 10A is (presumably, the point not having been tested) the civil standard of proof, i.e. that the claim is made out on a balance of probabilities. Given that the claim requires proof of dishonesty, the same caveats to that apply as are set out above in relation to deceit.

*Publication of Information containing an untrue statement or omission*

42. The remedy in Section 90A/Schedule 10A was introduced in order to give effect to the UK's obligation under EU law to ensure that an effective remedy existed for a person injured by a breach of EU law. As such, it represents something of an anomalous bolt-on to the broader statutory and common law regime for dealing with misrepresentations. The EU law in question is the Transparency Directive 2004/109/EC (as amended) and as implemented in the UK it requires an issuer to publish through a "recognised information service" (a) an annual financial report (Article 4); (b) a half-yearly financial report (Article 5) and (c) reports on contracts with governments (Article 6).

---

[32] FSMA Schedule 10A paragraph 7(2)
[33] FSMA Schedule 10A paragraph 7(1) – (2)

22

43.    In order to make a claim under Schedule 10A, the Plaintiffs will have to show that the statements about which they are complaining were made in an annual or half-yearly report that was published through a 'recognised information service' (i.e. an entity specifically authorised by the FCA for the purpose).[34] This obviously does not apply to statements said to have been made in press releases or conference calls.

44.    The Plaintiffs will further have to show that the information in those statements was untrue or misleading in some respect, or that the statements omitted some information that they were required to contain.[35]

*Dishonesty*

45.    Schedule 10A imposes liability only on proof of dishonesty. Dishonesty is defined in Schedule 10A(3)(2) in relation to an untrue or misleading statement in terms which are similar in effect to the *Derry v Peek* test for fraud set out above:

   (2)    The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

46.    In relation to an omission, the test is slightly different. Schedule 10A paragraph 3(3) provides that:

   (3)    The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

---

[34] FSMA Schedule 10A paragraph 2. The main recognised information service in the UK is the London Stock Exchange's "Regulatory News Service" online
[35] FSMA Schedule 10A paragraph 3(1)

23

47.     Schedule 10A paragraph 6 amplifies paragraph 3(3) as follows:

For the purposes of paragraphs 3(3) … a person's conduct is regarded as dishonest if (and only if)—

(a) it is regarded as dishonest by persons who regularly trade on the securities market in question, and

(b) the person was aware (or must be taken to have been aware) that it was so regarded.

48.     There is no case law to provide guidance as to how these tests are to be applied, but given the similarity between the statutory test and the *Derry v Peek* standard it is likely that similar considerations will apply.

*Reasonable reliance*

49.     A plaintiff relying on Schedule 10A must also plead and prove that it has suffered a loss by acting in reasonable reliance on the published information containing the untrue or misleading statement or omission.[36] Again there is no case law to provide guidance on the way that this is applied in practice, but it seems likely that proving reliance will give rise to similar considerations as set out above. Proving that reliance was "reasonable" will require a careful consideration of all of the other information that was available to the Plaintiffs at the time of their decision to acquire, retain or dispose of shares.

**The Requirements of Common Law Negligent Misrepresentation/Misstatement**

50.     In order to found a common law action for negligent misrepresentation (more usually referred to in English law as 'negligent misstatement') a plaintiff must plead and prove:

a.      A representation of fact (or law) made by the Defendant;

b.      The representation was false;

---

[36] FSMA Schedule 10A paragraph 3(1) and 3(4)

c.    There was a relationship between the Plaintiff and the Defendant of a kind that renders it appropriate to impose a duty of care on the Defendant as to the correctness of the representation;

d.    The Defendant acted negligently, i.e. the Defendant ought to have known that the representation was false;

e.    The Plaintiff in fact relied on the representation; and

f.    The Plaintiff has suffered loss (of a kind which it was reasonably foreseeable he might suffer if the representation was false) as a result.

51.    Requirements (a), (b) and (e) are the same as for fraudulent misrepresentation and reference should be made to what is said above in relation to those elements. The other elements (c), (d), and (f) differ and are addressed below.

*Duty of Care*

52.    Generally, as a matter of English law a person does not owe any duty to avoid causing financial loss to others. Until the decision of the House of Lords in *Hedley Byrne & Co Ltd v Heller & Partners Ltd*,[37] there was no common law liability to pay damages for making a misrepresentation if fraud could not be proved. In *Hedley Byrne*, the plaintiff was intending to enter into a contract with a client of the defendant bank. The plaintiff asked the defendant to provide a credit reference. The defendant negligently provided a reference which was misleading (but included a provision stating that the reference was provided "without responsibility"). The House of Lords held (a) that a relationship 'equivalent to contract' had arisen between the plaintiff and the defendant which gave rise to a duty on

---

[37] [1964] AC 465

the part of the defendant to exercise reasonable care and skill in its provision of the credit reference but (b) the disclaimer was effective to prevent any liability arising.

53. Since that case, a duty of care to avoid making negligent misstatements has been imposed in a number of cases and rejected in others. The courts have struggled to articulate a principled basis upon which to identify the circumstances in which a duty of care will be imposed and any short statement of the test cannot hope to do justice to the complexities of the case law or the very many different ways that matter has been approached.

54. As matters stand, the position in short is that a duty of care in relation to an allegedly negligent misstatement may be imposed when (at least) one of three tests is met:

a. The defendant has voluntarily assumed responsibility to the plaintiff for the correctness of the statement;

b. The relationship between the parties is sufficiently 'proximate' to make it appropriate to impose liability and it was reasonably foreseeable to the defendant that if the information provided was wrong, the claimant would suffer harm; and it is fair, just and reasonable to impose a duty of care on the defendant;

c. The relationship between the parties is one where a duty of care has been held to exist in previous authorities or is closely analogous to such a relationship.[38]

55. A duty of care will not be imposed where to do so would cut across or be inconsistent with the contractual arrangements between the parties.[39]

---

[38] See *Williams v Natural Life Health Foods* [1998] 1 WLR 830 and *Caparo Industries v Dickman* [1990] 2 AC 605 which put forward the assumption of responsibility test and the proximity/foreseeability/fairness tests respectively, after much back-and-forth, led to *Commissioners of Customs & Excise v Barclays Bank plc* [2007] 1 AC 181 in which the different tests from those cases were both applied.
[39] See e.g. *Pacific Associates v Baxter* [1990] 1 QB 993

56.     It may be that the second and third tests do not add a great deal to the first,[40] and all three can be criticized as being to some extent circular, but the current approach is to have regard to all three and reach an overall assessment of whether it is appropriate to impose a duty of care on the facts by reference to them.

57.     Imposing a duty of care in relation to statements made in the annual report, press releases and conference calls about the company's general performance seems – on the face of it – to be seeking to impose a very broad duty indeed, well outside the type of case in which a duty of care has been found to exist to date. I am not aware of any case in which a duty of care has been imposed on a company or its directors in relation to statements to the market in general contained in press releases, conference calls or the publication of financial statements.[41] While this is a matter for the court to determine, some assistance as to the approach may be derived from the judgment of Sir Alastair Norris (formerly Norris J) in *Sharp v Blank* [2019] EWHC 2096 (Ch) at paragraphs 636 – 659. The case concerned a transaction by which one bank (Lloyds) acquired another (HBOS) at the height of the 2008 financial crisis. The transaction was not a happy one for Lloyds: HBOS was found to have liabilities that made the acquisition much less attractive than it had appeared to be. A group of Lloyds shareholders sued the directors alleging (amongst other things) that they had made negligent misstatements about the transaction in various releases to the market and in a circular to shareholders in which it was recommended that the acquisition be approved. The directors conceded that they owed a duty of care in relation to statements made in the

---

[40] See e.g. *Playboy Club London Ltd v Banca Nazionale del Lavoro* [2018] 1 WLR 4041, where the primacy of the first test was stated by the Supreme Court

[41] The imposition of a duty of care in relation to financial statements required to be published by the Transparency Directive would be inconsistent with FSMA Schedule 10A paragraph 7, as set out above, and probably also with the decision in *Caparo v Dickman* itself where no duty of care in relation to the publication of financial statements was held to exist.

circular (where they were giving a specific recommendation to the shareholders that it was expected they would rely on) but denied any duty of care in relation to the other communications. Sir Alastair Norris held that the directors did not owe any duty of care to shareholders in relation to the other communications (and that the statements made in the circular had not been negligent) and dismissed the claim. In my view:

a.      Many of the considerations that led Sir Alastair to reject the existence of any duty of care in that case would apply equally in the present case; and

b.      The statements that the Plaintiffs are relying on in this case appears to be of a much more general nature than the very specific communications that were in issue in *Sharp*, which concerned the merits of the particular acquisition transaction that was being considered and which was said to have given rise to the harm. This would tend to be a factor counting against the imposition of a duty of care in relation to those statements.

58.    I have seen the decision of Teare J in *Hall v Cable & Wireless* [2009] EWHC 1793 (Comm) cited in support of the suggestion that a company and its directors might owe a duty of care in relation to statements to the market. In that case a claim was brought against a company by shareholders alleging (among other things) negligent misstatement in the company's announcement to the market of the sale of a subsidiary. The claim was struck out on various grounds. It is correct that the judge in passing held that the argument that a duty of care arose on the facts was not one that could be summarily dismissed. However:

a.      The case has very little value as authority. It was a summary procedure where the claim was struck out: all that the Judge was saying about the duty of care was that

28

he was not prepared to strike out on the basis that the argument that such a duty existed was unarguable.

b.    As in *Sharp*, the documents relied on related to a specific transaction. I do not believe that (even if the case had precedential value) it would support an argument that general press releases or conference calls about the company's performance (or financial statements) would be intended to give rise to an assumption of responsibility or a duty of care.

59.    The imposition of a duty of care on the facts alleged by the Plaintiffs against Reckitt appears to go beyond any situation in which a duty of care has been imposed in English law before. On the face of it, the relationship between a company and its directors on the one hand, and the world of potential investors on the other, does not appear to be a relationship of proximity, or one 'equivalent to contract' and it seems unlikely that the company or potential investors would consider it likely that the company intended voluntarily to assume responsibility to all the world for the correctness of its statements made in that context. The scope for very broad liability that might arise if such a duty were imposed might be thought to render it not fair, just and reasonable to impose it. But the assessment is ultimately one for the court to conduct by reference to the facts of the case.

*Negligence*

60.    A defendant acts negligently if he fails to meet the standard of conduct to be expected of a reasonably competent person in his position. Thus a person may be liable for negligent misstatement if he fails to take reasonable care to check that a statement he is making is accurate. What is reasonable in any given circumstance is a question for the court to determine on the evidence. Whether Reckitt or any director could be said to have acted

negligently in relation to any of the statements upon which the Plaintiffs rely would thus be a question of fact for the court to assess.

*Remoteness of damage*

61.    Just as in deceit, in order to succeed in a claim for negligent misstatement a plaintiff must show that the misstatement caused it to suffer loss, and the measure of damages will be the sum necessary to put the plaintiff into the position it would have been in had the representation not been made (not the position it would have been in if the representation had been true). The only difference between damages for fraudulent misrepresentation and negligent misrepresentation is that in negligence claims, the plaintiff must show that the loss that it has suffered is not too "remote", which means (a) that it must be loss of a kind that was reasonably foreseeable at the time of the misrepresentation and (b) it must be loss that falls within the scope of the defendant's duty of care. The result of the latter point is that, if the plaintiff has suffered additional loss due to a fall in the value of the shares since the date of acquisition (e.g. because there has been a fall in the market generally, or Reckitt has performed poorly for reasons unconnected with the alleged misrepresentations) that additional loss is generally not recoverable in a negligence claim (even if the plaintiff was 'locked in' to ownership of the shares).[42]

---

[42] *South Australia Asset Management v York Montague Ltd* [1997] AC 191 and *Galoo Ltd v Bright Grahame Murray* [1994] 1 WLR 1360

31

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 24, 2021

_____
Stephen Midwinter QC



**Brick Court Chambers**
7-8 Essex Street, London WC2R 3LD
**DX** 302 London Chancery Lane

# Stephen Midwinter QC

**YEAR OF CALL**: 2002  **YEAR OF SILK**: 2017

*"He's excellent: responsive, down-to-earth and makes himself available." "He is very precise when drafting and articulating points for us, and is a real pleasure to work with."*

Chambers & Partners 2018

**Clerk's Email**: TonysClerkingTeam@brickcourt.co.uk



## Practice Overview

Stephen Midwinter QC advises on and appears in a broad range of commercial disputes, in litigation and arbitration. He has appeared in commercial cases in the Supreme Court, the House of Lords, the Privy Council, the Court of Appeal, the Commercial Court, the Chancery Division and the European Court of Human Rights. He has been recommended as a leading silk by the directories in eight fields: commercial dispute resolution, insurance and reinsurance, banking, international arbitration, energy and natural resources, civil fraud, offshore and professional negligence.

A significant proportion of Stephen's work takes place in arbitration and he has appeared in and advised on arbitrations under the ICC, LCIA, ARIAS, UNCITRAL, ICSID and Stockholm Chamber of Commerce rules, as well as ad hoc arbitrations pursuant to the Arbitration Act 1996 and under the Bermuda Form. Recent instructions include a $150million dispute in the oil sector and a US$25 million LCIA arbitration concerning offshore drilling rigs. Stephen is also experienced in proceedings dealing with the enforcement of arbitral awards in the domestic courts.

Stephen also sits as an arbitrator in arbitrations for the LCIA and ICC.

Stephen is a member of the bar of the British Virgin Islands where he regularly appears in the Commercial Court and Court of Appeal. Recent instructions include jurisdiction disputes, freezing order applications, international fraud claims and insolvency disputes.

Stephen has written several articles on commercial law subjects, and writes and lectures on banking, insurance and European law and on commercial conflict of laws topics including the Brussels Regulation

Recast and the Rome I and II Regulations.

## Commercial

Stephen has advised on and appeared in commercial disputes covering the full range of Commercial Court work and beyond. Recent instructions include a US$500 million civil fraud claim, a US$1bn dispute concerning Ukrainian industrial assets, a €50m oil and gas partners' dispute and a £25m breach of directors' duty claim.

**Important Cases**

- UBS AG v Fairfield Sentry Ltd [2019] UKPC 20
- Keymed Ltd v Hillman [2019] EWHC 485 (Ch)
- Bostani v Pieper [2019] EWHC 547 (Comm)
- Single Buoy Moorings Inc v Aspen Insurance UK Ltd [2018] EWHC 1763 (Comm)
- Nori Holding Ltd v PJSC Otkritie Bank [2018] EWHC 1343 (Comm)
- Triple 7 Ltd v Azman Air Services Ltd [2018] EWHC 1348 (Comm)
- Taylor v Van Dutch Marine Holding Ltd [2017] EWHC 636 (Ch)
- UBS AG v Kommunale Wasserwerke Leipzig [2017] EWCA Civ 1567
- Goldman Sachs v Novo Banco SA [2016] EWCA Civ 1092
- Hallman Holdings v Webster [2016] UKPC 3
- Anzen Ltd v Hermes One Ltd [2016] UKPC 1
- Blue Tropic v Chkhartishvili [2015] EWHC 3640 (Ch)
- Banque Cantonale de Genève v Polevent [2015] EWHC 1968 (Comm)
- Young v Anglo-American South Africa Ltd [2014] EWCA Civ 1130
- Tokio Marine Europe v Novae Corporate Underwriting [2014] EWHC 2105
- Fairfield Sentry v Migani [2014] UKPC 9
- Edmond de Rothschild v Exillon Energy [2014] EWHC 2165 (Comm)
- Telenor East Holding v Altimo Holdings [2011] EWHC 85 (Comm)
- Alfa Petroleum v BP International Ltd (1 Feb 2011, Commercial Ct)
- Lehman Brothers Special Financing v Belmont (2011, UKSC)
- Satinland Finance v BNP Paribas [2010] EWHC 3062 (Ch)
- Yukos CIS Investments v Yukos Hydrocarbons BVIHC (Comm) No.85 of 2010
- National Transport Co-Operative Society v AG Jamaica [2009] UKPC 48
- Markel International Insurance Co v Higgins [2009] EWCA Civ 790
- Lexington Insurance v AGF Insurance [2009] UKHL 40
- Cavell USA v Seaton Insurance [2009] EWCA Civ 1363
- Equitas v Horace Holman [2008] EWHC 2287 (Comm)
- Yugraneft v Abramovich [2008] EWHC 2613 (Comm)
- Korea National Insurance v Allianz [2007] EWCA Civ 1066

- Markel International Insurance v Surety Guarantee Company [2009] Lloyd's Rep IR 77
- Wasa and AGF v Lexington Insurance [2007] EWHC 896 (Comm)
- EWS v E.ON [2007] EWHC 599 (Comm)
- Sibir Energy v Sibneft (2006) BVI HC 2005/174
- Transworld v Bluzwed (2005) BVI HCV 2003/179

## Insurance and reinsurance

Stephen's practice covers the full range of insurance and reinsurance disputes. Recent instructions range from a US$1.2 billion claim in respect of damage to a North Sea oil rig to a £1m claim under a professional indemnity insurance, with claims under policies covering hurricane damage, business interruption following flood, malicious hacking and patent infringement in between. He also regularly appears in insurance and reinsurance arbitrations under LCIA, ICC, UNCITRAL, ARIAS and Bermuda rules. Recent arbitrations include a $70m war risks claim, a $50m construction DSU dispute, a $50m Cat XL dispute in Bermuda, a $1m aviation coverage dispute and a £10m PA reinsurance coverage dispute.

## Banking and finance

Stephen's banking practice continues to include disputes arising out of the global financial crisis and the Madoff fraud as well as ordinary banking transaction disputes related to syndicated lending, derivative trading, mistaken payments and restitutionary claims. Stephen has advised in numerous cases involving ISDA and similar agreements including market standard form forward freight agreements and commodities trading agreements.

## Arbitration

As well as appearing in commercial and insurance and reinsurance disputes that happen to be taking place in arbitration, Stephen regularly advises on technical and procedural aspects of arbitration law. Recent cases include a $150million dispute in the oil sector, an LCIA arbitration concerning damage to offshore drilling rigs, a dispute as to the applicability of an arbitration clause to a reinsurance dispute, and a claim to set aside a €70m arbitration award on the grounds of fraud. Stephen is also experienced in proceedings dealing with the enforcement of arbitral awards in the domestic courts, and sits as an LCIA and ICC arbitrator.

Stephen also acts and advises on international treaty arbitrations. Recent instructions include ICSID arbitrations against Ukraine, Uzbekistan and the UK involving alleged confiscation of investments.

## Professional negligence

Stephen has appeared and advised in numerous professional negligence claims in the Chancery Division and Commercial Court involving allegations of negligence by insurance brokers, solicitors, accountants,

auditors and bankers.

## Competition

A former teacher of European law, Stephen has advised and acted in a number of European and human rights law disputes including *European Commission v Korea National Insurance Corporation* (concerning the EU's sanctions on North Korea), *Northern Foods v DEFRA* (the Melton Mowbray pork pies case) and *Yukos v Russian Federation*, a $98bn claim in the ECHR.

## Qualifications & Further Information

**Qualifications**

BA (Hons) Law (2000) (First Class), LLM Law (Commercial) (2001) (First Class), Bar Vocational Course (2002) (Outstanding)

**Career**

- Queen's Counsel, 2017 –
- Barrister (Middle Temple), July 2002 –
- Sept 2001 – July 2002: Lecturer and examiner in contract and restitution, University of Cambridge; Supervisor in equity, Fitzwilliam and King's Colleges
- Aug 2000– July 2001: Research assistant to Richard Hooley, working chiefly on Modern Banking Law 3rd Ed and Encyclopedia of Banking Law

**Further Information**

- 'Insurance Junior of the Year' at the Chambers Bar Awards 2011
- Nominated in 2016 by Chambers & Partners as Insurance Law Junior of the Year.
- Selected as one of Legal Week's 'Stars at the Bar' 2010.
- Languages:
  French (A-level standard), Italian (conversational), German (GCSE standard)
- Called to the BVI Bar (2005)

## Publications

- Competition Litigation (2010) (contributor)
- Butterworths' Banking Law Guide (2006) (contributor),
- The Aggregation of Claims Arising out of One Event (2007) Insurance Law Monthly Bulletin (July),
- After Etridge: The Endgame for Banks and Non-Commercial Sureties? (2002) Cambridge Restitution Online Resource
- Subrogation Finds some Well-Settled Principles [2003] L.M.C.L.Q.

- Causation, Loss and Double Recovery [2003] C.L.J. 23
- The Great Peace and Precedent (2003} 119 L.Q.R. 180,
- Non-disclosure and Material Rumours [2003] L.M.C.L.Q.
- Review of Anson's Law of Contract, 28th Edition [2003], L.M.C.L.Q.
- Cross Border Share Voting Practices ICGN Review (2002)