UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

CITY OF STERLING HEIGHTS POLICE    :    Civil Action No. 1:20-cv-10041-PKC
FIRE RETIREMENT SYSTEM, Individually  :
and on Behalf of All Others Similarly Situated, :    <u>CLASS ACTION</u>
                                :
                   Plaintiff,    :    PLAINTIFFS' OPPOSITION TO
                                :    DEFENDANTS' MOTIONS TO DISMISS
    vs.                          :    AND/OR STAY THE THIRD AMENDED
                                :    COMPLAINT
RECKITT BENCKISER GROUP PLC,      :
RAKESH KAPOOR, ADRIAN HENNAH,   :
SHAUN THAXTER and ADRIAN        :
BELLAMY,                           :
                                :
                   Defendants.   :
                                :

——————————————————————— x

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................2

     A.     Reckitt Developed Film to Thwart Generic Competition Threatening Tablets.............................................................................................................2

     B.     Defendants Concocted a Baseless "Safety Story" to Denigrate Tablets and Promote Film in Order to Delay Generic Tablet Entry............................................4

     C.     Defendants Fraudulently Coerced Patients and Physicians to Switch from Tablets to Film Through Misrepresentations About Film's Safety .......................5

     D.     Defendants Withdrew Tablets to Coerce Patients and Physicians to Switch to Film.......................................................................................................................7

     E.     Defendants Artificially Inflated the Value of RBP Prior to the Demerger.............9

     F.     Defendants' Fraud Was Revealed in a Series of Disclosures ...............................10

III.  ARGUMENT .........................................................................................................12

     A.     Legal Standards.....................................................................................................12

     B.     The TAC Adequately Alleges Materially False and Misleading Statements and Omissions.....................................................................................................12

           1.     Misstatements Concerning the Safety and Success of Film .....................12

           2.     Misstatements Concerning RBP's Competitive Environment...................18

           3.     Misstatements Putting the Cause of Reckitt's Financial Success at Issue ........................................................................................................19

           4.     Misstatements Concerning Compliance and Sales Practices....................20

           5.     Defendants Violated Their Disclosure Duty Under Item 303 ..................22

           6.     Defendants' Purported Opinion Statements Are Actionable ....................23

     C.     Plaintiffs Adequately Allege Scienter ...................................................................24

           1.     Defendants Fabricated a "Safety Story" to Justify Switching Patients from Tablets to Film.........................................................................24

**Page**

2.      Defendants Possessed Motive and Opportunity to Commit Fraud ............27

3.      Reckitt's Prior Product-Hopping Scheme Establishes a Pattern of Culpable Conduct ........................................................................................27

4.      Thaxter's Additional Scienter Arguments Fail .........................................28

D.      Plaintiffs Adequately Allege Loss Causation .......................................................31

E.      Plaintiffs' Claims Are Timely ..............................................................................33

F.      Plaintiffs Adequately Allege Control Person Claims ...........................................35

G.      Plaintiffs Adequately Allege English Law Claims ...............................................36

1.      The English Law Claims Are Not Subject to Arbitration Because They Fall Outside the Scope of Reckitt's Articles of Association ...........37

a.      Article 132 Does Not Apply to the English Law Claims ..............37

b.      Article 133 Does Not Apply to the English Law Claims ..............39

2.      Defendants' *Forum Non Conveniens* Argument Should Be Rejected ....................................................................................................39

3.      The English Law Counts State a Claim ....................................................41

a.      The TAC Has Pleaded Reliance for the English Law Claims ............................................................................................41

b.      The TAC Pleads All Elements of the English Law Claims ..........44

IV.      CONCLUSION ..................................................................................................................45

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abramson v. Newlink Genetics Co.*,
   965 F.3d 165 (2d Cir. 2020).................................................................................31

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)................................................................12, 22, 26

*Anwar v. Fairfield Greenwich Ltd.*,
   306 F.R.D. 134 (S.D.N.Y. 2015) .....................................................................40, 42

*AP-Fonden v. Goldman Sachs Grp., Inc.*,
   2021 WL 2659797
   (S.D.N.Y. June 28, 2021)......................................................................................32

*Arco Capital Corps. Ltd. v. Deutsche Bank AG*,
   949 F. Supp. 2d 532 (S.D.N.Y. 2013).................................................................34

*Audet v. Fraser*,
   332 F.R.D. 53 (D. Conn. 2019)............................................................................43

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*,
   273 F.3d 241 (2d Cir. 2001)................................................................................39

*Bedford v. Bagshaw*,
   4 H. & N. 538, 157 E.R. 951 (1859) ...................................................................42

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   2002 WL 33934282
   (D.N.J. June 26, 2002) .........................................................................................35

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   2020 WL 6270482
   (E.D. Va. Oct. 26, 2020) ................................................................................16, 32

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)................................................................................31

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) ..............................................................................21

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.*,
   192 F. Supp. 3d 456 (S.D.N.Y. 2016)
   *vacated on other grounds and remanded sub nom. Christine Asia Co. v. Ma*,
   718 F. App'x 20 (2d Cir. 2017) .....................................................................22, 23

Page

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020)........................................................................25, 29

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................................................................20

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
   637 F.3d 169 (2d Cir. 2011)............................................................................................33

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)............................................................................................21

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020)..............................................................................35

*Dandong v. Pinnacle Performance Ltd.*,
   2013 WL 5658790
   (S.D.N.Y. Oct. 17, 2013) ...........................................................................................42, 43

*Dartell v. Tibet Pharms., Inc.*,
   2016 WL 718150
   (D.N.J. Feb. 22, 2016)......................................................................................................32

*Diehl v. Omega Protein Corp.*
   339 F. Supp. 3d 153 (S.D.N.Y. 2018)..............................................................................19

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)........................................................................19, 34

*Fogel v. Wal-Mart de México SAB de CV*,
   2017 WL 751155
   (S.D.N.Y. Feb. 27, 2017) .................................................................................................34

*Fort Worth Employers' Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009)..............................................................................34

*Gagnon v. Alkermes PLC*,
   368 F Supp. 3d 750 (S.D.N.Y. 2019)...............................................................................19

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)..............................................................................20

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)......................................................................................13, 16

**Page**

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
  68 F. Supp. 3d 530 (S.D.N.Y. 2014) ..................................................................34

*Gillis v. QRX Pharma Ltd.*
  197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................17

*Granite Rock Co. v. Int'l Brotherhood of Teamsters*,
  561 U.S. 287 (2010) .............................................................................................37

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..................................................................17

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................24, 25, 31

*In re Apple Comput. Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .............................................................................15

*In re Axis Capital Holdings Ltd., Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ..................................................................22

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ...........................................................16, 33

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) ..................................................................26

*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) ..................................................................28

*In re Celgene Corp. Sec. Litig.*,
  2019 WL 6909463
  (D.N.J. Dec. 19, 2019) ...................................................................................27, 28

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..................................................................20

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675
  (D.N.J. Aug. 8, 2018) ...........................................................................................20

*In re DaimlerChrysler AG Sec. Litig.*,
  269 F. Supp. 2d 508 (D. Del. 2003) .....................................................................15

**Page**

*In re Dynagas LNG Partners LP Sec. Litig.*,
2020 WL 6947521
(S.D.N.Y. Nov. 25, 2020) ........................................................................................23

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................................................30

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)......................................................................15

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) .........................................................................22

*In re Livent, Inc. Sec. Litig.*,
148 F. Supp. 2d 331 (S.D.N.Y. 2001)......................................................................30

*In re Marsh & McLennan Cos. Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................17, 19

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W.Va. 2012)..................................................................14

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)......................................................................32

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) .............................................................................32

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985
(S.D.N.Y. Mar. 28, 2018) ........................................................................................18

*In re Navient Corp. Sec. Litig.*,
2019 WL 7288881
(D.N.J. Dec. 30, 2019) .............................................................................................31

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................................39

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801
(D.N.J. Aug. 28, 2017)..............................................................................................28

*In re QLT Inc. Sec. Litig.*,
312 F. Supp. 2d 526 (S.D.N.Y. 2004)......................................................................24

**Page**

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)...................................................................21

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...........................................................................25

*In re: Suboxone Antitrust Litig.*,
  64 F. Supp. 3d 665 (E.D. Pa. 2014) ..................................................................16

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665
  (E.D.N.Y. Dec. 5, 2013) ...............................................................................27

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................................33

*In re Teva Sec. Litig.*,
  2021 WL 231130
  (D. Conn. Jan. 22, 2021) ..............................................................................40

*In re Top Tankers, Inc. Sec. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007)................................................................23

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013)...........................................................................43

*In re UBS Auction Rate Sec. Litig.*,
  2010 WL 2541166
  (S.D.N.Y. June 10, 2010)..............................................................................17

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011),
  *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)...........................................................................44

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016).............................................................................22

*Iragorri v. United Tech. Corp.*,
  274 F.3d 65 (2d Cir. 2001).............................................................................39

*Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,
  510 F. Supp. 3d 583 (M.D. Tenn. 2020)............................................................40

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)....................................................................................28

**Page**

*JPMorgan Auction Rate Sec. Marketing Litig.*,
　　2014 WL 4953554
　　(S.D.N.Y. Sept. 30, 2014) ......................................................................17

*Kalnit v. Eichler*,
　　264 F.3d 131 (2d Cir. 2001) ....................................................................17

*Klein v. Altria Grp.*,
　　2021 WL 955992
　　(E.D. Va. Mar. 12, 2021) .........................................................................14

*Lapin v. Goldman Sachs Grp., Inc.*,
　　506 F. Supp. 2d 221 (S.D.N.Y. 2006) .....................................................35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
　　797 F.3d 160 (2d Cir. 2015) ...............................................................31, 33

*Matrixx Initiatives, Inc. v. Siracusano*,
　　563 U.S. 27 (2011) ..............................................................................12, 21

*Merck & Co. v. Reynolds*,
　　559 U.S. 633 (2010) .............................................................................17, 33

*Meyer v. Concordia Int'l Corp.*,
　　2017 WL 4083603
　　(S.D.N.Y. July 28, 2017) ........................................................................35

*Nadoff v. Duane Reade, Inc.*,
　　107 F. App'x 250 (2d Cir. 2004) .............................................................20

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
　　455 F. App'x 10 (2d Cir. 2011) ...............................................................29

*Nguyen v. New Link Genetics Corp.*,
　　297 F. Supp. 3d 472 (S.D.N.Y. 2018) .....................................................24

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000) ............................................................ *passim*

*Omnicare, Inc. v. Laborers District Council Constr. Industry Pension Fund*,
　　575 U.S. 175 (2015) .............................................................................21, 23

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
　　2020 WL 5757628
　　(S.D.N.Y. Sept. 27, 2020) ........................................................................23

**Page**

*Pelletier v. Endo Int'l PLC*,
439 F. Supp. 3d 450 (E.D. Pa. 2020) ........................................................................18

*Richman v. Goldman Sachs Grp., Inc.*
868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................................22

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229
(D.N.J. July 27, 2018) ...........................................................................................17, 18

*Rosi v. Aclaris Therapeutics, Inc.*,
2021 WL 1177505
(S.D.N.Y. Mar. 29, 2021) ...........................................................................................19

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)........................................................................................12

*Shah v. Stanley*,
2004 WL 2346716
(S.D.N.Y. Oct. 19, 2004) ............................................................................................17

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)..........................................................................................21

*Speakes v. Taro Pharm. Indus., Ltd.*,
2018 WL 4572987
(S.D.N.Y. Sept. 24, 2018) ...........................................................................................18

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008)........................................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................................................24

*Thomas v. Roach*,
165 F.3d 137 (2d Cir. 1999)........................................................................................19

*Tongue v. Sanofi*
816 F.3d 199 (2d Cir. 2016)........................................................................................23

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
2020 WL 564222
(N.D. Ill. Feb. 5, 2020)................................................................................................22

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013).........................................................................32

Page

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020) ................................................................34

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2d Cir. 2000) ..............................................................................40

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §2 ......................................................................................................................33
    §78j(b) ........................................................................................................ *passim*
    §78t(a) ..........................................................................................................1, 35
    §78u-4 ..............................................................................................................12

17 C.F.R.
    §229.303 ...........................................................................................................22

28 U.S.C.
    §1658(b) ...........................................................................................................33

Federal Arbitration Act ............................................................................................37

The United States Federal
    Food, Drug, and Cosmetic Act .................................................................11, 17, 29

U.K. Financial Services and Markets Act 2000
    Section 90A .......................................................................................36, 38, 40, 45

Federal Rules of Civil Procedure
    Rule 9(b) ...........................................................................................................12
    Rule 12(b)(6) ................................................................................................12, 33
    Rule 23 ..............................................................................................................43
    Rule 44.1 .....................................................................................................36, 41

## SECONDARY AUTHORITIES

Barbara Black,
    *Fraud On The Market: A Criticism of Dispensing*
    *With Reliance Requirements In Certain Open Market Transaction*,
    62 N.C. L. Rev. 435 (1984) .........................................................................41, 42

**Page**

Professor A.A. Berle,
  *Liability for Stock Market Manipulation*
  31 Colum. L. Rev. 264 (1931) ................................................................................42


**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
  Pub. L. No. 104-67, 109 Stat. 737 (1995).........................................................12, 35

## I.    INTRODUCTION[1]

On April 9, 2019, Reckitt's former pharmaceutical subsidiary Indivior – formerly known as Reckitt Benckiser Pharmaceuticals Inc. ("RBP") and, until shortly before his imprisonment, led by Defendant Shaun Thaxter – was indicted by the DOJ in connection with its marketing and sale of the opioid addiction treatment drug Suboxone Sublingual Film ("Film").  ¶¶4, 21.  On July 11, 2019, the DOJ announced that Reckitt agreed to pay $1.4 billion to resolve claims related to Suboxone – the largest recovery by the federal government in a case concerning an opioid drug.  ¶20.  A year later, Indivior paid $600 million to resolve the government's claims.  ¶290.

The Indictment, as well as materials obtained from the criminal sentencing of Thaxter and others, included myriad internal documents that publicly revealed for the first time that the senior-most executives of Reckitt and RBP, including the Individual Defendants, knowingly misled investors and the public regarding the safety of Film in order to maintain their Suboxone monopoly in the face of impending generic competition to Suboxone Sublingual Tablets ("Tablets").  These documents disclosed a multifaceted scheme whereby Defendants promoted the sale or use of Film using intentionally false and misleading claims that Film was safer and less susceptible to accidental child exposure (*i.e.*, children taking Suboxone by accident) and diversion (*i.e.*, illegal selling, sharing, and smuggling of Suboxone) than Tablets.  ¶¶4, 21, 281.

The TAC alleges that Defendants made material misstatements and omissions concerning:

---

[1]  Lead Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") and Plaintiff City of Sterling Heights Police & Fire Retirement System ("Sterling Heights") purchased Reckitt Benckiser Group plc ("Reckitt") American Depositary Shares ("ADSs") on the over-the-counter market and/or incurred irrevocable liability for the ADSs in the U.S. and/or title to the ADSs passed to them in the U.S., and they assert claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  *See* Third Amended Complaint (ECF No. 82, "TAC" or "¶") ¶¶32-37, 326-333.  Plaintiff City of Pontiac General Employees' Retirement System ("Pontiac") purchased Reckitt ordinary shares on the London Stock Exchange ("LSE") and asserts English common law and statutory claims.  ¶¶38, 334-357.  They are collectively referred to as "Plaintiffs" for all claims.  "Defendants" refers to Reckitt, Rakesh Kapoor, Adrian Hennah, Adrian Bellamy, and Shaun Thaxter.  Reckitt, Kapoor, Hennah, and Bellamy jointly filed a Memorandum of Law in support of their Motion to Dismiss (ECF No. 90); Thaxter separately filed his own (ECF No. 96).  Unless otherwise defined, all capitalized terms carry the same meaning as defined in the TAC.  All emphasis is added unless otherwise noted, and internal citations and quotations are omitted.  Exhibits ("Ex.") cited in this brief are attached to the Declaration of Alan I. Ellman, submitted herewith.

(1) the safety and success of Film; (2) the competitive environment for Film; (3) the cause of Reckitt's financial success; (4) RBP's compliance and sales practices; and (5) the monetary risks of governmental prosecution due to Defendants' misconduct. The TAC also alleges a strong inference, based on internal documents and other facts, that Defendants made these statements with scienter.

Defendants contend they merely had a good-faith disagreement with the FDA over Film's safety. But internal documents reveal just the opposite: Defendants lacked a legitimate scientific basis in support of their dispute with the FDA, and their "safety story" was a fabricated tale designed to protect Suboxone's market share. Defendants' truth-on-the-market defense likewise fails because the fraud was not known to the market until the Indictment was filed, and Defendants repeatedly contradicted the FDA's conclusion that Film was not safer than Tablets. Defendants' other arguments concerning, *inter alia*, loss causation and the timeliness of Plaintiffs' claims likewise fail.

In addition to Exchange Act claims on behalf of Reckitt ADS purchasers, Plaintiffs adequately allege English law claims on behalf of Reckitt ordinary-share purchasers on the LSE. As Plaintiffs' English-law experts confirm, tort and statutory claims are not subject to the arbitration and forum-selection clauses in Reckitt's Articles of Association, and Plaintiffs can avail themselves of a presumption of reliance under English law. Accordingly, Defendants' motions should be denied.

## II.     STATEMENT OF FACTS

### A.     Reckitt Developed Film to Thwart Generic Competition Threatening Tablets

Prior to December 23, 2014, Reckitt maintained a pharmaceutical division, RBP, dedicated to the treatment of opioid addiction. ¶¶48-50. RBP was effectively a one-drug business – from 2006 through 2019, 100% of its U.S. net revenue was attributed to Suboxone. ¶91. Reckitt, through RBP, received FDA approval for Tablets in October 2002, along with seven years of exclusivity. ¶¶94-95. By 2009, annual sales of Suboxone grew to over $700 million. ¶96. Reckitt predicted that it would lose 80% of that revenue to generic competitor drugs at the end of the exclusivity period. ¶98.

Between December 2006 and March 2007, Reckitt began developing Film as a patent-protected replacement for Tablets "[t]o mitigate the potential impact" of "generic competition" for Tablets. ¶¶97-98.  In devising Film, Defendants engaged in an anticompetitive practice known as "product hopping," whereby a company tweaks its product slightly without any actual improvements, and then applies for a new patent with the intent of keeping its market share intact. ¶110.  Any differences between the formulations for Film and Tablets are "clinically insignificant," as Film contains the same active ingredients and is clinically interchangeable with Tablets.  Indeed, Reckitt obtained FDA approval for Film based almost exclusively on previous studies used for Tablets.  ¶99.  The one quality of Film that was materially different from Tablets, and which was critical to Reckitt's suppression of generic competition, was the dosage form: Film consisted of a thin strip placed under the tongue, whereas the Tablet was a conventional tablet (also placed under the tongue).  ¶100.  Film, however, actually had numerous ***disadvantages*** compared to Tablets with respect to accidental child exposure and diversion.  ¶¶112-113.[2]

When a pharmacist fills a prescription for a branded drug, laws in all 50 states allow or require the pharmacist to dispense a therapeutically equivalent, or "AB-rated," generic version of the drug instead of the more expensive branded drug, unless a physician directs or the patient requests otherwise.  ¶87.  Defendants knew that, due to the different dosage forms, generic Tablets could not be considered AB-rated to Film and, therefore, pharmacists could not legally substitute the less-expensive, generic Tablets when presented with a prescription for Film.  ¶100.

But Defendants could only exploit this distinction if they were able to convince physicians

---

[2] The disadvantages of Film over Tablets included: (1) Film's rapid dissolution creates barriers to removal if accidentally ingested; (2) because patients are known to divide doses of Suboxone, the leftover Film cannot be stored safely after opening the foil pouch (whereas Tablets were stored in child-proof bottles); (3) Film is more likely to become stuck on the tongue if accidentally ingested by a child; (4) Film is more dangerous because of its less unpleasant taste compared to Tablets, making children less likely to spit it out; (5) Film's higher dosage strength increases dosage exposure to children; (6) Film contains higher naloxone bioavailability, increasing the risk of opioid withdrawal symptoms when taken as intended; and (7) Film is easier to conceal and smuggle into prisons.  ¶113.

and patients to switch to Film before generic Tablets reached the market.  ¶101.  To that end, Defendants utilized coercive and fraudulent tactics to effectuate this market switch.  *Id.*  These efforts were extraordinarily successful: Reckitt's revenues from Film increased ten-fold to more than $840 million annually between 2010 and 2014.  ¶208.  By the time generic Tablets entered the market in 2013, 85% of Suboxone prescriptions were being written for Film.  ¶207.

## B.  Defendants Concocted a Baseless "Safety Story" to Denigrate Tablets and Promote Film in Order to Delay Generic Tablet Entry

Defendants knew they needed a basis to differentiate Film from Tablets, but they did not have the science to back it up.  So to effectuate the market switch, Defendants sought to discontinue Tablets under the false pretext of a safety concern, thereby triggering FDA safety-related processes that could have delayed generic approval for as long as a year.  ¶107.  As revealed in the Indictment, Timothy Baxter, RBP's Global Medical Director, wrote in or about 2007, "***We could tie up generic for 1 year*** . . . .  When we file for film and withdraw tablet [the FDA] is precluded from approving another tablet until they have made a determination in response to a petition from generic company to determine that product was not withdrawn for safety or efficacy"; a "negative safety issue" could "prevent approval of generic"; "***We need to think creatively about a safety story***"; "we probably also need to think very negatively about [Tablets] and identify aspects that could be unsafe"; "***We cannot prevent generics*** . . .  ***We can delay***."  *Id.*

But Reckitt lacked any scientific data to support their "story."  For example, notes written by Baxter during a 2007 meeting illustrate how Reckitt reverse-engineered a safety issue with Tablets without any existing clinical data in order to prevent approval of generic Tablets:

> Routes to protect [redacted][3] from generic:
> – Negative safety issue [with] sublingual
> – Superior safety/efficacy of oral film
> ***Either of the above would prevent approval of generic sublingual.***  To prove superior safety or efficacy ***would involve generation of clinical data***.  Eg  is there

---

3  On information and belief, and based on the context of the notes, Baxter is referring to Suboxone.  ¶109.

less abuse liability [with] film than sublingual? No other route would prevent generic entry [with] sublingual.  ¶109.

In 2008, Baxter and others sent the FDA a list of ideas for why Film could offer superior safety, but they did not provide the FDA with scientific studies or tests showing that Film guarded against unintended pediatric exposure or protected against diversion; these were untested ideas. ¶115.  On October 20, 2008, Reckitt, through RBP, filed an application with the FDA for approval of a New Drug Application ("NDA") for Film.  ¶102.  On June 9, 2009, Baxter told fellow RBP medical personnel, "***We need to develop a story about childhood exposures to set the stage for switching patients***" to Suboxone Film.  ¶117.

### C. Defendants Fraudulently Coerced Patients and Physicians to Switch from Tablets to Film Through Misrepresentations About Film's Safety

Defendants embarked on a fraudulent scheme to convert patients to Film before generic Tablets entered the market by making false statements about the safety of Film and coercing patients to make the switch.  ¶104.  Between May 2009 and August 2010, while awaiting FDA approval of the NDA for Film, RBP managers drafted marketing plans for Film that included messages that Film was "a more responsible medication from a public health perspective," was a "less divertible/abusable formulation," and had a "lower risk of child exposure," and that the generic drug would "jeopardize the entire disease space," though there were no scientific studies to establish these claims.  ¶116.  Thaxter received these marketing plans.  *Id*.

On August 21, 2009, the FDA declined to approve Reckitt and RBP's NDA for Film because it did not contain an adequate risk evaluation and mitigation strategy to address the FDA's concerns about misuse, abuse, and accidental overdose.  ¶118.  On October 5, 2009, RBP sent a letter to the FDA asking whether the FDA agreed that Film's packaging would protect against accidental child exposure and diversion.  ¶119.  Before the FDA responded, RBP executives and others internally expressed concern that the FDA could disagree.  *Id.*  RBP's concern was justified: on March 29,

2010, the FDA responded to Defendants that it did not agree that Film was safer than Tablets, and was actually more dangerous in certain ways.  ¶123.

Meanwhile, between these two dates, Bart Becht, Reckitt's then-CEO, sold $204 million in shares of Reckitt stock and Colin Day, Reckitt's then-CFO, sold $17.4 million in shares of Reckitt stock.  ¶10.  In the three months after the FDA responded, Becht sold another $29 million of stock, and Day sold another $7.3 million of stock.  ¶125.[4]  According to the Indictment, after the FDA's response, Baxter wrote to Thaxter and others underscoring the lack of scientific support for their safety claims: "It looks like they [the FDA] are trying to deny us the ability to make a claim on additional pediatric safety of the film. ***I believe that we will need to collect data on this as a post marketing exercise before we can make any specific claim***, although we will be able to describe the nature and intent of the packaging in marketing materials."  ¶126 n.11.

On August 30, 2010, the FDA approved Film for use.  ¶127.  None of the materials approved by the FDA stated that Film was safer than Tablets, or reduced the risk of misuse, abuse, diversion, or accidental child exposure.  *Id.*  Although Reckitt included "a small open-label safety study" of Film and "a small laboratory study" in its application to the FDA, "[n]o new efficacy studies were conducted" and "[t]here was no statistical review of the clinical data."  ECF No. 84 at 3; *see also* ¶127.  Moreover, the FDA noted that Reckitt's "study had a number of flaws . . . As a result, although no major safety concerns arose in this study, ***the quality of the data and their relevance to the proposed labeling are questionable***[.]"  ¶127.[5]

That did not stop Defendants.  After the FDA's approval, Thaxter promptly told Reckitt executives, including Reckitt's then-CEO Becht and then-CFO Day, "We will be making the most of every minute between now and generic approval to convert our tablet business to film," including a

---

[4]  *See also* ¶304.  The TAC alleges that these insider transactions were unusual in scope and timing.  ¶305.
[5]  Despite the FDA's fundamental criticisms of Reckitt's study, Defendants cite the same document to support their contention that "RBP commissioned studies to investigate Film safety."  ECF No. 90 at 3.  This underscores Defendants' lack of reliable data concerning Film's safety.

- 6 -

"Full Blitz campaign for salesforce through Thanksgiving." ¶128. For the Full Blitz campaign, RBP salespeople planned to raise "diversion and misuse and pediatric safety" in sales presentations to physicians, even though there were no scientific studies to establish that Suboxone Film was safer with regard to diversion, misuse, or pediatric safety. *Id.*

The Indictment, however, quotes an RBP manager as stating to Baxter and others in May 2012, "[u]nder no circumstances can we make the claim that Suboxone Film is safer or better at reducing pediatric exposures [than Suboxone Tablet]." ¶145. The RBP manager also stated, "[s]aying Suboxone Film is safer than any tablet on the market because Film has less ability to be snorted/injected [is an] unsubstantiated superiority claim." *Id.* Despite this knowledge, Defendants executed their scheme to coerce patients and physicians to switch to Film under false pretenses, which also included: (1) misleading healthcare providers regarding the safety of Film (¶¶130-146); (2) misleading Medicaid administrators regarding the safety of Film (¶¶170-197); (3) marketing Film to doctors whom they knew were illegally prescribing it (¶¶198-203); and (4) promoting Film using false and misleading marketing materials (¶¶204-206).

Defendants' scheme was highly successful, as they fraudulently converted thousands of opioid-addicted patients to Film and caused state Medicaid programs to expand coverage of Film, instead of much less-expensive Tablets, at a substantial cost to the government. ¶14. Between 2010 and 2014, Reckitt received approximately $3 billion in revenues from Film sales. *Id.*

**D.   Defendants Withdrew Tablets to Coerce Patients and Physicians to Switch to Film**

According to the Indictment, in June 2012, Reckitt's investor-relations ("IR") director emailed Reckitt's CEO Rakesh Kapoor and Thaxter, referencing ***"our plans" to withdraw Suboxone Tablet's FDA approval in order to delay FDA approval of generic versions of the Tablet***. ¶148. Reckitt's General Counsel responded to them and other senior executives, stating, ***"please do not***

***create any emails or other documents suggesting that we would consider***" attempting to delay FDA approval of generic versions of the Tablet in this way, and "any decision we make will be based on consumer safety." *Id*.

The Indictment revealed that, on September 14, 2012, RBP executives caused the preparation of a public-relations strategy for discontinuing Tablets, indicating that RBP would dispel the "[p]erception of discontinuation as a means for blunting generic/competitive entry" and convey a "'[w]e must be responsible' sentiment." ¶153.  The same day, Reckitt's contractors provided Reckitt with an "executive summary" of a study of calls to poison control centers that failed to include any finding that Film was safer than Tablets with regard to accidental child exposure.  The summary stated that there were fewer references to Film than Tablets in the telephone call notes, but the reasons for this could not be determined, and "***any results related to the original packaging should be interpreted with considerable caution***." ¶158.

On September 18, 2012, Reckitt and RBP sent a "Notice of Discontinuance" of Tablets to the FDA, stating that the reason for the discontinuance was "increasing concerns regarding pediatric exposure to" Tablets, even though there was insufficient scientific data to support these newfound safety concerns.  ¶156.  Kapoor and Thaxter approved the notice, even though they knew the primary reason for the discontinuance was to delay FDA approval of generic Suboxone.  *Id.*  Thus, the Tablets that Defendants had marketed for years as safe suddenly became so dangerous that they had to be taken off the market and patients had to start using Film.  ¶12.  And the danger only applied in the U.S. – Reckitt continued to sell Tablets overseas.  *Id.*  The only reason for the discontinuance, of course, was to delay the FDA's approval of generic Tablets.  *Id*.

On September 25, 2012, Reckitt submitted a citizen petition to the FDA, signed by Baxter, falsely stating that RBP discontinued Tablets "due to safety concerns," and asking the FDA not to

approve generic versions of Tablets.  ¶157.  The petition referenced a new version of the executive summary that Reckitt and RBP executives had secretly altered.  The alterations included deleting the statement that "any results related to the original packaging should be interpreted with considerable caution" and adding a false and misleading conclusion.  ¶158.  Kapoor and Thaxter approved the petition, even though they knew the primary reason for the discontinuance was to delay FDA approval of generic Tablets and that the executive summary had been altered.  *Id.*

Defendants knew that by filing a citizen petition, the FDA would be required to take at least five months to consider its merits, further delaying entrance of generic Tablets into the market and giving Reckitt more time to convert patients and physicians to Film.  ¶13.  The FDA concluded on February 22, 2013 that the withdrawal of Tablets for safety reasons was unnecessary, noting that Reckitt's study was inconclusive and that accidental pediatric exposure to Suboxone was actually on the decline due to new labeling requirements.  ¶164.  The FDA also referred Reckitt to the FTC to investigate anticompetitive business practices, and stated that the "timing" of the September 2012 announcement "given its close alignment with the period in which generic competition for this product was expected to begin, cannot be ignored."  ¶¶164, 167.  The five-month delay resulted in more than $600 million in Film sales for Reckitt.  Defendants nonetheless informed investors in Reckitt's 2012 Annual Report, published on or about March 27, 2013, that Reckitt voluntarily discontinued Tablets in the U.S. "due to increasing concerns with pediatric exposure."  ¶¶168-169.

### E.    Defendants Artificially Inflated the Value of RBP Prior to the Demerger

Amidst the apparent success of Defendants' scheme, federal and state governments began to investigate.  ¶15.  Seeing the potential for massive liability on the horizon, on July 28, 2014, Reckitt announced its plans to cut ties with RBP and demerge it from Reckitt.  To artificially inflate the value of RBP, Defendants made false and misleading statements about Film to investors.  ¶¶222-249.  Kapoor claimed, on July 28, 2014, the start of the Class Period, that the success of Film had

given RBP a "global leadership position" in addiction treatment, that RBP had a "sustainable business" model as a standalone company, and that RBP was positioned for "strong medium and long-term growth." ¶¶230, 232. Thaxter also claimed that Film's success was driven by legitimate factors, including "the preference of the patient for the film[.]" ¶235. In reality, Defendants knew that Suboxone was a ticking time bomb. Indeed, as part of the demerger agreement, RBP agreed to indemnify Reckitt for any losses arising from liabilities associated with RBP's business. ¶218.[6]

Despite demerging RBP, Defendants continued to profit from their fraudulent Suboxone scheme. ¶217. Provisions in the demerger agreement required RBP's successor, Indivior, whose only real assets were Suboxone revenues, to pay Reckitt more than $500 million in so-called "dividends" in the years after the demerger. *Id.*

On December 11, 2014, Reckitt's shareholders approved the demerger in reliance on Defendants' misstatements regarding the success of RBP as a standalone entity. Reckitt recognized a gain of £1.3 billion ($2 billion) from the demerger. ¶266. With a vested interest in the continued success of Film, Defendants concealed the truth about the true risks and benefits of Film. ¶273. Meanwhile, Indivior continued to propagate the false basis on which RBP discontinued Tablets from the market, and to tout the "additional safety and compliance features" of Film. ¶274.

### F.    Defendants' Fraud Was Revealed in a Series of Disclosures

The truth began to emerge on July 24, 2017, when Reckitt announced that it had recorded a £318 million charge related to ongoing DOJ and FTC investigations into its former RBP operations. ¶275. On this news, the price of Reckitt ADSs fell 5% and Reckitt ordinary shares fell 3.3%. *Id.* On February 19, 2018, Reckitt announced that it had recorded an exceptional charge of £296 million due to the investigations, and that the investigation now also involved the California Department of

---

[6]  On November 13, 2020, Reckitt exercised this provision and filed suit against Indivior in England to preserve its right to seek indemnification under the demerger agreement. The amount claimed under the submission was £1.07 billion, or approximately $1.4 billion – the amount Reckitt paid to the U.S. government to resolve its own potential liability. ¶219. Indivior paid Reckitt $50 million to settle the indemnity claim. ¶294.

Insurance.  ¶278.  The price of Reckitt ADSs declined more than 10% and Reckitt ordinary shares declined 7.5% on this news.  *Id*.  On April 9, 2019, a grand jury indicted Indivior on charges of healthcare fraud, wire fraud, mail fraud, and conspiracy, in connection with the marketing and promotion practices, pediatric safety claims, and overprescribing of Film and/or Tablets by certain physicians.  ¶279.  On this news, the price of Reckitt ADSs declined more than 6% and Reckitt ordinary shares declined 6.5%.  *Id*.  On July 11, 2019, Reckitt agreed to settle the federal investigations into its marketing and sale of Film for $1.4 billion, constituting the "largest opioid settlement in US history."  ¶280.  This included a payment of $50 million to the FTC to settle claims that Reckitt willfully maintained its monopoly power by utilizing coercive and exclusionary conduct to convert patients from Tablets to Film.  ¶¶282-284.

After the Class Period, on June 30, 2020, Thaxter pleaded guilty to an Information charging him with causing "misbranded" Film to be introduced to interstate commerce in violation of the Food, Drug, and Cosmetic Act ("FDCA").  ¶288.  The government alleged that Thaxter, in his oversight of RBP's efforts to gain coverage for the Film from MassHealth (Massachusetts' Medicaid program), caused or failed to prevent RBP from providing false and misleading safety statistics, and failed to correct the information for three years.  *Id*.  Specifically, RBP's Medical Affairs Manager manipulated data showing the rates of unintended pediatric exposure in three categories of drugs, including Film, in order to falsely portray Film as having the lowest rate of unintended pediatric exposure.  ¶178.  Baxter, who reported directly to Thaxter, was aware of the data manipulation.[7] ¶¶179, 182-184.  On October 22, 2020, Thaxter was sentenced to six months in federal prison, one year of supervised release, and ordered to pay a fine of $100,000 and forfeit $500,000.  ¶288.[8]

---

[7]  Baxter pled guilty to the same crime.  ¶289.  He was sentenced to six months of home detention.  *Id*.  Indivior Solutions, an Indivior subsidiary, pled guilty to a felony violation of the FDCA.  ¶290.
[8]  A related aspect of Reckitt's scheme to coerce MassHealth to add Film to its formulary of prescribed medicines included hiring purportedly independent physicians to lobby MassHealth without disclosing their connection to Reckitt. ¶189.  One such "independent physician" engaged in a coercive letter-writing campaign to influence MassHealth to add

## III.    ARGUMENT

### A.    Legal Standards

On a Rule 12(b)(6) motion, a Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

Section 10(b) proscribes "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Novak v. Kasaks*, 216 F.3d 300, 305-06 (2d Cir. 2000). To state a Section 10(b) claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Securities fraud actions are subject to the pleading requirements of the PSLRA, 15 U.S.C. §78u-4, *et seq.*, and Fed. R. Civ. P. 9(b).

### B.    The TAC Adequately Alleges Materially False and Misleading Statements and Omissions

#### 1.    Misstatements Concerning the Safety and Success of Film

Defendants' statements to investors regarding the purported safety advantages of Film over Tablets, and Reckitt's success in converting patients to Film from Tablets, were materially false and misleading because Defendants failed to disclose that: (i) there was no reliable scientific data to support their claims that Film was safer and less susceptible to diversion and misuse than Tablets, and Defendants' safety claims were nothing more than a false pretext to coerce patients and

---

Film to its formulary; in actuality, he did not possess a medical license, and his actions were coordinated with RBP's Director of Public Sector.  ¶¶189-197.

physicians to switch from Tablets to Film (*supra* at 4-9); (ii) Reckitt engaged in an illicit marketing and promotional scheme that fueled Reckitt's expansion of the network of physicians who were providing treatment for patients with Film (¶¶198-206); and (iii) the supposed preference of patients, physicians, and payers for Film was due to Reckitt's coercive and deceptive conduct.  ¶¶235-240, 250-255.  Defendants do not dispute that Plaintiffs have pled these statements with the requisite particularity.

Defendants' primary argument for dismissal on falsity grounds is that "the market was already aware of the alleged anticompetitive conduct at the time of each challenged statement."  ECF No. 90 at 7; *see also* ECF No. 96 at 9 n.9.  Defendants' argument invokes the truth-on-the-market defense, which provides that an otherwise actionable misstatement or omission may be deemed "immaterial" if the truth is already fully known to the investing public.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  To prevail on such a defense, "the corrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *Id*.

First, the truth concerning Defendants' fraud was not known to the market until the Indictment was filed in April 2019.  Defendants' truth-on-the-market argument centers on certain facts that were included in public documents filed with or by the FDA.  *See* ECF No. 90 at 7 n.6. Defendants assert that RBP merely maintained a "good faith," "genuine[]," "public disagreement with the FDA about Film's superior safety profile."  *Id*. at 14-15.  The basis of Plaintiffs claims of securities fraud, however, goes far beyond the facts available in those documents and extends to facts that were not publicly known until the filing of the Indictment.  Specifically, the TAC alleges a multifaceted scheme in which Defendants failed to disclose numerous adverse facts pertaining to Reckitt and Suboxone, including the following:

- Defendants did not have a genuine disagreement with the FDA about the safety profile of Film. Beginning in 2006, Defendants fabricated a "safety story" about the purported benefits of Film over Tablets in order to switch patients prior to introduction of generic Tablets, even though they had no reliable data or studies to support that claim (¶¶105-110, 115-117, 126 n.11, 148).

- Reckitt and RBP personnel had internally concluded that Film posed a **greater** risk of abuse and child endangerment than Tablets, and in any case was not safer than Tablets (¶¶143, 145, 150-151, 156, 304).

- Reckitt and RBP personnel, including in certain instances Defendants themselves, falsified data concerning the purported safety benefits of Film in communications with the FDA and MassHealth (¶¶158, 170-188), and hired a fake physician and dozens of other letter-writers to coerce MassHealth to make the Film a preferred drug on its formulary (¶¶189-197).

- Defendants engaged in a massive marketing campaign that misrepresented the purported benefits of Film as compared to Tablets to doctors, healthcare providers, government regulators, and investors (¶¶161, 204-206).

- Defendants encouraged Suboxone sales through medical providers that they knew were overprescribing the drug, facilitating the drug's abuse and/or prescribing it in a careless and clinically unwarranted manner, often to hundreds of individuals at a time in violation of federal law (¶¶198-203, 281).

None of these facts were known to investors until April 2019, when the DOJ indicted Indivior. Even if the market knew certain facts concerning Defendants' anticompetitive practices (which Defendants contradicted, *see infra* at 14), the litany of undisclosed material facts renders Defendants' statements false and misleading. *See In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617 (S.D. W.Va. 2012) (rejecting truth-on-the-market defense and stating, "Further, the availability of a safety and compliance record on [a public government] website would not cure the Defendants' alleged failure to disclose to the market its [separate] practice of using an early warning system to alert miners of the presence of . . . inspectors, which was adequately pled[.]").

Second, the truth-on-the-market defense fails because Defendants repeatedly contradicted the FDA's February 2013 conclusion that Film was not safer than Tablets and that Reckitt filed a suspiciously timed citizen petition. Defendants' statements to the contrary blunted the intensity and credibility of the facts disclosed by the FDA and others, dooming their truth-on-the-market defense. *See, e.g., Klein v. Altria Grp.*, 2021 WL 955992, at *14 (E.D. Va. Mar. 12, 2021) (rejecting truth-on-

the-market defense because "Defendants explicitly denied the allegations that they now claim relieved them of their obligation to make full disclosures."); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1037 (S.D. Cal. 2005) (truth-on-the-market defense was not established where complaint alleged that defendants "attempted to suppress public knowledge" of the truth); *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) ("The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders."); *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 515 (D. Del. 2003) (same).   Examples of Defendants' statements that contradicted the information they claim revealed their scheme to the public include:

- On February 13, 2013, Kapoor stated that Reckitt's "decision to withdraw the tablet was made independent of the Citizens Petition.  We announced the decision to withdraw, before we filed the Citizens Petition.  It's got nothing to do with it. . . . And we withdraw the tablet because we strongly believe that there is an issue of . . . pediatric safety."  ¶163.

- In Reckitt's 2012 Annual Report, published on March 27, 2013, Defendants stated that Reckitt voluntarily discontinued Tablets in the U.S. "due to increasing concerns with paediatric exposure."  ¶169.

- In Reckitt's 2013 Annual Report, published on April 3, 2014, Defendants repeated the false basis for the discontinuance of Tablets in the U.S.  *Id.*

- During the July 28, 2014 earnings call, Thaxter praised the purported safety of Film, which he claimed had a lower potential for abuse.  ¶241.

- During the same earnings call, Thaxter was asked about pulling Tablets in favor of Film, and whether RBP would do the same to Film in favor of a new injectable product.  Thaxter said, "we're not in the business of forcing the market or patients to do anything."  ¶248.

- Separately, in its 2016 Form 20-F, filed on July 14, 2016, Indivior discussed how it withdrew Tablets from the U.S. market in 2012 "owing to pediatric safety concerns," and that Film had "additional safety and compliance features."  ¶274.

These statements beg the question: If the market knew that Film was not safer than Tablets, and that Reckitt's withdrawal of Tablets and its filing of the citizen petition were part of an anticompetitive scheme, then why would Defendants and Indivior continue to tell the market that the opposite was true?  The answer is that Defendants did not believe that the market knew the truth.

For them to take that position now is disingenuous.[9]  This argument presents a factual issue that cannot be resolved at this stage.  *See Ganino*, 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismiss[al.]"); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) (Castel, J.) (same).

Defendants also point to private antitrust actions that were filed in 2013, which they claim revealed the truth to the market.  *See* ECF No. 90 at 4, 22.  Not so.  Reckitt moved to dismiss those actions, vigorously denied the allegations (including any purported allegations of fraud),[10] and succeeded in dismissing itself from all of them.  *See In re: Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665 (E.D. Pa. 2014); *see also id.*, No. 2:13-md-02445-MSG, ECF Nos. 98, 155 (attached as Exs. 2-3).  Moreover, the antitrust actions do not mention ***any*** of the Individual Defendants (nor any employee) by name.  *Cf.* ECF No. 91-3.[11]  In *Cambridge Retirement System v. Jeld-Wen Holding, Inc.*, 2020 WL 6270482 (E.D. Va. Oct. 26, 2020), the court held that the plaintiff adequately alleged a material misstatement when the defendant failed to disclose its anticompetitive scheme even as it defended a lawsuit stemming from that scheme.  *Id.* at *3-*4.  Although the defendant had "repeatedly disclos[ed] the existence and relevant details of the [earlier] litigation," the court held that "disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures."  *Id.*

Defendants also argue that the FDA's February 22, 2013 letter referring Reckitt to the FTC

---

[9]  After the FDA approved Film for use on August 30, 2010, and simultaneously criticized Reckitt's study and stated that Film was not any safer than Tablets, Thaxter and Becht swiftly launched their "Full Blitz" campaign to fraudulently market Film to physicians and patients.  ¶¶128, 130.  And in 2011 and 2012, they told investors that Film was safer for children and less abusable.  ¶¶138-140.  If Thaxter and Becht believed that the market knew the truth at that time, they would not have encouraged such a pointless endeavor nor made statements to the market that investors knew were false.
[10]  *See* Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss, *In re: Suboxone Antitrust Litig.*, No. 2:13-md-02445-MSG (E.D. Pa.) (ECF No. 56-1 at 1, 4, 9, 18 n.11, 31, 34) (Ex. 1).
[11]  The TAC alleges that at the time Reckitt's misstatements were made, Reckitt and the Individual Defendants knew the statements concealing the anticompetitive scheme were false.  But since the antitrust complaint does not allege knowledge of the anticompetitive scheme by anyone in particular, and most certainly not the Individual Defendants, the market could not have known that the C-suite of Reckitt and RBP knew of and/or participated in the scheme.  Indeed, because the antitrust action only survived with respect to RBP, RBP's scienter (assuming it was even adequately pled in the antitrust action) could not – as Defendants themselves argue – be imputed to Reckitt.  *See* ECF No. 90 at 14.

for investigation provided the truth to the market.  *See* ECF No. 90 at 7; ECF No. 96 at 9 n.9.[12]

Neither the FDA nor the FTC, however, found any anticompetitive conduct at the time – indeed, no

investigation had even begun, and Defendants themselves have described "the outcome of the

investigations [as] merely speculative."  ECF No. 84 at 7.  In fact, the FDA based its referral on

comments from Reckitt's ***competitors***, and expressly said that it was not denying Reckitt's citizen

petition pursuant to a section of the FDCA that permits denial when a petition "was submitted with

the primary purpose of delaying the approval of an application and the petition does not on its face

raise valid scientific or regulatory issues."  ECF No. 84-2 at 15-16.[13]

Defendants also contend that certain statements concerning Film are inactionable puffery.

*see* ECF No. 90 at 9-10; ECF No. 96 at 9-10, but "courts will not insulate relatively general positive

statements from liability if they are 'misrepresentations of existing facts.'"  *Hawaii Structural*

*Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y.

2019) (quoting *Novak*, 216 F.3d at 315 (statements that defendants' inventory was "in good shape"

and "under control" were not puffery because "they allegedly knew that the contrary was true")).

The misstatements that Defendants challenge are plainly not puffery because they are

---

[12] Thaxter argues that Reckitt publicly disclosed that one purpose of Film was to mitigate the effects of generic competition to the Tablet.  ECF No. 96 at 9 n.9.  Reckitt, however, failed to disclose that the means by which it was mitigating the effects of generic competition was through deception and anticompetitive practices.  *See In re Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("When a corporation does make a disclosure . . . there is a duty to make it complete and accurate.").

[13] Defendants' cases are inapt.  *See* ECF No. 90 at 7.  In *Gillis v. QRX Pharma Ltd.*, the court held that defendants' failure to disclose "the nuances as to how the [FDA] was proposing to apply" a particular rule to the defendants' leading drug candidate "were not material."  197 F. Supp. 3d 557, 581 (S.D.N.Y. 2016).  Here, Defendants failed to disclose anticompetitive, coercive, and fraudulent conduct designed to switch patients from Tablets to Film.  In *Shah v. Stanley*, 2004 WL 2346716, at *10 (S.D.N.Y. Oct. 19, 2004), the court addressed the timeliness of plaintiff's claims under the statute of limitations, not a truth-on-the-market argument, and the Supreme Court's subsequent decision in *Merck & Co. v. Reynolds* renders *Shah* inapplicable.  *See infra* at 33.  In addition, unlike here, the allegedly undisclosed improper business practices at issue in *Shah* were "set forth in no uncertain terms" in a news article.  2004 WL 2346716, at *10. In *JPMorgan Auction Rate Securities Marketing Litigation*, 2014 WL 4953554, at *9 (S.D.N.Y. Sept. 30, 2014), and *In re UBS Auction Rate Securities Litigation*, 2010 WL 2541166, at *18 (S.D.N.Y. June 10, 2010), unlike here, the defendants repeatedly disclosed to investors that they could engage in the very conduct of which the plaintiffs complained.  Defendants' reliance on *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), is misplaced.  *Cf.* ECF No. 90 at 13. Absent in *Kalnit* are any allegations that defendants, unlike here, concealed various aspects of their fraud or attempted to suppress the public knowledge of the truth behind the fraudulent conduct.  *Cf.* 264 F.3d at 143.

misrepresentations of existing facts and/or Defendants knew they were misleading.[14]  In *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018), the court rejected a similar puffery argument, holding that "Defendants' statements regarding competitiveness in the generic market and pricing pressures are . . . actionable."  The court emphasized that the challenged statements were not puffery because, as here, there was "a direct nexus between the illegal conduct" and the misstatements.  *Id.*[15]  Likewise, Thaxter's description of Film as having been "designed with the intent of being a lower potential for abuse and misuse than the previous products on the market" (ECF No. 96 at 10) is not puffery because Thaxter knew that Film was designed to thwart competition from generic Tablets and he lacked clinical data to support this theory.  ¶109.

## 2. Misstatements Concerning RBP's Competitive Environment

Defendants are liable for misstatements concerning RBP's purportedly competitive environment because they failed to disclose their anticompetitive practices.  *See, e.g.*, ¶¶223, 228, 237, 243, 250, 254.  Courts have found that where a company was engaged in a variety of anticompetitive practices, statements that characterized the markets for the company's drugs as "very competitive" and "highly sensitive to price" were "misleading in the absence of a disclosure of that anticompetitive conduct."[16]  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6-*7 (S.D.N.Y. Mar. 28, 2018); *see also Speakes*, 2018 WL 4572987, at *6 (same); *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 466 (E.D. Pa. 2020) (statements purporting to inform investors about competitive

---

[14] *See, e.g.*, ECF No. 90 at 9 n.9 (quoting ¶237 ("We've maintained our double-digit market growth"); ¶235 (Film showed "level of resilience" in face of generic competition)); *id.* at 9 n.10 (quoting ¶235 ("we continue to drive conversion of patients from tablets onto the film driven by the preference of the patient for the film."); ¶237 ("the data has already demonstrated that [Film] is very clearly the preferred product, not only by patients, not only by physicians, but also by payers")).  Likewise, Thaxter's statement that "we're very confident that we will **continue** to be successful here" (¶237) implies an existing fact (Reckitt's current success), which Plaintiffs allege is misleading.  *Infra* at 19-20; *cf.* ECF No. 96 at 9 n.7.

[15] To illustrate the direct nexus, Thaxter's statement that "the data has already demonstrated that [Film] is very clearly the preferred product" (¶237) is misleading because the actual reason for Film preference was Defendants' undisclosed anticompetitive, coercive, and fraudulent conduct.  *See supra* at 4-9, 12-13.

[16] The TAC "plausibly articulate[s]" that Defendants were engaged in anticompetitive practices.  *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *4 (S.D.N.Y. Sept. 24, 2018).  *See supra* at 7-9; *see also* FTC Complaint, attached as Ex. B to the TAC (ECF No. 82-2).

environment, sources of revenue, and basis of pricing decisions, which omitted information that company engaged in a price-fixing scheme, were materially misleading).  Defendants do not challenge Plaintiffs' argument that statements concerning a company's purportedly competitive environment are misleading when they fail to disclose anticompetitive practices, and have therefore conceded the argument at this stage.  *See Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) (argument is waived unless a party raises it in its opening brief).

### 3.    Misstatements Putting the Cause of Reckitt's Financial Success at Issue

Defendants also made numerous misstatements about the source of Reckitt's revenues and the purported reasons for Reckitt's financial success.  *See, e.g.*, ¶¶223, 228, 230, 232, 245, 252, 254. These statements were materially false and misleading because Defendants put the source of Reckitt's success at issue without disclosing that their deceptive and anticompetitive conduct were key drivers of Film growth.  In *Diehl v. Omega Protein Corp.*, this Court stated that "[c]ourts in this district have held that [w]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices."  339 F. Supp. 3d 153, 165 (S.D.N.Y. 2018) (Castel, J.).[17]

Defendants argue that "[a]ccurate statements about past performance are self-evidently not actionable under the securities laws."  ECF No. 90 at 8; *see also* ECF No. 96 at 8-9.  To be sure, "the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."  *Marsh*, 501 F. Supp. 2d at 469.  But "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Id*.  "In determining whether there is a duty to disclose omitted information, [t]he critical consideration . . . is whether 'the alleged omissions . . . are sufficiently connected to defendants'

---

[17]   Numerous courts in this District have held likewise.  *See, e.g., Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at \*16 (S.D.N.Y. Mar. 29, 2021); *Gagnon v. Alkermes PLC*, 368 F Supp. 3d 750, 768 (S.D.N.Y. 2019); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 441-44 (S.D.N.Y. 2018).

existing disclosures to make those public statements misleading.'" *Diehl*, 339 F. Supp. 3d at 165. Here, Defendants' omissions are directly connected to their existing disclosures. For example, Thaxter stated, "we continue to drive conversion of patients from tablets onto the film driven by the preference of the patient for the film. . . . So we saw by March of last year that the film share had grown to 70% and the tablet business had come down to 15%." ¶235; *cf.* ECF No. 96 at 8.[18] That statement (and others like it) was misleading because the conversion to Film was driven by Reckitt's undisclosed coercive and deceptive conduct aimed at patients and doctors. ¶236.[19]

### 4. Misstatements Concerning Compliance and Sales Practices

Thaxter's statements touting RBP's compliance program (¶245) were materially misleading because the compliance committee intentionally circumvented RBP's controls. Between December 2011 and February 2012, the compliance committee determined that RBP salespeople's written reports of their fraudulent promotional statements to physicians and pharmacists posed "compliance risks," and discontinued the reports. ¶144. In other words, RBP's compliance committee perversely found that the true "compliance risk" involved the writing, not the wrongdoing.[20]

---

[18] Defendants' cases are inapposite. *Cf.* ECF No. 90 at 8; ECF No. 96 at 9 n.8. Defendants mischaracterize *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004), which did not, contrary to Defendants' assertion, involve allegations that "recitations of past earnings [were] misleading even when driven in part by criminal acts." ECF No. 90 at 8. And in *In re Cognizant Technology Solutions Corp. Securities Litigation*, 2018 WL 3772675, at *22 (D.N.J. Aug. 8, 2018) – unlike here – the court held that the challenged statements presented accurate historical data that were "not adequately related to the bribery scheme to render them misleading." In *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), the defendant was not alleged to have put the source of its revenue at issue.

[19] Defendants argue that the TAC pleads no specific factual basis for the proposition that positive financial results, or patient, physician, or payer preference, were due to the allegedly anticompetitive conduct as opposed to other factors such as the convenience of individually packaged Film. *See* ECF No. 90 at 8 n.8. But the TAC describes in detail how Defendants employed anticompetitive and deceptive practices to coerce and deceive patients, physicians, and insurers to switch from Tablets to Film, and to delay FDA approval of generic Tablets. *See, e.g.*, ¶¶12-14, 104-117, 148-206, 281(b). Plaintiffs allege that Defendants' filing of a sham citizen petition with the FDA for the purpose of delaying generic competition for Film resulted in more than $600 million in Film sales. ¶13. And the TAC plausibly alleges that Defendants' anticompetitive and deceptive practices caused Film to account for 85% of Suboxone prescriptions by February 2013, even though it was only approved by the FDA three years earlier. ¶207. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 367 (S.D.N.Y. 2012) (applying plausibility standard to plead falsity). Regarding Defendants' assertion that the convenience of individually packaged Film caused Film's success, the TAC adequately alleges that the purported benefits of Film were illusory. *See supra* at 3. Thus, the cases that Defendants cite are factually distinguishable. *Cf.* ECF No. 90 at 8 n.8.

[20] Thaxter has the temerity to argue that the TAC's allegations regarding RBP's compliance committee "only serve to highlight that RBP had a compliance committee, confirming Mr. Thaxter's statement that '[w]e've got compliance' was

- 20 -

The context of Thaxter's compliance statements, as well as statements touting RBP's sales practices, is critical. *See Matrixx Initiatives*, 563 U.S. at 44 ("contextual inquiry" required to assess materiality). With respect to these statements made during the July 28, 2014 earnings call, Thaxter was attempting to convince investors of RBP's ability to succeed as a standalone business after Reckitt had just announced its plans to demerge RBP, and in advance of a shareholder vote on the demerger that could (and did) net Reckitt billions of dollars. *See supra* at 9-10; *see also* ¶¶215-216. In that context, Defendants' statements were not puffery.[21] *Cf.* ECF No. 90 at 10-11; *see Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").[22]

Thaxter's statements that RBP's compliance system and sales force have "been a key driver of our success" (¶245) are actionable for the reasons explained above because those statements put the success of RBP at issue. *See supra* at 19-20. Thaxter's statements are directly connected to his omission that RBP's compliance committee concealed fraudulent practices (¶144), and its sales force engaged in rampant deception regarding the safety of Film (¶¶130-146).[23]

---

entirely accurate." ECF No. 96 at 11 n.10. "[O]nce a party chooses to speak," about a particular subject, "it has a 'duty to be both accurate and complete.'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 296 (S.D.N.Y. 2018). Thaxter's omission that the compliance committee discontinued the reports documenting fraudulent sales tactics and practices "conflict[ed] with what a reasonable investor would take from" Defendants' statements touting RBP's compliance and sales force, *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 189 (2015), and rendered those statements "misleading to a reasonable person reading the statement[s] fairly and in context." *Id.* at 194.

[21] Defendants challenge certain statements concerning the demerger on falsity and puffery grounds (*see* ECF No. 90 at 10-11; ECF No. 96 at 10), but Defendants' arguments are misplaced because Plaintiffs only challenge statements made in the context of the demerger to the extent they pertain to the success of Film. *See, e.g.*, ¶¶259-262.

[22] Defendants cite inapposite cases for the proposition that generic compliance statements are too vague to cause a reasonable investor to rely on them. *See* ECF No. 90 at 11. *Singh v. Cigna Corp.*, unlike here, concerned general statements regarding reputation, integrity, and compliance with ethical norms. *See* 918 F.3d 57, 63 (2d Cir. 2019). In *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), the statements were aspirational, whereas here they are statements of current fact. In *In re Sanofi Securities Litigation*, 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016) (Castel, J.), the Court found that compliance-related statements were "too general to cause a reasonable investor to rely on them"; here, however, Thaxter's statements were specifically made to ***induce*** Reckitt shareholders to vote in favor of the demerger.

[23] Plaintiffs' allegations regarding Defendants' fraudulent sales practices are far from "bare assertions." ECF No. 96 at

### 5. Defendants Violated Their Disclosure Duty Under Item 303

Item 303 required Reckitt's regulatory filings to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." ¶298. Because of Becht, Kapoor, and Thaxter's knowledge of, and participation in, Reckitt's fraudulent scheme, Defendants had a duty prior to July 24, 2017 to disclose that Reckitt's misconduct subjected it to monetary risks of criminal and/or civil governmental prosecution.[24] ¶299; *see Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96-97 (2d Cir. 2016) (finding Item 303 violation where company failed to disclose overbilling practices subjecting it to potential criminal liability, even though the effect on its current and future revenues was uncertain, because company knew its employees had committed fraud); *see also Twin Master Fund, Ltd. v. Akorn, Inc*., 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020).[25]

Defendants incorrectly assert that Reckitt cannot have violated Item 303 because "as a foreign issuer, it is not subject to Regulation S-K." ECF No. 90 at 12. The court in *Christine Asia Co. v. Alibaba Group Holding Ltd*., 192 F. Supp. 3d 456 (S.D.N.Y. 2016), explained:

> Though Item 303 does not apply to foreign corporations, the SEC has stated that its interpretations of Item 303 "apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F," which does apply to foreign

---

12. Indivior's settlement with the DOJ required it to disband its U.S. Suboxone sales force and never reinstate it. ¶129.

[24] Defendants assert that Reckitt "disclosed numerous governmental investigations, contradicting any assertion of nondisclosure." ECF No. 90 at 12. Reckitt's disclosure, however, was vague and ambiguous; it is unclear whether those "historical" investigations announced in 2013 actually concerned Suboxone. ECF No. 91-1 at 45. Indeed, the FTC began investigating Reckitt no earlier than 2013, so that investigation is unlikely to have been considered "historical." ¶¶164-167. Because analysts reacted with surprise at Reckitt's July 24, 2017 disclosure (¶276), Defendants raise a question of fact that cannot be resolved at this stage. *See Anderson News*, 680 F.3d at 185.

[25] Defendants characterize Plaintiffs' claim as expecting Defendants to "prophesize" that RBP would be subject to prosecution. ECF No. 90 at 12. Based on the Individual Defendants' direct participation in the fraud, however, they understood how the scheme, and the ongoing governmental investigations, "might reasonably be expected to materially impact [Reckitt's] future revenues." *SAIC*, 818 F.3d at 96. Defendants' cases are inapt. *In re Lions Gate Entertainment Corp. Securities Litigation* involved an "isolated incident," not a years-long fraud like here. 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016). Likewise, the Item 103 claim in *Richman v. Goldman Sachs Group, Inc.*, concerned the defendant's failure to disclose receipt of a Wells Notice from the SEC, not a years-long fraud. 868 F. Supp. 2d 261, 273-275 (S.D.N.Y. 2012). And *In re Axis Capital Holdings Ltd., Securities Litigation* did not even mention an Item 303 claim. 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006).

corporations. Accordingly, the Court will "interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K."[26]

Defendants' cases all rely on *In re Top Tankers, Inc. Securities Litigation*, 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007), which only held that **Item 304** of Regulation S-K (regarding changes in auditors) does not apply to foreign issuers.[27]  This Court should follow the principled reasoning of *Christine Asia* and *Panther Partners* and find that Item 303 applies to Reckitt.

## 6.      Defendants' Purported Opinion Statements Are Actionable

Defendants argue that statements concerning growth prospects (ECF No. 90 at 8-9), Film rollout (*id*. at 9), and the demerger (*id*. at 10; ECF No. 96 at 10) are inactionable opinions.  Plaintiffs dispute that they are statements of opinion, but assuming, *arguendo*, that they are, the statements are actionable under *Omnicare*.  In *Omnicare*, the Supreme Court held that opinions are actionable if: (1) "the speaker did not hold the belief she professed" (575 U.S. at 186); (2) a "supporting fact she supplied" for the opinion was untrue (*id*.); or (3) the speaker has omitted facts "whose omission makes the opinion statement at issue misleading to a reasonable person." *Id*. at 194.  Any purported opinion statements by Defendants are actionable under *Omnicare*'s first and third prongs because Defendants did not believe Film was safer and less subject to diversion, and omitted facts concerning the lack of reliable scientific studies to back up their safety claims and the deceptive and anticompetitive practices designed to switch patients from Tablets to Film.  *See supra* at 3-9.  As the Second Circuit stated in *Tongue v. Sanofi*, a defendant must have "conducted a meaningful inquiry and ha[ve] a reasonable basis upon which to make such an assertion."  816 F.3d 199, 214 (2d Cir. 2016).  Defendants lacked a reasonable basis backed by scientific studies – if they possessed any

---

[26]  *Id*. at 476 (first quoting In Re Comm'n Guidance Regarding MD & A of Fin. Condition & Results of Operation, Release No. 8350 (Dec. 19, 2003); then quoting Release No. 33-7745, 64 Fed. Reg. 53900, 59304 (Sept. 28, 1999)) (alterations in original), *vacated on other grounds and remanded sub nom. Christine Asia Co. v. Ma*, 718 F. App'x 20 (2d Cir. 2017); *see also Panther Partners Inc. v. Jianpu Tech. Inc*., 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020) (quoting *Christine Asia*).

[27]  Defendants cite *In re Dynagas LNG Partners LP Securities Litigation*, 2020 WL 6947521, at *9 (S.D.N.Y. Nov. 25, 2020), which cites *Top Tankers* and other cases that rely on *Top Tankers*.  *See* ECF No. 90 at 12.

legitimate basis – for their statements touting Film over Tablets.[28]

### C. Plaintiffs Adequately Allege Scienter

To state a claim under Section 10(b), a complaint must allege facts that, considered holistically and not in isolation, support a strong inference that defendants acted with scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. The scienter requirement is met where a complaint alleges facts showing either (1) "motive and opportunity to commit fraud"; or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307.[29] "Courts routinely impute to the corporation the intent of officers and directors[.]" *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010). The TAC is replete with well-pled allegations that Defendants made the alleged misstatements and omissions with scienter. *See, e.g.*, ¶¶105-109, 119-120, 123-128, 130, 147-164.

### 1. Defendants Fabricated a "Safety Story" to Justify Switching Patients from Tablets to Film

The TAC alleges that Defendants fabricated a story that Film had a superior safety profile, tried to sell that story to the FDA but were rebuffed, and nevertheless continued to tell the market that the story was true. *See supra* at 4-7. There was no legitimate disagreement of opinion with the FDA or internally. *Cf*. ECF No. 90 at 14-15. Any purported difference of opinion between Reckitt and the FDA was a sham: Defendants knew that their "safety story" was a pretext. *See supra* at 4-5. Defendants also knew that Film was, in many respects, ***more*** dangerous than Tablets. *See supra* at 3

---

[28] Defendants contend that the statement that Reckitt was expecting "continuing strong market growth" is an inactionable opinion statement. ECF No. 90 at 8-9. But Defendants omitted that this expectation was based on an undisclosed anticompetitive scheme. Defendants' reliance on *In re QLT Inc. Securities Litigation* is misplaced because Defendants' misstatements are not expressions of "optimistic opinions," 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004); rather, the statements "contradict facts known to [D]efendant[s]." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018).

[29] Defendants' portrayal of the pleading requirements for scienter, *e.g.*, "Plaintiffs must create a strong inference that" the alleged fraud "was ***intended*** to mislead investors" is an inaccurate recitation of law. ECF No. 90 at 13.

n.2.  In addition, massive stock sales by Becht and Day between Reckitt's submission of its letter to the FDA regarding the purported safety of Film and the FDA's response show the safety issue was more than a sincere difference of opinion with the FDA, and reflect the executives' knowledge that Reckitt lacked a legitimate basis for its superior safety claim.  ¶¶8, 304.[30]

Defendants take issue with Plaintiffs' pre-Class Period allegations of Defendants' knowledge of the falsity of their claims of superior safety of Film.  *See* ECF No. 90 at 15, 17-18.  The inference of scienter, however, extends from Defendants' pre-Class Period conduct into the Class Period during which Defendants made false and misleading statements to investors.  *See, e.g., In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001) (holding that pre-class period data is relevant when evaluating scienter allegations); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 411 (S.D.N.Y. 2020) ("there is no bright-line rule prohibiting courts from considering allegations that predate the Class Period").  The TAC draws a straight line from 2006, when Defendants first began to fabricate safety and diversion as pretextual reasons for Film to replace Tablets without any scientific basis (¶¶106-109), through 2009-2011 when information casting doubt on their hypothesis became known to them (¶¶119-120, 123-127, 143), to 2013 when the FDA concluded that the withdrawal of Tablets for safety reasons was not necessary (¶¶164-167), and into the Class Period – when Defendants told investors of the safety superiority of Film despite known facts to the contrary.  ¶¶221-274.  Thus, Plaintiffs have adequately identified contradictory information regarding the Film's safety that was available to, and known by, Defendants at the time of the alleged misstatements.[31]

Thaxter argues the email from Reckitt's IR director to himself, Kapoor, and others

---

[30]  It is of no moment that Becht (Reckitt's then-CEO) and Day (Reckitt's then-CFO) are not named defendants, as their scienter is imputed to Reckitt.  *See Ambac*, 693 F. Supp. 2d at 265.

[31]  A strong inference of scienter exists where a defendant "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor[.]"  *Novak*, 216 F.3d at 311.

referencing "'our plans' to withdraw Suboxone Tablet's FDA approval in order to delay FDA approval of generic versions of Suboxone Tablet" (¶148; *see also supra* at 7-8), is not indicative of a conspiracy to engage in anti-competitive behavior because "there are no allegations supporting the claim that any views of the [IR] director . . . were shared by the group that received the email." ECF No. 96 at 16-17.[32]   Defendants' reading of the email strains credulity.  Read in the light most favorable to Plaintiffs, the IR director's statement about "our plans" refers to the plans of the people copied on the email.   Moreover, it defies reason that a director of investor relations would have developed his or her own plans to withdraw a drug's FDA approval in order to delay FDA approval of a generic version of that drug; rather, the IR director was undoubtedly referring to the plans of Reckitt's and RBP's senior executives.[33]

Defendants assert that Plaintiffs have not pled that "the Reckitt Group executives knew the Company's subsidiary was engaging in anticompetitive activity" and that "it is not plausible that those executives" used that activity "as a vehicle to commit securities fraud or were reckless in not knowing the market would be misled."  ECF No. 90 at 13.  But this case is not about executives far-removed from a subsidiary's fraud; the TAC alleges that Reckitt CEOs Becht and Kapoor were intimately involved in the fraudulent scheme.  *See supra* at 6-7, 16 n.9 (Becht), 7-9, 15 (Kapoor); *see In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d 731, 764–65 (S.D.N.Y. 2017) (scienter where defendants were "directly involved in the bribery scheme and therefore had actual knowledge that the . . . SEC filings were false").[34]

---

[32]  Perplexingly, Defendants state that the TAC lacks "statements by confidential witnesses or internal documents, insider trading, [or] factual showings that executives had a financial incentive to commit fraud[.]" ECF No. 90 at 13-14. Although there are no confidential witnesses pled in the TAC, the TAC extensively cites internal emails and documents evidencing Defendants' scienter, as well as insider trading and facts demonstrating motive to commit fraud. *Supra* at 4-9; *infra* at 27.

[33]  It is of no moment that this email does not indicate that its recipients disagreed with the General Counsel or responded in support of the IR director's views. *Cf.* ECF No. 96 at 17. At most, Defendants raise questions of fact that cannot be resolved on this motion. *See Anderson News*, 680 F.3d at 185.

[34]  Defendants argue that the TAC does not allege "RBP officers had *any* role in Reckitt Group's management." ECF No. 90 at 16 (emphasis in original). This argument is a red herring. Not only did Thaxter participate in the scheme with

### 2. Defendants Possessed Motive and Opportunity to Commit Fraud

In addition to conscious wrongdoing, Defendants had the requisite motive to defraud, as Suboxone's multibillion dollar revenues were jeopardized by the prospect of generic Tablets entering the market.  ¶306; *see In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *21 (D.N.J. Dec. 19, 2019) ("the fact that Celgene was under pressure to find a new source of profitability gives rise to a strong inference that [defendants were] at best, recklessly disregarding the risk of misleading the public as to Celgene's ability to obtain FDA approval for Ozanimod.").

In addition to the anticompetitive scheme, the TAC alleges that Defendants knew that RBP was a ticking time bomb such that, in order to rid themselves of the economic impact of liabilities associated with Suboxone, they announced the decision to demerge RBP from Reckitt on July 28, 2014 – in the midst of federal and state criminal investigations relating to the anticompetitive scheme.  ¶¶15-16, 218, 256, 259, 270.[35]  Defendants' positive statements about RBP and Suboxone between the start of the Class Period and the date of the demerger's approval (December 11, 2014) served to increase the value of RBP, which netted Reckitt a gain of roughly $2 billion.  ¶216.  Thus, Defendants were motivated to artificially inflate the value of RBP before demerging it from Reckitt.  ¶307.  These allegations are plainly not "generic corporate motive allegation[s]."  ECF No. 90 at 17.

### 3. Reckitt's Prior Product-Hopping Scheme Establishes a Pattern of Culpable Conduct

Reckitt previously engaged in a strikingly similar product-hopping scheme for another of its pharmaceutical products around the same time as Defendants developed their "safety story" for Film, resulting in a £10 million fine by the U.K.'s Office of Fair Trading ("OFT").  ¶¶308-309.  The OFT found that Reckitt's Board, which included Defendant Bellamy, and Executive Committee

_____

the other Defendants, he also participated in Reckitt conference calls alongside these Defendants and made false and misleading statements to investors.  *See, e.g.*, ¶¶228, 234-235, 237, 239, 241, 243, 245, 248, 259, 263.

[35]  Reckitt itself did not disclose the DOJ and FTC investigations into the RBP business until February 15, 2016.  *See* Reckitt Full Year Results 2015 Press Release at 23 (Feb. 15, 2016), available at: https://www.reckitt.com/investors/results-and-presentations/.

were involved in the relevant decision-making process.   ¶309.  The finding of wrongdoing and penalty demonstrate Defendants' consciousness of wrongdoing of this type of scheme.  *See, e.g., In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *10 n.3 (E.D.N.Y. Dec. 5, 2013) ("the admitted prior misconduct establishes a pattern of culpable conduct on the part of Symbol and its management which supports a strong inference of scienter"); *cf*. ECF No. 90 at 18.[36]

In addition, the Individual Defendants and Becht spoke to investors about RBP and Suboxone,[37] so they were obviously knowledgeable about RBP's business.  *See, e.g., In re PTC Therapeutics, Inc. Sec. Litig*., 2017 WL 3705801, at *16-*17 (D.N.J. Aug. 28, 2017) (finding "powerful evidence of scienter" where defendants spoke "explicitly and repeatedly" about drug trials and defendants' "statements to investors . . . implied that they had first-hand knowledge of [the study] results and PTC's conversations with the FDA").

### 4.    Thaxter's Additional Scienter Arguments Fail

Thaxter also possessed a unique motive to artificially inflate the value of RBP and Film to secure shareholder approval of the demerger because of the "concrete and personal way" in which he benefitted from the fraud.  *Novak*, 216 F.3d at 307-08.  The demerger enabled Thaxter to become Indivior's CEO, which increased his total compensation by 234% from 2014 to 2015.  ¶42; *see* Ex. 5.  This concrete and personal benefit that Thaxter received as a result of the demerger – which depended on investors believing that Film would succeed despite the threat of generic Tablets – is sufficient to plead scienter.  *See Celgene*, 2019 WL 6909463, at *21 (finding that defendants who "received a performance award and/or bonus, in part, because the NDA was filed in 2017 . . . also

---

[36] *See also* David Leigh, Company Accused of Cheating NHS, THE GUARDIAN (Mar. 6, 2008) (Ex. 4) and Decision of the Office of Fair Trading: Abuse of a dominant position by Reckitt Benckiser Healthcare (UK) Ltd. And Reckitt Benckiser      Group      plc      (Apr.      12,      2011),      available      at: https://assets.publishing.service.gov.uk/media/555de4bbe5274a7084000156/rb-decision.pdf.
[37] During the Class Period, Reckitt CFO Hennah signed public securities filings and spoke during earnings conference calls on behalf of Reckitt. *See* ¶¶228, 252, 254, 256, 265.  Reckitt Board Chairman Bellamy signed public securities filings as well. *See* ¶¶227, 259, 270.

had a personal financial motivation to push for the NDA filing to occur 2017").[38]

Thaxter's focus on the crime for which he was recently incarcerated, a strict-liability violation of the FDCA for failing to prevent and correct the distribution of false and misleading pediatric exposure data to MassHealth, is misplaced and adds even more support for his scienter. *See* ECF No. 96 at 2, 5-6, 15-16.[39]  Suboxone was the core operation of RBP, and the TAC pleads facts showing Thaxter was knowledgeable about Suboxone strategy.  *See, e.g.*, ¶¶173, 177, 197, 289.[40]  Under the core operations doctrine, it is reasonable to infer that Thaxter knew about the manipulated data sent to MassHealth that his direct report, Baxter, was aware of.  *See Evoqua Water Techs.*, 450 F. Supp. 3d at 423.[41]  Moreover, in April 2013, the Medical Affairs Manager spoke to RBP lobbyists *at an RBP corporate conference* about her misrepresentations to MassHealth. ¶186. Thus, it was no secret at RBP that the Medical Affairs Manager deceived MassHealth, and it is reasonable to infer that Thaxter, the CEO, knew about the deception.  *Cf.* ECF No. 96 at 16.

Thaxter also ignores Plaintiffs' allegation that Reckitt hired a purportedly "independent physician" – who was neither independent nor a physician and who secretly coordinated with RBP's

---

[38]   Thaxter was a "maker" of the statements in the July, October, and November 2014 press releases to the extent the statements concerned RBP. *Cf.* ECF No. 96 at 7-8.  As CEO of RBP, Thaxter had direct involvement in in the everyday business of RBP, and exercised "ultimate authority over the statement[s]" in these press releases regarding RBP.  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Plaintiffs may rely on the group pleading doctrine, "which allows a plaintiff to rely on a presumption that written statements that are 'group-published,' *e.g.*, SEC filings and press releases, are statements made by all individuals with direct involvement in the everyday business of the company."  *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240 (S.D.N.Y. 2018).  "[M]ost judges in this District have continued to conclude that group pleading is alive and well [after *Janus*]."  *Id.* at 241.

[39]   Thaxter only approved sending a correction letter to MassHealth in December 2015, in the midst of the government's investigation of Indivior. *Cf.* ECF No. 96 at 16.  It is reasonable to infer that he did so because he knew full-well that the government was going to get access to the false data.  ¶187; *cf.* ECF No. 96 at 16.  Additionally, Baxter said at his sentencing that he elevated concerns regarding RBP's sales force conduct to "members of our management with the relevant responsibility."  ¶289.  It is reasonable to infer that he was referring to Thaxter.

[40]   Defendants contest that neither Suboxone nor RBP were core operations of Reckitt because they constituted a small percentage of "Reckitt Group's large and varied business portfolio."  ECF No. 90 at 16.  But Plaintiffs do not allege that RBP was a core operation of Reckitt, only that Suboxone was the core operation of RBP – which is probative of Thaxter's scienter.  In any case, Defendants misleadingly focus on the percentage of Reckitt's *net sales* that RBP comprised in the first half of 2014 (7%).  *See* ECF No. 90 at 14.  RBP, however, accounted for roughly 17% of Reckitt's *operating profits* – a more meaningful figure to investors – during the same period.  ¶222.  And RBP constituted between 18-25% of Reckitt's operating profits between 2010 and 2013.  *See* Ex. 6.

[41]   Thaxter criticizes the core operations doctrine (ECF No. 90 at 17-18), but many courts within this Circuit have held that the core operations doctrine is valid as supplemental support for allegations of scienter.  *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011); *see also Evoqua Water Techs.*, 450 F. Supp. 3d at 424.

Director of Public Sector – to lobby MassHealth.  *See supra* at 11-12 n.8.  Indeed, Thaxter knew that

an RBP lobbyist planned to hire "a guerilla" for strategic communications to help garner MassHealth

formulary approval for Film, he found the lobbyist's statements to be "outrageous," but he did not

put a stop to the lobbyist's plans.  ¶¶190-191; *see also* ¶197.[42]

Viewing the facts holistically, they raise a strong inference of Thaxter's (and the other

Defendants') scienter.  Specifically, these facts include: (1) fabrication by Thaxter and others of the

Film's "safety story"; (2) internal documents refuting the "safety story";[43] (3) statements by the FDA

demonstrating that Film was not safer or less subject to diversion than Tablets; (4) a scheme to

thwart generic competition; (5) a scheme to delay FDA approval of generic Tablets; (6) pulling

Tablets from the U.S. market only; (7) filing a sham citizen petition with the FDA; (8) distributing

false marketing materials; (9) enabling doctors to illegally over-prescribe Suboxone;

(10) manipulating data that was sent to the FDA; (11) hiring a fake doctor to harass MassHealth;

(12) a motive to engage in fraud in order to find a new source of profitability for Suboxone; (13) a

motive to artificially inflate the value of RBP and Film to secure shareholder approval of the

demerger; (14) the Indictment of Indivior, the company he led as CEO;[44] and (15) massive

settlements (amounting to $2 billion) by the DOJ with Reckitt and Indivior.[45]  In light of these

allegations, considered collectively, Thaxter's liability for securities fraud does not arise merely "by

reason of his position" in Reckitt.  ECF No. 96 at 15.  To the contrary, Thaxter created a culture of

---

[42]  Although the FDA did not find that "RBP's submissions to [it] were knowingly false," ECF No. 96 at 14, that is likely because the FDA did not have access to the internal documents cited in Indictment.  Indeed, this fact further undermines Defendants' position that the market knew the truth about Defendants' fraud.  And it is irrelevant that the TAC does not allege that Thaxter sold any Reckitt securities during the Class Period, *cf. id*. at 13, since Thaxter's transactions in Reckitt securities are not publicly reported because he is not a reporting officer of Reckitt.

[43]  Thaxter contends that the TAC is "devoid of allegations that [he] specifically possessed knowledge of facts or access to information contradicting the public statements at issue."  ECF No. 96 at 14.  That contention is plainly false.  *See, e.g*., ¶¶116, 126, 128, 148, 156, 158; *see also supra* at 4-9, 13-14.

[44]  *See In re Gentiva Sec. Litig*., 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (governmental investigation is "one piece of the puzzle" with respect to scienter).

[45]  *See In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 367 (S.D.N.Y. 2001) ("the magnitude of the alleged fraud is properly considered in weighing whether the complaint meets the pleading standard for scienter").

deception at RBP, which extended to his public statements to investors. Reckitt's $1.4 billion settlement with the government was the "largest opioid settlement in US history" (¶280) for good reason – because Defendants' misconduct was so egregious. Plaintiffs' inference of scienter, that Defendants knew or were reckless in making statements to the market regarding Film, is far more compelling than Defendants' implausible explanation that they "disagree[d] in good faith with the FDA" about the benefits of Film. ECF No. 90 at 14.[46]

### D.    Plaintiffs Adequately Allege Loss Causation

To plead loss causation, a plaintiff must allege either (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). "[A]t this early pleading stage, [courts] do not require 'conclusive proof' of the causal link between the fraud and Plaintiffs' loss." *Abramson v. Newlink Genetics Co.*, 965 F.3d 165, 180 (2d Cir. 2020). A plaintiff's burden to plead loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

Reckitt's misconduct was revealed to the market through three corrective disclosures. *See supra* at 10-11. Each of these disclosures led to immediate material stock price declines. *See id.* In response, Defendants reiterate their truth-on-the-market argument, and wrongly claim that the Indictment "did not reveal new information to the market" because "investigations" and "claims RBP had engaged in anticompetitive activity" were previously disclosed. ECF No. 90 at 18-19. However, as discussed above, the public was not privy to the trove of Reckitt internal emails and documents revealed in the Indictment, nor the fraudulent marketing scheme, physician-prescribing fraud, or MassHealth fraud, which demonstrate Defendants' intentional, fraudulent efforts to

---

[46]  Because the TAC adequately alleges that Kapoor, Hennah, Bellamy, Becht, Day, and Thaxter acted with scienter, it adequately alleges scienter as to Reckitt. *See Ambac*, 693 F. Supp. 2d at 265.

promote Film.  *See In re Navient Corp. Sec. Litig.*, 2019 WL 7288881, at \*12 (D.N.J. Dec. 30, 2019)

(rejecting argument that an Attorney General's lawsuit merely restated allegations made by another

government agency earlier because the complaint "specifically alleges that this suit contains new

allegations."); *AP-Fonden v. Goldman Sachs Grp., Inc.*, 2021 WL 2659797, at \*16 (S.D.N.Y. June

28, 2021) (rejecting argument that "after years of news reports and disclosures detailing

investigations, potential prosecutions, and potential fines facing Goldman in light of the 1MDB

scandal, Goldman's stock price already 'would have already reflected' all that risk").

Defendants cannot rely on *In re Moody's Corp. Securities Litigation*, 274 F.R.D. 480

(S.D.N.Y. 2011), because it analyzes loss causation at the class certification stage, after both sides

were afforded an opportunity to conduct an expert analysis.  *Id.* at 488.  It also does not involve a

comparable disclosure, instead focusing on whether a "broad call for an investigation" by Congress

into the entire ratings industry was sufficient to disclose issues with Moody's in particular.  *Id.*[47]

Moreover, Defendants ***repudiated*** information that might have disclosed details of the fraud,

and continued to tout the supposed safety advantages of Film after the FDA's February 22, 2013

letter, including as soon as the following month in Reckitt's Annual Report.  ¶¶163, 169.  By

publicly rejecting an account that could reveal the truth, Defendants "entrenched the alleged fraud."

*Dartell v. Tibet Pharms., Inc.*, 2016 WL 718150, at \*6 (D.N.J. Feb. 22, 2016) (disclosure on foreign

website not corrective disclosure when "repudiated by management in an official press release"); *see

also Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 478 n.10 (S.D.N.Y. 2013) (rejecting

argument that share price reflected information on internet when company disputed it); *Goldman

Sachs*, 2021 WL 2659797, at \*18 (same); *Jeld-Wen Holding*, 2020 WL 6270482, at \*10 (same).

Defendants also cite a Reckitt stock-price decline "in February 2013" in support of their

---

[47]    Defendants' reliance on *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 568 F. Supp. 2d 349
(S.D.N.Y. 2008), where concealed risks in research reports were purportedly disclosed in a subsequent research report, is
similarly misplaced.  *Id.* at 360.  In *Merrill Lynch*, unlike here, the court found that the prior reports showed the
concealed risks "on their face" and the collapse of the Internet sector presented a significant intervening cause.  *Id.*

argument that "[a]ny loss caused by the alleged anticompetitive conduct would have necessarily been experienced in 2013." ECF No. 90 at 19; *see also id.* at n.21 & n.22. But Defendants neglect to explain what other news was disclosed at the time. On the same day as the FDA's February 22, 2013 letter denying Reckitt's citizen petition, the market learned that the FDA approved two generic variants of Tablets, which more likely caused the stock-price declines noted by Defendants. *See* Exs. 7-9.[48] Defendants' assertion that Reckitt's stock price increased on July 11, 2019, when Reckitt settled with the DOJ and FTC, *see* ECF No. 90 at 19, does nothing to refute Plaintiffs' allegations because a lack of negative stock-price reaction to subsequent corrective disclosures could signal that "the market already had taken account of such information." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008). In any case, Defendants raise a question of fact that cannot be resolved at the pleading stage. *See Loreley*, 797 F.3d at 187 (loss causation is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").

### E.     Plaintiffs' Claims Are Timely

Securities fraud claims brought under Section 10(b) are subject to a two-year statute of limitations. *See* 28 U.S.C. §1658(b). The limitations period "does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' ***including scienter*** – irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010); *see also City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). And statute of limitations is an affirmative defense, requiring Defendants to carry the burden of showing untimeliness. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

Defendants argue that "litigation, news articles, investigations, and public FDA proceedings" from 2012 and 2013 "included all underlying material information[,]" ECF No. 90 at 20, but they do

---

[48]   The Court may consider news articles at the pleading stage to demonstrate "the fact of publication." *Bank of Am.*, 757 F. Supp. 2d at 302.

not explain how Plaintiffs could have discovered or alleged scienter based on those facts. While the lawsuits referenced by Defendants alleged anticompetitive misconduct, the plaintiffs there were not required to and did not allege scienter. *See* 15 U.S.C. §2 (Section 2 of the Sherman Act). Moreover, the antitrust complaint does not mention any of the Individual Defendants, Reckitt vigorously defended against any allegations of fraud in the antitrust action, and all claims against Reckitt were dismissed. *See supra* at 16; *cf.* ECF No. 90 at 22. Here, Plaintiffs rely on internal documents evidencing scienter that could not have been discovered until the Indictment was filed in April 2019. ¶18. As a result, Defendants have failed to meet their "burden to show how these events did alert or should have alerted Plaintiff[s] to discover facts 'with sufficient detail and particularity' to demonstrate each element of the alleged violations, including the scienter of each Defendant." *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 62 (S.D.N.Y. 2020) (CEO's arrest and related news coverage did not disclose information concerning "the scienter of each Defendant" and "thus plainly do not trigger the statute of limitations."); *DoubleLine*, 323 F. Supp. 3d at 438-439 (news articles that company was "being investigated for potential fraud" did "not provide the who, what, where, when, and how that securities fraud plaintiffs must plead").

Defendants' reliance on *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530 (S.D.N.Y. 2014) is unpersuasive. There, the plaintiffs argued that the company's lack of valuable intellectual property ("IP") was first disclosed through a Chapter 11 Trustee's investigation, but the IP valued on the company's balance sheet had been written down to zero two years earlier. *Id.* at 536. Defendants' reference to *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 221 (S.D.N.Y. 2009), is also misplaced, as that case centered on an alleged misrepresentation that the FDA would not grant approval of defendant's drug without a single-dose

study, but the complaint itself confirmed that such a single-dose study was not necessary.[49]

The declines in Reckitt's stock price alleged in the TAC also undermine Defendants' argument that all relevant information was previously disclosed.  *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 236 (S.D.N.Y. 2006) ("despite the news reports and *Stefansky* complaint that were supposedly absorbed into Goldman's market price, Goldman stock still suffered a sizable drop in value when the state and federal investigations into investment bank practices were announced to the investing public, thereby suggesting that the news reports and *Stefansky* complaint did not put Plaintiff on inquiry notice").  In any case, "the question of when the plaintiffs should have known of the alleged violation often requires a fact sensitive inquiry that is not appropriate at this early stage of the proceedings."  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 2002 WL 33934282, at *25 (D.N.J. June 26, 2002).

## F.    Plaintiffs Adequately Allege Control Person Claims

Thaxter's participation in the July 28, 2014 earnings call demonstrates his control of Reckitt. ¶¶228, 234-249; *cf.* ECF No. 96 at 18-19.  During that call, he spoke on behalf of Reckitt concerning RBP and Suboxone, which suffices to plead control.  *See Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *9 (S.D.N.Y. July 28, 2017) (control-person claim sufficiently pleaded where, *inter alia*, defendants participated in investor conference calls "in their capacities as senior representatives" of defendant corporation).[50]  In addition, pleading Thaxter's scienter is more than sufficient to plead his "culpable participation" under Section 20(a).[51]  *See City of Warren Police & Fire Ret. Sys. v. World*

---

[49]  Defendants also inaptly cite *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 545 (S.D.N.Y. 2013), where the plaintiff solely relied on allegations from four paragraphs of the complaint to argue that scienter was adequately alleged, which in turn relied on materials from outside the limitations period, and *Fogel v. Wal-Mart de México SAB de CV*, 2017 WL 751155, at *3 (S.D.N.Y. Feb. 27, 2017), where Wal-Mart conducted an internal investigation into the alleged fraud by its subsidiary, and did not conceal information after undertaking that process.
[50]  Thaxter was also quoted in Reckitt's November 17, 2014 Demerger Release.  ¶¶259, 261.
[51]  Likewise, because Plaintiffs have pled a Section 10(b) claim against Kapoor, Hennah, and Bellamy, they have pled a Section 20(a) claim against them as well.  *Cf.* ECF No. 90 at 22 n.24.

*Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020); *cf.* ECF No. 96 at 19.[52]

### G.   Plaintiffs Adequately Allege English Law Claims

The Court should not stay Plaintiffs' claims brought under English common law and Section 90A of the U.K. Financial Services and Markets Act 2000 ("FSMA") (the "English Law claims"). ¶1.  In support, Plaintiffs have submitted the Declaration of David Lord, QC (the "Lord Decl."), a Queen's Counsel with more than 30 years of expertise in English law, in which he explains that the disputes clauses in Reckitt's Articles of Association (the "Articles") do not apply to the English Law claims. *See* Lord Decl. at ¶¶45-46.[53]  Because the English Law claims fall outside the scope of the Articles, the forum selection clause (Article 133) also does not apply.  Thus, the Court should hear the English Law claims together with the Exchange Act claims in this District.

Plaintiffs have also submitted the Declaration of Tom Lowe, QC (the "Lowe Decl."), a Queen's Counsel with more than 35 years of expertise in English law, including experience in securities litigation in the UK and the US, in which he explains the elements of the English Law claims, including reliance.  *See* Lowe Decl. at ¶¶4, 15-21.  According to Lowe, more than a century's worth of English legal precedent permits the Court to presume an investor's reliance on an issuer's alleged misstatements.  *Id.*

Despite the arguments raised by Defendants (*see* ECF No. 90 at 22-25; ECF No. 96 at 19-20), and in the Declaration of Stephen Midwinter, Q.C. (ECF No. 92) (the "Midwinter Decl."), the English Law claims are not subject to mandatory arbitration and have been sufficiently pleaded against all of the Defendants.  There is also no merit to Defendants' *forum non conveniens* argument.

---

[52]  Without citing any facts whatsoever, Defendants lodge a baseless attack on Lead Plaintiff Birmingham and its PSLRA certification. *See* ECF No. 90 at 6 n.4.  The number of Birmingham's appointments as lead plaintiff is irrelevant at this stage because the Court is not faced with a motion for lead-plaintiff appointment or class certification.  Assuming Defendants are referring to Birmingham's lead-plaintiff motions that were granted ***after*** the date the certification was signed, the certification was accurate and truthful as of the date it was executed, and all pending lead-plaintiff motions were accurately listed on the certification. *See* ECF No. 20-4.  But since Defendants cite no facts in support of their argument, Plaintiffs and the Court are left to wonder what, precisely, they are even referring to.

[53]  "In determining foreign law, the court may consider any relevant material or source, including testimony" by an expert retained by a party. *See* Fed. R. Civ. P. 44.1.

1.      **The English Law Claims Are Not Subject to Arbitration Because**
        **They Fall Outside the Scope of Reckitt's Articles of Association**

Defendants assert that "Reckitt Group and plaintiff Pontiac . . . have an agreement to

arbitrate." ECF No. 90 at 23.  Citing Article 132, Defendants contend that disputes "arising out of"

the Articles "or otherwise" between a shareholder "in that shareholder's capacity as such and the

company and/or its directors" are contractually bound to arbitrate in London and English law

governs.  *Id.*; *see also* Midwinter Decl. ¶¶9-18.  Article 132 does not apply to Plaintiffs' English

Law claims, however, because those claims are outside the scope of the Articles, which renders any

provisions that compel arbitration in them inapplicable to the instant litigation.

Defendants offer a blanket assertion that the Federal Arbitration Act "mandates that the Court

stay Pontiac's claims in favor of arbitration." ECF No. 90 at 23-24.  No such mandate exists.  To the

contrary, the Supreme Court requires that "courts should order arbitration of a dispute only where

the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a

valid provision specifically committing such disputes to an arbitrator) its enforceability or

applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561

U.S. 287, 299-300 (2010).  Where, as here, "a party contests either or both matters, 'the court' must

resolve the disagreement." *Id.*

a.      **Article 132 Does Not Apply to the English Law Claims**

The parties do not contest that English law applies to deciding contract formation. *See, e.g.*,

ECF No. 90 at 23 ("English law governs" the Articles' arbitration provision).  As the Lord Decl.

explains in greater detail, a company's articles of association are a "statutory contract" that "are

binding only insofar as they affect the rights and obligations between the company and the members

acting in their capacity as members; if the provisions are "not truly referable to the rights and

obligations of members as such it does not operate as a contract." Lord Decl. ¶19.4.  Indeed, where

the agreement "may not be a contractual bargain of the same nature and the relationship created by the agreement may be narrower, a more restrictive approach [of contract interpretation] may be necessary." *Id.* ¶32. To that end, English courts recognize that it is unlikely that rational businessmen would choose to have determined together to arbitrate a claim in tort "related" to an unarguable contractual claim (the "Rational Businessmen standard"). *Id.* ¶30.4.

Here, Article 132[54] compels arbitration of all disputes "between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise[.]" ECF No. 90 at 23. Plaintiffs' English Law claims – which are all based in part on the right not to be deceived by Defendants, whether fraudulently or negligently, when acquiring or retaining Reckitt shares – do not relate to any provision of the Articles. For example, Plaintiffs do not bring any of their English Law claims as arising from, or by reference to, the Articles. Instead, they arise from common law and statute.

None of the Articles are written as to protect shareholders against fraudulent misstatements when acquiring shares in Reckitt. There is no reference in the Articles to "claims in tort" or "claims under FSMA 2000." Lord Decl. ¶36.3. While the Articles contain disputes clauses that refer to "any derivative claim under the legislation," *see* Article 134(A)(ii), the FSMA claim is not a derivative claim. *Id.* Thus, the English Law Claims are "entirely non-contractual." Lord Decl. ¶29.3.[55]

In short, none of the Articles provide enforceable rights analogous to those relied upon in the English Law claims. *See id.* ¶36.3. The English Law claims are therefore outside the scope of the Articles. *See id.*[56] In addition, the ambiguity of the phrase "in that shareholder's capacity as such ... or otherwise" in Article 132 should be interpreted to mean a shareholder seeking to rely on a right annexed to their shares or a right set out in the Articles, which are acquired upon becoming a

---

[54] The Articles mistakenly refer to Article 132 as Article 135. *See* ECF No. 90 at 23 n.25.
[55] Moreover, there is no need to resolve a contractual issue in order to determine the English Law claims. *See* Lord Decl. ¶36.5.
[56] The authorities relied on in the Midwinter Decl. are readily distinguishable. *See* Lord Decl. ¶36.7.

shareholder, not as a right acquired by a person other than a shareholder.  *See* Lord Decl. ¶¶19.7; 37. The "or otherwise" language therefore does not capture the English Law claims, because Plaintiffs had no rights under the Articles prior to becoming induced into purchasing artificially inflated Reckitt stock.  *See* Lord Decl. ¶39.3.  Therefore, Article 132 does not compel arbitration of the English Law claims.

### b.    Article 133 Does Not Apply to the English Law Claims

In the alternative, Defendants argue Article 133 is an enforceable forum selection agreement under English Law.  *See* ECF No. 90 at 24-25.  But because Article 132 does not apply to the English Law claims, the catch-all provision embodied by Article 133 does not apply either.  *See* Lord Decl. ¶¶43-44.  It therefore cannot be said that the resolution of any issue contemplated by the Articles is necessary to resolve the English Law claims, and Reckitt cannot rely on the dispute resolution provisions in the Articles as the relevant contractual right under which Plaintiffs are seeking to enforce.  *See id.*; *see also id.* at ¶19.6.[57]

### 2.    Defendants' *Forum Non Conveniens* Argument Should Be Rejected

Defendants also argue that if the Court finds the arbitration clause unenforceable, then it should dismiss the English Law claims on *forum non conveniens* grounds.  *See* ECF No. 90 at 24. As described above, the English Law claims do not arise out of the Articles, rendering the forum selection clause in Article 133 inapplicable.  Nevertheless, Defendants have failed to demonstrate – as is their burden, *see Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001) – that they would be unduly inconvenienced by litigating the English Law claims in tandem with the Exchange Act claims in this District.

---

[57]  For this reason, Defendants' reliance on *In re Petrobras Securities Litigation*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015) is inapposite.  ECF No. 90 at 24-25.  There, the defendant's articles explicitly stated that the causes of action alleged in the litigation were subject to arbitration, unlike here.  *See Petrobras*, 116 F. Supp. 3d at 387.

Defendants have not undertaken the requisite analysis[58] nor have they offered any factual or legal support to overcome the strong presumption in favor of Plaintiffs' choice of forum. This alone is sufficient for denial. *See Iragorri*, 274 F.3d at 70 ("[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). Instead, they offer a conclusory argument that dismissal under *forum non conveniens* is appropriate because "this case concerns the conduct of an English company, raises complicated issues of English law, and is brought by a class of stock purchasers who purchased on the [LSE] – the vast majority of which undoubtedly are foreign." ECF No. 90 at 24. This argument should be rejected.

First, Defendants ignore that Pontiac, which purchased Reckitt ordinary shares on the LSE, is a U.S. plaintiff. ¶38. "To the same extent that England may have an interest in adjudicating matters affecting a British corporation, the United States courts have an interest in adjudicating matters affecting its residents." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 107-08 (2d Cir. 2000).

Second, Defendants ignore that the English Law claims and the Exchange Act claims are derived from the same underlying facts and alleged misconduct. Since Defendants acknowledge that the federal claims may proceed here, there is no efficiency or convenience to be gained by splitting the claims. To the contrary, pursuing the English Law claims abroad would be a waste of resources for all parties involved, including the courts. *See Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 600-01 (M.D. Tenn. 2020) (rejecting inconvenient forum argument raised by foreign defendants in securities class action alleging foreign law and Exchange Act claims where the alleged misconduct was "derive[d] from a common nucleus of operative facts" in the interest of "juridical economy, convenience, and fairness to litigants"); *In re Teva Sec. Litig.*, 2021 WL 231130, at *30 (D. Conn. Jan. 22, 2021) (rejecting *forum non conveniens* argument raised by defendants in

---

[58] The Second Circuit has outlined a three-step analysis for motions to dismiss for *forum non conveniens*: (1) determining the degree of deference to be afforded to the plaintiff's choice of forum; (2) examining whether an adequate alternative forum exists; and (3) balancing the private and public factors implicated in the choice of forum. *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74. (2d Cir. 2001).

securities class action alleging combined foreign law and Exchange Act claims).

Moreover, Defendants' argument that the FSMA "is a new and important enactment in the U.K. that even English courts have yet to interpret extensively" (ECF No. 90 at 24) is belied by Midwinter's acknowledgement that the statute has been active for "13 years" and at least one English court has overseen Schedule 10A claims through to the eve of trial.  *See* Midwinter Decl. ¶38 n.30.  The Federal Rules of Civil Procedure also specifically contemplate procedures by which U.S. federal courts can make determinations of foreign law, *see* Fed. R. Civ. P. 44.1, and the elements of the English Law claims are not complex and substantially resemble the U.S. law that the Court must apply.  *See* Lowe Decl. ¶¶7-32.

### 3.     The English Law Counts State a Claim

#### a.     The TAC Has Pleaded Reliance for the English Law Claims

Defendants argue that "the English law claims require actual reliance and do not recognize a presumption akin to 'fraud on the market,'" and, therefore, Pontiac was required to plead actual reliance.  ECF No. 90 at 25.  The Midwinter Decl., however, contradicts their position.  According to Midwinter, "a plaintiff is entitled to rely on a rebuttable factual presumption of reliance."  Midwinter Decl. ¶34.[59]  This opinion is consistent with Lowe's view on reliance, which states "the presumption of reliance is applied whenever the relevant representation is material," and is sufficient "even when [a] plaintiff [gives] no evidence of reliance."  Lowe Decl. ¶¶19(2),(3).  The defendants can then attempt to rebut the presumption of reliance at a later stage of the litigation.  *See id.* ¶¶19(1),(5),(6).

While there are no UK court decisions that have formally adopted the fraud-on-the-market theory, a body of English caselaw going back to the 19th century demonstrates that reliance can be

---

[59]  Lowe disputes Midwinter's opinion that the presumption is rebutted by merely producing "some evidence casting doubt on actual reliance."  Lowe Decl. ¶19(4).  The presumption, as the UK Supreme Court affirmed, "is very difficult to rebut[.]"  *Id.*  This is because a party who made a fraudulent misrepresentation is not permitted to "speculate upon what might have been the result if there had been a full communication of the truth[.]"  *Id.*

established through a presumption.  *See* Lowe Decl. ¶¶15-21.[60]  It is not coincidental that these

authorities bear a striking resemblance to the fraud-on-the-market doctrine, because the doctrine

itself is derived from the English common law "free and open market theory," which dictated that

"the public has a right to expect that the markets are free and open and reflect prices arrived at

through bona fide transactions and not through manipulation."  Black, 62 N.C. L. Rev. 435 at 456.

In analyzing *Bedford v. Bagshaw*, [1859] 4 H. & N. 538, 157 E.R. 951 (1859), Professor A.A. Berle,

one of the most prominent shareholder governance commentators of the 20th century, noted that "the

false representations were [not] made to the plaintiff" but were instead broadly "made to the London

Stock Exchange."  Berle, *Liability for Stock Market Manipulation*, 31 Colum. L. Rev. 264, 269, n9

(1931).[61]  The plaintiff nevertheless secured a verdict for bringing an action in deceit.  *See id.*  This

1859 English case has been referred to as "one of the earliest expressions of a fraud on the market

theory."  Black, 62 N.C. L. Rev. 435 at 456.

In addition, courts in this District frequently apply a presumption of reliance in the absence

of the fraud-on-the-market doctrine for non-federal securities claims.  The plaintiffs in *Dandong v.*

*Pinnacle Performance Ltd.*, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013), brought class-wide fraud

claims pursuant to New York common law in connection with false and misleading Note offerings.

The court held that it could not "presume, as a matter of *law*, that the element of reliance is satisfied

for each putative class member."  *Id.* at *11 (emphasis in original).  Instead, the Court concluded,

based on the evidence in the record at that stage of the proceedings, that "a reasonable factfinder

[could] conclude beyond a preponderance of the evidence that each individual plaintiff relied on the

defendants' [uniform] representations."  *Id.*  The court further held that "while each plaintiff must

---

[60]  Indeed, in the earliest English stock manipulation case, *Rex v. De Berenger*, 3 M. & S. 67, 105 Eng. Rep. 536 (K.B. 1814), "defendants were convicted of conspiring to raise the price of government securities by circulating false rumors that Napoleon had been killed and peace was forthcoming."  Barbara Black, *Fraud On The Market: A Criticism of Dispensing With Reliance Requirements In Certain Open Market Transaction*, 62 N.C. L. Rev. 435, 456 (1984).
[61]  Available at; https://www.jstor.org/stable/1115043 (last visited Aug. 23, 2021).

prove reliance," he or she may do so through "common evidence" *i.e.*, "through legitimate inferences based on the nature of the alleged misrepresentations." *Id.*; *see also Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 144-45 (S.D.N.Y. 2015).

Without invoking the fraud-on-the-market doctrine, courts within the Second Circuit have certified common-law securities class actions and found that reliance may be proved through circumstantial evidence that plaintiffs would "not have purchased a product but for a defendant's uniform misrepresentations and omissions" about that product. *Anwar*, 306 F.R.D. at 144 (certifying a class of investors "even absent a 'fraud created the market' theory or the *Affiliated Ute* presumption of reliance" because "common evidence can show reliance by the class on alleged misrepresentations by [the defendants]"); *Audet v. Fraser*, 332 F.R.D. 53, 80-81 (D. Conn. 2019) ("financial investments 'that [p]laintiffs made in hopes that they would prove profitable'" combined with "the nature of the alleged misrepresentations permits a common inference of reliance"); *Dandong*, 2013 WL 5658790, at *10 (certifying class of investors where alleged misrepresentations and omissions were "fundamental" to the securities at issue, so that "it is hard to imagine a reasonable investor purchasing them if the [statements] had revealed their true nature"). And "in the context of a financial transaction—which 'does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase'—payment alone 'may constitute circumstantial proof of reliance upon a financial representation.'" *Id.* at *9; *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119-20 (2d Cir. 2013) ("Fraud claims [involving overbilling] may thus be appropriate candidates for class certification because while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue))."

Here, Defendants engaged in a wide-ranging fraudulent scheme to promote Film, artificially

inflate the value of RBP and Reckitt, and deceive the market about the source of Reckitt's success. *See supra* at 2-9, 13-14.  Thus, "the alleged misrepresentations and omissions" were "fundamental to the value" of Reckitt securities in part because the securities "were not the type of product that individuals purchase for 'any number of reasons' they were financial investments that Plaintiffs made in hopes that they would prove profitable." *Dandong*, 2013 WL 5658790, at*10.  It logically follows that "individual issues" of reliance would not "predominate."  *Id*. at *9 (finding New York common-law fraud claims were not "beyond the reach of Rule 23").

Further, "courts in securities fraud actions have consistently recognized that issues of individual reliance can and should be addressed after a class-wide trial, through separate jury trials if necessary." *In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 584-85 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223 (2d Cir. 2016).  This is consistent with English law.  *See* Lowe Decl. ¶¶19(1),(5),(6); Midwinter Decl. ¶34.  And even if some individual Reckitt ordinary share purchasers "did not receive or read [the misleading statements]," this would still "not preclude class certification," as the Court "can address [any existing individual issues] at a later stage."  *Anwar*, 306 F.R.D. at 145; *cf.* ECF No. 90 at 25.[62]  In light of the foregoing, Defendants' reliance argument should be rejected.

### b.    The TAC Pleads All Elements of the English Law Claims

Defendants contend in conclusory fashion that the English Law claims are deficient because they "all require a misrepresentation," which (they contend) the TAC has failed to allege.  ECF No. 90 at 25; *see* also ECF No. 96 at 19-20.  As described above in §III.B., *supra,* Plaintiffs have adequately pled falsity.  Defendants also argue that Plaintiffs' fraudulent misrepresentation claims

---

[62]  The district court in *Vivendi* held post-trial proceedings in which "Vivendi [was] entitled to rebut the presumption of reliance on an individual basis."  765 F. Supp. 2d at 584.  For that reason, the court declined to enter a final judgment after trial.  Instead, the court determined that the post-trial proceeding would include Vivendi's right to challenge individual claims.  The district court's decision of August 11, 2015, *see* 2015 U.S. Dist. LEXIS 106307, addressed one such situation.  *See also* Ex. 10 (https://www.law360.com/articles/699273/after-plaintiffs-win-verdict-in-securities-class-actions?copied=1).

require a mental state akin to scienter.  *See* ECF No. 90 at 25; ECF No. 96 at 19-20.  Defendants

similarly claim that Count V, Plaintiffs' negligent misrepresentation claims (¶¶352-357), require a

mental state akin to negligence.  *Id.*  As detailed in §III.C., *supra*, the TAC has adequately alleged

Defendants' scienter.  Thaxter also argues that the TAC fails to allege his "duty to disclose any of

the allegedly concealed information at issue."  ECF 96 at 20; Midwinter Decl. ¶50.  But Thaxter's

failure to correct his Class Period statements with the truth renders him responsible for his false

representations under English Law.  *See* Lowe Decl. ¶¶31-32.

Defendants argue that Plaintiffs' FSMA claim only applies to statements made in "annual or

half-yearly report[s]" published through a "recognised information service."  Midwinter Decl. ¶43;

ECF No. 90 at 25.  According to Defendants, FSMA "does not apply to statements said to have been

made in press releases or conference calls."  *See* Midwinter Decl. ¶43.  As an initial matter, the TAC

alleges that these precise statements were materially false and misleading in violation of FSMA.

*See, e.g.*, ¶¶266-272.  In addition, there are no indications that press releases and conference calls are

excluded, because a plain reading of FSMA indicates that it applies to "all information" published by

the issuer of a security.  *See* Lowe Decl. ¶27(4).

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motions be denied.

DATED:  August 24, 2021              Respectfully submitted,

                                     ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     MARIO ALBA JR.
                                     ALAN I. ELLMAN
                                     CHRISTOPHER T. GILROY
                                     SARAH E. DELANEY


                                          */s/ Alan I. Ellman*
                                     ———————————————————
                                          ALAN I. ELLMAN

- 45 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631-367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
malba@rgrdlaw.com
aellman@rgrdlaw.com
cgilroy@rgrdlaw.com
sdelaney@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
cbdunn@asherkellylaw.com

VANOVERBEKE, MICHAUD &
   TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel*

## CERTIFICATE OF SERVICE

I, Alan I. Ellman, hereby certify that on August 24, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Alan I. Ellman*
ALAN I. ELLMAN
