# EXHIBIT 1

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*Burlington Drug Co., Inc. v. Reckitt Benckiser Group plc, et al.*<br><br>*Meijer, Inc. et al. v. Reckitt Benckiser, Inc. et al.*<br><br>*Rochester Drug Co-operative, Inc. v. Reckitt Benckiser, Inc., et al.* | **MDL NO. 2445**<br><br>**Master File No. 2:13-MD-2445-MSG**<br><br><br>No. 2:13-cv-3230-MSG<br><br><br>No. 2:13-cv-1122-MSG<br><br><br>No. 2:13-cv-1164-MSG |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Thomas Demitrack
Brett Bell
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
E-mail: tdemitrack@jonesday.com
E-mail: bbell@jonesday.com

Kevin D. McDonald
Mark R. Lentz
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: kdmcdonald@jonesday.com
E-mail: mrlentz@jonesday.com

Kimberly A. Brown
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
Facsimile: (412) 394-7959
E-mail: kabrown@jonesday.com

*Counsel for Defendants Reckitt Benckiser Pharmaceuticals, Inc.; Reckitt Benckiser Inc.; Reckitt Benckiser LLC; Reckitt Benckiser Pharmaceuticals, Inc.; Reckitt Benckiser Healthcare (UK) Ltd.; and Reckitt Benckiser Group plc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ................................................................................................................................ 1

BACKGROUND ................................................................................................................................... 5

      A.     Regulatory Overview ................................................................................................ 5

      B.     Statement of Facts ................................................................................................... 7

LEGAL STANDARD........................................................................................................................ 10

ARGUMENT ...................................................................................................................................... 11

I.      RECKITT'S INTRODUCTION OF SUBOXONE FILM IMPROVED RATHER
       THAN INJURED COMPETITION AS A MATTER OF LAW ...................................... 11

      A.     Introducing A New And Different Product, Without More, Cannot Injure
           Competition, No Matter How Much It Injures Competitors................................. 12

      B.     Plaintiffs Have Not Attempted To Plead That Reckitt's Introduction Of Film
           Made No Economic Sense. .................................................................................... 16

      C.     The Fact That Generic Suboxone Tablets Must Now Compete With Suboxone
           Film Does Not Constitute Antitrust Injury .......................................................... 20

II.     NO LAW OBLIGATED RECKITT TO ASSIST ITS FUTURE COMPETITORS BY
       SHARING ITS PROPRIETARY REMS PROGRAM...................................................... 23

      A.     Antitrust Law Does Not Compel Alleged Monopolists to Aid Their Rivals........ 23

      B.     No Other Source Of Law Can Supply An Antitrust Duty To Deal ...................... 26

III.    PLAINTIFF'S CLAIM THAT RECKITT'S "SHAM" CITIZEN PETITION
       DELAYED ANDA APPROVAL DOES NOT STATE A CLAIM ................................ 30

      A.     Plaintiff Does Not Plead That The Citizen Petition Caused Delay ...................... 31

      B.     Reckitt's Petition Was Not Objectively Baseless As A Matter of Law................ 33

IV.    NO ALCHEMY CAN TURN PLAINTIFF'S FAILED INDIVIDUAL CLAIMS
       INTO A SINGLE VIABLE CLAIM ................................................................................ 38

V.     PLAINTIFFS FAIL TO ALLEGE BASIC PREREQUISITES FOR THEIR CLAIMS,
       INCLUDING MARKET DEFINITION AND POWER .................................................. 39

CONCLUSION................................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*,
432 F. Supp. 2d 408 (D. Del. 2006) .................................................................19, 21

*Actelion Pharms. Ltd. v. Apotex Inc.*,
No. 1:12-cv-5743 (D.N.J. filed Sept. 14, 2012) .................................................27

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*,
592 F.3d 991 (9th Cir. 2010) .................................................................13, 15

*Am. Floral Servs. v. Florists' Transworld Delivery Ass'n*,
633 F. Supp. 201 (N.D. Ill. 1986) .................................................................5, 37

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*,
446 F.2d 1131 (2d Cir. 1971) .................................................................29

*Am. Sales Co. v. Smithkline Beecham Corp.*,
274 F.R.D. 127 (E.D. Pa. 2010) .................................................................31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .................................................................25

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .................................................................20

*AstraZeneca AB v. Mylan Labs. Inc.*,
No. 00-6749, 2010 WL 2079722 (S.D.N.Y. May 19, 2010) .................................................................13

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .................................................................18, 21

*Ball Mem. Hosp. Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) .................................................................29

*Bath Petro. Storage, Inc. v. Market Hub Partners, L.P.*,
129 F. Supp. 2d 578 (W.D.N.Y. 2000) .................................................................37

*Behrend v. Comcast Corp.*,
No. 03-6604, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) .................................................................3, 12, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................10, 11, 32

ii

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)..................................................................................... *passim*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................................................................................................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)...........................................................................................3, 20, 22

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972).....................................................................................................30

*CBC Cos. v. Equifax, Inc.*,
561 F.3d 569 (6th Cir. 2009) .......................................................................................29

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) ..............................................................................25, 26

*City of Groton v. Conn. Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981)........................................................................................38

*Conte v. Wyeth, Inc.*,
168 Cal. App. 4th 89 (Cal. Ct. App. 2008) ................................................................26

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)..........................................................................................2, 14, 15

*E.R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)......................................................................................4, 37, 30

*Eatoni Ergonomics, Inc. v. Research in Motion Corp.*,
826 F. Supp. 2d 705 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012)................25, 26

*Eon Labs Mfg., Inc. v. Watson Pharms., Inc.*,
164 F. Supp. 2d 350 (S.D.N.Y. 2001).........................................................................13

*Exxon Corp. v. Amoco Oil Co.*,
875 F.2d 1085 (4th Cir. 1989) ....................................................................................33

*Gal v. Viacom Int'l, Inc.*,
518 F. Supp. 2d 526 (S.D.N.Y. 2007)..........................................................................35

*George Haug Co. v. Rolls Royce Motor Cars, Inc.*,
148 F.3d 136,139 (2d Cir. 1998)..................................................................................22

*Goldwasser v. Ameritech Corp.*,
222 F.3d 390 (7th Cir. 2000) ...............................................................................5, 13, 26

*In re DDAVP Direct Purchaser Antitrust Litig.*,
 585 F.3d 677 (2d Cir. 2009)..................................................................................34, 36

*In re Flonase Antitrust Litig.*,
 795 F. Supp. 2d 300 (E.D. Pa. 2011) ...................................................................35

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010).................................................................4, 5, 18, 24

*In re Livent, Inc. Noteholders Sec. Litig.*,
 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................11

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
 281 F. Supp. 2d 751 (E.D. Pa. 2003) ..................................................................10

*Intergraph Corp. v. Intel Corp.*,
 195 F.3d 1346 (Fed. Cir. 1999).............................................................................38

*Kottle v. Nw. Kidney Ctrs.*,
 146 F.3d 1056 (9th Cir. 1998) ..............................................................................36

*La. Wholesale Drug Co. v. Shire LLC*,
 No. 12-3711, 2013 BL 60769 (S.D.N.Y. Mar. 6, 2013)....................................28

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)..................................................................................19

*Lum v. Bank of Am.*,
 361 F.3d 217 (3d Cir. 2004)...........................................................................18, 28

*Medtronic Minimed Inc. v. Smiths Med. MD Inc.*,
 371 F. Supp. 2d 578 (D. Del. 2005).....................................................................15

*Meijer, Inc. v. Biovail Corp.*,
 533 F.3d 857 (D.C. Cir. 2008) .............................................................................32

*Midland Export, Ltd. v. Elkem Holding, Inc.*,
 947 F. Supp. 163 (E.D. Pa. 1996) .......................................................................33

*Mylan Lab., Inc. v. Matkari*,
 7 F.3d 1130 (4th Cir. 1993) ..................................................................................27

*Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*,
 No. 12-395, 2012 WL 3655459 (W.D. Pa. Aug. 27, 2012).................................38

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
 838 F.2d 360 (9th Cir. 1988) ...............................................................................13

*Olympia Equip.Leasing Co. v. W. Union Tele. Co.*,
  797 F.2d 370 (7th Cir. 1986) ...................................................................................29

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
  555 U.S. 438 (2009)............................................................................... *passim*

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)......................................................................................33, 34, 35

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
  537 F.2d 1307 (5th Cir. 1976) ..................................................................................14

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) ....................................................................................18

*Sanjuan v. Am. Bd. of Psych. & Neurology, Inc.*,
  40 F.3d 247(7th Cir. 1994) .......................................................................................22

*Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*,
  401 F.3d 123 (3d Cir. 2005)........................................................................17, 18, 28

*Schor v. Abbott Labs.*,
  457 F.3d 608 (7th Cir. 2006) ...............................................................................19, 20

*SmithKline Beecham Corp. v. Apotex Corp.*,
  383 F. Supp. 2d 686 (E.D. Pa. 2004) ...................................................................13, 38

*Steamfitters Local Union No. 420 Welf. Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999)...................................................................................11, 12

*Stearns Airport Equip. Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) ......................................................................................12

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)....................................................................................................24

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
  540 U.S. 398 (2004)............................................................................... *passim*

*Walgreen Co. v. AstraZeneca Pharms. LP*,
  534 F. Supp. 2d 146 (D.D.C. 2008) ......................................................... *passim*

*West Penn Allegheny Health System, Inc. v. University of Pittsburgh Medical Center*,
  627 F.3d 85 (3d Cir. 2010)....................................................................................22, 38

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007)....................................................................................................29

v

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)................................................................................19

**STATUTES**

21 U.S.C. § 337(a) ...........................................................................................27

21 U.S.C. § 355-1 ..................................................................................6, 26, 27

21 U.S.C. § 355............................................................4, 5, 6, 7, 30, 31,35

21 U.S.C. §§ 355a ...............................................................................................6

21 U.S.C. § 356c ...............................................................................................1

**OTHER AUTHORITIES**

21 C.F.R. § 10.30 ..............................................................................................7

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ....................................... *passim*

FDA, *Determination That the Oxycontin Drug Products Covered by Application 20-553
  Were Withdrawn From Sale for Reasons of Safety or Effectiveness*, 78 Fed. Reg.
  23,273, 23,274 (Apr. 18, 2013)..........................................................................36

FDA, *Fourth Annual Report on Delays in Approvals of Applications Related to Citizens
  Petitions* at 4 (attached as Exhibit C)..................................................................32

Fed. R. Civ. P. 9..................................................................................4, 18, 28

Fed. R. Civ. P. 12.............................................................................. *passim*

Herbert Hovenkamp *et al.*, *IP & Antitrust* (2d ed. 2010) .........................................15

Eric J. Lavonas, M.D. *et al.*, *Root Causes, Clinical Effects, and Outcomes of
  Unintentional Exposures to Buprenorphine byYoung Children,* 13 J. Peds. ---
  (forthcoming 2013), available at http://www.jpeds.com/webfiles/images/
  journals/ympd/JPEDSLavonas.pdf ......................................................................36

*Review of the Proposed Generic Drug and Biosimilars User Fees and Further
  Examination of Drug Shortages: Hearing Before the H.R. Comm. on Energy and
  Commerce*, 112th Cong. 1 (2012)..........................................................................6

Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No
  Economic Sense" Test*..................................................................................12, 17

Seth Silber and Kara Kuritz, *Product Switching in the Pharmaceutical Industry*,
  7 J. Generic Meds. 119, 126 (2010)....................................................................20

**INTRODUCTION**

Reckitt Benckiser Pharmaceuticals, Inc. ("Reckitt") began selling Suboxone and Subutex, pharmaceuticals for treatment of opioid dependence, in 2002. Both drugs contain buprenorphine, which is itself an opioid. They thus present risks of abuse and diversion, and even small amounts ingested by children may be fatal. Prior to selling either Subutex or Suboxone, Reckitt worked with the Food and Drug Administration ("FDA") to develop a comprehensive risk mitigation program, later known as a Risk Evaluation and Mitigation Strategy ("REMS").

In 2010, the FDA approved Reckitt's application to sell Suboxone in a new dissolving film form, in addition to the previously approved sublingual tablet. The film dissolved faster than the tablet and could be packaged in material that is both unit-based and child-resistant. For two years, Reckitt sold both tablets and film. By 2011, Reckitt's safety data demonstrated a significant decline in the number of accidental pediatric exposures to buprenorphine-naloxone products since the introduction of Suboxone film. (Compl., Exh. D (Dkt. No. 47-4) at 23.) As the Consolidated Amended Complaint ("Compl.") of the Direct Purchaser Plaintiffs ("Plaintiffs") acknowledges, moreover, doctors and patients demonstrated a preference for film during this period. (*See* Compl. ¶¶ 11, 92.)

In June 2010, however, the first known pediatric fatality from exposure to Suboxone occurred when a child ingested a Suboxone tablet. After Reckitt learned of this sad event, it stepped up its ongoing education and mitigation efforts, and commissioned a study to compare the incidence of pediatric exposure as between Suboxone film and tablets. In September 2012, that study concluded that the number of pediatric exposures was *eight times* lower with Suboxone film. Given the availability of its equally effective and safer film product, Reckitt concluded that the benefits of tablets no longer outweighed the risks. Reckitt gave notice of its intent to discontinue tablet sales in six months, as required by 21 U.S.C. § 356c(a), and

petitioned the FDA to require all other applicants seeking to market buprenorphine drugs to take safety steps similar to Reckitt's, including targeted education and use of child-resistant, unit-dose packaging. Although the FDA denied the specific relief requested, it agreed to take further steps to monitor the issues raised. With respect to unit dosing in particular, the FDA "welcomes and encourages sponsors to utilize unit dose packaging for their oral buprenorphine products." (Compl., Exh. G at 14.)

Plaintiffs—drug wholesalers (or alleged assignees)—challenge nearly all of Reckitt's actions as exclusionary conduct prohibited by § 2 of the Sherman Act. Only Reckitt's unilateral conduct is attacked; there is no claim of conspiracy or collusion. But the courts are clear that § 2 has a far narrower sweep than § 1, which applies to concerted action. "Congress treated concerted behavior more strictly than unilateral behavior." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). Thus, there are only "rare instances in which a dominant firm may incur antitrust liability for purely unilateral conduct." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

The need for such circumspection is obvious: "[F]alse condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 414 (2004) (citation omitted). Indeed, as *Trinko* explains, antitrust law protects the freedom of all sellers, including monopolists, to choose the products they sell and the prices they charge: "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free market system. The opportunity to charge monopoly prices—at least for a short periods—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Id.* at 407. Thus, only

2

when a monopolist acts irrationally, excluding competition and incurring costs it has no hope of recovering unless it eliminates competitors, is liability under § 2 possible. Otherwise, the conduct is lawful, even if rivals make fewer sales and earn lower profits as a result. "The antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Plaintiffs' claims ignore these § 2 standards. Indeed, Plaintiffs attack the exercise of Reckitt's most basic legal rights—the right to introduce a new product (Suboxone sublingual film); the right not to share its property with rivals (Reckitt's REMS program); and the right to petition a federal agency for relief under the First Amendment (Reckitt's FDA citizen petition). As explained below, none of these allegations state a claim.

***New Products.*** With respect to the introduction of Suboxone film, Plaintiffs do not and cannot dispute that:

- At all times since the introduction of Suboxone film, Suboxone has been available in both film and tablet form, including today.

- Suboxone film provides a "significantly different" dosage form, (Compl. ¶ 88), that dissolves under the tongue much more rapidly, (Compl. ¶ 84), and comes in unit-dose, child resistant packaging. (Compl. ¶ 85.) Plaintiffs allege that a majority of consumers (64%) have chosen film, while others (36%) remained with tablets. (Compl. ¶ 92.)

- The Complaint contains no allegation (or even argument) that the sale of film was below cost and hence unprofitable for Reckitt. Plaintiffs thus do not allege that the introduction of Reckitt's new product was "economically irrational" but for its harm to competitors. *Behrend v. Comcast Corp.*, No. 03-6604, 2012 WL 1231794, at *19 (E.D. Pa. Apr. 12, 2012).

These facts are fatal to Count II. The law presumes that the introduction of new and different products increases competition. It is for consumers, not Plaintiffs or an antitrust jury, to decide whether the product differences (which Plaintiffs acknowledge but deem "unnecessary") are in fact valuable. The product-switching claim should be dismissed. *Walgreen Co. v. AstraZeneca Pharms. LP*, 534 F. Supp. 2d 146, 151-52 (D.D.C. 2008).

***REMS.*** With respect to Reckitt's alleged refusal to assist the generic ANDA filers in developing their own REMS program, Plaintiffs likewise do not and cannot dispute that:

- As the FDA acknowledged (Compl. ¶ 108), Reckitt had no obligation to share its proprietary safety program or the confidential data underlying the program with Reckitt's rivals. And even if Reckitt had had such a duty under FDA law, that would not create such a duty under the *antitrust* laws. *Linkline*, 555 U.S. at 450 ("[T]he defendant has no antitrust duty to deal with its rivals at wholesale; any such duty arises only from FCC regulations, not from the Sherman Act.").

- The generic applicants remained free at all times to develop their own REMS program, as they ultimately did, and the FDA remained free to accept it, as it ultimately did.

- Plaintiffs' insinuation that Reckitt somehow committed fraud, while legally irrelevant, is not supported by factual allegations satisfying Rule 9(b), or indeed by any allegation that any statement by Reckitt was actually false.

In sum, Plaintiffs' claim that Reckitt bargained unreasonably is legally inadequate to state a claim for monopolization. *Linkline*, 555 U.S. at 450 (A monopolist with no duty to deal at all "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous."). Count III therefore fails.

***Citizen Petition.*** Finally, with respect to Plaintiffs' claim that Reckitt's Petition to the FDA delayed the approval of any Suboxone ANDA, Plaintiffs do not and cannot dispute that:

- 21 U.S.C. § 355(q)(1)(A) expressly forbids the FDA from delaying ANDA approval "either before or during consideration" of any citizen petition.

- This Complaint alleges no fact to indicate that the FDA failed to comply with the statute in this case; on the contrary, it contains numerous other facts indicating that the statute was not violated, including the FDA's express refusal to deny Reckitt's Petition as frivolous.

- Under the *Noerr* doctrine, the Petition cannot give rise to antitrust liability unless it was objectively baseless. Because the full record of Reckitt's Petition and the FDA's decision are before the Court, the determination of whether the Petition was objectively baseless is a question of law.

- The FDA's ruling—which (i) described the agency's detailed analysis, (ii) agreed with Reckitt's fundamental premise that there was a correlation between education and decreasing risks, (iii) "encourage[d] sponsors to utilize unit-dose packaging," and (iv) "refer[red] this matter to the Consumer Products Safety Commission" for further consideration of packaging, (Compl., Exh. G at 12-17)—establishes as a matter of law that Reckitt's Petition was not objectively baseless.

4

Whether for want of causation, or for want of exclusionary conduct, Counts IV and V fail as well.

Each of Plaintiffs' claims fail individually. Grouping them together, as Plaintiffs attempt in Count I, does not change the analysis. "[Z]ero plus zero plus zero still equals zero." *Am. Floral Servs. v. Florists' Transworld Delivery Ass'n*, 633 F. Supp. 201, 215 n.23 (N.D. Ill. 1986.)[1]

In the end, Plaintiffs' claims are based on a false premise: that because *state drug substitution* laws give advantages to generic competitors, the *antitrust* laws obligated Reckitt to make its unilateral business decisions (what product to sell, how to price it, how to market it, how to ensure its safety) in ways that maximize that benefit to generic competitors. Plaintiffs are wrong. *See Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 399 (7th Cir. 2000) ("The fundamental fallacy in the Plaintiff's theory is that the duties of the 1996 [Communications] Act imposes on [incumbents] are coterminous with the duty of a monopolist to refrain from exclusionary practices. They are not."). No company, not even a monopolist, has an affirmative duty to aid its competitors. This Complaint fails to state a claim.

## BACKGROUND

### A. Regulatory Overview

The FDA has exclusive jurisdiction over the marketing and selling of prescription drugs. 21 U.S.C. § 355(a). To receive FDA approval for a new drug, the innovator pharmaceutical company must submit a new drug application (NDA) with comprehensive clinical studies demonstrating that the drug is both safe and effective for its proposed uses. *Id.* § 355(b). In exchange for the substantial work necessary to prepare an NDA, including clinical trials, the

---

[1] Dismissal is appropriate for additional reasons as well. By excluding obvious substitute pharmaceutical products with the same treatment indications, Plaintiffs' alleged antitrust market is implausible. Likewise, by ignoring the corporate form and labeling all five defendants 'Reckitt,' Plaintiffs fail to state a claim against four of the named defendants.

Federal Food, Drug, and Cosmetic Act rewards pioneer drug manufacturers with differing periods of market exclusivity. *E.g.*, 21 U.S.C. §§ 355a(b), 360cc(a).

The Hatch-Waxman Act created a process for FDA approval of generic drugs upon expiration of the NDA holder's exclusivity rights. Specifically, the generic manufacturer may file an abbreviated application, or ANDA, that relies on the NDA drug's safety and effectiveness data. 21 U.S.C. § 355(j). An ANDA must show only that the generic's drug is bioequivalent to the innovator drug and that the generic will (with limited exceptions) copy the branded manufacturer's labeling. *Id.*[2]

In 2007, Congress authorized the FDA to require REMS to ensure that the benefits of certain prescription drugs outweigh their risks. 21 U.S.C. § 355-1. If the FDA determines a REMS is necessary, the drug manufacturer must develop and propose its own strategy. 21 U.S.C. § 355-1(a)(1), (a)(2)(B). REMS must include assessment timetables, 21 U.S.C. § 355-1(d), and can also include educational materials (*e.g.*, medication guides, patient packages inserts, or communications plans) or elements to assure safe use (*e.g.*, certification requirements, distribution requirements, or registration and monitoring requirements). 21 U.S.C. § 355-1(e) to (f). As applied to ANDAs, REMS cannot require communications plans and, if the REMS for the NDA drug contains elements to assure safe use, the ANDA manufacturer "shall use a single, shared system" with the NDA manufacturer unless "an aspect of the elements to assure safe use for the applicable [NDA] . . . is a method or process that, as a trade secret, is entitled to protection." 21 U.S.C. § 355-1(i)(1). The statute allows the FDA to waive the requirement of a

---

[2] As of February 2012, the FDA's "median time to approval [wa]s approximately 31 months" after the ANDA filing. *Review of the Proposed Generic Drug and Biosimilars User Fees and Further Examination of Drug Shortages: Hearing Before the H.R. Comm. on Energy and Commerce*, 112th Cong. 1, 4-5 (2012) (Statement of Dr. Janet Woodcock, Director, Center for Drug Evaluation and Research).

shared REMS in any given case.  21 U.S.C. § 355-1.

A person or entity may petition the FDA to take (or to refrain from taking) any particular action, including actions with respect to an NDA, ANDA, or REMS.  21 C.F.R. § 10.30. Although the Secretary is permitted 150 days to review the type of citizen petition at issue here, she is also empowered to summarily deny a petition that she "determines . . . was submitted with the primary purpose of delaying the approval of an application."  21 U.S.C. § 355(q)(1)(E)-(F).  Moreover, by statute, the "Secretary *shall not delay* approval of a pending [NDA or ANDA] because of any request to take any form of action relating to the application . . ., unless . . . the Secretary determines . . . that a delay is necessary to protect the public health."  21 U.S.C. § 355(q)(1)(A) (emphasis added).

### B.     Statement of Facts

Opioid addiction and abuse is a pervasive public health problem that plagues patients, families, and communities.  (Compl. ¶ 74.)  Prior to 2002, patients who suffered from opioid addiction were primarily referred to a narcotic treatment program (NTP) for methadone treatment.  (*Id.* ¶ 75.)  Many patients, however, avoided NTPs due to privacy concerns and the perceived social stigma.  (*Id.* ¶ 76.)  Accordingly, Congress passed the Drug Addiction Treatment Act of 2000 ("DATA 2000"), which enabled specially-trained practitioners to administer Schedule III, IV, or V controlled substances in an office-based setting.  (*Id.*)

Subutex and Suboxone are buprenorphine drugs for treatment of opioid addiction.  (*Id.* ¶ 77.)  Buprenorphine is the only known μ receptor agonist opioid with a 'ceiling' effect—once the ceiling is reached, euphoria will not increase with added dosage.  (*see id.*, Exh. D at 8-9, 36.) In addition to buprenorphine, Suboxone also contains naloxone, a "μ-opioid antagoinst" whose "properties . . . precipitate withdrawal symptoms if" Suboxone is diverted and abused (*e.g.*, by

7

injection). (*Id.*)[3] These properties, and the associated reduced risk of abuse, allowed Subutex and Suboxone to become the first opioid addiction treatments available outside an NTP pursuant to DATA-2000. (*Id.* ¶ 77.)

Both drugs, however, still posed substantial risks of diversion and abuse by addicts. (*Id.*, Exh. D at 9.) Prior to FDA approval in 2002, Reckitt worked with the FDA, the DEA, and the Substance Abuse and Mental Health Services Administration to manage these risks, resulting in an FDA-approved risk minimization action plan (RiskMAP). (*Id.*) In light of the substantial costs Reckitt incurred in developing Subutex, Suboxone, and its RiskMAP, the FDA granted Reckitt orphan drug exclusivity, which expired in 2009. (*Id.* ¶ 79.) Generic Subutex became available in 2009. (*Id.*, Exh. C at 4.)

Meanwhile, although its Suboxone tablets were a commercial success (*id.* ¶ 5), Reckitt became aware through its safety program of pediatric exposure issues regarding Suboxone. (*Id.* ¶ 136; *id.*, Exh. D at 18-21.) In 2006, Reckitt began developing a new buprenorphine-naloxone product: Suboxone film. (*Id.* ¶¶ 81, 152; *id.*, Exh. D at 21.) The film format dissolved more quickly and had several advantages with regard to safety. A primary advantage was that each individual dose of film could be placed inside a child-resistant package, whereas the tablets approved under Reckitt's NDA, like the generic tablets being sold today, are available only in multi-dose packaging. (*Id.* ¶ 87; *id.*, Exh. D at 22 & n.57.)[4] Although tablets sold in Europe had

---

[3] Oral buprenorphine products must be taken sublingually. The same is true of naloxone, which does not cause withdrawal if taken sublingually. Thus, Suboxone tablets may not be swallowed. Like the film, they must be held under the tongue until they dissolve, which takes much longer with tablets than with film. (*See* Compl. ¶ 84.)

[4] Plaintiffs' claim that the FDA "express[ed] new concerns over the film formulation . . . in the context of accidental pediatric exposure," (Compl. ¶ 84), is proven false by the very next line of the FDA study cited in support: "[T]he unit-dose packaging [of Suboxone film] will help protect against" pediatric exposure. (Compl., Exh. A at 6.) And the FDA ultimately concluded

unit-dose packaging, those tablets had a different chemical formula from Reckitt's FDA-approved tablet. When Reckitt was developing its film product, it did not regard individual packaging for the U.S. tablet as feasible. (*Id.* at ¶ 136.)

The FDA approved Suboxone film as a safe and effective new drug in September 2010, following one year of additional negotiation over Reckitt's REMS for the distribution of Suboxone film. (*Id.*, Exh. E at 2.) Reckitt then began marketing its new product, detailing its benefits to doctors and providing purchasers with price incentives. (*Id.* ¶¶ 89-90.) Suboxone film proved to be an "overwhelming success," capturing "approximately 64% of all BPN/NLX prescriptions within two years," despite the continued availability of Suboxone tablets. (*Id.* ¶ 92.)

After introducing Suboxone film, Reckitt continued to monitor the risk of pediatric exposure, including hiring two independent consulting firms.[5] (*Id.*, Exh. E at 12.) On September 14, 2012, those firms reported that, even though Suboxone film had much higher sales than the tablet, the risks of pediatric exposure associated with Suboxone tablets were *eight times* greater than the risks associated with film. (*Id.*, Ex. D at 24-25.) Shortly thereafter, Reckitt announced its intent to withdraw Suboxone tablets from the U.S. market for safety reasons. (*Id.* ¶ 113.) Reckitt also petitioned the FDA to require all pending Suboxone applications—whether NDAs or ANDAs—to meet the same safety standards regarding dosage and education that Reckitt had employed with respect to its film. (*Id.*)

---

(continued…)

that the "unit-dose packaging is likely to be an effective deterrent to accidental pediatric exposure." (*Id.* at 15.) Plaintiffs' contradictory assertion is not a well-pleaded fact.

[5] Pediatric "exposures," it should be noted, are not the same as pediatric deaths. The first child fatality did not occur until 2010. (Compl., Exh. F at 1.) To date all reported pediatric deaths have resulted from exposure to tablets, rather than film. (*Id.*, Exh. F at 4.)

9

Reckitt knew that Suboxone ANDAs were pending with the FDA because the FDA had previously instructed all ANDA applicants to contact Reckitt and attempt to collaborate on the creation and implementation of a Single Shared REMS program. (*Id.* ¶¶ 100-103.) To submit their own REMS, Plaintiffs allege, "the generics needed access to Reckitt's information." (*Id.* ¶ 102.)[6] This information was admittedly "non-public." (*Id.* ¶ 107.)

Reckitt negotiated with the generics over access to its trade secrets, but required consideration for its cooperation, including an agreement on liability-sharing. (*Id.* ¶ 106.) Ultimately the generics and Reckitt could not agree, and the FDA acknowledged that it lacked authority "to compel Reckitt to share the information." (*Id.* ¶ 108.) The generics filed their own SSRS, which the FDA approved in February 2013, some ten days after the last amendments to those ANDAs. (Compl. ¶ 112; Compl., Exh. G at 12 n.45; *see also* Exhs. A-B.)

Plaintiffs allege that Reckitt's conduct violated § 2. Their claims focus on three particular actions: (1) introducing Suboxone film, (2) refusing to share its confidential REMS with generic ANDA applicants, and (3) petitioning the FDA to implement certain safety requirements.

## LEGAL STANDARD

Fed. R. Civ. P. 12(b)(6) requires dismissal of claims where the supporting allegations are not "plausible" and fail to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Given the high costs of antitrust discovery, "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely

---

[6] Plaintiffs' allegation that the generics could not formulate a REMS without access to Reckitt's proprietary data is contradicted by the FDA's approval in February 2013 of two generic ANDAs, complete with REMS, (Compl., Exh. G at 12 n.45; Exhs A-B), of which this Court may take judicial notice. *See In re Wellbutrin SR/Zyban Antitrust Litigation*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) (taking judicial notice of published FDA material).

groundless claim be allowed to take up [discovery] . . . ., with the right to do so representing an *in terrorem* increment of the settlement value." *Twombly*, 550 U.S. at 557-58 (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court should give no weight to "legal conclusions" or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Likewise, the Court need not credit "conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the Court make take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

## ARGUMENT

### I.  RECKITT'S INTRODUCTION OF SUBOXONE FILM IMPROVED RATHER THAN INJURED COMPETITION AS A MATTER OF LAW

The antitrust laws protect, rather than constrain, a seller's right to design and market the products it chooses to sell: "It is appropriate to emphasize that as a general rule any firm, even a monopolist, may bring its products to market whenever and however it chooses." *Steamfitters Local Union No. 420 Welf. Fund v. Philip Morris, Inc.*, 171 F.3d 912, 925 n.7 (3d Cir. 1999) (quotation marks and citation omitted). Counsel for the Indirect Purchasers already conceded as much: "[T]his is America. People are supposed to be able to bring out whatever products they want, and the market will decide which product is better. That's usually how we do things." (Dkt. No. 45 at 30.) Nonetheless, Plaintiffs attempt to turn this principle upside down in Count II, which alleges that the introduction of Suboxone film constituted exclusionary conduct.

As noted, § 2—the basis for all of Plaintiffs' claims—allows only "rare instances in

11

which a dominant firm may incur antitrust liability for purely unilateral conduct." *Linkline*, 555 U.S. at 448. The courts recognize that every business can, *and should*, compete vigorously to maintain its place in the market. To fall afoul of § 2, the alleged monopolist must, at minimum, employ a "predatory or exclusionary means" of preserving its monopoly position. *Steamfitters*, 171 F.3d at 925 n.7 (quotation marks and citation omitted). Exclusionary conduct is defined as "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *Behrend*, 2012 WL 1231794, at *19 (E.D. Pa. Apr. 12, 2012) (quotation marks and citation omitted). Thus, "a finding of exclusionary conduct requires . . . behavior that— examined without reference to its effects on competitors—is economically irrational." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 523 (5th Cir. 1999).

Plaintiffs do not attempt to meet this high standard with respect to Reckitt's introduction of a new product, Suboxone film. Instead, by acknowledging that Suboxone film is in fact different from tablets (*e.g.*, film has a quicker dissolving time and unit-dose, child-resistant packaging, (Compl. ¶ 84)), Plaintiffs necessarily concede that the introduction of film increased, rather than reduced, consumer choices, and their naked assertion that film was "unnecessary" has repeatedly been rejected as establishing exclusionary conduct. Finally, the Complaint does not attempt to allege that Reckitt's sale of film was unprofitable, much less economically irrational. Count II fails to state a claim for monopolization.

### A. Introducing A New And Different Product, Without More, Cannot Injure Competition, No Matter How Much It Injures Competitors

Count II fails even before reaching the question of economic irrationality. For that is the second step in the §2 analysis, "applied only after a demonstration that the challenged conduct has some tendency to eliminate or lessen competition." Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test,* 73 Antitrust L.J. 413,

12

417 (2006). In other words, conduct cannot be "exclusionary" unless it first excludes. As many courts—including this one—have held, however, introducing a new product by definition *increases* competition in the relevant market. *SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686, 696-98 (E.D. Pa. 2004); *see also, e.g.*, *Eon Labs Mfg., Inc. v. Watson Pharms., Inc.*, 164 F. Supp. 2d 350, 358 (S.D.N.Y. 2001). Such a new product can harm competitors (rather than competition) only if consumers deem it to be desirable. IIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 781b, at 318 (3d ed. 2005). For that reason, introduction of a product that enhances consumer choice is absolutely protected by the antitrust laws. *See, e.g.*, *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010) ("[P]roduct improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result."); *AstraZeneca AB v. Mylan Labs. Inc.*, No. 00-6749, 2010 WL 2079722, at *6 (S.D.N.Y. May 19, 2010) (granting Rule 12(b)(6) motion to dismiss because "the alleged conduct—introducing new products—is generally considered pro-competitive.").[7]

Aware of these principles, Plaintiffs strain to argue that Reckitt's film was not "superior" to the tablets from a clinical or safety standpoint. (*E.g.*, Compl. ¶ 82-83.)[8] Such allegations are

---

[7] A long "line of 'product innovation' cases has consistently rejected antitrust liability for a monopolist's decision about when or whether to market new products." *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 369 (9th Cir. 1988); *see, e.g.*, *Goldwasser*, 222 F.3d at 397 ("[E]ven a monopolist is entitled to compete; it need not lie down and play dead, as it watches the quality of its products deteriorate and its customers become disaffected."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979) ("[A]ny firm, even a monopolist, may generally bring its products to market whenever and however it chooses."); IIIB Areeda & Hovenkamp, *supra*, ¶ 781e, at 325 ("Indeed, no responsible commentator proposes to subordinate the public and consumer interest in better products to the preservation of less inventive rivals.").

[8] These allegations are, however, contradicted by the documents attached to Plaintiffs' Complaint. (*See, e.g.*, Compl., Exh. B at 15 ("This product represents a new formulation of an approved product, *offering relatively minor advantages*. The more rapid dissolution may be

13

surely necessary to Count II's survival, for conceding that the film was an improvement would be fatal. *Copperweld Corp.*, 467 U.S. at 767 & n.14 (noting that "§ 2 does not forbid market power to be acquired as a consequence of a superior product"); *see generally* IIIB Areeda & Hovenkamp, *supra*, ¶ 776a, at 285-86 ("At the very least, as all courts recognize, product improvement without more is protected and beyond antitrust challenge."). But Plaintiffs' allegations are far from sufficient to save Count II. For the test is not whether the product is better (or worse) in some abstract sense, but rather whether the product offers consumers a choice that *some* may prefer—a choice that the market will either reward or punish. *See Berkey*, 603 F.2d at 286-87 ("[T]he question of product quality has little meaning. A product that commends itself to many users because superior in certain respects may be rendered unsatisfactory to others by flaws they considered fatal. . . . Preference is a matter of individual taste."); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976) ("Any other conclusion would enmesh the courts in a technical inquiry into the justifiability of product innovations."); *Walgreen*, 534 F. Supp. 2d at 151 ("Plaintiffs also have not identified any antitrust law that requires a product new on the market—with or without a patent—to be superior to existing products. Antitrust law holds, and has long held, to the contrary.").

It is thus critical that Plaintiffs admit film is a different product, with features that some consumers may prefer. For example, Plaintiffs concede that "Suboxone Film hydrates to a gel within approximately 30 seconds, and erodes completely over the course of 3 minutes, releasing all of the buprenorphine. In contrast, Suboxone Tablets have a much longer oral residence time (each tablet may take up to 10 minutes to dissolve) . . . ." (Compl. ¶ 84.) In addition, unlike the

---

(continued…)

perceived as a convenience to patients. The unit-dose packaging is likely to be an effective deterrent to accidental pediatric exposure." (emphasis added)).)

14

generic tablets Plaintiffs would rather buy, Suboxone film comes in unit-dosed, child-resistant packaging. (Comp. ¶ 86.) And users of film are exposed to relatively less naloxone—a withdrawal agent—than users of tablets. (Compl., Exh. A at 2.) Consumers have been given a choice between film and tablets for several years. (Compl. ¶ 10.) According to Plaintiffs' Complaint, "the vast" or "overwhelming" majority of consumers have chosen film. (Compl. ¶¶ 11, 56, 92.)

Where, as here, the old and new products are different, consumers may—whether wisely or unwisely—prefer one over the other. When they choose, "courts should not take it upon themselves to decide that the marketplace has made the wrong decision." Herbert Hovenkamp *et al.*, *IP & Antitrust*, § 12.3, at 12-33 (2d ed. 2010); *Medtronic Minimed Inc. v. Smiths Med. MD Inc.*, 371 F. Supp. 2d 578, 589 (D. Del. 2005) ("[I]t is not the role of the courts to determine how companies should innovate."). And any harm caused by consumer preferences "is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster." *Copperweld Corp.*, 467 U.S. at 767 & n.14. Accordingly, Plaintiffs' allegation that, even "assuming" that film provides "some sort of safety benefit over tablets," its introduction was "not needed" (Compl. ¶ 87) misses the point.[9]

Plaintiffs' claims here are strikingly similar to those dismissed in *Walgreen*, 534 F. Supp. 2d 146. Here, as there, the defendant is alleged to have introduced a new and similar product at the end of the original product's period of exclusivity. *Compare* (Compl. ¶ 81) *with*

---

[9] In judging product improvements, "necessity is a slippery concept." *Berkey*, 603 F.2d at 286; *see Allied Orthopedic*, 592 F.3d at 1000-01 ("There is no room in this [§ 2] analysis for balancing the benefits or worth of a product improvement against its anticompetitive effects. . . ." (quotation marks and citation omitted)). Such a standard would chill all incentives to innovate. IIIB Areeda & Hovenkamp, *supra*, ¶ 781e, at 319-320 ("[G]iven that the payoff for R&D is even more speculative than for other investments[,] . . . . a society concerned with its productivity would not wish to instruct firms that they undertake R&D at the peril of treble damage antitrust liability.").

15

*Walgreen*, 534 F. Supp. 2d at 148-49 ("Plaintiffs allege that [the branded drug company] deliberately switched the market from [one] drug, just as [exclusivity] was about to expire, to . . . its newly FDA-approved equivalent [drug]," even though "there [was] almost no difference between" the two drugs.)  Moreover, in both cases, the plaintiffs alleged that the defendant withdrew its support for, and falsely disparaged, the old product.  *Compare* (Compl. ¶¶ 89-94) *with Walgreen*, 534 F. Supp. 2d at 149 ("Plaintiffs allege . . . that to effectuate this market switch, [the branded company] used distortion and misdirection in marketing.")

Thus, the result here should be the same:  a Rule 12(b)(6) dismissal.  "The fact that a new product siphoned off some of the sales from the old product and, in turn, depressed sales of the generic substitutes for the old product, does not create an antitrust cause of action. . . .  The complaint reflects little reason for plaintiffs' circumscribed ability to realize sales other than AstraZeneca introducing a new competitive product and successfully competing in marketing the new product.  This is not an antitrust injury."  *Id.* at 152.

There is no principled distinction between this case and *Walgreen*.  Reckitt's freedom to redesign its own product cannot be curtailed simply because Plaintiffs would prefer to buy generic tablets unburdened by competition from Suboxone film.  Plaintiff's claim is antithetical to antitrust law, which "safeguard[s] the incentive to innovate."  *Trinko*, 540 U.S. at 407.

## B. Plaintiffs Have Not Attempted To Plead That Reckitt's Introduction Of Film Made No Economic Sense.

Even if Plaintiffs could demonstrate that the injuries suffered by generic applicants forced to compete with Suboxone film did, in fact, restrict, rather than increase, competition, that still would not allege that Reckitt's conduct was "exclusionary or predatory" within the meaning of § 2.  *Behrend*, 2012 WL 1231794, at *19.  To meet that second element of their claim, Plaintiffs would have to allege facts plausibly showing that Reckitt's conduct made no economic sense but

16

for its effect on generic companies. The test is objective, not subjective, and requires allegations sufficient to show that the conduct was actually unprofitable unless and until Reckitt could recoup its losses after generic competition was ended.[10]

No such allegation appears in the Complaint, even though counsel for the Indirect Purchaser Plaintiffs acknowledged this essential element of § 2 liability before the Court. (Dkt. No. 45 at 32 ("It's an economic test that decides can the plaintiff's (sic) prove through economic evidence . . . that the only reason that this manufacturer did the transition was to impair competition from the generics.") Plaintiffs do not allege that the introduction of Suboxone film was financially harmful to Reckitt in any way, much less that Reckitt sold the film at a loss. To the contrary, Plaintiffs allege that Reckitt successfully moved demand to the film and away from the tablets without any suggestion, much less a plausible allegation of fact, that Reckitt did so without covering its costs. Count II therefore fails to state a claim.

In lieu of such allegations, Plaintiffs attempt to bolster their claim by asserting that Reckitt coerced consumers with improper advertising and pricing. (Compl. ¶¶ 10(b), 89-97.) Plaintiffs apparently believe that the courts' unwillingness to second-guess the market's judgment of a new product will be suspended if they assert that *some* consumers (64%), but not others (36%), were "coerced" into preferring film. (Compl. ¶ 92.) The law is to the contrary.

**Advertising.** *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123 (3d Cir. 2005), is fatal to Plaintiffs' reliance on Reckitt's advertising. There, the Third

---

[10] *See* Werden, *supra*, 73 Antitrust L.J. at 416-17 (noting that "what matters are the objective economic considerations for a reasonable person, and not the state of mind of" the defendant). Nor is conduct "exclusionary" simply because one asserts that the defendant sacrificed any amount of current profit by failing to choose another course, because "much procompetitive conduct entails the sacrifice of current profit in the pursuit of greater profit over the long term." *Id.* at 424. Like the test for predatory pricing, the test requires that the defendant has incurred costs that it has no prospect of recovering unless its rivals are excluded. *Id.* at 425.

Circuit rejected antitrust claims "built on allegations" of product disparagement, even though it was "undisputed that the defendants informed potential customers that Santana's product presented safety hazards," because "Santana does not allege that [Defendant] engaged in any coercive measures." *Id.* at 132.  The court's conclusion, equally applicable here, was that "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *Id.* (quotation marks and citation omitted).  Thus, just as "Santana's allegations of fraud in the manner in which the hazards of HDPE were portrayed are irrelevant," *id.*, so too Plaintiffs' allegations of fraud in the manner in which the hazards of Suboxone tablets were portrayed, (*E.g.*, Compl. ¶ 89-94), are irrelevant.[11]  *See also, e.g.*, *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) ("Commercial speech is not actionable under the antitrust laws."); *Walgreen*, 534 F. Supp. 2d at 152 (Plaintiffs cannot rebut the antitrust presumption that advertising has *de minimis* effects "because Nexium sales necessarily depended on prescriptions written by medical professionals, that is, persons knowledgeable of the subject matter.").

**Pricing.**   Plaintiffs' pricing allegations concern only purported *increases* for Suboxone tablets.  (*See* Compl. ¶¶ 10(b)(iv), 90, 96, 168(c), 174.)  Plaintiffs themselves admit that these increases cannot be coercive in the pharmaceutical market.  (Compl. ¶ 47 ("The result is a marketplace in which price plays a comparatively unimportant role in product selection.").)  And Plaintiffs' concession is legally correct.  As the Supreme Court instructs, only predatory pricing by a monopolist—*i.e.*, price *decreases* below any reasonable measure of cost—can be

---

[11] Even if Plaintiffs' allegations were relevant, they would be insufficient to satisfy the stringent pleading requirements of Rule 9(b).  *See Lum v. Bank of Am.*, 361 F.3d 217, 220, 224 (3d Cir. 2004) (Rule 9(b) applies to an "antitrust claim . . . based on fraud—on misrepresentations in the information given to consumers" and requires identification of "who made a misrepresentation to whom and the general content of the misrepresentation."), *abrogation on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010).  Here, Plaintiffs fail to identify any specific instance of a fraudulent statement, its speaker, its recipient, its time, or its place.

18

anticompetitive. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) ("[I]n the context of pricing practices, only predatory pricing has the requisite anticompetitive effect."); *see also, e.g.*, *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (rejecting nearly identical claims based on incentive pricing of pharmaceuticals because "[t]he price of Norvir cannot violate the Sherman Act: a patent holder is entitled to charge whatever the traffic will bear. This is true of both Norvir's price and of a claim that the patent holder has engaged in price discrimination . . . ." (citations omitted)); *Berkey*, 603 F.2d at 294 ("[S]etting a high price may be a use of monopoly power, but it is not in itself anticompetitive.").

The decision in *Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006), on which Plaintiffs rely (*see* Dkt. No. 45 at 31; Compl. ¶ 56 n.2), simply underscores the conclusion that "coercion" only matters to a § 2 claim if it meets the definition of exclusionary conduct. In *Abbott*, the defendant allegedly twice introduced a new product at or near the end of the older product's exclusivity. 432 F. Supp. 2d at 416, 418. Both times, however, the defendant took additional steps that made no economic sense but for the effect on the generic plaintiff. First, it not only discontinued the old product, but also *repurchased* existing supplies held by pharmacies. *Id.* Second, it removed the old product from a national database, the only effect of which was to block generic substitution. *Id.*[12] Such money-losing conduct is irrational except for its effect on the generic sellers of the old product. And only because this exclusionary conduct did in fact prevent consumer choice was the complaint permitted to survive a motion to dismiss. *See id.* at 424 ("By *removing the old products* from the

---

[12] *Abbott* was decided in 2006, before the Supreme Court decided *Linkline* in 2009. Furthermore, *Abbott* relied on *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), a decision the Third Circuit has since explained "was undermined by intervening Supreme Court precedent," *i.e.*, *Trinko* (2004) and *Linkline*, and thus does not apply where "plaintiffs have not made any allegations of bundling or tying." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 274 n.11 (3d Cir. 2012).

market and *changing the NDDF code*, Defendants allegedly suppressed competition by blocking the introduction of generic fenofibrate." (emphases added)).

*Abbott* remains the only complaint to survive a motion to dismiss in this context, and subsequent courts have easily distinguished it on these very grounds. *See Walgreen*, 534 F. Supp. 2d at 151. In sum, "[i]t would still be unchartered territory for a court to create an exception to the general rule that there is no duty to aid competitors in product hopping cases." Seth Silber and Kara Kuritz, *Product Switching in the Pharmaceutical Industry*, 7 J. Generic Meds. 119, 126 (2010).

> C.     The Fact That Generic Suboxone Tablets Must Now Compete With Suboxone Film Does Not Constitute Antitrust Injury

Even if Plaintiffs' product switching claim could satisfy the test of exclusionary conduct, it would fail for lack of antitrust injury. That is because Plaintiffs' injury flows from the alleged inability of current generic sellers of tablets to make more sales due to the presence of Reckitt's competing film. (*See* Compl. ¶¶ 146, 148 (claiming that, absent Suboxone film, generics would have been able to "more successfully market" their product and "substantial purchases would have migrated" to generics).)[13] The Supreme Court has flatly rejected the notion that the injury caused when a rival is forced to face more competition instead of less is injury "of the type" that the antitrust laws protect. *Brunswick Corp.*, 429 U.S. at 489 (1977).

Because "[t]he antitrust laws . . . were enacted for the protection of competition, not competitors" *id.* at 488 (internal quotation marks and citation omitted), the antitrust injury doctrine requires a plaintiff to connect its injury to an actual reduction in competition. As the

---

[13] These allegations also demonstrate that the Direct Purchaser Plaintiffs lack antitrust standing, given the existence of more direct alleged victims of Reckitt's conduct—the generic manufacturers. *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539-45 (1983) (*AGC*).

Supreme Court has explained:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a *competition-reducing* aspect or effect of the defendant's behavior.

*Atl. Richfield Co.*, 495 U.S. at 343-44 (original emphasis). The need to apply this principle is underscored here, because rivals will always be "hurt" by the need to compete with new products. But that injury is not caused by the "competition-reducing" aspect of the conduct.

There are two periods of time relevant to plaintiffs' claim of injury based on the presence of Suboxone film: (1) the period before FDA approval of generic tablets in February 2013, and (2) the period thereafter. (*See* Exhs. A-B (FDA approval letters).) Prior to approval, Plaintiffs do not allege that Suboxone film delayed the approval or entry of generic Suboxone tablets, nor could they. The existence of *film* had no relevance to the FDA's decision whether the generic ANDA products were bioequivalent to Reckitt's *tablet*. That is why the original complaint in these actions, filed prior to the FDA's approval of the generic tablets, alleged only contingent future harm with respect to film: "Reckitt's [product-switch] scheme *will cause* the first manufacturers of Suboxone Tablets *to come to market* to capture only a small fraction of the . . . market . . . ." (Compl. ¶ 9, *Burlington Drug*, No. 2:13-cv-3230 (filed Dec. 21, 2013).) After FDA approval of those "first" generic manufactures in 2013, however, plaintiffs' claim of injury is based solely on the assumption that some percentage of consumers will continue to choose film over generic tablets, and there will be less automatic generic substitution as a result. That is fatal to the attempt to plead antitrust injury in Count II.

If the introduction of a new product by a monopolist actually delayed the advent of generic competition *and* otherwise made no economic sense, then there might be a claim of

21

antitrust injury based on that exclusion.  But that is precisely what Plaintiffs do *not* allege here: the film's introduction and success had no impact on the FDA's decision to approve the tablet ANDAs.[14]  After the entry of the generic tablets, Plaintiffs allege no exclusion or delay for the obvious reason that the generic tablet makers were (and are) in the market competing.  Plaintiffs instead derive their injury from the fact that those generics will make fewer sales than otherwise due to the continued presence of film in the marketplace.

The Supreme Court rejected that very claim of injury in *Brunswick*.  There, the plaintiffs alleged that, but for an illegal merger by Brunswick, they would not have had to compete with certain Brunswick bowling alleys.  The Court rejected the claim of injury based on having to compete *more* rather than less.  *Brunswick Corp.*, 429 U.S. at 490.  Although the merger was indeed illegal, it was not illegal because the competition between the alleys would remain; the injury thus did not "flow[] from that which makes defendants' acts unlawful."  *Id.* at 489.

So too here, Plaintiffs' alleged injury from the introduction of film was caused not by any exclusion of generic rivalry (which is not pleaded), but because it gives consumers another choice that these Plaintiffs—like the plaintiffs in *Brunswick*—find inconvenient.  Accordingly, after the generic entry, the continued presence of film cannot be competition-reducing.  *Sanjuan v. Am. Bd. of Psych. & Neurology, Inc.*, 40 F.3d 247, 251(7th Cir. 1994) ("The claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws . . . .").

_____

[14] The fact that plaintiffs allege that delays were caused by *other* conduct related to the REMS program and the Citizen Petition is irrelevant to the question of whether the conduct alleged in Count II caused antitrust injury.  If introducing film caused no antitrust injury, it is not actionable in a private antitrust case.  As the Third Circuit held in *West Penn Allegheny Health System, Inc. v. University of Pittsburgh Medical Center*, 627 F.3d 85 (3d Cir. 2010), a plaintiff with a viable claim still may not challenge conduct for which it "fail[s] to allege that it sustained an antitrust injury."  *Id.* at 110 & n.16; *see also, e.g.*, *George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136,139 (2d Cir. 1998) (antitrust injury is an essential element of each private antitrust claim).

22

Suboxone film gives the doctors and patients the choice of an alternative with (as Plaintiffs concede) different features that consumers can either accept or reject. The generic tablet makers are free to price or market their products in any way they deem appropriate to compete. Plaintiffs do not, and cannot, allege that any doctor or patient who prefers generic tablets over film may not choose them immediately. The competitive process is intact.

In sum, Count II makes no attempt to allege harm flowing from an injury to the competitive process before the entry of generic tablets, and it cannot allege harm to that process thereafter. Because Count II fails to allege antitrust injury, it should be dismissed.

## II. NO LAW OBLIGATED RECKITT TO ASSIST ITS FUTURE COMPETITORS BY SHARING ITS PROPRIETARY REMS PROGRAM

Plaintiffs concede that Reckitt's REMS program contains confidential and proprietary information. (Compl. ¶ 107-08 (noting the "FDA's inability to compel Reckitt to share" its "non-public information").) Nonetheless, in Count III, Plaintiffs ask this Court to hold that the antitrust laws require Reckitt to provide this information to its generic competitors. Such extreme relief would be unprecedented. Indeed, the Supreme Court recently decried the "uncertain virtue of forced sharing" at length. *See Trinko*, 540 U.S. at 407-08.

As *Trinko, Linkline*, and other cases teach, the antitrust laws do not compel Reckitt to deal with its generic rivals at all, much less on whatever terms the rivals demand. Indeed, not even the Food, Drug, and Cosmetic Act obligated Reckitt to provide its REMS program to the generics involuntarily. And, absent such a duty to deal, Reckitt's negotiating position cannot, as a matter of law, violate the antitrust laws. Count III must be dismissed.

### A. Antitrust Law Does Not Compel Alleged Monopolists to Aid Their Rivals

Reckitt had, and has, no antitrust obligation to share its REMS. The Sherman "[A]ct does not restrict the long recognized right of trader or manufacturer engaged in an entirely private

23

business, freely to exercise his own independent discretion as to parties with whom he will deal."
*United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Courts have thus sharply limited
antitrust claims based on an alleged monopolist's unilateral refusal to deal with potential
competitors. *E.g., Trinko*, 540 U.S. at 407-08. Plaintiffs' claim does not fall within those narrow
limitations.

Indeed, given the proprietary nature of Reckitt's REMS program, Count III strikes at the
very heart of why courts refuse to find antitrust duties to deal. "Compelling . . . firms to share
the source of their advantage is in some tension with the underlying purpose of antitrust law,
since it may lessen the incentive for the monopolist, the rival, or both to invest in those
economically beneficial facilities." *Trinko*, 540 U.S. at 407-08; *accord, e.g., Berkey Photo*, 603
F.2d at 281 ("[A] firm may normally keep its innovations secret from its rivals as long as it
wishes, forcing them to catch up on the strength of their own efforts . . . ."); IIIB Areeda &
Hovenkamp, *Antitrust Law* ¶ 772c, at 212 ("[R]efusal to give rivals the benefit of one's R & D"
"seems absolutely privileged").

*Trinko* itself was a closer case. There, the Supreme Court affirmed the Rule 12(b)(6)
dismissal of an antitrust complaint based on the alleged failure of Verizon to provide rivals with
*statutorily-mandated* access to its operations support systems. 540 U.S. at 406-08. In other
words, it was undisputed in *Trinko* that the defendant was legally obligated to assist its rivals,
and that the FCC found that the defendants had failed to do so. But the Court was clear that the
provisions of communications law imposing a duty on the defendant to assist its rivals did not
thereby impose such an obligation under the *antitrust* laws. *Id.* at 406; *see also Linkline*, 555
U.S. at 450 ("[T]he defendant has no *antitrust* duty to deal with its rivals at wholesale; any such
duty arises only from FCC regulations, not from the Sherman Act." (emphasis added)).

24

*Trinko* explained that the rare exception to the rule against finding a duty to deal found in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), was "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409; *see also, e.g.*, *Linkline*, 555 U.S. at 448 (only in "rare instances" may "a dominant firm . . . incur antitrust liability for purely unilateral conduct"). In *Aspen*, the alleged monopolist had (1) terminated a long-running, prior course of dealing with its rival, and (2) sacrificed short-run profits (by refusing to sell to the rival at retail prices) that could only be justified by the elimination of the rival from the market. *See Trinko*, 540 U.S. at 409.

Subsequent cases applying *Trinko* confirm that both factors—prior dealings and profit sacrifice—are necessary to allege a duty to deal. *See, e.g.*, *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 826 F. Supp. 2d 705, 709 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012) (dismissing antitrust claim predicated on bad faith joint development efforts over the course of "less than a year" for lack of a prior course of dealing: "[T]he antitrust laws do not impose a duty on RIM to work with Eatoni to develop a new product."); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009) ("The critical fact in *Aspen Skiing* was that there were no valid business reasons for the refusal. Here, in contrast, we have no indication that DVRC is terminating a profitable business relationship.").

Here, Plaintiffs do not allege any prior course of dealing between Reckitt and the generic applicants. Nor do they allege that Reckitt sacrificed short-term profit by insisting on its rights; to the contrary, they allege that Reckitt consistently gained "monopoly profits." (Compl. ¶ 147.)[15] *Eatoni* and *Christy Sports* are thus fatal to Plaintiffs' attempt to use the antitrust laws to

---

[15] Although not legally relevant, Reckitt's interest in upholding Suboxone's reputation for reliability and safety more than justifies any refusal to deal with its potential competitors. (*See* Compl., Exh. F at 1 ("Amneal has stated its desire to execute the minimum possible risk

25

impose forced sharing of Reckitt's REMS program. As in *Eatoni*, Reckitt had attempted to work with the generics for less than a year, and would have *lost* money if the attempt had succeeded. No monopolist can be required to shoot itself in the foot. "The Sherman Act does not force DVRC [or Reckitt] to assist a competitor in eating away its own customer base, especially when that competitor is offering DVRC nothing in return." *Christy Sports*, 555 F.3d at 1197.

### B. No Other Source Of Law Can Supply An Antitrust Duty To Deal

Unable to plead facts sufficient to show that Reckitt had a duty to deal with the generic manufacturers under antitrust law, Plaintiffs attempt to create a duty to deal under other sources of law. The attempt not only fails, but is beside the point. As noted, the defendant's duty to cooperate with competitors under federal communications law in *Trinko* was not only established, but *violated*, for purposes of the Court's analysis. That fact still did not amend the antitrust laws to create a new duty to deal with rivals that did not otherwise exist. *Trinko*, 540 U.S. at 414-16; *see also, e.g.*, *Goldwasser*, 222 F.3d at 399. *Trinko*'s rule applies *a fortiori* here, where the Complaint fails to establish a duty to deal under *any* body of law. This failure underscores the impropriety of Plaintiffs' attempt to convert this case into one of the "rare instances" of §2 liability for wholly unilateral conduct. *Linkline*, 555 U.S. at 450.

*First*, Plaintiffs repeatedly assert that Reckitt violated 21 U.S.C.§ 355-1(f)(8), (*see* Compl. ¶¶ 10(c), 60, 105, 108, 181, 186), but alleges no fact to support the conclusion. By its terms, the statute only prohibits "use [of] *any element to assure safe use . . .* to block or delay" ANDAs. 21 U.S.C. § 355-1(f)(8) (emphasis added). Such elements to assure safe use, known as "ETASUs,"

---

(continued…)

mitigation activities that might satisfy FDA.").) Reckitt's position on liability-sharing is fully supported by precedents holding branded manufacturers liable for injuries suffered by patients taking generic equivalents. *E.g.*, *Conte v. Wyeth, Inc.*, 168 Cal. App. 4th 89 (Cal. Ct. App. 2008).

26

include (A) provider requirements, (B) dispenser requirements, (C) location requirements, (D) evidentiary requirements, (E) monitoring requirements, or (F) registry requirements related to Suboxone. *See* 21 U.S.C. § 355-1(f)(3) (defining ETASUs). Here, the Complaint contains no fact to indicate that the ETASUs in Reckitt's REMS *could* block or delay any ANDA. Reckitt's REMS program does not contain any restrictions on distribution ("dispenser requirements") that would prevent a generic applicant from acquiring and testing the drug for purposes of filing an ANDA. (To the contrary, the Complaint acknowledges that multiple ANDAs were filed and, according to Plaintiffs, were ready for approval but for their own lack of a REMS program.)[16] According to the facts alleged, the only way in which Reckitt "used" its REMS was by refusing to share it with the generics except on terms Plaintiffs deem "unreasonable." (Compl. ¶ 105.) But that does not come close to meeting the statutory language, and plaintiffs can cite nothing to the contrary. Thus, as Plaintiffs allege, not even the FDA thought Reckitt had any obligation under the FDCA to grant its REMS to the generics. (*Id*. ¶ 108.)

In addition, the statute specifically provides that where "an aspect of the elements to assure safe use . . . is a method or process that, as a trade secret is entitled to protection," (*cf.* Compl. ¶ 107), the Secretary may waive any requirement for a single shared REMS system or "may seek to negotiate a *voluntary* agreement with the owner of the process." 21 U.S.C. § 355-1(i)(B) (emphasis added). Clearly the statute imposes no *mandatory* duty to deal.[17]

---

[16] This is thus not a case where the ETASUs of a drug, such as dispenser requirements, made it difficult for a potential ANDA applicant to obtain the drug and perform the necessary bio-equivalency testing to file an ANDA. *Cf.* Complaint, *Actelion Pharms. Ltd. v. Apotex Inc.*, No. 1:12-cv-5743 (D.N.J. filed Sept. 14, 2012).

[17] Even if 21 U.S.C. § 355-1(f)(8) could apply to Reckitt's conduct, that would not give Plaintiffs a private right of action to enforce the statute. Indeed, the FDCA confers all enforcement authority—including authority "to restrain violations[] of this chapter"—on the United States. 21 U.S.C. § 337(a); *see Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir.

27

***Second***, Plaintiffs repeatedly call Reckitt's negotiating position "feigned." (Compl. ¶¶ 125, 136, 153, 154, 168(e), 181.) Here, and elsewhere, Plaintiffs seem to believe that invoking the term "fraud" will create a new definition of exclusionary conduct under § 2. Even assuming that a deceptive negotiating position could supply an antitrust violation (a dubious assumption under *Santana* and related cases),[18] the Complaint's factual allegations contradict Plaintiffs' label. The Complaint nowhere alleges that Reckitt deceived the generic companies, let alone alleges fraud with the specificity required by Rule 9(b). *See Lum*, 361 F.3d at 220, 224.

To the contrary, Plaintiffs allege in great detail that Reckitt made plain the terms on which it was willing to participate in a shared REMS program, and that those terms were not met. Indeed, although negotiations did not start until February 2012, Reckitt stated clearly *by March of 2012* that it "refused to sign a governing Memorandum of Understanding for the group unless it was given veto authority or a super-majority vote," and "continued to demand that each [generic] member agree to share a pre-specified percentage of all product liability claims." (Compl. ¶ 106.) The Plaintiffs do not allege that the generics ever agreed to these terms. Plaintiffs may label these positions "unnecessary, unprecedented, and unreasonable," (*Id.* ¶ 105), but the facts alleged contradict any claim of deception: "These demands *made clear* that

---

(continued…)

1993) (affirming Rule 12(b)(6) dismissal of attempt to use "Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act").

[18] The antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (internal quotation marks and citation omitted); *see La. Wholesale Drug Co. v. Shire LLC*, No. 12-3711, 2013 BL 60769, at *5 (S.D.N.Y. Mar. 6, 2013) ("[N]ot every sharp-elbowed business practice—though potentially wrongful as a breach of contract *or even fraud*—necessarily amounts to an antitrust violation . . . ." (emphasis added)). That is because actionable exclusionary conduct requires the exercise of monopoly power; but anyone—monopolist or not—can commit a tort or fraud. *E.g.*, IIIB Areeda & Hovenkamp, *supra*, ¶ 782a, at 321-22 ("Proof of harm to a specific competitor, which is all that tort law typically requires, is almost never sufficient to meet the antitrust concern.").

[Reckitt] was seeking to leverage access to its REMS program to its own commercial advantage." (*Id.* ¶ 106 (emphasis added).)

Nor do such allegations of hard bargaining establish an antitrust violation. A monopolist with no duty to deal "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *Linkline*, 555 U.S. at 450. Numerous other cases have rejected claims that an alleged monopolist's commercial conduct was too harsh for its rivals to prosper. *See, e.g.*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 325 (2007) ("[T]he exclusionary effect of higher bidding that does not result in below-cost output pricing is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate procompetitive conduct." (quotation marks and citation omitted)); *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) ("[E]ven where a business carries a significant portion of the market share, antitrust law is not a negotiating tool for a plaintiff seeking better contract terms."); *Ball Mem. Hosp. Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1339 (7th Cir. 1986) ("Even a monopolist may bargain hard."); *Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971) ("Foreclosure implies actual exertion of economic muscle, not a mere statement of bargaining terms . . . . Such bartering ploys are not generally the concern of antitrust laws.").

According to the complaint, the FDA asked Reckitt to engage in a shared REMS negotiation, and Reckitt agreed to do so, but failed to offer terms these Plaintiffs deem acceptable. That does not state a claim for monopolization. *See, e.g.*, *Olympia Equip.Leasing Co. v. W. Union Tele. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (Posner, J.) ("Since Western Union had no duty to encourage the entry of new firms into the equipment market, the law would be perverse if it made Western Union's encouraging gestures the fulcrum of an antitrust violation.").

These principles exist for good reason.  If Count III were permitted to stand, the antitrust laws would require future branded drug companies to surrender proprietary REMS information *to rivals* for free.  Plaintiffs would have this Court believe such a taking of private property somehow furthers competition.  But why would any company invest in REMS innovations if they knew they could just receive the innovation for free by threatening an antitrust suit?  *See Trinko*, 540 U.S. at 407-08.  They would not, and REMS safety innovations would be reduced across the industry, to the detriment of consumers.  Count III should be dismissed.

### III.  PLAINTIFF'S CLAIM THAT RECKITT'S "SHAM" CITIZEN PETITION DELAYED ANDA APPROVAL DOES NOT STATE A CLAIM

Petitioning a regulatory agency is classic First Amendment activity protected by the *Noerr* doctrine.  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972).  Accordingly, Plaintiffs' antitrust claim cannot succeed unless Reckitt's Petition was a sham.  The FDA's decision proves that it was not, and that alone is sufficient for dismissal of Counts IV and V.  Here, however, there is an even more direct response to Plaintiffs' claim that the Petition delayed FDA approval of any pending ANDA.  In 2007, Congress passed a statute expressly forbidding the delay that Plaintiffs claim occurred here.  Plaintiffs cannot dispute that the statute *required* the FDA to consider Reckitt's Petition "separate and apart from review and approval" of the generic ANDAs, and *forbade* the FDA from delaying of ANDA approval "before and during" consideration of the Petition.  21 U.S.C. § 355(q)(1)(A).  Plaintiffs have made no attempt to allege that the statute was not observed in this case, and hence cannot plead causation or antitrust injury based on Reckitt's Citizen Petition.  Thus, the Petition either was not a sham, and is protected by the First Amendment; or it was a sham, and is not alleged to have caused delay.

These deficiencies doom both of Plaintiffs' petitioning claims in Counts IV and V.[19]

### A.  Plaintiff Does Not Plead That The Citizen Petition Caused Delay

Congress passed the FDA Amendments Act of 2007 precisely to end the very delay of which Plaintiffs complain with respect to Reckitt's citizen petition.  That statute, as several courts have recognized, "prevent[s] pharmaceutical companies from using" sham petitions "to delay generic entry into the market."  *E.g.*, *Am. Sales Co. v. Smithkline Beecham Corp.*, 274 F.R.D. 127, 131 & n.4 (E.D. Pa. 2010).  Instead, under the statute, a citizen petition can delay an ANDA approval only if the petition is *not* a sham, *i.e.*, if delay "is necessary to protect the public health."  In full, the relevant statutory provision provides:

> The Secretary **shall not delay approval** of a pending application submitted under subsection (b)(2) [a NDA] or (j) [an ANDA] . . . because of any request to take any form of action relating to the application, **either before or during consideration of the request**, unless—
>
> . . .
>
> (ii) the Secretary determines, upon reviewing the petition, that a **delay is necessary to protect the public health.**
>
> Consideration of the petition **shall be separate and apart** from review and approval of any application.

21 U.S.C. § 355(q)(1)(A) (emphases added).  The statute further provides that, if a sham petition is presented, the FDA may summarily deny it.  21 U.S.C. § 355(q)(1)(E).

Shortly after Reckitt's Petition, several generic applicants did request that the FDA deny the Petition as frivolous and intended solely for delay, (*e.g.*, Compl., Exh. E.), but the FDA did not do so.  Instead, after taking the full 150 days to rule on the petition, the FDA expressly refused "to den[y] Reckitt's Petition pursuant to section 505(q)(1)(E) [21 U.S.C. § 355(q)(1)(E)]

---

[19] Under either of these theories, the timing of Reckitt's petition does not matter.  Under 21 U.S.C. § 355(q), all petitions filed since September 2007 cannot cause delay.  And if some reasonable litigant could expect success, then the First Amendment absolutely protects Reckitt's conduct.

of the FD&C Act." (Compl., Ex. G at 16.)

Although Reckitt raised the 2007 statute in its motion to dismiss the original *Burlington* complaint, Plaintiffs now address it only in their background discussion of the statutory scheme, suggesting that delays of ANDA approvals still "may" occur despite the statute. (Compl. ¶ 72.) The Complaint, however, provides no indication that this allegedly possible scenario happened *here*. Indeed, Plaintiffs allege that Reckitt's Petition was "an *attempt* to delay FDA approval of ANDAs," (Compl. ¶ 10(d) (emphasis added)), but offer no fact—other than a conclusory assertion—to show that the alleged attempt succeeded. *See Twombly*, 550 U.S. at 570 (allegations must go beyond the "conceivable" to the "plausible"). Nothing in the Complaint or the FDA's ruling raises any inference that the FDA breached its statutory obligation to keep its review of Reckitt's Petition separate from its review of the generic ANDAs.

To the contrary, documents subject to judicial notice indicate that the FDA honored its statutory obligation. The FDA's approval letters to two generic applicants, attached as Exhibits A and B, document that the generics amended their ANDAs on December 27, 2012, and February 12, 2013. Thus, any delay in the FDA's approval—which came 10 days after the last amendment—was caused by the generics' need to revise their applications (likely in response to the FDA's ongoing review and comments), and not Reckitt's Petition. *Cf. Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 864 & n.* (D.C. Cir. 2008) (holding that antitrust plaintiff failed to prove alleged patent misuse caused delayed entry because the approval noted amendments to the ANDA at issue and the need for additional evaluations).

The FDA knows how to state when a citizen petition subject to the statute causes delay.[20]

---

[20] To date, the FDA has generally been faithful to Congress's instruction. Out of 92 petitions relating to NDAs or ANDAs, only 5 (6%) have caused delay. *See* FDA, *Fourth Annual Report on Delays in Approvals of Applications Related to Citizens Petitions* at 4 (attached as

32

It did so in a recent ruling on a citizen petition filed by Novartis. "We note that the 25-day delay in approval of the ANDAs was entirely the result of the timing of Novartis's Petition, rather than its merits." (Exhibit D.) Tellingly, although the FDA took the full 150 days to deny Novartis's petition, it approved the generic ANDAs only *twenty-five* days after the petition was filed—as soon as it concluded that the petition had no arguable merit. (Exh. D at 1, 12.) Here, in contrast, the FDA made no similar statement and did not approve the generic ANDAs at any time during consideration of the petition. This silence is echoed by Plaintiffs' failure to provide any plausible factual allegation that the FDA breached the statute in connection with Reckitt's citizen petition.

The most fundamental requirement of antitrust causation is that the alleged conduct actually caused the claimed injury. Plaintiffs cannot offer any fact to show that the FDA violated its statutory duty not to delay its ANDA approvals. Counts IV and V therefore fall.[21]

**B.      Reckitt's Petition Was Not Objectively Baseless As A Matter of Law**

Antitrust liability cannot be imposed for petitioning activities designed to procure action from any branch of government unless (1) the petition is "objectively baseless in the sense that

---

(continued…)

Exhibit C). Moreover, each time, the FDA has informed Congress that the delay was caused by its own "determin[ation] that a delay . . . was necessary to protect the public health," *i.e.*, that the petition was not a sham. (*Id.* at 3.)

[21] Even if Plaintiffs attempted to amend the Complaint to allege that the FDA breached its statutory duty, that would not solve their causation problem. For then any generic delay would have been proximately caused not by the petition, but by the FDA's disregard of the statute. The delay would be the result of "an independent government choice, constituting a supervening 'cause' that breaks the link between a private party's request and the plaintiff's injury." I Areeda & Hovenkamp, *Antitrust Law*, ¶ 202c, at 159; *see, e.g., Exxon Corp. v. Amoco Oil Co.,* 875 F.2d 1085, 1089 (4th Cir. 1989) (reversing denial of judgment as a matter of law for negligence defendant because of superseding "arbitrary act[] of government bureaucracy"); *Midland Export, Ltd. v. Elkem Holding, Inc.*, 947 F. Supp. 163, 166 (E.D. Pa. 1996) (finding lack of antitrust standing because ITC's "independent determination" was "the direct cause of the harm alleged here").

33

no reasonable litigant could realistically expect success on the merits" and (2) the petitioning party acted with the subjective intent of interfering "*directly* with the business relationships of a competitor through the use of the governmental *process* . . . as an anticompetitive weapon." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993).

The first prong of this "sham" test—showing that a petition is "objectively baseless"—is particularly difficult to satisfy where, as here, the petition is directed to an agency with broad authority. Administrative petitions are "less susceptible than lawsuits to the sham exception," because agencies are less constrained by precedent and have more political discretion. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009) (citing *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1062 (9th Cir. 1998)).

Moreover, because the first prong is objective, "a court may decide probable cause as a matter of law" where "there is no dispute over the predicate facts of the underlying . . . proceeding." *PRE*, 508 U.S. at 63. Here, the Court has Reckitt's petition, various responses, Reckitt's reply, and the FDA's ruling. (Compl., Exhs. D-F.) Reckitt certified, as required by law, that it had submitted "all information … upon which the petition relie[d]" (Compl., Exh. D at 48.) There is no dispute as to the content of that record, or as to the content of the FDA's lengthy opinion. Thus, the Court need not credit Plaintiffs' sham allegations; whether Reckitt's petition was so baseless that no reasonable person would think it meritorious is a question of law.

The FDA's response to Reckitt's Petition establishes that a reasonable litigant could have expected success. The FDA agreed with the major premise of Reckitt's Petition—that there was a "downward trend in accidental pediatric exposures" following Reckitt's educational efforts and introduction of unit-dose packaging. (*See* Compl., Exh. G at 10.) Nonetheless, the FDA denied the specific relief Reckitt requested because the agency concluded that Reckitt had failed

34

to prove causation.  (*See, e.g., id.* at 13 ("Reckitt has not provided evidence demonstrating that the use of unit-dose packaging (rather than labeling changes, REMS modifications, dosage form or other changes) caused the decline in accidental pediatric exposure.").)  For four reasons, as set forth below, the FDA's response shows that Reckitt's Petition was not a sham.

*First*, the FDA took the full 150-day period allotted for review and rejected requests to summarily deny the petition.  (Compl. Exh. G at 16.)  Indeed, the agency undertook significant independent research, including gathering data from several foreign sources.  (*Id.* at 10 & n. 40, 14 (detailing queries to regulatory agencies in Australia, Canada, New Zealand, Singapore, and Europe, as well as independent review of 187 case-narratives).)  The FDA denied the specific relief requested in a thorough, seventeen-page, single-spaced opinion concluding that the data was insufficient "at this time" (*id.* at 14-15) to require the additional safety measures for all applications.  The FDA is a reasonable actor, and it determined that Reckitt's Petition had sufficient merit such that it was not submitted "with the primary purpose of delaying the approval of an [ANDA]."  21 U.S.C. § 355(q)(1)(E); *see Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 549 (S.D.N.Y. 2007) ("[D]enial of defendants' motion to dismiss undermines the argument that plaintiff's copyright infringement action was utterly baseless.").

*Second*, the FDA did grant partial relief on Reckitt's requests.  Specifically, with respect to packaging, the FDA  "welcome[d] and encourage[d] sponsors to utilize unit-dose packaging . . . . [and] refer[ed] this matter to the Consumer Product Safety Commission" for potential standard setting.  (Compl. Exh. G at 14.)  Likewise, with respect to "educational interventions," the FDA stated that it would indeed require what Reckitt had requested if "continuing monitoring and assessment" of the current REMS showed that such a  requirement "is necessary."  (*Id.* at 12.)  Such partial success precludes a sham finding  *See PRE*, 508 U.S. at 60 n.5; *In re Flonase*

35

*Antitrust Litig.*, 795 F. Supp. 2d 300, 312 (E.D. Pa. 2011) ("[C]onduct is not a sham if 'at least one claim in the petition has objective merit.'" (quoting *Dentsply Int'l, Inc. v. New Tech. Co.*, No. 96-cv-272, 1996 WL 756766, at *2 (D. Del. Dec. 19, 1996)).

**Third**, a reasonable litigant would have had no way of knowing that the FDA would require Reckitt—but not other petitioners—to provide stringent proof of causation.[22] Only two months after denying Reckitt's Petition, the FDA considered whether the withdrawal of original Oxycontin had been based on safety reasons, given the availability of a new, safer version of Oxycontin less subject to abuse. Pointing to studies "that *suggest, but do not confirm* a reduction in non-oral abuse" with the new version, the FDA found the data sufficient: "FDA concludes that the benefits of original Oxycontin no longer outweigh its risks." FDA, *Determination That the Oxycontin Drug Products Covered by Application 20-553 Were Withdrawn From Sale for Reasons of Safety or Effectiveness*, 78 Fed. Reg. 23,273, 23,274 (Apr. 18, 2013) (emphasis added). The shifting evidentiary standards employed and broad discretion exercised by the FDA demonstrate why, under *DDAVP* and *Kottle*, the sham standard is applied narrowly in the administrative setting.[23]

**Fourth**, the FDA rejected Reckitt's request to require educational interventions based in part on its own regulatory requirement that ANDA's use the same labeling as the branded drug,

---

[22] Reckitt's Petition acknowledged that its supporting data did not prove causation and noted that the FDA had not required stringent proof of causation in the past. (*See* Compl., Exh. D at 32 ("FDA has not required conclusive evidence of causation to take action in response to other pediatric safety concerns.").) Indeed, the FDA stated its intent to take action against drugs containing carbinoxamine even though "a causative relationship between exposure to carbinoxamine and death in these infants has not been established." (*Id.* (citation omitted).)

[23] It bears noting that the study Reckitt provided to the FDA, which concluded that "package . . . deficiencies contribute to unintentional exposures in young children," has since been accepted for publication in the *Journal of Pediatrics*, an international peer-reviewed journal. *See* Eric J. Lavonas, M.D. *et al.*, *Root Causes, Clinical Effects, and Outcomes of Unintentional Exposures to Buprenorphine by Young Children*, 13 J. Peds. --- (forthcoming 2013), *available at* http://www.jpeds.com/webfiles/images/journals/ympd/JPEDSLavonas.pdf.

and at least similar REMS. (Compl. Exh. G at 8 & n. 38, 12 & n.45.)[24] But at the very time

Reckitt's Petition was pending, the FDA was considering altering that requirement. *See* U.S. Br.

at 15 n.2, *Mut. Pharm. Co. v. Bartlett*, No. 133 S. Ct. 2466 (2013), *available at* 2013 WL 314460

("FDA is considering a regulatory change that would allow generic manufacturers, like brand-

name manufacturers, to change their labeling in appropriate circumstances"). Thus, a reasonable

litigant would have perceived a possibility of success on this claim, notwithstanding the then-

current FDA regulations.

In short, a reasonable petitioner could have expected Reckitt's Petition to succeed.

\*\*\*\*\*

As the Supreme Court has explained, immunity for petitioning conduct not only

implements the First Amendment, but also safeguards a "valuable source of information" for the

government—the views and concerns of interested parties whose perspectives are necessary for

making informed policy decisions. *E.R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S.

127, 139 (1961); *see also, e.g.*, *Bath Petro. Storage, Inc. v. Market Hub Partners, L.P.*, 129 F.

Supp. 2d 578, 594-97 (W.D.N.Y. 2000) (applying *Noerr-Pennington* to preclude antitrust

liability based on a competitor's expression of safety and environmental concerns to approval of

a natural gas storage facility). The FDA knows how to call a petition baseless when it believes it

to be true (Exh. D), and it expressly declined an express invitation to do so here. That is

sufficient to conclude that the petition was not objectively baseless. Counts IV and V fail to state

a claim.

---

[24] The FDA had earlier concluded that "distribution of a Medication Guide is partially intended to address unintended pediatric exposures." (Compl., Exh. C at 4.)

## IV. NO ALCHEMY CAN TURN PLAINTIFF'S FAILED INDIVIDUAL CLAIMS INTO A SINGLE VIABLE CLAIM

Finally, in Count I of the Complaint, Plaintiffs combine all the previously-discussed claims to allege an overall scheme in violation of the Sherman Act. But the whole cannot be greater than the sum of its parts. "[I]t requires no sophistication in mathematical theory to recognize that zero plus zero plus zero still equals zero." *American Floral Servs.*, 633 F. Supp. at 215 n.23. Count I thus fails to state a claim.

Several other courts have clearly "reject[ed] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of . . . the Sherman Act." *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1367 (Fed. Cir. 1999) ("Each legal theory must be examined for its [own] sufficiency and applicability."). The Supreme Court recently affirmed the validity of this rule in *Linkline*, 555 U.S. 438. There, the plaintiffs "tried to join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability never before recognized by this Court. . . . Two wrong claims do not make one that is right." *Id.* at 457.

Third Circuit law, as reflected by *West Penn Allegheny Health System, Inc. v. University of Pittsburgh Medical Center*, 627 F.3d 85 (3d Cir. 2010), is entirely consistent. In *West Penn*, the Third Circuit reversed a 12(b)(6) dismissal of the complaint, finding sufficient allegations of exclusionary conduct. *Id.* at 110. But the Court held that, on remand, the plaintiff "may not challenge" conduct for which it had "failed to allege that it sustained an antitrust injury," despite an overall scheme claim. *Id.* at n.16; *see id.* at 97 (overall scheme claim); *accord, e.g., Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*, No. 12-395, 2012 WL 3655459, at *11 (W.D. Pa. Aug. 27, 2012) (dismissing part of claim for failure to allege relevant market).

Here, where all of Plaintiffs' individual claims fail, so too do all the constituent parts of the alleged scheme. But even if any of the individual claims were to withstand dismissal, the overall scheme claim would add nothing to the Complaint—the only alleged constituent parts of the scheme are the same individual claims raised in Counts II-IV. (*See* Compl. ¶ 168(a)-(g).) Plaintiffs "may not challenge," *W. Penn.*, 627 F.3d at 110 n.16, and "will not be able to recover" for, *SmithKline*, 383 F. Supp. 2d at 703, any part of the scheme that fails to state an independent claim. Such duplicative pleading is unnecessary, prejudicial, and subject to dismissal.

## V.  PLAINTIFFS FAIL TO ALLEGE BASIC PREREQUISITES FOR THEIR CLAIMS, INCLUDING MARKET DEFINITION AND POWER

Even if Plaintiffs' allegations *could* state an antitrust claim, the current Complaint does not. Plaintiffs fail to define a plausible relevant market for their claims (*see* Compl. ¶ 160), and then fail to allege Defendants' conduct within that market by using the generic label 'Reckitt.' Defendants incorporate by reference the arguments made in Defendants' Memorandum In Support of Their Motion Dismiss the End Payor Plaintiffs' Consolidated Amended Class Action Complaint (filed concurrently) regarding the market definition and the four additional defendants' conduct. (*See* Defs.' Memo. in Supp. of Mot. to Dismiss, § IV.A-B.)

## CONCLUSION

The Consolidated Amended Complaint of the Direct Purchasers should be dismissed.

Dated: September 16, 2013

**Respectfully submitted,**


 /s/ Kevin D. McDonald_____
Kevin D. McDonald
Thomas Demitrack                    Mark R. Lentz
Brett Bell                          JONES DAY
JONES DAY                           51 Louisiana Avenue, NW
North Point                         Washington, DC 20001
901 Lakeside Avenue                 Telephone: (202) 879-3939
Cleveland, Ohio  44114-1190         Facsimile: (202) 626-1700
Telephone: (216) 586-3939           E-mail: kdmcdonald@jonesday.com
Facsimile: (216) 579-0212           E-mail: mrlentz@jonesday.com
E-mail: tdemitrack@jonesday.com
E-mail: bbell@jonesday.com          Kimberly A. Brown
                                    JONES DAY
                                    500 Grant Street, Suite 4500
                                    Pittsburgh, PA 15219
                                    Telephone: (412) 391-3939
                                    Facsimile: (412) 394-7959
                                    E-mail: kabrown@jonesday.com

*Counsel for Defendants Reckitt Benckiser Pharmaceuticals, Inc.;
Reckitt Benckiser Inc.; Reckitt Benckiser LLC; Reckitt Benckiser
Pharmaceuticals, Inc.; Reckitt Benckiser Healthcare (UK) Ltd.;
and Reckitt Benckiser Group plc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of September, 2013, I electronically filed the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to all counsel of record.

　　　　　　　　　　　　　　　　　 /s/ Mark R. Lentz

　　　　　　　　　　　　　　　　　Mark R. Lentz