UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

| | | |
|---|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:20-cv-10041 |
| | : | CLASS ACTION |
| Plaintiff, | : | DECLARATION OF DAVID LORD QC |
| | : | |
| vs. | : | |
| | : | |
| RECKITT BENCKISER GROUP PLC, RAKESH KAPOOR, ADRIAN HENNAH, SHAUN THAXTER and ADRIAN BELLAMY, | : : : : | |
| | : | |
| Defendants. | : : | |

——————————————————————— x

## DECLARATION OF DAVID LORD QC

I, DAVID LORD QC, of Three Stone Chambers, 3 Stone Buildings, Lincoln's Inn, London, WC2A 3XL, England, state as follows:

### INTRODUCTION

1. I am a self-employed barrister and Queen's Counsel at Three Stone, 3 Stone Buildings, Lincoln's Inn, London. I practise law in England and specialise in commercial and commercial chancery litigation and arbitration.

2. I have been asked by Robbins Geller Rudman & Dowd LLP ("RGRD"), Lead Counsel for the Lead Plaintiffs City of Birmingham Retirement and Relief System, City of Pontiac General Employees' Retirement System, City of Sterling Heights Police & Fire Retirement System, and the Class, referred to herein collectively as the "Plaintiffs", in connection with the above-captioned action, to express my professional opinion on certain aspects of English law which are defined at paragraphs 6-7 below in the above-referenced proceedings before United States District

- 1 -

Judge Castel sitting in the Southern District of New York between the Plaintiffs and Reckitt Benckiser Group Plc ("Reckitt") and others - the "Defendants."

3.    Capitalised terms used in this opinion are as defined in the Third Amended Complaint of the Plaintiffs dated 26 March 2021.

**Qualifications**

4.    I was called to the bar in 1987 and was appointed Queen's Counsel in 2009. I have been a member of Three Stone Chambers (originally, 3 Stone Buildings until its merger with Thirteen Old Square in 2016) since 1988. I regularly appear before the Senior Courts of England & Wales (that is, the High Court, the Court of Appeal and the Supreme Court[1]) as well as before international arbitral tribunals. I am a Fellow of the Chartered Institute of Arbitrators. I was called to the Bar of the British Virgin Islands in 2000 and have appeared regularly before those courts (and the Eastern Caribbean Court of Appeal) since then and have been called to the Bar of other jurisdictions (the Cayman Islands and the Seychelles) and appeared before the Privy Council. I was called to the New York State Bar as a Foreign Legal Consultant in 2014.

5.    My legal practice is predominantly in the field of commercial and commercial chancery litigation and arbitration; I specialise in corporate and commercial law. I have substantial experience of jurisdictional disputes. I attach my CV which provides further detail, including a list of recent representations.

**Purpose of this Declaration**

6.    I am asked to give my professional opinion on the scope and effect under English law of the arbitration and jurisdiction agreements found in the Articles of Association of Defendant

---

[1]    For reference, the High Court is a court of first instance; the Court of Appeal is the first-level appeal court; the Supreme Court is the final appeal court for all UK civil cases. The judicial business of the House of Lords (previously the final appeal court) was transferred to the Supreme Court by virtue of the Constitutional Reform Act 2005.

Reckitt (the "Articles") and, in particular, on whether the English Law Claims set out in the Third Amended Complaint (Counts III – V, inclusive), which are advanced by those Plaintiffs who purchased Reckitt ordinary shares on the London Stock Exchange during the Class Period (28 July 2014 to 9 April 2019), fall within their scope.

7.    I have seen and considered a copy of the Declaration of Stephen Midwinter QC dated 24 June 2021 in support of the Defendants' Motions to Stay and Dismiss. In paragraph 2 of Mr. Midwinter QC's Declaration, he identifies three questions of English law that he has been asked to comment on. In the course of this Declaration, I will address the first two of those questions (and Mr. Midwinter QC's responses to them) – that is,

> -    "a. Whether, as a matter of English law, holders of Reckitt ordinary shares traded on the London Stock Exchange are required by Article 132 of Reckitt's Articles of Association to arbitrate their claims against Reckitt and its directors and officers.
>
> -    b. Whether, under English law, should the arbitration clause in Article 132 be declared invalid or unenforceable, Article 133 of Reckitt's Articles of Association provides an exclusive forum selection clause providing England and Wales as the only forum in which holders of Reckitt ordinary shareholders [sic] may bring suit against Reckitt and its directors and officers".[2]

However, for the reasons explained in paragraph 43.1.2 below, I consider that the second question should be reformulated along the lines and for the reasons explained in that paragraph.

8.    I will not comment here on every matter raised in Mr. Midwinter QC's Declaration. The fact that I have not done so should not be taken to mean that I agree with every such matter. Rather, in preparing this Declaration, I have considered the principal arguments raised by Mr. Midwinter QC in relation to questions a. and b. and respond to them below.

---

[2]    I note that Mr. Midwinter QC has apparently been asked to confine his Declaration to consideration of the claims brought by holders of Reckitt ordinary shares traded on the London Stock Exchange – i.e. the English Law Claims. His subsequent reference at paragraph 15 of his Declaration to claims brought under the US Exchange Act therefore appears to be misplaced – see further paragraph 16 below.

9.      I confirm that the opinions expressed herein represent my true, complete and honest professional opinions on the matters. I understand that my duty is to provide to the Court such assistance as I am able on matters falling within my expertise and that this duty to the Court overrides any obligation I may owe to those instructing me. I confirm that I have complied with that duty and that my compensation for providing this report is entirely independent of the outcome of the dispute.

10.     The English law materials referred to in this Declaration are attached.

**Structure**

11.     This Declaration is divided into the following sections:

(1)     Key background facts (pp.4-8).

(2)     Relevant principles of English law (pp.9-23).

(3)     Interpretation of the disputes clauses in the Articles of Association for Reckitt and whether or not they apply to the English Law Claims (pp.23-33).

(4)     My conclusions that the English Law Claims are not subject to ICC arbitration in London *or* the exclusive jurisdiction of the courts of England and Wales (p.33).

## I.      KEY BACKGROUND

**Overview of the Disputes Clauses in the Articles of Association**

12.     I have been provided with the Articles of Association for Reckitt which I understand were adopted on 28 August 2007 and amended on 1 May 2008, 6 May 2010 and 3 May 2012 (it appears that the 2012 iteration also takes into account an ordinary resolution passed at an AGM held on 7 May 2015 – see Article 86). That is the version to which I will refer, attached as Exhibit 1 for ease of reference.

13.    The Articles contain a *"Dispute Resolution"* section consisting of: (a) Article 132 (Arbitration); (b) Article 133 (Exclusive Jurisdiction); and (c) Article 134 (General Dispute Resolution Provisions). I will refer to these collectively as the **"Disputes Clauses"**. By way of overview, they contain:

13.1.    An express choice of English law to govern the Articles, including the arbitration agreement in Article 132 (**Article 134(B)**).

13.2.    An agreement by each shareholder in Reckitt, the company and its directors and professional service providers (defined in Article 134(D)) to submit *"[a]ll disputes"* arising from 4 categories of case (set out at Article 132(A)(i)-(iv)), including those *"between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise"*, to London-seated, English language ICC arbitration (3-member panel) <u>unless</u> Article 133 applies. There is also a waiver as far as permitted by law of the right to apply for court-determination of preliminary points of law and to appeal/challenge the ICC tribunal's award (**Article 132**).

13.3.    A 'fall-back' exclusive jurisdiction agreement in favour of the courts of England and Wales which applies in one of two situations: (a) where a dispute which would *"otherwise be subject to Article 132"* but in respect of which a court determines that Article *"135"*[3] is *"invalid or unenforceable in relation to that dispute in that jurisdiction"* (Article 133(A)(i)); and (b) for *"any derivative claim under the*

---

[3]    There is no Article 135 in the version of the Articles that I have reviewed. There are, however, two other references to it in the Articles: at Article 132(A)(iv) (reference to 'sub-paragraph 135(A)(iii)') and Article 134(D)(iii) (reference to 'Article 135 and/or 136'). As explained in paragraph 42 below, I agree with what Mr. Midwinter QC says in paragraph 5 of his Declaration that the reference to Article 135 is an obvious error that English law would treat as corrected to refer to Article 132.

*legislation*" (Article 133(A)(ii)).  Article 133(C) replicates the list of 4 categories of dispute set out in Article 132(A)[4] (**Article 133**).

13.4.   An exclusion from the scope of Article 132 and 133 of disputes regarding the company's failure to pay dividends and (only in the case of Article 132) of "*any derivative claim under the legislation*": see Article 134(A)(i)-(ii) (**Article 134**).

14.   I note that the preamble to the Glossary states that it "is not legally part of the articles and it does not affect their meaning.  The explanations are intended to be a general guide - they are not precise. Words and expressions which are printed in bold in a definition have their own general explanation of their meaning which is contained in this Glossary." 'Legislation' is explained in the Glossary as "every statute (and any orders, regulations or other subordinate legislation made under it) applying to the company". 'Derivative claim' is explained as "an action which may be brought by a member on behalf of the company to enforce liability for breach by a director of his duties to the company". The principal source of derivative claims is Part 11 of the Companies Act 2006 ("**CA 2006**") (derivative claims and proceedings by members).[5]

**Overview of the English Law Claims**

15.   The Third Amended Complaint sets out the English Law Claims at paragraphs 334-357 inclusive (Counts III – V).  I understand that the Plaintiffs will submit a Declaration by Mr. Thomas Lowe QC which explains the legal elements of those claims.  For present purposes, and to assist the Court, I set out a high-level overview of the claims, as follows:

15.1.   **Count III** - for "Violations of English Common Law Fraudulent Misrepresentation and Deceit Against All Defendants on Behalf of Reckitt Ordinary Share Purchasers."

---

[4]   With the exception that Article 132(A)(iv) refers to "sub-paragraph 135(A)(iii)" whereas Article 133(C)(iv) refers to "sub-paragraph (C)(iii)."

[5]   s.260(1) Companies Act 2006.

This is an action in the tort of deceit, the five constituent elements of which are: (a) false representation(s) of fact or law by the Defendants; (b) made by them to the purchasers of Reckitt ordinary shares (the representees) fraudulently, (c) which is/are intended to be acted on by the representees, (d) reliance on the representation(s) by the representees, and (e) damage to the representees as a result of that reliance.

15.2. **Count IV** - for "Violations of the Financial Services and Markets Act of the United Kingdom Against Reckitt on Behalf of Reckitt Ordinary Share Purchasers." This is a statutory claim arising under (what is now) Schedule 10A of the Financial Services and Markets Act 2000 ("**FSMA 2000**"). s.90A FSMA 2000 provides: "Schedule 10A makes provision about the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of—a misleading statement or dishonest omission in certain published information relating to the securities, or a dishonest delay in publishing such information." As to which:

15.2.1. Published information to which Schedule 10A applies is defined at paragraph 2 of Schedule 10A.

15.2.2. Liability for untrue or misleading statements or dishonest omissions is dealt with at paragraph 3 of Schedule 10A.

15.2.3. The requirements are: (i) dealing in securities issued in a securities market in reliance upon published information (*e.g.* acquisition, holding or disposal of such securities); (ii) an untrue or misleading statement in the published information or an omission of information required to be included in that published information; (iii) a person discharging managerial responsibility, including any director (a "**PDMR**") knew or was reckless as to the untrue or misleading statement *or* knew the omission was a

- 7 -

dishonest concealment of a material fact; (iv) the claimant has suffered loss as a result of the untrue or misleading statement in the published information or the omission and it was reasonable for him to rely upon the statement or the omitted information at the time of suffering the loss.

15.3.    **Count V** - for "Violations of English Common Law, Negligent Misrepresentation and Misstatement Against All Defendants on Behalf of Reckitt Ordinary Share Purchasers." The constituent elements of this tort are: (a) establishing a duty of care arose between the Defendants and the purchasers of Reckitt ordinary shares as to the correctness of representations; (b) failure by the Defendants to take reasonable care by making material misrepresentation(s) of fact (or law) to the purchasers of Reckitt ordinary shares which was/were intended to influence the purchaser(s); (c) reliance on the representation(s) by the purchaser(s); and (d) reasonably foreseeable damage to the purchaser(s) as a result of that reliance.

16.    I note, in this regard, that at paragraph 15 of his Declaration, Mr. Midwinter QC refers to "*claims brought against Reckitt by Plaintiffs who acquired ordinary shares in Reckitt, including those alleging violations of the US Exchange Act, [....]*". As I understand the Third Amended Complaint, there are no such claims by Reckitt ordinary shareholders. Instead, the Exchange Act claims are brought by those who purchased Reckitt American Depositary Shares (ADSs) on the over-the-counter market in the United States and/or who incurred irrevocable liability for the ADSs in the United States and/or to whom title to the ADSs passed in the United States in the Class Period (see paragraph 1 of the Third Amended Complaint).

17.    I have not been asked to, and do not, express any views on either the merits of the Plaintiffs' English Law Claims or the Defendants' (non-jurisdictional) defences to those claims.

- 8 -

## II.    RELEVANT PRINCIPLES OF ENGLISH LAW

18.    The Articles, including the arbitration agreement at Article 132, are expressly governed by English law. I will therefore apply English law to the question of the interpretation of the Disputes Clauses.[6] To that end, I set out below the relevant English law principles on three issues: (a) the nature of articles of association; (b) interpretation of contracts (in general); and (c) interpretation of dispute resolution provisions.

### Articles of Association

19.    As set out above, the Disputes Clauses which fall to be analysed for the purposes of this Opinion are found in the Articles. The general characteristics of articles of association have been explained as follows:

19.1.    A company's memorandum and articles of association set out each shareholder's rights and obligations as regards other shareholders and the company.

19.2.    s.33(1) CA 2006 provides "*[t]he provisions of a company's constitution* [[7]] *bind the company and its members to the same extent as if there were covenants on the part of the company and of each member to observe those provisions*".[8]

19.3.    The purpose of a company's memorandum and articles of association is to define the position of a shareholder as shareholder, not to bind him in his capacity as an

---

[6]    If authority is needed for that approach, see the recent Supreme Court authority of **Enka Insaat ve Sanayi AS v OOO Insurance Company Chubb** [2020] UKSC 38; [2020] 1 WLR 4117.

[7]    *See* s.17 CA 2006: unless the context otherwise requires, references in the Companies Acts to a company's constitution include—(a) the company's articles, and (b) any resolutions and agreements to which Chapter 3 applies (*see* s. 29 CA 2006).

[8]    There may also be a personal undertaking by a member in the Articles which can be enforced by other members by suing upon it, and without joining the company as a party.

individual – **Bisgood v Henderson's Transvaal Estates Ltd** [1908] 1 Ch 743, 759 (CA).

19.4.    As explained by Lord Justice Steyn (as he then was) in the Court of Appeal in **Bratton Seymour Service Co Ltd v Oxborough** [1992] BCLC 693, 698 articles of association are a 'statutory contract' with special features: they derive their binding force not from a bargain struck between the parties but from the terms of the statute; they are binding only insofar as they affect the rights and obligations between the company and the members acting in their capacity as members; if the provisions are "not truly referable to the rights and obligations of members as such it does not operate as a contract"; articles are not defeasible on the grounds of misrepresentation.

19.5.    Thus, in **Hickman v Kent or Romney Marsh Sheepbreeders Association** [1915] 1 Ch 881 (HC), Mr Justice Astbury explained (at page 897) that "[a]*n outsider to whom rights purport to be given by the articles in his capacity as such outsider, whether he is or subsequently becomes a member, cannot sue on those articles treating them as contracts between himself and the company to enforce those rights. Those rights are not part of the general regulations of the company applicable alike to all shareholders and can only exist by virtue of some contract between such person and the company, and the subsequent allotment of shares to an outsider in whose favour such an article is inserted does not enable him to sue the company on such an article to enforce rights which are res inter alios acta and not part of the general rights of the corporators as such ...*" In other words, rights and obligations which do not apply equally to all the shareholders (or all shareholders of a particular class of shareholding) in their capacity as shareholder are outside the articles.

19.6.   **Hickman** was applied by the Court of Appeal in **Beattie v E&F Beattie Ltd** [1938] Ch 708, such that an arbitration clause in the company's articles of association could *not* be relied upon by a shareholder who was being sued in his capacity as director of the company. The first instance judge had found the arbitration clause did not apply both as a matter of construction and given the absence of contractual nexus between the appellant and the company (as required by s.4 of the Arbitration Act 1889 which gave the court power to stay[9]). Sir Wilfrid Greene MR in the Court of Appeal left the construction question open but agreed in relation to s.4: the arbitration clause did not apply because the contractual force of the articles of association under the Companies Act (1929) only extended to those rights and liabilities of members in their capacity as members; and the real matter in dispute was between the company and the appellant in his capacity as a director.

19.7.   In **Cumbrian Newspapers Group Ltd v Cumberland & Westmorland Herald Newspaper & Printing Co Ltd** [1987] Ch 1, Scott J gave a three-fold classification of rights or benefits which may be found in articles of association: (a) rights or benefits which are annexed to particular shares (for example, the right to participate in surplus assets on winding up); (b) rights or benefits conferred on individuals not in the capacity of members or shareholders but for ulterior reasons connected with the administration of the company's affairs or the conduct of its business (for example, a provision that a specified individual should be the company solicitor); and (c) rights or benefits which, although not attached to any particular shares, were nevertheless

---

[9]   s.4 of the Act was limited to a "party to a submission"; 'submission' was defined as a *"written agreement to submit present or future differences to arbitration"*.

conferred on a beneficiary in the capacity of member or shareholder of the company.[10] (a) and (c) are examples of rights which a member has *qua* member.

20.      In terms of the approach to interpretation of articles of association:

20.1.    Articles of association are commercial documents which should be construed as such: in **Holmes v Lord Keyes** [1959] Ch 199 (CA), Jenkins LJ noted that *"they should be regarded as a business document and should be construed so as to give them reasonable business efficacy where a construction tending to that result is admissible on the language of the articles, in preference to a result which would or might prove unworkable."*[11]

20.2.    The editors of Russell on Arbitration, a leading practitioners' textbook, suggest that provisions in articles of association which incorporate an arbitration agreement *"are likely to be construed restrictively and, as a general rule, they apply only to disputes between the company and one of its members in his capacity as a member".*[12]

20.3.    That statement is consistent with **London Sack & Bag Co Ltd v Dixon & Lugton Ltd** [1943] 2 All ER 763 in which the Court of Appeal rejected the argument that a dispute between two members of a trade association whose rules provided for arbitration for disputes arising out of trade should be referred to arbitration because those rules constituted a written submission to arbitration. The Court held (among other reasons) that the rights which were being sued upon arose from an ordinary

---

[10]      At p.15-17.

[11]      At p.215. There has been considerable water under the bridge since then in the law of contractual interpretation – as summarised at paragraph 21 – but **Holmes** has been applied more recently, in **Cream Holdings Limited v Stuart Davenport** [2010] EWHC 3096 (Ch).

[12]      D St John Sutton, J Gill and M Gearing (eds), *Russell on Arbitration* (S&M, 24th edn, 2015) §2-053.

- 12 -

business contract (in which there was no arbitration clause) which had nothing to do with the association; rather the dispute was concerned with individual trading.[13]

**Interpretation of Contracts**

21.    A useful recent recap of the English law on interpretation of contracts is provided by Mr Justice Pelling in the High Court decision of **Lamesa Investments Ltd v Cynergy Bank Ltd** [2019] EWHC 1877 (Comm),[14] which the Court of Appeal expressly approved.[15] I set out that recap here in full:

> "i) The court construes the relevant words of a contract in their documentary, factual and commercial context, assessed in the light of [a] the natural and ordinary meaning of the provision being construed, [b] any other relevant provisions of the contract being construed, [c] the overall purpose of the provision being construed and the contract or order in which it is contained, [d] the facts and circumstances known or assumed by the parties at the time that the document was executed, and [e] commercial common sense, but [f] disregarding subjective evidence of any party's intentions – see Arnold v. Britton [2015] UKSC 36 [2015] AC 1619 per Lord Neuberger PSC at paragraph 15 and the earlier cases he refers to in that paragraph;
>
> ii) A court can only consider facts or circumstances known or reasonably available to both parties that existed at the time that the contract or order was made - see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 20;
>
> iii) In arriving at the true meaning and effect of a contract or order, the departure point in most cases will be the language used by the parties because (a) the parties have control over the language they use in a contract or consent order and (b) the parties must have been specifically focussing on the issue covered by the disputed clause or clauses when agreeing the wording of that provision – see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 17;
>
> iv) Where the parties have used unambiguous language, the court must apply it – see Rainy Sky SA v. Kookmin Bank [2011] UKSC 50 [2011] 1 WLR 2900 per Lord Clarke JSC at paragraph 23;
>
> v) Where the language used by the parties is unclear the court can properly depart from its natural meaning where the context suggests that an alternative meaning

---

13    At p.766.

14    At [12].

15    [2020] EWCA Civ 821 at [18].

- 13 -

*more accurately reflects what a reasonable person with the parties' actual and presumed knowledge would conclude the parties had meant by the language they used but that does not justify the court searching for drafting infelicities in order to facilitate a departure from the natural meaning of the language used – see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 18;*

*vi) If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other – see Rainy Sky SA v. Kookmin Bank (ibid.) per Lord Clarke JSC at paragraph 2 - but commercial common sense is relevant only to the extent of how matters would have been perceived by reasonable people in the position of the parties, as at the date that the contract was made – see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 19;*

*vii) In striking a balance between the indications given by the language and those arising contextually, the court must consider the quality of drafting of the clause and the agreement in which it appears – see Wood v. Capita Insurance Services Limited [2017] UKSC 24 per Lord Hodge JSC at paragraph 11. Sophisticated, complex agreements drafted by skilled professionals are likely to be interpreted principally by textual analysis unless a provision lacks clarity or is apparently illogical or incoherent– see Wood v. Capita Insurance Services Limited (ibid.) per Lord Hodge JSC at paragraph 13; and*

*viii) A court should not reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight, because it is not the function of a court when interpreting an agreement to relieve a party from a bad bargain - see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 20 and Wood v. Capita Insurance Services Limited (ibid.) per Lord Hodge JSC at paragraph 11."*

**Interpretation of Dispute Resolution Provisions**

22.    Turning to the applicable principles for interpreting dispute resolution provisions, **Fiona Trust & Holding Corpn v Yuri Privalov** [2007] UKHL 40 is the leading authority. It swept away the previous approach, referred to by some as the 'jurisprudence of prepositions' (said by Lord Hoffmann to *"reflect no credit upon English commercial law"*[16]) and imposed what was intended to be a common sense – and expansive – approach.  It is also authority for the proposition that

---

[16]    At [12].

arbitration (and jurisdiction) clauses are 'separable' or distinct from the substantive contract of which they form part.[17]

23. Lord Hoffmann held in **Fiona Trust** (at [13]) that:

*In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended **any dispute arising out of the relationship into which they have entered or purported to enter** to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: "if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so"* (emphasis added)

24. The *"relationship"* referred to by Lord Hoffmann is the relationship which arises from the contract entered into by the parties containing the jurisdiction clause. Lord Hoffmann and Lord Hope both referred, in that regard, to a Bundesgerichthof decision[18] which found that "[t]*here is every reason to presume that reasonable parties will wish to have the relationships created by their contract and the claims arising therefrom ... decided by the same tribunal and not by two different tribunals"*.[19] Thus, the generous approach to the interpretation of arbitration clauses must be read in light of the fact that the relationship between the parties arose out of the same contract and it is that relationship (and not any facts or matters that pre-date it) that it might be presumed is to be governed by any arbitration agreement.[20]

25. Furthermore, the presumption that arises from what rational businessmen are likely to have intended when negotiating the contract that is to govern that relationship has no application to

---

[17] *See also* s.7 AA 1996.

[18] Decision of 27 February 1970 of the Federal Supreme Court of the Federal Republic of Germany (Bundesgerichtshof) (1970) 6 Arbitration International 79, 85.

[19] At [14] and [30].

[20] *See* **Terre Neuve SARL v Yewdale Ltd** [2020] EWHC 772 (Comm) at [27(4)] (Bryan J).

an arbitration agreement contained in the articles of association of a company. A new shareholder does not negotiate the terms upon which he or she is to become a member with the company or the other members. Rather, once he or she becomes a member, he or she is bound by the existing articles.

26.    **Fiona Trust** concerned an arbitration rather than a jurisdiction agreement. However, the Court of Appeal had put the issue of interpretation in broad terms – for example, Longmore LJ's statement that "*any jurisdiction or arbitration clause in an international commercial contract should be liberally construed*". In the House of Lords, Lord Hoffmann endorsed Longmore LJ's judgment and Lord Hope expressly referred to both jurisdiction and arbitration clauses.[21] The **Fiona Trust** approach has subsequently been deployed in the context of exclusive and non-exclusive jurisdiction clauses: *see, e.g.*, **Deutsche Bank AG v Sebastian Holdings Inc** [2010] EWCA Civ 998 [39].

27.    This approach to interpretation, as subsequently applied by the English courts, can be characterised as follows:

27.1.    In the case of commercially negotiated contracts, one must arrive at the parties' presumed mutual intention using ordinary principles of construction (as to which, see paragraph 21 above) but clear words are required if the scope of the arbitration clause is to be narrowed or limited. There is a presumption in favour of 'one-stop arbitration' rather than the fragmentation of disputes under the same agreement.

27.2.    The presumption of 'one-stop arbitration' does not apply, or is rebutted, even in the case of commercially negotiated contracts, in various situations. They include:

27.2.1. where a dispute arises *outside* the relationship created by the contract in which the arbitration agreement is found, even if the dispute arises between

---

[21]    **Fiona Trust** [18].

the same parties. For example, non-contractual claims which have no bearing on the performance of the parties' obligations under the agreement in question - such as a claim for false imprisonment which was found to fall outside the scope of arbitration clauses contained within a Share Subscription Agreement and a Placement Agency Agreement.[22] By contrast, where, say, a claim in tort is sufficiently closely connected to the contractual rights, the disputes clause in the contract is likely to apply. This point, which has particular relevance to the present case, is discussed further below in paragraph 36.

27.2.2. where the parties have expressly confined the scope of the arbitration clause to a particular type (or types) of dispute. For example, in **Guidance Investments Ltd v Guidance Hotel Investments Co BSC** [2013] EWHC 3413, an arbitration clause providing for "*[a]ny dispute arising out of or in connection with an Event of Default under clause 9*" was held to relate specifically to instances where notice of termination had been given under clause 9; otherwise disputes under the agreement were to be litigated – including the defendant's allegations that the claimant had failed to exercise reasonable care and skill amounting to gross negligence.

27.2.3. where the parties have expressed different parts of their relationship in different agreements. The court must undertake a careful interpretation exercise of all relevant agreements. For example, in **UBS AG v HSH Nordbank AG** [2009] EWCA Civ 585, the High Court had asked: "*to which*

---

[22]     **Injazat Technology Capital Ltd v Dr Hamid Najafi** [2012] EWHC 4171 at [9] (Flaux J). *See* further *Russell* (fn 12) at §2-004.

*contract the dispute in question was properly to be allocated; and the court then applied whatever jurisdictional provisions, if any, that contract might contain*" (citing **Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd** [1999] CLC 579). The Court of Appeal (which upheld the first instance judge's decision) looked for the disputes clause in the agreement at the commercial centre of the transaction in question ([95]-[97]). A presumption against overlapping disputes clauses is applied but that can be displaced by the language used and the surrounding circumstances of the case, in which case both clauses can apply – see for example **BNP Paribas SA v Trattamento Rifiuti Metropolitani SPA** [2019] EWCA Civ 768.

    27.2.4. where the dispute concerns the validity of the arbitration agreement itself (this, notwithstanding the principle of separability).

28.    The limiting effect of Lord Hoffmann's phrase "*arising out of the relationship into which* [the parties] *have entered*" (quoted above) has been considered in a number of subsequent cases. There are two authorities which are of particular assistance in this regard.

29.    First, the Court of Appeal decision in **Ryanair Ltd v Esso Italiana Srl** [2013] 2 CLC 950, which can be summarised as follows:

    29.1.    The relevant disputes clause (found in a master contract for fuel supply entered into by Ryanair and ExxonMobil Aviation International Ltd as agent for Esso Italian Srl) provided that "*[f]or the purposes of the resolution of disputes under this Agreement, each party expressly submits itself to the non-exclusive jurisdiction of the Courts of England*". Ryanair had pleaded claims in contract (that Esso has breached the fuel supply contract with Ryanair by their cartel activities in inflating the price of fuel at

Italian airports) and a statutory tort claim (for breach of statutory duty based upon art.101 of the Treaty on the Functioning of the European Union, TFEU).

29.2. Ryanair's contractual claim was found by Lord Justice Rix to be unarguable: *"the clause [relied upon] was never intended to apply to the use to which Ryanair's contract claim seeks to put it"* (at [40]); *"… there is no prospect of Ryanair having a contractual claim under article IV or an implied term such as would give a remedy, albeit limited to goods supplied under the contract itself, which reduplicated the effect of a statutory duty pursuant to article 101."* (at [41]).

29.3. Having considered the Court of Appeal decision in **The Angelic Grace**[23] (discussed below), Rix LJ found that Lord Hoffmann's reasoning in **Fiona Trust** *"does not carry over into a situation where there is no contractual dispute …"*. Without the existence of a contractual claim, Rix LJ described Ryanair's statutory tort claim as *"entirely non-contractual"*. He further noted that it depended on proof of unlawful arrangements between the seller and third parties with whom the buyer had no relationship whatsoever *"and the gravamen of which was a matter which probably affected many other potential claimants, with whom such a buyer might very well wish to link itself"* ([46]).

29.4. Thus, the disputes clause in the fuel supply contract did not apply to the statutory tort claim.

30. Secondly, the High Court decision in **Microsoft Mobile Oy (Ltd) v Sony Europe Limited** [2017] EWHC 374 (Ch), as to which:

---

[23] **Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)** [1995] 1 Lloyd's Rep. 87.

30.1.    the relevant disputes clause (found in a Product Purchase Agreement between Nokia Mobile Phones Ltd (subsequently acquired by the Microsoft group of companies) and Sony Corporation) provided for: "*[a]ny disputes related to this Agreement or its enforcement shall be resolved and settled by arbitration in the English language in United Kingdom, in accordance with the Arbitration Rules of the International Chamber of Commerce in United Kingdom.*" The claimant brought a contract claim (based on the obligations to negotiate changes in price in good faith and promptly notify any event that might reasonably affect the seller's ability to meet its obligations under the agreement) and a statutory tort claim (based on art 101 TFEU and/or Art 53 of the EEA Agreement).

30.2.    At [45], Mr. Justice Marcus Smith held that "*[t]he importance of having a 'one-stop-shop' for all disputes – and the likelihood that the parties to an agreement would intend this – is clear. But that is true only to the extent that disputes arise out of the parties' relationship. Thus, absent extremely clear wording, a court would presume that the parties would have intended the same tribunal to deal with contractual disputes arising out of the relationship, as well as any "parallel" claims in tort. But, what would not be covered, absent extremely clear wording, would (to take a somewhat extreme hypothetical case) be Party A's case against Party B (Party A and Party B being in a contract with each other containing an arbitration clause) for Party B negligently, but coincidentally and unrelated to the contract, running Party A over in the street. That would not be a dispute arising out of the parties' contractual relationship.*"

- 20 -

30.3.  In determining whether a claim fell within the relevant relationship, the Judge derived assistance (at [46]) from the pre-**Fiona Trust** authority of **The Angelic Grace**, in which the Court of Appeal held that: "*[t]he question in a nutshell is whether the relevant claims and cross-claims arise out of the contract. It is common ground that the question must be answered in the light of Empresa Exportadora De Azucar (CUBAZUCAR) v Industria Azucarera Nacional SA (IANSA) (The Playa Larga and Marble Islands) [1983] 2 Lloyd's Rep. 171, in which this court upheld the dictum of Mr. Justice Mustill that a tortious claim does "arise out of" a contract containing an arbitration clause if there is a sufficiently close connection between the tortious claim and a claim under the contract. In order that there should be a sufficiently close connection, as the Judge said, the claimant must show either that the resolution of the contractual issue is necessary for a decision on the tortious claim, or, that the contractual and tortious disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other.*" [24]

30.4.  And, at [72], in determining whether any contractual claims arising out of the agreement would be sufficiently closely related to the tortious claims actually advanced by the claimant (so as to render it likely that the parties, as rational businessmen intended both to be decided by arbitration), the Judge concluded that: (i) the question needed to be considered at the time the agreement was concluded; (ii) it is irrelevant whether a contractual claim is actually pleaded; (iii) that said, "*the extent to which a contractual claim is pleadable is obviously relevant to the thinking*

---

[24]  [1995] 1 Lloyd's Rep. 87 at [89].

- 21 -

*of rational businessmen at the time the arbitration clause is concluded. The more strained, recondite, convoluted or plain outlandish the contractual claim being postulated, the less likely it is that rational businessmen would expect 'related' tortious claims to be subject to an arbitration clause*" (relying upon **Ryanair**); and (iv) when weighing the link between a tortious and contractual claim, it is not merely the unarguable contractual claim that is an indicator that the arbitration clause does not apply, but also the strained one.

31.    Overall, the Judge found that the contract claim was well-arguable, the tortious claims were sufficiently closely related to any contractual claims (because there was a high degree of factual overlap), and that the arbitration clause therefore did extend to the claims in tort.

**Conclusion**

32.    Drawing the threads together, a distinction must be drawn between the approach to interpretation of dispute resolution provisions in commercially negotiated contracts and those contained in other types of *sui generis* agreements. In the former case, a broad approach to interpretation, which incorporates the assumed intentions of "*ordinary businessmen*"[25], including a presumption of 'one-stop arbitration' (or litigation), should be applied. In the latter case, where the agreement may not be a contractual bargain of the same nature and the relationship created by the agreement may be narrower, a more restrictive approach may be necessary.

33.    Articles of association are not a negotiated outcome but a 'take it or leave it' agreement which new shareholders must adopt – they are a special type of statutory contract. Moreover, articles of association regulate the rights and obligations between the company and the

---

[25]    The Court of Appeal's decision in **Fiona Trust** at [17]; the House of Lords opinion at [26].

members acting in their capacity as members from the time that a person becomes a member. Thus, the correct approach to interpretation of the Disputes Clauses in the Articles is a restrictive one.

34.    Furthermore, it is the incidents of the contractual relationship between the parties that it might be presumed would be governed by the dispute resolution provision. In the case of articles of association that relationship is narrow in scope: it concerns the administration and running of the company and it only arises once a potential shareholder actually becomes a member of the company (and is thereby bound by the articles of association).

## III.    INTERPRETATION OF THE DISPUTES CLAUSES IN THE ARTICLES

35.    It is my opinion that when one applies the principles set out above, the English Law Claims fall outside the scope of Article 132 (Arbitration) and Article 133 (Exclusive Jurisdiction) such that they are not subject to ICC arbitration in London *or* the exclusive jurisdiction of the courts of England and Wales. I explain my reasoning below.

36.    **First**, the English Law Claims do not arise out of the relationship between the parties as constituted by the Articles, nor are those claims closely associated with rights set out in the Articles:

36.1.    As a preliminary point, there are two broad categories of claim: (a) where the relevant misrepresentation(s), misstatement(s) and/or omission(s) relied upon by the Plaintiffs resulted in them acquiring ordinary shares in Reckitt on the London Stock Exchange during the Class Period for the first time and thereby suffering loss; and (b) where the relevant misrepresentation(s), misstatement(s) and/or omission(s) relied upon by the Plaintiff resulted in them either acquiring additional ordinary shares and/or in continuing to hold (rather than disposing of) ordinary shares and thereby suffering loss. In both categories, the English Law Claims arise either directly or indirectly (where the relevant misrepresentation(s), misstatement(s) and/or

- 23 -

omission(s) caused the Plaintiffs to retain their shares) out of transactions with third parties pursuant to which the Plaintiffs acquired the ordinary shares in Reckitt.

36.2. The English Law Claims are all based on the right of the Plaintiffs not to be deceived by Reckitt or its directors, whether fraudulently or otherwise, when deciding to acquire or retain Reckitt ordinary shares. The claims arise from the common law (in the case of deceit and negligent misrepresentation/misstatement) and statute (in the case of the s.90A/Schedule 10A FSMA 2000 claim). As noted above, the claims are made against Reckitt and its directors in respect of transactions with third parties whereby the Reckitt ordinary shares were acquired.

36.3. Accordingly, the claims do not derive from a commercial transaction entered into directly with Reckitt or its directors. Moreover, they do not rely upon (or indeed relate to) any provision in the Articles. For example, none of articles 1 through to 134 refers to protecting shareholders against misrepresentation(s) or misstatement(s) when acquiring shares in the company (and the only reference to 'omissions' is in the context of meetings or other proceedings: article 47). There is no reference in the Articles to 'claims in tort' or 'claims under FSMA 2000'. While the Disputes Clauses do refer to "*any derivative claim under the legislation*" (a carve-out from the scope of Article 132: *see* Article 134(A)(ii), which provides the definition of "*dispute*"), the claim under FSMA 2000 in Count IV is not a derivative claim (explained in the Glossary to the Articles to be: "*[a]n action which may be brought by a member on behalf of the company to enforce liability for breach by a director of his duties to the company.*"). In short, none of the articles provides enforceable rights analogous to those relied upon in Counts III-V which shareholders can invoke

- 24 -

against the company or its directors. The English Law Claims are therefore *"entirely non-contractual"*.[26] Moreover, there is no need to resolve a contractual issue in order to determine the English Law Claims. The position is similar to that in **Ryanair v Esso Italiana Srl** which I refer to in paragraph 29 above.

36.4.　In my view the losses which the Plaintiffs have suffered would not have been foreseen as falling within the scope of the Articles, and in particular the Disputes Clauses, at the time those Plaintiffs became subject to the Articles by acquiring the ordinary shares. To suggest otherwise is to elide the circumstances in which a person acquires shares from a third party and thereby becomes a shareholder and the rights which an individual acquires as a member of the company from the constitutional document of the company. It is not, of course, the entry into the Articles which has caused the loss to the Plaintiffs for the purposes of the English Law Claims (just as it is not entry into Reckitt's register of members that is the harmful event); there is no need to rescind the Articles to obtain relief (which, in any event, is not an available remedy under English law). Rather, it is the acquisition and retention of the ordinary shares as units of value which has caused the Plaintiffs to suffer loss, since that value was artificially inflated in the market by the relevant Defendants' actions.

36.5.　It is true, in this context, that claims advanced by the Plaintiffs only crystallise when a person becomes a shareholder (or increases or fails to reduce their shareholding) and thereby suffers loss. Otherwise, they will not have relied upon the relevant misrepresentations/misstatement(s)/omissions (as appropriate) and the causes of action will not be complete. But, again, it does not follow that the resolution of any

---

[26]　**Ryanair** at [46] – see paragraph 29.3 above.

contractual issue (*i.e.* the effect of any provision contained within the Articles) is necessary to resolve the claims. In this regard, Reckitt cannot rely on the Disputes Clauses themselves as the relevant contractual right which the Plaintiffs are seeking to enforce (which are, indeed, common to all the shareholders) – that approach, which amounts to pulling oneself up by one's own bootstraps, was ruled out in **Beattie**.[27]

36.6.   In light of the foregoing, the Plaintiffs *could not* formulate any of the English Law Claims by reference to the Articles. Nor for that matter could they advance a contractual claim against Reckitt under the contracts pursuant to which they obtained the ordinary shares in the secondary market since Reckitt is not a party to those contracts.

36.7.   The factual position is very different to that which arose in the cases referred to in Mr. Midwinter QC's Declaration. In both the **Hickman** case and **Fulham Football Club (1987) Ltd v Richards** [2012] Ch 333, the dispute concerned the way in which the sheepbreeder's association (in Hickman) or the football league (in Fulham) was administered or managed. That administration or management was a matter governed by the articles and therefore the arbitration agreements governed it. The English Law Claims are categorically different: they are not concerned with the administration or management of Reckitt in a remotely analogous sense; rather they are claims relating to the way in which the Plaintiffs were induced to purchase (or retain) shares in Reckitt.

---

[27]    *See* paragraph 19.6 above.

36.8.   In any event, in the case of the Plaintiffs who were induced to purchase shares, the relevant facts arose at a time before they were members and therefore before they were even bound by the Articles. The causes of action of those Plaintiffs who retained shares (and the facts relied upon) are the same and it would be a very strange result (and one that cannot have been the intention of the draftsman of the Articles) if one set of claims fell within Article 132 and the other did not. For the reasons I have explained, in my view, neither do.

36.9.   In paragraphs 16a-b. of his declaration, Mr. Midwinter QC refers to disputes relating to the formation of the contract containing the arbitration agreement itself, citing **Fiona Trust** as an example of such a dispute that fell within the arbitration agreement. However, **Fiona Trust** was concerned with arbitration agreements in eight charterparties that it was alleged were procured by bribery of officers of the parties who contracted with the charterers and rescission of the charters was sought. The relevant clause referred to "*Any dispute arising under this charter*" and it is not at all surprising that the House of Lords decided that the disputes fell within that clause. The English Law Claims do not seek to rescind the Articles themselves. In fact, the English Law Claims are not concerned with the Articles at all.

36.10. The factual basis for the English Law Claims and the causes of action relied upon are by no means unusual (sadly it is a not uncommon occurrence for plaintiffs to allege that they were wrongly induced to purchase shares) and neither is an arbitration agreement in a company's articles of association. However, as far as I am aware, there is no reported English law case in which it has been held that claims such as the

- 27 -

English Law Claims fall within an arbitration agreement in a company's articles of association.

37.    **Secondly**, the wording in Article 132(A)(i) which refers to *"in that shareholder's capacity as such"* should be taken to mean a shareholder seeking to rely on a right annexed to their shares or a right set out in the Articles – a right acquired *qua* member, not a right acquired as a person other than as a member.[28] For the reasons set out above, the Plaintiffs who acquired Reckitt ordinary shares on the London Stock Exchange during the Class Period are suing as persons who were deceived into entering contracts with third parties to acquire and/or to retain ordinary shares in Reckitt so acquired and who, because of the deception, have suffered loss as a result. The purchaser became, or remained, a party to the Articles as a result of the acquisition or retention of the shares – but that (ancillary) consequence has no part to play in asserting and proving the English Law Claims. Thus, the Plaintiffs are not suing in their *"shareholder's capacity as such"*.

38.    In paragraph 16c. of his Declaration, Mr. Midwinter QC suggests that the reference in Article 132 to a claim *"between a shareholder in that shareholder's capacity as such and the company"* is likely to be intended to distinguish between claims brought in a different capacity (such as a director or lawyer) by a person who also happens to be a shareholder. Whilst in my view such claims would plainly fall outside of Article 132 (as Mr. Midwinter QC appears to accept), the important distinction is between a claim that arises as a result of a person being a shareholder and suing on a right that arises as a result of that relationship (for example a claim that the company is being mismanaged) and other claims.

39.    **Thirdly**, as for the wording in Article 132(A)(i) "[…] *arising out of or in connection with these articles or otherwise*":

---

[28]    **Cumbrian Newspapers Group Ltd** (paragraph 19.7 above).

39.1. The meaning of *"arising out of* [...] *these articles"* is straightforward. I have explained above why the English Law Claims do not arise out of the Articles.

39.2. *"[...] in connection with these articles* [...]*"* is an incremental extension which is limited by the requirement that a shareholder sue *"in that shareholder's capacity as such"*. In my opinion, it has the effect of incorporating disputes regarding provisions in the Articles which expressly refer to external sources for the relevant shareholder rights. For example, Article 59 which provides that *"[s]hareholders will be entitled to vote at a general meeting, whether on a show of hands or a poll, **as provided in the legislation"*** (emphasis added); or Article 122 which provides that *"a shareholder is not entitled to inspect any of the company's accounting records or other books or papers unless: (i) **the legislation or a proper court order gives him that right** [...]"* (emphasis added). A dispute regarding those rights arises, if not 'out of' the Articles, then in connection with them – and as a result falls within Article 132. For the avoidance of doubt, that does not apply to the English Law Claims.

39.3. Finally, *"or otherwise"* is a further incremental extension to the scope of the clause. Again, the requirement that a shareholder sue *"in that shareholder's capacity as such"* acts to limit its extent. In my opinion, it incorporates rights which a shareholder has, *qua* shareholder, arising from the *"legislation"* but which are not referred to *at all* in the Articles (and are not 'derivative claims' which would fall into Article 133). This would include, for example, an unfair prejudice petition under s.994 CA 2006.[29]

---

[29]    s.994(1) provides: "A member of a company may apply to the court by petition for an order under this Part on the ground—

39.4.   I have considered whether Claim IV (*i.e.* the claim under s.90A and Schedule 10A FSMA 2000), which is a claim arising from "*legislation*", falls within the scope of this wording. In my view it does not. I come to that conclusion for three principal reasons. First, I do not consider that a claim brought under s.90A/Schedule 10A is brought in a shareholder's capacity, notwithstanding that share ownership is one of the qualifying criteria for bringing the claim – as explained in paragraphs 36 above. Secondly, and in any event, because of the restrictive approach to interpretation of disputes clauses in articles of association, I consider that in order to incorporate disputes regarding investor protections such as those in FSMA 2000 into an arbitration agreement express reference to FSMA 2000 is required. Reckitt did not do so: there is no mention of the Act in the Disputes Clauses. Thirdly the claims under FSMA 2000 are factually closely connected to the other English Law Claims and in my view, it would be very surprising if they fell within the scope of Article 132 whilst the other English Law Claims do not.

40.   Thus, none of the English Law Claims is a dispute which arises between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with the Articles or otherwise for the purposes of Article 132(A)(i) (and, for completeness, none of the other disputes defined by sub-paragraphs (A)(ii) – (iv) to Article 132 is descriptive of the English Law Claims).

---

(a) that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or
(b) that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."

41.    Accordingly, in my opinion the English Law Claims fall outside the scope of Article 132 and are not subject to ICC arbitration in London. In the premises, and on the assumption that the first question posed in paragraph 2a. of Mr. Midwinter's Declaration is specifically addressing the English law Claims and whether or not they are required by Article 132 to be arbitrated, the answer to that question is "no".

42.    **Fourthly**, in light of the foregoing, the analysis in relation to Article 133 can be briefly stated. There is an issue of interpretation regarding whether under English law the reference to Article 135 (which does not exist in the version of the Articles which I have reviewed) should be corrected to Article 132. I have read and agree with paragraph 5 of Mr. Midwinter QC's Declaration that English law would recognise the reference to Article 135 as an obvious error and correct it to a reference to Article 132 as a matter of interpretation.

43.    It is my opinion that the English Law Claims:

43.1.    Are not disputes "*which would otherwise be subject to Article 132*" but in respect of which a court has determined that Article 132 is invalid or unenforceable in relation to that dispute in that jurisdiction (Article 133(A)(i)):

43.1.1. First, for the reasons explained above, the English Law Claims are not disputes which would otherwise be subject to Article 132.

43.1.2. Secondly, and as a consequence, this Court would not, in holding that Article 132 is inapplicable to the English Law Claims, be determining that Article 132 is "*invalid or unenforceable*" (as those terms would be interpreted as a matter of English law) in relation to those claims. Rather, it would merely be deciding that they are outside its scope because of the nature of the causes of action advanced.

- 31 -

In this respect I note that Mr. Midwinter QC has posed and answered the question *"Whether, under English law, **should the arbitration clause in Article 132 be declared invalid and unenforceable**, Article 133 of Reckitt's Articles of Association provides an exclusive forum selection clause providing England and Wales as the only forum in which holders of Reckitt ordinary shareholders (sic) may bring suit against Reckitt and its directors and officers"* (emphasis added). That question presupposes that the arbitration clause in Article 132 is declared invalid and unenforceable (although I note that in paragraph 20 of his Declaration Mr. Midwinter QC uses the words *"invalid and ineffective"* which do not appear in Article 132). However, the effect of the English Law Claims falling outside Article 132 would not be that Article 132 was declared invalid or unenforceable. Article 132 would remain valid and unenforceable (nobody is challenging its validity or enforceability and indeed the Plaintiffs are seeking to enforce it) albeit, this Court would have ruled that it did not apply to the English Law Claims. Accordingly, I would re-formulate this question to read: *"Whether, under English law, the English Law Claims fall within Article 133 such that England and Wales is the only forum in which the holders of Reckitt ordinary shares may bring those claims."*

43.2.   Are <u>not</u> *"derivative claim[s] under the legislation"*. The English Law Claims are brought by the Plaintiffs in their own right, not on behalf of Reckitt.

44.   Accordingly, in my opinion the English Law Claims also fall outside the scope of Article 133 and are not subject to the exclusive jurisdiction of the courts of England and Wales and

the answer to the question posed in paragraph 2b. of Mr. Midwinter's Declaration, as reformulated above, is "no".

## IV.    CONCLUSION

45.    In my opinion the English Law Claims fall outside the scope of Article 132 and are not subject to ICC arbitration in London. The answer to the first question (a.) posed in paragraph 2 of Mr. Midwinter's Declaration is "no".

46.    In my opinion the English Law Claims also fall outside the scope of Article 133 and are not subject to the exclusive jurisdiction of the courts of England and Wales. The answer to the second question (b.) posed in paragraph 2 of Mr. Midwinter's Declaration – as amended above[30] – is also "no".

Pursuant to 28 U.S.C. paragraph 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    23/08/21

Signed:_____
           David Lord QC

---

[30]    As discussed at paragraph 43.1.2 above



Chambers of John McDonnell QC
3 Stone Buildings
Lincoln's Inn
London WC2A 3XL

Tel: +44 (0)20 7242 4937
Fax: +44 (0)20 7405 3896
DX 52 Chancery Lane

# David Lord QC

Call: 1987 | Silk: 2009

David's practice comprises Commercial and Chancery Litigation and Arbitration with particular emphasis on Insurance and Reinsurance, Company and Insolvency, Civil Fraud and Asset Tracing and Media and Entertainment in England and other jurisdictions in the Caribbean and Far East.



David is a member of COMBAR and the Chancery Bar Association. He is called to the Bar of the British Virgin Islands and has been called to the Bar of the Cayman Islands and the Bar of the Seychelles for particular cases. David is a Fellow of the Chartered Institute of Arbitrators and is called to the New York State Bar (FLC).

At home, David regularly appears in both the Commercial Court and the Chancery Division of the High Court, as well as the Appellate Courts including the Privy Council. Internationally he appears regularly in different Caribbean jurisdictions and appeared recently before the Supreme Court of Seychelles as well acting in international arbitrations in Europe and the Far East.

David was heavily involved in the Lloyd's litigation in the 1990s acting on behalf of the Names. He then became involved in the arbitrations that arose following the personal accident spiral and has since been involved in a number of High Court actions and arbitrations (including Bermuda Form Arbitrations) representing insureds, Lloyd's syndicates, corporate insurers and reinsurers and brokers.

David was involved in the litigation that arose in relation to British & Commonwealth, Maxwell and Barings and acted for Prince Jefri in his long running dispute with the State of Brunei and the Brunei Investment Agency and for Mr Cherney in his oligarch battle with Mr Deripaska. He is currently involved in other litigation in London and the BVI involving Russian and other Eastern European oligarchs.

David has recently been involved in a large number of international arbitrations concerning subjects such as viatical insurance policies, a Romanian Bank, a Nigerian mobile telephone network, a steel mill in Malaysia, an aluminium smelting plant in Malaysia, and a dispute between a Chinese company and a Russian business concerning mobile telephone communications in Russia. He is currently involved in a high value Bermuda Form Arbitration in London.

He has been involved in a number of cross-border insolvency proceedings and in recent years has been heavily involved in Madoff related litigation in the British Virgin Islands, Court of Appeal of the Eastern Caribbean and the Privy Council acting on behalf of Swiss Banks, and in proceedings brought in the Cayman Islands by the liquidator of a Cayman Fund against the directors of the Fund and to re-claim redemption payments from investors made prior to the liquidation.

David has also acted for a number of high profile sports stars, musicians and actors as well as corporate entities involved in the media and entertainment industry.

## Expertise

Arbitration

Banking and financial regulation litigation

Civil fraud – asset tracing and recovery

Commercial disputes and litigation

Company law

Conflict of laws

Entertainment – media – sports

Insolvency and restructuring

Insurance – reinsurance

Offshore

Partnership

Professional liability

## What the directories say

> He gets the ear of any judge with ease and clients love his no-nonsense plain language. An exceptionally good cross-examiner and advocate, who works immensely hard and is always committed.
>
> **Legal 500 2021**

> He is creative, sensible and easy to work with. Straight to the point and very commercial-minded. His work is always excellent. Practical, very hands-on and someone who makes sure he gets on top of the detail quickly. He is excellent in court and has very good experience in heavy jurisdictional disputes.
>
> **Chambers & Partners UK 2021**

> David is listed as one of the leaders of the Bar in the current editions of Chambers UK and Chambers Global where he is described respectively as being "very hands-on, really does his prep, knows the matter inside out and backwards – generally very impressive" and as having "a great reputation particularly for BVI work."
>
> **Chambers & Partners UK**

> He is also listed as a "Leading Silk" in The Legal 500 where he is described as both as "A superb advocate who has an immediate grasp of a situation and makes incisive decisions" and "A friendly barrister with excellent drafting skills and a practical outlook" and in "Legal Experts".
>
> **Legal 500**

## Cases of interest

- *SFO and Ors v Litigation Capital and Ors*
  An action concerning proprietary rights in assets held by Enforcement Receivers, Joint Liquidators, the Viscount of Jersey and Others with a large number of parties. There have been a number of interlocutory judgments which include [2020] EWHC 3548 (Comm). David acts for parties that claim an equitable right to distributions from BVI Companies that are in liquidation and appeared at the recent Commercial Court Trial that was listed for 10 weeks between January and March 2021 and was conducted remotely before Foxton J. Judgment is awaited.
- *Re Unicorn Worldwide Holdings Ltd*
  BVIHGMAP2020/012 – Eastern Caribbean Court of Appeal – Baptiste, Michel and Farara Jas
  The Joint Liquidators of BVI Companies applied to the court for the sanction of a settlement agreement entered into by some of the parties to the litigation referred to above (SFO and Ors v Litigation Capital and Ors). Jack J granted sanction and the Court of Appeal upheld that decision. An application for permission to appeal to the Privy Council is pending.
- *Business Mortgage Finance v Wood and Pengelly*
  [2021] EWCA Civ 471 – Court of Appeal – David Richards, Males and Laing LJJ
  The Court of Appeal heard 2 appeals together concerning secret and half-secret commissions paid to the agents of borrowers. Judgment was handed down on 31 March 2021. The Court of Appeal held that it was not necessary to establish a fiduciary relationship between the borrower and the agent. Rather the question was simply whether the payee was under a duty to provide information, advice or recommendation on an impartial or disinterested basis.
- *Nosnehpetsji Ltd (in liquidation) v Watersheds Capital Partners Ltd and Anr*
  [2020] EWHC 1938 (Ch)
  The Chancery Division made rulings concerning two groups of shares in the first claimant company, which was in liquidation. The Transfer of ordinary shares for no consideration had been made in breach of duty to the company and the liquidator was entitled to relief on behalf of the company, Further, the preference shares had been redeemable at £2 per share.
- *Bridgehouse (Bradford) No. 2 Ltd v BAE Systems Plc*
  [2020] EWCA Civ 759 – Court of Appeal – Newey, Males and Stephen Jones LJJ
  The Court held that a claim pursuant to section 1028(3) Companies Act 2006 was a matter that could be referred to arbitration and was within the terms of an arbitration agreement between the parties.
- *JSC VTB Bank v Skurikhin and Ors*
  [2020] EWCA Civ 1337 – Court of Appeal – Lewison, Males and Stephen Jones LJJ
  A Liechtenstein Foundation applied to set aside the Court's appointment of receives by way of equitable execution over the membership shares and

interest in an English LLP. The Court refused to do so on the basis that the original appointment of receivers was final and binding and it was an abuse of process for the Foundation to rely on the exclusion of the judgment debtor as a beneficiary or it when that exclusion had been brought about with the knowledge and approval of the judgment debtor himself. The Court of Appeal upheld the Judge's decision.

- *JSC VTB Bank v Miccros Group Ltd and Taurus Ltd*
  BVIHC (COM) 2018/0067 – 19 January 2020 (Jack J)
  In the BVI a receiver was appointed over the shares of a BVI Company on the basis of the appointment of receivers in London. The legal owner of the shares, an Anguillan company, successfully applied to discharge the receivership.

- *Candey Ltd v Crumpler and Farmer*
  [2020] EWCA Civ 26 and UKSC 2020/0039
  The applicant, a firm of solicitors, sought a charging order pursuant to section 73 Solicitors Act 1974 over sums paid to the liquidators of a BVI Company in settlement of proceedings in which the solicitors had acted for the company. The Judge held that the solicitors had waived their solicitors' lien prior to the liquidation of the company by taking additional security in the form of a deed of charge without reserving the solicitor's lien. The Court of Appeal upheld the Judge's decision and refused permission to appeal. However, the Supreme Court itself granted permission to appeal and that appeal is pending.

- *Skandinaviska Enskilda Banken AB v Conway and Anr*
  [2019] UKPC 36 – Privy Council
  David acted for the successful liquidators against the Bank's appeal from the Court of Appeal of the Cayman Islands. The Liquidators recovered redemption payments made to the Bank shortly before the Weavering Fund was placed into liquidation as invalid preferences.

- *Galagaev and Ors v Ananyev and Ors*
  [2019] EWHC 2414 (Comm) – Andrew Baker J
  Proceedings brought by a number of Russian investors in Notes issued by a Russian Bank owned by 2 brothers against the 2 brothers and 8 other defendants were struck out on the grounds of want of jurisdiction or because the claims were without foundation.

- *Pedriks and Anr v Grimaux*
  [2019] EWHC 2165 (QB) – Ms Leigh-Ann Mulcahy QC
  The defendant sought to strike out parts of the claimants' claims including those for breach of fiduciary duty. The Court refused to do so.

- *Fraser Turner Ltd v Pricewaterhousecoopers LLP and Ors*
  [2019] EWCA Civ 1290 – Court of Appeal – Vos, Males LJJ and Snowden J
  The claimant claimed damages in excess of £100 million against PWC and the administrators of London Mining plc. The Court of Appeal upheld the decision of the deputy judge to strike out the claims.

- *Terry and Ors v Watchstone Limited*
  [2018] EWHC 3082 (Comm) – Stephen Hofmeyr QC
  The claimants successfully claimed sums paid by them in respect of tax liabilities pursuant to an indemnity granted to them as shareholders in the defendant company prior to the company entering into a reverse takeover.

- *Bazhanov & Anr v Fosman & Ors*
  [2017] EWHC 3404 (Comm) – Daniel Toledano QC
  The Judge set aside permission to serve the Claim Form out of the jurisdiction in Russia in a dispute between 2 Russian businessmen concerning a sunflower seed oil production business in Russia.

- *Barrington Development Limited & Anr v Ocra (Seychelles) Ltd & Anor*
  Supreme Court of the Seychelles 184/2017 – Govinden J – 20 October 2017
  In proceeding concerning the shareholding of a Seychelles company, David acted for the defendants who successfully set aside leave to serve the proceedings on them out of the jurisdiction and had the claim against them struck out.

- *In the matter of OS3 Distribution Limited*
  [2017] EWHC 2621 (Ch) – Elizabeth Jones QC
  David acted for the successful respondents in a petition by Watchstone Group plc pursuant to section 994 Companies Act 2004 in which it was alleged that the affairs of the company had been operated unfairly prejudicially.

- *Grenda Investments Ltd v Philip Barton*
  [2017] EWHC 2371 (Comm) – Simon Picken J
  A claim by the claimant for c £20m pursuant to 3 loan facility agreements. This was the hearing of the claimant's claim for summary judgment and the defendant's claim to strike out the claim.

- *Leeds and Hellard v Lemos*

  [2017] EWHC 1825 (Ch) – His Honour Judge David Hodge QC

  David acted for the bankrupt who successfully argued that potentially privileged documents that had been obtained from his former solicitors and were in the hands of his trustee in bankruptcy could not be used in proceedings against him.

- *NRC Holding Ltd v Danilitskiy & Ors*

  [2017] EWHC 1431 (Ch) – Robin Dicker QC

  David acted for the registered owner of a valuable property in Knightsbridge in a trial during which the claimant sought to enforce a judgment by way of a charging order.

- *Millicom Tanzania N.V. v Golden Globe International Services Ltd and Yusuf Manji*

  BVIHCMAP2016/0036 – 10 May 2017 – Eastern Caribbean Court of Appeal

  David acted for the second defendant in proceedings concerning the ownership of shares of a telecommunications company in Tanzania. The second defendant applied to set aside service of BVI proceedings and freezing orders against him on the basis the proceedings should be pursued in Tanzania. David was successful both before the Commercial Court Judge and the Eastern Caribbean Court of Appeal.

- *Blue Tropic Ltd & Anr v Ivane Chkhartishvili*

  [2016] EWCA Civ 1259 – Court of Appeal – Arden LJ and Henderson LJ

  The defendant, a well known Georgian business man and politician had judgment for damages to be assessed entered against him pursuant to Article 992 of the Georgian Civil Code following a lengthy trial in the Commercial Court (at which time David did not act for the defendant). David was instructed to seek permission to appeal and to appeal that judgment which he did successfully on the basis that the claim was only successful as a result of a late amendment to the claimant's claim which amendment, the Court of Appeal decided should not have been allowed. The judgment was therefore set aside and the claim against the defendant dismissed.

- *Weavering Macro Fixed Income Fund Ltd v SEB AB*

  4th December 2015 – Cayman Islands – The Honourable Nigel Clifford QC

  A successful claim by liquidators of a Cayman Fund to recover redemption payments made to an investor as invalid preferences.

- *Tseitline v Mikhelson*

  [2015] EWHC 3065 (Comm)

  Stephen Phillips J upheld personal service of Commercial Court proceedings on a Russian oligarch.

- *The Federal Republic of Brazil v Durant*

  [2015] UKPC 35

  The Privy Council upheld the decisions of the Royal Court and Court of Appeal in Jersey in allowing backwards tracing.

- *Michael Norcross & Ors v The Estate of Christos Georgallides*

  [2015] EWHC 2405 (Comm)

  Andrew Smith J dismissed the Claimants' claims concerning the running of the Sugar Hut nightclubs on the basis that the claims had not been made out and in any event were barred by a settlement agreement and limitation.

- *Weavering Macro Fixed Income Fund Ltd v Peterson and Ekstrom*

  (26th August 2011 and 12th February 2015 – Andrew Jones J and Court of Appeal)

  A claim by Liquidators of a Cayman Fund for US$111 million against the directors of the Fund.

- *Fairfield Sentry Ltd (in liquidation) v Migani & Ors*

  [2014] UKPC 9

  The Privy Council dismissed the Liquidator's appeals against the decisions of Bannister J dismissing the Liquidator's claims to repayment of sums paid to the redeeming shareholders on account of the Ponzi Scheme run by Mr Madoff.

- *Arts & Antiques Ltd v Richards and Others*

  [2013] EWHC 3361 (Comm)

  The Commercial Court struck out an insured's claim for breach of contract and professional negligence arising out of the refusal of an indemnity under an insurance contract where the same claim had been determined by arbitration. An issue estoppel arose as against the insurers in relation to the presence of a condition precedent in the policy and it would be an abuse of process to allow the insured to fight that issue against the brokers, who had not been parties to the arbitration.

- *RP Explorer Master Fund v Chilukuri*

  [2013] EWHC 103 (Ch).

  Judgment was entered for a Cayman Fund for US$91 million in a dispute concerning investments in India and the Democratic Republic of Congo.

- *Fairfield Sentry Limited (In Liquidation) v Bank Julius Baer & Co Ltd & Ors*
  BVIHC (COM) 30/2010 and 7 Other Claims.
  The Court of Appeal upheld the judgment of Bannister J granting judgment to the Defendant Banks in respect of the Liquidator's claim to claw-back historical redemption payments on the basis they were paid under a mistake.

- *The Seashell of Lisson Grove Ltd and Ors v Aviva Insurance and Ors*
  [2011] EWHC 1761 (Comm) Teare J
  The trial of 3 preliminary issues concerning an insurance policy for a famous restaurant in London that had suffered losses from a catastrophic fire.

- *Michael Cherney v Oleg Deripaska*
  [2009] EWCA Civ 849
  A very large claim between oligarchs in which the English Court gave permission for the claim form to be served out of the jurisdiction where the risks inherent in a trial in Russia were sufficient to make England the forum in which the case could most suitably be tried in the interests of both parties and the ends of justice.

- *Aspen Insurance UK Ltd v Pectel Ltd*
  [2009] Lloyd's Rep. I.R. 440
  Teare J – A claim by Insurers for a declaration that they were not liable to indemnify the Insured because of a breach of a condition precedent in the insurance policy.

- *Re East Sussex County Council & Ors*
  [2009] EWHC 935 (Fam)
  Eleanor King J – A decision that a reporting restriction should not be continued where the material in dispute was extensively available on the internet and had been in the public domain for a significant length of time.

- *Aspinall's Club Limited v Fouad Al-Zayat*
  [2008] EWHC 2101 (Comm)
  Teare J – An assent by a gaming club to a gambler's suggestion that he should be allowed one year in which to repay a gambling debt, but that during that period he would continue to gamble at the club and would repay the money out of any money won, amounted to providing or allowing him credit contrary to the Gaming Act 1968 s. 16(1(b).

- *Michael Wilson & Partners Ltd v Temujuin International Ltd and Ors*
  [2008] High Court of Justice, British Virgin Islands
  A large fraud case involving asset tracing in the BVI, Bahamas, England and Australia, worldwide freezing orders and the appointment of receivers and applications to dismiss such orders.

- *Amedeo Hotels Ltd Partnership & Ors v Zaman & Ors*
  [2007] EWHC (Comm) 295
  David Mackie J – an application to discharge a worldwide freezing order made pursuant to section 25 Civil Jurisdiction and Judgments Act 1982 on the grounds of material non-disclosure.

- *Aspinall's Club Limited v Fouad Al-Zayat*
  [2007] EWCA 1001
  The Court of Appeal allowed the appeal of Mr Al-Zayat and held that on a proper analysis of the provisions of section 16 Gaming Act 1968 Mr Al-Zayat had defences with reasonable prospects of success and summary judgment should not have been entered against it.

- *His Royal Highness Prince Jefri Bolkiah v The State of Brunei Darussalam and Anr*
  [2007] UKPC 62
  Following hearings before the Chief Justice and the Court of Appeal in Brunei, the Privy Council decided that the Chief Justice of Brunei was correct not to recuse himself from hearing the proceedings and there were no grounds for granting a stay on the basis that there could not be a fair hearing of the application to enforce the Settlement Agreement.

- *His Royal Highness Prince Jefri Bolkiah v The State of Brunei Darussalam and Anr*
  [2007] UKPC 63
  Following hearings before the Chief Justice and the Court of Appeal in Brunei, the Privy Council decided that Prince Jefri had no reasonably arguable defence to the claim by the Brunei Investment Agency to enforce a Settlement Agreement reached on 12th May 2000.

- *Konkola Copper Mines & Anr v Coromin Ltd and Any*
  [2006] EWCA Civ 5 Court of Appeal.
  An application for a stay of proceedings against Reinsurers on jurisdictional and case management grounds.

- *Freakley & Ors v Centre Re & Anr*
  [2006] 1 WLR 2863
  House of Lords.
  An appeal concerning whether claims handling costs amounted to administration expenses.
- *Feasey v Sun Life & Phoenix, Steamship Mutual v Feasey*
  [2003] EWCA Civ
  Court of Appeal. An avoidance action which also involved consideration of the Life Assurance Act 1774 and insurable interest generally and is currently being appealed to the House of Lords.
- *Akinola v Heath*
  [2002] EWHC 2062 (Ch)
  An action to determine who owned the copyright in the highly successful dance song "The Key, The Secret"
- *Henderson v Merrett Syndicates*
  [1995] 2 AC 145
  House of Lords. A decision on the particular construction of the agency agreements entered into between names, members' agents and managing agents at Lloyds and the tortious duties owed between those persons.
- *Deeny & Ors v Gooda Walker Ltd and Ors*
  [1994] CLC 1224
  Phillips J. The first major Lloyd's Action (arising out of the difficulties encountered by those underwriting through Lloyds in the late 1980s and early 1990s in the LMX Spiral) involving an Action Group of Names to get to trial and judgment.

## Professional membership

- Chancery Bar Association
- COMBAR
- Called to the Bar of the British Virgin Islands
- Called to the New York State Bar (FLC)
- Fellow of the Chartered Institute of Arbitrators

## Education

King's School, Rochester.

University of Bristol

# EXHIBIT 1

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | Exclusion of Model Articles | 1 |
| 2. | Definitions | 1 |
| 3. | Limited Liability | 4 |
| 4. | Change of Name | 4 |
| 5. | Rights Attached to Shares | 4 |
| 6. | Redeemable Shares | 6 |
| 7. | Variation of Rights | 6 |
| 8. | Pari Passu Issues | 6 |
| 9. | Shares | 7 |
| 10. | Payment of Commission | 7 |
| 11. | Trusts Not Recognised 7 | |
| 12. | Suspension of Rights Where Non-Disclosure of Interest | 7 |
| 13. | Uncertificated Shares | 9 |
| 14. | Right to Share Certificates | 11 |
| 15. | Replacement of Share Certificates | 11 |
| 16. | Execution of Share Certificates | 12 |
| 17. | Share Certificates Sent at Holder's Risk | 12 |
| 18. | Company's Lien on Shares Not Fully Paid | 12 |
| 19. | Enforcing Lien by Sale | 12 |
| 20. | Application of Proceeds of Sale | 13 |
| 21. | Calls | 13 |
| 22. | Timing of Calls | 14 |
| 23. | Liability of Joint Holders | 14 |
| 24. | Interest Due on Non-Payment | 14 |

| 25. | Sums Due on Allotment Treated as Calls | 14 |
| 26. | Power to Differentiate | 14 |
| 27. | Payment of Calls in Advance | 14 |
| 28. | Notice if Call or Instalment Not Paid | 15 |
| 29. | Form of Notice | 15 |
| 30. | Forfeiture for Non-Compliance with Notice | 15 |
| 31. | Notice after Forfeiture | 15 |
| 32. | Sale of Forfeited Shares | 15 |
| 33. | Arrears to be Paid Notwithstanding Forfeiture | 16 |
| 34. | Statutory Declaration as to Forfeiture | 16 |
| 35. | Transfer | 16 |
| 36. | Signing of Transfer | 17 |
| 37. | Rights to Decline Registration of Partly Paid Shares | 17 |
| 38. | Other Rights to Decline Registration | 17 |
| 39. | No Fee for Registration | 18 |
| 40. | Untraced Shareholders | 18 |
| 41. | Transmission on Death | 19 |
| 42. | Entry of Transmission in Register | 20 |
| 43. | Election of Person Entitled by Transmission | 20 |
| 44. | Rights of Person Entitled by Transmission | 20 |
| 45. | Sub-division | 21 |
| 46. | Fractions | 21 |
| 47. | Omission or Non-Receipt of Notice | 21 |
| 48. | Postponement of General Meetings | 22 |

73

| 49. | Quorum | 22 |
|---|---|---|
| 50. | Procedure if Quorum Not Present | 22 |
| 51. | Security Arrangements | 23 |
| 52. | Chairman of General Meeting | 23 |
| 53. | Orderly Conduct | 23 |
| 54. | Entitlement to Attend and Speak | 24 |
| 55. | Adjournments | 24 |
| 56. | Notice of Adjournment | 24 |
| 57. | Amendments to Resolutions | 25 |
| 58. | Amendments Ruled Out of Order | 25 |
| 59. | Votes of Members | 25 |
| 60. | Method of Voting | 25 |
| 61. | Procedure if Poll Demanded | 26 |
| 62. | When Poll to be Taken | 26 |
| 63. | Continuance of Other Business after Poll Demand | 26 |
| 64. | Votes of Joint Holders | 27 |
| 65. | Voting on behalf of Incapable Member | 27 |
| 66. | No Right to Vote where Sums Overdue on Shares | 27 |
| 67. | Objections or Errors in Voting | 27 |
| 68. | Appointment of Proxies | 28 |
| 69. | Receipt of Proxies | 28 |
| 70. | Maximum Validity of Proxy | 29 |
| 71. | Form of Proxy | 29 |
| 72. | Cancellation of Proxy's Authority | 29 |

| 73. | Separate General Meetings | 30 |
|-----|---------------------------|----|
| 74. | Number of Directors | 30 |
| 75. | Directors' Shareholding Qualification | 30 |
| 76. | Power of Company to Appoint Directors | 30 |
| 77. | Power of Directors to Appoint Directors | 30 |
| 78. | Retirement of Directors by Rotation | 31 |
| 79. | Filling Vacancies | 31 |
| 80. | Power of Removal by Special Resolution | 31 |
| 81. | Persons Eligible as Directors | 31 |
| 82. | Position of Retiring Directors | 32 |
| 83. | Vacation of Office by Directors | 32 |
| 84. | Alternate Directors | 33 |
| 85. | Executive Directors | 34 |
| 86. | Directors' Fees | 34 |
| 87. | Additional Remuneration | 34 |
| 88. | Expenses | 35 |
| 89. | Pensions and Gratuities for Directors | 35 |
| 90. | Directors' Interests | 35 |
| 91. | General Powers of Company Vested in Directors | 40 |
| 92. | Borrowing Powers | 40 |
| 93. | Agents | 44 |
| 94. | Delegation to Individual Directors | 45 |
| 95. | Registers | 45 |
| 96. | Provision for Employees | 45 |

| 97. | Directors' Meetings | 45 |
|---|---|---|
| 98. | Notice of Directors' Meetings | 46 |
| 99. | Quorum | 46 |
| 100. | Directors below Minimum through Vacancies | 46 |
| 101. | Appointment of Chairman | 46 |
| 102. | Competence of Meetings | 47 |
| 103. | Voting | 47 |
| 104. | Delegation to Committees | 47 |
| 105. | Participation in Meetings | 48 |
| 106. | Resolution in Writing | 48 |
| 107. | Validity of Acts of Directors or Committee | 48 |
| 108. | Use of Seals | 48 |
| 109. | Declaration of Dividends by Company | 49 |
| 110. | Payment of Interim and Fixed Dividends by Directors | 49 |
| 111. | Calculation and Currency of Dividends | 49 |
| 112. | Amounts Due on Shares can be Deducted from Dividends | 50 |
| 113. | No Interest on Dividends | 50 |
| 114. | Payment Procedure | 50 |
| 115. | Uncashed Dividends | 51 |
| 116. | Forfeiture of Unclaimed Dividends | 51 |
| 117. | Dividends Not in Cash | 51 |
| 118. | Scrip Dividends | 52 |
| 119. | Power to Capitalise Reserves and Funds | 54 |
| 120. | Settlement of Difficulties in Distribution | 55 |

| 121. | Power to Choose Any Record Date | 55 |
|------|-------------------------------|-----|
| 122. | Inspection of Records | 56 |
| 123. | Summary Financial Statements | 56 |
| 124. | Method of Service | 56 |
| 125. | Record Date for Service | 57 |
| 126. | Members Resident Abroad or on Branch Registers | 57 |
| 127. | Service of Notices on Persons Entitled by Transmission | 58 |
| 128. | Deemed Delivery | 58 |
| 129. | Notice When Post Not Available | 59 |
| 130. | Presumptions Where Documents Destroyed | 59 |
| 131. | Indemnity of Directors | 60 |
| GLOSSARY | | 64 |

ARTICLES OF ASSOCIATION

of

RECKITT BENCKISER GROUP PLC

public limited company

(Articles adopted on 28 August 2007 and amended on 1 May 2008, 6 May 2010, and 3 May 2012)

**1.      Exclusion of Model Articles**

The articles prescribed in any legislation relating to companies do not apply as the articles of the company.

**2.      Definitions**

(A)      The following table gives the meaning of certain words and expressions as they are used in these articles.  However, the meaning given in the table does not apply if it is not consistent with the context in which a word or expression appears.  At the end of these articles there is a Glossary which explains various words and expressions which appear in the text.  The Glossary also explains some of the words and expressions used in the memorandum.  The Glossary is not part of the memorandum or articles and does not affect their meaning.

| | |
|---|---|
| "address" | includes a number or address used for sending or receiving documents or information by electronic means; |
| "amount" (of a share) | this refers to the nominal amount of the share; |
| "these articles" | means these articles of association, including any changes made to them, and the expression "this article" refers to a particular article in these articles of association; |
| "auditors" | means the auditor of the company and, where two or more people are appointed to act jointly, any one of them; |
| "Bank of England base rate" | means the base lending rate most recently set by the Monetary Policy Committee of the Bank of England in connection with its responsibilities under Part 2 of the Bank of England Act 1998; |

2

| | |
|---|---|
| "certificated share" | means a share which is not a CREST share and is normally held in certificated form; |
| "chairman" | means the chairman of the board of directors; |
| "clear days" | in relation to the period of a notice means that period excluding the day when the notice is served or deemed to be served and the day for which it is given or on which it is to take effect; |
| "CREST" | means the electronic settlement system for securities traded on a recognised investment exchange and owned by Euroclear UK & Ireland Limited, or any similar system; |
| "CREST share" | means a share which is noted on the shareholders' register as being held through CREST in uncertificated form; |
| "directors" | means the executive and non-executive directors of the company who make up its board of directors (and "director" means any one of them) or the directors present at a meeting of the directors at which a quorum is present; |
| "Executive Committee" | means the committee comprising the Chief Executive Officer, Chief Financial Officer and such members of the company's senior management personnel as the Chief Executive Officer may from time to time appoint; |
| "holder" | in relation to any shares means the person whose name is entered in the register as the holder of those shares; |
| "legislation" | means every statute (and any orders, regulations or other subordinate legislation made under it) applying to the company; |
| "the office" | means the company's registered office; |
| "ordinary shareholder" | means a holder of ordinary shares; |

3

| | |
|---|---|
| "ordinary shares" | means the company's ordinary shares; |
| "paid up" | means paid up or treated (credited) as paid up; |
| "pay" | includes any kind of reward or payment for services; |
| "register" | means the company's register of shareholders and, at any time when the company has shares in issue which are CREST shares, means the Operator register of members (maintained by CREST) and the issuer register of members (maintained by the company); |
| "Scheme" | means the scheme of arrangement implemented in October 2007 between Reckitt Benckiser plc and its ordinary shareholders, in its original form or with or subject to any modification, addition or condition approved or imposed by the Court. |
| "seal" | means any common or official seal that the company may be permitted to have under the legislation; |
| "secretary" | means the secretary, or (if there are joint secretaries) any one of the joint secretaries, of the company and includes an assistant or deputy secretary and any person appointed by the directors to perform any of the duties of the secretary; |
| "shareholder" | means a holder of the company's shares; |
| "Subscriber Ordinary Shares" | means the subscriber ordinary shares in the capital of the company, the rights attaching to which are described in Article 4; |
| "uncertificated securities rules" | means any provision in the legislation which relates to CREST shares or to the transfer of CREST shares or how the ownership of CREST shares is evidenced; and |
| "United Kingdom" | means Great Britain and Northern Ireland. |

4

(B)     References in these articles to a document being "signed" or to "signature" include references to its being executed under hand or under seal or by any other method and, in the case of a communication in electronic form, such references are to its being authenticated as specified by the legislation.

(C)     References in these articles to "writing" and to any form of "written" communication include references to any method of representing or reproducing words in a legible and non-transitory form whether sent or supplied in electronic form or otherwise.

(D)     Any words or expressions defined in the legislation in force when these articles or any part of these articles are adopted will (if not inconsistent with the subject or context in which they appear) have the same meaning in these articles or that part save the word "company" includes any body corporate.

(E)     References to a meeting will not be taken as requiring more than one person to be present if any quorum requirement can be satisfied by one person.

(F)     Headings in these articles are only included for convenience.  They do not affect the meaning of these articles.

(G)     Where these articles refer to a person who is entitled to a share by law, this means a person who has been noted in the register as being entitled to a share as a result of the death or bankruptcy of a shareholder or some other event which gives rise to the transmission of the share by operation of law.

**3.      Limited Liability**

The liability of the company's members is limited to any unpaid amount on the shares in the company held by them.

**4.      Change of Name**

The company may change its name by resolution of the directors.

**5.      Rights Attached to Shares**

(A)     The company can issue shares with any rights or restrictions attached to them as long as this is not restricted by any rights attached to existing shares.  These rights or restrictions can be decided either by an ordinary resolution passed by the shareholders or by the directors as long as there is no conflict with any resolution passed by the shareholders.

5

(B)     The rights and restrictions attached to Subscriber Ordinary Shares shall be as set out below:

(i)     Income

the holders of the Subscriber Ordinary Shares shall not be entitled to any dividends or distributions in respect of such shares;

(ii)    Capital

the amount that would otherwise be distributed to the holders of the Subscriber Ordinary Shares out of the surplus assets of the company remaining after the payment of its liabilities on a winding up shall be limited to the nominal value of each Subscriber Ordinary Share they hold which shall be paid only after the holders of any and all other classes of share in the capital of the company then in issue shall have received the nominal value of those shares (or any capital entitlement specified as an alternative to the nominal value) in respect of the relevant shares held by them at that time;

(iii)   Transfer

the board may decline to register any transfer of any of the Subscriber Ordinary Shares to any person of whom they do not approve and decline to give any reason for that disapproval.  If the board declines to register a transfer of any of the Subscriber Ordinary Shares, they shall within two months after the date the transfer was lodged with the company send to the transferee notice of their declining to register the transfer and the relevant instrument of transfer; and

(iv)    Voting Rights

the holders of the Subscriber Ordinary Shares shall have no right as such to receive notice of or attend or vote at any general meeting of the company unless a resolution is to be proposed to wind up the company or a resolution is to be proposed which varies, modifies, alters or abrogates the rights attaching to the Subscriber Ordinary Shares.

(C)     As a result of the rights and restrictions attached to the classes of share in the capital of the company described above, any surplus assets on a winding up of the company are to be applied;

(i)     first, in payment of the nominal amount of the ordinary shares;

(ii)    secondly, in payment of the nominal amount of the Subscriber Ordinary Shares;

999999/10120  TP093430108 ZZP 110515:1821

6

(iii)    thirdly, in distribution to the holders of ordinary shares pro rata to the aggregate nominal amount of their holding of ordinary shares.

**6.      Redeemable Shares**

Subject to any rights attached to existing shares, the company can issue shares which can be redeemed.  This can include shares which can be redeemed if the holders want to do so, as well as shares which the company can insist on redeeming.  The directors can decide on the terms and conditions and the manner of redemption of any redeemable share.  These terms and conditions will apply to the relevant shares as if they were set out in these articles.

**7.      Variation of Rights**

If the legislation allows this, the rights attached to any class of shares can be changed if this is approved either in writing by shareholders holding at least three quarters of the issued shares of that class by amount (excluding any shares of that class held as treasury shares) or by a special resolution passed at a separate meeting of the holders of the relevant class of shares.  This is called a "class meeting".

All the articles relating to general meetings will apply to any such class meeting, with any necessary changes.  The following changes will also apply:-

(i)      a quorum will be present if at least two shareholders who are entitled to vote are present in person or by proxy who own at least one third in amount of the issued shares of the class (excluding any shares of that class held as treasury shares);

(ii)     any shareholder who is present in person or by proxy and entitled to vote can demand a poll; and

(iii)    at an adjourned meeting, one person entitled to vote and who holds shares of the class, or his proxy, will be a quorum.

The provisions of this article will apply to any change of rights of shares forming part of a class.  Each part of the class which is being treated differently is treated as a separate class in applying this article.

**8.      Pari Passu Issues**

If new shares are created or issued which rank equally with any other existing shares, the rights of the existing shares will not be regarded as changed or abrogated unless the terms of the existing shares expressly say otherwise.

7

**9.      Shares**

The directors can decide how to deal with any shares in the company.  They can, for instance, offer the shares for sale, grant options to acquire them, allot them or dispose of the shares in any other way.  The directors are free to decide who they deal with, when they deal with the shares and the terms on which they deal with the shares.  However, in making their decision they must take account of:

(i)      the provisions of the legislation relating to authority, pre-emption rights and other matters;

(ii)     the provisions of these articles;

(iii)    any resolution passed by the shareholders; and

(iv)    any rights attached to existing shares.

**10.     Payment of Commission**

In connection with any share issue or any sale of treasury shares for cash, the company can use all the powers given by the legislation to pay commission or brokerage.  The company can pay the commission in cash or by allotting fully or partly-paid shares or other securities or by a combination of both.

**11.     Trusts Not Recognised**

The company will only be affected by, or recognise, a current and absolute right to whole shares.  The fact that any share, or any part of a share, may not be owned outright by the registered owner (for example, where a share is held by one person as a nominee or otherwise as a trustee for another person) is not of any concern to the company.  This applies even if the company knows about the ownership of the share.  The only exceptions to this are where the rights of the kind described are expressly given by these articles or are of a kind which the company has a legal duty to recognise.

**12.     Suspension of Rights Where Non-Disclosure of Interest**

(A)    The company can under the legislation send out notices to those it knows or has reasonable cause to believe have an interest in its shares.  In the notice, the company will ask for details of those who have an interest and the extent of their interest in a particular holding of shares.  In these articles this notice is referred to as a "statutory notice" and the holding of shares is referred to as the "identified shares".

8

(B)     When a person receives a statutory notice, he has 14 days to comply with it.  If he does not do so or if he makes a statement in response to the notice which is false or inadequate in some important way, the company can decide to restrict the rights relating to the identified shares and send out a further notice to the holder, known as a restriction notice.  The restriction notice will take effect when it is delivered.  The restriction notice will state that the identified shares no longer give the shareholder any right to attend or vote either personally or by proxy at a shareholders' meeting or to exercise any other right in relation to shareholders' meetings.

(C)     Where the identified shares make up 0.25 per cent. or more (in amount or in number) of the existing shares of a class (calculated exclusive of any shares of that class held as treasury shares) at the date of delivery of the restriction notice, the restriction notice can also contain the following further restrictions:-

   (i)      the directors can withhold any dividend or part of a dividend (including scrip dividend) or other money which would otherwise be payable in respect of the identified shares without any liability to pay interest when such money is finally paid to the shareholder; and

   (ii)     the directors can refuse to register a transfer of any of the identified shares which are certificated shares unless the directors are satisfied that they have been sold outright to an independent third party.  The independent third party must not be connected with the shareholder or with any person appearing to be interested in the shares.  Any sale through a recognised investment exchange or any other stock exchange outside the United Kingdom or by way of acceptance of a takeover offer will be treated as an outright sale to an independent third party.  For this purpose, any associate (as that term is defined in section 435 of the Insolvency Act 1986) is included in the class of persons who are connected with the shareholder or any person appearing to be interested in the shares.  In order to enforce the restriction in this sub-paragraph, the directors can give notice to the relevant shareholder requiring him to change identified shares which are CREST shares to certificated shares by the time given in the notice and to keep them in certificated form for as long as the directors require.  The notice can also say that the relevant shareholder may not change any identified shares which are certificated shares to CREST shares.  If the shareholder does not comply with the notice, the directors can authorise any person to instruct the Operator to change any identified shares which are CREST shares to certificated shares in the name and on behalf of the relevant shareholder.

(D)     Once a restriction notice has been given, the directors are free to cancel it or exclude any shares from it at any time they think fit.  In addition, they must cancel the restriction notice within seven days of being satisfied that all information requested in the statutory notice has been given.  Also, where any of the identified shares are sold and the directors are satisfied that they were sold outright to an independent third party, they

9

must cancel the restriction notice within seven days of receipt of notification of the sale. If a restriction notice is cancelled or ceases to have effect in relation to any shares, any moneys relating to those shares which were withheld will be paid to the person who would have been entitled to them or as he directs.

(E)     The restriction notice will apply to any further shares issued in right of the identified shares.  The directors can also make the restrictions in the restriction notice apply to any right to an allotment of further shares associated with the identified shares.

(F)     If a shareholder receives a restriction notice, he can ask the company for a written explanation of why the notice was given, or why it has not been cancelled.  The company must respond within 14 days of receiving the request.

(G)     If the company gives a statutory notice to a person it has reasonable cause to believe has an interest in any of its shares, it will also give a copy at the same time to the person who holds the shares.  If the company does not do so or the holder does not receive the copy, this will not invalidate the statutory notice.

(H)     This article does not restrict in any way the provisions of the legislation which apply to failures to comply with notices under the legislation.

**13.     Uncertificated Shares**

(A)     Under the uncertificated securities rules, the directors can allow the ownership of shares to be evidenced without share certificates and for these shares to be transferred through CREST.  The directors can select and make arrangements for any class of shares to participate in CREST in this way, provided that the shares of the class are identical in all respects.

As long as the directors comply with the uncertificated securities rules, they can also withdraw a class of shares from being transferred through CREST and from allowing ownership of them to be evidenced without share certificates.

CREST shares do not form a class of shares separate from certificated shares with the same rights.

(B)     If the company has any shares in issue which are CREST shares, these articles apply to those shares, but only as far as they are consistent with:-

(i)      holding shares in an uncertificated form;

(ii)     transferring shares through CREST; or

(iii)    any provision of the uncertificated securities rules,

999999/10120  TP093430108 ZZP 110515:1821

10

and, without affecting the general nature of this article, no provision of these articles applies so far as it is inconsistent with the maintenance, keeping or entering up by the Operator, so long as that is permitted or required by the uncertificated securities rules, of an Operator register of securities in respect of CREST shares.

(C)     CREST shares can be changed to become certificated shares and certificated shares can be changed to become CREST shares, provided the requirements of the uncertificated securities rules are met.

(D)     If under these articles or the legislation the company can sell, transfer or otherwise dispose of, forfeit, re-allot, accept the surrender of or otherwise enforce a lien over a CREST share, then, subject to these articles and the legislation, the directors may:

   (i)     require the holder of that CREST share by written notice to change that CREST share to a certificated share within a period specified in the notice and to keep it as a certificated share for as long as the directors require;

   (ii)     appoint any person to take any other steps, by instruction given through CREST or otherwise, in the name of the holder of that share as may be necessary to effect the transfer of that share and these steps will be as effective as if they had been taken by the registered holder of that share; and

   (iii)     take any other action that the directors consider appropriate to achieve the sale, transfer, disposal, forfeiture, re-allotment or surrender of that share or otherwise to enforce a lien in respect of that share.

(E)     Unless the directors decide otherwise, CREST shares held by a shareholder will be treated as separate holdings from any certificated shares which that shareholder holds.

(F)     Unless the uncertificated securities rules otherwise require or the directors otherwise determine, shares which are issued or created from or in respect of CREST shares will be CREST shares and shares which are issued or created from or in respect of certificated shares will be certificated shares.

(G)     The company can assume that entries on any record of securities kept by it as required by the uncertificated securities rules and regularly reconciled with the relevant Operator register of securities are a complete and accurate reproduction of the particulars entered in the Operator register of securities and therefore will not be liable in respect of anything done or not done by or on its behalf in reliance on such assumption; in particular, any provision of these articles which requires or envisages action to be taken in reliance on information contained in the register allows that action to be taken in reliance on information contained in any relevant record of securities (as so maintained and reconciled).

**14.    Right to Share Certificates**

(A)    When a shareholder is first registered as the holder of any class of certificated shares, he is entitled, free of charge, to one certificate for all of the certificated shares of that class which he holds.  If a shareholder holds certificated shares of more than one class, he is entitled to a separate share certificate for each class.  This does not apply if the legislation allows the company not to issue share certificates.

(B)    If a shareholder receives more certificated shares of any class, he is entitled, without charge, to a certificate for the extra shares.

(C)    If a shareholder transfers some of the shares represented by a share certificate, he is entitled, free of charge, to a new certificate for the balance to the extent the balance is to be held in certificated form.

(D)    Where a certificated share is held jointly, the company does not have to issue more than one certificate for that share.  When the company delivers a share certificate to one joint shareholder, this is treated as delivery to all of the joint shareholders.

(E)    The time limit for the company to provide a share certificate under this article is as prescribed by the legislation or, if this is earlier, within any prescribed time limit or within a time specified when the shares were issued.

**15.    Replacement of Share Certificates**

(A)    If a shareholder has two or more share certificates for shares of the same class, he can ask the company for these to be cancelled and replaced by a single new certificate. The company must comply with this request.

(B)    A shareholder can ask the company to cancel and replace a single share certificate with two or more certificates for the same total number of shares.  The company may comply with this request.

(C)    A shareholder can ask the company for a new certificate if the original is:-

(i)    damaged or defaced; or

(ii)    said to be lost, stolen or destroyed.

(D)    If a certificate has been damaged or defaced, the company can require the certificate to be returned to it before issuing a replacement.  If a certificate is said to be lost, stolen or destroyed, the company can require satisfactory evidence of this and insist on receiving an indemnity before issuing a replacement.

12

(E)    The directors can require the shareholder to pay the company's exceptional out-of-pocket expenses incurred in connection with the issue of any certificates under this article.

(F)    Any one joint shareholder can request replacement certificates under this article.

**16.    Share Certificates Sent at Holder's Risk**

Every share certificate will be sent at the risk of the member or other person entitled to the certificate.  The company will not be responsible for any share certificate which is lost or delayed in the course of delivery.

**17.    Execution of Share Certificates**

Share certificates must be sealed or made effective in such other way as the directors decide, having regard to the terms of issue and any listing requirements.  The directors can resolve that signatures on any share certificates can be applied to the certificates by mechanical or other means or can be printed on them or that signatures are not required.  A share certificate must state the number and class of shares to which it relates and the amount paid up on those shares.

**18.    Company's Lien on Shares Not Fully Paid**

The company has a lien on all partly paid shares.  This lien has priority over claims of others to the shares.  The lien is for any money owed to the company for the shares.  The directors can decide to give up any lien which has arisen and can also decide to suspend any lien which would otherwise apply to particular shares.

**19.    Enforcing Lien by Sale**

If a shareholder fails to pay the company any amount due on his partly paid shares, the directors can enforce the company's lien by selling all or any of them in any way they decide.  The directors cannot, however, sell the shares until all the following conditions are met:-

(i)     the money owed by the shareholder must be payable immediately;

(ii)    the directors must have given notice to the shareholder.  The notice must state the amount of money due, it must demand payment of this sum and state that the shareholders' shares may be sold if the money is not paid;

(iii)   the notice must have been served on the shareholder or on any person who is entitled to the shares by law and can be served in any way that the directors decide; and

999999/10120  TP093430108 ZZP 110515:1821

13

(iv)    the money has not been paid by at least 14 clear days after the notice has been served.

The directors can authorise any person to sign a document transferring the shares.  Any such transferee will not be bound to ensure that his purchase moneys are transferred to the person whose shares have been sold, nor will his ownership of the shares be affected by any irregularity or invalidity in relation to the sale to him.

**20.    Application of Proceeds of Sale**

If the directors sell any shares on which the company has a lien, the proceeds will first be used to pay the company's expenses associated with the sale.  The remaining money will be used to pay off the amount which is then payable on the shares and any balance will be passed to the former shareholder or to any person who would otherwise be entitled to the shares by law.  But the company's lien will also apply to any such balance to cover any money still due to the company in respect of the shares which is not immediately payable.  The company has the same rights over the money as it had over the shares immediately before they were sold.  The company need not pay over anything until the certificate representing the shares sold has been delivered to the company for cancellation.

**21.    Calls**

The directors can call on shareholders to pay any money which has not yet been paid to the company for their shares.  This includes the nominal value of the shares and any premium which may be payable on those shares.  The directors can also make calls on people who are entitled to shares by law.  If the terms of issue of the shares allow this, the directors can do any one or more of the following:-

(i)     make calls at any time and as often as they think fit;

(ii)    decide when and where the money is to be paid;

(iii)   decide that the money may be paid by instalments;

(iv)    revoke or postpone any call.

A shareholder who has received at least 14 clear days' notice giving details of the amount called and of the time and place for payment, must pay the call as required by the notice.  A person remains liable jointly and severally with the successors in title to his shares to pay calls even after he has transferred the shares to which they relate.

14

**22.    Timing of Calls**

A call is treated as having been made as soon as the directors have passed a resolution authorising it.

**23.    Liability of Joint Holders**

Joint shareholders are jointly and severally liable to pay any calls in respect of their shares.  This means that any of them can be sued for all the money due on the shares or they can be sued together.

**24.    Interest Due on Non-Payment**

Where a call is made and the money due remains unpaid, the shareholder will be liable to pay interest on the amount unpaid from the day it is due until it has actually been paid.  The directors will decide on the annual rate of interest, which must not exceed the Bank of England base rate by more than five per cent.  The shareholder will also be liable to pay all expenses incurred by the company as a result of the non-payment of the call.  The directors can decide to forego payment of any or all of such interest or expenses.

**25.    Sums Due on Allotment Treated as Calls**

If the terms of a share require any money to be paid at the time of allotment, or at any other fixed date, the money due will be treated in the same way as a valid call for money on shares which is due on the same date.  If this money is not paid, everything in these articles relating to non-payment of calls applies.  This includes articles which allow the company to forfeit or sell shares and to claim interest.

**26.    Power to Differentiate**

On or before an issue of shares, the directors can decide that shareholders can be called on to pay different amounts or that they can be called on at different times.

**27.    Payment of Calls in Advance**

The directors can accept payment in advance of some or all of the money from a shareholder before he is called on to pay that money.  The directors can agree to pay interest on money paid in advance until it would otherwise be due to the company.  The rate of interest will be decided by the directors, but must not exceed the Bank of England base rate by more than five per cent. unless the company passes an ordinary resolution to allow a higher rate.

15

**28.    Notice if Call or Instalment Not Paid**

If a shareholder fails to pay a call or an instalment of a call when due, the directors can send the shareholder a notice requiring payment of the unpaid amount, together with any interest accrued and any expenses incurred by the company as a result of the failure to pay.

**29.    Form of Notice**

This notice must:-

(i)      demand payment of the amount immediately payable, plus any interest and expenses;

(ii)     give the date by when the total amount due must be paid.  This must be at least 14 clear days after the date of the notice;

(iii)    say where the payment must be made; and

(iv)    say that if the full amount demanded is not paid by the time and at the place stated, the company can forfeit the shares on which the call or instalment is outstanding.

**30.    Forfeiture for Non-Compliance with Notice**

If the notice is not complied with, the shares it relates to can be forfeited at any time while any amount is still outstanding.  This is done by the directors passing a resolution stating that the shares have been forfeited.  The forfeiture will extend to all dividends and other sums payable in respect of the forfeited shares which have not been paid before the forfeiture.  The directors can accept the surrender of any share which would otherwise be forfeited.  Where they do so, references in these articles to forfeiture include surrender.

**31.    Notice after Forfeiture**

After a share has been forfeited, the company will notify the person whose share has been forfeited.  However, the share will still be forfeited even if such notice is not given.

**32.    Sale of Forfeited Shares**

(A)     A forfeited share becomes the property of the company and the directors can sell or dispose of it on any terms and in any way that they decide.  This can be with, or without, a credit for any amount previously paid up for the share.  It can be sold or disposed of to any person, including the previous shareholder or the person who was

16

previously entitled to the share by law.  The directors can, if necessary, authorise any person to transfer a forfeited share.

(B)    After a share has been forfeited, the directors can cancel the forfeiture, but only before the share has been sold or disposed of.  This cancellation of forfeiture can be on any terms the directors decide.

### 33.    Arrears to be Paid Notwithstanding Forfeiture

When a person's shares have been forfeited, he will lose all rights as shareholder in respect of those forfeited shares.  He must return any share certificate for the forfeited shares to the company for cancellation.  However, he will remain liable to pay calls which have been made, but not paid, before the shares were forfeited.  The shareholder also continues to be liable for all claims and demands which the company could have made relating to the forfeited share.  He must pay interest on any unpaid amount until it is paid.  The directors can fix the rate of interest, but it must not exceed the Bank of England base rate by more than five per cent.  He is not entitled to any credit for the value of the share when it was forfeited or for any consideration received on its disposal unless the directors decide to allow credit for all or any of that value.

### 34.    Statutory Declaration as to Forfeiture

(A)    A director or the secretary can make a statutory declaration declaring:-

(i)      that he is a director or the secretary of the company;

(ii)     that a share has been properly forfeited under the articles; and

(iii)    when the share was forfeited.

The declaration will be evidence of these facts which cannot be disputed.

(B)    If such a declaration is delivered to a new holder of a share along with a completed transfer form (if one is required), this gives the buyer good title.  The new shareholder does not need to take any steps to see how any money paid for the share is used.  His ownership of the share will not be affected if the steps taken to forfeit, sell or dispose of the share were invalid or irregular, or if anything that should have been done was not done.

### 35.    Transfer

(A)    Certificated shares

Unless these articles say otherwise, any shareholder can transfer some or all of his certificated shares to another person.  A transfer of certificated shares must be made in writing and either in the usual standard form or in any other form approved by the directors.

(B)    CREST shares

Unless these articles say otherwise, any shareholder can transfer some or all of his CREST shares to another person.  A transfer of CREST shares must be made through CREST and must comply with the uncertificated securities rules.

(C)    Entry on register

The person making a transfer will continue to be treated as a shareholder until the name of the person to whom the share is being transferred is put on the register for that share.

**36.    Signing of Transfer**

(A)    A share transfer form for certificated shares must be signed or made effective in some other way by, or on behalf of, the person making the transfer.

(B)    In the case of a transfer of a certificated share, where the share is not fully paid, the share transfer form must also be signed or made effective in some other way by, or on behalf of, the person to whom the share is being transferred.

(C)    If the company registers a transfer of a certificated share, it can keep the transfer form.

**37.    Rights to Decline Registration of Partly Paid Shares**

The directors can refuse to register the transfer of any shares which are not fully paid.

**38.    Other Rights to Decline Registration**

(A)    Certificated shares

(i)      A share transfer form cannot be used to transfer more than one class of shares. Each class needs a separate form.

(ii)     Transfers cannot be in favour of more than four joint holders.

(iii)    The share transfer form must be properly stamped to show payment of any applicable stamp duty or certified or otherwise shown to the satisfaction of the directors to be exempt from stamp duty and must be delivered to the office, or

999999/10120  TP093430108 ZZP 110515:1821

18

any other place decided on by the directors.  The transfer form must be accompanied by the share certificate relating to the shares being transferred, unless the transfer is being made by a person to whom the company was not required to, and did not send, a certificate.  The directors can also ask (acting reasonably) for any other evidence to show that the person wishing to transfer the share is entitled to do so and, if the share transfer form is signed by another person on behalf of the person making the transfer, evidence of the authority of that person to do so.

(B)     CREST shares

(i)      Registration of a transfer of CREST shares can be refused in the circumstances set out in the uncertificated securities rules.

(ii)     Transfers cannot be in favour of more than four joint holders.

(C)     Renunciations

Where a share has not yet been entered on the register, the directors can recognise a renunciation by that person of his right to the share in favour of some other person. Such renunciation will be treated as a transfer and the directors have the same powers of refusing to give effect to such a renunciation as if it were a transfer.

**39.     No Fee for Registration**

No fee is payable to the company for transferring shares or registering changes relating to the ownership of shares.

**40.     Untraced Shareholders**

(A)     The company can sell any certificated shares at the best price reasonably obtainable at the time of the sale if:-

(i)      during the 12 years before the earliest of the notices referred to in (ii) below, the shares have been in issue either as certificated shares or as CREST shares, at least three cash dividends have become payable on the shares and no dividend has been cashed during that period;

(ii)     after the 12 year period, the company has published a notice, stating that it intends to sell the shares.  The notice must have appeared in a national newspaper in the United Kingdom and in a local newspaper appearing in the area in the United Kingdom which includes the postal address held by the company for serving notices relating to those shares; and

999999/10120  TP093430108 ZZP 110515:1821

19

(iii)    during the 12 year period and for three months after the last of the notices referred to in (ii) above appear, the company has not heard from the shareholder or any person entitled to the shares by law.

(B)    The company can also sell at the best price reasonably obtainable at the time of the sale any additional certificated shares in the company issued either as certificated shares or as CREST shares during the said 12 year period referred to in paragraph (A)(i) in right of any share to which paragraph (A) applies (or in right of any share so issued), if the criteria in paragraph (A)(ii) and (iii) are satisfied in relation to the additional shares (but as if the words "after the 12 year period" were omitted from paragraph (A)(ii) and the words "during the 12 year period and" were omitted from paragraph (A)(iii)) and no dividend has been cashed on these shares.

(C)    To sell any shares in this way, the directors can appoint anyone to transfer the shares. This transfer will be just as effective as if it had been signed by the holder, or by a person who is entitled to the shares by law.  The person to whom the shares are transferred will not be bound to concern himself as to what is done with the purchase moneys nor will his ownership be affected even if the sale is irregular or invalid in any way.

(D)    The proceeds of sale will belong to the company, but it must pay an amount equal to the sale proceeds less the costs of the sale to the shareholder who could not be traced, or to the person who is entitled to his shares by law, if that shareholder, or person, asks for it.

(E)    After the sale, the company must record the name of the shareholder, or (if known) the person who would have been entitled to the shares by law, as a creditor for the money in its accounts.  The company will not be a trustee of the money and will not be liable to pay interest on it.  The company can use the money, and any money earned by using the money, for its business or in any other way that the directors decide.

**41.    Transmission on Death**

(A)    When a sole shareholder or a shareholder who is the last survivor of joint shareholders dies, his personal representatives will be the only people who will be recognised as being entitled to his shares.

(B)    If a joint shareholder dies, the surviving joint shareholder or shareholders will be the only people who will be recognised as being entitled to his shares.

(C)    However, this article does not discharge the estate of any shareholder from any liability.

20

**42.** **Entry of Transmission in Register**

A person who becomes entitled to a share as a result of the death or bankruptcy of a shareholder or some other event which gives rise to the transmission of the share by operation of law must provide any evidence of his entitlement which is reasonably required.  In the case of certificated shares, the directors must note this entitlement in the register within two months of receiving such evidence.

**43.** **Election of Person Entitled by Transmission**

(A)     Subject to these articles, a person who becomes entitled to a share by law can either be registered as the shareholder or choose another person to become the shareholder.

(B)     If a person who is entitled to a certificated share by law wants to be registered as a shareholder, he must deliver or send a notice to the company saying that he has made this decision.  This notice will be treated as a transfer form.  All the provisions of these articles about registering transfers of certificated shares apply to it.  The directors have the same power to refuse to register a person entitled to certificated shares by law as they would have had to refuse to register a transfer by the person who was previously entitled to the shares.

(C)     If a person entitled to a CREST share by law wants to be registered as a shareholder, he must do so in accordance with the uncertificated securities rules.  All the provisions of these articles about registering transfers of CREST shares will apply and the same power to refuse to register a person entitled to a CREST share by law will apply as would have applied to refuse to register a transfer by the person who was previously entitled to the shares.

(D)     If a person who is entitled to a certificated share by law wants the share to be transferred to another person, he must do this by signing a transfer form to the person he has selected.  The directors have the same power to refuse to register the person selected as they would have had to refuse to register a transfer by the person who was previously entitled to the shares.

(E)     If a person who is entitled to a CREST share by law wants the share to be transferred to another person, he must do this using CREST.  The same power to refuse to register the person selected will apply as would have applied to refuse to register a transfer by the person who was previously entitled to the shares.

**44.** **Rights of Person Entitled by Transmission**

(A)     Where a person becomes entitled to a share by law, the rights of the registered shareholder in relation to that share will cease to have effect.

21

(B)     A person who is entitled to a share by law is entitled to any dividends or other money relating to the share, even though he is not registered as the holder of the share, on supplying evidence reasonably required to show his title to the share.  However, the directors can send written notice to the person saying the person must either be registered as the holder of the share or transfer the share to some other person.  If the person entitled to a share by law does not do this within 60 days of the notice, the directors can withhold all dividends or other money relating to the share until he does.

(C)     Unless he is registered as the holder of the share, the person entitled to a share by law is not entitled to:-

    (i)        receive notices of shareholders' meetings or attend or vote at these meetings; or

    (ii)       exercise any of the other rights of a shareholder in relation to these meetings,

unless the directors decide to allow this.

**45.    Sub-division**

Any resolution authorising the company to sub-divide any of its shares can provide that, as between the holders of the divided shares, different rights and restrictions of a kind which the company can apply to new shares can apply to different divided shares.

**46.    Fractions**

If any shares are consolidated, consolidated and then divided or divided, the directors have power to deal with any fractions of shares which result.  For example, they can decide that fractions are aggregated and sold or deal with fractions in some other way.  The directors can arrange for any shares representing fractions to be entered in the register as certificated shares if they consider that this makes it easier to sell them.  The directors can sell those shares to anyone, including the company, and can authorise any person to transfer or deliver the shares to the buyer or in accordance with the buyer's instructions.  The buyer does not have to take any steps to see how any money he is paying is used and his ownership will not be affected if the sale is irregular or invalid in any way.

**47.    Omission or Non-Receipt of Notice**

(A)     If any notice, document or other information relating to any meeting or other proceeding is accidentally not sent or supplied, or is not received (even if the company becomes aware of such non-receipt), the meeting or other proceeding will not be invalid as a result.

22

(B)     A shareholder present in person or by proxy at a shareholders' meeting is treated as having received proper notice of that meeting and, where necessary, of the purpose of that meeting.

**48.     Postponement of General Meetings**

If the directors consider that it is impracticable or undesirable to hold a general meeting on the date or at the time or place stated in the notice calling the meeting, they can move or postpone the meeting (or do both).  If the directors do this, an announcement of the date, time and place of the rearranged meeting will, if practicable, be published in at least two national newspapers in the United Kingdom.  Notice of the business of the meeting does not need to be given again.  The directors must take reasonable steps to ensure that any shareholder trying to attend the meeting at the original time and place is informed of the new arrangements.  If a meeting is rearranged in this way, proxy forms are valid if they are received as required by these articles not less than 48 hours before the time of the rearranged meeting.  The directors can also move or postpone the rearranged meeting (or do both) under this article.

**49.     Quorum**

Before a general meeting starts to do business, there must be a quorum present. Unless these articles say otherwise, a quorum for all purposes is two people who are entitled to vote.  They can be shareholders who are personally present or proxies for shareholders or a combination of both.  If a quorum is not present, a chairman of the meeting can still be chosen and this will not be treated as part of the business of the meeting.

**50.     Procedure if Quorum Not Present**

(A)     This article applies if a quorum is not present within five minutes of the time fixed for a general meeting to start or within any longer period not exceeding one hour which the chairman of the meeting can decide or if a quorum ceases to be present during a general meeting.

(B)     If the meeting was called by shareholders it will be cancelled.  Any other meeting will be adjourned to a day (being not less than ten days later, excluding the day on which the meeting is adjourned and the day for which it is reconvened), time and place decided on by the chairman of the meeting.

(C)     One shareholder present in person or by proxy and entitled to vote will constitute a quorum at any adjourned meeting and any notice of an adjourned meeting will say this.

23

**51.      Security Arrangements**

The directors can put in place arrangements, both before and during any general meeting, which they consider to be appropriate for the proper and orderly conduct of the general meeting and the safety of people attending it.  This authority includes power to refuse entry to, or remove from meetings, people who fail to comply with the arrangements.

**52.      Chairman of General Meeting**

(A)      The chairman will be the chairman of the meeting at every general meeting, if he is willing and able to take the chair.

(B)      If the company does not have a chairman, or if he is not willing and able to take the chair, a deputy chairman will chair the meeting if he is willing and able to take the chair. If more than one deputy chairman is present they will agree between themselves who will take the chair and if they cannot agree, the deputy chairman who has been a director longest will take the chair.

(C)      If the company does not have a chairman or a deputy chairman, or if neither the chairman nor a deputy chairman is willing and able to chair the meeting, after waiting five minutes from the time that a meeting is due to start, the directors who are present will choose one of themselves to act as chairman of the meeting.  If there is only one director present, he will be the chairman of the meeting, if he agrees.

(D)      If there is no director willing and able to be the chairman of the meeting, then the persons who are present at the meeting and entitled to vote will decide which one of them is to be the chairman of the meeting.

(E)      Nothing in these articles is intended to restrict or exclude any of the powers or rights of a chairman of a meeting which are given by law.

**53.      Orderly Conduct**

The chairman of a meeting can take any action he considers appropriate for proper and orderly conduct at a general meeting.  The chairman's decision on points of order, matters of procedure or on matters that arise incidentally from the business of a meeting is final, as is the chairman's decision on whether a point or matter is of this nature.

24

**54.    Entitlement to Attend and Speak**

Each director can attend and speak at any general meeting of the company.  The chairman of a meeting can also allow anyone to attend and speak where he considers that this will help the business of the meeting.

**55.    Adjournments**

(A)    The chairman of a meeting can adjourn the meeting before or after it has started, and whether or not a quorum is present, if he considers that:-

(i)    there is not enough room for the number of shareholders and proxies who can and wish to attend the meeting;

(ii)    the behaviour of anyone present prevents, or is likely to prevent, the business of the meeting being carried out in an orderly way; or

(iii)    an adjournment is necessary for any other reason, so that the business of the meeting can be properly carried out.

The chairman of the meeting does not need the consent of the meeting to adjourn it for any of these reasons to a time, date and place which he decides.  He can also adjourn the meeting to a later time on the same day or indefinitely.  If a meeting is adjourned indefinitely, the directors will fix the time, date and place of the adjourned meeting.

(B)    The chairman of a meeting can also adjourn a meeting which has a quorum present if this is agreed by the meeting.  This can be to a time, date and place proposed by the chairman of the meeting or the adjournment can be indefinite.  The chairman of the meeting must adjourn the meeting if the meeting directs him to.  In these circumstances the meeting will decide how long the adjournment will be and where it will adjourn to.  If a meeting is adjourned indefinitely, the directors will fix the time, date and place of the adjourned meeting.

(C)    A reconvened meeting can only deal with business that could have been dealt with at the meeting which was adjourned.

(D)    Meetings can be adjourned more than once.

**56.    Notice of Adjournment**

If the continuation of an adjourned meeting is to take place three months or more after it was adjourned or if business is to be considered at an adjourned meeting the general nature of which was not stated in the notice of the original meeting, notice of the adjourned meeting must be given in the same way as was required for the original

25

meeting.  Except as provided in this article, there is no need to give notice of the adjourned meeting or of the business to be considered there.

**57.     Amendments to Resolutions**

(A)     Amendments can be proposed to any resolution if they are clerical amendments or amendments to correct some other obvious error in the resolution.  No other amendments can be proposed to any special resolution.

(B)     Amendments to an ordinary resolution which are within the scope of the resolution can be proposed if:-

   (i)     notice of the proposed amendment has been received by the company at least two working days before the date of the meeting, or adjourned meeting; or

   (ii)     the chairman of the meeting decides that the amendment is appropriate for consideration by the meeting.

No other amendment can be proposed to an ordinary resolution.  The chairman of the meeting can agree to the withdrawal of any proposed amendment before it is put to the vote.

**58.     Amendments Ruled Out of Order**

If the chairman of a meeting rules that a proposed amendment to any resolution under consideration is out of order, any error in that ruling will not affect the validity of a vote on the original resolution.

**59.     Votes of Members**

Shareholders will be entitled to vote at a general meeting, whether on a show of hands or a poll, as provided in the legislation.  Where a proxy is given discretion as to how to vote on a show of hands this will be treated as an instruction by the relevant shareholder to vote in the way that the proxy decides to exercise that discretion. This is subject to any special rights or restrictions as to voting which are given to any shares or upon which any shares may be held at the relevant time and to these articles.

**60.     Method of Voting**

A resolution put to the vote at any general meeting will be decided on a show of hands unless a poll is demanded when, or before, the chairman of the meeting declares the result of the show of hands.  Subject to the legislation, a poll can be demanded by:-

   (i)       the chairman of the meeting;

26

(ii)     at least five persons at the meeting who are entitled to vote;

(iii)    one or more shareholders at the meeting who are entitled to vote (or their proxies) and who have between them at least ten per cent. of the total votes of all shareholders who have the right to vote at the meeting; or

(iv)    one or more shareholders at the meeting who have shares which allow them to vote at the meeting (or their proxies) and on which the total amount which has been paid up is at least ten per cent. of the total sum paid up on all shares which give the right to vote at the meeting.

The chairman of the meeting can also demand a poll before a resolution is put to the vote on a show of hands.

A demand for a poll can be withdrawn if the chairman of the meeting agrees to this.

If no poll is demanded or a demand for a poll is withdrawn, any declaration by the chairman of the meeting of the result of a vote on that resolution by a show of hands will stand as conclusive evidence of the result without proof of the number or proportion of the votes recorded for or against the resolution.

**61.     Procedure if Poll Demanded**

If a poll is demanded in the way allowed by these articles, the chairman of the meeting can decide when, where and how it will be taken.  The result will be treated as the decision of the meeting at which the poll was demanded, even if the poll is taken after the meeting.

**62.     When Poll to be Taken**

If a poll is demanded on a vote to elect the chairman of the meeting, or to adjourn a meeting, it must be taken immediately at the meeting.  Any other poll demanded can either be taken immediately or within 30 days from the date it was demanded and at a time and place decided on by the chairman of the meeting.  It is not necessary to give notice for a poll which is not taken immediately.

**63.     Continuance of Other Business after Poll Demand**

A demand for a poll on a particular matter (other than on the election of the chairman of the meeting or on the adjournment of the meeting) will not stop a meeting from continuing to deal with other matters.

27

**64.     Votes of Joint Holders**

If more than one joint shareholder votes (including voting by proxy), the only vote which will count is the vote of the person whose name is listed before the other voters on the register for the share.

**65.     Voting on behalf of Incapable Member**

This article applies where a court or official claiming jurisdiction to protect people who are unable to manage their own affairs has made an order about the shareholder.  The person appointed to act for that shareholder can vote for him.  He can also exercise any other rights of the shareholder relating to meetings.  This includes appointing a proxy, voting on a show of hands and voting on a poll.  Before the representative does so however, such evidence of his authority as the directors require must be received by the company not later than the latest time at which proxy forms must be received to be valid for use at the relevant meeting or on the holding of the relevant poll.

**66.     No Right to Vote where Sums Overdue on Shares**

Unless the directors decide otherwise, a shareholder cannot attend or vote shares at any general meeting of the company or upon a poll or exercise any other right conferred by membership in relation to general meetings or polls if he has not paid all amounts relating to those shares which are due at the time of the meeting.

**67.     Objections or Errors in Voting**

If:-

(i)      any objection to the right of any person to vote is made;

(ii)     any votes have been counted which ought not to have been counted or which might have been rejected; or

(iii)    any votes are not counted which ought to have been counted,

the objection or error must be raised or pointed out at the meeting (or the adjourned meeting) or poll at which the vote objected to is cast or at which the error occurs.  Any objection or error must be raised with or pointed out to the chairman of the meeting.  His decision is final.  If a vote is allowed at a meeting or poll, it is valid for all purposes and if a vote is not counted at a meeting or poll, this will not affect the decision of the meeting or poll.

28

**68.    Appointment of Proxies**

A proxy form must be in writing, signed by the shareholder appointing the proxy, or by his attorney.  Where the proxy is appointed by a company, the proxy form should either be sealed by that company or signed by someone authorised to sign it.  A shareholder can appoint more than one proxy to attend on the same occasion.

**69.    Receipt of Proxies**

(A)    Proxy forms which are in hard copy form must be received at the office, or at any other place specified by the company for the receipt of appointments of proxy in hard copy form:-

    (i)    48 hours (or such shorter time as the directors decide) before a meeting or an adjourned meeting;

    (ii)    24 hours (or such shorter time as the directors decide) before a poll is taken, if the poll is taken more than 48 hours after it was demanded; or

    (iii)    before the end of the meeting at which the poll was demanded (or at such later time as the directors decide), if the poll is taken after the end of the meeting or adjourned meeting but not more than 48 hours after it was demanded.

If such a proxy form is signed by an attorney and the directors require this, the power of attorney or other authority relied on to sign it (or a copy which has been certified by a notary or in some other way approved by the directors, or an office copy) must be received with the proxy form.

(B)    Proxy forms which are in electronic form must be received at the address specified by the company for the receipt of appointments of proxy by electronic means at least:-

    (i)    48 hours (or such shorter time as the directors decide) before a meeting or an adjourned meeting;

    (ii)    24 hours (or such shorter time as the directors decide) before a poll is taken, if the poll is taken more than 48 hours after it was demanded; or

    (iii)    before the end of the meeting at which the poll was demanded (or at such later time as the directors decide), if the poll is taken after the end of the meeting or adjourned meeting but not more than 48 hours after it was demanded.

If such a proxy form is signed by an attorney and the directors require this, the power of attorney or other authority relied on to sign it (or a copy which has been certified by a notary or in some other way approved by the directors, or an office copy) must be

29

received at such address, at the office or at any other place specified by the company for the receipt of such documents by the time set out in paragraph (i) or (ii) or (iii) above, as applicable.

(C)    If the above requirements are not complied with, the proxy will not be able to act for the person who appointed him.

(D)    If more than one valid proxy form is received in respect of the same share for use at the same meeting or poll, the one which is received last (regardless of its date or the date on which it is signed) will be treated as the valid form.  If it is not possible to determine the order of receipt, none of the forms will be treated as valid.

(E)    A shareholder can attend and vote at a general meeting or on a poll even if he has appointed a proxy to attend and vote on his behalf at that meeting or on that poll.

(F)    The proceedings at a general meeting will not be invalidated where an appointment of a proxy in respect of that meeting is sent in electronic form as provided in these articles, but because of a technical problem it cannot be read by the recipient.

(G)    When calculating the periods mentioned in this article the directors can decide not to take account of any part of a day that is not a working day.

**70.    Maximum Validity of Proxy**

A proxy form will cease to be valid 12 months from the date of its receipt.  But it will be valid, unless the proxy form itself states otherwise, if it is used at an adjourned meeting or on a poll after a meeting or an adjourned meeting even after 12 months, if it was valid for the original meeting.

**71.    Form of Proxy**

A proxy form can be in any form which the directors approve.  A proxy form gives the proxy the authority to demand a poll or to join others in demanding a poll and to vote on any amendment to a resolution put to, or any other business which may properly come before, the meeting.  Unless it says otherwise, a proxy form is valid for the meeting to which it relates and also for any adjournment of that meeting.

**72.    Cancellation of Proxy's Authority**

Any vote cast in the way a proxy form authorises or any demand for a poll made by a proxy will be valid even though:-

(i)    the person who appointed the proxy has died or is of unsound mind;

30

(ii)      the proxy form has been revoked; or

(iii)     the authority of the person who signed the proxy form for the shareholder has been revoked.

Any vote cast or poll demanded by a company representative will also be valid even though his authority has been revoked.

However, this does not apply if written notice of the relevant fact has been received at the office (or at any other place specified by the company for the receipt of proxy forms) not later than the last time at which a proxy form should have been received to be valid for use at the meeting or on the holding of the poll at which the vote was given or the poll taken.

### 73.    Separate General Meetings

If a separate general meeting of holders of shares of a class is called otherwise than for changing or abrogating the rights of the shares of that class, the provisions of these articles relating to general meetings will apply to such a meeting with any necessary changes.  A general meeting where ordinary shareholders are the only shareholders who can attend and vote in their capacity as shareholders will also constitute a separate general meeting of the holders of the ordinary shares.

### 74.    Number of Directors

The company must have a minimum of four directors and a maximum of [fifteen] directors (disregarding alternate directors).  But the shareholders can change this restriction by passing an ordinary resolution.

### 75.    Directors' Shareholding Qualification

The directors are not required to hold any shares in the company.

### 76.    Power of Company to Appoint Directors

Subject to these articles, the company can, by passing an ordinary resolution, appoint any willing person to be a director, either as an extra director or to fill a vacancy where a director has stopped being a director for some reason.

### 77.    Power of Directors to Appoint Directors

Subject to these articles, the directors can appoint any willing person to be a director, either as an extra director or as a replacement for another director.  Any director

31

appointed in this way must retire from office at the first annual general meeting after his appointment.  A director who retires in this way is then eligible for re-appointment.

**78.     Retirement of Directors by Rotation**

(A)     At every annual general meeting the following directors shall retire from office:

    (i)     any director who has been appointed by the directors since the last annual general meeting, and

    (ii)     any director who held office at the time of the two preceding annual general meetings and who did not retire at either of them, and

    (iii)     any director who has been in office, other than as a director holding an executive position, for a continuous period of nine years or more at the date of the meeting.

(B)     Any director who retires at an annual general meeting may offer himself for re-appointment by the shareholders.

**79.     Filling Vacancies**

Subject to these articles, at the general meeting at which a director retires, shareholders can pass an ordinary resolution to re-appoint the director or to appoint some other eligible person in his place.

**80.     Power of Removal by Special Resolution**

In addition to any power to remove directors conferred by the legislation, the company can pass a special resolution to remove a director from office even though his time in office has not ended and can (subject to these articles) appoint a person to replace a director who has been removed in this way by passing an ordinary resolution.

**81.     Persons Eligible as Directors**

The only people who can be appointed as directors at a general meeting are the following:-

    (i)     directors retiring at the meeting;

    (ii)     anyone recommended by the directors; and

    (iii)     anyone nominated by a shareholder (not being the person to be nominated) in the following way:

32

The shareholder must be entitled to vote at the meeting.  He must deliver to the office not less than seven nor more than 42 days before the day of the meeting:

(a)     a letter stating that he intends to nominate another person for appointment as a director; and

(b)     written confirmation from that person that he is willing to be appointed.

**82.    Position of Retiring Directors**

A director retiring at a general meeting retires at the end of that meeting or (if earlier) when a resolution is passed to appoint another person in the director's place or when a resolution to re-appoint the director is put to the meeting and lost.  Where a retiring director is re-appointed, he continues as a director without a break.

**83.    Vacation of Office by Directors**

Any director automatically stops being a director if:-

(i)      he gives the company a written notice of resignation;

(ii)     he gives the company a written notice in which he offers to resign and the directors decide to accept this offer;

(iii)    all of the other directors (who must comprise at least three people) pass a resolution or sign a written notice requiring the director to resign;

(iv)    he is or has been suffering from mental or physical ill health and the directors pass a resolution removing the director from office;

(v)     he has missed directors' meetings (whether or not an alternate director appointed by him attends those meetings) for a continuous period of six months without permission from the directors and the directors pass a resolution removing the director from office;

(vi)    a bankruptcy order is made against him or he makes any arrangement or composition with his creditors generally;

(vii)   he is prohibited from being a director under the legislation; or

(viii)  he ceases to be a director under the legislation or he is removed from office under these articles.

33

If a director stops being a director for any reason, he will also automatically cease to be a member of any committee or sub-committee of the directors.

**84.    Alternate Directors**

(A)    Any director can appoint any person (including another director) to act in his place (called an "alternate director").  That appointment requires the approval of the directors, unless previously approved by the directors or unless the appointee is another director.  A director appoints an alternate director by sending a signed written notice of appointment to the office or to an address specified by the company or by tabling it at a meeting of the directors, or in such other way as the directors approve.

(B)    The appointment of an alternate director ends on the happening of any event which, if he were a director, would cause him to vacate that office.  It also ends if the alternate director resigns his office by written notice to the company or if his appointor stops being a director, unless that director retires at a general meeting at which he is re-appointed.  A director can also remove his alternate director by a written notice sent to the office or to an address specified by the company or tabled at a meeting of the directors.

(C)    An alternate director is entitled to receive notices of meetings of the directors.  He is entitled to attend and vote as a director at any meeting at which the director appointing him is not personally present and generally at that meeting is entitled to perform all of the functions of his appointor as a director.  The provisions of these articles regulating the meeting apply as if he (instead of his appointor) were a director.  If he is himself a director, or he attends any meeting as an alternate director for more than one director, he can vote cumulatively for himself and for each other director he represents but he cannot be counted more than once for the purposes of the quorum.  An alternate director's signature to any resolution in writing of the directors is as effective as the signature of his appointor, unless the notice of his appointment provides to the contrary.  This article also applies in a similar fashion to any meeting of a committee of which his appointor is a member.  Except as set out in this article, an alternate director:-

    (i)    does not have power to act as a director;

    (ii)    is not deemed to be a director for the purposes of these articles; and

    (iii)    is not deemed to be the agent of his appointor.

(D)    An alternate director is entitled to contract and be interested in and benefit from contracts, transactions or arrangements and to be repaid expenses and to be indemnified by the company to the same extent as if he were a director.  However, he is not entitled to receive from the company as an alternate director any pay, except for

999999/10120  TP093430108 ZZP 110515:1821

that part (if any) of the pay otherwise payable to his appointor as his appointor may tell the company in writing to pay to his alternate director.

**85.    Executive Directors**

(A)    The directors or any committee authorised by the directors can appoint one or more directors to any executive position, on such terms and for such period as they think fit. They can also terminate or vary an appointment at any time.  The directors or any committee authorised by the directors will decide how much remuneration a director appointed to an executive office will receive (whether as salary, commission, profit share or any other form of remuneration) and whether this is in addition to or in place of his fees as a director.

(B)    If the directors terminate the appointment, the termination will not affect any right of the company or the director in relation to any breach of any employment contract which may be involved in the termination.

**86.    Directors' Fees**

The total fees paid to all of the directors (excluding any payments made under any other provision of these articles) must not exceed:-

(i)        £1,000,000 a year; or[1]

(ii)        any higher sum decided on by an ordinary resolution at a general meeting.

It is for the directors to decide how much to pay each director by way of fees under this article.

**87.    Additional Remuneration**

The directors or any committee authorised by the directors can award extra fees to any director who, in their view, performs any special or extra services for the company. Extra fees can take the form of salary, commission, profit-sharing or other benefits (and can be paid partly in one way and partly in another).  This is all decided by the directors or any committee authorised by the directors.

---

[1]  The fees were further increased to £2.25m a year by an ordinary resolution in accordance with Article 86(ii) at the AGM held on 7 May 2015.

35

**88.     Expenses**

The company can pay the reasonable travel, hotel and incidental expenses of each director incurred in attending and returning from general meetings, meetings of the directors or committees of the directors or any other meetings which as a director he is entitled to attend.  The company will pay all other expenses properly and reasonably incurred by each director in connection with the company's business or in the performance of his duties as a director.  The company can also fund a director's or former director's expenditure and that of a director or former director of any holding company of the company for the purposes permitted by the legislation and can do anything to enable a director or former director or a director or former director of any holding company of the company to avoid incurring such expenditure all as provided in the legislation.

**89.     Pensions and Gratuities for Directors**

(A)     The directors or any committee authorised by the directors can decide whether to provide pensions, annual payments or other benefits to any director or former director of the company, or any relation or dependant of, or person connected to, such a person.  The directors can also decide to contribute to a scheme or fund or to pay premiums to a third party for these purposes.  The company can only provide pensions and other benefits to people who are or were directors but who have not been employed by, or held an office or executive position in, the company or any of its subsidiary undertakings or former subsidiary undertakings or any predecessor in business of the company or any such other company or to relations or dependants of, or persons connected to, these directors or former directors if the shareholders approve this by passing an ordinary resolution.

(B)     A director or former director will not be accountable to the company or the shareholders for any benefit provided pursuant to this article.  Anyone receiving such a benefit will not be disqualified from being or becoming a director of the company.

**90.     Directors' Interests**

*Conflicts of interest requiring authorisation by directors*

(A)     The directors may, subject to the quorum and voting requirements set out in this article, authorise any matter which would otherwise involve a director breaching his duty under the legislation to avoid conflicts of interest ("Conflict").

(B)     A director seeking authorisation in respect of a Conflict must tell the directors of the nature and extent of his interest in a Conflict as soon as possible. The director must give the directors sufficient details of the relevant matter to enable them to decide how to address the Conflict together with any additional information which they may request.

36

(C)     Any director (including the relevant director) may propose that the relevant director be authorised in relation to any matter the subject of a Conflict. Such proposal and any authority given by the directors shall be effected in the same way that any other matter may be proposed to and resolved upon by the directors under the provisions of these articles except that:

    (i)     the relevant director and any other director with a similar interest will not count in the quorum and will not vote on a resolution giving such authority; and

    (ii)    the relevant director and any other director with a similar interest may, if the other directors so decide, be excluded from any meeting of the directors while the Conflict is under consideration.

(D)     Where the directors give authority in relation to a Conflict or where any of the situations described in paragraph (F) applies in relation to a director ("Relevant Situation"):

    (i)     the directors may (whether at the relevant time or subsequently) (a) require that the relevant director is excluded from the receipt of information, the participation in discussion and/or the making of decisions (whether at directors' meetings or otherwise) related to the Conflict or Relevant Situation; and (b) impose upon the relevant director such other terms for the purpose of dealing with the Conflict or Relevant Situation as they think fit;

    (ii)    the relevant director will be obliged to conduct himself in accordance with any terms imposed by the directors in relation to the Conflict or Relevant Situation;

    (iii)   the directors may also provide that where the relevant director obtains (otherwise than through his position as a director of the company) information that is confidential to a third party, the director will not be obliged to disclose that information to the company, or to use or apply the information in relation to the company's affairs, where to do so would amount to a breach of that confidence;

    (iv)    the terms of the authority shall be recorded in writing (but the authority shall be effective whether or not the terms are so recorded); and

    (v)     the directors may revoke or vary such authority at any time but this will not affect anything done by the relevant director prior to such revocation in accordance with the terms of such authority.

*Other conflicts of interest*

(E)     If a director knows that he is in any way directly or indirectly interested in a proposed contract with the company or a contract that has been entered into by the company, he

37

must tell the other directors of the nature and extent of that interest in accordance with the legislation.

(F)     If he has disclosed the nature and extent of his interest in accordance with paragraph (E), a director can do any one or more of the following:

   (i)      have any kind of interest in a contract with or involving the company or another company in which the company has an interest;

   (ii)     hold any other office or place of profit with the company (except that of auditor) in conjunction with his office of director for such period and upon such terms, including as to remuneration, as the directors may decide;

   (iii)    alone, or through a firm with which he is associated do paid professional work for the company or another company in which the company has an interest (other than as auditor);

   (iv)    be or become a director or other officer of, or employed by or otherwise be interested in any holding company or subsidiary company of the company or any other company in which the company has an interest; and

   (v)     be or become a director of any other company in which the company does not have an interest and which cannot reasonably be regarded as giving rise to a conflict of interest at the time of his appointment as a director of that other company.

*Benefits*

(G)     A director does not have to hand over to the company or the shareholders any benefit he receives or profit he makes as a result of anything authorised under paragraph (A) or allowed under paragraph (F) nor is any type of contract authorised under paragraph (A) or allowed under paragraph (F) liable to be avoided.

*Quorum and voting requirements*

(H)     A director cannot vote or be counted in the quorum on a resolution of the directors relating to appointing that director to a position with the company or a company in which the company has an interest or the terms or the termination of the appointment.

(I)     This paragraph applies if the directors are considering proposals about appointing two or more directors to positions with the company or any company in which the company has an interest.  It also applies if the directors are considering setting or changing the terms of their appointment.  These proposals can be split up to deal with each director separately.  If this is done, each director can vote and be included in the quorum for

38

each resolution, except any resolution concerning him or concerning the appointment of another director to a position with a company in which the company is interested where the director has a Relevant Interest in it.

(J)     A director cannot vote or be counted in the quorum on a resolution of the directors about a contract in which he has an interest and, if he does vote, his vote will not be counted, but this prohibition will not apply to any resolution where that interest cannot reasonably be regarded as likely to give rise to a conflict of interest or where that interest is included in the following list:-

(i)     a resolution about giving him any guarantee, indemnity or security for money which he or any other person has lent or obligations he or any other person has undertaken at the request of or for the benefit of the company or any of its subsidiary undertakings;

(ii)    a resolution about giving any guarantee, indemnity or security to another person for a debt or obligation which is owed by the company or any of its subsidiary undertakings to that other person if the director has taken responsibility for some or all of that debt or obligation. The director can take this responsibility by giving a guarantee, indemnity or security ;

(iii)   a resolution about giving him any other indemnity where all other directors are also being offered indemnities on substantially the same terms;

(iv)    a resolution about the company funding his expenditure on defending proceedings or the company doing something to enable him to avoid incurring such expenditure where all other directors are being offered substantially the same arrangements;

(v)     a resolution relating to an offer by the company or any of its subsidiary undertakings of any shares or debentures or other securities for subscription or purchase if the director takes part because he is a holder of shares, debentures or other securities or if he takes part in the underwriting or sub-underwriting of the offer;

(vi)    a resolution about a contract in which he has an interest because of his interest in shares or debentures or other securities of the company or because of any other interest in or through the company;

(vii)   a resolution about a contract involving any other company if the director has an interest of any kind in that company (including an interest by holding any position in that company or by being a shareholder in that company). This does not apply if he knows that he has a Relevant Interest in that company;

39

(viii)   a resolution about a contract relating to a pension fund, superannuation or similar scheme or retirement, death or disability benefits scheme or employees' share scheme which gives the director benefits which are also generally given to the employees to whom the fund or scheme relates;

(ix)   a resolution about a contract relating to an arrangement for the benefit of employees of the company or of any of its subsidiary undertakings which only gives him benefits which are also generally given to the employees to whom the arrangement relates; and

(x)   a resolution about a contract relating to any insurance which the company can buy or renew for the benefit of directors or of a group of people which includes directors.

(K)   A director will be treated as having a Relevant Interest in a company if he holds an interest in shares representing one per cent. or more of a class of equity share capital (calculated exclusive of any shares of that class in that company held as treasury shares) or of the voting rights of that company.  In relation to an alternate director, an interest of his appointor shall be treated as an interest of the alternate director without prejudice to any interest which the alternate director has otherwise.  Interests which are unknown to the director and which it is unreasonable to expect him to know about are ignored.

(L)   Where a company in which a director has a Relevant Interest is interested in a contract, the director will also be treated as being interested in that contract.

(M)   Subject to these articles, the directors can exercise or arrange for the exercise of the voting rights attached to any shares in another company held by the company and the voting rights which they have as directors of that company in any way that they decide. This includes voting in favour of a resolution appointing any of them as directors or officers of that company and deciding their remuneration.  Subject to these articles, they can also vote and be counted in the quorum as directors of the company in connection with any of these things.

(N)   If a question comes up at a meeting of the directors about whether a director (other than the chairman of the meeting) has an interest in a contract and whether it is likely to give rise to a conflict of interest or whether he can vote or be counted in the quorum and the director does not agree to abstain from voting on the issue or not to be counted in the quorum, the question must be referred to the chairman of the meeting.  The chairman of the meeting's ruling about any other director is final and conclusive unless the nature or extent of the director's interest (so far as it is known to him) has not been fairly disclosed to the directors.  If the question comes up about the chairman of the meeting, the question shall be decided by a resolution of the directors.  The chairman of the meeting cannot vote on the question but can be counted in the quorum.  The directors'

40

resolution about the chairman of the meeting is conclusive, unless the nature or extent of the chairman's interest (so far as it is known to him) has not been fairly disclosed to the directors.

*General*

(O)    References in this article to

(i)    a contract include references to an existing or proposed contract and to an existing or proposed transaction or arrangement whether or not it is a contract; and

(ii)    a conflict of interest include a conflict of interest and duty and a conflict of duties.

(P)    The company can by ordinary resolution suspend or relax the provisions of this article to any extent or ratify any contract which has not been properly authorised in accordance with this article.

**91.    General Powers of Company Vested in Directors**

(A)    The directors will manage the company's business.  They can use all the company's powers except where these articles say that powers can only be used by the shareholders voting to do so at a general meeting.  The general management powers under this article are not limited in any way by specific powers given to the directors by other articles.

(B)    The directors are, however, subject to:-

(i)    the requirements of these articles; and

(ii)    any regulations laid down by the shareholders by passing a special resolution at a general meeting.

(C)    If a change is made to these articles or if the shareholders lay down any regulation relating to something which the directors have already done which was within their powers, that change or regulation cannot invalidate the directors' previous action.

**92.    Borrowing Powers (\*)**

(A)    The directors can exercise all the company's powers:-

(i)    to borrow money;

41

(ii)    to guarantee;

(iii)    to indemnify;

(iv)    to mortgage or charge all or any of the company's undertaking, property and assets (present and future) and uncalled capital;

(v)    to issue debentures and other securities; and

(vi)    to give security, either outright or as collateral security, for any debt, liability or obligation of the company or of any third party.

(B)    (i)    The directors must limit the borrowings of the company and exercise all voting and other rights or powers of control exercisable by the company in relation to its subsidiary undertakings so as to ensure that no money is borrowed if the total amount of the group's borrowings then exceeds, or would as a result of such borrowing exceed, three times the company's adjusted capital and reserves. This affects subsidiary undertakings only to the extent that the directors can do this by exercising these rights or powers of control.

(ii)    This limit can be exceeded if the consent of the shareholders has been given in advance by passing an ordinary resolution.

(iii)    This limit does not include any borrowings owing by one member of the group to another member of the group.

(C)    Adjusted capital and reserves

The company's adjusted capital and reserves will be established by the following calculations:-

Add:

(i)    the amount paid up on the company's issued share capital (including any shares held as treasury shares); and

(ii)    the amount standing to the credit of the reserves of the company (which include any share premium account, capital redemption reserve and retained earnings),

using the figures shown on the then latest audited balance sheet.

42

Then:-

(iii)    deduct any debit balance on retained earnings at the date of the audited balance sheet (if such a deduction has not already been made),

and

(iv)    make any adjustments needed to reflect any changes since the date of the audited balance sheet to the amount of paid up share capital or reserves.

(D)    Borrowings

When calculating the group's borrowings, the directors will include not only borrowings but also the following (unless these have already been included in borrowings):-

(i)    the amount of any issued and paid up share capital (other than equity share capital) of any subsidiary undertaking beneficially owned otherwise than by a member of the group;

(ii)    the amount of any other issued and paid up share capital and the principal amount of any debentures or borrowed moneys not beneficially owned by a member of the group where a member of the group has given a guarantee or indemnity for its redemption or repayment or where a member of the group may have to buy such share capital, debenture or borrowed money;

(iii)    the amount outstanding under any acceptance credits opened for or in favour of any member of the group;

(iv)    the principal amount of any debenture (whether secured or unsecured) issued by any member of the group which is not beneficially owned by any other member of the group;

(v)    any fixed or minimum premium payable on the final repayment of any borrowing or deemed borrowing;

(vi)    the minority proportion of moneys borrowed by a member of the group and owing to a partly-owned subsidiary undertaking.

However, the directors will not include the following items in the borrowings:-

(vii)    amounts borrowed by any member of the group to repay some or all of any other borrowings of any member of the group (but this exclusion will only apply if the original debt is discharged within six months from the new borrowing);

43

(viii)    amounts borrowed by any member of the group to finance any contract where part of the price receivable by any member of the group is guaranteed or insured by the Export Credits Guarantee Department or any other similar government department or agency (but this exclusion will only apply up to an amount equal to the amount guaranteed or insured);

(ix)    amounts borrowed by, or amounts secured on assets of, an undertaking which became a subsidiary undertaking of the company after the date of the last audited balance sheet (but this exclusion will only apply up to an amount equal to the amount of borrowing, or amounts secured on assets, of the undertaking at the time immediately after it became a subsidiary undertaking); or

(x)    the minority proportion of moneys borrowed by a partly-owned subsidiary undertaking which is not owing to another member of the group.

(E)    Any foreign currency amounts will be translated into sterling when calculating total borrowings.  The exchange rate applied will be the exchange rate on:-

(i)    the last business day before the date of the calculation; or

(ii)    the last business day six months before the date of the calculation,

whichever exchange rate produces the lower figure.

The exchange rate will be taken as the spot rate in London which is recommended by a London clearing bank (chosen by the directors for this purpose) as the most appropriate rate for buying the relevant currency for sterling on the relevant day.

(F)    If the amount of adjusted capital and reserves is being calculated in connection with a transaction involving a company becoming or ceasing to be a member of the group, the amount is to be calculated as if the transaction had already occurred.

(G)    The audited balance sheet of the company will be taken as the audited balance sheet of the company prepared for the purposes of the legislation.  However, if an audited consolidated balance sheet relating to the company and its subsidiary undertakings has been prepared for the same financial year, the audited consolidated balance sheet will be used instead.  In that case, all references to reserves will be taken to be references to consolidated reserves.

(H)    The company can from time to time change the accounting convention applied in the preparation of the audited balance sheet, but any new convention applied must comply with the requirements of the legislation.  If the company prepares a supplementary audited balance sheet applying a different convention from the main audited balance

44

sheet, the main audited balance sheet will be taken as the audited balance sheet for the purposes of the calculations under these articles.

(I)     The group will be taken as the company and its subsidiary undertakings (if any).

(J)     For the purposes of this article the minority proportion means a proportion equal to the proportion of the issued share capital of a partly-owned subsidiary undertaking which does not belong to a member of the group.

(K)     A certificate or report by the company's auditors:-

    (i)     as to the amount of the adjusted capital and reserves;

    (ii)    as to the amount of any borrowings; or

    (iii)   to the effect that the limit imposed by this article has not been or will not be exceeded at any particular time,

    will be conclusive evidence of that amount or that fact.

**93.    Agents**

(A)     The directors can appoint anyone as the company's attorney by granting a power of attorney or by authorising them in some other way.  Attorneys can either be appointed directly by the directors or the directors can give someone else the power to select attorneys.  The directors or the persons who are authorised by them to select attorneys can decide on the purposes, powers, authorities and discretions of attorneys.  But they cannot give an attorney any power, authority or discretion which the directors do not have under these articles.

(B)     The directors can decide how long a power of attorney will last for and attach any conditions to it.  The power of attorney can include any provisions which the directors decide on for the protection and convenience of anybody dealing with the attorney.  The power of attorney can allow the attorney to grant any or all of his power, authority or discretion to any other person.

(C)     The directors can:-

    (i)     delegate any of their authority, powers or discretions to any manager or agent of the company;

    (ii)    allow managers or agents to delegate to another person;

    (iii)   remove any people they have appointed in any of these ways; and

999999/10120  TP093430108 ZZP 110515:1821

45

(iv)     cancel or change anything that they have delegated, although this will not affect anybody who acts in good faith who has not had any notice of any cancellation or change.

Any appointment or delegation by the directors which is referred to in this article can be on any conditions decided on by the directors.

(D)     The ability of the directors to delegate under this article applies to all their powers and is not limited because certain articles refer to powers being exercised by the directors or by a committee authorised by the directors while other articles do not.

**94.     Delegation to Individual Directors**

(A)     The directors can give a director any of the powers which they have jointly as directors (with power to sub-delegate).  These powers can be given on terms and conditions decided on by the directors either in parallel with, or in place of, the powers of the directors acting jointly.

(B)     The directors can change the basis on which such powers are given or withdraw such powers.  But if a person deals with an individual director in good faith without knowledge of the change or withdrawal, he will not be affected by it.

(C)     The ability of the directors to delegate under this article applies to all their powers and is not limited because certain articles refer to powers being exercised by the directors or by a committee authorised by the directors while other articles do not.

**95.     Registers**

The company can keep an overseas, local or other register.  The directors can make and change any regulations previously made by them relating to any of such registers.

**96.     Provision for Employees**

The directors can exercise the powers under the legislation to make provision for the benefit of employees or former employees of the company or any of its subsidiaries in connection with the cessation or transfer of the whole or part of the business of the company or that subsidiary.

**97.     Directors' Meetings**

The directors can decide when and where to have meetings and how they will be conducted.  They can also adjourn their meetings.  A directors' meeting can be called by any director.  The secretary must call a directors' meeting if asked to by a director.

46

**98.     Notice of Directors' Meetings**

Directors' meetings are called by giving notice to all the directors.  Notice is treated as properly given if it is given personally, by word of mouth or in writing to the director's last known address or any other address given by him to the company for this purpose.  Any director can waive his entitlement to notice of any directors' meeting, including one which has already taken place and any waiver after the meeting has taken place will not affect the validity of the meeting or any business conducted at the meeting.

**99.     Quorum**

If no other quorum is fixed by the directors, two directors are a quorum.  Subject to these articles, if a director ceases to be a director at a directors' meeting, he can continue to be present and to act as a director and be counted in the quorum until the end of the meeting if no other director objects and if otherwise a quorum of directors would not be present.

**100.     Directors below Minimum through Vacancies**

The directors can continue to act even if one or more of them stops being a director.  But if the number of directors falls below the minimum which applies under these articles (including any change to that minimum number approved by an ordinary resolution of shareholders), or the number fixed as the quorum for directors' meetings, the remaining director(s) may only act to:-

(i)     appoint further director(s) to make up the shortfall; or

(ii)    convene general meetings.

If no director or directors are willing or able to act under this article, any two shareholders (excluding any shareholder holding shares as treasury shares) can call a general meeting to appoint extra directors(s).

**101.     Appointment of Chairman**

(A)     The directors can appoint any director as chairman or as deputy chairman and can remove him from that office at any time.  If the chairman is at a directors' meeting, he will chair it.  In his absence, the chair will be taken by a deputy chairman, if one is present.  If more than one deputy chairman is present, they will agree between them who should chair the meeting or, if they cannot agree, the deputy chairman longest in office as a director will take the chair.  If there is no chairman or deputy chairman present within five minutes of the time when the directors' meeting is due to start, the directors who are present can choose which one of them will be the chairman of the meeting.

47

(B)      References in these articles to a deputy chairman include, if no one has been appointed with that title, a person appointed to a position with another title which the directors designate as equivalent to the position of deputy chairman.

**102.    Competence of Meetings**

A directors' meeting at which a quorum is present can exercise all the powers and discretions of the directors.

**103.    Voting**

Matters to be decided at a directors' meeting will be decided by a majority vote.  If votes are equal, the chairman of the meeting has a second, casting vote.

**104.    Delegation to Committees**

(A)      The directors can delegate any of their powers or discretions to committees of one or more persons, or in the case of the Executive Committee, persons who are eligible to be appointed to that committee because of their position in the senior management of the company.  If the directors have delegated any power or discretion to a committee, any references in these articles to using that power or discretion include its use by the committee.  Any committee must comply with any regulations laid down by the directors.  These regulations can require or allow people who are not directors to be members of the committee, and can give voting rights to such people.  But:-

   (i)       there must be more directors and/or Executive Committee members on any such committee than persons who are not directors or Executive Committee members; and

   (ii)      a resolution of  a committee is only effective if a majority of the members of the committee present at the time of the resolution were directors or members of the Executive Committee, as the case may be.

(B)      Unless the directors decide not to allow this, any committee can sub-delegate any of its powers or discretions to sub-committees.  Reference in these articles to committees include sub-committees permitted under this article.

(C)      If a committee consists of more than one person, the articles which regulate directors' meetings and their procedure will also apply to committee meetings (if they can apply to committee meetings), unless these are inconsistent with any regulations for the committee which have been laid down under this article.

48

(D)     The ability of the directors to delegate under this article applies to all their powers and discretions and is not limited because certain articles refer to powers and discretions being exercised by committees authorised by directors while other articles do not.

## 105.   Participation in Meetings

All or any of the directors can take part in a meeting of the directors by way of a conference telephone or any communication equipment which allows everybody to take part in the meeting by being able to hear each of the other people at the meeting and by being able to speak to all of them at the same time.  A person taking part in this way will be treated as being present at the meeting and will be entitled to vote and be counted in the quorum.

## 106.   Resolution in Writing

A resolution in writing must be signed by all of the directors who at the time are entitled to receive notice of a directors' meeting and who would be entitled to vote on the resolution at a directors' meeting, and who together meet the quorum requirement for directors' meetings.  This kind of resolution is just as valid and effective as a resolution passed by those directors at a meeting which is properly called and held.  The resolution can be passed using several copies of the resolution if each copy is signed by one or more directors.

## 107.   Validity of Acts of Directors or Committee

Everything which is done by any directors' meeting, or by a committee of the directors, or by a person acting as a director, or as a member of a committee, will be valid even if it is discovered later that any director, or person acting as a director, was not properly appointed.  This also applies if it is discovered later that anyone was disqualified from being a director, or had ceased to be a director or was not entitled to vote.  In any of these cases, anything done will be as valid as if there was no defect or irregularity of the kind referred to in this article.

## 108.   Use of Seals

(A)     The directors must arrange for every seal of the company to be kept safely.

(B)     A seal can only be used with the authority of the directors or a committee authorised by the directors.

(C)     Subject as otherwise provided in these articles, every document which is sealed using the common seal must be signed by one director and the secretary, or by two directors or by one director in the presence of a witness who attests the signature or by any other person or persons authorised by the directors.

49

(D)    Any document to which the official seal is applied need not be signed, unless the directors decide otherwise or the legislation requires otherwise.

(E)    The directors can resolve that the requirement for any counter-signature in this article can be dispensed with on any occasion.

**109.    Declaration of Dividends by Company**

The company's shareholders can declare dividends in accordance with the rights of the shareholders by passing an ordinary resolution.  No such dividend can exceed the amount recommended by the directors.

**110.    Payment of Interim and Fixed Dividends by Directors**

If the directors consider that the financial position of the company justifies such payments, they can:-

(i)    pay the fixed or other dividends on any class of shares on the dates prescribed for the payment of those dividends; and

(ii)    pay interim dividends on shares of any class of any amounts and on any dates and for any periods which they decide.

If the directors act in good faith, they will not be liable for any loss that any shareholders may suffer because a lawful dividend has been paid on other shares which rank equally with or behind their shares.

**111.    Calculation and Currency of Dividends**

(A)    All dividends will be declared and paid in proportions based on the amounts paid up on the shares during any period for which the dividend is paid.  Sums which have been paid up in advance of calls will not count as paid up for this purpose.  If the terms of any share say that it will be entitled to a dividend as if it were a fully paid up, or partly paid up, share from a particular date (in the past or future), it will be entitled to a dividend on this basis.  This article applies unless these articles, the rights attached to any shares, or the terms of any shares, say otherwise.

(B)    Unless the rights attached to any shares, the terms of any shares or these articles say otherwise, a dividend or any other money payable in respect of a share can be paid in whatever currency the directors decide using an exchange rate selected by the directors for any currency conversions required.  The directors can also decide how any costs relating to the choice of currency will be met.

50

**112.    Amounts Due on Shares can be Deducted from Dividends**

If a shareholder owes the company any money for calls on shares or money in any other way relating to his shares, the directors can deduct any of this money from any dividend or other money payable to the shareholder on or in respect of any share held by him.  Money deducted in this way can be used to pay amounts owed to the company.

**113.    No Interest on Dividends**

Unless the rights attached to any shares, or the terms of any shares, say otherwise, no dividend or other sum payable by the company on or in respect of its shares carries a right to interest from the company.

**114.    Payment Procedure**

(A)    Any dividend or other money payable in cash relating to a share can be paid by sending a cheque, warrant or similar financial instrument payable to the shareholder who is entitled to it by post addressed to his registered address. Or it can be made payable to someone else named in a written instruction from the shareholder (or all joint shareholders) and sent by post to the address specified in that instruction.  A dividend can also be paid by inter-bank transfer or by other electronic means (including payment through CREST) directly to an account with a bank or other financial institution (or other organisations operating deposit accounts if allowed by the company) in the United Kingdom named in a written instruction from the person entitled to receive the payment under this article.  Alternatively, a dividend can be paid in some other way requested in writing by the shareholder (or all joint shareholders) and agreed with the company.

(B)    For joint shareholders or persons jointly entitled to shares by law, payment can be made to the shareholder whose name stands first in the register.  The company can rely on a receipt for a dividend or other money paid on shares from any one of them on behalf of all of them.

(C)    Cheques, warrants and similar financial instruments are sent, and payment in any other way is made, at the risk of the person who is entitled to the money.  The company is treated as having paid a dividend if the cheque, warrant or similar financial instrument is cleared or if a payment is made through CREST, bank transfer or other electronic means.  The company will not be responsible for a payment which is lost or delayed.

(D)    Dividends can be paid to a person who has become entitled to a share by law as if he were the holder of the share.

999999/10120  TP093430108 ZZP 110515:1821

**115.    Uncashed Dividends**

(A)    The company can stop sending dividend payments through the post, or cease using any other method of payment (including payment through CREST), for any dividend if:-

(i)    for two consecutive dividends:-

(a)    the dividend payments sent through the post have been returned undelivered or remain uncashed during the period for which they are valid; or

(b)    the payments by any other method have failed; or

(ii)    for any one dividend:-

(a)    the dividend payment sent through the post has been returned undelivered or remains uncashed during the period for which it is valid; or

(b)    the payment by any other method has failed,

and reasonable enquiries have failed to establish any new postal address or account of the registered shareholder.

(B)    Subject to these articles, the company must recommence sending dividend payments if requested in writing by the shareholder, or the person entitled to a share by law.

**116.    Forfeiture of Unclaimed Dividends**

Where any dividends or other amounts payable on a share have not been claimed, the directors can invest them or use them in any other way for the company's benefit until they are claimed.  The company will not be a trustee of the money and will not be liable to pay interest on it.  If a dividend or other money has not been claimed for 12 years after being declared or becoming due for payment, it will be forfeited and go back to the company unless the directors decide otherwise.

**117.    Dividends Not in Cash**

If recommended by the directors, the company can pass an ordinary resolution that a dividend be paid, and the directors can decide that an interim dividend be paid, wholly or partly by distributing specific assets (and, in particular, paid up shares or debentures of any other company).  Where any difficulty arises on such a distribution, the directors can resolve it as they decide.  For example, they can:

52

    (i)        authorise any person to sell and transfer any fractions;

    (ii)       ignore any fractions;

    (iii)      value assets for distribution purposes;

    (iv)      pay cash of a similar value to adjust the rights of shareholders; and/or

    (v)       vest any assets in trustees for the benefit of more than one shareholder.

**118.    Scrip Dividends**

The directors can offer ordinary shareholders (excluding any shareholder holding shares as treasury shares) the right to choose to receive extra ordinary shares, which are credited as fully paid up, instead of some or all of their cash dividend.  Before they can do this, shareholders must have passed an ordinary resolution authorising the directors to make this offer.

    (i)        The ordinary resolution can apply to some or all of a particular dividend or dividends.  Or it can apply to some or all of the dividends which may be declared or paid in a specified period.  The specified period must not end later than the fifth anniversary of the date on which the ordinary resolution is passed.

    (ii)       The directors can also offer shareholders the right to request new shares instead of cash for all future dividends (if a share alternative is available), until they tell or are treated as telling the company that they no longer wish to receive new shares.

    (iii)      A shareholder will be entitled to ordinary shares whose total "relevant value" is as near as possible to the cash dividend he would have received (disregarding any tax credit), but not more than it.  The relevant value of a share is the average value of the company's ordinary shares for five consecutive dealing days selected by the directors starting on or after the day when the shares are first quoted "ex dividend".  This average value is worked out from the middle market quotations for the company's ordinary shares on the London Stock Exchange as derived from the Daily Official List (or any other publication of a recognised investment exchange showing quotations for the company's ordinary shares) for the relevant dealing days.

    (iv)      The ordinary resolution can require that the relevant value is worked out in some different way.  A certificate or report by the auditors stating the relevant value of a share for any dividend will be conclusive evidence of that value.

53

(v)      After the directors have decided how many new shares ordinary shareholders will be entitled to, they can notify them in writing of their right to opt for new shares. This notice should also say how, where and when shareholders must notify the company if they wish to receive new shares. Where shareholders have opted to receive new shares in place of all future dividends, if new shares are available, the company will not need to notify them of a right to opt for new shares. No shareholders will receive a fraction of a share. The directors can decide how to deal with any fractions left over. For example, they can decide that the benefit of these fractions belongs to the company or that fractions are ignored or deal with fractions in some other way.

(vi)     If a notice informing any shareholders of their right to opt for new shares is accidentally not sent or is not received (even if the company becomes aware of such non-receipt), the offer will not be invalid as a result nor give rise to any claim, suit or action.

(vii)    The directors can exclude or restrict the right to opt for new shares or make any other arrangements where they decide that this is necessary or convenient to deal with any of the following legal or practical problems:-

        (a)      problems relating to laws of any territory, or

        (b)      problems relating to the requirements of any recognised regulatory body or stock exchange in any territory,

or where the directors believe that for any other reason the right should not be given.

(viii)   If a shareholder has opted to receive new shares, no dividend on the shares for which he has opted to receive new shares (which are called the "elected shares"), will be declared or payable. Instead, new ordinary shares will be allotted on the basis set out earlier in this article. To do this, the directors will convert into capital the sum equal to the total amount of the new ordinary shares to be allotted. They will use this sum to pay up in full the appropriate number of new ordinary shares. These will then be allotted and distributed to the holders of the elected shares on the basis set out above. The sum to be converted into capital can be taken from:-

        (a)      any amount which is then in any reserve or fund (including the share premium account, any capital redemption reserve and the profit and loss account or retained earnings); or

        (b)      any other sum which is available to be distributed.

54

The directors can do anything they think necessary to give effect to any such conversion into capital.

(ix)     The new ordinary shares will rank equally in all respects with the existing fully paid up ordinary shares at the time when the new ordinary shares are allotted. But, they will not be entitled to share in the dividend from which they arose, or to have new shares instead of that dividend.

(x)      The directors can decide that new shares will not be available in place of any cash dividend.  They can decide this at any time before new shares are allotted in place of such dividend, whether before or after shareholders have opted to receive new shares.

(xi)     The directors can decide how any costs relating to making new shares available in place of a cash dividend will be met.  For example, they can decide that an amount will be deducted from the entitlement of a shareholder under this article.

(xii)    Unless the directors decide otherwise or unless the uncertificated securities rules require otherwise, any new ordinary shares which a shareholder has chosen to receive instead of some or all of his cash dividend will be:-

(a)      CREST shares if the corresponding elected shares were CREST shares on the record date for that dividend; and

(b)      certificated shares if the corresponding elected shares were certificated shares on the record date for that dividend.

(xiii)   The directors may not proceed with any election unless the company has sufficient reserves or funds that may be capitalised, and the directors have authority to allot sufficient shares, to give effect to it after the basis of allotment is determined.

## 119.    Power to Capitalise Reserves and Funds

(A)     If recommended by the directors, the company's shareholders can pass an ordinary resolution to capitalise any sum:-

(i)      which is part of any of the company's reserves (including premiums received when any shares were issued, capital redemption reserves or other undistributable reserves); or

(ii)     which the company is holding as net profits.

55

(B)     Unless the ordinary resolution states otherwise, the directors will use the sum which is capitalised by setting it aside for the ordinary shareholders on the register at the close of business on the day the resolution is passed (or another date stated in the resolution or fixed as stated in the resolution) and in the same proportions as the ordinary shareholders' entitlement to dividends (or in other proportions stated in the resolution or fixed as stated in the resolution).  The sum set aside can be used:-

   (i)      to pay up some or all of any amount on any issued shares which has not already been called, or paid in advance; or

   (ii)     to pay up in full shares, debentures or other securities of the company which would then be allotted and distributed, credited as fully paid, to shareholders.

   However, a share premium account, a capital redemption reserve, or any reserve or fund representing unrealised profits, can only be used to pay up in full the company's shares that are then to be allotted and distributed, credited as fully paid, to shareholders.  Where the sum capitalised is used to pay up in full shares that are then to be allotted and distributed, credited as fully paid, to shareholders, the company is also entitled to participate in the relevant distribution in relation to any shares of the relevant class held by it as treasury shares and the proportionate entitlement of the relevant class of shareholders to the distribution will be calculated on this basis.

(C)     The directors can appoint any person to sign a contract with the company on behalf of those who are entitled to shares, debentures or other securities under the resolution.  Such a contract is binding on all concerned.

**120.    Settlement of Difficulties in Distribution**

If any difficulty arises in connection with any distribution of any capitalised reserve or fund, the directors can resolve it in any way which they decide.  For example, they can deal with entitlements to fractions by deciding that the benefit of fractions belong to the company or that fractions are ignored or deal with fractions in some other way.

**121.    Power to Choose Any Record Date**

This article applies to any dividend on any shares, or any distribution, allotment or issue to the holders of any shares.  This can be paid or made to the registered holder or holders of the shares, or to anyone entitled in any other way, at a particular time on a particular day selected by the directors.  It will be based on the number of shares registered at that time on that day, even if this is before any resolution to authorise what is being done was passed.  This article applies whether what is being done is the result of a resolution of the directors, or a resolution at a general meeting.  The time and date can be before the dividend and so on is to be paid or made, or before any relevant resolution was passed.

56

**122.    Inspection of Records**

A shareholder is not entitled to inspect any of the company's accounting records or other books or papers unless:-

(i)        the legislation or a proper court order gives him that right;

(ii)       the directors authorise him to do so; or

(iii)      the shareholders authorise him to do so by ordinary resolution.

**123.    Summary Financial Statements**

The company can send or supply summary financial statements to its shareholders instead of copies of its full reports and accounts.

**124.    Method of Service**

(A)     The company can send or supply any notice, document, including a share certificate, or other information to a shareholder:-

(i)        by delivering it to him personally;

(ii)       by addressing it to him and posting it to, or leaving it at, the shareholder's registered address;

(iii)      through CREST, where it relates to CREST shares;

(iv)      as authorised in writing by the relevant shareholder;

(v)       where appropriate, by sending or supplying it in electronic form to an address notified by the relevant shareholder to the company for that purpose; or

(vi)      where appropriate, by making it available on a website and notifying the shareholder of its availability in accordance with this article.

Where there are joint shareholders, the notice, document or other information can be sent or supplied to any one of the joint holders and will be treated as having been sent or supplied to all the joint holders.

(B)     Where there are joint shareholders, anything which needs to be agreed or specified in relation to any notice, document or other information to be sent or supplied to them can be agreed or specified by any one of the joint shareholders.  The agreement or specification of the senior will be accepted to the exclusion of the agreement or

999999/10120  TP093430108 ZZP 110515:1821

57

specification of the other joint shareholder(s).  For this purpose, seniority will be determined by the order in which the joint shareholders' names stand in the register in respect of the joint shareholding.

(C)     If on three consecutive occasions any notice, document or other information sent or supplied to a shareholder has been returned undelivered, the company need not send or supply further notices, documents or other information to that shareholder until he has communicated with the company and supplied the company (or its agents) with a new registered address, or a postal address within the United Kingdom for the service of notices and the despatch or supply of documents and other information, or has informed the company of an address for the service of notices and the sending or supply of documents and other information in electronic form.  Any notice, document or other information sent by post will be treated as returned undelivered if the notice, document or other information is sent back to the company (or its agents), and any notice, document or other information sent or supplied in electronic form will be treated as returned undelivered if the company (or its agents) receives notification that the notice, document or other information was not delivered to the address to which it was sent.

(D)     The company may at any time and in its sole discretion choose to serve, send or supply notices, documents or other information in hard copy form alone to some or all members.

**125.     Record Date for Service**

Where the company sends or supplies notices, documents or other information to shareholders, it can do so by reference to the shareholders' register as it stands at any time not more than 15 days before the date the notice, document or other information is sent or supplied.  Any change of details on the register after that time will not invalidate the sending or supply and the company is not obliged to send or supply the same notice, document or other information to any person entered on the shareholders' register after the date selected by the company.

**126.     Members Resident Abroad or on Branch Registers**

(A)     If a shareholder's address on the register is outside the United Kingdom, he can give the company a United Kingdom postal address to which notices, documents or other information can be sent or supplied to him.  If he does, he is entitled to have notices, documents or other information sent to him at that address or, where applicable, to be notified at that address of the availability of the notice, documents or other information on a website.  Alternatively, a shareholder whose address on the register is outside the United Kingdom can give the company an address for the purposes of communications in electronic form.  If he does, notices, documents or other information may, subject to

58

these articles, be sent or supplied to him at that address.  Otherwise, he is not entitled to receive any notices, documents or other information from the company.

(B)      For a shareholder registered on a branch register, notices, documents or other information can be posted or despatched in the United Kingdom or in the country where the branch register is kept.

**127.    Service of Notices on Persons Entitled by Transmission**

This article applies where a shareholder has died or become bankrupt or is in liquidation, or where someone else has otherwise become entitled by law to that shareholder's shares, but is still registered as a shareholder.  It applies whether he is registered as a sole or joint shareholder.  A person who is entitled to that shareholder's shares by law, and who proves this to the reasonable satisfaction of the directors, can give the company a United Kingdom postal address for the sending or supply of notices, documents and other information.  If this is done, notices, documents and other information must be sent to that address or, where applicable, he must be notified at that address of the availability of the notice, document or other information on a website.  Alternatively, a person who is entitled to that shareholder's shares by law, and who proves this to the reasonable satisfaction of the directors, can give the company an address for the purposes of communications by electronic means.  If this is done, notices, documents or other information may be sent or supplied to him at that address or, where applicable, he may be notified at that address of the availability of the notice, document or other information on a website.  Otherwise, if any notice, document or other information is sent or supplied to the shareholder named on the register, this will be valid despite his death, bankruptcy or liquidation or the fact that any other event giving rise to an entitlement to the shares by law has occurred.  This applies even if the company knew about these things.  If any notice, document or other information is sent or supplied in accordance with this article, there is no need to send or supply it to any other people who may be involved.

**128.    Deemed Delivery**

(A)      If any notice, document or other information is given, sent or supplied by the company by post, it is treated as being received the day after it was posted if first class post was used or 48 hours after it was posted if first class post was not used.  In proving that any notice, document or other information was given, sent or supplied, it is sufficient to show that the envelope was properly addressed and put into the postal system with postage paid.

(B)      If any notice, document or other information is left by the company at a shareholder's registered address or at a postal address notified to the company in accordance with these articles by a shareholder or a person who is entitled to a share by law, it is treated as being received on the day it was left.

59

(C)    If a notice is sent through CREST, it is treated as being received when the company, or any CREST participant acting for the company, sends the issuer-instruction relating to the notice, document or other information.

(D)    If any notice, document or other information is given, sent or supplied by the company using electronic means, it is treated as being received on the day it was sent even if the company subsequently sends a hard copy of such notice, document or other information by post.  In the case of any notice, document or other information made available on a website, the notice, document or other information is treated as being received on the day on which the notice, document or other information was first made available on the website, or, if later, when a notice of availability is received or treated as being received by the shareholder in accordance with these articles.  In proving that any notice, document or other information was given, sent or supplied by electronic means, it is sufficient to show that it was properly addressed.

(E)    If any notice, document or other information is given, sent or supplied by the company by any other means authorised in writing by a shareholder, it is treated as being received when the company has done what it was authorised to do by that shareholder.

**129.    Notice When Post Not Available**

If the postal service in the United Kingdom or some part of the United Kingdom is suspended or restricted, the directors only need to give notice of a meeting to shareholders with whom the company can communicate by electronic means and who have provided the company with an address for this purpose.  The company must also publish the notice in at least one United Kingdom national newspaper and make it available on its website from the date of such publication until the conclusion of the meeting or any adjournment of the meeting.  If it becomes generally possible to send or supply notices by post in hard copy form at least six clear days before the meeting, the directors will send or supply a copy of the notice by post to those who would otherwise receive it in hard copy form by way of confirmation.

**130.    Presumptions Where Documents Destroyed**

(A)    The company can destroy or delete:-

(i)    all transfer forms or Operator-instructions transferring shares, and documents sent to support a transfer, and any other documents which were the basis for making an entry by the company on the register, after six years from the date of registration;

(ii)    all dividend and other payment instructions and notifications of a change of address or name, after two years from the date these were recorded;

60

(iii)    all cancelled share certificates, after one year from the date they were cancelled; and

(iv)    all proxy forms after one year from the date they were used if they were used for a poll, or after one month from the end of the meeting to which they relate if they were not used for a poll.

(B)    If the company destroys or deletes a document under this article, it is conclusively treated as having been a valid and effective document in accordance with the company's records relating to the document.  Any action of the company in dealing with the document in accordance with its terms before it was destroyed or deleted is conclusively treated as having been properly taken.

(C)    This article only applies to documents which are destroyed or deleted in good faith and where the company is not on notice of any claim to which the document may be relevant.

(D)    If the documents relate to CREST shares, the company must comply with any requirements of the uncertificated securities rules which limit its ability to destroy these documents.

(E)    This article does not make the company liable if:-

(i)    it destroys or deletes a document earlier than the time limit referred to in paragraph (A);

(ii)    it does not comply with the conditions in paragraph (C); or

(iii)    the company would not be liable if this article did not exist.

(F)    This article applies whether a document is destroyed or deleted or disposed of in some other way.

**131.    Indemnity of Directors**

(A)    As far as the legislation allows this, the company:-

(i)    can indemnify any director or former director of the company or of any associated company against any liability; and

(ii)    can purchase and maintain insurance against any liability for any director or former director of the company or of any associated company.

61

(B)    A director or former director of the company or of any associated company will not be accountable to the company or the shareholders for any benefit provided pursuant to this article.  Anyone receiving such a benefit will not be disqualified from being or becoming a director of the company.

**Dispute Resolution**

**132.    Arbitration**

(A)    Unless article 133 applies:

All disputes:

(i)    between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise; and/or

(ii)    so far as permitted by law, between the company and any of its directors in their capacities as such or as employees of the company, including all claims made by or on behalf of the company against its directors; and/or

(iii)    between a shareholder in that shareholder's capacity as such and the company's professional service providers; and/or

(iv)    between the company and the company's professional service providers arising in connection with any claim within the scope of sub-paragraph 135(A)(iii),

will be exclusively and finally resolved under the Rules of Arbitration of the International Chamber of Commerce ("ICC") (the "ICC Rules"), as amended from time to time.

(B)    The tribunal will consist of three arbitrators to be appointed in accordance with the ICC Rules.

(C)    The chairman of the tribunal must have at least 20 years' experience as a lawyer qualified to practise in a common law jurisdiction within the Commonwealth (as constituted on the date of adoption of this article) and each other arbitrator must have at least 20 years' experience as a qualified lawyer.

(D)    The place of arbitration will be London, England.

(E)    The language of the arbitration will be English.

(F)    These articles are a contract between the company and its shareholders and between the company's shareholders amongst themselves.  This article (as supplemented from

62

time to time by any agreement to a similar effect between the company and its directors or professional service providers) also contains or evidences an express submission to arbitration by each shareholder, the company, its directors and professional service providers and such submissions will be treated as a written arbitration agreement under the Arbitration Act 1996 of England and Wales and Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958).

(G)     Each person to whom this article applies hereby waives, as far as permitted by law: (i) any right under the laws of any jurisdiction to apply to any court of law or other judicial authority to determine any preliminary point of law, and/or (ii) any right he or she may otherwise have under the laws of any jurisdiction to appeal or otherwise challenge the award, ruling or decision of the tribunal.

**133.    Exclusive Jurisdiction**

(A)     This article applies to (i) a dispute (which would otherwise be subject to Article 132) in any jurisdiction if a court in that jurisdiction determines that Article 135 is invalid or unenforceable in relation to that dispute in that jurisdiction; and (ii) any derivative claim under the legislation.

(B)     For the purposes of this paragraph (A), "court" means any court of competent jurisdiction or other competent authority including for the avoidance of doubt, a court or authority in any jurisdiction which is not a signatory to the New York Convention.

(C)     Any proceeding, suit or action:

(i)      between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise; and/or

(ii)     so far as permitted by law, between the company and any of its directors in their capacities as such or as employees of the company, including all claims made by or on behalf of the company against its directors; and/or

(iii)    between a shareholder in that shareholder's capacity as such and the company's professional service providers and/or

(iv)     between the company and the company's professional service providers arising in connection with any claim within the scope of sub-paragraph (C)(iii),

can only be brought in the courts of England and Wales.

63

Damages alone may not be an adequate remedy for any breach of this <u>article</u>, so that in the event of a breach or anticipated breach, the remedies of injunction and/or an order for specific performance would in appropriate circumstances be available.

**134.    General Dispute Resolution Provisions**

(A)    For the purposes of Articles 132 and 133, a "dispute" means any dispute, controversy or claim, other than

(i)    any dispute, controversy or claim relating to any failure or alleged failure by the company to pay all or part of a dividend which has been declared and which has fallen due for payment; and

(ii)    in the case of Article 132 only, any derivative claim under the legislation.

(B)    The governing law of these articles, including the submissions to arbitration and written arbitration agreement contained in or evidenced by Article 132, is the substantive law of England.

(C)    The company is entitled to enforce Articles 132 and 133 for its own benefit, and that of its directors, subsidiary undertakings and professional service providers.

(D)    References in Articles 132 and 133 to:

(i)    "company" includes each and any of the company's subsidiary undertakings from time to time; and

(ii)    "director" includes each and any director of the company from time to time in his or her capacity as such or as employee of the company and extends to any former director of the company; and

(iii)    "professional service providers" includes the company's auditors, legal counsel, bankers, ADR depositaries and any other similar professional service providers in their capacity as such from time to time but only if and to the extent such person has agreed with the company in writing to be bound by Article 135 and/or 136 (or has otherwise agreed to submit disputes to arbitration and/or exclusive jurisdiction in a materially similar way).

64

**GLOSSARY**

**NB:** **the relevant nominal amount of the company's shares must be completed in the definition of "nominal amount or nominal value".**

**About the Glossary**

This Glossary is to help readers understand the company's articles.  Words are explained as they are used in the articles - they might mean different things in other documents.  This Glossary is not legally part of the articles and it does not affect their meaning. The explanations are intended to be a general guide - they are not precise.  Words and expressions which are printed in bold in a definition have their own general explanation of their meaning which is contained in this Glossary.

**abrogate** If the **special rights** of a share are abrogated, they are cancelled or withdrawn.

**adjourn** Where a meeting breaks up, to be continued at a later time or day, at the same or a different place.

**allot** When new shares are allotted, they are set aside for the person they are intended for.  This will normally be after the person has agreed to pay for a new share, or has become entitled to a new share for any other reason.  As soon as a share is allotted, that person has the right to have his name put on the register of shareholders.  When he has been registered, the share has also been **issued**.

**asset** Anything which is of any value to its owner.

**attorney** An attorney is a person who has been appointed to act for another person.  The person is appointed by a formal document, called a "**power of attorney**".

**brokerage** Commission which is paid to a broker by a company **issuing** shares where the broker's clients have applied for shares.

**call** A call to pay money which is due on shares which has not yet been paid.  This happens if the company **issues** shares which are partly paid, where money remains to be paid to the company for the shares.  The money which has not been paid can be "called" for.  If all the money to be paid on a share has been paid, the share is called a "**fully paid share**".

**capitalise** To convert some or all of the **reserves** of a company into capital (such as shares).

**capital redemption reserve** A **reserve** which a company may have to set up to maintain the level of its capital base when shares are **redeemed** or bought back.

65

**certificated form** A shareholder holds a share or other security in certificated form if it is not able to be held in **uncertificated form** or, if it is able to be held in **uncertificated form** but that shareholder has requested that a certificate be issued for that share or other security (see also **uncertificated form**).

**company representative** If a corporation owns shares, it can appoint a company representative to attend a shareholders' meeting to speak and vote for it.

**consolidate** When shares are consolidated, they are combined with other shares - for example, three £1 shares might be consolidated into one new £3 share.

**debenture** A typical debenture is a long-term borrowing by a company.  The loan usually has to be repaid at a fixed date in the future and carries a fixed rate of interest.

**declare** Generally, when a dividend is declared, it becomes due to be paid.

**derivative claim**  An action which may be brought by a member on behalf of the company to enforce liability for breach by a director of his duties to the company.

**electronic form** A document is in electronic form if it is either sent by **electronic means** or it is sent by other means while in an electronic form e.g. a CD ROM.

**electronic means** A communication is sent by electronic means if it is sent by means of a telecommunications system.  It includes fax and telephone communications and also electronic mail.

**entitled to a share by law** In some situations, a person will be entitled to have shares which are registered in somebody else's name registered in his own name or to require the shares to be transferred to another person.  When a shareholder dies, or the sole survivor of joint shareholders dies, his **personal representatives** have this right.  If a shareholder is made bankrupt, his **trustee** in bankruptcy has the right.

**ex dividend** Once a share has gone ex-dividend, a person who buys the share in the market will not be entitled to the dividend which has been declared shortly before it was bought.  The seller remains entitled to this dividend even though it will be paid after he has sold his share.

**executed** A document is executed when it is signed or sealed or made valid in some other way.

**exercise** When a power is exercised, it is used.

**forfeit and forfeiture** When a share is forfeited it is taken away from the shareholder and goes back to the company.  This process is called "forfeiture".  This can happen if a **call** on a **partly paid share** is not paid on time.

**fully paid shares** When all of the money or other property which is due to the company for a share has been paid or received, a share is called a "fully paid share".

**hard copy form** A document is in hard copy form if it is in a paper copy or similar form.

**indemnity and indemnify** If a person gives another person an indemnity, he promises to make good any losses or damage which the other might suffer.  The person who gives the indemnity is said to "indemnify" the other person.

**in issue** See **issue**.

**instruments** Formal legal documents.

**issue** When a share has been issued, everything has been done by a company to make the shareholder the owner of the share.  In particular, the shareholder's name has been put on the register.  Existing shares which have been issued are called "**in issue**".

**lien** Where the company has a lien over shares, it can take the dividends, and any other payments relating to the shares which it has a lien over, or it can sell the shares, to repay the debt and so on.

**members**  Shareholders.

**nominal amount or nominal value** The amount of the share shown in a company's account. The nominal value of the company's ordinary shares is •p.  This amount is shown on the share certificate for a share.  When a company **issues** new shares this can be for a price which is at a **premium** to the nominal value.  When shares are bought and sold on the stock market this can be for more, or less, than the nominal value.  The nominal value is sometimes also called the "par value".

**officer** The term officer includes (subject to the provisions of the articles) a director, secretary, any employee who reports directly to a director or any other person who the directors decide should be an officer.

**Operator** A person approved by the Treasury under the Uncertificated Securities Regulations 2001 as operator of a **relevant system**.

**Operator-instruction** A properly authenticated instruction sent by or on behalf of an **Operator** and sent or received by means of a **relevant system**.

**ordinary resolution** A decision reached by a simple majority of votes - that is by more than 50 per cent. of the votes cast.

67

**partly paid shares** If any money remains to be paid on a share, it is said to be partly paid.  The unpaid money can be "**called**" for.

**personal representatives** A person who is entitled to deal with the property (the "estate") of a person who has died.  If the person who has died left a valid will, the will appoints "executors" who are personal representatives.  If the person died without a will, the courts will appoint one or more "administrators" to be the personal representatives.

**poll** On a vote taken on a poll, the number of votes which a shareholder has will depend on the number of shares which he owns.  An ordinary shareholder has one vote for each share he owns.  A poll vote is different to a vote taken on a **show of hands**, where each person who is entitled to vote has just one vote, however many shares he owns.

**power of attorney** A formal document which legally appoints one or more persons to act on behalf of another person.

**pre-emption rights** The right of some shareholders which is given by the legislation to be offered a proportion of certain classes of newly issued shares and other securities before they are offered to anyone else.  This offer must be made on terms which are at least as favourable as the terms offered to anyone else.

**premium** If a company **issues** a new share for more than its **nominal value**, the amount above the  **nominal value** is the premium.

**proxy** A proxy is a person who is appointed by a shareholder to attend a meeting and vote for that shareholder.  A proxy is appointed by using a **proxy form,** which may be electronic.  A proxy does not have to be a shareholder.  A proxy can vote on a poll and on a show of hands under the company's articles.

**proxy form** A form (including an electronic form) which a shareholder uses to appoint a **proxy** to attend a meeting and vote for him.  The proxy forms are sent out by the company and must be returned to the company before the meeting to which they relate.

**quorum** The minimum number of shareholders or directors who must be present before a shareholders' or, as appropriate, directors' meeting can start.  When this number is reached, the meeting is said to be "quorate".

**rank** When either capital or income is distributed to shareholders, it is paid out according to the rank (or ranking) of the shares.  For example, a share which ranks ahead of (or above) another share in sharing in a company's income is entitled to have its dividends paid first, before any dividends are paid on shares which rank below (or after) it.  If there is not enough income to pay dividends on all shares, the available income must be used first to pay dividends on shares which rank first, and then to shares which rank next.  The same applies for repayments of capital.  Capital must be paid first to shares which rank first in sharing in the company's capital,

and then to shares which rank next.  A company's preference shares (if it has any) generally rank ahead of its ordinary shares.

**recognised investment exchange** An investment exchange which has been officially recognised by the UK authorities.  An investment exchange is a place where investments, such as shares, are traded.  The London Stock Exchange is a recognised investment exchange.

**redeem, redemption and redeemable** When a share is redeemed, it goes back to the company in return for a sum of money which was fixed (or calculated from a formula fixed) before the share was **issued**.  This process is called "redemption".  A share which can be redeemed is called a "redeemable" share.

**relevant system** This is a term used in the legislation for a computer system which allows shares without share certificates to be transferred without using transfer forms.  The CREST system for paperless share dealing is a "relevant system".

**renounces and renunciation** Where a share has been **allotted**, but nobody has been entered on the share register for the share, it can be renounced to another person.  This transfers the right to have the share registered to another person.  This process is called "renunciation".

**reserves** A fund which has been set aside in the accounts of a company - profits which are not paid out to shareholders as dividends, or used up in some other way, are held in a reserve by the company.

**retire by rotation** Directors must retire at an annual general meeting after they have been in office for three years or if they have been appointed since the last annual general meeting.  This gives the shareholders the chance to confirm or renew their appointments by voting on whether to re-appoint them.  In addition, non-executive directors who have acted as such for nine years must retire at every annual general meeting.

**revoke** To withdraw or cancel.

**shadow director** Where the directors of a company are accustomed to act in accordance with directions or instructions given by a person, that person is known as a shadow director.  This does not include the company's professional advisers.

**share premium account** If a new share is **issued** by a company for more than its **nominal value**, the amount above the **nominal value** is the **premium** and the total of these **premiums** is held in a **reserve** (which cannot be used to pay dividends) called the share premium account.

**show of hands**  A vote where each person who is entitled to vote has just one vote, however many shares he holds.

999999/10120  TP093430108 ZZP 110515:1821

69

**special resolution** A decision reached by a majority of at least 75 per cent. of votes cast. Shareholders must be given at least 14 days' notice of any special resolution.

**special rights** These are the rights of a particular class of shares as distinct from rights which apply to all shares generally.  Typical examples of special rights are: where the shares **rank**; their rights to sharing in income and **assets**; and voting rights.

**statutory declaration** A formal way of declaring something in writing.  Particular words and formalities must be used - these are laid down by the Statutory Declarations Act of 1835.

**sub-divide** When shares are subdivided they are split into shares which have a smaller **nominal amount**.  For example, a £1 share might be subdivided into two 50p shares.

**subject to** Means that something else has priority, or prevails, or must be taken into account. When a statement is subject to something this means that the statement must be read in the light of that other thing, which will prevail if there is any conflict.

**subsidiary** A company which is controlled by another company (for example, because the other company owns a majority of its shares) is called a subsidiary of that company.  This is defined in more detail in the legislation.

**subsidiary undertaking** This is a term used by the legislation.  It has a wider meaning than **subsidiary**.  Generally speaking, it is a company which is controlled by another company because the other company:

• has a majority of the votes in the company, either alone or acting with others;

• is a shareholder who can appoint or remove a majority of the directors; or

• can **exercise** dominant influence over the company because of anything in the company's memorandum or articles or because of a certain kind of contract.

**treasury shares** Shares in the company which were bought by the company as provided by the legislation and which have been held by the company continuously since being bought are called treasury shares.

**trustees** People who hold property of any kind for the benefit of one or more other people under a kind of arrangement which the law treats as a "trust".

**uncertificated form** A share or other security is held in uncertificated form if no certificate has been issued for it.  A share or other security held in uncertificated form is eligible for settlement in CREST or any other **relevant system**.

70

**underwriting** A person who agrees to buy new shares if they are not bought by other people underwrites the share offer.

**warrant or dividend warrant** Similar to a cheque for a dividend.