**Appendix**

| |
|---|
| Aggeliki Charis Compania Maritima S.A.v. Pagnan S.P.A. (The Angelic Grace) [1995] 1 Lloyd's Rep. 87 |
| Beattie v. E&F Beattie Ltd. [1938] Ch. 708 |
| Bisgood v. Henderson's Travsvaal Estates Ltd [1908] 1 Ch. 743, 459 (CA) |
| BNP Paribas SA v. Trattamento Rifiuti Metropolitani SPA [2019] EWCA Civ. 768 |
| Bratton Seymour Service Co Ltd v. Oxborough [1992] BCLC 693 |
| Excerpts of The Companies Act 2006 |
| Cream Holdings Limited v. Stuart Davenport [2010] EWHC 3096 (Ch) |
| Credit Suisse First Boston (Europe) Ltd v. MLC (Bermuda) Ltd [1999] CLC 579 |
| Cumbrian Newspapers Group Ltd v. Cumberland & Westmorland Herald Newspaper & Printing Co Ltd [1987] Ch. 1 |
| Deutsche Bank AG v. Sebastian Holdings Inc [2010] EWCA Civ 998 |
| Enka Insaat ve Sanayi AS v. OOO Insurance Company Chubb [2020] 1 W.L.R. 4117 |
| Fiona Trust & Holding Corpn v. Yuri Privalov [2007] UKHL 40 |
| Fulham Football Club (1987) Ltd v. Richards [2012] Ch. 333 |
| Guidance Investments Ltd v. Guidance Hotel Investments Co BSC [2013] EWHC 3413 |
| Hickman v. Kent or Romney Marsh Sheepbreeders Association [1915] 1 Ch. 881 (HC) |
| Holmes v. Lord Keves [1959] Ch. 199 (CA) |
| Injazat Technology Capital Ltd v. Dr. Hamid Najafi [2012] EWHC 4171 |
| Lamesa Investments Ltd v. Cynergy Bank Ltd [2019] EWHC 1877 (Comm) |
| London Sack & Bag Co Ltd v. Dixon & Lugton Ltd [1943] 2 All ER 763 |
| Microsoft Mobile Ov (Ltd) v. Sony Europe Limited [2017] EWHC 374 (Ch) |
| Russell on Arbitration (S&M, 24th Ed. 2015) – Chapter 2 |

| |
|---|
| Ryanair Ltd v. Esso Italiana Srl [2013] 2 C.L.C. 950 |
| Terre Neuve SARL v. Yewdale Ltd [2020] EWHC 772 (Comm) |
| UBS AG v. Nordbank AG [2009] EWCA Civ 585 |
| Excerpts of The Financial Service and Markets Act 2000 |
| Excerpts of The Arbitration Act 1996 |

# Appendix
## Part 1 of 5

Case 1:20-cv-10041-PKC     Document 104-1     Filed 08/24/21     Page 4 of 151

## COURT OF APPEAL

May 16 and 17, 1994

---

### AGGELIKI CHARIS COMPANIA MARITIMA S.A.

v.

### PAGNAN S.p.A.

(THE "ANGELIC GRACE")

Before Lord Justice NEILL
Lord Justice LEGGATT
and Lord Justice MILLETT

**Arbitration — Arbitration clause — Jurisdiction — Vessel collided with lightening vessel — Whether claims made in London and in Italy within arbitration clause and within jurisdiction of London arbitrators — Whether charterers should be restrained from proceeding in Italy.**

The plaintiff Panamanian company were owners of *Angelic Grace* which they let to the Italian charterers for the carriage of grain from Rio Grande to two safe ports on the Italian Adriatic. The charter dated Oct. 2, 1992 contained an amended Centrocon arbitration clause which provided inter alia:

All disputes from time to time arising out of this contract shall . . . be referred to the arbitrament of two Arbitrators carrying on business in London . . .

The charterers nominated Chioggia as a discharge port and became entitled under a special Chioggia lightening clause to use Chioggia roads for lightening/lighterage operations.

The charterers called for discharge into *Clodia*, an unpowered open "floating elevator", which they owned. The two vessels were moored alongside each other for the purpose of the discharging operation. During deteriorating weather conditions in December, 1992 the master of *Angelic Grace* deemed it prudent to move her position. During the manoeuvre the mooring lines connecting the two vessels either parted or were released on the advice of the master of *Clodia* and as a result contact occurred between the two vessels damaging both.

Following the casualty bank guarantees were exchanged between the parties in Italy.

On Jan. 15, 1993 the owners obtained leave ex parte to serve an originating summons on the charterers in Italy claiming a declaration that the claims and cross-claims arising out of the incident were properly justiciable by arbitration in London and that the charterers be restrained from commencing proceedings in respect of any such claims otherwise than by arbitration in London. The originating summons was issued on Jan. 18 and served in Italy on Jan. 25 and on Jan. 27 the owners commenced arbitration proceedings. The charterers commenced proceedings in Venice on Feb. 9.

On Apr. 30 the owners served points of claim in the arbitration and on July 16, 1993 the charterers served points of defence and counterclaim in that arbitration.

The issues for decision were whether the claims and counterclaims made or anticipated in the London arbitration and Italy were within the arbitration clause and thus within the jurisdiction of the London arbitrators, and whether an injunction should be granted restraining the charterers from continuing their proceedings in Italy.

————*Held*, by Q.B. (Com. Ct.) (RIX, J.), that (1) the submission by the charterers that both parties' claims in negligence, as well as the owners' claims for salvage arising out of the collision were properly to be characterized as tortious claims or collision claims and were not within the arbitration clause would be rejected; the so called "collision claims" raised disputes which were within the arbitration clause; all the claims and cross-claims arose out of the same incident, the identical set of facts which had to be investigated by the arbitrators; and the parties plainly contemplated that a collision or other accident could give rise to a charter-party dispute; moreover the discharging operation which gave rise to all these claims was an integral part of the contractual adventure;

(2) the disputes which were the subject matter of the arbitration and of the Italian proceedings were disputes arising out of the contract and fell within the scope of the parties' agreement to arbitrate and the declaration would be granted;

(3) it was right, in this case in the Court's discretion to grant a permanent injunction preventing a party to an English arbitration clause from pursuing foreign proceedings in breach of that clause before any challenge to the foreign Court's jurisdiction had been resolved; if the Italian proceedings continued the owners could suffer real prejudice in the form of a binding judgment on the merits in Italy which would render their rights to arbitration nugatory; the charterers had presented no evidence of any argument or interest under Italian law why an Italian Court would not stay the Italian proceedings under the mandatory provisions of the New York Convention, applying English law for the purpose of construing the arbitration clause; in the circumstances the charterers' determination to proceed in Italy was vexatious;

(4) the collision occurred in Italian waters and if it were not for the parties' contract and their agreement to arbitrate in London the Italian Courts would be the natural and appropriate forum for the adjudication of a claim arising out of such a collision; there was need for caution and desirability of judicial comity in this area; nevertheless much greater damage would be done to the interests which that caution and that comity were intended to serve if these proceedings were adjourned to await the outcome of the challenge to the jurisdiction in Italy and then resulted in an injunction against the charterers; nothing had happened in Italy since the issue of the Italian summons and the Court's injunction at this stage would be of the least possible interference to the Italian Courts; an injunction to restrain the charterers from proceeding in Italy would be granted.

The charterers appealed submitting that (1) the claim before the Italian Court was not a claim which fell within the arbitration clause in the charter-party; and (2) even if it could be so characterised the Court ought

LEGGATT, L.J.]                    The "Angelic Grace"                            [C.A.

not to have granted an injunction, the effect of which, it was said, was to pre-empt the decision of the Italian Court as to its own jurisdiction.

————Held, by C.A. (NEILL, LEGGATT and MILLETT, L.JJ.), that (1) the parties might be taken to have intended that disputes between them should be determined by the same tribunal as dealt with disputes about its express terms; the difficulties relating to claims for torts committed abroad were due to their treatment under English law not to the provisions of the arbitration agreement; while it was possible that, had the parties had their attention directed specifically to those difficulties, they might have made special provision for tortious claims, there was no warrant for inferring that the parties intended separate resolution of disputes caused by a collision involving the chartered vessel (see p. 91, col. 1; p. 96, col. 1);

(2) in the circumstances of this case the claim in tort could not be segregated from the cross-claims under the charter-party; the collision in the course of discharge operations under the charter, on any view, arose out of the contract, since the same facts founded the owners' claim in tort as founded the claims and cross-claims in contract (see p. 91, cols. 1 and 2);

(3) the Judge's conclusion that the charterers' maintenance of proceedings in Italy were vexatious was correct in the circumstances, and his consequent exercise of discretion in favour of granting an injunction was unassailable (see p. 96, col. 1);

(4) where an injunction was sought to restrain a party from proceeding in a foreign Court in breach of an arbitration agreement governed by English law, the English Court ought not to feel any diffidence in granting the injunction provided that it was sought promptly and before the foreign proceedings were too far advanced; there was no difference in principle between an injunction to restrain proceedings in breach of an arbitration clause and one to restrain proceedings in breach of an exclusive jurisdiction clause; the justification for the grant of the injunction in either case was that without it the plaintiff would be deprived of its contractual rights in a situation in which damages were manifestly an inadequate remedy; the appeal would be dismissed (see p. 96, col. 2; p. 97, col. 1);

————Continental Bank N.A. v. Aeakos Compania Naviera, S.A., [1994] 1 Lloyd's Rep. 505 considered.

The following cases were referred to in the judgments:

Ashville Investments Ltd. v. Elmer Contractors Ltd., (C.A.) [1988] 2 Lloyd's Rep. 73; [1989] 1 Q.B. 488;

Continental Bank N.A. v. Aeakos Compania Naviera S.A., (C.A.) [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588;

Ermoupolis, The [1990] 1 Lloyd's Rep. 160;

Golden Anne, The [1984] 2 Lloyd's Rep. 489;

Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Insurance Co. Ltd., (C.A.) [1993] 1 Lloyd's Rep. 455;

Lisboa, The (C.A.) [1980] 2 Lloyd's Rep. 546;

Pena Copper Mines Ltd. v. Rio Tinto Co. Ltd., (C.A.) (1911) 105 L.T. 846;

Playa Larga, The [1983] 2 Lloyd's Rep. 171;

South Carolina Insurance Co. v. Assurante Maatschappij "De Zeven Provincien" N.V., (H.L.) [1986] 2 Lloyd's Rep. 317; [1987] 1 A.C. 24;

Tracomin S.A. v. Sudan Oil Seeds Co. Ltd., [1983] 2 Lloyd's Rep. 624; [1983] 1 W.L.R. 1026.

This was an appeal by the defendant charterers Pagnan S.p.A. against the order of Mr. Justice Rix ([1994] 1 Lloyd's Rep. 168) given in favour of the plaintiff owners Aggeliki Charis Compania Maritima S.A. and holding in effect that the owners and charterers were entitled and obliged to refer certain claims and cross-claims between them to arbitration under the amended Centrocon arbitration clause in a voyage charter in the Synacomex form relating to the vessel Angelic Grace; and that the owners were entitled to an injunction restraining the charterers from pursuing against the owners in the Italian Courts the claims declared to be arbitrable.

The Hon. Peregrine Simon, Q.C. and Miss Sarah Lee (instructed by Messrs. Middleton Potts) for the charterers; Mr. Peter Gross, Q.C. and Mr. A. Baker (instructed by Messrs. Holman Fenwick & Willan) for the owners.

The further facts are stated in the judgment of Lord Justice Leggatt.

## JUDGMENT

**Lord Justice LEGGATT:** The defendant charterers, Pagnan S.p.A., appeal against the order of Mr. Justice Rix dated Oct. 22, 1993 made in favour of the plaintiff owners, Aggeliki Charis Compania Maritima S.A. By his order, the Judge (1) declared that the owners and charterers are entitled and obliged to refer certain claims and cross-claims between them to arbitration under the amended Centrocon arbitration clause in a voyage charter in Synacomex form dated London Oct. 2, 1992 relating to the vessel Angelic Grace; and (2) granted an injunction restraining the charterers from pursuing against the owners in the Court of Venice the claims declared to be arbitrable (see [1994] 1 Lloyd's Rep. 168).

The charterers' submissions before us were (1) that the claim before the Italian Court is not a claim which falls within the arbitration clause in the

| C.A.] | The "Angelic Grace" | [LEGGATT, L.J. |
|---|---|---|

charter-party; and (2) that even if it can be so characterized, the Court should not have granted an injunction, the effect of which, it is said, was to pre-empt the decision of the Italian Court as to its own jurisdiction.

The charter was a voyage charter. The circumstances in which the dispute came about are conveniently summarized by the Judge whose judgment is now reported at [1994] 1 Lloyd's Rep. 168. At p. 170 he said:

> The charter-party was for the carriage of grain from Rio Grande to two safe ports on the Italian Adriatic. In the event the charterers nominated Chioggia as a discharge port and thereby became entitled under a special "Chioggia Lightening Clause" to use Chioggia roads for lightening lighterage operations. The charterers called for discharge into *Clodia*, an unpowered open "floating elevator" which they owned. The two vessels were moored alongside one another for the purpose of the discharging operation. During deteriorating weather conditions in December, 1992 the master of the *Angelic Grace* deemed it prudent to move her position, with *Clodia* still moored alongside. During the manoeuvre the mooring lines connecting the two vessels either parted or were released on the advice of the master of *Clodia*, and as a result contact occurred between the two vessels, damaging both of them.

It should be said that bank guarantees have been given on behalf of both parties. That given on behalf of the owners is dated Dec. 23, 1992 and was for the purpose of securing payment of damages awarded by the Italian Court. That given on behalf of the charterers was dated the following day, and secured payment of damages awarded in arbitration proceedings in London.

In the course of the trial it seems that the owners offered to provide security in relation to the arbitration proceedings equivalent to what the charterers had obtained in relation to the Italian proceedings.

The arbitration proceedings were begun on Jan. 27, 1993. The amended Centrocon arbitration clause provided, so far as material, that:

> All disputes from time to time arising out of this contract shall . . . be referred to the arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic and engaged in the shipping and/or grain trades . . .

It was on Feb. 9, 1993 that the charterers began proceedings in the Court of Venice. It is those proceedings which the owners say is brought in breach of the arbitration clause and to which the injunction ordered by the Judge applies. That, it is common ground, is a claim in tort as a matter of

English law. It is said to arise, according to the charterers, on account of the negligent conduct of the master of *Angelic Grace* in manoeuvring his vessel in the circumstances which the Judge recounted in the passage I have read from his judgment.

The question in a nutshell is whether the relevant claims and cross-claims arise out of the contract. It is common ground that the question must be answered in the light of *The Playa Larga*, [1983] 2 Lloyd's Rep. 171, in which this Court upheld the dictum of Mr. Justice Mustill that a tortious claim does "arise out of" a contract containing an arbitration clause if there is a sufficiently close connection between the tortious claim and a claim under the contract. In order that there should be a sufficiently close connection, as the Judge said, the claimant must show either that the resolution of the contractual issue is necessary for a decision on the tortious claim, or, that the contractual and tortious disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other.

The respondent's case is that the Judge's approach exactly accorded with that dictum. At p. 172 of the report of his judgment, Mr. Justice Rix remarked that:

> There was in truth, little, if anything, between the parties as to the governing principles or the relevant authorities.

He then referred to the case of *Ashville Investments Ltd. v. Elmer Contractors Ltd.*, [1988] 2 Lloyd's Rep. 73; [1989] 1 Q.B. 488, for comments by Lords Justices Balcombe and Bingham sufficiently summarised in the words of the latter, who said at p. 90, col. 1; p. 517E:

> . . . I would be very slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings.

Relied on before the Judge and also in this Court by Mr. Simon, Q.C. for the charterers, was a passage from the judgment of Lord Justice May in the same case who said at p. 75, col. 1; p. 494B:

> . . . In seeking to construe a clause in a contract, there is no scope for adopting either a liberal or a narrow approach, whatever that may mean. The exercise which has to be undertaken is to determine what the words used mean. It can happen that in doing so one is driven to the conclusion that that clause is ambiguous, that it has two possible meanings. In those circumstances the Court has to prefer one above the other in accordance with settled principles.

Lord Justice May went on to remark that that was a well-recognized principle of construction, not the

consequence of adopting any particular approach to the question of construction, save, as he said:

> ... to ascertain the true intention of the parties and the correct meaning of the words used.

Also cited by Mr. Justice Rix was the pithy comment of Lord Justice Hoffmann in *Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Insurance Co. Ltd.*, [1993] 1 Lloyd's Rep. 455 at p. 470, where he said:

> The presumption [meaning a presumption in favour of what he called "one-stop adjudication"] merely reassures one that the natural meaning of the words produce a sensible and business-like result.

The Judge observed that:

> It was common ground between the parties that an appropriate clause could cover a claim in tort if there is a sufficiently close connection between a contractual and tortious claim ...

citing *The Playa Larga.*

The Judge referred also to a recent decision of Mr. Justice Steyn in *The Ermoupolis*, [1990] 1 Lloyd's Rep. 160 at p. 163, when he said:

> Clearly the matters to be proved, and therefore the potential issues, greatly overlap. That such closely related claims should be subject to different forms of dispute resolution, arbitration and litigation, possibly in different jurisdictions, would, in my view, hold no attraction for the reasonable businessman versed in the business of shipping.

Mr. Justice Rix summarized his conclusion on this topic by saying at p. 174:

> Applying these principles and following these authorities, I have no hesitation in holding that the so-called "collision claims" in the present case raised disputes which are within the arbitration clause. To some extent the claims in contract and in tort are true alternatives (for example the charterers' counterclaim). To some extent they may not be true alternatives, but they closely overlap (as in the owners' claims for breach of the warranty of safety and for fault in collision). In any event all claims and cross-claims arise out of the same incident, the identical set of facts which have to be investigated by the arbitrators. To the extent that the charterers' cross-claim in negligence, their claim cannot be adjudicated without considering the charter-party terms, not only the exceptions clause, but perhaps also cl. 33, which states that lightening and/or lighterage, if any, is to be at receivers' risk. The parties plainly contemplated that a collision or other accident of navigation could give rise to a charter-party dispute: see not only cl. 19, but also the Both to Blame Collision clause. Moreover,

the discharging operation which gave rise to all those claims was an integral part of the contractual adventure.

Power is lent to that conclusion by the case since decided in this Court of *Continental Bank N.A. v. Aeakos Compania Naviera S.A.*, [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588. Those were proceedings in which a stay was sought in relation to a loan agreement requiring the borrowers to submit to the jurisdiction of the English Courts. One issue raised was whether the English Courts had exclusive jurisdiction over disputes concerning the agreement, and the Court was also called upon to determine whether an injunction should be available to restrain the borrowers' action in the Greek Court against the lending bank.

The judgment of the Court was delivered by Lord Justice Steyn, who considered the same authorities as had Mr. Justice Rix in the present case. At p. 508, col. 2; p. 593D, Lord Justice Steyn said:

> ... If the defendants' contention is accepted, it follows that the two claims might have to be tried in different jurisdictions. That would be a forensic nightmare. Again, in the field of the construction of arbitration clauses the modern approach provides helpful guidance.

Having referred to the relevant authorities of *Ashville Investments Ltd. v. Elmer Contractors Ltd.*, [1988] 2 Lloyd's Rep. 73; [1989] 1 Q.B. 488, and *Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Insurance Co. Ltd.*, [1993] 1 Lloyd's Rep. 455, Lord Justice Steyn said:

> We are in respectful agreement with these observations, and there is no conceivable reason why the same approach should not apply to the construction of jurisdiction agreements.

The same is manifestly true in reverse.

In support of this issue, Mr. Simon made submissions about the ambit of the arbitration clause. He contended that English law does not construe arbitration clauses, either narrowly or liberally. As authority for that proposition, he referred, of course, to the judgment of Lord Justice May in *Ashville Investments Ltd. v. Elmer Contractors Ltd.* In *Continental Bank v. Aeakos S.A.*, Mr. Simon discerned what he called a move away from the ordinary construction, towards a presumption in favour of "one-stop adjudication". Before, however, the Court moved in that direction, he counselled caution on the ground that there is a danger in a presumption in favour of one-stop adjudication, because in any particular case it would be impossible to know where to draw the line. In relation to the intention of the parties, he asked three questions, which he described as rhetorical, but which in due course I shall endeavour to answer: Can the

[1995] Vol. 1          LLOYD'S LAW REPORTS                              91

C.A.]                          The "Angelic Grace"                         [LEGGATT, L.J.

parties have intended (a) that tortious claims should be heard not in the place where the tort was committed but in arbitration; (b) that a tort should have to be actionable as a matter of English law as well as by the law of the place where the tort was committed; and (c) that parties ·claiming would have to prove, as a matter of fact, that a tort was actionable in the place where it was committed?

The approach which Mr. Simon commended to this Court was, while accepting that the test propounded in *The Playa Larga* applies, to take the view that it is not enough to say that there is an argument that the contract impinges, as a matter of law, on the tortious claim. Here, he contends that the charterers are not going so far as to say that the claim is not arbitrable; they are simply concerned to make their claim, as they have, as soon as possible, in a convenient forum. This is not a case, as Mr. Simon reminds the Court, in which there are claims which are truly alternative. He submits that the real question is whether the dispute is contractual in its nature, or tortious albeit against a background of contract. He submits that the Court should conclude that it is the latter.

Where such general words have been chosen in an arbitration clause as "arise out of", it is not difficult to conclude that a particular dispute is within its terms. It is then that Judges have found room for the exercise of common sense, and have not readily been prepared to assume that the parties would have intended that cross-claims arising out of the same incident should be tried in different countries by different processes, that is by litigation and by arbitration.

I bear in mind that there may be difficulties inherent in a presumption of one-stop adjudication, but the answer, to my mind, to all three of Mr. Simon's questions, is that the parties may be taken to have intended that disputes between them about the performance of the charter-party, should be determined by the same tribunal as deals with disputes about its express terms. The difficulties relating to claims for torts committed abroad are due to their treatment under English law, not to the provisions of the arbitration agreement. While it is possible that, had the parties had their attention directed specifically to these difficulties, they might have made special provision for tortious claims, there is no warrant for inferring that the parties intended separate resolution of disputes caused by a collision involving the chartered vessel.

About Mr. Simon's argument that the Court should not be deflected from viewing a claim in tort independently from the charter-party by the possibility that the charter-party might be relied on by way of defence, I need say no more than that in the circumstances of this case the claim in tort cannot in my judgment be segregated from the cross-claims under the charter-party. The collision in the course of discharge operations under the charter on any view arose out of the contract, since the same facts founded the owners' claim in tort as founded the claims and cross-claims in contract.

The second main submission made by Mr. Simon was, as I have indicated, that the Judge ought not in the circumstances to have granted an injunction. The background against which he did so, as Mr. Peter Gross, Q.C. for the owners has indicated in his skeleton argument, although we have not called upon him orally, included the fact that a final decision had been made at trial that the claim pursued by the charterers in Italy was arbitrable, with the result that the continued pursuit of the Italian proceedings would be in breach of contract.

The charterers had, it must be remembered, submitted to the jurisdiction of the English Court for the purpose of determining whether their claim in Italy was arbitrable, and they had participated fully in the trial of that issue. It is also material that, as the Judge recorded in the course of his judgment, the charterers had made plain that they intended to proceed with their claim in Italy, even if the English Court were to hold that that claim was arbitrable.

The Judge, at pp. 181 and 182 of the report of his judgment, reviewed the relevant authorities and remarked:

> There is a risk that, if the Italian proceedings continue, the owners could suffer real prejudice, in the form of a binding judgment on the merits in Italy which would render their rights to arbitration nugatory.

The Judge said that he did not know what difficulties the owners might face in enforcing an award against the charterers in Italy, pending the determination of the Italian proceedings. He expressed the view that:

> ... in such circumstances the burden upon the charterers to persuade this Court that the position is in any real sense different just because the challenge to the Italian Courts' jurisdiction has not yet been determined is a heavy one.

> I bear in mind that the collision occurred in Italian waters and that, were it not for the parties' contract and their agreement to arbitrate, the Italian Courts would be the natural and appropriate forum for the adjudication of a claim arising out of such a collision. I am also fully conscious of the need for caution and the desirability of judicial comity in this area. Yet it seems to me that much greater damage is done to the interest which that caution and that comity are intended to serve, if this Court adjourns these proceedings to await the outcome of a challenge

LLOYD'S LAW REPORTS [1995] Vol. 1

LEGGATT, L.J.]                    The "Angelic Grace"                    [C.A.

to the jurisdiction in Italy, as Mr. Simon has urged me to do, and *then* proceeds to issue an injunction. Moreover, that could involve an adjournment of up to two years and waste considerable costs on the part of both parties.

The Judge mentioned that no reason for the persistence of the Italian proceedings had been advanced other than that the charterers wished to relitigate the question of the arbitration agreement's scope in relation to their claim in Italy. He added:

No evidence has been put before me of any argument or interest under Italian law why an Italian Court would do other than stay the proceedings under the mandatory provisions of the New York Convention.

Mr. Justice Rix concluded:

... the charterers have failed in this Court as a matter of English law, and have not even raised a scintilla of an argument as to why their rights in Italy should be any different.

The Judge said that in those circumstances he did not see why he should not conclude that their determination to press on in Italy is vexatious and, in his judgment, it was. The exercise of jurisdiction to grant an injunction, would, in the Judge's estimate, at this of all stages be the least possible interference to the Italian Courts.

Mr. Simon prefaced his submissions under this head by reminding the Court that, as a general principle, it does not enforce arbitration agreements by injunction, but negatively by stay or by refusing to enforce a foreign judgment made notwithstanding an arbitration agreement. Relevant in this context is the fact that English Courts do not regard a party as acting vexatiously by issuing proceedings, despite the fact that there is an apparently governing arbitration agreement.

According to Mr. Simon, although in the past English Courts have been prepared to grant injunctions in circumstances such as these, in recent years they have done what he describes as "exercised caution" on the ground that to grant an injunction would constitute an interference with the judicial process of another State. As my brother Lord Justice Millett remarked in argument, one must be a little careful in one's approach to the word "caution". The exercise of caution does not involve that the Court refrains from taking the action sought, but merely that it does not do so except with circumspection.

Mr. Simon referred to *Pena Copper Mines Ltd. v. Rio Tinto Co. Ltd.*, (1911) 105 L.T. 846. That case concerned a contract made in England containing an arbitration clause. Rio Tinto began proceedings in a Spanish Court in breach of contract. This Court had to consider whether there was jurisdiction to do so, as Mr. Justice Swinfen Eady had held. The

Master of the Rolls, Sir Herbert Cozens-Hardy, felt no doubt about the matter, and indeed, it should be said, the respondents were not called on in that case. At p. 851 he said:

But to contend that as regards any breach of a clear contract made between the plaintiffs and the defendants the court cannot restrain the defendants — who have contracted that they will not sue in a foreign court — from so suing is a proposition to which I think no sanction ought to be given by this court and which is certainly quite unwarranted by any authority that I am aware of.

Lord Justice Fletcher Moulton considered the position of arbitration clauses before saying at p. 852:

... the status of an arbitration clause in England is that it will not be specifically enforced, but by proper proceedings you can prevent the other party from appealing to the English Courts in respect of any matter which by contract ought to be decided by arbitration.

Later on the same page he added:

In the present case by bringing an action in the Spanish court the Rio Tinto Company are depriving the Pena Company, the plaintiffs in the present action, of the right to apply to our courts to prevent this dispute from being decided in any other way than by arbitration. Therefore we ought to exercise our powers *in personam* to prevent that line of conduct taking effect which is certainly contrary to their contractual duties. Of course if it was a question of discretion — and it certainly is — I agree with what the Master of the Rolls has said, to the effect that this is a case in which certainly we ought to exercise our discretion.

Also cited by Mr. Simon for its reiterated references to caution, was *The Lisboa*, [1980] 2 Lloyd's Rep. 546, a case in which cargo-owners had towed a vessel to a discharging port and arrested it in Italy. The bill of lading contained an exclusive jurisdiction clause affording jurisdiction to the English Court, and the question was whether the owners' application for an injunction restraining the cargo-owners from proceeding with the arrest should be granted.

The approach of the Court is sufficiently seen from the judgment of Lord Justice Dunn at p. 552 where he said:

The question at the end of the day is whether the arrest of the vessel was so vexatious and oppressive that the defendants ought to be ordered by mandatory injunction to release her. It is said on behalf of the plaintiffs that the effect of not granting the injunction will be to enable the defendants to take advantage of their breach of the exclusive jurisdiction clause and that the

cases show that the Courts are astute to hold parties to their agreements especially as to jurisdiction and arbitration clauses. That is certainly right. But there are other considerations here. There is no suggestion that the merits of the defendants' claim will be litigated in the Italian Courts. The only purpose in arresting the vessel was to provide security in the event of the defendants succeeding in the English proceedings. The arrest of a ship is a very common and recognized proceeding in all maritime countries. And the remedy of arrest was not available to the defendants in England because the vessel was not here, and was only available in Italy. In this case there is reason to suppose that if the vessel were released the plaintiffs would be unable to satisfy any judgment against them. The counterclaim itself is not vexatious. In those circumstances, I cannot see anything oppressive in the defendants' action.

It is to be observed that the Court was permitting an exception to the operation of the exclusive jurisdiction clause, and doing so in order to maintain the arrest of a ship, which constituted the sole security for the cargo-owner's action properly constituted before our Courts.

Mr. Simon submits that an injunction will not be granted merely because there is a breach of an exclusive jurisdiction clause or an arbitration clause. Great caution should be exercised before granting an injunction. Whether the conduct of a defendant is at the stage when the discretion is exercised so vexatiously as to require an injunction, is the test which the Court should apply. He referred us to *South Carolina Insurance Co. v. Assurante Maatschappij "De Zeven Provincien" N.V.*, [1986] 2 Lloyd's Rep. 317; [1987] 1 A.C. 24, a case in which the House of Lords were concerned with an action brought in England, and defendants who nonetheless lodged a petition in the District Court in the United States seeking pre-trial discovery. The question was whether the defendants should be restrained from proceeding with the petition in exercise of the Court's inherent jurisdiction. At p. 324, col. 1; p. 39 of the reports, delivering the principal speech, Lord Brandon of Oakbrook considered the basic principles governing the grant of injunctions in the High Court. After referring to the first such principle as being that the power is statutory, and to the second as being that although the jurisdiction is very wide, it has in practice been circumscribed by the practice of the Court, so as ordinarily to grant it only when one party to an action can show that the other party has invaded a legal or equitable right, or one party to an action has behaved in a manner which is unconscionable, he said at p. 324, col. 2; p. 40D:

... The third basic principle is that, among the forms of injunction which the High Court has power to grant, is an injunction granted to one party to an action to restrain the other party to it from beginning, or if he has begun from continuing, proceedings against the former in a foreign Court. Such jurisdiction is, however, to be exercised with caution because it involves indirect interference with the process of the foreign Court concerned.

Mr. Simon's citation of the case ended at that point, but it is necessary to read the next paragraph to understand the context in which Lord Brandon was referring to his third specific principle. He continued at p. 324, col. 2; p. 40E:

The latter form of injunction may be granted in such circumstances as to constitute an exception to the second basic principle stated above. This may occur where one party has brought proceedings against another party in a foreign Court which is not the forum conveniens for the trial of the dispute between them, as that expression was defined and applied in *MacShannon v. Rockware Glass Ltd.*, [1978] A.C. 795. In such a case the party who has brought the proceedings in the foreign Court may not, by doing so, have invaded any legal or equitable right of the other party, nor acted in an unconscionable manner. The Court nevertheless has power to restrain him from continuing his foreign proceedings on the ground that there is another forum in which it is more appropriate, in the interests of justice, that the dispute between the parties should be tried.

The same principle would be applicable in the circumstances of the present case. As I have already indicated, since Mr. Justice Rix gave judgment in this case, the charterers have additionally been confronted by the decision of this Court in *Continental Bank N.A. v. Aeakos Compania Naviera S.A.*, [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588, in relation to the grant of an injunction and in particular the exercise of discretion under English law. Lord Justice Steyn referred to the argument of Counsel in that case which has a striking resemblance to that of Mr. Simon in the present case. He said at p. 511, col. 2; p. 597G:

Miss Dohmann emphasized that the Greek Court is the Court first seised with the substantive action. She said that it would be wrong for the English Court to decide that the Greek Court does not have jurisdiction. The question whether the Greek Court has jurisdiction ought to be left to the Greek Court. The English Court ought to trust the Greek Court. The injunction will operate as an indirect interference with the workings of a Community Court. Such an injunction should only be granted if the pursuit of the

remedy in the foreign Court would be vexatious and oppressive. That test is not satisfied. For these reasons, Miss Dohmann submitted, the Judge erred in not staying the English action, but, in any event, she said, he plainly erred in exercising his discretion in favour of the granting of an injunction.

Lord Justice Steyn mentioned that in the case then before the Court there had arguably been a submission to the jurisdiction, but he made clear that the Court did not rest its judgment on that point. He referred also to the fact that when objecting to jurisdiction it was necessary for the purposes of Greek law to file a defence on the merits with the supporting evidence, an expensive process. But once more he made plain that the Court did not rest its judgment on that point.

He concluded at p. 512, col. 1; p. 598E by saying:

> In our view the decisive matter is that the bank applied for the injunction to restrain the defendants' clear breach of contract. In the circumstances, a claim for damages for breach of contract would be a relatively ineffective remedy. An injunction is the only effective remedy for the defendants' breach of contract. If the injunction is set aside, the defendants will persist in their breach of contract, and the bank's legal rights as enshrined in the jurisdiction agreements will prove to be valueless. Given the total absence of special countervailing factors, this is the paradigm case . . .

and I complete my citation from the judgment by supplementing the language of the Law Report from [1994] 1 Lloyd's Rep. 505 at p. 512, col. 1. The Judge continued:

> . . . this is the paradigm case for the grant of an injunction restraining a party from acting in breach of an exclusive jurisdiction agreement. In our judgment the continuance of the Greek proceedings amounts to vexatious and oppressive conduct on the part of the defendants. The Judge exercised his discretion properly.

Confronted by that authority, which has considerably increased Mr. Simon's difficulties since he was before the Judge, he urges that this Court (in a memorable phrase) should "robustly restrain" itself. In effect, he asks the Court, notwithstanding the *Continental Bank* case, still to approach the resolution of the present problem with diffidence. He submits that a plaintiff cannot overcome the reluctance of an English Court to grant an injunction in circumstances such as these by dubbing foreign proceedings as vexatious or oppressive. That diffidence, as he submits, should be heightened where the foreign proceedings are properly within the jurisdiction of the foreign Court. The

country of the foreign Court has bound itself to recognize arbitration agreements, and has done so by a treaty which envisages that the Court should give effect to an arbitration clause. Those references are to the New York Convention, 1958, art. II, par. 1 of which provides:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any difficulties which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

More pertinently, and invoked by Mr. Simon, is par. 3 of that article which provides that:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

It seems to me, however, that that provision does not confer an exclusive jurisdiction on the Court of the Contracting State concerned; and it is consonant with that provision that the Court of another Contracting State should make an order procuring the same result.

The present case is, as my brother Lord Justice Steyn would say, the paradigm case for the prompt issue of an injunction. The charter here is governed by English law. According to English law, the arbitration clause extends to claims in tort. Proceedings in a foreign Court are in breach of contract, so an injunction can issue to restrain them. If no injunction issues, a foreign Court will either decline or accept jurisdiction. If, as we are entitled to assume it would, the Italian Court were to decline jurisdiction, those proceedings would have constituted a waste of time and money. If, on the other hand, the Italian Court were to accept jurisdiction, any injunction then issued would directly conflict with the deliberate assumption of jurisdiction by the foreign Court. The owners would also be set at risk of being held to have submitted to the jurisdiction of the foreign Court. In the absence of submission, the undesirable process would then occur envisaged by this Court in *Tracomin S.A. v. Sudan Oil Seeds Co. Ltd.*, [1983] 2 Lloyd's Rep. 624; [1983] 1 W.L.R. 1026 and the arbitrator's award would have to be for any damage held by them to have been suffered by the owners, in excess of any sum found due from them by the Italian Court. But if there were held to have been a submission, there would follow two parallel sets of proceedings where the arbitration clause had been contractually designed

# LLOYD'S LAW REPORTS

C.A.] **The "Angelic Grace"** [LEGGATT, L.J.

to ensure that there was only one. If the charterers are not restrained from pursuing the Italian proceedings and the Italian Court exercised jurisdiction, then the question would arise, referred to by the Judge, whether a judgment by the Italian Court on the merits of the charterers' claim would be recognized or enforced in England.

The approach suggested by Mr. Gross on behalf of the owners to that dilemma is this. If such a judgment would not be recognized and enforced in England, then an injunction to restrain the charterers from seeking to obtain such a judgment is appropriate because the continuance of the Italian proceedings would only lead to multiplicity of proceedings and additional inconvenience and expense, whereas, if such a judgment would be recognized and enforced in England, then a fortiori the only effective remedy for the charterers' breach would be an injunction preventing them from seeking to obtain such a judgment.

It was to avoid predicaments of this kind that in the exercise of his discretion the Judge granted the injunction. No reason was advanced before him, or before us, why the Italian Court might come to a different conclusion. It was an undisguised attempt by the charterers to have another bite at the same cherry, in the hope, presumably, that the domestic Court might irrationally come to a conclusion favourable to them.

Mr. Simon crowns his submissions with the contention that "the proper approach", as he terms it, of the English Courts, is to leave to the local Court the question whether it should decline jurisdiction or not. Alternatively, he submits that this Court should defer the grant of an injunction until it is clear, as he puts it, that "something has gone wrong", in other words, that the Italian Court has accepted jurisdiction.

In aid of this submission, Mr. Simon relies on *The Golden Anne*, [1984] 2 Lloyd's Rep. 489, in which Mr. Justice Lloyd was concerned with a case in which the plaintiffs had let their vessel to the defendants for a period of five years. The charter contained an arbitration clause. While the vessel was discharging in Florida, one of the longshoremen employed by the stevedoring company sustained personal injuries. He brought proceedings against the plaintiffs in Florida, and some time later he joined as defendants several other companies, including the defendants in the proceedings before Mr. Justice Lloyd. One of the issues for his decision was whether he should grant an injunction to prevent the arbitrator's award in proceedings brought between the plaintiffs and the defendant from being pre-empted by a decision of the United States District Court before which both plaintiffs and defendants were parties.

The Judge dealt with this matter at p. 498 of the report by pointing to the need for caution and judicial comity and remarking that the desirability of leaving the decision whether or not to grant a stay, or as the American Court would term "continuance", was a matter for the District Court. He said:

> I recognize that the District Court may refuse a stay; in which case the unfortunate result will follow that if Daiichi's motion for summary judgment is rejected, there will be concurrent proceedings on both sides of the Atlantic. Obviously I hope that that will not happen. But to my mind it is better to run that risk, rather than grant an injunction which will, in effect, operate as a stay of the Florida proceedings. That is a function which belongs properly to the District Court, and may still, I hope, be exercised by that Court. This Court should not appear to usurp that function, except as a last resort.

It is not altogether clear what the Judge meant by that last expression, although he may be taken to have contemplated that it would still be open to this Court to grant an injunction in the event that the District Court came to a conclusion other than that to which he hoped it would come.

In the circumstances of that case, an injunction would have had the effect of frustrating proceedings before the District Court which by then were far advanced. The Judge therefore thought it appropriate to leave that decision to that Court.

Mr. Simon, by reference to that case in particular, urged us to conclude that by cutting the Gordian Knot, the Judge was not adopting "the proper approach". For my part, I do not contemplate that an Italian Judge would regard it as an interference with comity if the English Courts, having ruled on the scope of the English arbitration clause, then seek to enforce it by restraining the charterers by injunction from trying their luck in duplicated proceedings in the Italian Court. I can think of nothing more patronising than for the English Court to adopt the attitude that if the Italian Court declines jurisdiction, that would meet with the approval of the English Court, whereas if the Italian Court assumed jurisdiction, the English Court would then consider whether at that stage to intervene by injunction. That would be not only invidious but the reverse of comity. The Judge was not deterred from rejecting this approach by *The Golden Anne* and, in my judgment, he was right not to be deterred.

That case is sufficiently explained as an exercise of discretion in the light of the foreign Court's past history of involvement. It is not to be regarded as authority for the proposition that it is wrong in principle to grant an injunction before the foreign Court has decided whether to assume jurisdiction or

reject it in favour of arbitration. That it is not wrong in principle to do so is plain from the recent decision of this Court in *Continental Bank.*

Contrary to Mr. Bumble's view, the law is not normally "an ass" and comity does not require it to behave like one. In my judgment, the Judge's conclusion that the charterers' maintenance of proceedings in Venice are vexatious is correct in the circumstances, and his consequent exercise of discretion in favour of granting an injunction was unassailable. I pay my tribute to his careful judgment which has made possible, and I hope appropriate, the summary treatment in this Court of Mr. Simon's arguments. I endorse the Judge's order and would dismiss the appeal.

**Lord Justice MILLETT:** I agree and wish only to add a few observations of my own on the approach which the Courts should adopt when asked to exercise its undoubted jurisdiction to restrain a party from taking or continuing proceedings in a foreign Court in breach of an agreement to refer the dispute to arbitration.

In my judgment, the time has come to lay aside the ritual incantation that this is a jurisdiction which should only be exercised sparingly and with great caution. There have been many statements of great authority warning of the danger of giving an appearance of undue interference with the proceedings of a foreign Court. Such sensitivity to the feelings of a foreign Court has much to commend it where the injunction is sought on the ground of forum non conveniens or on the general ground that the foreign proceedings are vexatious or oppressive but where no breach of contract is involved. In the former case, great care may be needed to avoid casting doubt on the fairness or adequacy of the procedures of the foreign Court. In the latter case, the question whether proceedings are vexatious or oppressive is primarily a matter for the Court before which they are pending. But in my judgment there is no good reason for diffidence in granting an injunction to restrain foreign proceedings on the clear and simple ground that the defendant has promised not to bring them.

The Courts in countries like Italy, which is a party to the Brussels and Lugano Conventions as well as the New York Convention, are accustomed to the concept that they may be under a duty to decline jurisdiction in a particular case because of the existence of an exclusive jurisdiction or arbitration clause. I cannot accept the proposition that any Court would be offended by the grant of an injunction to restrain a party from invoking a jurisdiction which he had promised not to invoke and which it was its own duty to decline.

In *The Golden Anne,* [1984] 2 Lloyd's Rep. 489, the Court refused a similar injunction because the

foreign Court had not yet ruled on an application to stay the proceedings in favour of arbitration in London. We were pressed to follow that decision and leave it to the Italian Court to determine the limits of its own jurisdiction, even though that jurisdiction depended upon a question of construction of a contract governed by English law.

We should, it was submitted, be careful not to usurp the function of the Italian Court except as a last resort, by which was meant, presumably, except in the event that the Italian Court mistakenly accepted jurisdiction, and possibly not even then. That submission involves the proposition that the defendant should be allowed, not only to break its contract by bringing proceedings in Italy, but to break it still further by opposing the plaintiff's application to the Italian Court to stay those proceedings, and all on the ground that it can safely be left to the Italian Court to grant the plaintiff's application. I find that proposition unattractive. It is also somewhat lacking in logic, for if an injunction is granted, it is not granted for fear that the foreign Court may wrongly assume jurisdiction despite the plaintiffs, but on the surer ground that the defendant promised not to put the plaintiff to the expense and trouble of applying to that Court at all. Moreover, if there should be any reluctance to grant an injunction out of sensitivity to the feelings of a foreign Court, far less offence is likely to be caused if an injunction is granted before that Court has assumed jurisdiction than afterwards, while to refrain from granting it at any stage would deprive the plaintiff of its contractual rights altogether.

In my judgment, where an injunction is sought to restrain a party from proceeding in a foreign Court in breach of an arbitration agreement governed by English law, the English Court need feel no diffidence in granting the injunction, provided that it is sought promptly and before the foreign proceedings are too far advanced. I see no difference in principle between an injunction to restrain proceedings in breach of an arbitration clause and one to restrain proceedings in breach of an exclusive jurisdiction clause as in *Continental Bank N.A. v. Aeakos Compania Naviera S.A.,* [1994] 1 W.L.R. 588. The justification for the grant of the injunction in either case is that without it the plaintiff will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy. The jurisdiction is, of course, discretionary and is not exercised as a matter of course, but good reason needs to be shown why it should not be exercised in any given case.

I agree that *The Golden Anne* should be regarded as having been decided on its own special facts and that this appeal should be dismissed.

**Lord Justice NEILL:** I agree that this appeal should be dismissed for the reasons given by my Lords. It is unnecessary for me to add anything except to endorse the approach suggested by Lord Justice Millett as to the grant of an injunction in cases where an exclusive jurisdiction clause or an arbitration agreement has provided that the proceedings between the parties should be brought in the manner agreed between the parties in the clause or in the arbitration agreement, and therefore the foreign proceedings are in contravention either of the clause or of the agreement. I too would dismiss the appeal.

[*Order: Appeal dismissed with costs. Application for leave to appeal to the House of Lords refused.*]

[Ed. Note: The defendants subsequently petitioned the House of Lords for leave to appeal. That petition was dismissed.]

---

# COURT OF APPEAL

July 20 and 21, 1994

---

### CEMENTATION PILING AND FOUNDATIONS LTD.
v.
### AEGON INSURANCE CO. LTD. AND COMMERCIAL UNION INSURANCE CO. PLC.

Before Lord Justice RUSSELL
Lord Justice WAITE and
Sir RALPH GIBSON

**Insurance (Contractors All Risks) — Construction — Plaintiffs contractually bound to carry out works at Barrow-in-Furness docks — Defects in design material and workmanship —Plaintiffs required to remedy defects — Whether rectification of defects within insurance cover.**

By a sub-contract dated Nov. 15, 1983, the plaintiffs contracted with Sir Alfred McAlpine and Son Ltd. to carry out, complete and maintain bored, piling and continuous diaphragm walls forming part of a series of quays to be constructed within the existing docks at Barrow-in-Furness. The whole project included the filling and reclaiming of a redundant part of the Devonshire Dock.

The area was reclaimed from the sea by depositing pumped sand dredged from Morecambe Bay to form a land area or berm some seven hectares in area protruding $2\frac{1}{2}$ metres above sea level.

The diaphragm walls were constructed by excavating cavities in the sand in the precise shape of the concrete sections which would form the diaphragm walls of the dock. As the excavations were carried out the cavities were continuously filled with liquid bentonite which maintained the integrity of the cavity. Steel reinforcement cages were lowered into the cavity which was then filled with liquid concrete through a "tremi" pipe at the foot of the cavity. At the joints between the sections one metre side panels were cast in such a shape as to enable the next panel to abut and provide a tight fit behind the diaphragm wall in the finished dock. Upon completion of the sections the sand in the centre was dredged out to a depth of 19 metres and removed allowing seawater to enter and take its place.

In September 1985 it was discovered that quantities of sand fill which had previously been placed in the area retained by the walls had escaped into the newly constructed docks. It was discovered that in a number of places there were gaps and voids between adjacent panels which had permitted sand to escape. There were also places where the steel reinforcement for the panels were exposed or where the reinforcement was inadequately covered by concrete.

The plaintiffs were obliged to carry out works to remedy these matters. It was accepted by the parties that the need for these works arose from defects in design materials and workmanship. The losses suffered

708                    CHANCERY DIVISION.                    **[1938]**

C. A.              BEATTIE *v.* E. & F. BEATTIE, LIMITED.

1938

June 1, 2.              [1936.  B.  4661.]

*Company—Director—Claim that sums improperly paid by him to himself and to another out of company's funds—Representative action—Motion for stay of proceedings—Article containing reference to arbitration—Companies Act,* 1929 (19 & 20 Geo. 5, c. 23), *s.* 20.

The Companies Act, 1929, s. 20, sub-s. 1, provides : " Subject "to the provisions of this Act, the memorandum and articles "shall, when registered, bind the company and the members "thereof to the same extent as if they respectively had been "signed and sealed by each member, and contained covenants "on the part of each member to observe all the provisions of the "memorandum and of the articles."

*Held* (affirming the decision of the Vice-Chancellor of the County Palatine Court of Lancaster on this point), that, even if a particular article of a private company was wide enough to make it apply to a dispute between the company and a member in his capacity of a director and provided for reference of such a dispute to arbitration, s. 20 of the Act did not give contractual force to the article in reference to such a dispute so as to constitute it, for the purpose of that dispute, a written agreement for submission to arbitration within s. 4 of the Arbitration Act 1889.

*Hickman* v. *Kent or Romney Marsh Sheep-Breeders' Association* [1915] 1 Ch. 881, approved and applied.

APPEAL from the Vice-Chancellor of the County Palatine Court of Lancaster.

E. & F. Beattie, Ld., was incorporated on December 13, 1900, under the Companies Acts as a company limited by shares with a nominal capital of 4000*l.*, divided into 4000 shares of 1*l.* each, of which 3228 had been issued and were fully paid. Until the death of Frank Beattie, the husband of the plaintiff Margaret Jane Beattie, the issued shares of the company were held by Frank Beattie and the defendant Ernest Beattie in equal shares. Since the death of Frank Beattie the plaintiff had become and still was the registered holder of 1614 shares. The remaining 1614 shares were at all material times registered as to 1514 in the name of Ernest Beattie and 100 in the name of Edward Beattie, the son of Ernest Beattie.

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

Since the death of Frank Beattie the only directors of the company had been the defendant Ernest Beattie and the plaintiff.  The defendant Ernest Beattie was the chairman of directors and the managing director and on July 18, 1935, Edward Beattie was appointed to be secretary of the company.

On December 30, 1936, the plaintiff commenced proceedings on behalf of herself and all other members of the company, except the defendant Ernest Beattie, against the company and Ernest Beattie, claiming a declaration that she, through or in company with her authorized agent, was entitled to inspect all books and accounts of the company including the minutes of the proceedings of the directors, and an injunction accordingly restraining the defendants from excluding her or her agent from such inspection, and a declaration that a resolution to increase the capital of the company to 14,000*l*. purported to be passed at a meeting of directors was invalid and an injunction accordingly.

After the pleadings in the action were delivered, the plaintiff applied by summons on December 22, 1937, for liberty to amend the writ and the statement of claim.  The proposed additional claims to be added to the writ and statement of claim raising new issues were :—

(*a*) " An injunction restraining the company, its agents "and servants from paying to the defendant Ernest Beattie "and the defendant Ernest Beattie from drawing from the "funds of the company any sums by way of remuneration "not authorized by a resolution of the company in general "meeting."

(*b*) " An injunction restraining the defendants their servants "and agents from paying to or on account of the said Edward "Beattie or . . . . Fred D. Beattie out of the funds of the "company any sums by way of remuneration or otherwise "not authorized by the terms of a valid and subsisting service "agreement or by a resolution of the board of directors."

(*c*) " An order upon the defendant Ernest Beattie to repay "to the company all sums improperly paid to or on account "of or drawn by the defendant Ernest Beattie, the said "Edward Beattie or the said Fred D. Beattie out of the

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE
LD.

"funds of the company subsequently to the death of the said "Frank Beattie."

(*d*) " If necessary, an inquiry what sums have been paid or "drawn by the defendant Ernest Beattie the said Edward "Beattie and the said Fred D. Beattie or any of them out "of the funds of the company subsequently to the death of "the said Frank Beattie and how much of such sums have been "improperly paid or drawn."

The case made against the defendant Ernest Beattie in the suggested amendments to the statement of claim was, first, that in respect of the years ended April 5, 1934, to April 5, 1937, he had drawn sums amounting to 6186*l.* 7*s.* 5*d.*, purporting to be the sum of 20*l.* a week by way of salary and the residue as bonuses ; and that there had at no time been any resolution, either of the company in general meeting or of the board of directors, authorizing these payments. Secondly, it was said that by a resolution of the directors at a meeting held on July 18, 1935, Edward Beattie was appointed secretary to the company at such remuneration as should from time to time be agreed between the directors, and at the same meeting it was resolved that he should be paid a commission of 5 per cent. on the profits of the business including the year 1932 ; and that otherwise no resolution had been passed fixing his remuneration. The defendant Ernest Beattie had nevertheless caused to be paid out of the funds of the company to or on account of Edward Beattie in respect of the years ended April 5, 1934, to April 5, 1937, sums amounting to 5454*l.* 11*s.* 8*d.*, of which the sums paid in respect of the years ending April 5, 1935, and April 5, 1936, were made up of salary at the rate of 20*l.* per week, bonuses and sums for income tax. The bonuses paid in these two years alone exceeded the commission of 5 per cent. on the profits of the company's business. Complaint was also made as to two small sums paid to Fred D. Beattie, another son of the defendant Ernest Beattie, and an employee of the company.

On December 30, 1937, the defendant Ernest Beattie gave notice of motion by which he moved that all further proceedings upon the summons taken out by the plaintiff

on December 22, 1937, should be stayed until further order
pursuant to s. 4 of the Arbitration Act, 1889, in view of
the submission to arbitration contained in art. 133 of the
articles of association of the defendant company.

Art. 133 of the company's articles of association provides :
"Whenever any doubt, difference, or dispute shall arise
"between any members of the company, or between the
"company and any member or members (and for the purpose
"of this article the word ' member ' shall include any person
"claiming through or under a member) touching the con-
"struction of these presents, or any article herein contained,
"or any provision or regulation to be substituted for or added
"to the articles herein contained, or any of them ; or the
"conduct, affairs, business or interest thereof, or any act or
"default of the directors, or any of them, the members of the
"company respectively, shall not take proceedings at law in
"respect of such doubt, difference, or dispute, but the same
"shall be referred to two arbitrators or their umpire, pursuant
"to and so with regard to the mode and consequences of the
"reference, and in all other respects to conform to the provi-
"sions in that behalf contained in the Arbitration Act, 1889,
"or any then subsisting statutory modifications thereof ; and
"these presents may be made a rule of any decision of the
"High Court of Justice."

The Vice-Chancellor said that the action so far as the
amendments in question were concerned was in substance an
action by and on behalf of the company against a director,
or possibly managing director, for breach of trust as an agent.
That seemed at once to raise a question on the construction
of art. 133, of which the material words were " Whenever
"any doubt, difference, or dispute shall arise between . . . .
"the company and any member or members . . . . touching
". . . . any act or default of the directors or any of them
". . . ." Such an article should be construed strictly. It
did not follow that all the members would be directors or
that the directors would necessarily be members, as a director
might act before acquiring his qualification shares. That
being so, it would be giving a very liberal construction to

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

C. A.

1938

BEATTIE

*v.*

E. & F.

BEATTIE,

LD.

art. 133 to hold that it covered any doubt, difference or dispute between the company and any member or members in his or their capacity as directors ; and it could not be so read. It was an article which dealt with disputes arising between the company or the members in their capacity of members. If that construction was right, there was in this case no agreement to submit to arbitration the matters raised by the proposed amendments.

But assuming that art. 133 did apply to such a dispute, a very difficult question arose as to the effect to be given to an article of this kind having regard to s. 20 of the Companies Act, 1929, which provided in sub-s. 1 : " Subject to the "provisions of this Act, the memorandum and articles shall, "when registered, bind the company and the members thereof "to the same extent as if they respectively had been signed "and sealed by each member, and contained covenants on "the part of each member to observe all the provisions of "the memorandum and of the articles."

That section, which appeared originally in the Companies Act, 1862, had given rise to a number of decisions which were difficult to reconcile. He had been referred to *Hickman* v. *Kent or Romney Marsh Sheep-Breeders' Association* (1), where Astbury J. reviewed the cases with great care. The question seemed to be whether art. 133 properly constituted a contract between the company and Ernest Beattie in his capacity of director, because he was also a member. There seemed no doubt that articles of association did not in themselves constitute a contract between a company and a director : *In re Wheal Buller Consols* (2) and *In re New British Iron Co.* (3)

If his interpretation of the authorities was right, he considered that he was bound to hold that art. 133, having the effect given to it by s. 20 of the Companies Act, 1929, did not constitute an agreement between the company and the defendant director in his capacity as director, even though he was a member of the company. He would there-fore allow the amendments in the statement of claim, the

(1) [1915] 1 Ch. 881.          (3) [1898] 1 Ch. 324.
(2) (1888) 38 Ch. D. 42.

1 **Ch.**                  CHANCERY DIVISION.                    713

plaintiff paying the costs of the application and the costs of or occasioned by the amendment, and the motion would be dismissed with costs.

The defendant Ernest Beattie appealed. The appeal was heard on June 1 and 2, 1938.

*Cleveland-Stevens K.C.* and *R. A. Forrester* for the appellant. The Vice-Chancellor was wrong in refusing a stay of the proceedings under s. 4 of the Arbitration Act, 1889, pursuant to the arbitration clause contained in art. 133 of the company's articles of association. This is really a family squabble between the plaintiff, who holds half the shares of the company, and the defendant and his son, who hold the remaining half. Further, there are only two directors, the plaintiff and the defendant, and the chairman has no casting vote ; and at a general meeting, if a poll was demanded, there would be the same division of voting power and again no casting vote. Therefore on a matter on which the plaintiff and defendant disagree there is a complete deadlock. The questions it is sought to raise by the amendments to the statement of claim relate to payments made by the defendant to himself as managing director and to his son as secretary, and it will be said that these payments were justified by an established practice taken together with the resolutions passed. The arbitration clause, art. 133, relates to disputes between members of the company or between the company and any member or members. Further, one of the subject-matters of such a dispute is " any act or default of the directors or any "of them." It is contended therefore that the article applies directly to the present case and it is immaterial whether it is regarded as a dispute between members or as a dispute between the company and a member. An article which deals with the rights of directors or managing directors constitutes a contract not only between the members inter se but also between members and the company : *Salmon* v. *Quin & Axtens, Ld.* (1)

(1) [1909] 1 Ch. 311 ; [1909] A. C. 442.

*Margin:*
C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

714                    CHANCERY DIVISION.              [1938]

C. A.
1938

BEATTIE
v.
E. & F.
BEATTIE,
LD.

[SIR WILFRID GREENE M.R.  That was a case where the plaintiff's right as member was being enforced.]

So here the defendant as a member is asserting his right to have a question in regard to his acts as a director referred to arbitration.  He is asserting a right common to all members, and a recognized subject-matter to which the arbitration clause applies is the act or default of a director.  This is not a case where the defendant is asking for the benefit of some provision in his capacity of director, but he is seeking to assert a right common to him and every other member of having the particular subject-matter referred to arbitration. The article constitutes a contract of which the defendant is entitled to the benefit by virtue of s. 20 of the Companies Act, 1929.  *Salmon* v. *Quin & Axtens, Ld.* (1) is of great importance, because it shows that whether the dispute here be regarded as one between members inter se or as one between the company and the member, art. 133 applies.  In *Eley* v. *Positive Government Security Life Assurance Co.* (2) the plaintiff was employed by the company as solicitor, but he was not a member of the company, he could therefore only enforce an article dealing with his employment in so far as it was embodied in his contract of employment.  The root distinction here is that the defendant as a member seeks to enforce art. 133.  It is not as if he was claiming something as director to which no ordinary member would be entitled. The defendant is not relying on his being a director but claiming as a member to have a dispute as to the acts or defaults of himself as director determined by arbitration, and the subject-matter of the dispute comes directly within art. 133.

[SIR WILFRID GREENE M.R.  The dispute here is between the company or a member of the company and a servant of the company.]

A member is not less a member because he happens to be a director.  If any limit is to be placed on art. 133 it must be by limiting the class of subject-matter to which it relates and not by limiting the class of disputants : see *Piercy* v. *Young.* (3)

(1) [1909] 1 Ch. 311.          (3) (1879) 14 Ch. D. 200, 204,
(2) (1876) 1 Ex. D. 20.          210.

1 Ch.            CHANCERY DIVISION.                    715

[SIR WILFRID GREENE M.R.  Does not s. 20 of the Companies Act, 1929, operate only to give the articles of association a contractual effect between members of the company as such ?]

It is submitted that as a result of the effect given to art. 133 by s. 20 of the Act, a member binds himself to go to arbitration in respect to matters as regards which he has a relation to the company other than that of a member ?  The shareholder is bound as an individual, and the only limit to the contractual relationship is that he is bound only as regards matters that affect him as a shareholder :  see the line of cases culminating in *Hickman* v. *Kent or Romney Marsh Sheep-Breeders' Association.* (1)

[They also referred to *Imperial Hydropathic Hotel Co., Blackpool* v *Hampson.* (2)]

*R. F. Roxburgh K.C.* and *Harold Brown* for the respondent. The contention on the construction of art. 133 that any limitation on its effect must be in regard to the subject-matter of the dispute and not in regard to the disputants is unsound.  That may be true when the disputants are specified persons, but not when, as here, they are described as members of a class.  Here the words " in the capacity of members " should be read into art. 133.  There is no other limit which can be given to s. 20 of the Act of 1929 in construing it, and that is what is done in practice, as was indicated by Astbury J. in *Hickman's* case. (3)

[SCOTT L.J.  Do you say that the word " member " in art. 133 can have no wider meaning than it does in s. 20 ?]

Yes.  In this connection *Isaacs* v. *Chapman* (4) is directly applicable to show that in the article " member " must be construed as meaning " member as such."  Further, when art. 133 is examined it is clear that " members " and " directors " are contrasted.

Again the subject-matter of the dispute here is payment by a director to himself and to another.  Therefore the dispute is whether what the defendant did as a director was

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

(1) [1915] 1 Ch. 881.          (3) [1915] 1 Ch. 881, 903.
(2) (1882) 23 Ch. D. 1.        (4) (1916) 32 Times L. R. 183.

C. A.

1938

BEATTIE
v.
E. & F.
BEATTIE,
LD.

lawful. If therefore art. 133 is to be treated as applying in such a case, there must be an agreement between the director and the company to refer his conduct as director to arbitration, otherwise the case is not within s. 4 of the Arbitration Act, 1889.

In fact, however, no such contract exists in law, for such a contract does not arise by the application of s. 20 of the Companies Act, 1929. The conduct of a director is involved, and that is not a matter concerning the rights of members only, and is not therefore within the article : see *Hickman's* case. (1)   That is Astbury J.'s conclusion, and he arrives at it in seeking to reconcile earlier decisions. No right extraneous to the right of a member as such is involved as a result of the contractual effect given to art. 133 by s. 20 : see also *Eley's* case (2) and *Browne* v. *La Trinidad.* (3)   In *Eley's* case (2) the plaintiff was a member of the company at the date when the dispute arose, and those two cases are clear authority that a person who happens to occupy a position in regard to a company other than that of member cannot acquire any additional right in respect of that position by becoming a member : see also *In re New British Iron Co.* (4)

Lastly, the Court ought in any case to exercise its discretion by refusing the application for a stay by reason of art. 133. The action has in any case to continue in regard to the other matters raised by the statement of claim and the issues involved here are mainly issues of law.

*Cleveland-Stevens K.C.* replied and referred to *Willesford* v. *Watson* (5) and the Arbitration Act, 1934, s. 8.

SIR WILFRID GREENE M.R.   This is an appeal from the decision of the Vice-Chancellor of the County Palatine of Lancaster which arises out of an action brought by Mrs. Margaret Jane Beattie against a company called E. and F. Beattie, Ld., and Mr. Ernest Beattie. The company is a private company, and the action is brought by the plaintiff

(1) [1915] 1 Ch. 881, 897, 900, 903.

(2) 1 .Ex. D. 20.

(3) (1887) 37 Ch. D. 1.

(4) [1898] 1 Ch. 324.

(5) (1873) .L. R. 8 Ch. 473.

in her representative capacity as shareholder. The total number of issued shares of the company is 3228 ordinary shares. Of those shares the plaintiff holds 1614, which is exactly half. The remainder are held as to 1514 by the defendant, Ernest Beattie, and as to 100 by his son, Edward Beattie, who is not a party to the action. There are two directors of the company, Mrs. Beattie and the defendant, Ernest Beattie, who is chairman but has no casting vote.

    Disputes having arisen, Mrs. Beattie issued her writ on December 30, 1936, and the indorsement related to two matters : (1.) a question of her right to inspect the books and accounts : and (2.) a question as to a purported increase of capital and an allotment of new shares. With regard to that latter question, there were two subsequent amendments. So far as that part of the action is concerned, no question arises on this appeal. The action is continuing on those points.

    On December 22, 1937, the plaintiff applied by summons for leave to amend her statement of claim and her writ. The nature of the amendments which she desired to make was, shortly, as follows. She alleged that the defendant, Ernest Beattie, had paid to himself and to Edward Beattie certain sums by way of remuneration which, under the regulations of the company, he was not entitled to pay. There is no allegation of any bad faith or anything of that kind in respect of the payments. They are merely payments of remuneration which are said not to have been justified.

    When the application for leave to amend was made, Ernest Beattie applied under s. 4 of the Arbitration Act to have that part of the action stayed pursuant to an arbitration clause contained in the articles of association. The notice of motion was in the ordinary form. It asked for the action to be stayed, so far as it related to the new matters, proposed to be litigated, pursuant to s. 4 of the Arbitration Act. Then it went on : "The plaintiff "—that is, Mrs. Margaret Beattie— "and the defendants "—that is, the company and Mr. Ernest Beattie— "having under the submission contained in art. 133 "of the articles of association of the company agreed that all

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

Sir Wilfrid
Greene M.R.

718                    CHANCERY DIVISION.              [**1938**]

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

Sir Wilfrid
Greene M.R.

"disputes arising between the company and any member or "members touching"—various matters, which I will deal "with when I come to read the article — "should be referred "to arbitration."

It is not suggested that there is any objection to the application on the ground of a step in the action having been taken, this new matter being treated, for the purpose of s. 12 of the Arbitration Act, as in effect a new action. The learned Vice-Chancellor held that the application ought not to succeed. He accordingly dismissed it and this appeal ensued.

As I have said, Mr. Ernest Beattie is, and was at all material times, a director of the company and it is against him, in his capacity as director, that these claims are made. It is as a director in charge of the company's funds that he is responsible for their proper application, in accordance with the regulations which govern the company. It is in that capacity, therefore, that the action is brought against him.

The claim which the plaintiff is seeking to enforce in the action—I am now only dealing with the new matter which it is sought to introduce—is, and must be, in a representative action of this character, a claim of the company itself, because a minority shareholder suing in a representative action is suing to enforce rights of the company. The reason the action takes that form is that the minority shareholder is not in a position to see that the action is brought in the name of the company itself to enforce the company's rights. Nevertheless, the action is, in reality, an action to enforce the rights of the company and of nobody else. The essence of the claim is that the plaintiff is seeking to enforce the company's right to recover from Mr. Ernest Beattie moneys of the company, which, as it is alleged, have been paid away by him. The company, of course, is a necessary defendant because the order, if an order is made, will be an order for payment to the company, the moneys being the company's moneys.

The arbitration clause contained in art. 133 is as follows [His Lordship read the article]. There was some question as to the accuracy of the print which is before us, where it uses the words "the members of the company respectively, shall

"not take proceedings." It was suggested that the "of" should be either "and" or "or." I do not think that it matters whether this is so or not.

The learned Vice-Chancellor dealt with the matter in this way. He held, first, that on the true construction of the article this present dispute did not fall within it. Secondly, he held that, if that be wrong as a matter of construction, the present appellant, Mr. Ernest Beattie, cannot rely on this article as constituting a contract between himself and the company, and that, therefore, it cannot be relied on as a submission to arbitration between him and the company for the purpose of s. 4. Lastly, he expressed his view on the question of discretion, but in view of his decision it was not necessary for him to exercise his discretion in the matter.

The way in which the matter is put on the first question, that of construction, is this. It is said on behalf of the plaintiff, and it was so held by the learned Vice-Chancellor, that in the phrase : "Where any doubt, difference, or dispute shall arise "between any members of the company, or between the "company and any member or members" the words "any "member or members" must be construed as subject to the "qualification" in his or their capacity as member or members." That means, as a matter of construction, that a disputant who happens to be a member, but is disputing in his capacity as director, will be excluded from the class of disputant with which this clause is concerned.

It is argued on behalf of the appellant, on the other hand, that this is not what the language really means. That a member is a member, and there is no distinction to be drawn for this purpose between his capacity as a member and his capacity as an individual.

I do not myself find it necessary to resolve what appears to be a rather subtle question. It may be just to say that on construction the word "members" in this clause means "members in their capacity as members," that is, excluding any relationship which does not flow from the membership itself. It may mean that or it may not, and I prefer to leave that matter without any expression of opinion on my part,

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

Sir Wilfrid
Greene M.R.

720                    CHANCERY DIVISION.                    [1938]

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE
LD.

Sir Wilfrid
Greene M.R.
because, in my judgment, there is a quite clear answer to this present appeal in the second matter with which the learned Vice-Chancellor dealt.

To bring himself within s. 4 of the Arbitration Act the appellant must point to a written agreement for submission. For that reason it will not be sufficient for him to rely on an agreement appointing him director which is merely to be inferred from conduct, even if in such an agreement a term corresponding to art. 133 ought to be imported.   An agreement so extracted from the general relationship of the parties would not be a sufficient submission within s. 4.

The appellant, accordingly, seeks to find in the articles themselves a contract to which he is a party giving him the right to demand an arbitration in the present circumstances. I cannot find that contract.   The appellant must rely on s. 20 of the Companies Act, 1929, which gives to articles of association a contractual force.   That section provides : "(1) Subject to the provisions of this Act, the memorandum "and articles shall, when registered, bind the company and "the members thereof to the same extent as if they respectively "had been signed and sealed by each member, and contained "covenants on the part of each member to observe all the "provisions of the memorandum and of the articles."

Mr. Cleveland-Stevens says : Here is a member— namely, Mr. Ernest Beattie.   Here is an article which provides that a dispute between the company and a member shall be referred to arbitration.   It covers, among other things, a dispute relating to an act or default of a director. And he says that what he is seeking in the present case to do is to enforce that right as a member under that article and not any right as a director ; that he has a right, and all other members have a right, when they find the company disputing with a director, to insist on that dispute being referred to arbitration.   Mr. Cleveland-Stevens says that the case must be treated as though the circumstance that the appellant happens to be a director is immaterial.   He says that it is quite immaterial that the member who is demanding arbitration is himself the member attacked.

In my judgment, that argument is based on an incorrect view both as to the effect of the article and as to the effect of s. 20 of the Companies Act. The question as to the precise effect of s. 20 has been the subject of considerable controversy in the past, and it may very well be that there will be considerable controversy about it in the future. But it appears to me that this much, at any rate, is good law : that the contractual force given to the articles of association by the section is limited to such provisions of the articles as apply to the relationship of the members in their capacity as members.

I do not think, in saying that, that I am in any way departing from or extending (and it certainly is not my intention to depart from or extend) certain observations of Astbury J. in the well-known case of *Hickman* v. *Kent or Romney Marsh Sheep-Breeders' Association.* (1) In that case Astbury J. made a careful review of all the decisions, and he expressed his conclusions with regard to them in this way. He referred to *Eley* v. *Positive Life Assurance Co., Ld.* (2), and certain other cases, and pointed out (3) that those decisions amounted to this : "An outsider to whom rights purport to be given by the articles "in his capacity as such outsider, whether he is or subsequently "becomes a member, cannot sue on those articles treating them "as contracts between himself and the company to enforce "those rights. Those rights are not part of the general regula- "tions of the company applicable alike to all shareholders "and can only exist by virtue of some contract between such "person and the company." Then, again, he said (4).: "no "right merely purporting to be given by an article to a person, "whether a member or not, in a capacity other than that of a "member, as, for instance, as solicitor, promoter, director, "can be enforced against the company."

With those two statements I respectfully agree. They are statements with regard to the true construction and operation of s. 20, and they have the result in the present case of preventing that section from giving contractual force to the article as between the company and its directors as such.

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

Sir Wilfrid
Greene M.R.

(1) [1915] 1 Ch. 881.           (3) [1915] 1 Ch. 897.
(2) 1 Ex. D. 20.                (4) Ibid. 900.

722                    CHANCERY DIVISION.              [1938]

C. A.

1938

BEATTIE
v.
E. & F.
BEATTIE,
LD.

Sir Wilfrid
Greene M.R.

It is to be observed that the real matter which is here being litigated is a dispute between the company and the appellant in his capacity as a director, and when the appellant, relying on this clause, seeks to have that dispute referred to arbitration, it is that dispute and none other which he is seeking to have referred, and by seeking to have it referred he is not, in my judgment, seeking to enforce a right which is common to himself and all other members. He is seeking to enforce a quite different right. I will explain what I mean. Let me assume that this article on its true construction entitles any member of the company to say to the company, when it is in dispute with a director : "You, the company, are bound by "your contract with me in the articles to refer this dispute "to arbitration, and I call upon you so to do." That is the right, and the only right in this respect, which is common to all the members, under this article. If that were the right which the appellant was seeking to exercise, there might be something to be said for that argument, but, with all respect to the able argument of Mr. Cleveland-Stevens, it appears to me that that is not at all the right which the appellant is seeking to enforce. He is not seeking to enforce a right to call on the company to arbitrate a dispute which is only accidentally a dispute with himself. He is asking, as a disputant, to have the dispute to which he is a party referred. That is sufficient to differentiate it from the right which is common to all the other members of the company under this article, which I have tried to define. That right is one which a member might find very great difficulty in enforcing in the Courts, because it concerns a matter relating to the internal management of the company, with which the Courts will not, in general, interfere.

But quite apart from that consideration, the two rights are, in my judgment, perfectly distinct and quite different—the general right of a member as a member and the right which the appellant as a party to the dispute is seeking to enforce. Indeed, Mr. Cleveland-Stevens agrees that his argument really amounted to saying that the present application is in essence the same as proceedings brought by Mr. Ernest Beattie, as a shareholder, to restrain the company from litigating and

to obtain a mandatory order on the company to go to arbitration. But that is a very different thing from what he is now seeking since his claim, as I have said, is to insist on a reference of his own dispute.

That seems to me to deal conclusively with the matter, and I do not think that anything which I have said in any way differs from the reasons which the learned Vice-Chancellor has given on this part of the case. When he says, as he does say, after examining the cases : '' This art. 133 having the "effect given to it by s. 20 of the Companies Act, 1929, does "not constitute an agreement between the company and the "defendant director in his capacity as director, even though "he is a member of the company,'' his conclusion, in my opinion, is perfectly right.

The only other matter which has been discussed is the question of discretion. The learned Vice-Chancellor appears to indicate the view that, had he been in favour of the appellant on other matters, he would have exercised his discretion in his favour. That has been touched on in the argument before us, but having regard to the grounds on which 1 have rested my decision it is unnecessary for me to deal with it. But from that I do not wish it to be in any way thought that I should necessarily have taken the same view on the matter of discretion as the learned Vice-Chancellor appears to have taken.

In the result the appeal must be dismissed.

SCOTT L.J. I agree with what the Master of the Rolls has said as to the scope of No. 133 of the company's articles of association in the light of s. 20 of the Companies Act, and as to the application to that article of the provision of s. 4 of the Arbitration Act that if any party to a submission, or any person claiming through or under him, begins any legal proceedings against any other party to the submission, then application can be made to the Court to stay such proceedings.

I agree that this appeal should be dismissed, for the reasons which the Master of the Rolls has given, but I should like to add expressly that I should not regard this particular dispute

C. A.

1938

BEATTIE
*v.*
E. & F.
BEATTIE,
LD.

Sir Wilfrid
Greene M.R.

724.                    CHANCERY  DIVISION.                 [**1938**]

C. A.

1938

BEATTIE

*v.*

E. & F

BEATTIE

LD.

as one which ought to be taken from the Court and referred to arbitration, even if our decision on the question of the interpretation of the particular article were wrong.

CLAUSON L.J.   I agree with all that has fallen from the Master of the Rolls and Scott L.J. and, in those circumstances, I have nothing to add.

Solicitors :  *Cunliffe & Airy, for Lee, Scott, Start & Mottershead, Manchester ; T. J. Smith & Son, Liverpool.*

H. C. G.

**1 Ch.**                    CHANCERY DIVISION.                    **743**

BISGOOD *v.* HENDERSON'S TRANSVAAL ESTATES, LIMITED.

[1908  B.  611.]

C. A.

1908

*March* 14, 18, 19, 20; *April* 3.

*Company—Reconstruction—Memorandum of Association—Sale of Undertaking to New Company for partly-paid Shares—Distribution of Consideration— Ultra vires—Companies Act,* 1862 (25 & 26 *Vict. c.* 89), *s.* 38, *sub-s.* 4 ; *s.* 161.

The sale of all a company's assets and all its undertaking and the distribution of the proceeds cannot be a corporate object so that under a clause for that purpose introduced into the memorandum of association such a sale and distribution can be made without regard to the provisions of s. 161 of the Companies Act, 1862.

A company limited by shares cannot by its memorandum and articles of association provide as part of its constitution that in an event the corporator shall either submit to a liability in excess of the limit of liability on his shares or shall be dispossessed of his status as corporator.

Where, therefore, a limited company, which had issued 1,770,386 fully-paid shares of 1*l.* each, acting under the powers of its memorandum and articles of association, passed resolutions in general meeting approving a scheme of reconstruction and for a voluntary winding-up, and by the scheme the undertaking of the company was to be sold to a new company to be formed for the purpose in consideration of a like number of 1*l.* shares in the new company, credited with 17*s.* 6*d.* per share as paid thereon, and the payment of the debts and the costs of liquidation of the old company, and the liquidator was to offer the shares in the new company (credited as aforesaid) for distribution among the members of the old company at the rate of one of such new shares for each share in the old company held by such members, and, in the event of any of the members not accepting their due proportion of such shares within a limited time, was to use his best endeavours to sell such shares and distribute the net proceeds among the non-accepting members in proportion to the number of shares in the old company held by them respectively :—

*Held,* that the scheme was ultra vires.

*Cotton* v. *Imperial and Foreign Agency and Investment Corporation,* [1892] 3 Ch. 454, and *Fuller* v. *White Feather Reward, Ld.,* [1906] 1 Ch. 823, overruled.

*Bisgood* v. *Nile Valley Co.,* [1906] 1 Ch. 747, approved.

Decision of Eve J. reversed.

APPEAL from a decision of Eve J.

The plaintiff, who was the holder of fifty fully paid-up shares in the first-named defendant company, Henderson's Transvaal

3 *D* 2                    1

744                        CHANCERY DIVISION.                    **[1908**

C. A.
1908
BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Estates, Limited, suing on behalf of himself and all other share-holders in the company, moved for an injunction to restrain the company until judgment in the action from carrying into effect a reorganization scheme submitted to, and the resolutions approving the same passed by, a general meeting of the share-holders held on February 13, 1908, or in the alternative from carrying into effect the said scheme or acting upon the resolutions, numbered 2, 4, and 5 respectively, passed at such meeting, in so far as the said scheme and resolutions purported to authorize the liquidator of the company, when appointed, to deal with the assets of the company without making proper provision for payment or satisfaction to the plaintiff of his distributive share in such assets as a shareholder of the company.

This company was incorporated on August 10, 1894, under the Companies Acts, 1862 to 1890. In November, 1907, the amount of capital issued was 1,770,386*l.* in fully-paid shares of 1*l.* each. The primary object of the company, as stated in clause 3 of the memorandum of association, was to purchase from Mr. J. C. A. Henderson certain mining properties in the Transvaal. Among the further objects therein stated were the following :

" (M.) To sell or otherwise dispose of any property of the company to any other company, person or firm, and in particular either for cash, shares, debenture stock or mortgage, or any other securities of any company, whether registered in South Africa, England or elsewhere, and whether such shares be fully paid or not : "

" (O.) To amalgamate with any other company in South Africa, England or elsewhere, whether the objects of such company are to include objects similar to those of the company or otherwise, and whether by sale or otherwise (for shares or otherwise) of the undertaking subject to the liabilities of the company or any such company as aforesaid, with or without winding up, or by sale or purchase (for shares or otherwise) of all the shares or stock of the company or any such other com-pany as aforesaid, or by partnership or any arrangement of the nature of partnership, or in any other manner :

" (P.) To sell, exchange, let on royalty, share of profits or hire, or otherwise use or grant licenses, easements and other rights

**1 Ch.**                   CHANCERY DIVISION                   745

of and in respect of, and in any other manner deal with or
dispose of the whole or any part of the undertaking, business
and property of the company to any company, firm or person in
South Africa, England or elsewhere, and in consideration thereof
to accept in whole or part cash or shares, stock, debentures or
securities of any company, whether the objects of such company
are or include objects similar to those of the company or other-
wise, and to distribute any of the property of the company among
the members in specie :

" (Q.) To form, register and promote any company, either
limited by shares or otherwise, in South Africa, England or
elsewhere, for the purpose of acquiring the properties or any of
them of the company, or for any other purpose which may
seem directly or indirectly calculated to benefit this company,
and to subscribe for and take or otherwise acquire and hold
shares, debentures or stock therein, or in any other company
having objects altogether or in part similar to those of this
company, or carrying on any business capable of being conducted
so as directly or indirectly to benefit this company : "

The memorandum also empowered the company to do all
things incidental or conducive to the attainment of the above
objects.  Clause 131 of the articles of association provided as
follow :—

"If the company shall be wound up (whether voluntarily,
under supervision, or compulsorily), the liquidator may, with
the sanction of an extraordinary resolution, divide among the
contributories in specie any part of the assets of the company,
and may with like sanction vest any part of the assets of the
company in trustees, upon such trusts for the benefit of the
contributories as the liquidators with the like sanction shall
think fit."

The company had issued debentures to the amount of 250,000*l.*,
and the amount outstanding on June 30, 1907, was 102,400*l.*
In the beginning of January, 1908, the company endeavoured to
raise some additional capital by a further issue of debentures,
but failed.  In this state of things the directors, in order to
provide for the repayment of the debentures falling due on
March 31 and further working capital, proposed a reorganization

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED

CHANCERY DIVISION. **[1908]**

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

scheme. By this scheme, as amended, a new company (being the second-named defendant company) was to be formed and registered in Rhodesia under the same name as the old company with a capital of 2,000,000*l.*, divided into 2,000,000 shares of 1*l.* each, in order to purchase from the old company its undertaking and assets for a consideration consisting of (*a*) 1,770,386 shares in the new company of 1*l.* each credited as paid up to the extent of 17*s.* 6*d.* per share, (*b*) the payment and satisfaction of the debts and liabilities of the old company, including the cost of liquidation; the old company was to go into voluntary liquidation and the liquidator was to offer the shares in the new company (credited with 17*s.* 6*d.* per share as paid up thereon), receivable as above, for distribution among the members of the old company at the rate of one of such new shares for each share in the old company held by such members; and in the event of any of the said members not accepting their due proportion of such shares within a time to be limited in such offer (not being less than fourteen days) the liquidator was to use his best endeavours to sell the shares not so accepted upon the best terms obtainable and distribute the net proceeds of such sale among the non-accepting members in proportion to the number of shares in the old company held by them respectively.

At an extraordinary general meeting of the old company held on January 24, 1908, for the purpose of considering the scheme in its original form a committee of shareholders was appointed to consider the position of the company, and the meeting was adjourned to February 7, 1908. At the adjourned meeting the report of the shareholders' committee was presented, and the meeting was again adjourned to February 13, 1908.

At the adjourned meeting held on February 13, 1908, the following resolutions were duly proposed and carried :—

" (1.) That the agreement proposed to be made between this company of the one part and Henderson's Transvaal Estates Limited (incorporated in Rhodesia) of the other part as amended be and the same is hereby approved.

" (2.) That the reorganization scheme submitted to this meeting as amended by the substitution of 1,770,386 shares of the new company of 1*l.* each (17*s.* 6*d.* paid) for a like number of

shares of 10s. each    (7s.  paid) be and the   same is  hereby
approved.

" (3.) That it is  desirable to  wind up  this company and
accordingly Henderson's Transvaal Estates Limited be wound
up voluntarily.

"(4.) That the liquidator of this company be and is hereby as
from the date of his appointment authorized and required to
offer  1,770,386 of the  shares of the new  company of .1l. each
(credited with 17s. 6d. as paid up thereon) receivable under the
above  agreement for  sale referred to in the reorganization
scheme  as amended  as aforesaid for  distribution among the
members of this company at the rate of one of such new shares
for each share in this company held by such members.

" (5.) That  in the  event of any  of the said  members  not
accepting their due proportion of such shares within a time to be
limited in such offer (not less than fourteen days) the liquidator
be authorized and required to  use his best endeavours to sell
the shares not so accepted upon the best terms obtainable, and
to hold any net proceeds of such sale upon trust to distribute
the same among the non-accepting members in proportion to the
number of shares of this company held by them respectively."

The plaintiff was not present at this meeting either personally
or by proxy.

At an extraordinary general meeting held on March 6, 1908,
the resolution for voluntary winding-up was duly confirmed and
a liquidator was appointed.

The new company having been incorporated on January 21,
the agreement between the old company and the new company
was executed on February 20.  It provided—(1.) that the old
company should sell, and the new company should purchase,
all the undertaking, business, and property of the old company ;
(2.) that as part of the consideration the new company should
undertake to pay and discharge all the existing debts and
liabilities of the old  company and the premiums on the
debentures which, but for the liquidation of the old company,
would become payable by them on March 31, 1908 ; (3.) that
as a further consideration for the sale the new company,
in the event of the passing of an effective resolution for the

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED

748                    CHANCERY DIVISION.              **[1908]**

C. A.

1908

BISGOOD

*v.*

HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

winding up of the old company within six calendar months of the date of the agreement, should pay the costs of the winding-up and dissolution ; (4.) that as a further consideration for the sale the new company should allot to the old company, or at the old company's option to its nominees as therein mentioned, 1,770,386 shares of 1*l.* each in the new company credited with 17*s.* 6*d.* per share as paid thereon ; (5.) that the old company should apply for or find substantial nominees, who should within two calendar months from the date of the agreement, or within such extended time as might be mutually agreed between the parties thereto, apply for and accept an allotment of the said shares, and pay 6*d.* per share on application and agree to pay 6*d.* per share on allotment, and the balance in calls to be made after the expiration of six calendar months from the first allotment, and that shareholders in the old company should be considered substantial for the purpose of this clause ; (6.) that, in the event of the company failing to comply with the conditions of the last preceding clause with respect to any of the shares so to be applied for, the shares unapplied for should be at the disposal of the new company, and the old company should not be under any liability to become a member of the new company in respect of any of the shares ; (8.) that the sale and purchase should be completed on March 6 then next.

In the meantime, namely, on February 14, 1908, the plaintiff issued the writ in this action, and on February 15 he served notice of motion for an injunction on the old company. The writ and notice of motion were subsequently amended by adding the new company as a party and in other minor particulars not material to be mentioned.

The motion came on for hearing before Eve J. on March 6. The learned judge refused the motion. Upon the question whether the reconstruction agreement was within the powers of the company, he said it was quite true, as alleged by the plaintiff, that this scheme of reorganization was both a device to extract further capital from the holders of fully-paid shares in the old company and a device to avoid paying to the non-assenting shareholders the full value of their interest; but that was equally true of most of these schemes, and, provided that those devices

**1 Ch.**                    CHANCERY DIVISION.                    749

were carried out within the powers of the company and in a manner which was not fraudulent or otherwise illegitimate, he recognized that the Court was bound to give effect to them; and in this case he held that the agreement, which was substantially identical with the agreement in *Fuller* v. *White Feather Reward, Ld.* (1), was not ultra vires. With reference to the proposed method of dealing with the shares in the new company which the shareholders in the old company refused to take up, he thought that the decision in *Burdett-Coutts* v. *True Blue (Hannan's) Gold Mine* (2), which was a decision upon a scheme under s. 161 of the Companies Act, 1862, afforded an indication of what, in the opinion of the Court, was the proper course to pursue with regard to the assets which were incapable of being distributed in specie, because, although in that case it was quite true that the shareholder had had an option of dissenting, at the time when the matter came before the Court that option had been lost, and therefore for all practical purposes the non-assenting shareholder was in exactly the same position as the non-assenting shareholder in this case, where he had not had the opportunity of dissenting under s. 161. In that position of affairs the Court of Appeal held that there was nothing inequitable or improper in providing by the scheme that the shares which were not claimed by the members who were entitled to take them should be sold and the net proceeds distributed rateably amongst the shareholders who had refused or neglected to take up their aliquot proportion. *In re Lake View Extended Gold Mine (Western Australia), Ld.* (3) was to the same effect. In his opinion those two cases were sufficient authority, apart altogether from *Fuller* v. *White Feather Reward, Ld.* (1), to justify him in arriving at the conclusion that this mode of dealing with the unclaimed shares was not illegal. *Fuller* v. *White Feather Reward, Ld.* (1) was no doubt at variance with *Bisgood* v. *Nile Valley Co.* (4); but, having regard to the conflict of authority between those two cases, he considered himself entitled to act upon his own view, and for the reasons above stated he held that the plaintiff was not entitled to an injunction

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

(1) [1906] 1 Ch. 823.      (3) [1900] W. N. 44.
(2) [1899] 2 Ch. 616.      (4) [1906] 1 Ch. 747.

750                       CHANCERY DIVISION.                    **[1908]**

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

either in respect of the reconstruction agreement or in respect of the distribution of the resulting shares.

The plaintiff appealed.

*P. O. Lawrence*, K.C., and *M. J. L. Beebee*, for the plaintiff. A scheme for the sale of the undertaking of a company to a new company for partly-paid shares in that company, and the distribution of those shares among the members of the old company, cannot be forced upon the shareholders except under the provisions of s. 161 of the Companies Act, 1862. That section safeguards the interests both of the dissentient shareholders and of the creditors, but this scheme does neither. Under this scheme the unapplied-for shares, when sold by the liquidator, will realize practically nothing, and in substance this is a device to compel a fully-paid shareholder to subscribe further capital or give up his interest in the company. Further, the shares are to go direct to the corporator from the new company, and consequently there will be no assets available for payment of the debts of the old company except the proceeds of such part of the shares as may not be claimed. In effect this is a winding-up for the distribution of the assets, but not for the purpose of paying the debts. But assume that the liquidator has in hand a substantial fund arising from the sale of the unclaimed shares, he would have no answer to an action by a debenture-holder, and in that way the dissentient shareholder will be placed at a disadvantage as compared with the accepting shareholder; but the power to distribute shares in specie must be exercised for the benefit of all the shareholders, and not of some to the detriment of others. This scheme injures both the dissentient shareholders and the creditors, and it offends against s. 38, sub-s. 4, s. 133, sub-s. 10, and s. 161 of the Companies Act, 1862. As regards the cases under s. 161, *Griffith* v. *Paget* (1) shews that the distribution must be amongst all the shareholders according to their rights and interests; *In re City and County Investment Co.* (2) shews that the sale may be for partly-paid shares and that those shares may go direct to the members. *Higgs's Case* (3) shews that a shareholder cannot

(1) (1877) 5 Ch. D. 894.          (2) (1879) 13 Ch. D. 475.
(3) (1865) 2 H. & M. 657.

be compelled to take the shares in the new company. Under s. 161 either a shareholder comes in fully, or he dissents and goes to arbitration or he does nothing and forfeits his shares. It follows that some time limit must be fixed within which the shareholder must exercise his option to take the shares, otherwise schemes under this section would be unworkable, and accordingly *Postlethwaite* v. *Port Phillip and Colonial Gold Mining Co.* (1) shews that a time limit may be fixed provided it is reasonable. That case also decides that a provision that the liquidator should sell the shares unapplied for and should account for any premiums to the shareholders who neither dissented nor exercised their option was valid, inasmuch as it was a provision for the benefit of the shareholders who did nothing and would otherwise have received nothing. *In re Lake View Extended Gold Mine (Western Australia), Ld.* (2) shews that where under a scheme under s. 161 the liquidator, in pursuance of the reconstruction agreement, sells the shares which have not been applied for and the agreement is silent as to the distribution of the proceeds of sale, such proceeds go to the shareholders who did not exercise their option because the shareholders who took up the shares had all that they bargained for. *Burdett-Coutts* v. *True Blue (Hannan's) Gold Mine* (3) decides that a shareholder who neither dissents nor exercises his option to take shares in the new company within the time limited by the scheme forfeits his interest, but that depends upon the principle that under s. 161 a shareholder is entitled to dissent and go to arbitration. The judgment of Eve J. proceeds upon a misapprehension of the two last cases, which have nothing whatever to do with a sale of the undertaking and scheme of reconstruction under the powers of the memorandum of association where the shareholder is bound to accept such compensation as the scheme offers.

Passing on to the cases of schemes for reorganization under the powers of the memorandum of association, in *Cotton* v. *Imperial and Foreign Agency and Investment Corporation* (4) Chitty J. decided that a sale of the company's undertaking under a valid power of sale contained in the memorandum of association

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

(1) (1889) 43 Ch. D. 452.          (3) [1899] 2 Ch. 616.
(2) [1900] W. N. 44.          (4) [1892] 3 Ch. 454.

752                          CHANCERY DIVISION.                    **[1908]**

C. A.

1908

BISGOOD

*v.*

HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

was not necessarily bad because a winding-up was contemplated. In *Payne* v. *The Cork Co.* (1) Stirling J. distinguished *Cotton's Case* (2) from that before him on the ground that in the latter the sale was in the winding-up. In *Doughty* v. *Lomagunda Reefs, Ld.* (3) Buckley J. (as he then was) followed *Cotton's Case.* (2) But in both those cases the sale was for fully-paid shares which became assets of the company, and there was nothing to prevent distribution of the assets in the usual way.

*Wall* v. *London and Northern Assets Corporation* (4), *In re Borax Co.* (5), and *In re H. H. Vivian & Co.* (6) were all cases of going companies in which debenture-holders tried to restrain the company from selling part of its assets and failed. Then in *Mason* v. *Motor Traction Co.* (7) Buckley J. (as he then was) decided that a sale of the assets of a company might be made under a power in the memorandum for partly-paid shares, but the question as to the distribution of those shares did not arise, and he refused to decide it.

[BUCKLEY L.J. There is nothing in that case inconsistent with your present argument.]

In *Manners* v. *St. David's Gold and Copper Mines* (8) Joyce J. and the Court of Appeal held that a scheme closely resembling that proposed in this case was a mere device to compel fully-paid shareholders to provide further capital or forfeit their shares and was void. It is true that, in that case, the proceeds of the sale of dissentient shareholders' shares were to be applied in payment of the company's debts, instead of being distributed among the dissentients; but in *Bisgood* v. *Nile Valley Co.* (9) Kekewich J. applied that decision in a case which is undistinguishable from the present. In *Fuller* v. *White Feather Reward, Ld.* (10) Warrington J. refused to follow *Bisgood* v. *Nile Valley Co.* (9), but he seemed to think that the case was covered by *Burdett-Coutts* v. *True Blue (Hannan's) Gold Mine* (11), although that was a case under s. 161, which is quite different. Neither Warrington J. nor

(1) [1900] 1 Ch. 308, 318.          (6) [1900] 2 Ch. 654.
(2) [1892] 3 Ch. 454.               (7) [1905] 1 Ch. 419.
(3) [1902] 2 Ch. 837.               (8) [1904] 2 Ch. 593.
(4) [1898] 2 Ch. 469.               (9) [1906] 1 Ch. 747.
(5) [1901] 1 Ch. 326.              (10) [1906] 1 Ch. 823.
                   (11) [1899] 2 Ch. 616.

Eve J. in the Court below fully appreciated the force of the decision in *Manners' Case*. (1)    The reconstruction agreement and the resolutions for distribution are both, therefore, wholly ultra vires.

Gore-Browne, K.C., Stewart-Smith, K.C., and H. E. Wright, for the defendants. A reconstruction by allotting to shareholders partly-paid shares is often the only way of getting capital to save a company, and is therefore for the interest of all the shareholders. A man cannot be compelled to take shares in a company: *Higgs's Case*. (2) A power to distribute shares in specie implies a power to sell shares not accepted, or no such distribution could ever be made. The scheme is therefore intra vires. As far back as *Griffith* v. *Paget* (3) Jessel M.R. refused to stop a sale on the ground that the proceeds were to be distributed in a way then thought to be illegal. The plaintiff in this case is in the same position as the plaintiff in *Burdett-Coutts* v. *True Blue (Hannan's) Gold Mine* (4), and the principle of that case applies here.

Cotton v. *Imperial and Foreign Agency and Investment Corporation* (5) shews that it is competent for a company under the powers of its memorandum to sell its undertaking to another company for shares with a view to a winding-up and the distribution of the purchase consideration among its shareholders. This proposition has since come before the Court of Appeal in *New Zealand Gold Extraction Co.* v. *Peacock* (6), where the point is specifically dealt with by Davey L.J., who expresses a strong opinion that such a sale would be intra vires, in *Wall* v. *London and Northern Assets Corporation* (7), and in *Booth* v. *New Afrikander Gold Mining Co.* (8), where there is a dictum of Stirling L.J. in favour of the respondents; and, although the point did not actually arise for decision, in none of those cases did the Court throw any doubt upon Chitty J.'s decision. That decision has been standing for sixteen years and has been constantly acted on, and after so long a period this Court ought not

| | |
|---|---|
| (1) [1904] 2 Ch. 593. | (5) [1892] 3 Ch. 454. |
| (2) 2 H. & M. 657. | (6) [1894] 1 Q. B. 622. |
| (3) 5 Ch. D. 894. | (7) [1898] 2 Ch. 469. |
| (4) [1899] 2 Ch. 616. | (8) [1903] 1 Ch. 295. |

**C. A.**

**1908**

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES.
LIMITED.

now to disturb it and say that a sale by a company of all its assets in contemplation of a winding-up, assuming that it is authorized by the memorandum of association, is unlawful. The memorandum of association is the charter of the company, and if one of the objects of the company as defined in the memorandum is to sell its assets either for cash or shares, in order to invalidate such a sale the Court must find something in the Companies Acts to prohibit it. Among the objects of the company may properly be included what is to be done with the property and how it is to be divided when the time comes for the distribution of the assets. That remains binding on the people who have accepted the memorandum as their charter : *Doughty* v. *Loma-gunda Reefs, Ld.* (1)   Sect. 161 of the Companies Act, 1862, does not purport to be prohibitory ; its object is not to prevent a company from doing something which it might otherwise do ; but it is an enabling clause empowering the liquidator to sell for shares.   *Manners* v. *St. David's Gold and Copper Mines* (2) is distinguishable, because the proceeds of the sale of the unclaimed shares were to go, not to the non-assenting members, who were entitled to them, but to the purchasing company.   Eve J.'s definition of this scheme as a device to extract further capital from the fully-paid shareholders may be accepted, but that is not a reason for declaring the scheme invalid if it is not prohibited by the Companies Acts : *Salomon* v. *Salomon & Co.* (3)

*Beebee* in reply.

COZENS-HARDY M.R.   We all think that the injunction must go, but we will give our reasons later.

April 3. BUCKLEY L.J. This is a case of the first importance. The question involved is whether by clauses even in the memorandum of association of a company limited by shares the limit upon the shareholder's liability can be raised—whether the constitution of the company can provide that the majority may impose upon the minority a scheme under which the member must either come under an increased liability or accept such compensation as the

(1) [1902] 2 Ch. 837.          (2) [1904] 2 Ch. 593.
(3) [1897] A. C. 22.

scheme offers him. .Sect. 161 of the Companies Act, 1862, protects the dissentient member by securing him the value of his interest to be determined by arbitration or agreement. The purpose of schemes such as that here in question is to evade or escape the provisions of that section. Their object is to impose upon the shareholders what is generally called an assessment— to require that in a limited company after the shares are fully paid the shareholder must either come under liability to make further contributions to capital or submit to take, not the value of his interest to be determined by arbitration or agreement, but such satisfaction as the scheme offers him. That satisfaction commonly means, and in substance means in this case, the surrender of his interest in the company.

The facts are as follows: Henderson's Transvaal Estates, Limited, which I will call the old company, was incorporated on August 10, 1894, as a company limited by shares with a memorandum of association, which includes amongst the objects of the company—(M.) to sell any property of the company for shares, whether fully paid or not; (O.) to amalgamate with any other company by sale or otherwise (for shares or otherwise) of the undertaking; (P.) to sell the whole or any part of the undertaking, business and property of the company for shares and to distribute any of the property of the company among the members in specie; and (Q.) to promote companies for the purpose of acquiring the properties of the company and to take and hold shares in such companies; each of these clauses (M.), (O.), (P.), and (Q.) extends to companies registered in South Africa. The articles of association include (article 131) a provision that in winding up the liquidator may, with the sanction of an extraordinary resolution, divide assets among the contributories in specie, and article 132 a provision (which is, however, illegal) that in case of a sale under s. 161 of the Companies Act, 1862, a dissentient shall not have the rights given to him by that section. In November, 1907, the issued capital of the old company consisted of 1,770,386 shares of 1l. each fully paid. The company was financially at the end of its resources. A scheme for obtaining further working capital by the issue of debentures was unsuccessful. In that state of facts a reorganization

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

scheme was started on January 16, 1908, with the object of providing funds for debentures which were falling due on March 31, and for working capital. On January 16 notice was given for a meeting to be held on January 24 to vote upon the scheme. The meeting appointed a committee to look into the matter. The committee made certain recommendations by a report, dated February 7, with the result that the scheme was amended in certain particulars, and as amended is contained in the agreement presently stated. On February 13 the meeting, which had been convened for January 24 and adjourned to that day, met and passed resolutions which are shortly as follows: (1.) approving an agreement proposed to be made between the old company and a new company which had been incorporated in Rhodesia on January 21 ; (2.) approving the reorganization scheme as amended; (3.) resolving to wind up voluntarily; (4.) authorizing and requiring the liquidator to offer 1,770,386 shares of the new company of 1*l.* credited with 17*s.* 6*d.* receivable under the agreement presently mentioned for distribution amongst the shareholders at the rate of one new share for each share in the old company; (5.) authorizing and requiring the liquidator to use his best endeavours to sell shares which the members should not accept within a time to be limited (not less than fourteen days), and to hold the net proceeds of sale upon trust to distribute them among the non-accepting members. On February 14 the writ in this action was issued by the plaintiff, who is the holder of fifty fully-paid shares, asking an injunction to restrain the old company from carrying the reorganization scheme into effect. The writ was amended in particulars, which I need not stay to specify, and on March 6 Eve J. refused the plaintiff's motion for an injunction to restrain the carrying out of the scheme. From that order the present appeal is brought. In the interval, namely, on February 20, the agreement contemplated by the first resolution of February 13 was executed between the old and the new company. That agreement recites that the old company is empowered by its memorandum to sell its undertaking and to accept payment in shares, and provides—(1.) that the old company shall sell, and the new company shall purchase, all the undertaking, business, &c., of

CHANCERY DIVISION.

the old company ; (2.) that the new company shall pay the debts
and pay the premiums on the debentures issued by the old com-
pany which, but for the liquidation of such company, would be
payable by them on March 31, 1908 ; (3.) that the new company
shall, if the old company within six months wind up, pay the
costs of the winding-up ; (4.) that the new company shall allot
to the old company, or at the old company's option to its nominees,
1,770,386 shares of 1l. each in the new company credited with
17s. 6d. ; (5.) that the old company shall apply or find substan-
tial nominees who shall within two months apply for and accept
an allotment for those shares and pay 6d. on application and
agree to pay 6d. on allotment ; and (6.) that in the event of the
old company failing to comply with article 5 with regard to any
of the shares the shares unapplied for shall be at the disposal of
the purchasing company, and the old company shall not be under
any liability to become a member of the new company in respect
of any of those shares.

The question is whether the reorganization scheme contained
in the agreement and resolutions is intra vires. The argument
is that it is because it is justified by clauses in the memorandum
of association.

Under the Companies Act, 1862, the incorporation of a com-
pany is effected by the registration of a memorandum of
association which is to state the " objects for which the proposed
company is to be established." To my mind that means the
objects which the corporation during its corporate life is to
pursue, the purposes by whose fulfilment it is to seek to earn
profit. The definition of the objects is the definition of what is
generally called the undertaking of the company. The modern
practice is to add, but I think erroneously, an enumeration of
powers for carrying those objects into effect. But, however that
may be, the words " objects for which the proposed company is
to be established " have, in my opinion, no relation to acts to be
done after the corporate life has come to an end. So soon as the
company passes into liquidation the distribution of its assets is a
matter which concerns the corporation not at all, but its creditors
and contributories only. In my judgment, it is no part of the
function of the memorandum of association to define under the

C. A.
1908

BISGOOD
v.
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

758                          CHANCERY DIVISION.                    **[1908]**

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

corporate objects the distribution of the assets after the corporate life is over.

The purpose of the memorandum and articles, however, is not confined to defining and limiting the purposes of the corporation; it extends also within proper limits to defining and ascertaining the rights of the corporators. I have no doubt that within proper limits the memorandum and articles may provide how, as between the corporators, the corporate assets shall be dealt with after liquidation. But in this, as in many matters, there are limits imposed by the statutes. There are matters in respect of which the constitution of the company cannot provide that the corporator shall not enjoy rights and immunities which the statute gives him. For instance, s. 82 of the Companies Act, 1862, empowers a contributory to present a winding-up petition. His right in that respect cannot be excluded by the articles: *In re Peveril Gold Mines.* (1)   The issue of shares at a discount is illegal, and this not only in the sense that a less sum than 20*s.* in the pound cannot be limited to the injury of the creditor, but that, as between shareholders, provisions in the articles for the issue of shares at a discount remain illegal even after all creditors have been paid. In winding up a call may be made ultra the discount amount of the share for the adjustment of the rights of contributories amongst themselves: *Welton* v. *Saffery.* (2)   "These companies," said Lord Macnaghten, "are the creature of statute, and by the statute to which they owe their being they must be bound in regard to shareholders as well as in regard to creditors in all matters coming within the conditions of the memorandum of association. Shareholders in these companies require protection just as much as creditors— perhaps even more." Upon a like principle the articles cannot exclude a shareholder from his right of dissent under s. 161 of the Companies Act, 1862: *Baring-Gould* v. *Sharpington Combined Pick and Shovel Syndicate* (3); *Payne* v. *The Cork Co.* (4)   It is, therefore, not necessarily true that, because there are found in the memorandum and articles clauses such as those upon which the question here arises, that the

(1) [1898] 1 Ch. 122.                    (3) [1899] 2 Ch. 80.
(2) [1897] A. C. 299, 324.              (4) [1900] 1 Ch. 308.

corporators as individuals are contractually bound by them. The question is not whether each individual corporator can bind himself in respect of his distributive share in the assets. The question is whether, consistently with the statutes, the constitution of the corporation can be such that every corporator shall in the matter of distribution—or a fortiori of distribution and further liability—be bound by the vote of the majority. The company as a company have no power to agree to provisions which reduce the shareholder's liability even inter socios below the nominal amount of the share (*Welton* v. *Saffery* (1) ) ; nor, in my opinion, to provisions which increase his liability above that amount. The purpose of the memorandum and articles is to define the position of the shareholder as shareholder, not to bind him in his capacity as an individual. The definition of his position as shareholder must be a definition consistent with the statutes. A perusal of the opinions of the learned Lords in *Welton* v. *Saffery* (1), and particularly those of Lord Halsbury, Lord Macnaghten, and Lord Davey, will shew that these statements are well founded.

In the matter of liability upon his shares the statute provides in plain terms by s. 38, sub-s. 4, that in the case of a company limited by shares no contribution shall be required from any member exceeding the amount unpaid on his shares. In my opinion, any attempt so to define the constitution of the company as that the member shall in an event be liable for a larger sum is in breach of the statute and is ultra vires. Any clauses which can be used to maintain a scheme which imposes upon the member the alternative of accepting liability for a larger sum or of being dispossessed of his status as shareholder upon terms which he is not bound to accept are, I think, ultra vires.

When liquidation ensues, the scheme of the Act shortly is that the assets are to be turned into money, the contributions of the contributories enforced as far as need be, the debts paid, and the balance divided amongst the contributories according to their rights. Sect. 161 introduces a modification. That is a section which speaks not only after liquidation, but when the company is proposed to be, as well as when it is in the course of being,

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L..J.

(1) [1897] A. C. 299.

760                          CHANCERY DIVISION.                    **[1908]**

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

wound up. The special resolution may be passed antecedently to or concurrently with the resolution for winding up. It is a section which enables the liquidator instead of converting the assets into money to exchange them for shares or like interests for the purpose of distribution amongst the members, but it safeguards the dissentient member by providing for the purchase of his interest at a price to be determined as mentioned in the Act of Parliament. The dissentient member being thus in a position, by taking proper steps, to obtain the value of his interest in the company, there is no hardship upon him in any of the following arrangements within reasonable limits : (1.) That the shares for distribution be partly-paid shares, or (2.) that if he wants the shares he must apply for them within a limited time, or (3.) that shares unapplied for are to be at the disposal of the new company, or (4.) that shares unapplied for may be sold and the member who does not assent shall take the proceeds (for this is giving him something more than that to which he would be otherwise entitled), or (5.) that the shares shall not go to the company and be assets of the company, but shall go direct to the members. It has accordingly been held that all these are legitimate in sales under that section. On the other hand, if there are dissentient members unpaid, the company may be put under an undertaking not to part with the assets until provision is made for them : *In re Hester & Co.* (1) And, further, the creditors are not injured, for under the last words of the section the sale is invalid if within a year a winding-up order be obtained. But none of these things are true if the sale be made, not under s. 161, but under clauses in the memorandum such as are here relied upon, for when the shareholder cannot obtain the value of his interest all the above are a hardship upon him. In substance he is placed in the position that he must either take the shares with the liability, take them within a limited time, and so on, or else find himself dispossessed of his proportionate share of the assets of the old company. And the creditor is injured, for the distribution of the shares direct to the members before the debts are paid leaves the creditor with nothing to look to but such part of the assets, if any, as goes to non-assenting members,

(1) [1875] W. N. 179; 44 L. J. (Ch.) 757.

Under s. 161 the creditor can stop the sale under the last words of the section ; under the memorandum of association he cannot. Moreover, if the creditor resorts, as he naturally will in the first instance, to the last-mentioned assets, the non-assenting members will see those swept away by the creditors, while the assenting members have received and gone away with their shares. All this is wholly at variance with the right of the member who is not minded to take the new shares with the liability upon them. His right is to have the assets, including the shares in the new company, realized and applied first in payment of the debts, and then to have his proportionate share of the balance. These considerations lead irresistibly to the review of Chitty J.'s decision in *Cotton* v. *Imperial and Foreign Agency and Investment Corporation*. (1)     He there held that a company might by proper clauses in its memorandum of association evade or escape the operation of s. 161. It is true that the agreement there was dated May 2, and the special resolution for liquidation was passed on May 4, but the notice of the meeting for May 4 must necessarily have been current on May 2, and the company must on May 2 have been one which, within the language of s. 161, was " proposed to be wound up voluntarily." The decision cannot fairly, I think, be regarded as resting in any way upon the difference between the dates of May 2 and 4. The decision affirmed that under clauses in the memorandum of association the company might sell its whole undertaking—meaning by that expression not merely all its assets at the moment, but all its present and future business—and might under the authority of special resolutions divide the proceeds of sale amongst the members without the safeguards provided by s. 161. With the greatest respect to that very learned judge, I am unable to agree with this decision. Sale of even all the property at a particular moment may be, but sale of the whole undertaking and division of the proceeds cannot be, a corporate object. Under a clause in its memorandum of association a single steamship company may no doubt sell its only steamship with the whole of its equipment and with the proceeds buy another. But under a clause in its memorandum of

C. A.

1908

BISGOOD

*v.*

HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

(1) [1892] 3 Ch. 454.

762                    CHANCERY DIVISION.              [1908]

C. A.
1908

BISGOOD
v.
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

association it cannot, in my opinion, sell its only steamship and all its undertaking and divide the proceeds. Distribution of capital (except in reduction of capital) can only be made in winding up. An agreement for sale may be a corporate act of the going company and within its objects, but an agreement for sale and distribution can only be valid when the company " is proposed to be wound up " or is in course of being wound up. · When the company is proposed to be wound up or is in course of being wound up s. 161 contains provisions which, in my judgment, define rights in the members which cannot by any clauses in the memorandum and articles of association be excluded. If the company is proposed to be wound up and the transaction is a sale and distribution, then, in my opinion, the statute provides that sale by conversion into money may be replaced by exchange for shares upon the terms, but only upon the terms, of complying with the provisions of s. 161. It has been decided, as mentioned above, that part of s. 161, namely, the right of the member to dissent, cannot be excluded by the articles, but the argument before us is that the whole of s. 161 may be excluded. I think not. In my judgment the basis and reasoning of the decision in *Cotton* v. *Imperial and Foreign Agency and Investment Corporation* (1) cannot stand consistently with principle or with the reasoning of the subsequent decision of the House of Lords in *Welton* v. *Saffery*. (2)

We have been referred to some cases in the Court of Appeal since 1892 in which the decision in *Cotton* v. *Imperial and Foreign Agency and Investment Corporation* (1) was referred to; and there are others. In none of them did the question of the correctness of the decision really arise, and in none of them was that case adopted or affirmed by the Court of Appeal. Mr. Gore-Browne pressed us with Davey L.J.'s words in *New Zealand Gold Extraction Co.* v. *Peacock*. (8) The answer is easy. The action was for calls, and all that was decided was that the old company possessed, and had validly exercised, its power to make a call. The scheme did not impose upon Peacock the

(1) [1892] 3 Ch. 454.                (2) [1897] A. C. 299.
          (3) [1894] 1 Q. B. 622.

liability to pay more than the 20*s.* payable upon his shares. The only question was whether his executors were right in saying that he was not liable to pay so much. It is only fair to say that in *Cotton* v. *Imperial and Foreign Agency and Investment Corporation* (1) the shares in the new company were fully-paid shares, so that the particular iniquity of using the memorandum for the purpose of imposing an assessment did not arise. Had the case contained that additional feature it may be that Chitty J. would not have gone as far as he did. But apart from that feature and upon the general question, I cannot agree with the decision. Moreover, it is, I think, inconsistent in principle with the subsequent cases, such as *In re Peveril Gold Mines* (2) and *Baring-Gould* v. *Sharpington Combined Pick and Shovel Syndicate* (3) in this Court, and with *Welton* v. *Saffery* (4) in the House of Lords. It has never been considered and approved in this Court, and, on the contrary, *Manners* v. *St. David's Gold and Copper Mines* (5) is, I think, inconsistent with it. That case is an authority for the proposition that an agreement, whose effect is that, if the member does not choose to accept a further liability, his share of the assets shall be forfeited and handed over to the purchasing company, is ultra vires; that any device which compels the member to find further money or to forfeit his interest is bad. Kekewich J. in *Bisgood* v. *Nile Valley Co.* (6) followed the same principle. I think *Bisgood* v. *Nile Valley Co.* (6) was rightly decided. It follows that *Fuller* v. *White Feather Reward, Ld.* (7), in my opinion, was wrong.

In *Doughty* v. *Lomagunda Reefs, Ld.* (8) I followed, as I was bound as a judge of first instance to follow, *Cotton* v. *Imperial and Foreign Agency and Investment Corporation.* (1) In so doing I said all I properly could to invite an appeal, hoping that the Court of Appeal might see its way to do what I could not do and consider whether *Cotton* v. *Imperial and Foreign Agency and Investment Corporation* (1) was rightly decided. Unfortunately the appeal went off on another point, and my decision, to my

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

(1) [1892] 3 Ch. 454.
(2) [1898] 1 Ch. 122.
(3) [1899] 2 Ch. 80.
(4) [1897] A. C. 299.

(5) [1904] 2 Ch. 593.
(6) [1906] 1 Ch. 747.
(7) [1906] 1 Ch. 823.
(8) [1902] 2 Ch. 837.

764 CHANCERY DIVISION. **[1908]**

C. A.

1908

BISGOOD
*v.*
HENDER-
SON'S
TRANSVAAL
ESTATES,
LIMITED.

Buckley L.J.

regret, was affirmed without argument. In the present case it is necessary to say whether *Cotton* v. *Imperial and Foreign Agency and Investment Corporation* (1) was rightly decided or not. I feel bound to express the opinion that it was not. I prefer to decide this case upon the broad ground, and not upon any detail in the particular facts of the scheme in this case.

At the same time there is here an additional feature which should not be left without mention. The new company is one formed in Rhodesia under the Rhodesia Company Ordinance, so that under this scheme the corporator in the English company is to find himself a corporator with an increased liability in a company formed and residing, not in this country, but in South Africa and under another law. The fact that clauses (M.), (O.), (P.), and (Q.) of the memorandum of association extend to companies registered in South Africa does not wholly cover this point. The plaintiff is a person who, as the holder of fully-paid shares, finds that he must either take the like number of shares in the Rhodesian company with a liability of 2*s.* 6*d.* upon them or accept such benefit, if any, as comes to him under the agreement and resolutions. The company, it is true, have issued the allotment letters in such form as that the shareholder could sell his right to an allotment and put forward the name of a purchaser if he found one. And the old company could within the language of the agreement sell the shares which are not applied for, and under the fifth resolution the proceeds would be distributable among the non-assenting members. Shortly stated, the scheme is one under which the shareholder is told that he may take the share in the new company with its liability or sell the share in the new company with its liability, but he shall have nothing but the share in the new company or its proceeds; that he must be assessed or find some one who will take the new share with the assessment or take his chance that the liquidator may find some one who will do so, but that he shall have nothing else. In my opinion this is ultra vires. The plaintiff is, in my judgment, entitled to an injunction to restrain the defendants from carrying out the reorganization scheme.

(1) [1892] 3 Ch. 454.

**1 Ch.**                    CHANCERY DIVISION.                    765

Cozens-Hardy M.R.    I have read the judgment delivered by
Buckley L.J.; I agree with it, and I do not feel that I can with
advantage add anything to it.

Fletcher Moulton L.J.    I am of the same opinion.

*Beebee.*    Will your Lordships say what will be the effect of the
judgment upon the resolution for voluntary winding up?

Buckley L.J.    We decline to express any opinion upon that
point.

Solicitors: *Hatchett Jones, Bisgood & Marshall; Ashurst,
Morris, Crisp & Co.*

H. B. H.

C. A.

1908

Bisgood
*v.*
Hender-
son's
Transvaal
Estates,
Limited.

---

THOMSON *v.* HENDERSON'S TRANSVAAL ESTATES,
LIMITED.

[1908 T. 569.]

C. A.

1908

EVE J.
*April* 10.

C. A.
*April* 11.

*Company—Winding-up—Validity—Contemporaneous Resolutions for a volun-
tary Winding-up and Reconstruction Scheme—Invalidity of Scheme.*

> A resolution for a voluntary winding-up is not invalid by reason of
> its being passed contemporaneously and in concert with resolutions for
> a reconstruction scheme which are held to be invalid.
> Dictum of Turner L.J. in *In re Imperial Bank of China, India and
> Japan,* (1866) L. R. 1 Ch. 339, 347, explained and distinguished.
> *Cleve* v. *Financial Corporation,* (1873) L. R. 16 Eq. 363, approved.

Motion.

This action was brought by a shareholder in the defendant
company, suing on behalf of himself and all other shareholders,
for a declaration that a resolution passed at an extraordinary
general meeting of the company held on January 24, 1908, and
confirmed at an extraordinary general meeting held on March 6,
1908, for the voluntary winding up of the company, and a resolu-
tion passed at the last-mentioned meeting appointing the
defendant J. D. Pattullo liquidator of the company, were invalid
and that the company was not in liquidation, and for an injunc-
tion restraining the defendant Pattullo from acting as such

**822**

A

## BNP Paribas SA v Trattamento Rifiuti Metropolitani SpA.
[2019] EWCA Civ 768

Court of Appeal (Civil Division).
Hamblen, Flaux and Asplin L JJ.
Judgment delivered 7 May 2019.

B

> *Jurisdiction clause – Banks – Hedging – Swaps – ISDA Master Agreement – Claimant bank bringing English proceedings seeking declarations that swap valid and binding – Swap on ISDA terms providing for English law and jurisdiction – Defendant bringing Italian proceedings alleging breach of financing agreement subject to Italian law and jurisdiction and of implied advisorship contract – Whether English claim fell within English jurisdiction clause in ISDA Master Agreement – Interpretation of competing jurisdiction clauses – Presumption of mutual exclusivity – Recast Judgments Regulation 1215/2012, art. 25.*

C

D

This was an appeal by the defendant Italian company (TRM) against a decision ([2018] EWHC 1670 (Comm)) that the English court had jurisdiction over the claim of the claimant bank (BNP) for negative declaratory relief in respect of an interest rate hedging transaction entered into on ISDA Master Agreement terms between BNP and TRM, by virtue of an English jurisdiction clause in the agreement.

E

TRM had obtained a concession from the Province of Turin to design, build and operate a power plant. BNP was appointed to lead the financing of the project and TRM entered into a financing agreement with a syndicate of lenders led by BNP. The agreement was subject to Italian law and jurisdiction. It provided for a hedging strategy intended to cover the risk of interest rate fluctuations on the loan and for TRM to conclude hedging contracts with BNP as the hedging bank, using standard ISDA documentation.

F

In 2010 TRM entered into a swap transaction with BNP on the terms of the 1992 ISDA Master Agreement, pursuant to its interest rate hedging obligations to the lenders under the financing agreement. The ISDA Master Agreement provided for English law and jurisdiction.

G

In September 2016 BNP brought proceedings in the Commercial Court, relying on the jurisdiction clause in the Master Agreement, seeking declarations that TRM's obligations under the swap were valid and binding, that TRM had not relied on any advice or recommendation from BNP to enter the transaction and that BNP had not acted as TRM's adviser or fiduciary, that TRM had full capacity to enter into the transaction, and that it had done so for hedging and not speculative purposes.

H

In April 2017 TRM commenced proceedings against BNP in Italy, alleging breach by BNP of the financing agreement and of an implied advisorship contract.

TRM challenged English jurisdiction on the basis that the declarations sought in the claim fell within the Italian jurisdiction clause in the facility agreement.

The judge held that BNP had much the better of the argument that the claims in the English proceedings all fell within the jurisdiction clause in the ISDA Master Agreement, for the purposes of art. 25 of Regulation 1215/2012.

*Held*, dismissing the defendant's appeal:

1. When the parties agreed (together with the other banks) the Italian jurisdiction clause in the financing agreement, it was in circumstances where it was contemplated that hedging contracts would be made with BNP acting as the hedging bank, which would be subject to ISDA standard terms containing their own jurisdiction and choice of law clause and would be entire and separate. The natural interpretation of the jurisdiction clauses was that the Italian jurisdiction clause was to govern claims relating to the overarching or background financing agreement, whilst the English jurisdiction clause was to govern claims relating to the specific interest rate swap entered into pursuant to the financing agreement. That conclusion was supported by the implausibility of sensible business people agreeing inconsistent jurisdiction clauses and by the presumption of mutual exclusivity. (Trust Risk Group SpA v AmTrust Europe Ltd [2015] EWCA Civ 437; [2017] 1 CLC 456 and Deutsche Bank AG v Comune di Savona [2018] EWCA Civ 1740; [2018] 2 CLC 483 followed.)

2. For the purposes of art. 25, the 'particular legal relationship' to which the Italian jurisdiction clause applied was to claims arising in connection with the background lending relationship set out in the financing agreement, made between TRM as borrower and various lending banks, led by BNP. The particular legal relationship to which the English jurisdiction clause applied was to claims arising in connection with the specific interest rate swap relationship between TRM as customer and BNP as hedging bank. That conclusion was reinforced by the entire agreement clause in the ISDA Master Agreement which indicated that the swap contract was a self-contained contract to be interpreted in accordance with its terms regardless of other prior relationships between the parties. (Deutsche Bank AG v Petromena ASA [2015] EWCA Civ 226; [2015] 1 CLC 482 and Deutsche Bank AG v Comune di Savona [2018] EWCA Civ 1740; [2018] 2 CLC 483 followed.)

3. The ISDA terms provided that, in the case of conflict between the provisions of the swap contract and the financing agreement, the provisions of the financing agreement should prevail, but there was no conflict: the swap and

A

the financing agreement were different relationships so that the jurisdiction clauses were complementary rather than conflicting. A factual overlap between possible claims under the financing agreement and the swap did not alter the legal reality that a claim under the former was a different claim made under a different contract in relation to a different legal relationship to a claim under the latter.

B

4. The declarations sought, after amendment, all related to the swap transaction and fell within the English jurisdiction clause.

The following cases were referred to in the judgment:

C

*AIB Group (UK) plc v Martin* [2001] UKHL 63; [2002] 1 WLR 94.
*Costain Ltd v Tarmac Holdings Ltd* [2017] EWHC 319 (TCC); [2017] 1 CLC 491.
*Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] CLC 579.
*Deutsche Bank AG v Comune di Savona* [2018] EWCA Civ 1740; [2018] 2 CLC 483.

D

*Deutsche Bank AG v Petromena ASA* [2015] EWCA Civ 226; [2015] 1 CLC 482.
*Dexia Crediop SpA v Provincia di Brescia* [2016] EWHC 3261 (Comm).
*Lehman Bros International (Europe) (in administration), Re* [2016] EWHC 2417 (Ch); [2017] 2 All ER 275.
*Lomas v JFB Firth Rixson Inc* [2010] EWHC 3372 (Ch); [2011] 2 BCLC 120.
*Knorr-Bremse Systems for Commercial Vehicles Ltd v Haldex Brake Products GmbH* [2008] EWHC 156 (Pat).

E

*Monde Petroleum SA v Westernzagros Ltd* [2015] EWHC 67 (Comm); [2015] 1 CLC 49.
*Morgan Grenfell & Co Ltd v SACE* [2001] EWCA Civ 1932.
*Powell Duffryn plc v Petereit* (Case C-214/89) [1992] ECR I-1745.
*Ryanair Ltd v Esso Italiana Srl* [2013] EWCA Civ 1450; [2013] 2 CLC 950.

F

*Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade)* [1983] QB 529.
*Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998; [2010] 2 CLC 300.
*Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437; [2017] 1 CLC 456.

G

*UBS AG v HSH Nordbank* [2009] EWCA Civ 585; [2009] 1 CLC 934.
*Vizcaya Partners Ltd v Picard* [2016] UKPC 5; [2016] 1 CLC 806.
*Wood v Capita Insurance Services Ltd* [2017] UKSC 24; [2017] AC 1173.

H

Adrian Beltrami QC and Christopher Bond (instructed by Allen & Overy LLP) for the claimant/respondent.

Charles Samek QC and James Bickford Smith (instructed by Collyer Bristow LLP) for the defendant/appellant.

© DSP Publishing Ltd

JUDGMENT

### Hamblen LJ:  Introduction

1. This appeal concerns apparently competing jurisdiction clauses.

2. Trattamento Rifiuti Metropolitani SpA ('TRM') appeals against the judgment of Knowles J dated 17 July 2018 ([2018] EWHC 1670 (Comm)) whereby he refused TRM's application to dismiss for want of jurisdiction the claim of BNP Paribas SA ('BNPP'), issued on 23 September 2016 and served on 10 March 2017 ('the Claim').

3. The issue raised on the appeal is whether the judge was correct to conclude that the claims for declaratory relief sought in the Claim fall within an English jurisdiction clause ('the EJC') contained in a swap transaction between the parties and not within an Italian jurisdiction clause ('the IJC') contained in a financing agreement between them.

4. TRM contends that declarations sought in the Claim fall within the IJC in favour of the courts of Turin in a financing agreement ('the FA') entered into between a syndicate of banks, including BNPP in its capacity as 'Mandated Lead Arranger, Lending Bank and Agent Bank', and TRM on 29 October 2008, as subsequently amended. TRM has issued a claim against BNPP in Turin on 14 April 2017 (after service of the Claim) ('the Italian Claim'). The Italian Claim makes claims in respect of alleged breaches by BNPP of the FA and of various alleged advisory obligations.

5. The Claim is for negative declaratory relief in respect of an interest rate hedging transaction entered into on ISDA Master Agreement terms between BNPP, in its capacity as 'Hedging Bank', and TRM in March 2010 ('the Swap' or 'the Transaction'). The Swap documentation contains the EJC. The judge held that BNPP has much the better of the argument that the Claim falls within the EJC and that it must therefore be heard in England, pursuant to Article 25 of Regulation (EU) No. 1215/2012 of 12 December 2012 ('the Regulation' and 'Article 25').

### Factual background

6. TRM is a project company incorporated in Italy. BNPP is an international bank, headquartered in Paris, with branches in London and Milan, among other places.

7. In July 2005, TRM received a concession from the Province of Turin to design, build and operate a power plant in Gerbido, Italy ('the Project'). TRM sought to appoint a financial advisor for the Project by way of a call for tenders dated 23 January 2006.

8. On 6 July 2006, TRM entered into a financial advisory contract ('the FAC') with a consortium of companies led by Banca OPI SpA. BNPP was not a party to or otherwise involved in the FAC.

A

9. In January 2007, pursuant to the FAC, TRM received a preliminary information memorandum ('the PIM'), with recommendations for TRM's financing needs for the Project and to which was appended a preliminary term sheet ('the PTS') setting out proposed terms and conditions for the project financing. On 17 May 2007, TRM initiated a tendering process for financing the Project, and, on 31 October 2007, BNPP was one of ten banks that received an invitation to tender ('the Call for Tender'). The Call for Tender referred to a further document, the Notes on Tender, which itself referred to the PIM and PTS.

B

C

10. BNPP made a tender expressed by reference to its Technical Offer, among other documents. TRM submits that BNPP's Technical Offer dated 23 November 2007 outlined a range of activities that it would undertake on TRM's behalf including designing, advising on and implementing the financing structure for the Project. Those activities included 'provision for alternatives for hedging against the risk of interest rate fluctuation and, in accordance with TRM, subsequent definition of the definitive hedging coverage'. In the Technical Offer BNPP stated that 'with regard to TRM, BNPP … will be able to act as a single reference point for all the activities described … which will be carried out entirely by its Italian branch'.

D

11. TRM's case is that BNPP's agreement, if it won the tender, to act as 'single reference point' entailed an assumption of roles and responsibilities which gave rise to significant legal duties on BNPP under Italian law.

E

12. BNPP won the tender on 19 December 2007.

13. The FA was entered into on 29 October 2008 between TRM and a syndicate of lenders, led by BNPP. BNPP was party to the FA through its Milan branch as 'Mandated Lead Arranger, Lending Bank and Agent Bank'. The FA defines BNPP as 'Hedging Bank' for the purpose of interest-rate hedging arrangements, but BNPP is not party to the FA in that capacity.

F

14. The FA is governed by Italian law. Article 28.2 is the IJC and provides:

G

'Any dispute relating to the interpretation, conclusion, performance or termination of this contract or otherwise relating to it shall be within the exclusive competence of the Court of Turin'.

15. Under the FA, TRM was to pay a floating interest rate against which interest rate hedging contracts were to be made. In the FA, the Hedging Bank is defined as '[BNPP] in its capacity as counterparty of [TRM] within the meaning of the Tender Documents and Hedging Contracts' (Article 1.2). Article 17.19 provides that '[TRM] is committed to sign the Hedging Contracts in accordance with the Strategy of Hedging'. The Strategy of Hedging is defined as 'the hedging strategy intended to cover the risk of fluctuation of interest on the Loan, as more fully described in Appendix 17.19'. Appendix 17.19 to the FA provides as follows:

H

'1. [TRM] must conclude and maintain derivatives contracts covering the risk arising from interest rate fluctuations on 100% of the total amount disbursed from time to time and not reimbursed under the Base Lines ("Hedging Contracts") from the first Date of Use indicated in the Financing Contract until the Final Expiry date of the Base Lines.

2. [TRM] must conclude Hedging Contracts exclusively with [BNPP] in its capacity as a Hedging Bank.

3. Hedging Contracts shall be concluded by [signing] the relative standard documentation as published from time to time by the International Swaps and Derivatives Association, Inc. ("ISDA") and shall refer to the 1992 ISDA definitions.

4. Except in the case of Hedging Contracts, [TRM] may not enter into any sort of agreement which constitutes a derivative contract.'

16. On 30 January 2013, Article 17.19 was subsequently amended to include the following, further obligation on TRM:

'… to comply with its undertakings under the Hedging Contracts and to abstain from perfecting transactions of any kind whatsoever on financial instruments different from the Hedging Contracts'.

17. On 29 October 2008, BNPP and other lenders entered into an Intercreditor Agreement ('the ICA'). As with the FA, BNPP was party to the ICA through its Italian branch as 'Mandated Lead Arranger, Lending Bank and Agent Bank'. BNPP was, however, also party to the ICA through its Paris office as 'Hedging Bank'. The ICA is governed by Italian law, with an exclusive jurisdiction clause in favour of the courts of Milan, later amended to Turin TRM submits.

18. In fulfilment of its interest rate hedging obligations to the lenders under the FA, TRM entered into the Swap on 23 March 2010. The Swap documents comprise a 1992 ISDA Master Agreement dated 1 March 2010 ('the ISDA Master') and the Schedule thereto ('the Schedule'), and a final Confirmation dated 23 March 2010 (together, 'the Transaction Documents'). The Transaction Documents include the representations relied on by BNPP in the Claim. They were amended, and the representations repeated, on 9 October 2015. BNPP was counterparty to the Swap in its capacity as 'Hedging Bank' and through its central office in Paris.

19. The ISDA Master provides:

'Section 1(b) *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. ...

Section 13  *Governing Law and Jurisdiction*    A

…

(b) *Jurisdiction*. With respect to any suit, action or proceedings relating to this
Agreement … each party irrevocably–    B

(i) submits to the jurisdiction of the English courts, if this Agreement is
expressed to be governed by English law …' (as it was).

20. The Schedule contains the following provisions:

C

'Notwithstanding anything to the contrary contained herein, this
Agreement is entered into in connection with the loan agreement dated
October 29th, 2008, as subsequently amended by the Atto Modificativo
del Contratto di Finanziamento dated January 21st, 2010 [i.e. the FA] …
and the relevant intercreditor agreement dated as of January 21st, 2010
[i.e. the ICA] …    D

For the purpose of this Agreement, the parties acknowledge the existence
of the [FA] and the [ICA] and further acknowledge that (i) their respective
rights under this Agreement are subject to the terms and conditions of the
[FA] and the [ICA]; (ii) that BNPP is the "Banca Hedging" (i.e. the bank    E
that will provide the "Contratti di Hedging" pursuant to the "Strategia di
Hedging" as these terms are defined in paragraph 1 (Interpretazione) and
annex 17.19 (Strategia di Hedging) of the [FA] and (iii) no derivative
transactions shall be entered into hereunder other than those foreseen in
annex 17.19 (Strategia di Hedging) of the [FA] …    F

… In the case of conflict between the provisions of this Agreement and the
[FA] and the [ICA], the provisions of the [FA] and the [ICA] as appropriate
shall prevail.'

21. TRM places particular reliance upon the conflict resolution provision in the    G
last paragraph ('the Conflicts Provision').

22. The Transaction Documents also contain the following provisions:

(1) by Section 13(a) of the ISDA Master and part 4(h) of the Schedule, the Transaction
was governed by English law;    H

(2) by Section 13(c) of the ISDA Master and part 4(b) of the Schedule, the parties
agreed that BNPP would appoint its London branch as its process agent and that TRM
would on BNPP's request appoint a process agent in the City of London;

A    (3) by Sections 3(a)(ii), 3(a)(v) and 9(a) of the ISDA Master and part 5(d) of the Schedule (repeated in the final Confirmation), the parties made various representations relied upon by BNPP in the Claim;

B    (4) by Section 9(a) of the ISDA Master it was agreed that the Transaction Documents constitute 'the entire agreement and understanding' between BNPP and TRM 'and supersedes all oral communications and writings with respect thereto'; and

C    (5) by part 1(h)(i) of the Schedule, in the event of TRM repaying, prepaying or cancelling any loan under the FA, BNPP had the right under Section 6(b)(iv) to designate an Early Termination Date ('ETD') in respect of the Swap and to the payment from TRM of any early termination amount.

23. In the course of correspondence and meetings in 2016, TRM made allegations which BNPP believed constituted a serious threat of litigation. This led to BNPP issuing the Claim on 23 September 2016.

D    24. On 14 November 2016, TRM asked BNPP to waive its right under part 1(h)(i) of the Schedule and Section 6(b)(iv) to designate an ETD under the Swap in the event that TRM repaid the loan under the FA ('the Waiver'). BNPP refused to grant the Waiver under the terms of the Swap. The Claim Form was amended on 7 December 2016 to seek a further declaration in respect of the Waiver and served on TRM in Italy
E    on 10 March 2017.

25. The Italian Claim was issued on 14 April 2017. In advance of the first hearing on 8 November 2017, BNPP was required to submit a substantive defence brief, which it did.

F    **The judge's decision**

26. The judge recognised that the dispute as to jurisdiction turns on the application of Article 25 of the Regulation which provides:

G        '1. If the parties, regardless of their domicile, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction …'

H    27. In relation to the proper approach to the argument on jurisdiction, the judge directed himself as follows:

(1) Where there is more than one contract, and the contracts contain jurisdiction clauses in favour of different countries, the court is faced with a question of construction: *Trust Risk Group SPA v AmTrust Europe Ltd* [2015] EWCA Civ 437; [2017] 1 CLC 456 at [44]-[49] per Beatson LJ, *Credit Suisse First Boston (Europe)*

A

*Ltd v MLC (Bermuda) Ltd* [1999] CLC 579 at 590 per Rix J (as he then was) and *Sebastian Holdings Inc v Deutsche Bank* [2010] 2 CLC 300 per Thomas LJ (as he then was) at [42] (judgment at [27]).

(2) The approach to the construction of a jurisdiction clause should be broad and purposive: *Sebastian Holdings*, at [39] per Thomas LJ (judgment at [28]).

B

(3) When interpreting any provision of a commercial contract the court will look at the language and investigate the commercial consequences: *Wood v Capita Insurance Services Ltd* [2017] UKSC 24; [2017] AC 1173 at [8]-[15], per Lord Hodge (judgment at [28]).

C

28. Since this was an interlocutory hearing to challenge jurisdiction, it was sufficient for the judge to see whether BNPP had 'much the better of the argument' [29].

29. The judge considered that the two jurisdiction clauses governed different legal relationships, stating that:

D

'38. The two jurisdiction clauses as a matter of language readily bear the interpretation that one is concerned with the Master Agreement and the other is concerned with the Financing Agreement. This fits perfectly well in the context of the parties' dealings. It recognises that the parties had more than one relationship.

E

39. The wider language of the written contracts ("performance … of this contract" "or otherwise relating to it" in the Financing Agreement; "relating to this Agreement" in the Master Agreement) does not prevent an interpretation that allows those contracts to fit together. That is certainly more commercial than an interpretation that would have general words in the Financing Agreement prevail over the fact that the parties specifically agreed jurisdiction in favour of the English court for their obligations under the Master Agreement when they agreed that and the swap transaction. There is no basis for rewriting the contracts: *Sebastian Holdings* (above) at [65] per Thomas LJ and *Dexia Crediop SpA v Provincia di Brescia* [2016] EWHC 3261 (Comm) at [100]□ [111] per Ali Malek QC sitting as a Deputy High Court Judge.'

F

G

30. The judge said that since there is no conflict between the two jurisdiction clauses, TRM's argument of primacy of the IJC because of the Conflicts Provision 'is not engaged' [40].

H

31. In relation to context, the judge said that TRM sought impermissibly to rely upon the nature of the disputes raised by the Italian Claim, but that this was not part of the context at the time when the jurisdiction clauses were agreed and therefore cannot contribute to the task of interpretation [42].

A    32. The judge considered the most powerful point of context to be the use of ISDA documentation and the ISDA jurisdiction clause within it. The judge cited with approval the statement of Coulson J (as he then was) in *Costain Ltd v Tarmac Holdings Ltd* [2017] EWHC 319 (TCC); [2017] 1 CLC 491 at [42] that: 'Dispute resolution provisions require certainty. The parties need to know from the outset what to do and where to go if a dispute arises.' He observed that use of ISDA documentation

B    signalled the parties' interest in achieving consistency and certainty in this area of financial transacting, and that it 'is axiomatic that [the ISDA Master] should, so far as possible, be interpreted in a way that serves the objectives of clarity, certainty and predictability so that the very large number of parties using it should know where they stand': *Lomas v JFB Firth Rixson Inc (ISDA intervening*) [2010] EWHC 3372 (Ch);

C    [2011] 2 BCLC 120 at [53] per Briggs J (as he then was) referring to *Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade)* [1983] QB 529 at 540 per Robert Goff LJ (as he then was) (judgment at [44]).

D    33. The judge said that where commercial parties use ISDA documentation, they are even less likely to intend that provisions have one meaning in one context and another meaning in another context, citing the following statement of Hildyard J in *Re Lehman Brothers International (Europe) (in administration) (No. 8)* [2016] EWHC 2417 (Ch); [2017] 2 All ER 275 at [48(2)], referring to *AIB Group (UK) plc v Martin* [2001] UKHL 63; [2002] 1 WLR 94:

E    'Although the relevant background, so far as common to transactions of such a varied nature and reasonably expected to be common knowledge among those using the ISDA Master Agreements, is to be taken into account, a standard form is not context-specific and evidence of the particular factual background or matrix has a much more limited, if any, part to play'

F    34. The judge did not consider it was necessary to start by interpreting the IJC in the FA as it was first in time. He said that the essential point is that there are two jurisdiction clauses, not one [47].

G    35. In relation to the expert evidence of Italian law, the judge said that he had not found it necessary to use that evidence to decide the application, although he had considered it and found 'enough to confirm to [him] that the language used by the parties is central to interpretation in Italian law as it is in English law' [49].

H    36. The judge then rejected various of the arguments raised by TRM in reliance on the Italian law expert evidence. He said that the court is able to interpret the IJC for itself and that the argument as to whether TRM has complied or will comply or threatens not to comply with its commitments under the Swap plainly comes within the Scope of the IJC had no merit, observing that:

'… The parties agreed jurisdiction in favour of the English court under the Master Agreement. The fact that TRM further committed itself in the

A
Financing Agreement to comply with its commitments under the Master Agreement does not mean that commitments under the Master Agreement and swap transaction are any the less subject to the jurisdiction agreed under the Master Agreement, or any the less able to be adjudicated upon and enforced by proceedings in England.' [54]

B
37. The judge found that with minor amendments, all the declarations sought in the Claim fell within the EJC. He accepted that all the declarations sought either derive directly from the contractually agreed language of the Transaction Documents or are consequent on those declarations [31]. The declarations sought are set out in the Appendix to this judgment.

C
38. The judge accordingly concluded that BNPP had much the better of the argument and dismissed TRM's application.

**The grounds of appeal**

D
39. TRM's grounds of appeal are:

(1) The judge did not undertake, correctly or at all, the contractual analysis necessary to dispose of TRM's application. In particular, he failed to construe, correctly or at all, the IJC.

E
(2) The judge did not undertake, correctly or at all, the analysis required by Article 25 of the Regulation, before concluding that the court had jurisdiction by virtue of Article 25.

(3) The judge was wrong to find that 'with the exception of the declaration sought under paragraph 7(1)(f) [of the Claim Form], all of the declarations sought either derive directly from the contractually agreed language of the Swap, and in particular the ISDA Master Agreement (7(1)(a) to 7(1)(c) and 7(1)(e)) or are consequent on those declarations (7(1)(d), (g), (h) and (i))' (at [31]).

F

(4) The judge was wrong to find that the Conflicts Provision was not engaged 'because there is no conflict'.

G
40. TRM contends that had the judge correctly construed the IJC and undertaken the analysis required by Article 25 (with the exception of the declaration at 7(1)(a) in the Claim Form) he would have concluded that:

H
(1) The declarations in substance raised disputes concerning the legal relationship of the parties constituted by the FA; and

(2) The declarations in 7(1)(b), (f), (g), (h) and (i) in the Claim Form did not come within the EJC; and

A    (3) The declarations came within the ambit of the IJC; and

(4) Even if any of the declarations came also within the ambit of the EJC, the effect of the Conflicts Provision in the Schedule to the Master Agreement was that the IJC prevailed, with the result that the court of Turin, not the English court had jurisdiction under Article 25 to determine the declarations.

B

41. By a Respondent's Notice, BNPP, if necessary, seeks to support the judge's decision on the following further grounds:

(1) There was no relevant obligation on BNPP under the FA. Accordingly, there is no
C    possibility of a potential conflict between the EJC and the IJC.

(2) Even if BNPP did have some relevant obligation under the FA, it is not one under which BNPP could incur any liability to TRM, and so there is still no possibility of competing jurisdiction clauses.

D
(3) Even if there were potentially competing jurisdiction clauses, the proper approach is to ask where the 'centre of gravity' of the Claim lies. BNPP submits that the Claim is more closely related to the Swap and so the EJC still applies. There is therefore no need to resort to the Conflicts Provision which is clearly intended to apply to other potential conflicts of terms between the Swap and the FA.

E

**Grounds 1, 2 and 4 – The proper interpretation of the EJC and IJC and the application of Article 25 of the Regulation**

42. Grounds 1, 2 and 4 concern the proper interpretation of the EJC and the IJC, the application of Article 25, and whether in general terms disputes relating to the
F    Swap fall exclusively within the EJC. Ground 3 concerns the further and different question of whether the particular declarations sought raise disputes which relate to the Swap. It is accordingly appropriate to consider Grounds 1, 2 and 4 first and together.

G    43. TRM's case on Grounds 1, 2 and 4 may be summarised as follows:

(1) Where the court is faced with multiple jurisdiction clauses, the court must construe them all and do so in a careful and commercially-minded way: see *Trust Risk Group* at [48] and the recent Court of Appeal decision in *Deutsche Bank AG v Savona* [2018] EWCA Civ 1740; [2018] 2 CLC 483 at [3].
H

(2) The clauses need to be construed in the light of the transaction as a whole, taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme: see *UBS AG v HSH Nordbank* [2009] EWCA Civ 585; [2009] 1 CLC 934 at [83] per Lord Collins and *Trust Risk Group* at [47] per Beatson LJ (citing from Thomas LJ in *Sebastian Holdings* at [39]–[42]).

A

(3) The judge focused unduly, if not completely, on the proper interpretation of the EJC and failed to construe the EJC and the IJC together and to analyse how they worked within the scheme of the parties' overall bargain, which included the provisions in Article 17.19 and the corresponding Annex 17.19 in the FA and the parties' express agreement in the Schedule, namely that the ISDA was entered into in connection with the FA and that their respective rights under the ISDA were subject

B

to the terms and conditions of the FA.

(4) The judge erred in failing to construe the IJC by applying the relevant provisions of Italian law and drawing assistance from the Italian law expert reports when doing so. If the judge had construed the IJC by applying Italian law, then he would and should have concluded that the 'dispute' fell within the ambit of the IJC – the dispute raised by the declarations sought concerned the 'performance' of the FA 'or otherwise related to it' such that an Italian court (applying Italian law) would conclude that they fell within the IJC.

C

(5) The judge further erred in not carrying out the enquiry which Article 25 requires the court to perform, which is to characterise the dispute or disputes between the parties and determine who has the better of the argument as to whether the claim (in this case, the declarations) relates to a dispute arising in connection with the particular legal relationship regulated by the jurisdiction agreement relied on before the court. On the facts of this case, that meant determining whether the dispute between the parties related to a relationship regulated only by the ISDA, or only by the FA, or by both the ISDA and the FA.

D

E

(6) Had the judge conducted the correct enquiry under Article 25, he would and should have concluded that the declarations in substance raised disputes which arose in connection with the parties' legal relationship set out in the FA and therefore within the IJC.

F

(7) By virtue of the Conflicts Provision, the conclusion which the judge should have drawn under (4) and/or (6) would have entailed that, whether or not any declaration claims also fell within the ambit of the EJC, the Italian court had exclusive jurisdiction to determine them.

G

44. Before addressing the detail of TRM's case it is appropriate to address two preliminary matters raised by it, namely (i) the relevance of Italian law and (ii) the relevant 'dispute' or 'disputes'.

*The relevance of Italian law*

H

45. The role of foreign law experts in relation to issues of contractual interpretation is a limited one. It is confined to identifying what the rules of interpretation are.

46. It is not the role of such experts to express opinions as to what the contract means. That is the task of the English court, having regard to the foreign law rules of interpretation.

47. This is well established law and is clearly set out and summarised by Lord Collins in *Vizcaya Partners Ltd v Picard* [2016] UKPC 5; [2016] 1 CLC 806 at [60]:

'60. … Where the applicable law of the contract is foreign law, questions of interpretation are governed by the applicable law. In such a case the role of the expert is not to give evidence as to what the contract means. The role is "to prove the rules of construction of the foreign law, and it is then for the court to interpret the contract in accordance with those rules": *King v Brandywine* [2005] EWCA Civ 235, [2005] 1 CLC 283, para 68; *Dicey*, paras 9-019 and 32-144 ("the expert proves the foreign rules of construction, and the court, in the light of these rules, determines the meaning of the contract").'

48. To similar effect is the judgment of Longmore LJ in *Savona* at [15]:

'15. … In a case in which the main, let alone the only, issue is as to the construction of a foreign jurisdiction clause as opposed to an English jurisdiction clause, the only relevance of evidence of foreign law is to inform the court of any difference of law in relation to the principles of construction, see *King v Brandywine* [2005] 1 CLC 283, para 68 per Waller LJ and *Vizcaya Partners Ltd v Picard* [2016] 1 CLC 806 para 60 per Lord Collins. It is not to have competing arguments as to how the highest court in the foreign jurisdiction would decide the question whether a claim brought in England would (or would not or would also) fall within the foreign jurisdiction clause. The task of the English court is merely to inform itself of any relevant different principles of construction there might be in the foreign law and, armed with such information, look at both jurisdiction clauses and decide whether the English claim falls within the English clause. That should be a comparatively straightforward exercise.'

49. TRM's Italian law expert did express views as to how an Italian court would interpret the IJC and what she considered the IJC to mean. That is inadmissible and irrelevant evidence.

50. In its written submissions, TRM supported the relevance of inquiring into what an Italian court would decide by reliance on passages from this court's decision in *Morgan Grenfell & Co Ltd v SACE – Istituto per I Servizi Assicurativi del Commercio* [2001] EWCA Civ 1932 and contended that submissions as to how an Italian court would resolve an issue are simply a different way of submitting what the effect of Italian law is.

51. The *Morgan Grenfell* case was primarily concerned with an issue of substantive law relating to the principles of non-disclosure under the Italian Civil Code rather than issues of contractual interpretation. That is the context in which the court made the comments upon which particular reliance was placed by TRM at [50]:

A

'50. In that case the court was concerned with the construction of the Uniform Commercial Code which was part of the law of New York. It was therefore a question upon which an English judge might perhaps be expected to make a valuable contribution. In this case, on the other hand, the judge was faced with differing views of Italian law, which is not based in any relevant respect upon the common law. Indeed, whatever their true extent,

B

the principles of Italian law which the judge had to consider, especially Article 1892 of the Italian Civil Code, are significantly different from the principles of non-disclosure in English law. In these circumstances, there was less room for the judge to apply his own legal training and experience to help determine the relevant question, namely how, in the case of each

C

disputed question of law, the Italian courts (and in particular the Corte di Cassazione ) would have resolved it.'

52. It is correct that issues of construction also arose in that case and that in relation to a new issue raised in respect of which there was no Italian law expert evidence the court referred *obiter* at [300] to the question of 'how an Italian court

D

would interpret the new clause'. There appears, however, to have been no argument as to the appropriateness of this hypothetical question. In my judgment, the correct approach is as clearly and authoritatively set out in the passages from the *Vizcaya* and *Savona* cases set out above.

E

53. In oral argument, TRM did not press this argument and ultimately its only point was that it was inaccurate for Longmore LJ to state in *Savona* that the 'task of the English court is merely to inform itself of any relevant different principles of construction' because, strictly speaking, the court is still applying the foreign law relating to contractual interpretation even where there is no material difference. In theory that may be so, but in practical terms it is a distinction without a difference.

F

54. As to the Italian law in relation to contractual interpretation, there was no issue as to the relevant rules. The primary rule is Article 1362 of the Italian Civil Code, under which the literal meaning of the words must be considered. It is only if that meaning is not clear that one goes on to consider later Articles, although they may be used as a cross check. In these circumstances, the judge was entitled to find at [50]

G

that 'the language used by the parties is central to interpretation in Italian law as it is in English law' and to consider that it did not assist the court in its task of determining the meaning of the IJC. That was a similar conclusion to that reached by this court in *Savona,* in which it was found that there was no material difference on the principles of contractual interpretation between Italian and English law (at [16]).

H

55. In these circumstances, although the IJC was governed by Italian law, the judge was entitled to approach the task of interpreting the EJC and the IJC by reference to English law relating to the interpretation of such provisions, concentrating on the meaning of the words used in their relevant context.

**© DSP Publishing Ltd**

A    *The relevant 'dispute' or 'disputes'*

56. The interpretation of the scope of a jurisdiction clause falls to be considered at the time that jurisdiction agreement is made, at which time there will be no 'dispute' unless, which is not this case, it is an *ad hoc* agreement relating to existing disputes.

B
57. Save in relation to such *ad hoc* agreements, the interpretation of the scope of a jurisdiction clause is therefore necessarily forward looking and looks towards the general nature of dispute or disputes that would fall within the clause.

58. As Rix LJ stated in *Ryanair Ltd v Esso Italiana Srl* [2013] EWCA Civ 1450;
C    [2013] 2 CLC 950 at [34], the scope of a jurisdiction clause 'has to be capable of being answered at the date of the contract' and the clause is not to be interpreted 'on the basis of post-contract events'.

59. Where proceedings are commenced in this country in reliance on an English jurisdiction clause and a jurisdictional challenge is raised, the issue of whether the
D    clause may be so relied upon is to be answered by reference to the claim in relation to which those proceedings have been issued.

60. As Thomas LJ stated in *Sebastian Holdings* at [62]:

E        '… the question as to whether a claim falls within the jurisdiction clause is an issue that has to be determined at the time the proceedings are issued'.

61. The answer to this question cannot change by reason of subsequent events, such as a defence raised or a subsequent set of proceedings, like the Italian Claim. As Rix LJ observed in *Ryanair*, the issue of interpretation must not be confused with
F    'the adventitious circumstances of a defendant's reaction to a particular claim' (at [34]). The same applies to the application of Article 25, as made clear by the ECJ's explanation of its purpose in *Powell Duffryn plc v M Petereit* (Case C-214/89) [1992] ECR I-1745, as set out below.

G    62. The judge was accordingly correct to reject TRM's argument that, with regard to the correct characterisation of the dispute, the Claim was in substance directed to providing a defence to the Italian Claim (at [43]). Longmore LJ endorsed the judge's approach in *Savona* at [33]. At times, TRM's submissions on the appeal appeared to resurrect this argument. To the extent that it did so, I would similarly reject it.

H    *The approach to the interpretation of the EJC and IJC*

63. Under Article 25 of the Regulation the interpretation of the scope of the jurisdiction clause is a matter for the national court applying the relevant applicable law – see *Powell Duffryn*.

A
64. For reasons already given, the judge was correct to consider this question as a matter of English law.

65. The judge directed himself by reference to the judgment of Beatson LJ in *Trust Risk Group*, which itself references the other judgments cited by the judge, *Credit Suisse v MLC* (Rix J) and *Sebastian Holdings* (Thomas LJ). In *Trust Risk Group* Beatson LJ stated as follows at [45]-[48]:

B

> '45. … This case concerns an overall agreement package which contains two express choice of law and jurisdiction clauses, one of English law and jurisdiction, the other of Italian law and arbitration … As Lord Collins stated in *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, [2009] 1 CLC 934 at [84], where the agreements are all connected and part of one package, "sensible businesspeople would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements".

C

> 46. Where the overall contractual arrangements contain two or more differently expressed choices of jurisdiction and/or law in respect of different agreements, however, the position differs in that one does not approach the construction of those arrangements with a presumption. So, the 14th edition of *Dicey, Morris and Collins on the Conflict of Laws* stated:

D

> "the decision in *Fiona Trust* has limited application to the questions which arise where parties are bound by several contracts which contain jurisdiction agreements for different countries. There is no presumption that a jurisdiction (or arbitration) agreement in contract A, even if expressed in wide language, was intended to capture disputes in contract B; the question is entirely one of construction …" (§12-094)

E

F

> That reflects *inter alia* the statement of Rix J in *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] CLC 579 at 590 per Rix J (as he then was):

> "where different agreements are entered into for different aspects of an overall relationship, and those different agreements contain different terms as to jurisdiction, it would seem to be applying too broad and indiscriminate a brush simply to ignore the parties' careful selection of palette".

G

> 47. In *Sebastian Holdings Inc v Deutsche Bank* [2010] EWCA Civ 998, [2010] 2 CLC 300, a case involving a complex series of eight agreements, Thomas LJ referred with approval (at [42] and [49]) to the passages from *Dicey, Morris and Collins* and the judgment of Rix J I have set out. He summed up the position as follows:

H

(1) "… [I]n construing a jurisdiction clause, a broad and purposive construction must be followed": see [39];

(2) "… [A]n agreement which [is] part of a series of agreements [should be construed] by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme": see [40];

(3) "It is generally to be assumed … that just as parties to a single agreement do not intend as rational businessmen that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements do not generally intend a dispute to be litigated in two different tribunals": see [41]; but

(4) "… [W]here there are multiple related agreements, the task of the court in determining whether the dispute falls within the jurisdiction clauses of one or more related agreements depends upon the intention of the parties as revealed by the agreements as against these general principles": see [42].

48. The current (16th) edition of *Dicey, Morris and Collins* states (at §12-110) that:

"Where a complex financial or other commercial transaction is put in place by means of a number of interlinked contracts, and each has its own provision for the resolution of disputes, the point of departure will be that it is improbable that a jurisdiction clause in one contract, even expressed in ample terms, was intended to capture disputes more naturally seen as arising under a related contract. … Even if the effect is that there will be a risk of fragmentation of the overall process for the resolution of disputes, this is not by itself sufficient to override the construction, and consequent giving of effect to, the complex agreements for the resolution of disputes which the parties have made."

In short, what is required is a careful and commercially-minded construction of the agreements providing for the resolution of disputes. This may include enquiring under which of a number of inter-related contractual agreements a dispute actually arises, and seeking to do so by locating its centre of gravity and thus which jurisdiction clause is "closer to the claim". In determining the intention of the parties and construing the agreement, some weight may also be given to the fact that the terms are standard forms plainly drafted by one of the parties.

…

59. … If the conclusion is that the parties made two contracts at different times which contain jurisdiction agreements for different countries, there is no presumption that the provisions in the more recent contract are intended

to capture disputes in the earlier contract even if the effect is a risk of
fragmentation of the overall process for the resolution of disputes …'

66. As stated in the passage from *Dicey, Morris and Collins* at §12-110 cited
above, where there are interlinked contracts between the same parties, each containing
its own jurisdiction clause, 'the point of departure will be that it is improbable that
a jurisdiction clause in one contract, even expressed in ample terms, was intended
to capture disputes more naturally seen as arising under a related contract.' As Lord
Collins said in *UBS v HSH Nordbank* at [84], 'sensible business people' are unlikely
to intend that disputes between them should fall within the scope of two inconsistent
jurisdiction clauses. As Longmore LJ observed in *Savona* at [1], where there are
theoretically competing jurisdiction clauses, 'one's natural reaction is that it should
be possible to assign any particular dispute to one or other such clause and that there
should be no overlap between them'.

67. In *Savona* the court cited with approval the following passage from the
judgment of Popplewell J in *Monde Petroleum SA v Westernzagros Ltd* [2015] 1 CLC
49 at [35]-[36]:

> '35. Where there is more than one agreement between the same parties, and
> they contain conflicting dispute resolution provisions, the presumption of one
> stop adjudication dictates that the parties will not be taken to have intended
> that a particular kind of dispute will fall within the scope of each of two
> inconsistent jurisdiction agreements. They will fall to be construed on the
> basis that they are mutually exclusive in the scope of their application, rather
> than overlapping, if the language and surrounding circumstances so allow …
>
> 36. Nevertheless the possibility of fragmentation may be inherent in the
> scheme of the parties' agreements and clear agreements must be given effect
> to even if this may result in a degree of fragmentation in the resolution of
> disputes between the parties.'

68. In the light of the guidance provided by these authorities, so far as relevant to
the present case I would summarise the approach to be as follows:

(1) Where the parties' overall contractual arrangements contain two competing
jurisdiction clauses, the starting point is that a jurisdiction clause in one contract
was probably not intended to capture disputes more naturally seen as arising under a
related contract: *Trust Risk Group* at [48]; *Dicey, Morris & Collins* at §12-110.

(2) A broad, purposive and commercially-minded approach is to be followed: *Trust
Risk Group* at [48]; *Sebastian Holdings* at [39] and [50].

(3) Where the jurisdiction clauses are part of a series of agreements they should be
interpreted in the light of the transaction as a whole, taking into account the overall

A    scheme of the agreements and reading sentences and phrases in the context of that overall scheme: see *UBS v Nordbank* [2009] at [83]; *Trust Risk Group* at [47]; *Sebastian Holdings* at [40].

B    (4) It is recognised that sensible business people are unlikely to intend that similar claims should be the subject of inconsistent jurisdiction clauses: *UBS v Nordbank* at [84], [95]; *Sebastian Holdings* at [40]; *Savona* at [1].

(5) The starting presumption will therefore be that competing jurisdiction clauses are to be interpreted on the basis that each deals exclusively with its own subject matter and they are not overlapping, provided the language and surrounding circumstances

C    so allow: *Monde Petroleum* at [35]-[36]; *Savona* at [1].

(6) The language and surrounding circumstances may, however, make it clear that a dispute falls within the ambit of both clauses. In that event the result may be that either clause can apply rather than one clause to the exclusion of the other: *Savona* at [4] and [31].

D

*The proper interpretation of the EJC and the IJC*

69. In the present case the starting point is that the EJC was probably intended to capture claims naturally arising under the Swap and the IJC was probably intended

E    to capture claims naturally arising under the FA. The clearest example of such claims would be contractual claims brought under the Swap and the FA respectively.

70. The most obvious subject matter of a generally worded jurisdiction clause contained in a contract is that it is to capture claims made under that contract, not some other contract, more especially another contract containing its own jurisdiction

F    clause or other dispute resolution provision.

71. Wide words such as 'relating to' the contract may capture broader claims, such as related tortious claims, but would not naturally extend to claims under a different contract.

G

72. This natural reading of the wording in the EJC and IJC is supported by their contractual context and the overall scheme of the parties' agreements. The FA was an overarching financing agreement made between TRM as borrower and a syndicate of lending banks, including BNPP. BNPP entered into that contract in its capacity of Mandated Lead Arranger, Lending Bank and Agent Bank. Although the FA referred

H    to the fact that Hedging Contracts were to be entered into, that BNPP was to be the Hedging Bank, and that BNPP was to enter into those contracts 'in its capacity as Hedging Bank', BNPP did not contract under the FA in that capacity, in contrast to the position under the ICA. The FA therefore drew a clear distinction between the capacity in which BNPP was entering into the FA and that in which it would be entering into the Swap.

A

73. Under the FA various further contracts were to be entered into, such as 'Project Contracts' and the Hedging Contracts. Under Appendix 17.19 the Hedging Contracts were to be on standard ISDA terms. Those standard terms include a jurisdiction clause in favour of either New York or England and an entire agreement clause. When the parties agreed (together with the other banks) the IJC, it was therefore in circumstances where it was contemplated that Hedging Contracts would be made with BNPP acting in a different capacity, which contracts would contain their own jurisdiction (and choice of law) clause and would be entire and separate.

B

74. The Swap was one of the contracts entered into pursuant to the FA. Its specific subject matter was hedging through the mechanism of swaps. As contemplated by the FA, it contained its own EJC and (as another standard ISDA term) an entire agreement clause. It was governed by English law.

C

75. The natural interpretation of the IJC and the EJC in this context is that the IJC was to govern claims relating to the overarching or background FA, whilst the EJC was to govern claims relating to the specific interest rate Swap entered into pursuant to the FA. Each was to apply to claims relating to the separate contracts in which they were contained and was to be mutually exclusive.

D

76. This conclusion is further borne out by the implausibility of sensible business people agreeing inconsistent jurisdiction clauses and the presumption of mutual exclusivity. As discussed further below, there is no clear language displacing that presumption.

E

*The application of Article 25*

77. As Longmore LJ stated in *Deutsche Bank AG v Petromena ASA* [2015] EWCA Civ 226; [2015] 1 CLC 482 at [85]-[86]:

F

'85. English law cannot, however, be decisive of the matter in the European context. It is important to note that Article 23 is itself confined to agreements to settle disputes "which have arisen or which may arise in connection with a particular legal relationship." The emphasis on the "particular legal relationship" shows that a dispute arising from a second relationship is not likely to be included in an agreement for resolving disputes in an earlier, and different, relationship. The European Court of Justice made exactly this point in *Powell Duffryn plc v M Petereit* (Case C-214/89) [1992] ECR I-1745. Powell Duffryn was an English company which subscribed for shares in a German company which increased its capital but subsequently went into liquidation; the liquidator (Mr Petereit) sued Powell Duffryn in Germany for sums due in respect of the increase in capital and for dividends paid by mistake, relying on a clause inserted into the company statutes on a show of hands in a general meeting by which it was said that any shareholder submitted to the jurisdiction of the

G

H

A          courts ordinarily competent to entertain suits against the company. Powell Duffryn asserted that it should be sued in the courts of its domicile. The Court of Justice was asked to rule on a number of questions including: "Does the jurisdiction clause satisfy the requirement that the dispute must arise in connection with a particular legal relationship within the meaning of Article 17 of the Brussels Convention?" [which later became Article 23 and is now Article 25].

B

86. The court held at para 34 that the requirements of Article 17 would be satisfied if the clause "may be interpreted as referring to the disputes between the company and its shareholders", leaving it to the domestic court to determine whether the clause was to be so construed or not. In reaching that conclusion it said at para 31 that the requirement that the dispute arise in connection with a particular legal relationship:

C

"is intended to limit the scope of an agreement conferring jurisdiction solely to disputes which arise from the legal relationship in connection with which the agreement was entered into. Its purpose is to avoid a party being taken by surprise by the assignment of jurisdiction to a given forum as regards all disputes which may arise out of its relationship with the other party to the contract and stem from a relationship other than that in connection with which the agreement conferring jurisdiction was made".'

D

E

78. In the light of the proper interpretation of the EJC and the IJC as outlined above, in terms of Article 25, the IJC was to apply to claims arising in connection with the background lending relationship set out in the FA, made between TRM as borrower and various lending banks, including BNPP in its capacity of Mandated Lead Arranger, Lending Bank and Agent Bank. That was the relevant 'particular legal relationship' for the purposes of the IJC. The EJC was to apply to claims arising in connection with the specific interest rate swap relationship set out in the Swap, made between TRM as customer and BNPP in its capacity as Hedging Bank. That was the relevant 'particular legal relationship' for the purposes of the EJC.

F

G          79. This conclusion is strongly supported by this court's decision in *Savona*.

80. In that case the parties ('the Bank' and 'Savona') had agreed an advisory services agreement ('the Convention'), which contained an exclusive jurisdiction clause expressed in broad terms which referred 'disputes relating to' the Convention to the Italian courts. A few months later the parties entered into an ISDA Master Agreement, with an English exclusive jurisdiction clause. The parties then executed swap transactions subject to the terms of the ISDA Master Agreement. As in the present case, the Bank issued a Claim Form seeking declarations tracking clauses of the ISDA Master Agreement, and Savona made an application challenging jurisdiction.

H

81. The court concluded that the two jurisdiction clauses governed different relationships and did not materially overlap. Longmore LJ concluded that the parties had two 'particular legal relationship[s]' in relation to one another: a generic relationship set out in the Convention, and a specific interest rate swap relationship set out in the swap contracts incorporating the ISDA Master Agreement [21]. Gross LJ agreed, stating as follows at [36]:

> '… the Convention governed the background or generic relationship between the parties but, as clause 2(b) thereof made plain, not the individual swap contracts subsequently proposed and entered into by the parties. These were to be governed by separate agreements with separate terms, here the ISDA Master Agreement …'

82. Equally, in the present case it may be said that the parties had two 'particular legal relationship[s]' in relation to one another: a background or generic relationship set out in the FA, and a specific interest rate swap relationship set out in the Transaction incorporating the ISDA Master. The IJC and the EJC governed those different relationships and do not materially overlap.

83. The court also held in the *Savona* case at [22] that the entire agreement clause is 'a strong confirmation that the swap contracts are indeed separate contracts and that any dispute relating to them is to come within the jurisdiction clause of those contracts.' It stressed that such a clause exists 'for the purpose of expressing the parties' understanding that the swap contracts are self-contained contracts to be interpreted in accordance with their terms regardless of other prior relationships between the parties.' The ISDA Master for the Swap contained the same clause.

*TRM's arguments*

84. TRM seeks to distinguish *Savona* and to suggest that a different conclusion should be reached in this case on four main grounds:

(1) The terms of the Schedule and the Conflicts Provision.

(2) BNPP's alleged obligation under the FA to implement the 'Hedging Strategy'.

(3) The 2013 amendment to Article 17.19 of the FA by which TRM was to 'comply with its undertakings under the Hedging Contracts'.

(4) The governing nature of the parties' legal relationship set out in the FA.

85. As to (1), TRM stresses the reference in the Schedule to the fact that it stated that the Swap was being entered into 'in connection with' the FA and the ICA. There is, however, no issue that the FA and the Swap are connected. Indeed, the terms of the FA required TRM to enter into the Hedging Contracts. Such a connection does

A    not in any way prevent the relationships being entered into thereby being separate and different 'particular legal relationship(s)', as they were in *Savona*.

86. TRM also relies on the reference in the second paragraph to the Swap being 'subject to the terms and conditions' of the FA and the ICA. Aside from the complication that this refers to the ICA as well as the FA, this should be read together
B    with the Conflicts Provision in the following paragraph. In other words, in so far as the FA or the ICA contain applicable terms and conditions which conflict with the terms of the Swap then they are to prevail and the Swap is to be subject to them. Indeed, it is difficult to see in what other circumstances the terms and conditions of the FA and ICA would be relevant. This therefore adds nothing to TRM's case based
C    on the Conflicts Provision.

87. With respect to the Conflicts Provision, this can only assist TRM if there is a conflict. Where, as here, the Swap and the FA deal with different relationships so that the EJC and the IJC are complementary rather than conflicting, I agree with the judge that there is no conflict. TRM's argument also assumes that: (i) the fact that
D    some disputes may be resolved under either the EJC or the IJC involves a conflict as opposed to an agreement to parallel jurisdictions, as contemplated by Longmore LJ in the *Savona* case at [4]; and (ii) the Conflicts Provision applies to collateral agreements such as a jurisdiction agreement and not just to the substantive provisions of the contracts.

E
88. As to (2), even if it was established that BNPP was under an implied obligation under the FA to implement the Hedging Strategy, an alleged failure so to do might give rise to a claim under the FA but that does not mean that a claim under the Swap could not be made. A factual overlap between claims under the FA and the Swap does not alter the legal reality that a claim under the FA is a different claim made
F    under a different contract in relation to a different legal relationship to a claim under the Swap. The possibility that such a claim under the FA could be made provides no good reason why the IJC and the EJC should not continue to apply to claims under the separate contracts in which they are contained.

G    89. The argument also involves placing impermissible reliance on TRM's response to the Claim rather than the terms of the Claim itself. On the making of a claim there is no means of knowing whether such a claim will be alleged to involve the implementation of the Hedging Strategy.

H    90. The resulting line of demarcation between the EJC and the IJC is, moreover, wholly unclear, if not unworkable. How are parties to know whether a claim which they wish to make does or does not involve implementation of the Hedging Strategy? What exactly is the Hedging Strategy and what did it require? This is not spelt out in Art 17.19 or any other documents to which we were referred. Nor was this defined or explained by TRM in argument, other than by reference to the terms in which the Italian Claim is couched, an impermissible aid.

A

91. Fragmentation of jurisdiction is undesirable and unlikely to be intended by sensible commercial business people, all the more so if it is on an unclear and impractical basis. The logic of TRM's argument is that claims relating to different terms of the Swap may require to be resolved in different jurisdictions and, moreover, under different governing laws. Indeed, it means that claims relating to the same term may be so bifurcated. A claim against TRM for failure to pay under the Swap is a very clear example of a claim under the Swap, not just relating to it. On TRM's case, if such a claim resulted from an alleged failure to implement the Hedging Strategy it would fall under the IJC, either from the outset or on a subsequent migratory basis.

B

92. As to (3), TRM's argument is that this meant that any claim for failure to comply with the terms of the Swap also involves a failure to comply with the FA and that the Swap was thereby somehow subsumed into the FA. However, they remain separate contracts. The amendment does not mean that BNPP is no longer entitled to bring claims under the Swap. It may also be able to bring a claim on the same grounds under the FA, if it so chooses, but that remains a different claim made under a different contract, however great the factual overlap. Moreover, the logical consequence of TRM's argument, as was accepted, is that all claims have to be brought under the IJC so that the EJC is deprived of any effect. This is a legally incoherent and commercially unreal conclusion. As Gross LJ observed in the *Savona* case at [38]:

C

D

'… it would be startling if the bank's claims falling squarely under the swap contracts could not be brought in the forum selected by the parties through the jurisdiction clause under those agreements, namely that contained in the ISDA Master Agreement. A fortiori, if and to the extent that such an outcome might be said to turn on subsequent proceedings which Savona chose to initiate: cf *Deutsche Bank AG v Sebastian Holdings Inc* at para 63. A conclusion to this effect would be highly damaging to market certainty and I would not agree to it unless driven to do so.'

E

F

93. As to (4), this is essentially the conclusion which TRM submits follows from points (1), (2) and (3). For the reasons already outlined, there is no proper basis for treating the parties as effectively having only one 'particular legal relationship'. They clearly had two such relationships, as illustrated by the choice of different governing laws and jurisdictions in relation to each such relationship.

G

94. In summary, none of TRM's arguments provides a satisfactory reason for distinguishing *Savona* or for arriving at a different conclusion in this case.

H

*Conclusion on Grounds 1, 2, and 4*

95. For the reasons outlined above I would uphold the judge's decision in relation to these Grounds. In my judgment he was correct to conclude that in general terms disputes relating to the Swap fall exclusively within the EJC.

CA     **BNP Paribas v Trattamento Rifiuti Metropolitani**     **847**
(*Hamblen* LJ)

A     **Ground 3 – Whether the declarations sought either derive directly from the contractually agreed language of the Swap or are consequent on those declarations**

B     96. The declarations sought and the terms of the ISDA Master to which each of them relate are set out in the Appendix.

97. There is no dispute as to declaration (a).

C     98. As is apparent from the Appendix, each of the declarations in (c) precisely tracks the language of terms of the ISDA Master. As Longmore LJ stated in relation to similar declarations sought in *Savona*, it is 'self-evident that they raise a dispute which relates to the swap contracts' (at [24]). The same conclusion follows if, as in that case, one considers the positive mirror image of those declarations (at [25]).

D     99. The declaration sought in (d), which relates to contractual estoppel, is the alleged consequence of the declarations sought in (c) and must equally relate to the Swap.

100. The declaration sought in (b) is:

E     'The Transaction Documents, *as well as all other written agreements and/ or written notifications and/or documents entered into and/or executed pursuant to the Transaction Documents*, constitute the entire agreement and understanding of the parties thereto with respect to their subject matter and supersede all oral communication and prior writings with respect thereto.' (emphasis added)

F     101. This tracks the language of the entire agreement clause (clause 9(a)) of the ISDA Master, save in relation to the italicised words, which are concerned with notices and similar documents. TRM submits that it cannot be correct that the Transaction Documents constitute the parties' entire agreement with respect to their subject matter because this must be read subject to the wording contained in the first two paragraphs of the Schedule and in particular the Conflicts Provision, and that this

G     engages the IJC. This ignores or seeks to sidestep the judge's unappealed conclusion (at [18]) that the Transaction Documents and thus the 'entire agreement' in respect of the Swap do not include the FA. The mere reference in the Conflicts Provision to the existence of the provisions of the FA (as well as of the ICA) does not mean that the IJC is engaged in addressing any question relating to the incorporation of those

H     provisions.

102. The declaration sought in (e) mirrors paragraph d(ii) of Part 5 of the Schedule to the ISDA Master and asserts the consequence of contractual estoppel. Like the declarations in (c) and (d), it too relates to the Swap.

103. The declaration sought in (f) is:

'In respect of the Transaction, that [BNPP] neither owed nor owes no duty or obligation in deciding whether to grant the Waiver or otherwise to grant the Waiver' and/or 'a refusal by [BNPP] to grant the Waiver does not constitute a breach of the terms of the Transaction Documents'.

104. This declaration does not track any provisions in the ISDA Master. Nor, TRM submits, is it consequent in any logically necessary sense on any such provisions. TRM's early reimbursement request was made pursuant to the FA. Its argument is that BNPP failed in breach of the FA to grant its early reimbursement request on the basis proposed by TRM. It is submitted that the fact that part of that basis was that BNPP should waive the ETD right it had under the ISDA Master did not entail that there was any dispute relating to the parties' relationship under the Swap. The dispute related to the parties' rights and obligations under the FA and on any view it could not be said that no dispute was raised under the FA.

105. The right which BNPP was being asked by TRM to waive was a right to designate an ETD under the Swap. While the right to pre-pay the loan arises under the FA that right is not in dispute and has not been challenged. There was no need for TRM to request agreement to the exercise of its own right or to attach conditions to any such request. I agree with the judge's conclusion that this declaration addresses the question of whether a refusal to grant the Waiver constitutes a breach of the terms of the ISDA Master, and so also relates to the Swap.

106. The declaration sought in (g) is:

'By reason of 7(1)(a) to 7(1)(f) above, the Claimant is not liable in respect of any claim relating to the Transaction, or for losses in respect of any claim, under any system of law or regulation, whether by reference to the Transaction or the Financing Agreement or otherwise, in contract, tort/delict, statute or otherwise, and including but not limited to claims for breach of duty of care (including without limitation, a duty to advise), breach of contract, breach of fiduciary or other duty including any duty of good faith, non-disclosure, omission, misrepresentation (whether innocent, negligent or fraudulent) or breach of statutory or regulatory obligations arising out of or in connection with the Transaction (including but not limited to its suitability, its pricing, its notional amount, its terms, its execution and the circumstances of the Defendant's entry into it) (a "Claim").'

107. This declaration does not track any terms of the ISDA Master and it seeks to capture a wide variety of non-contractual claims and, moreover, includes express reference to the FA. BNPP made it clear that the intention was to ensure that it was limited to claims related to the Swap and that it was prepared to amend the wording to achieve that (by, for example, removing the reference to the FA). In my judgment

this is best achieved by replacing the 'or' before 'losses in respect of any claim' with 'including' and removing the phrase 'whether by reference to the Transaction or the Financing Agreement or otherwise', so that it reads as follows:

> 'By reason of 7(1)(a) to 7(1)(f) above, the Claimant is not liable in respect of any claim relating to the Transaction, including for losses in respect of any claim, under any system of law or regulation, in contract, tort/delict, statute or otherwise, and including but not limited to claims for breach of duty of care (including without limitation, a duty to advise), breach of contract, breach of fiduciary or other duty including any duty of good faith, non-disclosure, omission, misrepresentation (whether innocent, negligent or fraudulent) or breach of statutory or regulatory obligations arising out of or in connection with the Transaction (including but not limited to its suitability, its pricing, its notional amount, its terms, its execution and the circumstances of the Defendant's entry into it) (a "Claim").'

108. If those amendments are made I consider that the claims referred to are sufficiently anchored in the Swap to ensure that it only covers claims relating to the Swap.

109. TRM's objections to declarations (h) and (i) were founded on its objections to (g) and the width of the definition of 'Claim' therein. If (g) is appropriately amended, these consequential objections fall away.

110. Subject to the amendments to declaration (g) above, in my judgment all the declarations sought fall within the EJC and not the IJC and I would uphold the judge's decision on this Ground.

**Conclusion**

111. For the reasons outlined above, I would dismiss the appeal on all Grounds. In those circumstances it is not necessary to consider the further issues raised by the Respondent's Notice.

112. The conclusion that BNPP's claims fall within the EJC contained in the ISDA Master accords with the objects of the Regulation of: (i) allowing the claimant easily to identify the court before which he may bring an action and the defendant reasonably to foresee the court before which he may be sued; and (ii) enabling the court seised to be able readily to decide whether it has jurisdiction, without having to consider the substance of the case – see *Knorr-Bremse Systems v Haldex Brake Products* [2008] EWHC 156 (Pat) at [30(i)].

113. It also accords with the commercial imperative that jurisdiction clauses provide certainty and that the parties know where their disputes will be resolved, both from the outset and when a claim arises.

**850**    BNP Paribas v Trattamento Rifiuti Metropolitani    **[2019] 1 CLC**
(*Asplin* LJ)

A

114. It also accords with the acknowledged importance of interpreting the standard terms of the ISDA Master Agreement so as to provide clarity, certainty and predictability.

**Flaux LJ:**

B

115. I agree.

**Asplin LJ:**

116. I also agree.

C

APPENDIX

| *Declarations sought* | *Relevant term of Master Agreement* |
|---|---|
| (a) The obligations of the Defendant under the Transaction Documents, as well as under all other written agreements and/or written notifications and/or documents entered into and/or executed pursuant to the Transaction Documents, constitute its legal valid and binding obligations, enforceable in accordance with their terms. | 3(a)(v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)). |
| (b) The Transaction Documents, as well as all other written agreements and/or written notifications and/or documents entered into and/or executed pursuant to the Transaction Documents, constitute the entire agreement and understanding of the parties thereto with respect to their subject matter and supersede all oral communication and prior writings with respect thereto. | 9(a) *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto. |

| *Declarations sought* | | | *Relevant term of Master Agreement* |
|---|---|---|---|
| (c) | In entering into the Transaction, the Defendant: | (i) Was acting for its own account and had made its own independent decisions to enter into the Transaction and as to whether the Transaction was appropriate or proper for it based on its own judgment and upon advice from such advisers as it had deemed necessary. | Schedule, PART 5 OTHER PROVISIONS<br><br>(d)(i) *Non-Reliance* It is acting for its own account and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. |
| | | (ii) Was not relying on any communications (written or oral) of the Claimant as investment advice or as a recommendation to enter into the Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction should not be considered investment advice or a recommendation to enter into the Transaction. | (d)(i) *Non-Reliance* … It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. |
| | | (iii) Had not received from the Claimant any assurance or guarantees as to the expected results of the Transaction. | (d)(i) *Non-Reliance*… It has not received from the other party any assurance or guarantee as to the expected results of the Transaction. |

**852**    **BNP Paribas v Trattamento Rifiuti Metropolitani**    **[2019] 1 CLC**
(*Appendix*)

| Declarations sought | Relevant term of Master Agreement |
|---|---|
| (iv) Was capable of evaluating and understanding (on its own behalf or through independent professional advice) and understood and accepted, the terms, conditions and risks of the Transaction. | (d)(ii) *Evaluations and Understanding* It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. |
| (v) Was also capable of assuming, and assumed, the financial and other risks of the Transaction. | (d)(ii) *Evaluations and Understanding* … It is also capable of assuming, and assumes, the financial and other risks of that Transaction. |
| (vi) Was acting as principal and not as agent or in any other capacity, fiduciary or otherwise. | (d)(iv) *Acting as Principal*. It is acting as principal and not as agent or in any other capacity, fiduciary or otherwise. |
| (vii) Had specific competence and expertise to enter into the Transaction and in connection with financial instruments. | (e)(i) *Competence and Expertise*. For the purpose of this Agreement, Party B will be deemed to represent to Party A on the date on which it enters into a Transaction that it has a specific competence and expertise to enter into the Transaction and in connection with financial instruments. |
| (viii) Entered into the Transaction for hedging purposes and not for speculative purposes. | (e)(ii) *Hedging Purposes*. Party B has entered into the Transaction for hedging purposes and not for speculative purposes. |
| (ix) Had full capacity to Undertake the obligations under the Transaction, the execution of which fell within its institutional functions. | (e)(iii) *Capacity*. The execution of the Transaction falls within the institutional functions of the Party B which has full capacity to undertake the relevant obligations. |

© DSP Publishing Ltd

| Declarations sought | Relevant term of Master Agreement |
|---|---|
| (d) Further or in the alternative, in respect of each of the matters in 7(1)(c) above, the Defendant is estopped by contract from contending otherwise. | Consequent upon the above |
| (e) In respect of the Transaction, the Claimant did not act as fiduciary or an adviser for the Defendant. Further or in the alternative, the Defendant is estopped by contract from contending otherwise. | Schedule, PART 5 OTHER PROVISIONS<br><br>(d)(iii) *Status of Parties*. The other party is not acting as a fiduciary or an adviser for it in respect of that Transaction. |
| (f) In respect of the Transaction, the Claimant neither owed nor owes any duty or obligation in deciding whether to grant the Waiver or otherwise to grant the Waiver. Further, or in the alternative, a refusal by the Claimant to grant the Waiver does not constitute a breach of the terms of the Transaction Documents. | (6)(b)(iv) *Right to Terminate*.<br><br>(2) either party in the case of … an Additional Termination Event if there is only one Affected Party may, by not more than 20 days' notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.<br><br>SCHEDULE<br><br>PART 1 TERMINATION PROVISIONS<br><br>(h) '*Additional Termination Event*' will apply. The following shall constitute Additional Termination Events:<br><br>(i) if a Loan provided to Party B by any lender is repaid, prepaid or cancelled in accordance with the provisions of the Contratto di Finanziamento Modificato; |

| *Declarations sought* | *Relevant term of Master Agreement* |
|---|---|
| (g) By reason of 7(1)(a) to 7(1)(f) above and in any event, the Claimant is not liable in respect of any claim relating to the Transaction, or for losses in respect of any claim, under any system of law or regulation, whether by reference to the Transaction or the Financing Agreement or otherwise, in contract, tort/delict, statute or otherwise, and including but not limited to claims for breach of duty of care (including without limitation, a duty to advise), breach of contract, breach of fiduciary or other duty including any duty of good faith, non-disclosure, omission, misrepresentation (whether innocent, negligent or fraudulent) or breach of statutory or regulatory obligations arising out of or in connection with the Transaction (including but not limited to its suitability, its pricing, its notional amount, its terms, its execution and the circumstances of the Defendant's entry into it) (a 'Claim'). | Consequent upon 7(1)(a) to 7(1)(f) above |
| (h) The Claimant is entitled to an indemnity from the Defendant and/or damages in respect of all loss or damage incurred by it arising out of, in respect of any Claim brought in breach of 7(1)(a) to 7(1)(f) above and in respect of all reasonable out of pocket expenses incurred in the enforcement and protection of its rights under the Transaction. | Consequent upon the above |
| (i) Each and every Claim, save for a claim arising in connection with or by reason of the matters referred to in 7(1)(f) above, is in any event statute barred pursuant to the provisions of the *Limitation Act* 1980. | Consequent upon the above |

A

B

C

D

E

F

G

H

© DSP Publishing Ltd

# Bratton Seymour Service Co Ltd v Oxborough

COURT OF APPEAL, CIVIL DIVISION
DILLON, STEYN LJJ AND SIR CHRISTOPHER SLADE
21 FEBRUARY 1992

*Articles of association – Nature of the articles of association – Whether term could be implied in articles – Companies Act 1985, s 14.*

The issue before the court was whether it was possible to imply into the articles of association of a company set up to manage a development of flats a term that the shareholders, who were the owners of the flats, should make contributions for the upkeep of the amenity areas of the development.

**Held** – The articles of association constitute a statutory contract with its own distinctive features. For example, unlike an ordinary contract it was not defeasible on the grounds of misrepresentation and it could not be rectified on the grounds of mistake. Whereas the court might be able to infer a term purely by way of constructional implication, it was not possible to go further and to imply a term from extrinsic circumstances. On the facts, it was not possible to imply a term that the shareholders of the company should be under an obligation to make an additional financial contribution since this went well beyond the language of the articles.

**Cases referred to in judgments**
*Holmes v Keyes* [1958] 2 All ER 129, [1959] Ch 199, [1958] 2 WLR 772, CA.
*Scott v Frank F Scott (London) Ltd* [1940] 3 All ER 508, [1940] Ch 794, CA.

**Appeal**
The defendant, Eric Arthur Oxborough, appealed from the decision of Judge O'Malley in the Yeovil County Court made on 11 July 1990 whereby he granted to the plaintiff, Bratton Seymour Service Co Ltd, a declaration that the defendant was, by virtue of his membership of the plaintiff company, under an obligation to pay such reasonable contribution, determined by the company, towards the expenses reasonably incurred of maintaining both the utility and the amenity areas of the Bratton House development, provided that the element of such contribution attributable to utility expenditure did not exceed the amount that would be due in respect thereof under the covenant in the conveyance to him of his property. The facts are set out in the judgment of Dillon LJ.

*Ian Partridge* (instructed by *Clarke Willmott & Clarke*, Yeovil) for the defendant.
*Nicholas Asprey* (instructed by *Jeremy Wood & Co*, Yeovil) for the plaintiff.

**DILLON LJ.** This is an appeal by Mr Oxborough, who is the defendant in the action, against an order made by his Honour Judge O'Malley on 11 July 1990 in the Yeovil County Court whereby he adjudged and declared –

'that the Defendant is, by virtue of his membership of the Plaintiff Company [which is a company called Bratton Seymour Service Co Ltd], under an obligation to pay such reasonable contribution, determined by the Company, towards the expenses reasonably incurred of maintaining both the utility and the amenity areas of the Bratton House development, provided that the element of such contribution attributable to utility expenditure does not exceed the amount that would be due in respect thereof under the covenant in the conveyance to him of his property.'

The form of the declaration distinguishes between the utility and the amenity areas of the Bratton House development and the reason for that will become apparent. The judge granted that declaration because he held that he was entitled to imply such an obligation as a term of the articles of association of the company.

What is referred to as the Bratton House development is a development of a property now known as Bratton House which used to be called the Hall School at Bratton Seymour near Wincanton in Somerset, and basically the scheme was that the school premises and grounds would be divided up into a number of lots and sold off and various parts of the buildings would be subdivided into smaller residential units. The developer, who had this development in mind in 1984, was a company originally known as Mobile Home Parks Ltd, but which changed its name to Berkeley Leisure Group Ltd. The moving spirit in that company, in effect the developer, was a Mr Berkeley.

The defendant, Mr Oxborough, came in as a purchaser of a part of the property under a conveyance of 14 December 1984 to himself and a Mr Atkins, who carried on business in partnership as builders under the name of Oxborough & Atkins. They bought an area, including Bratton House itself, which was then scheduled for development as nine lots. Subsequently Mr Oxborough decided to retain part of that for his own use and sell off some six flats to purchasers and he bought out Mr Atkins's interest.

The conveyance to Mr Oxborough and Mr Atkins provides for the conveyance of the property which is identified together with the rights and easements set out in the First Schedule, and these include a right of way over the drive and the right to discharge water, soil and effluent into and through the drains lying between the property and certain filter beds and thence through the filter beds and soakaways, a right to take a supply of water to the property from pipes and tanks in certain positions, and a right to enter upon the adjoining property for the purposes of inspecting, repairing, maintaining and renewing the pipes and drains – fairly usual rights. There are conversely exceptions and reservations to the vendor to make connections to use any cables, wires, drains and pipes in the property serving the adjoining property, and so forth, and a reservation of easements and quasi-easements which would be implied by statute or by reason of severance if the retained property of the vendor had been sold. There is a covenant by the vendor to maintain in good repair first the surface of the entrance drive shown coloured brown on the plan; secondly the common drains, pipes, drainage system and filter beds serving the property and the adjoining property; and thirdly all the common water supply pipes and tanks serving the property and the adjoining property.

Conversely there are various covenants by the purchaser. One restricts the number of units that may be created out of what was being sold to him, and

there are other restrictions on user. Then there is a covenant by the purchasers, Mr Oxborough and Mr Atkins –

> 'to pay to the Vendor or its successors in title to the property edged blue and green on the ... plan Thirty Five per cent (35%) of the cost to be incurred from time to time by the Vendor or its successors in title in maintaining the surface of the said drive and the verges Thirty Seven and a half per cent (37.5%) of the cost to be so incurred as aforesaid in inspecting maintaining repairing and renewing the said drains and filter beds and Thirty Five per cent (35%) of the cost to be so incurred as aforesaid in inspecting maintaining and repairing and renewing the said water pipes and tanks.'

Then there is a provision for installing a water meter at a convenient point at or near the boundary of the property conveyed and to pay water charges to the Wessex Water Authority or other statutory water undertaking. What that conveyance says nothing at all about are the areas of the Bratton House estate which were in the event laid out as tennis courts and a swimming pool and a garden.

It was envisaged that there would be a management company set up which would hold the common parts of the estate and the members of which would be the residents in the various residential units built or converted out of the buildings on the estate. That company is the plaintiff company. It was incorporated on 28 August 1984. The memorandum of association was subscribed on 3 August 1984 by Mr Berkeley, a director of the development company, and a Mr Sprackling, a chartered accountant of Lyme Regis, who was in fact a purchaser of one of the units on the estate from the development company. The memorandum provides in its objects clause (cl 3) firstly in (a) a general power –

> 'to acquire or deal with or invest in any property real or personal or to carry on any trade or business or to erect any buildings and generally to do all acts and things which in the opinion of the Company or the Directors may be conveniently or profitably or usefully acquired dealt with invested in carried on erected or done by the Company.'

Then, more specifically, and in line with what was at the outset intended, in (b):

> '(i) To acquire from Mobile Home Parks Limited the freehold property comprising the entrance drive, visibility plays, recreational area, filter beds, pipes and soakaways and water tank and pipes at the premises formerly known as The Hall School, Bratton Seymour near Wincanton and to hold the same for the benefit of the owners or tenants of the dwellings and flats constructed on adjacent land.
> (ii) To manage the property and to collect the income therefrom and to supply to the owners and tenants the services undertaken by Mobile Home Parks Limited on the sales of the dwellings and flats and generally to discharge the duties of Mobile Home Parks Limited from time to time.'

The common parts, both the drive and utility areas which were the subject of the rights granted in, for instance, the conveyance to Mr Oxborough, and the

amenity areas (the tennis courts, swimming pool and area of garden), were conveyed to the plaintiff company by the development company, Berkeley Leisure Group Ltd, by a conveyance of 1 July 1985.

The position has now come about that Mr Oxborough disagrees with the demands of other residents that he should contribute to the upkeep and maintenance of the amenity areas. He accepts his liability under his covenant in respect of the drive and utilities, but points out that he has never covenanted to contribute to the maintenance of the amenity areas. He did, however, like all residents, take shares in the company when the company had been incorporated and he had acquired his land under the conveyance which I have mentioned. In fact, as he was acquiring the property for conversion and sub-division, he was allocated, it seems, initially nine shares of which six were transferred into the names of the six purchasers of the six flats created out of parts of Bratton House by Mr Oxborough and his former partner. He has continued to occupy the seventh flat formed in Bratton House and he has therefore, in respect of that flat, one, two or three shares in the company. The total share capital of the company is only 24.

It is the submission of the company, which the learned judge upheld, that by necessary implication and in order to give business efficacy to the scheme which the promoters of the company had in mind in relation to the management of the Bratton House estate there is to be implied into the articles of association of the company the obligation, which the judge declared, to contribute 'such reasonable contribution, determined by the Company, towards the expenses reasonably incurred of maintaining both the utility and the amenity areas of the Bratton House development'. The judge limited the contribution in relation to the utilities because of the covenants which I have mentioned which Mr Oxborough and other purchasers entered into, and the benefit of those covenants was assigned by the development company to the present plaintiff company.

I see insuperable difficulties in the way of any such implication into the articles of association of the company. It is said, 'Oh, the articles constitute a contract between the company and its members, and so you can imply any term into such a contract as you can imply any term into any other contract in order to give business efficacy'. But the articles of association of a company differ very considerably from a normal contract. They are a document which has statutory force. If a company, limited by shares, chooses to have articles of association instead of merely relying on Table A, then those articles have to be registered. These articles were registered when the company was incorporated. The articles thus registered are one of the statutory documents of the company open for inspection by anyone minded to deal with the company or to take shares in the company. It is thus a consequence, as was held by this court in *Scott v Frank F Scott (London) Ltd* [1940] 3 All ER 508, [1940] Ch 794, that the court has no jurisdiction to rectify the articles of association of a company, even if those articles do not accord with what is proved to have been the concurrent intention of the signatories of the memorandum at the moment of signature.

It is because of the statutory force of the articles, when registered, that that conclusion was reached. The articles, if not in accordance with the intention of the subscribers, have to be altered by the statutory procedure of a special resolution if the appropriate majority of the members agree to such an alteration. There is the further restriction that the company cannot, by an alteration of its articles, impose an extra burden of contribution on a member who does not

vote in favour of the alteration. That was introduced into company law by way of clarification in the Companies Act 1928 and is now to be found in s 16(2) of the Companies Act 1985. Of course, Mr Asprey, appearing for the company in this court, does not seek to rely on alteration of the articles. He says that he can get round that difficulty by implication into the original articles at the time the company was incorporated. But there is nothing in the articles to give any hint of any contribution by the members to the maintenance of the utilities or the amenity areas or anything else. He has to reach his implication by taking into account surrounding circumstances not apparent from the articles themselves or from the memorandum.

On the facts, what was in issue in *Scott v Scott Ltd* was whether the executor of a deceased member of a company was bound to offer the deceased member's shares in the company to the other members at par. It was said that the common intention of the subscribers was that if one of the subscribers died the others should be entitled to acquire his shares at par. When one died his widow and sole executrix claimed, by virtue not of any special provision in the articles but of her ownership of the shares in the absence of any provision to the contrary in the articles, to be registered in the share register of the company as the owner of her deceased husband's shares in the company. This court held that she was so entitled, and held also, affirming in this respect the decision of the judge at first instance, that the court had no jurisdiction to rectify the articles of association, even if they did not accord with what was proved to have been the concurrent intention of the signatories at the moment of signature.

The argument advanced in the present case of an implied term necessary to give business efficacy to the scheme which the subscribers had formed would, it would seem, have been open to the respondents in *Scott v Frank F Scott (London) Ltd* but their counsel, Mr Charles Harman KC, and Mr Winterbotham, apparently did not think of that easy way round their difficulties and they argued instead for the court's right to rectify the articles to bring in a provision obliging the executrix to offer the deceased's shares to the other shareholders at par. I do not need to quote specifically from the judgment of the court delivered by Luxmore LJ. To my mind it is wholly inconsistent with that judgment that there should be any such power in the court to imply a term into the articles of association, such as Mr Asprey has contended for, which arises from the surrounding circumstances not apparent from the terms of the memorandum and articles themselves. In particular, it does not in the least appear from the memorandum and articles themselves that the purchasers of the various parts of the property are going to enter into covenants to contribute to the cost of the utilities but not covenants to contribute to the maintenance of the amenity areas: nor does it appear from the memorandum and articles that there was no intention to form some members' club to run the amenity areas for the benefit of those residents and others who wished to take advantage of the tennis courts and swimming pools.

There is the further point in relation to Mr Oxborough that his conveyance came subsequent to the incorporation of the company, and so at the time of the incorporation of the company it would have been perfectly possible that terms might have been negotiated in his conveyance which did put a contractual obligation on him to contribute to the development company a due proportion, whatever it may have been, of the cost of maintaining the amenity areas. The percentages also that are fixed for contribution to the upkeep of the utilities

must make it highly doubtful whether contribution to the upkeep of the amenities was intended to be per shareholding in the company rather than by some other means related to user.

In these circumstances, with all respect to the learned judge, I am wholly unable to agree that there is any term to be implied into the articles of association of this company. I would therefore allow this appeal.

STEYN LJ. The question is whether it is ever permissible to imply into articles of association a term not on the basis of a construction or implication derivable purely from the consideration of the language of an instrument, but on the basis of extrinsic evidence of surrounding circumstances.

Section 14(1) of the Companies Act 1985 provides that 'the memorandum and articles, when registered, bind the company and its members to the same extent as if they respectively had been signed and sealed by each member'. By virtue of s 14 the articles of association become, upon registration, a contract between a company and members. It is, however, a statutory contract of a special nature with its own distinctive features. It derives its binding force not from a bargain struck between parties but from the terms of the statute. It is binding only insofar as it affects the rights and obligations between the company and the members acting in their capacity as members. If it contains provisions conferring rights and obligations on outsiders, then those provisions do not bite as part of the contract between the company and the members, even if the outsider is coincidentally a member. Similarly, if the provisions are not truly referable to the rights and obligations of members as such it does not operate as a contract. Moreover, the contract can be altered by a special resolution without the consent of all the contracting parties. It is also, unlike an ordinary contract, not defeasible on the grounds of misrepresentation, common law mistake, mistake in equity, undue influence or duress. Moreover, as Dillon LJ, has pointed out, it cannot be rectified on the grounds of mistake.

Turning now to the present case, the question is whether the implied term of requiring members to contribute to maintenance of the amenities can be implied not on the basis of any language to be found in the articles, but on the basis of extrinsic circumstances. The question is, is it notionally ever possible to imply a term in such circumstances? I will readily accept that the law should not adopt a black-letter approach. It is possible to imply a term purely from the language of the document itself: a purely constructional implication is not precluded. But it is quite another matter to seek to imply a term into articles of association from extrinsic circumstances.

Here, the company puts forward an implication to be derived not from the language of the articles of association but purely from extrinsic circumstances. That, in my judgment, is a type of implication which, as a matter of law, can never succeed in the case of articles of association. After all, if it were permitted, it would involve the position that the different implications would notionally be possible between the company and different subscribers. Just as the company or an individual member cannot seek to defeat the statutory contract by reason of special circumstances such as misrepresentation, mistake, undue influence and duress and is furthermore not permitted to seek a rectification, neither the company nor any member can seek to add to or to subtract from the terms of the articles by way of implying a term derived from extrinsic surrounding circumstances. If it were permitted in this case, it would be equally permissible

over the spectrum of company law cases. The consequence would be prejudicial to third parties, namely potential shareholders who are entitled to look to and rely on the articles of association as registered. Despite Mr Asprey's lucid and incisive argument, I take the view that on this ground alone the implication cannot succeed.

For this reason, and also for the reasons given by Dillon LJ, I agree that the appeal ought to be allowed.

**SIR CHRISTOPHER SLADE.** A careful prospective shareholder in a private limited company, such as the plaintiff company in the present case, may wish to know, before he subscribes for his shares, to what potential financial liabilities in relation to the company he will be exposed. For this purpose he will be entitled to direct his attention to the memorandum and articles of association of the company as registered. Their form will, in this context be crucial. As has already been pointed out, they will constitute a form of contract between himself and the company of a special nature having statutory operation. The decision in *Scott v Frank F Scott (London) Ltd* [1940] 3 All ER 508, [1940] Ch 794 to which Dillon LJ has referred, shows that this form of contract has some special incidents, in particular because it is incapable of rectification.

To quote some words from the judgment of Jenkins LJ in *Holmes v Keyes* [1958] 2 All ER 129 at 138, [1959] Ch 199 at 215, I accept Mr Asprey's submission that:

> '. . . the articles of association of the company should be regarded as a business document and should be construed so as to give them reasonable business efficacy, where a construction tending to that result is admissible on the language of the articles, in preference to a result which would or might prove unworkable.'

Mr Asprey, however, has had to accept that the language of the articles of association of the company in the present case, if read on its own without extrinsic evidence, cannot be said to impose on the shareholders the financial obligations which the judge held to have been imposed on them by the articles. He has therefore been driven to rely on extrinsic evidence for this purpose.

I accept that, in construing the articles of association of a company, evidence of surrounding circumstances may be admissible for the limited purpose of identifying persons, places or other subject matter referred to therein. Mr Asprey, however, has not invoked extrinsic evidence of surrounding circumstances in the present case for that limited purpose. He has sought to invoke it for the purpose of imposing additional financial obligations on the members far beyond those which the language of the articles of association of the company, read fairly on its own, would impose on them, because, he says, such an implication is required to give the articles business efficacy. No authority has been cited to us which begins to support the proposition that extrinsic evidence is admissible for that wide purpose in construing the statutory contract created by the articles of association of a company. In my judgment, the admission of such evidence for such purpose would be quite contrary to the principles governing this type of statutory contract. If it were to be admissible, this would place the potential shareholders in a limited company, who wished to ascertain their potential obligations to the company, in an intolerable position. They are in my judgment

entitled to rely on the meaning of the language of the memorandum and articles of association, as such meaning appears from the language used.

For these short reasons, I would agree that this appeal must be allowed.

*a*

*Appeal allowed.*

Carolyn Toulmin   Barrister.

Case 1:20-cv-10041-PKC    Document 104-1    Filed 08/24/21    Page 96 of 151

# Companies Act 2006 c. 46
# s. 33 Effect of company's constitution

 **Law In Force**

**Version 1 of 1**

1 October 2009 - Present

**Subjects**
Company law

**Keywords**
Company constitutions; Debts; Shareholders

**33 Effect of company's constitution**

(1)  The provisions of a company's constitution bind the company and its members to the same extent as if there were covenants on the part of the company and of each member to observe those provisions.

(2)  Money payable by a member to the company under its constitution is a debt due from him to the company. In England and Wales and Northern Ireland it is of the nature of an ordinary contract debt.

*Part 3 A COMPANY'S CONSTITUTION > Chapter 4 MISCELLANEOUS AND SUPPLEMENTARY PROVISIONS > Other provisions with respect to a company's constitution > s. 33 Effect of company's constitution*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Companies Act 2006 c. 46
## s. 260 Derivative claims

 **Law In Force**

**Version 1 of 1**

1 October 2007 - Present

**Subjects**
Civil procedure; Company law

**Keywords**
Derivative claims; Shareholders

**260 Derivative claims**

(1)  This Chapter applies to proceedings in England and Wales or Northern Ireland by a member of a company–

    (a)  in respect of a cause of action vested in the company, and

    (b)  seeking relief on behalf of the company.

This is referred to in this Chapter as a *"derivative claim"* .

(2)  A derivative claim may only be brought–

    (a)  under this Chapter, or

    (b)  in pursuance of an order of the court in proceedings under section 994 (proceedings for protection of members against unfair prejudice).

(3)  A derivative claim under this Chapter may be brought only in respect of a cause of action arising from an actual or proposed act or omission involving negligence, default, breach of duty or breach of trust by a director of the company. The cause of action may be against the director or another person (or both).

(4)  It is immaterial whether the cause of action arose before or after the person seeking to bring or continue the derivative claim became a member of the company.

(5)  For the purposes of this Chapter–

    (a)  *"director"* includes a former director;

    (b)  a shadow director is treated as a director; and

    (c)  references to a member of a company include a person who is not a member but to whom shares in the company have been transferred or transmitted by operation of law.

*Part 11 DERIVATIVE CLAIMS AND PROCEEDINGS BY MEMBERS > Chapter 1 DERIVATIVE CLAIMS IN ENGLAND AND WALES OR NORTHERN IRELAND > s. 260 Derivative claims*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

© 2021 Thomson Reuters.

# Companies Act 2006 c. 46
# s. 994 Petition by company member

 **Law In Force**

**Version 3 of 3**

26 May 2015 - Present

**Subjects**
Company law

**Keywords**
Auditors; Petitions; Removal; Shareholders; Unfairly prejudicial conduct

**994 Petition by company member**

(1)  A member of a company may apply to the court by petition for an order under this Part on the ground–

(a)  that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or

(b)  that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial.

[

(1A)  For the purposes of subsection (1)(a), a removal of the company's auditor from office—

(a)  on grounds of divergence of opinions on accounting treatments or audit procedures, or

(b)  on any other improper grounds,

 shall be treated as being unfairly prejudicial to the interests of some part of the company's members.

][1]

(2)  The provisions of this Part apply to a person who is not a member of a company but to whom shares in the company have been transferred or transmitted by operation of law as they apply to a member of a company.

(3)  In this section, and so far as applicable for the purposes of this section in the other provisions of this Part, *"company"* means–

(a)  a company within the meaning of this Act [.][2]

[...][2]

## Notes

1    Added by Statutory Auditors and Third Country Auditors Regulations 2007/3494 Pt 6 reg.42(1) (April 6, 2008: insertion of s.994(1A) does not apply in relation to auditors appointed for financial years beginning before April 6, 2008)

© 2021 Thomson Reuters.

# **Notes**

2        Repealed by Deregulation Act 2015 c. 20 Sch.23(5) para.28(7) (May 26, 2015)

*Part 30 PROTECTION OF MEMBERS AGAINST UNFAIR
PREJUDICE > Main provisions > s. 994 Petition by company member*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

Claim No: 21407/2009

<u>**Neutral Citation Number: [2010] EWHC 3096 (Ch)**</u>
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

<u>Friday, 5 November 2010</u>

BEFORE:

**MR JOHN RANDALL QC**
**(Sitting as a deputy judge of the High Court)**

-------------------

BETWEEN:

**CREAM HOLDINGS LIMITED**

Claimant

- and -

**STUART DAVENPORT**

Defendant

-------------------

<u>MR R HOLLINGTON QC and MR S PRENTIS</u> (instructed by Marriott Harrison) appeared on behalf of the Claimant

<u>MR F TREGEAR QC</u> (instructed by CJ Jones) appeared on behalf of the Defendant

-------------------

**<u>Approved Judgment</u>**
Crown Copyright ©
-------------------
Digital Transcript of Wordwave International, a Merrill Communications Company
101 Finsbury Pavement London EC2A 1ER
Tel No: 020 7422 6131  Fax No: 020 7422 6134
Web: www.merrillcorp.com/mls     Email: mlstape@merrillcorp.com
(Official Shorthand Writers to the Court)

No of words: 17,405
No of folios: 242

1.  MR RANDALL QC:  This case concerns the construction and effect of the articles of association of the claimant company, Cream Holdings Limited.  Taking the circumstances giving rise to the claim very shortly, the claimant company was incorporated in October 1995 as a promoter of concerts, music, dance and clubs.  The defendant was one of the original shareholders and directors.  In August 2004 he was removed as a director which, the parties agree, under article 11.2 brought about the deemed service of a transfer notice in respect of his shareholding, absent the service by him of an actual transfer notice.  His holding at the time was just over 25 per cent of the total, being 9,132 shares.

2.  Adopting the terminology of the articles, the defendant was a "good leaver" and, therefore, entitled to fair value as at 24 September 2004 for his shares, a particular feature of that being that they should be valued pro rata rather than subject to a minority discount.  Fair value in the absence of agreement was to be certified in writing, as we will see shortly, by someone defined as the "third party accountant".

3.  In earlier proceedings initially in front of Ms Susan Prevezer QC, sitting as a deputy High Court judge, but then on appeal, the validity of the first attempted appointment of a third party accountant, if I may put it that way, was in issue.  In the event, it was determined both at first instance and in the Court of Appeal that such appointment was ineffective.  I will shortly come to the reasons why it was so held.

4.  In between the first instance and Court of Appeal hearings, the claimant, in order to establish what his counsel described as a fallback position, decided to operate, without prejudice to the outcome of its appeal, the alternative method under the articles for an appointment of a third party accountant.  This method is perhaps most conveniently referred to as being under limb 2 of the relevant definition.  Pursuant to that, the claimant sought and obtained from the president of the Institute of Chartered Accountants a nomination, if that is a suitably neutral term, and the firm and individual so nominated were PKF and Mr Nicholas Whitaker of that firm.  Following the decision of the Court of Appeal, that fallback step taken by the claimant became of immediate relevance.  Unfortunately, however, it has not been possible for the claimant and the defendant to agree the terms of engagement of Mr Whitaker, and hence little progress has been made in the operation of the relevant provisions of the articles.  Indeed, one cannot help but note that the effect of all this is that we are now six years past the date of the deemed transfer notice, and the date at which the valuation is to be made, and yet in one sense little progress has been made.

5.  The obstacles to a consensual appointment of Mr Whitaker are in essence twofold in nature.  Firstly, the defendant will not agree to join in such an appointment until all his requests for prior disclosure of documentation have been met to his satisfaction.  Secondly, he takes objection to essentially three terms of the nominated third party accountant's proposed letter of engagement.

6.  Although I fear this judgment will not be short, I can at least shorten it to this extent: I do not propose to recite at any length the history giving rise to disputes between the parties.  What enables me to do that is that they are already dealt with in the judgments of Ms Prevezer and the Court of Appeal.  I will come to the relevant history of dealings between the parties since the decision of the Court of Appeal later in my judgment.

7.  I therefore turn directly to the provisions of the claimant's articles of association.  The definitions within the articles of association at article 2.1 include the following:

> "'Board' means the board of Directors of the Company from time to time or any duly authorised committee thereof.
> 'Fair value' means the price per share certified in accordance with Article 11.14.
> 'Good leaver' means a holder of shares (other than Ingenious and/or the Investor and/or an Investor/Director whose employment or engagement has terminated and who is not a Bad Leaver [as no one suggests that the defendant was a bad leaver and the definition of one is lengthy, I will not recite the same].
> 'Sale price' shall have the meaning given to such term in Article 11.12 or Article 11.11 as the case may be."

8.  Finally, and perhaps most importantly, this:

> "'Third party accountant' shall be an independent firm of accountants chosen by the Transferor and the Board or failing agreement on such appointment within seven days as chosen by the president from time to time of the Institute of Chartered Accountants."

9.  Informed by those definitions, I move to article 11.  The overall heading is "pre-emption rights":

> "11.1 Transfer Notice... Any member (a "Transferor') wishing to dispose of any of his Shares ... ("Sale Shares') shall give notice in writing (a "Transfer Notice') to the Company ... Every Transfer Notice shall: 11.1.1 - constitute the Company as the agent of the Transferor for the sale of the Sale Shares ...   11.1.5 - not be revocable except with the consent of the Directors.
>
> 11.2 Employee Transfers. Any Employee who is a member and who ceases to be an Employee shall within 14 days of the Termination Date serve a Transfer Notice at the Sale Price specified in Article 11.11 (and if no such Transfer Notice has been served within such period, then the required Transfer Notice shall be deemed to have been served) in respect of all the Shares held by him at the Termination Date ...
>
> 11.6 Pre-emption Rounds. Subject (if applicable) to the Sale Price being agreed or determined (as the case may be) in accordance with Article 11.11 and Article 11.14, the Company shall, as soon as reasonably practicable, give notice in writing to each member informing them that the Sale Shares are available for transfer and of the Sale Price and shall invite each member to state in writing within 30 days from the date of the said notice ... whether he is willing to purchase any and, if so, how many of the Sale Shares ..."

11.8 Allocations.  Subject to Article 11.9, upon such allocations being made as aforesaid, the Transferor shall be bound, on payment of the Sale Price, to transfer the Sale Shares comprised in the Allocation Notice to the Applicant(s) named therein at the time and place specified therein.  If the Transferor defaults in doing so the chairman for the time being of the board or, failing him, one of the other Directors or some other person duly nominated by a resolution of the Board for that purpose, shall forthwith be deemed to be the duly appointed attorney of the Transferor with full power to execute, complete and deliver in the name and on behalf of the Transferor a transfer or transfers of the relevant Sale Shares to the Applicant(s) and any Director may receive and give a good discharge for the purchase money on behalf of the Transferor and (subject to the transfer(s) being duly stamped) enter the name of the Applicant(s) in the register of members as the holder(s) of the Shares so purchased.  The Company shall forthwith pay the purchase money into a separate bank account in the Company's name and shall hold such money on trust (without interest) for the Transferor until the Transferor shall deliver up to the Company his certificate(s) (or such indemnity in lieu thereof as the Company may reasonably require) for the relevant Shares when the Transferor shall thereupon be paid the purchase money.

11. 10 Exhaustion of Pre-emption provisions. In the event of all the Sale Shares not being sold by the Company under the foregoing provisions of this Article 11, the Transferor may at any time within 3 calendar months after receiving notice from the Company that the pre-emption provisions herein contained have been exhausted transfer any Sale Shares not sold to any person or persons at any price not less than the Sale Price ...

11.11 Sale Price for Good Leavers and Bad Leavers. If a Transfer Notice is ... deemed to have been given ... then the sale price per Sale Share (also a "Sale Price") shall be determined as follows:
11. 11. 1 in the case of a Good Leaver, the Sale Price shall be the Fair Value ...

11.14 Fair Value.  In these Articles the term 'Fair Value' shall mean the price per Share as agreed by the Board and the Transferor or failing such agreement as determined by the Third Party Accountant and certified in writing by the Third Party Accountant as being the price which, in their opinion represents a fair value for such Share as between a willing vendor and purchaser of the same as at the date the Transfer Notice is given or is deemed to have been given in respect of such share.  When giving such certificate, the Third Party Accountant shall not take into account whether the Shares concerned comprise the majority or a minority interest in the share capital of the Company, nor the fact that the right to transfer such Shares is restricted by these Articles and shall assume that the entire issued share capital of the Company is being sold.

> However, in so certifying the Third Party Accountant shall take into account such other facts as they, in their absolute discretion shall consider appropriate including, if they so consider appropriate, the past and current performance of the group and the apparent future prospects of the Group.  The Third Party Accountant shall act as experts and not as arbitrators and in the absence of manifest error their decision shall be final and binding on the Company and its members.  The costs of the Third Party Accountant in certifying the Fair Value shall be borne as the Third Party Accountant determines."

10.    Reverting to the definition of "third party accountant", what I shall describe as the first limb thereof provides for the appointment of such as "chosen by the transferor and the board" although in the events which occurred the presence of the following words in the definition, which I have already quoted, is important.

11.    In essence, what occurred was that the defendant provided to the claimant the names of three firms of chartered accountants who would be acceptable to him as potential third party accountants.  The claimant chose one of them, the well-known firm BDO Stoy Hayward.  However, although the claimant signed that firm's engagement letter, the relevant individual being a Mr Eamer, the defendant was unwilling to do so.  However, the claimant took the view that it was entitled to sign an engagement letter alone on the basis that the person or firm being engaged was one as to whose identity the defendant had already expressed his satisfaction.

12.    The final hearing of the resultant proceedings came before Ms Prevezer QC who gave judgment on 22 February 2008 (see [2008] EWHC 298 (Ch), [2008] All ER (D) 338 (Feb)).  The essence of her decision is adequately encapsulated by the head note in the latter report, which reads as follows:

> "The first defendant company operated an entertainment and events business.  By 1997 the claimant and the second defendant had become 50 per cent shareholders and directors of the company.  In September 2001, the third defendant company invested £5 million in the company in exchange for a 48 per cent shareholding and the appointment of two directors to the company's board.  At that time, the claimant stepped down from his executive role and became a non-executive director.  Towards the end of 2002/beginning of 2003, the company terminated the claimant's paid employment.  The claimant remained as an unpaid director until he was removed in August 2004.  In October 2004, the claimant was offered £68,000 for his 26.7 per cent minority shareholding in the company.  The claimant sought information from the company from which he could asses the proper value of the shares, however the company threatened to proceed with the appointment of a third party accountant, in accordance with its articles of association, as a result of the inability to reach agreement over the valuation of the shares.  Article 2.1 of the company's articles of association defined the third party accountant as 'an independent firm of accountants chosen by the transferor and the board, or failing agreement on

> such appointment ... as chosen by the President … of the Institute of Chartered Accountants'. Article 11 created pre-emption rights for existing shareholders where a member wished to dispose of any of his shares; Article 11.14 provided that 'Fair Value' shall mean the price per share as agreed by the board and the transferor or, failing such agreement, as determined by the third party accountant. As no agreement as to the fair value of the shares had been reached, and in purported compliance with the company's articles of association, a third party accountant was appointed by the board to value the claimant's interest in the company. In December 2006, the third party accountant certified that the value of a one penny ordinary share in the company to be £59.00 as at the agreed valuation date. The claimant successfully applied, without notice, for an injunction restraining the defendants from implementing the compulsory share transfer provisions in the articles of association, and sought a declaration that the valuation of his shareholding ¡n the company was not binding on him and/or was subject to manifest error."

13. Ms Prevezer from paragraph 10 in her judgment recited the history which gave rise to the case. It included the fact that it was then, as it remains now, common ground that a deemed transfer notice was to be taken as served on 24 September 2004. She recited the correspondence, including the essential features thereof to which I have already made reference. At paragraphs 37 and 38 of her judgment she set out the nature of the dispute before her.

14. In paragraph 41, she summarised the submissions on behalf of the defendant, who was then, as he has been at this hearing before me, represented by Mr Francis Tregear QC. At paragraph 41, the learned deputy judge records:

> "In support of his argument, Mr Tregear emphasises the inclusion of the word 'appointment' in Article 2.1 and contends that there would be no point in choosing a firm if they did not accept the appointment, and an appointment can only take place once the Board and the Transferor have agreed the identity of the valuer and the terms of engagement with the valuer. Further, the fact that under article 11.14 either party could potentially bear the whole of the costs of the exercise and that any firm appointed as TPA will owe contractual and tortuous duties to both the company and the Transferor, makes it clear that the appointment must be by both parties. Finally, Mr Tregear contends that his suggested construction is workable as it is implicit in the process under Article 2.1 that the parties' agreement on an appointment should not be unreasonably withheld. Recourse to the court, therefore, may be had for the limited purpose of determining whether one party's refusal to appoint the particular valuer on the terms agreed by the valuer and the other party was unreasonable."

15.    Turning to the learned judge's reasoning, which I think can fairly be said in essence to have accepted Mr Tregear's submissions as there summarised, she said this:

> 45. In my view, Article 2.1 and Article 11.14 taken together were intended to provide a workable quick and effective expert determination procedure to resolve the issue of the price of a Transferor's share in the Company. With this in mind, I share Mr Tregear's view that for an accounting firm to be the TPA in accordance with Article 2.1, it was intended that that firm had to agree with both parties to act in that capacity and the terms of the firm's appointment had to be agreed by both parties. In my view, it is neither sufficient nor workable procedurally for there to be a bilateral choice of accountant, followed by a unilateral appointment where, as here, one party had not agreed the firm's terms of engagement. It is only when the parties have agreed the terms of appointment with the valuer and to appoint the valuer on such terms, that there is a TPA within the definition of Article 2.1. If the parties cannot agree the appointment after 7 days, then the matter can be referred to the President of the ICA.
>
> 46. In summary, I would express my conclusions on the construction of Article 2.1 as follows. The issue is whether it is sufficient for the two parties merely to identify a valuer, as Mr Clutterbuck argues, or whether they must enter into a tripartite agreement as to his appointment, as Mr Tregear argues. Looked at linguistically, either the concepts of "choice" in Article 2.1 are different, as Mr Tregear contends (based on the use of the different words "chosen" and "appointment") or they are the same, as Mr Clutterbuck contends (in light of the word "such"). If the two concepts are different, then it seems to me reasonably clear that Mr Davenport must succeed. An "appointment" of a valuer by the parties, particularly if it is to be contrasted with the parties "choosing" a valuer, involves, as a matter of ordinary language, a formal offer and acceptance of that role by the valuer. On the other hand, if the two concepts are the same, then albeit with more hesitation, I would reach the same conclusion. The fact that, when the parties are involved, the concept of "choice" and "appointment" are the same suggests that one should adopt a meaning for the two words which is a meaning they both naturally bear. While it would be a misuse of language to describe a valuer as "appointed" by the parties if he had not agreed with the parties to be appointed, it would not be a misuse of language to say that a valuer was not "chosen" by the parties until he had agreed with the parties to be so appointed. Further, the fact that the President "chooses" does not, on analysis, assist the Defendants as it is no misuse of language to describe the President as "appointing" a valuer if he merely nominates him without identifying, let alone agreeing the terms of his appointment.
>
> 47. Where I depart from Mr Tregear's analysis is that in my view, the actual appointment of the valuer, once both parties have agreed with the valuer its terms of appointment, may be made by one party

or both.    Article 2.1 talks of "failing agreement on such appointment" as opposed to "failing such appointment" and I do not think a joint appointment is required under Article 2.1 before a firm qualifies as a TPA.  What is required, however is that both parties must have agreed the valuer's terms of engagement with the valuer and the valuer must have agreed with both parties to act on such terms.  In the present case, Mr Davenport ultimately never agreed to the terms of BDO's appointment.

48. My conclusion is reinforced by practical considerations.  First, it seems likely that the parties would not have envisaged an agreed valuer effecting the valuation unless the terms of his appointment had been agreed by both parties.  His terms as to fee, liability, insurance cover, et cetera, could be as important as his identity.

Further, an independent expert nominated for the purposes of valuing property, in particular shares which are the subject of pre-emption provisions in Articles, will owe a duty of care to the parties who are going to be bound by his valuation (Arenson v Casson Beckman [1974] AC 405).  That liability could be very large and one which the person who is asked to act as an expert may not be prepared to take on without both parties agreeing to its terms of engagement with a liability cap.  Secondly there is an obvious lacuna on Mr Clutterbuck's case if the parties "choose" a valuer whose terms they can not then agree.  On Mr Clutterbuck's case, they will have "chosen" a valuer who will not value, but no application to the President can be made because a valuer has been "chosen".    While it would be theoretically possible for Mr Clutterbuck to get out of this problem at the first stage by invoking the decision of the House of Lords in Sudbrook Trading Ltd v Eggleton and Ors [1983] AC 444 at 479 per Lord Diplock, it would seem a very odd application of that case.  If the parties "chose" on Mr Clutterbuck's basis but did not agree on the terms of the valuers appointment with the valuer, one would be implying a term that they would have to try and choose again, not so much because that is necessary in itself, but because it is necessary to bring in the next step in Article 2.1.  If, however, one construes Article 2.1 in either of the ways suggested above, then the default provision works.  If the parties choose a firm but, for whatever reason (including the firm's refusal to agree terms of engagement) they fail to agree the terms of that firm's appointment within 7 days, then the President can choose a firm, presumably off a list of suitable accountants held by the ICA for such purposes.  If the firm then chosen off the list by the President refuses to accept the proposed terms of engagement, all three parties may be able to seek the court's assistance to settle those terms; the assumption being that a firm of accountants which has agreed to be on a list held by the ICA has already agreed to be employed, on reasonable terms, by third parties who seek the President's nomination.  The question for the court to determine in such circumstances will simply be the reasonableness of such terms.  Alternatively, if the machinery of Article 2.1 has in fact broken down at this stage as a result of the

parties failing to implement an implied obligation to co-operate to make the machinery work, the court may substitute its own machinery to ascertain Fair Value. (Sudbrook v Eggleton (ibid) at 484 B-C, per Lord Fraser).

49. I do not consider that the fact that only 7 days is allowed under Article 2.1 for the process of selection and agreement on the terms of appointment by the parties and the valuer to be determinative one way or another. Under Article 2.1 the parties are not obliged to appoint a TPA within 7 days. It is simply that a reference to the President may be made by one or both parties if after 7 days no agreement on such appointment has been made by the parties. This enables a party who wishes to hurry matters along to keep the process moving in the event that the parties are not able to agree the appointment of a firm within that period. Mr Clutterbuck's submission on this point is, in my view, misconceived.

50. Likewise, Mr Clutterbuck's complaint that Mr Tregear's construction effectively gives one party a potential veto over the whole procedure (if he withholds agreement to the terms of appointment of the proposed TPA) is not valid. The parties have a veto, subject to the President of the ICA nominating, in any event. Either party can refuse to agree; the only issue is when this occurs. It is an inherent risk in the procedure in Article 2.1 that the terms of engagement might be contentious. What Article 2. 1 does is simply move the battle over the valuer's terms of engagement to after a valuer has been appointed by the president.

51. However, in answer to Mr Clutterbuck's "veto" argument, Mr Tregear suggested that it was implicit in the wording of Article 2.1 that agreement to the terms of appointment would not be unreasonably withheld by the parties. For the reasons I have already given, I am not convinced that it is necessary to imply such a term to Article 2.1 in order to make it work. It is certainly not necessary to imply such a term at the first stage. If the parties cannot agree the terms of appointment with the valuer (for whatever reason) within 7 days, then they have not "chosen" the valuer and the President may do so. Thereafter, when a valuer has been nominated by the President, in my view the proper reading of Article 2.1 is that the parties have agreed to engage that nominated valuer, subject only to the question of reasonableness of the terms of such engagement, At this juncture, the court may be asked to determine that question."

16. Cream Holdings appealed against that decision and the judgment of the Court of Appeal, comprising Mummery LJ, Sedley LJ and Wilson LJ, was given on 9 December 2008 ([2008] EWCA Civ 1363, [2009] BCC 183). The essence of the dispute was unchanged from that before Ms Prevezer and I will not, therefore, take time to read the first part of the head note. Further, as I propose to cite what I regard as the key paragraphs in the reasoning of the judgments given, it would be redundant also to read the summary of them in the 'held' section of the head note.

17.    Mummery LJ, giving the first judgment, summarised the submissions for the appellant at paragraphs 25 to 28, to which reference can be made in the report if necessary.  He then began his discussion and conclusion on the construction issue with three preliminary comments.  The second and the third are of relevance to my decision.  In the second, the learned Lord Justice expressed the view that the loose drafting of the definition of the third party accountant in the articles of association was responsible for increasing the risk of a dispute between the parties.  He then observed in paragraph 32 that:

> "Agreed formal requirements are aimed at eliminating, or at least reducing, the risk of avoidable, time wasting and cost consuming disputes about whether or not a person has been appointed to a position and on what terms.  There is, in general, more to the appointment of a person to perform any duties than simply selecting a name to fill the position.  Appointment is a process which should be formal and precise."

18.    His third point was that the disputed definition of third party accountant, within the definition article 2.1, should be read as a whole.

19.    Having made those preliminary points, the learned Lord Justice then said this:

> 34. In my judgment, the substantial difficulty for the Company on this point is that its construction produces consequences so surprising that it must be doubtful whether they can have been within the contemplation of the parties.  The TPA's role is to produce an expert valuation of shares held in the Company by the person who is liable to be compelled to offer his shares for sale at that valuation to those who remain.  The TPA also has power to decide who should bear the costs of the exercise.  The firm of accountants appointed would also lay down the terms, such as limitation of liability, on which it would be prepared to act.
>
> 35. In those circumstances it would be very surprising if a firm of accountants could become the TPA solely as a result of nomination by the parties and without any agreement by both parties and the firm on the terms of engagement as the TPA.  The constituting of the TPA, whether characterised in the Articles as being 'chosen' or as 'agreement on such appointment', is more realistically analysed as a process than as an event, such as nomination.  In my judgment, the TPA process is not complete unless and until all parties and the accountants have reached an agreement on the TPA's terms of engagement.  The Company and the shareholders may reach an agreement among themselves on the firm of accountants to be approached.  But the selected or nominated firm may decline to act for a variety of reasons.  Until a firm is found which agrees to act as the TPA there is no TPA.  No firm is likely to agree to make a joint valuation without the agreement of both sides on the terms of engagement.  The firm which agrees to act on the instructions of one of the parties would not be acting as the TPA.

36. Article 2.1 provides for what is to happen 'failing agreement on such appointment'. In my view, this pivotal provision must be read in the context of the earlier reference to being 'chosen' and the later reference to 'as chosen' by the President. In other words the provision should be construed as a whole, not word by word or in parts. Agreement between all concerned on the terms of the appointment is what is required. In my judgment, the selection of an agreed name from a list of 3 named firms would not in itself be sufficient to constitute the TPA. Mr Davenport did no more than indicate his willingness to accept any of 3 different firms acting in the role of TPA. That was insufficient to constitute agreement on an appointment. It was not an offer which was capable of acceptance so as to create a contract for an appointment between Mr Davenport and the TPA. There was no agreement between Mr Davenport and the Board or between him and BDO to their terms of engagement. BDO were not therefore the TPA."

20. Accordingly, in the result the appeal was dismissed. In a short concurring judgment, Sedley LJ said this (at paragraph 40):

"The definition of third party accountant is framed in language which does not make sense. Choosing a firm of accountants is one thing; appointing it is another. But the articles of association treat them as if they were the same. One of them has to give way, and for the reasons given by the deputy judge and by Lord Justice Mummery it has to be choosing. The consequence is that, if an appointment is not consensually made within 7 days, the recourse is to the president of ICA for a nomination."

He therefore concurred, as did Wilson LJ, agreeing with both judgments.

21. The proceedings which have now come before me were commenced on 1 December 2009 with a Part 8 claim form and, indeed, they remain Part 8 proceedings to this day. The relief there sought by the claimant is as follows:

"1. A declaration that the appointment, or alternatively the nomination, by the President of the Institute of Chartered Accountants on 19th August 2008 of Nicholas Whitaker as the Third Party Accountant pursuant to clause 2.1 of the Claimant's articles of association is effective and that Nicholas Whitaker is the Third Party Accountant for the purposes of the said articles; or alternatively that he will become such on his terms of engagement being settled.
2. Appropriate declarations and orders as to the terms on which Nicholas Whitaker shall be engaged by the parties and the terms on which he shall carry out his valuation.
3. Such further or other relief as the court shall deem fit, including provision for the costs of this claim."

22. In his acknowledgement of service, the defendant through his then solicitors was careful to indicate specifically on what issues he did and did not intend to contest the claim. In section A he indicated that he did not intend to contest the claim so far as it concerned the identity of the valuer. In section B he indicated that he did intend to contest the claim "so far as it concerns the information to be put before him and the initial responsibility for his fees".

23. In the event, the scope of the issues canvassed before me has been considerably wider than a reading of those two documents alone would have led one to believe. There are various points which have arisen which one or other side say, or one might even say complain, have been raised late, but - commendably in my view - ultimately neither side has objected to me dealing with any of the issues raised save for one. Mr Tregear, on behalf of the defendant, indicated that he would object to my forming a view or judgment as to whether or not (a) advice which the defendant has said in his witness statement and some correspondence he received from advisors, but which advice is not directly in evidence, was either reasonable or unreasonable in itself; and/or (b) the defendant's reliance on it was either reasonable or unreasonable. Given the way in which this the issues in this case have emerged, that strikes me as a reasonable objection which I would not have been willing to override. However, the way in which this case has ultimately developed, including during the hearing, has meant that it has not proved necessary for me to do anything within the scope of Mr Tregear's objection in order to decide it.

24. During the hearing, both parties have expressed a desire that the valuation process under the articles should be made to work if possible, and, of course, in accordance with their own respective submissions to me. That is particularly so now that, as will be seen when I come to what I will call the stage 4 submissions in the case, the parties face the prospect that the only alternative to operation of the article 11 provisions is what I will call a full court valuation. Both parties have invited me, should I reach the position that I find an objection to Mr Whitaker's proposed terms not presently unreasonable, but am able to identify a revision to those terms which I consider would render further objection unreasonable, to say so in my judgment, and make provision in my order to enable that possibility to be explored before any order for a full court valuation takes effect.

25. Given the period of time over which these parties have been in dispute or at loggerheads in correspondence, and given that this matter has been to the Court of Appeal once already, I think it only right and in the parties' best interests if I say something on each of the issues that has been canvassed before me, whether or not, on my own decision in the matter, that would in all places be necessary.

26. Mr Robin Hollington QC, who appears with Mr Sebastian Prentis on behalf of the claimant, puts his case in four stages or levels, and I shall follow his lead in presenting them structured in such a way that, if he wins on any one of them, he does not need to go any further down the list. In summary, they are as follows: stage 1, the appointment of PKF/Mr Whitaker was effective by virtue of (a) the presidential nomination, and (b) Mr Whitaker issuing terms of engagement, given that they were neither contradictory of the articles of association nor irrational; stage 2, it was an implied term of the articles of association that terms of engagement issued by the third party accountant nominated by the president would be binding on the parties unless unreasonable; stage

3, there are implied terms of the articles that the transferor will co-operate in doing everything reasonably necessary to procure the appointment of the presidential nominee as third party accountant and/or that the transferor would not unreasonably withhold his consent to an appointment, and/or the terms of engagement, of the presidential nominee; stage 4, the court should if necessary substitute its own machinery for that of article 11.14 in order to achieve an effective determination of a fair price.

27.    At a number of points, including stage 1, the parties' arguments involve construing the claimant's articles of association, so it is convenient for me to deal at the outset with the approach to be taken when so doing.  Mr Hollington submits, firstly, that articles of association remain, as they long have been, essentially contractual in nature notwithstanding the slightly changed language of section 33(1) of the Companies Act 2006 as compared to its predecessor Act; secondly, that company articles are to be construed in like manner as any other contract, which process includes these days, since the case of Attorney General of Belize v Belize Telecom Ltd [2009] UKPC 10, [2009] 1 WLR 1988, implication of terms where necessary; and thirdly that they should be construed in accordance with the well-known contractual principle of construction, *ut res magis valeat quam pereat*, for which Vaisey J in Rayfield v Hands (below) offered a non-literal translation: validate when possible.

28.    In support of this, he cites firstly **Chitty on Contracts**, 30th edition (2008), at paragraph 12-081, the relevant part of which reads:

> "Saving the document.  If the words used in an agreement are susceptible of two meanings, one of which would validate the instrument or the particular clause in the instrument, and the other render it void, ineffective or meaningless, the former sense is to be adopted.  This principle is often expressed in the phrase *ut res magis valeat quam pereat*.  Thus if by a particular construction the agreement would be rendered ineffectual and the apparent object of the contract would be frustrated, but another construction, though in itself less appropriate looking to the words only, would produce a different effect, the latter interpretation is to be applied, if that is how the agreement would be understood by a reasonable man with a knowledge of the commercial purpose and background of the transaction ..."
> (Footnotes omitted)

29.    He then cites a short dictum of Jenkins LJ in Holmes v Keyes [1959] Ch 199 at 215 where that exceptionally distinguished lawyer said, in the course of his reasoning as to facts which I need not summarise, this:

> "I think that the articles of association of the company should be regarded as a business document and should be construed so as to give them reasonable business efficacy, where a construction tending to that result is admissible on the language of the articles, in preference to a result which would or might prove unworkable."

30. Finally in this sequence, he referred to the well-known case of <u>Rayfield v Hands</u> [1960] Ch 1 in which Vaisey J at page 4 said:

> "It has been said that articles of association ought not to be construed too meticulously. See per Wynn-Parry J. in <u>In re Hartley Baird Ltd.,</u> where he said: "In the interpretation of such a commercial document as articles of association, the maxim *ut res magis valeat quam pereat* should certainly be applied, and I propose to interpret these articles in the light of that maxim." I am not aware that this maxim has ever been put into English, but I suggest that it directs us to "validate if possible." and see also per Jenkins L.J. in <u>Holmes v. Keyes,</u> where he is reported as saying that in his view the "articles of association of the company should be regarded as a business document and should be construed so as to give them reasonable business efficacy ... in preference to a result which would or might prove unworkable."

Mr Tregear does not dispute these general principles but adds certain glosses to them, to which I will come at the relevant stages of my judgment.

31. Turning then to the first stage argument, I have of course to construe the provisions of the definition of third party accountant in both their commercial context and the context of the full text of the articles of association themselves.  In their skeleton argument, the claimant's counsel summarise their case thus (at paragraph 2):

> "The defendant obviously cannot have a right of veto over the TPA's terms of engagement for otherwise the process of valuation will fail and therefore lack business efficacy.  The whole purpose of stage 2, i.e. appointment of the TPA by the President, is to provide a default mechanism in the event of a disagreement between the parties: it would make a nonsense of the process if stage 2 were to be allowed to fail because of a disagreement between the parties…  The terms proposed by the TPA are on their face in accordance with the Articles of Association and rational."

32. They rely upon the summary of the intended nature of the relevant articles in Ms Prevezer's judgment, the essence of which read:

> "In my view, Article 2.1 and Article 11.14 taken together were intended to provide a workable, quick and effective expert determination procedure to resolve the issue of the price of a Transferor's share in the Company."

33. They rely in particular on the terms of the judgment of Sedley LJ at paragraph 40 of the earlier Court of Appeal judgment, which I have already quoted.  He argues that paragraph 36 of the judgment of Mummery LJ is clearly limited to limb 1 appointments only, in particular emphasising the words "the selection of an agreed name from a list of three named firms" to be found within that paragraph.  In his oral submissions Mr Hollington emphasised the commercial reality of why the limb 2 appointment mechanism is there at all, and the importance of the court applying the maxim *ut res*

*magis valeat quam pereat*.    Although Mr Hollington submits that in theory an appointment could take effect without a letter of engagement, he goes on to submit that in practice it is inevitable that a reputable and well run firm of accountants would wish to have the assurance of confirmed contractual terms on which they are to work before taking on such an engagement.

34.    Mr Tregear submits, firstly, that Mr Hollington's stage 1 case is a gloss on article 11.14 which is not demanded by its express terms.    Secondly, that Mr Hollington's touchstones of what is necessary to make a binding contract, namely consistency with the articles of association and rationality, are general or vague to the point that they would add little and offer no practical restriction on the nature of the terms of engagement proposed, and certainly would not help as to their reasonableness. Thirdly, that the claimant's stage 1 case is not consistent with judgments in the previous case, and for that he relies on paragraph 46 of Ms Prevezer's judgment and paragraphs 32 and 34 to 36 of Mummery LJ's judgment in the Court of Appeal and, interestingly, the very same paragraph in Sedley LJ's judgment, paragraph 40, on which Mr Hollington relies.    He submits that a nominated third party accountant is unlikely to be in a good position to set his own terms of engagement at the very beginning of an appointment given that unlike, for example, a company's own auditor, he would have little background knowledge as to the nature of the dispute.    He also draws attention to an implication of Mr Hollington's case, namely that the appointment of PKF/Mr Whitaker actually took effect as long ago as 11 September 2008.

35.    As to the passages relied on in the judgments in the previous case, I am satisfied firstly that they do not constitute *ratio decidendi* but, secondly, that they do constitute persuasive reasoning, albeit expressed in the context of a disputed stage 1 appointment, which is applicable to a stage 2 appointment also.    Perhaps the most pertinent single sentence, without re-reading the paragraphs which I have just identified, is to be found in paragraph 32 of the judgment of Mummery LJ:

> "There is, in general, more to the appointment of a person to perform any duties than simply selecting a name to fill the position."

36.    The drafting of the definition of the third party accountant could, but does not, provide for an independent party to fix the terms of engagement, as well as to make the nomination.    In the passage I have already read from paragraph 31 of his judgment, Mummery LJ criticised the loose drafting of this passage in the articles.    Given that no such express provision is to be found, and applying the persuasive though not binding reasoning of Ms Prevezer and the Court of Appeal, I am not persuaded that this definition must be construed so that a presidential nominee takes office in effect by way of a unilateral appointment on his own proffered terms of engagement, subject only to the two limitations proposed by Mr Hollington.    The effect would be that the parties would be bound by whatever terms he proposed, subject only to caveats of very limited potential operation, as Mr Tregear submitted.    I agree with Mr Tregear's submission that the results of the claimant's stage 1 argument would be surprising, given the words of Mummery LJ which I have just quoted.

37.    Mr Hollington's trump card is the maxim *ut res magis valeat quam pereat*, but unless I am persuaded that no implied term in accordance with either of the stage 2 or stage 3

arguments can suffice to give workable effect to article 11, or to "validate it" (per Vaisey J), that does not compel me to construe it in accordance with Mr Hollington's stage 1 argument. It is not necessary to do so, and I decline to do so.

38.   The claimant's stage 2 argument is the first of two which are founded on implied terms. It is therefore convenient for me now to deal with the principles relating to the implication of terms, bearing in mind the passage from Hoffmann LJ in the <u>Belize Telecom</u> case, which points out that this should not be seen as something separate from the process of construction, but as part of it. So, for my purposes, the implication of terms is one of the ways in which the court can construe a contract, here specifically articles of association, *ut res magis valeat quam pereat*. The most convenient starting point for the principles relied on is again **Chitty on Contracts**, which at paragraphs 13-011 and 13-012 states as follows:

> "13-011 Co-operation. The court may be willing to imply a term that the parties shall co-operate to ensure the performance of their bargain. Thus:
>> '… where in a written contract it appears that both parties have agreed that something shall be done, which cannot effectively be done unless both concur in doing it, the construction of the contract is that each agrees to do all that is necessary to be done on his part for the carrying out of that thing, though there may be no express words to that effect.' [<u>Mackay v Dick</u> (1881) 6 App Cas 251, 263 et al]
>
> However, the conditions for the implication of a term … must be satisfied. Also the duty to co-operate and the degree of co-operation required is to be determined, not by what is reasonable, but by the obligation imposed – whether expressly or impliedly – upon each party by the agreement itself, and the surrounding circumstances.
>
> 13-012 Prevention of performance. By the same token:
>> '…if a party enters into an arrangement which can only take effect by the continuance of a certain existing state of circumstances, there is an implied engagement on his part that he shall do nothing of his own motion to put an end to that state of circumstances under which alone the arrangement can become operative.' [<u>Stirling v Maitland</u> (1864) 5 B&S 840, 852 et al]
>
> Also where a binding contract is subject to a condition precedent, a term may be implied that a party will not do an act which, if done, would prevent fulfilment of the condition. But these implications are not inevitable: the alleged term may be unreasonably wide or the nature of the contract indicate otherwise. A term may also be implied that a right, remedy or benefit expressly conferred upon one party to a contract or to which he may be entitled shall not be available if that party relies on his own breach of the contract, to establish his claim."
> (Footnotes omitted)

39. Mr Hollington made further submissions specific to articles of association. He submitted that terms can and should be implied to give effect to the reasonable expectations of the parties, so in the context of articles of association that is the reasonable expectations of the shareholders. He referred to the speech of Lord Steyn in Equitable Life Assurance Society v Hyman [2002] 1 AC 408. When reading the passage in the speech, to which I will come, it should be borne in mind that this speech was delivered well before the decision of the Privy Council in the Belize Telecom case and, therefore, Lord Steyn was still distinguishing more firmly between the process of construction and the process of interpretation than might now be thought appropriate. That said, I am satisfied that the passage from 459A onwards is still applicable, and very helpful as to the operation of the law. Lord Steyn was speaking in the context of article 65 of the relevant articles of association, which were set out in full earlier in his speech at 452E - 453B. From 459A-H he said this:

> "If a term is to be implied, it could only be a term implied from the language of article 65 read in its particular commercial setting. Such implied terms operate as ad hoc gap fillers. In *Luxor (Eastbourne) Ltd v Cooper* [1941] AC 108, 137 Lord Wright explained this distinction as follows:
>
>> 'The expression 'implied term' is used in different senses. Sometimes it denotes some term which does not depend on the actual intention of the parties but on a rule of law, such as the terms, warranties or conditions which, if not expressly excluded, the law imports, as for instance under the Sale of Goods Act and the Marine Insurance Act ... But a case like the present is different because what it is sought to imply is based on an intention imputed to the parties from their actual circumstances.'
>
> It is only an individualised term of the second kind which can arguably arise in the present case. Such a term may be imputed to parties: it is not critically dependent on proof of an actual intention of the parties. The process 'is one of construction of the agreement as a whole in its commercial setting': Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd [1997] AC 191, 212E, per Lord Hoffmann. This principle is sparingly and cautiously used and may never be employed to imply a term in conflict with the express terms of the text. The legal test for the implication of such a term is a standard of strict necessity. This is how I must approach the question whether a term is to be implied into article 65(1) which precludes the directors from adopting a principle which has the effect of overriding or undermining the GARs.
> The inquiry is entirely constructional in nature: proceeding from the express terms of article 65, viewed against its objective setting, the question is whether the implication is strictly necessary. My Lords, as counsel for the GAR policyholders observed, final bonuses are not bounty. They are a significant part of the consideration for the premiums paid. And the directors' discretions as to the amount and distribution of bonuses are conferred for the benefit of policyholders. In this context the self-evident commercial object of the inclusion of guaranteed rates in the policy is to protect the

policyholder against a fall in market annuity rates by ensuring that if the fall occurs he will be better off than he would have been with market rates. The choice is given to the GAR policyholder and not to the Society. It cannot be seriously doubted that the provision for guaranteed annuity rates was a good selling point in the marketing by the Society of the GAR policies. It is also obvious that it would have been a significant attraction for purchasers of GAR policies. The Society points out that no special charge was made for the inclusion in the policy of GAR provisions. So be it. This factor does not alter the reasonable expectations of the parties. The supposition of the parties must be presumed to have been that the directors would not exercise their discretion in conflict with contractual rights. These are the circumstances in which the directors of the Society resolved upon a differential policy which was designed to deprive the relevant guarantees of any substantial value. In my judgment an implication precluding the use of the directors' discretion in this way is strictly necessary. The implication is essential to give effect to the reasonable expectations of the parties. The stringent test applicable to the implication of terms is satisfied."

40. Next, Mr Hollington submits that where appropriate the familiar officious bystander test may be used. He submits that the fact that practical difficulties may remain after the implication of a term does not preclude their implication, and further submits that, at least probably, an implied term in articles of association should be limited to providing the minimum machinery necessary to make the article in question workable. To support all three of these propositions he cites what I have found to be the very helpful judgment of Slade LJ in <u>Tett v Phoenix Property Co Limited</u> [1986] BCLC 149. The case concerned the operation of article 5 of Phoenix's articles of association, which are set out in full in Slade LJ's judgment between 151e and 152c.

41. At 158e-i the learned judge explained the issues in <u>Tett v Phoenix</u> thus:

"Read literally and in isolation, art. 5(E) by its terms takes away the right of a member to transfer his shares to a non-member only in one specified contingency, namely "if any member for the time being of the Company or the wife, husband, parent or child (not being a minor) of any member shall be willing to purchase the same". For convenience, I shall refer collectively to the wife, husband, parent or adult child of any member as his or her 'specified relatives'.

In the present case there is not evidence that this contingency had arisen at the time when the executors executed their transfer in favour of the plaintiff. Read literally and in isolation, Article 5(E) would leave a member free to transfer his shares to an outsider provided only that he did it in secret, taking care to ensure that none of the other members and their specified relatives were made aware of his intentions so as to be given an opportunity to decide upon and demonstrate their willingness to purchase his shares.

However, to read Article 5(E) in this manner would make practical nonsense of it, particularly when it is read in conjunction with

> Article 5(F). The parties to the contract embodied in the articles, in my opinion, clearly contemplated that, before a member was to be at liberty to transfer his shares to an outsider, some opportunity would first have to be given to the other members and their specified relatives to make an offer for the shares in question. The difficulty (submitted by Mr. Mawrey to be insuperable) lies in formulating, by a process of implication, the machinery by which the other members and their specified relatives where to be given the opportunity to put in an offer for the shares of a person proposing to transfer his shares to an outsider."

42. Having rejected the approach of the judge at first instance, at 159g-h the learned Lord Justice went on to say this:

> "Is there then any alternative provision which can properly be implied in art 5, as a matter of necessary inference, so as to give business efficacy to the obvious intention of the parties that before a person is to be at liberty to transfer his shares to an outsider, an opportunity must be given to the other members and their relatives to make an offer for the shares in question?  In my opinion there is ..."

43. Having set out the implied term contended for by counsel, and the slightly different implied term found by the Court of Appeal, Slade LJ went on to say (at 160c-e):

> "I would write this implied term into the very end of article 5.
> The justification for implying such a term may be tested in this way.  Let it be supposed that at the time when the articles of association of the company were being negotiated, some officious bystander had asked the interested parties: 'Is a member to be free to transfer his shares to a non-member without first taking reasonable steps to give all other members and the relevant class of relatives a reasonable opportunity to offer to purchase them at a fair value?'  I feel no doubt that the answer would have been to the following effect, 'Of course not; we did not trouble to say that, it is too clear'.
> Counsel for the plaintiff has forcefully stressed the practical difficulties to which the implication of a term on these lines would give rise…"

44. The learned Lord Justice then set out at length the submissions formulating such supposed practical difficulties before continuing thus (at 160h-161b):

> "I have been impressed by counsel for the plaintiff's submissions on these lines and indeed nearly persuaded by them.  In the end, however, I think there is a short answer to them.  It could not, in my opinion, be plausibly suggested that an implied term on the lines set out above would be void for uncertainty.  If it were expressly written out *in extenso* in the article, I do not doubt that the court could and would give effect to it if invited to do so, by

reference to the facts of the particular case before it. The mere fact that the implication of the term may give rise to practical difficulties (or more accurately may not remove all of the many practical difficulties caused by the brief wording of art 5 as drafted) does not entitle the court to decline to imply it if it is satisfied (as I am in the present case) that it must have represented the intentions of the parties to the relevant contract. If counsel for the plaintiff is right in submitting that the court is only justified in implying the 'minimum machinery' to make art 5E and F workable, then I think this implication represents the minimum machinery."

45.  These passages clearly support Mr Hollington's three submissions. Though as to the third of them Slade LJ did not specifically endorse the submission as to the court being only justified in implying the minimum machinery necessary to make the articles workable, in my respectful view that would seem to be the logical consequence of the basic test for implying terms in any form of contract, namely necessity.

46.  Mr Tregear does not dispute these three propositions so far as they go, but he reminds me: (1) that if on a true construction of a contract the parties have merely agreed to make an agreement, it is not for the court to complete the agreement for them whether by use of a purported implied term or otherwise; and (2) that if an agreement has been made it is not for the court, however well intentioned, to set about improving it for the parties, whether under the label of implication of terms or otherwise; terms are only to be implied to give full effect to what the parties have agreed, not to turn the agreement they did make into one which the court might consider would have been a better one for them to make. I accept both those submissions, and note that the second is directly reflected in the language of Slade LJ in Tett v Phoenix at 161a.

47.  Mr Hollington's stage 2 submission comprises essentially two submissions: first, that it is necessary to imply a term into the articles that the parties are bound by such terms of engagement as are proposed by the third party accountant provided that they are reasonable; second, that there is nothing in any of the points raised on behalf of the defendant (which it will be necessary for me to review in detail when I come to the stage 3 submission), which indicates that the terms in fact put forward by Mr Whitaker are anything other than reasonable.

48.  Mr Hollington in making his oral submissions in support of this implied term relied in particular on passages in the first instance judgment of Ms Prevezer at paragraphs 48, 50 and 51. As I have already (at paragraph 15 above) cited those paragraphs in their entirety in any event, I will cite here only the particular words relied on:

"If the firm then chosen off the list by the President refuses to accept the proposed terms of engagement all three parties may be able to seek the court's assistance to settle those terms, the assumption being that a firm of accountants which has agreed to be on a list held by the ICA has already agreed to be employed on reasonable terms by third parties who will seek the President's nomination. The question for the court to determine in such circumstances will simply be the reasonableness of such terms ... What article 2.1 does is simply move the battle over the valuer's

> terms of engagement to after a valuer has been appointed by the President ...  In my view the proper reading of article 2.1 is that the parties have agreed to engage that nominated valuer subject only to the question of reasonableness of the terms of such engagement."

49.   Mr Hollington himself draws attention to the fact that his stage 2 submission is the second of two submissions which do not involve any active consent to the terms on the part of the transferor.  He nevertheless submitted that the implication of such a term is necessary to give business efficacy to the articles, and to apply the *ut res magis valeat quam pereat* approach.  Such an implication, he submitted, is consistent with the passage from the speech of Lord Hoffman in Attorney General of Belize v Belize Telecom Ltd [2009] UKPC 10, [2009] 1 WLR 1988 at [21], which he quotes in his skeleton argument at paragraph 9, where Lord Hoffman said this:

> "It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean… this question can be reformulated in various ways which a court may find helpful in providing an answer — the implied term must 'go without saying', it must be 'necessary to give business efficacy to the contract' and so on — but these are not in the Board's opinion to be treated as different or additional tests. There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"

50.   Mr Tregear submits that the passages in Ms Prevezer's judgment which I have just read, and in particular those in paragraphs 50 and 51, are *obiter dicta* and, putting it in less formal legal language (though he emphasised without disrespect) in the nature of judicial musings.

51.   In response to the stage 2 submission, he makes essentially three points: (1) that such an implied term goes against the grain because it negates the involvement of the parties in agreeing the third party accountant's terms; (2) that reasonableness has to be judged by objective criteria; in this particular case it would be very difficult to make it work; how would you define it?; how would you judge it?; reasonableness *in vacuo* is a difficult concept - contrast, for example, the Unfair Contract Terms Act 1977 and its schedule of factors; (3) that this implied term suffers from a similar vice to that proposed at the stage 1 argument, namely inconsistency with the reasoning of Ms Prevezer and the Court of Appeal.  Its effect is that the third party accountant is for all practical purposes setting his own terms.

52.   I am not impressed by Mr Tregear's second point.  The courts frequently have to apply the test of reasonableness without further assistance from the express words of the instrument in question, and do so in a wide variety of juridical contexts.  However, I agree with his first and third points.  My conclusion here runs parallel to my conclusion on the level 1 argument.  Again Mr Hollington's trump card is the *ut res magis valeat quam pereat* maxim, but, again, unless I am persuaded that there is no implied term at stage 3 which can suffice to give workable effect to article 11, that does not compel me

to imply so stringent an implied term as is contended for at stage 2. It is not, in my judgment, necessary to do so. Mr Hollington's stage 2 submission therefore fails.

53. The stage 3 submission for the claimants is the second of the two based on implied terms. However it differs in this respect, that this is the first submission which does involve or assume the need for the parties to give consent to the third party accountant's proposed terms of engagement, whilst seeking to regulate that process. There are, it should be understood, three parts to the stage 3 argument. The first is that both or either of the implied terms which I have already indicated (and will mention again in a moment) are to be implied into the articles. Second, Mr Davenport is in breach of them by withholding his consent to the appointment of Mr Whitaker or his firm on the revised terms that they put forward on 6 January 2010, and further revised in one respect during this hearing. Third, that as a matter of normal construction or implication, a party cannot rely on his own breach of duty to avoid a contract and escape his obligations thereunder. That third part of the submission I will deal with now, because it is uncontroversial. This principle is supported by **Chitty on Contracts**, paragraph 12-082, and <u>Alghussein Establishment v Eton College</u> [1988] 1 WLR 587 (HL) at 591D-E and 595H per Lord Jauncey. This is the same principle as was referred to by Lord Diplock in the course of his speech in <u>Sudbrook Trading Estates Ltd v Eggleton</u> [1983] 1 AC 444 at 479C-D, where he said this:

> "… the only thing that has prevented the machinery provided by the option clause for ascertaining the fair and reasonable price from operating is the lessors' own breach of contract in refusing to appoint their valuer. So, if the synallagmatic contract created by the exercise of the option were allowed to be treated by the lessors as frustrated the frustration would be self-induced, a circumstance which English law does not allow a party to a contract to rely on to his own advantage."

54. It is to the first two parts of the stage 3 argument that I must turn, because Mr Tregear realistically accepts that if the claimant can establish its case on the first two there is no answer to the third. As I earlier summarised, the claimant contends for two implied terms, albeit covering similar ground here: firstly, a positive obligation to co-operate, often referred to by the name of the leading case *Mackay v Dick*, which supports the passages in **Chitty** which I have cited; secondly, an implied term that the transferor should not unreasonably withhold his consent to the appointment, or the relevant terms of engagement for an appointment, of the third party accountant. I have already dealt with the relevant legal principles.

55. Mr Hollington points out that in the earlier case, Mr Tregear expressly acknowledged in his submissions to the Court of Appeal that firstly:

> "The approach in this case will probably be to ask the court to declare that there are certain implied terms so that in making machinery work the transferor or the company are under an implied obligation to co-operate in the agreement of reasonable terms for the appointment of a valuer";

secondly:

> "It can either be not unreasonably to withhold consent or positively to act in such a way to bring about an appointment on reasonable terms";

and thirdly (both to Ms Prevezer -see her judgment at paragraph 51 - and the Court of Appeal) that there would be an implied obligation not unreasonably to withhold consent.

56. Before me, in the changed forensic context, Mr Tregear submitted, first, that to imply the *Mackay v Dick* implied term on these facts would be to subvert the principle that an agreement to agree is not binding in English law; and second, that applying these implied terms and, in particular, the *Mackay v Dick* one, was going to be difficult and give rise to all sorts of problems on the facts, a submission which he developed by reference to three examples. He elegantly sought to draw the forensic sting from what he himself had submitted in the previous action by referring to his own submissions as "thinking aloud".

57. I prefer the submissions Mr Tregear made in the previous proceedings to those which he made to me. There is no inconsistency, in my judgment, between the rule as to agreements to agree and implying either of these suggested implied terms. There is no essential term in the articles left to be negotiated and the subject of subsequent agreement. Some practical difficulties will remain in their working out, but that, as was stated by Slade LJ in Tett v Phoenix, is no sufficient objection to them.

58. The *ut res magis valeat quam pereat* principle is important. These implied terms are, in my judgment, necessary to imply, and do represent the minimum machinery necessary to make these articles work. I share the view expressed in the form of a question by Wilson LJ during the hearing in the Court of Appeal in the earlier action:

> "Clearly neither party unreasonably to withhold consent to proposals as to the terms of an appointment put by the other."

59. Whether or not the learned Lord Justice intended that to be a statement or a question, in any event it accurately reflects my view and judgment. I am satisfied that the implication of these two terms does give effect to the parties' (i.e. here the shareholders') reasonable expectations, objectively determined.

60. The implied term which the Privy Council (Australia) was willing to find, albeit in a somewhat different factual context, in Queensland Electricity Generating Board v New Hope Collieries Pty Ltd [1989] 1 Lloyd's Rep 205 at 210 per Sir Robin Cooke, does support Mr Hollington's submissions; its applicability is not negated by the different facts of that case.

61. As I have mentioned, these two terms do cover much the same ground. As the positive obligation is to co-operate, in seeking to establish breaches Mr Hollington would not be limited to the merits of individual points taken by the defendant as to the proposed terms of engagement of Mr Whitaker. As to the other suggested implied term, the

burden would clearly lie on Mr Hollington to establish that consent was being unreasonably withheld; it would not be for Mr Davenport to prove that he was acting reasonably in withholding consent. I find for both these suggested implied terms.

62. The second, and the other controversial, part of the claimant's stage 3 argument relates to whether or not Mr Hollington can establish a breach of those implied terms on the part of Mr Davenport. Regrettable as it perhaps is, at least for those having to listen to this oral judgment, in order to deal properly with this there is no alternative but to refer shortly to the history of the matter as commenced by the application to the President of the Institute of Chartered Accountants for an appointment made on 17 June 2008, a copy of which has now been added (without objection) to the papers before the court. As it will be relevant for a later point, I might mention now that on the face of that form it is recorded that there is a differential fee payable, depending upon whether the value of the dispute in question is said to below £1 million or to exceed £1 million.

63. In that context, the claimant's representatives completed question G, "approximate amount in dispute" with the words "less than £1 million". The appointment itself was made on 19 August 2008, it contained an obvious typographical error which can, as the parties agree, be corrected as a matter of construction, in that it misnamed Mr Whitaker's firm. Everyone agrees Mr Whitaker's firm was intended correctly to appear, and that it is the well known firm PKF.

64. On 11 September 2008 Mr Whitaker issued his proposed terms of engagement in the form of a document which described itself on its face as a draft. It appears at pages 52 and following of volume 2 of the court bundle.

65. On 18 September 2008 Mr Davenport, by his solicitors' letter of that date, asserted that:

> "In the light of the previous valuation it is clear that the parties should agree, prior to the appointment of an accountant, both the process of making such an appointment and also the procedure by which the third party accountant is to undertake the revaluation. For example, the procedure should provide for an agreement to be made between the parties as to the specific disclosure of financial documentation, as well as details of the submissions that may be made to the Third Party Accountant on the basis of the information produced."

66. If one stopped there I would not be persuaded that that paragraph on its true construction necessarily meant that the process of disclosure of documentation sought by the defendant had to take place before the appointment, as opposed to following the appointment as part of its procedure. But the former position was clearly stated on 19 February 2009 when the defendant's solicitors in their letter of that date wrote this:

> "If this matter is to progress the terms of the engagement of the Accountant need to be agreed between the parties. Following the decision at first instance and the subsequent appeal, it is clear that pre-agreed disclosure of information must be agreed by both parties before the appointment of an accountant or the signing of an

> engagement letter. [I would interpolate at this point that in my view that is a clear misstatement of the position under those judgments]
>
> Furthermore, it should be agreed that both parties will be able to make submissions to the accountant in relation to the documents provided by them as well as being able to make submissions on those documents disclosed by the other party."

67. It may be convenient to note that that letter reiterated the position, from which the defendant has not sought to resile, that he had no objection to the particular firm of accountants which the President had nominated. Indeed, that was the logical position for him to take, as they happened to be one of the three firms which he had originally indicated he would be content to be appointed, some considerable time ago now.

68. On 4 March 2009 the claimant by its solicitors disputed the view taken by the defendant as to implications of the earlier judgment, a stance with which I agree, and in the second paragraph of the same letter stated:

> "You state in … your letter, dated 10 February 2009, that if this matter is to progress the terms of the engagement of the accountant need to be agreed between the parties [we agree]."

69. Mr Hollington was anxious to emphasise that such expression of agreement was intended to refer to the practicalities of getting a firm of accountants actually to start the task, as opposed to the legal theory of what was necessary to constitute an effective appointment.

70. The defendant's solicitors wrote again on 17 March 2009. The letter was headed Subject to Contract and, reflecting that point, in its third paragraph spelled out that:

> "Nothing in this letter should be taken as constituting an agreement by this letter to the appointment of Mr Whittaker. Such agreement on the appointment will only be constituted by Mr Davenport's signature on the letter of engagement."

71. That passage makes it quite clear that the defendant and his representatives were consciously withholding his signature on such a letter of engagement pending obtaining satisfaction on the various issues that were raised from to time to time. On the second page of that letter, four issues were raised in respect of the terms and conditions which Mr Whitaker had proposed. I will come to those in a moment. However, with regard to the topic of pre-agreed disclosure information, the stance taken was similar to that to which I have referred to in earlier correspondence, and included the following:

> "If progress is now to be made (and we hope that it will be) the parties will have to engage positively with regard to the provision of information in order to enable the poorly drafted provisions of the relevant Articles work."

72.   The points taken with regard to the terms and conditions included that one particular paragraph of them was irrelevant, a point which has subsequently been conceded and dealt with accordingly by Mr Whitaker in his revised terms, to which I shall come.

73.   A clause which is now entirely uncontroversial (then number 10.2, now number 12.1), casts on all parties to the engagement an obligation to provide Mr Whitaker with all documents and information needed to complete the engagement.

74.   The clause then numbered 5.2 restricts the use or disclosure of any report produced pursuant to this engagement without the prior consent of Mr Whitaker or his firm. Another clause imposes a cap on liability.  There remain live issues between the parties as to these; I will come to the detail of that in due course.

75.   However, the stance taken at this stage in the correspondence is worthy of record because it remains the position to this date.  The defendant's solicitors wrote this:

> "Although our client acknowledges that there should in principle be a cap on liability, he is not in any position to express a view as to the amount of the cap at this preliminary stage, until such time as the Company discloses financial information."

76.   Finally, by reference to the appendix to Mr Whitaker's proposed terms of engagement, which is, in effect, the procedural part of his documentation, the defendant's solicitors said this:

> "The procedure for the valuation exercise appears to be satisfactory as long as it is clearly understood that any financial information given to the valuing accountant shall be made available to both parties."

An amendment to make that position express has, again, subsequently been agreed.

77.   The claimant's solicitors replied on 20 March 2009.  In a letter of 8 April there was no movement in the defendant's position.  On 29 April the claimant's solicitors wrote indicating an intention to apply to the court.  In their response, dated 18 May 2009, the defendant's solicitors, in a passage which starts at (ii) on the first page of the letter and runs down two paragraphs into the second page (which I will not quote, but summarise), in effect maintained the position that they wanted that all the defendant's disclosure requests be dealt with prior to any consent to an appointment being given.

78.   At the end of that lengthy letter they wrote this:

> "We wish to make it as clear as we can that our client has no desire to impede the process but he wishes to ensure that the process can be effective and fair to your clients and to our client who is not a voluntary seller.  If your clients do commence proceedings, we will obviously seek to refer to this letter and any answer to it to the court for its consideration on the question of reasonableness."

79. It is noteworthy that it was obvious to them as long ago as May 2009 that reasonableness was likely to be a matter in issue in such proceedings.

80. On 12 June last year the claimant's solicitors tried a different stance, and offered, in order "to break the impasse and to try to avoid having to make an application to the court", to provide within reason what information the defendant sought.

81. The defendant's solicitors duly made a request, dated 26 June 2009, seeking information in eight numbered categories, and asserting that it formed the basis of information necessary to calculate the value of the claimant's brand, which was said to be integral to the value of the company as a whole, as at its valuation date. The letter ended with a reaffirmation of the defendant's agreement to the identity of PKF and said:

> "… once the information requested above is provided, we can move to agreeing the formal terms of their appointment."

82. In the circumstances I need not read out all eight categories, but will only refer to the two which have produced subsequent controversy. Number 3 was management accounts for associated companies for 2000-2004; number 6 was details of licensing deals for operations run internationally using the Cream brand or associated companies and revenue streams attached from 1999 to the present [in other words, I interpolate, for a ten-year period straddling the valuation date].

83. In a letter dated 20 July 2009, the claimant's solicitors asserted that provision of everything called for by item 6 was impractical, but suggested that the numbers (as they put it) be made available to the defendant, with an opportunity for him to request any particular licences. Then on 22 September they sent the documents requested, subject to (i) the management accounts that were sent being for the later period, 2005 onwards; and (ii) as has been foreshadowed, not providing ten years' worth of licensing contracts.

84. No substantive reply was sent for five weeks or so, but eventually one came in the form of a letter dated just two days before the suggested deadline for the commencement of proceedings, i.e. dated 29 October 2009. It contained complaints about deficiencies in the information provided, but ended in its penultimate paragraph with what appeared to be in the nature pf progress:

> "We hope that we can sort these matters out and proceed with the valuation process. It would be regrettable if the information-gathering process was to be interrupted at this stage. Our client is as keen as your client to proceed to valuation; the only [my emphasis] caveat is that the valuation should proceed on the basis of proper and useful financial information."

85. The correspondence continued, though little significant progress was made. In particular, once proceedings commenced the number of issues raised grew from the 29 October position. The acknowledgement of service added a second, concerning initial responsibility for Mr Whitaker's fees. The extent of the points in play by the time

skeleton arguments were exchanged is reflected in the content and length of this judgment.

86. Though I will not quote them, the next letters of importance were 3 November, claimant to defendant, 9 November, defendant to claimant and an important letter, 22 December, written by the claimant to Mr Whitaker and copied to the defendant. I will not take time to read it out but suffice it to say that its nature was to raise with Mr Whitaker a number of points which it was thought might improve the position from the defendant's point of view. Mr Whitaker's response came in an email of 6 January this year, in which he acceded to a number of the points that were raised and sent through a second and, for most purposes, the current draft of his proposed terms of engagement. Six days later these were forwarded to the defendant's solicitors by the claimant's, under cover of their letter dated 12 January 2010.

87. Given the nature of the disputes before me I think I must refer to certain passages in these terms. In the letter of engagement itself, at paragraph 6, it states:

> "The proposed procedures to be performed, together with the consequent timetable, shall be in accordance with Appendix 1. Notwithstanding these proposed procedures, all matters relating to the evidence required in the procedures to be adopted shall be at my sole discretion …
> 8) In performing the engagement, subject to prior notification to the Parties, I will be entitled to employ independent legal or other expert assistance that I deem necessary and the costs incurred will be included in my disbursements and recovered from the Parties, as described under "Fees" below. I will be entitled to take into account the written opinion(s) of such legal or other experts (if any) included in my determination."

88. The subject of fees was dealt with between paragraphs 14 and 22 of the draft letter of engagement; I will refer only to 19 to 21. In 19 Mr Whitaker estimated that his fees for providing the determination would be £332,500 plus out of pocket expenses and VAT. In paragraph 20 he noted that they should be borne between the parties as he determined in accordance with paragraph 11.4 (I think that should say 11.14) of the Articles of Association adding, "… and in the first instance I determine that will be borne equally by the parties". In 21 he stated:

> "So far as payment is concerned, an initial amount equivalent to 50 per cent will be due on confirming your agreement to these terms and the balance (inclusive of costs and disbursements) due immediately prior to the issuance of my determination. The initial payment is therefore £16,250, plus VAT, on acceptance of these terms of engagement, i.e. £8,125, plus VAT, each."

89. In the first enclosed document were General Terms and Conditions. Under heading 6, Confidentiality and the Operation of Law, they included this (at 6.2):

> "You agree that otherwise than with our prior written consent, any advice, opinions, and statements, reports and other information that

we provide in connection with the services (in whatever form or medium) or any document or statement which bears our name (other than financial statements) in the form in which they have been reported on by ourselves as auditors) …"

90. At 12.1 under the heading Information:

"You [i.e. all parties to the process] agree to provide us with all documents and information we may need to complete the engagement and, unless stated otherwise, you confirm that the documents and information provided are complete and accurate …"

91. At 14.6:

"The aggregate liability of [PKF] in respect of this engagement shall be limited to £500,000.  For the avoidance of doubt this limit of liability applies to the aggregate of all claims that may be made against us by all the clients named in our engagement letter and not separately to each client or to each separate incident of loss or damage."

92. There was then an appendix marked Appendix 1, incorporated by clause 6 (which I have already read), providing for the procedures and timetable.  Endeavouring to summarise this it, in essence, provided for three rounds of submissions from each party: the first to be a reasoned valuation of the shareholding; the second to be written comments on the other side's first round written submissions; and the third to be written comments on the other side's second round submissions.  There was provision for both the seller and the purchaser, which I have taken in this context to mean the prospective purchasers under the pre-emption provisions, to provide Mr Whitaker with all information and assistance as he reasonably required.  There was express provision for his entitlement, at his discretion, to requite written clarification of matters, and there then followed, picking up requests made earlier in correspondence:

"The Expert Accountant will address such requests to the Seller and the Purchaser simultaneously copying to each party requests made to the other party. For the avoidance of doubt and for use solely within the valuation exercise, the Expert Accountant shall provide to each Party copies of all documents disclosed by the other Party to the Expert Accountant"

93. It is convenient to mention here that a revision, or addition is perhaps the right word, to the procedures set out in Appendix 1 has been indicated by Mr Whitaker during the course of these proceedings, mirroring a possibility I canvassed with counsel as to the possible terms of any order providing for an expert assessor under the stage 4 submission.  This provides for, as it were, a preliminary round prior to the three rounds of submissions (which I have just summarised) whereunder the defendant is to provide to Mr Whitaker and, as it is put still, the purchaser, a list of further documents which he says he does not have, and reasonably requires to have.  The purchaser is to respond.  Mr Whitaker is then to decide what further documents should be disclosed and to set

therewith a timetable for the remaining process, including the three rounds of submissions mentioned above.

94. So far as the information limb of the matters in dispute at stage 3 is concerned, the arguments have, broadly speaking, ranged thus: the claimant has taken a primary point of principle that all these objections are impermissible as being made for a collateral purpose, submitting that the question of disclosure should be dealt with within the appointment, rather than using the withholding of consent to the appointment as a lever to force the claimant to deal with it first, and deal with it to the defendant's satisfaction. The defendant has retorted with what I will call the agency point, and the claimant responds to that, firstly, by disputing it and, secondly, by submitting that it is in any event an argument which the defendant is estopped from raising under the principle in Henderson v Henderson (1843) 3 Hare 100, as explained in Johnson v Gore Wood & Co [2002] 2 AC 1.

95. In that sequence, then, the claimant's point of principle is advanced by Mr Hollington essentially on the basis that it is clear from the scheme of the articles and, in particular, article 11.14, that the third party accountant is to be the master of the process of valuation. All questions of what documentation is required are for him, and Mr Hollington emphasised in particular the words "absolute discretion" to be found within Article 11.14. Mr Tregear submits that if one looks closely at that sentence of article 11.14, Mr Hollington overstates the effect of those words.

96. As to the particular sentence which includes the "absolute discretion", I agree with Mr Tregear. The sentence is, in itself, dealing with what is to be taken into account when the third party accountant issues his or his firm's certificate, and as to that he or his firm has an absolute discretion conferred on it, although an (inclusive) list of possibilities follows.

97. However, construing article 11.14 as a whole, and in the context of all of article 11, my sympathies are with Mr Hollington's submissions. The process here prescribed, to my mind, clearly contemplates that the third party accountant will take the primary and leading role in conducting the process. Inevitably, given the nature of the task conferred on him, questions of what information is required will arise as part of that process, and it would make no sense for anyone other them him, given the various duties cast upon him by that article (which I have already read in full), to have to resolve them.

98. Withholding consent to any appointment (even of a firm to which the defendant expressly and repeatedly acknowledges he has no objection) as a lever to get all the disclosure the defendant requires before any appointment is made is, in my judgment, unreasonable. It is not co-operating to make the appointment effective, and it is the use of the withholding of consent for a collateral purpose. Pressed by me as to exactly how he put his case in this regard, Mr Tregear very helpfully ultimately formulated his case as thus: the reason for withholding consent relied on in relation to the provision of information is not any flaw or inadequacy in Mr Whitaker's terms and conditions, but is the defendant's concern that until the company has provided the requested information he will be unable, meaningfully and effectively, to participate in Mr Whitaker's process. Despite (characteristically of Mr Tregear) the most favourable possible presentation of his client's position (in the language I have just quoted), that

does not, in my judgment, answer the essential point against the defendant here, which is that, there being nothing in the terms and conditions of the presidential nominee which is unreasonable or otherwise objectionable, his remedy for the problem he perceives, encapsulated in Mr Tregear's submission, would be either to ask the third party accountant to hold back from carrying through one or more of the three rounds of submissions until additional documentation is provided, or to qualify at least his first round of submissions on the basis that he is unable fully to do himself justice in the figure he puts forwards, or any of the reasoning for it, due to absence of documentation. In the event, by his proposed revision to the Appendix 1 procedure, Mr Whitaker has now expressly met and provided for that remedy in any event.

99. Seeking to, as it were, reinforce his client's rather limited position; Mr Tregear raised what I have referred to as the agency point. In his skeleton argument he contended that pursuant to Article 11.3 the claimant company was constituted the agent to the defendant for the sale of his shares, and that the duties the defendant is owed by the claimant as such are fiduciary in nature, giving rise to obligations not to act under a conflict of interest and to act with undivided loyalty to the interests of the defendant. This generated indignant submissions to the contrary, in both a supplemental skeleton and oral submissions, from Mr Hollington for the claimant.

100. By the time Mr Tregear actually came to address me, his agency point was modified to a submission that pursuant to Articles 11.1 and 11.2, the claimant acted for the length of the process as the agent of the defendant, and the scope of the claimant's duties as such is to do that which has to be done in order to facilitate the ascertainment of the sale price including, in particular, to enable Mr Davenport, the defendant, to participate meaningfully and effectively in the valuation process by providing information and material to him as requested by him. Subsequently, Mr Tregear added a like limb as to providing information and material to the third party accountant.

101. Whilst Mr Tregear did not formally abandon the suggestion that there might be some fiduciary element to these agency duties, he wisely did not press it. I will, therefore, deal with that suggestion only very shortly. As Millet LJ explained in <u>Bristol & West Building Society v Mothew</u> [1998] Ch, 1 at 18A-C:

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary … As Dr. Finn pointed out in his classic work Fiduciary Obligations (1977 ed. p. 2), he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

102. Where the agent's obligations derive from a contractual relationship, the legal position is as summarised by Sir Anthony Mason in the High Court of Australia in <u>Hospital Products v United States Surgical Corporation</u> [1984] HCA 64, 156 CLR 41 at 97, where he said:

> "That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a

> foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to, them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its true construction."

That passage was cited by Patten J (as he then was) in Halton International v Guernroy [2005] EWHC 1968 (Ch), [2006] 1 BCLC 78.  In a detailed consideration of like issues between paragraphs 135 and 153 in that lengthy judgment, Patten J, who had expressly found in paragraph 136 that the defendant Guernroy acted as the agent of the claimant, nevertheless went on to find that no relevant fiduciary relationship resulted.   At paragraphs 138 and 139 (report 131d-132c) he said this:

> "138   I can therefore concentrate on the central issue, which is whether the voting agreement gave rise to the fiduciary duties alleged. There are, of course, some relationships which are by their very nature recognised to be fiduciary. The relationships which conventionally exist between trustee and beneficiary, director and company, solicitor and client are well known examples. But there is no clear authority which recognises agents as having a fiduciary relationship with their principals and some clear judicial statements that they do not. In Phipps v Boardman [1967] 2 AC 46 at 127 Lord Upjohn analysed the question in this way:
>> '1. The facts and circumstances must be carefully examined to see whether in fact a purported agent and even a confidential agent is in a fiduciary relationship to his principal. It does not necessarily follow that he is in such a position (see Re Coomber [1911] 1 Ch 723).
>> 2. Once it is established that there is such a relationship, that relationship must be examined to see what duties are thereby imposed upon the agent, to see what is the scope and ambit of the duties charged upon him.
>> 3. Having defined the scope of those duties one must see whether he has committed some breach thereof and by placing himself within the scope and ambit of those duties in a position where his duty and interest may possibly conflict. It is only at this stage that any question of accountability arises.
>> 4. Finally, having established accountability it only goes so far as to render the agent accountable for profits made within the scope and ambit of his duty.'
>
> 139   This approach has been followed in a number of recent cases of high authority. In Henderson v Merrett Syndicates Ltd [1995] 2 AC 145 at 206 Lord Browne-Wilkinson said this:

'The phrase "fiduciary duties" is a dangerous one, giving rise to a mistaken assumption that all fiduciaries owe the same duties in all circumstances. That is not the case. Although, so far as I am aware, every fiduciary is under a duty not to make a profit from his position (unless such profit is authorised), the fiduciary duties owed, for example, by an express trustee are not the same as those owed by an agent. Moreover, and more relevantly, the extent and nature of the fiduciary duties owed in any particular case fall to be determined by reference to any underlying contractual relationship between the parties. Thus, in the case of an agent employed under a contract, the scope of his fiduciary duties is determined by the terms of the underlying contract. Although an agent is, in the absence of contractual provision, in breach of his fiduciary duties if he acts for another who is in competition with his principal, if the contract under which he is acting authorises him so to do, the normal fiduciary duties are modified accordingly: see Kelly v Cooper … [1993] AC 205, and the cases there cited. The existence of a contract does not exclude the co-existence of concurrent fiduciary duties (indeed, the contract may well be their source); but the contract can and does modify the extent and nature of the general duty that would otherwise arise.'

103. Accordingly, I conclude that the correct approach is, first, to look at what duties are imposed on an agent in order to determine their scope and ambit, and, having done that, then to consider whether the nature and scope of any of them is such as to introduce or add a fiduciary element into what otherwise are simply their contractual obligations as an agent. So here, in the context of Article 11, and subject, in any event, to the point to which I will shortly come, the question is whether the nature of the claimant company's duties under that article is such as to introduce or add a fiduciary element to them.

104. Having heard Mr Tregear's carefully modified oral submissions on the agency point, Mr Hollington replied that he could answer them simply. He submitted, first, that for someone to act as an agent means acting for or in the place of the principal. The duties inherent in Mr Tregear's orally formulated scope of the supposed agency relationship had nothing to do with the company acting for or in the place of the defendant; rather it was the company, acting in its own right, providing its own documents to other people. Second, Mr Hollington submitted that the agency created by article 11.1.1 is limited to that element of sale process in which the claimant *does* act for or in the place of the defendant, which is essentially offering his shares for sale to others. Insofar as Mr Tregear is correct in submitting that the more detailed provisions of articles 11.6 and 11.8 make sufficient provision for that anyway, it is still unsurprising to see the inclusion of a provision such as 11.1.1 in an article of this nature, and any such duplication of provisions, both general (11.1.1) and specific (11.6 and 11.8) is simply an example of 'belt and braces' drafting.

105. Mr Tregear's submissions run almost in the opposite direction over the same material. He submits that the starting point is the presence of the express provisions of article 11.6 and 11.8. He then submits that these perfectly adequately provide for the mechanics of the process of which Mt Hollington spoke. Therefore, Mr Tregear submits, I should apply the general principle of construction that wherever possible the court construes words so as to have some operative effect rather to be redundant or duplicatory in nature, and find some meaning for them. Here, Mr Tregear submits, the obvious operative effect to give them is the duty of facilitation for which he contended.

106. I prefer and accept both limbs of Mr Hollington's submissions on this point. There is nothing in article 11.1.1 which assists the defendant in shoring up his case as to the provision of information and, in particular, to entitle him to require the company, as his agent, to provide him with the company's own documents. I would observe that, even if there had been some such duty, any breach of it would not have entitled the defendant to withhold his consent (see the remarks I have already made in relation to the collateral purpose submission of Mr Hollington). The remedy for a breach of any such agency obligation would ultimately be to seek to enforce the company's obligations through the court. So far as the third party accountant is concerned, I have already indicated the stances which would have been available to the defendant. Mr Tregear ingeniously floated out the possibility of the court withholding relief from the claimant as a matter of discretion, but none of the relief which is sought from me is equitable relief discretionary in nature.

107. I will, therefore, deal only very shortly with the claimant's alternative answer to the agency point, which is estoppel. Mr Hollington submitted that Mr Tregear had not raised any such agency point in the previous proceedings, and that much is common ground. He submitted that its nature was such that it most certainly both could and should have been raised in the earlier proceedings, and, if it had been so raised, the effect would have been to torpedo Mr Tregear's own case. He referred to the case of Henderson v Henderson (1843) 3 Hare 100.

108. Mr Tregear, in his submissions, referred me to Johnson v Gore Wood [2002] 2 AC 1 where the current state of the rule of Henderson v Henderson is dealt with, in particular at pages 23, 27 and 30 in the speech of Lord Bingham, and also by Lord Millett at page 58 and following, especially at 59B. I will not take time to quote the various passages, but the ultimate submission deriving from them is that there is only question the court need ask to decide whether or not there is a Henderson v Henderson estoppel, which is whether the conduct of the party sought to be estopped can properly be categorised as oppressive or otherwise an abuse of the court's process.

109. I accept Mr Tregear's submissions that for him now to raise his agency point is neither oppressive nor otherwise an abuse of process. Firstly, it did not directly arise on the issue that was before the court in the previous action. Secondly, the agency obligation, at least as formulated in oral submissions to me (albeit that in the event I have rejected it) would not have torpedoed the defendant's case in the earlier proceedings. The most it would have done, if aired, would, in my judgment, have been perhaps to cause the claimant company to consider adopting a different or additional course, namely, to purport to appoint Mr Eamer or his firm BDO to act as third party accountant on behalf of, or as the agent of, the defendant, as well as (which it had done in any event) on its own behalf. Whilst Mr Tregear certainly could have raised it during the course of his

submissions last time, there is no sufficient basis to say that he *should* have raised it, given what the issues then were (which I have already summarised earlier in this judgment). Raising it now is not oppressive or otherwise abusive of this court's process. The problem with Mr Tregear's agency point lies in its substance, rather than any legitimate objection to him raising it at all.

110. Still with the information point, I turn to say a few words about the merits with regard to the categories of documentation raised, and it is convenient to do so by reference to paragraph 62 of Mr Tregear's skeleton argument. Taking his points in accordance with his own hierarchy, in other words taking the top of the hierarchy first, 62.1 concerns all of the information sought in the letter of 26 June 2009. Only two bits were not provided. Item 3 is dealt with separately below under 62.3, which leaves only item 6 here. The position is broadly unchanged since the request of 26 June 2009 was made, and the first response of 20 July 2009 was sent.

111. Mr Tregear's objection to my forming any view on the present evidence as to the reasonableness or otherwise of the advice the defendant says he has received, and/or of his own reliance on it, could have presented an obstacle to resolution here. However, first, the claimant's collateral purpose point has succeeded and, second, the alteration to the third party accountant's proposed procedure which was volunteered during the hearing makes it now clear beyond doubt that the defendant will have an opportunity to seek further information or documents within the valuation process, and before he has to put forward even his first round submissions (which, it will be remembered, are to include his own figure as to value).

112. Next in Mr Tregear's hierarchy comes the point at 62.3. This concerns management accounts for the years 2000 to 2005. The outstanding dispute in respect of this point appears to me to have resulted either from a misunderstanding, or from the fact that this request and the reasons for it, not having been directly dealt with in the September 2009 documents, has thereafter simply been rather lost amongst the morass of other issues between the parties. Management accounts were supplied for the later years. Mr Hollington explained in court (though it appears not to have been picked up in the correspondence) that it was thought to be unnecessary to send those for 2000 – 2005 because the audited accounts for the same period had already been disclosed. It turned out that the defendant has his reasons, right or wrong, for still wanting these management accounts (see paragraphs 39 and 41 of his witness statement in these proceedings). That having been clarified towards the end of Mr Tregear's submissions, Mr Hollington was rapidly given instructions to volunteer an undertaking to produce, as soon as reasonably practical, such management accounts of the company for the period between 2000 and 2005 as it retains in its possession. Subject to the question of whether that wording needs to be altered to extend to subsidiary or associated companies, and Mr Tregear himself was frank enough to say that he was not immediately in a position himself to identify what, if any, 'tweak' was needed in that respect, that undertaking seems to me completely to meet the point. Mr Tregear realistically accepted that the attempt to expand this category made in paragraph 54.3 of his client's witness statement, so as also to pick up "details of all inter-company deals for the years 2000, 2002, 2003, 2004 to 2005" could not be supported, due to the breadth and vagueness of that formulation.

113.  As to category 62.2, this is not a request for any documentation that exists at all, as the claimant made clear in correspondence some time ago. Rather, it is an expression of concern that it is difficult fully to understand and/or reconcile the content of certain accounting documents which have been disclosed due to a postulated difference in accounting treatment. This is a matter self evidently suited to being addressed to the third party accountant, dealt with in submissions to him, and in particular, if thought appropriate, in submissions made to him in his 'preliminary round', suggesting that he should seek further information from the company under the express contractual power he has to do so. If the third party accountant were to find such a submission well-founded, the company's response to his resultant request would fall to be circulated to the defendant as of right.

114.  In summary, with regard to the position on information, the provisions in clause 12.1 of Mr Whitaker's proposed terms and conditions, coupled with his procedural appendix, revised as it has been during the course of the proceedings, is, in my judgment, entirely satisfactory.

115.  I turn then to the three heads which do concern complaint as to particular terms of Mr Whitaker's proposed terms and conditions of engagement, conveniently summarised at paragraphs 62.4 – 62.6 of Mr Tregear's skeleton argument. First, at 62.4, comes the question of initial responsibility for his fees. As is apparent from the history, this is a matter on which questions were raised early. It appeared to have lapsed at the stage that only one remaining caveat was indicated. It was then resurrected in the acknowledgment of service. Mr Tregear submitted that on the true construction of the last sentence of article 11.14, Mr Whitaker has no power to make an interim direction in respect of costs. That is certainly the case prior to his appointment taking effect. A more difficult question is whether, once his appointment takes effect, he would then be empowered to make such a direction prior to his certificate being issued. Mr Tregear submits that I, in considering the true construction of this sentence, should find it surprising were an involuntary transferor of shares required to make a contribution towards stage payments of the accountant's fees, albeit that the sums concerned would suggest that a contribution of £8,000 would be relatively modest compared to the value of the shares in question and, on any view, must be very, very modest compared to the costs of the litigation that has now been going on for several years. He also submits that one of the assumed factual circumstances that I should take into account is that at least a proportion of reputable accountants would (he asserted) be willing to undertake such a task on terms which provide for their receiving all their remuneration only at the end of the process.

116.  I find that a difficult submission, and would have found the resolution of the construction question, had it ultimately been necessary, difficult too. However, the claimant, by letter of 6 October 2010, clarified orally by Mr Hollington in the course of his submissions, has volunteered a willingness to fund all Mr Whitaker's costs up to the point of certification, so up to the point at which, even on Mr Tregear's submissions, the third party accountant is clearly authorised to make a determination as to who should bear the costs. That being so, I am quite satisfied there is no remaining ground for reasonable objection to Mr Whitaker's terms and conditions with regard to fees even if (which in the event it is unnecessary for me to decide) there ever was.

117.  Next, at 62.5 in the skeleton argument, comes the question of the cap on liability.  This appeared to have been dropped when the course of correspondence reached the 29 October 2009 letter, and was not mentioned in the matters to be disputed in section B of the Acknowledgment of Service.  Nevertheless, it has now been raised and I have already quoted clause 14.6 of Mr Whitaker's proposed General Terms and Conditions.  The points which Mr Hollington makes include that Mr Davenport has persistently declined to put forward any alternative figure.  Nor has he put forward in his witness statement, in terms, any evidence that it is in some way impossible for him to do so.  He has thus left his counsel to draw on strands from the correspondence in constructing such submissions before me.  With regard to the role and operation of the proposed cap itself, Mr Hollington draws my attention to the fact that I should not leap gratefully to the mention of specific figures such as £500,000 and £1 million at various points of the correspondence, because to do that would be to equate postulated possible prices for the shares, or postulated possible maximum valuations, on the one hand, with an appropriate level for possible recompense for a party if his shares are negligently undervalued by the third party accountant.  On analysis that appears to me to be an entirely proper point.

118.  Mr Tregear realistically accepts, as his client had already done in correspondence, that one would expect a reputable accountant accepting such an engagement to require some sort of cap.  In my judgment, it is inherent in any such appointment as these articles contemplate, that some figure for such a cap is going to have to be determined before the transferor's case on value et cetera is fully refined.  I do not accept that Mr Davenport is in an impossible position in this regard, *a fortiori* since he has not even come out and so asserted in his witness statement.  He has given no reasoned basis for why £500,000 is an unacceptable (presumably inadequate) figure, nor any reasoned basis in support of some other figure, because he has not put one forward.  In these circumstances I accept Mr Hollington's submission that in this regard Mr Davenport is withholding his consent to an appointment unreasonably.

119.  Finally, at paragraph 62.6 in his skeleton argument, there is the question of the defendant's freedom or otherwise to disclose such valuation report as in due course comes from the third party accountant to others, and more specifically to prospective purchasers in the event that those with a right of pre-emption under the Articles of Association choose not to exercise the same.  This is provided for in 6.2 of the General Terms and Conditions which I have already read, though some element of, as it has been put, 'comfort' is said to have been provided by the e-mail of 6 January 2010, under cover of which the revised engagement letter was sent.  What Mr Whitaker actually said in that email was, having quoted from 6.2:

> "On being informed of the purposes, parties etc we may be in a position to give such consent, no doubt conditional on the third party being aware of the context of our opinions etc."

120.  My own initial view was that this might be another example of unreasonableness on the basis of collateral purpose as, although the Articles do allow a transfer, in the event that pre-emption rights are not taken up, of shares to others, the process of drumming up interest, getting the price as high possible and so forth, could not (in contrast to the process of valuing the shares under article 11.14) be said to be part of the article 11 process.  That said, Mr Hollington, seeking of course best to promote his client's

interests, in courteous and diplomatic terms declined to adopt any such suggestion, and it would be very undesirable for me to resolve a point on a basis that neither party wishes to support.

121. Mr Hollington's point here is that, contrary to Mr Tregear's submissions, one should not necessarily assume that Mr Whitaker's valuation will be a non-speaking one, in the nature of the sort of one sentence certificate of value one quite often sees in this context. Although I had originally found myself in sympathy with the contrary assumption Mr Tregear was making, on reflection, having heard Mr Hollington, I think it is right that one has to allow for the possibility that the valuation might end up being of a speaking or reasoned nature, albeit that if one had to guess at this stage the contrary is the more likely outcome. In those circumstances one cannot simply dismiss the reference to "the context of our opinions" in Mr Whitaker's email of 6 January 2010 from which I have just quoted.

122. A powerful point also made by Mr Hollington here is that, on the Defendant's own case, the possibility of him having to deal with prospective purchasers other than those with pre-emption rights over the shares, is highly unlikely. For, as Mr Tregear's skeleton, paragraph 5, says (in the last sentence):

> "The practical reality is that the shares will be purchased whatever the price since the company is now so valuable."

Although he sought to deal with this point carefully and elegantly when it was put to him, Mr Tregear was stuck with the point that so clearly appears from his own skeleton, and ultimately his submission to me, when I questioned him about this, came to "all sorts of things might happen".

123. This is a point which I would very much prefer to see resolved consensually. Given the approach which the parties have invited me to take for today's purposes, what, at this stage, I will rule is that were PKF/Mr Whitaker to modify General Term and Condition 6.2 for the purposes of this appointment, so as to add the words "(such consent not to be unreasonably withheld)" immediately after the reference to possible consent in 6.2, then there would then, in my judgment, clearly be no reasonable ground in relation to this condition for Mr Davenport to withhold his consent.

124. Looking, then, at the overall position with regard to the stage 3 implied terms, I am satisfied firstly that both the terms contended for are indeed to be implied, and secondly that the claimants have established breaches of both of them. I am satisfied that Mr Davenport has no reasonable grounds for withholding his consent to Mr Whitaker's/PFF's appointment on the terms on which he is now prepared to act, subject to the two qualifications I have mentioned, namely, clarification of the exact wording of the undertaking, and seeing whether PKF/Mr Whitaker will make the modest modification to their General Term and Condition 6.2 which I have mentioned.

125. With regard to the <u>Mackay v Dick</u> implied term for positive co-operation, the breaches do, in my judgment, go further, in particular with regard to the changes of stance, the resurrection of points apparently dropped in the correspondence, and the further expansion of issues after the acknowledgement of service was filed. I have already indicated a like view on the more specific point with regard to proffering a figure in

support of the alleged inadequacy of the cap. In the position which has now been reached, taking the pragmatic approach that both parties invite me to do, even if (contrary to my judgment) the point as to provisional information when previously raised was a valid objection, and not susceptible to criticism as a collateral objection, Mr Davenport ought reasonably to have accepted the modification to Mr Whitaker's proposed process, providing for the additional 'preliminary' round of submissions, as satisfactorily covering his point.

126. I turn, finally, to the claimant's stage 4 submission. Here Mr Hollington relies on the well known case of, and I think one could now say principle in, Sudbrook v Eggleton [1983] 1 AC 444, to which I have already made reference. He cites one of the Macro v Thompson cases, Macro v Thompson (No 3) [1997] 2 BCLC 36, a decision of Robert Walker J as he then was. I am not going to take time to quote from that judgment because if one looks at the relevant passage, principally 69a-e, whilst it clearly acknowledges the possibility of Sudbrook v Eggleton being applied in this context, the learned Judge in that case was very careful to express his reasons as being limited to the particular circumstances of that, I think I can safely say notorious, case, without establishing any particular precedent.

127. The first question raised by Mr Tregear's submissions here is whether, on the true construction of these particular articles, the role of a third party accountant appointed under one or other of the two limbs of the definition of that term, is an integral and essential part of the agreement as to the price, or whether it is a non-essential machinery for the ascertainment of a fair price as provided for by article 11.14. Mr Tregear cites the interesting case of Gillatt v Sky Television [2000] 1 All ER (Comm) 461, a decision of the Court of Appeal (also reported at [2000] 2 BCLC 103). The issues and decision in that case appear to me to be conveniently and accurately summarised in its head note, which I will not myself read out.

128. The issues for decision at first instance for Lloyd J, as he then was, were threefold. The first two were these: (1) The determination of an independent chartered accountant is integral to any claim under clause 6.1 of the [agreement there in question] and there is no entitlement under clause 6.1 in the absence of such a determination. (2) Whether it is no longer open to either the claimant or the defendant to call for the appointment of an independent chartered accountant for the purposes of the same clause of the same agreement. Issue (3) does not matte for present purposes. It is clear from the report at 463g that, by the time the matter came for hearing, it was conceded that under (2) the answer was, yes, it was no longer open, or to put it another way it was too late, for an appointment to be made. That, I think, is sufficient to identify the issues which were in play in that case.

129. In giving the leading judgment, Mummery LJ cited *inter alia* from the case of Sudbrook v Eggleton, both per Lord Fraser and per Lord Diplock. Having cited that and a number of other cases he said, at 469a:

> "These cases are relevant to the resolution of this appeal to the extent that (a) they identify the importance of distinguishing between essential and inessential contractual terms and the different consequences of them becoming ineffective; (b) they indicate the factors to be considered in determining whether a term

is an essential one or not; (c) they emphasise the importance of upholding, if possible, the validity of the contract and the intentions of the parties ; and (d) they illustrate the approach of the court in seeking to prevent contracts from becoming ineffective in consequence of a party taking advantage of either his own failure to perform his contractual obligations or of the refusal or inability of a non-party to fulfil the role which the parties contractually anticipated he would fulfil."

130. Lord Justice Mummery broke up his reasoning into five lettered sub paragraphs. In common with counsel, I would respectfully break them up slightly differently. There appear to be reasons of two categories. Firstly, there is reasoning of what I will call a conventional construction nature, three in number, the first being (a) plus (b), the second (c) and third (e). Secondly, there is reasoning of a different nature encapsulated within (d), which is that this was not a case where the problem arose because of a breakdown of the machinery, but rather because one party had simply failed, for a long time, to take a step that was open to it.

131. Mr Hollington ingeniously turns that into a submission that everything other than (d) is actually *obiter* anyway, although clearly even if he were right about that I would take a good deal of persuading to dismiss as insufficiently persuasive *obiter dicta* of Mummery LJ. However, in any event I do not accept Mr Hollington's submission. In my judgment, properly analysed Gillatt v Sky Television is a case which has two free standing reasons for decision, each of which is capable of supporting the decision without the other, and neither of which logically had to be taken first. On that basis, who am I to say that the Court of Appeal ought to have taken them in the other order than that in which they did? Anyway, I am far from persuaded that the better course would have been for them to do so.

132. So far as the three reasons for the construction point are concerned, item (c) deals with the inherent uncertainty in the words "open market value" without additional definition. As the learned Lord Justice pointed out at 470c and following, referring to submissions that had been made:

> "There is more than one possible approach to such evaluation of shares in a private company, an earnings basis, an assets basis, a discounted for cash flow basis or a combination of these approaches. The fact is that in this case the judgment for the independent accountant entrusted with the task by the parties. The agreement did not prescribe of him any detail of the basis on which he was to approach the determination of open market value, it was treated as a matter of judgment and trust to his discretion which the parties agreed to accept as final and binding. It is the duty of the court to give effect to the parties' agreement on ascertainment of entitlement to the final payment and to payment of the shares. It is not the function of the court to modify clause 6.1 of the agreement so as to enable it to intervene and make its own valuation."

133. As to (e), Mummery LJ indicated that commercial considerations tended to support an inference that the parties would have wanted the open market value determining by an

independent accountant, but not determining by the court.  That has resonance, submits Mr Tregear, in the present case.  However Mr Hollington reminds me that in the case of Rayfield v Hands [1960] Ch 1 the relevant (and extremely short) article of association provided as follows (see report at 2):

> "No shares in the company shall be transferred to a person not a member of the company so long as any member of the company may be willing to purchase such shares at a fair value [my emphasis]."

134. With no further definition as to fair value (cf open market value) Vaisey J had no difficulty in directing an inquiry to ascertain the fair value of the shares, see at page 9. Furthermore, here there is some greater guidance as to fair value than there was in the Rayfield v Hands article, though still not, it is right to say, as full a definition as there might have been.. Such assistance as there is is to be found in the provisions of article 11.14, which I have already quoted.  In those circumstances I am satisfied that this is not a case where the involvement of the third party accountant, appointed as per the definition earlier in the articles, must be taken as essential to the ascertainment of the fair value within clause 11.14.   Therefore, if necessary, without rewriting the agreement but merely as a matter of substitute mechanics not undermining the parties' agreement, the court can if necessary take over.

135. The next question, therefore, is whether this is a case where the machinery has broken down.  Given my finding in the claimant's favour on its stage 3 submission, this part of the judgment necessarily proceeds on the hypothesis that the matter has not been resolved at stage 3.  Having reviewed the correspondence and facts which demonstrate how the current impasse has been reached, I am satisfied that, on this hypothesis, this is a case where the machinery has broken down.  Unlike Gillatt v Sky Television there is no step open to the claimant which could have been taken but was not.

136. With the defendant withholding consent until all his wishes are accommodated, on the basis that both sides' stances are reasonable (contrary to what I have concluded at stage 3 in respect of the defendant's position on some issues) deadlock would almost inevitably ensue, and be close to impossible to resolve.  If, on the true construction of the articles and contrary to my findings on the stage 3 submission, there is no other means of resolving the matter then this is a case where the machinery has broken down and, therefore, resort may be had to the Sudbrook v Eggleton.  What form should that substitute machinery take?  In essence, the court will have to take control of the valuation process, and on the first day of the hearing before me there was some debate as to whether that should be by a full court valuation (as the defendant contended from the start), or by the use of an expert accountant as an assessor, under CPR35.15 (which was the claimant's initial preference), or as a single joint expert under CPR35.7 (a further possibility, on which I invited submissions).  However, on the basis that Mr Hollington had to accept that he had no authority for his initial submission that the court could completely delegate its powers of decision to an assessor appointed under CPR35.15, and after the opportunity for reflection overnight on the inevitability that each side would want to involve an accountant's assistance in any event, on the second day of the hearing Mr Hollington accepted that if stage 4 is reached the substitute mechanics might as well be a full court valuation.  With both parties having the advantage in this case of the advice of leading counsel as to where their best interests

lie, I see no need whatever for me to start second-guessing a position which each leading counsel now supports.

137. In opening, Mr Hollington indicated that he would only rely on the reference in the judgment of Ms Prevezer QC to the possibility of the court settling the terms on which the accountant was to act, in the context of a possible appointment of a court assessor at stage 4.  Otherwise, he effectively conceded that the submissions in Mr Tregear's skeleton argument as to the absence of any jurisdiction for the court to start settling the terms on which an accountant would act, appeared to have some force.  In the event, now that the claimant agrees with the defendant that any valuation should be by the court itself, unassisted by any assessor, the position is that, notwithstanding Ms Prevezer QC's observations, no question arises of the court itself settling the terms of appointment of an accountant in any capacity.

138. Therefore, in broad terms, first I resolve the issues raised by the claimant's stage 1 and stage 2 submissions in favour of the defendant.  Second, I have resolved the issues raised by the claimant's stage 3 submissions broadly in its favour, subject to (a) the clarification of the exact terms of an undertaking and (b) waiting to see whether Mr Whitaker and his firm PKF is prepared to make one modest modification to clause 6.2 of their General Terms and Conditions.  Third, had I been against the claimant on its stage 3 submission too, I would have acceded to its stage 4 submission and ordered a court valuation.

139. Despite the fact that it is now 4.50pm on a Friday, this judgment would not be complete without my paying credit to the helpful manner in which both counsel have addressed me, not only in dealing with the numerous questions with which I taxed them, but also in adopting a constructive approach to enable this first effective hearing of a Part 8 claim to be used effectively to resolve the numerous issues between the parties.  The manner in which they have done so deserves to be complimented.

# *579 Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd

 **Positive/Neutral Judicial Consideration**

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
21 December 1998

**Report Citation**
[1999] C.L.C. 579

Queen's Bench Division (Commercial Court)

Rix J.

Judgment delivered 21 December 1998

*Conflict of laws—Anti-suit injunction—Exclusive and non-exclusive jurisdiction clauses in contracts relating to sale of bonds—Seller of bonds sued in England for buyer's failure to repurchase—Buyer took proceedings in US—Whether US proceedings should be restrained.*

This was the plaintiff's application for an anti-suit injunction to restrain the defendant's pursuit of proceedings in New York.

The defendant, 'MLC', was a hedge fund which through its US investment manager, 'MLC Group', bought an amount of two series of Russian loan notes sold by the plaintiff English company, 'CS Europe', and issued by 'CS Switzerland'. The transactions took place in New York between MLC Group and CS Europe's US agent, 'CS US'. MLC had appointed CS US as its prime broker under a customer agreement which contained a New York law clause but no jurisdiction clause. The purchase of the notes was financed by means of repurchase transactions and a global master repurchase agreement ('GMRA') between CS Europe and MLC contained a non-exclusive English jurisdiction clause and provided that CS US was acting only as a facilitating agent and would have no liability in respect of the agreement (cl. 2(g)(ii)). The purchase agreements for the bonds between CS Europe and MLC contained an English jurisdiction clause (cl. 5.2) which provided for the purchaser to submit irrevocably to the English courts and gave the seller option to take proceedings in any other court of competent jurisdiction. The bonds themselves were expressed to be governed by English law and contained an non-exclusive English jurisdiction clause.

The bonds became valueless after the Russian government in August 1998 announced a moratorium on the repayment of foreign debt. When MLC became liable to repurchase the notes from CS Europe it failed to pay the price, totalling some US $7.6m. CS US acting under the customer agreement liquidated assets belonging to MLC which it held and transferred the proceeds of about US$4.5m to CS Europe. CS Europe issued proceedings for the balance under the GMRA. MLC commenced proceedings in New York against CS Europe, CS US and CS Switzerland alleging misrepresentation and non-disclosure in the sale of the bonds and in the after-sale period, and fraud, and conversion of MLC's assets by liquidating the US accounts. CS Europe sought an anti-suit injunction to restrain MLC's US proceedings relying on cl. 2(g)(ii) of the GMRA and cl. 5 of the purchase agreements. CS Europe also sought to join CS US and CS Switzerland as second and third plaintiffs.

*Held*, giving leave to amend to add the new plaintiffs and granting an anti-suit injunction in relation to the defendant's claims in the New York proceedings which fell within the purchase agreements:

© 2021 Thomson Reuters.

1. Clause 5.2 of the purchase agreements was an exclusive jurisdiction clause so far as claims brought by MLC were concerned. Despite the absence of the word 'exclusive', the existence of the unilateral option for CS Europe to take proceedings elsewhere indicated that MLC was bound to bring proceedings arising out of or in connection with the purchase agreements exclusively in the English courts. ( *Continental Bank NA v Aeakos Compania Naviera SA [1994] 1 WLR 588 applied* .)

2. The claims of MLC in New York were not all covered by the jurisdiction clause in the purchase agreements. Claims which arose out of or in connection with the GMRA did not necessarily also arise out the purchase agreements, and where the claims arose out of both agreements the GMRA clause prevailed either because in a case of conflict on standard *\*580* forms put forward by CS Europe MLC should be entitled to exercise the broader rights or because the clause in the contract which was closer to the claim prevailed over the more distant clause.

3. Disputes between MLC and anyone other than CS Europe were not within cl. 5.2. CS US could not take advantage of the clause because it signed the agreements as agent only.

4. CS US was intended to be a party to the GMRA for the purpose of cl. 2(g) but was not intended to have a complete immunity. A failure by CS US to comply with applicable US securities laws in performing its duties as facilitating agent was specifically excepted under cl. 2(g)(ii) and MLC's complaints fell within that exception.

5. It was not in the interests of justice to prevent MLC from pursuing its New York claims against CS US and CS Switzerland. The claims against CS US under federal law or the law of New York or the customer agreement were not subject to a jurisdiction clause and it could not be said that New York was an inappropriate forum. As a matter of comity it was for the New York court to consider whether the claims should under applicable New York principles be stayed in favour of English jurisdiction. Nor would the court restrain MLC's claims against CS Europe under the GMRA, since the right to sue in New York, if New York accepted jurisdiction, was expressly reserved to MLC. MLC should be restrained from pursuing in New York its claims arising out of or in connection with the purchase agreements on the basis of the jurisdiction clause. That might encourage MLC to litigate its claims as a whole in London. ( *The Angelic Grace [1995] 1 Ll Rep 87 applied* .)

The following cases were referred to in the judgment:

*Airbus Industrie GIE v Patel [1998] CLC 702; [1999] 1 AC 119* .
*Akai Pty Ltd v People's Insurance Co Ltd [1997] CLC 1508* .
*Angelic Grace, The [1995] 1 Ll Rep 87* .
*Aratra Potato Co Ltd v Egyptian Navigation Co ('The El Amria') [1981] 2 Ll Rep 119* .
*Bouygues Offshore SA v Caspian Shipping Co (No. 2) [1997] 2 Ll Rep 485* .
*British Aerospace plc v Dee Howard Co [1993] 1 Ll Rep 368* .
*Continental Bank NA v Aeakos Compania Naviera SA [1994] 1 WLR 588* .
*Ocarina Marine Ltd v Marcard Stein & Co [1994] 2 Ll Rep 524* .
*Philip Alexander Securities & Futures Ltd v Bamberger [1996] CLC 1757* .
*Snelling v John G Snelling Ltd [1973] QB 87* .
*Société Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 871* .
*Ultisol Transport Contractors Ltd v Bouygues Offshore SA ('The Bos 400') [1998] CLC 1526 (CA)* .

**Representation**

© 2021 Thomson Reuters.

Iain Milligan QC and Christopher Butcher (instructed by Allen & Overy ) for the plaintiff.
Richard Salter QC and Jonathan Nash (instructed by Richards Butler ) for the defendant.

JUDGMENT

Rix J:

Introduction

The defendant, MLC (Bermuda) Ltd ('MLC'), is a hedge fund. As its name suggests, it is a Bermudan company, but it operates through its investment manager, MLC International Investment Group ('MLC Group'), which has offices in New York (and Dallas). This litigation arises out of MLC's purchase of some Russian bonds from the plaintiff, Credit Suisse First Boston (Europe) Ltd, an English company ('CS Europe'). The actual deals were made on the telephone in New York, between Mr Amit Agarwala and Mr Marc Tishfield of MLC Group and Mr Aaron Tighe of Credit Suisse First Boston Corp, a Massachusetts corporation with offices in New York which operates as CS Europe's agent ('CS US').

*581

There were two series of bonds. On 12 March 1998 MLC purchased US$3m nominal Tatneft Credit Linked Notes, due 18 August 1998, series EM399 (the 'Tatneft notes'). The Tatneft notes were issued by a third Credit Suisse company, Credit Suisse First Boston, a Swiss company ('CS Switzerland'). The value of the Tatneft notes was linked to the performance of the underlying obligation of a Russian oil company, OA Tatneft. The second series of bonds was an issue of Russian Federation GKO Credit & Convertibility Linked Notes series EM438, due 16 October 1998 (the 'GKO notes'). The underlying security in this case was expressed in Russian roubles, so that purchase of such notes involved a currency risk which as part of the overall purchase was hedged by a forward contract written with CS Switzerland. The rationale was that if the rouble declined in value, the currency contract appreciated: ultimately, however, there was a credit risk on a Russian bank. On 5 May 1998 MLC bought US$20m nominal of the GKO notes.

The troubles of the Russian economy which ultimately burst on the international financial scene in August 1998 are well known. Although there is a degree of dispute about the residual value of the notes, it would seem that their value may have shrunk to nothing. MLC managed to sell US$13m nominal of the GKO notes at a loss in two tranches before the final melt-down, but on 17 August they were told that the Tatneft notes had zero value, and it was at about the same time that the Russian government announced a moratorium on the repayment of foreign debt, following a calamitous decline in the value of the rouble. It was, I think, that moratorium which has led to the ineffectiveness of the hedge.

The purchase of the notes was financed by means of repurchase transactions ('repos'). These were transactions by which CS Europe agreed to repurchase the notes (first leg) and then after a defined interval to sell them back again to MLC at a price which reflected the first leg repurchase price plus a financing charge (second leg). The effect of these transactions was that MLC obtained credit for their purchases (82 per cent on the Tatneft notes and 90 per cent on the GKO notes), but CS Europe retained the security of title to the notes itself.

On 17 August 1998 CS Europe made a margin call in respect of the Tatneft notes which MLC failed to pay. On 18 August MLC became liable to repurchase the Tatneft notes, but failed to pay the repurchase price of US$1,665,969.16. By reason of MLC's default, MLC became liable to pay a further US$6,058,882.28 in respect of the GKO notes. On 25 September CS US, at Europe's request, liquidated assets belonging to MLC which realised US$4,490,625.71 which was then transferred to CS Europe. On the same day CS Europe commenced these proceedings for the balance claimed to be due by serving the writ on MLC's process agents in London in accordance with the provisions of the agreement which controlled the repo transactions, namely the Global Master Repurchase Agreement (the 'GMRA') dated 6 April 1998.

© 2021 Thomson Reuters.

On 8 October MLC acknowledged service of these proceedings and indicated its intention to defend them. On 22 October CS Europe served its points of claim on MLC.

Then on 26 October MLC commenced proceedings in the federal district court for the Southern District of New York. It did so not only against CS Europe, but also against CS US and CS Switzerland. On 3 November MLC issued a demand for a jury trial in the New York proceedings, which I understand cannot be opposed. By consent, activity in the New York proceedings has been temporarily stayed pending the determination of an application by CS Europe to the English court for an anti-suit injunction against MLC's pursuit of its proceedings in New York. MLC has responded by requesting a stay of the English proceedings in favour of New York.

The basis of CS Europe's application for an anti-suit injunction is an English jurisdiction clause, said to be an agreement for exclusive jurisdiction in England, which is contained in the purchase agreements for the two series of notes.

*582*

With that brief introduction to the overall structure of the dispute before me, I must now refer to the various agreements governing the relationships of the parties.

The contractual regime

The contractual regime between MLC and the three Credit Suisse companies, CS Europe, CS US and CS Switzerland, is a relatively complex one. The first contract in point of time is the customer agreement dated 16 May 1997 made between MLC and CS US.

*The customer agreement*

The function of the customer agreement was that it reflected MLC's appointment of CS US (as representative of the Credit Suisse group as a whole) as its 'prime broker'. The gist of it was that MLC would purchase equities, securities and other financial instruments from CS US and its affiliates or deliver such financial instruments bought elsewhere to CS US, and CS US would in return maintain MLC's accounts (the 'customer accounts') and provide MLC with financing and financial information. The equity in the accounts was to secure all of MLC's indebtedness to CS US and any of the Credit Suisse affiliates. The customer agreement contained a New York law clause, but no jurisdiction clause. It was pursuant to the customer agreement that on 25 September 1998 CS US, at CS Europe's request, exercised rights to liquidate MLC's assets held in its accounts at CS US following MLC's alleged default under the customer agreement in failing to put up further margin in respect of the Tatneft notes. Thus on that day CS US wrote to MLC as follows:

'We are writing to inform you that as a result of the occurrence of an Event of Default under Section 7 of the Customer Agreement dated May 16, 1997 (the "Agreement") between [CS US] and [MLC], in accordance with Sections 3 and 8 of the Agreement we have liquidated and closed your accounts. The proceeds of such accounts (the "Proceeds") will be applied as a credit against any Obligations (as defined in the Agreement) of MLC to [CS US, CS Europe] and any other CSFBC Party (as defined in the Agreement).'

The customer agreement provided inter alia as follows:

1. Applicable Rules and Regulations; Other Agreements

This Agreement and all Transactions executed in connection herewith hereby incorporate and shall be subject to the constitution, by-laws, rules, regulations, customs, usages, rulings and interpretations, as amended, of the exchange or

market (and its clearinghouse, if any) where the Transactions are executed by CSFBC or its agents and of the National Association of Securities Dealers, Inc., the Securities and Exchange Commission and the Board of Governors of the Federal Reserve system, in all cases where applicable. Provisions contained in and remedies provided by this Agreement which are additional to and more or less expansive than any provisions contained in or remedies provided by any other agreement with Customer (including, without limitation, provisions or remedies that cover the same subject matter) shall not be deemed to be in conflict with each other, and all such provisions and remedies shall be applicable and available.

19. Single Agreement

[CS US] and Customer acknowledge that they have entered into this Agreement and will enter into Transactions in consideration of and in reliance upon the understanding that all such Transactions constitute a single business and contractual relationship and have been made in consideration of each other …
   *583

22. Governing Law

This Agreement and its enforcement shall be governed by the laws of the State of New York (without giving effect to the conflict of law principles thereof). The parties acknowledge that this Agreement is a "securities contract" within the meaning of the Bankruptcy Code (II U.S.C. Section 74(7)).'

*The Global Master Repurchase Agreement ('GMRA')*

The GMRA is the agreement which, as its name suggests, was intended to provide the framework in accordance with which repo transactions could be carried out to finance MLC's investments. The parties to it are CS Europe and MLC. It is also countersigned by CS US 'solely in its capacity as agent'. The current GMRA is dated 6 April 1998 and supersedes the original such agreement which was executed in July 1997. It applies to so-called 'Transactions' which under cl. 1 are defined as ones in which:

'one party … agrees to sell to the other … "Securities" … against the payment of the purchase price by Buyer to Seller, with a simultaneous agreement by Buyer to sell to Seller Securities equivalent to such Securities at a date certain or on demand against the payment of the purchase price by Seller to Buyer.'

The GMRA contains provisions for margin maintenance and events of default. A representations clause (cl. 9) provides that in the absence of written agreement to the contrary neither party relies on any advice of the other, that each party has and will make its own decisions based on its own judgment, and that it understands and is willing to assume the risk of each Transaction. Clause 15 states that the GMRA:

'shall supersede any existing agreements between the parties containing general terms and conditions for Transactions.'

Clause 17 (headed 'Governing Law') provides for English law and jurisdiction as follows:

'This Agreement shall be governed by and construed in accordance with the laws of England. Buyer and Seller hereby irrevocably submit for all purposes of or in connection with this Agreement and each Transaction to the jurisdiction of the Courts of England.

…

Nothing in this paragraph shall limit the right of any party to take proceedings in the courts of any other country of competent jurisdiction.'

It is therefore common ground that the GMRA contains a *non-exclusive* English jurisdiction clause.

Annex 1, Pt. 1 to the GMRA contains a series of 'Supplemental Terms or Conditions'. Paragraph 2(g) provides that if CS US acts as 'facilitating agent' with respect to any transaction, the confirmation of that transaction shall so state and the following terms shall apply, viz:

'(i)  [CS US], as a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC"), will arrange such Transaction, as facilitating agent for each of Buyer and Seller. As facilitating agent, [CS US] will be responsible for (I) effecting and settling such Transaction, on behalf of [CS Europe], (II) issuing all required confirmations and statements to Buyer and Seller in compliance with Rule 15c3-1 under the Securities Exchange Act of 1934 (the "Exchange Act"), (III) maintaining books and records relating to such Transaction as required … under the Exchange Act , and (IV) if requested by Buyer or Seller, receiving, delivering and safeguarding such party's funds and securities in connection with such Transaction in compliance with … the Exchange Act …  *584
(ii)  [CS US] is participating in such Transaction solely as facilitating agent for Buyer and Seller. [CS US] shall have no responsibility or personal liability to Buyer or Seller arising from any failure by Buyer or Seller to perform any obligations hereunder, or to monitor or enforce compliance by Buyer or Seller with any obligation hereunder, including, without limitation, any obligation to maintain margin. Each of Buyer and Seller agrees to proceed solely against the other to collect or recover any securities or monies owing to it in connection with or as a result of such Transaction or otherwise hereunder. [CS US] shall otherwise have no liability in respect of this Agreement or such Transaction except for its gross negligence or wilful misconduct, or its failure to comply with applicable U.S. securities laws and regulations, in performing its duties as facilitating agent hereunder.'

CS Europe and CS US rely before me on para. 2(g)(ii) just cited as a promise by MLC to both or either that MLC will not sue CS US in connection with or as a result of any repo transaction entered into through CS US. Thus, although the GMRA taken by itself does not enable CS US to say that it cannot be sued outside England, it points to this para. 2(g)(ii) as a general prohibition on MLC bringing suit against it anywhere.

MLC takes issue with the substance and effectiveness of this submission for reasons which I will elaborate below.

*The purchase agreements*

The actual purchase of the notes was effected in the following way.

The Tatneft notes were purchased on the telephone on 12 March 1998. That was in advance of the issue date of the notes of 24 March. As stated above, the deal was done in New York between CS Europe and MLC through the agency of CS US acting by Mr Tighe and with Mr Agarwala of MLC's associate company, MLC Group, acting for MLC. It would seem upon the present evidence, but the matter is not entirely clear to me, that at that stage there was nothing that passed or had passed in writing between the parties to describe the notes being purchased. MLC alleges before me and in the New York proceedings that certain representations were made by Mr Tighe to Mr Agarwala, such as that CS Europe would make a market in the Tatneft notes, viz. that there was an assurance of liquidity, and that the notes were part of an issue of US$40m. The parties respectively support and deny the making of such representations in evidence before me: for present purposes I can treat such allegations and denials as merely that, but recognising that they are seriously made and supported by evidence.

On the following day, 13 March 1998, paperwork was passed from CS Europe in London to MLC Group in New York. The paperwork consisted of a document headed 'Final Terms and Conditions' of the Tatneft notes as well as the document which set out the terms of purchase itself (the 'purchase agreement') and which was dated 12 March 1998.

The Tatneft notes purchase agreement referred to the accompanying document as the 'summary terms and conditions in final form' of the notes but also to an 'Information Memorandum' which was to be dated the date of issue of the notes and was to come forward prior to the settlement date of 24 March 1998.

The purchase agreement contained standard printed representations by MLC as purchaser, which were expressed also as warranties and agreements. These were to the effect that MLC was a sophisticated institutional investor with knowledge and experience in financial and business matters and expertise in assessing credit risk, that it was relying exclusively on its own sources of information and credit analysis, that neither CS Europe nor any affiliate had made any representation as to the credit quality of the notes, that in certain circumstances the hedging provision amount could be substantially less than par and might be zero, that based on its own independent review and professional advice it  *585  had determined that the notes

Case 1:20-cv-10041-PKC    Document 104-1    Filed 08/24/21    Page 148 of 151

were a fit, proper and suitable investment for it notwithstanding the clear and substantial risks inherent in them, that it had not relied on CS Europe or any affiliate in so determining, that neither CS Europe nor any affiliate had acted as its financial advisor or fiduciary, and that it could not sell the notes without their issuer's prior written consent. MLC similarly gave to CS Europe an indemnity against any loss, liability, claim or action that CS Europe might incur or which might be made against it arising out of any breach by CS Europe of any of such representations, warranties or agreements.

Of particular relevance to the present applications is cl. 5 headed 'Governing Law and Jurisdiction'. It provided as follows:

'5.1  This Agreement shall be governed by and construed in accordance with English Law.

5.2  The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and accordingly any legal action or proceedings arising out of or in connection with this Agreement ("Proceedings") may be brought in such courts. The Purchaser irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is made for the benefit of the Seller and shall not limit the right of the Seller to take proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not) if and to the extent permitted by applicable law.'

This cl. 5.2 is the jurisdiction clause relied on by CS Europe in the present proceedings as an exclusive jurisdiction clause so far as MLC is concerned.

The GKO notes purchase agreement, dated 6 May 1998, was in materially identical form, mutatis mutandis. It referred to a trade date of 5 May and a settlement date of 12 May. It also contained in its cl. 5 an identical English law and jurisdiction clause. The actual trade was done in New York between Mr Tighe of CS US and on this occasion Mr Tishfield of MLC Group. MLC alleges in respect of this trade that Mr Tighe told Mr Tishfield that CS Europe would again make a market in these notes and that the currency hedge included in the purchase would protect MLC against any devaluation of the rouble without exposure to the Russian banking system.

Both purchase agreements were signed in London on behalf of CS Europe and sent out to MLC Group in New York for signature on behalf of MLC.

*The repurchase transactions*

On 16 March 1998 a repo transaction was made in respect of the Tatneft notes purchase. The 'repo start date' was 24 March, i.e. the purchase settlement date, and the 'repo end date' was three months later on 24 June. That is to say that on 24 March CS Europe repurchased the Tatneft notes from MLC (the first leg) and on 24 June the position was again reversed by a further sale back to MLC (the second leg). On 24 June a further repo transaction was entered into, and so on.

Similar repo transactions were entered into in relation to the GKO notes, commencing with 13 May 1998.

These transactions were all expressed to supplement and form part of and be subject to the GMRA.

*The conditions of the notes*

Ultimately, the conditions of the notes were set out in the information memoranda issued in the case of the Tatneft notes on 24 March 1998 and in respect of the GKO notes on 12 May 1998, in both cases after the respective deal dates.

*586

The issuer of both series of notes was expressed to be CS Switzerland acting through its Nassau branch, while CS Europe was described as 'calculation agent' and 'paying agent' and also as 'arranger' in respect of the notes' issue.

The information memoranda contained warnings:

'No person is authorised to give any information or to make any representation not contained in this Information Memorandum …

Any prospective purchaser of any Notes should ensure that it understands the nature of the Notes and the extent of its exposure to risk and that it considers the suitability of the Notes as an investment in the light of its own circumstances and financial condition, as a professional investor. The Notes differ from an ordinary debt security in that the Redemption Amount which a holder may receive on redemption of a Note will depend, inter alia, on various economic and political factors in Russia and on whether a Regulatory Change Event occurs during the Valuation Period …'

A passage in the information memoranda headed 'Investment Considerations' stated that 'No secondary market is expected to develop in respect of the Notes' and that CS Switzerland, CS Europe and any CS affiliate may have existing business relationships with Tatneft or Russia.

Condition 12 of the conditions of the notes contained a 'Governing Law' clause as follows:

'The Agency Agreement and the Notes are governed by, and shall be construed in accordance with, English law.

The Issuer irrevocably and unconditionally agrees for benefit of the Noteholders that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with the Agency Agreement or the Notes and that accordingly any suit, action or proceedings (together referred to as "Proceedings") arising out of or in connection therewith may be brought in the courts of England.

The Issuer irrevocably and unconditionally waives and agrees not to raise any objection which it may have now or subsequently to the laying of the venue of any Proceedings in the courts of England and any claim that any Proceedings have been brought in an inconvenient forum and have further irrevocably and unconditionally agreed that a judgment in any Proceedings brought in the courts of England shall be conclusive and binding upon the Issuer and may be enforced in the courts of any other jurisdiction. Nothing in this Condition shall limit any right to take Proceedings against the Issuer in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not.'

It is common ground that this jurisdiction clause, like the jurisdiction clause in the GMRA, does not provide for exclusive jurisdiction in England.

The English proceedings

On 25 September 1998 CS Europe commenced these proceedings by issuing a writ against MLC. The writ claims 'US $1,665,969.16 and/or other sums due' under and/or damages for breach of the GMRA. The relief is limited to that due under the GMRA. Service was effected on MLC within the jurisdiction under express provisions in the GMRA for such service.

On 22 October 1998 CS Europe served its points of claim. These claim US$1,665,969.16 as being the repurchase price of the Tatneft notes due from MLC under *587 the last of the Tatneft repo transactions, and an additional US$6,058,882.28 as being the similar sum due under the last of the GKO repo transactions. Against these sums CS Europe gives credit for US $4,490,625.71 being the sum transferred to CS Europe by CS US as a result of the liquidation of MLC's accounts with CS US under the customer agreement. Thus, interest apart, the net amount claimed in principal is US$3,234,225.73.

There is no claim under the purchase agreements, which have been performed.

The New York complaint

On 24 October 1998 MLC commenced its action in New York and served a complaint against CS Europe, CS US and CS Switzerland. The causes of action asserted arise under federal US securities laws and/or the common law and statutes of the state of New York. MLC alleges inter alia violations of the Securities Exchange Act 1934 (the '1934 Act') based on misrepresentation and non-disclosure both in connection with the initial sale of the notes and subsequently in connection with the after-sale relationship at a time when the repo transactions were in effect; common law fraud and negligent

misrepresentation in connection with the initial sales and the subsequent relationship; and conversion of MLC's assets by reason of CS US's liquidation of MLC's accounts. Factually, these causes of actions and the remedies claimed in respect of them depend on allegations as to what was said over the telephone in New York by Mr Tighe to Mr Agarwala or Mr Tishfield, either prior to and at the time of dealing, or subsequently. It is said that during the after-sale period, as a result of Mr Tighe's then misrepresentations or non-disclosures, MLC forbore from taking action which it would or could otherwise have taken.

MLC asserts that there is both subject matter and personal jurisdiction over the three CS entities in New York. It relies on the policy of the 1934 Act to achieve fair dealing in the US securities industry, on the presence of CS US and CS Switzerland in the USA, and on the fact that the transactions in question were entered into in New York through CS Europe's New York agent, CS US. Much of that is in dispute, but is a matter for the New York court. What, however, CS Europe puts at the forefront of its objection to New York jurisdiction is the jurisdiction clause, cl. 5, in the purchase agreements. It is on that basis, as well as on para. 2(g)(ii) of the GMRA's supplemental terms and conditions, that CS Europe asks the London court to injunct MLC from continuing its proceedings in New York. CS Europe points out that at the forefront of MLC's New York complaint is the allegation that misrepresentation or non-disclosure occurred in the initial sale of the notes.

The amendments in the London action

In the light of MLC's proceedings in New York, and because MLC has initiated its New York action against CS US and CS Switzerland as well as against CS Europe, CS Europe and its two affiliates riposte by seeking to amend the writ and points of claim in the London action. First, there is an application to join CS US and CS Switzerland as parties to the action as second and third plaintiffs respectively. Secondly, the relief sought in the writ is to be substantially amended so as to include eight new paragraphs: these seek a declaration that the purchase agreements are valid and binding upon MLC; a declaration that by cl. 5.2 of the purchase agreements MLC was and is obliged to refer the issues raised in the New York proceedings for determination exclusively by the English court; an injunction to restrain MLC from pursuing the New York proceedings or from pursuing the same or substantially the same issues elsewhere than in England; damages for breach of cl. 5.2; an indemnity under the purchase agreements; a declaration that CS Europe and/or CS US were entitled to liquidate MLC's accounts with CS US pursuant to the customer agreement; a declaration that neither CS US nor CS   *588  Switzerland has any liability to MLC in respect of any of these transactions; and damages for breach of para. 2(g)(ii). These new claims are then reflected in the amended points of claim, which indicate that CS US as well as CS Europe are claimants to damages for breach of cl. 5.2 and/or para. 2(g)(ii).

The draft amendments to the writ need the leave of the court. Logically the first question is whether I should give leave to amend and to add the new parties.

Leave to amend

Only the joinder of CS US and CS Switzerland is objected to by MLC. It is accepted that there is power to join them under the wide terms of RSC, O. 15, r. 6(2)(b)(ii) , but it is submitted that as a matter of principle leave should not be given where CS US and CS Switzerland would not have been entitled to issue and serve new proceedings out of the jurisdiction on MLC.

On behalf of MLC Mr Richard Salter QC has taken a broad brush and has not sought to investigate in detail each claim which the draft amended points of claim ascribes to CS US or CS Switzerland respectively. His broad submission, however, is that neither CS US's claims under the GMRA nor both new parties' claims for declarations of non-liability are within the letter or the spirit of RSC, O. 11 (by analogy).

In my view, however, Mr Iain Milligan QC, who appears for the CS plaintiffs, is correct to submit that there would be jurisdiction under O. 11, r. 1(1)(d)(iii) and (iv) so far as any claim by CS US under the GMRA is concerned, since that

contains an English law and jurisdiction clause, and that the claims for declarations of non-liability are similarly within those subrules as being claims to 'otherwise affect' contracts that contain English law and jurisdiction clauses, viz. the GMRA and the notes. Moreover, the concept of subr. (c) ('necessary or proper party'), also relied on by Mr Milligan, applies with peculiar force to additional plaintiffs in the context of O. 15, r. 6 . It is true that it is difficult to see what liability is asserted against CS Switzerland as issuer of the notes, but that has not prevented CS Switzerland from being sued in New York: in the circumstances there seems to me to be sufficient cause for all three CS entities to be entitled to join in the English proceedings, and I give leave to amend in accordance with the CS Plaintiffs' summons.

Clause 5.2 an exclusive or non-exclusive jurisdiction clause?

It is convenient to go next to the question of the construction of cl. 5.2 and the issue whether it does or does not impose on MLC an exclusive regime for jurisdiction in England: for this is the linchpin of the CS Plaintiffs' applications. I will consider below the further question of the scope of the clause in relation to the issues raised in the New York proceedings.

Mr Milligan submits that cl. 5.2 is essentially no different from the jurisdiction clause considered in *Continental Bank NA v Aeakos Compania Naviera SA [1994] 1 WLR 588* and therefore must likewise be regarded as an exclusive jurisdiction clause so far as claims brought by MLC are concerned. He accepts that CS Europe would be entitled under the last sentence of the clause to bring proceedings against MLC elsewhere than in England, but submits that this unilateral licence merely emphasises, as in *Continental Bank v Aeakos* , the exclusive nature of the clause so far as concerns MLC.

It will be recalled that the clause in *Continental Bank v Aeakos* provided:

'Each of the borrowers … hereby irrevocably submits to the jurisdiction of the English courts … but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof.'

*589

Steyn LJ, in giving the judgment of the Court of Appeal, said at p. 594:

'We have already explained why we interpret clause 21.02 in a transitive sense as involving an agreement by the defendants to submit disputes in connection with the loan facility to the jurisdiction of the English courts. That does not necessarily mean that clause 21.02 is an exclusive jurisdiction agreement. Mr Clarke submits that where there is an agreement to submit disputes to the jurisdiction of a particular country, the parties are taken to have intended the chosen court's jurisdiction to be exclusive unless there are unusual or particular circumstances which indicate otherwise … We find it unnecessary to explore this line of authority or to express any view on Mr Clarke's submission. We say that because clause 21.02 (the only jurisdiction agreement that we are asked to consider) does not contain a submission to English jurisdiction simpliciter. We regard the concluding words as significant: "but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof". The juxtaposition of a submission by the defendants to the jurisdiction of the English courts and the option reserved in favour of the bank to sue elsewhere brings into play the expressio unius exclusio alterius canon of construction. It suggests that a similar option in favour of the defendants was deliberately omitted. In our judgment the language of clause 21.02 evinces a clear intention that the defendants, but not the bank, would be obliged to submit disputes in connection with the loan facility to the English courts.'

Mr Salter, however, emphasises the absence from cl. 5.2 of the word 'exclusive', the presence of the word 'may' (not 'shall') in the first sentence, and submits that the final phrase of the clause, that beginning with the words 'nor shall the taking of Proceedings', can apply to the proceedings of both parties and not merely to those of CS Europe. He also submits that in *Continental Bank v Aeakos the Court of Appeal* was construing the parties' principal agreement, whereas in this case the