# Appendix
## Part 2 of 5

purchase agreements take place in the context and against the background of the customer agreement and the GMRA the former of which provides for New York law and no agreed jurisdiction and the latter of which provides for what is accepted to be a non-exclusive jurisdiction agreement. Moreover, given the importance of the role of CS US and the actual deal-making being carried out in New York, an exclusive clause depriving MLC of the right to bring proceedings in New York should be regarded as unusual and not one that the parties and in particular MLC should lightly be thought of as making. For all these reasons, Mr Salter concludes, *Continental Bank v Aeakos* should be distinguished.

I do not agree. The word 'exclusive' was missing in *Continental Bank* as well and did not affect the issue. The word 'may' reflects the possibility that CS Europe may at its option bring proceedings against MLC outside England. The 'taking of proceedings' in the context of the final sentence can in my judgment only apply to the taking of proceedings by CS Europe. The presence of different law or jurisdiction clauses in other agreements merely serves to highlight the express wording of this clause. Although the presence of an exclusive clause binding on MLC in the purchase agreements alone may seem odd, or at any rate incoherent, I do not feel able in the light of *Continental Bank v Aeakos* and its reasoning, which lays stress on the bank's unilateral option, to hold otherwise than that MLC is bound by its contract to bring proceedings 'arising out of or in connection with' the purchase agreements exclusively in the courts of England.

How much of the subject matter of the New York action is in breach of MLC's promise to bring proceedings exclusively in England?

The question then arises as to the scope of cl. 5.2 and of the extent to which the New York complaint raises claims or issues within the reach of that clause.

*590*

It is common ground that to some extent at any rate the complaint is concerned with matters within cl. 5.2, i.e. in so far as MLC claims damages for fraudulent or negligent misrepresentation or non-disclosure either under the 1934 Act or at common law in connection with the original sales of the notes. In my view this is in itself an important part of the New York action.

Mr Salter submits, nevertheless, that in all other respects the complaint does not impinge on MLC's obligations under cl. 5.2. Thus the second important area of MLC's complaint concerns alleged misrepresentations and non-disclosures or lack of fair dealing *subsequent to* the initial purchases: it is said that but for such failures in CS Europe's responsibilities MLC would have been able to extricate itself from its purchases, or would have suffered less loss, or would have taken steps to hedge its exposure. These allegations relate to the period of the repo transactions, rather than to the original purchase agreements. The third important area of the complaint relates to the liquidation of MLC's accounts. Thus, it is said, MLC's claims in respect of these second and third aspects of its complaint do not arise out of or in connection with the purchase agreements, but out of or in connection with the repo transactions, the GMRA and the customer agreement. Indeed, Mr Salter submits that these second and third areas represent the real centre of gravity of MLC's complaint, and that the complaint could if necessary be reformulated so as entirely to exclude matters within cl. 5.2. In any event, cl. 5.2 should not be accorded a 'halo effect' beyond its true scope.

Mr Milligan on the other hand submits that every part of the complaint can properly be described as arising out of or in connection with the allegations relating to the original purchases and that all such parts are in any event inextricably interwoven with one another. He points out that expressions such as 'arising out of or in connection with' are extremely broad, as affirmed in *Continental Bank v Aeakos* itself at p. 593, and see also *The Angelic Grace [1995] 1 Ll Rep 87* at p. 91.

I find the evaluation of these competing submissions rather elusive. In one sense all that happened, beginning with the negotiations for the purchase of the notes and ending in MLC's alleged defaults and the liquidation of its accounts, is part of a single narrative, which it is artificial to divide up into different compartments. On the other hand, where different agreements

are entered into for different aspects of an overall relationship, and those different agreements contain different terms as to jurisdiction, it would seem to be applying too broad and indiscriminate a brush simply to ignore the parties' careful selection of palette.

Sometimes it is possible confidently to divide the claims between wholly different agreements, as in *Ocarina Marine Ltd v Marcard Stein & Co [1994] 2 Ll Rep 524* at p. 531. In such cases the mutually exclusive allocation of claim to relevant jurisdiction clause becomes much easier. In the present case, however, I do not regard such a hard and fast division to be possible. However, this difficulty must redound in CS Europe's rather than in MLC's favour. It is of course possible that cl. 5.2 exerts an influence beyond the time of the purchase agreements themselves: but it is conceded that the GMRA does not exert an influence the other way. Moreover, whereas CS Europe is a party with MLC to the purchase agreements and the GMRA, only CS US is a party with MLC to the customer agreement. Therefore the latter agreement's absence of any jurisdiction clause does not seem to matter at this point. Moreover, I am inclined to think that the centre of gravity of MLC's complaints, however they are or could be pleaded, is focused on the alleged vice of the initial deals, in the sense that if once that vice was proved or failed of proof, MLC's claim would either flourish or have the heart torn out of it accordingly.

I am nevertheless reluctant to hold that those of MLC's claims in its New York complaint which refer to the GMRA are claims which arise out of or in connection with *591* the purchase agreements and do not arise out of or in connection with the GMRA. If they arise out of or in connection with both the purchase agreements and the GMRA, then, where the jurisdiction clauses are in conflict, I do not see why the GMRA clause should not prevail: either on the basis that, in a case of conflict on standard forms plainly drafted by CS Europe, MLC should be entitled to exercise the broader rights; or on the basis that the clause in the contract which is closer to the claim and which is more specifically invoked in the claim should prevail over the clause which is only more distantly or collaterally involved.

The next question to be asked is whether the agreement contained in cl. 5.2 binds MLC also in respect of its claims against parties who are not privy to the purchase agreements.

Does cl. 5.2 entitle CS Europe to restrain MLC from bringing proceedings outside England against CS US or CS Switzerland?

It might be thought that the answer to this question must be 'No', but Mr Milligan submits otherwise. He takes the following points:

(1) that 'any disputes' in the opening line of cl. 5.2 ('The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement') is capable of referring to and therefore should be taken as referring to disputes not only between CS Europe and MLC but also between MLC and other CS affiliates, especially seeing that the purchase agreements themselves make provision about CS affiliates;

(2) that CS Europe, as the recipient of MLC's promise not to take proceedings against CS affiliates otherwise than in the courts of England, is entitled to vindicate MLC's promise by claiming an injunction; and

(3) that in any event CS US, even if not also CS Switzerland, can take direct advantage of cl. 5.2 because it made the deals as agent and even signed the GKO notes purchase agreement 'acting as agent for' CS Europe.

In my judgment points (1) and (3) are bad, and point (2) fails on the back of point (1).

As for point (1), it seems to me to be far-fetched to regard 'any disputes' as covering disputes between MLC and any one other than MLC's contract partner under the purchase agreements, namely CS Europe. Clause 5.2 is part of a bilateral agreement between a seller and a buyer, and the disputes to which such an agreement may give rise are prima facie bilateral disputes. Indeed, it is I would have thought axiomatic that, at any rate in the absence of plain language to the contrary, a contract seeks neither to benefit nor to prejudice non-parties: even where such plain language is used, it is black-letter law that the non-party

can himself neither take the benefit nor suffer the burden of the contract. In the present case there is nothing in the language of cl. 5.2 to suggest that it is intended to have an ambit beyond the parties to the purchase agreements themselves. While it is true that the agreements mention CS affiliates, there is nothing in the express language of cl. 5.2 to suggest that the clause is intended to bind MLC as to where it is entitled to sue such affiliates. It would be all the more surprising if nevertheless cl. 5.2 did bind MLC to sue CS US in England when the contract which does govern MLC's and CS US's mutual relations, the customer agreement, does no such thing: on the contrary, it provides for New York law as the governing law.

As for point (3), Mr Milligan submitted that an agent may always sue on the contract which it makes for its principal. He cites Bowstead and Reynolds on Agency (16th edn, 1996), at art. 100 and para. 9-005 for this surprising submission. That, however, is dealing with the position where an agent contracts personally, as the text makes clear. It is always possible for an agent to contract so as to make itself liable concurrently with or even to the exclusion of its principal; but that is the exceptional situation. Does that exceptional  *592  situation apply here? In my judgment, No. CS US was always known to be acting as an agent or broker on behalf of CS Europe, rather than for itself. The purchase agreements refer to CS Europe as 'seller', and are signed for CS Europe. In the case of the Tatneft notes purchase agreement, the signature is for CS Europe simpliciter, and the agreement is on CS Europe's letter-head; and in the case of the GKO notes purchase agreement, although the document is on CS US's letterhead and is signed by CS US, the signature is 'acting as agent for' CS Europe, and the text of the agreement makes clear that CS Europe is the seller and CS US merely its agent.

As for point (2), this does not arise in the light of my decision on point (1). It is therefore unnecessary to discuss the use to which Mr Milligan seeks to put authorities such as *Snelling v John G Snelling Ltd [1973] QB 87*

Does para. 2(g)(ii) of the GMRA's supplementary terms and conditions entitle CS Europe and/or CS US to restrain MLC from bringing proceedings against CS US at all?

Mr Milligan submits in the alternative that CS Europe and CS US are entitled to enforce para. 2(g)(ii) so as to prevent MLC from making any claim at all. This right is attributed to CS US as well as to CS Europe on the ground that CS US signed the GMRA under the rubric 'Accepted and Agreed to solely in its capacity as agent'. It seems to me that Mr Milligan is on stronger grounds at this stage of the argument for saying that it was intended that CS US should become a party to the GMRA at any rate for the purpose of the terms of para. 2(g). I shall assume that that is so. It is therefore again unnecessary to decide whether CS Europe could enforce MLC's promise in favour of CS US: but I will assume that it could, even though Mr Salter submits that it lacks any sufficient interest to do so, since any right of indemnity owed by CS Europe to CS US as its agent would be limited to circumstances where CS US was not acting outside its authority or wrongly.

It will be recalled that para. 2(g)(ii), which I have cited in full above, states that:

'[CS US] shall otherwise have no liability in respect of this Agreement or such Transaction except for its gross negligence or wilful misconduct, or its failure to comply with applicable U.S. securities laws and regulations, in performing its duties as facilitating agent hereunder.'

Mr Milligan, relying on the words 'shall otherwise have no liability', submits that MLC has agreed that CS US should be immune from suit and that it has broken that promise by suing CS US in New York. Mr Salter, on the other hand, emphasises the exception to that immunity and submits that at any rate parts of the New York complaint fall within that exception, either in as much as CS US is accused of fraud and deceit or to the extent that it is accused of breaches of the 1934 Act. Mr Milligan ripostes to the effect that any such claim does not arise out of CS US's conduct 'in performing its duties as facilitating agent hereunder'. Mr Salter rejoins that under para. 2(g)(i) CS US's duties as facilitating agent are defined as including 'effecting and settling such Transaction'. Mr Milligan disputes that, but it seems to me that Mr Salter is right. It is clear that CS US is not intended to have a complete immunity, and I do not see why MLC's complaints against CS US in

the New York proceedings are not complaints relating to the latter's duties as CS Europe's facilitating agent in connection with the Tatneft and GKO transactions.

I am now in a position to consider the essential question posed by these applications, which is whether an injunction should be granted either to restrain MLC from breaking its promise in cl. 5.2 to bring proceedings arising out of or in connection with the purchase agreements exclusively in England or in any event to ensure that all matters be heard exclusively in London in the interests of justice. For these purposes, I have already decided that neither CS Europe nor the other two CS entities have the right to insist on *593 exclusive jurisdiction in England so far as claims against CS US and CS Switzerland are concerned; and that only some of MLC's New York claims fall within cl. 5.2.

Should an injunction be granted?

Mr Milligan submits that the answer to this question is 'Yes', and that this answer can be reached by a combination of two routes. One is by way of straightforward reliance on *The Angelic Grace [1995] 1 Ll Rep 87* , where Millett LJ said at p. 96:

'In my judgment, where an injunction is sought to restrain a party from proceeding in a foreign Court in breach of an arbitration agreement governed by English law, the English Court need feel no diffidence in granting the injunction, provided that it is sought promptly and before the foreign proceedings are too far advanced. I see no difference in principle between an injunction to restrain proceedings in breach of an arbitration clause and one to restrain proceedings in breach of an exclusive jurisdiction clause as in *Continental Bank NA v Aeakos Compania Naviera SA [1994] 1 WLR 588* . The justification for the grant of the injunction in either case is that without it the plaintiff will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy. The jurisdiction is, of course, discretionary and is not exercised as a matter of course, but good reason needs to be shown why it should not be exercised in any given case.'

Mr Milligan submits that, to the extent that MLC's New York claims are within cl. 5.2, no good reason can be shown why an injunction should not issue, but that on the contrary there are very good reasons to support its grant in the fact that CS Europe's English action will proceed in any event. He points out that there could be no application to stay the English action, given the express waiver in cl. 5.2 (and in cl. 17 of the GMRA) by MLC of any objection to the English courts on grounds of venue or forum non conveniens. ('The Purchaser irrevocably submits to the jurisdiction of such courts and waives any objection to proceedings in such courts whether on the grounds of venue or on the ground that the proceedings have been brought in an inconvenient forum'. Clause 17 of the GMRA contains a provision that the parties 'irrevocably submit for all purposes … to the jurisdiction of the Courts of England.')

Mr Milligan can also illustrate that submission by reference to his alternative way of pressing for an injunction, since he goes on to submit that in any event an injunction should be granted in the interests of justice under the doctrine laid down in *Société Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 871* . For these purposes he says that in so far as MLC's New York claims are within cl. 5.2, there is an exclusive jurisdiction clause in CS Europe's favour, and that in so far as those claims fall outside cl. 5.2 they are nevertheless within the GMRA's English law and non-exclusive English jurisdiction clause. Therefore, it cannot be said that England is not the appropriate forum for the resolution of the parties' disputes. In this connection he relies on *British Aerospace plc v Dee Howard Co [1993] 1 Ll Rep 368* at pp. 375–376 where Waller J assumed that the jurisdiction clause with which he was there concerned was (contrary to his primary holding) non-exclusive and concluded, for instance at p. 376:

'Adopting that approach it seems to me that the inconvenience for witnesses, the location of documents, the timing of a trial, and all such matters, are aspects which they are simply precluded from raising. Furthermore, commencing an action in Texas, albeit that may not be a breach of the clause, cannot give them a factor on which they can rely, unless of course that action has continued without protest from BAe.'

That of course was a case where the defendants were trying to prevent the plaintiffs from commencing an English action in the face of the Texas action already commenced by the defendants.

*594*

Mr Milligan in any event submits that London is as convenient a forum as New York. Some factual witnesses would have to come from New York, but equally, there would be CS Europe witnesses from London and expert witnesses on English law would also presumably have to come from London. Much of the documentation is in London. Although the customer agreement provides for New York law, it was not easy to see what its relevance was, since the liquidation of MLC's accounts was a matter that arose under the GMRA.

The appropriate course, Mr Milligan concludes, is to ensure that all the claims are litigated once and for all in one place, namely in London.

Mr Salter, on the other hand, submits that even if the more liberal approach to the grant of anti-suit injunctions, as adopted by the *Court of Appeal in Continental Bank v Aeakos* and *The Angelic Grace* in the case of exclusive jurisdiction or arbitration clauses, is correct, and he seeks to reserve his right to submit elsewhere that it is wrong in principle and should be overruled, nevertheless there is in this case good reason for the court in its discretion not to grant one. In effect, there are three limbs to his argument under this submission.

First, he invokes the fact that the situation in this case differs from that in either of the above cases, in that here the claims in New York (and London) also involve different contracts and different parties who are not bound by an exclusive jurisdiction clause. That this may lead to an exercise of discretion other than that exemplified by the more straightforward cases just cited is, he says, exemplified by the decisions in the *Bouygues* litigation: see *Bouygues Offshore SA v Caspian Shipping Co (No. 2) [1997] 2 Ll Rep 485* (Morison J) and *Ultisol Transport Contractors Ltd v Bouygues Offshore SA ('The Bos 400') [1998] CLC 1526 (CA)* .

Secondly, he emphasises that, in the absence of an exclusive jurisdiction clause in favour of CS US and CS Switzerland, the more general principles applicable to anti-suit injunctions in the interests of justice as found in *SNIA v Lee Kui Jak* and *Airbus Industrie GIE v Patel [1998] CLC 702; [1999] 1 AC 119* do not support removing the New York claims against them to London. It cannot be said that New York is not an entirely appropriate forum for such claims, a fortiori it cannot be said that the bringing of them in New York is vexatious or oppressive or unconscionable.

Thirdly, he submits that not only is New York an appropriate forum, but it is the clearly more appropriate forum for the overall litigation and that such considerations in themselves amount to good reason for not enforcing cl. 5.2. In this connection he draws attention to the central position of CS US and of New York itself in the litigation. Thus CS US is an American company with a place of business, probably its principal place of business, in New York. It was the company through which the transactions in question were made. It was CS Europe's, and also CS Switzerland's, agent. It was MLC's prime broker, and in contractual relations with MLC under the customer agreement, itself a contract under New York law. It kept and liquidated MLC's accounts in New York. Contrary to Mr Milligan's submission, the liquidation of the accounts, so far at any rate as concerned CS US, was under the customer agreement. Its employee, Mr Tighe, is accused of fraud, misrepresentation and non-disclosure, speaking on the telephone in New York. MLC itself, through its agent MLC Group, was operating in New York. The strong public policy enshrined in the 1934 Act reflects the local federal law under which CS US, as a broker in

Case 1:20-cv-10041-PKC    Document 104-2    Filed 08/24/21    Page 7 of 149

New York, was operating. Witnesses and documents would have to come from New York. In New York MLC would be entitled to a jury trial.

In contrast with all this, Mr Salter continues, there is comparatively little to be said for England. There are the jurisdiction clauses, and English law. But the GMRA expressly permits MLC to sue outside England. Some witnesses and documents would have to come from England. The English litigation was started first, but has only just begun. CS *595 Europe is an English company, but part of a multinational group operating through its agent in New York.

There is force in both parties' submissions, but I would seek to reason the matter as follows.

(1) I take as my starting point the twin ratios of *The Angelic Grace* and of *SNIA v Lee Kui Jak* . That is to say that in the case of an exclusive jurisdiction clause the jurisdiction to enforce by injunction is discretionary and is not to be exercised as a matter of course, but good reason needs to be shown why it should not be exercised; and that in other cases the ultimate test is that of the interests of justice. That does not of course mean that in the former case the interests of justice are not sought, merely that as a general rule and barring good reason to the contrary it is thought to be just that the agreement of an exclusive jurisdiction clause should be upheld.

(2) What is good reason to the contrary? A classic exposition of the particular factors to be taken into account, developed in the analogous context of an English court's consideration of an application to stay in deference to a foreign exclusive jurisdiction clause, where the rule is similarly that a stay will be granted unless good reason is shown to the contrary, is that of Brandon LJ in *Aratra Potato Co Ltd v Egyptian Navigation Co ('The El Amria') [1981] 2 Ll Rep 119* at pp. 123–124. Those principles have been applied to the reverse case of an English court's consideration of its discretion to issue an anti-suit injunction in aid of an English exclusive jurisdiction clause: see *Akai Pty Ltd v People's Insurance Co Ltd [1997] CLC 1508* at p. 1528. Of course the court has to consider all the circumstances of the case, including other matters particularly referred to by Thomas J in that judgment (ibid.).

(3) Sight should not be lost of the fact that both *The Angelic Grace* and *Continental Bank v Aeakos* were straightforward cases. The first involved a non-domestic arbitration clause which under the terms of the New York Convention has to be mandatorily enforced, save in certain limited exceptions. The second involved a jurisdiction clause within the terms of art. 17 of the Brussels Convention , which also mandates enforcement. Moreover, the facts in *The Angelic Grace* were all one way: see Leggatt LJ's citations from the judgment at first instance at *[1995] 1 Ll Rep 87* at p. 92. One will therefore look in vain in *The Angelic Grace* for guidance in more difficult cases where 'good reason' is advanced in argument as to why the court's discretion should be exercised differently from the prima facie rule.

(4) The question of comity remains an important consideration. Submissions made in the light of *The Angelic Grace* tend to overlook that fact. In my judgment the Court of Appeal was not there saying that the question of comity was of little regard, but rather that in a straightforward case there was little mileage in a 'ritual incantation' (Millett LJ at p. 96) of the doctrine of comity as supporting a general principle that the issue should always be left in the first instance to the foreign court whose jurisdiction was invoked in breach of the parties' agreement. Again, that was said against the background of the facts of that case, including the international regime of the New York Convention and the fact that the essential issue there was whether the claim in Italy fell as a matter of construction within the scope of an English arbitration clause. That in other circumstances and in the light of new considerations the question of comity may well require caution is illustrated for instance by what the *Court of Appeal said in Philip Alexander Securities & Futures Ltd v Bamberger [1996] CLC 1757* at pp. 1789–1790. Moreover, outside the sphere of the exclusive English jurisdiction clause, the importance of the question of comity has been recently underlined in the speech of Lord Goff of *596 Chieveley in *Airbus Industrie v Patel [1998] CLC 702 at pp. 708 and 712–713; [1999] 1 AC 119* at pp. 133 and 138–139.

(5) An important fact in this case, as it seems to me, is that, whether I enforce cl. 5.2 or not, I cannot ensure that all litigation between MLC and the Credit Suisse entities is carried forward in one jurisdiction unless I would be prepared to extend my injunction to all the claims against all three CS entities in New York. That is because cl. 5.2 does not bind CS US and CS Switzerland. That remains the case even if I assume that all the claims against CS Europe come within cl. 5.2, but I have already stated that in my judgment that is not the case. It follows that unless I am prepared not only to enforce cl. 5.2 but also to injunct MLC's claims against CS US and CS Switzerland and MLC's claims against CS Europe outside cl. 5.2, MLC's complaint in New York will continue in any event. On the other hand Mr Salter has not pursued MLC's application for a stay of the Plaintiffs' action, but if he had, it would fail for the reasons for which Mr Milligan cited *British Aerospace v Dee Howard* above. Thus the continuation of the proceedings in England is inevitable too.

(6) I would not, however, injunct the claims against CS US and CS Switzerland because, however undesirable it is in principle to have parallel litigation in two jurisdictions, it seems to me that the duplication of litigation does not in

itself make it in the interests of justice to injunct the New York proceedings in so far as claims against CS US and CS Switzerland are concerned. For these purposes I am particularly concerned with CS US, for it is not easy at present to see how exactly CS Switzerland has incurred any liability to MLC. But as Lord Goff said in *Airbus Industrie v Patel* at pp. 708H–709B; 133G–H:

> 'I must stress again that, as between common law jurisdictions, there is no system as such, comparable to that enshrined in the Brussels Convention . The basic principle is that each jurisdiction is independent. There is therefore, as I have said, no embargo on concurrent proceedings in the same matter in more than one jurisdiction. There are simply these two weapons, a stay (or dismissal) of proceedings and an anti-suit injunction. Moreover, each of these has limitations. The former depends on its voluntary adoption by the state in question, and the latter is inhibited by respect for comity. It follows that, although the availability of these two weapons should ensure the practical justice is achieved in most cases, this may not always be possible.'

The fact remains that claims against CS US are made either under federal statute law, or under the common law of New York, or under the customer agreement. To the extent that such claims are free-standing of any contract between MLC and CS US, no jurisdiction clause applies, and it cannot be said that New York is an inappropriate forum. On the contrary, much can be said and has been said to suggest that the centre of gravity of such claims against CS US is in New York. To the extent that such claims are under or affected by the customer agreement (see, e.g. the complaint's count VI), that contract contains no jurisdiction clause, and is governed by New York law. To the extent that such claims are under or affected by or in connection with the GMRA, to which CS US may be a party for the purposes of para. 2(g) — although that is not I think pleaded in the complaint — cl. 17 specifically provides that:

> 'Nothing in this paragraph shall limit the right of any party to take proceedings in the courts of any other country of competent jurisdiction.'

The mechanism of the complaint is not particularly easy to follow, at any rate for an English lawyer, and the parties before me have not spent much time in seeking to analyse it. The New York court would be in a much better position to *\*597* understand and determine how the various claims arise. Since I am here considering a complaint before the New York court, questions of comity suggest to me that the New York court should be the primary court to consider whether such claims should under principles applicable in New York be stayed in favour of English jurisdiction.

For all these reasons I do not consider it in the interests of justice to injunct MLC from pursuing its New York claims against CS US and CS Switzerland.

(7)  Similarly, I would not injunct MLC's claims made against CS Europe under or in connection with the GMRA itself. MLC's right to sue CS Europe under the GMRA in New York, if New York would accord jurisdiction to such claims, is expressly reserved to MLC by the sentence from cl. 17 of the GMRA cited above. I have already held that such claims are preferably to be viewed as arising out of or in connection with the GMRA rather than the purchase agreement and thus are not within cl. 5.2. If I am wrong about this, it seems to me that, again, the New York court would be in a much better position than I am to analyse the complaint for the purpose of identifying the relevant or more relevant jurisdiction clause. For these reasons, I cannot say it is in the interests of justice that they must all be tried together in England with such claims as are within cl. 5.2. In any event, for all I know, and there has been little if any submission about this, the claims against CS Europe under the GMRA could and should more appropriately be considered together with the claims against CS US, rather than with such claims against CS Europe as are plainly within cl. 5.2 of the purchase agreements. Again, the New York court would be in a better position than I to consider such questions.

(8)  In such circumstances Mr Salter has relied on *Ultisol v Bouygues [1998] CLC 1526 (CA)* as an authority for saying that there is good reason why even breach of an exclusive English jurisdiction clause should not be injuncted, where parallel litigation abroad cannot be prevented in any event and where the best hope of a single all-embracing field of litigation was in the foreign forum: see at pp. 1536–1537. In that case, however, the matter was complicated by the fact that although all claims arose out of a single casualty, wholly different and independent parties were involved, some bound by contract and others involved only by alleged tortious responsibilities. In only one contract, however, that between Bouygues and Ultisol, was there an English jurisdiction clause.

(9)  The present case is different from the *Bouygues* litigation in that even though New York is one possible forum in which the whole gamut of the litigation could be conducted, and where, apart from the force of cl. 5.2, the only real impediment to that jurisdiction would be the need for English law to be brought by evidence before the New York jury, London is another jurisdiction in which the whole litigation could be conducted and where the action will proceed in any event. The only party which would have to be brought here, as it were unwillingly, is MLC, for all three CS entities are London plaintiffs and CS Europe is an English company. MLC, however, has agreed to litigate in England. For the purposes of the purchase agreements it has not only submitted to the jurisdiction of the English courts and waived any objections on

the ground of venue or inconvenience, but it has agreed to litigate exclusively in England. For the purposes of the GMRA it similarly 'irrevocably submit[s] for all purposes of or in connection with this Agreement and each Transaction to the jurisdiction of the Courts of England'. It therefore cannot be heard to say that England is an inappropriate jurisdiction so far as disputes relating to the GMRA are concerned. It is only in relation to the customer agreement, with its reference to New York law and its lack of any *598 jurisdiction clause, that MLC is not bound to accept the jurisdiction of the English courts.

In these circumstances it seems to be that London is a feasible and wholly appropriate forum for the litigation as a whole and that there is ultimately no good reason why I should not injunct MLC from pursuing in New York its claims arising out of or in connection with the purchase agreements. On the contrary, there seems to me to be a very good reason why I should do so, quite apart from MLC's own agreement and the philosophy of *The Angelic Grace* , and that is that MLC's inability as a result to pursue the whole range of its claims in New York may well encourage it to litigate its claims as a whole in London instead. That, however, is a matter for it, since I am not willing to injunct MLC from pursuing the rest of its claims in New York, to the extent that they relate to the GMRA, the notes themselves, or the customer agreement. Under the GMRA, MLC has the express right reserved to it to invoke the New York court 'for all purposes of or in connection with' that agreement, unless that court rules itself incompetent. Under the conditions of the notes MLC has likewise the express right to take proceedings in any court of competent jurisdiction. The customer agreement contains no English jurisdiction clause at all.

It will, therefore, be necessary to achieve clarity by reference to the New York complaint itself, as to exactly what claims cannot and what claims at present can be continued before the New York court. Therefore for the purpose of formulating my order, I will hear counsel further on this matter, but it is my intent to injunct those claims which it is common ground fall within the purchase agreements, namely to quote Mr Salter's skeleton argument at para. 25(i):

'Damages for fraudulent/negligent misrepresentation and non-disclosure (contrary to US Securities law) in connection with the sale of the Instruments.'

To that I would add *common law* as well as statutory causes of action in connection with the sale of the instruments, viz. in fraud or misrepresentation. In effect, that means I think that those parts of counts I, II and III of the New York complaint which deal with 'the initial investment in the Linked Notes' (see para. 65 of the complaint) are within my injunction, but not those parts of those counts which deal with MLC's 'ongoing decisions regarding holding and/or hedging them' (ibid.), nor the other counts save to the extent that those other counts themselves depend, if they do, on the injuncted claims.

I say 'at present', because if it subsequently appears from any analysis or amendment of the complaint in New York that other claims or disputes are properly to be regarded as within the scope of cl. 5.2 and not within the scope of the other contracts, then it may be appropriate to extend my injunction.

Stay of the London action

There is formally before me MLC's summons to stay the London action, but at an early stage of the hearing Mr Salter made it clear that he did not really press the argument. He realistically observed that the parties had expressly agreed to permit suit in more than one jurisdiction (on his submissions that applied as much to cl. 5.2 as to the provisions in other contracts) and that it was therefore inconsistent with that position to be asking for a stay. His primary case was that the court should permit multiplicity of proceedings. His fall-back case was that, if I had considered that the interests of justice demanded a single forum, then New York should be regarded as the preferable option. In the circumstances, I have gone some way to accepting his primary submission. In any event, I have not had to consider MLC's summons for a stay, and I dismiss it.

© 2021 Thomson Reuters.

Extension of time for service of MLC's points of defence

I have left for last a point which Mr Milligan put at the forefront of his submissions. He suggested that a short answer to the whole of this hearing was to refuse MLC an **\*599** extension of time for putting in its points of defence in the London action save on terms that it should discontinue its New York action. Indeed CS Europe had issued a summons for judgment in default of defence.

Thus Mr Milligan pointed out that MLC had no justification for needing further time. The points of claim had been served on 22 October 1998, by which time MLC had all but served its complaint: that was done on 24 October. An extension of time on terms would therefore be an elegant solution to the otherwise messy and undesirable existence of two sets of proceedings.

The making of such an order would, however, have precluded MLC from addressing the wide-ranging argument with which it has sought, in part successfully, not to injunct the New York proceedings. Alternatively, I would have had to hear such submissions in order to deal properly with MLC's application for an extension of time in which to plead its defence. In truth, this would have been no short-cut, and any attempt to make use of it as such would, in my judgment, have been to misuse the court's discretion under RSC, O. 3, r. 5(1) . I therefore reject Mr Milligan's submission and CS Europe's summons for judgment.

*(Order accordingly)*  **\*600**

© 2021 Thomson Reuters.

A

# CASES

determined by the

## CHANCERY DIVISION

B

and the

## COURT OF PROTECTION

and on appeal therefrom in the

C

## COURT OF APPEAL

D

### CUMBRIAN NEWSPAPERS GROUP LTD. v. CUMBERLAND & WESTMORLAND HERALD NEWSPAPER & PRINTING CO. LTD.

E    1986   Feb. 12, 13, 14, 17, 18, 19;                               Scott J.
         March 13

*Company—Shares—Classes of shares—Articles conferring rights on individual shareholder—Rights not attached to particular shares—Whether class rights—Whether rights capable of being varied or abrogated by special resolution passed by members—Companies*
F    *Act 1985 (c. 6), s. 125*[1]

  The plaintiff and defendant, who were both publishers of newspapers, negotiated a transaction whereby the defendant would acquire inter alia one of the plaintiff's newspapers and the benefit of certain advertising arrangements and the plaintiff would acquire, inter alia, 10 per cent. of the defendant's share capital. The defendant duly issued the 10 per cent. shareholding
G    to the plaintiff and as part of the agreement under which the shares were issued amended its articles to grant to the plaintiff rights of pre-emption over other ordinary shares, rights in respect of unissued shares and the right to appoint a director. The purpose of such rights was to enable the plaintiff, in its capacity as shareholder, to be in a position to be able to prevent a take-over of the defendant. After the arrangements so embarked on had continued for several years the directors of
H    the defendant proposed to convene an extraordinary general meeting and to pass a special resolution to cancel the articles which gave such special rights to the plaintiff.

[1] Companies Act 1985, s. 125(1)(2): see post, p. 14c, D–E.

1

Cumbrian Newspapers v. Cumberland Co.                    [1987]

A

In an action by the plaintiff for (1) a declaration that the rights were class rights which could not be abrogated without its consent and (2) an injunction restraining the defendant from convening or holding the extraordinary general meeting:—

*Held*, granting the declaration, (1) that the special rights granted by the defendant's articles were rights that although not attached to any particular shares were conferred on the plaintiff in its capacity as shareholder in the defendant and were attached to the shares for the time being held by the plaintiff without which it was not entitled to the rights; that accordingly the plaintiff had "rights attached to a class of shares" and since section 125 of the Companies Act 1985 provided that class rights could not be varied or abrogated without the consent of the class members the special rights enjoyed by the plaintiff could not be varied or abrogated without the consent of the plaintiff (post, p. 22C–E, F–G).

B

*Bushell v. Faith* [1970] A.C. 1099, H.L.(E.) applied.

C

(2) That on the facts, the adoption of articles by the defendant conferring the special rights on the plaintiff was a condition precedent to the agreement between the parties and was not a contractual obligation of the defendant; that, accordingly, it was not a term of the agreement between the plaintiff and the defendant that the plaintiff would have the benefit of the special rights conferred on it by the articles, nor could such a term be implied (post, p. 23A–D).

D

The following cases are referred to in the judgment:

*Allen v. Gold Reefs of West Africa Ltd.* [1900] 1 Ch. 656, C.A.

*Andrews v. Gas Meter Co.* [1897] 1 Ch. 361, C.A.

*Bushell v. Faith* [1969] 2 Ch. 438; [1969] 2 W.L.R. 1067; [1969] 1 All E.R. 1002, C.A.; [1970] A.C. 1099; [1970] 2 W.L.R. 272; [1970] 1 All E.R. 53, H.L.(E.)

E

*Eley v. Positive Government Security Life Assurance Co. Ltd.* (1875) 1 Ex. D. 20

*Kirkness v. John Hudson & Co. Ltd.* [1955] A.C. 696; [1955] 2 W.L.R. 1135; [1955] 2 All E.R. 345, H.L.(E.)

*Punt v. Symons & Co. Ltd.* [1903] 2 Ch. 506

F

*Rayfield v. Hands* [1960] Ch. 1; [1958] 2 W.L.R. 851; [1958] 2 All E.R. 194

*Southern Foundries (1926) Ltd. v. Shirlaw* [1940] A.C. 701; [1940] 2 All E.R. 445, H.L.(E.)

*Welsbach Incandescent Gas Light Co. Ltd., In re* [1904] 1 Ch. 87, C.A.

The following additional cases were cited in argument:

G

*Baily v. British Equitable Assurance Co. Ltd.* [1904] 1 Ch. 374, C.A.; [1906] A.C. 35, H.L.(E.)

*Beattie v. E. & F. Beattie Ltd.* [1938] Ch. 708; [1938] 3 All E.R. 214, C.A.

*British Murac Syndicate Ltd. v. Alperton Rubber Co. Ltd.* [1915] 2 Ch. 186

*Browne v. La Trinidad* (1887) 37 Ch.D. 1, C.A.

*Hickman v. Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch. 881

H

*Inland Revenue Commissioners v. Beveridge* [1979] S.T.C. 592

*London Sack & Bag Co. Ltd. v. Dixon & Lugton Ltd.* [1943] 2 All E.R. 763, C.A.

ACTION

The plaintiff, Cumbrian Newspapers Group Ltd. sought against the defendant, Cumberland & Westmorland Herald Newspaper & Printing Co. Ltd. by paragraph (1) of its statement of claim a declaration that upon their true construction the defendant's articles of association constituted the plaintiff a separate class of the defendant's members and that accordingly the special rights conferred upon the plaintiff by articles 5(a), 7, 9 and 12 might not be altered or abrogated otherwise than with the consent of the plaintiff and/or pursuant to section 32 of the Companies Act 1980. The plaintiff also sought (2) a declaration that the defendant was estopped or precluded from altering or abrogating the special rights conferred upon the plaintiff by articles 5(a), 7, 9 and 12 of the defendant's articles of association otherwise than with the consent of the plaintiff; and (3) an injunction restraining the defendant from convening or holding any meeting of its members the purpose whereof was to consider and if thought fit pass a resolution purporting to alter or abrogate the special rights conferred upon the plaintiff under articles 5(a), 7, 9 and 12 of the defendant's articles of association otherwise than with the plaintiff's consent and/or in accordance with the provisions of section 32 of the Companies Act 1980.

The facts are stated in the judgment.

*John Brisby* for the plaintiffs. The plaintiffs put their case in two alternative ways: (1) that the special rights conferred upon them by the defendants' articles of association constitute them a separate class of the defendants' members so that these rights cannot be varied or abrogated save with their consent and/or in accordance with section 125 of the Companies Act 1985; (2) that it was an implied term of the contractual arrangements entered into in 1968 that the defendants would not alter their articles of association so as to deprive the plaintiffs of those rights (or at any rate that they would not initiate such a process) save with the plaintiffs' consent.

As to (1) above, it is clear that (notwithstanding the fact that the articles refer to the plaintiffs by name) the special rights under consideration are incidents of membership, and not personal rights or privileges capable of being enjoyed by the plaintiffs irrespective of whether or not they actually hold any shares in the defendant company: see, for example, *Rayfield v. Hands* [1960] Ch. 1. Indeed, were the special rights under consideration personal privileges as opposed to incidents of membership, they would (in the absence of the existence of any contract conferring those rights outside the articles) be unenforceable. See *Eley v. Positive Government Security Life Assurance Co. Ltd.* (1875) 1 Ex.D. 20; *Browne v. La Trinidad* (1887) 37 Ch.D. 1; *Hickman v. Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch. 881; *Beattie v. E. & F. Beattie Ltd.* [1938] Ch. 708 and *London Sack & Bag Co. Ltd. v. Dixon & Lugton Ltd.* [1943] 2 All E.R. 763.

Where certain incidents of membership are enjoyed by some but not all members, those members constitute a separate class for the purposes of section 125 of the Companies Act 1985 and/or regulation 4 of Table A. The special rights are "attached" to the shares for the time being

held by them because it is only by holding their shares in the company
that they are able to enforce the contract contained in the articles of
association. The language used by the Court of Appeal and the House
of Lords in *Bushell v. Faith* [1969] 2 Ch. 438; [1970] A.C. 1099 is some
authority for the proposition that special rights of this sort are rights
attached to a class of shares for the purposes of article 4 of Table A.
There is nothing in the wording of section 125 that compels one to a
contrary conclusion; indeed, the Act of 1985 as a whole confirms the
view contended for.

As to (2) above, a term that the defendants' articles of association
would not be altered save with the plaintiffs' consent is necessary to give
commercial efficacy to the contractual arrangements entered into in
1968. In a suitable case (i.e. where damages is an inadequate remedy), a
company may be restrained from (a) altering its articles or, alternatively
(b) acting upon the articles as altered. Proposition (a) is supported by
*British Murac Syndicate Ltd. v. Alperton Rubber Co. Ltd.* [1915] 2 Ch.
186 a strong decision, in view of the fact that the case concerned a
meeting that had been requisitioned by shareholders. Proposition (b) is
endorsed by several leading textbooks (see *Gore-Browne on Companies*,
43rd ed. (1977), para. 4.4, *Buckley on the Companies Acts*, 14th ed.
(1981), vol. I pp. 47–48, *Gower, Modern Company Law*, 4th ed. (1979),
pp. 558–559) and on a proper analysis, not contradicted by either *Punt
v. Symons* [1903] 2 Ch. 506, *Baily v. British Equitable Assurance Co.
Ltd.* [1904] 1 Ch. 374 or *Southern Foundries (1926) Ltd. v. Shirlaw*
[1940] A.C. 701. The dicta of Lord Porter in the latter case at p. 740 are
obiter as no injunction was sought in that case, and in addition the
*British Murac* decision does not appear to have been cited.

*Nigel Howarth* for the defendant. As to the plaintiffs' argument (1)
rights granted by articles fall into three classes: (a) rights attached to
particular identified shares which alone are class rights; (b) rights
conferred on persons not in their capacity as members; it is common
ground that these are not class rights; (c) rights conferred on members
in their capacity as such but which are not attached to any particular
shares which includes the rights in the present case. These are not class
rights; they merely confer rights on the plaintiffs which are not enjoyed
by the other ordinary members. The rights granted by articles 5, 7 and 9
of the defendants' articles exist whether or not the plaintiffs are members
of the defendants. The rights granted by article 12 of the defendants'
articles can only exist if the plaintiffs hold at least 10 per cent. of the
shares in the defendant, but any 10 per cent. will do for this purpose.
The shares need not be the shares issued on 29 August 1968 or any of
them.

There is no clear definition of what are in fact class rights. Article 4
of Table A and section 125(1) of the Companies Act 1985 both refer to
"rights attached to any class of shares." This pre-supposes that there
must be something special about the particular shares which sets them
apart from the other shares in the company and so constitutes them a
separate class. In this case, there is nothing special about the plaintiffs'
shares. The only thing in any way different about them is that the
registered holders are the plaintiffs.

If the plaintiffs are correct, the rights conferred by articles 5, 7, and 9 cannot be altered without the plaintiffs' consent so long as they hold at least one ordinary share in the company and any ordinary share for that purpose would do. Thus, if the plaintiffs dispose of all of their shares, then, on their argument, there ceases to be a separate class of shares. If at a later date the plaintiffs acquire further ordinary shares in the defendants (even if those shares were never previously a separate class or part of one) then the class is reconstituted once more. This creates practical problems in completing the annual return form; see *Buckley on the Companies Acts*, 14th ed., vol. 1 p. 1077ff.

In *Eley v. Positive Government Security Life Assurance Co. Ltd.*, 1 Ex.D. 20, the article in question was not intended to confer any sort of contractual right on the solicitor. It was equivalent to a resolution of the members or of the directors that the solicitors should act on behalf of the company for the time being. In *Browne v. La Trinidad*, 37 Ch.D. 1 the parts of the judgments relied upon by the plaintiffs are obiter dicta only. What was said was that the articles were not a contract between the members and the company, but merely a contract between the members inter se. In *Hickman v. Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch. 881 the judge held that *Eley v. Positive Government Securities Life Assurance Co. Ltd.* and *Browne v. La Trinidad* were both cases where the rights conferred by the articles were in fact conferred on persons not in their capacity as members but as outsiders. There was, therefore, no contract created by the articles between them and the company. Rights which are granted by the articles are only enforceable if they are given to the members generally. If they are not given to the members generally then they could not be enforced by the members against the company or vice versa: see pp. 897–898. Accordingly the defendants rely upon this case. The dispute in *Beattie v. E. & F. Beattie Ltd.* [1938] Ch. 708, was held to be a dispute between the company and one of its directors. The arbitration clause related to disputes between the company and its members. The fact that the director was also a member did not bring the dispute within the ambit of the arbitration clause: see pp. 720–721. *Hickman's* case [1915] 1 Ch. 881 was approved by the Court of Appeal and is relied on. In *Rayfield v. Hands* [1960] Ch. 1 it was held that the articles of that company created a contract between a member who was not a director and those members who were directors for the time being. It did not hold that there were two classes of members or shareholders. The case may be relevant to determine the nature of the rights given to the plaintiffs by the defendants' articles. It does not deal with the main point which is in issue, namely, whether or not the plaintiffs are a separate class of shareholder. In *Bushell v. Faith* [1969] 2 Ch. 438; [1970] A.C. 1099 the question was whether the rights granted by the articles in question were valid or whether they infringed section 184 of the Companies Act 1948. It does not consider whether the rights constituted each of the directors for the time being as a separate class of shareholders. If each of the directors was such a separate class there would have been no need for the special voting rights conferred by the articles in that case. Accordingly, as a matter of principle and sound

common sense, class rights are only created where special rights are attached to particular shares by the articles and one can see from the resolution issuing the shares that those shares are separate and different from the other ordinary shares of the company.

As to the plaintiffs' argument (2), the claim as to the existence of an implied term fails on the facts. Furthermore the court should only imply such a term as the plaintiffs allege in a very clear and strong case, see the judgment of Sir Nathaniel Lindley M.R. in *Allen v. Gold Reefs of West Africa* [1900] 1 Ch. 656, 693.

In any event, a contract made by a company cannot deprive the members of that company of the right to alter the company's articles by special resolution: see *Punt v. Symons & Co. Ltd.* [1903] 2 Ch. 506. If the company does so contract, the members can requisition the holding of a meeting to alter the articles and can validly pass a special resolution altering the articles. A company cannot be prevented from altering its articles even if this involves a breach of contract: see *Southern Foundries (1925) Ltd. v. Shirlaw* [1940] A.C. 701, 740 *per* Lord Porter. This dictum represents the law. In so far as *British Murac Syndicate Ltd. v. Alperton Rubber Co. Ltd.* [1915] 1 Ch. 881 is contrary to the above, it is wrong.

*Brisby* replied.

*Cur. adv. vult.*

13 March. SCOTT J. read the following judgment. The plaintiff company, Cumbrian Newspapers Group Ltd., formerly known as Cumberland Newspapers Ltd., is the holder of 10·67 per cent. of the issued ordinary shares in the defendant company, Cumberland & Westmorland Herald Newspaper & Printing Co. Ltd. The plaintiff's shares were issued to it in 1968. At the same time, and as part of the arrangement under which the shares were issued, the defendant adopted articles of association under which, inter alia, the plaintiff was granted, first, rights of pre-emption over the other ordinary shares in the defendant; second, rights in respect of unissued shares and, third, the right, so long as it held not less than 10 per cent. in nominal value of the issued ordinary shares of the defendant, to appoint a director of the defendant.

The board of directors of the defendant have made it known that they desire to convene an extraordinary general meeting of the shareholders of the defendant, and to put before the general meeting a special resolution designed to cancel the articles under which the plaintiff enjoys the special rights I have mentioned.

The plaintiff contends that the special rights which it enjoys under the articles in question are "class rights" which cannot be varied or abrogated without its consent. Alternatively, the plaintiff contends that it is entitled to enjoy those special rights pursuant to an agreement made between itself and the defendant in 1968, and that it is, in consequence, entitled either to restrain the defendant from convening the proposed general meeting, or at least to restrain the defendant from acting on any special resolution abrogating, or varying, the plaintiff's special rights.

The defendant, on the other hand, denies that the plaintiff's rights under the articles in question are class rights, denies the contractual entitlement of the plaintiff to enjoy those rights, and asserts that it is entitled to alter its articles in the manner prescribed by law.

These contentions raise some difficult questions of law. I must, however, first relate the events of 1968 which gave rise to the adoption by the defendant of the articles in question. Both companies are private companies. As their respective corporate names indicate, they were and are publishers of newspapers in Cumberland. The plaintiff published, among other newspapers, the "Penrith Observer." The "Penrith Observer" was a weekly paper, published on Tuesdays and with a circulation of five to six thousand copies, mainly in Penrith. Given the size of Penrith, the paper had little or no scope for expansion. The defendant published the "Cumberland & Westmorland Herald." This, too, was a weekly paper. It was published on Saturdays; it had a circulation throughout Cumberland and, accordingly, a larger circulation than that of the "Observer." For the same reason it had, unlike the "Observer," scope for expanding its circulation. The "Herald" was the defendant's only newspaper.

The plaintiff was, as a company, a good deal larger than the defendant; it published several newspapers. It was enabled, by its size and by the number of its publications, to make certain arrangements with advertisers under which its newspapers, and certain other newspapers, were combined together as a group for the purpose of advertisements being placed therein. The defendant's "Herald" was not a member of this group or of any other group. Its ability to attract advertising suffered accordingly.

Both the "Observer" and the "Herald" were local newspapers, owned and controlled locally. The chairman and chief executive of the plaintiff was Mr. John Burgess, whose family had been associated with the "Observer" for over 100 years. He later became Sir John Burgess and is still chairman, albeit now non-executive, of the plaintiff. He gave evidence before me. It was clear from his evidence that he and his board place, and have always placed, very great importance on Cumberland retaining local newspapers, locally owned and controlled.

By 1968 the large national newspaper groups had begun the process of acquiring local newspapers up and down the country. Sir John Burgess and his board were anxious that the local newspapers of Cumberland should not suffer that fate. In the early part of 1968 discussions began between the plaintiff and the defendant, with a view to the "Herald" being added to the plaintiff's group for advertising purposes. For the commercial reasons I have mentioned, this was important to the defendant. It was recognised that the joinder of the "Herald" to the plaintiff's group would not be practicable if both the "Observer" and the "Herald" continued to be published in Penrith. This problem was not insuperable. The plaintiff was willing, in principle and provided satisfactory terms could be reached, to allow the "Observer" to close, so that the "Herald" could become the only local paper circulating in Penrith. The plaintiff required assurances, in particular, that the

"Herald," if it became the only newspaper circulating in Penrith, would remain an independent newspaper, locally owned and controlled.

A

This was the background to the negotiations in 1968 which led to the adoption by the defendant of the articles in question. On the plaintiff's side the negotiations were carried on by its chairman, Sir John Burgess. On the defendant's side, a senior director, Mr. Burne, carried on the negotiations. Both gentlemen reported back to their respective boards from time to time.

B

It is not surprising that in the period between 1968 and 1983 or 1984, when the contentions that have led to this litigation began to emerge, many of the documents evidencing the conduct of the negotiations have been lost or destroyed. Nonetheless, a good deal of important documentation, including the board minutes of each company, is still available. Mr. Burne is now dead, but oral evidence has been given by Sir John Burgess. His evidence has provided valuable background material regarding the plaintiff and the defendant respectively, and regarding the newspaper industry in Cumberland in 1968, but he was not, in my view, able to add anything of real value to the contemporaneous documents, so far as the negotiations are concerned. After the 18 years or so that have elapsed since 1968, he has (as he frankly admitted) no reliable independent recollection. The progress of the negotiations does, however, clearly appear from the contents of the documents before me. Both sides in the negotiations had the assistance of solicitors. The plaintiff had instructed Linklaters & Paines. The defendant had instructed a local firm, Little & Shepherd.

C

D

The minutes of a board meeting of the plaintiff held on 16 February 1968 set out the broad proposals at that early stage. The minutes record:

E

"Mr. Burgess reported that Mr. Burne was to retire and that he had discussed with him the question of a joint advertising agreement on the following terms:

"1. Cumberland Newspapers Ltd. to take up shares in the 'Cumberland & Westmorland Herald' equal to 10 per cent. of their share capital either by a cash payment or exchange of shares the value of this being approximately £6,000.

F

"2. The articles of association of the 'Cumberland & Westmorland Herald' would be altered to give Cumberland Newspapers Ltd. the first option on shares offered for sale.

"3. The copyright of the 'Penrith Observer' to be sold to the 'Cumberland & Westmorland Herald.'

"The board agreed that Mr. Burgess should proceed to negotiate on these terms. Cumberland Newspapers Ltd. would be protected against the issuing of any new shares or a takeover bid and if Cumberland Newspapers Ltd. should be taken over the above agreement would be null and void."

G

Following 16 February 1968, negotiations continued between Sir John and Mr. Burne. Linklaters & Paines drafted proposed new articles of association for the defendant, intended to prevent the defendant being taken over without the consent of the plaintiff. These proposed articles were sent by Sir John to Mr. Burne. In certain respects Mr.

H

Burne found them unacceptable. Little & Shepherd drafted an alternative version. These were sent to Sir John, for him to consider. An important meeting then took place on 27 April 1968 between Sir John and Mr. Burne. Mr. Burne prepared a note of their discussions. By letter to Mr. Burne dated 30 April 1968, Sir John agreed that the note represented a correct record. I am satisfied that I can rely on it.

The meeting began with discussions as to the respective merits of the draft articles that had been prepared by Linklaters & Paines and by Little & Shepherd, respectively. Mr. Burne is recorded as justifying the latter draft in these terms:

"It had been felt that the draft proposals prepared by the Herald's solicitors, coupled with a 10 per cent. holding and the other arrangements proposed, could be justified to the shareholders and at the same time were an assurance to Cumberland Newspapers that the 'Herald' would not—and could not—be sold to some outside organisation."

The note then records:

"Mr. Burgess stated that he had been advised that there was nothing to prevent an outside group making an offer to the shareholders to buy their shares provided the articles of association were altered—in which case the articles could be altered provided there was the requisite vote. While he thought this was a very remote possibility, he had to safeguard his position if his company was to cease publishing a paper in Penrith."

This passage of the note is important. It was submitted by Mr. Howarth, counsel for the defendant, that the passage shows that Sir John directed his mind to the possibility that the proposed new articles might be altered so as to enable a takeover bid to be made, that he regarded the possibility as remote, and that he was prepared to take the risk provided the new articles included the additional provisions referred to in the note. Those additional provisions are: (a) that a clause be included that should any shares be issued in future they must not alter the proportion held by Cumberland Newspapers; (b) that so long as Cumberland Newspapers held 10 per cent. they should have the right to nominate a director. I agree with Mr. Howarth that that is the natural meaning of this part of the note. The note then goes on to record discussions between Sir John and Mr. Burne regarding the arrangements for issuing the plaintiff with a 10 per cent. shareholding in the defendant and regarding the arrangements under which the defendant would join the plaintiff's advertising group.

At their meeting on 27 April 1968, Sir John and Mr. Burne seem to have reached broad agreement on the proposals under discussion. The proposals were discussed and accepted at a meeting of the defendant's board held on 3 May 1968. The minutes of that meeting record:

"On behalf of Cumberland Newspapers Ltd., Mr. Burgess had suggested a working arrangement whereby their London advertisement office should on a commissions basis act for the 'Herald' and that the 'Herald' should for purposes of group

advertising orders become associated with the Cumberland Weekly Newspaper Group (all owned by Cumberland Newspapers Ltd.) and the Border TV Area Group (which includes also papers in the south of Scotland in that ownership) whereupon Cumberland Newspapers Ltd. would cease publication of the 'Penrith Observer' with the 'Herald' agreeing to accept advertisements for their papers, particularly the 'Cumberland Evening News'—all this subject to a proviso that Cumberland Newspapers Ltd. would wish to be safeguarded against the Herald company passing into other ownership. To this end it had been suggested that the Herald company should allow Cumberland Newspapers a 10 per cent. holding of ordinary shares, preferably on an exchange of shares in their company with certain provisions also that in the event of any holders of ordinary shares in the Herald company wishing to dispose of shares outside their families Cumberland Newspapers should have a right to purchase."

The meeting resolved that the necessary extraordinary general meeting be called.

On 2 August 1968, Sir John wrote two contractual letters to Mr. Burne. The first letter was headed "To complete the formalities and for record purposes." It then continued:

"In consideration of Cumberland Newspapers Ltd. being appointed London advertising agents for the 'Cumberland and Westmorland Herald,' Cumberland Newspapers Ltd. will undertake to issue to Cumberland and Westmorland Herald Printing Co. Ltd. 2,500 fully paid up £1 ordinary shares in Cumberland Newspapers Ltd. such shares to rank pari passu in all respects with the existing ordinary shares of Cumberland Newspapers Ltd. Cumberland Newspapers Ltd. on being appointed London advertising agents for the 'Cumberland and Westmorland Herald' will include the 'Cumberland and Westmorland Herald' in its group selling of advertising of Cumberland Newspapers Group and the Border Weekly Group. Cumberland Newspapers Ltd. will charge 'Cumberland and Westmorland Herald' a commission of 10 per cent. on all advertising booked by them for the 'Herald.' Cumberland Newspapers Ltd. will use their best endeavours to increase the advertising revenue of the 'Cumberland and Westmorland Herald'."

This letter thus set out the contractual obligations being undertaken by the plaintiff. The second letter started with this:

"I write to record the terms and conditions upon which Cumberland Newspapers Ltd. ('my company') would be prepared to take a 10 per cent. interest in the share capital of Cumberland & Westmorland Herald Printers Co. Ltd. ('your company') free from all charges liens and encumbrances and ranking for all dividends and other distributions now or hereafter paid, made or declared."

There then followed five paragraphs. The letter ended:

"If you and your fellow directors are in agreement with the terms and conditions herein set out, would you please sign and return the

A carbon copy of this letter which is enclosed with the form of acceptance endorsed thereon duly completed."

The copy of the letter was signed by five of the defendant's directors, including Mr. Burne, and returned to the plaintiff. The five signatories held between them 2,060 of the 2,500 issued ordinary shares in the defendant.

B Paragraph 1 of this letter contained an undertaking by the signatory directors not to dispose of their shares until the intended extraordinary general meeting had been convened. By paragraph 2, the signatory directors were required to procure the holding of an extraordinary general meeting, in order to amend the defendant's articles:

C "so as to provide inter alia—that sufficient unissued shares in the capital of your company are available for immediate issue to my company in accordance with the provisions of paragraph 3 below."

Paragraph 3 of the letter required the board of the defendant, after the passing of the resolution specified in paragraph 2, to issue to the plaintiff ordinary shares in the defendant amounting to 10 per cent. at least of the issued share capital. The paragraph expressed these shares "to be issued in consideration of my company transferring to your company the copyright of the 'Penrith Observer'." Paragraph 4 of the letter contained D a warranty by the signatory directors regarding the affairs of the defendant. Paragraph 5 contained an undertaking by the signatory directors to vote in favour of the resolutions to be put to the extraordinary general meeting.

E There are some important features of this letter to which I should draw attention. First, the signatory directors signed the letter as shareholders of the defendant. They were not expressed to sign as directors and were not expressed to be signing on behalf of the defendant. The contractual obligations to which this letter gave rise were not obligations of the defendant—they were obligations of the individual signatories.

F Second, the only resolution which the signatories undertook to place before the extraordinary general meeting, was a resolution to amend the articles of association so as to provide that sufficient unissued share capital was available to enable the plaintiff to be issued with sufficient shares to give it a 10 per cent. holding. There is no doubt but that by 2 August 1968, the form of the proposed new articles, intended to assure the plaintiff that the defendant would remain independent and based G upon Little & Shepherd's draft, had been agreed by both sides. It is an oddity that this contractual letter did not impose on the signatory directors any obligation to place those agreed articles before the extraordinary general meeting for adoption.

The importance to the plaintiff of those agreed articles is apparent from the documents in evidence and underlines the oddity to which I have referred. If articles, in the agreed form, had not been adopted H then, I have no doubt, none of the arrangements specified in the first letter of 2 August 1968 would have been brought into effect; the plaintiff would not have accepted the 10 per cent. shareholding in the defendant and would not have transferred the "Penrith Observer" to the

defendant. In the circumstances, the adoption by the defendant, at its    A
intended extraordinary general meeting, of articles in the agreed form
must, in my judgment, be regarded as a condition precedent to the
coming into effect of the contractual obligations outlined in the first
letter of 2 August 1968.

Pursuant to the arrangements which had been agreed upon, a number
of steps were taken. (1) On 29 August 1968, an extraordinary general
meeting of the defendant's ordinary shareholders was convened. At this    B
meeting new articles of association in the agreed form, based upon Little
& Shepherd's draft, were adopted. (2) Immediately after the extraordinary
general meeting, a meeting of the defendant's board took place, at
which it was resolved unanimously that 280 of the defendant's ordinary
shares of £5 each, be issued to the plaintiff at par, in consideration of
the issue to the defendant by the plaintiff of 2,500 ordinary shares of £1    C
each in the plaintiff. The plaintiff's 280 shares in the defendant
represented a little over 10 per cent. of the defendant's issued share
capital. The defendant's 2,500 shares in the plaintiff, represented about
1 per cent. of the plaintiff's issued share capital. (3) On 30 August 1968
a meeting of the plaintiff's board took place. It was resolved that 2,500
£1 ordinary shares be allotted to the defendant in consideration of the    D
allotment to the plaintiff of the 280 shares in the defendant. In addition,
it was agreed that Sir John Burgess be the plaintiff's nominee to join the
defendant's board, in accordance with the new articles adopted by the
defendant. (4) By a deed dated 28 October 1968, the plaintiff assigned
to the defendant the copyright in, and goodwill of, the "Penrith
Observer". The consideration for the assignment was expressed to be
£1. The "Observer" was thereupon closed down. (5) Finally, a formal    E
agreement was entered into by the plaintiff and the defendant, setting
out the details of the arrangement under which the defendant was to
become a member of the plaintiff's advertising group. The agreement
was expressed to continue for 10 years from 1 October 1968, and
thereafter until termination by one year's notice on either side.

The arrangements thus embarked upon are still continuing. The    F
advertising agreement has not been terminated. The plaintiff still holds
the 280 shares issued to it on 29 August 1968. Those shares still
represent more than 10 per cent. of the defendant's issued share capital.
The defendant still holds 2,500 shares in the plaintiff. The defendant,
however, now proposes to cancel the articles adopted on 29 August
1968, so as to deprive the plaintiff of the rights enjoyed thereunder. The    G
members of the board of directors of the defendant are in a position, by
their own votes as shareholders together with the votes of their
shareholder adherents, to carry a special resolution altering the articles
in the manner proposed. This litigation will settle whether they are in
law entitled to do so.

I must, at this stage, set out more fully the contents of the articles in
question. The defendant's articles adopt Table A. There are no relevant    H
exclusions or variations. Under article 3, the share capital is declared to
be £25,000, divided into 500 six per cent. preference shares of £5 each,
2,000 unclassified shares of £5 each, and 2,500 ordinary shares of £5

each. This provision repeats a corresponding provision in the defendant's memorandum of association.

Article 4 sets out the special rights attached to the preference shares and provides under paragraph (d):

"The said 2,000 unclassified shares shall subject to the provisions of article 5 be issued either as ordinary shares or with such preferred, deferred or other special rights or with such restrictions whether in regard to dividend, voting, return of capital or otherwise as the directors may from time to time determine subject to any special rights previously conferred on the holders of any existing shares or classes of shares."

Article 5 provides:

"(a) Subject to any direction to the contrary by special resolution of the company and subject also to paragraph (b) of this article, no unissued shares in the capital of the company shall be issued to any person save (i) Cumberland Newspapers Ltd. (ii) a person who on 28 August 1968 was entered on the register of members of the company (iii) persons who at the time of such issue are in the full time employment of the company. (b) Subject to any direction to the contrary by special resolution of the company in general meeting, all unissued ordinary shares shall, before issue, be offered to such persons as at the date of the offer are registered as holders of ordinary shares in proportion, as nearly as the circumstances admit, to the amount of the existing shares to which they are entitled . . ."

This article 5 was obviously intended to give the plaintiff protection against its percentage of the issued share capital in the defendant being diluted by means of an issue of unissued ordinary shares. The protection is not, however, absolute. The provisions of the article are expressed to be "subject to any direction to the contrary by special resolution." Article 7 provides:

"The directors may in their absolute discretion and without assigning any reason therefor decline to register any transfer of any share whether or not it is a fully paid share not being a transfer to Cumberland Newspapers Ltd. under the provisions of article 9."

This article serves to ensure that if the plaintiff should exercise its right of pre-emption over any shares, the directors cannot decline to register the transfer. Article 8 authorises the transfer of shares (a) to other members, (b) to certain relatives of the transferor member, (c) to employees of the defendant and (d) to certain defined family trusts. Article 9 is the important pre-emption article. Except in the case of a transfer expressly authorised by article 8, article 9 imposes, in respect of all shares in the company, a restriction on the right to transfer unless, in accordance with a prescribed procedure, the shares are first offered to the plaintiff. Finally, article 12 provides:

"If and so long as Cumberland Newspapers Ltd. shall be registered as the holder of not less than one tenth in nominal value of the

Scott J.          Cumbrian Newspapers v. Cumberland Co.          [1987]

issued ordinary share capital of the company Cumberland Newspapers     A
Ltd. shall be entitled from time to time to nominate one person to
be a director of the company . . ."

The plaintiff contends that its rights under articles 5, 7, 9 and 12 are
class rights that cannot validly be varied or abrogated without its
consent.

Section 9(1) of the Companies Act 1985 provides:          B

"Subject to the provisions of this Act and to the conditions
contained in its memorandum, a company may by special resolution
alter its articles."

Section 125 of the Act of 1985 is headed "Class Rights." Several of its
subsections are relevant to the plaintiff's contention. Subsection (1)
introduces the section. It reads:          C

"This section is concerned with the variation of the rights attached
to any class of shares in a company whose share capital is divided
into shares of different classes."

I draw attention to the phrase "rights attached to any class of shares." It
is a phrase which recurs in this section and is to be found also in article     D
4 of Table A. Section 125(2) deals with the case

"Where the rights are attached to a class of shares otherwise than
by the company's memorandum, and the company's articles do not
contain provision with respect to the variation of the rights . . ."

In such a case, the subsection permits the variation of the rights only if

"(a) the holders of three-quarters in nominal value of the issued     E
shares of that class consent in writing to the variation; or (b) an
extraordinary resolution passed at a separate general meeting of the
holders of that class sanctions the variation; . . ."

Section 125(4) deals, inter alia, with the case where the rights are
attached to a class of shares otherwise than by the memorandum, and
where the articles do contain provision for their variation. In such a     F
case, the subsection permits the variation of those rights in accordance
with provision of the articles, but not otherwise.

Section 125 is, in my judgment, intended to provide a comprehensive
code setting out the manner in which "rights attached to any class of
shares" (whatever that phrase truly means) can be varied. I must decide,
therefore, whether or not the plaintiff's rights under articles 5, 7, 9 and     G
12 are, for the purposes of section 125, rights attached to a class of
shares. If they are, they can only be altered in the manner provided by
the articles or, as the case might be, by the procedure described in
subsection (2). But if they are not rights attached to a class of shares,
section 125 has no application to them.

The articles adopted by the defendant on 29 August 1968 contained
no special article dealing with the alteration, either of the articles     H
generally, or of articles 5, 7, 9 and 12, in particular; Table A was,
however, incorporated, and article 4 of Table A contains provision for
the variation or abrogation of class rights. The article provides:

"If at any time the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the company is being wound up, be varied with the consent in writing of the holders of three-fourths of the issued shares of that class, or with the sanction of an extraordinary resolution passed at a separate general meeting of the holders of the shares of the class."

The terms of this article underline the importance of the question whether or not the plaintiff's rights can properly be described as rights attached to any class of shares. If the rights can be so described, both section 125 and article 4 of Table A apply. The effect would be that articles 5, 7, 9 and 12 could not be altered without the plaintiff's consent. But if the rights cannot be so described, then neither section 125 nor article 4 of Table A apply. The articles could therefore, it is said, be varied or cancelled by special resolution under the statutory authority granted by section 9. In effect, the plaintiff could be deprived of the rights which it enjoys under articles 5, 7, 9 and 12 by the other members of the company who do not enjoy such rights. Moreover, that would have been the position at all times since the adoption of the articles in August 1968.

I turn to the critical question: are the plaintiff's rights under articles 5, 7, 9 and 12, rights attached to a class of shares?

Rights or benefits which may be contained in articles can be divided into three different categories. First, there are rights or benefits which are annexed to particular shares. Classic examples of rights of this character are dividend rights and rights to participate in surplus assets on a winding up. If articles provide that particular shares carry particular rights not enjoyed by the holders of other shares, it is easy to conclude that the rights are attached to a class of shares, for the purpose both of section 125 of the Act of 1985 and of article 4 of Table A. It is common ground that rights falling into this category are rights attached to a class of shares for those purposes. Mr. Howarth submitted at first that this category should be restricted to rights that were capable of being enjoyed by the holders for the time being of the shares in question. Such a restriction would exclude rights expressly attached to particular shares issued to some named individual, but expressed to determine upon transfer of the shares by the named individual. *Palmer's Company Precedents*, 17th ed. (1956), Pt. I, p. 818, contains a form for the creation of a life governor's share in a company. Mr. Howarth accepted that the rights attached to a share in accordance with this precedent would be rights attached to a class of shares. He accepted, rightly in my judgment, that a provision for defeasance of rights on alienation of the share to which the rights were attached, would not of itself prevent the rights, pre-alienation, from being properly described as rights attached to a class of shares. The plaintiff's rights under articles 5, 7, 9 and 12 cannot, however, be brought within this first category. The rights were not attached to any particular shares. In articles 5, 7 and 9, there is no reference to any current shareholding held by the plaintiff. The rights conferred on the plaintiff under article 12 are dependent on the plaintiff

holding at least 10 per cent. of the issued ordinary shares in the defendant. But the rights are not attached to any particular shares. Any ordinary shares in the defendant, if sufficient in number and held by the plaintiff, would entitle the plaintiff to exercise the rights.

A second category of rights or benefits which may be contained in articles (although it may be that neither "rights" nor "benefits" is an apt description), would cover rights or benefits conferred on individuals not in the capacity of members or shareholders of the company but, for ulterior reasons, connected with the administration of the company's affairs or the conduct of its business. *Eley v. Positive Government Security Life Assurance Co. Ltd.* (1875) 1 Ex.D. 20, was a case where the articles of the defendant company had included a provision that the plaintiff should be the company solicitor. The plaintiff sought to enforce that provision as a contract between himself and the company. He failed. The reasons why he failed are not here relevant, and I cite the case only to draw attention to an article which, on its terms, conferred a benefit on an individual but not in the capacity of member or shareholder of the company. It is, perhaps, obvious that rights or benefits in this category cannot be class rights. They cannot be described as rights attached to a class of shares. The plaintiff in *Eley v. Positive Government Security Life Assurance Co. Ltd.* was not a shareholder at the time the articles were adopted. He became a shareholder some time thereafter. It is easy, therefore, to conclude that the article in question did not confer on him any right or benefit in his capacity as a member of the company. In a case where the individual had been issued with shares in the company at the same time and as part of the same broad arrangement under which the article in question had been adopted, the conclusion might not be so easy. But if, in all the circumstances, the right conclusion was still that the rights or benefits conferred by the article were not conferred on the beneficiary in the capacity of member or shareholder of the company, then the rights could not, in my view, be regarded as class rights. They would not be rights attached to any class of shares.

In paragraph 7 of the defence in the present case, it is pleaded that the plaintiff's rights under articles 5, 7, 9 and 12 "are privileges personal to the plaintiffs, whether or not they hold any shares in the defendant company." If this plea were well-founded, the rights would fall into this second category and would not be class rights. Mr. Howarth did not, however, persist in this plea. In my judgment he was right not to do so. The evidence in this case has clearly established that the adoption by the defendant of articles 5, 7, 9 and 12, was inextricably connected with the issue to the plaintiff, and the plaintiff's acceptance, of the 280 ordinary £5 shares in the defendant. The purpose of the rights and privileges conferred on the plaintiff by those articles, was to enable the plaintiff, in its capacity as shareholder in the defendant, to obstruct an attempted take-over of the defendant. In my judgment, the plaintiff's rights under those articles do not fall within this second category.

That leaves the third category. This category would cover rights or benefits that, although not attached to any particular shares, were nonetheless conferred on the beneficiary in the capacity of member or

shareholder of the company. The rights of the plaintiff under articles 5, 7, 9 and 12 fall, in my judgment, into this category. Other examples can be found in reported cases.

In *Bushell v. Faith* [1969] 2 Ch. 438, affirmed by the House of Lords [1970] A.C. 1099, articles of association included a provision that on a resolution at a general meeting for the removal of any director from office, any shares held by that director should carry the right to three votes. The purpose of this provision was to prevent directors being removed from office by a simple majority of the members of the company. The validity of the article was upheld by the Court of Appeal and by the House of Lords; the reasons do not, for present purposes, matter. But the rights conferred by the article in question fall, in my view, firmly in this third category. They were not attached to any particular shares. On the other hand, they were conferred on the director/beneficiaries in their capacity as shareholders. The article created, in effect, two classes of shareholders—namely, shareholders who were for the time being directors, on the one hand, and shareholders who were not for the time being directors, on the other hand.

The present case is, and *Bushell v. Faith* was, concerned with rights conferred by articles. The other side of the coin is demonstrated by *Rayfield v. Hands* [1960] Ch. 1. That case was concerned with obligations imposed on members by the articles. The articles of the company included an article entitling every member to sell his shares to the directors of the company at a fair valuation. In effect, the members enjoyed "put" options exercisable against the directors. Vaisey J. held that the obligations imposed by the article on the directors for the time being were enforceable against them. He held that the obligations were imposed on the directors in their capacity as members of the company. It follows from his judgment that, as in *Bushell v. Faith* [1970] A.C. 1099, there were in effect two classes of shareholders in the company. There were shareholders who were not for the time being directors, and shareholders who were for the time being directors: the former had rights against the latter which the latter did not enjoy against the former. The two classes were identifiable not by reference to their respective ownership of particular shares, but by reference to the office held by the latter. But the rights of the former, and the obligations of the latter, required their respective ownership of shares in the company. Accordingly, as a matter of classification, the rights in question fall, in my view, into the third category.

In the present case, the rights conferred on the plaintiff under articles 5, 7, 9 and 12 were, as I have held, conferred on the plaintiff as a member or shareholder of the defendant. The rights would not be enforceable by the plaintiff otherwise than as the owner of ordinary shares in the defendant. If the plaintiff were to divest itself of all its ordinary shares in the defendant, it would not then, in my view, be in a position to enforce the rights in the articles. But the rights were not attached to any particular share or shares. Enforcement by the plaintiff of the rights granted under articles 5, 7 and 9, would require no more than ownership by the plaintiff of at least some shares in the defendant.

Enforcement by the plaintiff of the rights granted under article 12, require the plaintiff to hold at least 10 per cent. of the issued shares in the defendant. But any shares would do. It follows, in my judgment, that the plaintiff's rights under the articles in question fall squarely within this third category.

The question for decision is whether rights in this third category are within the meaning of the phrase in section 125 of the Companies Act 1985 and in article 4 of Table A, rights attached to a class of shares. Mr. Howarth relied on the natural meaning of the language used. Article 4 is expressed to apply "If at any time the share capital is divided into different classes of shares." Section 125 is expressed, by subsection (1) to be dealing with companies "whose share capital is divided into shares of different classes." This language, submitted Mr. Howarth, coupled with the repeated references to the rights attached to any class of shares, shows that the legislature had in contemplation only the first category of rights. It intended to protect rights attached to particular shares; it withheld protection from rights which were not attached to particular shares.

Mr. Brisby, on the other hand, submitted that whenever rights were conferred by articles on individuals in their capacity as members or shareholders, the shares that they for the time being held, and by virtue of which they were for the time being entitled to the rights, constituted a class of shares for the purposes of section 125 and article 4 of Table A. For those purposes, the rights were, he submitted, attached to the shares for the time being held. This is a question on which there is, it seems, no authority. It is a question to which the language of section 125 of the Act of 1985 provides, in my view, no certain answer. I ought, therefore, I think, to try and discern the legislative purpose behind section 125 and take that purpose into account in construing the section.

The class rights, or alleged class rights, with which this case is concerned, are contained in the articles; that is common practice. Class rights may, however, as section 125 in terms recognises, be contained in the memorandum. It is, and always was, clear company law that in the absence of some statutory enabling provision, or unless the memorandum itself provides a procedure for variation, rights embodied in the memorandum cannot be altered: see *In re Welsbach Incandescent Gas Light Co. Ltd.* [1904] 1 Ch. 87. This principle is recognised by section 17 of the Companies Act 1985, formerly section 23 of the Act of 1948. Subsection (1) provides a limited power for the alteration of provisions in a company's memorandum; but subsection (2) provides, inter alia, that the section "(b) . . . does not authorise any variation or abrogation of the special rights of any class of members." I draw attention to the phrase "rights of any class of members." In the case of a company limited by shares, the phrase "rights of any class of shareholders" can be substituted.

Section 125(5) provides:

"If the rights are attached to a class of shares by the memorandum, and the memorandum and articles do not contain provision with respect to the variation of those rights, those rights may be varied if all the members of the company agree to the variation."

Section 125(5), read in conjunction with section 17(2), suggests that in relation to a company limited by shares, the expressions, "rights of any class of members" and "rights . . . attached to a class of shares", have the same meaning. If that were not so, then third category rights would be within the expression "rights of any class of members" but excluded from the expression "rights . . . attached to a class of shares." That would, apparently, leave third category rights contained in a memorandum unalterable, even if all the members consented to the alteration, otherwise than by a scheme of arrangement approved by the court. This would be an anomalous state of affairs.

Class rights are, however, more usually to be found in articles than in memoranda of association. There seems to have been at one time the view that shareholders' rights, conferred by articles, could not be varied unless special provision had been made in the articles for their variation: see, for example, the cases cited in the argument of counsel for the appellant in *Andrews v. Gas Meter Co.* [1897] 1 Ch. 361, 364. This view was shown to be wrong by the decision of the Court of Appeal in *Andrews v. Gas Meter Co.* The practice of including in articles of association special provision for the variation of class rights on the lines now to be found in article 4 of Table A, is said by the author of *Gower, Modern Company Law*, 4th ed. (1979), pp. 563–564, to have pre-dated that decision. It is consistent with this view of the history of article 4, that it is couched in an enabling form and not in a restrictive form. It enables class rights to be varied by the procedure prescribed. It is not expressed to restrict the variation of class rights otherwise than by the procedure prescribed. It may, however, fairly be said to be implicit in article 4 of Table A that rights attached to a class of shares cannot be varied, at least by the members themselves, otherwise than by the procedure there laid down.

Section 125 of the Companies Act 1985, reproduces (with variations not here relevant) section 32 of the Companies Act 1980. Section 32 was, however, new. Previous statutory provision regarding the variation of class rights, had been contained in section 72 of the Companies Act 1948, which now forms part of section 127 of the Act of 1985. Section 72 of the Act of 1948, like section 32 of the Act of 1980 and section 125 of the Act of 1985, was expressed to apply to a company whose share capital "is divided into different classes of shares," and to be dealing with "the variation of the rights attached to any class of shares." Section 72, therefore, leaves open the same question, namely, whether third category rights, as well as first category rights, were within its scope. Section 72(1) was expressed to apply only where

> "provision is made by the memorandum or articles for authorising the variation of the rights . . . subject to the consent of . . . the holders . . . or the sanction of a resolution passed at a separate meeting . . ."

The section gave the right to a dissentient minority of at least 15 per cent. to apply to the court, and gave the court a discretion whether or not to confirm the variation. Section 72 of the Act of 1948 did not, therefore, apply where neither the memorandum nor the articles

contained any variation of class rights provision. So, where the class
rights were contained in the articles, section 72 only applied where the
articles contained some such provision as article 4 of Table A.

It has been forcefully pointed out by Professor Gower that this
distinction made little or no sense, except on the footing that, in the
absence of some variation of rights provision contained in the articles,
class rights could not be varied at all: see *Gower, Modern Company
Law*, p. 564. If, in the absence of such an article, class rights contained
in the articles could be altered by a special resolution passed at a
general meeting, why was not a dissentient 15 per cent. minority given
the same rights as those conferred by section 72 of the Act of 1948?
Professor Gower's suggested answer was that it should be regarded as
implicit in section 72 that if the memorandum or articles did not contain
any provision for the alteration of class rights, then there could be no
alteration of them—save, of course, an alteration forming part of a
scheme of arrangement approved by the court. This argument is
unexceptional so far as class rights contained in the memorandum are
concerned: see section 23 of the Act of 1948, now section 17 of the Act
of 1985. But so far as class rights contained in the articles are concerned,
the argument regards the statutory power to alter articles (section 10 of
the Act of 1948, now section 9 of the Act of 1985) as limited by the
implicit limitations of section 72 of the Act of 1948.

The particular point made by Professor Gower has been overtaken
by a combination of section 125 and section 127 of the Companies Act
1985. Rights attached to a class of shares can, if contained in the
articles, now be varied, even if no provision for variation is contained in
the articles: see section 125(2). A dissentient minority is given the same
protection whether or not provision is made in the articles for the
variation of the rights: see section 127(2).

But if Mr. Howarth is right in contending that there can be class
rights which are not rights attached to any class of shares, within the
meaning of section 125, then, as it seems to me, Professor Gower's
argument is still relevant. If the rights are contained in the memorandum
there is no problem. They cannot be altered: see section 17 of the Act
of 1985. If, on the other hand, the rights are contained in the articles,
can they be altered by special resolution pursuant to the statutory power
contained in section 9 of the Act of 1985, or is section 125 to be read as
excluding, by implication, the statutory power to alter class rights that
are not rights attached to any class of shares?

The statutory power to alter articles by special resolution is expressed
to be "subject to the provisions of this Act." The question is whether
section 72 in the Act of 1948, and sections 125 and 127 in the Act of
1985, provide any sufficient context to justify restricting the breadth of
the statutory power granted by section 9. In my judgment they do not.
Section 72 was enacted in order to provide a benefit to certain members
of a company in certain circumstances. The reason why the benefit was
not extended to cover certain other circumstances may well have been,
as Professor Gower has suggested, that the legislature was proceeding
on a mistaken assumption as to the law. But that would not, in my view,
justify reading into the section a restriction on the power of a company

to alter its articles in circumstances not covered by the section. As Viscount Simonds remarked in *Kirkness v. John Hudson & Co. Ltd.* [1955] A.C. 696, 714, "the beliefs or assumptions of those who frame Acts of Parliament cannot make the law." If, as I conclude, section 72 of the Act of 1948 did not prevent the alteration, by special resolution, of articles containing class rights in cases where the articles contained no provision for the alteration, it must, a fortiori, be the case that sections 125 and 127 of the Act of 1985 do not do so.

In my judgment, if it is right, as the defendant contends, that third category rights are not rights attached to a class of shares, for the purposes of section 125, it must follow that articles containing such rights can be altered by special resolution pursuant to section 9 of the Act of 1985. This conclusion is, I think, relevant to the question whether the defendant's contention is right. It would, in my opinion, be surprising and unsatisfactory if class rights contained in articles were to be at the mercy of a special resolution majority at a general meeting, unless they were rights attached to particular shares. If the articles of a particular company grant special rights to a special class of members, it would be odd to find that members not in that class could cancel the rights simply by means of a special resolution.

A number of considerations lead me to the conclusion that the purpose of sections 125 and 127 of the Act of 1985, and of section 32 of the Act of 1980, was to deal comprehensively with the manner in which class rights in companies having a share capital could be varied or abrogated. They are these: first, chapter II of Part V of the Act (which includes sections 125 to 129) is headed "Class Rights." The side note to section 125 reads "Variation of class rights." The language seems to treat "class rights" as synonymous with "rights attached to any class of shares," at any rate so far as companies with a share capital are concerned. Second, the use in section 17(2)(*b*) of the Act of 1985 of the expression "rights of any class of members" in connection both with companies having a share capital and with companies having no share capital, underlines the point that the expression "rights attached to any class of shares" in section 125, must have been regarded by the legislature as synonymous with the former phrase, so far as companies with a share capital were concerned. Third, the evident intention of the legislature to protect rights attached to any class of shares against variation or abrogation by the mere alteration of articles, would, if coupled with an intention to provide no such protection against variation or abrogation of class rights of the third category, be anomalous and arbitrary. Fourth, if the variation or abrogation of third category rights are not dealt with by section 125, then the conclusion would seem to follow that if the rights were contained in the memorandum, the rights could not be varied or abrogated at all. The enabling provisions of section 125 of the Act of 1985 would obviously not apply, nor would the enabling provisions of section 17 of the Act of 1985. The terms of section 17, to my mind, strongly suggest a legislative belief that section 125 would deal with the variation or abrogation of any "special rights of any class of member" contained in the memorandum. Fifth, the combination of the considerations thirdly and fourthly abovementioned,

leads to a further point. What sense could there be in a result under which third category rights contained in articles were more freely alterable than rights attached to any class of shares contained therein, but under which third category rights contained in the memorandum were less freely alterable than rights attached to any class of shares contained in the memorandum? The distinction would not be merely anomalous; it would, to my mind, be perverse.

For these reasons I conclude that section 125 of the Act of 1985 was intended by the legislature to cater for the variation or abrogation of any special rights given by the memorandum or articles of a company to any class of members—that is to say, not only rights falling into the first category I have described, but also rights falling into the third category. I must, therefore, construe section 125 so as to give effect to that legislative intention if the language of the section so permits. In my judgment, it does.

Subsection (1) refers to "the rights attached to any class of shares in a company whose share capital is divided into shares of different classes." In my judgment, if specific rights are given to certain members in their capacity as members or shareholders, then those members become a class. The shares those members hold for the time being, and without which they would not be members of the class, would represent, in my view, a "class of shares" for the purpose of section 125. The class would include those shares the ownership of which for the time being entitled the members of the company to the rights in question. For the purposes of section 125, the share capital of a company is, in my judgment, divided into shares of different classes, if shareholders, qua shareholders, enjoy different rights.

This construction of section 125 has the consequence that shares may come into or go out of a particular class on acquisition or disposal of the shares by a particular individual. I do not see any conceptual difficulty in this. Mr. Howarth pointed out certain administrative difficulties that might follow, mainly regarding the details to be included in annual returns. These seem to me to be capable of administrative solution. I do not think they have any real weight on the question of construction of section 125.

In my judgment, a company which, by its articles, confers special rights on one or more of its members in the capacity of member or shareholder thereby constitutes the shares for the time being held by that member or members, a class of shares for the purposes of section 125. The rights are class rights. I have already expressed the opinion that the rights conferred on the plaintiff under articles 5, 7, 9 and 12, were conferred on the plaintiff as member or shareholder of the defendant. It follows that, in my judgment, the shares in the defendant for the time being held by the plaintiff constitute a class of shares for the purpose of variation or abrogation of those rights.

The conclusion I have reached on the plaintiff's first point disposes of this action. However, the second point, the contractual point, has been fully argued. I think, therefore, that I should deal with it. The contractual point is based upon the allegation first, that in or about 1968 the plaintiff and the defendant entered into an agreement of which it

was a term that the plaintiff would have the rights conferred on it under articles 5, 7, 9 and 12 and, secondly, that it was an implied term of that agreement that those articles would not be altered or abrogated without the prior consent of the plaintiff. This point fails, in my judgment, on the facts.

There was, in my judgment, no agreement ever entered into between the plaintiff and the defendant, under which the defendant agreed that the plaintiff would have the rights in question. I have already set out the relevant history; I will not repeat it. The agreement evidenced or constituted by the second letter of 2 August 1968, was not an agreement between the plaintiff and the defendant. It was an agreement between the plaintiff and the directors of the defendant, as individuals. These directors did not agree that the plaintiff would have the rights in question. At most they agreed that a resolution for the adoption of the agreed articles would be put before a general meeting of the defendant. I have already stated my opinion that the adoption of those articles represented a condition precedent to the coming into effect of the rest of the agreed arrangement. There was no contractual obligation on the directors, let alone on the defendant, to ensure that the articles would be adopted. In these circumstances, the contention that there was an agreement between the plaintiff and the defendant that the plaintiff would have the rights in question is, in my judgment, unsustainable.

The implied term argument fails for the same reasons. There was no agreement between the plaintiff and the defendant that the articles would be adopted, so how could there be an implied term that the articles would not be changed? Moreover, as Mr. Howarth pointed out, the right to alter articles by special resolution is not a right of the company; it is a right of the members. A contract made by the company cannot deprive the members of that right. It is, of course, possible that a company might, nonetheless, contract that an article would not be altered, but it would be a strong thing to imply an agreement by a company to that effect. In *Allen v. Gold Reefs of West Africa Ltd.* [1900] 1 Ch. 656, 673 Sir Nathaniel Lindley M.R. said:

> "when dealing with contracts referring to revocable articles, and especially with contracts between a member of the company and the company respecting his shares, care must be taken not to assume that the contract involves as one of its terms an article which is not to be altered."

When, on 29 August 1968, the defendant issued to the plaintiff, and the plaintiff accepted, the 280 ordinary shares of £5 each, the plaintiff became a shareholder in the defendant with its new articles. The new articles had been adopted with a view to the issue of the shares. It may very well be the case, as Mr. Brisby submitted, that both parties thought the arrangement would be permanent, but that does not justify, in my judgment, saddling the defendant with an implied agreement that the articles would not be altered. The directors of the defendant were careful to keep the defendant free of any contractual commitment as to the content of its articles. It would be quite wrong, in my judgment, to imply the term contended for.

I have had considerable argument as to what the consequences would have been had I concluded that the defendant ought to be saddled with the alleged implied term. I ought shortly to state my views on those arguments. First, it is, in my view, as I have already stated, well-established that a company cannot, by contract, deprive its members of their rights to alter the articles by special resolution: see *Punt v. Symons & Co. Ltd.* [1903] 2 Ch. 506. Second, if a company does contract that its articles will not be altered, nonetheless its members are entitled to requisition a meeting and pass a special resolution altering the articles. Third, if the articles are validly altered, the company cannot be prevented from acting on the altered articles, even though so to act may involve it in breach of its contract. The law is, in my view, correctly stated in an obiter passage from the judgment of Lord Porter in *Southern Foundries (1926) Ltd. v. Shirlaw* [1940] A.C. 701, 740:

> "The general principle therefore may, I think, be thus stated. A company cannot be precluded from altering its articles thereby giving itself power to act upon the provisions of the altered articles—but so to act may nevertheless be a breach of contract if it is contrary to a stipulation in a contract validly made before the alteration."

Mr. Brisby submitted that this dictum did not represent the law. In my view, it does. Fourth, where a company has contracted that its articles will not be altered, I can see no reason why it should not, in a suitable case, be injuncted from initiating the calling of a general meeting with a view to the alteration of the articles. But an injunction could not, in my view, be properly granted so as to prevent the company from discharging its statutory duties in respect of the convening of meetings: see, for example, section 368 of the Companies Act 1985.

In the event, however, the plaintiff's case, in my judgment, succeeds on the class rights point. I am prepared to make a declaration accordingly.

*Judgment for plaintiff with costs.*
*Declaration as claimed in para-*
*graph (1) of statement of claim.*

*Solicitors: Cartmell Mawson & Main, Carlisle; Harrison Grainger & Reed, Penrith.*

[Reported by SARAH WADHAM, Barrister-at-Law]



Neutral Citation Number: [2010] EWCA Civ 998

Case No: A3/2009/2201, A3/2009/2201(A) & A3/2009/2749

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION COMMERCIAL COURT**
**MR JUSTICE WALKER**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 20/08/2010

**Before :**

**LORD JUSTICE MUMMERY**
**LORD JUSTICE THOMAS**
and
**LORD JUSTICE PITCHFORD**

- - - - - - - - - - - - - - - - - - - -

**Between :**

|  |  |
|---|---|
| **Sebastian Holdings Inc** | **Appellant** |
| - and - | |
| **Deutsche Bank AG** | **Respondent** |

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7404 1424
Official Shorthand Writers to the Court)

**Tim Lord QC and Jasbir Dhillon** (instructed by **Travers Smith Solicitors Llp**) for the
**Appellant**
**David Foxton QC and Sonia Tolaney** (instructed by **Freshfields Bruckhaus Deringer Llp**)
for the **Respondent**

Hearing dates : 28 and 29 April 2010

- - - - - - - - - - - - - - - - - - - -

Judgment
As Approved by the Court

Crown copyright©

**Lord Justice Thomas:**

**Introduction**

1.      The principal issue in this appeal is the construction of jurisdiction clauses in a series of agreements between a bank and its customer; most provided for the jurisdiction of the English courts; one provided for the jurisdiction of the courts of New York. The agreements related to trading in the financial markets made over a two year period. The trading ended in October 2008 when losses in the region of $750m were made by the appellant (Sebastian) in trading through the respondent (the Bank); the Bank claims unpaid debts due under two of the agreements and Sebastian claims damages in respect of the losses it has funded.

2.      Sebastian wishes to pursue its claims in New York; accordingly in November 2008 it brought proceedings against the Bank in the Supreme Court of New York to recover approximately $750m as damages for breach of one of the agreements.  The Bank wishes to pursue its claim in England; accordingly in January 2009, the Bank brought proceedings in the Commercial Court in London to recover approximately $250m which it contends Sebastian should have paid under two agreements each of which contained English jurisdiction clauses. Sebastian contends that the English Court does not have jurisdiction under the jurisdiction clauses in the agreements on the true construction of the series of agreements looked at together or that if it has, the claim should be stayed in favour of New York.

3.      In the Commercial Court Walker J held on 14 August 2008 that the Bank was entitled to bring the claim under the jurisdiction clauses in the two agreements under which the outstanding sums were claimed by the Bank. On 1 December 2009 Burton J refused to stay the proceedings brought in the Commercial Court in favour of the New York proceedings.  In New York, Kapnick J on 10 December 2009 refused the Bank's application to stay the proceedings in New York on the ground of *forum non conveniens*, but also refused Sebastian's application to restrain the proceedings in the Commercial Court.  Kapnick J's decision has been appealed. Sebastian appeals by permission of Moore-Bick LJ against the decision of Walker J and applies for permission to appeal against the decision of Burton J.

**The factual background**

4.      Before turning to the issues in more detail it is necessary to provide an outline of the agreements, the factual background and the issues, so far as they have emerged at this stage.  The Bank, one of the world's largest banks, is incorporated in Germany and has offices throughout the world, including London, New York and Geneva. Sebastian, a company incorporated in the Turks and Caicos Islands, was wholly owned by Alexander Vik, a resident of Monte Carlo, Monaco.  It was formed by him for the purpose of holding securities and dealing in the financial markets.  In 2004 Sebastian became a customer of the Bank. In May 2006, November 2006 and January 2008 Sebastian entered into a series of agreements with the Bank for trading in the financial markets which are relevant to the claims made by both the Bank and Sebastian.

*The May 2006 agreement*

5.      The first agreement was for trading in equities and was entered into in May 2006. It was a Master Agreement on the 1992 ISDA (International Swap Dealers Association) standard form of master agreement (the Equities ISDA Master Agreement). It provided a framework under which the Bank and Sebastian could enter into over the counter derivative contracts (derivative contracts which are privately negotiated and traded between counterparties rather than being traded through an exchange or an intermediary).

6.      Part 4 of the schedule to the ISDA standard form (where matters particular to the agreement were set out) provided that it should be governed by English law and thus, in accordance with the terms of the jurisdiction clause in the standard form, subjected the agreement to the non-exclusive jurisdiction of the courts of England in the following terms:

> "13(b) Jurisdiction.  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:-
>
> i)      submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
> ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.
>
> Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction."

> There was provision in the schedule for the nomination of an agent for the service of process on Sebastian, but none was specified.

*The November 2006 agreements*

7.      Three agreements relating to foreign exchange (FX) trading were executed in November 2006. Although they bear different dates in November, they were plainly part of a series of agreements.

8.     The first was described as the Prime Brokerage Agreement (the FX Prime Brokerage Agreement) setting out the framework under which the Bank and Sebastian agreed to engage in FX and related trading.

i)      Sebastian, acting as the Bank's agent, was authorised to enter into FX and related transactions with 4 named financial institutions as counterparties. Clause 2 provided that the deal with each counterparty was to be set out in a FX Prime Brokerage Counterparty Agreement in the form of a template to be provided by the Bank; the agreement in the template made provision for that agreement to be governed by New York law and to be subject to the non-exclusive agreement of the New York courts.

ii)     Each counterparty transaction entered into by Sebastian with a named counterparty was to give rise to an equal and offsetting transaction between the Bank and Sebastian which could be performed in one of two ways. However, only one was in the result used – namely an offsetting transaction, as follows:

> "….. subject to and governed by, the applicable ISDA Master Agreement or other master agreement between [the Bank] and  [Sebastian], including the Credit Support Annex which is part thereof (the "Agent Master Agreement"). [Sebastian] shall be required to post collateral with respect to its obligations under the Agent Master Agreement (including the Agent Transactions) in accordance with terms and provisions of the Credit Support Annex.  [The Bank] and [Sebastian] agree that any breach of this Agreement by [Sebastian] shall constitute an Event of Default under the Agent Master Agreement"

The "Agent Master Agreement" is conveniently referred to as the FX Master Agent Agreement; it was the second of the agreements entered into in November 2006 – see paragraph 10 below. The FX Prime Brokerage Agreement contained detailed terms about the provision of information and monitoring by the Bank.

9.     Clause 13 of the FX Prime Brokerage Agreement provided that it was governed by the law of the State of New York and Clause 14 provided that:

> "Any action or proceeding relating in any way to this Agreement may be brought and enforced in the courts of the State of New York and the United States District Court, in each case located in the Borough of Manhattan, New York."

10.    The second agreement was the FX Agent Master Agreement to be used for the FX offsetting transactions as I have explained at paragraph 8 above. It was also on the 1992 ISDA standard form. Part 4 of the schedule provided that it was governed by English law and thus the non-exclusive jurisdiction of the English courts by reason of the provisions of the jurisdiction clause set out at paragraph 6 above. Part 4 of the Schedule also provided that Sebastian appointed Clifford Chance at its office at 10 Upper Bank Street, London for service of process.  This is one of the two agreements under which the Bank says sums are due and brings its claim relying on the English jurisdiction clause.

11.     The third agreement related to the provision of security and was called a Pledge and Pledgeholder Agreement (the Swiss Pledge Agreement). The Bank (as Pledgee) its subsidiary, Deutsche Bank (Suisse) SA (as Pledgeholder) through its Geneva Office, and Sebastian (as Pledgor) were parties to that agreement. The governing law and jurisdiction provisions were contained in clause 21:

> "This Pledge and Pledgeholder Agreement is governed by Swiss law.  Place of performance, place of collection for Pledgors residing abroad and sole place of jurisdiction for all proceedings shall in each case be the place where the respective DBS office is located.  For this purpose the Pledgor elects the respective office of DBS as the legal and special domicile. However, the Pledgee shall also have the right to bring an action against the Pledgor before the competent court at its place of residence or before any other competent court."

12.     In conjunction with those agreements Sebastian in a letter addressed to the Bank designated Mr Klaus Said as the agent to trade on its behalf under the FX dealings envisaged by the three agreements. A webpage was used to record the transactions.

13.     Sebastian claimed in October 2008 that a further agreement was made orally between Mr Vik and the Bank limiting Sebastian's maximum exposure in connection with foreign exchange trading to $35m and that its obligation to provide collateral was limited to that amount. It is not entirely clear where Mr Vik alleges that that agreement was made, but has alleged in the New York proceedings it was made in New York by the Bank's New York Office. The Bank denies there was any such agreement and points to the fact that, unlike all the other arrangements, there is nothing at all in writing.

*The January 2008 agreements*

14.     At the end of January 2008 four further agreements were made in respect of trading in equities, extending the types of transaction to include trading over an exchange or through an intermediary.

15.     The first was an Equities Prime Brokerage Agreement for trading in equities.  This was governed by English law. By clause 31, the parties agreed irrevocably to submit themselves to the exclusive jurisdiction of the English courts.  Clifford Chance were appointed agents for the service of process on Sebastian.

16.     The second was a Listed F&O Agreement under which the Bank agreed to provide services for listed futures, options and other derivative transactions. Clause 18.1 provided that the agreement was governed by English law, except that a transaction which was subject to the rules of an exchange would be governed by the law applicable to it under those rules; clause 18.2 provided for English jurisdiction and clause 18.4 for service of process against Sebastian on Clifford Chance.

17.     The third agreement was an Overseas Securities Lender's Agreement between Sebastian and the Bank for lending and borrowing securities.  Clause 23 subjected this agreement to London arbitration and clause 26 provided for English law.

18.    The fourth was a Master Netting Agreement which provided for the ability to terminate the May 2006 Equities ISDA Master Agreement, the January 2008 Equities Prime Brokerage Agreement and the January 2008 Listed F&O agreement.  The agreement provided that on termination net termination amounts would be payable. This was governed by English law and contained the following jurisdiction clause:

"12.1  The courts of England have exclusive jurisdiction to settle any dispute arising from or connected with this Agreement (a "Dispute").

12.2  The parties agree that the courts of England are the most appropriate and convenient courts to settle any Dispute and, accordingly, that they will not argue to the contrary."

Sebastian agreed that Clifford Chance was to be designated as the agent to receive service of process. This is the second of the two agreements under which the Bank says sums are due and brings its claim relying on the English jurisdiction clause.

*The trading between the parties*

19.    The trading in equities was carried out in London.

20.    There is a dispute between the parties as to the details of the way FX trading was conducted. It is sufficient to say that it was carried out by Mr Said who was based in Connecticut with the Bank's New Jersey office; agreements were made for the transactions in accordance with the arrangements agreed in November 2006. Collateral was provided by Sebastian. Some accounts into which the debit or credit entries were made were held and operated by the Bank in London.

21.    The FX trading in 2007 was said by Sebastian to have been spot, forward and options trading resulting in profits to it.  It was alleged by Sebastian that Mr Said in addition in 2007 began to enter into structured options and from early 2008 entered into pivot accrual structured options trades, but that the Bank never advised Sebastian that collateral was required in excess of the $35m it alleged it had agreed to provide.

*October 2008: The dispute*

22.    In September 2008 the financial markets went into crisis, marked particularly by the collapse of Lehman Brothers and other Banks.

23.    On 6 October 2008 the Bank informed Mr Said that it required additional collateral. It was asserted by Sebastian that until that time trades had been carried out and approved by the Bank without any request for further collateral; that as at 6 October 2008 the Bank's webpage used for Sebastian's FX trading inaccurately showed a net credit in favour of Sebastian in the FX trading of $27m, whereas the true position, unknown to Sebastian at that time, was that it had accumulated losses measured in hundreds of millions of dollars.

24.    On or before 14 October 2008, Mr Vik asserted that an agreement had been made with the Bank that Sebastian's exposure on foreign exchange trading was limited to $35m, as I have mentioned at paragraph 13.

25.    Between 14 and 21 October 2008 margin calls in respect of losses on foreign exchange trading amounting to approximately $436m were paid by Sebastian or realised by the Bank from the accounts Sebastian held at the Bank.  Sebastian has asserted that this was all done on the basis of erroneous information and under duress. Sebastian has also asserted that thereafter, the Bank closed and liquidated positions that Sebastian had taken. The Bank asserted that Sebastian agreed to the close out of all positions governed by the FX Agent Master Agreement with assets held under the Swiss Pledge Agreement and other funds and securities held by the Bank.

26.    On 22 October 2008 the representatives of the Bank in London spoke to Mr Vik.  In a record of that conversation the representatives in London told Mr Vik that the fact that losses were being accumulated in foreign exchange trading was not known to the office of the Bank in London.

27.    On the following day, 23 October 2008, the Bank sent Sebastian a notice informing it that the failure to provide cash or securities in accordance with the Equities Prime Brokerage Agreement of January 2008 was an event of default.

28.    On the following day, 24 October 2008, the Bank terminated the FX Prime Brokerage Agreement of November 2006 with immediate effect.

29.    On 4 December 2008:

   i)    The Bank demanded from Sebastian $120,650,166 under the FX Agent Master Agreement made in November 2006.

   ii)    The Bank sent a letter terminating the Equity Prime Brokerage Agreement made in January 2008 and informing Sebastian that 4 December 2008 would be the date for netting under the Master Netting Agreement of January 2008. Subsequently on 20 January 2009 the Bank notified Sebastian that the amount due under the Master Netting Agreement of January 2008 was $125,523,086.

*The claims made in the New York Supreme Court and the Commercial Court*

30.    On 24 November 2008 Sebastian issued the claim in New York claiming damages of at least $750m; it was served on the Bank on 5 December 2008.  The Complaint, served subsequently on 20 January 2009, set out Sebastian's case that the FX trading was limited to a maximum exposure of $35m and was entirely unrelated to the trading in equities; that Sebastian relied on the Bank's obligations under the FX Prime Brokerage Agreement, its twice daily reporting of the positions and the Bank's superior knowledge and expertise which enabled it in particular to provide calculations of the net exposure and report those to Sebastian; that the Bank had breached these agreements; that the margin calls had been paid by Sebastian as a result of erroneous information and under duress. Positions had been liquidated without its assent. It claimed damages for breach of the FX Prime Brokerage Agreement, the collateral agreements, breach of fiduciary duty, conversion, fraudulent concealment by failing to report the exposure until 6 October 2008, fraudulent misrepresentation and negligent misrepresentation and other claims. It also sought a declaratory judgment that it was not liable to the Bank.

31.     On 21 January 2009 the Bank issued its claim in the Commercial Court, claiming under the three agreements subject to the jurisdiction of the English courts:

i)      $125,523,086 and interest, as money due under the Master Netting Agreement (January 2008) and underlying agreements (comprising the Equities Prime Brokerage Agreement (January 2008), the Equities ISDA Master Agreement (May 2006) and Listed F&O Agreement (January 2008). It was contended by the Bank that these debts arose from over the counter trading under the Equities ISDA Master Agreement, the listed derivatives trading under the Listed F&O Agreement and prime brokerage services under the Equities Prime Brokerage Agreement; and

ii)     $120,650,166, together with interest, being money due under the FX Agent Master Agreement of November 2006.

Particulars of claim were served on that date.

32.     Although the particulars of claim claimed the money under the FX Agent Master Agreement, the particulars also referred to the FX Prime Brokerage Agreement and the Swiss Pledge Agreement. It was averred at paragraph 30:

> "[The Bank] and Sebastian did not at any time enter into an agreement that:
>
> a)      limited the exposure of Sebastian to [the Bank] under the FX Agreements or
>
> b)      otherwise varied the terms of the FX Agreements."

The court was told by the Bank that this plea was made as it was known that Sebastian had asserted, as I have set out at paragraph 24, that the Bank had agreed with Mr Vik that its exposure was limited to $35m.

33.     That summary of the factual background and the issues (as far as are known) is sufficient to enable me to turn to the issues that arise on the appeal of the decision of Walker J holding that the Bank was entitled to bring its claim in England under jurisdiction clauses and the application for permission to appeal from the decision of Burton J refusing a stay of that claim.

## THE ISSUE ON THE JURISDICTION CLAUSES

*(i)     The issue and the arguments*

34.     The jurisdiction of the English Court is governed by Article 23 of Council Regulation (EC) 44/2001 (the Brussels 1 Regulation). As the Bank is domiciled in Germany, the jurisdiction is established, if the disputes which have arisen fall within the clauses which confer jurisdiction on the English courts. The claim form contained, as required by CPR 6.19(1A), a statement that the claim was brought under the Judgments Regulation, that there were no pending claims in States party to that Regulation and that Sebastian was party to an agreement conferring jurisdiction under Article 23.

35. The issue as to whether the Bank is entitled to bring its claim is therefore one of construction of the jurisdiction clauses in the agreements. The debts claimed by the Bank are due under the Master Netting Agreement and the FX Master Agent Agreement, each of which has an English jurisdiction clause set out at paragraphs 18 and 10 above. It is contended, however, by Sebastian that if the nature of the claim and the dispute is analysed and the series of agreements properly construed, the claims made by the Bank under these agreements cannot be brought in England under those jurisdiction clauses. It is therefore necessary first to summarise that argument in a little more detail as follows:

i) Where commercial men enter into a series of agreements with conflicting jurisdiction clauses, commercial men are to be presumed to intend that if a claim or dispute arises that claim or dispute should be subject to a single jurisdiction. It made no difference that the jurisdiction clauses were not exclusive clauses, as the parties did not contemplate parallel proceedings.

ii) The jurisdiction clauses therefore should be construed so that parties were taken to have agreed to refer the claim or dispute to the jurisdiction provided for in the jurisdiction clause in the transaction that was at the commercial centre of the claim or the dispute.

iii) It was a question of fact to determine which contract was at the centre of the claim or dispute. In these transactions, there could be no doubt that the claims and the disputes all arose from FX trading; that was the centre of gravity of the dispute. The particulars of claim did not set out the true nature of the claim, as if the Bank had not entered into the FX trades and not wrongfully made the margin calls, then the Bank would not be entitled to claim under the agreements set out in the particulars of claim. The entire claim in truth arose under the FX Prime Brokerage Agreement and not the agreements upon which the Bank purported to claim. In those circumstances, the parties must be taken to have agreed that the Bank's claim would be allocated to the jurisdiction chosen under the FX Prime Brokerage Agreement made in November 2006 rather than the FX Agent Master Agreement (which was subordinate to it) or the Master Netting Agreement (where the debts were merely consequential).

iv) The claim by the Bank and the dispute had nothing to do with the agreements relating to equities, as the losses on those accounts had only arisen because of transfers to cover the FX positions.

v) As the FX Prime Brokerage Agreement provided for the jurisdiction of the court in New York, the claims and disputes under all the agreements should be resolved in that court, though the clause did not oblige the Bank to sue in NY.

vi) If the claims could be viewed as relating to the Master Netting Agreement and the FX Agent Master Agreement as well as the FX Prime Brokerage Agreement, then in the case of a conflict between standard forms drafted by the Bank, Sebastian should be entitled to exercise its rights to New York jurisdiction under the FX Prime Brokerage Agreement.

vii) Sebastian relied primarily on the decision of Rix J in *Credit Suisse First Boston (Europe) Ltd v MLC Bermuda Ltd* [1999] 1 Lloyd's Rep 767 and the

judgment of Lord Collins of Mapesbury in the Court of Appeal in *UBS AG v HSH NordBank AG* [2009] EWCA Civ 585, [2009] 2 Lloyd's Rep 272.

viii) Although the judge had purported to apply the principles set out in *UBS*, he had wrongly concluded that there was no conflict between the clauses in holding that the clauses contemplated and enabled parallel proceedings.

36. The Bank's response was that the claims were brought for debts arising under the Master Netting Agreement and the FX Master Agent Agreement; those claims fell within the jurisdiction clause of each of those agreements.

i) The Master Netting Agreement had an exclusive English jurisdiction clause and all the underlying agreements relating to equity trading had English jurisdiction clauses.

ii) The debts to the Bank in respect of FX trading in fact arose under offsetting transactions made under the FX Master Agent Agreement; it had a non exclusive English jurisdiction clause.

iii) The Bank was making no claim in respect of the FX Prime Brokerage Agreement; it was Sebastian which was trying to bring the Bank's claims under the other agreements within the jurisdiction clause of that agreement.

iv) It mattered not that Sebastian in defence might wish to raise other issues, including issues under the FX Prime Brokerage Agreement, as it was an analysis of the claim that was the essential consideration. Nor did it matter that the Bank had referred to Sebastian's defence in its pleading, as the scope of a clause could not depend on the happenchance of whether the defendant had revealed all its defences at the time a claim was brought.

v) The agreements between the parties plainly contemplated that different jurisdiction clauses would apply to claims under the different agreements; in those circumstances multiplicity of proceedings was inevitable.

vi) The court should not re-write the agreements by making one jurisdiction clause override the other with the effect of allocating all disputes to the court it considered best suited to deal with the dispute.

*(ii)   The decision of Walker J*

37. Walker J rejected the argument put forward by Sebastian. A short summary cannot do justice to the careful and detailed analysis of the clauses and the decision in *UBS,* as set out at paragraphs 45-48 and 63-80 of his judgment.

i) The court had to begin by considering the development of the overall contractual relationship. In May 2006, the parties agreed by use of the ISDA clause as analysed in *Royal Bank of Canada v Coöperatieve Centrale Raiffeisen-Boerenleenbank* [2004] EWCA Civ 07 that if one party brought proceedings in the English courts, then the other was obliged to submit, but either party could bring proceedings in other courts and the bringing of proceedings in one would not preclude the bringing of proceedings in another.

ii)    As regards the position at the end of November 2006, the use of the ISDA form and the specific choice of English jurisdiction in the FX Agent Master Agreement showed that the parties contemplated the same as regards that agreement; as to the FX Prime Brokerage Agreement, there was again consistency, as it contained a non exclusive New York jurisdiction clause:

> "70. …The general approach to a non-exclusive jurisdiction clause would be that in the ordinary course the parties cannot have contemplated that if proceedings were commenced in the forum each had agreed as convenient parallel proceedings would still take place in another forum. However it seems to me clear that the overall relationship between the parties departed from that course in May 2006, and in relation to [the FX Agent Master Agreement] continued to depart from that course in November 2006. It is in my view impossible to read into [the FX Prime Brokerage Agreement] a ban on proceedings elsewhere once a New York claim was under way. It follows that the jurisdiction clause in [the FX Prime Brokerage Agreement] was not inconsistent with those in [the Equities ISDA Master Agreement of May 2006] and [the FX Agent Master Agreement]."

iii)    After referring to the Swiss Pledge Agreement at paragraphs 71-73 with its provision for Swiss jurisdiction, he concluded as regards the position in November 2006:

> "74. Thus it seems to me as a matter of contractual entitlement to sue in a particular jurisdiction, the position in November 2006 was that any Proceedings could be begun in England if relating to [the FX Agent Master Agreement] or [the Equities ISDA Master Agreement], and it would not matter so far as contractual entitlement was concerned that the claim also fell within the [FX Prime Brokerage Agreement] jurisdiction clause….No contractual primacy was afforded to any one jurisdiction clause."

iv)    The position did not change as a result of the agreements in January 2008. The exclusive English jurisdiction clauses in the Master Netting Agreement and the Equity Prime Brokerage Agreement, although on the Bank's standard form, could not be seen as being concerned with technical banking disputes, as they were at the heart of the agreements for the extension of trading in equities. It was impossible to contend that businessmen would have agreed that the obligation as to where to sue for debts arising under those agreements would give way to the jurisdiction clause in the earlier agreement.

v)    The Bank was correct in accepting  that, although it could not bring a claim in London in relation to the operation of the FX Prime Brokerage Agreement, issues arising under it might become part of the proceedings if Sebastian chose to raise such issues by way of defence.

vi)    The service of process provisions relied on by the Bank could not provide a different result to that achieved by a construction of the jurisdiction clauses.

38.    It was contended by Mr Tim Lord QC on the appeal that the judge had fallen into error by not applying the general principle set out by Lord Collins in *UBS;* he had failed to give effect to the fact that the centre of gravity of the claims and the dispute related to FX trading governed by the FX Prime Brokerage Agreement and thus subject to New York jurisdiction.

*(iii)*    *The applicable principles*

39.    It is clear that in construing a jurisdiction clause, a broad and purposive construction must be followed: *Donohue v Armco* [2001] UKHL 64; *Fiona Trust Holding Corporation v Privalov* [2007] EWCA Civ 20 affirmed in *sub nom Premium Nafta Products v Fili Shipping* [2007] UKHL 40 where Lord Hoffmann observed at paragraph 7;

> "If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention."

40.    The Supreme Court emphasised in *Re Sigma Finance Corporation* [2009] UKSC 2 the need, when looking at a complex series of agreements, to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme.

41.    It is generally to be assumed on these principles that just as parties to a single agreement do not intend as rational businessmen that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements do not generally intend a dispute to be litigated in two different tribunals.

42.    However, where there are multiple related agreements, the task of the court in determining whether a dispute falls within the jurisdiction clauses of one or more related agreements, depends upon the intention of the parties as revealed by the agreements against these general principles: see Collins LJ in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487 at para 93 and *UBS* at paragraph 83.

43.    The considerations have been examined in particular by Rix J in *Credit Suisse v MLC* and by Lord Collins in *UBS.* It is necessary to refer to these in a little more detail. In the first of these cases, *Credit Suisse,* MLC, a hedge fund, had purchased bonds from Credit Suisse under two agreements made in March and May 1998 with exclusive English jurisdiction clauses. The parties had in April 1998 entered into a third agreement with the object of financing the purchase – the Global Master Repurchase Agreement (GMRA); this was governed by a non exclusive English jurisdiction clause which expressly acknowledged the right of each party to bring proceedings in a

court of competent jurisdiction. When the hedge fund defaulted under the GMRA, Credit Suisse sued in England under the GMRA; it sought an anti-suit injunction restraining the hedge fund from pursuing proceedings (including claims for violations of US securities laws) the hedge fund had brought against Credit Suisse and two of its associated companies in New York. Credit Suisse asserted that there was a breach of the exclusive jurisdiction clauses in the purchase agreements, as the whole of the hedge fund's claims fell within the English jurisdiction clauses in those agreements. The hedge fund contended that there were significant aspects of the New York proceedings that did not relate to the purchase agreements. Rix J referred to the dispute being, on the one hand, one single narrative arising out of the purchase, but on the other,

> "where different agreements are entered into for different aspects of an overall relationship, and those different agreements contain different terms as to jurisdiction, it would seem to be applying too broad and indiscriminate a brush simply to ignore the parties' careful selection of palette" (page 777)

44.    Although he considered that the centre of gravity of the hedge fund's complaints was focused on the purchases, he was reluctant to hold that the complaints in New York which related to the GMRA arose out of the purchase agreements. He continued:

> "If they arise out of or in connection with both the Purchase Agreements and the GMRA, then, where the jurisdiction clauses are in conflict, I do not see why the GMRA clause should not prevail: either on the basis that, in a case of conflict on standard forms plainly drafted by [Credit Suisse], [the hedge fund] should be entitled to exercise the broader rights; or on the basis that the clause in the contract which is closer to the claim and which is more specifically invoked in the claim should prevail over the clause which is only more distantly or collaterally involved."

45.    For those two reasons, he decided that the hedge fund's claims in New York were preferably to be viewed as claims under the GMRA rather than under the purchase agreement. If he was wrong about the claims being claims under the GMRA, then the New York court was better placed to analyse the complaint in the proceedings to decide whether claims in the complaint should be stayed in favour of English jurisdiction. He therefore refused to grant an injunction to Credit Suisse restraining the hedge fund continuing in New York with its claims under the GMRA, undesirable though it was in principle to have claims in two jurisdictions.

46.    Before turning to *UBS,* it is convenient to note Lord Collins' comment at paragraph 94 of his judgment in *UBS*:

> "The essence of Rix J's first reason is that under the *contra proferentem* principle, the intention must be taken to have been that, where a dispute fell within the wording of both jurisdiction agreements, it was the GMRA which was to be taken as the agreed position. The second reason, which he must

> have meant as a matter of construction, was that the parties must be taken to have intended that, where a dispute fell within both sets of agreements, it should be governed by the jurisdiction clause in the contract which was closer to the claim."

47. In *UBS,* UBS had entered into a complex set of agreements with HSH, a German bank, in connection with the issue of securities under a Collateralised Debt Obligation transaction. The overall structure of the transaction was set out in a letter agreement of 23 January 2002 governed by the law of New York. The transaction was then effected by a series of agreements dated 5 March 2002; two of the agreements (An Offering Circular embodied in the Indenture and the Reference Pool Side Agreement) were governed by New York law and had non-exclusive New York jurisdiction clauses; three (the Credit Swap, the Dealer's Confirmation and Pricing Supplement) were governed by English law with English jurisdiction clauses. When there were defaults in the underlying securities, the German bank brought proceedings in New York alleging mis-selling and mismanagement under the Reference Pool Side Agreement. UBS sought to bring an action in England for a declaration that it was not liable, relying upon the jurisdiction clause in the Dealers Confirmation; the sole point in invoking the jurisdiction of the English court was to pre-empt the proceedings in New York. The issue was whether the claims within the English action fell within the jurisdiction clause of the Dealer's Confirmation (see paragraph 50). Walker J held that they did not and his decision was upheld on appeal. Lord Collins considered that the issue turned on whether, in the light of the complex documentation as a whole, the parties should have been taken objectively to have intended by the jurisdiction clause in the Dealer's Confirmation that claims in respect of misrepresentation in relation to the notes should be subject to the exclusive jurisdiction of the English Court, whilst claims in respect of other agreements should be subject to the jurisdiction of the New York courts, observing at paragraph 84:

> "Plainly the parties did not actually contemplate at the time of the conclusion of the contracts that there would be litigation in two countries involving allegations of misrepresentation in the inception and performance of the agreements. But in my judgment sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seems to me plain that the result for which UBS contends would be a wholly uncommercial result and one that sensible business people cannot have intended."

48. After examining the claims in the particulars of claim in the English proceedings and the role of the Dealer's Confirmation in the scheme of the transaction as a whole, he concluded that the parties cannot have objectively been taken to have intended that the clause in that agreement would govern every claim for misrepresentation. After referring to the judgment of Rix J in *Credit Suisse* and to paragraph 94 from which I quoted in paragraph 46 above, he concluded:

> "95. In this case it is not necessary to go so far. Whether a jurisdiction clause applies to a dispute is a question of

construction. Where there are numerous jurisdiction agreements which may overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should be the subject of inconsistent jurisdiction clauses. The jurisdiction clause in the Dealer's Confirmation is a "boiler plate" bond issue jurisdiction clause, and is primarily intended to deal with technical banking disputes. Where the parties have entered into a complex transaction it is the jurisdiction clauses in the agreements which are at the commercial centre of the transaction which the parties must have intended to apply to such claims as are made in the New York complaint and reflected in the draft particulars of claim in England."

49.    The decisions in *Credit Suisse* and *UBS* are both examples of the process of construction that has to be undertaken, using the well recognised general principles and tools of contractual construction in the context of the principles relating to different jurisdiction clauses in related agreements. The overall task of the court is summarised in the 2010 supplement to *Dicey, Morris and Collins* at paragraph 12-094:

> "But the decision in *Fiona Trust* has limited application to the questions which arise where parties are bound by several contracts which contain jurisdiction agreements for different countries. There is no presumption that a jurisdiction (or arbitration) agreement in contract A, even if expressed in wide language, was intended to capture disputes under contract B; the question is entirely one of construction …. The same approach to the construction of potentially-overlapping agreements on jurisdiction (but there will, in this respect, be no difference between the construction of agreements on jurisdiction, arbitration agreements and service of suit clauses) was taken in [*UBS*]…    In the final analysis, the question simply requires the careful and commercially-minded construction of the various agreements providing for the resolution of disputes, the point of departure being that agreements which appear to have been deliberately and professionally drafted are to be given effect so far as it is possible and commercially rational to do so, even where this may result in a degree of fragmentation in the resolution of disputes. It may be necessary to enquire under which of a number of inter-related contractual agreements a dispute actually arises; this may be answered by seeking to locate its centre of gravity.
>
> The same approach, namely to focus on the commercially-rational construction, governs the interpretation of agreements on jurisdiction as exclusive or non-exclusive, and of agreements which specifically provide that the parties will not take objection to the bringing of proceedings if proceedings are

> brought in more courts than one." (omitting the citation of the authorities)

*(iv)    The general approach in this case*

50.    I therefore turn to the construction of the agreements in issue focusing on finding the commercially rational construction and giving effect to clear agreements, even if this may result in a degree of fragmentation in the resolution of disputes between parties to the series of agreements.

51.    It is first important to begin by setting out what Sebastian accepted as a matter of construction of the agreements:

    i)    The Bank's claims could be brought in the English Courts on the ordinary construction of each of the jurisdiction clauses in the Master Netting Agreement and the FX Agent Master Agreement, if they had stood alone without the FX Prime Brokerage Agreement. That was because the claims are claims brought for debts due under each of those agreements.

    ii)    As was accepted in the course of argument, if, prior to the issue of proceedings by the Bank, Sebastian had not said anything in relation to its denial of liability for the debts due under the FX Agent Master Agreement and the Master Netting Agreement being based in part on breaches of the FX Prime Brokerage Agreement, then the Bank would have been entitled to bring its claim in England under each of those agreements, relying on the jurisdiction clauses in those agreements.

It follows from the above, that it was not disputed that the clear language of the jurisdiction clauses in each of the two agreements permitted the Bank ordinarily to bring its claims for debts due under the two agreements in the jurisdiction specified in the jurisdiction clauses.

52.    Furthermore construing the agreements *contra proferentem* would not assist in arriving at their meaning or effect, as it may have done in *Credit Suisse.* The language of the agreements looked at as a whole is too clear. It must therefore follow, if the contention advanced by Sebastian is correct, that as a matter of construction, the language of the two agreements looked at as part of a series does not on its ordinary reading produce a commercially rational result and therefore must be construed in a commercially rational way to arrive at the meaning put forward by Sebastian; that the parties, as rational businessmen, must have intended the agreements to be read as a whole in such a way as at least not to permit the claims for debts due under the FX Master Agent Agreement and the Master Netting Agreement being brought in London under the clauses in those agreements;  that the agreements had also to be read so, whatever the nature of the claims, disputes in relation to the claims had to be heard in a single forum; that the probable effect was that, as a matter of construction, claims brought by the Bank had also to be brought by the Bank in a single forum.

53.    The foundation of Sebastian's contention to that effect was that the parties must have intended claims to be brought in the forum specified in the agreement from which the claim had its cause or origin or the agreement which was at the commercial centre of the dispute. The contention can be formulated more fully as follows:

i)      As the Bank had accepted in this case that, as matter of calculation, if there had been no losses on FX trading there would have been no loss on the equities account, the origin or cause of the claim was the FX trading which was regulated by the FX Prime Brokerage Agreement. As the Bank knew this, their claim was not in fact a claim for debts under the agreements on which the Bank was suing but was a claim which has its origin or cause in or arose out of the FX Prime Brokerage Agreement. The Bank therefore had no claim under the agreements on which it had brought proceedings and therefore could not bring itself within the Judgments Regulation, as it had no claim under the two agreements; in other words, the centre of gravity of the claim was under the FX Prime Brokerage Agreement and not for debts due under the other two agreements. The claims could not therefore be brought in London and probably should be brought in New York.

ii)     Alternatively, Sebastian's defence to the claims under the two agreements was that the debts were the result of prior breaches of the FX Prime Brokerage Agreement. As the losses would not have occurred but for the FX trading, the dispute related to FX trading and it was that trading that was the centre of gravity of the dispute. As FX trading related primarily to the FX Prime Brokerage Agreement, the dispute was a dispute under that agreement and not under the other two agreements under which the debts in fact arose. The claim by Sebastian in respect of those breaches was therefore not only a defence to the obligations under the other agreements, but, as a matter of construction of the agreements as a whole, had the consequence that the Bank no longer had any entitlement to bring its claims under the other agreements in the forum specified in those other agreements.

54.   The breadth of this argument can be illustrated by the following:

i)      This is not a case where the Bank was seeking a negative declaration in respect of its liabilities under the FX Prime Brokerage Agreement with its New York jurisdiction clause. It is a case where the Bank is seeking to bring very substantial claims for disputed debts which, if due at all, would only be due under two agreements with English jurisdiction clauses and are specifically claimed under those agreements.

ii)     It is not a case where the Bank is seeking to bring claims which more properly relate to another agreement, as was the case in *UBS*. In that case UBS was not attempting to use the jurisdiction clause in one contract, the Dealer's Confirmation, to obtain performance of that agreement, but to seek a declaration that they were not liable under other agreements.

iii)    It is a case where, if Sebastian is right, the Bank cannot bring its claim under two agreements governed by English law for debts that are due under those agreements in the forum chosen in those contracts, England.

55.   I have reached the clear conclusion that the Bank is entitled to bring its claims in the English courts and the arguments advanced by Sebastian cannot as a matter of construction disentitle the Bank from bringing claims under the two agreements.

*(v)    The effect of the nature of the claim brought by the Bank*

56.    First I will consider the argument that the Bank could not bring its claim under the two agreements on the basis that the debts under those agreements have their cause or origin in losses brought about by breaches of the FX Prime Brokerage Agreement and are therefore in truth not claims under the agreements which contain English jurisdiction clauses, but are claims which arise out of the FX Prime Brokerage Agreement. This argument is necessarily premised upon parties to a series of related agreements having, as commercially rational businessmen, agreed as a matter of the construction of the agreements in the series that the underlying basis of the claim would be analysed in the light of all the information that a party had before that party issued proceedings. Such an analysis would be necessary so that the proceedings were brought under the jurisdiction clause in the agreement which might be the cause or origin of the claim, even though the claim was for monies clearly due under another agreement and the claim was actually made under that other agreement with a different jurisdiction clause.

57.    Jurisdiction clauses are rarely the subject of detailed negotiation and there is nothing to suggest that in these transactions any detailed attention was paid in the negotiations to the jurisdiction clauses; in most transactions in the financial markets this is the case as little attention seems to be paid to this element of risk management discussed by Richard Fentiman in "*International Commercial Litigation*" (2010). There are, however, three factors which can objectively be seen as important when considering the construction of these clauses:

    i)    The clauses in all the agreements where Sebastian undertook direct financial obligations to the Bank contained clauses which gave the Bank the right to bring proceedings against Sebastian under that agreement in a named forum (in most cases London) and in some of the agreements the express right to bring claims in any other forum where jurisdiction might be obtained.

    ii)    Although it is common ground that dealing in equities was all to be carried out in London, it is equally important that agreements did not provide that the FX dealings were, as asserted by Sebastian, entirely to be carried on in the United States. The obligations in the FX dealings incurred by Sebastian to the Bank were under the offsetting transactions to be made under the FX Agent Master Agreement; these were expressly governed by English law with its English jurisdiction clause, in contradistinction to the Bank's obligations to the named counterparties which were governed by New York law and had a New York jurisdiction clause.

    iii)    The agreements were entered into over a two year period. This is not the case of financial transactions closely related in time such as where conflicting clauses might be found within the agreements contained in the transaction bible or are different agreements which are part of one package (as in *UBS)*.

58.    Against that background, it is, in my view, impossible to see how it can be said that the Bank and Sebastian were to be taken to have agreed that the Bank would analyse its claim and ascertain under which agreement the cause or origins of the debts arose before issuing its proceedings.   The agreements under which debts or other obligations to the Bank would actually become due (whatever its origins) gave the Bank the express right to bring proceedings for debts due under those agreements in named jurisdictions; not only was that right to bring proceedings for debts arising

under each agreement in its chosen forum inconsistent with the suggested construction put forward by Sebastian, but contrary to what those engaged in commercial dealings of this kind would expect as rational businessmen. Rational businessmen entering into agreements relating to different aspects of trading in the financial markets would understand that the Bank would wish to be entitled to bring proceedings to enforce payment of debts under each agreement which gave rise to the specific debt. In this particular case, it is clear from the language of the agreements looked at as a series that both the Bank and Sebastian intended this result in the agreements; each had specific obligations that debts under those specific contracts, including debts under the FX Agent Master Agreement, could be enforced by the Bank in its chosen forum. In some agreements that was supplemented with the right to bring proceedings in other jurisdictions where Sebastian might have assets, though it is not necessary to analyse the circumstances in which that right could be exercised in addition to the right to bring proceedings in a named forum (cf the observations of Mance LJ in *Royal Bank of Canada* at paragraph 35). Far from being commercially irrational, it was what those doing this type of business with a bank would anticipate as a means of providing a bank with further rights, in addition to the provision of collateral, to secure its position.

59. There are moreover good commercial reasons why the Bank might have chosen England as a forum in which to bring proceedings under the contracts under which specific sums might become due. It is the case that a bank may need to enforce the judgment outside the jurisdiction; a judgment in England has the advantage of enforcement under the Judgments Regulation and the Lugano Convention. It is difficult to see how a court could say rational businessmen did not intend to give that further advantage to the Bank.

60. Furthermore the difficulty of Sebastian's contention based on the need to analyse the nature of the claim is demonstrated by the dilemma that faced Sebastian in asserting that the claims could not be brought under the two agreements in England. It had to face the question as to where the Bank, on the proper construction of the agreements, was entitled to bring its claim.

    i)    If, as Sebastian appears at one stage of the oral argument to have accepted, the Bank could bring its claims against Sebastian in another competent jurisdiction (such as the state of its domicile or incorporation – the Turks and Caicos Islands), then the courts of that state were merely substituted as another forum in place of England. There would be multiplicity of proceedings, but the intention to avoid multiplicity of proceedings was the primary reason for contending that the parties must have agreed on the true construction of the agreements that the express clauses conferring jurisdiction on England were not to take effect.

    ii)    If Sebastian contended that the Bank's claims had to be made under the jurisdiction clause of the FX Prime Brokerage Agreement, then the logic of Sebastian's argument meant that what was agreed to be a non exclusive jurisdiction clause in that agreement had to be construed as an exclusive jurisdiction clause with the effect of depriving the Bank of its right to bring proceedings to enforce debts in jurisdictions such as England where the judgment could be easily enforced elsewhere or in jurisdictions where Sebastian might have assets.

*(vi)    The effect of the nature of the defence.*

61.    I turn next to the analysis premised on the parties having agreed that they would allocate jurisdiction to the contract which was the centre of gravity of the dispute. This is a different analysis, as it focuses not on the underlying nature of the Bank's claim but on the dispute between the parties.  It involves the acceptance that, although the Bank was ordinarily entitled to claim under the agreements under which the debt arose and to rely on the jurisdiction clauses in those agreements, the parties intended that there would be circumstances where the Bank did not have that right on the true construction of the series of  agreements taken as a whole. For example, if prior to the issue of proceedings a defence to the payment of a debt was known to arise under one of the other agreements, the parties must be taken to have agreed in such circumstances that the claim could not be brought under the agreement under which the debt was owed, but would have to be brought in the forum specified in the agreement by reference to which, on an analysis of the dispute as a whole, the dispute had its centre of gravity.

62.    Again I cannot see how rational businessmen could have agreed this in the face of the clear language of the agreements. First, the question as to whether a claim falls within the jurisdiction clause is an issue that has to be determined at the time the proceedings are issued. In most cases, it is likely to be relatively simple to determine whether a claim is made under a specified agreement and therefore whether jurisdiction is founded. That is certainly so in a case such as the present where there is a debt claimed under a contract.

63.    Businessmen agreeing to different jurisdiction clauses in a series of related contracts cannot have been taken to have intended that the entitlement to bring that claim in the chosen forum in respect of one contract should depend on whether a defence had been raised prior to the bringing of the claim and that the defence to that claim might place the centre of gravity of the dispute as being related to a different contract with a different jurisdiction clause. Not only would it give rise to a complete lack of certainty, but could seriously prejudice an institution such as a bank bringing a claim, if there was a limitation period about to expire or there was otherwise a need to bring a claim urgently.

64.    This part of Sebastian's argument was rightly characterised by the Bank as seeking to persuade a court to engage in case management under the guise of contractual interpretation.  It is not possible to treat all the claims between the Bank and Sebastian and the defences to those claims as if they gave rise to a single dispute which must be allocated to a single contract. No doubt a complex clause could be devised to provide for this, but I doubt if any rational businessman would ever accede to such a clause, as it would cause too much uncertainty for financial institutions. There is, however, no need to consider whether they would do so, for there was no such language in these agreements and the agreements cannot rationally be read in that way.

*(vii)   Conclusion*

65.    I have sought to analyse the argument put by Sebastian in terms first of examining whether the parties intended jurisdiction to be determined by ascertaining the underlying origins of the claim in this series of agreements before the issue of proceedings or second by an examination of the basis of what was known as to the

dispute. Neither of these bases provides any commercial rationality for construing the agreements differently from what is apparent from their clear language. On the contrary, application of the wording of the clauses in the agreements shows that the parties plainly intended the Bank to be able to bring a claim under an agreement under which a debt was due in the jurisdiction provided for in that agreement. Although in one sense the clauses in the agreements might be said to conflict, as disputes which are related or overlap might arise under different agreements in the series, the clauses do not in fact conflict, as they envisage claims being brought under the different agreements for monies owed under each agreement, even if the defences may overlap. The language of the agreements plainly envisages this and for the reasons I have given it is entirely rational for businessmen to agree to this. The construction advanced by Sebastian faces the difficulty that it not only requires the court to rewrite the agreements, but on analysis, would impose a regime that would not have been commercially rational.

66. This conclusion is underlined by the fact that the FX Master Agent Agreement contains in clause 13 a promise not to challenge the English jurisdiction and the Master Netting Agreement has an exclusive jurisdiction clause. It is difficult to understand how as a matter of construction those particular provisions can be overridden so that proceedings brought to recover debts due under those contracts cannot be brought in accordance with those provisions.

67. In short, to construe the agreements in the way suggested by Sebastian far from giving effect to the intention of the parties would frustrate it. I gratefully adopt this phraseology which was used by Flaux J in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm) at paragraph 88 where he expressed his conclusion on construction in that case – the decision upheld on appeal and to which I referred at paragraph 42 above.

68. Although I have reached this conclusion by a route that had not involved an examination of the chronology of the agreements undertaken by Walker J, the broad thrust of that analysis arrives at exactly the same conclusion. Although I would not be prepared to agree without further argument that part of it which relates to the decision in *Royal Bank of Canada* to which I referred at paragraph 37.i) above, that part was not necessary to the judge's clear and careful conclusion.

**THE ISSUE ON STAY**

69. As I have set out at 3 paragraph above, Burton J, in a judgment dated 1 December 2009, refused Sebastian's application for a stay made on the basis of common law principles as set out in *Spiliada Maritime Corporation v Cansulex Ltd* [1987] AC 460.

*(i)    The nature of the issue*

70. In the written argument before Burton J, two bases for a stay were put forward. The first was the argument, based on the principles set out in *Spiliada*, that the New York court was the more appropriate forum; the second was that some, if not all, of the claim in England should be stayed on a "case management basis". The second basis was not pursued in oral argument before Burton J though the position was reserved for the future. It is not necessary for me to say anything further about that second basis.

*(ii)   The decision in Owusu and the reflexive effect of the Judgments Regulation*

71.    Before turning to the details of the argument based on *Spiliada* principles, it is necessary to refer briefly to a point raised before Burton J and which was raised again in this court. The Bank asserted that by reference to the decision of the ECJ in *Owusu v Jackson & Others* [2005] ECR I-1383, [2005] QB 801, if a court had jurisdiction under the Judgments Regulation, then the court could not divest itself of jurisdiction by reason of the traditional common law stay on the grounds of *forum non conveniens*. Although Burton J heard full argument on the issue, he decided that he would not express a view on this issue which had been considered in a number of first instance decisions in England and Wales, in the light of his decision that the application for a stay failed in any event and the observations of Sir John Chadwick in this Court in *Chaitan Choudhary v Damodar Prasad Bhatter* [2009] EWCA Civ 1176 at paragraph 54.

72.    In the course of argument on the second day of the appeal, Sebastian raised a new submission on what is described as the reflexive effect of the *lis alibi pendens* provisions of the Judgments Regulation (Articles 27 and 28), namely whether those provisions should be applied when the prior court was a non Member State court. It was suggested that they should be and on that basis, as the New York proceedings had commenced first, then the London proceedings must be stayed. Sebastian contended that this was an issue that should be referred to the Court of Justice of the European Union and for that purpose relied on the decision of the Irish Supreme Court in *Goshawk Dedicated Ltd v Life Receivables* [2009] IESC 7 to refer such an issue, though in the event the reference was not determined. The Bank objected to the point being raised at so late a stage. In the event, Sebastian rightly decided not to pursue the new submission. It is therefore not necessary to deal with the issue further and I can deal simply with the argument based on the principles in *Spiliada.*

*(iii)   Burton J's decision*

73.    The argument advanced on behalf of Sebastian based on the principles in *Spiliada* can be summarised:

   i)    The substantial dispute between the Bank and Sebastian related to the FX Prime Brokerage Agreement and FX trading which was substantially carried on between Mr Said and the Bank in the United States.

   ii)    There were strong or exceptional overwhelming reasons why in the interests of justice the dispute should be heard in New York, as that is where its centre of gravity lay.

   iii)    New York was more convenient as there were more witnesses there in relation to the FX dispute.

74.    Burton J, after a careful review of authorities which have considered the application of the principles in *Spiliada* in the context of exclusive jurisdiction clauses, non-exclusive jurisdiction clauses and clauses where the parties agreed not to object to proceedings on the basis that it was an inconvenient forum, concluded that he should follow the decisions of Gross J in *Import Export Metro Ltd v CSAV* [2003] 1 Lloyd Rep 405 and Gloster J in *Antec International Ltd v Biosafety USA Inc* [2006] EWHC

47 (Comm) that parties will be held to their contractual choice of English jurisdiction, unless there were overwhelming, or at least very strong, reasons for departing from the rule. He considered that Gloster J had stated the principle correctly in these terms:

> "Such overwhelming or very strong reasons do not include factors of convenience that were foreseeable at the time that the contract was entered into (save in exceptional circumstances involving the interests of justice); and it is not appropriate to embark upon a standard *Spiliada* balancing exercise. The defendant has to point to some factor which it could not have foreseen at the time the contract was concluded. Even if there is an unforeseeable factor, or a party can point to some other reason, which, in the interests of justice, points to another forum, this does not automatically lead to the conclusion that the court should exercise its discretion to release a party from its contractual bargain."

He considered that this passage correctly summarises the law being derived from *British Aerospace v Dee Howard* [1993] 1 Lloyds Rep 368 at 376 and *Ace Insurance SA-NZ v Zurich Insurance Co* [2001] 1 Lloyds Rep 618.

75.    Although it was desirable to have all the disputes heard in one place, it was far from clear that that place was not to be London. Applying the principles in *Spiliada* without reference to the presence of jurisdiction and waiver clauses, he was not satisfied that New York was clearly the more appropriate forum. At paragraphs 24-27 he considered the location of witnesses, the location of the FX trading, the fact that there might be disputes as to the agreements relating to equities and the fact that accounts were kept in London. Although it was desirable to have all disputes heard in one place, it was far from clear that place was not London.

76.    He then applied the more stringent test to an application where as in the Master Netting Agreement there was an exclusive jurisdiction clause and where as in the case of the FX Master Agent Agreement the ISDA clause set out at paragraph 6 above expressly waived its objection on that basis, he was certainly not satisfied that there were exceptional circumstances or strong reasons why New York was clearly the more appropriate forum or why exceptionally the parties should not be kept to their bargain for English jurisdiction under those agreements.

*(iv)    Sebastian's argument*

77.    In the argument presented to us on behalf of Sebastian, it was accepted that Burton J's summary of the law was broadly correct. It was, however, submitted that the position was different in this court because (1) disputes under the FX Prime Brokerage Agreement were not within any of the English jurisdiction clauses and (2) the New York court had decided that all the issues in dispute could be determined in New York. Moreover, it was clear, as the Bank accepted, that all the losses that had occurred had arisen out of FX Trading. New York was plainly the appropriate forum for the resolution of that dispute as the trading had been carried on in New York. Furthermore, the New York proceedings were up and running and it was New York law that governed the Prime Brokerage Agreement.

*(v)    My conclusion*

78.    It was not necessary to review the authorities in argument in view of Sebastian's acceptance that Burton J had correctly summarised the law. I am therefore content for the purposes of this appeal to adopt the approach of Gross J and Gloster J in the cases to which I have referred in paragraph 74.

79.    I cannot, however, accept Sebastian's submissions that Burton J was wrong in the exercise of the discretion to the extent that this court should interfere. First of all, with respect to the argument advanced on behalf of Sebastian, it appears that there has been a confusion of claims and defences. It has never been an issue, if Sebastian's argument on construction was rejected, that the claims being made by the Bank fall within the plain wording of the jurisdiction clauses of the Master Netting Agreement and the FX Agent Master Agreement. The additional issues which Sebastian wishes to raise in the proceedings brought by the Bank are raised as defences to claims. It is without doubt the case that the defences that Sebastian wishes to raise under the FX Prime Brokerage Agreement plainly can be brought within the action in England as defences to the claims. There is no new point; they can be litigated in England, as Burton J held.

80.    In the second place, the fact that the New York Court held it had jurisdiction to deal with all matters does not take the matter any further. Third, it is not in dispute that the judge applied the correct principles. In applying those principles, he first decided that, without taking into consideration the effect of jurisdiction clauses, Sebastian had failed to satisfy him there should be a stay. He then went on to hold that applying the more stringent test in the case of jurisdiction clauses (whether exclusive or non-exclusive or whether there was a waiver clause) Sebastian had failed to show exceptional circumstances or strong reasons why the parties should not be held to their bargain. As is clear from the long line of authority, the issue for this court in such circumstances is whether the judge's exercise of his discretion, given the fact that he had acted in accordance with correct principles, is one where this court should interfere.

81.    In my judgement the decision of the judge, based as it was on the correct application of principle, was well within the discretion open to him. He carefully reviewed the availability of witnesses, the prior existing proceedings in New York, its ability to deal with the issues, the scope of the action in England and all relevant matters. The decision that he made was in my judgement one with which this court should not on well established principles interfere.

**Conclusion**

82.    I would therefore dismiss the appeal from Walker J on the issue of construction of the jurisdiction clauses. Although I consider that the decision of Burton J was plainly one open to him, in all the circumstances I would grant permission to appeal, but dismiss the appeal.

**Lord Justice Pitchford:**

83.    I agree.

**Lord Justice Mummery:**

84.    I also agree.

A

Supreme Court

## *Enka Insaat ve Sanayi AS *v* OOO "Insurance Company Chubb"

### [2020] UKSC 38

B

2020  July 27, 28;              Lord Sales, Lord Hamblen, Lord Leggatt,
       Oct 9                    Lord Burrows JJSC, Lord Kerr of Tonaghmore

*Conflict of laws — Contract — Arbitration agreement — Arbitration agreement in construction contract with London seat but no choice of law clause — Claimant alleging claim brought by defendant in Russia in breach of arbitration clause and seeking anti-suit injunction — Defendant contending that under Russian law*
C
*claim outside scope of clause — Proper approach to determining governing law of arbitration agreement — Applicability of English principles of contractual interpretation — Relevance of parties' express choice of law to govern substantive contract — Whether law of seat governing arbitration agreement either by virtue of implied choice or by being law with which agreement most commonly connected — Whether dispute between parties within scope of arbitration agreement — Whether anti-suit injunction to be granted*

D

The claimant was a sub-contractor in the construction of a power plant in Russia. The contract provided that specified provisions in it were governed by Russian law, and included an arbitration agreement, which stipulated London as the place of arbitration, but did not provide an express choice of law. Following a catastrophic fire at the plant, the Russian first defendant insurer paid an insurance claim made by the owner and was subrogated to the owner's rights against the claimant. The first defendant went on to bring a claim against the claimant before a Russian court
E
seeking damages for losses arising from certain defects. The claimant brought a claim in England for an anti-suit injunction to restrain the first defendant from pursuing the Russian claim, on the ground that it was a breach of the arbitration agreement. The first defendant contended that as a matter of Russian law, which it said applied to the main contract and arbitration agreement, there was a good arguable case that the Russian claim fell outside the scope of the arbitration agreement. The High Court dismissed the claim on the ground that the appropriate
F
forum to determine the scope of the arbitration agreement was the Russian court. The Court of Appeal reversed that decision, holding that if there was no choice of law governing the arbitration agreement itself, there was a strong presumption that the parties had impliedly chosen the law of the seat of the arbitration to govern the arbitration agreement. In the present case, the arbitration agreement was governed by English law as the law of the seat, and, in the circumstances, it was appropriate to grant an anti-suit injunction to restrain the first defendant from pursuing the Russian
G
claim.

On the first defendant's appeal—

*Held*, (1) that an arbitration agreement was governed by the law expressly or impliedly chosen by the parties or, in the absence of such choice, the law with which the agreement was most closely connected; that in determining whether the parties had made a choice of law, the court should construe the arbitration agreement and the contract containing it by applying rules of contractual interpretation of English
H
law as the law of the forum; that, although the law applicable to the arbitration agreement might not be the same as the law applicable to other parts of the contract, where there was a choice of law to govern the contract that should generally be construed as applying also to the arbitration agreement; and that where there was no express choice of law to govern the contract, a choice of the seat of the arbitration, even if it was a major arbitration centre, did not by itself justify an inference that the

© 2020 The Incorporated Council of Law Reporting for England and Wales

4118
**Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))**        [2020] 1 WLR

contract, or the arbitration agreement, was intended to be governed by the law of the        A
seat (post, paras 33, 34, 43, 53–54, 60, 94, 113, 117, 120, 170, 193, 260, 265–267, 269, 277).

*Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572, HL(E) considered.

(2) Dismissing the appeal (Lord Burrows and Lord Sales JJSC dissenting), that where there was no express or implied choice of governing law in the contract, the law of the place chosen as the seat of arbitration was as a general rule to be regarded        B
as the place most closely connected with the arbitration agreement; that in the present case there was no system of law which was intended to govern the main contract or the arbitration agreement within it; that, therefore, English law, being the law of the chosen seat of arbitration, was the law governing the validity and scope of the arbitration agreement; that it was common ground that in those circumstances the arbitration agreement was valid and the dispute between the parties fell within it; and that, accordingly, the injunction to restrain the first defendant from proceeding        C
against the claimant in Russia had been properly granted (post, paras 120, 125, 145–146, 147–148, 155–156, 169, 170, 173, 186).

Dicta of Longmore LJ in *C v D* [2008] Bus LR 843, para 26 and Moore-Bicke LJ in *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2013] 1 WLR 102, para 32 applied.

*Per curiam.* The principles governing the grant of an anti-suit injunction in support of an arbitration agreement with an English seat do not differ according to        D
whether the arbitration agreement is governed by English law or foreign law. Forum conveniens considerations are irrelevant and comity has little if any role to play. The court's concern will be to uphold the parties' bargain, absent strong reason to the contrary (post, paras 184, 261, 293).

*Per* Lord Hamblen, Lord Leggatt JJSC and Lord Kerr of Tonaghmore. Factors which might indicate that the arbitration agreement is intended to be governed by the law of the seat include the existence of a serious risk that, if governed by the same law        E
as the main contract, the arbitration agreement will be ineffective (post, paras 109, 146).

*Hamlyn v Talisker* [1894] AC 202, HL applied

Decision of the Court of Appeal [2020] EWCA Civ 574; [2020] Bus LR 1668 affirmed on different grounds

The following cases are referred to in the judgments:        F

*Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep 87, CA

*Amin Rasheed Shipping Corpn v Kuwait Insurance Co (The Al Wahab)* [1984] AC 50; [1983] 3 WLR 241; [1983] 2 All ER 884; [1983] 2 Lloyd's Rep 365, HL(E)

*Arsanovia Ltd v Cruz City 1 Mauritius Holdings* [2012] EWHC 3702 (Comm); [2013] 2 All ER (Comm) 1; [2013] 1 Lloyd's Rep 235

*BCY v BCZ* [2016] SGHC 249; [2016] 2 Lloyd's Rep 583, Singapore HC        G

*BNA v BNB* [2019] SGCA 84; [2020] 1 Lloyd's Rep 55, Singapore CA

*Black Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep 446

*Bonython v Commonwealth of Australia* [1951] AC 201, PC

*Bremer Vulkan Schiffbau und Maschinenfabrik v South India Shipping Corpn* [1981] AC 909; [1981] 2 WLR 141; [1981] 1 All ER 289; [1981] 1 Lloyd's Rep 253, HL(E)        H

*C v D* [2007] EWHC 1541 (Comm); [2007] 2 All ER (Comm) 557; [2007] 2 Lloyd's Rep 367; [2007] EWCA Civ 1282; [2008] Bus LR 843; [2008] 1 All ER (Comm) 1001; [2008] 1 Lloyd's Rep 239, CA

*Carpatsky Petroleum Corpn v PJSC Ukrnafta* [2020] EWHC 769 (Comm); [2020] Bus LR 1284; [2020] 1 Lloyd's Rep 566

© 2020 The Incorporated Council of Law Reporting for England and Wales

4119

[2020] 1 WLR       *Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb"* (SC(E))

A   *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334; [1993] 2 WLR 262; [1993] 1 All ER 664; [1993] 1 Lloyd's Rep 291, HL(E)
*Cia Maritima Zorroza SA v Sesostris SAE (The Marques de Bolarque)* [1984] 1 Lloyd's Rep 652
*Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572; [1970] 3 WLR 389; [1970] 3 All ER 71; [1970] 2 Lloyd's Rep 99, HL(E)
*Coast Lines Ltd v Hudig & Veder Chartering NV* [1972] 2 QB 34; [1972] 2 WLR
B   280; [1972] 1 All ER 451; [1972] 1 Lloyd's Rep 53, CA
*Cockett Marine Oil DMCC v ING Bank NV (The M/V Ziemia Cieszynska)* [2019] EWHC 1533 (Comm); [2019] 2 Lloyd's Rep 541
*Dallah Real Estate and Tourism Holding Co v Ministry of Religious Affairs of the Government of Pakistan* [2008] EWHC 1901 (Comm); [2009] 1 All ER (Comm) 505; [2008] 2 Lloyd's Rep 535; [2010] UKSC 462; [2011] 1 AC 763; [2010] 3 WLR 147; [2011] Bus LR 158; [2011] 1 All ER 485; [2011] 1 All ER (Comm)
C   383; [2010] 2 Lloyd's Rep 691, SC(E)
*Deutz AG v General Electric Co* (unreported) 14 April 2000, Thomas J
*Dubai Islamic Bank PJSC v Paymentech Merchant Services Inc* [2001] 1 All ER (Comm) 514; [2001] 1 Lloyd's Rep 65
*Egon Oldendorff v Libera Corpn* [1995] 2 Lloyd's Rep 64
*Egon Oldendorff v Libera Corpn (No 2)* [1996] 1 Lloyd's Rep 380
*Fiona Trust & Holding Corpn v Privalov* [2007] UKHL 40; [2007] Bus LR 1719;
D   [2007] 4 All ER 951; [2007] 2 All ER (Comm) 1053; [2008] 1 Lloyd's Rep 254, HL(E)
*FirstLink Investments Corpn Ltd v GT Payment Pte Ltd* [2014] SGHCR 12
*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi AS v VSC Steel Co Ltd* [2013] EWHC 4071 (Comm); [2014] 1 Lloyd's Rep 479
*Hamlyn & Co v Talisker Distillery* [1894] AC 202, HL
*Hellenic Steel Co v Svolamar Shipping Co Ltd (The Komninos S)* [1991] 1 Lloyd's Rep 370, CA
E   *JSC Zestafoni G Nikoladze Ferroalloy Plant v Ronly Holdings Ltd* [2004] EWHC 245 (Comm); [2004] 2 Lloyd's Rep 335
*Jacobs, Marcus & Co v Crédit Lyonnais* (1884) 12 QBD 589
*Kabab-Ji SAL (Lebanon) v Kout Food Group (Kuwait)* [2020] EWCA Civ 6; [2020] 1 Lloyd's Rep 269, CA
*Kahler v Midland Bank Ltd* [1950] AC 24; [1949] 2 All ER 621, HL
*Lancashire County Council v Municipal Mutual Insurance Ltd* [1997] QB 897;
F   [1996] 3 WLR 493; [1996] 3 All ER 545; 95 LGR 234, CA
*Lawlor v Sandvik Mining and Construction Mobile Crushers and Screens Ltd* [2013] EWCA Civ 365; [2013] 2 Lloyd's Rep 98, CA
*Leibinger v Stryker Trauma GmbH* [2005] EWHC 690 (Comm)
*Lesotho Highlands Development Authority v Impregilo SpA* [2003] EWCA Civ 1159; [2004] 1 All ER (Comm) 97; [2003] 2 Lloyd's Rep 497; [2005] UKHL 43; [2006] 1 AC 221; [2005] 3 WLR 129; [2005] 3 All ER 789; [2005] 2 All
G   ER (Comm) 265; [2005] 2 Lloyd's Rep 310, HL(E)
*Libyan Arab Foreign Bank v Bankers Trust Co* [1989] QB 728; [1989] 3 WLR 314; [1989] 3 All ER 252; [1988] 1 Lloyd's Rep 259
*MWB Business Exchange Centres Ltd v Rock Advertising Ltd* [2018] UKSC 24; [2019] AC 119; [2018] 2 WLR 1603; [2018] 4 All ER 21; [2018] 2 All ER (Comm) 961, SC(E)
*Maher v Groupama Grand Est* [2009] EWCA Civ 1191; [2010] 1 WLR 1564; [2010]
H   2 All ER 455; [2010] 2 All ER (Comm) 823; [2010] Lloyd's Rep IR 543; [2010] RTR 10, CA
*Minister of Finance (Inc) v International Petroleum Investment Co* [2019] EWCA Civ 2080; [2020] Bus LR 45; [2020] 2 All ER (Comm) 269; [2020] 1 Lloyd's Rep 93, CA
*Missouri Steamship Co, In re* (1889) 42 Ch D 321, CA

© 2020 The Incorporated Council of Law Reporting for England and Wales

4120
**Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))**      [2020] 1 WLR

*National Iranian Oil Co v Crescent Petroleum Co International Ltd* [2016] EWHC     A
    510 (Comm); [2016] 2 Lloyd's Rep 146
*Paal Wilson & Co A/S v Partenreederei Hannah Blumenthal (The Hannah
    Blumenthal)* [1983] 1 AC 854; [1982] 3 WLR 1149; [1983] 1 All ER 34; [1983]
    1 Lloyd's Rep 103, HL(E)
*Peterson Farms Inc v C&M Farming Ltd* [2004] EWHC 121 (Comm); [2004]
    1 Lloyd's Rep 603
*Schiffahrtsgesellschaft Detlev von Appen GmbH v Voest Alpine Intertrading GmbH*    B
    *(The Jay Bola)* [1997] 2 Lloyd's Rep 279, CA
*Shashoua v Sharma* [2009] EWHC 957 (Comm); [2009] 2 All ER (Comm) 477;
    [2009] 2 Lloyd's Rep 376
*Shayler v Woolf* [1946] Ch 320; [1946] 2 All ER 54, CA
*Sonatrach Petroleum Corpn (BVI) v Ferrell International Ltd* [2002] 1 All
    ER (Comm) 627
*South African Breweries Ltd v King* [1899] 2 Ch 173      C
*Star Shipping AS v China National Foreign Trade Transportation Corpn (The Star
    Texas)* [1993] 2 Lloyd's Rep 445, CA
*Sterling v Rand* [2019] EWHC 2560 (Ch); [2020] 1 All ER (Comm) 934; [2019]
    2 Lloyd's Rep 577
*Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2012] EWCA Civ
    638; [2013] 1 WLR 102; [2012] 2 All ER (Comm) 795; [2012] 1 Lloyd's Rep
    671, CA
*Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's    D
    Rep 45
*Svenska Petroleum Exploration AB v Government of the Republic of Lithuania*
    [2005] EWHC 2437 (Comm); [2006] 1 All ER (Comm) 731; [2006] 1 Lloyd's
    Rep 181
*Tzortzis v Monark Line A/B* [1968] 1 WLR 406; [1968] 1 All ER 949; [1968]
    1 Lloyd's Rep 30, CA
*Union of India v McDonnell Douglas Corpn* [1993] 2 Lloyd's Rep 48      E
*United Railways of Havana and Regla Warehouses Ltd, In re* [1961] AC 1007; [1960]
    2 WLR 969; [1960] 2 All ER 332, HL(E)
*West Tankers Inc v Ras Riunione Adriatica di Sicurtà SpA (The Front Comor)* [2007]
    UKHL 4; [2007] 1 All ER (Comm) 794 (Note); [2007] 1 Lloyd's Rep 391, HL(E)
*Whitworth Street Estates (Manchester) Ltd v James Miller & Partners Ltd* [1970] AC
    583; [1970] 2 WLR 728; [1970] 1 All ER 796; [1970] 1 Lloyd's Rep 269, HL(E)
*XL Insurance Ltd v Owens Corning* [2001] 1 All ER (Comm) 530; [2000] 2 Lloyd's    F
    Rep 500

The following additional cases were cited in argument:

*AES Ust-Kamenogorsk Hydropower Plant llp v Ust-Kamenogorsk Hydropower
    Plant JSC* [2013] UKSC 35; [2013] 1 WLR 1889; [2013] Bus LR 1357; [2014]
    1 All ER 335; [2014] 1 All ER (Comm) 1; [2013] 2 Lloyd's Rep 281, SC(E)
*BMO v BMP* [2017] SGHC 127; [2017] 2 Lloyd's Rep 57, Singapore HC      G
*Cook v Virgin Media Ltd* [2015] EWCA Civ 1287; [2016] 1 WLR 1672; [2017] 1 All
    ER 929, CA
*Pepsico Inc v Oficina Central de Asesoria y Ayuda Tecnica CA* (1996) 945 F Supp 69,
    US District Ct (New York, Southern District)
*Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015]
    EWHC 194 (Comm); [2015] 1 All ER (Comm) 545; [2015] 1 Lloyd's Rep 504
*Sokana Industries Inc v Freyre & Co Inc* [1994] 2 Lloyd's Rep 57      H

**APPEAL** from the Court of Appeal

    The claimant company, Enka Insaat ve Sanayi AS, was party to a contract
dated 27 June 2012 with Energoproekt Closed Joint Stock Company, by
which it carried out works in the construction of the Berezovskaya power

© 2020 The Incorporated Council of Law Reporting for England and Wales

4121

[2020] 1 WLR    Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))

A  plant in Russia.  Following a major fire at the power plant on 1 February 2016, the first defendant, OOO "Insurance Company Chubb", claimed to be subrogated as insurer to the alleged claims of its insured, PJSC Unipro (to whom Energoproekt had assigned its rights and obligations under the contract on 21 May 2014), against the claimant.  By a claim filed on 25 May 2019 and formally accepted on 3 September 2019 the first defendant commenced proceedings in the Moscow Arbitrazh Court, Russia against, inter alios, the claimant in respect of alleged insurance losses caused by the fire.

B

By an arbitration claim form dated 16 September 2019 the claimant brought a claim against the defendants, the first defendant, Chubb Russia Investments Ltd, Chubb European Group SE and Chubb Ltd seeking (i) a declaration that the Russian proceedings were in breach of an agreement

C  in the underlying construction contract settle disputes by International Chamber of Commerce arbitration seated in London, and (ii) an anti-suit injunction restraining continuance of the Russian proceedings and ordering their discontinuance.  On 17 September 2019, the claimant filed a motion in the Russian proceedings challenging the jurisdiction of the Russian court on the basis of the arbitration agreement, pursuant to the provision of domestic law giving effect to Russia's obligations under article II(3) of the Convention

D  on the Recognition and Enforcement of Foreign Arbitral Awards (1958) ("New York Convention").

On 23 September 2019, the claimant applied for permission to serve out of the jurisdiction and for interim injunctions.  On 30 September 2019, the second and third defendants acknowledged service of the claim and Teare J granted the claimant permission to serve out of the jurisdiction on the first,

E  third and fourth defendants.  On 11 October 2019, the first and fourth defendants accepted service without prejudice to their rights to challenge the court's jurisdiction.  At a subsequent inter partes hearing on 15 October 2019, Carr J declined to grant interim relief on an expedited basis and instead gave directions for an expedited trial of the claimant's claims for final injunctions.  On 7 November 2019, the fourth defendant issued an application to set aside the order granting permission to serve out.

F

On 20 December 2019 Andrew Baker J [2019] EWHC 3568 (Comm); [2020] Bus LR 463 declined to determine the proper law of the arbitration agreement and dismissed the claim against the first defendant on forum non conveniens grounds, holding that the Moscow court was the more appropriate forum to determine the scope of the arbitration agreement and, inter alia, made a declaration that the court lacked jurisdiction to determine

G  the claim.

The Court of Appeal (Flaux, Males, Popplewell LJJ) [2020] EWCA Civ 574; [2020] Bus LR 1668 allowed the claimant's appeal on 29 April 2020 on the grounds that there was a strong presumption that the arbitration agreement was governed by English law and, therefore, granted the anti-suit injunction.

H

With permission of the Supreme Court (Lady Black, Lord Hamblen and Lord Leggatt JJSC) granted on 5 June 2020, the first defendant appealed. The issues in the appeal were not agreed, but included, by mutual agreement: (a) What was the correct approach to determining the proper law of an arbitration agreement?  In particular, what was the relative weight to be given to the parties' choice of law (if any) for the main contract and their

© 2020 The Incorporated Council of Law Reporting for England and Wales

choice of seat?   (b) What was the role of the court of the seat of an   A
arbitration and in what circumstances was it permissible and appropriate for
the English court to refuse an anti-suit injunction on the ground that a
foreign court should decide whether proceedings before it were a breach of
an arbitration agreement?

The facts are stated in the judgment of Lord Hamblen and Lord
Leggatt JJSC, post, paras 7–22.                                             B

*David Bailey QC*, *Toby Landau QC*, *Marcus Mander* and *Clara Benn*
(instructed by *Kennedys Law llp*) for the first defendant.
*Robin Dicker QC*, *David Joseph QC* and *Niranjan Venkatesan*
(instructed by *Shearman & Sterling llp*) for the claimant.

The court took time for consideration.                                     C

9 October 2020.  The following judgments were handed down.

**LORD HAMBLEN** and **LORD LEGGATT JJSC** (with whom **LORD KERR
OF TONAGHMORE** agrees)

*I. Introduction*                                                          D

1   Where an international commercial contract contains an agreement to
resolve disputes by arbitration, at least three systems of national law are
engaged when a dispute occurs.  They are: the law governing the substance
of the dispute; the law governing the agreement to arbitrate; and the law
governing the arbitration process.  The law governing the substance of the
dispute is generally the law applicable to the contract from which the dispute
has arisen.  The law governing the arbitration process (sometimes referred to   E
as the "curial law") is generally the law of the "seat" of the arbitration,
which is usually the place chosen for the arbitration in the arbitration
agreement.  These two systems of law may differ from each other.  Each may
also differ from the law which governs the validity and scope of the
arbitration agreement.

2   The central issue on this appeal concerns which system of national   F
law governs the validity and scope of the arbitration agreement when the
law applicable to the contract containing it differs from the law of the seat of
the arbitration.

3   This is an issue which has long divided courts and commentators,
both in this country and internationally.  On one side there are those who say
that the law that governs a contract should generally also govern an
arbitration agreement which, though separable, forms part of that contract.   G
On the other side there are those who say that the law of the chosen seat of
the arbitration should also generally govern the arbitration agreement.
There have been Court of Appeal decisions falling on either side of this
divide: *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA*
[2013] 1 WLR 102 and *C v D* [2008] Bus LR 843.

4   In its judgment in the present case, the Court of Appeal [2020] Bus LR   H
1668 considered that "the time has come to seek to impose some order and
clarity on this area of the law" (para 89) and held that, unless there has been
an express choice of the law that is to govern the arbitration agreement, the
general rule should be that the arbitration agreement is governed by the law
of the seat, as a matter of implied choice, subject only to any particular

4123
[2020] 1 WLR    Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

features of the case demonstrating powerful reasons to the contrary (para 91).

5    On this appeal the appellant argues that this conclusion is heterodox and wrong and that the correct approach is that, in the absence of strong indications to the contrary, a choice of law for the contract is a choice of that law to govern the arbitration agreement. The appellant contends that in the present case the parties have chosen Russian law to govern the construction contract between them and that the implication that they intended the arbitration agreement included in that contract to be governed by Russian law is not displaced by their choice of London as the seat of arbitration.

6    If that issue is decided in its favour, the appellant goes on to argue that the Court of Appeal was wrong to grant an injunction to restrain it from pursuing proceedings in Russia in alleged breach of the arbitration agreement. The appellant's case is that, because the arbitration agreement is governed by Russian law, the Russian courts are best placed to decide whether or not the arbitration agreement applies to the claim which the appellant has brought against the respondent in Russia and that, as a matter of comity or discretion, the English courts ought not to interfere with those proceedings by granting an anti-suit injunction.

II. *Factual background*

*(i) The construction contract*

7    On 1 February 2016 a power plant situated at Berezovskaya in Russia was severely damaged by fire. The appellant ("Chubb Russia") is a Russian insurance company which had insured the owner of the power plant, a company now named PJSC Unipro ("Unipro"), against such damage. Chubb Russia is part of the Chubb Group, which is the world's largest publicly traded property and casualty insurer.

8    The company responsible for the design and construction of the power plant under a contract made with Unipro in May 2011 was a Russian company called CJSC Energoproekt. The respondent ("Enka") was engaged by Energoproekt as one of many sub-contractors involved in the construction project. Enka is a global engineering and construction company incorporated and based in Turkey with a substantial presence and history of operations in Russia, amongst other countries.

9    The contract between Energoproekt and Enka dated 27 June 2012 ("the construction contract") is a substantial document running to 97 pages, with around 400 pages of attachments. It was executed in parallel Russian and English versions (though it provides that the Russian language version has precedence).

10    The construction contract contains, in article 50, a dispute resolution clause in these terms:

"*Resolution of disputes*

"50.1 The Parties undertake to make in good faith every reasonable effort to resolve any dispute or disagreement arising from or in connection with this Agreement (including disputes regarding validity of this agreement and the fact of its conclusion (hereinafter—'Dispute') by means of negotiations between themselves. In the event of the failure to resolve any Dispute pursuant to this article within 10 (ten) days from the date that either Party sends a Notification to the opposite Party containing

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

an indication of the given Dispute (the given period may be extended by mutual consent of the Parties) any Party may, by giving written notice, cause the matter to be referred to a meeting between the senior managements of the Contractor and Customer (in the case of the Contractor senior management shall be understood as a member of the executive board or above, in the case of Customer, senior management shall be understood as general directors of their respective companies).

B

The parties may invite the End Customer to such Senior Management Meeting.  Such meeting shall be held within fourteen (14) calendar days following the giving of a notice.  If the matter is not resolved within twenty (20) calendar days after the date of the notice referring the matter to appropriate higher management or such later date as may be unanimously agreed upon, the Dispute shall be referred to international arbitration as follows:

C

    "● the Dispute shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce,
    "● the Dispute shall be settled by three arbitrators appointed in accordance with these Rules,
    "● the arbitration shall be conducted in the English language, and
    "● the place of arbitration shall be London, England.

D

    "50.2 Unless otherwise explicitly stipulated in this Agreement, the existence of any Dispute shall not give the Contractor the right to suspend Work.
    "50.3 Not used.
    "50.4.  Not used.
    "50.5 All other documentation such as financial documentation and cover documents for it must be presented in Russian."

E

11    On 21 May 2014 Energoproekt transferred its rights and obligations under the construction contract to Unipro pursuant to an assignment agreement made between Energoproekt, Unipro and Enka.  By clause 7.5 of that agreement, the parties agreed that disputes between Unipro and Enka were to be finally and exclusively resolved by arbitration in accordance with the provisions of article 50.1 of the construction contract.

F

12    After the fire in February 2016 Chubb Russia paid 26.1bn roubles (approximately US$400m) to Unipro under its property insurance policy and thereby became subrogated to any rights of Unipro to claim compensation from third parties for the damage caused by the fire.

*(ii) The Russian proceedings*

G

13    On 25 May 2019 Chubb Russia filed a claim in the Moscow Arbitrazh (ie commercial) Court against Enka and ten other defendants whom it claimed were jointly liable for the damage caused by the fire.  Chubb Russia was required by the Moscow court to provide further details of its claims, following which the claims were accepted by the court on 3 September 2019.

H

14    On 17 September 2019 Enka filed a motion in the Russian proceedings to have Chubb Russia's claim against it dismissed (or "left without consideration") pursuant to article 148(5) of the Arbitrazh Procedure Code, which is intended to give effect to Russia's obligations under article II(3) of the Convention on the Recognition and Enforcement of

© 2020 The Incorporated Council of Law Reporting for England and Wales

4125

A   Foreign Arbitral Awards 1958 ("the New York Convention") to refer to arbitration parties who have agreed to submit to arbitration a dispute of which a court of a contracting state is seized. Enka argued that the claim against it fell within the scope of the arbitration agreement contained in article 50.1 of the construction contract and ought therefore to be resolved, not by the Russian courts, but by an arbitration conducted in accordance with that provision in London. The Moscow court decided to deal with

B   Enka's motion at the same time as the merits of Chubb Russia's claims at a hearing fixed for 22 January 2020.

  15   Following that hearing, which continued on two later dates, on 18 March 2020 the judge in the Russian proceedings announced her decisions (a) not to grant Enka's motion to refer the claim against it to arbitration and (b) to dismiss Chubb Russia's claims against all the

C   defendants on the merits. The reasons for those decisions were given in a written judgment handed down on 6 May 2020.

  16   Chubb Russia and Enka have both filed appeals in the Russian proceedings (in relation to the decision on the merits and the decision to refuse Enka's application, respectively).

  *(iii) The English proceedings*

D   17   Meanwhile, Enka had on 16 September 2019 brought an arbitration claim in the Commercial Court in London seeking an anti-suit injunction to restrain Chubb Russia from further pursuing the Russian proceedings against Enka on the ground that this was a breach of the arbitration agreement in article 50.1 of the construction contract. Enka also sought injunctions against other members of the Chubb Group said to be "caught

E   up" in Chubb Russia's breach of the arbitration agreement, namely Chubb UK Ltd, Chubb European Group SE ("Chubb Europe") and the ultimate parent company of the Chubb Group which is incorporated in Switzerland.

  18   On 15 October 2019 Carr J declined to grant an interim anti-suit injunction but gave directions for an expedited trial. The trial took place on 11 and 12 December 2019 before Andrew Baker J. He gave judgment on 20 December 2019, dismissing Enka's claims against all the defendants. His

F   primary reason for doing so was that he considered the appropriate forum to decide whether Chubb Russia's claim against Enka falls within the arbitration agreement to be the Moscow Arbitrazh Court and not the English Commercial Court.

  19   Enka applied to the Court of Appeal for permission to appeal from this decision as it applied to Chubb Russia (alone). The application was

G   granted on 6 February 2020 and the appeal was heard on 7 and 8 April 2020. On 29 April 2020 the Court of Appeal (Flaux, Males and Popplewell LJJ) allowed Enka's appeal and issued an anti-suit injunction restraining Chubb Russia from continuing the Russian proceedings.

  *(iv) The arbitration proceedings*

H   20   On 10 January 2020 Enka gave notice to Chubb Russia and Chubb Europe of a "Dispute" under article 50 of the construction contract. This was followed on 11 March 2020 by a request for arbitration filed with the International Chamber of Commerce ("ICC") in which Enka sought a declaration that Chubb Russia's claims in the Russian court fall within the scope of the arbitration agreement and damages.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4126
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

21   On 22 May 2020 Chubb Russia and Chubb Europe filed their answer to the request for arbitration in which they challenged the jurisdiction of the arbitrators and denied that Enka is entitled to any of the relief claimed.

22   On 12 June 2020 the ICC notified the parties of the appointment of Mr Michael Brindle QC as president of the arbitral tribunal. The other members of the tribunal are Lord Hoffmann, nominated by Enka, and Lord Mance, nominated by Chubb Russia and Chubb Europe (without prejudice to their objections to the jurisdiction of the tribunal).

### (v) This appeal

23   On 26 May 2020 Chubb Russia applied to the Supreme Court for permission to appeal from the decision of the Court of Appeal. On 5 June 2020 this court granted permission to appeal and also stayed the anti-suit injunction upon Chubb Russia giving suitable undertakings to protect Enka's position pending the outcome of the appeal. The appeal was expedited and heard over two days on 27 and 28 July 2020.

24   It is a striking feature of the English proceedings that the trial, the appeal to the Court of Appeal and the appeal to the Supreme Court have all been heard in just over seven months. This is a vivid demonstration of the speed with which the English courts can act when the urgency of a matter requires it.

### III. The English conflict of laws rules

#### (i) The Rome I Regulation

25   Where a court of England and Wales has to decide which system of national law governs a contract, the court must normally apply the provisions of the "Rome I Regulation" (a shorthand for Parliament and Council Regulation (EC) No 593/2008 of 17 June 2008 on the law applicable to contractual obligations (OJ 2008 L177, p 6)). By article 1(1), the Rome I Regulation applies, in situations involving a conflict of laws, to contractual obligations in civil and commercial matters. Article 1(2)(e), however, excludes from its scope "arbitration agreements and agreements on the choice of court".

26   Pursuant to article 3, a contract to which the Rome I Regulation applies is governed by the law chosen by the parties, where the choice is made expressly or clearly demonstrated by the terms of the contract or the circumstances of the case. In determining whether the parties have made a choice of law, the court should adopt a broad Regulation-based approach, not constrained by national rules of contractual interpretation: see e g *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), para 32-048. Article 4 contains rules for determining the law applicable to the contract to the extent that no such choice has been made. Article 4(1) sets out presumptions or prima facie rules that apply in relation to particular types of contract. However, where it is clear from the circumstances of the case that the contract is manifestly more closely connected with another country, or where none of the prima facie rules applies, article 4(3) and 4(4) respectively provide for the contract to be governed by the law of the country with which it is most closely connected.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4127
[2020] 1 WLR        Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

*(ii) The common law rules*

27    Because the Rome I Regulation does not apply to arbitration agreements, an English court which has to decide which system of law governs the validity, scope or interpretation of an arbitration agreement must apply the rules developed by the common law for determining the law governing contractual obligations.  Those rules are that a contract (or relevant part of it) is governed by: (i) the law expressly or impliedly chosen by the parties; or (ii) in the absence of such choice, the law with which it is most closely connected: see e g *Dicey, Morris & Collins*, rule 64(1).

28    In view of the similarity between the common law rules and the rules provided by the Rome I Regulation, cases in which the two regimes would yield different results are likely to be rare.  But in principle, where an English court has to determine which law governs an arbitration agreement incorporated in a contract, it is the common law rules alone which—because of the exclusion of arbitration agreements from the scope of the Rome I Regulation by article 1(2)(e)—the court must apply.

*(iii) Party choice*

29    The starting point at common law (as under the Rome I Regulation) is that contracting parties are free to choose the system of law which is to govern their contract, provided only that their choice is not contrary to public policy.  The court must therefore construe the contract to see whether the parties have agreed on a choice of law to govern it.  As Lord Diplock explained in *Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572, 603:

"The first stage, therefore, when any question arises between parties to a contract as to the proper law applicable to it, is to determine whether the parties intended by their contract to exercise any choice at all and, if they did, to determine what was the system of law which they selected.  In determining this the English court applies the ordinary rules of English law relating to the construction of contracts."

30    The exclusion of arbitration agreements from the scope of the Rome I Regulation by article 1(2)(e) does not prevent an arbitration clause from being taken into consideration for the purposes of article 3 in determining whether there has been a choice of the law applicable to other parts of the contract, as noted in *Giuliano and Lagarde, Council Report on the Convention on the law applicable to contractual obligations* (OJ 1980 C282, p 1), p 12.  By the same token, the fact that other parts of the contract are within the scope of the Rome I Regulation does not prevent them from being taken into consideration in determining in accordance with the English common law rules of construction whether the parties have agreed on a choice of law to govern the arbitration clause.  Like any question of contractual interpretation, this is a unitary exercise which requires the court to construe the contract, including the arbitration clause, as a whole.

*(iv) Law of the forum*

31    Where an English court has to decide whether a contract which is said to be governed by a foreign system of law is valid, the court applies the "putative applicable law", in other words the law which would govern the

© 2020 The Incorporated Council of Law Reporting for England and Wales

4128
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

contract if it were validly concluded.  At the prior stage, however, of   A
determining what is the applicable law or putative applicable law of the
contract, all the leading authorities proceed on the basis that it is English
rules of law which apply, as stated by Lord Diplock in the passage quoted
above.  In the *Tunisienne* case, for example, a contract for the transport of
oil in several shipments contained a provision (clause 13) that the contract
"shall be governed by the laws of the flag of the vessels carrying the goods".   B
The first question which the House of Lords had to decide was whether, in
the circumstances of the case which included the fact that vessels flying
different flags were used to ship the oil, this clause conveyed a choice of
French law to govern the contract, as the shipowners argued.  To answer that
question the House did not apply the rules of French law governing the
interpretation of contracts, but (only) those of English law.

32    The same approach was adopted in *Whitworth Street Estates*   C
*(Manchester) Ltd v James Miller & Partners Ltd* [1970] AC 583, where the
House of Lords held that subsequent conduct of the parties could not be
looked at to construe a contract in order to decide whether it was intended
to be governed by English (rather than Scottish) law.  The exclusion of
subsequent conduct as an aid to interpretation is a consequence of the
objective principle of interpretation in English law, which searches not for   D
what the parties subjectively thought or intended the effect of their contract
to be but for what reasonable people in their position would be understood
to have meant by the language used.  Although in the *Whitworth Street
Estates* case English law was one putative applicable law of the contract,
there is no suggestion in the speeches that this was the basis for applying
English principles of contractual interpretation.

33    In our view, it is both consistent with authority and sound in   E
principle to apply English law as the law of the forum to ascertain whether
the parties have agreed on the law which is to govern their contract (and, if
not, what law governs it in the absence of agreement).  To apply any other
law for this purpose would introduce an additional layer of complexity into
the conflict of laws analysis without any clear justification and could
produce odd or inconsistent results.  As the authors of *Dicey, Morris &
Collins*, at para 32-036, by reference to a case in which subsequent conduct   F
was taken into account to construe a contract found to be governed by
Chilean law because it was admissible under that law:

"But it would be very odd if when a question arose as to whether a
contract was governed by English law or Chilean law, subsequent
conduct would not be taken into account in determining whether a choice
of English law could be inferred, but it could be taken into account in   G
determining whether Chilean law applied."

34    The Court of Appeal in the present case asserted (although without
explanation) that, in construing the contract to determine whether a choice
of governing law applies to an arbitration agreement within it, the court
should apply the principles of construction of the main contract law if
different from English law (see paras 90 and 105(2) of the judgment).  We do   H
not consider this to be correct.  As we have indicated, the proper approach in
determining whether there has been a choice of law is to apply English law as
the law of the forum.  Where the question is whether there has been a choice
of the law applicable to an arbitration clause, the relevant English law rules

are the common law rules which require the court to interpret the contract as a whole applying the ordinary English rules of contractual interpretation. The main contract law, if different, has no part to play in the analysis.

### (v) Express or implied choice

35   Many of the cases applying the common law rules distinguish between a choice of law which is "express" or "implied". Article 3 of the Rome I Regulation draws a similar distinction in referring to a choice which is "made expressly or clearly demonstrated". The terminology is useful in reflecting the fact that an agreement on a choice of law to govern a contract, like any contractual term, may be explicitly articulated or may be a matter of necessary implication or inference from other terms of the contract and the surrounding circumstances. The distinction, however, is not a sharp one: language may be more or less explicit and the extent to which a contractual term is spelt out in so many words or requires a process of inference to identify it is a matter of degree. Determining whether the parties have agreed on a choice of law to govern their contract is in every case a question of interpretation. It is also important to keep in mind that whether a choice is described as express or implied is not a distinction on which any legal consequence turns. An implied choice is still a choice which is just as effective as a choice made expressly.

### (vi) The default rule

36   Where a choice of law cannot be identified by interpreting the contract, the approach of the common law was at one time to presume that the parties must nevertheless have intended their contract to be governed by some particular system of national law and to impute a relevant intention to them. This is reflected, for example, in the first edition of Dicey's treatise on the conflict of laws, which defined the law governing a contract as "the law or laws to which the parties intended, or may fairly be presumed to have intended, to submit themselves": *Dicey, A Digest on the Law of England with reference to the Conflict of Laws*, 1st ed (1896), rule 143. In the second half of the 20th century, however, the test of presumed intention came gradually to be superseded by an acknowledgement that at this stage of the analysis the court is no longer concerned with intention at all and is applying a positive rule of law, with the rule being that the contract is governed by the system of law with which it has its "closest and most real connection": see *Dicey, Morris & Collins*, paras 32-006 to 32-007; *Hellenic Steel Co v Svolamar Shipping Co Ltd (The Komninos S)* [1991] 1 Lloyd's Rep 370, 374 (Bingham LJ). Lord Diplock stated the modern position clearly in the *Tunisienne* case [1971] AC 572, 603–604:

> "If, applying these rules [sc the ordinary rules of English law relating to the construction of contracts], the court reaches the conclusion that the parties did not intend to exercise any choice of proper law, or is unable to identify what their choice was, it becomes necessary for the court to proceed to the second stage, of determining itself what is the proper law applicable. In doing so, the court applies the English rule of the conflict of laws . . . that the proper law is that system of law with which the transaction has its closest and most real connection: *Bonython v Commonwealth of Australia* [1951] AC 201, 219.

© 2020 The Incorporated Council of Law Reporting for England and Wales

"My Lords, this is applied as a positive rule of English law. It is applied not because it is the choice of the parties themselves but because they never intended to exercise their liberty to make a choice or, if they did, they have failed to make their choice clear."

37   Whether the parties have agreed on a choice of law is a matter which inevitably may sometimes give rise to differences of opinion.  In the *Tunisienne* case three members of the House of Lords appellate committee (Lord Morris of Borth-y-Gest, Viscount Dilhorne and Lord Diplock) held that clause 13 (quoted earlier) was in its context to be construed as an agreement that French law was to govern the contract.  The other two members of the committee (Lord Reid and Lord Wilberforce) did not consider that the clause could be so construed but still concluded at the second stage of the analysis that French law was the governing law.  In *Amin Rasheed Shipping Corpn v Kuwait Insurance Co (The Al Wahab)* [1984] AC 50, Lord Diplock (with whose speech three of the other law lords agreed) applied the principles he had identified in the *Tunisienne* case to determine whether an insurance contract was governed by English law or the law of Kuwait.  He concluded (at p 62) that on their proper construction the provisions of the contract, taken as a whole, "by necessary implication point ineluctably to the conclusion that the intention of the parties was that their mutual rights and obligations under it should be determined in accordance with the English law of marine insurance".  Lord Wilberforce reached the same result on the basis that English law was the system of law with which the contract had the closest and most real connection.

*(vii) Splitting the contract*

38   English common law (along with other legal systems) recognises the possibility that different parts of a contract may be governed by different laws-a concept known in conflict of laws theory as dépeçage.  This is also expressly provided for in the Rome I Regulation.  Article 3(1) includes the statement: "By their choice the parties can select the law applicable to the whole or to part only of the contract."

39   There are many English cases in which courts have contemplated that different obligations in the same contract may be governed by different laws.  The earliest such case to which we were referred was the decision of the Court of Appeal in *Jacobs, Marcus & Co v Crédit Lyonnais* (1884) 12 QBD 589.  There appear to be few cases, however, in which such a situation has been found to exist (although one such case is *Libyan Arab Foreign Bank v Bankers Trust Co* [1989] QB 728, 746–747).  No doubt this is because, as Lord MacDermott said in *Kahler v Midland Bank Ltd* [1950] AC 24, 42, "the courts of this country will not split the contract in this sense readily or without good reason".  It is generally reasonable to assume that parties would intend or expect their contract to be governed by a single system of law.  To apply different systems of law to different parts of a contract has the potential to give rise to inconsistency and uncertainty.  This is particularly so where questions about the validity or enforceability of contractual obligations arise.  As observed in *Dicey, Morris & Collins*, para 32-026:

"Even if different parts of a contract are said to be governed by different laws, it would be highly inconvenient and contrary to principle for such issues as whether the contract is discharged by frustration, or

4131
[2020] 1 WLR      Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

whether the innocent party may terminate or withhold performance on account of the other party's breach, not to be governed by a single law."

40   The assumption that, unless there is good reason to conclude otherwise, all the terms of a contract are governed by the same law applies to an arbitration clause, as it does to any other clause of a contract.   As Mustill J said in *Black Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep 446, 456: "In the ordinary way, this [sc the law of the arbitration agreement] would be likely to follow the law of the substantive contract."   An arbitration clause may, however, more readily than other clauses be governed by a different law.   One reason for this is that an arbitration clause has a different subject matter and purpose from the rest of the contract.   It is concerned not with establishing substantive rights and obligations of the parties but with providing a mechanism by which a dispute about such rights and obligations will be resolved.   A second reason flows from the principle of separability of the arbitration agreement.   This is a cardinal principle of arbitration law, codified in section 7 of the Arbitration Act 1996.   Section 7 provides that, unless otherwise agreed by the parties,

"an arbitration agreement which forms or was intended to form part of another agreement . . . shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement."

41   As counsel for Chubb Russia emphasised, the principle of separability is not a principle that an arbitration agreement is to be treated as a distinct agreement for all purposes but only that it is to be so treated for the purpose of determining its validity or enforceability.   That is clear from the words "for that purpose" in section 7 of the 1996 Act.   Thus, the separability principle does not require that an arbitration agreement should be treated as a separate agreement for the purpose of determining its governing law. Nevertheless, the principle is relevant to the conflict of laws analysis because it alleviates the difficulty identified by *Dicey, Morris & Collins* in the passage quoted at para 39 above in treating different parts of a contract as governed by different laws.   Where the separability principle is recognised by the putative applicable law of the arbitration agreement, no inconsistency will arise from treating issues such as whether the contract is discharged by frustration, or whether the innocent party may terminate or withhold performance on account of the other party's breach, or whether the contract has been rescinded for misrepresentation, as governed by a different law from the law of the arbitration agreement, as the resolution of those issues will not affect the validity or enforceability of the arbitration agreement.

42   The possibility that an arbitration agreement may be governed by a different system of law from the contract of which it forms part is also implicitly recognised by the exclusion of arbitration agreements from the scope of the Rome I Regulation, with the consequence that the law applicable to an arbitration agreement and the law applicable to the rest of the contract must be determined independently by different conflict of laws regimes.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4132
**Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))**      [2020] 1 WLR
**Lord Hamblen and Lord Leggatt JJSC**

*IV. Choice of law for the whole contract*                                                    A

   *(i) Significance of a governing law clause*

**43**   It is rare for the law governing an arbitration clause to be specifically identified (either in the arbitration clause itself or elsewhere in the contract). It is common, however, in a contract which has connections with more than one country (or territory with its own legal system) to find a clause specifying the law which is to govern the contract.  A typical clause of this      B
kind states: "This Agreement shall be governed by and construed in accordance with the laws of [name of legal system]."  Where the contract also contains an arbitration clause, it is natural to interpret such a governing law clause, in the absence of good reason to the contrary, as applying to the arbitration clause for the simple reason that the arbitration clause is part of the contract which the parties have agreed is to be governed by the specified      C
system of law.  As stated in *Redfern and Hunter: Law and Practice of International Commercial Arbitration*, 6th ed (2015), para 3.12:

   "Since the arbitration clause is only one of many clauses in a contract, it might seem reasonable to assume that the law chosen by the parties to govern the contract will also govern the arbitration clause.  If the parties expressly choose a particular law to govern their agreement, why should      D
   some other law-which the parties have not chosen-be applied to only one of the clauses in the agreement, simply because it happens to be the arbitration clause?"

**44**   This approach is supported by other leading commentaries.  For example, *Merkin on Arbitration Law* (looseleaf ed), Issue 84 (2020), para 7.12, states that:                                                                          E

   "even if there is no express contractual statement to that effect, a choice of law clause for the entire agreement is likely to be construed as extending to the arbitration clause.  There are numerous decisions to this effect . . . However, that presumption may be ousted in appropriate circumstances . . ."

See also *Dicey, Morris & Collins*, para 16-017: "If there is an express choice      F
of law to govern the contract as a whole, the arbitration agreement may also be governed by that law."

   *(ii) Domestic case law*

**45**   There is a considerable body of English case law which proceeds on the assumption that a choice of law for the contract will normally apply to      G
an arbitration clause in the contract.  The approach was summarised by Colman J in *Sonatrach Petroleum Corpn (BVI) v Ferrell International Ltd* [2002] 1 All ER (Comm) 627, para 32:

   "Where the substantive contract contains an express choice of law, but the agreement to arbitrate contains no separate express choice of law, the latter agreement will normally be governed by the body of law      H
   expressly chosen to govern the substantive contract."

**46**   It has not generally been considered to make any difference in this regard that the arbitration clause provides for arbitration to take place in a different country from the country whose law has been chosen to govern the

© 2020 The Incorporated Council of Law Reporting for England and Wales

4133

A contract. Examples of decisions in which a choice of law clause in the contract has been treated as applying to the arbitration agreement despite the seat of arbitration being in a different jurisdiction include: *Cia Maritima Zorroza SA v Sesostris SAE (The Marques de Bolarque)* [1984] 1 Lloyd's Rep 652, 653; *Union of India v McDonnell Douglas Corpn* [1993] 2 Lloyd's Rep 48, 49–50; *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's Rep 45, 57; *Deutz AG v General Electric Co*
B (unreported) 14 April 2000; *Peterson Farms Inc v C&M Farming Ltd* [2004] 1 Lloyd's Rep 603, paras 43–46; *Leibinger v Stryker Trauma GmbH* [2005] EWHC 690 (Comm) at [38]; and *Svenska Petroleum Exploration AB v Government of the Republic of Lithuania* [2006] 1 All ER (Comm) 731, paras 76–77.

47    A different view was expressed in *XL Insurance Ltd v Owens*
C *Corning* [2001] 1 All ER (Comm) 530, a case concerning a policy of insurance on "Bermuda form" terms which provide for New York law to govern the policy but for disputes to be determined by arbitration in London. The English court granted an injunction to restrain the insured from pursuing a claim against the insurers in the courts of Delaware. The insured argued that the choice of New York law to govern the policy included the arbitration agreement and that this agreement was invalid
D under the Federal Arbitration Act which formed part of New York law. Toulson J rejected that argument and concluded that, by stipulating for arbitration in London under the provisions of the 1996 Act, the parties had impliedly chosen English law to govern the arbitration agreement (see p 543B). We will consider his reasoning later in this judgment.

48    In *C v D* [2008] Bus LR 843, another case concerning a Bermuda
E form insurance policy, the Court of Appeal likewise expressed the view (obiter) that the arbitration agreement was governed by English law. In *C v D*, however, Longmore LJ (with whom the other members of the court agreed) reached this conclusion, not on the basis of implied choice, but on the basis that there was no choice of law for the arbitration agreement so that it was necessary to identify the law with which it was most closely connected. He considered this to be the law of the place where the parties
F had chosen to arbitrate rather than the law of the insurance contract (paras 25–26).

49    Many commentaries and authorities, including *XL Insurance* and *C v D*, were considered by the Court of Appeal in *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2013] 1 WLR 102. In a judgment with which the other members of the court agreed, Moore-Bick LJ said (at
G para 11):

"It is common for parties to make an express choice of law to govern their contract, but unusual for them to make an express choice of the law to govern any arbitration agreement contained within it; and where they have not done so, the natural inference is that they intended the proper law chosen to govern the substantive contract also to govern the
H agreement to arbitrate."

50    Moore-Bick LJ expressed reservations about the dicta of Longmore LJ in *C v D*, noting that the court in that case did not have the benefit of full citation of authority and that a rule that an arbitration agreement is governed by the law of the seat even where there is a choice of

© 2020 The Incorporated Council of Law Reporting for England and Wales

4134
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))        [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

law clause in the contract cannot "easily be reconciled with the earlier  *A*
authorities or with the established principles for determining the proper
law" (para 24).  His conclusion (at para 26) was in the following terms:

"In the absence of any indication to the contrary, an express choice of
law governing the substantive contract is a strong indication of the
parties' intention in relation to the agreement to arbitrate.  A search for an
implied choice of proper law to govern the arbitration agreement is  *B*
therefore likely (as the dicta in the earlier cases indicate) to lead to the
conclusion that the parties intended the arbitration agreement to be
governed by the same system of law as the substantive contract, unless
there are other factors present which point to a different conclusion.
These may include the terms of the arbitration agreement itself or the
consequences for its effectiveness of choosing the proper law of the  *C*
substantive contract . . ."

51   This approach was followed in *Arsanovia Ltd v Cruz City
1 Mauritius Holdings* [2013] 2 All ER (Comm) 1.  In that case a contract
contained clauses providing that it was to be governed by the laws of India
and that disputes were to be settled by arbitration in London.  It was held
that, as a matter of construction, the parties had chosen Indian law to govern
the arbitration agreement.  *D*
52   Recently, in *Kabab-Ji SAL (Lebanon) v Kout Food Group (Kuwait)*
[2020] 1 Lloyd's Rep 269 the Court of Appeal similarly construed a clause in
a contract which stated "This Agreement shall be governed by and construed
in accordance with the laws of England" as meaning that all the terms of the
contract were governed by English law including an arbitration clause which
provided for arbitration in France.  This conclusion was reinforced by the  *E*
fact that the contract included a clause which stated that "This Agreement
consists of . . . the terms of agreement set forth herein below".

*(iii) Considerations of principle*

53   A number of further considerations confirm the reasonableness of, as
a general rule, construing a choice of law to govern the contract as applying  *F*
to an arbitration agreement set out in a clause of the contract, even where the
law chosen to govern the contract differs from that of the place chosen as the
seat of the arbitration:
(i) This approach provides a degree of certainty.  The parties can be
assured that an agreement as to the governing law will generally be an
effective choice in relation to all of their contractual rights and obligations
and to all of their disputes.  *G*
(ii) It achieves consistency.  The same system of law governs all the
parties' rights and obligations.  It can be unsatisfactory for potentially
closely related issues such as the identity of the contracting parties or the
proper approach to the interpretation of their bargain to be governed by
different systems of law, depending on whether it relates to the main contract
or the arbitration agreement.  *H*
(iii) It avoids complexities and uncertainties.  As soon as the relationship
between the parties is subject to two systems of law, problems can arise as to
where and how to draw the boundaries between them.  This is exemplified
by the increasing prevalence of multi-tier dispute resolution clauses.  If the
arbitration agreement is governed by a different system of law from the main

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    body of the contract, provisions that require negotiation and/or mediation and/or expert determination in advance of arbitration raise potentially difficult questions as to whether they are governed by the law applicable to the arbitration agreement or by the law generally applicable to the contract, and indeed as to whether those questions should be answered by applying the common law rules or the Rome I Regulation.  Article 50.1 of the construction contract is an example of such a clause.  Although we explain

B    later how these difficulties may be addressed, if there is only one system of law then no such difficulties arise.

(iv) It avoids artificiality.  The principle that an arbitration agreement is separable from the contract containing it is an important part of arbitration law but it is a legal doctrine and one which is likely to be much better known to arbitration lawyers than to commercial parties.  For them a contract is a

C    contract; not a contract with an ancillary or collateral or interior arbitration agreement.  They would therefore reasonably expect a choice of law to apply to the whole of that contract.

(v) It ensures coherence.  It is consistent with the treatment of other types of clauses whose validity is also insulated from challenges to the contract, such as choice of law or choice of court clauses.  Such clauses are generally presumed to be governed by the law of the contract of which they form part:

D    see *Dicey, Morris & Collins*, paras 12-103 and 12-109.

54    As a matter of principle and authority there are therefore strong reasons why an agreement on a choice of law to govern a contract should generally be construed as applying to an arbitration agreement set out or otherwise incorporated in the contract.

E    *(iv) The international perspective*

55    As to the international perspective, although there is no uniformity, there are many commentators on international arbitration who support such an approach, at least where there is an express choice of governing law for the contract.  Examples to which we were referred include: Bantekas, "The Proper Law of the Arbitration Clause: A Challenge to the Prevailing Orthodoxy" (2010) 27 Journal of International Arbitration 1, 1-2; *Born,*

F    *International Commercial Arbitration*, 2nd ed (2014), p 592; Grover, "Dilemma of the Proper Law of the Arbitration Agreement: An Approach Towards Unification of Applicable Laws" (2014) 32 Sing L Rev 227, 255; Choi, "Choice of Law Rules Applicable for International Arbitration Agreements" (2015) 11 Asian International Arbitration Journal 105, 108–109; Khatchadourian, "Fortifying the Arbitration Clause" in

G    *Festschrift Ahmed Sadek El-Kosheri* (2015), pp 53–56; and Miles and Goh, "A Principled Approach Towards the Law Governing Arbitration Agreements" in *Jurisdiction, Admissibility and Choice of Law in International Arbitration: Liber Amicorum Michael Pryles* (2018) chapter 24, p 393.

56    This is also said to be the approach generally adopted by ICC arbitrators (see Lew, "The Law Applicable to the Form and Substance of the

H    Arbitration Clause: 40 Years of Application of the New York Convention" in *Improving the Efficiency of Arbitration Agreements and Awards* (ed van den Berg) (1998) ICCA Congress Series, vol 9, pp 143–144).  It would appear that the same approach has been adopted in a number of common law and civil law jurisdictions.  These include Singapore, India, Pakistan, Germany

© 2020 The Incorporated Council of Law Reporting for England and Wales

4136
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

and Austria.  According to Chubb Russia they also include Hong Kong, Australia and Switzerland, although this was questioned by Enka.

57    Singapore provides an instructive example.  In *FirstLink Investments Corpn Ltd v GT Payment Pte Ltd* [2014] SGHCR 12 it was held that the law of the seat should generally apply to the arbitration agreement.  In *BCY v BCZ* [2016] 2 Lloyd's Rep 583 Steven Chong J disagreed and held that the approach in *Sulamérica* [2013] 1 WLR 102 should be followed as it "is supported by the weight of authority and is, in any event, preferable as a matter of principle" (para 49).  Having set out detailed reasons why that was so, he concluded that, as the arbitration agreement in that case was contained in a contract expressly governed by New York law, the presumption was that New York law governed the arbitration agreement and this presumption was not displaced by the choice of Singapore as the seat of arbitration.

58    *BCY v BCZ* has been approved by the Singapore Court of Appeal—see *BNA v BNB* [2020] 1 Lloyd's Rep 55, para 44, where it was accepted by both parties as a correct statement of the law.

### V. The approach of the Court of Appeal
#### (i) The Court of Appeal's judgment

59    The Court of Appeal reached a contrary conclusion in the present case.  Leaving aside cases in which, exceptionally, a choice of the law governing the arbitration agreement is specified in the arbitration agreement itself, Popplewell LJ (with whom Flaux and Males LJJ agreed) was prepared to accept that an express choice of the law applicable to the contract containing the arbitration agreement may sometimes, as a matter of construction, amount to an express choice of the law applicable to the arbitration agreement (para 90).  But he considered that this conclusion would follow only in a minority of cases and that in all other cases there is a strong presumption that the parties have impliedly chosen the law of the seat of the arbitration to govern the arbitration agreement.  This was said to be the general rule, "subject only to any particular features of the case demonstrating powerful reasons to the contrary" (para 91).

#### (ii) Separability

60    Our first difficulty with this proposed general rule is that we do not agree that it is only in a minority of cases that an express choice of law to govern the contract should properly be construed as being a choice of law to govern an arbitration agreement included in the contract.  As we have discussed, a clause such as "This Agreement is to be governed by and construed in accordance with the laws of [a named country]" is naturally and sensibly understood to mean that the law of that country should govern and determine the meaning and effect of all the clauses in the contract which the parties signed including the arbitration clause.  It is unclear to us why more should be needed—or what more on the Court of Appeal's approach is required—to make it clear that a phrase such as "This Agreement" means the whole agreement and not just part of it.

61    The Court of Appeal justified its approach on the ground that a choice of law to govern the contract "has little if anything to say about the [arbitration agreement] law choice because it is directed to a different and separate agreement" (para 92).  This was said to follow from the doctrine

© 2020 The Incorporated Council of Law Reporting for England and Wales

4137

A   that an arbitration agreement is separable from the rest of the contract. In our view, this puts the principle of separability of the arbitration agreement too high. For reasons given earlier, the requirement that an arbitration clause is to be treated as a distinct agreement for the purpose of determining its validity, existence and effectiveness makes it more amenable than other parts of a contract to the application of a different law. The rationale underlying the separability principle is also relevant, as we will mention

B   later, in cases where applying the governing law of the contract to the arbitration clause would render the arbitration agreement invalid or ineffective. But it does not follow from the separability principle that an arbitration agreement is generally to be regarded as "a different and separate agreement" from the rest of the contract or that a choice of governing law for the contract should not generally be interpreted as applying to an

C   arbitration clause.

62    Descriptions of an arbitration clause as, for example, "collateral to the main contract in which it is incorporated" (*Paal Wilson & Co A/S v Partenreederei Hannah Blumenthal (The Hannah Blumenthal)* [1983] 1 AC 854, 917, per Lord Diplock) or "a separate contract, ancillary to the main contract" (*Bremer Vulkan Schiffbau und Maschinenfabrik v South India Shipping Corpn* [1981] AC 909, 998, per Lord Scarman) need to be seen in

D   their context as ways of expressing the doctrine that the discharge by frustration (or for other reasons) of the substantive obligations created by the contract will not discharge the parties' agreement to arbitrate. The arbitration clause is none the less part of the bundle of rights and obligations recorded in the contractual document. So, for example, an assignment of the contract will include an arbitration clause without the need for any separate

E   or additional assignment: see *Schiffahrtsgesellschaft Detlev von Appen GmbH v Voest Alpine Intertrading GmbH (The Jay Bola)* [1997] 2 Lloyd's Rep 279, 285; *Shayler v Woolf* [1946] Ch 320; and *Cockett Marine Oil DMCC v ING Bank NV (The M/V Ziemia Cieszynska)* [2019] 2 Lloyd's Rep 541. As Colman J put it in construing the words "any clause of this Agreement" as including an arbitration clause in *JSC Zestafoni G Nikoladze Ferroalloy Plant v Ronly Holdings Ltd* [2004] 2 Lloyd's Rep 335, para 31:

F   "There is nothing in the intrinsic character of an arbitration agreement as having an attribute of separability which prevents it from being included in that phrase."

63    Moore-Bick LJ summed up the position clearly when he said in the *Sulamérica* case [2013] 1 WLR 102, para 26:

G   "The concept of separability itself, however, simply reflects the parties' presumed intention that their agreed procedure for resolving disputes should remain effective in circumstances that would render the substantive contract ineffective. Its purpose is to give legal effect to that intention, not to insulate the arbitration agreement from the substantive contract for all purposes."

H   64    In his lead judgment in the Court of Appeal Popplewell LJ quoted this passage (at para 93) and appeared there to recognise that it is wrong to characterise an arbitration clause generally as a separate agreement. He went on, however, to make a more specific point that one of the purposes for which an arbitration agreement is treated as separate and severable is that of applying the curial law which, where the parties have chosen a different

© 2020 The Incorporated Council of Law Reporting for England and Wales

4138
**Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))**       [2020] 1 WLR
**Lord Hamblen and Lord Leggatt JJSC**

arbitration seat-and hence curial law-from the law applicable to their    A
contract, is distinct from the latter system of law.  The rhetorical question
was posed, at para 94:

> "Why then should [the law applicable to the contract] have anything to
> say about the closely related aspect of the very same arbitration agreement,
> namely the [law which governs it] (absent express language to that effect so
> as to give rise to an express choice of [the arbitration agreement] law)?"    B

Leaving aside what should count as "express language" in this regard, this
argument rests on the premise that the curial law which governs the
arbitration process is so closely related to the law governing the arbitration
agreement that a choice of law to govern the contract should generally be
presumed not to apply to an arbitration clause when the parties have chosen
a different curial law.  It is to this argument, which was central to the Court    C
of Appeal's reasoning, that we therefore turn.

### (iii) The overlap argument

65    This argument, which we will call the "overlap argument", seems to
have made its first appearance in *XL Insurance Ltd v Owens Corning* [2001]
1 All ER (Comm) 530, mentioned earlier, where Toulson J considered    D
that, by stipulating for arbitration in London under the provisions of the
Arbitration Act 1996, the parties had impliedly chosen English law to govern
the validity of the arbitration agreement despite the choice of New York law
as the governing law of the policy (see p 543B).  His essential reasoning (at
p 541E) was that the substance and process of arbitration "are closely
intertwined" and that the 1996 Act "contains various provisions which could
not readily be separated into boxes labelled 'substantive arbitration law' or    E
'procedural law', because that would be an artificial division".

66    The Court of Appeal in the present case endorsed and elaborated on
this reasoning, concluding that "the overlap between the scope of the curial
law and that of the [arbitration agreement] law strongly suggests that they
should be the same" (para 96).  They further considered that, given this
overlap and the fact that the curial law which regulates the arbitration    F
process is a matter of choice which comes with an express choice of seat, it
seems "natural to regard" a choice of seat as an implied choice of the law
applicable to the arbitration agreement (para 101).  On this basis they held
that there is a "strong presumption" that a choice of seat is an implied choice
of the law which is to govern the arbitration agreement (para 105(3)).

### (iv) Choice of curial law    G

67    On this appeal Chubb Russia disputed the initial premise that a
choice of seat for an arbitration involves any choice of law at all, procedural
or substantive.  Counsel for Chubb Russia submitted that the application of
the curial law of the seat is something that follows automatically from a
choice of place of arbitration rather than being itself a matter of choice.
They cited as an analogy a hypothetical case postulated by *Redfern and*    H
*Hunter*, para 3.63, of an English motorist who takes her car to France.
*Redfern and Hunter* comment that

> "it would be an odd use of language to say that this notional motorist
> had opted for 'French traffic law'; rather, she has chosen to go to

© 2020 The Incorporated Council of Law Reporting for England and Wales

4139
[2020] 1 WLR     Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

A   France—and the applicability of French law then follows automatically. It is not a matter of choice."

68   We agree that it would be inapt to describe the tourist in this example as having made a choice to be regulated by French traffic law. But as Mr Dicker QC for Enka submitted, it is difficult to conceive that a person's decision to visit France might be informed by a desire to be

B   governed by French traffic law. By contrast, the nature and scope of the jurisdiction exercised by the courts of a country over an arbitration which has its seat there is a highly material consideration in choosing a seat for the arbitration. That is reinforced by the fact that the seat of an arbitration is a legal concept rather than a physical one. A choice of place as the seat does not dictate that hearings must be held, or that any award must actually be

C   issued, in that place. As the Court of Appeal observed (at para 46), it is perfectly possible to conduct an arbitration with an English seat at any convenient location, anywhere in the world. Furthermore, under section 53 of the Arbitration Act 1996, unless otherwise agreed by the parties, where the seat of an arbitration is in England and Wales, any award in the proceedings shall be treated as made there, regardless of where it was signed, despatched or delivered to any of the parties (see also article 31(3) of the

D   UNCITRAL Model Law on International Commercial Arbitration adopted by the United Nations Commission on International Trade Law on 21 June 1985). The point of agreeing a seat is to agree that the law and courts of a particular country will exercise control over an arbitration which has its seat in that country to the extent provided for by that country's law. A choice of seat can in these circumstances aptly be regarded as a choice of the curial law.

E   69   As noted at the beginning of this judgment, however, the curial law which applies to the arbitration process is conceptually distinct from the law which governs the validity and scope of the arbitration agreement. Whether a choice of the curial law carries any implication that the parties intended the same system of law to govern the arbitration agreement-and, if so, the strength of any such implication-must depend on the content of the relevant

F   curial law.

### (v) Relationship between curial law and arbitration agreement law

70   In *Carpatsky Petroleum Corpn v PJSC Ukrnafta* [2020] Bus LR 1284, the claimant applied to enforce in England and Wales an arbitration award made in Sweden. Enforcement was resisted on the ground (among

G   others) that there was no valid arbitration agreement in the contract between the parties. This argument depended on the assumption that the validity of the arbitration agreement was governed by the law of Ukraine. The contract provided for the "law of substance of Ukraine" to apply "on examination of disputes". Butcher J held (at paras 67–71) that this was not a choice of Ukrainian law to govern the arbitration agreement and that, in the circumstances, the choice of Stockholm as the seat for any arbitration

H   demonstrated an implied choice that the validity and interpretation of the arbitration agreement should be governed by Swedish law. His reasons were that: (1) it was reasonable to infer that the parties had deliberately chosen a neutral forum to resolve their disputes and hence "intended the law of that jurisdiction to determine issues as to the validity and ambit of that choice";

© 2020 The Incorporated Council of Law Reporting for England and Wales

4140
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

and (2) by choosing Sweden as the seat for the arbitration, the parties agreed    A
to the application of the Swedish Arbitration Act, including section 48
which provides that, in the absence of agreement on a choice of law to
govern an arbitration agreement with an international connection, the
arbitration agreement shall be governed by the law of the country in which,
by virtue of that agreement, the arbitration proceedings have taken place or
will take place.  It follows that, by providing for a Swedish seat, the parties
were impliedly agreeing that Swedish law should govern the arbitration    B
agreement.

71    A similar inference could also be drawn where a contract contains an
agreement for arbitration in Scotland.    Section 6 of the Arbitration
(Scotland) Act 2010 provides:

"Where— (a) the parties to an arbitration agreement agree that an    C
arbitration under that agreement is to be seated in Scotland, but (b) the
arbitration agreement does not specify the law which is to govern it, then,
unless the parties otherwise agree, the arbitration agreement is to be
governed by Scots law."

72    There is, however, no similar provision in the Arbitration Act 1996.
The argument made by Enka, and accepted by the Court of Appeal, is that
the 1996 Act contains provisions which are substantive as well as provisions    D
which are procedural in nature, and that there is no clear division between
the two.  In these circumstances it is argued that, by choosing an English seat
in the knowledge that the Arbitration Act 1996 will apply where the seat of
the arbitration is in England, the parties are by implication choosing English
law to govern at least some aspects of their substantive rights under the
arbitration agreement.  Furthermore, as suggested by Toulson J in the *XL*    E
*Insurance* case [2001] 1 All ER (Comm) 530, the provisions which affect
substantive rights are intertwined with, and cannot readily be separated
from, procedural provisions of the Act.  The natural inference is said to be
that the parties intended all their rights under the arbitration agreement to
be governed by English law.

*(vi) Section 4(5) of the 1996 Act*    F

73    We agree that there is a close relationship between provisions of the
Arbitration Act 1996 concerned with the arbitration agreement and
provisions of the Act concerned with the arbitration process and that the
distinction between them is not always clear or easy to draw.  But we do not
accept that this justifies the conclusion that a choice of an English seat of
arbitration is an implied choice that the arbitration agreement will be    G
governed by English law.  In our view, a conclusive answer to that argument
lies in a point raised by Chubb Russia on this appeal which was not fully
developed in the Court of Appeal.  The point in short is that almost all the
provisions of the 1996 Act relied on to support the overlap argument are
non-mandatory and, where the arbitration agreement is governed by a
foreign law, by reason of section 4(5) the non-mandatory provisions of    H
the Act which concern arbitration agreements do not apply to it.  As the
legislation contemplates and specifically provides for a situation in which the
arbitration agreement will be governed by a foreign law even though English
law governs the arbitration process, no necessary inference can be drawn
that, by choosing an English seat and with it English law as the curial law,

© 2020 The Incorporated Council of Law Reporting for England and Wales

*A*  parties are also impliedly choosing English law to govern their arbitration agreement.

74    Section 4(5) of the 1996 Act states:

"The choice of a law other than the law of England and Wales or Northern Ireland as the applicable law in respect of a matter provided for by a non-mandatory provision of this Part is equivalent to an agreement

*B*  making provision about that matter.

"For this purpose an applicable law determined in accordance with the parties' agreement, or which is objectively determined in the absence of any express or implied choice, shall be treated as chosen by the parties."

75    The clear meaning and effect of this provision is that, where a foreign law is applicable to an arbitration agreement (whether by choice or as

*C*  determined in the absence of choice by the closest connection test), that fact alone is enough to disapply any non-mandatory provision of the Act in so far as it would otherwise affect a matter governed by the law applicable to the arbitration agreement. This is because the applicability of a foreign law is treated as equivalent to an agreement to make contrary provision about a matter. It is not necessary to inquire whether or not the foreign law does in fact make such contrary provision.

*D*  76    Even if there were otherwise considered to be any ambiguity in the meaning of section 4(5), it is dispelled by the Supplementary Report on the Arbitration Act 1996, dated January 1997, produced by the Departmental Advisory Committee on Arbitration ("the DAC"), which explains the genesis of the provision. As originally drafted, clause 2 of the Bill provided:

*E*  "(1) The provisions of this Part apply where the law of England and Wales or Northern Ireland is applicable, or the powers of the court are exercisable, in accordance with the rules of the conflict of laws.

"(2) They apply, in particular— (a) to matters relating to or governed by the arbitration agreement, where the applicable law is the law of England and Wales or Northern Ireland; and (b) to matters governed by the law applicable to the arbitral proceedings, where the seat of the

*F*  arbitration is in England and Wales or Northern Ireland."

77    The DAC Supplementary Report, at para 7(ii), observed that the purpose of clause 2(2) was to avoid the danger that all the provisions of Part I of the Act would be imported if English law was found to govern one particular aspect of an arbitration. For example:

*G*  "an arbitration may have a French seat, with French law governing the procedure, but English law governing the arbitration agreement. In such a situation, only those provisions of the Act which concern arbitration agreements should apply. It would be quite wrong to apply provisions of the Act which concern arbitral procedure, as this would be governed by French law."

*H*  Plainly, this reasoning applies equally in reverse to an arbitration with an English seat and English law governing the procedure, but French law governing the arbitration agreement. In such a situation, only those provisions of the Act which concern arbitral procedure should apply and not those which concern the arbitration agreement, as this would be governed by French law.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4142
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))   [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

78   The clause as drafted, however, was considered unworkable in   A
practice (although sound in principle)—one reason being that, to apply
clause 2(2), it would have been necessary individually to characterise and
separate all those provisions of the Act which concerned the arbitration
agreement, as distinct from all those that concerned the arbitral procedure
(see para 9(ii) of the DAC Supplementary Report).  It was noted that the
attempt to do this "had proved an extremely difficult and complex exercise".
Furthermore: "Many provisions concern both arbitration agreements and   B
arbitral procedure, and there appeared to be a divergence of view with
respect to many others."

79   In the light of these difficulties, the DAC decided to recommend
recasting the whole provision so as to establish in section 2(1) the basic rule
that Part I of the Act applies to arbitrations which have their seat in England
and Wales or Northern Ireland (see paras 10–11 of the DAC Supplementary   C
Report).  In such a case, however, as explained in para 12:

> "If . . . a foreign law has been chosen to govern any particular aspect
> of the arbitration, such as the arbitral procedure or the arbitration
> agreement, or is otherwise applicable to any such aspect, this is catered
> for by section 4(5).  Therefore, reference may be made to this Act in the
> first instance, and then back to another law with respect to a specific issue.   D
> Whilst a process of characterisation may still have to be done, the
> combination of section 2 and section 4(5) avoids the dangers that:
> "—a choice of English law with respect to one part of an arbitration will
> import other parts of the Act that concern other aspects of the arbitration;
> "—a choice of England as the seat of the arbitration will necessarily
> entail the imposition of every provision of the Act."

E

80   We observe that the "recasting" carried out on the recommendation
of the DAC did not remove the need individually to characterise the
provisions of the Act as substantive or procedural (or partly substantive and
partly procedural) whenever the applicable law is in issue—an exercise
described by the DAC as "extremely difficult and complex".  Nevertheless,
the legislative history confirms that sections 2 and 4(5) of the 1996 Act as   F
enacted were intended to have the effect that, where England is chosen as the
seat of an arbitration but the arbitration agreement is governed by a foreign
law, the non-mandatory provisions of the Act do not apply to any matter
concerning the parties' substantive rights and obligations under the
arbitration agreement.  The fact that the Act contains some provisions which
are substantive, or partly substantive, cannot therefore—where those
provisions are non-mandatory—support an inference that, by choosing an   G
English seat of arbitration, parties must be taken to have contemplated and
intended that the validity and scope of their arbitration agreement should be
governed by English law.

81   The only mandatory provisions of the 1996 Act are sections 12, 13
and 66–68.  Section 12 gives the court power to extend time for beginning an
arbitration where there is a contractual time limit.  This could only have any
bearing on the law applicable to the arbitration agreement if the arbitration   H
agreement includes a contractual time limit (which the relevant clause in this
case does not).  Section 13 applies the Limitation Acts to arbitrations.  As
these Acts include the Foreign Limitation Periods Act 1984, which applies
foreign limitation law to any substantive obligation governed by foreign law,

© 2020 The Incorporated Council of Law Reporting for England and Wales

this cannot support an inference that the arbitration agreement is governed by English law. Sections 66 to 68 are concerned with enforcement of the award and applications to the court to challenge an award. They are procedural in nature and cannot be said to determine the law applicable to the arbitration agreement.

82   The provisions of the Arbitration Act 1996 therefore do not justify any general inference that parties who choose an English seat of arbitration thereby intend their arbitration agreement to be governed by English law.

### (vii) Enka's case on section 4(5)

83   Enka put forward three responses to this reasoning, none of which we have found persuasive.

84   First, counsel for Enka submitted that section 4(5) is concerned only with a choice of foreign law as the curial law for the arbitration process, and not with a choice of foreign law to govern the arbitration agreement. This, however, is not a tenable reading of section 4(5), which is manifestly not limited in this way and expressly applies whenever a foreign law is applicable in respect of a matter provided for by a non-mandatory provision of the Act. As emphasised on Enka's own case, the matters provided for by non-mandatory provisions of the Act include some matters which concern the substance of the arbitration agreement as well as matters of procedure. Nor does section 4(4) support a different interpretation, as suggested in Enka's written case. Section 4(4) provides that it "is immaterial whether or not the law applicable to the parties' agreement is the law of England and Wales". This makes it clear that, if the parties have made arrangements by agreement in place of any non-mandatory provision of the Act, it is irrelevant whether or not that agreement is governed by English law. There is no inconsistency between that provision and the rule established by section 4(5) that a choice of foreign law in respect of a matter is equivalent to an agreement making provision about that matter.

85   The second argument advanced by Enka is that, if—as we think clear—section 4(5) is not confined to a choice of curial law and also covers cases where a foreign law is applicable to the arbitration agreement, section 4(5) nevertheless applies only where the arbitration agreement makes specific reference to the matter provided for by a non-mandatory provision of the Act.

86   As authority for this restrictive interpretation, Enka relied on a dictum of Lord Steyn in *Lesotho Highlands Development Authority v Impregilo SpA* [2006] I AC 221. That case involved an attempted challenge under section 68 of the 1996 Act to a decision by an arbitral tribunal to award interest under section 49(3) on principal sums awarded. The challenge failed because the House of Lords held that substantial injustice had not been established, as required to invoke section 68. However, Lord Steyn, who gave the leading speech, went on to point out that the challenge had also faced other formidable difficulties. In particular, the power under section 49(3) to award interest was prima facie available: the only question was whether there had been an agreement to the contrary for the purpose of section 49(2). In that context Lord Steyn noted (at para 37) that the judge at first instance had appeared to take the view that the law of Lesotho, as the law applicable to the construction contract under which the claim arose,

4144
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

might be relevant—presumably on the basis that it constituted an agreement    A
to the contrary. In relation to this, Lord Steyn remarked:

> "Ignoring for the moment the fact that one does not know what the
> law of Lesotho is, this view comes up against the difficulty that only an
> agreement in writing as defined in the Act can qualify as an agreement to
> the contrary under section 49: section 5(1) . . . The law of Lesotho is not
> an agreement to the contrary in writing."    B

87   Lord Steyn made no mention of section 4(5) of the Act: the point that
he made was based on section 5(1), which states that an "agreement between
the parties as to any matter is effective for the purposes of this Part only if in
writing". Nevertheless, in *C v D* [2008] Bus LR 843, para 19, Longmore LJ
treated Lord Steyn's dictum as supporting the view that section 4(5) requires
a choice of law "with regard to the specific provision of the [1996] Act which    C
the parties agree is not to apply". This statement was in turn relied on by
Burton J in *National Iranian Oil Co v Crescent Petroleum Co International
Ltd* [2016] 2 Lloyd's Rep 146, paras 12–17, to conclude that a choice of
Iranian law to govern an arbitration agreement was not sufficient to disapply
section 7 of the 1996 Act, which codifies the principle of separability of the
arbitration agreement, and that nothing less than an agreement expressly    D
disapplying section 7 or the English law governing separability would have
sufficed for that purpose.

88   The notion that section 4(5) applies only where parties have
specifically excluded a non-mandatory provision of the Act by the terms of
their arbitration agreement cannot, in our view, be accepted. It is not
consistent with the language of section 4(5). The words "in respect of a
matter provided for by a non-mandatory provision" require only that the    E
matter governed by the foreign law should be a matter provided for by a
non-mandatory provision of the Act. They cannot reasonably be read as
requiring the parties' specific agreement that the foreign law and not the
non-mandatory provision will govern the matter. Apart from anything else,
the second paragraph of section 4(5) makes it explicitly clear that no choice
or agreement of the parties at all is required for section 4(5) to apply. The    F
interpretation contended for by Enka is also inconsistent with the legislative
intent, as explained in the DAC Supplementary Report. Furthermore, as the
late Mr V V Veeder QC observed, if correct, it would make a practical
nonsense of the 1996 Act by requiring parties choosing a foreign law to
govern an agreement for arbitration in England to analyse and identify
individually in their agreement each of the 35 or so non-mandatory
provisions of the 1996 Act which they wish to disapply. We agree with    G
Mr Veeder's comment that the absurd consequences of such an interpretation
speak for themselves: see *Jurisdiction, Admissibility and Choice of Law in
International Arbitration: Liber Amicorum Michael Pryles* (2018), chapter
23, p 382.

89   We do not think it credible that Lord Steyn in the *Lesotho* case
[2006] 1 AC 221 intended to endorse such an interpretation of section 4(5),
and to do so without giving any reasons or even mentioning that provision of    H
the Act at all. The likely reason why no reference was made to section 4(5) is
that it was not relevant to the power to award interest. The Court of Appeal
in the *Lesotho* case ([2004] 1 All ER (Comm) 97) characterised the power to
award interest under section 49(3) of the 1996 Act as discretionary and

© 2020 The Incorporated Council of Law Reporting for England and Wales

4145

procedural—a characterisation which Lord Steyn seems to have endorsed when referring to the reasoning of the Court of Appeal in para 38 of his speech. The fact that section 49(3) was treated by both the Court of Appeal and the House of Lords in the *Lesotho* case as procedural in nature was later relied on by the Court of Appeal in *Maher v Groupama Grand Est* [2010] 1 WLR 1564, para 38, to support a similar characterisation of the power of a court to award interest under section 35A of the Senior Courts Act 1981 (as inserted by section 5(1) of, and Schedule 1 to, the Administration of Justice Act 1982). Because section 49(3) is procedural, the choice of the law of Lesotho to govern substantive contractual rights was not in respect of a matter provided for by section 49(3) and therefore did not engage section 4(5). As it was not in doubt that the curial law governing the arbitration process was English law, to disapply section 49(3) would accordingly have required a specific agreement (in writing), as Lord Steyn observed. Whether or not Lesotho law contained any equivalent procedural power was in these circumstances not relevant. Even if it did, the law of Lesotho concerning that matter could not amount to an agreement to the contrary.

90    This is, we think, how Lord Steyn's dictum should be understood. But whether this was what was meant or not, we are satisfied that section 4(5) does not require a specific agreement to disapply a non-mandatory provision of the Act. It follows that Longmore LJ's statement to that effect in *C v D* [2008] Bus LR 843 was erroneous and that the *National Iranian Oil Co* case [2016] 2 Lloyd's Rep 146 was wrongly decided on this point.

91    The third response of Enka was to contend that the consequences of giving section 4(5) what we consider to be its unambiguous meaning would be "as far-reaching as they are surprising" because it would cause numerous non-mandatory provisions, which parties to a London arbitration are unlikely to have intended to exclude, none the less to be excluded. To support this contention, Enka relied as examples on sections 5, 7, 30 and 58 of the 1996 Act.

92    Of these provisions, only section 7 which codifies the principle of separability concerns the validity or scope of the arbitration agreement. Section 5, which states that Part I of the Act applies only where the arbitration agreement is in writing, is not concerned with the validity or scope of the arbitration agreement but with the circumstances in which the provisions of the Act will apply. If the requirement of writing is not met, Part I of the Act will not apply to the arbitration agreement but it will be regulated by, and will still be valid at, common law (see section 81). Section 30, which empowers the arbitral tribunal to rule on its own jurisdiction, is procedural. It does not deal with the parties' substantive rights under the arbitration agreement but with the competence of the tribunal to determine the validity and scope of those rights. Section 58, which provides for the finality of an arbitral award, is also procedural in nature. (For that reason, the insurer's argument in *C v D* that, as a result of section 4(5), section 58 was disapplied by a choice of New York law to govern the arbitration agreement was misconceived.) These and other procedural non-mandatory provisions will only be excluded in the unusual event that the parties have chosen a foreign procedural law for an English-seated arbitration: see *Dubai Islamic Bank PJSC v Paymentech Merchant*

© 2020 The Incorporated Council of Law Reporting for England and Wales

4146
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

*Services Inc* [2001] 1 All ER (Comm) 514, para 31; *C v D* [2007] 2 All *A*
ER (Comm) 557, paras 25–26 (Cooke J); *Sterling v Rand* [2020] 1 All ER
(Comm) 934, para 58. As observed in the DAC Supplementary Report,
para 7(ii) (quoted at para 77 above), in such a case it would be wrong to
apply non-mandatory provisions of the Act which concern arbitral
procedure, as this would be governed by foreign law.

94    We accept that characterising individual provisions of that Act as *B*
procedural or substantive can, as recognised by the DAC, be a difficult and
complex exercise. But we are satisfied that giving section 4(5) its plain
meaning does not lead to surprising or untoward consequences and is
inconsistent with the contention that choosing English law as the curial law
of an arbitration involves an implied choice of English law as the law
applicable to the arbitration agreement.

94    For these reasons, we do not consider the overlap argument as *C*
accepted by the Court of Appeal to be well founded. While a choice of seat
and curial law is capable in some cases (based on the content of the relevant
curial law) of supporting an inference that the parties were choosing the law
of that place to govern the arbitration agreement, the content of the
Arbitration Act 1996 does not support such a general inference where the
arbitration has its seat in England and Wales.

*D*

## VI. Avoiding invalidity

### (i) The validation principle

95    It is a well-established principle of contractual interpretation in
English law, which dates back at least to the time of Sir Edward Coke (see
*Coke upon Littleton* (1628) 42a), that an interpretation which upholds the
validity of a transaction is to be preferred to one which would render it *E*
invalid or ineffective. In the days when Latin was commonly used in the
courts, it was expressed by the maxim "verba ita sunt intelligenda ut res
magis valeat quam pereat"—translated by Staughton LJ in *Lancashire
County Council v Municipal Mutual Insurance Ltd* [1997] QB 897, 910, as
"the contract should be interpreted so that it is valid rather than ineffective".

96    This principle may apply if, in determining whether the parties have *F*
agreed on a choice of governing law, a putative governing law would render
all or a part of the contract ineffective. For example, in *In re Missouri
Steamship Co* (1889) 42 Ch D 321 a contract for the carriage of cattle by sea
from Boston to England contained a clause that the carrier should not be
liable for the negligence of the master or crew of the ship. The clause was
valid under English law but void under the law of Massachusetts as being
against public policy. The cattle were lost by the negligence of the master *G*
and crew, and the shipper claimed against the carrier for the loss. In
concluding that the parties intended the contract to be governed by English
law, the judge and the Court of Appeal placed reliance on the presumption
that, in the words of Fry LJ, at p 341, "the law which would make the
contract valid in all particulars was the law [intended] to regulate the
conduct of the parties".

97    In that case the potential invalidity of a significant clause in a *H*
contract was relied on as indicating the law intended to govern the entire
contract. Where the clause in question is an arbitration clause, because of its
severable character its putative invalidity may support an inference that it
was intended to be governed by a different law from the other provisions of

© 2020 The Incorporated Council of Law Reporting for England and Wales

4147
[2020] 1 WLR      Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

A   the contract—or may at least negate an inference that the law generally applicable to the contract was intended to apply to the arbitration clause.

*(ii) Hamlyn v Talisker*

98    An early but authoritative instance of such reasoning is the decision of the House of Lords in *Hamlyn & Co v Talisker Distillery* [1894] AC 202.
B   A contract between an English company and a Scottish company, to be performed in Scotland, contained the following provision: "Should any dispute arise out of this contract, the same to be settled by arbitration by two members of the London Corn Exchange, or their umpire, in the usual way." It was common ground that this arbitration clause was valid according to English law but invalid according to the law of Scotland because the arbitrators were not named.  The Court of Session held that the contract was
C   governed by Scottish law as the law of the place of performance of the contract and that, in consequence, the arbitration clause was invalid.  The House of Lords unanimously reversed that decision.  As Lord Wilberforce subsequently noted in the *Tunisienne* case [1971] AC 572, 596, the only question decided by the House of Lords was whether the arbitration clause was governed by Scottish law or by English law.  The members of the
D   appellate committee were careful to limit their opinions to that question and to express no view on which law governed the other provisions of the contract.

99    Two reasons were given for concluding that the arbitration clause was governed by English law.  One reason, most fully expressed by Lord Watson (at pp 212–213), was that the language of the arbitration clause showed that the parties were contracting with reference to English law, as
E   the clause required the arbitrators to be members of a commercial body in London and to decide disputes "in the usual way"—in other words, in the manner customary in London.  This reasoning did not, however, as it seems to us, justify treating the arbitration clause itself as governed by English law irrespective of which law governed the rest of the contract.  It was a reason for inferring that the parties intended the arbitrators to apply English law in
F   deciding any dispute under the contract and therefore for regarding the parties' substantive contractual obligations as governed by English law. The question whether the arbitration clause was valid determined whether the arbitrators had jurisdiction, which was not at that time a matter that the arbitrators themselves were seen as competent to decide.  This reasoning is therefore an early example of an approach we will consider shortly which treats a choice of seat of arbitration as an implied choice of
G   law to govern the contract as a whole.

100    The principal enduring significance of *Hamlyn v Talisker* lies in the second reason given for the decision, which was clearly articulated by Lord Herschell LC and Lord Ashbourne.  It was this reason which justified treating the arbitration clause as potentially governed by a different law from rest of the contract.  In Lord Herschell's words (at p 208):

H      "the contract with reference to arbitration would have been absolutely null and void if it were to be governed by the law of Scotland.  That cannot have been the intention of the parties; it is not reasonable to attribute that intention to them if the contract may be otherwise construed; . . ."

© 2020 The Incorporated Council of Law Reporting for England and Wales

4148
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))        [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

Lord Ashbourne made the same point, stating graphically (at p 215) that:        A

"the arbitration clause becomes mere waste paper if it is held that the parties were contracting on the basis of the application of the law of Scotland, which would at once refuse to acknowledge the full efficacy of a clause so framed."

He continued: "It is more reasonable to hold that the parties contracted with the common intention of giving entire effect to every clause, rather than of mutilating or destroying one of the most important provisions."        B

### (iii) The decision in Sulamérica

101    It was this reasoning which led the Court of Appeal in the Sulamérica case [2013] 1 WLR 102 to conclude that the arbitration clause in that case was governed by English law despite, as discussed earlier, starting from the position that an express choice of law to govern the contract is normally intended to apply to the arbitration clause.        C

102    In the Sulamérica case claims were made by Brazilian companies involved in a construction project in Brazil under two insurance policies. Each policy contained an express choice of Brazilian law to govern the policy and a clause conferring exclusive jurisdiction on the courts of Brazil, but also mediation and arbitration clauses. These provided that any dispute should be referred to mediation and that, if the parties failed to agree the amount to be paid under the policy through mediation, the dispute should then be referred to arbitration in London. The insurers commenced arbitration proceedings in London and applied successfully to the English court for an interim injunction to restrain the insured from pursuing proceedings in the courts of Brazil. An appeal by the insured was dismissed by the Court of Appeal.        D

103    The insured's case was that the contract, including the arbitration agreement, was governed by Brazilian law and that under Brazilian law the arbitration agreement was not enforceable against them without their consent. As noted earlier, Moore-Bick LJ (with whom Hallett LJ and Lord Neuberger of Abbotsbury MR agreed) accepted that the choice of Brazilian law to govern the contract was a strong indication that the parties intended that system of law to govern the arbitration agreement. However, Moore-Bick LJ identified two factors pointing the other way. The first was the overlap argument which we have just discussed: that by choosing London as the seat of arbitration, the parties must have foreseen and intended that the provisions of the Arbitration Act 1996 should apply to any arbitration, including those provisions which are more substantive than procedural in nature (para 29). For the reasons already given, we do not think that this argument is sound, as it overlooks the fact that, if the arbitration agreement was governed by Brazilian law, the non-mandatory substantive provisions of the Act would be excluded by section 4(5). It was the second factor, however, which the Court of Appeal regarded as decisive. This was the possible existence of a rule of Brazilian law which would render the arbitration agreement enforceable only with the insured's consent (para 30). Moore-Bick LJ reasoned that, given the terms of the mediation and arbitration clauses, the parties could not have intended to choose a system of law that "either would, or might well, have that effect" (para 31). As he also        E

        F

        G

        H

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    put it, Brazilian law could not have been intended to govern the arbitration agreement when "there is at least a serious risk that a choice of Brazilian law would significantly undermine that agreement".

104    In these circumstances it was necessary to identify the system of law with which the arbitration agreement was most closely connected. On this point Moore-Bick LJ said, at para 32, that:

B        "an agreement to resolve disputes by arbitration in London, and therefore in accordance with English arbitral law, does not have a close juridical connection with the system of law governing the policy of insurance, whose purpose is unrelated to that of dispute resolution; rather, it has its closest and most real connection with the law of the place where the arbitration is to be held and which will exercise the supporting
C        and supervisory jurisdiction necessary to ensure that the procedure is effective."

On this basis he concluded that the arbitration agreement was governed by English law.

105    Although reasoning of this kind was not relied on in the *XL Insurance* [2001] 1 All ER (Comm) 530 case—where, as discussed earlier,
D    Toulson J relied on the overlap argument—it provides in our view a better justification for the result reached in that case. The fact that the arbitration clause would arguably have been invalid under New York law was itself a strong reason for interpreting the choice of New York law to govern the insurance policy as not extending to the arbitration agreement.

E        *(iv) Commercial purpose of an arbitration clause*

106    The principle that contracting parties could not reasonably have intended a significant clause in their contract, such as an arbitration clause, to be invalid is a form of purposive interpretation, which seeks to interpret the language of the contract, so far as possible, in a way which will give effect to-rather than defeat-an aim or purpose which the parties can be taken
F    to have had in view. The strength of the inference that an interpretation of the contract would defeat an aim of the parties is, however, a matter of degree. An interpretation which would without doubt mean that an arbitration clause is void and of no legal effect at all gives rise to a very powerful inference that such a meaning could not rationally have been intended. That was the position in *Hamlyn v Talisker*, where it was common ground that, if the arbitration clause were governed by Scottish
G    law, it would have been (in Lord Herschell's words [1894] AC 202, 208) "absolutely null and void". In the *Sulamérica* case [2013] 1 WLR 102 the inference was weaker. There was a serious risk—but not a certainty—that, if Brazilian law applied to the arbitration clause, it would render the agreement to arbitrate enforceable only with the insured's consent. That would not have meant that the arbitration clause was of no effect at all. As
H    Moore-Bick LJ acknowledged, although most arbitration agreements permit either party to refer disputes to arbitration, some provide for arbitration only at the option of one or other party. He did not think it reasonable, however, to attribute to the parties in that case an intention to enter into "a one-sided arrangement of that kind" (para 30).

© 2020 The Incorporated Council of Law Reporting for England and Wales

4150

Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

107    In *Fiona Trust & Holding Corpn v Privalov* [2007] Bus LR 1719,    A
the House of Lords affirmed the principle that

"the construction of an arbitration clause should start from the
assumption that the parties, as rational businessmen, are likely to have
intended any dispute arising out of the relationship into which they have
entered or purported to enter to be decided by the same tribunal" (see
para 13, per Lord Hoffmann).    B

Contrary to a submission made on behalf of Chubb Russia, this is not a
parochial approach but one which, as the House of Lords noted in the *Fiona
Trust* case, has been recognised by (amongst other foreign courts) the German
Federal Supreme Court (Bundesgerichtshof), the Federal Court of Australia
and the United States Supreme Court and, as stated by Lord Hope at para 31,
"is now firmly embedded as part of the law of international commerce". In his    C
monumental work on *International Commercial Arbitration*, 2nd ed (2014),
p 1403 Gary Born summarises the position as follows:

"In a substantial majority of all jurisdictions, national law provides
that international arbitration agreements should be interpreted in light of
a 'pro-arbitration' presumption.  Derived from the policies of leading
international arbitration conventions and national arbitration legislation,    D
and from the parties' likely objectives, this type of presumption provides
that a valid arbitration clause should generally be interpreted expansively
and, in cases of doubt, extended to encompass disputed claims.  That is
particularly true where an arbitration clause encompasses some of the
parties' disputes and the question is whether it also applies to related
disputes, so that all such controversies can be resolved in a single
proceeding (rather than in multiple proceedings in different forums)."    E

108    To the extent that a putative applicable law fails to recognise this
presumption that arbitration has been chosen as a one stop method of
dispute resolution, it is inherently less likely that reasonable commercial
parties would have intended that law to determine the validity and scope of
their agreement to arbitrate (rather than litigate) disputes.

109    What degree of impairment to the commercial purpose of an    F
arbitration agreement will be enough to negate the assumption that a choice
of law to govern the contract is intended to apply to the arbitration
agreement is not a question which can be answered in the abstract.  As with
any question of construction, it will be necessary to have regard to the
particular words used in the contract and the surrounding circumstances, as
well as the nature and extent of the risk that the purpose of the arbitration    G
agreement would be undermined if its validity and scope were governed by
the relevant system of law.  We cannot improve on the formulation of
Moore-Bick LJ in the *Sulamérica* case [2013] 1 WLR 102, para 31, that
commercial parties are generally unlikely to have intended a choice of
governing law for the contract to apply to an arbitration agreement if there
is "at least a serious risk" that a choice of that law would "significantly
undermine" that agreement.    H

### VII. Relevance of the arbitration seat to the main contract law

110    During the 20th century a line of authority developed which treated
a choice of place of arbitration, where there was no express choice of

© 2020 The Incorporated Council of Law Reporting for England and Wales

governing law clause in the contract, as a strong indication that the parties intended the contract to be governed by the law of that place. This inference hardened into a rule of law and reached its high-water mark in *Tzortzis v Monark Line A/B* [1968] 1 WLR 406, where the Court of Appeal held that a London arbitration clause gave rise to an implication that the parties intended English law to govern their contract which could only be rebutted by an express provision to the contrary.

111    In the *Tunisienne* case [1971] AC 572 the House of Lords held that this put the strength of the implication too high and that the implication stemming from a choice of arbitral forum could be overridden by contrary indications derived from the express provisions of the contract or relevant surrounding circumstances. Nevertheless, Lord Wilberforce (at p 596B) described the inference that the parties intended the law of the place of arbitration to govern their contract as "a sound general rule". Lord Diplock went further and said (at p 609E) that he did not

> "wish to throw any doubt upon the proposition that an arbitration clause is generally intended by the parties to operate as a choice of the proper law of the contract as well as the curial law and should be so construed unless there are compelling indications to the contrary . . ."

112    As is apparent from, for example, the submissions of Robert Goff QC in defence of this approach in the *Tunisienne* case (at p 579D), its rationale was that contracting parties, by agreeing to arbitration in a particular place, must normally be taken to have expected the arbitrators to be resident in that place and to apply the law with which they are familiar. Lord Wilberforce expressed some reservation about this reasoning, observing (at p 596C):

> "I venture to think that in commercial matters, at the present time, this may give insufficient recognition to the international character of the City of London as a commercial centre—the reason, rather than any preference for English rules, for which arbitration in London is selected."

113    In the half century since the *Tunisienne* case was decided international arbitration has undergone major evolution and exponential growth. This has been accompanied by the development of international arbitral institutions such as the ICC's International Court of Arbitration, the International Centre for Dispute Resolution established by the American Arbitration Association and the London Court of International Arbitration. The primary reason for selecting London as a place of arbitration is no longer the international character of London as a commercial centre but its attractiveness specifically as a forum in which to arbitrate international disputes. In some cases where the parties have chosen English law as the governing law of their contract, the ready availability of expert English lawyers may be a relevant factor in choosing London as the arbitration venue. But even in the kinds of arbitration where the members of the arbitral tribunal are chosen for their legal expertise (rather than solely or mainly for their commercial experience), there is nothing to prevent the appointment of lawyers qualified in other jurisdictions to act as arbitrators in a London-seated arbitration, or English lawyers to act as arbitrators in a foreign-seated arbitration, and such appointments are frequently made. Furthermore, experienced international arbitrators qualified as lawyers in England and

© 2020 The Incorporated Council of Law Reporting for England and Wales

4152
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

Wales or in other jurisdictions are perfectly familiar with applying systems of law other than their own. There can in these circumstances be no general implication that a choice of London (or any other major arbitration centre) as the seat of arbitration demonstrates an intention that the parties' contractual obligations will be governed by the law of that place. This is equally so whether the question of implied choice is governed by article 3 of the Rome I Regulation (in relation to the main body of the contract) or the common law conflict rules (in relation to the arbitration agreement).

114    There are still cases in which an arbitration clause providing for arbitration in London by, for example, English maritime arbitrators, or by London brokers, or by a local association or exchange, may in combination with other factors be regarded as conveying an implied choice of law. An example is *Egon Oldendorff v Libera Corpn (No 2)* [1996] 1 Lloyd's Rep 380, where an arbitration clause in a charterparty made between Japanese owners and German charterers provided for arbitration in London by arbitrators appointed by the London Maritime Arbitrators' Association. Also relevant to Clarke J's decision that the parties intended English law to govern the charterparty were: (1) the fact that it was made on a well-known standard form containing clauses with well-known meanings in English law; and (2) that having agreed a "neutral" forum, the parties intended that forum to apply a "neutral" law, namely English law and not German or Japanese law. In such cases that implied choice of law will equally apply to the arbitration agreement: see *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi AS v VSC Steel Co Ltd* [2014] 1 Lloyd's Rep 479, para 102.

115    Such a situation may be contrasted with one in which the arbitration clause, although it specifies a place of arbitration, does not provide for a method of identifying the arbitrators except through appointment by an international arbitral body such as the ICC. As Andrew Baker J observed in his judgment in this case (at para 62), the ICC is "a quintessentially and deliberately supranational institution", with its own internal, and so again supranational, supervisory apparatus of the International Court of Arbitration and its Secretary General and Secretariat. In a case of this kind the parties could not reasonably assume that the selection of London as the seat of arbitration, even where it is a neutral forum, points ineluctably by necessary implication to a choice of English law to govern the contract so as to make the express designation of a governing law unnecessary.

116    Enka did not seek to argue on this appeal that the choice of London as the seat of arbitration in this case implies that the parties intended the construction contract as a whole to be governed by English law. But counsel for Enka submitted that, even though such an inference cannot be drawn in relation to the law intended to govern the parties' substantive contractual obligations, it can nevertheless be drawn in relation to the arbitration agreement itself.

117    We do not accept this. Where there is insufficient reason to infer that the parties chose London as the seat of arbitration because they wanted the arbitrators to be versed in English law, that applies as much to any issues concerning the validity or scope of the arbitration agreement which the arbitrators might be asked to decide as it does to the substance of any dispute. Nor can any necessary implication be drawn from the possibility that issues concerning the validity or scope of the arbitration agreement

© 2020 The Incorporated Council of Law Reporting for England and Wales

4153

[2020] 1 WLR        Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

A    might have to be decided by the English courts in the exercise of their supervisory jurisdiction. Questions of foreign law are dealt with in the English Commercial Court on a daily basis—the trial of the present case being an example—and, as Steyn LJ said in *Star Shipping AS v China National Foreign Trade Transportation Corpn (The Star Texas)* [1993] 2 Lloyd's Rep 445, 451–452, even an express choice of jurisdiction does not by itself give rise to an implied choice of law. We therefore do not consider

B    that a choice of the seat of arbitration can by itself be construed as an implied choice of the law applicable to the arbitration agreement.

### VIII. *Applying the closest connection test*

118    So far we have been considering the question whether the parties to a contract have chosen the law applicable to the arbitration agreement,

C    either specifically or by choosing a system of law to govern the contract as a whole including the arbitration agreement. We now turn to the situation in which no such choice has been made. As discussed earlier (see para 36 above), the court must in these circumstances determine, objectively and irrespective of the parties' intention, with which system of law the arbitration agreement has its closest connection. This exercise is different in nature from the attempt to identify a choice (whether express or implied), as

D    it involves the application of a rule of law and not a process of contractual interpretation.

119    Even where the parties have not agreed what law is to govern their contract, it is reasonable to start from an assumption—for reasons given earlier—that all the terms of the contract, including an arbitration clause, are governed by the same system of law. Where, however, the parties have

E    selected a place for the arbitration of disputes, there is authority for, as a general rule, regarding the law with which the arbitration agreement is most closely connected as the law of the seat of arbitration. As we have seen, this was the approach adopted by the Court of Appeal in the *Sulamérica* case [2013] 1 WLR 102 (see para 104 above). It was also endorsed by the Court of Appeal in *C v D* [2008] Bus LR 843 (see para 48 above), albeit that in that case insufficient reason was given, in our opinion, for rejecting the inference

F    that the law chosen to govern the insurance contract was intended to apply to the arbitration clause. Among commentators, this rule notably has the support of *Dicey, Morris & Collins*, rule 64(1)(b) and para 16-016; see also *Russell on Arbitration*, 24th ed, (2015), para 2-121.

120    There are a number of reasons of principle and policy which in our opinion justify as a general rule regarding the law of the place chosen as the

G    seat of arbitration as the law most closely connected with the arbitration agreement which in the absence of choice will apply by default.

### (i) *The place of performance*

121    The starting point is that the seat of arbitration is the place where (legally, even if not physically) the arbitration agreement is to be performed.

H    In identifying the system of law with which a contract (or relevant part of it) has its closest and most real connection, the place where the transaction is to be performed is the connecting factor to which the common law has long attached the greatest weight (since the place where the contract was concluded ceased to be seen as significant): see e g *Dicey, Morris & Collins*, para 32-073. This is justified by the fact that states have an interest in

© 2020 The Incorporated Council of Law Reporting for England and Wales

regulating transactions taking place within their territory and by the consequent natural assumption that the law of the territory in which a transaction is taking place will govern it in the absence of a contrary indication.  By agreeing to a seat of arbitration the parties submit themselves to the jurisdiction of the courts of that place and to its law and coercive powers for the purposes of deciding any issue relating to the validity or enforceability of their arbitration agreement.  Thus, as we discuss later in this judgment (see Part XI below), the courts of the seat have jurisdiction to grant an injunction to restrain proceedings brought in breach of the agreement to arbitrate.  The parties also by their choice of seat impliedly agree to bring any claim for a remedy relating to the existence or scope of the arbitrators' jurisdiction (including any issue as to the validity or scope or the arbitration agreement), and any challenge to an arbitral award, in the courts of that place: see *C v D* [2007] 2 All ER (Comm) 557, paras 29–34 (Cooke J); *C v D* [2008] Bus LR 843, para 17 (CA); *Minister of Finance (Inc) v International Petroleum Investment Co* [2020] Bus LR 45, paras 36–49; *Dicey, Morris & Collins*, para 16-036.  The seat of arbitration is in these circumstances the place to whose system of law the arbitration agreement is most closely attached.

122    By contrast, there is no reason to regard the place of performance of the substantive obligations created by the contract as a significant connection for the purpose of determining the law applicable to the arbitration agreement (as opposed to for the purpose of determining what law the arbitrators should apply in deciding a dispute).  This is because (as noted at para 40 above) the subject matter and purpose of an arbitration agreement are different from those of the contract in which it is incorporated.  The irrelevance of the place of performance of the main contract is illustrated by the fact that seats of arbitration are frequently chosen which have no connection with where the parties' substantive obligations are to be performed (or otherwise with the contract) and sometimes precisely because they have no such connection.  Other factors connecting the main contract to a country or its laws are equally irrelevant in regard to the arbitration agreement.  For example, article 4 of the Rome I Regulation adopts a presumption that the contract is most closely connected with the country where the party required to effect the characteristic performance of the contract has his habitual residence.  There is no reason to regard this as a factor which should have any bearing on the law applicable to the arbitration agreement.

123    We therefore agree with the view of Moore-Bick LJ in the *Sulamérica* case [2013] 1 WLR 102, para 32, quoted at para 104 above and also with statement of Longmore LJ in *C v D* [2008] Bus LR 843, para 26, that:

> "an agreement to arbitrate will normally have a closer and more real connection with the place where the parties have chosen to arbitrate than with the place of the law of the underlying contract in cases where the parties have deliberately chosen to arbitrate in one place disputes which have arisen under a contract governed by the law of another place."

124    We do not consider that the importance of the connection between the law governing the arbitration agreement and the law of the seat is undermined by the fact that some national laws, such as the Arbitration Act

© 2020 The Incorporated Council of Law Reporting for England and Wales

4155

A    1996 in England and Wales, allow the parties a wide degree of freedom to make their own arrangements, either by choosing another system of law to govern their arbitration agreement or arbitral procedure (see section 4(5) of the 1996 Act, discussed earlier) or by agreeing to the application of institutional rules made by an arbitral body such as the ICC (see section 4(3) of the 1996 Act). The extent to which the parties are free to make such arrangements is itself a matter for the law of the seat. Furthermore, any national law is likely to include mandatory provisions, described in section 1(b) of the 1996 Act as "such safeguards as are necessary in the public interest", which have effect notwithstanding any agreement to the contrary. As noted earlier, in the 1996 Act these include sections 66 to 68, which govern any challenge to an award made in England including any challenge to the substantive jurisdiction of the arbitrators on grounds that the arbitration agreement is invalid or unenforceable or does not cover the dispute referred to arbitration. Such provisions of themselves establish a close nexus between the law determining the validity and scope of the arbitration agreement and the law of the seat of arbitration.

### (ii) Consistency with international law and legislative policy

125    A second, and in our view compelling, reason for treating an arbitration agreement as governed by the law of the seat of arbitration in the absence of choice is that such a rule accords with international law as embodied in the 1958 New York Convention and other international instruments, as well as with the national law which gives effect to the New York Convention in England and Wales.

126    The New York Convention, to which the United Kingdom became a party in 1975 and which more than 160 states have now signed, has been described as "the single most important pillar on which the edifice of international arbitration rests", and as "perhaps . . . the most effective instance of international legislation in the entire history of commercial law": see *Redfern and Hunter*, para 2.11, quoting Wetter, "The present status of the International Court of Arbitration of the ICC: An appraisal" (1990) 1 Am Rev Intl Arb 91, p 93, and Mustill, "Arbitration: History and background" (1989) 6 J Intl Arb 43, p 49. The essential aim of the Convention was to establish a single uniform set of international legal standards for the recognition and enforcement of arbitration agreements and awards. Its success is reflected in the fact that, according to *Born, International Commercial Arbitration*, 2nd ed (2014), p 113, the New York Convention has been implemented through national legislation in virtually all contracting states.

127    Article V(1)(a) of the Convention specifies, among the limited circumstances in which recognition or enforcement by the courts of a Convention state of an award made in another Convention state may be refused, proof that the arbitration agreement "is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made". As stated in *Dicey, Morris & Collins*, para 16-014: "In the light of the pervasive reach of the New York Convention in modern times, this rule, although not itself prescribing a choice of law rule of general application, nevertheless provides a strong indication of one . . ."

© 2020 The Incorporated Council of Law Reporting for England and Wales

4156
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

128    Article V(1)(a)—enacted into English law by section 103(2)(b) of    A
the Arbitration Act 1996—has two limbs, which are intended to be treated
as uniform international conflict of laws rules: see *Dallah Real Estate and
Tourism Holding Co v Ministry of Religious Affairs of the Government of
Pakistan* [2009] 1 All ER (Comm) 505, para 78 (Aikens J); and [2011] 1 AC
763, para 123 (Lord Collins of Mapesbury JSC).  The first, and primary, rule
is that the validity of the arbitration agreement is governed by "the law to
which the parties [have] subjected it"—in other words the law chosen by the    B
parties.  The second, default rule, which applies where no choice has been
indicated is that the applicable law is that of "the country where the award
was made".  Where the parties have chosen the seat of arbitration, this will
be (or be deemed to be) the law of the seat.  In English law this is expressly
provided by section 100(2)(b) of the 1996 Act.

129    There is a division of opinion among commentators over whether    C
the first limb of article V(1)(a) applies only where there is an express choice
of law to govern the arbitration agreement or whether it also encompasses a
choice that is implied—for example from a choice of law to govern the
contract in general: compare *van den Berg, The New York Arbitration
Convention of 1958* (1981), p 293 and *Born*, pp 564–565.  We think the
latter is the better view.  As discussed earlier, a choice of law for the    D
arbitration agreement may be clearly indicated by a choice of law for
the contract of which it forms part and a choice conveyed impliedly is just
as much a choice entitled to respect in accordance with the principle of
party autonomy as a choice stated expressly.  Furthermore, the broader
interpretation is supported by the language of article V(1)(a), which applies
the default rule only failing "any indication" of the law to which the parties
have subjected the arbitration agreement.    E

130    Where proceedings are brought in a court of a contracting state in
respect of a matter covered by an arbitration agreement to which the New
York Convention applies, article II(3) of the Convention requires the court,
at the request of one of the parties, to refer the parties to arbitration, unless
the agreement "is null and void, inoperative or incapable of being
performed".  Article II does not itself specify rules for identifying the law by    F
which the validity of the arbitration agreement is to be determined.  There is,
however, a strong and widely accepted argument that the Convention is to
be interpreted as requiring the same conflict rules to be applied in relation to
article II(3) as are specifically required at the stage of enforcement by
article V(1)(a).  Thus, Professor van den Berg, a leading authority on the
New York Convention, has written:    G

> "A systematic interpretation of the Convention, in principle, permits
> the application by analogy of the conflict rules of article V(1)(a) to the
> enforcement of the agreement.  It would appear inconsistent at the time of
> the enforcement of the award to apply the Convention's uniform conflict
> rules and at the time of the enforcement of the agreement to apply possibly
> different conflict rules of the forum.  It could lead to the undesirable
> situation of the same arbitration agreement being held to be governed by    H
> two different laws: one law determined according to the conflict rules of
> the forum at the time of the enforcement of the agreement, and the other
> determined according to article V(1)(a) at the time of enforcement of the
> award."

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  van den Berg, *The New York Arbitration Convention of 1958* (1981), pp 126–127; and see *Born*, pp 494, 495–499; *Lew & Mistelis, Comparative International Commercial Arbitration* (2003), para 6-55; Schramm, Geisinger & Pinsolle, "article II" in *Recognition and Enforcement of Foreign Arbitral Awards: A Global Commentary on the New York Convention* (ed Kronke, Nacimiento et al (eds), (2010), p 55.

B  131   This approach is also supported by other international instruments. The 1961 European Convention on International Commercial Arbitration adopts the conflict rules set out in article V(1)(a) of the New York Convention and, by article VI(2), provides for those rules to be applied at any stage when a court of a contracting state is required to rule on the existence or validity of an arbitration agreement-in other words, whether the question arises pre- or post-award.

C  132   Article 36 of the Model Law adopted by the United Nations Commission on International Trade Law (UNCITRAL) on 21 June 1985 parallels article V of the New York Convention in its list of grounds (set out in article 36) on which recognition or enforcement of an arbitral award may be refused.  The Model Law takes this a step further in article 34 by restricting any challenge to an arbitral award to an application brought in the state in which the award was made and by limiting the grounds on which an award may be set aside to those on which recognition or enforcement of a foreign award may be refused.

D  133   The primary reason for the exclusion of arbitration agreements from the Rome I Regulation was that such agreements were already adequately regulated by international conventions: see *McParland, The Rome I Regulation on the Law Applicable to Contractual Obligations*

E  (2015), paras 7-126 to 7-127.  The exclusion can accordingly be seen as a recognition of the fact that arbitration agreements are already subject to international uniform conflict rules derived, in particular, from the 1958 New York Convention and the 1961 European Convention.

134   Although the United Kingdom has not signed the 1961 European Convention and has not in all respects adopted the UNCITRAL Model Law, the rules laid down in article V of the New York Convention (and article 36 of the Model Law) relating to the recognition or enforcement of awards have

F  been directly incorporated into English law by section 103 of the 1996 Act. Thus, under section 103(2)(b) the grounds on which recognition or enforcement of an award made in another Convention state may be refused include proof that: "the arbitration agreement was not valid under the law to which the parties subjected it or, failing any indication thereon, under the

G  law of the country where the award was made; . . ."

135   While this provision only applies directly in proceedings brought to enforce an award made in another Convention state, it would be illogical to apply different conflict rules to determine which law governs the validity of the arbitration agreement where the arbitration is seated (and the award therefore treated as made) in England.  Thus, in cases where the parties have not chosen the law of the arbitration agreement but have chosen the seat of

H  arbitration, it would be illogical if the English courts were to treat the validity of the arbitration agreement as governed by the law of the seat if the parties have chosen a foreign seat but by the law of the main contract if they have been chosen an English seat of arbitration.  Such an approach would be all the more incoherent given that, if proceedings were brought in another

© 2020 The Incorporated Council of Law Reporting for England and Wales

Convention state to enforce an award made in England, the foreign court would apply the law of the seat (and not the law of the main contract, if different) to determine the validity of the award as required by article V(1)(a) of the Convention.

136   As pointed out by Professor van den Berg in the passage quoted at para 130 above, it would be equally illogical if the law governing the validity of the arbitration agreement were to differ depending on whether the question of validity is raised before or after an award has been made. To ensure consistency and coherence in the law, the same law should be applied to answer the question in either case. Again, the incoherence that would result if English common law were to adopt a different conflict rule from the New York Convention's uniform rule would be compounded when the international perspective is considered. As one commentator has observed:

> "It is fair to say that today, the conflict rule contained in article V(1)(a) New York Convention . . . has developed into a truly transnational conflict rule for the determination of the law governing the substantive validity of the arbitration agreement. This rule has been applied in numerous international arbitral awards, is favoured by international arbitral doctrine and has been accepted by domestic courts."

See Berger, "Re-examining the Arbitration Agreement: Applicable Law-Consensus or Confusion?" (2006) ICCA Congress Series, vol 13, 301, pp 316–317. It is not desirable that, when a question about the enforceability of the same arbitration agreement arises in different national courts, different conflict rules should be applied to determine the governing law. This point is well made by Gary Born in his work on *International Commercial Arbitration*, 2nd ed (2014), p 498:

> "The international arbitral process aspires towards a maximally uniform approach by national courts presented with disputes about the substantive validity of a particular international arbitration agreement. A lack of uniformity on this issue would result in some courts referring parties to arbitration, and others refusing to do so, under the same arbitration agreement; that makes no sense and results in unnecessary litigation, forum shopping and uncertainty. Rather, in so far as possible, it is much more desirable for all national courts to reach the same conclusion as to the validity (or invalidity) of a particular arbitration agreement."

Exactly the same points apply to the approach taken by national courts to the scope of an international arbitration agreement.

137   As with questions of validity, issues about whether a dispute falls within the scope of the arbitration agreement may arise at any stage from when a party wishes to refer a dispute to arbitration to the stage of seeking to enforce an award. Article V(1)(c) of New York Convention provides that recognition and enforcement may be refused if "[the] award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration". Section 103(2)(d) of the 1996 Act contains an almost identical provision, as does article 36(i)(a)(iii) of the UNCITRAL Model Law and article IX(1)(c) of the European Convention.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4159

A   138   The general approach in the conflict of laws, adopted by both the common law and the Rome I Regulation, is to treat the validity and scope of a contract (as well as other issues such as the consequences of breach and ways of extinguishing obligations) as governed by the same applicable law. This makes good sense, not least because the boundary between issues of validity and scope is not always clear.  Thus, it is logical to apply the law identified by the conflict rules prescribed by article V(1)(a) of the New York

B   Convention and section 103(2)(b) of the 1996 Act to questions about the scope or interpretation of the arbitration agreement as well as disputes about its validity.

139   This also accords with the approach taken by the American Law Institute in the final draft of the Restatement (Third) of the US Law of International Commercial and Investor-State Arbitration (24 April 2019).

C   Section 2.14 of the draft Restatement recommends a rule that a court should determine whether an international arbitration agreement is null and void in accordance with: (1) the law to which the parties have subjected the arbitration agreement; or (2) in the absence of such a choice of law, the law of the seat of arbitration.  This approach is consistent with article V(1)(a) of the New York Convention.  The comment on the applicable law explains:

D   "On balance, the present section favors ensuring symmetry between pre-arbitration and post-award standards for determining the validity of an arbitration agreement.  There is no reason in principle why a court should answer that question differently depending on the stage of the proceedings, and doing so would inject unnecessary uncertainty and complexity into the analysis."

E   140   Section 2.15 of the draft Restatement adopts the same rule for the purpose of determining whether a matter falls within the scope of an arbitration agreement, taking the position that the law applicable to determining the scope of an agreement to arbitrate should parallel the law applicable to determining whether the agreement is valid.

141   Accordingly, whatever merit there might be, if one were designing a system of law from scratch, in a conflicts rule which treated the law of the

F   main contract as applicable to the arbitration agreement in the absence of choice, it would in our view be wrong for the English common law to adopt a rule out of step with both the legislative policy of the 1996 Act and the underlying uniform rule established by the New York Convention.  The court should apply the same conflict rules to identify the governing law irrespective of whether the arbitration has a domestic or foreign seat and

G   irrespective of the stage at which an issue about the validity or scope of the arbitration agreement is raised.  Internal coherence of English law, as well as harmony with international law and practice, is achieved by treating the applicable law in all cases, in the absence of a choice by the parties, as the law of the seat of arbitration.

*(iii) Giving effect to commercial purpose*

H   142   A third reason for applying the law of the seat as a default rule is that it is likely to uphold the reasonable expectations of contracting parties who have chosen to settle their disputes by arbitration in a specified place but made no choice of law for their contract.  This is particularly so where, as is often the case in contracts made between parties of different

© 2020 The Incorporated Council of Law Reporting for England and Wales

4160
**Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))**      [2020] 1 WLR
Lord Hamblen and Lord Leggatt JJSC

nationalities, a popular seat of international arbitration has been chosen as a neutral forum with which neither party is connected. In such circumstances, if the parties had been required to make a common choice of law to govern their arbitration agreement at the time of contracting, it is inherently unlikely that they would have agreed on either of their national systems of law and much more likely that they would have settled on the law of the place which they had chosen as the seat of arbitration. Not only does this provide a neutral choice of law but it is already the law of that place which—in countries which have implemented the Model Law or are parties to the New York Convention—will determine the validity of an award if an application is made to set it aside or if its enforcement in the other party's home state is resisted.

143   Countries frequently chosen as neutral seats of arbitration can also be expected to have legal regimes which are supportive of arbitration and which seek to give effect to the parties' intention that they do not wish to have their disputes decided by a court. That is the case for all the most preferred seats of international arbitration—which, according to the most recent 2018 international arbitration survey conducted by the School of International Arbitration at Queen Mary, University of London, are London, Paris, Singapore, Hong Kong and Geneva. As discussed earlier, it is reasonable to assume that parties who have chosen to settle their disputes by international arbitration want an arbitration that resolves all (and not only some) disputes through an award that is binding and enforceable and which is immune from collateral attacks, particularly in the home country of one of the parties. As a general rule, applying the law of the chosen seat of arbitration is calculated to achieve that purpose.

### (iv) Legal certainty

144   Finally, there is merit is recognising a clear default rule in the interests of legal certainty. Applying a general rule that, in the absence of choice, an arbitration agreement is governed by the law of the seat of arbitration (where a seat has been designated) enables the parties to predict easily and with little room for argument which law the court will apply by default. The benefits of certainty are further enhanced if the same law is applied irrespective of the country in which the proceedings are brought and whether the question of the validity or scope of the arbitration agreement is raised before or after an award has been made. Certainty might not be a sufficient reason to recognise a clear and uniform rule if the rule interfered with party choice. But here there is no risk of such interference because we are concerned with the situation in which the parties have not exercised their freedom to choose the law to be applied so that the court must make the selection for them. It is desirable that parties should be able to know with certainty what law a court will apply in this situation. If they do not like the default option, they can always choose a system of law that they prefer.

### (v) Conclusion on the default rule

145   Chubb Russia did not argue against the contention that the law most closely connected with the arbitration agreement, which in the absence of choice will apply by default, will in general be the law of the seat of the arbitration. Indeed, leading counsel for Chubb Russia at one point in oral argument volunteered the suggestion that an appropriate default rule would

© 2020 The Incorporated Council of Law Reporting for England and Wales

be that the arbitration agreement is governed by the law of the seat.  He noted that such a rule would have the advantages of certainty and consistency with article V(1)(a) of the New York Convention.  Counsel later withdrew that suggestion and in reaching our conclusion on this issue we have placed no reliance on the fact it was made.  But it was in our view no more than a realistic acknowledgement of the overwhelming case for recognising such a general rule.

146   A case can be made for recognising an exception to the ordinary default rule where the arbitration agreement would be invalid under the law of the seat but not under the law governing the rest of the contract: see e g *Merkin & Flannery, The Arbitration Act 1996*, 6th ed (2019), para 46.10.5 and *Born*, pp 542–549; for a contrary view, see Glick and Venkatesan, "Choosing the Law Governing the Arbitration" Agreement' in *Jurisdiction, Admissibility and Choice of Law in International Arbitration: Liber Amicorum Michael Pryles* (2018), ch 9, pp 148–149.  Since the issue does not arise in the present case, it is not necessary to decide whether such an exception should be recognised.  Even if there be no such exception, where the law of the seat is English law an arbitration agreement will only be invalid in limited circumstances and for good reason.  Where the law of the seat is not English law, an award made under an arbitration agreement invalid under that law is liable in any event to be set aside by the courts of the seat, whose decision would normally be followed by the English courts: see the discussion by Lord Mance in "Arbitration—a law unto itself?" (2016) 32 Arbitration International 223.  There can also be cases where no seat has been designated, where it may be appropriate to apply the law applicable to the rest of the contract.  But such exceptional cases apart, we consider that the law of the seat will apply by default.

### IX. *The law applicable to the arbitration agreement in article 50.1*

147   Applying the principles discussed above to the present case, it is common ground that the parties have not chosen a system of law specifically to govern the arbitration agreement contained in article 50.1 of the construction contract.  Chubb Russia, however, contends that the parties have chosen Russian law to govern the contract as a whole including the arbitration agreement.  Enka disputes this.  Enka accepts that the main body of the construction contract is governed by Russian law but maintains that this is so only because of the connections between the construction contract and the law of Russia and not as a matter of choice.

#### (i) No choice of law

148   The first thing to note is that the construction contract does not contain a choice of governing law clause.  Amongst almost 100 pages of primary text and another 400 pages of appendices, there is no provision which says that the contract shall be governed by or interpreted in accordance with a specified system of law.  In a detailed and professionally drafted commercial contract made between substantial organisations based in different countries, such a clause is an entirely standard clause, almost invariably included along with a clause specifying the forum in which any dispute is to be resolved.  It is difficult to conceive that the omission of such a clause in this case—despite the inclusion of a detailed provision dealing with

© 2020 The Incorporated Council of Law Reporting for England and Wales

the resolution of disputes—was accidental. We agree with counsel for Enka A
that an obvious explanation for its absence is that the parties were not able
to agree on a choice of the governing law.

149   Chubb Russia contends that a choice of Russian law can none the
less be discerned from the use in the construction contract of the term
"Applicable Law", taken together with the definition of that term in
Attachment 17 as: B

"Law of the Russian Federation, including legislation of the Russian
Federation, all regulatory legal acts of the State Authority Federal Bodies,
State Authorities of the constituent entities of the Russian Federation,
legislation of the constituent entities of the Russian Federation, regulatory
legal acts by Local Authorities and any other applicable regulatory legal
acts." C

There are numerous references throughout the body of the contract to the
"Applicable Law", as well as other references to the law or laws of the
Russian Federation. Counsel for Chubb Russia submitted that, read as a
whole, the language of the construction contract makes it clear that the
parties were contracting by reference to Russian law and chose Russian law
as the law applicable to their agreement. D

150   Had it been the parties' choice, however, that the construction
contract should be governed by the "Applicable Law" as defined in
Attachment 17, it would have been simple to say so. Yet, as noted, there is
no clause which states this. Rather, the term "Applicable Law" is used in
specific provisions of the contract which impose obligations on the
contractor to comply with laws and Regulations applicable in the
country where the construction work was to take place. As the Court of E
Appeal observed (at para 107), it is a common technique in international
construction contracts to define such an applicable law or laws and to
impose an obligation to comply with them separately from any choice of
the law that is to govern the validity and interpretation of the parties'
contractual rights and obligations.

151   As evidence of this practice, the Court of Appeal cited a leading text F
on the widely used standard forms of international construction contract
issued by the International Federation of Consulting Engineers ("FIDIC"):
see *Baker Mellors Chalmers and Lavers on FIDIC Contracts: Law and
Practice*, 5th ed (2009), paras 2.126, 2.140 and 2.145. Counsel for Chubb
Russia pointed out that the contract in this case was not made on a FIDIC
standard form and, unlike contracts made on FIDIC forms, does not contain
a governing law clause. They observed that the technique employed in G
drafting FIDIC contracts is to select a governing law and then to apply a
different law (usually the local law) expressly to certain provisions in such a
way that the contractor will be obliged to comply with that law. That was
not done here, where the only law specified was the "Applicable Law".

152   The drafting technique to which the Court of Appeal referred is
not, however, peculiar to FIDIC standard forms. Authoritative texts cited H
by counsel for Enka confirm that other standard forms of international
construction contract also typically include provisions which require the
contractor to comply with applicable laws or with laws of the country where
the works are carried out: see *Huse, Understanding and Negotiating*

© 2020 The Incorporated Council of Law Reporting for England and Wales

4163

A  *Turnkey and EPC Contracts*, 4th ed (2020), paras 4-110 to 4-112; *Bailey, Construction Law*, 2nd ed (2016), para 18.11.  The clear purpose of such provisions is to protect the employer against the risk of incurring liability through failure by the contractor to comply with local laws such as building Regulations, health and safety and environmental laws, tax laws and other applicable regulatory requirements.  The rationale for including such provisions is not affected by the presence or absence of a governing law
B  clause in the contract.

153    There is no necessary inference that the validity and interpretation of a contractual obligation requiring compliance with a law or laws of a particular country is itself to be determined by applying the contract law of that country.  This is underlined by the point which Chubb Russia itself makes that the law chosen to govern a contract made on a FIDIC standard
C  form (or, we would add, other forms of international construction contract) may and often does differ from the "applicable" law with which the contractor is required to comply in performing the contract.  In any case the contractual obligations of Enka were not limited to compliance with the "Applicable Law".  Article 4.1 of the construction contract provides:

D      "The Contractor shall ensure performance of the Work in accordance with:
        "(a) The requirements of this Agreement (including references to the non-mandatory rules of Applicable Law but to the extent the provisions of the Agreement are not at variance with mandatory rules of Applicable Law);
        "(b) Applicable Law (including the Mandatory Technical Rules
E      constituting a part of such Applicable Law);
        "(c) An Implied Covenant of Good Faith and Fair Dealing."

The definition in Attachment 17 of the phrase "Implied Covenant of Good Faith and Fair Dealing" imports standards applied by "experienced international contractor organisations" engaged in similar projects.  As well as such standards, the construction contract and its attachments set out
F  many specific requirements for the work which do not form part of the "Applicable Law".

154    Quite apart from this, there are numerous rights and obligations established by the construction contract which make no reference to the "Applicable Law" (or to laws of the Russian Federation).  Examples are clauses dealing with the consequences of delay (article 26), force majeure
G  (article 31), payment of the price (article 33) and termination (article 43).

155    In these circumstances, it cannot be said that the parties have in the construction contract expressly selected a system of law to govern the validity and interpretation of their contractual obligations nor that the terms of the contract construed in their context point ineluctably to the conclusion that the parties intended Russian law to apply.  To the contrary, the obvious inference from the fact that the parties have not anywhere in the
H  contract stated what system of law is to govern any of their contractual obligations—as opposed to creating obligations to comply with applicable laws—is that they have not agreed (for whatever reason) on a choice of governing law.  This inference applies to the arbitration agreement as much as to the rest of the contract.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*(ii) Closest connection*

156   In the absence of any choice of the law that is to govern the arbitration agreement, it is necessary to fall back on the default rule and identify the system of law with which the arbitration agreement is most closely connected. In accordance with our earlier analysis, this will generally be the law of the seat chosen by the parties, which in this case is London.

157   As already mentioned, Chubb Russia did not actively oppose this conclusion if it is necessary to identify the law with which the arbitration agreement is most closely connected. Chubb Russia's case has been put solely on the basis that the parties chose Russian law as the law governing the contract including the arbitration agreement. No alternative argument has been advanced that, if this is wrong, Russian law nevertheless applies as the law most closely connected with the arbitration agreement.

158   Chubb Russia has put forward an argument, however, about the proper interpretation of particular terms of the construction contract which it remains relevant to consider. This argument is that the agreement to arbitrate disputes is embedded in a clause of the contract (article 50) dealing with dispute resolution which contains other obligations in addition to the obligation to arbitrate and which itself is, as Mr Bailey QC put it, "buried deep inside" the contract and inextricably connected to other provisions of it. It is said that in these circumstances the parties must have intended all the obligations in article 50, including the arbitration agreement, to be governed by the same system of law as each other and as the rest of the contract. For the purpose of this argument, it is necessary to determine the law applicable to the main body of the construction contract. As discussed earlier, for that purpose the court must apply the Rome I Regulation.

*(iii) The law applicable to the main contract*

159   Although it would be a mistake to interpret the Rome I Regulation through the prism of the common law, there does not appear to be any substantial difference (save possibly in relation to the admissibility of subsequent conduct) between the approach of the common law to determining whether there has been an express or implied choice of law and the approach to be followed in deciding whether a choice has been made expressly or "clearly demonstrated" for the purpose of article 3 of the Rome I Regulation. Thus, in *Lawlor v Sandvik Mining and Construction Mobile Crushers and Screens Ltd* [2013] 2 Lloyd's Rep 98, para 33 the Court of Appeal held that the test of whether a choice has been "clearly demonstrated" is objective and is equivalent to Lord Diplock's formulation of the common law test, requiring the court to be satisfied that the only reasonable conclusion to be drawn from the circumstances is that the parties should be taken to have intended the putative law to apply.

160   For the reasons already given when considering the position at common law, the parties have not in this case expressly made or clearly demonstrated a choice of law to govern the construction contract but are, as it seems to us, reasonably to be understood as having not agreed on a choice of law. The governing law is therefore to be determined by applying article 4 of the Rome I Regulation.

161   Under the construction contract Enka was engaged to install a boiler and auxiliary equipment, with the equipment and materials (except for consumable materials) to be supplied by Energoproekt as customer. The

© 2020 The Incorporated Council of Law Reporting for England and Wales

4165
[2020] 1 WLR        Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

A    contract was therefore, at least predominantly, a contract for the provision of services by Enka.  Article 4(1)(b) of the Rome I Regulation establishes a prima facie rule that, to the extent that the law applicable to it has not been chosen in accordance with article 3, a contract for the provision of services shall be governed by the law of the country where the service provider "has his habitual residence".  This rule points towards the law of Turkey as the country where the contractor, Enka, had its place of central administration

B    and therefore habitual residence (see article 19(1)).  However, the other party to the contract, Energoproekt, was a Russian company, as was the "End Customer", Unipro.  The contract was for the performance of construction work in Russia and required compliance with Russian laws and Regulations.  It is written in the Russian language (as the authoritative version); notifications under it were likewise required to be written in

C    Russian and English but with the Russian version taking precedence and, when sent to the contractor, were to be sent to its Moscow office.  The price for the work, although calculated in US dollars, was to be paid in roubles to a Russian bank account.  The fact that the dispute resolution clause provides for arbitration in London is not a sufficient connection to indicate that English law should govern the contractual obligations of the parties.  It is clear from all the circumstances of the case that the main body of the

D    construction contract is manifestly more closely connected with Russia than with any other country.  Pursuant to article 4(3) of the Rome I Regulation, it is therefore governed by Russian law.

### (iv) The dispute resolution clause

162    Chubb Russia's argument that the arbitration agreement cannot

E    reasonably be detached from the rest of the contract in terms of its governing law has two aspects.  The first is that article 50.1, which contains the arbitration agreement, must be governed by a single law.  The second is that it makes no sense for that law to differ from the law applicable to the rest of the construction contract.

163    Article 50.1 sets outs a series of procedures of increasing formality

F    which the parties have agreed to follow for resolving any dispute, with arbitration being the last resort.  Thus, where a "Dispute" as defined in the first sentence of article 50.1 arises, the parties are first of all obliged to "make in good faith every reasonable effort" to resolve it by negotiations.  If the Dispute is not resolved within ten days of either party sending a "Notification" (a term defined in article 51.2 of the contract) to the opposite party containing an indication of the Dispute, either party may then give a

G    written notice causing it to be referred to a meeting between the parties' senior managements.  It is only if the matter is not resolved within a further 20 calendar days that the obligation arises to refer the Dispute to international arbitration.

164    Enka accepts that article 50.1 can only reasonably be interpreted as governed by a single system of law, as it is clearly intended to establish a single, staged dispute resolution process and it would make no sense for the

H    meaning or scope of a "Dispute" as defined in the earlier part the clause to be determined by applying a different system of law from the law governing the validity and scope of the obligation to arbitrate.  But it is Enka's case that the implication in terms of governing law flows in the opposite direction from that contended for by Chubb Russia, and that it follows from the

© 2020 The Incorporated Council of Law Reporting for England and Wales

identification of English law as the law which (on Enka's case) governs the       A
arbitration agreement that English law applies to the whole of article 50.1.
That conclusion should be reached, Enka contends, either by applying the
common law rules to the whole of article 50.1 on the basis that the whole of
that clause constitutes an "arbitration agreement" within the meaning
of article 1(2)(e) of the Rome I Regulation or by applying the principle of
dépeçage and treating article 50.1 as a severable part of the contract for the
purpose of the Rome I Regulation.                                                  B

165   Mr Bailey QC for Chubb Russia drew attention to connections
between article 50.1 and other parts of the contract: in particular the use of
capitalised terms such as "Notification" which are defined elsewhere.  He
also pointed out that article 42.2 of the contract includes provision for
referring disputes arising out of the operation of the change control
procedure to arbitration pursuant to article 50.  He submitted that the          C
dispute resolution clause is not hermetically sealed from the rest of the
contract but is inextricably bound up with it, and that this points strongly to
the conclusion that the arbitration agreement and the other obligations
contained within the contract must all be governed by the same system of
law.

166   This contention could be formulated on the basis of implied choice
or by reference to the closest connection test.  As to the former, no doubt       D
parties could in principle agree that the whole of their contract, including an
arbitration agreement within it, should be governed by a single system of law
even though they have not agreed on what that law should be.  But this does
not seem to us an inherently likely agreement for contracting parties to
make.  To establish such an agreement a clearer demonstration of intent
would be necessary than the mere fact that the arbitration agreement forms     E
part of a wider dispute resolution clause which is referred to elsewhere and
uses terms defined elsewhere in the contract.

167   In terms of connections, we agree with both parties that article 50.1
makes sense only as an integrated whole governed by one system of law.  But
we do not regard the connections to which Chubb Russia drew attention
between article 50.1 and the rest of the contract as particularly strong or
sufficient to require the application of the same law in circumstances where    F
no choice of law has been made by the parties.  There is no difficulty in
principle in using within a contract or clause of a contract governed by a
particular system of law a term defined in another part of the contract or in a
separate instrument governed by a different system of law.  In such a case the
term will carry its defined meaning by agreement.   The reference in
article 50.1 to a "Notification" can readily operate in this way.  Likewise, the  G
cross-reference in article 42.2 of the construction contract to the dispute
resolution clause does not require both clauses to be governed by the same
system of law.

168   It has become increasingly common for commercial parties to
include in their contracts provisions which require other forms of dispute
resolution, such as good faith negotiation or mediation, to be undertaken
without success before a dispute is referred to arbitration.  We find it difficult  H
to see how, as a matter of principle or policy, the fact that such an approach
is adopted can justify the application of a different law to determine the
validity or scope of the arbitration agreement.  All the reasons that we have
identified for, as a general rule, regarding the law governing the arbitration

© 2020 The Incorporated Council of Law Reporting for England and Wales

A agreement in the absence of choice as the law of the seat of arbitration apply equally and with equal force where the arbitration agreement is contained in a wider dispute resolution clause (or integrated set of clauses) as where it is self-contained. We do not think that reasonable commercial parties would expect the law applied to determine the validity and scope of their arbitration agreement to depend on which form of dispute resolution procedure is chosen. Rather, it is reasonable to expect that, where a multi-tiered procedure is chosen, the law which determines the validity and scope of the arbitration agreement will determine the validity and scope of the whole dispute resolution agreement.

B

169    The fact that two conflict of laws regimes are potentially in play complicates the analysis but provides no reason to alter the result. Where, as in this case, an obligation to arbitrate disputes is embedded in a single dispute resolution agreement which provides for other steps to be undertaken before the obligation to arbitrate arises, we do not think it unreasonable to regard the whole dispute resolution agreement as an "arbitration agreement" for the purpose of article 1(2)(e) of the Rome I Regulation. On this basis, applying the common law conflict of laws rules, article 50.1 of the construction contract is governed by English law.

C

D

*X. Conclusions on applicable law*

170    It may be useful to summarise the principles which in our judgment govern the determination of the law applicable to the arbitration agreement in cases of this kind:

(i) Where a contract contains an agreement to resolve disputes arising from it by arbitration, the law applicable to the arbitration agreement may not be the same as the law applicable to the other parts of the contract and is to be determined by applying English common law rules for resolving conflicts of laws rather than the provisions of the Rome I Regulation.

E

(ii) According to these rules, the law applicable to the arbitration agreement will be (a) the law chosen by the parties to govern it or (b) in the absence of such a choice, the system of law with which the arbitration agreement is most closely connected.

F

(iii) Whether the parties have agreed on a choice of law to govern the arbitration agreement is ascertained by construing the arbitration agreement and the contract containing it, as a whole, applying the rules of contractual interpretation of English law as the law of the forum.

(iv) Where the law applicable to the arbitration agreement is not specified, a choice of governing law for the contract will generally apply to an arbitration agreement which forms part of the contract.

G

(v) The choice of a different country as the seat of the arbitration is not, without more, sufficient to negate an inference that a choice of law to govern the contract was intended to apply to the arbitration agreement.

(vi) Additional factors which may, however, negate such an inference and may in some cases imply that the arbitration agreement was intended to be governed by the law of the seat are: (a) any provision of the law of the seat which indicates that, where an arbitration is subject to that law, the arbitration will also be treated as governed by that country's law; or (b) the existence of a serious risk that, if governed by the same law as the main contract, the arbitration agreement would be ineffective. Either factor may

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

be reinforced by circumstances indicating that the seat was deliberately chosen as a neutral forum for the arbitration.

(vii) Where there is no express choice of law to govern the contract, a clause providing for arbitration in a particular place will not by itself justify an inference that the contract (or the arbitration agreement) is intended to be governed by the law of that place.

(viii) In the absence of any choice of law to govern the arbitration agreement, the arbitration agreement is governed by the law with which it is most closely connected. Where the parties have chosen a seat of arbitration, this will generally be the law of the seat, even if this differs from the law applicable to the parties' substantive contractual obligations.

(ix) The fact that the contract requires the parties to attempt to resolve a dispute through good faith negotiation, mediation or any other procedure before referring it to arbitration will not generally provide a reason to displace the law of the seat of arbitration as the law applicable to the arbitration agreement by default in the absence of a choice of law to govern it.

171    Applying these principles, we have concluded that the contract from which a dispute has arisen in this case contains no choice of the law that is intended to govern the contract or the arbitration agreement within it. In these circumstances the validity and scope of the arbitration agreement (and in our opinion the rest of the dispute resolution clause containing that agreement) is governed by the law of the chosen seat of arbitration, as the law with which the dispute resolution clause is most closely connected. We would therefore affirm—albeit for different reasons—the Court of Appeal's conclusion that the law applicable to the arbitration agreement is English law.

172    We have not found it necessary to consider arguments made by Enka that, if the arbitration agreement were governed by the law of Russia as the place of performance of the construction project and country with which the parties' substantive contractual obligations have their closest connection, there would be a serious risk that the parties' intention of having their disputes finally settled by arbitration in a neutral forum would be defeated. This was disputed by Chubb Russia, but in the light of the conclusion we have reached there is no need to resolve this further issue.

## XI. The anti-suit injunction

173    If, as we have held, the arbitration agreement is governed by English law, Chubb Russia does not dispute that it was legitimate for the Court of Appeal to exercise its discretion whether to grant an anti-suit injunction afresh and does not contend that it erred in so doing. Its challenge to the order made by the Court of Appeal rests on the assumption that the arbitration agreement is governed by Russian law. Chubb Russia contends that the English courts ought in these circumstances to defer to the decision of the Russian courts on whether their dispute must be referred to arbitration or may be resolved by litigation in the Russian courts. On Chubb Russia's case the English court's approach to the grant of anti-suit injunctions should differ according to whether the arbitration agreement is governed by English law or a foreign law. As we have held that the arbitration agreement is governed by English and not Russian law, it is not necessary to address this further ground of appeal. Nevertheless, given that

© 2020 The Incorporated Council of Law Reporting for England and Wales

4169

A   it has been fully argued and the importance of the issues raised, we shall briefly address it.

174   As already noted, by choosing a seat of arbitration the parties are choosing to submit themselves to the supervisory and supporting jurisdiction of the courts of that seat over the arbitration. A well established and well recognised feature of the supervisory and supporting jurisdiction of the English courts is the grant of injunctive relief to restrain a party from breaching its obligations under the arbitration agreement by bringing claims which fall within that agreement in court proceedings rather than, as agreed, in arbitration. A promise to arbitrate is also a promise not to litigate.

175   As explained by Lord Hoffmann in *West Tankers Inc v Ras Riunione Adriatica di Sicurtà SpA (The Front Comor)* [2007] 1 Lloyd's Rep 391, paras 20–22:

C
"20. Of course arbitration cannot be self-sustaining. It needs the support of the courts . . . Different national systems give support in different ways and an important aspect of the autonomy of the parties is the right to choose the governing law and seat of the arbitration according to what they consider will best serve their interests.

D
"21. The Courts of the United Kingdom have for many years exercised the jurisdiction to restrain foreign court proceedings as Colman J did in this case: see *Pena Copper Mines Ltd v Rio Tinto Co Ltd* (1911) 105 LT 846. It is generally regarded as an important and valuable weapon in the hands of a court exercising supervisory jurisdiction over the arbitration. It promotes legal certainty and reduces the possibility of conflict between the arbitration award and the judgment of a national court . . . it saves a party to an arbitration agreement from having to keep a watchful eye

E
upon parallel court proceedings in another jurisdiction, trying to steer a course between so much involvement as will amount to a submission to the jurisdiction . . . and so little as to lead to a default judgment. That is just the kind of thing that the parties meant to avoid by having an arbitration agreement.

"22. Whether the parties should submit themselves to such a

F
jurisdiction by choosing this country as the seat of their arbitration is, in my opinion, entirely a matter for them. The courts are there to serve the business community rather than the other way round. No one is obliged to choose London. The existence of the jurisdiction to restrain proceedings in breach of an arbitration agreement clearly does not deter parties to commercial agreements. On the contrary, it may be regarded as one of the advantages which the chosen seat of arbitration has to offer."

G
176   In the same case Lord Mance stated at paras 31–32:

"31. The purpose of arbitration (enshrined in most modern arbitration legislation) is that disputes should be resolved by a consensual mechanism outside any court structure, subject to no more than limited supervision by the courts of the place of arbitration. Experience as a commercial

H
judge shows that, once a dispute has arisen within the scope of an arbitration clause, it is not uncommon for persons bound by the clause to seek to avoid its application. Anti-suit injunctions issued by the courts of the place of arbitration represent a carefully developed—and, I would emphasise, carefully applied—tool which has proved a highly efficient means to give speedy effect to clearly applicable arbitration agreements.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

"32. It is in practice no or little comfort or use for a person entitled to the benefit of a London arbitration clause to be told that (where a binding arbitration clause is being—however clearly—disregarded) the only remedy is to become engaged in the foreign litigation pursued in disregard of the clause. Engagement in the foreign litigation is precisely what the person pursuing such litigation wishes to draw the other party into, but is precisely what the latter party aimed and bargained to avoid."

B

177    In granting an anti-suit injunction the English courts are seeking to uphold and enforce the parties' contractual bargain as set out in the arbitration agreement. In principle it should make no difference whether that agreement is governed by English law or by a foreign law. In both cases the enquiry is whether there has been a breach of the arbitration agreement and whether it is just and convenient to restrain that breach by the grant of an anti-suit injunction. The detail of the enquiry may differ, but its nature is the same.

C

178    Chubb Russia contends that as a matter of discretion the considerations to be taken into account are different where the arbitration agreement is governed by foreign law. It submits that issues of scope and breach of the arbitration agreement are generally best left to the foreign court which has the requisite expertise in the applicable foreign law.

D

179    The judge's view was that different considerations arise where the arbitration agreement is governed by foreign law by reason of the doctrine of forum conveniens. We agree with the Court of Appeal that forum conveniens, which is a matter that goes to the court's jurisdiction, is not relevant. By agreeing to arbitrate in London the parties were agreeing to submit to the supervisory and supporting jurisdiction of the English courts, including its jurisdiction to grant anti-suit injunctions.

E

180    Chubb Russia's principal argument is that considerations of comity nevertheless make it appropriate to defer to the foreign court as a matter of discretion. Comity, however, has little if any role to play where anti-suit injunctive relief is sought on the grounds of breach of contract. As Millett LJ stated in *Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep 87, 96:

F

"in my judgment there is no good reason for diffidence in granting an injunction to restrain foreign proceedings on the clear and simple ground that the defendant has promised not to bring them.
"The courts in countries . . . party to . . . the New York Convention, are accustomed to the concept that they may be under a duty to decline jurisdiction in a particular case because of the existence of an . . . arbitration clause. I cannot accept the proposition that any court would be offended by the grant of an injunction to restrain a party from invoking a jurisdiction which he had promised not to invoke and which it was its own duty to decline."

G

181    Although *The Angelic Grace* concerned an arbitration agreement governed by English law, that was not material to the reasoning of the Court of Appeal. The rationale for the court's approach was the fact of the promise made, not the law by which it was governed. That accords with principle.

H

182    Nor does article II(3) of the New York Convention make any difference. As noted earlier, under this article a court of a Convention state is

© 2020 The Incorporated Council of Law Reporting for England and Wales

4171
[2020] 1 WLR    Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Hamblen and Lord Leggatt JJSC

A   required to refer the parties to arbitration when it is seized of a matter which the parties have agreed to arbitrate (unless the arbitration agreement is null and void, inoperative or incapable of being performed). The New York Convention is concerned with recognition and enforcement of arbitration agreements and awards, not jurisdiction-see, for example, *Shashoua v Sharma* [2009] 2 All ER (Comm) 477, paras 36–38. If a court is seized of jurisdiction under its own law or rules, article II(3) obliges it to exercise that jurisdiction to enforce arbitration agreements. It does not purport to nor does it confer any primacy over the jurisdiction of the courts of the seat.

B

183    The grant of an anti-suit injunction is always a matter of discretion. There may be circumstances in which it would be appropriate to await a decision of a foreign court. If, for example, the scope of the arbitration agreement was about to be determined by the highest court in the country of the governing law in unrelated proceedings, then it might be sensible for the English court to await that decision. Where, however, the issue arises in proceedings brought in alleged breach of the arbitration agreement, deference to the foreign court should generally give way to the importance of upholding the parties' bargain and restraining a party to an arbitration agreement from doing something it has promised not to do.

C

184    We therefore agree with the Court of Appeal that the principles governing the grant of an anti-suit injunction in support of an arbitration agreement with an English seat do not differ according to whether the arbitration agreement is governed by English law or foreign law. Forum conveniens considerations are irrelevant and comity has little if any role to play. The court's concern will be to uphold the parties' bargain, absent strong reason to the contrary, and the court's readiness to do so is itself an important reason for choosing an English seat of arbitration.

D

185    It follows that if the agreement to arbitrate disputes contained in article 50.1 of the construction contract had been governed by Russian law, it would have been necessary for the English court to determine whether under the law of Russia the agreement is valid and the claim which Chubb Russia is seeking to pursue in Russia falls within its scope. If those questions were answered in the affirmative, it would in any event have been appropriate to grant an anti-suit injunction.

E

F

### XII. *Overall conclusion*

186    Although our approach to the determination of the law applicable to the arbitration agreement differs from that taken by the Court of Appeal, we have similarly concluded that the arbitration agreement in this case is governed by English law. It is common ground that in these circumstances the arbitration agreement is valid, the dispute between the parties falls within it and that the injunction granted by the Court of Appeal to restrain Chubb Russia from proceeding against Enka in Russia was properly granted. It follows that we would dismiss the appeal.

G

**LORD BURROWS JSC** (dissenting) (with whom **LORD SALES JSC** agrees)

H

### 1. *Introduction*

187    In this case, we are presented with an intriguing question of law which courts and commentators have been grappling with for many years. What is the proper law (in the English common law conflicts of law) of an

© 2020 The Incorporated Council of Law Reporting for England and Wales

4172
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Burrows JSC

arbitration agreement where there is no express choice of law clause in the
arbitration agreement? In particular, should the proper law of the arbitration
agreement be the law of the main contract in which the arbitration agreement
is contained or should it be the law of the seat of arbitration? In shorthand,
should one determine the proper law of the arbitration agreement by the
"main contract" approach or the "seat" approach? In this case, the seat of the
arbitration is England but the proper law of the main construction contract,
in which the arbitration agreement is contained, is Russian law (although
there is a dispute as to the precise reason for that). Although the ultimate
question for this court is whether to issue an anti-suit injunction to stop
proceedings in Russia it is first helpful, and arguably essential, to determine
the proper law of the arbitration agreement. That proper law issue is of wide
public importance and this (dissenting) judgment is almost entirely devoted
to it.

188   A bare outline of the facts will here be sufficient. The claimant and
respondent to this appeal ("Enka") is a Turkish engineering company that
had been engaged as a subcontractor in construction work at a power plant
in Russia. The head-contractor (CJSC "Energoproekt") assigned its rights
against Enka to the owner and developer (PJSC "Unipro"). There was an
arbitration agreement (in article 50.1) in the construction contract ("the
main contract") between Enka and the head-contractor that disputes would
be determined by way of International Chamber of Commerce ("ICC")
arbitration with London seat. Following a massive fire at the power plant,
the Russian first defendant insurer and the appellant in this appeal, OOO
"Insurance Company Chubb" (which I shall refer to throughout as "Chubb
Russia"), paid an insurance claim made by the owner and was subrogated to
any rights the owner had against Enka. Chubb Russia brought a claim
against Enka (and others) in Russia. Enka contended that those proceedings
were in breach of the arbitration agreement and applied to the Russian court
to dismiss Chubb Russia's claim. It also brought a claim in England for an
anti-suit injunction against the defendants, all members of the Chubb group
of companies.

189   At first instance, Andrew Baker J declined to reach a decision on the
proper law of the arbitration agreement but dismissed Enka's claim for an
anti-suit injunction on the ground of forum non conveniens: [2020] Bus LR
463. Subsequently Enka's claim in Russia to dismiss the Russian proceedings,
as being in breach of the arbitration agreement, failed although Chubb
Russia's claim on the merits against Enka also failed. Both Enka and Chubb
Russia are appealing that decision to the Russian appeal court (and the appeal
is set for late October 2020). Meanwhile the Court of Appeal here (Flaux,
Males and Popplewell LJJ) ([2020] Bus LR 1668) allowed Enka's appeal
against Andrew Baker J's decision. It held that the proper law of the
arbitration agreement was English and granted Enka an anti-suit injunction
to stop any Russian appeal going ahead as being in breach of the arbitration
agreement.

190   Chubb Russia applied to the Supreme Court for permission to
appeal from the decision of the Court of Appeal. This court granted
permission to appeal and also stayed the anti-suit injunction upon Chubb
Russia giving suitable undertakings to protect Enka's position pending the
outcome of this expedited appeal.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4173

191   It will be helpful to set out immediately the arbitration agreement. This appears within article 50.1 of the main construction contract in the following terms:

"*Resolution of disputes*
"50.1.  The Parties undertake to make in good faith every reasonable effort to resolve any dispute or disagreement arising from or in connection with this Agreement (including disputes regarding validity of this agreement and the fact of its conclusion (hereinafter—'Dispute') by means of negotiations between themselves.  In the event of the failure to resolve any Dispute pursuant to this article within 10 (ten) days from the date that either Party sends a Notification to the opposite Party containing an indication of the given Dispute (the given period may be extended by mutual consent of the Parties) any Party may, by giving written notice, cause the matter to be referred to a meeting between the senior managements of the Contractor and Customer (in the case of the Contractor senior management shall be understood as a member of the executive board or above, in the case of Customer, senior management shall be understood as general directors of their respective companies). The parties may invite the End Customer to such Senior Management Meeting.  Such meeting shall be held within fourteen (14) calendar days following the giving of a notice.  If the matter is not resolved within twenty (20) calendar days after the date of the notice referring the matter to appropriate higher management or such later date as may be unanimously agreed upon, the Dispute shall be referred to international arbitration as follows:
"• the Dispute shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce,
"• the Dispute shall be settled by three arbitrators appointed in accordance with these Rules,
"• the arbitration shall be conducted in the English language, and
"• the place of arbitration shall be London, England.
"50.2.  Unless otherwise explicitly stipulated in this Agreement, the existence of any Dispute shall not give the Contractor the right to suspend Work.
"50.3.  Not used.
"50.4.  Not used.
"50.5.  All other documentation such as financial documentation and cover documents for it must be presented in Russian."

192   This judgment builds up to answering the question as to the proper law of the arbitration agreement by initially clearing the ground in three sections.  The first sets out some clear or undisputed points of law, the second explains that the issue in this case concerns interpretation not invalidity, and the third clarifies why the proper law of the main contract is Russian.  There is then an overview of the case law on the proper law of the arbitration agreement before I come to the central sections of the judgment on determining the proper law of the arbitration agreement in this case and generally.  The analysis enables me to provide a statement of the common law on the proper law of an arbitration agreement that is principled, straightforward, clear and easy to apply.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*2. Clear or undisputed points of law*                                                    A

193    A number of important matters of law relevant to deciding the proper law of the arbitration agreement are not in dispute (or are clear) and are worth setting out immediately. They are:

(i) The seat of the arbitration is England as set out in article 50.1.

(ii) The proper (or "applicable") law of the main construction contract, which is determined by applying the Rome I Regulation (EC) No 593/2008 (laying down the EU and therefore English conflict of law rules to determine the proper law for contractual obligations), is Russian law. But there is a dispute as to how that conclusion is reached. The relevant provisions of the Rome I Regulation are as follows:                                              B

> "*Article 3*
> "Freedom of choice
> "1. A contract shall be governed by the law chosen by the parties. The choice shall be made expressly or clearly demonstrated by the terms of the contract or the circumstances of the case. By their choice the parties can select the law applicable to the whole or to part only of the contract."
> "*Article 4*
> "Applicable law in the absence of choice
> "1. To the extent that the law applicable to the contract has not been chosen in accordance with article 3 . . . , the law governing the contract shall be determined as follows: . . . (b) a contract for the provision of services shall be governed by the law of the country where the service provider has his habitual residence; . . .
> "2. Where the contract is not covered by paragraph 1 or where the elements of the contract would be covered by more than one of points (a) to (h) of paragraph 1, the contract shall be governed by the law of the country where the party required to effect the characteristic performance of the contract has his habitual residence.
> "3. Where it is clear from all the circumstances of the case that the contract is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2, the law of that other country shall apply.
> "4. Where the law applicable cannot be determined pursuant to paragraphs 1 or 2, the contract shall be governed by the law of the country with which it is most closely connected."

David Bailey QC, for Chubb Russia, submitted that the proper law of the main contract is Russian because, applying article 3(1) of Rome I, the choice of Russian law has been made expressly or clearly demonstrated. Robin Dicker QC, for Enka, denied that there has been an express or implied (i e clearly demonstrated) choice of Russian law. Mr Dicker accepted that Russian law is the proper law by reason of article 4 of Rome I but he did not pinpoint why that was so (but because Enka, as the service-provider, is Turkish this must presumably be because Russia is the country with which the contract is manifestly more closely connected than Turkey).

(iii) Although there is no bar to having different proper laws applying to different clauses of the same contract (the so-called concept of dépeçage), the general position taken at common law (not least on grounds of practical convenience) is that a contract has a single proper law. See, for example, *Kahler v Midland Bank* [1950] AC 24, 42 (per Lord MacDermott); *Libyan*

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  *Arab Foreign Bank v Bankers Trust Co* [1989] QB 728, 747 (per Staughton J); *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), para 32-026. It is worth stressing that the arbitration agreement here is contained in the main contract. We are not concerned with a free-standing arbitration agreement (see para 230 below).

(iv) The Rome I Regulation does not apply (directly) to an arbitration agreement because of an exclusion from the Regulation of "arbitration agreements and agreements on the choice of court" in article 1(2)(e) of the Regulation. The proper law of the arbitration agreement must therefore (in an English court) be determined by applying English common law conflict of laws rules. They require a court to look for (applying English law) an express choice, an implied choice or, if neither of those applies, the system of law with which the arbitration agreement has its closest and most real connection: *Bonython v Commonwealth of Australia* [1951] AC 201, 219; *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2013] 1 WLR 102, paras 9 and 25. The first two of those stages are both concerned with ascertaining the parties' objective intentions. One can regard the exercise as being one of interpretation of the main contract and the arbitration agreement. There is no express choice of law clause in the arbitration agreement in this case, i e there is no mention of choice of law in article 50.1 of the contract.

(v) Mr Bailey at one stage in oral argument appeared to concede that, if the proper law of the arbitration agreement was not Russian by reason of an express or implied choice, it must be English because, as the seat of the arbitration was England, one could not decide that the arbitration agreement had its closest and most real connection to Russia. But he later withdrew that concession. I consider that he was correct to do so (I return to this in para 256 below).

(vi) What is commonly referred to as the curial law is, according to *Mustill and Boyd, Commercial Arbitration*, 2nd ed (1989), pp 60–62, 64–68, the law dealing with "the manner in which the parties and the arbitrator are required to conduct the reference of a particular dispute" (p 60) and includes "the procedural powers and duties of the arbitrator" (p 62). The curial law is (almost) invariably the law of the seat of the arbitration. As the law of the seat is England, the curial law here is English. Inextricably linked to this is what may be referred to as the curial or supervisory jurisdiction of the courts. This is concerned with the courts' jurisdiction to support and enforce the arbitration. It includes, for example, the power to remove or replace an arbitrator, to enforce or set aside an arbitral award, and to grant injunctions to support the arbitration including anti-suit injunctions. Like the curial law, the curial or supervisory jurisdiction of the courts is (almost) invariably determined by the seat of the arbitration. Here, therefore, it is not in doubt that the English courts have curial or supervisory jurisdiction in relation to the arbitration and this includes the jurisdiction to grant an anti-suit injunction in this case to restrain the Russian proceedings. In summary, as Popplewell LJ expressed it in the Court of Appeal at para 46, "The significance of the choice of a seat is . . . a legal one as to the curial law and the curial court".

(vii) If the proper law of the arbitration agreement is determined to be English, the anti-suit injunction ordered by the Court of Appeal is appropriate. This was conceded by Mr Bailey. The dispute as to whether an

© 2020 The Incorporated Council of Law Reporting for England and Wales

4176
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Burrows JSC

anti-suit injunction should be ordered therefore arises only if the proper law    A
of the arbitration agreement is determined to be Russian.

*3. A preliminary important point: the dispute concerns the interpretation (or scope) of the arbitration agreement not its validity*

194    The reason why the parties respectively favour Russian or English
law as the proper law of the arbitration agreement is because English law    B
may take a wider interpretation of the arbitration agreement in this case
than Russian law. The precise basis for this is not entirely clear. The most
obvious basis is that English law regards tort as well as contractual claims
between the parties to be included within the scope of the disputes covered
by the arbitration agreement (see *Aggeliki Charis Cia Maritima SA v Pagnan
SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep 87), whereas Russian law
may interpret disputes as applying only to contractual disputes between the    C
parties. However, it may be that the true basis is slightly more complex than
that and involves Russian law tending to interpret the arbitration agreement
as not covering *joint* tortious liability whereas English law appears to
include that. Whatever the precise basis for respectively favouring Russian
or English law, the important point is that the issue between the parties is as
to the scope or interpretation of the arbitration agreement. It is not about    D
the validity of the arbitration agreement.

195    Andrew Baker J recognised this in his judgment at [2020] Bus LR
463, paras 11–12 (and also at para 88). He said:

"11. . . . [It] is common ground that there exists between Enka and
Chubb Russia a valid and binding arbitration agreement. That is so even
though Chubb Russia is suing in Moscow, and is therefore sued here, as    E
subrogated insurer of Enka's original contractual counterparty. Whether
Russian law or English law governs that question, it is common ground
that such an insurer is bound by its insured's applicable arbitration
agreement. The dispute between the parties, then, again as it was in *The
Angelic Grace*, is whether the claim being pursued in the target
proceedings is a claim in tort that falls outside the scope of the agreement
to arbitrate.    F
"12. The detail is more complex than it was in *The Angelic Grace*,
however, because in that case there was no dispute but that the claim as
brought in Italy was a claim in tort, and it was common ground that the
question whether it fell within the scope of the arbitration agreement was
governed by English law. Here . . . the law applicable to the question of
the scope of the arbitration agreement is disputed; and it is also
contentious between the parties whether the claim as brought under    G
Russian law in the Moscow Claim is a claim in tort, or, more strictly,
whether it is viable as such. Furthermore, it is effectively common ground
that if the question of the scope of the arbitration agreement is governed
by English law, then that claim, however it is to be characterised under
Russian law, is within that scope. The defendants' argument that the
claim, if rightly characterised as a claim in tort, falls outwith the scope of    H
the arbitration agreement, only arises at all if they are right that scope is a
matter of Russian law."

196    That interpretation or scope, not validity, is in issue is borne out by
the decision of the Russian court on 6 May 2020 which decided a

© 2020 The Incorporated Council of Law Reporting for England and Wales

4177

[2020] 1 WLR        Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Burrows JSC

A   preliminary question as to whether, applying Russian law, the court
proceedings should go ahead despite the arbitration clause. The Russian
court made clear that the issue was as to the interpretation or scope of the
arbitration agreement and not the validity of the arbitration agreement. The
Court's short judgment on this preliminary question was as follows:

B   "So it is article 965 of the Russian Federation Civil Code that
establishes the right of the claimant to file against the persons liable for
the losses, regardless of what served as the grounds for their occurrence.
Therefore, *the arbitration clause to which Enka refers does not
encompass this dispute and does not extend to it*, as the participants are
not Enka alone, but also the other ten co-defendants who did not enter
into an arbitration clause, and the subject of the dispute is the general
obligation of all 11 co-defendants to indemnify the losses caused. On the
C   basis of the above, the arbitral clause set out in point 50.1 of the contract
is not applicable and because of this the motion declared by defendant 11
that the claim should be left on file should not be granted." (Emphasis
added.)

197   However, Mr Dicker has now submitted that there is also an issue
about the validity of the arbitration agreement under Russian law that does
D   not arise under English law. He referred to a Russian decision on 8 February
2018 (in an unrelated matter) on enforcement of an arbitral award under
this type of arbitration agreement. The decision was that the arbitration
agreement was too uncertain to be enforceable under Russian law
apparently because of uncertainty about whether there should have been a
reference in the arbitration agreement to the International Court of
E   Arbitration. It was submitted by Mr Bailey in Chubb Russia's written case
(at para 22) that "there is no question of the arbitration agreement being
invalid under Russian law"; and, as we have seen in the last paragraph, such
an argument about invalidity played no part in the reasoning of the Russian
court in the 6 May 2020 decision. In any event, our attention was drawn to
a note on the website of Debevoise & Plimpton llp, dated 7 January 2019,
F   indicating that the February 2018 decision in Russia is inconsistent with the
usual approach of the Russian Supreme Court and is not a binding authority.
Although Mr Dicker submitted that, in the light of that case, there is
"a serious risk" (to use the language in *Sulamérica Cia Nacional de Seguros
SA v Enesa Engenharia SA* [2013] 1 WLR 102, para 31: see below para 217)
that the arbitration agreement would be struck down as invalid under
Russian law, that is not a submission that I can accept without having been
G   provided with proper evidence as to the Russian law on the point. One can
accept that there may be a triable issue as to whether there is a serious risk of
invalidity in this case by reason of that 2018 case. However, we must decide
the issue before us as to the proper law of the arbitration agreement on the
evidence presented and on the matters pleaded (which do not include this
invalidity point). In any event, the arbitration agreement in question in this
case was entered into in 2012 and it would seem that, for the purpose of
H   determining the proper law of the arbitration agreement, we must assess the
parties' intentions and all other relevant factors as at that point in time
unaffected by subsequent legal developments in 2018.

198   Why is it an important point that the dispute concerns the
interpretation or scope of the arbitration agreement not its validity? There

© 2020 The Incorporated Council of Law Reporting for England and Wales

4178
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))        [2020] 1 WLR
Lord Burrows JSC

are two linked reasons. First, it is a general principle within the English   A
conflict of laws that, as between two possible proper laws, the courts should
favour the proper law that would uphold the validity of an agreement rather
than one that would invalidate it (see, for example, *In re Missouri Steamship
Co* (1889) 42 Ch D 321, 341; *South African Breweries Ltd v King* [1899]
2 Ch 173, 181; *Coast Lines Ltd v Hudig & Veder Chartering NV* [1972]
2 QB 34, 44 (per Lord Denning MR), 48 (per Megaw LJ); *Chitty on
Contracts*, 33rd ed (2018), para 30-12). Mr Bailey referred to this (in   B
reliance on the work of Gary Born, *International Commercial Arbitration*,
2nd ed (2014), pp 542–549, and *Merkin and Flannery*, *The Arbitration Act
1996*, 6th ed (2019), para 46.10.5) as "the validation principle". It rests on
the rational assumption that parties would prefer to have an agreement
upheld than not. But if it is correct that there is no dispute about the validity
of the arbitration agreement in this case, the validation principle is not a   C
reason here for favouring English law over Russian law as the proper law of
the arbitration agreement.

    199 Secondly, Mr Dicker submitted that, even if the dispute goes to the
interpretation of the arbitration agreement and not its validity, the rational
assumption is that parties would prefer to have all their disputes referred to
arbitration rather than just some ie that "rational businessmen are likely to
have intended" (using Lord Hoffmann's words in *Fiona Trust & Holding   D
Corpn v Privalov* [2007] Bus LR 1719, para 13) that a wider rather than
a narrower interpretation of disputes which should be arbitrated was
intended. However, there is an important difference between, on the one
hand, upholding as valid an undisputed agreement which the parties have
reached and, on the other hand, determining the correct interpretation or
scope of the agreement where the very question at issue is what is it that the   E
parties have agreed. Without empirical evidence about what rational
businessmen, one Russian and one Turkish, concluding a contract for work
to be carried out in Russia, would be likely to have intended, I am reluctant
to place weight on the idea that these parties would have intended a wider
rather than a narrower interpretation of their arbitration agreement. The
rational assumption is that the parties intended their agreement to be
interpreted in such a way that matches what they agreed. Rationally they do   F
not want to be held to have agreed something which is outside their
agreement. And one cannot say that, just because English law may adopt a
wider rather than a narrower approach to interpretation of an arbitration
agreement than Russian law, that will ensure the correct interpretation of
the arbitration agreement. I therefore agree with Mr Bailey's written
submission on this point where he said:   G

    "[There] is no suggestion of invalidity in this case, so as to engage the
'validation principle'. The argument is simply that English law should be
taken to apply because it construes AAs [ie arbitration agreements] more
liberally. That point only has to be articulated to reveal its parochialism.
It is impossible to say that just because Russian law takes a narrower view
of AAs than English law does . . . that the parties must have intended   H
English law to apply. That is results-based reasoning that ignores the fact
that there are legitimate reasons for adopting a narrower approach (such
as, in this very case, that a broad interpretation of AAs can lead to an
undesirable fragmentation of disputes and proceedings where many
different parties are involved)."

© 2020 The Incorporated Council of Law Reporting for England and Wales

4179

[2020] 1 WLR        Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Burrows JSC

A    *4. Why is the proper law of the main contract Russian?*

200    As I have explained in para 193(ii), while it is not in dispute that the proper law of the main construction contract is Russian, the route to that conclusion through the Rome I Regulation is disputed. This matter is of central importance because it has a significant impact on determining the proper law of the arbitration agreement.

B    201    As we have seen in para 193(ii), the Rome I Regulation provides in article 3.1 that the governing law is that chosen by the parties where a choice is "made expressly or is clearly demonstrated by the terms of the contract or the circumstances of the case". In the absence of such choice article 4 provides that in a contract for the provision of services the governing law is prima facie that of the habitual residence of the service provider but that the law of another country applies "where it is clear from all the circumstances

C    of the case that the contract is manifestly more closely connected with [that] country".

202    Mr Bailey submitted that Russian law had been expressly chosen as the proper law. He relied on the definition of "Applicable Law" in Attachment 17 to the contract which reads:

D    "Law of the Russian Federation, including legislation of the Russian Federation, all regulatory legal acts of the State Authority Federal Bodies, State Authorities of the constituent entities of the Russian Federation, legislation of the constituent entities of the Russian Federation, regulatory legal acts by Local Authorities and any other applicable regulatory legal acts."

E    Although this was not a classic choice of law clause of the type "This Agreement is governed by Russian law" Mr Bailey submitted that it had the same effect. I am not persuaded by that. The applicable law article (Attachment 17) does not say "This Agreement is governed by the Applicable law". Rather article 1 of the contract provides that "The terms used in this Agreement shall have the definitions set forth in Attachment No 17 to this Agreement". Admittedly, the term "Applicable Law" is used in

F    a large number of specific provisions. But Mr Dicker submitted that one is here talking about an incorporation by reference of relevant legislative provisions and that that is how the phrase "Applicable law" is used in international construction contracts (and he here referred us to a major practitioner work on standard contracts issued by the International Federation of Consulting Engineers ("FIDIC"): *Baker, Mellors, Chalmers and Lavers, FIDIC Contracts, Law and Practice* at paras 2.126, 2.140,

G    2.145). Mr Dicker took as a typical article in the main contract, article 4.1(b) which provides that Enka shall ensure performance of the work in accordance with the Applicable Law. This ensures that, incorporated into the contract, are local laws and Regulations, such as those governing planning, health and safety, labour laws, taxes and customs. Admittedly the main contract was not a *FIDIC* contract. And it may be thought odd to

H    incorporate, where specified, all the relevant law of the Russian Federation (as the first phrase of Attachment 17 requires) including presumably the Russian law of contract in the Russian Civil Code, if all one is concerned with are particular mandatory Regulations. My view is that, although there is some ambiguity about the role of the "Applicable Law" definition, Mr Dicker

© 2020 The Incorporated Council of Law Reporting for England and Wales

is correct that Attachment 17 does not constitute an express choice of law clause.

203   However, Attachment 17 is not alone.  There are many other additional references to Russian law in the contract.  So, for example, at article 24.2 there is reference to the provisions of the Russian Civil Code, there is reference to "RF law" in article 4.15, and there are numerous references (e g at articles 4.5, 4.26, 19.2 and 36.1) to "law" which, in the context, are clearly references to Russian law.  It is helpful here to refer to Title II, article 3, para 3 of the Giuliano-Lagarde Report on the Convention on the law applicable to contractual obligations which was the report that lay behind the Rome Convention which was the predecessor of the Rome I Regulation (and had the same wording as article 3.1 except that the formulation was "The choice must be expressed or demonstrated with reasonable certainty" rather than "The choice shall be made expressly or clearly demonstrated"):

> "The choice of law by the parties will often be express but the Convention recognizes the possibility that the court may, in the light of all the facts, find that the parties have made a real choice of law although this is not expressly stated in the contract.  For example . . . references in a contract to specific articles of the French Civil Code may leave the court in no doubt that the parties have deliberately chosen French law, although there is no expressly stated choice of law." (OJ C282/17.)

204   One can add to those express words in the contract, several other circumstances.  The head-contractor in the contract with Enka was Energoproekt, a Russian company and the owner and end customer, Unipro, was also Russian.  The place of performance was Russian.  The effects of any breach would be suffered in Russia.  The primary language of the contract was Russian.  And the price for the work was to be paid in Russian currency to a Russian bank account.  Indeed, the only non-Russian elements of the contract are that Enka is a Turkish company and that the seat of the arbitration is England.

205   My conclusion, therefore, is that, applying article 3.1 of the Rome I Regulation, Russian law is the proper law of the main contract chosen by the parties because, even though not expressly chosen, that choice has been "clearly demonstrated by the terms of the contract or the circumstances of the case".

206   The most powerful argument to the contrary is that the parties could easily have inserted a choice of law clause into the contract and yet failed to do so.  Mr Dicker submitted that, in the context of a professionally drafted, detailed, and long contract, the most obvious explanation for that was that the parties could not agree on which law should be the governing law.  But we have seen no evidence as to the circumstances in which this contract was drawn up and it seems to me more plausible as an objective interpretation of the parties' intentions that, given that there was some ambiguity over the role of the "Applicable Law" definition, the parties thought it was clear, and did not need to be further stated, that Russian law was the proper law.

207   Although there may be marginal differences as between article 3.1 of the Rome I Regulation and the first two stages (express or implied choice) of the common law test for the proper law, they are very closely aligned: see

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    *Lawlor v Sandvik Mining and Construction Mobile Crushers and Screens Ltd* [2013] 2 Lloyd's Rep 98. In my view, English common law, which I here refer to by analogy, would in this case regard there as having been an implied choice of Russian law. Even though there was no express term to that effect, the correct objective interpretation of the contract is that Russian law has been chosen by the parties.

B    208    I should stress that the lower courts did not decide this question as to why Russian law was the proper law of the main contract. Andrew Baker J, at paras 91–93, simply said that whether there was a choice of Russian law as the proper law is "far from clear in Enka's favour" (i e it was not clear that no choice had been made). The Court of Appeal decided that there was no express choice of proper law but appeared to leave open whether there had nevertheless been a clearly demonstrated choice under C    article 3(1) of the Rome I Regulation.

### 5. *The case law on the proper law of the arbitration agreement*

209    In the Court of Appeal in this case, Popplewell LJ said, at para 89:

D    "In my view the time has come to seek to impose some order and clarity on this area of the law, in particular as to the relative significance to be attached to the main contract law on the one hand, and the curial law of the arbitration agreement on the other, in seeking to determine the AA law. The current state of the authorities does no credit to English commercial law which seeks to serve the business community by providing certainty."

E    As this passage suggests, the English cases on this question, which appear to have been proliferating in recent years, do not speak with one voice. Certainly in seeking to provide the clarity which Popplewell LJ was rightly seeking, one cannot simply examine the relevant cases and hope to find in them a definitive answer to our question. With reasoning and decisions going both ways, the major purpose of looking at past cases is rather to put the task facing us in context and to ensure that all relevant considerations have been borne in mind. But ultimately, and without any authority binding F    this court, the way forward rests on a re-examination of principle. It also follows that no attempt is here being made to cover all relevant cases. Rather I shall focus on the most important cases to which we were referred by counsel.

210    The earliest case we were referred to was the House of Lords decision in *Hamlyn & Co v Talisker Distillery* [1894] AC 202. This G    concerned a contract between an English and Scots firm, made in London but to be performed in Scotland, with an arbitration clause for arbitration by "two members of the London Corn Exchange, or their umpire, in the usual way". It was held that the interpretation of the arbitration clause was governed by English law (i e in modern terminology, the proper law of the arbitration agreement was English). But in determining the respective weights of the proper law of the main contract and the proper law of the seat H    of the arbitration, the case does not take one very far for two reasons. First, the proper law of the main contract was not clarified and indeed it seemed to be assumed that the proper law of the arbitration agreement would also be the proper law of the main contract. In the words of Lord Herschell LC, at p 209: "I see no difficulty whatever in construing the language used as an

© 2020 The Incorporated Council of Law Reporting for England and Wales

indication that the contract, or that term of it [i e the arbitration agreement], was to be governed and regulated by the law of England." Secondly, it was regarded as an important consideration that the arbitration clause was invalid in Scotland—because the arbitrators were not named—but valid in England. It was for this reason that Mr Bailey submitted that this case was an example of the application of the "validation principle".

211   In *Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572, the House of Lords was deciding on the proper law of the main contract (a contract for the carriage of goods by sea) in a context where that proper law was specified as being governed "by the laws of the flag of the vessel carrying the goods". There was an arbitration clause with London as the seat. It was held that the proper law of the main contract was French. The majority (Lords Morris, Dilhorne and Diplock) reasoned that this was because there was a choice of French law as the proper law (because, on the true construction of the choice of law clause, the relevant flag was French). Lords Reid and Wilberforce reasoned that, although there was no operative choice of law clause (because the dispute could not be related to a specific vessel or shipment), the rest of the contract and the relevant surrounding facts meant that the contract had the closest connection with France (the majority preferred to treat this as an alternative reason for their decision). Their Lordships placed considerable weight on the seat of the arbitration as a strong indication of the proper law of the main contract (and implicitly the proper law of the arbitration agreement) but held that that strong indication was here negatived by the choice of law clause (per the majority) or by the other factors linking the contract most closely to French law (per Lords Reid and Wilberforce). Lord Diplock's analysis of the "curial law" is particularly helpful. He said the following at p 604:

"My Lords, it is possible for parties to a contract to choose one system of law as the proper law of their contract and a different system of law as the curial law. Although they may want their mutual rights and obligations under the contract to be ascertained by reference to the system of law of a country with which the transaction has some close and real connection, they may none the less consider that the arbitral procedure adopted in some other country, or the high reputation and commercial expertise of arbitrators available there, make the curial law of that country preferable to the curial law of the country whose system of law they have chosen as the proper law.

"It is not now open to question that if parties to a commercial contract have agreed expressly upon the system of law of one country as the proper law of their contract and have selected a different curial law by providing expressly that disputes under the contract shall be submitted to arbitration in another country, the arbitrators must apply as the proper law of the contract that system of law upon which the parties have expressly agreed.

"But the cases which have given rise to difficulty are those where the parties have made a choice of curial law by a clause of their contract expressly agreeing to arbitration in a particular country but have made no express provision as to the proper law applicable to the contract."

212   We were then referred to two judgments of Lord Mustill, who was the co-author, with Stewart Boyd QC, of *Commercial Arbitration* (the first

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  edition of which appeared in 1982 with a second edition in 1989). In *Black Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep 446 Mustill J as he then was said, at p 455: "Where the laws diverge at all, one will find in most instances that the law governing the continuous agreement [sc the arbitration agreement] is the same as the substantive law of the contract in which it is embodied . . ." And at p 456:

B  "In the ordinary way, this [sc the proper law of the arbitration agreement] would be likely to follow the law of the substantive contract." These statements offer support to the proper law of the arbitration agreement being the same law as the main contract rather than being the law of the seat. This is consistent with the approach favoured in *Mustill and Boyd, Commercial Arbitration*, 2nd ed (1989), at p 63:

C  "The starting point is to determine the proper law of the contract in which the arbitration is embodied. As a general rule the arbitration agreement will be governed by the same law, since it is part of the substance of the underlying contract."

However, in the *Black Clawson* case itself, the force of Mustill J's support for the "main contract" approach is somewhat diminished because he went
D  on to treat the parties' choice of Zurich as the place of arbitration as indicating an intention that the law governing the arbitration agreement should be the law of Zurich.

213  Subsequently, we see Lord Mustill favouring the "main contract" approach in the House of Lords in *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334. At p 357, Lord Mustill said:

E  "It is by now firmly established that more than one national system of law may bear upon an international arbitration. Thus, there is the proper law which regulates the substantive rights and duties of the parties to the contract from which the dispute has arisen. *Exceptionally, this may differ from the national law governing the interpretation of the agreement to submit the dispute to arbitration.* Less exceptionally it may also differ
F  from the national law which the parties have expressly or by implication selected to govern the relationship between themselves and the arbitrator in the conduct of the arbitration: the 'curial law' of the arbitration, as it is often called." (Emphasis added.)

214  In *XL Insurance Ltd v Owens Corning* [2001] 1 All ER (Comm) 530 Toulson J was concerned with an insurance policy which (to simplify slightly) had a New York governing law clause and an arbitration clause
G  with a London seat which included reference to the Arbitration Act 1996. It was alleged that the arbitration agreement was unenforceable because it was not in the correct written form under New York law. It was held, inter alia, that the enforceability of the arbitration agreement should be governed by English law as the law of the seat. Although Toulson J's reasoning is open to various possible interpretations—and certainly his reasoning lends support
H  to hiving off arbitration from the rest of the main contract as dealing with "a particular method of resolving disputes" (at 541E)—one interpretation is that, as he was satisfied that the parties had made an arbitration agreement, the validation principle was being applied so as to ensure that that arbitration agreement was upheld.

© 2020 The Incorporated Council of Law Reporting for England and Wales

**215**   The primary importance of *C v D* [2008] Bus LR 843 is obiter dicta of Longmore LJ supporting the "seat" approach.  The case dealt with an insurance contract governed by New York law with an English arbitration clause (ie an English seat).  The question was which law, New York or English, governed challenges to the arbitral award.  It was held that English law applied to determine that question.  That seems straightforward because that question was one of curial law and curial jurisdiction and the seat of arbitration (here England) almost invariably determines that law.  The proper law of the arbitration agreement and the proper law of main contract were irrelevant in this case.  However, Longmore LJ went on, in obiter dicta, to look at the proper law of the arbitration agreement and said this, at para 22:

> "The question then arises whether, if there is no express law of the arbitration agreement, the law with which that agreement has its closest and most real connection is the law of the underlying contract or the law of the seat of arbitration.  It seems to me that if (contrary to what I have said above) this is a relevant question, the answer is more likely to be the law of the seat of arbitration than the law of the underlying contract."

**216**   It is worth interjecting here that, in line with Longmore LJ's obiter dicta, the 15th edition of *Dicey, Morris & Collins, The Conflict of Laws*, published in 2012 has the following main rule (rule 64(1)):

> "The material validity, scope and interpretation of an arbitration agreement are governed by its applicable law, namely: (a) the law expressly or impliedly chosen by the parties; or, (b) in the absence of such choice, the law which is most closely connected with the arbitration agreement, which will in general be the law of the seat of the arbitration."

**217**   We then come to what can probably be regarded as the leading case: *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2013] 1 WLR 102.  Moore-Bick LJ's leading judgment (with which Hallett LJ and Lord Neuberger MR agreed) was cited by both Mr Bailey and Mr Dicker in support of their submissions.  Claims were brought by Brazilian companies under two insurance policies covering construction work in Brazil.  The insurers denied liability on the basis of an exclusion clause and material non-disclosure.  There was an express choice of Brazilian law as the governing law in the insurance contracts and an exclusive jurisdiction clause in favour of Brazilian courts.  However, the arbitration clause specified England as the seat.  In the insurers' application for an anti-suit injunction, the central question was what was the proper law of the arbitration agreement.  Under Brazilian law, there was a "serious risk" (per Moore-Bick LJ, at para 31) that the insured was not bound by the arbitration clause as the insured may not have specifically consented to its enforcement.  The Court of Appeal held that English law was the proper law of the arbitration agreement.  But it is not easy to determine whether Moore-Bick LJ's judgment supports the "main contract" or "seat" approach.

**218**   The following passage, at para 26, supports the "main contract" approach provided there is an express choice of law clause in the main contract:

> "where the arbitration agreement forms part of a substantive contract an express choice of proper law to govern that contract is an important

© 2020 The Incorporated Council of Law Reporting for England and Wales

4185

A    factor to be taken into account . . . In the absence of any indication to the contrary, an express choice of law governing the substantive contract is a strong indication of the parties' intention in relation to the agreement to arbitrate.  A search for an implied choice of proper law to govern the arbitration agreement is therefore likely . . . to lead to the conclusion that the parties intended the arbitration agreement to be governed by the same system of law as the substantive contract, unless there are other factors
B    present which point to a different conclusion.  These may include the terms of the arbitration agreement itself or the consequences for its effectiveness of choosing the proper law of the substantive contract."

219    Moore-Bick LJ went on to decide that there were two "conflicting indications" (para 31) that meant that the parties had not impliedly chosen Brazilian law as the proper law of the arbitration agreement.  The first was
C    that England was the seat, which inevitably imported English law, and hence the provisions of the Arbitration Act 1996, relating to the conduct and supervision of the arbitration (ie the curial law was English and the English courts had supervisory jurisdiction).  The second was the "serious risk" that the arbitration agreement might not be binding, as against the insured, under Brazilian law.  He then turned to the third stage of the common law
D    approach and, in a passage which supports the "seat" approach he said this at para 32:

"One then has to consider with what system of law the agreement has the closest and most real connection.  Although [counsel for the appellant] submitted that the agreement has a close and real connection with the law of Brazil, being the law governing the substantive contract in
E    which the arbitration agreement itself is embedded, I think his argument fails adequately to distinguish between the substantive contract and the system of law by which it is governed.  No doubt the arbitration agreement has a close and real connection with the contract of which it forms part, but its nature and purpose are very different.  In my view an agreement to resolve disputes by arbitration in London, and therefore in accordance with English arbitral law, does not have a close juridical
F    connection with the system of law governing the policy of insurance, whose purpose is unrelated to that of dispute resolution; rather, it has its closest and most real connection with the law of the place where the arbitration is to be held and which will exercise the supporting and supervisory jurisdiction necessary to ensure that the procedure is effective.  Its closest and most real connection is with English law. I therefore agree with the judge that the arbitration agreement is governed
G    by English law."

220    Subsequent to *Sulamérica*, there have been two significant first instance decisions.  In *Arsanovia Ltd v Cruz City 1 Mauritius Holdings* [2013] 2 All ER (Comm) 1, Andrew Smith J was faced with an express choice of Indian law in the main contract and an arbitration agreement with
H    a London seat.   Distinguishing *Sulamérica*, because there were no indications conflicting with the express choice of law, he held that the proper law of the arbitration agreement was Indian law.
221    Then we come to the valiant attempt by Hamblen J (as he then was) in *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi AS v VSC Steel Co Ltd* [2014] 1 Lloyd's Rep 479, to set out, as clearly as possible, the relevant

© 2020 The Incorporated Council of Law Reporting for England and Wales

4186
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Burrows JSC

principles to be derived from the cases in this tangled area.  In relation to the question of the proper law of the arbitration agreement it was assumed that there was no choice of law in the main contract but that it was governed by Turkish law as the law with which it was most closely connected.  The parties had agreed (as found by Hamblen J) a London arbitration clause.  It was held that the proper law of the arbitration agreement was English.  At para 101, Hamblen J said:

"101. The leading authority is the recent Court of Appeal decision in *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2012] 1 Lloyd's Rep 671.  Moore-Bick LJ (with whom Hallett LJ and Lord Neuberger MR agreed), summarised the test for determining the law applicable to arbitration agreements at paras 26–32.  The Court of Appeal's decision was considered but distinguished by Andrew Smith J in *Arsanovia Ltd v Cruz City 1 Mauritius Holdings* [2013] 1 Lloyd's Rep 235.  The guidance provided by these authorities may be summarised as follows:

"(1) Even if an arbitration agreement forms part of a matrix contract (as is commonly the case), its proper law may not be the same as that of the matrix contract.

"(2) The proper law is to be determined by undertaking a three-stage enquiry into: (i) express choice; (ii) implied choice; and (iii) the system of law with which the arbitration agreement has the closest and most real connection.

"(3) Where the matrix contract does not contain an express governing law clause, the significance of the choice of seat of the arbitration is likely to be 'overwhelming'.  That is because the system of law of the country seat will usually be that with which the arbitration agreement has its closest and most real connection.

"(4) Where the matrix contract contains an express choice of law, this is a strong indication or pointer in relation to the parties' intention as to the governing law of the agreement to arbitrate, in the absence of any indication to the contrary.

"(5) The choice of a different country for the seat of the arbitration is a factor pointing the other way.  However, it may not in itself be sufficient to displace the indication of choice implicit in the express choice of law to govern the matrix contract.

"(6) Where there are sufficient factors pointing the other way to negate the implied choice derived from the express choice of law in the matrix contract the arbitration agreement will be governed by the law with which it has the closest and most real connection.  That is likely to be the law of the country of seat, being the place where the arbitration is to be held and which will exercise the supporting and supervisory jurisdiction necessary to ensure that the procedure is effective.

"102. In relation to point (3), I would add that the terms of the arbitration clause may themselves connote an implied choice of law.  It is recognised that they may operate as an implied choice of law for the matrix contract itself-see, for example, *Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572, per Lord Wilberforce, at p 596 and Lord Diplock, at pp 604–605; . . . In such cases they must surely equally operate as an implied choice of law for the arbitration agreement.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

"103. The present case is one where there is no express choice of law in the matrix contract. In such a case the *Sulamérica* decision is clear authority that the applicable law will be that of the country of seat. This was acknowledged by Habas who reserved the right to challenge the decision should this case go further."

B

222   The reference to "overwhelming" in point (3) appears to refer to the words of Moore-Bick LJ in the *Sulamérica* case [2013] 1 WLR 102, para 26, but it should be noted that Moore-Bick LJ was using that description in the context of a free-standing agreement to arbitrate not an arbitration agreement contained in a main contract.

223   Hamblen J's summary represents clear support for the "seat" approach: unless there is an express choice of law clause in the main

C

contract, the seat will very likely determine the proper law of the arbitration agreement; and even where there is such an express choice of law clause, there may be sufficient factors pointing towards the "seat" determining the arbitration agreement's proper law.

224   I interject at this point that there was a careful analysis of these issues by Steven Chong J (as he then was) in *BCY v BCZ* [2016] 2 Lloyd's Rep 583 in the High Court of Singapore. In a judgment which favoured the

D

"main contract" approach, he said at para 65:

"where the arbitration agreement is part of the main contract, I would hold, adopting *Sul América*, that the governing law of the main contract is a strong indicator of the governing law of the arbitration agreement unless there are indications to the contrary. The choice of a seat different from the law of the governing contract would not in itself be sufficient to

E

displace that starting point."

225   The approach in the *BCY* case was subsequently assumed to be the correct law in Singapore by the Singaporean Court of Appeal (Sundaresh Menon CJ, Judith Prakash JA, and Steven Chong JA), and by the parties, in *BNA v BNB* [2020] 1 Lloyd's Rep 55, paras 44–95.

226   Popplewell LJ's approach in the Court of Appeal in the present case

F

may be regarded as somewhat similar to that of Hamblen J's in the *Habas* case. At para 91, Popplewell LJ said that, subject to an express choice of law in the main contract, "the general rule should be that the arbitration agreement law is the curial law, as a matter of implied choice, subject only to any particular features of the case demonstrating powerful reasons to the contrary". And at para 105, he said the following:

G

"I would therefore summarise the principles applicable to determining the proper law of an arbitration agreement, what I have called the AA law, when found in an agreement governed by a different system of law, as follows:

"(1) The AA law is to be determined by applying the three stage test required by English common law conflict of laws rules, namely (i) is there

H

an express choice of law? (ii) if not, is there an implied choice of law? (iii) if not, with what system of law does the arbitration agreement have its closest and most real connection?

"(2) Where there is an express choice of law in the main contract it may amount to an express choice of the AA law. Whether it does so will be a

© 2020 The Incorporated Council of Law Reporting for England and Wales

4188
**Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))**        [2020] 1 WLR
**Lord Burrows JSC**

matter of construction of the whole contract, including the arbitration     *A*
agreement . . .

"(3) In all other cases there is a strong presumption that the parties
have impliedly chosen the curial law as the AA law.  This is the general
rule, but may yield to another system of law governing the arbitration
agreement where there are powerful countervailing factors in the
relationship between the parties or the circumstances of the case."     *B*

*6. What is the proper law of the arbitration agreement?*

*(1) The proper law of the arbitration agreement is Russian law by reason
of an implied choice*

**227**   We are now in a position to decide what is the proper law of the
arbitration agreement.  As I have said at para 193(iv) above, this is to be     *C*
resolved by the common law choice of law rules i e one is looking for an
express choice, an implied choice or, if neither of those applies, the system of
law with which the arbitration agreement has its closest and most real
connection.  In this case, the three most important factors in deciding this
issue are:

(i) There is no express choice of law clause in the arbitration agreement
here i e there is no mention of choice of law in article 50.1 of the main     *D*
construction contract.

(ii) The seat of the arbitration, as laid down in the arbitration agreement,
is England.

(iii) The proper law of the main construction contract, as we have
established at paras 200–208 above, is Russian law by reason of the implied
choice of the parties.     *E*

**228**   It is my view that that combination of factors leads to the conclusion
that, under English common law, the proper law of the arbitration agreement
is, by reason of an implied choice, Russian law.  As the parties have impliedly
chosen Russian law for the main contract it is natural, rational and realistic to
regard that choice for the main contract as encompassing, or carrying across
to, the arbitration agreement.  That implied choice is simply the correct
objective interpretation of the parties' main contract and arbitration     *F*
agreement.

**229**   Although the decision as to the proper law of the arbitration
agreement turns on the interpretation of the main contract and the
arbitration agreement, there are a number of general reasons (i e reasons that
do not turn on the interpretation of these particular contracts) which
support the view that, absent an express choice of law in the arbitration     *G*
agreement, there is a presumption (or general rule) that the proper law of the
main contract is also the proper law of the arbitration agreement; and there
is no such presumption (or general rule) that the law of the seat is the proper
law of the arbitration agreement.  In short, these are reasons for favouring
the "main contract" rather than the "seat" approach.

**230**   I should make clear at the outset that, everything that is here said,     *H*
relates to an arbitration agreement that is contained in a main contract.
While a free-standing arbitration agreement entered into at the same time
would not be treated differently, a free-standing arbitration agreement
entered into at a different time and under different circumstances would
require a different analysis.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*(2) Reasons why, absent an express choice of law in the arbitration agreement, there is a presumption (or general rule) that the proper law of the main contract is also the proper law of the arbitration agreement*

(i) Dépeçage is the exception not the rule

231   If one were to treat the arbitration agreement in the same way as all the other clauses in the main contract, the general rule would be that the same proper law would apply throughout. Dépeçage is the exception not the rule. See para 193(iii) above.

(ii) The rationale of the separability doctrine

232   Under the separability doctrine, an arbitration agreement is viewed for certain purposes, both at common law and under section 7 of the Arbitration Act 1996, as a separate contract from the main contract. The reason for that is in order to ensure that the arbitration agreement is effective despite the non-existence, invalidity, termination or rescission of the main contract. In other words, it stops the argument that the parties have not agreed to arbitration to deal with disputes about the non-existence, invalidity or initial ineffectiveness of the main contract; and it also stops the argument that the arbitration agreement cannot deal with disputes once the main contract has been terminated or rescinded. This explains the wording of section 7 of the Arbitration Act 1996:

> "*Separability of arbitration agreement*
> "Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall *for that purpose* be treated as a distinct agreement." (Emphasis added.)

233   This statutory wording makes clear that the separability doctrine has been devised for a particular purpose. For that purpose, it treats (one might say somewhat fictionally) the arbitration agreement as a separate agreement when, in reality, it is not a free-standing agreement but is merely part of the main contract. However, that purpose does not extend to working out the conflict of laws rules applicable to an arbitration agreement. It follows that in deciding on the proper law of the arbitration agreement, the arbitration agreement should be regarded as part of the main contract.

234   I therefore agree with the characteristically clear and helpful exposition by *Adrian Briggs, Private International Law in English Courts* (2014), paras 14.37–14.38:

> "If the agreement to arbitrate is a term of a larger contract, the law which governs the contract as a whole will generally determine the scope of the terms of that contract. For even though the arbitration agreement is for some important purposes notionally severable from the substantive contract, those purposes do not include the need for its governing law to be separate or different from that of the substantive contract in which the arbitration agreement is contained. It would be perverse to deduce from the principle of severability a rule that the law governing the agreement to arbitrate should be identified without reference to the substantive

© 2020 The Incorporated Council of Law Reporting for England and Wales

contract in which the parties included it as a term. The autonomy of the arbitration agreement is one thing; its hermetic isolation would be quite another. To put the point yet another way: the agreement to arbitrate is *severable*, but that does not mean it is separate. Prior to any severance it will have been governed by the law which governs the contract; after severance, it must remain governed by the same law, for otherwise 'it' is not being severed; something else is instead being created.

"The result is that if the law which governs the substantive contract is identified by the Rome I Regulation, that law is very likely to govern the agreement to arbitrate, and will therefore also be used by the court to determine the validity, meaning and scope of the arbitration agreement. The fact that the Rome I Regulation makes no claim to identify the applicable law for arbitration agreements does not prevent the common law rules of private international law applying their own solution to the question, which is that the agreement to arbitrate is generally governed by the law of the contract of which it is a term if it is a term of a substantive contract." (Footnotes omitted.)

(iii) Dividing the arbitration agreement from the rest of the contract may be problematic

235   There may sometimes be practical problems in drawing the line for proper law purposes between the arbitration agreement and the rest of the main contract. This case provides an excellent example. This is because the arbitration agreement is itself part of a wider dispute resolution clause, i e article 50.1 (set out at para 191 above) includes an obligation to resolve the dispute in good faith and for there to be a meeting of senior management and only after that should the dispute, if still unresolved, be referred to international arbitration. It would be very odd and inconvenient to apply one proper law to interpret the earlier sentences in article 50.1 and a different proper law to interpret the later sentences. Moreover, the terms "notification" and "written notice" are used in article 50.1—and therefore impact on the time when the matter can be referred to arbitration—and the meaning of those terms is set out in article 51.4 of the main contract. It might be said that the whole of article 50.1 should be separated off from the main contract for the purposes of deciding the proper law. But while that would avoid the difficulty of different proper laws applying within the same dispute resolution clause, it creates the problem of how to ensure consistency with other terms of the main contract, such as article 51.4 (or another example, article 51.2 which is an entire agreement clause). To have a different proper law applying to the definitional article 51.4 than applies to article 50.1 would be problematic. All these difficulties would be avoided if the proper law of the arbitration agreement were the same as the proper law of the main contract.

236   Let us further assume that, instead of putting the arbitration agreement in a dispute resolution clause, the contract, as is often the case, had two separate clauses: a dispute resolution clause operative prior to arbitration and an arbitration agreement. Surely using two clauses instead of one cannot make all the difference to the proper law issue. Yet on the face of it that is what the seat approach would require.

237   One can envisage other examples of the difficulties that this division of the proper law would cause. Take, for example, the English law

© 2020 The Incorporated Council of Law Reporting for England and Wales

4191
[2020] 1 WLR    Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Burrows JSC

A    rule of interpretation that pre-contractual negotiations are not to be taken into account. Let us assume (as appears to be the case) that that is different from the law on interpretation in New York. Then, let us assume, that there is a main contract governed by New York law which includes an arbitration agreement with London as the seat. There may be pre-contractual negotiations that are relevant to understanding the contract including the arbitration agreement. It would be most odd to take those negotiations into

B    account in interpreting the main contract (governed by New York law) but to exclude them when interpreting the arbitration agreement (governed by English law). Again that problem is avoided if the same proper law applies across the board.

238    Another problematic example arises because of different possible approaches to a "no oral modification" clause. Such a clause is effective to

C    prevent subsequent oral variations of a contract in English law (as laid down in *MWB Business Exchange Centres Ltd v Rock Advertising Ltd* [2019] AC 119). Let us assume, as appears to be the case, that the contrary position is taken under New York law. Let us then assume that there is a contract containing a no oral modification clause and an arbitration agreement. The main contract is governed by New York law but London is the seat of the arbitration. If one applies different proper laws to the main contract and to

D    the arbitration agreement, that would appear to produce the odd result that a subsequent oral variation, which might affect the arbitration agreement, would be effective in relation to the main contract but would be ineffective in relation to the arbitration agreement. Again there would be no such problem if the proper law that applied to the main contract applied also to the arbitration agreement.

E    239    No doubt one can envisage many other such practical problems arising from the division required by the seat approach. They indicate the underlying truth that, in contrast to the main contract approach, the seat approach cuts across a principled way forward.

(iv) In past cases excessive weight has been given to the seat of arbitration

F    240    It is not easy to pinpoint why, in several past cases (as we have seen in paras 209–226 above) the seat of arbitration has been thought to be of such major importance in determining the proper law of the arbitration agreement. True it is that the seat of arbitration (almost) invariably carries with it the curial law and the courts' curial or supervisory jurisdiction (see para 193(vi) above). So in this case it is not in dispute that the curial law of the arbitration agreement here is England and that the English courts have

G    curial or supervisory jurisdiction. It may be, therefore, that in the past there has sometimes been a failure to distinguish between, on the one hand, the curial law and the curial/supervisory jurisdiction of the courts—which are (almost) invariably determined by the law of the seat-and, on the other hand, the proper law of the arbitration agreement.

241    As Adrian Briggs has written in *Private International Law in*

H    *English Courts* (2014), para 14.41:

"[The] identification of the seat is a reliable indicator of the law which was intended or expected by the parties to apply to the proceedings before the arbitral tribunal, to their support, supervision, and control, but it is not a statement of the law which will govern the initial validity and scope

© 2020 The Incorporated Council of Law Reporting for England and Wales

of the agreement to arbitrate. The parties may say that they wish to have arbitration in London, and it may well be true that they expect the Arbitration Act 1996 to provide the template for the procedure which will be followed once the arbitration is underway. But it does not follow, or does not need to follow, that the validity of the contract by means of which that agreement was or [was] not made must also be understood to be governed by English law, for that is another question entirely."

242   Another possible explanation for the weight given to the seat in older cases is that this has rested on the now outdated assumption (given the way modern international arbitration works) that arbitrators at the seat would only be comfortable applying their own law. In *Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572, the House of Lords reasoned that the choice of seat in an arbitration clause was an indicator as to the proper law of the main contract. A submission put forward in support of that was that a reason for choosing an English seat was because English arbitrators would be most familiar with English law. Lord Wilberforce rejected that submission. He said, at p 596:

"I venture to think that in commercial matters, at the present time, this may give insufficient recognition to the international character of the City of London as a commercial centre—the reason, rather than any preference for English rules, for which arbitration in London is selected. In this case the arbitrators had no difficulty in finding for French law and I do not suppose they would find ascertainment of the French law as to damages any more difficult than the English law of anticipatory breach."

243   And as Popplewell LJ said in the Court of Appeal in this case, at para 72:

"I doubt that [that submission] would now be accorded significant weight in the context of most international arbitration in England, in which English arbitrators are often asked to decide questions under a foreign governing law and are regarded as equipped to do so. A fortiori it is inapplicable to a case such as the present involving arbitration under the ICC Rules which commonly involves appointment of foreign arbitrators from different legal traditions and disciplines notwithstanding that the seat of the arbitration is in London."

244   Mr Dicker submitted that the seat might often be chosen to ensure neutrality. However, the desire for neutrality is surely normally concerned with the quality and integrity of the decision-makers and rarely has anything to do with the proper law to be applied (i e the relevant neutrality is referring to the decision-maker not the proper law to be applied by that decision-maker). There may have been an implication in Mr Dicker's submission that the parties in this case precisely chose England as the seat because they did not trust the Russian courts. Certainly one can readily accept that neutrality away from home courts may be a reason why parties choose international arbitration, and that the curial or supervisory jurisdiction of the courts at the seat may be significant. But the desire for neutrality does not explain why the parties would choose the law of the seat rather than the law of the main contract as the proper law of the arbitration agreement. Moreover, in this case if the parties really did not trust the Russian courts, one would have expected there to have been an exclusive jurisdiction clause (requiring any

© 2020 The Incorporated Council of Law Reporting for England and Wales

4193
[2020] 1 WLR   Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Burrows JSC

A litigation to come before the English courts) in the main contract. In any event, we were supplied with no evidence to support any suggestion that the parties in the present case did not trust the Russian courts. Clearly they preferred to resolve the matter by arbitration rather than litigation but that is a different point.

B  (v) In past cases insufficient weight has traditionally been given to the implied choice of the parties

245  Although it is very difficult to rationalise all past cases, the apparent rationalisation given by the Court of Appeal in this case (mirroring other judicial attempts), in seeking to put the law on a sound footing, with respect places insufficient weight on the implied choice of the parties. That approach was to say that, in general, the proper law of the arbitration agreement was

C dictated by the seat chosen for the arbitration unless there was an express choice of proper law in the main contract (see Popplewell LJ's judgment at paras 90–91 and 105 and above para 226). But why should only an express choice of proper law in the main contract have this effect? As Mr Bailey persuasively submitted, in his written case, "it is the fact that the parties have made a choice which matters, not the way in which that choice was

D manifested." In other words, it makes no rational sense to place heavy weight on an express choice in the main contract while placing little weight on an implied choice in the main contract.

(vi) The curial law and curial jurisdiction can be separated out from the proper law of the arbitration agreement

E  246  A central submission of Mr Dicker, in line with the views of Popplewell LJ in the Court of Appeal at paras 96 to 99, is that one cannot properly separate out the curial law of the arbitration from the proper law of the arbitration agreement. They are intertwined. It follows, so the submission goes, that the parties are unlikely to have intended the proper law of the arbitration agreement to be different from the curial law (and we know that the latter is English by reason of the choice of seat). While in

F general terms, the curial law may be said to be dealing with arbitral procedure, and the proper law of the arbitration agreement with the substance of the parties' arbitration agreement (its existence, validity and scope), one cannot in this context neatly divide procedure and substance. This is illustrated, so the submission goes, by the provisions of the Arbitration Act 1996. If the seat is England, the provisions of that Act apply

G whatever the proper law of the arbitration agreement; and many of these provisions (for example, sections 5, 7, 12, 28(1), 58, 60, 71(4), 79 and 82(2)) are substantive not procedural.

247  Looked at in the overall context of the English rules on the conflict of laws, this may be thought a surprising submission. This is because it has long been recognised that, while there may be issues at the margins in drawing the distinction, there is an important difference between matters of

H procedure that are governed by the law of the forum and matters of substance that are governed by the particular proper law; and in modern times it would not be suggested that the forum chosen, governing procedure, would be a decisive, or even an important, factor in deciding on the proper law determining the substantive rights of the parties.

© 2020 The Incorporated Council of Law Reporting for England and Wales

248  It should also be noted that one would face the same issue of separating out the curial law from the proper law of the arbitration agreement if there were an express choice of law clause in the main contract specifying a different proper law than the curial law.  Yet there is wide acceptance that an express choice of law clause in the main contract would override the choice of seat in determining the proper law of the arbitration agreement.

249  Moreover, as regards the Arbitration Act 1996, I accept the submissions of Chubb Russia, put forward so persuasively on this matter by Toby Landau QC, that Mr Dicker's submissions (and the reasoning of Popplewell LJ on this) are incorrect for the following two reasons:

(i) Almost all the provisions of the Arbitration Act 1996 being referred to as substantive not procedural are non-mandatory.  And in relation to such non-mandatory provisions, section 4(5) of the 1996 Act lays down (as one would expect in any event) that a foreign proper law for the arbitration agreement means that the non-mandatory provisions of the 1996 Act do not apply.  This provision was not relied on by Chubb Russia in the Court of Appeal and was not mentioned in the Court of Appeal's judgment.  Section 4 reads as follows:

> "*Mandatory and non-mandatory provisions*
> "(1) The mandatory provisions of this Part are listed in Schedule 1 and have effect notwithstanding any agreement to the contrary.
> "(2) The other provisions of this Part (the 'non-mandatory provisions') allow the parties to make their own arrangements by agreement but provide rules which apply in the absence of such agreement.
> "(3) The parties may make such arrangements by agreeing to the application of institutional rules or providing any other means by which a matter may be decided."
> "(5) The choice of a law other than the law of England and Wales or Northern Ireland as the applicable law in respect of a matter provided for by a non-mandatory provision of this Part is equivalent to an agreement making provision about that matter.  For this purpose an applicable law determined in accordance with the parties' agreement, or which is objectively determined in the absence of any express or implied choice, shall be treated as chosen by the parties."

As the Supplemental Report of the Department's Advisory Committee on Arbitration Law (DAC) said, at para 12, section 4(5) "avoids the dangers that . . . a choice of England as the seat of the arbitration will necessarily entail the imposition of every provision of the Act".

(ii) The remaining provisions of the 1996 Act relied on by Mr Dicker (sections 12–13 and 66–68) appear to be procedural not substantive (they are concerned with extending time limits for beginning arbitration proceedings, limitation periods, and the enforcement and setting aside of an award).  But even if one regards them as substantive (see Popplewell LJ, at para 96) it is clear that, in themselves, they cannot be regarded as having any bearing on the proper law of the arbitration agreement.

(vii) Section 103(2)(b) of the Arbitration Act 1996 (codifying article V(1)(a) of the 1958 New York Convention) is neutral

250  Mr Dicker sought to pray in aid article V(1)(a) of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral

© 2020 The Incorporated Council of Law Reporting for England and Wales

Awards, which has been codified in what is now section 103(2)(b) of the Arbitration Act 1996. This statutory provision (which is materially identical to article V(1)(a) of the 1958 New York Convention) reads as follows:

"103. *Refusal of recognition or enforcement*
"(1) Recognition or enforcement of a New York Convention award shall not be refused except in the following cases.
"(2) Recognition or enforcement of the award may be refused if the person against whom it is invoked proves— (a) that a party to the arbitration agreement was (under the law applicable to him) under some incapacity; (b) that the arbitration agreement was not valid under the law to which the parties subjected it or, failing any indication thereon, under the law of the country where the award was made; . . ."

This statutory provision therefore deals with the refusal of recognition or enforcement of a non-domestic arbitral award (ie an award made in a territory outside the UK in a state which is a party to the New York Convention: section 100(1) of the Arbitration Act 1996) where an arbitration agreement is invalid under the law to which the parties subjected it or, failing any indication thereon, under the law of the seat. True it is that that constitutes legislative acceptance of the relevance of the law of the seat. But this provision is only directly concerned with the enforcement or recognition of arbitral awards. It is not directly concerned with the validity of an arbitration agreement prior to any question as to its enforcement or recognition although Mr Dicker submitted (relying on *Berg, The New York Convention of 1958* (1981), pp 126–128) that what is relevant at the end should also be relevant at the start. Mr Bailey's response was that, even if one were to regard this provision as having relevance at the pre-enforcement stage, the provision tended to support his case because the relevance of the law of the seat is only at the default level: where the parties have chosen the proper law of the arbitration agreement, including impliedly, the law of the seat does not apply. In other words, his submission was that this statutory provision was simply irrelevant where there has been an implied choice (as on the facts of this case). I agree with that. However, it is important to add that the statutory provision is irrelevant to this case for a wider reason: as I have made clear at paras 194–199 above, this case is concerned with the interpretation of an arbitration agreement and not with its validity. It should also be stressed that the award in this case, because the seat is England, would be a domestic award to which section 103(2)(b) does not apply.

251    Nevertheless, I am here concerned to articulate reasons that apply generally to favour the "main contract" as opposed to "seat" approach. On the face of it, the statutory provision (and article V(1)(a) of the New York Convention) does offer support in relation to the validity of the arbitration agreement and, at least at the enforcement and recognition stage, for applying the law of the seat where there has been no choice of law, express or implied, made by the parties. One may say that it represents a legislative policy, and a policy of international arbitration, which the common law should respect. However, in so far as one might apply this provision so as to make a practical difference to the determination of the proper law of the arbitration agreement (ie where one would be applying, as the proper law of the arbitration agreement, at the pre-enforcement stage, the law of the seat

© 2020 The Incorporated Council of Law Reporting for England and Wales

rather than the law of the main contract) there is a difficulty with reconciling that provision with the "validation principle". We have explained in para 198 above that that principle is the general principle whereby the courts favour the proper law that would uphold an arbitration agreement rather than one that would invalidate it; and this can be seen to rest on the assumption that rational parties would prefer to have an agreement upheld than not. It follows that, unless one is to accept the unfortunate conclusion that the legislative provision may (sometimes) override the validation principle (of course sometimes it will be consistent with it), one will need to interpret the provision in such a way that, where the arbitration agreement would be invalid under the law of the seat but valid under the law of the main contract, the law of the seat will give way to the law of the main contract. The most obvious way of achieving this is to recognise that the provision confers a discretion. The relevant statutory words are that recognition or enforcement of the award "may be refused". Assuming there is such a discretion, it should be exercised to accommodate the "validation principle". The consequence would be that any practical difference, as to validity, between the proper law of the seat and the proper law of the main contract would be nullified.

252   Ardavan Arzandeh and Jonathan Hill, "Ascertaining the Proper Law of an Arbitration Clause under English Law" (2009) Journal of Private International Law 425, 442, stress, correctly in my view, that, while superficially attractive, it is problematic to decide the proper law of the arbitration agreement by reading across from article V(1)(a) of the New York Convention (and hence from section 103(2)(b) of the 1996 Act):

"Although international harmonisation of choice-of-law rules on the basis of the rules enshrined in article V(1)(a) of the New York Convention is superficially attractive, it is not wholly unproblematical. If a national court may, in the exercise of discretion, order enforcement of an award notwithstanding the fact that the underlying arbitration clause is invalid according to the law specified by article V(l)(a), it is legitimate to question whether it would be logical or sensible to treat the choice-of-law rules endorsed by article V(l)(a), as interpreted by van den Berg, as being automatically applicable in contexts other than the enforcement of arbitral awards, contexts in which the element of discretion is absent."

253   The overall position, therefore, is that not only does section 103(2)(b) have no direct relevance to the facts of this case (because we are concerned with interpretation not validity and the award would be a domestic award), it also has no direct relevance to our general enquiry because we are not concerned with the enforcement or recognition of an award. This is in line with the view of *Merkin, Arbitration Law* (Issue 84, 2020) para 7.15 that the provision "has a more limited effect" than may at first sight appear. In any event, it would appear that the provision's support for the "seat approach" can, and should, be limited so as to adhere to the "validation principle" (thereby nullifying any practical difference, as to validity, between the proper law of the seat and the proper law of the main contract). For all these reasons, it seems reasonable to regard section 103(2)(b) of the Arbitration Act 1996 as an essentially neutral consideration that should not be regarded as inconsistent with, or as standing in the way of, a principled solution.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4197
[2020] 1 WLR      Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))
Lord Burrows JSC

A   (viii) The analogy to an exclusive jurisdiction clause

254   In deciding on a principled approach to the proper law of an arbitration agreement, it is helpful to think of the analogy between an arbitration agreement and an exclusive jurisdiction clause. Say one has a contract governed by Russian law but with a jurisdiction clause giving the English courts exclusive jurisdiction. What is the proper law of the exclusive jurisdiction agreement? Although Mr Dicker submitted that that clause

B   would be governed (presumptively) by English law-as the courts (and place) chosen by the parties—he was not able to support that submission with any convincing references. It would be surprising if, at least normally, the proper law of the jurisdiction clause is anything other than the same as the proper law of the main contract. Certainly that is the position favoured by *Dicey, Morris & Collins*, 15th ed (2012), para 12.103:

C
"[As] a matter of common law, normally a jurisdiction agreement (like arbitration agreements, which are also excluded by article 1(2)(e) from the application of the Rome I Regulation) is governed by the law applicable to the contract of which it forms a part. Accordingly, and as a matter of the common law principles of the conflict of laws, the law which governs the contract will also generally govern the jurisdiction

D   agreement. This means . . . that this law governs the construction and interpretation of the agreement . . ."

(ix) Conclusion

255   Taken together, these reasons provide a convincing case for favouring the "main contract" as opposed to "seat" approach to determining

E   the proper law of the arbitration agreement. They should be viewed as supporting a presumption (or general rule) that the proper law of the main contract is also the proper law of the arbitration agreement. In this case, they support the conclusion that the proper law of the arbitration agreement is Russian law by reason of an implied choice.

*(3) The proper law of the arbitration agreement is Russian law even if*

F   *there has been no implied choice*

256   I would arrive at the same conclusion—that the proper law of the arbitration agreement is Russian law—for the reasons that have been set out in paras 231–255 above, even if the proper law of the main contract was Russian under article 4, rather than under article 3(1), of the Rome I Regulation at least if the reason for that was that Russia is the country with

G   which the contract is most closely connected. That would then carry across to the third stage of the common law approach and would mean that, despite the seat for the arbitration being England, the arbitration agreement also has the closest and most real connection with Russia. That one arrives at the same result at common law whether applying the implied choice or the default rule is unsurprising. It has long been recognised that there is a thin distinction between those two stages: they represent the distinction between

H   implied and imputed intention. In *Amin Rasheed Shipping Corpn v Kuwait Insurance Co* [1984] AC 50 the majority, led by Lord Diplock, decided that English law was the proper law by necessary implication whereas Lord Wilberforce came to the same conclusion applying the closest and most real connection test while recognising, at p 69, that the two "merge into each

© 2020 The Incorporated Council of Law Reporting for England and Wales

other".  But although, in general terms, it is important to recognise that one would arrive at the same conclusion if one applied the third stage of the common law approach, this case can be decided without going beyond the choice of the parties.  The proper law of the arbitration agreement is Russian because that is the law which they have impliedly chosen.

*(4) Stating the common law on the proper law of an arbitration agreement*

257    The reasoning above enables me to state the common law on the proper law of an arbitration agreement (contained in a main contract) in the following straightforward and principled way which (had this view found favour) would have been easy to apply and would have been one way of providing the clarity that Popplewell LJ was rightly seeking:

(i) The proper law of the arbitration agreement is to be determined by applying the three stage common law test.  Is there an express choice of law? If not, is there an implied choice of law?  If not, with what system of law does the arbitration agreement have its closest and most real connection?

(ii) Where there is an express proper law clause in the arbitration agreement (which is rare) that will be determinative.

(iii) Where there is no such clause, there is a presumption or general rule that the proper law of the main contract is also the proper law of the arbitration agreement.  That presumption or general rule can assist the enquiry at any of the three stages of the common law approach.  (It is most appropriate to use the language of a presumption where one is considering the parties' choice at the first two stages of the enquiry—i e it is a presumption of the parties' intentions-and to use the language of a general rule where one is considering the third stage of the closest and most real connection.)

(iv) That presumption may most obviously be rebutted, or there is an exception to that general rule, where the standard "validation principle" (of the English conflict of laws) applies i e where the law of the seat (or another relevant jurisdiction) would treat the arbitration agreement as valid whereas the proper law of the main contract would treat the arbitration agreement as invalid (or, as in the *Sulamérica* case [2013] 1 WLR 102, not binding on one of the parties).  In very rare cases that presumption would also be rebutted where it is clear that the parties have chosen the law of the seat as the proper law of the arbitration agreement even though there is no express proper law clause in the arbitration agreement.

258    The above statement of the common law on the proper law of an arbitration agreement does not undermine the well-established and uncontroversial position that the curial law and curial jurisdiction are (almost) invariably determined by the seat chosen for the arbitration.

*7. Concluding remarks on the proper law of an arbitration agreement*

259    We were referred to the writings of many commentators on this issue.   Several (for example, *Gary Born, International Commercial Arbitration*, 2nd ed (2014), Chapter 4; and *Julian Lew, The Law Applicable to the Form and Substance of the Arbitration Clause* in *Improving the Efficiency of Arbitration Agreements and Awards: 40 Years of Application of the New York Convention*, Albert van den Berg (ed), (1998) ICCA

© 2020 The Incorporated Council of Law Reporting for England and Wales

Congress Series Vol 9, 114, 114–145) refer to the international context and I have been very conscious throughout that it would be inappropriate to lay down an approach for the English common law that would be inconsistent with accepted principles of international arbitration law. Although the commentators, as with the judges, do not speak with one voice on the issue facing us, I have found illuminating most of the writings to which we were referred. I have derived particular help from the work I have earlier mentioned of Lord Mustill and Stewart Boyd, Gary Born, Robert Merkin and Louis Flannery, Albert van den Berg, Adrian Briggs, and Ardavan Arzandeh and Jonathan Hill. In addition, I have been helped by an excellent case-note on the Court of Appeal decision in this case by Edwin Peel, "The Proper Law of an Arbitration Agreement" (2020) 136 LQR 534.

260    It will be clear from all that I have said above that, while there are large measures of agreement between us (for example, that (at least in general) an express or implied choice of the proper law for the main contract carries across to be the proper law of the arbitration agreement, irrespective of the specified seat of arbitration) I cannot agree, with great respect, with the overall approach or conclusion in this case of my colleagues, Lord Hamblen and Lord Leggatt JJSC (with whom Lord Kerr of Tonaghmore agrees). In their view, the proper law of the arbitration agreement is here English law because there has been no choice of law for the arbitration agreement, express or implied, and the arbitration agreement has the closest and most real connection to England as the seat of the arbitration. Their decision would have been different had the proper law of the main contract been Russian law by reason of an express or implied choice. But because the proper law of the main contract is, in their view, Russian law, only because it has the closest and most real connection to Russia, that means that the proper law of the arbitration agreement is English law. That is to rest crucially different consequences on a divide between the choice and default stages of the Rome I Regulation and between the second and third stages of the common law approach in a way that, with respect, I do not believe to be justified in principle. I also consider that that approach produces undesirable practical and unprincipled consequences (especially by forcing a division of the proper laws) such as those set out in paras 235–239 above. I also have misgivings about the idea that the English common law should depart from a principled solution on the basis of a supposed—but in my view unproven—consensus as to international arbitration policy favouring the seat approach (in the absence of choice). My view is that the proper law of the arbitration agreement is Russian. That is because the proper law of the main contract is Russian by implied choice and that implied choice encompasses, or carries across to constitute, an implied choice of Russian law for the arbitration agreement. Even if my reasoning on the proper law of the main contract is wrong—and the proper law of the main contract is Russian by reason of Russia having the closest and most real connection rather than by implied choice—I would still regard the proper law of the arbitration agreement as being Russian law by reason of the arbitration agreement having the closest and most real connection with Russian law. This is to apply the general rule, to which there is here no exception, that the proper law of the main contract is also the proper law of the arbitration agreement.

© 2020 The Incorporated Council of Law Reporting for England and Wales

4200
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))      [2020] 1 WLR
Lord Burrows JSC

*8. The anti-suit injunction*                                                                                      A

261    Had my conclusion on the proper law of the arbitration agreement prevailed—that the proper law of the arbitration agreement is Russian—the following question would have arisen. Should this matter be remitted to the English Commercial Court to decide if an anti-suit injunction should be granted or, as Mr Bailey submitted, should the matter be left to the Russian courts by refusing an anti-suit injunction (overturning the Court of Appeal)?      B
It is not in dispute that the English courts, because England is the seat of the arbitration, have curial or supervisory jurisdiction to support and enforce the arbitration agreement (see para 193(vi) above). It is also clear that the English Commercial Court has the means and experience, relying on expert evidence on Russian law, to decide on the correct interpretation of the arbitration agreement applying Russian law. I consider that, in these circumstances, had my view on the proper law of the arbitration agreement      C
been the majority view, the appropriate course would have been for the question as to whether an anti-suit injunction should be ordered to be remitted to the English Commercial Court which would have been required to determine whether, applying Russian law to interpret the arbitration agreement, the proceedings in Russia constituted a breach of the arbitration agreement. That court would also have been required to determine, if Enka      D
had been given permission to plead the point, whether, applying Russian law, there was a serious risk of the arbitration agreement being held invalid under Russian law as at the time this arbitration agreement was entered into (see para 197 above). Had my view on the proper law prevailed, the stay of execution of the anti-suit injunction would not therefore have been lifted and the undertakings given by the parties, pending the outcome of this appeal, would have had to be extended to protect Enka's position.      E

*9. Conclusion*

262    Contrary to the joint judgment of Lord Hamblen and Lord Leggatt JJSC (with whom Lord Kerr agrees), it is therefore my view that, on the main issue in the case, Chubb Russia is correct that the proper law of the arbitration agreement is Russian, not English, law; and, on that basis,      F
I would have remitted the question, whether an anti-suit injunction should be ordered, to the English Commercial Court.

**LORD SALES JSC**
263    I agree with the judgment of Lord Burrows JSC. In relation to determining the proper law of an arbitration agreement contained in a main contract my view is that the "main contract" approach should be preferred      G
to the "seat" approach. I add a short judgment of my own to explain my position in relation to the points on which there is a difference of view within the court and to indicate the areas where I am in agreement with the judgment of Lord Hamblen and Lord Leggatt JJSC.
264    The court is taking this opportunity to clarify the position regarding the approach to determining the proper law of an arbitration agreement      H
which is a provision within a main contract. The main contract may or may not contain a provision stating the proper law of the contract. Where the main contract contains such a provision, it is not usual for the parties also to include a distinct term to state the proper law of the arbitration agreement embedded in the main contract.

© 2020 The Incorporated Council of Law Reporting for England and Wales

265   According to English conflict of laws rules, the proper law of the main contract will usually be determined by application of the Rome I Regulation, but that does not apply in relation to the arbitration agreement. In relation to the arbitration agreement, the proper law is determined by reference to the conflict of laws rules of the common law: the proper law is that chosen by the parties (i) expressly or (ii) by implication, according to the terms of any agreement between them, and (iii) in the absence of such choice is the law of the jurisdiction with which the arbitration agreement has the closest and most real connection.

### Choice of the parties

266   Where the main contract includes a provision stating the proper law of that contract, I agree with Lord Hamblen and Lord Leggatt JJSC that the ordinary effect of the provision is that this indicates that the parties have chosen the same proper law for the arbitration agreement.

267   I further agree with Lord Hamblen and Lord Leggatt JJSC that for these purposes there is not necessarily a sharp division between an express choice of law and an implied choice of law. The point can be illustrated by the decision in *Sulamérica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2013] 1 WLR 102. That case concerned an arbitration agreement contained in a main contract which included a term stating that the proper law of the contract was Brazilian. In his judgment, Moore-Bick LJ assumed that what was in issue was whether the parties had thereby made an implied choice of law in relation to the arbitration agreement, and held that by virtue of the application of the validation principle the choice of law term could not be interpreted as having that effect: paras 25–26 and 31. However, one might analyse the effect of the proper law provision in the main contract by asking whether on the true construction of its express terms the statement that the proper law of the contract was Brazilian law extended to cover the arbitration agreement which was part of that contract. Again, application of the validation principle would indicate that in the particular circumstances of the case the parties did not intend that statement to extend so far.

268   Stages (i) and (ii) of the common law rule are aligned with the test in article 3(1) of the Rome I Regulation. The first main point of difference between the judgment of Lord Burrows JSC and the judgment of Lord Hamblen and Lord Leggatt JJSC is whether in the circumstances of the present case the parties impliedly chose Russian law as the law governing the main contract, including the arbitration agreement. On that question, I agree with Lord Burrows JSC that they did. Although the parties did not include an express choice of law statement in the main contract, they included many references in the main contract to make it clear that they intended that Russian law should govern their relationship. In the circumstances of the case, and given the nature of the task to be performed by Enka, it would have been bizarre for them to assume that any other law was to apply. The guidance in the report by Giuliano and Lagarde on the Rome Convention which later became the Rome I Regulation (para 203 above) is strong support for this view. Unlike in *Sulamérica*, there was no good countervailing reason to indicate that the parties intended that the choice of law they had made for their contract should not extend to the arbitration agreement which was part of it.

© 2020 The Incorporated Council of Law Reporting for England and Wales

269   Where the parties to a main contract include an arbitration
agreement as part of that contract, then in general terms there are strong
grounds to infer that they intend their choice of the law to govern that
contract to cover the arbitration agreement as well, as Lord Hamblen and
Lord Leggatt JJSC point out: para 53 above. There is a presumption that in
ordinary circumstances a contract has a single proper law since otherwise
"a serious element of uncertainty" would be introduced into mercantile
agreements: *Jacobs, Marcus & Co v Credit Lyonnais* (1884) 12 QBD 589,
602–603, per Bowen LJ; see also *Kahler v Midland Bank* [1950] AC 24, 42
(Lord MacDermott). A contract contains a unified package of rights and
obligations, created in the same set of circumstances, so the usual and
natural inference is that the parties intend, on an objective basis, that the
same proper law should apply in relation to it. An arbitration agreement
contained in the main contract imposes an obligation to take disputes to
arbitration in certain circumstances, as part of the package of rights and
obligations created by and set out in the main contract. In usual
circumstances, I can see no good reason to infer that the parties to the main
contract intended the interpretation of the obligation to arbitrate to be
governed by any different system of law than the system of law which
governs the interpretation of all the other obligations in their contract.

270   Applying the same system of law to govern the construction of the
whole of the contract the parties have made ensures simplicity and
coherence in its interpretation. It avoids the uncertainty associated with
subjecting different parts of the contract to interpretation according to
different systems of law. Any national system of law may be expected to
have internal coherence, which will not be the case when two national
systems of law are set side by side or are overlaid. Each will have an internal
logic and in dealing with particular matters which is at variance from the
internal logic of the other. Each may have different solutions to practical
problems which are coherent within that system, but are opposed to the
solutions given by the other system according to what is coherent within that
other system. The presumption that a contract has a single proper law thus
reflects the usual expectations of the parties to a contract, since it is a
reasonable inference that they prefer certainty, coherence and simplicity in
working out the practical implications of their agreement.

271   In my view, these points underlie the observation by Lord Mustill in
*Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC
334, 357–358, that it would be exceptional for the proper law of the
arbitration agreement to be different from the proper law of the main
contract. Lord Mustill's opinion in this area carries great weight. He also
pointed out that it is less unusual for the curial law in relation to an
arbitration to be different from the proper law of the main contract (and the
proper law of an arbitration agreement contained in the main contract). The
explanation for this is that the curial law follows the choice of seat. When
the parties choose a particular seat, their reasons for doing so include the
relationship stipulated by the law of the jurisdiction of the seat as to
the grounds on which the courts of that jurisdiction may interfere with the
arbitral process or its outcome and the extent to which those courts may take
action positively to support the arbitral process and uphold the agreement to
arbitrate, including by the grant of injunctive relief. These reasons apply
whatever the proper law of the main contract or the arbitration agreement

© 2020 The Incorporated Council of Law Reporting for England and Wales

4203

A    may be.  Hence I do not consider that ordinarily the choice of the seat provides any sound basis to infer what the parties intended or might have expected the proper law of the main contract or the arbitration agreement to be.

272    Two comments may be made about this.  First, many decades ago it was understood that when the parties stipulated that the seat for their arbitration would be in a particular jurisdiction their intention was that the

B    arbitrators would be local lawyers chosen for their expertise in the law of that jurisdiction, so that the inference could be drawn that the parties intended that they would apply that law in determining issues in dispute, including as to the proper interpretation of the arbitration agreement and the main contract.  But changes in the way international arbitration was conducted meant that such an inference was already suspect by 1970, as

C    Lord Wilberforce explained in *Cie Tunisienne de Navigation SA v Cie d'Armement Maritime SA* [1971] AC 572, 596.  Under modern conditions of international arbitration, in which arbitrators may be drawn from different jurisdictions and are regularly expected to receive evidence about and to apply foreign law, it is now no longer a plausible inference.

273    Secondly, parties may sometimes choose arbitration for resolution of their disputes with a seat in a neutral jurisdiction because one or other of

D    them does not have complete trust in the impartiality of the courts of the state of the other.  But a preference for a neutral seat does not support any inference as to the parties' intentions as to the law which the arbitrators should apply when interpreting the main contract or the arbitration agreement.  Arbitrators can be expected to apply any relevant law, of whichever legal system is appropriate, in an impartial way and the courts of

E    the neutral jurisdiction will be impartial in applying the curial law.  If an inference is sought to be drawn as to the proper law of the main contract or the arbitration agreement, something more is required: an indication that the parties wished the law to be applied to govern the interpretation of their contract to be neutral in the sense that it is not aligned with the home jurisdiction of either of them.  Exceptionally, the circumstances may support such an inference: see e g *Egon Oldendorff v Libera Corpn* [1995] 2 Lloyd's

F    Rep 64, 69 and see para 114 above.  However, the circumstances of the present case show that no such inference can be drawn here.  The parties have stipulated that Enka's obligations under the main contract should incorporate norms of Russian law.  Accordingly, it is my view that Lord Hamblen and Lord Leggatt JJSC overstate the significance of the choice of the seat in this case.  The choice of curial law associated with the choice

G    of the seat is directed to a different subject matter (Regulation of the relationship between the courts of place of the seat and the arbitral process) than the rules directed to determining the proper law of a contract for the purpose of interpreting it, so it is not appropriate to use the former as a basis for establishing what the latter should be.

274    The inference that the parties who made the contract in the present case intended that the interpretation of the whole of it should be governed by

H    Russian law is especially strong, since the arbitration agreement is contained in a complex main contract with many interacting parts which have to live together in a coherent relationship.  In particular, the parties' intention, judged objectively, is that the obligation to arbitrate set out in the arbitration agreement contained in article 50.1 of the main contract should be

© 2020 The Incorporated Council of Law Reporting for England and Wales

4204
Enka Insaat ve Sanayi AS v OOO "Insurance Co Chubb" (SC(E))    [2020] 1 WLR
Lord Sales JSC

interpreted in a way which makes it coherent with the other obligations in    A
the same provision to seek to negotiate in good faith to find a resolution for
disputes.  I can see no reason why the interpretation of the latter set of
obligations is not governed by Russian law, like all the other obligations in
the main contract.  The obligation to arbitrate in article 50.1 is likewise just
another obligation set out in the main contract and it is so closely related to
the other dispute resolution obligations in the main contract that the obvious
inference is that the parties intended the interpretation of the whole of the    B
provision to be governed by the same law, i e Russian law.

275    The separability principle which exists in relation to an arbitration
agreement contained within a main contract does not alter this analysis.
That principle has limited significance.  As reflected in section 7 of the
Arbitration Act 1996, it allows for the survival of an arbitration agreement
contained in a main contract if the validity, existence or effectiveness of the    C
main contract is called in question, so that the arbitrators can rule on such
matters.  This tells one nothing about the legal system which the parties
intended or might reasonably have expected to govern the interpretation of
the arbitration agreement as part of the main contract.

276    By contrast, the validation principle, as illustrated by *Hamlyn &
Co v Talisker Distillery* [1894] AC 202 and *Sulamérica* [2013] 1 WLR 102,    D
does allow one to draw an inference as to the system of law which the parties
intended should govern the interpretation of the arbitration agreement.  The
principle can provide a basis for distinguishing the proper law of the
arbitration agreement from that of the main contract or, where the proper
law of the main contract is uncertain, it may provide a basis for an inference
also to be drawn that the proper law of the main contract is intended to
follow the choice of proper law for the arbitration agreement (in *Hamlyn v    E
Talisker* Lord Herschell LC referred to this possibility at p 209).

277    In my view, the validation principle is an aspect of the general
objective approach to determining the intention of the parties to a contract
ut res magis valeat quam pereat (so that the main object of the agreement is
upheld and not destroyed).  Where the main contract contains an arbitration
agreement, it will be clear that the parties intend that the obligation to
arbitrate as set out in the arbitration agreement should be valid and effective.    F
The parties are presumed to know the state of the law at the time they
contract.  If it appears that according to the law which governs the main
contract the arbitration agreement would be invalid, then it can be inferred
that the parties intended that a different law should govern the arbitration
agreement in order to uphold its validity and effect.  The same is true if it
appears that according to the law which governs the main contract the    G
arbitration agreement would be subject to a serious risk of being found to be
invalid or that its binding force would be destroyed (as in *Sulamérica* [2013]
1 WLR 102), since the inference is that the parties would choose certainty
rather than uncertainty in upholding the effectiveness of this part of their
contract.  Usually, since the legal system which governs the main contract is
ruled out by this reasoning, the obvious conclusion is that the parties
intended the law of the jurisdiction of the seat which they have stipulated to    H
apply instead.  The terms of the arbitration agreement, set against the
background of the state of the law in the two candidate jurisdictions, show
that the parties intended the law of the jurisdiction of the seat to apply in this
sort of case.  This reasoning does not apply where what is in issue is the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   choice of the proper law to determine the scope of the arbitration agreement rather than whether it would be invalid or would not impose a binding obligation to go to arbitration if one system of law were applied rather than another.

278   In *Sulamérica*, Moore-Bick LJ rightly held that the validation principle applied so as to negative any choice of Brazilian law as the proper law of the arbitration agreement. He seems to have drawn the conclusion
B   that this meant that the parties had formed no intention regarding what was to be the proper law of the arbitration agreement (see para 31) and so proceeded to analyse the position by reference to the common law default rule at stage (iii), in order to conclude that English rather than Brazilian law governed the arbitration agreement contained in the main contract. However, in my opinion, following the reasoning above, the better view is
C   that the validation principle showed that the parties intended that English law should govern the arbitration agreement. This conclusion should have been reached at stage (i)/stage (ii) of the common law analysis.

279   In the present case, subject to one argument introduced by Enka for the first time on the appeal to this court (see para 197 above), the validation principle has no application. Up to the hearing in this court, it has been common ground that under Russian law the arbitration agreement in
D   article 50.1 is valid and binding in its effect; the issue that has divided the parties is the effect that application of Russian law would have regarding the interpretation of its scope. As to Enka's new argument that the validation principle does in fact apply, I agree with Lord Burrows that if our view regarding the proper law of the arbitration agreement had prevailed the case should have been remitted to the Commercial Court and that it would have
E   been for that court to consider whether the new argument could be introduced and, if it were, then to rule upon it alongside the other issue of Russian law which is in dispute between the parties, namely whether the interpretation of article 50.1 according to Russian law would be narrower or the same as that given by English law.

280   The second main area of disagreement appearing from the judgment of Lord Burrows JSC and the judgment of Lord Hamblen and
F   Lord Leggatt JJSC relates to the operation of the common law default rule at stage (iii), if the parties have made no choice at stage (i) or stage (ii). On the analysis of Lord Burrows JSC, with which I agree, the parties to the main contract impliedly intended that the interpretation of the AA in that contract should be governed by Russian law, at stage (ii). If that were right, stage (iii) would not be reached. However, the majority do not agree about this.
G   On their analysis it is necessary to consider the position on the footing that the parties have made no choice at stage (i) or stage (ii).

*The default rule*

281   In the early formulation of the common law rule by Dicey in 1896 (para 36 above), the difference between stage (i)/stage (ii) and stage (iii) was described as one between what the parties (actually) intended and what they
H   "may fairly be presumed to have intended". Obviously, imputed choice is something different from actual choice. Later, the common law default rule at stage (iii) was formulated in terms of the system of law with which the contract has its closest and most real connection. But this does not mark a radical change. Rather, focusing on the closest and most real connection

serves the same underlying policy, which is to seek to reflect the likely    A
expectations of the parties as businesspeople, by producing an outcome
which is reasonable and coherent in its own terms and does not place
excessive emphasis on the boundary between stage (ii) and stage (iii). If, on
analysis, the parties have not made a choice of proper law themselves-
perhaps because they did not think about it or they chose to leave matters
unclear in the interests of arriving at an agreement without having to argue    B
about it and in the hope that a dispute might never arise which required a
determination of the issue—the policy of the common law, as expressed in
the default rule at stage (iii), is to produce the answer which it is plausible to
think businesspeople in the position of the parties, acting reasonably, would
have been likely to have chosen for themselves if they had to confront the
issue.

   282    Many of the factors relevant to an argument that an implied choice    C
of proper law can be identified at stage (ii) will also be relevant to the
alternative argument based on the default rule at stage (iii). In broad terms,
businesspeople would expect them to be likely to produce similar outcomes.
That has certainly been the judicial approach until fairly recently, as
illustrated by the decision of the House of Lords in *Amin Rasheed Shipping
Corpn v Kuwait Insurance Co* [1984] AC 50. In that case, the majority of the    D
Appellate Committee determined the proper law of the contract by reference
to stage (ii), while Lord Wilberforce reached the same conclusion by reference
to the test at stage (iii), for closely similar reasons. Similarly, in the *Cie
Tunisienne* case [1971] AC 572 all members of the Appellate Committee
arrived at the same conclusion regarding the proper law of the contract, but
they did so by different routes; some found that the parties had made a choice,
others that the default rule in stage (iii) applied. In the leading authorities    E
referred to in the *Cie Tunisienne* case, *Bonython v Commonwealth of
Australia* [1951] AC 201, and *In re United Railways of Havana and Regla
Warehouses Ltd* [1961] AC 1007, the test applied to determine the proper
law of the contract was that stated by Lord Simonds in *Bonython*, at p 219:
"the system of law by reference to which the contract was made or that with
which the transaction has its closest and most real connexion", which elides    F
the question of party choice and the default rule, and deliberately so. The
close alignment of the approach under stage (ii) and that under stage (iii) was
traced by Toulson LJ in *Lawlor v Sandvik Mining and Construction Mobile
Crushers and Screens Ltd* [2013] 2 Lloyd's Rep 98, paras 20–27.

   283    Since the boundary between stage (ii) and stage (iii) is by no means
crystal clear and there is scope for eminent judges to reach different views    G
about which stage of the common law analysis supplies the answer in any
given case, it would risk the appearance of arbitrariness to adopt a default
rule at stage (iii) which was radically at variance in the results it produced by
comparison with stage (i) and stage (ii). Further, if the common law adopted
a radically divergent default rule, so that significant differences in outcome
turned on this, that would be an incentive for parties to litigate the question    H
of whether a case was to be analysed as falling within stage (i)/ stage (ii) or
within stage (iii). This would be contrary to the interest of businesspeople to
avoid expensive litigation to resolve disputes, so far as possible. If the
parties appreciate that all roads lead to Rome, so to speak, the need for
litigation to decide which road should be taken is avoided.

© 2020 The Incorporated Council of Law Reporting for England and Wales