# Appendix
## Part 3 of 5

284    This analysis prompts a further comment on *Sulamérica* [2013] 1 WLR 102. Having held (contrary to my view at para 278 above) that the application of the validation principle meant that the parties had made no choice as to the proper law of the arbitration agreement within the main contract, Moore-Bick LJ proceeded to apply the default rule at stage (iii) (para 32). However, in doing so he took the view that the arbitration agreement had its closest and most real connection with the law of the place of the seat (England); and this despite the fact that, subject to the application of the validation principle, he thought that at stage (ii) the parties impliedly intended that the proper law of the main contract (Brazilian law) would also apply to the arbitration agreement (paras 26–27). I think it is evident that Moore-Bick LJ's analysis at both stage (ii) and stage (iii) was rightly designed to give effect to the validation principle and to uphold the effective binding force of the arbitration agreement in that case in line with the parties' intention. But unfortunately in doing so he proposed a solution which, if taken at face value and generalised, would give rise to the kind of radical divergence of outcome between stage (i)/stage (ii) and stage (iii) which the common law default rule in fact seeks to avoid, and which does not reflect the previous authorities referred to above.

285    The court in *Sulamérica* did not need to take the step of saying that the arbitration agreement had its closest and most real connection with the law of the place of the seat in order to produce the appropriate result, which was to uphold the binding effect of the arbitration agreement in line with the parties' intention by application of the validation principle: see para 278 above. One might also say that the validation principle is capable of operating at stage (iii) as well as at stage (i)/stage (ii), as an aspect of the common law default rule, as an expression of the policy of the common law to uphold the validity and binding effect of an arbitration agreement which the parties have chosen to enter into. But again, that would mean that the law of the place of the seat (England) was applicable as the proper law of the arbitration agreement as the only remaining candidate once Brazilian law had been eliminated as a candidate by application of the validation principle. At the end of this process of analysis, it could be said that the arbitration agreement had its closest and most real connection with the law of the place of the seat; but that is only in the very limited sense that this was the only system of law with which the arbitration agreement could be said to have any connection, if the validation principle was to be given effect. However, the way in which Moore-Bick LJ explains his reasoning at para 32 makes it sound as though the general starting point, if the analysis at stage (i)/stage (ii) does not give a result, is always that the arbitration agreement contained in the main contract has as its proper law the law of the place of the seat rather than generally following the proper law of the main contract. In my respectful opinion, that approach is erroneous and contrary to principle and authority.

286    In my view, the powerful points which Lord Hamblen and Lord Leggatt JJSC make at para 53 of their judgment regarding the expectations of businesspeople to the effect that their contractual arrangements should have internal coherence (so that if the parties have chosen the proper law of the main contract they would ordinarily expect the same proper law to apply in relation to an arbitration agreement contained within it) also apply in relation to the operation of the default rule at stage (iii) where the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

circumstances mean that it is clear what the proper law of the main contract is, even when that is not as a result of the exercise of choice within the meaning of article 3(1) of the Rome I Regulation. The main contract carries with it the legal system which governs its interpretation and application. Accordingly, the need for and expectation that there will be coherence between the main contract and the arbitration agreement contained within it means that the arbitration agreement has its closest and most real connection with the legal system which constitutes the proper law of the main contract in which it is contained.

B

287   By contrast, it is my opinion that the argument for a connection between the arbitration agreement and the law of the place of the seat is much weaker. The parties obtain the benefits of the curial law of the place of the seat in any event, whatever the proper law of the arbitration agreement: see para 271 above. Therefore the choice of seat does not point to any particular connection with the arbitration agreement in terms of providing guidance as to its proper law. To the extent that the courts of the place of the seat exercise a supervisory function in relation to the arbitration, for example to ensure that the arbitrators act within the scope of the arbitration agreement according to its true construction, they can readily do that by reference to evidence about any foreign law which is identified as the proper law of the arbitration agreement.

C

D

288   In the present case, Enka disputes that there has been a choice of proper law within article 3(1) of the Rome I Regulation for the main contract but accepts that article 4, as the default rule set out in the Regulation, has the effect that the proper law of the main contract is Russian. This concession must be based on an acceptance that it is clear from all the circumstances that the main contract is manifestly more connected with Russia than with any other country (including the country where Enka is habitually resident, Turkey): see article 4(3).   The assessment under article 4(3) involves inquiring into the country with which the contract taken as a whole has its closest connection. Where, in this case, following this path of analysis, the main contract taken as a whole manifestly has its closest connection with Russia so that Russian law is taken to be its proper law, it seems to me that the reasoning above indicates that the arbitration agreement contained in the main contract similarly has its closest and most real connection with Russian law. There is no good reason to conclude that the law of the seat is more closely connected or provides a better guide for the purposes of application of a rule designed to identify the law which is to govern the interpretation of the arbitration agreement.

E

F

289   In their judgment, in relation to stage (iii) of the common law rule Lord Hamblen and Lord Leggatt JJSC rely on article V(1)(a) of the New York Convention and section 103(2)(b) of the Arbitration Act 1996 in support of their view that at that stage the arbitration agreement in the main contract has its closest and most real connection with the law of the seat (England) rather than with the law which governs the main contract. In my opinion, this is to give those provisions excessive weight in analysing the application of the common law rule. As I have sought to show, the policy of the common law as reflected in the default rule at stage (iii) is to align that rule with the likely result the parties would have wished to achieve to produce reasonable coherence across their whole contractual relationship. Application of article V(1)(a) would defeat that policy, because it would

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   produce a radical divergence between the effect of stage (i)/stage (ii) and stage (iii) of the common law rule.

290   Another way of putting this is to say that the points made by Lord Hamblen and Lord Leggatt JJSC at para 53 of their judgment do not drop out of the analysis for the purposes of the common law at stage (iii), but continue to have validity and force at that stage as well. By contrast, when one is applying article V(1)(a) those points do drop out of the picture and

B   have no force, precisely because the New York Convention legislates for a rule which excludes them from being relevant.

291   Moreover, article V(1)(a) does not provide a good guide as to the application of the common law rule. Article V(1)(a) sets out a default rule within the scheme of the Convention which is different from the default rule under the common law and which, if applied, would undermine the

C   validation principle when it is applied by the common law as an aspect of stage (iii) (see para 285 above). The provision states that, in the absence of a choice by the parties, recognition of an arbitral award may be refused if the arbitration agreement "is not valid . . . under the law of the country where the award was made". That seems to say that recognition may be refused if the arbitration agreement is invalid according to the law of the place of the seat; but under the common law in such a case the validation principle

D   would apply and the court would identify another system of law as the proper law of the arbitration agreement in order to uphold and give effect to the arbitration agreement. Article V(1)(a) thus sets out what can fairly be described as a very simple and inflexible default rule for the purposes of the Convention regime which is different from the more flexible and nuanced common law default rule of "closest and most real connection" and should

E   not be taken to displace that rule. Within the Convention regime, the rationale for the choice of a simple test is not difficult to understand. It is a clear rule by reference to which it is reasonably easy to judge whether the actions of states party to the Convention comply with it or not. By contrast, the common law default rule has been established for a very long period of time, well before international policy arguably came to crystallise in line with article V(1)(a) of the New York Convention, and it reflects different policy

F   objectives, as set out above. So far as choice of proper law for an arbitration agreement is concerned (as distinct from Regulation of the recognition of foreign arbitral awards, which is governed by section 103(2)(b) of the 1996 Act), article V(1)(a) of the New York Convention is part of an unincorporated treaty and it is unclear by what process of legal reasoning it could be taken to have displaced the well established common law default

G   rule. None of the leading common law authorities give any weight to article V(1)(a) in the formulation or application of the common law rule.

292   For present purposes, it is not necessary to determine the position where it is not article 4(3) but one of the other more mechanical rules in article 4 which determines the proper law of the main contract. It suffices to say that I think there is force in the argument that the analysis above tends to indicate that also in that sort of case the proper law of the main contract will

H   usually provide the best indication of the proper law of an arbitration agreement contained within it, at stage (iii) of the common law rule. Again, the points made by Lord Hamblen and Lord Leggatt at para 53 of their judgment should not drop out of the picture here. This approach would reflect how the parties are likely to have approached matters themselves, by

© 2020 The Incorporated Council of Law Reporting for England and Wales

starting with their agreement on the substantive aspects of the main contract    A
and then adding the arbitration agreement into that framework, with the
general intention and expectation that the main contract and the arbitration
agreement would form a coherent whole.  It would also have the merit of
making the analysis in any case as simple and clear as possible.  One would
start by identifying the proper law of the main contract according to the
choice of the parties pursuant to article 3 of the Rome I Regulation and, in
default of any choice, by reference to the rules in article 4 of the Regulation,    B
and then the presumption would be that the proper law of the arbitration
agreement is the same.

*The anti-suit injunction*

   293   Finally, if the interpretation of article 50.1 were governed by
Russian law, as Lord Burrows JSC and I think it is, and a Russian court is    C
about to pronounce on the interpretation of that provision according to
Russian law in the parallel proceedings between the parties in Russia, the
question arises whether this makes it inappropriate for the English court to
issue an anti-suit injunction in favour of Enka, whether on grounds of forum
non conveniens, comity or otherwise.  On that issue, I agree with section XI
of the judgment of Lord Hamblen and Lord Leggatt JJSC, which is in line    D
with Lord Burrows JSC's judgment.  The English court, as the court of the
place of the seat of the arbitration chosen by the parties, has a particular
responsibility to ensure that the arbitration agreement is upheld and applied
in accordance with its terms.  On the basis of expert evidence of foreign law
adduced in the usual way, the English court could determine the meaning of
article 50.1 according to Russian law.  If article 50.1, so construed, imposes
an obligation on Chubb Russia to proceed by way of arbitration rather than    E
by litigation, the English court could and should enforce that obligation by
way of an anti-suit injunction.

*Appeal dismissed.*

Ms B L Scully, Barrister

F

———

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

1719

A                                    House of Lords

# Fili Shipping Co Ltd and others *v* Premium Nafta Products Ltd and others

## [On appeal from Fiona Trust and Holding Corpn and others *v* Privalov and others]
B

### [2007] UKHL 40

2007  July 30, 31;                        Lord Hoffmann, Lord Hope of Craighead,
       Oct 17                 Lord Scott of Foscote, Lord Walker of Gestingthorpe
                                      and Lord Brown of Eaton-under-Heywood

C
*Arbitration — Arbitrator — Jurisdiction — Owners bringing tort proceedings against charterers and purporting to rescind charterparties for bribery — Owners seeking court declaration as to validity of rescission — Charterers seeking determination of issue by arbitrator pursuant to arbitration clause — Whether arbitration clause impeached by allegations of bribery — Arbitration Act 1996 (c 23), ss 7, 9, 72(1)*

D
Eight companies within a Russian group of companies entered into charterparties as owners with three chartering companies. Each of the charterparties contained a clause providing for "any dispute arising under this charter" to be decided in England and conferred on either party the right to elect to have any such dispute referred to arbitration. The owners, among others, brought proceedings against the charterers for the torts of conspiracy, bribery and breach of fiduciary duty, claiming, inter alia, that each of the eight charterparties had been induced by bribery and, having
E
purported to rescind the charters, sought a declaration from the court as to the validity of that act. The charterers sought to have the issue determined under the arbitration clause and appointed an arbitrator. On the owners' application under section 72(1) of the Arbitration Act 1996[1] to restrain the arbitral proceedings and on the charterers' application under section 9 of the Act that the court proceedings be stayed, the judge held that the question whether the charterparties were void for bribery fell outside the scope of the arbitration clause and refused the charterers'
F
application for a stay. On appeal by the charterers, the Court of Appeal held that the dispute did fall within the arbitration clause, which survived notwithstanding any illegality of the main contract since section 7 of the 1996 Act required an arbitration clause to be treated as a distinct agreement.

On the owners' appeal—

*Held*, dismissing the appeal, that the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, were likely to
G
have intended any dispute arising out of the relationship into which they had entered or purported to enter to be decided by the same tribunal unless the language made it clear that certain questions were intended to be excluded from the arbitration; that where it was claimed that in any event the arbitration clause had been impeached by the illegality of the contract in which it was contained, the effect of the principle of

H
[1] Arbitration Act 1996, s 7: see post, para 9.
S 9: "(1) A party to an arbitration agreement against whom legal proceedings are brought . . . in respect of a matter which under the agreement is to be referred to arbitration may . . . apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter . . ."
S 72(1): "A person alleged to be a party to arbitral proceedings but who takes no part in the proceedings may question—(a) whether there is a valid arbitration agreement . . . by proceedings in the court for a declaration or injunction or other appropriate relief."

1720
**Fiona Trust and Holding Corpn v Privalov (HL(E))**                    **[2007] Bus LR**

separability in section 7 was that the agreement to go to arbitration could be        A
challenged only on grounds relating directly to that agreement; and that, accordingly,
since the language of the arbitration clause contained nothing to exclude disputes
about the validity of the contract on grounds of fraud, and there were no grounds of
challenge specific to the validity of the arbitration clause, the claims that the charter
contracts had been induced by bribery fell to be determined by arbitration (*post*,
paras 13–19, 22, 26, 27, 31, 32, 35, 36–38).

   Decision of the Court of Appeal [2007] EWCA Civ 20; [2007] Bus LR 686;        B
[2007] 1 All ER (Comm) 891; [2007] 2 Lloyd's Rep 267 affirmed.

The following cases are referred to in their Lordships' opinions:

*A T & T Technologies Inc v Communication Workers of America* (1986) 475 US 643;
      106 S Ct 1415
*Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488; [1988] 3 WLR
      867; [1988] 2 All ER 577; [1988] 2 Lloyd's Rep 73, CA                            C
*Comandate Marine Corpn v Pan Australia Shipping Pty Ltd* [2006] FCAFC 192
*Decision of 27 February 1970* (1970) 6 Arbitration International 79
*Fillite (Runcorn) Ltd v Aqua-Lift* (1989) 26 Con LR 66, CA
*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd*
      [1992] 1 Lloyd's Rep 81; [1993] QB 701; [1993] 3 WLR 42; [1993] 3 All ER 897;
      [1993] 1 Lloyd's Rep 455, CA
*Heyman v Darwins Ltd* [1942] AC 356; [1942] 1 All ER 337, HL(E)                       D
*Mackender v Feldia AG* [1967] 2 QB 590; [1967] 2 WLR 119; [1966] 3 All ER 847;
      [1966] 2 Lloyd's Rep 449, CA
*Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988]
      2 Lloyd's Rep 63
*Prima Paint Corpn v Flood & Conklin Manufacturing Co* (1967) 388 US 395; 87 S Ct
      1801
*Threlkeld & Co (David L) Inc v Metallgesellschaft Ltd (London)* (1991) 923 F 2d      E
      245
*Union of India v E B Aaby's Rederi A/S (The Evje)* [1975] AC 797; [1974] 3 WLR
      269; [1974] 2 All ER 874; [1974] 2 Lloyd's Rep 57, HL(E)

The following additional cases were cited in argument:

*A B Norrkopings Trikafabrik v A B Per Persson* (1936) NJA 521
*Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's  F
      Rep 87, CA
*Albon (trading as NA Carriage Co) v Naza Motor Trading Sdn Bhd* [2007]
      EWHC 9 (Ch); [2007] Bus LR D87; [2007] 1 WLR 2489; [2007] 2 All ER 719;
      [2007] 1 All ER (Comm) 795; [2007] 1 Lloyd's Rep 297
*Antonis P Lemos, The* [1985] AC 711; [1985] 2 WLR 468; [1985] 1 All ER 695;
      [1985] 1 Lloyd's Rep 283, HL(E)
*BTR Engineering (Australia) Ltd v Dana Corpn* [2000] VSC 246                          G
*Buckeye Check Cashing Inc v Cardegna* (2006) 546 US 440; 126 S Ct 1204
*Cancanon v Smith Barney, Harris, Upham & Co* (1986) 805 F 2d 998
*Capital Trust Investments Ltd v Radio Design TJ AB* [2002] EWCA Civ 135; [2002]
      2 All ER 159; [2002] 1 All ER (Comm) 514, CA
*Carnoustie Universal SA v International Transport Workers Federation* [2002]
      EWHC 1624 (Comm); [2002] 2 All ER (Comm) 657
*Chimimport plc v G d'Alesio SAS* [1994] 2 Lloyd's Rep 366                             H
*Credit Suisse First Boston (Europe) Ltd v Seagate Trading Co Ltd* [1999] 1 All ER
      (Comm) 261; [1999] 1 Lloyd's Rep 784
*Deweer v Belgium* (1980) 2 EHRR 439
*El Nasharty v J Sainsbury plc* [2003] EWHC 2195 (Comm); [2004] 1 All ER (Comm)
      728; [2004] 1 Lloyd's Rep 309

A    *Ethiopian Oilseeds and Pulses Export Corpn v Rio del Mar Foods Inc* [1990]
        1 Lloyd's Rep 86
     *Law Debenture Trust Corpn plc v Elektrim Finance BV* [2005] EWHC 1412 (Ch);
        [2005] 2 All ER 476; [2005] 2 Lloyd's Rep 755
     *Paper Products Pty Ltd v Tomlinsons (Rochdale) Ltd* (1993) 43 FCR 439
     *Philippines, Republic of v Westinghouse Electric Corpn* (1989) 714 F Supp 1362
     *Stretford v Football Association Ltd* [2007] EWCA Civ 238; [2007] Bus LR 1052;
B        [2007] 2 All ER (Comm) 1; [2007] 2 Lloyd's Rep 31, CA
     *Three Valleys Municipal Water District v E F Hutton & Co Inc* (1991) 925 F 2d 1136
     *Walter Rau Neusser Oel und Fett AG v Cross Pacific Trading Ltd* [2005] FCA 1102

     **APPEAL** from the Court of Appeal
          This was an appeal, by leave of the House of Lords (Lord Hoffmann,
     Lord Walker of Gestingthorpe and Lord Neuberger of Abbotsbury), by the
C    14th and the 21st to 27th claimants, Fili Shipping Co Ltd, Glefi Shipping
     VII Co Ltd, Progress Shipping Co, Universal Navigation Co Ltd, Glefi
     Shipping XXIX Co Ltd, Glefi Shipping XXVIII Co Ltd, Integrity Maritime
     Inc and Valloy Shipping Corpn ("the owners") against the decision of
     the Court of Appeal (Tuckey, Arden and Longmore LJJ) whereby, in
     proceedings brought by Fiona Trust and Holding Corpn and 28 other
     claimants, including the owners, claiming damages for conspiracy, bribery
D    and breach of fiduciary duty against Yuri Privalov and 21 other defendants
     and as part of which proceedings the owners having sought a declaration
     that they had validly rescinded charterparties entered into between
     themselves and the twentieth to twenty-second defendants, Premium
     NAFTA Products Ltd, Remmy Commercial Corpn and Henriot Finance Ltd
     ("the charterers") as having been procured by bribery, and the charterers in
E    response having sought a determination of that issue under an arbitration
     clause in each of the charters, the Court of Appeal reversed the decision
     of Morison J [2006] EWHC 2583 (Comm); [2007] 1 All ER (Comm) 81
     restraining the arbitral proceedings pending the trial of the court action.
          The facts are stated in the opinion of Lord Hoffmann.

F    *Christopher Butcher QC* and *Philip Jones QC* for the owners.
     *Nicholas Hamblen QC* and *Vernon Flynn* for the charterers.

          Their Lordships took time for consideration.

          17 October.    **LORD HOFFMANN**
          1    My Lords, this appeal concerns the scope and effect of arbitration
G    clauses in eight charterparties in Shelltime 4 form made between eight
     companies forming part of the Sovcomflot group of companies (which is
     owned by the Russian state) and eight charterers.  It is alleged by the owners
     that the charters were procured by the bribery of senior officers of the
     Sovcomflot group by a Mr Nikitin, who controlled or was associated with
     the charterer companies.  It is unnecessary to set out the details of these
     allegations because it is not disputed that the owners have an arguable case.
H    They have purported to rescind the charters on this ground and the question
     is whether the issue of whether they were entitled to do so should be
     determined by arbitration or by a court.  The owners have commenced court
     proceedings for a declaration that the charters have been validly rescinded
     and the charterers have applied for a stay under section 9 of the Arbitration

Act 1996. Morison J [2007] 1 All ER (Comm) 81 refused a stay but the *A*
Court of Appeal (Tuckey, Arden and Longmore LJJ) [2007] Bus LR 686
allowed the appeal and granted it.

2   The case has been argued on the basis that there are two issues: first,
whether, as a matter of construction, the arbitration clause is apt to cover
the question of whether the contract was procured by bribery and
secondly, whether it is possible for a party to be bound by submission to
arbitration when he alleges that, but for the bribery, he would never have *B*
entered into the contract containing the arbitration clause. It seems to me,
however, that for the reasons I shall explain, these questions are very
closely connected.

3   I start by setting out the arbitration clause in the Shelltime 4 form:

"41(a) This charter shall be construed and the relations between the *C*
parties determined in accordance with the laws of England.

"(b) Any dispute arising under this charter shall be decided by the
English courts to whose jurisdiction the parties hereby agree.

"(c) Notwithstanding the foregoing, but without prejudice to any
party's right to arrest or maintain the arrest of any maritime property,
either party may, by giving written notice of election to the other party,
elect to have any such dispute referred . . . to arbitration in London, one *D*
arbitrator to be nominated by owners and the other by charterers, and in
case the arbitrators shall not agree to the decision of an umpire, whose
decision shall be final and binding upon both parties. Arbitration shall
take place in London in accordance with the London Maritime
Association of Arbitrators, in accordance with the provisions of the
Arbitration Act 1950, or any statutory modification or re-enactment
thereof for the time being in force. (i) A party shall lose its right to make *E*
such an election only if: (a) it receives from the other party a written
notice of dispute which—(1) states expressly that a dispute has arisen out
of this charter; (2) specifies the nature of the dispute; and (3) refers
expressly to this clause 41(c); and (b) it fails to give notice of election to
have the dispute referred to arbitration not later than 30 days from the
date of receipt of such notice of dispute . . ." *F*

4   It will be observed that clause 41(b) is a jurisdiction clause in respect
of "any dispute arising under this charter" which is then incorporated by
reference (by the words "any such dispute") in the arbitration clause in 41(c).
So the first question is whether clause 41(b) refers the question of whether
the charters were procured by bribery to the jurisdiction of the English court.
If it does, then a party may elect under clause 41(c) to have that question *G*
referred to arbitration. But I shall for the sake of convenience discuss the
clause as if it was a simple arbitration clause. The owners say that for two
reasons it does not apply. The first is that, as a matter of construction, the
question is not a dispute arising under the charter. The second is that the
jurisdiction and arbitration clause is liable to be rescinded and therefore not
binding upon them.

5   Both of these defences raise the same fundamental question about the *H*
attitude of the courts to arbitration. Arbitration is consensual. It depends
upon the intention of the parties as expressed in their agreement. Only the
agreement can tell you what kind of disputes they intended to submit to
arbitration. But the meaning which parties intended to express by the words

A  which they used will be affected by the commercial background and the reader's understanding of the purpose for which the agreement was made. Businessmen in particular are assumed to have entered into agreements to achieve some rational commercial purpose and an understanding of this purpose will influence the way in which one interprets their language.

6    In approaching the question of construction, it is therefore necessary to inquire into the purpose of the arbitration clause. As to this, I think there

B  can be no doubt. The parties have entered into a relationship, an agreement or what is alleged to be an agreement or what appears on its face to be an agreement, which may give rise to disputes. They want those disputes decided by a tribunal which they have chosen, commonly on the grounds of such matters as its neutrality, expertise and privacy, the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its

C  supervisory law. Particularly in the case of international contracts, they want a quick and efficient adjudication and do not want to take the risks of delay and, in too many cases, partiality, in proceedings before a national jurisdiction.

7    If one accepts that this is the purpose of an arbitration clause, its construction must be influenced by whether the parties, as rational businessmen, were likely to have intended that only some of the questions

D  arising out of their relationship were to be submitted to arbitration and others were to be decided by national courts. Could they have intended that the question of whether the contract was repudiated should be decided by arbitration but the question of whether it was induced by misrepresentation should be decided by a court? If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have

E  questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention.

8    A proper approach to construction therefore requires the court to give effect, so far as the language used by the parties will permit, to the

F  commercial purpose of the arbitration clause. But the same policy of giving effect to the commercial purpose also drives the approach of the courts (and the legislature) to the second question raised in this appeal, namely, whether there is any conceptual reason why parties who have agreed to submit the question of the validity of the contract to arbitration should not be allowed to do so.

9    There was for some time a view that arbitrators could never have

G  jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63, 66 Evans J said that this rule "owes as much to logic as it does to authority". But the logic of the proposition was denied by the Court of Appeal in *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance*

H  *Co Ltd* [1993] QB 701 and the question was put beyond doubt by section 7 of the Arbitration Act 1996:

"Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or

ineffective because that other agreement is invalid, or did not come into    A
existence or has become ineffective, and it shall for that purpose be
treated as a distinct agreement."

10    This section shows a recognition by Parliament that, for the reasons
I have given in discussing the approach to construction, businessmen
frequently do want the question of whether their contract was valid, or came
into existence, or has become ineffective, submitted to arbitration and that    B
the law should not place conceptual obstacles in their way.

11    With that background, I turn to the question of construction. Your
Lordships were referred to a number of cases in which various forms of
words in arbitration clauses have been considered. Some of them draw a
distinction between disputes "arising under" and "arising out of" the
agreement. In *Heyman v Darwins Ltd* [1942] AC 356, 399 Lord Porter said    C
that the former had a narrower meaning than the latter but in *Union of India
v E B Aaby's Rederi A/S* [1975] AC 797 Viscount Dilhorne, at p 814, and
Lord Salmon, at p 817, said that they could not see the difference between
them. Nevertheless, in *Overseas Union Insurance Ltd v AA Mutual
International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63, 67, Evans J said
that there was a broad distinction between clauses which referred "only
those disputes which may arise regarding the rights and obligations which    D
are created by the contract itself" and those which "show an intention to
refer some wider class or classes of disputes." The former may be said to
arise "under" the contract while the latter would arise "in relation to" or "in
connection with" the contract. In *Fillite (Runcorn) Ltd v Aqua-Lift* (1989)
26 Con LR 66, 76 Slade LJ said that the phrase "under a contract" was not
wide enough to include disputes which did not concern obligations created    E
by or incorporated in the contract. Nourse LJ gave a judgment to the same
effect. The court does not seem to have been referred to *Mackender v Feldia
AG* [1967] 2 QB 590, in which a court which included Lord Denning MR
and Diplock LJ decided that a clause in an insurance policy submitting
disputes "arising thereunder" to a foreign jurisdiction was wide enough to
cover the question of whether the contract could be avoided for non-
disclosure.    F

12    I do not propose to analyse these and other such cases any further
because in my opinion the distinctions which they make reflect no credit
upon English commercial law. It may be a great disappointment to the
judges who explained so carefully the effects of the various linguistic
nuances if they could learn that the draftsman of so widely used a standard
form as Shelltime 4 obviously regarded the expressions "arising under    G
this charter" in clause 41(b) and "arisen out of this charter" in
clause 41(c)(1)(a)(i) as mutually interchangeable. So I applaud the opinion
expressed by Longmore LJ in the Court of Appeal [2007] Bus LR 687,
para 17, that the time has come to draw a line under the authorities to date
and make a fresh start. I think that a fresh start is justified by the
developments which have occurred in this branch of the law in recent years
and in particular by the adoption of the principle of separability by    H
Parliament in section 7 of the 1996 Act. That section was obviously
intended to enable the courts to give effect to the reasonable commercial
expectations of the parties about the questions which they intended to be
decided by arbitration. But section 7 will not achieve its purpose if the

A courts adopt an approach to construction which is likely in many cases to defeat those expectations. The approach to construction therefore needs to be re-examined.

13    In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The

B clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: "if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so."

14    This appears to be the approach adopted in Germany: see the

C *Decision of 27 February 1970 of the Federal Supreme Court of the Federal Republic of Germany (Bundesgerichtshof)* (1970) 6 Arbitration International 79, 85:

"There is every reason to presume that reasonable parties will wish to have the relationships created by their contract and the claims arising therefrom, irrespective of whether their contract is effective or not,

D decided by the same tribunal and not by two different tribunals."

15    If one adopts this approach, the language of clause 41 of Shelltime 4 contains nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. In my opinion it therefore applies to the present dispute.

E 16    The next question is whether, in view of the allegation of bribery, the clause is binding upon the owners. They say that if they are right about the bribery, they were entitled to rescind the whole contract, including the arbitration clause. The arbitrator therefore has no jurisdiction and the dispute should be decided by the court.

17    The principle of separability enacted in section 7 means that the invalidity or rescission of the main contract does not necessarily entail

F the invalidity or rescission of the arbitration agreement. The arbitration agreement must be treated as a "distinct agreement" and can be void or voidable only on grounds which relate directly to the arbitration agreement. Of course there may be cases in which the ground upon which the main agreement is invalid is identical with the ground upon which the arbitration agreement is invalid. For example, if the main agreement and

G the arbitration agreement are contained in the same document and one of the parties claims that he never agreed to anything in the document and that his signature was forged, that will be an attack on the validity of the arbitration agreement. But the ground of attack is not that the main agreement was invalid. It is that the signature to the arbitration agreement, as a "distinct agreement", was forged. Similarly, if a party alleges that someone who purported to sign as agent on his behalf had no authority

H whatever to conclude any agreement on his behalf, that is an attack on both the main agreement and the arbitration agreement.

18    On the other hand, if (as in this case) the allegation is that the agent exceeded his authority by entering into a main agreement in terms which were not authorised or for improper reasons, that is not necessarily an

attack on the arbitration agreement. It would have to be shown that whatever the terms of the main agreement or the reasons for which the agent concluded it, he would have had no authority to enter into an arbitration agreement. Even if the allegation is that there was no concluded agreement (for example, that terms of the main agreement remained to be agreed) that is not necessarily an attack on the arbitration agreement. If the arbitration clause has been agreed, the parties will be presumed to have intended the question of whether there was a concluded main agreement to be decided by arbitration.

19   In the present case, it is alleged that the main agreement was in uncommercial terms which, together with other surrounding circumstances, give rise to the inference that an agent acting for the owners was bribed to consent to it. But that does not show that he was bribed to enter into the arbitration agreement. It would have been remarkable for him to enter into any charter without an arbitration agreement, whatever its other terms had been. Mr Butcher, who appeared for the owners, said that but for the bribery, the owners would not have entered into any charter with the charterers and therefore would not have entered into an arbitration agreement. But that is in my opinion exactly the kind of argument which section 7 was intended to prevent. It amounts to saying that because the main agreement and the arbitration agreement were bound up with each other, the invalidity of the main agreement should result in the invalidity of the arbitration agreement. The one should fall with the other because they would never have been separately concluded. But section 7 in my opinion means that they must be treated as having been separately concluded and the arbitration agreement can be invalidated only on a ground which relates to the arbitration agreement and is not merely a consequence of the invalidity of the main agreement.

20   Mr Butcher submitted that the approach to construction and separability adopted by the Court of Appeal infringed the owners' right of access to a court for the resolution of their civil disputes, contrary to article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms. I do not think there is anything in this point. The European Convention was not intended to destroy arbitration. Arbitration is based upon agreement and the parties can by agreement waive the right to a court. If it appears upon a fair construction of the charter that they have agreed to the arbitration of a particular dispute, there is no infringement of their Convention right.

21   For these reasons, which are substantially the same as those given by Longmore LJ in the Court of Appeal, I would hold that the charterers are entitled to a stay of the proceedings to rescind the charters and dismiss the appeal.

## LORD HOPE OF CRAIGHEAD

22   My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I entirely agree with it, and for the reasons he gives I too would dismiss the appeal. I wish to add only a few brief comments.

23   There are, as Lord Hoffmann has said, two issues in this appeal. The first is an issue of construction: whether the appellant owners' claims that the charterparties have been validly rescinded are disputes which arise

A under, or out of, the charterparties within the meaning of clause 41. The second is an issue of separability: whether, assuming that the owners have an arguable case that the charterparties have been validly rescinded, they also have an arguable case that the arbitration agreements in clause 41 have been rescinded as well. The owners submit that they were entitled to rescind the charterparties, including the arbitration agreements, because the charterparties were induced by bribery. The allegations of bribery are B directed to the terms on which the charters were entered into by the Sovcomflot group of companies as owners with Mr Nikitin's chartering companies. They are said to have been uncommercial and unbelievably generous. The bribes are said to impeach not only the charters themselves but also the arbitration clause. The argument is essentially one of causation. It is that the charters would not have been entered into in the absence of C these bribes or other benefits, and that but for the agreement to enter into them there would have been no agreement to go to arbitration. Had it not been for the bribes provided by Mr Nikitin to their director general, Mr Skarga, Sovcomflot would not have done business with Mr Nikitin's companies at all.

24 On the first issue, the owners say that it is highly unlikely that the parties, in agreeing to an arbitration provision, intended it to cover disputes D as to whether the contract itself was induced by bribery, as to which it must be assumed one party would be entirely ignorant. The clear trend of recent authorities, they say, is to give a narrow meaning to the words used in the arbitration agreement to identify the disputes that are referred by it. They must be taken to have informed any decision to use the clause which is set out in the Shelltime 4 standard forms. I think that there are two answers to E this argument. One is to be found in the wording of clause 41 itself. The other is to be found by considering whether its consequences make sense in the international commercial context within which these standard forms are designed to operate.

25 As for the wording, contracts negotiated between parties in the international market are commonly based upon standard forms the terms of which are well known. Because they have a well-understood meaning, they F enable contracts to be entered into quickly and efficiently. The Shelltime 4 standard form is a good example of this practice. It has been in frequent use since at least 1984, and it is still in use. But it must be appreciated that the various clauses in these forms serve various functions. In some a high degree of precision is necessary. Terms which define the parties' mutual obligations in relation to price and performance lie at the heart of every G business transaction. They fall into that category. In others, where the overall purpose is clear, the parties are unlikely to linger over the words which are used to express it.

26 Clause 41 falls into the latter category. No contract of this kind is complete without a clause which identifies the law to be applied and the methods to be used for the determination of disputes. Its purpose is to avoid the expense and delay of having to argue about these matters later. It is the H kind of clause to which ordinary businessmen readily give their agreement so long as its general meaning is clear. They are unlikely to trouble themselves too much about its precise language or to wish to explore the way it has been interpreted in the numerous authorities, not all of which speak with one voice. Of course, the court must do what it can to provide

charterers and shipowners with legal certainty at the negotiation stage as to what they are agreeing to. But there is no conflict between that proposition and the guidance which Longmore LJ gave in paras 17–19 of the Court of Appeal's judgment about the interpretation of jurisdiction and arbitration clauses in international commercial contracts. The proposition that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed promotes legal certainty. It serves to underline the golden rule that if the parties wish to have issues as to the validity of their contract decided by one tribunal and issues as to its meaning or performance decided by another, they must say so expressly. Otherwise they will be taken to have agreed on a single tribunal for the resolution of all such disputes.

27   The overall purpose of clause 41 is identified in the two opening paragraphs. These are the choice of law and jurisdiction clauses. There is no sign here—leaving aside the question of arbitration for a moment—that the parties intended that the disputes which were to be determined in accordance with the laws of England and be decided by the English courts were not to include disputes about the charter's validity. The simplicity of the wording is a plain indication to the contrary. The arbitration clause which follows is to be read in that context. It indicates to the reader that he need not trouble himself with fussy distinctions as to what the words "arising under" and "arising out of" may mean. Taken overall, the wording indicates that arbitration may be chosen as a one-stop method of adjudication for the determination of all disputes. Disputes about validity, after all, are no less appropriate for determination by an arbitrator than any other kind of dispute that may arise. So I do not think that there is anything in the owners' point that it must be assumed that when the charters were entered into one party was entirely ignorant that they were induced by bribery. The purpose of the clause is to provide for the determination of disputes of all kinds, whether or not they were foreseen at the time when the contract was entered into.

28   Then there are consequences that would follow, if the owners are right. It is not just that the parties would be deprived of the benefit of having all their disputes decided in one forum. The jurisdiction clause does not say where disputes about the validity of the contract are to be determined, if this is not to be in the forum which is expressly mentioned. The default position is that such claims would have to be brought in the jurisdiction where their opponents were incorporated, wherever and however unreliable that might be, while claims for breach of contract have to be brought in England. But why, it may be asked, would any sensible businessmen have wished to agree to this? As Bingham LJ said in *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488, 517, one should be slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings. If the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other? Why, having chosen their jurisdiction for one purpose, should they leave the question which court is to have jurisdiction for the other purpose unspoken, with all the risks that this may give rise to? For them, everything is to be gained by avoiding litigation in two different jurisdictions. The same approach applies to the arbitration clause.

29   The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context. It has indeed been clear for many years that the trend of recent authority has risked isolating the approach that English law takes to the wording of such clauses from that which is taken internationally. It makes sense in the context of international commerce for decisions about their effect to be informed by what has been decided elsewhere.

30   The Bundesgerichtshof's decision of 27 February 1970 to which Lord Hoffmann has referred makes two points that are relevant to this issue. The first is that haphazard interpretations should be avoided and a rule of construction established which presumes, in cases of doubt, that reasonable parties will wish to have the claims arising from their contract decided by the same tribunal irrespective of whether their contract is effective or not. The second is that experience shows that as soon as a dispute of any kind arises from a contract, objections are very often also raised against its validity. As the Bundesgerichtshof said, entrusting the assessment of the facts of the case to different tribunals according to the approach that is taken to the issues between them is unlikely to occur to the contracting parties.

31   In *A T & T Technologies Inc v Communications Workers of America* (1986) 475 US 643, 650 the United States Supreme Court said that, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration could prevail. In *David L Threlkeld & Co Inc v Metallgesellschaft Ltd (London)* (1991) 923 F 2d 245 (2d Cir) the court observed that federal arbitration policy required that any doubts concerning the scope of arbitral issues should be resolved in favour of arbitration and that arbitration clauses should be construed as broadly as possible. In *Comandate Marine Corpn v Pan Australia Shipping Pty Ltd* [2006] FCAFC 192, para 165 the Federal Court of Australia said that a liberal approach to the words chosen by the parties was underpinned by the sensible commercial presumption that the parties did not intend the inconvenience of having possible disputes from their transaction being heard in two places, particularly when they were operating in a truly international market. This approach to the issue of construction is now firmly embedded as part of the law of international commerce. I agree with the Court of Appeal that it must now be accepted as part of our law too.

32   It is in the light of these observations that the issue of severability should be viewed also. Section 7 of the Arbitration Act 1996 reproduces in English law the principle that was laid down by section 4 of the United States Arbitration Act 1925. That section provides that, on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. Section 7 uses slightly different language, but it is to the same effect. The validity, existence or effectiveness of the arbitration agreement is not dependent upon the effectiveness, existence or validity of the underlying substantive contract unless the parties have agreed to this. The purpose of these provisions, as the United States Supreme Court observed in *Prima Paint Corpn v Flood & Conklin Manufacturing Co* (1967) 388 US 395, 404 is that the arbitration procedure, when selected by the parties to a contract, should be speedy and not subject to delay and obstruction in the courts.

The statutory language, it said, did not permit the court to consider claims    A
of fraud in the inducement of the contract generally.  It could consider only
issues relating to the making and performance of the agreement to arbitrate.
*Dicey, Morris & Collins, The Conflict of Laws*, 14th ed (2006), vol 1,
para 12-099, acknowledge that there are excellent reasons of policy to
support this approach.

33    The owners' case is that, as there was no real consent to the    B
charterparties because they were induced by bribery, there was no real
consent to the arbitration clauses.  They submit that a line does not have to
be drawn between matters which might impeach the arbitration clause and
those which affect the main contract.  What is needed is an analysis of
whether the matters that affect the main contract are also matters which
affect the validity of the arbitration clause.  As the respondent charterers
point out, this is a causation argument.  The owners say that no substantive    C
distinction can be drawn between various situations where the complaint is
made that there was no real consent to the transaction.  It would be contrary
to the policy of the law, which is to deter bribery, that acts of the person
who is alleged to have been bribed should deprive the innocent party of
access to a court for determination of the issue whether the contract was
induced by bribery.    D

34    But, as Longmore LJ said in para 21 of the Court of Appeal's
judgment, this case is different from a dispute as to whether there was ever a
contract at all.  As everyone knows, an arbitral award possesses no binding
force except that which is derived from the joint mandate of the contracting
parties.  Everything depends on their contract, and if there was no contract
to go to arbitration at all an arbitrator's award can have no validity.  So,    E
where the arbitration agreement is set out in the same document as the main
contract, the issue whether there was an agreement at all may indeed affect
all parts of it.  Issues as to whether the entire agreement was procured by
impersonation or by forgery, for example, are unlikely to be severable from
the arbitration clause.

35    That is not this case, however.  The owners' argument was not that
there was no contract at all, but that they were entitled to rescind the    F
contract including the arbitration agreement because the contract was
induced by bribery.  Allegations of that kind, if sound, may affect the
validity of the main agreement.  But they do not undermine the validity
of the arbitration agreement as a distinct agreement.  The doctrine of
separability requires direct impeachment of the arbitration agreement
before it can be set aside.  This is an exacting test.  The argument must be    G
based on facts which are specific to the arbitration agreement.  Allegations
that are parasitical to a challenge to the validity to the main agreement will
not do.  That being the situation in this case, the agreement to go to
arbitration must be given effect.

### LORD SCOTT OF FOSCOTE

36    My Lords, I have had the advantage of reading in advance the    H
opinion of my noble and learned friend Lord Hoffmann and find myself in
complete agreement with the conclusion he has reached and his reasons for
that conclusion.  I cannot improve upon those reasons and shall not try to do
so.  I, too, would dismiss this appeal.

A    **LORD WALKER OF GESTINGTHORPE**

    **37**    My Lords, I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann.  I am in full agreement with it.  It gives full effect to the legislative purpose of section 7 of the Arbitration Act 1996.  It marks a fresh start, leaving behind some fine verbal distinctions (on the language of particular arbitration clauses) which few commercial men would regard as significant.  For these reasons I, too, would dismiss this

B    appeal.

    **LORD BROWN OF EATON-UNDER-HEYWOOD**

    **38**    My Lords, for the reasons given in the speeches prepared by my noble and learned friends Lord Hoffmann and Lord Hope of Craighead, with which I am in full agreement, I too would dismiss this appeal.

C
*Appeal dismissed with costs in House.*

    *Solicitors: Ince & Co; Lax & Co.*

C T B

D

E

F

G

H

333

A

Court of Appeal

# Fulham Football Club (1987) Ltd *v* Richards and another

## [2011] EWCA Civ 855

2011  June 8, 9;                                   Rix, Longmore, Patten LJJ
B        July 21

*Company — Unfair prejudice — Conduct of affairs — Company and member agreeing to refer disputes and differences between them to arbitration — Member presenting unfair prejudice petition against company — Whether court to stay petition — Whether rule of public policy or statutory restriction making unfair prejudice disputes non-arbitrable — Whether dispute outside scope of arbitration clause — Arbitration Act 1996 (c 23), s 9 — Companies Act 2006 (c 46), s 994*

C

The petitioner was a member of F Ltd of which R was the chairman. By various rules the parties had agreed that "all disputes" and "any dispute or difference" between them would be referred to arbitration. The petitioner presented a petition under section 994 of the Companies Act 2006[1] alleging that R's actions had caused F Ltd to conduct its affairs in a manner which was unfairly prejudicial to the petitioner's interests as one of its members and sought injunctions restraining R from acting in breach of various regulations and an order that R cease to be the chairman or director of F Ltd. R and F Ltd sought a stay of those proceedings under section 9 of the Arbitration Act 1996[2], on the basis that the matters in issue between the parties fell within the terms of the arbitration agreements. The judge granted a stay, holding, inter alia, that members of companies and companies themselves could agree to refer to arbitration disputes which might otherwise support unfair prejudice petitions, providing that the award sought was not in a category which was limited by considerations of public policy.

D

E

On the petitioner's appeal—

*Held*, dismissing the appeal, that the relevant provisions of the Arbitration Act 1996 left open the possibility that a challenge could be made to a stay application on the ground of arbitrability; that the question in each case was whether the dispute engaged third party rights or represented an attempt to delegate to arbitrators a matter of public interest which could not be determined within the limitations of a private contractual process; that a petition under section 994 of the Companies Act 2006 was not an application for a class remedy, despite the availability of relief affecting third parties; that the inability of an arbitral tribunal to make third party orders in the context of a complaint of unfair prejudice did not mean that such a dispute was beyond what the law would permit the parties to submit to arbitration, rather it was an incident of the agreement which the parties had made as to the method by which their disputes were to be resolved; that a claim alleging unfair prejudice consisting of a breach of an agreement or some other unconscionable behaviour, which did not involve the making of any winding up order, was plainly capable of being decided by an arbitrator and there was nothing to make it unsuitable for determination by arbitration on grounds of public policy; that section 994 of the 2006 Act did not impliedly prohibit arbitration; that, in the absence of a restriction imposed by a rule of policy or statute, and in light of their wide terms, the arbitration clauses did not exclude claims for unfair prejudice; and that, accordingly, the judge's decision to stay the petition under section 9(1) of the 1996 Act had been correct (post, paras 38, 40, 61, 77–78, 83, 84, 92, 93, 94, 95, 96, 99, 101, 103, 104, 105, 106).

F

G

H

[1] Companies Act 2006, s 994(1): see post, para 44.
[2] Arbitration Act 1996, s 9: see post, para 32.

© 2012 The Incorporated Council of Law Reporting for England and Wales

334
**Fulham Football Club (1987) Ltd v Richards (CA)**                              **[2012] Ch**

*In re Vocam Europe Ltd* [1998] BCC 396 approved.                                      A
*Société Commerciale de Réassurance v Eras International Ltd (formerly Eras (UK))* [1992] 2 All ER 82 (Note), CA applied.
*Exeter City Association Football Club Ltd v Football Conference Ltd* [2004] 1 WLR 2910 overruled.

*Per curiam.* (i) An agreement cannot arrogate to the arbitrator the question of whether a winding up order should be made, which remains a matter for the court in any subsequent proceedings. However the arbitrator can decide whether the    B
complaint of unfair prejudice is made out and whether it would be appropriate for winding up proceedings to take place or whether the complainant should be limited to some lesser remedy ( post, paras 83, 106 ).

(ii) If the relief sought is of a kind which may affect other members who are not parties to the existing reference, there is no reason in principle why their views could not be canvassed by the arbitrators before deciding whether to make an award in those terms ( post, paras 83, 101, 106).                                              C

Decision of Vos J [2010] EWHC 3111 (Ch); [2011] Ch 208; [2011] 2 WLR 1055; [2011] 2 All ER 112 affirmed.

The following cases are referred to in the judgments:

*ACD Tridon Inc v Tridon Australia Pty Ltd* [2002] NSWSC 896
*Best (A) Floor Sanding Pty Ltd v Skyer Australia Pty Ltd* [1999] VSC 170
*British Eagle International Airlines Ltd v Cie Nationale Air France* [1973] 1 Lloyd's   D
    Rep 414; [1974] 1 Lloyd's Rep 429, CA; [1975] 1 WLR 758; [1975] 2 All ER
    390; [1975] 2 Lloyd's Rep 43, HL(E)
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR
    689; [2006] 3 All ER 829; [2006] 2 All ER (Comm) 695, PC
*Clyde & Co LLP v Van Winkelhof* [2011] EWHC 668 (QB); [2011] CP Rep 31
*Company (No 00709 of 1992), In re A* [1999] 1 WLR 1092; [1999] 2 All ER 961,   E
    HL(E)
*Crigglestone Coal Co Ltd, In re* [1906] 2 Ch 327, Buckley J and CA
*Exeter City Association Football Club Ltd v Football Conference Ltd* [2004]
    EWHC 831 (Ch); [2004] 1 WLR 2910; [2004] 4 All ER 1179
*Hyman v Hyman* [1929] AC 601, HL(E)
*Larsen Oil and Gas Pte Ltd v Petroprod Ltd* [2011] SGCA 21; [2011] 3 SLR 414
*Neath Rugby Ltd, In re (No 2); Hawkes v Cuddy (No 2)* [2009] EWCA Civ 291;   F
    [2009] 2 BCLC 427, CA
*Peveril Gold Mines Ltd, In re* [1898] 1 Ch 122, CA
*Rica Gold Washing Co, In re* (1879) 11 Ch D 36, CA
*Société Commerciale de Réassurance v Eras International Ltd (formerly Eras (UK))*
    [1992] 2 All ER 82 (Note); [1992] 1 Lloyd's Rep 570, CA
*Vocam Europe Ltd, In re* [1998] BCC 396
*Wealands v CLC Contractors Ltd (Key Scaffolding, Third Party)* [2000] 1 All   G
    ER (Comm) 30; [1999] 2 Lloyd's Rep 739, CA

The following additional cases were referred to in the skeleton arguments:

*Bird Precision Bellows Ltd, In re* [1984] Ch 419; [1984] 2 WLR 869; [1984] 3 All ER
    444; [1986] Ch 658; [1986] 2 WLR 158; [1985] 3 All ER 523, CA
*British Empire Match Co Ltd, In re* (1888) 59 LT 291
*Company (No 0022 of 1915), In re A* [1915] 1 Ch 520, CA                               H
*Company (No 004377 of 1986), In re A* [1987] 1 WLR 102
*Company (No 004415 of 1996), In re A* [1997] 1 BCLC 479
*Company (No 006834 of 1989), In re A, Ex p Kremer* [1989] BCLC 365
*Durtnell (R) & Sons Ltd v Secretary of State for Trade and Industry* [2001] 1 All
    ER (Comm) 41; [2001] 1 Lloyd's Rep 275

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   *ET Plus SA v Welter* [2005] EWHC 2115 (Comm); [2006] 1 Lloyd's Rep 251
    *Fiona Trust and Holding Corpn v Privalov* [2007] UKHL 40; [2007] Bus LR 1719;
      [2007] 4 All ER 951; [2007] 2 All ER (Comm) 1053; [2008] 1 Lloyd's Rep 254,
      HL(E)
    *Harmer (HR) Ltd, In re* [1959] 1 WLR 62; [1958] 3 All ER 689, CA
    *Harrison (Saul D) & Sons plc, In re* [1995] 1 BCLC 14, CA
    *Hickman v Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch 881
B   *Kershaw Mechanical Services Ltd v Kendrick Construction Ltd* [2006] EWHC 727
      (TCC); [2006] 4 All ER 79; [2006] 2 All ER (Comm) 81
    *MacLeod v MacLeod* [2008] UKPC 64; [2010] 1 AC 298; [2009] 3 WLR 437; [2009]
      1 All ER 851, PC
    *Phoenix v Pope* [1974] 1 WLR 719; [1974] 1 All ER 512
    *Practice Direction (Companies Court: Contributory's Petition)* [1990] 1 WLR 490;
      [1990] 1 All ER 1056
C   *Via Networks Ireland Ltd, In re* [2002] IESC 24; [2002] 2 IR 47
    *Welton v Saffery* [1897] AC 299, HL(E)
    *Westbourne Galleries Ltd, In re* [1973] AC 360; [1972] 2 WLR 1289; [1972] 2 All
      ER 492, HL(E)
    *Wine Inns Ltd, In the matter of* [2000] NICA 15; [2000] NIJB 343
    *Woolcock v Bushert* (2004) 246 DLR (4th) 139

D   **APPEAL** from Vos J
    By a petition presented on 27 April 2010 pursuant to section 994 of the Companies Act 2006, the petitioner, Fulham Football Club (1987) Ltd, alleged that the first respondent, Sir David Richards, had acted in breach of the FA Football Agents' Regulations thereby causing the second respondent, Football Association Premier League Ltd, to act in breach of its articles of association and of its rules such that its affairs had been conducted in a manner which was unfairly prejudicial to the petitioner's interests, and sought injunctions to restrain the first respondent acting in further breach of the regulations and participating in future player transfer negotiations and for an order that he cease to be the chairman or a director of the second respondent. On 1 December 2010 Vos J held that the disputes raised by the petition fell squarely within the scope of arbitration agreements between the parties and stayed the petition under section 9(1) of the Arbitration Act 1996 on the basis that the relief sought could be granted by the arbitrator.

    By an appellant's notice filed on 21 December 2010 and pursuant to permission of the judge the petitioner appealed on the ground that, since (a) a petition presented pursuant to section 994 of the 2006 Act was in respect of unfair prejudice to members as a whole, (b) on such a petition the court had a wide discretion as to the appropriate relief to grant, which was not limited to that sought by the petitioner, (c) in granting relief the court had regard to the interests of other members, creditors, employees and other third parties and (d) the relief could affect the future conduct of the affairs of the company and its assets and thereby affect third parties, the judge should have held that section 9(4) of the 1996 Act applied; alternatively, the judge should have held, in the absence of an express provision that the arbitration clauses extended to unfair prejudice disputes, that the dispute in question did not fall within their ambit. The appeal was heard in private.

    The facts are stated in the judgment of Patten LJ.

© 2012 The Incorporated Council of Law Reporting for England and Wales

336
**Fulham Football Club (1987) Ltd v Richards (CA)**                    [2012] Ch
Patten LJ

*Philip Marshall QC*, *Paul Harris QC* and *Owain Draper* (instructed by    A
*Lewis Silkin LLP*), whose argument is referred to, post, paras 33, 35–36,
38–39, 46, 49, 51, 61, 80, 85, 89, 100, 103, for the petitioner.
    *Richard Snowden QC* and *James Potts* (instructed by *Brabners Chaffe
Street LLP, Manchester*) for the first respondent.
    *Ian Mill QC* and *Andrew Hunter* (instructed by *DLA Piper UK LLP*),
whose argument is referred to, post, para 35, for the second respondent.
                                                                              B

    The court took time for consideration.

    21 July 2011. The following judgments were handed down.

**PATTEN LJ**

                                                                              C
*Introduction*

    1  Fulham Football Club (1987) Ltd ("Fulham") appeals with the leave
of the judge against an order of Vos J dated 1 December 2010 made under
section 9 of the Arbitration Act 1996. Under this order the judge stayed a
petition presented by Fulham on 27 April 2010 under section 994 of the
Companies Act 2006.
                                                                              D
    2  The petition relates to the affairs of the second respondent, the
Football Association Premier League Ltd ("the FAPL"), which was
incorporated in 1992 in order to give the Premier League the commercial
independence to organise its own broadcast and sponsorship agreements.
Under its memorandum of association, the FAPL is empowered to organise
and manage the Premier League (under the jurisdiction of the Football
Association ("the FA")) and, for these purposes, to make its own rules. Each    E
of the 20 clubs in the Premier League holds a share in the company. The
allegations of unfair prejudice raised in the petition do not, however, relate
to the conduct of the other members of the FAPL but rather to that of the
first respondent, Sir David Richards, who is its chairman. What is alleged is
that Sir David acted as an unauthorised agent in breach of the FA Football
Agents Regulations when in July 2009 he was asked by the chief executive of    F
Portsmouth City Football Club Ltd ("Portsmouth") (Mr Peter Storrie) to
approach the chairman of Tottenham Hotspur Football and Athletic Co Ltd
("Tottenham") (Mr Daniel Levy) in order to facilitate the transfer to
Tottenham of one of Portsmouth's players, Mr Peter Crouch.
    3  At the time Portsmouth was in severe financial difficulties and needed
to raise £9m in order to avoid winding up proceedings threatened by    G
HM Revenue and Customs. It is alleged that by 25 July Fulham had made an
offer of £9m to secure the registration of Mr Crouch which had been rejected
but was prepared to increase its offer to £11m. Mr Crouch had indicated his
preference to play for Tottenham but Tottenham had made lower offers for
the player which had also been rejected.
    4  The principal allegation made in the petition is that on 24 July
Mr Storrie approached Sir David and asked him to assist Portsmouth in    H
facilitating the transfer of Mr Crouch to Tottenham. It is said that Sir David
agreed to help and subsequently entered into negotiations with Mr Levy on
behalf of Portsmouth to secure an increased offer for the player. What is not
in dispute is that on 26 July Tottenham did make an improved offer of £9m

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    payable immediately which was accepted by Portsmouth and that Mr Crouch was then transferred to Tottenham.

5    Article 79 of the articles of association of the FAPL ("the articles") requires the company to comply with the rules of the Football Association ("the FA Rules"). The FA rules empower the FA to make regulations such as the Agents Regulations which prohibit any player or club from using or seeking to use the services of an unauthorised agent in relation to agency

B    activity as defined. This includes acting in the capacity of an agent, representative or adviser to a club, either directly or indirectly, in the negotiations or arrangements of any transaction facilitating or effecting the transfer of the registration of a player from one club to another.

6    On 10 August 2009 Fulham made a complaint to the FAPL about Sir David's involvement in the transfer of Mr Crouch to Tottenham. Mr Peter

C    McCormick, a legal adviser to the FAPL, was appointed to inquire into the matter. He produced a report on 10 February 2010 in which he made findings that Sir David had spoken to Mr Levy and did play a part in "mediating" between Portsmouth and Tottenham. He concluded, however, that Sir David had not brokered the transfer of Mr Crouch to Tottenham. The board of the FAPL considered the report on 2 March 2010 and concluded that Sir David's role in the transfer was one which it was

D    legitimate for him to perform as chairman of the FAPL. Fulham was informed in a letter of 3 March that its complaint would be dismissed.

7    On 15 March 2010 Fulham's solicitors wrote to the FAPL stating that Sir David had acted unfairly so as to prejudice the interests of Fulham as a member of the FAPL. The FAPL offered to place the matter on the agenda of a shareholders' meeting which was scheduled to take place at the beginning

E    of June 2010 and indicated that it would be bound by the decision of the majority of the member clubs taken at the meeting. Article 46 of the articles entitles the members to dismiss the chairman and the chief executive officer. In the same letter it put Fulham on notice that if it wished to take further action in respect of the complaint then it was bound under the FAPL rules to submit the dispute to arbitration.

8    On 27 April 2010 the petition was presented and on 21 June 2010 and

F    9 July 2010 the FAPL and Sir David issued their respective applications for a stay of the proceedings.

9    The FA rules (see rule B.12) provide that membership of the Premier League constitutes an agreement between the FAPL and the member clubs to be bound by and comply with the FA rules, the articles and the FAPL rules. The FAPL rules are those made by the FAPL from time to time under the

G    power contained in article 16.1 for the purpose of regulating the organisation and management of the Premier League. The combined effect of article 79 and article 16 is that member clubs are bound by both the FA and the FAPL rules and any regulations made under the FA rules.

10    In its petition Fulham alleges that it is an implied term of the FAPL rules that members of the board of the FAPL will comply with their fiduciary obligations and not act so as to prefer the interests of one member

H    club over another. The duties of Sir David as a director of the FAPL include the general duties set out in Part 10 of the Companies Act 2006 to act in accordance with the company's constitution and to exercise his powers for a proper purpose (section 171); to act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit

© 2012 The Incorporated Council of Law Reporting for England and Wales

338
Fulham Football Club (1987) Ltd v Richards (CA)                              [2012] Ch
Patten LJ

of the members as a whole having regard (inter alia) to the need to act fairly    A
as between members of the company (section 172); and to avoid conflicts of
interest: section 175.

11   It is alleged that, by acting as he did in connection with the transfer
of Mr Crouch, Sir David acted in breach of the FA rules and caused the
FAPL to act in breach of the articles and the FAPL rules (para 23 of the
petition); exercised his powers for an improper purpose, namely to advance
the interests of Portsmouth and Tottenham over those of other members    B
such as Fulham (para 24.2); and failed to act in the best interests of the
FAPL or to act fairly between its members: para 24.3.

12   The board of the FAPL has failed, it is said, to take action to rectify
these breaches of the articles and the FAPL rules and of Sir David's duties as
a director and, by dismissing Fulham's complaint based on the findings in the
McCormick report, has conducted the affairs of the FAPL in a manner which    C
is unfairly prejudicial to the interests of some part of its members including
Fulham: para 26.

13   By way of relief, Fulham seeks an injunction restraining Sir David
from acting as an unauthorised agent or from participating in any way in
negotiations regarding the transfer of players. In the alternative, it seeks an
order that Sir David should cease to be the chairman of the FAPL and such    D
other relief as the court thinks fit.

14   The central allegation that Sir David acted as an unauthorised agent
for Portsmouth is strongly denied by both Sir David and the FAPL. Sir David
has indicated that he intends (if Fulham succeeds in this appeal) to apply to
the Companies Court for an order striking out the petition. They have also,
through their counsel, made various submissions to the effect that the
principal purpose of the petition is to provide a public hearing of the    E
allegations against Sir David.  But none of these matters is material to
the disposal of this appeal.  The issue for the judge was whether the
conditions for a stay of proceedings set out in section 9 of the 1996 Act were
made out. If so, then the grant of a stay is mandatory: see section 9(4). As to
this, Vos J was faced with two conflicting decisions of the High Court. The
first in time is that of Rimer J in *In re Vocam Europe Ltd* [1998] BCC 396    F
who stayed an unfair prejudice petition under section 9 where a
shareholders' agreement provided for all matters in dispute to be referred to
arbitration. The second is the decision of Judge Weeks QC (sitting as a judge
of the High Court) in *Exeter City Association Football Club Ltd v Football
Conference Ltd* [2004] 1 WLR 2910 who declined to grant a stay of an
unfair prejudice petition because (as he put it): "the statutory rights
conferred on shareholders to apply for relief at any stage are, in my    G
judgment, inalienable and cannot be diminished or removed by contract or
otherwise."

15   Vos J followed the decision in *In re Vocam Europe Ltd* in preference
to that in the *Exeter City* case and granted a stay of the petition under
section 9. Fulham appeals on the grounds that the *Exeter City* case was
correctly decided and should have been followed by the judge. Alternatively,
it is contended that the arbitration clauses contained in the FAPL rules and    H
the FA rules, which are relied on in this case, should be construed so as to
exclude a dispute about unfair prejudice. Both grounds of appeal depend
to some extent on the argument that a section 994 petition is concerned to
protect class rights and to secure relief which will be effective to bind third

© 2012 The Incorporated Council of Law Reporting for England and Wales

parties. The inability of an arbitrator to grant such relief is relevant both to the fundamental issue of whether a dispute of this kind is arbitrable at all and to the narrower issue of construction of the arbitration agreements. But before turning to the particular arguments it is necessary to set out the relevant provisions of the FAPL and FA rules which contain the arbitration clauses and to examine more generally the provisions of the 1996 and 2006 Acts which are relied on.

*The FAPL rules*

16   As already mentioned, rule B12 of the FAPL rules provides that membership of the FAPL is deemed to constitute an agreement between the FAPL and the member clubs and between clubs to be bound by and comply with the FAPL rules, the articles and the FA rules. This is supplemented by article 79 which requires the FAPL to comply with the FA rules.

17   Section S of the FAPL rules contains the agreement to arbitrate. Rule 2 provides:

> "Membership of the league shall constitute an agreement in writing between the company and clubs and between each club for the purposes of section 5 of [the Arbitration Act 1996] in the following terms: 2.1 to submit all disputes which arise between them (including in the case of a relegated club any dispute between it and a club or the company the cause of action of which arose while the relegated club was a member of the league), whether arising out of these rules or otherwise, to final and binding arbitration in accordance with the provisions of the Act and this section of these rules; 2.2 that the seat of each such arbitration shall be in England and Wales; 2.3 that the issues in each such arbitration shall be decided in accordance with English law; 2.4 that no other system or mode of arbitration will be invoked to resolve any such dispute."

18   Rule 3 of section S places disputes under these rules into three categories including: "3.2 disputes arising from the exercise of the board's discretion ("board disputes"); 3.3 other disputes arising from these rules or otherwise."

19   In terms of relief rule 28 of section S gives the arbitral tribunal wide powers including the power to "order a party to do or refrain from doing anything".

*The FA rules*

20   The arbitration provisions are contained in section K of the FA rules. So far as material, they provide:

> "1(a) Subject to rule K1(b), K1(c) and K1(d) below, any dispute or difference between any two or more participants (which shall include, for the purposes of this section of the rules, the association) including but not limited to a dispute arising out of or in connection with (including any question regarding the existence or validity of): (i) the rules and regulations of the association which are in force from time to time; (ii) the rules and regulations of an affiliated association or competition which are in force from time to time; . . . shall be referred to and finally resolved by arbitration under these rules . . . (c) Rule K1(a) shall not apply to any dispute or difference which falls to be resolved pursuant to any rules from

© 2012 The Incorporated Council of Law Reporting for England and Wales

340
**Fulham Football Club (1987) Ltd v Richards (CA)**                              **[2012] Ch**
Patten LJ

time to time in force of any affiliated association or competition . . .   A
(e) The parties agree that the powers of the court under sections 44, 45
and 69 of the Arbitration Act 1996 are excluded and shall not apply to
any arbitration commenced under these rules.”

21   "Participant" is defined by rule A2 to include any club, competition
or official and "all such persons who are from time to time participating in
any activity sanctioned either directly or indirectly by the [FA]".          B

22   "Official" is defined by rule A2 as "any official, director, secretary,
servant or representative of an affiliated association or competition".

23   "Competition" is defined by rule A2 as "any competition (whether a
league or knockout competition or otherwise) sanctioned by [the FA]", thus
including the Premier League.

24   It is common ground that, although Sir David is not a party to the
arbitration agreement contained in section S of the FAPL rules, he is a      C
participant (along with Fulham and the FAPL) within the meaning of
section K of the FA rules.   Subject to the issues of arbitrability and
construction, there could therefore be an arbitration of the dispute between
the parties under the FA rules.   But if the dispute between Fulham and the
FAPL proceeds as a reference under section S of the FAPL rules, it will have
the effect of removing that dispute from the terms of section K leaving only   D
the dispute between Fulham and Sir David within the scope of the FA rules:
see rule K1(c).

25   Sir David has indicated in evidence that he is willing to be joined as a
party to an arbitration under section S of the FAPL rules.   He would also
favour consolidation of the two references if the dispute is not referred to a
single arbitration or at least concurrent hearings.   This would require the   E
agreement of all parties: see section 35 of the Arbitration Act 1996.   Points
have been taken about the practical difficulties of consolidation due to the
possibility of different arbitrators being selected for each reference.   But, in
my view, none of this really impacts on what we have to decide.   Although it
would undoubtedly be convenient for the disputes to be determined in a
single arbitration or at least a single hearing, the procedural inconveniences
of not taking that course are not sufficient to create an objection to the    F
arbitrability of the disputes based on grounds of public policy or some other
legal principle and the decision in the *Exeter City* case [2004] 1 WLR 2910
was not based on considerations of that kind.   The right of a shareholder to
invoke the court's jurisdiction under section 994 of the Companies Act 2006
unrestricted by an arbitration agreement covering the same subject matter
cannot depend on whether the agreement would achieve a single hearing of    G
all issues.   If such a right exists it must apply as much to a dispute between
the parties to a single arbitration agreement as it would do to the present
case.

*Arbitrability*

26   The first step in the appeal must be to identify the legal principle    H
which is said to prevent disputes between a shareholder and the company or
between shareholders from being determined by arbitration.   This is central
to the principal ground of appeal which proceeds on the assumption that
each of the matters complained of in paras 23–26 of the petition falls within
the terms of the relevant arbitration agreement.

© 2012 The Incorporated Council of Law Reporting for England and Wales

27   On that premise one has to be looking for a statutory provision or a rule of public policy which has the effect of rendering the arbitration agreement either void or unenforceable in so far as it purports to bind the parties to an arbitral determination of the section 994 issues.

28   The first point to make is that there is no express provision in either the Arbitration Act 1996 or the Companies Act 2006 which excludes arbitration as a possible means of determining disputes of this kind. Section 1 of the 1996 Act sets out the general principles which govern the construction of the Act:

> "*General principles*
> "The provisions of this Part are founded on the following principles, and shall be construed accordingly— (a) the object of arbitration is to obtain the fair resolution of disputes by an impartial tribunal without unnecessary delay or expense; (b) the parties should be free to agree how their disputes are resolved, subject only to such safeguards as are necessary in the public interest; (c) in matters governed by this Part the court should not intervene except as provided by this Part."

29   Section 1(b) recognises the principle of party autonomy which underpins much of the 1996 Act. This is relied on by the respondents to the appeal as providing a strong contextual pointer in favour of the disputes in this case being capable of arbitration. But it is, in my view, little more than a neutral factor in this appeal. I say that for two reasons. The first is that even if one construes section 1(b) as directed to the issue of arbitrability, it gives no indication of when public policy considerations should intervene, although it recognises that they are preserved by the statute. The second reason is that it is doubtful whether section 1(b) is really concerned with this overarching issue of arbitrability as opposed to the conduct of the dispute within the arbitration itself. On this view section 1(b) is simply affirming the right of the parties to determine the method of resolution of their arbitrable disputes subject to the overriding duties imposed on the tribunal under section 33 to adopt procedures suitable to the circumstances of the particular case.

30   This is certainly the view of Lord Mustill and Mr Boyd QC in *Commercial Arbitration*, 2nd ed (1989) (2001 Companion). They say, at p 27, that since the reference to public policy

> "is embodied in a general principle concerned with the manner of resolving arbitrations, and not with the permissible subject matter of arbitrations, it is not aimed at questions of 'arbitrability'."

31   What the 1996 Act does, however, clearly do is to give primacy to the arbitration agreement even in domestic disputes by making a stay of court proceedings relating to the same dispute mandatory. This is a significant change from the Arbitration Act 1975 under which it was a matter of discretion.

32   Section 9 now provides:

> "(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings)

© 2012 The Incorporated Council of Law Reporting for England and Wales

342
Fulham Football Club (1987) Ltd v Richards (CA)                    [2012] Ch
Patten LJ

apply to the court in which the proceedings have been brought to stay the          A
proceedings so far as they concern that matter.

"(2) An application may be made notwithstanding that the matter is to
be referred to arbitration only after the exhaustion of other dispute
resolution procedures.

"(3) An application may not be made by a person before taking the
appropriate procedural step (if any) to acknowledge the legal proceedings          B
against him or after he has taken any step in those proceedings to answer
the substantive claim.

"(4) On an application under this section the court shall grant a stay
unless satisfied that the arbitration agreement is null and void,
inoperative, or incapable of being performed.

"(5) If the court refuses to stay the legal proceedings, any provision
that an award is a condition precedent to the bringing of legal          C
proceedings in respect of any matter is of no effect in relation to those
proceedings."

33    This section is modelled on Article II of the Convention on the
Recognition and Enforcement of Foreign Arbitral Awards (1958) ("the New
York Convention") and the wording of section 9(4) is taken directly from the
Convention. Section 9(1) draws a distinction between the legal proceedings          D
(in this case the petition) and the subject matter of the reference which is the
dispute. At some points Mr Marshall QC's argument for Fulham seemed to
come close to suggesting that the matter to be referred to arbitration was
what might be termed the section 994 claim but one needs to be precise
about this. The dispute between the parties and therefore the subject matter
of the arbitration agreement is the allegation of unfair prejudice set out in          E
paras 23–26 of the petition. In terms of relief, it is, I think, common ground
that the arbitrators could make an order against Sir David preventing him
from acting as an agent of any club in the future and could also order him to
resign as chairman. What they could not do is to wind up the FAPL or make
orders regulating the affairs of the company which bind other shareholders
who are not parties to the arbitration. But no orders of that kind are sought
in this case and, even if they were, they would not, in my view, form part of          F
the "matter" to be referred to arbitration. The inability, however, of an
arbitral tribunal to wind up a company or make third party orders in the
context of a complaint of unfair prejudice is relied on in support of an
argument that claims where that or comparable relief could be sought in
court proceedings and might be granted lie beyond what the law will permit
the parties to submit to arbitration.          G

34    If Fulham is right about this one needs to identify how the legal bar
to arbitration is to be accommodated within the provisions of section 9.
There are two possible views about this. One is to treat the arbitration
agreement as either null and void or inoperative at least in so far as it relates
to the unfair prejudice dispute. Section 81(1) of the 1996 Act expressly
preserves "the operation of any rule of law consistent with the provisions of
this Part, in particular, any rule of law as to— (a) matters which are not          H
capable of settlement by arbitration . . ."

35    Consistently with this, an arbitration agreement which purports to
refer such matters to arbitration would, to that extent, be treated as
unenforceable. Mr Marshall referred to Professor Merkin's book on

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   *Arbitration Law*, looseleaf ed, where the author treats "inoperative" as
including a case where the dispute is not arbitrable.  The alternative
argument (put forward by Mr Mill QC) is that issues of validity or
enforceability come into play in section 9(1) so that the conditions for the
making of an application for a stay are not satisfied if the dispute is not
arbitrable.

B   36   On balance, I prefer Mr Marshall's approach to this issue.  It seems
to me that the conditions for a stay prescribed by section 9(4) make it
unlikely that Parliament intended to deal with any issues of arbitrability
except on the substantive hearing of the stay application.  Section 9(1) is
concerned only to identify the existence of an arbitration agreement which
in terms covers the matters in dispute as the pre-conditions for the making of
the stay application.  Section 9(4) also makes it clear that the determination

C   of whether the agreement is null and void, inoperative or incapable of being
performed is a matter for the court whereas a challenge to the validity of the
agreement ahead of any application for a stay might itself be considered to
be arbitrable.

37   There is, however, nothing between the two arguments in terms of
outcome.  Neither side suggests that a rule of public policy or statutory

D   provision which renders an arbitration agreement void or unenforceable in
respect of some particular matter within its scope could not be determined at
the latest on the hearing of the stay application.  The issue which divides the
parties is that of arbitrability itself.

38   This brief excursion through the relevant provisions of the 1996 Act
is enough to indicate that the statute leaves open the possibility of a
challenge to an application for a stay on grounds of arbitrability but does

E   little to identify the basis of any such challenge.  In *Mustill & Boyd,
Commercial Arbitration*, 2nd ed (1989), this aspect of the law is given a
somewhat cursory and inconclusive treatment.    The authors say, at
pp 149–150:

"English law has never arrived at a general theory for distinguishing
those disputes which may be settled by arbitration from those which may

F   not.    The general principle is, we submit, that any dispute or claim
concerning legal rights which can be the subject of an enforceable award, is
capable of being settled by arbitration. This principle must be understood,
however, subject to certain reservations. First, certain types of dispute are
resolved by methods which are not properly called arbitration. These are
discussed in Chapter 2, ante. Second, the types of remedies which the

G   arbitrator can award are limited by considerations of public policy and by
the fact that he is appointed by the parties and not by the state.  For
example, he cannot impose a fine or a term of imprisonment, commit a
person for contempt or issue a writ of subpoena; nor can he make an award
which is binding on third parties or affects the public at large, such as a
judgment in rem against a ship, an assessment of the rateable value of land,
a divorce decree, a winding up order or a decision that an agreement is

H   exempt from the competition rules of the EEC under article 85(3) of the
Treaty of Rome.  It would be wrong, however, to draw from this any
general rule that criminal, admiralty, family or company matters cannot be
referred to arbitration: indeed, examples of each of these types of dispute
being referred to arbitration are to be found in the reported cases."

© 2012 The Incorporated Council of Law Reporting for England and Wales

344
Fulham Football Club (1987) Ltd v Richards (CA)                [2012] Ch
Patten LJ

39  Mr Marshall relied upon this passage as a recognition that there are    A
limits to what can legitimately be arbitrated. It confirms, he submitted, that
arbitration is a consensual dispute resolution process and therefore one
which is unsuitable for use in connection with a dispute in which the
interests and representations of third parties need to be taken into account or
where the appropriate relief is an order which creates rights in rem or affects
the public at large. A similar statement of principle can be found in *Born,*
*International Commercial Arbitration*, 3rd ed (2009), vol I, p 768, where the    B
author says:

"Although the better view is that the Convention imposes limits on
contracting states' applications of the non-arbitrability doctrine, the types
of claims that are non-arbitrable differ from nation to nation. Among
other things, classic examples of non-arbitrable subjects include certain
disputes concerning consumer claims; criminal offences; labour or    C
employment grievances; intellectual property; and domestic relations.
The types of disputes which are non-arbitrable none the less almost
always arise from a common set of considerations. The non-arbitrability
doctrine rests on the notion that some matters so pervasively involve
public rights, or interests of third parties, which are the subjects of
uniquely governmental authority, that agreements to resolve such    D
disputes by 'private' arbitration should not be given effect."

40  This extract is interesting because it attempts to identify some
common criteria applicable in the cases in which the matter in dispute has
been held to be non-arbitrable. But it also, I think, indicates that the
limitation which the contractual basis of arbitration necessarily imposes on
the power of the arbitrator to make orders affecting non-parties is not    E
necessarily determinative of whether the subject matter of the dispute is itself
arbitrable. As *Mustill & Boyd* point out, it does not follow from the
inability of an arbitrator to make a winding up order affecting third parties
that it should be impossible for the members of a company, for example, to
agree to submit disputes inter se as shareholders to a process of arbitration.
It is necessary to consider in relation to the matters in dispute in each case    F
whether they engage third party rights or represent an attempt to delegate to
the arbitrators what is a matter of public interest which cannot be
determined within the limitations of a private contractual process.

41  Not surprisingly, the source of such restrictions cannot be found in
the 1996 Act or what might be termed the law of arbitration itself. The
statements of principle set out in the textbooks referred to above are simply
recognitions that the scope of even the most widely drafted arbitration    G
agreement will have to yield to restrictions derived from other areas of the
law. Sections 9(4) and 81 of the Arbitration Act 1996 confirm this. But the
source of those restrictions is to be found elsewhere. The judgment in *Exeter*
*City* case [2004] 1 WLR 2910, which I will come to shortly, is based on a
principle of inalienable access to the Companies Court which can only be
derived from the 2006 Act. One can point to a number of examples of
statutory intervention designed to preserve a right of access to the courts. In    H
the field of matrimonial law post-nuptial agreements dealing with
maintenance on any subsequent separation were held to be unenforceable on
grounds of public policy in so far as they purported to remove the right of the
parties to apply to the court for financial relief. This reservation is now

© 2012 The Incorporated Council of Law Reporting for England and Wales

A statutory: see *Hyman v Hyman* [1929] AC 601 and sections 34–36 of the Matrimonial Causes Act 1973. In relation to employment and discrimination, there are statutory restrictions on the enforceability of any agreement which excludes or limits an employee's access to the employment tribunal: see section 203 of the Employment Rights Act 1996 and section 144(1) of the Equality Act 2010 as discussed in *Clyde & Co LLP v Van Winkelhof* [2011] CP Rep 31.

B 42    These examples show that in a number of areas the right of the party to apply to the court or tribunal is expressly preserved. Such a provision is inconsistent with an agreement to submit the dispute to binding arbitration and would therefore defeat any application for a stay of the proceedings either under section 9 or under the inherent jurisdiction. Vos J at one point in his judgment, para 8, adopted Mr Marshall's way of characterising the issue as whether a member of a company can agree to remove or diminish, by contract, his right to present a petition under section 994 based on unfair prejudice: ie to contract out of the Act. This may be an inaccurate way of formulating the question in so far as most arbitration agreements will not expressly exclude any reference to the court. But the combined effect of an arbitration agreement which covers the dispute and section 9(4) of the Arbitration Act 1996 is that the agreement to refer the dispute to arbitration will exclude the parties' right to bring or continue legal proceedings covering the same subject matter unless one of the exceptions contained in section 9(4) is established. I will deal later in this judgment with the separate question of whether any stay should be a permanent one or should at least be the subject of re-consideration in a case where the arbitrators consider that the winding up of the company is the appropriate relief but are, of course, themselves unable to make such an order.

C

D

E

*Unfair prejudice*

43    There are no provisions in the 2006 Act which correspond to those I have referred to in other areas of the law and if a company dispute about unfair prejudice is to be held to be non-arbitrable then Fulham has to rely on either an implied restriction in the statute or some equivalent rule of public policy based on the considerations referred to in para 40.

F 44    Section 994(1) provides:

"A member of a company may apply to the court by petition for an order under this Part on the ground— (a) that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or (b) that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."

G

45    If the petitioner establishes unfair prejudice to at least himself as a member, the court has wide powers. Section 996 provides:

H "(1) If the court is satisfied that a petition under this Part is well founded, it may make such order as it thinks fit for giving relief in respect of the matters complained of.
"(2) Without prejudice to the generality of subsection (1), the court's order may— (a) regulate the conduct of the company's affairs in the

© 2012 The Incorporated Council of Law Reporting for England and Wales

future; (b) require the company— (i) to refrain from doing or continuing    A
an act complained of, or (ii) to do an act that the petitioner has
complained it has omitted to do; (c) authorise civil proceedings to be
brought in the name and on behalf of the company by such person or
persons and on such terms as the court may direct; (d) require the
company not to make any, or any specified, alterations in its articles
without the leave of the court; (e) provide for the purchase of the shares of   B
any members of the company by other members or by the company itself
and, in the case of a purchase by the company itself, the reduction of the
company's capital accordingly."

46    In the present case the relief sought is limited.  But Mr Marshall
reminded us that the petition contains the usual prayer for such further or
other relief as the court shall think fit and the form of relief granted at the   C
conclusion of a trial is not limited to the express relief sought in the petition.
Under section 996 the court can grant the relief which it considers
appropriate and can also take into account the interests of other members
and creditors in formulating that relief: see *In re Neath Rugby Ltd (No 2);
Hawkes v Cuddy (No 2)* [2009] 2 BCLC 427.

47    That said, the scope for much wider relief than that sought in the
petition is extremely limited in the present case.  The decision was taken in   D
1992 to establish the FAPL as a limited company in order to give it the
commercial independence I have mentioned.  But the nature of the Premier
League and the kind of disputes which can occur are very different from
those in the case of an ordinary private trading company.  The value of the
shares is nominal and they can only be held so long as the club in question
continues to participate in the Premier League.    Demotion to the    E
Championship results in the transfer of the relevant shares to the promoted
clubs.  For the same reason, there can be no question of any one or more
member clubs seeking or successfully obtaining a buy-out order in respect of
any of the other shares.  Share ownership is further complicated by the fact
that the FA retains a special share which carries with it a power of veto in
respect of a number of matters including the alteration of certain of the
articles; the name of the Premier League; and the promotion to and    F
relegation of clubs from the Premier League.

48    Such disputes as are likely to occur in the conduct of the affairs of the
company (not the competition) are therefore likely to be limited and the
same will apply to the scope for relief.  Buy-out orders are not appropriate
for the reasons I have mentioned and an order for the winding up of the
FAPL on just and equitable grounds under section 122(1)(g) of the    G
Insolvency Act 1986 is similarly unrealistic as well as being highly
undesirable in the interests of the member clubs whose fortunes depend
upon the income generated by the broadcasting of Premier League fixtures.

49    It is not therefore surprising that the FAPL and FA rules contain
arbitration clauses which are designed to resolve disputes between clubs and
between clubs and the FAPL by a process of arbitration conducted by a panel
of specialist arbitrators with experience in this field.  The exclusive nature of    H
that process depends on whether the disputes which arise are arbitrable.
Mr Marshall submits that the allegations contained in paras 23–26 of the
petition differ from other possible disputes because a section 994 petition is
presented in respect of unfair prejudice to members as a whole (or, at least,

A some section of the membership of the company) and requires the court, in granting relief, to have regard to the interests of members and other interested parties such as creditors who, in this case, will be strangers to the arbitration agreement. By the same token, it can grant relief (e g a change in the articles, rules or officers of the FAPL) which will affect all the member clubs and possibly other third parties.

B 50 Fulham's argument about the arbitrability of an unfair prejudice dispute cannot therefore turn on the precise relief which is sought or even appropriate in any individual case. It has to be that any unfair prejudice claim under section 994 attracts a degree of state intervention and public interest such as to make it inappropriate for disposal by anything other than judicial process. The questions which we have to decide do not therefore turn on the nature of the company in this case or the nature of this particular

C dispute. If Mr Marshall is right, there is no obvious basis for differentiating in this context between particular cases which can be brought within section 994. If section 994 itself operates to preserve a right of access to the court, it must do so in respect of any petition which is properly brought within the section.

51 I turn therefore to consider the constituent elements of a section 994

D petition which are said to give it the protection claimed. Mr Marshall submits that the presentation of a section 994 petition invokes the supervisory jurisdiction of the court. By this he means that the petition seeks a class remedy which requires the court to have regard to the interests of other shareholders and perhaps even creditors particularly in formulating the relief to be granted. The position, he says, is analogous (and, in substance, identical) to that under a winding up petition brought on just and

E equitable grounds under section 122(1)(g) of the 1986 Act which, like any of the grounds for compulsory liquidation, seeks to invoke the court's statutory jurisdiction to make a winding up order and to subject the rights of both contributories and creditors to control by a liquidator.

52 It is, of course, common ground that a creditor's petition under section 122(1)(f) based on the alleged insolvency of the company does

F undoubtedly seek relief on behalf of the creditors generally even though the petition relies as evidence of insolvency on the company's failure to pay the petition debt which is due and owing to the petitioner: see *In re Crigglestone Coal Co Ltd* [1906] 2 Ch 327.

53 A winding up order in insolvency proceedings brings into effect a statutory regime which Lord Hoffmann described in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of*

G *Navigator Holdings plc* [2007] 1 AC 508, para 14 in these terms:

"The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. That mechanism may vary in its details. For example, in personal bankruptcy in England, the assets of the

H bankrupt are vested in a trustee for realisation and distribution to creditors. So the mechanism operates by divesting the bankrupt of his property. In corporate insolvency, on the other hand, the insolvent company continues to be owner of its property but holds it in trust for the creditors in accordance with the provisions of the Insolvency Act 1986:

© 2012 The Incorporated Council of Law Reporting for England and Wales

see *Ayerst v C & K (Construction) Ltd* [1976] AC 167. In the case of     A
personal bankruptcy, the bankrupt may afterwards be discharged from
liability for his pre-bankruptcy debts. In the case of corporate insolvency,
there is no provision for discharge. The company remains liable but when
all its assets have been distributed, there is nothing more against which
the liability can be enforced: see *Wight v Eckhardt Marine GmbH* [2004]
1 AC 147, 155–156. At that point, the company is usually dissolved."

                                                                           B

54    The power of the court to wind up on the just and equitable ground
is also contained in section 122 of the 1986 Act but, in relation to a
contributory's petition, the conditions for its exercise are very different. As a
general rule, the shareholder seeking the winding up order must be able to
establish that the company is solvent and that there will be a surplus
remaining for distribution after the payment of the company's debts and the     C
costs and expenses of the liquidation: see *In re Rica Gold Washing Co Ltd*
(1879) 11 Ch D 36.

55    A shareholder will not therefore be permitted to petition under
section 122(1)(g) for the winding up of an insolvent company and, in the
case of a solvent company, the court's power will only be exercised in his
favour with a view to dividing the net assets of the company where no other
means can be found of resolving the dispute between shareholders in relation     D
to their rights and interests as members. To this end, section 125(2) of the
Insolvency Act 1986 provides:

   "If the petition is presented by members of the company as
contributories on the ground that it is just and equitable that the company
should be wound up, the court, if it is of opinion— (a) that the petitioners
are entitled to relief either by winding up the company or by some other     E
means, and (b) that in the absence of any other remedy it would be just
and equitable that the company should be wound up, shall make a
winding up order; but this does not apply if the court is also of the opinion
both that some other remedy is available to the petitioners and that they
are acting unreasonably in seeking to have the company wound up
instead of pursuing that other remedy."                                     F

56    Section 994 will usually provide the source of a satisfactory
alternative remedy such as a buy-out order so that winding up under
section 122(1)(g) is therefore a last resort and, in my experience, an
exceptional remedy to grant in the context of disputes between shareholders.
This is confirmed by the terms of the current Practice Direction 49B (Order
under section 127 of the Insolvency Act 1986) which draws attention to the     G
undesirability of asking, as a matter of course, for a winding up order as an
alternative to an order under section 994.

57    The remedy to deal with unfair prejudice introduced by section 210
of the Companies Act 1948 and now contained in section 994 like the court's
use of its jurisdiction under section 122(1)(g) to wind up companies formed
on the basis of a quasi-partnership was designed to deal with disputes
between the members of private companies (usually minority shareholders)     H
who may be the subject of oppression but are prevented by the articles or a
shareholder's agreement from taking effective steps to resolve their
difficulties or to realise the value of their investment in the company by a sale
of their shares.

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    58    This kind of dispute, taking place as it must do in the context of a solvent company, will not therefore ordinarily involve the creditors and is intended to avoid causing damage to the value of the company which is not in the interests of any of its members.  For that reason, advertisement of the petition is exceptional.    The residual power of the court under section 122(1)(g) to order winding up where no other remedy would be appropriate or available does not therefore support the characterisation of a petition for section 994 relief as a class remedy.  It is designed to resolve issues of unfair prejudice without the winding up of the company.  These are essentially internal disputes about alleged breaches of the terms or understandings upon which the parties were intended to co-exist as members of the company.

59    The nature of the permissible grounds for seeking relief under section 994 was explained by Lord Hoffmann in *In re A Company (No 00709 of 1992)* [1999] 1 WLR 1092, 1098–1099 in a well known passage:

"In the case of section 459, the background has the following two features.  First, a company is an association of persons for an economic purpose, usually entered into with legal advice and some degree of formality.  The terms of the association are contained in the articles of association and sometimes in collateral agreements between the shareholders.  Thus the manner in which the affairs of the company may be conducted is closely regulated by rules to which the shareholders have agreed.  Secondly, company law has developed seamlessly from the law of partnership, which was treated by equity, like the Roman societas, as a contract of good faith.  One of the traditional roles of equity, as a separate jurisdiction, was to restrain the exercise of strict legal rights in certain relationships in which it considered that this would be contrary to good faith.  These principles have, with appropriate modification, been carried over into company law.

"The first of these two features leads to the conclusion that a member of a company will not ordinarily be entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted.  But the second leads to the conclusion that there will be cases in which equitable considerations make it unfair for those conducting the affairs of the company to rely upon their strict legal powers.  Thus unfairness may consist in a breach of the rules or in using the rules in a manner which equity would regard as contrary to good faith."

60    The jurisdiction now contained in section 994 originated as an alternative to winding up on the just and equitable ground.  Section 210 of the 1948 Act required the court to be of the opinion that the facts would justify the making of a winding up order on the just and equitable ground. But this link was broken in section 75 of the Companies Act 1980 as a result of the recommendations of the Jenkins Committee (*Report of the Company Law Committee* (1962) (Cmnd 1749)) that the grounds for seeking alternative relief should be widened.  The decision in *In re A Company (No 00709 of 1992)* [1999] 1 WLR 1092 was intended to define the circumstances in which the section 994 jurisdiction should be exercised but it has not re-forged the original link with section 122(1)(g).  Although Lord

Hoffmann described these provisions as parallel jurisdictions, he was keen, *A* at pp 1099–1100, to emphasise the limits of their common features:

"I should make it clear that the parallel I have drawn between the notion of 'just and equitable' as explained by Lord Wilberforce in *In re Westbourne Galleries Ltd* [1973] AC 360 and the notion of fairness in section 459 does not mean that conduct will not be unfair unless it would *B* have justified an order to wind up the company. There was such a requirement in section 210 of the Companies Act 1948 but it was not repeated in section 459. As Mummery J observed in *In re A Company (No 00314 of 1989), Ex p Estate Acquisition and Development Ltd* [1991] BCLC 154, 161, the grant of one remedy will not necessarily require proof of conduct which would have justified a different remedy: 'Under sections 459 to 461 the court is not . . . faced with a death *C* sentence decision dependent on establishing just and equitable grounds for such a decision. The court is more in the position of a medical practitioner presented with a patient who is alleged to be suffering from one or more ailments which can be treated by an appropriate remedy applied during the course of the continuing life of the company.' The parallel is not in the conduct which the court will treat as justifying a *D* particular remedy but in the principles upon which it decides that the conduct is unjust, inequitable or unfair."

61    The analogy which Mr Marshall seeks to draw between section 994 and section 122(1)(g) does not therefore assist him in providing a basis for the restriction on arbitrability he contends for and one is thrown back to section 994 itself to consider whether that should be the law. I accept, of *E* course, that some of the relief which can be granted under section 996 is capable of affecting third parties: eg orders for the regulation of the company's affairs or restraints upon its power to make alterations in its articles. Orders of this kind will inevitably impact on other shareholders who can be joined to court proceedings for the purpose of being bound by any order. But that does not make a section 994 petition an application for a *F* class remedy. What it may, however, do is to impose limitations on the scope of relief obtainable in arbitral proceedings.

62    At this point it is convenient to look at the two English cases where the High Court has had to consider the grant of a stay under section 9 in respect of an unfair prejudice position.

*In re Vocam Europe Ltd [1998] BCC 396*                                    *G*

63    The petitioners in this case were minority shareholders who had been removed as directors of a joint venture company. There was a shareholders' agreement under which all disputes between the parties whether or not arising under the agreement were to be resolved by arbitration.

64    The argument presented to Rimer J (as recorded in his judgment) *H* appears to have been primarily directed to the construction of the agreement and it does not look as if the judge was troubled with the authorities on arbitrability to which we have been referred. The judge ordered a stay of the petition.

© 2012 The Incorporated Council of Law Reporting for England and Wales

*The Exeter City case [2004] 1 WLR 2910*

65    The complaint in this case was that the rules of the Nationwide Conference League under which a member club was required to pay football creditors in full as part of any company voluntary arrangement had caused Exeter City unfair prejudice because it exposed the club to an application by HM Revenue and Customs for the revocation of the CVA.  The Football Conference then applied for a stay of the petition under section 9(4) of the 1996 Act because the dispute was referable to arbitration under the rules of the FA.

66    In this case the argument was clearly based on the issue of arbitrability.  The judge refused the stay on the following grounds, at paras 21–23:

"21. As to section 9, it is common ground that there are some disputes which are not susceptible to arbitration and that section 9 does not apply to such disputes.  There is a tension here between reserving matters of public interest to the courts and the public interest in the encouragement of arbitration.  In *A Best Floor Sanding Pty Ltd v Skyer Australia Pty Ltd* [1999] VSC 170, Judge Warren held that the right of a contributory to apply to the court for a winding up order could not be limited by agreement and refused to stay a winding up petition because it did not fall within the scope of the discretionary provisions of section 53 of the Commercial Arbitrations Act 1984.

"22. I find her reasoning compelling and I can see no difference in principle for this purpose between a winding up petition and a petition under section 459.  If the right to petition to wind up conferred on every single shareholder is a condition of incorporation under the Companies Act 1985, then so in my judgment is the right to petition for relief for unfair prejudice.  In *In re Magi Capital Partners LLP* [2003] EWHC 2790 (Ch), leading counsel, probably with the Australian authority in mind, conceded that a limited liability partnership was a creature of statute and that it was not possible to exclude the statutory right to apply to have the statutory entity wound up by the court.  The Companies Court has jurisdiction to wind up a company or limited liability partnership, and the same court has supervisory powers, designed to give protection to shareholders by enabling them to apply to the court for special relief.  In effect, the court controls by statute the creation and extinction of the company, and it also attends to it during midlife crises.

"23. The statutory rights conferred on shareholders to apply for relief at any stage are, in my judgment, inalienable and cannot be diminished or removed by contract or otherwise."

67    *A Best Floor Sanding Pty Ltd v Skyer Australia Pty Ltd* [1999] VSC 170, which was relied on by the judge as establishing an unfettered right of access to the court in the case of an unfair prejudice petition, was concerned with a contributory's petition to wind up a joint venture company under section 462(2) of the Corporations Law of the State of Victoria.  This entitles a contributory to apply to the court for a winding up order in a case where the affairs of the company are conducted in a manner that is unfairly prejudicial to the interests of a member or is contrary to the interests of the members as a whole: see section 461(1)(f).  There is also power under section 461(1)(k) for the court to wind up the company on just and equitable grounds.

© 2012 The Incorporated Council of Law Reporting for England and Wales

68    Section 461 therefore resembles section 122 of the 1986 Act but includes unfair prejudice as an additional ground for winding up. There is, however, no provision equivalent to section 994 under which the court, on an application by a shareholder, can make other types of order to deal with the prejudice complained of.

69    The reasoning of Warren J which Judge Weeks QC found so compelling turned on the construction of section 462(2) of the Corporation Law which sets out a list of the persons (including contributories) who "may apply for an order to wind up a company". The section is in similar but not identical terms to section 124(1) of the Insolvency Act 1986. The judge was faced with a submission that section 462(2) conferred a right which could not be excluded or modified by agreement.

70    The arbitration clause in clause 16 of the joint venture agreement provided:

"If during the continuance of the association or at any time afterwards any dispute, difference or question shall arise between the parties or their legal personal representatives touching the association or the accounts or transactions thereof or the value of the share of a party in the assets of the association or *the dissolution or winding up thereof* or the construction meaning or effect of these presents or anything herein contained or the rights and liabilities of the associates or their representatives under these presents or otherwise in relation to the premises then every such dispute difference or question subject as otherwise herein expressly provided shall be referred in the first instance to the President for the time being of the Law Institute of Victoria and if within the period of fourteen days from the referral of the matter concerned as aforesaid the parties do not agree to abide by the solution proposed by the President for the time being of the Law Institute of Victoria then the same shall be referred to arbitration in accordance with the Arbitration Act 1959 or any statutory modification or re-enactment thereof for the time being in force." (Warren J's emphasis.)

71    The clause was therefore very widely drawn and, as a matter of construction, extended to a dispute or question touching the winding up of the company. On one view this would include the question whether the company should be wound up and not merely a dispute about unfair prejudice which might (once adjudicated upon) entitle the court to grant that kind of relief. This is certainly the way in which the judge interpreted it because in para 11 of her judgment she says that:

"The issue as to whether parties associated with a company can enter into an agreement that the statutory rights and powers under the Corporations Law, in particular, the winding up power under section 462 be referred to arbitration does not appear to have been the subject of consideration by the courts."

72    Her reasons for refusing a stay are set out in the following passages of her judgment, at paras 13, 15 and 18:

"13. The application to stay the winding up application on the basis of an arbitration agreement between the joint venture parties raises a fundamental principle of corporations law. To state the very obvious, a

© 2012 The Incorporated Council of Law Reporting for England and Wales

company is a corporation in the common law sense formed by registration under Part 2A.2 of the Corporations Law or under corresponding earlier legislation.   In the words of Ford, Austin and Ramsay in *Ford's Principles of Corporations Law*, p 1061: 'a corporation (or body corporate in the common law sense) is a legal device by which legal rights, powers, privileges, immunities, duties, liabilities and disabilities may be attributed to a fictional entity equated for many purposes to a natural person . . . The fictional entity acquires rights and liabilities by the acts of persons behind it.'   Upon incorporation, the Corporations Law applies to the new entity.  Its company directors and management are subject to regulation under the Corporations Law.  The Corporations Law contains provisions relating to the company's constitution, general meetings of members, management of the company, the company's dealings with other parties, the company's financing, the handling of its affairs when it is subject to a financial crisis and, most significantly for present purposes, its winding up and dissolution.  The Corporations Law controls by statutory force the creation and demise of the company; it oversees the birth, the life and death of the company. Such matters cannot and ought not be subject to private contractual arrangement."

"15. Throughout Chapter 5 of the Corporations Law there exists a statutory structure setting out the manner in which applications for the winding up of a company are to be made, the persons or parties who are permitted under the Law to make an application for the winding up of a company and, most significantly, the effect of a winding up order on creditors and contributories.  A major aspect of the control by the court of the winding up of a company is the fact that the court appoints an official liquidator to be liquidator of the company.   In this respect the Corporations Law sets out the powers and duties of a liquidator or a provisional liquidator of the company in the course of the winding up of that company.  Indeed, the order of the court for the winding up of the company does not in effect wind up that company.  Rather, the effect of the court order is that it directs that the process of liquidating the assets of the company and the winding up of its affairs should begin (see *In re Crust 'n' Crumbs Bakers (Wholesale Pty Ltd)* (1992) 2 Qd R 76, 78; (1991) 5 ACSR 70).  Upon a court ordering a winding up and so long as the winding up of the company remains unterminated no further order can be made by a court with respect to that company (see *Commonwealth v Emanuel Projects Pty Ltd* (1996) 21 ACSR 36; *Dewina Trading Sdn Bhd v Ion International Pty Ltd* (1996) 141 ALR 317; 22 ACSR 352)."

"18. The application by AB Floor to stay the winding up application strikes at the very heart of the corporation structure enshrined in the Corporations Law.  The arbitration clause in the joint venture agreement is null and void in so far as it purports to subject the parties to an arbitration with respect to the dissolution or winding up of the company. The provision is null and void because it has the effect of obviating the statutory regime for the winding up of a company.   More so, the arbitration clause, if adhered to, would frustrate the contributory, Skyer Australia in its efforts to seek relief from the court under the winding up provisions of the Law.  In essence, the arbitration clause in the joint

© 2012 The Incorporated Council of Law Reporting for England and Wales

*A*

venture agreement is contrary to the provisions of the Corporations Law and cannot be applied."

73    Much of this analysis is uncontroversial.    Companies are undoubtedly the creations of statute and operate in accordance with the provisions of the Companies Act 2006 which governs their registration; the rights of their members; and the duties of their directors.  In the event of insolvency, they become subject to the statutory regime set out in the Insolvency Act 1986 which places their assets under the control of a liquidator and invests him with statutory powers to get in and realise those assets for the benefit of the creditors.  He is empowered to take proceedings against the former directors for fraudulent or wrongful trading and to apply to the court for orders setting aside transactions between the company and third parties at an undervalue or dealings with creditors which amount to preferences: see sections 238 to 239 of the 1986 Act.

74    There is no doubt that many aspects of this regime are immune from interference by the members of the company whether by contract or otherwise.  They cannot override the provisions of the 1986 Act which apply on liquidation by agreeing between themselves or with a particular creditor that property which belongs to the company in liquidation should be dealt with other than in accordance with the Act: see *British Eagle International Airlines Ltd v Cie Nationale Air France* [1975] 1 WLR 758.  The same must go for the exercise of the liquidator's powers under sections 238 to 239 of the Insolvency Act 1986.  They involve an exercise of a statutory power to intervene in and set aside transactions with third parties in the context of the insolvency regime.  These are rights vested in the liquidator for the benefit of the creditors as a whole and cannot be overridden by a contract entered into by the company prior to its liquidation.

75    This was the conclusion reached by the Singapore Court of Appeal in *Larsen Oil and Gas Pte Ltd v Petroprod Ltd* [2011] 3 SLR 414 where an arbitration clause in a management agreement was relied on as the basis of an application for a stay of proceedings brought by a liquidator for recovery of payments said to constitute preferences or transactions at an undervalue. VK Rajah JA said, at paras 44–46:

"44. The concept of non-arbitrability is a cornerstone of the process of arbitration.  It allows the courts to refuse to enforce an otherwise valid arbitration agreement on policy grounds.  That said, we accept that there is ordinarily a presumption of arbitrability where the words of an arbitration clause are wide enough to embrace a dispute, unless it is shown that Parliament intended to preclude the use of arbitration for the particular type of dispute in question (as evidenced by the statute's text or legislative history), or that there is an inherent conflict between arbitration and the public policy considerations involved in that particular type of dispute.

"45. A distinction should be drawn between disputes involving an insolvent company that stem from its pre-insolvency rights and obligations, and those that arise only upon the onset of insolvency due to the operation of the insolvency regime.  Many of the statutory provisions in the insolvency regime are in place to recoup for the benefit of the company's creditors losses caused by the misfeasance and/or malfeasance of its former management.  This is especially true of the avoidance and

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  wrongful trading provisions.  This objective could be compromised if a company's pre-insolvency management had the ability to restrict the avenues by which the company's creditors could enforce the very statutory remedies which were meant to protect them against the company's management.  It is a not unimportant consideration that some of these remedies may include claims against former management who would not be parties to any arbitration agreement.  The need to avoid
B  different findings by different adjudicators is another reason why a collective enforcement procedure is clearly in the wider public interest.

"46. We, therefore, are of the opinion that the insolvency regime's objective of facilitating claims by a company's creditors against the company and its pre-insolvency management overrides the freedom of the company's pre-insolvency management to choose the forum where such
C  disputes are to be heard.  The courts should treat disputes arising from the operation of the statutory provisions of the insolvency regime per se as non-arbitrable even if the parties expressly included them within the scope of the arbitration agreement."

76  Warren J was, I think, right to regard the arbitration clause she had to consider as unenforceable in so far as it included within the scope of the
D  reference the question whether the company should be wound up.  Such an order lies within the exclusive jurisdiction of the court and the discretion as to whether or not to make that order is for the court, not the arbitrator to exercise.  But I part company with her if and in so far as she suggests in para 18 of her judgment that there can be no resort to arbitration in respect of the dispute between shareholders or the company which forms the
E  grounds upon which such relief may be sought.

77  The determination of whether there has been unfair prejudice consisting of the breach of an agreement or some other unconscionable behaviour is plainly capable of being decided by an arbitrator and it is common ground that an arbitral tribunal constituted under the FAPL or the FA rules would have the power to grant the specific relief sought by Fulham in its section 994 petition.  We are not therefore concerned with a case in
F  which the arbitrator is being asked to grant relief of a kind which lies outside his powers or forms part of the exclusive jurisdiction of the court.  Nor does the determination of issues of this kind call for some kind of state intervention in the affairs of the company which only a court can sanction. A dispute between members of a company or between shareholders and the board about alleged breaches of the articles of association or a shareholders'
G  agreement is an essentially contractual dispute which does not necessarily engage the rights of creditors or impinge on any statutory safeguards imposed for the benefit of third parties.  The present case is a particularly good example of this where the only issue between the parties is whether Sir David has acted in breach of the FA and FAPL rules in relation to the transfer of a Premier League player.

78  Judge Weeks QC was therefore wrong in my view to extend the
H  reasoning of Warren J in *A Best Floor Sanding Pty Ltd v Skyer Australia Pty Ltd* [1999] VSC 170 to a petition under what was then section 459.  The statutory provisions about unfair prejudice contained in section 994 give to a shareholder an optional right to invoke the assistance of the court in cases of unfair prejudice.  The court is not concerned with the possible winding up

© 2012 The Incorporated Council of Law Reporting for England and Wales

of the company and there is nothing in the scheme of these provisions which, in my view, makes the resolution of the underlying dispute inherently unsuitable for determination by arbitration on grounds of public policy. The only restriction placed upon the arbitrator is in respect of the kind of relief which can be granted.

79   The same view has been taken by the Supreme Court of New South Wales in *ACD Tridon Inc v Tridon Australia Pty Ltd* [2002] NSWSC 896. Austin J, at para 191, treated the decision in the *A Best Floor Sanding Pty Ltd* case as turning very much on the exclusive jurisdiction of the court to make a winding up order:

"191. . . . [Warren J's] decision was partly based on public policy considerations surrounding the process of winding up a company pursuant to court order. An additional ground seems to have been that a winding up order operates to affect the rights of third parties, not merely the rights of the parties to the arbitration clause.

"192. In my opinion, the latter ground is a strongly persuasive one, in keeping with the general observations by *Mustill & Boyd*. I accept, as well, that public policy considerations operate against referring to arbitration a determination to wind up a company on the grounds upon which a court may order that a company be wound up. However, I would not regard these public policy considerations as preventing parties to a dispute from referring questions to arbitration merely because those questions arise under the Corporations Act. I see nothing special about the Corporations Act that would distinguish it, as a whole, from other legislation such as the Trade Practices Act. This seems to be the position reached by United States courts: see *Dean Witter Reynolds Inc v Byrd* (1985) 470 US 213; *Shearson Lehman Hutton Inc v Wagoner* (1991) 944 F 2d 114; also *Pick v Discover Financial Services Inc* (unreported) 28 September 2001, United States District Court, D Delaware.

"193. The statutory powers of a court under the Corporations Act are, generally speaking, comparable to the powers exercised by a court under the general law (the power to make a winding up order being an exception to this proposition). They are generally not special powers to be exercised having regard to specialist public interest criteria.

"194. Specifically, the public policy considerations held by Warren J to be applicable to a disputed claim to wind up a company do not seem to me to prevent the parties from referring to arbitration a claim for some merely inter partes relief under the oppression provisions of the Corporations Act, or for access to corporate information under section 247A. However, the 'in rem' nature of an order for rectification of the share register of a company may prevent reference of that power to an arbitrator."

80   One of the cases referred to by Warren J and relied on by Mr Marshall in the present case is the decision of the Court of Appeal in *In re Peveril Gold Mines Ltd* [1898] 1 Ch 122. This concerned an application by shareholders for a stay of a winding up petition presented by another shareholder under what was then section 79 of the Companies Act 1862 (25 & 26 Vict c 89). Section 82 of the Act (like section 124 of the 1986 Act) conferred locus on a contributory to bring such proceedings but the articles

A   of the company provided that no winding up petition should be presented by a member unless one of three conditions was satisfied. These were the consent in writing of at least two directors; the permission of the majority of members given in general meeting; or the holding by the petitioner of at least one-fifth of the issued share capital.

81   The restriction in the articles was held to be invalid because it imposed on the petitioner conditions which were at variance with those

B   specified in section 82 of the 1862 Act. But the court did not suggest that it would have been unlawful for the members to have agreed not to petition to wind up. Lord Lindley MR said, at p 131:

"Section 79 states the circumstances under which such a company may be dissolved by the court, and section 82 states the persons who may petition for a dissolution. Any article contrary to these sections—any

C   article which says that the company is formed on the condition that its life shall not be terminated when any of the circumstances mentioned in section 79 exist, or which limits the right of a contributory under section 82 to petition for a winding up, would be an attempt to enforce on all the shareholders that which is at variance with the statutory conditions, and is invalid. It is no answer to say that the right to petition

D   may be waived by any contributory personally. I do not intend to decide whether a valid contract may or may not be made between the company and an individual shareholder that he shall not petition for the winding up of the company. That point does not arise now. But to say that a company is formed on the condition that its existence shall not be terminated under the circumstances, or on the application of the persons, mentioned in the Act is to say that it is formed contrary to the provisions

E   of the Act, and upon conditions which the court is bound to ignore."

82   The decision is therefore limited to the narrow point of whether the articles of a company can effectively restrict or re-model the conditions for the presentation of a petition under what would now be section 122 of the Insolvency Act 1986. It does not suggest that an agreement to resolve a dispute between shareholders which might justify a winding up order on just

F   and equitable grounds would either infringe the statute or be void on grounds of public policy. In fact it suggests the opposite.

83   It is therefore open to us to decide whether the provisions of section 994 are to be construed as restricting the resolution of unfair prejudice disputes to the exclusive jurisdiction of the court free of any binding authority. I have already set out my own reasons for preferring the

G   view that disputes of this kind which do not involve the making of any winding up order are capable of being arbitrated. Although not necessary for the resolution of this appeal, I also take the view, as Austin J did in the *ACD Tridon* case [2002] NSWSC 896, that the same probably goes for a similar dispute which is used to ground a petition under section 122(1)(g) to wind up the company on just and equitable grounds. In those cases the arbitration agreement would operate as an agreement not to present a

H   winding up petition unless and until the underlying dispute had been determined in the arbitration. The agreement could not arrogate to the arbitrator the question of whether a winding up order should be made. That would remain a matter for the court in any subsequent proceedings. But the arbitrator could, I think legitimately, decide whether the complaint of unfair

© 2012 The Incorporated Council of Law Reporting for England and Wales

prejudice was made out and whether it would be appropriate for winding up proceedings to take place or whether the complainant should be limited to some lesser remedy. It would only be in circumstances where the arbitrator concluded that winding up proceedings would be justified that a shareholder would then be entitled to present a petition under section 122(1)(g). In these circumstances the court could be invited to lift any stay imposed on proceedings imposed under section 9(4). In much the same way, it would, I think, be open to an arbitrator who considered that the proper solution to a dispute between a shareholder and the company was to give directions for the conduct of the company's affairs to authorise the shareholder to seek such relief from the court under section 994. But such cases are likely to be rare in practice. If the relief sought is of a kind which may affect other members who are not parties to the existing reference, I can see no reason in principle why their views could not be canvassed by the arbitrators before deciding whether to make an award in those terms. Opposition to the grant of such relief by those persons may be decisive. Similarly if the order sought is one which cannot take effect without the consent of third parties then the arbitrators' hands will be tied.

84   But, as explained earlier in this judgment, these jurisdictional limitations on what an arbitration can achieve are not decisive of the question whether the subject matter of the dispute is arbitrable. They are no more than the practical consequences of choosing that method of dispute resolution: see *Société Commerciale de Réassurance v ERAS (International) Ltd (formerly Eras (UK))* [1992] 1 Lloyd's Rep 570 and *Wealands v CLC Contractors Ltd (Key Scaffolding, Third Party)* [1999] 2 Lloyd's Rep 739.

85   This leaves for consideration what amounts to the alternative argument that regardless of any general considerations of public policy, section 994 ("a member of a company may apply to the court") should be construed as granting an unfettered right of access. This would have to be an implied restriction but, aside from the argument that it creates a class remedy which I have already dealt with, Mr Marshall also relies on a comparison between the treatment of section 994 relief in the context of companies and the equivalent provisions which apply to limited liability partnerships ("LLPs").

86   Under the Limited Liability Partnership Act 2000 an LLP is given the status of a body corporate and the members are liable to contribute to its assets on a winding up: see section 1(1)(4). The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009 (SI 2009/1804) ("the 2009 Regulations") which took effect on 1 October 2009 apply sections 994 to 996 of the Companies Act 2006 to LLPs but in a modified form. As modified (by regulation 48 of the 2009 Regulations), section 994(3) provides:

"The members of an LLP may by unanimous agreement exclude the right contained in subsection (1) either indefinitely or for such period as is specified in the agreement. The agreement must be recorded in writing."

87   Mr Marshall makes the point that no equivalent opt-out was given to the members of companies when section 994 of the 2006 Act came to be amended in 2008 by the insertion in the form of section 994(1A) of provisions dealing with the removal of a company's auditors. It is to be

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    inferred from this, he says, that Parliament considered that the provisions of section 994 should be immutable in the case of companies. Similarly the recommendations of the Company Law Review Steering Group contained in its 2001 report (*Modern Company Law for a Competitive Economy*) which favoured the promotion of alternative dispute resolution including arbitration for the resolution of shareholder disputes were not taken up. By 2008 the *Exeter City* case [2004] 1 WLR 2910 had been decided but
B    Parliament chose to make no changes to the 2006 Act to counter its effect.

88    I am not persuaded that we should draw any inferences from these aspects of the legislative history of the 2006 Act. The absence of any change to the provisions of section 994 following the decision in the *Exeter City* case cannot be taken as some kind of affirmation of the correctness of that decision, let alone a statutory embodiment of its effect. The Act remained
C    unchanged throughout the period. The consequence is that if the *Exeter City* case was correctly decided then there has been no statutory change to displace it. Conversely if it was, as I believe, wrongly decided then we are free to overrule it unhindered by any alteration in the relevant legislation. Similarly, although the provisions of the 2009 Regulations in relation to LLPs are interesting, the absence of any opt-out provision in relation to
D    companies merely confirms that this form of statutory relief remains available to contributories. Again, it cannot justify giving to the provisions of section 994 (which remain unchanged) a meaning which they cannot otherwise bear.

*Construction*

E    89    Fulham's alternative argument is that the arbitration clauses contained in the FAPL and FA rules should be construed so as to exclude claims for unfair prejudice which fall within section 994.

90    It is said that section 994 creates an important form of shareholder protection and the loss of that right should require the use of clear language in the arbitration agreement. Similarly the possibility of the arbitrator being unable to bind all the relevant parties or even to provide effective relief by
F    regulating the affairs of the company is also said to militate against the all-embracing effect of the language used.

91    Since the clauses in question refer in wide terms to "all disputes which arise between [the FAPL and the member class] . . . whether arising out of [the FAPL rules] or otherwise" and to "any dispute or difference [between the FAPL and the clubs] . . . including but not limited to a dispute
G    arising out of or in connection with [the FA rules]" any limitation on the scope must, I think, come in the form of an implication derived from the arbitrability of the subject matter.

92    The argument about construction therefore turns on the issues already considered about the effectiveness of any agreement to refer questions of unfair prejudice to arbitration. If, as I believe, there is no statutory restriction or rule of public policy which prevents the parties from
H    agreeing to submit such disputes to arbitration, it is not possible to read into the language of the arbitration clause the limitation contended for. The wide terms of the clauses also negative, in my view, any suggestion that the parties intended to limit the scope of the arbitration agreements out of concern for the inability of the arbitrator to make orders binding on non-parties.

© 2012 The Incorporated Council of Law Reporting for England and Wales

360
Fulham Football Club (1987) Ltd v Richards (CA)          [2012] Ch
Patten LJ

*Conclusions*                                                        A

93    For these reasons, I would affirm the decision of Vos J and dismiss the appeal.

**LONGMORE LJ**

94    I agree with Patten LJ that there are three questions which need to be determined, although I would prefer to consider them in a slightly different order: (1) whether the arbitration agreements contained in the FAPL rules and the FA rules purport, on their true construction, to refer to arbitration the issues which arise between the parties namely; (i) whether Sir David acted as an agent on behalf of Portsmouth in and about the procurement of Mr Crouch's transfer to Tottenham rather than to Fulham or in any other way in breach of his duties as chairman of the FAPL in relation to that transfer and (ii) whether Sir David's conduct constituted such unfair prejudice on the part of the FAPL as to entitle Fulham to invoke section 994 of the Companies Act 2006; (2) whether, if so, the 2006 Act expressly or impliedly prohibits the reference to arbitration of such matters; (3) whether, if there is no statutory prohibition of such a reference, public policy of the law of England and Wales prohibits such a reference.

95    In relation to the first question, Patten LJ has set out the terms of the FAPL rules which bind the clubs and the Premier League itself and the FA rules which bind Sir David and the clubs as participating in activity sanctioned by the FA. These rules are very wide being, in the case of the FAPL and its members, an agreement "to submit all disputes which arise between them . . . to final and binding arbitration" and in the case of the FA and its participants an agreement that "any dispute or difference between any two or more participants . . . shall be referred to and finally resolved by arbitration." The phrases "all disputes" and "any dispute or difference" mean what they say and must cover the disputes that have arisen between Fulham on the one hand and Sir David and the Premier League on the other.

96    In relation to the second question, it is clear that there is no express requirement in the 2006 Act that matters arising on an unfair prejudice petition under section 994 should not be referred to arbitration. Nor do I consider that there is any implied prohibition of arbitration. It is true that section 994(1) empowers a company member "to apply to the court by petition" and section 996(1) provides that "if the court is satisfied that a petition . . . is well-founded, it may make such order as it thinks fit for giving relief". But the fact that a statutory power, which a court would not have at common law apart from the statutory provision, is given to the court does not mean that an arbitrator, to whom a dispute is properly agreed to be referred, does not have a similar power. Power to make awards of monetary sums as between joint tortfeasors and between those who together have acted in breach of separate contracts are given to "the court" by various statutory provisions but it cannot be suggested that arbitrators are prohibited from making such awards: see *Wealands v CLC Contractors Ltd (Key Scaffolding, Third Party)* [1999] 2 Lloyd's Rep 739, paras 16–18. Such awards are frequently made. If, therefore, one looks at the actual wording of the relevant sections of the 2006 Act, there is no ground for supposing that there is any implicit prohibition on agreeing to refer an allegation of unfair prejudice to arbitration.

© 2012 The Incorporated Council of Law Reporting for England and Wales

A        97   Thirdly, does public policy prohibit or invalidate an agreement to refer to arbitration the question whether a company's affairs are being (or have been) conducted in a manner that is unfairly prejudicial to the interest of at any rate some of its members?  If public policy does prohibit such an agreement, there could of course be no question of the court staying any petition seeking relief under sections 994 to 996 of the Companies Act 2006 because the court would be satisfied (within the meaning of section 9(4) of

B   the Arbitration Act 1996) that the arbitration agreement would, to the extent that it purported to apply to unfair prejudice petitions, be "null and void" or, perhaps, "inoperative".

         98   It is this question that is at the heart of the appeal and I would, for my part, derive some guidance from the principle set out in section 1(b) of the 1996 Act namely "the parties should be free to agree how their disputes

C   are resolved, subject only to such safeguards as are necessary in the public interest".  To the extent therefore that public policy has a part to play it can only be as a "safeguard . . . necessary in the public interest".

         99   This is a demanding test and I cannot see that it is necessary in the public interest that agreements to refer disputes about the internal management of a company should in general be prohibited; nor can I see any reason why it is necessary to prohibit arbitration agreements to the extent

D   that they, in particular, apply to disputes whether a company's affairs are being (or have been) conducted in a manner unfairly prejudicial to the interests of its members.

         100   Mr Philip Marshall QC for Fulham suggested two reasons why there might be good reason for public policy to prohibit agreements to refer unfair prejudice disputes to arbitration.  The first was that an arbitrator might feel inhibited from making an award in favour of a petitioner because

E   there was no way in which he could assess whether any conduct of the company was unfairly prejudicial to the interests of any member who was not a party to the arbitration.  The second reason was that, if the arbitrator did issue an award, it might or would affect such members and there would be a risk that the award would be unenforceable because it would purport to affect the interests of members of the company who were not parties to the

F   arbitration.

         101   For my part I find it difficult to see why an arbitrator should feel any such inhibition as Mr Marshall suggested since there is no reason why any member of the FAPL who considered that its interests might be affected should not be able to give such evidence to the arbitrator as it wanted to.  But even if any inhibition did exist, that could not amount to a reason why in the

G   public interest an agreement to refer an unfair prejudice dispute should be prohibited.  It would just be an incident of the agreement and an example of a reason why in some circumstances arbitration could be less satisfactory than court proceedings.  The risk of that occurring cannot mean that it is necessary in the public interest to prohibit such agreements.

         102   The second reason is likewise somewhat fanciful but, again, the risk that an award might ineffectively purport to affect parties other than the

H   immediate parties to the arbitration and, to that extent, be unenforceable cannot render it necessary that agreements to refer unfair prejudice allegations should be banned as a matter of public policy.

         103   It is well settled that the fact that an arbitrator cannot give all the remedies which a court could does not afford any reason for treating an

© 2012 The Incorporated Council of Law Reporting for England and Wales

362
**Fulham Football Club (1987) Ltd v Richards (CA)**                    **[2012] Ch**
**Longmore LJ**

arbitration agreement as of no effect: see *Société Commerciale de*   A
*Réassurance v Eras International Ltd (formerly Eras (UK))* [1992] 1 Lloyd's
Rep 570, 610. The inability to give a particular remedy is just an incident of
the agreement which the parties have made as to the method by which their
disputes are to be resolved. The reason put forward by Mr Marshall for
regarding the FAPL rules and FA rules as inapplicable to unfair prejudice
petitions (because of the effect any award might have or might not have on
third parties) is of even less substance than the supposed inability of an   B
arbitrator to give any particular remedy.

104   For these reasons and those given by Patten LJ I agree the judge
reached the right conclusion. I would also commend his reluctance to treat
the hearing before him as a foregone conclusion in the light of the decision of
the *Exeter City* case [2004] 1 WLR 2910 merely because it was a second
decision of a judge at first instance which had taken into account (and   C
differed from) an earlier decision of a first instance judge. First instance
judges have the luxury (which we do not) of not being bound by each other's
decisions and, particularly in a specialist jurisdiction, it is usually useful to
this court to have a considered view even if it is at variance with the latest
first instance decision. I must confess to being much assisted by the views of
Vos J in coming to my own conclusion in this case.
D
105   I would also dismiss this appeal.

**RIX LJ**

106   I agree with both judgments.

107   To the extent that there may be any difference of emphasis between
Patten and Longmore LJJ, I can detect only the passages at paras 29–30 of
the former's judgment and paras 98–99 of the latter's, concerning the scope   E
of section 1(b) of the 1996 Act. On this point I would rather discount the
doubts of Patten LJ about the subsection dealing with arbitrability. I do not
myself see why the autonomy of the parties to which the subsection gives
primacy (subject to such safeguards as are necessary in the public interest)
should not apply to the choice to arbitrate, i e to resolve their disputes by
arbitration, as well as to the manner in which an arbitration is conducted. It
seems to me that "how the disputes are resolved" involves the former as well   F
as the latter.

*Appeal dismissed.*
*Permission to appeal refused.*

22 February 2012. The Supreme Court (Lord Hope of Craighead DPSC,
Lord Mance and Lord Sumption JJSC) dismissed an application by the   G
petitioner for permission to appeal.

JOHN SPENCER, *Barrister*

H

© 2012 The Incorporated Council of Law Reporting for England and Wales

Neutral Citation Number: [2013] EWHC 3413 (Comm)

Case No: 2013-208

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane London, EC4A 1NL

Date: 07/11/2013

**Before**:

**MR JUSTICE HAMBLEN**

- - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---|
| **Guidance Investments Limited** | **Claimant** |
| **- and -** | |
| **Guidance Hotel Investment Company B.S.C (Closed)** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**George Bompas QC and Tom Gentleman** (instructed by **Clyde & Co LLP**) for the **Claimant**
**John McCaughran QC and Conall Patton** (instructed by **Norton Rose Fulbright LLP**) for
the **Defendant**

Hearing dates: Friday 1 November 2013
- - - - - - - - - - - - - - - - - - - -

# Judgment

**Mr Justice Hamblen :**

**Introduction**

1.      There are two applications before the Court.

2.      The first is an application by the Claimant for a stay of part of the Defendant's Counterclaim under section 9 of the Arbitration Act 1996 ("the Act") and/or pursuant to the court's inherent jurisdiction on the grounds that it relates to matters covered by an arbitration clause.  In addition the Claimant seeks an order that the Defendant be debarred from relying on the like allegations by way of defence.

3.      The second is a contingent cross-application by the Defendant for a stay of the Claimant's claim pursuant to the court's inherent jurisdiction in the event that it was minded to grant the Claimant's stay application.

**Factual Background**

4.      The Defendant is incorporated in Bahrain and has carried on business since 2006 as an investment company investing in hotel properties and businesses.  The Claimant is its investment manager.

5.      The relationship between the parties is regulated by a Management Agreement originally made on 21 July 2006 and subsequently amended on 4 June 2008 and again on 14 October 2010.  For present purposes, nothing turns on the amendments.

6.      In these proceedings the Claimant contends that it is entitled to payment of Management Fees pursuant to clause 7 of the Management Agreement, calculated as a percentage of the sums invested by the Defendant's shareholders.  It contends that these fees have accrued due on a quarterly basis since 31 December 2010 and that the sum currently outstanding is US$8,942,850.

7.      The Defendant denies that any sums are due.  It contends, in broad summary, that the accrual of any fees is dependent on the provision of commensurately valuable services by the Claimant, and that this has not occurred.  The Defendant further contends that the Claimant has caused the Defendant substantial loss and damage as a result of its alleged mismanagement of a transaction for the purchase of a plot of land in Cairo for the construction of a hotel in 2007-09.  The Defendant's case is that the Claimant caused expenditure of about US$24.9m to be incurred in relation to the Cairo property, including the cost of its purported acquisition, but without obtaining good title to the land and without promptly registering such title as may have been acquired and generally acting with gross negligence.  The Defendant contends, *inter alia*, that the Claimant's conduct (a) was beyond the Claimant's contractual mandate (Defence, paras 24-5), (b) involved a failure to exercise reasonable care and skill (Defence, paras 26, 30, 31) and (c) amounted to gross negligence (ibid).  The Defendant seeks to rely on these matters in support of a defence of set-off (Defence, para 45) and it has also counterclaimed for restoration of the expenditure incurred, damages and restitution of fees previously paid, together with interest.

8.      In its Reply and Defence to Counterclaim, the Claimant has (*inter alia*) relied on certain provisions of the Management Agreement (clauses 11.1 and 11.2) as excluding its liability for simple negligence or breach of contract.

**The Management Agreement**

9.    The most relevant terms of the Management Agreement are as follows:

"9.    Termination of the Manager's appointment

9.1    Pursuant to clause 7.4(b) Of the Shareholders' Agreement and subject to a prior arbitral award in favour of the Company where the existence of an Event of Default (defined below) is disputed, the Company shall be entitled to promptly terminate the Manager's appointment under this Agreement and, thereby, this Agreement on the occurrence of any of the following events (each an "Event of Default") by giving written notice to the Manager of such termination within 60 days after the Company and/or the Board becomes aware of such an Event of Default:

(a)    the Manager has engaged in grossly negligent, reckless, fraudulent or wilful misconduct in the performances of it duties under this Agreement;

(b)    the Manager has committed a crime involving fraud and/or financial dishonesty; or

(c)    the Manager has committed a material breach of this Agreement and, in the case of a breach capable of being remedied has failed to remedy such breach within a period of 30 days after being required to do so in writing by the Company.

13.    Arbitration

13.1    Any dispute arising out of or in connection with an Event of Default under clause 9 shall be referred to and finally resolved by arbitration under the rules of the London Court of International Arbitration ("LCIA") which rules are deemed to be incorporated by reference to this clause. The number of arbitrators shall be one who shall be an English barrister or solicitor who has practised as such for at least 15 years, unless the LCIA Court determines that in view of all the circumstances of the case a three-member tribunal is appropriate three. The place and seat of arbitration shall be London, England. The language to be used in the arbitration proceedings shall be English.

17.    Governing Law and Jurisdiction

17.1    This Agreement and the rights, obligations and relationships of the parties hereto under this Agreement shall be governed by and construed in accordance with the laws of England and Wales and the parties irrevocably agree that the courts of England and Wales shall have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement (subject to clause 13 (Arbitration) in relation to disputes under clause 9."

10.    The Management Agreement also contains indemnities and exclusions of liability, at clause 11.  The Claimant contends that, in broad outline, clause 11.1 provides that the Claimant shall have no liability for any loss to the Defendant, howsoever arising in connection with the services performed by the Claimant; and clause 11.2 provides for

the Defendant to grant extensive indemnities for losses suffered by the Claimant. The operation of those clauses is qualified by clause 11.3, which states (so far as material) as follows:

> "The provisions of clauses 11.1 and 11.2 shall not apply, the persons specified in clause 11.1 shall not be exculpated, and no Indemnified Party shall be indemnified in respect of any matter resulting from its fraud ... its gross negligence ...".

**The court's power to stay proceedings**

11.    Section 9 of the Act provides for a mandatory stay of court proceedings, including proceedings brought by way of counterclaim, to the extent that they concern a matter which is to be referred to arbitration:

> "9. Stay of legal proceedings.
>
> (1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.
>
> (2) An application may be made notwithstanding that the matter is to be referred to arbitration only after the exhaustion of other dispute resolution procedures.
>
> (3) An application may not be made by a person before taking the appropriate procedural step (if any) to acknowledge the legal proceedings against him or after he has taken any step in those proceedings to answer the substantive claim.
>
> (4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.
>
> …"

12.    In addition to powers under section 9 of the Act, the court may also grant a stay pursuant to its inherent jurisdiction and case management powers. This inherent jurisdiction is reflected in CPR Rule 3.1(2)(f), which states that the court may "stay the whole or part of any proceedings or judgement either generally or until a specified date or event".

**The Issues**

13.    The principal issues which arise are:

(1)    Whether the relevant allegations in the Defence and Counterclaim are caught by the arbitration agreement.

(2)     If they are, whether the Defendant is entitled to advance those allegations in these proceedings because they are relied on for the purposes of a defence of transaction set-off.

14.     Further issues may then arise depending upon how those questions are determined.

*Issue (1) - Whether the relevant allegations in the Defence and Counterclaim are caught by the arbitration agreement.*

15.     The general approach to the construction of arbitration agreements is that there is a presumption of one stop adjudication as was explained by Lord Hoffmann in *Fiona Trust v Privalov* [2007] UKHL 40, [2007] 4 All ER 951.  The starting point is that the parties, as rational businessmen, are likely to have intended that any dispute arising out of the relationship should be decided by the same tribunal.

16.     However, as was common ground, there is no presumption where, as in the present case, the parties have provided for some disputes to be litigated and others arbitrated. In *Barclays Bank PLC v Nylon Capital LLP* [2011] EWCA Civ 826, [2012] 1 All ER (Comm) 912, which concerned the construction of an expert determination clause, Thomas LJ said (at [27]):

> "In contradistinction expert determination clauses generally presuppose that the parties intended certain types of dispute to be resolved by expert determination and other types by the court (or if there is an arbitration clause by arbitrators). The rationale of the Fiona Trust case does not therefore apply, as the parties have agreed to two types of dispute resolution procedure for disputes which might arise under the agreement. The LLP agreement illustrates this: the parties agreed by cl 26.2 to submit to the exclusive jurisdiction of the English courts, but reserved specific disputes under cl 26.1 to the expert. They carved out of the exclusive jurisdiction of the English courts, to which they had submitted all disputes between the parties, a limited class of dispute. Therefore, quite unlike the position under agreements with arbitration clauses (as exemplified by the <u>Fiona Trust</u> case), the parties have chosen two alternative forms of dispute resolution. There is, therefore, no presumption in favour of giving a wide and generous interpretation to the jurisdiction of the expert conferred by the expert determination clause as the reasoning in the Fiona Trust case is inapplicable. The simple question is whether the dispute which has arisen between the parties is within the jurisdiction of the expert conferred by the expert determination clause or is not within it and is therefore within the jurisdiction of the English court. It is a question of construction with no presumption either way."

17.     In relation to the arbitration clause in the present case, the Claimant stresses that the wording used in clause 13 is expansive – "<u>any</u> dispute arising <u>out of or in connection with</u> an Event of Default".  It submits that it covers not just the narrow situation where one party alleges that there has been an Event of Default and seeks on that basis to terminate the current Management Agreement, but it also covers a claim made by the Defendant that it is entitled to damages or compensation by reference to a matter which qualifies, or potentially qualifies, within the definition of an Event of Default.

18.     In this case the Defendant is claiming damages by reference to facts which qualify or potentially qualify as gross negligence.  Since gross negligence is a specified Event of

Default the Claimant contends that it follows that such allegations must be referred to arbitration.

19.   The Claimant further relies on clause 11 and what it submits is the scheme of clauses 9, 11 and 13 taken together.  It submits that this is that the Claimant is not liable to the Defendant save in respect of the matters referred to in respect of clause 11.3, which include gross negligence on the part of the Claimant.  Gross negligence constitutes an Event of Default under clause 9 and any dispute arising out of or in connection with such an Event of Default is to be referred to arbitration rather than being litigated in the High Court.

20.   The Defendant's case is that clause 13 arbitration only applies where the Defendant has given notice of termination under clause 9 on the grounds of an alleged Event of Default.  It is the giving of such notice that serves to elicit from the Claimant whether the existence of an Event of Default is disputed and, accordingly, whether the Defendant needs to secure a "prior arbitral award" in order to render its notice of termination effectual.  It is only in those limited circumstances that there is a carve-out from the general position that disputes should be litigated in accordance with the non-exclusive jurisdiction clause, clause 17.

21.   The Defendant relies in particular on the following:

(1)   Clause 13 does not simply refer to an Event of Default; it refers to an Event of Default "under Clause 9".

(2)   Clause 9, as its content make clear, is exclusively concerned with termination.

(3)   Clause 9 lays down a specific mechanism for termination whereby the Defendant as a first step gives notice of termination following an Event of Default.  If the Claimant disputes the existence of an Event of Default, then the Defendant must, as a second step, obtain a "prior arbitral award" in its favour.  It would appear that the notice of termination only takes effect once the arbitral tribunal has issued a favourable award.

(4)   The arbitration agreement in clause 13 is the means by which, as part of the second step, the Defendant may seek to obtain an arbitral award confirming the existence of an Event of Default.

(5)   Clause 9 says that gross negligence (among other things) is a ground for termination, but it does not purport to deal with claims for damages based, amongst other things, upon allegations of gross negligence, which do not arise in the context of a disputed notice of termination.  Thus, a dispute about whether the Claimant must pay damages for its grossly negligent conduct, and in what amount, is not a dispute arising out of or in connection with an Event of Default "under clause 9" at all.

(6)   That the cross-reference in clause 13 to "clause 9" was deliberate is supported by the fact that clause 17 makes a similar cross-reference: the carve-out for arbitration is expressed using the words "subject to clause 13 (Arbitration) in relation to disputes under clause 9".

22.   I prefer the Defendant's construction of the agreement for the reasons given by it and in particular:

(1)    The starting point is that clause 13 only applies in relation to disputes in connection with an Event of Default.

(2)    An Event of Default is a defined term for the purpose of clause 9, and for that purpose only.

(3)    Clause 9 is concerned with termination and the only contractual circumstance in which it is necessary to establish an Event of Default is for the purpose of exercising a right of termination under that clause.

(4)    In the present case no right of termination is being claimed and no allegation or averment of an Event of Default needs to be or is being made.

(5)    Since no Event of Default is being alleged, there is and can be no dispute in connection with an Event of Default.

(6)    There is accordingly no dispute within the meaning of clause 13.1.

23.    I agree with the Defendant that clause 13 is concerned with resolving disputes about the right to terminate under clause 9.  I also agree that such a carve-out makes good commercial sense.  It enables an important but defined dispute to be dealt with by a relatively speedy means (LCIA arbitration) with no right of appeal in law.  It avoids the resolution of that dispute being caught up with other disputes which may arise between the parties generally.

24.    The Claimant's construction involves rewriting the clause.  On their case clause 13 covers not disputes in connection with an Event of Default, but rather disputes in connection with allegations which might support a claim that there has been an Event of Default, even though it is not being asserted or claimed that there has been any Event of Default.

25.    In support of its case the Claimant submits that on the Defendant's construction the arbitration provision could be circumvented because the Defendant could, for example, bring and establish claims for gross negligence and, having done so, immediately terminate, there then being no need to arbitrate since its right would already be established.  However, as the Defendant points out, this scenario is most unlikely to arise as under clause 9 the Defendant is required to give notice of termination within 60 days of becoming aware of an Event of Default.

26.    The Claimant further submits that the Defendant's construction would leave it free to bring, for example, gross negligence damages claims in court and gross negligence termination claims in arbitration, a duplication which cannot sensibly have been intended.  However, in a case where the Defendant is asserting a disputed right to terminate on the grounds of an Event of Default it may well be that disputed claims for damages arising out of that same Event of Default would be regarded as arising in connection with an Event of Default.  However, that is not this case.

27.    The Defendant's construction results in a coherent contractual scheme whereby there is a limited and defined carve-out to arbitration of the specific issue of disputes in connection with whether there has been an Event of Default for the purpose of termination under clause 9.  All other disputes are covered by the jurisdiction clause.

28.    By contrast, the Claimant's construction produces incoherence and confusion.  In many cases, as the present case illustrates, a claim by the Defendant may be based on

allegations of breach, some of which would amount to an Event of Default within clause 9 and some of which would not. As the present case also illustrates, the same facts may found those differing allegations of breach. On the Claimant's case, some of those claims have to be arbitrated, but others do not.

29.     The Claimant suggests that there are unlikely to be claims for breaches of contract or duty that do not involve gross negligence or serious misconduct by reason of the clause 11 exclusions. However, the ambit of that clause is very much in issue and the present case illustrates that other claims may indeed be brought. Further, on any view such claims may be brought by way of set-off. In any event this does not avoid the problem that they are not covered by the arbitration clause.

30.     To seek to mitigate such difficulties the Claimant suggests that claims in ordinary negligence also have to be arbitrated because such claims would be encompassed in gross negligence claims. However, that is not their pleaded case. In their Reply clause 13 is only said to apply to allegations of gross negligence, fraudulent or wilful misconduct. As the pleading recognises, even if clause 13 covers allegations which would amount to an Event of Default (were that being alleged) that would still not cover claims in simple negligence or simple breach of contract, or, for that matter, breach of mandate.

31.     It would, as the Defendant submits, be unworkable if these different allegations had to be artificially disentangled and separately adjudicated. This was indeed acknowledged by the Claimant in its supporting evidence and was the basis of its application for a stay under the inherent jurisdiction of the court. As was stated:

> "The allegations of gross negligence form part of the Defendant's breach of contract case. They are inextricably linked with the allegations of negligence, and the breach of contract, more generally. In the circumstances, it would be unworkable for the allegations of breach of contract to be litigated in court, with the specific part of those allegations concerning gross negligence stripped out and addressed in a different forum…"

32.     This all serves to reinforce the conclusion that clause 13 was never intended to apply to any allegation of gross negligence, howsoever arising, but only to an allegation of gross negligence relied upon as an Event of Default to justify a notice of termination.

33.     As the Defendant further submits, insofar as clause 13 may be open to more than one construction, its construction is more consistent with business common sense and should be preferred: *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2012] 1 All ER 1137.

34.     For all these reasons I conclude that clause 13 does not apply to the claims made by the Defendant in this case and therefore no question of stay arises.

*Issue (2) - whether the Defendant is entitled to advance those allegations in these proceedings because they are relied on for the purposes of a defence of transaction set-off.*

35.     This only arises for decision if I am wrong on issue (1).

36.     The general position in relation to defences of transaction set-off is summarised by Professor Merkin's *Arbitration Law* (2012) at para 8.29(b):

"If C has a claim against D which is not governed by an arbitration clause, and D has a counterclaim against C which is governed by an arbitration clause and which gives rise to a transaction set-off, C is not entitled to a stay of D's counterclaim in any proceedings brought by C.  Instead, the court is entitled to resolve the dispute which gave rise to the counterclaim in order to allow D's defence to be recognised.  The effect is to override C's right to insist upon arbitration in respect of the counterclaim."

37.   This reflects the authorities.  In *Aectra Refining v Exmar NV* [1995] 1 All ER 641, the issue was whether, on a claim to enforce an arbitral award, the award debtor could set off sums which it contended to be due under a separate contract and which was subject to a separate arbitration.  The award creditor argued that, in order to be available as a set-off, the cross-claim had to be capable of being litigated in the court in which the set-off was pleaded.

38.   Hoffmann LJ said it was necessary to distinguish between "independent set-off" and "transaction set-off": the former does not require any relationship between the transactions out of which the cross claims arise, whereas transaction set-off is a cross-claim arising out of the same transaction or one so closely related that it operates in law or in equity as a complete or partial defeasance of the claim.

39.   In the case of transaction set-off, Hoffmann LJ observed that that the authorities favoured allowing the set-off to be pleaded; notwithstanding its submission to arbitration and that this obviously makes good sense.  As he stated at 685c-g:

"In the case of transaction set-off, the authorities are in favour of allowing the set-off to be pleaded, notwithstanding its submission to arbitration or a different jurisdiction. *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd. [1974] A.C. 689* concerned the question of whether a *Mondel v. Steel*, 8 M. & W. 858 abatement for defective work could be pleaded as a defence to a claim by a builder for payment under an architect's certificate. The House of Lords decided that it could, notwithstanding that the contract provided for arbitration on the question of whether the work was defective. Lord Diplock *[1974] A.C. 689*, 720 said that the contractor could apply for the stay of his own action pending arbitration but if he did not "the court would have to decide on the evidence adduced before it whether the defence was made out." Lord Salmon said, at p. 726, that it would "emasculate" the right of set-off if the courts were to say to the defendant, "Pay up now and arbitrate later." Likewise in *Meeth v. Glacetal S.a.r.l. (Case 23/78) [1978] E.C.R. 2133* the Court of Justice of the European Communities decided that a German buyer of glass, sued for the price in a German court by the French seller, could plead a set-off for delays and defaults by the seller notwithstanding a choice of jurisdiction clause valid under article 17 which said that each party could be sued only in his own jurisdiction.

In cases of transaction set-off, this obviously makes good sense. *Mondel v. Steel (1841) 8 M. & W. 858* is, as Lord Diplock emphasised in *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd. [1974] A.C. 689* , 717, "no mere procedural rule designed to avoid circuity of action but a substantive defence at common law." The same is true of set-off in equity. The defendant is pleading a confession and avoidance to the plaintiff's claim. He is

saying that, although the facts alleged by the plaintiff entitle him to judgment for the amount claimed, a wider examination of related facts would show that the claim is wholly or partly extinguished. It would be quite unreasonable for a plaintiff who has chosen to sue in one forum to rely upon an arbitration or jurisdiction clause to confine the court to the facts which he chooses to prove and prevent it from examining related facts as well."

40. It may be that the reason why there is no mandatory stay under s.9 in such a case is that the deployment of a set-off by way of substantive defence does not involve the bringing of legal proceedings within the meaning of s. 9, whether by way of claim or counterclaim, even though the set-off may be pleaded within the confines of a pleading described as a counterclaim: *Prekons Insaat Sanayi v Rowlands Castle Contracting Group* [2006] EWHC 1367 (Comm) at [11].

41. In the present case the defence of set-off invoked by the Defendant is one of transaction set-off, and not an independent set-off.  The Claimant acknowledges that if there is a right of transaction set off then it may be relied upon as a defence.  It disputes, however, that any such right arises in this case.

42. The Defendant contends that it has a right of equitable set-off, a form of transaction set-off.  It relies on the explanation of equitable set-off set out by Rix LJ in his judgment in *Geldof Metaalconstructie v Simon Carves* [2010] EWCA Civ 667, [2010] 4 All ER 847.  At [43] he states that the test for an equitable set-off  has a formal and a functional requirement: the formal requirement is of a close connection between claim and cross-claim and the functional requirement is that it needs to be unjust to enforce the claim without taking into account the cross-claim.

43. These requirements may be satisfied even though the claim and cross-claim do not arise from the same contract or transaction: see *Bim Kemi AB v Blackburn Chemicals Ltd* [2001] EWCA Civ 457, [2001] 2 Lloyd's Rep 93.  Where, as in the present case, they do arise from the same contract, then the Defendant submits that they are likely to be and in this case are met.  In this connection the Defendant relies in particular on Rix LJ's statement in *Geldof* at 848j that "where a case concerns a claim and cross-claim arising out of the same contract, although that fact is not in itself enough to ensure an equitable set-off, it is on the whole likely to take a special rule excluding set-off, such as the rules about freight, rent and cheques".  The Defendant also relies on *Derham on Set-Off* at 4.91 where it is stated:

> "Under more modern formulations of the principle governing equitable set-off approved by English courts, cross claims arising out of the same contract <u>ordinarily</u> would give rise to a set-off.  Nevertheless, it is still the case that there is no universal rule that claims arising out of the same contract may be set against each other in all circumstances." (emphasis added)

44. The Claimant submits that in this case neither the formal nor the functional requirements are satisfied.  It points out that its claim for fees is based on services provided from the last quarter of 2010 onwards.  The Defendant's cross-claim relates to matters which occurred some years before that and has no, or no sufficient connection, with the Claimant's claim for fees so as to give rise to the injustice necessary to found a right of equitable set-off.  It relies by analogy on cases in which employees have been held entitled to claim wages notwithstanding allegations of earlier misconduct, such as *Miles v Wakefield MBC* [1987] ICR 368; *Sim v Rotherham*

*MBC* [1990] ICR 383*; New Centurion Trust Ltd. V Welch and Another* [1990] ICR 383.

45.   The Defendant disputes the relevance of the wages cases and points out that they are mainly concerned with a failure or refusal to work as opposed to a cross claim for damages. In any event it submits that they are a special case and involve a legislative background. I consider, however, that there is force in the Claimant's fundamental point that they cannot be required to go on providing services for no fee on the grounds of alleged misconduct which is long past. On the Defendant's case, given the quantum of its counterclaim, not only has the Claimant been obliged so to do, but it is obliged to go on doing so indefinitely.

46.   I am reluctant finally to decide this issue as it involves determination of whether or not there is a particular right of defence and it is likely to require a consideration of issues of fact. In particular, it is the Defendant's case that there has been an ongoing breach of contract by the Claimant in failing to inform it of the matters which give rise to its claim. But for that breach of duty the claim might well have been raised when there was a co-incidence in time between the fees claimed and the events founding the counterclaim. This may well be relevant to considerations of justice and the functional requirement. I am inclined to the view that this is the type of case in which the mere fact that the cross-claim arises out of the same contract is unlikely to be sufficient to establish the injustice necessary to found a right of equitable set-off and that further facts will need to be established. However, since it is not necessary to express a final view on the matter, I do not propose to do so.

47.   In the light of my conclusions on Issue (1) it is not necessary to consider either side's application for a stay under the court's inherent jurisdiction.

**Conclusion**

48.   In conclusion, for the reasons outlined above, the allegations made in the Defence and Counterclaim are not caught by the arbitration agreement and the Claimant's application for a stay is accordingly to be dismissed.

**Introduction**

49.   There are two applications before the Court.

50.   The first is an application by the Claimant for a stay of part of the Defendant's Counterclaim under section 9 of the Arbitration Act 1996 ("the Act") and/or pursuant to the court's inherent jurisdiction on the grounds that it relates to matters covered by an arbitration clause. In addition the Claimant seeks an order that the Defendant be debarred from relying on the like allegations by way of defence.

51.   The second is a contingent cross-application by the Defendant for a stay of the Claimant's claim pursuant to the court's inherent jurisdiction in the event that it was minded to grant the Claimant's stay application.

**Factual Background**

52.    The Defendant is incorporated in Bahrain and has carried on business since 2006 as an investment company investing in hotel properties and businesses.  The Claimant is its investment manager.

53.    The relationship between the parties is regulated by a Management Agreement originally made on 21 July 2006 and subsequently amended on 4 June 2008 and again on 14 October 2010.  For present purposes, nothing turns on the amendments.

54.    In these proceedings the Claimant contends that it is entitled to payment of Management Fees pursuant to clause 7 of the Management Agreement, calculated as a percentage of the sums invested by the Defendant's shareholders.  It contends that these fees have accrued due on a quarterly basis since 31 December 2010 and that the sum currently outstanding is US$8,942,850.

55.    The Defendant denies that any sums are due.  It contends, in broad summary, that the accrual of any fees is dependent on the provision of commensurately valuable services by the Claimant, and that this has not occurred.  The Defendant further contends that the Claimant has caused the Defendant substantial loss and damage as a result of its alleged mismanagement of a transaction for the purchase of a plot of land in Cairo for the construction of a hotel in 2007-09.  The Defendant's case is that the Claimant caused expenditure of about US$24.9m to be incurred in relation to the Cairo property, including the cost of its purported acquisition, but without obtaining good title to the land and without promptly registering such title as may have been acquired and generally acting with gross negligence.  The Defendant contends, *inter alia*, that the Claimant's conduct (a) was beyond the Claimant's contractual mandate (Defence, paras 24-5), (b) involved a failure to exercise reasonable care and skill (Defence, paras 26, 30, 31) and (c) amounted to gross negligence (ibid).  The Defendant seeks to rely on these matters in support of a defence of set-off (Defence, para 45) and it has also counterclaimed for restoration of the expenditure incurred, damages and restitution of fees previously paid, together with interest.

56.    In its Reply and Defence to Counterclaim, the Claimant has (*inter alia*) relied on certain provisions of the Management Agreement (clauses 11.1 and 11.2) as excluding its liability for simple negligence or breach of contract.

**The Management Agreement**

57.    The most relevant terms of the Management Agreement are as follows:

"9.    Termination of the Manager's appointment

9.1    Pursuant to clause 7.4(b) Of the Shareholders' Agreement and subject to a prior arbitral award in favour of the Company where the existence of an Event of Default (defined below) is disputed, the Company shall be entitled to promptly terminate the Manager's appointment under this Agreement and, thereby, this Agreement on the occurrence of any of the following events (each an "Event of Default") by giving written notice to the Manager of such termination within 60 days after the Company and/or the Advisory Committee becomes aware of such an Event of Default:

(d)    the Manager has engaged in grossly negligent, reckless, fraudulent or wilful misconduct in the performances of it duties under this Agreement;

(e)     the Manager has committed a crime involving fraud and/or financial dishonesty; or

(f)     the Manager has committed a material breach of this Agreement and, in the case of a breach capable of being remedied has failed to remedy such breach within a period of 30 days after being required to do so in writing by the Company.

13.     Arbitration

13.1    Any dispute arising out of or in connection with an Event of Default under clause 9 shall be referred to and finally resolved by arbitration under the rules of the London Court of International Arbitration ("LCIA") which rules are deemed to be incorporated by reference to this clause. The number of arbitrators shall be one who shall be an English barrister or solicitor who has practised as such for at least 15 years, unless the LCIA Court determines that in view of all the circumstances of the case a three-member tribunal is appropriate three. The place and seat of arbitration shall be London, England. The language to be used in the arbitration proceedings shall be English.

17.     Governing Law and Jurisdiction

17.2    This Agreement and the rights, obligations and relationships of the parties hereto under this Agreement shall be governed by and construed in accordance with the laws of England and Wales and the parties irrevocably agree that the courts of England and Wales shall have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement (subject to clause 13 (Arbitration) in relation to disputes under clause 9."

58.    The Management Agreement also contains indemnities and exclusions of liability, at clause 11.  The Claimant contends that, in broad outline, clause 11.1 provides that the Claimant shall have no liability for any loss to the Defendant, howsoever arising in connection with the services performed by the Claimant; and clause 11.2 provides for the Defendant to grant extensive indemnities for losses suffered by the Claimant.  The operation of those clauses is qualified by clause 11.3, which states (so far as material) as follows:

"The provisions of clauses 11.1 and 11.2 shall not apply, the persons specified in clause 11.1 shall not be exculpated, and no Indemnified Party shall be indemnified in relation to any matter resulting from its fraud ... its gross negligence ...".

**The court's power to stay proceedings**

59.    Section 9 of the Act provides for a mandatory stay of court proceedings, including proceedings brought by way of counterclaim, to the extent that they concern a matter which is to be referred to arbitration:

"9. Stay of legal proceedings.

(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.

(2) An application may be made notwithstanding that the matter is to be referred to arbitration only after the exhaustion of other dispute resolution procedures.

(3) An application may not be made by a person before taking the appropriate procedural step (if any) to acknowledge the legal proceedings against him or after he has taken any step in those proceedings to answer the substantive claim.

(4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.

…"

60.    In addition to powers under section 9 of the Act, the court may also grant a stay pursuant to its inherent jurisdiction and case management powers.  This inherent jurisdiction is reflected in CPR Rule 3.1(2)(f), which states that the court may "stay the whole or part of any proceedings or judgement either generally or until a specified date or event".

**The Issues**

61.    The principal issues which arise are:

(1)    Whether the relevant allegations in the Defence and Counterclaim are caught by the arbitration agreement.

(2)    If they are, whether the Defendant is entitled to advance those allegations in these proceedings because they are relied on for the purposes of a defence of transaction set-off.

62.    Further issues may then arise depending upon how those questions are determined.

*Issue (1) - Whether the relevant allegations in the Defence and Counterclaim are caught by the arbitration agreement.*

63.    The general approach to the construction of arbitration agreements is that there is a presumption of one stop adjudication as was explained by Lord Hoffmann in *Fiona Trust v Privalov* [2007] UKHL 40, [2007] 4 All ER 951.  The starting point is that the parties, as rational businessmen, are likely to have intended that any dispute arising out of the relationship should be decided by the same tribunal.

64.    However, as was common ground, there is no presumption where, as in the present case, the parties have provided for some disputes to be litigated and others arbitrated.  In *Barclays Bank PLC v Nylon Capital LLP* [2011] EWCA Civ 826, [2012] 1 All ER

(Comm) 912, which concerned the construction of an expert determination clause, Thomas LJ said (at [27]):

> "In contradistinction expert determination clauses generally presuppose that the parties intended certain types of dispute to be resolved by expert determination and other types by the court (or if there is an arbitration clause by arbitrators). The rationale of the Fiona Trust case does not therefore apply, as the parties have agreed to two types of dispute resolution procedure for disputes which might arise under the agreement. The LLP agreement illustrates this: the parties agreed by cl 26.2 to submit to the exclusive jurisdiction of the English courts, but reserved specific disputes under cl 26.1 to the expert. They carved out of the exclusive jurisdiction of the English courts, to which they had submitted all disputes between the parties, a limited class of dispute. Therefore, quite unlike the position under agreements with arbitration clauses (as exemplified by the Fiona Trust case), the parties have chosen two alternative forms of dispute resolution. There is, therefore, no presumption in favour of giving a wide and generous interpretation to the jurisdiction of the expert conferred by the expert determination clause as the reasoning in the Fiona Trust case is inapplicable. The simple question is whether the dispute which has arisen between the parties is within the jurisdiction of the expert conferred by the expert determination clause or is not within it and is therefore within the jurisdiction of the English court. It is a question of construction with no presumption either way."

65.    In relation to the arbitration clause in the present case, the Claimant stresses that the wording used in clause 13 is expansive – "any dispute arising out of or in connection with an Event of Default".  It submits that it covers not just the narrow situation where one party alleges that there has been an Event of Default and seeks on that basis to terminate the current Management Agreement, but it also covers a claim made by the Defendant that it is entitled to damages or compensation by reference to a matter which qualifies, or potentially qualifies, within the definition of an Event of Default.

66.    In this case the Defendant is claiming damages by reference to facts which qualify or potentially qualify as gross negligence.  Since gross negligence is a specified Event of Default the Claimant contends that it follows that such allegations must be referred to arbitration.

67.    The Claimant further relies on clause 11 and what it submits is the scheme of clauses 9, 11 and 13 taken together.  It submits that this is that the Claimant is not liable to the Defendant save in respect of the matters referred to in respect of clause 11.3, which include gross negligence on the part of the Claimant.  Gross negligence constitutes an Event of Default under clause 9 and any dispute arising out of or in connection with such an Event of Default is to be referred to arbitration rather than being litigated in the High Court.

68.    The Defendant's case is that clause 13 arbitration only applies where the Defendant has given notice of termination under clause 9 on the grounds of an alleged Event of Default.  It is the giving of such notice that serves to elicit from the Claimant whether the existence of an Event of Default is disputed and, accordingly, whether the Defendant needs to secure a "prior arbitral award" in order to render its notice of termination effectual.  It is only in those limited circumstances that there is a carve-

out from the general position that disputes should be litigated in accordance with the non-exclusive jurisdiction clause, clause 17.

69.    The Defendant relies in particular on the following:

(1)    Clause 13 does not simply refer to an Event of Default; it refers to an Event of Default "under Clause 9".

(2)    Clause 9, as its content make clear, is exclusively concerned with termination.

(3)    Clause 9 lays down a specific mechanism for termination whereby the Defendant as a first step gives notice of termination following an Event of Default.  If the Claimant disputes the existence of an Event of Default, then the Defendant must, as a second step, obtain a "prior arbitral award" in its favour.  It would appear that the notice of termination only takes effect once the arbitral tribunal has issued a favourable award.

(4)    The arbitration agreement in clause 13 is the means by which, as part of the second step, the Defendant may seek to obtain an arbitral award confirming the existence of an Event of Default.

(5)    Clause 9 says that gross negligence (among other things) is a ground for termination, but it does not purport to deal with claims for damages based, amongst other things, upon allegations of gross negligence, which do not arise in the context of a disputed notice of termination.  Thus, a dispute about whether the Claimant must pay damages for its grossly negligent conduct, and in what amount, is not a dispute arising out of or in connection with an Event of Default "under clause 9" at all.

(6)    That the cross-reference in clause 13 to "clause 9" was deliberate is supported by the fact that clause 17 makes a similar cross-reference: the carve-out for arbitration is expressed using the words "subject to clause 13 (Arbitration) in relation to disputes under clause 9".

70.    I prefer the Defendant's construction of the agreement for the reasons given by it and in particular:

(1)    The starting point is that clause 13 only applies in relation to disputes in connection with an Event of Default.

(2)    An Event of Default is a defined term for the purpose of clause 9, and for that purpose only.

(3)    Clause 9 is concerned with termination and the only contractual circumstance in which it is necessary to establish an Event of Default is for the purpose of exercising a right of termination under that clause.

(4)    In the present case no right of termination is being claimed and no allegation or averment of an Event of Default needs to be or is being made.

(5)    Since no Event of Default is being alleged, there is and can be no dispute in connection with an Event of Default.

(6)    There is accordingly no dispute within the meaning of clause 13.1.

71. I agree with the Defendant that clause 13 is concerned with resolving disputes about the right to terminate under clause 9. I also agree that such a carve-out makes good commercial sense. It enables an important but defined dispute to be dealt with by a relatively speedy means (LCIA arbitration) with no right of appeal in law. It avoids the resolution of that dispute being caught up with other disputes which may arise between the parties generally.

72. The Claimant's construction involves rewriting the clause. On their case clause 13 covers not disputes in connection with an Event of Default, but rather disputes in connection with allegations which might support a claim that there has been an Event of Default, even though it is not being asserted or claimed that there has been any Event of Default.

73. In support of its case the Claimant submits that on the Defendant's construction the arbitration provision could be circumvented because the Defendant could, for example, bring and establish claims for gross negligence and, having done so, immediately terminate, there then being no need to arbitrate since its right would already be established. However, as the Defendant points out, this scenario is most unlikely to arise as under clause 9 the Defendant is required to give notice of termination within 60 days of becoming aware of an Event of Default.

74. The Claimant further submits that the Defendant's construction would leave it free to bring, for example, gross negligence damages claims in court and gross negligence termination claims in arbitration, a duplication which cannot sensibly have been intended. However, in a case where the Defendant is asserting a disputed right to terminate on the grounds of an Event of Default it may well be that disputed claims for damages arising out of that same Event of Default would be regarded as arising in connection with an Event of Default. However, that is not this case.

75. The Defendant's construction results in a coherent contractual scheme whereby there is a limited and defined carve-out to arbitration of the specific issue of disputes in connection with whether there has been an Event of Default for the purpose of termination under clause 9. All other disputes are covered by the jurisdiction clause.

76. By contrast, the Claimant's construction produces incoherence and confusion. In many cases, as the present case illustrates, a claim by the Defendant may be based on allegations of breach, some of which would amount to an Event of Default within clause 9 and some of which would not. As the present case also illustrates, the same facts may found those differing allegations of breach. On the Claimant's case, some of those claims have to be arbitrated, but others do not.

77. The Claimant suggests that there are unlikely to be claims for breaches of contract or duty that do not involve gross negligence or serious misconduct by reason of the clause 11 exclusions. However, the ambit of that clause is very much in issue and the present case illustrates that other claims may indeed be brought. Further, on any view such claims may be brought by way of set off. In any event this does not avoid the problem that they are not covered by the arbitration clause.

78. To seek to mitigate such difficulties the Claimant suggests that claims in ordinary negligence also have to be arbitrated because such claims would be encompassed in gross negligence claims. However, that is not their pleaded case. In their Reply clause 13 is only said to apply to allegations of gross negligence, fraudulent or wilful misconduct. As the pleading recognises, even if clause 13 covers allegations which

would amount to an Event of Default (were that being alleged) that would still not cover claims in simple negligence or simple breach of contract, or, for that matter, breach of mandate.

79. It would, as the Defendant submits, be unworkable if these different allegations had to be artificially disentangled and separately adjudicated. This was indeed acknowledged by the Claimant in its supporting evidence and was the basis of its application for a stay under the inherent jurisdiction of the court. As was stated:

> "The allegations of gross negligence form part of the Defendant's breach of contract case. They are inextricably linked with the allegations of negligence, and the breach of contract, more generally. In the circumstances, it would be unworkable for the allegations of breach of contract to be litigated in court, with the specific part of those allegations concerning gross negligence stripped out and addressed in a different forum…"

80. This all serves to reinforce the conclusion that clause 13 was never intended to apply to any allegation of gross negligence, howsoever arising, but only to an allegation of gross negligence relied upon as an Event of Default to justify a notice of termination.

81. As the Defendant further submits, insofar as clause 13 may be open to more than one construction, its construction is more consistent with business common sense and should be preferred: *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2012] 1 All ER 1137.

82. For all these reasons I conclude that clause 13 does not apply to the claims made by the Defendant in this case and therefore no question of stay arises.

*Issue (2) - whether the Defendant is entitled to advance those allegations in these proceedings because they are relied on for the purposes of a defence of transaction set-off.*

83. This only arises for decision if I am wrong on issue (1).

84. The general position in relation to defences of transaction set off is summarised by Professor Merkin's *Arbitration Law* (2012) at para 8.29(b):

> "If C has a claim against D which is not governed by an arbitration clause, and D has a counterclaim against C which is governed by an arbitration clause and which gives rise to a transaction set-off, C is not entitled to a stay of D's counterclaim in any proceedings brought by C. Instead, the court is entitled to resolve the dispute which gave rise to the counterclaim in order to allow D's defence to be recognised. The effect is to override C's right to insist upon arbitration in respect of the counterclaim."

85. This reflects the authorities. In *Aectra Refining v Exmar NV* [1995] 1 All ER 641, the issue was whether, on a claim to enforce an arbitral award, the award debtor could set off sums which it contended to be due under a separate contract and which was subject to a separate arbitration. The award creditor argued that, in order to be available as a set-off, the cross-claim had to be capable of being litigated in the court in which the set-off was pleaded.

86. Hoffmann LJ said it was necessary to distinguish between "independent set-off" and "transaction set-off": the former does not require any relationship between the transactions out of which the cross claims arise, whereas transaction set-off is a cross-

claim arising out of the same transaction or one so closely related that it operates in law or in equity as a complete or partial defeasance of the claim.

87.  In the case of transaction set-off, Hoffmann LJ observed that that the authorities favoured allowing the set-off to be pleaded; notwithstanding its submission to arbitration and that this obviously makes good sense.  As he stated at 685c-g:

> "In the case of transaction set-off, the authorities are in favour of allowing the set-off to be pleaded, notwithstanding its submission to arbitration or a different jurisdiction. *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd. [1974] A.C. 689* concerned the question of whether a *Mondel v. Steel*, 8 M. & W. 858 abatement for defective work could be pleaded as a defence to a claim by a builder for payment under an architect's certificate. The House of Lords decided that it could, notwithstanding that the contract provided for arbitration on the question of whether the work was defective. Lord Diplock *[1974] A.C. 689*, 720 said that the contractor could apply for the stay of his own action pending arbitration but if he did not "the court would have to decide on the evidence adduced before it whether the defence was made out." Lord Salmon said, at p. 726, that it would "emasculate" the right of set-off if the courts were to say to the defendant, "Pay up now and arbitrate later." Likewise in *Meeth v. Glacetal S.a.r.l. (Case 23/78) [1978] E.C.R. 2133* the Court of Justice of the European Communities decided that a German buyer of glass, sued for the price in a German court by the French seller, could plead a set-off for delays and defaults by the seller notwithstanding a choice of jurisdiction clause valid under article 17 which said that each party could be sued only in his own jurisdiction.
>
> In cases of transaction set-off, this obviously makes good sense. *Mondel v. Steel (1841) 8 M. & W. 858* is, as Lord Diplock emphasised in *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd. [1974] A.C. 689*, 717, "no mere procedural rule designed to avoid circuity of action but a substantive defence at common law." The same is true of set-off in equity. The defendant is pleading a confession and avoidance to the plaintiff's claim. He is saying that, although the facts alleged by the plaintiff entitle him to judgment for the amount claimed, a wider examination of related facts would show that the claim is wholly or partly extinguished. It would be quite unreasonable for a plaintiff who has chosen to sue in one forum to rely upon an arbitration or jurisdiction clause to confine the court to the facts which he chooses to prove and prevent it from examining related facts as well."

88.  It may be that the reason why there is no mandatory stay under s.9 in such a case is that the deployment of a set-off by way of substantive defence does not involve the bringing of legal proceedings within the meaning of s. 9, whether by way of claim or counterclaim, even though the set-off may be pleaded within the confines of a pleading described as a counterclaim: *Prekons Insaat Sanayi v Rowlands Castle Contracting Group* [2006] EWHC 1367 (Comm) at [11].

89.  In the present case the defence of set-off invoked by the Defendant is one of transaction set-off, and not an independent set-off.  The Claimant acknowledges that if there is a right of transaction set off then it may be relied upon as a defence.  It disputes, however, that any such right arises in this case.

90.     The Defendant contends that it has a right of equitable set off, a form of transaction set off.  It relies on the explanation of equitable set off set out by Rix LJ in his judgment in *Geldof Metaalconstructie v Simon Carves* [2010] EWCA Civ 667, [2010] 4 All ER 847.  At [43] he states that the test for an equitable set-off  has a formal and a functional requirement: the formal requirement is of a close connection between claim and cross-claim and the functional requirement is that it needs to be unjust to enforce the claim without taking into account the cross-claim.

91.     These requirements may be satisfied even though the claim and cross-claim do not arise from the same contract or transaction: see *Bim Kemi AB v Blackburn Chemicals Ltd* [2001] EWCA Civ 457, [2001] 2 Lloyd's Rep 93.  Where, as in the present case, they do arise from the same contract, then the Defendant submits that they are likely to be and in this case are met.  In this connection the Defendant relies in particular on Rix LJ's statement in *Geldof* at 848j that "where a case concerns a claim and cross-claim arising out of the same contract, although that fact is not in itself enough to ensure an equitable set off, such as the rules about freight, rent and cheques".  The Defendant also relies on *Derham on Set Off* at 4.91 where it is stated:

>       "Under more modern formulations of the principle governing equitable set-off approved by English courts, cross claims arising out of the same contract ordinarily would give rise to a set-off.  Nevertheless, it is still the case that there is no universal rule that claims arising out of the same contract may be set against each other in all circumstances." (emphasis added)

92.     The Claimant submits that in this case neither the formal nor the functional requirements are satisfied.  It points out that its claim for fees is based on services provided from the last quarter of 2010 onwards.  The Defendant's cross-claim relates to matters which occurred some years before that and has no, or no sufficient connection, with the Claimant's claim for fees so as to give rise to the injustice necessary to found a right of equitable set off.  It relies by analogy on cases in which employees have been held entitled to claim wages notwithstanding allegations of earlier misconduct, such as *Miles v Wakefield MBC* [1987] ICR 368; *Sim v Rotherham MBC* [1990] ICR 383*; New Centurion Trust Ltd. V Welch and Another* [1990] ICR 383.

93.     The Defendant disputes the relevance of the wages cases and points out that they are mainly concerned with a failure or refusal to work as opposed to a cross claim for damages.  In any event it submits that they are a special case and involve a legislative background.  I consider, however, that there is force in the Claimant's fundamental point that they cannot be required to go on providing services for no fee on the grounds of alleged misconduct which is long past.  On the Defendant's case, given the quantum of its counterclaim, not only has the Claimant been obliged so to do, but it is obliged to go on doing so indefinitely.

94.     I am reluctant finally to decide this issue as it involves determination of whether or not there is a particular right of defence and it is likely to require a consideration of issues of fact.  In particular, it is the Defendant's case that there has been an ongoing breach of contract by the Claimant in failing to inform it of the matters which give rise to its claim.  But for that breach of duty the claim might well have been raised when there was a co-incidence in time between the fees claimed and the events founding the counterclaim.  This may well be relevant to considerations of justice and the functional requirement.  I am inclined to the view that this is the type of case in

which the mere fact that the cross-claim arises out of the same contract is unlikely to be sufficient to establish the injustice necessary to found a right of equitable set off and that further facts will need to be established.  However, since it is not necessary to express a final view on the matter, I do not propose to do so.

95.    In the light of my conclusions on Issue (1) it is not necessary to consider either side's application for a stay under the court's inherent jurisdiction.

**Conclusion**

96.    In conclusion, for the reasons outlined above, the allegations made in the Defence and Counterclaim are not caught by the arbitration agreement and the Claimant's application for a stay is accordingly to be dismissed.

**1 Ch.**  CHANCERY DIVISION.  881

to Mrs. Connell and will not form part of the estate of Mr. Benett.

Solicitors for plaintiff and the defendant M. W. Connell: *Foyer & Co.*

Solicitors for the defendant W. C. Benett: *Rose, Johnson & Hicks.*

Solicitors for the other defendants: *Martineau & Reid.*

F. E.

[Compare *In re Currie's Settlement* [1910] 1 Ch. 329.—F. E.]

SARGANT J.
1915

CONNELL'S
SETTLEMENT,
*In re.*

BENETT'S
TRUSTS,
*In re.*

FAIR
*v.*
CONNELL.

---

HICKMAN *v.* KENT OR ROMNEY MARSH SHEEP-BREEDERS' ASSOCIATION.

[1914 H. 3037.]

ASTBURY J.
1915

*March* 4, 25, 31.

*Company—Articles—Contract—Action by Member to enforce his Ordinary Rights—Arbitration Clause—Application by Company to stay—Sufficient Submission—Arbitration Act,* 1889 (52 & 53 Vict. c. 49), ss. 4, 27—*Companies (Consolidation) Act,* 1908 (8 Edw. 7, c. 69), s. 14, sub-s. 1.

The true interpretation of the apparently conflicting decisions and dicta on s. 16 of the Companies Act, 1862 (25 & 26 Vict. c. 89), re-enacted by s. 14, sub-s. 1, of the Companies (Consolidation) Act, 1908, is that though articles of association can neither constitute a contract between a company and an outsider, nor give any individual member special contractual rights beyond those of the members generally,—*Pritchard's Case* (1873) L. R. 8 Ch. 956; *Melhado* v. *Porto Alegre Ry. Cb.* (1874) L. R. 9 C. P. 503; *Eley* v. *Positive Life Assurance Co.* (1876) 1 Ex. D. 20, 88; *Browne* v. *La Trinidad* (1887) 37 Ch. D. 1—they do in fact constitute a contract between a company and its members in respect of their ordinary rights as members.

Observations in *Imperial Hydropathic Hotel Co., Blackpool* v. *Hampson* (1882) 23 Ch. D. 1, 13; *Johnson* v. *Lyttle's Iron Agency* (1877) 5 Ch. D. 687, 693; *Bradford Banking Co.* v. *Briggs* (1886) 12 App. Cas. 29, 33; *Wood* v. *Odessa Waterworks Co.* (1889) 42 Ch. D. 636, 642; *Salmon* v. *Quin & Axtens, Ld.* [1909] 1 Ch. 311, 318; *Welton* v. *Saffery* [1897] A. C. 299, 315; and *Bisgood* v. *Henderson's Transvaal Estates* [1908] 1 Ch. 743, 759, followed and applied.

An article providing for the reference of disputes to arbitration is a

882                          CHANCERY DIVISION.                    **[1915]**

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

sufficient submission in writing within the Arbitration Act, 1889, ss. 4, 27.

    *Baker* v. *Yorkshire Fire and Life Assurance Co.* [1892] 1 Q. B. 144 applied.

SUMMONS.

The above company was registered on April 23, 1895, as an association not for profit.

Its objects were (inter alia): (*a*) " The encouragement of the breeding of Kent or Romney Marsh sheep at home and abroad, and the maintenance of the purity of the breed." (*b*) " The establishment and publication of a flock book of recognised and pure-bred sires which have been used, or ewes which have been bred from, and of such other flock books (if any) which the council may think fit, and the annual registration of the pedigrees of such sheep as are proved to the satisfaction of the council to be eligible for entry."

The articles provided as follows :—

Article 5. " The subscribers of the memorandum and articles of association, and such other persons as shall be admitted in accordance with these articles, and none other, shall be members of the association, and be entered on the register as such."

Article 9 imposed an entrance fee and an annual subscription and provided that the annual subscription should be payable on January 1 in each year unless the member " shall give three months' notice in writing to the secretary, before that date, of his intention to withdraw from the association."

Article 10. " Every member shall observe all lawful bye-laws, regulations, and orders of the council, for the government and work of the association . . . ."

Article 11. " Any member who shall fail in the observance of any lawful regulation of the association, or of any lawful bye-law, regulation, or order of the council, may be excluded from the association . . . ."

Articles 31 to 40 contained provisions as to the constitution and election of the council and officers, and article 41 provided that the management of the business of the association should be vested in the council.

Article 42. " In furtherance, and not in limitation, of the

general powers conferred by or implied in the preceding articles, it is expressly declared that the council shall have power to exercise and perform the following acts and duties :—

"(e) To publish such information and to hold such meetings for communication of discoveries and information as the council may deem expedient for the purposes defined in the memorandum of association.

"(f) To receive subscriptions yearly or otherwise from persons wishing to aid the objects of the association, but without admitting such persons to any of the rights of members, except (if the council think fit) the right of receiving all or some of the publications of the association free of charge.

"(g) To fix the amount of the annual subscription, and to make bye-laws and regulations for the government and work of the association, and for shows held by or in connection therewith, to be observed by the members of the association. Provided that no bye-law or regulation shall be made under this power which would amount to such an addition to or alteration of the articles as could only legally be made by a special resolution.

"(h) To impose such reasonable fines, forfeitures, and penalties (including suspension of privileges and incapacity to vote at meetings) for breach of the rules, regulations, and conditions contained in these articles, or to be made by the council in pursuance thereof, as they think proper, provided that no fine or pecuniary forfeiture or penalty shall exceed the sum of 5l.

"(i) To make such regulations as to the entry and registration of sheep in the flock book as they think proper.

"(k) To appoint and remove the secretary, clerks, and other officers, fix their salaries (if any) and duties, and require security if they think proper.

"(l) Subject to the regulations contained in the memorandum of association which relate to the conditions and regulations imposed by the Board of Trade, and to these articles, to dispose of the funds of the association for the promotion of the objects thereof, and in the first place to pay the costs, charges, and expenses preliminary and incidental to the promotion, formation, establishment, and registration of the association."

ASTBURY J.

1915

HICKMAN
v.
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

884                      CHANCERY DIVISION.                  **[1915]**

ASTBURY J.

1915

HICKMAN

*v.*

KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

Article 45 provided that minutes of every meeting of the association and of the council should be recorded, and should be prima facie evidence of the matters stated therein.

Article 48. " The members of the council and other officers for the time being of the association shall be indemnified out of the funds of the association against all costs, charges, losses, damages, and expenses which they shall respectively incur or be put to on account of any contract, act, deed, matter, or thing which shall be made, done, entered into, or executed by them respectively on behalf of the association, and they shall be reimbursed by the association all reasonable expenses incurred by them in or about any legal proceedings or arbitration on account of the association, or otherwise in the execution of their respective offices, except such costs, losses, and expenses as shall happen through their respective wilful neglect or default; . . . ."

Article 49. " Whenever any difference arises between the association and any of the members touching the true intent or construction or the incidents or consequences of these presents or of the statutes, or touching anything then or thereafter done, executed, omitted, or suffered in pursuance of these presents or of the statutes, or touching any breach or alleged breach of these presents, or any claim on account of any such breach or alleged breach, or otherwise relating to the premises or to these presents, or to any statute affecting the association, or to any of the affairs of the association, every such difference shall be referred to the decision of an arbitrator to be appointed by the parties in difference, or, if they cannot agree upon a single arbitrator, to the decision of two arbitrators, of whom one shall be appointed by each of the parties in difference, or an umpire to be appointed by the two arbitrators.  And upon every or any such reference the costs of and incident to the reference and award respectively shall be in the discretion of the arbitrators or umpire respectively, who may determine the amount thereof, or direct the same to be taxed as between solicitor and client or otherwise, and may award by whom and to whom and in what manner the same shall be borne and paid ; and such decision shall be made an order of the High Court of Justice upon the application of either party."

On November 11, 1905, the plaintiff sent in the following application for membership and flock entry :—

"I Alfred J. Hickman of Court Lodge Egerton in the county of Kent am desirous of becoming a member of the ' Kent or Romney Marsh Sheep-Breeders' Association'(Incorporated) as a flock owner and I engage, when elected, to pay the entrance fees, annual subscription, and such fees for entry of ewe flocks and individual sheep, as may then be in force or subsequently adopted, together with all such costs for inspection and tattooing as may be sanctioned by the council for the time being, and to conform to the rules and regulations of the association, until I, by notice in writing to the secretary, cease to be a member of the association.

"Alfred J. Hickman."

On December 12, 1905, the plaintiff was duly elected a member, and on December 14, 1905, written notice of his election was sent by the secretary with an intimation that his flock would be inspected.   The inspection took place in May, 1906.

On December 18, 1914, the plaintiff issued a writ against the association and Chapman claiming : 1. An injunction to restrain the association from employing Chapman as secretary, and to restrain Chapman from acting as secretary.   2. An injunction to restrain the defendants from taking any steps to expel the plaintiff from the association.   3. An injunction to restrain the defendants from doing any acts in derogation of the plaintiff's rights as a member.   4. A declaration that the plaintiff was entitled to have the resolutions and proceedings of the association and of any committee thereof truly and accurately entered in the minutes, and consequential relief. 5. An injunction to restrain the defendants from incorrectly recording such resolutions in the minutes.   6. An order that all minutes be expunged which did not accurately record the proceedings of the association, and in particular that the entry be expunged stating that a certain committee appointed to inspect the plaintiff's sheep and to see that they were tattooed was appointed on Chapman's motion and not on the plaintiff's motion. 7. An injunction to restrain Chapman from calling any meeting of the association except in accordance with the rules.   8. Damages for unlawfully refusing to register the plaintiff's sheep and a

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

886                    CHANCERY DIVISION.              [1915]

ASTBURY J. declaration that the plaintiff was entitled to have his sheep
1915      registered.  9. Further or other relief.  10. Costs.

HICKMAN       On January 12, 1915, the defendants issued a summons
v.        asking that all further proceedings in the action be stayed
KENT OR
ROMNEY    pursuant to s. 4 of the Arbitration Act, 1889, and that the
MARSH
SHEEP-    matters in question in the action be referred to arbitration
BREEDERS' in accordance with the provisions of article 49, or alterna-
ASSOCIATION.
——       tively under the submission to arbitration contained in the
plaintiff's written application for membership dated Novem-
ber 11, 1905, and duly accepted by the association on
December 12, 1905, notice of such acceptance having been
given to the plaintiff by letter of December 14, 1905.  The
alternative ground of submission to arbitration was added by
amendment on March 12, 1915.

      *Micklem, K.C.*, and *Frederick Hinde*, for the defendants.  The
plaintiff is merely seeking to enforce his ordinary rights as
a member.   That is directly within the arbitration clause
(article 49).   The burden is on the plaintiff to show why
the dispute should not be referred, and, as he has filed no
evidence, the action ought to be stayed under the Arbitration
Act, 1889, s. 4: *Willesford* v. *Watson* (1); *Hodgson* v. *Railway
Passengers Assurance Co.* (2)  It was suggested in chambers
that there was a difficulty owing to the joinder of Chapman,
a non-member, but he is only joined virtute officii, and he is
a proper defendant.   There is nothing in this point.

      *Hon. Frank Russell, K.C.*, and *Harold S. Simmons*, for the
plaintiff.   We do not rely on the joinder of Chapman, and for
the purposes of our argument the action may be treated as an
action against the association alone.   The defendants, purporting
to be parties to a submission to arbitration, seek to stay the
action under the Arbitration Act, 1889, s. 4.   But under s. 27
" submission " means " a written agreement " to refer differences
to arbitration.   Where is this written agreement ?   The defen-
dants rely on article 49.   But that is not an agreement between
the plaintiff and the association.   Articles are only a contract
between the members inter se, and not between the members

      (1) (1873) L. R. 8 Ch. 473, 480.        (2) (1882) 9 Q. B. D. 188.

and the company : Companies (Consolidation) Act, 1908, s. 14, sub-s. 1 ; *Pritchard's Case* (1) ; *Melhado* v. *Porto Alegre Ry. Co.* (2) ; *Eley* v. *Positive Life Assurance Co.* (3) ; *Browne* v. *La Trinidad* (4); Buckley on Companies, 9th ed. pp. 27, 51, 206 ; Lindley on Companies, 6th ed. p. 456. The same point was recognized in *Borland's Trustee* v. *Steel Brothers & Co.* (5) and *In re Famatina Development Corporation.* (6)

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

Again the written agreement to submit to arbitration must be signed by both parties—*Caerleon Tinplate Co.* v. *Hughes* (7)—just as in the case of a written agreement under the Attorneys and Solicitors Act, 1870 (33 & 34 Vict. c. 28), s. 4 : *In re Lewis.* (8) See also Halsbury's Laws of England, vol. i. p. 441, note (*n*). Now under s. 14, sub-s. 1, of the Companies (Consolidation) Act, 1908, the articles bind the company and the members to the same extent as if they had been signed and sealed by each member and contained covenants on the part of each member to observe them. But there is no provision that they are to be deemed signed by the company. In any case the section, which is merely a re-enactment of the Companies Act, 1862, s. 16, cannot mean that the articles are to be treated as signed either by the company or the members within the Arbitration Act, 1889, s. 27. No doubt, if the articles constituted an agreement signed by the association, the plaintiff by suing on them would affirm them as his contract, just as in the case of an action by the assured on a policy signed only by the assurers : *Baker* v. *Yorkshire Fire and Life Assurance Co.* (9), recognized by the Court of Appeal as an authority in *Morgan* v. *William Harrison, Ld.* (10) But in the present case that initial element is wanting.

The plaintiff's application for membership and its acceptance by the association carry the matter no further. The application does not mention the articles, and non constat that the plaintiff knew of article 49. The rules and regulations mentioned in the application may well have referred to the by-laws, regulations,

(1) L. R. 8 Ch. 956, 960.
(2) L. R. 9 C. P. 503.
(3) 1 Ex. D. 20, 88.
(4) 37 Ch. D. 1.
(5) [1901] 1 Ch. 279, 288.
(6) [1914] 2 Ch. 271, 279.
(7) (1891) 60 L. J. (Q.B.) 640.
(8) (1876) 1 Q. B. D. 724.
(9) [1892] 1 Q. B. 144.
(10) [1907] 2 Ch. 137, 142.

888                    CHANCERY DIVISION.              **[1915]**

ASTBURY J. and orders of the council mentioned (passim) in the articles,

1915      e.g., articles 10, 11, 42. In any case there is no agreement signed

HICKMAN   by the association, or any resolution authorizing the secretary

*v.*      to send the written notice of acceptance of the application.

KENT OR

ROMNEY        *Micklem, K.C.,* in reply. The articles constitute a contract

MARSH

SHEEP-    between a company and its members in respect of their ordinary

BREEDERS' rights as members: *Imperial Hydropathic Hotel Co., Blackpool*

ASSOCIATION. *v. Hampson* (1); *Bradford Banking Co.* v. *Briggs* (2); *In re*

Wheal Buller Consols (3); Wood v. Odessa Waterworks Co. (4);
Welton v. Saffery (5); Salmon v. Quin & Axtens, Ld. (6); though,
as decided in Pritchard's Case (7) and the other cases relied on
by the plaintiff, they would not constitute a contract with an
outsider, or give an individual member special contractual
rights beyond those of the members generally : see Palmer's
Company Precedents, 11th ed. pt. i. pp. 632—636.  In Borland's
Trustee v. Steel Brothers & Co. (8) the company, which required
a transfer notice under the articles, was in fact the sole defen-
dant.  The case does not suggest that the articles were not
binding as between the member and the company.  In In re
Famatina Development Corporation (9) O'Driscoll had gone outside
the scope of his employment as a servant of the company, so that
of course he could not rely on the indemnity article.

The plaintiff then objects that there is no written agreement
signed by both parties.  But the articles are the written agree-
ment signed by the association, and by suing on them the plain-
tiff affirms them as his agreement : *Baker* v. *Yorkshire Fire and
Life Assurance Co.* (10)  In *Caerleon Tinplate Co.* v. *Hughes* (11)
there was no agreement at all, as the parties were never ad
idem.

If the articles alone are not a sufficient contract, we rely on
the plaintiff's application and its acceptance.  The plaintiff
agreed to conform to the rules and regulations.  Many of these
would of course be contained in the articles : Companies

(1) 23 Ch. D. 1, 13.               (6) [1909] 1 Ch. 311, 318.
(2) 12 App. Cas. 29, 33.           (7) L. R. 8 Ch. 956.
(3) (1888) 38 Ch. D. 42, 46, 48.   (8) [1901] 1 Ch. 279.
(4) 42 Ch. D. 636, 642.            (9) [1914] 2 Ch. 271, 279.
(5) [1897] A. C. 299, 315.         (10) [1892] 1 Q. B. 144.
                (11) 60 L. J. (Q.B.) 640.

**1 Ch.**                    CHANCERY DIVISION.                    889

(Consolidation) Act, 1908, s. 10.   The notice of acceptance was
obviously signed by the secretary as the association's agent.
On both grounds therefore there was a sufficient submission
to arbitration.

*Cur. adv. vult.*

March 31.   ASTBURY J.   This is a summons by the defendants
to stay proceedings in the action pursuant to s. 4 of the Arbitra-
tion Act, 1889.   The action is against the defendant association
and their secretary Chapman, and the plaintiff, who became a
member in 1905, claims certain injunctions and a declaration and
other relief in respect of matters arising out of and relating solely
to the affairs of the association.   In substance he claims to
enforce his rights under the association's articles.   The secretary
is not a member of the association, but the plaintiff admits that
he is only sued virtute officii, and the plaintiff does not seek to
resist this summons on the ground that the secretary is one of
the defendants.   [After stating the objects of the association and
reading article 49 as to arbitration, his Lordship continued:]   This
is a common form of article in private companies, and the objects
of this association being what they are, it and its members might
be seriously prejudiced by a public trial of their disputes, and if
this summons fails, as the plaintiff contends that it should,
these arbitration clauses in articles are of very little, if any,
value.

It is clear on the authorities that if there is a submission to
arbitration within the meaning of the Arbitration Act, 1889,
there is a prima facie duty cast upon the Court to act upon such
an agreement : *Willesford* v. *Watson.* (1)

In the present case the defendants contend, first, that article 49,
dealing as it does with the members of the association, in their
capacity of members only, constitutes a submission within the
meaning of the Arbitration Act, or, secondly, that the contract
contained in the plaintiff's application for membership and the
association's acceptance of it amounts to such a submission.
The plaintiff contests both these propositions, and independently
of the particular dispute in this case, the arguments, especially

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

(1) L. R. 8 Ch. 473, 480.

890                     CHANCERY DIVISION.                **[1915]**

ASTBURY J. upon the first of these contentions, have raised questions of far-
reaching importance.

HICKMAN    I will first deal with the question as to the effect of article 49.
*v.*
KENT OR    Sect. 14, sub-s. 1, of the Companies (Consolidation) Act, 1908,
ROMNEY    says : " The memorandum and articles shall, when registered,
MARSH
SHEEP-    bind the company and the members thereof to the same extent
BREEDERS'
ASSOCIATION. as if they respectively had been signed and sealed by each member,
and contained covenants on the part of each member, his heirs,
executors, and administrators, to observe all the provisions of the
memorandum and of the articles, subject to the provisions of
this Act."

It is laid down in text-books of the highest repute that the
articles are not a contract between the member and the company;
that the articles are no contract with the company but a contract
with the other members ; and that the articles are a contract
only as between the members inter se in respect of their rights
as shareholders : Buckley on Companies, 9th ed. pp. 27, 51, 206
that the exact nature of this covenant, that is the covenant
referred to in s. 14, has given rise to considerable discussion
and is even now very difficult to define ; but it is now settled
that it is not equivalent to a contract between the company on
the one part and the members on the other, on which either a
member can sue the company or the company can sue a member :
Lindley on Companies, 6th ed. p. 456.    Other writers have
formed a different conclusion, and the construction of the
language of this section has long been the subject of contro-
versy : Palmer's Company Precedents, 11th ed. pt. i. pp. 632—636;
Hamilton's Company Law, 3rd ed. p. 219; Gore-Browne on
Joint Stock Companies, 32nd ed. pp. 40, 41.

The principal authorities in support of the view that the
articles do not constitute a contract between the company and
its members are *Pritchard's Case* (1), *Melhado* v. *Porto Alegre
Ry. Co.* (2), *Eley* v. *Positive Life Assurance Co.* (3), and *Browne* v.
*La Trinidad.* (4)

In *Pritchard's Case* (1) the articles of association of a mining
company provided that the company should immediately after

(1) L. R. 8 Ch. 956.              (3) 1 Ex. D. 20, 88.
(2) L. R. 9 C. P. 503.            (4) 37 Ch. D. 1.

incorporation enter into an agreement with De Thierry the vendor for the purchase of the mine for 2000*l.* and 3200 fully-paid shares. The articles were signed by the vendor and six other persons, and the directors allotted the 3200 shares to the vendor or his nominees, but no further agreement was made with him. It was held, affirming the decision of Wickens V.-C., that the articles of association did not constitute a contract in writing between the vendor and the company within s. 25 of the Companies Act, 1867 (30 & 31 Vict. c. 131), and that the shares could not therefore be considered as fully paid. Mellish L.J. in giving judgment said (1): " I am of opinion that the articles of association cannot be considered as a contract in writing between De Thierry and the company for the sale of the mine to them. It may, no doubt, be the case, if no other contract was entered into, and if De Thierry signed these articles and they were acted upon, that a Court of Equity would hold that as between him and the company—from their acting upon it—there was a binding contract; but in themselves the articles of association are simply a contract as between the shareholders inter se in respect of their rights as shareholders. They are the deed of partnership by which the shareholders agree inter se."

In *Melhado* v. *Porto Alegre Ry. Co.* (2) the articles of association of a joint stock company provided that the company should defray such expenses incurred in its establishment as the directors should consider might be deemed and treated as preliminary expenses to an amount not exceeding 2000*l.* The plaintiffs, who were promoters of the company, had incurred preliminary expenses in its establishment, but it was held that no action for these expenses would lie at the suit of the plaintiffs against the company under the articles. Lord Coleridge C.J. said : " The action is brought on a clause in the articles of association, by which the directors are authorized to pay certain expenses if they should consider them to be properly deemed preliminary expenses. The declaration avers that all conditions were performed necessary to entitle the plaintiffs to be paid their expenses ; and therefore I think we must take it that they were expenses which, if the directors had thought proper to pay them, the articles

(1) L. R. 8 Ch. 960.    (2) L. R. 9 C. P. 503, 505, 506, 507.

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

ASTBURY J. would have justified them in paying. The question, therefore, is whether an action will lie for the payment of these expenses, in pursuance of the articles of association, to which the plaintiffs were not parties. I have come to the conclusion that no such action will lie—I must say somewhat reluctantly, because, though I wish to express no opinion on the merits of this particular case, having no materials for forming such an opinion, it does seem just, in general, if a company takes the benefit of the work and expenditure by which its existence has been rendered possible, and voluntarily comes into existence on the terms that it shall be liable to pay for such work and expenditure, that a cause of action should be given. I can find, however, no legal principle upon which such an action can be maintained. It appears to me that there is no contract between the plaintiffs and the defendants. The doctrine of ratification is inapplicable, for the reasons given in the judgments in *Kelner* v. *Baxter*." (1) Mellor J. said : " The plaintiffs were not in any way parties to the articles of association, and there was not, therefore, any express contract to pay them." Brett J. said : " There is no contract, in my judgment, of any sort upon which they·can sue, and unless there be a contract of some sort between them and the company, I do not see that they can have any cause of action. No contract made with them before the existence of the company can be ratified by the company for the reasons pointed out in the case of *Kelner* v. *Baxter* (1), with which I fully agree."

In *Eley* v. *Positive Life Assurance Co.* (2) the articles of association contained a clause in which it was stated that the plaintiff, a solicitor, should be the·solicitor to the company and transact its legal business. The articles were registered and the company incorporated, and eleven months later the plaintiff became a member. The plaintiff was not appointed solicitor by any resolution of the directors, nor by any instrument bearing the seal of the company, but he acted as such for a time. Subsequently the company ceased to employ him and he brought an action for breach of contract against the company for not employing him as its solicitor. The first count of the declaration

(1) (1866) L. R. 2 C. P. 174.          (2) 1 Ex. D. 20, 88.

*Margin note:* HICKMAN v. KENT OR ROMNEY MARSH SHEEP-BREEDERS' ASSOCIATION. 1915

**1 Ch.**                    CHANCERY DIVISION.                           893

stated (1) that it was agreed by and between the plaintiff and the

defendants that the plaintiff should be employed by the defen-
dants as, and appointed by them to the office of, solicitor of the
company. During the argument (2) it was contended that the
contract declared on was not the contract purported to be con-
tained in the articles. Amphlett B. said (3) : " The articles,
taken by themselves, are simply a contract between the share-
holders inter se, and cannot, in my opinion, give a right of
action to a person like the plaintiff, not a party to the articles,
although named therein. If authority were wanted for this
proposition, the cases cited in the argument, *Pritchard's Case* (4)
and *Melhado* v. *Porto Alegre Ry. Co.* (5), are, in my opinion,
quite conclusive on the subject." Subsequently he said (6) :
" For these reasons, I think that there was no contract at all
between the plaintiff and the company to the effect stated in the
declaration." Cleasby B. confined his judgment to the last
points raised in the case and said (7) : " I am of opinion that
clause 118 of the articles cannot by itself be taken to operate
as a contract between the solicitor and the company." Kelly
C.B. said (7) : " I forbear to pronounce any opinion as to
whether these articles, with the fact of the subsequent employ-
ment, constitute a contract on the terms contained in them,
because, were I to so hold, there would be a difficult question
behind, whether it was not ultra vires for the directors to attempt
to bind the company to employ a solicitor to transact, for all his
life, all the legal business of the company. Passing by this, I
come to consider the objection raised under the 4th section of
the Statute of Frauds. I do not see how any one can doubt that
this agreement was not to be performed within a year. It was
for the life of the plaintiff, subject to a defeasance on the possi-
bility of his being guilty of some misconduct. But, assuming, as
I think we must, that this was not to be performed in a year, the
question arises, whether there is any memorandum or note in
writing of it signed by the defendants. The signatures affixed to

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

(1) 1 Ex. D. 22.              (4) L. R. 8 Ch. 956.
(2) 1 Ex. D. 23.              (5) L. R. 9 C. P. 503.
(3) 1 Ex. D. 26.              (6) 1 Ex. D. 28.
             (7) 1 Ex. D. 30.

894                    CHANCERY DIVISION.                **[1915]**

ASTBURY J.  the articles were alio intuitu, and it can hardly be suggested that

1915        the directors had any idea that, in signing the articles, they were

HICKMAN     signing a note of this contract."
*v.*
KENT OR           This case went to the Court of Appeal and Lord Cairns L.C.
ROMNEY      said (1): "I wish to say, in the first place, that in my opinion a
MARSH
SHEEP-      contract of the kind suggested to exist in this case ought not to
BREEDERS'   receive any particular favour from the Court. The statement is
ASSOCIATION.
            that Baylis was endeavouring to form a joint stock insurance com-
            pany upon a new principle, and applied to the plaintiff to make
            advances to meet the expenses of getting up the company, and it
            was arranged between them that in the event of the company
            being formed the plaintiff should be appointed permanent solicitor
            to the company. That is to say, a bargain is made between a
            professional man and Baylis which, so far as the case is con-
            cerned, does not appear to have been communicated to those
            who were invited to join the company, that if the former will
            advance money for the formation of the company, he shall be
            appointed permanent solicitor, and the company shall be obliged
            to employ him as their professional adviser. When the articles
            are prepared, they are so by the plaintiff, and in them he inserts
            a clause which no doubt informs those who signed the articles of
            the arrangement, but does not appear to have been brought to
            the notice of those who joined from receiving circulars. This, I
            repeat, is not a proceeding which the Court would encourage in
            any way. I also wish to reserve my judgment as to whether a
            clause of this kind is obnoxious to the principles by which the
            Courts are governed in deciding on questions of public policy."
            Then a little lower down he said (1): "This case was first rested
            on the 118th article. Articles of association, as is well known,
            follow the memorandum, which states the objects of the company,
            while the articles state the arrangement between the members.
            They are an agreement inter socios, and in that view, if the
            introductory words are applied to article 118, it becomes a
            covenant between the parties to it that they will employ the
            plaintiff. Now, so far as that is concerned, it is res inter alios
            acta, the plaintiff is no party to it. No doubt he thought that
            by inserting it he was making his employment safe as against

                          (1) 1 Ex. D. 89.

**1 Ch.**                CHANCERY DIVISION.                **895**

the company; but his relying on that view of the law does not
alter the legal effect of the articles. This article is either a
stipulation which would bind the members, or else a mandate to
the directors. In either case it is a matter between the directors
and shareholders, and not between them and the plaintiff."

In *Browne* v. *La Trinidad* (1) before the formation of the
company an agreement was entered into between B. and a person
as trustee for the intended company, by which it was stipulated
(inter alia) that B. should be a director and should not be
removable till after 1888. The 6th clause of the articles
provided that the directors should adopt and carry into effect
the agreement with or without modification, and that subject to
such modification (if any) the provisions of the agreement should
be construed as part of the articles. The agreement was acted
upon, but no contract adopting it was entered into between the
plaintiff and the company. It was held that treating the agree-
ment as embodied in the articles, still there was no contract
between B. and the company that he should not be removed
from being a director, the articles being only a contract between
the members inter se, and not between the company and B.
Cotton L.J. towards the end of his judgment said (2): "Assuming
that an unlimited power is given to the meeting by article 91,
ought we, having regard to the contract entered into by the
memorandum of the 24th of November, 1884, and article 6, to
interfere by injunction to restrain the company in general meeting
from acting under that power? I do not give any opinion upon
the question how far the Court would have interfered by injunc-
tion in order specifically to enforce an agreement between the com-
pany and the plaintiff that he should be an irremovable director.
That point raises questions upon which I should not like to give
any opinion without having them fully discussed. In my opinion
we ought not to interfere in the present case, because there is no
such contract between the plaintiff and the company. The memo-
randum of agreement of the 24th of November, 1884, is in no
way a contract between the plaintiff and the company. It is said
that it was adopted and incorporated into the articles, but I
cannot accede to that. The company by its directors acted upon

(1) 37 Ch. D. 1.                    (2) 37 Ch. D. 13.

*Margin:*

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

896                    CHANCERY DIVISION.              **[1915]**

ASTBURY J. the agreement, but that does not make it binding on the company.
Then is it incorporated into the articles in such a way as to
entitle the plaintiff to say I have such a contract between me
and the company as can be enforced by a Court of law, and as I
might enforce in equity by way of specific performance ? That
point is clearly settled, I think, by *Eley* v. *Positive Life Assurance Co.* (1) There two of the members of the Court of first
instance held, and the other member did not express dissent,
that the articles are merely a contract between the shareholders
inter se, and that though a person in whose favour a stipulation
is made in the articles may afterwards have shares allotted to
him, he does not by that means become in the same position as
if he had entered into a contract with the company." Lindley L.J.
said (2): "Having regard to the construction put upon s. 16
of the Companies Act of 1862 in the case of *Eley* v. *Positive Life
Assurance Co.* (1) and subsequent cases, it must be taken as
settled that the contract upon which he relies is not a contract
upon which he can maintain any action, either on the common
law side or the equity side. There might have been some
difficulty in arriving at that conclusion if it had not been for the
authorities, because it happens that this gentleman has had
shares allotted to him, and is therefore a member of the company.
Having regard to the terms of s. 16, there would be some
force, or at all events some plausibility, in the argument that,
being a member, the contract which is referred to in the articles
has become binding between the company and him. Of course
that argument is open to this difficulty that there could be no
contract between him and the company until the shares were
allotted to him, and it would be remarkable that, upon the shares
being allotted to him, a contract between him and the company,
as to a matter not connected with the holding of shares, should
ari e."

Now in these four cases the article relied upon purported to
give specific contractual rights to persons in some capacity other
than that of shareholder, and in none of them were members
seeking to enforce or protect rights given to them as members,
in common with the other corporators. The actual decisions

*Margin case heading:* 1915 HICKMAN *v.* KENT OR ROMNEY MARSH SHEEP-BREEDERS' ASSOCIATION.

---

(1) 1 Ex. D. 20, 88.                    (2) 37 Ch. D. 14.

amount to this. An outsider to whom rights purport to be given by the articles in his capacity as such outsider, whether he is or subsequently becomes a member, cannot sue on those articles treating them as contracts between himself and the company to enforce those rights. Those rights are not part of the general regulations of the company applicable alike to all shareholders and can only exist by virtue of some contract between such person and the company, and the subsequent allotment of shares to an outsider in whose favour such an article is inserted does not enable him to sue the company on such an article to enforce rights which are res inter alios acta and not part of the general rights of the corporators as such. The language of some of the judgments appears, however, to go further, as recognized, for instance, by Sargant J. in *In re Famatina Development Corporation.* (1)

The wording of s. 14, sub-s. 1, of the Consolidation Act, which is in the same terms as s. 16 of the Companies Act, 1862, is difficult to construe or understand. A company cannot in the ordinary course be bound otherwise than by statute or contract and it is in this section that its obligation must be found. As far as the members are concerned, the section does not say with whom they are to be deemed to have covenanted, but the section cannot mean that the company is not to be bound when it says it is to be bound, as if, &c., nor can the section mean that the members are to be under no obligation to the company under the articles in which their rights and duties as corporators are to be found. Much of the difficulty is removed if the company be regarded, as the framers of the section may very well have so regarded it, as being treated in law as a party to its own memorandum and articles.

It seems clear from other authorities that a company is entitled as against its members to enforce and restrain breaches of its regulations. See, for example, *MacDougall* v. *Gardiner* (2), *Pender* v. *Lushington* (3), and *Imperial Hydropathic Hotel Co., Blackpool* v. *Hampson.* (4) In the last case Bowen L.J. said: "The articles of association, by s. 16, are to bind all the company

ASTBURY J.

1915

HICKMAN
v.
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

(1) [1914] 2 Ch. 271, 279.        (3) (1877) 6 Ch. D. 70.
(2) (1875) 1 Ch. D. 13.          (4) 23 Ch. D. 1, 13.

898                              CHANCERY DIVISION.                      **[1915]**

ASTBURY J. and all the shareholders as much as if they had all put their
1915          seals to them."

HICKMAN         It is also clear from many authorities that shareholders as
  *v.*         against their company can enforce and restrain breaches of its
KENT OR        regulations, and in many of these cases judicial expressions of
ROMNEY
MARSH          opinion appear, which, in my judgment, it is impossible to
SHEEP-         disregard.
BREEDERS'
ASSOCIATION.        In *Johnson* v. *Lyttle's Iron Agency* (1), in an action by a
shareholder against the company, James L.J. said: " The notice
. . . . did not comply strictly with the provisions of the contract
between the company and the shareholders which is contained in
the regulations of table A."

In *Bradford Banking Co.* v. *Briggs* (2) the articles gave the
defendant company a lien on its members' shares. The
plaintiffs, who were equitable mortgagees of certain shares,
brought an action against the mortgagors and the company to
enforce their security. The company claimed priority for their
lien. Lord Blackburn said: " The only one of the articles of
association which I think it material to notice is the 103rd article,
which is as follows :—' The company shall have a first and per-
manent lien and charge, available at law and in equity, upon
every share of every person who is the holder or one of several
joint holders thereof, for all debts due from him, either alone or
jointly with any other person, whether a shareholder or not in
the company.' John Faint Easby, a coal merchant, became a
proprietor of a number of shares in the respondent company,
and obtained certificates for them. This property in the shares
was, by virtue of the 16th section of the Act already quoted, I
think, bound to the company as much as if he had (at the time
he became holder of these shares) executed a covenant to the
company in the same terms as article 103, but I do not think it
was bound any further."

In *Wood* v. *Odessa Waterworks Co.* (3), which was an action
by the plaintiff on behalf of himself and all other shareholders
against the company, Stirling J. said : " The articles of associa-
tion constitute a contract not merely between the shareholders

(1) 5 Ch. D. 687, 693.              (2) 12 App. Cas. 29, 33.
                    (3) 42 Ch. D. 636, 642.

and the company, but between each individual shareholder and every other."

In *Salmon* v. *Quin & Axtens, Ld.* (1) Farwell L.J., referring to this last statement, said : " I think that that is accurate subject to this observation, that it may well be that the Court would not enforce the covenant as between individual shareholders in most cases."

In *Welton* v. *Saffery* (2) Lord Herschell, who dissented on the main question from the rest of the House, made the following general observation : " Sect. 16 of the Act of 1862 provides that the articles of association, when registered, shall bind the company and the members thereof to the same extent as if each member had signed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors, and administrators to conform to all the regulations contained in such articles, subject to the provisions of this Act. The articles thus become in effect a contract under seal by each member of the company, and regulate his rights. They cannot, of course, diminish or affect any liability created by the express terms of the statute ; but, as I have said, the statute does not purport to settle the rights of the members inter se, it leaves these to be determined by the articles (or the articles and memorandum together), which are the social contract regulating those rights. I think it was intended to permit perfect freedom in this respect. It is quite true that the articles constitute a contract between each member and the company, and that there is no contract in terms between the individual members of the company ; but the articles do not any the less, in my opinion, regulate their rights inter se. Such rights can only be enforced by or against a member through the company, or through the liquidator representing the company ; but I think that no member has, as between himself and another member, any right beyond that which the contract with the company gives."

In all these last mentioned cases the respective articles sought to be enforced related to the rights and obligations of the members generally as such and not to rights of

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

(1) [1909] 1 Ch. 311, 318.          (2) [1897] A. C. 299, 315.

ASTBURY J. the character dealt with in the four authorities first above referred to.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION

It is difficult to reconcile these two classes of decisions and the judicial opinions therein expressed, but I think this much is clear, first, that no article can constitute a contract between the company and a third person; secondly, that no right merely purporting to be given by an article to a person, whether a member or not, in a capacity other than that of a member, as, for instance, as solicitor, promoter, director, can be enforced against the company; and, thirdly, that articles regulating the rights and obligations of the members generally as such do create rights and obligations between them and the company respectively.

In *Bisgood* v. *Henderson's Transvaal Estates* (1) Buckley L.J. said : " The purpose of the memorandum and articles is to define the position of the shareholder as shareholder, not to bind him in his capacity as an individual."

Sect. 4 of the Arbitration Act, 1889, says : " If any party to a submission, or any person claiming through or under him, commences any legal proceedings in any Court against any other party to the submission, or any person claiming through or under him, in respect of any matter agreed to be referred, any party to such legal proceedings may at any time after appearance, and before delivering any pleadings or taking any other steps in the proceedings, apply to that Court to stay the proceedings, and that Court or a judge thereof if satisfied that there is no sufficient reason why the matter should not be referred in accordance with the submission, and that the applicant was, at the time when the proceedings were commenced, and still remains, ready and willing to do all things necessary to the proper conduct of the arbitration, may make an order staying the proceedings." Then s. 27 says : " ' Submission ' means a written agreement to submit present or future differences to arbitration, whether an arbitrator is named therein or not." The defendants' first contention is that article 49 is, on the authorities, a written agreement within the meaning of this Act.

In *In re Lewis* (2) it was held that a document containing the terms of an agreement as to the amount of costs payable by a

(1) [1908] 1 Ch. 759.          (2) 1 Q. B. D. 724, 726.

client to his solicitor, assented to by the client, but signed by the solicitor only, is not an "agreement in writing" within the Attorneys and Solicitors Act, 1870 (33 & 34 Vict. c. 28), s. 4. Lord Coleridge C.J. said: "It is quite clear that there was no agreement in writing within s. 4 of the Act"; and, later on, he says: "An 'agreement in writing' within s. 4 must be an agreement by both parties, and both parties must sign their names upon the agreement."

In *Caerleon Tinplate Co.* v. *Hughes* (1), an action for the price of goods sold, the bought note signed by the defendants contained a provision for arbitration in case of dispute, whilst the sold note signed by the plaintiff contained no such provision. It was held that there was no submission within the meaning of the Act, for an agreement to submit to arbitration must be in writing and signed by both parties. *In re Lewis* (2) was referred to, and Denman J., referring to s. 27 of the Arbitration Act, said: "In my judgment there can be no written agreement unless in writing signed by the parties as their agreement, and that 'written agreement' means one in which the terms on both sides are reduced into writing. It is useless to discuss the documents here, for the bought and sold notes differ in the essential particular that the former contains a provision which is wholly absent in the latter." Then Wills J. said: "Supposing there were a contract, and the parties were ad idem,"—which in fact they were not in this case—"yet there was no submission under the Act unless there were an agreement in writing by both parties. *In re Lewis* (2) is conclusive on this point. In the present case the agreement is to be in writing under s. 27, and we must hold that both parties must sign their names to it; otherwise there might be a conflict of evidence, and a discussion as to what was understood by either party."

In *Baker* v. *Yorkshire Fire and Life Assurance Co.* (3) an action was brought on a fire policy which was executed in the usual way by the company but not by the assured, and it was held that the policy, though not signed by the plaintiff, amounted to a submission to arbitration within the meaning of the Act.

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

(1) 60 L. J. (Q.B.) 640, 641.          (2) 1 Q. B. D. 724.
(3) [1892] 1 Q. B. 144, 145.

902                      CHANCERY DIVISION.                [1915]

ASTBURY J. Lord Coleridge C.J., who had been a party to the case of *In re*

1915     *Lewis* (1), said: "The plaintiff sues on the policy, and by so

HICKMAN   suing affirms it to be his contract; he cannot disaffirm a part of
*v.*
KENT OR   the very contract on which he is suing.   He contends that in
ROMNEY    order to bring into operation the arbitration clause contained in
MARSH
SHEEP-    the policy, the policy must be signed by both parties; but the
BREEDERS'
ASSOCIATION. Act of Parliament says nothing of the kind, and the only

apparent justification for the contention is to be found in
*Caerleon Tinplate Co.* v. *Hughes.* (2)   That decision must be
interpreted, however, with regard to the particular facts of that
case.   There was there no complete contract; the two documents
constituting the contract differed materially in their terms, and
the Court said it was plain that the parties never were ad idem."
Then A. L. Smith J. said: "It is said, however, that by the
interpretation clause a submission must be a written agreement
to refer disputes to arbitration.   This, however, is not a higher
interpretation than was necessarily put on the language of the
old Act, under which it was the universal practice to refer these
cases, and does not mean that in all cases the written agreement
to refer must be signed by both parties.   It is quite unnecessary
to say more as to the decision in *Caerleon Tinplate Co.* v. *Hughes* (2)
than that it turned entirely upon the peculiar facts of the case."

The result of these decisions is, I think, that if the submission
is in writing and is binding on both parties as their agreement
or as the equivalent in law to an agreement between them the
statute is satisfied.

In the present case, the plaintiff's action is, in substance, to
enforce his rights as a member under the articles against the
association.   Article 49 is a general article applying to all the
members as such, and, apart from technicalities, it would seem
reasonable that the plaintiff ought not to be allowed in the
absence of any evidence filed by him to proceed with an action
to enforce his rights under the articles, seeing that the action is
a breach of his obligation under article 49 to submit his disputes
with the association to arbitration, and if the case falls within
the Act I see no reason for exercising my discretion under s. 4
in his favour.

(1) 1 Q. B. D. 724.              (2) 60 L. J. (Q.B.) 640.

**1 Ch.**                    CHANCERY DIVISION.                    903

In my judgment, article 49, for the reasons above referred to, creates rights and obligations enforceable as between the plaintiff and the association respectively and those rights and obligations are contained in a written document, but whether that document is a contract or agreement between the plaintiff and the association within s. 27 of the Arbitration Act depends upon whether the decisions in *Eley* v. *Positive Life Assurance Co.* (1), and the other three cases of a similar character above referred to, ought to be regarded as only dealing with and applying to articles purporting, first, to contain an agreement with the company and a third person, or, secondly, to define the rights of a shareholder in some capacity other than that of a member of the company. To reconcile those decisions with the other expressions of judicial opinion above mentioned, some such view should, I think, be adopted and general articles dealing with the rights of members " as such " treated as a statutory agreement between them and the company as well as between themselves inter se, and, in my judgment, article 49 in the present case does constitute a submission to arbitration within the true meaning and intent of the Arbitration Act.

Having regard, however, to the conclusion to which I have come on the second contention raised by the defendants, it is not necessary for me to base my decision upon this ground alone, and upon the opinion I have so expressed.

The defendants' second contention is that the contract contained in the plaintiff's application for membership, and the association's acceptance of it, amounts to a submission within the Act. [His Lordship stated the facts as to the plaintiff's application and election and continued :] In consideration of being elected a member and of his offer to join the association being accepted, the plaintiff contracted in writing with the association to conform to its rules and regulations. One of those regulations was a general submission to arbitration of all differences between the association and any of its members as such, amply wide enough to cover the matters in dispute in this action. The association at the date of the contract was already bound to each and all its

(1) 1 Ex. D. 20, 88.

ASTBURY J.

1915

HICKMAN
*v.*
KENT OR
ROMNEY
MARSH
SHEEP-
BREEDERS'
ASSOCIATION.

904·                        CHANCERY DIVISION.                    **[1915]**

ASTBURY J. corporators to act in conformity with those regulations, and was

1915

HICKMAN

*v.*

KENT OR

ROMNEY

MARSH

SHEEP-

BREEDERS'

ASSOCIATION.

at the date of the writ in this action, and has been since, ready and willing to so act. It is submitted on behalf of the plaintiff that at the date of this contract he may have known nothing about article 49, and that as the council of the association have power under its articles to make further by-laws and regulations as to certain matters therein referred to the plaintiff's offer may have referred to these. The plaintiff has, however, filed no evidence in support of this, and the articles not only constitute the rules and regulations of the association but refer to the rules and regulations of the association as contained in them, and I am unable to accept this contention.

In my judgment, the contract so made between the plaintiff and the association is also a submission in writing within the true meaning and intent of the Arbitration Act, and I make an order to stay under s. 4 and direct that the matters in dispute in this action be referred to arbitration accordingly.

Solicitors : *Walters & Co. ; Ernest Simmons & Co.*

G. R. A.

**1 Ch.**          CHANCERY DIVISION.                    199

by the will,. to take the benefits which the provisions of the will seek to confer on that class? I find this a difficult question and I can well imagine that different minds might well take different views. I come to the conclusion that the only safe view to adopt is that if a man attests a will he should not in any way be enabled to take any benefit under that will—not even if he only enters a class intended to benefit by the will after the will has been proved.

There is a good deal to be said for the argument put forward by Mr. Walton, but I think that it would necessarily in many cases lead to uncertainty and it might, in certain cases, lead to collusion. For those reasons, therefore, I come to the conclusion that, in answer to Question 1, I should declare that the first defendant is not entitled either to receive remuneration for his services under clause 16, or to charge for professional remuneration under clause 17.

*Declaration accordingly.*

Solicitors: *Jaques & Co.; Callingham, Griffith & Bate; Treasury Solicitor.*

I. G. R. M.

----

HOLMES AND ANOTHER *v.* KEYES AND OTHERS.

*Company—Meeting—Vote—Date of vote—Poll taken on resolution for election and completed—Votes counted and result declared on following day—Whether director elected on day of poll or when result declared—Companies Act,* 1948 (11 & 12 Geo. 6, c. 38), s. 182.

On December 23, 1957, at a general meeting of the G. Co. a poll was taken on resolutions for the election of the defendants to be directors. The voting was completed on that day but the counting did not take place until the following day, December 24, when the scrutineers informed the company that the defendants had been elected. The company's articles required that the qualification of a director should be the holding of 500 shares in the capital of the company and that, in accordance with section 182 of the Companies Act, 1948,[1] he should obtain that qualification within two months

----

[1] Companies Act, 1948, s. 182: "(1) Without prejudice to the restrictions imposed by the last foregoing "section, it shall be the duty of "every director who is by the articles "of the company required to hold a "specified share qualification, and "who is not already qualified, to

"obtain his qualification within two "months after his appointment, or "such shorter time as may be fixed "by the articles. . . . (3) The office "of director of a company shall be "vacated if the director does not "within two months from the date of "his appointment, or within such

----

*Margin notes:*

1958
ROYCE'S
WILL
TRUSTS,
*In re.*

Wynn-Parry J.

----

C. A.

1958
*Mar.* 24, 25.

Jenkins,
Romer and
Ormerod L.JJ.

200                    CHANCERY DIVISION.                    **[1959]**

C. A.

1958

HOLMES
*v.*
KEYES.

after his appointment. The articles further provided that a transferor of shares should be deemed to remain the holder of shares until the name of the transferee was entered in the company's register. The defendants' names were not entered in the company's register as holders of the requisite number of qualification shares until the afternoon of February 24, 1958.

On a motion to restrain the defendants from acting as directors of the company, the plaintiffs contended that the defendants were elected on December 23, 1957; that, therefore, the period within which they must obtain their qualification began to run at midnight on December 23/24, 1957; and that the entry of the defendants' names in the register on February 24, 1958, was too late.

Danckwerts J. granted the injunction sought. On appeal:—

*Held*, that, in effect, the meeting should be treated as continuing until the result on the poll was ascertained, and there could be no effective appointment of a director until then. The elections of the defendants therefore took place on December 24, when the result of the poll had been ascertained, and, accordingly, the period within which they were required to obtain their qualifications began at midnight on December 24/25, 1957, and expired at midnight, February 24/25, 1958. Therefore, the registration of the defendants' names on February 24 was within time.

*Shaw* v. *Tati Concessions Ltd.* [1913] 1 Ch. 292; 29 T.L.R. 261 and *Spiller* v. *Mayo (Rhodesia) Development Co. (1908) Ltd.* [1926] W.N. 78 applied.

Decision of Danckwerts J. [1958] Ch. 670; [1958] 2 W.L.R. 540; [1958] 1 All E.R. 721 reversed.

APPEAL from Danckwerts J.

By this motion in the action, the plaintiffs, William Arthur Holmes and Zena Daniels, on behalf of themselves and all other shareholders in the Gordon Hotels Ltd., sought an interlocutory injunction restraining the first two defendants, Lord Keyes and Fredman Ashe Lincoln, from acting as directors of the company, the third defendant.

On December 23, 1957, at a general meeting of the company, resolutions for the election of the defendants to be directors were presented and, in accordance with a previous demand, a poll was taken on the resolutions. The voting was completed on that day but the counting did not take place until the following day, December 24, when the scrutineers communicated the result,

" shorter time as may be fixed by the " articles, obtain his qualification, or " if after the expiration of the said " period or shorter time he ceases at " any time to hold his qualification. " . . . (5) If after the expiration of " the said period or shorter time any " unqualified person acts as a director " of the company, he shall be liable " to a fine not exceeding five pounds " for every day between the expira- " tion of the said period or shorter " time or the day on which he ceased " to be qualified, as the case may be, " and the last day on which it is " proved that he acted as a director."

namely, that the defendants had been elected to the company. The defendants were not told of the result until about December 27. Article 23 of the Company's Articles of Association provided that " . . . the transferor shall be deemed to " remain the holder of the share until the name of the transferee " is entered in the register." Article 83 provided: " The quali- " fication of a director other than a nominated director shall be " the holding in his own right of 500 ordinary shares of the " company of £1 each and section 141 of the Act [the Companies " Act, 1929] shall be duly complied with by every director " requiring such qualification." Section 141 of the Companies Act, 1929, was in terms similar to those of section 182 of the Companies Act, 1948. No steps were taken by the defendants to acquire the necessary qualification until about January 31, 1958, when the requisite number of shares were purchased by brokers on behalf of each of them. The completion of the purchases was delayed, however, until February, 1958, and the defendants' names were not entered in the company's register as holders of the shares until the afternoon of February 24, 1958.

The plaintiffs contended that the defendants were elected to be directors on December 23, 1957; that the period of two months in which they were required to obtain their qualifications began to run at midnight on December 23/24, 1957, and expired at midnight on February 23/24, 1958, and that the entry of the defendants' names in the company's register on the afternoon of February 24, 1958, was too late. The defendants contended that they were not appointed until December 24, 1957, and the period, therefore, did not begin to run until midnight on December 24/25, 1957.

Danckwerts J. granted the injunction sought.

The first two defendants appealed.

*Gerald Gardiner Q.C.* and *T. D. D. Divine* for the second defendant. The question is what constitutes the election or appointment of a director, and at what time is he appointed? It is no longer contended that the individual defendants became duly qualified when they entered into contracts to purchase shares; it is conceded that they could only become qualified when their title to them was completed by registration. Further, it is not disputed that if the defendants' election took place on December 23, 1957, time began to run for the purpose of acquiring the necessary qualification shares prescribed by section 182 of the Act of 1948 from midnight on that day, whilst if the election is

202                        CHANCERY DIVISION.           **[1959]**

C. A.

1958

HOLMES
*v.*
KEYES.

treated as taking place on December 24, 1957, time began to run from midnight on that day.

Suppose the case of a company which has articles of association in terms similar to those of the defendant company, and a general meeting is held on a Monday at which resolutions for the election of directors are presented, and a poll is demanded. If the poll is taken on Tuesday, the votes counted on Wednesday, and the result declared on Thursday, on which day was a candidate for the office of director validly appointed?

In favour of Monday, it could be contended that the internal arrangements of a company depend upon its articles, and here the point is covered by article 66: '' If a poll be demanded . . . it '' shall be taken at such time and place and in such manner as the '' chairman shall direct, and the result of the poll shall be deemed '' to be the resolution of the meeting at which the poll was '' demanded. . . .'' Accordingly, since the meeting at which the poll was demanded was held on Monday, the election must be deemed to have taken place on Monday, and since the matter is covered by the article it is unnecessary to look at any other provision.

Those who contend that Tuesday is the relevant day might argue that it is not Monday for two reasons: (a) article 66 is not concerned with time or date at all, its sole effect is to make the result of the poll the equivalent of the meeting at which it was demanded. Further, article 66 must be read in conjunction with article 104, which provides: '' Subject to any resolution for '' reducing the number of directors, if at any meeting at which '' an election of directors ought to take place, the places of the '' retiring directors are not filled up, the retiring directors as afore- '' said shall be deemed to have been re-elected.'' (b) Where at a meeting a poll is demanded, to be taken at a future date, then the meeting continues for the purpose of the poll: *Shaw* v. *Tati Concessions Ltd.*[2] [Reference was also made to *Neuschild* v. *British Equitorial Oil Co. Ltd.*[3]; *Spiller* v. *Mayo (Rhodesia) Development Co. (1908) Ltd.*[4]; *Jackson* v. *Hamlyn.*[5]]

It is submitted that either Wednesday or Thursday (it matters not which for present purposes) is the relevant day. The argument against Monday and Tuesday as the relevant date is adopted, but it is contended that it is Wednesday, since an election is a process only part of which consists of the casting of

[2] [1913] 1 Ch. 292, 297.          [4] [1926] W.N. 78.
[3] [1925] Ch. 346.                  [5] [1953] Ch. 577.

votes; it is not completed until the votes have been counted and the result ascertained. The primary meaning of the word " poll " in this connexion is counting: see meanings (6) and (7) under the heading " poll " in the Oxford English Dictionary. A poll is not complete until all the votes have been cast and counted, and if there is a tie, the chairman has a casting vote: see article 68. The result is the vital factor; the taking of the poll is not complete until the result is ascertained; it is not until that moment that a candidate can be said to have been elected a director. [Reference was made to *Catesby* v. *Burnett*.[6]]

The correct day may also be Thursday, since (a) in law, so far as the company is concerned, that which alone is decisive is the *declared* result of the poll. (b) There is nothing in the Companies Act, 1948, or in the articles, to prevent the chairman of the meeting at which a poll is demanded announcing that the result of the poll would not be declared until two months hence. In these circumstances, however, a successful candidate would not be able to obtain his qualification shares within the prescribed period, and, indeed, would have to vacate his office of director on the day on which it was declared that he had been elected a director. (c) The declaration of the result is the completion of the poll: see *per* Russell J. in *Spiller* v. *Mayo (Rhodesia) Development Co. (1908) Ltd.*[7]

In the present case the result of the poll was ascertained and declared on the same day, December 24, 1958, and, accordingly, adopting the arguments in favour of Wednesday and/or Thursday as stated above, the individual defendants were " appointed " directors within the meaning of section 182 (1) of the Companies Act, 1948, on December 24, 1958, and therefore acquired their qualification shares within the period prescribed by that section.

Finally, on each of the resolutions at the meeting of December 23, 1957, a poll was demanded without first going through the formality of a show of hands. It is submitted that on the true construction of article 65 that might have the effect of vitiating the appointments of all five directors who were appointed at that meeting, since, as there had been no valid show of hands, the demand for a poll was irregular: see *per* Lord Blanesburgh in *Carruth* v. *Imperial Chemical Industries Ltd.*[8]

*J. E. S. Ricardo,* for the first defendant, adopted the argument on behalf of the second defendant. Section 182 of the Companies

C. A.

1958

HOLMES
*v.*
KEYES.

[6] [1916] 2 Ch. 325.            [8] [1937] A.C. 707, 754, 755.
[7] [1926] W.N. 78, 79.

204                        CHANCERY DIVISION.                **[1959]**

C. A.

1958

HOLMES
*v.*
KEYES.

Act imposes a duty on a director to obtain his share qualification within two months. There is no provision either in the Companies Act, 1948, or in the articles prescribing a time limit within which the result of a poll must be declared. In those circumstances, it would be surprising if a person who had stood for the office of director was under a duty to acquire within the two months the shares necessary to qualify him in case it should turn out that he had been elected. [Reference was also made to sections 144, 183, 187, 190 of the Companies Act, 1948.]

*Denys Buckley* for the defendant company. The only authority relating to a vote being taken by a show of hands would appear to be the dictum of Lord Blanesburgh in *Carruth* v. *Imperial Chemical Industries Ltd.*,[9] but the relevant article in that case was differently worded from article 65 of the defendant company's articles. Under the terms of article 65 the necessity for a show of hands would seem to be otiose if in any event there is to be a poll, that is, it is known that a poll is to be demanded.

*Gilbert Beyfus Q.C.* and *Paul Sieghart* for the plaintiffs. *Carruth* v. *Imperial Chemical Industries Ltd.*[9] is plainly distinguishable. The article was quite different from article 65 here. It concerned the right to demand a poll immediately upon the declaration of the result of a show of hands. In the circumstances Lord Blanesburgh held that there had not been a valid show of hands and that, accordingly, the demand for a poll was irregular. In any event, Lord Blanesburgh's observations were merely obiter. The words " unless before " in article 65 make it plain that if a poll is demanded before there is a show of hands it is not necessary to go through the formality of having a show of hands.

On the main question, the election was complete when the poll was closed, and the subsequent ascertainment of the result was mere machinery. Accordingly, the election of the defendants took place on December 23, 1957, and the period within which they had to obtain their qualification expired at latest at midnight on February 23/24, 1958; their registration as holders of the shares on the afternoon of February 24, 1958, was therefore too late. That the defendants' election took place on December 23, 1957, is reinforced by a consideration of the provisions of section 26 of the Betting and Lotteries Act, 1934. If on the morning of December 24, 1957, X had wished to make a bet on whom had been appointed directors of the defendant company, he would not have been making a forecast as to a " future event "

[9] [1937] A.C. 707, 754, 755.

**1 Ch.**          CHANCERY DIVISION.                    205

C. A.

1958

HOLMES
*v.*
KEYES.

but " of a past event the result of which is not yet ascertained or " not yet generally known." The close of the poll is the vital date, if the poll is postponed then a successful candidate is elected a director on the day the poll closes: *Shaw* v. *Tati Concessions Ltd.*[10] and *Spiller* v. *Mayo (Rhodesia) Development Co. (1908) Ltd.*[11] The argument for the defendants, if accepted, might lead to an impossible situation. Suppose five shareholders of this company held the majority of the shares and cast their votes at 4 p.m. on December 23, 1957, and at 6 p.m. on that day all of them were killed in an accident. It would follow from the defendants' argument that they had been elected by dead men! [Reference was also made to *Catesby* v. *Burnett.*[12]]

*Gardiner Q.C.* in reply. The contention that the election was complete on the day the poll closed involves using the word " poll " in its secondary sense of the casting of votes. The defendants rely on its primary meaning of *counting* of votes.

*Ricardo*, in reply, cited *Young* v. *Higgon.*[13]

JENKINS L.J. stated the facts and continued: The substantial question in the case is whether in the circumstances, for the purposes of section 182 of the Act of 1948, the two individual defendants should be treated as having been appointed at the meeting itself so soon as all the votes on the relevant resolutions had been cast, or whether the true view is that the two individual defendants were not appointed until the result of the poll was ascertained on the following day. The importance of that question is this: If the individual defendants are to be treated as elected on December 23, then for the purposes of the two months allowed for the acquisition of qualification shares, time began to run from midnight on December 23, 1957, and expired, as I understand it, at midnight on February 23.

The individual defendants in fact set about acquiring their qualification shares some time during January, and well within the two months they became beneficially entitled to shares, but there was no registration of the individual defendants as proprietors of the shares acquired until some time on February 24, which would be too late, if time is properly to be calculated from midnight on December 23. If, on the other hand, they were not elected until December 24, when the result of the poll was ascertained, then their acquisition of qualification shares and completion of their title by registration took place just within

[10] [1913] 1 Ch. 292.          [12] [1916] 2 Ch. 325.
[11] [1926] W.N. 78, 79.         [13] (1840) 6 M. & W. 49.

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

time. The question is a highly technical one and probably would not have been litigated at all but for certain unfortunate internal divisions in the councils of the company.

[His Lordship read section 182 of the Act of 1948 and continued:] Article 1 of the articles of association of the company excludes Table A in the First Schedule to the Companies Act, 1929, which was the Act in force when the articles were adopted, " except so far as the same are repeated or contained in these " articles." Article 80 deals with the number of directors and provides: " Until otherwise determined by a general meeting, the " number of directors shall not be less than three nor more than " nine." I understand that the maximum of nine was reduced to seven, exclusive of certain directors appointed on behalf of debenture holders, but nothing turns upon that.

Article 81 is the usual provision for the appointment of directors by the board: " The directors may from time to time " appoint any other person to be a director, either to fill a casual " vacancy or by way of addition to the board, but so that the " maximum number fixed as above shall not be thereby exceeded. " Any director appointed under this article shall hold office only " until the ordinary general meeting following next after his " appointment, but shall then be eligible for re-election."

Article 83 concerns the qualification of a director. That article as it originally stood was altered by special resolution, and in its new form reads as follows: " The qualification of a director " other than a nominated director shall be the holding in his own " right of 500 ordinary shares of the company of £1 each and " section 141 of.the Act shall be duly complied with by every " director requiring such qualification." Section 141 of the Act of 1929 corresponds to section 182 of the Act of 1948.

Article 98 deals with the vacation of office by directors and it provides: " The office of a director shall be vacated." Then there are events (A) and (B) which are not material. Then (C): " If " he ceases to hold the number of shares required to qualify him " for office or does not acquire the same within two months after " election or appointment." There are three other disqualifying events, with which we are not concerned.

There follow provisions as to the rotation of directors. They begin with article 100: " At the ordinary meeting in every year, " two of the directors for the time being shall retire from office." Then there is the usual provision deciding who is to retire, the rule being that the longest in office since their last election are the ones to retire; and there is a provision that as between

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

directors of equal seniority, the directors to retire, in the absence of agreement, are to be selected from among them by lot. Then:
" A retiring director shall be eligible for re-election and shall act
" as a director throughout the meeting at which he retires."

Article 102 provides: " Subject to any resolution for reducing
" the number of directors, the company shall, at the meeting at
" which any directors retire in manner aforesaid, fill up the
" vacated office of each director by electing a person thereto."
Nothing turns on article 103.

Article 104 provides: " Subject to any resolution for reducing
" the number of directors, if at any meeting at which an election
" of directors ought to take place, the places of the retiring
" directors are not filled up, the retiring directors as aforesaid
" shall be deemed to have been re-elected."

We were referred in the course of the argument to articles 23 and 24, which deal with transfers of shares. I need not refer to those articles, for they were quoted only on the point that a director cannot be said to have qualified himself by the requisite shareholding unless and until his title is perfected by registration. That point was the subject of some argument, I understand, before the judge, but it is not now contended that a director can claim to have acquired his qualifying shares until he is actually on the register.

Finally, I should refer to some of the articles dealing with general meetings and proceedings at general meetings. Article 60 is the usual article stating the ordinary business at an ordinary meeting, and that includes the election of directors. Then article 63 gives the usual power to the chairman, with the consent of any meeting at which a quorum is present, to adjourn the meeting from time to time and from place to place.

Article 65 is another article which has been amended by special resolution. In its present form it reads thus: " At any
" general meeting of the company a resolution put to the vote of
" the meeting shall be decided on a show of hands unless before
" or upon the declaration of the result of the show of hands a
" poll be demanded in writing by the chairman or by at least five
" members present in person or by proxy and entitled to vote
" at the meeting, or by the holder or holders in person or by
" proxy of at least one-tenth of the total voting rights of all
" members having the right to vote at the meeting." I do not
think it is necessary for me to read the whole of that article,
which is in a very usual form. After the provisions for demanding

208                          CHANCERY DIVISION.                    **[1959]**

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

a poll, it goes on: " and unless a poll be so demanded a declara- " tion by the chairman of the meeting that a resolution has been " carried, or has been carried by a particular majority, or lost, " or not carried by a particular majority, shall be conclusive and " an entry to that effect in the minute book of the company shall " be conclusive evidence thereof, without proof of the number " or proportion of the votes recorded in favour of or against such " resolution."

Article 66 is of some importance. It is in these terms: " If a poll be demanded in manner aforesaid, it shall be taken at " such time and place and in such manner as the chairman shall " direct, and the result of the poll shall be deemed to be the " resolution of the meeting at which the poll was demanded. The " demand for a poll may be withdrawn."

Article 68 provides: " In the case of an equality of votes, " either on a show of hands or at a poll, the chairman of the " meeting shall be entitled to a further or casting vote, in addition " to the votes to which he may be entitled as a member." Article 69: " The demand of a poll shall not prevent the con- " tinuance of a meeting for the transaction of any business other " than the question on which a poll has been demanded."

Those are all the relevant articles, but I should perhaps refer again to the Act for section 144. That provides: " Where a " resolution is passed at an adjourned meeting of—(*a*) a com- " pany "—that is the material case—" the resolution shall for all " purposes be treated as having been passed on the date on which " it was in fact passed, and shall not be deemed to have been " passed on any earlier date."

In the course of his submissions to us on behalf of the two individual defendants, Mr. Gardiner made two admissions. First, he said that he did not pursue the contention to the effect that the two individual defendants became duly qualified when they entered into contracts to purchase shares, but accepted the view that they could only become qualified when their title was com- pleted by registration. That point, therefore, disappears from the case. Mr. Gardiner further agreed that if the election took place on December 23, time began to run from midnight on that day, and, on the other hand, if the election is treated as taking place on December 24, time began to run from midnight on that day. So there is no dispute as to the method of computing time, and it is clear that if December 23 was the proper date from which to compute the time, these two defendants were too late. On the

**1 Ch.**          CHANCERY DIVISION.                    209

other hand, if the proper date was December 24, they were within
time.

The judge, after stating the facts and citing the relevant
articles of association, expressed his conclusion thus [1]: " In the
" present case the meeting was called on December 23 and was
" on no other day. It is true that the result was not ascertained
" till the next day, but the meeting was complete and the poll
" was complete, except for the declaration of the result, on
" December 23; and the elections of the defendants, if they were
" valid, took place on that day and on no other day. Conse-
" quently, time did start to run from midnight at the end of
" that day, December 23, and, therefore, expired at midnight on
" February 23, 1958; and the registration of the defendants'
" shares in their names on February 24 was too late."

That is the conclusion which Mr. Gardiner, for the two
individual defendants, was concerned to attack. In the course of
his argument he referred us to certain authorities, which were
also referred to before the judge but which he regarded as
distinguishable from the present case. It is perfectly true that
these authorities did each of them deal with a different set of
circumstances, but two of them, I think, do afford some assistance
to the appellants' case, and I propose to confine my citation to
those two cases. The first is *Shaw* v. *Tati Concessions Ltd.*,[2]
which is a decision of Swinfen Eady J. The headnote reads:
" A poll demanded at a company meeting was directed to be
" taken at a future date, but the meeting itself was not
" adjourned :—*Held*, that the mere postponement of the poll was
" not an adjournment ad hoc of the meeting within the meaning
" of an article allowing the lodgment of proxies forty-eight hours
" before a meeting ' or adjourned meeting,' but the original meet-
" ing continued for the purpose of the poll, and no fresh proxies
" could be lodged."

The judge said this at the conclusion of his judgment [3]: " If
" there is an adjourned meeting they "—that is, the proxies—
" may be deposited later, namely, forty-eight hours before the
" adjourned meeting. But here there was no adjourned meeting,
" and the taking of a poll is not a meeting. The true legal
" position is this. There is no adjourned meeting, but the original
" meeting continues for the purpose of taking the poll until the
" poll is closed. Therefore proxies obtained and lodged later than
" forty-eight hours before the original meeting are not available."

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

---

[1] [1958] Ch. 670, 677.          [3] [1913] 1 Ch. 292, 297.
[2] [1913] 1 Ch. 292; 29 T.L.R. 261.

210 CHANCERY DIVISION. **[1959]**

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

Mr. Beyfus, in regard to that authority, points to the words "until the poll is closed," and he says the poll was closed in the present case when the votes on the poll were cast. Therefore, he says that this authority should not be regarded as telling against him. I doubt whether, when he referred to the closing of the poll, Swinfen Eady J. meant to say that the meeting did not continue for the purpose of ascertaining the result of the poll.

The other authority, *Spiller* v. *Mayo (Rhodesia) Development Co. (1908) Ltd.,*[4] appears to me clearly to regard a meeting in such a case as continuing until the declaration of the poll, which is in effect the ascertainment of the result of the poll. It was a case tried by Russell J. To put it very shortly, the question appears to have been whether, on the true construction of the articles of association of the company, a proxy could be revoked between the holding of a meeting at which a poll was demanded on a resolution and the time when the poll was held, this being a case where the entire poll—that is to say, the casting of the votes as well as the ascertainment of the result—was held on a day subsequent to the meeting. I think that sufficiently indicates the nature of the case, and I refer to it for these observations[5]:
" The first point was there had been in fact no intimation of any
" revocation at all. In his Lordship's opinion that could not be
" sustained. The second point was in his view a more formid-
" able one. It was said that no intimation of the revocation was
" received before the meeting. In his Lordship's opinion, if
" English language meant anything, the article required that in
" order to invalidate the vote, intimation in writing of the revoca-
" tion must be received at the office before the meeting, and in
" his view that must mean before the commencement of the
" meeting. It was well settled that the taking of a poll was not
" a meeting of the company in the strict sense, but was in
" law a mere continuation of the meeting at which the poll was
" directed to be taken. For the particular purpose in question
" therefore the meeting must be held to have begun on Decem-
" ber 15 and to have come to an end at the declaration of the
" poll, a week later. The intimation of revocation, however, had
" been received between those two dates. In his opinion it was
" impossible to say on the true construction of the particular
" article that the proviso had been complied with, namely, that
" intimation in writing of the revocation had been received before
" the meeting."

4 [1926] W.N. 78.          5 Ibid. **79.**

**1 Ch.**          CHANCERY DIVISION.          211

C. A.

1958

HOLMES
v.
KEYES.

Jenkins L.J.

Those are the only two authorities to which I propose to refer on the effect of a poll being taken, or the result of a poll being declared, on a day subsequent to the date of the actual meeting at which the resolution was put, but I should also make some reference to *Carruth* v. *Imperial Chemical Industries Ltd.*[6] I cite that for this reason: It appears that in fact on each of the resolutions appointing directors at the meeting of December 23, a poll was demanded without first going through the formality of a show of hands, and it was suggested that, on the true construction of article 65, that vitiated not only the appointments of the two individual defendants, but also the appointments of the directors who were appointed at the same meeting (in some ways one might say a rather appropriate conclusion to the dispute), but I am satisfied that the resolutions cannot be regarded as having been invalidated on that ground.

The case to which I refer dealt with a highly complicated scheme of arrangement between a company and its various classes of shareholders. The presentation of the scheme to the court for approval had to be preceded by the approval of the scheme at a meeting of the company, and also at the meetings of the various classes of shareholders. The proceedings at these meetings had to be regulated in accordance with the articles of association of the company. The particular article of association which was material for the present purpose was the article corresponding to article 65 in the articles of Gordon Hotels Ltd., but it had this important difference, that provision was made for a demand for a poll simply on the declaration of the result of the show of hands.

The point arose in this way: Apparently the arrangements for separating the different classes for the purposes of their several meetings were not as effective as they might have been, so that in the case of at least one meeting there were present holders of shares of the class and strangers of various kinds—I imagine members of the company holding shares of other classes. The resolution was, in fact, put to the vote by show of hands, and on the declaration of the result, a poll was demanded, but Lord Blanesburgh took the point that inasmuch as the meeting was diluted by the presence of strangers, the vote on a show of hands was (as one might say) a nullity because it was impossible to tell how far it included non-members. Of course, that difficulty would not enter into the voting by poll because each member would have to produce proper evidence of his being a holder of

---

[6] [1937] A.C. 707; 53 T.L.R. 524; [1937] 2 All E.R. 422.

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

shares in the class. So, said Lord Blanesburgh, as there had been no valid show of hands, the demand for a poll was irregular, because the proper time to demand it was upon the declaration of the result of the show of hands, being a valid show of hands.

In my view, that case does not touch the present case. I should say that the point was taken and dealt with only by Lord Blanesburgh, so that his observations may, I think, be regarded as obiter, though entitled to respect.

What, to my mind, concludes the matter is the circumstance that the article with which we are here concerned, article 65, as adopted by special resolution, provides as follows: '' At any '' general meeting of the company a resolution put to the vote '' of the meeting shall be decided on a show of hands unless before '' or upon the declaration of the result of the show of hands a poll '' be demanded . . . '' It is to be observed that a poll can be demanded before the show of hands as well as upon the declaration of the result of the show of hands. The language is capable of reading: '' Unless before the declaration of the result of the '' show of hands or upon the declaration of the result of the show '' of hands,'' and then it could conceivably be argued that the demand could not be made before the declaration of the result of the show of hands if there was no show of hands at all. That would be an inconvenient construction, which would compel going through the formality of a show of hands, not for the purpose of obtaining the result of that vote, but merely so that a demand for a poll could be made before the declaration of the result. I think the article should read, as suggested by my brother Romer in the course of the argument, in this way: '' At any general meeting of '' the company a resolution put to the vote of the meeting shall be '' decided on a show of hands unless before (comma) or upon the '' declaration of the result of (comma) the show of hands a poll be '' demanded.'' That makes it clear that a poll can be demanded without going through the formality of a show of hands. That question, therefore, is, in my judgment, out of the way.

I should next state as best I can the arguments on either side in this highly technical controversy. The case for the two individual defendants may possibly be put in some such way as this: It cannot be said of any candidate for the office of director that he has been elected or appointed until he can say with truth '' I am a director,'' or until the company could truthfully tell him, if he asked, '' You are a director.'' These defendants agree that knowledge on the part of a candidate of his election is not the test, but they do submit that at all events he is not elected,

in any effective sense of that expression, until the company can
tell him, if he asks, " Yes, you are a director." It is clear, say
these defendants, that neither of them could, during the period
between the casting of the votes on the poll and the ascertainment
of the result of the poll, claim to be, or to exercise, any of the
powers of a director. In these defendants' submission, the taking
of the poll was not complete until the result was ascertained.
Therefore, the individual defendants could not be said to have
been elected until the result was ascertained. The possibility
was suggested, I think, of the resolution for the election of a
director being put to the vote by show of hands, and in such a
case it was said that, although the votes had been cast in the
form of hands raised, so that in one sense the election may be
said to have taken place, in another sense, and in the effective
sense, it cannot be said to have taken place until the result of
the show of hands, by counting hands raised on either side, has
been ascertained.

On the appellants' side it is further argued that there is no
sufficient reason for treating the election (which only becomes
effective when the result is ascertained) as relating back to the
date of the meeting; and it is pointed out that the period between
the meeting and the ascertainment of the result need not (as in
the present case) be a matter only of one day, it might be a sub-
stantial period; and, indeed, under certain circumstances, delay
in ascertaining the result of the poll on the resolution for the
appointment of a director might absorb the whole period allowed
him under the articles in which to qualify himself. Suppose the
articles said that he was to acquire his qualification within a
fortnight of his appointment, and suppose a poll on the resolution
for his election had been demanded and the result was not ascer-
tained for a fortnight after the date of the meeting. The peculiar
result would apparently ensue that at the very moment when for
the first time it could be said of him: " He is a director," he
would vacate office for failure to acquire his qualification shares.
This side of the argument may also be put thus: By the express
terms of section 182 of the Act, every director is placed under a
duty to obtain his qualification within two months after his
appointment. How can a person who has stood for the office of
director at a meeting and whose appointment has been the subject
of a resolution, voted upon by a poll vote, of which the result
has not yet been ascertained, be said to be under a duty to
acquire his qualification shares? He does not know whether he
is a director or not; the company does not know whether he is a

C. A.

1958
_____

HOLMES
*v.*
KEYES.
____

Jenkins L.J.
____

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

director or not.  Nobody knows or can know until the result is ascertained.  If he asks the secretary of the company: '' Am I '' under a duty to acquire my qualification shares? '' at any time before the ascertainment of the result of the vote, the secretary could only answer: '' Well, you may be under an obligation to '' do so, but it is impossible to say whether you are or not.'' It is obviously unreasonable to expect such a person to acquire the shares necessary to qualify him in case the poll turns out to have resulted in his election.

In substance, therefore, in the appellants' submission, the effect of the view contended for by the plaintiffs and taken by the judge is that the period prescribed by the Act or the article for the acquisition of the qualification would be curtailed by the period of time elapsing between the date of the meeting and the date of the ascertainment of the result of the poll.  The true view, as the appellants would have it, is, as I understand it, in effect that the meeting should be treated as notionally continuing until the result of the poll is ascertained and that the appointment of the director concerned takes effect as from the date of such ascertainment.  Some support for that view is, I think, to be found in *Shaw* v. *Tati Concessions Ltd.*[7] and *Spiller* v. *Mayo (Rhodesia) Development Co. (1908) Ltd.*,[8] to which I have already referred. It is not right, in the defendants' submission, to treat the ascertainment of the result as a mere formality, and by way of illustration of their submission to the contrary, they point out that in the event of an equality of votes, the chairman has a second or casting vote.  They say that the ascertainment of the result is just as much a part of the taking of the poll as the casting of the votes.

Article 66 is relied on to some extent by both sides.  It will be remembered that that article provides: '' If a poll be '' demanded in manner aforesaid, it shall be taken at such time '' and place and in such manner as the chairman shall direct, and '' the result of the poll shall be deemed to be the resolution of the '' meeting at which the poll was demanded.''  The appellants point out that what is referred to is the result of the poll and not the taking of the poll, and they say the effect of it is that when the result of the poll is ascertained, then that result is to be deemed to be the resolution of the meeting, but they say, in effect, that the resolution of the meeting should be taken as being of the same date as the ascertainment of the result of the poll.

7 [1913] 1 Ch. 292.                    8 [1926] W.N. 78.

**1 Ch.**          CHANCERY DIVISION.                    215

The plaintiffs' view, on the other hand, is that the effect of article 66 is to make the result of the poll the equivalent of the resolution of the meeting, that resolution being dated back to the date of the meeting, that is to say, December 23, 1957, in the present case.

On the plaintiffs' side, the argument is of this nature: The election is complete when the votes are cast on the poll; the ascertainment of the result of the poll is mere machinery; the people who ultimately turn out to have been elected were elected when those votes were cast, although they did not know it and the company did not know it, and although they could not claim to be considered directors pending such ascertainment. Mr. Beyfus, for the plaintiffs, admitted, as I understood him, that if the poll was taken—that is to say, if the votes on the poll were taken—on a later date, then that later date would be the date of the directors' appointment or election; but he says it is otherwise if the votes are cast on the actual day of the meeting and the counting takes place on a later day. That seems to me to involve an extremely fine distinction, because the effect would be that if in the present case the poll, in the sense of the casting of the votes, had been taken on December 24, then that date would have been the date of appointment of the directors concerned, whereas December 23 is taken for the day in the plaintiffs' submission simply because the convenient course was to let the votes be cast on December 23, before the meeting broke up, and to arrange for the votes to be counted and the result to be ascertained on the following day. Moreover, this line of argument involves abandonment of the contention that the election must take place strictly at a meeting, for the holding of the poll on a date subsequent to the actual meeting is recognized as amounting to election on that day.

I hope I have now done justice to the arguments on either side, and, finally, I should endeavour to express my own conclusions. I think that the articles of association of the company should be regarded as a business document and should be construed so as to give them reasonable business efficacy, where a construction tending to that result is admissible on the language of the articles, in preference to a result which would or might prove unworkable. In my view, the doctrine of relation back for which the plaintiffs contend would produce a wholly unreasonable result, and I decline to adopt it unless constrained to do so by the terms of the Act and the articles. I can find nothing in the Act or the articles which constrains me to do so. I do not

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

216                          CHANCERY DIVISION.                    **[1959]**

C. A.

1958

HOLMES
*v.*
KEYES.

Jenkins L.J.

think that article 66 is inconsistent with the individual defendants' view; on the contrary, I think it tends to support that view. In my judgment, the ascertainment of the result should be considered as part of the poll, and, consequently, there can be no appointment of a director by a general meeting until the result of the poll is ascertained. It is only then that the appointment can become in any sense effective. I think that, in effect, the meeting should be treated as continuing until the result of the voting on the poll is ascertained. Unless the appointment begins when the result of the poll is ascertained and on no earlier date, it would be impossible for the company to know who its directors were. It seems to me that produces a really quite impossible result. It also seems to me to be contrary to principle to place a man under a duty to acquire qualification shares, on the footing that he has been elected as a director, at a period when it is not known whether the resolution appointing him a director has been carried or not.

It is with reluctance that I differ from the judge, a judge of great experience in matters of this kind, but, for the reasons I have endeavoured to express, I would allow this appeal and discharge this injunction.

I should perhaps add that in the course of the hearing before us reference was made to some further evidence which it was suggested might cast doubt on the qualification in shares of the individual defendants or one of them even now. We did not go into the details of that matter because it appeared to us that we should confine our attention to the matters which were raised before the judge. I only wish to say that I am for allowing the appeal simply on the footing that the only material facts were those before the judge and before us, and I say nothing as to any other ground it may be possible to advance for the contention that these directors are not duly qualified.

ROMER L.J. I agree. It appears to me that the appeal raises a very short question of construction of section 182 (3) of the Companies Act, 1948, and of article 98 (C) of the company's articles of association. It is said by the plaintiffs that the effect of those provisions is that the two months which the appellants had to acquire their qualification shares started at midnight on December 23/24, on the ground that the poll which had been demanded at the meeting on December 23 was taken on the same day and was then closed, and that there was nothing remaining to be done thereafter except to ascertain the result of the voting.

That was the view which found favour with the judge. The appel-
lants, however, say that the period of two months did not start
to run until midnight on December 24/25, because the count did
not take place until December 24, and, therefore, it was not
known until that day whether the appellants had been elected
or not.

It may well be that from one point of view the appellants may
be regarded as having been elected directors on December 23,
for it was by virtue of the votes given at the meeting on that day
that they were appointed to the board. The question is, however,
what is meant by " the date of his appointment " in the context
in which those words appear in section 182 (3) of the Act. The
provisions of that subsection impose a time limit within which a
director has to perform a specified act, videlicet, attain his quali-
fication shares. Failure to perform the act within the stipulated
time is attended by serious consequences, namely, the compulsory
vacation of his office by the director concerned.

In these circumstances, common sense would seem to suggest
that the time should not start to run until it was known, at least
by somebody, that a position had arisen which necessitated the
acquisition of the qualification shares; and that position could not
be said to have arisen until it had been ascertained that a
particular candidate had in fact been elected, for until that was
known, no question of obtaining qualification shares could arise.

It seems to me that in a case such as the present a director
cannot be said to have been appointed for relevant purposes until
the result of the poll has been made known. Until that moment
of time, it is a matter of speculation as to whether he has been
elected to the board or not, and until that moment he is neither
entitled to exercise the rights nor is he subject to the obligations
of a director of the company.

In my judgment, it is not until those rights and obligations are
shown to have arisen and a candidate has become clothed with his
office accordingly that he can be said to have been appointed for
the purpose of the section and article 98 (C).

It is unnecessary to refer to any of the authorities cited further
than my Lord has already done. As I have said, it is a short
question of construction, primarily of section 182, and in a
parallel sense of article 98, and, in my opinion, the effect of those
provisions is as I have stated it to be. I would, therefore, allow
the appeal. I would only add that I agree that it is irrelevant
that the poll was not preceded by a show of hands. This is really
quite clear when one analyses article 65 as my Lord has done.

C. A.

1958

HOLMES
*v.*
KEYES.

Romer L.J.

C. A.

1958

HOLMES
*v.*
KEYES.

ORMEROD L.J.  I agree, and were it not for the fact that we are differing from the judge, I think I should find it unnecessary to add anything to the reasons which have already been given by my brethren.

The issue as it came before this court resolved itself into a short point, and was whether the poll was complete when the votes were cast, or was not complete until the result was ascertained by somebody, not necessarily communicated to the persons interested, but certainly ascertained by somebody.

It was agreed, I think, by Mr. Sieghart, on behalf of the plaintiffs, that in the case of a vote by a show of hands the result was not complete until the votes had been counted and the result of the count declared by the person in charge of the meeting.  That seems a reasonable and common-sense view, particularly having regard, as was pointed out, to the fact that people may take their hands down in the course of the voting, and that many other things may happen before the votes are finally counted.  But it was contended on behalf of the plaintiffs that the same considerations would not apply to the taking of a poll, that when the votes were cast the matter was complete, the result could then be determined, and the contingencies such as a voter being able to change his mind and withdraw his hand could not arise, and therefore the poll was complete and nothing further needed to be done.

I find it extremely difficult to accept this argument.  Apart from anything else, it appears that even when the votes are cast, there may be much to be done and much to be decided before the result of the poll can be ascertained.  It may well be that the proxies have to be examined, some of the votes may be disqualified, and so on; and, of course, there is always the possibility, as was pointed out by Mr. Gardiner, that there may be a tie which would require the casting vote of the chairman.

In these circumstances, it seems to be abundantly clear that the poll cannot be said to be taken until these matters have been examined, the votes finally determined and counted and the result ascertained.  In this case the votes were cast on December 23, the day of the meeting, but the result was not ascertained until December 24, the day after the meeting.

Mr. Beyfus, as I understand his argument, does not now contend that in any event, having regard to article 66, the result of the poll, which is to be deemed to be a resolution of the meeting, must be dated back to the date of the meeting.  His contention is that all that was necessary to be done had been done

at the meeting on December 23, and that, in those circumstances, the matter was complete and the directors were elected.

This view does not seem to be in accordance with article 66, which provides that when a poll is taken it shall be taken at such place and in such manner as the chairman may direct, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. As I see it, the words "the result of the poll" must imply the necessary ascertainment of that result, and until that result is ascertained I find it difficult to understand how the poll could become what the article required, something which may be deemed to be the resolution of the meeting.

In any event, it does appear that any other construction would be so impracticable as to be unworkable. In this particular case, for instance, there were four vacancies on the board of directors. There were five candidates and four were elected. Until the result of the poll was ascertained, the officials of the company had no idea how many of the persons who had been candidates for election had been elected, who they were, and out of the seven directors to which the company was entitled there were only three who could with any certainty be said to be directors of the company. It seems quite impossible that a company should carry on its business in such circumstances. Though the delay here was only a matter of some 24 hours, there seems to be no reason why in a similar case the delay should not be for a very much longer period.

Taking all those matters into consideration, I am of the opinion that the poll here was not taken until the result was ascertained, and as the result was not ascertained until December 24, it means that the election or the appointment of these two directors did not take place until then, and if that be so, they have, of course, acquired their qualification shares in time.

I agree that this appeal should be allowed.

*Appeal allowed.*
*Leave to appeal refused.*

Solicitors: *Alastair Thomson; A. Kramer & Co.; Herbert Oppenheimer, Nathan & Vandyk; Basil Greenby & Co.*

J. A. G.

C. A.

1958

HOLMES
*v.*
KEYES.

Ormerod L.J.

Case No:  HC2012790

Neutral Citation Number: [2012] EWHC 4171 (Comm)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

The Rolls Building
7 Rolls Buildings
Fetter Lane
London, EC4A 1NL

Friday, 23rd November 2012

BEFORE:

**MR JUSTICE FLAUX**

-------------------

BETWEEN:

**INJAZAT TECHNOLOGY CAPITAL LIMITED**

Claimant/Applicant

- and -

**DR. HAMID NAJAFI**

Defendant/Respondent

-------------------

MR DAVID MURRAY (instructed by **Gibson Dunn and Crutcher LLP**) appeared on behalf of the Claimant/Applicant

No representation given on behalf of the Defendant/Respondent

-------------------

**Approved Judgment**
Crown Copyright ©

-------------------
Digital Transcript of Wordwave International Ltd (a Merrill Corporation Company)
8th Floor, 165 Fleet Street, London, EC4A 2DY
Tel No: 020 7421 4036  Fax No: 020 7404 1424
Web: www.merrillcorp.com/mls     Email: courtcontracts@merrillcorp.com
(Official Shorthand Writers to the Court)

1. MR JUSTICE FLAUX:   This is the claimant's application for an injunction to restrain the defendant from pursuing arbitrations purportedly commenced by him by a Request for Arbitration addressed to the ICC dated 30th March 2012 and by a request for arbitration directed to the DIFC in Dubai commenced in the name of Broadlink Research FZLLC on 22nd October 2012.

2. It is the claimant's case that these arbitrations are abusive and oppressive because by them the defendant seeks to re-litigate issues already decided against him in an earlier ICC arbitration, where after a three day hearing in London at which the Defendant was legally represented, the arbitrator, Mr James Evans, made an award which determined all issues against the defendant.  Alternatively, the claimants say that the matters raised in the second and third arbitrations could and should have been raised in the first arbitration and it is abusive and a collateral attack on the first award to raise those matters now.

3. The background facts can be stated briefly as follows. By a Share Subscription Agreement ("the SSA") dated 22nd September 2006 between the first claimant and a company called Broadlink, the defendant and a Mr Michael Comisky, the first claimant agreed to subscribe for a number of shares in Broadlink sufficient to give it 35 per cent of the share capital for a consideration of $3,000,000.  Broadlink had been established by the defendant and Mr Comisky as a vehicle for the commercialisation of a new mobile phone that they had developed.  In this SSA, the defendant and Mr Comisky were described as "guarantors."  The purchase price for the shares was payable in three instalments.  The SSA contained a number of warranties and by clause 9 the warranties were continuing warranties and Broadlink and the guarantors warranted their truth and accuracy.  Completion of each subsequent payment of instalments was conditional upon the warranties being true, correct and complete.  The SSA provided for disputes to be submitted to arbitration in London pursuant to the ICC rules before a single arbitrator who was to be an English qualified barrister or a solicitor.

4. On the same day, 22nd September 2006, the first claimants, Broadlink and the guarantors entered into a Shareholders Agreement ("the SHA") setting out their rights and obligations in relation to the management and operation of Broadlink.  These included a term that certain matters should not be undertaken without prior approval of the board of directors, including at least one director appointed by the first claimant. That contract again contained a London arbitration clause in essentially the same terms as the SSA.  By a Placement Agency Agreement ("the PAA") dated 23rd July 2006 (so pre-dating the other two agreements) made between Broadlink and the second claimant (which is the manager of the first claimants) Broadlink appointed the second claimant as its placement agent to raise capital in an amount not to exceed $3,000,000.  That contract provided that any dispute should be resolved by arbitration in Dubai in accordance with the rules of the Dubai International Financial Centre ("DIFC").

5. On 1st and 4th October 2006, the first claimant made the initial and second payments under the SSA of $1.25 million and $750,000 respectively to Broadlink.  It did not pay the third payment of $1,000,000 because it considers the conditions precedent under the SSA were not satisfied.  Broadlink ceased trading in about August 2007 by which time it was hopelessly insolvent, so the first claimant lost its $2,000,000 investment in Broadlink.  On 20th October 2008, the first claimant commenced arbitration under both the SSA and SHA against the guarantors claiming damages of $2,000,000 on the

grounds that the first claimant's entry into the Agreement had been induced by misrepresentations by the guarantors and that the guarantors had breached the SHA causing Broadlink to fail. Neither guarantor made any counterclaim in that first arbitration.

6.    The hearing of the first arbitration (at which, as I have already said, the defendant was legally represented) took place in London between 31st January and 2nd February 2011; and on 25th July 2011, the arbitrator issued his final award upholding the claimant's claim against the guarantors, awarding damages and interest and costs in the total sum of $3,426,533.45. He held that the warranties given by the guarantors had been untrue, inaccurate and misleading. It is not necessary to recite the details of those findings here, suffice it to say that he found the guarantors had made false statements as to Broadlink's profitability and that Broadlink was in fact insolvent at the date of the agreements, and he found that the misrepresentations made by the guarantors has induced the first claimant to enter into the Agreement and make payment under the SSA. No steps were taken by either guarantor to challenge the final award under the Arbitration Act 1996, but equally neither has made any payment pursuant to the award. The claimants have commenced enforcement proceedings against the defendant in California, which is the state in the United States where the defendant is resident.

7.    On 30th March 2012, the defendant purported to commence arbitration against the claimants under the ICC rules, advancing claims according to his request for arbitration:

    (1)    That the first claimant was in breach of the SSA by not making the third payment and in other respects.

    (2)    A claim for breach of "promissory estoppel" apparently based on an oral promise by the first claimant that it would pay $750,000 to Broadlink if the defendant stepped down as Chief Executive.

    (3)    A claim for breach of the PAA alleging that the second claimant failed to use its best efforts to obtain investment.

    (4)    Claims for alleged tortious interference with Broadlink's contracts with customers and other claims for tortious interference for breach of fiduciary duty and false imprisonment. The latter because, as part of steps to enforce the final award in Dubai, the claimants had obtained an order preventing the defendant from leaving Dubai; an order which was subsequently lifted.

8.    So far as the claims for breach of the SSA and breach of promise are concerned, they are clearly an attempt to re-open matters decided against the defendant in the final award. Alternatively, they are entirely spurious claims, which, if anyone could make them, it would be Broadlink not the defendant. Similarly, the claims for tortious interference and breach of fiduciary duty are all attempts to re-open matters decided against the defendant by the final Award, or matters which could and should have been raised by the defendants in the first arbitration, and in any event, if they had any merit and if anybody could make such claims, it would be Broadlink, not the defendant.

9.    Accordingly, in my judgment, those are all claims either precluded by res judicata or claims which are an abuse of process. The claim for breach of the PAA is not one the defendant can bring since he was not party to the PAA, and the claim for false imprisonment, even if it were not wholly unmeritorious, is not a claim which falls within the scope of the arbitration clause in either contract. All-in-all, I agree with Mr

Murray, who appeared on behalf of the claimants, that these claims are abusive and a collateral attack on the first Award and a transparent attempt to frustrate enforcement proceedings in the United States. That is apparent from the fact that on the very day he made the request for the second arbitration, 30th March 2012, the defendant issued a Motion to stay confirmation by the Californian court of the final award relying on the fact that he had commenced the second arbitration.

10. The present proceedings seeking an injunction restraining the defendant from pursuing the second arbitration were issued on 12th June 2012. Permission to serve them on the defendant in California was granted by Christopher Clarke J on 15th June 2012. Thereafter, the defendant was duly served. So far as the second arbitration is concerned, the ICC has requested payment and an advance on costs from the defendant, which he has not paid, so no steps have been taken by the ICC to appoint an arbitrator. Furthermore, it appears that the defendant has invited the ICC to stay that arbitration.

11. On 27th July 2012, the defendant filed an Acknowledgement of Service in these proceedings indicating that he intended to dispute this court's jurisdiction and that evidence will be filed in support of that application within 21 days. The Acknowledgement of Service was defective since it did not provide an address in the United Kingdom for service, but only the defendant's residential address in San Francisco. Despite being informed of this defect several times, the defendant has not cured it, and the defendant has not served either an Application Notice challenging the jurisdiction of the court or any evidence in support of such application.

12. On 26th September 2012, the claimant's solicitors, Gibson Dunn and Crutcher, wrote by email to the defendant asking him to inform them by 4th October of any dates between 1st November 2012 and 1st March 2013 when he would be unavoidably unavailable to attend a hearing of this application. No response was received, so a further email was sent on 9th October giving the defendant more than 24 hours notice that the claimants would be seeking to fix a date with the Commercial Court listing office. That was duly done and today's date was fixed. On 15th October 2012, the claimant's solicitors sent the defendant an email informing him that the date of the hearing was fixed as 23rd November. Having had no response, the email was then forwarded to his US attorney, Ms Cabrera. The response from her was that her firm did not act for him in these proceedings.

13. It is clear that both the defendant and his US attorney were well aware of this application a month ago. In fact, what happened is that on 22nd October 2012, the defendant purported to commence a third arbitration in the name of Broadlink against the second claimants under the PAA in Dubai claiming damages for the second claimant's alleged breach of the PAA in failing to use their best efforts to raise investment. The commencement of that arbitration was allegedly authorised by shareholder's resolutions by the defendant and Mr Comisky. Since, on the defendant's own case, Broadlink is insolvent and in fact is no longer licensed by the relevant authorities in Dubai, the resolution is invalid and, in any event, Broadlink has no standing to pursue that arbitration. Nothing has happened in the arbitration and the second claimants do not intend to participate. Again, it is clear to me that that is a transparent attempt to frustrate any enforcement of the final award in the first arbitration.

14.    On 14th November, the defendant wrote to the court requesting that this hearing be adjourned until January 2013 on the grounds that it is currently the Thanksgiving holiday and, with ensuing holidays of Christmas and New Year, it would be too expensive to attend any hearing.  As Gibson Dunn pointed out in their response on 20th November, resisting any adjournment, the defendant has known for a month, at least, of this date.  Andrew Smith J refused an adjournment on paper and ordered this hearing to proceed.

15.    In that letter of 14th November, the defendant asserts that the claimants have not:

> "…been able to identify any legal basis on which the court is entitled to interject itself into this arbitration, rather than letting the ICC court decide the first claimant's preliminary jurisdiction challenges itself."

16.    That statement proceeds on a misunderstanding of the relevant English law.  It is well established that even though the arbitral tribunal has jurisdiction to determine its own jurisdiction pursuant to section 30 of the Arbitration Act, in an appropriate case the English court will grant an injunction restraining a party from commencing or continuing arbitration.

17.    The most recent statement of the principles pursuant to which the court will act is set out in the judgment of Andrew Smith J in Nomihold Securities v Mobile Telesystems Finance [2012] 1 Lloyd's Rep. 442 paragraph 27:

> "It is not disputed that the court has jurisdiction under section 37 of the Senior Courts Act 1981 to grant what have been called anti-arbitration injunctions, that is to say to make an order that a person does not commence or does not pursue an arbitral reference.  If authority still be needed for that, I refer to Claxton Engineering Services v TXM [2011] 1 Lloyd's Rep. 510 paragraph 28.  It is equally well established that if it is just and convenient to do so, the court may exercise its jurisdiction under section 37 to make an anti-arbitration injunction on either or both of two basis: (1) that the arbitral proceedings are an infringement of a legal or equitable right of a party or threatened breach of such a right; (2) if the proceedings are or threatened to be vexatious, oppressive or unconscionable.  This formulation reflects the judgment of Aikens J in Elektrim SA v Vivendi [2007] 2 Lloyd's Rep 8 paragraph 56.  It is possible to regard the right not to be subject to vexatious, oppressive or unconscionable litigation or arbitral proceedings itself as an equitable right as Hobhouse J did in Compagnie Europeene de Cereals SA v Tradax Export SA [1986] 2 Lloyd's Rep. 301 at 304, but that debate is not useful for present purposes."

18.    The question which arises is whether the court still has jurisdiction to grant such an injunction in circumstances where there is a valid and binding arbitration agreement, pursuant to which the tribunal can determine whether or not it has jurisdiction and

whether or not particular claims are oppressive and vexatious. Andrew Smith J dealt with this at paragraphs 55 to 57 of his judgment and again at paragraph 59 where he held that the court retains jurisdiction in such a case. For present purposes it is not necessary to do more than to quote from a passage in the judgment of Jackson J in Jarvis & Sons v Blue Circle Dartford Estates [2007] B.L.R. 439 paragraph 39 quoted by Andrew Smith J in paragraph 37:

> "It is clear from the two decisions of the commercial court [that is the decision of Aikens J in Vivendi and of Gloster J in Intermet v Ansell] (with which I respectfully agree) that the jurisdiction does survive the enactment of the 1996 Act, but its exercise will be even more sparing than before."

19. Andrew Smith J goes on to consider the impact of a doctrine of kompetenz-kompetenz and says at paragraph 59:

> "It does not necessarily mean that tribunals have exclusive power or jurisdiction to do so (that is to say, to examine their own jurisdiction). Given the consensual nature of arbitration its application is necessarily subject to the parties' agreement. Under the 1996 Act, the tribunal's jurisdiction to rule upon its own substantive jurisdiction is enshrined in section 30 and the court's power to determine, circumscribed by section 32, but these sections are not directly relevant for present purposes. Here the parties agree to references under the rules of the LCIA including Rule 23(4) to which I have referred. Suffice to say, Mr Flynn did not argue that it would be a breach of Rule 23(4) or contravene that doctrine of competence-competence to grant Nomihold's application."

20. It is clear from those passages that, even in circumstances where the tribunal would have jurisdiction to determine whether or not claims are abusive, the court retains its supervisory jurisdiction to grant an anti-arbitration injunction pursuant to section 37 of the 1981 Act in an appropriate case.

21. On the facts of that case, the second arbitration which had been commenced by the defendant raised new allegations of money laundering to the effect that enforcement of the first award would be contrary to public policy and Andrew Smith J appears to have thought that those contentions were at least arguable. Furthermore, the defendant offered an undertaking, the effect of which was that what the claimant's counsel had described as the most blatantly abusive part of the process was abandoned altogether. It is clear from Andrew Smith J's judgment, and particularly paragraph 52, that but for the undertaking, he would have granted the injunction sought.

22. In my judgment, there are no such redeeming features in the present case. Both the second and third arbitrations are a blatant attempt to avoid enforcement of the first award by re-litigation of issues already decided by the arbitrator against the defendant

in the first arbitration or by raising matters which could and should have been raised by way of defence and counterclaim in the first arbitration proceedings.

23.    In those circumstances, it seems to me that both the bases for the grant of an anti-arbitration injunction set out by Andrew Smith J in paragraph 27 of his judgment are satisfied: first of all that the arbitral proceedings are an infringement of a legal or equitable right of the claimants; and secondly, that the second and third arbitrations are vexatious, oppressive and unconscionable.  Accordingly, although the jurisdiction to grant an anti-arbitration injunction will (as Andrew Smith J indicated) be exercised sparingly, I propose to grant the order sought by Mr Murray, which is clearly appropriate in the circumstances of this case.



<u>Neutral Citation Number: [2019] EWHC 1877 (Comm)</u>

<u>Case No: CL-2018-000826</u>

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 12/09/2019</u>

**Before** :

<u>**HIS HONOUR JUDGE PELLING QC**</u>
<u>**SITTING AS A JUDGE OF THE HIGH COURT**</u>
- - - - - - - - - - - - - - - - - - - -
**Between :**

**LAMESA INVESTMENTS LIMITED**                <u>**Claimant**</u>
**- and -**
**CYNERGY BANK LIMITED**                          <u>**Defendant**</u>

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Ms Maya Lester QC and Mr Richard Blakeley** (instructed by **Elborne Mitchell LLP**) for the
**Claimant**
**Mr Brian Kennelly QC and Ms Harriet Ter-Berg** (instructed by **Sidley Austin LLP**) for the
**Defendant**

Hearing dates: 15 July 2019
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

............................

HIS HONOUR JUDGE PELLING QC

**His Honour Judge Pelling (sitting as a judge of the High Court):**

## Introduction

1. This is the hearing of a Part 8 Claim by which the claimant ("LIL") seeks a determination as to whether the defendant ("CBL") continues to be obliged to make repayments under a Facility Agreement dated 19 December 2017 ("FA") in the events that have happened and on the true construction of the FA.

## Factual Background

2. There is no dispute concerning the material factual background. LIL is a company registered in accordance with the laws of the Republic of Cyprus. It is wholly owned by Lamesa Group Incorporated ("LGI"), a company registered in accordance with the laws of the British Virgin Islands. LGI is wholly owned by Mr. Viktor Vekselberg ("VV").

3. CBL is a UK registered company carrying on business in England as a retail bank. CBL's only connection with the United States of America ("US") is that in common with most banks it is only able to carry on its US-Dollar denominated business by maintaining a US Dollar correspondent account with a US bank.

4. Under the FA, LIL lent £30m to CBL. CBL was contractually obliged to make interest payments on 21 June and 21 December of each year throughout the term of the loan. To date, interest totalling £3.6m has become due but has not been paid, although it has been "*ring-fenced*" by CBL and is available for payment subject to resolution of the issues to which I turn below – see paragraph 1.6 of Mr Jordan's first witness statement. What Mr Jordan means when he says the interest payable under the FA has been ring-fenced is unclear – see paragraph 13 of Mr Brentnall's second witness statement – but this is immaterial to the issue I have to decide.

5. In so far as is material to the issue I have to decide, the FA provides as follows:

> "1.2    **Construction**
>
> (a)    Unless a contrary indication appears, any reference in this Agreement to:
>
> …
>
> (iv) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental, or supranational body, agency, department or of any regulatory, self-regulatory, or other authority or organisation
>
> …
>
> 9.    **ENFORCEMENT**
>
> 9.1    **Non-payment**
>
> In the event that any principal or interest in respect of the … loan has not been paid within 14 days from the due date for payment and such sum has not been duly paid within a further 14 days following written notice from

[LIL] to [CBL] requiring the non-payment to be made good, [LIL] may institute proceedings in a court of competent jurisdiction in England for the winding up of [CBL] … provided that [CBL] shall not be in default if during the 14 days after [LIL's] notice is satisfies [CBL] that such sums were not paid in order to comply with any mandatory provision of law, regulation or order of any court of competent jurisdiction. Where there is doubt as to the validity or applicability of any such law, regulation or order, [CBL] will not be in default if it acts on the advice given to it during such 14 day period by its independent legal advisers.

…

### 16    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Parties in relation to the Facility and supersedes any previous agreement, whether express or implied, regarding the Facility.

…

### 18    GOVERNING LAW

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

### 19    ENFORCEMENT

#### 19.1    Jurisdiction

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement …".

6.    On 6 April 2018, VV was placed on a list of *"Specially Designated Nationals"* ("SDN") by the US Department of The Treasury Office for Foreign Assets Control ("OFAC") by Executive Order No. 13662 made under the International Emergency Economic Powers Act – a US Federal statute. In consequence LIL became a *"blocked person"* by reason of its indirect ownership by VV.

7.    Although some time was taken up at the hearing in exploring the various US statutes and regulations, it is not necessary that I do so in this judgment since their effect is largely common ground. All US persons anywhere in the world, anyone dealing with property subject to US jurisdiction and anyone operating in the US are prohibited from dealing with VV by reason of him being a SDN or LIL by reason of it being a Blocked Person. Anyone dealing with either VV or LIL in breach of these prohibitions is liable to have various economic sanctions of unquestionably potential severity imposed upon it. These sanctions are known in US sanctions law as *"primary sanctions"*. It is not suggested by either party that the payment of interest by CBL to LIL is prohibited by the requirements of US primary sanctions law.

8.    In addition to the imposition of primary sanctions, the US legislation entitles the US Federal Government to impose *"secondary sanctions"* on non-US persons not dealing with property subject to US jurisdiction and not operating in the US. Although there are various US Federal

Acts that are relevant, the primary Act relevant for present purposes is section 5(b) of the Ukraine Freedom Support Act 2014 (as amended) ("UFSA").  It provides that:

> "(b) FACILITATION OF FINANCIAL TRANSACTIONS ON BEHALF OF SPECIALLY DESIGNATED NATIONALS – The President shall impose, unless the President determines that it is not in the national interest of the United States to do so, the sanction prescribed in (c) with respect to a foreign financial institution if the President determines that the foreign financial institution has, on or after the date that is 30 days after the date of the enactment of the Countering Russian Influence in Europe and Eurasia Act of 2017, knowingly facilitated a significant financial transaction on behalf of any … person included on the lost of specially designated nationals and blocked persons maintained by [OFAC] pursuant to  …(2)  Executive Order ….13662 …
>
> (c) SANCTIONS DESCRIBED – The sanction described in this subsection is, with respect to a foreign financial institution, a prohibition on the opening, and a prohibition or the imposition of strict conditions on the maintaining, in the United States of a correspondent account or a payable through account by the foreign financial institution …
>
> (d) NATIONAL SECURITY WAIVER – The President may waive the application of sanctions under this section with respect to a foreign financial institution if the President –
>
> (1) determines that the waiver is in the national security interest of the United States; and
>
> (2) submits to the appropriate congressional committees a report on the determination and the reasons for the determination "

9.      It is common ground that the US Government could impose the sanction described in section 5(c) UFSA on CBL if it determined that the payment of interest to LIL pursuant to the FA was " … *a significant financial transaction* …", subject to the president's express power to waive the imposition of that sanction conferred by sections 5(b) and/or 5(d)(1) of the Act.

10.     The potential effect of the imposition of the section 5(c) UFSA sanction on CBL is described in its skeleton argument as "*... obviously ruinous ...*". The reasons why that is so are set out in paragraphs 2.3 to 2.8 of the second witness statement of Mr. Jordan filed on behalf of CBL.  In summary, a significant part of CBL's business is denominated in US Dollars; Dollars deposited with CBL by its retail customers are deposited by CBL in a correspondent account (known as a "Nostro" account) maintained by CBL with JP Morgan in the US. Its Nostro account currently has a balance in favour of CBL of about US$15m. In addition to this critical issue, Mr. Jordan draws attention to the fact that CBL has entered into foreign exchange swap contracts with another bank in order to protect against exchange rate risk, which of necessity is denominated in Dollars and has long term service contracts with a number of US based companies that would or might be prevented from dealing with CBL if it was sanctioned.  I accept this evidence at face value since it is not challenged.

**English Law Principles**

11.    There is no real dispute that apart from any contractual provision that modifies the position, English law will not excuse contractual performance by reference to foreign law unless that law is the law of the contract or the law of the place of performance – see Ralli Brothers v. Campania Naviera Sota Y Aznar [1920] 2 KB 287, Kleinwort Sons & Co v. UBIA [1939] 2 KB 678 at 694-5 and Libyan Arab Foreign Bank v. Bankers Trust Co [1989] 1 QB 728 at 743 F-G. The outcome in National Bank of Kazakhstan and another v. Bank of New York Mellon [2018] EWCA Civ 1390 was as it was because the contract in issue was subject to an express provision that in effect reversed the common law position – see the judgment of Hamblen LJ at paragraphs 27, 28 and 68 to 70. CBL submits that clause 9.1 of the FA is similar in effect. Thus the sole issue that arises is whether, on its true construction, clause 9.1 of the FA in effect reverses the common law principles that would otherwise apply. If it does not then LIL is entitled to payment notwithstanding the impact that may have on CBL.

**Effect of Clause 9.1 of the FA**

*Applicable Legal principles*

12.    Those principles are well known and are not in dispute. In summary, they are as follows:

   i)    The court construes the relevant words of a contract in their documentary, factual and commercial context, assessed in the light of (i) the natural and ordinary meaning of the provision being construed, (ii) any other relevant provisions of the contract being construed, (iii) the overall purpose of the provision being construed and the contract or order in which it is contained, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions – see Arnold v. Britton [2015] UKSC 36 [2015] AC 1619 per Lord Neuberger PSC at paragraph 15 and the earlier cases he refers to in that paragraph;

   ii)    A court can only consider facts or circumstances known or reasonably available to both parties that existed at the time that the contract or order was made - see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 20;

   iii)    In arriving at the true meaning and effect of a contract or order, the departure point in most cases will be the language used by the parties because (a) the parties have control over the language they use in a contract or consent order and (b) the parties must have been specifically focussing on the issue covered by the disputed clause or clauses when agreeing the wording of that provision – see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 17;

   iv)    Where the parties have used unambiguous language, the court must apply it – see Rainy Sky SA v. Kookmin Bank [2011] UKSC 50 [2011] 1 WLR 2900 per Lord Clarke JSC at paragraph 23;

   v)    Where the language used by the parties is unclear the court can properly depart from its natural meaning where the context suggests that an alternative meaning more accurately reflects what a reasonable person with the parties' actual and presumed knowledge would conclude the parties had meant by the language they used but that does not justify the court searching for drafting infelicities in order to facilitate a departure from the natural meaning of the language used – see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 18;

vi) If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other – see Rainy Sky SA v. Kookmin Bank (ibid.) per Lord Clarke JSC at paragraph 2 - but commercial common sense is relevant only to the extent of how matters would have been perceived by reasonable people in the position of the parties, as at the date that the contract was made – see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 19;

vii) In striking a balance between the indications given by the language and those arising contextually, the court must consider the quality of drafting of the clause and the agreement in which it appears – see Wood v. Capita Insurance Services Limited [2017] UKSC 24 per Lord Hodge JSC at paragraph 11. Sophisticated, complex agreements drafted by skilled professionals are likely to be interpreted principally by textual analysis unless a provision lacks clarity or is apparently illogical or incoherent– see Wood v. Capita Insurance Services Limited (ibid.) per Lord Hodge JSC at paragraph 13; and

viii) A court should not reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight, because it is not the function of a court when interpreting an agreement to relieve a party from a bad bargain - see Arnold v. Britton (ibid.) per Lord Neuberger PSC at paragraph 20 and Wood v. Capita Insurance Services Limited (ibid.) per Lord Hodge JSC at paragraph 11.

*The Parties' Cases in Summary*

13. CBL maintains that section 5(b) UFSA is a mandatory provision of law within the meaning of clause 9.1 of the FA because its effect is to impose on it an implied obligation not knowingly to facilitate a significant financial transaction on behalf of a person included on the list of SDNs and Blocked Persons maintained by OFAC pursuant to Executive Order 13662. It maintains that since LIL is a Blocked Person (something that is common ground) and that payment of interest under the FA is at least arguably a significant financial transaction and there is no realistic prospect of a presidential waiver it follows that CBL is at realistic risk of becoming subject to the sanctions set out in section 3(c) UFSA if it pays LIL the interest to which it is entitled under the FA. It maintains that in those circumstances it is entitled to avoid this risk by not paying the interest otherwise due by operation of clause 9.1 of the FA.

14. LIL contends that this is an unsustainable proposition. It maintains that clause 9.1 requires CBL to be able to demonstrate that there is a legal provision that expressly prohibits it from making the payment relied on. It submits that on proper analysis none of the provisions of US law that CBL relies on have that effect (since it does not come within any of the categories to which primary sanctions would apply) and that on proper analysis all that CBL is doing is not paying in order to avoid the possibility that the section 5(c) UFSA sanction might be imposed on it. It maintains that the word "*mandatory*" means that the provision relied on must make it compulsory for CBL to refuse payment and the provisions that it relies on do not have that effect. Above all, LIL submits that the words "*… provision of law ...*" means a law that applies to a "*... UK party, acting in the UK, that has agreed to make a sterling payment pursuant to a contract governed by English law ...*" – see paragraph 23(3) of LIL's written opening submissions. LIL maintains that none of these requirements are

satisfied by CBL's exposure to the risk that it may become subject to secondary sanctions and therefore that the common law position should prevail.

*The Construction Exercise*

15.    It is necessary first to set out the relevant documentary, factual and commercial context including the facts and circumstances known or assumed by the parties at the time that the document was executed and any other provisions within the contract that throw light on the issue that arises.

16.    *Documentary Context*

Aside from clauses 16, 18 and 19.1(a), the only provision within the FA that either party referred to was the definition of the word "*regulation*". As is apparent from the express definition of regulation, it applies to everything other than either primary legislation or the general law. That much is apparent from the list of instruments covered, which noticeably does not include either any primary legislation or general law. Thus, in my judgment it is clear that the phrase "*... mandatory provision of law ...*" is designed to bring within the scope of the clause all otherwise relevant primary legislation and general law including, in relation to English law, the common law. It is also apparent from the terms of the definition that it includes any instrument promulgated by any government or any instrument as defined that is promulgated any of the relevant organisations identified. The definition does not include any causative constraint because it does not have to. That is provided by clause 9.1, which requires CBL to establish that sums otherwise payable have not been paid "*... in order to comply ...*" with either (a) a mandatory provision of law or (b) a regulation or (c) an order of a court of competent jurisdiction. It would be inconsistent with the absence of any territorial qualification from the definition of the word "*regulation*" and to the courts whose orders can be relied on by CBL to construe the reference to a mandatory provision of law as being confined to English law. This much is common ground – see paragraph 17(b) of the List of Issues.

17.    *Factual and Commercial Context*

VV was placed on the SDN list on 6 April 2018, just over 3 months after the parties entered into the FA on 19 December 2017. However, Mr. Jordan states in paragraph 5.1 of his first witness statement in these proceedings that CBL was aware in December 2017 that it was possible but not likely that US sanctions would be imposed on LIL. LIL does not challenge this, nor does it suggest that its analysis was any different to that of CBL. This possibility is therefore a circumstance known or assumed by the parties at the time that the document was executed.

18.    As is common ground – see paragraph 9 of the List of Issues – there is nothing within the FA that requires payment to be made in US Dollars or to a US bank account and neither of the parties to it were US persons or entities nor did the agreement involve conduct in the US. That being so, neither of the parties could have thought that any question of direct sanction could arise even if VV became a SDN and in consequence LIL became a Blocked Person. The risk that arose was exclusively that if LIL became a Blocked Person CBL would be exposed to the risk of secondary sanctions.

19.    There can be no doubt that CBL was also aware of the impact that the imposition of secondary sanctions would have on it and its business. The impact on its business would be

ruinous for the reasons identified by Mr. Jordan in his second statement. If CBL was subjected to secondary sanctions it would have no recourse against LIL notwithstanding that on this hypothesis it would have paid LIL the interest due under the FA and would have to continue doing so for the duration of the FA. This risk had been well known since at least the hand down of the judgment in Libyan Arab Foreign Bank v. Bankers Trust Co [1989] 1 QB 728, although the principle giving rise to that risk is derived from the earlier authorities identified in paragraph 11 above. As Hamblen LJ observed in National Bank of Kazakhstan and another v. Bank of New York Mellon (ibid.) at paragraph 69:*"There is every reason why an international bank would wish to protect itself from the risk of being exposed to very substantial liabilities as a result of disputes between its customer and third parties"*. Subject to substituting "*lender*" for "*customer*" that applies with equal force here.

20.     Further, since the only risk to which CBL was exposed was of becoming subject to secondary sanctions, it is improbable that the parties could have intended the scope of clause 9.1 to be limited to protecting CBL from the risk it was not exposed to – becoming the subject of primary sanctions – and not to extend to the risk that was apparent – that if LIL became a Blocked Person and CBL paid LIL the sums due under the FA thereafter, it would become exposed to the risk of becoming subject to the secondary sanctions regime set out in the US legislation to which I referred earlier whilst at the same time being liable to meet future interest payments as they fell due.

21.     *The Effect of Clause 9.1 of the FA*

LIL's case is that the word '*mandatory*" means as LIL put it in its skeleton submissions "*... a law applying to UK parties, acting in the UK, that have agreed to make a sterling payment pursuant to a contract governed by English law*" that (in this context at least) prohibits something. If and to the extent this implies that only an English statute or a rule of common law that prohibits particular conduct will suffice then I do not agree. As I have explained already, when read in its documentary context and together with the word "*… regulation....*", the contractual definition of that word and *the phrase "... any court of competent jurisdiction..."* it is clear that no territorial qualification was made or intended. Had the parties wished to qualify those words and phrases in that way they could have done so easily enough. They chose not to do so. To the contrary, in the only definition that matters (that of the word "*regulation*") it is clear that such a qualification was not intended. If no such qualification was intended for what constituted a relevant regulation, there can be no justification for implying such a qualification to the phrase "*... mandatory provision of law ...*".

22.     More generally, it is not in dispute that both parties were legally represented or that lawyers acting for the parties drew up the FA. I do not accept that the natural understanding of English lawyers at the date of the agreement would have been that a mandatory rule of law was one that requires compliance – see paragraph 23(2) of LIL's skeleton submissions. All provisions of law by definition have to be complied with unless the parties, or one of the parties, dis-apply them to the extent that is possible. It is necessary therefore to search for some other meaning for the word "*... mandatory ...*". I accept CBL's submission that it means a provision of law that the parties cannot vary or dis-apply. This makes contextual sense. Clause 9.1 is concerned with enabling CBL to avoid what would otherwise be its clear contractual obligations. It makes sense for the parties to agree to such a provision where non-payment results from the need to comply with a provision of law that neither can dis-apply but it would make no sense for the parties to agree to such a provision where the provision of law preventing payment could be disapplied by either or both of the parties.

23.     It was submitted on behalf of CBL and I agree that English lawyers during the period the FA was being negotiated and down to the date when it became binding would have understood a mandatory law to be one that could not be derogated from. The context that makes this probable includes the meaning given to the phrase "*... mandatory provision of law ...*" in the Rome Convention 1980 and the Rome 1 Regulation on Choice of Law. It was not submitted by CBL that the construction for which they contend applies by operation of either regulation. It submits however and I accept that they provide some support for the submission that lawyers at the relevant time would have understood the effect of the word "*mandatory*" to be as I have described.  It goes without saying that it was not open at any stage to either party to dis-apply the US statutes that purported to apply secondary sanctions by their agreement, nor did the parties attempt to do so either in the FA itself or afterwards.

24.     In my judgment the real issue that arises concerns the effect of the words "*... in order to comply ...*". LIL draws a distinction between a statute which requires or prohibits something and one that creates the risk of a penalty or sanction if something is done or not done. It maintains that clause 9.1 is engaged only if a statute or rule of law expressly prohibited CBL from paying LIL. It is common ground that this is not the effect of the US legislation on which CBL relies. It follows so it is submitted that CBL is not entitled to rely on clause 9.1.

25.     There are at least three possible permutations in which the phrase could apply. The first is that compliance can arise only in relation to a statute that expressly prohibits payment on pain of the imposition of a sanction or penalty, the second is that compliance occurs whenever a party either acts or refrains from acting in a manner that would otherwise attract a sanction or penalty imposed by statute and the third is that compliance occurs whenever a party either acts or refrains from acting in a manner that would otherwise attract the possible imposition of a sanction or penalty by operation of statute.

26.     Which of these three possibilities was intended to apply is likely to be dependent on the context in which the word is used.  However, there is no reason why of necessity a contractual provision in the terms of clause 9.1 should be read a confined in its scope to the first of these permutations. It has long been recognised in English law in the context of whether a contract is to be held void for illegality that a contract can be prohibited either expressly or by implication and that if a statute imposes a penalty that will be treated as an implied prohibition because the imposition of a penalty implied prohibition – see Cope v. Rowlands [1836] 2 M & W 150 at 157 approved by the Court of Appeal in Phoenix General Insurance Co of Greece SA v. Halvanon Insurance Company Limited  [1988] 1 QB 216 *per* Kerr LJ at 268 C-G. The qualification noted at 270 C and following is not material for present purposes because it is not being contended by CBL that the FA is void but merely that payment has been impliedly prohibited because of the probability that the relevant sanction will be imposed if it pays LIL the sums it is entitled to under the contract. A party who acts so as to avoid the imposition of a penalty is complying with the implied prohibition just as much as a party who acts so as to comply with an express prohibition.

27.     Once the meaning of "*mandatory*" is understood to be as I have set out above, there is nothing in the language used by the parties that suggests it was intended that the scope of clause 9.1 would be confined to the first of the permutations mentioned above. The factual and commercial context suggests that it is highly unlikely that was what could have been intended because as I have explained there was no prospect of CBL being subjected to the primary sanctions regime if LIL became a Blocked Person but only that CBL would or might become subject to the secondary sanctions regime. Once this point has been reached, it is as unlikely that the parties could have intended to limit the scope of clause 9.1 to the

first and second of the permutations I have referred to but not the third. There are a number of reasons for reaching this conclusion, all of which are contextual. All parties were or should have been aware of the effect of the US legislation. The reason why a provision such as clause 9.1 is included in a contract such as the FA is to eliminate the "double jeopardy" risk. It is not of any effect or benefit where a payment has been made to LIL and a sanction is imposed following an attempt by CBL to persuade the US authorities not to impose a sanction. It is only prospective in effect because it only operates so as to excuse payment by CBL to LIL. It does not create any form of after the event recourse in the event that a sanction is imposed. Thus the risk to which clause 9.1 is directed is not avoided by a contractual provision intended by the parties to apply to the first and second but not the third of the permutations I have referred to.

28.     It is all the more unlikely that the parties intended to exclude the third of these permutations given the position adopted by the US authorities in relation to foreign financial institutions that do not comply. OFAC's guidance made clear that the default position would be that the sanctions would generally apply – see the quotations from OFAC's FAQ Guidance quoted at paragraphs 12-13 of CBL's skeleton submissions. This follows from the statutory language used which imposes a requirement subject only to the Presidential power to waive. The terms under which a waiver could be granted are very limited – being limited to situations in which waiver was in either the *"national interest"* or the *"national security interest ..."* of the US. There was no material available to the parties down to the date when the FA was made that would have enabled them to conclude that either (i) the US Government would not regard payments by CBL to LIL under the FA as *"significant"* or (ii) there was any realistic possibility of the President of the USA concluding that it would be in either in the *"national interest"* or the *"national security interest ..."* of the US not to impose the section 5(c) UFSA sanctions on CBL if it paid LIL in accordance with the terms of the FA. As I have said already, clause 9.1 of the FA was a provision by which the parties chose to manage risk.

29.     It was submitted by LIL that this approach creates enormous uncertainty and thus is likely not to be what the parties had intended. I do not agree. The clause is drafted in wide terms in order that it could effectively protect CBL from the risk of breaching an express or implied prohibition against payment that exposed it to potentially severe penalties or sanctions as a result of making a payment under the FA to LIL. Uncertainty is not an answer because the parties could not know for certain what was to happen in the future. All that they could be certain of is that there was a risk that they chose to manage by clause 9.1, which was drafted in wide and unqualified language in order to ensure that the risk was properly and clearly managed contractually. Such clauses have to be wide in their terms to mitigate the rigours of the common law rule noted earlier. The clause in this case is no wider than the material parts of the clause considered in National Bank of Kazakhstan and another v. Bank of New York Mellon (ibid.).

30.     I reject LIL's submission that the construction that I have arrived at is contrary to "*... the UK's long standing policy of not giving extraterritorial effect to US foreign policy as enacted through its secondary sanctions programmes"* for the following reasons. The issue I am concerned with is one of construction of the contract between the parties. Unless there is a mandatory rule of English law that precludes parties to a contract from including a provision to the effect alleged I do not consider the alleged policy is material. The secondary sanctions with which I am now concerned create a risk that the parties to a contract such as the FA are entitled to manage by agreement in the absence of such a

provision. There is no such mandatory rule. The only such rule that is incorporated into English law is that contained in Council Regulation (EC) No. 2271/96. That applies only to those laws specified in the Appendix. Thus there is no general policy as suggested by LIL. The laws giving rise to the issue in this case are not included within the Appendix to Regulation 2271/96.

31.    The "*territoriality*" principle relied on by LIL does not assist it either. Whilst I accept the general principle identified in such cases as Société Eram Shipping Co Ltd v. Cie Internationale de Navigation [2004] 1 AC 260, it misses the point so far as the construction issues that arise in this case are concerned. There is nothing in that case (or for that matter the cases I referred to earlier in this judgment that establish that English law will not excuse contractual performance by reference to foreign law unless that law is the law of the contract or the law of the place of performance) that precludes the parties from making alternative arrangements by express agreement between them. That is what the parties did in National Bank of Kazakhstan and another v. Bank of New York Mellon (ibid.). There is no question of the court giving effect to the mandatory provisions of a law other than the law of the contract or the law of the place of performance as suggested by LIL in paragraph 48 of its opening submissions. The conclusion I have arrived at means that the parties have chosen to do so. That choice is one they were lawfully entitled to make.

## Conclusions

32.    Subject to hearing from counsel for the parties as to the terms of the appropriate order, I consider that CBL is entitled to a declaration that it is entitled to rely on clause 9.1 of the FA for as long as VV remains a SDN and LIL remains a Blocked Party by reason of it being controlled by VV.

Sensitivity: Confidential

C.A.]    LONDON SACK & BAG CO. *v.* DIXON & LUGTON    **763**

# LONDON SACK & BAG CO., LTD. *v.* DIXON & LUGTON, LTD.

[COURT OF APPEAL (Scott, MacKinnon and du Parcq, L.JJ.), **November 9, 10, December 6, 1943.**]

*Arbitration—Written submission—Contention that rules of a trade association applicable—Articles of association as contract between members of company—Companies Act, 1929 (c. 23), s. 20.*

A
The respondents bought from the appellants 5,000 used cotton flour bags and on delivery complained that the goods were not up to description and claimed repayment with interest and damages. There was no arbitration clause in the written contract but none the less the appellants took out a summons under the Arbitration Act, 1889, s. 4, to stay the action, relying upon the contention that there was a written submission within the Act for the following reasons : (i) both parties were members of the

B
United Kingdom Jute Goods Association, Ltd. ; (ii) that company had rules binding upon all members, No. 1 of which provided that " all disputes arising out of transactions connected with the trade . . . shall be referred to arbitration " ; (iii) the transaction in question was concerned with the jute trade ; (iv) the Companies Act, 1929, s. 20, made a binding agreement between the members of the association in the terms of the articles and rules regulating the association and the rules were, therefore, a sufficient

C
submission to arbitration. The respondents opposed any stay on the grounds that (i) the appellants had proved no written submission and (ii) the appellants had taken a step in the action :—

HELD : the appellants had failed to prove that they and the respondents had made a binding submission to arbitration.

D
[**EDITORIAL NOTE.** For certain purposes the articles of association are by the Companies Act, 1929, s. 20, made a binding contract between members. This, however, it seems, can relate only to their rights as members of the company and not to their rights in an ordinary business contract having nothing to do with the company. It is here sought to make the articles with the rules of the company, which was a trade association, a written submission to arbitration.

As TO WHAT AMOUNTS TO A SUBMISSION IN WRITING, see HALSBURY, Hailsham Edn., Vol. 1, pp. 623-625, para. 1072 ; and FOR CASES, see DIGEST, Vol. 2, pp. 313-318,

E
Nos. 5-50.]

Cases referred to :

*(1) *Hickman* v. *Kent or Romney Marsh Sheepbreeders' Assocn.*, [1915] 1 Ch. 881 ; 9 Digest 86, *341* ; 84 L.J.Ch. 688 ; 113 L.T. 159.

*(2) *Welton* v. *Saffery*, [1897] A.C. 299 ; 9 Digest 197, *1230* ; 66 L.J.Ch. 362 ; 76 L.T. 505.

(3) *Wood* v. *Odessa Waterworks Co.* (1889), 42 Ch.D. 636 ; 9 Digest 87, *344* ; 58 L.J.Ch. 628.

F
(4) *Borland's Trustee* v. *Steel Bros. & Co., Ltd.*, [1901] 1 Ch. 279 ; 9 Digest 100, *423* ; 70 L.J.Ch. 51.

(5) *Baker* v. *Yorkshire Fire and Life Assurance Co.*, [1892] 1 Q.B. 144 ; 2 Digest 315, *24* ; 61 L.J.Q.B. 838 ; 66 L.T. 161.

(6) *Re Tavarone Mining Co., Pritchard's case* (1873), 8 Ch. App. 956 ; 9 Digest 86, *342* ; 42 L.J.Ch. 768 ; 29 L.T. 363.

(7) *Pitchers, Ltd.* v. *Plaza (Queensbury), Ltd.*, [1940] 1 All E.R. 151 ; Digest Supp. ;

G
162 L.T. 213.

(8) *Metropolitan Tunnel & Public Works Co.* v. *London Electric Ry. Co.*, [1926] Ch. 371 ; Digest Supp. ; 95 L.J.Ch. 246 ; 135 L.T. 35.

APPEAL by the defendants from an order of CROOM-JOHNSON, J., dated July 30, 1943. The facts are fully set out in the judgment of SCOTT, L.J.

*A. S. Comyns Carr*, K.C., and *Ivan Horniman* for the appellants.

*C. B. Guthrie* for the respondents.

H
*Comyns Carr*, K.C. : There is nothing to prevent a company from adopting an article which allows a man to become a member of a company without his having to buy a share. Both parties in the present case signed something which must be read as adopting the memorandum and articles of association and the rules of the United Kingdom Jute Goods Association, Ltd. An agreement in writing to arbitrate is satisfied, although the agreement is not signed by the parties, if it can be identified as their agreement. In general, no signature is required to a written agreement to arbitrate. If signature is required, it is to be found in the present case by reason of the Companies Act, 1929, s. 20.

Signature is to be found also by reason of the application for membership of the association as a result of which the parties became members and became bound by the rules. One cannot have a clearer agreement than that. Either no signature is required or I have it. *Hickman* v. *Kent or Romney Marsh Sheepbreeders' Association* (1) connects together all the authorities on the points which arise in the present case. Dealing in used cotton flour bags is a transaction connected with the jute trade. That is not disputed. *Baker* v. *Yorkshire Fire and Life Assurance Co.* (5) shows quite clearly that signature is not necessary to a submission to arbitration. [Counsel referred to *Welton* v. *Saffery* (2), *Wood* v. *Odessa Waterworks Co.* (3), *Borland's Trustee* v. *Steel Bros. & Co., Ltd.* (4), *Re Tavarone Mining Co.* (6), *Pitchers, Ltd.* v. *Plaza (Queensbury), Ltd.* (7) and *Metropolitan Tunnel & Public Works Co.* v. *London Electric Ry. Co.* (8).]

*Guthrie :* In the present case the appellants have taken a step which defeats their claim to apply for a stay. On the facts the present case is distinguishable from *Metropolitan Tunnel & Public Works Co.* v. *London Electric Ry. Co.* (8). Before the appellants can avail themselves of the Companies Act, 1929, s. 20, or the memorandum and articles and the rules which apply to arbitration, they must show that the parties are members of the association. It is impossible in law to admit to membership of a limited company anyone who is not a shareholder. If the rules contemplate members of a company who are not shareholders, the rules are *ultra vires* the Companies Act. The appellants say that in the present case the two companies who are parties to this action are members of the association through their respective directors. That, however, is not possible in law. [Counsel referred to BUCKLEY ON THE COMPANIES ACTS, 11th Edn., s. 20, pp. 34 and 35]. [He was stopped by the court].

SCOTT, L.J. : By writ issued on June 8, 1943, the respondent company (to whom I will refer as the buyers) brought an action against the appellant company (to whom I will refer as the sellers). The dispute arose out of a contract for the sale of 5,000 used cotton flour bags. The contract was made by a letter dated May 18, 1943, from the buyers to the sellers, and a letter and telegram both dated May 20, 1943, from the sellers to the buyers. The price was 2s. per bag payable in advance. The buyers paid the £500, but on delivery complained that the goods were not up to description and claimed to get their money back with interest and damages. There was no arbitration clause in that written contract—either set out in the letters or printed on the back or expressly incorporated in it in any way, as is so usual with contracts made by members of commercial associations. But the sellers none the less took out a summons under the Arbitration Act, 1889, s. 4, to stay the action relying on the contention that there was a written submission within the Act for the following reasons. (i) Both companies, the sellers allege, are members of the United Kingdom Jute Goods Association, Ltd., a company incorporated in 1909 ; (ii) that company has rules binding on all members, r. 1 of which provides that :

. . . all disputes arising out of transactions connected with the trade . . . shall be referred to arbitration . . .

(iii) a sale of used cotton flour bags is, as proved by an affidavit, a transaction connected with the jute trade. How they sought to spell out a written submission from membership of the association I will explain in a moment. The buyers opposed any stay, (i) because, as they submitted, the sellers had proved no written submission ; and (ii) because they contended that the sellers had taken a step in the action. With this I will deal later.

The sellers sought to reach their goal of a written submission by a devious route. They relied on the following steps in their argument. The Companies Act, 1929, s. 20 (1), provides as follows :

Subject to the provisions of this Act, the memorandum and articles shall, when registered, bind the company and the members thereof to the same extent as if they respectively had been signed and sealed by each member, and contained covenants on the part of each member to observe all the provisions of the memorandum and of the articles.

The memorandum of association of the United Kingdom Jute Goods Association, Ltd., contains *inter alia* the following objects :

(3) (i) To promote and protect the character, status and interest of the jute goods trade, to make rules and regulations for its conduct . . . (iii) To make rules and regulations

C.A.]    LONDON, SACK & BAG CO. *v.* DIXON & LUGTON (Scott, L.J.)    **765**

for the admission of members not necessarily shareholders of this association . . . (v) To maintain uniformity in rules, regulations and usages of the jute goods trade.

The articles of association provide as follows :

A
3 The shares shall be under the control of the directors, who may allot or otherwise dispose of the same to such persons on such terms and conditions and at such times as the directors think fit.   5 No person shall be recognised by this association as holding any share upon any trust.   6 Every member shall without payment be entitled to one certificate under the seal specifying the shares held by him.   12 (1) Every application of membership of this association shall be made in writing signed by the applicant and his proposer and seconder, both of whom must be members, and addressed to the secretary.   (4) Every person upon being elected a member of this association shall be entitled to have allotted or transferred to him one share in this association . . . The acquisition of one share shall be made a condition precedent to admission to membership.   (5) No shares held by any member in a representative capacity shall confer upon him any rights or privileges except as expressly provided herein. (8)

B
Registered joint stock companies may be admitted to this association.   They must be represented by one or more of their directors whose names must be submitted to this association for approval at the time when the company is proposed for election, but the company shall have the right at any future time, with the approval of the association, to substitute other representatives.   Every such director must acquire one share of this association.   As distinct from its director a company need not acquire a share.

C
The association's register of members pursuant to the Companies Act, 1929, s. 95 (1), was not in evidence.

Their contention was that both the selling company and the buying company were members of the association under art. 12 (8) ; and that the first of the rules of the association, made pursuant to the articles, was thus binding upon both, and that there was therefore a written submission within the meaning of the

D
Arbitration Act, even though not signed by the parties to that " arbitration agreement," as the submission is defined by sect. 27 of the Act.   In answer to the court, counsel for the appellants went so far as to contend that a purely oral agreement expressed to include a printed arbitration clause pasted up on the wall would satisfy the statute.   I reject this contention.   The arbitration clause must be in the written submission,   It cannot be said that there is a written agreement to arbitrate unless there is a clear reference in the written

E
contract between the parties to the alleged arbitration clause and that reference must amount to an incorporation of it.   His second contention was a roundabout one.   He submitted that sect. 20 creates a contract between the members of a company *inter se*, and cited the chief cases dealing with that topic such as *Hickman* v. *Kent or Romney Marsh Sheepbreeders' Assocn.* (1), *Welton* v. *Saffery* (2), *Wood* v. *Odessa Waterworks Co.* (3), and *Borland's Trustee* v. *Steel Bros. & Co., Ltd.* (4).

F
I am not satisfied that he has interpreted those decisions correctly.   It may well be, even as between ordinary members of a company who are also in the nominal way shareholders, that sect. 20 adjusts their legal relations *inter se* in the same way as a contract in a single document would if signed by all ; and yet the statutory result may not be to constitute a contract between them about rights of action created entirely outside the company relationship, such

G
as trading transactions between members.   I notice that HALSBURY, LAWS OF ENGLAND, Hailsham Edn., Vol. 5, p. 142, para. 256, says this :

While the articles regulate the rights of the members, *inter se*, they do not it would seem constitute a contract between the members, *inter se*, but only a contract between the company and its members, and, therefore, the rights and liabilities of members as members under the articles can only be enforced by or against the members through the company.

H
The importance of that paragraph is that any doubt about the written submission being quite clearly established is, in my view, a sufficient reason for the judge's exercising his discretion against a stay :  and *a fortiori* a reason for our not disagreeing with him.

There is an even stronger point against allowing the appeal.   Even if the cases which counsel for the appellants cited amounted to the enunciation of a clear rule that, as between shareholding members—*i.e.*, ordinary members of a company having a capital interest in the company by reason of their shares— there is a written contract for what may be called the purposes of company law,

766 [DEC. 18, 1943] ALL ENGLAND LAW REPORTS ANNOTATED [Vol. 2

it does not in the least follow that the rule applies to extrinsic purposes such as individual trading. But in the present case that objection may be pushed even further. The two companies parties to this litigation are not ordinary members of the company at all; they are only members in the same sense that members of a proprietary club who have no shares in the company owning the club, are given certain rights of members, *e.g.*, to frequent the club for meals, or golf, or reading. I cannot think that the principle of the cases cited to us can be extended to such members as these two companies are. Their directors are required to hold a share in order to represent them, but no trusts are recognised by the articles; and I do not think the cases in question have any bearing on the issue we have to decide. I am not satisfied that it is possible to spell a written submission out of the memorandum and articles of association and the rules, even with the help of the Companies Act, 1929, s. 20.

That decides the appeal and renders consideration of the other point superfluous. I will only add that, on the facts, I should be doubtful whether a step had been taken which would bar the right to a stay if there were a written submission. The appeal must be dismissed with costs.

I should add that I have read the judgments of MacKINNON and DU PARCQ, L.JJ., and I am satisfied that the rights of the parties in regard to pleading a defence that the article acts as a condition precedent are not affected by this decision.

MacKINNON, L.J.: The plaintiffs by their writ and statement of claim sued the defendants for an alleged breach of a contract to sell 5,000 cotton flour bags in good sound condition. The contract relied on was contained in a letter of May 18, 1943, and a letter and telegram of May 20. On July 9 the defendants took out a summons asking that the action be stayed pursuant to the Arbitration Act, 1889, s. 4, and stating that the plaintiffs and the defendants were bound by an agreement to refer to arbitration matters in respect of which the action was commenced. This application was refused and the defendants appealed to the judge in chambers, who dismissed the appeal, but gave leave to appeal to this court. By their notice of appeal the defendants ask for an order:

That all further proceedings in this action be stayed pursuant to the Arbitration Act, 1889, s. 4.

To succeed under that section the defendants must establish that there is, as regards the claim put forward by the plaintiffs, a written submission to arbitration binding upon both of them. There is no suggestion whatever that the contract in the letters and telegram on which the plaintiffs base their claim contains any such submission or says a single word about arbitration.

For the submission in writing on which they rely the defendants refer to the memorandum and articles of association of the United Kingdom Jute Goods Association, Ltd., and the rules and regulations of that association as to disputes and arbitrations. Of the latter, r. 1 says:

All disputes arising out of transactions connected with the trade, or between parties to contracts made subject to the rules of this association shall be referred to arbitration.

There seems no definition in this rule of "the trade," but r. 2 refers in four places to "a dispute arising out of a transaction or transactions in connection with the jute goods trade, and presumably "the trade" in r. 1 refers to "the jute goods trade." R. 21 provides that:

No action shall be brought in respect of any dispute falling within the meaning of these rules until such dispute shall have been decided by an arbitration award . . . and the obtaining of such an award shall be a condition precedent to the right of any party to bring any action . . . in respect of such dispute against the other party.

To establish that in these rules there is a submission or agreement to arbitrate any dispute arising out of the contract sued on by the plaintiffs, the defendants must prove (i) that the plaintiffs and defendants made a binding contract with each other to abide by and be subject to these rules, and (ii) that the dispute involved in this action arises out of a "transaction connected with the jute goods trade."

In my opinion, they failed to prove either of these propositions. For the first reliance was placed on the memorandum and articles of the association.

Art. 12 of the latter provides for individuals becoming members by purchasing a share. It also provides that :

Registered joint stock companies may be admitted to this association. They must be represented by one or more of their directors . . . Every such director must acquire one share.

It is asserted that the plaintiff company and the defendant company have been " admitted to the association," being represented by a director or directors holding a share. No doubt articles of association may create a contract between the member-shareholders. Indeed, it is so provided by the Companies Act, 1929, s. 20. But I think it is impossible to contend that, by reason of these articles, the plaintiff company and the defendant company have made a contract to submit disputes to arbitration because each has a director who is a shareholder and the companies have been admitted to the association—whatever that may mean.

As to (ii) the affidavit in support of the summons says airily that " the goods in question are within the category of jute goods . . . " and " the dispute is one connected with the jute trade within the meaning of rr. 1 and 21." But this is a matter of construction, not a question of opinion. The goods in question are described as " cotton flour bags." Is that " a transaction in connection with the jute goods trade " ? Jute is the fibre from certain Indian plants. Cotton is a fibrous substance which clothes the seeds of the cotton plant. As a matter of construction I am satisfied that a sale of " cotton flour bags " is not " a transaction in connection with the jute goods trade."

If the defendants' contention is correct, r. 21 will provide them with a complete defence to the action. It is significant of the confidence of the plaintiffs in the error of that contention that they are apparently content to run the risk of this defence being pleaded. If it is pleaded by the defendants, the issue must be determined by the judge at the trial. And I do not think our decision on this summary application to stay the action ought to be taken as having decided that issue in the action in favour of the plaintiffs.

The plaintiffs also relied on a contention that the defendants had taken a step in the action because on July 9 they issued a summons asking for further time to deliver their defence. The facts are that, on July 9, they took out the summons to stay the action. As the return day for that summons would be after the date when they should deliver their defence, they took out the summons for time on the same day, and on July 12 got the master to extend their time until the hearing of the summons to stay on July 16. In these circumstances, I do not think the plaintiffs can say that the defendants took a step in the action so as to debar them from pursuing their application to stay the action.

This appeal must be dismissed with costs.

DU PARCQ, L.J. : I have had the advantage of reading the judgments of SCOTT and MACKINNON, L.JJ., and agree with them that this appeal should be dismissed. The evidence which was advanced before this court and before the judge has not satisfied me that the parties ever agreed to refer to arbitration the matter in dispute in the action. At the same time, I wish to make it plain that I concur in the opinion expressed by MACKINNON, L.J., that our decision on this summary application is not to be taken to have decided in favour of the plaintiffs the issue which may be raised at the trial under r. 21. The judge who tries the action may have evidence before him which is not before us. I have only to add that I prefer to express no opinion on the question whether the defendants can be said to have taken a " step in the proceedings."

*Appeal dismissed with costs.*

Solicitors : *Woodcock, Ryland & Co.*, agents for *Lancashire, Humphreys & Grundy*, Manchester (for the appellants) ; *Bell & Ackroyd* (for the respondents).

[*Reported by* W. K. SCRIVENER, ESQ., *Barrister-at-Law.*]

# MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

BEFORE THE HIGH COURT OF JUSTICE (CHANCERY DIVISION)

Presiding, Smith J: 28 February 2017

[2017] EWHC 374 (Ch); [2017] 5 C.M.L.R. 5

☞ Arbitration clauses; Batteries; Competition law; Cartels; Mobile telephones; Non-disclosure; Service out of jurisdiction; Setting aside; Stay of proceedings

H1 *Anti-competitive practices—agreements, decisions, and concerted practices—cartels—market for lithium ion batteries—control of upstream and downstream markets—private right of action before national court—jurisdiction of national courts—Regulation 1215/2012—contract law—arbitration clause—agreement to arbitrate—national legislation on arbitration—application for stay of proceedings—grant of stay unless arbitration clause valid and enforceable—construction of arbitration clauses—impact of contractual relations on claim in tort—concept of one-stop-shop—sufficiently close relationship of tortious act—links between tortious and contractual claims—participation of party in cartel or illegal combination—overlap with contractual claim—involvement of third parties—no bringing in of third parties due to arbitration clause—requirement for separate proceedings—potential incompatibility of arbitration clause with EU law—issue of fragmentation—remedies in Member States and through preliminary hearing sufficient guarantee of rights—arbitration clauses not inimical to EU law—determination of stay of proceedings by national court—service out of jurisdiction—duty of full and frank disclosure—challenging out of service jurisdiction—serious issue to be tried—good and arguable case—necessary or proper parties to claim—damage within jurisdiction—assignment and disaggregation of claims—substantial damage—direct and indirect damage—proper forum—stay of proceedings granted—order for service out of jurisdiction set aside*

H2      Proceedings before the High Court of Justice (UK), Chancery Division.

H3      The claimant, M, was a wholly owned subsidiary of MC, and was a manufacturer and distributor of mobile telephone handsets, which contained lithium ion batteries (Li-ion Batteries), purchased from third parties. M brought proceedings in national court claiming that the defendants, SE, SC LG and SS, had participated in a cartel involving, on the downstream market, products into which Li-ion Batteries had been incorporated, and on the upstream market, Li-ion Batteries purchased for incorporation into downstream products. The relevant geographic market alleged included the EU and/or the EEA during the period of 1999–2011. The defendant, SE, sought a stay of proceedings due to the inclusion of an arbitration clause in the contract governing the parties' relationship. The other defendants sought to set

aside the order for service out of jurisdiction. The Court found that the arbitration clause in the contract between the claimant and defendant SE was enforceable, as there were links between the contractual relationship and the damage alleged to have been caused by the defendants' anti-competitive behaviour, and stayed proceedings against SE. The Court further found that M had failed to satisfy the requirements for service out of jurisdiction, and set aside the Master's order for such service as against the other defendants.

### Held:

*Jurisdiction of national court*

H4    The national court had jurisdiction by virtue of art.4 of Regulation 1215/2012 of the European Parliament and of the Counsel of 12 December 2012 on jurisdiction and the recognition of judgments in civil and commercial matters (recast) (the Brussels I Regulation (Recast)). By art.1(2)(d) of that regulation, it did not apply to arbitration. [22], [32]

*Arbitration clauses*

H5    Where an agreement between two parties contained an arbitration clause, s.9 of the Arbitration Act 1996 provided that: (1) a party to an arbitration proceeding might apply to the court in which the proceedings were brought to stay proceedings so far as they concerned that matter; (2) an application might be made notwithstanding that the matter was to be referred to arbitration only after the exhaustion of other dispute resolution procedures; (3) an application might not be made by a person before taking any appropriate procedural steps to acknowledge the legal proceedings or to answer the substantive claim; (4) on application, the court was to grant a stay unless satisfied that the arbitration agreement was null and void, inoperative or incapable of being performed; and (5) if the court refused to stay legal proceedings, any provision that an award was a condition precedent to the bringing of legal proceedings in respect of any matter were of no effect in relation to those proceedings. [38]

*Construction of arbitration clauses*

H6    Where an arbitration clause governed the contractual relationship between two parties, the importance of having a "one-stop-shop", and the likelihood the parties to an agreement would intend this was clear, however this was only true to the extent the dispute arose out of the parties' relationship. Absent extremely clear wording, a court would presume that the parties would have intended the same tribunal to deal with contractual disputes arising out of the relationship, as well as any "parallel" claims in tort. What would not be covered, absent extremely clear wording, would be one party's case against another party for that party negligently, but coincidentally and unrelated to the contract, committing a tort against the first party. That would not be a dispute arising out of the parties' contractual relationship. For a sufficiently close connection, the party seeking to enforce the arbitration provision had to show either that the resolution of the contractual issue was necessary for a decision on the tortious claim, or that the contractual and tortious disputes were so closely tied together that an agreement to arbitrate on one could

properly be construed as covering the other. The parties to an arbitration clause were, as rational businessmen, likely to have intended any dispute arising out of the relationship into which they had entered or purported to have entered to be decided by the same tribunal. It was however, difficult to see how a tortious claim could arise out of a contractual relationship when the only contract that could be said to be related was unarguable. [45]–[46], [53]–[54]

*Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep. 87; *Ryanair Ltd v Esso Italiana Srl* [2013] EWCA Civ 1450; *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40, followed.

### *Relation of claim in tort to contract*

H7 Where the contract in question was not a relational contract, and no question of implication of terms arose, it was necessary to have regard to its express terms and to consider whether any contractual claims arising out of the contract would be sufficiently closely related to the tortious claims actually advanced, so as to render rational business men likely to have intended such a dispute to be decided (like a contractual dispute) by arbitration pursuant to the contract's arbitration clause. This was a question which had to be determined at the time the contract was concluded and not with the benefit of hindsight. It was irrelevant that a contractual claim was not pleaded by the party seeking to avoid arbitration. Where the manner in which a case was actually pleaded to matter, instead of how it could have been pleaded, it would be easy for a party seeking to avoid arbitration to circumvent the scope of an arbitration or jurisdiction clause by selectively pleading or not pleading certain causes of action. It would be an extraordinary outcome such a party successfully able to contend that, because a contractual claim had not been pleaded, a "parallel" claim in tort arising out of exactly the same facts and with a scope defined by that contract fell outside the scope of such a provision. The extent to which a contractual claim was pleadable was obviously relevant to the thinking of rational businessmen at the time the arbitration clause was concluded. The more strained, recondite, convoluted or outlandish the contractual claim being postulated, the less likely such individuals would have expected related tortious claims to be subject to an arbitration clause. When weighing the link between a tortious and contractual claim, it was not merely the unarguable contractual claim that was an indicator that the arbitration clause did not bite, but also the strained one. [69], [72]

*Ryanair Ltd v Esso Italiana Srl* [2013] EWCA Civ 1450, followed.

### *Participation in cartel or illegal combination*

H8 Where a pleaded case involved the defendant's dealings with third parties in the form of a cartel or other illegal combination, the overlap between the contractual claim, the cartel claim and the combination claim was likely to be considerable. The contractual claim would be for damages, just as the tortious claims, and the claimant's loss and damage would have to take account of any pass-on and volume effects, as part of the ordinary process of assessing damages. [72]

### *Involvement of third parties*

H9 In such a case, the claim would be confined to the defendant, and there could be no bringing in of other parties to the cartel, due to the arbitration clause.

Questions of contribution from other cartelists would not arise, in the arbitration at least. Neither would the question of competing jurisdiction/arbitration clauses. It remained open to the claimant to select a claim against a different defendant, such that other parties involved in the cartel could be brought in to such proceedings. [72]

*Incompatibility with EU law*

H10    Where the application of an arbitration clause was likely to cause fragmentation of rights of action, the question was whether this fragmentation was a breach of EU law, such as to render the application of the clause ineffective or inoperable. While it was possible for the provisions of EU law to permit a court to side-line or declare ineffective an arbitration clause, nothing mandated such a course. The location of a harmful event had to be assessed for each claim for damages independently of any subsequent assignment or consolidation, meaning it was possible a claimant may have to bring separate actions for the loss suffered by each associated undertaking before the courts with jurisdiction for their respective registered offices. A court seized of a matter could not, without undermining the aim of Regulation 44/2001, refuse to take into account a jurisdiction clause which satisfied the requirements of art.23 of that regulation solely on the ground that it considered that the court with jurisdiction under that clause would not give full effect to the requirement or effective enforcement of the prohibition of cartel agreements by not allowing a victim of the cartel to obtain full compensation for the loss it suffered. On the contrary it had to be considered that the system of legal remedies in each Member State, together with the preliminary ruling procedure provided for in art.267 TFEU afforded a sufficient guarantee to individuals in that respect. No case law of the EU courts required national courts to displace the effect of arbitration clauses as inimical to EU law due to the risk of fragmentation of claims. [76]–[78], [80]–[81]

   *Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV* (C-352/13) EU:C:2015:335; [2015] 5 C.M.L.R. 4, followed.

*Determination of stay of proceedings*

H11    It was for the party seeking a stay of proceedings on the basis of an arbitration clause to show that there was a concluded arbitration agreement within the meaning of the Arbitration Act 1996, and that it covered the disputes that were the subject of the court proceedings. Where such a contention was advanced, the court may: (i) decide the issue for itself in summary fashion; (ii) direct an issue to be tried; (iii) or stay the proceedings so that the arbitral panel can decide on its own jurisdiction. If the court decided that there was an arbitration agreement covering the scope of the disputes, then the counterparty to the arbitration clause may, the burden being on it, seek to satisfy the court that the clause was null and void pursuant to s.9(4) of the 1996 Act. [83]–[84]

   *Aeroflot - Russian Airlines v Berezovsky* [2013] EWCA Civ 784; *Golden Ocean Assurance and World Mariner Shipping SA v Martin (The Goldean Mariner)* [1990] 2 Lloyd's Rep. 215, followed

190         MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

*Service out of jurisdiction*

H12    Three requirements had to be shown before the court permitted service of a claim
or claims out of jurisdiction: (i) the claimant had to satisfy the court that in relation
to the foreign defendant there was a serious issue to be tried on the merits; (ii) the
claimant had to satisfy the court that there was an arguable case that the claim fell
within one or more classes of case in which permission to serve might be given;
and (iii) the claimant had to satisfy the Court that England and Wales were clearly
and distinctly the proper forum for the trial of the claims. There was a close nexus
between these three requirements and the national court's procedural requirements.
The relevant provisions of the Civil Procedure Rules were CPR rr.6.36 and 6.37.
[25], [87]–[89]

*Duty of full and frank disclosure*

H13    As parties out of jurisdiction had ex hypothesi not been joined, applications to
serve out of jurisdiction were generally made ex parte. There was, on such
applications, a duty on the applicant to make full and frank disclosure of the material
facts, including adverse facts. [90]
   *Konamaneni v Rolls Royce Industrial Power (India) Ltd* [2002] I.L.Pr. 40;
*Sloutsker v Romanova* [2015] EWHC 545 (QB); *Heraeus Medical GmbH v Biomet
UK Healthcare Ltd* [2016] EWHC 1369 (Ch), followed.

*Challenging order permitting out of jurisdiction service*

H14    If a party served pursuant to such an order was minded to challenge it, this was
to be done on the inter partes return date of the applicant's original ex parte
application for permission to serve out of the jurisdiction. At this point the court
was to reconsider and decide de novo, by way of rehearing, whether permission
to serve out was to be given. It was for the party seeking to serve out to demonstrate
that this was a proper case for service out. The question on the re-hearing was
whether it was proper to grant permission on the date upon which the order to serve
out was granted, not (in light of changed circumstances or fresh evidence) whether
it would be right to grant it as at the time of the inter partes application. [91]–[93]
   *ISC Technologies v Guerin (James Howard)* [1992] 2 Lloyd's Rep. 430;
*Mohammed v Bank of Kuwait and the Middle East KSC* [1994] 1 W.L.R. 1483,
followed.

*Serious issue to be tried*

H15    The requirement that there be a "serious issue to be tried" has been held to be
the same as the "reasonable prospect of success" test.
   *BAS Capital Funding Corp v Medfinco Ltd* [2003] EWHC 1798 (Ch); [2004]
I.L.Pr. 16; *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645,
followed.

*Good and arguable case*

H16    At common law the national courts of the UK had no power to permit claims to
be served abroad. Power to do so was introduced by statute. All of the provisions,
or gateways, contemplated required some connection with England and Wales, ie.

that the connection was between the pleaded causes of action and the jurisdiction of England and Wales, not any wider jurisdiction, like the EU or the EEA. The burden of demonstrating that a claim fell within one of the gateways lay on the party seeking to serve out of the jurisdiction. First, where the facts required for jurisdiction were disputed, the applicant had to show a good and arguable case that those facts were true. This involved a relative test of whether, on the evidence before the court, the applicant had much the better of the argument. The absolute standard required a "much better argument", meant more than that on the material available, the case was arguable. There had to be some substance to it. Secondly, where there was a pure point of law, not involving a factual dispute, on which jurisdiction depended, the court should normally decide it. A claimant had to show that each claim pleaded fell within one of the gateways. To the extent that service out was authorized for some, but not for other, claims, those claims had to be removed so far as any defendants out of the jurisdiction were concerned. [99]–[100], [104]

*Canada Trust Co v Stolzenberg (No.2)* [2000] 4 All E.R. 481; [1998] I.L.Pr. 290; *Brownlie v Four Seasons Holdings Inc* [2015] EWCA Civ 665; *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, followed.

*Necessary or proper parties to claim*

H17    The claim against the anchor defendant, against whom no jurisdictional issue arose, had to give rise to a real issue which it was reasonable for the court to try. Assuming the claim against the anchor defendant did give rise to a real issue which it was reasonable for the court to try, the defendants out of jurisdiction had to be necessary or proper parties to that claim. The fact that an anchor defendant was joined for the sole purpose of brining into the proceedings other defendants did not render the claim against the anchor defendant one that was unreasonable for the court to try. The requirements of "necessary" and "proper" were disjunctive. The circumstances in which a party was a "proper" party to proceedings already commenced or to be commenced against an anchor tenant was the wider test of whether a defendant would be a proper party assuming that party to be within the jurisdiction. [106], [111], [126], [133]–[135]

*Vitol Bahrain EC v Nasdec General Trading LLC* [2014] EWHC 984 (Comm); *Witted v Galbraith* [1893] 1 Q.B. 577, followed.

*Damage within the jurisdiction*

H18    This gateway (9)(a) referred both to damage sustained in the jurisdiction and damage resulting from acts committed in the jurisdiction. Clearly a good and arguable case had to be shown regarding the applicability of the gateway. Factors included (i) where a contract for sale was concluded; (ii) where such product was delivered; where each entity which purchased a product was located; (iii) where each payment for a product was made; and/or (iv) where each product incorporating a product was ultimately sold. The question of where damage was sustained had ot be informed by the jurisdictional rules of the lex fori. If the claimant were able to show damage sustained within the jurisdiction on the basis of the foregoing, the requirements were satisfied. [141], [149], [152]–[154]

192          MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

*Assignment and disaggregation of claims*

H19     Each claim that was advanced by a claimant and which that claimant sought to
        pursue against a defendant outside the jurisdiction had to fall within one or more
        of the gateways. The question which arose was how this applied where there had
        been an assignment of claims. In such a claim, it may be necessary to consider
        who was the claimant. Where there was an assignment there were two candidates,
        the person who originally had the claim, the assignor, and the person who now had
        the claim, the assignee. Where the identity of the person whose claim was being
        considered for the purposes of a gateway mattered, that person was the original
        holder of the claim, and not the last person to whom that claim was transferred.
        The jurisdictional rules had to be applied not in relation to the claim as assigned,
        but to the claim as it originally subsisted. The assignee could not, by virtue of the
        assignment, be in a better position than the assignor had been in. This was reflected
        in the damages that the assignee could recover if a cause of action was assigned
        to him (the assignee could not recover more than the assignor could have done)
        and in the fact that an assignee was bound by choice of jurisdiction and arbitration
        clauses. [157]–[160]
            *Glencore International AG v Metro Trading International Inc (No.1)* [2000]
        I.L.Pr. 358; *Montedipe SpA v JTP-RO Jugotanker (The Jordan Nicolov)* [1990] 2
        Lloyd's Rep. 11, followed.

*Substantial damage*

H20     This gateway gave jurisdiction in respect of damages sustained both within and
        without the jurisdiction. What damage had been sustained had to be assessed by
        reference to that particular claim. It was irrelevant when a number of claims had
        been assigned to a single assignee to consider where the damages sustained in
        respect of one particular claim were substantial when compared to the damages
        sustained in respect of other claims. The substantial damage test was not an absolute
        test. The amount of damage sustained did not have to be above a certain threshold.
        The test related to a case where damage was sustained both within and without the
        jurisdiction. In such a case, the damage sustained within the jurisdiction had to be
        significant relative to the damage sustained outside the jurisdiction. [162]–[163]
            *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391,
        followed.

*Direct and indirect damage*

H21     The damage that needed to be established under this gateway was direct, and
        not indirect or consequential, damage. [164]
            *Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ
        379, followed.

*Proper forum*

H22     A claimant had to show that England and Wales was clearly and distinctly the
        proper forum for the trial of the claims. The factors that needed to be taken into
        account were (i) the personal connection which the parties had to England; (ii) the
        factual connections which the events had with England; (iii) the question which

law should apply; and (iv) the possibility that other persons might become party to, and affect the overall shape of, litigation. [186]–[187]

H23 **Cases referred to in the judgment:**
1. *Accentuate Ltd v Asigra Inc* [2009] EWHC 2655 (QB)
2. *Aeroflot - Russian Airlines v Berezovsky* [2013] EWCA Civ 784
3. *Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep. 87
4. *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7
5. *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (106/77) EU:C:1978:49; [1978] 3 C.M.L.R. 263
6. *Antonio Gramsci Shipping Corp v Recoletos Ltd* [2012] EWHC 1887 (Comm); [2012] I.L.Pr. 36
7. *Arab Business Consortium International Finance & Investment Co v Banque Franco-Tunisienne* [1996] 1 Lloyd's Rep. 485
8. *Arena Corp Ltd (In Provisional Liquidation) v Schroeder* [2003] EWHC 1089 (Ch)
9. *Arnold v Britton* [2015] UKSC 36
10. *Artlev AG v Joint Stock Company Almazy Rossii-Sakha*, unreported, 8 March 1995
11. *BAS Capital Funding Corp v Medfinco Ltd* [2003] EWHC 1798 (Ch); [2004] I.L.Pr. 16
12. *Berezovsky v Forbes Inc (No.1)* [2001] I.L.Pr. 21
13. *BP Exploration Co (Libya) Ltd v Hunt (No.1)* [1976] 1 W.L.R. 788
14. *Brink's-MAT Ltd v Elcombe* [1988] 1 W.L.R. 1350
15. *Brownlie v Four Seasons Holdings Inc* [2015] EWCA Civ 665
16. *Canada Trust Co v Stolzenberg (No.2)* [2000] 4 All E.R. 481; [1998] I.L.Pr. 290
17. *Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV* (C-352/13) EU:C:2015:335; [2015] 5 C.M.L.R. 4
18. *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645
19. *Cordoba Shipping Co v National State Bank, Elizabeth, New Jersey (The Albaforth)* [1984] 2 Lloyd's Rep. 91
20. *Credit Agricole Indosuez v Unicof Ltd (No.2)* [2003] EWHC 2676 (Comm)
21. *Dawson v Great Northern & City Railway Co* [1905] 1 K.B. 260
22. *Derby & Co v Larsson* [1976] 1 W.L.R. 202
23. *DSG Retail Ltd v Mastercard Inc* [2015] CAT 7
24. *Emerald Supplies Ltd v British Airways Plc* [2015] EWCA Civ 1024
25. *Empresa Exportadora De Azucar (CUBAZUCAR) v Industria Azucarera Nacional SA (IANSA) (The Playa Larga and Marble Islands)* [1983] 2 Lloyd's Rep. 171
26. *Erdenet Mining Corp v Kazakhstan* [2016] EWHC 299 (Comm)
27. *Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379
28. *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40
29. *Glencore International AG v Metro Trading International Inc (No.1)* [2000] I.L.Pr. 358
30. *Goldenglow Nut Food Co Ltd v Commodin (Produce) Ltd* [1987] 2 Lloyd's Rep. 569

194          MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

31. *Golden Ocean Assurance and World Mariner Shipping SA v Martin (The Goldean Mariner)* [1990] 2 Lloyd's Rep. 215

32. *Golden Ocean Group Ltd v Humpuss Intermoda Transportasi Tbk Ltd* [2013] EWHC 1240 (Comm)

33. *Handelswekerij GJ Bier BV v Mines de Potasse d'Alsace SA* (21/76) [1977] 1 C.M.L.R. 284

34. *Heraeus Medical GmbH v Biomet UK Healthcare Ltd* [2016] EWHC 1369 (Ch)

35. *Iiyama Benelux BV v Schott AG* [2016] EWHC 1207 (Ch)

36. *Investors Compensation Scheme Ltd v West Bromwich Building Society (No.1)* [1998] 1 W.L.R. 896

37. *ISC Technologies v Guerin (James Howard)* [1992] 2 Lloyd's Rep. 430

38. *Konamaneni v Rolls Royce Industrial Power (India) Ltd* [2002] I.L.Pr. 40

39. *Kroch v Rossell et Compagnie société à responsabilité limitée* [1937] 1 All E.R. 725

40. *Massey v Heynes & Co* (1888) L.R. 21 Q.B.D. 330

41. *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391

42. *Mohammed v Bank of Kuwait and the Middle East KSC* [1994] 1 W.L.R. 1483

43. *Montedipe SpA v JTP-RO Jugotanker (The Jordan Nicolov)* [1990] 2 Lloyd's Rep. 11

44. *Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd* [1983] Ch. 258

45. *NML Capital Ltd v Argentina* [2011] UKSC 31

46. *OJSC Oil Co Yugraneft v Abramovich* [2008] EWHC 2613 (Comm)

47. *OJSC TNK-BP Holding v Beppler & Jacobson Ltd (In Provisional Liquidation)* [2012] EWHC 3286 (Ch)

48. *Owusu v Jackson (t/a Villa Holidays Bal Inn Villas)* (C-281/02) [2005] I.L.Pr. 25

49. *Pacific International Sports Clubs Ltd v Soccer Marketing International Ltd* [2009] EWHC 1839 (Ch)

50. *R. (on the application of IDT Card Services Ireland Ltd) v Customs and Excise Commissioners* [2006] EWCA Civ 29

51. *Raiffeisen Zentralbank Osterreich AG v Five Star General Trading LLC (The Mount I)* [2001] EWCA Civ 68

52. *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50

53. *Ross v Eason & Son* [1911] 2 I.R. 459

54. *Ryanair Ltd v Esso Italiana Srl* [2013] EWCA Civ 1450

55. *Sainsbury's Supermarkets Ltd v Mastercard Inc* [2016] CAT 11

56. *Saipem SpA v Dredging VO 2 BV (The Volvox Hollandia) (No.1)* [1989] E.C.C. 16

57. *Seaconsar (Far East) Ltd v Bank Markazi Jomhouri Islami Iran (Service Outside Jurisdiction)* [1994] 1 A.C. 438; [1994] I.L.Pr. 678

58. *Sharples v Eason* [1911] 2 I.R. 436

59. *Sinclair-Jones v Kay* [1989] 1 W.L.R. 114

60. *Sloutsker v Romanova* [2015] EWHC 545 (QB)

61. *Société Generale de Paris v Dreyfus Bros* (1887) 37 Ch. D. 215

62.  *Spiliada Maritime Corp v Cansulex Ltd (The Spiliada)* [1987] A.C. 460; [1987] E.C.C. 168
63.  *Tyne Improvement Commissioners v Armement Anversois SA (The Brabo) (No.2)* [1949] A.C. 326
64.  *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2015] 3 C.M.L.R. 2
65.  *Vitkovice Horni a Hutni Tezirstvo v Korner* [1951] A.C. 869
66.  *Vitol Bahrain EC v Nasdec General Trading LLC* [2014] EWHC 984 (Comm)
67.  *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5
68.  *Witted v Galbraith* [1893] 1 Q.B. 577
69.  *Yam Seng Pte Ltd v International Trade Corp Ltd* [2013] EWHC 111 (QB)

H24  **Legislation referred to by the Court:**
Treaty on the Functioning of the European Union art.267
Regulation 1215/2012 arts 1(2)(d), 4
Regulation 44/2001 art.23
Arbitration Act 1996 s.9, 9(4)
Civil Procedure Rules rr.6.36, 6.37

**JUDGMENT**

**MARCUS SMITH J:**

**A. Introduction**

*(1) The claimant*

1    The claimant, Microsoft Mobile Oy (Ltd) (the "claimant" or "Microsoft Mobile"),[1] is a company established with limited liability under the laws of Finland. It is a wholly owned subsidiary of the Microsoft Corporation. It was, and is, a manufacturer and distributor of mobile telephone handsets, which contain lithium ion batteries ("Li-ion Batteries"). These Microsoft Mobile purchased from third parties.

2    Li-ion Batteries contain one or more lithium ion battery cells ("Li-ion Cells").

3    By a Stock and Asset Purchase Agreement dated 2 September 2013 (the "SAPA"), the Microsoft group of companies acquired the mobile devices business of Nokia Corporation and its relevant subsidiaries ("Nokia"[2]). Nokia Corporation was a multinational communications and information technology company, established under the laws of Finland. Microsoft Mobile alleges that prior to the SAPA, when these activities transferred to the Microsoft group of companies, its activities included the manufacture, distribution and sale of mobile telephone handsets, which contained Li-ion Batteries purchased from third parties.

4    Microsoft Mobile alleges that both it and Nokia also sold replacement Li-ion Batteries in an after-market. Again, these were purchased from third parties.

---

[1] Annex 1 lists the terms and abbreviations used in this judgment, together with the paragraph in which that term or abbreviation was first used.
[2] It is important to bear in mind this compendious definition of Nokia, including not merely Nokia Corporation, but also its relevant subsidiaries. This is the definition used in para.1 of the Amended Particulars of Claim.

196        MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

*(2) The Cartel*

Microsoft Mobile brings these proceedings in its own right and as assignee of the rights of Nokia and its relevant subsidiaries. Microsoft claims damages for losses caused by allegedly anti-competitive conduct in relation to the sale to Nokia and/or to Microsoft Mobile of Li-ion Batteries (the "Cartel").

More specifically, Microsoft Mobile contends that:

   i) The products that were the subject of the Cartel were Li-ion Batteries. For the purposes of market definition, Microsoft Mobile identifies:

      a) "Downstream Products", being products into which Li-ion Batteries have been incorporated; and

      b) "Upstream Products", being Li-ion Batteries purchased on the upstream wholesale market either for incorporation into Downstream Products or for sale on the after-market.

   ii) The relevant geographic markets are defined by Microsoft Mobile as follows:

      a) For Upstream Products, global and/or regional, alternatively the EU and/or the EEA as a whole, alternatively national (including at least Finland, Germany, Hungary, Romania and the United Kingdom (within the EU/EEA) and Brazil, China, Hong Kong, India, Japan and South Korea (outside the EU/EEA)).

      b) For Downstream Products, the relevant geographic markets are similarly defined.

   iii) The period over which the Cartel is said to have operated by Microsoft Mobile is from at least August 1999 to at least May 2011. Microsoft Mobile also pleads a "run-off" period, and seeks to claim damages "in so far as either the Cartel continued to operate and/or be implemented … and in so far as it continued to affect the prices charged for Li-ion Cells and/or Li-ion Batteries" (the "Run-Off Period").[3]

*(3) The defendants*

There were, originally, six defendants to these proceedings. Proceedings against the third defendant, Panasonic Corporation, and the fifth defendant, Sanyo Electric Co Ltd, were withdrawn by Microsoft Mobile. Save incidentally, these defendants do not feature in this judgment: they did not appear before me.

As pleaded in the Amended Particulars of Claim, the remaining defendants are:

   i) The first defendant, Sony Europe Ltd, a limited company established in England ("D1/Sony Europe").

   ii) The second defendant, Sony Corporation, a company established under the laws of Japan (D2/Sony Corporation). It is the parent company of the Sony group, including of D1/Sony Europe, and of the various other companies set out in paras 20 and 21 of the Amended Particulars of Claim.

---

[3] Paragraph 2 of the Amended Particulars of Claim.

It is alleged by Microsoft Mobile that D1/Sony Europe and D2/Sony Corporation were part of a single economic unit, and so an "undertaking" for the purposes of EU and EEA competition law.

iii) The fourth defendant, LG Chem Ltd, a company established under the laws of South Korea ("D4/LG Chem"). D4/LG Chem is the ultimate parent company of LG Chem (Nanjing) I&E, and it is alleged by Microsoft Mobile that these entities were part of a single economic unit and so an undertaking for the purposes of EU and EEA competition law.

iv) The sixth defendant, Samsung SDI Co Limited, is a company established under the laws of South Korea ("D6/Samsung"). It is the parent company of the companies set out in paras 34 and 35 of the Amended Particulars of Claim. It is alleged by Microsoft Mobile that these companies were part of a single economic unit, and so an undertaking for the purposes of EU and EEA competition law.

9    Collectively, D1/Sony Europe, D2/Sony Corporation, D4/LG Chem and D6/Samsung are referred to herein as the "defendants".

### (4) The factual case pleaded by Microsoft Mobile against the defendants

10    It is unnecessary, for the purposes of this judgment, to set out in detail the facts and matters pleaded by Microsoft Mobile in support of its claims. Paragraph 37 of the Amended Particulars of Claim provides a summary of the operation of the Cartel, as follows:

"Unknown to the claimant and/or Nokia at the material times, the defendants and/or the undertakings of which they were a part, together with other undertakings (collectively 'the Cartelists') in the period from at least August 1999 to May 2011 entered into agreements and/or arrangements and/or concerted practices by which they or two or more of them:

37.1 exchanged commercially sensitive information; and/or
37.2 agreed to fix prices; and/or
37.3 agreed to restrict their output; and/or
37.4 agreed to limit their technological development; and/or
37.5 agreed to share or allocate markets and/or customers; and/or
37.6 engaged in bid-rigging."

11    It is specifically averred – in [38] – that "[s]uch conduct took place in secret in the course of the conclusion, implementation and/or operation of the Cartel and the defendants deliberately took steps to avoid detection".

12    It is also averred – in [40] – that "the Cartel was a single and continuous infringement of the prohibition contained in Article 101 TFEU (formerly Article 81(1)EC) and/or Article 53 of the EAA Agreement".

13    As a result of the Cartel, it is said that Microsoft Mobile and Nokia suffered loss and damage. This loss and damage manifested itself in:

i) Higher prices paid by Nokia and/or Microsoft Mobile for Li-ion Batteries. In this regard, it is important to note that although it is Microsoft Mobile's case that the defendants all sold Li-ion Batteries to Microsoft and/or Nokia at prices higher than they would have been absent the Cartel, Microsoft Mobile's case goes further than this. Microsoft Mobile contends that prices

for Li-ion Batteries generally – including those sold by non-Cartelist undertakings – were higher than they would have been in a competitive market: see paras 181.1 and 184 of the Amended Particulars of Claim.

ii) Additional costs, incurred by Nokia and/or Microsoft Mobile, to finance the overcharge suffered by them: see para.181.2 of the Amended Particulars of Claim.

14    It was not Microsoft Mobile's primary case that the overcharge incurred by it was passed on by Microsoft Mobile and/or Nokia to its customers: see para.195 of the Amended Particulars of Claim. However, in the alternative, if such costs were passed on, then it is contended (in para.196) that "the necessary price increases would have reduced demand for Nokia's and/or the claimant's products accordingly".

15    Microsoft Mobile contends that the defendants or any of them are jointly and severally liable for the loss and damage claimed including (to quote from para.197 of the Amended Particulars of Claim)[4]:

"…the loss and damage caused by purchases at an overcharge during the Cartel Period and in the Run-Off Period from:

197.1 The other Defendants;
197.2 Other participants in the infringement; and
197.3 The other undertakings engaged in the manufacture and/or supply of Li-ion Batteries, who did not participate in the infringement or who did not participate throughout the entirety of the Cartel Period, but where prices were nonetheless inflated as a result of the effect of the infringement."

*(5) Applicable law*

16    The precise nature of the liability of the defendants depends not only on the facts alleged by Microsoft Mobile (and its ability to make good those facts) but also on the applicable law. This judgment does no more than describe the contentions advanced by Microsoft Mobile in the Amended Particulars of Claim, without expressing any view as to those contentions. Essentially, the position is as follows:

i) The causes of action pleaded by Microsoft Mobile are entirely tortious in nature.

ii) The tortious causes of action pleaded by Microsoft Mobile fall within two broad camps:

a) Torts based upon infringement of applicable competition laws; and
b) Other torts – what Mr de la Mare, Q.C., leading counsel for D1/Sony Europe and D2/Sony Corporation called "economic" torts, which term, *faut de mieux*, I adopt – arising out of the same facts but not being directly for breach of applicable competition laws.

iii) Because of the period of time covered by the Cartel, the choice of law rules governing the applicable law were:

---

[4] There is also a plea of vicarious liability for the conduct of servants, agents, subsidiaries, associated companies and/or corporate predecessors elsewhere identified in the Amended Particulars of Claim: para.198.

    a) For conduct from 1 May 1996 to 10 January 2009, the Private International Law (Miscellaneous Provisions) Act 1995 (the "1995 Act").

    b) For conduct after 11 January 2009, Regulation (EC) No. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations ("Rome II").

iv) The applicable laws contended for by Microsoft Mobile are set out schematically in the table below:

| | Torts based upon infringement of applicable competition laws | Torts based upon economic torts |
| --- | --- | --- |
| **For the period 1 May 1996 to 10 Jan 2009, the 1995 Act applies:** | | |
| Primary case | **Amended Particulars of Claim, para.156** | **Amended Particulars of Claim, para.173** |
| | Pursuant to ss.11 and 12 of the 1995 Act, Finnish law. | Pursuant to ss.11 and 12 of the 1995 Act, Finnish law. |
| Alternative case. | **Amended Particulars of Claim, para.159** | **Amended Particulars of Claim, para.173** |
| | To the extent that the relevant affected market is found to be that of another EEA State other than the UK or Finland or that of a country outside the EEA, then the claimant relies on the law of each such country to support its claim for loss to the extent that such laws recognise a tortious claim for damages arising from the operation and/or implementation of the Cartel. | Pursuant to ss.11 and 12 of the 1995 Act, English law. |
| **For the period after 11 Jan 2009, Rome II applies:** | | |
| Primary case | **Amended Particulars of Claim, para.153.1** | **Amended Particulars of Claim, para.171.1.** |
| | Pursuant to Art 6(3)(a) of Rome II, the national law of each country where the market is, or is likely to be, affected by the defendants' conduct. That is each country in which Nokia and/or the claimant bought Li-ion Batteries whose price was affected by the Cartel. | Pursuant to Art 6(3)(b) of Rome II, English law. |
| Alternative case | **Amended Particulars of Claim, para.153.2** | **Amended Particulars of Claim, para.171.2** |
| | Pursuant to Art 6(3)(b) of Rome II, the law of England and Wales. | Pursuant to Art 4(3) of Rome II, English law. |
| Further alternative case | **Amended Particulars of Claim, para.159**. | **Amended Particulars of Claim, para.172.1** |

200          Microsoft Mobile Oy (Ltd) v Sony Europe Ltd

|  | Torts based upon infringement of applicable competition laws | Torts based upon economic torts |
|---|---|---|
|  | To the extent that the relevant affected market is found to be that of another EEA State other than the UK or Finland or that of a country outside the EEA, then the claimant relies on the law of each such country to support its claim for loss to the extent that such laws recognise a tortious claim for damages arising from the operation and/or implementation of the Cartel. | Pursuant to art.4(1) of Rome II, Finnish law. |
| Yet further alternative case |  | **Amended Particulars of Claim, para.172.3** |
|  |  | Pursuant to art.4(3) of Rome II, Finnish law. |

### (6) Aggregation of claims and Microsoft Mobile's pleaded case

17    As described in [5] above, Microsoft Mobile brings these proceedings in its own right and as assignee of the rights of Nokia. As described in [3] above, Nokia is not a single legal person, but comprises "Nokia Corporation and its relevant subsidiaries" (to quote from para.1 of the Amended Particulars of Claim). Appendix 1 to the Amended Particulars of Claim lists the relevant Nokia subsidiaries "which purchased Li-ion Batteries from the defendants in the Cartel Period and/or Run-Off Period" (see para.10 of the Amended Particulars of Claim).

18    Appendix 1 lists some 16 Nokia subsidiaries which purchased Li-ion Batteries. They are set out below, together with the place in which they are pleaded as being established:

| 1. | Nokia GmbH | Germany |
|---|---|---|
| 2. | Nokia do Brazil Technologia Ltd | Brazil |
| 3. | Nokia Capitel Telecommunications Ltd | China |
| 4. | Dongguan Nokia Mobile Phones Company Ltd | China |
| 5. | Nokia Komarom Kft | Hungary |
| 6. | Nokia TMC Limited | Republic of Korea |
| 7. | Nokia Inc | United States under the laws of Delaware |
| 8. | Nokia UK Limited | United Kingdom |
| 9. | Nokia India Pvt Ltd | New Delhi, India |
| 10. | Nokia Romania SRL | Romania |
| 11. | Nokia (China) Investment Co Ltd | China |
| 12. | Nokia Communications Equipment (Shanghai) Ltd | China |

| 13. | Nokia Telecommunications Ltd — Dong Guan Branch | China |
| 14. | Nokia (HK) Ltd | Hong Kong |
| 15. | Nokia Mobile Phone Manufacturing (HK) Ltd | Hong Kong |
| 16. | Nokia Mobile Communications KK (formerly Nokia Mobile Phone Japan) | Japan |

19    The averments in the Amended Particulars of Claim aggregate the claims made by Nokia and/or Microsoft Mobile (as claimants) against the defendants without differentiating between them. Thus, by way of example:

i)    The purchase of Li-ion Batteries is pleaded as follows:

"13. Prior to the execution of the SAPA, during the Cartel Period, Nokia, whether by itself, its subsidiaries or its servants or agents, purchased from the defendants components for the manufacture of handsets, including Li-ion Batteries; constructed and/or arranged for the construction of handsets; and distributed the said handsets and replacement Li-ion Batteries to mobile telephone wholesalers, and/or retailers worldwide.

14. Thereafter, during the Run-off Period, Nokia whether by itself, its subsidiaries or its servants or agents, continued to purchase and, following the execution of the SAPA, the claimant purchased in like manner to Nokia, Li-ion Batteries from the defendants for incorporation into their handsets and/or for sale as replacements."

In para.150.2, it is averred that

"Nokia was the most significant purchaser, globally, of Li-ion Batteries. During the Cartel Period, and the Run-Off Period, Nokia held a market-leading position in the manufacture and distribution of handsets. Its global market shares were approximately 30% and 40% of the relevant market for Downstream Products during the Cartel Period".

Paragraph 150.1 avers:

"Nokia was a direct purchaser of Li-ion Batteries".

ii)    The Cartel is pleaded (in para.37) in the following terms:

"…the defendants and/or the undertakings of which they were a part, together with other undertakings (collectively 'the Cartelists') in the period from at least August 1999 to May 2011 entered into agreements and/or arrangements and/or concerted practices…".

iii)    Finally, causation loss and damage is pleaded in para.181 as follows:

"As an intended and/or foreseeable consequence of the conduct set out above, the defendants and the undertakings of which they formed part caused the claimant loss and damage, in that:

"181.1 they caused the prices paid by Nokia and/or the claimant for Li-ion Batteries, to be higher than they would have been absent

202    MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

the infringement. The prices charged by the infringing undertakings for Li-ion Batteries, were higher than they would have been absent the infringement; and

181.2 they caused Nokia and/or the claimant to incur the additional cost of financing the overcharge it suffered, from the date on which it was paid up until the date of judgment.""

20    Precisely what Microsoft Mobile could, and could not, establish in terms of the purchases of Li-ion Batteries between Nokia and Microsoft Mobile and the defendants was explored with Mr Beal, QC, leading counsel for Microsoft Mobile, during the course of submissions. Essentially, the position was as follows:

i) Microsoft Mobile has been able to identify a certain number of purchases from D1/Sony Europe by Nokia and/or Microsoft Mobile[5]:

| Q (Marcus Smith J) | "In the jurisdiction, there are no purchases at all from any of the other Defendants that you can evidence, none from D2 for example?" |
| --- | --- |
| A (Mr Beal, QC) | "I am not sure that the data disaggregation has gone that far. What we have identified is purchases from D1. D1 is established here. D1 is, quite clearly, selling from its premises where they are located in the UK. Therefore, we have attributed that to a sale within the UK segment of the EEA market." |

ii) Microsoft Mobile has also been able to suggest that entities within Nokia made purchases of Li-ion batteries, which include one of the Appendix 1 entities, Nokia UK Ltd (number 8 on the list set out in [18] above), which is established in the UK. Mr Beal, QC made the following point in this regard[6]:

"We make the point here that Nokia UK is one of the subsidiaries listed in Appendix 1. At paragraphs 10 and 13 [of the Amended Particulars of Claim] we have pleaded that Nokia UK Ltd has made purchases and has sustained loss. It has sustained loss through selling handsets in the United Kingdom."

iii) However, Microsoft Mobile was unable to state or identify any specific link between Li-ion Batteries sold by D1/Sony Europe in the UK and Li-ion Batteries purchased by any Nokia specific entity, as became apparent in a dialogue commenced by Ms Demetriou, QC, leading counsel for D4/LG Chem:[7]

| Q (Ms Demetriou, QC) | My Lord, because this is new evidence and just so I can understand the point that is made against us, so I can look at these documents properly, could I just ask Mr Beal to identify where, if anywhere, in these new documents there is evidence showing that Nokia UK purchased the batteries itself? |
| --- | --- |

[5] Transcript Day 4 at p.607.
[6] Transcript Day 4 at pp.609–610.
[7] Transcript Day 4 at pp.615ff.

| | |
|---|---|
| Q (Marcus Smith J) | I think that that is a point that Mr Beal is moving slightly away from. It is a question that I, myself, was going to raise. |
| A (Mr Beal, QC) | The answer I gave, my Lord, was paragraph 13. |
| Q (Marcus Smith J) | I have looked at that. We have so far had a bifurcation between indirect purchases and direct purchases. It all depends on how you define "direct purchases". If one looks at the supply chain–we have at the one end, where the batteries are being sold, D1. |
| A (Mr Beal, QC) | Yes. |
| Q (Marcus Smith J) | I think that that is a fixed end for present purposes, because that is what we are interested in for jurisdiction. The question is whether one is talking about direct purchases by Nokia UK from D1, which I think was the point being addressed yesterday by Ms Demetriou. |
| A (Mr Beal, QC) | When I have said D1, D1 is, obviously, one of the people from whom we purchased batteries. This analysis is not looking at specific purchases from D1. That was the prior point based on the 12 million units of batteries purchased from D1. This point is looking at purchases more generally from each of the defendants, which we have pleaded have been purchased by each of the claimants and their subsidiaries. Paragraph 13 says we have purchased these batteries, whether by servants, agents or otherwise. We are not an indirect purchaser case. We have bought these batteries. Nokia has bought these batteries. |
| Q (Marcus Smith J) | That is my point though. How you define "indirect purchaser" depends on whether you count Nokia as a single entity or whether you disaggregate it into the various little Nokia legal persons that form part of the overall Nokia undertaking. I want to be clear in my own mind as to how we are establishing, or how you are contending, damage is sustained within the jurisdiction. One way you are putting it is that one has direct purchases by Nokia UK from D1. |
| A (Mr Beal, QC) | No. |
| Q (Marcus Smith J) | No? |
| A (Mr Beal, QC) | No. There are purchases from D1, which we have identified at 12 million units, which are within the market. Therefore, that is market harm, and we put it that way. It is loss deriving from the segment of the EEA market that is in the UK |
| Q (Marcus Smith J) | Looking simply at the 12 million, the chain is very short? It is Nokia UK to D1? |
| A (Mr Beal, QC) | Not necessarily Nokia UK. We have pleaded that the Nokia companies have purchased 12 million units from D1. That evidence comes from looking at sales data that we have where D1 is the seller. |
| Q (Marcus Smith J) | And some Nokia entity is the purchaser? |
| A (Mr Beal, QC) | Some Nokia entity is the purchaser. |

204                    MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

| | |
|---|---|
| Q (Marcus Smith J) | So if one is seeking to disaggregate the Nokia corporation, or Nokia undertaking — let us call it that — it could be, on that basis, indirect, because you might find that D1 sells to Nokia Undertaking 1, who sells on to Nokia Undertaking 2, who sells on to Nokia Undertaking 3, who eventually puts it into a phone that is sold? |
| A (Mr Beal, QC) | My Lord, that is not what is being pleaded. What is being pleaded is that the purchases took effect by each of the claimants when they are the purchaser by themselves or using an agent. The contractual chain is, as a matter of analysis, going to be a Nokia company and D1. The fact that the purchasing entity may be a Nokia company but that Nokia company is acting as an agent for the company that has the battery and puts it in the handset and sells the handset does not change that analysis,The analysis is the reason why we have not disaggregated all of these claims is for precisely this reason in many ways. There is a practical problem which is that it is incredibly difficult to do so because we would need all of the disclosure from all of the defendants to re-piece some of the transaction chain" |
| | … |
| Q (Marcus Smith J) | Let us pretend, for the moment, because I am quite anxious to avoid questions of assignment, if I possibly can, that the acquisition of the mobile devices division by Microsoft did not occur and we are simply talking about Nokia Corporation. I think you are telling me that if you are seeking to formulate a specific claim by an individual, a Nokia entity, against D1, you would not actually be able to do that, but you would be able to formulate a claim by aggregating the Nokia entities, as you have done in Appendix 1 to the pleading, together, and you could say the claimants, being those Nokia companies, leaving assignment entirely on one side, have suffered a loss, but cannot tell as between those claimants which one it is? |
| A (Mr Beal, QC) | Could I posit a situation in which there are, perhaps, 20 claimants on the claim form, which I think would do the job of the thought experiment that your Lordship is engaged in. You have 20 claimants on the claim form. The claim is, therefore, brought on the basis of a pleaded claim on behalf of those 20 claimants. The claim in tort — say it is only established by one claimant against all of the defendants, that would satisfy the gateway |
| Q (Marcus Smith J) | Just to put a little bit of meat on the skeleton of our mutual thought experiment, the claimants would be the 16 that you have listed in Appendix 1 as being Nokia subsidiaries, which purchased Lithium Ion Batteries at page 202? |
| A (Mr Beal, QC) | Yes. |

Pressed on precisely what was being alleged in paragraph 13 of the Amended Particulars of Claim as to how Nokia purchased Li-ion Batteries, Mr Beal, QC was unable to be more specific. It was possible either that Nokia

subsidiaries acquired batteries through or via a common purchasing agent so that there was a direct purchase between that subsidiary and the vendor of the battery <u>or</u> that there was a chain of sales and purchases within Nokia, whereby one subsidiary purchased the Li-ion Battery from the vendor, and then on-sold it within Nokia.[8]

21    It is necessary to set out exactly what Microsoft Mobile was alleging in the Amended Particulars of Claim for the purposes of dealing with Microsoft Mobile's contentions on jurisdiction.

*(7) Service of the proceedings on the defendants and the present applications*

22    D1/Sony Europe is sued in the jurisdiction of its domicile – England and Wales – and Microsoft Mobile contends that this court has jurisdiction by virtue of art.4 of Regulation (EU) 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition of judgments in civil and commercial matters (recast) ("the Brussels I Regulation (Recast)").

23    By an application dated 3 June 2016, D1/Sony Europe seeks a stay of the proceedings against it pursuant to s.9 of the Arbitration Act 1996 and/or under the inherent jurisdiction of the court, on the grounds that the dispute between Microsoft and D1/Sony Europe is subject to a valid arbitration clause.

24    The other defendants are all companies domiciled in Japan and the Republic of Korea. Since none of these defendants is domiciled in the EU or the EEA, this was not a case falling within the Brussels I Regulation (Recast), and Microsoft Mobile needed permission to serve the claim out of the jurisdiction pursuant to Part 6.36 of the Civil Procedure Rules. An application was made on 23 December 2015, supported by a witness statement of Mr Robert Murray ("Murray 1").

25    As is considered in greater detail below, three requirements must be shown before the court will permit service of a claim or claims out of the jurisdiction:

   i) The claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law or both.

   ii) The claimant must satisfy the court that there is a good arguable case that the claim falls within one or more classes of case in which permission to serve may be given. These classes – referred to in this judgment as "Gateways" – are presently listed in para.3.1 of Practice Direction 6B of the Civil Procedure Rules. The Gateways relied upon by Microsoft Mobile were two:

      a) Gateway (3) (i.e. para.3.1(3) of Practice Direction 6B), where there is a necessary or proper party to a claim made against a defendant susceptible to the jurisdiction of the court (the so-called "anchor defendant"). In this case, the anchor defendant, for the purposes of Gateway (3), was D1/Sony Europe.

      b) Gateway (9(a)) (i.e. para.3.1(9)(a) of Practice Direction 6B), where the claim is made in tort and the damage is sustained or will be sustained within the jurisdiction. To be clear, Microsoft Mobile did not rely upon Gateway (9)(b) (i.e. para.3.1(9)(b) of Practice Direction

---

[8] Transcript Day 4 at pp.627–629.