# Appendix
## Part 4 of 5

206    MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

6B), which is satisfied where the claim is made in tort and the damage sustained resulted from an act committed within the jurisdiction.

iii) The claimant must satisfy the court that England and Wales is clearly and distinctly the proper forum for the trial of the claims.

26    The application was heard by Master Clark, who made an order for service out of the jurisdiction on 19 January 2016.[9]

27    D2/Sony Corporation, D4/LG Chem and D6/Samsung all object to this court assuming jurisdiction:

i) D2/Sony Corporation does so on the same basis (and pursuant to the same application) as D1/Sony Europe: it seeks a stay of the proceedings against it pursuant to s.9 of the Arbitration Act 1996.

ii) By applications dated 17 June 2016 and 27 June 2016, D4/LG Chem and D6/Samsung respectively seek orders:

a) Declaring that this court has no jurisdiction against them; and/or

b) Declaring that this court will not exercise any jurisdiction which it may have over them; and

c) Setting aside service out of the jurisdiction.

28    I shall refer to these applications of the defendants as the "Applications".[10] D2/Sony Corporation – as a fall-back to its stay application – also challenges the court's jurisdiction. This application, however, was not before the court on this occasion, the parties having agreed that (given the points raised by D2/Sony Corporation's application) there would be insufficient time. The somewhat unsatisfactory basis on which this particular application was "parked" is described further in Section E below. The upshot is that the defendants contend:

i) That there is no good arguable case that the claims against them fall within either of the Gateways relied upon by Microsoft Mobile.

ii) That England and Wales is not clearly and distinctly the proper forum for the trial of the claims.

As has already been noted, the satisfaction of the first requirement – that there was a serious issue to be tried on the merits – was "parked", but it certainly cannot be said that the defendants were conceding that this requirement was met in respect of all parts of the claim.

29    The Applications were supported by the evidence listed in Annex 2 hereto, to which I shall refer using the abbreviations set out in Annex 2. This evidence was responded to by a further statement of Mr. Murray ("Murray 2").[11]

---

[9] The order of 19 January 2016 was amended (following an application made by Microsoft Mobile on 5 February 2016) on 9 February 2016.

[10] There was a question as to whether the defendants were applying for a stay of proceedings against them if – contrary to their primary position – Microsoft Mobile succeeded in demonstrating that the three requirements set out at [25] were met. I consider that the Applications were wide enough to cover this, fall-back, position, which, however, is only engaged if Microsoft Mobile does succeed in demonstrating that the order of the Master permitting service out was justified.

[11] D2/Sony Corporation and D4/LG Chem both needed to make applications for extensions of time to (in the words of Microsoft Mobile) "piggy-back on applications that others have previously brought". The reasons for the need to make these applications appeared in the written submissions, and I did not invite oral argument on the point. The applications were not opposed by Microsoft Mobile. I am satisfied that it is appropriate to grant these applications, and do so.

30    The Applications were heard over four days (16 to 19 January 2017). This judgment determines the Applications and is structured as follows:

   i)  Section B deals with the application for a stay sought by D1/Sony Europe pursuant to s.9 of the Arbitration Act 1996 and/or the court's inherent jurisdiction.
   ii)  Section C deals with the similar stay application made by D2/Sony Corporation.
   iii)  Section D considers in broad terms the relevant principles that apply when considering the sort of jurisdictional objections raised by the Applications. Thereafter, the three requirements for service out are considered in greater detail:

      a)  Section E considers the first requirement (serious issue to be tried).
      b)  Section F considers the second requirement (good arguable case that the claim falls within one or more of the Gateways).
      c)  Section G considers the third requirement (whether England and Wales is clearly and distinctly the proper forum for the trial of the action).

31    It was also contended by the defendants that the statement in support of Microsoft Mobile's application to serve D2/Sony Corporation, D4/LG Chem and D6/Samsung out of the jurisdiction (Murray 1) made material non-disclosures and that the order of Master Clark and the service out of the proceedings should be set aside on that ground alone. This aspect is considered in Section H below.

**B. Stay of the proceedings against D1/Sony Europe in favour of arbitration**

*(1) Introduction*

32    D1/Sony Europe is domiciled in the United Kingdom within the meaning of art.63 of the Brussels I Regulation (Recast). It is common ground that the claims advanced by Microsoft Mobile against D1/Sony Europe are civil and commercial matters within the scope of art.1 of the Brussels I Regulation (Recast) and that – but for the arbitration clause described in [35] below – the claims against the D1/Sony Europe were commenced as of right by Microsoft Mobile under art.4 of the Brussels I Regulation (Recast).

33    By art.1(2)(d), the Brussels I Regulation (Recast) does not apply to arbitration. D1/Sony Europe contends:

   i)  That an arbitration clause subsisted between it and Nokia, was unaffected by the assignment to Microsoft Mobile and continued to bind Microsoft Mobile.
   ii)  That the claims brought in these proceedings against D1/Sony Europe fall within the scope of that arbitration clause.

On this basis, D1/Sony Europe sought a stay of the proceedings as against it pursuant to s.9 of the Arbitration Act 1996 and/or pursuant to the court's inherent jurisdiction.

208         Microsoft Mobile Oy (Ltd) v Sony Europe Ltd

*(2) The arbitration clause*

34      Product Purchase Agreement No. 000247 (the "PPA") is an agreement made in writing and becoming effective on 1 July 2001 (see art.23.1) between Nokia Mobile Phones Ltd (as "BUYER") and "Sony Corporation" i.e. D2/Sony Corporation (as "SELLER"). These parties contracted on behalf of themselves and:

> i) In the case of Nokia Mobile Phones Ltd, "its Affiliated Companies listed in Appendix 1". "Affiliated Companies" is a defined term under art.1 of the PPA:
>
>> "…means any other entity controlled by, or under control with, a Party[12] (or in case of BUYER, Nokia Corporation, BUYER's parent company formed under the laws of Finland). For purposes of this definition "control" shall mean the direct or indirect ownership of fifty (50) percent or more of the shares or interests which are entitled to vote for the directors of an entity or the equivalent, for as long as such entitlement subsists, or which mean equivalent power over management of an entity."
>
> Appendix 1 lists various Nokia Affiliated Companies. No-one – in particular not Microsoft Mobile – sought to contend that Nokia was not bound by the terms of the PPA.
>
> ii) In the case of D2/Sony Corporation, "its Affiliated Companies [are] listed in Appendix 1". "Affiliated Companies" bears the same meaning as above, and Appendix 1 lists D1/Sony Europe.

35      Article 25 of the PPA provides as follows:

> "25.1 This Agreement shall be governed by and construed in accordance with United Kingdom law."

Pausing there, it was common ground between the parties that this was a reference to English law. I agree, and so hold.

> "25.2 Any disputes related to this Agreement or its enforcement shall be resolved and settled by arbitration in the English language in United Kingdom, in accordance with the Arbitration Rules of the International Chamber of Commerce in United Kingdom. However, any disputes related to BUYER's Intellectual Property Right(s)[13] or Confidential Information,[14] or for injunctive relief, may, at BUYER's sole election, be resolved by a court of competent jurisdiction. The decision of the arbitrators shall be final, binding and executable. The arbitration shall be the exclusive remedy of the Parties to the dispute."

36      Although the scope of this arbitration clause was contested between Microsoft Mobile and D1/Sony Europe, two matters were common ground:

> i) First, that the arbitration clause was binding as between D1/Sony Europe (who sought to rely on it) and Nokia. This is plain from the facts I have

---

[12] Defined in art.1 of the PPA as "either BUYER or SELLER".
[13] A defined term under art.1 of the PPA, but nothing turns on this.
[14] Also a defined term under art.1 of the PPA, but again nothing turns on this.

stated, and (had it not been common ground) I would have reached this conclusion in any event.

ii)  Secondly, that the assignment of Nokia's rights to Microsoft (referred to in [5] above) could not change this position. Here, the position is a little less clear-cut:

   a)  Paragraph 1 of the Amended Particulars of Claim avers that Microsoft Mobile claims in its own right and also as the assignee of the rights of Nokia.

   b)  Paragraph 11 of the Amended Particulars of Claim avers that by the SAPA, the Microsoft group of companies acquired the mobile devices business of Nokia.

   c)  Paragraphs 9.2 and 11 of the Amended Particulars of Claim aver that various causes of action – including of necessity those Nokia claims advanced in the Amended Particulars of Claim – were assigned by Nokia to Microsoft International Holdings BV.

   d)  Paragraph 12 of the Amended Particulars of Claim avers that "[t]he entitlement to bring these claims was assigned by Microsoft International Holdings BV, to the claimant, by an agreement dated 20 September 2014."

Neither the SAPA nor any of the other documents relating to these assignments were before the court nor disclosed to the other parties by Microsoft Mobile. That, in itself, does not matter, for the Amended Particulars of Claim are verified by a statement of truth. However, had Microsoft Mobile sought to contend that the effect of these assignments was to enable an assignee in some way to escape the effect of an arbitration clause binding on the assignor (whether through a single assignment or a chain of assignments), I would have required considerable persuasion that this point could be correct. I would also have needed to see all of the underlying documents in order to determine the point. As it was, Microsoft Mobile accepted that the assignments in this case could not have this effect, and I proceed on that basis.

### (3) Section 9 of the Arbitration Act 1996

37    It will be necessary to consider other provisions of the PPA in due course. For present purposes, however, all that needs to be noted is that D1/Sony Europe relied upon art.25.2 (set out in [35] above) to contend that these proceedings should be stayed as against it pursuant to s.9 of the Arbitration Act 1996.

38    Section 9 provides as follows:

      "(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.

210     MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

> (2) An application may be made notwithstanding that the matter is to be referred to arbitration only after the exhaustion of other dispute resolution procedures.
>
> (3) An application may not be made by a person before taking the appropriate procedural step (if any) to acknowledge the legal proceedings against him or after he has taken any step in those proceedings to answer the substantive claim.
>
> (4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative or incapable of being performed.
>
> (5) If the court refuses to stay the legal proceedings, any provision that an award is a condition precedent to the bringing of legal proceedings in respect of any matter is of no effect in relation to those proceedings."

39     D1/Sony Europe contended that all or some of the claims pleaded against it in the Amended Particulars of Claim were matters to be referred to arbitration under art.25.2, and it sought a stay of the proceedings against it on this basis.

40     Microsoft Mobile disputed this, and advanced two points in response:

   i) First, it contended that none of the claims pleaded in the Amended Particulars of Claim fell within the scope of art.25.2.

   ii) Secondly, and in the alternative, it contended that even if some or all of the claims pleaded against D1/Sony Europe in the Amended Particulars of Claim fell within the scope of art.25.2, the arbitration clause was not to be applied.

41     These points are considered in turn below. There was a third point: this was a question as to who should determine these questions, this court or whatever arbitral tribunal is in due course established.[15] I should say at the outset that I have decided to determine these questions myself: my reasons for doing so are set out at [82]–[84] below.

   *(4) The approach to construction*

42     It was common ground between the parties that arbitration clauses, as contractual provisions, fall to be construed according to the precepts laid down in *Investors Compensation Scheme Ltd v West Bromwich Building Society (No.1)* [1998] 1 W.L.R. 896, *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50 and *Arnold v Britton* [2015] UKSC 36.

43     Additionally, the parties recognised that whilst arbitration clauses had, in the past, been subject to a series of specific and technical rules, the starting point now for the construction of an arbitration clause was *Fili Shipping Co Ltd v Premium Nafta Products Ltd* [2007] UKHL 40, better known as *Fiona Trust* (from its name before the Court of Appeal: *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40).[16]

---

[15] Microsoft commenced proceedings against some of the same defendants – including D2/Sony Corporation – in the US in respect of the same conduct. A US court has granted D2/Sony Corporation's motion to compel arbitration pursuant to the same arbitration clause in respect of the same products, Li-ion Batteries. In these circumstances, therefore, it can be said that there will, in due course, be an arbitral tribunal established.

[16] The old law in this respect – involving distinctions between disputes "arising under" or disputes "arising out of" or disputes "in relation to" or disputes "in connection with" or "under" the agreement or contract – was adverted to by Lord Hoffmann at [11]. At [12], he noted that "the distinctions which they make reflect no credit upon English

[2017] 5 C.M.L.R. 5    211

44    In *Fiona Trust* [2007] UKHL 40, Lord Hoffmann stated:[17]

> "5. Both of these defences raise the same fundamental question about the attitude of the courts to arbitration. Arbitration is consensual. It depends upon the intention of the parties as expressed in their agreement. Only the agreement can tell you what kind of disputes they intended to submit to arbitration. But the meaning which parties intended to express by the words which they used will be affected by the commercial background and the reader's understanding of the purpose for which the agreement was made. Businessmen in particular are assumed to have entered into agreements to achieve some rational commercial purpose and an understanding of this purpose will influence the way in which one interprets their language.
>
> 6. In approaching the question of construction, it is therefore necessary to inquire into the purpose of the arbitration clause. As to this, I think there can be no doubt. **The parties have entered into a relationship, an agreement or what is alleged to be an agreement or what appears on its face to be an agreement, which may give rise to disputes. They want those disputes decided by a tribunal which they have chosen, commonly on the grounds of such matters as its neutrality, expertise and privacy, the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its supervisory law.** Particularly in the case of international contracts, they want a quick and efficient adjudication and do not want to take risks of delay and, in too many cases, partiality, in proceedings before a national jurisdiction.
>
> 7. If one accepts that this is the purpose of an arbitration clause, its construction must be influenced by whether the parties, as rational businessmen, were likely to have intended that only some of the **questions arising out of their relationship** were to be submitted to arbitration and others were to be decided by national courts. Could they have intended that the question of whether the contract was repudiated should be decided by arbitration but the question of whether it was induced by misrepresentation should be decided by a court? If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention.
>
> 8. A proper approach to construction therefore requires the court to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitration clause….
>
> …
>
> 13. In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute **arising out of the relationship into which they have entered or purported to have entered** to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless

---

commercial law. It may be a great disappointment to the judges who explained so carefully the effects of the various linguistic nuances if they could learn that the draftsman of so widely used a standard form as Shelltime 4 obviously regarded the expressions "arising under this charter" in cl.41(b) and "arisen out of this charter" in cl.41(c)(1)(a)(i) as mutually interchangeable…".

[17] Emphasis supplied.

212 MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore L.J. remarked, at para. 17: 'if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so'."[18]

45    The importance of having a "one-stop-shop" for all disputes – and the likelihood that the parties to an agreement would intend this – is clear. But that is true only to the extent that disputes arise out of the parties' relationship. Thus, absent extremely clear wording, a court would presume that the parties would have intended the same tribunal to deal with contractual disputes arising out of the relationship, as well as any "parallel" claims in tort. But, what would not be covered, absent extremely clear wording, would (to take a somewhat extreme hypothetical case) be Party A's case against Party B (Party A and Party B being in a contract with each other containing an arbitration clause) for Party B negligently, but coincidentally and unrelated to the contract, running Party *A* over in the street. That would not be a dispute arising out of the parties' contractual relationship.

46    The spectrum of cases falling within and without a "relationship" was considered in *Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep. 87. This decision was cited to the House of Lords in *Fiona Trust* [2007] UKHL 40, but not mentioned in their Lordships' opinions. As it pre-dates *Fiona Trust*, *The Angelic Grace* must be treated with a degree of caution. I have, nevertheless, derived some assistance from the case, in particular the following passage[19]:

"The question in a nutshell is whether the relevant claims and cross-claims arise out of the contract. It is common ground that the question must be answered in the light of *Empresa Exportadora De Azucar (CUBAZUCAR) v Industria Azucarera Nacional SA (IANSA) (The Playa Larga and Marble Islands)* [1983] 2 Lloyd's Rep. 171, in which this court upheld the *dictum* of Mr. Justice Mustill that a tortious claim does "arise out of" a contract containing an arbitration clause if there is a sufficiently close connection between the tortious claim and a claim under the contract. **In order that there should be a sufficiently close connection, as the Judge said, the claimant must show either that the resolution of the contractual issue is necessary for a decision on the tortious claim, or, that the contractual and tortious disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other**."

47    All of the parties before me contended that *Ryanair Ltd v Esso Italiana Srl* [2013] EWCA Civ 1450 was of particular relevance to the present case, no doubt because it involved competition law claims. It is necessary to consider this decision at some length.

48    In *Ryanair v Esso* [2013] EWCA Civ 1450, Ryanair had entered into a contract with Esso for the purchase of jet fuel in Italian airports. The contract was made on the basis of English law and the non-exclusive jurisdiction of the English courts. Subsequently, Esso and other oil companies were found to have been operating an illegal cartel in Italy for the supply of jet fuel to Italian airports in breach of art.101 of the Treaty on the Functioning of the European Union ("TFEU").

---

[18] See, also, Lord Hope at [26] and [28].
[19] At [89], emphasis supplied.

49    Ryanair then brought a claim in England for damages against Esso alleging breach of the fuel supply contract in relation to Esso's cartel activities in inflating the price of the fuel at Italian airports (i.e. a contractual claim) and a claim for breach of statutory duty based upon art.101 TFEU (i.e. a tortious claim). The question was whether (to use the terms of Eder J. at first instance) the tortious claims were so closely knitted together with the contractual claims that a rational or sensible businessman would expect them to be subject to determination by a single tribunal.

50    Rix L.J. set out the essential facts[20]:

> "1. This appeal concerns the scope of an English jurisdiction clause and arises on a challenge to jurisdiction in the English courts. Does the clause embrace a claim against a member of an Italian cartel selling jet fuel in Italian airports, a claim advanced on the basis of a statutory tort under English law in vindication of rights arising out of article 101 of the Treaty on the Functioning of the European Union ('TFEU').
>
> 2. The claimant is Ryanair Ltd ('Ryanair'), the well-known Irish airline. The defendant is Esso Italiana Srl ('Esso Italiana'), part of the world-wide Exxon-Mobil group. The jurisdiction clause is contained in their contract, entered into through the agency of ExxonMobil Aviation International Ltd ('EMAIL'), for the purchase of jet fuel in Italian airports. The jurisdiction clause is found in article 12.1 of Part II of a master contract, made by EMAIL on behalf of group subsidiaries supplying fuel in various countries of the world, which was originally entered into with Ryanair back in 1999, then in a slightly different form in 2000, and subsequently renewed annually until expiry on 31 April 2009.
>
> 3. Article 12.1 provides as follows:
>
>> 'The Agreement contains the entire agreement of the parties with respect to the subject matter hereof and there are no other promises, representations or warranties affecting it. This Agreement cannot be modified in any way except in writing signed by the parties. No claims shall be made hereunder for prospective profits or for indirect or consequential damages except as otherwise provided in the footnotes attached to the schedule. This Agreement shall be governed by the laws of England excluding its conflict of laws rules and the United Nations Convention on the International Sale of Goods Act shall not apply. **For the purposes of the resolution of disputes under this Agreement, each party expressly submits itself to the non-exclusive jurisdiction of the Court of England.**'
>
> 4. Thus, the parties' contract was made on the basis of English law and the non-exclusive jurisdiction of the English courts. Prospective profits and indirect or consequential damages were excluded. It is not clear what follows from the exclusion of English conflict of law rules, which might be said to be a large exclusion, but no point has been taken on that."

51    Rix L.J. noted that

---

[20] Emphasis supplied.

214            Microsoft Mobile Oy (Ltd) v Sony Europe Ltd

> "[i]t is important to observe that Ryanair at no time asserted that its claim for breach of statutory duty fell within the jurisdiction clause in the absence of a concomitant contractual claim under article IV in respect of the lower quantity of fuel supplied by Esso Italiana itself, which was itself premised on Esso Italiana participating in infringing behaviour in breach of article 101".[21]

Indeed, the "whole edifice" of Ryanair's jurisdictional argument

> "is built on the initial claim, the contract claim, that Ryanir had a remedy pursuant to article IV of the contract[22] … it seemed to be a necessary part of Ryanair's argument based on the *Fiona Trust* presumption in favour of the rational and reasonable businessman's preference for one-stop adjudication, that a contractual claim based on article IV for a breach of article 101 had some prospect of success. If, therefore, there was no contractual claim under article IV by reason of Esso Italiana's supply of jet fuel at prices inflated by conduct in breach of article 101, then, at any rate arguably, it became harder to see why reasonable businessmen would interpret the jurisdiction clause as covering a separate claim for breach of statutory duty arising out of conduct in Italy in breach of article 101[23]."

52    It was therefore necessary to consider the nature of the contractual claim being advanced. It is not necessary to set out the argument before the Court of Appeal on this point, nor even the detail of the Court of Appeal's conclusions. For present purposes, what matters is that the Court of Appeal held that:

> "40. In my judgment there is no answer to Mr. Beard's powerful submissions concerning the construction of article IV. The clause simply was never intended to apply to the use to which Ryanair's contract claim seeks to put it.
> 41. It follows that there is no prospect of Ryanair having a contractual claim under art IV or an implied term as would give a remedy, albeit to goods supplied under the contract itself, which reduplicated the effect of a statutory duty pursuant to article 101."

53    Standing by itself, without the buttress of a contractual claim, the Court of Appeal held that the tortious claims fell outside the scope of the non-exclusive jurisdiction clause. Rix LJ considered *The Angelic Grace* [1995] 1 Lloyd's Rep. 87 to be of no assistance to Ryanair in this context.[24] He referred to *Fiona Trust* [2007] UKHL 40, in particular [13] cited at [44] above, and held[25]:

> **"Such reasoning, however, does not carry over into a situation where there is no contractual dispute (by which I intend to include disputes about contracts), but all that has happened is that a buyer has bought goods from a seller who has participated in a cartel.** I think that rational businessmen would be surprised to be told that a non-exclusive jurisdiction clause bound or entitled the parties to that sale to litigate in a contractually agreed forum an entirely non-contractual claim for breach of statutory duty pursuant to article 101, the essence of which depended on proof of unlawful

---

[21] At [12].
[22] At [15].
[23] At [19].
[24] At [44].
[25] At [46]. Emphasis supplied.

arrangements between the seller and third parties with whom the buyer had no relationship whatsoever, and the gravamen of which was a matter which probably affected many other potential claimants, with whom such a buyer might very well wish to link itself."

54    The point is, in many respects, an obvious one. The starting assumption articulated in *Fiona Trust* [2007] UKHL 40 is that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to have entered to be decided by the same tribunal. But it is difficult to see how a tortious claim can arise out of a contractual relationship when the only claim in contract that can be said to be related is unarguable.

*(5) The relevant provisions of the PPA*

55    As stated in [34] above, the PPA had an effective date of 1 July 2001. I was told that there was no evidence of any prior business dealings between Nokia and Sony: the parties proceeded, and I proceed, on the basis that the first dealings for the sale and purchase of batteries between Nokia and Sony were under this PPA and would therefore have commenced on 1 July 2001.

56    By art.2.1 of the PPA, "[t]his Agreement contains the terms and conditions which apply globally to all sale and purchase of Product(s)". Under art.1, "Product(s)" means "certain lithium-ion batteries manufactured by or for SELLER subject to purchase and sale between the Parties as listed in Appendix 2." Appendix 2 of the PPA lists only one product, the "BPS-2" battery, at a price of JPY770. Below that entry is the following note:

      "Prices are agreed on separate negotiations."

That meshes with the definition of "Price(s)" in art.1 as meaning "the mutually agreed price(s) for each Product".

57    Article 26 provides:

      "26.1 This Agreement supersedes all previous arrangements, communication and agreements between the Parties in relation to the subject matter of this Agreement. This Agreement supersedes any general conditions of purchase/sale and other standard conditions. The Appendices shall be an integral part of this Agreement.[26]
      26.2 Appendices 1 and 2 may be amended by a mutual written agreement (in paper, electronic or other format), even if not physically incorporated into this Agreement document. Other amendments to this Agreement shall be valid only if in writing and signed by both Parties."

58    Although Appendix 2 refers to only a single product, I infer from the terms of art.2.1 and the relatively informal way in which Appendix 2 could be amended or supplemented pursuant to art.26.2, that Appendix 2 was, in fact, so amended or supplemented from time-to-time, to reflect the products (and the prices for those

---

[26] I should say that I attach no weight to the reference to "previous arrangements, communication and agreements": this has all the hallmarks of a standard-form provision, and says nothing about whether such previous arrangements in fact existed.

products) that Sony was supplying to Nokia.[27] I further infer that all Li-ion Batteries supplied by Sony to Nokia were supplied pursuant to the PPA.

59    Article 10 provides:

> "10.1 The Price(s) are stated in Appendix 2 and shall include all SELLER's obligations in accordance with this Agreement. Changes in Prices(s) shall be mutually agreed in writing and negotiated in good faith. The Price(s) are set in **JPY** unless otherwise mutually agreed in Appendix 2 or otherwise."

60    Central to D1/Sony Europe's submissions on the scope and effect of the arbitration clause was the "good faith" obligation contained in art.10.1. One of the issues between D1/Sony Europe and Microsoft Mobile was the ambit of this good faith obligation. It was common ground that the obligation to negotiate a price in good faith applied when the price for a battery already listed in Appendix 2 was changed. That, however, was as far as Microsoft Mobile contended the obligation went. D1/Sony Europe, on the other hand, contended that the obligation to negotiate in good faith extended to all Prices agreed, even where a new Product was being added to Appendix 2 for the first time.

61    On this point, I prefer the contentions of D1/Sony Europe:

    i) To "change" something means to make it different: the addition of a new Product with, inevitably, a new Price, changes the state of affairs that pertained originally. Where there was once no Product of that description, and so no Price, there is now a Product and a Price.

    ii) That fits with the wording of art.10.1, when read as a whole:

        a) The first sentence of art.10.1 provides that Prices are stated in Appendix 2.

        b) The second sentence then refers to "[c]hanges in Price(s)", which can only be a reference to the Prices stated in Appendix 2. It follows that a "change" is a change to Prices stated in Appendix 2, and such a change can either be by the insertion of a wholly new Price (where there is a new Product introduced) or by the alteration of an existing Price (where a Product is already listed).

        c) The second sentence requires that changes in Prices *(i)* be mutually agreed in writing and *(ii)* be negotiated in good faith. It is clear that the first requirement – mutual agreement in writing – extends to amendments to Appendix 2 whether by <u>adding</u> or <u>changing</u> prices, which is consistent with art.26.2. It is natural to read the good faith obligation co-extensively.

    iii) Furthermore, it is unlikely that the parties – having agreed to include a good faith obligation regarding prices – would have wanted to confine that obligation only to changes to prices already agreed. Although Microsoft Mobile suggested one possible reason for this – that the value of Li-ion Batteries would decline over-time, as those batteries became more and more obsolescent, and that the "negotiation in good faith" provision was required for this reason – this was speculation and there was nothing in the factual matrix to allow me to conclude that this was something that might have

---

[27] I was shown some documents amending or supplementing the PPA, but it is clear that these were not comprehensive – nor did any party suggest them to be.

been in the contemplation of both parties. I prefer to rely on what I find to be the natural construction of the words of art.10.1.

62    Article 19 of the PPA provides:

"19.1 EXCLUDING WARRANTY CLAIMS UNDER ARTICLE 16, INDEMNIFICATION CLAIMS UNDER ARTICLE 17, NEITHER PARTY SHALL UNDER ANY CIRCUMSTANCES BE LIABLE FOR ANY LOST PROFITS, LOST OPPORTUNITIES, LOST REVENUES OF THE OTHER PARTY OR OTHER SIMILAR INDIRECT DAMAGE INCURRED BY THE OTHER PARTY AND ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, UNLESS SUCH DAMAGE IS CAUSED BY GROSS NEGLIGENCE OR WILFUL MISCONDUCT."

63    There are two points that need to be made in respect of this clause limiting liability:

i)    First, consistent with the approach in *Fiona Trust* [2007] UKHL 40, I take no account of the difference between the words "arising under or in connection with this agreement" in art.19.1 and the words "[a]ny disputes related to this Agreement" in art.25.2.

ii)   Secondly, art.19.1 seems to have been carefully thought through: the carve-outs, in relation to the warranty that all Products will be free from defects, etc (art.16.1) and in relation to indemnification by SELLER in case the BUYER is found liable for defects in Products (art.17), relate to central aspects of the PPA, namely the provision of Products by SELLER to BUYER in return for a mutually agreed Price.

64    Article 21 of the PPA provides:

"21.1 SELLER agrees to promptly inform BUYER in writing of event(s) coming to SELLER's attention that reasonably may affect SELLER's ability to meet any of its obligations under the Agreement.
21.2 The affected Party is not liable for a failure to perform any of its obligations under this Agreement to the extent it proves that the failure was due to Force Majeure. The affected Party shall without delay take reasonable steps to limit or minimise the consequences of Force Majeure. If Force Majeure continues for more than seven (7) years, BUYER may cancel the relevant Purchase Orders."

65    The force majeure provision is of no interest for the purposes of this judgment: but D1/Sony Europe did rely upon the provisions of art.21.1, as a corollary to the good faith obligation in art.10.1, in that if it came to the attention of SELLER that changes in Prices were not being negotiated in good faith, there was an obligation to inform BUYER under art.21.1.

66    Microsoft Mobile disputed this, and suggested that there was a relationship as between arts 21.1 and 21.2, which caused art.21.1 to be confined, in some way, to cases of Force Majeure. I reject that submission:

i)    What links arts 21.1 and 21.2 is the fact that they relate to an inability to meet (in the case of art.21.1) or failure to perform (in the case of art.21.2)

"any of its obligations" under the PPA. That is no doubt why they appear in a single article.[28]

ii) Of course, it may be that a Force Majeure event will signal itself before actually occurring, thus triggering the duty to inform under art.21.1: but that is not a reason to read art.21.1 as confined to those cases where SELLER's inability to meet any of its obligations is due to Force Majeure.

*(6) The scope of the arbitration clause*

67      D1/Sony Europe contended that the PPA was a "relational" contract, and that its terms should be read in this light. The reference to a "relational" contract was a reference to the analysis of Leggatt J in *Yam Seng Pte Ltd v International Trade Corp Ltd* [2013] EWHC 111 (QB). In *Yam Seng*, Leggatt J stated at [142]:

> "In some contractual contexts the relevant background expectations may extend further to an expectation that the parties will share information relevant to the performance of the contract such that a deliberate omission to disclose such information may amount to bad faith. English law has traditionally drawn a sharp distinction between certain relationships – such as partnership, trusteeship and other fiduciary relationships – on the one hand, in which the parties owe onerous obligations of disclosure to each other, and other contractual relationships in which no duty of disclosure is supposed to operate. Arguably, at least, that dichotomy is too simplistic. While it seems unlikely that any duty to disclose information in performance of the contract would be implied where the contract involves a simple exchange, many contracts do not fit this model and involve a longer term relationship between the parties [to] which they make a substantial commitment. Such 'relational' contracts, as they are sometimes called, may require a high degree of communication, cooperation and predictable performance based on mutual trust and confidence and involve expectations of loyalty which are not legislated for in the express terms of the contract but are implicit in the parties' understanding and necessary to give business efficacy to the arrangements. Examples of such relational contracts might include some joint venture agreements, franchise agreements and long term distributorship agreements."

68      I did not find D1/Sony Europe's reference to *Yam Seng* [2013] EWHC 111 (QB) of particular assistance:

i) In the first place, I do not consider that the PPA amounted to a "relational" contract of the sort described by Leggatt J. The PPA is much more a contract of "simple exchange", albeit one intended to operate over a considerable period of time and embracing multiple Products and purchases. Those factors do not, however, turn a contract for the sale and purchase of Products into anything more than that.

ii) Secondly, Leggatt J's analysis in *Yam Seng* was directed to the question of whether a duty of good faith should be <u>implied</u> into the contract before him. In this case, D1/Sony Europe placed much emphasis on the <u>express</u> duty to negotiate in good faith contained in art.10.1, and did not contend for any

---

[28] The heading to art.21, it should be noted, adds nothing: it simply refers to "DUTY TO INFORM AND FORCE MAJEURE".

implied term over-and-above this. Indeed, it is difficult to see how – given the nature of the PPA, and the extent to which the parties expressly provided for "good faith" obligations – any further, implied, good faith obligations could be found to exist.

69    I therefore proceed on the basis that the PPA is not a relational contract, and that no question of implication of terms arises. However, it is necessary to have regard to the express terms of the PPA, which I have considered and construed in [59]–[61] above.

70    It is very difficult to see how a party to the PPA, like D1/Sony Europe, could knowingly engage in cartelist behaviour of the sort alleged by Microsoft Mobile without at the same time breaching art.10.1 and triggering the obligation to inform under art.21.1. For present purposes, I regard the second of these provisions as less important than the first. Plainly, as Mr de la Mare, Q.C. submitted, were D1/Sony Europe to comply with art.21.1, and disclose in writing an intention to negotiate prices in bad faith because of an agreement with other cartelists, the cartel would end before it began.

71    Assuming, for present purposes, the existence of the Cartel alleged by Microsoft Mobile, it is much more likely that D1/Sony Europe would (and did) breach art.10.1 and so, incidentally, art.21.1. But it is the provision in art.10.1, containing the obligation to negotiate in good faith, that would be key.

72    In this context, it is necessary to consider whether any contractual claims arising out of the PPA would be sufficiently closely related to the tortious claims actually advanced by the claimant so as to render rational businessmen likely to have intended such a dispute to be decided (like a contractual dispute) by arbitration pursuant to art.25.2 of the PPA. I conclude that they are for the following reasons:

    i)   It was common ground that this was a question that needed to be considered as at the time the PPA was concluded. This is a matter of interpretation of the PPA, not an exercise in hindsight.

    ii)  It is irrelevant that a contractual claim has not been pleaded by Microsoft Mobile. Microsoft Mobile stressed that its claims were pleaded entirely in tort, and of course that is right. However, the mere fact that a claim in contract has not been pleaded is, to my mind, irrelevant. Were the manner in which a case was actually pleaded to matter, instead of how a case could have been pleaded, it would be easy for a claimant to circumvent the scope of an arbitration or jurisdiction clause by selectively pleading or not pleading certain causes of action. It would be an extraordinary outcome were a claimant successfully to be able to contend that, because a contractual claim had not been pleaded, a "parallel" claim in tort arising out of exactly the same facts and with a scope defined by that contract fell outside the scope of such a provision. The proposition only has to be stated to be rejected.

    iii) That said, the extent to which a contractual claim is pleadable is obviously relevant to the thinking of rational businessmen at the time the arbitration clause is concluded. The more strained, recondite, convoluted or plain outlandish the contractual claim being postulated, the less likely it is that rational businessmen would expect "related" tortious claims to be subject to an arbitration clause. This is the approach in *Ryanair v Esso* [2013] EWCA Civ 1450, where the Court of Appeal was faced with an unarguable contractual claim, and concluded that it was unlikely that rational

businessmen would choose to have determined together in a one-stop-shop a claim in tort "related" to an unarguable contractual claim.

iv) When weighing the link between a tortious and contractual claim, it is not merely the unarguable contractual claim that is an indicator that the arbitration clause does not bite, but also the strained one.

v) But I do not consider that, in this case, a breach of contract claim based upon arts 10.1 and 21.1 to be anything other than plausible, and certainly well-arguable. I have well in mind the points that Rix L.J. weighed in *Ryanair v Esso*:

> "31. Mr. Beard further submitted that Ryanair's construction of the clause renders it otiose: because it is triggered by proof of a breach of statutory duty which provides its own remedy, and, on Ryanair's case, provides the very remedy which the statutory tort provides.
> 32. If therefore article IV does not cover or allow Ryanair's contract claim or permit the use to which Ryanair seeks to put it, then it becomes all the more unlikely that article 12.1 should be interpreted to cover a claim in statutory tort whose ramifications are so far removed from the considerations of contractual remedies which the parties would otherwise be reasonably regarded as having in mind in a jurisdiction clause which is concerned with 'the resolution of disputes under this agreement', a fortiori where the same clause expressly excludes claims for 'prospective profits or for indirect or consequential damages'.
> 33. In this connection Mr Beard pointed out in his submissions some of the broad and idiosyncratic consequences of a claim for breach of statutory duty pursuant to article 101: such as that such a claim properly concerns tortious arrangements between rivals generally unrelated to a particular contract between a buyer and a seller; that such arrangements can come in all varieties; that it is possible to sue any member of a cartel for damages caused by each and any member of the cartel; that a customer of various members of a cartel may have different jurisdiction clauses in its contracts with such members; that losses caused by different cartel arrangements may be very various; that in any case such losses may also vary from those caused by being charged prices higher than a more competitive model would indicate to losses on business missed because of inflated prices, i.e. losses due to non-sales (an example of loss of profits excluded from article IV); that direct customers from a cartel may suffer no loss because they have passed on the higher price to *their* customers, in circumstances where it is *their* customers, so-called indirect purchasers, who have suffered the inflated prices and may correspondingly sue the cartel members. Mr. Beard submitted that it is unlikely that parties to a clause such as article 12.1 contemplated such claims for damages for breach of statutory duty, which are likely to arise between multiple claimants and multiple defendants, as falling naturally or presumptively within a contractual jurisdiction clause."

[2017] 5 C.M.L.R. 5                            221

vi) Rix L.J. found that there was "no answer to Mr Beard QC's powerful submissions"[29] and – in the context of a case where no contractual claim analogous to the tortious one being advanced is possible – I respectfully agree. But that is not this case. There may be many reasons why a change in price might not be negotiated by SELLER in good faith, and so amount to a breach of art.10.1 of the PPA. No doubt some of these might require consideration only of the conduct of SELLER, unrelated to SELLER's interactions with third parties. But, equally, SELLER's failure to act in good faith may (as would appear to be the case here, based upon Microsoft Mobile's pleaded case) have been actuated by SELLER's dealings with third parties, in the form of a cartel or other (illegal) combination. In such a case, the overlap between the contractual claim, the cartel claim and the combination claim will be considerable:

    a) The contractual claim will not sound in debt (it will not be for the price), but for damages – just as the tortious claims.

    b) The extent to which the negotiated price was above the "good faith" price will inevitably involve an examination of the dealings between SELLER and the various other cartelists. The arrangements and dealings between protagonists not party to the PPA will be relevant.

    c) BUYER's loss and damage will have to take account of any pass-on (if any) and (if higher prices were passed on) volume effects will come into play – as part of the ordinary process of assessing damages.

vii) It is true that the claim that BUYER has against SELLER will be confined to SELLER. There can – because of the arbitration clause – be no bringing in of other parties to the cartel. For this reason, questions of contribution from other cartelists will not arise, in the arbitration at least. Neither will the question of competing jurisdiction/arbitration clauses.

viii) Of course, it would remain open to the BUYER to select a claim against a different defendant, such that other parties involved in the cartel could be brought in to such proceedings. The feasibility of such a course would depend on all the circumstances.

ix) I am also conscious that the parties to the PPA gave careful thought to the allocation of risk and liability as between themselves:

    a) The provisions of art.19 of the PPA are set out in [62] and [63] above. It is clear that SELLER's primary responsibilities and so liability lie in providing Products free of defects, and these aspects of performance are carved out of the art.19 exclusion clause.

    b) All other aspects of liability – apart from cases where damage is caused by gross negligence or wilful misconduct – fall within art.19, including the negotiation of Prices.

    c) If, at the time of the conclusion of the PPA, the prospect of liability in respect of an <u>innocent</u> participation or involvement in a cartel had been mooted, I consider that rational businessmen would have expected such a claim (even though sounding in tort) to fall within art.19.

---

[29] At [40].

222        MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

73    I therefore hold that art.25.2 extends to all pleaded claims made by Microsoft Mobile against D1/Sony Europe, save for those (if any) pre-dating the commencement of the PPA. To the extent that such pre-PPA claims are or can be advanced against D1/Sony Europe, they would fall outside the scope of the arbitration clause. As a continuing tort – or single, continuous infringement – the right of action (under English law at least) accrues afresh every day, but damages can be recovered only for the period covered by the proceedings.

*(7) Is article 25.2 to be applied, even if wide enough to embrace the claims against D1/Sony Europe?*

74    Microsoft Mobile contended that if, contrary to its submissions, art.25.2 covered all or part of its claims, it should not be applied, either pursuant to s.9(4) of the Arbitration Act 1994 (which can be invoked to deal with an incompatibility between an arbitration clause and EU law[30]) or (by virtue of EU law) in order to give effect to the primacy of EU law.[31]

75    D1/Sony Europe did not seek to deny that it was possible, as a matter of law, to disapply art.25.2 in this way, underlined provided that an incompatibility with EU law could be shown. What was disputed, however, was that application of the arbitration clause in this case was in any way incompatible with EU law.

76    Microsoft Mobile's contention was that the operation of the Brussels I Regulation (Recast) must permit the effective protection of rights derived from competition law, including private law rights of action for infringement, these being rights accorded by EU law, and that an arbitration clause which caused the fragmentation of such rights of action was, for that reason, in breach of EU law.

77    It should be said at the outset that it was not disputed by D1/Sony Europe, and is accepted by me, that the application of the arbitration clause in this case is likely to cause fragmentation, in at least two respects:

    i)   First, because D1/Sony Europe is invoking the arbitration clause, the claims made against D1/Sony Europe will have to be determined in arbitration against D1/Sony Europe and the other parties to the PPA (like D2/Sony Corporation) only, without the joinder of other parties (absent the consent of all).

    ii)  Secondly, Microsoft Mobile has lost its anchor defendant. D1/Sony Europe was, as I have described in [25(ii)(a)] above, the party by way of which it sought to establish jurisdiction against the other defendants.

78    The question is whether this fragmentation, caused by the arbitration clause, is an infringement of EU law such as to render the application of the clause ineffective or inoperable. In this regard, Microsoft Mobile placed considerable reliance upon the opinion of the Advocate General (AG Jääskinen) in *Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV* (C-352/13) EU:C:2015:335; [2015] 5 C.M.L.R. 4, and rather less reliance on the subsequent decision of the Court of Justice. It is therefore appropriate to set out in a little more detail than would

---

[30] See *Accentuate Ltd v Asigra Inc* [2009] EWHC 2655 (QB) at [88] and [89] (*per* Tugendhat J).
[31] See *Amministrazione delle Finanze dello Stato v Simmenthal SpA* (106/77) EU:C:1978:49; [1978] 3 C.M.L.R. 263 at [21]; *R. (on the application of IDT Card Services Ireland Ltd) v Customs and Excise Commissioners* [2006] EWCA Civ 29 at [92] (*per* Arden LJ); *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2015] 3 C.M.L.R. 2 at [86] and [87] (*per* Lord Dyson MR).

normally be appropriate the reasoning of the Advocate General (emphasis supplied in all quotations):

   i) The Advocate General noted that the reference, by the *Landgericht Dortmund*, unusually involved the interplay between the Brussels Regulation and art.101 TFEU.[32] The Advocate General also noted that:

   > "8. … it appears to me that the Brussels I Regulation, the aim of which is to create a system of rules of jurisdiction for the Union in respect of cross-border disputes in civil and commercial matters, **is not fully geared towards ensuring effective private implementation of the Union's competition law (or 'private enforcement', as it is usually called in this field)** in circumstances such as those in this case.
   > 9. The application of certain provisions of that regulation **is likely to lead to a territorial division of jurisdiction between the courts of the Member States which might, on the one hand, be inadequate from the point of view of the geographical scope of EU competition law or, on the other hand, make it more difficult for persons adversely affected by unlawful restrictions of competition to seek and obtain full reparation for the damage that they have suffered.** It seems to me, therefore, possible that the authors of such restrictions could use those provisions of international private law to bring about a situation in which the civil-law consequences of a single, serious infringement of Union competition rules are to be determined in the context of **a series of actions scattered across the various Member States**.
   > 10. The general conclusion that I shall draw from this request for interpretation is that, *de lege ferenda*, because of the particular repercussions which cross-border anti-competitive practices are likely to have in terms of judicial cooperation in civil matters, especially when they are complex, as they are in the main proceedings, it would be advisable for the EU legislature to envisage incorporating in the Brussels I Regulation a rule of jurisdiction apt to cover such practices, on the lines of the conflict-of-laws provision which usually applies specifically to obligations deriving from acts restrictive of competition under the regulation usually known as 'Rome II'."

   ii) The Advocate General's starting point was, therefore, his appreciation of what he regarded as certain inadequacies in the Brussels I Regulation when dealing with a single, continuous, infringement of competition law. He sought, through interpretation of the Brussels I Regulation, to resolve these perceived inadequacies by unifying causes of action in a single forum:

   > "27. …I consider that the interpretation and application of the Brussels I Regulation **must make it possible to preserve the full effectiveness of provisions of EU competition law**, which are vitally important for the internal market and constitute a fundamental element of the EU economic constitution because, as the Court has already stressed, Article 85 of the EC Treaty, now Article 101 TFEU, is a 'fundamental

---

[32] At [1], [7].

224    Microsoft Mobile Oy (Ltd) v Sony Europe Ltd

provision which is essential for the accomplishment of the tasks entrusted to the Community, and, in particular, for the functioning of the internal market'. Furthermore, the procedural rules of EU law must, to a certain extent, serve the substantive rules of EU law, in the sense that the former are an instrument which enables the rights and obligations of private and public persons to be made tangible, particularly in terms of the right to an effective remedy and to a fair trial, as affirmed in Article 47 of the Charter of Fundamental Rights of the European Union.

…

52. In conclusion, by analogy with the Court's ruling in *Besix*, I consider that the special jurisdiction rule in matters of tort, delict or quasi-delict, laid down in Article 5(3) of the Brussels I Regulation, is inoperative when, as in the case in the main proceedings, the place where the harmful event allegedly occurred cannot be determined, by virtue of the fact that the infringement of Article 101 TFEU on which the action is based consists of actions notable for the multiplicity of places where they were agreed and/or performed, with the result that it is not possible to determine clearly and usefully what court has a particularly close link with the dispute as a whole.

53. In my opinion, in such a case jurisdiction must be determined either by applying the general rule in Article 2(1) of the Brussels I Regulation or by applying other special jurisdiction rules specified in that regulation, such as the rule in Article 6(1), which allows actions brought against several defendants to be combined before a single court, provided that the conditions for applying one or other of those rules are satisfied in the case in point. In that connection, it must be pointed out that it is possible for account to be taken of the connection between actions against several defendants, as a basis for establishing jurisdiction, only in the context of Article 6(1), which provides for that possibility solely where there is the strong connecting link of the domicile of one of the defendants, but not in the context of a provision such as Article 5(3) of the Brussels I Regulation whose application depends on the place where an event occurred.

…

56. In accordance with Article 6(1) of the Brussels I Regulation, all the claims on the part of a single applicant against a number of defendants may be brought before a court of a Member State in whose jurisdiction at least one of those defendants, who will be referred to here as the 'anchor defendant', is domiciled, provided always that there is a connecting link between those heads of claim. In this regard, the relevant provision expressly states that the claims must be 'so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings'.

57. **By allowing actions to be centralised before a single court** and by extending the jurisdiction of the latter to cover defendants vis-à-vis whom the court would not have been able to give a ruling failing that extension, Article 6(1) reflects the objectives of sound administration

of justice, by eliminating unnecessary proceedings and preventing the concomitant risk of concurrent proceedings and conflicting decisions, as referred to in the Brussels I Regulation.

…

71. I would emphasise that, if it were to be held that Article 6(1) of the Brussels I Regulation was not applicable to proceedings such as the main proceedings in this case, that would mean that different courts would have to examine the alleged damage, without any consultation, in the light of the various domestic legal orders, with the attendant risk that each of the participants in the same unlawful cartel might be ordered to pay different amounts of damages, when it would be desirable, not to say necessary, to rule uniformly on the claims submitted by the same applicant.

72. As the Commission points out, in my view rightly, 'the effectiveness of this provision would be undermined if it were to be interpreted so strictly that it would render impossible, in such circumstances, the bringing of joint actions against all the participants in a cartel before a court which is situated in the domicile of one of the defendants belonging to the cartel, on the sole grounds that it lacked international jurisdiction.'

73. In the light of these factors, **I consider that a situation in which several companies established in different Member States are tried separately, before different courts, and not before a single court, for the purpose of obtaining damages in respect of the same infringement of EU competition law, resulting from acts committed at different times and in different places but constituting a single and continuous infringement, is liable to lead to irreconcilable judgments, within the** meaning of Article 6(1) of the Brussels I Regulation, if the cases are judged separately.

74. In accordance with the Court's case law, it will be for the referring court to assess, in the light of all the elements in the case, whether there exists such a risk in the proceedings before it.

75. Like the Commission, I note that such an interpretation has the not inconsiderable advantage of reflecting the intention expressed by the legislature in the Rome II Regulation, especially in Article 6 entitled 'Unfair competition and acts restricting free competition', paragraph 3 of which sets out the possibility, for a claimant suing several defendants in the context of a dispute in this field, of centralising his claims before a single court 'in accordance with the applicable rules on jurisdiction' and of basing his claims on the law of that court. To my mind, due account should be taken of this legal guideline, in the interests of coherence between the instruments of Union law applicable to cross-border disputes, despite the fact that, as the defendants in the main proceedings contend, the Rome II Regulation is not, *ratione temporis*, applicable in this case."

iii) Thus, through interpretation, the Advocate General effectively sought to bring the Brussels I Regulation into line with Rome II, in order to ensure a

single forum. He then considered the effect of jurisdiction and arbitration clauses, as possible derogations from the regime he had thus constructed.

iv)  The claim in the Landgericht Dortmund was in fact an agglomeration of claims. A number of victims of the cartel had assigned their claims to a single claimant entity, which was bringing these proceedings. Of course, these victims had purchased the cartelised product (hydrogen peroxide) pursuant to a variety of contracts containing a variety of different arbitration and jurisdiction clauses, which (no doubt) pointed in various jurisdictional directions.[33] As to choice of jurisdiction and arbitration clauses, the Advocate General showed a high degree of hostility to these, particularly if they pointed to a jurisdiction outside the EU:

> "97. …In the first place, it must be recalled that choice of jurisdiction clauses, under which the parties, at least one of which had its domicile in the territory of a Member State, have designated a court of a Member State to hear and determine disputes arising or likely to arise out of a particular legal relationship, fall within the ambit of Article 23 of the Brussels I Regulation.
>
> 98. On the other hand, arbitration clauses are, as a matter of principle, excluded from the scope of that regulation. It follows that questions relating to the validity of, and the possibility of relying on, those clauses ought to be governed by the national law of each of the Member States and by the international conventions binding the latter. Nevertheless, the Court has held that if, because of the main subject-matter of the dispute, that is to say, the nature of the rights to be protected in proceedings, such as a claim for damages, the proceedings brought before a national court fall within the scope of the Brussels I Regulation, then an incidental preliminary issue concerning the applicability of an arbitration agreement, including its validity, falls within the scope of that regulation too and it is, therefore, exclusively for that court to rule on the objection of lack of jurisdiction based on the existence of an arbitration agreement and on its own jurisdiction under the provisions of that regulation.
>
> 99. Despite this difference in terms of the applicability of the Brussels I Regulation, it must be recalled that the two categories of clause at issue have the common effect of *derogating from the rules on jurisdiction laid down in that regulation*, by reason of respect for the autonomy of the parties concerning the determination of the court, whether national or arbitral as the case may be, to which they mean to entrust the task of settling their disputes.
>
> 100. Nevertheless, a clause conferring jurisdiction in accordance with Article 23 of the Brussels I Regulationmay confer jurisdiction only on the courts of Member States of the European Union and by extension, under the Lugano Convention, on the courts of the Parties to that Convention, whereas an arbitration clause may provide that arbitration is to take place in any third State whatsoever. The likelihood of

---

[33] The Advocate General (and the Court) had limited information: see [94].

provisions of EU competition law not being applied, even by way of public policy rules, is much greater when jurisdiction is conferred on arbitrators or courts of States not bound by the Lugano Convention."

v) The Advocate General considered that a distinction needed to be drawn between *(i)* jurisdiction clauses falling within art.23 of the Brussels I Regulation, on the one hand, and *(ii)* jurisdiction clauses outside art.23 and arbitration clauses, on the other.

vi) As regards clauses to which art.23 applied:

"109. I would, in particular, recall that it follows from the Court's case-law in relation to Article 23 of the Brussels I Regulation, on the one hand, that the validity of a jurisdiction clause inserted in a contract is dependent on the parties that concluded it having clearly indicated their agreement to that clause and, on the other hand, that the court seised is required to examine whether that clause was the subject of consensus between the parties.

…

111. Like CDC, I very much doubt that a clause conferring jurisdiction, included in contracts such as those at issue, could satisfy the requirement of clear unvitiated consensus, because the point is the attribution of jurisdiction to the court designated to settle a case relating to the tortious liability of one of the contracting parties deriving from an unlawful cartel when, at the time it concluded the agreement, the person allegedly injured was unaware of the existence of the cartel.

112. On the other hand, it could, to my mind, be accepted that the person injured should enter into an agreement conferring jurisdiction after it had learned of the existence of the unlawful cartel agreement prohibited by Article 101 TFEU, the former agreement being entered into after the dispute arose, and hence accepted in full knowledge of the facts."

vii) As regards jurisdiction clauses outwith art.23 and arbitration clauses:

"118. With regard to the clauses conferring jurisdiction to which Article 23 of the Brussels I Regulation proves not to be applicable and to arbitration clauses, the problem raised by the referring court is more complex, for it must be tackled by applying, not the provisions of that regulation, as interpreted by the Court, but rules of national law, whose implementation must be consistent with the binding provisions of EU primary law, and in particular with Article 101 TFEU.

119. In this connection, I would recall that, according to its consistent case-law in the judgments in *Courage and Crehan and Manfredi and Others*, the Court has held that, failing EU legislation in that sphere, it is for the domestic legal system of each Member State to prescribe the detailed rules for exercising the right to compensation for damage resulting from an agreement, decision or concerted practice prohibited under Article 101 TFEU, subject to observance of the principles of equivalence and effectiveness which require, in particular, that those national rules should not hinder the full effectiveness of Union competition law and should take account, more specifically, of the

objective contained in that article. In my opinion, it therefore follows in this case that the application of national rules may not allow the jurisdiction and/or arbitration clauses at issue to prejudice that full effectiveness.

120. Furthermore, the Court has held that the full effect of Article 101 TFEU and, in particular, the effectiveness of paragraph 1 thereof would be put at risk if it were not open to any individual to claim damages for loss caused to him by a contract or conduct liable to restrict or distort competition, such as the unlawful cartel agreement which, in this case, forms the basis for CDC's claims. The guarantee that individuals may seek such compensation is likely to discourage agreements or practices of this nature, which are often concealed, and it therefore contributes significantly towards maintaining effective competition within the Union.

121. As a general rule, when faced with an arbitration clause, a court of a Member State should decline jurisdiction and refer the parties to arbitration, at the request of one of the parties, unless that court finds that the arbitration agreement relied upon has lapsed, is inoperative or cannot be applied in the dispute before it, following scrutiny within the scope of its own jurisdiction, in the light of the requirements of domestic law, since the Brussels I Regulation does not regulate the conditions governing the validity of such a clause. The same would apply to clauses designating a national court which are not covered by Article 23 of the regulation.

122. However, the principle requiring effective implementation of the prohibition under EU law of agreements, decisions and concerted practices, to which the Landgericht refers, can, in my view, be invoked vis-à-vis the jurisdiction or arbitration clauses at issue for the purpose, in particular, of ensuring that all persons have the right to seek full compensation for losses resulting from a prohibited agreement, such as those alleged in the main proceedings.

123. In this connection, it is to be observed that the Court held in the judgment in *Eco Swiss*, which concerns the relationship between arbitration and the competition rules under EU law, that Article 85 of the Treaty, now Article 101 TFEU, 'may be regarded as a matter of public policy'. The Court held that 'where its domestic rules of procedure require a national court to grant an application for annulment of an arbitration award where such an application is founded on failure to observe national rules of public policy, it must also grant such an application where it is founded on failure to comply with [that article]. Community law requires that questions concerning the interpretation of the prohibition laid down in [that article] should be open to examination by national courts when asked to determine the validity of an arbitration award and that it should be possible for those questions to be referred, if necessary, to the Court of Justice for a preliminary ruling'.

124. By analogy, I consider that national courts are required by EU law not to apply an arbitration clause, or a jurisdiction clause not governed by Article 23 of the Brussels I Regulation, in cases where

the implementation of such a clause would hamper the effectiveness of Article 101 TFEU. In this connection, it may with advantage be noted that the judgment in *Eco Swiss* predates those in *Courage and Crehan and Manfredi and Others*, which upheld the recognition in EU law of a right to compensation for all damage suffered by persons adversely affected by unlawful barriers to free competition, not only in the interests of those persons but above all in order to preserve the general interests bound up with that freedom. The case-law after those two judgments has further reinforced that approach, by encouraging the private implementation of those competition rules (commonly known as 'private enforcement'), particularly following the removal of the potential obstacles deriving from national provisions.

125. It is true that the application of jurisdiction or arbitration clauses is not *in itself* an obstacle to the effectiveness of Article 101 TFEU within the meaning of the case-law cited. In particular, the fact that clauses of this type may, if they are valid and applicable to the dispute concerned, entail the ousting of the special bases of jurisdiction provided for in Articles 5 and/or 6 of the Brussels I Regulation does not necessarily have the effect of depriving the persons allegedly adversely affected by damage caused by an unlawful cartel agreement of the possibility of obtaining full compensation on that basis, given that they are not prevented from bringing actions before each of the appointed national or arbitration courts, even though, given the wide variety of clauses relied upon in this case, their application would certainly be likely to render such a course of action more difficult.

126. None the less, I consider that it is a matter of some delicacy to put that theoretical position into practice in the particular context of an unlawful cartel agreement, involving numerous participants and persons allegedly adversely affected, whose implementation has generated a multitude of individual supply contracts, possibly concluded between different companies in the group to which a vendor or purchaser belongs. In the case of a horizontal restriction of competition, such as that on which the main proceedings are based, I find it difficult to accept an exclusion of the normal forms of judicial protection, unless the parties allegedly adversely affected have expressly entered into an agreement to that effect and the national arbitration courts to which jurisdiction has been assigned in this way are required to apply the provisions of EU competition law as rules of public policy."

viii) The Advocate General's conclusion at [132] was as follows:

"In consequence, I consider that Article 101 TFEU must be interpreted as meaning that, in the context of an action for compensation for damage caused by an agreement declared to be contrary to that article, the implementation of jurisdiction and/or arbitration clauses does not *in itself* compromise the principle of the full effectiveness of the prohibition of agreements, decisions and concerted practices. **In so far as a clause of one or other of those categories could be declared applicable, pursuant to the law of a Member State, in a dispute**

**concerning liability in matters of tort, delict or quasi-delict that might follow from such an agreement, that principle, in my view, precludes jurisdiction over that dispute being attributed under a clause of a contract whose content had been agreed when the party against whom that clause is relied on was unaware of the cartel agreement in question and of its unlawful nature, and could not, therefore, have foreseen that the clause could apply to the damages sought on that basis**."

79    I have quoted extensively from the opinion of AG Jääskinen because there was considerable resonance between the submissions of Microsoft Mobile and the opinion of AG Jääskinen. Basing itself on the Advocate General's opinion, Microsoft Mobile contended for a single jurisdiction – England and Wales – to hear all claims, apart from those US claims it had itself brought. Factors – like the arbitration clause – which stood in the way of this outcome were to be set aside pursuant to this higher object.

80    Opinions of Advocates General are advisory only, and are neither binding on the Court of Justice, nor on me. In a case where the Court of Justice has followed the opinion of an Advocate General, in terms of outcome or (more importantly) reasoning, the opinion of the Advocate General can be of importance in elucidating the judgment of the Court. In this case, however, the Court of Justice took a different approach from that of AG Jääskinen, and placed little (if any) weight on the concerns regarding the fragmentation of actions in competition claims that so troubled AG Jääskinen, and which Microsoft Mobile associated itself with:

  i)  In the first place, the Court of Justice pointed out that consolidation by assignment of claims could not affect the essential jurisdictional rules that applied. At [35] it was noted (in the case of all quotations, emphasis added):

      "Given that the circumstances of the present case are characterised by the consolidation of a number of potential claims for damages brought by the applicant in the main proceedings which had been assigned to the applicant by several undertakings allegedly victims of the Hydrogen Peroxide cartel, it should be pointed out from the outset that the transfer of claims by the initial creditor cannot, by itself, have an impact on the determination of the court having jurisdiction under Article 5(3) of Regulation No 44/2001 …"

  ii) With great respect, this is obviously right. The consequence – spelt out in [36] – was that "the location of the harmful event must be assessed for each claim for damages independently of any subsequent assignment or consolidation". The Court then considered where – in particular in competition cases – the place of the causal event and the place where the damage occurred might be. The detail of the Court's reasoning does not, for present purposes, matter. What <u>does</u> matter is that the Court did not share the Advocate General's concerns about fragmentation of claims. At [55], it stated:

      "However, given that the jurisdiction of the court seised of the matter by virtue of the place where the loss occurred is limited to the loss suffered by the undertaking whose registered office is located in its

jurisdiction, an applicant such as CDC, who has consolidated several undertakings' potential claims for damages, would therefore, in accordance with the case-law set out in paragraph 35 above, **need to bring separate actions for the loss suffered by each of those undertakings before the courts with jurisdiction for their respective registered offices**."

iii) The Court then turned to jurisdiction and arbitration clauses, and noted that it did "not have sufficient information at its disposal in order to provide a useful answer to the referring court".[34] The Court said nothing about jurisdiction clauses outside art.23 nor arbitration clauses. As regards jurisdiction clauses within art.23, the Court simply noted:

"59. …it is to be observed that, in the context of the Convention on jurisdiction and the enforcement of judgments in civil and commercial matters, signed in Brussels on 27 September 1968…, the Court has stated that, by concluding an agreement on the choice of court under Article 17 of the Brussels Convention, the parties may derogate, not only from the general jurisdiction under Article 2 thereof, but also from the special jurisdiction laid down in Articles 5 and 6 of that convention…

60. Since the interpretation given by the Court in respect of the provisions of that convention is also valid for those of Regulation No. 44/2001 whenever the provisions of those instruments may be regarded as equivalent, it must be found that such is the case as regards the first paragraph of Article 17 of the Brussels Convention and Article 23(1) of Regulation No. 44/2001, which are drafted in almost identical terms…

61. It must therefore be concluded that the court seised of a matter can, in principle, be bound by a jurisdiction clause derogating from the rules of jurisdiction laid down in Articles 5 and 6 of Regulation No. 44/2001, which was concluded by the parties under Article 23(1) of that regulation.

62. That conclusion cannot be called in question by the requirement of effective enforcement of the prohibition of cartel agreements. First, the Court has already held that the substantive rules applicable to the substance of a case must not affect the validity of a jurisdiction clause agreed in accordance with Article 17 of the Brussels Convention … In accordance with the case-law referred to in paragraph 60 above, that interpretation is also relevant to Article 23 of Regulation No. 44/2001.

63. Second, it must be considered that the court seised of the matter cannot, without undermining the aim of Regulation No. 44/2001, refuse to take into account a jurisdiction clause which has satisfied the requirements of Article 23 of that regulation solely on the ground that it considers that the court with jurisdiction under that clause would not give full effect to the requirement of effective enforcement of the prohibition of cartel agreements by not allowing a victim of the cartel

[34] At [58].

232          MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

to obtain full compensation for the loss it suffered. On the contrary, it must be considered that the system of legal remedies in each Member State, together with the preliminary ruling procedure provided for in Article 267 TFEU, affords a sufficient guarantee to individuals in that respect…".

81    In conclusion, whilst I accept that it is possible for the provisions of EU law to permit a court to sideline or declare ineffective an arbitration clause, there is nothing in the decision of the Court in *CDC* [2015] 5 C.M.L.R. 4 to mandate such a course. Indeed, to the contrary, to do so, would be to disregard the entire trend and direction of the approach of the Court. I appreciate that the Court did not consider arbitration clauses specifically. However, that fact cannot disguise the basic truth that the Court's approach to the risk of "fragmentation of claims" was fundamentally different to that of the Advocate General, and involved a wholesale rejection of his approach. I can see nothing in the decision of the Court to require me to displace the effect of the arbitration clause as something inimical to EU law. Accordingly, I reject Microsoft Mobile's contention that the arbitration clause should be set aside or disregarded on the grounds of EU law.

*(8) Can and should the court determine the scope of the arbitration clause?*

82    I have already held that the court should determine the scope of the arbitration clause in this case (see [41] above) and have done so. I set out here my reasons for deciding the issue myself, rather than referring the point to the arbitral tribunal.

83    The approach to determining an application for a stay under s.9 of the Arbitration Act 1996 was set out by Aikens L.J. in *Aeroflot - Russian Airlines v Berezovsky* [2013] EWCA Civ 784 at [72]–[74] and Popplewell J. in *Golden Ocean Group Ltd v Humpuss Intermoda Transportasi Tbk Ltd* [2013] EWHC 1240 (Comm) at [59].

84    Essentially:

   i)    It is for the party seeking a stay of proceedings on the basis of an arbitration clause to show that there is a concluded arbitration agreement within the meaning of the 1996 Act and that it covers the disputes that are the subject of the court proceedings.

   ii)   Where such a contention is advanced, the court may do one of three things. It may decide the issues for itself in a summary fashion; it may direct an issue to be tried pursuant to CPR Part 62.8(3); or it may stay the proceedings so that the (putative) arbitral panel can decide on its own jurisdiction pursuant to s.30 of the 1996 Act.

   iii)  If the court decides that there is a concluded arbitration agreement covering the scope of the disputes the subject of the court proceedings, then the counterparty to the arbitration clause may – the burden being on it – seek to satisfy the court that the clause is "null and void" pursuant to s.9(4).

   iv)   In terms of the choice between the various courses outlined in sub-paragraph (ii) above, Popplewell J. set out a series of factors "likely to be of significance" in *Golden Ocean Group* [2013] EWHC 1240 (Comm) at [59(7)]. These are, of course, context sensitive. In the present case, the factors that suggest that it is most appropriate for the court to decide the issues for itself in a summary fashion are the following:

a) As a matter of case management, this is clearly the most efficient approach. The parties had, before this hearing, prepared detailed argument on the point, and court time had been set aside for a substantive hearing. None of the parties seriously contended that the s.9 point should be adjourned for an issue to be tried or for the matter to be determined by an arbitral tribunal yet to be constituted.

b) As will become apparent when considering the Gateways, the effect of the arbitration clause is significant for the purposes of determining whether Microsoft Mobile can bring itself within Gateway (3). It was important to decide the question of the scope of the arbitration clause in order to deal properly with the Applications, which of course could not be referred to arbitration.

c) Microsoft Mobile contended that the EU issues it raised – and which have been considered in [74]–[81] above – are matters more appropriately dealt with by a court, and not an arbitral tribunal.[35]

## C. Stay of the proceedings against D2/Sony Corporation in favour of arbitration

85     The position of D2/Sony Corporation is materially the same as that of D1/Sony Europe so far as the arbitration clause in the PPA is concerned. The PPA is actually between D2/Sony Corporation and Nokia Mobile Phones Ltd as contracting parties, and art.25.2 falls to be construed in exactly the same way. Equally, there is no reason for holding the arbitration clause effective in the case of D1/Sony Europe and ineffective in the case of D2/Sony Corporation (or *vice versa*).

## D. Objections to jurisdiction: an overview of the relevant principles

### (1) Three requirements

86     This is a case where D1/Sony Europe was sued as of right pursuant to art.4 of the Brussels I Regulation (Recast). All of the other defendants – including D2/Sony Corporation – are foreign companies not domiciled in the EU. Jurisdiction over the claims against them is determined by English national law, pursuant to art.6(1) of the Brussels I Regulation (Recast).

87     The relevant provisions in the CPR are CPR Parts 6.36 and 6.37. These provide, insofar as is material, that:

"6.36 In any proceedings to which rule 6.32 or 6.33 does not apply,[36] the claimant may serve a claim form out of the jurisdiction with the permission of the court if any of the grounds set out in paragraph 3.1 of Practice Direction 6B apply.

6.37

    (1) An application for permission under rule 6.36 must set out –

---

[35] See [81] and [82] of Microsoft Mobile's written submissions.
[36] These rules deal respectively with "Service of the claim form where the permission of the court is not required-Scotland and Northern Ireland" and "Service of the claim form where permission of the court is not required-out of the United Kingdom".

234        MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

> (a) which ground in paragraph 3.1 of Practice Direction 6B is relied on;
> (b) that the claimant believes that the claim has a reasonable prospect of success; and
> (c) the defendant's address or, if not known, in what place the defendant is, or is likely, to be found.
> (2) Where the application is made in respect of a claim referred to in paragraph 3.1(3) of Practice Direction 6B, the application must also state the grounds on which the claimant believes that there is between the claimant and the defendant a real issue which it is reasonable for the court to try.
> (3) The court will not give permission unless satisfied that England and Wales is the proper place in which to bring the claim.
> …"

88    Three requirements must be shown before the Court will permit service of claims out of the jurisdiction:[37]

  i) The claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law, or both.
  ii) The claimant must satisfy the court that there is a good arguable case that the claim falls within one or more of the Gateways.
  iii) England and Wales must be clearly and distinctly the proper forum for the trial of the claims.

89    There is naturally a close nexus between these three requirements and the procedural requirements of CPR Part 6.37. Thus:

  i) The requirement under CPR Part 6.37(1)(a) that the ground relied upon be set out must be established to the standard of a "good arguable case" (as stated in paragraph 88(ii) above).[38]
  ii) The requirement under CPR Part 6.37(1)(b) that the claimant believes the claim has a "reasonable prospect of success" equates to the "serious issue to be tried on the merits test" referenced in [88(i)] above.[39]
  iii) The requirement in CPR Part 6.37(3) that England and Wales be the proper place in which to bring the claim equates to the test that England and Wales must be clearly and distinctly the proper forum for the trial of the claims (as stated in [88(iii)] above).[40]

### (2) The duty to make full and frank disclosure

90    Because the parties in question have *ex hypothesi* not been joined, applications to serve out of the jurisdiction are generally made *ex parte*. There is, on such applications, a duty on the applicant to make full and frank disclosure of the material

---

[37] See *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7 at [71] (*per* Lord Collins).
[38] As to which, see further Section F below.
[39] As to which, see further Section E below.
[40] As to which, see further Section G below.

facts, including adverse facts.[41] The question of whether Murray 1 was full and frank is considered in Section H below.

### (3) Challenging an order permitting service out of the jurisdiction

91    If a party served pursuant to such an order is minded to challenge it, this will be done on the *inter partes* return date of the applicant's original *ex parte* application for permission to serve out of the jurisdiction. At this point, the court will reconsider, and decide *de novo*, by way of rehearing, whether permission to serve out should be given. It is for the party seeking to serve out – Microsoft Mobile – to demonstrate that this is a proper case for service out. The position is clearly explained in Briggs, *Civil Jurisdiction and Judgments*, 6th edn (2015) (hereafter "*Briggs*") at p.460:[42]

> "The application is made without the opponent's being notified that it is being made; the court will almost always grant permission unless there is a very obvious flaw in the application. If permission is granted, as in practice it almost always is, and service is effected in accordance with it, the defendant may dispute the jurisdiction by challenging the order which granted permission, and the service which was made pursuant to it, by applying underCPR Part 11. The *inter partes* procedure which then follows marks the point in the process at which the court will investigate whether permission to serve should have been granted. **The fact that permission was granted to the claimant in the first place is largely irrelevant at this point: it leaves no footprint; no onus is placed upon the defendant who applies to have the permission set aside; the application is in effect a rehearing of an application for permission, with the onus lying on the party who needed the permission in the first place.** The court is not inhibited from discharging or varying the order, and for which the claimant now in substance (if not in form) reapplies, by reason of the fact that it has already been made."

92    However, the question on the re-hearing is whether it was proper to grant permission *on the date upon which the order to serve out was granted*, not (in the light of changed circumstances or fresh evidence) whether it would be right to grant it as at the time of the *inter partes* application. In *ISC Technologies v Guerin* [1992] 2 Lloyd's Rep. 430 at 434, Hoffmann J stated[43]:

> "Mr. Crystal said I should look at the position today. An application under R.S.C. O.12, r.8 is a rehearing of the application to the Master and the exercise of a fresh discretion. It should therefore take into account whatever has since happened. I do not agree. The application is under R.S.C. O.12, r.8(1)(c) to discharge the Master's order giving leave to serve out. **The question is therefore whether that order was rightly made at the time it was made. Of course, the court can receive evidence which was not before the Master and subsequent events may throw light upon what should have been**

---

[41] *Konamaneni v Rolls Royce Industrial Power (India) Ltd* [2002] I.L.Pr. 40 at [179]–[182] (*per* Lawrence Collins J.); *Sloutsker v Romanova* [2015] EWHC 545 (QB) at [51] (*per* Warby J.); *Heraeus Medical GmbH v Biomet UK Healthcare Ltd* [2016] EWHC 1369 (Ch) at [63] (*per* Mann J.).
[42] Emphasis supplied. See also: *ISC Technologies v Guerin (James Howard)* [1992] 2 Lloyd's Rep. 430 at 434; *Artlev AG v Joint Stock Company Almazy Rossii-Sakha*, unreported, 8 March 1995 (*per* Saville LJ)
[43] Emphasis supplied. See also: *Mohammed v Bank of Kuwait and the Middle East KSC* [1994] 1 W.L.R. 1483 at 1492–1493 (*per* Evans LJ); *Credit Agricole Indosuez v Unicof Ltd (No.2)* [2003] EWHC 2676 (Comm) at [22] (*per* Cooke J); *Vitol Bahrain EC v Nasdec General Trading LLC* [2014] EWHC 984 (Comm) at [42(1)] (*per* Popplewell J).

**relevant considerations at the time. But I do not think that leave which was rightly given should be discharged simply because circumstances have changed. That would mean that different answers could be given depending upon how long it took before the application came on to be heard.** The position is quite different when the application is for a stay on grounds of forum non conveniens. In such a case, the appropriate time to consider the matter is the date of the hearing."

93   As Evans LJ noted in *Mohammed v Bank of Kuwait* [1994] 1 W.L.R. 1483 at 1492,

"[t]he question for the court is whether the evidence in support of the application justifies the order which is applied for being made. The evidence may be produced then or subsequently, but it must be directed at the situation at the date when the application is made."[44]

94   It is now necessary to consider the three requirements set out in [88] above in greater detail.

### E. The first requirement: serious issue to be tried

*(1) The law*

95   The requirement that there be a "serious issue to be tried" has been held to be the same as the "reasonable prospect of success" test contained in CPR Part 6.37. In *BAS Capital Funding Corp v Medfinco Ltd* [2003] EWHC 1798 (Ch); [2004] I.L.Pr. 16, Lawrence Collins J. held at [153]:

"It was held by the House of Lords in *Seaconsar (Far East) Ltd v Bank Markazi Jomhouri Islami Iran (Service Outside Jurisdiction)* [1994] 1 A.C. 438[45] that the standard of proof in respect of the cause of action relied on was whether, on the evidence, there was a serious question to be tried, i.e. a substantial question of fact or law, or both, which the claimant bona fide desired to have tried. There is no reason to believe that the standard introduced under CPR 6.21(b) of a 'reasonable prospect of success' differs in any material way from the 'serious issue to be tried' test."

96   In *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645, Clarke L.J. stated at [24]:

"It is common ground between the parties that the merits test under CPR 6.20 is in substance no different from the test of a real prospect of success under CPR 3.4 or 24.2 … the underlying rationale is that the court should not subject a foreign litigant to proceedings which the defendant would be entitled to have summarily dismissed. It is, however, important in my opinion to have in mind that the test is not a high one. A claimant has a real prospect of success if its chances of success are not fanciful."

---

[44] Instances where significant amounts of later evidence have been admitted to elucidate the situation which existed when the application was made are: *Société Generale de Paris v Dreyfus Bros* (1887) 37 Ch. D. 215; *Tyne Improvement Commissioners v Armement Anversois SA (The Brabo) (No.2)* [1949] A.C. 326.
[45] At 456.

*(2) The parties' agreement to "park" the issue*

97    Before me, the parties were agreed that I should proceed on the basis, for purposes of the Applications, that the "serious issue to be tried" requirement was met. However, the agreement that they made was incomplete, in that it left certain issues open. Essentially, the position was as follows:

   i) In support of the application of D2/Sony Corporation on jurisdiction (as opposed to its application to stay the proceedings in favour of arbitration), evidence was adduced in support of the contention that this test was *not* met. However, the parties were agreed that there was insufficient time for this matter to be dealt with at the hearing before me.

   ii) In these circumstances, the parties agreed that instead of adjourning the hearing:

      a) For the purposes of the CPR Part 11 applications of D4/LG Chem and D6/Samsung, I should proceed on the basis that there was a serious issue to be tried, but without prejudice to any subsequent summary judgment application that the defendants might bring.

      b) Subject to one point on the question of burden of proof, the D2/Sony Corporation application should effectively be confined to the same points as were being advanced by D4/LG Chem and D6/Samsung.

      c) The evidence in support of the D2/Sony Corporation application would be deployed (in the event of the Applications being unsuccessful) in support of an application to strike out or for summary judgment in respect of the Amended Particulars of Claim. I anticipate that such an application would be brought by at least D1/Sony Europe and D2/Sony Corporation. Ordinarily, the burden of the application would rest on the applicants.

   iii) The issue that was unresolved by the parties was on whom the burden of proof on this point should rest: on Microsoft Mobile (as the party seeking to justify the order serving out of the jurisdiction) or on the defendants (as the parties applying for summary judgment).

98    The parties were agreed that this issue did not have to be determined by me now, and I do not do so. The upshot, however, was that the agreement between the parties was not complete: an important element was unresolved, and I am being asked to deal with an important element going to jurisdiction on the basis of this incomplete agreement. In the circumstances, whilst I proceed on the basis that there *is* a serious issue to be tried, and that the first requirement is satisfied, I should make absolutely clear – particularly given the terms of para.100 of Microsoft Mobile's written submissions, which seek to suggest that the issue was open-and-shut – that I am making no determination on this point. It is simply that, given the agreement of the parties, I am not going to consider the question and will not set aside the Master's order on this ground.

238        MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

## F. The second requirement: a good arguable case that the case falls within one or more of the Gateways

### (1) Good arguable case regarding one or more of the Gateways

99      At common law, the court had no power to permit claims to be served abroad. Power to do so was introduced by the Common Law Procedure Act 1852; was from 1883 in Order 11, rule 1 of the Rules of the Supreme Court; and since 2000 has been provided for by CPR 6.36 and para.3.1 of Practice Direction 6B.

100     All of the Gateways listed in the Practice Direction presuppose some connection – apart from mere presence in the jurisdiction when served – with England and Wales. It is fair to say that the connection is between the pleaded causes of action and *this* jurisdiction – not any wider jurisdiction, like the EU or the EEA.

101     The burden of demonstrating that a claim falls within one of the Gateways lies on the party seeking to serve out of the jurisdiction:

   i) Where the facts required for jurisdiction are disputed, the applicant must show a good arguable case that those facts are true. The court will not make any factual determination binding at trial. The test has two strands, a relative one and an absolute one.

      a) The relative test is whether, on the evidence before the court, the applicant has much the better of the argument. In *Canada Trust Co v Stolzenberg (No.2)* [2000] 4 All E.R. 481 at 555, Waller LJ articulated the test as follows:[46]

         "It is, I believe, important to recognise, as the language of their Lordships in *Vitkovice Horni a Hutni Tezirstvo v Korner* [1951] A.C. 869 demonstrated, that what the court is endeavouring to do is to find a concept not capable of very precise definition which reflects that the plaintiff must properly satisfy the court that it is right for the court to take jurisdiction. That may involve in some cases considering matters which go both to jurisdiction and to the very matter to be argued at the trial, e.g. the existence of a contract, but in other cases a matter which goes purely to jurisdiction, e.g. the domicile of a defendant. The concept also reflects that the question before the court is one which should be decided on affidavits from both sides and without full discovery and/or cross-examination, and in relation to which therefore to apply the language of the civil burden of proof applicable to issues after full trial is inapposite. Although there is power under Order 12, rule 8(5) to order a preliminary issue on jurisdiction, as Staughton L.J. pointed out in *Sinclair-Jones v Kay* [1989] 1 W.L.R. 114, 1156D, it is seldom that the power is used because trials on jurisdiction issues are to be strongly discouraged. It is also important to remember that the phrase which reflects the concept 'good arguable case' as the other phrases in *Korner*'s case 'a strong argument' and 'a case for

---

[46] Emphasis supplied. See also: *Antonio Gramsci Shipping Corp v Recoletos Ltd* [2012] EWHC 1887 (Comm); [2012] I.L.Pr. 36 at [39] (*per* Teare J); and *Brownlie v Four Seasons Holdings Inc* [2015] EWCA Civ 665 at [17]–[22] (*per* Arden LJ).

strong argument' were originally employed in relation to points which related to jurisdiction but which might also be argued about at the trial. **The court in such cases must be concerned not even to appear to express some concluded view as to the merits, e.g. as to whether the contract existed or not. It is also right to remember that the 'good arguable case' test, although obviously applicable to the ex parte stage, becomes of most significance at the inter partes stage where two arguments are being weighed in the interlocutory context which, as I have stressed, must not become a 'trial'. 'Good arguable case' reflects in that context that one side has a much better argument on the material available.** It is the concept which the phrase reflects on which it is important to concentrate, i.e. of the court being satisfied or as satisfied as it can be having regard to the limitations which an interlocutory process imposes that factors exist which allow the court to take jurisdiction.

The civil standard of proof itself has a flexibility depending on the issue being considered and the concept 'good arguable case' has a similar flexibility."

b) The absolute standard was described by Arden LJ in *Brownlie v Four Seasons Holdings Inc* [2015] EWCA Civ 665 at [23][47]:

"As submitted on behalf of Lady Brownlie, when looking for 'the much better argument' the court is concerned with the question of relative plausibility. **But there is also an absolute standard to be met. The words used by Waller L.J., namely a 'much better argument', mean more than that, on the material available, the case is arguable. There must be some substance to it**: since we are deciding a question of jurisdiction, the evidence must achieve an acceptable level of quality and adequacy. However, the standard to be attained is not that of succeeding on a balance of probabilities because there is no trial…"

ii) Where there is a pure point of law, not involving a factual dispute, on which jurisdiction depends, the court should normally decide it: *Kyrgyz Mobil* [2011] UKPC 7 at [81] (*per* Lord Collins).

### (2) The Gateways relied upon by Microsoft Mobile

102    In its application to serve the defendants out of the jurisdiction, Microsoft Mobile relied upon Gateways (3) and (9)(a) of para.3.1 of Practice Direction 6B.

103    The relevant parts of Practice Direction 6B on service out of the jurisdiction provide:

---

[47] See also *Erdenet Mining Corp v Kazakhstan* [2016] EWHC 299 (Comm) at [13] (*per* Cooke J.).

"3.1 The claimant may serve a claim form out of the jurisdiction with the permission of the court under rule 6.36 where–

…

(3) A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and —

(a) there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and

(b) the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim.

…

(9) A claim is made in tort where–

(a) damage is sustained, or will be sustained, within the jurisdiction…".

104      It is, of course, trite that Microsoft Mobile must show that *each* claim pleaded in the Amended Particulars of Claim falls within one or other of these Gateways. To the extent that service out can be authorised for some, but not for other, claims, those claims must be removed so far as any defendants out of the jurisdiction are concerned.[48]

*(3) Gateway (3): whether D2/Sony Corporation,[49] D4/LG Chem and/or D6/Samsung are necessary or proper parties to Microsoft Mobile's claims against D1/Sony Europe*

(i) Requirements that have to be satisfied

105      In *Kyrgyz Mobil* [2011] UKPC 7, Lord Collins considered this Gateway in general terms:

"73. The necessary or proper party head of jurisdiction is anomalous, in that by contrast with the other heads, it is not founded upon any territorial connection between the claim, the subject matter of the relevant action and the jurisdiction of the English courts: [1949] A.C. 326, 338, per Lord Porter. Piggott, *Foreign Judgments and Jurisdiction* (3rd edn, 1910), pt III, p 238, said: 'This is perhaps the most important of the sub-rules, for it throws the net of jurisdiction over a wider area; and the principle of considering the nature of the cause of action which pervades the whole subject, appears here to be ignored.' Consequently as Lloyd LJ said in *Golden Ocean Assurance and World Mariner Shipping SA v Martin (The Goldean Mariner)* [1990] 2 Lloyd's Rep. 215 at 222:

'I agree…that caution must always be exercised in bringing foreign defendants within our jurisdiction under O.11 r.1(1)(c). It must never become the practice to bring foreign defendants here as a matter of course, on the ground that the only alternative requires more than one suit in more than one different jurisdiction.'

---

[48] *Briggs* at p.461
[49] I appreciate that I have decided that D2/Sony Corporation has the benefit of a stay pursuant to s.9 of the Arbitration Act 1996. Nevertheless, it is appropriate to consider what the position would be if there were no stay.

74. Among the questions which arise on this appeal are these: When is an action 'properly brought' against the defendant served within the jurisdiction (and outside the jurisdiction under the English rules), referred to here as D1, or 'the anchor defendant'? When will the foreign additional defendant, or D2, be a 'proper party'? In particular, what is the merits threshold for each of those claims? Is the claim not 'properly brought' against D1 if the motive of the claimant in suing D1 is to add D2? Does it matter that in practice the claimant will not recover against D1?

75. The leading decisions are the decisions of the House of Lords in *Improvement Commissioners v. Armement Anversois SA (The Brabo)* [1949] A.C. 32 and *Derby & Co v Larsson* [1976] 1 W.L.R. 202, and of the Court of Appeal in *Massey v Heynes & Co* (1888) L.R. 21 Q.B.D. 330 and *Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd* [1983] Ch. 258. The members of those tribunals do not all speak with one voice, but the following propositions may be derived from them.

**The motive in suing the anchor defendant**

76. First, the mere fact that D1 is sued only for the purpose of bringing in D2 is not fatal to the application for permission to serve D2 out of the jurisdiction: [1949] A.C. 326, 338–339, *per* Lord Porter; *Derby & Co v Larsson* [1976] 1 W.L.R. 202, 203, *per* Viscount Dilhorne.

77. The question was discussed extensively (and somewhat discursively) in *Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd* [1983] Ch. 258, but without reference to the relevant passages in *The Brabo* and without any citation to the court of *Derby & Co v Larsson*.

78. The point arose in *Multinational Gas* [1983] Ch. 258 because D1 was in liquidation and therefore the plaintiff had no real prospect of recovery against D1. Lawton L.J. did not treat as fatal to the application the fact that the sole, or predominant, reason for beginning the action against a party duly served within the jurisdiction was to enable an application to be made to serve the parties outside the jurisdiction. It was instead a relevant factor in the exercise of the discretion: at 268. Dillon L.J. said (at 285) that an action was not to be regarded as properly brought against D1 if the true inference from all the facts was that the sole reason for suing D1 was to found an application to join foreign defendants in the action. But although he held that the predominant reason for the action against D1 was to enable foreign defendants to be joined, he regarded the action as *bona fide* and properly brought: at 286–287. May L.J. considered that if there was a good arguable case against D1 in an action in which any judgment obtained against that defendant might or would not be met owing to lack of funds, the fact that the main or predominant purpose of keeping D1 in the proceedings was to enable the plaintiff to bring in D2 was not a ground for saying that the proceedings were not properly brought against D1: see at 273–279. See also *Goldenglow Nut Food Co Ltd v Commodin (Produce) Ltd* [1987] 2 Lloyd's Rep. 569, 578 (CA).

79. The better view, therefore, is that the fact that D1 is sued only for the purpose of bringing in the foreign defendants is a factor in the exercise of the discretion and not an element in the question whether the action is 'properly brought' against D1, provided that there is a viable claim against D1.

**'Bound to fail'**

80. Second, the action is not properly brought against D1 if it is bound to fail: [1949] A.C. 326, 338–9, *per* Lord Porter. He also put the point (echoing *Witted v Galbraith* [1893] 1 Q.B. 577) on the basis that leave will not be granted if the lack of a plausible cause of action against D1 shows that the presence of D1 in the jurisdiction is being used as a device to bring in D2. See also *Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd* [1983] Ch. 258, 268, 273–274."

106    As Lord Collins identified, there are two very distinct requirements to this Gateway:

    i)  First, the claim against the anchor defendant – against whom no jurisdictional issue arises – must give rise to "a real issue which it is reasonable for the court to try". In *Vitol Bahrain EC v Nasdec General Trading LLC* [2014] EWHC 984 (Comm), Popplewell J. considered *Kyrgyz Mobil* [2011] UKPC 7 and observed at [46][50]:

        "The starting point when considering the necessary or proper party head of jurisdiction is to examine the nature of the claim which arises against the anchor defendant(s). That is the claim to which it must be necessary or proper for the additional defendant(s) to be party. **At this first stage, the approach requires consideration of such claim in isolation, that is to say assuming that there will be no joinder of the additional foreign defendant(s)**."

    ii) Secondly, and assuming the claim against the anchor defendant does give rise to "a real issue which it is reasonable for the court to try", the defendants out of the jurisdiction must be "necessary or proper parties" to that claim.

(ii) The first requirement: the claim against the anchor defendant

107    I do not consider – in light of the agreement reached by the parties regarding the existence of a serious issue to be tried – that it is open to me to debate whether there is a "real issue" – in the sense of an arguable issue – between Microsoft Mobile and D1/Sony Europe.[51]

108    However, the first requirement goes beyond a requirement of mere arguability. In *Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379, the Court of Appeal considered Lord Collin's statement in [79] of *Kyrgyz Mobil* [2011] UKPC 7. Gloster LJ stated[52]:

        "41. …We do not accept Mr. Salzedo's submissions that Lord Collins' statement in paragraph 79, together with his statement in paragraphs 65 and 66 that, in effect, the changes in the wording of English rules made no difference to the old law relating to what was meant by 'properly brought', lead to the conclusion that the only criterion which had to be satisfied at the first stage under paragraph 3.1(3)(a) of PD6B is whether there is an arguable

---

[50] Emphasis supplied.
[51] To the extent that the defendants sought to contend otherwise – and para.127 of Samsung's written submissions at least appears to do so – I decline to embark upon the debate. By reason of the parties' agreement on the question of whether there was a serious issue to be tried, I did not hear argument on this point.
[52] Emphasis supplied.

claim against the anchor defendants. **Such a construction would in our view unjustifiably restrict the wide ambit of the phrase 'which it is reasonable for the court to try.'** Nor do we consider that Lord Collins was attempting any such exclusive or exhaustive definition of the phrase 'which it is reasonable to try' as used in paragraph 3.1(3)(a) of PD6B of the English CPR, when he addressed the meaning of 'properly brought' and 'proper party', or the issues of 'the motive in suing the anchor defendants' and 'bound to fail' in the context of the Isle of Man provisions. If the Board has been attempting to do so, it clearly would have been *obiter* since the only issues that the Board were addressing in the context of the relevant Isle of Man 'properly brought' provision were (a) whether the relevant claims were bound to fail and (b) whether the motive for the defendants in bringing their counterclaim (viz for the sole or predominant purpose of establishing jurisdiction against the other defendants to counterclaim, as opposed to suing the anchor defendants) was an issue that fell to be considered as part of the question whether the action had been 'properly brought': see paragraphs 127 and 128. There was no consideration of the separate question whether there were real issues which it was reasonable to try.

42. **Accordingly in our view AK Investment** is not to be regarded as even persuasive authority for the proposition that the court is precluded from considering wider issues of reasonableness at stage one of the process under paragraph 3.1(3)(a) of PD6B."

109   It is, therefore, necessary to consider wider issues regarding the "reasonableness" of the claim brought by Microsoft Mobile against D1/Sony Europe. The defendants contended that the claim brought by Microsoft Mobile against D1/Sony Europe was unreasonable on the following grounds:

    i) The proceedings against D1/Sony Europe had been commenced by Microsoft Mobile for the sole purpose of founding jurisdiction against the other defendants, using D1/Sony Europe as the anchor defendant.
    ii) The arbitration clause caused the claims against D1/Sony Europe to be stayed.
    iii) Given the manner in which the various claims advanced by Microsoft Mobile had been aggregated, the claims against D1/Sony Europe were unreasonable or (if this makes a difference) not reasonable.

I consider each of these points in turn.

Sole reason for joining D1/Sony Europe was to found jurisdiction against the other defendants

110   I consider that the sole reason that Microsoft Mobile's action is structured as it is, with D1/Sony Europe as the "lead defendant", has been to found jurisdiction in England against the other defendants. Apart from D1/Sony Europe, all of the other defendants are the ultimate parent companies of their respective corporate groups, claimed against as a part of a "single economic unit" or "undertaking".[53] D1/Sony Europe is the exception: it is a subsidiary of D2/Sony Corporation, which is the

---

[53] See Amended Particulars of Claim, para.15 (relating to the defendants generally), para.28 (relating to D4/LG Chem) and para.36 (relating to D6/Samsung). The same is true of the third and fifth defendants (see paras 24 and 31 of the Particulars of Claim).

244   MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

parent company of the entire Sony group.[54] I can discern no other, additional, reason or benefit accruing to Microsoft Mobile for pursuing this course of action, and it is significant that in Microsoft's proceedings in the United States, which involved similar issues and similar parties, D1/Sony Europe was *not* joined.

111   The defendants pointed to some (old) authority which they contended suggested that the joinder of an anchor defendant in such circumstances was unreasonable.[55] I do not consider that it is open to me on the (later) authorities on this point to reach such a conclusion, and I do not, therefore, consider these authorities further. In *Kyrgyz Mobil* [2011] UKPC 7, Lord Collins considered that the fact that a party had been joined solely for the reason of bringing in other parties as defendants was relevant only to discretion, and not to the question of whether the Gateway was satisfied. In *Erste Group Bank* [2015] EWCA Civ 379, Gloster LJ stated at [43][56]:

"It was obvious from the evidence that the commercial (and indeed only) driver behind the Bank's issue of proceedings in England against D1 and D2 was to enable a claim to be brought against D3 and D5 and to attempt to execute against their assets, whether in Russia or elsewhere. However, we do not consider that in the present case it is necessary or appropriate for this court to revisit the question whether the fact that a claimant's motive in bringing proceedings against the anchor defendants was only for the purposes of enabling a claim to be brought against the foreign defendants is a factor which is relevant to the question whether the threshold criteria under paragraph 3.1(3) of PD6B have been satisfied. To do so would involve reconsideration of this court's decision in *Multinational Gas* [1983] Ch. 258 and the various authorities there cited. That would be a task for the Supreme Court. Accordingly, even if we have reservations on this point, we must accept for the purposes of this case the Board's conclusion, as expressed in paragraph 79 of *AK Investment*, that the fact that the anchor defendant is sued only for the purpose of bringing in the foreign defendants is not an element in deciding the question whether the gateway requirements of paragraph 3.1(3)(a) or (b) have been satisfied. That factor is only for consideration under the wider discretionary head of Issue 4.

On the state of the law as it presently stands, therefore, my conclusion that D1/Sony Europe was joined for the sole purpose of bringing into the proceedings the other Defendants does not render the claim against D1/Sony Europe one that it is unreasonable for this court to try."

### The arbitration clause and section 9 of the Arbitration Act 1996

112   For the reasons given in Sections B and C above, I have concluded that the arbitration clause in the PPA is sufficiently wide to embrace the claims brought by Microsoft Mobile against D1/Sony Europe and D2/Sony Corporation. For the reasons I have given, I have stayed the proceedings against these defendants.

113   The question is whether this determination – made after Microsoft Mobile's application to serve out of the jurisdiction, and after that application was determined

---

[54] See paras 18–20 of the Amended Particulars of Claim.
[55] See, for instance: *Witted v Galbraith* [1893] 1 Q.B. 577 at 579 (*per* Lindley LJ) and 579–580 (*per* Kay LJ); *Multinational Gas* [1983] Ch. 258 at 268 (*per* Lawton LJ).
[56] Emphasis supplied.

in Microsoft Mobile's favour by the Master – is relevant to the question of reasonableness.

114    Microsoft Mobile contended that such a determination was not relevant, because it post-dates the order for service out, and matters need to be assessed as at that date. I do not accept this contention, for two, related, reasons.

115    First, it is clear from the terms of Murray 1 that the arbitration clause was a matter that was before the Master on the application for service out of the jurisdiction:

   i) Paragraph 52(a) of Murray 1 identifies the arbitration provisions in the PPA between Nokia and D1/Sony Europe and D2/Sony Corporation.

   ii) Paragraph 53 notes that the Third and Fifth Defendants – no longer party to the proceedings – had raised the question of arbitration in *their* PPAs with Nokia, but that Mr Murray's view was that "properly interpreted the present dispute does not fall within the ambit of the arbitration agreements".

   iii) Plainly, this is a matter which was squarely and properly raised by Microsoft Mobile for the Master's attention, and in relation to which it is appropriate to take into account further developments. Specifically:

      a) At the time of the hearing before the Master, the position of D1/Sony Europe and D2/Sony Corporation in regard to the arbitration clause was unknown. That position is now clear.

      b) The Master was not, it would appear, specifically invited to determine the question of the scope of the arbitration clauses identified by Mr Murray in Murray 1. In my judgment, he should have been. This is a question of law, going directly to the position of the anchor defendant, which should have been resolved one way or the other.

116    Secondly, and relatedly, it matters not that the position of D1/Sony Europe *quoad* the arbitration clause was unknown at the time of the hearing, because it should have been *assumed* that any point on jurisdiction properly available to D1/Sony Europe would be taken by it. In *Tyne Improvement Commissioners v Armement Anversois SA (The Brabo) (No.2)* [1949] A.C. 326, Lord Simonds stated at 347:

   "…I do not think that the court ought to assume that the defendants within the jurisdiction would not avail themselves of any defence open to them. In this case it was suggested that the second and third defendants might not assert the immunity of the Crown. But if one valid line of defence is assumed to be abandoned, so might another, until at last any action may be deemed to be properly brought because the defendants might throw down their arms and run away."

117    Accordingly, I find that the effect of the arbitration clause on the *lis* between Nokia and D1/Sony Europe is a factor to be considered on the present Applications. The question whether, in these circumstances, the claim against D1/Sony Europe gives rise to "a real issue which it is reasonable for the court to try", is straightforward to answer. Given the scope of the arbitration clause, and the fact that D1/Sony Europe is asserting it and seeking arbitration of the claims against it, there is simply no real issue between Microsoft Mobile and D1/Sony Europe for this court to try. The point is so fundamental, it goes beyond any question of reasonableness.

246      MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

118    This finding is sufficient to determine the argument in relation to Gateway (3) against Microsoft Mobile. However, in case I am wrong on the question of a stay in favour of arbitration, I consider the alternative scenario where the proceedings against D1/Sony Europe continue. That brings me to the third point: whether – given the manner in which the various claims advanced by Microsoft Mobile have been aggregated – it can be said that the claims against D1/Sony Europe are unreasonable or (if this makes a difference) not reasonable.

Aggregation of claims

119    As I have already noted, I do not consider that it is open to me to set aside the Master's order on the basis that the claims advanced by Microsoft Mobile against D1/Sony Europe are unarguable. That is a matter – if at all – for a later and different hearing on summary judgment.[57]

120    However, there is a secondary issue, on the question of reasonableness. I have described above the aggregated nature of the claims being made by Microsoft Mobile, in that claims are made by Nokia and Microsoft Mobile generally, against the various defendants generally, such that it is not possible to define or identify specific aspects of a claim against (for example) D1/Sony Europe by a specific entity within Nokia.

121    Although it is true to say that the claims being advanced by Microsoft Mobile are in this sense vague, I do not consider that it can be said that this renders the claims unreasonable. It is perfectly proper to advance claims in the alternative – alternative claimants and alternative defendants – and in this case, of course, any defendant participating in the Cartel will be jointly and severally liable for the acts of the other participants of the Cartel – whether joined as defendants or not.

122    Microsoft Mobile has alleged, in terms, that D1/Sony Europe participated in the Cartel, although it has done so by advancing that allegation generally against all of the defendants. See, for example, the following paragraphs in the Amended Particulars of Claim:

> "37. … the defendants and/or the undertakings of which they were a part, together with other undertakings (collectively the 'Cartelists') in the period from at least August 1999 to May 2011 entered into agreements and/or arrangements and/or concerted practices by which they or two or more of them…[58]
>
> …
>
> 63. In summary, beginning no later than 1999, the Cartelists began communicating with each other bilaterally and/or multilaterally with a common goal of cooperating to prevent, restrict or distort competition on the relevant market for Li-ion Batteries.
>
> …
>
> 174. By reason of the defendants' participation in and/or implementation of the Cartel as described hereinabove…
>
> …

---

[57] To the extent that D6/Samsung was seeking to maintain such a point in para.127 of its written submissions, I consider that that point was closed off by the agreement between the parties described in Section E above.
[58] Strictly speaking, because of the "and/or", Microsoft Mobile's claim could succeed on the pleading without establishing D1/Sony Europe's involvement. In argument, however, I was assured by Mr Beal QC that an averment of participation was being made against D1/Sony Europe specifically. This is borne out by later paragraphs of the pleading.

181. As an intended and/or foreseeable consequence of the conduct set out above, the defendants and the undertakings of which they formed part caused the claimant loss and damage…"

123    In short, there is a clearly pleaded case against D1/Sony Europe, by way of which all of the claims pleaded in the Amended Particulars of Claim are advanced. I reject the contention – set out most clearly in para.64 of D6/Samsung's written submissions – that

"Sony Europe was not alleged to have directly participated in the cartel or even to have known of the cartel. Instead Sony Europe was sued simply on the basis that it was part of the same economic unit as Sony…and was said to be jointly and severally liable with Sony and the rest of the Japanese and Korean Defendants for the damages caused by the cartel".

124    Although, of course, I accept that D1/Sony Europe might be found to be liable in damages to Microsoft Mobile on the basis of what can be termed "group liability" – i.e. because D1/Sony Europe, although not involved in the Cartel, was liable because it was part of the same undertaking, entities within which *did* participate in the Cartel – that is not the case that is pleaded by Microsoft Mobile. The case that is pleaded, which is verified by a statement of truth and by the witness statements of Mr. Murray, is that D1/Sony Europe *itself* participated in the Cartel. I conclude that, but for the arbitration clause, the claim against D1/Sony Europe gives rise to real issues which it is reasonable for the court to try.

125    It is, for this reason, unnecessary for me to determine what the parties called the "*Provimi*" point. The *Provimi* point only arises if D1/Sony Europe's liability is based *solely* on its being a part of the same undertaking as its parent D2/Sony Corporation – in short, if the claim against D1/Sony Europe is predicated solely on a theory of group liability, without any allegation that it knew or directly participated in the Cartel. Were the case against D1/Sony Europe to be solely a group liability case, very difficult questions of whether D1/Sony Europe was, or was not, a part of the same undertaking as D2/Sony Corporation might arise, in addition to difficult questions of attribution of conduct within an undertaking.[59] As it is, my conclusion regarding the nature of the allegations made by Microsoft Mobile against D1/Sony Europe means that I do not have to venture into these difficult waters, and I do not consider the *Provimi* question further in this Judgment.

(iii) The second requirement: necessary or proper party

**Introduction**

126    The next question which arises is whether the defendants, apart from D1/Sony Europe, are persons who are "necessary or proper" parties to the claim against D1/Sony Europe. It is important to note that "necessary" and "proper" are disjunctive.

127    Microsoft Mobile did not contend that the defendants were necessary parties to the action – the defendants quite rightly pointed out that there is no need to sue every member of a cartel: joint and several liability means that only one cartelist <u>needs</u> to be joined in an action such as this.

---

[59] See, for instance, the analysis of the law set out in *Sainsbury's Supermarkets Ltd v Mastercard Inc* [2016] CAT 11 at [362]ff.

128    Microsoft Mobile did, however, contend that the defendants were *proper* parties. Microsoft Mobile contended that the test for being a "proper" party was simply whether – on the assumption that the foreign defendant was within the jurisdiction – that defendant could be joined pursuant to CPR Part 19. This was disputed by the defendants, who submitted that:

  i) the test imported more than this; and
  ii) they were not proper parties because D1/Sony Europe had been sued as anchor defendant in order to bring the claim against the other defendants.

129    Two questions therefore arise:

  i) What is the nature of the requirement that a party be a "proper" party to the proceedings?
  ii) According to that test, are the defendants "proper" parties?

**What does "proper" mean?**

130    The defendants relied upon a test propounded by Lindley LJ in *Witted v Galbraith* [1893] 1 Q.B. 577 at 579[60]:

> "The rule that now applies isOrder XI, r.1(g), and it is said that the present case comes within that rule. There is a very easy method of testing whether this is true. **Supposing that both the defendant firms were resident within the jurisdiction, would they both have been joined in the action?** I cannot think so; there is no plausible cause of action against the brokers. I come to the conclusion that the brokers have been brought into the action simply to enable the plaintiff to bring the other defendants within the jurisdiction. It is not a bona fide case of an action properly brought against a person who has been served within the jurisdiction. Consequently there is no right to proceed under the order, and the appeal must be allowed."

131    The defendants submitted that there was significance in the use of the word "would" in Lindley LJ's test. The question was not whether the claim *could* have been brought, but whether it *would* have been on the assumption that all parties were resident within the jurisdiction. This, of course, is a much narrower and more stringent test than simply whether a defendant *could* be joined pursuant to CPR Part 19.

132    The defendants' contention places a great deal of weight on a single word. Other cases take a different approach. In *Massey v Heynes & Co* (1888) L.R. 21 Q.B.D. 330 – another decision of the Court of Appeal, pre-dating *Witted v Galbraith* [1893] 1 Q.B. 577, and where Lindley LJ was a member of the court – Lord Esher M.R. said at 338[61]:

> "The question, whether the person out of the jurisdiction is a 'proper party' to an action against a person who has been served within the jurisdiction, must depend on this, —**supposing both parties had been within the jurisdiction would they have been proper parties to the action?** If they would, and only one of them is in this country, then the rule says that the other may be served, just as if he had been within the jurisdiction."

---

[60] Emphasis supplied.
[61] Emphasis supplied.

Lindley LJ did not dissent from this test.

133    Lord Esher M.R.'s test in *Massey v Heynes & Co* (1888) L.R. 21 Q.B.D. 330 is altogether wider than Lindley LJ's "counter-factual" "would" test in *Witted v Galbraith* [1893] 1 Q.B. 577. The touchstone of Lord Esher M.R.'s test is whether a defendant would be a "proper" party *assuming* that party to be within the jurisdiction. That comes very close to the test propounded by Microsoft Mobile: could the defendant be joined pursuant to CPR Part 19?

134    This wide approach is confirmed by a number of cases relied upon by the defendants, where service out of the jurisdiction was set aside on the ground that the claim against the anchor defendant had not *bona fide* been brought. In these cases, the claim against the anchor defendant was no more than a device or sham to enable claims to be brought against other defendants who were out of the jurisdiction.[62] Given these findings, it is easy to see that (in these cases) the joinder of the foreign defendant would be "improper" according to the test propounded by Lord Esher M.R.

135    I conclude that the circumstances in which a party is a "proper" party to proceedings already commenced or to be commenced against an anchor defendant are significantly wider than those contended for by the defendants. I consider the test simply to be whether the foreign defendant could, if within the jurisdiction, properly have been joined pursuant to CPR Part 19.

136    There is a further reason why I reject the approach contended for by the defendants. *Ex hypothesi*, if the sole reason for bringing D1/Sony Europe into the proceedings was to found jurisdiction against the other defendants, then (assuming the other defendants were already amenable to the court's jurisdiction) D1/Sony Europe would never have been joined. Such a test is not only inconsistent with the law as I have described it, but also it is not open to me, given Lord Collins' statement in *Kyrgyz Mobil* [2011] UKPC 7 at [79] and the Court of Appeal's view of that statement in *Erste Group Bank* [2015] EWCA Civ 379 at [43] (see [111] above). This approach to what is a "proper" party brings into play precisely the same "reasonableness" arguments in relation to forum-shopping as Lord Collins rejected in *Kyrgyz Mobil*. This is very clear from para.120 of D6/Samsung's written submissions:

> "In this case, it is submitted that the answer to Lindley L.J.'s counterfactual question is plainly 'No'…it is obvious (and certainly, Samsung has the better of the argument on the material before the Court, it being more plausible) that Sony Europe would**not** have been sued were the Japanese and Korean Defendants resident in England, and has been sued solely or predominantly in order to found jurisdiction over the Japanese and Korean Defendants. As a result, those foreign defendants are not 'proper parties' to the claims against Sony Europe, and it is not 'reasonable' for the English Court to try those claims with the claims against the foreign defendants, within the letter, spirit or substance of sub-paragraph 3…".

137    It seems to me that questions as to the propriety of the claim against the anchor defendant are more properly considered at the stage of the first requirement (a

---

[62] Thus, in *Ross v Eason & Son* [1911] 2 I.R. 459 at 463, it was concluded that the action against the anchor defendant had not been commenced *bona fide*; that was also the conclusion in *Sharples v Eason* [1911] 2 I.R. 436 at 447 and 448–449.

250          MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

reasonable issue for the court to try) and not at the stage of the second requirement (necessary or proper party).

138     In conclusion, the law is well-described in Dicey, Morris & Collins, *The Conflict of Laws*, 15th edn (2012) at para.11-165:

> "Y, who is out of England, must be either a necessary or proper party to the proceedings. If Y is a proper party it is not also a requirement that he be a necessary party; but if adding Y is likely in practice to achieve no potential advantage for the claimant, it would not ordinarily be a proper case for service out of the jurisdiction. The question whether Y is a proper party to proceedings against X depends on this: supposing both X and Y had been in England, would they both have been proper parties to the proceedings? If they would, and only one of them, X, is in this country, then Y is a proper party and permission may be given to serve him out of the jurisdiction. Y will be a proper party if the claims against X and Y involve one investigation. It is not necessary that the alleged liability of Y be joint and several with that of X."

### Are the defendants "proper parties"?

139     I have no doubt that the defendants are, according to the test that I have described, "proper" parties to the proceedings against D1/Sony Europe:

    i) Although I have concluded that the proceedings against D1/Sony Europe were brought for the sole purpose of founding jurisdiction against the other Defendants, that does not render the action against D1/Sony Europe unreasonable, nor the joinder of the defendants improper.

    ii) Matters might be different if the claim against D1/Sony Europe were brought without a *bona fide* intention to prosecute the action against D1/Sony Europe. However, the evidence before me is clear that even if the proceedings against the other Defendants do *not* proceed in this jurisdiction, the claim against D1/Sony Europe, *will*. Paragraph 136 of Murray 2 states:

> "…the claimant sued the First Defendant as a Cartel participant and in good faith. The defendants have not asserted that the claimant's claim against the First Defendant was motivated by bad faith. I can also confirm … that … the claimant *would* proceed against the First Defendant in these proceedings irrespective of whether the other Defendants remained parties or not. As participants in cartels are jointly and severally liable for all the losses that result from their breach of competition law, the claimant could proceed against the First Defendant for the full value of its losses…"

    iii) In these circumstances, there are strong reasons for concluding that there would be real advantage in joining the defendants. They are jointly and severally liable with D1/Sony Europe; investigating the Cartel is, effectively, a single investigation; and it makes no sense to duplicate this investigation and run the risk of inconsistent findings. It is clear from the case law that this is a particularly powerful factor – indeed, it may be said to be one of the essential functions of this particular Gateway.[63]

---

[63] See, for instance, *Massey v Heynes & Co* (1888) L.R. 21 Q.B.D. 330 at 338: "I have no doubt that the rule applies to such a case as this. When the liability of several persons depends upon one investigation, I think they are all 'proper parties' to the same action, and, if one of them is a foreigner residing out of the jurisdiction, rule 1(g) of Order XI

*(4) Gateway (9)(a): damage within the jurisdiction*

(i) The wording of the Gateway

140    The wording of this Gateway has changed over time. Prior to 1987, the predecessor to para.3.1(9) was RSC O.11 r.1(h), which applied where the claim was "founded on a tort committed within the jurisdiction". The focus was thus on the place where the wrongful act was done.

141    In 1987, rule 1(h) became rule 1(f) and was changed substantially to its present form, referring separately to:

    i)   Damage sustained in the jurisdiction; and
    ii)  Damage resulting from acts committed in the jurisdiction.

142    This change was made from a desire to incorporate into the common law rules of jurisdiction the effect of what is now art.7(3) of the Brussels I Regulation (Recast) as interpreted by the Court of Justice in *Handelswekerij GJ Bier BV v Mines de Potasse d'Alsace SA* (21/76) [1977] 1 C.M.L.R. 284. As a result, it may be appropriate (as Ms Demetriou, QC, leading counsel for D4/LG Chem, contended) to take into account, when construing this Gateway, other case law emanating from the Court of Justice, even though the Gateway is an English and not an EU jurisdictional rule.[64] Whilst it might be appropriate to keep an eye on non-English case law as being of potentially persuasive force, in my judgment it would be inappropriate to go further than this: the Gateway is an English and not an EU jurisdictional rule, and must be construed on that basis.

143    In this case, Microsoft Mobile based its contentions as regards this Gateway entirely on the basis that damage had been sustained within the jurisdiction i.e. para.3.1(9)(a) of Practice Direction 6B. It is not necessary, for present purposes, to consider further the alternative ground of acts committed within the jurisdiction.

(ii) Basis upon which Microsoft Mobile contended that there had been damage within the jurisdiction

144    The factual basis on which Microsoft Mobile sought to demonstrate jurisdiction turned on the following aspects, which were set out in para.33 of Murray 1:

"Based on an initial review of the claimant's and Nokia's sales and purchase data, I understand from the claimant's economic experts that the claimant and/or Nokia suffered damage within the jurisdiction as a result of the defendants' unlawful participation in the Cartel.

    (a) In the Cartel Period and the Run-Off Period, Nokia and/or the claimant purchased 12.1 million units from the First Defendant, which, as set out above, is a company located in the UK and incorporated under English law.

    (b) Nokia entered into a series of Product Purchase Agreements ('PPAs') with the Second Defendant (which agreement includes the First Defendant as an affiliated company), Third, Fourth, Fifth and Sixth Defendants. Of

applies" (*per* Lindley L.J.); *Vitol Bahrain EC v Nasdec General Trading LLC* [2014] EWHC 984 (Comm) at [55]: "What ordinarily makes the entry through the necessary or proper party gateway a weighty factor in favour of exercising the discretion to grant permission is the risk of duplication of time and cost, and the risk of inconsistent judgments" (*per* Popplewell J).
[64] This may have occurred in *Brownlie v Four Seasons Holdings Inc* [2015] EWCA Civ 665 at [83]–[85], where the Gateway was read in the light of Rome II, which was construed in accordance with the Brussels Convention.

252      MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

these PPAs, the agreements with the Second and First Defendants, and with the Fifth Defendant, are governed by 'United Kingdom law'. In the absence of any connection between the claimant and these Defendants to Scotland or Northern Ireland, the reference to 'United Kingdom law' can only reasonably be construed as a reference to the law of England and Wales. Pursuant to Article 4(3) of Regulation 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations ('Rome II'), this is recognised to establish a close connection between England and Wales and the tortious conduct which the claimant has identified in its claim.

(c) In addition, the claimant and Nokia sold substantial quantities of Handsets in England and Wales over the Cartel Period and Run-Off Period. While the claimant does not consider that there has been any 'pass on' of the cartelised prices to its own customers, if the defendants were, on the contrary, to show that its higher prices had been passed on to the claimant or Nokia's own customers, then any higher sales prices that resulted from an increase in the costs of its component products would have caused the claimant and/or Nokia to suffer lower volume of sales…That would in turn have caused loss to be sustained by them within England and Wales. Moreover, in that event, it would also be the case that UK consumers and/or businesses also suffered significant damage as a result of the defendants' unlawful conduct."

145    In its written and oral submissions, Microsoft Mobile appeared to supplement or extend these three bases. Thus, para.116.2 of Microsoft Mobile's written submissions states that "[t]he entities within Nokia that made purchases of Li-ion Batteries, in respect of whose purchases the claim is brought, include Nokia UK Ltd which is established in the UK". The significance of Nokia UK Ltd is that it would have its registered office within the jurisdiction which (assuming the approach in *CDC* [2015] 5 C.M.L.R. 4 is applicable, which I do) could be the place where damage was sustained.

146    It will be necessary to consider all of these bases, together with the additional evidence relied upon by Microsoft Mobile (Murray 1 being the evidence deployed before the Master: it was supplemented by Murray 2 before me). Before doing so, however, something needs to be said about the nature of the Gateway itself.

(iii) Legal aspects regarding the Gateway

147    There are a number of points that fall to be considered:

   i) The law by which it is to be ascertained whether there has, in fact, been damage within the jurisdiction.
   ii) Whether and, if so, to what extent, the causes of action relied upon by Microsoft Mobile must be viewed in what I shall term a "disaggregated" way, that is to say by focusing on the original claims and disregarding the assignment of claims from Nokia to Microsoft Mobile.
   iii) The need for the damage sustained to be "substantial".
   iv) The need for the damage sustained to be "direct".

148    These various aspects are considered in turn below. Thereafter, I turn to the specific contentions of Microsoft Mobile.

[2017] 5 C.M.L.R. 5                                                 253

The relevant law to determine whether the requirements of the Gateway are satisfied

149    Clearly, a good arguable case needs to be shown regarding the applicability of the Gateway: see [101] above. The question is, what law should apply when seeking to determine whether the criteria demanded by a Gateway are met. *Briggs* at pp.466–467 says this:

> "The heads set out in Paragraph 3.1 contain various definitional elements. A question which appears important, but which is oddly free of convincing authority, is whether these are to be interpreted by reference to English domestic law, or English rules of private international law, or something else. Suppose the claimant wishes to serve out on the basis 'the claim is in respect of a contract where the contract was made within the jurisdiction'. Is the question whether there actually was a contract for the claim to be made in respect of answered by reference to English domestic law, or by reference to the rules of English private international law? And is the place where it was made answered by applying the offer and acceptance rules of English domestic law, or the corresponding rules of whichever law is picked out by the rules of private international law, or some other way altogether?"

150    I was referred to no authority on this question. In a straightforward case, where the facts are clear, it might be possible to determine the applicable law as a matter of law; in other cases, the facts may be capable of determination on the "good arguable case" test, and the applicable law then determined on the basis of those facts.

151    The present case is, however, altogether more complex. Unsurprisingly, very little has been said before me about the operation of the Cartel, and it is clear from the exchanges with Mr Beal, QC recorded in [20] above, that the facts relating to the sale and purchase of the Li-ion Batteries will be difficult to establish, as regards place of purchase; the identity of the vendor; the identity of the buyer; whether there was a "chain" of purchases within Nokia; and how the Li-ion Battery was, in the end, on-sold by Nokia.

152    The difficulty of the point is stated very clearly in Murray 2:

> "139. As a preliminary comment, I note that this is not a case where it is straightforward to identify the location of damage. There are numerous candidates:
>
> (a) Where each contract of sale for a Relevant Product (as defined in Section D of the Particulars of Claim) was concluded;
>
> (b) Where each Relevant Product was delivered;
>
> (c) Where each entity within Nokia which purchased a particular Relevant Product was located;
>
> (d) Where each payment for a Relevant Product was made; and/or
>
> (e) Where each product incorporating a Relevant Product was ultimately sold.
>
> …
>
> 141. Which of these particular locations should be considered appropriate will be a matter for legal submission. How the many millions of Relevant Products that were purchased during the Cartel Period should be divided up on these different bases will be a complex matter requiring expert evidence in due course. In short, the detailed analysis will be a matter for trial…"

153    In these circumstances, it is simply not possible to make any determination as to what might be the applicable law in the present case; still less have I received factual evidence in relation to all of the potentially applicable laws. None of the defendants sought to contend that the inability of Microsoft Mobile to identify the applicable law, and so identify more specifically the places where damage had been sustained by Nokia, was fatal to Microsoft Mobile's contention that its claims fell within Gateway (9)(a). In my judgment, they were right not to do so. In a case such as this, the question of where damage has been sustained must be informed by the jurisdictional rules of the *lex fori* – by which I mean, the manner in which the Gateway has been formulated and construed, plus (when dealing with questions such as "what is damage?" and "where did that damage occur?"), the sort of "broad internationalist spirit" described by Lord Mance in *Raiffeisen Zentralbank Osterreich AG v Five Star General Trading LLC (The Mount I)* [2001] EWCA Civ 68 at [27].

154    Adopting this broad internationalist spirit, I take the approach that if Microsoft Mobile can show damage sustained within the jurisdiction on the basis of any of the candidates described in para.139 of Murray 2, the requirements of Gateway (9)(a) will be satisfied.

Assignment and disaggregation

155    The *White Book* 2016 says this at para.6.37.15.1:

"The applicant must show that each claim made by them [*sic*] has the attributes set out in at least one of the sub-paragraphs listed under para. 3.1 of 6PDB…The burden is upon the applicant to show in respect of each claim that it comes within one or other of the 'jurisdictional gateways' in para. 3.1 of 6BPD…".

156    In *Saipem SpA v Dredging VO 2 BV (The Volvox Hollandia) (No.1)* [1988] 2 Lloyd's Rep. 361 at 371–372, Kerr LJ stated:

"Given the settled principles governing the jurisdiction under O.11, there can in my view be no doubt that the plaintiffs' claims for the negative declarations in question were improperly included in their writs for service on the shipowners in Holland, even though their claims for damages could properly be pursued by means of these writs. It requires no authority that a writ for which leave is sought under O.11 may, like the curate's egg, be good in part and bad in part, in which case the plaintiffs may not proceed with those claims which are bad…"

157    Each claim that is advanced by a claimant and which that claimant seeks to pursue against a defendant outside the jurisdiction must fall within one or more of the Gateways. The question which arises is how this applies where – as here – there has been an assignment of claims. In such a case, it may – and in this case will – be necessary to consider "who is the claimant?". Where there has been an assignment, there are two candidates – the person who originally had the claim, the assignor, and the person who now has the claim, the assignee.

158    In my judgment, where the identity of the person whose "claim" is being considered for the purposes of a Gateway matters, that person is the original holder of the claim, and not the last person to whom that claim was transferred. The

jurisdictional rules must be applied not in relation to the claim as assigned (where the ultimate assignee would be regarded as the claimant) but to the claim as it originally subsisted (so that the original assignor would be regarded as the claimant).

159    This is clearly the approach of English national law. The assignee cannot, by virtue of the assignment, be in a better position than the assignor would have been in. This is reflected in the damages that the assignee can recover if a cause of action is assigned to him (where the rule is that the assignee cannot recover more than the assignor could have done[65]) and in the fact that an assignee is bound by choice of jurisdiction and arbitration clauses.[66]

160    Such an approach is, I have no doubt, entirely consistent with Lord Mance's "broad internationalist spirit". In the *CDC* [2015] 5 C.M.L.R. 4 case considered in [78ff] above, the Court of Justice considered that, for jurisdictional questions, it was necessary to have regard to the status of the original claimant and that jurisdiction clauses binding on an original claimant were also binding on that claimant's successor in title:

> "35. Given that the circumstances of the present case are characterised by the consolidation of a number of potential claims for damages brought by the applicant in the main proceedings which had been assigned to the applicant by several undertakings allegedly victims of the Hydrogen Peroxide cartel, it should be pointed out from the outset that the transfer of claims by the initial creditor cannot, by itself, have an impact on the determination of the court having jurisdiction under Article 5(3) …
>
> …
>
> 65. Only where a party not privy to the original contracting party's rights and obligations in accordance with national substantive law as established by the application of the rules of private international law of the court seised of the matter could that third party nevertheless be bound by a jurisdiction clause to which it had not agreed…"

Substantial damage

161    In *Berezovsky v Forbes Inc (No.1)* [2000] 1 W.L.R. 1004 at 1012, Lord Steyn – considering the old formulation of the Gateway – held that "a tort committed within the jurisdiction must be a real and substantial one".

162    Unlike the equivalent jurisdictional base under the Brussels I Regulation (Recast), where jurisdiction only exists in respect of such damage as was sustained within the jurisdiction, this Gateway gives jurisdiction in respect of damages sustained both within and without the jurisdiction. In *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391 at 437, the Court of Appeal noted:[67]

> "As the rule now stands it is plain that jurisdiction may be assumed only where (a) the claim is founded on a tort and either (b) the damage was sustained within the jurisdiction or (c) the damage resulted from an act committed within the jurisdiction…Condition (b) raises the question: what damage is referred to? It was argued for A.C.L.I. that since the draftsman had used the definite

---

[65] *Dawson v Great Northern & City Railway Co* [1905] 1 K.B. 260 at 272–273 (*per* Stirling LJ).
[66] See, e.g., *Glencore International AG v Metro Trading International Inc (No.1)* [2000] I.L.Pr. 358 (jurisdiction clause); *Montedipe SpA v JTP-RO Jugotanker (The Jordan Nicolov)* [1990] 2 Lloyd's Rep. 11 (arbitration clauses).
[67] Emphasis added.

256          MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

article and not simply referred to 'damage', it is necessary that all the damage should have been sustained within the jurisdiction. No authority was cited to support the suggestion that this is the correct construction of the Convention to which the rule gives effect **and it could lead to an absurd result if there were no one place in which all the plaintiff's damage has been suffered. The judge rejected this argument and so do we. It is enough if some significant damage has been sustained in England**."

163     In this case, when approaching the question of whether Microsoft Mobile can show substantial damage sustained within the jurisdiction, two points must be borne in mind:

  i) Consistent with what I have found in relation to disaggregation of claims and assignments, what damage has been sustained must be assessed by reference *to that particular claim*. It is altogether irrelevant – when a number of claims had been assigned so as to be held by a single assignee – to consider whether the damages sustained in respect of one particular claim are substantial when compared to the damages sustained in respect of other claims.

  ii) The "substantial" damage test is not an absolute test – the amount of damage sustained does not have to be above a certain threshold. The test instead relates to a case where damage is sustained *both* within and without the jurisdiction. In such a case, the damage sustained within the jurisdiction must be significant relative to the damage sustained outside the jurisdiction.

      Direct and indirect damage

164     It is clear that the damage that needs to be established under this Gateway is direct, and not indirect or consequential, damage. In *Erste Group Bank* [2015] EWCA Civ 379, Gloster L.J. stated[68]:

      "106. …it seems to us that the tort gateway is not satisfied in any event on the claim pleaded because, largely for reasons already given in relation to applicable law, we have reached the clear view that the relevant damage for this purpose was sustained in New York rather than London. None of the first instance cases had treated as relevant damage a non-payment of money in England which is simply and precisely dependent upon an earlier non-payment outside England, in circumstances where there were prior arrangements, for example with an agent, that the offshore payment would be followed by an onward payment to an account within the jurisdiction. **On the contrary, the damage successfully relied upon was, in each of those cases, 'direct' damage, whether it consisted of payment of funeral expenses or a continuing loss of earnings, arising afresh month by month when salary would otherwise have been paid to the victim, but for his injury**.
      107. In the present case, the relevant loss was the destruction of the value of the Bank's receivables under the Loan Agreement and Guarantee which, for reasons already given, is properly to be regarded as having occurred in New York, that being the place of payment. **The knock-on consequence, namely**

---

[68] Emphasis supplied.

**non-payment by the Facility Agent to the Bank's facility office in London was merely reflective of that earlier loss. In relation to the Bank's share of repayments it was, dollar for dollar, the same. It was not in any rational sense a fresh, different or separate loss.** Nor was it a continuing loss, like loss of earnings."

165    In *Brownlie v Four Seasons Holdings Inc* [2015] EWCA Civ 665, the Court of Appeal also drew a distinction between direct losses and indirect/consequential losses. A claim for damages brought by the claimant on her own behalf and on behalf of her husband's estate for injuries suffered as a result of an accident in Egypt was consequential loss; on the other hand, the claimant's claim under the Fatal Accidents Act 1976 had been sustained within the jurisdiction, as it was a separate statutory cause of action brought to recover compensation for the claimant's loss of dependency, and was not consequential loss. At [91], Arden L.J. stated:

"To sum matters up on this issue, concerning Lady Brownlie's tort claims, therefore, I would agree with the doubts expressed by this court in*Erste Group Bank* [2015] EWCA Civ 379 about claims for consequential loss for foreign accidents being within the tort gateway. I would allow the appeal in respect of Lady Brownlie's personal claim and in respect of the LRMPA34 claim…However, for the reasons given above, I would dismiss the appeal in so far as it relates to Lady Brownlie's own tort claim under the FAA76."

(iv) Application in the present case

166    I turn to consider whether Microsoft Mobile has demonstrated a good arguable case that, as a result of the tortious claims alleged by it, damage has been sustained within the jurisdiction.

Microsoft Mobile's first contention: damage because Nokia and/or the claimant purchased 12.1 million units from D1/Sony Europe

167    The relevant part of Murray 1 – para.33(a) – was set out in [144] above. Essentially, it is said that 12.1 million units of Li-ion Batteries were purchased from D1/Sony Europe *by one or more companies within the Nokia group and/or Microsoft Mobile, without differentiating between these entities*. No further information is provided.

168    This point is very clearly highlighted in Wheeler 2:

"The only potentially relevant factor identified by Mr. Murray is the statement at paragraph 33(a) that 'in the Cartel Period and/or the Run-Off Period, Nokia and/or the claimant purchased 12.1 million units from the First Defendant, which, as set out above, is a company located in the UK and incorporated under English law'. As to this:

13.1 Purchases from an English company do not equate to damage suffered in England and Wales. In order to establish that any of this damage was suffered in England and Wales, the claimant must address the following:
   a) which Nokia entity bought the products;

258          MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

> b) where payment for the products was made from; it appears from the Amended Claim Form (para 4) that the relevant bank accounts are likely to have been in Switzerland;
>
> c) where payment for the products was made to; just because the products were purchased from an English incorporated company, it does not follow that payment was made to an English bank account; and
>
> d) where the products were delivered to and what they were used for following delivery; just because batteries were bought from an English company, it does not follow that they were delivered to England and Wales or that they were used in England and Wales.

> 13.2 The alleged number of purchases is in any event not sufficient to demonstrate that significant direct damage was suffered in this jurisdiction. As LG Chem has pointed out (Botteman 1/para.24), even if all of the 12.1 million units of sales relied upon reflect direct damage suffered in this jurisdiction, these are less than half of one percent of the sales in issue."

169   Taking a point against himself, Mr. Wheeler identified (in para.15 of Wheeler 2) "at most €592,659 worth of the relevant products (i.e. approximately 200,000 units) to Nokia companies in the UK in the relevant period (all between 2002 and 2009)", which Mr. Murray seized upon in para.142 of Murray 2 to bolster Microsoft Mobile's arguments. Before me, it was common ground that some €250,000 of these sales – being sales to a former Nokia subsidiary, Vertu Ltd – could not count, but apart from these sales to Vertu Ltd, I take these additional sales in the UK into account.

170   In para.24 of Botteman 1, an attempt is made to put the volume of UK sales into perspective:

> "…the figure of 12.1 million sales is vanishingly small in the context of this claim. The claimant's case is that during the alleged infringement period it purchased over *three billion* units. Even if 12 million units *were* sold to Nokia in England and Wales during the infringement period…those sales would be *less than half of one percent* of the sales which are in issue in the case."

171   Apart from referencing the Sanyo sales mentioned in Wheeler 2 (see para.142 of Murray 2), paras 138–141 of Murray 2 really only repeat the facts stated in Murray 1, and no further substantive factual point is made.

172   In these circumstances, I hold that Microsoft Mobile has not made out a good arguable case that the requirements of Gateway (9)(a) have been met:

  i) Had Microsoft Mobile been able to show that – on one of the bases listed in para.139 of Murray 2, and set out at [152] above – a single entity within Nokia had sustained losses as a result of the UK sales by D1/Sony Europe then its position would be difficult enough. It is hard to see how the damage sustained as a result of the sales of 12.1 million units within the jurisdiction can be significant or substantial when (relative to the overall sales of Li-ion Batteries) this is but a tiny proportion of those overall sales.

  ii) But Microsoft Mobile cannot even show which entity within Nokia purchased these 12.1 million units. As was pointed out in [20] above, Microsoft Mobile is entirely unable to state or identify any specific link

between Li-ion Batteries sold by D1/Sony Europe in the UK and Li-ion Batteries purchased by any specific Nokia entity. In other words, the damage – such as it is – may have been suffered by multiple Nokia entities, because there may have been multiple purchasers within Nokia of these 12.1 million units.

iii) What is more, as Mr Beal QC frankly acknowledged (see [20]), it was not even possible to say whether these Li-ion Batteries were purchased directly by an entity within Nokia, using a common purchasing agent, so that there was a direct purchase and "direct" damage, or whether there was a chain of sales and purchases within Nokia, whereby one subsidiary purchased and on-sold to another – which would or would very likely be "indirect" damage.

Microsoft Mobile's second contention: damage because the PPAs are governed by English law and article 4(3) of Rome II applies

173    It is common ground that the PPA between D2/Sony Corporation is governed by English law: see [35] above. Other PPAs are also governed by English law, albeit not all.

174    Article 4 of Rome II provides:

"1. Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.
2. However, where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the same time when the damage occurs, the law of that country shall apply.
3. Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in paragraphs 1 and 2, the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort/delict in question."

175    Microsoft Mobile is thus relying on the second alternative choice of applicable law – what Recital (18) of Rome II refers to as an "escape clause" – as indicating that *English law* is the applicable law. The reason it is said the escape clause is triggered is because there is a manifestly close connection between the torts pleaded in the Amended Particulars of Claim and the English choice of law provisions in (some of) the PPAs.

176    I find this argument entirely unpersuasive, and I reject it for the following reasons:

i) Article 4 of Rome II is concerned with identifying the applicable law in the case of non-contractual obligations arising out of a tort/delict. It is quite clear that art.4(3) is a provision that will only rarely be triggered and then only when there is a "manifestly closer connection". I would take some persuading that art.4(3) pertained in the present case.

260        MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

ii)  However, I do not see how or why it is necessary to descend into the finer questions of what law is applicable. I have already accepted Mr Murray's point that identifying the applicable law is something that is not possible at this stage of the proceedings. As I have made clear, in my view the appropriate course, when considering whether there is or is not damage within the jurisdiction of England and Wales, is to apply a test that is based upon the "broad internationalist spirit" described by Lord Mance. I am – for the purposes of these applications – quite prepared to apply any one or all of the candidates listed in para.139 of Murray 2 (as set out in [152] above).

iii)  The problem that Microsoft Mobile faces is thus *not* the difficulty of identifying the applicable law and persuading me that it is the law of England and Wales. That is a difficulty that does not, in my judgment, arise. The problem that Microsoft Mobile *does* have is that the factual material it has adduced is too insubstantial to indicate that damage was sustained in the jurisdiction, *whatever* the applicable law.

iv)  In short, this contention, based as it is on no additional factual evidence, takes matters no further. All it does, unhelpfully from the perspective of Microsoft Mobile, is to suggest a close connection between the pleaded tortious claims and the PPA which, of course, contains the arbitration clause on which D1/Sony Europe and D2/Sony Corporation rely. To that extent, this is a point against Microsoft Mobile as regards the s.9 applications of these defendants.

Microsoft Mobile's third contention: damage through the sale of handsets in England and Wales and "volume effects"

177    The third contention advanced in para.33(c) of Murray 1 is that Nokia and/or Microsoft Mobile sold substantial quantities of handsets in England and Wales over the Cartel Period and Run-Off Period, and that there is the potential that Nokia and/or Microsoft Mobile suffered loss through "volume effects".

178    By volume effects, I mean that Nokia and/or Microsoft Mobile may have passed on to their customers (the ultimate purchasers of the handsets containing the Li-ion Batteries) any overcharge paid by them to the Cartelists. To this extent, therefore, neither Nokia nor Microsoft Mobile would have sustained any loss through the overcharge, but they might have sustained a loss by selling fewer handsets because of the higher price that was passed on to consumers.

179    Damages arguments of this type are fairly common in competition cases. But in my judgment, in order to found a good arguable case that the claims fall within the Gateway, something more than a theoretically possible contention must be advanced. Whilst, for the sake of argument, I am prepared to accept that Nokia and/or Microsoft Mobile sold considerable volumes of handsets in the UK market, there is no evidence before me of:

i)  Any pass-on to consumers.
ii)  Any loss arising by reason of fewer handsets being sold.

180    Indeed, it is important to note that both in the Amended Particulars of Claim and in Murray 1, damage of this sort is expressly disavowed. All Microsoft Mobile

does is keep open the option of taking the point (for whatever it may be worth) later on. Paragraph 33(c) of Murray 1 states[69]:

> **"While the claimant does not consider that there has been any 'pass on' of the cartelised prices to its own customers**, **if** the defendants were, on the contrary, to show that its higher prices had been passed on to the claimant or Nokia's own customers, then any higher sales prices that resulted from an increase in the costs of its component products would have caused the claimant and/or Nokia to suffer lower volume of sales…That would in turn have caused loss to be sustained by them within England and Wales. Moreover, in that event, it would also be the case that UK consumers and/or businesses also suffered significant damage as a result of the defendants' unlawful conduct."

181    I reject the suggestion that a contention that a claimant is in terms *not* advancing can amount to a good arguable claim. Furthermore, were Microsoft Mobile to make such a positive case, then it would once again be important to understand at least something of the factual basis for the assertion that damage has been sustained within the jurisdiction. For instance, I have been told nothing about how Nokia sold its handsets to the ultimate consumer; nor has there been any kind of explanation as to how such volume effects might manifest themselves.

Microsoft Mobile's fourth contention: purchases by Nokia UK Ltd

182    Paragraph 116.2 of Microsoft Mobile's written submissions states that "[t]he entities within Nokia that made purchases of Li-ion Batteries, in respect of whose purchases the claim is brought, include Nokia UK Ltd which is established in the UK", and has its registered office in the UK.

183    Microsoft Mobile has pleaded that Nokia UK Ltd was a part of the Nokia group: see Appendix 1 to the Amended Particulars of Claim. It may be that (as pleaded) Nokia UK Ltd purchased Li-ion Batteries – but beyond that it is impossible to go. It is not said how many units were purchased; it is not said from whom these units were purchased or where; it is not said whether these purchases were direct purchases or indirect purchases, or at what prices. The only point that is of any evidential substance is the fact that Appendix 1 of the PPA lists various Nokia "manufacturing centres". None are UK based; all save one (which is based in Germany) are outside the EU. One "distribution centre" is identified: it is based in Hong Kong. Nokia UK Ltd is not listed, and the inference must be that Nokia UK Ltd did not purchase Li-ion Batteries directly from D1/Sony Europe or D2/Sony Corporation.

184    I do not consider the bare assertion that Nokia UK Ltd purchased some Li-ion Batteries somewhere from someone to be sufficient to bring the claims in the Amended Particulars of Claim within Gateway (9)(a).

*(5) Conclusion on Gateways*

185    For the reasons I have given, Microsoft Mobile cannot demonstrate that the claims pleaded in the Amended Particulars of Claim, or any of them, fall within either Gateway (3) or Gateway (9).

---

[69] Emphasis added.

262    MICROSOFT MOBILE OY (LTD) v SONY EUROPE LTD

### G. Clearly and Distinctly the Proper Forum for the Trial

186    The claimant must show that England and Wales is clearly and distinctly the proper forum for the trial of the claims. The test derives from the well-known decision of the House of Lords in *Spiliada Maritime Corp v Cansulex Ltd (The Spiliada)* [1987] A.C. 460; [1987] E.C.C. 168 at 481:

> "The effect is, not merely that the burden of proof rests on the plaintiff to persuade the court that England is the appropriate forum for the trial of the action, but that he has to show that this is clearly so. In other words, the burden is, quite simply, the obverse of that applicable where a stay is sought of proceedings started in this country as of right."

187    The factors that need to be taken into account are easily stated in general terms. They comprise[70]:

    i)  the personal connection which the parties have to England;
    ii)  the factual connections which the events have with England;
    iii)  the question which law should apply. The possibility of there being a *lis pendens* in another court; and
    iv)  the possibility that other persons may become party to, and affect the overall shape of, the litigation.

188    In the present case, the status of the proceedings against D1/Sony Europe polarised the submissions of Microsoft Mobile on the one hand and the defendants on the other. Microsoft Mobile stressed that with a claim commenced as of right against D1/Sony Europe in this jurisdiction, the natural jurisdiction for the rest of the claims against the other defendants was this jurisdiction too. In para.125 of its written submissions, Microsoft Mobile stated:

> "England and Wales is the proper forum for these proceedings. Where, as in this case, there is a multi-jurisdictional cartel operating globally, there is in principle no unique natural home for any particular litigation. However, as set out above, C has a viable, and substantial, claim against D1 for the entirety of its losses on a joint and several basis which will proceed in this jurisdiction. In the light of that, the Master correctly concluded that the clearly and distinctly more appropriate forum for the rest of the claims against D1's joint tortfeasors was also England and Wales. That represents the most economic and timely use of resources; it will minimise the risk of conflicting decisions; and it will prevent the unnecessary duplication of costs for the parties. Indeed, if the Ds were acting rationally, rather than strategically, they would agree."

189    The defendants, by contrast, stressed the following points:

    i)  That proceedings had been brought against D1/Sony Europe for the sole reason of establishing jurisdiction against the other defendants. The defendants sought to contend that this was a relevant factor at the stage of Gateway (3), and I have rejected that contention. However, it is relevant here.
    ii)  That the place of the tort was not England and Wales. As to this:

---

[70] See *Briggs*, paras 4.23–4.28.

a) Whilst accepting that "the variety of circumstances is infinite" and that the over-arching principle is as stated in *The Spiliada* [1987] A.C. 460,[71] the defendants stressed the importance of the place of the commission of the tort. The relevant authorities are set out by Lord Mance in *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5:

> "14. In the present case, VTB relies upon the words of Robert Goff L.J. in an earlier Court of Appeal case: *Cordoba Shipping Co v National State Bank, Elizabeth, New Jersey (The Albaforth)* [1984] 2 Lloyd's Rep. 91, and the acceptance of that case as consistent with *The Spiliada* [1987] A.C. 460 by the House of Lords in the later case of *Berezovsky* [2001] I.L.Pr. 21. In *Cordoba* [1984] 2 Lloyd's Rep. 91, 96 Robert Goff LJ deduced from earlier case law that:
>
> > 'where it is held that a court has jurisdiction on the basis that an alleged tort has been committed within the jurisdiction of the court, the test which has been satisfied in order to reach that conclusion is one founded on the basis that the court, so having jurisdiction, is the most appropriate court to try the claim, where it is manifestly just and reasonable that the defendant should answer for his wrongdoing. This being so, it must usually be difficult in any particular case to resist the conclusion that a court which has jurisdiction on that basis must also be the natural forum for the trial of the action. If the substance of an alleged tort is committed within a certain jurisdiction, it is not easy to imagine what other facts could displace the conclusion that the courts of that jurisdiction are the natural forum. Certainly, in the present case, I can see no factors which could displace that conclusion.'
>
> 15. In *Berezovsky* [2001] I.L.Pr. 21 a challenge to the consistency of this approach with *The Spiliada* [1987] A.C. 460 was rejected by Lord Steyn in a speech with which the other two members of the majority agreed: speaking of a line of authority in which the approach taken in *The Albaforth* [1984] 2 Lloyd's Rep. 91 had been followed, he said, at p.1014:
>
> > 'The express or implied supposition in all these decided cases is that the substance of the tort arose within the jurisdiction. In other words the test of substantiality as required by *Kroch v Rossell et Compagnie société à responsabilité limitée* [1937] 1 All E.R. 725 was in each case satisfied. Counsel for Forbes argued that a prima facie rule that the appropriate jurisdiction is where the tort was committed is inconsistent with *The Spiliada* [1987] A.C. 460. He said that *The Spiliada* admits of no presumptions.

---

[71] See *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5 at [18] (*per* Lord Mance).

The context of the two lines of authority must be borne in mind. In *The Spiliada* the House examined the relevant questions at a high level of generality. The leading judgment of Lord Goff of Chieveley is an essay in synthesis: he explored and explained the coherence of legal principles and provided guidance. Lord Goff of Chieveley did not attempt to examine exhaustively the classes of cases which may arise in practice, notably he did not consider the practical problems associated with libels which cross national borders. On the other hand, the line of authority of which *The Albaforth* is an example was concerned with practical problems at a much lower level of generality. Those decisions were concerned with the bread and butter issue of the weight of evidence. There is therefore no conflict. Counsel accepted that he could not object to a proposition that the place where in substance the tort arises is a weighty factor pointing to that jurisdiction being the appropriate one. This illustrates the weakness of the argument. The distinction between a prima facie position and treating the same factor as a weighty circumstance pointing in the same direction is rather a fine one. For my part the *Albaforth* line of authority is well established, tried and tested, and unobjectionable in principle.'"

b) In his oral submissions, Mr Beard QC emphasised that the centre of gravity of the torts pleaded by Microsoft Mobile pointed away from England and Wales[72]:

"Without wishing to sound trite, it is important to remember that the mischief of a conspiracy tort, an unlawful means tort, or indeed a breach of Article 101 TFEU, is the coming together of people. If you think about a 101 case where an overcharge is alleged, the allegation is not that the actual price of the goods is inherently unlawful. It is not inherently unlawful to price at 110p rather than a pound. What is unlawful is where people agree who are competitors that the pricing should be at 110p. It is where that agreement is going on, it is where that concerted practice or agreement occurs that is the essence of the tortious behaviour for the purposes of breach of statutory duty that is found at least in English law on the basis of Article 101.

We say the same applies in relation to issues of conspiracy, or unlawful means, in the context of these allegations, where the claims are being brought that people got together in these company groups and coordinated their behaviour. Those people were at least primarily, probably almost completely, in Japan and Korea, and possibly China. When we look at the *dramatis personae*, we see 60 people who are Japanese and Korean.

[72] Transcript Day 3, pp.423ff.

Where the meetings took place, where the communications were: those were in Japan and Korea…

We say the answer here, actually the only answer we need to give is not England and Wales. That is the only answer, not England and Wales. We can go further, and say it is Japan and Korea. We do not need to. We just have to say it is not England and Wales…"

c) Against this, Microsoft Mobile could say relatively little: plainly, the centre of gravity of the Cartel is *not* England and Wales. The best that Microsoft Mobile could say (in para.131.1 of its written submissions) was that "[i]t is not correct that all the cartel conduct complained of took place in Asia", pointing to events allegedly occurring in Finland, occasionally in Europe and to an extent in Weybridge, Surrey. Of course, I take these facts fully into account – particularly those connecting with England – but Microsoft Mobile's submissions make the defendants' point for them: the torts have a rather nebulous connection with England and Wales.

d) Perhaps Microsoft Mobile's best point was that this was a multi-jurisdictional cartel operating perhaps globally, with "no unique natural home for any particular litigation". I recognise that there is some force in this, perhaps diluting the weight of this factor in this particular case. But even so, the jurisdictions centrally engaged were *not* England and Wales, which was peripherally involved.

iii) That the language and location of the parties' witnesses and documents pointed away from England and Wales. As to this:

a) The vast majority of the companies and natural persons (from whom the factual witnesses are drawn) involved in the Cartel are not present in England and Wales. Their documents will not be in English (they will likely be in Japanese or Korean) and – although these documents can be translated – the fact is that nuance and some meaning is always lost in translation, however good the translator.

b) Microsoft Mobile did not contest this, but emphasised that Nokia's and Microsoft Mobile's documents would be in English, "which is the language in which Nokia and Microsoft conduct their business. The witnesses in question will speak English (but not Korean or Japanese)".[73]

c) The point, therefore, goes both ways. Microsoft Mobile submitted that "it is the interests of C's witnesses which should take priority. The D's witnesses have – by admission, D4 to the DoJ and D6 to the Commission – participated directly in serious infringements of competition law and their interests should not outweigh those of the witnesses representing the victims of those infringements".

d) I am disinclined to treat this as a question for a "court of morals". The issue is not who is the wrongdoer, but where best these claims may be tried. Like it or not, an understanding of how the Cartel

---

[73] Microsoft Mobile's written submissions at para.131.1.6.

266     MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

operated – in which, *ex hypothesi*, Nokia and Microsoft Mobile did not participate and of which they say they knew nothing – will be critical to the claims pleaded, and it will be a disadvantage for a court to deal with these complex factual issues through the medium of translation. By contrast, the factual questions in which Nokia and Microsoft were involved are likely to be highly technical (what was purchased; where; and for how much), but more susceptible of translation.

e) In short, this is a factor that goes both ways, and I attach relatively less weight to it for that reason. On balance, however, I consider that it points away from England and Wales as the proper forum.

iv) That the applicable law pointed away from England and Wales. None of the parties encouraged me to make any findings in respect of the applicable law – that being a matter for another time and one which (as I have noted) it is actually not possible to resolve at this stage. Although I accept that this is a factor that *can* be relevant,[74] I consider the point to be a neutral one in this case:

a) As can be seen from the table at para.16(iv) above, Microsoft Mobile contends for a whole variety of applicable laws, of which English law is but one.

b) It is clear from Microsoft Mobile's case that multiple other laws – apart from English law – will have to be considered by this court. But that would equally be true of a court of another jurisdiction hearing these claims.

v) That no point had been taken about the non-availability of a foreign forum. On this, Mr Beard, QC stated[75]:

"There is one other factor that I highlighted at the outset: alternative fora. As this is a service out case, the burden, as I have emphasised, is on Microsoft to show that England is clearly the proper forum. It is not on Samsung to show that there is an available alternative forum where the case can more appropriately be tried.

Just to be clear, Microsoft has not suggested that it cannot obtain fair justice in Japan, which we say is the natural forum, or indeed Korea, which is a far more natural forum than here…"

It was D6/Samsung's case that Japan was the natural forum, closely followed by Korea[76]; D4/LG Chem regarded Japan and Korea as equally good.[77] Clearly, a potent indicator in favour of England and Wales would be an absence of other fora in which the dispute could be tried. Microsoft Mobile made no such contention.

190     As Microsoft Mobile has stressed, and as cannot be gainsaid, proceedings have been commenced against D1/Sony Europe as of right. However:

---

[74] See *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5 at [45]–[49] (*per* Lord Mance).
[75] Transcript Day 3 at pp.45ff.
[76] See the written submissions of D6/Samsung at para.153.
[77] See the written submissions of D4/LG Chem at para.70.

   i) I have determined that the proceedings against D1/Sony Europe (and, which is less to the point for present purposes, D2/Sony Corporation) should be stayed pursuant to s.9 of the Arbitration Act 1996.

   ii) I have also determined that, essentially by reason of this stay, Microsoft Mobile cannot bring the claims it has pleaded within Gateway (3).

   iii) For reasons unrelated to the stay against D1/Sony Europe, I have concluded that Microsoft Mobile cannot bring the claims it has pleaded within Gateway (9)(a).

191    It follows that, on the basis of these findings, we do not actually get to the third requirement: Microsoft Mobile's claim to serve out of the jurisdiction fails at the second hurdle, and the order of the Master permitting service out of the jurisdiction will have to be set aside. However, it follows from what I have said so far, that were I to decide the third requirement, I would conclude that Microsoft Mobile had failed to show – let alone show clearly – that England and Wales is clearly and distinctly the proper forum.

192    If, however, I am wrong on the application of the arbitration clause or on its relevance to the application of Gateway (3), then matters take on a different complexion. There are two possibilities:

   i) If I am *right* that the arbitration clause is sufficiently wide to embrace the claims pleaded by Microsoft Mobile, but *wrong* in concluding that this fact is a relevant consideration when determining whether the claims are outside Gateway (3), then – whilst the stay pursuant to s.9 of the Arbitration Act 1996 is effective against D1/Sony Europe (and D2/Sony Corporation) – the Master's decision to permit service out stands. It would be for the other Defendants to seek a stay of the proceedings against them, on the basis that there is a more appropriate forum elsewhere. Microsoft Mobile put the point in this way in para.147 of its written submissions;

> "D4 and D6 appear to apply for a stay on *forum non conveniens* grounds. The draft Orders filed in support of their applications include provision to this effect. Much of the supporting evidence, however, goes to the separate question of whether C satisfied CPR 6.37(3) at the time it applied for permission to serve out…This confusion underpins an apparent contention that the burden of proof lies with C. To be clear, while C accepts that it bears the burden of showing that CPR Rule 6.37(3) was satisfied at the time of the order for service out, the burden in respect of any separate *forum non conveniens* application which D4 and/or D6 wish to pursue lies squarely with them."

This analysis is clearly correct: on this basis, given the factors set out in [189] above, and the fact of the stay against the anchor defendant, I would have acceded to such applications had it been necessary that they be moved.

   ii) If I am *wrong* on the more fundamental question of the stay itself, then D1/Sony Europe will have been joined as of right in circumstances where it cannot deploy the arbitration clause. In this case:

      a) The requirements of Gateway (3) will have been met; and

268          MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

  b) There is no power to stay the proceedings against D1/Sony Europe, because of the decision of the Court of Justice in *Owusu v Jackson (t/a Villa Holidays Bal Inn Villas)* (C-281/02) [2005] I.L.Pr. 25.

The question that arises on this basis is whether – at the third stage of the inquiry, and given that the proceedings against D1/Sony Europe will inevitably continue – England and Wales is clearly and distinctly the proper forum for the trial of the claims against the other defendants. It is to this question that I now turn.

193    The problem is that, whereas under the English rules, a claim commenced as of right against a defendant could, in appropriate circumstances, be stayed, under the Brussels I Regulation (Recast) there is no such power. The proceedings against D1/Sony Europe will continue and there is at least the prospect:

  i) That further parties will be dragged into these proceedings, by D1/Sony Europe seeking to advance Part 20 claims against other parties.
  ii) Of inconsistent outcomes because of duplicative proceedings taking place in other jurisdictions.

194    Both of these are powerful points indicating in favour of this jurisdiction, and they clearly would need to be taken into account when deciding the proper forum for trial as against the defendants apart from D1/Sony Europe.

195    Two questions arise:

  i) What is the proper test to apply in these circumstances?
  ii) Applying that test, how is the third requirement to be determined?

196    *Briggs* suggests (at p.473) that the "correct analysis may be that if the court would have set aside service if it had not been for the decision in *Owusu*, it should still generally set it aside notwithstanding the effect of *Owusu*". In effect, the approach suggested by *Briggs* is – as regards defendants not subject to the Brussels I Regime (Recast) – to pretend that the anchor defendant who *is* subject to that regime is not so subject. That, as it seems to me, is a denial of reality which has the consequence of causing the court simply to disregard the very real adverse consequences of proceedings continuing against the anchor defendant but not against the other defendant(s). This is an approach that I accordingly reject.

197    On the other hand, it would be wrong to allow the fact that proceedings will inevitably continue against the anchor defendant *automatically* and without more to determine what should happen in relation to the other defendants.

198    The proper course, as it seems to me, is to apply the *forum conveniens* test as I have described it, but taking these factors into account. Obviously, this has the effect of skewing the scales in favour of proceedings continuing in this jurisdiction (since the proceedings against the anchor defendant cannot be stayed), but it is not the case that these weighty factors cannot be outweighed by factors going the other way. There have been a number of cases where – notwithstanding the continuation or threatened continuation of proceedings against the anchor defendant – a court has been prepared to decide that the proceedings against the other defendants should not so continue:

  i) In *OJSC Oil Co Yugraneft v Abramovich* [2008] EWHC 2613 (Comm) at [490], Christopher Clarke J noted:

> "*Owusu* mandates that any claim, if valid, against Millhouse must be determined here. But that is not a ground for bringing in a defendant if England is an inappropriate forum. It is obvious to me that the primary reason for suing Millhouse, with minimal net assets, is to provide the anchor on which to tether a claim against Mr. Abramovich. Had it been relevant, I would have loosed the chain."

ii) In *Pacific International Sports Clubs Ltd v Soccer Marketing International Ltd* [2009] EWHC 1839 (Ch), Blackburne J. stated:

> 111. … It follows, therefore, that neither the doctrine of *forum non conveniens* nor the application 'reflexively' of articles of the Judgments Regulation provides grounds for staying the pursuit by Pacific in this jurisdiction of its claims against SMI. Does this mean that, given Pacific's wish to pursue its claims against SMI in this jurisdiction, this court should allow Pacific to continue to pursue its claims against the other defendants in this jurisdiction notwithstanding that, as against those other defendants, application of the doctrine of *forum non conveniens*, unaffected in the case of those other defendants by the impact of the Judgments Regulation, indicates that Pacific's claims against those others should be pursued in Ukraine?
>
> 112. I am not persuaded that it does. According to the particulars of claim in this action, SMI is, like the BVI defendants, a relatively minor player in the dispute: it was no more than the means whereby Mr. Surkis held and was able to take control of Dynamo. The principal dispute is undoubtedly between Pacific on the one hand and Mr. Surkis and Mr. Zgursky on the other. To allow the fact that the doctrine of *forum non conveniens* cannot be applied to SMI to dictate where the dispute as a whole must be tried would be, in my view, to allow the tail to wag the dog. In particular, I see no reason why, given my conclusions in relation to the application of the doctrine of *forum non conveniens* to the other defendants, I should not stay the action against Mr. Surkis and set aside the permission order, and with it service of the claim form on the BVI defendants, leaving it to Pacific to pursue its dispute with those persons (and SMI if it wishes) in the courts of Ukraine…"

iii) In *OJSC TNK-BP Holding v Beppler & Jacobson Ltd (In Provisional Liquidation)* [2012] EWHC 3286 (Ch) at [313], Mr Andrew Sutcliffe, QC sitting as a Deputy High Court Judge stated:

> "It is necessary to consider the possibility of parallel proceedings in England and Russia. Mr. Kitchener accepts that *Owusu v Jackson* [2005] Q.B. 801 prevents this court from declining jurisdiction over the claim against BJUK on *forum conveniens* grounds. Accordingly, if the claim against this anchor defendant is viable it may continue even if permission to sue the Applicants is refused. The result might be the existence of parallel proceedings in Russia and England. However, as Mr. Kitchener points out, if this is of concern to Holding, the solution is in its own hands. It can join BJUK as a defendant to any Russian proceedings … This is a case where it is important to have regard to

270    MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

> Lloyd L.J.'s observation in *The Goldean Mariner* [1990] 2 Lloyd's Rep. 215 at 222…The fact that Russia is the natural forum means that the claim against BJUK should not dictate the location of trial against the Applicants."

199    Considering, therefore, whether England and Wales is clearly and distinctly the proper forum for the hearing of the claims against D2/Sony Corporation, D4/LG Chem and D6/Samsung on the assumption that the proceedings against D1/Sony Europe continue in this jurisdiction, it would have been my conclusion that this third requirement was satisfied and that the Master's order should stand. My reasons are as follow:

   i) As I have already stated, absent the continuation of proceedings against D1/Sony Europe, the case against England and Wales being a proper forum as regards the other Defendants is compelling and one-sided: see paragraph 189 above.

   ii) On the other hand, the potential for duplicative proceedings in multiple jurisdictions is an evil that ought to be avoided, albeit not at any price. I also have well in mind that – given my conclusion regarding the *reason* for the proceedings against D1/Sony Europe (see [189(i)] above) – D1/Sony Europe has been used to bring in the other defendants. It must also be acknowledged that Microsoft Mobile could easily decide that the proceedings it has begun against D1/Sony Europe could be stopped in light of proceedings in respect of the Cartel elsewhere.

   iii) I find these considerations finely balanced. The factor that in my mind determines matters in favour of allowing the claims against the other defendants to proceed is that (unlike in *OJSC Oil Co Yugraneft v Abramovich* [2008] EWHC 2613 (Comm) and *Pacific International Sports Clubs Ltd v Soccer Marketing International Ltd* [2009] EWHC 1839 (Ch)), D1/Sony Europe is a substantial entity in its own right. It is well-able to pay significant damages and well-worth suing in its own right. Moreover, if it so chooses, it may well seek to bring in other parties by way of Part 20.

200    Accordingly, had my decision regarding the s.9 stay been otherwise, my decision on this part of the Applications would have been different also. As it is, I set aside the order of Master Clark and with it the service of these proceedings on D2/Sony Corporation, D4/LG Chem and D6/Samsung.

**H. Not Full and Frank**

201    It follows that I do not need to determine whether the order of the Master should be set aside on the ground of material non-disclosure by Microsoft Mobile. However, because I was addressed on the point, and in case the matter goes further, I deal with it.

202    The relevant principles that I must apply were set out by Warby J in *Sloutsker v Romanova* [2015] EWHC 545 (QB) at [51]:

> "The relevant general principles are these:
>     i) An applicant for permission to serve proceedings outside the jurisdiction is under a duty of full and frank disclosure which applies on all applications without notice.

ii) The duty requires the applicant to make full and fair disclosure of those facts which it is material for the court to know: *Brink's-MAT Ltd v Elcombe* [1988] 1 W.L.R. 1350, 1356 (1) and (2) (Ralph Gibson LJ). Put another way, disclosure should be made of "any matter, which, if the other party were represented, that party would wish the court to be aware of": *Arab Business Consortium International Finance & Investment Co v Banque Franco-Tunisienne* [1996] 1 Lloyd's Rep. 485, 489 (Waller J).

iii) Non-disclosure of material facts on an application made without notice may lead to the setting aside of the order obtained, without examination of the merits. It is important to uphold the requirement of full and frank disclosure.

iv) But the court has a discretion to set aside or to continue the order. Whether the fact not disclosed is of sufficient materiality to justify or require immediate discharge of the order without examination of the merits depends on the importance of the fact to the issues that were to be decided. The answer to the question whether the non-disclosure was innocent is an important, though not decisive, consideration. See *Brink's-MAT* [1988] 1 W.L.R. 1350 at pp.1357(6) and (7) and 1358 (Balcombe LJ).

v) In the context of permission for service outside the jurisdiction the court has a discretion to set aside the order for service and require a fresh application, or to treat the claim form as validly served and deal with the non-disclosure by a costs order: *NML Capital Ltd v Argentina* [2011] UKSC 31 at [136] (Lord Collins)."

203    A helpful distillation of the correct approach was given by Kerr J in *BP Exploration Co (Libya) Ltd v Hunt (No.1)* [1976] 1 W.L.R. 788; [1976] 3 All E.R. 879 at 894[78]:

"… the court should not consider the supporting affidavit as though it were marking an examination paper, deciding one way or the other merely on the basis of the extent to which the affidavit could have been improved. The primary question should be whether in all the circumstances the effect of the affidavit is such as to mislead the court in any material respect concerning its jurisdiction and the discretion under the rule."

204    In *DSG Retail Ltd v Mastercard Inc* [2015] CAT 7 at [44], Roth J noted:

"44. This application was heard without notice, as is usually the case for an application for permission to serve out. As on any application without notice, the applicant is under a duty to make full and frank disclosure of matters material to the application. That means not only that care needs to be taken in setting out the factual basis for the application, but also that the Tribunal's attention should be drawn to any significant objections to the application that the defendants could reasonably be expected to raise if they were before the Tribunal. The duty does not require disclosure to the same degree as on an application for a without notice injunction, such as a freezing order, where granting the application has immediate and potentially serious consequences for the defendant. The factors relevant to an application to serve out are only

---

[78] Cited with approval in *Konamaneni v Rolls Royce Industrial Power (India) Ltd* [2002] I.L.Pr. 40 at [182] (*per* Lord Collins), itself cited with approval in *Heraeus* [2016] EWHC 1369 (Ch) at [63] (*per* Mann J).

those which relate to the limited inquiry the Tribunal carries out in determining whether to grant such permission. Nonetheless, within the limited scope of that inquiry, if the claimant is aware of such factors as might cause the Tribunal to doubt whether permission should be granted, they should be clearly disclosed …

45. In applications before the Tribunal, it will often be more appropriate for such disclosure to be made in a statement accompanying the claim form and similarly attested by a declaration of truth, rather than in the claim form itself. The Tribunal cannot be expected to go through a long claim form or Particulars of Claim teasing out material objections to service out of the jurisdiction. Moreover, since the Tribunal will generally seek to deal with such applications on the papers, compliance with the duty of full and frank disclosure cannot be left to counsel's skeleton argument for a hearing since in most cases there will not be a hearing."

205    Four points were taken by the defendants in relation to what were said to be material deficiencies in the evidence before Master Clark:

   i) First, it was said that Microsoft Mobile failed to draw to the Master's attention the full position regarding damage sustained in the jurisdiction. D4/LG Chem's written submissions stated:

   "76. First, whilst relying on [Gateway (9)(a)], the claimant failed to point out that it was unable to establish that any significant damage (or indeed any damage at all) had been incurred in England and Wales. Instead, Murray 1 sought to rely on sales of the relevant products made by the First Defendant, without going on to elucidate the critical fact whether those sales were made in England or whether they were made to Nokia entities located elsewhere …

   77. Further, the claimant failed to point out to the Court that, given the inadequacy of its evidence in relation to the place in which damage occurred, the defendants would have a good argument that [Gateway (9)(a)] was not satisfied.

   78. Second, the claimant failed in its application and evidence to present the position in relation to each individual assignee, and wrongly proceeded on the fundamentally flawed basis that all of the assignees' claims are to be treated not as separate claims but as if all of the sales had been made to a single entity. The claimant failed to explain to the Court that the defendants would have an argument that evidence of loss having been caused to one Nokia entity in England would be insufficient to fulfil [Gateway (9)(a)] in respect of the whole claim."

   ii) Secondly, it was contended that Microsoft Mobile had failed to draw to the Master's attention the range of factors pointing to Japan or Korea as being more appropriate *fora*. These factors have already been described in [189] above. Paragraph 79 of D4/LG Chem's written submissions stated:

   "Third, the claimant failed to draw to the Court's attention the wealth of factors indicating that Japan and South Korea are much more closely connected to the claim than England. The only discussion of Japan and South Korea as alternative fora was in Murray 1, §50. This (i)

made the point that neither of these jurisdictions "is the home jurisdiction of all of the defendants", and (ii) sought to minimise the linguistic difficulties in bringing a claim in England. Nowhere has the claimant drawn to the Court's attention the factors set out…above and notably that:

> (a) the pleaded conduct giving rise to the alleged infringement took place entirely (alternatively, almost entirely) in Japan and Korea;
> (b) the persons alleged by the claimant to have been involved all appear to be in Japan or Korea;
> (c) most of the documents are likely to be held in Japan and South Korea; and
> (d) most of the damage that is alleged to have been caused to the claimant was not even sustained in the EEA, let alone in England and Wales. Given that this claim does not extend to damage suffered in the United States, most of the loss is likely to have been suffered in Asia."

iii) Thirdly, it was contended that Microsoft Mobile had failed to draw to the Master's attention that there was a good argument that D1/Sony Europe had only been sued in order to found jurisdiction against the other defendants.

iv) Fourthly, and finally, it was contended that Microsoft Mobile had failed to draw to the Master's attention the fact that the defendants were likely to raise as a defence that the claim fell outside the scope of art.101 TFEU. Paragraph 74 of D4/LG Chem's written submissions states:

> "In *Iiyama Benelux BV v Schott AG* [2016] EWHC 1207 (Ch), Mann J. recently set aside an order permitting service out of the jurisdiction on the ground *inter alia* that the claimants had not complied with their duty of full and frank disclosure. That claim was also a cartel damages claim brought mainly against defendants domiciled in Asia in respect of cartel conduct in Asia. Mann J. held that the claimants had failed properly to set out for the court the factual position in relation to purchases of the cartelised product in the EEA and had also failed to draw the court's attention to the fact that the defendants were likely to raise as a defence that the claim fell outside the territorial scope of Article 101 TFEU … Mann J. held that these omissions were 'serious' and went 'to the heart of the case'."

206    In response, Microsoft Mobile could do little more than refer me to Murray 1 and suggest that these matters – to the extent they needed to be drawn to the attention of the court – had been properly adverted to in Murray 1. I have, therefore, reviewed this statement with particular care bearing in mind the points raised by the defendants. I have also borne in mind that the mere fact that the statement might be improved upon is not the point. The question is whether the court has been misled.

207    The points raised by the defendants are all connected to the fact that – in reality – the centre of gravity of the Cartel was actually Asian, whether one has regard to the participants (both corporate and individual); the sales of the cartelised products

(the Li-ion Batteries); and many of the purchasers. Microsoft Mobile, in my judgment, wrongly downplayed these important matters by:

i) Aggregating the claims of Nokia (as a group of companies) and not differentiating between them. As a result, it was possible to present purchases from D1/Sony Europe as by a single (legal) entity, and to avoid all mention of the potential that there were chains of purchasers within the Nokia group. This was a matter which only emerged during Mr Beal QC's oral submissions (see [20] above); which is significant; and which was certainly not disclosed in Murray 1. Indeed, when seeking to distinguish *Emerald Supplies Ltd v British Airways Plc* [2015] EWCA Civ 1024 in para.41 of Murray 1, Mr Murray says at para.41(a)[79]:

> **"Nokia was a direct purchaser of Li-ion Batteries**, whereas in *Emerald* the purchasers were indirect (that is, the defendants sold the relevant product to third parties, who then re-sold it to the claimants."

This statement is incomplete at best, and positively misleading at worst. Nokia can only be described as a "direct" purchaser when viewing matters at the level of the Nokia *group*. Viewed at the more granular level of the individual companies *within the Nokia group*, matters might well be different. The fact is that Microsoft Mobile simply does not know, and this undermines the boldness of the plea (at para.150.1 of the Amended Particulars of Claim, [19(i)] above) that Nokia was a direct purchaser of Li-ion Batteries. As far as it goes, this is right: but the certainty of the averment is only achieved through the broad definition of "Nokia". This should have been drawn to the Master's attention.

ii) A consequence of this would have been that the Master would have been able to probe a little more deeply into *who* was purchasing Li-ion Batteries from D1/Sony Europe. As it was, all that Murray 1 says (at para.33(a)) is:

> "In the Cartel Period and the Run-Off Period, Nokia and/or the claimant purchased 12.1 million units from the First Defendant, which, as set out above, is a company located in the UK and incorporated under English law."

iii) No mention is made of the fact that Microsoft Mobile was unable to say *who* had purchased these 12.1 million units – save that it was some company in the Nokia group. It is worth noting – although it is a minor point[80] – that this paragraph (and also para.5(e)) makes no mention of the fact that 12.1 million units is a drop in the ocean when considered in relation to the overall sales of Li-ion Batteries.

iv) It is entirely right to say that Murray 1 is silent on factors pointing in favour of a non-English jurisdiction. Murray 1 makes the point that D1/Sony Europe is, inevitably, going to be sued in England and that it would be hugely disadvantageous to have parallel relating proceedings going on elsewhere. That, as I have already noted is an entirely fair point of great force. But – even disregarding the effect of the arbitration clause – the point is not a conclusive one, as the authorities described in [198] above demonstrate.

---

[79] Emphasis supplied.
[80] It is a minor point because the volume of sales is apparent from the Amended Particulars of Claim.

Murray 1 should have set out the factors pointing in the other direction. Paragraphs 45 to 50 of Murray 1 do not come close to a fair statement of the points that the defendants could deploy, and before me did deploy, in favour of a jurisdiction other than England and Wales.

208    These are major criticisms, going to the heart of the issue that the Master had to decide. I consider that Murray 1 fell far short of what should have been said to the Master on the application to serve out.

209    In *Arena Corp Ltd (In Provisional Liquidation) v Schroeder* [2003] EWHC 1089 (Ch) at [213], the principles according to which the court should exercise its discretion in this case are helpfully set out:

"On the basis of the foregoing review of the authorities, I would summarise the main principles which should guide the court in the exercise of its discretion as follows:

(1) If the court finds that there have been breaches of the duty of full and fair disclosure on the *ex parte* application, the general rule is that it should discharge the order obtained in breach and refuse to renew the order until trial.

(2) Notwithstanding that general rule, the court has jurisdiction to continue or re-grant the order.

(3) That jurisdiction should be exercised sparingly, and should take account of the need to protect the administration of justice and uphold the public interest in requiring full and fair disclosure.

(4) The court should assess the degree and extent of the culpability with regard to non-disclosure. It is relevant that the breach was innocent, but there is no general rule that an innocent breach will not attract the sanction of discharge of the order. Equally, there is no general rule that a deliberate breach will attract that sanction.

(5) The court should assess the importance and significance to the outcome of the application for an injunction of the matters which were not disclosed to the court. In making this assessment, the fact that the judge might have made the order anyway is of little if any importance.

(6) The court can weigh the merits of the plaintiff's claim, but should not conduct a simple balancing exercise in which the strength of the plaintiff's case is allowed to undermine the policy objective of the principle.

(7) The application of the principle should not be carried to extreme lengths or be allowed to become the instrument of injustice.

(8) The jurisdiction is penal in nature and the court should therefore have regard to the proportionality between the punishment and the offence.

(9) There are no hard and fast rules as to whether the discretion to continue or re-grant the order should be exercised, and the court should take into account all relevant circumstances."

210    In all the circumstances, given the seriousness of the non-disclosure and importance of the issues it went to, I would have discharged the order of the Master and set aside the service out on the grounds of non-disclosure.

### I. Disposition

211    For the reasons given in this judgment:

276        MICROSOFT MOBILE OY (LTD) V SONY EUROPE LTD

i) The proceedings against D1/Sony Europe are stayed pursuant to s.9 of the Arbitration Act 1996.

ii) The order for service out of the jurisdiction against the other defendants – including D2/Sony Corporation – is set aside and the service of those proceedings out of the jurisdiction is also set aside.

**Annex 1**

(footnote 1 of the judgment)

*Terms and Abbreviations Used*

| Term/Abbreviation | Meaning | First reference in Judgment |
|---|---|---|
| Applications | The defendants' applications. | Para. 28 |
| Briggs | Briggs, "Civil Jurisdiction and Judgments", 6th edn (2015). | Para. 91 |
| Brussels I Regulation (Recast) | Regulation (EU) 1251/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition of judgments in civil and commercial matters (recast). | Para. 22 |
| Cartel | An alleged cartel selling Li-ion Batteries. | Para. 5 |
| Cartelists | The undertakings allegedly participating in the Cartel. | Para. 10 |
| Claimant | Microsoft Mobile. | Para. 1 |
| D1/Sony Europe | The First Defendant. | Para. 8(i) |
| D2/Sony Corporation | The Second Defendant. | Para. 8(ii) |
| D4/LG Chem | The Fourth Defendant. | Para. 8(iii) |
| D6/Samsung | The Sixth Defendant. | Para. 8(iv) |
| Defendants | The First, Second, Fourth and Sixth Defendants. | Para. 9 |
| Downstream Products | Products into which Li-ion Batteries are incorporated. | Para. 6(i)(a) |
| Gateways | The cases where permission to serve out of the jurisdiction may be given listed in paragraph 3.1 of Practice Direction 6B of the Civil Procedure Rules. | Para. 25(ii) |
| Gateway (3) | Paragraph 3.1(3) of Practice Direction 6B. | Para. 25(ii)(a) |
| Gateway (9)(a) | Paragraph 3.1(9)(a) of Practice Direction 6B. | Para. 25(ii)(b) |
| Gateway (9)(b) | Paragraph 3.1(9)(b) of Practice Direction 6B. | Para. 25(ii)(b) |
| Li-ion Batteries | Batteries for telephone handsets. | Para. 1 |
| Li-ion Cells | Lithium ion battery cells, which are contained in Li-ion Batteries. | Para. 2 |
| Microsoft Mobile | The claimant in these proceedings. | Para. 1 |
| Murray 1 | The first statement of Mr. Robert Murray on behalf of the claimant. | Para. 24 |

| Term/Abbreviation | Meaning | First reference in Judgment |
|---|---|---|
| Murray 2 | The second statement of Mr. Robert Murray on behalf of the claimant. | Para. 29 |
| Nokia | Nokia Corporation and its relevant subsidiaries. | Para. 3 |
| PPA | Product Purchase Agreement No. 000247. | Para. 34 |
| Rome II | Regulation (EC) 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations. | Para. 16(iii)(b) |
| Run-Off Period | The period of the Cartel's operation after May 2011. | Para. 6(iii) |
| SAPA | The Stock and Asset Purchase Agreement dated 2 September 2013. | Para. 3 |
| TFEU | Treaty on the Functioning of the European Union. | Para. 48 |
| Upstream Products | Li-ion Batteries purchased either for incorporation into Downstream Products or for sale on the after-market. | Para. 6(i)(b) |
| 1995 Act | Private International Law (Miscellaneous Provisions) Act 1995. | Para. 16(iii)(a) |

### Annex 2

([29] of the judgment)

*Evidence Relied Upon by the defendants*

| | |
|---|---|
| **Gadhia 1** | First statement of Sunil Gadhia filed on behalf of D1/Sony Europe and D2/Sony Corporation. |
| **Gadhia 2** | Second statement of Sunil Gadhia filed on behalf of D1/Sony Europe and D2/Sony Corporation. |
| **Gadhia 3** | Third statement of Sunil Gadhia filed on behalf of D1/Sony Europe and D2/Sony Corporation. |
| **Botteman 1** | First statement of Yves Botteman filed on behalf of D4/LG Chem. |
| **Botteman 2** | Second statement of Yves Botteman filed on behalf of D4/LG Chem. |
| **Botteman 3** | Third statement of Yves Botteman filed on behalf of D4/LG Chem. |
| **Wheeler 1** | First statement of Jonathan Wheeler filed on behalf of the Third and Fifth Defendants. |
| **Wheeler 2** | Second statement of Jonathan Wheeler filed on behalf of the Third and Fifth Defendants. |
| **Cordell 1** | First statement of Neville Cordell filed on behalf of D6/Samsung. |
| **Cordell 2** | Second statement of Neville Cordell filed on behalf of D6/Samsung. |

| Cordell 5 | Fifth statement of Neville Cordell filed on behalf of D6/Samsung. |
|-----------|------------------------------------------------------------------|

# CHAPTER 2

# The Arbitration Agreement

## CONTENTS

1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-001
2.  What is an Arbitration Agreement? . . . . . . . . . . . . . . . . . . . .   2-002
    (a)  Statutory definition of arbitration agreement . . . . . . . . . . .   2-002
    (b)  Separability of the arbitration agreement . . . . . . . . . . . . .   2-007
    (c)  Arbitration agreements falling outside the 1996 Act . . . . .   2-015
    (d)  Mutuality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-018
    (e)  Variations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-020
    (f)  Conditions precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-022
    (g)  Other types of clauses distinguished . . . . . . . . . . . . . . . .   2-025
3.  Form of an Arbitration Agreement . . . . . . . . . . . . . . . . . . . .   2-039
    (a)  "A written agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-039
    (b)  Incorporation by reference to another document . . . . . . . .   2-045
    (c)  Incorporation by reference to "prior course of dealing" . .   2-061
4.  Content of an Arbitration Agreement . . . . . . . . . . . . . . . . . . .   2-064
    (a)  Drafting the arbitration agreement . . . . . . . . . . . . . . . . . .   2-064
    (b)  Disputes capable of being referred to arbitration . . . . . . .   2-080
    (c)  Scope of the arbitration agreement . . . . . . . . . . . . . . . . . .   2-095
    (d)  Specific wordings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-098
    (e)  Particular types of dispute . . . . . . . . . . . . . . . . . . . . . . . .   2-107
5.  Laws to be Applied to an Arbitration . . . . . . . . . . . . . . . . . . .   2-112
    (a)  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-112
    (b)  The rules governing the substance of the dispute . . . . . . .   2-115
    (c)  The law of the arbitration agreement . . . . . . . . . . . . . . . .   2-119
    (d)  The "seat" of the arbitration and the procedural law . . . . .   2-125
6.  Termination of the Arbitration Agreement . . . . . . . . . . . . . . .   2-135
    (a)  Termination by agreement . . . . . . . . . . . . . . . . . . . . . . . .   2-135
    (b)  Repudiation of the right to arbitrate . . . . . . . . . . . . . . . . .   2-136
    (c)  Abandonment of the arbitration agreement . . . . . . . . . . . .   2-139

## 1.  INTRODUCTION

**Contents of the chapter.**   This chapter is concerned with the arbitration   **2-001**
agreement. It begins by considering what constitutes an arbitration agreement. This
involves examining the statutory definition, the nature of an arbitration agreement
and different types of arbitration agreements. It also considers how an arbitration
agreement is distinguished from other types of dispute resolution clause. The next
two sections examine respectively the form and content of an arbitration agreement.
There is clearly an overlap between the two, but the meaning of an agreement in
writing for the purposes of the Arbitration Act 1996 and incorporation of arbitra-

tion agreements by reference to other documents or by a prior course of dealing are all dealt with in the former section. The section dealing with the content of the arbitration agreement provides a checklist of the matters to be included as well as considering the question of arbitrability, the separate question of the scope of the arbitration agreement and the meaning and effect of different wordings commonly used in arbitration agreements. The laws to be applied to the arbitration are then examined. Finally, the chapter looks at how the arbitration agreement may be terminated.

## 2.    WHAT IS AN ARBITRATION AGREEMENT?

### (a)    Statutory definition of arbitration agreement

**2-002**    **Definition in the 1996 Act.**    Section 6 of the Arbitration Act 1996 contains a definition of an arbitration agreement.[1] It provides that an arbitration agreement is "an agreement to submit to arbitration present or future disputes (whether they are contractual or not)".[2] An arbitration agreement is therefore a contractual undertaking by two or more parties to resolve disputes by the process of arbitration,[3] even if the disputes themselves are not based on contractual obligations.[4] The term "disputes" includes "any difference".[5] It is important to note also:

(1)    The Arbitration Act 1996 will only apply to an arbitration agreement if it is in writing or evidenced in writing.[6]

(2)    Reference to a written form of arbitration clause or to a document containing an arbitration clause constitutes an arbitration agreement if the reference is such as to make that clause part of the agreement.[7]

**2-003**    **Agreement to submit present or future disputes.**    It is clear from the definition set out above that the term "arbitration agreement" covers both (i) an arbitration clause in a contract by which the parties agree in advance that future disputes arising out of that contract will be referred to arbitration and (ii) a separate agreement not forming part of another contract to refer an existing dispute to arbitration. This separate agreement,[8] sometimes known as a "submission agreement"[9] or an

---

[1]    The definition applies to Pt I of the Arbitration Act 1996. It does not therefore apply to arbitration agreements that fall outside the Arbitration Act 1996, e.g. because they are not made in writing, or to statutory arbitration, which is dealt with in Appendix 3.

[2]    Arbitration Act 1996 s.6(1).

[3]    An arbitration agreement is not contrary to Art.6 of the European Convention on Human Rights: see, e.g. *Stretford v Football Association* [2007] EWCA Civ 238 at [34]. See further para.1-039.

[4]    For example, disputes involving tort claims: see para.2-004.

[5]    Arbitration Act 1996 s.82(1). The DAC Report explained that there was some authority for the proposition that "difference" is wider than "dispute": see para.41 of the DAC Report. See also dicta in *Amec Civil Engineering Ltd v Secretary of State for Transport* [2005] 1 W.L.R. 2339 suggesting the words "dispute or difference" might mean something more than "dispute" alone. However, any distinction is now less significant following the decision in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40: see para.2-004. See also *Lombard North Central Plc v GATX Corp* [2012] EWHC 1067 (Comm) at [20] where the court rejected the introduction of "a semantic distinction between a 'difference' and a 'dispute' reminiscent of the 'fussy distinctions' deprecated in *Fiona Trust v Privalov*".

[6]    Arbitration Act 1996 s.5(1): see paras 2-039 et seq.

[7]    Arbitration Act 1996 s.6(2): see paras 2-045 et seq.

[8]    The importance of ensuring that clear agreement has been reached was underlined in *LG Caltex Gas Co Ltd v China National Petroleum Corp* [2001] 1 W.L.R. 1892 where the Court of Appeal held

ad hoc agreement,[10] deals only with the setting up of machinery to resolve the particular dispute which has arisen between the parties.[11]

**Non-contractual claims.**    The statutory definition of an arbitration agreement[12] makes clear that disputes may be referred to arbitration whether they arise in contract or otherwise. Accordingly, claims based on a cause of action arising in tort, restitution, breach of a statutory duty or some other non-contractual cause of action may in principle fall within an arbitration agreement. Whether they do so in any particular case requires an examination of the individual arbitration agreement but the courts have generally given a broad interpretation to the scope of arbitration agreements in this regard.[13] In this context it may be possible to conclude that the non-contractual claims are so intimately connected with a contract that even an arbitration clause designed primarily for contractual claims will extend to connected non-contractual claims.[14] In *Asghar v Legal Services Commission* claims for conspiracy, misfeasance in public office and inducement to commit breach of conduct were all found to be within the arbitration agreement because "the resolution of the contractual claims cannot sensibly or practically be divorced from the resolution of the non-contractual claims."[15] Many such cases relate to claims in tort[16] based on breach of a duty of care which arises under a contract and an arbitration agreement which covers disputes "arising out of" a contract will be wide enough to include such tort claims.[17]

**2-004**

The Court of Appeal decision in *Fiona Trust v Privalov*, which was endorsed by the House of Lords, provides the principal authority for the broad approach to the construction of arbitration clauses now widely followed in the case law. The Court of Appeal stated that a "fresh start" was needed in relation to the fine and sometimes inconsistent distinctions previously made on the basis of particular wordings used in arbitration agreements.[18] In the same case in the House of Lords, Lord Hoffman confirmed that construction of an arbitration clause should start from the presumption that:

> "the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal.

---

that no separate agreement had in fact been entered into. See also *Capes (Hatherden) Ltd v Western Arable Services Ltd* [2009] EWHC 3065 (QB).

[9]    See also Art.7.1 of the Model Law.

[10]    See para.2-006.

[11]    In *Ground Rent v Treasure Services* (unreported, Chancery Division, 15 October 2014) the court applied the test referred to in *RJT Consulting Engineers v DM Engineering (Northern Ireland) Ltd* [2002] EWCA Civ 270 to determine whether or not an ad hoc arbitration agreement had come into existence. That test required that there must be evidence of the terms of the alleged ad hoc agreement, as opposed to merely evidence of its existence.

[12]    Arbitration Act 1996 s.6(1). The words " … disputes (whether they are contractual or not)" were not in the statutory predecessor, Arbitration Act 1950 s.32.

[13]    See para.2-100.

[14]    *Woolf v Collis Removal Service* [1948] 1 K.B. 11. For arbitration of the tort of conspiracy, see *Lonrho Ltd v Shell Petroleum Co Ltd* , *The Times,* 1 February 1978, Ch D, Brightman J.

[15]    *Asghar v Legal Services Commission* [2004] EWHC 1803 at [18].

[16]    See further para.2-100.

[17]    The *"Playa Larga"* [1983] 2 Lloyd's Rep. 171; The *"Ermopoulis"* [1990] 1 Lloyd's Rep. 160; The *"Angelic Grace"* [1995] 1 Lloyd's Rep. 87; *Abdullah M Fahem & Co v Mareb Yemen Insurance Co and Tomen (UK) Ltd* [1997] 2 Lloyd's Rep. 738. See further para.2-103. Similarly claims for breach of duty as a bailee would be covered.

[18]    *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40) at [12] where Lord Hoffmann, applauding the Court of Appeal's decision, said that the linguistic distinctions drawn in earlier cases "reflect no credit upon English commercial" law.

The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction".[19]

Although some analysis of the nature of the non-contractual claims being made and the terms of the particular arbitration agreement is still necessary, subsequent judicial decisions have adopted and applied the approach advocated in *Fiona Trust*. As a result the arbitration agreement will be construed so as to encompass the widest range of potential disputes that its terms will reasonably permit, including non-contractual claims and claims involving an admission of a criminal purpose.[20] For example, in *Interprods v De La Rue International*, Teare J considered that clear words would be necessary in order to exclude allegations of criminal conduct that may be relevant to the contractual obligations of the parties from the scope of the arbitration agreement.[21] This is to be contrasted with non-contractual claims that have no bearing on the performance of the parties' obligations. See *Injazat Technology Capital Ltd v Dr Hamid Najafi*, where Flaux J held that a claim for false imprisonment relating to an order preventing the defendant from leaving the jurisdiction was not within the scope of the arbitration clause in question.[22] Moreover, there are important limitations to the presumption in favour of "one-stop" adjudication, discussed elsewhere in this chapter.[23] Whatever the wording of the arbitration agreement, non-contractual claims may of course become part of the reference if they are included in a pleading and no point is taken by the other party, even if there had originally been no contractual relationship between the parties.[24]

**2-005**    **Domestic arbitration agreements.**    There were restrictions imposed under the previous law in relation to domestic arbitration agreements. These restrictions affected the right to obtain a stay of legal proceedings brought in breach of an arbitration agreement and meant that parties were permitted to exclude the right to a determination by the court of a preliminary point of law or the right to appeal only after the arbitration had begun.[25] This is no longer the case. The distinction between domestic and international arbitration agreements which applied under previous legislation is no longer effective.[26]

**2-006**    **Meaning of "ad hoc".**    Although it is not referred to specifically in the legisla-

---

[19]  *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40 at [13].
[20]  See for example *Bilta (UK) Ltd (In Liquidation) v Nazir* [2010] EWHC 1086 (Ch) at [17] and [18] (although it was thought that certain aspects of the claims advanced in that case might fall outside the scope of the arbitration agreement: at [19]); *JSC BTA Bank v Ablyazov* [2011] EWHC 587 (Comm) at [64]; *Interprods v De La Rue International* [2014] EWHC 68 at [7] and [8] (claim for payment of a commission which it was admitted was to be used to pay bribes); *Steamship Mutual Underwriting Association (Bermuda) Ltd v Sulpicio Lines Inc* [2008] EWHC 914 (Comm) at [26] (where the arbitration clause applied in "the event of any difference or dispute whatsoever") and was held to cover non-contractual claims).
[21]  *Interprods v De La Rue International* [2014] EWHC 68 at [7].
[22]  *Injazat Technology Capital Ltd v Dr Hamid Najafi* [2012] EWHC 4171 at [9] (although the principle ground on which the claims were rejected were that they were res judicata). It is questionable whether a claim for false imprisonment is even arbitrable. See further at paras 2-080 to 2-095 on the subject of arbitrability.
[23]  See para.2-074.
[24]  *Almare Società di Navigazione SpA v Derby & Co Ltd (The "Almaea Prima")* [1989] 2 Lloyd's Rep. 376. The right to object would be lost under s.73 of the Arbitration Act 1996.
[25]  Under the Arbitration Act 1975 s.1.
[26]  Arbitration Act 1996 ss.85, 86 and 87 have not been brought into force: The Arbitration Act 1996 (Commencement No.1) Order 1996 (SI 1996/3146). A decision has been taken that they will not be brought into force. The press release issued by the Department of Trade and Industry on 30 January 1997 quoted the Corporate and Consumer Affairs Minister, John Taylor, as saying: " … I have also decided that all arbitrations, whether domestic or international, should be treated in the same way … This means the court will no longer have discretion to order legal proceedings to be stayed

tion, the expressions "ad hoc arbitration" or "ad hoc submission" are sometimes used to describe an agreement to refer an existing dispute to arbitration, as contrasted with an arbitration agreement providing for future disputes to be so referred.[27] It may also describe a situation where the parties agree to expand the reference and the tribunal's jurisdiction to take account of new issues introduced as the claim progresses, for example in their pleadings and where no objection by the other side is made.[28] This should not be confused with the quite different sense in which the phrase "ad hoc arbitration" is also used, namely to signify an arbitration conducted without an arbitration institution administering the proceedings or supplying the procedural rules for the arbitration. This second sense is more common in international arbitrations.

### (b)    Separability of the arbitration agreement

**The doctrine of separability.**    An arbitration agreement specifies the means whereby some or all disputes under the contract in which it is contained are to be resolved. It is however separate from the underlying contract: "An arbitration clause in a commercial contract … is an agreement inside an agreement. The parties make their commercial bargain … but in addition agree on a private tribunal to resolve any issues that may arise between them."[29] This is known as the doctrine of separability and s.7 of the Arbitration Act 1996 provides a statutory codification of the previous case law on this subject.[30] As the House of Lords noted in *Lesotho Highlands v Impreglio SpA*:

> "it is part of the very alphabet of arbitration law as explained in *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* … and spelled out in s.7 of the Act, the arbitration agreement is a distinct and separable agreement from the underlying or principal contract".[31]

The Court of Appeal has confirmed that the doctrine of separability as it applies to arbitration agreements and jurisdiction clauses is uncontroversial also as a matter of European law.[32]

**Statutory provision for separability.**    Section 7 provides that

> "unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement."[33]

**2-007**

**2-008**

---

or halted if there is a valid arbitration agreement. Also, parties are now free to enter into an agreement at any time that they will not involve the courts on point [sic] of law."

    See also DAC Supplementary Report on the Arbitration Act 1996, January 1997, para.47–50 at Appendix 2.

[27]    See, e.g. *Gulf Import & Export Co. v Bunge SA* [2007] EWHC 2667 at [37]-[46] for a discussion by Flaux J. of the proper test to determine whether an ad hoc submission has been made (and in that case, it was found that none was). See also *LG Caltex Gas Co Ltd v China National Petroleum Corp* [2001] 1 W.L.R. 1892, although in that case the Court of Appeal held that no ad hoc agreement had in fact been entered into.

[28]    See also para.5-132.

[29]    Per Saville J in *Union of India v McDonnell Douglas Corp* [1993] 2 Lloyd's Rep. 48.

[30]    See in particular *Heyman v Darwins Ltd* [1942] A.C. 356 and *Harbour Assurance Co (UK) Ltd v Kansa General Insurance Co Ltd* [1993] 1 Lloyd's Rep. 455. See also Model Law, Art.16(1). See para.2-008.

[31]    [2006] 1 A.C. 221 at [21].

[32]    See in particular *Joint Stock Company "Aeroflot Russian Airlines" v Berezovsky* [2013] EWCA Civ 784 at [62].

[33]    Arbitration Act 1996 s.7: cf. Model Law, Art.16(1), see Appendix 4.

This provision confirms by statute the separability doctrine which had evolved in the earlier case law.[34] In particular the use of the words "or was intended to form part of another agreement" make clear that even if the underlying contract never came into existence, the arbitration agreement may still be binding.[35] Similarly, the fact that the underlying contract subsequently fails or is found to be invalid or never to have come into existence will not of itself mean that the arbitration agreement is necessarily undermined also.[36] As the House of Lords confirmed in the *Fiona Trust* case, "[t]he doctrine of separability requires direct impeachment of the arbitration agreement before it can be set aside. This is an exacting test."[37] Section 7 of the Arbitration Act 1996 applies where the law applicable to the arbitration agreement is the law of England and Wales or Northern Ireland even if the seat of the arbitration is outside England and Wales or Northern Ireland or has not been designated or determined.[38]

2-009    **Consequences of separability.**    The doctrine of separability underlines the potential width of an arbitration agreement because it establishes that an arbitration agreement has a separate life from the contract for which it provides the means of resolving disputes. This enables the arbitration agreement to survive breach or termination of the contract of which it forms part. The consequence of this separate existence is that even if the underlying contract has been brought to an end, for example by accepted repudiation or frustration, the arbitration agreement continues

---

[34]  The House of Lords rejected the theory that an arbitration clause is terminated by breach of the contract of which it forms part in *Heyman v Darwins Ltd* [1942] A.C. 356. They held that neither repudiation nor accepted repudiation entails the termination of the obligation to refer disputes to arbitration. On the contrary, the injured party can insist on having the consequences of the repudiation assessed by arbitration. The reasoning behind the doctrine of separability was that the arbitration clause constitutes a self-contained contract collateral or ancillary to the underlying contract: *Bremer Vulkan Schiffbau und Maschinenfabrik v South India Shipping Corp Ltd* [1981] 1 Lloyd's Rep. 253 at 259. It had long been held that an arbitration agreement can continue to be implied as one of the terms of the relationship between parties after the formal expiry of an agreement between them containing an arbitration clause. Typically, this is the case with leases and partnership deeds: see *Morgan v William Harrison Ltd* [1907] 2 Ch. 137; *Cope v Cope* (1885) 52 L.T. 607; and *Gisborne Harbour Board v Spencer* [1961] N.Z.L.R. 204 at 211. Case law went on to confirm that an arbitration clause could also survive invalidity of the underlying contract: *Harbour Assurance Co (UK) Ltd v Kansa General Insurance Co Ltd* [1993] 1 Lloyd's Rep. 455. The Court of Appeal confirmed the position in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20, affirmed by the *House of Lords in Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40. See also Peter Gross Q.C., "Separability Comes of Age in England: Harbour v Kansa and Clause 3 of the Draft Bill" (1995) 11 Arbitration Int. 85.

[35]  In *Glaxosmithkline Ltd v Department of Health* [2007] EWHC 1470 it was alleged that the parties had entered into a purely non-binding and voluntary agreement such that there was no intention to create legal relations. Accordingly it was said that, notwithstanding the doctrine of separability, the arbitration agreement was no more binding than the larger whole of which it formed part, such that there was no "award" for the purposes of an appeal under s.69 of the Arbitration Act 1996. The court found that there was no agreement between the parties that the award should not be final and binding so as to displace ss.58 and 66 of the Arbitration Act 1996, the effect of which was that an award is binding and enforceable. See also *Contrast UR Power GmbH v Kuok Oils & Grains PTE Ltd* [2009] EWHC 1940 (Comm) at [34] and [40] where the court rejected, albeit obiter, the argument that it was "straining separability too far to seek to apply it to a case where negotiations had (at least arguably) not yet resulted in a binding agreement."

[36]  See paras 2-053 et seq.

[37]  *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40 at [35]. See also *Honeywell International Middle East Ltd v Meyden Group LLC* [2014] EWHC 1344 at [91] and [94] where the allegation of bribery in relation to the underlying contract was not alleged in respect of the arbitration agreement, and the claim that the arbitration agreement was not valid was therefore held not to have any real prospects of success.

[38]  Arbitration Act 1996 s.2(5).

in being in order to deal with any disputes in respect of liabilities under the contract arising before or after termination.[39]

**Invalidity of underlying contract.**    Section 7 of the Arbitration Act 1996 enables the arbitration agreement to survive not just termination or breach of the contract in which it is contained but also more serious defects. Unless otherwise agreed by the parties, the arbitration agreement may survive as a distinct agreement even if the underlying contract is regarded as invalid, non-existent or ineffective.[40] The validity of the underlying contract may therefore be determined by arbitration in accordance with the arbitration agreement, and the resulting award will be enforceable, even if the tribunal determines that the contract itself is invalid.

**2-010**

**Void contracts.**    Similarly, even where the underlying contract is held to be void, the arbitration agreement which forms part of it may still be upheld as a valid and independent agreement, so that any disputes within its scope must be referred to arbitration.[41] As Colman J put it in *Vee Networks Ltd v Econet Wireless International Ltd*:

**2-011**

> "If, in accordance with s.7 [of the Arbitration Act 1996], an arbitrator determines that the matrix contract is, for example, void ab initio by reason of illegality and it is not in issue whether the arbitration agreement is also illegal and void, the tribunal can continue to exercise such jurisdiction under the arbitration agreement as its scope permits. For example, if there were an alternative claim in tort or for restitution which was within the scope of the clause, the tribunal would continue to have jurisdiction conclusively to determine that claim."[42]

**Invalidity of arbitration agreement.**    The position differs however where the arbitration agreement itself is impeached[43] or the existence of an arbitration agreement is disputed.[44] In these circumstances, if the matter comes before the court,[45] the question of jurisdiction may never reach the arbitrators because it will be

**2-012**

---

[39]   Such as claims for accrued sums, due prior to termination or claims in respect of post-termination obligations. See generally *DDT Trucks of North America Ltd v DDT Holdings Ltd* [2007] EWHC 1542. See also *Kruse v Questier & Co Ltd* [1953] 1 Lloyd's Rep. 310; *Heyman v Darwins* [1942] A.C. 356; *Government of Gibraltar v Kenney* [1956] 2 Q.B. 410; *Sulamérica Cia Nacional de Seguros S.A. v Enesa Engenharia S.A.* [2012] EWCA Civ 638 at [26] ("The concept of separability itself, however, simply reflects the parties' presumed intention that their agreed procedure for resolving disputes should remain effective in circumstances that would render the substantive contract ineffective.")

[40]   See also *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20 affirmed in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40; *UR Power GmbH v Kuok Oils & Grains PTE Ltd* [2009] EWHC 1940 (Comm); *Honeywell International Middle East Ltd v Meyden Group LLC* [2014] EWHC 1344 at [91] and [94].

[41]   *Vee Networks Ltd v Econet Wireless International Ltd* [2004] EWHC 2909; [2005] 1 Lloyd's Rep. 192.

[42]   *Vee Networks Ltd v Econet Wireless International Ltd* [2004] EWHC 2909; [2005] 1 Lloyd's Rep. 192 at [21].

[43]   *Harbour Assurance Co (UK) Ltd v Kansa General Insurance Co Ltd* [1993] 1 Lloyd's Rep. 455; *Vee Networks Ltd v Econet Wireless International Ltd* [2004] EWHC 2909. See also *Hyundai Merchant Marine Company Ltd v Americas Bulk Transport Ltd* [2013] EWHC 470 (Comm) at [35] where there was a successful challenge under s.67 of the Act on the basis that there was no binding arbitration agreement because the conditions precedent to the main agreement had not been satisfied and the lack of consensus applied equally to the arbitration agreement.

[44]   See, e.g. *Cigna Life v Intercaser SA* [2002] 1 All E.R. (Comm) 235 where it was held that a contract of re-insurance did not incorporate an arbitration agreement in respect of two of the parties to proceedings. See also *Phoenix Finance v FIA* [2002] EWHC 1028; *Anglia Oils Ltd v Owners and/or Demise Charterers of the Marine Champion* [2002] EWHC 2407; *Albon v Naza Motor Trading Sdn Bhd (No.3)* [2007] EWHC 327.

[45]   For example on an application to stay under s.9 of the Arbitration Act 1996: see para.7-009.

determined by the court.[46] In this regard the court draws a distinction between disputes as to the existence of the arbitration agreement, which are likely to be for the court, and disputes as to its validity, which wherever possible should be left to the tribunal.[47] However if the argument is that there is no jurisdiction because the arbitration agreement itself is invalid or non-existent, the tribunal may decide that question[48] but its decision will not be conclusive and can be reviewed by the court.[49] It is only in exceptional circumstances however that the arbitration agreement itself will be impugned and, as stated above, attacks on the underlying contract will not generally suffice to prevent the arbitration agreement being upheld as conferring jurisdiction on the tribunal to determine the parties' disputes.[50] For example, in *Fiona Trust v Privalov*[51] allegations of bribery were raised in general terms but not so as to specifically impugn the arbitration agreement. The court upheld the application of the arbitration agreement by declining to decide the question of jurisdiction itself and referring the matter instead to the arbitrators:

> "If the arbitrators can decide whether a contract is void for initial illegality, there is no reason why they should not decide whether a contract has been procured by bribery, just as much as they can decide whether a contract has been procured by misrepresentation or non-disclosure. Illegality is a stronger case than bribery which is not the same as non est factum or the sort of mistake which goes to the question of whether there was any agreement ever reached. It is not enough to say that the bribery impeaches the whole contract unless there is some special reason for saying that the bribery impeaches the arbitration clause in particular."[52]

By contrast, where it was alleged that the signature of one of the parties to the underlying contract had been forged, and hence neither the contract nor the agreement to arbitrate had been reached, then this was a question going to whether there was any agreement ever reached and would be decided by the court.[53]

**2-013**    **Illegality affecting the contract.**    The question of invalidity of the arbitration agreement has arisen in a number of cases concerning contracts alleged to be void by virtue of illegality,[54] and the courts examine whether the particular form of illegality renders not just the contract but also the arbitration agreement void. This involves a consideration of the purpose and policy of the rule of illegality and whether this would be defeated by allowing the issue to be determined by arbitration.[55] In *Soleimany v Soleimany*[56] Waller LJ noted that:

---

[46]   As in *Albon v Naza Motor Trading Sdn Bhd (No.3)* [2007] EWHC 327.
[47]   See paras 7-013 et seq.
[48]   Under the Arbitration Act 1996 s.30.
[49]   Under the Arbitration Act 1996 s.67 which is a mandatory provision pursuant to the Arbitration Act 1996 s.4(1) and Sch.1; see for example *LG Caltex Gas Co Ltd v China National Petroleum Corp* [2001] EWCA Civ 788. See generally paras 8-060 et seq.
[50]   See paras 2-010 and 7-015.
[51]   *Fiona Trust v Privalov* [2007] EWCA Civ 20 at [29] affirmed in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40.
[52]   *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20 at [29], affirmed in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40.
[53]   As in *Albon v Naza Motor Trading Sdn Bhd (No.3)* [2007] EWHC 327.
[54]   Several have been concerned with the enforcement of arbitration awards made pursuant to contracts alleged to be illegal: see paras 8-038 et seq.
[55]   *Harbour Assurance Co (UK) Ltd v Kansa General Insurance Co Ltd* [1993] 1 Lloyd's Rep. 455 at [469].
[56]   *Soleimany v Soleimany* [1999] Q.B. 785.

> "There may be illegal or immoral dealings which are, from an English law perspective, incapable of being arbitrated because an agreement to arbitrate them would itself be illegal or contrary to public policy under English law."[57]

However, in that case the Court of Appeal found the arbitration agreement to be valid notwithstanding that the resulting award upholding the contract was unenforceable due to illegality.[58] Similarly, in *Beijing Jianlong Heavy Industry Group v Golden Ocean Group Ltd*, the policy and purpose of the rule in *Foster v Driscoll*[59] which resulted in the invalidity of certain contracts of guarantee (because they were entered into as part of a scheme to evade Chinese foreign exchange control laws) was found not to extend to the arbitration agreement contained in those guarantees because the London arbitration clause did not involve any breach of Chinese law.[60] In contrast, in *O'Callaghan v Coral Racing Ltd*,[61] the Court of Appeal was faced with a clause in a gaming contract under which disputes were to be referred to arbitration before the editor of *The Sporting Life*. The court held that the illegality of the contract meant that any claim was bound to fail owing to the transaction being null and void under s.18 of the Gaming Act 1845, and the "arbitration clause" could not survive independently.

**Application of terms of the underlying contract.**    The doctrine of separability does not prevent the application to the arbitration agreement of provisions in the underlying contract which are stated to apply to all clauses of the contract.[62] So for example if variations of any clause in the contract are required to be in writing, that will apply equally to the arbitration clause as to other provisions of the contract.[63]     **2-014**

## (c)    Arbitration agreements falling outside the 1996 Act

**Oral arbitration agreements.**    An oral agreement to arbitrate, sometimes known as a parol submission, is valid as a matter of English law[64] but is not subject to the provisions of Pt I of the Arbitration Act 1996 which apply only where the arbitration agreement is in writing.[65] However s.5 of the Arbitration Act 1996 contains a broad definition of writing and some agreements which would have been oral agreements under earlier legislation are now treated as "in writing" for the purposes of the Act.[66] The statute also makes it difficult to participate in arbitration proceedings arising out of an arbitration agreement which is alleged to be oral without it being construed as an agreement in writing.[67] An oral agreement to arbitrate is     **2-015**

---

[57]    At [797].
[58]    The contract was found to be contrary to the revenue laws and export controls of the country of performance. See also *Honeywell International Middle East Ltd v Meydan Group LLC* (formerly known as *Meydan LLC*) [2014] EWHC 1344 (TCC) at [91].
[59]    *Foster v Driscoll* [1929] 1 K.B. 470.
[60]    Mackie J noted however that each case will turn on its own facts. *Beijing Jianlong Heavy Industry Group v Golden Ocean Group Ltd & Others* [2013] EWHC 1063 (Comm) at [41]-[44].
[61]    *O'Callaghan v Coral Racing Ltd* , *The Times,* unreported 26 November 1998. For further background on the wider circumstances of the case, not relevant to the separability of the agreement to arbitrate, see *Locabail (UK) Ltd v Bayfield Properties* [2000] Q.B. 451, [98] et seq.
[62]    *JSC Zestafoni G Nikoladze Ferroalloy Plant v Ronly Holdings Ltd* [2004] EWHC 245.
[63]    *JSC Zestafoni G Nikoladze Ferroalloy Plant v Ronly Holdings Ltd* [2004] EWHC 245.
[64]    At common law. Oral agreements to arbitrate are acknowledged in s.81(1)(b) of the Arbitration Act 1996.
[65]    Arbitration Act 1996 s.5(1).
[66]    See paras 2-040 et seq.
[67]    Arbitration Act 1996 s.5(5).

unusual in most modern commercial contexts,[68] and where one is asserted, there must be proof of the terms on which the agreement is said to have been made.[69] Where the whole of the contract is oral, including the agreement to arbitrate, the existence and validity of the entire contract may also be in doubt.[70] Clearly therefore oral agreements to arbitrate should be avoided by reducing them to writing so that they will fall within the terms of the 1996 Act.

**2-016**    **Implied agreement to refer existing disputes to arbitration.**    An agreement to refer existing disputes to arbitration can in some cases be implied by the conduct of the parties. Where a party denies that it has entered into an agreement to arbitrate, the court will consider whether a reasonable person, knowing the relevant background and observing matters in the place of the party asserting the existence of the arbitration agreement, would have concluded from the other party's conduct that it was agreeing to participate in the proposed arbitration.[71] In *Gulf Import & Export Co v Bunge SA*,[72] Flaux J accepted that the test for determining whether such an implied agreement exists is that stated by Bingham LJ in *The Aramis*:[73]

> "It must, surely, be necessary to identify conduct referable to the contract contended for or, at the very least, conduct inconsistent with there being no contract made between the parties. Put another way, I think it must be fatal to the implication of a contract if the parties would or might have acted exactly as they did in the absence of a contract."[74]

In other words there must be conduct evidencing the agreement to arbitrate or conduct inconsistent with it, but if the parties would or might have acted in the same way without there being an agreement to arbitrate, none will be implied.

Since the introduction of the Arbitration Act 1996 there will rarely be any need to rely on an implied arbitration agreement. This is because the very broad definition of writing under the Arbitration Act 1996[75] means that in many cases there will be a written arbitration agreement for the purposes of the statute rather than an implied arbitration agreement. For example, if a tribunal has no jurisdiction to hear a dispute pursuant to the arbitration agreement, but the parties proceed with the reference and exchange written submissions alleging an arbitration agreement which is not denied, the written submissions will be sufficient to constitute an arbitration agreement in writing.[76] Even if there is no specific allegation of an arbitration agreement, if the parties proceed with a reference without objecting to

---

[68]    Save in the context of salvage contracts: see further J. Reeder, *Brice on Maritime Law of Salvage*, 5th edn (London: Sweet & Maxwell, 2012).

[69]    *Ground Rent v Treasure Services* (unreported, Chancery Division, 15 October 2014) (where the court applied to arbitration the test set out in *RJT Consulting Engineers v DM Engineering (Northern Ireland) Ltd* [2002] EWCA Civ 270, namely that evidence of the terms of the alleged agreement is required, and not merely evidence of its existence. See also para.2-003.

[70]    As, for example, in *E Turner & Sons Ltd v Maltind Ltd* (1985) 5 Const. LJ 273, where the court found that there was no offer and acceptance.

[71]    *Athletic Union of Constantinople v National Basketball Association* [2002] 1 All E.R. (Comm) 70. The court found in that case that a reasonable person would have so concluded.

[72]    *Gulf Import & Export Co v Bunge SA* [2007] EWHC 2667.

[73]    *The Aramis* [1989] 1 Lloyd's Rep 213 at [224]. *Gulf Import & Export Co. v Bunge SA* [2007] EWHC 2667 at [40], [44] citing *Baird Textiles Holdings v Marks & Spencer* [2001] EWCA Civ. 274.

[74]    Bingham J's test was endorsed by the Court of Appeal as of general application in *Baird Textiles Holdings v Marks & Spencer* [2001] EWCA Civ 274.

[75]    Arbitration Act 1996 s.5: see para.2-040.

[76]    Arbitration Act 1996 s.5(5). In *Athletic Union of Constantinople v National Basketball Association* [2002] 1 All E.R. (Comm) 70 the parties were agreed that if there was an agreement to arbitrate the merits of the dispute it fell within s.5 of the Arbitration Act 1996 as an agreement in writing and was subject to the provisions of the 1996 Act.

the lack of jurisdiction they will lose the right to object and the tribunal will be entitled to proceed to determine the matters referred.[77]

There may however be situations in which one party alleges that there is an implied agreement to arbitrate based on the parties' conduct notwithstanding the absence of an arbitration agreement for the purposes of the Arbitration Act 1996. In these circumstances, if one of the parties makes a timely objection to jurisdiction, the tribunal will have to consider the existence of an implied agreement. The conduct from which the implication may be drawn can arise in the context of an arbitration concerned with other disputes or in connection with proceedings whose status as a proper reference of the disputes in question is itself the subject of controversy.[78] In the former case it will not be the existence of an arbitration agreement that is in dispute, but rather its scope, i.e. whether the particular claim being made is within the arbitration agreement. One effect of an implied arbitration agreement can be to overcome objections to the enlargement of the scope of the reference beyond the tribunal's existing jurisdiction.[79] As stated above, it would be unusual for there to be an implied agreement to arbitrate in these circumstances which did not fall within the statutory definition, but in principle the parties could enter into an implied agreement to arbitrate which would not constitute a written arbitration agreement for the purposes of s.5 of the Arbitration Act 1996.[80] It would then take effect as an oral arbitration agreement to which the Arbitration Act 1996 will not apply.[81]

**Agreements involving decision makers other than the arbitrator.**    An agreement providing for arbitration of disputes in which the decision of the tribunal alone is not binding may not be an arbitration within the meaning of the Arbitration Act 1996. An example of such a clause is to be found in *Turville Health Inc v Chartis Insurance UK Ltd*,[82] in which the clause in question provided for two "appraisers" to act as experts in respect of any disputes, with any disagreement between the appraisers being referred to an arbitrator. In this regard, Edwards-Stuart J had no difficulty finding that there was a valid arbitration agreement. However, the clause went on to provide that only "a decision in writing agreed to by the two appraisers or either appraiser and the arbitrator" would be binding. This meant that a deci-

**2-017**

---

[77]  Arbitration Act 1996 s.73: see para.5-065. See also *Athletic Union of Constantinople v National Basketball Association* [2002] 1 All E.R. (Comm) 70; *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi AS v VSC Steel Company Ltd* [2013] EWHC 4071 (Comm) at [87].

[78]  *Westminster Chemicals & Produce Ltd v Eicholz & Loeser* [1954] 1 Lloyd's Rep. 99; *Aktiebolaget Legis v V Berg & Sons Ltd* [1964] 1 Lloyd's Rep. 203; *Luanda Exportadora SARL v Wahbe Tamari & Sons Ltd* [1964] 2 Lloyd's Rep. 535; *The "Tuyuti"* [1984] Q.B. 838; *Higgs & Hill Building Ltd v Campbell Denis Ltd* [1982] 28 B.L.R. 47; *Cia Maritima Zorroza SA v Sesostris SAE (The "Marques de Bolarque")* [1984] 1 Lloyd's Rep. 652; *Almare Società di Navigazione SpA v Derby & Co Ltd (The "Almaea Prima")* [1989] 2 Lloyd's Rep. 376; *Furness Withy (Australia) Pty Ltd v Metal Distributors (UK) Ltd (The "Amazonis")* [1990] 1 Lloyd's Rep. 236; *Allied Vision Ltd v VPS Film Entertainment GmbH* [1991] 1 Lloyd's Rep. 392. See also *Svenska Petroleum Exploration AB v Lithuania* [2005] EWHC 2437 at [18] where the tribunal appears to have proceeded on the basis that Lithuania had impliedly agreed to arbitrate disputes with Svenska. While the governing law of the arbitration agreement was Lithuanian law, Gloster J offered the view that had it been governed by English law, she would have concluded that Lithuania was not bound by the arbitration agreement.

[79]  See paras 5-062 et seq. For agreements to which the Arbitration Act 1996 applies, continuing with the reference may lead to a loss of the right to object pursuant to s.73: see para.5-068.

[80]  See paras 2-040 et seq.

[81]  See para.2-015.

[82]  *Turville Health Inc v Chartis Insurance UK Ltd* [2012] EWHC 3019 (TCC).

sion of the arbitrator acting alone would have no effect and the arbitration agreement was therefore held not to fall within the Arbitration Act 1996.[83]

### (d)   Mutuality

**2-018**    **Mutuality not required.**    Until 1986 English law required an arbitration agreement to be "mutual" in that it had to give both parties the same right to refer disputes to arbitration.[84] In *Pittalis v Sherefettin*,[85] a rent review case, the Court of Appeal redefined this requirement, seeing no lack of mutuality in an agreement between two persons which conferred on one of them alone the right to refer the dispute to arbitration. As Fox LJ said:

> "There is a fully bilateral agreement which constitutes a contract to refer. The fact that the option is exercisable by one of the parties only seems to me to be irrelevant. The arrangement suits both parties … the landlord is protected, if there is no arbitration, by his own assessment of the rent as stated in his notice: and the tenant is protected, if he is dissatisfied with the landlord's assessment of the rent, by his right to refer the matter to arbitration. Both sides have, therefore, accepted the arrangement and there is no lack of mutuality."[86]

Since then it has become well established that there is no requirement under English law for an arbitration agreement to confer on the parties a mutual right to initiate a reference[87] and an arbitration agreement providing an option for one party alone to refer disputes to arbitration is valid.[88] The courts are also prepared to construe an option to arbitrate broadly, in keeping with ordinary principles of construction, even where the language of the agreement is less than clear, as demonstrated by the decision of Leggatt J in *Union Marine v The Government of Comoros*.[89] Also in that case, Leggatt J expressed the view that where the option to arbitrate is available to both parties, the arbitration agreement becomes binding only when the option is exercised, i.e. by giving notice of commencement of arbitration.[90] A party who is not empowered to initiate a reference to arbitration will be entitled to pursue litigation in respect of a dispute in the absence of agreement on some other mechanism such as expert determination,[91] although if the option is validly invoked[92] a stay of those proceedings will be granted.[93] Further, once the option is validly invoked by a party it cannot subsequently change its mind and

---

[83]   *Turville Health Inc v Chartis Insurance UK Ltd* [2012] EWHC 3019 (TCC) at [52].
[84]   *Baron v Sunderland Corp* [1966] 2 Q.B. 56 at 64 A/B, a case about statutory arbitration. This was followed in *Tote Bookmakers v Development & Property Holding Co Ltd* [1985] Ch. 261. The dictum in *Baron v Sunderland* was subsequently held (in *Pittalis v Sherefettin* discussed below) to be wider than necessary because it had been a case where there was no arbitration clause at all, not just an agreement lacking mutuality.
[85]   *Pittalis v Sherefettin* [1986] 1 Q.B. 868.
[86]   *Pittalis v Sherefettin* [1986] 1 Q.B. 868 at 875, following *Woolf v Collis Removal Service* [1948] 1 K.B. 11.
[87]   See for example *Nine Gladys Road Ltd v Kersh* [2004] EWHC 1080; *NB Three Shipping Ltd v Harebell Shipping Ltd* [2005] 1 Lloyd's Rep. 509.
[88]   *NB Three Shipping Ltd v Harebell Shipping Ltd* [2005] 1 Lloyd's Rep. 509. See also *Deutsche Bank Ag v Tongkah Harbour Public Company Ltd* [2011] EWHC 2251 (Comm) at [25].
[89]   *Union Marine v The Government of Comoros* [2013] EWHC 5854 (Comm). In that case a clause providing that "[t]he parties are able to decide to submit any dispute between them to an arbitrator of their choice in London" was considered to be a valid and binding option to arbitrate.
[90]   *Union Marine v Government of Comoros* [2013] EWHC 5854 (Comm) at [17].
[91]   See para.2-029.
[92]   The option could not be invoked after a party had taken a step in the action or otherwise led the other party to believe on reasonable grounds that the option to arbitrate would not be exercised: *NB Three Shipping Ltd v Harebell Shipping Ltd* [2005] 1 Lloyd's Rep. 509.
[93]   *NB Three Shipping Ltd v Harebell Shipping Ltd* [2005] 1 Lloyd's Rep. 509.

unilaterally opt for litigation.[94] In practice an increasing number of clauses give only one party the right to refer disputes to arbitration, particularly in international finance transactions with counterparties in jurisdictions where English court judgments would not be enforced. In these cases it is typical for there to be a clause conferring jurisdiction on the courts of one or more jurisdictions with an option exercisable at the instance of only one party to insist that any dispute be referred to arbitration. Obviously it is important if adopting this approach to ensure that the precise circumstances in which the option may be exercised are clearly set out. Provided this is done, the clause will be valid under English law, although if the seat of the arbitration is in another country the relevant local law will have to be examined.[95] Should enforcement of the resulting award be required in some other jurisdiction it would also be prudent to check that the law of the place of enforcement considers such clauses to be valid.

**Unilateral option to litigate.**    Similarly it is also now established that a disputes provision which contains an arbitration agreement between the parties but also provides one party with an option to litigate will be valid under English law provided it is clear and unequivocal.[96] The effect of such a provision will be that one party has a choice of litigating or arbitrating any dispute, whereas the other party can be forced to arbitrate.[97] Again a party cannot "blow hot and cold" and if it starts, or participates in, an arbitration it will have waived the right to opt for litigation instead.[98] However, provided the party exercising its option to litigate has not participated in the arbitration, it will not be precluded from exercising its option by virtue of the fact that the other party has already commenced arbitration.[99]      **2-019**

## (e)    Variations

**Disputes where contract varied.**    Disputes may arise about whether a contract which has been varied includes or excludes the original arbitration agreement. For example in *Faghirzadeh v Rudolf Woolf SA (Pty) Ltd* a variation of a contract for the sale of steel bars was found to be unintelligible except by reference back to the      **2-020**

---

[94]  *Whiting v Halverson* [2003] EWCA Civ 403; *Deutsche Bank AG v Tongkah Harbour Public Company Ltd* [2011] EWHC 2251 at [25] and [29].

[95]  For example, in June 2012 the Supreme Arbitrazh Court of the Russian Federation issued a decree in *Russian Telephone Company CJSC v Sony Ericsson Communication Rus LLC* Case No. VAS-1831/12 rejecting unilateral clauses. The Cour de Cassation has taken a similar view in France: see *Ms X v Banque Privée Edmond de Rothschild* (Cour de Cassation, first civil chamber, Case No. 11-26.022 (26 September 2012)).

[96]  *Law Debenture Trust Corp Plc v Elektrim Finance BV* [2005] EWHC 1412; *Deutsche Bank AG v Tongkah Harbour Public Company Ltd* [2011] EWHC 2251 (Comm) at [25].

[97]  The question arises whether, if a party exercises its option to litigate, the other party can pursue any counterclaims in those proceedings or would be compelled to arbitrate them. In *Law Debenture Trust Corp Plc v Elektrim Finance BV* [2005] EWHC 1412 it was accepted (at [42]) that counterclaims would be entertained in the litigation, but in that case the disputes provision specifically contemplated such counterclaims. Absent such provision it is likely that a party could insist on the counterclaims being brought in separate arbitration proceedings, however inconvenient that may be.

[98]  *Law Debenture Trust Corp Plc v Elektrim Finance BV* [2005] EWHC 1413 at [42]. A party will not be held to have started, or participated in, an arbitration simply by protesting the jurisdiction of an arbitral tribunal: *Sovarex SA v Romero Alvarez SA* [2011] EWHC 1661 (Comm).

[99]  It was suggested in *Law Debenture Trust Corp Plc v Elektrim Finance BV* [2005] EWHC 1412 (by Mann J at [45]) that if the situation were otherwise then whether the dispute were to be arbitrated or litigated would depend on "potential accidents of timing or conceivably an unseemly scramble".

original contract and its arbitration clause.[100] Further, questions may arise as to whether time-bars in the original arbitration agreement still apply.[101]

**2-021**    **Effect of variation.**    The effect of the variation may be to terminate the arbitration agreement altogether, although this will be a matter of construction of the varied contract. In most cases a variation of the terms of the underlying contract will not impugn the parties' agreement to arbitrate disputes under that contract as varied absent express provision doing so.

### (f)   Conditions precedent

**2-022**    **Conditions precedent.**    Conditions precedent to the operation of an arbitration agreement must be fulfilled before a tribunal will have jurisdiction to determine disputes under it. So for example an arbitration agreement which provides for disputes to be submitted to arbitration "at the request of any party" will not make arbitration of any dispute compulsory unless and until a party requests it.[102] Similarly where a building contract contained an arbitration clause which provided that the "reference shall not be opened until after completion of the works", the court decided, with regret, that the arbitrator had no jurisdiction to determine whether the works had been completed, that in fact they had not been completed and therefore an award by the arbitrator was invalid.[103] Where a charter-party was stated to be subject to review of the owner's charter-party to ensure they were back to back, that condition precedent applied equally to the arbitration agreement.[104] Where the disputes provision is a multi-tiered clause, the steps to be taken prior to commencing arbitration may constitute conditions precedent in which case they must be complied with.[105]

**2-023**    **Scott v Avery clauses.**    The parties to a contract may agree that no action shall be brought upon it until an arbitration award has been made, or (what amounts to the same thing) may agree that the only obligation arising out of a particular term of the contract shall be to pay whatever sum a tribunal may award.[106] This is known as a *Scott v Avery* clause. It does not prevent litigation being initiated on a contract containing a clause of this type, but the condition precedent is a defence to the action.[107] The Court of Appeal in *Mantovani v Carapelli* held that a *Scott v Avery* clause did not preclude injunctive proceedings brought for the purpose of enforcing the arbitration agreement itself, as long as the injunctive proceedings were brought in England.[108] The apparent basis for that decision was s.12(6) of the Arbitration Act 1950, which provided for certain supervisory powers of the court

---

[100] *Faghirzadeh v Rudolf Woolf SA (Pty) Ltd* [1977] 1 Lloyd's Rep. 630.

[101] In *EB Aaby's Rederi A/S v Union of India* [1974] 2 Lloyd's Rep. 57 a charterparty containing a CENTROCON arbitration clause stated that any claim had to be made within 12 months of final discharge, or the claim would be barred. An undertaking was given to pay after the general average statement was drawn up, a process which apparently took "many years" and when the claim was finally presented, the defendants pleaded the time-bar. The House of Lords held that neither the arbitration clause nor the time-bar had survived the variation.

[102] *Secretary of State of the Environment, Transport and the Regions, Ex p. The Channel Group Ltd and France Manche SA* [2001] EWCA Civ 1185.

[103] *Smith v Martin* [1925] 1 K.B. 745, citing *Pethick Brothers v Metropolitan Water Board*, CA from *Hudson Building Contracts* (6th edn), Vol.2, p.456. See also *May v Mills* (1914) 30 T.L.R. 287.

[104] *Hyundai Merchant Marine Company Ltd v Americas Bulk Transport Ltd* [2013] EWHC 470 (Comm) at [34].

[105] See para.2-037. See also para.5-018.

[106] *Scott v Avery* (1856) 25 LJ Ex. 308. For a recent example see *B v S* [2011] EWHC 691 (Comm).

[107] *Viney v Bignold* (1887) 20 Q.B.D. 172.

[108] See *Mantovani v Carapelli* [1980] 1 Lloyd's Rep. 375 (Court of Appeal); and *Toepfer International*

and which was mandatory. The Court of Appeal held that it was not possible for the parties to contract out of s.12(6) by way of a *Scott v Avery* clause. The effect of this decision was that where the injunctive or other ancillary proceedings were brought outside England, they were precluded by a *Scott v Avery* clause (because those foreign proceedings were not subject to s.12(6) of the Arbitration Act 1950), but the same clause would be ineffective if the relevant proceedings were brought in the English court. The result of that decision was described by the Court of Appeal in *Toepfer International GmbH v Société Cargill France* as "not very satisfactory".[109] Had it been open to them to do so, the Court of Appeal indicated that it would have found a *Scott v Avery* clause applied only to proceedings involving substantive disputes, not to ancillary or other supportive proceedings at all. In any event the application of these decisions to arbitrations under the Arbitration Act 1996 is limited or arguably of no relevance at all; both were decided in relation to arbitrations commenced under the Arbitration Act 1950, with its mandatory language in s.12(6) with respect to the supervisory powers of the court. That mandatory language is not present in the equivalent s.44 of the Arbitration Act 1996, which provides for certain supervisory powers of the court in respect of an arbitration, unless the parties agree otherwise. In *B v S*, having reviewed these earlier authorities, Flaux J felt able to depart from the Court of Appeal decisions in both *Mantovani v Carapelli* and *Toepfer* on the basis that a *Scott v Avery* clause is an "agreement otherwise" for the purpose of s.44 Arbitration Act 1996 and is therefore sufficient to exclude the power of the English court to grant any such relief.[110]

**No effect if stay granted.**    The court used to have power to discharge *Scott v Avery* agreements, which has been repealed.[111] In order to avoid the combination of an unworkable arbitration clause and no right to bring legal proceedings,[112] it is now enacted that if the court refuses to stay legal proceedings in favour of arbitration, any provision that an award is a condition precedent to the bringing of legal proceedings in respect of any matter is of no effect in relation to those proceedings.[113] The *Scott v Avery* condition precedent is also disregarded for limitation purposes.[114]

**2-024**

### (g)    Other types of clauses distinguished

**Types of dispute resolution clauses.**    One reason why arbitration agreements are sometimes ineffective is because of a failure properly to distinguish between the different forms of dispute resolution available and the extent to which, if at all, they

**2-025**

---

*GmbH v Société Cargill France* [1998] 1 Lloyd's Rep. 379 which concerned an application to restrain foreign proceedings brought in breach of arbitration agreement. The Court of Appeal also expressed in *Toepfer* its view that it was unsatisfactory for a *Scott v Avery* clause to apply to ancillary proceedings outside England, but not those within England (as decided by the earlier Court of Appeal decision in *Mantovani v Carapelli* [1980] 1 Lloyd's Rep. 375), preferring if it had been open to them to decide that a *Scott v Avery* clause applied only to substantive disputes, although that is a matter that can now only be decided in the Supreme Court. Both cases were decided under the 1950 Arbitration Act. For a comprehensive discussion of the previous authorities and where the *Scott v Avery* clause was held to exclude the court's power to grant relief under the Arbitration Act s.44: see *B v S* [2011] EWHC 691 (Comm).

[109] *Toepfer International GmbH v Société Cargill France* [1998] 1 Lloyd's Rep. 379, 385.

[110] *B v S* [2011] EWHC 691 (Comm) at [69], [89] (application under Arbitration Act 1996 s.44 for freezing injunction).

[111] Arbitration Act 1996 s.109 has repealed Pt I of the Arbitration Act 1950, including this provision at s.25(4).

[112] DAC Report, para.57.

[113] Arbitration Act 1996 s.9(5).

[114] Arbitration Act 1996 s.13(3): see paras 5-016 and 8-186.

can be combined.[115] In particular, consideration needs to be given to whether a contract should provide for dispute resolution by the court, or by arbitration or by expert determination, all of which can lead to a binding decision. These procedures may be combined with adjudication or ADR processes. Each of these is considered below.

**2-026**    **Jurisdiction clauses.**    A jurisdiction clause provides expressly for the courts of a particular country to have jurisdiction to deal with disputes arising under a contract.[116] It may provide that the courts of a particular country have exclusive jurisdiction, in which case no other court can usually take jurisdiction. Or it may provide that the courts of a particular country have non-exclusive jurisdiction, in which case the chosen court has jurisdiction but both parties also have the right to commence proceedings in any other court of competent jurisdiction in certain circumstances. The third alternative is to provide that the courts of a particular country have non-exclusive jurisdiction for the benefit of one party only, in which case the party benefiting from the provision (generally the one with the stronger negotiating position) can sue in any court of competent jurisdiction whereas the other party is confined to bringing an action in the courts of the named country only.

Even if the parties have agreed on the courts of a particular country in their jurisdiction clause, it may be overridden by provisions in relevant Regulations and Conventions[117] which provide for certain courts to have exclusive jurisdiction to deal with particular types of disputes regardless of the domicile of the parties, e.g. those involving immovable property and proceedings concerning registration or validity of intellectual property rights. There are also special rules concerning insurance, consumer contracts and employment contracts.

**2-027**    **Incompatibility of jurisdiction clauses and arbitration agreements.**    Save where the disputes provisions are of a hybrid nature,[118] a jurisdiction clause is an alternative to an arbitration agreement and they should not be combined in the same contract.[119] This is because a valid reference to arbitration is a contractual obligation to pursue any disputes before an arbitration tribunal to the exclusion of the courts.[120] There have been a number of cases where the court has had to consider clauses providing for resolution of disputes by both arbitration and the courts and it then has to endeavour to ascertain the parties' intentions. That is not always a straightforward task. However, where the circumstances warrant, it seems the court will strive to give effect to apparently conflicting provisions by construing the refer-

---

[115] In *David Wilson Homes Ltd v Survey Services Ltd (in liquidation)* [2001] 1 All E.R. (Comm) 449 a clause provided simply for disputes to be "referred to a Queen's Counsel of the English Bar to be mutually agreed [between the parties]". At first instance the judge held that the clause was not an arbitration clause but was a clause providing either for expert determination or for a non-binding opinion. The Court of Appeal disagreed and held it was an arbitration clause because the parties intended there to be a procedure in the nature of a judicial inquiry. By contrast, an agreement providing for an "appraisal" by two appraisers and an arbitrator was held not to be binding as an arbitration agreement within the meaning of the Act, which contemplates the resolution of disputes by an impartial tribunal acting on its own, not in conjunction with anyone else: see *Turville Heath Inc v Chartis Insurance UK Ltd* [2012] EWHC 3019 (TCC).

[116] The law relating to exclusive and non-exclusive jurisdiction clauses is outside the scope of this work. See further, Briggs, Rees, *Civil Jurisdiction and Judgments*, 6th edn, (Routledge, Informa Law, 2015).

[117] Notably the Recast Brussels Regulation; the Brussels Convention and the Lugano Convention.

[118] See para.2-038.

[119] See though paras 2-018 et seq. in relation to options to arbitrate or litigate which may necessitate provision for both forms of dispute resolution in the parties' contract.

[120] Save insofar as the court may be asked to use its supervisory or supportive powers in relation to an arbitration: see Chs 7 and 8.

ences to the jurisdiction of the court as relating to its supportive and supervisory jurisdiction over the tribunal.[121]

**The court's approach.**    The courts take a pragmatic approach to the difficulties     **2-028**
that can arise when parties agree both a jurisdiction clause and an arbitration agreement in the same contract, tending to give primary weight to the arbitration agreement. So, for example, where printed conditions provided for the jurisdiction of the courts of Lima, Peru but a typed clause provided for "arbitration according to the conditions and laws of London", this was held to be an express choice of arbitration in London. Kerr LJ asked the rhetorical question: "How would the judge in Lima like to conduct a case according to English procedural law?"[122] In another case a clause in an international commercial contract provided for ICC arbitration, whilst another clause in the same contract provided for English law and that the courts of England should have exclusive jurisdiction. Steyn J rejected the argument that there was a hopeless inconsistency between the clauses, and held, on the proper construction of the clauses, that the second clause provided the law governing the arbitration and the reference to the jurisdiction of the courts referred to their supervisory powers.[123] Similarly a contract on GAFTA Form 100 provided that

> "the Court of England or arbitrators appointed in England, as the case may be, shall, except for the purpose of enforcing any award made in pursuance of the arbitration clause hereof, have exclusive jurisdiction over all disputes which may arise under this contract".

This was followed by an arbitration clause covering any dispute arising out of or under the contract. Colman J found that those disputes which were within the ambit of the arbitration agreement fell within the exclusive jurisdiction of the arbitrators and all others were within the jurisdiction of the court.[124] The Court of Appeal disagreed and concluded that the exclusive jurisdiction clause was intended to apply both where the contract provides for arbitration and where it does not, so that if provision for arbitration is included, as it was here, the exclusive jurisdiction of the English court does not take effect.[125] Recent case law further illustrates the courts' pragmatism in giving effect to arbitration clauses in the same contract, even when the relevant contract also contains an exclusive jurisdiction clause.[126] However, there are limits to this pragmatism, including where it is not clear that the

---

[121] See, e.g. *Paul Smith v H&S International Holding Inc* [1991] 2 Lloyd's Rep. 127 discussed in the following paragraph.

[122] *Naviera Amazonica Peruana SA v Compania Internacional de Seguros del Peru* [1988] 1 Lloyds Rep. 116.

[123] *Paul Smith v H&S International Holding Inc* [1991] 2 Lloyd's Rep. 127; followed in *Axa Re v Ace Global Markets Ltd* [2006] EWHC 216. See also *Daval Aciers D'Usinor et de Sacilor v Armare Srl (The Nerarno)* [1996] 1 Lloyd's Rep. 1; *Braes of Doune Wind Farm (Scotland) Ltd v Alfred McAlpine Business Services Ltd* [2008] EWHC 426 (TCC) at [17]. In *Shell International Petroleum Co Ltd v Coral Oil Co Ltd* [1999] 1 Lloyd's Rep. 72 the reference to the English courts was held to be confined to disputes about the proper law of the contract. See *Indian Oil Corp v Vanol Inc* [1991] 2 Lloyd's Rep. 634.

[124] *Toepfer International GmbH v Société Cargill France* [1997] 2 Lloyd's Rep. 98.

[125] *Toepfer International GmbH v Société Cargill France* [1998] 1 Lloyd's Rep. 379, 386.

[126] See e.g. *Sulamerica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2012] EWHC 42 (Comm) where a Brazilian jurisdiction clause was held to be relevant only for enforcement purposes. The Court of Appeal refused permission to appeal against this part of the decision: *Sulamerica CIA Nacional de Seguros SA v Enesa Engenharia SA* [2012] EWCA Civ 638. See also *ACE Ltd v CMS Energy Corporation* [2008] EWHC 1843 at [94] in which a service of suit clause was held not to exclude from the scope of the arbitration clause a money claim, but was instead intended to ensure that the US party was amenable to US jurisdiction for the purpose of any enforcement proceedings; *Braes of Doune Wind Farm (Scotland) Ltd v Alfred McAlpine Business Services Ltd* [2008]

parties have in fact agreed to refer their disputes to arbitration or where the agreement is too uncertain to be enforceable in which case, the jurisdiction clause will prevail.[127] The different approach of the courts for cases involving competing arbitration and jurisdiction clauses in multiple agreements is addressed below.[128]

**2-029**    **Expert determination (or valuation).[129]**    Like arbitration, expert determination provides for the final resolution of disputes by a private individual or individuals to whom issues are referred for a binding decision. Traditionally a distinction has been drawn between the two on the basis that a tribunal must act judicially by applying the law whereas an expert, unless the parties agree some other basis for his decision, decides according to his own expert opinion.[130] This has become a less clear distinction now that, if agreed by the parties, a tribunal is entitled to base its decision on "other considerations",[131] although if the requirement to act judicially can be established it will resolve the issue.[132] Experts are often appointed to get the benefit of their professional (non-legal) expertise in deciding technical issues, but arbitrators appointed for their technical expertise have long been a feature of English arbitration.[133] Experts have traditionally been involved in determinations prior to the existence of a dispute, whereas an arbitration tribunal deals with disputes after they have arisen. A more recent development is the use of experts, notably lawyers, to decide all aspects of a dispute, rather than particular technical issues. As a result of these factors the distinction between experts and arbitrators has in some cases become somewhat blurred although there are significant practical differences since expert determination is not governed by the Arbitration Act 1996 nor any other statutory code.[134]

**2-030**    **Construction of contractual provision.**    Whether a contract's chosen form of dispute resolution is expert determination or arbitration is a matter of construction of the contract, which involves an objective inquiry into the intentions of the parties. In this regard, the Court of Appeal has held that there is

> "no presumption in favour of giving a wide and generous interpretation to the jurisdiction of the expert conferred by the expert determination clause as the reasoning in *Fiona Trust* is inapplicable".[135]

The rationale for this is that the inclusion of a separate jurisdiction clause alongside an expert determination clause usually indicates a choice by the parties that only certain types of dispute should be submitted to expert determination which is in contrast to the rationale for "one-stop" adjudication which applies to arbitration fol-

---

EWHC 426 (TCC) at [17] where the court was of the view that an exclusive jurisdiction clause referred to the court's residual jurisdiction under the Arbitration Act 1996. For a contrary approach, see *Guidance Investments v Guidance Hotel Investment Co* [2013] EWHC 3413, where Hamblen J gave primacy to the non-exclusive jurisdiction provision despite apparent overlap between that clause and the arbitration clause. See also para.2-038.

[127]    See *Kruppa v Benedetti* [2014] EWHC 1887 at [9] in which the parties agreed to "endeavour" to resolve disputes through "Swiss arbitration", failing which their disputes were subject to the non-exclusive jurisdiction of the English courts.

[128]    See para.2-074.

[129]    See generally, J. Kendall J, *Expert Determination*, 5th edn, (London: Sweet & Maxwell, 2014).

[130]    *Re Carus-Wilson v Green* (1886) 18 Q.B. 7; *David Wilson Homes Ltd v Survey Services Ltd (in liquidation)* [2001] 1 All E.R. (Comm) 449.

[131]    Arbitration Act 1996 s.46. See further paras 2-115 et seq.

[132]    *David Wilson Homes Ltd v Survey Services Ltd (in liquidation)* [2001] 1 All E.R. (Comm) 449.

[133]    See paras 6-075 et seq.

[134]    See e.g. *Re British Aviation Insurance Co* [2005] EWHC 1621 at [130]-[132]; *Barclays Bank Plc v Nylon Capital LLP* [2011] EWCA Civ 826 at [23].

[135]    *Barclays Bank Plc v Nylon Capital LLP* [2011] EWCA Civ 826 at [28].

lowing *Fiona Trust*.[136] The express words used may give a strong indication of the parties' intentions and the phrase "as an expert and not as an arbitrator" is frequently used to signify that the process is intended to be one of expert determination. The terminology used is likely to be persuasive,[137] though not always conclusive, and it is not necessary for a clause to refer to arbitration in order for it to take effect as an arbitration agreement.[138] Where the express wording is ambiguous, the court looks first at the other provisions of the contract to try to resolve the ambiguity.[139] If that does not resolve the matter the court will refer to certain guidelines which may serve to distinguish which process the parties intended to adopt.[140] Of these, the most important used to be whether there was an "issue" between the parties, such as the value of an asset, on which they had not taken defined positions, in which case the procedure was held to be expert determination. If there was a "formulated dispute" between the parties where defined positions had been taken, the procedure was held to be arbitration.[141] This concept is in many cases somewhat artificial as the parties will often be in dispute about a matter before it is referred to an expert, and the fact that there is a pre-existing dispute is not generally determinative of the type or procedure involved.[142] However, in appropriate cases, this guideline is still relied on.[143] A further guideline, as noted above, is the judicial function of a tribunal as opposed to the application of his professional expertise by the expert.[144] A tribunal arrives at its decision on the evidence and submissions of the parties and must apply the law or, if the parties agree, other considerations.[145] An expert, unless it is agreed otherwise, makes his own inquiries, applies his own expertise and decides on the basis of his own expert opinion.[146] This distinction does

---

[136] See para.2-079.

[137] *Palacath Ltd v Flanagan* [1985] 2 All E.R. 161; *Wilky Property Holdings Plc v London & Surrey Investments Ltd* [2011] EWHC 2226 at [31] where the use of "expert and not arbitrator" was "a form of words, when used, [which] puts it beyond doubt that the dispute resolver is not intended to be an arbitrator" and that "parties who have, in a carefully drafted written agreement, expressly chosen to refer their disputes to an expert should not be taken to have intended a reference to arbitration".

[138] *Taylor v Yielding* (1912) 56 S.J. 253. See also *Hammond and Waterton* (1890) 62 L.T. 808; *Crowther v Rayment* [2015] EWHC 427 (Ch) at [27]. See also *England and Wales Cricket Board Ltd v Kaneria* [2013] EWHC 1074 (Comm) at [50] where Cooke J confirmed that "there can be no basis for saying that there has to be an express reference to the word … 'arbitration' in order for an arbitration agreement to arise". Contrast with a clause which does refer to arbitration, yet does not take effect as such because it does not provide for a decision that is final and binding: see *O'Callaghan v Coral Racing Ltd* , unreported 26 November 1998, *The Times* (CA). Inconsistent headings cannot prevail over the express wording of the clause if that is clear: *Cott UK Ltd v FE Barber Ltd* [1997] 3 All E.R. 540.

[139] *Langham House Developments Ltd v Brompton Securities Ltd* (1980) 256 E.G. 719.

[140] Or "indicia", established by Lord Wheatley in *Arenson v Casson Beckman Rutley & Co* [1975] 3 W.L.R. 815.

[141] *Collins v Collins* (1856) 26 Beav. 306 at 312; *Tharsis Sulphur & Copper Co Ltd v Loftus* (1872) L.R. 8 CP 1; *Chambers v Goldthorpe* [1901] 1 Q.B. 624; *Sutcliffe v Thackrah* [1974] 1 A.C. 727 at 762; *C and D Leigh v English Property Corp Ltd* [1976] 2 Lloyd's Rep. 298; *North Eastern Cooperative Society Ltd v Newcastle upon Tyne City Council* [1987] 1 E.G.L.R. 142 at 146A; *Capricorn Inks Pty Ltd v Lawter International (Australia) Pty Ltd* [1989] 1 Q.B. 8 at 15; *Ipswich Borough Council v Fisons Plc* [1990] 1 W.L.R. 108.

[142] *Wilky Property Holdings Plc v London & Surrey Investments Ltd* [2011] EWHC 2226 at [44] where the court held that there is "no general proposition that a clause providing for the binding resolution of a pre-existing dispute is necessarily an arbitration clause".

[143] *Ipswich Borough Council v Fisons Plc* [1990] 1 W.L.R. 108 at 115D.

[144] *David Wilson Homes Ltd v Survey Services Ltd (in liquidation)* [2001] 1 All E.R. (Comm) 449.

[145] Arbitration Act 1996 s.46.

[146] *Palacath v Flanagan* [1985] 2 All E.R. 161, at 166.

not apply in the case of "look-sniff arbitrations",[147] although these are rare.[148] A further distinction, that the parties agree to accept an expert's decision as final, whereas a tribunal's award can be appealed, has become less important because of the restrictions on appeals from arbitration awards.[149] It is also the case that regardless of the agreement between the parties, the courts will review a decision of an expert in certain limited circumstances.[150]

**2-031** **Procedural differences distinguishing expert determination.**    One of the main differences between expert determination and arbitration has traditionally been the procedure adopted to reach the decision.[151] There is usually a greater degree of formality in arbitration which arises from the judicial nature of the decision (in most cases) and the court's role in supervising the conduct of arbitration pursuant to its statutory powers.[152] However, under the 1996 Act, subject to any contrary agreement between the parties, a tribunal is given a great deal of flexibility in determining the procedure to be adopted.[153] The Arbitration Act 1996 makes clear that the tribunal may take the initiative in ascertaining the facts and the law,[154] and it can direct that there should be no oral evidence or oral submissions.[155] A tribunal has to comply with its statutory duty of fairness,[156] and machinery exists to permit its removal for failure to do so,[157] but otherwise it has considerable scope for determining the procedure most suited to the needs of the case, subject to any agreement of the parties. There is also authority that an expert is subject to an implied duty to act fairly when conducting an expert determination.[158]

**2-032** **Expert determination treated differently from arbitration.**    The following features demonstrate how expert determination is treated differently from arbitration in a number of important respects.

- An expert determination is constrained by the terms of the clause referring the matter to expert determination, whereas much is incorporated into an arbitration agreement by statute and by judicial precedent. For example, the court generally has no power to appoint an expert, whereas statute provides the court with the power to appoint an arbitrator.[159] Similarly there is no obligation of confidentiality in relation to expert determination unless one has been contractually agreed.
- An arbitration award can be challenged on grounds of "serious irregular-

---

[147] *Finnegan v Allen* [1943] 1 K.B. 425; *Mediterranean and Eastern Export Co Ltd v Fortress Fabrics (Manchester) Ltd* [1948] 2 All E.R. 186. See para.5-121.
[148] Perhaps because the procedure contemplated is more suited to expert determination.
[149] Arbitration Act 1996 s.69. See paras 8-132 et seq.
[150] See for example *Veba Oil Supply & Trading GmbH v Petrotrade Inc* [2001] EWCA Civ 1832; [2002] 1 All E.R. 703; *Walton Homes Ltd v Staffordshire CC* [2013] EWHC 3428 (Ch). An expert's decision can be reviewed for material manifest error or a material failure to follow instructions.
[151] So for example in *Town & City Properties v Wiltshier Southern Ltd and Gilbert Powell* [1988] 44 B.L.R. 109 an arbitrator who said that the hearing should take the form of meetings between himself and the technical representatives of the parties, and not a trial-type hearing with oral evidence, cross-examination and speeches, was said by the court to have adopted a process which was "really that of a valuation, rather than an arbitration" (at 119).
[152] See generally Chs 7 and 8.
[153] Pursuant to the Arbitration Act 1996 s.34(1).
[154] Arbitration Act 1996 s.34(2)(g).
[155] Arbitration Act 1996 s.34(2)(h).
[156] See paras 4-108 and 5-034 et seq.
[157] See paras 7-121 et seq.
[158] *Worrall v Topp* [2007] EWHC 1809; *Ackerman v Ackerman* [2011] EWHC 3428 (Ch).
[159] Arbitration Act 1996 s.18.

ity" in the conduct of the arbitration,[160] but this is a statutory remedy for which there is no common law analogue in expert determination.[161]

- An expert's decision can only be enforced as a matter of contract and not pursuant to the statutory machinery available in respect of an arbitration award.[162]
- An expert can be sued for negligence,[163] while an arbitrator has immunity.[164]
- There can be no appeal on a point of law from an expert determination, unless the wrong law has been applied to the issue for determination,[165] in which case there is not, strictly speaking, an appeal, but rather the decision can be challenged.[166] The parties to an arbitration can appeal against a tribunal's award on a point of law only in certain limited circumstances.[167]

**Adjudication.**    The word adjudication suggests a judicial decision-making process, but it is also used to refer to a system of interim dispute resolution used specifically in connection with construction contracts. Adjudication was for many years found only in some of the standard forms of construction contracts and was reserved for certain kinds of disputes. It is now mandatory for all disputes under many types of construction contracts.[168] Dyson J (as he then was) in *Macob Civil Engineering Ltd v Morrison Construction Ltd*,[169] explained that:    **2-033**

> "The intention of Parliament in enacting the Act was plain. It was to introduce a speedy mechanism for settling disputes in construction contracts on a provisional interim basis, and requiring the decisions of adjudicators to be enforced pending the final determination of disputes by adjudication, litigation or agreement."

**Relationship of adjudication to arbitration.**    The relationship of adjudication to arbitration was described in *London & Amsterdam Properties Ltd v Waterman Partnership Ltd*[170] as follows:    **2-034**

> "Arbitration and adjudication are dispute resolution procedures which have many similarities, they are privately conducted and confidentiality may attach to information received in relation to both. Arbitration gives rise to a final determination which is capable of registration for enforcement. Adjudication gives rise to a provisional determination which is only binding until the dispute is arbitrated, litigated or agreed. Adjudication further is subject to very restrictive time limits, and no matter how complex the dispute 'one size fits all'. Arbitration has no such limits imposed by Parliament."

---

[160] See paras 8-084 et seq.
[161] See though *Worrall v Topp* [2007] EWHC 1809 where it was held that there existed an implied obligation on the expert to act fairly.
[162] See paras 8-002 et seq.
[163] *Arenson v Casson Beckman Rutley & Co* [1975] 3 W.L.R. 815
[164] See paras 4-156 et seq.
[165] *Nikko Hotels (UK) Ltd v MEPC Plc* [1991] 28 E.G. 86.
[166] As was sought, unsuccessfully, in *Nikko*. See also *Barclays Bank Plc v Nylon Capital LLP* [2011] EWCA Civ 826 at [69].
[167] Arbitration Act 1996 s.69. See paras 8-132 et seq.
[168] Housing Grants, Construction and Regeneration Act 1996 s.108. For the wide definition of construction contracts, see s.104. For the operations excepted from the statutory provisions, see s.105(2). See generally *Keating on Construction Contracts* (9th edn, 2015) at para.18-015.
[169] *Macob Civil Engineering Ltd v Morrison Construction Ltd* [1999] B.L.R. 93 at [24].
[170] *London & Amsterdam Properties Ltd v Waterman Partnership Ltd* [2003] EWHC 3059; [2004] B.L.R. 179 at [136].

It will be observed that, although adjudication produces interim rather than final decisions, those decisions are binding pending agreement of the parties altering their effect or the reference of disputes about them to arbitration or litigation.[171] It is therefore perfectly consistent to make provision for adjudication followed by the possibility of challenge to the adjudicator's decision by arbitration.[172] Indeed this is employed in many construction contracts.

**2-035**    **Enforcement of adjudicator's decision.**    The court has held that an adjudication decision cannot be enforced as an arbitration award[173] but should be enforced by the court's summary judgment procedure under CPR Pt 24.[174] The existence of an arbitration agreement pursuant to which the dispute will be finally resolved does not prevent enforcement by the court of the adjudicator's decision on a temporary basis.[175] Nor will an application to stay court proceedings under s.9 of the Arbitration Act 1996[176] be effective to prevent enforcement of the adjudicator's decision.[177]

**2-036**    **ADR.**    Alternative dispute resolution (ADR) is regarded by English practitioners as any system of dispute resolution which is non-binding. Used in this context, "non-binding" means that the parties are under no obligation to comply with any decision or determination resulting from the process, if indeed there is one.[178] Nor are the parties obliged to participate in or continue with the process in the absence of express contractual provision to that effect. Where the parties do agree to adopt an ADR process they may be obliged to refer their dispute to a third party who is to act in some facilitative[179] or evaluative[180] capacity. The third party is not empowered to impose a decision on the parties, and, unless the parties agree on a settlement, the ADR process will not reach any binding agreement resolving the dispute. Thus ADR does not guarantee a binding result, although it can lead to one, and this is a key distinction between ADR and arbitration. Accordingly the parties should ensure that they have a binding system of dispute resolution to fall back on if they cannot agree a settlement following ADR. If no system is mentioned, the parties always have the right to litigate the dispute in court after failure to settle. ADR procedures include negotiation, mediation and conciliation,[181] mini-trial or executive tribunal, structured settlement conference, "med-arb" and expert evaluation or

---

[171] Housing Grants, Construction and Regeneration Act 1996, s.108(3). See also *Carillion Construction Ltd v Devonport Royal Dockyard Ltd* [2005] EWCA Civ 1358 at [85]–[87], *Benfield Construction Ltd v Trudson (Hatton) Ltd* [2008] EWHC 2333 (TCC) at [34]; *Carillion Construction Ltd v Smith* [2011] EWHC 2910 (TCC) at [49].

[172] Any contractual requirements of the arbitration agreement will still need to be complied with: *JT Mackley & Co Ltd v Gosport Marina Ltd* [2002] EWHC 1315. As to the scope of what is referred to arbitration see *Amec Civil Engineering Ltd v Secretary of State for Transport* [2005] 1 W.L.R. 2339.

[173] *Cameron (A) Ltd v Mowlem (John) & Co Plc* [1990] 52 B.L.R. 24.

[174] *Outwing Construction Ltd v H Randall and Son Ltd* [1999] B.L.R. 158. See also *Technology and Construction Court Guide*, 2nd edn, (HM Courts and Tribunals Service, 2014), s.9.

[175] *Absolute Rentals Ltd v Gencor Enterprises Ltd* (2001) 17 Const. LJ 322, *The Construction Group Centre v Highland Council* [2002] B.L.R. 476, [2002] C.I.L.L. 1906 and *Macob Civil Engineering Ltd v Morrison Construction Ltd* [1999] B.L.R. 93.

[176] See para.7-009.

[177] See *Comsite Projects Ltd v Andritz AG* [2003] EWHC 958; (2004) 20 Const. LJ 24 at [21].

[178] Which is unlikely unless the form of ADR chosen calls for some form of "early neutral determination".

[179] Assisting the negotiation without giving an opinion on the issues.

[180] Giving an opinion on the issues.

[181] The expressions "mediation" and "conciliation" are often used interchangeably, and the processes are difficult to distinguish in practice. The term "mediation" has become more popular in recent years.

non-binding appraisal.[182] They place a premium on party involvement. Like arbitration and expert determination, they are private and confidential, but they are also without prejudice, in the sense that oral and written exchanges cannot be disclosed in any subsequent legal proceedings.[183] The use of mediation in particular has greatly increased in the last two decades, particularly following court-led initiatives to impose it upon litigating parties in an effort to resolve disputes without the need for a full trial.[184]

**Multi-tier clauses.**    Many contracts containing arbitration clauses also provide for the parties first to try to settle the matter by negotiation or discussion between senior executives and, if that fails, the dispute must be referred to mediation or some other ADR process. Only when these steps have failed is the matter to be referred to arbitration. This type of clause, which contemplates at least two different levels of dispute resolution procedure, is known as a multi-tier or multi-level clause.[185] Depending on the form of words used, these clauses may or may not give rise to a binding obligation to submit to the different forms of dispute resolution before starting an arbitration. Where such preliminary steps are expressed in mandatory terms so as to constitute a condition precedent to the right to arbitrate they must be complied with.[186] In many cases however they will not be mandatory and it may then be possible for the claimant to commence arbitration even without complying with them.[187] Generally speaking, an obligation simply to negotiate is not binding.[188] However, this is an area in which the law is currently unsettled in particular as regards a requirement to negotiate before commencing arbitration. In *Emirates Trading Agency LLC v Prime Mineral Exports Private Ltd*, Teare J held that a time-limited requirement to hold "friendly discussions" was not only a binding pre-condition to commencing arbitration, it was also subject to an implied obligation to do so in good faith.[189] This contrasts with the approach of Hildyard J in *Tang Chung Wah v Grant Thornton International Ltd*, in which a similarly time-limited requirement to hold an "amicable conciliation [of] an informal nature" was held to "lack sufficient definition and certainty to constitute enforceable condi-

**2-037**

---

[182] See generally Brown & Marriott, *ADR Principles and Practice*, 3rd edn (London: Sweet & Maxwell, 2011). "Med-arb" is different because if a mediation fails the mediator is then to act as an arbitrator. Apparently popular in the United States, "med-arb" is regarded with suspicion in some countries, including England, because of the difficulties arising from the private disclosures made to the mediator who then becomes an arbitrator.

[183] See, for example, *Aird v Prime Meridian Ltd* [2006] EWCA Civ 1866 at [5], *Farm Assist (in liquidation) v The Secretary of State for the Environment, Food and Rural Affairs (No.2)* [2009] EWHC 1102 (TCC) at [42].

[184] CPR Pt 26, r.4.

[185] See for example *National Boat Shows Ltd v Tameside Marine* [2001] W.L. 1560826.

[186] See *JT Mackley & Co Ltd v Gosport Marina Ltd* [2002] EWHC 1315 where, amongst other things, failure to comply with a condition precedent rendered the arbitration notice invalid.

[187] *Sulamerica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2012] EWHC 42 (Comm), (approved by the Court of Appeal at [2012] EWCA Civ 638 at [36]); *Tang Chung Wah v Grant Thornton International Ltd* [2012] EWHC 3198. Although not an arbitration case, see also *Halifax Financial Services Ltd v Intuitive Systems Ltd* [1999] 1 All E.R. (Comm) 303.

[188] See *Courtney & Fairbairn Ltd v Tolaini Brothers (Hotels) Ltd* [1975] 1 W.L.R. 297, where an agreement to negotiate price was held to be unenforceable; *Itex Shipping Pte Ltd v China Ocean Shipping Co (The "Jing Hong Hai")* [1989] 2 Lloyd's Rep. 522; *Sulamerica Cia Nacional de Seguros SA v Enesa Engenharia SA* [2012] EWHC 42 (Comm), where an agreement to "seek" to have the dispute resolved by mediation was too uncertain to be enforceable (approved by the Court of Appeal at [2012] EWCA Civ 638 at [36]).

[189] *Emirates Trading Agency Llc v Prime Mineral Exports Private Ltd* [2014] EWHC 2104 at [51]–[52], describing as "masterly" the decision of Leggatt J in *Yam Seng Pte Ltd v International Trade Corporation Ltd* [2013] EWHC 111 (QB).

tions precedent to the commencement of arbitration".[190] When drafting a multi-tier clause it is therefore important to bear this in mind. At a minimum, it is advisable to set out time limits within which each stage of the process is to be completed, so that the parties can be certain about when they can proceed to the next level. If a requirement to attempt to find a resolution of the dispute by negotiation is intended to be a binding pre-condition to arbitration, this time limit should be coupled with clear words setting out the steps each party is required to take to put the process in place, thereby enabling a court to objectively determine the minimum required of the process and when it will be exhausted.[191] For example, a reference to resolving a dispute through an ADR procedure "as recommended by … the Centre for Dispute Resolution" may be sufficient.[192] In some cases the decisions made during the initial steps are binding on the parties, at least until a court or tribunal rules on the point.[193] An application can be made for a stay of court proceedings brought in breach of an agreement to arbitrate[194] even where the matter is to be referred to arbitration only after the exhaustion of other dispute resolution procedures, which includes both binding and non-binding systems.[195]

**2-038**    **Hybrid clauses.**    Some contracts provide that particular disputes will be resolved by one form of dispute resolution and other types of dispute by some other method. For example, it is common in an agreement for the sale and purchase of a business for disputes concerning the calculation of deferred consideration to be referred to expert determination whilst all other disputes under the agreement are to be resolved by arbitration or by the courts. Some questions of default, such as the failure to pay an instalment due, might be settled more effectively by litigation, whose summary procedures[196] have no direct counterpart in arbitration, whilst valuation and/or technical questions in the same contract might be settled more simply by expert determination. Some clauses distinguish between resolving disputes as to liability, which fall within the arbitration agreement, and those as to damages, which do not. The key issue when dealing with such provisions is to ensure that it is clear precisely which types of disputes fall to be resolved by each mechanism.[197] The difficulties that arise, and the scope for avoidable litigation, where precise words are not used is illustrated by *Guidance Investments v Guidance Hotel Investment Co*.[198] In that case a dispute arose about whether a counterclaim fell within the scope of the arbitration agreement which applied to disputes arising out of "an Event of Default under clause 9" or whether it was subject to the non-exclusive jurisdiction of the English court under a separate provision. It may assist to provide expressly how this is to be determined in the event of disagreement between the parties. So, for example, the expert might be empowered to determine whether particular disputes fall within his jurisdiction and the parties agree to be bound by that decision. Alternatively, the clause might provide that unless both parties agree that

---

[190]  *Tang Chung Wah v Grant Thornton International Ltd* [2012] EWHC 3198 at [82].
[191]  *Tang Chung Wah v Grant Thornton International Ltd* [2012] EWHC 3198 at [60].
[192]  *Cable & Wireless Plc v IBM United Kingdom Ltd* [2002] EWHC 2059.
[193]  *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] A.C. 334. See also the system of adjudication in building contracts at para.2-033.
[194]  See generally paras 7-009 et seq.
[195]  Arbitration Act 1996 s.9(2), following the decision in *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] 1 Lloyd's Rep. 291, HL. See though para.2-035 regarding enforcement of an adjudicator's decision pending arbitration.
[196]  Under CPR Pt 24. See paras 5–079 et seq.
[197]  See, for example, *May & Hassell Ltd v Vsesojuznoje Objedinenije Exportles* (1940) 66 Lloyd's Rep. 103 and *May & Hassell Ltd v Vsesojuznoje Objedinenije Exportles (No.2)* (1941) 69 Lloyd's Rep. 102.
[198]  *Guidance Investments v Guidance Hotel Investment Co* [2013] EWHC 3413 at [22].

the dispute falls to be considered by the expert then it shall be dealt with by arbitration, but this effectively gives each party a right of veto. A "hybrid" clause in the sense described here is to be distinguished from an arbitration agreement which provides for disputes to be resolved by arbitration "before" one institution but subject to the rules of another institution. While there is no case law on this under English law, in other jurisdictions such clauses have been upheld, albeit over the objections of the institution whose rules are said to apply.[199]

## 3.   FORM OF AN ARBITRATION AGREEMENT

### (a)   "A written agreement"

**Requirement of writing.**   To constitute an arbitration agreement to which the Arbitration Act 1996 applies, the agreement must be in writing.[200] The same requirement applies to other agreements between the parties.[201] However, the agreement need not be signed by the parties[202] and the agreement can be found in an exchange of communications,[203] which need not be signed.

**2-039**

**What constitutes writing?**   The requirement of writing can also be satisfied by:[204]

**2-040**

- (i)   the arbitration agreement being "evidenced in writing",[205] which includes the arbitration agreement being recorded by one of the parties, or by a third party, with the authority of the parties to the agreement[206] or
- (ii)   the arbitration agreement being made in some medium other than writing which refers to terms which are in writing[207] or
- (iii)   an exchange of written submissions (in arbitration or court proceedings) in

---

[199]  See for example *Insigma Technology Co Ltd v Alstom Technology Ltd* [2009] SGCA 24 in which the Singapore Court of Appeal upheld a clause providing for arbitration before SIAC, but applying the rules of the ICC. See also *HKL Group Co Ltd v Rizq International Holdings Pte Ltd* [2013] SGHCR 5 in which the Singapore High Court upheld an arbitration agreement providing for disputes to be resolved by arbitration before a non-existent Singapore institution under the ICC Rules, as long as the parties were able to secure the agreement of a Singapore institution to administer the arbitration; *Lucky-Goldstar International (Hk) Ltd v Ng Moo Kee Engi-Neering Ltd* [1993] 1 HKC 404 (Hong Kong); *Pricol Ltd v Johnson Controls Enterprise Ltd* Arbitration Case No. 30 of 2014 at [8] (Supreme Court of India) in which a clause referred to the "Singapore Chamber of Commerce" was construed as referring to SIAC.

[200]  Arbitration Act 1996 s.5 states that an agreement has to be in writing to bring it within Pt I of the Act. If an arbitration agreement is not in writing it is not completely ineffective: the Arbitration Act 1996 s.81(1)(b), and see para.2-015. See also the definition of international arbitration agreements in Art.II.2 of the New York Convention which specifically includes exchange of letters and telegrams; Model Law, Art.7.2 (see Appendix 4).

[201]  "Other agreements" are those on the powers of the tribunal and the procedure to be followed in the arbitration and any matter on which the parties may agree pursuant to the Arbitration Act 1996: see para.2-066.

[202]  Arbitration Act 1996 s.5(2)(a); see para.2-044.

[203]  Arbitration Act 1996 s.5(2)(b).

[204]  For an exhaustive if now slightly out-of-date study of international practice in this area, see Landau, *The Requirement for a Written Form of Arbitration Agreement: when Written means Oral*. ICCA Congress Series, no.11 (2003), pp.19–81.

[205]  Arbitration Act 1996 s.5(2)(c); see para.2-040. See also, e.g. *National Boat Shows Ltd v Tameside Marine* [2001] W.L. 1560826, where the acceptance of an offer in a prospectus by submission of an application form was held to include an agreement to be bound by the terms of the prospectus and thereby to constitute an agreement in writing.

[206]  Arbitration Act 1996 s.5(4).

[207]  Arbitration Act 1996 s.5(3).

which the existence of an arbitration agreement in some medium other than writing is alleged and not denied.[208]

"Writing" includes being recorded by any means.[209]

This very wide meaning given to the words "in writing" in the 1996 Act was considered justified on the basis of English law as it then stood.[210] It was also intended to reflect that in these times of rapidly evolving technology "writing" should include recording by any means.[211]

**2-041**  **Meaning of "evidenced in writing".**  The meaning of "evidenced in writing" was first considered by the Court of Appeal in the context of s.107 of the Housing Grants, Construction and Regeneration Act 1996, which so far as is material is in the same terms as s.5 of the Arbitration Act 1996.[212] The court concluded that for an agreement to be in writing the whole contract has to be evidenced in writing.[213] It is not sufficient merely to show that there are documents which indicate the existence of the agreement.[214] In *Ground Rent v Treasure Services*, the court confirmed that the test in *RJT Consulting Engineers Ltd v DM Engineering* is

"equally applicable to arbitrations. If a party asserted an oral agreement evidenced in writing, there had to be proof of the terms as well."[215]

**2-042**  **Reference to a written agreement.**  Where contracts for the salvage of ships are agreed orally by reference to a Lloyd's standard form of salvage agreement containing an arbitration clause, the exigencies of the disaster may remove the opportunity to sign the necessary documents.[216] Occasions when this arises have been said to be frequent and important.[217] To deal with this difficulty, it is now enacted that when parties agree otherwise than in writing by reference to terms which are in writing, they make an agreement in writing.[218] Outside the context of salvage contracts there may be little scope for the application of this provision. In principle however the parties could agree orally essential terms such as price and performance and also agree that the contract will be on certain standard terms and conditions which are in writing and include an arbitration agreement.[219]

---

[208] Arbitration Act 1996 s.5(5). It seems from the wording of the section that it is specifically the existence of an arbitration agreement which has to be alleged and not denied. If the parties simply proceed with the arbitration without specifically alleging an arbitration agreement, they may nevertheless be taken to have impliedly agreed to arbitrate: see para.2-016.

[209] Arbitration Act 1996 s.5(6).

[210] *Zambia Steel & Building Supplies Ltd v Clark & Eaton Ltd* [1986] 2 Lloyd's Rep. 225.

[211] DAC Report, para.34.

[212] *RJT Consulting v DM Engineering (Northern Ireland) Ltd* [2002] EWCA Civ 270.

[213] The majority considered that all the terms must be in writing, but Auld LJ considered it sufficient if the material in issue in the reference are evidenced in writing.

[214] Applied in *Rok Building Ltd v Bestwood Carpentry Ltd* [2010] EWHC 1409 (TCC); *Carillion Construction Ltd v Devonport Royal Dockyard Ltd* [2003] B.L.R. 79, also under s.107 of the Housing Grants, Construction and Regeneration Act 1996.

[215] *Ground Rent v Treasure Services* (unreported, 15 October 2014).

[216] For an example of an appeal from an arbitration award from a Lloyd's salvage contract, see *The Owners of the Motor Vessel Tojo Maru v NV Bureau Wijsmuller (The "Tojo Maru")* [1972] A.C. 242.

[217] DAC Report, para.36.

[218] Arbitration Act 1996 s.5(3).

[219] The limitations of a provision in identical terms in the Housing Grants, Construction and Regeneration Act 1996 in the context of construction contracts were observed in *Carillion Construction Ltd v Devonport Royal Dockyard Ltd* [2003] B.L.R. 79.

**Formality and incorporation.**   It is not necessary that an arbitration agreement be a formal agreement,[220] or that all the terms should be contained in one document. Issues as to whether an arbitration agreement has been established can arise however when it is purportedly incorporated from another document[221] or where further steps are required to make it effective.[222] If an arbitration agreement is not in writing, even in the broad sense used in the Act, it will not be governed by the Arbitration Act 1996. It may nevertheless be a valid oral agreement, in which case it will be governed by the common law.[223]

**2-043**

**Signature unnecessary.**   Signature of a written agreement by the parties is not required for an arbitration agreement to be valid under the UNCITRAL Model Law,[224] nor is it required under English law.[225] The position under the New York Convention is less clear however signature does not seem to be a mandatory requirement where, for example, the arbitration agreement is recorded in an exchange of correspondence.[226] Problems may arise if an award which is based on an arbitration agreement in an unsigned contract is sought to be enforced in another jurisdiction under the New York Convention but these problems can be overcome by having all parties sign terms of reference.[227]

**2-044**

### (b)   Incorporation by reference to another document

**Reference to another document.**   The terms of a contract may have to be ascertained by reference to more than one document. Ascertaining which documents constitute the contractual documents and in what, if any, order of priority they should be read is a problem encountered in many commercial transactions, particularly those involving shipping and construction but also increasingly in other forms of complex transaction including in the financial sector.[228] This issue has to be determined by applying the usual principles of construction and attempting to infer the parties' intentions by means of an objective assessment of the evidence. This may make questions of incorporation irrelevant if for example it is clear that the contractual documents in question are entirely separate and no intention to

**2-045**

---

[220] See *Lombard-Knight v Rainstorm Pictures Inc* [2014] EWCA Civ 356 at [34] (where the court commented that in modern business dealings, an arbitration agreement might often be found in an exchange of emails),

[221] See paras 2-045 et seq.

[222] For example in *Oceanografia SA de CV v DSND Subsea AS (The "Botnica")* [2006] EWHC 1360, a charter-party containing a London arbitration clause was agreed "subject to the signing of mutually agreeable contract terms and conditions" which in fact were signed by one party only. Following a challenge to the tribunal's jurisdiction the court held that, having proceeded with the charter-party, the parties were bound by its terms, including the arbitration clause, on the basis of both waiver and estoppel by convention, and the tribunal accordingly had jurisdiction.

[223] See para.2-015.

[224] Article 7, see para.3-066. The 2006 amendments to the Model Law contain a long and short form option which deals with the writing requirement. Neither expressly require signature. Option 1, see Art.7(3), is in very broad terms and provides that an agreement is in writing if its content is recorded in any form, even if the agreement has been concluded orally.

[225] Arbitration Act 1996 s.5(2).

[226] Article II(2) provides "The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams". See also generally, Landau, *The Requirement for a Written Form of Arbitration Agreement: When Written means Oral*. ICCA Congress Series, no.11 (2003), pp.19–81.

[227] For example, pursuant to Art.23 of the ICC Rules.

[228] *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585; *Sebastian Holdings Inc v Deutsche Bank AG (No.2)* [2010] EWCA Civ 998.

incorporate the terms of one in the other can be established.[229] However, the contractual document defining and imposing the performance obligations may be found to incorporate another document which contains an arbitration agreement. If there is a dispute about the performance obligations, that dispute may need to be decided according to the arbitration provisions of that other document. This very commonly occurs when the principal contractual document refers to standard form terms containing an arbitration agreement.[230] However the standard form wording may not be apt for the contract in which the parties seek to incorporate it, or the reference may be to another contract between parties at least one of whom is different. In these circumstances it may be possible to argue that the purported incorporation of the arbitration agreement is ineffective.[231] The draftsmen of the Arbitration Act 1996 were asked to provide specific guidance on the issue, but they preferred to leave it to the court to decide whether there had been a valid incorporation by reference.[232]

**2-046**   **Statutory guidance.**   The key question is whether the reference in an agreement to a written form of arbitration clause or to a document containing an arbitration clause constitutes an arbitration agreement. Section 6(2) of the Arbitration Act 1996 provides:

> "The reference in an agreement to a written form of arbitration clause or to a document containing an arbitration clause constitutes an arbitration agreement if the reference is such as to make that clause part of the agreement."

The provision begs the question *when* is the reference such as to make the clause part of the agreement. The courts struggled to find a consistent answer before the passing of the 1996 Act,[233] although a more consistent approach has now developed.

**2-047**   **A matter of construction.**   The basic juridical exercise involved in all these cases is the proper construction of general words of incorporation in one contract referring to the terms of another contract or document.[234]

> "The imputed mutual intention of the parties has to be arrived at by general principles of construction applicable to any other contractual term."[235]

In practice however specific rules of construction have been applied in this context and differing views have been advanced as to the proper approach to be adopted. This is perhaps best illustrated by the decision in *Aughton Ltd v MF Kent Services*

---

[229] See e.g. *The President of India v Metcalfe Shipping Co Ltd* [1969] 2 Q.B. 123. See also *Lisnave Estaleiros Navais v Chemikalien Seetransport* [2013] EWHC 338, discussed below at para.2-063.

[230] See para.2-049. In *Stretford v Football Association Ltd* [2006] EWHC 479, which was affirmed at [2007] EWCA Civ 238 though this point was not the subject of appeal, a licence was issued which required compliance with Rules of Association which contained an arbitration clause. The obligation to observe the Rules was held to be a term of the licence and the arbitration agreement was incorporated into it. See also *Whiting v Halverson* [2003] EWCA Civ 403 where a Rotary Club member was held bound by an arbitration agreement contained in a club's constitution.

[231] See paras 2-047 et seq.

[232] See DAC Report, para.42.

[233] In *Trygg Hansa Insurance Co Ltd v Equitas Ltd* [1998] 2 Lloyd's Rep. 439 it was held that the pre-1996 Act authorities were to be applied to determine whether the clause was indeed made part of the agreement in the absence of any indication in s.6(2) as to how this was otherwise to be determined. This was apparently also the intention of the drafters of the legislation: see DAC Report, para.42. The Arbitration Act 1950 was silent on incorporation by reference.

[234] *Excess Insurance Co Ltd v Mander* [1997] 2 Lloyd's Rep. 119.

[235] Per Colman J at [124]. See also *Habas Sinai Ve Tibbi Gazlar Isthisal Endustri AS v Sometal SAL* [2010] EWHC 29 (Comm) ("the function of the court is to determine what incorporation the parties intended to effect").

*Ltd*[236] where a sub-contractor's order provided for a sub-sub-contract to be "on GC/Works/1" (a standard form contract used by the British government as employer). The sub-sub-contractors claimed that this was a reference to the contract between the main contractor and the sub-contractor, which included an arbitration clause. The Court of Appeal disagreed[237] for two distinct reasons:

(i)   per Ralph Gibson LJ: The reference "on GC/Works/1" was not a reference to the contract between the sub-contractor and the main contractor, because the conditions of that contract could not be applied to the sub-sub-contract without significant modification. It was therefore not a written agreement[238]: it was a "direction in writing to a place where the terms of the arbitration agreement [were] to be found".[239]

(ii)  per Sir John Megaw: There are three factors peculiar to arbitration agreements to be considered. First, an arbitration agreement may preclude the parties from bringing a dispute before a court. Second an arbitration agreement has to be a written agreement,[240] and third an arbitration agreement is of a different nature from other types of clauses and constitutes a self-contained collateral contract. These factors apply equally to engineering contracts as they do to arbitration clauses in charterparties which it is sought to incorporate into bills of lading, with the result that, as in the charterparty cases,[241] there must be distinct and specific words expressing the parties' intention to make the incorporation.[242]

Sir John Megaw therefore concluded that specific words were necessary to incorporate an arbitration clause and that the mere reference to another contract's terms and conditions would not suffice to incorporate the arbitration clause into the contract.[243] His reasoning for imposing the requirement of specific words of incorporation was based on the three important factors peculiar to arbitration agreements outlined above. More generally, the rationale underlying the need for specific words is the application of common law rules restricting reliance on onerous or unusual terms unless those terms have been fairly brought to the attention of the recipient.[244] However, in the same case, Ralph Gibson LJ reached the conclusion that express words of incorporation were not always necessary and in some circumstances general words would be sufficient to effect incorporation depending on the terms of the arbitration agreement. His preferred approach was to look at the precise words of the contract alleged to permit incorporation and to the precise terms of the arbitration agreement. If the terms of the arbitration clause are such that they only apply to the contract in which they appear, Ralph Gibson LJ's view was that general words of incorporation would be insufficient, but if they apply to both then general words of incorporation are sufficient.

**Development of the case law.**   Sir John Megaw's view in *Aughton* followed the          **2-048**

---

[236]  *Aughton Ltd v MF Kent Services Ltd* [1991] 57 B.L.R. 1.

[237]  *Aughton Ltd v MF Kent Services Ltd* [1991] 57 B.L.R. 1.

[238]  Within what is now the Arbitration Act 1996 s.5.

[239]  Gibson LJ in *Aughton* at [29].

[240]  The case was decided under the previous legislation but the requirement for writing is now contained in the Arbitration Act 1996 s.5: see para.2-039.

[241]  *Thomas & Co v Portsea SS Co Ltd* [1912] A.C. 1: see also para.2-058.

[242]  Sir John Megaw in *Aughton* at [31] et seq.

[243]  At [31].

[244]  *William McIlroy Swindon Ltd v Quinn Insurance Ltd* [2010] EWHC 2448 at [37]; *Hood v Anchor Line (Henderson Brothers) Ltd* [1918] A.C. 837 at 847.

approach previously adopted in *Thomas & Co v Portsea SS Co Ltd*,[245] and a number of cases both before and after the 1996 Act have adopted the same approach. In *Barrett & Son (Brickwork) Ltd v Henry Boot Management Ltd*[246] Lloyd J relied on both Sir John Megaw's approach in *Aughton* and the dicta of Lord Diplock in *Bremer Vulkan Schiffbau v South India Shipping*[247] to support the conclusion that if a contract is to be incorporated into another contract there must be express reference to it in that other contract.[248] Hicks J on the other hand concluded in *Roche Products Ltd v Freeman Process Systems Ltd*[249] that he should give effect to the intentions of the contracting parties even if that was expressed as a general reference to a document to be incorporated. He saw no justification for a rule which artificially restricts the intention of the parties by requiring them to use particular forms of words to achieve incorporation.

Subject to drawing a distinction between incorporation of an arbitration agreement contained in a document setting out standard form terms or a previous contract between the same parties, and one contained in some other contract between different parties,[250] judicial thinking historically seems largely to have favoured the approach of Sir John Megaw in *Aughton*, namely that general words of incorporation are not sufficient. Rather, particular reference to the arbitration clause needs to be made to comply with s.6 of the Arbitration Act 1996, unless special circumstances exist. This was the view taken by Judge Raymond Jack Q.C. following a review of the relevant authorities in *Trygg Hansa Insurance Co Ltd v Equitas Ltd*[251] and it was supported and confirmed by Evans LJ in *Anonymous Greek Co of General Insurances, (The "Ethniki") v AIG Europe (UK)*.[252] Nevertheless the position is not entirely settled, as some recent cases appear to be moving away from this and towards permitting incorporation based on general wording save in those categories of cases where it has previously been established that specific reference is necessary.[253]

**2-049**    **Reference to standard form terms, single and two-contract cases.**    If the document sought to be incorporated is a standard form set of terms and conditions the

---

[245] *Thomas & Co v Portsea SS Co Ltd* [1912] A.C. 1.

[246] *Barrett & Son (Brickwork) Ltd v Henry Boot Management Ltd* (1995) C.I.L.L. 1026. See though *Roche Products v Freeman Process Systems Ltd* [1996] 80 B.L.R. 102; and *Secretary of State for Foreign and Commonwealth Affairs v Percy Thomas Partnership* (1998) 65 Con. L.R. 11.

[247] *Bremer Vulkan Schiffbau v South India Shipping* [1981] A.C. 909. Although as Bowsher J pointed out in *Secretary of State for Foreign and Commonwealth Affairs v Percy Thomas Partnership & Kier International* (1998) 65 Con. L.R. 11, the *Bremer Vulkan* case was not dealing with incorporation. See also *Federal Bulk Carriers Inc v Itoh & Co Ltd* [1989] 1 Lloyd's Rep. 103.

[248] See also *Cooperative Wholesale Society v Sanders & Taylor* (1995) 11 Constr. Law Jo. 118; *Trygg Hansa Insurance Co Ltd v Equitas Ltd* [1998] 2 Lloyd's Rep. 439; *Excess Insurance Co Ltd v CJ Mander* [1997] 2 Lloyd's Rep. 119. In *Alfred McAlpine Construction Ltd v RMG Electrical* [1998] A.D.R.L.J. 33 it was held that reference to terms applying to a sub-contract "as if fully set out hereunder and …fully incorporated herein" and the sub-contractor acknowledging that he fully appreciates and understands them was sufficient to meet Sir John Megaw's requirement of express words of incorporation.

[249] *Roche Products Ltd v Freeman Process Systems Ltd* [1996] 80 B.L.R. 102.

[250] See para.2-049.

[251] *Trygg Hansa Insurance Co Ltd v Equitas Ltd* [1998] 2 Lloyd's Rep. 439. Applied in *Cigna Life Insurance Co of Europe SA-NV v Intercaser SA de Seguros y Reaseguros* [2002] 1 All E.R. (Comm) 235; *American International Specialty Lines Insurance Co v Abbott Laboratories* [2002] EWHC 2714.

[252] *Anonymous Greek Co of General Insurances, (The "Ethniki") v AIG Europe (UK)* [2000] 2 All E.R. 566 at 575.

[253] See para.2-051.

courts are more likely to accept that general words of incorporation will suffice.[254] This is because the parties can be expected to be more familiar with those standard terms, including the arbitration clause.[255] In *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2*[256] the court drew a distinction between what it described as a "two-contract case", that is where the arbitration clause is contained in a secondary document which is a contract to which at least one party is different from the parties to the contract in question, and "a single contract case" where the arbitration clause is in standard terms to be found in another document.[257] Relying on dictum of Bingham LJ in *Federal Bulk Carriers Inc v C Itoh & Co Ltd (The "Federal Bulker")*,[258] Langley J stated that:

> "In principle, English law accepts incorporation of standard terms by the use of general words and, I would add, particularly so when the terms are readily available and the question arises in the context of dealings between established players in a well-known market. The principle, as the dictum makes clear, does not distinguish between a term which is an arbitration clause and one which addresses other issues. In contrast, and for the very reason that it concerns other parties, a 'stricter rule' is applied in charterparty/bills of lading cases. The reason given is that the other party may have no knowledge nor ready means of knowledge of the relevant terms. Further, as the authorities illustrate, the terms of an arbitration clause may require adjustment if they are to be made to apply to the parties to a different contract."

The court therefore reinforced the distinction between incorporation by reference of standard form terms and of the terms of a different contract, and concluded that in a single contract case general words of incorporation are sufficient, whereas by its nature a two-contract case may require specific reference to the other contract,[259] unless the secondary document is stated to be based on standard form terms containing an arbitration agreement. In that case, presumably specific reference to the arbitration clause would not be needed. As discussed below, this approach has been endorsed in subsequent cases, albeit drawing a slightly different but "material" distinction between incorporation of the terms of a separate contract—standard or otherwise—made between the same parties which are treated as "single contract" cases, even where there is in fact more than one contract; and those where the terms to be incorporated are contained in a contract between one or more different parties which are treated as the "two contract" cases.[260]

**Extension of the single contract cases.**   Recently, the courts appear to have extended the "single contract" principle applicable to standard form contracts,   **2-050**

---

[254] See e.g. *Trafigura Beheer BV v Yieh Phui (China) Technomaterial Co Ltd & Otrs* [2009] EWHC 2054 at [75]–[78]; *William McIlroy Swindon Ltd v Quinn Insurance Ltd* [2010] EWHC 2448 at [43] and [48], although Edwards-Stuart J did consider whether or not the arbitration clause in question (a) had been brought to the attention of the party concerned, and (b) was onerous. The same will apply to standard rules and regulations which are incorporated into a contract: *Stretford v Football Association Ltd* [2006] EWHC 479; *Whiting v Halverson* [2003] EWCA Civ 403.

[255] See *Modern Building Wales v Limmer and Trinidad Co* [1975] 2 Lloyd's Rep. 318; *Extrudakerb (Maltby Engineering) Ltd v Whitemountain Quarries Ltd* [1996] N.I. 567; *Hackwood Ltd v Areen Design Services Ltd* (2006) 22 Const. LJ 68. See also Andrew Tweeddale, "*Incorporation of Arbitration Clauses*", Arbitration (2002), Vol.68, No.1 at 48.

[256] *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2* [2006] EWHC 2530.

[257] At [62].

[258] *Federal Bulk Carriers Inc v C Itoh & Co Ltd (The "Federal Bulker")* [1989] 1 Lloyd's Rep. 103 at 105.

[259] See also *Impala Warehousing and Logistics v Wanxiang Resources (Singapore) Pte Ltd* [2015] EWHC 25 (Comm) at [19] (where the existence of a specific reference to "disputes" was found to be sufficient to incorporate standard terms and conditions including an exclusive jurisdiction clause, apparently adopting the approach typically applied in "two contract" cases).

[260] See para.2-050.

where general words of incorporation will suffice, to other types of contract where the same rationale can be said to apply. Thus, if the document sought to be incorporated is a bespoke contract between the same parties, the courts have accepted this as a "single contract" case where general words of incorporation will suffice, even though the other contract is not on standard terms and constitutes an entirely separate agreement.[261] The rationale for this approach is that the parties have already contracted on the terms said to be incorporated and are therefore even more likely to be familiar with the term relied on than a party resisting incorporation of a standard term.[262] Put another way, if general words of incorporation are sufficient for the latter, they should be even more so for the former. The courts also appear to have accepted as a "single contract" case a situation where the contract referred to is between one of the parties to the original contract and a third party, where the contracts as a whole "were entered into in the context of a single commercial relationship".[263]

**2-051**  **When specific reference required.**    In *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2*[264] the court referred to the stricter approach which requires specific reference to the arbitration agreement as being applicable in cases involving bills of lading that incorporate some or all of the terms of the charterparty. The rationale for this is that bills of lading are negotiated instruments which may come into the hands of a person in another jurisdiction who has no ready means of ascertaining the terms of the charterparty. As a result, the arbitration or jurisdiction clause in the charterparty must be expressly referenced if it is to be incorporated into the bill of lading.[265] The terms of the charterparty may not be applicable without modification and this too indicates specific reference is necessary in order to make clear that incorporation is intended. This approach has also been applied in other areas, notably reinsurance contracts and construction contracts.[266] In principle, the rationale for requiring specific words of incorporation, notably the absence of knowledge of the terms of another contract between different parties and the need for adjustment of the terms as written, should not be limited to those situations. However, see *Habas Sinai Ve Tibbi Gazlar Isthisal Endustri AS v Sometal SAL*[267] in which the court expressed reservation

> "about extending the restrictive approach beyond those cases where its application is already established, let alone extending it into supposedly analogous situations."[268]

**2-052**  **Contrast with the Model Law.**    The current position therefore seems to be that

---

[261] *Habas Sinai Ve Tibbi Gazlar Isthisal Endustri AS v Sometal SAL* [2010] EWHC 29 (Comm).

[262] *Habas Sinai Ve Tibbi Gazlar Isthisal Endustri AS v Sometal SAL* [2010] EWHC 29 (Comm) at [52].

[263] *Stellar Shipping Co LLC v Hudson Lines* [2010] EWHC 2985 at [61]. As discussed in para.2-059, however, the court was of the view that this case was not one involving incorporation by reference at all. See also *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437.

[264] *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2* [2006] EWHC 2530.

[265] *Caresse Navigation Ltd v Zurich Assurances MAROC* [2014] EWCA Civ 1366 at [15].

[266] See e.g. *AIG Europe UK Ltd v Anonymous Greek Insurance Company of General Insurances, The Ethniki* [2000] 1 Lloyd's Rep. IR 343; and *Caresse Navigation Ltd v Zurich Assurances MAROC* [2014] EWCA Civ 1366 where the jurisdiction clause was effectively incorporated. The submissions in *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd (The "Athena") No.2* [2006] EWHC 2530 at [62] also referred specifically to reinsurance contracts and construction contracts. See also *Pine Top Insurance Co Ltd v Unione Italian Anglo Saxon Reinsurance Co Ltd* [1987] 1 Lloyd's Rep 476 (obiter). For incorporation by reference in reinsurance contracts see para.2-057, in construction contracts see para.2-055 and in bills of lading see para.2-058.

[267] *Habas Sinai Ve Tibbi Gazlar Isthisal Endustri AS v Sometal SAL* [2010] EWHC 29 (Comm) at [2].

[268] *Stellar Shipping Co LLC v Hudson Lines* [2010] EWHC 2985 at [64].

if the arbitration agreement is incorporated from a standard form a general refer-
ence to those terms is sufficient, but at least in the case of reference to a non-
standard form contract in the context of construction and reinsurance contracts and
bills of lading a specific reference to the arbitration agreement is necessary. As for
reference to an arbitration agreement in non-standard form terms outside those
particular fields the position is less clear, but it seems that generally if the contract
to be incorporated is between the same parties, a general reference will suffice. Even
where the contract to be incorporated is between parties at least one of which is dif-
ferent, recent judicial thinking appears to be leaning away from the requirement for
specific reference outside of the cases where it is already established as being
required.[269] The previous approach led to the rather odd result that the English courts
have in a number of cases applied the wording of s.6(2) of the Arbitration Act 1996
to support a restrictive approach, whilst courts in other jurisdictions interpreting the
very similar wording of the pre-2006 version of Art.7(2) of the Model Law[270] have
taken a more liberal approach. This is tempered somewhat by the distinction drawn
in *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd,
(The "Athena") No.2*[271] but in any event the different approaches were justified in
*Trygg Hansa* on the basis that the DAC Report did not simply intend to apply
Art.7(2) of the Model Law and the more liberal approach because it specifically sug-
gested that existing case law should be applied.[272] In any event it appears that the
thinking of the English courts is evolving more in line with the approach under the
Model Law.

**Company articles of association.**   A company's articles of association may                **2-053**
incorporate an arbitration agreement. The question has arisen whether the arbitra-
tion agreement applies to:

- disputes between members, and, if so, whether only to disputes which relate
  to the affairs of the company or
- disputes between the company and its members and, if so, whether only to
  disputes with members in their capacity as members and not some other
  capacity.[273]

It is a matter of construction of the individual article, but provisions of this type
are likely to be construed restrictively and, as a general rule, they apply only to
disputes between the company and one of its members in his capacity as a member.
For example, as discussed further below and in Ch.7, it is now clear following the
decision of the Court of Appeal in *Fulham Football Club (1987) Ltd v Richards* that
a claim for unfair prejudice under s.994 of the Companies Act 2006 may be submit-
ted to arbitration, even though some of the statutory forms of relief for a claim of
that nature, such as a winding up order, may not be available to a tribunal.[274]
Disputes have also arisen between members of a trading association where the trad-
ing association has been a company and its articles include an arbitration clause.
The courts have rejected claims that the trading association's articles of associa-

---

[269] See para.2-051.
[270] See para.3-066. Art.7(6) of the UNCITRAL Model Law as updated in 2006 is in the same terms as
the last sentence of the 1985 Model Law.
[271] *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2*
[2006] EWHC 2530.
[272] Paragraph 42 of the DAC Report.
[273] *Hickman v Kent and Romney Marsh Sheep Breeders' Association* [1915] 1 Ch. 881; *Beattie v Beat-
tie Ltd* [1938] Ch. 708; *London Sack & Bag Co Ltd v Dixon and Lugton Ltd* [1943] 2 All E.R. 763.
[274] *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA Civ 855. See also para.2–087 and
para.7-039.

56                    THE ARBITRATION AGREEMENT

tion oblige the parties to submit their dispute to arbitration, and held that the dispute is not caught by the arbitration clause.[275]

**2-054**    **Leases and other assignments of real property.**    Obligations between landlord and tenant may last for a considerable time. As a result of the length of the relationship documents other than the original lease, including sub-leases, assignments, deeds and correspondence, come into existence. One or more of the documents may contain an arbitration clause, and others may not. The court has to decide as a matter of construction whether to read the documents together and give effect to the arbitration clause. In *Wade-Gery v Morrison*, for example, a supplemental deed varied the covenants in a lease, but the court held that it did not vary the provision for arbitration.[276]

**2-055**    **Construction contracts and sub-contracts.**    Construction projects usually involve sub-contractors and a common problem is whether the terms of the main contract, including its arbitration clause, have been incorporated into a sub-contract. As noted above[277] the courts have not always been consistent about whether these arbitration clauses are validly incorporated. For example in *Modern Buildings Wales Ltd v Limmer and Trinidad Co Ltd* an order placed on sub-contractors specified that it should be in the "appropriate form for nominated subcontractors (RIBA 1965 edition)".[278] There was no such form but the court held that the parties meant to refer to the "green form"[279] commonly used for sub-contracts. Like the RIBA forms, the green form contained an arbitration clause, which was held to be binding on the parties.[280] In *Aughton*[281] however, which was also a construction case,[282] the court declined to incorporate the arbitration agreement into a sub-sub-contract. While the decisions are not always consistent,[283] the court will in each case examine the language of the contracts in question to see whether, applying general principles of construction, it provides a clear indication of an intention to incorporate the arbitration provisions of the main contract.[284] Construction contracts are a field where the use of standard forms are commonplace and accordingly the approach taken in *Trade Maritime Corp v Hellenic*

---

[275] *London Sack & Bag Co Ltd v Lugton Ltd* [1943] 2 All E.R. 763.

[276] *Wade-Gery v Morrison* (1878) 37 L.T. 270.

[277] See para.2-048.

[278] *Modern Buildings Wales Ltd v Limmer and Trinidad Co Ltd* [1975] 1 W.L.R. 1281

[279] Published by the construction industry associations NFBTE and FASS.

[280] *Modern Buildings Wales Ltd v Limmer and Trinidad Co Ltd* [1975] 1 W.L.R. 1281. The Court of Appeal reached a similar conclusion, where the reference was again to an RIBA form, in *Brightside Kilpatrick Engineering Services v Mitchell Construction* (1973) Ltd [1975] 2 Lloyd's Rep. 493.

[281] See para.2-047.

[282] See also *Giffen (Electrical Contractors) Ltd v Drake & Scull Engineering Ltd, Femwork Ventilation Ltd v Same* (1993) 37 Con. L.R. 84 and *Astel-Reiniger Joint Venture v Argos Engineering and Heavy Industries Co Ltd* (1995) A.D.L.R.J. 41, where general rules of construction were applied. *Contrast Lexair Ltd (in administrative receivership) v Edgar W Taylor Ltd* [1993] 65 B.L.R. 87, where *Thomas v Portsea* (cited above) was applied. Bingham MR in *Giffen* suggested that the difference between the two approaches might not be so large as it might seem but he preferred that of Gibson LJ *Portsea* has subsequently been applied in *Co-operative Wholesale Society Ltd v Saunders & Taylor Ltd* (1994) 39 Con. L.R. 77 and in *Barrett & Son (Brickwork) Ltd v Henry Boot Management Ltd* (1995) C.I.L.L. 1026. See also *Roche Products Ltd and Celletech Therapeutics Ltd v Freeman Process Systems Ltd and Haden Maclellan Holdings Plc and Black Country Development Corp v Kier Construction Ltd* [1996] 80 B.L.R. 102.

[283] See also *Barrett & Son (Brickwork) Ltd v Henry Boot Management Ltd* (1995) C.I.L.L. 1026; *Roche Products v Freeman Process Systems Ltd* [1996] 80 B.L.R. 102; and *Secretary of State for Foreign and Commonwealth Affairs v Percy Thomas Partnership* (1998) 65 Con. L.R. 11.

[284] See para.2-048.

*Mutual War Risks Association (Bermuda) Ltd (The "Athena") No.2*[285] may be particularly appropriate. Indeed even when dealing with a two-contract case, if the secondary document is stated to be based on standard form terms containing an arbitration agreement then presumably specific reference to the arbitration clause would not be needed.[286]

**Unsigned construction contracts.**    It is, and has been, common commercial practice in the construction industry for the employer to delay signing contract documents even though the contractor starts work. The practice can lead to disputes about whether an arbitration agreement has been entered into at all.[287] These disputes are resolved by reference to the same principles of construction as apply to determine whether a contract has come into existence,[288] namely by a careful examination of whether all the terms have been agreed, despite the absence of formality. Similar issues can arise, and the same principles apply, in contracts for the sale and supply of materials related to those construction works.

**2-056**

**Re-insurance contracts.**    Re-insurance contracts often contain a provision that, save as expressly provided, they follow the same form as the primary insurance.[289] This is not normally sufficient to incorporate the arbitration clause in the primary policy, which is regarded as ancillary to the main subject matter.[290] A specific reference to the arbitration clause is usually required, even applying the approach *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2*.[291]

**2-057**

**Bills of lading and charterparties.**    The question frequently arises in shipping cases as to whether arbitration clauses in charterparties have been incorporated into bills of lading.[292] A bill of lading is a negotiable instrument and a document of title which may come into the hands of a person in another jurisdiction who has no means of ascertaining the terms of the charterparty, and this has been thought to affect the approach to be taken to construction of its terms.[293] It is clear however that specific reference is necessary to incorporate in a bill of lading an arbitration agree-

**2-058**

---

[285] *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd (The "Athena") No.2* [2006] EWHC 2530: see para.2-049.

[286] See para.2-047.

[287] See, e.g. *Birse Construction Ltd v St David Ltd* [1999] B.L.R. 194.

[288] See *Coltman Precast Concrete Ltd v W&J Simons (Contractors) Ltd* 35 Con. L.R. 127 and *Smith and Gordon Ltd v John Lewis Building Ltd* (1993) 44 Con. L.R. 11. In Smith and Gordon the Court of Appeal was told that this practice was common in the building industry: Mann LJ said he had little sympathy, and that it was for parties to ensure they had a contract, and that they could not expect the courts to find one for them.

[289] Various formulations are used, such as "same terms, exclusions, conditions, definitions and settlements" or "same terms, clauses, conditions and warranties".

[290] *Trygg Hansa Insurance Co Ltd v Equitas Ltd* [1998] 2 Lloyd's Rep. 439; *Excess Insurance Co Ltd v CJ Mander* [1997] 2 Lloyd's Rep. 119; *Pine Top Insurance Co Ltd v Unione Italiana Anglo Saxon Reinsurance Ltd* [1987] 1 Lloyd's Rep. 476; *Cigna Life Insurance Co of Europe SA NV v Intercaser SA de Seguros y Reaseguros* [2002] 1 All E.R. (Comm) 235.

[291] *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2* [2006] EWHC 2530. See para.2-049.

[292] See, e.g. *N.V. Reederij Amsterdam v President of India (The "Amstelmolen")* [1960] 2 Lloyd's Rep. 82; *The "Elizabeth H"* [1962] 1 Lloyd's Rep. 172; *Merak, The (Owners of Cargo on Board) v The Merak (Owners) (The "Merak")* [1965] P. 223; *The "Phonizien"* [1966] 1 Lloyd's Rep. 150; *Tradax SA v Volkswagenwerk AG* [1969] 2 Q.B. 599, affirmed [1970] 1 Q.B. 537; *Federal Bulk Carriers Inc v C Itoh & Co Ltd (The "Federal Bulker")* [1989] 1 Lloyd's Rep. 103; *Daval Aciers D'Usinor et de Sacilor v Armare Srl (The "Nerarno")* [1996] 1 Lloyd's Rep. 1; Guernsey v Jacobs UK Ltd [2011] EWHC 918 (TCC).

[293] In particular, subsequent endorsees might never have seen the charterparty and in the absence of specific words of incorporation might not appreciate that they had become bound by provisions in

ment in a charterparty. This is so whether the requirement for specific reference which Sir John Megaw advanced in Aughton[294] as applicable to incorporation of arbitration agreements in contracts generally, or just to certain two-contract cases as discussed in *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2*.[295] General words of incorporation in a bill of lading will not be construed as incorporating the terms of an arbitration agreement in a charterparty.[296] It is only where the charterparty or the bill of lading make specific provision to that effect that the incorporation will be effected.[297] However, whether the specific language used is sufficient to incorporate the particular arbitration (or jurisdiction) clause of the charterparty is a question of construction and the ordinary principles will apply.[298]

In addition to the fact that a bill of lading is a negotiable instrument, the reasoning put forward for this approach in the bill of lading context is that general, as distinct from specific, words of incorporation must be taken to cover only those contractual provisions that are in substance germane or directly relevant to the subject matter of the contract into which they are to be incorporated. They must also be capable of operating in conjunction with that contract if so incorporated.[299] An arbitration agreement between a ship owner and charterer is not considered germane to the contractual rights and obligations that arise under the bill of lading.[300]

**2-059**    **Contracts of guarantee.**    In *Stellar Shipping Co LLC v Hudson Lines*,[301] the question arose whether a dispute under an alleged guarantee was subject to the arbitration agreement contained in the underlying contract, the performance of which had allegedly been guaranteed by Stellar. Notwithstanding the fact that no written agreement was ever entered into, the court held that a contract of guarantee arose out of a course of correspondence which involved endorsement of the terms in the contract of affreightment, including the arbitration clause.[302] The court rejected the argument that the arbitration agreement could only be incorporated if clear and express words were used, principally on the basis that this was not a case where incorporation by reference arose. However, the court nonetheless stated that even if it were

---

another contract which precluded them enforcing their rights in the courts: *Excess Insurance Co Ltd v CJ Mander* [1997] 2 Lloyd's Rep. 119. See also the comments of Bingham LJ in *Federal Bulk Carriers Inc v C Itoh & Co Ltd (The "Federal Bulker")* [1989] 1 Lloyd's Rep. 103 at 105 endorsed in *Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2* [2006] EWHC 2530; *Caresse Navigation Ltd v Zurich Assurances MAROC* [2014] EWCA Civ 1366 at [15].

[294]  See para.2-047.

[295]  *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd, (The "Athena") No.2* [2006] EWHC 2530. See para.2-049.

[296]  *The Delos, Owners of Cargo v Delos Shipping Ltd* [2001] 1 All E.R. (Comm) 763; *Federal Bulk Carriers Inc v Itoh & Co Ltd (The "Federal Bulker")* [1989] 1 Lloyd's Rep. 103; *Skips A/s Nordheim v Syrian Petroleum Co Ltd and Petrofina SA (The "Varenna")* [1983] 2 Lloyd's Rep. 592; *Siboti K/S v BP France SA* [2003] EWHC 1278; *Caresse Navigation Ltd v Zurich Assurances MAROC* [2014] EWCA Civ 1366.

[297]  *Thomas & Co Ltd v Portsea SS Co Ltd* [1912] A.C. 1; *Merak, The (Owners of Cargo on Board) v The Merak (Owners) (The "Merak")* [1965] P. 223; "Michael S" Evryalos Maritime Ltd v China Pacific Insurance Co Ltd (The "MV Michael S"), (December 20, 2001); *Daval Aciers D'Usinor et de Sacilor v Armare Srl (The "Nerarno")* [1996] 1 Lloyd's Rep. 1; *The Delos, Owners of Cargo v Delos Shipping Ltd* [2001] 1 All E.R. (Comm) 763; *Welex AG v Rosa Maritime Ltd* [2002] EWHC 762; [2002] 1 All E.R. (Comm) 939 affirmed at [2003] EWCA Civ 938.

[298]  See for example, *Caresse Navigation Ltd v Zurich Assurances MAROC* [2014] EWCA Civ 1366 at [28].

[299]  *The "Annefield"* [1971] 1 All E.R. 394.

[300]  *Thomas & Co Ltd v Portsea SS Co Ltd* [1912] A.C. 1; *The "Annefield"* [1971] P. 168.

[301]  *Stellar Shipping Co LLC v Hudson Lines* [2010] EWHC 2985 (Comm).

[302]  *Stellar Shipping Co LLC v Hudson Lines* [2010] EWHC 2985 (Comm) at [53].

such a case, it was a "single contract" case on the basis that the two contracts between separate parties were entered into "in the context of a single commercial relationship". In those circumstances the restrictive approach described above did not apply and therefore no express words of incorporation would have been required.[303]

**Applicability of the arbitration agreement.** The courts are reluctant to give effect to arbitration clauses which on their face are inapplicable to the contract into which it is sought to incorporate them.[304] Some flexibility will be permitted, however, depending on the degree to which the clause can be said to be inapplicable.[305] Thus in *The "Rena K"*[306] a charterparty provided "any disputes which may arise under this charter to be settled by arbitration in London". The bills of lading provided that: "All terms, clauses, conditions and exceptions including the arbitration clause …are hereby incorporated." It was held that the use of these specific words meant that the parties to the bill of lading intended the arbitration clause to apply to disputes arising under the bill of lading, even though, (i) prima facie the words were apt to cover disputes arising only under the charterparty and (ii) it was necessary to manipulate or adapt part of the wording of the clause to give effect to the parties' intention.[307]

**2-060**

### (c) Incorporation by reference to "prior course of dealing"

**Introduction.** The same general approach discussed above in the context of arbitration agreements incorporated by reference to general or specific words in an agreement has been adopted in "single contract" cases where the arbitration agreement is sought to be incorporated by reference not to any language in the agreement per se, but instead to a "prior course of dealing". Of course, in such cases, the question of any general or specific words of incorporation in the contract itself does not arise. In that regard, it may be questioned whether an arbitration agreement could ever be incorporated as a result of a "prior course of dealing", given the requirements of s.6(2) of the Arbitration Act 1996 and in particular, the requirement for a "reference in an agreement". As noted above,[308] the question s.6(2) raises is *when* a reference to an arbitration agreement is sufficient to make the clause referred to part of the agreement. Cases have arisen that have tested whether a prior course of dealing as opposed to a written reference in an agreement is sufficient to incorporate the arbitration agreement, although as described below the approach taken in these cases has differed and no clear guidelines have emerged.

**2-061**

**No incorporation where terms not in common trade usage or no special knowledge.** The starting point in these cases is, as noted above, the proper construction of the contract in question. Whether a term can be incorporated by reference to a "prior course of dealing" will always be a question of fact and degree: how many previous dealings were there, how recent and how similar were they in

**2-062**

---

[303] *Stellar Shipping Co LLC v Hudson Lines* [2010] EWHC 2985 (Comm) at [63].

[304] *The "Annefield"* [1971] P. 168, affirmed by the Court of Appeal at [1971] 1 Lloyd's Rep. 1. As Brandon J noted in that case at 173 "when the arbitration agreement is, by its terms, applicable only to disputes under the charterparty, general words will not incorporate it into the bill of lading so as to make it applicable to disputes under the [bill of lading]".

[305] Or, as was said in *Siboti K/S v BP France SA* [2003] EWHC 1278, if "undue manipulation" is required.

[306] *The "Rena K"* [1978] 1 Lloyd's Rep. 545.

[307] See also *Daval Aciers D'Usinor et de Sacilor v Armare Srl (The "Nerarno")* [1996] 1 Lloyd's Rep. 1.

[308] See para.2-046.

terms of subject matter and the manner in which they were conducted.[309] In *Capes Hatherden Ltd v Western Arable Services Ltd*[310] the court refused to incorporate by reference to a previous course of dealing standard terms containing an arbitration agreement, on the basis that there was no evidence that (a) the standard terms containing the arbitration agreement were "usual terms" in use by grain merchants, or that (b) the purchaser knew that grain merchants commonly employed terms which provided for disputes to be resolved by arbitration.[311] On this latter point, the court relied on the general statement by Lord Dunedin in *Hood v Anchor Line (Henderson Brothers) Ltd*[312] that:

> "where the particular condition relied on involves a sort of restriction that is not shown to be usual in that class of contract, a defendant must show that his intention to attach an unusual condition of that particular nature was fairly brought to the notice of the other party."

As with the incorporation by reference cases referred to above, this principle was held to apply as much to the incorporation of an arbitration agreement as to any other unusual condition regardless of the fact that it was contained in standard terms and was therefore a "single contract" case dealing with standard terms.[313]

**2-063**   **No incorporation where the test for the implication of terms not satisfied.**   In the subsequent case of *Lisnave Estaleiros Navais v Chemikalien Seetransport*, Edelman QC (sitting as a deputy judge of the High Court) addressed this "unusual" question in a two stage approach. First, he applied the test for implication of a term as set out by the Privy Council in *Attorney General of Belize*.[314] On that basis, he refused to incorporate into a Fleet Agreement providing the general terms on which future ship repair contracts were to be concluded an arbitration agreement contained in separate standard terms but not referred to in the Fleet Agreement. He did so because it was not obvious that the parties intended the arbitration agreement to apply although the terms as a whole had applied and had been referred to in all 12 prior ship repair contracts concluded pursuant to the Fleet Agreement. Having rejected the implication of the arbitration agreement on that basis, Edelman QC did not consider it necessary to go on to consider the secondary issue, namely whether, had they existed, general words of incorporation would have been sufficient to import the arbitration agreement in any event.[315] On the basis that this was a "single contract" case in that the contract referred to was on standard terms, it is at least arguable that general words should have been sufficient. However, the approach in this case does suggest that the requirement in s.6(2) of the Arbitration Act 1996 for a "reference in an agreement" might pose a challenge for incorporation by reference to a prior course of dealing and it is notable that despite these various attempts, there have been no cases where an arbitration agreement has been held to have been incorporated by reference to a course of conduct.

---

[309] *Capes (Hatherden) Ltd v Western Arable Services Ltd* [2009] EWHC 3065 (QB) at [35]; *Lisnave Estaleiros Navais v Chemikalien Seetransport* [2013] EWHC 388 at [27].

[310] *Capes (Hatherden) Ltd v Western Arable Services Ltd* 2009 EWHC 3065.

[311] *Capes (Hatherden) Ltd v Western Arable Services Ltd* [2009] EWHC 3065 (QB) at [42].

[312] *Hood v Anchor Line (Henderson Brothers) Ltd* [1918] A.C. 837, at 847.

[313] See para.2-047. See also *William McIlroy Swindon Ltd v Quinn Insurance Ltd* [2010] EWHC 2448 at [43] although this is a case of incorporation by written reference, not by reference to a course of dealing.

[314] *Attorney General of Belize v Belize Telecom* [2009] 1 W.L.R. 1988.

[315] *Lisnave Estableuris Navais v Chemikalien Seetransport* [2013] EWHC 388 at [35(11)], [50]].

## 4.  CONTENT OF AN ARBITRATION AGREEMENT

### (a)  Drafting the arbitration agreement

**Level of detail.**   One of the briefest arbitration agreements to be reported merely   **2-064**
stated: "arbitration to be settled in London".[316] Although that agreement was
enforced, it required a court action to achieve that result.[317] Greater detail is desir-
able to achieve clarity and thereby certainty as to the parties' intentions, and to
avoid unnecessary and expensive disputes prior to consideration of the substan-
tive issues. A more recent illustration of why certainty and clarity is desirable is
*Flight Training International v International Fire Training Equipment Ltd* in which
a clause providing that

> "[d]isputes … on the performance of this Agreement, shall be submitted to ACAS London. Legal
> fees and costs shall be paid by either party which does not prevail at mediation"

was held not to be a binding agreement to arbitrate but rather an agreement only
to mediate. While ACAS provides conciliation, mediation and arbitration services,
the reference to "mediation" in the clause in the context of costs was held to be
inconsistent with an intention to refer future disputes to arbitration.[318] Ultimately,
if an agreement contains jurisdictional references which are completely contradic-
tory, the jurisdictional agreement may be void for uncertainty.[319]

Further, whilst it is possible that parties might reach agreement on some issues
concerning the conduct of the arbitration after a dispute has arisen, that is often
more difficult than securing agreement at the time of negotiating the arbitration
agreement. Accordingly it is usually preferable to consider such matters at the
contract drafting stage.

**Checklist of matters to be considered.**   When drafting an arbitration agreement   **2-065**
care needs to be taken to ensure that it is appropriate for the particular circumstances
of the case. The following is a checklist of the matters which need to be considered
when drafting an arbitration agreement, together with references to where they are
addressed in this book. It may not be necessary to include provision for all of them,
but thought should be given as to whether they need to be addressed in the particular
circumstances of the case:

   1.    Have the parties been properly identified?—para.3-003.

---

[316] *Tritonia Shipping Inc v South Nelson Forest Products Corp* [1966] 1 Lloyd's Rep. 114.
[317] See generally the approach of the courts at para.2-077.
[318] *Flight Training International v International Fire Training Equipment Ltd* [2004] EWHC 721 (Comm) at [46]–[49].
[319] See e.g. the decision of the Court of Appeal in *EJR Lovelock v Exportles* [1968] 1 Lloyd's Rep. 163 where the agreement provided for all disputes to be referred to arbitration in London and all other disputes to be referred to arbitration in Moscow and was found to be too uncertain for the court to give effect to it; *Kruppa v Benedetti* [2014] EWHC 1887 in which the parties agreed to "endeavour" to resolve disputes through arbitration, failing which their disputes were subject to the non-exclusive jurisdiction of the English courts. Contrast *Lobb Partnership Ltd v Aintree Racecourse Co Ltd* [2000] C.L.C. 431 where a clause providing that "disputes may be dealt with as provided in para.1.8 of the RIBA Conditions which provided for arbitration but shall otherwise be referred to the English court" was enforceable despite the dichotomy between the permissive first part and mandatory second part); *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 at [42]–[46]; *Union Marine v Government of Comoros* [2013] EWHC 5854 (Comm) (clause provid-ing that "The parties are able to decide to submit any dispute between them to an arbitrator of their choice in London" considered (obiter) to be a valid and binding option to arbitrate, binding upon exercise of the option). See also generally paras 2-027 et seq.

2.   Is there a clear reference to arbitration?—para.2-076.
3.   What disputes are to be referred to arbitration?—para.2-096.
4.   Where is the seat of the arbitration to be?—paras 2-125 and 5-076 et seq.
5.   How is the substance of the dispute to be determined?—paras 2-115 et seq.
6.   What is the law of the arbitration to be?—paras 2-119 et seq.
7.   Is there a choice of the procedural law?—paras 2-126 et seq.
8.   How will the tribunal be appointed?—paras 4-023 et seq.
9.   Is there an appointing authority?—para.2-068.
10.  Is the tribunal required to have any particular attributes or qualifications?—paras 4-015 et seq.
11.  How many members of the tribunal will there be?—para.4-014.
12.  Are procedural and/or evidential rules or the rules of an institution to be adopted, and, if so, which ones?—paras 2-067 and 5-100 et seq.
13.  Are any other rules or guidelines to be applicable to the arbitration, e.g. the IBA Rules of Evidence or Guidelines on Party Representation? — para.5-141.
14.  What will be the language of the arbitration?—paras 5-169 et seq.
15.  Should the tribunal be given power to make provisional awards under s.39 of the Arbitration Act 1996?—paras 5-092 et seq.
16.  Is specific provision for confidentiality required?—paras 5-214 et seq.
17.  Should applications and appeals to the court be excluded?—para.2-071.
18.  Is a waiver of sovereign immunity required?—para.3-021.
19.  Are provisions for multi-party arbitration, consolidation or concurrent hearings required?—paras 3-025 et seq.

**2-066**    **Amending the statutory regime.**    In addition to the matters set out above, consideration should also be given more generally to whether the parties wish to amend the statutory regime which will otherwise apply by virtue of the Arbitration Act 1996.[320] The parties are specifically given the right to make agreements in writing[321] about a wide range of matters subject only to "such safeguards as are necessary in the public interest".[322] They may do so by adopting a foreign procedural law.[323] In many instances the statute sets out the provisions that apply in the absence of agreement otherwise between the parties. Some provisions apply only if the parties agree that they should.[324] In other respects the fallback position is that it is for the tribunal to decide matters where the parties have not agreed them.[325]

The matters on which the parties may make agreements under the Arbitration Act 1996, with references to the relevant section numbers in the statute, are as follows.

The seat of the arbitration—s.3
Application of institutional rules—s.4(3)

---

[320]  Arbitration Act 1996 s.4(2) makes clear that the parties are allowed to make their own arrangements by agreement in respect of the non-mandatory provisions of the 1996 Act.

[321]  The requirement for any agreement to be "in writing" stems from the Arbitration Act 1996 s.5(1) although the section gives the expression a broad meaning.

[322]  This gives effect to the principle of party autonomy set out in the Arbitration Act 1996 s.1(b).

[323]  Arbitration Act 1996 s.4(5) and see para.2-103. The choice of a foreign law to govern the substance of the dispute, for example as the proper law of the contract in question, will not constitute an agreement as to the non-mandatory provisions of the of the Arbitration Act 1996: see *Lesotho Highlands Development Authority v Impreglio SpA* [2005] UKHL 43 at [37]; C v D [2007] EWHC 1541 at [38]; *XL Insurance Ltd v Owens Corning* [2000] 2 Lloyd's Rep. 500 at [508].

[324]  Such as the power to order consolidation of proceedings or concurrent hearings under s.35 or the power to make a provisional award under the Arbitration Act 1996 s.39.

[325]  Arbitration Act 1996 s.34(1).

CONTENT OF AN ARBITRATION AGREEMENT          63

Separability of arbitration agreement—s.7
Commencement of arbitral proceedings—s.14
The tribunal: number of arbitrators—s.15
The tribunal: whether third arbitrator to act as chairman—s.15
Procedure for appointment of arbitrators, including choice of an appointing authority—s.16
Power in case of default to appoint sole arbitrator—s.17
Failure of appointment procedure—s.18
Chairman—s.20
Umpire—s.21
Decision-making where no chairman or umpire—s.22
Revocation of arbitrator's authority—s.23
Procedure for challenge to arbitrators—s.24(2)
Resignation of arbitrator—s.25
Death of person by whom arbitrator appointed—s.26(2)
Filling of vacancy—s.27
Competence of tribunal to rule on its own jurisdiction—s.30
Procedural and evidential matters—s.34
Consolidation of proceedings and concurrent hearings—s.35
Legal or other representation—s.36
Power to appoint experts, legal advisors or assessors—s.37
General powers exercisable by the tribunal—s.38
Power to make provisional awards—s.39
Powers of tribunal in case of party's default—s.41
Enforcement of peremptory orders of tribunal—s.42
Court powers exercisable in support of arbitral proceedings—s.44
Determination of preliminary point of law—s.45
Rules applicable to substance of dispute—s.46
Awards on different issues—s.47
Remedies—s.48
Interest—s.49
Extension of time for making award—s.50
Settlement—s.51
Form of award—s.52
Place where award treated as made—s.53
Date of award—s.54
Notification of award—s.55
Correction of award or additional award—s.57
Effect of award—s.58
Award of costs—s.61
Effect of agreement or award about costs—s.62
The recoverable costs of the arbitration—s.63
Recoverable fees and expenses of arbitrators—s.64
Power to limit recoverable costs—s.65
Appeal on point of law—s.69
Service of notices—s.76
Powers of court in relation to service of documents—s.77
Reckoning periods of time—s.78
Power of court to extend time limits relating to arbitral proceedings—s.79

**Application of institutional rules.**    The 1996 Act specifically contemplates that **2-067**
the parties may amend the statutory regime which will otherwise apply by adop-

tion of institutional arbitration rules.[326] Some of the institutions who promulgate rules also offer their services in the administration of arbitrations. The United Nations does not administer arbitrations, but its updated UNCITRAL Rules[327] are useful for ad hoc arbitrations, particularly because they offer a means of ensuring the appointment of the tribunal.[328] The rules of a particular institution are not necessarily incorporated into an arbitration agreement merely because a particular institution has been made the appointing authority, and many institutions offer this as a separate service. It is important therefore to provide for the arbitration to be conducted in accordance with the institution's rules and not just that it shall appoint the tribunal. The incorporation of institutional rules in an arbitration agreement is not essential, but it may well be useful and may save time and money by providing a framework for the conduct of the arbitration.[329] The institutional rules will also circumscribe the tribunal's powers and jurisdiction, subject to the terms of the arbitration agreement.[330] Individual provisions within sets of institutional rules should be considered to see if they give the parties what they want. For example, do they want to give the tribunal all the powers conferred by Art.22 of the LCIA Rules, which include a power to join third parties against the wishes of one of the existing parties? Do they want the tribunal to have a very broad power to grant interim and conservatory measures as provided by Art.28 of the ICC Rules? Do they want the option for either party to refer requests for urgent interim relief to an emergency arbitrator?[331] Are there other matters not dealt with in the chosen rules that the parties need addressed in the arbitration agreement?[332] If appropriate the parties can amend the institutional rules by express provision in the arbitration agreement, though it is then sensible to make clear that the rules are adopted save as varied by the arbitration agreement.

2-068   **Appointing authority.**   An arbitration agreement should state how the tribunal is to be appointed, in default of agreement between the parties. The use of an institution to appoint the tribunal, where they take on the role of "appointing authority", may be considerably more effective, cheaper and quicker than applying to the court. As mentioned in the previous paragraph, acting as an appointing authority is offered by many institutions as a separate service from the administration of arbitrations so it is important to clarify in the arbitration agreement which role is to be performed. Adoption of an institution's rules will usually make the institution responsible for appointment of the tribunal but not the other way round: selection as appointing authority does not imply adoption of the institution's rules in the conduct of the arbitration.[333] In England the court may also appoint arbitrators.[334]

2-069   **Choice of venue for hearing that differs from seat.**   Particular care is needed when the parties wish to select a venue (in the sense of a physical location) for their

---

[326] Arbitration Act 1996 s.4(3). On institutions and their rules see further paras 3-061 et seq. and 5-101 et seq. and in particular paras 5-112 to 5-114.

[327] As revised in 2010.

[328] When using the UNCITRAL Rules it is recommended that an appointing authority be expressly provided for, as the mechanism in the rules for appointing one is cumbersome.

[329] See paras 5-112 et seq.

[330] *The Bay Hotel and Resort Ltd v Cavalier Construction Co Ltd* [2001] UKPC 34. Also see, for example, Art.1(1) of the UNCITRAL Rules which provides that such Rules apply, where agreed upon "subject to such modification as the parties may agree".

[331] See Art.9B of the LCIA Rules, Art.29 and Appendix V of the ICC Rules.

[332] In particular the matters specified at para.2-065.

[333] But note that the UNCITRAL Rules provide for ad hoc rather than institutional arbitration so a separate provision for an appointing authority should be included, although there is a default procedure.

[334] See paras 7-100 et seq. and 4–149.

hearing that differs from the juridical seat of the arbitration. The former is merely a question of geography, while the latter generally determines the procedural law governing the arbitration.[335] Yet disputes about conflicting requirements regarding the seat/venue in arbitration agreements are more common than might be supposed.[336] In some cases, this leads to protracted proceedings in several jurisdictions lasting many years before the substance of the dispute is even addressed and with the unfortunate potential for inconsistent judgments.[337] Where the parties intend for hearings to take place in a geographical location that differs from the seat, whether for reasons of efficiency, convenience, security or otherwise, clear words and care when drafting are required.[338] The rules of some arbitral institutions make express provision for this.[339]

**Characteristics of the arbitrator.**   It is not uncommon to find arbitration agreements in which the parties specify certain characteristics that they require of their arbitrators. Indeed, many of the institutional rules prescribe that the nationality of the chair of the tribunal shall be different to that of the parties (subject to any contrary agreement).[340] While careful thought should be given to whether the parties wish to limit their future choice of arbitrators in this way, it is at least now clear that imposing any such requirements will not fall foul of any discrimination or other employment laws in England.[341]   **2-070**

**Exclusion agreements.**   The parties to an arbitration agreement may exclude the right to seek (i) leave to appeal to the court on points of law[342] and (ii) determinations of preliminary points of law by the court.[343] An agreement to dispense with reasons for the tribunal's award constitutes an agreement to exclude the court's jurisdiction in these respects.[344] The exclusion agreement may be incorporated into the arbitration agreement by reference to another document in which it is contained.[345] In domestic cases parties used to be permitted to exclude the right to   **2-071**

---

[335]  See para.2-132.
[336]  *Naviera Amazonica Peruana v Cia Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116; *ABB Lummus Global v Keppel Fels Ltd* [1999] 2 Lloyd's Rep. 24; *Dubai Islamic Bank PJSC v Paymentech Merchant Services Inc* [2001] 1 Lloyd's Rep. 65; *Braes of Doune v Alfred McAlpine* [2008] EWHC 426; *C v D* [2007] EWHC 1541 (at first instance) and [2007] EWCA Civ 1282 (in the Court of Appeal); *Roger Shashoua, Rodemadan Holdings Ltd, Stancroft Trust Ltd v Mukesh Sharma* [2009] EWHC 957 (Comm); *Enercon GmbH Wobben Properties GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm); *Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015] EWHC 194 (Comm).
[337]  See for example, *Enercon GmbH Wobben Properties GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm) (in relation to which Eder J suggested that the "author of Bleak House would be appalled". The case resulted in numerous court applications including; *Enercon GmbH Wobben Properties GmbH v Enercon (India) Ltd* [2011] EWHC 3711 and *Enercon GmbH Wobben Properties GmbH v Enercon (India) Ltd* [2014] EWHC 4049 (Comm), at 15 where Eder J noted the decision of the Supreme Court of India holding that the seat of the arbitration was India, contrary to the English judge's earlier "tentative view" that it was in fact London: see *Enercon GmbH Wobben Properties GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm) at [62]).
[338]  *Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015] EWHC 194 (Comm) at [29].
[339]  See for example LCIA Rules, Art.16.3; ICC Rules, Art.18.2.
[340]  See for example LCIA Rules, Art.6(1).
[341]  See *Nurdin Jivraj v Sadruddin Hashwani* [2011] UKSC 40. See also para.4–016.
[342]  Arbitration Act 1996 s.69(1). Such an agreement is automatic where the parties choose the rules of certain institutions. See e.g. LCIA Rules, Art.29.2; ICC Rules, Art.34(6).
[343]  Arbitration Act 1996 s.45(1).
[344]  Arbitration Act 1996 s.69(1).
[345]  *Sukuman Ltd v The Commonwealth Secretariat* [2006] EWHC 304. This is also the case in relation to the availability of appeals on a point of law under the LCIA and ICC Rules. See LCIA Rules,

appeal only after the arbitration had begun, but this is no longer the case.[346] There also used to be a statutory limitation on this right in maritime, commodity and insurance cases[347] unless the exclusion agreement was entered into after the commencement of the arbitration or the contract was governed by a law other than the law of England and Wales.[348] Again this has been abolished[349] so the law is now the same in all cases: appeals and determinations of preliminary points of law can be excluded at the time of making the arbitration agreement. The ICC Rules[350] and the LCIA Rules[351] contain a valid exclusion agreement, such that a choice of those rules in an arbitration agreement is an effective exclusion of any right to appeal on a point of law.[352] The wording of an exclusion agreement where these rules are not selected can be relatively straightforward:

> "The parties hereby exclude all rights under ss.45 and 69 of the Arbitration Act 1996 to seek a determination of a preliminary point of law by the High Court, or to appeal from any arbitration award."[353]

However, it is also possible to contract out of or override the waiver contained in institutional rules, like those of the LCIA.[354] Where that happens, the permission of the court will not be required for any appeal on a point of law, because the contracting out language will constitute "the agreement of all the parties" to an appeal for the purposes of s.69(2)(a) Arbitration Act.[355]

**2-072**   **Standard form arbitration clauses.**   A reliable method of ensuring that the more important features of an arbitration agreement are included is to use one of the standard forms.[356] Using these standard forms provides a good measure of comfort that an effective arbitration agreement has been entered into, and these arbitration clauses, in conjunction with the rules which they incorporate, will include many of the matters referred to in the checklist at para.2-065. However, consideration should also be given to whether the particular features of the transaction suggest further provisions are necessary. The particular rules chosen should be examined to establish whether there are matters they omit to cater for but which, in the particular circumstances of the case, need to be addressed. For example, if the agreement containing the arbitration agreement is one of several related contracts or there are several parties to the agreement all of whom are likely to be involved in any dispute,

---

Art.29(2); ICC Rules, Art.34(6).

[346] Arbitration Act 1996 s.87: see para.2-005.

[347] The so-called "special categories".

[348] Arbitration Act 1979 s.4(1).

[349] Arbitration Act 1996 s.109(2).

[350] Article 34(6).

[351] Article 29(2).

[352] *Arab African Energy Corp Ltd v Olieprodukten Nederland BV* [1983] 2 Lloyd's Rep. 419; *Marine Contractors Inc v Shell Petroleum Development Co of Nigeria Ltd* [1984] 2 Lloyd's Rep. 77; *Sanghi Polyesters Ltd v The International Investor* [2000] 1 Lloyd's Rep. 480.

[353] In contrast, reference to an award being "final, conclusive and binding" in an arbitration clause does not exclude an appeal against the arbitral award on a point of law pursuant to the Arbitration Act 1996 s.69: see *Shell Egypt West Manzala GmbH v Dana Gas Egypt Ltd (formerly Centurion Petroleum Corp)* [2009] EWHC 2097 (Comm).

[354] *Royal & Sun Alliance Insurance Plc v BAE Systems (Operations) Ltd* [2008] EWHC 743 (Comm) at [16], [25].

[355] *Royal & Sun Alliance Insurance Plc v BAE Systems (Operations) Ltd* [2008] EWHC 743 (Comm) at [45].

[356] For example the recommended clauses from the LCIA and ICC. Various other arbitration institutions, including trade or professional associations, have their own suggested clauses, and reference should be made to the institutions concerned.

then additional provision for multi-party arbitration should be considered.[357] Many standard form clauses do not address this. However, the rules which they incorporate have in many cases been updated to make more comprehensive provision for consolidation in recognition of the growing number of multi-party/multi-contract disputes being referred to arbitration. For example, the LCIA Rules now permit consolidation (a) with the agreement of the parties, as was the case under the old rules, or without the agreement of the parties, either (b) prior to the appointment of the tribunal and by order of the LCIA Court, where two or more arbitrations are commenced under the same agreement and between the same parties, or (c) by order of the tribunal and without the parties' agreement, where there are multiple arbitrations between the same parties under the same or compatible arbitration agreements and where only one tribunal has been appointed or is the same in both cases.[358] Similarly confidentiality is a matter for which specific provision may be desirable.[359]

**Multiple Agreements.**   Where a transaction comprises a series of agreements between the same parties, it is important to consider the dispute resolution provisions in relation to each of them. Failure to do so may result in disputes under the different agreements being resolved in different fora, which carries the risk of additional expense and potentially inconsistent decisions.[360] Depending on the scope of the arbitration agreement it may be possible to bring disputes under different, related agreements in one proceeding, but to avoid issues arising in relation to the tribunal's jurisdiction to do so it is advisable to provide specifically for arbitration in the same terms in each agreement, or to cross refer to the applicable arbitration agreement. Such provisions are often known as consolidation and joinder provisions and require considerable care when drafting to ensure that all relevant factors are covered.[361] This remains the case, even though many of the latest revisions to the institutional rules provide for consolidation and/or joinder in certain circumstances and it is advisable to consider the specific language of the chosen institution's rules when drafting the arbitration agreement.[362]

**2-073**

**The court's approach to multiple agreements and jurisdiction clauses.**   The court's approach to single contracts containing competing arbitration and jurisdiction clauses has been addressed above.[363] Where competing jurisdiction and arbitration (and possibly, governing law) clauses appear in multiple agreements, however, the approach differs somewhat. As a starting point, and taking guidance from cases involving competing jurisdiction clauses as well as jurisdiction and arbitration clauses, the presumption is that parties do not intend for the same dispute to be litigated (or arbitrated) in more than one forum such that competing jurisdiction clauses are construed as being mutually exclusive.[364] In this regard, the courts tend to distinguish between situations where the multiple agreements all relate to a "single transaction",[365] on the one hand and, on the other, a single contract relationship which is later followed by a further contract, i.e. a two separate contracts

**2-074**

---

[357]  See paras 3-049 et seq.
[358]  See LCIA Rules (Art 22.1 (viii),(ix),(x)). See also ICC Rules, Arts 7–10.
[359]  See paras 5-182 et seq.
[360]  See e.g. *Sawyer v Atari Interactive Inc* [2006] I.L. Pr. 8.
[361]  See paras 3-053 et seq.
[362]  See e.g. ICC Rules, Arts 7–10; LCIA Rules, Art.22.1.
[363]  See para.2-028.
[364]  *Sebastian Holdings Inc v Deutsche Bank AG (No.2)* [2010] EWCA Civ 998 at [41]; *Monde Petroleum SA v Westernzagros Ltd* [2015] EWHC 67 at [35].
[365]  See *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, a case involving competing jurisdiction clauses in New York and in England; and *Sebastian Holdings Inc v Deutsche Bank AG (No.2)* [2010]

68                              THE ARBITRATION AGREEMENT

scenario.[366] In the case of the former, the presumption in favour of "one-stop" adjudication advocated in *Fiona Trust*[367] remains "a useful starting point".[368] However, it does not apply where the overall scheme of the "single transaction" or the two separate contracts contain two or more differently expressed choices of jurisdiction (and/or law) in respect of different agreements.[369] In that case, the starting point will be that disputes arising under one agreement with its own choice of dispute resolution mechanism are not caught by a different disputes clause in another agreement. In the two separate contracts scenario, that starting point arguably carries even more weight, since

> "it may be easier to conclude that the parties chose to have different jurisdictions to deal with different aspects of the relationship".[370]

That is so, "even if the effect is a risk of fragmentation of the overall process for the resolution of disputes".[371] Ultimately, therefore, the effect of different jurisdiction clauses contained in separate contracts, even if forming part of a single transaction, will be determined as a matter of their proper construction and not in accordance with any presumption.[372]

2-075    **Multiple agreements and jurisdiction clauses involving settlement or termination.**    The approach differs only where a subsequent agreement is settling disputes under, or terminating, a prior agreement. Where that is the case and where the subsequent agreement contains a new and competing dispute resolution clause, that clause should be construed on the basis that the parties are likely to have intended that it should supersede the clause in the earlier agreement and apply to all disputes arising out of both agreements.[373]

2-076    **Terms must be clear and certain.**    To be valid and enforceable, the terms of an arbitration agreement must be clear and certain.[374] It is obviously desirable for there to be a clear reference to arbitration,[375] and the procedure envisaged by the clause, to the extent that it is articulated, must be consistent with a provision for arbitration.[376] Whether the arbitration agreement meets the requirement for clarity and certainty is assessed in the same way as it would be for any other contract. In

---

EWCA Civ 998 at [42]–[49] concerning competing jurisdiction clauses in England and New York, as well as a competing arbitration agreement).

[366] *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437. This was a decision on jurisdiction, in which the claimant only had to establish that it had a "much better argument" on the scope and effect of the competing jurisdiction and arbitration clauses.

[367] See para.2-004.

[368] *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437 at [45]. See also *Sebastian Holdings Inc v Deutsche Bank AG (No.2)* [2010] EWCA Civ 998 at [42]–[49].

[369] *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437 at [46].

[370] *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437 at [49].

[371] *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437 at [59].

[372] *Trust Risk Group SpA v AmTrust Europe Ltd* [2015] EWCA Civ 437 at [60]; *Sebastian Holdings Inc v Deutsche Bank AG (No.2)* [2010] EWCA Civ 998 at [42]–[49].

[373] *Monde Petroleum SA v Westernzagros Ltd* [2015] EWHC 67 at [39]. Where the settlement or termination agreement contains no new dispute resolution clause, the presumption will be that the dispute resolution clause in the prior agreement continues to apply (at [44]).

[374] *Lobb Partnership Ltd v Aintree Racecourse Co Ltd* [2000] B.L.R. 65.

[375] Failure to do so may not necessarily be fatal: see *Plant v Plant* [2002] EWHC 2283, a case where there was no express reference to arbitration. The clause in question provided that disputes were "to be determined by the decision of a Chancery or Commercial Queen's Counsel appointed by the parties … and such decision shall be final and binding". See also *David Wilson Homes Ltd v Survey Services Ltd (in liquidation)* [2001] 1 All E.R. (Comm) 449.

[376] See e.g. *AIG Europe SA v QBE International Insurance Ltd* [2001] Lloyd's Rep. 268 where the clause in question was held to be "at best a procedure for conciliation which might or might not result

the absence of a clear reference to arbitration the court may be forced to conclude that there is no arbitration agreement at all.[377] Even if there is an arbitration agreement, disputes about its terms, whether it has been incorporated into the relevant contract and so forth can be costly and may delay or derail altogether the arbitration. It is of fundamental importance that the parties' agreement clearly and unequivocally reflects their wish to make arbitration the means for final and binding resolution of disputes between them.[378]

**The approach of the court.**    The court seeks to give effect to the parties' intention to refer disputes to arbitration, and to allow the tribunal full jurisdiction except in cases of hopeless confusion. So for example in *Mangistaumunaigaz Oil Production Association v United World Trade Inc*[379] an oil contract provided for "Arbitration, if any, by ICC rules in London". The respondents argued that the words "if any" were inconsistent with an unconditional contractual undertaking to arbitrate future disputes but the court found that the words were either surplusage or an abbreviation for "if any dispute arises". On the other hand an agreement referring "any dispute and/or claim" to arbitration in England followed by a clause referring "any other dispute" to arbitration in Moscow was held to be void for ambiguity, and was neither effective nor enforceable.[380] Similarly, a clause which provided for the parties to "endeavour" to resolve their disputes "through Swiss arbitration" failing which, any disputes would be subject to the non-exclusive jurisdiction of the English courts, was held to be unenforceable, primarily because the parties had not unconditionally agreed to refer disputes to arbitration, but only to endeavour to do so.[381]

    If the circumstances allow, the court will lean in favour of upholding the arbitration agreement[382] in order to give effect to the parties' intentions.[383] Where the wording used shows reasonably clearly that the parties intended to submit their disputes to arbitration, then the court will uphold the arbitration agreement even in the absence of mandatory language requiring disputes to be submitted to arbitration.[384] Further, following the approach laid down in *Investors Compensation Scheme v West Bromwich Building Society*,[385] the court may conclude that something has gone wrong with the language used and may correct that error.[386]

**No presumption in favour of arbitration.**    There is no presumption either in

2-077

2-078

---

in a compromise of the dispute" despite express reference to the appointment of "an arbitrator".

[377] As for example in *Al Midani v Al Midani* [1999] 1 Lloyd's Rep. 923. See also *Flight Training International Inc v International Fire Training Equipment Ltd* [2004] EWHC 721.

[378] In *Finnegan v Sheffield City Council* [1988] 43 B.L.R. 124 a construction contract contained a clause to the effect that the question whether disputes under the contract were to be referred to arbitration was to be a matter for further negotiation. This was held not to be an arbitration clause. See also *AIG Europe SA v QBE International Insurance Ltd* [2001] Lloyd's Rep. 268; *Kruppa v Benedetti* [2014] EWHC 1887, where a clause providing that in the event of any dispute the parties would "endeavour" to resolve the matter first through arbitration was held not to be a valid arbitration clause.

[379] *Mangistaumunaigaz Oil Production Association v United World Trade Inc* [1995] 1 Lloyd's Rep. 617. See also *Kruppa v Benedetti* [2014] EWHC 1887.

[380] *Lovelock Ltd v Exportles* [1968] 1 Lloyd's Rep. 163.

[381] *Kruppa v Benedetti* [2014] EWHC 1887 at [9].

[382] *Astro Vencedor Compania Naviera SA v Mabanaft GmbH* [1970] 2 Lloyd's Rep. 267, Mocatta J.

[383] In *Paul Smith Ltd v H&S International Holdings Inc* [1991] 2 Lloyd's Rep. 127, the court found a way of reconciling two apparently conflicting clauses. See also *Shell International Petroleum Co Ltd v Coral Oil Co Ltd* [1999] 1 Lloyd's Rep. 72; *ACE Capital Ltd v CMS Energy Corp* [2008] EWHC 1843 (Comm); *Transgrain Shipping BV v Deiulemar Shipping SpA (in liq) & Eleni Shipping Ltd* [2014] EWHC 4202 (Comm) and other cases referred to at para.2-027.

[384] *Lobb Partnership Ltd v Aintree Racecourse Co Ltd* [2000] B.L.R. 65.

[385] *Investors Compensation Scheme v West Bromwich Building Society* [1998] 1 All E.R. 98.

[386] *Nine Gladys Road Ltd v Kersh* [2004] EWHC 1080.

70                         THE ARBITRATION AGREEMENT

favour of or against arbitration and the construction of disputes clauses will not be influenced by some general notion of favouring or disapproving of the process.[387] Rather in each case it is a matter of the proper construction of the parties' agreement. The Court of Appeal has however said that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed.[388]

**2-079**   **The presumption of "one-stop adjudication".**   The legislative purpose behind the 1996 Act was the promotion of one-stop adjudication.[389] Accordingly, in considering the scope of an arbitration clause contained within a single contract, the court will apply the presumption that the parties have agreed to one forum for dispute resolution.[390] Where the parties have agreed an arbitration clause they are presumed to have intended to resolve their disputes through arbitration, and not by means of several different forms of dispute resolution including both arbitration and the courts.[391] This presumption has been given forceful judicial expression in *Fiona Trust & Holding Corp v Yuri Privalov* where it was described by the Court of Appeal as a "powerful" reason for a liberal interpretation of arbitration clauses.[392] The Court of Appeal considered that no commercial man would knowingly create a system that required that the court should first decide whether the contract should be rectified or avoided or rescinded, before the arbitrator could go on to resolve the dispute that had arisen. Often cited also is the reluctance expressed by Bingham LJ "to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings".[393] Citing that dictum, Hoffmann LJ stated that the presumption "merely reassures one that the natural meaning of the words [of the arbitration agreement] produce a sensible and business-like result".[394] The judiciary also showed their awareness of the adverse effects of the contrary view on London's continuing pre-eminence as a centre for international arbitration,[395] which fortified the presumption for "one-stop adjudication". While there are

---

[387] *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep. 63. The same is true of the principle of competence-competence, where there is a dispute as to the validity of the arbitration agreement. See e.g. *Golden Ocean Group Ltd v Humpuss Intermoda Transportasi Tbk Ltd* [2013] EWHC 1240 (Comm) at [58]. The courts will however strive to give effect to the arbitration process and to uphold arbitration awards where at all possible. See for example *London Underground Ltd v Citylink Telecommunications Ltd* [2007] EWHC 1749 (TCC); *Lombard-Knight v Rainstorm Pictures Inc* [2014] EWCA Civ 356 at [34] ("the process [of arbitration] is intended to promote enforcement, not to put meaningless and purposeless hurdles in the way").

[388] *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20, affirmed on appeal at [2007] UKHL 40. See further paras 2-004, 2-099—2-100,.

[389] See *Lesotho Highlands Development Authority v Impreglio SpA* [2005] UKHL 43 at [34]; *Capital Trust Investments Ltd v Radio Design TJ AB* [2002] 2 All E.R. 159.

[390] See, for example, *Asghar v The Legal Services Commission* [2004] EWHC 1803; *Et Plus SA v Welter* [2006] 1 Lloyd's Rep. 251; *Monde Petroleum SA v Westernzagros Ltd* [2015] EWHC 67 (Comm).

[391] See for example *Capital Trust Investments Ltd v Radio Design TJ AB* [2002] 2 All E.R. 159 where the court emphasised that the parties would have wanted one tribunal to determine all claims which could fairly be said to arise out of an application for shares, including claims for fraudulent or negligent misrepresentation.

[392] *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20. See also *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40 at [13]; *Benford Ltd v Lopecan SL* [2004] EWHC 1897 where the court applied the presumption to construe a proviso to an arbitration agreement as covering both claims and cross claims amounting to a transactional set-off such that the court was entitled to retain jurisdiction over both.

[393] *Ashville Investments v Elmer Contractors Ltd* [1989] 1 Q.B. 488 at 517, similarly, Balcombe LJ at 503.

[394] *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1993] 1 Lloyd's Rep. 455 at 470. See also Rix J in *Aggeliki Charis Compania Maritima SA v Pagnan SpA* [1994] 1 Lloyd's Rep. 168 at 172: Leggatt LJ in the same case on appeal at [1995] 1 Lloyd's Rep. 87 at 91.

[395] Leggatt LJ in *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd*

important limits to this presumption (discussed elsewhere in this chapter),[396] this approach has been followed consistently in subsequent case law.[397]

### (b)   Disputes capable of being referred to arbitration

**Introduction.**   The policy of English law as articulated in the Arbitration Act 1996 is to give effect to the parties' choice to resolve their disputes by arbitration.[398] A question may however arise as to whether the subject matter of the dispute is "arbitrable", in the sense of being capable of being submitted to arbitration. A dispute will not be arbitrable if, for example, it is inherently unsuitable for arbitration,[399] or concerns a matter reserved by the State for exclusive resolution by the courts for public policy reasons.[400] Used in this sense, arbitrability is to be distinguished from questions regarding the scope of an arbitration agreement[401] and the jurisdiction of an arbitral tribunal.[402] Despite a less than consistent use of the term in judicial reasoning,[403] the approach to arbitrability adopted here reflects the traditional view of the concept.

**2-080**

**Limits on arbitrability.**   There is no agreed definition of arbitrability[404] and none is provided in the Arbitration Act 1996, although the Act does recognise the right of the court to refuse recognition or enforcement of an award that is in respect of a matter which is not capable of settlement by arbitration.[405] There are also well-recognised categories of dispute that may not be capable of being resolved by arbitration and certain underlying principles that can be identified in determining whether a matter is arbitrable. In particular, a dispute will generally not be arbitrable if it involves an issue of public policy, public rights or the interests of third parties, or where the dispute in question is clearly covered by a statutory provision which provides for inalienable access to the courts. In these cases, as the Court of Appeal has confirmed, "even the most widely drafted arbitration agreement will have to yield".

**2-081**

**Crime.**   One of the accepted categories of dispute which is recognised as being incapable of being referred to arbitration is criminal proceedings leading to conviction and related penal sanctions such as a custodial sentence or a fine. These matters are reserved to the courts. However, that is not to suggest that any allegations or claims made in an arbitration which may give rise to the potential for criminal sanctions or reveal that a crime may be committed in the future (such as a claim

**2-082**

---

[1993] 1 Lloyd's Rep. 455 at 466.

[396]   See paras 2-073 et seq.

[397]   See e.g. *Barclays Bank Plc v Nylon Capital LLP* [2011] EWCA Civ 826 at [27] and other cases referred to at para.2-004.

[398]   See in particular s.1(b) of the Arbitration Act 1996.

[399]   Something which does not require the determination of a legal right, e.g. a moral issue.

[400]   See para.2-084.

[401]   Whether a dispute falls within the scope of an arbitration agreement is determined in English law by interpreting it in accordance with well-recognised principles of contract construction. See paras 2-077 et seq.

[402]   Whether for example the tribunal's mandate extends to a particular person.

[403]   For example, the Supreme Court in *Dallah Real Estate and Tourism Holding Company v The Ministry of Religious Affairs, Government of Pakistan* referred to the question of "whether [the parties] had previously agreed to submit to arbitration … a substantive issue arising between them" as one involving "the very question of arbitrability". But the question of whether the parties have agreed to submit a particular issue to arbitration is one of scope, not arbitrability in the sense used here. See [2010] UKSC 46 at [24]. See also *Golden Ocean Group Ltd v Humpuss Intermoda Transportasi Tbk Ltd* [2013] EWHC 1240. For a discussion of arbitrability in the sense used in this book.

[404]   In the M&B Companion ten possible meanings are identified—see p.70.

[405]   Arbitration Act 1996 s.103(3), which is consistent with the New York Convention.

for payment of a commission to be used for payment of a bribe) are not arbitrable. On the contrary, it is accepted that an arbitrator has jurisdiction to find facts which constitute a criminal offence, such as fraud, or in appropriate cases to find that a criminal offence has been committed.[406] An example of the former arose in the context of claims for damages relating to pollution caused by an oil spill from The Prestige in 2002 off the coast of Spain which was addressed in *London Steam Ship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain and the French State*.[407] In that case, the court rejected the submission that because an arbitrator cannot convict someone of a criminal offence, the civil law claims against the shipowner which involved allegations of criminality were not arbitrable.[408] The fact that those private civil law claims could give rise to separate criminal proceedings was not sufficient to prevent the claims being arbitrable. The arbitrator remained capable of deciding whether the sums claimed were recoverable from the insurer, which was a civil law dispute. In such circumstances a criminal conviction was not an integral element of the cause of action. The tribunal plainly could not convict anyone of a crime but determination of the damages claim did not require it to do so.[409]

A tribunal can also make findings that a criminal offence has been committed, in appropriate cases. For example in *Interprods v De La Rue International*,[410] Teare J considered that clear words would be necessary in order to exclude allegations of criminal conduct that may be relevant to the contractual obligations of the parties from the scope of the arbitration agreement.[411]

**2-083**    **Fraud.**    Claims involving conduct amounting to fraud can be the subject matter of arbitration, as s.107(2) of the Arbitration Act makes clear.[412] The Act expressly recognises that an arbitral tribunal may decide an issue of fraud,[413] and the courts have acknowledged that an arbitrator has jurisdiction to decide allegations of bribery against a party to an arbitration agreement.[414] Even in this context, however, an arbitral tribunal does not have jurisdiction to impose criminal sanctions on a party, even if bribery of a public officer is established[415]; its power is limited to the civil consequences of that conduct.

---

[406] *The London Steamship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain, The French State ("The Prestige")* [2015] EWCA Civ 333 at [78].

[407] *London Steam Ship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain and the French State* [2013] EWHC 3188 (the decision on arbitrability in that case was not part of the appeal: see *London Steam Ship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain and the French State* [2015] EWCA Civ. 333 at [9]).

[408] *London Steam Ship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain and the French State* [2013] EWHC 3188 at [77].

[409] *London Steam Ship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain and the French State* [2013] EWHC 3188 at [81]–[82] (approved by the Court of Appeal: *The London Steamship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain, The French State ("The Prestige")* [2015] EWCA Civ 333 at [81].

[410] *Interprods v De La Rue International* [2014] EWHC 68.

[411] See *Interprods v De La Rue International* [2014] EWHC 68 at [7]. See also para.2-004.

[412] See para.2-107.

[413] The provision to the contrary in the previous legislation was repealed: see the Arbitration Act 1996 s.107(2). Contrast the position where the award was obtained by fraud: see the Arbitration Act 1996 s.68(2)(g) and para.8-038.

[414] An agreement to split the proceeds of a crime was another example given by the Court of Appeal in *Soleimany v Soleimany* [1998] 3 W.L.R. 911 at 821. On the subject of illegality, see para.8-016.

[415] For example, a custodial sentence or fine under the Bribery Act 2010.

**Policy issues.**   A dispute may not be arbitrable as a matter of public policy. For example in *O'Callaghan v Coral Racing*[416] the parties agreed to arbitrate a dispute arising out of a betting transaction. The transaction was unenforceable as being null and void by virtue of the Gaming Act legislation. The Court found that the arbitration clause was an integral part of the terms on which the parties were willing to do business and so could not survive independently of the main contract. Instead it was part of the void transaction itself.[417]

**2-084**

**Disputes for which access to the courts is an inalienable right.**   There are disputes in relation to which access to the courts is an inalienable right and which are not capable of being submitted to arbitration. As noted by the Court of Appeal in *Fulham Football Club (1987) Ltd v Richards*, in matrimonial law post-nuptial agreements dealing with maintenance on a subsequent separation are unenforceable insofar as they purport to remove the right of the parties to apply to the Court for financial relief (a reservation which is now statutory).[418] There are also statutory restrictions on the enforceability of any agreement which excludes or limits an employee's access to an employment tribunal under the Employment Rights Act 1996 and Equality Act.[419] Similarly, claims under the Solicitors Act 1974 are not arbitrable, since the courts alone have jurisdiction over solicitors as officers of the court and the exercise of this jurisdiction is essentially a punitive and disciplinary function.[420] While the jurisdiction does not apply to those who are not solicitors, it may apply to individuals or companies who purport to act as a solicitor or who do anything to imply that they are a solicitor.[421]

**2-085**

**Statutory claims that may be arbitrable.**   While certain types of statutory claim are not capable of being resolved in arbitration, the courts have recently clarified that others may be arbitrable depending on the nature of the underlying dispute. In this regard, the Court of Appeal has made clear that

**2-086**

> "the jurisdictional limitations on what an arbitration can achieve are not themselves decisive of the question whether the subject-matter in dispute is arbitrable".[422]

In other words, while a tribunal may not be able to grant all forms of relief that are available to the court, that will not per se prevent the underlying dispute from being resolved in arbitration.[423]

**Unfair prejudice.**   One example of this is a claim of unfair prejudice. Until recently, the question whether a dispute among shareholders giving rise to a claim of unfair prejudice under s.994 of the Companies Act 2006 was capable of being resolved by arbitration was unsettled. In *Vocam Europe Ltd*,[424] the court stayed a petition under s.994 where a shareholders agreement provided for all matters in

**2-087**

---

[416] Decision of the Court of Appeal dated 19 November 1998, reported in *The Times*.
[417] Although the decision was based on the previous Arbitration Act, the doctrine of separability had been well-established by the Common law.
[418] See *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA Civ 855 at [41] referring to *Hyman v Hyman* [1929] AC 601; ss.34-36 of the Matrimonial Causes Act 1973.
[419] See *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA Civ 855 at [41] referring to Employment Rights Act 1996 s.203 and Equality Act 2010 s.144(1) as discussed in *Clyde & Co LLP v Van Winkelhof* [2011] EWHC 668 (QB).
[420] *Assaubayev v Michael Wilson & Partners Ltd* [2014] EWCA Civ 1491 at [19], [28], [31].
[421] *Assaubayev v Michael Wilson & Partners Ltd* [2014] EWCA Civ 1491 at [32], [53].
[422] *Assaubayev v Michael Wilson & Partners Ltd* [2014] EWCA Civ 1491 at [68].
[423] The position is the same in other common law jurisdictions. See for example the decision of the Singapore Court of Appeal in *Tomolugen Holdings Ltd v Silica Investors Ltd* [2015] SGA 57 at [82] adopting the approach in *Fulham Football Club (1987) Ltd v Richards*.
[424] [1998] B.C.C. 396

74                                    THE ARBITRATION AGREEMENT

dispute to be referred to arbitration. However an opposite view was taken in *Exeter City Association Football Club Ltd v Football Conference Ltd*.[425] That decision has now been overruled by *Fulham Football Club (1987) Ltd v Richards*,[426] in which the Court of Appeal held that the

> "determination of whether there has been unfair prejudice consisting of the breach of an agreement or some other unconscionable behaviour is plainly capable of being decided by an arbitrator …".

Central to this decision was that the claim related to

> "essentially internal disputes about alleged breaches of the terms or understandings upon which the parties were intended to co-exist as members of the company"[427]

and was therefore a private dispute in relation to the affairs of a solvent company where no order for winding up was sought.[428] The Court of Appeal also noted that a similar, internal dispute among shareholders that might justify a winding up order under s.122 Insolvency Act 1986 should also be arbitrable.[429] The Singapore Court of Appeal has recently adopted (and was "fortified" by) the approach of the Court of Appeal in Fulham Football Club (1987) v Richards.[430] The only restriction is that a tribunal does not have jurisdiction to grant any relief that would affect the rights or interests of third parties such as creditors, nor can it order the winding up of a company. However, the tribunal can decide whether a winding up order is appropriate, in which case a petition will then have to be presented to and dealt with by the court.

2-088    **Insolvency related claims.**    Despite the Court of Appeal's ruling that a private dispute between members of a solvent company that might justify, but which does not seek, a winding up order is arbitrable, as is a claim of unfair prejudice, insolvency related claims are not necessarily capable of being brought in arbitration. In particular, where a dispute involves claims against the directors of an insolvent company which engage the public policy objective of protecting the public from wrongful trading, that dispute will not be arbitrable, in particular where the rights of third parties such as creditors are implicated.[431]

2-089    **Disputes arising before insolvency.**    Disputes may arise before a company is insolvent but which involve the presentation of a statutory demand for payment of a debt or a petition for the winding up of the company under the Insolvency Act 1986. The earlier decision in *Rusant v Traxys*[432] had held that a claim to prevent a creditor issuing a winding up petition on the basis of a statutory demand should be stayed and the underlying dispute about payment of the debt referred to arbitration, even absent any bona fide defence to the alleged debt.[433] The rationale for the decision was that it is an abuse for the insolvency process to be used to enforce a debt. In other words, it was not in fact a claim invoking the statutory regime for

---

[425] [2004] EWHC 831 (Ch).
[426] *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA 855 at [77]
[427] *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA 855 at [58]
[428] *Salford Estates (No.2) Ltd v Altomart Ltd* [2014] EWCA 1575 Civ at [37].
[429] *Salford Estates (No.2) Ltd v Altomart Ltd* [2014] EWCA 1575 Civ at [38].
[430] See the decision of the Singapore Court of Appeal in *Tomolugen Holdings Ltd v Silica Investors Ltd* [2015] SGA 57 at [84], [90].
[431] *Salford Estates (No.2) Ltd v Altomart Ltd* [2014] EWCA 1575 Civ at [37]. See also the decision of the Singapore Court of Appeal in *Tomolugen Holdings Ltd v Silica Investors Ltd* [2015] SGA 57 at [81]-[83] adopting the approach in *Fulham Football Club (1987) Ltd v Richards*.
[432] *Rusant Ltd v Traxys Far East Ltd* [2013] EWHC 4083.
[433] *Rusant Ltd v Traxys Far East Ltd* [2013] EWHC 4083 at [19].

insolvency but rather an attempt to force payment of a disputed debt.[434] The Court of Appeal in *Salford Estates (No.2) Ltd v Altomart Ltd*[435] agreed that the presentation of a winding up petition should not be used to "by-pass the arbitration agreement" in circumstances where there is an existing dispute about the underlying debt on which the petition is based, being resolved in arbitration.[436] However, as discussed in Ch. 7, the Court of Appeal disagreed that the appropriate course of action was to stay the petition under s.9(1) of the Arbitration Act 1996 where no arbitration was on foot. In that case, the petition should instead be dismissed in exercise of the court's discretion.[437] It therefore remains the case that while an arbitrator has no power to order the winding up of a company on presentation of a petition, any dispute about a debt which forms the basis of such a petition should be resolved in arbitration, if that is the forum chosen by the parties in the contract to which the debt relates.

**Insolvency law: disputes arising after insolvency.**   In the event of an insolvency, companies become subject to the statutory regime in the Insolvency Act 1986.[438] Where their assets are placed under the control of a liquidator, he or she is invested with statutory powers including the power to take proceedings for fraudulent or wrongful trading or for the setting aside of certain transactions. Disputes arising from the exercise of these statutory powers are not arbitrable. This does not however prevent a debtor whose proof of debt is disputed insisting on having that dispute with the liquidator resolved in arbitration,[439] even where a claim to statutory set-off is made.[440] Similarly, claims between a contracting party and the trustee in bankruptcy of the counter-party that arise out of breaches of a contract subject to an arbitration agreement are also arbitrable.[441]

**2-090**

**European Union law.**   It is now established that principles of EU law, including mandatory law such as Arts 17 to 19 of the Commercial Agents (Council Directive) Regulations 1993[442] and EU competition law,[443] are arbitrable. Indeed any award which either fails to take account of or offends against EU law will be refused recognition by the national courts of Member States.[444] The decision in *Accentuate Ltd v Asigra Inc*, holding that an arbitration agreement was null, void and inoperative within the meaning of s.9(4) of the Arbitration Act "in so far as it purported to require the submission to arbitration of 'questions pertaining to' mandatory provisions of EU law" appears to run counter to these established

**2-091**

---

[434] *Rusant Ltd v Traxys Far East Ltd* [2013] EWHC 4083 at [17] and [18].
[435] *Salford Estates (No.2) Ltd v Altomart Ltd* [[2014] EWCA 1575 Civ.
[436] *Salford Estates (No.2) Ltd v Altomart Ltd* [2014] EWCA 1575 Civ at [40].
[437] *Salford Estates (No.2) Ltdv Altomart Ltd* [2014] EWCA 1575 Civ at [41]–[42]. In this regard, the Court of Appeal disagreed with the judge in *Rusant v Traxys* at [19] that an issue on a winding up petition which is essential to the foundation of the petition becomes a "claim" for the purposes the Arbitration Act 1996 s.9(1): see para.7-024.
[438] See further Ch.3.
[439] See para.3–044.
[440] *Philpott v Lycee Francais Charles De Gaulle School* [2015] EWHC 1065 (Ch) citing *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA Civ 855 at [98].
[441] *Bannai v Erez* [2013] EWHC 3689 (Comm) (grant of an anti-suit injunction to restrain foreign proceedings in which claims for an account of assets consequent upon a breach of contract were made).
[442] See *Ingmar GB Ltd v Eaton Leonard Technologies Ltd* [2000] ECR I-9305.
[443] *Eco Swiss China Time Ltd v Benetton International NV* Case C-126/97 [1999] ECR I-3055 (although this case provides only indirect approval for this proposition since the case dealt with enforcement of an award).
[444] *Eco Swiss China Time Ltd v Benetton International NV* Case C-126/97 [1999] ECR I-3055; *Elisa Maria Mostaza Claro v Centro Móvil Milenium SL* , C-168/05 [2006] E.C.R. I-10421.

authorities and should be treated with caution.[445] The same can be said of the decision in *Fern Computer Consultancy Ltd v Intergraph Cadworx & Analysis Solutions Inc* which, although declining to follow *Accentuate Ltd v Asigra Inc* on other grounds, nevertheless appears to endorse the approach as regards the effect on the arbitration agreement of a choice of foreign law which does not give effect to EU law.[446]

**2-092**    **Arbitrations involving state entities.**    Questions of international law, such as those involving transactions between foreign states, are non-justiciable by the English courts where there are no judicial or manageable standards (for example, customary international law principles) for the English courts to apply.[447] Similarly, the interpretation of international treaties to which the UK is a party but which have not been incorporated into English law is non-justiciable.[448] However, context is always important and these principles are not exhaustive. Where those questions are necessary to determining a person's rights and duties under domestic law (for example, in relation to an arbitration agreement), the principle does not apply and what would, in other circumstances, be non-justiciable may be determined by the court.[449] That same principle applies where a jurisdictional question arises as to whether or not a State entity is a successor or continuator of a former State-party to an arbitration agreement, and that question is arbitrable. The rationale given for this by the English court is that

> "it would be wrong to 'allow a State to escape liability under a commercial contract merely by pronouncing that it was not an original party to the contract, and then sheltering behind a cloak of non-justiciability in order to prevent an arbitration or adjudication based on the true legal position'."[450]

**2-093**    **The trend of broadening arbitrability.**    As can be seen from the specific instances of arbitrability discussed, there is a discernible trend towards expanding the range of disputes that are capable of being submitted to arbitration. Although there undoubtedly remain certain issues and disputes which cannot be arbitrated, often the limitations on the ability of a tribunal to decide issues referred to them arise more from a narrowly drafted arbitration agreement, which is an issue of scope rather than arbitrability.

**2-094**    **Effect of arbitrability on enforcement.**    Where another law is applicable that restricts resolution by arbitration of a particular dispute, arbitrability may come into play because the English courts may not enforce the arbitration agreement or any award. In *Westacre Investments Inc v Jugoimport SPDR Holding Co Ltd*,[451] the court had to decide whether to enforce an ICC award made in Switzerland involv-

---

[445] *Accentuate Ltd v Asigra Inc* [2009] EWHC 2655. The High Court has since declined to follow this decision, although on different grounds. See *Fern Computer Consultancy Ltd v Intergraph Cadworx & Analysis Solutions Inc* [2014] EWHC 2908.

[446] *Fern Computer Consultancy Ltd v Intergraph Cadworx & Analysis Solutions Inc* [2014] EWHC 2908 (Ch) at [34].

[447] See para.8-062. See also *Ecuador v Occidental Exploration & Production Co* [2007] EWCA Civ 656 at [23]; *The Republic of Serbia v Imagesat International NV* [2009] EWHC 2853 at [135].

[448] *Ecuador v Occidental Exploration & Production Co* [2007] EWCA Civ 656 at [24], [28].

[449] *Ecuador v Occidental Exploration & Production Co* [2007] EWCA Civ 656 at [31].

[450] *The Republic of Serbia v Imagesat International NV* [2009] EWHC 2853 at [126] (the question was dealt with obiter because it was found that Serbia had nonetheless submitted to the jurisdiction of the tribunal by signing the Terms of Reference, which included jurisdiction to determine whether Serbia was a successor state).

[451] *Westacre Investments Inc v Jugoimport SPDR Holding Co Ltd* [1998] QB 740. See Colman J's summary of the authorities and discussions of countervailing policies against enforcement of illegal contracts and supporting finality of arbitral awards (para.768). The case was referred to the Court of Appeal on another point.

ing allegations of bribery. In that case, the arbitral tribunal had determined that the allegations were unsubstantiated and, after reviewing earlier authorities, the court found that it would not offend English public policy to enforce the award. Had the court found that the award decided a matter that was not arbitrable, it could have refused enforcement.[452]

### (c)   Scope of the arbitration agreement

**Submitting disputes to arbitration**   In order to determine whether a particular dispute has been validly referred to arbitration a number of aspects need to be considered. First, is the dispute capable of being referred to arbitration at all? This issue of arbitrability is dealt with above.[453] Secondly, is the type of dispute that has arisen within the scope of the particular arbitration agreement? This will be the focus of the following paragraphs. Thirdly, even if disputes of the type in question are within the terms of the arbitration agreement, does the dispute fall within the scope of what was actually referred by the parties in the particular reference? This aspect is addressed in Ch.5.[454]

**2-095**

**What matters are within the scope of the arbitration agreement?**   The particular form of words used in an arbitration agreement will be the starting point for determining the types of dispute over which a tribunal has jurisdiction. The trend is against drawing fine distinctions on the basis of the form of words used[455] or, as Evans J put it in *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd*:[456] "[having] the lawyers engage in minute semantic analysis in the guise of ascertaining what the parties' intentions were." Hirst J expressed little relish for "an intricate and often regrettably hair-splitting exercise in weighing and contrasting the effect of [the] … prepositions encountered in arbitration agreements",[457] while Mustill LJ (as he then was) referred to the tendency to avoid nice distinctions and give the language of the arbitration agreement its natural meaning.[458] These views found strong endorsement by the House of Lords in *Fiona Trust & Holding Corp v Yuri Privalov*.[459] Nevertheless a party is entitled to object to a tribunal assuming jurisdiction over a dispute which falls outside what the parties have agreed in their arbitration agreement to refer,[460] and it is therefore important to consider the scope of the arbitration agreement and whether the dispute which has arisen falls within its terms on a true construction of that agreement.[461] Whilst it is very common for arbitration agreements to refer to arbitration all

**2-096**

---

[452]   See the Arbitration Act 1996 s.103(3).

[453]   At paras 2-080 et seq.

[454]   See para.5-028.

[455]   *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20, affirmed in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40. See further paras 2-079 et seq.

[456]   *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep. 63 at 67.

[457]   *Ethiopian Oilseeds & Pulses Export Corp v Rio Del Mar Foods Inc* [1990] 1 Lloyd's Rep. 86.

[458]   *Société Commerciale de Reassurance v ERAS (Internationale) Ltd (formerly ERAS (UK))* [1992] 1 Lloyd's Rep. 570.

[459]   *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40) at [12] where Lord Hoffmann, applauding the Court of Appeal's decision, said that the linguistic distinctions drawn in earlier cases "reflect no credit upon English commercial" law. See para.2-004.

[460]   See generally paras 5-062 et seq.

[461]   *Metal Distributors (UK) Ltd v ZCCM Investment Holdings Plc* [2005] EWHC 156; *Econet Satellite Services Ltd v Vee Networks Ltd (formerly Econet Wireless Nigeria Ltd)* [2006] EWHC 1664 (Comm) at [17]. For the position on cross claims, set-off and counterclaims see para.6-017.

disputes[462] arising under a particular contract, the parties may deliberately have chosen to refer some but not all types of dispute under their contract to arbitration.[463] This occurs for example where the parties wish some disputes, such as those relating to technical or valuation issues, to be submitted to expert determination.[464] Alternatively if the arbitration agreement forms part of a settlement agreement rather than a transactional agreement it may well limit the scope of the matters which may be submitted to arbitration.[465] Accordingly a close examination of the scope of what has been referred will be necessary as the tribunal will only have jurisdiction to hear disputes that fall within the arbitration agreement.[466]

**2-097**    **When does the issue arise?**    Issues concerning the scope of the arbitration agreement and therefore the tribunal's jurisdiction can arise at several stages:

- at the outset of the reference, the question arises whether a particular issue is or is not one that should be referred to arbitration under the terms of the arbitration agreement;
- during arbitration proceedings, issues may be raised concerning whether a reference as constituted is wide enough to resolve a particular dispute or aspect of a dispute;
- if the court is faced with a challenge to jurisdiction it may be on the basis that the dispute was beyond that which they had agreed to submit to arbitration;[467] and
- at the enforcement stage, the enforcing court may need to decide whether the scope of the award is wider than permitted by the agreement to arbitrate and/or the terms of the reference.

The discussion which follows should be read in the light of the statutory restrictions on the right to make tardy objections to jurisdiction[468] and the courts' desire to give effect to the wishes of parties and their choice of dispute resolution mechanisms in particular. Even if arguments can be deployed to defeat the tribunal's jurisdiction on the basis of the original arbitration agreement, it may be possible to argue that there has been an "ad hoc" submission agreement[469] and/or that the other party is estopped from challenging jurisdiction as a result of an implied agreement to arbitrate.[470]

---

[462]  As regards use of the terms "differences" or "disputes" in an arbitration agreement see para.5-003.

[463]  See also para.2-004 in relation to non-contractual causes of action and para.2-038.

[464]  See para.2-038 in relation to hybrid clauses.

[465]  See, for example, *Plant v Plant* [2002] EWHC 2283 where it was held that the relevant clause was only applicable to disputes arising under specific provisions of a settlement agreement and did not apply to disputes generally under the agreement. See also *T&N Ltd v Royal & Sun Alliance Plc* [2004] Lloyd's Rep. 102.

[466]  Save to the extent the parties subsequently agree to extent the tribunal's jurisdiction: see para.5–028.

[467]  Under the Arbitration Act 1996 s.67. Such a challenge would only be possible if a party promptly made clear its objection, otherwise the right to object will be lost under s.73 of the Arbitration Act: see para.8–070.

[468]  Arbitration Act 1996 s.73, cf. Model Law, Art.4 (see Appendix 4) and see paras 5-065 and 8-065.

[469]  See para.2-006.

[470]  As in *Jones Engineering Services Ltd v Balfour Beatty Building Ltd* (1992) A.D.L.R.J. 133. This was also argued, without success in *Cia Maritima Zorrosa SA v Sesostris SAE, (The "Marques de Bolarque")* [1984] 1 Lloyd's Rep. 652 and *Allied Vision Ltd v VPS Film Entertainment GmbH* [1991] 1 Lloyd's Rep. 392. In both these cases there were reservations of the right to object to an arbitrator's jurisdiction which were not overridden by subsequent ad hoc submissions.;See also *Almare Società di Navigazione SpA v Derby and Co Ltd (The "Almaea Prima")* [1989] 2 Lloyd's Rep. 376; *Jones v Balfour Beatty* (1992) A.D.L.R.J. 133 was distinguished in *MJ Gleeson Group*

## (d)   Specific wordings

**Current position.**   In *Fiona Trust & Holding Corp v Yuri Privalov*[471] the Court of Appeal reviewed the authorities on the meanings to be given to different formulations of arbitration agreement wordings. Longmore LJ, accepting that "not all these authorities are readily reconcilable", went on to say:[472]

2-098

> "Hearings and judgments get longer as new authorities have to be considered. For our part we consider that the time has now come for a line of some sort to be drawn and a fresh start made at any rate for cases arising in an international commercial context. Ordinary business men would be surprised at the nice distinctions drawn in the cases and the time taken up by argument in debating whether a particular case falls within one set of words or another very similar set of words. If business men go to the trouble of agreeing that their disputes be heard in the courts of a particular country or by a tribunal of their choice they do not expect (at any rate when they are making the contract in the first place) that time and expense will be taken in lengthy argument about the nature of particular causes of action and whether any particular cause of action comes within the meaning of a particular phrase they have chosen in their arbitration clause."

The approach advocated by the Court of Appeal was that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed. The words "arising out of" should cover every dispute except a dispute as to whether there was ever a contract at all. Although previously the words "arising under the contract" had sometimes been given a narrower meaning, that should no longer be so. The words "out of" and "under" should be widely construed.[473] This approach was whole heartedly endorsed by the House of Lords in *Fiona Trust & Holding Corp v Yuri Privalov*.[474]

**Broad interpretation favoured.**   *Fiona Trust*[475] provided a welcome statement of principle from the Court of Appeal[476] which was endorsed when the case reached the House of Lords. It reflects what has tended to be a broad approach to the construction of arbitration clauses which has been prevalent since the coming into force of the Arbitration Act 1996. For example, the Court of Appeal rejected a claim that a dispute about an insurer's liability under a policy fell outside the scope of an arbitration agreement which provided for mediation, then arbitration where the parties "fail[ed] to agree as to the amount to be paid under this Policy".[477] Moore-Bick LJ held that it would have been a simple matter for the parties to refer claims about liability to the courts, and those about quantum to arbitration if that is what had been intended. His comments endorse the principle that clear words are required if the scope of an arbitration agreement is to be narrowed or limited.[478] A recurring question is the extent to which tort claims fall within arbitration agreements contained in a contract.[479] Clearly they can do so, but there was some authority that

2-099

---

*Plc v Wyatt of Snetterton Ltd* (1994) 42 Con. L.R. 14. See also *Lesser Design & Build Ltd v University of Surrey* [1991] 56 B.L.R. 57. For implied agreements to arbitrate see para.2-016.

[471]   *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20.

[472]   At [17].

[473]   At [18].

[474]   *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40 at [12].

[475]   *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20 at [17].

[476]   Subsequent decisions indicate the approach is well received: *Film Finance Inc v The Royal Bank of Scotland* [2007] EWHC 195; *Mabey and Johnson Ltd v Danos* [2007] EWHC 1094.

[477]   *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 at [39].

[478]   See para.2-004.

[479]   See for example *Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The "Playa Larga" and The "Marble Islands")* [1983] 2 Lloyd's Rep. 171; *The "Angelic Grace"* [1994] 1 Lloyd's Rep. 168; *Astro Vencedor Compania Naviera SA v Mabanaft GmbH* [1970] 2 Lloyd's Rep.

particular wording may not be sufficient to achieve that.[480] The tendency now is very much to treat claims based on other causes of action as within the tribunal's jurisdiction, particularly if they relate to the same facts as other contractual claims falling within the arbitration agreement. So, for example, in *Et Plus SA v Welter*[481] a clause submitting to arbitration "any potential disputes regarding the performance or the interpretation of this contract" was held to extend to tort claims, provided they were sufficiently connected to the performance or non-performance of the contract. Similarly in *Asghar v Legal Services Commission*[482] the relevant provision covered "disputes … concerning alleged breaches of this contract". Lightman J held that the tort claims that were raised had

> "the closest possible connection with the contract and the rights and duties of the parties thereunder and at the very least critical issues in respect of each of those causes of action would be the subject of arbitration. The resolution of the contractual claims could not sensibly or practically be divorced from the resolution of the non-contractual claims."[483]

In *JSC BTA Bank v Ablyazov*, the relevant provision covered "[a]ny disputes, differences or claims arising from this contract (agreement) or in connection therewith" and was held to be wide enough to cover non contractual claims on the basis that they were "in connection with" the substantive agreement.[484]

**2-100**  **Standard wordings and court rulings.**  In light of the clear and authoritative statements in *Fiona Trust & Holding Corp v Yuri Privalov*,[485] the case law, and in particular some of the fine if not inconsistent distinctions,[486] that evolved as to the scope of what particular words or phrases refer to arbitration has now fallen largely into disuse.[487] As Smith J said recently in *Lombard North Central Plc v GATX*

---

267; *Ulysses v Huntingdon* [1990] 1 Lloyd's Rep. 160. *Bilta (UK) Ltd (In Liquidation) v Nazir* [2010] EWHC 1086 (Ch).and *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585.

[480] *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488 at 508; *Fillite (Runcorn) Ltd v Aqua-Lift (a firm)* [1989] 45 B.L.R. 27 (although note that *Fillite* was doubted in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40 at [11].

[481] *Et Plus SA v Welter* [2006] 1 Lloyd's Rep. 251; [2005] EWHC 2115.

[482] *Asghar v Legal Services Commission* [2004] EWHC 1803.

[483] See generally para.2-004 in relation to non-contractual claims. See also *Steamship Mutual Underwriting Association (Bermuda) Ltd v Sulpicio Lines Inc* [2008] EWHC 914 (Comm) at [26] (where the arbitration clause applied in "the event of any difference or dispute whatsoever") and was held to cover non-contractual claims).

[484] *JSC BTA Bank v Ablyazov* [2011] EWHC 587 (Comm) at [64].

[485] *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20; [2007] UKHL 40.

[486] For example, in *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488 claims for mistake and misrepresentation were held to be covered by an arbitration agreement which referred "any matter or thing of whatsoever nature arising thereunder or in connection therewith" to arbitration. However, in *Fillite (Runcorn) Ltd v Aqua-Lift (a firm)* [1989] 45 B.L.R. 27, claims for misrepresentation and negligent misstatement were found not to be covered by an arbitration agreement which referred "any dispute or difference arising under these heads of agreement" to arbitration. There is no substantive difference in effect between a clause "thereunder" and "under" and so it was the expression "in connection therewith" as used in *Ashville v Elmer* which widened its scope. However, the decision in *Fillite* was doubted in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40 at [11]. See also *Chimimport Plc v G D'Alesio SAS (The "Paola d'Alesio")* [1994] 2 Lloyd's Rep. 366 at 372.

[487] The Court of Appeal referred specifically to the international commercial context, but it is suggested that the same should apply in the domestic context. It must be doubtful whether businessmen in England would respond any differently from the their counterparts in the international context. Whilst there may be a greater awareness of the historical limitations of particular forms of wording the area has always been subject to some uncertainty and of course if particular claims are sought to be excluded from the scope of the arbitration agreement that can be achieved by express provision to that effect.

*Corporation*,[488] had the parties tried to argue that the difference in question was not a "dispute", he would have rejected that suggestion

> "which would introduce a semantic distinction between a 'difference' and a 'dispute' reminiscent of the 'fussy distinctions' deprecated in *Fiona Trust v Privalov*."

In any event it should be borne in mind that previous rulings are of limited assistance and should be treated with caution given the need to construe the particular arbitration agreement in question. As Evans J said in *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd*:

> "reported decisions in earlier cases, even of high authority, cannot necessarily be binding in later cases, unless exceptionally the relevant words and all the relevant circumstances are the same in both cases. Even then, the binding nature of the earlier decision would only become relevant if the Court in the later case, if unaided by authority, would reach a contrary conclusion as to the natural and proper meaning of the words in question."[489]

That said, it is perhaps premature to abandon entirely the guidance given, so the following paragraphs will address particular wordings albeit that the authorities referred to have now to be treated with considerable circumspection given the recent authorities referred to above.

**"All" or "any" differences, disputes or claims.**   The most comprehensive forms of wording are those which refer to the decision of the tribunal each and every dispute between the parties by use of the words "all" or "any". This may be expressed by reference to the terms differences, disputes or claims.[490] An arbitration agreement referring "any dispute or difference" to arbitration was found wide enough to cover the effects of exceptional dislocation and delay notwithstanding that the disputes clause provided that they were to be assessed by mutual agreement. Once the parties had clearly agreed to differ about those issues they fell within the arbitration clause.[491]     **2-101**

**Disputes "arising out of" or "arising under" the contract.**   As mentioned above,[492] the phrases "disputes arising under the contract" and "disputes arising out of the contract" were specifically considered by the Court of Appeal in *Fiona Trust*[493] who concluded that they should cover every dispute except a dispute as to whether there was ever a contract at all.[494] Although previously the words "arising under the contract" had sometimes been thought to have a narrower meaning, that     **2-102**

---

[488] *Lombard North Central Plc v GATX Corp* [2012] EWHC 1067 (Comm) at [20].

[489] *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep. 63 at [66].

[490] *Government of Gibraltar v Kenney* [1956] 2 Q.B. 410; *Re an arbitration between Hohenzollern Actien Gesellschaft fur Locomotivban and the City of London Contract Corp* (1886) 54 L.T. 596; *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488 at 508. See paras 5-003 et seq. for the significance of the terminology used.

[491] *Vosper Thorneycroft v Ministry of Defence* [1976] 1 Lloyd's Rep. 58.

[492] See para.2-098.

[493] *Fiona Trust & Holding Corp v Yuri Privalov* [2007] EWCA Civ 20, affirmed in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40.

[494] See *Mustill & Boyd* at 120 referred to in *Fiona Trust* and also in *Ethiopian Oilseeds & Pulses Export Corp v Rio Del Mar Foods Inc* [1990] 1 Lloyd's Rep. 86. See also *Fillite (Runcorn) Ltd v Aqua-Life (a firm)* [1989] 45 B.L.R. 27 where Nourse LJ said at 44 that the preposition "under" presupposes that the noun which it governs has some existence, and therefore an arbitration clause with that wording cannot be used to question the contract's existence (note, however, that *Fillite* was doubted in *Fiona Trust & Holding Corp v Yuri Privalov* [2007] UKHL 40 at [11]).

should no longer be so.[495] The words "out of" and "under" should be widely construed.[496] Accordingly the earlier case law suggesting that a provision referring "disputes arising out of the contract" would not include claims for a contribution under the Civil Liability (Contribution) Act 1978[497] or that "disputes arising under the contract" would not cover rectification claims[498] would no longer seem to apply. The words "disputes arising out of" have generally been held to have a wide meaning[499] but the Court of Appeal's approach represents a shift towards a broader interpretation of the words "arising under of the contract".[500]

**2-103**   **Disputes "in connection with", "in relation to", or "regarding" a contract.**   These words, which are frequently encountered and are to be given the same meaning,[501] were at one time given a restricted interpretation,[502] but are now well established as having a broad meaning.[503] They have been held[504] to include claims for rectification of a contract,[505] as well as mistake and misrepresentation.[506] They may also be sufficient to catch disputes arising under another contract related to the contract containing the arbitration clause.[507]

**2-104**   **Disputes "concerning alleged breaches of the contract".**   This phrase was held not to be confined to causes of action for breach of contract but to include all disputes which have at their heart the issue of breach of contract including claims for conspiracy, misfeasance in public office and inducement to commit breach of contract.[508]

**2-105**   **Disputes "with respect to the construction of".**   Where the arbitration agree-

---

[495] In *Heyman v Darwins Ltd* [1942] A.C. 356 both Lord Wright (at 385) and Lord Porter (at 399) indicated that "arising out of" had a wider meaning than "arising under"; see also *Government of Gibraltar v Kenney* [1956] 2 Q.B. 410 at 421; *Chimimport v D'Alesio* [1994] 1 Lloyd's Rep. 366. Cf. *Union of India v EB Aaby's Rederi A/S (The "Evje")* [1975] A.C. 797 at 814 and 817; *Ulysses Compania Naviera SA v Huntingdon Petroleum Services Ltd (The "Ermoupolis")* [1990] 1 Lloyd's Rep. 160.

[496] See also *Mabey and Johnson Ltd v Danos* [2007] EWHC 1094 and *Interprods Ltd v De La Rue International Ltd* [2014] EWHC 68 (Comm) at [7].

[497] *X Ltd v Y Ltd* [2005] B.L.R. 341. See para.6-111 for the tribunal's power to award a contribution.

[498] *Heyman v Darwins* [1942] A.C. 356; *Government of Gibraltar v Kenney* [1956] 2 Q.B. 410; *Crane v Hegeman-Harris Co Inc* [1939] 1 All E.R. 622; and *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488. The significance of these authorities was in any event doubtful given the statutory power, absent agreement otherwise, for tribunals to order rectification under s.48(5)(c) of the Arbitration Act 1996: see para.6-132.

[499] *Heyman v Darwins Ltd* [1942] A.C. 356; *Government of Gibraltar v Kenney* [1956] 2 Q.B. 410; *Kruse v Questier & Co Ltd* [1953] 1 Q.B. 669; *Mantovani v Carapelli SpA* [1978] 2 Lloyd's Rep. 63; *Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The "Playa Larga" and The "Marble Islands")* [1983] 2 Lloyd's Rep. 171; *Ethiopian Oilseeds & Pulses Export Corp v Rio Del Mar Foods Inc* [1990] 1 Lloyd's Rep. 86. For a recent example see *Capital Trust Investments Ltd v Radio Design TJ AB* [2002] 2 All E.R. 159.

[500] With regard to claims in tort see para.2-004 and para.2-100.

[501] *Et Plus SA v Welter* [2006] 1 Lloyd's Rep. 251.

[502] As in *Lawson v The Wallassey Local Board* (1882) 11 Q.B.D. 229, where "any difference … concerning anything in connection with this contract" was held not to cover a dispute about an implied term that certain other work on the site should not be delayed.

[503] *Woolf v Collis Removal Service* [1948] 1 K.B. 11; *A&B v C&D* [1982] l Lloyd's Rep. 166; *Jagger v Decca Music Group Ltd* [2004] EWHC 2542; *el Nasharty v J Sainsbury Plc* [2003] EWHC 2195; *Faghirzadeh v Rudolf Wolff* [1977] 1 Lloyd's Rep. 630 at 641. *Lombard North Central Plc v GATX Corp* [2012] EWHC 1067 (Comm).

[504] *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488.

[505] This remedy is now available in any event under s.48(5)(c) of the Arbitration Act 1996: see para.6-114.

[506] See the cases referred to at para.2-101.

[507] *A&B v C&D* [1989] 1 Q.B. 488.

[508] *Asghar v The Legal Services Commission* [2004] EWHC 1803 at [21].

ment applies to disputes concerning "the construction" of a document this refers to the meaning or interpretation of the document.[509] That would not cover claims for rectification.[510] However in *Macepark (Whittlebury) Ltd v Sargeant (No.1)* case[511] it was held that the addition of the words "or effect" to "the construction" of a document did encompass a jurisdiction to deal with a claim for rectification. The court reasoned that the words "or effect" suggested something more was intended that just the meaning of the document and would include what it is the parties must do or not do under the document as a matter of substance, which would include rectification.

**Preference for wording in wide terms.**   The preceding paragraphs demonstrate that in most cases the preferred course is to draft an arbitration agreement covering future disputes in the widest possible terms. Such a broad formula was used in *Government of Gibraltar v Kenney*:[512]

**2-106**

> "any dispute or difference which arises or occurs between the parties in relation to any thing or matter arising out of or under this agreement."

The ICC recommended wording is "All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration …" The LCIA form is more explicit:

> "Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration …"

## (e)   Particular types of dispute

**Fraud.**   As already discussed above, fraud claims can be within the scope of an arbitration agreement. Under previous legislation,[513] the court could revoke the authority of a tribunal to deal with claims involving issues of fraud and determine those claims itself. This provision has been repealed.[514]

**2-107**

**Consumers contracts.**   Under earlier legislation[515] consumers were not always bound by their arbitration agreements. The provisions were unsatisfactory[516] and were found by the Court of Appeal to be contrary to Arts 6 and 59 of the Treaty of Rome because they discriminated against non-English parties by preventing them from having the same right that English parties had to treat the arbitration provisions as optional.[517] Consumer arbitration agreements are now dealt with in ss.89 to 91 of the Arbitration Act 1996 which give effect to the Unfair Terms in Consumer Contracts Regulations 1999.[518] Under s.91 of the Arbitration Act 1996 an arbitra-

**2-108**

---

[509] *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488 at 508; *Macepark (Whittlebury) Ltd v Sargeant (No.1)* [2002] W.L. 1876043, Ch D.

[510] *Macepark (Whittlebury) Ltd v Sargeant (No.1)* [2002] W.L. 1876043, Ch D.

[511] *Macepark (Whittlebury) Ltd v Sargeant (No.1)* [2002] W.L. 1876043, Ch D.

[512] *Government of Gibraltar v Kenney* [1956] 2 Q.B. 410.

[513] Arbitration Act 1950 s.24(2).

[514] Arbitration Act 1996 s.107(2).

[515] Consumer Arbitration Agreements Act 1988.

[516] See DAC Report, paras 332 et seq.

[517] *Philip Alexander Securities and Futures Ltd v Bamberger: Same v Gilhaus* [1996] C.L.C. 1757.

[518] Section 89 refers to the Unfair Terms in Consumer Contracts Regulations 1994 including any regulations amending or replacing those regulations. The 1994 Regulations were repealed and replaced by the 1999 Regulations. The 1999 Regulations are due to be repealed and replaced as of 1 October 2015 by the Consumer Rights Act 2015, which received Royal Assent on 26 March 2015: see of the Consumer Rights Act 2015 Sch.4, s.34.

tion agreement,[519] where one of the parties is a consumer, is unfair insofar as it relates to a claim for an amount which does not exceed a figure specified by statutory instrument, currently £5,000.[520] Where the claimed amount exceeds that figure, the arbitration agreement may still be unfair under the general provisions of the 1999 Regulations[521] where the test to be applied is as follows:

> "A term falling within the scope of the Regulations is unfair if it causes a significant imbalance in the parties' rights and obligations under the contract to the detriment of the consumer in a manner or to an extent which is contrary to the requirement of good faith."[522]

A consumer is a natural or legal person[523] who, in making a contract, is acting for purposes which are outside his trade, business or profession.[524] In *Mylcrist Builders Ltd v Buck*[525] an arbitration agreement in a construction contract with an individual dealing as a consumer was found to be unfair because the arbitration agreement prevented the consumer's right of access to the courts in circumstances where the amount in dispute was, while over the £5,000 limit, still small in comparison to the comparatively significant fees of the arbitrator, and because it was not drawn to her attention at the time of entering into the contract.[526] The effect of the arbitration agreement being unfair is that it cannot be enforced against the consumer. The rest of the contract continues to bind the parties, with litigation available for dispute resolution.[527] Sections 89 to 91 of the Arbitration Act 1996 apply whatever the law applicable to the arbitration agreement.[528]

2-109    **Building and engineering disputes.**    Previous case law[529] suggested that arbitration agreements in building and engineering contracts gave arbitral tribunals wider jurisdiction in some respects than that of the court. This was said to arise from the drafting of arbitration clauses in standard form construction contracts which give the arbitrator power to "open up, review, and revise any certificate, opinion, decision, requisition or notice … and to determine all matters in dispute", a power that the court was said not to possess.[530] The House of Lords subsequently rejected this suggestion and a provision conferring this power upon the arbitrator is not to be construed as removing them from the court.[531]

2-110    **Prior reference to engineer.**    In many standard form construction contracts, disputes are first decided upon by the engineer. Following that decision the dispute

---

[519] Consumer arbitration agreements are defined in s.89 of the Arbitration Act 1996 using slightly different wording from the definition in s.6(1) of the Arbitration Act 1996. See also the Consumer Rights Act 2015 Sch.4, s.89.

[520] Arbitration Act 1996 s.91. See also the Consumer Rights Act 2015 Sch.4, s.33. SI 1999/2167 establishes the figure at £5,000.

[521] *Mylcrist Builders Ltd v Buck* [2008] EWHC 2172 (TCC) at [34].

[522] *Director General of Fair Trading v First National Bank Plc* [2002] 1 A.C. 481 at [17]. See also *Mylcrist Builders Ltd v Buck* [2008] EWHC 2172 (TCC) at [51].

[523] Arbitration Act 1996 s.90. See also the Consumer Rights Act 2015 Sch.4, s.32.

[524] Regulation 3 of the Unfair Terms in Consumer Contracts Regulations (SI 1999/2083). See also the Consumer Rights Act 2015 s.2(3).

[525] *Mylcrist Builders Ltd v Buck* [2008] EWHC 2172 (TCC).

[526] *Mylcrist Builders Ltd v Buck* [2008] EWHC 2172 (TCC) at [54]–[57].

[527] Regulation 8(2) of the Unfair Terms in Consumer Contracts Regulations (SI 1999/2083). See also s.67 of the Consumer Rights Act 2015.

[528] Arbitration Act 1996 s.89(3). See also Sch.4, s.31 of the Consumer Rights Act 2015.

[529] *Northern Regional Health Authority v Crouch (Derek) Construction Co Ltd* [1984] 1 Q.B. 644.

[530] *Northern Regional Health Authority v Crouch (Derek) Construction Co Ltd* [1984] 1 Q.B. 644.

[531] *Beaufort Developments (N.I.) Ltd v Gilbert-Ash (N.I.) Ltd* [1999] 1 A.C. 266.

will in many cases then be referred to adjudication,[532] and thereafter to arbitration or litigation. The parties are not limited in the arguments they can put to the tribunal by not having raised the same points with the engineer.[533] However there is often a time limit within which the engineer's decision must be challenged, failing which it becomes binding, and if that time limit is not complied with the right to refer the matter to arbitration may be lost.[534]

**Direct action claims against an insurer.**   Under the statutory regimes of many national systems of law, injured third parties are, in certain circumstances, given a right of direct access to pursue a claim against a civil liability insurer of the wrongdoer. A question sometimes arises as to whether such a claim falls within the scope of the arbitration clause in the underlying contract of insurance, in which case any proceedings in the courts will be the subject of a stay under s.9 Arbitration Act 1996 if the policy is governed by English law, or whether it is a claim arising under statute which is not covered by the arbitration clause.[535] In ascertaining whether the claim falls within the scope of the arbitration agreement in the insurance contract, the key question will be whether the claimant is seeking to enforce a contractual obligation derived from the contract of insurance or an independent right of recovery arising under statute.[536] While the answer may not always be clear cut, it is necessary to look at the content of the right the legislation is seeking to confer on the third party since. in any claim of this nature both statutory and contractual rights are engaged.[537] If the legislation permits the insurer to rely on defences that would have been available to him in any action brought by the insured under the policy, that will be a strong indication that the content of the right is contractual in nature and the claim will fall within the scope of the arbitration agreement. If, on the other hand, the legislation limits or prevents the insurer from relying on any contractual defences that would have been available under the policy, that might indicate that the claim arises under the legislation and is independent from the contract such that it will therefore fall outside the scope of the arbitration agreement.[538]

**2-111**

## 5.   LAWS TO BE APPLIED TO AN ARBITRATION

### (a)   Introduction

**General.**   Issues relating to the choice of law to be applied often arise in international arbitration and can be of fundamental importance, because:

**2-112**

---

[532] See para.2-033.

[533] *Mid Glamorgan County Council v Land Authority for Wales* [1990] 49 B.L.R. 61.

[534] *JT Mackley & Co Ltd v Gosport Marina Ltd* [2002] EWHC 1315 (TCC).

[535] See for example, *Through Transport Mutual Insurance Association (Eurasia) Ltd v New India Assurance Co Ltd* [2003] EWHC 3158 (Comm) (approved on appeal: [2004] EWCA Civ 1598); *The London Steamship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain, The French State ("The Prestige")* [2013] EWHC 3188 (Comm) (approved on appeal: [2015] EWCA Civ 333).

[536] *Through Transport Mutual Insurance Association (Eurasia) Ltd v New India Assurance Co. Ltd* [2003] EWHC 3158 (Comm) at [16] (in a passage approved on appeal: [2004] EWCA Civ 1598); *The London Steamship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain, The French State ("The Prestige")* [2015] EWCA Civ 333 at [14].

[537] *The London Steamship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain, The French State ("The Prestige")* [2015] EWCA Civ 333 at [24].

[538] *The London Steamship Owners' Mutual Insurance Association Ltd v The Kingdom of Spain, The French State ("The Prestige")* [2015] EWCA Civ 333 at [25].

- the parties are free to choose the applicable laws, whether they make an express choice or provide how the laws are to be chosen;
- different laws can operate simultaneously on different aspects of the arbitration;
- if the parties fail to make express choices and/or fail to make clear how the laws are to be chosen the matter will usually have to be investigated in the course of the arbitration; and
- the result of that determination can have a radical effect on the outcome of the dispute.

**2-113**   **Different laws applicable.**   It is possible for several different laws to apply to a dispute referred to arbitration. First, there is the law governing the substance of the dispute. Where the dispute concerns the performance of obligations under a contract, this will usually be the "governing law" or the "proper law of the contract".[539] Secondly, there is the law of the arbitration agreement which governs the obligation to submit disputes to arbitration and to honour any award.[540] Thirdly, there is the procedural law which is the law governing the conduct of the arbitration, also known as the curial law or *lex arbitri*.[541] These three are perhaps the most commonly encountered laws applicable in the context of an arbitration, but there are others that may be relevant including the law of the particular reference to arbitration,[542] the law applicable to the capacity of the parties to enter into the reference,[543] the law of any place other than the seat where hearings in the arbitration are to take place,[544] the law of the place or places where recognition and enforcement will be sought[545] and the law applicable to any compromise of the dispute.[546]

**2-114**   **Interplay of the different laws.**   The substantive rights and obligations of the parties have to be determined according to the rules[547] governing the substance of the dispute. Where the dispute is contractual this will usually be the proper law of the contract. If the claim is based on some other cause of action then the applicable law may need to be ascertained on a different basis.[548] The arbitration agreement often

---

[539] See paras 2-115 et seq.

[540] *Union of India v McDonnell Douglas Corp* [1993] 2 Lloyd's Rep. 48.

[541] This book will refer to the law governing the conduct of the reference as the procedural law, as this perhaps conveys most clearly the nature of what is being discussed. Strictly speaking however the concept of curial law is more accurate because, as explained in *Dubai Islamic Bank PJSC v Paymentech Merchant Services Inc* [2001] 1 Lloyd's Rep. 65, the 1996 Act uses the concept of seat rather than procedural law to determine when the provisions of Pt I apply. See also *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 at [11] and [14]

[542] See para.2-124. In practice this is almost always the same as the law governing the arbitration agreement, or, possibly, where it differs from the law of the arbitration agreement, the curial law.

[543] Questions of capacity to enter into an arbitration agreement will usually be determined, in the case of an individual, by the law of his domicile: see Dicey & Morris at para.32R-168 or, in the case of a corporate entity they will usually be governed by the law of the place of incorporation: see Dicey & Morris at para.36R-020. See also paras 3-002 et seq. for discussion of identity and capacity of the parties.

[544] See para.2-132.

[545] See para.2-134.

[546] *Halpern v Halpern* [2006] EWHC 603, which confirmed at [64] that the Rome Convention will apply in determining the law applicable to any compromise of the dispute. A finding which was not overturned on appeal see *Halpern v Halpern* [2007] EWHA Civ 291 at [20]–[25].

[547] The term "rules" is used as the parties may adopt rules which are not the laws of a country: see para.2-116.

[548] The reader is referred generally to Dicey & Morris and in particular to Ch.35 in relation to tort claims and Ch.36 in relation to claims in restitution.

forms part of an underlying contract and will often, but not always,[549] be governed by the same law.[550] As the court observed in *Sulamèrica*:

> "It is perfectly possible (and a not infrequent occurrence) for the parties expressly to agree that different identified bodies of law should apply to the commercial agreement and to the arbitration agreement within it."[551]

This may be significant if, for example, the arbitration agreement is valid according to the law which is alleged to govern it but not under the proper law of the contract.[552] The arbitration proceedings themselves are regulated by the procedural law, which governs matters of procedure in the conduct of the reference and may for example deny one of the parties a remedy which would have been available under the proper law of the contract. The procedural law will usually be that of the seat of arbitration unless for example the parties have expressly chosen a different law.[553]

### (b)   The rules governing the substance of the dispute

**Statutory Provision.**   The substance of the dispute is to be determined in accordance with the law chosen by the parties as applicable to the substance of the dispute[554] or, if they so agree, in accordance with such other considerations as are agreed by them or determined by the tribunal.[555] Absent such choice or agreement, the tribunal has to apply the law determined by the conflict of laws rules it considers applicable.[556]   **2-115**

**Other considerations.**   The 1996 Act brought English law into line with the approach in many other jurisdictions by permitting the parties to choose to have their dispute resolved by considerations other than the rules of a particular national law.[557] It is now clear that if the parties choose to have the tribunal decide the dispute "*ex aequo et bono*" or as an "*amiable compositeur*" or on the basis of non-national law principles or indeed on the basis of any other considerations, that choice will be binding so long as it is ascertainable.   **2-116**

**Absence of choice or agreement on rules governing the substance of the dispute.**   As mentioned above, where the parties have neither chosen a law nor agreed other considerations to govern the substance of their dispute, the tribunal has   **2-117**

---

[549]  See for example *C v D* [2007] EWHC 1541, where the contract was governed by New York law but the arbitration agreement by English law; *Tamil Nadu Electricity Board v ST-CMS Electric Co Private Ltd* [2007] EWHC 1713, where the contract was governed by Indian law but the arbitration agreement by English law; and *Abuja International Hotels Ltd v Meridien SAS* [2012] EWHC 87 (Comm) where the contract was governed by Nigerian law but the arbitration agreement by English law.

[550]  *Sonatrach Petroleum Corp v Ferrell International Ltd* [2002] 1 All E.R. (Comm) 627

[551]  *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 at [7].

[552]  See for example *XL Insurance Ltd v Owens Corning* [2000] 2 Lloyd's Rep. 500. In *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 it was contended that if the arbitration agreement had been govered by the proper law of the contract then it was only operative at the behest of one the parties.

[553]  Whilst it is possible to do so, this course adds a layer of complication as regards the interplay of those laws as interpreted by the courts of each jurisdiction and is therefore to be avoided.

[554]  Excluding the conflict of laws provisions: see the Arbitration Act 1996 s.46(2).

[555]  Arbitration Act 1996 s.46(1).

[556]  Arbitration Act 1996 s.46(3).

[557]  Arbitration Act 1996 s.46(1); *Halpern v Halpern* [2007] EWCA Civ 291 at [37]–[38]; *Musawi v R.E. International (UK) Ltd* [2007] EWHC 2981 (Ch) at [22] and [82].

to apply the law determined by the conflict of laws rules it considers applicable.[558] That will usually involve determining the law using the conflict of law rules of the seat of arbitration,[559] but the 1996 Act does not inhibit the tribunal's choice in this regard. If the arbitration is being conducted under a set of institutional or other rules, they may indicate how the tribunal is to determine the applicable law.[560] Under English law, the rules applicable to the determination of the proper law of a contract are, for contracts entered into before 17 December 2009,[561] those set out in the Rome Convention on the Law Applicable to Contractual Obligations, which was given effect to by the Contracts (Applicable Law) Act 1990.[562] For contracts entered into on or after 17 December 2009, the Regulation (EC) 593/2008 on the law applicable to contractual obligations (Rome I) applies ("the Rome I Regulation").[563] While there are some differences between the Rome Convention and the Rome I Regulation,[564] both apply to the determination of the proper law of the contract,[565] and both exclude arbitration agreements from their scope.[566] The rules of the Rome I Regulation apply whenever there is a choice to be made between the laws of different countries, even if the parties and the laws concerned are those of countries which are not signatories to the Rome I Regulation.[567] Save for different rules which apply to specific types of contracts under the Rome I Regulation,[568] essentially the position under both the Rome Convention and the Rome I Regulation in relation to the proper law of the contract is that where the parties have not chosen an applicable law, a contract is governed by the law of the country with which it is most closely connected.[569]

**2-118**   **Effect of seat on choice of proper law of contract.**   Under the Rome Conven-

---

[558] Arbitration Act 1996 s.46(3).

[559] *CGU International Insurance Plc v Astrazeneca Insurance Co Ltd* [2006] C.L.C. 162.

[560] See, for example, Art.21 of the ICC Rules.

[561] But after 1 April 1991. See footnote 563, below.

[562] The Rome Convention was opened for signature in Rome on June 19, 1980 and signed by the United Kingdom on 7 December 1981. There are some exceptions to its application: see Contracts (Applicable Law) Act 1990, Sch.1: Rome Convention, Art.1.2.

[563] Dicey & Morris, 32R-001. The Rome I Regulation applies to contracts concluded as from 17 December 2009. It replaced the Rome Convention on the Law Applicable to Contractual Obligations which was incorporated into English law by the Contracts (Applicable Law) Act 1990. The Contracts (Applicable Law) Act 1990 continues to apply to contracts concluded after 1 April 1991 and before 17 December 2009. Pursuant to s.4A of the Contracts (Applicable Law) Act 1990, the 1990 Act is disapplied where the Rome I Regulation applies for contracts made after 17 December 2009.

[564] For a description of the changes between the Rome Convention and the Rome I Regulation see Dicey & Morris para.32-012. In summary the main differences are: (1) where there has been no choice of law, the Rome I Regulation provides for specific sub-rules for these types of contract: contracts of sale; contracts for the provision of services; contracts relating to a right in rem in immovable property or to a tenancy of immovable property; franchise contracts; distribution contracts; contracts for the sale of goods by auction; contracts in a multilateral system bringing together or facilitating the bringing together of multiple third-party buying and selling interests in financial instruments (Art.4(1)); and contracts for the carriage of passengers (Art.5(2)); (2) the Rome I Regulation contains specific rules for insurance contracts (Art.7); (3) Art.9(3) enables effect to be given to the overriding mandatory provisions of the law of the place of performance which render the performance of the contract unlawful, and is narrower than the corresponding provision of the Rome Convention.

[565] See Dicey & Morris, para.32-R001 and para 32-021 describing the extent of the arbitration exclusion.

[566] Contracts (Applicable Law) Act 1990, Sch.1: Rome Convention, Art.1.2(d); Rome I Regulation, [Art.1.2(e)]

[567] Rome Convention Art.1.1; Rome I Regulation, Art.1.1.

[568] Specific rules are provided in relation to the following types of contract: contracts of carriage (Art.[5]), consumer contracts (Art.[6]), insurance contracts (Art.[7]) and individual employment contracts (Art.[8]).

[569] Both the Rome Convention and the Rome I Regulation provide that a contract will be governed by the law of the country with which it is most closely connected, and it is assumed that this will be

tion (as incorporated into the Contracts (Applicable Law) Act 1990) and the Rome I Regulation, the selection of a seat of arbitration may be regarded as an implied choice of a proper law for the substantive contract in appropriate circumstances. The requirement differs depending on whether the Rome Convention or the Rome I Regulation applies. Under the Rome Convention the requirement is that the choice of law by the parties must be "express or demonstrated with reasonable certainty".[570] Under Rome I Regulation, the choice of law by the parties must be "expressly or clearly demonstrated by the terms of the contract or the circumstances of the case".[571] Prior to the Rome Convention the choice of a seat was given considerable weight as an indication of the proper law of the contract.[572] Under the Rome Convention, the question is whether the seat is sufficient to demonstrate the choice with reasonable certainty.[573] It has been held that a standard form contract which stipulated London as the seat if, as was the case, the parties failed to agree on the proper law of the contract, demonstrated the choice of English law with reasonable certainty.[574] Provisions stipulating for arbitration by a local arbitral tribunal or institution, or, for example, the appointment of an arbitrator by the English High Court, may strengthen the inference. However, the inference to be drawn from the choice of seat may be weaker where arbitration is to be under the auspices of an international arbitral institution such as the ICC, because the appointment of a tribunal is effected by the institution and there is therefore less connection with the seat.[575] Under the Rome I Regulation, the seat will be taken into account as one of the circumstances of the case which indicate the parties' intentions.[576] While there is a difference in wording between the Rome Convention and the Rome I Regulation, case law applying the rules under the Rome Convention is still relevant to the

---

the country where the party who is to effect the performance which is characteristic of the contract has his habitual residence or, in the case of a corporate entity, the country where it has its central administration. Contracts (Applicable Law) Act 1990, Sch.1: Rome Convention, Art.4.1; Rome I Regulation, Art. [4.1].

[570] Contracts (Applicable Law) Act 1990, Sch.1: Rome Convention, Art.3.1. See also Dicey & Morris, paras 32-059 et seq.

[571] Rome I Regulation, Art.3.1. See also Dicey & Morris, paras 32-059 et seq.

[572] *Compagnie d'Armement Maritime SA v Cie Tunisienne de Navigation SA* [1971] A.C. 572; *Bangladesh Chemical Industries Corp v Henry Stephens Shipping Co Ltd and Tex-Dilan Shipping Co Ltd (The "SLS Everest")* [1981] 2 Lloyd's Rep. 389; *Compania Naviera Micro SA v Shipley International Inc (The "Parouth")* [1982] 2 Lloyd's Rep. 351, CA; *Astro Venturoso Compania Naviera v Hellenic Shipyards SA (The "Marianina")* [1983] 1 Lloyd's Rep. 12, CA; *Steel Authority of India Ltd v Hind Metals Inc* [1984] 1 Lloyd's Rep. 405; *Ilyssia Compania Naviera SA v Ahmed-Qawi Bamodah (The "Elli 2")* [1985] 1 Lloyd's Rep. 107, CA; cf. *Atlantic Underwriting Agencies Ltd v Compagnia di Assicuranzione di Milano* [1979] 2 Lloyd's Rep. 240; *James Miller & Partners Ltd v Whitworth Street Estates (Manchester) Ltd* [1970] A.C. 583; *Mitsubishi Corp v Castletown Navigation Ltd (The "Castle Alpha")* [1989] 2 Lloyd's Rep. 383. See also D. Rhidian Thomas, "Commercial Arbitration Agreements as a Signpost of the Proper Law", (1984) L.M.C.L.Q. 141.

[573] Rome Convention, Art.3.1.

[574] *Egon Oldendorff v Libera Corp No.2* [1996] 1 Lloyd's Rep. 380; *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi v VSC Steel Co Ltd* [2013] EWHC 4071 (Comm) is an example of a case under the Rome Convention, in which it was held that the proper law of the underlying contract could not be implied from the law of the country of the seat, London, because the underlying contract was to be performed in Turkey; in *Martrade Shipping & Transport GmbH v United Enterprises Corp (The Wisdom C)* [2014] EWHC 1884 (Comm) the choice of London as the seat of arbitration was not a significant connection between the contract and England for the purposes of the application of interest under the Late Payment of Commercial Debts (Interest) Act 1998.

[575] See Dicey & Morris, para.32-064. No inference as to the proper law to be applied can be drawn where the place of arbitration is to be selected by a third party such as the ICC Court of Arbitration or where the arbitration clause contemplates alternative places of arbitration: see *Star Shipping AS v China National Foreign Trade Transportation Corp (The "Star Texas")* [1993] 2 Lloyd's Rep. 445.

[576] Rome I Regulation, Art.3.1.

interpretation of the Rome I Regulation given the similarity of approach.[577] Where there is no express choice of the proper law applicable to a contract, and once a dispute arises when the parties agree to an ad hoc submission to arbitration, any express choice as to the law which governs the arbitration agreement will not be conclusive as to the proper law to be applied to the contract.[578]

### (c)    The law of the arbitration agreement

**2-119**    **Choice of law rules applicable to the arbitration agreement.**    The arbitration agreement is a separable agreement[579] and consequently, even if it forms part of an underlying contract, it may have a different applicable law to that contract. While the Rome Convention and the Rome I Regulation provide the choice of law rules for the proper law of the contract, they do not apply to arbitration agreements.[580] Instead the law applicable to the arbitration agreement is determined by the common law choice of conflict rules which undertakes a three-stage enquiry into: (i) express choice; (ii) implied choice; and (iii) the system of law with which the arbitration agreement has the closest connection.[581] The court should consider whether the parties have (impliedly, if not expressly) chosen an applicable law before considering which system of law has the closest connection with the arbitration agreement.[582] However, in practice there may be an overlap in identifying which law the parties have impliedly chosen and identifying the system of law with which the arbitration agreement has the closest connection.[583] The common law requires that the law applicable to an arbitration agreement must be the law of a country.[584] The analysis may be different if the court is considering the law applicable to the arbitration agreement in the context of an application to enforce the award. Section 103(2)(b) of the Arbitration Act 1996, which adopts the language of the New York Convention,[585] provides that recognition or enforcement of an award may be refused if

> "the arbitration agreement was not valid under the law to which the parties subjected it or, failing any indication thereon, under the law of the country where the award was made."

Presumably "the law to which the parties subjected [the arbitration agreement]" is the law which has either been expressly or impliedly agreed. Where there is no express or implied choice, the law where the award is made will apply. It is likely

---

[577] See the discussion in Dicey & Morris at para.32-64 which analyses the potential interplay between the arbitration agreement and the proper law of the contract from the perspective of case law under the rules of the Rome Convention as incorporated through the Contracts (Applicable Law) Act 1990.

[578] A particularly confused situation discussed in *Furness Withy (Australia) Pty Ltd v Metal Distributors (UK) Ltd (The "Amazonia")* [1990] 1 Lloyd's Rep. 236.

[579] See para.2-007.

[580] Contracts (Applicable Law) Act 1990, Sch.1: Rome Convention, Art.1.2(d); Rome I Regulation, Art.1.2(e).

[581] In *Halpern v Halpern* [2006] EWHC 603 it was suggested at [52], that common law choice of conflict rules applied to the arbitration agreement. On appeal the Court of Appeal considered only the applicable law of the compromise agreement to which the Rome Convention applied ([2007] EWCA Civ 291). The position has subsequently been clarified in *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638; *Arsanovia Ltd, Burley Holdings Ltd, Unitech Ltd v Cruz City 1 Mauritius Holdings* [2012] EWHC 3702 and *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi v VSC Steel Co Ltd* [2013] EWHC 4071 (Comm).

[582] *Arsanovia Ltd, Burley Holdings Ltd, Unitech Ltd v Cruz City 1 Mauritius Holdings* [2012] EWHC 3702 at [17].

[583] *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 at [25].

[584] *Musawi v R.E. International (UK) Ltd* [2007] EWHC 2981 (Ch) at [81]; *C v D* [2007] EWCA Civ 1282 at [9].

[585] Article V.

that this will be the law of the country of the seat.[586] The law of the seat is also likely to be the law which has the closest connection.[587]

**Law applicable to the arbitration agreement.**   It is a question of contract interpretation as to whether the parties have expressly agreed on a law which governs the arbitration agreement. Where parties have expressly stipulated that their arbitration agreement will be governed by a particular law, then that law will be applied.[588] Where the parties have made no express choice, the court will consider whether they have made an implied choice. In doing so, the court will consider other indications in the arbitration agreement and more generally the contract as to the parties' choice. Often this has involved the interplay between the governing law of the underlying contract and the seat of the arbitration, where these have been expressly selected by the parties. Where the underlying contract does not contain an express governing law clause, the significance of the choice of seat of the arbitration is likely to be "overwhelming".[589] That is because the system of law of the country seat will usually be that with which the arbitration agreement has its closest connection. Where the underlying contract contains an express choice of law, this is a strong indication of the parties' intention as to the governing law of the arbitration agreement, in the absence of any indication to the contrary.[590] However, in those circumstances the choice of a different country for the seat of the arbitration is a factor pointing the other way but may not in itself be sufficient to displace the indication of choice implicit in the express choice of law to govern the underlying contract.[591] In *Sulamerica CIA Nacional De Seguros S.A. v Enesa Engenharia S.A.*[592] the underlying contract was expressly governed by Brazilian law and the seat London. The Court of Appeal considered that there were powerful factors in favour of an implied choice of Brazilian law as the governing law of the arbitration agreement. However, there were two important factors going the other way which meant that no implied choice could be discerned; namely the combined impact of (i) the choice of London as a seat, which indicated that the parties intended English law to govern all aspects of the arbitration agreement, including matters touching on the formal validity of the agreement and jurisdiction of the arbitrators, and (ii) the perception that the parties could not have intended the arbitration agreement to operate as it would have done under Brazilian law. *Arsanovia Ltd, Burley Hold-*

**2-120**

---

[586] If the parties have selected a seat in England, Wales or Northern Ireland, any award in the proceedings shall be treated as made there, unless otherwise agreed, pursuant to the Arbitration Act 1996 s.53; in *Dallah Real Estate and Tourism Holding Co v Ministry of Religious Affairs* [2010] UKSC 46 upon an application for recognition and enforcement French law applied to the arbitration agreement as the award was made in Paris, the seat also being in Paris.

[587] See para.2-121.

[588] *Naviera Amazonica Peruana SA v Compania Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116; *Tamil Nadu Electricity Board v ST-CMS Electric Co Private Ltd* [2007] EWHC 1713.

[589] See para.2-126.

[590] *ABB Lummus Global Ltd v Keppel Fels Ltd* [1999] 2 Lloyd's Rep. 24; *Sonatrach Petroleum Corp v Ferrell International Ltd* [2002] 1 All E.R. (Comm) 627; *Tonicstar Ltd (t/a Lloyd's Syndicate 1861) v American Home Assurance Co* [2005] Lloyd's Rep. 32; *Svenska Petroleum Exploration AB v Lithuania (No.2)* [2006] 1 Lloyd's Rep. 181. For the law applicable to an arbitration agreement formed pursuant to the provisions of an investment treaty see *Republic of Ecuador v Occidental Exploration and Production Co* [2006] 2 W.L.R. 70.

[591] *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334 at [357F]; *Sulamerica CIA Nacional De Seguros S.A. v Enesa Engenharia S.A.* [2012] EWCA Civ 638 at [11] and [26]; *Arsanovia Ltd, Burley Holdings Ltd, Unitech Ltd v Cruz City 1 Mauritius Holdings* [2012] EWHC 3702; *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi v VSC Steel Co Ltd* [2013] EWHC 4071 (Comm).

[592] *Sulamerica CIA Nacional De Seguros S.A. v Enesa Engenharia S.A.* [2012] EWCA Civ 638 at [11] and [26].

*ings Ltd, Unitech Ltd v Cruz City 1 Mauritius Holdings*[593] is an example of a case going the other way. In *Arsanovia* the governing law of the underlying contract was Indian law and the seat of arbitration London. The court held that the parties intended the arbitration agreement to be governed by Indian law. Aside from the inference to be drawn from the fact that the parties had selected Indian law as governing the underlying agreement, the court also took into account the fact that the parties had specifically excluded certain provisions of the Indian Arbitration and Conciliation Act, drawing the inference that the parties understood and intended that otherwise Indian law would apply.[594] Ad hoc submission agreements drawn up after disputes have arisen do not form part of any underlying contract, and there may be less reason to imply that the same law is applicable to the arbitration agreement as to the underlying contract in respect of which disputes have arisen.

**2-121**  **Law with the closest connection to the arbitration agreement.**    Where there is no express or implied choice of law governing the arbitration agreement, the court will apply the system of law that has the closest connection to the arbitration.[595] Where the parties have agreed a seat of arbitration, that is likely to be the law of the country of seat, being the place where the arbitration is to be held and the courts in that jurisdiction which will exercise the supporting and supervisory jurisdiction necessary to ensure that the procedure is effective.[596]

**Place of performance of the underlying contract.**    The court will not enforce a contract, even if it is lawful by its governing law, if its performance is unlawful by the law of the country where it is to be performed.[597] The law that is relevant for these purposes is the law of the arbitration agreement, and not the underlying contract.[598] Consequently the court will consider where the arbitration agreement is to be performed, which is usually a question of where the arbitration is seated. Payments under an arbitral award need not be made in a particular country. Thus the performance of an arbitration agreement cannot be rendered unlawful by application of the laws of a country in which it may be unlawful to make such payments.[599]

**2-122**  **Matters covered by the law of the arbitration agreement.**    The law of the

---

[593] *Arsanovia Ltd, Burley Holdings Ltd, Unitech Ltd v Cruz City 1 Mauritius Holdings* [2012] EWHC 3702.

[594] While in *Arsanovia* the exclusion of Pt I of the Indian Arbitration and Conciliation Act was an indication that the law of the arbitration agreement was Indian law notwithstanding the fact that the seat was London, similar language did not displace the implied choice of English curial law which arises from the parties selection of London as the seat of arbitration. In the latter case, the association between venue and seat/curial law is so close that even an express reference to a different (foreign) arbitration regime may not be enough to break that association—see *Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015] EWHC 194 (Comm) at [54].

[595] *Sulamerica CIA de Seguros v Enesa Engenharia SA* [2012] EWCA Civ 638 where the Court of Appeal concluded that the parties had not made an implied choice because of the combined impact of the choice of a London seat and the perception that the parties could not have intended the arbitration agreement to operate as it would have done under Brazilian law, the law governing the underlying contract. See also the comments of Smith J in *Arsanovia Ltd, Burley Holdings Ltd, Unitech Ltd v Cruz City 1 Mauritius Holdings* [2012] EWHC 3702 at 19.

[596] *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep. 446; *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's Rep. 45 at 57; *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] A.C. 334; *C v D* [2007] EWCA Civ 1282 at [26], *Shashoua v Sharma* [2009] EWHC 957 (Comm).

[597] *Ralli Brothers v Compania Naviera Sota y Aznar* [1920] 2 K.B. 287.

[598] *Tamil Nadu Electricity Board v ST-CMS Electric Co Private Ltd* [2007] EWHC 1713; *Abuja International Hotels Ltd v Meridien SAS* [2012] EWHC 87 (Comm).

[599] *Tamil Nadu Electricity Board v ST-CMS Electric Co Private Ltd* [2007] EWHC 1713 at [49].

arbitration agreement regulates substantive matters relating to that agreement,[600] including in particular the interpretation, validity, effect and discharge of the agreement to arbitrate.[601] It also governs the identification of the parties to the arbitration agreement.[602] The law of the arbitration agreement also governs similar issues relating to the reference and enforcement of the award.[603] The question as to whether a particular dispute falls within the scope of an arbitration agreement will therefore be governed by the law of the arbitration agreement.[604]

**Distinguishing law of the arbitration agreement and procedural law.** A distinction has to be drawn between, on the one hand, substantive matters relating to the arbitration agreement which are governed by the law of the arbitration agreement and, on the other hand, procedural matters relating to a reference under that agreement which are governed by the procedural law of the arbitration. In the past the court has been driven to conclude that matters which would generally be considered procedural, such as the granting of an extension of time for the bringing of an arbitration, were subject to the law governing the arbitration agreement.[605] The position is now considerably clearer under Pt I of the Arbitration Act 1996 which provides guidance as to the matters governed by the procedural law.[606] Within the arbitration agreement itself, it is also open to the parties to specify a procedural law for the arbitration which is different from the law governing the arbitration agreement and, again, other factors may indicate that different laws should apply.[607]

**2-123**

**The law of the reference.** Mention is sometimes made of a "proper law of the reference".[608] This is based on there being a separate agreement to arbitrate the particular dispute. The reference therefore arises from an agreement subsidiary to, and separate from, the arbitration agreement itself, which comes into effect by the

**2-124**

---

[600] See *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's Rep. 45, in which Potter J stated (at 57) that the proper law of the arbitration agreement covered, inter alia, "questions as to the validity of the arbitration agreement, the validity of the notice of arbitration, the constitution of the tribunal and the question whether an award lies within the jurisdiction of the arbitrator". *Abuja International Hotels Ltd v Meridien SAS* [2012] EWHC 87 confirming that the law of the arbitration agreement goes to the jurisdiction of the tribunal.

[601] *Dalmia Dairy Industries Ltd v National Bank of Pakistan* [1978] 2 Lloyd's Rep. 223; *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep. 446; *XL Insurance Ltd v Owens Corning* [2000] 2 Lloyd's Rep. 500; *Svenska Petroleum Exploration AB v Lithuania (No.2)* [2006] 1 Lloyd's Rep. 181; *Weissfisch v Julius* [2006] EWCA Civ 218.

[602] *Petersen Farms Inc v C&M Farming Ltd* [2004] EWHC 121; [2004] 1 Lloyd's Rep. 603.

[603] It is an implied term of the arbitration agreement that the parties will perform the award: see para.6-163. See also *C v D* [2007] EWHC 1541; *Tamil Nadu Electricity Board v ST-CMS Electric Co Private Ltd* 2007 EWHC 1713.

[604] *Nova (Jersey) Knit Ltd v Kammgarn Spinnerei* [1977] 1 W.L.R. 713, HL; *Dalmia Dairy Industries Ltd v National Bank of Pakistan* [1978] 1 Lloyd's Rep. 223, CA; *The "Marques de Bolarque"* [1984] 1 Lloyd's Rep. 652 at 660; *Et Plus SA v Welter* [2006] 1 Lloyd's Rep. 251; *Abu Dhabi Investment Co v H Clarkson & Co Ltd* [2007] EWHC 1267.

[605] *International Tank and Pipe SAK v Kuwait Aviation Fuelling Co KSC* [1975] Q.B. 224. See also *CM van Stillevoldt BV v El Carriers Inc* , *The Times,* 8 July 1982; *Mitsubishi Corp v Castletown Navigation Ltd (The "Castle Alpha")* [1989] 2 Lloyd's Rep. 383.

[606] See para.2-123.

[607] *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep. 446; *Naviera Amazonica Peruana SA v Cia Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116 at 119, CA; *Deutsche Schachtbau-und Tiefbohr-Gesellschaft GmbH v Shell International Petroleum Co Ltd (Trading as Shell International Trading Co)* [1990] 1 A.C. 295 at 309–310, CA, reversed on other grounds at 329; *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] A.C. 334 at 357.

[608] See, e.g. *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's Rep. 45 at 57; and *C v D* [2007] EWHC 1541 where it was referred to as the agreement to refer.

reference of a particular dispute or disputes to arbitration. At this stage a new set of mutual obligations arises in relation to the conduct of the reference.[609] The proper law of the reference is said to govern the question of whether the parties have been discharged from the obligation to continue with the particular reference (while leaving intact the arbitration agreement to refer future disputes). The proper law of the reference will almost always be the same as the proper law of the arbitration agreement.[610]

### (d)    The "seat" of the arbitration and the procedural law

2-125    **The "seat" or place of arbitration.[611]**    In England it is essential for an arbitration to have a "seat",[612] which is the geographical location to which the arbitration is ultimately tied. English law does not recognise the concept of "delocalised" arbitral procedures which are "floating in the transnational firmament", unconnected with any national system of law.[613] Section 3 of the Arbitration Act 1996 defines the seat of an arbitration as its "juridical seat", which is the place to which the arbitration is legally attached. As the seat is the legal, rather than the physical, place of arbitration proceedings,[614] hearings can be held in other jurisdictions.[615] The seat of the arbitration is often specified in the arbitration agreement by the selection of a particular place or country in which the arbitration is to be held. In the absence of clear words or significant indications to the contrary, there is a strong presumption that the place where the arbitration is to take place will constitute its seat.[616] The expression "seat" is often used to refer to the particular city chosen, rather than the country (for example, "arbitration in London") and while the par-

---

[609] *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's Rep. 45 at 57; *Bremer Vulkan Schiffbau und Maschinenfabrik v South India Shipping Corp* [1981] 1 Lloyd's Rep. 253 at 263; *Black-Clawson International Ltd v Papierwerk Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep. 446.

[610] *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's Rep. 45 at 57.

[611] See para.5-076.

[612] *Naviera Amazonica Peruana v Cia Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116; *ABB Lummus Global v Keppel Fels Ltd* [1999] 2 Lloyd's Rep 24; *Dubai Islamic Bank PJSC v Paymentech Merchant Services Inc* [2001] 1 Lloyd's Rep. 65; *Braes of Doune v Alfred McAlpine* [2008] EWHC 426; [2007] EWHC 1541 (at first instance) and [2007] EWCA Civ 1282 (in the Court of Appeal); *Roger Shashoua, Rodemadan Holdings Ltd, Stancroft Trust Ltd v Mukesh Sharma* [2009] EWHC 957 (Comm).

[613] *Bank Mellat v Helliniki Techniki SA* [1984] 1 Q.B. 291 at 301; *Arab National Bank v El-Abdali* [2004] EWHC 2381. See also Sir Michael Mustill, "*Transnational Arbitration and English Law*", Current Legal Problems (Stevens, 1984), pp.133–152. The exception is arbitrations conducted pursuant to the ICSID arbitration rules. Awards of such arbitrations are enforceable in England under the ICSID Convention.

[614] *Union of India v McDonnell Douglas Corp* [1993] 2 Lloyd's Rep. 48.

[615] See para.2-132.

[616] *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] A.C. 334; *Halpern v Halpern* [2006] EWHC 603; *Roger Shashoua, Rodemadan Holdings Ltd, Stancroft Trust Ltd v Mukesh Sharma* [2009] EWHC 957 (Comm) at [27]; *U & M Mining Zambia Ltd v Konkola* [2013] 2 Lloyd's Rep 218 [neutral citation]; *Enercon GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm); *Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015] EWHC 194 (Comm). In *Braes of Doune Wind Farm (Scotland) Ltd v Alfred MacAlpine Business Services Ltd* [2008] EWHC 426 (TCC) Akenhead J decided that even the express reference to Glasgow as the "seat" of the arbitration did not, in context, amount to a choice of Glasgow as the juridical seat but only the place where the hearings would take place given the parties agreement that the English Arbitration Act 1996 would apply and that, but for the arbitration agreement, the English courts had exclusive supervisory jurisdiction.

ties' agreement is on a city, the crucial choice is of the jurisdiction in which the city is located.[617]

**Choice of seat.**  The parties are free to choose a seat.[618] Under English law the procedural law of an arbitration is generally the law of the country in which the arbitration has its seat (and vice versa).[619] So in the absence of agreement otherwise,[620] the choice of seat prescribes the procedural law of the arbitration and the choice of a procedural law will determine the seat. The parties' choice of a seat is therefore extremely important,[621] not simply in relation to the proper law of the contract,[622] but also because the law of the seat may contain provisions which have important consequences for the conduct of the proceedings.[623] Indeed, most provisions of the Arbitration Act 1996 will only apply to arbitrations whose seat is in England and Wales or Northern Ireland.[624]

**2-126**

**Ascertaining the seat.**  If the seat has not been agreed on by the parties, either expressly or by the choice of a procedural law, the matter may fall to be resolved by an arbitration institution or some other person the parties have agreed should have the power to designate the seat,[625] or by the tribunal if authorised to do so.[626] If the parties have agreed that a set of arbitration rules are to apply they may contain a means of establishing the seat of arbitration in the absence of express agreement by the parties.[627] In all other cases it is necessary to look at the parties' agreement and all the relevant circumstances.[628] Provision in an arbitration agreement stipulating for arbitration by a local tribunal or institution may indicate the appropriate place of arbitration.[629] If the arbitration agreement is silent as to the seat of the arbitration and the applicable procedural law, but does specify a governing law, that law may apply as the procedural law and serve to determine the seat of the arbitration.[630]

**2-127**

**Procedural law different from law of seat?**  It is common for arbitration agree-

**2-128**

---

[617] *Tongyuan (USA) International Trading Group v Uni-clan Ltd* [2001] W.L. 98036.

[618] Arbitration Act 1996 s.3(a).

[619] *Naviera Amazonica Peruana SA v Compania Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116; *ABB Lummus Global Ltd v Keppel Fels Ltd* [1999] 2 Lloyd's Rep. 24; *Arab National Bank v El-Abdali* [2004] EWHC 2381; *C v D* [2007] EWHC 1541.

[620] Even if the parties agree on a different procedural law, the mandatory provisions of the law of the seat will apply: see para.2-128.

[621] See further para.5-077.

[622] See paras 2-118 et seq.

[623] For example provisions prescribing the degree of intervention by the court in the arbitral process. See further para.2-131.

[624] Arbitration Act 1996 s.2(1) applies Pt I of the statute to arbitrations in England and Wales or Northern Ireland. The remaining subsections set out particular provisions that apply, or may apply, even if the seat is outside those countries or has not been designated.

[625] Arbitration Act 1996 s.3(b) acknowledges the possibility of the seat being designated by an arbitral or other institution or person.

[626] Arbitration Act 1996 s.3(c); see also *Dubai Islamic Bank PJSC v Paymentech Merchant Services Inc* [2001] 1 Lloyd's Rep. 65. In *Arab National Bank v El-Abdali* [2004] EWHC 2381 it was held that s.3(c) of the Arbitration Act 1996 applies even where a party takes issue with the tribunal's authority to act in the arbitration.

[627] See, e.g. ICC Rules, Art.18.1; LCIA Rules, Art.16; UNCITRAL Rules, Art.16.

[628] Arbitration Act 1996 s.3. See *Arab National Bank v El-Abdali* [2004] EWHC 2381 for an example of the court determining the seat on the basis of all the relevant circumstances.

[629] *Whitworth Street Estates (Manchester) Ltd v James Miller & Partners Ltd* [1970] A.C. 583 at 607, 612, 616; *Bank Mellat v Helliniki Techniki SA* [1984] Q.B. 291 at 301; *Naviera Amazonica Peruana SA v Cia Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116 at 119; *Sumitomo Heavy Industries Ltd v Oil and Natural Gas* [1994] 1 Lloyd's Rep. 45 at 56–59.

[630] *Egon Oldendorff v Libera Corp* [1995] 2 Lloyd's Rep. 64; *The Bay Hotel and Resort Ltd v Cavalier Construction Co Ltd* [2001] UKPC 34.

ments to be silent as to the procedural law. Procedural law will usually be implied from the parties' choice of seat.[631] As a consequence the procedural law of the arbitration may be different from the proper law of the arbitration agreement and the underlying contract.[632] Though undesirable, it is also possible for the parties to choose to hold an arbitration in one country but make it subject to the procedural laws of another country.[633] The Arbitration Act 1996 specifically recognises that the parties may choose a different procedural law where the seat of the arbitration is in England.[634] Where they do so, that law will apply as an agreement made by the parties in respect of the non-mandatory provisions of the 1996 Act.[635] The mandatory provisions of the of the Arbitration Act 1996 will still apply however, regardless of what the chosen procedural law says, as they cannot be excluded in respect of arbitrations whose seat is in England.[636] This gives rise to the unattractive prospect of a reference being governed by two procedural laws: that of the seat of the arbitration in so far as its provisions are mandatory (England) and that of the parties' express choice.[637] Given the close association between the seat and the procedural law, there needs to be clear wording that the parties intended such a bifurcation or significant contrary indications that they intended this to be the case.[638]

**2-129**    **Floating seat/procedural law possible.**    The procedural law of the arbitration may be determined only after the reference has been initiated.[639] So whilst a "floating" proper law of a contract is not permissible as a matter of English law,[640] a "floating" seat is allowed, even if they are contained in the same provision.[641]

---

[631] *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep. 446; *Braes of Doune Wind Farm (Scotland) Ltd v Alfred MacAlpine Business Services Ltd* [2008] EWHC 426 (TCC), *Roger Shashoua, Rodemadan Holdings Ltd, Stancroft Trust Ltd v Mukesh Sharma* [2009] EWHC 957 (Comm) at [34]; *Enercon GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm); *Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015] EWHC 194 (Comm).

[632] *Union of India v McDonnell Douglas Corp* [1993] 2 Lloyd's Rep. 48 at 50.

[633] *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981] 2 Lloyd's Rep. 446 at 453; *Naviera Amazonica Peruana SA v Compania Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116 at 120; *Union of India v McDonnell Douglas* [1993] 1 Lloyd's Rep. 48 at 50– 51; *ABB Lummus Global Ltd v Keppel Fels Ltd* [1999] 2 Lloyd's Rep. 24; *Braes of Doune Wind Farm (Scotland) Ltd v Alfred MacAlpine Business Services Ltd* [2008] EWHC 426 (TCC) at [13]. In *Braes of Doune* the Parties had agreed that, subject to the arbitration clause, the English courts were to have exclusive jurisdiction, that any reference to arbitration was to be deemed to be a reference to arbitration under the Arbitration Act 1996, and also that the seat of the arbitration be Glasgow, Scotland. The English court held at [17(e)], that it had jurisdiction over an application to appeal an arbitration award because "…where in substance the parties agree that the laws of one country will govern a given arbitration, the place where the arbitration is to be heard will not dictate what the governing or controlling law will be."

[634] Arbitration Act 1996 s.4(5). The choice of a law applicable to the substance of the dispute will not be sufficient for the purposes of s.4(5): *Lesotho Highlands Development Authority v Impreglio SpA* [2005] UKHL 43 at [37]; *C v D* [2007] EWHC 1541 at [38]; *XL Insurance Ltd v Owens Corning* [2000] 2 Lloyd's Rep. 500 at 508.

[635] Arbitration Act 1996 ss.4(2), (5).

[636] Mandatory provisions apply: see Arbitration Act 1996 ss.2(1), 4(1) and Sch.1.

[637] The analysis of Saville J on this issue in *Union of India v McDonnell Douglas Corp* [1993] 2 Lloyd's Rep. 48 at 51, a decision with predates the Act, has been called into question by Eder J in *Enercon GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm) at [60 iv)]. See also *Braes of Doune Wind Farm (Scotland) Ltd v Alfred MacAlpine Business Services Ltd* [2008] EWHC 426 (TCC).

[638] *Braes of Doune Wind Farm (Scotland) Ltd v Alfred MacAlpine Business Services Ltd* [2008] EWHC 426 (TCC), *Enercon GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm); *Shagang South-Asia (Hong Kong) Trading Co Ltd v Daewoo Logistics* [2015] EWHC 194 (Comm).

[639] *Star Shipping AG v China National Foreign Trade Transportation Corp (The "Star Texas")* [1993] 2 Lloyd's Rep. 445, CA. See also, *EJR Lovelock Ltd v Exportles* [1968] 1 Lloyd's Rep. 163.

[640] *Armar Shipping Co Ltd v Caisse Algerienne* [1981] 1 All E.R. 498; *The "Iran Vojdan"* [1984] 2

**Brussels Regulation, Brussels Regulation (Recast) and Brussels and Lugano Conventions do not apply.**   When considering procedural remedies under English law, it should be borne in mind that arbitration is excluded from the scope of the Brussels Regulation, Brussels Regulation (Recast) and the Brussels and Lugano Conventions on jurisdiction and enforcement of judgments in civil and commercial matters.[642] The Conventions also do not generally apply to court proceedings ancillary to arbitration proceedings[643] although they can apply to the jurisdiction of the court to order provisional measures in support of arbitration proceedings.[644] The precise scope of the exclusion has however been a matter of some uncertainty[645] but the test seems to be whether the, or perhaps a, principal focus of the proceedings is arbitration.[646]

**2-130**

**Matters covered by the procedural law.**   An exhaustive list of the matters covered by the procedural law of an arbitration in each jurisdiction is not possible. Their nature and scope are determined by the particular law concerned. Conflicts may arise between the procedural law, the proper law of the contract and the law of the arbitration agreement or the law of the place of enforcement, particularly in relation to questions of arbitrability and validity of the contract, appointment of a tribunal, time limits and the form and validity of the award.[647] In England, the procedural law of arbitration is principally set out in Pt I of the Arbitration Act 1996[648] and by s.2 it applies whenever the seat of the arbitration is in England, Wales or Northern Ireland. So under English law, the choice of an English seat[649]

**2-131**

---

[  ] Lloyd's Rep. 380; *Sonatrach Petroleum Corp v Ferrell International Ltd* [2002] 1 All E.R. (Comm) 627.

[641] *Sonatrach Petroleum Corp v Ferrell International Ltd* [2002] 1 All E.R. (Comm) 627; cf. *The "Iran Vojdan"* [1984] 2 Lloyd's Rep. 380.

[642] Article 1 of each convention. The conventions were given effect in English law by the Civil Jurisdiction and Judgments Acts 1982 and 1991—see generally Ch.11 of Dicey & Morris.

[643] e.g. proceedings to set aside or enforce arbitration awards, or to appoint or dismiss arbitrators, and even where proceedings involve the question of the existence or validity of an arbitration agreement: *Marc Rich & Co AG v Societa Italiana Impianti PA (The "Atlantic Emperor")* [1992] 1 Lloyd's Rep. 342, ECJ; *Allied Vision Ltd v VPS Entertainment GmbH* [1991] 1 Lloyd's Rep. 392; *Marc Rich & Co AG v Societa Italiana Impianti PA (No.2) (The "Atlantic Emperor")* [1992] 1 Lloyd's Rep. 624, CA. See also Audit (1993) 9 Arbitration Int. 1; Kaye (1993) 9 Arbitration Int. 27; Volkovittsch (1993) 2 *American Review of International Arbitration* 501.

[644] *Van Uden Maritime BV v Deco-Line* [1999] 2 W.L.R. 1181. In relation to anti-suit injunctions see *Navigation Maritime Bulgaria v Rustal Trading (The "Ivan Zagubanski")* [2002] 1 Lloyd's Rep. 106; cf. *West Tankers Inc v RAS Riunione Adriatica di Sicurta SpA* [2007] UKHL 4; Gazprom OAO Case C-536/13 and see further paras 7-043 et seq. and 7-190.

[645] *The "Heidberg"* [1994] 2 Lloyd's Rep. 287; *The "Angelic Grace"* [1994] 1 Lloyd's Rep. 168; *The "Xing Su Hai"* [1995] 2 Lloyd's Rep. 15; *Toepfer International GmbH v Molino Boschi Srl* [1996] 1 Lloyd's Rep. 510; *Lexmar Corp and Steamship Mutual Underwriting Association (Bermuda) Ltd v Nordisk Skibsrederforening and Northern Tankers (Cyprus) Ltd* [1997] 1 Lloyd's Rep. 289; *Toepfer International GmbH v Société Cargill France* [1998] 1 Lloyd's Rep. 379; *Through Transport Mutual v New India Assurance Co Ltd* [2004] EWCA Civ 1598; *West Tankers Inc v RAS Riunione Adriatica di Sicurta SpA* [2007] UKHL 4. See generally Dicey & Morris, paras 11-041 et seq.

[646] *Navigation Maritime Bulgaria v Rustal Trading (The "Ivan Zagubanski")* [2002] 1 Lloyd's Rep. 106; *Through Transport Mutual v New India Assurance Co Ltd* [2004] EWCA Civ 1598; *A v B* [2006] EWHC 2006; *National Navigation Co v Endesa Generacion SA (The Wadi Sudr)* [2009] EWCA Civ 1397.

[647] See for example *C v D* [2007] EWHC 1541 where an award made in England was not susceptible to challenge under the Arbitration Act 1996 but was alleged to be subject to be subject to review in the United States based on the nationality of the parties and the proper law of the contract.

[648] Although the common law is expressly preserved in so far as it is consistent with the Arbitration Act 1996: s.81(1).

[649] It is in fact the choice of England as the seat of the arbitration, rather than the choice of English

will, subject to agreement otherwise,[650] incorporate the various matters addressed in the Act, including questions relating to the appointment and revocation of the authority of the arbitration tribunal, the powers and duties of the tribunal and remedies for breach of duty, and any challenges to the award.[651] Foreign procedural law may also be relevant to enforcement of a foreign award in England.[652]

**2-132  Hearings in different locations.**   In international arbitrations, meetings or hearings may take place in several countries, without changing the seat.[653] In these cases it is important not to confuse the seat with what is simply the appropriate or convenient geographical location for particular hearings.[654] It will be necessary to ensure compliance with any mandatory local law requirements of the place where the meeting or hearing takes place.

**2-133  Procedural rules distinguished.**   The procedural law applicable to the reference must be distinguished from procedural rules which the parties might choose to apply to the reference, such as those of the ICC or LCIA.[655] The latter are rules for the conduct of the arbitration which have effect only because they have been agreed to by the parties. In contrast, the applicable procedural law as the law of the seat[656] will apply regardless of the parties' wishes; but the parties may agree amendments to details of the procedure in so far as this is permitted by the relevant national law.[657]

**2-134  Law of the place of enforcement.**   As mentioned above[658] regard must also be had to the law of the place or places where recognition and enforcement of the award will be sought. Any mandatory requirements of the law of the place of enforcement should be complied with, although in some cases the parties may not know in precisely which jurisdictions they will, if successful, seek to enforce the award. In any event consideration should be given to enforcement at an early stage so that any mandatory requirements of the relevant law can be ascertained. In addition to mandatory requirements, there may be a particular feature of the procedure or the arbitration agreement which is contrary to the law of the place of enforce-

---

procedural law which is the determinative factor, though in most cases the choice of seat and the choice of procedural law will be the same: see para.2-128.

[650] e.g. by selection of a different procedural law in relation to the non-mandatory provisions of the 1996 Act: see para.2-128.

[651] The supervisory jurisdiction of the courts of the seat has been emphasised recently by the Court of Appeal in *Weissfisch v Julius* [2006] EWCA Civ 218; see also *A v B* [2006] EWHC 2006; *C v D* [2007] EWHC 1541. Invoking the jurisdiction of the courts elsewhere is a breach of the agreement vesting supervisory jurisdiction in the courts of the seat and is remediable in damages or, in appropriate circumstances, an order for costs on an indemnity basis: see *A v B (No.2)* [2007] EWHC 54; *C v D* [2007] EWHC 1541. Declaratory or injunctive relief may also be available: see *Noble Assurance Co v Gerling-Konzern General Insurance Co* [2007] EWHC 253.

[652] *Dalmia Dairy Industries Ltd v National Bank of Pakistan* [1978] 2 Lloyd's Rep. 223.

[653] This is because the "seat" is the legal, rather than the physical place of arbitration, see para.2-125. The rules of various arbitration institutions specifically contemplate hearings in different locations: see, e.g. LCIA Rules, Art.16.3, ICC Rules, Art.18.2 and UNCITRAL Rules, Art.16(2). The ICC Rules expressly provide that the tribunal may conduct its deliberations at any location: see Art.18.3 of the ICC Rules.

[654] *Naviera Amazonica Peruana v Cia Internacional de Seguros del Peru* [1988] 1 Lloyd's Rep. 116 at 117, 121.

[655] See, e.g. *Paul Smith Ltd v H&S International Holding Inc* [1991] 2 Lloyd's Rep. 127.

[656] See though para.2-128 as to the possibility of choosing a different procedural law from that of the seat.

[657] See para.2-131 as to the scope for agreeing procedural matters under English law.

[658] See para.2–113.

ment, for example a lack of mutuality.[659] Again this is something that the parties would want to identify at an early stage so that they can attempt to address it, for example by seeking to enforce elsewhere or altering the relevant procedure or agreeing an ad hoc submission to arbitration which addresses the issue.

## 6.    TERMINATION OF THE ARBITRATION AGREEMENT

### (a)    Termination by agreement

**Termination of the arbitration agreement.**    The parties can by agreement bring the agreement to arbitrate to an end. Arbitration is consensual and there is no reason why the parties cannot agree to vary their arbitration agreement so as to bring about its termination.[660] The parties might for example jointly agree that all future disputes should be dealt with by the court rather than pursuant to the arbitration agreement contained in their contract. Alternatively, the parties might, by way of subsequent agreement which contains a clause conferring jurisdiction on the courts, terminate the earlier agreement in which the arbitration clause is contained. In that case, the jurisdiction clause in the subsequent contract may be construed so as to supersede the earlier arbitration agreement in order to avoid fragmentation of disputes, although ultimately this will be a question of construction of the relevant agreements.[661] Where the subsequent agreement terminating the earlier contract contains no competing jurisdiction clause, the original arbitration agreement is likely to survive on the basis of its separability.[662] There is no statutory requirement for the termination of the arbitration agreement to be in writing[663] although the underlying contract may provide that any variation of its provisions are to be in writing and this can apply equally to the arbitration agreement.[664] In any event a written record is desirable for evidential purposes.

Otherwise the nature of an arbitration agreement means that, even if parties decide to adopt a different dispute resolution mechanism for a particular dispute that arises under the arbitration agreement, that will not of itself bring about the termination of the arbitration agreement. Any subsequent dispute that arises within the ambit of the arbitration agreement will fall to be determined in accordance with its provisions.

Referring a dispute to mediation or some other non-binding process will not of itself rescind a prior agreement to refer the dispute to arbitration.[665]

**2-135**

### (b)    Repudiation of the right to arbitrate

**Express or implied repudiation.**    A party may repudiate the arbitration agreement and if the other party accepts that repudiation the arbitration agreement will come to an end. The repudiation may be express or may be inferred from the conduct of a party who acts in a way that is inconsistent with the continued opera-

**2-136**

---

[659]  See para.2-018.
[660]  Termination by agreement is expressly contemplated by s.23(4) of the Arbitration Act 1996.
[661]  *Monde Petroleum SA v Westernzagros Ltd* [2015] EWHC 67 at [39].
[662]  *DDT Trucks of North America Ltd v DDT Holdings Ltd* [2007] EWHC 1542 at [15]–[16].
[663]  Arbitration Act 1996 s.23(4); see also DAC Report, para.40.
[664]  *JSC Zestafoni G Nikoladze Ferroalloy Plant v Ronly Holdings Ltd* [2004] EWHC 245.
[665]  *Frota Oceanica Brasiliera SA v Steamship Mutual Underwriting Association (Bermuda) Ltd (The "Frotanorte")* [1996] Lloyd's Rep. 461, per Longmore J. The point was not addressed when the case came before the Court of Appeal.

tion of the arbitration clause and evinces an intention not to be bound by it.[666] However a failure to comply with the general duty to do all things necessary for the proper and expeditious conduct of the arbitral proceedings is not a repudiation of the arbitration agreement.[667] The repudiation may be by anticipatory breach of the arbitration agreement.[668] Acceptance of the repudiation may be demonstrated by the commencement of proceedings in court.[669]

**2-137**    **Repudiation by commencing proceedings.**    A party may repudiate the arbitration agreement by commencement of proceedings in court in breach of its terms, but such breach will only be repudiatory if done in circumstances that show the party in question no longer intends to be bound by the agreement to arbitrate.[670] Such an intention can only be inferred from conduct which is clear and unequivocal.[671] If there was some reason for the breach, such as confusion as to the correct course, the court will not infer that the party bringing the proceedings intended to renounce its obligation to arbitrate.[672]

**2-138**    **Tribunal to determine dispute as to repudiation.**    If there is a dispute about whether the arbitration agreement has been repudiated, that is a question going to the jurisdiction of the tribunal and is therefore to be determined by the tribunal under s.30(1)(a) of the Arbitration Act 1996 rather than the court, unless the requirements of s.32 of the Arbitration Act 1996 are met.[673]

### (c)    Abandonment of the arbitration agreement

**2-139**    Similarly a party may abandon its right to arbitrate, for example by delay or inaction,[674] or by commencing court proceedings in breach of an arbitration agreement.[675] However the courts are slow to find such abandonment without very clear evidence of an intention to abandon the right to arbitrate together with reliance by the other party to its detriment.[676] Even if the right to arbitrate a particular dispute has been abandoned, that does not necessarily mean that the arbitration agreement itself has been abandoned. This may be the case where, for example, the arbitration agreement contains a time limit for the commencement of any claims that is shorter than it would be under the Limitation Act 1980. In that case, the claim

---

[666] *Traube v Perelman* [2001] W.L. 1251816.

[667] *Elektrim SA v Vivendi Universal SA* [2007] EWHC 11 at [124]. The court reasoned that s.40 imposes statutory obligations, the remedy for breach of which is set out in the Act. It does not create duties by way of implied terms of the arbitration agreement of which there can be a repudiatory breach. It is of course possible for a party to commit a breach of an arbitration agreement which is not repudiatory and which does not therefore allow the other party to bring the agreement to arbitrate to an end. See also *BDMS Ltd v Rafael Advanced Defence Systems* [2014] EWHC 451 (Comm) where a party's failure to "play by the rules" was not held to be a repudiation of the arbitration agreement.

[668] *Downing v Al Tameer Establishment* [2002] EWCA Civ 721.

[669] *Traube v Perelman* [2001] W.L. 1251816; *Downing v Al Tameer Establishment* [2002] EWCA Civ 721.

[670] *BEA Hotels NV v Bellway LLC* [2007] EWHC 1363.

[671] *BEA Hotels NV v Bellway LLC* [2007] EWHC 1363.

[672] *Rederi Kommanditselskaabet Merc-Scandia IV v Couniniotis SA (The "Mercanaut")* [1980] 2 Lloyd's Rep. 183. See also *World Pride Shipping Ltd v Daiichi Chuo Kisen Kaisha (The "Golden Anne")* [1984] 2 Lloyd's Rep. 489.

[673] See paras 4-072 et seq.

[674] *Wakefield (Tower Hill Trinity Square) Trust v Janson Green Properties Ltd* [1998] E.G.C.S. 95. See though *Indescon Ltd v Ogden* [2005] 1 Lloyd's Rep. 31.

[675] See para.2–137, as commencing proceedings in breach of an agreement to arbitrate does not automatically entitle the other party to treat the agreement to arbitrate as being at an end. *World Pride Shipping Ltd v Daiichi Chuo Kisen Kaisha (The "Golden Anne")* [1984] 2 Lloyd's Rep. 489.

[676] *Shell International Petroleum Co Ltd v Coral Oil Co Ltd* [1999] 1 Lloyd's Rep. 72.

will be deemed to have been abandoned if not commenced within the prescribed time limit, but the arbitration agreement will remain effective.[677]

---

[677] *William McIlroy Swindon Ltd v Quinn Insurance Ltd* [2010] EWHC 2448 at [32].