# Appendix
## Part 5 of 5

## Ryanair Ltd v Esso Italiana Srl.

[2013] EWCA Civ 1450

Court of Appeal (Civil Division).
Rix, Patten and Tomlinson L JJ.
Judgment delivered 19 November 2013.

*Jurisdiction – Contract – Cartel – Contract for supply of jet fuel in Italy – Contract providing for English law and non-exclusive jurisdiction – Italian competition authority finding defendant part of cartel inflating price of jet fuel – Whether English court had jurisdiction over claims for breach of contract and breach of statutory duty – Contract terms not giving rise to valid breach of contract claim – Jurisdiction clause not covering breach of statutory duty claim where no analogous contract claim possible – EC Treaty, art. 81 – Treaty on the Functioning of the European Union, art. 101.*

This was an appeal from a decision ([2012] EWHC 200 (Comm)) that the English court had jurisdiction over the claim of the claimant Irish airline (Ryanair) against the defendant Italian company (Esso Italiana) which supplied jet fuel at Italian airports.

In 2006 a decision of the Italian competition authority (ICA) found certain oil companies selling jet fuel at various airports in Italy, including Esso Italiana, to be in breach of art. 81 of the EC Treaty, the predecessor of art. 101 of the TFEU. The ICA decision found that as a result of information sharing arrangements the suppliers were operating a cartel the effect of which was to set up barriers to entry and distort and inflate the price of jet fuel supplied at various Italian airports. The distortion did not affect the international price of the fuel, which was premised on Platts market prices, but there was evidence that it tended to push up an additional component of the price known as the 'differential', which was an increment on market prices intended to cover additional expenses and services. The ICA found that the Italian differentials tended to be higher than elsewhere in Europe.

Ryanair made a claim against Esso Italiana for the alleged excess differential paid by it for jet fuel supplied by Esso Italiana between 1999 and 2006, and a second claim in respect of the jet fuel supplied to it by all members of the cartel in that period. The parties' agreement provided for English law and the non-exclusive jurisdiction of the English courts. The first claim was described as a claim for breach of art. IV of the agreement; the second claim was for loss arising from Esso Italiana's breach of statutory duty on the basis that each member of the cartel was jointly and severally liable for all the losses caused by its operation. Article IV provided that, if at any time a price or fee provided in the agreement did not conform to the applicable laws, regulations or orders of a

government or other competent authority, appropriate price or fee adjustments would be made; provided, however, that in the event the seller was at any time prevented from collecting, or the buyer was required to pay more than, the full price or fee provided for in the agreement, the party adversely affected would have the option to cancel in respect of the affected delivery location on 15 days' prior written notice.

The judge held that both claims were within the jurisdiction clause on the basis that the claim under article IV for breach of contract in the absence of a price adjustment involved consideration of a breach of law in Italy pursuant to art. 101; the claim for breach of statutory duty by Esso Italiana in respect of the fuel supplied by it covered the same ground; and the parties must have intended the second limb of the statutory duty claim, concerning the greater quantity of fuel supplied in Italy by suppliers other than Esso Italiana, also to fall within the clause.

On appeal Esso Italiana argued that the contract claim had no foundation.

*Held*, allowing the appeal:

1. Article IV was not intended to apply in the situation where prices had been inflated by cartel arrangements. The cartel inflated price was not unlawful, it was the cartel which was unlawful. If an unlawful cartel arrangement led to a valid claim for damages for breach of statutory duty, there had been no 'price or fee adjustments' to conform with law. The article could not be construed as Ryanair wished, by reference to its language and purpose, nor in order to give Ryanair a remedy by way of breach of contract in the circumstances which had happened. Nor was it necessary to imply a term into the contract that prices would not be inflated in consequence of any breach by Esso Italiana of EU competition law.

2. The jurisdiction clause would not cover the claim in statutory duty where there was no analogous contractual claim possible under the contract. It would be surprising if the non-exclusive jurisdiction clause bound or entitled the parties to litigate in a contractually agreed forum an entirely non-contractual claim for breach of statutory duty pursuant to art. 101, the essence of which depended on proof of unlawful arrangements between the seller and third parties with whom the buyer had no relationship whatsoever, and the gravamen of which was a matter which probably affected many other potential claimants, with whom such a buyer might very well wish to link itself. Even on the assumption of a contractual link such as a claim under art. IV, there was no authority which supported Ryanair's claim. (Provimi Ltd v Roche Products Ltd [2003] EWHC 961 (Comm); [2003] 2 All ER (Comm) 683 and Fiona Trust & Holding Corp v Privalov [2007] UKHL 40; [2007] 2 CLC 553 considered.)

The following cases were referred to in the judgment:

A

*Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Ll Rep 87 (CA).
*Attorney-General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988.
*Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 WLR 588.

B

*Empresa Exportadora De Azucar v Industria Azucarera Nacional SA (The Playa Larga)* [1983] 2 Ll Rep 171.
*Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40; [2007] 2 CLC 553.
*Provimi Ltd v Roche Products Ltd* [2003] EWHC 961 (Comm); [2003] 2 All ER (Comm) 683.

C

Stephen Auld QC and Eleanor Campbell (instructed by Enyo Law LLP) for the respondent.

Daniel Beard QC (instructed by Hogan Lovells International LLP) for the appellant.

D

JUDGMENT

**Rix LJ:**

1. This appeal concerns the scope of an English jurisdiction clause and arises on a challenge to jurisdiction in the English courts. Does the clause embrace a claim against a member of an Italian cartel selling jet fuel in Italian airports, a claim advanced on the basis of a statutory tort under English law in vindication of rights arising out of article 101 of the Treaty on the Functioning of the European Union ('TFEU')?

E

2. The claimant is Ryanair Limited ('Ryanair'), the well-known Irish airline. The defendant is Esso Italiana Srl ('Esso Italiana'), part of the world-wide ExxonMobil group. The jurisdiction clause is contained in their contract, entered into through the agency of ExxonMobil Aviation International Limited ('EMAIL'), for the purchase of jet fuel in Italian airports. The jurisdiction clause is found in article 12.1 of Part II of a master contract, made by EMAIL on behalf of group subsidiaries supplying fuel in various countries of the world, which was originally entered into with Ryanair back in 1999, then in a slightly different form in 2000, and subsequently renewed annually until expiry on 31 April 2006.

F

G

3. Article 12.1 provides as follows:

H

'This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and there are no other promises, representations or warranties affecting it. This Agreement cannot be modified in any way except in writing signed by the parties. No claims shall be made hereunder for prospective profits or for indirect or consequential damages except as otherwise provided

in the footnotes attached to the schedule. This Agreement shall be governed by the laws of England excluding its conflict of law rules and the United Nations Convention on the International Sale of Goods Act shall not apply. For the purposes of the resolution of disputes under this Agreement, each party expressly submits itself to the non-exclusive jurisdiction of the Courts of England.'

4. Thus the parties' contract was made on the basis of English law and the non-exclusive jurisdiction of the English courts. Prospective profits and indirect or consequential damages were excluded. It is not clear what follows from the exclusion of English conflict of law rules, which might be said to be a large exclusion, but no point has been taken on that.

5. Ryanair's claim takes its point of departure from a decision of the Italian Competition Authority (the 'ICA') dated 14 June 2006, which found certain oil companies selling jet fuel at various airports in Italy, including Esso Italiana, to be in breach of article 81 of the EC Treaty, now article 101 of the TFEU. The ICA decision found that as a result of information sharing arrangements the suppliers were operating a cartel the effect of which was to set up barriers to entry and distort and inflate the price of jet fuel supplied at various Italian airports. The distortion did not affect the international price of the fuel, which was premised on Platts market prices, but there was evidence that it tended to push up the 'differential', i.e. an increment on market prices which was intended to cover additional expenses and services which a supplier of jet fuel to an airline would respectively incur or supply. The ICA decision explained:

'220. As seen earlier in the section dedicated to the description of the market, the price that the airlines pay for the supplying of *jet fuel* is a result of the aggregation of different components. Some of these components are not subject to the contracting between oil company and airline: the value of the product on the international market (Platts quotes), the airport tariffs, the tariffs for the utilization of fixed systems such as hydrant systems, piers, etc. Then there exists a further component (cad [*sc, perhaps* called] "differential"), that is established in the contract between the airline and the oil company, and it is on this component that the effects of competition between suppliers can mainly be exercised.'

6. The ICA imposed fines on the members of the cartel. In the case of Esso Italiana the fine was □66,690,000. There was an appeal in Italy against the ICA decision to the Consiglio di Stato, but the court's judgment of February 2008 dismissed it.

7. For present purposes the critical finding of the ICA decision was that the Italian differentials tended to be higher than elsewhere in Europe. The decision cited figures for 2004 supplies to an Italian airline, Meridiana, and continued:

'228. The table clearly shows that the differentials charged for deliveries in the three main Italian airports are significantly higher (at a rate of 50% or more) than

those airports of comparable size, if not of a smaller size (such as Paris Orly and Brussels) or significantly smaller (such as Cologne). Moreover, an Italian airline would enjoy more favourable conditions in domestic airports than in foreign airports.

The different conditions applied, however, are not justified by reasons such as high airport fees which at Fiumicino and Malpensa airports are charged on the price of fuel: these charges, in fact, amounted in 2004 to □7–8 per 1,000 litres of fuel sold, while the differences at issue here are about □10–20 per 1,000 litres. For deliveries to medium-sized airports (Nice, Linate, Bordeaux, Lyons and Ciampino), prices are more similar and in any case are based according to airport size.'

8. If I understand this paragraph correctly, the ICA is saying that at the three largest Italian airports there was evidence of the differential being □10–20 per 1,000 litres greater than at comparable European airports, although account would have to be taken of the fact that at two of those three airports there was an element of □7–8 per 1,000 litres which was caused by airport fees included in the differential. However, where smaller airports were concerned, the differential was smaller, and prices became 'more similar'. Be that as it may, and we are not presently concerned with matters of quantum, Ryanair has used the highest figure cited there of □20 in order to identify its claim against Esso Italiana.

9. By an amendment encouraged by the judge below, Eder J, Ryanair has reformulated its claim to be 'at least' as follows: (1) a loss of □20 per metric ton on 72,984 tonnes of fuel supplied to it between 1999 and 2006 by Esso Italiana under their contract: a total of □1,459,671 (plus 'loss of profit'); (2) a loss of □20 per metric ton on 374,391 tonnes of fuel supplied to it by all members of the cartel (including Esso Italiana) in the same period: a total of □7,487,823.19. The first claim is described as a claim for 'breach of contract'; and the second claim is described as one for loss arising from Esso Italiana's 'breach of statutory duty'. The theory of the latter claim is that each member of the illegal cartel is severally as well as jointly liable to any member of the public for all the losses caused by the operation of the cartel. Ryanair's original pleading had put the claim for breach of statutory duty first, and the claim in respect of fuel supplied by Esso Italiana under the contract second, as an alternative claim.

10. It is not readily apparent what the jurisdictional link between England and Esso Italiana may be so far as Ryanair's claim for breach of statutory duty is concerned: the claim is made against an Italian company in respect of its participation in Italy with other Italian suppliers of fuel oil in Italy in arrangements which an Italian regulatory agency has found to be unlawful pursuant to article 101. The theory of Ryanair's position, however, is that the breach of contract claim is firmly anchored to the contract as requiring an indemnity under its article IV (see below), and that in these circumstances the breach of statutory duty claim, being a claim pursuant to

article 101 under English law, also falls within the contract's non-exclusive English jurisdiction clause.

11. Article IV falls, like article XII, within the General Provisions of part II to the contract. It provides as follows:

'*ARTICLE IV – PRICES*

4.1 If at any time a price or fee provided in this Agreement shall not conform to the applicable laws, regulations or orders of a government or other competent authority, appropriate price or fee adjustments will be made; provided, however, that in the event Seller is at any time prevented from collecting, or Buyer is required to pay more than, the full price or fee provided for in this Agreement, including changes in said price or fee pursuant to other provisions hereof, the party adversely affected shall have the option at any time thereafter while such condition exists to cancel this Agreement as to any affected delivery location upon fifteen (15) days prior written notice to the other.'

12. It is important to observe that Ryanair at no time asserted that its claim for breach of statutory duty fell within the jurisdiction clause in the absence of a concomitant contractual claim under article IV in respect of the lower quantity of fuel supplied by Esso Italiana itself, which was itself premised on Esso Italiana participating in infringing behaviour in breach of article 101. When the question of whether article IV did indeed cover its contractual claim came to the fore (see below), Ryanair submitted for the first time that, if necessary, it could rely on an implied contractual term that Esso Italiana's prices would not be inflated as a consequence of any breach by Esso Italiana of EU competition law.

**The judgment below**

13. Thus in the Commercial Court Ryanair put the matter in the following way, as described by Eder J in his judgment:

'6. … In essence, what is said is that Esso Italiana participated in infringing behaviour in breach of article 101 … Therefore, the prices charged for the fuel supplied by Esso Italiana to Ryanair in Italy were not in conformity with the applicable law and Esso Italiana is in breach of clause 4 … that is what is referred to as the "contract claim".

7. It is an essential part of that contract claim that Esso Italiana participated in infringing behaviour in breach of article 101 …

25. On the basis of *Fiona Trust* [2007] 2 CLC 553, Mr Auld QC, acting on behalf of Ryanair, submitted that it was authority for the following propositions: (1) It is to be presumed that rational businessmen who are parties to the contract

intend all questions arising out of their legal relationship to be determined in the same forum. (2) This presumption is a strong one and requires clear words to the contrary to be displaced …

38. … Mr Beard QC submitted that it is at least odd that, in the context of a jurisdiction clause which expressly states that the agreement is governed by the laws of England, the parties might have contemplated that the jurisdiction clause extends to a potential claim for breach of statutory duty under Italian law. Mr Auld QC accepts for present purposes only that the claim for breach of statutory duty is one which would be governed by Italian law, although his case is, or at least might be (and he reserves his position) to say in due course that the claim for breach of statutory duty is in fact one of English law …

39. I am bound to say that I was initially impressed by this particular argument of Mr Beard QC. However, it seems to me that Mr Auld QC's answer is correct and that, although it might seem odd that such a claim might fall within the jurisdiction clause, the fact of the matter is that the contract claim itself will necessarily involve, or at least arguably necessarily involve, a consideration of the position under Italian Law because of the terms of article 4.1 and its reference to "the applicable laws, regulations and orders of a government or other competent authority". I do not have to decide that at this stage …

42. … I have to consider that the rational or reasonable business man would have contemplated that there would, or at least might be, a contractual claim …

43. It seems to me incontrovertible that the reasonable and rational businessman would also have contemplated that the claims against Esso Italiana in respect of breach of statutory duty in relation to the fuel supplied under this particular contract could equally be advanced in England. In my opinion, those two claims are beyond any doubt whatsoever claims which are "so closely knitted together", using the words of Leggatt LJ in *The Angelic Grace*. Also, looking at the speeches in the House of Lords in *Fiona Trust*, I am of the view that a reasonable and rational businessman would be taken to have agreed that a single tribunal would resolve both those disputes. It seems to me that there is an almost complete overlap between those two claims …

44. Mr Beard QC has a much more forceful case with regard to the wider claims that Ryanair seek to advance against Esso Italiana, i.e. the claims for losses based upon breach of statutory duty in relation to fuel supplied under contracts with other third party cartel members. Mr Beard QC is right in particular that the nature of the losses in relation to such other claims is potentially wider and much larger. He submitted that it is not conceivable that a rational business person would agree to such potentially wider and larger claims being dealt with in one jurisdiction.

45. As I have said, I have found this part of the case much more difficult. However, it seems to me that Mr Auld QC is right that, in considering a claim against Esso Italiana for breach of statutory duty in respect of losses allegedly suffered arising out of the other contracts with other cartel members, it would be a "forensic nightmare" that the contract and the more limited claim for breach of statutory duty would be pursued in England; whereas the claim in relation to the second limb for breach of statutory duty would be pursued in some other jurisdiction …'

14. It seems to me that the argument accepted by Eder J therefore proceeded as follows. (i) The claim under article IV was a claim under the contract for breach of contract in the absence of a price adjustment. (ii) That claim itself involved consideration of a breach of law in Italy pursuant to article 101, which was the necessary trigger for a claim under article IV. (iii) The 'first limb' of the statutory duty claim, i.e. a claim for breach of statutory duty by Esso Italiana in respect of the fuel supplied by it to Ryanair under the contract, covered the same ground as the contract claim under article IV. (iv) Therefore the contract claim and the first limb of the statutory duty claim were 'so closely knitted together', as in *The Angelic Grace* [1995] 1 Ll Rep 87 (CA). (v) The 'second limb' of the statutory duty claim, i.e. that part of it which concerned the much greater quantity of fuel supplied in Italy by suppliers *other than* Esso Italiana, was another matter, but on the whole it would be a 'forensic nightmare' (see Steyn LJ in *Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 WLR 588 at 593D) if that were adjudicated separately and therefore it was to be presumed that rational businessmen would have considered that the jurisdiction clause was intended to cover such a claim (Esso Italiana's joint and several liability for the breach of statutory duty committed by any cartel member who had supplied Ryanair) as well.

15. It follows that the whole edifice of this reasoning is built on the initial claim, the contract claim, that Ryanair had a remedy pursuant to article IV of the contract.

**The issue as to the validity of the article IV claim**

16. At the hearing in this court, the question therefore arose as to whether there was any prospect of Ryanair being able to bring itself within article IV. That question was raised by the court because Esso Italiana was at one and the same time saying that, for the purpose of jurisdiction it was accepted that there was a contractual claim pursuant to article IV, but also that it was intending to submit at a later stage that, upon a construction of that article, such a claim had no prospect of success. Thus in his judgment below, Eder J accurately said that it was conceded by Esso Italiana that the English court did have jurisdiction over Ryanair's claim in contract (see at paras [11] and [17] of his judgment). However, it was also clear from its written skeleton argument before Eder J himself that Esso Italiana's position was that Ryanair's contractual claim had no foundation.

17. Thus in its skeleton argument before Eder J (at its paras 1.6/7) Esso Italiana had submitted as follows:

> 'There is a governing law and non-exclusive jurisdiction clause in the Contract in favour of the English courts (Section 12.1). Esso Italiana accepts that that Section 12.1 means that the Contract Claim can be heard in the English courts. … It does, however, strenuously resist the Contract Claim as having no foundation and has reserved its position as to whether any further legal steps should be taken in relation to it … The present application concerns only the Breach of Statutory Duty Claim.'

18. That was consistent with Esso Italiana's first skeleton to the Court of Appeal which raised, although it has to be said obliquely, the submission that article IV was not intended to deal with anti-trust laws as distinct from governmental fuel price regulation (see at para 94 and footnote 7); and with Esso Italiana's supplementary skeleton in the Court of Appeal, which had a more extensive passage (at paras 33–38) submitting that 'Ryanair's reliance on Clause 4 of the Agreement does not assist it', that the contract claim was 'bogus' and would be subject to further challenge, and that 'Ryanair cannot pull itself up by its own bootstraps'.

19. It was as a result of such submissions, and the essential structure of Ryanair's argument and the judge's judgment, which were both premised on the existence of a contractual claim within the jurisdiction clause, that, on the hearing of this appeal, the court itself raised with Mr Daniel Beard QC, counsel for Esso Italiana, exactly what was being said about the validity of the contractual claim. For it seemed to be a necessary part of Ryanair's argument based on the *Fiona Trust* presumption in favour of the rational and reasonable businessman's preference for one-stop adjudication, that a contractual claim based on article IV for a breach of article 101 had some prospect of success. If, therefore, there was no contractual claim under article IV by reason of Esso Italiana's supply of jet fuel at prices inflated by conduct in breach of article 101, then, at any rate arguably, it became harder to see why reasonable businessmen would interpret the jurisdiction clause as covering a separate claim for breach of statutory duty arising out of conduct in Italy in breach of article 101.

20. As a result of the discussion which then occurred, it became reasonably clear that Esso Italiana did wish to submit, if it could, that the hopelessness of any claim under article IV ought to be taken into account as part of the jurisdictional challenge. It also emerged that Esso Italiana had previously shied away from that argument because of a concern that it might constitute a submission to the jurisdiction. The court considered that that was not the case. It was often part and parcel of a challenge to the jurisdiction that a claim raised no proper issue for trial. Provided that such arguments, legitimately connected to a challenge to the jurisdiction, were made under cover of a challenge to the jurisdiction, it was hard to see how it could be said that a defendant was submitting to the jurisdiction by raising an argument that was necessary to his challenge. In any event, although on behalf of Ryanair Mr Stephen

A  Auld QC submitted that it was too late to withdraw the concession that had been made with respect to the contract claim, because it would be unfair to Ryanair to permit Esso Italiana to do so and to argue the point of whether there was a triable issue under article IV, he did not submit that such a withdrawal was technically impossible. Indeed, Ryanair had, in the run-up to the hearing before Eder J, urged Esso Italiana to set out the substance of its defence to the contract claim and undertook not to rely on

B  any steps taken by Esso Italiana in doing so as a submission to the jurisdiction for the purposes of the statutory duty claim. Moreover, Mr Auld accepted that even where a claim form is served without permission under the Judgments Regulation, it is open to challenge the court's jurisdiction on the basis that the claim has no reasonable prospect of success (see his further supplemental skeleton argument at para 6.3(2)).

C

21. In the circumstances, we considered that it was necessary to consider the parties' jurisdictional arguments in the round. If a breach of statutory duty pursuant to article 101 did not sound in contractual damages pursuant to article IV, then the whole premise of Ryanair's claim to jurisdiction with respect to the statutory duty claim, and the reasoning of the judge's judgment, fell to the ground. Jurisdiction

D  would have been obtained on the basis that there was an arguable contractual claim which partly covered the same ground as the 'first limb' of the statutory duty claim and was otherwise sufficiently connected to the 'second limb' of that claim to entitle a conclusion that the parties must reasonably be regarded as agreeing that the jurisdiction clause covered both claims in their entirety. It was possible however that

E  there was no contract claim which had a reasonable prospect of success in which case there was nothing on which to hang the argument of an interpretative presumption, as to the width of the jurisdiction clause, in favour of one-stop adjudication. If that possibility turned into actuality, it would be wholly unfortunate for jurisdiction to be obtained on a misapprehension of the scope of article IV and of the jurisdiction clause.

F

22. We therefore gave directions at the conclusion of the first day's hearing of this appeal, adjourning the appeal part heard, giving time to Esso Italiana to serve any amended grounds of appeal and to the parties to serve any further supplementary skeleton arguments or evidence, and reserving costs.

G

**The adjourned hearing**

23. At the adjourned hearing, Mr Auld renewed his submissions that it would be unfair to allow Esso Italiana to go back on its earlier concession that there was jurisdiction to hear the contract claim or on its previous decision to reserve argument

H  as to the construction and applicability of article IV to a subsequent hearing. However, we were not persuaded by these submissions, and gave an oral decision to that effect, reserving our reasons for this judgment.

24. Our reasons were that it was necessary to a proper understanding of the jurisdictional challenge to consider whether the contract envisaged a contractual

claim arising out of a breach of article 101, as well as our rejection of the submission that there would be any unfairness to Ryanair in approaching the article IV and article 12.1 issues holistically. Mr Auld quite properly showed us everything which made plain that Esso Italiana did accept that the contract claim was within the jurisdiction clause, and that is not in doubt. However, it is equally not in doubt that this did not proceed on the basis of any concession that the contract claim was arguable, but rather on a mistaken view as to the proper time for taking the point that it was not. It seemed to us, however, that it would be impossible properly to evaluate Ryanair's submission that the statutory duty claim was so closely linked to the contract claim as to permit the conclusion that the parties must be taken to have contracted on the basis that it would fall within the jurisdiction clause, without at the same time evaluating the argument, which we were satisfied that Esso Italiana had always wished to advance but had mistakenly deferred, to the effect that article IV, which was the basis of Ryanair's contract claim, did not envisage or cover a claim based on conduct contrary to article 101. In the circumstances, there was no unfairness in permitting the argument on article IV, which would have to be considered at some point, to be considered at the point when it could throw light on the proper width of the jurisdiction clause and the proper forum for the statutory duty claim.

25. Meanwhile, the court had allowed the parties time to develop any argument based on evidence that the interpretation of article IV could not be grasped at this stage because of matters of matrix or context, but no such evidence was relied on by Ryanair. There was a bare submission by Mr Auld that there was not time to develop any such evidence: but in the absence of any indication of what evidence might have been sought and was wanting, we considered that this submission carried no weight at all. We considered that we had allowed sufficient time for the development of such evidence, if there was any such evidence to be brought forward. Mr Auld accepted that the question of what claims the jurisdiction clause covered was ultimately a question of construction of the contract.

26. We therefore gave permission for Esso Italiana's amended grounds of appeal, and for its concession, if necessary, to be withdrawn, and went on to hear competing submissions as to the applicability of article IV, and in the light of that, amplified submissions as to the proper interpretation of the width of the jurisdiction clause.

**The width of article IV**

27. For convenience I restate the provisions of article IV:

'If at any time a price or fee provided in this Agreement shall not conform to the applicable laws, regulations or orders of a government or other competent authority, appropriate price or fee adjustments will be made; provided, however, that in the event the Seller is at any time prevented from collecting, or Buyer is required to pay more than, the full price or fee provided for in this Agreement,

A  including changes in said price or fee pursuant to other provisions hereof, the party adversely affected shall have the option at any time thereafter while such condition exists to cancel this Agreement as to any affected delivery location upon fifteen (15) days prior written notice to the other.'

B  28. As to this clause, Mr Beard submitted as follows. The contract specified the prices that had to be paid under the contract in terms of Platts quoted prices plus the agreed differential, which differed from airport to airport. Article IV was intended to deal with the situation where government ('or other competent authority') by its 'laws, regulation or orders' interfered with the prices or fees charged under the contract, so that those prices or fees did not 'conform' to those laws etc. In such a

C  case 'appropriate price or fee adjustments will be made', i.e. so that the prices or fees charged shall be made to conform to the applicable laws, regulations or orders. There then follows the proviso of article IV, which permits 'the party adversely affected', i.e. the seller if it is prevented from collecting the full price or fee provided for in the contract, or the buyer if it is required to pay more than the price or fee provided for in the contract, to cancel the contract as to any affected airport upon written notice.

D

29. Mr Beard submitted that there is no room in such a provision for it to apply to prices inflated by cartel arrangements. The requirement is for prices to be adjusted to conform with law. However, article 101 does not operate by either invalidating contractual arrangements with customers of cartel operators or by requiring the prices

E  charged to such customers to be adjusted to some new and acceptable norm. A cartel in breach of article 101 does not render any price or fee specified in a customer contract unlawful. On the contrary, article 101 operates by invalidating the arrangements *between* the cartel parties, and it gives their customers a remedy not in the form of adjusted contractual prices but in the form of damages for losses created by the cartel parties' breach of statutory duty. Those damages are to be quantified not necessarily

F  by any uplift beyond some other hypothetical price, but by what the customer has lost. That might depend on many factors, including the degree to which the price can be said to have been inflated, such as whether the customer has been able to pass on the inflated price to its customers in turn (who themselves may therefore have a claim against the cartel parties for breach of statutory duty), or whether the customer has

G  lost out on further sales that it might have made if it had been charged a lower price.

30. Moreover, it would make nonsense for the party affected by any requirement for an adjusted price lower than the cartel engendered inflated price (i.e. on this hypothesis Esso Italiana) to have a right to cancel the contract for any affected airport as a result: but that is the consequence required by the clause as Ryanair would

H  construe it because the clause gives the right to cancel to the 'party adversely affected' by the interference the right to cancel, not the party protected by the law's remedy for breach of article 101. And thus, as Mr Beard submits, the effect of Ryanair's reading of article IV is to distort the plain words of the clause and to create an absurd outcome in relation to the cancellation option terms.

31. Mr Beard further submitted that Ryanair's construction of the clause renders it otiose: because it is triggered by proof of a breach of statutory duty which provides its own remedy, and, on Ryanair's case, provides the very remedy which the statutory tort provides.

32. If therefore article IV does not cover or allow Ryanair's contract claim or permit the use to which Ryanair seeks to put it, then it becomes all the more unlikely that article 12.1 should be interpreted to cover a claim in statutory tort whose ramifications are so far removed from the considerations of contractual remedies which the parties would otherwise be reasonably regarded as having in mind in a jurisdiction clause which is concerned with 'the resolution of disputes under this agreement', a fortiori where the same clause expressly excludes claims for 'prospective profits or for indirect or consequential damages'.

33. In this connection Mr Beard pointed out in his submissions some of the broad and idiosyncratic consequences of a claim for breach of statutory duty pursuant to article 101: such as that such a claim properly concerns tortious arrangements between rivals generally unrelated to a particular contract between a buyer and a seller; that such arrangements can come in all varieties; that it is possible to sue any member of a cartel for damages caused by each and any member of the cartel; that a customer of various members of a cartel may have different jurisdiction clauses in its contracts with such members; that losses caused by different cartel arrangements may be very various; that in any case such losses may also vary from those caused by being charged prices higher than a more competitive model would indicate to losses on business missed because of inflated prices, i.e. losses due to non-sales (an example of loss of profits excluded from article IV); that direct customers from a cartel may suffer no loss because they have passed on the higher prices to *their* customers, in circumstances where it is *their* customers, so-called indirect purchasers, who have suffered the inflated prices and may correspondingly sue the cartel members. Mr Beard submitted that it is unlikely that parties to a clause such as article 12.1 contemplated such claims for damages for breach of statutory duty, which are likely to arise between multiple claimants and multiple defendants, as falling naturally or presumptively within a contractual jurisdiction clause.

34. Mr Auld on the other hand submitted, primarily, that the true construction of article IV was irrelevant in circumstances where jurisdiction for the contract claim had been conceded and another non-contractual claim (the claim for breach of statutory duty) arose out of the same facts, since the parties cannot have intended concurrent proceedings in different courts, viz in England and in Italy, to arise out of the same facts. That submission, however, confuses a question of construction (the scope of the jurisdiction clause), which has to be capable of being answered as at the date of contract, with the adventitious circumstances of a defendant's reaction to a particular claim. That, in my judgment, makes no sense at all, and asks the court to construe the jurisdiction clause on the basis of post-contract events.

35. Turning to the construction of article IV, Mr Auld submitted that 'applicable laws, regulations or orders' are capable of encompassing EU competition law as applicable in Italy, and that the 'laws … of a government or other competent authority' are likewise capable of encompassing those who enact the relevant EU law, and that the ICA decision to fine the cartelists can amount to an 'order'. However, Mr Auld was unable to explain how the ICA decision involved any price adjustment imposed by law, regulation or order.

36. As to article IV's requirement of a price adjustment to conform to the applicable law etc., Mr Auld's submission was essentially that it was inapplicable where Ryanair was not aware of the activities of the cartel. I am unable to derive assistance from that submission. In my judgment, article IV is designed to operate in circumstances where the parties are mutually aware of a law, regulation or order and its effect on contract prices, so that the contract prices are altered to conform with the applicable law, regulation or order. That demonstrates to my mind that the situation of cartel infringements of article 101 are simply not within the purview of article IV, for such infringements of course normally operate in secrecy and are only brought to light, if ever brought to light, subsequently.

37. As to article IV's provision for an adversely affected party being entitled to terminate the contract for any affected airport, Mr Auld had no answer other than to submit that such provisions were not engaged where a party prevents a price adjustment being made by concealing the unlawful nature of the price; and that the affected party could not be entitled to terminate the contract under article IV once the unlawfulness was discovered. This submission, and its failure to grapple with the language and sense of the clause, in my judgment demonstrate that article IV is simply not designed to perform the function which Ryanair seeks to derive from it. The cartel inflated price is not unlawful, even though their effect on price may give rise to remedies. It is the cartel which is unlawful. If an unlawful cartel arrangement leads to a valid claim for damages for breach of statutory duty, there has been no 'price or fee adjustments' to conform with law, as distinct from proven damages for breach of statutory duty. If Ryanair is ignorant of the operation of a cartel in inflating prices, it is not the ignorant Ryanair who is not in a position to operate the termination option of the clause: that option applies to the 'adversely affected party', i.e. on the current hypothesis Esso Italiana. The necessary conclusion is that Ryanair's construction of the clause simply does not begin to work.

38. Mr Auld submitted that article IV has to be construed to operate as Ryanair would seek to use it because otherwise Ryanair would have no claim for breach of contract despite the fact that prices charged under the contract were inflated by reason of cartel arrangements in breach of article 101. Therefore 'reasonable commercial parties are to be understood as having intended it to mean' what Ryanair says it means. In my judgment, that is to cast all proper attempts to construe the clause by reference to its language, or to its purpose as indicated by its language, in favour of an infinitely broad process of interpretation derived from an invocation of the maxim

of *ubi ius ibi remedium*, the maxim that there must always be a remedy for any right. However, the right is to be found in article 101 which brings with it its own remedy for breach of statutory duty.

39. The same answer is to be given to Mr Auld's new fall-back position that a term must be implied into the contract that prices would not be inflated in consequence of any breach by Esso Italiana of EU competition law. Mr Auld relies on *Attorney-General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988 for this submission. However, there is no need to give a contractual remedy for breach of a statutory duty which brings with it its own remedy. Otherwise every single contract would involve such an implied term, yet such a term has never been found to exist.

40. In my judgment there is no answer to Mr Beard's powerful submissions concerning the construction of article IV. The clause simply was never intended to apply to the use to which Ryanair's contract claim seeks to put it.

41. It follows that there is no prospect of Ryanair having a contractual claim under article IV or an implied term such as would give a remedy, albeit limited to goods supplied under the contract itself, which reduplicated the effect of a statutory duty pursuant to article 101.

**The scope of the jurisdiction clause**

42. In the circumstances, I can be brief about the scope of the jurisdiction clause, for Mr Auld did not seek to submit that it would cover the claim in statutory duty in circumstances where there was no analogous contractual claim possible under the contract. In that I consider that he was right. His assertion of English jurisdiction within the jurisdiction clause had always been premised upon a contractual claim within article IV, both before the judge and on appeal.

43. In making that assertion, he had relied on *Fiona Trust* and *The Angelic Grace* and the cases which led up to those decisions and have led on from them.

44. *The Angelic Grace* was concerned with claims and cross-claims which arose on the same facts in both contract and tort. This court there said that it was common ground that the test, propounded by Mustill J and approved by this court in *The Playa Larga* [1983] 2 Ll Rep 171, was whether there was a sufficiently close connection between the tortious claim and the claim under the contract. Leggatt LJ continued (at 89 lhc):

'In order that there should be a sufficiently close connection, as the Judge said, the claimant must show that the resolution of the contractual issue is necessary for a decision on the tortious claim, or, that the contractual and tortious disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other.'

A   Ultimately therefore it is a question of construction of the jurisdiction clause (there the arbitration clause) in circumstances where there are parallel or closely analogous claims in both contract and tort. Without a contractual claim, however, this authority is of no assistance to Ryanair.

B   45. In *Fiona Trust* the question was whether issues arising out of the formation and validity of contract, rooted in the claimants' purported rescission of charterparties which they claimed to have been induced by bribery, to which purported rescission were added claims in tort for conspiracy and bribery, were all disputes 'arising under this charter' for the purpose of the charter's arbitration clause. It was held that they were. Contractual and tortious issues again arose on the same facts. The purpose

C   of parties to international arbitration agreements to channel all their disputes into a single arbitral forum was heavily emphasised (see Lord Hoffmann at paras [6], [7] and [8]). Some, but by no means all of that reasoning applies to non-exclusive jurisdiction clauses. In the context of arbitration clauses, however, Lord Hoffmann called for a 'fresh start' to the analysis of their scope. He concluded:

D   '13. In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it

E   clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: "if any businessman did not want to exclude disputes about the validity of a contract, it would be comparatively easy to say so".'

F   46. Such reasoning, however, does not carry over into a situation where there is no contractual dispute (by which I intend to include disputes about contracts), but all that has happened is that a buyer has bought goods from a seller who has participated in a cartel. I think that rational businessmen would be surprised to be told that a non-exclusive jurisdiction clause bound or entitled the parties to that sale to litigate in a contractually agreed forum an entirely non-contractual claim for breach

G   of statutory duty pursuant to article 101, the essence of which depended on proof of unlawful arrangements between the seller and third parties with whom the buyer had no relationship whatsoever, and the gravamen of which was a matter which probably affected many other potential claimants, with whom such a buyer might very well wish to link itself.

H   47. Even on the assumption of a contractual link such as a claim under article IV, there is no authority in this or other jurisdictions which has been brought to our attention to support Ryanair's claim. In this connection, Esso Italiana relied before Eder J on *Provimi Ltd v Roche Products Ltd* [2003] EWHC 961 (Comm); [2003] 2 All ER (Comm) 683, where a group of claimants who had bought vitamins from various defendant manufacturing sellers of such products brought a claim for breach of

statutory duty against them on the allegation, supported by a decision of the European Commission, that they had participated in an illegal cartel contrary to the then article 81. Such a multi-party claim involving multi-party defendants may be thought to be typical of such a claim for breach of statutory duty. Many of the defendants had jurisdiction clauses in their standard terms and conditions in favour of Swiss, German or French courts, and relied on them in an attempt to defeat jurisdiction in England, which had otherwise been established under the Brussels Convention. Aikens J, who heard evidence of foreign law about such jurisdiction clauses, held that the attempt to rely on them failed in each case. However, Eder J said that he was not assisted by *Provimi* because the case was largely, if not entirely influenced by principles of construction arising under Swiss, German or French law (at para [20]).

48. In this court, Mr Beard again referred to and relied on *Provimi*. However, Mr Auld also relied on one passage in *Provimi* (at para [120]), not referred to by Eder J, where Aikens J may seem to be suggesting that an English way of looking at the French clause ('exclusive jurisdiction over all and any disputes arising herefrom') would be to conclude 'that the present disputes have arisen out of the legal relationship in connection with which the jurisdiction clauses were made'. However, Aikens J immediately went on to discount such an English view, saying that he had to have regard to the fact that if the nature of the claim is tortious, 'then a French court would be inclined to say that the dispute arises out of the tort'. Aikens J commented further and more speculatively about such matters at para [124], where he balanced arguments as to whether the dispute can be said to arise out of the contract of sale or out of the pre-existing illegal cartel. It would seem that he was pondering on the width of the expression 'arising from'. This was prior to *Fiona Trust*, which disparaged fine distinctions of language and rather proceeded on the basis of what contracting parties would be reasonably understood to wish for in terms of one-stop adjudication of their contractual disputes.

49. Mr Auld cited *Provimi* at para [120] in support of his contention that a tortious claim which was intimately connected with a contractual claim would naturally fall within a contractual jurisdiction clause and even one which used the language of 'disputes *under* this Agreement' (emphasis added). However, he did not submit to this court, and he had not submitted to Eder J, that a tortious claim which had to stand by itself could or should be considered to fall within the scope of that expression, however broadly it is interpreted in accordance with the doctrine of *Fiona Trust*. Therefore that question does not arise. But even if it did, I see nothing in the *Fiona Trust* doctrine of a presumption in favour of one-stop adjudication to justify a conclusion that the parties to this supply contract should reasonably be regarded as intending that a purely tortious claim which lies against a cartel of Italian suppliers of fuel oil at Italian airports for breach of EU and/or Italian law should fall within the jurisdiction provisions of an English law contract, just because the claimant buyer is willing to limit his claim to only one of the cartel members, namely his seller, albeit his claim extends to the total supply from all the cartel members.

A    **Conclusion**

50. In sum, this appeal is allowed, for the reasons set out above.

**Patten LJ:**

B
51. I agree.

**Tomlinson LJ:**

52. I also agree.

C
(*Appeal allowed*)
——————

D

E

F

G

H



Neutral Citation Number: **[2020] EWHC 772 (Comm)**

Claim No: CL-2018-000064

**IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
QUEEN'S BENCH DIVISION
COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane
London, EC4A 1NL

Date: 31/03/2020

**Before**:

**THE HONOURABLE MR JUSTICE BRYAN**
- - - - - - - - - - - - - - - - - - -
**Between:**

**(1)  TERRE NEUVE SARL**
**(a company incorporated in France)**
**(2)  LARGELY INVESTMENTS SA**
**(a company incorporated in Panama)**
**(3)  LAURENT ZAHUT**

**Claimants**

**and**

**(1)  YEWDALE LIMITED**
**(2) REDS LLC**
**(a company incorporated in the State of New York, USA)**
**(3)  GPF SA (in liquidation)**
**(a company incorporated in Switzerland)**
**(4)  MEYER EL MALEH**
**(5)  JUDAH LEON MORALI**
**(as executor of the estate of the late Ernest Sasson)**
**(6)  SARA SASSON**
**(7)  CAROLE SASON-EL MALEH**
**(8)  LAURE VASARINO**
**(9)  AMANDINE JOSEK**
**(10)  ROBERT NAGGAR**

**(11) JUDAH EL MALEH**
**(12) NESSIM EL MALEH**
**(13) HSBC PRIVATE BANK (SUISSE) SA**
**(a company incorporated in Switzerland)**
**(14) DRISS MRIOUAH**

**Alain Choo-Choy QC** and **Samuel Rabinowitz** (instructed by **Quinn Emanuel Urquhart & Sullivan UK LLP**) for the **Claimants**

**Fred Hobson** (instructed by **Forsters LLP**) for the **Third Defendant**

**Raj Megha** (instructed by **Campbell & Co Solicitors**) for the **Fourth, Sixth, Seventh and Tenth Defendants**

**Adam Cloherty** (instructed by **Lipman Karas LLP**) for the **Eleventh Defendant**

Hearing dates: 19 and 20 February 2020

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

**MR. JUSTICE BRYAN:**

## A. Introduction.

### A.1 The Applications

1.  These proceedings are concerned with the alleged misappropriation of a sum of €10.6 million paid by the First Claimant ("Terre Neuve") to the First Defendant ("Yewdale") between July 2009 and September 2012, and thereafter allegedly misapplied with the alleged participation of other Defendants. The sums were paid pursuant to a tax optimisation scheme ultimately for the benefit of the Third Claimant ("Mr. Zahut"), who beneficially owned Terre Neuve and the Second Claimant ("Largely"). The scheme was allegedly created by a Mr. Sasson (now deceased), who gave tax advice through his company, the Third Defendant ("GPF") and controlled Yewdale (an English company) and the Second Defendant ("REDS") (a New York company).

2.  The Claimants allege that these monies were laundered through accounts at the Thirteenth Defendant (HSBC Private Bank SA ("HSBCPB")), which the Claimants allege the Eleventh Defendant ("Judah El Maleh") knew or should have known about, as a manager of the relevant department. The Claimants also allege that (amongst others) the Fourth, Sixth, Seventh and Tenth Defendants are implicated in and/or benefitted from the misappropriation.

3.  This is a consolidated hearing of three applications challenging the Court's jurisdiction ("the Applications") made by GPF (the Third Defendant), the Fourth, Sixth, Seventh and Tenth Defendants and Judah El Maleh (the Eleventh Defendant).

### A.2 The Background Facts

4.  The facts of the matter are complex, and have previously been addressed by Christopher Hancock QC (sitting as a Deputy Judge of the High Court) at [2]-[16] of his judgment in relation to a previous hearing of ex parte applications for service out (reported at [2019] EWHC 1119 (Comm)). I further summarise the background facts below.

### *(i) The Scheme*

5.  In 1996, following discussions with Mr. Sasson, Mr. Zahut and Terre Neuve entered into tax optimisation agreements, which were varied by agreements over the following years. Those of primary importance were alleged **oral** agreements entered into in 2003 and 2008 ("the 2003 Oral Agreement" and "the 2008 Oral Agreement" collectively "the GPF Agreements"). The arrangement (as from 2008) was said to be as follows:

    (1)  REDS would render invoices in respect of work done by Mr. Zahut for Terre Neuve;

    (2)  Terre Neuve would pay the invoiced sums to Yewdale;

    (3)  Yewdale would remit that money to REDS;

    (4)  REDS would in turn transfer those monies (less a 3% commission) to Largely, which would be for the ultimate benefit of Mr. Zahut;

    (5)  Largely and its bank accounts were controlled by GPF pursuant to various arrangements.

6.  As to the identity of certain of the Claimants and Defendants:

    (1)  The Sixth Defendant (Mrs. Sasson) and the Seventh Defendant (Mrs. Sasson-El Maleh) are the wife and daughter of Mr. Sasson, and heirs to his estate. Mr. Sasson worked with the Fourth Defendant (Meyer El Maleh), the husband of Mrs. Sasson-El Maleh. The Tenth Defendant (Mr. Naggar) was a director of Yewdale and, I am informed, a close friend of Mrs. Sasson, her daughter, and her son-in-law. These are collectively known as "the Campbell Co-Defendants", after their common legal representation by Campbell & Co Solicitors. All the Campbell Co-Defendants are domiciled in Switzerland.

    (2)  It was previously assumed that the Fifth Defendant ("Mr. Morali") was the executor of Mr. Sasson's estate. I understand from the Claimants' skeleton argument that Mr. Morali has now indicated in correspondence that he has not been appointed executor of Mr. Sasson's estate. I note that the Claimants do not allege that Mr. Morali was implicated in the misappropriation.

(3) The Eighth and Ninth Defendants ("Ms. Vasarino" and "Ms Josek") are former employees of GPF. Both have been convicted by French Courts of money laundering.

(4) Meyer El Maleh's brothers (Judah and Nessim), the Eleventh and Twelfth Defendants respectively, were employees of HSBCPB (the Thirteenth Defendant). They both worked in the MEDIS ("Mediterranean and Israel") Department of that Bank, which was headed by Judah El Maleh. Judah El Maleh is domiciled in Israel. Nessim El Maleh is domiciled in Switzerland.

(5) HSBCPB has been found by the Swiss Financial Market Supervisory Authority ("FINMA") to have breached Swiss anti-money laundering laws in connection with payments going through its accounts. Nessim and Meyer El Maleh have been convicted of money laundering in Switzerland (2013) and France (2018). Judah El Maleh was dismissed by HSBCPB in November 2012 because of, amongst other matters, a loss of trust in him based on failings in the MEDIS department in the context of the wrongdoing. It is in issue in this action as to whether he had, as alleged by the Claimants, knowledge of the wrongdoing.

(6) The Fourteenth Defendant (Mr Mriouah) is a businessman who had bank accounts including with HSBCPB, into which he received payments of at least €4.5 million from Yewdale. He is believed to be resident in France and/or Morocco.

### *(ii) The Written Agreements*

7. Four written agreements ("the Written Agreements") were entered into between GPF and Mr. Zahut or Largely.

(1) A 1996 Asset Management Agreement was entered into by GPF and Mr Zahut. Pursuant to that agreement, Mr Zahut assigned to GPF responsibility for the management of his bank account at the Discount Bank & Trust Company and granted to GPF all powers to represent him with that bank in accordance with the terms therein.

(2) A 2003 Management Contract between GPF and Largely.

(3) A 2012 Asset Management Agreement between GPF and Largely.

(4) A 2003 Fiduciary Agreement entered into by GPF and Mr. Zahut relating to GPF's trusteeship of the shares in Largely.

8. All these agreements contained clauses which, according to GPF, provide for the jurisdiction of the Geneva courts.

### (iii) The Claims

9. The claims relate to the sum of €10,627,699 paid by Terre Neuve to Yewdale between 2009 and 2012. The Claimants allege that pursuant to the 2008 Oral Agreement, this sum should have been transferred from Yewdale on to REDS and Largely. However, it appears that of this sum only US$137,288.80 was in fact transferred from Yewdale to Largely. The Claimants' case is that this money was misappropriated with the involvement of, and/or to the benefit of, the various Defendants.

10. In this action the Claimants seek damages of over €7.2 million (after taking into account applicable credits and a sum of US$3.75 million paid by REDS to Mr. Zahut in 2013) and/or restitution and/or rescission and/or an account and/or other relief under Swiss law and/or French law. There are a wide range of claims including for breach of contract, non-contractual liability for money laundering, breach of fiduciary duty, claims under the Swiss law doctrine of agency without authority, and claims in unjust enrichment.

### (iv) Procedural History

11. On 25 April 2019, Christopher Hancock QC handed down an order ("the April Order") in respect of several *ex-parte* applications made by the Claimants, which included giving permission to serve out on REDS, Mr. Morali, Judah El Maleh and Mr. Mriouah ("the Non-European Defendants"), pursuant to CPR r.6.37 and PD6B, paragraph 3.1(3) (the "Necessary or Proper Party" gateway). Judgment was handed down on 3 May 2019 [2019] EWHC 1119 (Comm) (the "May 2019 Judgment").

12. No permission for service out was required for the remaining Defendants, who were all resident/incorporated in Switzerland or France, and accordingly subject to the Lugano Convention or the Brussels I Regulation Recast (respectively), with the exception of

Yewdale, which is an English company. Yewdale did not, at that time, challenge jurisdiction.

13. Christopher Hancock QC found, amongst other matters, that:

(1) Although there were Swiss law jurisdiction clauses in the Written Agreements, those agreements were not themselves the basis or subject-matter of the Claimants' claims. This can be found at [42] of the May 2019 Judgment, in the context of determining whether there was a real issue which it was reasonable for the Court to try as against Yewdale, which was advanced as an anchor defendant for the purposes of the necessary and proper party jurisdictional gateway for service on, amongst others, Judah El Maleh.

(2) The Claimants' claims against Judah El Maleh and the other Non-European Defendants depended upon the same investigation as the claims against Yewdale, because the common thread was an investigation into what happened to the monies paid by Terre Neuve to Yewdale, how and to whom those monies were transferred, and whom they ultimately benefitted. Therefore, the evidence in all the claims would be similar and interlinked, and there was an obvious risk of irreconcilable judgments (at [46]).

(3) There was a serious issue to be tried as against Judah El Maleh for the purposes of CPR r.6.37(1)(b), though the Claimants' case against him was "more difficult" than against the other defendants before him (at [57]). In particular, Christopher Hancock QC accepted that the "factual arguments" put forward by Judah El Maleh "clearly give rise to triable issues" (at [56(a)]): those arguments included that Judah El Maleh had no personal involvement with the relevant transactions, that criminal proceedings were not taken against him, and that any supervisory failure by him would not be causative of the Claimants' loss.

(4) The claim against Yewdale was not brought for the sole object of establishing jurisdiction over the other Defendants, because Yewdale is at the centre of whatever happened to the misappropriated funds: it received from Terre Neuve all the money to which this claim relates (at [62]. Christopher Hancock QC therefore

distinguished *PJSC Commercial Bank Privatbank v Kolomoisky* [2018] EWHC 3308 (Ch), which was subsequently overturned by the Court of Appeal).

14. I note that an attachment order was made *ex parte* against Judah El Maleh by the Swiss First Instance Court: this was before Christopher Hancock QC in the hearing pursuant to which the April 2019 Order was made. This attachment order has since been vacated by the Swiss First Instance Court in a judgment dated 27 May 2019 following an *inter partes* hearing ("the Swiss First Instance Decision"). This judgment was upheld by the Geneva Cour de Justice (Chambre Civil) ("the Appeal Court Decision") by its judgment dated 22 November 2019.

15. On 7 June 2019, Christopher Hancock QC heard an application by Yewdale to challenge the English Court's jurisdiction. He found, in a judgment handed down on 15 July 2019, and reported at [2019] EWHC 1847 (Comm) (the "July 2019 Judgment"), that:-

(1) Yewdale had submitted to the English Court's jurisdiction by filing a substantive defence. In addition, he found that it was not appropriate to grant Yewdale relief from sanctions (as would be required to make its jurisdiction challenge application out of time). He nevertheless went on to consider Yewdale's grounds for challenging jurisdiction.

(2) The English Court had jurisdiction over Yewdale pursuant to Article 4 of the Brussels I Regulation Recast, as Yewdale had its registered office in the United Kingdom.

(3) The suit brought against Yewdale was not an abuse of the Article 4 jurisdictional provisions. The law on abuse of Article 4 was set out in the headnote to *Lungowe and ors v Vedanta Resources Plc* [2019] UKSC 20 ("*Vedanta*"). The claim against Yewdale was a bona fides one, and not brought solely for the purpose of bringing other Defendants within the jurisdiction. Further, there was no collusive behaviour between the Claimants and Yewdale. The case was far removed from the circumstances of the High Court decision in *PJSC Commercial Bank Privatbank v Kolomoisky and ors* [2018] EWHC 3308 (Ch).

(4) Yewdale was properly regarded as an "anchor defendant". The proceedings against Yewdale did not constitute an abuse of the European jurisdictional provisions, and the fact that Yewdale was not party to any agreement with an English jurisdiction clause did not mean that the claim was without merit.

(5) The alleged issue of whether Switzerland was the most convenient forum for the trial of the dispute did not arise, and was irrelevant, as this was a case involving the Brussels I Regulation, and as such issues of *forum non conveniens* did not arise: *Owusu v Jackson* (Case C-281/02) [2005] QB 801 ("*Owusu*").

(6) Article 7 of the Brussels I Regulation gave the Claimants a *right* to sue in a jurisdiction other than that which would otherwise be mandated by Article 4. Article 25 of the Brussels I Regulation did not assist Yewdale, because there was no evidence of an exclusive jurisdiction agreement in favour of Switzerland to be implied from course of dealing.

16. Christopher Hancock QC refused Yewdale's application for permission to appeal, and on 6 November 2019, Males LJ refused Yewdale's further application for permission to appeal. In his Order, Males LJ found that the appeal had no prospect of success, stating that Christopher Hancock QC was *"clearly right to find that Yewdale is domiciled here for the purpose of Article 4... he was entitled to find that there was no abuse of the jurisdictional provisions".*

17. I am informed that the Non-European Defendants other than Judah El Maleh (that is, REDS, Mr. Morali, and Mr. Mriouah) have not applied to challenge the English Court's jurisdiction and/or to set aside the relevant part of the April 2019 Order. I understand from the Claimants' skeleton argument (and it is not challenged by the Defendants) that:

(1) REDS has not yet been served.

(2) Mr. Morali has indicated in correspondence that he does not consider himself a proper party because he has not been appointed executor of Ernest Sasson's estate.

(3) Mr. Mriouah has submitted to the English Court's jurisdiction.

18. Further, I am informed that Swiss-domiciled Defendants (apart from GPF and the Campbell Co-Defendants) have submitted (or are deemed to have submitted) to the jurisdiction of the English Court. I am told in the seventh witness statement of Mr. Gerbi and the Campbell Co-Defendants' Skeleton Arguments that Nessim El Maleh and HSBCPB have submitted to the Court's jurisdiction, and that both have filed Acknowledgments of Service. I understand that Ms. Vasarino (as well as Ms. Josek, who is domiciled in France) have been served, but have not responded to the claim and not made any application to challenge jurisdiction within time, and so are deemed to have submitted.

19. It will be seen, therefore, that the action is already proceeding in this jurisdiction against Yewdale (which has been found to be a valid anchor defendant) as well as a number of the overseas defendants: both those domiciled in Switzerland, and elsewhere. It is clear that this action will proceed in this jurisdiction, and will address the issues advanced by the Claimants in relation to the alleged misappropriation of the money, regardless of the outcome of each or any of the three jurisdictional challenges before me for consideration.

## B. The Third Defendant's Application

20. GPF challenges the jurisdiction of the English Court, relying on Article 23 of the Lugano Convention and the four Written Agreements that GPF entered into with Largely or Mr. Zahut. The Written Agreements contain jurisdiction agreements purportedly in favour of the Swiss court and which GPF alleges, and Largely and Mr Zahut deny, extend to the claims in these proceedings advanced by them against GPF.

21. GPF applies for :

   (1)  A declaration that the court has no jurisdiction in respect of claims brought by Largely and Mr. Zahut and an order setting aside service of the claim form in respect of those claims; or

   (2) To the extent that Largely and Mr Zahut bring claims against GPF in reliance on the four Written Agreements containing Swiss jurisdiction agreements, an order (i) seeking a declaration that the court has no jurisdiction in respect of such claims

and (ii) requiring the Claimants to serve Amended Particulars of Claim that remove such claims.

### B.1 Applicable Law

22. Since GPF is domiciled in Switzerland, jurisdiction is governed by the Lugano Convention. Article 23 of the Lugano Convention provides that:

> "[i]f the parties, one or more of whom is domiciled in a State bound by this Convention, have agreed that a court or the courts of a State bound by this Convention are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise".

23. The wording of Article 23 Lugano Convention is materially identical to Article 23 of the Brussels Regulation (EU Regulation 44/2001), which has since been replaced by the Brussels Regulation Recast. Decisions of the Court of Justice of the European Union ("the CJEU") applicable to that provision of the Brussels Regulation apply equally to Article 23 of the Lugano Convention.

24. Two issues arise in this case, and I will take each in turn.

(1) The first issue is whether the present dispute (or any part of it) falls within the scope of one or more of the jurisdiction clauses as a matter of construction. This is to be determined as a matter of English law. Article 23 of the Lugano Convention prorogates jurisdiction in circumstances where the parties have "agreed" that the courts have jurisdiction: in *Powell Duffryn C-214/89,* the CJEU held that whether an agreement confers jurisdiction is to be regarded as an independent concept. The court will determine whether parties have so "agreed" as an exercise of construction governed by the contract's substantive law: *British Sugar Plc v Fratelli Babbini di Lionello Babbini* [2004] EWHC 2560 (TCC), [2005] 1 Lloyd's Rep. 332. In this case, the relevant agreements are governed by Swiss law, but neither GPF nor the Claimants have suggested that (or adduced Swiss law evidence to the effect that) the principles of contractual construction are different as between Swiss and English law; as such, the clauses are to be construed by reference to English legal principles.

(2) If the dispute is within the scope of the jurisdiction clauses, there is a further issue as to whether the jurisdiction agreements satisfy the requirements of Article 23 of the Lugano Convention. This requires the dispute to be in connection with the legal relationship with which the agreement containing the jurisdiction clause is concerned: see for example *Etihad Airways PJSC v Prof. Dr Lucas Flother* [2019] EWHC 3107 (Comm) *("Etihad")* per Jacobs J at [123] ff.

25. As to the standard of proof: these issues arise within the context of proceedings brought before the English court on the basis that there is no jurisdiction agreement for the courts of another Member State, and GPF, as defendant, contends that there is such an agreement. The CJEU has confirmed that the court should use its own procedural law to deal with such a jurisdictional challenge. It is well established, and was not in dispute, that the party *alleging* that there *is* an applicable jurisdiction agreement must have a "good arguable case" / "the better of the argument on the materials before the court at the time of the challenge" – Dicey, 15th Edition, 12-120, and *Etihad* at [55].

B.1.1 The First Issue

26. The fundamental question asked as a matter of English law is: how would the jurisdiction clause be understood objectively by a person having all the relevant background knowledge of the transaction (*Arnold v Britton* [2015] AC 1619)?

27. The English court's approach to construing jurisdiction clauses was authoritatively restated in *Fiona Trust & Holding Corp v. Privalov* [2007] UKHL 40 *("Fiona Trust")*. This case was concerned with an arbitration clause, but the principles equally apply to jurisdiction clauses: *Briggs (Civil Jurisdiction and Judgments, 5th edition: 4.42)*.

(1) *Fiona Trust* concerned the scope and effect of arbitration clauses in eight charter parties on the Shelltime 4 Form: "(b) Any dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree." Owners alleged that the charters were procured by bribery, and purported to rescind the charters on this ground. The issue was whether the rescission issue should be determined by arbitration (as argued by Charterers) or by a court (as argued by the Owners, on the ground that rescission concerned the validity of the contracts, rather than the interpretation of their terms): *Fiona Trust* at [1].

(2) Lord Hoffman held that the wording of jurisdiction clauses should be given a broad or generous interpretation, based on the presumption that rational businessmen are likely to have intended that all the questions which arise out of the relationship which they have entered into or purported to enter into, are to be submitted to the same forum (*Fiona Trust* at [7] and [13]). Lord Hope similarly stated that *"if the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other?"* (*Fiona Trust* at [28]).

(3) The "relationship" between the parties is the relationship which arises from the contract entered into by them containing the jurisdiction clause. This is clear from the context of *Fiona Trust*: the parties are not linked by any other "relationship". This is further supported by the Court's reference to the 1970 *Federal Republic of Germany case*, which explicitly refers to "the relationships created by their [the parties'] contract, and claims arising therefrom": *Fiona Trust* at [14], and [30]. Further, *Fiona Trust* was concerned with whether the arbitration clause covered disputes over the agreement's *validity,* or only its *interpretation*: the nature of the disputes is different, but they both clearly arise out of the same contract.

(4) Therefore, the Court's generous approach to the interpretation of arbitration clauses must be read in light of the fact that the relationship between the parties arose out of the same contract. If the parties have confidence in their chosen jurisdiction "for one purpose", they should have confidence in it for other purposes, where those purposes arise from the same contractual relationship.

28. Subsequent cases have supported this interpretation of *Fiona Trust*. My attention was specifically drawn to *Microsoft Mobile OY v Sony Europe* (*"Microsoft v Sony"*) [2018] 1 All ER (Comm) 419 in which Marcus Smith J stated at [45] (after referring to [6]-[13] of *Fiona Trust*):

> "45. The importance of having a "one-stop-shop" for all disputes – and the likelihood that the parties to an agreement would intend this – is clear. But that is true only to the extent that disputes arise out of the parties' relationship. Thus, absent extremely clear wording, a court would presume that the parties would have intended the same tribunal to deal with contractual disputes arising out of the relationship, as well as any "parallel" claims in tort. But, what would not be covered, absent extremely clear wording, would (to take a somewhat extreme hypothetical case) be Party A's case against Party B

(Party A and Party B being in a contract with each other containing an arbitration clause) for Party B negligently, but coincidentally and unrelated to the contract, running Party A over in the street. That would not be a dispute arising out of the parties' contractual relationship"

29. The example given is, of course, an extreme one being not only a tortious claim (and so different in legal nature) but also one that was wholly unrelated to the underlying contract. *Microsoft v Sony* itself was concerned with service out in a claim for losses caused by allegedly anti-competitive conduct, and whether that claim was covered by an arbitration agreement. In the event, Marcus Smith J found that the tortious claims were sufficiently closely related to any contractual claims arising out of their agreement, in large part because of the high degree of overlap between tortious claims arising out of cartelist behaviour, and breach of a contractual provision relating to price changes.

30. In cases subsequent to *Fiona Trust*, the generous interpretation to be given to jurisdiction clauses has been extended to cover multi-contract disputes. A jurisdiction agreement contained in one contract may, on its proper construction, extend to a claim that is made under another contract. In particular reference was made to *Sapinda Invest v Altera* [2017] EWHC 871 (Comm), *Emmott v Michael Wilson* [2009] 1 Lloyd's Rep 233 and *Etihad Airways v Flother* [2019] EWHC 3107 (Comm). Reference was also made to *UBS v HSH Nordbank* [2009] 1 CLC 934 [82] and *Deutsche Bank v Sebastian* [2011] 2 All ER (Comm) 245 [39]. For shorthand I will refer to the applicable principle as the "Extended Fiona Trust Principle". This has been referred to as a principle that applies where both contracts are part of an "overall package" of agreements: *UBS v Nordbank* [2009] 1 CLC 934 at 956; *Etihad* at [69], [72]-[74] and [102]; *Am Trust Europe Ltd v Trust Risk Group* at [45], and *Sapinda* at [20].

31. The following six points can be made about the Extended Fiona Trust Principle:-

   (1) The principle is based on the construction of the relevant jurisdiction clause (which I will refer to as being contained in "Contract A"): it is not based on an implication or implied incorporation of the jurisdiction clause from Contract A into a related contract (henceforth known as "Contract B").

   (2) As a matter of contractual construction, the wording of the clause in Contract A must be fairly capable of applying to disputes in Contract B. For example, a clause

which stated that "any dispute under this contract shall be referred to arbitration" may not apply to disputes arising out of a (related) Contract B.

(3) It is not legally or commercially odd or improbable that an agreement should have no jurisdiction clause. Equally an agreement may have no jurisdiction clause *and* not be covered by a jurisdiction clause in a different agreement. This was confirmed in *Am Trust Europe Ltd v Trust Risk Group* at [46] (albeit in reference to *competing* jurisdiction agreements):

> "There is no presumption that a jurisdiction (or arbitration) agreement in contract A, even if expressed in wide language, was intended to capture disputes under contract B; the question is entirely one of construction".

However, the absence of any *competing* jurisdiction clauses in any agreements within a particular set of agreements concluded by the parties for the same purpose, at the same time, and with the same subject matter, can be a relevant consideration (*Etihad* at [102(v)]).

(4) This principle normally applies where the parties to Contract A and Contract B are the same. This arises from the fact that the Extended Fiona Trust Principle ultimately involves an exercise in contractual construction. One would normally expect the parties to Contract A to intend that their dispute resolution mechanism be binding upon the parties to Contract A rather than also applying to persons who were not party to that contract at all. Where the principle is applied to a situation in which the parties to Contract A and Contract B are different, then it is possible that the court may conclude that it was the Contract A parties' intention that third parties should be able to rely on Contract A (for example in a Himalaya clause situation), or the court might conclude that only the common parties between Contract A and Contract B are bound by the jurisdiction clause in Contract A. However, the latter is an inherently unattractive prospect, as it involves the fragmentation of disputes pursuant to the same agreement (Contract B) – possibly even disputes concerning the very same obligations. This is the very menace which it was assumed in Fiona Trust rational businessmen want to avoid (of course agreements which appear to have been deliberately and professionally drafted are to be given effect, even where this may result in a degree of fragmentation in the resolution of disputes: see Dicey, 15th Edition at 12-110).

The effect of Fiona Trust is that fragmentation of disputes under one agreement is unlikely to be what the parties intended. However, it is perfectly possible that there may be fragmentation of the resolution of disputes across several agreements (although whether this was the parties' intentions is to be considered when construing the contracts).

(5) The Extended Fiona Trust Principle normally applies where Contract A and Contract B are interdependent (Point (5a)), or have been concluded at the same time as part of a single package or transaction (Point (5b)), or (if concluded at different times) dealt with the same subject-matter (Point (5c)).

(6) A jurisdiction agreement in Contract A will generally apply to Contract B where that contract was entered into at the same or a similar time as Contract A. In this regard:

(a) In *Etihad* at [104], the judge noted that jurisdiction agreements in Contract A generally did not apply to a different agreement (Contract B) which had been concluded *prior to* the jurisdiction agreement coming into existence:

"Whilst it is not impossible for a jurisdiction agreement to have, on its true construction, such retrospective effect, a party seeking to rely upon a subsequently agreed jurisdiction agreement, in a separate contract, is likely to face an uphill struggle: see e.g. *Satyam*. One reason is that the earlier contract had an existence of its own, and hence an applicable law, prior to the conclusion of the subsequent agreements. If there was no jurisdiction agreement at the time it was concluded, then it may be difficult to conclude that it is to be found in a subsequent agreement, particularly if (as in *Choil*) the disputes arising under the later agreement are likely to have a very different character to disputes arising under the earlier agreement."

(b) Further, if Contract B was concluded prior to Contract A and the Contract A parties intended for the jurisdiction clause to deal with disputes under Contract B, one would normally expect Contract A to deal expressly with jurisdiction under Contract B. Quite apart from anything else the parties already know about Contract B's existence.

(c) If Contract A was concluded prior to Contract B, and a jurisdiction clause in Contract A was intended to cover Contract B, one might expect Contract B to cross-refer back to Contract A (albeit that ultimately what one is construing

for present purposes is Contract A and on normal principles of contractual construction it stands to be construed at the date on which it was entered into). It is also to be borne in mind that it may be more difficult to conclude that parties to a particular jurisdiction agreement intended for that agreement to apply to disputes arising out of contracts that have not been concluded yet, particularly if such future contracts are not being discussed as part of the same package of agreements, or if the future contracts are in fact separated by a significant period of time from the conclusion of the jurisdiction agreement.

32. Points (1) to (4) are an uncontroversial application of the principles applicable to contractual construction. Points (5) to (6) can be derived from the cases identified below.

33. In this regard, *Sapinda* engages Points (5a), (5b), (5c), and (6):

(1) In *Sapinda*, Altera exercised an option requiring Sapinda to buy back shares in RNTS ("the First Option Agreement" which contained an English jurisdiction clause). However, in breach of the First Option Agreement, Sapinda failed to buy the shares. The parties then entered into negotiations: On 26 August Sapinda agreed to buy some shares from Altera in an oral agreement ("the Sale Agreement"). As to the remaining shares, a written agreement on 31 August was entered into: Altera had the option to sell to Sapinda those remaining shares at a specific price ("the Second Option Agreement"). The latter contained a jurisdiction clause in favour of England. A jurisdiction challenge was brought in respect of the Sale Agreement.

(2) The jurisdiction clause stated that: *"The parties irrevocably agree that the courts of England have non- exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement or its subject matter or formation (including non-contractual disputes or claims)."* (*Sapinda* at [4]). Sir Michael Burton, sitting as a Deputy Judge of the High Court, concluded that the dispute concerning the Sale Agreement did fall within the scope of the written jurisdiction clause in the Second Option Agreement, at [20] and [22]:

> "It seems to me clear that the contractual claims for breach of the 26th August Agreement can be said to fall within the jurisdiction clause in 31st August Agreement. Do they arguably do so or at least sufficiently to show clear water

between the two arguments? I have already read into this judgment the material evidence:

(1)  The 26th August Agreement and the 31st August Agreement were discussed simultaneously, to that extent "in respect of the same package."

(2)  Both arose from the breach of the First Share Option Agreement, and the First Share Option Agreement remained in place until both agreements had been entered into.

(3)  The two agreements together deal with the balance of the shares remaining unsold under the breached First Share Option Agreement.

(4)  There is unchallenged evidence at para.28 of Mr. Rice's evidence to which I have referred that:

We made it clear that Altera's agreement to a second put option was conditional upon the purchase of the 1,360,631 Shares….

21. … It seems to me that in non-legal language what Mr. Rice was there saying is what was submitted by Mr. Hobson: namely, that the two agreements were interdependent."

(3) Point (4) applies: the parties to the Sale Agreement and the Second Option Agreement are the same.

(4) Point (5a) applies, by virtue of the finding in paragraph 21: the two agreements were interdependent and conditional upon one another. The interdependency in the two agreements is as follows: the Claimants agreed to delay payment for 5 million of the shares (by the Second Option Agreement), if the Defendant agreed to purchase just over 1 million shares in a total time-frame for a specific price. The Claimants' agreement to the Second Option was *conditional* on the Defendants' purchase of the 1 million shares.

(5) Points (5b) and (5c) apply: the subject-matter of both the Sale Agreement and the Second Option Agreement was dealing with the fallout from the breach of the First Option Agreement. Further, the Sale Agreement and the Second Option Agreement were both discussed at the same negotiations, and were concluded within a very short period of time, as part of the same "package" to prevent further breach of the First Share Option Agreement.

(6) As to Point (6): counsel for GPF referred to the fact that, here, the Second Option Agreement (the "Contract A") contained a jurisdiction clause which covered the *prior* Sale Agreement (the "Contract B"): the jurisdiction clause was to have a retrospective effect. However, in this case both agreements were discussed/negotiated at the same time, and were conditional on each other. This explains why the jurisdiction clause in the Contract A did not deal with the prior

Contract B: they were viewed by the parties as forming one "package" of arrangements. Further, disputes arising under the later agreement were likely to have a similar character to disputes arising under the earlier agreement (see *Etihad* at [104], above).

34. In *Emmott*, Points (4) and (5c) militated in favour of construing the Contract A jurisdiction clause as covering a dispute arising out of Contract B. Point (5b) did not arise, as the agreements were not discussed at the same time as part of the same package. In this regard:

   (1) In *Emmott*, the Defendant ("MWP") provided legal services in Kazakhstan, and Michael Wilson was its director and shareholder. By an agreement in 2001, the Claimant ("Emmott"), MWP and Mr. Wilson agreed that Emmott would join MWP as a director and shareholder: MWP and Emmott would operate as a quasi-partnership, and Emmott was entitled to 33% of the profit-sharing interest in MWP's earned fees. The 2001 Agreement was to be *"governed by and interpreted in accordance with the laws of England and Wales and all and any disputes shall be referred to and subject to arbitration in London":* this is the "Contract A". The claim concerned shares in Steppe Cement, which Emmott alleged were acquired by the MWP in lieu of fees owed to it. Emmott alleged that he and MWP entered into an oral agreement with Mr. Wilson made in February 2005 (the "Contract B"). The agreement reflected the fact that when Emmott joined MWP in 2002, part of the legal work which generated the fees in lieu of which the Steppe Shares were provided had already been done. He therefore claimed 27% of the Steppe Shares. Teare J concluded that the arbitral tribunal had jurisdiction in respect of the 2005 Agreement by virtue of the 2001 Agreement (at [45]).

   (2) As to Point (4): again, although this was not referred to by Teare J, it appears that the parties to the 2001 and 2005 Agreements were both the same (*Emmott* at [42]).

   (3) As to Point (5): the two agreements were *not* discussed at the same time (Point (5b)). However, the 2005 Agreement was, in reality, a variation of the 2001 Agreement, regarding Emmott's consideration for his participation in the partnership – the claim based on the 2005 Agreement arose out of the relationship between the claimant and defendant, which they entered into by reason of the

2001 Agreement (at [38]). The *explanation* for the transfer of the 27% of the Steppe Shares was Emmott's entitlement under the 2001 Agreement to a 33% profit-sharing interest in MWP (at [44]). Therefore, the contracts dealt with the same subject-matter (Point (5c)).

35. In *Etihad*, Points (4), (5) and (6) were engaged:

(1) In *Etihad*, Air Berlin claimed against Etihad in Germany for breach of a Comfort Letter (the "Contract B"). Etihad brought equivalent claims in declaratory relief in England, pursuant to which Air Berlin disputed jurisdiction. Etihad argued that a jurisdiction clause contained in a Facility Agreement (the "Contract A") concluded between the two parties which provided for the jurisdiction of the English Court should also encompass claims made under the Comfort Letter. The jurisdiction clause concerned *"any disputes arising out of or in connection with this agreement"*.

(2) Jacobs J reached the conclusion that the jurisdiction clause in the Facility Agreement should apply to claims brought pursuant to the Comfort Letter, setting out his conclusions at [69] and [102]:

> "[69] Drawing these threads together, I consider that the position is as follows:
> a) There is no reason in principle why the jurisdiction clause in the Facility Agreement should not extend to disputes arising in relation to the Comfort Letter.
> b) The Fiona Trust starting assumption is potentially applicable if it can properly be said (applying the good arguable case standard) that the Comfort Letter was part of a package of agreements which contained no competing jurisdiction clause.
> c) Ultimately, the question is whether (again applying the good arguable case standard), looking at the overall scheme of the agreements, the parties' intention, as revealed by the agreements reached between them, was that a dispute under the Comfort Letter falls within the jurisdiction clause in the Facility Agreement […]
> d) In ascertaining the parties' intention, it is relevant to consider the closeness of the connection between the Comfort Letter and the Facility Agreement.
> […]
> [102] I consider that these matters – (i) the width of the jurisdiction clause in the Facility Agreement, (ii) the fact that the Comfort Letter was part of the overall support package where all relevant agreements between Etihad and Air Berlin were governed by English law with English jurisdiction

clauses, (iii) the close connection between the Comfort Letter and the Facility Agreement in terms of the genesis of the Comfort Letter, (iv) Etihad's good arguable case that the Comfort Letter did not create contractually binding obligations and was ancillary to the Facility Agreement, (v) the absence of any competing jurisdiction clause in any of the agreements within the support package, and the existence of English law and jurisdiction clauses in the relevant agreements as part of that package, and (vi) the reasonable foreseeability of disputes which required consideration of the Comfort Letter in conjunction with the Facility Agreement – all lead to the conclusion that the parties intended disputes arising in relation to the Comfort Letter to fall within the jurisdiction clause of the Facility Agreement. I reach that conclusion whether or not the Fiona Trust starting point is applied. Since I consider that it should, in the present circumstances, be applied, that reinforces the conclusion which I have reached."

(3) Point (2) applied: Jacobs J considered the wording of the jurisdiction clause in the Facility Agreement to be particularly wide: [71].

(4) Point (3) applied, in that a relevant consideration was the fact that the "package" of contracts did not contain any "competing jurisdiction" clauses. However, this (a) presumes the existence of a package of agreements which were agreed at the same time and for the same purpose, and (b) was likely a means of distinguishing the case from the decision in *BNP Paribas v Trattamento Rifiuti* Metropolitani [2019] EWCA Civ 768, which did involve *"apparently competing jurisdiction clauses"* (*Etihad* at [68]).

(5) Point (4) applied: the parties to the Facility Agreement and the Comfort Letter were the same (although this was not mentioned by Jacobs J at [69] or [102]).

(6) Point (5) applied:

 (a) The agreements were concluded fairly closely together in time, were negotiated as part of the same "package" of providing Air Berlin with financial support (specifically, a loan), and concerned closely-related subject matters. This was express in the wording of the Comfort Letter (at [73]-[74]: with reference to *"Support package – commercial arrangement")*.

 (b) Although the obligations in the Comfort Letter and the Facility Agreement were not conditional on each other, there was still a degree of

interdependence between the two agreements for two reasons. Firstly, Etihad initially refused to supply a facility agreement to Air Berlin with a sufficiently large loan amount: the Comfort Letter was conceived as a direct response to this, and was part of the reason that Etihad agreed to the Facility Agreement (as part of a package of cash and non-cash support: [76]-[83]). Secondly, Etihad had a good arguable case that the Comfort Letter did not create legally binding obligations. This provided significant support for Etihad's proposition that the Comfort Letter should be viewed as "ancillary or linked to something else" [84]-[86].

(7) As to Point (6), reference has already been made to *Etihad* at [104]. The Comfort Letter was discussed and entered into at a similar time to the Facility Agreement.

B.1.2 The Second Issue

36. Even if the jurisdiction agreement in the Written Agreements applies to disputes arising out of the Oral Agreements as a matter of contractual interpretation, GPF would have to demonstrate that, under Article 23, the dispute had arisen in connection with the particular relationship giving rise to the agreement containing the jurisdiction clause.

**B.2 Application of the Law to the Facts**

37. I am satisfied that the jurisdiction clauses in the Written Agreements do not extend to cover the claims by the Claimants made pursuant to the Oral Agreements. In this regard GPF have not established that they have the better of the argument on the evidence before me. I will set out the relevant provisions of the four Written Agreements which GPF submits contain exclusive jurisdiction clauses in favour of Switzerland, followed by the Claimants' pleaded case on the Oral Agreements which formed the Tax Optimisation scheme, followed by my reasons for the conclusion I have reached.

B.2.1 The Written Agreements

38. It is helpful at this point to set out the relevant provisions of the four Written Agreements which GPF submits amount to exclusive jurisdiction clauses in favour of Switzerland. In this regard: -

(1) The 1996 Asset Management Agreement between GPF and Mr. Zahut provided, amongst other matters, as follows:-

> "Clause 1: An asset management and administration agreement is hereby established between [Mr. Zahut and GPF].
>
> Clause 2: On the basis of this agreement, the Principal assigns to GPF responsibility for the management of the above-indicated account(s) and grants GPF all powers to represent him with the designated bank(s) within the limits of the provisions of the ad hoc form(s)…
>
> Clause 8: This asset management agreement is subject to Swiss law. Jurisdiction is assigned to the courts of Geneva, and the parties elect domicile for that purpose and effect".

(2) The 2003 Fiduciary Agreement between GPF and Mr. Zahut provided, amongst other matters, as follows:

> "ARTICLE 1: The Mandatory holds the certificate of shares of said corporation in a fiduciary capacity on behalf of and for the account of the Mandator. The Mandatory will upon written request deliver said certificate of shares to the Mandator or to a person or persons designated by him.
> ARTICLE 2: The Mandatory shall exercise his best efforts to safeguard the interests of the Mandator and to exercise the various formalities necessary for the duration and good functioning of the corporation. The Mandator will contribute to this good functioning by communicating all information requested by the Mandatory
> ARTICLE 7: The present Fiduciary Agreement shall be governed by the Swiss law…parties agree all disputes which may arise between them concerning its [the 2003 Fiduciary Agreement's] interpretation, its execution or its inexecution will be submitted to the ordinary courts of the Canton of Geneva, subject to appeal to the Swiss Federal Court in Lausanne as provided by law".

(3) The 2003 Management Contract between GPF and Largely provided, amongst other matters, as follows:

> "Clause 1: By means of this document, a management and administration contract has been entered into between [Largely as Principal and GPF as Agent].
> Clause 2: By virtue of this contract, the Principal assigns to GPF management of the account (s) indicated above, and for these purposes gives it all authority to represent it vis a vis the designated banks, within the limits of the provisions of the ad hoc forms…
> Clause 9: This management contract is subject to Swiss law. The court forum with jurisdiction is assigned to Geneva, and to that end the parties elect domicile thereat under reserve of appeal to the Federal Court; the agent [GPF] however, has the latitude to enforce its rights before the natural court of the principal or before any other competent court".

(4) The 2012 Asset Management Contract between GPF and Largely provided, amongst other matters, as follows:

"Clause 1: The undersigned [Largely as Principal and GPF as the other party, acting as authorised management agent] have agreed to the following.

Clause 2 Purpose of the Agreement: On the basis of this agreement, the Principal grants GPF discretionary management agency to manage in its best interest, but at its risk and peril, the assets deposited in the account (s) at the bank(s) designated hereinabove, without the right of substitution, within the limits of the Directives on Asset Management Agreements of the Swiss Banking Association, and pursuant to the investment objectives defined and described …

Clause 10: This agreement is subject to Swiss law. Any dispute between the parties shall be subject to the sole and exclusive jurisdiction of the Courts of the Geneva Canton without prejudice to any possible appeal to the Federal Court; the Agent [i.e. GPF] nevertheless has the latitude to enforce its rights in the Principal's [i.e. Largely's] normal jurisdiction or before any other court with jurisdiction".

B.2.2 The Oral Agreements

39. In relation to the alleged Oral Agreements which the Claimants rely upon in their contractual claims against the Defendants, the Claimants plead as summarised below in their Draft Amended Particulars of Claim ("DAPOC").

40. In the first quarter of 2003, the Claimants allege that the earlier 1996 tax optimisation agreement was modified after Mr. Sasson gave some further advice to Mr. Zahut and Terre Neuve. The changes were twofold: firstly, REDS would transfer the monies paid to it by Terre Neuve, less 3% commission to a new Panamanian company set up by GPF, and/or Mr. Sasson, and/or Meyer El Maleh ("the Transfer Operation"). Secondly, the new Panamanian company would be set up, and would be beneficially owned by Mr. Zahut as sole shareholder, though managed and controlled by GPF and/or Mr. Sasson and/or Meyer El Maleh in his interests. These constitute "the 2003 Arrangements" (set out at [31] DAPOC).

(1) The Claimants allege that Mr Zahut, Terre Neuve, GPF, and REDS all entered into a series of agreements in order to implement certain aspects of these arrangements ("The 2003 Agreements"):

(a) The 2003 GPF Agreement (as defined at [32]-[33] DAPOC). This Agreement was allegedly between Mr. Zahut, Terre Neuve and GPF. GPF allegedly undertook that:

(i) it would manage REDS in its operation of the 2003 Arrangements and procure that REDS issued the correct invoices in respect of Mr. Zahut's work on the basis of information provided by Mr. Zahut; REDS would ensure the safe receipt of monies accordingly paid to it by Terre Neuve, and would then transfer the monies, less the 3% commission, to the new company to be set up by Mr. Sasson and/or GPF and for the ultimate benefit of Mr. Sasson.

(ii) GPF would set up, manage and control in the interest of Mr. Zahut a new company in Panama beneficially owned by Mr. Zahut as sole shareholder.

(b) Further or alternatively, the Claimants alleged the existence of The 2003 REDS Agreement (as defined at [33.2] DAPOC). This was allegedly entered into between Mr. Zahut, Terre Neuve and REDS. Under this agreement, REDS undertook to perform the same obligations as set out above at (a)(i) in relation to the 2003 GPF Agreement.

(2) Further or alternatively, if Mr. Zahut and/or Terre Neuve did *not* enter into the 2003 REDS Agreement, the Claimants plead the 2003 REDS Agency Agreement (set out at [34.1] DAPOC). This was allegedly entered into between REDS and GPF. This agreement provided that REDS must issue the invoices to Terre Neuve, ensure safe receipt of the monies paid by Terre Neuve and transmit those monies, save for the commission fee, to the new company to be set up by Mr. Sasson and/or GPF for the ultimate benefit of Mr. Zahut. This is essentially the same substantive obligation as the 2003 REDS Agreement, but with different contracting parties. Mr. Zahut and Terre Neuve claim to be third party beneficiaries of this agreement, with the right to compel performance of this agreement under Swiss Law.

(3) Largely was the company that was set up pursuant to the 2003 Arrangements. As a matter of Swiss and/or French Law, Claimants contend that Largely became a

third-party beneficiary or a third party, to whom performance of the 2003 Agreements and/or the 2003 REDS Agency Agreement was due.

41. In 2008, the tax optimisation arrangements were allegedly modified. REDS would invoice Terre Neuve as before, but the invoices would direct payment to be made to Yewdale, a UK Company. Terre Neuve would pay Yewdale; Yewdale would then remit the monies to REDS, which would then transfer those monies (save 3% commission) to Largely ("the 2008 Arrangements"). The 2008 Arrangements were allegedly implemented via the following Agreements ("the 2008 Agreements"): -

   (1) The 2008 GPF Agreement (set out at [49.1] DAPOC). This was allegedly entered into between Mr Zahut, Terre Neuve and GPF. The gravamen of this agreement was that GPF undertook to manage REDS and Yewdale and procure in its operation of the 2008 Arrangements, and ensure that they correctly implemented those new arrangements.

   (2) The 2008 REDS Agreement (set out at [49.2] DAPOC). Further or alternatively, the Claimants allege that this agreement was entered into between Mr. Zahut, Terre Neuve and REDS. The gravamen of this agreement was that REDS undertook to perform its part of the new arrangements.

   (3) The Yewdale Agreement (set out at [49.3] DAPOC). Further or alternatively, the Claimants allege that this agreement was entered into between Mr. Zahut, Terre Neuve and Yewdale. The gravamen of the agreement was that Terre Neuve and Yewdale undertook to perform their part of the new arrangements.

   (4) Further, if Mr. Zahut and/or Terre Neuve did not enter into the 2008 REDS Agreement, the Claimants plead the 2008 REDS Agency Agreement (set out at [50.1] DAPOC). This agreement was allegedly entered into between REDS and GPF, in which REDS undertook to perform its part of new arrangements.

   (5) Further or alternatively, the Claimants plead the Yewdale Agency Agreement, purportedly entered into between GPF, REDS and Yewdale, which provided that Yewdale should perform its part of the new arrangements.

(6) The Claimants claim that as a matter of Swiss and/or French law, Largely was a third-party beneficiary or a third party to which performance of the 2008 Agreements and/or the 2008 Agency Agreements was due.

42. I note that that none of these Oral Agreements refer to the Written Agreements. The 2003 GPF Agreement provides for the setting up of what would become Largely, and that GPF should manage and control this company in the ultimate beneficial interest of Mr. Zahut.

43. The Claimants plead that, as a result of the dissipation and/or misappropriation of the monies paid by Terre Neuve to Yewdale, GPF, REDS and/or Yewdale failed to discharge their obligations under the 2003 Agreements, the 2003 REDS Agency Agreement, the 2008 Agreements and/or the 2008 Agency Agreements ([121] DAPOC for Swiss Law, and [148] DAPOC for French Law). I will refer to all these agreements as "the Oral Agreements". The Claimants' further claims in tort, breach of fiduciary duty and unjust enrichment in relation to the misappropriation of monies ([130], [135], and [140] DAPOC respectively). It is said that this misappropriation was done *in breach of* these Oral Agreements.

B.2.3 Conclusions

44. I am satisfied that the Claimants' claims do not fall within the scope of any of the aforementioned jurisdiction clauses in the Written Agreements. GPF clearly does not have a good arguable case/the better of the argument in this regard. This is for the following reasons (each of which I will identify and then address in more detail below):-

(1) The parties to the Written Agreements are different from the parties to the Oral Agreements (in relation to Point (4) of the Extended Fiona Trust Principle).

(2) The Written Agreements did not form part of the same package as the tax optimisation scheme, the subject-matter is not similar, and there is little interdependency between them (in relation to Point (5) of the Extended Fiona Trust Principle).

(3) There are difficulties in construing the 2012 Written Agreement as containing a jurisdiction clause that applies to the earlier oral agreements, and the 2003 Fiduciary Agreement does not contain obligations with a sufficiently broad scope to be relevant to issues arising under the Written Agreements.

(4) The fact that the Claimants rely on the Swiss law clauses in the Written Agreements in order to establish that Swiss law governs the Oral Agreements does not mean that the jurisdiction clauses in the Written Agreements also apply to the Oral Agreements.

45. I set out my detailed reasons in relation to each of those four factors below. I consider that two factors are of particular (and ultimately decisive) importance. Firstly, the Written Agreements and Oral Agreements have a different subject-matter, in that the Written Agreements mostly concern the management of monies or assets *already held* by Largely, whereas the Claimants' claims are all concerned with the misappropriation of monies which *should have been transferred to Largely*, but which were not. Secondly, the parties to the Written Agreements were also not the same parties as those to the Oral Agreements.

### *(i) Different Parties to the Written Agreements, and the Oral Agreements*

46. None of the Oral Agreements relied upon in support of the Claimants' pleaded claims have precisely the same parties as the parties to the Written Agreements which contain the jurisdiction clauses. GPF clearly does not have a good arguable case / the better of the argument in relation to this. In this regard:

(1) The purported Oral Agreements are between a variety of parties:

(a) The 2003 Agreements were entered into between Mr. Zahut and Terre Neuve on the one hand, and GPF and/or REDS on the other hand ([32] of the DAPOC). The 2003 GPF Agreement is alleged to have been entered into between Mr. Zahut, Terre Neuve and GPF. Further or alternatively, the Claimants plead that Mr. Zahut, Terre Neuve and REDS entered into the 2003 REDS Agreement, or that REDS and GPF entered into the 2003 REDS

Agency Agreement (pursuant to which Mr. Zahut and Terre Neuve claim to be third party beneficiaries and/or parties to whom performance of that agreement was due).

(b) The 2008 Agreements were again entered into by Mr. Zahut and Terre Neuve on the one hand, and GPF and/or REDS on the other hand ([48] DAPOC). The 2008 GPF Agreement is alleged to be between Mr. Zahut, Terre Neuve and GPF. Further or alternatively, the Claimants plead that there was a 2008 REDS Agreement, entered into between Mr. Zahut, Terre Neuve and REDS, or that the 2008 REDS Agency Agreement was entered into between REDS and GPF, or that the Yewdale Agency Agreement was entered into between Yewdale, REDS and GPF.

(2) Each of the 2003 and 2008 Oral Agreements involve one or more parties *additional* to Mr. Zahut and GPF, or Mr. Zahut and Largely. Further, in some cases, neither Mr. Zahut, nor Terre Neuve, nor Largely are parties to the alleged agreements (though they claim to be entitled to enforce those agreements by virtue of being third party beneficiaries under Swiss Law) – e.g.: the 2003 REDS Agency Agreement, the 2008 REDS Agency Agreement, and the Yewdale Agency Agreement.

(3) I do not consider that the jurisdiction clauses located in the Written Agreements (to which only Mr. Zahut/Largely and GPF are parties) extend to cover disputes which arise from the Oral Agreements and which contain additional parties:

(a) A person who is *not party* to a jurisdiction agreement is not bound by that agreement: therefore, the jurisdiction clauses in the Written Agreements cannot apply to disputes between Terre Neuve (which is party to none of the Written Agreements) and GPF. GPF accepts this, and has not sought to challenge the jurisdiction of Terre Neuve.

(b) It is conceptually possible that the jurisdiction clauses could apply to some parties but not others to the Oral Agreements. GPF submits that this analysis does not disturb the position of non-parties to the Written Agreements. They

accept that there would be some fragmentation of disputes arising from the same contract, but argue that this is the natural outcome of what the parties have agreed, and that I should not take into account whether all the parties to the Oral Agreements are also parties to the Written Agreements: rather I should only consider whether the dispute is sufficiently closely connected with the jurisdiction agreement.

(c) I find GPF's submissions unconvincing. They involve the fragmentation of disputes brought pursuant to the same agreement, and in this case disputes which concern the very same obligations. For example, Terre Neuve alleges that GPF breached the 2008 GPF Agreement by the misappropriation of monies paid by Terre Neuve to Yewdale; Mr. Zahut alleges that GPF breached the very same obligations. Such fragmentation is unattractive and unlikely to represent the common intention of the parties (for the reasons that I have already identified). This is not, as GPF argued, a type of *forum non conveniens* point - this potential fragmentation is part of the factual matrix against which I must construe the Written Agreements, and I am satisfied directly engages the very menace that the presumption in *Fiona Trust* seeks to avoid.

(4) Further, the Claimants bring some of their claims not as direct parties to the Oral Agreements, but as third-party beneficiaries under Swiss law:

(a) Certain of the Oral Agreements (the 2008 REDS Agency Agreement, the Yewdale Agency Agreement, and the 2003 REDS Agency Agreement) do not have Mr. Zahut as a party at all: instead, he seeks to enforce them as a third party beneficiary and/or a party to whom performance of that agreement was due, and who was intended to have the right to compel such performance. Further, Largely is not a party to any of the Oral Agreements, and seeks to recover pursuant to them on the same grounds.

(b) It is difficult to see how the parties to the Written Agreements could have intended the jurisdiction clauses therein to apply to disputes arising out of agreements that they themselves did not enter into, but which they could

enforce as third party beneficiaries, as long as at least one of the named parties happened to be parties to the Written Agreements.

(5) None of the Extended Fiona Trust Principle cases concerned disputes in which the parties to Contract A (which contained the jurisdiction agreement) were different from the parties to Contract B (a point which was accepted by GPF in oral submissions). As already identified, whilst it is conceptually possible for parties to agree that a jurisdiction clause extends to disputes between them under a separate agreement to which others are also party, clear words would need to be used (not least due to the potential fragmentation of disputes that such a construction could result in).

### *(ii) Different Subject-Matter and not part of the same package*

47. I am satisfied that the Written Agreements were not a necessary or integral part of, and did not form a single package with, the Oral Agreements. GPF clearly does not have a good arguable case / the better of the argument on the point. In this regard:

48. Firstly, the Claimants' pleaded case does not allege that the Written Agreements formed part of the tax optimisation scheme. The tax optimisation scheme itself is referred to as "the 1996 Arrangements", "the 2003 Arrangements", and "the 2008 Arrangements" in the DAPOC. The 2003 Oral Agreements and the 2008 Oral Agreements are all pleaded as implementing their respective Arrangements ([31]-[36] and [47]-[51] DAPOC). By contrast, each of the Written Agreements are pleaded separately from the main tax optimisation Arrangements. They are pleaded in this way to set out the background of contractual dealing between the parties, and in order later to be relied upon in the context of the Claimants' plea as to Swiss law (see below at [57]). In *Etihad*, an important reason as to why the Facility Agreement and the Comfort Letter were found to be part of the "same support package" was that Air Berlin had described them in similar terms in their pleadings in the German proceedings (*Etihad* at [74]).

49. Secondly, and crucially in my view, I am satisfied that the Written Agreements have a different subject-matter to the Oral Agreements, and exist independently of the Oral Agreements.

(1) The Written Agreements are all concerned with the management of Largely's assets and/or shares: the 1996 Asset Management Agreement concerned the management by GPF of a bank account held by Mr. Zahut. The 2003 Fiduciary Agreement concerned GPF's trusteeship of its shares in Largely on behalf of Mr. Zahut. The 2003 Asset Management Agreement assigned to GPF the management of Largely's bank accounts; and the 2012 Asset Management Agreement concerned GPF's management of assets deposited in Largely's bank accounts.

(2) The cornerstone of the tax optimisation scheme was the establishment of the flow of money from Terre Neuve to Yewdale to REDS and to Largely, in such a way that minimised Mr. Zahut's tax liability. The management of Largely's assets and/or shares was not necessary or integral to securing a tax advantage. By contrast, *Sapinda* was concerned with two agreements which covered the same subject-matter (the sale of certain shares in order to remedy Sapinda's earlier breach of an option agreement). *Etihad* was concerned with a Comfort Letter and a Facility Agreement, both of which related to Etihad's purported commitment to provide financial support to allow Air Berlin to meet certain financial obligations).

(3) The 2003 GPF Agreement allegedly provides for GPF to undertake to set up, manage and control in the interest of Mr. Zahut, a company that would receive the monies transferred by REDS, which would be beneficially owned by Mr. Zahut as a shareholder: this company became Largely. This may have some cross-over in terms of subject matter with the Written Agreements: specifically, the 2003 Fiduciary Agreement (the obligation on GPF to hold Largely's certificate of shares "in a fiduciary capacity on behalf of and for the account of Mr. Zahut"). However, this is only one part of the 2003 GPF Agreement. A relevant comparison is *Michael Wilson v Emmott*: in that case, the jurisdiction clause was contained in the 2001 Contract (which was wide-ranging), and was applied to the 2005 Contract (which was narrower, and its narrow subject-matter was encompassed by the subject-matter of the 2001 Contract). Here, the 2003 Fiduciary Agreement is narrower, and any cross-over in subject-matter is encompassed by the 2003 Oral Agreements collectively, and the 2003 GPF Agreement in particular. Construing the 2003 Oral Agreements as governed by a

jurisdiction clause in the 2003 Fiduciary Agreement would be to "allow the tail to wag the dog".

(4) The Written and Oral Agreements have different sets of reward mechanisms. In the Oral Agreements, REDS took 3% commission. By contrast, the 2003 Fiduciary Agreement had an annual fee of US$500 and reimbursement of expenses (under Article 3 thereof), and the Asset Management Agreements had remuneration fixed by reference to a percentage of the value of the assets under management and/or a fee based on the value or volume of transactions.

(5) Further, the Written Agreements were not interdependent with the Oral Agreements in the same way as in *Sapinda* and *Etihad*.

 (a) In *Sapinda*, there was Contract A (the 31 August Agreement) and Contract B (the 26 August Agreement). Entry into Contract A was conditional upon the parties earlier having entered into Contract B. By contrast, in the present case, it was not a *condition* of entry into the Oral Agreements that the Written Agreements should be entered into, or vice versa.

 (b) In *Etihad*, there was a good arguable case that the Comfort Letter (the "Contract B") was not a legally binding agreement: therefore, it was necessarily ancillary to the Facility Agreement. By contrast, in the present case, the Oral Agreements and the Written Agreements each have a separate legal existence of their own.

 (c) Whilst the Written Agreements probably would not have been entered into, but for the existence of the tax optimisation scheme set out in the Oral Agreements (as it appears that Largely was set up entirely to hold the proceeds of the tax-optimised transfers from Yewdale), this does not mean that the Written Agreements and the Oral Agreements are "interdependent" for the purposes of the principles applied in *Etihad* or *Sapinda* - the Written Agreements did not *have* to be entered into in order to secure the Oral Agreements.

(6) An additional argument of GPF is that the scope of the 2003 Fiduciary Agreement is broader than the other Written Agreements by virtue of Article 3: "*The*

*Mandatory [GPF] shall exercise his best efforts to safeguard the interests of the Mandator [Mr. Zahut] and to exercise the various formalities necessary for the duration and good functioning of the corporation".* GPF submits that this expands the matters covered by the jurisdiction clause. I address the submission in due course below – but in short, I am satisfied that this wording does not expand the subject matter of the agreement itself or the breadth of matters subject to the jurisdiction clause.

50. Thirdly, and more specifically, I am satisfied that the Written Agreements <u>have a different subject-matter to the obligations which the Claimants allege that the Defendants have breached</u> under the Oral Agreements:

    (1) I agree with the fundamental characterisation of the Claimants' claims as set out by Christopher Hancock QC in the May 2019 Judgment at [12]:

    > "The claim therefore relates to the €10,627,669 paid by Terre Neuve to Yewdale between 2009 and 2012. That money, less the 3% commission, should have been transferred from Yewdale to REDS and on to Largely. Of that money, US$137,288.80 was transferred from Yewdale to Largely; no money was transferred by REDS to Largely after April 2008. The Claimants' case is that this money was misappropriated with the involvement of and/or to the benefit of the various Defendants."

    (2) By contrast, the Written Agreements (as set out above) all concern what happened to the monies *after they had been transferred* by Yewdale for the benefit of Mr. Zahut. This distinguishes the present case from *Emmott*. In that case, the counterclaim in question arose out of the relationship between Mr. Emmott and MWP, into which they entered by reason of the 2001 Agreement (at [38]). The counterclaim was for Mr. Emmott to recover 27% of the Steppe Shares. The reason that Mr. Wilson was willing to agree that Mr. Emmott should have 27% of the Steppe Shares is because Mr. Emmott was entitled to a 33% profit sharing interest in MWP under the 2001 Agreement. Therefore, Mr. Emmott's claim arose substantially out of the 2001 Agreement: the 2005 Agreement was analogous to a variation of the relevant term of the 2001 Agreement. By contrast, the Written Agreements do not deal with the transfer of monies to Yewdale at all, but only with the management of monies in Largely.

51. Fourthly, the Written Agreements were <u>not intended to form part of the same "package"</u> <u>of measures</u> as the Oral Agreements for the purposes of the principles identified in *Etihad* and *Sapinda*.

    (1) For the reasons set out above, the subject-matter of the Written Agreements and the Oral Agreements is very different, and as such it would be inappropriate to characterise them as part of the same "package" of measures.

    (2) The Written Agreements and Oral Agreements were not (on the evidence before me) all "discussed simultaneously". The 2003 Oral Agreements were alleged to have been concluded in the first quarter of 2003. The 2003 Fiduciary Agreement and 2003 Management Contract were not concluded until 16 and 21 July 2003 respectively. There is no evidence before me that the Fiduciary Agreement, Asset Management Contracts, and the Oral Agreements were at any point discussed together in the same negotiation. Moreover, the 2012 Asset Management Agreement was concluded long after the 2008 Oral Agreements were entered into. This distinguishes the present case from *Sapinda* and *Etihad*, in which the two contracts were discussed in negotiations at the same time: in both of those cases, this fact was treated as an important indication in favour of the two contracts being part of the "same package" (*Sapinda* at [20] and *Etihad* at [75]-[83] and [102]).

    (3) There is no reference in the Written Agreements themselves to tax or tax optimisation, or to any of the processes by which the money would be transferred.

### *(iii) Scope of the wording of the Jurisdiction Agreements*

52. I also do not consider that the jurisdiction clauses in the Written Agreements are sufficiently widely worded to extend to the oral and conduct-based agreements relied upon in the Particulars of Claim. GPF clearly does not have a good arguable case / the better of the argument on this. This is for four reasons:

53. Firstly, there is a temporal disparity between the conclusion of the Written Agreements and the Oral Agreements, which renders it inherently unlikely that jurisdiction clauses in

the Written Agreements are intended to extend to the subject matter of the Oral Agreements. In this regard:

(1) As to the 2003 Written Agreements and the 2008 Oral Agreements it is inherently unlikely that a 2003 jurisdiction clause was intended, as at the time of entering into the 2003 Written Agreements, to extend to oral agreements (with different subject matter) that might be entered into many years in the future (in fact 5 years later). Whilst in *Emmott*, a prior jurisdiction clause in the 2001 Agreement was found to extend to the later 2005 Agreement, in that case there was a complete overlap of subject-matter of the 2005 Agreement with the terms of the 2001 Agreement, which was a comprehensive agreement intended to govern the partnership relationship between the parties. However, in the present case, the 2003 Fiduciary Agreement and the 2003 Asset Management Agreements do not overlap in subject-matter with the 2008 or the 2003 Oral Agreements, and the 2003 Written Agreements are not a comprehensive agreement intended to govern the relationship between the parties, for the reasons that have already been identified.  The 2008 Oral Agreements cannot properly be characterised as variations of the 2003 Written Agreements. They could be characterised as variations of the 2003 Oral Agreements, but for the reasons that have already been identified, disputes arising out of the 2003 Oral Agreements were also not governed by jurisdiction clauses in the Written Agreements.

(2) As to the 1996 Written Agreement, the claims in this case relate to the misappropriation of monies transferred from the Claimants between 2009 and 2012 – it is inherently unlikely that such were intended to be covered by an agreement about the management of an account which had ceased to be involved in the parties' arrangements six years earlier.

(3) The converse point applies in relation to the jurisdiction clause in the 2012 Asset Management Agreement. That agreement is said to apply retrospectively to the 2008 and 2003 Oral Agreements. In *Etihad*, Jacobs J found that a party seeking to rely upon a *subsequently agreed* jurisdiction agreement in a separate contract is likely to face an "uphill struggle" (at [104]). Further, if the parties had intended the jurisdiction clause to apply to an existing contract, one would normally expect the jurisdiction clause to expressly deal with its application to that earlier contract.

54. Secondly, as to the 2003 and 2012 Asset Management Agreements: they granted to GPF a mandate to manage Largely's bank accounts and for those purposes gave GPF authority to represent Largely vis-à-vis the designated banks. The claims made in these proceedings are about monies which never reached Largely's bank accounts, not the management of monies within those accounts. Clause 10 of the 2012 Asset Management Agreement provides that *"Any dispute between the parties shall be subject to the sole and exclusive jurisdiction of the Courts of the Geneva Canton"*. This does not mean that any dispute arising from the parties' asset management relationship falls under Clause 10. This clause must be read in the context of the rest of the Agreement, which only relates to the management of assets deposited in Largely's bank accounts, and as such Clause 10 is to be construed as limited to that subject matter.

55. Thirdly, as to the 2003 Fiduciary Agreement:-

   (1)  This agreement relates to the trusteeship of the shares in Largely, which GPF was to hold in a fiduciary capacity on behalf of and for the account of Mr Zahut. The Claimants' claims have nothing to do with the shares in Largely, so do not fall within the scope of the jurisdiction clause, which only concerns the *"interpretation… execution… or inexecution"* of the 2003 Fiduciary Agreement.

   (2) GPF argued that the 2003 Fiduciary Agreement ought to be given a broad scope by virtue of Article 3, which provides that *"The Mandatory [GPF] shall exercise his best efforts to safeguard the interests of the Mandator [Mr. Zahut] and to exercise the various formalities necessary for the duration and good functioning of the corporation"*. However, this obligation is clearly directed at, and restricted to, the scope of the Agreement. In this regard: -

      (a) The Clause must be read as part of the subject-matter of the whole agreement. The Fiduciary Agreement's purpose is for GPF to hold shares in Largely on behalf of Mr. Zahut: it is not related to the transfer of monies pursuant to the tax optimisation scheme.

      (b) In any event, Article 3 expressly relates to the "good functioning" of Largely.

(c) Under Article 398 Swiss Code of Obligations ("SCO"), a contractual agent always has a duty *"at all times to look after and safeguard the interests of"* its principal. In those circumstances it cannot realistically be argued that in every Swiss law contract that expressly included such a term, the intention is to create a general obligation extending beyond the subject-matter of the agreement.

56. Fourthly, as to the 1996 Asset Management Agreement: this relates to GPF's management of the Discount Bank & Trust account (no. 140631), into which the monies that had been paid by Terre Neuve in the period 1996 to 2003 were supposed to be transferred (before Largely was formed). Clause 8 provides that *"This asset management agreement is subject to Swiss law"*, followed by *"jurisdiction is assigned to the courts of Geneva"* (emphasis added). It is implicit in the placement of the jurisdiction agreement after the choice of law agreement that the assignment of jurisdiction also relates only to the management agreement itself.

### *(iv) Use of Written Agreements in pleadings to establish Swiss Law*

57. GPF contends that the Claimants' reliance upon the Written Agreements in the context of its plea that the Oral Agreements are governed by Swiss law amounts to a recognition that the jurisdiction provisions of the Written Agreements are engaged. Such contention does not bear examination, and it is clear that GPF does not have a good arguable case / the better of the argument in this regard. This is for the following reasons:

(1) The Claimants contend in their Particulars of Claim that Swiss Law governs the Claimants' claims for breach of contract, pursuant to Articles 3 and 4 of the Rome Convention. At the hearing, they confirmed that they would no longer be pursuing the Article 3 ground. The Rome Convention (and not the Rome I Regulation) is referred to because the Oral Agreements were entered into before 17 December 2009. These references are included in support of a conclusion that Swiss law is the law applicable to oral agreements (which do not have choice of law clauses). The Defendants submit that in such circumstances regard must also be had to the jurisdiction clauses.

(2) However, the fact that the Claimants rely on the Written Agreements in the context of identifying the law applicable to other agreements, does not mean that disputes arising out of those other agreements are governed by jurisdiction clauses in the Written Agreements. The Claimants argue that those oral contracts are closely connected to Switzerland, by virtue of the existence of the Written Agreements (Article 4 Rome Convention). In this regard every contract must have a governing/applicable law. In contrast (and as already noted) there is no necessity for a jurisdiction clause; jurisdiction clauses are often not provided for, and it does not follow from the fact that a particular law is applicable (or is set out in the Written Agreements) that the jurisdiction clause in such agreements applies to disputes under the Oral Agreements.  Further, the "closeness of connection" test in Article 4 is not a matter of contractual construction, it is an application of the conflict of laws rules in the Rome Convention.  This does not mean that the Written Agreements are part of the same transaction or package as the Oral Agreements, still less that disputes arising under the Oral Agreements fall within the jurisdiction clauses in the Written Agreements simply by virtue of the fact that both are governed by Swiss law, and the Swiss law provisions of the Written Agreements are prayed in aid when addressing the law applicable to the Oral Agreements. I have already noted that it is not alleged by GPF that the jurisdiction provisions in the Written Agreements are to be implied into the Oral Agreements (not least, no doubt, because the requirements for the implication of such terms are not met, there being no necessity for any such term).

(3) Ultimately, and in any event, GPF's point is in reality no more than a forensic one. It is for the Court to determine whether or not the Oral Agreements are governed by Swiss law, and whether these claims fall within the jurisdiction clauses in the Written Agreements. How the Claimants have advanced matters, and what they chose to rely upon, is not determinative in that regard. I am satisfied that the claims do not fall within the jurisdiction clauses.

### (iv) *Tortious/Restitutionary/Breach of Fiduciary Duty Claims*

58. In the above circumstances, and for the above reasons, I have concluded that the contractual claims under the Oral Agreements are not subject to the jurisdiction clauses in

the written agreements. I am equally satisfied that the tortious claims advanced are also not subject to the jurisdiction clauses. In this regard: -

(1) In tort, the claims are (a) on the basis that GPF has committed various unlawful acts that caused damage to the Claimants in misappropriating the monies that should have been (but were not) paid to Largely ([92.1] and [130] of the DAPOC) and (b) on account of GPF's responsibility for its governing officers' and employees' involvement in such wrongdoing ([131] of the DAPOC).

(2) In unjust enrichment and under the Swiss law principle of agency without authority, the claims are on the basis that GPF was paid certain sums of money from Yewdale (paras. [142]-[145] of the DAPOC, in particular [142.3]) – again, that relates to money that was not paid to Largely.

For the same reasons as in relation to the contractual claims, I am satisfied that the tortious claims are not subject to the jurisdiction clauses in favour of Switzerland.

### *(v) Article 23 and Exclusivity of Jurisdiction Agreements*

59. As I have concluded that the disputes do not fall within the scope of the jurisdiction agreements it is not necessary to consider whether the claims fulfil the Article 23 Lugano Convention requirement that the dispute in this case must arise in connection with the particular legal relationship with which the agreement containing the clause is concerned. However, for completeness, I am satisfied that the subject-matter of the dispute does not arise in connection with the particular legal relationship arising out of the Written Agreements, and for the same reasons as set out above when considering the scope of the jurisdiction agreements.

60. In the above circumstances it is also not necessary to consider whether the jurisdiction agreements were exclusive in nature.

61. Accordingly, GPF's jurisdictional challenge based on Article 23 of the Lugano Convention, fails, and is dismissed.

**C. The Fourth, Sixth, Seventh and Tenth Defendants' Application**

62. The Fourth, Sixth, Seventh and Tenth Defendants (collectively the Campbell Co-Defendants), who the Claimants allege were involved in and/or benefitted from the misappropriation, challenge the jurisdiction of the English Court on various grounds, inter alia; that the claims against them are not sufficiently closely connected to be heard with the claims against the other Defendants in this jurisdiction, pursuant to Article 6(1) of the Lugano Convention, and should instead be tried in Switzerland pursuant to Article 2 of the Lugano Convention; that the claims against them would be more conveniently heard in Switzerland; that bringing proceedings against them in England is an abuse of process; that they should be tried in Switzerland pursuant to Article 5 of the Lugano Convention; that proceedings against them in England are a breach of their rights under Article 6 of the European Convention of Human Rights ("ECHR"); and that various agreements contain jurisdiction clauses which prevent the English Court from hearing the case against them. I will first identify the applicable principles before addressing each contention in turn.

**C.1 Applicable Principles**

63. The relevant international convention applicable to the Campbell Co-Defendants is the Lugano Convention 2007, which provides in relevant respects as follows:

> "Article 1
> (2) The Convention shall not apply to:… (d) arbitration
> Article 2
> 1.  Subject to the provisions of this Convention, persons domiciled in a State bound by this Convention shall, whatever their nationality, be sued in the courts of that State…
> Article 3
> 1.  Persons domiciled in a State bound by this Convention may be sued in the courts of another State bound by this Convention only by virtue of the rules set out in Sections 2 to 7 of this Title.
>
> …
>
> Article 5
> A person domiciled in a Contracting State may, in another Contracting State, be sued:
> 1. in matters relating to a contract, in the courts for the place of performance of the obligation in question; in matters relating to individual contracts of employment, this place is that where the employee habitually carries out his work, or if the employee does not habitually carry out his work in any one country, this place shall be the place of business through which he was engaged;

2. in matters relating to maintenance, in the courts for the place where the maintenance creditor is domiciled or habitually resident or, if the matter is ancillary to proceedings concerning the status of a person, in the court which, according to its own law, has jurisdiction to entertain those proceedings, unless that jurisdiction is based solely on the nationality of one of the parties;

3. in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred;

4. as regards a civil claim for damages or restitution which is based on an act giving rise to criminal proceedings, in the court seised of those proceedings, to the extent that that court has jurisdiction under its own law to entertain civil proceedings;

Article 6
A person domiciled in a State bound by this Convention may also be sued:
1. Where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.
…
Article 23
[set out above in relation to GPF's Application]"

64. I bear in mind a number of points in relation to the application of the Lugano Convention:-

(1) Exceptions to Article 2 are to be construed restrictively (see *Melzer v MF Global UK Ltd* (C-228/11), in the context of the Brussels I Regulation).

(2) In order for a foreign defendant to be brought in under Article 6(1), there must be: (a) a claim against an anchor defendant over which the English Court has jurisdiction due to its domicile; (b) which is so closely connected to the claim(s) against the foreign defendant and (c) it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

(3) Previously there was arguably inconsistent CJEU jurisprudence as to whether Article 6(1) can be utilised to bring in further defendants where an action against the anchor defendant was brought solely with the object of ousting the jurisdiction of the courts of the State in which the defendant was domiciled: *Kalfelis v Schröder* and *Freeport Plc v Arnoldsson* Case C–98/06 [2007] E.C.R. I–839. However, more recently, a majority in the Court of Appeal in *PJSC Commercial Bank Privatbank v Kolomoisky* [2019] EWCA Civ 1708 ("PJSC"), held at [6] and

[102]-[111] that a claimant with a sustainable claim against an Anchor Defendant, which it intended to pursue to judgment in proceedings to which a foreign defendant was joined as a co-defendant, was entitled to rely on Article 6(1) of the Lugano Convention, even where the claimant's sole object in issuing the proceedings against the anchor defendant was to sue the foreign defendant in the same proceedings.

(4) Nothing short of fraud or collusion between the claimant and the anchor defendant improperly to subvert Article 2 (or another principle of the Brussels I Regulation) would be sufficient to engage the abuse of law principle in relation to Article 6(1) (*PJSC* at [94], quoting Lord Briggs in *Vedanta*): -

> "[94] Having referred to *Freeport* and *Cartel Damage* and to the Opinion of the Advocate General in the latter case where he stated the sole object test, Lord Briggs said at [34]:
>
> "In its judgment, the Court of Justice [in *Cartel Damage*] expressly affirmed that opinion in para 27, adding at para 33 that in the context of cartel cases nothing short of collusion between the claimant and the anchor defendant would be sufficient to engage the abuse of law principle…
>
> [108] Fifth, we regard the CJEU's decision in *Cartel Damage* as rejecting a general sole object test but subjecting reliance on article 6(1) to the principle of abuse of law in cases of artificial fulfilment of the close connection condition. In general, all rights under EU law are subject to this principle and there is no reason to exclude article 6(1). It is noteworthy that the example given by the Court is a collusive arrangement between the claimant and the anchor defendant to conceal a settlement of the claim until the proceedings have been issued and served on the foreign defendants. As earlier mentioned, other examples might be naming a fictitious person as the anchor defendant (Freeport) and commencing proceedings against an anchor defendant knowing that it was an inadmissible claim (*Reisch Montage). "*

(5) "Irreconcilable" means a 'divergence in the <u>outcome</u> of the dispute [which arises] in the context of <u>the same situation of law and fact'</u>: *Freeport plc v. Arnoldsson* [39]-[40] (emphasis added). The two claims do not need to have identical legal bases: this is only one relevant factor amongst others.

65. Where a defendant is within a jurisdictional provision of the Brussels I Regulation (and by extension, the Lugano Convention) because they are domiciled in a Member State,

there is no room for English courts to apply the principle of *forum non conveniens* (*Vedanta* at [16] and [81], applying *Owusu*). Therefore, *forum non conveniens* considerations are irrelevant if the requirements of Article 6(1) are otherwise fulfilled in relation to claims against the Campbell Co-Defendants.

66. Where the anchor defendant is sued in England under a provision of the Brussels I Regulation, but the "necessary or proper parties" are not domiciled in a Member State (so claims must be brought against them under the "necessary or proper party" gateway under PD6B), the *forum conveniens* consideration that hearing all the cases in England avoids the risk of irreconcilable judgments should not always be considered a decisive factor: *Vedanta* at [75].

### C.2 Application of the Law to the Facts

67. I have considered with care the various arguments made by the Campbell Co-Defendants, but for the reasons set out below I am satisfied that the claims against them fall within Article 6(1) of the Lugano Convention and that none of the specific arguments raised by the Campbell Co-Defendants as to abuse of EU law, Article 5 Lugano Convention, Article 6 European Convention on Human Rights and purported jurisdiction agreements avails them in relation to their challenge to jurisdiction.

C.2.1 Article 6(1) Lugano Convention

68. The Campbell Co-Defendants are all domiciled in Switzerland, so are subject to the Lugano Convention (a point which is not disputed by any parties to this litigation). I am satisfied that the requirements of Article 6(1) are met in the present case for the following reasons.

69. Firstly, the English Court has jurisdiction over Yewdale (as a company with an English registered address), and Yewdale has been found (rightly in my view) to be an anchor defendant for the purposes of Article 6(1) of the Lugano Convention. In this regard:

(1) The claim against Yewdale (relating to the Claimants' money which was transferred to Yewdale's bank account in England) is going to proceed, following the July 2019 Judgment.

(2) There is a real issue to be tried between the Claimants and Yewdale (May 2019 Judgment at [39]-[43]).

(3) The claim against Yewdale is not being brought for the sole purpose of bringing others to the jurisdiction, and there was no abuse in bringing the claim against Yewdale in England (May 2019 Judgment at [62]-[64]; July 2019 Judgment at [41]-[42]). Yewdale is properly to be regarded as an anchor defendant (July 2019 Judgment at [43].

(4) I am in agreement with, and adopt, the reasons given by Christopher Hancock QC in the May 2019 Judgment and July 2019 Judgment.

70. Secondly, the claims against the Campbell Co-Defendants are closely connected to the claims against Yewdale:-

(1) The Claimants' case, at its most basic, consists of an investigation into what happened to the monies paid by Terre Neuve to Yewdale, how and to whom those monies were transferred, and who they ultimately benefited (as rightly accepted by Christopher Hancock QC in the May 2019 Judgment at [46], in the context of determining necessary or proper parties pursuant to PD 6B 3.1).

(2) The claims against Meyer El Maleh, Carole Sasson-El Maleh, Sara Sasson, and Mr Naggar have the same common thread, and are intertwined with the substance of the claims brought against Yewdale. In this regard:-

 (a) Meyer El Maleh and Mr Sasson are alleged to have set up and implemented the tax optimisation scheme set out above. They were therefore two of the primary actors in relation to the transfer of money from Terre Neuve to Yewdale, and what subsequently happened to that money. These two persons were also involved in the management of Yewdale, GPF, and REDS: it is through these companies that the Claimants say that the wrongdoing was executed. In particular, Meyer El Maleh was a director of Yewdale for much of the relevant time, having been appointed on 26 January 2011.

(b) Carole Sasson El Maleh and Sara Sasson are both heirs of Mr. Sasson, who was centrally involved in the wrongdoing: claims are brought against them which depend on Mr. Sasson's liability (see the Seventh Statement of Mr Gerbi ("Gerbi-7"), at [22.2]).

(c) Further, Carole Sasson El Maleh and Sara Sasson are alleged to have been involved in the companies at the heart of the wrongdoing at the material time. Carole Sasson El Maleh was allegedly a director of GPF (whose employees were involved in the daily operations of Yewdale) from 19 October 2010 and the director-secretary from 9 December 2011. A claim is made in relation to Carole Sasson El Maleh's receipt of monies directly from Yewdale (Gerbi-7 at [22.2.3], Particulars of Claim at [142]). Sara Sasson was allegedly a shareholder of Yewdale at the material time, though she has since divested herself of those shares (Gerbi-7 at [22.2.3]).

(3) Meyer El Maleh and Carole Sasson El Maleh are alleged to have received misappropriated funds. Further, at least €5 million was purportedly transferred to a Panamanian company said to be created by Mr. Sasson and Meyer El Maleh, in an account allegedly held in HSBCPB. It is not clear if the accounts of Meyer El Maleh and Carole Sasson El Maleh were at HSBCPB.

(4) Further, there is significant overlap between the legal causes of action brought against Yewdale and the Campbell Co-Defendants. The Claimants allege that each is liable for unlawful damage caused by money laundering (POC, [130.4]), albeit that these claims as made against Carole Sasson El Maleh and Sara Sasson are based on their purported liability in respect of Mr. Sasson's acts as his heirs. The 2008 Oral Agreements are ones to which none of the Campbell Co-Defendants are parties. There is no overlap with regards to breach of contract, but there is substantial overlap with regards to the torts and restitutionary liability in respect of the Campbell Co-Defendants and other defendants.

(5) Some reference was made by the Campbell Co-Defendants as to the family background of the Campbell Co-Defendants. However, the criterion of connection is the existence of such close legal or factual connections between the two sets of claims that are the subject of Article 6, which I am satisfied there are.

71. Thirdly, in light of this close connection, it is expedient to determine these claims together to avoid the risk of irreconcilable judgments resulting from separate proceedings against Yewdale in England, and the Campbell Co-Defendants in Switzerland. In this regard:-

(1) The claims all depend on a single investigation into a network of connected parties. The Claimants ultimately seek the recovery of monies paid by Terre Neuve into Yewdale's account, but which was not transferred on to Largely pursuant to the tax optimisation arrangements. Therefore, to determine liability, the court will need to investigate the destination of these funds, and who caused them to be dissipated/retained rather than being paid through. This will inevitably require the court to investigate: (a) the directions given by Mr. Maleh, Mr. Sasson and Mr. Naggar (as persons involved in Yewdale's management) and (b) directions given by other persons at GPF. The destination of the monies is also relevant in determining quantum.

(2) This was rightly recognised by Christopher Hancock QC in the May 2019 Judgment at [46]: *"[t]he evidence in all the claims will be similar and interlinked"* and *"[t]here would be an obvious risk of irreconcilable judgments if these claims were pursued separately"*. He was considering the case against the Non-European Defendants, but I agree with his comments, and I am satisfied that they have equal application to all of the Claimants' claims.

(3) The contention that the Campbell Co-Defendants are *"isolated by the veil of incorporation"* from the claims against Yewdale makes little sense: the determination of each of these claims on the facts requires consideration of the same material and the actions of the same persons. Claims which are closely connected do not need to have an identical legal basis (see *Freeport v Arnoldsson*, above).

(4) If proceedings against the Campbell Co-Defendants were conducted in parallel to proceedings against Yewdale, there is an obvious risk of irreconcilable judgments. Even if a Swiss judge considered identical disclosure, witness statements and expert evidence in a case against only the Campbell Co-Defendants the judge

might well come to a different conclusion on the facts from an English judge in the Yewdale claim. This is not "mere speculation" as claimed by the Campbell Co-Defendants – it is a common pitfall of parallel proceedings, and the very mischief which the Lugano Convention was designed to prevent. The reality is that the danger of irreconcilable judgments is present whatever disclosure regimes/witness evidence is before the court, as long as the causes of action are sufficiently closely related. In any event the Campbell Co-Defendants cannot possibly guarantee that the *"disclosure and factual background and... witnesses remain the same irrespective of jurisdiction"*. Even if the same witnesses are summoned, they may give different evidence in different proceedings, and the Swiss First Instance Court and Appeal Court Decisions in this very case demonstrate that disclosure regimes can affect the information that is before a tribunal (e.g. where claimants present evidence at a time which is regarded as too late to be admitted).

(5) Irreconcilable judgments would be particularly problematic in a case such as this where the allegation is that multiple defendants have participated together in a dishonest fraudulent exercise.

(6) The Campbell Co-Defendants made submissions as the meaning of the word "expedient" which was directed at, or came very close to relying upon, *forum non conveniens* considerations. Such submissions were misguided. In the context of Article 6 of the Lugano Convention, expedient means "appropriate" (i.e. there is such a risk of irreconcilable judgments that it is <u>appropriate</u> to hear the claims together). This is clear from the language used and the purpose of the Convention in facilitating the recognition of judgments.

72. Fourthly, the Campbell Co-Defendants contended that *Vedanta* is authority for the proposition that, in the application of Article 6(1) of the Lugano Convention, a balancing exercise is to be carried out of the connecting factors and the risk of irreconcilable judgments: the risk of irreconcilable judgments is not, they argue, a "trump card". I do not consider such submission to be of any merit. If jurisdiction is established under the Lugano Convention rather than at common law, the court has no discretion to decline such jurisdiction on the basis that the claim would be more conveniently heard elsewhere

(*Owusu*). *Vedanta* concerned a Zambian defendant to whom the English rules on establishment of jurisdiction (including the *forum non conveniens* doctrine) applied. It did not deal with jurisdiction established *against that specific Defendant* under the Brussels I Regulation or the Lugano Convention. Therefore, Lord Briggs' statements about irreconcilable judgments not being a trump card apply only to non-EU defendants brought in under PD 6B para 3.1(3) or another gateway: not a defendant brought in under Article 6(1) of the Lugano Convention. Subject to consideration of any abuse argument (which is very narrow in scope and not of any application on the facts of the present case), there is no discretion in the English court based on the appropriateness of the forum where jurisdiction is established under the Lugano Convention. Arguments as to whether (as suggested by the Campbell Co-Defendants) Switzerland is the more appropriate forum simply do not arise.

C.2.2 Abuse of EU Law

73. I am satisfied that there was no abuse of EU law in the application of Article 4 Brussels I Regulation with respect to Yewdale and the subsequent reliance on Article 6(1) of the Lugano Convention, as argued by the Campbell Co-Defendants, for the following reasons.

74. Firstly, many of the same issues were decided by Christopher Hancock QC previously in the June 2019 Hearing and I consider that he was correct to find as he did. Accordingly, whilst the Campbell Co-Defendants were not applicants or respondents at that particular hearing, the sentiments expressed by him have equal application in the context of the Campbell Co-Defendants, In this regard: -

(1) Christopher Hancock QC found (rightly in my view) that Yewdale is a bona fides target for the Claimants' claims (at [37]-[44], July 2019 Judgment), which was not brought solely for the purpose of bringing other Defendants into the jurisdiction. Therefore, he concluded (again rightly in my view) that the "sole object" test (insofar as it was assumed at the time to exist) was satisfied. Yewdale was the recipient of the allegedly misappropriated funds, so at the centre of the claims advanced by the Claimants.

(2) He also found (again rightly in my view) that there had been "no collusive behaviour" between the Claimants and Yewdale in bringing the claim against Yewdale in England pursuant to Article 4 Brussels I Regulation improperly to subvert another EU law principle.

(3) The Campbell Co-Defendants attempt to distinguish the Deputy Judge's conclusions by arguing that though there may not have been abuse in bringing a claim against Yewdale in this court, *"it may well be an abuse to remove us from our home jurisdiction"* (at [18] of the Campbell Co-Defendants' skeleton) so that there is an *"abuse of Article 6(1) of the Lugano Convention"*. However, the purported "abuse" is that the Claimants are relying on the fact that Yewdale is domiciled in England (so can be sued here under Article 4) to justify jurisdiction in this country against Lugano Convention defendants under Article 6(1). This alleged abuse is the same alleged abuse as was considered, and rightly rejected, by the Deputy Judge. There is no *separate* abuse in using Article 6(1), from a supposed abuse of Article 2; it is part of the same purported abusive scheme. The main thrust of the Campbell Co-Defendants' submission goes to whether the Claimants' sole purpose in suing Yewdale is to bring other defendants within the jurisdiction; this was substantially the same submission as made by Yewdale (see the July 2019 Judgment at [38]). Yewdale argued that in this case the sole purpose of suing it in England was to enable proceedings to be brought against other defendants in states other than those of their domicile. Such argument was rightly rejected by the Deputy Judge and the point is no better when made by the Campbell Co-Defendants.

75. Secondly, since Christopher Hancock QC's May 2019 judgment, it has been confirmed in *PJSC* that a claimant with a sustainable claim against an anchor defendant, which it intended to pursue to judgment, can rely on Article 6(1) of the Lugano Convention to bring in relevant defendants, even where the claimant's sole object in issuing the proceedings against the anchor defendant was to sue the foreign defendant in the same proceedings. The Campbell Co-Defendants cannot now *"maintain the sole object and sole purpose argument"* (skeleton argument at [44]). Further, the Campbell Co-Defendants make the point that the jurisprudence on abuse of EU law is "complex and

convoluted", by reference to the disagreement between the majority and minority constitution in *PJSC*. However, the decision in *PJSC* binds this court and there is no "sole object test" for the application of Article 6(1) Lugano Convention.

76. Thirdly (and importantly), there is no evidence that the Claimants colluded with Yewdale to use them as an anchor defendant to bring proceedings against the Campbell Co-Defendants in this jurisdiction.  In this regard: -

(1)  The abuse of EU law principle can only apply to Article 6(1) where there is evidence of collusion or fraud (*PJSC* at [94] and [108]-[109] endorsing the *obiter* comments of Lord Briggs in *Vedanta*).

(2)  There can be no suggestion of any collusion between the Claimants and Yewdale in bringing English proceedings against Yewdale: in fact, Yewdale vigorously resisted the English Court's jurisdiction during the June 2019 hearing. Mr. Naggar in his first witness statement alleges that there has been collusion by the Claimants to remove him and other Defendants from his home jurisdiction but such allegation is neither particularised, nor supported by any documentation, and as such has not been demonstrated.

(3)  Further examples listed at [108] in *PJSC* were: naming a fictitious person as the anchor defendant; and commencing proceedings against an anchor defendant knowing that it was an inadmissible claim. Nothing that was alleged by the Campbell Co-Defendants before me, or in the skeleton arguments, comes close to any of these examples.

77. Further, I note that other Swiss-domiciled defendants (Ms. Vasarino, Nessim El Maleh and HSBCPB) have all submitted, or been deemed to have submitted, to the English Courts' jurisdiction. The main contentions of the Campbell Co-Defendants regarding the abuse of EU law would apply equally to these other Swiss-domiciled defendants.

C.2.3 Article 5 Lugano Convention

78. The Campbell Co-Defendants made submissions that Article 5 of the Lugano Convention was relevant in the current proceedings, because the Claimants' claims are centrally for

breach of contract. However, Article 5 clearly provides an *alternative* ground of jurisdiction: the Claimants can choose to sue defendants in the place of contractual performance, or as a related party under Article 6. The fact that the place of performance, the place where the harmful event occurred, or the country of the court seised in related criminal proceedings is in a different country than the present proceedings, has no bearing on the determination of whether it is expedient to try the claims against the Campbell Co-Defendants in this country to avoid a risk of irreconcilable judgments.

C.2.4 Breach of Article 6 ECHR

79. The removal of the Campbell Co-Defendants from their "home jurisdiction" of Switzerland does not contravene Article 6 of the European Convention on Human Rights. The Campbell Co-Defendants are sued in England pursuant to the Lugano Convention: it cannot sensibly be suggested that the English court process, in so far as England is the designated jurisdiction under those rules, is inherently unfair. Further, the existence of the practical difficulties that any of the Campbell Co-Defendants may have in terms of physical attendance at trial in England is not relevant to the issue of jurisdiction: they can fairly be addressed by the Court in due course, if indeed appropriate to do so in the specific circumstances, in accordance with well-established procedures (including e.g. use of video link facilities, hearsay evidence, or even the taking of evidence abroad).

C.2.5 Arbitration/Jurisdiction Clauses

80. The Campbell Co-Defendants contend that the English Court should refuse to take jurisdiction over the claims against them due to (1) an arbitration clause in an Agency Agreement dated 1998; (2) a letter of instructions from REDS to Terre Neuve dated 2009; and (3) the jurisdiction clauses in the Written Agreements. None of these contentions is of any merit and I reject each of them for the reasons set out below.

81. Firstly, as to the 1998 Agency Agreement:

(1) The "Agency Agreement" was entered into in 1998. It was signed by Mr. Zahut representing Terre Neuve, and Mr. Rousso, representing REDS LLC. It provided that Terre Neuve (as the Principal) was to be represented by REDS (as the agent)

in selling goods and/or services as described in the Annex (Preamble). Clause VI (1) of this agreement provides:

> "Any dispute arising out of or in connection with this Agreement shall be referred to the arbitration in New York state of a single arbitrator appointed by Agreement between the parties or, in default of Agreement, nominated on the application of either party by the President for the time being of The Law Society."

(2) The Campbell Co-Defendants contest the jurisdiction of the English Court "pursuant to CPR Part 11.1 Brussels Regulation Recast 2012 and Lugano Convention 2007" (application notice of the Fourth and Seventh Defendants dated 22 May 2019, and application notice of the Sixth and Tenth Defendants, dated 25 July 2019). Article 23 of the Lugano Convention only applies where parties have agreed "that a court or the courts of a state bound by this convention are to have jurisdiction to settle any disputes which have arisen": arbitration in New York is not a court of a state bound by this Convention. Matters relating to arbitration fall out-with the scope of the Convention (Article 1(2)(d)).

(3) None of the Campbell Co-Defendants are parties to the Agency Agreement; none of them could therefore rely on s.9(1) Arbitration Act 1996. I should only add that the Campbell Co-Defendants did not in fact seek a stay in favour of arbitration (though had they done so any such claim would have failed).

(4) Further, the Agency Agreement is not one upon which the Claimants base their case, and the arbitration agreement cannot conceivably cover this dispute. None of the claims allege any breach of the Agency Agreement. Further, the Agency Agreement exhibited is between Terre Neuve and REDS, and is dated 1998. It appears to concern the issuing of invoices by REDS (as agent) on behalf of Terre Neuve (as principal). The REDS Agency Agreement referred to in the POC and DAPOC is between REDS and GPF, and was entered into in or around 2003: under that agreement, REDS promised to issue the invoices to Terre Neuve, ensure safe receipt of the monies paid by Terre Neuve, and transmit those monies to a new company set up for the benefit of Mr. Zahut. The bulk of the Claimants' case concerns what happened to the money for which Terre Neuve were invoiced *after it reached Yewdale.*

82. Secondly, as to the Letter of Instructions: the Campbell Co-Defendants have made reference to a letter of instructions dated 27 February 2009 from REDS to Terre Neuve, in which REDS request Terre Neuve to transfer certain amounts that REDS have invoiced to them. This letter does not appear to be relevant to any question of jurisdiction and does not contain any jurisdiction agreement. The Campbell Co-Defendants have submitted that in fact there were no 2008 or 2003 Oral Agreements, so the only "agreements" as to the transfer of funds between inter alia REDS, Mr. Zahut, and Terre Neuve were the 1998 Agency Agreement and the 2009 letter. As to whether there were any oral agreements, this is a matter for trial, whilst any Agency Agreement is of no relevance to the Claimants' claims or the jurisdictional challenge that is brought.

83. Finally, as to the Written Agreements: the Campbell Co-Defendants adopted the arguments of GPF regarding the Swiss jurisdiction clauses in the Written Agreements. However, for the reasons already given I have rejected the applicability of the jurisdiction clauses in respect of claims against GPF, and the position is no different in relation to the claims against the Campbell Co-Defendants. The Campbell Co-Defendants were not parties to the agreements containing those jurisdiction clauses.

84. Accordingly, and for the reasons given above, the Campbell Co-Defendants' challenge to the jurisdiction of the English Court fails, and their applications are dismissed.

## D. The Eleventh Defendant's Application

85. Judah El Maleh is alleged to have owed and breached a Swiss-law duty to uncover and prevent the alleged laundering of misappropriated monies in the HSBC account. Judah El Maleh is domiciled in Israel. He applies to challenge the Court's jurisdiction to hear the claims made against him on the grounds:-

    (1) That claims against Judah El Maleh fail to meet the relevant evidential standard under CPR r.6.37(1)(b).

    (2) That he is neither a necessary nor a proper party within the meaning of para. 3.1(3) of PD 6B.

**D.1 Applicable Law**

86. On an application for permission to serve out of the jurisdiction under CPR rr. 6.36, 6.37 and 6.38, the applicant must demonstrate that he meets three criteria:

(1) The claims must fall within one of the jurisdictional gateways set out in paragraph 3.1 of Practice Direction 6B. In this case, the relevant gateway is contained within Paragraph 3.1(3):

"The claimant may serve a claim form out of the jurisdiction with the permission of the court under rule 6.36 where –

[…]

(3) A claim is made against a person ('the defendant') on whom the claim form has been or will be served (<u>otherwise than in reliance on this paragraph</u>) and –

(a) there is between the claimant and [that] defendant a real issue which it is reasonable for the court to try; and

(b) the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim."

(2) The claims must have a reasonable prospect of success/there must be a serious issue to be tried between the Claimant and the defendant that they seek to join (i.e. the Claimants and the Necessary or Proper Party Defendant ("the NPP Defendant")) on the merits (CPR r.6.37(1)(b)); and

(3) England and Wales must be the proper place to bring the claims (see e.g. *Brownlie v Four Seasons Holdings Inc* [2017] UKSC 80; [2018] 1 WLR 192 at [3]).

87. As to the <u>first</u> criterion, the Court must be satisfied that the <u>jurisdictional facts</u> or criteria relevant to the "necessary or proper party" gateway are satisfied, to the standard of a "good arguable case", or "the better of the argument". The court should be satisfied (to this degree) that:

(1) A claim form has been served on a "defendant" otherwise than in reliance on this gateway ("the Anchor Defendant").

(2) There is between the Claimants and the Anchor Defendant a real issue which it is reasonable for the Court to try.

(3) The other person on whom the Claimants wish to serve the claim form (the NPP Defendant) is a <u>necessary or proper party</u> to the claim between the Claimants and the Anchor Defendant. Where the liability of multiple persons depends upon "one investigation", they are all "proper parties" to the same action: see WB 6HJ.7. Other expressions to describe this relationship have included "closely connected" and "a common thread" running through the allegations: *Carvill America Inc v Camperdown UK Ltd* [2005] 2 Lloyd's Rep 457. Equally, a party who may be joined in proceedings in accordance with the joinder rules is generally a "proper party": see WB 6HJ.7.

88. As to the second criterion, the Court must determine whether there is a <u>serious issue to be tried on the merits</u> between the Claimants and the NPP Defendant to be joined (in this case, Judah El Maleh), pursuant to CPR r.6.37(1)(b).

(1) The evidential standard applicable to the <u>merits of the relevant claim</u> against the NPP Defendant under CPR r.6.37(1)(b) is whether the relevant claim has a reasonable prospect of success: there should be a "serious issue to be tried", which corresponds to a "real, as opposed to fanciful" prospect of success. This is the same test as is applied when resisting an application for summary judgment: *Altimo Holdings and Investments Ltd v Kyrgyz Mobil Tel Ltd* [2012] 1 WLR 1804 at [71].

(2) The test for summary judgment is whether there is a realistic (as opposed to fanciful) prospect of success (*Altimo Holdings* at [71]). The principles applicable to determining whether a party has a real prospect of success were summarised for the purpose of summary judgment in *JSC VTB Bank v Skurikhin* [2014] EWHC 271 (Comm) at [15]:

> "(1) The Court must consider whether the defendant has a 'realistic' as opposed to a 'fanciful' prospect of success, see *Swain v Hillman* [2001] 2 All ER 91, 92. A claim is 'fanciful' if it is entirely without substance, see Lord Hope in *Three Rivers District Council v Bank of England* [2001] UKHL 16 at [95].
>
> (2) A 'realistic' prospect of success is one that carries some degree of conviction and not one that is merely arguable, see *ED & F Man Liquid Products v. Patel* [2003] EWCA Civ 472.

(3) The court must avoid conducting a 'mini-trial' without disclosure and oral evidence*: Swain v Hillman* (above) at p.95. As Lord Hope observed in the *Three Rivers* case, the object of the rule is to deal with cases that are not fit for trial at all.

(4) This does not mean that the Court must take everything that a party says in his witness statement at face value and without analysis. In some cases, it may be clear that there is no real substance in factual assertions which are made, particularly if they are contradicted by contemporaneous documents, see *ED & F Man Liquid Products v. Patel* (above) at [10]. Contemporary activity or lack of activity may similarly cast doubt on the substance of factual assertions.

(5) However, the Court should avoid being drawn into an attempt to resolve those conflicts of fact which are normally resolved by a trial process, see *Doncaster Pharmaceuticals Group Ltd v. Bolton Pharmaceutical Co 100* Ltd [2006] EWCA Civ 661, Mummery LJ at [17].

(6) In reaching its conclusion, the court must take into account not only the evidence actually placed before it on the application for summary judgment, but the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond* (No. 5) [2001] EWCA Civ 550, [19].

(7) Allegations of fraud may pose particular problems in summary disposal, since they often depend, not simply on facts, but inferences which can properly drawn from the relevant facts, the surrounding circumstances and a view of the state of mind of the participants, see for example *JD Wetherspoon v Harris* [2013] EWHC 1088, Sir Terence Etherton Ch at [14].

(8) Some disputes on the law or the construction of a document are suitable for summary determination, since (if it is bad in law) the sooner it is determined the better, see the Easyair case. On the other hand the Court should heed the warning of Lord Collins in *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2012] 1 WLR 1804 at [84] that it may not be appropriate to decide difficult questions of law on an interlocutory application where the facts may determine how those legal issues will present themselves for determination and/or the legal issues are in an area that requires detailed argument and mature consideration, see also at [116].

(9) The overall burden of proof remains on the claimant,... to establish, if it can, the negative proposition that the defendant has no real prospect of success (in the sense mentioned above) and that there is no other reason for a trial, see Henderson J in *Apovodedo v Collins* [2008] EWHC 775 (Ch), at [32].

(10) So far as Part 24.2(b) is concerned, there will be a compelling reason for trial where 'there are circumstances that ought to be investigated', see Miles v Bull [1969] 1 QB 258 at 266A. In that case Megarry J was satisfied that there were reasons for scrutinising what appeared on its face to be a

legitimate transaction; see also *Global Marine Drillships Limited v Landmark Solicitors LLP* [2011] EWHC 2685 (Ch), Henderson J at [55]-[56]."

(3) In some cases, the disputed issues are such that their conclusion by settlement or trial largely depends upon the expert evidence relied on by each side. In such cases, an application for summary judgment will usually be inappropriate unless it is made after the exchange of the experts' reports and, in most cases, after the experts have discussed the case and produced a joint statement (*Hewes v West Hertfordshire* Hospitals NHS Trust [2018] EWHC 2715 (QB), a clinical negligence claim, at [45]).

89. As noted above, the evidential standard applicable to jurisdictional facts required for the CPR PD6B para 3.1(3) gateway (as set out in the first criterion) is that of a good arguable case: there must be a plausible evidential basis for it, which is sometimes referred to (as it was by counsel before me) as one side having "the better of the argument". This is a higher standard than the test applicable to the merits of the relevant claim under CPR r.6.37(1)(b): *Brownlie v Four Seasons Holdings Inc* [2018] 1 WLR 192, at [4]-[7]. I reiterate this point because the Skeleton Argument served by Judah El Maleh appeared to apply the "good arguable case" / "the better of the argument" test to the merits of the relevant claim under CPR r.6.37(1)(b) (e.g.: at [10], [38], [39], [43], [62], and in heading C). During oral submissions, counsel for Judah El Maleh accepted that the relevant test under the second criterion is a serious issue to be tried, though he argued that the wording of the test ("serious issue" vs "better of the argument") made little difference. In so far as there is a difference between the two tests, it is clear that there must be a "serious issue to be tried", and no more, in relation to the merits of the relevant claim under CPR r.6.37(1)(b).

90. Finally, as to the third criterion, the court must determine whether England and Wales is the "proper place in which to bring the claim" (CPR r. 6.37(3)). Judah El Maleh has not sought to challenge jurisdiction on this ground.

**D.2 Application of the Law to the Facts**

91. Judah El Maleh argues that the claims against him (as the NPP Defendant) do not reach the necessary evidential threshold in CPR r.6.37(1)(b), and that he is not a necessary or proper party pursuant to PD6B paragraph 3.1(3).

D.2.1 Necessary Evidential Threshold on each claim

92. In order for the Claimants to meet the evidential threshold in CPR r.6.37(1)(b), they must establish that there is a "serious issue to be tried" as to the two claims that they bring against Judah El Maleh, on the following grounds:

    (1) The Tort Claim: the Claimants allege that Judah El Maleh <u>unlawfully</u> caused damage to the Claimants under Article 41 SCO. The unlawful element is alleged to be money laundering, contrary to Article 305bis Swiss Penal Code ("SPC").

    (2) The Derivative Claim: the Claimants allege that Judah El Maleh's actions or omissions/failures placed him in breach of fiduciary duties that he owed to HSBCPB under Articles 716a, 717 and 754 of the SCO, and that such breach is actionable at the suit of the Claimants under Article 754 of the SCO, because they are "creditors" of HSBCPB who suffered direct damage.

93. I am satisfied that there is a serious issue to be tried between the Claimants and Judah El Maleh with respect to each of the aforementioned claims. I will now deal with each claim in turn, and set out why each element of each claim raises a serious issue to be tried.

*(i) The Tort Claim: Introduction*

94. In relation to the Tort Claim, I will set out the uncontested points of law, followed by the three questions in relation to which there must be a serious issue to be tried, followed by some preliminary comments on the state of the expert evidence before me. I will then go on to set out why I consider that each of the three questions raises a serious issue to be tried as between the parties.

*(ii) The Tort Claim: Summary of Uncontested Law*

95. I understand that the following points of law are uncontested in relation to the tort claim, which I derive from the expert reports of Mr. Burrus and Mr. Hofmann:

(1) The relevant provisions of the SCO and the SPC) are as follows:

> "Article 41 SCO
>
> 1 Any person who unlawfully causes loss or damage to another, whether wilfully or negligently, is obliged to provide compensation."
>
> "Article 305bis SPC
>
> 1. Any person who carries out an act that is aimed at frustrating the identification of the origin, the tracing or the forfeiture of assets which he knows or must assume originate from a felony or aggravated tax misdemeanour is liable to a custodial sentence not exceeding three years or to a monetary penalty"

(2) The tort of unlawfully causing damage under Article 41 SCO may involve either wilful conduct or mere "negligence or carelessness".

(3) A breach of Article 305bis SPC can constitute a basis for liability under Article 41 SCO. A criminal conviction pursuant to Article 305bis SPC is not a necessary precondition: a finding of breach of Article 305bis SPC can be made in the context of civil proceedings alleging tortious liability under Article 41 SCO. To establish a breach of Article 305bis, the Claimants must establish the following:

(a) The state of mind element: the defendant knew or should have known (i.e. must have assumed) the criminal origin of the funds. It is sufficient that the defendant is aware of circumstances which cause him to suspect that the money stems from a criminal predicate offence.

(b) The act element: money laundering can arise by omission where the defendant is under a positive legal obligation to act to prevent the occurrence of the offence (i.e. if it is the position of a "guarantor") and is at <u>fault</u> in failing to comply with this obligation

(4) The commission of money laundering by negligence is not punishable by law, subject to two qualifications: (i) as seen above, a suspicion (i.e. something short of

actual knowledge) of the criminal origin of the money can found liability for money laundering; and (ii) money laundering can be committed by omission.

### (iii) The Tort Claim: Summary of the Issues

96. In relation to the Tort Claim, there are three matters pursuant to which there must be at least a serious issue to be tried in order for CPR r.6.37(1)(b) to be satisfied:

(1) Firstly, the Claimants must show that there is at least a serious issue to be tried in establishing the following facts, as are necessary in order to establish the **unlawfulness element** of Article 41 SCO (i.e. a breach of Article 305bis):

(a) Issue 1.1: As to the 'state of mind' element of Article 305bis: the Claimants must establish to the relevant standard that Judah El Maleh knew that the funds that were passing through accounts maintained at HSBC, or that were otherwise managed or handled by employees of HSBC, were the proceeds of crime or connected to criminal activity, or alternatively, that he at least knew of circumstances that gave rise to a suspicion (or reasonable grounds to suspect) that this was the case.

(b) As to the 'act' element of Article 305bis: the Claimants do not allege that Judah El Maleh had an active role in the money laundering. Therefore, they must establish that this is a case in which money laundering can be committed by omission, as follows:

Issue 1.2: Judah El Maleh's role, responsibilities and functions within HSBC were such that he was subject to the obligation under Articles 3-9 SLML to prevent (including by investigating and reporting on) the money laundering activities that occurred within HSBC.

Issue 1.3: Judah El Maleh was at fault in failing to comply with the above obligation.

(2) Secondly, Claimants must establish that there is at least a serious issue to be tried that their claims fall within the **scope** of Article 41 SCO and Article 305bis SPC. In this context, Judah El Maleh relies on the contents and correctness of the judgment of the Swiss Appeal Court dated 22 November 2019 ("Issue 2").

(3) Thirdly, Claimants must establish that there is at least a serious issue to be tried that Judah El Maleh **caused damage** to the Claimants. Judah El Maleh relies on the correctness of the Swiss Appeal Court's purported finding that the existence of a natural causal link between the alleged damage and the alleged unlawful act was not plausible. ("Issue 3").

*(iv) The Tort Claim: Preliminary Points on the Expert Evidence Provided*

97. Before addressing such matters, a preliminary point to note is that the state of the expert evidence before me, in particular in relation to the interpretation of the Swiss Appeal Court judgment, is somewhat unsatisfactory:-

(1) In an Order dated 20 September 2019, Cockerill J gave permission to Judah El Maleh to adduce expert evidence in support of his jurisdiction challenge, and for the Claimants to adduce expert evidence on Swiss law in reply. The Order provides for one expert report per party, and does not provide for supplementary reports. Mr Burrus' expert report on behalf of Judah El Maleh is dated 24 September 2019 ("Burrus 1"). Mr Hofmann's expert report on behalf of the Claimants in response is dated 7 November 2019 ("Hofmann 1").

(2) On 22 November 2019, the Swiss Court of Appeal's decision was handed down. Judah El Maleh then served a further supplementary expert report from Mr Burrus dated 11 December 2019 ("Burrus 2"), commenting on that decision and on certain matters in Hofmann 1. However, Judah El Maleh did not have permission to serve such supplemental expert evidence. No application was made for permission to adduce this evidence until during the course of oral reply submissions. The consequence is that whilst Mr. Burrus has made certain comments as to Swiss law in this regard, the Claimants have not had the opportunity to provide responsive evidence from Mr Hofmann in relation thereto. Clearly it would be inappropriate to accept the evidence in Burrus 2 at a time when the Claimants have not had the opportunity to serve responsive evidence from their expert (even assuming the Court would otherwise have been willing to give permission for the service of Burrus 2). In such circumstances I do not give permission for the service of Burrus 2.

*(v) The Tort Claim: Issue 1.1 Factual Issues relating to Judah El Maleh's subjective knowledge*

98.  The majority of Judah El Maleh's arguments before me focussed on whether there was a serious issue to be tried between the parties on Issue 1.1. In this context, the following arguments were made before me:

(1) the Claimants rely, amongst other matters, on Judah El Maleh's role in HSBCPB relative to the size of the fraud; recordings of telephone conversations of Judah El Maleh obtained by the French police and other supporting evidence, including a deposition given by Ms. Vasarino (a trusted employee of GPF) during the French criminal proceedings.

(2) Judah El Maleh argues that this evidence is, by itself, insufficient to found a case which passes the relevant evidential threshold; he also relies upon a judgment of the Swiss First Instance Court dated 28 May 2019, in which that court overturned an attachment order for seizure of Judah El Maleh's property pursuant to the Claimants' English proceedings, and the fact that he was not charged by either the Swiss or the French authorities following their investigation.

99. For the reasons that I identify below, I am satisfied that there is at least a serious issue to be tried that Judah El Maleh knew, or suspected, that funds that were passing through accounts maintained at HSBCPB, or that were otherwise managed or handled by employees of HSBCPB, were the proceeds of crime or connected to criminal activity.

100.  Firstly, the Claimants do not have to provide "smoking gun" evidence that Judah El Maleh actually knew about the money laundering. It is not in issue between the Claimants' and Judah El Maleh's experts that the requisite "knowledge" for the purposes of Article 305bis SCP can either be actual knowledge of the money laundering, or knowledge of facts which are sufficient to give rise to a suspicion of money laundering. The Claimants only have to prove (at a minimum) that there is a serious issue to be tried as to whether Judah El Maleh had sufficient knowledge to give rise to a suspicion that the money came from criminal activity, which is a relatively low standard. Furthermore, as a general matter, it is relatively rare in financial fraud or money laundering for there to be

clear proof of the perpetrators' state of mind, due to the sophisticated nature of the crime and the persons involved. Therefore, evidence as to knowledge is likely only to be inferential, or on the basis of some documentary evidence interpreted using inferences made about knowledge from an alleged perpetrator's position within the organisation or his relationship with other perpetrators.

101. Secondly, the fact that Judah El Maleh had an important supervisory role over the HSBCPB department at which such a wide-ranging fraud took place, combined with his personal relationship with the persons committing that laundering, provides, I consider, significant support to the Claimants' contention that it can be inferred that he would have known (or would have had grounds to suspect) that the money laundering was taking place. In this regard:-

   (1) The MEDIS department is recorded indirectly by FINMA as having managed the majority of the accounts involved in the money laundering at HSBCPB. Further, I am satisfied, to the standard required on an interlocutory basis, that this department was shut down by the HSBCPB in 2013 as a result of the fraud being perpetrated.

   (2) Judah El Maleh was head of the MEDIS department, and was on the bank's Executive Committee. In his capacity as the department's head, he had overall responsibility for managing the team below him, and overall responsibility for consistent implementation of risk control and management and compliance with money laundering legislation. Judah El Maleh claims that when he became a member of the bank's Executive committee in 2002, he ceased to be involved in the "day-to-day" business of the MEDIS department. However, he does accept that he had weekly meetings with the head of each department, including the head of the Israel team. During those meetings, he accepts that he discussed problems with clients in some detail (e.g. some discussion of specific clients and transfers of money). Judah El Maleh acknowledges that he was able to look at account information if he needed to do so, but he says that he did not do this on a regular basis. However the issue of whether he was aware of the money laundering or would have had grounds to suspect that there was money laundering taking place is a classic issue for trial rather than for summary determination/strike out, not

least in the context of the further evidence I refer to below which supports the conclusion that Mr El Maleh was actually aware of money laundering taking place at an earlier period of time (pre 2009) – the inference being that such awareness also existed as at the later period of time in question.

(3) It is not obviously credible that the overall head of MEDIS had no knowledge, or even a suspicion, that such widespread money laundering was occurring in his department. It is of course possible that Judah El Maleh was not carrying out his supervisory responsibilities for the department at all (i.e. that he was grossly negligent), or that he was carrying out his duties but hired someone incompetent to carry them out after having taken reasonable steps. However, it is not possible to, and would not be appropriate to, carry out a "mini-trial" of such matters at this stage – which are again classically a matter for trial with the benefit of full documentary, and witness, evidence (potentially extending to banking expert evidence). It suffices to conclude that there is at least a serious issue to be tried that Judah El Maleh did know or suspect that money laundering was occurring.

(4) Further, Judah El Maleh had indirect supervisory responsibility over Nessim El Maleh, who was alleged to be involved in the money laundering. Further, it is suggested by the Federal Court in Geneva in its summary of the facts before giving its judgment in the employment proceedings between Judah El Maleh and HSBCPB that Nessim El Maleh was in an *earlier* period under the direct supervision of his brother. This creates a closer link between Judah El Maleh and the alleged money laundering. I bear in mind Judah El Maleh's evidence that he could not approve transactions by Nessim El Maleh due to their familial relationship, but it does not follow from this that he was unaware of what was going on, and it raises issues that will need to be explored at trial as to what supervisory role he was required to carry out, and did in fact carry out, and what knowledge he did, or should, have acquired as a result.

(5) The circumstances in which Judah El Maleh was let go from his position at the bank will also need to be explored at trial. Judah El Maleh points out that he was not dismissed with immediate effect for misconduct in relation to the money laundering activities, rather he was given six months' notice. Equally it was not alleged in the Swiss employment tribunal proceedings which resulted from Judah

El Maleh's dismissal that he was guilty of any involvement in the money laundering. The reason given for his dismissal appears to have been a "complete loss of trust" in the context of the money laundering that was taking place under his watch. This may have been all that HSBCPB needed to assert to justify his dismissal – as a result of which there does not appear to have been any adjudication as to whether he was in fact involved in the money laundering or knew of it.

102.  Thirdly, and in my view importantly for present purposes, the evidence of Ms. Vasarino in the French Criminal Proceedings in June 2013 supports the contention that Judah El Maleh had the relevant knowledge:

(1)  It appears from the evidence that Ms Vasarino was a trusted employee of GPF, as the assistant to Mr. Sasson and then to Meyer El Maleh. She stated that Mr. Zahut used to have funds held by International Trading Corporation (ITC) at HSBCPB. I understand from the Claimants' submissions that ITC was a company into whose HSBCPB account monies from REDS and/or GPF was received from the tax optimisation scheme and the Defendants' purported money laundering before 2009 (with its account with HSBC being closed in 2008).

(2)  Ms. Vasarino states that "of course, ITC accounts were initially with HSBC in the JUDAS and NESSIM ELMALEH team. **JUDAS personally supervised them to avoid problems**". She continues that, "JUDAS feared that the bank would notice suspicious movements in the name of a nominee. ITC's account left HSBC in 2009… **We fled HSBC at the express request of JUDAS ELMALEH who was in a panic**" (emphasis added).

(3)  The inference that the Claimants invite the Court to draw is that what Judah feared was that HSBCPB would discover the money laundering being performed using ITC (and of which he was, in the context of such an inference, aware). I consider that this is a possible inference that the Court might well draw at trial – certainly there is a serious issue to be tried in this regard. The Claimants will also invite the Court at trial to draw an inference from this that Judah was aware of the tax optimisation scheme, and associated money laundering that went on after 2009 using the successors to ITC in the scheme.

(4) Judah El Maleh points out that this testimony was given in the context of French proceedings in which he himself was not charged, convicted or questioned: however, it is still testimony that has the potential to fix him with knowledge of the tax optimisation scheme and money laundering, and there is certainly a serious issue in this regard.

(5) I consider that the evidence of Ms. Vasarino adds materially to the Claimants' case that there is a serious issue to be tried as to Judah El Maleh's knowledge of the money laundering, not least when also taken in conjunction with the other evidence that I have already referred to including as to his position within HSBCPB. Whilst Ms Vasarino has not (at least to date) given evidence as to any involvement of Judah El Maleh in the period between 2009-2012, her evidence in relation to an earlier period is supportive of an inference that he had knowledge of a similar money laundering scheme, in the same bank department, occurring before 2008. Of course, and assuming that she is called as a witness at trial, she may or may not repeat such evidence, and may or may not come up to proof in relation to the earlier period (or indeed any evidence she may be able to give in respect of the later period) – but this is again a classic matter to be explored at a full trial, and in the meantime the evidence she has given to date bolsters the merits of the Claimants' claim for present purposes.

103.   Fourthly, there are recordings of Judah El Maleh's telephone conversations obtained by the French police in the course of their investigation into the money laundering which are also supportive of the Claimants' case that Judah El Maleh had the requisite knowledge. The Claimants rely on several extracts of covert recordings of conversations allegedly between Judah El Maleh, Meyer El Maleh and Nessim El Maleh, as tending to show Judah El Maleh's knowledge of the alleged money laundering. Judah El Maleh asserts that there are innocent explanations for the contents of each of the recordings, and that they have been taken out of context. The very fact that there may (at least on Judah El Maleh's case) be more than one interpretation to what is being said in a particular conversation evidences that such matters will need to be explored in their full context (and with all available documentary and witness evidence) at trial. Whilst the possibility of innocent explanations is to be borne well in mind, this does not mean that what the

conversations appear to show on their face, should be ignored when considering the merits to the requisite level, on Judah El Maleh's application.

104.  I will now go through each conversation relied upon by the Claimants as establishing a serious issue to be tried as to Judah el Maleh's knowledge.

(1)  The first conversation was on or around 25 August 2012 and between Meyer El Maleh and Judah El Maleh, in the context of Judah warning Meyer not to engage in "compensation transactions":

> "*Judah: Be careful with that, the day when it comes crashing down, you won't be comfortable anywhere: not in Morocco, not anywhere.*
>
> *Meyer: No no no (...) I'm doing things discreetly (...)*
>
> *Judah: (...) Meyer, get out of there ok, get out, very quickly, but be careful.*
>
> *Meyer: But I'm not there, inside.*
>
> *Judah: Yes, but, but yeah, you told me no no no, but there you go, he delivered the money to Mardoché, you took them. So, you too are being stupid!*"

Mardoché is another El Maleh brother, to whom a Mr. Simon Perez had allegedly delivered cash. Simon Perez was (according to the French police), one of the primary actors in the money laundering scheme. I understand that a compensation transaction is a type of banking transaction which carries a higher risk of being used for money laundering. I understand that in a compensation transaction, there is movement of money from account A to account B, and a corresponding payment back from B to A, usually in cash, creating a circular transaction. I accept that there is nothing in this particular conversation which links the compensation transactions that Judah is warning Meyer about to money laundering through HSBCPB. However, I consider this evidence supports the submission that Judah ought at least to have been suspicious that Meyer was undertaking money laundering (and the Claimants at trial will no doubt submit that he was).

(2)  The second conversation was between Judah and Nessim:

*"Judah: I don't understand that Meyer is also agreeing to take Mardoché the money and not Mardoché take the money. So, there are limits to all these screw-ups too.*

*Nessim: What do you mean? For who?*

*Judah: Because he agreed to PEREZ giving the money to Mardoché in Paris?*

*Nessim: My friend, he will tell you who do you want me to give them to? (Laughs) but he doesn't want to introduce these guys there in…*

*Judah: But Meyer only had to say no, I don't need it. […]*

*Judah to Nessim: "Listen to me carefully: what you are doing with Meyer in the foreign exchange office, I don't agree with it, I'm totally against it. (…) I'm going to tell him, don't count on me introducing a client to you because that would be signing the death warrant for everything, that's it"*

(a) The Claimants contend that this reveals that Judah was aware of the money laundering in which Nessim, Meyer and Simon Perez were involved. Judah El Maleh contends that this is not supposed to be advice to Nessim, but Judah telling Nessim about a conversation that he intends to have with Albert Maleh (their brother, who was not an employee of HSBCPB), to warn him against compensation transactions, as he had previously warned Meyer.

(b) In my view, there is at least a serious issue to be tried that the Claimants' interpretation of this recording is the correct one, in the context of Judah El Maleh discussing with Nessim specific details of the alleged money laundering occurring between Simon Perez and Mardoché. Further, I read this recording in the context of Ms. Vasarino's above allegations that Judah El Maleh <u>previously</u> supervised Nessim El Maleh personally to cover for him in the context of similarly "suspicious movements" in the ITC account.

(c) My attention was drawn to the Claimants' *Replique* in the Swiss attachment proceedings where the Claimants refer to the same conversation, and assume that Judah El Maleh is making comments to Nessim about Albert, not offering advice to Nessim. However, in those pleadings it is pleaded by way of conclusion that, *"the Respondent [Judah*

*El Maleh] knew that his brothers, among whom was Mr. Nessim El Maleh, were engaged in offsetting transactions [...]* " The full context of what was being asserted in the *Replique* was not before me, as only one page of it had been translated.

(d) Even if Judah El Maleh is correct in that he was making comments to Nessim about *Albert's* conduct, not warning off Nessim, the tenor of these conversations still implies that Judah and Nessim were within the circle of confidence of Meyer and Simon Perez in relation to the compensation transactions. As it is alleged that Nessim was partaking in those transactions the Claimants may well be able to justify the drawing of an inference at trial that Judah knew about Nessim's involvement, in addition to knowing about Meyer and Simon's involvement.

(3) In a third conversation, Judah El Maleh is alleged to mention transferring money to or through a "Simon", in a conversation recorded on 23 August 2012. The Claimants claim that this is clearly a reference to Simon Perez. Judah El Maleh claims that this is a reference to a different Simon, and further that he did not know of Simon Perez's involvement in the alleged money laundering. In circumstances where Judah El Maleh refers to "Perez" giving money to Mardoche El Maleh in Paris in the second telephone conversation I consider that there is at least a serious issue to be tried that the Claimants' interpretation is the correct one. Again, this is a matter for exploration at trial when there is likely to be much more evidence before the Court. I am satisfied, however, that the evidence currently available supports the Claimants' case.

105. I also bear in mind that the French police adopted the interpretation of the recordings advocated by the Claimants, and formed the view that Judah El Maleh knew about the alleged money laundering, albeit that (for whatever reason), the French authorities did not charge Judah El Maleh. Ultimately, of course, it is a matter for me as to whether the Claimants have a sufficient evidential basis for their claims in the context of the application before me.

106. Meyer El Maleh gave the following evidence in a hearing on 6 November 2012 in Geneva (in relation to Simon Perez allegedly asking Judah El Maleh to tell his brother Mardoche to be more discreet):

> "I was afraid that MARDOCHE was beginning to do things fast and in the end would do something stupid. In other words, make calls directly to clients to satisfy them and that he would end up being too indiscreet.
>
> You ask me how that justifies my indicating that it was going to cost everyone dearly. […]. You ask me why Simon asked me to have my brother Judas intervene. Judas was supposed to tell MARDOCHE to stay discreet. You pointed out to me that Judas was therefore informed of these matters. My response is **not especially**, because I did not ask him to do so."

(emphasis added)

107. The Claimants place particular reliance on the words "not especially". It is submitted that the use of such language supports the inference (based on Meyer's evidence) that Judah <u>was</u> informed of the relevant matters, but not to a high degree. Judah El Maleh submits, by way of rebuttal, that this evidence is to be interpreted as Meyer El Maleh denying that Judah El Maleh knew about the relevant matters, because he did not ask Judah to speak to Simon Perez. On balance, I consider (solely for the purpose of considering the merits at an interlocutory stage) that the language used is more consistent with Judah having been informed ("not especially" is somewhat defensive/evasive to a question that ought to be capable of a "yes or no answer", and is capable of being construed as carrying the connotation that Judah was informed at least at some level).

108. Judah El Maleh submits that nothing in these conversations links the money laundering allegedly perpetrated by Meyer, Nessim and Simon Perez to accounts within HSBCPB. However, if Judah El Maleh did indeed have knowledge or suspicion that Nessim El Maleh, who worked under him in HSBCPB, was in fact undertaking money laundering or "compensation" transactions, then I consider it well arguable that this in itself should have raised at least a suspicion that Nessim El Maleh was using his position at this bank to make transfers to compensate the cash transactions. I consider that there is a serious issue to be tried that, from this evidence in conjunction with Nessim El Maleh's position at HSBCPB and Judah El Maleh's supervisory role, Judah El Maleh did know about, or suspected, the alleged money laundering going on through HSBCPB accounts.

109. Judah El Maleh notes that Meyer gave further evidence in the 6 November 2012 Geneva hearing that:-

"my brother Judas never talked to me about what I was doing with Nessim… I never talked to him about clearing transactions. Personally, I never talked to him about Simon PEREZ. Nessim never informed me of any conversation that he might have had with Judas regarding clearing, Simon PEREZ, and the money MARDOCHE received in Paris. Between 2007 and May 2010, I have no contact with Judas, with whom I was on bad terms. […]".

110. I bear such evidence in mind, but none of this is conclusive as to whether Judah knew about Nessim's role in the HSBCPB alleged money laundering: it only speaks of Meyer El Maleh's knowledge of conversations between him and Judah. Meyer El Maleh told the investigating magistrate in Paris on 14 June 2016 that Judah El Maleh was *"fired because he was covering for Nessim, and because then there was another case with Asia, a sector which Judah handled"*. This is not the reason that HSBCPB gave for terminating Judah El Maleh's employment, but this does not detract from the general point that Meyer considered Judah to have been *"covering for Nessim"*.

111. Fifthly, the fact that Judah El Maleh was not charged by the Swiss or the French authorities following investigations into the money laundering does not (thereby) mean that the Claimants do not have a case against Judah El Maleh as to money laundering in civil proceedings. That is a matter for consideration by the English court with the benefit of all available documentary and factual evidence, including expert evidence on Swiss law. I make three further points with regard to the matters specifically drawn to my attention by Judah El Maleh's counsel:

(1) Judah El Maleh submitted (in reliance on Burrus 1) that the fact that a criminal investigation was conducted in the context of the Claimants' allegations but did not result in Judah El Maleh being charged or convicted of any criminal offence would carry significant weight in the decision-making process of a civil judge in Switzerland. This was repeated in oral submissions, in the context of the Swiss courts being allegedly deferential to what the criminal authorities had determined. However, Mr. Hofmann did not fully agree with this conclusion, stating that Swiss civil courts will examine "freely" whether the prerequisites of the offence are fulfilled, based on the evidence before them. The degree of deference shown by Swiss courts to the determinations of criminal authorities may well itself be a

serious issue to be tried between the parties, but it clearly cannot be assumed that a Swiss court applying Swiss law would always follow the determinations of criminal authorities.

(2) Judah El Maleh further relied on the fact that money laundering is an offence to be prosecuted *ex officio* in Switzerland. In Burrus 2, it is noted that the criminal justice authorities are obliged to commence and conduct proceedings where they are aware of or have grounds for suspecting that an offence has been committed (Article 7 Swiss Criminal Procedure Code). Again this is not decisive as to the merits of any civil claim. I also do not have before me evidence as to the finer details of Article 7 and how it is applied in practice or as to what the actual reasons were which led the Swiss authorities to conclude that there were no grounds to suspect that Judah El Maleh had committed an offence (assuming they did so conclude) or as to whether they had the same evidence before them, as I have before me (or a judge at trial is likely to have).

(3) Judah El Maleh also relied on the decision by the French authorities not to charge Judah El Maleh. I consider that this is limited relevance to the Claimants' case. The French police believed (as of 5 September 2015) that Judah El Maleh was *"perfectly aware of the activities of Meyer and Nessim"*, having obtained the telephone conversations that I have referred to. In the event it appears that Judah El Maleh was not prosecuted, but I do not have evidence as to the reasons for that. Nor do I have evidence as to whether money laundering is an *ex officio* offence in France, or indeed what the purpose of the police operation may or may not have been, and whether or not particular offenders, or classes of offenders, were targeted.

112. Sixthly, the conclusions of the Swiss Courts as to the factual allegations of unlawfulness are not determinative of the issues before me, and that will arise at trial:

(1) It is not alleged that this court is bound by the decision of the Swiss First Instance Court or the Appeal Court as a matter of res judicata and/or issue estoppel.

(2) It is an obvious point, but it does not follow that the documentary, factual and expert evidence before this Court will be the same, or that the same decision will be reached in the light of such evidence.

(3) There appears to be a dispute between the parties as to the evidential standard to which the claimants must prove their claim as applied by the Swiss Court. According to Mr Burrus, in his supplemental report, the evidential standard that the Claimants' claim failed to meet in the Swiss attachment proceedings is a similar standard to that applied by the English court in these proceedings: whether the claimants had a prima facie case, in which the judge acquires *"the impression of a certain plausibility of the existence of the alleged facts, without having to exclude that it may be otherwise [...] the condition is that there must be some initial evidence"*. However, the Claimants submit that the test in fact applied by the Swiss courts was higher, as suggested by the language in the Swiss First Instance Decision: *"demonstration of the likelihood of [the claim's] existence",* whether the applicant has *"plausibly argued his claim",* and in the Swiss Appeal Court's judgment *"plausibility that the debt exists"* and *"probability that the claim exists"*. In circumstances where the experts were not directed to address the standard of proof in their first report, and Mr Hofmann has had no opportunity to reply to Mr Burrus' supplementary report (for which no permission has been granted by this Court in any event), it would be neither possible, nor appropriate, for me to attempt to resolve this question on this application. To the extent relevant, this is just the sort of point best determined at trial after hearing both the written and oral evidence from the experts (to the extent that they ultimately disagree).

(4) It does not appear that the Swiss First Instance Court's decision addressed directly the question of whether Judah El Maleh had the relevant knowledge/suspicion of the money laundering going on in HSBCPB, instead their decision was based on several other factors (inter alia, that Judah El Maleh had not been convicted or arrested, and that his dismissal by HSBCPB was pursuant to the contractual notice period).

113. In the above circumstances, and for all the reasons I have given, I am satisfied that there is, at the very least (if not more than) a serious issue to be tried that Judah El Maleh had actual knowledge or suspicion of the alleged money laundering taking place through HSBCPB bank accounts, having regard, in particular, to the documentary and witness evidence (in the form of Ms. Vasarino's statement and the covert recordings) which

themselves have to be considered in the context of the potential inferences that it may be appropriate to draw set against the backdrop of Judah El Maleh's senior position overseeing a department in which extensive money laundering allegedly took place. The decisions of the Swiss/French authorities not to prosecute, and of the Swiss First Instance and Appeal Court, are matters that will no doubt be addressed in expert evidence, and raise issues for consideration at trial, but do not lead to the conclusion that there are not serious issues to be tried on the merits.

### (vi) The Tort Claim: Issue 1.2 and 1.3: Factual Issues relating to Judah El Maleh's Obligations and Breach thereof

114. I consider that there is clearly a serious issue to be tried as to the 'act' (Issue 1.2) and 'fault' (Issue 1.3) elements of Article 305bis, for the following reasons.

115. Firstly, I am satisfied that there is a serious issue to be tried as to whether Judah El Maleh's responsibilities and functions within HSBC were such that he should be subject to obligations under Articles 3-9 SLML to prevent the money laundering activities that occurred within HSBC. Judah El Maleh does not accept that he was under such a duty. In this regard:-

(1) As addressed by the Swiss law experts, financial intermediaries such as banks (e.g. HSBCPB, which was Judah El Maleh's employer at the time) are under a positive duty pursuant to Articles 3-9 SLML to prevent money laundering (i.e. they are "guarantors" in this context). The required mental element for the reporting obligation under Article 9 SLML is that the financial intermediary "knows or has reasonable grounds to suspect" that the assets involved in the particular business relationship are connected with specific criminal offences, or represent the proceeds of specific crimes, or are subject to the power of disposal of a criminal organisation, or serve to finance terrorism. An individual working within such a financial intermediary may be a "*guarantor*" in this context, and hence may be himself liable for money laundering by omission, if that individual acts (a) as a governing officer or as a member of a governing body of the relevant institution, (b) as a partner, (c) as an employee with independent decision-making authority in his field, or (d) without being a governing officer, member of a

governing body, partner or employee, as a de facto manager. I understand that this exposition of the law is not in dispute.

(2) The question of whether Judah El Maleh is a guarantor depends upon a detailed examination of his duties within the institution, including the bank's internal guidelines defining processes, responsibilities and distribution of tasks. The question of whether Judah El Maleh is a "guarantor" raises a serious issue to be tried between the parties.

116. Secondly, I am satisfied that there is a serious issue to be tried that Judah El Maleh failed to comply with that obligation, and was at fault in doing so. Some submissions were made to the effect that Judah El Maleh complied with his Article 3-9 duties by making sure that compliance officers assigned to the MEDIS department were professional and efficient. The Claimants' expert Mr Hofmann accepts that a delegation of obligations to subordinated persons is allowed, but only where the transferred obligation is precisely described and the start date stated. Further, this "delegation" is just a modification of the content of the duties: Judah El Maleh was still responsible for selecting, instructing and overseeing the subordinate persons. Given the widespread nature of the alleged money laundering discovered by the Swiss authorities in the MEDIS department, and the judgment of the Employment Tribunal upholding the bank's "total loss of trust" in Judah El Maleh following his failure to identify the unlawful acts in the MEDIS department, I am satisfied that there is at least a serious issue to be tried as to whether Judah El Maleh failed in his selection, instruction or oversight of the subordinate persons responsible for compliance, and was at fault in doing so.

117. Thirdly, Judah El Maleh made submissions as to the conclusions of the Swiss Courts, the failure of Swiss Authorities to charge him, and the failure of HSBCPB to dismiss him for misconduct apply to Issues 1.2 and 1.3. However, for the reasons that I have already identified I do not consider that these matters lead to the conclusion that there is no serious issue to be tried on this part of the Claimants' claim.

### (vii) The Tort Claim: Issue 2 Scope of Articles 305bis SPC and 41 SCO.

118. I consider that there is a serious issue to be tried as to whether or not the Claimants' case falls outside the scope of Article 305bis SCP and Article 41 SCO. I will set out the

arguments each party made, followed by my reasoning in support of the conclusion reached.

119. Judah El Maleh contends that the Claimants' case fails (regardless of the factual issues identified above) because it is said that it falls outside the scope of Article 305bis SCP and Article 41 SCO due to, inter alia, the fact that the money laundering was an inherent part of the tax optimisation scheme, and Claimants therefore benefitted from the offence that they now seek to base a tort claim on. In this regard:

(1) Judah El Maleh relies, in support of these contentions, on the decision of the Swiss Appeal Court that the Claimants could not recover anything as a matter of Swiss law.

(2) Further, he relies on and adopts each of the grounds that the Swiss Appeal Court gave for concluding that the Claimants could not recover anything as a matter of Swiss law, even if Judah El Maleh did act unlawfully within Article 305bis (at [71] ff of his Skeleton Argument).

(3) The relevant grounds of the Swiss Appeal Court are set out as follows:

"In particular, the claimants do not have the status of injured parties, within the meaning of criminal law, of the prior offence whose purpose was to conceal the product, in this case drug trafficking [the First Ground].

Nor were the plaintiffs harmed by the money laundering acts committed; on the contrary, they benefited for several years, directly or even indirectly, from the commission of such acts, which provided them with liquidity without raising suspicions [the Second Ground].

They cannot also complain that their involvement – apparently unintentional – in such money laundering acts ultimately prevented them from exploiting for longer the tax optimisation scheme that they had put in place, which was considered fraudulent. The purpose of repression of money laundering cannot be to allow the commission of other offences, in particular tax offences, provided that the proceeds of such offences are not laundered [the Third Ground]."

(4) Judah El Maleh must logically rely upon the decision and each of the grounds as being a correct exposition and implementation of Swiss law.

120. The Claimants contend that their claim does fall within the scope of Article 305bis SCP and Article 41, because the money laundering was not an inherent part of the tax optimisation scheme, and because their claim is based on damages caused by misappropriation (a form of theft). The Claimants also contend that Judah El Maleh cannot rely on the Swiss Appeal Court's decision, because it is wrong in its application of Swiss law to the facts. Further, the Claimants' Skeleton Argument sets out substantive reasons as to why the Swiss Appeal Court was wrong on the First and Third Ground (at [56.4] and [56.5]), and why there is a serious issue to be tried as to the factual allegations upon which the Second Ground was based.

121. I am satisfied that there is a serious issue to be tried as to whether the Claimants' case falls within the scope of Articles 41 SCO and 305bis SCP for the reasons I identify below.

122. Firstly, there is a serious issue to be tried between the parties as to whether the *decision* of the Swiss Appeal Court is correct, in its application of Swiss law to the facts, in circumstances where its correctness is heavily relied upon by Judah El Maleh. I cannot determine this issue before trial not least in circumstances where this would require further expert evidence (and the testing of that evidence in the absence of agreement between the experts). In this regard:-

(1) In his second witness statement and in his submissions, Judah El Maleh relies on the Swiss Appeal Court as correctly applying Swiss law to the facts of the present case: he refers to this judgment in his skeleton argument at [84] as "inherently convincing" and states that there is "no sensible basis" on which the court should go behind the Swiss Court's conclusions on Swiss law. Judah El Maleh does not provide an expert report setting out why the Appeal Court's exposition of the law and its application to the facts is correct: Burrus 1 sets out the legal test at [24] for the scope of Article 305bis, and Burrus 2 sets out in bare terms the conclusions of the Appeal Court. However, as I have already noted, Judah El Maleh does not have the permission of the Court to serve such a further report.

(2) For their part, the Claimants have in their written and oral submissions contended that the Appeal Court's findings are <u>not</u> a correct application of Swiss law to the factual matters arising in this case, but have yet to produce an expert report in this regard in circumstances where there was no permission granted to the parties to serve a further report (and the Swiss Appeal Court judgment post-dates the experts' reports for which permission was given).

123. I do not have the expert evidence before me that would enable me to conclude with any certainty whether Swiss law is as stated in the Swiss Appeal Court judgment or, still more pertinently, what the proper application of Swiss law is to the facts of the present case. It is clear that there is a live issue between the parties on this and it is one that will need to be resolved at trial, with the benefit of expert evidence from each party's expert. Even had such expert evidence been available and before me at this time (which it is not) I consider there would have been a danger of, in effect, conducting a mini-trial on issues of foreign law on which the experts are not *ad idem* – on established principles that would not have been appropriate.

124. Secondly, I am satisfied that there are further specific serious issues to be tried between the parties as to the correctness of the First and Third Grounds in the Swiss Appeal Court's decision. In this regard:-

(1) I consider that there is a serious issue to be tried in relation to the First Ground as to who the "norm" of Article 305bis SCP is intended to protect.

(a) In Burrus 1, Mr Burrus considers that a breach of Article 305bis SCP can constitute an unlawful act creating liability under Article 41 SCO, provided that the norm breached is one that specifically intends to protect the rights of the injured party (at [24]). This is not disputed by Mr. Hofmann. The point of dispute is whether the "norm" in the Claimant's case is theft/misappropriation (as the Claimants and Mr. Hofman contend), or whether the predicate offence has to be the criminal offence pursuant to which money was laundered under Article 305bis SCP (Judah El Maleh contends that this is correct based on the Swiss Appeal Court's decision). The Claimants contend that the Swiss Appeal

Court is wrong, on the basis that it has fundamentally misunderstood their case as being about something other than misappropriation.

(b) Neither expert report comments on the correctness of the Swiss Appeal Court's conclusion on the First Ground. In these circumstances, the point of dispute involves issues of foreign law on which I have not yet heard full evidence. I am satisfied that there is a serious issue to be tried in this regard, and it is classically a matter that will need to be addressed at trial on the expert evidence exchanged in due course.

(2) I am satisfied that there are serious issues to be tried as to the correctness and interpretation of the Swiss Appeal Court's conclusions on the Third Ground. In this regard:-

(a) The meaning of the Third Ground is unclear from the face of the judgment. I did not have the benefit of expert evidence to explain the court's reasoning. Burrus 2 does not clarify matters; indeed, Mr Burrus largely recites the words of the judgment and Mr Hofmann has yet to provide expert evidence in relation to the judgment.

(b) If the Swiss Appeal Court has concluded that the money laundering was an inherent part of the tax optimisation scheme, this is a restatement of the Second Ground, and it raises the same serious factual issue to be tried (as addressed below).

(c) If the Swiss Appeal Court has concluded that the Claimants cannot use the Article 305bis SCP money laundering offence in circumstances where it was considered to be part of a tax fraud scheme, is it being said the commission of any tax offences by the Claimants operates effectively as a defence of illegality to any of their claims? Again, this is an area that will require expert evidence both to explain the Swiss court's reasoning, and any effect of such reasoning on the Claimants' claim. Judah El Maleh accepts that any argument as to illegality as a substantive defence in Swiss law is a matter for trial (see the Second Witness Statement of Mr Ford at [54]).

125.  Thirdly, I am satisfied that there is a serious issue of *fact* to be tried between the parties as to whether the Claimants benefitted directly or indirectly from the commission of the alleged money laundering acts. This is related to the Second Ground. This ground was adopted by Judah El Maleh as being correct (at [70.2] of his Skeleton Argument). Its correctness, however, was challenged by the Claimants (at [56.5] of their Skeleton Argument). In this regard:

(1) Judah El Maleh alleges that the Claimants did benefit indirectly from the money laundering scheme, because it was an intrinsic part of the tax optimisation scheme. This is based upon the description of the money laundering operation in the French Police Report and the factual findings of the Swiss Appeal Court, and the finding of the *Tribunal de Grande Instance de Paris* (the Paris first instance criminal court) on 11 June 2019 that Mr. Zahut was guilty of, *inter alia*, laundering tax fraud proceeds as part of an organised group. The Claimants submit that the money laundering was <u>not</u> an intrinsic part of the tax optimisation scheme, but the reason for and therefore ultimate cause of the misappropriation – see paragraph 78.2 of the DAPOC, in which they plead that *"the monies were misappropriated including by being transferred, it is inferred, through HSBCPB accounts, by and/or with the assistance and/or knowledge of and/or for the benefit of the Defendants pursuant to a money laundering scheme"*.

(2) I am satisfied that there is a serious issue to be tried between the parties as to which version of events is correct, and it is not a matter that can, or should, be determined on an interlocutory basis. Judah El Maleh has adduced no expert evidence to support a conclusion that Claimants benefitted from the money laundering scheme, and this would be likely to require expert account evidence. The police report does not mention the tax optimisation scheme explicitly; neither does the finding of the Paris First Instance Criminal Court against Mr. Zahut. I note that the Swiss Appeal Court appears to have considered that the money laundering and the tax optimisation were interlinked (as would be necessary for their Second Ground to work) – however the Claimants contend that the Swiss Appeal Court was wrong to reach such a conclusion.

126.  Again, Judah El Maleh seeks to rely on the Swiss First Instance Appeal Court's conclusions that the Claimants' claim fails for want of causation, and seeks to rely on

each individual reason. He relies on two of the Appeal Court's conclusions as being correct:

(1) The Swiss Appeal Court firstly upheld the first instance court's decision on causation, and itself determined that *"the existence of a natural causal link between the alleged damage and the alleged unlawful act is not plausible"*, because there was no indication that the suggested *"impossibility"* of the Claimants being able to recover their funds is due to the alleged money laundering, as opposed to other reasons – such as the "tax fraud acts" for which Mr Zahut was convicted.

(2) The Swiss Appeal Court secondly determined that: *"the claimants do not indicate that they made any steps that would have been in vain to recover this balance before bringing the company and others before the London courts [...]"*and *"serious doubts remain as to the impossibility of recovering the disputed funds and therefore as to the actual nature of the damage suffered by the claimants"*.

127. However, I am satisfied that there is a serious issue to be tried as to whether the tort allegedly committed by Judah El Maleh caused the damages to the Claimants. In this regard:-

128. Firstly there is, on the facts, a serious issue to be tried as to whether Judah El Maleh's participation in the money laundering operation *caused* the Claimants loss:

(1) The Claimants claim that there is "a wealth of evidence" that monies paid by Terre Neuve to Yewdale were flowing through accounts held at HSBCPB and managed by the MEDIS department during the period from 2009 to 2012, which they allege were operated by Nessim El Maleh. Those transfers are set out (amongst other purported transfers) in their DAPOC at [77.1] – [77.5], and in particular at [77.2]-[77.3]. The existence of this evidence was not substantially challenged by Judah Maleh for the purposes of the jurisdictional challenge.

(2) The Claimants use this evidence to contend that the money laundering was essentially a cause of the misappropriation of funds: the monies were transferred "pursuant to a money laundering scheme". The Defendants challenge this in that they argue (in relation to legal liability) that the money laundering scheme was

part and parcel of the tax optimisation. For the reasons that I have identified above, there is a serious issue to be tried between the parties as to whether the money laundering caused the misappropriation, or was an intrinsic part of the tax optimisation scheme.

(3) The Claimants further contend that there is a link between Judah El Maleh's involvement in the money laundering and the Claimants' loss, in that the Claimants would not have lost all the funds paid to Yewdale if Judah El Maleh had blown the whistle on, and/or acted so as to prevent, the MEDIS department's money laundering activities, particularly Nessim and Meyer El Maleh's participation in compensation transactions that were likely matched with interbank transfers involving accounts at HSBCPB. Save for claiming that the money laundering activities and the tax optimisation scheme were interlinked, Judah El Maleh does not fully engage with this issue.

129.  Secondly, the conclusions of the Swiss First Instance and Appeal Courts on causation, were made, as I understand it, without access to evidence which is now before this Court. In this regard:

(1) The First Instance Court and Appeal Court reached the conclusion that there was no causation because there was no evidence brought by the Claimants that Yewdale regularly transferred funds to the accounts of other entities within HSBCPB. The Appeal Court refused to consider this evidence because the Claimants had failed adequately to explain why they were unable to adduce that evidence before the First Instance Court.

(2) However, that evidence, and the Claimants' associated allegations, are before me and I consider that they raise a serious issue to be tried, for the reasons I have already identified. For the same reason, I do not find the Swiss Appeal Court's other conclusions on causation (cited at [72] of Judah El Maleh's skeleton argument) to be helpful in determining whether there is a serious issue to be tried: they did not have to consider the specific causal scenario which is now before this Court.

(3) Further, the Claimants contend that the Appeal Court's alternative conclusion on causation was (a) in the nature of an illegality defence and (b) was in any event

incorrect ([56.7.2] of their Skeleton Argument). In these circumstances, I cannot determine whether this application of Swiss law is correct on an interlocutory basis.

(4) Judah El Maleh contends that the Claimants cannot complain about the way that the Claimants presented the case to the Swiss Courts, but I consider that to be beside the point. The English Court will have to consider the question of causation on the basis of all the evidence, and the Swiss law expert evidence addressed to that evidence. Once again, this raises serious issues to be tried.

### (ix) The Derivative Claim

130. In my view, there are also serious issues of law to be tried between the parties as to whether the Derivative Claim can succeed. I will first set out the various contentions of the parties, followed by the relevant provisions of Swiss law, followed by the reasons for my conclusion.

131. As to the contentions of the parties before me:

(1) Judah El Maleh contends that the Claimants' Derivative Claim must fail as a matter of Swiss law for two reasons: firstly, that the Claimants are not creditors in the sense required by the Derivate Claim pursuant to Article 754(1) SCO; and secondly, that the Claimants suffered no direct damage because the company against whom the primary offence was committed (HSBCPB) is solvent.

(2) The Claimants submit that there is a serious issue to be tried as to each of the above points based on the evidence of the parties' respective Swiss law experts.

132. The relevant provisions of the Swiss Code of Obligations are as follows:

> "Art. 716a
>     1 The board of directors has the following non-transferable and inalienable duties:
>         […]
>         3. the organisation of the accounting, financial control and financial planning systems as required for management of the company;
>         […]
>         5. overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations and directives;
>         […]
>     2 The board of directors may assign responsibility for preparing and

implementing its resolutions or monitoring transactions to committees or individual members. It must ensure appropriate reporting to its members.

Article 717

1 The members of the board of directors and third parties engaged in managing the company's business must perform their duties with all due diligence and safeguard the interests of the company in good faith.

Article 754

1 The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties.

2 A person who, as authorised, delegates the performance of a task to another governing officer is liable for any losses caused by such officer unless he can prove that he acted with all due diligence when selecting, instructing and supervising him."

133.  As to the reasons for my conclusion: I consider that two issues of Swiss law are raised: the question of whether the Claimants are "creditors" within the meaning of the relevant provisions of Swiss law, and the question of whether the Claimants can have suffered direct damage where HSBCPB is solvent. These are issues that will need to be tried between the parties, and it would not be appropriate to determine them now, whether by way of "mini-trial" or otherwise. On any view there is a serious issue to be tried. In this regard:-

134.  Firstly, as to the question of whether the Claimants are "creditors" within the meaning of the relevant Swiss legal provisions:

(1) It is common ground that in order to bring a derivative claim for breach of Article 717, the Claimants must be "creditors" for the purposes of Article 754.

(2) There is a disagreement between the experts as to whether the facts of the present case entitle the Claimants to contend that they have become creditors of HSBCPB. In this regard:

(a) Mr Burrus contends that the Claimants are not entitled to bring a derivative claim from a breach of Article 717, because they are not "creditors" within

the meaning of Article 754, and they did not have a contractual relationship with HSBCPB. Mr Hofmann contends that this is incorrect because one can acquire the status of a creditor by suffering damage by the debtor at one earlier point in time (before the breach of duty in Article 717), so that subsequent damage done by the breach of Article 717 can equally be recovered under Article 754.

(b) The dispute between the experts was put as follows in the Claimants' skeleton argument: "*whether the facts of the present case entitle the Cs to contend that they have become creditors of HSBC as a result of one or more of their claims against HSBC crystallising before, even if only a scintilla temporis before, Judah El Maleh committed the alleged breaches of duty.*"

(3) This also raises a serious factual issue for trial. It is not possible to conclude at an interlocutory stage that the Claimants could never be HSBCPB's creditors by reason of damages claims against it before Judah El Maleh committed his alleged breaches of fiduciary duty. It is not currently possible at this early stage of the proceedings to plead precise dates for HSBCPB's alleged wrongdoing in failing to prevent the money laundering, versus Judah El Maleh's breach of his fiduciary duties towards HSBCPB.

135. Secondly, as to whether the Claimants have suffered "direct" damage:

(1) It is common ground that the only damage that can be recoverable under Article 754(1) SCO is "direct" damage.

(2) There is a disagreement as to whether "direct" damage of the creditor can exist in situations outside the relevant company (HSBCPB) being placed in bankruptcy. Mr Burrus contends that "direct damage of the creditor is essentially theoretical, except if the company has been placed in bankruptcy" (Burrus 1, [49]). Mr Hofmann contends that direct damage actually has to do with a direct loss suffered by the creditor, which can include damage caused by money laundering (Hofmann 1, [49]). This is a disagreement as to the interpretation of the applicable law, which I cannot resolve on an interlocutory basis.

D.2.2 Necessary or Proper Party

136. Judah El Maleh contends that he is neither a necessary, nor a proper party, primarily because his liability is contingent on proving that the money laundering alleged to have been performed by the other defendants in fact took place, so it is possible for the claim against him to be run in standalone proceedings. The Claimants contend that he is a proper party, because the claims against him are bound up with the claims against HSBCPB.

137. I am satisfied that Judah El Maleh is a proper party to these proceedings, for the following reasons:-

138. Firstly, an examination of Judah El Maleh's state of mind for the purposes of the Claimants' claims under Article 41 SCO will inevitably involve a single investigation of the claims against him and the claims against the other Defendants: for example, further analysis of the covert recordings I have set out above will be required to determine the precise nature of the money laundering scheme, and to determine whether Judah El Maleh knew about this scheme.

139. Secondly, the claims against Judah El Maleh are closely bound up with the claims against HSBCPB and Nessim El Maleh. The Claimants allege that money laundering occurred contrary to Article 305bis SPC, and that amongst others Judah El Maleh, Nessim El Maleh, HSBCPB and Mr. Mriouah each committed this offence as principal, co-author and/or accomplice ([130.4] DAPOC). Similarly, HSBCPB and GPF are alleged to be liable under Article 55 SCO, Article 722 SCO and/or Article 55 SCO on the basis of the actions of those companies' governing officers and/or persons with authority to represent the companies or manage their business and/or employees, with Judah El Maleh alleged to be a governing officer ([131] DAPOC). Nessim El Maleh and HSBCPB have already submitted to this court's jurisdiction, so a trial of the claims against them will inevitably take place here.

140. Thirdly, I am not persuaded by Judah El Maleh's submissions that he is not a proper party because joining him to proceedings would force him to be part of wide-ranging litigation, despite the fact that he played a relatively small role and the case against him is

based on his alleged failure to spot and prevent money laundering or misappropriation. There are still clear factual and legal connections between the claims against him and the claims against the other Defendants, particularly the money laundering claims against HSBCPB, so that it would be impractical and wasteful to have separate proceedings, potentially in another jurisdiction. Further, it is not uncommon in the Commercial Court for defendants with a self-contained role to be caught up in much larger proceedings, as long as the claims against them do overlap with the claims against the main defendants. Normally such defendants will tailor their participation, so as to limit their involvement to what is necessary to protect their interests and answer the claims against them.

### D.2.3 England and Wales as the Proper Place to Hear the Claim

141. Judah El Maleh does not challenge the conclusion in the May 2019 Judgment that this Court is the proper place to hear the claim. That is clearly correct: the claims against Nessim El Maleh and HSBCPB will go ahead here because they have already submitted to the jurisdiction, regardless of whether the claim against Judah El Maleh is heard in this country. Due to the legal and factual links between the two claims, hearing the claims together will be cost and time-efficient, and avoid a risk of irreconcilable findings (e.g.as to the meaning of the covertly-recorded conversations).

### D.2.4 Conclusion

142. In the above circumstances, and for the above reasons, I am satisfied that:-
    (1) Judah El Maleh is a proper party to the Claimants' claim;
    (2) There is at least a serious issue to be tried on each of the Claimants' claims (tort and derivative) against Judah El Maleh; and
    (3) England and Wales is the proper place to bring the claim against Judah El Maleh.

143. Accordingly, Judah El Maleh's application also fails and is dismissed.

144. I trust that the parties will be able to agree the terms of the Order to reflect the outcome of the applications before me, and any consequential matters including as to costs.

Neutral Citation Number: [2009] EWCA Civ 585

Case No: A3/2008/1888

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM  HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION (COMMERCIAL COURT)**
**MR JUSTICE WALKER**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 18/06/2009

**Before :**

**LORD JUSTICE WARD**
**LORD COLLINS OF MAPESBURY**
**LORD JUSTICE TOULSON**
and

**Between :**

| | |
|---|---|
| **UBS AG and UBS SECURITIES LLC** | **Appellants/Claimants** |
| **- and -** | |
| **HSH NORDBANK AG** | **Respondents/Defendants** |

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7404 1424
Official Shorthand Writers to the Court)

Mr David Railton QC and Ms Sonia Tolaney (instructed by Simmons & Simmons) for the
Appellants
**Mr Jonathan Sumption QC, Ms S Prevezer QC and Mr Andrew Henshaw** (instructed by
**Quinn Emanuel**) for the Respondents

Hearing dates : April 1 and 2, 2009

**Judgment**
**As Approved by the Court**

**Crown copyright©**

**Lord Collins of Mapesbury:**

**I    Introduction**

1.    This appeal turns on the construction of a jurisdiction clause. This is yet another case in which an action for a negative declaration has been used as a means of seeking to have a dispute litigated in what is perceived as a favourable forum: see e.g. *The Volvox Hollandia* [1988] 2 Lloyd's Rep 361, 371; *Hatzl v XL Insurance* [2009] EWCA 223, [2009] 1 Lloyd's Rep 555, at [27]. The principal issue is whether the English jurisdiction clause in one of the documents recording the complex transaction between the parties (a 1 page document among 500 pages of other documents constituting the overall deal) applies to the claims in the action in England for the negative declaration.

2.    This case concerns derivatives in relation to the property market, or Collateralised Debt Obligations ("CDOs"). The contractual documentation in this matter consists of more than 500 pages and its size and complexity, which is no doubt duplicated in many other transactions, make it easier to understand, if not to excuse, why senior banking figures (but not necessarily in this case) had little understanding of this market and of the risks their institutions were undertaking.

3.    HSH Nordbank AG ("HSH") is a commercial bank incorporated in Germany with dual headquarters in Hamburg and Kiel in Germany.  It was established in June 2003 as the result of a merger between two regional German banks, Landesbank Schleswig-Holstein Girozentrale ("LB Kiel") and Hamburgische Landesbank.   The first claimant, UBS AG, is an investment bank created in July 1998 by the merger between Union Bank of Switzerland and Swiss Bank Corporation.  UBS AG is incorporated in Switzerland, where it has its head office, and has substantial offices worldwide, including New York and London.  The second claimant, UBS Securities LLC ("UBS LLC"), is an affiliate of UBS incorporated in the United States with its principal place of business in the United States. It will not normally be necessary to distinguish between them, and I will generally refer to either or both of them as UBS.

4.    The transactions which are the subject matter of the actions took place in 2002/2003 between UBS and LB Kiel. HSH has assumed all material assets, rights and obligations of LB Kiel, and it is in that capacity that HSH has sued UBS in New York, and is being sued by UBS in England.  HSH is domiciled in Germany for the purposes of Council Regulation 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ("the Brussels I Regulation").

5.    The action for seeking negative declaratory relief against HSH was instituted on February 25, 2008, in anticipation of proceedings which were going to be instituted by HSH against UBS in New York. The New York proceedings were commenced later the same day in the New York state court. HSH alleged mis-selling and mismanagement of the securities which were the subject of the complex arrangements between the parties. The complaint relied on these causes of action: breach of contract; fraud; negligent misrepresentation; breach of fiduciary duty; breach of an implied covenant of good faith and fair dealing; unjust enrichment; constructive trust.

6.    The only possible basis for the jurisdiction of the English court is the jurisdiction clause in one of the agreements in the CDO transaction. HSH applied in the English proceedings for an order that the English court had no jurisdiction to try UBS's claim in the English proceedings. In the alternative HSH asked the court to decline to exercise jurisdiction on forum non conveniens grounds. Walker J decided that the English court did not have jurisdiction in respect of the claims made in the English proceedings, and that it was unnecessary to decide on the alternative application for a stay.

7.    A distinctive feature of this case is that the only point of the English proceedings is to pre-empt any decision of the New York court in the proceedings brought there by the defendants in the English proceedings. It is accepted that if the relevant claims (for fraudulent and negligent misrepresentation) in the New York proceedings do not stand, there will be no point in the English proceedings. UBS filed a motion in New York for an order dismissing the New York complaint on substantive grounds, alternatively dismissing or staying the action on jurisdictional grounds.

8.    After Walker J's judgment, the New York judge acceded in part to UBS's motion to dismiss, but HSH has revived some of the relevant claims in an amended complaint, which is itself the subject of a further motion to dismiss by UBS on the ground that they are precluded by the res judicata effect of the New York court's judgment.  That motion has been heard but not yet decided.

**II    Collateralised Debt Obligations**

9.    The background to the claim is that LB Kiel wished to invest in real estate related credit and asset backed securities which, at the time of the transaction in March 2002, were seen in the market as having outperformed similarly rated corporate securities. As a consequence, LB Kiel invested in a multiple tranche synthetic CDO.

10.    A CDO is a financial structure at the centre of which a special purpose vehicle ("SPV") issues tranches of debt securities, the performance of which is linked to a portfolio of assets.  The SPV may either hold the underlying assets (a "cash CDO") or take exposure to assets such as corporate bonds or asset-backed securities via a credit default swap with a financial counterparty (a "synthetic CDO"). The performance of CDOs is linked or "referenced" to the pool of underlying bonds or securities, the "Reference Pool".

11.    In the case of a synthetic CDO the issuer may (as in the present case) invest the proceeds of issue of the CDOs in a portfolio of high quality, typically AAA-rated assets ("collateral"); those collateral assets are used to generate income to make coupon (interest) payments on the CDOs and, in the case of a default of any of the Reference Pool to which the SPV is exposed, to pay the financial counterparty the loss due under the credit default swap.  On each occasion on which one of the assets in the Reference Pool defaults or is subject to some other "credit event" (such as a downgrading of its credit rating), then a payment becomes due from the SPV to the financial institution under the credit default swap.  At the same time, the principal and interest due from the SPV to the CDO noteholder is correspondingly reduced.   The usual practice is for CDO notes to be issued in different classes, whereby the losses are allocated sequentially commencing with the most "junior" tranche of notes until the original principal amount of such class of notes are written down to zero, and then

losses are allocated to the next "higher" tranche of notes, until the entire capital structure is exhausted or the maturity date of the CDO notes occurs.    As a consequence junior notes suffer as a result of earlier Reference Pool defaults/other credit events and the less risky "senior" tranches suffer loss only after the underlying classes of CDO notes have been reduced to zero principal value.

12.    A common feature of actively managed CDOs is that one of the parties to the transaction has the right to alter the composition of the Reference Pool.    Such a right potentially increases the risk for the holder of the CDO note, particularly if the party with the right to alter the composition of the Reference Pool has an economic interest in the transaction, as in the present case.

**III    The facts**

13.    In this case the SPV was set up by UBS, which was the financial institution under the credit default swap, and LB Kiel was the original holder of the CDO Notes issued by the SPV. The SPV used for the issue of the credit linked notes was a Cayman Islands company set up by UBS called North Street Referenced Linked Notes, 2002-4 Ltd ("NS4").

14.    NS4 issued notes which were denominated in United States dollars classified in three categories. The first category comprised $500 million of floating rate notes of classes A to D ("the NS4 Notes"). They were issued to and purchased by UBS so that UBS could sell them to LB Kiel as part of the transaction. The second and third categories comprised $25 million floating rate notes of class E ("the Class E NS4 Notes") and $49 million fixed rate income notes ("the NS4 Income Notes"). They also were issued to UBS but were not involved in the transaction.

15.    LB Kiel received the NS4 Notes which provided credit protection to UBS against certain credit risks in relation to the Reference Pool, which was a pool of international assets with an emphasis on U.S. commercial and residential real estate backed bonds and other asset-backed securities, selected by UBS.

16.    The credit default swap with NS4 gave UBS the right to alter the Reference Pool within certain parameters. If UBS chose asset-backed securities of high quality and stability, LB Kiel would receive a steady stream of income based on performance of assets in the Reference Pool. In return UBS was to receive "credit protection payments" upon the happening of certain "credit events" to cover losses in the Reference Pool. The effect was that LB Kiel provided credit protection to UBS in the event of defaults which would result in reductions in the principal amounts of the NS4 Notes.

17.    UBS was the manager responsible for the allocation and substitution of assets in the Reference Pool, as well as the direct recipient of any payments from the SPV due to credit events in respect of securities in the Reference Pool.    Accordingly, in order to protect LB Kiel the "Reference Pool Side Agreement" ("RPSA") was entered into between LB Kiel and UBS as a condition of the purchase of the CDO Notes.    The RPSA created obligations for UBS in connection with UBS's management, selection, and substitution of securities in the Reference Pool.

18.    In return, LB Kiel issued to UBS $500 million of puttable (i.e. redeemable on certain conditions) medium term notes (the "Kiel MTN Notes") under LB Kiel's existing medium term note programme.

*The Kiel MTN Notes*

19.    There had for some years been in existence a programme which had been agreed between LB Kiel and its Dutch subsidiary LB Schleswig-Holstein Finance BV ("LB Finance") and a group of banks ("the Dealers"), which included UBS. On September 11, 2001 the parties signed an amended and restated programme agreement ("the Programme Agreement"). The Programme Agreement set out terms and conditions which would apply if either LB Kiel or LB Finance agreed with any Dealer for the issue and purchase of notes.

20.    The normal practice would then be for the Dealer to sell the Notes in the secondary market. An information memorandum also dated September 11, 2001 ("the Information Memorandum") set out terms and conditions of Euro Notes. The Kiel MTN Notes, despite their denomination in dollars, fall within this category.

21.    By clause 21(1) the Programme Agreement and every agreement for the issue and purchase of Notes was to be governed by English law, and by clause 21(2):

> "Each of the Bank and Finance hereby irrevocably agrees for the exclusive benefit of the Dealers that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceedings arising out of or in connection with this Agreement (together referred to as 'Proceedings') may be brought in such courts.
>
> Each of the Bank and Finance hereby irrevocably waives any objection which it may have to the laying of the venue of any Proceedings in the courts of England and any claim that any such Proceedings have been brought in an inconvenient forum and hereby further irrevocably agrees that a judgment in any Proceedings brought in the English courts shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction.  Nothing contained herein shall limit any right to take Proceedings against the Bank and/or Finance in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not."

22.    The Information Memorandum of the same date indicated that the Notes would be issued on the conditions set out in the document, as modified and supplemented by the applicable Pricing Supplement. Condition 19(a) provided that the Notes would be governed by English law and by clause 19(b) there was a jurisdiction clause in these terms:

"The Issuer agrees, for the exclusive benefit of the Agents, the Noteholders, the Receiptholders and the Couponholders that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with the Agency Agreement, the Notes, the Receipts and/or the Coupons and that accordingly any suit, action or proceedings arising out of or in connection with the Agency Agreement, the Notes, the Receipts and the Coupons (together referred to as 'Proceedings') may be brought in such courts.

The Issuer hereby irrevocably waives any objection which it may have now or hereafter to the laying of the venue of any such Proceedings in the courts of England and any claim that any Proceedings have been brought in an inconvenient forum and hereby further irrevocably agrees that a judgment in any Proceedings brought in the English courts shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction.  Nothing contained in this Condition shall limit any right to take Proceedings against the Issuer in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not."

### *The Transaction*

*Letter Agreement: governed by New York law/no jurisdiction agreement*

23.     On January 23, 2002 UBS and LB Kiel signed a letter agreement ("the Letter Agreement") confirming the purchase by LB Kiel of what became the NS4 Notes subject to acceptable documentation. Clause 1 recorded a mutual expectation that the structure of the transaction would be substantially as described in a Term Sheet dated January 2002. It also recorded that the final structure would be as described in the final offering memorandum relating to the securities. Under clause 6 the Letter Agreement was governed by New York law. The Letter Agreement contained no jurisdiction clause. It was common ground that the sale which took place on March 5, 2002 should be treated as having taken place pursuant to the Letter Agreement. Consequently the sale was subject to New York law but did not involve any express term as to jurisdiction.

*Offering Circular and Indenture: New York law and non-exclusive New York jurisdiction*

24.     An offering circular dated March 1, 2002 ("the Offering Circular") described features of the NS4 Notes which came to be embodied in an Indenture dated as of March 5, 2002. The Offering Circular described how the performance of the NS4 Notes was to be linked, through a credit swap with UBS, to the performance of assets forming the US$3 billion notional amount Reference Pool. Under the credit swap NS4 would be obliged to make credit protection payments to UBS in the event of defaults on the assets, and the Offering Circular explained that such payments would give rise to corresponding reductions in the unpaid accrued interest on the NS4 Income Notes and thereafter the principal balance of all classes of the NS4 Notes, working progressively

upwards from the NS4 Income Notes through classes E, D, C, B and A. The offering circular stated:

> "Governing Law
>
> The Notes, the Indenture (including the grant by the Issuer of the security interest in the Collateral and the enforcement by the Trustee of such security interest (except to the extent that the validity or perfection of the Issuer's or the Trustee's interest in the Collateral, or remedies under the in respect thereof, may be governed by the laws of a jurisdiction other than the State of New York, in which case the laws of such jurisdiction shall apply to such extent)), the Kiel Custody Agreement, the Repurchase Agreements, the Non-Kiel Custody Agreements and the Administration Agreement will be governed by, and shall be construed in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws. The Issuer will submit to the non-exclusive jurisdiction of the New York courts for all purposes in connection with the Notes, the Indenture, the Kiel Custody Agreement, the Repurchase Agreements, the Non-Kiel Custody Agreements and the Administration Agreement and will appoint UBS Warburg LLC to accept service of process on its behalf. The Repo Counterparty will submit to the non-exclusive jurisdiction of the New York courts for all purposes in connection with the Repurchase Agreements and the Non-Kiel Custody Agreements and will appoint UBS Warburg LLC to accept service of process on its behalf.
>
> The Kiel MTN Notes will be governed by, and shall be construed in accordance with, the laws of England. The MTN Issuer will submit to the jurisdiction of the English courts in connection with the Kiel MTN Notes and has appointed its United Kingdom representative office at 50 Gresham Street, London EC2V 7AY to accept service of process on its behalf.
>
> The Credit Swap, and all matters arising from or connected with it, will be governed by, and shall be construed in accordance with, the laws of England. The Issuer and the Swap Counterparty will submit to the jurisdiction of the English courts for all purposes in connection with the Credit Swap, and the Issuer will appoint Clifford Chance Secretaries Limited to accept service of process on its behalf."

25.    The Indenture provided that the Indenture and the NS4 Notes were governed by New York law and it contained a non-exclusive New York jurisdiction clause.

*Credit swap: English law and non-exclusive English jurisdiction*

26.    Contemporaneously with the transaction, and in accordance with the Offering Circular, UBS and NS4 entered into a credit swap ("the Credit Swap"). Under the

Credit Swap UBS purchased credit default protection from NS4 with respect to the Reference Pool. In return a total premium of $574 million, subject to reduction in certain events, was to be paid by UBS to NS4 as periodic premium payments over the life of the swap. The Credit Swap provided for credit protection payments as described in the Offering Circular. It was governed by English law and (by virtue of the incorporation of the ISDA Master Agreement) contained a non-exclusive English jurisdiction clause.

*Reference Pool Side Agreement: New York law and non-exclusive New York jurisdiction*

27. The RPSA was also dated March 5, 2002, and provided LB Kiel with protections regarding UBS's management of the portfolio comprising the Reference Pool. Under Article II of the RPSA there was an obligation on UBS which required the creation of a "Commitments Committee" to monitor the credit quality of the Reference Pool. The Commitments Committee was to meet on a daily basis or as necessary. Article IV gave LB Kiel a power of veto in certain circumstances.

28. The RPSA was subject to New York law and contained a non-exclusive New York jurisdiction clause. Section 9.08 of the RPSA was entitled "Governing Law: Consent to Jurisdiction and Service of Process." It included the following governing law and jurisdiction clauses:

> "(a)    This agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflicts of laws.
>
> (b)    ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST [UBS] OR [LB KIEL] ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK AND ANY APPELLATE COURT FROM ANY SUCH COURT, AND, BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF [UBS] AND [LB KIEL] ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT
>
> …"

*Pricing Supplement/Dealer's Confirmation: English law and exclusive English jurisdiction*

29. On March 5, 2002 LB Kiel issued to UBS $500 million of Kiel MTN Notes. They were "puttable" (i.e. redeemable) in that the principal amount of each note with

accrued interest would become payable to a noteholder on any business day at the noteholder's option subject to written notice being given 5 business days in advance. These Notes were issued pursuant to a Pricing Supplement and a Dealer's Confirmation under the terms of the 2001 Programme Agreement regulating the issue of Kiel MTN Notes.

30.    The Pricing Supplement was signed by LB Kiel and dated March 5, 2002. The Pricing Supplement was to be read in conjunction with the Information Memorandum. It had detailed provisions concerning, among other things, the interest rate of the Kiel MTN Notes and the put option available to holders of the Kiel MTN Notes. Clause 32 of the Pricing Supplement dealt with "other terms or special conditions". It provided that Condition 19(b) of the Information Memorandum for Euro Notes was to be modified. The modification resulted in a jurisdiction clause which read:

>    "(b)    Subject as provided [below], the parties agree that the courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with the …[Kiel MTN Notes]… and the parties accordingly submit to the exclusive jurisdiction of the English courts… nothing contained in this condition shall limit any right of the … Noteholders… to take proceedings against [LB Kiel] in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not."

31.    The other document executed on March 5, 2002 was a "Dealer's Confirmation" signed by UBS AG. It has also been referred to in this case as "the Kiel Notes Initial Purchase Agreement" or IPA. The Dealer's Confirmation recorded that clause 21 of the Programme Agreement was deemed to have been deleted and replaced. The replacement was a jurisdiction clause which read:

>    "Subject as provided in this sub-clause (2), the parties hereby irrevocably agree that the courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and the parties accordingly submit to the exclusive jurisdiction of the English courts for any suit, action or proceedings arising out of or in connection with this Agreement (together referred to as 'Proceedings').
>
>    Each of [LB Kiel and LB Finance] hereby irrevocably waives any objection which it may have to the laying of the venue of any Proceedings in the courts of England and any claim that any such Proceedings have been brought in an inconvenient forum and hereby further irrevocably agrees that a judgment in any Proceedings brought in the English courts shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction. Nothing contained herein shall limit any right of the Dealers to take Proceedings against the

> [LB Kiel and/or LB Finance] in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not.
>
> ..."

32. Immediately upon issue by LB Kiel to UBS the Kiel MTN Notes were transferred by UBS to NS4 in exchange for the issue by NS4 to UBS of the NS4 Notes. This transfer was envisaged by the Offering Circular, which explained that payments of principal under the NS4 Notes, along with Credit Protection Payments affecting those notes, would be funded by NS4 exercising its option to redeem the Kiel MTN Notes.

## IV    The dispute and the New York proceedings

33. Since March 5, 2002 regular payments on the NS4 Notes have been made by NS4 to LB Kiel and subsequently by NS4 to HSH. In recent times there have been defaults on assets in the Reference Pool. These defaults have not yet reached the top 4 tranches of the obligations to make credit protection payments. HSH says that it is nevertheless concerned at what may happen in future, and that those concerns have led it to review the circumstances in which LB Kiel entered into the transaction and the way in which the transaction has been put into effect. Following that review a dispute has arisen between HSH and UBS.

## A    The original New York complaint

34. As I have said, the New York proceedings were commenced on February 25, 2008 shortly after, on the same date, UBS had issued its proceedings for negative declaratory relief in England. The essence of the New York complaint in its original form concerned the alleged initial mis-selling and subsequent mismanagement of the Reference Pool underlying the NS4 Notes in that (a) UBS in selling the NS4 Notes to LB Kiel made various misrepresentations to LB Kiel, fraudulently or negligently; (b) UBS was in breach of the contract for the sale of the NS4 Notes to LB Kiel, by failing to deliver notes with the characteristics promised; (c) UBS breached the RPSA.

35. In paragraph 29 the complaint referred to LB Kiel as making "a $500 million cash investment" in return for the NS4 Notes, and in paragraph 30 the complaint said that NS4 used what it received from LB Kiel in order to invest in the Kiel MTN Notes. HSH acknowledged that this was inaccurate. The true position was that LB Kiel bought the NS4 Notes by issuing the Kiel MTN Notes to UBS, and UBS transferred them to NS4 which retained them as collateral.

36. The first cause of action was for breach by UBS of contractual obligations found in the agreement for the purchase of the NS4 Notes by LB Kiel from UBS and in the RPSA. In consequence it was claimed that HSH should be awarded rescission of its contracts with UBS, or, in the alternative, damages.

37. The second and third causes of action were for fraud and negligent misrepresentation respectively. Each gave an account of allegedly untrue representations, along with failures to disclose, which were said to have induced LB Kiel to have purchased the

NS4 Notes. In relation to both these causes of action it was said that HSH should be awarded rescission of its contracts with UBS, or, in the alternative, damages.

38.    The fourth cause of action was for breach of fiduciary duty. It asserted that UBS had utilised LB Kiel's investment as an opportunity to take default risk off its own balance sheet and profit by taking short positions against the Reference Obligations it selected for inclusion in the Reference Pool. As a result HSH said that it had been damaged in an amount to be determined at trial, and was also entitled to punitive damages.

39.    The fifth cause of action was for breach of an implied covenant of good faith and fair dealing. It asserted that UBS knowingly, intentionally, in bad faith, and in secret, selected Reference Entities that fundamentally compromised the NS4 Notes, charged an excessively high price for those Notes, and set an excessively low yield to be paid on them. It also asserted that UBS had made multiple adverse substitutions of collateral in the Reference Pool for its own benefit. The remedy claimed was rescission of the NS4 transaction, or, in the alternative, damages in an amount to be determined at trial.

40.    The sixth cause of action was for unjust enrichment and breach of constructive trust, on the basis that UBS had received a monetary benefit to which it was not entitled, and which it had unjustly retained, and that in consequence the parties should be returned to their original position prior to UBS's misconduct, and UBS's ill-gotten gains should be held on constructive trust for HSH.

41.    The seventh cause of action sought an injunction requiring UBS to establish a Commitments Committee conforming with the requirements of the RPSA or in some other way to manage its conflicts of interest.

42.    The eighth cause of action was for conversion, on this basis: HSH had entrusted funds, through its investment in the NS4 Notes, to UBS for specific and limited purposes; UBS had wrongfully converted those funds; as a result of the conversion HSH had been damaged in an amount to be proved at trial.

**B    The Motion to Dismiss**

43.    On March 28, 2008, UBS filed a motion to dismiss the New York proceedings as not disclosing a cause of action.  UBS also argued (as an alternative submission) that the New York court should stay its proceedings on forum non conveniens grounds.  A few days after Walker J's judgment on July 4, 2008, UBS withdrew its forum non conveniens challenge, on the basis that in the light of Walker J's decision and pending the present appeal it was moot.

44.    In his decision dated October 21, 2008, Justice Richard B Lowe III dismissed six out of the eight causes of action advanced in the New York complaint, namely the second to fourth and sixth to eighth causes of action, i.e., the causes of action for (alleged) fraudulent and negligent misrepresentation, breach of fiduciary duty, unjust enrichment and constructive trust, request for an injunction and conversion.

45.    The fraud claims were dismissed on the ground that because HSH's claims of fraud were merely repetition of its claims for breach of contract, with the addition of allegations that UBS never intended to act in HSH's interests, and the many ways in

which UBS did not honour the agreements, HSH had failed to allege fraud in the inducement, and that the many disclaimers and disclosures in the documents also barred the claim. The claim for negligent misrepresentation was barred because there was no special relationship of trust or confidence.

46.     Consequently, the only causes of action which Justice Lowe was prepared to allow HSH to continue to advance in the New York proceedings against UBS were the first and fifth causes of action set out in the New York complaint, for: (a) breach of contract, in connection with which Justice Lowe described HSH's "overarching claim" as being the allegation that "UBS failed to maintain the promised high quality of the notes in the Reference Pool, by failing to ensure that the Commitments Committee keep an eye on the condition of the investments" (i.e., a claim for breach of the RPSA); and (b) breach of the implied covenant of good faith and fair dealing, which is implied in all New York contracts, and which was treated in essence as an allegation in respect of the RPSA.

## C     The Amended New York Complaint

47.     During the course of argument before Walker J, the judge in effect indicated that HSH's position might be stronger if in the New York claim HSH were not seeking rescission or alleging conversion of the Kiel MTN Notes. Consequently HSH confirmed that it was withdrawing its request that the NS4 transaction be unwound, and that it would amend the complaint to omit the request for rescission. HSH says that, although the request for rescission never concerned the Kiel MTN Notes issued by HSH, which were no longer even held by UBS, the amendment would make clear that the Kiel MTN Notes were not at issue in the dispute before the New York court.

48.     On December 10, 2008, HSH filed an Amended Complaint in the New York proceedings. HSH re-introduced its claims that UBS made fraudulent and negligent misrepresentations and non-disclosures in respect of the transaction, and thereby induced HSH to invest in it.  There are now four causes of action in the New York complaint: (1) breach of the contract; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) breach of the implied covenant of good faith and fair dealing. The essence of the claims for misrepresentation is that HSH was induced "to purchase debt securities in [NS4]" in reliance on those representations, and "HSH would not have purchased the debt securities" in the absence of those representations (paras 97-98 and 107-108).

49.     On January 16, 2009, UBS filed a motion to dismiss the misrepresentation claims in the Amended Complaint on the basis that these claims were barred by reason of *res judicata*, following the decision of Justice Lowe dated  October 21, 2008; or alternatively should be dismissed on the substantive grounds identified by Justice Lowe. The motion was heard in April 2009 and judgment is expected in the autumn.

## V     Jurisdiction under the Brussels I Regulation, Article 23

50.     It is common ground that HSH is domiciled in Germany for the purposes of the Brussels I Regulation, and that the only possible basis for jurisdiction in the English action is the jurisdiction clauses in the Dealer's Confirmation and the Kiel MTN Notes (via the Pricing Supplement). But nothing turns on the jurisdiction clause in the Kiel MTN Notes, since they passed immediately to NS4. It is therefore the Dealer's

Confirmation which was the focus of the judge's decision and of this appeal. The question on this issue is whether the claims in the draft particulars of claim fall within the Dealer's Confirmation jurisdiction clause, with the consequence that the English court has jurisdiction under Article 23 of the Brussels I Regulation, which provides that where the agreement complies with the formal requirements (as to which there is no issue):

> "1.  If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction.  Such jurisdiction shall be exclusive unless the parties have agreed otherwise. …"

## A     The judge's decision

51.    The judge said that the fundamental question was the meaning of the English jurisdiction clause in the Dealer's Confirmation jurisdiction clause rather than the Kiel MTN Notes jurisdiction clause, because UBS held the Kiel MTN Notes for no more than an instant. The judge accepted that had the contracts in which those clauses were found stood on their own, they should be given a wide construction. But this was a case where the parties had entered into different agreements for different aspects of an overall relationship, with different terms as to jurisdiction.

52.    As a matter of general principle the court must seek to identify the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract: *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 W.L.R. 896, 912-913. The relevant background knowledge in the present case would include knowledge of other contracts forming part of the transaction.

53.    When considering the jurisdiction clauses found in the RPSA, the Kiel MTN Notes, and the Dealer's Confirmation, a person having that background knowledge would at once see that there was scope for the clauses to clash. In order to limit that scope, and to ensure that the clauses had meaning, such a person would be driven to the conclusion that each such clause focused upon matters directly relating to the contract in which it was found. It was manifestly incompatible with a non-exclusive New York jurisdiction clause for a matter falling within it also to be the subject of an exclusive English jurisdiction clause.

54.    The question in each case was to which contract the dispute in question was properly to be allocated; and the court then applied whatever jurisdiction provisions, if any, that contract might contain: *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767. The English jurisdiction clauses were insufficiently wide to cover the dispute set out in the New York complaint. All matters relating to the NS4 Notes, including the Indenture, the Letter Agreement and the RPSA, were subject to the laws of New York. All those agreements contained submissions to the jurisdiction of the New York courts, except for the Letter Agreement which was silent as to jurisdiction and hence effectively agreed that action

could be brought in any court of competent jurisdiction. The Letter Agreement would not entitle UBS to sue HSH, a German domiciled company, in England.

55.    The focus must be on the cause of action rather than the remedy flowing from that cause of action. Thus a claim to rescission, or for damages based upon the risk of exercise of the put option, was not to be regarded as so directly linked to the Kiel MTN Notes or the Dealer's Confirmation as to fall within the English jurisdiction clauses. The result was that the English court did not have jurisdiction under Article 23 of the Brussels I Regulation.

## B    The appeal

### *UBS's arguments*

56.    UBS's arguments are essentially these. It accepts that a claim for post-inception breaches of the RPSA would be outside the scope of the Dealer's Confirmation jurisdiction clause. That would include the first and fourth causes of action in the amended New York complaint.

57.    But HSH's claim for misrepresentation is a claim concerning the representations which caused it to issue and transfer the Kiel MTN Notes. The Dealer's Confirmation was the agreement by which HSH invested in the transaction.  Accordingly a dispute as to whether or not HSH was misled into agreeing to invest would clearly fall within the Dealer's Confirmation jurisdiction clause.  So would any dispute as to whether damages should be paid for any loss caused by entering into the Dealer's Confirmation, or for any breach of the Dealer's Confirmation.

58.    The New York complaint clearly indicates from the start that the action relates to HSH's investment in NS4, i.e. by its sale of the Kiel MTN Notes to UBS, so that it could fit into the NS4 structure described in the Offering Circular. Section B of the complaint is headed "UBS induces HSH to invest $500 million in North Street 4" (i.e. the investment of the Kiel MTN Notes pursuant to the Dealer's Confirmation).  The fraud and misrepresentation allegations made by the second and third causes of action are that HSH was induced to "purchase the debt securities" (Paras 72 and 82) (i.e. invest in NS4) in reliance on the truth of UBS's statements.

59.    The Kiel MTN Notes were central to the transaction. Without them there would have been no issue and purchase of NS4 Notes. In addition to being the consideration provided by HSH for the NS4 Notes, the Kiel MTN Notes also serve as collateral for any credit protection payments relating to the NS4 Notes due to UBS under the credit swap.  Should a credit protection payment need to be made in respect of the NS4 Notes, it is effected by redemption of the appropriate amount of Kiel MTN Notes.

60.    The proper approach to the construction of clauses agreeing jurisdiction is to construe them widely and generously, and the words "arising out of" or "in connection with" apply to claims arising from pre-inception matters such as misrepresentation.

61.    The Dealer's Confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court. If the parties had intended to give it a narrower scope, they would have done so. They must have envisaged the risk of a clash, and could have avoided it. The meaning of the clause is

to be determined as at the time it was entered into and not by reference to the events which have happened.

62. The judge wrongly proceeded on the basis that the Dealer's Confirmation jurisdiction clause had to be construed narrowly (because of the existence of non-exclusive jurisdiction clauses in other agreements comprising the transaction), and thus wrongly construed the Dealer's Confirmation jurisdiction clause as applying only to matters "directly relating to" (Judgment, para 92) or "directly linked to" (para 94) the Dealer's Confirmation. The judge wrongly approached the matter not by asking whether or not a particular cause of action directly related to the Dealer's Confirmation, but whether it was more directly related to some other agreement.

63. The only question for the judge was whether on a true construction of the Dealer's Confirmation jurisdiction clause, Article 23 was engaged in relation to any of the claims made by HSH.  It was irrelevant to this question whether or not the disputes, or some of them, also fell within a jurisdiction clause in any other contract.  Nothing in the language of the Dealer's Confirmation jurisdiction clause indicates that certain disputes which otherwise fall within the scope of the clause are to be *excluded* from the English court's jurisdiction, whether by reason of the other jurisdiction clauses or otherwise.

64.  The judge's assumption that the different jurisdiction clauses had to be interpreted so that they did not "overlap", and therefore that a dispute had to be "allocated" to only one agreement within the transaction, was erroneous.  Claims in relation to the transaction may well involve more than one agreement.  The fact that the different agreements comprise a single transaction makes it all the more likely that *certain* claims might fall within more than one jurisdiction clause in those agreements.  This does not however mean that on an ordinary interpretation of the Dealer's Confirmation jurisdiction clause, the jurisdiction clauses in the RPSA, the Kiel MTN Notes and the Dealer's Confirmation will "clash", or that the Dealer's Confirmation jurisdiction clause properly interpreted would render the other (non-exclusive) jurisdiction clauses otiose.

65. If contrary to UBS's principal submission, the judge's approach that only one jurisdiction clause can be engaged at any one time was correct, then he should have given particular weight to the fact that the Dealer's Confirmation jurisdiction clause, in favour of the English courts, was an exclusive jurisdiction clause. The other jurisdiction clauses in the other contracts comprising the transaction were each non-exclusive New York clauses.  In so far as the parties are to be taken to have been addressing the question of how any overlap between different jurisdiction clauses was to be resolved, this is the clearest indication that they envisaged that if a matter fell within the wording they had agreed in the Dealer's Confirmation jurisdiction clause, then it would take precedence over any other clause which might also apply.

*HSH's arguments*

66. HSH's arguments are these. The terms of the sale of the NS4 Notes were contained in the Letter Agreement and the RPSA. The only purpose of the Dealer's Confirmation was to set out the conditions on which the Kiel MTN Notes were to be issued. HSH used the Kiel MTN Notes (rather than cash) to pay for the NS4 Notes. There is no dispute about the issue, sale or performance of the Kiel MTN Notes.   The dispute

revolves entirely around the contracts by which the CDOs, i.e. the NS4 Notes, were acquired and managed.  The Kiel MTN Notes are at best collaterally involved and which UBS held them for a mere *scintilla temporis.*

67.   The dispute relates wholly to the NS4 Notes and not the Kiel MTN Notes, which are no more than part of the mechanics by which the NS4 Notes were acquired and collateralised. Not merely the centre of gravity but the entirety of the dispute is focused on the sale of the CDO Note and its subsequent management.  The sale of the Kiel MTN Notes is only more distantly or collaterally involved, if involved at all.

68.   The misrepresentation claims were made about the Reference Pool, not about the Kiel MTN Notes. The same allegations would be made if Kiel LB had paid for its investment in cash instead of Notes. The Kiel MTN Notes were no more than the consideration for the NS4 Notes. The jurisdiction clause contained in the Dealer's Confirmation (i.e. the method of payment for the investment) cannot govern the dispute relating to inducement of making such investment.

69.   HSH's claims against UBS are in essence that UBS wrongfully sold and managed the CDOs (the NS4 Notes) issued by NS4.  In particular, the New York complaint alleges that UBS (1) induced HSH to purchase the NS4 Notes by misrepresentations concerning, among other things, the credit quality of the Reference Pool to which payments under the NS4 Notes were linked; (2) failed to deliver to HSH CDOs with the characteristics which it had agreed to provide; and (3) breached the RPSA, which was intended to provide HSH with important protections regarding the contents, and UBS's management, of the Reference Pool.

70.   The Claim Form does not mention the Dealer's Confirmation. The draft Particulars of Claim underline the point that the dispute revolves around the represented and actual qualities of the NS4 Notes and their subsequent management. The draft places extensive reliance on provisions of the Letter Agreement, the Offering Circular, the Indenture and the RPSA, none of which contains an English jurisdiction agreement. The draft discloses no dispute in relation to the Kiel MTN Notes and no other connection with England. HSH's claims arise from or in connection with two written agreements only: the RPSA and the Letter Agreement.

71.   In determining which contract a dispute arises from or in connection with, in a multi-contract situation, a degree of common sense is appropriate: *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767 (Rix J). The parties entered into different agreements for different aspects of an overall relationship, with different terms as to jurisdiction.  All matters relating to the CDO Note, including the Note itself (as set out in the Indenture), the Letter Agreement and the RPSA, are subject to the laws of New York.  All those agreements contain submissions to the jurisdiction of the courts of New York, except for the Letter Agreement, which is silent as to jurisdiction and would not entitle UBS to sue HSH in England.  The existence of the other contracts, with their own provisions as to jurisdiction, indicates that the parties intended that disputes arising out of them were *not* to be regarded as arising out of some other, at best collaterally involved, contract such as the Dealer's Confirmation.

## VI    Conclusions

72.    The question on this part of the appeal is whether the claims in the English action fall within the jurisdiction agreement in the Dealer's Confirmation. That question turns on whether, in the light of the complex documentation as a whole, the parties should be taken objectively to have intended by the jurisdiction clause in the Dealer's Confirmation that, when a dispute arose as to whether the transaction as a whole was induced by fraudulent or negligent misrepresentation, the issue whether the issue and transfer of the Kiel MTN Notes was so induced should be subject to the exclusive jurisdiction of the English courts, while the question whether the conclusion of the other agreements was induced by the same alleged misrepresentations should be subject to the non-exclusive jurisdiction of the New York courts.

73.    The claim form in the English proceedings makes no mention of the Dealer's Confirmation. It specifies only (1) the credit default swap dated March 3, 2002, which is an agreement between NS4 and UBS, to which HSH is not a party and under which it has made no claim; (2) HSH's subscription for the NS4 Notes, the terms of which contain a non-exclusive New York jurisdiction clause; (3) a subscription by NS4 for the Kiel MTN Notes issued by HSH,  in relation to which no dispute exists; and (4) the RPSA, an agreement under which HSH makes claims in the New York court, and which contains a New York non-exclusive jurisdiction clause.

74.    The draft particulars of claim have not been produced in a revised form following the dismissal of the misrepresentation claims in New York. This does not matter for present purposes. As I have said, the essence of the claims for misrepresentation is that HSH was induced "to purchase debt securities in [NS4]" in reliance on those representations, and "HSH would not have purchased the debt securities" in the absence of those representations (paras 97-98 and 107-108 of the Amended Complaint). Those pleas are in the same terms as the original complaint (paras 72-73 and 82-83).

75.    According to the draft particulars of claim (para 2):  "These proceedings concern the Defendant's investment in a multiple tranche synthetic Collateralised Debt Obligation ('the Transaction') which is the subject of these proceedings." It is important to note the wide definition of "the Transaction."

76.    Section B of the draft particulars of claim is headed "Events leading to the Transaction." Paragraph 6.2 pleads:

> "HSH decided to participate in the Transaction by issuing to UBS on a principal to principal basis US$500 million of puttable medium term notes ('the MTNs') under HSH's existing MTN programme, and pursuant to a series of Agreements ('the MTN Agreements') in return for HSH providing credit protection to UBS against certain credit risks in relation to the Reference Pool. HSH's objective was to enhance its return … in exchange for assuming a degree of risk on the Reference Pool."

77.    Paragraph 8 pleads:

> "HSH also expressly confirmed that it understood, acknowledged and agreed that UBS was only acting as initial purchaser for the Transaction and was not acting as adviser to HSH (clause 2 of the Letter Agreement), and that the Letter Agreement constituted the entire agreement and understanding of the parties with respect to the Transaction and superseded all oral or written communications in relation thereto (clause 6(b) of the Letter Agreement)."

78.    Then after referring to several passages in the Offering Circular, paragraph 13 pleads:

> "Accordingly, at the time at which HSH entered into the Transaction it did so of its own volition based on its own judgment (following advice from its independent advisors and not on the basis of any advice or representation made by UBS), at its own risk and solely on the terms of the written agreements comprising the Transaction."

79.    Paragraphs 15 to 17 record that the Kiel MTN Notes were the mechanism by which Kiel made its $500 million investment in the Transaction, and described the Dealer's Confirmation, the Pricing Supplement, the role of the notes as collateral for Credit Protection Payments, and the NS4 Kiel margin.

80.    Paragraph 31 summarises HSH's claim as being that it is entitled to rescind the Transaction ( a claim now dropped) and/or to damages on the grounds that UBS acted fraudulently and/or in breach of duty and/or wrongfully in relation to the Transaction and, in particular, in relation to the selection and substitution of assets comprising the Reference Pool. It then goes on to summarise the allegations in the original New York complaint.

81.    Section E sets out the declarations of non-liability which are sought. The draft particulars of claim defined "the Principal Agreements" to include all of the documents involved in the transaction, including the Dealer's Confirmation, and defined "Related Documents" as "all other written agreements and/or written notifications and/or documents entered into and/or executed by the parties pursuant to or related to or in connection with the Transaction". As I have said, "Transaction" was defined as HSH's "investment in a multiple tranche synthetic Collateralised Debt Obligation". The declarations which were sought were:

i)    that the Principal Agreements and the terms contained therein, as well as all other written agreements and/or written notifications and/or documents entered into and/or executed by the parties pursuant to or related to or in connection with the Transaction (the "Related Documents") were and had been at all material times valid, binding and enforceable;

ii)    that HSH was not entitled to rescind any of the Principal Agreements or any of the Related Documents (which is no longer relevant since the claim for rescission has been dropped);

iii)    that HSH was not induced to enter into the Transaction by the alleged misrepresentations and/or non-disclosures;

iv) that the obligations of the parties in relation to the Transaction were (and had at all material times been) governed by, and are limited to, the terms of the Principal Agreements and/or the Related Documents and, save as expressly set out in those Agreements and/or the Related Documents, UBS had assumed no obligation, duty or other responsibility, whether of a fiduciary or other nature, to HSH;

v) alternatively, that any such duty, obligation or responsibility undertaken by UBS had been lawfully performed and discharged;

vi) that UBS had not been unjustly enriched as alleged and/or had not converted any of HSH's funds and/or HSH's investment as alleged;

vii) that UBS had materially complied with and/or discharged each and all of its relevant obligations arising out of or in connection with the Principal Agreements and the Related Documents and accordingly UBS had not caused and/or was not liable to HSH in respect of any loss or damage arising out of or in connection with those Agreements and the Related Documents (whether in contract, tort, statute or otherwise) which may have been suffered or incurred by HSH in connection with the Transaction.

82. Are these claims within the Dealer's Confirmation jurisdiction clause? I accept UBS's submission that the proper approach to the construction of clauses agreeing jurisdiction is to construe them widely and generously: *Donohue v Armco Inc* [2001] UKHL 64, [2002] 1 Lloyd's Rep 425 at [14]. I also accept that in the usual case the words "arising out of" or "in connection with" apply to claims arising from pre-inception matters such as misrepresentation: *Fiona Trust & Holding Corp v Privalov* [2007] EWCA Civ 20, [2007] 2 Lloyd's Rep 267 (affd sub nom *Premium Nafta Products Ltd v Fili Shipping Co Ltd* [2007] UKHL 40, [2007] 4 All ER 951); *Deutsche Bank AG v Asia Pacific Broadband Wireless Communications Inc* [2008] EWCA Civ 1091, [2008] 2 Lloyd's Rep 619; *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488.

83. But the essential task is to construe the jurisdiction agreement in the light of the transaction as a whole. As I suggested in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2 All ER (Comm) 465, at [93], whether a dispute falls within one or more related agreements depends on the intention of the parties as revealed by the agreements.

84. Plainly the parties did not actually contemplate at the time of the conclusion of the contracts that there would be litigation in two countries involving allegations of misrepresentation in the inception and performance of the agreements. But in my judgment sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seems to me plain that the result for which UBS contends would be a wholly uncommercial result and one that sensible business people cannot have intended.

85. It is fanciful to suppose (as UBS contends) that the Dealer's Confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive

jurisdiction of the English court to deal with disputes of this kind, or that the parties must have envisaged the risk of a clash.

86.    The Dealer's Confirmation is expressed to be issued pursuant to LB Kiel's US$20 billion Global Medium Term Note Programme and simply confirms the issue of the US$500 Kiel MTN Notes to UBS as one of the dealers on HSH's bond programme. UBS immediately transferred them to NS4.  NS4 kept the Kiel MTN Notes as an investment or "collateral" to create income in order to fund payments under the NS4 Notes.

87.    I accept HSH's argument that the Kiel MTN Notes are simple AAA-rated bonds that HSH issued pursuant to a pre-existing bond programme.  HSH used these Notes (rather than cash) to pay for the NS4 Notes. This dispute has nothing to do with the Kiel MTN Notes, which were no more than the consideration for the NS4 Notes. The parties cannot be taken objectively to have intended that the jurisdiction clause contained in the Dealer's Confirmation (i.e. the method of payment for the investment) would govern every dispute relating to inducement of making such investment.

88.    There is no dispute about the issue, sale or performance of the Kiel MTN Notes. Their holder, NS4, is not a party to any of the proceedings.  None of the parties to the proceedings advances any claim under the Kiel MTN Notes against any other party. None of the parties suggests there has been any breach of the Kiel MTN Notes, or any misrepresentation in relation to them.  The Kiel MTN Notes are supported by a German state guarantee and are virtually equivalent to cash.   The misrepresentation claims were made about the Reference Pool, not about the Kiel MTN Notes. The same allegations would be made if Kiel LB had paid for its investment in cash instead of Notes.

89.    The New York complaint alleges (inter alia) that (a) UBS induced HSH to purchase the NS4 Notes by misrepresentations concerning, among other things, the credit quality of the Reference Pool to which payments under the NS4 Notes were linked; (b) UBS failed to operate a Commitments Committee, as required by the RPSA, so as to select Reference Pool assets with stable or improving credit profiles, carefully monitor the credit status and quality of each asset, and avoid downgrades.  As Justice Lowe stated in his decision of October 21, 2008 (at p 5) (in relation to HSH's first cause of action): "HSH's overarching claim is that UBS failed to maintain the promised high quality of the notes in the Reference Pool, by failing to ensure that the Commitments Committee keep an eye on the condition of the investments."

90.    In *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767, MLC, a hedge fund, bought Russian bonds from the claimant, an English company, pursuant to two Purchase Agreements containing exclusive English jurisdiction clauses.  MLC financed the purchase of the bonds by repurchase transactions with the claimant pursuant to a Global Master Repurchase Agreement ("GMRA"), containing a non-exclusive English jurisdiction clause.  When the claimant made a margin call under the GMRA which MLC failed to pay, and the claimant sued MLC in England for the amounts due under the GMRA.

91.    MLC then sued the claimant and two of its group companies in New York for securities violations.  The claimant sought an anti-suit injunction relying on the

exclusive English jurisdiction clauses in the Purchase Agreements. One issue was how much of the subject matter of the New York proceedings arose out of the Purchase Agreements, and was therefore in breach of the exclusive jurisdiction clauses in those agreements.

92. Rix J concluded (at 777):

> "then, where the jurisdiction clauses are in conflict, I do not see why the GMRA clause should not prevail: either on the basis that, in a case of conflict on standard forms plainly drafted by CS Europe, MLC should be entitled to exercise the broader rights; or on the basis that the clause in the contract which is closer to the claim and which is more specifically invoked in the claim should prevail over the clause which is only more distantly or collaterally involved."

93. He therefore refused to grant an injunction restraining MLC's claims in New York under the GMRA, because (at 781) the claims were preferably to be viewed as arising out of or in connection with the GMRA rather than the Purchase Agreement and thus were not within the jurisdiction clause in the Purchase Agreement; but if he were wrong about that, the New York court would be in a much better position to analyse the complaint for the purpose of identifying the relevant or more relevant jurisdiction clause.

94. The essence of Rix J's first reason is that under the *contra proferentem* principle, the intention must be taken to have been that, where a dispute fell within the wording of both jurisdiction agreements, it was the GMRA which was to be taken as the agreed position. The second reason, which he must have meant as a matter of construction, was that the parties must be taken to have intended that, where a dispute fell within both sets of agreements, it should be governed by jurisdiction clause in the contract which was closer to the claim.

95. In this case it is not necessary to go so far. Whether a jurisdiction clause applies to a dispute is a question of construction. Where there are numerous jurisdiction agreements which may overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should be the subject of inconsistent jurisdiction clauses. The jurisdiction clause in the Dealer's Confirmation is a "boiler plate" bond issue jurisdiction clause, and is primarily intended to deal with technical banking disputes. Where the parties have entered into a complex transaction it is the jurisdiction clauses in the agreements which are at the commercial centre of the transaction which the parties must have intended to apply to such claims as are made in the New York complaint and reflected in the draft particulars of claim in England.

96. I return to the draft particulars of claim to emphasise that the claims raising the misrepresentation issue refer to "the Principal Agreements," the "Related Documents," and to "the Transaction." As I have said, "the Principal Agreements" means all of the documents involved in the Transaction (including the Dealer's Confirmation), and "Related Documents" are "all other written agreements and/or written notifications and/or documents entered into and/or executed by the parties pursuant to or related to or in connection with the Transaction". "Transaction" was

defined as HSH's "investment in a multiple tranche synthetic Collateralised Debt Obligation".

97.    The action in England is intended to mirror the New York proceedings. I have already emphasised that the essence of the claims for misrepresentation in New York is that HSH was induced to purchase the NS4 Notes in reliance on the fraudulent and negligent misrepresentations, and would not have purchased them in the absence of those representations. No sensible commercial interpretation of the jurisdiction clause in the Dealer's Confirmation could have the result that identical misrepresentation claims would fall both within that clause and within the non-exclusive New York jurisdiction clauses, simply because the consideration for the transaction was the issue of the Kiel MTN Notes. In my judgment the standard form bond issue jurisdiction clause in the Dealer's Confirmation does not apply to claims that the transaction as a whole, and in particular the purchase of the NS4 Notes, was induced by misrepresentation. I am satisfied that the judge's decision was right.

## VII    Forum non conveniens

98.    In the alternative, HSH sought a stay of the English proceedings on forum non conveniens grounds, which only arises if (contrary to HSH's main case) the English court has jurisdiction under Article 23. In view of his conclusion that the English court did not have jurisdiction, the judge did not deal with this application because it did not arise for decision.

99.    There are a number of formidable difficulties arising from the jurisdiction agreement, which on this part of the appeal must be taken to apply to part of the dispute, in the way of HSH establishing its case for a stay. It is true that HSH would have a very good prospect of showing that there is another court with competent jurisdiction (the New York court) which is clearly or distinctly more appropriate than England for the trial of the action: *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460. The employees of UBS who made the alleged misrepresentations to HSH were and are based in New York. The employees of HSH who negotiated the transaction were based in Germany.  There were meetings between UBS and HSH in New York prior to the completion of the transaction, in which it is alleged that UBS confirmed that its management of NS4 would be performed in New York. Negotiations occurred in New York, between HSH and UBS's New York lawyers.  No individual at HSH involved in the purchase of the NS4 Notes or the negotiation of the RPSA was located in London.  No meetings or negotiations concerning the Notes or the RPSA occurred in London. The transaction was concluded in New York. The UBS employees who administered NS4 and were responsible for ensuring UBS complied with the terms of the RPSA were based in New York.

100.    But against that, it is most unusual for an English court to stay proceedings brought in England pursuant to an English jurisdiction agreement. In *British Aerospace v Dee Howard* [1993] 1 Lloyd's Rep. 368, at 376, Waller J. said (in the context of an exclusive English jurisdiction clause) that it should not be open to a party to start arguing about the relative merits of fighting an action in the foreign jurisdiction as compared with fighting an action in London, where the factors relied on would have been foreseeable at the time that they entered into the contract. That case involved an application to set aside service out of the jurisdiction. It has been approved in this court in the context of an application to stay English proceedings (*Ace Insurance SA-*

*NV* v *Zurich Insurance Co* [2001] EWCA Civ 173, [2001] 1 Lloyd's Rep 618, at [62], per Rix LJ) and of an application to restrain foreign proceedings in which the foreign court was asked to prevent a party suing in England pursuant to an English jurisdiction clause (*Sabah Shipyard (Pakistan) Ltd. v Islamic Republic of Pakistan* [2002] EWCA Civ 1643, [2003] 2 Lloyd's Rep 571, at [36], per Waller LJ) and it has been applied in many decisions in the Commercial Court.

101.   The next difficulty is that there is an express agreement in the jurisdiction clause the effect of which is that HSH irrevocably waived any claim that proceedings had been brought in an inconvenient forum. In *National Westminster Bank v Utrecht-America Finance Co* [2001] EWCA Civ 658, [2001] CLC 1372, at [23], Clarke LJ thought it was "fatal" to any forum non conveniens case, whereas in *Sabah Shipyard (Pakistan) Ltd. v Islamic Republic of Pakistan*, ante, at [36] Waller LJ did not treat such an agreement as decisive, but thought that it underlined the point that the jurisdiction agreement would be overridden only in exceptional circumstances.

102.   Finally, it is a matter of controversy whether there is any room at all under the Brussels I Regulation regime for a stay on forum conveniens grounds. The effect of the ruling of the European Court in Case C-281/02 *Owusu v Jackson* [2005] ECR I-1383, [2005] QB 801 is that the Brussels I Regulation precludes a court of a Member State from declining jurisdiction under Article 2 (domicile of the defendant) on the ground that a court of a non-Member State would be a more appropriate forum for the trial of the action. The Supreme Court of Ireland has made a reference to the European Court as to whether the ruling in *Owusu v Jackson* applies even where proceedings have been commenced in a non-Member State prior to the proceedings in Ireland (the so-called "reflexive effect" of Regulation provisions, which does not arise in the present case): *Goshawk Dedicated Receivables Ltd v Life Receivables Ireland Ltd* [2009] IESC 7, [2009] ILPr 26.

103.   The prevailing view is that there is no scope for the application of forum conveniens to remove a case from a court which has jurisdiction under the Regulation, even as regards a defendant who is not domiciled in a Member State: see , e.g. Dicey, Morris & Collins, *Conflict of Laws*, 14th ed 2006, paras 11-023, 12-020, and specifically in relation to jurisdiction agreements, para 12-124, and Briggs, *Agreements on Jurisdiction and Choice of Law* (2008), para 7.02; and it has been held at first instance that *Owusu v Jackson* applies to cases where Article 23 applies: *Equitas Limited v. Allstate Insurance Company* [2008] EWHC 1671, [2009] Lloyd's Rep IR 227, at [64].

104.   I am therefore disinclined (in common with the judge) to express a view on this controversial area where, on my view of the case, it does not arise for decision. For the reasons given on the main point, I would dismiss the appeal.

105.   I add only one more point. As I have said, the motion in New York to dismiss the relevant parts of the Amended Complaint is still pending. The motion to dismiss was due to be heard shortly after the hearing in this appeal, and judgment is expected in the autumn. If the motion is successful this appeal would have been entirely unnecessary, since the English proceedings will have no point. I do not understand why the parties did not co-operate to have this appeal stood out of the list to await the outcome of the motion in New York.

**Lord Justice Toulson:**

106.    I agree.

**Lord Justice Ward:**

107.    I also agree.

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 132 of 150

s. 90 Compensation for statements in listing particulars or..., UK ST 2000 c. 8 Pt...

# Financial Services and Markets Act 2000 c. 8
# s. 90 Compensation for statements in listing particulars or prospectus

 **Law In Force**

**Version 5 of 5**

21 July 2019 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; False statements; Listing particulars; Loss; Misleading statements; Non-compliance; Omissions; Prospectuses; Securities

**90.— [Compensation for statements in listing particulars or prospectus]**[1]

(1)  Any person responsible for listing particulars is liable to pay compensation to a person who has–

   (a)  acquired securities to which the particulars apply; and

   (b)  suffered loss in respect of them as a result of–

      (i)  any untrue or misleading statement in the particulars; or

      (ii)  the omission from the particulars of any matter required to be included by section 80 or 81.

(2)  Subsection (1) is subject to exemptions provided by Schedule 10.

(3)  If listing particulars are required to include information about the absence of a particular matter, the omission from the particulars of that information is to be treated as a statement in the listing particulars that there is no such matter.

(4)  Any person who fails to comply with section 81 is liable to pay compensation to any person who has–

   (a)  acquired securities of the kind in question; and

   (b)  suffered loss in respect of them as a result of the failure.

(5)  Subsection (4) is subject to exemptions provided by Schedule 10.

(6)  This section does not affect any liability which may be incurred apart from this section.

(7)  References in this section to the acquisition by a person of securities include references to his contracting to acquire them or any interest in them.

(8)  No person shall, by reason of being a promoter of a company or otherwise, incur any liability for failing to disclose information which he would not be required to disclose in listing particulars in respect of a company's securities–

   (a)  if he were responsible for those particulars; or

   (b)  if he is responsible for them, which he is entitled to omit by virtue of section 82.

(9)  The reference in subsection (8) to a person incurring liability includes a reference to any other person being entitled as against that person to be granted any civil remedy or to rescind or repudiate an agreement.

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 133 of 150

s. 90 Compensation for statements in listing particulars or..., UK ST 2000 c. 8 Pt...

(10)  *"Listing particulars"* , in subsection (1) and Schedule 10, includes supplementary listing particulars.

[

(11)  This section applies in relation to a prospectus as it applies to listing particulars, with the following modifications—

(a)  references in this section or in Schedule 10 to listing particulars, supplementary listing particulars or sections 80, 81 or 82 are to be read, respectively, as references to a prospectus, supplementary prospectus and [Articles 6 and 14(2), Article 23 and Article 18 of the prospectus regulation][3];

(b)  references in Schedule 10 to admission to the official list are to be read as references to admission to trading on a regulated market;

(c)  in relation to a prospectus, *"securities"* means "transferable securities".

[

(11A)  In subsection (11)(a) *"supplementary prospectus"* includes, where final terms (see Article 8 of the prospectus regulation) are contained in a separate document that is neither a prospectus nor a supplementary prospectus, that separate document.

][4][

(12)  A person is not to be subject to civil liability solely on the basis of a summary in a prospectus unless the summary, when read with the rest of the prospectus—

(a)  is misleading, inaccurate or inconsistent; or

(b)  does not provide key information [specified by Article 7 of the prospectus regulation][6] ,

and in this subsection a summary includes any translation of it.

][5][2

# Notes

1        Heading substituted by Companies Act 2006 c. 46 Sch.15(1) para.5 (November 8, 2006)
2        Added by Prospectus Regulations 2005/1433 Sch.1 para.6(2) (July 1, 2005)
3        Words substituted by Financial Services and Markets Act 2000 (Prospectus) Regulations 2019/1043 Pt 2 reg.25(2) (July 21, 2019: substitution has effect subject to transitional provisions specified in SI 2019/1043 reg.40)
4        Added by Financial Services and Markets Act 2000 (Prospectus) Regulations 2019/1043 Pt 2 reg.25(3) (July 21, 2019: insertion has effect subject to transitional provisions specified in SI 2019/1043 reg.40)
5        Substituted by Prospectus Regulations 2012/1538 reg.7 (July 1, 2012)
6        Words substituted by Financial Services and Markets Act 2000 (Prospectus) Regulations 2019/1043 Pt 2 reg.25(4) (July 21, 2019: substitution has effect subject to transitional provisions specified in SI 2019/1043 reg.40)

*Part VI OFFICIAL LISTING > Compensation for false or misleading statements etc > s. 90 Compensation for statements in listing particulars or prospectus*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
## s. 90ZA Liability for key investor information

 **Law In Force**

**Version 4 of 4**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Collective investment schemes; Information; Investors; Liabilities; Listing applications and prospectus offences; Misleading statements
[

**90ZA.— Liability for key investor information**

(1)   A person is not to be subject to civil liability solely on the basis of the key investor information produced in relation to a collective investment scheme or a sub-fund of such a scheme in accordance with rules or other provisions [originally made in implementation of][2]Chapter IX of the UCITS directive, or of any translation of that information, unless the key investor information is misleading, inaccurate or inconsistent with the relevant parts of the prospectus published for that collective investment scheme or sub-fund in accordance with rules made by [the FCA][3] under [section 248 or 261J][4] of this Act.

(2)  In this section, a reference to a sub-fund of a collective investment scheme is a reference to a part of the property of the collective investment scheme which forms a separate pool where—

(a)  the collective investment scheme provides arrangements for separate pooling of the contributions of the participants and the profits and income out of which payments are made to them; and

(b)  the participants are entitled to exchange rights in one pool for rights in another.

][1]

## Notes

1        Added by Undertakings for Collective Investment in Transferable Securities Regulations 2011/1613 Pt 2 reg.2(3) (July 1, 2011)
2        Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.29 (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))
3        Words substituted by Financial Services Act 2012 c. 21 Pt 2 s.16(3)(g) (January 24, 2013 for the purpose of making rules as specified in SI 2013/113 art.2 and Sch.1 Pt 3; April 1, 2013 otherwise)
4        Words inserted by Collective Investment in Transferable Securities (Contractual Scheme) Regulations 2013/1388 Pt 2 reg.3(2) (June 6, 2013: insertion has effect subject to transitional provision specified in SI 2013/1388 reg.24)

*Part VI OFFICIAL LISTING > Compensation for false or misleading*
*statements etc > s. 90ZA Liability for key investor information*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 135 of 150

s. 90A Liability of issuers in connection with published..., UK ST 2000 c. 8 Pt...

# Financial Services and Markets Act 2000 c. 8
# s. 90A Liability of issuers in connection with published information

 **Law In Force**

**Version 2 of 2**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Liabilities; Loss; Misleading statements; Omissions; Securities
[

**90A. Liability of issuers in connection with published information**

Schedule 10A makes provision about the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of—

   (a)  a misleading statement or dishonest omission in certain published information relating to the securities, or

   (b)  a dishonest delay in publishing such information.

][1]

## Notes

1      Substituted by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 reg.2(2) (October 1, 2010: substitution has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Part VI OFFICIAL LISTING > Compensation for false or misleading statements
etc > s. 90A Liability of issuers in connection with published information*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 136 of 150

s. 90B Power to make further provision about liability for..., UK ST 2000 c. 8 Pt...

# Financial Services and Markets Act 2000 c. 8

# s. 90B Power to make further provision about liability for published information

 **Law In Force**

**Version 1 of 1**

8 November 2006 - Present

**Subjects**
Financial regulation

**Keywords**
Admission to trading; Information; Issuers; Liabilities; Listing; Regulations; Securities

[

**90B Power to make further provision about liability for published information**

(1)  The Treasury may by regulations make provision about the liability of issuers of securities traded on a regulated market, and other persons, in respect of information published to holders of securities, to the market or to the public generally.

(2)  Regulations under this section may amend any primary or subordinate legislation, including any provision of, or made under, this Act.

]<sup>1</sup>

### Notes

1        Added by Companies Act 2006 c. 46 Pt 43 s.1270 (November 8, 2006)

*Part VI OFFICIAL LISTING > Compensation for false or misleading statements etc*
*> s. 90B Power to make further provision about liability for published information*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
# para. 1 Securities to which this Schedule applies

 **Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Misleading statements; Non-disclosure; Securities
[

**1.— Securities to which this Schedule applies**

(1)  This Schedule applies to securities that are, with the consent of the issuer, admitted to trading on a securities market, where—

  (a)  the market is situated or operating in the United Kingdom, or

  (b)  the United Kingdom is the issuer's home State.

(2)  For the purposes of this Schedule—

  (a)  an issuer of securities is not taken to have consented to the securities being admitted to trading on a securities market by reason only of having consented to their admission to trading on another market as a result of which they are admitted to trading on the first-mentioned market;

  (b)  an issuer who has accepted responsibility (to any extent) for any document prepared for the purposes of the admission of the securities to trading on a securities market (such as a prospectus or listing particulars) is taken to have consented to their admission to trading on that market.

[

(3)  For the purposes of this Schedule the United Kingdom is the home State of an issuer if—

  (a)  the transparency rules impose requirements on the issuer in relation to the securities, or

  (b)  the issuer has its registered office (or, if it does not have a registered office, its head office) in the United Kingdom.

]²]¹

## Notes

1        Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

2        Added by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(2) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

© 2021 Thomson Reuters.

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 138 of 150

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION*
*> Part 1 SCOPE OF THIS SCHEDULE > para. 1 Securities to which this Schedule applies*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 139 of 150

para. 2 Published information to which this Schedule applies, UK ST 2000 c. 8 Sch....

# Financial Services and Markets Act 2000 c. 8
# para. 2 Published information to which this Schedule applies

 **Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Information services; Issuers; Misleading statements; Non-disclosure; Securities
[

**2.— Published information to which this Schedule applies**

(1)  This Schedule applies to information published by the issuer of securities to which this Schedule applies—

(a)  by recognised means, or

(b)  by other means where the availability of the information has been announced by the issuer by recognised means.

(2)  It is immaterial whether the information is required to be published (by recognised means or otherwise).

(3)  The following are "recognised means"—

(a)  a recognised information service;

(b)  other means required or authorised to be used to communicate information to the market in question, or to the public, when a recognised information service is unavailable.

(4)  A *"recognised information service"* means—

(a)  in relation to a securities market situated or operating in the [United Kingdom][2] , a service used for the dissemination of information in accordance with [transparency rules][3] ;

(b)   in relation to a securities market situated or operating outside the [United Kingdom][4] , a service used for the dissemination of information corresponding to that required to be disclosed under [transparency rules][5] ; or

(c)  in relation to any securities market, any other service used by issuers of securities for the dissemination of information required to be disclosed by the rules of the market.

][1]

## Notes

1        Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

© 2021 Thomson Reuters.

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 140 of 150

## Notes

2       Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(a)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

3       Words substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(a)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

4       Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(b)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

5       Words substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(b)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION >*
*Part 1 SCOPE OF THIS SCHEDULE > para. 2 Published information to which this Schedule applies*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
# para. 3

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Misleading statements; Non-disclosure; Securities

[

**3.**—

(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

(a)  acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and

(b)  suffers loss in respect of the securities as a result of—

(i)  any untrue or misleading statement in that published information, or

(ii)  the omission from that published information of any matter required to be included in it.

(2)  The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

(3)  The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4)  A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—

(a)  in reliance on the information in question, and

(b)  at a time when, and in circumstances in which, it was reasonable for him to rely on it.

][1]

## Notes

1        Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

© 2021 Thomson Reuters.

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 142 of 150

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for misleading statement or dishonest omission > para. 3*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
# para. 4

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Listing particulars; Misleading statements; Non-disclosure; Prospectuses; Securities

[

**4.**

An issuer of securities to which this Schedule applies is not liable under paragraph 3 to pay compensation to a person for loss suffered as a result of an untrue or misleading statement in, or omission from, published information to which this Schedule applies if—

(a) the published information is contained in listing particulars or a prospectus (or supplementary listing particulars or a supplementary prospectus), and

(b) the issuer is liable under section 90 (compensation for statements in listing particulars or prospectus) to pay compensation to the person in respect of the statement or omission.

]$^1$

## Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for misleading statement or dishonest omission > para. 4*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
# para. 5

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Issuers; Securities

[

**5.—**

(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

(a)  acquires, continues to hold or disposes of the securities, and

(b)  suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.

(2)  The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.

]¹

## Notes

1       Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for dishonest delay in publishing information > para. 5*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

Case 1:20-cv-10041-PKC    Document 104-5    Filed 08/24/21    Page 145 of 150

# Financial Services and Markets Act 2000 c. 8
# para. 6

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Interpretation; Issuers; Misleading statements; Securities

[

**6.**

For the purposes of paragraphs 3(3) and 5(2) a person's conduct is regarded as dishonest if (and only if)—

    (a)  it is regarded as dishonest by persons who regularly trade on the securities market in question, and

    (b)  the person was aware (or must be taken to have been aware) that it was so regarded.

]¹

## Notes

1       Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Meaning of dishonesty > para. 6*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
## para. 7

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Exemptions; Issuers; Misleading statements; Securities
[

**7.**—

(1)  The issuer is not subject—

(a)  to any liability other than that provided for by paragraph 3 in respect of loss suffered as a result of reliance by any person on—

(i)  an untrue or misleading statement in published information to which this Schedule applies, or

(ii)  the omission from any such published information of any matter required to be included in it;

(b)  to any liability other than that provided for by paragraph 5 in respect of loss suffered as a result of delay in the publication of information to which this Schedule applies.

(2)  A person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(3)  This paragraph does not affect—

(a)  civil liability—

(i)  under section 90 (compensation for statements in listing particulars or prospectus),

(ii)  under rules made by virtue of section 954 of the Companies Act 2006 (compensation),

(iii)  for breach of contract,

(iv)  under the Misrepresentation Act 1967, or

(v)  arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned;

(b)  liability to a civil penalty; or

(c)  criminal liability.

(4)  This paragraph does not affect the powers conferred by sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution).

(5)  References in this paragraph to liability, in relation to a person, include a reference to another person being entitled as against that person to be granted any civil remedy or to rescind or repudiate an agreement.

© 2021 Thomson Reuters.

]$^1$

## Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Exclusion of certain other liabilities > para. 7*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Financial Services and Markets Act 2000 c. 8
# para. 8 Interpretation

 **Law In Force**

**Version 3 of 3**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Interpretation; Issuers; Misleading statements; Securities
[

**8.— Interpretation**

(1)  In this Schedule—[

(a)  *"securities"*  means transferable securities as defined in Article 2(1)(24) of the markets in financial instruments regulation, other than money market instruments as defined in Article 2(1)(25A) of that regulation that have a maturity of less than 12 months (and includes instruments outside the United Kingdom);[3]

][2]

(b)  *"securities market"*  means—[

(i)  a regulated market as defined in Article 2(1)(13) of the markets in financial instruments regulation, or

(ii)  a multilateral trading facility as defined in Article 2(1)(14) of that regulation.

][4]

(2)  References in this Schedule to the issuer of securities are—

(a)  in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading as mentioned in paragraph 1(1), to the issuer of the securities represented;

(b)  in any other case, to the person who issued the securities.

(3)  References in this Schedule to the acquisition or disposal of securities include—

(a)  acquisition or disposal of any interest in securities, or

(b)  contracting to acquire or dispose of securities or of any interest in securities,

except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.

(4)  References to continuing to hold securities have a corresponding meaning.

(5)  For the purposes of this Schedule the following are persons "discharging managerial responsibilities" within an issuer—

(a)  any director of the issuer (or person occupying the position of director, by whatever name called);

© 2021 Thomson Reuters.

(b)  in the case of an issuer whose affairs are managed by its members, any member of the issuer;

(c)  in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication.

(6)  The following definitions (which apply generally for the purposes of Part 6 of this Act) do not apply for the purposes of this Schedule:

(a)  section 102A(1), (2) and (6) (meaning of "securities" and "issuer")[5][.][6]

[...][7]

][1]

# Notes

| | |
|---|---|
| 1 | Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3) |
| 2 | Substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(a)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1)) |
| 3 | Articles 1(1)(24) and (25A) are substituted by S.I. 2018/****. |
| 4 | Para.8(1)(b)(i)-(ii) substituted for para.8(1)(b)(I)-(iii) by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(a)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1)) |
| 5 | Sections 102A to 102C and 103 were substituted for section 103 as originally enacted by regulation 2(1) of and paragraph 1 of Schedule 11 to the Prospectus Regulations 2005(S.I. 2005/1433). |
| 6 | Repealed by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(b) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1)) |
| 7 | Repealed by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(b) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1)) |

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 3 SUPPLEMENTARY PROVISIONS > para. 8 Interpretation*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

Case 1:20-cv-10041-PKC   Document 104-5   Filed 08/24/21   Page 150 of 150

# Arbitration Act 1996 c. 23
## s. 7 Separability of arbitration agreement.

 **Law In Force**

**Version 1 of 1**

31 January 1997 - Present

**Subjects**
Arbitration

**Keywords**
Arbitration agreements; Severability

**7. Separability of arbitration agreement.**

Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.

*Part I ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT*
*> The arbitration agreement > s. 7 Separability of arbitration agreement.*

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland