UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

CITY OF STERLING HEIGHTS POLICE &    :    Civil Action No. 1:20-cv-10041-PKC
FIRE RETIREMENT SYSTEM, Individually  :
and on Behalf of All Others Similarly Situated, :
                                     :
                Plaintiff,           :
                                     :
        vs.                          :
                                     :
RECKITT BENCKISER GROUP PLC, et al., :
                                     :
                Defendants.          :
                                     :
—————————————————————— x

## DECLARATION OF THOMAS LOWE, QC

I, THOMAS LOWE QC of Wilberforce Chambers, 8 New Square, London WC2 A 3QP, England STATE AS FOLLOWS:

1    I am a self-employed barrister in independent practice and a member of Wilberforce Chambers, 8 New Square, London. I was called to the bar of England and Wales in 1985 and appointed Queen's Counsel in 2008. I have also been a member of the bar of the Cayman Islands since 2010 and the British Virgin Islands since 2014. I have always practised primarily in the area of international corporate and financial litigation.

2    A copy of my curriculum vitae is attached hereto and I also attach a list of the case law and texts to which I have referred as Annex 2.

3    I have been provided with the declaration of Stephen Midwinter QC ("**Mr Midwinter**") dated 25 June 2021 (the "**Midwinter Declaration**").

4    I have been asked by Robbins Geller Rudman & Dowd LLP, Lead Counsel for Lead Plaintiffs City of Birmingham Retirement and Relief System, City of Pontiac General Employees' Retirement System, City of Sterling Heights Police & Fire Retirement System and the proposed Class, referred to herein collectively as "Plaintiffs", to state

where I agree or disagree with the Midwinter Declaration in its description of the elements of the following causes of action:

(i)    English common law fraudulent misrepresentation and deceit;

(ii)    Section 90A of the United Kingdom's Financial Services and Markets Act; and

(iii)    English common law negligent misrepresentation and misstatement.

I approach this exercise on the basis that my primary obligation is to provide the Court with such assistance as I can and to express my views on matters which fall within my knowledge and expertise. I understand that this duty is owed to the Court and overrides any obligation I may owe to the Plaintiffs. I am not being compensated on the basis of the outcome of these proceedings.

I will not comment on every matter raised in the Midwinter Declaration. The fact that I have not done so should not be interpreted as an agreement with Mr. Midwinter's opinion(s).

**COUNT III – FRAUDULENT MISREPRESENTATION AND DECEIT**

Fraudulent misrepresentation is the same tort as deceit and its elements are correctly summarised in paragraph 22 of the Midwinter Declaration. Mr Midwinter cites an out-of-date edition of the well-known practitioner's textbook, "Clerk & Lindsell on Torts" in footnotes 6, 20, 23 and 27 of the Midwinter Declaration. The correct reference is to the 23 edition and not the 22nd edition. As a consequence, the relevant chapter in the 23rd edition is Chapter 17 and not 18.

Paragraph 22 of the Midwinter Declaration correctly explains that in England as a matter of procedure fraud must be "distinctly alleged and distinctly proved".  It is said in that connection that the Court requires "cogent proof".  This is a way of stating that particulars of the allegation must be given and explaining what, as a matter of evidence, is expected by the Court *at trial*. Proof is for the ultimate trier of fact and "pleading and proving" does not mean in England that there should be immediate proof of pleading

before the case is tried. All that is needed to plead a case in England is enough evidence to support an arguable factual case.

9   Moreover, this expresses nothing more than a rule of procedure in the English conflict of laws and is treated as a matter for the procedural law of the forum where the matter is being litigated ("lex fori").  An English Court would assume that the Southern District of New York Court would apply its own rules of pleading and evidence. Conversely, an English Court would not allow a US Court to dictate to it these matters, being a gloss on the standard of proof or the manner in which something is pleaded in a complaint.

10   Although it is sometimes said that more cogent proof is required when an accusation is serious, as suggested in paragraphs 23 and 24 of the Midwinter Declaration, this is not a complete statement of the way in which Courts evaluate proof of deceit as well as being subject to the reservations I have expressed above. It is incomplete for the reasons stated by Lewison J in FoodCo UK LLP & Ors v Henry Boot Developments Ltd [2010] EWHC 258 (Ch) at [3] "…*Although the standard of proof is the same in every civil case, where fraud is alleged cogent evidence is needed to prove it, because the evidence must overcome the inherent improbability that people act dishonestly rather than carelessly. On the other hand, inherent probabilities must be assessed in the light of all the actual circumstances of the case*" (emphasis added). There is no logical correlation between seriousness and probability (see Lady Hale in Re B [2009] AC 11 at [72]).

**(a)   Representation of fact or law made by the Defendant to the Plaintiff**

11   I agree as suggested in paragraph 25 of the Midwinter Declaration that an actionable case of deceit requires a statement of "present fact". I wish to make the following additional observations with respect to what amounts to "present fact":

(1)   Although a statement of intention and prediction as to the future are not statements of present fact, a statement of present fact is usually inherent in a statement of intention or in a statement of the future.  Thus, it is inherent in a statement of opinion that the opinion is honestly held (see Bisset v Wilkinson [1927] AC 177 at 182).  It is thus fraud to express an opinion which is not in fact

held as to the financial position of a customer (see Clerk & Lindsell 17-013 fn 72). Similarly, making a statement as to some future event which the maker of the statement does not believe will happen is also fraud.

(2)     Moreover, when the parties are aware that there is disparity between the information known to the representor and representee it will also frequently be implied that the maker has reasonable grounds for expressing an opinion (see Smith v. Land and House Property Corporation (1884) 28 Ch.D. 7 where Bowen LJ remarked that "*if the facts are not equally known to both sides, then a statement of opinion by one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion.*").  The same point was made in Brown v Raphael [1958] Ch 636 at pp642-3 and Barings v Coopers & Lybrand [2002] PNLR 39 at [48]-[52].

(3)     The Midwinter Declaration suggests in paragraph 25 (b) that a statement that a business earned US$100 million last year would or could be construed as a statement of belief. That may be so depending on the surrounding circumstances, but when made by someone with greater knowledge it is, as I suggested in (2) above, likely to be treated as a statement of belief based on reasonable grounds known to the maker.

(4)     Whilst a party may simply be making statements about himself which represent a "mere puff", that is a fairly rare and fact specific case. The examples given in paragraph 25 (c) in the Midwinter Declaration only work in circumstances where no sensible person would place reliance on such statements. Whether a statement is discounted as a "mere puff" depends on the context in which it was made. In Carney v NM Rothschild [2018] EWHC 958 the judge remarked on this point that "Here it is very much a question of emphasis and nuance" (see [238]).[1]

---

[1] The old prospectus case of Jennings v Broughton referred to in the Midwinter Declaration at fn 14 is not referred to in any other reported case or recognised textbook to support this point.

**(b)     Falsity**

Paragraph 27 of the Midwinter Declaration is also in my view a correct statement of the requirement to show substantial falsity.

I believe it is necessary to add the following to the proposition about half-truths in paragraph 28 of the Midwinter Declaration:

(1)     Such statements are often potent. The Courts frequently cite the well-known observation of Lord Steyn in <u>Smith New Court v Scrimgeour Vickers (Asset Management Ltd</u> [1997] AC 254 at p274 that "*a cocktail of truth, falsity and evasion is a more powerful instrument of deception than undiluted falsehood. It is also difficult to detect*" (see e.g. <u>Vald Nielsen Holdings v Baldorino</u> [2019] EWHC 1926 (Comm) at [139]).

(2)     A fragmentary statement will amount to a deceit if it is suggestive of a falsehood and intended to mislead as for example, where a defendant relays the favourable portion of a surveyor's report but omits the less encouraging part

**(c)     Dishonesty**

I do not take issue with the description of dishonesty in paragraphs 29 and 30 of the Midwinter Declaration. As is there made clear, dishonesty includes recklessness.

**(d)     Intention that the Plaintiff would Rely on the Representation**

The Plaintiff must establish that the statement is made with an intention that a representation is acted on by the Plaintiff (or by a class of person to which the Plaintiff belongs) and not necessarily, as stated in paragraph 31 of the Midwinter Declaration, that the maker of the statement intended to deceive (see Clerk & Lindsell [17-31]. Only when a defendant is actively dishonest as opposed to reckless does the Defendant's intention that the representation is acted upon equate to an intention to deceive. A person can recklessly intend for a representation to be acted on without wishing to deceive.

**(e)**      **False Statements to a Class**

16      England does not have a common law "fraud on the market" doctrine in the form in which it developed in the United States. However, much the same result is reached because the theoretical building blocks for such a concept are present:

(1)      `First, a representation to the plaintiff may be made directly or indirectly and through the instrumentality of others (see paragraph 26 of the Midwinter Declaration and Clerk & Lindsell 17-32 ). "*In order to enable a person injured by a false representation to sue for damages, it is not necessary that the representation should be made to the plaintiff directly; it is sufficient if the representation is made to a third person to be communicated to the plaintiff, or to be communicated to a class of persons of whom the plaintiff is one, or even if it is made to the public generally, with a view to its being acted on, and the plaintiff as one of the public acts on it and suffers damage thereby*." (Quain J in Swift v Winterbotham (1873) L.R. 8 Q.B. 244 at 253, cited with approval by Blackburn J in Richardson v Silvester (1873) L.R. 9 Q.B34 at 36).

(2)      Secondly, it is entirely possible for the Defendant to make a fraudulent statement (directly or indirectly) to a group of persons and intend for it to be relied upon by that group. The Defendant's intention that a particular group of persons rely on the statement is the critical factor in defining the class. For example, in Peek v Gurney ((1873) L.R. 6 H.L. 377) false representations were made in a listing prospectus by the promoters of the company. Because of the nature of the publication, the misrepresentations contained in the prospectus were held to have been made to the whole of the class consisting of all the investors who subscribed in a share issue. The Court could infer that those were the persons whom the defendants had intended to deceive. In contrast, on the facts of that particular case, the Defendants were not held to have made statements to the different class of persons consisting of purchasers in the aftermarket to whom the prospectus was not sent and who were not intended to rely on the prospectus.

(3)     Thirdly, provided it can be shown that the statement was material in the sense that it might have affected the investment decision of a reasonable person, it is presumed that the plaintiffs relied on the statement (as explained below). Thus reliance is in essence proved in a generic fashion because all the investors can point to the reaction of a reasonable person.

**(f)     Causation: Inducement and Reliance**

Inducement or causation occurs where the representee believes the representation to be true and acts in reliance on it. Reliance and the rebuttable nature of the presumption of reliance are discussed in paragraphs 32-35 of the Midwinter Declaration.

Since reliance is a form of factual causation, it is recognised that a false statement can induce both a positive decision to enter into a transaction as well as a negative one in which the representee decides not to transact (e.g. by retaining an investment which might otherwise be sold). This was confirmed by the Court of Appeal in in <u>Barton v County Nat West Ltd</u> [1999] Lloyd's Rep. Bank. 408 in which it observed that inducement was a wide concept;

> "*Thus, the first question is whether the representation made by Mr Murphy was of such a nature as would be likely to induce a person to enter into a contract. If so then the presumption will apply. But in connection with both this and the third submission made by counsel for the Guarantors it is necessary to appreciate the width of the concept of inducement. First the misrepresentation does not have to be the sole inducement. Second it is not essential that its effect should be to induce some positive action. The abstention from something bearing on the material interests of the plaintiff is enough. Halsbury's Laws of England 4th Ed. Vol 31 1998 Reissue paras 771 and 779. Thus in Australian Steel & Mining Corpn Pty Ltd v Corben [1974] 2 NSWLR 202 the plaintiff was misled by the representation of the agent for the purchaser to grant him an option to purchase land which the plaintiff had already determined to sell. The Court of Appeal of New South Wales considered that the plaintiff had been induced by the misrepresentation to grant the option which was therefore liable to be set aside even if he had already determined to sell the land because the misrepresentation caused the plaintiff to persevere in a decision already made.*"

19   Reliance can be *actual* or, as is acknowledged in paragraph 34 of the Midwinter Declaration, *presumed* (as to which see Clerk & Lindsell [17-36] and cases cited at fn 188).

(1)   For actual reliance it is necessary to show only that the representation materially influenced the representee in the sense that the statement was in fact actively present in the plaintiff's mind when the decision to transact was made, even if there were also other reasons to have done so (see BV Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises Inc [2020] QB 551 at [32]). The Plaintiff would fail to show actual inducement or actual reliance, for example, if the evidence showed that a decision to transact or not was made before learning of the statement or if the Plaintiff was determined to transact or not regardless of this information. The Defendant may have difficulty in defending a case on the basis of actual non-reliance because of the strength of the presumption of reliance.

(2)   The presumption of reliance is applied whenever the relevant representation is material in the sense that a reasonable person might have been influenced by the representation. Reliance is then proved because it is presumed that the representee was in fact influenced. This was explained in Barton v County Nat West Ltd by Morritt LJ who, after reviewing the authorities, remarked as follows:

> "*if the false statement is of such a nature that it would be likely to play a part in the decision of a reasonable person it will be presumed that it did unless the representor satisfies the court to the contrary. The continued existence of the presumption was reaffirmed by Lord Mustill in Pan Atlantic Insurance Co. Ltd v Pine Top Insurance Ltd [1995] 1 AC 501 at page 542A. The nature and limits of the presumption appear from the speech of Lord Blackburn, with whom the other members of the Appeal Committee agreed, in Smith v Chadwick (1884) 9 App.Cas.187 at page 196. Lord Blackburn said in relation to an allegation of deceit*
>
>> "*I think that if it is proved that the defendants with a view to induce the plaintiff to enter into a contract made a statement to the plaintiff of such a nature as would be likely to induce a person to enter into a contract, and it is proved that the plaintiff did enter into the contract, it is a fair inference of fact that he was induced to do so by the statement.*"

(3)     In <u>Barton v County Nat West Ltd</u> the Court of Appeal held that the presumption was sufficient to prove reliance even when the plaintiff gave no evidence of reliance.

(4)     I do not agree with the suggestion in the Midwinter Declaration that the presumption is rebutted by merely producing some evidence casting doubt on actual reliance.  In fact, the presumption is a strong one which is not easily displaced, a point well recognised at the highest level.  In <u>Zurich Insurance v Hayward</u> [2017] AC 142 the Supreme Court remarked that:

> *"… the authorities seem to me to support the conclusion that it is very difficult to rebut the presumption.  As it seems to me, the orthodox view is contained in <u>Sharland v Sharland</u> [2016] AC 871. In <u>Smith v Kay (1859)</u> 7 HL 750 at 759   Lord Chelmsford LC asked this question in a rescission case based on an allegation of fraudulent misrepresentation "can it be permitted to a party who has practised a deception, with a view to a particular end, which has been attained by it, to speculate upon what might have been the result if there had been a full communication of the truth?"*".

(5)     I also do not accept that <u>Zurich Insurance</u> is somehow an outlier or unusual and would not be followed on the issue of presumed reliance. The discussion on the presumption was entirely founded on conventional reasoning. The dicta quoted above is stated authoritatively in general terms by England's highest court and relies on well-known case law such as <u>Smith v Kay</u>. The reference to the case of <u>Sharland v Sharland</u> confirms that the Court in <u>Zurich</u> was seeking to express itself generally. <u>Sharland</u> was itself a factually unusual case in the sense that it was not about a free-standing claim for deceit but about the setting aside of a matrimonial consent order made by a Court because one party had made a fraudulent representation. Nevertheless, the Supreme Court referred to the presumption of reliance and the requirement imposed on the representor to rebut that (see [33]). The explanation in <u>Sharland</u> of that presumption was entirely conventional and, as it had been the most recent Supreme Court case, the Court in <u>Zurich</u> treated it as a general precedent.

(6)   The strength of the presumption was also confirmed recently by the English Court of Appeal in BV Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises (see per Longmore LJ [43]-[45]). In that case the representor made a fraudulent statement about the need for a price increase and the issue was whether the representee had to prove inducement or reliance. The Court of Appeal held that the representee had to prove inducement but could do so by showing that the representation had been *material* because, once *materiality* was shown, the presumption applied. "*Materiality*" meant that the representation was capable of having some influence on a hypothetical reasonable decision-maker: the fact that there were other factors which could have induced the hypothetical reasonable representee did not matter.

Allied to the presumption of reliance, is the further principle that it is no answer for a defendant in a claim for misrepresentation to point to the fact that the plaintiff could have discovered the truth with reasonable diligence if the plaintiff did not in fact discover the truth (see Redgrave v Hurd [1881] 20 Ch 1). There, Sir George Jessel MR in the Court of Appeal at p13 observed as follows:

> *"If a man is induced to enter into a contract by a false representation it is not a sufficient answer to him to say, "If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity and did not choose to avail yourself of them." I take it to be a settled doctrine of equity, not only as regards specific performance but also as regards rescission, that this is not an answer unless there is such delay as constitutes a defence under the Statute of Limitations."*

For this reason, I also disagree with the statement in paragraph 35 of the Midwinter Declaration that reliance is disproved by showing that the plaintiff had grounds to suspect or did suspect that the representation was untrue. If the Plaintiff fails to investigate the truth or follow up the suspicions that might exist that is no more than careless and cannot amount to an answer to the claim in the light of Redgrave v Hurd. As was said more recently in the English Court of Appeal in Peekay Intermark Ltd v ANZ Bank [2006] EWCA Civ 386, after a review of the authorities (see [30]-[40]):

*As such is it always open to the defendant to show, if he can, that since the claimant was aware of the true facts, he was not induced by the misrepresentation to act as he did. For that purpose, however, <u>it is not enough to show that the claimant could have discovered the truth, but that he did discover it.</u> (see per Moore-Bick LJ at [40] emphasis added)*

**(f)   Loss**

I do not dispute as suggested in paragraph 36 of the Midwinter Declaration that damage must be shown and that a common measure is the difference between what was paid and the market value but I disagree that the market value is always ascertained by reference to the date when the shares were acquired or that a plaintiff has suffered no loss because he is deemed to be able to sell before the market has discovered the truth. In effect the defendant is taking advantage of a false market in calculating damages.

It was only ever a prima facie rule that the true market value would be fixed at the date of the transaction (see Clerk & Lindsell 17-47). In fact, in <u>Smith New Court</u> the highest court recognised that the prima facie rule cannot apply when the plaintiff is unlikely to discover the truth behind the representation for some time. A plaintiff who does not discover the truth cannot be criticised for not going into the market to mitigate loss by liquidating/realising a position. In <u>Smith New Court</u> supra at pp265-266 Lord Browne-Wilkinson rejected the prima facie rule as "the old inflexible rule" established by the English Court of Appeal in the mid 19th century. The point about timing was also explained in <u>Parabola Investments v Browallia</u> [2011] QB 477 at [32]ff

I agree with the explanation of permissible heads of loss in paragraph 37 of the Midwinter Declaration but I would point that the assessment of damages in English conflict of laws is a matter of procedure for the law of the forum where the matter is being litigated (i.e. the "lex fori"). Thus, there is no substantive English law rule which prevents the forum from recognising a head of loss which would not be available from an English Court.

**COUNT IV THE CLAIM UNDER THE FINANCIAL SERVICES AND MARKETS ACT**

25      Section 90A Financial Services and Markets Act ("FSMA"), introduced in 2007, has a long pedigree in investor protection legislation (previously the Financial Services Act 1986 Section 47). The UK had a statutory remedy for investors who have been misled by an untrue or misleading statement or omission in a prospectus published by a company before it was re-introduced in different form in the FSMA. The current manifestation in the FSMA is derived from the EU Transparency Directive. Member States of the EU were free to implement the Transparency Directive in their own terms. Schedule 10A is the UK's attempt to impose liability on issuers to those investors in the market who acquire, dispose of or continue to hold investments in respect of communications to the market. Section 90A was a stop gap before a more considered solution was introduced in October 2010 in Schedule 10A. Section 90A now simply cross-refers to a newly drafted remedy set out in Schedule 10A, introduced by amendment with effect from 1 October 2010.

26      Although paragraph 38 of the Midwinter Declaration is correct to state that there is no case law directly on point on the current provision and that it has been derived from EU law, it is not correct to state that it is an "anomalous bolt on" (see paragraph 42 of the Midwinter Declaration). UK domestic statutory law regulating publications to investors has a long history dating back to the Directors Liability Act 1890 which imposed liability for negligent misstatements in "prospectuses", a publication required when shares are offered to the public. At the time liability in negligence was not accepted and that remained the case until the decision of the House of Lords in Hedley Byrne & Co Ltd v Heller (see [1964] AC 465). Liability for misstatement in a prospectus is now in Section 90 FSMA. Schedule 10A is addressing less formal publications.

27      The first issue is to define "published information" for the purposes of Schedule 10A:

(1)      Paragraphs 39(a), 42 and 43 of the Midwinter Declaration assert that "*published information*" is restricted to a yearly or half-yearly report (or other document required to be published by the EU Transparency Directive) published through a "*recognised information service*". In support of this construction, the Midwinter

Declaration refers to *Palmer's Company Law* at fn.31 (when it stated "*see generally…*") ("**Palmer's**").  It appears that the reference should begin at §5.368 rather than §5.363.  Section 5.370 of *Palmer's Company Law* supports Mr Midwinter QC's position; it reads: "*This provision applies to any reports or statements which are published further to arts 4, 5 and 6 of the Transparency Obligations Directive in relation to annual accounts, half-yearly accounts and interim management statements respectively.* [fn 2 is a reference to s.90A(1)(a)]. *The provision also covers 'any preliminary statement made in advance of a report or statement to be published' in relation to art.4 to the extent that any of those statements are intended to appear in the ultimate report or statement.* [fn.3 is a reference to s.90A(1)(b)]."

(2)     However, this interpretation of FSMA seems to be based on the wording of what was formerly contained in Section 90A(1) which has now been repealed but to which Palmers still refers. This is plain when one looks at the current language of in Section 90A  and Schedule 10A itself.  I believe this accounts for my disagreement with Mr Midwinter on the scope of the remedy.

(i)     Although the relevant paragraphs in Palmer's purport to have been reviewed in May 2020, the relevant text in Palmer's contains outdated references to a previous iteration of s.90A of FSMA. Section 90A(1)(a)-(b) only appeared in a previous version of s.90A (which had effect from 8 November 2006 to 30 September 2010).

(ii)    These sub-sections were repealed from 1 October 2010 and were not carried forward into the amended version of the FSMA. Thus, the current version of s.90A and Schedule 10A (in force from 1 October 2010 to now) does not have the provision which was previously in subsection (1) and is not limited to annual accounts, half-yearly accounts and interim management statements.

(iii)   Schedule 10A now makes no reference to information published on a "registered information service". Instead, "*published information*" is

defined by Paragraph 2(1) of Schedule 10A as "*... information published by the issuer of securities to which this Schedule applies— (a) by recognised means, or (b) <u>by other means where the availability of the information has been announced by the issuer by recognised means</u>*". Paragraph 2(2) of Schedule 10A (Published information to which this schedule applies) reinforces this by stating that "[i]*t is immaterial whether the information is required to be published (by recognised means or otherwise)*." This is significant because the annual and bi-annual reports of listed companies must be published by recognised means, whereas Paragraph 2 of Schedule 10A Schedule 10A makes it clear that it applies to other information as well. It appears therefore that the commentary in Palmer's is based on the repealed terms of Section 90A (notwithstanding that the section in Palmer's states that it was reviewed in May 2020).

(3)     This view is also consistent with the explanation in Gower's General Principles of Company Law 11th ed 2021, a well-regarded company law text. The editors state that liability extends to any information communicated by the Regulated News Service (RNS) including regulatory disclosures (see p977 at [27-021]).

(4)     Overall, it appears that published information means anything published through (in the case of the London Stock Exchange) the Regulated News Service (RNS) such as press releases, timely disclosure of material events or announcements and not simply annual or bi-annual reports alone (although those would also constitute "*published information*".  While the construction of "*published information*" has not been worked out in the case law, it seems to me to be plain on a reading of the FSMA that it applies to all information. I cannot see how the restriction set out in (1) above can still be applied when it has been repealed removed from the statute.

28     I also do not agree with the conclusion in paragraph 40 of the Midwinter Declaration, that one "<u>*cannot*</u> *bring proceedings under English law based on alleged misstatements or omissions in such documents (a) against a director or (b) otherwise than in accordance*

*with the requirements of Schedule 10A*" (emphasis in original). This conclusion does not follow from the wording of Schedule 10A paragraph 7. In fact, the exceptions in Paragraph 7(3) make that clear.

(1)     Paragraph 7(3)(a)(v) includes an exception for "*liability arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned*".  The reference to an "assumption of responsibility" is language used in English law in imposing a duty of care for negligent misstatement. In other words, Schedule 10 Paragraph 7(3)(a)(v) expressly preserved liability for negligence. It would be extremely odd if the law recognised that there would be liability for *negligent* misstatement but not liability for *fraudulent* misstatement and I do not believe that to have been the legislative intention. Accordingly, in my view, Paragraph 7(3)(a)(v) ought to be construed to include a person who has deceitfully published a statement to the plaintiff with the intention that it is relied upon by that person or class of persons. In those circumstances it would also be natural to say that the representor is taken to have "assumed responsibility: for the accuracy of the statement

(2)     In any event, nothing in Paragraph 7 of Schedule 10A suggests that proceedings could not still be brought to the extent they relate to statements not contained in 'published information' and therefore outside the scope of s.90A/10A.  Insofar as a statement is not within the definition of "published information:, then it cannot be covered by any immunity from suit for ordinary common law deceit or negligence. The commentary in Palmer's at §5.372-3 reveals some of the uncertainty regarding the scope of this provision.

29    I do not otherwise disagree with the description of the statutory claim under Section 90A and Schedule 10A in the Midwinter Declaration.

## COUNT V NEGLIGENCE

30      Although I agree with the general description of the cause of action for negligence in Paragraphs 55 to 56 of the Midwinter Declaration, I do not agree with paragraphs 57 to 59.

31      English law has for some time recognised that a common law duty of care applied to the publication of statements in a prospectus (see Possfund Custodian Trustee Ltd v Diamond [1996] 1 W.L.R. 1351).  Since duties of care are recognised by the law incrementally and because Possfund has never been overruled I would expect a duty of care to be recognised in a similar context.  Sharp v Blank [2019] EWHC 3096 (Ch), referred to in Paragraphs 57 of the Midwinter Declaration, concerned exclusively the liability of directors for statements made by them on an individual or personal level, rather than on behalf of the company, so that a personal assumption of responsibility was necessary in the context of other statutory duties. Sharp v Blank also did not refer to Possfund.

32      It is also important to understand that what amounts to a false representation is essentially the same for negligent misstatement as it is for fraudulent misstatement. Thus, although it may be that Mr Thaxter claims not to have a free-standing duty of disclosure, he would be responsible for failing to correct a statement made by him which turned out to be false or for publishing a half-truth. He might also be jointly liable for the deceit of his employer.

Pursuant to 28 U.S.C. paragraph 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   August 24, 2021

*Tom Lowe*
_____

Thomas Lowe QC

**Appendix 1**



**Thomas Lowe QC**
Called 1985
QC 2008

Wilberforce Chambers
8 New Square
London WC2 A3QP

UK +44 207 306 0102
Cayman Isl +1345 623 5693

Email:

tlowe@wilberforce.co.uk or
tlowe@wilberforce-cay.com

Tom Lowe was called to the Bar in 1985 and became Queen's Counsel in 2008. Having obtained an upper second LLB from London School of Economics, he went on to obtain a First in his LLM at Cambridge. He won the Inner Temple Queen Elizabeth scholarship when he came to the Bar and a number of prizes at the College of Law. He joined Wilberforce Chambers in 1997.

**Practice**

Tom Lowe QC practices in the Cayman Islands and regularly appears in British Virgin Islands and other jurisdictions. He retains his right to appear in the Courts of England and Wales and is a member of Wilberforce Chambers.

Mr. Lowe has acted in numerous high-profile cases in a wide range of commercial disputes. His main areas of expertise include company law, commercial fraud, insolvency, trust litigation and related arbitrations. He has appeared as counsel in dozens of reported cases over the last 30 years, some of which are listed below.

Most of Mr. Lowe's offshore work relates to international cross-border commercial and company litigation involving shareholder and other corporate disputes, creditor claims, insolvency and winding-up. Much of his work has involved asset tracing in the context of corporate misconduct and financial fraud.

He has appeared in Courts in England and Wales, the Bahamas, Bermuda, British Virgin Islands, the Cayman Islands, Turks & Caicos and Jersey as well as acting for clients in Singapore, Hong Kong and Malaysia. Mr Lowe regularly acts as an expert in cases in the US and Hong Kong.

The directories rank Mr. Lowe in the top tier for offshore work and describe him as being "*user-friendly, client-focused and easy to work with, able to grapple with the most complex of cases.*" (Legal 500) and "an incredible advocate", "outstanding intellect", "*very technically able", "very knowledgeable on the law and very user-friendly*" (Chambers and Partners).

He has a working knowledge of French, German and Spanish.

**Notable cases**

**England**

*Morgan Crucible v Hill Samuel* [1991] 1 CH 259 (negligence, bidders' duty of care, Company accountants' takeovers, auditors' negligence)

*SIB v Pantell No 2* [1993] Ch 296 (Financial Services, financial fraud, SIB's powers to obtain restitution orders for investors).

*Kaufmann v Credit Lyonnais* [1995] CLC 300 Financial Services, s62 FSA 1986, negligent fund management, negligence/churning/ breach of duty investment managers, Public Interest immunity.

*British Boss UK v Boss France* [1997] 1 WLR 351 EC Judgments Convention, breach of contract, distribution agreements, forum shopping, negative declarations.

*Cobra Golf Inc v Rata* [1998] Ch 109 (copyright, counterfeiting, Anton Piller Orders, privilege against self-incrimination, s72 Supreme Court Act 1981, intellectual property.

*Punch v Saunders* [1998] 1 WLR 986 newspapers, obligation to disclose source of information, privilege.

*Python (Monty) Pictures v Paragon Entertainment Corp* [1998] EMLR 640 acted on behalf of Channel 4 up to and including trial about copyright licensing of film rights in *Life of Brian*

*Haig v Atkin* [2000] 3 AER 80 Insolvency, power of trustee to sell private correspondence, human rights.

*Peskin v Milner* [2000] BCLC company law, whether directors owe fiduciary duties to members, ultra vires, clubs.

*Gorham v British Telecommunications* [2000] 1 WLR 2129 pension mis-selling Financial Services Act 1986, duty of care of financial adviser to dependents, pensions.

*Hamilton v Al Fayed (2001) EWCA* (2009) EWCA 97 (41) LSG 40 [2000] EWCA Civ 3012 acted for disgraced former politician against Al Fayed on basis that he had procured theft of notes of politician's legal team and used the same during the trial

Re Richbell Strategies [2001] B.C.C. 409; [2000] 2 B.C.L.C. 794 acted for well known private equity fund, seeking to recover US$100m and fending off fraud claim in the US

*Walker v Stones* [2001] Q.B. 902, trusts, solicitors, fraudulent breach of trust, constructive trusts, limitation, rule in *Prudential v Newman,* Partnership Act 1890.

*Haig v Aitken* [2001] Ch 110 acted for disgraced politician in his bankruptcy defending claim of trustee in bankruptcy

*Re Equitable Life Assurance* [2000]-[2001] produced a report with Nicholas Warren QC on rights of non-guaranteed annuity holders of large pension fund in run off

*Dextra v Bank of Jamaica* [2002] 1 AER (Com) 193 Privy Council, validity of bills of exchange, restitution for mistake, change of position. fraud and financial services

*Societe Internationale de Telecommunications v Watson Wyatt* [2002] EWHC 2401 professional negligence, solicitors, trust powers, employee benefit trust.

*Lewis v Eliades (No 1)* [2002] EWHC 335 freezing injunctions, interim relief acted for manager of well known boxing champton in claim brought against him for misuse of funds

*Midland Tooling v Midland International Tooling* [2003] All ER (D) 174 directors, breach of fiduciary duty, breach of confidence, conspiracy.

*Al Bassam v  A I Bassam* [2004] EWCA Civ 857 Probate, succession, domicile, conflict of laws, human rights.

*Wight v Eckhardt Marine* [2004] 1 AC 147 Insolvency - Winding up -Proof in liquidation.

*Settelen v Metropolitan Police Cssrs* [2004] EWHC 2171 claim for video tapes of Princess Diana against police commissioners who detained tapes

*Harley Street v Tchigirnsky* [2005] EWHC 2471 acted for investor group taking derivative claim against directors of London listed company with its centre of management in Russia, issue of law applicable

*Fidelity Management SA v Myriad International Holdings* [2005] EWHC 1193 arbitration, setting aside award, arbitrator fell asleep

*Bottin v Venson*  [2006] EWHC 3112 (Ch) company, fraud, deceit and breach of shareholders agreement.

*Mandrake Associates v Balanus* [2006] EWCA 1716 and [2005] EWCA Civ 840 guarantee and indemnity, claim for losses caused by failing to meet obligations under an indemnity contract

*Farrukh v Irwin Mitchell* [2006] EWHC 1541 (Ch) company, financial services solicitors negligence in context of flotation, damages.

*Reeves v Sprecher* [2007] partnership dispute about management of fund of hedge funds, dissolution and employment, conflict of laws.

*Phillips v Nusberger* [2008] House of Lords on service conventions: substantive claim fraud, private international law

*Re Freshwater* [2008-2010] Chancery Division, tax, recovery of GBP10m funds under tax avoidance scheme, liability to tax

*Cobbetts v Hodge* [2010] 1 B.C.L.C. 30 partnership dispute, recovery of secret profit from employee and ambit of principle in *Reading v Attorney-General*

*BCCG v Society Generale* [2009-2011] Commercial Court, hedge fund platform and claim relating to duties of provider of synthetic note instruments

*Isis v Oscatello* [2007-2013], [2012] EWHC 745 (Ch) [2013] EWHC 7 England and Isle of Man acting for liquidator defending claims in excess of compromise, invalid corporate transactions arising in the context of offshore vehicle of Kaupthing Bank, interpretation of Credit Regulations

**Examples of International Cases**

*Enka v Mass Global Energy* [2020] Cayman Isl. conspiracy, unlawful interference in context of directors seeking to render company judgment proof

*Re Ascot Fund* Cayman [2020] Cayman Isl liquidation dispute seeking clawback of overpaid shareholder distributions.

*Re Pelletier* [2020] Cayman Isl. bankruptcy fraudulent preferences aand dispositions.

*Kingate v Kingate Management Ltd* (2013 to 2016] Bermuda claim by liquidators of Madoff feeder fund against managers for negligence and to claw back fees.

*Kilometre v Shanda Games* (Cayman 2015] represent creditor seeking winding up of Cayman registered co with NASDAQ listing and multi-billion USD business in the PRC

*Re Qunar* (Cayman2016-2020) Judgment represented online travel agent company in merger dissenters action involving valuation

*Re Qihoo (Cayman 2017-2020)* represented Chinese online search engine company in merger dissenters action involving valuation

*Re Khongzhong (Cayman 2017)* represented Chinese company in merger dissenters action involving valuation

*Re Torchlight Fund* (Cayman 2016-2017) represented limited partners in winding up of private equity fund on grounds of misconduct and breaches of fiduciary duty

*EHi v Ctr**p*** **(**Cayman 2018) represented petitioner in just and equitable winding up on grounds of misconduct and breaches of fiduciary duty

*Sterling Macro Fund* (Cayman 2016-2018) represented company in just and equitable winding up on grounds of misconduct and breaches of fiduciary duty

*Oriental Knowledge Tank v Business Intelligence* (Cayman 2018) represented petitioner in just and equitable winding up on grounds of misconduct and breaches of fiduciary duty

*Ritchie v GECC* [2018-2020] representing Plaintiff in claims about fraudulent conspiracy relating to collapse of Ponzi scheme.

*Re Lunan BVI 2018-2020)* represented plaintiff in dispute between PRC shareholders involving breach of fiduciary duty

- 20 -

*APEV IV v Abraaj Holdings* (2018-20) represented private equity fund purusing general partner and management entities for breach of fiduciary duty under derivative suit

*Tanrui v China Chanshui* Cayman 2018-2020) represented petitioner in just and equitable winding up petition involving takeover battle in Hong Kong on grounds of misconduct and breaches of fiduciary duty

*VRG v Mattlin Patterson* (Cayman 2016]-[2020]) represented Brazilian creditor seeking to enforce ICC arbitration award in which the Court of Appeal of the Cayman Islands has given important judgments

*Re Rhone Holdings* (Cayman 2015-6) represented company in winding up petition and arbitration stay

*Re Caledonian Bank* (Cayman 2016) represented creditor in dispute about trust deposits with collapsed bank

*Cayman Islands Tax Information Authority v MH Investments* (Cayman 2015) represented respondent in challenging Australian tax information request

*Banks v Insurance Company of West Indies (*Cayman 2016) represented insurance company in dispute against third party arising from non-disclosure by policyholder

*Foster v GKF Holdings* (Cayman 2017) successfully represented defendants in claims based on loan subordination and restitution

*Re Boshiwa* [2015] Cayman Isl acted for creditor and obtained order for appointment of provisional liquidators of Hong Kong based muliti billion USD company incorporated in Cayman Islands

*Re Mayer Holdings* [2015] Cayman Islands Court of Appeal represented Cayman Reg Hong Kong listed co in winding up proceedings in Cayman.

*Re Harbinger* (Cayman 2015) represented petitioner in just and equitable winding up on grounds of misconduct and breaches of fiduciary dut

*AHAB v SAAD et al* [2010-to 2019] Cayman Islands, successfully obtained judgment for defendant SPV resisting claim for recovery of US$6bn proceeds of alleged fraudulent breaches of fiduciary duty

*Wang v Ministry of Defence (Republic of China – Taiwan)* [2013] acting for Taiwanese arms dealer in defending substantial asset tracing claims arising from corruption in awarding large defence contracts

*CEVA Holdings* [2013] acted for company in winding up and restructuring of logistic companies with debts exceeding US$3bn

*Axis* v *Civil Aviation Authority of the Cayman Islands* [2011-13] commercial judicial review proceedings, ultra vires, challenge to exercise of discretion of Aviation Authority

*KBC v Palm Beach* [2013] argued for the validity and effect of side letter for $20m redemption claim

*SPhinX Companies* [2008] Cayman Islands, complex liquidation with cash of US$500m arising from collapse of Refco, segregated portfolio companies, schemes of arrangement, contingent debtors, co-mingling of assets

*Gottex v New Stream* [2009-2011] Bermuda, liquidation of segregated accounts company operating as US$1 billion plus hedge fund, winding up, validity of informal restructuring

*Fintan v Medley* Opportunity Fund [2012] Cayman Islands, liquidation of hedge fund, validity of informal restructuring, redemption dispute, successfully defeated petition based on US$25m

*Fenris v Ennismore Fund* [Cayman Islands, Privy Council and Court of Appeal [2011-2018] dispute between fund managers

*ABC Capital* [Cayman Islands Court of Appeal [2012] winding up of segregated portfolio company

*Bancredito v GFN* [2004-2011] Cayman Islands - liquidation of offshore branch of Bank based in Dominican Republic, fraud, successfully defended numerous claims against former owners by Central Bank and others for US$bn, Privy Council Appeal

*Re Palm Beach Capital and Re Lancelot* [2008 and 2013] Cayman Islands – cross border cooperation with Chapter 7 trustee in winding up of US$1bn asset backed loan funds on just and equitable ground as a result of Petters fraud in underlying vehicles,

*Banco Economico v Allied Leasing* [1999-2003] Cayman Islands -collapse of Brazilian Bank, winding up of offshore vehicle, insolvency and fraud

*Magnum Investments v Zulauf Asset Management* [2004-2006] Cayman Islands - claim by sponsor's of hedge fund against fund managers for ongoing fees

*Oracle Fund* [2000-2003] Bahamas - collapse of substantial hedge fund and negligence of directors and fund administrators

*E-Millennium Fund v Deutsche Bank* [2000-3] Cayman Islands -dispute between private equity fund manager and underwriter of commitments to the fund arising from closure of fund

*Re Refco* [2007] New York - provided expert evidence on status of assets belonging to segregated portfolio companies in US bankruptcy appeal

*Schramm v Financial Secretary* [2004] company, restoration to register after dissolution

**Trust Cases**

*Wang Din-shin v Nina Wang* [2003-7] Hong Kong Successfully defended probate case involving an estate of US$6bn allegations of forgery – junior counsel. One of the largest probate cases to have been the subject

*Hinds v Hinds* [Cayman 2014] representing beneficiaries in probate dispute about beneficial entitlement and claim against estate

*A v N Francois v Beaufour* [2007] WTLR 565 [2003-2007] trust, fraudulent breach of trust, validity of forfeiture clause, recovery of Euro 2bn

*HSBC v Wong Kit Wan* [2007] WTLR 631 [2004-8] Trust created for Hong Kong family, power of appointment and locus standi of protectors, sale of Chinese business

*Miller v Gianne* (2007) Cayman Islands fraud, asset tracing, community property and private international law

*Bridge Trust v Jahre* [2000-2004] Cayman Islands fraud tracing, claim by Norwegian Government of assets in Panama

*Re Poulton* [2017 to 2021] Cayman Islands validity of exclusion from trust, undue influence and lack of capacity

*Zhao Long v Lunan Pharmaceuticals* [2021] British Virgin Islands claim to substantial shareholding of PRC pharmaceutical involving questions of PRC company law.

**Examples of Expert Testimony**

*Re Fursa* [2012-3] State of South Carolina provided expert evidence to US State Court about status of limited partnerships in the Cayman Islands

*Re Wimbledon Fund* [2011-2012] State of California evidence as to duties of directors, fund managers, administrators and law of misrepresentation under Cayman law.

*Re Primeo Fund* [2012] Madoff, New York evidence as to liability for fraud and deceit of various third parties under Cayman law

*BP Securities Litigation* [2013] expert opinion to Court in Texas about UK financial services and securities law in context of class action by shareholders claiming losses arising from liabilities in Gulf of Mexico oil spill

*Ren-Ren Litigation* [2019] expect opinion to New York Court in relation to shareholder dispute, derivative actions and standing in relation to Cayman and UK law.

*Kowk Hu Kwan v Convoy Global Holdings Ltd* [2018] HKCFI 2112 expert opinion on Cayman law to Hong Court on the validity of decisions made by the chairman of the general meeting

*Bitmain litigation* [2020] expert opinion for Hong Kong Court in relation to validity of Company meetings

*Platinum Litigation* [2020] expert opinion to Delaware Court in relation to Cayman law claims relating to enforceability of fraudulent preference remedies and piercing corporate veil.

*Liquidators of MBI v Sheikh Al Jaber* [2021] expert opinion for UK Court in relation to issues concerning the validity of share transfers and duties of directors under BVI law.

**Memberships and publications**

Tom is a member of the UK Chancery Bar Association, UK COMBAR, American Bankruptcy Institute and has published articles in the Journal of International Business and Finance and Trusts and Estates and co-authored a chapter in a book on Trust Arbitrations in Cayman Islands

**Appendix 2**

**Case Law and Texts**

| |
|---|
| Australian Steel & Mining Corpn Pty Ltd v Corben [1974] 2 NSWLR 202 |
| Barings v Coopers & Lybrand [2002] PNLR 39 |
| Barton v County Nat West Ltd [1999] Lloyd's Rep. Bank. 408 |
| Bisset v Wilkinson [1927] AC 177 |
| Brown v Raphael [1958] Ch 636 |
| BV Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises Inc [2020] QB 551 |
| Carney v NM Rothschild [2018] EWHC 958 |
| *Clerk & Lindsell Ch 17* |
| FoodCo UK LLP & Ors v Henry Boot Developments Ltd [2010] EWHC 258 (Ch) |
| *Gower's General Principles of Company Law 11th ed 2021 p977* |
| Jennings v Broughton (1853) 17 Beav. 234 |
| Re B [2009] AC 11 |
| *Palmer's Company Law, §§5.370; 5.368; 5.363* |
| Pan Atlantic Insurance Co. Ltd v Pine Top Insurance Ltd [1995] 1 AC 501 |
| Parabola Investments v Browallia [2011] QB 477 |
| Possfund Custodian Trustee Ltd v Diamond [1996] 1 W.L.R. 1351 |
| Redgrave v Hurd [1881] 20 Ch 1 |
| Sharland v Sharland [2016] AC 871 |
| Sharp v Blank [2019] EWHC 3096 (Ch) |

| |
|---|
| Smith New Court v Scrimgeour Vickers (Asset Management Ltd [1997] AC 254 at p274 |
| Smith v Chadwick (1884) 9 App.Cas.187 |
| Smith v Kay (1859) 7 HL 750 |
| Smith v. Land and House Property Corporation (1884) 28 Ch.D. 7 |
| Vald Nielsen Holdings v Baldorino [2019] EWHC 1926 (Comm) |
| Zurich Insurance v Hayward [2017] AC 142 |