# THE
# NEW SOUTH WALES
# LAW REPORTS

# 1974

## Volume 2

*Published for*

**THE COUNCIL OF LAW REPORTING FOR NEW SOUTH WALES**

*by*

**THE LAW BOOK COMPANY LIMITED**

SYDNEY – – – – – – – 301–305 Kent Street
MELBOURNE – – – – 389–393 Lonsdale Street
BRISBANE – – – – – – 27–35 Turbot Street

202                        SUPREME COURT                        ([1974] 2

## AUSTRALIAN STEEL & MINING CORPORATION PTY. LTD.    A

### v. CORBEN AND OTHERS

Court of Appeal: Moffitt P., and Hutley and Samuels JJ.A.

Sept. 4-6; Nov. 12, 1974.

*Contract—Vendor induced by false representation to grant an option to
purchase land—Specific performance refused—Inoperative sentence in
notice of exercise of option does not render whole notice ineffective.*    B

A clause in an option to purchase land provided as follows: "Any reference to
you herein includes your nominee and any person or company appointed by you
in writing as your nominee shall have all your rights hereunder and may exercise
this option AND you may exercise this option on behalf of such nominee".

The grantee of the option did not appoint any nominee, but itself gave the grantors
notice of exercise of the option, concluding as follows: "The purchaser named in the
Contract will be Coorilla Developments Pty. Limited, Registered Office, 16 O'Connell    C
Street, Sydney".

The grantors defended a suit for specific performance of a contract alleged to
arise out of the exercise of the option on the grounds (1) that the option was not
correctly exercised; and (2) that the option was induced by representations which
were false, and which entitled the grantors to rescind, which they had done. It was
conceded that, if the grantors were entitled to rescind, they had validly done so.

Holland J. made an order for specific performance of the contract. On appeal
there was evidence with respect to the second ground of appeal that, before they    D
entered into the option, the grantors had decided to sell the land and had determined
upon a price; but had inquired of the purchaser's agent who the purchaser might
be, and had been told that he was a doctor, meaning, so the grantors understood,
and were intended by the agent to understand, a doctor of medicine. The agent said
it would be necessary to take an option because the doctor was overseas and could
not be contacted, and later, but still before the option was granted, that the doctor
was "probably a Pitt Street farmer". In fact the agent was acting for a doctor, but
not of medicine, who was in turn acting for a consortium comprising a number of    E
corporations.

*Held*: (1) The granting of the option had been induced by the misrepresentations
of the purchaser's agent and, therefore, the grantors were not bound by its terms.

*Nicholas* v. *Thompson* [1924] V.L.R. 554, at pp. 565, 566 and *Barton* v. *Armstrong*
[1973] 2 N.S.W.L.R. 598, at p. 631, applied.

*Smith* v. *Kay* (1859) 7 H.L.C. 750, at p. 759; 11 E.R. 299, at p. 303, referred to.

(2) Supposing that the grantors had made a firm decision to sell before the
misrepresentations were made, nevertheless the position was still the same, because
the misrepresentations had the effect of inducing the grantors to persevere in a    F
decision already reached.

(3) There had been an error of law which vitiated the findings of fact in the Court
below. Therefore, those findings were properly subject to appeal.

*Edwards* v. *Noble* (1971) 125 C.L.R. 296, distinguished.

(4) The last sentence in the notice of exercise of the option, which was admittedly
ineffective as a nomination of the party to be the purchaser named in the contract,
could not destroy the operative effect of the first sentence. Therefore, the option,
apart from the matter of the misrepresentations, had been effectively exercised.    G

CASES CITED.

The following cases are cited in the judgment of Hutley J.A.:

*Barton* v. *Armstrong* [1973] 2 N.S.W.L.R. 598.

*Edwards* v. *Noble* (1971) 125 C.L.R. 296.
*Macleay* v. *Tait* [1906] A.C. 24.
*Nicholas* v. *Thompson* [1924] V.L.R. 554.
*Smith* v. *Chadwick* (1884) 9 A.C. 187.
*Smith* v. *Kay* (1859) 7 H.L.C. 750; 11 E.R. 299.
*Wilcher* v. *Steain* (1961) 79 W.N. (N.S.W.) 141.

The following additional cases were cited in argument:
*Basma* v. *Weekes* [1950] A.C. 441.
*Bell Bros. Pty. Ltd.* v. *Sarich* [1971] W.A.R. 157.
*Beswick* v. *Beswick* [1968] A.C. 58.
*Chang* v. *Chang* (1974) 48 A.L.J.R. 362.
*Coulls* v. *Bagot's Executor and Trustee Co. Ltd.* (1967) 119 C.L.R. 460.
*Da Costa* v. *Cockburn Salvage & Trading Pty. Ltd.* (1970) 124 C.L.R. 192.
*Edgington* v. *Fitzmaurice* (1885) 29 Ch. D. 459.
*O'Keefe* v. *Taylor Estates Ltd.* (1916) Q.S.R. 301.
*P. Samuel and Co. Ltd.* v. *Dumas* [1924] A.C. 431.
*Reynell* v. *Sprye* (1852) 1 De G.M. & G. 660; 42 E.R. 710.
*Sidney Eastman Pty. Ltd.* v. *Southern* (1962) 80 W.N. (N.S.W.) 548.
*Smith* v. *Wheatcroft* (1878) 9 Ch. 223.
*Whiteley Muir and Zwanenberg Ltd.* v. *Kerr* (1966) 39 A.L.J.R. 505.

APPEAL.

This was an appeal by the first to third defendants against a decree by Holland J. for specific performance of a contract for the sale of land arising out of the exercise of an option granted by those defendants to the plaintiff. The fourth defendant, named in the notice of exercise of the option as the purchaser to be named in the contract, submitted and, on the appeal, was joined as a respondent by the appellants. The facts are set out in the judgment of Hutley J.A.

*F.J.D. Officer* Q.C. and *T.F.M. Naughton*, for the appellants (first to third defendants, prospective vendors).

*G.D. Needham* Q.C. and *R.V. Gyles*, for the respondents (plaintiff and nominee of plaintiff, prospective purchasers).

*Cur. adv. vult.*

Nov. 12.

MOFFITT P. I concur in the judgment of Hutley J.A. and in the orders he proposes.

HUTLEY J.A. This is an appeal from a judgment of Holland J. in which he ordered specific performance of an agreement brought about by the exercise of an option. The plaintiff, Australian Steel & Mining Corporation Pty. Ltd., was at the relevant time known as Haughty Clare Pty. Ltd. The appellants, S.R. Corben and K. Wong Holdings Pty. Ltd. were co-owners of land in the South Illawarra area.

On 25th July, 1969, the option was granted in the following terms:

"To: HAUGHTY CLARE PTY. LIMITED
      C/– J.F. Boulton & Co. Pty. Ltd., Sydney.

1. In consideration of the sum of two hundred dollars, $200.00, paid by you this day (the receipt whereof is hereby acknowledged), I HEREBY GRANT

to you an option to purchase the property shortly described in the Schedule  A
hereto.

2. The purchase price of the property shall be One Hundred and Forty Thousand Dollars ($140,000) clear of agent's commission payable in cash on completion.

3. This option may be exercised by you at any time within SIXTY days from the date hereof by notice in writing either delivered or to be forwarded by registered post to me at the address set out below.

4. Upon your exercising this option I agree to enter into a contract with  B you in the form (1965 Edition) approved by the Law Society of New South Wales and The Real Estate Institute of New South Wales for the sale and transfer of the property at the above price and providing for vacant possession on completion.

5. If you exercise this option the consideration shown in paragraph 1 shall be credited as part of the purchase money payable under the said Contract.  C

6. Any reference to you herein includes your nominee and any person or company appointed by you in writing as your nominee shall have all your rights hereunder and may exercise this option AND you may exercise this option on behalf of such nominee."

Within the period of sixty days the option was exercised by notice in the following terms:

"Mr. R. Corben,
9-15 Eveleigh Street,  D
Redfern. N.S.W. 2016.

Mr. K. Wong,
83 Mona Vale Road,
Pymble. N.S.W. 2073.                    17th September, 1969.

Haughty Clare Pty. Limited gives you Notice that it hereby exercises the option dated 25th July 1969 to purchase all that piece of land comprising approximately 700 acres freehold and 1780 acres leasehold, situated  E south of Nowra, both sides of Princes Highway, known as Falls Creek, known as Wongcor Grazing for the sum of One hundred and forty thousand dollars cash, and hereby requests you to submit a form of Contract of Sale for execution as provided in the Option.

The purchaser named in the Contract will be Coorilla Developments Pty. Limited, Registered Office, 16 O'Connell Street, Sydney.

The Common Seal of Haughty )
Clare Pty. Limited was hereunto )        (sgd.) JOHN D. STEED   F
affixed pursuant to a resolution )               Director.
of the Directors in the presence )
of the Director whose name is )
set opposite hereto and in the )
presence of:                       )        (Common Seal)
(sgd.) DIANE BURGESS Secretary                   "

The appellants defended the suit for specific performance on the ground  G that the option was not correctly exercised and also on the ground that it was induced by representations which were false and entitled them to rescind, and they did rescind. There is no dispute that, if the appellants were entitled to rescind, they had validly done so.

A  I propose to deal with the second ground first, namely, the ground of misrepresentation.

The option was obtained by a Mr. Cavanagh, a real estate agent, a director of J.F. Boulton & Co. Pty. Ltd., stock and station agents. In obtaining this option he was acting on the instructions of a Mr. Steed, solicitor, and Dr. Bissig, a director of Development Finance Corporation Ltd. Development Finance Corporation Ltd. was acting for a consortium consisting of Armco Steel Corporation, Kaiser Steel and Mining Australia Pty. Ltd., a B  wholly owned subsidiary of Kaiser Steel Corporation, U.S.A., and August Thyssen, Huppe AG of Dusseldorf. He, however, had no knowledge of on whose behalf he was acting.

Having received his instructions, Cavanagh got into touch with F.G. Corben, the brother of S.R. Corben. S.R. Corben was gravely ill, able to attend to business only intermittently, and was not available for business phone calls from strangers. Cavanagh told F.G. Corben that he had a client C  who was looking around the area for a suitable property and was interested in the Corben property. His Honour found that F.G. Corben got into touch with his brother, S.R. Corben, who told him it would be necessary to consult Mr. Wong who controlled K. Wong Holdings Pty. Ltd., the second appellant. His Honour found that the first telephone conversation between Cavanagh and F.G. Corben ended without S.R. Corben having indicated a willingness to sell and with F.G. Corben telling Cavanagh that he would have to ring again.

D  The option was dated 25th July, 1969. His Honour found that the first defendant rang Wong on 24th July, 1969, in the afternoon about selling the property and that "this conversation with Wong led the first defendant (i.e. S.R. Corben) to decide that the property would be sold if the price was acceptable and that at all times Wong left it entirely to the first defendant to fix the price." There is a dispute as to the time at which the price was fixed, but his Honour found that S.R. Corben had decided his price and E  told Wong what it was on the afternoon of 24th July, 1969.

However, S.R. Corben was concerned about the identity of the purchaser and his Honour found that, before F.G. Corben's second conversation with Cavanagh, which took place on 25th July, 1969, in the morning, he told his brother to ask Cavanagh the identity of the purchaser. Again there was a conflict as to the reason which led S.R. Corben to be interested in the identity of the purchaser. His Honour found that the purpose of the purchaser in acquiring the property was not a matter activating the mind of the first F  defendant (i.e. S.R. Corben) when he fixed the price. He then, however, made the following significant finding: "No doubt the identity of the purchaser would encourage him to fix the best price that he thought he could get for the land if the purchaser appeared to have the capacity to pay it, for example a local grazier might pay less than a newcomer, but I am not satisfied that the first defendant's interest in the purchaser went beyond this."

When F.G. Corben told Cavanagh on the morning of 25th July, 1969, G  that his brother (i.e. S.R. Corben) might be interested in selling he also told Cavanagh that his brother wanted to know who was the purchaser. Cavanagh told him that it was a doctor and this was relayed to S.R. Corben. He then told his brother who relayed it to Cavanagh that he was not all that interested in selling, but the price would be $140,000.

It was then that Cavanagh revealed that he wanted an option and F.G. Corben communicated this to his brother. When Cavanagh rang back he was informed that S.R. Corben wanted to know why there should be an option. His Honour found that Cavanagh replied "the doctor was overseas and he could not get in touch with him so it had to be an option."

Telephone conversations then took place between F.G. Corben and S.R. Corben and Wong, as a result of which Cavanagh was informed that they were agreeable for an option over a period until the doctor returned from overseas. His Honour found that, though Cavanagh was at this stage getting his instructions from Dr. Bissig, so that in one sense his client was "a doctor", he knew that the Corbens and Wong assumed that they were dealing with a doctor of medicine and he was guilty of misrepresentation as to the identity of the purchaser.

The actual execution of the option took place in Wong's office. Cavanagh produced an option designed by Steed to F.G. Corben, who took it, rang S.R. Corben and read it to him. He raised, inter alia, the question as to the identity of Haughty Clare Pty. Ltd. and required his brother to find out who was this company. F.G. Corben took up this matter with Cavanagh and his Honour found: "that Mr. Cavanagh answered this query by saying either that Haughty Clare Pty. Ltd. was 'the nominee company' and that the doctor was going to form another company to hold the property when he came back from overseas, or that Haughty Clare Pty. Ltd. was his, Cavanagh's company and that when the doctor returned he would exercise the option, either in his own name, or in the name of a company of the doctor."

At the office, in conversation with Wong or Corben, Cavanagh said the doctor was "probably a Pitt Street farmer". It is thus clear that Cavanagh lied to the Corbens and Wong about the identity of the purchaser. His Honour, however, found that these misrepresentations were not material misrepresentations inducing the granting of the option.

In reaching this conclusion his Honour's finding as to the time at which S.R. Corben, who was the dominant party, had fixed the price was of considerable importance. His Honour found that S.R. Corben had fixed the price before he had directed his brother to discover the identity of the purchaser. In analyzing the consequences of this order of events, his Honour did not have (as this Court has) the benefit of the decision of the Privy Council in *Barton* v. *Armstrong* (1), where the majority said: "If it were established that Barton did not allow the representation to affect his judgment then he could not make it a ground for relief, even though the representation was designed and known by Barton to be designed to affect his judgment. If on the other hand Barton relied on the misrepresentation, Armstrong could not have defeated his claim to relief by showing that there were other more weighty causes which contributed to his decision to execute the deed, for in this field the court does not allow an examination into the relative importance of contributory causes.

"'Once make out that there has been anything like deception and no contract resting in any degree on that foundation can stand'. Per Lord Cranworth L.J. in *Reynell* v. *Sprye* (2)."

---

(1) [1973] 2 N.S.W.L.R. 598, at p. 631.    (2) (1852) 1 De G.M. & G. 660, at p. 708; 42 E.R. 710 at p. 728.

A   His Honour was at pains to analyze the materiality of the representation and the degree of weight in the ultimate decision which was reached. He said: "Before a misrepresentation of fact can constitute a material inducement there must be the assertion of a fact on which the person entering into transaction relied, and in the absence of which it is reasonable to infer that he would not have entered into it at all, or at least not on the same terms. Both facts must concur; there must be false and material representations, and the party seeking relief should have acted upon the faith and credit

B   of such representations. A misrepresentation goes for nothing unless it is a proximate and immediate cause of the transaction. It is not enough that it may have remotely or indirectly contributed to the transaction or may have supplied a motive to the other party to enter into it. The representation must be the very ground on which the transaction has taken place. The transaction must be a necessary and not merely an indirect result of the representation. It is not, however, necessary that the representation should

C   have been the sole cause of the transaction. It is enough that it may have constituted a material inducement. (*Kerr on Fraud and Mistake*, 7th ed., pp. 73, 74)."

I am of the opinion that this is not a correct statement of the law in the light of the passage quoted above from *Barton* v. *Armstrong* (3). The burden of proof of misrepresentation lies upon the appellants, defendants in the suit below. The party relying upon misrepresentation to avoid a contract has to prove that the false statement did influence him (see per Lord Black-

D   burn in *Smith* v. *Chadwick* (4)), but it is not correct to say that the representation must be the very ground upon which the transaction has taken place. Once there is acceptable evidence that the representation was one among the factors which induced the contract, that is sufficient.

I am also of opinion that the proposition that the misrepresentation must be material is incorrect. Though there is much judicial and textbook support for this proposition (e.g. *Spencer Bower on Actionable Misrepresenta-*

E   *tion*, 3rd ed., p. 130 et seq.; *Kerr on Fraud and Mistake*, 7th ed., p. 73 et seq.) it cannot survive the criticism of Cussen A.C.J. in *Nicholas* v. *Thompson* (5). A material misrepresentation is one which would affect a normal person. As Spencer Bower, op. cit. p. 130, says "it is of no avail to show that the representee was in fact induced to act to his prejudice by a falsehood, unless that falsehood was of a nature to induce a normal person so to act in the circumstances of the case." Cussen A.C.J., however, said (6): "In connection with this question of 'materiality' the test of the ordinary reasonable man

F   has been suggested, and no doubt in many cases the test can, as a matter of evidence and for the purposes of the tribunal which has to find the facts, be properly resorted to. It must be remembered that there may be cases, though they do not often occur, in which what would be 'material' to the ordinary man would not be 'material' to the parties or one of them."

He also said (7): "I may add that I think that, in a case like the present, the direct attachment of the word 'material' to the word 'inducement' instead

G   of the word 'representation', leads to confusion. It suggests that a comparison

---

(3) [1973] 2 N.S.W.L.R. 598, at p. 631.          (6) [1924] V.L.R. 554, at p. 565.
(4) (1884) 9 A.C. 187, at p. 195.                (7) [1924] V.L.R. 554, at p. 566.
(5) [1924] V.L.R. 554, at pp. 564–566.

208                    SUPREME COURT                    ([1974] 2

should be instituted between the effect on the mind of a plaintiff of the    A
particular representation in question and the effect on the mind of a plaintiff
of other representations, matters and things, and that if, the first effect
compared with the second is not 'material'—i.e. 'substantial'—it should,
whether it was a real inducement or not, be disregarded. This, I think, is
not the proper test which is indicated by the question, 'Was the plaintiff
induced by the particular representation?' Or, in other words, was it alone
or with or notwithstanding other things which accompanied it, a real in-
ducement, or one of the real inducements to the plaintiff? In answering    B
this question, the tribunal deciding the facts might, no doubt, mediately
put to itself this question: 'Was the representation in the mind of the plaintiff
so material that it was to him a real inducement?' But this does not necessitate
the instituting of any such comparison as is mentioned above, and is merely
a convenient method of arriving at the answer to the final question."

   *Nicholas* v. *Thompson* (8) was followed by the Full Court (Evatt C.J.
Herron and Collins JJ.) in *Wilcher* v. *Steain* (9). In my opinion, it represents    C
the correct doctrine. The passage quoted above from *Barton* v. *Armstrong*
(10) is founded on the same principle, namely, to determine whether the
individual was induced, requires the examination of how the individual
responded to any misrepresentation and, if he responded to its effects,
whether by being moved to activity or being lulled into inactivity, he has
been induced, and the transaction which results cannot stand.

   There are indeed old dicta that where there has been deception and the
object of the deception has been attained, the person guilty of deception    D
cannot set up that the representations were immaterial. Thus, in *Smith* v.
*Kay* (11) Lord Chelmsford said: "But can it be permitted to a party who
has practised a deception, with a view to a particular end, which has been
attained by it, to speculate upon what might have been the result if there had
been full communication of the truth?"

   The law has permitted proof that the deception which was practised was
not a factor in the ultimate decision, but the task of the deceiver is heavy.    E
His own conduct provides some evidence of the materiality of his representa-
tions. As it is put in *"Williston on Contracts"*, revised ed. s. 1490: "A distinc-
tion must be noticed in this connection between an innocent misrepresentation
and one which is not innocent. 'In the first place materiality of the mistake
induced by innocent misrepresentation is essential while materiality is not
essential if a mistake induced by fraud produces the intended consequences.
One who makes an innocent misrepresentation of an unimportant fact has
no reason to suppose that his statement will cause action, but fraud is    F
directed to that very end, or is expected to achieve it, and if the result is
achieved the fraudulent person cannot be allowed to insist on his bargain.'"

   The problem posed here can be looked at in another way. It may be
suggested that the only real question was the price, and the dominant party,
having made a decision to sell at a certain price, cannot be said to have been
induced to enter into the option by false representations made after he has
come to a decision as to that price, but before he actually executes the relevant    G

---

(8) [1924] V.L.R. 554.                    (11) (1859) 7 H.L.C. 750, at p. 759;
(9) (1961) 79 W.N. (N.S.W.) 141.              11 E.R. 299, at p. 303.
(10) [1973] 2 N.S.W.L.R. 598, at p. 631.

Case 1:20-cv-10041-PKC    Document 105-1    Filed 08/24/21    Page 9 of 32

A instruments. I would not have thought that this was a correct reading of the evidence, in that, when he fixed the price, S.R. Corben had not made an irrevocable decision. The identity of the purchaser bore on questions of price.

There is no doubt here that S.R. Corben was insistent on knowing the identity of the purchaser. Indeed, Cavanagh paid a tribute to the objective relevance of his inquiry by his ingenuity in lulling the grantors into the belief that they were dealing with a doctor of medicine.

B Assuming his decision was absolute, I have not been able to find any decision directly in point, but in *Hart and Honore on Causation in the Law*, the following passage appears at p. 177: "It is an interesting question whether inducement can be shown if the party induced would have entered into the contract or acted as he did irrespective of the false statement. There are certainly a number of dicta in the cases and by writers to the effect that the statement must be a *sine qua non* of the act. On the other hand Sir W.M. C James V.C. said (12): 'I do not think a court of equity is in the habit of considering that a falsehood is not to be looked at because, if the truth had been told, the same thing might have resulted.' Probably the opposing views can be reconciled in the following way. If the representee has already made up his mind to act before the representation is made, the latter cannot be said to have induced him to act, and in this sense the representation must be a *sine qua non* of the representee's decision. Even in this case, however, there might be liability based on the representation having induced the D representee to persevere in a decision already reached."

In the last sentence, the very question which arises here is posed and, in my opinion, should be answered in the affirmative.

A person who knows that an erroneous belief is entertained does not, unless a fiduciary relationship exists, have any obligation to dissipate such a belief or to correct a position reached upon such a belief, but when asked after the decision has been reached a question which touches the belief E upon which it has been reached and he answers falsely he, in my opinion, has induced all those acts which flow from that continuing belief.

In this case the plaintiff, through its agent, induced the appellants to continue to act upon the decision reached by S.R. Corben to sell at the price of $140,000 and as the writing which was necessary to make the option enforceable had not been executed he induced the execution of the option.

It was argued that questions of causation or inducement are questions of fact and the decision of the trial judge on this question of fact should stand, F and, following the decision of the High Court in *Edwards* v. *Noble* (13), should not be reviewed. However, the finality of findings of fact which that decision has sought to canonize is confined to findings of fact untainted by error of law. His Honour's findings of fact in this case are, therefore, not in the protected class. The error of law which his Honour made is intimately bound up with his findings of fact. He was concerned to disentangle the relevant weight of the factors leading to the execution of the option on the G basis that materiality was in some way connected with weight or dominance, whereas, provided he found the representations had any causative effect upon the ultimate result, he should have found for the defendants. As he

---

(12) (1869) L.R. 9 Eq. 223, at p. 226 (n).    (13) (1971) 125 C.L.R. 296.

did not apply his mind to this question, it is the responsibility of this Court, A accepting his Honour's finding as to the credibility of the witnesses, to make its own finding. I am of the opinion that there is no reason to regard the reiterated inquiries of S.R. Corben as to the identity of the purchaser as purely intellectual exercises or mere inquisitiveness without point.

Once the party setting up deliberate misrepresentation has succeeded in establishing it, the burden upon the person responsible for the false representation is bound to be heavy. He can of course discharge it by proving that the misrepresentation had absolutely nothing to do with the result, a B burden successfully undertaken by the defendants in *Macleay* v. *Tait* (14).

In my opinion, that burden was not, nor could have been, successfully undertaken here. The fact that the representations were without effect can rarely be established, otherwise than by admissions from the person to whom they were made either in the court or on other occasions. No admissions were obtained in this case. The identity of the intending purchaser was important to S.R. Corben. He insisted on being informed of the identity, C and the inference is that, if he had had any knowledge of the identity of the purchaser, he would not have executed the option.

It was suggested that the defendant, K. Wong Holdings Pty. Ltd., not having shown any interest in the identity of the purchaser, was not entitled to rescind, because it could not be shown in this case that it had been induced by this misrepresentation. However, his Honour found that, on the question of price, the matter was left by the vendors to S.R. Corben.

In my opinion, where a party to whom the relevant question is referred D is induced, those who have referred the question to his decision are, for legal purposes, also induced.

In my opinion, the first and second defendants successfully established that this contract was induced by a fraudulent misrepresentation of the agent of the plaintiff and the rescission of the contract brought into existence by the exercise of the option, assuming it was validly exercised, was effective.

The suit should, therefore, have been dismissed. E

The defendants also submitted that the option had not been validly exercised. They relied upon the last sentence in the instrument of exercise of option. It was conceded by counsel that the notice of exercise of option could not constitute a nomination of Coorilla Developments Pty. Ltd. as the plaintiff's nominee, and an exercise of the option on behalf of, or as agent for, that nominee could not be valid and the case proceeded upon that concession.

It is not disputed that, if the last sentence in the exercise of the option F did not appear, there was a valid exercise of the option and a contract would have come into existence between the plaintiff and the first and second-named defendants/appellants.

I would have thought that, in these circumstances, the last sentence, which is ineffective, could not destroy the operative effect of the first paragraph. It is true that the words "will be" are used, whereas more appropriate language to give effect to the stance now taken by the plaintiff would have been G precatory rather than imperative. However, in my opinion, the exercise as a whole should not be read so as to render it entirely nugatory. There is no

(14) [1906] A.C. 24.

A  doubt that the grantee wanted to acquire the property and the nomination of Coorilla Developments Pty. Ltd. as the person in whose favour the contract is to be actually drawn does not amount to saying that the exercise of option is conditional upon the vendors agreeing to the purchaser being Coorilla Developments Pty. Ltd. If the purchaser was not interested in completing the contract and the defendants had brought an action for specific performance, it would not be any answer that the plaintiff had not exercised the option, but had merely made a counter offer on the part of

B  Coorilla Developments Pty. Ltd. This is what the defendants' case on this point really amounts to.

I am of the opinion that on this question the judgment of Holland J. is correct.

I am of the opinion that the appeal should be allowed with costs and the suit dismissed with costs. The first-named defendant should, if qualified, have a certificate under the *Suitors' Fund Act*, 1951.

C

SAMUELS J.A. I agree in the judgment of Hutley J.A. and with the orders he proposes.

*Appeal allowed with costs. Suit dismissed with costs. First defendant, if qualified, to have certificate under Suitors' Fund Act, 1951.*

Solicitors for the appellants (first to third defendants, prospective vendors): *D.A. Cameron, Gillingham & Co.*

D

Solicitors for the respondents (plaintiff and nominee of plaintiff, prospective purchasers): *Connah & Steed & Co.*

O.M.L. DAVIES,

*Barrister.*

E

———————

MURRAY *v.* FAVELLE MORT LTD.

Court of Appeal: Moffitt P. and Reynolds and Hutley JJ.A.

Aug. 19, 20; Nov. 14, 1974.

F  *Workers' Compensation—Worker, sent abroad by his employer, there contracts rare disease—Disease contracted in course of employment— Employment a contributing factor to contraction of disease—Workers' Compensation Act, 1926, s. 6 (1), definition of "Injury", par. (a).*

A worker was sent by his employer to the United States of America to work as its project engineer in the setting up and use of cranes used in the erection of the World Trade Centre in New York City. He was away some fifteen months and, either

G  in the United States or on the way back to Australia by plane, he contracted viral meningo-encephalitis, and was left permanently and seriously incapacitated.

The Chairman of the Workers' Compensation Commission found that he had contracted the disease in the course of his employment within par. (a) of the definition of "Injury" in s. 6 (1) of the *Workers' Compensation Act*, 1926, but denied his claim

[2002] P.N.L.R. 39 823

# BARINGS PLC (IN LIQUIDATION) & Anor v. COOPERS & LYBRAND (A Firm)

CHANCERY DIVISION   (Evans-Lombe J.): March 20, 2002

[2002] EWHC 461; [2002] P.N.L.R. 39[1]

H1    *Accountants—negligence—audit—representation letter by client—false statements—effect—whether barring action against accountants by circuity of action*

H2    *Audit—deceit—requirements—causation—vicarious liability*

H3    B plc was the holding company of Barings, a major worldwide merchant banking empire. BFS Pte Ltd was its Singapore subsidiary. From February 1990 J. was a senior director, and later finance director, of BFS, responsible *inter alia* for support facilities provided by BFS for its trading and settlement staff, though not for trading activity as such. From September 1992 one L, the general manager of BFS, began to engage in unauthorised trading on an increasingly large scale. The unauthorised trades were booked via BFS's computer system to a special account set up by L. L suppressed details of that account, where necessary destroying activity statements, so as to hide its existence and contents from B plc and also from the group's auditors. As a result of the disastrous outcome of L's unauthorised trading, the Barings group collapsed in February 1995 and B plc and BFS went into liquidation.

H4    BFS sued, among others, their auditors, D&T, alleging that the audits for the four months ending in September 1992 and for the subsequent 15 months ending in December 1993 had been negligently conducted. BFS alleged that if these audits had been properly carried out they would have been alerted to L's activities and hence the losses caused by L's unauthorised trading would have been wholly or partly avoided.

H5    D&T denied negligence, but also defended the proceedings on a further ground. This was that before each audit J., on behalf of BFS, had written them a "representation letter" stating, among other things, that there had been no irregularities involving management or employees with a significant role in the system of internal control; that all books of account and supporting documentation had been made available to D&T; and that the financial statements provided by BFS and B plc were free of material errors and omissions; that there were no material transactions or related issues or liabilities not properly recorded in the financial and accounting

[1] Paragraph numbers in this judgment are as assigned by the court.

records; that BFS had recorded or disclosed all liabilities, both actual and contingent; that any expenditure included in the accounts where receipts or vouchers were not available had been was properly made in connection with the carrying on of the company's business; and that other than those described in notes to the financial statements, there had been no events subsequent to the balance sheet date which required adjustment of, or disclosure in, the financial statements and related notes. D&T alleged (a) that J. had acted fraudulently or recklessly in making the statements in this letter, since he had had neither actual knowledge of the matters attested to nor reasonable grounds for making the assertions he did; (b) that BFS were responsible for J.'s fraud since it had been committed in the course of his employment and hence BFS were liable in deceit to D&T; (c) that J.'s fraud had caused D&T to approve BFS's accounts and thus to incur a potential liability in negligence to BFS; and hence (d) that BFS's proceedings were bound to fail for circuity of action. A preliminary issue was ordered to be tried on this point.

**Held:**

(1) A representor who was in a position to know more about the circumstances in question that the representee would be liable in deceit if (i) he knew the facts stated to be false; (ii) he was reckless in that he did not have an honest belief in their truth; or (iii) even if he did assume them to be true, he did not have an honest belief in facts which would afford him reasonable grounds for asserting them (*Brown v. Raphael* [1958] Ch. 636 followed).

(2) In the circumstances J. had not acted fraudulently. In particular,

    (a) he had honestly believed that there had been no irregularities involving management or employees, errors in the financial statements, improper recording of transactions or non-disclosure of liabilities. Furthermore, he had on the basis of his knowledge had reasonable grounds for stating this fact, since he had been entitled to rely on those working with and under him to draw such matters, if any, to his attention.

    (b) since specific documentation was only normally supplied to auditors at their request, and L had effectively suppressed the fraudulent account , he had had reasonable grounds to believe that that all books of account and supporting documentation had been made available to D&T.

    (c) he had believed, and had known of no facts giving him reason to disbelieve, that there had been no relevant post balance sheet events.

It followed that the defence of circuity of action must fail on this ground (see paragraphs [63–115]).

(3) It was doubtful whether liability in deceit depended on proof of materiality. In any case, had fraud been proved against J., the represen-

tations were material and had induced D&T to sign the accounts (see paragraph [117]).

H10    (4) To establish liability in deceit for a given loss, it had to be proved that the deceit had caused that loss. In the present case, had fraud been proved against J., his statements had been a substantial cause of D&T signing the accounts and hence incurring a possible liability to BFS (*Smith New Court Ltd v. Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254 and *Downs v. Chappell* [1997] 1 W.L.R. 426 discussed) (see paragraphs [122–148]).

H11    (5) Had fraud been proved against J., BFS would have been vicariously liable to D&T for that fraud (*Lloyd v. Grace*, *Smith & Co.* [1912] A.C. 716 followed; *British Racing Drivers Club Ltd v. Hextall Erskine* [1996] 3 All E.R. 667 discussed) (see paragraphs [150–160]).

H12    **Cases referred to in judgment:**
(1) *Smith v. Land and House Property Corporation* (1884) 28 Ch.D. 7.
(2) *Derry v. Peek* (1889) 14 App. Cas. 337.
(3) *Angus v. Clifford* [1891] 2 Ch. 449.
(4) *Re Hampshire Land Company* [1896] 2 Ch. 743.
(5) *Lloyd v. Grace*, *Smith & Co.* [1912] A.C. 716.
(6) *Weld-Blundell v. Stephens* [1920] A.C. 956.
(7) *Yorkshire Dale Steamship Co. Ltd v. Minister of War Transport* [1942] A.C. 691.
(8) *Stansbie v. Troman* [1948] 2 K.B. 48.
(9) *Brown v. Raphael* [1958] Ch. 636.
(10) *Quinn v. Burch Bros (Builders) Ltd* [1966] 2 Q.B. 370.
(11) *Doyle v. Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158.
(12) *Pacific Acceptance Corporation v. Forsyth* [1970] 92 W.N. (N.S.W.) 29.
(13) *Simonius Vischer & Co. v. Holt & Thompson* [1979] 2 N.S.W.L.R. 322.
(14) *Caparo plc v. Dickman & Ors* [1990] 2 A.C. 605.
(15) *Banque Keyser Ullman SA v. Skandia Insurance Co.* [1991] 2 A.C. 249.
(16) *Galoo Ltd v. Bright Grahame Murray* [1994] 1 W.L.R. 1360.
(17) *Daniels v. Anderson* (1995) 16 A.C.S.R. 607.
(18) *Meridian Global Funds Management Asia Ltd v. Securities Commission* [1995] 2 A.C. 500.
(19) *Pan Atlantic Insurance Co. Ltd v. Pine Top Insurance Co. Ltd* [1995] 1 A.C. 501.
(20) *British Racing Drivers Club Ltd v. Hextall Erskine* [1996] 3 All E.R. 667.
(21) *Crédit Lyonnais Bank Nederland NV v. Export Credits Guarantee Department* [1996] 1 Lloyd's Rep. 200.
(22) *Downs v. Chappell* [1997] 1 W.L.R. 426.
(23) *Smith New Court Ltd v. Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254.
(24) *South Australia Asset Management Corporation v. York Montague Ltd* [1997] A.C. 191.
(25) *Economides v. Commercial Assurance Ltd* [1998] Q.B. 587.

826   Barings Plc (In Liquidation) and Anor v. Coopers & Lybrand

(26) *Arab Bank Ltd v. Zurich Insurance* [1999] 1 Lloyd's Rep. 262.

(27) *Duke Group Ltd v. Pilmer* [1999] S.A.S.R. 64

(28) *Environment Agency v. Empress Car Co. (Abertillery) Ltd* [1999] 2 A.C. 22.

(29) *Mid-Continent Paper Converters Inc v. Brady, Wear & Schoenfeld Inc.,* 715 NE 2d 906 (1999).

(30) *Standard Chartered Bank plc v. Pakistan National Shipping Corp. (No. 4)* [2001] Q.B. 167

**Preliminary issue**

*Michael Brindle Q.C.* and *Craig Orr*, instructed by Ashurst Morris Crisp, for BFS.

*Jonathan Gaisman Q.C.*, *Christopher Butcher Q.C.*, *David Bailey* and *James Brocklebank*, instructed by Clifford Chance, for D&T.

**EVANS-LOMBE J.:** On October 23, 2001 I ordered, on the application of Deloitte & Touche (Singapore) ("D&T"), the trial of a preliminary issue, namely "whether the claim of Baring Futures (Singapore) Pte Limited ("BFS") against D&T in respect of their 1992 and 1993 audits of BFS fails because D&T have a complete defence of circuity of action and/or a set-off extinguishing BFS's claim and/or an estoppel preventing BFS from making the claim against them that it does in these proceedings". D&T allege that these consequences flow from certain representation letters addressed to them by Mr Simon Jones, who was at the relevant time the Finance Director of BFS. In the event, no argument based on estoppel was pursued.

*Factual Background*

I set out the factual background giving rise to this litigation in my judgment of November 23, 2001, by which I struck out the claims of Barings Plc and Bishopscourt (BS) Ltd (formerly Barings Securities Ltd ("BSL") against D&T in the Plc action (as that term is used in that judgment). To render this judgment comprehensible, I need to add a few further facts to the facts set out in that judgment

*Simon Jones*

Mr Jones is a qualified accountant. He spent five years at Deloitte Haskins & Sells and seven years as regional finance director, and then Divisional Vice President, of Associated Merchandising Company. In February 1990 he became finance director of Barings Securities (Singapore) Pte Ltd ("BSS"), the Barings group's stockbroking company in Singapore.

In 1990 BFS was a dormant company. Mr Jones was appointed a director of BFS in May 1990, as its second Singapore resident director. The other Singapore resident director, and Mr Jones' immediate superior, was James

Bax, who had been managing director of BSS since August 1987 and of BFS since June 1988. Mr Bax was the head of the Singapore office and was a director of BSL. It is not in issue that Mr Bax played an insignificant role in the immediate supervision of the operations of BFS.

5    When BFS became active as a corporate clearing member of SIMEX in June 1992, Mr Jones became its Finance Director.

6    From the end of 1992 onwards, BSL operated a matrix management system. This meant that the different aspects of the business of the Barings group were organised and managed "globally". Thus a particular business being conducted by subsidiary A might be managed by directors or executives actually employed by subsidiary (or parent) B. Materially to this judgment (though this is not accepted on every side), responsibility for the trading or "product" aspect of BFS's business was split from that for the settlement or "operational" side, and both appear to have been managed by executives nominally employed by, or directors of, other companies in the Barings group, in particular BSL and Barings Securities (Japan) Ltd ("*BSJ*").

7    Although Mr Jones was, with Mr Bax, one of BFS's two executive directors, he had no immediate responsibility for BFS's, and therefore Mr Leeson's, trading activity or the resulting settlement and account-keeping activity. It is not in issue that Mr Jones was responsible for the support facilities provided by BFS for its trading and settlement staff—offices, stationery, computers, personnel and such like; for expenses, tax computations, budgeting on the costs side, capitalisation of the company, and banking arrangements and controls; and for the production of BFS's annual accounts which had to be consolidated with the accounts of its ultimate parent (BSL in 1992 and Barings plc in 1993).

8    Mr Jones was nominally Mr Leeson's immediate superior but whether Mr Leeson reported to him is in dispute. According to the witness statement of Mr Norris (Chief Operating Officer of BSL from October 1992 and Chief Executive of BSL from March 1993), Mr Jones had operational accountability for Mr Leeson's activities. According to Mr Jones, his responsibility was limited to the accounting side of the office, including checking Mr Leeson's expenses, and Mr Leeson did not report to him at all.

9    There is an issue in the Part 20 proceedings between D&T and BSJ whether Mr Leeson's trading activity during 1992 and 1993 was controlled from BSJ. At this hearing, D&T deny that Mr Jones perceived Mr Leeson's trading to be so controlled.

*The relevant trading*

10    BFS's claims against D&T relate to their audits of the period of trading of four months up to September 30, 1992 ("the 1992 audit") and the period of 15 months up to December 31, 1993 ("the 1993 audit").

11    Until September 1992 BFS was believed by Barings management to be conducting only agency trading. The instructions for this were given by the group of agency traders at BSJ in Tokyo headed by Mike Killian, one of

Barings' experts on derivative trading. This trading was almost wholly on behalf of clients of BSL. The resulting settlements were processed through BFS's office using the CONTAC system described in my November 23, 2001 judgment. The trades were then reported to BSL by means of the electronic "trade feed" direct from the CONTAC system to BSL's First Futures system.

12    It is now known that, within about a month of the commencement of trading, Leeson had procured the system to be falsified so that the trade feed omitted trades booked to the 88888 account.

13    The electronic feeds from BFS were received at BSL in a settlements department headed by Gordon Bowser, to whom Leeson, at least nominally, reported on the settlement or "operational" side.

14   From September or October 1992 onwards Mr Leeson commenced executing proprietary or "house" trading in addition to the agency trading. The proprietary trading was executed primarily (there were also some instructions from London) on the instructions of the group of BSJ proprietary traders who from April 1993 onwards were headed by Fernando Gueler. This trading was on behalf of both BSJ and BSL (most of the trading on behalf of BSL being carried out by BSJ traders). Trades for BSL were reported through the trade feed described above. All proprietary trades, whether booked to BSL or BSJ, were reported to BSJ by faxing the daily activity sheets.

15    Ron Baker became head of Barings' Financial Products Group in December 1993, the final month of the 1993 audit, and thus became Mr Leeson's ultimate "product" manager in relation to proprietary trading. Mr Baker did not take over responsibility for agency trading until a year later.

*Suppression of activity statements for the 88888 account*

16    At paragraphs 11 to 14 of my November 23, 2001 judgment I explained the BFS computer system and Mr Leeson's interference with it in pursuance of his fraud. For the purposes of this judgment, I should add one detail to that explanation.

17    BFS's trading computer system, CONTAC, contained full information as to the activity on all BFS accounts, including the 88888 account. It generated daily and monthly activity statements for all BFS accounts, though it appears that monthly activity statements for the 88888 account were not printed out unless requested by Mr Leeson.

18    It appears that during 1993, at least, the daily activity statements for the 88888 account were delivered to Mr Leeson, who destroyed them. In 1992 the position is slightly less clear, in that in the course of that audit one of the D&T auditors is known to have traced a payment through to the 88888 account daily activity statement. Therefore it may be that Mr Leeson only began destroying the daily activity statements after that audit.

[2002] P.N.L.R. 39                                                           829

*The chronology of the 1992 and 1993 audits*

19    D&T audited BFS for the first time in relation to the trading period ending September 30, 1992. BFS had commenced active trading on SIMEX only in June 1992 and its revenues, consisting of commission and interest, for the period to September 30 were S$3.9 million. The chronology of D&T's 1992 audit was as follows:

(i)    on October 16, 1992 D&T sent to Coopers & Lybrand (London) ("C&LL") the consolidation schedules which they had prepared in relation to BFS and the other Barings Singapore companies, for consolidation into the group accounts of BSL. They were expressed to be subject, *inter alia*, to the resolution of the local statutory accounts;

(ii)   on November 20, 1992, D&T sent BFS's statutory accounts in draft to Mr Jones, along with a draft representation letter addressed to D&T to cover the 1992 audit which they asked him to sign and return. They repeated the request on December 10, 1992;

(iii)  on or about December 17, 1992, Mr Jones returned the signed representation letter. Apparently he had had it retyped on BFS letterhead, but he did not change the text from D&T's draft;

(iv)   on December 31, 1992, D&T issued their opinion on the statutory accounts of BFS and submitted their regulatory reports to the Singapore regulators, MAS and SIMEX.

20    The 1993 audit covered the period October 1, 1992 to December 31, 1993. BFS's revenues had increased from S$3.9 million for the four months covered by the 1992 audit to S$27.9 million for the 15 months covered by the 1993 audit.

21    Mr Jones signed at D&T's request a representation letter covering the 1993 audit on January 27, 1994. This was in identical form to that for 1992. D&T sent their consolidation schedules to C&LL on January 28, 1994. They issued their opinion on the statutory accounts and the regulatory reports on February 28, 1994.

*The representation letters*

22    Each representation letter was written on BFS letterhead and signed by Mr Jones as Finance Director of BFS. Each read as follows:

"Baring Futures (Singapore) Pte Ltd
20 Raffles Place, 24 superth Floor, Ocean Towers, Singapore 0104

Deloitte & Touche
Certified Public Accountants
95 South Bridge Road 09–00
Pidemco Centre
Singapore 0105

Gentlemen,

FINANCIAL STATEMENTS FOR FINANCIAL [YEAR/PERIOD] ENDED [SEPTEMBER 30, 1992/DECEMBER 31, 1993]

This representation letter is provided to you in connection with your audit of the financial statements of Baring Futures (Singapore) Pte Ltd ('company') as of the above date and for the period then ended for the purpose of expressing an opinion as to whether the financial statements give a true and fair view of the financial position, results of operations and changes in financial position in accordance with statements of accounting standard consistently applied bearing in mind the requirements of the Companies Act. For convenience the term 'company' covers the company and where appropriate the group and members of the group audited by you.

We confirm, to the best of our knowledge and belief, the following representation:

1 We acknowledge our responsibility for the fair presentation of the financial statements in accordance with statements of accounting standard including the appropriate disclosure of all information required by the Companies Act, and in conformity with generally accepted accounting principles in Singapore.

2 There have been no irregularities involving management or employees who have a significant role in the system of internal control or that could have a material effect on the financial statements. There are no instances where any officer or employee of the company has an interest in a company with which the company does business which would be considered a 'conflict of interest'. Such an interest would be contrary of company policy.

3 We have made available to you all books of account and supporting documentation and all minutes of the meetings of shareholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared from the beginning of the financial year to the date of this letter.

4 The financial statements are free of material errors and omissions. There are no material transactions or related issues or liabilities that have not been properly recorded in the financial and accounting records.

Adequate provision has been made for current and deferred taxes on income including adjustments for over or under accrual for prior years.

5 The company has complied with all aspects of contractual agreements that could have a material effect on the financial statements in the event of non-compliance.

There have been no communications concerning non-compliance with requirements of regulatory authorities with respect to financial statements nor any fraud or dishonesty reportable by you under section 207(9A) of the Companies Act.

6 Where applicable or required, the following have been properly recorded and, where required, adequately disclosed in the financial statements:

(a) Balances and transactions with related parties. The notes to the financial statements fully describe such related party transactions and balances as required by the statement of accounting standard No. 21. Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial and operating decisions. There were no non-cash assets over S$100,000 purchased from or sold to a director or director connected person or company requiring shareholders approval in accordance with sections 160A to 160D of the Companies Act. There were no loans to directors nor assistance to acquire shares in the company or its holding company that breach the Companies Act.

(b) Losses arising from sale and purchase commitments (including forward transactions in inventories, commodities, foreign exchange etc).

(c) Agreements to buy back assets previously sold and agreements to repurchase assets previously sold and options to purchase property or equipment of material amounts.

(d) Assets pledged as collateral.

(e) Capital shares purchase options or agreements or capital shares reserved for options, warrants, conversions, or other requirements.

(f) Unasserted claims that our lawyers have advised are probable of assertion.

(g) All possible claims that our lawyers have advised are probable of assertion.

(h) All unsupported expenses have been incurred on the company's business and are a charge to the company.

(i) All plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

(j) Capital expenditure commitments.

7 We have no plans or intentions that may materially affect the carrying value or classification of assets and liabilities reflected in the financial statements.

We are aware of the requirements of section 201(3C) of the Companies Act that require the directors to ascertain that no non-current asset is shown at an amount which exceeds the recoverable amount of the non-current asset over its useful life or on its disposal. There are no such items requiring provision or explanation to avoid the financial statements being misleading.

8 The company has satisfactory title to all assets and there are no liens or encumbrances on the company's assets, except for those that are disclosed in the notes to the financial statements. Receivables do not include amounts for goods or services provided or transactions that

have occurred after the balance sheet date for goods or services not sold.

9 We have recorded or disclosed all liabilities, both actual and contingent, and have disclosed in the notes to the financial statements the guarantees that we have given to all third parties. Any expenditure included in the accounts where receipts or vouchers were not available was properly made in connection with the carrying on of the company's business.

10 Other than those described in notes to the financial statements, there have been no events subsequent to the balance sheet date which require adjustment of or disclosure in the financial statements and related notes.

11 Fixed assets accounts and depreciation accounts have been reduced in respect of all items which have been sold, scrapped or which are otherwise no longer usable. The carrying costs of the fixed assets and other non-current assets are not in excess of recoverable amounts. No provision for impairment which is other than temporary is necessary.

12 There are no formal or informal compensating balance arrangements with any of our bank and investment accounts. Except as disclosed in the notes to the financial statements, we have no other line of credit arrangements.

13 We have properly recorded or disclosed in the financial statements the redemption options and agreements and shares reserved for options, warrants, conversions and other requirements.

14 The company has good title to the fixed assets, investments and other assets detailed in the financial statements, and no provision is necessary for any impairment in value.

The directors have valued unquoted investments as detailed in the financial statements and have arrived at the values using the basis of valuation more fully described in the notes to the financial statements.

Yours faithfully,
S.D. Jones
Director"

23    Paragraph 1 of each letter, by which the management accepted its responsibility for the financial statements, is not relevant to the preliminary issue. The issue turns upon the representations contained in the remaining paragraphs, in particular paragraphs 2, 3, 4, 6, 9 and 10.

*Evidence for the Preliminary Issue*

24    In advance of the hearing I ordered the parties to exchange schedules setting out the written evidence each would rely upon, and the names of the witnesses who would be called.

25    Mr Mah, D&T's only factual witness at this hearing, gave evidence before me for a day and a half. Mr Jones gave oral evidence on behalf of BFS

for five days. BFS's other factual witness, Mr Bax, submitted a witness statement but was not cross-examined.

26    Supplementary experts' reports directed to the preliminary issue were submitted by Mr Spence for D&T and Mr Mason for BFS. In the result Mr Mason gave oral evidence and was cross-examined but Mr Spence was not called.

27    An unusual aspect of the case was that the parties and court had available to them the verbatim transcripts of the interviews of Mr Jones and other witnesses by the inspectors of the Singapore committee of inquiry into the Barings collapse. Mr Jones was interviewed on four separate occasions by the inspectors between March 30 and May 30, 1995. I have also been directed to a letter dated 16 March 1995 to that inquiry from Mr Jones' Singapore solicitors and to the affidavit Mr Jones swore in March 1998 in the Company Directors Disqualification Act proceedings against Mr Bax.

28    Finally, I was referred to a large amount of written evidence recording the recollections of other witnesses who were not called to give oral evidence: witness statements in these proceedings, interviews by the Singapore inspectors and the SFO, and affidavits in CDDA proceedings. I am of course conscious of the need for care as to the weight to be attached to such evidence, given that it has not been tested by cross-examination.

29    In the context of the procedure followed, I should add that, after hearing the oral evidence, I initially asked the parties to make their closing submissions only on the legal issues that had been raised, on the assumption that Mr Jones had been fraudulent. However, having heard their submissions, I did then invite the parties to address me on the issue of deceit, namely the effect of the representation letters as statements by Mr Jones, the test of what constitutes reckless fraud and whether Mr Jones' conduct in signing the representation letters was reckless within that test.

*The Elements of D&T's Defence*

30    The hearing proceeded, as does this judgment, on the assumption that in the main trial BFS will establish that D&T were negligent in conducting their 1992 and 1993 audits in the respects pleaded at paragraphs 73 and 74 of the re-amended statement of claim. I need hardly say that this remains an entirely open question and nothing in this judgment should be read as indicating the contrary.

*D&T's case in the preliminary issue*

31    It is to be assumed, but not conceded, that D&T were negligent in their conduct of the 1992 and 1993 audits and would be liable for the claimed damages as a result. That liability was the result of their certifying the consolidation schedules and statutory accounts without qualification, notwithstanding the discoverable unauthorised dealings by Mr Leeson, but it might also result from a failure to warn BFS of those dealings as they should have been discovered in the course of the audits. The damage

834    BARINGS PLC (IN LIQUIDATION) AND ANOR V. COOPERS & LYBRAND

resulting from these acts, or failures to act, necessarily accrued after the negligent acts in question and resulted from Mr Leeson being thereby enabled to continue his fraudulent activity, thus producing or increasing BFS's losses.

32    It was the invariable practice of D&T to require its audit clients to provide a representation letter, signed by an appropriately senior and knowledgeable director or senior employee and containing representations similar to those in the representation letters in question, before they would certify the statutory accounts (on which the final certification of the consolidation schedules was dependent) and the regulatory returns in respect of the year being audited.

33    Mr Jones, as the Finance Director, signed the representation letters. His office made him ostensibly the suitable signatory. However, unknown to D&T, his contact with BFS during the 1992 and 1993 accounting periods was so small that he had no relevant knowledge, either of his own or as a result of enquiries, which would render him properly able to sign the letters. He did so recklessly and thus fraudulently (*Derry v. Peek* (1889) 14 App. Cas. 337 ).

34    Mr Jones's signature on the representation letters induced D&T to certify the accounts, which they would not have done without it. Had they refused to certify the accounts, the subsequent damage to BFS would have been averted because the resulting enquiries would have led to Mr Leeson being unmasked. Therefore Mr Jones's reckless signature was a cause of the exposure of D&T to the claims for negligence being made against it.

35    Mr Jones signed the representation letters as a director of BFS and in the course of acting as such a director. It follows that BFS is vicariously liable for the consequences of his doing so (*Lloyd v. Grace, Smith & Co.* [1912] A.C. 716).

36    It further follows that D&T have a claim against BFS for the consequences of Mr Jones's fraud. That claim in fraud "trumps" D&T's negligence as a cause of D&T's exposure to BFS' claim, with the result that contributory negligence is not available to reduce D&T's claim (*Standard Chartered Bank v. Pakistan National Shipping Corp. (No. 4)* [2001] Q.B. 167). That claim mirrors the damages being claimed against D&T and so gives them an absolute defence of circuity. D&T accept that, if Mr Jones's conduct can only be categorised as negligent, they will not have demonstrated a complete defence to BFS's claim.

37    In order to make out their case in deceit, D&T have to establish the following:

    (i)   one or more representations by Mr Jones,
    (ii)  which were false,
    (iii) which were made deceitfully (in this case recklessly, so as to amount to deceit),
    (iv)  which were intended to, and did, induce D&T to engage in, or abstain from, certain conduct,

    (v)  which caused loss to D&T, and
    (vi) for which BFS is responsible.

It will be seen from the above analysis of D&T's case in the preliminary issue that, in order to succeed in demonstrating that they have a complete defence to BFS's claim, they must establish that, in signing the representation letters, Mr Jones was making fraudulent misrepresentations to D&T. They seek to do so, not by demonstrating that he knew at the time that the material statements in the letters were false, but rather that he was reckless of their truth or falsity. As I shall later demonstrate, this involves a finding as to the subjective state of mind of Mr Jones at the time of signing. I shall deal with this issue, which comprises issues (i), (ii) and (iii) above, first.

In arriving at a conclusion on this issue, it will be necessary to make not only this but other subsidiary findings of fact. I can only make these findings on the basis of the evidence put before me by the parties in the preliminary issue. It is important to bear in mind that, if the trial is to continue, these findings may have to be revised in the light of the further evidence which will emerge.

*Legislation and Accounting Guidance*

It is convenient and, I hope, helpful to set out at this point the basic legislation and accounting guidance in force in Singapore which applied to the 1992 and 1993 audits.

*Singapore legislation*

The relevant provisions of the Singapore Companies Act (and their equivalents in the UK Companies Act 1985) are as follows:

> **"Section 172 (equivalent s.310 CA 1985)**
> (1) Any provision, whether in the articles or in any contract with a company or otherwise, for exempting any officer or auditor of the company from, or indemnifying him against, any liability which by law would otherwise attach to him in respect of any negligence, default, breach of duty or breach of trust of which he may be guilty in relation to the company, shall be void.
>
> **Section 201 (equivalent s.226 CA 1985)**
>
> (1) The directors of every company shall . . . lay before the company at its annual general meeting a profit and loss account . . . that gives a true and fair view of the profit and loss of the company . . .
> (3) The directors of every company shall cause to be made out, and to be laid before the company at its annual general meeting with the profit and loss account required by subsection (1) a balance-sheet . . . that gives a true and fair view of the state of affairs of the company . . .
> (4) The profit and loss account and the balance-sheet of a company . . . shall be duly audited before they are laid before the company at its

annual general meeting as required by this section and the auditor's report required by section 207 shall be attached to or endorsed upon the accounts . . .

**Section 205 (equivalent s.384 CA 1985)**

(1) The directors of a company shall . . . appoint a person or persons to be the auditor or auditors of the company . . .

**Section 207 (equivalent ss.235 and 237 CA 1985)**

(1) An auditor of a company shall report to the members on the accounts required to be laid before the company in general meeting and on the company's accounting and other records relating to those accounts . . .

(2) An auditor shall, in a report under this section, state—

    (a) whether the accounts . . . are in his opinion properly drawn up (i) so as to give a true and fair view of the matters required by section 201 to be dealt with in the accounts . . . ; and (ii) in accordance with this Act so as in the case of a balance-sheet to give a true and fair view of the company's affairs and in the case of a profit and loss account to give a true and fair view of the company's profit or loss;

    (b) whether the accounting and other records . . . have been, in his opinion, properly kept in accordance with this Act;

(3) It is the duty of an auditor of a company to form an opinion as to each of the following matters:

    (a) whether he has obtained all the information and explanations that he required;

    (b) whether proper accounting and other records, including registers, have been kept by the company as required by this Act . . .

and he shall state in his report particulars of any deficiency, failure or shortcoming in respect of any matter referred to in this subsection.

*Singapore Statements of Auditing Guideline ("SAGs")*

42    The SAGs in force at the material time were those approved by the Institute of Certified Public Accountants of Singapore and its predecessor bodies. All mirror very closely the relevant current International Auditing Guidelines ("IAG"), identified below. Their substance is also broadly the same as the relevant current UK Auditing Guidelines and Statements of Accounting Standards, also identified below.

    **"SAG 9 (Audit Evidence) (equivalent to IAG 8 and UK Auditing Guideline 203)**

    12. The auditor obtains evidence in performing compliance and substantive procedures by one or more of the following methods:

      ● inspection;

      ● observation;

      ● inquiry and confirmation;

[2002] P.N.L.R. 39                                837

- computation; and
- analytical review.

15. Inquiry consists of seeking appropriate information of knowledge-able persons inside or outside the entity. Inquiries may range from formal written inquiries addressed to third parties to informal oral inquiries addressed to persons inside the entity. Responses to inquiries may provide the auditor with information which he did not previously possess or may provide him with corroborative evidence.

16. Confirmation consists of the response to an inquiry to corroborate information contained in the accounting records. For example, the auditor normally requests confirmation of receivables by direct communication with debtors.

### SAG 12 (Fraud and Error) (equivalent to IAG 11 and UK Auditing Guideline 418)

4. The responsibility for the prevention and detection of fraud and error rests with management through the implementation and continued operation of an adequate system of internal control. Such a system reduces but does not eliminate the possibility of fraud or error.

5. The objective of an audit of financial information is to enable an auditor to express an opinion on such financial information. In forming his opinion, the auditor carries out procedures designed to obtain evidence that will provide reasonable assurance that the financial information is properly stated in all material respects. Consequently, the auditor seeks reasonable assurance that fraud or error which may be material to the information has not occurred or that, if it has occurred, the effect of fraud is properly reflected in the financial information or the error is corrected. The auditor, therefore, should plan his audit so that he has a reasonable expectation of detecting material misstatements in the financial information result-ing from fraud or error. The degree of assurance of detecting errors would normally be higher than that of detecting fraud, since fraud is usually accompanied by acts specifically designed to conceal its existence.

8. The risk of not detecting material misstatement resulting from fraud is greater than the risk of not detecting a material misstatement resulting from error, because fraud usually involves acts designed to conceal it, such as collusion, forgery, deliberate failure to record transactions, or intentional misrepresentations being made to the audit. Unless the auditor's examination reveals evidence to the contrary, he is entitled to accept representations as truthful and records and documents as genuine. However, the auditor should plan and perform his audit with an attitude of professional scepticism recognising that he may encounter conditions or events during his examination that would lead him to question whether fraud or error exist.

9. While the existence of an effective system of internal control reduces the probabilities of misstatement of financial information resulting from fraud or error, there will always be some risk of internal controls failing to operate as designed. Furthermore, any system of internal control may be ineffective against fraud involving collusion among employees or fraud committed by management. Certain levels of management may be in a position to override controls that would prevent similar frauds by other employees; for example, by directing subordinates to record transactions incorrectly or to conceal them, or by suppressing information relating to transactions. 11. In planning and performing his examination, the auditor should take into consideration the risk of material misstatement of the financial information caused by fraud or error. He should inquire of management as to any fraud or significant error which has occurred in the reporting period and modify his audit procedures, if necessary.

### SAG 20 (Representations by Management) (equivalent to IAG 22 and SAS 440)

2. The auditor performs various audit procedures designed to obtain sufficient appropriate audit evidence to enable him to express an opinion on the financial statements as a whole. One form of audit evidence is relevant representations from management.

4. The auditor should obtain evidence that management acknowledges its responsibility for the appropriate presentation of the financial statements and that management has approved the financial statements. The auditor can obtain evidence of management's acknowledgement of such responsibility and approval from relevant minutes of meetings of the management board or similar body or by obtaining a written representation from management or a signed copy of the financial statements.

5. During the course of an audit, management makes many representations to the auditor, either unsolicited or in response to specific inquiries. When such representations relate to matters which are material to the financial statements, the auditor should:

- seek corroborative audit evidence from sources inside or outside the entity,
- evaluate whether the representations made by management appear reasonable and consistent with other audit evidence obtained, including other representations, and
- consider whether the individuals making the representations can be expected to be well-informed on the matter.

If a representation by management is contradicted by other evidence, the auditor should investigate the circumstances and, when necessary, reconsider the reliability of other representations made by management.

6. Representations by management cannot be a substitute for other audit evidence that the auditor would expect to find. For example, a representation by management as to the original cost of an asset is no substitute for the normal evidence of such cost that an auditor would expect to find. If the auditor is unable to obtain sufficient appropriate audit evidence that he believes should be available, this will constitute a limitation in the scope of his examination even if he has a representation from management on the matter.

7. In certain instances a representation by management may be the only audit evidence which can reasonably be expected to be available. For example, the auditor would not necessarily expect that other evidence would be available to corroborate management's intention to hold a specific investment for long-term appreciation. In such circumstances, provided that the auditor obtains written confirmation of management's oral representations, this may not constitute a limitation on the scope of his examination.

8. The auditor can document in his working papers evidence of management's representations by summarising oral discussions with management, or by obtaining written representations from management. Written representations can take the form of:
- a representation letter from management, or
- a letter from the auditor outlining his understanding of management's representations, duly acknowledged and confirmed by management.

9. The possibility of misunderstandings between the auditor and management is reduced when oral representations are confirmed by management in writing. Furthermore, as described in paragraph 7, written representations from management should be obtained to confirm oral representations given to the auditor on matters material to the financial statements when other sufficient appropriate audit evidence cannot reasonably be expected to exist. Matters which might be included in a letter from management or in a confirmatory letter to management are contained in the example of a management representation letter in the Appendix.

13. A management representation letter should be signed by the members of management who have primary responsibility for the entity and its financial aspects, usually the senior executive officer and the senior financial officer, based on the best of their knowledge and belief . . .

14. If management refuses to provide representations that the auditor considers necessary, this will constitute a limitation on the scope of his examination. In such circumstances, the auditor should evaluate any reliance he has placed on other representations made by management during the course of his examination and consider if the refusal may have any additional effect on his report."

43    Finally in this section I should set out the well-known extract from the judgment of Lord Oliver in *Caparo v. Dickman* [1990] 2 A.C. 605 at page 630, dealing with an auditor's functions:

> "My Lords, the primary purpose of the statutory requirement that a company's accounts shall be audited annually is almost self-evident. The structure of the corporate trading entity, at least in the case of public companies whose shares are dealt with on an authorised stock exchange, involves the concept of a more or less widely distributed holding of shares rendering the personal involvement of each individual shareholder in the day-to-day management of the enterprise impracticable, with the result that management is necessarily separated from ownership. The management is confided to a board of directors which operates in a fiduciary capacity and is answerable to and removable by the shareholders who can act, if they act at all, only collectively and only through the medium of a general meeting. Hence the legislative provisions requiring the board annually to give an account of its stewardship to a general meeting of the shareholders. This is the only occasion in each year on which the general body of shareholders is given the opportunity to consider, to criticise and to comment on the conduct by the board of the company's affairs, to vote on the directors' recommendation as to dividends, to approve or disapprove the directors' remuneration and, if thought desirable, to remove and replace all or any of the directors. It is the auditors' function to ensure, so far as possible, that the financial information as to the company's affairs prepared by the directors accurately reflects the company's position in order, first, to protect the company itself from the consequences of undetected errors or, possibly, wrongdoing (by, for instance, declaring dividends out of capital) and, second, to provide shareholders with reliable intelligence for the purpose of enabling them to scrutinise the conduct of the company's affairs and to exercise their collective powers to reward or control or remove those to whom that conduct has been confided."

*The Representations*

44    I heard argument as to the precise meaning of the express representations in the representation letters and whether, and if so what, further representations were to be implied into them.

45    It seems to me clear that, by the words in the representation letters which he signed, Mr Jones was representing that the statements in those letters were true as far as he knew. The contrary was not seriously argued.

46    As regards any implied representation, Mr Brindle for BFS submitted that, by signing the letters, Mr Jones was representing only that he had knowledge of some relevant facts and genuinely believed the truth of the matters stated. He adopted the test propounded by Longmore J in, at page 216:

> "any opinion given carries with it a representation that the maker of the statement has some genuine factual basis for the formation of [his] opinion"

or, as Simon Brown L.J. put it in *Economides v. Commercial Assurance* [1998] Q.B. 587, at page 598,

> "the plaintiff had to have some basis for his statement of belief in this valuation; he could not simply make a blind guess: one cannot believe to be true that which one has not the least idea about. But . . . the basis of belief does not have to be an objectively reasonable one. . . . he was under a duty of honesty, not a duty of care."

47    While by the conclusion of the hearing there was some suggestion that Mr Brindle accepted some higher level of test, I do not think that was formally conceded.

48    Mr Gaisman for D&T, on the other hand, relied upon *Smith v. Land and House Property Corporation* (1884) 28 Ch.D. 7 and *Brown v. Raphael* [1958] Ch. 636, in support of the implication that Mr Jones was representing that he had reasonable grounds for the belief expressed in his express representations. In the former case, Bowen L.J., at page 15, said that:

> "if the facts are not equally known to both sides, then a statement of opinion by one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion."

49    In *Brown v. Raphael*, Lord Evershed M.R., at page 642, noted that "it suffices for the application of the principle if it appears that, between the two parties, one is better equipped with information or the means of information than the other." This test was clearly met in circumstances where the vendor's solicitors expressed an opinion in sale particulars as to an important aspect of the property up for sale about which the purchaser could know nothing: Lord Evershed continued, at page 643:

> "What would be the effect of this language upon the mind of a possible purchaser? Clearly, I should have thought, it would flow from the language used and would be intended to be understood by a reader of the particulars that persons who knew the significance of this matter and who were experienced and competent to look into it were expressing a belief founded upon substantial and reasonable grounds."

50    In cross-examination, Mr Jones accepted that, in signing the representation letters, he was representing that he had reasonable grounds for doing so. Given that implication of a term is a matter of law, that is not decisive. However I do not read the judgments of the Court of Appeal in *Economides* as deciding that the test in *Brown v. Raphael* should not be applied to a representation by a professional man, in a position where he would be expected to have significantly greater knowledge of the facts

represented than did the representee. Indeed Peter Gibson L.J., at page 606, expressly distinguished the facts of *Brown v. Raphael*, in which "the statement of belief came from reputable solicitors in respect of a matter . . . which they would be expected to know and on which they had advised the vendor", and of *Highlands Insurance Co. v. Continental Insurance Co.* [1987] 1 Lloyd's Rep. 109, in which the relevant representation was made by a professional underwriter, from "a case such as the present where the statement is made by a layman with no relevant skills."

51    Mr Jones was the finance director of the audit client, making representations as to the financial statements which he had the responsibility for preparing and the financial records which he had the responsibility for keeping. While the auditors had spent two or three weeks auditing the company, plainly they could not be expected to have as much knowledge of these matters as the finance director: otherwise there would be no point in having a representation letter. It seems to me that the test in *Brown v. Raphael* applies and Mr Jones's representations included the implied representation that he had reasonable grounds for making the statements he did.

52    Accordingly I conclude that the representation letters constituted representations by Mr Jones that:

> (i)   he believed the statements in the letters to be true, and
> (ii)  he *bona fide* believed that he had reasonable grounds for making representation (i).

*Falsity of Representations*

53    There is no dispute that a number of the statements in the letters were inaccurate: D&T rely upon statement 2, that there had been no irregularities involving employees that could have a material effect on the financial statements; statement 4, that the financial statements were free of material errors and omissions; statement 6, that transactions with related parties and losses on sale and purchase commitments had been properly recorded; statement 9, that BFS had recorded or disclosed all its liabilities; and statement 10, that there had been no post-balance sheet events requiring adjustment of or disclosure in the financial statements.

54    In a slightly different category was statement 3, that BFS had made available to D&T all books of account and supporting documentation. As I have described above, in 1993 Mr Leeson suppressed the daily activity statements for the 88888 account and therefore they were not available in paper form to D&T (though the data was available on CONTAC, to be printed out if required). BFS submitted that the evidence did not establish that the same was true for 1992.

55    It is not alleged that Mr Jones knew the statements in the letters to be untrue. However D&T contend that representation (i) was nevertheless false, in that Mr Jones did not believe that the statements were true. Likewise they contend that Mr Jones did not bona fide believe that he had

reasonable grounds for making representation (i), and therefore representation (ii) was also false.

56    Both D&T's propositions were disputed by BFS. In part, the answer depends upon the test for the mental element in deceit, to which I come next.

*Deceit: The Test for Deceit*

57    There was little disagreement between the parties as to the definition of the mental element in deceit which D&T had to establish. Both pointed me to the classic statement of the law by Lord Herschell in *Derry v. Peek* (1889) 14 App. Cas. 337 at page 374:

> "fraud is proved when it is shewn that a false representation has been made (1) knowingly, (2) without belief in its truth or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth."

58    In *Angus v. Clifford* [1891] 2 Ch. 449 at page 471, Bowen L.J. provided some further guidance on the third possibility described by Lord Herschell:

> "... the old direction [to the jury], time out of mind, was this, did he know that the statement was false, was he conscious when he made it that it was false, and without caring? Not caring, in that context, did not mean not taking care, it meant indifference to the truth, the moral obliquity which consists in a wilful disregard of the importance of truth ..."

59    In the light of these authorities, the burden on D&T is to establish that, when Mr Jones signed the representation letters, he did so:

(i)    knowing that the statements in the letters were untrue, without an honest belief in their truth, or indifferent as to whether or not they were true, or

(ii)   knowing that he had no reasonable grounds for making the statements, without an honest belief that he had such grounds, or indifferent as to whether he had or not.

60    These tests are subjective. As is pointed out in *Spencer Bower on Actionable Misrepresentation* (4th ed.) at paragraph 110:

> "A representor may have acted on inquiry and materials which would not have satisfied a person of normal intelligence, much less a trained judge, but this counts for nothing if the belief—the individual being who he was—really and truly existed. Belief is none the less belief because it is irrational."