844    BARINGS PLC (IN LIQUIDATION) AND ANOR V. COOPERS & LYBRAND

Nonetheless, given the difficulty described by Bowen L.J. in *Angus v. Clifford* in "look[ing] into a man's mind", a court has to have regard to the surrounding circumstances in trying to descry his belief when he made the representation. The inquiry is not limited to "did he believe this statement to be false when he made it?" The court should also ask "*must* he have believed it to be false?"

An aspect of this regard to surrounding circumstances is motive. I fully accept D&T's contention that motive is irrelevant to fraud (see *Derry v. Peek*, *per* Lord Herschell at page 374: "if fraud be proved, the motive of the person guilty of it is immaterial."). Nevertheless, in trying to decide whether a person made a statement which he must have known to be false (or which satisfied the other tests set out above), it must be relevant to consider why he should have done so. A man is more likely knowingly to make a false statement if he has some reason for doing so. The question is what was the state of mind of Mr Jones at the moment he signed the representation letters. It must be shown that at that moment he must have known that he had no proper basis in knowledge, either direct or indirect through enquiry of others, for signing. Since Mr Jones did sign the letters, it is easier to conclude that he did so knowing that he should not if it is possible to demonstrate a likely motive for signing, notwithstanding a lack of such knowledge.

*Deceit: Was Mr Jones deceitful?*

*D&T's case*

Mr Gaisman for D&T contended strongly that Mr Jones signed the representation letters without any honest belief either in the truth of many of the statements in them or in his having reasonable grounds for making the statements. This was on the basis that Mr Jones had no relevant personal knowledge of the matters dealt with by the representation letters, and made no inquiries of people who had that knowledge.

Mr Gaisman supported his contention by pointing to passages in Mr Jones's evidence given to the Singapore inspectors in 1995 in which, Mr Gaisman argued, Mr Jones disowned any relevant knowledge of, or involvement in, BFS' activities. In so far as Mr Jones now claims to have had greater knowledge and involvement than he admitted to then, Mr Gaisman said that his 1995 evidence was bound to be more reliable. But in fact, Mr Gaisman argued with some justification, Mr Jones's evidence under cross-examination proved in some respects to be closer to his evidence in 1995 than it did to the contents of the witness statement which he prepared (admittedly without the benefit of access to the Singapore transcripts or the contemporary documents) in November 2001.

In his witness statement and under cross-examination, Mr Jones relied on a number of factors which, he contended, meant that he believed that the representation letters were true and that he had reasonable grounds for making the representations. I shall deal with those in detail, but Mr

Gaisman argued that many of them were without substance and those that remained could not have allowed Mr Jones to believe honestly that he was able to sign the letters.

66      Mr Gaisman cross-examined Mr Jones in relation to certain incidents in 1994, 1995 and last year when, he argued, Mr Jones had misled auditors, regulators and the Court in order to serve his current objectives. He also argued that Mr Jones's evidence to the Court at this hearing was that of a thoroughly unreliable witness who distorted the truth to fit in with his own interests. Mr Gaisman alleged that this propensity to make deliberately false or reckless statements on important occasions rendered it likely that Mr Jones was prepared to sign the representation letters without any honest belief in their truth, and that his professions to the contrary in the witness box were not to be accepted.

67      Mr Gaisman said that it was in Mr Jones's interests to lie on this occasion because of his anxiety to maintain the delusion practised on auditors and regulators, that BFS had local management who were involved in its operations. Had that delusion not been maintained, MAS and SIMEX would not have allowed BFS to continue operating as it was, and D&T would not have accepted a representation letter signed by him (and there was no other director qualified to sign). Alternatively Mr Gaisman submitted that Mr Jones, for the sake of his reputation and prospects in Barings, did not wish to risk the obloquy of delaying the finalisation of the Group accounts, which he would have caused by either telling D&T that he was not in a position to sign a representation letter or taking the time to check the truth of the statements in the letter. Alternatively Mr Jones just could not be bothered, for whatever reason, to check the truth of his statements, and that was enough to establish fraud.

*BFS's case*

68      In reply, Mr Brindle for BFS argued that Mr Jones did believe the representations to be true and his grounds for making the representations to be reasonable. While Mr Brindle conceded that Mr Jones was a far from satisfactory witness, he said that his evidence was in its essentials consistent with his evidence to the Singapore inspectors. His conduct in 1992 and 1993 should not be judged by reference to his conduct in later years, when circumstances were very different.

69      Mr Brindle admitted that Mr Jones had proved to have been wrong in relation to some of the factual matters upon which he said in his witness statement he relied, in signing the representation letters. But he contended that this was so only to a limited extent: Mr Jones's functions as Finance Director gave him detailed personal knowledge of the subject-matter of many of the representations; and Mr Jones honestly believed that he could make the other representations in the light of, among other things, his knowledge of the systems and controls applying to BFS.

70      Mr Brindle submitted that Mr Jones had no motive for making the representations fraudulently, for reasons I shall explain below.

846    Barings Plc (In Liquidation) and Anor v. Coopers & Lybrand

*Mr Jones's knowledge of BFS's activities*

71    Mr Jones accepted that he did not make any specific enquiries before signing the representation letters, other than that he says that he had discussions with Mr Leeson concerning the level of commission charged to clients at about the relevant time in each year. His evidence was that he had sufficient knowledge about BFS to feel able to sign the letters.

72    Mr Jones accepted that he had no continuing involvement in either the trading or the settlement side of BFS's activities. As it emerged from the evidence, the most important areas of knowledge as to the company's activities in 1992 and 1993 available to him when he signed the representation letters were the following:

*Mr Jones's knowledge of BFS's operations and controls*

73    It is I think accepted by both parties that the following were the essential features of BFS's business as it was established:

> It was set up as a small, simple order-filler, to allow BSL's and BSJ's traders to execute trades in Singapore where margin requirements were lower than in Japan. Accordingly its function was to be limited to filling the orders placed by BSL and BSJ traders (and, to a much lesser extent, its two other clients, Barings Hong Kong and Banque Nationale de Paris) and not to initiating its own trades,
> Orders were placed by BSL or BSJ and executed, and the details were transmitted back to BSL and BSJ. The transmission to London was by automatic computer feed and that to Japan was by fax,
> BSL's and BSJ's settlements departments reconciled all trades done on their behalves. Virtually all agency trading was for accounts maintained in London. Proprietary trading was on behalf of both BSL and BSJ, though it was all initiated by BSJ traders. BSJ provided to London details of all proprietary trading carried out by BFS and BSJ,
> The BSL settlements department checked BFS's margin requirement against the trade information before remitting the margin to Citibank. BSJ calculated the margin required in relation to its own proprietary trading and remitted it to BFS.

74    Mr Leeson's fraud meant that not all of these points proved to be correct, and he came to take a much larger role in initiating legitimate trades over time, but the above is the structure as Barings management believed it to exist in 1992 and 1993.

75    Mr Jones said that he knew the above details, as a result of his involvement in the establishment of BFS and later discussions. Although Mr Gaisman suggested that Mr Jones's knowledge of these matters was a recent invention, I am satisfied that that is not the case. Mr Jones was involved in the discussions leading up to the establishment of BFS, in particular with Mr Bax, Mr Bowser (Derivatives Controller in BSL Settlements), Mr Killian of BSJ, and Mr Dickel (who was responsible for

setting up BFS's systems). He was involved in the administrative arrangements for banking, expenses and personnel for BFS. Mr Mah's evidence was that Mr Jones had more than minimal knowledge of both the trading and financial affairs of BFS. Certainly Mr Jones in his evidence to the Singapore inspectors tried to play down his involvement in, and knowledge of, BFS's systems, and to present the impression that he was excluded from the chain of command. But I am satisfied that he was told enough in 1992 to understand the very simple concepts (for someone with his background) set out above.

76    Mr Jones's evidence was that he had little or no knowledge of the internal procedures within BFS for the recording and settlement of trades. But he understood the feed to London and the verification of trades and reconciliation of margin calls by BSL and BSJ to constitute a watertight control on the very simple activity conducted by BFS. He said to the Singapore inspectors in 1995 that "anyone who paid their margin calls I assumed was knowing the trades and knowing the basis of the margins they were paying" and that was a view shared by Mr Bax, Mr Mah and Mr Spence, D&T's audit expert. Mr Spence commented in his report:

> "It would be reasonable to expect that the process of reconciliation of margin calls by the related company customers would serve to identify fraudulent acts."

77    I also note that Mr Bowser was involved in the specification of the feeds to London and it would be reasonable to assume that the system which resulted would provide an effective control.

78    Mr Gaisman attacked Mr Jones's evidence on the basis that Mr Jones knew that the London settlements department was subject to serious problems and therefore could not be relied upon as a control. However I accept Mr Jones' evidence, supported by the unchallenged evidence of Mr Bax and statements contained in Mr Bowser's witness statement, that these problems related to client balances, not to an issue such as the reconciliation of margin between BFS and BSL.

*Supervision of BFS's trading and settlement functions, and of Mr Leeson*

79    Mr Jones accepted that he played no material part in the day-to-day supervision of BFS's trading and consequential settlement and recording of that trading during the periods of the 1992 and 1993 audits.

80    Mr Killian was the General Manager of BSJ's Futures and Options Sales Department, and head of its agency trading group. It was his idea to start trading on SIMEX and he became a director of BFS. All BFS's agency trading was the execution of orders placed by Mr Killian's agency group.

81    Mr Gueler was the head of the proprietary derivatives traders in Japan from April 1993, and in its earlier stages all BFS's proprietary trading was the execution of trades placed by Mr Gueler's group (as Mr Leeson's switching business developed, he initiated the trades on SIMEX, and Mr Gueler's group handled the matching trades on the Japanese markets).

82    D&T's skeleton argument for the trial alleges that Mr Killian was Mr Leeson's product manager for agency business until January 1995 and that Mr Gueler had managerial responsibility for the Japanese derivatives books of which Mr Leeson's proprietary trading formed part. This is supported by Mr Bax's witness statement, and Mr Killian's witness statement records that he was in touch with Mr Leeson daily during his initial posting. However at this hearing D&T contended that Mr Jones's perception at the time was that Mr Leeson was in fact unsupervised. In putting this to Mr Jones they drew on Mr Jones's evidence to the Singapore inspectors, to the effect that Mr Leeson was running the operation on his own from 1993.

83    This is the trial of a preliminary issue and, if the trial is to continue, the question of whether BSJ personnel supervised Mr Leeson's trading will be a very live one in the contribution proceedings. BSJ has made clear that it disputes vigorously the case put forward by D&T in its skeleton for the trial. However for the purposes of the preliminary issue I accept Mr Jones's evidence that, when BFS was established, he believed that Mr Killian, the head of agency trading, would be the person principally in charge of Mr Leeson's trading operations. Mr Jones's evidence was that he did not know in 1993 that Mr Leeson was carrying out arbitrage trading. It was not put to Mr Jones whether he knew that Mr Leeson was conducting proprietary trading at all in 1993. I infer not, but it is clear from his other evidence that Mr Jones knew that Mr Gueler was in charge of proprietary trading and that, if Mr Jones knew that Mr Leeson was conducting such trading, he believed it to be supervised by Mr Gueler (and, above Mr Gueler, by Mr Baker after he took over the Financial Products Group in December 1993). When answering questions in Singapore about the extent to which Mr Leeson was supervised, Mr Jones appears to have been directing his mind only to the extent to which Mr Leeson was supervised from London.

84    It is less controversial that settlement of trades between BFS and BSL was handled by the BSL settlements department under Mr Bowser. In the structure as devised in 1992 Mr Leeson was to report to Mr Bowser on the "client" settlements side, and Mr Jones was to supervise settlement with SIMEX (though he admitted that he did not do so, except in the sense of being available if there were any problems, and that in practice Mr Leeson performed this function unsupervised). Mr Bax's unchallenged evidence was that, as BFS was established, Mr Leeson was to report to Mr Bowser in relation to the settlement of the transactions undertaken for Mr Killian's agency clients.

*Administrative and financial back-up*

85    Mr Jones performed the normal finance director's functions in providing administrative and financial back-up to BFS's activities. He dealt with expenses, tax computations, budgeting on the costs side, capitalisation, premises, personnel issues, and banking arrangements and controls. He discussed with Leeson the level of commission income charged to BFS's

clients. He and/or his staff were responsible for the drawing up of the financial statements which were audited by D&T.

86    Mr Jones's evidence was that he reviewed the financial statements, but he could only verify the expenses figures. The income figures meant nothing, as they did not reflect trading profits (which were recorded in the clients' books) but only commission and interest on client margins held on deposit. The margin owed by SIMEX and to clients likewise reflected only the level of clients' trading at the year-end.

87    While Mr Jones's account of his involvement in these matters was challenged by D&T, his account seems consistent with his evidence to the Singapore inspectors and the documentation.

*Audits and consolidation with BSL accounts*

88    Finally, when he signed the 1992 representation letter Mr Jones knew that the BFS consolidation schedule had been submitted for incorporation into the BSL group accounts nearly two months earlier, and presumably no discrepancies in inter-company balances or other items had been found. Also D&T had completed all their investigative work without finding any problems with the financial statements. Clearly an audit could not form a basis for representations to the auditor, but the fact that the auditors had found no irregularities could contribute to an honest belief that there were no such irregularities.

89    The same is true of the 1993 D&T audit. In addition, there had been a regulatory audit by SIMEX during the year, which had found no significant problems.

*Must Mr Jones have had no honest belief in the representations made?*

90    It is not disputed by D&T that Mr Jones had sufficient knowledge on the basis of his own responsibilities to make a number of the representations: in particular those in paragraphs 4 (second part), 6(c), 7, 8, 11 and 14. D&T do not allege that these representations were false, relying only on paragraphs 2, 3, 4 (first part), 6(a) and (b), 9 and 10.

91    Of those representations, I shall deal first with representation 3. This was a representation that BFS had made available to D&T all books of account, supporting documentation, etc. D&T say that, since Leeson destroyed the daily activity statements for the 88888 account, this representation was false. Given Mr Jones's complete absence of knowledge as to BFS's records, he could not have had an honest belief that the representation was true, and must have known he had no reasonable grounds for making it.

92    On this representation, I accept Mr Mason's and Mr Jones's evidence that in practice an audit client does not physically hand over to its auditor all its records at the start of the audit. Instead it gives the auditor the trial balance and the auditor then asks for the records which he needs to verify the balance as the audit proceeds. That was how the BFS audit was handled.

Mr Jones had no idea of the existence of account 88888, and thus of any daily activity statements in respect of it. Even if Mr Leeson had suppressed those statements (and there is a question whether he did so in 1992), there was no reason why Mr Jones should have known that. Therefore, in the absence of any complaint by the auditors, Mr Jones was entitled to have an honest belief in the truth of that representation and that he had reasonable grounds for giving it, notwithstanding that Mr Jones appears to have had little if any knowledge of BFS's internal systems and controls.

93    I turn to representation 10, dealing with post-balance sheet events. D&T allege that the representation that there had been no such events was false by reason of the ¥670 million transfer from BSL which Mr Leeson caused to be credited to the 88888 account on the last day of the 1992 accounting year and then reversed out after the year-end. Mr Jones's evidence was that this was not a post-balance sheet event, a term which he understood as referring to major events such as a major client or the exchange getting into financial difficulties. Rather, it was an issue as to the point in time at which a payment should be treated as received and how this payment should be treated in BFS's books. In any event Mr Brindle submitted that (a) Mr Jones was not aware of the receipt, and there was no suggestion that he should have been checking bank reconciliations and statements himself and (b) Mr Jones had discussed the post-balance sheet events review with D&T. If such an issue, turning purely on the correct accounting treatment of a receipt, constituted a post-balance sheet event, he reasonably relied on D&T to identify it.

94    These reasons seem to me persuasive. Thus in my judgement Mr Jones was entitled to have an honest belief in the truth of representation 10 and to believe that he had reasonable grounds for giving it.

95    The issue therefore becomes whether Mr Jones was deceitful when he made the representations in paragraphs 2, 4 (first part), 6(a) and (b), and 9. These dealt with irregularities by employees, errors in the financial statements, proper recording of transactions and disclosure of liabilities.

96    My conclusion is that Mr Jones was not deceitful in making those representations. This is for two reasons.

    (i)   the first is simply the result of assessing Mr Jones in the course of his giving evidence before me for five days. I deal below with the defects in Mr Jones's evidence, which were many. Nevertheless I was left with the view that Mr Jones did honestly believe when he signed the 1992 and 1993 representation letters that the statements in the letters were true and that his knowledge of BFS and its business was sufficient to give him reasonable grounds for signing the letters;

    (ii)  the second stems from an analysis of (a) the knowledge Mr Jones had, (b) whether that knowledge would cause another person in Mr Jones's position to feel able to sign the letters, and (c) whether

the defects in Mr Jones's evidence should nevertheless cause me to hold that he was dishonest when another person would not have been. I develop this analysis below.

*Could a reasonable finance director have signed the representation letters?*

97    I think it useful to start by considering whether a notional reasonable finance director, one of only two executive directors controlling BFS, not Mr Jones, but with the same knowledge as I have held Mr Jones had, could have signed the representation letters.

98    In forming a view on this, I must take into account the nature of BFS's operations during the 1992 and 1993 accounting periods and the matrix management system operated by the Barings group. The basis of this system was that Barings functioned on a global basis. Mr Leeson's trading activities were supervised, as I have held Mr Jones to have believed, by Mr Killian from Japan in the 1992 accounting period and by him, Mr Gueler and Mr Ron Baker in 1993. Mr Leeson reported to Mr Bowser in London in relation to settlements between BFS and BSL, and Mr Bowser also had ultimate responsibility for settlement between BFS and BSJ of BSJ's proprietary trading.

99    If Mr Killian, Mr Gueler, Mr Baker and Mr Bowser had been located in Singapore with their supporting staff, supervising Mr Leeson's activities from within the same building rather than many miles away, what would have been the attitude of my notional finance director? Clearly there could have been no obligation on him to supervise Mr Leeson's trading activities, or the settlement with clients of his trades. The finance director would have been entitled to leave that to the executives whose job it was, and there has been no suggestion that that was part of the BFS finance director's job. As a finance director he would have been obliged to provide financial and administrative back-up, but not, for example, to scrutinise the daily activity statements recording BFS's trading.

100    Furthermore the finance director might have been entitled to assume, without specific enquiry by him, that, if those supervising the trading and settlement activities had not made him aware of any problems in their areas, there were no such problems. A finance director in those circumstances, before he signed the usual representation letters which were required at each annual audit, might well feel that he did not need specifically to ask each of his executives if they were aware of any problems in their areas. If the executives with responsibility for such matters had not reported any irregularities (representation 2), or drawn to his attention circumstances which might suggest that there were material errors or omissions in the records (representations 4 and 6(a) and (b)) or undisclosed liabilities (representation 9), he might well feel that there was no need to ask them if there had been any, even if he had no relevant knowledge arising from day-to-day supervision.

101    If that would be the case if Mr Killian, Mr Gueler, Mr Baker and Mr Bowser had been executives of BFS, given modern methods of communi-

cation, the situation should be no different because they were instead in Japan and London. It seems to me that the finance director could honestly have held the view that the faxed daily activity statements to Tokyo and computer feed to London would have allowed them to supervise Mr Leeson's activities as efficiently as would reports or print-outs delivered within the same building: as I have mentioned, Mr Bowser was involved in specifying the feed he was to receive.

102    With the benefit of hindsight, it is likely that, if Mr Killian or Mr Bowser had been in the same building and asking questions, Mr Leeson would have been unable to practise his fraud, either at all or at least while his superior was in the room. But that is indeed the product of hindsight, and a finance director signing a representation letter might well not have realised that the distance separating Mr Leeson from those supervising him would have such disastrous consequences.

103    Therefore I conclude that, whereas a notional finance director, in Mr Jones' situation and with Mr Jones's knowledge, might possibly have been negligent in not making specific enquiries of the specialist executives before signing the representation letters, there would be no reason to believe that, because he did not, he must have lacked any honest belief in the truth of the statements in the representation letters or have known that he had no reasonable grounds for making those statements.

*Mr Jones's evidence*

104    Mr Jones was an unsatisfactory witness. He was evasive and argumentative, and prone to accuse others of lying where their accounts differed from his. In certain respects his evidence before me differed from that given to the Singapore inspectors, and he admitted "moulding" his evidence to the inspectors in the light of the circumstances (though I am sure that all who were interviewed at that time shared Mr Jones's tendency to distance himself as far as possible from Mr Leeson's activities, and that Mr Jones's answers to the inspectors reflected that tendency).

105    Mr Gaisman cross-examined Mr Jones at length in relation to his submission of BFS's application to SIMEX to renew its licence in March 1994, his failure to implement the 1994 internal audit report, the failure to provide it to the auditors, Mr Leeson's renewal of his SIMEX registration in December 1994, the SLK receivable in 1995 and his statements to this court with reference to his ability to come to this country to give evidence. Mr Jones's evidence indicated that, in relation to at least some of those questions, he had, in order to achieve his own ends, withheld information, from auditors, the Singapore authorities or the court, which he should have disclosed.

106    Likewise some of the justifications which Mr Jones put forward for signing the representation letters did not stand up to cross-examination. Thus he relied in his witness statement on 10 visits which Mr Dickel made before, and 10 after, BFS started trading, as a source of his information about BFS's systems and justification for his belief that they were effective.

In fact it is clear from Mr Dickel's passport entries that Mr Dickel visited nine times before, and only once after, BFS started trading. Equally a number of the other visits from Barings management, on which he relied as giving him confidence that Mr Leeson was closely supervised from London, proved to be dubious or exaggerated.

107   I have already expressed the view that a notional reasonable finance director, in Mr Jones's situation and with Mr Jones's knowledge, would not necessarily have lacked any honest belief in the truth of the statements in the representation letters or have known that he had no reasonable grounds for making those statements. Should I conclude that nevertheless Mr Jones lacked such honest belief or had such guilty knowledge, purely because he had a tendency on other occasions to withhold information so as to mislead auditors and others to further his own ends?

108   I conclude that I should not. It is clear, from the evidence of Mr Mah, and even those within Barings (such as Mr Broadhurst) who found him difficult and wished to remove him from his post, that Mr Jones was a very able finance director. He was personally difficult, and prepared to be awkward. He worked extremely long hours for long periods, despite trying private circumstances. Those factors seem to be against Mr Jones having signed the representation letters fraudulently out of laziness.

109   Shortly before the crash, in early February 1995, Mr Jones showed himself prepared to mislead auditors in order to have the 1994 audit completed against a particularly tight deadline and in the light of awkward discoveries by the auditors relating to Barings' star trader. However the 1992 and 1993 audits raised no difficult issues and the deadlines were no more than usually difficult to achieve. There was no pressure of circumstances tempting him to reckless fraud in order to get the audits through. So why should Mr Jones have committed such fraud?

110   Mr Gaisman's answer was that Mr Jones was anxious to conceal from the auditors and the regulators that he and Mr Bax were not, contrary to the belief of those persons, actively managing BFS's business. Otherwise BFS would not have been allowed to continue operating as it was.

111   One answer to that is that Mr Jones does not seem to have concealed his role (or lack of it) from the auditors. He said as much in evidence before me, and that is strongly corroborated by the evidence of Coopers & Lybrand Singapore ("C&LS"), who conducted the 1994 audit. Their Assessment of Control Environment form noted that "Level of involvement by the Board of Directors is assessed to be minimal—GM [*i.e.* Leeson] runs day-to-day operations". C&LS' audit manager told the Singapore inspectors that Jones had a general feel of the financial balances but was not hands-on and could not generally deal with any queries himself; it was Leeson, not Jones, who was in charge of the company. Mr Jones seems to have made no attempt to mislead C&LS as he is said to have misled D&T.

112   A further point is that, when BFS was being established in 1992, Mr Bax and Mr Jones had submitted in a memorandum dated 25 March 1992 that Mr Leeson should report to, and only to, Mr Jones on operational matters.

854   BARINGS PLC (IN LIQUIDATION) AND ANOR V. COOPERS & LYBRAND

Mr Bax's evidence was that they felt that Mr Jones should be given ultimate responsibility for BFS operations. If BFS did not have overall control of the settlement process, that would encourage mistakes and make it much harder for Mr Jones to supervise what was going on.

113   Mr Bax and Mr Jones lost that argument. However Mr Jones was an awkward character. It seems unlikely that he would have committed fraud in order to prevent D&T pointing out to Barings management that which he and Bax had pointed out to them unsuccessfully, only (in the case of the 1992 audit) nine months before.

114   Accordingly there is no reason to conclude that Mr Jones's unsatisfactory conduct in other later situations means that he must have had no honest belief in the representations contained in the 1992 and 1993 letters, given that a reasonable finance director with his knowledge and in his circumstances could have made such representations without it being concluded that he must have lacked such belief.

115   Therefore, on the basis of the evidence adduced for the purposes of the preliminary issue, D&T have not established to my satisfaction that, when Mr Jones signed the representation letters, he did so:

i) knowing that the statements in the letters were untrue, without an honest belief in their truth, or indifferent as to whether or not they were true, or

ii) knowing that he had no reasonable grounds for making the statements, without an honest belief that he had such grounds, or indifferent as to whether he had or not.

*Other Legal Issues*

116   That is sufficient to dispose of this preliminary issue. However the other legal issues set out in paragraph 37 above were fully argued before me. In deference to those arguments and in case this goes further, I shall express my views, albeit shortly, upon them, which may also be relevant to awards of costs hereafter. The discussion which follows is on the basis that, contrary to the finding I have just made, Mr Jones's signature on the representation letters was recklessly fraudulent.

*Materiality and Inducement*

117   Whether materiality is a requirement of an action in deceit was disputed before me. D&T argued strongly that it was sufficient for them to establish inducement. This is an area of academic dispute. Were it necessary for me to decide the question, I should incline to the view that materiality is at most an aspect of proving inducement and is not a separate requirement. I note in particular Lord Mustill's statement in *Pan Atlantic Insurance v. Pine Top Insurance* [1995] 1 A.C. 501, at page 533:

"... whereas, if the representation inducing a contract was ... fraudulent, ... its falsehood would invariably give a right to avoid, an innocent misrepresentation inducing the contract would give the underwriter a right to avoid only if it was material."

[2002] P.N.L.R. 39                    855

118    In any event I am satisfied that the representation letters were material, at least in the sense that D&T would not have signed their audit opinions on the statutory accounts without receiving them.

119    SAG 20, which I have quoted above, did not require auditors to obtain a representation letter, save in relation to matters for which other sufficient audit evidence could not be expected to exist, which was not the case here. But it recommended that "the possibility of misunderstandings between the auditor and management is reduced when oral representations are confirmed by management in writing" and attached a sample letter which was clearly the basis for those used by D&T. It stated that (at paragraph 14):

> "If management refuses to provide representations that the auditor considers necessary, this will constitute a limitation in the scope of his examination. In such circumstances, the auditor should evaluate any reliance he has placed on other representations made by management during the course of his examination and consider if the refusal may have any additional effect on his report."

120    Mr Mason, BFS's audit expert, expressed the view that the representation letters in this case were a formality, as D&T should have obtained from other sources sufficient evidence in relation to all the issues covered. However, in the light of the guidance quoted above, he admitted that refusal by management to provide a representation letter would cause an auditor to reconsider his opinion, and to examine whether the other evidence he had gathered was sufficient.

121    Mr Mah gave evidence that he had obtained a representation letter from management in every audit he had conducted, save one where the client agreed to sign a memorandum prepared by D&T in place of a letter. He confirmed that, if they had not received satisfactory representation letters from BFS, D&T would not have signed unqualified audit reports in 1992 and 1993 and, in the case of 1992, would have withdrawn the opinion on the BSL consolidation pack which they had already given.

122    Finally, Mr Jones in cross-examination agreed that he knew that receipt of the representation letter in each year was a necessary step without which D&T would not sign their audit opinion.

123    In the light of this evidence, it seems clear that, by signing the representation letters, Mr Jones did intend to induce D&T to sign their audit opinions and that, as a matter of fact, it did so induce them.

*Causation*

124    D&T's case on causation is that:

(i)    there is no requirement in a deceit claim to prove causation, once inducement is proved, and

(ii)   if there is such a requirement, D&T have clearly met the test of

showing that the transaction which was induced by Mr Jones' alleged fraud was a cause of D&T being exposed to a claim in negligence arising from the 1992 and 1993 audits.

125   I deal with these arguments in turn.

*Is causation a requirement?*

126   I have held that the representation letters were material, in the sense that they induced D&T to sign their audit certificates and thus put their name to inaccurate financial statements. However that does not dispose of the issue of whether that action by D&T was the cause of the loss which is the subject of D&T's cross-claim.

127   D&T submitted that there is no such requirement, and that in deceit claims it is sufficient to prove inducement. I reject this submission. It is clear from *Smith New Court v. Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254 that in deceit claims there is a requirement of causation over and above the requirement to prove inducement. This is evident from Lord Steyn's speech at page 284. He there considered the case of *Doyle v. Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, which established that in deceit there is a more generous rule for remoteness than in negligence cases, in that the victim is entitled to all the loss directly flowing from the transaction induced by the wrongdoer, without regard to foreseeability. However he then went on to say:

> "So far I have discussed in general terms the scope of a fraudster's liability in accordance with the rule identified in *Doyle v. Olby (Ironmongers) Ltd*. It is now necessary to consider separately the three limiting principles which, even in a case of deceit, serve to keep wrongdoers' liability within practical and sensible limits. The three concepts are causation, remoteness and mitigation."

128   Lord Steyn then went on to describe the tests for causation in a passage which I quote below, and to conclude that, because of the nature of the transaction into which Smith New Court had been induced to enter, the types of losses claimed were indeed caused by the fraud.

129   I note also that in *South Australia Asset Management Corporation v. York Montague Ltd* [1997] A.C. 191, Lord Hoffmann commented at page 217 that:

> "even if the maker of the fraudulent statement is liable for all the consequences of the plaintiff having entered into the transaction, the identification of those consequences may involve difficult questions of causation."

130   D&T rely on *Downs v. Chappell* [1997] 1 W.L.R. 426 as establishing that there is no requirement of causation in deceit beyond inducement. But when Hobhouse L.J. in that case (at page 433) said that, as the plaintiffs had proved inducement:

> "the judge should have concluded that the plaintiffs had proved their

[2002] P.N.L.R. 39                                                    857

> case on causation and that the only remaining question was what loss the plaintiffs had suffered as a result of entering into the contract . . .",

he was clearly acknowledging the need to prove that the claimed loss had been caused by the transaction which the fraud had induced.

131    In this case the representation letters induced D&T to put their name to the statutory and consolidated accounts (or, in the case of 1992, not to withdraw their name from the consolidated accounts). That does not in itself mean that their loss was caused by their doing so.

*Is causation established?*

132    The subject of D&T's cross-claim for deceit is their exposure to, and (assumed) liability for, a claim for their (assumed) negligence in conducting the audits of BFS. D&T's case is that, in a deceit claim, the claimant is entitled to recover all his loss directly flowing from the fraudulently induced transaction. In this case the "transaction" was signature of the audit reports. Applying the test of causation expressed by Lord Steyn in *Smith New Court v. Scrimgeour Vickers* (see paragraph 134 below), that transaction was at least *a* cause of D&T's liability. Although D&T's assumed negligence in conducting the audits would also be a cause of that liability, *Standard Chartered Bank v. Pakistan National Shipping Corp. (No. 4)* [2001] Q.B. 167 decides that, if the signature of the audit reports was **a** cause of the liability, then it is to be treated as the *only* cause. Thus D&T are entitled to damages in the same amount as their liability on the main claim, and the main claim fails for circuity.

133    Therefore the question is whether the signature of the audit reports as a result of the allegedly fraudulent representation letters was a cause of D&T's exposure to a negligence claim and therefore loss.

134    In *Smith New Court v. Scrimgeour Vickers*, after the passage I have quoted above, Lord Steyn stated at page 284:

> "The development of a single satisfactory theory of causation has taxed great academic minds . . . But, as yet, it seems to me that no satisfactory theory capable of solving the infinite variety of practical problems has been found. Our case law yields few secure footholds. But it is settled that at any rate in the law of obligations causation is to be categorised as an issue of fact. What has further been established is that the 'but for' test, although it often yields the right answer, does not always do so. That has led judges to apply the pragmatic test whether the condition in question was a substantial factor in producing the result. On other occasions judges assert that the guiding criterion is whether in common sense terms there is a sufficient causal connection: see *Yorkshire Dale Steamship Co. Ltd. v. Minister of War Transport* [1942] A.C. 691, 706, *per* Lord Wright. There is no material difference between these two approaches. While acknowledging that this hardly amounts to an intellectually satisfying theory of causation, that is how I must approach the question of causation."

858    BARINGS PLC (IN LIQUIDATION) AND ANOR V. COOPERS & LYBRAND

135    In *Galoo Ltd v. Bright Grahame Murray* [1994] 1 W.L.R. 1360, the audit clients sued their auditors for negligence. They alleged that (to quote from the headnote) "if the [auditors] had performed their duties with reasonable care and skill, the insolvency of the companies would have been shown and they would have ceased to trade immediately and subsequent losses would not have occurred." Glidewell L.J. asked (at page 1374H):

> "How does the court decide whether the breach of duty was the cause of the loss or merely the occasion of the loss? The answer in my judgment is supplied by the Australian decisions to which I have referred, . . . in relation to a breach of duty imposed on a defendant whether by contract or in tort in a situation analogous to breach of contract. The answer in the end is 'By the application of the court's common sense.' Doing my best to apply this test, I have no doubt that the deputy judge arrived at a correct conclusion on this issue. The breach of duty by the defendants gave the opportunity to Galoo and Gamine to incur and to continue to incur trading losses; it did not cause those trading losses, in the sense in which the word 'cause' is used in law."

136    While I am dealing here with a claim in deceit rather than contract or negligence, I think this approach is equally applicable. There are respects in which the rules as to causation and remoteness in deceit differ from those in negligence, but the basic appeal to common sense and the distinction between cause and occasion of the loss apply to both.

137    In *Environment Agency v. Empress Car Co. (Abertillery) Ltd* [1999] 2 A.C. 22, Lord Hoffmann took a more policy-based approach. He said at page 29:

> "The first point to emphasise is that common sense answers to questions of causation will differ according to the purpose for which the question is asked. Questions of causation often arise for the purpose of attributing responsibility to someone, for example, so as to blame him for something which has happened or to make him guilty of an offence or liable in damages. In such cases, the answer will depend upon the rule by which responsibility is being attributed. . . ."

138    Having considered various factual examples, Lord Hoffmann continued at page 31:

> "These examples show that one cannot give a common sense answer to a question of causation for the purpose of attributing responsibility under some rule without knowing the purpose and scope of the rule. Does the rule impose a duty which requires one to guard against, or makes one responsible for, the deliberate acts of third persons? If so, it will be correct to say, when loss is caused by the act of such a third person, that it was caused by the breach of duty. In *Stansbie v. Troman* [see [1948] 2 K.B. 48—Ed.] Tucker L.J. referred to a statement of Lord Sumner in *Weld-Blundell v. Stephens* [see [1920] A.C. 956—Ed.] in which he had said:

'In general, even though A is in fault, he is not responsible for injury to C which B, a stranger to him, deliberately chooses to do. Though A may have given the occasion for B's mischievous activity, B then becomes a new and independent cause.'

Tucker L.J. went on to comment:

'I do not think that Lord Sumner would have intended that very general statement to apply to the facts of a case such as the present where, as the judge points out, the act of negligence itself consisted in the failure to take reasonable care to guard against the very thing that in fact happened.'

Before answering questions about causation, it is therefore first necessary to identify the scope of the relevant rule. This is not a question of common sense fact; it is a question of law. In *Stansbie v. Troman* the law imposed a duty which included having to take precautions against burglars. Therefore breach of that duty caused the loss of the property stolen. In the example of the vapour-filled drum, the duty does not extend to taking precautions against arsonists. In other contexts there might be such a duty . . . but the law of negligence would not impose one."

139    In the light of these authorities, it seems to me that, under the head of causation, I need to have regard to both Lord Steyn's test—was the alleged deceit a substantial factor in producing D&T's liability?—and Lord Hoffmann's regard for "the purpose and scope of the rule", responsibility under which is to be attributed.

140    As Lord Steyn says in *Smith New Court*, the "but for" test does not always yield the right result, and the right approach is more the pragmatic one of whether the condition in question was a substantial factor in producing the result. In an action in deceit, as he points out at page 283C, "the plaintiff is entitled to recover all his loss directly flowing from the fraudulently induced transaction". Lord Steyn contrasts this with the rule in cases of negligent misrepresentation, where the plaintiff may recover only loss flowing from the misrepresentation. In other respects, the test for causation in deceit does not differ from that applicable to other torts.

141    Mr Brindle for BFS submitted that the substantial cause of D&T being sued for negligence in conducting their audits was D&T's negligence in conducting those audits: their failure, in carrying out their audit investigations, to obtain audit evidence which would have enabled them to detect Leeson's illicit activities. By contrast, D&T's act of signing the audit opinions was no more the substantial cause of their liability than the fact that they were appointed as auditors in the first place. Like their appointment, that act exposed them to the possibility that, *if they were negligent*, they would be liable to BFS. He submitted that that is not enough to render signature of the opinions a substantial cause of D&T's liability.

142    Mr Brindle relied upon *Galoo Ltd v. Bright Grahame Murray*, which I have quoted above, and also *Quinn v. Burch Bros (Builders) Ltd* [1966] 2 Q.B. 370

860   Barings Plc (In Liquidation) and Anor v. Coopers & Lybrand

and *Banque Keyser Ullman v. Skandia Insurance Co.* [1991] 2 A.C. 249 as cases in which the defendant's tort clearly created the occasion for the loss but was held not to be the operative cause of it. He submitted that is the position here: signature of the accounts was a necessary precondition to D&T's liability but the substantial cause of that liability was their negligence in conducting their audit. If it had not been for that negligence, D&T would have discovered Leeson's frauds, would have known that the representation letters were false when they received them, would not have signed off on the accounts and would not have been liable to be sued in the present proceedings.

143   I have some sympathy for this argument. However, as a matter of common sense, it seems to me impossible to say that D&T's signature of the accounts (which was the relevant transaction flowing from the fraud) was not *a* cause of their being sued for negligence, even though their negligent investigatory work may have been a more significant cause. I note that one of the particulars of negligence pleaded by BFS (at paragraph 73(o) of the Re-amended Statement of Claim) is that D&T:

> "gave unqualified reports on the Plaintiff's financial statements and the group consolidation package notwithstanding the matters afore-said and the fact that they did not show a true and fair view ..."

144   The fact that BFS's cause of action had accrued before the certificates were signed is irrelevant, given that I am considering D&T's cross-claim for an amount equal to the claim against them: that cross-claim was only complete, so as to extinguish BFS' claim, once BFS had incurred its fraudulently induced trading losses, long after the certificates had been signed.

145   One can speculate what would have happened if D&T had not signed the audit certificates. Maybe Mr Jones would have been required to carry out the checks necessary to allow him to sign the representation letter, maybe there would have been a further audit. But it must be quite likely that the end result would have been that D&T would not have been exposed to a claim in negligence by BFS. Therefore it must follow that signature of the audit certificates was a cause of their exposure.

146   I reach the same conclusion when I follow Lord Hoffman's injunction to look at the policy of the rules concerned. No doubt the purpose of the rule allowing a company to sue its auditors in respect of a negligent audit is to allow the company (and through the company its shareholders) to recover losses which it has suffered as a result of the auditors failing to discover fraud or error. Had I found Mr Jones to have been fraudulent, it would be of concern to me that D&T were able to escape liability completely, as a result of a reckless representation letter written by the very management which had prepared the financial statements which D&T were appointed to verify and concerning whose conduct of the company's affairs D&T were appointed to provide shareholders with reliable intelligence. This view underlay the judgments of Moffitt J. in the Australian cases of *Pacific*

*Acceptance Corporation v. Forsyth* [1970] 92 W.N. (N.S.W.) 29 and *Simonius Vischer & Co. v. Holt & Thompson* [1979] 2 N.S.W.L.R. 322, and it finds echoes in Carnwath J.'s approach in *British Racing Driving Club v. Hextall Erskine* [1996] 3 All E.R. 667 , to which I refer below.

147    However I must also take into account the policy of the rule allowing a victim who has been deceived to sue his deceiver. The judgments in Standard Chartered Bank express very clearly the policy of the common law in relation to deceit. One could hardly have a clearer statement of policy than Ward L.J.'s words at paragraph 126:

> "Commercial fraud must be condemned. It can only properly be condemned by an award of the whole of the damage which the defendants intended to cause. Highwaymen in commerce forfeit the right to just and equitable treatment. In my judgment in the law of deceit there is to be no apportionment."

148    Accordingly, with some regret, I do not see that it is open to me to find, taking account either of a commonsense approach to factual causation or of the policy of the rules concerned, that D&T's signature of the audit certificates induced by the representation letters was not a cause of D&T's liability.

*Multiple causes*

149    It is common ground that, if D&T's signature of the audit certificates was induced by fraud and was a cause of D&T's liability to BFS, it is to be treated as the only cause: see Standard Chartered Bank.

*Vicarious Responsibility*

150    Mr Jones signed the representation letters on BFS's letterhead, as a director of BFS. On the face of it, he did so in the course of his employment and within the scope of his implied authority from the company.

151    That being so, D&T submitted that BFS was responsible for Mr Jones's acts, in accordance with the rule in *Lloyd v. Grace Smith & Co.* [1912] A.C. 716. BFS should be liable to a third party for such acts whether or not the director was acting fraudulently and whether his fraud was for the company's benefit or not.

152    Initially Mr Brindle for BFS relied on two arguments in response to this: an argument that D&T were insiders, not outsiders; and an argument based on the rule in *Re Hampshire Land Company* [1896] 2 Ch. 743. Mr Brindle abandoned the latter argument in the course of submissions.

153    Mr Brindle's former argument was to the effect that D&T were officers of BFS, together with Mr Jones, its director, and therefore insiders. The rule in *Lloyd v. Grace Smith & Co.* governs liability of a company for the acts of its agents within the scope of their authority as they impact on outsiders only. Thus BFS was not to be made liable for Mr Jones's fraud by means of the rule. Mr Brindle relied upon *Meridian Global Funds Management v. Securities*

862    BARINGS PLC (IN LIQUIDATION) AND ANOR V. COOPERS & LYBRAND

*Commission* [1995] 2 A.C. 500 as authorising the court to fashion a special rule of attribution in such circumstances. He pointed to *British Racing Drivers Club v. Hextall Erskine* [1996] 3 All E.R. 667 as a recent such case: the court there held that directors' actions were not to be attributed to a company because to do so would defeat the statutory purpose of section 320 of the Companies Act 1985.

154    Mr Brindle pointed out that, in the present case, BFS' directors owed a duty to the company under section 201 of the Singapore Companies Act to lay before the company in general meeting financial statements that give a true and fair view of the company's affairs; and that D&T owed a duty to the company under section 207 of that Act to report to the company in general meeting whether the financial statements did give such a view. As in the British Racing Driving Club case, it would defeat the purpose of those sections if the company's claim against the auditors for negligence in performing their duties in connection with the audit could be defeated by making the company liable for the directors' defaults in the same connection.

155    I am unable to accept that auditors are to be treated as "insiders" in their relationship with their audit-client company. There is no English authority for any such concept. By contrast, however, in *Duke Group Ltd v. Pilmer* [1999] S.A.S.R. 64, in the full court of the Supreme Court of South Australia it was held that, for the purpose of a defence of contributory negligence by accountants to a claim by their client company in negligence, the client company was held to be liable under the rule in *Lloyd v. Grace Smith & Co.* and thus at fault for the fraudulent representation of the client's directors. The accountants were not acting as auditors but had been specially employed by the company to advise a general meeting of the shareholders of the company as to the merits of a proposed takeover. See also *Daniels v. Anderson* (1995) 16 A.C.S.R. 607 at page 725, an audit case in the New South Wales Court of Appeal. See also *Mid-Continent Paper Converters Inc v. Brady, Wear & Schoenfeld Inc* 715 NE 2d 906 (1999), a decision of the Indiana Court of Appeals in which the fraud of a director, who misled the company's auditors for the benefit of the company, was imputed to the company so as to bar any claim in negligence by the company against the auditors. BFS's acceptance that the defence of contributory negligence is available to D&T also seems to me to be inconsistent with this submission.

156    Nor do I accept that the *Meridian* case justifies me in disapplying the normal rules of vicarious liability in circumstances such as these. In his discussion of rules of attribution in that case, Lord Hoffmann began by saying, at page 507:

> "The company's primary rules of attribution, together with the general principles of agency, vicarious liability and so forth, are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer . . ."

[2002] P.N.L.R. 39                          863

157    It does not seem to me that Lord Hoffmann in his speech in the *Meridian*case was deciding that, where the facts established that the director of a company was acting within the scope of his authority, it was open to a court to disapply the rule of vicarious liability so as to make the company not liable for those acts. It matters not that the actions of the director were done with some fraudulent intent (see *Duke v. Pilmer, ibid.*), unless the fraud has the effect of undermining the conclusion that he was in fact acting within the scope of that authority.

158    Contrary to Mr Brindle's submission, the decision of Rix J. in *Arab Bank v. Zurich Insurance* [1999] 1 Lloyd's Rep. 262 does not seem to me to be a case where the judge was disapplying the rule of vicarious responsibility where it would otherwise have applied on the facts of the case. He was seeing whether he could be assisted in deciding the case before him by applying the rule by analogy and finding that it did not fit.

159    The *British Racing Drivers Club* case does support Mr Brindle's approach to *Meridian*. However with great respect to Carnwath J., whose decision in that case seems justified on the facts, I do not believe that *Meridian* does allow me to disapply the rule of vicarious liability, in reliance upon the statutory context of duties under the Companies Act, in the way in which the judge did there and Mr Brindle would have me do here.

160    Accordingly, had I found Mr Jones's action in signing the representation letters to have been recklessly fraudulent, I should have held that BFS was vicariously liable for his action.

*Conclusion*

161    In the result I answer the question posed by the preliminary issue in the negative sense and contrary to the submissions of D&T.

H14                                         *Order: preliminary issue decided in*
                                            *favour of the claimants.*

A.T.



# Lloyd's Law Reports: Banking

# 1999

*Editors*

Paul McGrath, Barrister and
Richard Millett, Barrister



LONDON    HONG KONG

1999

## COURT OF APPEAL

23, 24, 25 June; 14 July 1999

————

### BARTON AND ORS
v
### COUNTY NATWEST LIMITED

Before Lord Justice MORRITT,
Lord Justice ROCH and
Mr Justice LINDSAY

**Guarantee and indemnity — Whether obtained by fraudulent misrepresentation — Whether the guarantors relied on misrepresentation — Whether the guarantees should be rescinded.**

In order to acquire a leisure complex and a night club, Regent Leisure Time Ltd ("the company") borrowed £2.025 million from the respondent/plaintiff, County NatWest ("the Bank"), secured by a first charge on the purchased properties, and a third property which had been acquired by the company the year before. The Bank also obtained guarantees by the appellant/defendants, Mr Barton, Mr and Mrs Amos ("the guarantors") who were to be officers in the company. Mr Barton's liability was limited to £250,000 and that of Mr and Mrs Amos £500,000. Both guarantees were secured by second charges on their respective matrimonial homes of Mr and Mrs Barton and Mr and Mrs Amos.

On 5 July and 27 August 1993, the Bank demanded payment both from the company as well as the guarantors. No payment was forthcoming and proceedings were commenced against the guarantors by writ on 13 February 1995. By their defence and counterclaim, the guarantors alleged that they had been induced into their respective guarantees by fraudulent representations by the bank manager (Mr Murphy) and negligent representations by the bank's solicitors (Mr Salter) relating to the basis upon which the Bank had obtained a property valuation. The guarantors sought to rescind their guarantees, discharge the charges, and recover damages under the Misrepresentation Act 1967. They also sought orders setting aside the guarantees and damages.

The issues were tried by HH Judge Weeks, QC, sitting as deputy judge of the Chancery Division, between 23 and 30 January 1998. In his judgment handed down on 20 February 1998, the judge rejected the allegations of the guarantors and found in favour of the Bank. The judge found that both Mr Murphy and Mr Salter had implicitly represented that the valuation was that of a forced sale but that they did not intend or expect any of the guarantors would have relied upon that representation. The judge further found that, in fact, no such reliance was placed on the representation. He gave judgment for the Bank against Mr Barton for £356,118 and interest, and against Mr and Mrs Amos for £712,236 and interest. The guarantors and Mrs Barton appeal from that order.

————*Held*, by CA (MORRITT LJ, ROCH LJ and LINDSAY J agreeing) allowing the appeal:

(1) an appellant court should be slow to find fraud where the trial judge had not. However, it was appropriate to displace a trial judge's findings where the evidence was clear. This was an appropriate case so to do especially given the trial judge's failure to provide separate findings of fact in relation to Mr Murphy and Mr Salter (*see* p 416, col 1; p 424, cols 1 and 2; p 426, col 1);

————*Akerhielm* v *De Mare* [1959] AC 789; *Ansbacher* v *Binks Stern* [1998] PNLR 221 applied;

(2) a representor cannot be guilty of fraudulent misrepresentation save where it was shown that he intended or was willing that his representation be understood in a sense which he knew was false (*see* p 416, col 1);

————*Gross* v *Lewis Hillman Ltd* [1970] Ch 445 applied;

(3) the findings of fact reached by the judge show clearly that Mr Murphy, whether implicitly or expressly, represented that the aggregate forced sale valuation of the three properties which were to secure the borrowings was £3.5 million and that the condition precedent for the Bank granting the loan was satisfied. It was further clear from the judge's findings that Mr Murphy was well aware that this representation was false especially as Mr Murphy had been told by the valuers that the forced sale valuation would be between 30 per cent to 50 per cent less than the vacant possession valuation which had been carried out (*see* p 418 col 2; p 419, col 1).

————*Derry* v *Peek* (1889) 14 App Cas 337 applied;

(4) the evidence demonstrated beyond any reasonable doubt that Mr Murphy, the bank manager, intended the guarantors and, implicitly, Mrs Barton to rely on his representation which he knew to be false contrary to the judge's finding (*see* p 420, col 2);

(5) the representation in this case was of such a nature as would be likely to induce a person to enter into a contract. Accordingly, and taking into account the width of the principle, there was a presumption that the representation had been relied upon. The judge failed properly to deal

with the question of the presumption of reliance. That presumption remains unless and until it is rebutted by evidence: the mere fact that evidence has been given by those alleged to have relied upon the representations does not in itself automatically remove the presumption. The presumption acts to shift the burden of proof onto the representor to show that no reliance was, in fact, placed (*see* p 421, col 2; p 422, col 1);

————*Smith* v *Chadwick* (1884) 9 App Cas 187; *Pan Atlantic Insurance Co Ltd* v *Pine Top Insurance Ltd* [1995] 1 AC 5019; *Australian Steel & Mining Corp Ltd* v *Corben* [1974] 2 NSWLR 202; *Watt* v *Thomas* [1947] 484; *The Ocean Frost* [1985] 1 Lloyd's Law Reports applied;

(6) on the facts the relevant issue was whether the representation induced the guarantors to continue with a decision which they had already made. There was a presumption that it did. The Bank had failed to discharge its burden in displacing the presumption of reliance. The judge's finding to the contrary was wrong and should be departed from for four reasons: (i) there was no indication that the judge had realised how passive the necessary inducement may be; (ii) given that he failed to appreciate that the representation had been fraudulent, he did not properly address the consequence of the presumption applying; (iii) the facts relied upon by the judge, in themselves, did not entitle him to rebut the presumption; (iv) the proper inference from all the evidence was insufficient to rebut the presumption (*see* p 423, cols 1 and 2; p 424, cols 1 and 2);

(7) in the circumstances, the guarantors succeed in their claims against the Bank in deceit based upon the fraudulent misrepresentation of Mr Murphy. They were entitled to have the guarantees rescinded and to recover damages. There was no need to consider the claim based upon Mr Salter's representations (*see* p 424, col 1);

————*Archer* v *Brown* [1985] 1 QB 401 applied;

(8) given the above conclusion, there was no need to consider the alternative argument based upon the Bank's alleged breach of duty of disclosure (*see* p 421, col 1).

————

The following cases were referred to in the judgment:

*Akerhielm* v *De Mare* [1959] AC 789;

*Ansbacher* v *Binks Stern* [1998] PNLR 221;

*Archer* v *Brown* [1985] 1 QB 401;

*Australian Steel & Mining Corp Ltd* v *Corben* [1974] 2 NSWLR 202;

*Commercial Bank of Australia* v *Amadio* (1983) 151 CLR 447;

*Davies* v *London & Provincial Maritime Insurance Co* (1878) 8 Ch D 469;

*Derry* v *Peek* (1889) 14 App Cas 337;

*Gross* v *Lewis Hillman Ltd* [1970] Ch 445;

*Pan Atlantic Insurance Co Ltd* v *Pine Top Insurance Ltd* [1995] 1 AC 501, [1994] 2 Lloyd's Rep 427;

*Smith* v *Chadwick* (1884) 9 App Cas 187;

*The Ocean Frost* [1985] 1 Lloyd's Rep 1;

*Watt* v *Thomas* [1947] AC 484.

The following text was referred to in the judgment:

*Halsbury's Laws of England*, 4th ed, 1998, vol 31.

————

Dirik Jackson (instructed by Blight Skinnard) appeared for the appellant/Barton and Ors; Nicholas Elliot, QC and Ian Wilson (instructed by Dibb Lupton Alsop) appeared for the respondent/County NatWest Limited.

14 July 1999

————

## JUDGMENT

### Lord Justice MORRITT:

1. On 1 April 1992 Regent Leisure Time Ltd ("the Company") borrowed from the plaintiff, County NatWest Ltd ("the Bank"), £2.025 million primarily for the purpose of acquiring a leisure complex and a night club in Newquay Cornwall called the Blue Lagoon and Tall Trees respectively. The loan was secured by a first legal charge on The Blue Lagoon, Tall Trees and a third property, the Carvynick Golf and Country Club, which had been acquired by the Company the year before. The loan was also secured by guarantees of the liability of the Company to the Bank given by the defendants Mr Barton and Mr and Mrs Amos ("the Guarantors"), who were or later became officers of the Company, limited in the case of Mr Barton to £250,000 and in the case of Mr and Mrs Amos to £500,000. The guarantee liabilities to the Bank were secured by second charges on the matrimonial homes of Mr and Mrs Barton and Mr and Mrs Amos.

2. The Company did not prosper. On 5 July and 27 August 1993 the Bank demanded repayment of the loan by the Company and payment in respect thereof by each of the Guarantors pursuant to their

Case 1:20-cv-10041-PKC    Document 105-2    Filed 08/24/21    Page 24 of 32

MORRITT LJ]                    **Barton and Ors v County NatWest Limited**                    [CA

respective guarantees. The Guarantors failed to comply with the demands made on them and these proceedings were commenced by a writ against them issued by the Bank on 13 February 1995. By their defence and counterclaim served on 24 April 1995 the Guarantors claimed that each of them had been induced to enter into their respective guarantees by representations made to them on 26 March 1992 by Mr Timothy Murphy, then employed by the Bank as a manager, and, on 27 March 1992, by Mr Salter of Dibb Lupton, the Bank's solicitors.

3. The alleged representation of Mr Murphy was that the valuers appointed by the Bank, Tretheweys, to value Carvynick, the Blue Lagoon and Tall Trees had arrived at a forced sale valuation of £3.5 million. The alleged representation of Mr Salter was that the condition precedent to the drawdown of the loan that such a valuation had been obtained was satisfied. The Guarantors alleged that each representation was false. In the case of Mr Murphy only they alleged that the representation was made fraudulently. In the case of both Mr Murphy, in the alternative, and Mr Salter they alleged that the representations were made negligently or, in any event, in circumstances entitling them to rescind their guarantees (and the securities therefor) and to recover damages under the Misrepresentation Act 1967. They sought orders setting aside the guarantees and damages.

4. The action was tried by HH Judge Weeks, QC, sitting as a deputy of the Chancery Division, between 23 and 30 January 1998. In his judgment given on 20 February 1998 the judge concluded that:

> ... both Mr Murphy and Mr Salter, by the words they used on 26th and 27th March respectively, implicitly represented that County NatWest had obtained a report giving a forced sale value of the three properties of at least £3.5 m. I find also that Mr Murphy and Mr Salter or, indeed, anyone reading the report carefully, knew or would have known that this was untrue. I find, however, that they did not intend and had no reason to believe that the Defendants or Mrs Barton would rely on that representation.

Further the judge decided that Mr and Mrs Barton and Mr and Mrs Amos did not actually rely on such misrepresentations. In consequence of those conclusions the judge rejected the defence and counterclaim and gave judgment for the Bank against Mr Barton for £356,118 and interest and against Mr and Mrs Amos in the sum of £712,236 and interest.

5. This is the appeal of the Guarantors and Mrs Barton from that order. They claim that the judge was wrong in that (1) he should have found, assuming that on the proper reading of his judgment he

did not, that the representation of Mr Murphy was fraudulent; (2) the representation of (i) Mr Murphy and (ii) Mr Salter was made with the intention that it should be acted on by the Guarantors and (3) the Guarantors were thereby induced to enter into their guarantees and, in the case of Mr and Mrs Amos, the second charge over their home. I will deal with each of those issues in due course but first it is necessary to describe the facts in greater detail. In doing so I shall, on occasion, refer to matters to which the judge did not advert but which were established by the evidence of the one witness by whom he was impressed.

6. The Bank is a subsidiary of National Westminster Bank plc. It carried on the business of merchant banking from a number of regional offices including an office in Leeds. The individuals in the Leeds office who feature in this case were Mr Murphy, a manager in the Bank's Acquisition Finance Department, and Mr Peter Hargreaves, the local director to whom Mr Murphy reported. It is an important feature of this case that in the conduct of its business the Bank used the criterion of a forced sale valuation in a sense different to that used by other lending institutions. To the Bank it meant the open market value of the property in question on all the usual assumptions but also assuming that its sale is achieved within six months of the valuation. It considered that such a criterion was realistic and produced a higher figure than that produced by the more usual criterion of a forced sale but a lower figure than simple open market value.

7. The Company was incorporated in February 1991. The original directors of the Company were Mr Barton and a Mr Sambrook, the latter also being the company secretary. Mr Barton had been concerned in the hotel and leisure business and Mr Sambrook was a retired bank manager. They were associated with Mr and Mrs Amos. Mr Amos was a builder by trade but, until April 1992, was also an undischarged bankrupt. No doubt this was why, when Mr Sambrook resigned as a director and the company secretary in January 1992, Mrs Amos took his place as the company secretary but the appointment of Mr Amos to the board of the Company did not occur until April 1992. The only shareholders in the company were Mr Barton and Mrs Amos.

8. The first venture of the Company was the acquisition of the Carvynick Golf and Country Club in March 1991. For that purpose the Company borrowed £400,000 from the Bank. The loan was repayable within 12 months and was secured by a first legal charge over that property, a mortgage debenture of the Company conferring fixed and floating charges over all its assets and the unlimited guarantees of Mr Barton and Mr Sambrook secured by second charges over their homes. In the case of

Mr Barton his home was in the joint names of himself and his wife who, having obtained separate advice, joined in the grant of the requisite charge. The conditions precedent to the making of the loan also required the production of a valuation of the property as at 5 March 1991 showing a forced sale value of not less than £600,000. This condition was satisfied by a valuation dated 11 March 1991 made by Countrywide and addressed to Mr Hargreaves at the Bank describing the property and stating "the value of the property on the open market, assuming sale within six months acceptable for security purposes ie 'forced sale valuation' to be reflected in the sum of £750,000".

9. On 27 January 1992 Mr Barton and Mr Amos met Mr Hargreaves and Mr Murphy to discuss the further works the Company had carried out at Carvynick in building more holiday cottages and other projects. In a letter from Mr Murphy to Mr Barton dated 28 January 1992 Mr Murphy assured Mr Barton that the Bank remained actively involved in funding leisure projects and continued to view them in a positive light.

10. In February 1992 the Company engaged the services of Waycotts Ltd, an independent firm of estate agents, for two purposes. The first related to the acquisition of the Blue Lagoon and Tall Trees and the second was the valuation of Carvynick. In the furtherance of the first, on 14 February 1992, Waycotts made an offer on behalf of the Company to the Receiver of Dibhouse Ltd to buy the Blue Lagoon and Tall Trees for £1.5 million with funding to be provided by the Bank. In relation to the second on 21 February 1992 Waycotts valued Carvynick for balance sheet purposes on the basis of "the current open market value of the freehold interest in the fully operational leisure business as a going concern with full vacant possession" at £2.3 million.

11. On 28 February 1992 heads of agreement for the sale by the Receiver of Dibhouse Ltd to the Company of the Blue Lagoon and Tall Trees were agreed subject to contract. The price was £1.575 million. Contracts were to be exchanged within 14 days of a draft being submitted by the vendors' solicitors for completion not more than four weeks thereafter. Over the weekend of 28 February to 1 March 1992 Mr Murphy met Mr Barton and Mr Amos in Cornwall. They inspected the Blue Lagoon and Tall Trees and discussed the funding required by the Company.

12. By a letter dated 3 March 1992 Mr Murphy sent to Mr Barton an indication of the terms of "a funding package" to refinance the existing facility and to fund the acquisition of the Blue Lagoon and Tall Trees (as well as a third property called Quaywest which in the event did not proceed). The loan was to be of £2.125 million, repayable over six years, and a further £100,000 working capital, repayable on demand if the Bank considered its security to be prejudiced. The interest rate was to be three per cent over LIBOR and there were four separate fees to be paid. The necessary security was to include legal charges over Carvynick, the Blue Lagoon and Tall Trees as well as the joint and several guarantees of Mr and Mrs Amos and of Mr Barton, limited to £500,000 in the case of the former and £250,000 in the case of the latter. The conditions precedent included one whereby "the Bank and its advisers [are] . . . satisfied with: (i) An independent valuation (open market value assuming sale within six months) of the Properties to be a minimum of £4m". The letter did not represent any commitment by the Bank but sought the Company's approval to its terms so that Mr Murphy might seek formal sanction through the Bank's Credit Committee.

13. Those terms being acceptable to the Company, on 9 March 1992 Mr Hargreaves and Mr Murphy submitted them as a proposal to the Bank's Credit Committee for its approval. The proposal contained a detailed description of the background, the proposed acquisitions, the management, financial analysis and security. It recorded that the security was to include a guarantee from Mr and Mrs Amos and that Mr Amos was to become a director at the start of the new tax year, ie on 6 April 1992, but failed to disclose that he was an undischarged bankrupt. In relation to security it contained a table showing the estimated open market values and estimated forced sale values of The Blue Lagoon and Tall Trees, of Quaywest and Virginia House, which did not proceed, of Carvynick and of Mr Barton's personal property. The total gave a loan to value ratio of 30 per cent against estimated open market value and 55 per cent against estimated forced sale value. For the purposes of this appeal the relevant figures are:

| Property | Estimated OMV | Estimated FSV |
| --- | --- | --- |
| Blue Lagoon | 3m | Together |
| Tall Trees | 0.8m, | 1.6m |
| Carvynick | 2.3m, | 1.61m |
| Barton's property | 0.138m | .041m |
| Total | 6.238m, | 3.251m |

Revised loan to value 35.67 per cent, 68.44 per cent

14. In their conclusions and recommendations Mr Murphy and Mr Hargreaves observed that "we have the opportunity to assist an existing client, whose current well secured and highly remunerative facility has been operated entirely to our satisfaction"; they strongly recommended approval of the transaction. Mr Moore, the director to whom the proposal was directed, raised certain questions, to

which Mr Murphy replied on 12 March. In relation to the security Mr Murphy wrote:

A bank appointed valuer will be appointed to value the individual properties, a pre-condition to the Bank advancing monies being that a minimum FSV for mortgage purposes of £4m is recorded.

On the same day Mr Moore gave his approval and Mr Murphy wrote to Mr Barton so informing him.

15. The Bank appointed a valuer to whom Mr Murphy had referred was Mr Douglas McLaughlan FRICS of Tretheweys, the witness by whom the judge was impressed. Though that firm's principal office was in Plymouth Mr McLaughlan was based in Bradford. Tretheweys carried out valuations on the basis of Conditions of Engagement which, in Condition 4, provided that:

4.1 Unless otherwise instructed the value given is the open market value defined as being the best price at which the property and business might reasonably be expected to be sold by private treaty at the date of Messrs Tretheweys' valuation assuming:

4.1.1 a willing seller;

4.1.2 a reasonable period in which to negotiate a sale, taking into account the nature of the property and business, and the state of the market;

4.1.3 that values remaining static during that period;

4.1.4 that the property and business is freely exposed to the open market; and

4.1.5 that no account is taken of any additional bid by a purchaser with a special interest.

4.2 No reduction or allowance has been made for forced (or distressed) sale, and clients acting on the valuation should provide for any allowance for such items — either expressly or in the amount of finance advanced.

4.3 "The freehold with vacant possession valuation" means the "Open Market Value" (see above) ascribed to the property on the basis that the existing occupier has vacated on the date of valuation, taking all staff and removable items of furniture, fixtures, fittings. The property is valued on the basis that all planning permissions, registrations, certifications and licences remain available for a new occupier who will immediately occupy the property for the same or similar purposes together with all requisite staff, furniture, fixtures and fittings.

Neither of these bases was a valuation on a forced sale basis as understood by the Bank. Mr Murphy was aware of the valuation bases used by

Tretheweys, as indicated in their conditions of engagement for, on behalf of the Bank, he had instructed Mr McLaughlan to carry out a valuation of other leisure property in October 1991.

16. Mr McLaughlan was instructed on the telephone on 15 March to carry out a valuation of the Blue Lagoon, Tall Trees and the other properties then under consideration. His instructions came from Mr Murphy or Mr Hargreaves but he was not instructed to carry out the valuations on a forced sale basis. In that or a later telephone conversation, but before 17 March, Mr McLaughlan was informed by My Murphy that the Bank was looking for a value for Carvynick, the Blue Lagoon and Tall Trees of £3.5 million. Mr McLaughlan went to Cornwall on 16 March and inspected all three properties on that and the following day. He spent two further days in Cornwall writing up his report.

17. The written instructions from the Bank to Tretheweys were dated 17 March, addressed to their office in Plymouth and signed by Mr Hargreaves. The Bank thereby sought a report and valuation of the specified properties which would form the security in support of finance to be made available to the Company. The properties to be valued were Carvynick, the Blue Lagoon, Tall Trees and the other two properties, Quaywest and Virginia House then under consideration. The letter stated

Your report should cover the following areas:

Your opinion of:

1. a current market value of the properties assuming a willing buyer and willing seller within a reasonable time period.

2. a current market value assuming a willing buyer and a willing seller, assuming a sale within six months as may be considered acceptable for security reasons. "A forced sale mortgage valuation."

The letter did not specify whether the respective businesses were to be treated as going concerns. Mr McLaughlan noticed that the written instructions sought a forced sale valuation as so defined and spoke to Mr Murphy on the telephone. He told Mr Murphy that a forced sale valuation would be between 30 per cent and 50 per cent below his open market valuation and would, though the price payable for the Blue Lagoon and Tall Trees was low, be likely to produce a value for Carvynick, the Blue Lagoon and Tall Trees of less than £3.5 million. Mr Murphy agreed that Mr McLaughlan should complete his valuation in the normal Tretheweys form as indicated in the Conditions of Engagement.

18. By 25 March Mr McLaughlan had returned to Bradford. On that day he wrote to the Bank confirming that the other two properties, Quaywest

and Virginia House, were unlikely to become part of the Bank's security. On the following day his reports were signed and delivered to the Bank. The report acknowledged the instructions received from the Bank on 18 March. On page 4 it was stated:

> NB This report is prepared in accordance with previously agreed Conditions of Engagement which are recited in Appendix 1 to this document. The report must be read in the light of such Conditions of Engagement and the report must not be used in any fashion without inclusion of that Appendix.

Mr McLaughlan valued each property on two specified bases. The first was "the value of the freehold interest with vacant possession"; the second was "the value of the property and business as a trading entity together with goodwill, fixtures, fittings and equipment". The values attributed by Mr McLaughlan to each of the three properties on each of those bases (though in the case of the Blue Lagoon the valuation of the freehold was stated to be with part vacant possession only) were:

| Property | Freehold | Trading Entity |
| --- | --- | --- |
| Carvynick | £1.8 million | £2.25 million |
| Blue Lagoon | £1.15 million | £1.7 million |
| Tall Trees | £0.55 million | £0.775 million |
| Total | £3.5 million | £4.725 million |

Mr Murphy read the reports carefully and appreciated that they did not provide forced sale values, as defined by the Bank, because paragraph 4.2 of the Conditions of Engagement so indicated. The aggregate freehold value of £3.5 million was reduced by £40,000 later that day in consequence of a telephone conversation between Mr Murphy and Mr McLaughlan concerning one of the shop units in the Blue Lagoon.

19. In the meantime arrangements for completion of the purchase of the Blue Lagoon and Tall Trees were proceeding. On 12 March Mr Murphy had instructed Dibb Lupton to draft the facility letter to be sent to the Company. Exchange of contracts and completion was fixed for 27 March. On 26 March, as found by the judge,

> ... Mr Barton and Mr Amos were at their solicitors office in Tavistock with Mr Hills, a legal executive, preparing for completion the next day. Everyone agrees that there was a conference call to Mr Murphy in which he was asked about Tretheweys' report. Mr Murphy accepts that he might have said words to the effect that "he had got the report and it was just enough."

This is the first representation relied on by the Guarantors. As I have already indicated they allege that the representation was made fraudulently.

20. The facility letter as drafted by Dibb Lupton was dated 27 March. It offered a loan facility of £2.15 million and a working capital facility of £100,000. The required security included charges on Carvynick, the Blue Lagoon and Tall Trees and guarantees from Mr and Mrs Amos limited to £500,000 and Mr Barton limited to £250,000, secured in each case on their respective homes. The conditions precedent contained in Paragraph 9 stipulated that:

> The obligation of the Bank to make available the facility is subject to . . .
>
> 9.3.1 the Bank and its advisors being satisfied with a report and valuation by independent valuers showing a minimum forced sale valuation of [the Blue Lagoon and Tall Trees] and Carvynick of £3.5m . . .

21. In the words of the judge:

> Completion was scheduled for 27th March 1992 at Osborne Clarke's [the vendors' solicitors] offices in Bristol and Mr and Mrs Barton, Mr and Mrs Amos and Mr Hills attended. Mr Salter, then a solicitor with Dibb Lupton, came down from Leeds. He had been provided with a copy of Tretheweys' report, which he read in the train, and he had been told that the Bank was content with it. He gave the directors of [the Company the] facility letter from [the Bank] . . . The facility letter was formally accepted at a board meeting of [the Company] held that day. Before that, Mr Hills and Mr Salter went through the facility letter together and Mr Salter indicated that condition 9.3.1 had been complied with. He did not show his copy of the report to anyone else. Completion did not take place that day, mainly because Mr Salter received a call from his office to the effect that Dibb Lupton's searches revealed Mr Amos to be an undischarged bankrupt.

This is the second representation on which the Guarantors rely. They do not allege that it was made fraudulently but they do contend that it was made negligently and without reasonable grounds for belief in its truth.

22. On 31 March Mr Murphy and Mr Hargreaves reported to Mr Moore of the Bank's Credit Committee on Mr McLaughlan's valuation. In the column headed FSV Mr Murphy inserted Mr McLaughlan's freehold with vacant possession values with the deduction of £40,000 on account of the problem with the shop at the Blue Lagoon discussed with Mr McLaughlan on 26 March. The paper stated that the forced sale values were higher than those included in his memorandum of 9 March, thereby asserting that the forced sale value basis used by the Bank was the same as the freehold with vacant possession basis used by Tretheweys. Mr Murphy knew such assertion to be untrue for he had been informed by Mr McLaughlan on 18

March that his freehold with vacant possession values would have to be discounted by anything between 30 per cent and 50 per cent in order to approximate to the Bank's forced sale values. Nothing was said concerning the discovery that Mr Amos was an undischarged bankrupt. The paper concluded with a recommendation for approval. Such approval was given by Mr Moore on 1 April.

23. Completion duly took place on 1 April 1992. The Company drew down £2.025 million from which it paid £1.425m for the Blue Lagoon and Tall Trees and repaid the existing facility of £400,000 secured on Carvynick. The Bank retained the debenture previously issued by the Company, the first legal charge over Carvynick and the second charge over the home of Mr and Mrs Barton and took charges over the Blue Lagoon, Tall Trees and the home of Mr and Mrs Amos and limited guarantees from Mr and Mrs Amos and Mr Barton. The guarantee and charge formerly given by Mr Sambrook were released.

24. The facility letter was amended on 13 October 1992 to recognise that the other two properties, Quaywest and Virginia House, had not been acquired and to reflect an agreed alteration to the repayment schedule. On 21 October 1992 the Bank faxed to the Company, at the request of Mr Amos, copies of the summaries to Tretheweys' reports and valuations on Carvynick, the Blue Lagoon and Tall Trees. On 31 January 1993 the Company failed to repay the sum of £125,000 then due and on 15 February 1993 the Bank called for repayment of the loan by the Company. Demands were made of the Guarantors on 5 July and 27 August 1993. The Bank appointed administrative receivers of the Company pursuant to the debenture it had been granted in March 1991 on 31 August 1993.

25. On 6 September 1993 Tretheweys, in answer to an enquiry from Mr Amos, confirmed that the valuations they had given in March 1992 were not forced sale valuations. At that time the Company had agreed to sell its assets for a price of £4 million with £2.5 million payable on completion. If completed the sale would have enabled the substantial repayment of the loan. But the purchaser failed to complete. In writing to the National Westminster Bank on 20 March 1994 to express his concern that the sale had gone off Mr Barton claimed that he had relied on Tretheweys' valuations when assessing whether to buy the properties and whether to accept the loan and enter into the guarantees.

26. As I have already indicated these proceedings were commenced by a writ issued by the Bank on 13 February 1995. By their original defences and counterclaims the Guarantors claimed to be entitled to avoid the guarantees and recover damages not only on the basis of the alleged representations to which I have referred but also on the basis that, through Mr Murphy, the Bank had taken on the role of business adviser to the Company. They alleged that on behalf of the Bank in such capacity Mr Murphy had confirmed the accuracy of certain accounts produced by the Receiver of Dibhouse Ltd and prepared projections of the Company's trading for the year to 31 March 1993, in each case, negligently. The claim in relation to the allegation that the Bank had undertaken the role of business adviser was not abandoned until after the conclusion of all the evidence.

27. It is also material to note at this stage the nature of the Bank's defence to the allegations which were pursued. With regard to the alleged misrepresentations the Bank's defence included the allegations that Tretheweys had been instructed to carry out a forced sale valuation either during a telephone conversation between Mr Murphy and Mr McLaughlan or by the letter dated 17 March, that the freehold with vacant possession valuation was approximately equivalent to their forced sale value and that Mr Murphy honestly and reasonably believed that it was. In addition the Bank alleged that a copy of the Tretheweys report had been released to Mr Amos on 26 March. In respect of the alleged representation made by Mr Murphy on 26 March it was admitted only that Mr Murphy had confirmed to Mr Amos on the telephone that he had received a copy of Tretheweys report and was happy with its contents. With regard to the representation of Mr Salter allegedly made on 27 March the Bank denied that he had been asked any questions about the Tretheweys report.

28. The trial before Judge Weeks, QC was on liability alone. He heard oral evidence from Mr Barton, Mr Amos, Mr Hills, Mr Salter, Mr Murphy and Mr McLaughlan. In his judgment he said that he did not find either Mr Barton or Mr Amos or Mr Murphy a wholly reliable witness; Mr McLaughlan, on the other hand, impressed him. Having set out the background and indicated his impression of the witnesses the judge continued:

The conflicts I need to resolve are ten.

One, did Mr Murphy suggest Blue Lagoon and Tall Trees as a possible investment for Regent to Mr Amos and Mr Barton? I prefer Mr Murphy's evidence, and find that Mr Barton and Mr Amos found out that the properties were on the market from local information in Cornwall.

Two, did the Defendants know that it would be a condition precedent to the facility that there would be a report showing a forced sale value of £3.5m for the three properties? I find that they did. The terms of the loan were obviously a matter for discussion between the issue of the indicative terms letter on 3rd March and the

formal issue of the facility letter on the 27th. Once Quaywest dropped out the figure obviously became £3.5m.

Three, did the Defendants tell Mr Murphy that they were prepared to proceed only if the report showed a forced sale value of £3.5m? I accept Mr Murphy's evidence on this point and I find that they did not.

Four, did Mr Murphy instruct Mr McLaughlan to value the properties on a forced sale basis? I do not accept that he or Mr Hargreaves orally instructed Mr McLaughlan to value on a forced sale basis? The letter of 17th March was, however, plainly an instruction to give a forced sale valuation.

Five, did Mr McLaughlan tell Mr Murphy by phone shortly after 18th March that a forced sale valuation would be 30 to 50 per cent below the vacant possession value? I accept Mr McLauglan's evidence that he did. I find that he was told before 17th March that County NatWest were looking for a value for the three properties of £3.5m, and he must have noticed the express instructions in the letter of 17th March to value on a forced sale basis, and I find that he spoke to Mr Murphy to advise him that a valuation on that basis would be likely to fall below the required figure.

Six, did Mr Murphy tell Mr McLaughlan that the normal Tretheweys' report should be issued and would be acceptable? Again, I accept Mr McLaughlan's evidence and I think it is inconceivable that without such instructions Mr McLaughlan would have disregarded the written instructions to give a forced sale value.

Seven, did the Defendants see the Tretheweys' report before completion on 1st April 1992? I accept their evidence that they did not.

Eight, did the Defendants, on 26th March, ask Mr Murphy for a copy of the report and were they refused? I accept Mr Murphy's evidence that he was not asked.

Nine, did the Defendants, or Mr Hills on their behalf, ask Mr Salter for a copy of the report on 27th March and were they refused? I accept Mr Salter's evidence that he was not asked.

Ten, did Mr McLaughlin on 26th March tell Mr Murphy that the paragraph A valuations were equivalent to a forced sale valuation and could be relied on by the bank as such? I accept Mr McLaughlan's evidence that he told Mr Murphy no such thing.

29. Having reached those conclusions he recognised the issue he had to decide as:

... whether Mr Murphy or Mr Salter, knowingly or unknowingly, made a false representation to any of the Defendants or, indeed, Mrs Barton intending or realising that it would be

relied upon and whether any of the Defendants or Mrs Barton relied on such misrepresentation.

I have already quoted part of his decision on those issues but in the light of the submissions made to us I should set it out again in its complete context. The conclusion of the judge was:

I find that both Mr Murphy and Mr Salter, by the words they used on 26th and 27th March respectively, implicitly represented that County NatWest had obtained a report giving a forced sale value of the three properties of at least £3.5m. I find also that Mr Murphy and Mr Salter or, indeed, anyone reading the report carefully, knew or would have known that this was untrue. I find, however, that they did not intend and had no reason to believe that the Defendants or Mrs Barton would rely on that representation.

The answer has to be taken in the context of the question. The Defendants and Mr Hills were anxious to know whether the conditions precedent had been satisfied and the loan would be forthcoming. It is for that purpose that they needed to know whether the bank had a satisfactory valuation. Regent had its own valuers, Waycotts, who had recently given a professional valuation of Carvynick and were instructed in the purchase of Blue Lagoon and Tall Trees. Everyone concerned thought that the price which Regent was paying was a bargain at the time. There was no reason to believe that the Defendants would rely on Tretheweys' valuation, which I find that they did not ask to see at the time.

Did the Defendants or Mrs Barton actually rely on the misrepresentations? I have heard evidence from Mr Barton and Mr Amos to the effect that they would not have gone ahead if they had known that Tretheweys' figure of £3.5m was a bricks and mortar and not a forced sale valuation. Mr Amos has said the same in a statement admitted under the Civil Evidence Act. I do not accept that evidence which, in my judgment, is tinged by hindsight. Mr Barton and Mrs Amos, as shareholders, and Mr Amos, as prospective shareholder, were, in my judgment, keen to proceed with what they saw as an advantageous transaction with great benefits to Regent, and provided the bank was prepared to lend I do not think that they would have been deterred from giving their personal support. I think it significant that they made no complaint of being misled when they discovered the truth in September 1993.

Mrs Barton is different in that she had nothing personally to gain and something to lose from the transaction. However, her consent was not strictly necessary because the mortgage was already in place and her husband's guarantee was to be reduced in amount. I do not accept that if

she had been told the truth, that is that the £3.5m figure was a bricks and mortar valuation and not a forced sale valuation, she would have tried or succeeded in persuading her husband or Mr and Mrs Amos not to go ahead with the transaction.

The result is that the defence and counterclaim fail, and that there will be a judgment against Mr Barton for £356,118 and against Mr and Mrs Amos for £712,236. The counterclaim will be dismissed.

*Was Mr Murphy's representation fraudulent?*

30. This is the first of the issues to which I referred earlier and is crucial to the resolution of this appeal. Counsel for the Bank rightly emphasised that, although not impossible, it would be unusual for this court to find fraud where the judge had not. We have not had the benefit the judge had of seeing the witnesses give their evidence. Further it is dangerous to draw inferences on matters on which the judge made no findings, particularly in cases such as this when much of the evidence was adduced in respect of issues which were subsequently abandoned. In those circumstances it is necessary to approach this issue recognising that the decision in favour of Mr Murphy and the Bank should not be displaced by this court except on the clearest grounds. *Akerhielm* v *De Mare* [1959] AC 789, 806; *Ansbacher* v *Binks Stern* [1998] PNLR 221, 234.

31. In his consideration of this issue the judge dealt with the allegations against Mr Murphy and Mr Salter together, notwithstanding that fraud was alleged against the first but not the second. In my view that was wrong for the evidence plainly showed that the knowledge of the two representors and the circumstances in which the two representations were made were quite different. Each of them was entitled to clear findings from the judge as to the terms of the representation he made and his knowledge or otherwise of its truth or falsity. In my view the judge did not make the findings on these issues which he should have done.

32. The first question is what representation did Mr Murphy make on 26 March. This is important because a representor cannot be guilty of fraud unless he intended or was willing that his representation should be understood in a sense which he knew to be false. *Gross* v *Lewis Hillman Ltd* [1970] Ch 445, 459G–H. The finding of the judge is unclear. In the passage I have quoted in paragraph 19 above the judge recorded only Mr Murphy's admission that he had said that "he had got the report and it was just enough". He did not revert to this point in his ten findings of fact. In his conclusion, quoted in paragraph 29 above, he considered

that by the words Mr Murphy used on 26 March he "implicitly represented that [the Bank] had obtained a report giving a forced sale value of the three properties of at least £3.5m". But he then found that Mr Murphy did not intend that the Guarantors should rely on that representation.

33. For the Guarantors it is submitted that the representation must have been that the condition in the facility letter had been satisfied because the Bank had received valuations from Tretheweys giving a forced sale value of the three properties of at least £3.5 million. This was referred to in argument as Sense A. For the Bank it is submitted that the context showed that the answer was directed to the question whether the Bank considered the condition to have been satisfied so that the loan would be forthcoming irrespective of the figures indicated in the valuation. This was referred to as Sense B. It was suggested that the judge's description of the representation being implicit and his omission of any reference to the oral evidence of Mr Barton and Mr Amos on this issue showed that he accepted the evidence of Mr Murphy. It was also suggested that the judge's consideration of the question in conjunction with his consideration of the parallel question in connection with Mr Salter shows that he acquitted Mr Murphy of fraud.

34. It is necessary to start by considering the evidence of Mr Murphy on this aspect of the matter. In an affidavit sworn by him on 31 May 1995 he stated (paragraphs 18 and 19) that:

I was left in no doubt as a result of my conversation with [Mr Amos] on (I believe) 26th March that he had received a copy of the Tretheweys' report and was extremely pleased with its findings. It is possible that I may have said that the valuation provided by Tretheweys was "just enough" (see paragraph 22 of the Defence and Counterclaim). This was indeed the case.

Mr Murphy, in effect, repeated that account in his witness statement. His cross-examination on this topic went as follows:

Q. On 26th March, do you recollect that you were called on the telephone by Mr Barton, Mr Amos and Mr Hills who was the solicitor to Regent, from the offices of Craig Mooney and Company, Mr Hill's offices? Do you recall that?

A. Not specifically, no.

Q. So you are not denying that it could have happened?

A. No. It may well have taken place on a telephone conversation.

Q. And Mr Amos asked you if you had the report and was it at least 3 and a half million forced sale value; do you recall that?

A. I do not recall a telephone conversation.

Q. And you said, "We have it, and it is just enough"?

A. I may well have done.

Q. You said that to Mr Hills?

A. If Mr Hills was enquiring as to the bank's position on the preconditions as to what stage we had got to with the preconditions, that is probably why they did phone them from the solicitors, then, yes, I would confirm that we had it.

Q. You said to my Lord in chief that Mr Amos had the report already and that was on the basis that he referred to parts of the text that you could see in front of you, as I understand it?

A. I discussed that report with Mr Amos, and he had it.

Q. So you said to him, for example, at page 18, "Mr McLaughlan makes this point" and he said "I see"; is that how it was?

A. I can't remember the specifics, but yes, we worked through the report.

Q. But he did not say to you, for example, "I am looking at page 18, McLaughlan makes this point; do you see that Mr Murphy?" It was not like that, was it?

A. We were both reading the report on the telephone. It was a two-way conversation. I don't remember the specifics but I do recall that he definitely had that report.

35. In his evidence in chief Mr Barton originally said that he asked Mr Murphy "what the forced sale value was and I was informed that it was just enough". Subsequently he corrected his statement so as to indicate that he asked Mr Hills to ask the question. His examination continued:

A. It was a general conversation as to what questions were to be put to Mr Murphy.

Q. And as a result of that conversation did Mr Hills ask questions of Mr Murphy?

A. Yes.

Q. In your presence? And were any of those questions concerned with the question of forced sale valuation?

A. Yes.

Q. Can you remember what question Mr Hills asked?

A. "Have you got a forced sale value of £3.5M?"

Q. And what was the answer?

A. "Yes, it's just enough."

In cross-examination Mr Barton said:

Q. You were particularly anxious that transaction should go through on the following day?

A. Yes.

Q. You wanted to simply ensure that all the conditions precedent had been met, did you not?

A. I'd be pleased that they had, yes.

Q. And all that the enquiry was was whether or not the bank was satisfied the conditions precedent had been met. That was the only inquiry?

A. That's what stands out in my mind, yes.

36. Mr Amos was more emphatic. In his examination in chief he said:

A. I spoke to Tim, I can't remember whether it was 25th or the 26th, about the valuation, first of all, and the valuers had done the valuation. Obviously, it was a key part of the whole transaction that the property valued up, if you like, to a figure because without that it couldn't go through, so far as we were told it couldn't go through, and I asked Tim Murphy if he'd had a valuation, if he'd had the figures. He said: "Yes," and I said: "Did it come up to £3.5m?" And he said: "Yes, it did, well just", or whatever it was, but he confirmed to me that they had the valuation of £3.5m. But by what I assumed that they had a forced sale valuation of £3.5m.

Q. If he had not said that would you have given a guarantee?

A. No, I would not.

In his cross-examination he said:

Q. He said to you "It is £3.5 million forced sale"; that was his word, was it?

A. If you want the words, I said to Tim Murphy over the telephone, "Have you got the valuations?" "Yes". "Did they come up to £3.5 million? And he said "Just". That is Tim Murphy's words to me. I can't swear what he said to anybody else, but I can swear what he said to me, and that is all I can do. He told me, Tim Murphy, before the date we went to Bristol, I wouldn't have even gone.

Q. Mr Amos, that is a complete fabrication.

A. That is the absolute truth.

Q. You do not state in your statement that you made an enquiry of him as to whether or not he had got a valuation of £3.5 million, do you, Mr Amos?

A. Yes, I do. I thought I did. In the affidavits I certainly do.

Q. Page 45 of the witness bundle. Have you got paragraph 20?

A. Yes.

Q. "Mr Murphy on that occasion in the course of a telephone conversation on the loudspeaker confirmed and represented to myself and to Mr Hills of the company's solicitors and to Mr Barton that the bank were in possession of a minimum forced sale value of £3.5 million. His words were 'It is just enough' which led everyone present to believe that the bank did in fact hold—"

A. Of course it did, yes. He did say that.

Q. You are not saying there that you asked Mr Murphy whether or not he had a valuation of £3.5 million, did you?

A. Yes, I did. Yes, I did ask him.

Later he reaffirmed that:

A. I can remember clearly, emphatically, asking Tim Murphy, he has got the figures for the valuation, "Did it get up to 3.5 million?" Because it was a very important figure for everybody, the bank, for us as far as I was concerned, and he said "Yes". And also, what has never been told to me, that has come out in this court, about this reduction for these shops. I had never ever been told that at all.

37. The only other individual capable of hearing the conversation was Mr Hills. He thought that Mr Murphy was the valuer because he was aware that Mr Amos had been trying to contact the valuer and had made contact with Mr Murphy. He described the event in this way:

Q. Do you recall whether there was any telephone call made during the meeting?

A. Yes, I know Mr Amos particularly was trying to contact the valuer and eventually reached him.

Q. To contact the manager?

A. The valuer.

Q. Yes.

A. Because he wanted to know that the valuation was accepted, that it was this figure they required.

Q. And can you remember exactly what happened?

A. Well, he said something to the effect that, "Is the value of 3.5 million required?" and I understood the answer was "Yes", and I certainly asked the gentleman of the telephone, was that correct, it was the 3.5 million? And he said "Yes, this is in order" and we then, to conclude the meeting, said "Well, we can go ahead with the completion tomorrow."

Q. Forgive me, did I understand you to say that you then asked him the same question?

A. Yes, I asked him to confirm it.

Q. And he said what?

A. I said "Is that 3.5 million valuation in order?" and he said "Yes, it is," or words to that effect, "Yes".

Q. And at that time, you believed you were speaking to the valuer; is that right?

A. Yes.

38. I bear in mind the criticism the judge made of the reliability of the evidence of Mr Barton, Mr Amos and Mr Murphy. But all the witnesses agreed that the words used by Mr Murphy in reference to having the report was that "it is just enough". Also it is important to appreciate that the judge in his

seventh finding rejected the evidence of Mr Murphy that Mr Amos had a copy of the Tretheweys report on 26 March. Thus the statement cannot have occurred during a general discussion between Mr Amos and Mr Murphy concerning the contents of the report. Although the judge said that the answer has to be taken in the context of the question he, unfortunately, makes no express finding what the question was. However, given that Mr Amos did not then have a copy of the report and given the weight of the evidence to which I have referred, it must follow that the context in which the answer was given was an enquiry by the Guarantors about the contents of the report and its relevance to the condition precedent. The words "just enough" must refer to the amount of the valuation and not to the willingness of the Bank to lend the money irrespective of the amount; for if the question had been whether or not the condition had been satisfied the answer would have been a simple "yes" or "no". In my view the judge must have used the words "implicitly represented" in the sense that the meaning was necessarily implicit in the different words actually used. I do not think that he found that the representation made was in Sense B rather than in Sense A. If he did then in my view he was clearly wrong.

39. Derry v Peek (1889) 14 App Cas 337 at page 374 Lord Herschell summarised the effect of the decided cases in three propositions, namely:

First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be a honest belief in its truth. And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made.

40. The judge's fifth and tenth findings of fact show beyond any doubt that Mr Murphy knew that the Tretheweys' freehold with vacant possession valuation was not the same as the Bank's forced sale value. Moreover the difference being between 30 per cent and 50 per cent discount from the former to arrive at the latter, of which he had been told, could not be ignored as immaterial. Thus the