judge must be taken to have rejected the Bank's defence to the charge of fraud that Mr Murphy thought that the two valuation bases were substantially the same.

41. Counsel for the Guarantors submitted that in the passage of his judgment, quoted in paragraph 29, where the judge said that "Mr Murphy and Mr Salter, or, indeed, anyone reading the report carefully, knew or would have known that this was untrue" was a finding of fraud against Mr Murphy. I agree. But, once again, if the judge did not mean to make a finding of fraud against Mr Murphy then on his own findings of primary fact he should have done.

42. In my view it is clear beyond any reasonable doubt that the representation made by Mr Murphy to Mr Barton, Mr Amos and Mr Hills on 26 March, whether properly described as express or implicit, was that the report of Tretheweys gave an aggregate forced sale valuation for the three properties of £3.5 million and therefore satisfied any condition precedent similar to that contained in paragraph 13(i) of the letter of 3 March. In my view it is equally clear that Mr Murphy knew that the representation was false for, as the judge found, Mr McLaughlan had told him not only that Tretheweys freehold with vacant possession basis of valuation was not the same as the Bank's forced sale valuation but also that the latter was between 30 per cent and 50 per cent less than the former and would be likely to produce a figure of less than £3.5 million.

*Did Mr Murphy intend that his representation should be acted on by the Guarantors?*

43. This is the second of the issues to which I referred earlier. The judge answered it in the negative. The Guarantors submit that he was wrong and failed to follow logic of his own findings. They submit that the reasons the judge gave do not bear critical examination. First, they submit, the concern of the Guarantors to ascertain whether the loan would be forthcoming was not exclusive of a concern to know what the Bank's valuer considered the forced sale valuation to be. Moreover the question relates to the intention of Mr Murphy not the state of mind of the Guarantors. Second, there was no evidence that the Guarantors had asked Waycotts for, or obtained, a valuation of Blue Lagoon and Tall Trees and the valuation of Carvynick carried out by them in February 1992 was not on a forced sale basis. As Mr Amos said in cross-examination on that matter it would be silly to pay Waycotts for a further valuation when they were already liable to pay for the Bank's valuer. Third, the fact that everyone thought that the Company was getting a bargain did not mean that the Guarantors must be unconcerned at any forced sale valuations obtained by the

Bank. Fourth the fact that the Guarantors did not ask to see the valuation is not material to the question whether Mr Murphy intended that they should rely on his answer.

44. The Bank supports the decision of the judge for the reasons he gave. They rely strongly on the express finding that Mr Murphy did not intend that the Guarantors should rely on his representation.

45. I prefer the submissions for the Guarantors. In my view it is necessary to consider first certain evidence, as to which there could have been no doubt, to which the judge did not refer. The first category is evidence given by Mr McLaughlan by whom the judge was impressed. There is no indication in his judgment that the judge was not prepared to accept any part of Mr McLaughlan's evidence; in the case of each conflict between his evidence and that of Mr Murphy to which he referred the judge accepted the evidence of the former. When dealing with the telephone conversations which occurred between 15 and 26 March Mr McLaughlan described the attitude of Mr Murphy to the proposed loan. In his examination in chief Mr McLaughlan said:

> That information was conveyed to Tim Murphy either in the first or the second telephone conversation and, in truth, I can't remember whether there were one or two. And it was ill received by him in as much as it was obvious that this would prejudice his ability to do the deal. It was . . . We then discussed at some length the actual wording. Was there some way that we could provide a figure or perhaps give a form of wording which he would find less difficult. And, eventually, after what I think was a fairly protracted conversation, it was agreed that we would simply put out the standard Tretheweys report giving the two valuations in respect of each property which were, in fact, subsequently given. But this was based on the premise that if the forced sale figure was going to be as much as fifty per cent, perhaps, off the open market value it would be prejudicial to the deal being done. It made no difference to us at Tretheweys whether or not a forced sale value was given. We were simply quite happy to put in whichever valuations were appropriate and in as much as we had a standard format if we could stick to that then we'd be so much happier. That was, in fact, what happened.

When cross-examined on why he did not state in his report that the basis of valuation did not accord with his written instructions Mr McLaughlan said:

> Q. Why did you not set that out in a covering letter then?
> A. For reasons to which I have already alluded. It would have embarrassed Tim Murphy who was requiring me not to do it.

Q. So you say, he was saying that he did not want that. He wanted the deal so desperately to go through that he wanted to conceal the fact that a forced sale value was less than what he had stipulated was his requirement?

A. Yes, a simple yes.

Q. So you must have thought: "Well, that is pretty suspicious", did you not?

A. No, that approach would be, you might say it was wrong but it would not be untypical of a banker who was anxious to do a deal. I am not saying he was desperate to do a deal but a banker who was enthusiastic to want the deal, as evidently that he was.

These passages demonstrate an unusual determination on the part of Mr Murphy to ensure that the deal went through.

46. The second category of evidence to which the judge did not refer relates to the communications between Mr Murphy and Mr Moore. Plainly there was a risk that if the forced sale values turned out to be much less than those forecast in the original submission made on 9 March the approval of the Credit Committee might not be forthcoming. On what Mr Murphy had been told by Mr McLaughlan it was obvious that the forced sale values lay between £2.422 million and £1.73 million being respectively 70 per cent and 50 per cent of the freehold with vacant possession values. Yet in the Memorandum dated 31 March Mr Murphy put forward Tretheweys' freehold with vacant possession values, namely £3.46 million as equivalent to the Bank's forced sale values. Further I find it surprising that Mr Murphy, who accepted that he suspected that Mr Amos was an undischarged bankrupt, did not himself ascertain at any early stage whether or not his suspicion was well founded and when he found that it was did not inform his head office. Mr Murphy cannot have been unaware of the fact that part of the security for the loan was to be a joint and several guarantee from Mr and Mrs Amos secured by a charge on their home.

47. Thus there was clear evidence of knowingly false representations being made to Head Office in the same sense as those made to the Guarantors so as to ensure, so far as Mr Murphy could, that the deal went ahead. The obvious inference is that Mr Murphy was likewise concerned not to give the Guarantors cause to question the wisdom of their proposed purchase which so substantial a shortfall on the requisite forced sale value might well have done.

48. It is in that context that I consider the four points relied on by the judge for his conclusion that Mr Murphy did not intend the Guarantors to rely on his representation. First, Mr Murphy could not be sure that the Guarantors were not interested in the forced sale values. Plainly it is likely that they would have been concerned if he had told them the true figures because a shortfall of over £1 million on what the Bank considered to be necessary would at the least colour the Bank's attitude to what security was needed. Second, there was no reason why Mr Murphy should think that the Guarantors would be any the less concerned even if, as to which there was no evidence, they had obtained valuations from Waycotts. Third, if Mr Murphy did not intend the Guarantors to rely on his representation why did he not tell them the truth?

49. In my view it is plain beyond any reasonable doubt that Mr Murphy intended the Guarantors to rely on his representation which he knew to be false.

*Did the Guarantors rely on the representation of Mr Murphy?*

50. The judge concluded that they did not. He rejected the evidence to that effect given by Mr Barton, Mr and Mrs Amos and Mrs Barton. He thought that they were all keen to proceed with what they perceived to be an advantageous transaction provided that the Bank would lend the money to the Company. He found it significant that no complaint of being misled was made when they discovered the truth in September 1993.

51. This reasoning is supported by Counsel for the Bank. He emphasised that the judge was entitled to reject the evidence of the Guarantors. He pointed out that they had abandoned their other claims only after all the evidence had been given and that the judge had rejected their evidence in his first, third, eighth and ninth findings. He suggested that the Guarantors had no reason to be concerned with the Bank's forced sale valuations both because it was common ground that they had got a bargain and because the services of Waycotts were available to them. He emphasised that the representation came very late in the course of the transaction so that it could only have a very limited impact on the decisions of the Guarantors.

52. The reasoning and conclusion of the judge are criticised by Counsel for the Guarantors on three separate bases. First he contended that the judge's third finding of fact, namely that the Guarantors were prepared to proceed even if the report showed a forced sale value of less than £3.5 million, was wrong. Second he contended that the judge erred in failing to give any consideration to the rebuttable presumption which arises from the making of a fraudulent representation. Third, he submitted that in considering whether the Guarantors relied on the representation he overstated the requirement of reliance. I will consider each of those submissions in turn.

53. The first contention is that it is inconsistent with the finding of fraud, which, if the judge did not make, I consider that he should have made, that the Guarantors should be unconcerned with the forced sale valuations obtained by the Bank. Consequently the judge should have accepted the evidence of the Guarantors that they did make it plain that they would only proceed if the report showed a forced sale value of £3.5 million. In my view, that submission is merely a variation of the second. In any event I do not accept that the inconsistency is sufficient to entitle this court to depart from the clear conclusion of the judge who heard the witnesses whose evidence he rejected.

54. The second submission arises from the presumption that if the false statement is of such a nature that it would be likely to play a part in the decision of a reasonable person it will be presumed that it did unless the representor satisfies the court to the contrary. The continued existence of the presumption was reaffirmed by Lord Mustill in *Pan Atlantic Co Ltd* v *Pine Top Insurance Ltd* [1995] 1 AC 501 at page 542A. The nature and limits of the presumption appear from the speech of Lord Blackburn, with whom the other members of the Appeal Committee agreed, in *Smith* v *Chadwick* (1884) 9 App Cas 187 at page 196. Lord Blackburn said in relation to an allegation of deceit:

> I think that if it is proved that the defendants with a view to induce the plaintiff to enter into a contract made a statement to the plaintiff of such a nature as would be likely to induce a person to enter into a contract, and it is proved that the plaintiff did enter into the contract, it is a fair inference of fact that he was induced to do so by the statement. In *Redgrave* v *Hurd* the late Master of the Rolls is reported to have said it was an inference of law. If he really meant this he retracts it in his observations in the present case. I think it not possible to maintain that it is an inference of law. Its weight as evidence must greatly depend upon the degree to which the action of the plaintiff was likely, and on the absence of all other grounds on which the plaintiff might act. I quite agree that being a fair inference of fact it forms evidence proper to be left to a jury as proof that he was so induced. But I do not think that it would be a proper direction to tell a jury that if convinced that there was such a material representation they ought to find that the plaintiff was induced by it, unless one of the things which the last Master of the Rolls specified was proved; nor do I think he meant to say so. I think there are a great many other things which might make it a fair question for the jury whether the evidence on which they might draw the inference was of such weight that they would draw the inference.

55. Thus the first question is whether the representation made by Mr Murphy was of such a nature as would be likely to induce a person to enter into a contract. If so then the presumption will apply. But in connection with both this and the third submission made by Counsel for the Guarantors it is necessary to appreciate the width of the concept of inducement. First the misrepresentation does not have to be the sole inducement. Second it is not essential that its effect should be to induce some positive action. The abstention from something bearing on the material interests of the plaintiff is enough. (*Halsbury's Laws of England* 4th ed, vol 31 1998 Reissue paras 771 and 779). Thus in *Australian Steel & Mining Corpn Pty Ltd* v *Corben* [1974] 2 NSWLR 202 the plaintiff was misled by the representation of the agent for the purchaser to grant him an option to purchase land which the plaintiff had already determined to sell. The Court of Appeal of New South Wales considered that the plaintiff had been induced by the misrepresentation to grant the option which was therefore liable to be set aside even if he had already determined to sell the land because the misrepresentation caused the plaintiff to persevere in a decision already made.

56. In my view, given the width of those principles, the misrepresentation must be regarded as one to which the presumption applies. The Guarantors were dependent on the Bank for finance. Whether or not they were right in thinking that they were getting a bargain it would be most material to the decision to buy to know that the valuation condition the Bank thought was important had been complied with. For if it were not then the financial viability of the project could be affected by pressure from the Bank.

57. The principal issue between the parties is what must be shown to rebut the presumption. Counsel for the Guarantors submitted that for the representor to rebut the presumption it was necessary for him to show that the representee (i) never knew of the statement until after he had entered into the contract; (ii) discovered before he entered into the contract that the statement was false; (iii) showed by words or clear conduct that the statement did not influence his decision. Counsel for the Bank submitted that the question of inducement was one of fact so that if, as in this case, the representee gives evidence the presumption has no part to play and the judge, like a jury, must determine the issue on all the evidence.

58. In my view the differences between counsel are more apparent then real. First the presumption is one of fact and capable, like any other such presumption, of being rebutted. It would be dangerous in connection with any issue of fact to suggest that it may only be proved in certain specified ways. Similarly it would be wrong to suggest that as a

matter of law the presumption can only be rebutted by proof of certain specified matters. but given that the presumption is that the representation did induce the act or omission in question it is hard to imagine facts sufficient to rebut it which do not fall within any of the categories to which Counsel for the Guarantors referred. But my inability to imagine them is no ground for limiting the facts sufficient to rebut the presumption. However I do not accept the submission of Counsel for the Bank that once the representee gives evidence the presumption no longer has any force. The effect of the presumption is to alter the burden of proof; the alteration remains unless and until the presumption is rebutted whether or not the representee gives evidence. This conclusion is supported by *Australian Steel Mining Corpn Pty Ltd* v *Corben* [1974] 2 NSWLR 202. In that case the representee gave evidence. The judge considered that the presumption had been rebutted. The Court of Appeal disagreed (page 210). They held that the presumption had not been rebutted; they did not say that its force was spent by the evidence of the representee. In my view it is a valid criticism of the judge's judgment that there is no reference to the presumption or to the alteration in the burden of proving inducement to which it gives rise.

59. I turn then to the third point relied on by Counsel for the Guarantors. This is to the effect that the judge overstated what was required to demonstrate reliance. I have already referred to *Australian Steel & Mining Corpn Ltd* v *Corben* [1974] 2 NSWLR 202 in connection with the second criticism but it is directly relevant to this one also. In that case the owners of land sought to sell it. The agent for the prospective purchaser, described by him as "a Doctor", thereby implying a doctor of medicine, asked for an option only because the Doctor was abroad. The owner was concerned to know more about the purchaser so as to be sure that the price he sought matched the purchaser's capacity to pay. The owner agreed to the grant of an option to be exercised when the Doctor returned. The option was prepared and, at the time and place agreed for its execution, the Doctor's agent stated that the Doctor was "probably a Pitt Street farmer". In fact "the Doctor" was a director of a development finance company acting for a large consortium. As stated by Hutley JA at page 206 the agent for the purchaser thereby lied to the vendors about the identity of the purchaser. By then the price had been fixed and the option was granted. The judge held that the fraudulent misrepresentation did not induce the grant of the option. The Court of Appeal disagreed. At page 208 Hutley JA referred to the principle applicable to the question whether the individual was induced by the misrepresentation as requiring the examination of:

how the individual responded to [the] representation and, if he responded to its effects, whether by being moved to activity or lulled into inactivity, he has been induced, and the transaction which results cannot stand.

On the basis that the judge was right that the decision to sell and on the price at which to sell was absolute the owners had been induced to grant the option by the fraudulent misrepresentation. At page 209 Hutley JA said:

Assuming his decision was absolute, I have not been able to find any decision directly in point, but in Hart and Honore on *Causation in the Law*, the following passage appears at page 177: "It is an interesting question whether inducement can be shown if the party induced would have entered into the contract or acted as he did irrespective of the false statement. There are certainly a number of dicta in the cases and by writers to the effect that the statement must be a *sine qua non* of the act. On the other hand Sir W M James VC said "I do not think a court of equity is in the habit of considering that a falsehood is not to be looked at because, if the truth had been told, the same thing might have resulted." Probably the opposing views can be reconciled in the following way. If the representee has already made up his mind to act before the representation is made, the latter cannot be said to have induced him to act, and in this sense the representation must be a *sine qua non* of the representee's decision. Even in this case, however, there might be liability based on the representation having induced the representee to persevere in a decision already reached.

In the last sentence, the very question which arises here is posed and, in my opinion, should be answered in the affirmative.

A person who knows that an erroneous belief is entertained does not, unless a fiduciary relationship exists, have any obligation to dissipate such a belief or to correct a position reached upon such a belief, but when asked after the decision has been reached a question which touches the belief upon which it has been reached and he answers falsely he, in my opinion, has induced all those acts which flow from that continuing belief.

The other members of the court, Moffitt P and Samuels JA agreed with the judgment of Hutley JA. Whilst of persuasive authority only in my view the principle stated by Hutley JA represents the law of England.

60. Accordingly the question is whether Mr Murphy's misrepresentation as to the forced sale valuation in answer to the question posed by Mr Hills induced the subsequent contracts, including

Case 1:20-cv-10041-PKC    Document 105-3    Filed 08/24/21    Page 5 of 36
[1999]                                    BANKING                                    423
CA]                        Barton and Ors v County NatWest Limited                [MORRITT LJ]

the guarantees, must be answered by reference also to whether it induced the Guarantors to persevere in a decision already reached. As I have already indicated Counsel for the Bank placed great reliance on the findings of the judge as being findings of fact with which this court should not interfere. This point was also considered by the Court of Appeal of New South Wales in *Australian Steel & Mining Corpn Pty Ltd* v *Corben* [1974] 2 NSWLR 202. At page 209 Hutley JA said:

It was argued that question of causation or inducement are questions of fact and the decision of the trial judge on this question of fact should stand, and, following the decision of the High Court in *Edwards* v *Noble* should not be reviewed. However the finality of findings of fact which that decision has sought to canonize is confined to findings of fact untainted by error of law. His Honour's findings of fact in this case are, therefore, not in the protected class. The error of law which His Honour made is intimately bound up with his findings of fact. He was concerned to disentangle the relevant weight of the factors leading to the execution of the option on the basis that materiality was in some way connected with weight or dominance, whereas, provided he found the representations had any causative effect upon the ultimate result, he should have found for the defendants. As he did not apply his mind to this question, it is the responsibility of this Court, accepting His Honour's finding as to the credibility of the witnesses, to make its own finding. I am of the opinion that there is no reason to regard the reiterated enquiries of S R Corben [one of the vendors] as to the identity of the purchaser as purely intellectual exercises or mere inquisitiveness without point.

Once the party setting up deliberate misrepresentation has succeeded in establishing it, the burden upon the person responsible for the false representation is bound to be heavy.

In my view the Bank did not discharge that burden.

61. The judge gave three reasons for reaching the contrary conclusion. First he rejected the evidence of Mr Barton and Mr and Mrs Amos that they would not have proceeded with the purchase if they had known that the Tretheweys' valuation was of the bricks and mortar not a forced sale valuation. Second, he considered that the Guarantors were keen to proceed provided that the Bank was prepared to lend the money. Third they made no complaint of having been misled when they discovered the truth in September 1993. It seems to me that the second and third reasons are little more than grounds for the first reason. It is necessary to appreciate that the evidence of the Guarantors was neces-

sarily hypothetical. Its rejection leaves the presumption in operation unless it can be affirmatively established by the Bank that the representation was not an inducement.

62. I have already referred to the matters relied on by the Bank in support of the judge's conclusion. First, the question of whether the Bank rebutted the presumption is not a question of credibility alone for the evidence of the Guarantors as to what they would have done is hypothetical. The issue is not so much the credibility of the Guarantors but what was the effect of the misrepresentation. Second the facts that the Guarantors did not ask for a copy of the valuation and did not seek any forced sale valuation from Waycotts confirms rather than rebuts a presumption of inducement in the sense of persevering in a decision already made. Third it was suggested that there was no reason why the Guarantors should be concerned with the forced sale valuations because everyone thought that they were getting a bargain, the sale by the Receivers to the Company was, in effect, a forced sale and the security for the loan would provide a substantial equity of redemption anyway. Counsel for the Bank summarised his submission under this head with the observation that it was only the Bank that was concerned with forced sale values. But, in my view, it is precisely because the Bank was concerned with such valuations that the Guarantors should be concerned with whether the requisite figure had been achieved. If it had not then not only might the loan not be forthcoming but, even if it were, it might lead to unwelcome pressure on the facility in the future. In any event it is incorrect to say that even on a forced sale valuation there was substantial equity of redemption. If Mr McLaughlan's figures had to be discounted by 30 per cent to 50 per cent then from the point of view of the Bank the forced sale value of the security was £2.422 to £1.73 million; but the loan, before the addition of fees and interest, was to be £2.25 million. Such figures would be of real concern to any purchaser dependent on the continued support of the Bank. Fourth the Bank relied on the lateness of the representation. But that does not exclude the necessary inducement if its effect is to lead the representee to persevere in a decision already taken.

63. In summary I consider that the judge came to the wrong conclusion and that this court is entitled to substitute its own view on the question whether the representation of Mr Murphy induced the Guarantors to enter into the transaction. First, there is no indication that the judge appreciated how passive the necessary inducement may be. Second, as he did not, apparently, recognise that the representation was fraudulent, he did not appreciate the consequence that the presumption applied. Third, the

matters relied on by him are not sufficient of themselves to rebut the presumption. Fourth, the proper inference from all the facts is insufficient to rebut the presumption.

64. I would hold that the Guarantors claims against the Bank for deceit in respect of the representation made on its behalf by Mr Murphy on 26 March 1992 are made out. It follows that they are entitled both to rescind the guarantees and to recover damages. (*Archer* v *Brown* [1985] 1 QB 401).

### *The representation made by Mr Salter*

65. My conclusion in respect of the representation made by Mr Murphy on 26 March makes it unnecessary to reach any conclusion on the representation made by Mr Salter the following day. However it is right to emphasise that it was never alleged that Mr Salter's representation was made fraudulently. Plainly it was not, for, as the judge found, Mr Salter's instructions were that the Bank was content with Tretheweys' report. The fact that he had read the report and had a copy with him could not make his representation fraudulent for he had not been party to any of the conversations between Mr Murphy and Mr McLaughlan.

### *The Bank's duty of disclosure*

66. Counsel for the Guarantors also submitted, as an alternative to his main argument, that the Bank was under a duty to disclose to the Guarantors any unusual aspect of the proposed transaction with the principal debtor which might affect the nature or degree of the liability of the surety. He relied on *Davies* v *London and Provincial Marine Insurance Co* (1878) 8 Ch D 469, 475, *Westminster Bank Ltd* v *Cond* (1940) 46 Comm Cas 60, 69 and *Commercial Bank of Australia* v *Amadio* (1983) 151 CLR 447, 457. In the light of my conclusion on the main argument of Counsel for the Guarantors it is unnecessary to deal with this submission either.

### Conclusion

67. I would allow the appeal of the Guarantors on the ground that the guarantees on which the Bank sues were induced by the deceit of their agent, Mr Murphy. It follows that the judgment of Judge Weeks should be set aside and the action dismissed. It will be necessary to consider what further or consequential orders are required to deal with the outstanding issues on the counterclaim.

**Lord Justice LINDSAY:** I agree. I recognise the "high test affirmed by the Privy Council in *Akerhielm* v *De Mare*" referred to in *Ansbacher (Henry) & Co Ltd* v *Binks Stern* [1998] PNLR 221 at 234

CA as to departure from the facts as found by a judge who has seen and heard the witnesses being appropriate, particularly in fraud cases, only upon the clearest grounds. For that reason I add one brief point by way of addition to Morritt LJ's conclusion that the judge should have found fraud in Mr Murphy. It is this. In relation to Trethewey's report the judge held, as Morritt LJ has cited, that (with my emphasis):

> . . . Mr Murphy . . . or, indeed, anyone reading the report carefully, knew or would have known . . .

that it was untrue to represent that the Bank had obtained a report giving a forced sale value of the three properties of at least £3.5 million. As to how well he had read the report, Mr Murphy's evidence in cross-examination had been as follows:

> Q. When you received this report . . . did you read it?
> A. Yes I did read it.
> Q. You did not just look at the pages with the valuations on them, by any chance?
> A. No, I did not.
> Q. How carefully did you read it?
> A. I tend to read these things a couple of times at least.

In the light of that answer and the judge's own conclusion as to what anyone reading the report carefully would have known of the untruth of the "implicit" representation which was then made, it is not, in my view, possible to regard Mr Murphy as having made it other than, to use Lord Herschell's phrase, "without belief in its truth" (*Derry* v *Peek* [1889] *supra* at page 374).

**Lord Justice ROCH:** I agree. Like Morritt LJ, I would not have differed from the judge in the conclusion he reached that the defendants and Mrs Barton did not actually rely on the misrepresentations made to them by Mr Murphy and Mr Salter, but for the fact that the judge's treatment of one of the issues that he had to resolve, namely whether Mr Murphy made a fraudulent misrepresentation, and the evidence relevant to that issue was unsatisfactory.

In *Watt* v *Thomas* [1947] AC 484 at page 487, Lord Thankerton stated the principles that an appellate court should follow in this way:

> Where a question of fact has been tried by a judge without a jury, and there is no question of misdirection of himself by the judge, an appellate court which is disposed to come to a different conclusion on the printed evidence, should not do so unless it is satisfied that any advantage enjoyed by the trial judge by reason of having seen and heard the witnesses, could not be sufficient to explain or justify the trial judge's conclusion;

The appellate court may take the view that, without having seen or heard the witnesses, it is not in a position to come to any satisfactory conclusion on the printed evidence;

The appellate court, either because the reasons given by the trial judge are not satisfactory, or because it unmistakably so appears from the evidence, may be satisfied that he has not taken proper advantage of his having seen and heard the witnesses, and the matter will then become at large for the appellate court.

Goff LJ in *The Ocean Frost* [1985] 1 Lloyd's Rep at page 57, after citing the passage from Lord Thankerton's speech in *Watt* v *Thomas* said:

It is obvious that the value and importance of having seen and heard the witnesses will vary according to the class of case, and, it may be, the individual case in question. Furthermore it is implicit in the statement of Lord Macmillan in *Powell* v *Streatham Nursing Home* at page 256 that the probabilities and possibilities of the case may be such as to impel an appellate court to depart from the opinion of the trial judge formed upon his assessment of witnesses whom he has seen and heard in the witness box. Speaking from my own experience, I have found it essential in cases of fraud, when considering the credibility of witnesses, always to test their veracity by reference to the objective facts proved independently of their testimony, in particular by reference to the documents in the case, and also to pay particular regard to their motives and to the overall probabilities. It is frequently very difficult to tell whether a witness is telling the truth or not; and where there is a conflict of evidence such as there was in the present case, reference to the objective facts and documents, to the witnesses' motives and to the overall probabilities, can be a very great assistance to a judge in ascertaining the truth. I have been driven to the conclusion that the judge did not pay sufficient regard to these matters in making his findings of fact in the present case.

Henry LJ in two recent cases in the Court of Appeal has reminded trial judges of the importance of identifying critical issues which have been raised by the evidence before them and marshalling the arguments for and against on each critical issue.

In this case the judge came to the conclusion that the defendants and Mrs Barton did not rely upon the misrepresentations made to them, by rejecting their evidence that they had relied upon those representations and, had they been told the true position with regard to the forced sale values of the three properties, that they would not have entered into the mortgages or the guarantees. The judge's reasons for rejecting that part of the evidence of those three

witnesses appear to have been that the defendants had not asked to see Tretheweys' valuation; that their evidence was tinged by hindsight; and that they made no complaint of being misled when they discovered the truth in September 1993. The judge did not reject the whole of the defendants' evidence. For example he accepted their evidence that they did not see Tretheweys' report before completion on the 1 April 1992, rejecting Mr Murphy's evidence that they had seen Tretheweys' report. The judge also accepted the defendants' account of what Mr Murphy said in the telephone conference of the 26 March.

The judge made four other findings of fact namely his findings 4, 5, 6 and 10 in which the judge accepted Mr McLaughlan's evidence and rejected that of Mr Murphy concerning the instructions that Mr McLaughlan had been given; that Mr McLaughlan had told Mr Murphy that a forced sale valuation would be 30–50 per cent below the vacant possession values of these properties, and that Mr McLaughlan had advised Mr Murphy that a valuation of the three properties on that basis would be likely to fall below the required figure; that Mr Murphy told Mr McLaughlan that the normal Tretheweys' report should be issued and would be acceptable; and, finally that Mr McLaughlan had not told Mr Murphy, as Mr Murphy maintained, that the paragraph A valuations were equivalent to forced sale valuations and could be relied upon by the Bank as such.

The judge's finding as to the misrepresentations made by Mr Murphy and Mr Salter has already been set out in the judgment of Morritt LJ. The judge's finding is unsatisfactory for two reasons. First, the judge did not, as he should have done, deal separately with the representations made by Mr Murphy and Mr Salter. Had he done so, and had he in relation to the representation made by Mr Murphy, recalled the findings that he had made namely findings 4, 5, 6, 7 and 10 he must have concluded that Mr Murphy deliberately and knowingly misrepresented that the forced sale values of the three properties were just sufficient to satisfy the requirement that they total £3.5 million. The second unsatisfactory feature about this part of the judge's judgment is that he did not identify the question to which Mr Murphy's statement that "it was just sufficient" was an answer. Again I agree with Morritt LJ that the terms of the answer are a clear indication that the question was "did the forced sale values of these three properties amount to £3.5 million?"

Had the judge identified the question, it would have led the judge to ask himself why that question had been asked. The question was not whether the bank were going to go ahead with the loan to

426          LLOYD'S LAW REPORTS          [1999]

ROCH LJ]          **Barton and Ors v County NatWest Limited**          [CA

Regent; it was a question directed at the valuations the Bank had received in respect of the properties.

Nor did the judge, having made his findings 4, 5, 6, 7 and 10 ask himself why Mr Murphy should, in his evidence, have asserted the opposite to the findings the judge made. Our attention has been drawn to other parts of the evidence of Mr McLaughlan, the only witness whom the judge found to be wholly satisfactory, which indicated that Mr Murphy was determined that this transaction should proceed whatever the forced sale valuations of the three properties were, and that Mr Murphy was prepared to withhold the true forced sale valuations from his head office. Such behaviour would explain Mr Murphy giving the evidence on those matters covered in those five findings which the judge rejected. On this aspect of the case there was the further detail that Mr Murphy learned that Mr Amos was probably an undischarged bankrupt, but did not communicate that fact to his superiors in the Bank.

Returning to the passage from *The Ocean Frost* in the judgment of Goff LJ which I have set out above, it seems to be that whereas the judge took account of the obvious motive that the defendants had to say that they were relying upon the representation made by Mr Murphy, the judge failed to examine the motive of Mr Murphy in answering as he did on the 26 March and to put that factor in the balance on the issue whether the proper inference to draw was that the defendants had relied upon Mr Murphy's fraudulent representation. The judge expressed the view that Mr Murphy would have no reason to think that the defendants would rely on his representation. If that was so, then the question should have been asked why didn't Mr Murphy give a truthful answer? Had he been convinced that the defendants would have gone ahead with the transaction had they been told of Tretheweys' opinion that the forced sale values would fall below the £3.5 million, then there was no reason why Mr Murphy should not have told them that. The very fact that Mr Murphy lied to them is an indication that Mr Murphy thought that if they knew the true position they would not have gone ahead with the transaction. Mr Murphy was well placed to gauge the defendants' likely reaction to a truthful answer from him about the forced sale valuations of the three properties.

I respectfully agree with Morritt LJ as to the factual presumption which arises where a fraudulent misrepresentation has been established, with regard to the question whether the representees who are shown to have acted to their detriment were acting in reliance upon it. In my judgment the judge did not approach that issue on the correct basis, simply because he did not deal separately with the representation made by Mr Murphy, and, I suspect, that he thought that Mr Murphy's misrepresentation had been innocent, and consequently the presumption of fact did not arise. In my judgment a conclusion that Mr Murphy's misrepresentation was innocent and not fraudulent simply cannot stand with the judge's findings numbered 4, 5, 6, 7 and 10.

**A. C.**          AND PRIVY COUNCIL.                          177

[PRIVY COUNCIL.]

BISSET . . . . . . . . . . . APPELLANT;          J. C.*

AND                                              1926

WILKINSON AND ANOTHER . . . . . RESPONDENTS.     July 20.

ON APPEAL FROM THE COURT OF APPEAL OF NEW ZEALAND.

*Misrepresentation—Vendor and Purchaser—Rescission of Contract—Statement of Opinion—Carrying Capacity of Sheep Farm.*

A representation of fact may be inherent in a statement of opinion; in any case the existence of the opinion in the person expressing it is a question of fact. When it is sought to rescind a contract on the ground of the falseness of a statement of opinion by which it was induced, it must be inquired what was the meaning of the statement made, and whether it was true. Relevant to those inquiries are, the material facts of the transaction, the knowledge of the parties, the words used, and the actual condition of the subject-matter.

In an action by a vendor of land in New Zealand to recover under the contract, the purchaser claimed to rescind the contract on the ground of the falseness of a statement as to the carrying capacity of the land for sheep :—

*Held*, on the evidence, applying the above considerations, that the statement was merely of an opinion which the vendor honestly held; and accordingly that the defence failed.

Judgment of the Court of Appeal reversed.

APPEAL (No. 42 of 1926) from a judgment of the Court of Appeal of New Zealand (June 6, 1925) reversing a judgment of the Supreme Court (September 5, 1924).

The action out of which the appeal arose was brought by the appellant in the Supreme Court of New Zealand to recover 316*l*., being half a year's interest on the balance of purchase money due from the respondents under a contract dated May 7, 1919, for the sale and purchase of an estate. The respondents, by their defence and counterclaim, claimed rescission of the contract, or alternatively, damages for fraudulent misrepresentation.

The facts are fully stated in the judgment of the Judicial Committee.

* *Present :* VISCOUNT DUNEDIN, LORD ATKINSON, LORD PHILLIMORE, LORD CARSON, and LORD MERRIVALE.

A. C. 1927.                                      3          N

178                          HOUSE OF LORDS                          [1927]

J. C.    The trial judge (Sim J.) gave judgment for the plaintiff.
1926    On appeal the Court of Appeal (Stout C.J., Adams and
BISSET    Ostler JJ.; Reed J. dissenting) reversed the decision.
v.
WILKINSON. Judgment was given for the respondents on the claim and
counterclaim, the contract being rescinded, and the case
remitted for inquiries.

1926. June 14, 15, 17. *Myers K.C.* and *Errington* for
the appellant.

*Gresson* and *F. O. Langley* for the respondents.

July 20. The judgment of their Lordships was delivered by

LORD MERRIVALE. The appellant in this litigation brought
his action in the Supreme Court of New Zealand to recover
a sum of money payable to him under an agreement for sale
and purchase of land. The defendants by way of defence
and counterclaim alleged misrepresentation by the appellant
in a material particular as to the character and quality of
the land in question and claimed rescission of the agreement
with consequential relief or alternatively damages for
fraudulent misrepresentation or breach of warranty. Upon
the trial of the action judgment was given for the plaintiff
on the claim and the counterclaim. The Court of Appeal
of New Zealand, by a majority, set aside the judgment of
the trial judge and decreed rescission of the contract between
the parties with consequential relief as prayed. The appellant
claims to have the judgment of the Supreme Court reinstated.

The contract between the parties was an agreement in
writing made in May, 1919, whereby the respondents agreed
for the purchase by them of two adjoining blocks of land
at Avondale, in the Southern Island of New Zealand, called
" Homestead " and " Hogan's," containing respectively
2062 acres and 348 acres or thereabouts, for 13,260*l*. 10*s*.;
2000*l*. payable—and it was in fact paid—on the signing of
the agreement, and the balance payable in May, 1924, interest
to be paid half-yearly in the meantime. The lands in question
formed parts of an area of 5225 acres which the appellant
had bought in 1907 and after sundry works of reclamation

J. C.
1926
BISSET
v.
WILKINSON.

and improvement had in 1911 sub-divided for sale. He sold lots containing 1500 acres and upwards, 964 acres, 350 acres, and Hogan's block of about 348 acres, retaining the Homestead block of 2400 acres which he used for his business of a sheep-farmer and sheep dealer until 1919—during the war under some difficulties with regard to labour. Hogan's block was thrown on the appellant's hands by failure of the purchaser to complete, and in September, 1918, on the breakdown of a provisional arrangement which the appellant had made with another intending purchaser, he resumed his occupation of it. During the spring and summer, September, 1918, to April, 1919, the appellant carried out renewal work and stocked part of Hogan's block with young sheep, and in May he made his agreement for sale of the combined areas to the respondents, who had agreed upon a partnership as farmers.

Sheep-farming was the purpose for which the respondents purchased the lands of the plaintiff. One of them had no experience of farming. The other had been before the war in charge of sheep on an extensive sheep-farm carried on by his father, who had accompanied and advised him in his negotiation with the appellant and had carefully inspected the lands at Avondale. In the course of coming to his agreement with the respondents the appellant made statements as to the property which, in their defence and counter-claim, the respondents alleged to be misrepresentations.

At an early period after the respondents went into occupation and commenced their farming operations they found themselves in difficulties. They sought and obtained extensions of time for payment of the interest which fell due to the appellant. Sheep-farming became very unprofitable and they changed their user of the land. One of them withdrew from the partnership. The other made an assignment of the valuable part of his property to his wife, and on being eventually pressed by the appellant for payments under the agreement disclosed this assignment as an answer to the practical enforcement by the appellant of his demands. The appellant brought his action for a half-year's interest

3          N 2

J. C.
1926

BISSET
*v.*
WILKINSON.
—

on the unpaid purchase money and the respondents set up their case of misrepresentation.

By their defence and counterclaim the respondents alleged that the appellant had " represented and warranted that the land which was the subject of the agreement had a carrying capacity of two thousand sheep if only one team were employed in the agricultural work of the said land." It was common ground at the hearing and in the Court of Appeal that the carrying capacity of a sheep-farm is its capacity the year round. As was said by Reed J. in the Court of Appeal : " The meaning of the representation as alleged was that the carrying capacity of the farm during the winter, with such special food and new pasture as could be grown by the proper use in ploughing of one team of horses regularly employed throughout the year was two thousand sheep." " It is also common ground," said the same learned judge, " that to bring a farm to its full carrying capacity skilled management is required. It is admitted that the appellants were not experienced farmers."

The appellant made these admissions at the hearing : " I told them that if the place was worked as I was working it, with a good six-horse team, my idea was that it would carry two thousand sheep. That was my idea and still is my idea." Further, he said : " I do not dispute that they bought it believing it would carry the two thousand sheep."

The learned judge who tried the action, Sim J., based his judgment in favour of the appellant upon conclusions at which he arrived upon his examination of the evidence, first, that the representation made by the plaintiff was a representation only of his opinion of the capacity of the farm, not a representation of what that capacity in fact was ; and secondly, that this representation of opinion was honestly made by the appellant. " It seems to me," the learned judge said, " that the defendants were not justified in regarding anything said by the plaintiff as to the carrying capacity as being anything more than an expression of his opinion on the subject. I am satisfied that what he said was, and still is, his honest opinion on the subject." These conclusions—

if warranted by the evidence—were sufficient to dispose of the whole case of misrepresentation, whether as grounding a claim for rescission or a claim for damages. By them the charge of fraud in the pleadings is also specifically negatived. The cause of action founded on alleged warranty which is set up in the defence and counterclaim was, it has been agreed, not asserted at the trial, and the fact is not without bearing on the true effect of the claims which were relied upon.

In the Court of Appeal, as is said in the judgment of Stout C.J., " the real question in dispute turned out to be whether the appellants were entitled to rescission of the contract. They did not rely upon the breach of warranty, but they asked for rescission of the contract, though their claim for damages for misrepresentation had not been formally withdrawn." The learned judges of the Court of Appeal differed in opinion. Reed J.—who thought the appeal failed —dealt with the case upon the contention of the defendants —the now respondents—that the representation made to them by the plaintiff was a representation of fact. He found it to be conclusively established by the defendants' own evidence that, given proper management, the farm was fully capable of carrying at least two thousand sheep. Stout C.J. held that the statement relied upon was made and accepted as a statement of fact. " It would surely be improbable," the learned Chief Justice said, " that when a seller is asked to say what the carrying capacity of his farm is he should not answer the question, but volunteer his opinion or estimate." As to the truth of the representation, the learned Chief Justice said : " The evidence in my opinion is clear that this place never carried all the year round two thousand sheep." He added this : " The respondent allowed the appellants to purchase the farm from him believing that it would carry two thousand sheep, and, therefore, they were misled." Adams and Ostler JJ. alike held that the statement was a representation of fact and was proved to be untrue.

In an action for rescission, as in an action for specific performance of an executory contract, when misrepresentation

J. C.

1926

BISSET

v.

WILKINSON.

J. C.
1926
BISSET
*v.*
WILKINSON.
—

is the alleged ground of relief of the party who repudiates the contract, it is, of course, essential to ascertain whether that which is relied upon is a representation of a specific fact, or a statement of opinion, since an erroneous opinion stated by the party affirming the contract, though it may have been relied upon and have induced the contract on the part of the party who seeks rescission, gives no title to relief unless fraud is established. The application of this rule, however, is not always easy, as is illustrated in a good many reported cases, as well as in this. A representation of fact may be inherent in a statement of opinion and, at any rate, the existence of the opinion in the person stating it is a question of fact. In *Karberg's Case* (1) Lindley L.J., in course of testing a representation which might have been, as it was said to be by interested parties, one of opinion or belief, used this inquiry : " Was the statement of expectation a statement of things not really expected ? " The Court of Appeal applied this test and rescinded the contract which was in question. In *Smith* v. *Land and House Property Corporation* (2) there came in question a vendor's description of the tenant of the property sold as " a most desirable tenant "—a statement of his opinion, as was argued on his behalf in an action to enforce the contract of sale. This description was held by the Court of Appeal to be a misrepresentation of fact, which, without proof of fraud, disentitled the vendor to specific performance of the contract of purchase. " It is often fallaciously assumed," said Bowen L.J., " that a statement of opinion cannot involve the statement of fact. In a case where the facts are equally well known to both parties, what one of them says to the other is frequently nothing but an expression of opinion. The statement of such opinion is in a sense a statement of fact, about the condition of the man's own mind, but only of an irrelevant fact, for it is of no consequence what the opinion is. But if the facts are not equally well known to both sides, then a statement of opinion by one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his

(1) [1892] 3 Ch. 1, 11.            (2) (1884) 28 Ch. D. 7, 15.

**A. C.**          AND PRIVY COUNCIL.          183

opinion." The kind of distinction which is in question is illustrated again in a well known case of *Smith* v. *Chadwick*. (1) There the words under consideration involved the inquiry in relation to the sale of an industrial concern whether a statement of " the present value of the turnover or output " was of necessity a statement of fact that the produce of the works was of the amount mentioned, or might be and was a statement that the productive power of the works was estimated at so much. The words were held to be capable of the second of these meanings. The decisive inquiries came to be : what meaning was actually conveyed to the party complaining ; was he deceived, and, as the action was based on a charge of fraud, was the statement in question made fraudulently ?

In the present case, as in those cited, the material facts of the transaction, the knowledge of the parties respectively, and their relative positions, the words of representation used, and the actual condition of the subject-matter spoken of, are relevant to the two inquiries necessary to be made : What was the meaning of the representation ? Was it true ?

In ascertaining what meaning was conveyed to the minds of the now respondents by the appellant's statement as to the two thousand sheep, the most material fact to be remembered is that, as both parties were aware, the appellant had not and, so far as appears, no other person had at any time carried on sheep-farming upon the unit of land in question. That land as a distinct holding had never constituted a sheep-farm. The two blocks comprised in it differed substantially in character. Hogan's block was described by one of the respondents' witnesses as " better land." " It might carry," he said, " one sheep or perhaps two or even three sheep to the acre." He estimated the carrying capacity of the land generally as little more than half a sheep to the acre. And Hogan's land had been allowed to deteriorate during several years before the respondents purchased. As was said by Sim J. : " In ordinary circumstances, any statement made by an owner who has been occupying his own farm as to its

(1) (1884) 9 App. Cas. 187 ; (1882) 20 Ch. D. 27.

J. C.

1926

BISSET
*v.*
WILKINSON.

J. C.

1926

BISSET

*v.*

WILKINSON.

carrying capacity would be regarded as a statement of fact. . . . . This, however, is not such a case. The defendants knew all about Hogan's block and knew also what sheep the farm was carrying when they inspected it. In these circumstances . . . . the defendants were not justified in regarding anything said by the plaintiff as to the carrying capacity as being anything more than an expression of his opinion on the subject." In this view of the matter their Lordships concur.

Whether the appellant honestly and in fact held the opinion which he stated remained to be considered. This involved examination of the history and condition of the property. If a reasonable man with the appellant's knowledge could not have come to the conclusion he stated, the description of that conclusion as an opinion would not necessarily protect him against rescission for misrepresentation. But what was actually the capacity in competent hands of the land the respondents purchased had never been, and never was, practically ascertained. The respondents, after two years' trial of sheep-farming, under difficulties caused in part by their inexperience, found themselves confronted by a fall in the values of sheep and wool which would have left them losers if they could have carried three thousand sheep. As is said in the judgment of Ostler J.: " Owing to sheep becoming practically valueless, they reduced their flock and went in for cropping and dairy-farming in order to make a living."

The opinions of experts and of their neighbours, on which the respondents relied, were met by the appellant with evidence of experts admitted to be equally competent and upright with those of his opponents, and his own practical experience upon part of the land, as to which his testimony was unhesitatingly accepted by the judge of first instance. It is of dominant importance that Sim J. negatived the respondents' charge of fraud.

After attending to the close and very careful examination of the evidence which was made by learned counsel for each of the parties their Lordships entirely concur in the view

which was expressed by the learned judge who heard the case. The defendants failed to prove that the farm if properly managed was not capable of carrying two thousand sheep.

Questions of laches and of affirmance of the contract on the part of the respondents which were argued at the hearing, are not material for further consideration, and in view of the course of the proceedings and the finding of Sim J. as to the honesty of the appellant in the statements he in fact made, it would be improper to accede to the application which was made at the Board on behalf of the respondents for leave to proceed anew upon the charge of fraudulent misrepresentation.

Their Lordships will humbly advise His Majesty that the appeal should be allowed, and the judgment of Sim J. restored. The respondents must bear the appellant's costs here and below.

Solicitors for appellant : *Collyer-Bristow & Co.*

Solicitors for respondents : *Mackrell, Maton, Godlee & Quincey.*

J. C.
1926
BISSET
*v.*
WILKINSON.

---

[PRIVY COUNCIL.]

ATTORNEY-GENERAL FOR ONTARIO } APPELLANTS ;
AND OTHERS . . . . . . . . . }

AND

McLEAN GOLD MINES, LIMITED . . RESPONDENTS.

J. C.*
1926
*July* 22.

ON APPEAL FROM THE SUPREME COURT OF ONTARIO,
APPELLATE DIVISION.

*Canada (Ontario)—Crown—Action impugning Title of Crown—Absence of Petition of Right—Forfeiture and Regrant of Mining Claims—Mining Tax Act (R. S. Ont., 1914, c. 26), s. 21—Petitions of Right Act, 1864 (23 & 24 Vict. c. 34), s. 5.*

Two mining claims in Ontario granted by the Crown were forfeited, under the Mining Tax Act, for default in the payment of taxes, and were granted to another person. Assignees of the original grantee

* *Present :* VISCOUNT HALDANE, VISCOUNT DUNEDIN, LORD ATKINSON, LORD JUSTICE WARRINGTON, and CHIEF JUSTICE ANGLIN.

636                    CHANCERY DIVISION.              [**1958**]

C. A.                        BROWN *v.* RAPHAEL.

1957
*Oct.* 2, 3.      *Contract—Representation—Representation of opinion—Implied repre-*

Lord Evershed          *sentation of reasonable grounds therefor—Sales particulars—*
M.R.,                  *Reversion on death of annuitant—Annuitant " believed to have no*
Romer and
Ormerod L.JJ.         *" aggregable estate "—Statement as to material fact by well-known*
                       *solicitors to induce purchase—No reasonable supporting grounds—*
                       *Vendor's means of knowledge superior to purchaser's.*

The sale particulars prepared for the vendor of an absolute
reversion in a trust fund on the death of an annuitant contained
the statement that the annuitant was " believed to have no aggreg-
" able estate." That statement of belief was made honestly by
solicitors for the vendor, but they had no reasonable grounds for
so believing. The purchaser, having relied on this representation,
sought rescission:—

*Held,* that he was entitled to rescind on the ground of an inno-
cent misrepresentation since, as (1) the statement was one obviously
and vitally affecting the subject-matter being offered, and (2) the
vendor was in a far stronger position—to put it at its lowest—than
the purchaser to ascertain the relevant facts, there must be imported
into the representation the further representation that he, being
competently advised, had reasonable grounds supporting that belief.

*Smith* v. *Land and House Property Corporation* (1884) 28 Ch.D.
7 applied.

Decision of Upjohn J. affirmed.

APPEAL from Upjohn J.

The following statement of the facts is taken substantially
from the judgment of Lord Evershed M.R.

Lot 11, in a sale by auction held on February 17, 1955, was
described in the sale particulars as follows: " Lot 11. The abso-
" lute reversion receivable on the decease of a lady aged 69 (born
" December 30, 1885) to the whole of a trust fund now represented
" by £8,000 2½ per cent. consols, of estimated value £5,210.
" *This sum has been set aside to pay an annuity of £200 per*
" *annum to the lady mentioned above. The trustee is the Public*
" *Trustee. Estate duty will be payable on the death of the*
" *annuitant who is believed to have no aggregable estate.*" By
additional conditions of sale as to lot 11 it was stated first that
the reversion was derived under a will dated March 13, 1916, and
that the probate of the will was to constitute the root of title.
The conditions continued: " 2. The vendor sells as the trustee in
" bankruptcy of the beneficial owner. 3. The reversion is sold
" subject to all death and other duties which may be or become
" payable in respect thereof. The above information regarding

**1 Ch.**              CHANCERY DIVISION.                    637

C. A.

1957

Brown
v.
Raphael.

" duty so payable is believed to be correct, but the vendor accepts
" no responsibility as to what duties will in fact become payable
" nor as to the amount which will become payable and no com-
" pensation shall be paid or allowed in respect of any error as to
" duties."    Condition 4 stated where completion was to take
place.    Condition 5 was that the particulars of the investment
were as provided by the Public Trustee Office on a particular date,
and were " believed to be correct and the reversion is sold subject
" to such variation as may occur therein before completion of sale.
" The vendor accepts no responsibility for the estimated value of
" the investment."    Condition 6 related to expenses and con-
dition 7 to requisitions on title.    Condition 8 stated that the sale
was subject to a reserved price.    Condition 9 provided: " These
" additional conditions shall prevail notwithstanding anything
" inconsistent with or contrary thereto in the general conditions
" which (in so far as they are not varied by these conditions) shall
" apply to the sale of this lot."    There followed in heavy leaded
type.    " Solicitors as to lot 11—Messrs. Oscar Mason & Co.,
" Cliffords Inn, Fleet Street, E.C.4."

Ernest Brown entered into a contract for purchase of the
reversion at the sum of £2,825, but by January, 1956, the
contract had not been completed and he sought to rescind, stating
that he had been misled by the representation which he said was
to be found in the part of the particulars printed in italics, that is,
the words " who is believed to have no aggregable estate."    The
vendor, the defendant, repudiated the claim and by a counter-
claim sought to enforce the contract.

At the trial of the action before Upjohn J. it appeared that
the statement in the particulars had been made by a managing
clerk of the solicitors named in the particulars, who normally
acted as a litigation clerk.    He had made it without any compre-
hension of the meaning of the words " no aggregable estate," or
of their significance to a would-be purchaser.    The grounds on
which the belief were expressed were inquiries addressed to the
bankrupt, a Mrs. Heath, who was a half-sister of the annuitant
but was not, apparently, on friendly terms with her, the bank-
rupt's mother and, at her suggestion, another lady, a Mrs. Gould,
whose relationship with the persons concerned was not at any time
made clear.    In addition, a communication was addressed to the
annuitant, Mrs. Ritchie, herself.    None of these sources of
information was productive.    Mrs. Ritchie passed the letter to her
brother, who told the inquirer that it was none of his business.
Mrs. Gould said that she had had no direct contact with Mrs.

638                    CHANCERY DIVISION.                    **[1958]**

C. A.

1957

BROWN
*v.*
RAPHAEL.

Ritchie for some time, but she said that Mrs. Ritchie spent some part of her time at Nice. Mrs. Heath added very little, though both she and Mrs. Gould indicated that they did not think that Mrs. Ritchie would be likely to leave very much.

Upjohn J. acquitted the defendant and his agents and representatives of dishonesty, a ground which had been emphasized in the statement of claim, but he held that the plaintiff was entitled to relief on the basis of an innocent material misrepresentation on which he had acted.

The defendant appealed.

*I. J. Lindner Q.C.* and *T. Michael Eastham* for the defendant. The statement that the vendor believed that the annuitant had no aggregable estate was a statement of opinion which was made, as the judge found, honestly. It was not made in circumstances such as those envisaged by Bowen L.J. in *Smith* v. *Land and House Property Corporation,*[1] where the vendor had knowledge not available to the purchaser, and the character of the statement carried with it an implication that it was founded on reasonable grounds. [Reference was also made to *Bisset* v. *Wilkinson.*[2]] The court will not, it is submitted, readily come to the conclusion that an opinion of belief carries with it such an implication, and will only do so where there is inequality of opportunity between the vendor and purchaser in having access to vital information. It is easier to prove inequality in a case where the vendor is selling property of which he is the beneficial owner than in the present type of case where the defendant is selling as a trustee. In this case he was expressing an opinion on matters which were not necessarily any more within his knowledge than that of the purchaser.

The plaintiff should not be allowed to take the point that the expression of opinion carried with it any such implication. It was not taken before Upjohn J. and is not mentioned in the notice of appeal. Nor should the plaintiff be allowed to amend the pleadings at this stage.

[*Montgomery White Q.C.* for the plaintiff, intervening, submitted that the point was sufficiently pleaded, and referred to *Nocton* v. *Lord Ashburton,*[3] *Swinfen* v. *Lord Chelmsford*[4] and *London Chartered Bank of Australia* v. *Lemprière.*[5]]

[1] (1884) 28 Ch.D. 7, 15.
[2] [1927] A.C. 177; 42 T.L.R. 727.
[3] [1914] A.C. 932; 30 T.L.R. 602.
[4] (1860) 5 H. & N. 890.
[5] (1873) L.R. 4 P.C. 572.

**1 Ch.**           CHANCERY DIVISION.                    639

C. A.

1957

BROWN
*v.*
RAPHAEL.

[The court, after discussion, held that the point was open on the appeal and that no amendment of the pleadings was required.]

*Lindner.* There is always a great element of chance in purchasing a reversionary interest. What was being sold was the reversion, not the annuity itself, and the defendant vendor was in no better position than the purchaser to know the means of Mrs. Ritchie, the annuitant. [Reference was also made to *The Moorcock.*[6]]

The issue was whether the defendant honestly believed what he said. The judge has acquitted him of fraud and, however stupid the statement of opinion may have been in this case, he is entitled to say that the matter was dealt with entirely in the office of the solicitor and he was entitled to rely on his lawyer and to assume that proper inquiries had been made. [Reference was made to *Derry* v. *Peek.*[7]]

[ORMEROD L.J. The name of reputable solicitors was stated on the auction particulars and there was an inevitable inference that the trustee had been advised by competent solicitors and on that advice had reached a conclusion in his own mind that there was no aggregable estate. When the representation was made the purchaser had no means of finding out about the means of Mrs. Ritchie at all.]

The circumstances of the annuitant were not facts peculiarly within the knowledge of the defendant. But the plaintiff has to go further than that to come within Bowen L.J.'s statement.[8] He has to show that the vendor knew facts which falsified his statement of opinion and that those facts were peculiarly within his knowledge. The judge has acquitted the defendant of fraud here and the plaintiff has not shown that the defendant had no grounds for the statement which the judge found he honestly believed. He has not even shown that in fact the annuitant has or will have aggregable estate. Indeed, the fact that she is living in Nice may be said to point in the other direction, for she may be domiciled outside the United Kingdom. The solicitor's clerk had formed his opinion on grounds which to the court may not appear conclusive, but the best he could do was to get some information as to the financial circumstances of the annuitant. He could not compel her to disclose anything.

[6] (1889) 14 P.D. 64; 5 T.L.R. 316.    [8] 28 Ch.D. 7, 15.
[7] (1889) 14 App.Cas. 337; 5 T.L.R. 625.

640                     CHANCERY DIVISION.                [1958]

C. A.

1957

BROWN
v.
RAPHAEL.

[LORD EVERSHED M.R.   The question is whether he was justified in making this representation.]

He knew nothing contrary to his representation and it is submitted that what he said was reasonable in the circumstances. If the grounds which he had were not reasonable, the court would have to consider what would be reasonable grounds. It is not easy to decide what is and what is not aggregable estate. But even if the grounds were not reasonable, the trustee defendant was entitled to rely on the statement as affording him reasonable grounds.

It is admitted that this was a statement inducing a contract and that the words had importance in relation to the value of the interest, but by the additional conditions of sale No. 3 the vendor is expressly exonerated from liability for death duties and other duties payable and did not accept any responsibility to make compensation for any error.

[LORD EVERSHED M.R.   That condition is directed to an entirely different matter, namely, after-acquired estate.]

[ORMEROD L.J.   If the plaintiff is entitled to rescind the contract, it does not matter what the conditions are.   They would fall to the ground with the rest of the contract.]

It would be strange to grant rescission of the contract for an innocent misrepresentation when, if the contract had been upheld, there could have been no liability for duty at all. This misrepresentation, if there were one, went to the value of the thing sold and not to the nature of the thing itself.

*Montgomery White Q.C.* and *E. I. Goulding* for the plaintiff were not called on.

LORD EVERSHED M.R.   The present action and appeal arise out of a sale at auction on February 17, 1955, of a certain property, an absolute reversion in a trust fund.   Because I think much in the case depends upon the exact nature of the subject-matter of the sale as stated in the particulars, I shall take time to read what was described as " Lot 11 " more or less fully.

[His Lordship read the particulars set out above, and having stated the facts, continued:] At an early stage in this appeal the question arose whether, on the pleadings, if fraud was rejected, it remained open to the plaintiff to proceed on the ground of innocent misrepresentation; and we came to the conclusion that he was so entitled.   No question now arises as to dishonesty, so that we must now consider the case on the footing that

**1 Ch.**          CHANCERY DIVISION.                    641

it is open to the plaintiff to proceed on the basis of innocent misrepresentation.

In order that he may succeed on such a ground it is, of course, necessary that three things should be established. He must, first, show that the language relied upon does import or contain a representation of some material fact. Second, he must show that the representation is untrue, and, third, he must show that the plaintiff in entering into the contract was induced so to do in reliance upon it. The judge concluded all those three matters in the plaintiff's favour, and he therefore gave to the plaintiff the necessary relief in the action and dismissed the counterclaim.

I will say at once that, although Mr. Lindner has put all the points forcibly and attractively before us, in my judgment there is no ground shown for this court to disturb the judge's conclusions. I will, therefore, deal, though I hope at not too great length, with each of the three essential points in turn.

The first is, to my mind, the most significant and perhaps the most difficult: is there here a representation of a material fact? The essential words are those which I have already read more than once—" who "—that is the annuitant—" is believed to have " no aggregable estate." At first sight, therefore, this is a statement of an opinion; but, of course, a statement of opinion is always to this extent a statement of fact, that it is an assertion that the vendor does in fact hold the opinion which he states. But, if that was all there was in the matter, plainly the defendant would succeed on the judge's finding; for the judge has held that there was here no dishonesty on the part of the defendant or his agent; in other words, he has held that the defendant through his agent did believe that the annuitant had no aggregable estate. The question therefore arises: is that all that these few words import?

Upon that there is some considerable guidance for the court in *Smith* v. *Land and House Property Corporation*,[1] a decision of the Court of Appeal. The contract in that case was one for the sale of an hotel at Walton-on-the-Naze, which at that time, according to what is said in the report, was apparently regarded as being in the last stages of decay. The question which arose there emerged from a reference in the particulars to the effect that the tenant of the hotel was regarded by the vendor as a most desirable tenant. It turned out in fact that those words were singularly inappropriate to him, since he was one who was

C. A.

1957

BROWN
v.
RAPHAEL.

Lord Evershed
M.R.

---

[1] (1884) 28 Ch.D. 7.

C. A.

1957

BROWN
*v.*
RAPHAEL.

Lord Evershed
M.R.

habitually in arrear with his rent, and the business he was able to do in the decaying town was regarded as quite inadequate to support that or indeed any rent for the hotel. Those are matters of fact, however, peculiar to *Smith's* case.[1] For present purposes the guidance I seek to get is to be found in the language of Bowen L.J., who said[2]: " In considering whether there was a " misrepresentation, I will first deal with the argument that the " particulars only contain a statement of opinion about the " tenant. It is material to observe that it is often fallaciously " assumed that a statement of opinion cannot involve the state- " ment of a fact. In a case where the facts are equally well " known to both parties, what one of them says to the other is " frequently nothing but an expression of opinion. The statement " of such opinion is in a sense a statement of a fact, about the " condition of the man's own mind, but only of an irrelevant " fact, for it is of no consequence what the opinion is. But if " the facts are not equally known to both sides, then a statement " of opinion by the one who knows the facts best involves very " often a statement of a material fact, for he impliedly states " that he knows facts which justify his opinion." It is that last sentence which is particularly pregnant for present purposes.

I observe two things; first that the Lord Justice is not laying down a universal rule. His language is: " a statement of " opinion . . . involves very often a statement of a material " fact." Second, he observes that for that possibility to arise one party must know the facts better than the other. Observe that he is not saying that one party must know all the facts; it suffices for the application of the principle if it appears that between the two parties one is better equipped with information or the means of information than the other.

It is very often said, and truly said, that each case must depend upon its own facts; and I apprehend that the real question for the court is to say, on the basis of the facts and the context of this case, whether this is an instance in which the representation that the vendor has reasonable grounds for his belief ought to be imported. Mr. Lindner argued that to hold, as the judge did, affirmatively on that point was to lay down the principle that wherever it is stated that one party entertains a particular belief then it must follow that there is a representation that he has grounds reasonably supporting his belief. But I lay down no such general proposition. The question here is whether in this case and in the context of these particulars concerning

[1] 28 Ch.D. 7.                              [2] Ibid. 15.

**1 Ch.**            CHANCERY DIVISION.                                643

C. A.
1957

Brown
v.
Raphael.

Lord Evershed
M.R.

lot 11 such a representation of reasonable grounds to support the belief ought to emerge; and, as the judge held, I think that in this case the answer is in the affirmative.

First, it is to be noted that the subject-matter of the sale was a reversion to a sum of consols under a will. Anybody seeking to buy such a property must obviously first consider when the subject-matter is likely to come to hand. The age, therefore, of the annuitant on the determination of whose life the reversion falls in is of vital importance. But I should have thought it of no less importance that the purchaser wants to know how much will be left of the capital fund when duties have been paid at the death of the annuitant. Therefore it is of the utmost importance to a purchaser to know (if he can find out, which he may or may not be able to do) whether the impost of estate duty will be limited to the appropriate rate for the sum of the reversion alone or whether the rate will be affected by the circumstance that the annuitant has other considerable means, disposable capital of his or her own, which for duty purposes will be aggregated with the amount passing, namely, the sum providing the annuity. Therefore the statement " who is believed to have no " aggregable estate " is one obviously and vitally affecting the subject-matter being offered. As the judge pointed out, anybody who has any experience in dealing with properties of this kind must be very much alive to that point.

The next thing to notice, I think, about the particulars is the item at the end: " Solicitors as to lot 11—Messrs. Oscar Mason " & Co."—a well-known firm of solicitors of standing and repute.

What would be the effect of this language upon the mind of a possible purchaser? Clearly, I should have thought, it would flow from the language used and would be intended to be understood by a reader of the particulars that persons who knew the significance of this matter and who were experienced and competent to look into it were expressing a belief founded upon substantial and reasonable grounds. As between the vendor and the prospective purchaser it is quite plain that this is a case within the category stated by Bowen L.J., namely, a case where the vendor's knowledge or means of knowledge is far superior to that of the purchaser. The purchaser can know nothing whatever which could guide him on this point. He does not know the lady's name and he knows nothing about the will except its date. He has, when he reads this, no possible means of knowing whether the annuitant is a woman of means or is not a woman of means. It is, no doubt, possible that a purchaser might find

644                    CHANCERY DIVISION.                [1958]

C. A.
1957

BROWN
v.
RAPHAEL.

Lord Evershed
M.R.

out. I suppose he might communicate with the Public Trustee, just as in *Smith's* case [3] the purchaser might have made inquiries about the desirability of the tenant; but in this case it is far less likely even than in *Smith's* case [3] that, if a purchaser had the time and opportunity of inquiring, he could have found the answer. The Public Trustee would probably have been unable to tell him anything. It is very doubtful whether the will in question could have been successfully identified. On the other hand, by virtue of the bankruptcy, the vendor is the beneficial owner of the reversion. He, therefore, has available to him a considerable amount of fact quite unknown to the purchaser; and available to him obviously also would be means of information and of inquiry. He could inquire of the annuitant or of other persons about the circumstances relevant to this matter of aggregable estate. I observe that this was a sale subject to a reserve price. A purchaser would note that and would obviously assume that the reserve price would have been fixed with due regard to this matter of aggregability.

I am, therefore, entirely of the same opinion as was the judge, that this is a case in which the representation was not merely confined to the fact that the vendor entertained the belief but also, inescapably, there goes with it the further representation that he, being competently advised, had reasonable grounds for supporting that belief.

The judge put the matter thus in his judgment. He first of all observed that, if the purchaser is not entitled to suppose that the vendor is in possession of facts enabling him to express an opinion which is based upon reasonable grounds that would, he thought (and I agree with him) make business dealings, certainly in this class of business, almost impossible. " It must " be remembered," he said, " that in this case the purchaser " going to the auction had no means whatever of finding out " anything about the annuitant's means. When the contract " was signed, the purchaser did not even know the name of the " annuitant. On the other hand the vendor must be expected to " be in possession of facts unavailable to the purchaser and the " purchaser is entitled to suppose that he is in possession of facts " which enable him to express an opinion which is based upon " reasonable grounds. As I have already said, if that is not so, " business relationships become quite impossible. It may be " different where the facts upon which the opinion is expressed " are equally available to both parties. Then the opinion may

[3] 28 Ch.D. 7.

## 1 Ch.    CHANCERY DIVISION.    645

C. A.

1957

BROWN
v.
RAPHAEL.

Lord Evershed
M.R.

" be no more than an expression of opinion, but where the " opinion is expressed on facts assumed to be available to the " vendor, which certainly are not available to the purchaser, and " that opinion is expressed to induce the contract, in my judg- " ment the purchaser is entitled to expect that the opinion is " expressed on reasonable grounds." The judge, using that general language in relation to this case, is reflecting the language of Bowen L.J., which he then proceeds to quote in the next paragraph. I am, therefore, satisfied that this relevant language does involve the representation that there were reasonable grounds for the belief, and certainly that was a representation of a most material fact.

The next question, then, is: was that representation true? Upon that, Mr. Lindner has not argued, if he will allow me to say so, with very great strenuousness, and, indeed, I think he would have had difficulty in doing so. The grounds upon which the belief was expressed were set out in summary by the judge in his judgment. [His Lordship referred to the inquiries made by the managing clerk summarized above, commenting that the information that the annuitant spent some part of her time at Nice was somewhat significant and since the amount of the annuity was £200 sterling per annum it might have been thought that that at any rate carried a certain element of caution with it. His Lordship continued:] The question then arises whether that information was such as to justify a reasonable person, who had any awareness of the significance of the matter, asserting as an inducement to a possible purchaser that the annuitant was believed to have no aggregable estate? I think the question has only to be put to be answered. It is quite plain that that very meagre information formed no basis whatever upon which a responsible person could put forward that view as an inducement for somebody to come and buy the reversion.

The inquiry was made, as one would expect, by a representative of the firm of Oscar Mason & Co., whose concern in the matter as solicitors was stated in heavy leaded type in the particulars. The judge was obviously somewhat troubled by the extraordinary fact that any responsible member of a well-established firm of solicitors could possibly have asserted a belief upon such flimsy grounds. That was a consideration which was in his mind when he had to consider on the question of costs the justification of the allegation of fraud, including that of recklessness; but the judge had the advantage of seeing the managing clerk concerned

646                          CHANCERY DIVISION.                    [1958]

C. A.
1957

BROWN
v.
RAPHAEL.

Lord Evershed
M.R.

and he was satisfied that the managing clerk, though in this respect, unhappily, quite inept, was none the less honest. He was inept because this subject-matter was far outside the ordinary scope of his professional duties, he being a litigation clerk; and it became quite manifest that he himself had no comprehension at all, when he started dealing with this matter, of the meaning of the words " aggregable estate " and certainly never comprehended at any stage the importance of the alleged belief to a would-be purchaser of a reversion.

At this stage I will consider, shortly, another point raised by Mr. Lindner. From what I have said it will be appreciated that the inquiries were made by, and indeed the whole of the preparation of these particulars was in the hands of, the firm of solicitors whose name I have mentioned. The defendant, the trustee in bankruptcy, very naturally and very properly left the matter to the solicitors to do the work for him. The draft form of particulars sent by the auctioneers was amended by the solicitors and returned to them; and the trustee in bankruptcy naturally and properly relied upon it. But Mr. Lindner put forward the argument that this question of belief and grounds of belief in a context such as this has a subjective quality about it; so that, even if it were wholly unreasonable for the solicitors concerned to have put forward a belief about there being no aggregability, it was quite otherwise in the case of the trustee in bankruptcy, who was said to be an accountant. It was said that it would suffice for the accountant, the vendor, to say: " I made no " inquiries myself. I relied, as I submit I am entitled to do, " on a competent firm of solicitors, and, I having so relied and " they having done this draft for me, I reasonably, accepted it." I am bound to say, after hearing the argument, that I am still, for my part, quite unable to apprehend it at all. The defendant, the trustee in bankruptcy, is the vendor who asserts the belief. He did not give evidence; there was no reason why he should; but the evidence in his case proved that the belief was put forward founded upon inquiries made by the solicitors which produced results quite incapable reasonably of supporting the belief. The defendant accepted and ratified what had been done by his agents, as he was entitled to do; but he must abide by the consequences. All that they put forward he must be treated as having put forward himself.

The extravagance of the argument, if I may so describe it, is revealed by this. I put to Mr. Lindner the suggestion that if

**1 Ch.**          CHANCERY DIVISION.                            647

his argument was right it would follow that if the solicitors, having made an inquiry, were then informed that the annuitant was in fact possessed of a quarter of a million pounds of her own money but, owing to some mental aberration on their part, the solicitors thought that it did not matter and was not aggregable, still, apparently, the accountant, the trustee in bankruptcy, would be able to say that he reasonably entertained the belief put forward by way of inducement merely because the solicitors asserted it. I think the proposition, so illustrated, has really only to be stated to be rejected.

There remains the third necessary condition essential to the plaintiff's case, namely, that he relied upon the representation which I hold was implicit and was untrue. Upon that, we have not really been troubled with any argument at all. The judge heard the plaintiff and was quite satisfied that the plaintiff did in fact rely upon this representation. That, therefore, is the end of the matter.

Some other subsidiary points were indicated; but, in my judgment, none of them contained any substance. It was said that the implied representation as to grounds of belief was in some sense subsidiary; from which it was sought to say that, once the belief put forward was held to be honest, however incredibly, that was the end of the matter. I can find no basis in authority or good sense for that view, and I reject it.

Another point was made on condition 3 of the conditions of sale. That condition stated, among other things, that " the " vendor accepts no responsibility as to what duties will in fact " become payable nor as to the amount which will become " payable." It was suggested that somehow or other that so qualified the effect of the preceding representation as to make it ineffective for the purposes of this action. I am quite unable to accept that argument. I observe that condition 3, for one thing, repeats the representation, for it says: " The above information " regarding duty so payable is believed to be correct." What condition 3 is concerned with is to say that, whatever be the position today, when this lady dies, which may be 10 or 15 years hence, the vendor is not himself to be responsible at all for or in respect of the payment of any duty. In other words, the condition seems to me to deal with an entirely different point and cannot, in my judgment, in the least qualify the representation which I hold was earlier made as an inducement and, in fact, relied upon by the plaintiff.

C. A.

1957

BROWN
*v.*
RAPHAEL.

Lord Evershed
M.R.

648                           CHANCERY DIVISION.                    [**1958**]

C. A.

1957

Brown
v.
Raphael.

[His Lordship then considered the question of costs, a matter which does not call for report, and concluded:] For the reasons which I have given, I think the appeal fails and must be dismissed.

Romer L.J. I entirely agree with everything my Lord has said. In the course of the passage from Upjohn J.'s judgment which the Master of the Rolls has read, the judge, after pointing out that the statement of belief in the particulars that the annuitant was believed to have no aggregable estate was made with a view to inducing the contract, expressed the view that the plaintiff as purchaser was entitled to expect that the opinion was founded on reasonable grounds. It appears to me that that is the real point in this case, namely, whether the judge was right or whether he was wrong in that view. Mr. Lindner has submitted that he was wrong, but I am abundantly satisfied that he was perfectly right. In the first place, one must remember that the plaintiff knew practically nothing whatever about the subject-matter of this sale, or the title from which it derived, or the circumstances which affected its value. All he knew about it was that which was stated in the particulars, that it was a reversionary interest then represented by a sum of £8,000 consols receivable on the death of a lady aged 69, that the reversion derived under a will dated March 13, 1916, which was proved in December, 1917, and that the trustee of that will was the Public Trustee. That really is all that he knew. Short of writing to the vendor's solicitors, who are named in the particulars, and persuading them to help him in ascertaining further particulars, I cannot see that he was in a position to do anything whatever for himself. It would be of little use even to have written to the Public Trustee, because he could not inform the Public Trustee anything about the will under which this reversion derived except its date and the date of its probate. It might be, such is the efficiency of the Public Trustee's office, that that might be sufficient, after a great deal of research, to discover who the testator was and the terms of the will and everything else; but short of that, as my Lord has pointed out, the purchaser was helpless in this matter. On the other hand, the vendor, who has to be identified for this purpose, as I think, with the bankrupt herself, the owner of the reversion, was in a far stronger position —to put it at its lowest—than was the purchaser to ascertain all relevant facts bearing upon this reversion, and more particularly

**1 Ch.**              CHANCERY  DIVISION.                    649

bearing upon its value and what it was likely to bring in on the          C. A.
death of the annuitant.                                                   1957

That being so, I should have thought that it was fairly obvious          Brown
that the statement purporting to come, as it did come, from the           v.
vendor's solicitors, and expressing a belief vital in relation to this    Raphael.
legal transaction, inevitably would suggest to the purchaser that         Romer L.J.
the opinion was being expressed upon reasonable grounds; for
it was a matter which everybody concerned, and especially a
solicitor, must know would vitally affect the value of the reversion
which the purchaser was proposing to buy, in that a matter which
obviously affects the value of a reversion more than anything else
is whether the value of it will be reduced because of the principle
of aggregation when it falls in.

For my part, accordingly, even in the absence of authority,
I should have thought, on the facts of this particular case, that
it was abundantly clear that the judge was right when he said
that the purchaser was entitled to expect that the opinion or
belief was expressed upon reasonable grounds, and I should have
come to that conclusion if there had been no authority on the
matter at all.   But, in fact, there is the authority to which the
Master of the Rolls and the judge referred, namely, *Smith* v.
*Land and House Property Corporation*,[4] and in particular the
judgment of Bowen L.J. which, when applied to this particular
case (and we are only dealing with the facts of this particular
case) supports beyond doubt the conclusion at which the judge
arrived and with which I entirely agree.

None of the other points which were addressed to us and
relied upon in this appeal appear, if I may respectfully say so, to
have very much substance in them; and there is nothing that I
can add to what Lord Evershed M.R. has said with regard to
them.   I entirely agree with the conclusions at which he has
arrived.   I agree that the appeal should be dismissed.

ORMEROD L.J.   I agree that this appeal should be dismissed.

*Appeal dismissed.*

Solicitors: *Oscar Mason & Co.; Charles H. Wright & Brown.*

E. D.

[4] 28 Ch.D. 7.

*A*  Court of Appeal

# BV Nederlandse Industrie van Eiprodukten *v* Rembrandt Enterprises Inc

## [2019] EWCA Civ 596

*B*  2019  March 19, 20;                    Longmore, Peter Jackson, Coulson LJJ
      April 9

*Contract — Rescission — Fraudulent misrepresentation — Whether onus on*
  *representee to prove misrepresentation induced him to enter contract — Whether*
  *representee required to prove he would not have entered into contract but for*
  *misrepresentation — Whether presumption that representee induced by*
*C*  *fraudulent misrepresentation*
*Damages — Contract — Breach — Claimant contracting to supply defendant with*
  *egg product — Claimant's sister company making some of supplies with*
  *defendant's agreement — Claimant subsequently seeking damages for loss of*
  *profit caused by defendant's breach of contract — Whether claimant entitled to*
  *claim for loss of profit relating to product supplied by sister company*

*D*  The claimant contracted to supply the defendant with 4,200 metric tons of egg
product for set prices per kilo, on condition that the claimant's procedures received
regulatory approval.  Prior to approval being granted, the claimant informed the
defendant that, due to unanticipated extra regulatory costs, the set prices would have
to be increased.  After some negotiation a new contract was entered into that was in
materially the same terms as the first, save for increased set prices.  After shipments
began the claimant informed the defendant that some of the egg product was to be
supplied by its sister company.  Subsequently the defendant suspended its performance
*E*  of the contract on the ground that the claimant was failing to comply with regulatory
requirements.  The claimant brought a claim for breach of contract, claiming damages
for loss of profit, including profit from supplies made by its sister company.  The
defendant contended that it was entitled to rescind the second contract on the ground
that it had been induced to enter into it by a fraudulent misrepresentation made by the
claimant, namely that the increase in sale price contained no element of extra profit
but was calculated by reference to the extra regulatory costs alone.  The judge held
*F*  (i) that the defendant was entitled to rescind the second contract as a result of the
fraudulent misrepresentation alleged, with the consequence that the claimant was
restricted to damages for loss of profit based on the sale prices in the first contract, and
(ii) that the claimant could not claim for loss of profit from supplies made by its sister
company.
      On the claimant's appeal—
      *Held*, dismissing the appeal, (1) that where a party sought to rescind a contract
*G*  on the ground that he had been induced to enter the contract by a fraudulent
misrepresentation made by the other party, the onus was on the representee to prove
that he had been induced to enter the contract, rather than on the representor to prove
that the representee had not been so induced; that, in order to prove inducement, the
representee was required to prove that the misrepresentation had materially
influenced his decision to make the contract, in the sense that it had been actively
present to his mind; that a representee was not required to show that he would not
*H*  have entered the contract but for the misrepresentation, and the fact that there were
other reasons besides the misrepresentation for the representee to have entered the
contract did not mean that he had not been induced by the misrepresentation made;
that, further, there was an evidential presumption of fact, which would be very
difficult to rebut, that a representee would have been induced by a fraudulent
misrepresentation that was intended to cause him to enter the contract; that, on the

© 2020 The Incorporated Council of Law Reporting for England and Wales

552
**BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)**        [2020] QB

facts, the judge had been entitled to find that that presumption had not been rebutted in the present case; and that, accordingly, the defendant was entitled to rescind the second contract (post, paras 32, 34, 43–45, 49, 51, 52).

*Reynell v Sprye* (1852) 1 De GM & G 660, *Smith v Chadwick* (1884) 9 App Cas 187, HL(E), *Edgington v Fitzmaurice* (1885) 29 Ch D 459, CA and *Barton v Armstrong* [1976] AC 104, PC considered.

(2) That, if a contract of sale was performed partly by the seller and partly, with the buyer's consent, by a non-contracting third party, the seller on a claim for breach of contract could recover for both its own losses and those of the third party if, at the time the underlying contract was made, it had been the common intention and/or a known object of the contracting parties to benefit the third party or a class of persons to which the third party belonged; that since, at the time of the making of the contract, the defendant had not even been aware of the third party's existence there could have been no such intention or object; and that, accordingly, the judge had been right to reject the claimant's claim for loss of profit in respect of the egg product supplied by its sister company (post, paras 50, 51, 72–74, 80–82).

*Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85, HL(E), *Alfred McAlpine Construction Ltd v Panatown Ltd* [2001] 1 AC 518, HL(E) and *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2018] AC 313, SC(E) considered.

Decision of Teare J [2018] EWHC 1857 (Comm); [2019] 1 All ER (Comm) 543 affirmed.

The following cases are referred to in the judgments:

*Albazero, The* [1977] AC 774; [1976] 3 WLR 419; [1976] 3 All ER 129, HL(E)
*And So To Bed Ltd v Dixon* [2001] FSR 47
*Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2002] EWCA Civ 1642; [2003] 1 WLR 577; [2003] 1 All ER (Comm) 140, CA
*Barton v Armstrong* [1976] AC 104; [1975] 2 WLR 1050; [1975] 2 All ER 465, PC
*Cassa di Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd* [2011] EWHC 484 (Comm); [2011] 1 CLC 701
*DRC Distribution Ltd v Ulva Ltd* [2007] EWHC 1716 (QB)
*Derry v Peek* (1889) 14 App Cas 337, HL(E)
*Downs v Chappell* [1997] 1 WLR 426; [1996] 3 All ER 344, CA
*Edgington v Fitzmaurice* (1885) 29 Ch D 459, CA
*Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85; [1993] 3 WLR 408; [1993] 3 All ER 417, HL(E)
*London and Leeds Bank, In re, Ex p Carling* (1887) 56 LJ Ch 321
*McAlpine (Alfred) Construction Ltd v Panatown Ltd* [2001] 1 AC 518; [2000] 3 WLR 946; [2000] 4 All ER 97, HL(E)
*Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; [1994] 3 WLR 677; [1994] 3 All ER 581; [1994] 2 Lloyd's Rep 427, HL(E)
*Raiffeisen Zentralbank Österreich AG v Royal Bank of Scotland plc* [2010] EWHC 1392 (Comm); [2011] Bus LR D65; [2011] 1 Lloyd's Rep 123
*Reynell v Sprye* (1852) 1 De GM & G 660
*Ross River Ltd v Cambridge City Football Club Ltd* [2007] EWHC 2115 (Ch); [2008] 1 All ER 1004
*Smith v Chadwick* (1882) 20 Ch D 27, CA; (1884) 9 App Cas 187, HL(E)
*SmithKline Beecham plc v Apotex Europe Ltd* [2006] EWCA Civ 658; [2007] Ch 71; [2006] 3 WLR 1146; [2006] 4 All ER 1078, CA
*Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2017] UKSC 32; [2018] AC 313; [2017] 2 WLR 1161; [2017] 3 All ER 785, SC(E)
*Zurich Insurance Co plc v Hayward* [2015] EWCA Civ 327; [2015] Lloyd's Rep IR 585, CA; [2016] UKSC 48; [2017] AC 142; [2016] 3 WLR 637; [2016] 4 All ER 628; [2016] 2 All ER (Comm) 755, SC(E)

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] QB        BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)

No additional cases were cited in argument.

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Arnison v Smith* (1889) 41 Ch D 348, Kekewich J and CA
*Australian Steel & Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202
*Avon Insurance plc v Swire Fraser Ltd* [2000] 1 All ER (Comm) 573
*Axa Versicherung AG v Arab Insurance Group (BSC)* [2015] EWHC 1939 (Comm); [2016] Lloyd's Rep IR 1
*BGC Capital Markets (Switzerland) llc v Rees* [2011] EWHC 2009 (QB)
*BP Exploration Operating Co Ltd v Chevron Shipping Co* [2001] UKHL 50; [2003] 1 AC 197; [2001] 3 WLR 949; [2002] 1 All ER (Comm) 1 , HL(Sc)
*Barings plc v Coopers & Lybrand* [2003] EWHC 1319 (Ch); [2003] PNLR 34
*Barton v County Natwest Ltd (Note)* [2002] 4 All ER 494
*Brikom Investments Ltd v Carr* [1979] QB 467; [1979] 2 WLR 737; [1979] 2 All ER 753, CA
*Dadourian Group International Inc v Simms* [2009] EWCA Civ 169; [2009] 1 Lloyd's Rep 601, CA
*De Beers UK Ltd (formerly Diamond Trading Co Ltd) v Atos Origin IT Services UK Ltd* [2010] EWHC 3276 (TCC); [2011] BLR 274
*Edwards v Ashik* [2014] EWHC 2454 (Ch)
*Gestmin SGPS SA v Credit Suisse (UK) Ltd* [2013] EWHC 3560 (Comm)
*Goose v Wilson Sandford & Co (No 2)* [2001] Lloyd's Rep PN 189
*Gould v Vaggelas* (1984) 157 CLR 215
*Occidental Worldwide Investment v Skibs A/S Avanti (The Siboen and The Sibotre)* [1976] 1 Lloyd's Rep 293
*Otkritie International Investment Management Ltd v Urumov* [2014] EWHC 191 (Comm)
*Prest v Petrodel Resources Ltd* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1; [2013] 4 All ER 673; [2014] 1 BCLC 30, SC(E)
*Rolls-Royce Power Engineering plc v Ricardo Consulting Engineers Ltd* [2003] EWHC 2871 (TCC); [2004] 2 All ER (Comm) 129
*Sidhu v Van Dyke* [2014] HCA 19
*Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4)* [2002] UKHL 43; [2003] 1 AC 959; [2002] 3 WLR 1547; [2003] 1 All ER 173; [2002] 2 All ER (Comm) 931; [2003] 1 BCLC 244, HL(E)

**APPEAL** from Teare J

The claimant, BV Nederlandse Industrie van Eiprodukten, brought proceedings for breach of contract against the defendant, Rembrandt Enterprises Inc, seeking damages for loss of profit on sales that would have taken place if the defendant had not suspended its performance of the contract, under which the claimant supplied the defendant with egg product for set prices per kg. The loss of profit claimed included profit in respect of egg product supplied by a sister company of the claimant, Henningsen van den Burg, as well as in respect of the claimant's own product.

By a decision dated 24 July 2018 Teare J sitting in the Commercial Court of the Queen's Bench Division [2018] EWHC 1857 (Comm); [2019] 1 All ER (Comm) 543 held, inter alia: (i) that the defendant was entitled to rescind the contract relied on by the claimant as a result of the fraudulent misrepresentations made by the claimant while it was being negotiated, thus restricting the claimant to a claim for loss of profit based on the sale prices in an earlier contract between the parties; and (ii) that the claimant could not claim in respect of the product supplied by its sister company, but only for its own loss.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*A*

By an appellant's notice dated 14 August 2018 and with the permission of the judge the claimant appealed on the grounds, inter alia, that (1) the judge had erred in concluding that the defendant was entitled to rescind the contract, and (2) the judge had erred in concluding that the claimant could not claim in respect of the product supplied by its sister company, but only for its own loss.

*B*

By a respondent's notice dated 5 September 2018 the defendant sought to uphold the judgment of Teare J on the grounds, inter alia, that (1) the judge had rightly concluded that the defendant was entitled to rescission of the contract by reason of the claimant's fraudulent misrepresentation and (2) the judge had rightly decided that the claimant was not entitled to recover in respect of the loss of profits sustained by its sister company.

The facts are stated in the judgment of Longmore LJ, post, paras 1–11.

*C*

*Guy Morpuss QC* and *Theo Barclay* (respectively of and instructed by *Macfarlanes llp*) for the claimant.

The judge wrongly reversed the evidential burden of proof and applied an unorthodox and erroneous test for causation. It is correct to refer to a presumption or inference as to inducement but it is merely an inference of fact to be weighed as part of the overall evidence; and it is incorrect to find

*D*

that that fact shifts the evidential burden of proof. The presumption of inducement is merely an evidential inference which does not alter the burden of proof: see *Reynell v Sprye* (1852) 1 De GM & G 660, *Smith v Chadwick* (1882) 20 Ch D 27; (1884) 9 App Cas 187, *Edgington v Fitzmaurice* (1885) 29 Ch D 459 and *Barton v Armstrong* [1976] AC 104. The judge further erroneously concluded that in a case of fraudulent misrepresentation it is appropriate to apply the "weaker" rather than the "stronger" test of

*E*

causation. [Reference was made to *Raiffeisen Zentralbank Österreich AG v Royal Bank of Scotland plc* [2011] Bus LR D65; [2011] 1 Lloyd's Rep 123 and *Cassa di Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd* [2011] 1 CLC 701.] On the evidence the judge concluded that a relevant witness "might have agreed to the requested price increase"; but that conclusion is inconsistent with both the weaker and the stronger tests. The judge ought to have found that the presumption of inducement had been

*F*

rebutted.

In the light of the principle in *Alfred McAlpine Construction Ltd v Panatown Ltd* [2001] 1 AC 518 it is not a requirement that for transferred loss to be claimed the claimant is obliged to establish that there was a known third party benefit: see further *Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85, *And So To Bed Ltd v Dixon* [2001] FSR 47,

*G*

*SmithKline Beecham plc v Apotex Europe Ltd* [2007] Ch 71, *DRC Distribution Ltd v Ulva Ltd* [2007] EWHC 1716 (QB) and *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2018] AC 313. The authorities demonstrate that there is no requirement of prior contemplation in the present case, and, given the informal nature of such arrangements, such a requirement would likely defeat most cases falling within the so-called "broader ground" as identified by Lord Griffiths in *Linden Gardens* [1994]

*H*

1 AC 85, 96–97. The judge mis-applied authority in concluding that there has to be a common intention on the part of the contracting parties to benefit the third party. The judge ought to have concluded that as a matter of law and fact the present case falls within the broader ground, and that the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A claimant is entitled to recover damages for the losses suffered by the third party.

It is also a relevant factor that both the claimant and the third party are companies within the same group and are owned by the same family: see per Lord Clyde in *Panatown* [2001] AC 518, 535H–536A.

B *Gavin Kealey QC*, *Simon Goldstone* and *Henry Moore* (instructed by *Squire Patton Boggs (UK) llp*) for the defendant.

Where the defendant as a party to a contract seeks to rescind the contract on the foundation that it was induced to enter into the contract by a fraudulent misrepresentation said to have been made by the claimant, it is accepted that the onus is on the defendant to prove that it was induced to enter the contract, and not on the claimant to prove that that was not the case. In order to prove that assertion the defendant has to prove that the C misrepresentation relied upon materially influenced its decision to enter into the contract, in the sense that it had been actively present to its mind, although the defendant is not required to show that it would not have entered the contract but for the misrepresentation; and the fact that there were other reasons besides the misrepresentation for the defendant to have entered the contract would not mean that it was not induced by the D misrepresentation made. Furthermore, there is an evidential presumption of fact, which will be very difficult to rebut, that the defendant would have been induced by a fraudulent misrepresentation which was intended to cause him to enter into the contract: see further *Reynell v Sprye* (1852) 1 De GM & G 660, *Smith v Chadwick* (1882) 20 Ch D 27; (1884) 9 App Cas 187, *Edgington v Fitzmaurice* (1885) 29 Ch D 459 and *Barton v Armstrong* [1976] AC 104. The judge made no error of law and was entitled to hold E that the presumption had not been rebutted, and accordingly that the defendant was entitled to rescind the contract.

The judge was also right to reject the claimant's claim for loss of profit in respect of the egg product supplied by the third party. Where a contract of sale is performed partly by the seller and partly, with the buyer's consent, by a non-contracting third party, the seller on a claim for breach of contract can F recover for both its own losses and those of the third party if, at the time the underlying contract was made, it was the common intention and/or a known object of the contracting parties to benefit the third party or a class of persons to which the third party belonged. The claimant is wrong to submit that the latter is not a requirement, as is clear from a proper application of *Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85, *Alfred McAlpine Construction Ltd v Panatown Ltd* [2001] 1 AC 518 and G *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2018] AC 313. If the claimant were right and the known third party benefit were irrelevant, a main contractor would always be able to claim against the employer the losses suffered by his sub-contractor, even if the employer had no knowledge of the sub-contractor, or even that a sub-contractor was going to be used at all. That would be contrary to the general rule, referred to by Lord Diplock in *The Albazero* [1977] AC 774 and by Lord Sumption JSC H and Lord Neuberger of Abbotsbury PSC in *Swynson*, that a party can only recover the losses which it has itself suffered; and it would also turn transferred loss, which is supposed to be a narrow exception to that rule, into a commonplace route of recovery. In the present case the defendant was not aware at the time of the making of the contract of the third party's

© 2020 The Incorporated Council of Law Reporting for England and Wales