existence, so that there can have been no such intention or object. It makes no difference that the claimant and the third party are owned by members of the same family. It follows that the claimant is not entitled to recover the loss it seeks relating to the egg product supplied by the third party.

*Morpuss QC* replied.

The court took time for consideration.

9 April 2019. The following judgments were handed down.

**LONGMORE LJ**

*Introduction*

1   This appeal from Teare J, now reported at [2019] 1 All ER (Comm) 543, raises two quite separate issues. The first main issue relates to the requirement of inducement in a case of fraudulent misrepresentation. The questions that arise on this first issue are:

(1) Whether the normal requirement for rescission in misrepresentation cases that the representee must prove that he was induced to enter the relevant contract by the misrepresentation made by the representor is any different if the representation was made fraudulently (rather than innocently or negligently); more particularly whether the onus is on the representee to prove he was induced or on the representor to show that the representee was not so induced;

(2) Whether what is to be proved is: (i) that the representee *would* not have made the relevant contract if the misrepresentation had not been made; or (ii) that the representation played a *part/no part* of the decision to make the contract; or (iii) that the representee *might* not have made the contract or; indeed, (iv) that he would have wished to consider his position without being able to say at trial what it is that he would have done; and

(3) Whether, on the primary findings of fact of the judge, the right to rescind for misrepresentation was made out.

2   The second main issue is whether, if a contract of sale is performed partly by the seller as the contracting party and partly by a non-contractual party but with the consent of the buyer (the counter-party to the contract), the contracting party can recover for both its own losses and those of the non-contracting party, in the event that the buyer, in breach of contract, refuses to perform.

3   All this arises in the context of the avian flu epidemic which struck the United States in April 2015. It was disastrous for United States suppliers of egg products. Rembrandt Enterprises Inc ("Rembrandt") was one such supplier and had to destroy over 50% of its own birds. It also had to find a new source of supply of egg products in order to honour its own commitments. It found a supplier based in the Netherlands, BV Nederlandse Industrie van Eiprodukten ("NIVE"), with which on 13 May 2015 it made a contract to buy 4,200 metric tons of dry whole egg, dry yolk and dry white over a two-year period for prices of €6·15, €4·15 and €14·90 per kg respectively, provided that its procedures in the Netherlands satisfied the US regulatory authorities for supervision of the egg business. The authorities gave the required approval on 1 June 2015.

© 2020 The Incorporated Council of Law Reporting for England and Wales

557
[2020] QB                BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)
                                                                      Longmore LJ

4   Before that happened, however, NIVE e-mailed Rembrandt on 21 May 2015 saying that there would be unanticipated extra regulatory costs and that the prices would have to be increased and on 12 June 2015 NIVE proposed a €2·50 per kg increase in the price "after thorough calculation". After some negotiation, Rembrandt requested a breakdown of the extra costs and on 22 June 2015 NIVE sent Rembrandt a cost calculation of €2·59 per kg. Two days later Rembrandt agreed the price increase; on 25 June a new contract was made in materially the same terms as the original contract save that all the prices had been increased by €2·50 per kg. Both contracts had an English law and jurisdiction clause.

5   Shipments began on 6 September 2015. Later that month NIVE informed Rembrandt that some of the egg white powder would be supplied by its sister company Henningsen van den Burg ("Henningsen") whose plant had also been approved by the US regulatory authorities; on 30 October 2015 NIVE explained that the amount of that product being supplied by Henningsen was about 50%.

6   At about this time the price of egg products began to fall from the heights achieved at the time of the avian flu outbreak. Rembrandt's solicitors in due course wrote to NIVE alleging that NIVE was failing to comply with US inspection requirements and suspending Rembrandt's continued performance of the two-year contract. On 30 March 2016 NIVE began proceedings for loss of profit on the sales that would have taken place but for such suspension of performance. That claim included loss of profit on the total amount to be supplied and so included loss of profit in respect of the product supplied by Henningsen as well as in respect of NIVE's own product.

7   Rembrandt defended the proceedings not merely on the basis that, in breach of contractual warranty, the product did not comply with US Regulations but also on the basis that the second contract had been procured by NIVE's fraudulent misrepresentation that the increased sale price was calculated by reference only to the extra costs incurred as a result of compliance with US Regulations, whereas in truth the increased price included an element of profit as well as the increase in cost.

*The judgment*

8   The judge held that the product supplied by NIVE did comply with US Regulation and there is no appeal against that finding.

9   He further held that the agreed increase in the sale price included an element of profit and that the representations made in the e-mails of 12 June 2015 (that the extra €2·50 was reached "after thorough calculation") and 22 June 2015 (that the calculation of €2·59 was a "cost calculation") were false representations deliberately made and that Rembrandt believed the increase to be a genuine estimate of additional cost. They thus constituted fraudulent misrepresentations. He held that in law there was a presumption that Rembrandt relied on the representations and that it was for NIVE to prove that the second contract would have been made even if there had been no fraudulent misrepresentation. That NIVE could not do. The fact that Mr David Rettig, the chief executive officer of Rembrandt could not answer the question "what would Rembrandt have done" if it had known that the increased figure included an element of profit was nothing to the point. This gives rise to the first main ground of appeal.

© 2020 The Incorporated Council of Law Reporting for England and Wales

558
BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)          [2020] QB
Longmore LJ

10    The judge therefore held that Rembrandt was entitled to rescind the    *A*
second contract with the result that NIVE was restricted to a claim for loss of
profit based on the sale prices in the first contract.

11    He held further that NIVE could make no claim in respect of the
product supplied by its sister company Henningsen, but could only claim for
its own loss.  This gives rise to the second main ground of appeal.

*The first appeal*                                                            *B*

*(1) Relevant facts as found by the judge*

12    Before considering the law, it is necessary to set out the primary facts
found by the judge relevant to the question whether NIVE's misrepresentation
induced the second contract.  These are set out by the judge as follows:

"62. By 24 June 2015 Rembrandt had accepted the requested price    *C*
increase of €2·50 per kg.  It appears that the decision was taken by
Mr Rettig.  He gave evidence, which was not challenged, that he took the
decision.  He said his reasons for doing so were threefold.  First, given the
shortage of eggs in the US market he wished to secure product quickly to
secure an advantage over competitors.  Second, despite the requested
increase in price, the pricing remained 'viable'.  In particular the dried egg    *D*
white price remained lower than the Urner Barry market price.  Third, he
had no reason to believe that the costs put forward by NIVE were not
genuine and although they appeared higher than Rembrandt's own costs
he thought they would be much the same for all Netherlands producers.
Mr Rettig also said in his witness statement that had he known that the
stated costs were not NIVE's real costs of complying with US Regulations    *E*
but contained a very significant element of profit he would have viewed
the situation very differently.

"63. It was suggested to Mr Rettig in cross-examination that he was
very anxious to get dried egg product from NIVE and that he 'didn't
really have anywhere else to go'.  He said that was not true; what was
imported from NIVE 'was less than 15% of our overall imports'.  He said
'if we didn't end up with NIVE, we could find other suppliers, whether    *F*
with Spain, Italy, Latvia, the other countries that produced'.  NIVE was
going to be 'certified first and certified to sell finished egg products'.  But
shell eggs could be pursued elsewhere.  It was suggested to him that NIVE
was his best option.  He replied that 'short term, NIVE was the first
option'.  He accepted that with the increase of €2·50 per kg the contract
would be 'commercially viable'.  He said he was very interested in    *G*
procuring product quickly because 'the customers were in deep, deep,
deep need of product' and he accepted that he was 'keen to lock in the
deal'.  He was asked what he would have done had he been told that 2·50
was not a real number, that the additional costs could be between 1·50
and 2·50 but that NIVE were insistent on getting an extra 2·50 per kg.  He
replied: 'I don't know.  It's hypothetical.  I can't answer.'  It was suggested
to him that Rembrandt was sufficiently desperate for the eggs that he    *H*
would have agreed to the demand.  Mr Rettig replied: 'Oh my gosh.  After
this testimony, I mean, we had 30 other countries we were working with.
We were interested in an early solution.  I'll stand by my previous
testimony.' "

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   13   It is tolerably clear from this that the incidence of burden of proof may be important.  If the onus of proving that the fraudulent misrepresentation induced Rembrandt to make the second contract is on Rembrandt (as it would be for non-fraudulent misrepresentations), Rembrandt's claim to rescission may fail.  If on the other hand, the onus is on NIVE to prove that Rembrandt would have made the second contract even if they had known that NIVE was fraudulently representing that the increased price was solely due to increases

B   in cost and contained no element of profit, Rembrandt's claim to rescission should "probably" succeed.  I say "probably" because Mr Guy Morpuss QC for NIVE had a secondary argument that the only onus on NIVE had been discharged by virtue of the fact that Mr Rettig could not say what Rembrandt would have done if it had known the true facts.

14   It is also important to know what has to be proved by the party who
C   has the onus of proof.  Is it that the representee would/would not have acted differently but for the misrepresentation?  Or is it that the representation played a part in (or influenced) the decision of the representee?  Or is it sufficient that the representee might/might not have acted differently?

15   It is surprising that these are still controversial questions in English law especially since the test for inducement in cases of innocent or negligent representation appears to be settled in the form that the representee has the
D   burden of showing inducement in the sense that he has to show he would not have entered into the relevant contract had the representation not been made: see Assicurazioni Generali SpA v Arab Insurance Group (Practice Note) [2003] 1 WLR 577, Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd [1995] 1 AC 501, and Chitty on Contracts, 33rd ed (2018), para 7-039.

16   Although, as far as fraud (and particularly rescission for fraud) is
E   concerned, the test for inducement appears to be controversial, both Mr Gavin Kealey QC for Rembrandt and Mr Morpuss for NIVE submitted that the test was settled in Victorian times and that, if subsequent cases were inconsistent with the Victorian ones, the law had taken a wrong turn.

17   The judge decided the case on the basis that the burden of proof was on NIVE to show that, if the representation had not been made, Rembrandt would still have made the second contract.  He said (para 104):
F
   "However, the representation was made by NIVE for the purpose of persuading Rembrandt to agree the requested price increase and Rembrandt did accept the requested price increase.  There is therefore a 'particularly strong' presumption, or a 'fair inference of fact', that the representation induced Mr Rettig to reach his decision in the sense that but for the representation he would not, or might not, have agreed to the
G   requested price increase.  The evidential burden therefore lies on NIVE to rebut that presumption or inference.  That is 'very difficult' to do (per Lord Clarke).  It is not rebutted (per Christopher Clarke J) if all that can be said is that the representee might have entered the contract had there been no representation.  The presumption will only be rebutted, in a case of fraud, by showing that the representee would have entered the contract had there been no representation."
H
And (para 112):

   "The conclusion I have reached is that, whilst Mr Rettig might have agreed to the requested price increase, NIVE cannot show that he would have agreed to the requested price increase.  The fraudulent

A

misrepresentation as to the additional costs of complying with the US Regulations was made for the very purpose of persuading Rembrandt to agree the requested price increase. That end was achieved. Very strong evidence is required to rebut the presumption or inference of inducement in such a case. Whilst there is evidence that Mr Rettig, on behalf of Rembrandt, might have agreed to the requested price increase had the misrepresentation not been made I do not consider that that evidence has the clarity and cogency necessary to enable NIVE to persuade the court that Mr Rettig would in fact have agreed to the requested price increase even if the misrepresentation had not been made."

B

18   In broad terms, Mr Kealey submitted that the judge rightly held that there was a heavy burden on NIVE to reverse the natural inference that Rembrandt had been induced to make the second contract by NIVE's fraudulent misrepresentations. He relied on *Reynell v Sprye* (1852) 1 De GM & G 660 and *Edgington v Fitzmaurice* (1885) 29 Ch D 459; Mr Morpuss submitted that the judge was wrong to reverse the normal burden of proof which would lie on a claimant and relied primarily on *Smith v Chadwick* (1884) 9 App Cas 187 for this purpose. It is therefore necessary to examine these Victorian cases with a little care.

C

19   *Reynell v Sprye*, on appeal from Sir James Wigram, was a decision of the Court of Appeal in Chancery by which we would normally consider ourselves bound even though it was a judgment of a two-judge court and was given before the Court of Appeal took its present shape after the Supreme Court of Judicature Act 1875 (38 & 39 Vict c 77). It was a claim to rescind an agreement between Sir Thomas Reynell, an aspiring heir, and a wily genealogist called Captain Sprye that he (Sprye) would perform services in obtaining the inheritance in return for half of what he managed to obtain. Not surprisingly the senior Lord Justice, Knight Bruce LJ, decided (as the main ground of his judgment) that the agreement could be rescinded because of its champertous nature. It was only the junior Lord Justice, Lord Cranworth LJ, (appointed to the then new Court of Appeal in Chancery after he had been created a peer, but before he was made Lord Chancellor) who founded on the alternative case of fraudulent misrepresentation. He held that Captain Sprye had represented: first, that the contract was the usual course among men of business in conducting litigation of this kind and (by implication) that it was a lawful and honourable practice; secondly, that an unidentified "legal man" had said that the arrangement was usual and that he would represent the heir in court, and thirdly that the case was a difficult one because there was a tenant for life with remainder to her children. These were fraudulent misrepresentations because the contract was neither lawful nor honourable but champertous, no lawyer had said that it was usual or that he would represent the heir and, as Captain Sprye came to know, the tenant for life was an illegitimate daughter who could not inherit so that there was no difficulty in the case at all.

D

E

F

G

20   Lord Cranworth LJ said 1 De GM & G 660, 707–709:

H

"Every one of these considerations would be material ingredients towards enabling Sir T Reynell to form his judgment as to whether he should or should not accede to the proposal of Captain Sprye. If he had not received what was equivalent to an assurance that [the lawyer] considered the proposed division of the property as the usual course of

© 2020 The Incorporated Council of Law Reporting for England and Wales

561
[2020] QB          BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)
Longmore LJ

A conducting business on such occasions, and if he had not been led to suppose that his interest was contingent, depending on the chance of his surviving Mrs Williams Reynell, and then only to be recovered by expensive and doubtful litigation, it may well be that he would not have acted as he did; perhaps he might, perhaps he might not. But this is a matter on which I do not feel called upon or indeed at liberty to speculate. Once make out that there has been anything like deception, and no

B contract resting in any degree on that foundation can stand. It is impossible so to analyse the operations of the human mind as to be able to say how far any particular representation may have led to the formation of any particular resolution, or the adoption of any particular line of conduct. No one can do this with certainty, even as to himself, still less as to another. Where certain statements have been made, all in their nature

C capable, more or less, of leading the party to whom they are addressed, to adopt a particular line of conduct, it is impossible to say of any one such representation so made, that even if it had not been made, the same resolution would have been taken, or the same conduct followed. Where therefore in a negotiation between two parties, one of them induces the other to contract on the faith of the representations made to him, any one of which has been untrue, the whole contract is in this court considered

D as having been obtained fraudulently. Who can say that the untrue statement may not have been precisely that which turned the scale in the mind of the party to whom it was addressed? The case is not at all varied by the circumstance that the untrue representation, or any of the untrue representations, may in the first instance have been the result of innocent error. If after the error has been discovered, the party who has innocently

E made the incorrect representation, suffers the other party to continue in error and act on the belief that no mistake has been made; this, from the time of the discovery, becomes, in the contemplation of this court, a fraudulent misrepresentation, even though it was not so originally.

"These are all principles of such obvious justice as to require neither argument nor authority to illustrate or enforce them, and they need but to be stated, in order to command immediate assent. The only question can

F be in each particular case, how far the facts bring it within the principle? I have already pointed out several particulars in which I think these principles apply to the present case; and, therefore, without inquiring whether there are or are not other instances of misrepresentation fatal to the case of Captain Sprye, I feel bound to say, that I concur with Sir James Wigram in his conclusion, that the conveyance of the 15 July was obtained by fraud, and so must be set aside."

G
21   Lord Cranworth LJ appears to express himself in terms of inference of law rather than inference of fact; moreover the trial before Sir James Wigram took place before the Evidence Act 1851 (14 & 15 Vict c 99) entitled a claimant to give evidence on his own behalf: see *CJW Allen, The Law of Evidence in Victorian England* (1997), pp 102–103. It is also pertinent to say that the law relating to rescission for innocent misrepresentation and indeed

H to bars to such rescission was in its infancy. Actions at law for damages for deceit were not common and *Derry v Peek* (1889) 14 App Cas 337 had not yet been decided. The legal landscape in 1854 in this respect was very different from what it is today. But for the fact that *Reynell v Sprye* was (as we shall see) relied on in the duress case in the Privy Council in *Barton v*

© 2020 The Incorporated Council of Law Reporting for England and Wales

562
BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)          [2020] QB
Longmore LJ

*Armstrong* [1976] AC 104 it might not be considered an important authority    A
today.

22   *Smith v Chadwick* 9 App Cas 187 was a case of deceit at common
law and not a case of rescission at all.  It turned on the true construction to
be put on a representation in relation to the turnover of an ironworks that
"the present value of the turnover or output of the entire works is over
£1,000,000 sterling per annum".  It was untrue to the knowledge of the      B
defendants if it meant that the works had actually in one year turned out
produce worth more than a million pounds.  If it meant that the works were
capable of turning out that amount of produce, the statement was true.  The
claimant asserted in response to interrogations that he understood the
meaning of the statement "to be that which the words obviously conveyed".
He was asked no further questions about how he understood the words at
the trial.  Both the Court of Appeal (1882) 20 Ch D 27 and the House of     C
Lords held that the claimant had to show that he relied on the representation
in entering the contract that caused him loss and that he therefore had to
show not merely that the representation had the meaning which was false
but also that he understood it in that sense.  Since he could not do that the
claim must fail.    In addressing the question of materiality of the
representation Sir George Jessel MR said 20 Ch D 27, 44–45:
                                                                            D
   "if the court sees on the face of it that it is of such a nature as would
   induce a person to enter into the contract, or would tend to induce him to
   do so, or that it would be a part of the inducement, to enter into the
   contract, the inference is, if he entered into the contract, that he acted on
   the inducement so held out, and you want no evidence that he did so act;
   but even then you may shew that in fact he did not so act in one of two
   ways, either by shewing that he knew the truth before he entered into the   E
   contract, and therefore, could not rely on the mis-statements; or else by
   shewing that he avowedly did not rely upon them, whether he knew the
   facts or not.  He may by contract have bound himself not to rely upon
   them, that is to take the matter at his own risk whether they were true or
   false (which was the conclusion to which the House of Lords came in the
   recent case of *Brownlie v Campbell* (1880) 5 App Cas 925), or he may     F
   state that he did not rely upon them in the witness-box, which I think is so
   in one instance here.  But unless it is shewn in one way or the other that he
   did not rely on the statement the inference follows."

This passage can be read to mean that, unless it was shown that the claimant
knew the truth of the matter or that he "avowedly" did not rely on the
representation, an inference of reliance must be drawn as a matter of law.    G

23   It does not appear that *Reynell v Sprye* was cited to the House of
Lords but Mr Robert Reid QC for the defendants did make the point in
argument that the claimant had to show not merely the sense in which he
understood the representation but also that the defendants knew that that
sense was false "or made the statement without knowing whether it was true
or not".  That was because an action at law could not succeed "without
moral fraud" whereas in equity "moral fraud need not be proved".  This is    H
reported as eliciting the following comment from Lord Blackburn 9 App Cas
187, 189:

   "I have often thought that perhaps the discrepancies between
   expressions of equity and common law judges are greatly owing to the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    fact that at common law questions of fact are for the jury and it is necessary for the judge to separate them clearly from the questions of law; whereas in equity the judges have to determine both law and fact, and it is sometimes impossible to understand whether their decisions were meant to be inferences of fact or of law."

B    24    Lord Blackburn (with whom the Earl of Selborne LC and Lord Watson agreed) returned to this consideration at p 195 of the report and then added that, though he very nearly agreed with what was said by Sir George Jessel MR in the Court of Appeal, he did not quite state what Lord Blackburn conceived to be the law. He then proceeded to state the law on inducement for the purposes of an action in deceit as he conceived it to be (pp 195–196):

C    "Whatever difficulties there may be as to defining what is fraud and deceit, I think no one will venture to dispute that the plaintiff cannot recover unless he proves damage. In an ordinary action of deceit the plaintiff alleges that false and fraudulent representations were made by the defendant to the plaintiff in order to induce him, the plaintiff, to act upon them. I think that if he did act upon these representations, he shews damage; if he did not, he shews none. And I think the plaintiff in such a
D    case must not only allege but prove this damage. It is as to what is sufficient proof of this damage that I wish to make my remarks. I do not think it is necessary, in order to prove this, that the plaintiff always should be called as a witness to swear that he acted upon the inducement. At the time when *Pasley v Freeman* 2 Sm LC 66, 73, 86 (8th ed) was decided, and for many years afterwards, he could not be so called. I think that if it
E    is proved that the defendants with a view to induce the plaintiff to enter into a contract made a statement to the plaintiff of such a nature as would be likely to induce a person to enter into a contract, and it is proved that the plaintiff did enter into the contract, it is a fair inference of fact that he was induced to do so by the statement. In *Redgrave v Hurd* 20 Ch D 21 the late Master of the Rolls [Sir George Jessel MR] is reported to have said it was an inference of law. If he really meant this he retracts it in his
F    observations in the present case. I think it not possible to maintain that it is an inference of law. Its weight as evidence must greatly depend upon the degree to which the action of the plaintiff was likely, and on the absence of all other grounds on which the plaintiff might act. I quite agree that being a fair inference of fact it forms evidence proper to be left to a jury as proof that he was so induced. But I do not think that it would be
G    a proper direction to tell a jury that if convinced that there was such a material representation they ought to find that the plaintiff was induced by it, unless one of the things which the late Master of the Rolls specified was proved; nor do I think he meant to say so. I think there are a great many other things which might make it a fair question for the jury whether the evidence on which they might draw the inference was of such weight that they would draw the inference. And whenever that is a
H    matter of doubt I think the tribunal which has to decide the fact should remember that now, and for some years past, the plaintiff can be called as a witness on his own behalf, and that if he is not so called, or being so called does not swear that he was induced, it adds much weight to the doubts whether the inference was a true one. I do not say it is conclusive."

© 2020 The Incorporated Council of Law Reporting for England and Wales

564
BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)          [2020] QB
Longmore LJ

25    This to my mind shows that if a representor fraudulently intends his   *A*
words to be taken in a certain sense and the representee understands them in
that sense and enters into a contract, it is likely to be inferred that the
representee was induced to enter into the contract on the faith of the
representor's statement. It is fair to call this a presumption of inducement.
But it is a presumption of fact which can be rebutted, not a presumption of
law which cannot be rebutted or can only be rebutted in a particular way.   *B*
The tribunal of fact has to make up its mind on the question whether the
representee was induced by the representation on the basis of all the evidence
available to it. If a claimant does not give evidence, or if he does give evidence
which is equivocal, that is part of the overall picture but is not conclusive. It
also follows that the legal burden of proving inducement/reliance is on the
representee and the fact that the court may start by making a presumption of
fact in his favour does not change that position. Although *Smith v Chadwick*   *C*
was an action for damages in the tort of deceit, it would, on the face of it, be
odd if the law was any different in an action for rescission on the ground of
fraudulent misrepresentation.

26    That still leaves open the question of what it is precisely that the
representee must prove. Is it that he *would* not have made the relevant
contract if the representation had not been made or is it enough to show that
he *might* not have made the contract or that the representation had some   *D*
but not critical "influence" on his decision to enter the contract. *Smith v
Chadwick* gives no direct answer to that question. The Earl of Selborne LC
(p 190) said that a claimant had to establish two things in an action of deceit;
first actual fraud and secondly: "he must establish that this fraud was an
inducing cause to the contract; for which purpose it must be material, and it
must have produced in his mind an erroneous belief, influencing his   *E*
conduct." He went on to say that the claimant had not satisfied the burden
of proof which "under those circumstances, was incumbent upon him". I do
not think that by the use of the word "influencing", Lord Selborne LC was
intending to dilute the requirement of inducement. *Edgington v Fitzmaurice*
29 Ch D 459 did, however, give an answer to the still open question a year
after *Smith v Chadwick* had been decided.

27    In this case the directors of a company interested in supplying   *F*
cheap fish to Londoners had issued a prospectus inviting subscriptions for
debentures in the amount of £25,000 for the purpose of completing
additions to a newly acquired building and of purchasing its own horses and
vans rather than relying on subcontractors. In fact the money was needed to
discharge other pressing commitments of which no mention was made. The
claimant erroneously believed that the debentures would be a charge on the
property of the company and in evidence he stated that he would not have   *G*
advanced his money but for such belief but that he also relied on the
statements contained in the prospectus. Denman J believed him on the basis
(p 471) that the statements in the prospectus: "might most seriously have
entered into the consideration of a person who was subscribing money upon
such bonds as these". The Court of Appeal upheld his judgment.

28    Cotton LJ having decided that the statements in the prospectus were   *H*
material said (pp 480–481):

"But it was urged by the counsel for the appellants that the plaintiff
himself stated that he would not have taken the debentures unless he
thought they were a charge upon the property, and that it was this

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   mistaken notion which really induced the plaintiff to advance his money. In my opinion this argument does not assist the defendants if the plaintiff really acted on the statement in the prospectus. It is true that if he had not supposed he would have a charge he would not have taken the debentures; but if he also relied on the misstatement in the prospectus, his loss none the less resulted from that misstatement. It is not necessary to shew that the misstatement was the sole cause of his acting as he did. If

B   he acted on that misstatement, though he was also influenced by an erroneous supposition, the defendants will be still liable. Did he act upon that misstatement? He states distinctly in his evidence that he did rely on the defendants' statements, and the learned judge found, as a fact, that he did, and it would be wrong for this court, without seeing or hearing the witness, to reverse that finding of the judge. We must therefore come to

C   the conclusion that the statements in the prospectus as to the objects of the issue of the debentures were false in fact, and were relied upon by the plaintiff."

Bowen LJ (p 483) emphasised that there had to be a misstatement of an existing fact for the action to succeed, famously adding that the state of a man's mind was as much a fact as the state of his digestion, and then turned

D   to inducement:

    "Then the question remains—Did this misstatement contribute to induce the plaintiff to advance his money. [Counsel for the first defendant's] argument has not convinced me that they did not. He contended that the plaintiff admits that he would not have taken the debentures unless he had thought they would give him a charge on the property, and therefore he

E   was induced to take them by his own mistake, and the misstatement in the circular was not material. But such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the plaintiff's mind, and if his mind was disturbed by the misstatement of the defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference. It resolves itself into

F   a mere question of fact. I have felt some difficulty about the pleadings, because in the statement of claim this point is not clearly put forward, and I had some doubt whether this contention as to the third misstatement was not an afterthought. But the balance of my judgment is weighed down by the probability of the case. What is the first question which a man asks when he advances money? It is, what is it wanted for?

G   Therefore I think that the statement is material, and that the plaintiff would be unlike the rest of his race if he was not influenced by the statement of the objects for which the loan was required. The learned judge in the court below came to the conclusion that the misstatement did influence him, and I think he came to a right conclusion."

Fry LJ said (p 485):

H   "The next inquiry is whether this statement materially affected the conduct of the plaintiff in advancing his money. He has sworn that it did, and the learned judge who tried the action has believed him. On such a point I should not like to differ from the judge who tried the action, even though I were not myself convinced, but in this case the natural

© 2020 The Incorporated Council of Law Reporting for England and Wales

566
BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)          [2020] QB
Longmore LJ

inference from the facts is in accordance with the judge's conclusion. The prospectus was intended to influence the mind of the reader. Then this question has been raised: the plaintiff admits that he was induced to make the advance not merely by this false statement, but by the belief that the debentures would give him a charge on the company's property, and it is admitted that this was a mistake of the plaintiff. Therefore it is said that the plaintiff was the author of his own injury. It is quite true that the plaintiff was influenced by his own mistake, but that does not benefit the defendants' case. The plaintiff says: I had two inducements, one my own mistake, the other the false statement of the defendants. The two together induced me to advance the money. But in my opinion if the false statement of fact actually influenced the plaintiff, the defendants are liable, even though the plaintiff may have been also influenced by other motives. I think, therefore, the defendants must be held liable. The appeal must therefore be dismissed."

29  *Edgington v Fitzmaurice* has a certain similarity to the present case in as much as the representee in that case had two reasons for making the contract whereas Mr Rettig has given the three reasons set out in para 64 of the judgment, although Mr Morpuss would no doubt say that his evidence on reliance was less clear-cut than that of the Reverend Charles Edgington.

30  Both *Edgington v Fitzmaurice* and *Smith v Chadwick* were followed by Stirling J in the insolvency case, *In re London and Leeds Bank, Ex p Carling* (1887) 56 LJ Ch 321. Mr Carling issued a motion that the register of members of the company should be rectified by the deletion of his name and he be repaid the £120 he had given for his shares on the faith of statements in the company prospectus leading him to believe that the shares would form an excellent investment. When he discovered that he was given all the shares for which he had asked rather than the 25% applicants usually got on a flotation, his suspicions were aroused and he discovered that the company was not a stable one. On 24 September 1886 Mr Carling issued his notice of motion and on the same day a petition was presented for the winding up of the company. He therefore sought leave to prove in the winding up. One point taken by the liquidator was that Mr Carling was seeking to rescind the contract and that the right to rescind was lost if the company was insolvent at the time a claimant takes proceedings but this was rejected. Mr Buckley QC for the liquidator also said that Mr Carling had to prove (as he would in a common law action for deceit) that he would not have applied for shares unless he had been induced by misrepresentation; he cited *Smith v Chadwick* as authority for the proposition.

31  Stirling J accepted that proposition but pointed out that *Edgington v Fitzmaurice* said that the misrepresentation complained of did not need to be the sole inducement. He then addressed the argument that Mr Carling had not said that, if the statements had not been made, he would not have taken the shares and asked himself whether it was necessary that he should have so said. He cited the first half of the extract from the judgment of Lord Blackburn in *Smith v Chadwick* which I have set out above together with the last two sentences and said this (p 324):

"Therefore the question is one of fact which I must decide upon the evidence before me. The sole evidence as to it is contained in the affidavit of the applicant filed so far back as the 27 September 1886. And when the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    matter was before me in chambers the liquidator did not cross-examine him upon it, and he did not ask that the applicant might be cross-examined viva voce in court.  Upon the evidence I must come to the conclusion that the mind of the applicant was materially influenced by the misstatements contained in the prospectus."

B    32    In the light of these authorities it seems to me that the law at the end of the 19th century had assimilated the requirement of inducement in the tort of deceit and in actions for rescission for fraudulent misrepresentation and could be stated as being that the representee had to prove he had been materially "influenced" by the representations in the sense that it was "actively present to his mind" to use Bowen LJ's phrase; that, whereas there is a presumption that a statement, likely to induce a representee to enter into a contract, did so induce him, that is merely a presumption of fact which is to be taken into account along with all the evidence.  There was no requirement as a matter of law, that the representee should state in terms that he would not have made the contract but for the misrepresentation but the absence of such a statement was part of the overall evidential picture from which the judge had to ascertain whether there was inducement or not.  The fact that there were other reasons (besides the representation) for the claimant to have made the contract did not mean that he was not induced by the representation made.  In so far as *Reynell v Sprye* 1 De GM & G 660 had said that there was no need for evidence from the claimant or that it was sufficient if the claimant "might" have made the contract, if there had been no representation, that did not represent the law at any rate if "might" meant something different from "influencing" his decision in deciding whether to make the contract.

C

D

E    33    This state of the law was considered by the Judicial Committee of the Privy Council in the duress case, *Barton v Armstrong* [1976] AC 104, on appeal from the Court of Appeal of the Supreme Court of New South Wales.  Barton alleged that a deed, made with Armstrong setting out the terms in which he (Barton) would buy out Armstrong's interest in a company in which they were the major shareholders, had been procured by threats of murder.  There was an acute conflict of evidence on the facts and the Court of Appeal had held that Barton could not succeed in setting aside the deed unless he established that but for the threats of murder he would not have signed the agreement.  The majority of the Judicial Committee held that the law of duress was the same as the law of fraud in relation to inducement and (like Stirling J in *In re London and Leeds Bank*) it was not necessary for the claimant to prove that he would not have executed the deed but for the threats.  Lord Cross of Chelsea giving the majority opinion said (p 118):

F

G

"Had Armstrong made a fraudulent misrepresentation to Barton for the purpose of inducing him to execute the deed of 17 January 1967, the answer to the problem which has arisen would have been clear.  If it were established that Barton did not allow the representation to affect his judgment then he could not make it a ground for relief even though the representation was designed and known by Barton to be designed to affect his judgment.  If on the other hand Barton relied on the misrepresentation Armstrong could not have defeated his claim to relief by showing that there were other more weighty causes which contributed to his decision to

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

execute the deed, for in this field the court does not allow an examination    *A*
into the relative importance of contributory causes."

That with respect seems to me to be an orthodox exposition of the law of fraudulent misrepresentation. He cited as authority one sentence from Lord Cranworth LJ in *Reynell v Sprye* 1 De GM & G 660, 708—"Once make out that there has been anything like deception, and no contract resting in any degree on that foundation can stand"—and other cases cited in the then    *B* current (8th) edition of *Cheshire & Fifoot's Law of Contract* (1972) and continued:

"Their Lordships think that the same rule should apply in cases of duress and that if Armstrong's threats were 'a' reason for Barton's executing the deed he is entitled to relief even though he might well have entered into the contract if Armstrong had uttered no threats to induce    *C* him to do so."

34   Mr Kealey relied on the word "might" in this last sentence to submit that it was sufficient for a claimant if the judge at trial decided that he might have been influenced to make the relevant contract. But there is a dangerous ambiguity in that submission.   In ordinary language a decision that something might have happened is hypothetical and downgrades the onus of    *D* proof. I do not think Lord Cross used the word "might" in that sense. It is necessary for a claimant to show that his decision to make the relevant contract was "influenced" or "affected" by the representation as shown by the first citation from Lord Cross's opinion set out in the previous paragraph. The representee must show that as a matter of fact not as a hypothesis. So understood, *Barton v Armstrong* has not changed the law on inducement in relation to fraudulent misrepresentation save perhaps as to the incidence of    *E* the burden of proof.

35   In the 28th edition (1999) of *Chitty on Contracts*, no distinction was drawn in respect of the requirement of inducement between cases of fraudulent misrepresentation and innocent misrepresentation.   Para 6-039 merely said that where rescission was sought for misrepresentation it was not necessary for the representee to prove that if the misrepresentation had    *F* not been made he would not have made the contract, citing *In re London and Leeds Bank* for that proposition.

36   This changed in the 29th edition (2004) which said (para 6-034) that the normal rule was that a representee would not have a remedy if it was shown that he would have made the contract in any event, citing *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501 but that the position was different in cases where rescission was claimed for fraud citing    *G* *In re London and Leeds Bank* (see the now 33rd edition (2018), para 7-040). The editors added that it was sufficient if there was evidence to show that the representation had some impact on his thinking or, citing the judgment of Bowen LJ in *Edgington v Fitzmaurice* 29 Ch D 459, "was actively present to his mind".   The editors then referred to *Barton v Armstrong* [1976] AC 104 for the first time in the chapter on misrepresentation (as opposed to    *H* duress).

37   It seems that the emergence of *Barton v Armstrong* into the text of misrepresentation may have been due to the industry of Professor Andrew Burrows who in the 2nd edition (2002) of his *Law of Restitution* described it (p 46) as "the leading case" and in his 3rd edition (2011) points out that it

© 2020 The Incorporated Council of Law Reporting for England and Wales

A "controversially" placed the onus of proof on the defendant rather than the claimant. That is because when it came to the discussion of the facts, the majority judgment said [1976] AC 104, 120:

"If Barton had to establish that he would not have made the agreement but for Armstrong's threats, then their Lordships would not dissent from the view that he had not made out his case. But no such onus lay on him.
B On the contrary it was for Armstrong to establish, if he could, that the threats which he was making and the unlawful pressure which he was exerting for the purpose of inducing Barton to sign the agreement and which Barton knew were being made and exerted for this purpose in fact contributed nothing to Barton's decision to sign."

38 This is perhaps less controversial than it sounds, since the factual
C presumption of which Lord Blackburn speaks in *Smith v Chadwick* 9 App Cas 187 is another way of expressing the same concept.

39 This can be seen from two more recent authorities of the House of Lords and the Supreme Court. In *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501 it was argued that there was no requirement in insurance law for an underwriter to show that he had been induced to write the contract by any relevant non-disclosure or misrepresentation. The House
D of Lords rejected this argument since it was contrary to the general common law approach. Lord Mustill said at p 542A:

"Take the case of misrepresentation. In the general law it is beyond doubt that even a fraudulent misrepresentation must be shown to have induced the contract before the promisor has a right to avoid, although the task of proof may be made more easy by a presumption of inducement.
E The case of innocent misrepresentation should surely be a fortiori . . ."

This was, in my opinion, part of Lord Mustill's ratio since he used fraud as an essential stepping stone to determine the existence of a requirement of inducement for innocent misrepresentation. *Barton v Armstrong* was not cited but *Smith v Chadwick* was before the House since it was cited in argument (p 505G) and in Lord Lloyd of Berwick's speech agreeing on this
F point with Lord Mustill (p 570C).

40 The later case, *Zurich Insurance Co plc v Hayward* [2017] AC 142, was the main case relied on by the judge. Insurers had settled a personal injury case despite doubts about the claimant's injuries. They later discovered that the claimant had fully recovered a year before the settlement had been reached and brought an action in deceit claiming that he had
G fraudulently misrepresented the extent of his injuries. The Court of Appeal held [2015] Lloyd's Rep IR 585 that the insurers had not relied on the representation in reaching the settlement agreement because they had always had their suspicions about the claim. The Supreme Court allowed the insurers' appeal holding that the fact that the insurers had not wholly believed the claimant did not preclude them from having been induced to reach the settlement by the claimant's misrepresentation; they only had to
H prove that the misrepresentation had been "a material cause" of their reaching the settlement. Since the judge had held that it was a material cause, his order in their favour would be restored.

41 The question to be resolved was whether a representee had to show he believed the representation to which the Supreme Court returned a

negative answer and, in one sense, the case is no more than an example of the     *A*
principle set out in *Edgington v Fitzmaurice* 29 Ch D 459 that the representee
only has to show that the representation was "a cause" of his entering the
relevant contract. Indeed, Lord Clarke of Stone-cum-Ebony JSC (with whom
Lord Neuberger of Abbotsbury PSC, Baroness Hale of Richmond DPSC and
Lord Reed JSC agreed) cited *Barton v Armstrong* [1976] AC 104 for that very
proposition. More importantly, for the present purpose, Lord Clarke JSC     *B*
relied on the existence of the presumption of inducement and agreed with
the insurers' submission that the presumption would have little value if the
representee had to show that he believed the misrepresentation. He cited
the relevant paragraph of *Chitty* (now para 7-041 of the 33rd edition) to the
effect that it was a fair inference of fact though not of law that the representee
will have been influenced by the representation: "and the inference is
particularly strong where the misrepresentation was fraudulent." He then     *C*
relied further on extracts from *Pan Atlantic* [1995] 1 AC 501 and a decision
of Briggs J in *Ross River Ltd v Cambridge City Football Club Ltd* [2008] 1 All
ER 1004, para 241 in which the judge referred to the requirement that the
representation was "actively in the mind of the recipient when the contract
came to be made".

42    Lord Clarke JSC said further that it was not necessary to     *D*
address differences in the authorities about what was required to rebut
the presumption but he would simply say "it is very difficult to rebut the
presumption". He concluded this part of his judgment by approving a
passage in KR Handley's "impressive" article entitled "Causation in
Misrepresentation" (2015) 131 LQR 277, 284:

> "The representor must have decided to make the misrepresentation     *E*
> because he or she judged that the truth or silence would not, or might not,
> serve their purposes or serve them so well. In doing so they fashioned an
> evidentiary weapon against themselves, and the court should not subject
> the victim to 'what if' inquiries which the representor was not prepared to
> risk at the time."

43    It seems to me, therefore, that overall the modern authorities do not     *F*
add much to the conclusions that I drew from the Victorian authorities in
para 32 above. I do not think that *Barton v Armstrong* [1976] AC 104
intended to reverse the legal burden of proof but, if it did, this court must
prefer the later analysis of the House of Lords and the Supreme Court that
there is an evidential presumption of fact (not law) that a representee will
have been induced by a fraudulent representation intended to cause him to
enter the contract and that the inference will be "very difficult to rebut" to     *G*
use the words of Lord Clarke JSC.

44    There remains the question whether, if it be the case that the burden
of proof is on the representee to show that he was induced (albeit with the
help of the presumption which is very difficult to rebut), it is sufficient for
him to show that he might have acted differently. Both Christopher Clarke J
in *Raiffeisen Zentralbank Österreich AG v Royal Bank of Scotland plc*
[2011] Bus LR D65; [2011] 1 Lloyd's Rep 123 and Hamblen J in *Cassa di*     *H*
*Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd* [2011]
1 CLC 701 have obiter given some support for this being an appropriate test
in cases of fraudulent misrepresentation: see paras 196–199 and 232–233
respectively.

© 2020 The Incorporated Council of Law Reporting for England and Wales

45    I have already pointed out the ambiguity in the word "might" which was in fact used in *Barton v Armstrong*. If it means no more than being actively present in the mind of the representee to repeat the phrase of Bowen LJ, it is perhaps a convenient shorthand. But if it means that the court cannot make up its mind on inducement and therefore decides as a matter of law to give the representee the benefit of the doubt, it is not a helpful concept because that would be contrary to the law as I conceive it to be: see para 32 above, which requires the representee to prove inducement albeit with the assistance of a presumption that "[will be] very difficult to rebut". To some extent this is a matter of terminology but terminology can be important in some cases.

*The facts*

46    I turn then to consider whether that presumption was rebutted on the facts of the present case. The judge held that it was not and this court must necessarily be reluctant to differ from the judge on what is essentially a question of fact.

47    Mr Morpuss submitted that it was sufficient for him to point to the passage in cross-examination in which Mr Rettig, in response to being asked what he would have done if he had been told that €2·50 was not the real number which reflected cost because it included an element of profit, said: "I don't know. It's hypothetical. I can't answer." But as Hobhouse LJ said in *Downs v Chappell* [1997] 1 WLR 426, 433:

"The judge was wrong to ask how they [the representees] would have acted if they had been told the truth. They were never told the truth. They were told lies in order to induce them to enter into the contract. The lies were material and successful . . ."

48    Once the irrelevance of this answer of Mr Rettig is clear, the other submissions of Mr Morpuss to the effect that Mr Rettig was very keen to obtain the product because his customers were "in deep, deep, deep need" and that he was "keen to lock in the deal" were matters of fact considered by the judge. So also was the absence of any positive evidence from Mr Rettig that he would not have agreed (or even that he might not have agreed) to the new contract because the question was hypothetical (paras 105–110).

49    Having reminded himself of the strength of the presumption that a representee will have acted on a fraudulent statement intended to be acted upon, the judge said (para 112) that Mr Rettig's evidence established that he might have agreed to the increase in price if the representation had not been made, but he did not think that the evidence overall had sufficient clarity and cogency to persuade him that Mr Rettig would have agreed to the requested price increase, even if the representation had not been made. He is not there relying on any rule of law (see para 111) and he has not reversed the burden of proof. He is merely saying that the factual presumption has not, on the evidence, been rebutted. Like Denman J in *Edgington v Fitzmaurice* 29 Ch D 459 he accepted (paras 101–102) the evidence that the representation was one of the reasons why the representee made the relevant contract. The Court of Appeal did not consider they should interfere with Denman J's decision. Similarly, I do not think we should interfere with the decision of Teare J and I would reject the first appeal.

© 2020 The Incorporated Council of Law Reporting for England and Wales

572
BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)          [2020] QB
Longmore LJ

*The second appeal*                                                                          A

50   I agree with Coulson LJ that, for the reasons he gives, we should also reject the second appeal.

**PETER JACKSON LJ**

51   I agree with both of these incisive judgments. I pay particular tribute to Longmore LJ's masterly exegesis of the Victorian cases on inducement in   B cases of fraudulent misrepresentation, which illuminates how much the modern law owes to those classic authorities.

**COULSON LJ**

52   I agree that, for the reasons given by Longmore LJ, the first appeal (inducement in a case of fraudulent misrepresentation) should be dismissed.   C

53   The second appeal (transferred loss) arises out of the judge's conclusion that NIVE could not recover the loss of profit suffered by Henningsen, and said to arise from Rembrandt's breach of contract. Henningsen is another supplier of egg products who, like NIVE, is part of the Interovo Group. The companies have common owners, who are part of the same family. They are separate legal entities and the evidence was that they traded with one another on commercial terms. NIVE now says that it always   D intended that some of the egg white powder that it was contractually obliged to provide to Rembrandt would in fact be provided by Henningsen, although it was common ground that at no time prior to the making of the contract did NIVE ever communicate that intention to Rembrandt.

54   Rembrandt subsequently agreed to accept some egg white powder from Henningsen and to be invoiced by it directly. But it is agreed that   E Henningsen had no contractual rights against Rembrandt, or vice versa. Thus, if there were defects in the egg white powder supplied by Henningsen, Rembrandt would have had no right of redress against it: it (Rembrandt) would have had to have looked to NIVE, pursuant to the terms of its subcontract. Similarly, if there were any payment issues, it was not suggested that Henningsen could have looked to Rembrandt for payment: because there   F was no contract between them, Henningsen could only have sought payment from NIVE.

55   To all intents and purposes therefore, Henningsen was a subcontractor to NIVE, without any rights or liabilities under NIVE's contract with Rembrandt. When Rembrandt repudiated that contract, it meant that Henningsen was not going to make the profits which it had anticipated. Henningsen could not pursue Rembrandt for such losses because   G there was no contractual vehicle to permit it to do so. Was there some way that NIVE could itself claim those losses from Rembrandt?

56   It appears that this possibility only occurred to NIVE late in the litigation. In April 2018, NIVE sought to make significant amendments to its claim relying, amongst other things, on a settlement agreement it had concluded with Henningsen. Permission to make the bulk of those   H amendments was refused. The only amendment which was permitted was a claim for "transferred loss", in accordance with the decision of the House of Lords in *Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85, as discussed and explored in subsequent cases.

© 2020 The Incorporated Council of Law Reporting for England and Wales

57    At the trial, Teare J [2019] 1 All ER (Comm) 543 rejected the claim for transferred loss. Having referred to some of the relevant authorities, he summarised his reasons in relatively short order:

"161. It is apparent from the decision in that case, as summarised in para 17 of the judgment of Lord Sumption, that in order for the principle of transferred loss to apply there must have been an intention, known to the defendant, to benefit the third party. The argument failed in that case because 'it was no part of the object of the engagement of HMT [the defendant] or indeed of any other aspect of the 2006 transaction to benefit Mr Hunt [the third party]'. This reflects the account given by Lord Browne-Wilkinson in *Alfred McAlpine Construction Ltd v Panatown Ltd* [2001] 1 AC 518 of the essential feature of the principle upon which NIVE relies: 'The essential feature of the broader ground is that the contracting party A, although not himself suffering the physical or pecuniary damage sustained by the third party C, has suffered his own damage being the loss of his performance interest, ie the failure to provide C with the benefit that B had contracted for C to receive.'

"162. I note in particular the description of A's performance interest as 'the failure to provide C [the third party] with the benefit that B had contracted for C to receive'.

"163. In the present case it is not said that Rembrandt had contracted for Henningsen to receive any benefit or that it was part of the contract to benefit Henningsen. In those circumstances it must follow that, just as Swynson was unable to recover Mr Hunt's losses in *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2018] AC 313, so NIVE is unable to recover Henningsen's losses in the present case.

"164. Counsel for NIVE has sought to argue, with reference to other passages in the judgments in *Panatown*, that there is no requirement that both parties to the contract must have intended, pre-contract, to confer a benefit on the third party. For the reasons I have given, derived from the decision in the most recent Supreme Court case and the judgment of Lord Browne-Wilkinson in *Panatown* (which counsel for NIVE said was the most useful summary of the principle) I am unable to agree."

58    The concept of transferred loss can be traced back to the decision of the House of Lords in *The Albazero* [1977] AC 774. That was concerned with a lost cargo, and the principal issue was who owned the cargo at the time of the loss. Lord Diplock's formulation of the legal foundation for a claim for loss suffered by a third party was in the following terms (p 847):

"where it is in the contemplation of the parties that the proprietary interests in the goods may be transferred from one owner to another after the contract has been entered into and before the breach which causes loss or damage to the goods, an original party to the contract, if such be the intention of them both, is to be treated in law as having entered into the contract for the benefit of all persons who have or may acquire an interest in the goods before they are lost or damaged, and is entitled to recover by way of damages for breach of contract the actual loss sustained by those for whose benefit the contract is entered into."

59    This principle was applied in *Linden Gardens* [1994] 1 AC 85 and, in particular, the case heard and decided at the same time, *St Martins*

*Property Corpn Ltd v Sir Robert McAlpine Ltd*. In the *St Martins* case,   A
which was concerned with a defective building, Corporation had the benefit
of the contract with McAlpine but no longer owned the building; a related
company called Investments owned the building but had no cause of action
against McAlpine. Four of the five members of the court dealt with this
conundrum on the basis of what was subsequently referred to as "the
narrow ground", encapsulated by Lord Browne-Wilkinson at pp 114–115 as
follows:   B

> "In my judgment the present case falls within the rationale of the
> exceptions to the general rule that a plaintiff can only recover damages for
> his own loss. The contract was for a large development of property
> which, to the knowledge of both Corporation and McAlpine, was going
> to be occupied, and possibly purchased, by third parties and not by
> Corporation itself. Therefore it could be foreseen that damage caused by   C
> a breach would cause loss to a later owner and not merely to the original
> contracting party, Corporation. As in contracts for the carriage of goods
> by land, there would be no automatic vesting in the occupier or owners of
> the property for the time being who sustained the loss of any right of suit
> against McAlpine. On the contrary, McAlpine had specifically contracted
> that the rights of action under the building contract *could* not without   D
> McAlpine's consent be transferred to third parties who became owners or
> occupiers and might suffer loss. In such a case, it seems to me proper, as
> in the case of the carriage of goods by land, to treat the parties as having
> entered into the contract on the footing that Corporation would be
> entitled to enforce contractual rights for the benefit of those who suffered
> from defective performance but who, under the terms of the contract,
> could not acquire any right to hold McAlpine liable for breach. It is truly   E
> a case in which the rule provides 'a remedy where no other would be
> available to a person sustaining loss which under a rational legal system
> ought to be compensated by the person who has caused it'."

60   Lord Griffiths, however, dealt with the issue in a different way, in
what has come to be known as "the broader grounds". He said (pp 96–97):
  F

> "In my view neither of these considerations provide McAlpine with a
> defence to Corporation's claim. I cannot accept that in a contract of this
> nature, namely for work, labour and the supply of materials, the recovery
> of more than nominal damages for breach of contract is dependent upon
> the plaintiff having a proprietary interest in the subject matter of the
> contract at the date of breach. In everyday life contracts for work and
> labour are constantly being placed by those who have no proprietary   G
> interest in the subject matter of the contract. To take a common example,
> the matrimonial home is owned by the wife and the couple's remaining
> assets are owned by the husband and he is the sole earner. The house
> requires a new roof and the husband places a contract with a builder to
> carry out the work. The husband is not acting as agent for his wife, he
> makes the contract as principal because only he can pay for it. The   H
> builder fails to replace the roof properly and the husband has to call in
> and pay another builder to complete the work. Is it to be said that the
> husband has suffered no damage because he does not own the property?
> Such a result would in my view be absurd and the answer is that the
> husband has suffered loss because he did not receive the bargain for which

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   he had contracted with the first builder and the measure of damages is the cost of securing the performance of that bargain by completing the roof repairs properly by the second builder.  To put this simple example closer to the facts of this appeal—at the time the husband employs the builder he owns the house but just after the builder starts work the couple are advised to divide their assets so the husband transfers the house to his wife.  This is no concern of the builder whose bargain is with the husband.

B   If the roof turns out to be defective the husband can recover from the builder the cost of putting it right and thus obtain the benefit of the bargain that the builder had promised to deliver.  It was suggested in argument that the answer to the example I have given is that the husband could assign the benefit of the contract to the wife.  But what if, as in this case, the builder has a clause in the contract forbidding assignment without his consent and refuses to give consent as McAlpine has done.  It

C   is then said that neither husband nor wife can recover damages; this seems to me to be so unjust a result that the law cannot tolerate it.”

61    These different formulations were considered by the House of Lords in *Alfred McAlpine Construction Ltd v Panatown Ltd* [2001] 1 AC 518. That was similarly a case about a defective building that had been sold on

D   and the real issue, which was ultimately decisive of the appeal, was the existence of a deed of warranty that gave the third party building owner a direct right to claim against the contractor.  In those circumstances, it was held by a majority of 3:2 that the original employer (Panatown) was not entitled to anything other than nominal damages.  The members of the House of Lords displayed varying degrees of support for (or rejection of) Lord Griffiths’s broader ground.  Perhaps the most helpful summary can be

E   found in the speech of Lord Browne-Wilkinson (who assumed the broader ground was right without expressly endorsing it), at p 577:

“I turn now to the broader ground on which Lord Griffiths decided the *St Martins* case.  He held that the building contractor (B) was liable to the promisee (A) for more than nominal damages even though A did not own the land at the date of breach.  He held in effect that by reason of the

F   breach A had himself suffered damage, being the loss of the value to him of the performance of the contract.  On this view even though A might not be legally liable to C to provide him with the benefit which the performance of the contract by B would have provided, A has lost his ‘performance interest’ and will therefore be entitled to substantial damages being, in Lord Griffiths’s view, the cost to A of providing C with

G   the benefit.  In the *St Martins* case Lord Keith of Kinkel, Lord Bridge of Harwich and I all expressed sympathy with Lord Griffiths’s broader view. However, I declined to adopt the broader ground until the possible consequences of so doing had been examined by academic writers.  That has now happened and no serious difficulties have been disclosed. However, there is a division of opinion as to whether the contracting party, A, is accountable to the third party, C, for the damages recovered

H   or is bound to expend the damages on providing for C the benefit which B was supposed to provide.  Lord Griffiths in the *St Martins* case, at p 97G, took that view.  But as I understand them Lord Goff of Chieveley and Lord Millett in the present case (in agreement with Steyn LJ in *Darlington Borough Council v Wiltshier Northern Ltd* [1995] 1 WLR 68, 80H)

© 2020 The Incorporated Council of Law Reporting for England and Wales

576

BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)          [2020] QB
Coulson LJ

would hold that, in the absence of the specific circumstances of the present case A, is not accountable to C for any damages recovered by A from B.

"I will assume that the broader ground is sound in law and that in the ordinary case where the third party (C) has no direct cause of action against the building contractor (B) A can recover damages from B on the broader ground. Even on that assumption, in my judgment *Panatown* has no right to substantial damages in this case because UIPL (the owner of the land) has a direct cause of action under the DCD.

"The essential feature of the broader ground is that the contracting party A, although not himself suffering the physical or pecuniary damage sustained by the third party C, has suffered his own damage being the loss of his performance interest, i e the failure to provide C with the benefit that B had contracted for C to receive."

62   It is possibly unhelpful to identify in too much detail the differing views of the remaining members of the court. Lord Goff of Chieveley and Lord Millett both adopted the broader ground, although they were in the minority as to the result of the appeal. As noted above, Lord Browne-Wilkinson did not expressly endorse the broader ground but assumed it to be correct. Lord Clyde and Lord Jauncey of Tullichettle did not endorse it and offered different formulations which appear to be based closely on the narrow ground.

63   In identifying the principles underpinning the broader ground, Lord Goff said at p 538G that it applied in the situation "in which a party contracts for a benefit to be conferred on a third party", and later at p 538H he said:

"It would be an extraordinary defect in our law if, where (for example) A enters into a contract with B that B should carry out work for the benefit of a third party, C, A should have no remedy in damages against B if B should perform his contract in a defective manner."

He later repeated this analysis of the broader ground, saying at p 544E that what *Panatown* was concerned with was "the case of a contract which is intended to confer a benefit on a third party but not to confer on the third party an enforceable right"; and at p 545D noting that Lord Griffiths was not concerned with the problem of privity of contract: "on the contrary, he was concerned that a contracting party who contracts for a benefit to be conferred on a third party should himself have an effective remedy."

64   The Supreme Court considered this issue again in *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2018] AC 313. The case concerned loans made by Swynson to borrowers based on due diligence reports produced by HMT, a firm of accountants. Swynson was owned by a Mr Hunt. When the borrowers defaulted, Mr Hunt repaid the unpaid sums to Swynson. In Swynson's claim for negligence against HMT, the accountants argued that Swynson had suffered no loss. The Supreme Court held that HMT's duty was owed to Swynson but the loss had been suffered by Mr Hunt. Lord Sumption JSC pointed out in the first paragraph of his judgment that "The distinct legal personality of companies . . . has never stopped businessmen from treating their companies as indistinguishable from themselves. Mr Michael Hunt is not the first businessman to make that mistake and doubtless he will not be the last".

© 2020 The Incorporated Council of Law Reporting for England and Wales

65    The claim based on the transferred loss principle failed for the reasons explained by Lord Sumption JSC. His summary of the principle is important (para 14):

"The principle of transferred loss is a limited exception to the general rule that a claimant can recover only loss which he has himself suffered. It applies where the known object of a transaction is to benefit a third party or a class of persons to which a third party belongs, and the anticipated effect of a breach of duty will be to cause loss to that third party. It has hitherto been recognised only in cases where the third party suffers loss as the intended transferee of the property affected by the breach."

66    Then, having dealt with *The Albazero* and *Linden Gardens* he went on:

"16. It is, however, important to remember that the principle of transferred loss, whether in its broader or narrower form, is an exception to a fundamental principle of the law of obligations and not an alternative to that principle. All of the modern case law on the subject emphasises that it is driven by legal necessity. It is therefore an essential feature of the principle that the recognition of a right in the contracting party to recover the third party's loss should be necessary to give effect to the object of the transaction and to avoid a 'legal black hole', in which in the anticipated course of events the only party entitled to recover would be different from the only party which could be treated as suffering loss: see *Alfred McAlpine Construction Ltd v Panatown Ltd* [2001] 1 AC 518, 547–548 (Lord Goff), 568 (Lord Jauncey), 577–578 (Lord Browne-Wilkinson), 582–583 (Lord Millett). That is why, as the House of Lords held in this last case, it is not available if the third party has a direct right of action for the same loss, on whatever basis.

"17. In the present case the relevant duty was owed to Swynson but the loss has in the event been suffered by Mr Hunt. Since Mr Hunt did not suffer his loss in his capacity as the owner of property, only the broader principle of transferred loss could be relevant to his case. Like others before me, I consider that there is much to be said for the broader principle. But it is not necessary to decide the point on this appeal because it is plain that the principle cannot apply in either form to the present facts. The reason is that it was no part of the object of the engagement of HMT or indeed of any other aspect of the 2006 transaction to benefit Mr Hunt. That is the main reason why no duty of care was owed to him. It is also one reason why the engagement letter was unassignable without consent. Mr Hunt's loss arises out of the refinancing of December 2008, which had nothing to do with HMT and did not arise out of their breach of duty."

67    Lord Mance JSC and Lord Neuberger of Abbotsbury PSC reached the same view: at para 104, when explaining the broader ground, Lord Neuberger PSC characterised the underlying contract as one which "can be seen as having been entered into by B partly for C's benefit".

68    Unsurprisingly, perhaps, the principles underlying a claim for transferred loss have been considered in a number of other decisions. It is unnecessary to deal with them in any detail. I note just three:

(i) In *And So To Bed Ltd v Dixon* [2001] FSR 47, ASTBL were franchisors, and the second claimant was a manufacturer of bedsteads.

© 2020 The Incorporated Council of Law Reporting for England and Wales

ASTBL had a franchise agreement with the defendant, but when the defendant defaulted, the loss was suffered not by ASTBL but by the second claimant. David Donaldson QC, sitting as a deputy judge of the Chancery Division, rejected ASTBL's claim for transferred loss (para 54):

> "However, it does not appear to me that Lord Griffiths's approach assists ASTBL in the present case. The 'performance interest' of party A to a contract, as envisaged by Lord Griffiths in *Linden Gardens* and by Lord Goff, Lord Jauncey and Lord Millett in *Panatown*, is no more than the obverse of the positive obligations assumed by the other party B. It is the benefit inherent in the performance of those obligations itself to the exclusion of any further consequential loss. Even if that were not right, A's 'performance interest' cannot, in my judgment, encompass benefits which a third party C can anticipate in consequence of steps taken by B to put himself in a position to perform the positive obligations owed by B to A. More concretely in the present case the positive obligations of the licensee under the Agreement were, in essence, to sell bedding and associated products under the franchised name from the agreed premises. The correlative 'performance interest' of the licensor did not extend beyond that to the benefits which would enure to C under future contracts of sale by C to the licensee of bedding products merely because the motive for their purchase by the licensee was to resell them from the franchised premises . . . Loss of profit suffered by the second claimants in respect of the anticipated sales cannot therefore constitute a loss to ASTBL inherent in the defendants' non-performance of the Agreement and is not recoverable by ASTBL as damages for repudiation under Lord Griffiths's alternative approach."

(ii) In *SmithKline Beecham plc v Apotex Europe Ltd* [2007] Ch 71, Jacob LJ stressed that none of the speeches in either *Linden Gardens* or *Panatown* "begin to regard, as within the concept of 'performance interest', anyone who might be adversely affected by a breach of contract".

(iii) In *DRC Distribution Ltd v Ulva Ltd* [2007] EWHC 1716 (QB) at [76], Flaux J considered the decisions in *Linden Gardens* and *Panatown* and said:

> "As [counsel for the defendant] submitted in his analysis, there may be some difficulty in identifying the precise ratio decidendi of the majority decision in *Panatown* and the extent to which more general observations of their Lordships represent the law. As I have already stated, it does seem clear that the majority were rejecting the broader ground put forward by Lord Griffiths in the *St Martins* case."

69    When outlining the sub-issues between the parties on the second appeal, Mr Morpuss accepted that the narrow ground simply did not apply on the facts so that, in order for NIVE to succeed in its claim for transferred loss, they needed to bring themselves within the broader ground. He said that there were three sub-issues:

(a) Whether the broader ground requires that, at the time that the underlying contract was made, there was a common intention and/or a known object to benefit the third party, or a class of persons to which the third party belonged. For shorthand purposes only, I shall refer to this as "the known third party benefit".

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    (b) Whether the broader ground applies to contracts for the sale of goods.
(c) Whether this was a "black hole" case at all, given that Henningsen could recover from NIVE.

70    Mr Morpuss assumed that, contrary to the indication of Flaux J in *DRC Distribution Ltd*, the broader ground was still good law, notwithstanding what was said about it in *Panatown*. Mr Kealey did not suggest to the contrary. Following the clear guidance in *Swynson*, I consider
B    that it is.

71    I also agree that the first of the sub-issues outlined by Mr Morpuss, namely whether the broader ground requires a known third party benefit, is much the most important sub-issue. Mr Morpuss properly accepted that, if he was wrong to suggest that this was not a component of the broader ground, NIVE's claim for transferred loss must fail.

C    72    In my view, based on the authorities summarised above, the known third party benefit is an essential component of the broader ground. It is a consistent feature of the authorities to which I have referred:
(a) In *Linden Gardens* [1994] 1 AC 85, in Lord Griffiths's example of the builder installing a new roof, the builder would have known that he was benefitting the owners of the house, even if he was unaware of their specific identity. Thus, he would have known that it was for the benefit of the wife,
D    whether she legally co-owned the house with her husband or not, and even if all the builder's dealings had been with her husband.
(b) In *Panatown* [2001] 1 AC 518, Lord Browne-Wilkinson referred to this essential component at p 577H as "the failure to provide C [the third party] with the benefit that B [the contract breaker] had contracted for C to receive".

E    (c) Also in *Panatown*, Lord Goff talked about the broader ground requiring a contract having to be "for the benefit of a third party" (p 538H); "a contract which is intended to confer a benefit on a third party but not to confer on the third party an enforceable right" (p 544E); and "a contracting party who contracts for a benefit to be conferred on a third party should himself have an effective remedy" (p 545B).

(d) In *Swynson* [2018] AC 313, Lord Sumption JSC described the rule as
F    one "where the known object of a transaction is to benefit a third party or a class of persons to which a third party belongs" (para 14), and he referred to "the benefit that the third party was intended to have" (para 15). Lord Sumption JSC rejected the application of the principle of transferred loss in that case because "it was no part of the object of the engagement of HMT or indeed of any other aspect of the 2006 transaction to benefit Mr Hunt"
G    (para 17). Lord Neuberger PSC said the same at paras 104–105.

73    Accordingly, I have no hesitation in concluding that, as a matter of law, for a successful claim for transferred loss that seeks to rely on the so-called broader ground, as explained in *Linden Gardens* and *Panatown*, the claimant must show that, at the time that the underlying contract was made, there was a common intention and/or a known object to benefit the third party or a class of persons to which the third party belonged.

H    74    On that basis, as Mr Morpuss accepted, NIVE's claim for transferred loss must fail. At the time of the making of the contract, Rembrandt was not even aware of the existence of Henningsen, let alone the possibility that Henningsen might be providing some of the egg white powder on behalf of NIVE. NIVE therefore cannot bring itself within Lord Griffiths's broader

© 2020 The Incorporated Council of Law Reporting for England and Wales

580
BV Nederlandse Industrie v Rembrandt Enterprises Inc (CA)        [2020] QB
Coulson LJ

ground. Of all the authorities noted above, the present claim for transferred loss is perhaps closest to the claim for loss of profits in *And So To Bed* [2001] FSR 47. It must fail for the same underlying reasons.

75   It is perhaps worth pausing a moment to reflect on the consequences if Mr Morpuss was right, that this component was not required for a claim for transferred loss. As I have already pointed out, Henningsen was a domestic subcontractor to NIVE, being used to fulfil some of NIVE's own contractual obligations to Rembrandt. Its involvement was entirely a matter for NIVE: Rembrandt had no knowledge of Henningsen. So, if Mr Morpuss was right and the known third party benefit was irrelevant, it would mean that a main contractor would always be able to claim against the employer the losses suffered by his subcontractor, even if the employer had no knowledge of the subcontractor, or even that a subcontractor was going to be used at all. That would not only be contrary to the general rule, referred to by Lord Diplock in *The Albazero* [1977] AC 774 and Lord Sumption JSC and Lord Neuberger PSC in *Swynson*, that a party can only recover the losses that it has itself suffered, but it would also turn transferred loss, which is supposed to be a narrow exception to that rule, into a commonplace route of recovery. In my view, that would go far beyond even what Lord Griffiths had in mind in *St Martins* [1994] 1 AC 85, and I do not consider that it is a correct analysis of the law.

76   During the course of his oral submissions, Mr Morpuss suggested that it was a relevant factor that both NIVE and Henningsen were companies within the same group and were owned by the same family. In support of this contention, he referred to Lord Clyde's speech in *Panatown* [2001] 1 AC 518 when he said, at p 535H–536A, that the problem that arose in that case "is most likely to arise in the context of the domestic affairs of a family group or the commercial affairs of a group of companies".

77   But, certainly on the facts of this case, I do not consider that it makes any difference that NIVE and Henningsen are owned by members of the same family. First, as Mr Kealey pointed out, the evidence was that, not only were these companies separate legal entities, but they traded with each other on commercial terms. Secondly, it was obviously in the interests of the family members who owned these companies to use their separate legal entities for their own purposes. They cannot rely on the separate nature of those companies when it suits them, and then seek to break down the barriers when it creates difficulties. That comes uncomfortably close to what Mr Hunt was trying to do in *Swynson* [2018] AC 313.

78   In the light of my conclusion on this critical sub-issue, it is unnecessary, and possibly unwise, to express concluded views on the other sub-issues. I will confine myself to saying that, although I consider that, on the face of the authorities, the argument that the broader ground does not arise in sale of goods contracts has some force, it may be difficult to justify treating different types of contracts in a different way. Ultimately, it will depend on the analysis of the particular contract in question. Similarly, the fact that this was a claim for loss of profit, rather than the sort of claim addressed in the principal authorities (which were largely concerned with the cost of necessary remedial work) may also be a reason to find that the broader ground did not apply although, since a claim for loss of profit is a recognised head of loss in claims under or for breach of commercial

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    contracts, it may again be difficult to exclude the principle of transferred loss merely because of the nature of the damages claimed.

79    As to the final sub-issue, namely whether or not this was a claim which was otherwise disappearing into a black hole, I have some sympathy with Mr Kealey's argument that it was not. After all, it appears to have been agreed that Henningsen could look to NIVE to recover its losses, which is what one would expect. This is not therefore a situation in which the party who has suffered the loss has no means of redress against anyone. On the other hand, I can see that, since NIVE could not have recovered from Rembrandt any sums paid out to Henningsen, that could be said to establish the necessary black hole for these purposes. But although Mr Morpuss supported this submission by saying that, in *St Martins* [1994] 1 AC 85, Investments could have recovered from Corporation but that did not prevent the finding by the House of Lords of a black hole, that is not actually what happened: there, it was Corporation who paid for the remedial works, and "for financial reasons beneficial to Corporation and Investments" (p 96F), Investments then reimbursed Corporation. So, the position is far from clear-cut. As it is, however, that is not a question which this court needs to decide on this appeal.

80    For the reasons that I have given, I consider that the transferred loss claim must fail because, on the facts, the claim lacks a critical component. The contract between NIVE and Rembrandt was not (even in part) for the benefit of Henningsen; it was not for the transfer of any right to Henningsen; any possible benefit to Henningsen was not a known or intended object of the contract; Henningsen was not known to Rembrandt at the time that the contract was made; and NIVE's intention to use Henningsen as a subcontractor was similarly unknown to Rembrandt. There was no known third party benefit.

81    In consequence, I conclude that Teare J was right to reject the transferred loss claim in the succinct terms that he did. The second appeal is also dismissed.

*Overall conclusion*

82    This appeal will be dismissed.

*Appeal dismissed.*

Matthew Brotherton, Barrister

© 2020 The Incorporated Council of Law Reporting for England and Wales



Neutral Citation Number: [2018] EWHC 958 (Comm)

Claim No. LM-2016-000117

1 May 2018

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES (QBD)**
**LONDON CIRCUIT COMMERCIAL COURT**

B e f o r e :
**HIS HONOUR JUDGE WAKSMAN QC**
**(sitting as a Judge of the High Court)**

B E T W E N :-

|  |  |  |
|---|---|---|
| (1) | **MICHAEL CARNEY** | |
| (2) | **ROBERTA CARNEY** | |
| (3) | **BRIAN NOEL FOX** | |
| (4) | **PAMELA JEAN FOX** | |

**Claimants**

-and-

**N M ROTHSCHILD & SONS LIMITED**

**Defendant**

Nicholas Yell (instructed by Carter-Ruck, Solicitors) for the Claimants

Richard Hanke (instructed by Freshfields Bruckhaus Deringer LLP, Solicitors) for the Defendant

# JUDGMENT

**Hearing dates: 16-19, 23-26, 29-30 January and 5 February 2018**

**INTRODUCTION**

1.  This is a financial mis-selling claim brought by two sets of Claimants, Mr and Mrs Carney and Mr and Mrs Fox, who at all material times were British expatriates resident in Malaga and Alicante, Spain, respectively.

2.  The Defendant bank, NM Rothschild & Sons Limited ("the Bank") entered into loan agreements ("Loan Agreements") with the Claimants on or about 13 March 2006 and 3 November 2005. By such agreements the Bank advanced €292,500 to Mr and Mrs Carney ("the Carney Loan") and €750,000 to Mr and Mrs Fox ("the Fox Loan").

3.  The purpose of the Loan Agreements was to advance funds to the Claimants for the purpose of investing into a fund known as the "Optima 2 Fund" provided by a Luxembourg company called Aspecta Assurance International Luxembourg SA ("Aspecta") which also provided a life-insurance "wrapper". The underlying investment was in Notes issued by Barclays Bank plc which in turn represented investments into three highly rated (AA or AAA) funds known as Gartmore Investment Funds, Mellon Global Funds plc and Permal FX, Financial and Futures Limited.

4.  Barclays gave a capital guarantee on the Notes so that at maturity (10 years) the Claimants would receive back approximately 100% of the capital invested.

5.  The loans to the Claimants were secured by these investments and also their (previously unencumbered) properties in Spain.

6.  The loans also allowed for up to 5% of the sum advanced to be drawn down immediately for general use. Furthermore, and depending on the performance of the investments, they could take up to 3% of the value of the investment each year as income drawdown. Finally, they had the option of rolling up interest so that it was payable only at maturity. In making the loans the Bank applied a LTV ratio of 75% as far as the properties were concerned.

7.  Although the Loan Agreements were made with the Bank, it was the Bank's Guernsey subsidiary, now known as Rothschild Bank International Ltd ("RBI") which dealt with this on the ground, as it were.

8.  There is a very considerable dispute about the nature and extent of the role of the Bank in its dealings with the Claimants prior to the making of the Loan Agreements and the investment. But there is no doubt that the investment was in any event promoted by an independent financial adviser (IFA) called Henry Woods Investment Management ("HW") which seems to have been the trading name of Henry Woods Associates S.L., based in Marbella. Neither Aspecta nor its predecessor for these purposes, the Premier Group ("Premier"), marketed their investments directly to investors but rather went through IFAs such as HW. The main representatives of HW who dealt with the Claimants were Terry Morgan and Donald Nott respectively.

9.  In the event, the investments underperformed. No doubt this was partly due to the financial crash of 2007-2008 but it seems also to have been due also to a desire on the part of Barclays to deal with the investments conservatively and avoid risk so as to ensure that it would not have to use its own funds to repay the guaranteed amount at the end of the day; but by the same token this reduced the opportunity to make profits. Whatever the cause, it is not suggested (and there is no evidence) that the investments themselves were other than proper.

10. In the case of Mr and Mrs Fox, having seen what happened with the investment, they terminated it early and invested elsewhere.

11. At the time when these proceedings were issued in 2016, Mr and Mrs Carney owed about €125,000 under the Carney Loan and Mr and Mrs Fox owed about €242,000 under the Fox Loan. Their houses in Spain, therefore, all remain at risk.

12. The Claimants allege that the Bank acted as their adviser as to the suitability of the investment and its risks and also in particular as to its efficacy as a way of avoiding the Spanish version of inheritance tax ("ISD") in relation to their properties. This was of concern to them because the local tax rate was very high and would apparently impose a direct liability on any of the beneficiaries of the properties on the death of one or more of the Claimants. A core allegation made by all the Claimants is that the Bank's representative, Mr Stephen Dewsnip, made a number of serious misrepresentations about the investments and the tax position in particular (a) at a cocktail party at the Alhaurin Golf Club, Malaga on 4 October 2005 attended by Mr and Mrs Carney among others ("the Cocktail Party"), and (b) at a lunch hosted by Mr and Mrs Fox at their home on 10 October 2005 ("the Lunch").

13. The broad thrust of the Claimants' case is that the Bank, through Mr Dewsnip and also through certain documents, some produced by HW but for which the Bank was responsible, advised that this was a very good and safe investment, that it would have the additional effect of taking the value of their properties which stood as security, out of their Spanish estate for the purpose of IHT, thereby substantially reducing the IHT burden on their survivors, and that they could have confidence in the investment and their ability to repay the loans because of the *imprimateur* of the Bank which had a 200-year-old history and a reputation for being careful and cautious with clients' money.

14. In fact, say the Claimants, the overall scheme was very risky, it did not generate sufficient funds to be able to repay the interest, the fees charged (which depleted the amount of money which could be invested) were significantly more than and different from what they had expected; further, the tax position was not as they had been led to believe although (fortunately for the Claimants) the tax position as it affects their properties has yet to be tested.

15. Mr Carney is now 73, as is Mrs Carney. Mr Fox is now 85 and his wife is 83. So in 2005 they were 60, 72 and 70 respectively.

16. The sole claim made against the Bank by the Claimants is pursuant to s140A and s140B of the Consumer Credit Act 1974 ("the Act"). That is to say, an unfair relationship arose between the Claimants and the Bank out of the Loan Agreements. The principal relief claimed is the removal of their present indebtedness to the Bank under the Loan Agreements and the discharge of the security.

17. The Bank denies all the key legal and factual allegations made by the Claimants.

## THE EVIDENCE

18. I heard from all the Claimants. I also heard briefly from Geoffrey Hewgill, and Steve Bicknell, and received a witness statement from Karen Douglas who were all further dissatisfied investors. There was also an affidavit admitted as a hearsay statement from Katherine Dillon who was involved in the same scheme but as a financial adviser working for an IFA in Spain called Hamiltons Financial Services ("Hamiltons").

19. In this trial, HW, as the IFA at the time, has been conspicuous by its absence. The Claimants had intended to call Mr Nott whose witness statement effectively placed all the responsibility for recommending and advising on the scheme upon the Bank. But shortly before the trial was due to start, the Claimants' solicitors said that they had decided not to call him. It was not suggested that he was unable to give his evidence nor was his witness statement sought to be put in as a hearsay statement. It is difficult to avoid the inference that if he had come to give evidence it might have been difficult for him to sustain his account of matters.

20. For the Bank I heard from Mr Dewsnip who was a director of RBI in the period 2004 - 2006, managing marketing and business development for RBI's Private Client Department. He subsequently left the Bank. I also heard from Claire Whittett, a director of RBI and Head of Lending at the time, Christopher Coleman, a managing director at the Bank, Group Head of Banking at the Rothschild Group and chairman of RBI, and Peter Rose who was Managing Director of RBI at the time. There is also a hearsay statement from Luis Marban, a Spanish Notary Public who was engaged by the Bank in connection with the notarising of the documents associated with the Loan Agreements. I should add that all of the Bank's witnesses dealing with the circumstances of the granting of the loans stayed outside Court until it was their turn to give evidence.

21. Each side also called an expert witness to deal with various aspects of the Loans and the investment, from the point of view of suitability and risk among other things. For the Claimants I heard from Solomon Green and for the Defendants I heard from Jason Nicholls.

22. The events to which the principal witnesses directed their evidence all took place some 12-13 years ago. That imposes a considerable burden in terms of their recollections. The fact that the Claimants have been litigating this case for two years now and have been making complaints of one kind or another for a number of years previously and indeed not long after problems arose, does not necessarily assist them. That is because over time, views and impressions, even if inaccurate, can solidify into what appear to be clear and reliable accounts of what took place, even to the witnesses themselves. There is certainly an element of that here for the Claimants who have, to one extent or another been in touch with many other investors who took out similar loans and faced similar difficulties. I do not underestimate those difficulties which left all the Claimants in a seriously adverse financial position at a time when they would have expected to be enjoying a stress-free retirement, having provided for their families, and where they did not need to make this investment at all.

23. The fact that for the most part (but not always) the Claimants were trying to assist the court does not mean that their evidence was always reliable.

24. In addition, there is no doubt that whether right or wrong, the Claimants (and others too, I have no doubt) have come to view the Bank generally and Mr Dewsnip in particular as the sole source of all of their difficulties. This was reflected in the obvious hostility towards Mr Dewsnip shown when the Claimants gave evidence and the somewhat derogatory references to him on many occasions simply as "Dewsnip".

25. This concentration upon the role of the Bank led, in my view, to an almost irrational disregard for or diminution of the role played by HW and in particular Mr Nott and Mr Morgan who were, after all, the Claimants' expressly appointed financial advisers. One example of this was the Claimants' anger, on their accounts, when they said they discovered that Aspecta had charged an 8% fee for the making of their investments which would come out of the loan monies. It did not seem to me that they took in that half of this i.e. 4% went to HW itself which, on their account, had a very small role indeed. And in other respects, some or all of the Claimants stuck to particular "mantras" such as the notion that they only filled in the application forms for the Loans in order to obtain further information, thus laying the ground for the critical allegation that they would never have entered into these contracts absent the assurances given by Mr Dewsnip at the Cocktail Party and the Lunch.

26. As against all of that, however, was the evidence of Mr Dewsnip, a witness who perhaps understandably in the circumstances, clearly wished he was somewhere else. He obviously felt under a great deal of pressure but his reluctance to stray very far from what he regarded as the safe territory of his witness statement and in particular his own mantra that the Bank was always acting purely as lender (and no more) meant that his evidence was less helpful than it might have

4

been. And on occasion, it was implausible or unrealistic. I also take into account that he is likely to have been somewhat more relaxed at the Cocktail Party and the Lunch.

27.    In those circumstances, the Court will naturally look to see what part of the protagonists' evidence is either supported or negated by the contemporaneous documents, and what the objective realities must have been, together with the inherent plausibility or implausibility of what the witnesses said. There is no actual note taken by anybody of what Mr Dewsnip said on the two occasions.

28.    There are some unhelpful features of the Claimant's disclosure. First, it emerged that Mrs Carney had kept diaries covering the relevant period which had not been disclosed. Second she had made notes of various events and conversations (including with her financial advisers) which were not now available (see below). Further none of the Claimants could produce electronic communications which had all been lost or destroyed since 2015. These would likely have included communications between the Claimants and IFAs or other investors and it was accepted that not all of them had been disclosed and some had been redacted. In respect of one email coming from Mrs Fox's email account she said she did not send it and the account must have been hijacked which did not seem very likely. Nor was there any disclosure of their communications with their financial advisers generally at the time.

29.    Such disclosure may well have shed light on how some of the allegations emerged and how much they had been discussed with others, and also on the role of HW and the true extent of its communications with the Claimants – especially since there is no witness evidence from HW and no complete set of the documents which HW would have had.

## OTHER PROCEEDINGS

30.    In September 2011 the Claimants made separate complaints to the Financial Ombudsman Service ("FOS") which concluded in July 2012 that it did not have any jurisdiction. At the same time, representatives of the Bank met with the FSA to discuss the loans and the allegations made by the Claimants, but no action was taken then or thereafter. In September 2012, Mr Carney complained to the Equity Release Council saying that the loan was an equity release scheme. The Bank responded (although it was not a member of the Council) to point out that the loan was not an equity release scheme because it was for a fixed term and the loan proceeds could only be used for the purpose of the investment after consultation with an IFA; no further action was taken. In May 2013 the Guernsey Financial Services Commission received a mis-selling complaint about the Bank but after it responded there was no further action.

31.    There have also been legal proceedings in Spain. In March 2012 two other borrowers, Ms Leftwick and Ms Holley brought a claim against their IFA, Hamiltons and the Bank making similar allegations to the Claimants here. Mr Dewsnip gave evidence to the Court of First Instance including what was said at the Cocktail Party. The Court held that at no point was the Bank involved in the provision of advice or offering or selling a financial product. That judgment was appealed but the appeal was dismissed by the Provincial Court of Malaga on 19 April 2017. There is now a pending appeal to the Supreme Court.

32.    In addition, other borrowers, Mr and Mrs Al Yawer brought a claim against International Property Finance (Spain) Ltd ("IPF"). The latter is another Rothschild group company but which made loans to non-residents in Spain as opposed to residents. They made their claim also in the Court of First Instance in a similar manner to those made by Ms Leftwick and Ms Holley and once more, Mr Dewsnip gave evidence. The Court in November 2016 gave judgment against the Bank specifically finding that IPF was responsible for the conduct of Mr and Mrs Al Yawer's IFA and that IPF had caused misunderstandings which induced them wrongly to enter into the loan and to make the investment. The Bank has appealed that decision. Transcripts of Mr

Dewsnip's evidence were made available and he was asked some questions about it in cross-examination.

## THE MATERIAL TERMS OF THE LOAN AGREEMENTS

33.    The Loan Agreements were in the same form and contained the same printed terms. They each consisted of (a) the completed Residents' Application Form ("Application Form") and (b) the Residents' Terms and Conditions ("Terms and Conditions").

34.    Mr and Mrs Carney completed and signed one Application Form on 20 September 2005 and then a further form on 13 March 2006. Mr and Mrs Fox signed an Application Form on 19 July 2005. In all cases their signatures were witnessed.

35.    All the Claimants had to sign before a Spanish Notary. Mr Marban dealt with Mr and Mrs Fox. He explains that he checked all the documents and asked the parties if they wanted him to read them to them and give any required clarification. If they did not he would check that they understood them fully and understood what they were signing and their obligations. There is no reason to suppose the notary dealing with Mr and Mrs Carney would not have done the same.

### Application Form Terms

36.    The Application Form is headed by a box of text itself headed "IMPORTANT NOTICE". It goes on to say that:

> "This Application Form, together with the Terms and Conditions, sets out the basis upon which NM Rothschild & Sons Ltd (the "Lender") will provide a Credit Select loan facility. Their contents are important and should be read carefully before completing and signing the Application Form as together they constitute the Clients contract with the Lender…

> Clients are advised to seek independent legal and tax advice before signing and where the Client consist of more than one person each individual is advised to seek such legal and tax advice independently of the other.

> The enforcement by the Lender of its rights hereunder may result in the loss of part or all of the Collateral that is provided as security for the facility."

37.    There are then the following terms:

    (1)    Clause 1 (d) of the Application Form:

> "We understand that the value of the Collateral can fall as well as rise, and that the Lender makes no recommendation whatsoever as to the suitability, quality or future performance of any of the Collateral."

    (2)    Clause 1 (e):

> "We understand that this Application Form and the Terms and Conditions are important documents, that the enforcement by the Lender of its rights hereunder may result in the loss of part or all of the Collateral and that we have been advised to seek independent legal and tax advice before signing."

    (3)    Clause 1 (f):

> "We understand that this … Agreement shall constitute the whole agreement and that no reliance may be placed on any representation made by or on behalf of either party unless expressly contained in that agreement";

    (4)    Clause 1 (g):

> "We hereby confirm that in connection with this Facility the Lender has acted as the provider of finance only and has not provided any advice to me/us regarding legal matters, investment matters, tax laws or my/our tax position in any jurisdiction. We also confirm that I/we have not requested from the Lender, nor have I/we received, any representation or warranty regarding either my/our tax position or, in the event of my/our death(s), that of my/our estate(s) in any jurisdiction nor has the Lender provided any representation or warranty regarding the tax consequences of the Facility, such consequences being entirely at my/our own risk. I/We further confirm that, to the fullest extent permitted by applicable law, the Lender shall have no liability in contract or in tort for any losses, damages or costs incurred by me/us regarding investment matters, tax matters or resulting from my/our tax position, or in the event of my/our death(s) that of my/our

6

estate(s), being less favourable than I/we expect. Finally, I/we confirm that for the purposes of this paragraph 1 (g) only, any reference to "Lender" shall include the Lender's directors, officers, employees, agents and advisers."

(5)    Clause 4: SOURCE AND GENERATION OF FUNDS

"We hereby also confirm that given my present level of surplus income/liquid assets we believe that we will be able to service interest payable on an ongoing basis should the need arise";

(6)    Clause 6: FINANCIAL ADVISER DETAILS

"We hereby appoint [HW] as our financial adviser and hereby authorise you to disclose any information regarding our Facility to them as they may request from time to time. We understand that our financial adviser is acting as our agent and not agent for the Lender";

## Terms and Conditions Terms

38.    The Terms and Conditions contained the following terms:

(1)    in Clause 1, the definitions section:

(a)    "Collateral" means the Property and the Chargor's holdings in the Investment Fund;

(b)    "First Tranche" means an initial advance of 3% of the market value of the Property on the date of execution of the Loan Agreement; "Second Tranche" means the balance of the loan;

(c)    "Investment Fund" means the particular capital guaranteed Euro denominated mutual fund acceptable to the Lender;

(d)    "Property" means the property described in the Application Form as constituting the Collateral;

(2)    Clause 8:

"The Client hereby warrants and represents to the Lender that…

8.7 it is entering into the Finance Documents solely on the basis set out therein and not in reliance on any representations made to it by the Lender or in any other document or otherwise;

8.8 the representations and warranties in this paragraph 8 shall be deemed to be repeated by the Client with reference to the facts and circumstances then existing, on and as of each day from the date of this Agreement Form until all monies due and owing by the Client under the terms of the Facility Agreement have been repaid in full."

(3)    Clauses 12 and 13 provide for an excess capital sum to be paid to the Lender and/or interest as it falls due (where the interest had otherwise been rolled-up) in the event that the value of the Collateral falls below a certain percentage of the loan.

## THE UNFAIR RELATIONSHIP CLAIM

39.    Section 140A provides as follows:

"(1)    The court may make an order under section 140B in connection with a credit agreement if it determines that the relationship between the creditor and the debtor arising out of the agreement (or the agreement taken with any related agreement) is unfair to the debtor because of one or more of the following— (a) any of the terms of the agreement or of any related agreement; (b) the way in which the creditor has exercised or enforced any of his rights under the agreement or any related agreement; (c) any other thing done (or not done) by, or on behalf of, the creditor (either before or after the making of the agreement or any related agreement);

(2)    In deciding whether to make a determination under this section the court shall have regard to all matters it thinks relevant (including matters relating to the creditor and matters relating to the debtor)…"

7

40.     Section 140B (1) then provides that:

> "An order under this section in connection with a credit agreement may do one or more of the following —
> ....
> (c)     reduce or discharge any sum payable by the debtor or by a surety by virtue of the agreement or
> any related agreement;
>
> (d)     direct the return to a surety of any property provided by him for the purposes of a security;.."

41.     The core allegations centre around the alleged wrong advice given and misrepresentations made by or on behalf of, the Bank to the Claimants ("the Substantive Claim"). The Bank denies that any advice was given or any actionable representations were made, and if they were that they were wrong or false, but insofar as necessary, it also calls in aid the terms referred to in paragraphs 36-37 above ("the Relevant Clauses"). The riposte by the Claimants is that such terms themselves gave rise to, or contributed to, the unfair relationship alleged ("the Terms Claim") and so cannot be relied upon.

42.     The Substantive Claim falls to be considered within s140A (1) (c) because it concerns things done or not done by the creditor prior to the making of the Loan Agreements. The Terms Claim falls to be considered within s140A (1) (a).

43.     Mr Yell produced a number of helpful schedules in amplification of the Claim, as follows:

(1)          Schedule A which contains extracts from documents which are said to show the Banks "integral role in the set up of the scheme";

(2)          Schedule B, which is a comparison between a PowerPoint presentation given by Mr Dewsnip to HW on 22 September 2005, and HW's Confidential Report to Mr and Mrs Carney dated 28 September 2005;

(3)          Schedule C, being the collection of misrepresentations alleged as against the Bank; and

(4)          what I shall refer to as Schedule D being the terms of the Loan which are alleged to be unfair.

44.     I will deal with those Schedules below, in context.

45.     I deal with the legal aspects of the Claim in paragraphs 46-101 below.

## THE LAW

### Unfair Relationship:

*The General Approach*

46.     A number of preliminary observations may be made. First, as to the general scope of these provisions, Lord Sumption described it at paragraph 10 of his judgment in the leading case of *Plevin v Paragon* [2014] UKSC 61:

> "Section 140A is deliberately framed in wide terms with very little in the way of guidance about the criteria for its application, such as is to be found in other provisions of the Act conferring discretionary powers on the courts. It is not possible to state a precise or universal test for its application, which must depend on the court's judgment of all the relevant facts. Some general points may, however, be made. First, what must be unfair is the relationship between the debtor and the creditor. In a case like the present one, where the terms themselves are not intrinsically unfair, this will often be because the relationship is so one-sided as substantially to limit the debtor's ability to choose. Secondly, although the court is concerned with hardship to the debtor, subsection 140A(2) envisages that matters relating to the creditor or the debtor may also be relevant. There may be features of the transaction which operate harshly against the debtor but it does not necessarily follow that the relationship is unfair. These features may be required in order to protect what the court regards as a legitimate interest of the creditor. Thirdly, the alleged unfairness must arise from one of the three categories of cause listed at sub paras (a) to (c). Fourthly, the great majority of relationships between commercial lenders and private borrowers are probably characterised by large differences of financial knowledge and expertise. It is an inherently unequal relationship. But it cannot have been

8

> Parliament's intention that the generality of such relationships should be liable to be reopened for that reason alone."

47. Second, as can be seen from paragraph 17 of his judgment, "the standard of commercial conduct reasonably to be expected of the creditor" is a "legitimate influence" on the exercise of determining the fairness or otherwise of the relationship. Thus, for example (and it is of some relevance here) the ICOB rules are some evidence of that standard. But they cannot be determinative because their role is to decide if the creditor is in breach of a particular duty, while the test under s140A is a broader one of fairness by reference to the relationship "which may lead to the transaction being reopened as a matter of judicial discretion". Accordingly,

> "An altogether wider range of considerations may be relevant to the fairness of the relationship, most of which would not be relevant to the application of the rules. They include the characteristics of the borrower, her sophistication or vulnerability, the facts which she could reasonably be expected to know or assume, the range of choices available to her, and the degree to which the creditor was or should have been aware of these matters."

48. But on the other hand:

> "The fact that section 140A is intended to protect the debtor does not dispense the court from considering what degree of protection was intended; nor does it mean that the legislator cannot have intended to protect the interests of the creditor in a situation for which he was not responsible."

49. Pausing there, it seems to me that the "discretion" referred to in paragraph 17 arises once the relationship has been determined to be unfair, as can be seen from the use of the word "may" at the beginning of s140A. The determination itself must be more than an exercise of discretion however, and indeed in the same paragraph Lord Sumption says that it involves a "large amount of forensic judgment".

*Claims under s140A (1) (c)*

50. Sometimes the thing done or not done by the creditor is a free-standing matter – for example the failure to disclose the high level of commission (equal to 71% of the PPI premium in issue) in *Plevin*. But it could also be something which is, or could be the subject of a separate claim. That is true of both the bad advice and misrepresentation allegations made here. Indeed, but for the expiry of the limitation period, they would no doubt have been alleged separately as well. That gives rise to the question whether, in such cases, for such matters to be "made out" it must be shown that in the case of advice, for example, not only was advice given but there should have been an accompanying duty of care. Or in the case of misrepresentation, that the representation made was material and relied upon, and matters of that kind. It seems to me that generally speaking, and subject to the burden of proof which is of course on the creditor here, the same elements as are required by the cause of action should be shown when such matters are raised as constituting an unfair relationship. Otherwise, there is a danger that the analysis of their significance or otherwise becomes blurred and uncertain.

51. Causation is perhaps less straightforward. In cases of wrong advice and misrepresentation, it would be odd if any relief could be considered if they did not have at least some material impact on the debtor when deciding whether or not to enter the agreement. And thus in *Plevin*, while the unfairness was said to be the failure to disclose the commission, there was at least a finding that the debtor would have "certainly questioned this" the size of the commission being of "critical relevance" – see paragraph 18 of the judgment. However, the Supreme Court then remitted the case back to the Manchester County Court to decide what relief, if any, under s140B should be awarded. But in a case like the one before me, if in fact the debtors would have entered into the agreement in any event, this must surely count against a finding of unfair relationship under s140A. See also the case of *Graves v CHL* [2014] EWCA Civ. 1297 at paragraph 22 of the judgment of Patten LJ where it was held (among other things) that the impugned conduct of the LPA receivers was not causally related to the loss complained of by Mr Graves.

52. On the other hand, the Court is not constrained in its unfair relationship analysis by the fact that the particular feature relied upon eg misrepresentation, would itself have been time-barred if claimed as a standalone cause of action. See paragraph 82 of the judgment of Kitchin LJ in *Scotland v BCT* [2014] EWCA Civ. 790.

53. As to some other points affecting such claims:

(1) The fact that there has been no breach of a relevant regulatory rule, while not determinative, might be highly relevant. Thus, where, as in *Plevin* there was no regulatory duty on the creditor to advise, there was such a duty on the credit broker and this militated against unfairness, in that context, on the part of the creditor – see paragraph 26 of the judgment of Lord Sumption;

(2) On the other hand conduct on the part of the creditor which would have amounted to a breach of such rule (eg ICOB) can be relevant even where such rules do not actually apply to it – see paragraph 84 of the judgment of Kitchin LJ in *Scotland*;

(3) The words "on behalf of" the creditor must be given their usual legal meaning as connoting an agency relationship – there is no need to construe them more widely especially given (a) the width of the unfair relationship provisions themselves and (b) the fact that where the Act imputed liability otherwise to the creditor (for example through the acts of an "associate") such terms were defined expressly – see paragraphs 29-31 of Lord Sumption's judgment;

*Claims under s140A (1) (a)*

54. The case-law to date has dealt with what I might refer to as "operational" or "substantive" terms of the agreement which are alleged to give rise to the unfair relationship, as opposed to the terms in issue here, the basis clauses. For example, see *Maple Leaf v Rouvroy* [2009] 2 All ER 287 and *Rahman v HSBC* [2012] EWHC 11.

55. As to the unfairness or otherwise of the terms, and adopting the guidance given by Hamblen J (as he then was) in paragraph 345 of his judgment in *Deutsche Bank (Suisse) SA v Khan* [2013] EWHC 482, the following are likely to be relevant:

(1) whether the term is commonplace and/or in the nature of the product in question (*Rahman* para. [277]);

(2) whether there are sound commercial reasons for the term (*Rahman* para. [278]);

(3) whether it represents a legitimate and proportionate attempt by the creditor to protect its position (*Maple Leaf* para. [288]);

(4) to the extent that a term is solely for the benefit of the lender, whether it exists to protect him from a risk which the debtor does not face (*Maple Leaf* para. [289]);

(5) the scale of the lending and whether it was commercial or quasi-commercial in nature (*Rahman* para. [275]) (a court is likely to be slower to find unfairness in high value lending arrangements between commercial parties than in credit agreements affecting consumers);

(6) the strength (or otherwise) of the debtors' bargaining position (*Rahman* para. [275]); and

(7) whether the terms have been individually negotiated or are pro forma terms and, if so, whether they have been presented on a "take it or leave it" basis (*Rahman* para. [275]);

56. In addition Hamblen J considered that the following factors were also relevant in connection with terms said to constitute an unfair relationship, although he set these out under the s140A (1) (c) heading of things done before the agreement:

10

(1)          whether the creditor applied any pressure on the borrowers to execute the agreement (if an agreement has been entered into with a sense of urgency it will be relevant to consider to what extent responsibility for this lay with the debtor, as distinct from the creditor) (*Maple Leaf* para. [274]);

(2)          whether the creditor understood and had reasonable grounds to believe that the borrower had experience of the relevant arrangements and had available to him the advice of solicitors (*Maple Leaf* para. [274]);

(3)          whether the creditor had any reason to think that the debtor had not read or understood the terms (*Maple Leaf* para. [274]); and

(4)          whether the debtor demurred at the time of formation over the terms he now suggests are unfair (this point has particular force if he did complain over other terms) (*Maple Leaf* para. [274]; *Rahman* para. [276]).

**Advisory duties of care**

57.    There was no real dispute between the parties as to the applicable law.

58.    First, there is no general obligation on a lending bank to give advice about the prudence or otherwise of the transaction which the loan is intended to fund; that applies with even more force where (as here) the borrowers have their own investment advisers. See paragraph 96 of the judgment of Silber J in *Murphy v HSBC* [2004] EWHC 467 and paragraphs 52-57 of the judgment of HHJ Pelling QC in *Finch v Lloyds TSB* [2017] 1 BCLC 34.

59.    Second, and as a corollary to that, a bank does not give advice or assume an advisory role simply because it agrees to lend to the customer for a particular purpose. See *Murphy* as above and the decision of the Court of Appeal in *Lloyds Bank v Cobb* 18 December 1991 at paragraph 3-4 in the judgment of Scott LJ.

60.    Accordingly, it is necessary to determine in each particular case where (as here) the Bank lends for a particular purpose, whether the requisite advisory duty of care has arisen. In practice, that requires proof of two things: (a) that the Bank actually gave what can properly be described as advice and (b) that in so doing, the Bank assumed responsibility for its advice or that a duty of care by reason of one of the other familiar tests (the "three-stage" test and the "incremental" test) has arisen; see paragraphs 25-33 of the judgment of HHJ Moulder (as she then was) in *Thornbridge*.

61.    As to whether advice was in fact given, this will require a careful analysis of all the relevant exchanges between the parties in context, and the question is an objective one - see paragraph 52 (ii) of *Finch* and paragraph 89 of the judgment of Tim Kerr QC (as he then was) sitting as a Deputy Judge in *Crestsign v NatWest* [2014] EWHC 133 which itself refers back to earlier authorities.

62.    As to the relevant duty of care, it seems to me that in practice and certainly in this type of case, the "assumption of responsibility" test is the most useful one. This has been helpfully clarified by the Supreme Court in the recent case of *Steel v NRAM* [2018] UKSC 13. The context there was somewhat different because the alleged adviser was the solicitor acting for the borrower and the party to whom the duty was said to be owed was the lender itself, acting without solicitors. However, the statements of principle all concern the advisory duty of care which (together with the misrepresentation claim) is the foundation for the Claim here. In paragraphs 19, 23, 24, 35 and 38 of the leading judgment of Lord Wilson, he considered that the necessary assumption of responsibility would arise where (a) the alleged adviser must reasonably foresee that the other party would rely on their advice and  (b) the other party must reasonably so rely. I consider that to be a most useful working test in a case like this.

11

63. In this context, it is important to note that the alleged advice needs to go beyond the sort of recommendations which a seller of a product (including of the type sold here) might typically give to the potential purchaser as part of the sales process. Such a process does not, without more, indicate that the seller is assuming the duties of an adviser - see paragraph 70 of *Thornbridge*, itself referring back to Paragraph 8.2.8 of the FCA Handbook and the dicta of Gloster J (as she then was) at paragraphs 361, 374 and 449 of her judgment in *Springwell JP Morgan v Springwell* [2008] EWHC 1186 (*"Springwell 1"*).

64. *Thornbridge* and other cases also make clear, and it is in any event common sense, that in deciding whether there was an advisory duty of care, the existence or otherwise of a fee paid to the alleged adviser for the advice, and the existence or otherwise of another party who is advising the recipient of the alleged advice, are significant factors.

65. It is also obvious that to begin the analysis with allegations that the alleged adviser in fact acted negligently or carelessly does not assist with the prior question as to whether there was any relevant duty. Likewise, complaint was made here, forensically, that the Bank in effect took the position that it owed no duties to the Claimants at all and that this was so unattractive that it somehow proved that it did act as an adviser. There is nothing in this. The Bank accepts that it owed a duty to the Claimants not to misrepresent or mislead – rather its point was that there was no breach of that duty. And equally, the Bank's denial of any advisory duty can hardly be regarded as heterodox – it is often plainly the case. Finally, the Bank does accept that it was and is here subject to the unfair relationship regime – again its key point is that there was no relevant unfairness.

66. Finally, if there is no advisory duty of care, and subject to any applicable COB rules, there is no general duty on the Bank to give information on all aspects of the product (including risk elements), sometimes called a "mezzanine" duty; rather, the Bank's duty is simply not to mis-state any information which it does give including where silence can itself be interpreted as implying that a particular state of affairs either does or does not exist, which itself is false. See paragraph 17 of my judgment in *Green v Rowley v RBS* [2014] Bus LR 168 later approved by the Court of Appeal. See also paras. 235-236 of the judgment of Rose J in *London Executive Aviation v RBS* [2018] EWHC 74 (Ch) which was a swaps mis-selling case. Rose J there referred to the earlier decision of Asplin J (as she then was) in *PAG v RBS* [2016] EWHC 3342. An appeal against that decision was recently dismissed by the Court of Appeal in *PAG v RBS* [2018] EWCA Civ. 355. While the Court of Appeal commented that it was unhelpful to use expressions like "mezzanine" and that the existence of such a duty may be more nuanced and fact-sensitive than previously supposed, that has no bearing on this case. There were no detailed submissions from the Claimants on this point and in any event, on my findings (see below) there is no basis for such a duty.

67. Explanation of risk, of course will usually be required as part of any advice if there was indeed an advisory relationship.

68. There is no free-standing claim in negligent-misstatement here, but for the reasons already given, it is difficult to see why, if any allegation of negligent advice is relied upon as part of the Unfair Relationship case, it should not conform to the essential elements of the advisory duty of care referred to above.

**Misrepresentation**

69. So far as the misrepresentation element of the present claim is concerned, the following, again, appear to be common ground:

(1)         the representation must be a statement of fact which the representor intends the representee to rely upon;

12

(2)        whether the representee was entitled to rely upon the statement is an objective question to be decided on all the relevant facts and context;

(3)        a statement of opinion from one who knows the facts can amount to a representation that the maker of the statement believes those facts to exist which then justify his opinion;

(4)        a statement of opinion will also amount to a representation that the maker honestly holds that opinion;

(5)        there must then be actual reliance upon the representation by the representee;

(6)        for the above propositions see the judgment of Hamblen J (as he then was) in *Risparmio*;

(7)        the requirement for actual reliance however merits some elaboration. The essential point is that, outside fraud (and this is not alleged here) it must be shown that but for the representation, the representee would not have entered the contract. It is not enough to show that the representation might have caused him to enter it. In practical terms, therefore, if he would have entered into the contract absent the representation alleged, the necessary reliance is not made out. The question is not what the representee would have done had he known the truth. It is what he would have done if no representation had been made at all. See the detailed observations of and examples given by Christopher Clarke J (as he then was) in *Raiffeisen Zentralbank v RBS* [2011] 1 Lloyds 177 at paragraphs 163-194 and Chitty on Contracts (32nd Edition) at para. 7-038;

(8)        finally, representations are to be distinguished from mere sales talk or "puffs" – see *Spencer Bower and Handley's* Actionable Misrepresentation (fifth edition) at paragraph 2-34.

70.    Again, for the reasons given above, the misrepresentation elements of an Unfair Relationship claim should comply with the constituent elements for the underlying tort claim as set out above.

**Basis clauses**

71.    The Relevant Clauses are said by the Bank to amount to no more than contractual agreements as to (a) the scope of the relationship between the Claimants and the Bank, being one which was not in any sense advisory and (b) the absence of any representations made by the Bank and/or any reliance thereon. Such clauses are, today, typically referred to as "basis clauses".

72.    While the meaning and effect of basis clauses has received much judicial attention in recent years, so far as I am aware this is the first case where their efficacy in relation to an unfair relationship claim has been tested. Accordingly, when dealing with the law, I will set out first, the position in relation to basis clauses generally, then unfair relationship claims generally and then how the former may operate in connection with the latter.

73.    These provisions are given that description because they purport to delineate the scope or basis of the parties' primary relationship, for example whether it is advisory or not. They have been distinguished from exclusion clauses (which might otherwise be subject to statutory control for example by the Unfair Contract Terms Act 1977 ("UCTA")) because, far from excluding a liability which would otherwise exist, they are merely defining the parties' obligations or duties towards each other in the first place. This has always been regarded as an important conceptual difference although the functional consequence might be the same either way: no liability for negligent advice if given. In the banking context the relevant clauses would be found in the underlying contract. The contract itself would not otherwise oblige the bank to give advice - far from it - but the clause would serve the purpose of preventing some separate duty of care arising.

13

74.    In the context of claims for misrepresentation, such clauses would typically provide that no representations had been given and/or the relevant party had not relied on them. Those clauses would, again, usually be found in the contract later entered into between the same parties. Accordingly, what these clauses sought principally to avoid (using this term neutrally) was a claim under the Misrepresentation Act 1967 ("the 1967 Act") but they could also operate to negative a free-standing negligent misstatement claim.

75.    In the case-law, the first question was whether and if so how such clauses were binding upon the parties at all. In some cases they had been seen as giving rise potentially to an estoppel by representation, the representation being given by the party who would later make a claim, to the effect that, for example, it had not placed any reliance upon any pre-contractual statements made by the other party. But to be effective, it would have to be shown that the other party had relied upon that representation and/or that it would be unconscionable for the party giving it to go behind it. See in particular the consumer case of *Lowe v Lombank* [1960] 1 WLR 196 and later commercial cases such as the decisions of the Court of Appeal in *Grimstead v McGarrigan* 29 October 1999 and *Watford Electronics v Sanderson* [2001] EWCA Civ 317.

76.    However those cases are irrelevant for present purposes because the modern way of looking at such clauses is to say that they are contractual estoppels. In other words, the parties have agreed that no representations have been given or relied upon, or that no advice has been given. Particularly in the commercial (as opposed to the consumer) context and provided that clear words are used, the general view is that there can be nothing wrong with the parties agreeing the basis on which they deal with each other as set out in such clauses.

77.    In an oft-quoted passage from his judgment in *Peekay v ANZ* [2006] EWCA Civ 386, Moore-Bick LJ said this:

> "56.    There is no reason in principle why parties to a contract should not agree that a certain state of affairs should form the basis for the transaction, whether it be the case or not. For example, it may be desirable to settle a disagreement as to an existing state of affairs in order to establish a clear basis for the contract itself and its subsequent performance. Where parties express an agreement of that kind in a contractual document neither can subsequently deny the existence of the facts and matters upon which they have agreed, at least so far as concerns those aspects of their relationship to which the agreement was directed. The contract itself gives rise to an estoppel: see *Colchester Borough Council v Smith* [1991] Ch. 448, affirmed on appeal [1992] Ch. 421.
>
> 57.    It is common to include in certain kinds of contracts an express acknowledgment by each of the parties that they have not been induced to enter the contract by any representations other than those contained in the contract itself. The effectiveness of a clause of that kind may be challenged on the grounds that the contract as a whole, including the clause in question, can be avoided if in fact one or other party was induced to enter into it by misrepresentation. However, I can see no reason in principle why it should not be possible for parties to an agreement to give up any right to assert that they were induced to enter into it by misrepresentation, provided that they make their intention clear, or why a clause of that kind, if properly drafted, should not give rise to a contractual estoppel of the kind recognised in *Colchester Borough Council v Smith…*"

78.    And following his review of authorities in *Cassa di Risparmio v Barclays Bank* [2011] 1 CLC 701, Hamblen J (as he then was) put it thus in paragraph 505 (1) of his judgment:

> "It is possible for parties to agree that one party has not made any pre-contract representations to the other about a particular matter, or that any such representations have not been relied on by the other party, even if they both know that such representations have in fact been made or relied on, and that such an agreement may give rise to a contractual estoppel."

79.    As far as clauses dealing with advice were concerned, since their function was to negative the existence of any duty of care that might otherwise arise, they could operate on two levels. First, and perhaps together with other evidence, they would be indicative of there being no duty at all.

14

But second, even if the evidence would otherwise establish or point to the existence of a duty of care, the clauses would stop the claiming party from asserting it as a matter of contract, not by convention or representation.

80. Particularly where there had been, in the banking context, communications between the parties about the product which was the subject of the agreement between them (a loan, mortgage, or swap) such clauses would serve to make it plain that the provision of information about the product or mere sales talk, which might otherwise be viewed as advice given pursuant to a possible duty of care, simply could not do so. They would thus remove what might have been a grey area of possible liability. See the observations of Tim Kerr QC in *Crestsign* at paragraphs 115 - 117.

81. However, in a number of cases the question then arose as to whether those clauses would be subject to statutory control, even if otherwise contractually valid, in particular by reference to UCTA or s3 of the 1967 Act because they amounted to exclusion clauses and were thus subject to the requirement of reasonableness. That question did not arise in *Peekay* and in the end, did not arise in *Risparmio*.

82. Provisions which are clearly seeking to define the scope of the parties' primary relationship are perhaps easier to characterise as not being exclusion clauses than those dealing with representations and reliance, simply because the latter do appear to negative or exclude something otherwise there - the representation or the reliance thereon. And often, the expression "basis clause" is used in contradistinction to "exclusion clause".

83. But the ability to distinguish one from the other is often not easy once one moves away from either end of the spectrum. This was a problem recognised by Parliament when enacting UCTA because s13 (1) provides that s2 (negligence liability) also prevents excluding or restricting liability "by reference to terms and notices which exclude or restrict the relevant obligation or duty." But if one takes that approach too far, the result would be, for example, to expose "entire agreement" clauses to statutory control on the basis that their effect is to remove the possibility of relying upon a collateral contract or warranty even where on the face of it the relevant promise has been made. UCTA has rarely if ever been invoked here, at least where the clause is confined to collateral agreements as opposed to pre-contractual representations.

84. On the other hand, there is the principle that "a party cannot by a carefully chosen form of wording circumvent the statutory controls on exclusion of liability for a representation which has on proper analysis been made". See the judgment of Toulson J (as he then was) in *IFE v Goldman Sachs* [2007] 1 Lloyds Rep. 264 at paragraphs 68-69. Hence deciding whether a provision is an exclusion clause is a matter of substance not form. He therefore took the view that if a seller made a clear representation about a car, that representation would still exist even if he added the words "but those statements are not representations on which you can rely". The latter, therefore, would amount to an exclusion clause. But on the other hand, if the seller simply said that the clock reading is 20,000 miles but he did not know whether that reading was true or not the position would be different "because the qualifying words could not fairly be regarded as an attempt to exclude liability for a false representation…" I follow that but it seems to me that the particular examples given are a long way removed from each other and therefore the result is quite clear. It may not always be so.

85. In *Raiffeisen*, Christopher Clarke J commented on this dichotomy. He postulated a case where the car dealer had negligently misrepresented that the car had one owner only and its clock reading was accurate, because he was talking about the wrong car. The purchaser relied on those statements. But the contract of sale provided in a set of standard terms on its reverse, not read by the purchaser, that the latter had entered the contract on the basis that no representations had been made or relied upon. See paragraph 306 of his judgment. He took the view in paragraph

15

308 that this was a case where, absent the clause, there was a clearly actionable misrepresentation and so the clause was seeking to avoid a liability which was otherwise there. So it would be subject to s3 of the 1967 Act. The question was whether the clause was intended to be relied upon "as a means of evading liability which is intended to be impregnable" see paragraph 313. He then said in paragraph 314 that "the key question… is whether the clause attempts to rewrite history or parts company with reality." And thus, as suggested in paragraph 315, "to tell the man in the street that the car you are selling him is perfect and then agree that the basis of your contract is that no representations have been made or relied on, may be nothing more than an attempt retrospectively to alter the character and effect of what has gone before and in substance an attempt to exclude or restrict liability."

86.    Gloster J in *Springwell 1* had to consider a number of provisions which were argued to be, in truth, exclusion clauses. The particular clauses are worth setting out because they are fairly typical and resound to some extent with the clauses relied upon in this case:

(1)                   DDDS LETTER

"4.    Neither CMB nor CIBL is required to give you investment advice generally or in relation to specific investments, make any enquiries about, or to consider, your particular financial circumstances or investment objectives. By placing an order with CMB or CIBL you represent that you are a sophisticated investor … and that you have independently, without reliance on CMB, CIBL or any associated person, made a decision to acquire the instrument having examined such information relating to the instrument and the issuer thereof as you deem relevant and appropriate. You have represented to CMB and CIBL, and therefore they have assumed that, you are fully familiar with and able to evaluate the merits and risks associated with such instruments and any consequence of these instruments forming part of a portfolio of investments and are able to assume the risk of loss associated with such instruments. You should therefore consider whether an instrument is appropriate in your particular financial circumstances or in the light of your investment objectives. <u>Neither CMB nor CIBL is liable for any loss which you may incur arising out of any investment decision made by you in consequence of any service contemplated in this letter unless such loss is caused by its gross negligence or wilful misconduct</u> ….

6.    When providing you with any circular, information memorandum, investment advertisement, published recommendation or any other written or oral information regarding any instrument or investment opportunity, neither CMB nor CIBL will have taken any independent steps to verify the document or information and <u>no representation or warranty, express or implied, is or will be made by either CMB or CIBL, their representative officers, servants or agents or those of their associated companies in or in relation to such documents or information nor will CMB or CIBL or any of their associated companies be responsible or liable (save to the extent required under any applicable law, rules or regulations) for the fairness accuracy or completeness of such documents or information.</u>"

(2)                   GKO LM Terms

"… <u>The Holder has not relied on and acknowledges that neither CSMCI nor CMIL has made any representations or warranty with respect to the advisability of purchasing this Note</u>". (my underlining).

87.    At paragraphs 180 and 181 of his judgment in the Court of Appeal in *JP Morgan Chase Bank v Springwell Navigation* [2010] 2 CLC 701 ("*Springwell 2*"), Aiken LJ held that those parts of the clauses which I have underlined did amount to exclusion clauses, although he found the middle part of paragraph 6 of the DDDS Letter more difficult to classify than the last part of paragraph 4. The remainder of paragraph 4 constituted terms on which the parties agreed to contract with each other and were therefore not exclusion clauses. Finally, in relation to the GKO LM Terms, this part was "an attempt retrospectively to alter the character and effect of what had gone before and so is in substance an attempt to exclude or restrict liability."

16

88. In *Thornbridge v Barclays Bank Plc.* [2015] EWHC 3430, when dealing with the question as to whether the clauses relied upon by the Bank were exclusion clauses or not, HHJ Moulder (as she then was) considered that the test was not whether the clauses sought to "rewrite history" or had "parted company with reality" (*pace* Christopher Clarke J in *Raiffeisen*) but rather whether the terms defined the basis upon which the parties were transacting business or whether they were clauses inserted as a means of evading liability. I follow that the latter is indeed the question but I think, for myself, that what Christopher Clarke J was saying was that one way of answering the question was by reference to "rewriting history" or "departing from reality".

89. It is true that Moore-Bick LJ in *Peekay* and Hamblen J in *Risparmio* both saw basis clauses as having the potential effect of ruling out reliance on representations, even if they had previously been made, as a matter of fact, but this was in the context of describing their effect as contractual estoppels rather than the separate question of whether, however described, they amounted to exclusion clauses, which is what Christopher Clarke J was concerned with when making his observations.

90. Further, at paragraphs 31 and 32 of his judgment in *First Tower v CDS* [2017] EWHC 891, Michael Brindle QC (sitting as a Deputy Judge) thought that the approach of Christopher Clarke J had indeed been recognised by Aikens LJ in *Springwell 2* in the passages referred to above, and that he would differ from the view expressed by HHJ Moulder in *Thornbridge* as to the relevance of the "rewriting history/departing from reality" test.

91. Indeed, in *Crestsign,* that test was considered to be relevant. Thus, Tim Kerr QC said as follows:

> "[115] Although Crestsign was a retail client and not a large and sophisticated commercial party, it was not in a position akin to the buyer of a second-hand car. I do not accept Mr Edwards's submission that it would be rewriting history or parting company with reality (in Christopher Clarke J's phrases in *Raiffeisen*) to define the relationship as one in which advice is not given, even though I have found that, in substance, it was. The line that separates provision of information from giving advice may be a fine one. as where advice is conveyed by presenting information selectively. It is not always easy for a salesman such as Mr Gillard to know where one ends and the other begins. Reasonable people could disagree about whether the line is crossed in a particular case.

> [116] It is considerations such as these that lead parties in this type of arrangement legitimately to define their relationship and avoid disputes afterwards. No violence is done to history or reality by construing the documents as meaning what they say, even though the first document in time….post-dated the meeting on 28 May 2008 and even though what Mr Gillard said at that meeting (and subsequently) in my judgment crossed the line and would have amounted to advice coupled with an assumption of responsibility, were it not for the disclaiming effect of the documents.

> [117] The end result is that by the time the swap contract was entered into, what Mr Gillard was saying in effect was: 'although I recommend one of these products as suitable, the Banks do not take responsibility for my recommendation; you cannot rely on it and must make up your own mind.' I do not see anything unrealistic about that, nor does it mean the documents must be exemption clauses not basis clauses."

92. And as it happens the clauses relied upon by the Bank in *Thornbridge* were essentially about the (non) advisory relationship, as follows:

> "Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary):

>> *(a)*    *Non-reliance.* It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the transaction shall not be considered investment advice or as a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

*(b)*        ***Assessment and understanding.*** It is capable of assessing the merits and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risk of the Transaction.

*(c)*        ***Status of parties.*** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction."

93.    HHJ Moulder held that these were not exclusion clauses and even if they were, they were reasonable.

94.    In my view, the question whether basis clauses are in fact exclusion clauses for the purpose of UCTA and s3 of the 1967 is a multifaceted one, and its determination must have regard (at least) to the following factors, none of which might be determinative by itself:

(1)            the natural meaning of the language of the clauses in their contractual context;

(2)            the particular factual context in which the agreement containing those clauses was made; so, for example,

(a)    in the context of a "non-advice" clause the extent to which there are other oral or written indications that this clearly was, or was not, an advisory relationship; if the former, then this might point to the clause being exclusionary but if the latter, then not so; and if the status of any communications which took place was itself unclear, it could be said that the clause was simply deciding what the status of the communications was and again, was not exclusionary;

(b)    and in the context of clauses about representations, the extent to which clear representations had been made and objectively, were intended to be relied upon, or not;

and in that endeavour, I would consider that looking to see whether history had been rewritten or reality was departed from, and if so to what extent, was a useful, though not determinative guide;

(3)            in addition, the format and location within the contract of the clause and whether it was simply one of a myriad of standard terms may point to it being exclusionary, especially if alongside express exclusions of liability but as always, context is important; certainly, in the commercial context, the Court might well separate out for differing treatment a collection of multiple provisions, as, in effect, the Court of Appeal did in *Springwell 2*;

(4)            for my part I would not consider that the relative position of the parties in terms of, for example bargaining power, is particularly relevant to this exercise unless it somehow showed objectively that they were engaging in a real consideration of the proper ambit of their dealings; it would be much more relevant, of course, to the separate question of the reasonableness or otherwise of any clause deemed to be exclusionary.

95.    Two further points should be made. First, so far as consumers are concerned, for the most part UCTA has now been replaced by the Consumer Rights Act 2015 which applies to all consumer contracts made on or after 1 October 2015. That Act employs a wholly different regime for statutory control of exclusion clauses and which does not in fact depend on a particular term constituting an "exclusion clause". Instead, the question is whether any particular term (other than a "core term") is unfair in the sense defined by the Act which includes a long list of relevant factors. This essentially reproduces the approach taken by the Unfair Terms in Consumer Contracts Regulations 1999 ("the 1999 Regulations") as amended. But UCTA and s3 of the 1967 Act remain in effect for non-consumers.

18

96. Second, in the context of unfair relationship claims, the issue is not the narrow one of whether a particular clause is exclusionary or not, although that must remain a highly pertinent question. Any term, in theory, could fall within s140A (1) (a). Precisely how the Court should approach basis clauses of the kind just discussed in this context, I deal with below.

## Basis clauses and unfair relationships

97. In order to assess the effect of the clause relied upon it is necessary first to determine as a matter of construction what its scope is, and then to see whether it actually applies to the particular advisory relationship or representation relied upon. This may require a careful analysis of the facts and the contractual context as in the decision of Hamblen J in *Risparmio* shows.

98. The assessment of the unfairness or otherwise of the terms in this context, or, more accurately, whether they give rise to an unfair relationship, is not the same as an exercise to see if they would be unreasonable under UCTA or the 1967 Act or unfair under the 1999 Regulations, because of the different and wider exercise entailed by the unfair relationship provisions. Accordingly it is possible that a term which is not unfair under the 1999 Regulations nonetheless gives rise to an unfair relationship. See paragraph 283 of the judgment of Andrew Smith J in *Maple Leaf v Rouvroy* [2009] EWHC 257. However, in this case, Mr Yell has concentrated on reasonableness or otherwise under UCTA as a useful guide or starting point. He added in paragraph 64 of his Closing Submissions that it may be that "there is no great difference between fairness [for the purposes of s140A] and reasonableness [for the purposes of UCTA]".

99. There might have been an argument that resort could be had instead, or additionally to the provisions of the Consumer Rights Act 2015. However, that Act applies only to contracts made on or after 1 October 2015 so it might be difficult to apply it, even simply as guidance, to much earlier contracts, as here. Furthermore, on the particular facts of this case, I do not think much turns here on which particular unfairness or unreasonableness regime is relied upon.

100. But the reference to UCTA does raise the question as to its effect on the Terms Claim here, insofar as all or any of the clauses relied upon by the Bank are no more than basis clauses (which will assist it in relation to the Substantive Claim – see paragraph 98 above). While (for the reasons given above) the mere fact that such clauses are outwith UCTA does not mean that they avoid scrutiny under s140A (1) altogether, it must, as a matter of common sense mean that, their impact for the issue of unfair relationship is much less than if they were found to have been exclusion clauses subject to UCTA 1977 and putatively unreasonable under that regime.

## s140 Relief

101. Finally, and as noted above, the Court has a wide discretion as to any relief to be ordered once the unfair relationship has been found. In that regard I adopt paragraph 71 of the Bank's written closing submissions which I did not understand to be challenged. This is that if the court decides to make an order, then it "should reflect and be proportionate to the nature and degree of unfairness which the court has found": *Patel v Patel* [2010] 1 All ER (Comm) 864 at [79]-[80]. It should not give the Claimant a windfall, but should approximate, as closely as possible, the overall position which would have applied had the matters giving rise to the perceived unfairness not taken place: *Link Finance Limited v Wilson* [2014] C.T.L.C. 145 at [77]; *Chubb & Bruce v Dean*.[2013] EWHC 1282 (Ch) at [24]; *Nelmes v NRAM Pic* [2006] EWCA Civ 491 at [116].

102. I now turn to the facts, which I consider by reference to different topics.

## THE PRODUCTS IN QUESTION

103. There were two relevant products here. The first was the Loan, which was the Bank's product. The second was the investment, accompanied by an Insurance Wrapper, which was Aspecta's. The Claimants purchased each product separately, by a separate agreement made with the relevant counterparty. Originally the investment provider was Premier with Aspecta providing

19

the wrapper alone but this would not work for regulatory reasons as explained below. But either way, the underlying investment funds were the same.

104. It is of course true that, together, the two products made a package - a client would not have taken one without the other, indeed could not have had this particular loan without a qualifying investment. But the fact of such a package does not mean that it (as opposed to merely the Loan) was also a product of the Bank. For this reason it is misleading to refer to the entire package as a "Scheme" of the Bank although no doubt, forensically, to speak of it in this way, as occurred during this trial on the part of the Claimants, adds to the suggestion that the Bank was responsible for all aspects of it. The fact that the Bank saw that there was a ready market for such a package, which it undoubtedly did, and that it would like to obtain some or all of the loan business that would be generated as a result, does not mean that it took such responsibility, either.

105. Equally, Aspecta could hardly be said to be assuming responsibility for the suitability or otherwise of the Loan itself.

106. The party which of course did act as the unifying feature for the package and which, on its face, would obviously have assumed an advisory responsibility, was HW.

## KEY DOCUMENTS FROM HW AND THE BANK

107. I set out below what I consider to be the key contemporaneous documents other than those relating to the actual loan applications and terms, cited above.

### "It's time to make your move"

108. This was a general promotional article by HW about the "SPAIRS" scheme produced in around February 2005. Page 2 says that the scheme was for both Spanish residents and non-residents. It then shows the following graphic:



And then this text:

"**SPAIRS provides a legal charge against your property and when registered via a notary it reduces liability to Spanish inheritance tax by the amount of the loan**
**THE SPANISH PROPERTY** and income release scheme is founded on the virtues of responsible lending from blue chip financial institutions who grant loans against your real estate. SPAIRS provides a number of Euro based investments whose anticipated percentage returns exceed the interest due on the loan. All investments are approved by the nominated banks for lending purposes.
**SPANISH** residents will be advised to use an EU compliant insurance bond accepted by the Spanish tax authorities achieving tax breaks. It gives...
40% reduction in capital gains tax after 3 years
75% reduction in capital gains tax after 5 years
Reduced or avoided income tax and wealth tax
Potential inheritance tax savings
**NON-SPANISH** residents may wish to consider the use of an offshore trust.
**CHOICE OF INVESTMENTS**
The choice of investments depends on a number of factors:
The nominated bank • Any income requirements • The value of your property ■ Any equity release requirement • Your attitude towards risk, however small • Your overall liability to Spanish inheritance tax • Your tax and residency status"

109.   Page 5 refers to the charges stating that a serious effort had been made by all parties concerned to keep them low to make SPAIRS attractive. Under arrangements made with all the investment product providers there would be no initial fee and no sales charge so 100% of all monies released by the banks would be invested at the outset. However there would be a redemption charge for any capital redemption in the first five years. Full details of the fees would be disclosed in the relevant prospectuses. As the scheme provided for only one transaction HW had negotiated special fees with the investment providers. Various illustrations are then given. Page 7 refers to Spanish inheritance tax known as ISD. It shows on one particular example, potential tax savings of €135,810 or 88%. This is by means of the reduction in the net value of the property due to the loan which funds the investment.

110.   However at page 8, a number of caveats are given. The scheme is said not to be a no-risk scheme but a low-risk scheme and therefore the reader's attention was drawn to the following, among other paragraphs:

> "5. Investment risk Apart from the Optima Fund which has a 100% capital guarantee there are no such capital guarantees with the other two investment funds. Although the funds have been selected very much with SPAIRS in mind, there is a risk, however small, that the capital growth of any fund will not, over time, achieve the growth rate which will cover the interest costs of the loan
>
> 6. Legal and tax opinions
> Extensive legal and tax opinions have been obtained from one of Spain's leading law firms and the world's third largest accountancy group, amongst others. However, specialist tax and legal advice should be undertaken before any investment is made or tax strategy implemented. You will appreciate that HW Investment Management - HWIM - concentrate solely on the giving of investment advice and does not give and cannot give tax advice and cannot accept liability for any loss suffered as result of action taken or refrained from on the basis of this publication. The statements made in relations to Spanish taxation and the taxation consequences of participation in SPAIRS are believed to be correct as at the date of this brochure. HWIM conducts business using compliance procedures close to those necessary in the UK. Business is concluded only after a written report, which has passed HWIM compliance procedures, has been given and read by prospective clients. HWIM consultants have achieved a level of competence to UK regulatory standards. However, in Spain currently there is no framework which enables regulatory authorities to regulate the giving of investment advice. All financial institutions involved in the SPAIRS are aware of the above situation in granting terms of business to HW Investment Management."

111.   This therefore makes plain that HW was indeed giving investment advice but was not purporting to give tax advice and that separate specialist tax and legal advice was recommended.

112.   An earlier draft of this leaflet had been shown by HW to the Bank. This had referred to "major institutions" supporting the "solution" to Spanish inheritance tax and used the Bank's logo. Mr Rose and Ms Whittet emailed HW on 23 September 2004 to say that the Bank's logo should be moved but in the event the logo does not appear at all. They also stated that they did not want the Bank's name to appear in the same advert as "El Chopper" at all because it was not the tone of advertisement that they would wish to be associated with. Certain other corrections to the description of the loan facilities were also made. While I accept that this shows that the Bank was consulted about the advert, I do not accept that it shows that the Bank was taking a significant role and certainly not as an adviser.

**"A Place in the Sun"**

113.   However, later in the first part of 2005 the Bank produced its own newsletter for clients which included an article by Mr Rose called "A Place in the Sun". This referred to the problem of Spanish inheritance tax and the risk that, for example, a widow would find that she had a bill of 34% of the share of the house left to her by her late husband. Under the heading "the antidote", the question was whether this could be avoided or mitigated. And the answer was given "yes with careful planning." It went on to state that the loan taken for an investment would reduce the net assets of the Spanish home and that the investment held outside Spain would not form part of the Spanish estate. The sort of investment to be bought would depend on the attitude to risk. "… The important thing is to get proper financial advice." The position was said to be more complex for those who were resident in Spain because then, all their assets, wherever located would be subject to Spanish inheritance tax and possibly UK inheritance tax and "these people definitely

21

need to get tax advice." This article was not advocating SPAIRS or any particular investment scheme and I do not consider that any reasonable reader would see this as giving specific tax advice in respect of their own situation.

**HW Investment Review**

114.   There is then the HW Spring/Summer 2005 edition of its "Investment Review". It includes an article about SPAIRS which it said had now been launched at a series of cocktail parties on the Costa del Sol. It referred to fulfilling many of the differing demands from the expatriate community especially because of the problems of rising property prices and increasing tax burdens and reduced income due to low interest rates. It said that the scheme was founded on the virtues of "responsible lending from blue-chip financial institutions whose financial stability is highly rated in the industry and which aims to focus on wealth preservation." The scheme was said to be designed in such a way as to potentially generate sufficient growth to service the interest on the loan, create additional spendable income if desired and provide modest capital growth over time. There is then a reference again to the slogan "it's time to make your move".

115.   Nothing in this article suggests that the Bank (or any bank) had any advisory role.

**The March Confidential Reports**

116.   I now turn to two of the "Confidential Reports" produced by HW for the Claimants.

117.   The first such report is dated 21 March 2005, addressed to Mr and Mrs Fox. It sets out some details of their finances including their current investments. It stated that Income Release was required by them.

118.   It then states as follows:

> "EQUITY RE-INVESTMENT AND SPANISH INHERITANCE TAX (ISD)
> INVESTMENT OBJECTIVES
> To recommend a strategy for transferring equity capital from your Spanish property for investment purposes which might have a beneficial effect on Spanish tax. Income Release is required.
> INVESTMENT RECOMMENDATIONS
> In keeping with best advisory practice, we are obliged to give you a standard warning. In presenting any investment programme you should he aware for the avoidance of doubt, that the investment values may fall as well as rise and that the past performance is not necessarily a guide to future performance. Further, you should regard the investment strategy being proposed as a period of 10 years and not less than 5 years.
> SPANISH INHERITANCE TAX
> All the assets transferred to an heir or beneficiary who is resident in Spain, wherever the assets are situated worldwide, will be subject to the Spanish Inheritance Tax… "ISD". Non Spanish residents, however, are only subject to this tax on Spanish based assets, e.g. property.
> You should be aware that in many ways ISD is much more severe than UK Inheritance Tax and therefore it makes great sense to mitigate the tax as far as possible.
> Until recently, there was little that we could do to take your villa/apartment out of your estate, however, a new scheme, after extensive legal and tax opinion confirming its viability, has been developed which achieves this under current Spanish legislation.
> ISD is payable on the "Net Asset Value" of properties, The scheme provides a method of unlocking the equity capital in your property and using the released funds for reinvestment, As a legal charge is levied against your property, the "net" effect becomes a lower "Net Asset Value" and thus a lower ISD liability.
> The investment is designed in such a way as to potentially generate sufficient growth to service the interest on the loan and modest capital appreciation. This also leaves the property available to benefit from both appreciation in property prices and the growth of an investment, the additional benefit being the mitigation of ISD. The capital released is invested through an EU Compliant Insurance Bond, i.e. a single premium life insurance policy, that is designed as a tax efficient investment vehicle for Spanish Residents (see Appendix I)."

119.   At this stage, the Bank had not yet come on board as the lender for the scheme and the existing lender at that stage was going to be Barclays Bank International. The report states that HW had

22

agreed preferential terms and rates with Barclays International which would grant a loan against the value of the property. From that loan up to 5% could be taken as capital release and all fees rolled into the loan provided the loan does not exceed 95% of LTV. The purpose of the structure was to provide an asset-backed interest only loan for investment purposes. Clients could use an existing pre-owned asset (an unencumbered Spanish property) to use as collateral to support the investment loan. It is noteworthy that in the section dealing with that bank, the leaflet states:

> "Barclays International acts as finance provider under your application. Barclays International do not provide any investment, tax or legal advice."

120.    The fees were said to equate to approximately 3-3.5% of the loan and includes all setup costs i.e. the lenders 1.25% arrangement fee, 1% stamp duty, professional valuation and notary fees. They had also negotiated reduced fees for the EU Compliant Bond which may also be incorporated as part of the loan. Under arrangements made with the investment providers there would be no initial fee so 100% of all monies released by the lender will be invested at the outset.

121.    HW said that it was of the view that this type of fund structure was neither aggressive nor growth- focused but rather an investment which could give real returns comfortably beating inflation and cash in the long term and yet provide significant protection through negative financial market environments.

122.    Various examples followed and at page 10 it is stated that "there is the potential for significant inheritance tax savings associated with this scheme". A number of the risks associated with the scheme are then set out at page 11 and page 12 states, among other things, that:

> "HW are not tax or legal specialists and we recommend that you take independent tax and legal advice. It must be stressed that HW is an independent company free to recommend the best investments from every source and is not confined to the fund manager or Trust company recommended in this report....
>
> The single most important issue to consider, apart from growth in the value of your portfolio over a period of time, is the ability, effectively and regularly to communicate across the table with the investment adviser handling your financial affairs who has the expertise on an offshore investment strategy locally here in Costa del Sol.
>
> If you decide to implement this property scheme it could provide you with substantial investment benefits combined with potentially attractive Spanish Inheritance tax savings whilst continuing to participate fully in any rise in property prices."

123.    The page ends with a reference to Mr Nott, the date 21 March 2005 and a section for signature by the recipient of the report to the effect that they have read and understood its contents in agreeing to proceed with an application to Barclays Bank plc. In the copy before me, there is in fact no signature from Mr and Mrs Fox. However, Mr Fox thought they might have signed it since they were "interested in Barclays."

124.    There is then a Confidential Report dated 28 March 2005 addressed to Mr and Mrs Carney. Apart from the fact that it obviously refers to the details of their particular assets there is little or no difference between this and the Confidential Report addressed to Mr and Mrs Fox. I should note, however, that in this case, it was stated that Income Release was not required and the illustrations were obviously different. In addition, at page 9, it was added that "we recommend that all tax calculations are reviewed with your tax advisor but..." And then an estimated tax savings figure was given in the range of €86,780.

125.    These documents are wholly consistent with the investment adviser being HW and the Bank taking the role of lender and nothing else.

126.    However, by this time, HW had already produced at least one Confidential Report for a client referring to the Bank (although not, at this stage, for the Claimants). This is apparent from an email dated 18 April sent by Ms Sauvarin of the Bank to "Rachel" at HW when dealing with the application of a different client for the loan. She stated that she had read through the Confidential

Report for that client and had assumed it would be provided to every client. She wanted to make "a few important points". This included the statement that all costs could be rolled up in the loan when in fact that was not so for the valuation fee which had to be paid at the outset. Also there was a reference to a facility for a fixed rate interest option every three months when in fact it could only be chosen at the beginning. There is then a manuscript note which it is not suggested came from anyone other than Ms Sauverin referring to telephoning Rachel on 21 April and stating that [according to Rachel] "this report was a one-off and the points/amendments have been noted for these clients." The Confidential Report in question when referring to the Bank provided the same caveat in terms of it not providing advice as the other reports had done for Barclays International.

127. I do not think there is any particular significance in this email. The Bank happened upon the Confidential Report in question and made some corrections. Again, it is no evidence to support the notion that the overall scheme was in fact that of the Bank or that it acted other than as lender.

**June Credit Committee internal recommendation**

128. The next document is an email dated 22 June 2005 which encloses the agenda and papers for the Bank's Credit Committee meeting to take place on the following day. This included a further paper dated 23 June 2005 from Mr Rose and Ms Whittet dealing with the Credit Select Series 4 and a recommendation to extend it so that clients could refinance existing mortgages up to 5% of property value, alternatively draw 5% on an "equity-release" basis, together with a recommendation to permit further drawings of up to 3% of the investment fund per annum subject to the previous year's investment fund performance having exceeded the mortgage interest rates by a similar amount.

129. Under the heading "Key Risks and Mitigants" it states:

> "although in practice we do not anticipate Optima 2's investment performance exceeding mortgage interest by at least 3% per annum, we have lost market share in recent months due to a lack of annual income drawdown facility. These amendments will therefore enable us to compete more effectively in the increasingly competitive marketplace.
> Our existing key risks of early repayment interest exceeding investment performance and a fall in property values together with their mitigants of additional collateral in the form of a first legal charge over a Spanish property and the quality of Optima 2's underlying investments remain unchanged since our previous credit submission.
> The amendments expose us more to the risk of falling Spanish house prices and a poor investment performance. Although continuing growth in Spanish house prices and back testing of Optima 2's fund performance would suggest that these risks are low, we nevertheless propose to introduce a new covenant to protect us. This covenant will suspend the income drawdown facility and require borrowers to service interest should the LTV against our total collateral exceed 55% at any time. Even under our severe downside stress testing assumptions that Spanish house prices fall by 5% per annum and that the investment fund returns only its minimum guaranteed level, this covenant ensures that the collateral fully covers the loan at the end of year 10."

130. There then follow details of the investment "fund of funds" and its AAA/AA rating and the fact that the investment Notes were guaranteed by Barclays Bank plc on maturity only to return the greater of 100% of initial capital or 108.6957% of the highest portfolio index until 28 April 2006 or the level of index on the Maturity Date.

131. The report ends with the "stress testing" figures. Two of the four tables setting out different possibilities were the subject of extensive discussion at the trial and it is helpful to set them out in their entirety.

> (1)         "Stress testing - base case
> House value increases by 5% per annum throughout 10 year term. 5% Capital Gains Tax deducted from house value year 1 onwards
> •Investment fund increases by 7.5% per annum throughout 10 year term

24

- Interest rate of 4.25% per annum throughout 10 year term
- Initial 5% drawdown option taken together with 3% (maximum) optional annual drawdown

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| House value | 1,000.00 | 997.50 | 1,047.38 | 1,099.74 | 1,154.73 | 1,212.47 | 1,273.09 | 1,336.75 | 1,403.5B | 1,473.76 | 1,547.45 |
| Actual fund value | 661.25 | 710.84 | 764.16 | 821.47 | 883.08 | 949.31 | 1,020.51 | 1,097.05 | 1,179.32 | 1,267.77 | 1,362.86 |
| Fund surrender value | | 653.98 | 718.31 | 788.61 | 865.42 | 949.31 | 1,020.51 | 1,097.05 | 1,179.32 | 1,267.77 | 1,362.86 |
| Fund NPV min gtee'd | | 454.65 | 473.98 | 494.12 | 515.12 | 537.01 | 559.84 | 583.63 | 608.43 | 634.29 | 661.25 |
| Allowable Collateral | 1,661.25 | 1,651.48 | 1,765.68 | 1,888.35 | 2,020.15 | 2,161.78 | 2,293.60 | 2,433.79 | 2,582.91 | 2,741.54 | 2,910.31 |
| Loan | 750.00 | 750.00 | 801.71 | 857.11 | 916.46 | 980.06 | 1,048.20 | 1,121.23 | 1,199.50 | 1,283.39 | 1,373.31 |
| Loan interest | | 31.88 | 34.07 | 36.43 | 38.95 | 41.65 | 44.55 | 47.65 | 50.98 | 54.54 | 58.37 |
| Optional additional drawing availability: | | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | |
| | | 19.84 | 21.33 | 22.92 | 24.64 | 26.49 | 28.48 | 30.62 | 32.91 | 35.38 | |
| | 750.00 | 801.71 | 857.11 | 916.46 | 980.06 | 1,048.20 | 1,121.23 | 1,199.50 | 1,283.39 | 1,373.31 | 1,431.68 |
| Accum rolled up interest | | 31.88 | 65.95 | 102.37 | 141.32 | 182.98 | 227.53 | 275.18 | 326.16 | 380.70 | 439.07 |
| **LTV against property** | **9%** | **15%** | **13%** | **12%** | **10%** | **8%** | **8%** | **8%** | **7%** | **7%** | **4%** |
| LTV against total collateral | 45% | 49% | 45% | 49% | 49% | 48% | 49% | 49% | 50% | 50% | 49% |
| Loan - Fund NPV / House | | 35% | 37% | 38% | 40'.,, | 42% | 44% | 46% | 48% | 50% | 50% |

•No covenants are breached"

(2)                    "Stress testing - downside case
•House value falls by 5% per annum throughout 10 year term. 5% Capital Gains Tax deducted from house value year 1 onwards
•Investment fund increases by 8% per annum throughout 10 year term, but crashes in final year to return only the minimum guaranteed amount
•Interest rate of 5% throughout 10 year term
•Initial 5% drawdown option taken together with 3% (maximum) optional annual drawdown when available

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| House value | 1,000.00 | 902.50 | 857.38 | 814.51 | 773.78 | 735.09 | 698.34 | 663.42 | 630.25 | 598.74 | 568.80 |
| Actual fund value | 661.25 | 714.15 | 771.28 | 832.98 | 899.62 | 971.59 | 1,049.32 | 1,133.27 | 1,223.93 | 1,321.84 | 661.25 |
| Fund surrender value | | 657.02 | 725.01 | 799.67 | 881.63 | 971.59 | 1,049.32 | 1,133.27 | 1,223.93 | 1,321.84 | 661.25 |
| Fund NPV min gtee'd | | 423.25 | 447.56 | 469.94 | 493.43 | 618.11 | 544.01 | 571.21 | 599.77 | 629.76 | 661.25 |
| Allowable Collateral | 1,661.25 | 1,559.52 | 1,582.38 | 1,614.17 | 1,655.41 | 1,706.69 | 1,747.66 | 1,796.69 | 1,854.18 | 1,920.58 | 1,230.05 |
| Loan | 760.00 | 750.00 | 807.34 | 869.13 | 887.79 | 910.48 | 938.68 | 961.21 | | 1,019.80 | 1,056.32 |
| Loan interest | 5% | 37.50 | 40.37 | 43.46 | 44.39 | 45.52 | 46.93 | 48.06 | 49.41 | 50.99 | 52.82 |
| Interest service | | | | -24.79 | -21.71 | -17.32 | -24.40 | -21.09 | -17.79 | -14.47 | -11.12 |
| Optional ann. drawdown | 3% | 19.84 | 21.42 | 0.00 | 0.00 | 0.00 | 00.0 | 00.0 | 0.00 | 0.00 | |
| | 750.00 | 807.34 | 869.13 | 887.79 | 910.48 | 938.68 | 961.21 | 988.18 | 1,019.80 | 1,056.32 | 1,098.01 |
| Accum rolled up interest | | 37.50 | 77.87 | 121.32 | 165.71 | 211.24 | 258.17 | 306.23 | 355.64 | 406.63 | 459.45 |
| **LTV against property** | **9%** | **17%** | **17%** | **11%** | **-4%** | **4%** | **13%** | **-22%** | **-32%** | **-44%** | **77%** |
| LTV against total collateral | 45% | 52% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 89% |
| Loan - Fund NPV / House | | 42% | 49% | 51% | 54% | 57% | 50% | 33% | 67% | 7151 | 77% |

•55% LTV against total collateral covenant breached during year 3, meaning that 3% annual drawdown facility Is suspended and interest has to be partially serviced in years 3-10. Collateral still covers facility at year 10" [missing figure in Loan line is 988.18]

26

132.    On any view, this document shows not that the Bank was proposing to act in any advisory role as regards the investment, but that it was considering its performance in terms of its constitution as collateral for the loan. Otherwise, I deal further with this document below.

**The Banks' Presentation Document for HW - 22 September 2005**

133.    I have referred to this document already above. It refers to the Bank's history and the setting up of its Channel Islands branch in Guernsey in 1967. It refers to its target market as being high net worth individuals directly and via intermediaries. It describes the Credit Select Series 4 as being a "responsible competitively priced asset-backed lending facility from a prestigious bank available to Spanish residential property-owning clients of HW as part of SPAIRS". The benefits are stated to be liquidity from unencumbered pre-owned assets by providing loan for investment purposes, an initial cash-back facility plus the prospect of an annual "income" stream, the prospect of long-term capital growth and "in certain circumstances, it can provide tax planning opportunities". Under "Key Features", it refers to the loan as:

> "available to Spanish residents and non-residents… Well structured loan and investment products and excellent brand names… Clients not exposed to unnecessary risks due to Rothschild's conservative approach… Tax-deductible loans for Spanish IHT reasons (i.e. located, exercisable and fulfilled in Spain) competitive charges and interest payment options…"

134.    Then, under "how does it work?"

> "Loan is taken out and secured against the property… Loan proceeds are invested into a 100% capital guaranteed investment fund… Fund matures 10 years later… Principal amount (excluding "cash back", annual "income" and capitalised fees) is guaranteed to be repaid at the end of the 10 year term… Aim is that the investment return exceeds the loan interest."

135.    The presentation itself was made by Mr Dewsnip.

136.    I will deal further with it below but once more, there is nothing here to suggest that the Bank was adopting an advisory role so far as any individual borrowers/investors were concerned.

**Further Confidential Report to Mr and Mrs Carney - 28 September 2005**

137.    This followed essentially the same form as the earlier Confidential Report but this time the lending bank is the Bank. This report contains the same caveats about the role of the Bank as has been seen in the earlier reports. At page 7, the Investment Funds are described. The fund here is stated to be "a special fund from Aspecta Luxembourg which invests into the Optima Series 2 Fund plc. This is a new 10 year Capital Guaranteed investment opportunity that allows investors to benefit from the investment expertise of some of the world's leading fund managers. The fund purchases notes issued by Barclays bank plc and it is these which provide capital guarantees upon maturity". The funds with their AAA or AA ratings are then described. It then says:

> "Barclays, in giving an underlying guarantee of 100% capital protection obviously feel very comfortable with the choice of funds.
> For this type of guaranteed investment to work, Barclays need a 10-year period to ensure that it covers not one but possibly two economic cycles. In terms of performance the fund is obviously not designed to shoot the lights out but rather to obtain a steady growth in a low-risk and low volatile manner with a capital guarantee.
> Of the funds available for investment, 100% is invested at the outset however there are exit penalties over an eight-year term reducing by 1.5% per annum."

138.    Under the "Risks" section the reader is reminded that a property is always at risk against any loan or mortgage secured against it. "However, with this particular type of lending, as many risks as possible have been factored out, making this possibility extremely unlikely. This is unlike a standard mortgage, hence the term used by the Bank as an "Asset Backed Loan"". As noted above, the illustration has come from figures prepared by the Bank.

27

139.  Again, there is nothing to suggest that the overall scheme is that of the Bank or that it is acting otherwise than as a lender.

**The "Tailor-Made" Article ("the Article")**

140.  HW's Autumn/Winter Investment Review newsletter, produced in September 2005, contained an article by Mr Dewsnip on behalf of the Bank. It states, variously, as set out below:

> **"Rothschild presents a Tailor-Made Plan to fit your needs**
>
> By STEPHEN Dewsnip    Director ROTHSCHILD BANK
>
> *"Now with capital and income release'*
>
> *75%    Loan to value*
>
> *5%    Capital release*
>
> *3%    Income release*
>
> *100%    Capital guarantee*
>
> *At Rothschild we are insistent that customers are not exposed to unexpected risks therefore our ultra cautious approach includes a 100% capital guarantee*
>
> Listening to our clients is the core of Rothschild's business development efforts. Our focus on innovation has therefore led us to design products to meet the demands of our customers, rather than to design a product as a "one size fits all"! In the last year our Spanish lending facility was designed and implemented using exactly this principle. The significant rise in the values of Spanish properties over recent years has seen the creation of a "feel-good" factor. However, this has been tempered by rising inflation following the advent of the Euro as well as a reduction in income for many because of low interest rales. The phrase "asset rich but cash poor" has been much in evidence as of late. The effect of this has encouraged people to attempt to access the capital currently "locked" into their property in order to ease their situation.
>
> The rise in property values has caught many expatriates out with unexpected tax consequences. Inheritance Tax (IHT) does not work the same way in Spain as it does in the UK and elsewhere and, furthermore, to rub salt into the wound, there may be no relief in the country of domicile for Spanish tax suffered.
>
> With careful planning, Spanish IHT (ISD Impuesto sobre Sucesionos y Donaciones) can be mitigated and this is where Spanish Property and Income Release Scheme (SPAIRS), as promoted by HW Investment Management, comes in.
>
> However, the thought of raising a mortgage for some may present a major dilemma. Having worked hard for ones retirement the aim for most is to be free from loans.
>
> Should a mortgage be considered one would want to ensure that there is no or, at least, very little risk to the property. The asset backed loan is unlike a conventional mortgage and although a charge would be registered against your property; Rothschild will look upon both the property and the investment portfolio as collateral for the loan.
>
> Managing your wealth requires more than straightforward deposit and lending facilities, it requires, as mentioned earlier, innovation. However, innovation needs careful handling which is the principal reason why the monies advanced must be invested into funds that have a 100% capital) guarantee issued by a bank with a minimum AA credit rating.
>
> At Rothschild we are insistent that customers are not exposed to unexpected risks therefore we offer solutions that mitigate as many risks as possible. Our ultra cautious approach not only includes the underlying 100% capital guarantee mentioned above but, following a professional valuation of your property, we will only lend up to 75% of the market value. This differs from other lenders who will lend up to 100% of the property value.
>
> The investment linked to the plan is designed in such a way as' to potentially generate sufficient growth to not only cover the interest on the loan but also additional capital growth. This provides you with the potential of a dual benefit both in appreciation of the price of your property and the investment.
>
> **In order to benefit our clients further we have now made two significant changes to our lending facility;**
>
> 1.    A capital release of up to 5% of the property valuation is now available - to be used as you wish.
>
> 2.    An income payable annually of up to 3% based on the cumulative performance of the investment and which is added to the loan.
>
> Rothschild are pleased to be associated with HW and other financial advisory companies in Spain who will give financial advice tailored to the circumstances of each individual property owner. Best advice may in fact result in a recommendation not to proceed with an application.
>
> Those who do apply will receive a full written report from their' nominated financial adviser detailing the potential benefits as well as the associated potential risks.

28

I have, with pleasure, accepted an invitation to address HW' consultants at their annual convention to be held in Granada in September and also I very much look forward to being of assistance to new and existing HW clients in due course.

**It is time to make your *move!***

Welcome to HW launch parties with Rothschild at the following times and venues .

| | | | |
|---|---|---|---|
| **Monday** | **3/10** | **18.00** | **Nerja Parador** |
| **Tuesday** | **4/10** | **18.00** | **Alhaurin Golf Hotel** |
| **Wednesday** | **5/10** | **18.00** | **Kempinski, Estepona** |
| **Thursday** | **6/10** | **16.00-20.00** | **Marbella Office** |
| **Monday** | **10/10** | **18.00** | **Javea Parador** |
| **Tuesday** | **11/10** | **18.00** | **Kaktus Hotel Albir** |
| **Wednesday** | **12/10** | **18.00** | **La Zenia Hotel** |

If you wish to attend, please give us a call!"

141. The Article had essentially been drafted by Mr Nott for Mr Dewsnip to sign and he made some amendments to the draft on 2 September 2005. It is not suggested, however, nor could it be that any representations within it cannot be attributed to the Bank.

142. It was sent under cover of a letter to Mr and Mrs Carney on 4 October, the day of the Cocktail Party. They probably did not see or read it before the party, itself on 4 October, and Mr Carney said not. However they had clearly read it later as their evidence showed, because they make a number of references to it.

**These Documents Generally**

143. It was plain from the evidence of all the Claimants that they have made themselves very familiar with all of the key documents in this case even if they did not read them at the time. It was clear to me that on occasion, they were transposing the contents of such documents into what Mr Dewsnip was alleged to have said orally and they were not always able to distinguish between the two.

144. This means that merely because on a particular matter they appear to be very clear about what was said (or not said) one has to be cautious because they might well be applying their knowledge of particular documents (whether from the Bank or, importantly, from HW or elsewhere) with hindsight.

145. Hindsight was also evident from the frequent statements which Mrs Fox made to the effect that the whole scheme was "illegal" even when not relevant to the question being asked.

**THE RESPECTIVE ROLES OF PREMIER/ASPECTA, HW AND THE BANK**

146. The Bank had been offering a loan product called Credit Select since 2001 and it was only available through certain IFAs and its purpose was to provide funding for particular investments which would then stand as collateral.

147. Then, in April 2004 Premier Group, an investment provider, approached the Bank to see if it would provide funding to Spanish property owners for the purpose of investments, one such investment being Premier's Optima Fund plc. At the same time, the Bank wanted to expand its Credit Select loan range. At a meeting on 18 May 2004 between Mr Dewsnip, Mr Rose and Ms Whittet and representatives of Premier, the latter explained the investment scheme which included potential tax benefits. There were already other banks potentially in the market for this although most would participate only if the investments were provided in-house by them. The Bank's representatives said that they had no particular desire to be lending for only one investment. The question was rather which investment was on offer and whether it would meet their collateral requirements. In particular, any investment had to have a minimum capital guarantee which therefore would reduce the risk of the borrower being unable to repay the principal of the loan. Premier later said that the Optima Fund, itself a basket of investments managed and offered by Barclays, had such a guarantee.

29

148.  It is clear from the Bank's evidence and indeed the extracts from the emails and other documents cited in Schedule A, that the Bank wanted a lending role, not least because of the potential market and the fact that other bankers had already expressed interest. Assuming it was thought that the lending would be profitable, the fact that there was a new untapped market out there would obviously be of interest. However none of this means that the Bank would be displacing the role of the IFAs involved vis-a-vis the clients or that the particular product which the Bank was selling (albeit for the purpose of the package) was something other than just the Loan.

149.  It is unsurprising that the Bank investigated in detail the proposed scheme; not least because the investment would be collateral and it wanted the minimum repayment guarantee so that the only real risk was the ability of the client to pay interest if the investment did not perform. Equally, since the scheme was said to be tax advantageous, which would affect its marketability, the Bank wished to look into that feature as well. I will deal with questions of tax and investment performance later, but I cannot see why the fact that as a lender, the Bank wanted to examine these matters meant that the overall scheme is properly to be regarded as its scheme or that it was setting itself up as an adviser in relation to it.

150.  Since the scheme was to be marketed through IFAs, Mr Dewsnip and Mr Coutanche met various IFA's in Spain in June 2004 including HW. HW was itself one of the largest IFAs in Spain and had won an award in 1999. Although it has been suggested in this case that HW was in fact financially unsophisticated, I can see no basis for that. Indeed, its website at the time said that it was a "Specialist in advising on ….inheritance tax planning." It had also been involved in promoting investments using other banks as lenders. And on the face of its literature, there is no basis for thinking – or for the Bank to think – that it was a dubious operation that should be treated with caution.

151.  The Bank's file note of its discussions with Mr Nott, Mr Walton and Mr Eves on 14 June 2004 shows that they were asking about HW's history and operations in considerable detail. It was on this occasion that Mr Nott explained how a disgruntled client called David "Dogman" Klein had accused HW of mis-selling but he explained that there was nothing in this by reference to correspondence, health-warnings given etc and said he would provide further information if needed. The Bank had its concerns about HW because of its prior knowledge about the David Klein issue (see Ms Whittet's email of 8 June 2004). But this issue was considered by Ms Whittet, among others, at a Credit Committee meeting on 1 October which included a note prepared by Mr Coutanche who also worked for RBI explaining that the Spanish regulators had investigated and found no case for legal or disciplinary action against HW. I interpose to say that one criticism of the Bank made by the Claimants here was that it had carried out insufficient "due diligence" of HW. On this point, I disagree.

152.  The Bank was obviously also keen to pitch for business if schemes like this were going to be promoted in any event, using other banks. In the penultimate paragraph of the meeting note, there is a reference to "our proposal" i.e. the Banks offer to act as lender in the scheme and that names such as Rothschild and Barclays (as opposed to Halifax) made for an easier selling point. I follow why the Bank said this though I fail to see why this is any evidence that the overall scheme was the Bank's.

153.  Mr Dewsnip and Ms Whittet then submitted a detailed internal recommendation dated 2 July 2004 that the Credit Select loan should be extended so as to enable the Bank to participate in this scheme. Having explained the estimated investment performance, tax consequences and the introduction of the scheme to the Bank by Premier they also made clear that the Bank should not be tied to one particular investment product as it might be seen to be endorsing it; but that there had to be a capital guarantee, the Optima Fund had it and was typical of the sort of fund which the Bank would expect to see. The last two paragraphs of the note are important to read:

30

"The potential clients will be introduced via a broker network. The intention is to document terms of business with around ten of Premier's network of Spanish brokers which will provide us with a good geographical split of introducers. There is no regulation of brokers in Spain for this type of business but we have met, or will shortly meet, all of Premier's intended brokers for this scheme prior to agreeing terms of business with them and will take up our usual industry and professional references on them in the usual manner. From discussions with the brokers that SPD and Mark Coutanche had when they visited them last month, we believe that the potential marketplace for this service within Spain could be €200 - 400m of mortgage applications per annum. PJR and CEAW will also visit and meet these brokers later this month. [The facility documentation will be based upon the CreditSelect loan documentation that has proved to be robust over recent years, but changed to be written under UK law, and with provision for the mortgage to be taken over the property under Spanish Law] Full due diligence will be required on each client and all promotional material and documentation will make it explicitly clear that neither we nor Newco are in any way endorsing either the investment fund choice or the suitability or legitimacy of any inheritance, wealth or other tax consequences of clients borrowing in this way. Clients will be advised in our documentation to take independent advice from their own financial adviser and lawyer.

Looking ahead, whilst these lending terms have been designed with the Spanish expatriate marketplace in mind, we believe that they could have equally large lending potential for non-domiciled individuals owning property in many other jurisdictions. We also believe that the attraction of such property-owning individuals could provide us with attractive cross-selling opportunities for other NMR (CI) offshore private client baking services."

154. The response to this paper dated 8 July picked up a number of points including the assumed return of 7-9% could not be guaranteed. Further, the marketing material would make it clear that no tax advice was being given. The risk warnings attached to previous Credit Select businesses have been shown to be effective although further consideration was to be given to the reputational issues that might arise from the product. The lack of regulation of the brokers was to be checked since such regulation is usually required by the EU.

155. A further note followed from Mr Rose dated 21 July. On the question of tax avoidance, he noted that the advice may not be conclusive and may simply say there was nothing to prevent it. They should not expect the advice positively to endorse the proposal. He then went on to say that

"the broker is likely to say whatever it takes to induce the customer to sign up. We understand that customers will be shown a copy of the tax advice received by PLR (this with the adviser's permission). We will cover our exposure to poor advice by an awareness of and due diligence on the IFA's selling process, but more importantly by requiring the customer to sign a risk awareness statement that asserts… He is aware that we do not warrant the tax advice… He is aware that we do not warrant the suitability of the investment for him… He is aware of the principal covenants in the loan agreement."

156. All of this shows that the Bank was paying particular attention to its own (limited) role so far as the investment was concerned and the need to make this clear to investors.

157. There then followed a meeting of the credit committee on 8 September itself following a detailed presentation and this meeting approved the extension of the Credit Select product to this new scheme.

158. The upshot was that Mr Dewsnip, Mr Rose and Ms Whittet had successfully pitched internally for the participation of the Bank as lender within the scheme because it was an attractive and safe extension of the Credit Select product. Given in particular the various references to ensuring that the Bank's role was clearly delineated and did not involve the giving of any advice, this seems unexceptionable. I do not see how it can support the notion that the package was the Bank's product or that it gave rise to any advisory role.

159. Moreover, the particular role of any IFA vis-à-vis the Bank was explained by Ms Whittet and Mr Dewsnip without any serious challenge. It included the IFA considering the suitability of the loan and investment and if suitable the IFA would then recommend them to the client. The IFA would then assist the client to complete the loan application form. The IFA would also complete a questionnaire including its assessment of the client's financial position. The forms would then be submitted to the Bank which, once a valuation was obtained would consider the application ultimately by its credit committee.

31

160. On 27 October 2004 the Bank and HW signed a Terms of Business Agreement dated 22 October 2004, in respect of the Credit Select Series 4. It stipulated that the Bank's name would not be used in any literature without its written consent and that HW would not represent itself as the agent of the Bank. Clause 7.1 noted that HW was established under Spanish law and that its business was to act as an investment adviser on behalf of its clients.

161. As for the scattered references in Schedule A to "our scheme" or suchlike:

(1) the reference in the 15 June 2004 note to "our proposed IHT scheme" to Spanish lawyers by Mr Dewsnip was in the context of asking about Spanish property law in respect of the charges on the properties to be taken by way of security, and is not therefore particularly relevant;

(2) in the 16 June 2004 note, Mr Dewsnip's reference to "our proposed Spanish mortgage" is clearly about the feature which was the Bank's particular loan product and its requirement for a minimum capital guarantee;

(3) Mr Dewsnip's note of his conversation with Mr Walton at Premier about a different use of the scheme involving another bank, records that Mr Walton said that nonetheless the Bank's proposed terms represented that what he called an "out and out IHT scheme" was more attractive for pure IHT planning. But again, the emphasis there is really upon the loan terms and what the loan required by way of collateral;

(4) the presentation for the Bank's Credit Committee spoke of "the product" and did explain the overall scheme. But the particular product in question, taken in context, was the loan and the investment which would be acceptable collateral for it and how this differed from previous Credit Select product. Overall, none of this meant that the investment itself or the overall scheme was treated as the Bank's product;

(5) moving into 2005, in an email of 11 April, it was noted that Mr Eves liked the capital guarantee element on the product offered but all that meant was that the Credit Select loan would only be available if the underlying investment had such a guarantee-again it hardly means that the Bank was assuming the investment to be its product;

(6) the same goes for references to the Bank's "income and equity release scheme" in Mr Dewsnip's email-the loan did provide for the ability to take capital up front and then a yearly income drawdown but again this is all in the context of the loan.

162. It is argued that the Bank was "controlling" all aspects of the overall scheme and accordingly it was, in reality, its own scheme. I do not agree. Obviously, like any lender it has to specify what collateral it would accept, hence here, the need for a minimum capital guarantee. And also it is entitled to investigate whether any interest repayments can be met. The fact that this may be regarded as the approach of a responsible bank not wishing to be associated with improvident lending does not mean that it is therefore legally responsible for the performance of the investment. A further point which Mr Yell made emphasised the discussions between Premier and the Bank on the "insurance wrapper" needed for the investment if it was to attract tax relief for Spanish residents. However, as Ms Whittet made clear in paragraph 31 of her witness statement, the Bank was told by Premier that Aspecta could not provide an insurance wrapper for Premier's Optima Fund for regulatory reasons and the result of this was that any fund for Spanish residents which required the wrapper could not be provided by Premier. Instead a fund set up by Aspecta with similar baskets of investments (again managed by Barclays) and also carrying a guarantee would be available. This was the key point for the Bank if it later chose to lend to Spanish residents, because it needed to be clear that the Aspecta investment also met its conditions. None of this meant that the scheme was the Bank's product.

32

163. And of course, if in truth this was all the initiative of the Bank and it was the true supplier of the product, it is remarkable that it neither took from, nor paid to either Premier or Aspecta or HW any commission. It simply charged the initial 0.5% setup fee on the loan and then made its money on the spread of the interest rates in the way that commercial lenders do. On the other hand, Premier/Aspecta would raise an 8% fee with HW obtaining half (ie 4%) in circumstances where, according to the Claimants, HW was doing little or nothing.

**The Role of HW**

164. Mr Nott had been the financial adviser to Mr and Mrs Fox since about 2002 and they regarded him as a good friend. Indeed he remains their financial adviser although not now through HW. Equally HW had been the financial adviser to Mr and Mrs Carney since 2003 and indeed Mr Morgan of that firm had previously advised them when working for a different firm.

165. It was HW which promoted the scheme calling it SPAIRS (the Spanish Property and Income Release Scheme) and had been doing so for some time before the Bank became formally involved as a lender; as noted above the previous intended lender was Barclays but it withdrew. No doubt that is why the Spring 2005 edition of HW's Investment Review referred simply to "UK High Street Banks" as being the lenders involved.

166. As the relevant IFA to the Claimants, HW would be expected to have had contact with those providing the different elements of the package i.e. the lender and the investment provider. There is no basis for saying that HW did not obtain all relevant information from both Premier and Aspecta. It is suggested that in truth HW was simply reliant upon the Bank but that does not work because the package was around before the Bank was involved. And since HW was expected to (and did) earn a substantial fee for introducing clients to the investment it had to be in contact in order to discover what its fee was and indeed to make its own fee agreement with Premier and Aspecta. At one stage, Mr Yell suggested that in its 22 September 2005 presentation to HW, the Bank was guilty of "deeply misleading" HW because it failed to mention the 8% fee. With respect, that is an absurd point since HW must have known about the commission structure since it was benefiting from it. Indeed, Mr Yell accepted in argument that HW must have known about it.

167. It was then suggested that although the presentation was aimed at HW the Bank should have drawn the 8% fee to the client's attention. That, of course, assumes that HW, the recipient of the presentation, did not do so. If that be the case, then that is hardly the fault of the Bank. It is true that in an email dated 22 September 2005 dealing with the Aspecta charging structure, Mr Dewsnip referred to "the 8% that Premier would ordinarily rip-out of (oops, slip of the fingers, I am sure I meant to say deduct from) each initial investment ….". However, I fail to see why that means that the Bank should assume that the IFA is not going to disclose the commission.

168. This then led into an argument that precisely because HW was going to collect a substantial fee, the Bank in effect should not trust it because it may well mis-sell products in order to gain the fee and so the Bank should assume the IFA's role instead. I do not accept that. What in fact the Bank did was to take the view that it could and should protect itself by making it plain that it was not acting as an adviser. See above.

169. Schedule B is designed to show that when HW produced its Confidential Report to Mr and Mrs Carney on 28 September 2005 key parts of it had been drawn from the Bank's earlier presentation on 22 September. Thus, the Confidential Report was in reality, if not the work of the Bank, then a document for which it must be responsible, or that it forms a building block for the allegation of an advisory duty on the part of the Bank. But on analysis, most of the points in the Confidential Report which had not appeared in earlier reports (marked in Yellow) were concerned with the terms of the loan and its new features like the 3% income drawdown. As for investments, there is a new section which refers to the Aspecta 2 Fund - but that section is in fact

more detailed than the pages which are said to have inspired it from the 22 September presentation.

170. I do agree that Appendix III to the Confidential Report showing the investment illustrated over a ten-year period reproduced the Barclays 10 year back-testing details shown in the 22 September presentation. To that extent it is obviously drawn from that and it is not suggested that HW did its own testing. I will deal further with the question of back-testing below.

171. Looked at overall, I fail to see how this comparison supports the notion that in truth the Bank was the real driving force and the provider of all relevant information concerning the scheme to HW. In substance, the earlier Confidential Reports were to the same effect as this later one (see above).

172. I will deal with a number of particular publications by HW and the Bank later but certainly at this stage, I can see nothing in the materials produced to suggest that the Bank was acting outside its lender role for the package or that HW was acting other than as an IFA.

## DEALINGS BETWEEN MR AND MRS CARNEY AND THE BANK

173. As noted above HW had already been the adviser to Mr and Mrs Carney for at least two years prior to the investment and as their stated assets included shares and a trust fund it is reasonable to assume that he had given advice about those investments.

174. They spoke initially to Mr Morgan about this scheme in early 2005. According to them, he explained the difficulties over Spanish inheritance tax and that the investment return would be enough to repay the loan and there was then potential to mitigate the tax consequences. As Mr Carney explained, this was of particular interest to him because he had been diagnosed in 1999 with a rare and potentially fatal lung disease and indeed was surprised to have survived until 2005. But because of this, he was especially concerned that Mrs Carney should be financially secure upon his death.

175. Mr Carney's medical condition is also the reason why he was unable to travel to London to give evidence in court. Instead it was taken by video link, but it was none the worse for that and enabled me to form a clear impression of him.

176. I think, as Mr Hanke has contended, that Mr and Mrs Carney are likely in fact to have actually applied for the loan as originally offered by Barclays even though there is no application form disclosed. After all, the first Confidential Report to them was in respect of a scheme which involved a loan from Barclays. Further, it appears from the passports later sent to the Bank that there had been earlier certified copies on 18 April and this was just a few days after Mrs Carney's diaries noted a meeting with Mr Morgan. And it is not clear why a meeting with Mr Morgan was at that time necessary if the application was not to be proceeded with as indeed the signed Confidential Report contemplated. On any view, it seems to me that they were at least interested in the scheme even though not involving the Bank as lender. (I add here to say that these diaries were not disclosed until partway through the trial itself; manifestly they should have been disclosed earlier. She also referred in evidence to some notes she had made at the time and which she had had used subsequently for the purpose of making a statement but the notes were not now to be found.)

177. Any application with Barclays could not have proceeded because Barclays in fact then withdrew as a lender for these purposes. What happened next in terms of documents was that Mr and Mrs Carney signed the application forms to the Bank, the first being on 20 September 2005. Both of them were (and are) intelligent people with a significant knowledge of professional or business affairs. Mr Carney had worked in the offshore banking industry for some 28 years as a trust officer. He was familiar with standard terms whereby clients would confirm that they had taken their own advice and were not relying on the other party, as he accepted, by way of example, in

34

respect of the trust application form which he and Mrs Carney signed in 2003. He also showed in his evidence his awareness that the value of gilts could go down as well as up and his understanding of life insurance wrappers. Equally he understood that where an investment was going to be used to service a loan there was a risk that if it did not perform as expected the loan would have to be serviced from another source and there would be further risk if some of the loan had been used for some other capital purpose (like a new kitchen).

178. Further, in my view, Mr Carney has in the course of these proceedings given some thought to the various provisions about the Bank not giving advice and whether they would be effective or not. For example, when taken to the reference in the 28 March Confidential Report about Barclays not having any advisory role, he said in cross-examination that this was fine because Barclays did not have such a role but unlike other banks who did the same sort of thing, the Bank went out and gave advice (i.e. at the Cocktail Party). He then suggested that this would "nullify the disclaimer they put there in the first place". He was keen to make this point even though the Bank was not material at that stage. In fact, the point does not work because while both Mr and Mrs Carney sought to diminish the importance of the application form they signed on 20 September, prior to the Cocktail Party, the fact is that the contract of loan was based on the second application form which they signed in March 2006 and in which, again, the Relevant Clauses made plain that the Bank did not give any advice. So they signed that form with the knowledge (according to them) that Mr Dewsnip had by now sought to advise them. In any event, the clauses take effect at the contract date. In fairness to both Mr and Mrs Carney, neither of them suggested that they did not understand any of the relevant clauses or that they did not have an opportunity to read all of the relevant materials. Indeed they said that they did.

179. As for Mrs Carney she stated in her client questionnaire that she had been a company director and had acted as an expert witness.

180. Both of them were highly articulate, and at times robust, in their evidence.

181. The one point which they both made in various ways was that the first application form was signed, not because they intended by then to enter into the scheme (in which case what Mr Dewsnip would say later at the Cocktail Party would not have been of any real significance) but so as to obtain further information about the scheme and to get the valuation.

182. In the event, this contention failed to stack up. First, if all they wanted was a valuation they could have asked a local agent to provide one, at much less or perhaps even no cost. It would be odd in my view to have spent £1,000 on a valuation for the Bank if they did not at that stage wish to progress the application. Although Mrs Carney said that their property was somewhat isolated and not in a specific residential area, I do not see why that means that an agent who might be interested in the sale would not come to provide a valuation. Second, in his evidence, Mr Carney had real difficulties in explaining what the further information was that he needed or why he could not simply have asked Mr Morgan for it, rather than submit a full application to the Bank. At one stage he changed his evidence somewhat by saying that actually by 20 September they were coming round to the idea of the investment and so all they needed was the valuation and then they would see. He also said that in fact what they wanted at the time of the application was reassurance about the safety of the scheme; if so, it is not at all clear how at that point, they thought they were going to get it. It is not as if they knew then that they would be at the Cocktail Party to hear what Mr Dewsnip said. Nor did I find persuasive the suggestion that it was HW who in effect said that they had to sign the application form to obtain such further information as they might need. Moreover, all of this really overlooks the fact of the earlier meetings with Mr Morgan and the very existence of the 28 September Confidential Report containing all the detailed information set out therein.

35

183. As for Mrs Carney, she said that when £450,000 had been put into the 28 March Confidential Report as the value of the house, it was overstated and this was Mr Morgan's idea. She and Mr Carney had seen other properties go for much less, around £250,000, but at that level they were unlikely to get a loan at all. She said that they signed that Confidential Report as indicating they wished to proceed (with Barclays) simply because they wanted to investigate further. But she said that she only signed the 20 September application form to get more information; in fact, at the end of her evidence she said that the scheme looked very big and complicated to her and was something she definitely did not want to end up being responsible for when her husband died. She thought she could do without the scheme. She also thought that eventually the inheritance tax situation would change and get better. She actually wanted the scheme to "go away". She later said that she had a bad gut feeling about it and did not want to enter the scheme. But Mr Carney did, and she supported him and it very much became "a separate thing, really, that it was his thing and I wasn't interested and I didn't really like the idea at all." She then said that nothing changed her "gut feeling" about the scheme, and when things started to go wrong she just "knew that they would".

184. She also added that neither she nor Mr Carney actually understood the scheme as a whole but overall, from the evidence, I am sure that they did at least in its essence. She also said that the form which they signed was incomplete but it was not clear how. She suggested that she had understood from Mr Morgan that if the form was incomplete, then the Bank would then know that it was not a true application to be acted on, but that seems implausible, and unsurprisingly the Bank's evidence was that it would be processed in the usual way. She then said that actually she did not understand about the term "collateral" as relating to the house and the investment but did not ask Mr Morgan to explain because (again) this was only done in order to obtain more information. She did however accept that she understood the meaning of clause 1 (g) of the Application Form and that the Bank was at that stage giving no advice. She added that they did not at that point provide copies of their passports as part of the application package but the documents suggest that they did.

185. In the end, Mrs Carney accepted that despite filling in all of the various forms, no further information as such emerged; but what they got instead was the invitation to the Cocktail Party. Of course they did not know that as at 20 September.

186. What the late-disclosed diary entries of Mrs Carney also showed was a meeting with Mr Morgan on 26 September. I accept that this must have been in connection with the documents to accompany the application form. But if so, then Mrs Carney cannot have been correct to say that they did not know until long after 20 September that the application and the other forms had been submitted. In addition, they had completed the forms relevant for the investment side of things including the Aspecta application form and an acknowledgement that they had read its special conditions.

187. Further, on the face of the 20 September application form, clause 1 (a) provided that following receipt of the application by the Bank, if the application was accepted then the applicant would without taking further action be agreeing to take out the loan in the amount approved.

188. The upshot of all this is that I reject the notion that the 20 September application form had been signed by Mr and Mrs Carney only in some very tentative way on the basis that they could obtain further information. I think that they were both clear by that stage that they wanted to enter the scheme, Mrs Carney, because Mr Carney wanted to. I reject the notion that everything then changed and they only decided to enter the scheme, after hearing Mr Dewsnip speak at the Cocktail Party. Having lived with this case for so long, they may well both have now convinced themselves of the correctness of their evidence in this respect but in my view it just does not add up.

36

189. I should add that the fact that the application form ultimately made and signed by Mr and Mrs Carney and which forms part of the Loan Agreement was that executed on 13 March rather than 20 September does not make any difference. The valuation on the house was not provided to the Bank until 23 December 2005 and it had been delayed while Mr and Mrs Carney finished off building works. The Bank approved their loan on 17 January. The 13 March 2006 application form was in slightly different terms to the earlier including in particular the fact that the loan would be for 10 rather than five years.

190. Furthermore, and on any view, given that they had not even met Mr Dewsnip although they had seen his article, taking all of the evidence as a whole prior to the Cocktail Party it is quite impossible as a matter of fact to see how the Bank could in any way have assumed an advisory duty towards them. Indeed the thrust of their evidence was that they did not see the Bank having that role - until the Cocktail Party itself.

## The Cocktail Party

*Background*

191. On 1 October 2005 Mr Morgan invited Mr and Mrs Carney to the Cocktail Party at the Alhaurin Golf Club. This event had been organised by HW. Mr and Mrs Carney referred to banners being at the party and Mrs Carney thought that they were of the Bank. But this was after seeing a photograph - most likely that in the Article which in fact was not from a SPAIRS event at all, but rather a quite different corporate event involving the Bank in Guernsey, according to Mr Dewsnip, which I accept. Indeed he thought that there may have been a HW banner which had been at other SPAIRS events.

192. The event was opened by Mr Nott. Mr Hewgill and Mr Dewsnip both thought that he spoke for about 20 minutes. Mrs Carney said about 10 minutes. Mr Dewsnip then spoke, he thought, for about 20 minutes, as did Mr Hewgill. Mrs Carney thought that he spoke for about 40 minutes and Mr Carney for 45 minutes-one hour, with Mr Nott speaking only for a few minutes, really by way of introduction to Mr Dewsnip. I do not regard that as likely. It is plain from the literature that the SPAIRS scheme was itself being promoted by HW not the Bank and the former had organised the various launch events. It is highly improbable Mr Nott spoke for only a few minutes. I also think it highly unlikely that Mr Dewsnip would have spoken for anything in the region of an hour. I think it is much more likely to have been in the region of 20 minutes but it could be somewhat more. After all, it was not timed. But Mr Dewsnip would have more cause to know how long he would speak because he had given similar presentations at all the other SPAIRS events organised by HW, 10 or 12 of them he thought.

*Approach to Mr Dewsnip's presentation generally*

193. It is common ground that Mr Dewsnip would have dealt with the history of the Bank and also the recent appointment of Baron David de Rothschild as Chairman, the details of the loan, including eligibility criteria and the application process. Obviously, not everyone there had yet applied for the loan. He would also have said something about the investment since it was collateral for the loan. Mr Dewsnip also agreed that he might have compared the features of the CS4 loan to similar products offered by other banks.

194. I do not accept the notion that if Mr Dewsnip was essentially confining himself to speaking about the loan he would have been a very short time and therefore he must have been addressing the investment (and tax) at some length. After all, his PowerPoint presentation on 22 September was quite extensive and Mr Rose said that it was a complex matter to explain.

195. Mr and Mrs Carney have, perhaps understandably, given accounts of the presentation which are not always consistent. For example, Mr Carney stated in paragraph 16 of his witness statement that what Mr Dewsnip said was "a verbal version of the literature" which could only refer to the Article and yet in cross-examination he said that Mr Dewsnip went "far beyond" the Article. The

37

congruence with the Article was also referred to by Mrs Carney at paragraph 13 of her witness statement where she said that the Article accorded with what they had been told by Mr Dewsnip at the Cocktail Party.

196.    At one point in her evidence, Mrs Carney also accepted that in the presentation, Mr Dewsnip was not recommending the scheme for Mr and Mrs Carney in particular, rather he was addressing people generally about it. She then said that he was emphasising how safe the investment was and it sounded like they did not need to do much about it because the Bank had done all the work for them. When it was suggested that they would have been able to get independent advice she said this, in a revealing passage:

> "where would we have got independent advice from? Rothschild have the facilities to get the best advice possible for us and they have got customers to care for namely us and surely we come first anyway. So they make it sound as if were the most important people in the world and they're doing all of this for us. Why should we suddenly think yes these wonderful people are doing all of this for us we've got to get advice against them? How can they be honest?"

197.    When it was then put to her that she received independent investment advice from HW she denied it. When it was then suggested that she received a confidential report stressing the independence of the advice on making an investment recommendation, and asked whether that was not investment advice, she said:

> "well, not to my mind, it isn't, no. It's just somebody thoughts and information on the subject."

198.    What this shows in my view is (a) an exaggerated account of the role that the Bank would play and (b) a very much played down account of HW who obviously gave Mr and Mrs Carney investment advice specifically for them in the Confidential Report which Mrs Carney seemed unwilling to acknowledge.

199.    In addition, Mr Carney referred to Mr Dewsnip as having given "a hard sales pitch" during the event (paragraph 17 of his witness statement) and having been enthusiastic and excited. But as noted in paragraph 66 above a sales pitch is not the same as the giving of advice.

200.    At this point, however, I should say something about Mr Dewsnip's evidence. He was very keen at all stages to say that the Bank's role at the Cocktail Party was as lender only. But even in this capacity, he was unwilling to accept that there was any kind of sales pitch. Rather he said, he had been invited there as a guest and was simply promoting business development. I do not find that plausible especially since he had come over to Spain at the Bank's expense to give the presentation initially to the IFAs. At the end of the day, the CS4 loan was a product like any other lending product and he was surely there to promote it. There is, after all, nothing wrong with a sales pitch provided that it does not involve actionable misrepresentations. And indeed, in an email to Mr Rose about a different presentation Mr Dewsnip actually referred to it as a sales pitch.

201.    Similarly, it is unrealistic to suppose that when he referred to the investment he did so purely in the context of its suitability as collateral. After all (and subject to the caveats on advice) he had said in the Article that the Bank was insistent that customers were not exposed to unexpected risks and so it offered solutions that mitigated as many risks as possible including the capital guarantee and the maximum LTV of 75%. At least to that extent he might well have been communicating the Bank's cautious approach to its collateral as something which was also of benefit to the clients.

202.    On the other hand, Mr Dewsnip was very well aware of the need to avoid anything that looked like the giving of advice and the need to avoid making statements which could not be backed up. That was emphasised by his superior Mr Rose who in fact had observed Mr Dewsnip give other presentations to IFAs and clients though not this one. Like Mr Dewsnip, Mr Rose was reluctant to accept that there was any sales pitch until shown the email referred to above. While it is true

38

that there was no question of the Bank being there to try and get people to sign up to the loan and other documents there and then, this does not mean that there could not have been a general sales pitch. This is especially where, as the Bank was aware, there were other banks trying to offer broadly the same product in connection with similar investments. What I did find of assistance was the fact that when Mr Rose heard him at the Alicante and Majorca presentations, he did not in any way step out of line into giving advice. I do not accept the suggestion that because his ultimate boss was not present at the Golf Club Mr Dewsnip would then go very much further.

203.    Mr Dewsnip was also cross-examined about his evidence to the Spanish Court in the Leftwick/Holley case. In evidence he was asked what his role was at the HW presentations. He said:

> "I did not deliver a presentation as such, I answered some questions, I provided some information at the invitation of Henry Woods about Rothschild and its history and I gave some information about the type of loan facility that Rothschild was happy to consider providing if the customers met certain criteria."

204.    It was suggested that he had therefore lied to the Spanish judge when he said there were no presentations as such because he has accepted here that there was a presentation at the Golf Club. I do not accept this. As he explained in evidence, the point he was making was that there was not a formal presentation with a PowerPoint etc and he did answer questions and provide information. That may have understated the exercise slightly but I do not consider that there was any deliberate untruth to the Spanish Court. After all, in his witness statement for this case he referred to it as an "informal" presentation which obviously it was in the sense that it took place in the course of a cocktail party as opposed to a seminar or some such.

205.    In the light of all this, and subject to where there was other material discussed (for example references to the Baron) the only safe approach here is to assume that the presentation would have been along the lines of the Article - no more and no less. After all that is consistent with those parts of the evidence of Mr and Mrs Carney which saw a congruence between the Article and the presentation at the Cocktail Party.

206.    I should also take into account, however, the fact that it is not as if these proceedings were the first occasion when Mr and Mrs Carney articulated their recollection of what Mr Dewsnip said at the Cocktail Party. Mr Carney went into a fair amount of detail in his email letter to the Bank dated 16 July 2008 ("the 2008 letter"). He referred to the Bank's assurances that the investment fund was of the highest quality being the only one approved by it as "deception number one". Number two was that the Bank would be working with and monitoring the investment managers. The third was that the Bank would keep the clients informed and they could be reassured about the integrity of the project because the Bank was behind it. And fourth was the requirement that there be a minimum guarantee.

207.    That said, it is not as if these topics did not come up at the Cocktail Party, rather the question is the context: the Bank's role when speaking about them along with what in fact is likely to have been said. I should add that there was no reference in the 2008 letter to remarks about speaking with the Baron (see further on this, paragraph 239 below).

208.    I also take into account that the evidence of Mr and Mrs Carney was supported to some extent by the witness statements of Mr Hewgill and Mr Bicknell who were also investors. Mr Hewgill was at the Cocktail Party. At paragraph 6 of his witness statement he said that Mr Dewsnip had said that the scheme was 100% secure although in evidence he said Mr Dewsnip was speaking about the 100% minimum guarantee not that the investment was 100% secure in the sense of there being no risk. At one point in his oral evidence he said that Mr Dewsnip, along with Mr Nott, had said that 100% of the loan would go into the investment although he then said he could not be sure about that. He ended up saying that he did not recollect Mr Dewsnip referring to a 100% minimum guarantee. Generally, he said he recalled "bits and pieces". Overall, I did not think his

39

evidence really assisted Mr and Mrs Carney very much. He unfortunately also lost money on the investment, having taken the view essentially that if the Bank thought it was a good scheme, that was good enough for him. I did feel towards the end of his evidence that he was somewhat partisan in favour of the Claimants. It is not in dispute that a number of investors including the Claimants, have had conversations with each other about the investments over the years. That is perhaps not surprising, but it does mean that collective memories can emerge which may not be accurate.

209.    As for Mr Bicknell, he was not at the Cocktail Party. However he attended the Santa Ponsa Country Club event on 26 May 2006. He said that Mr Dewsnip there strongly encouraged those present to enter the scheme and to take the loan from the Bank. However, there were some points of concern in his evidence. First his witness statement said that he only applied for the loan after that event. However the documents clearly show that he had already made applications through different financial advisers by the end of March, and all the relevant documents were sent off to the Bank on 24 April. Even with that evidence, he was reluctant to accept that he made his applications before the event.

210.    When asked about the role of HW by reference to its introductory letter to the various events it was organising, Mr Bicknell said that he gave more credence to the Bank because he had not heard of HW - but that rather overlooks their different roles. At this point, like Mr Hewgill, I felt that he had become rather partisan.

211.    Further, he exhibited to his witness statement an unsigned copy of a complaint letter dated 8 May 2007 which he said he had sent to the Bank. That letter made particular reference to a performance graph apparently used by Mr Dewsnip at the presentation. However it then emerged that the letter which was in fact sent was materially different and made no reference to any graph. In respect of the letter generally, he said that naturally, he had been in touch with his financial advisers but as the Bank was the lender and had chosen the fund as the vehicle it was not inappropriate to request its comments on the poor investment performance.

212.    Overall, I do not think that Mr Bicknell's evidence adds up to very much.

213.    There was also a hearsay statement from Karen Douglas, another investor who was at the Cocktail Party and who now lives in Devon. She thought that Mr Dewsnip had spoken for at least 20 minutes, perhaps more. She said that after the presentation Mr Dewsnip came up to her and opened his arms wide and said that it was Rothschild bank that they were talking about and everyone had heard of Rothschild. From this she understood that as the Bank had approved the scheme she had every reason to be reassured. She said that categorically, she would not have entered the scheme had it not been that Rothschild was involved. She also said that she recalled a Rothschild logo in the room though not exactly where it was. She did not recall the person she said introduced Mr Dewsnip. Ms Douglas was due to give evidence before me but then it was said on the eve of the trial that she could not attend because of a health issue. Given that the particular matters she refers to are in dispute, I do not consider that I can attach any real weight to her witness statement when there has been no opportunity to cross-examine her on it.

214.    I take the same approach to the hearsay evidence contained in the witness statement of Kathryn Dillon who worked for Hamiltons. Although she lives in Spain, arrangements could have been made for her evidence to be given by video-link or in some other way. Part of her witness statement actually emphasised the active role of the IFAs in promoting the scheme including training days where Premier and Aspecta representatives, as well as Mr Dewsnip, had been invited, each dealing with their own product. She added that the Hamiltons "salesforce" would meet with clients to discuss how the scheme might mitigate tax. Her only direct comments about Mr Dewsnip were that at the training day he extolled the virtues of the Bank and that the clients' homes would not be at risk, that the investment was the security and the Bank would not ever

40

evict borrowers. I am not prepared to attach any weight to her evidence (which in any event was limited) because of the lack of opportunity to cross-examine.

215. A total of 49 different representations are alleged as having been made to the Claimants. I deal with them below by reference to their numbers as set out in Schedule C to the Claimants' closing submissions.

*The Representations allegedly made at the Cocktail Party*

216. I deal first with those relating to tax:

> "20: the Scheme would save participants a fortune in Spanish inheritance tax as well as providing them with an income.
>
> 24: the Scheme was a valid means of avoiding payment of IHT and that "in the event of a partner's death, the surviving partner would be able to carry on living in the property, which would be simply transferred into the sole name with minimal inheritance tax consequences."

217. Representation 20 is put in very definite terms amounting to a guarantee of the fortune to be saved. This seems inherently unlikely since Mr Dewsnip was obviously not an expert and could hardly know the individual circumstances of everyone present. He himself was unclear if he volunteered anything at all about inheritance tax at the Cocktail Party but if he had, or had been asked, he would have referred to potential tax savings but no more. I think this is more likely because it would then follow the rather more measured terms of the Article that "with careful planning, Spanish IHT can be mitigated."

218. And to the extent that Mr and Mrs Carney had said that Mr Dewsnip's statement really reflected the literature, that view would be supported. Mr Rose also supports that position. Mrs Carney accepted that Mr Nott had provided far more information about tax than Mr Dewsnip ever did. She later said that he said that he had talked to people in Madrid about tax and things like that and it was as safe as could be. That is not actually the same as Representation 20. In my view, the most that was represented was that there was a potential tax saving.

219. As to Representation 24, this was not in fact pleaded although it is in paragraph 17 of Mr Carney's witness statement. Once again, it is far more categoric than the Article and indeed if correct would have been an extremely foolish thing to say since it is in the form of a general and unqualified piece of tax advice. I appreciate that at one point Mr Carney did indeed say that Mr Dewsnip had gone way beyond the Article but I do not find this a plausible account. The alleged tax representations did not feature, although perhaps understandably, in the 2008 letter which was all about performance of the investment; but it does mean that Mr and Mrs Carney may both be wrong in the precise terms of their recollection and certainly it is odd that it did not feature in the Amended Particulars of Claim.

220. Accordingly, I do not accept that Representation 24 was made either.

221. To the extent that there were the much more qualified representations on tax referred to above, these would have been true. See the section on The Tax Position below.

222. Representation 21:

> "the investment performance would cover the interest on the loans and all outgoings and should provide sufficient growth to allow for income distributions"

223. Mr Dewsnip said that he could not have said this because he would not have known. Again, it is far too categoric. More likely is that the option of the capital and income drawdown were mentioned which the Bank saw as a real selling point. In evidence, Mr Carney accepted that the drawdowns were not guaranteed and Mrs Carney agreed that Mr Dewsnip did not say the investment would definitely go up in value. His not saying this is consistent with the Bank's general reluctance to have the CS4 product described as "self-funding" (see Ms Whittet's email

41

of 18 November 2004 to a different IFA). In addition the loan documentation made extensive provision for recourse to collateral, margin calls at set up. So I do not think that this representation was made.

224.    Representation 22:

"there would be nominal setup charges and any investments charges would be at amortised over five years"

225.    Mr Dewsnip denies saying this because he was there only to talk about the loan terms. That is certainly consistent with the description of fees in the 22 September presentation - see slide 12 under the heading "Loan Terms". It would have been fair to see the setup charges as nominal but the issue here is the other fees. While Mr Dewsnip accepted that he was aware of the investment providers fees - the 8% or 8.5% for Aspecta being taken up front - if anyone was to talk about those fees at the Cocktail Party it would be much more natural to have come from Mr Nott since the investment was being sold through them and not through the Bank.

226.    In re-examination, Mr Rose said that Mr Dewsnip might have said as alleged in Representation 22 but it is clear from the further questions put to him that what he was referring to and answering was about the arrangement fee of 1% and a "trail commission" in the first five years. He would not have mentioned the 8% for IFAs which would have come off the investment. So it is not clear to me that Mr Rose was really taking issue with Mr Dewsnip's account. Further, given that it is common ground that Mr Dewsnip was aware of the Aspecta upfront fee of 8% if he really said that all the investment fees would be amortised over five years that would be deliberately misleading and I cannot see why he would have said that. This is a plain statement of fact as opposed to a possibly more nuanced question of judgment or assessment about the tax position or investment performance. So I do not accept that he made this representation. On the face of it, this was plainly a matter for HW and not the Bank.

227.    There is then a collection of representations to the effect that the Bank was guaranteeing the safety and performance of the investment. I accept that they can be conveniently dealt with together.

> "23: the Scheme was practically 100% secure because of Rothschild's involvement.
> 25: Mr and Mrs Carney could be reassured by Rothschild's impeccable reputation they would not be prepared to support such a scheme unless they were satisfied of its safety.
> There was nothing to worry about (at no point did Stephen Dewsnip either in the presentation or the conversation afterwards mention any of the potential risks associated with the scheme.
> 30: the scheme was 100% secure.
> 31: the scheme could not fail:
> 32: that Rothschild would not compromise on the safety of the Scheme."

228.    These are all put in very absolute terms and it is in my view wholly implausible that someone like Mr Dewsnip, well aware of the Bank's specific role as lender and the frequent reminders in its (and other) literature that investment performance cannot be guaranteed, would have said this. He denied it and Mr Rose says that he would not have said it.

229.    Mr Carney in fact accepted that it would have been "a bit dubious" if Mr Dewsnip did say 100% secure although he still maintained that he said it or "basically" so. Mrs Carney said in evidence that Mr Dewsnip was saying that there were "minimal" risks.

230.    Mr Rose added that he would have been very unhappy if Mr Dewsnip had given guarantees about the performance of the investment, all staff being trained not to give advice and to steer clear of statements about performance. He recalled that in the presentations which he did attend, Mr Dewsnip would say that there were risks and the client needed to speak to the IFAs.

231.    I think that Mr and Mrs Carney here have simply overstated their case. Undoubtedly Mr Dewsnip would have said that the Bank approved the investment, because it had it as collateral. I

42

think that he would also have referred to the minimum capital guarantee and perhaps the maximum 75% LTV as means by which the risks to the Bank - and to the customer - would be reduced. And I think that he would to some extent have relied upon the institutional standing of Rothschild to say that the loan was a good product; all much as he did in the Article.

232. But I regard all of these representations as being far too categoric to have been made by someone in the position of Mr Dewsnip.

233. I have no doubt at all that Mr and Mrs Carney (and indeed Mr and Mrs Fox) would have placed some general emphasis on the fact that it was Rothschild, a very long established and well-known bank, which was the lender here. But that would not have arisen at the Cocktail Party as such but rather from the fact that it would be the lender as had already been explained to them and as they had signed up for in the documents. I also have little doubt that Mr Dewsnip would have made use of the Bank's reputation in a general way, as is evident from the references to "ultra-cautious" in the Article. It is also the reason why he would have gone over the history of the Bank as he accepted he did and why he would have made at least some reference to the Baron. None of that would have been the usual kind of sales pitch one would see from a high street bank because the history and background and perception is different.

234. But the fact that Rothschild was and was prepared to be the lender in this scheme that and was content with the investment as security is a very long way from an actionable representation and certainly the ones pleaded here.

235. I suspect that at the end of the day, all of the Claimants feel that, right or wrong from a legal point of view, because Rothschild is such an established institution, it simply should provide them with redress irrespective of its actual role or the documents they signed.

236. Representation 26:

> "Stephen Dewsnip had lengthy personal meetings with Baron Rothschild to discuss the scheme".

237. Here it is very much a question of emphasis and nuance. As I explained above, I do think that some generalised reliance on the Bank's reputation by Mr Dewsnip would have occurred and highlighting the name of the Baron (who, it is common ground was mentioned) would have been attractive to those who were considering the scheme, as a general *imprimateur*. Mr Hewgill had said in his witness statement that Mr Dewsnip had said that the Baron would not have agreed the scheme if it had not been 100% secure.

238. But it would be very odd for Mr Dewsnip to go so far as to say he had meetings with the Baron whom he had never met. As with the position on the 8% upfront fee, if he made this representation, then it was dishonest because he would have known it was untrue. That seems very unlikely, even if the Claimants now believe it to be the case.

239. And importantly, here, Mr Carney really downplayed the significance of the reference to the Baron. It was not to be found in the 2008 letter, he said, because it was all a bit "vague and fluffy" and references to the Baron might not have made any difference since according to Mr Carney, Mr Dewsnip was in any event so effusive. It was just a "little booster" for Mr Dewsnip, he said.

240. On balance I do not think that Mr Dewsnip made this representation and even if he did, I think they would fall into the category of a "mere puff" ie they would not be actionable.

241. Representation 27:

> "Rothschild would be working with investment fund managers on a daily basis to ensure the performance of the funds."

43

242. If this representation was made, it meant that Mr Dewsnip was going to be monitoring and working with the actual investment managers as if he was involved in managing them himself; given the huge size this would seem very unlikely.

243. What is more plausible (and correct) is that the Bank would closely monitor the performance of the investment; in fact it had to do this for its own purposes, so as to ensure that none of the relevant covenants were breached and to see if at any given time, income drawdown was permissible or not. Since that was the condition for the 3% drawdown in any given year, it would be logical to say something about it here and indeed it was part of the loan terms. So I do not accept the submission that there would have been no point in mentioning monitoring unless it was in the context of the alleged representation.

244. So I do not think that representation was made.

245. Representation 29:

> "the particular investment structure would meet all projections and was for this reason that it was only the Premier fund that they would accept."

246. Again, if true, Mr Dewsnip would have given an absolute assurance that the investment would perform in the way expected. That is quite different from making the point that the Bank had approved this investment as collateral and emphasising such features as were insisted upon like the 100% capital guarantee. To some extent, this representation is allied to the earlier collection of representations about the investment being "100% secure" and it is just as implausible. Indeed, when Mrs Carney was asked about which specific fund he was talking about she said "Optima". She was then asked to confirm that she knew that it was not the Bank's own fund and that the Bank was not, as it were the manager. She said that the Bank was the investment manager. I do not accept that she really thought that at the time.

247. That deals with the representations allegedly made during Mr Dewsnip's presentation at the Cocktail Party. But Mr and Mrs Carney also say that following the presentation Mr Dewsnip mingled with the guests and spent 10 or 15 minutes talking to them. They say that he repeated the statements about the investment being 100% safe, otherwise the Bank would not be involved, or words to that effect. He is also said to have repeated the assurance that the Bank would monitor the investment on their behalf. While Mr Dewsnip has no recollection of this encounter, I am prepared to accept that he did speak to them - they would be more likely to remember it if he did and Mrs Carney had a particular reason to remember because she had previously looked after a member of the Rothschild family and had mentioned that to him.

248. However, there is no reason to suppose that Mr Dewsnip made the representations alleged at this juncture any more than at the meeting itself. I have already set out above my rejection of such representations. It is not as if it is alleged that during the conversation, he made specific enquiries of their own financial or tax position. It is important to note that Mrs Carney's view, even after this conversation, was that the scheme was still "too good to be true". As noted above, she entered into the scheme along with Mr Carney because he wanted her to.

249. Mr Yell makes a general point that I should be cautious before accepting Mr Rose as a witness supportive of Mr Dewsnip's recollection of what he did or did not say. This is not simply because Mr Rose was not at the Cocktail Party but because in his witness statement at paragraphs 63 he said that at the other events which he attended, he could not recall them in detail nor specifically what Mr Dewsnip said. So when in evidence he said that Mr Dewsnip would or would not have said something at the Cocktail Party or had actually said something at the other events this was a serious inconsistency.

250. I do not agree. The thrust of Mr Rose's written and oral evidence was that if Mr Dewsnip had "crossed the line" by giving advice or giving assurances about the investment performance

44

(especially if categoric) he would have noticed, or as he said in evidence, alarm bells would have rung. He knew from the whole approach of the Bank not to do that and he thought that Mr Dewsnip must have known, too. If on occasion in evidence Mr Rose recalled a particular phrase that Mr Dewsnip might have used at the presentations he saw I do not see that as undermining his evidence generally even if not specifically mentioned in the witness statement.

## DEALINGS BETWEEN THE BANK AND MR AND MRS FOX

251.    Mr and Mrs Fox became clients of HW and Mr Nott in particular in January 2002. They first met with Mr Nott in connection with this scheme in February 2005 when he introduced SPAIRS to them.

252.    They then discussed the suggestion that they take a loan from Barclays and invest the proceeds in the Aspecta life policy, with Richard Malthouse, Mrs Fox's brother, a solicitor who, prior to retirement, had been a partner at McKenna & Co. He raised a large number of questions in his email to them dated 12 February 2005 which was forwarded to HW.

253.    Then, as noted above, Mr Nott produced a Confidential Report for Mr and Mrs Fox dated 21 March 2005 in relation to the Barclays loan. They applied for the Aspecta policy with Barclays as lender on 22 April 2005 and confirmed receipt of Aspecta's General and Special Conditions applicable to the policy.

254.    But on 19 July 2005, after Barclays had withdrawn and the Bank came in as lender, Mr and Mrs Fox completed the CS4 application form along with a domiciliation agreement for Aspecta and an instruction to change the underlying fund from 50% Close All Weather Fund and 50% Optima Series 2, to 100% in the latter.

255.    On 10 August, Mr Eves of HW chased Mr Coutanche at the Bank whose credit committee was considering the loan application. He did so on behalf of Mr and Mrs Fox because they were going away for a few weeks on 1 September and wanted the notary to sign everything before they went. Signature before the notary was the final step in the making of the relevant contracts. In the event, the Credit Committee approved the application including the capital release and income drawdown on 26 August.

256.    The next significant event involving Mr and Mrs Fox was the Lunch they hosted for Mr Dewsnip and Mr Nott on 10 October 2005.

257.    But what is very significant was Mr Fox's clear evidence at trial that they had already decided to enter the scheme before the Lunch occurred. He agreed that if the notary had visited his house on 10 October instead of Mr Dewsnip, they would have signed there and then because they wanted to get on with it. Partly, he said this was because it (i.e. Rothschild) was a very good bank. He said that even his brother-in-law had said it was a good deal. They would gladly have entered the scheme as soon as the valuation had been done and the loan had been approved. At another point, he said that they were certain about entering the scheme prior to the Lunch and even more certain afterwards.

258.    Even when asked in re-examination why they had the Lunch, Mr Fox said it was because a director of the Bank had been prepared to discuss the scheme they hoped to enter which was sensible and wise. He did not say that they needed the Lunch to obtain further information or assurances or anything like that before they would have made the final decision.

259.    For her part, Mrs Fox, who I think realised more than Mr Fox the significance of the point, did not accept that they had made their minds up once they had applied in July 2005. She said that she wanted a second opinion from Mr Dewsnip and only after the Lunch did it become definite. But she did not say this in her witness statement and more importantly it cannot be right. In July, they had no idea that they would meet Mr Dewsnip, whether at the Lunch three months later or

45

at all. Her evidence on this point was quite unconvincing and I think she had also decided to proceed, before the Lunch.

260. As for Mr Nott, Mr Fox would brook no criticism of him at all and seems to have accepted the line taken by Mr Nott after things started to go wrong that HW as the IFA had no real responsibility and all the blame should be foisted upon the Bank. To that extent, as with Mr and Mrs Carney, I think that Mr and Mrs Fox have fixed upon the Bank as wholly to blame and now will not accept any other possibility. It remains quite extraordinary that despite being involved in all of this as the financial adviser and having provided a witness statement but then not appeared as a witness, Mr Nott apparently still acts as their financial adviser. But perhaps because of this, they do not wish to see him in a poor light.

*The Lunch*

261. This took place because Mr and Mrs Fox could not get to any of the receptions organised by HW. They asked Mr Nott if he could bring Mr Dewsnip to meet them at their home. For his part, Mr Dewsnip says that Mr Nott was going and asked him to come along. I doubt whether Mr and Mrs Fox were focusing on Mr Dewsnip as opposed to Mr Nott; after all the events were being organised by HW, and HW was the first point of contact for Mr and Mrs Fox. At all events, Mr Nott and Mr Dewsnip did go for lunch; it was a three-course meal with an expensive wine provided by Mr and Mrs Fox.

262. In his evidence at trial, Mr Fox said that the two matters discussed, broadly, were investment performance and the question of tax. Although initially he said that Mr Dewsnip referred to the Bank's "back-testing" showing a 7% return (which Mr Dewsnip did not recall saying), Mr Fox was less sure later - he said he thought that Mr Dewsnip had referred to this but he could not vouch for it. Later on still he said that Mr Dewsnip did not even discuss tax and tax was not mentioned although the inheritance tax issue (which Mr Nott had discussed with them) was why they went into the scheme.

*The alleged representations at the Lunch*

263. Representation 33:

> "the Premier fund brochure given to Mr and Mrs Fox advertised the way in which the investment fund was to be operated and what it involved."

264. Mr Fox's evidence suggested that he did not really know if they discussed these documents at the Lunch and Mrs Fox said there was no such discussion. On that basis this representation is not made out.

265. Representation 34:

> "the investment manager's fees were to be amortised over five years".

266. As with the Cocktail Party, Mr Dewsnip's evidence was that he would not have spoken of this because it was a matter for Mr Nott. And in their oral evidence, Mr and Mrs Fox only referred to discussions about the underlying investments not the payment of fees. Mr Fox said it was not necessary to discuss fees because they had been referred to in the documents. So this representation is not made out.

267. Representation 38:

> "Premier Optima 2 Series Fund was the only fund in the market at that time that Rothschild would accept."

268. Although Mr and Mrs Fox were insistent in their evidence that Mr Dewsnip referred specifically to the Premier Fund it was in fact quite difficult to see where that name had appeared in the documents they had signed, or in the Confidential Report or the Article. And it is not clear why Mr Dewsnip would have referred to it as such. However, the more general allegation is that the fund which they had applied for (in fact Aspecta) was the only one that the Bank would accept.

46

269. It is hard to see why Mr Dewsnip would have said that, as distinct from saying that the Bank had approved this particular investment as collateral which was a correct statement. In fact, as we know, the Bank was prepared to change the investment once HW came to them with that suggestion in January 2006 and they so told HW. But it is noteworthy that Mr Fox said that he had been told by Mr Nott that the latter's request to the Bank to change the investment funds had fallen on deaf ears. That was not in fact the case. When the suggestion was put to Mr Fox, therefore, that Mr Nott may not have told him the true position, Mr Fox was not at first prepared to accept that that could be so. This was an example of his reluctance to find any fault at all with Mr Nott.

270. In principle the Bank could approve any investment that fitted its particular collateral criteria. Indeed the printed terms of the Application Form simply refer to the "Investment Fund" and the Terms and Conditions defined the Investment Fund as "a capital guaranteed Euro denominated mutual fund acceptable to the Lender". The point is rather that by the time of the Lunch or indeed the Cocktail Party, the particular funds which were being offered through HW and for which the Bank had agreed to act as lender were the Premier/Aspecta funds, and so these were obviously the investments in question. But there is a distinction between saying that the Bank had approved these investments for its purposes and that the only investment the Bank could or would approve were these ones. Accordingly, this representation is not made out.

271. Representation 39:

> "there was a 10 year guarantee of, by implication, the amount of the outstanding loan."

272. In paragraph 16 of his witness statement, Mr Fox said that it was Mr Nott who said that the investment had a 10 year guarantee. In addition, he said that he was not now sure who said what. It is difficult to see how there was the implied guarantee. Mrs Fox does not refer to this matter and paragraph 8 of her witness statement does not deal with this matter. Mr Yell has relied upon paragraph 25 of Mr Fox's witness statement but that just says that they did not recall ever seeing any detail of the Barclays Guarantee. Mr Dewsnip denied in his evidence that he referred to such a 10 year guarantee and there is no basis for saying that he adopted everything that Mr Nott said at the Lunch. They both had different roles and there is no reason why silence on the part of Mr Dewsnip should amount to an acceptance or endorsement of what Mr Nott said. Otherwise one is left with what was said in the Article which refers to a capital guarantee (see above). If there was the alleged implied guarantee of the outstanding loan it would have to include interest as well. For all those reasons, I reject the alleged representation here as having been made.

273. Representation 40:

> "The full value of the proceeds of the loan would be invested."

274. Mr Fox says that Mr Nott said this. Once more, I do not see how this can be attributed to Mr Dewsnip who denies making any statement about it. Otherwise, in support of this representation the Claimants rely upon representations made in the Confidential Report to Mr and Mrs Fox. But there is no basis for attributing the content of those reports to the Bank (see below).

275. Representations 41 and 44:

> "Mr Fox could expect 7% investment growth which would be 3% above the cost of borrowing"… "The investment would provide "additional cash after meeting the required mortgage interest payment".

276. In paragraph 17 of his witness statement Mr Fox says that these representations were made by Mr Nott. At first, in his oral evidence Mr Fox said that Mr Dewsnip had said that the funds were back-tested and were producing 7 to 9% per year profit and the Bank's charges were going to be about 4% so there would be 3% growth every year. But later, when referring to back-testing, Mr Fox said that he believed that the Bank's "own Special Branch" had done the back-testing and referred to the same percentages saying that "you got it all in your searches which we saw." So

47

that rather suggests that Mr Fox has obtained this information from the documents disclosed in these proceedings. This is possible because the 7-9% return does feature in credit committee report for example that of 2 July 2004 and there is also reference to a 4% assumed interest rate. Mr Fox ended up by saying that he thought that Mr Dewsnip had referred to this at the Lunch but he could not vouch for it. Moreover, Mr Fox did accept in evidence that Mr Dewsnip could not actually guarantee performance. In those circumstances, again, I do not accept that the alleged representations were made by Mr Dewsnip.

277. Representations 42, 45, 46 and 48: these are similar to Representations 23, 25 and 30-32 alleged in respect of the Cocktail Party about the investment being safe with little or no risk. As with the Cocktail Party, Mr Dewsnip denied making any such representations save that he would have referred to the Bank's generally cautious approach to lending. In oral evidence Mr Fox said that Mr Dewsnip did guarantee to reduce risk as much as possible and the investment was very safe and Mrs Fox said that he referred to it as being perfectly safe and unlikely to fail and being a guarantee. Later, however, Mrs Fox said that Mr Dewsnip did not go into too much detail and she just "wanted it done". For the reasons given in paragraphs 228 - 235 above, I do not accept that these representations were made. There is in fact a further point here. So far as I am aware the investment did not "fail" although it did underperform. Equally, it was "safe" in the sense that the underlying investments were highly rated and it is not as if the Claimants were in fact entering into some sort of investment scam. I deal further with projected investment performance below in the context of the expert evidence.

278. Representation 43:

> "the statements made by Stephen Dewsnip in the ... Article.. were correct".

279. The evidence of Mr and Mrs Fox now is that there was no express discussion about or confirmation of the Article at the Lunch. Accordingly, this representation is not made out. In any event, it is difficult to see how this could add to the representations alleged in relation to the Article itself.

280. Representation 47:

> "Stephen Dewsnip would be closely involved in monitoring the performance of the investment fund."

281. This is somewhat similar to Representation 27 alleged in respect of the Cocktail Party. Paragraph 7 of Mrs Fox's witness statement is relied upon. If what is meant by this Representation is that Mr Dewsnip would be monitoring the investment for Mr and Mrs Fox to ensure that it was performing or some such, then, for the reasons given in paragraphs 242-243 I do not consider that he would have said that. What he said would have been limited to monitoring the value of the investment as collateral, which the Bank would have to do. In evidence he denied going any further. I should add here that the allegation is that Mr Dewsnip in fact had no intention of monitoring the investment (for Mr and Mrs Fox). That is effectively an allegation of dishonesty which I do not believe Mr Dewsnip would have engaged in.

282. Representation 49:

> "that the Scheme was suitable for Mr and Mrs Fox."

283. Mr Dewsnip denied saying this although Mrs Fox said in paragraph 9 of her witness statement that he did. But it is classically the language of a financial adviser and if it was said at all, I consider that it would have been said by Mr Nott. Indeed Mrs Fox agreed that Mr Dewsnip was not giving independent advice like HW. She said he came to sell the scheme not give advice. Further, and as with a number of the general statements said to constitute representations this did not fall within the two topics which Mr Fox said were specifically discussed that is to say the underlying funds and potential inheritance tax benefits.

*Length of the Lunch*

284. It is said that if Mr Dewsnip did not make all the representations alleged, then it must have been a very short lunch. I do not accept that because first, there was still a lot of detail to go through as far as the Loan was concerned and Mr Nott spoke to them as well. Furthermore, it is not as if Mr Dewsnip did not say something about the matters alleged; it is more a question of precisely what he said and the emphasis, for example monitoring the investment or the cautious approach. Moreover, this was all done over a lunch and then there was a walk round the garden. It is not suggested that the conversation was exclusively directed to the scheme. So I do not think there is anything in this point.

*The Testimonial*

285. It is true that Mr and Mrs Fox did give a testimonial which was very complimentary about Mr Dewsnip, although what they said about him was limited to the fact that he was "very switched on" so that they became "even more certain" that the scheme was sound. Most of the testimonial was about HW, which is understandable because it was for the benefit of HW. Mr Dewsnip agreed that he saw it before it was published but this was in the context of him speeding up the loan process because they were not going to give the testimonial until everything had been set up. While I would accept that Mr and Mrs Fox had clearly been impressed by Mr Dewsnip, this does not mean that he made the alleged Representations and it is noteworthy that the specific matter referred to, about the cautious approach and the 100% capital guarantee in fact comes from the Article.

*The Article: Misrepresentations*

286. This part of the misrepresentation allegation, in paragraph 37 of the Amended Particulars of Claim, is concerned with Mr and Mrs Fox only. It is not alleged that Mr and Mrs Carney relied upon the Article although it is clear that they saw it at some stage (see above). At this point, I am only concerned with what representations (if any) could be spelled out of this document, as opposed to the effect upon them of any of the Relevant Clauses.

287. Representation 16:

> "the title of the Article: "Rothschild presents a tailor-made plan to fit your needs"

288. This is the heading, or by-line to, the Article. It is not actually a pleaded representation in the Amended Particulars of Claim. It is not clear what the misrepresentation alleged is, from Schedule C. It may be a representation that there was individual advice to or recommendations for the customers, and the misrepresentation is that at least according to the Bank it had no such role hence the title of the article was false. Quite apart from where that representation would go in terms of causation if it existed I do not think in context that there was such a representation since it is plain that the Article was entirely general in form and advised readers to consult their IFAs.

289. Lest there be some other representation alleged, the fact is that this is simply a general title obviously designed to attract the attention of the reader. Once more, having regard to the article as a whole and the specific references to the need for advice from HW tailored to the individual circumstances of each customer, and the need for "careful [tax] planning", it is impossible reasonably or objectively to read the title as some general statement that the scheme as a whole was suitable for everyone without more. No doubt this is why this representation was not alleged in the Amended Particulars of Claim. Accordingly, I reject it.

290. Representation 17:

> "the article gave tax advice: "with careful planning, Spanish IHT… Can be avoided".

291. The actual sentence reads "with careful tax planning, Spanish IHT can be mitigated". But in any event, this cannot be read as a general tax advice to all, especially with the later references to the

49

need to obtain financial advice from the advisers. No one reading this paragraph could reasonably assume that it meant that without more, they would be able to mitigate such IHT liability as they would otherwise have. Both Mr and Mrs Fox agreed that nothing was guaranteed about mitigation of tax and it was all about careful planning. In my view, the area of tax advice and planning is, objectively speaking a complex area and I cannot see how such a general statement could reasonably amount to an actionable representation as to tax. Otherwise see the section on The Tax Position below.

292. Representation 18:

> "the investment linked to the plan is designed in such a way as to potentially generate sufficient growth to not only cover the interest on the loan but also additional growth"

293. That is the actual statement in the Article but the representation alleged includes the following, (which was not expressly said):

> "even with interest roll-up, capital release of 5% and income drawdown at 3% PA."

294. The key word here is "potential". For the representation to be false, it would have to be shown that as designed, the investment did not and could not have the potential to produce growth above that required to pay the accrued interest.

295. On the facts, and for the reasons given below in the section on Expert Evidence, I do not consider that there was a misrepresentation, certainly not one by reason of which the Bank had acted negligently. It is true that the Bank did not anticipate a return (above that needed for the payment of interest) of at least 3% - see the 23 June 2005 internal paper. But by itself, this does not mean that the investment could not potentially produce "modest capital growth".

296. I agree that the position in relation to fees would affect this if taken out initially. The same is true of personal income tax in respect of the monies received. But neither fees (other than the Bank's) nor income tax were matters on which it was the Bank's role to advise, in my view and it made no actionable representations about them.

297. Representation 19:

> "at Rothschild we are insistent that customers are not exposed to unexpected risks therefore our ultra cautious approach includes a 100% guarantee."

298. The actual passage reads as follows, in full:

> "at Rothschild we are insistent that customers are not exposed to unexpected risks therefore we offer solutions that mitigate as many risks as possible. Our ultra cautious approach not only includes the undertaking 100% capital guarantee mentioned above but following a professional valuation of your property we will only lend up to 75% of the market value. This differs from other lenders who will lend up to 100% of the property value".

299. On a fair reading, Mr Dewsnip was saying that the Bank was being ultra cautious because it insisted on a 100% minimum guarantee and lending only up to 75% of the property value (where other lenders lend up to 100%). Both of those features therefore meant that the prospect of the Bank needing to have recourse to the borrower's property was much reduced.

300. Further, I do not see that the reference to "ultra cautious" means in every respect concerned with the investment. Rather, and despite the use of the word "including" I think it is simply a reference to the two particular features mentioned: the minimum guarantee and 75% LTV. On that footing that representation was true.

301. I agree that there was not to be a 100% guarantee of the loan monies but the Article does not actually say that there was.

*The Article Generally*

302. There is an overarching point which is that in truth, this was sales material designed to whet the appetite of potential investors who could (as referred to) then go to their IFA for more detailed advice and planning. I do not see it as a set of statements to be relied upon by investors directly when entering into the loan without seeking out such advice. To conclude otherwise in respect of these particular representations would be to ignore the difference between the roles of the Bank and the IFA.

*The Alleged misrepresentations contained in the Confidential Reports given to Mr and Mrs Carney and Mr and Mrs Fox dated 28 September 2005 and 21 March respectively.*

303. The principal difficulty faced by the Claimants here is that these reports were produced, expressly on their face, by HW and not by the Bank and they do not say otherwise. See their contents cited above.

304. In fact, much of the Confidential Report dated 28 September can be seen in the earlier report to Mr and Mrs Carney dated 28 March. Furthermore, at the presentation on 22 September 2005, there were also presentations from Premier and Aspecta so it is hardly as if HW could only have been informed about the investment (which itself had little coverage in the Bank's presentation) from the Bank. Indeed, one might assume and the Bank was entitled to assume, as Mr Dewsnip did, that HW would obtain such information as it needed about the investment which formed part of its SPAIRS scheme as and when necessary. That would include the relevant fees which in fact HW must have known about since it made contractual arrangements which included fees with Premier and Aspecta.

305. The fact that after the event, Ms Sauvarin saw one such report and made comments to correct certain parts of it (see above) does not alter this nor does the fact that Mr Dewsnip probably saw one or more at different stages.

306. Further, it is now clear from the evidence that it is not said that Mr Dewsnip actually endorsed any Confidential Report at the Lunch. See paragraph 279 above.

307. In the case of Mr and Mrs Fox, there is no basis for saying that the Bank somehow became "responsible" for the Confidential Report to them because it made statements which were the same as or similar to those made by the Bank to HW. The fact that HW chose not to provide a revised report to Mr and Mrs Fox following the introduction of the Bank as lender is irrelevant.

308. As for the Confidential Report to Mr and Mrs Carney, first, it was not, essentially, a copy of what was said in the Bank's 22 September presentation (see paragraphs 169-171 above). And to the extent that the report did utilise information from the Bank it still does not alter the fact that it was a document produced by and only by HW.

309. There is no basis for saying that either generally or in relation to the Confidential Reports in particular, HW was acting as agent for the Bank. There is no reason why it should be, especially as it was the explicit financial adviser and the Bank was not.

310. In fact, there is no real evidence at all that HW relied upon the Bank to any real extent for the provision of any information that might appear in the Confidential Reports (other than in respect of the loan itself). The Claimants' evidence cannot help on this issue and Mr Nott was not called as a witness. The fact that at various times, the Claimants asserted that the Bank played a much more dominant role than Mr Nott is irrelevant here and I have rejected it - see above.

311. HW, as with any IFA, could be expected to deal with the investment provisions and obtain all the information it needed to give appropriate advice. The contractual documents also make clear the Bank's non-advisory role.

312. While, as Mr Dewsnip accepted, the Bank would for obvious reasons not wish to deal with or work through an IFA where there were serious concerns, not least in the case of any reputational issues, that does not mean that there would arise a related agency relationship without more. The Bank did consider the Klein matter (see above) and satisfied itself that there was no bar to proceeding with HW.

313. In truth, there is simply no basis at all to suggest that in law the Bank was liable for any misrepresentations contained in the Confidential Reports. And although the legal context here is Unfair Relationship, there is no reason why some other wider test for liability or responsibility should be employed, and none was suggested in argument by Mr Yell.

314. Accordingly, any issue as to misrepresentation in the Confidential Reports does not arise as against the Bank.

## THE TAX POSITION

315. The Claimants pleaded case was that, contrary to the alleged representations in respect of Spanish inheritance tax, the scheme as a whole was ineffective to save ISD for the Claimants and accordingly the representations were false. Furthermore it was said that there was no reasonable basis for the Bank to have made the representations.

316. The bank took issue with this in its Defence.

317. At the CMC on 11 November 2016, it appeared to me that such tax avoidance (or not) might well be a live issue at trial which would require expert evidence. However the need for that could be avoided or reduced if both parties agreed the position. Accordingly I made appropriate directions for an exchange of correspondence on the question. An exchange there was, but it became unnecessarily protracted.

318. I do not intend to rehearse all or even much of the correspondence. The Bank and the Claimants agreed that where a property is subject to a charge for a loan (as here) it is only the net value of the property that is subject to ISD. The ISD liability is based not upon the value of the deceased's estate and as against the estate, but rather on the value of the share of it which devolves to the beneficiaries. The first beneficiary here would be the surviving spouse. So ISD for the spouse would indeed be avoided to that extent.

319. However, there is then the question of the investment within the insurance policy. For those not resident in Spain who are beneficiaries of an asset belonging to the deceased which is outside Spain, essentially that asset would not count for ISD purposes. But for residents becoming entitled to such an asset it would, because all assets worldwide are included.

320. In the case of a non-resident beneficiary, therefore, there was potential for the relevant investment not to count.

321. However there are two problems with this. First, it is common ground that because the Aspecta policy was entered into in Spain and governed by Spanish law (although the policy itself is located in Luxembourg) it would count as a Spanish asset regardless of its actual location. Second, all of the Claimants are resident in Spain for Spanish tax purposes although their children, as further beneficiaries, are not.

322. That does not necessarily mean that a spouse in the position of Mrs Fox or Mrs Carney in the sad event of the death of Mr Fox or Mr Carney would be liable to ISD on the value of the policy; the

reason is that it would not or might not yet have matured and they would have no entitlement to it and if that analysis is correct, then they would still avoid a significant ISD tax bill. However on their own deaths or the maturity of the policy, the next beneficiaries would have to pay ISD since the investment is regarded as a Spanish asset.

323. This rather illustrates the difference between agreeing some general points about ISD on the one hand and how it might affect particular beneficiaries on the other. Accordingly, the Bank's essential last word on this before trial was in its letter of 16 June 2017, where it said this:

> "As explained previously, but for the avoidance of doubt, our client's position concerning Spanish law at the relevant times is as follows:
>
> (a)    A loan secured by way of legal mortgage over a property in Spain was effective to reduce the value of that property for the purposes of Spanish inheritance tax.
>
> (b)    Spanish inheritance tax is payable by the beneficiaries (not by the deceased estate), by reference (among other things) to the value of the asset inherited, the beneficiary's own financial circumstances, and the nature of the relationship between the deceased and the beneficiary.
>
> (i)     Beneficiaries resident for tax purposes in Spain were obliged to pay Spanish inheritance tax on assets inherited wherever those assets were located.
>
> (ii)    Beneficiaries who were not resident in Spain were only obliged to pay Spanish inheritance tax on assets inherited in Spain. They were not liable to pay Spanish inheritance tax on assets they inherited which were located outside of Spain.
>
> (c)    An insurance policy governed by Spanish law, and concluded in Spain, is deemed for the purposes of Spanish inheritance tax to be an asset located in Spain…..
>
> …What is also clear - and again we do not understand this point to be in dispute - is that the application of those principles to any individual's position was complex, and heavily dependent upon the particular personal and financial circumstances of the individual in question, including in relation to the location and value of each of their assets and the specific circumstances of all of the other people involved in the individual's estate planning.
>
> For those reasons, while it may have been possible to agree at a high level of generality propositions as to the application of Spanish tax law to the general structure of arrangements of which our client's loan formed a part (i.e., taking out a loan secured by way of (among other things) mortgage over a Spanish property, the proceeds of which were to be used to acquire an investment - the "Scheme"), it is not possible for our client to agree, in the absence of evidence, how Spanish tax law applied in the abstract to the particular transactions entered into by your clients. That matter is more nuanced than your present approach permits. To take one example:
>
> (a)    The insurance policies offered by Aspecta (including those acquired by your clients) provided that the proceeds were payable to the beneficiaries identified in the policy on the death of the second policyholder.
>
> (b)    On the death of the first policyholder, no Spanish inheritance tax was payable by the second policyholder (the surviving spouse) in relation to the insurance policy.
>
> (c)    Accordingly, on first death:
>
> (i)     the value of the Spanish property the surviving spouse stood to inherit was significantly reduced by the loan secured by way of legal mortgage, with the consequence that the surviving spouse's liability to pay Spanish inheritance tax in relation to that asset was reduced;
>
> (ii)    the surviving spouse did not have any liability to pay Spanish inheritance tax in relation to the insurance policy acquired with the proceeds of their loan.
>
> (d)    The acquisition of an insurance policy by two (Spanish-resident) policyholders jointly, with the proceeds of a loan secured by of mortgage over the policyholders' Spanish property, was therefore both (i) a tax-effective investment in relation to the Spanish personal income tax payable by the policyholders on any growth in the policy; and (ii) effective to reduce the net liability to Spanish inheritance tax payable by the surviving spouse (qua beneficiary) on first death…."

324. The response from the Claimants' solicitors was to dispute this example. It also stated, inaccurately in my view, that the Bank had now accepted that the scheme was ineffective to save ISD. The Bank's position was reiterated in its letter of 15 September 2017 and there the matter rested.

53

325. There has been no expert evidence adduced to show that in fact the Scheme would be ineffective in the particular case of these Claimants and of course (happily) it has not been put to the test.

326. In the absence of expert or agreed evidence the best I can do is to conclude that as far as a surviving spouse is concerned, there was at least a real prospect that she could receive the family home in Spain but without having to pay a large amount of ISD on it, because of the scheme. However, this would not avoid ISD for the next beneficiaries. On that analysis, one could fairly say that the scheme would at least mitigate the incidence of ISD in particular for the surviving spouse.

327. On that footing, if there was a general representation to the effect that there was a prospect of saving or mitigating ISD, it seems to me that this was true. Whether it would work in any given case would depend on further consideration and tax advice. If the Claimants really wanted to say that actually there was no prospect at all of this particular scheme producing any real saving of ISD for these Claimants (or other Spanish residents) then it was for the Claimants to adduce expert evidence on the point. The fact that the Bank bears the burden of showing fairness does not absolve a party who wishes to raise a positive case on some particular point from at least adducing some proper evidence on it and here it would be expert evidence.

328. Accordingly, I cannot proceed on the basis that the scheme as referred to by the Bank was generally ineffective for ISD-saving purposes. The Claimants point was that if in fact it was ineffective then there were no reasonable grounds for the Bank to say otherwise. I agree that the issue of reasonableness was raised by the Claimants although in the months before trial, the focus seems to have been more simply upon what the tax position was. In addition, and again, while the issue of reasonableness was raised, it is doubtful whether the Claimants have put in any proper evidence of unreasonableness. Indeed their position was that effectively, and again, the burden was on the Bank to show that it had acted reasonably, which would be akin to the position under the 1967 Act. I am inclined to the view that in a context like this where the question of reasonableness would again probably be likely to require expert evidence, the burden was upon the Claimants to at least adduce some expert evidence on the question.

329. However, the real point is that the issue of reasonableness does not now arise because:

(1)           I do not accept that the Bank made the more specific and categoric representations as to tax saving which, on present materials could then be shown to be incorrect; and

(2)           for the reasons already given the Basis Clauses are operative to remove any actionable representations especially in relation to tax.

330. The Bank was in possession of a Spanish lawyer's opinion on the tax question which, while maintaining it was privileged, the Bank did disclose in the course of the trial, but it was not prepared to disclose any other opinions. Mr Yell's point was that the Bank could have waived privileged to show all the tax materials it had in order to demonstrate that it acted reasonably in making the representations and as it has not done so, there can be no finding of reasonableness. However, for the reasons already given this issue does not arise.

331. Mr Yell also made the forensic point that the Bank must be taken to have assumed responsibility for the Claimants' tax position for otherwise why go to the trouble of exploring the tax question at all? This is a non-sequitur. If the Bank, because it is cautious and wishes to act responsibly, wants to see for itself that there is something in the tax benefits argument which in fact was promoted not by it but by Premier and/or the IFAs in the first instance, it hardly follows that it is assuming the role of tax adviser.

332. Further, Mr Yell suggested that the Bank knew or should have known that the Claimants would not take their own tax advice because they would not be in a position to do so, and anyway the

Bank had not been contacted by any such adviser on behalf of the Claimants. Had they instructed such an adviser they would have been in such contact. But I see nothing in this point either. The Claimants could have consulted a tax adviser had they wished to, and indeed Mr and Mrs Fox had a tax adviser though they did not consult him on this occasion. And even if the Bank thought that there was a prospect that they would not take individual tax advice, it was entitled to assume that they would take the risk - just as the Claimants might not in fact seek detailed advice from their IFA.

333.    After all, it is not as if Mr Dewsnip said or is alleged to have said that the Claimants did not need to take their own advice and all the written materials they had suggested the opposite. Against that background, to suggest simply that because Mr Dewsnip said something about tax saving there was no need to go elsewhere, is not a good point.

## WAS THERE AN UNFAIR RELATIONSHIP?

334.    I examine this in the light of my findings above (and below) and I direct myself to the particulars of unfairness relied upon by the Claimants. I bear in mind of course that it is for the Bank to disprove unfairness.

335.    The key unfairness points taken concern:

    (1)    Bad advice;

    (2)    Misrepresentation (to include unfairness of a number of terms);

    (3)    Regulatory considerations;

    (4)    Investment performance, suitability and affordability;

    (5)    Lack of information about Aspecta including its fees;

    (6)    Absence of risk warnings;

    (7)    Other Matters.

336.    I deal with them in turn.

## (1) BAD ADVICE

### Introduction

337.    The starting point for this is whether there was an advisory relationship at all between the Claimants and the Bank. It underpins a number of the particulars of unfairness alleged, especially in relation to the suitability or otherwise of the loan (or the investment).

### Factual findings

338.    As noted above, the first question is whether, apart from any of the Relevant Clauses to be relied upon, the Bank (a) actually gave advice  and (b) if so in giving that advice it had assumed the role of an adviser.

339.    As to the giving of advice, in my judgment, there was overall, no such giving of advice. It cannot possibly be inferred from the Article which expressly gives that role to HW. Nor can it be derived from what was said at the Cocktail Party or the Lunch - see above. The fact, as I have found, that to some extent Mr Dewsnip's presentation was a sales pitch (as some of the witnesses recognised) does not mean that he was giving advice; see *Thornbridge* cited above.

340.    Indeed, in reality, the whole flavour of the Claimants' evidence, especially as it emerged at trial, was much more to the effect that, as part of that sales pitch, Mr Dewsnip had made misrepresentations rather than giving negligent advice.

341.    Accordingly I find that the Bank did not give any material advice.

55

342.    As to the second requirement, it is quite impossible to see how the Bank ever assumed an advisory role. The Article was very clear in that respect, as were the contractual documents (see above and below).

343.    And importantly, there already was an IFA there whose job it was specifically to advise on the elements of the scheme but in particular the investment. At various points the Claimants accepted that HW gave them advice but I reject their attempts to downplay its significance in favour of the Bank as the dominant adviser. HW's role is exemplified by the production of the very detailed Confidential Reports addressed to the Claimants. Moreover, the Bank received no commission for any advice as distinct from HW who in fact received 4% which was obviously its only source of revenue when dealing with the clients.

344.    I agree, of course, that it is possible to have more than one adviser as Mr Yell has pointed out, although I suspect that in many cases this will be unlikely. While the Bank could in theory, have assumed an advisory role, there is no basis for finding that here.

**The Relevant Clauses**

345.    So far as the question of an advisory role is concerned, it is then important to note first, that Mr and Mrs Carney actually signed the operative application form (with the Bank as the lender) long after the Cocktail Party. Objectively, they would have that in mind when agreeing to those clauses.

346.    In my judgment, clause 1 (g) of the Application Form and Clause 6 of the Terms make it plain, as a matter of evidence, that there was no advisory role. The same is true of the statements in the Confidential Reports themselves which say in terms that the Bank was acting as a lender only and not giving any advice. All of this simply negatives the existence of any advisory duty on the facts - see paragraphs 80 and 82 above.

347.    There then arises the question as to whether in the context of advice, these clauses are susceptible to judicial control. For the reasons given above, a useful starting point is whether such clauses would be regarded as exclusion clauses for the purpose of UCTA. Having regard to the factors set out in paragraph 94 above in my judgment they are plainly not exclusion clauses:

(1)    the language is not expressly that of exclusion of liability but rather the absence of any advice that could give rise to it;

(2)    there are other clear indications that this was not an advisory relationship: see in particular the Article and the terms of the Confidential Report;

(3)    the terms cannot sensibly be described as artificial or "rewriting history" - rather they affirm it;

(4)    the clauses are not to be found within a mass of standard terms as one might see in a typical consumer contract.

348.    But even if as a matter of analysis, the clauses or any of them are to be construed as exclusion clauses, they would in my judgment be manifestly reasonable:

(1)    they were clearly stated;

(2)    they are a proportionate and legitimate attempt by the Bank to limit its exposure to a wider role for sound commercial reasons;

(3)    all of the Claimants were able to understand them and Mr Carney in particular was familiar with these sorts of clause from his business experience;

(4)    there was no pressure from the Bank on the Claimants to enter the Loan;

(5)    yet again, the presence of the IFA is a compelling reason why the Bank should not be seen or treated as giving advice, and why the Bank could reasonably assume that the Claimants would not rely upon it as an adviser;

(6)    the fact that in this particular case there was already a relationship between the Claimants and HW or the individual adviser working for HW;

(7)    in the case of Mr and Mrs Carney, the fact that no advice had been tendered at the Cocktail Party anyway and in the case of Mr and Mrs Fox they had made their minds up before they had any direct contact with Mr Dewsnip albeit that the contracts were not made until afterwards;

(8)    once more, the terms of the Article and Confidential Report;

(9)    Mr and Mrs Fox actually took the advice of a lawyer;

(10)    on the other hand, Mrs Carney was never persuaded of the benefits of the scheme and so was not relying on any alleged advice prior to her making the contracts, in any event.

349.    Accordingly, in my view, there is an overwhelming case for reasonableness if it was needed. Here of course the question is unfairness but on the facts of this case the analysis and the result should be the same.

**Conclusion**

350.    In the light of that, there can be no advice-based element of unfairness here.

## (2) MISREPRESENTATION

**Introduction**

351.    On the findings I have made, there either were no actionable representations in the first place or to the extent that they were, they were not false. Further, and for the reasons given in paragraphs 178-189 above (in respect of Mr and Mrs Carney) and 257-259 above (in respect of Mr and Mrs Fox) the representations would not have been causative in the required sense anyway in respect of the Cocktail Party and the Lunch. I add that I reject the suggestion that the Claimants would not have attended those events had they decided to proceed. That does not follow especially as they were quasi-social.

352.    Had this been a conventional action in misrepresentation, therefore, there would have been no need to have recourse to certain of the Relevant Clauses.

**The Basis Clauses**

353.    However, lest my findings be wrong in any way, the Bank relies in particular on clause 1 (d) (no recommendations as to the investment), Clause 1 (g) (no representations as to tax) of the Application and clause 8 of the Terms (no representations generally).

354.    The first point is that in my view, these are clearly basis clauses which establish a contractual estoppel as against the Claimants. See paragraphs 76-80 above. The particular point made in *Crestsign*, that such clauses serve the useful function of removing a grey area as to what might or might not be a representation, is very apposite here where many of the alleged representations were given orally in a quasi-social setting and where differences of emphasis could make all the difference.

355.    Subject to the question of reasonableness (or unfairness) therefore, these clauses would be effective to prevent any reliance by the Claimants on the alleged misrepresentations as against the Bank.

**Reasonableness**

356. As to reasonableness, this exercise is not straightforward since it is being undertaken on the basis of a counter-factual to my actual findings. However, in general terms, it seems to me that these clauses would be regarded as reasonable for the following reasons:

(1)      the misrepresentations alleged against the Bank essentially concerned the performance or tax-efficiency of the investment or the wider scheme;

(2)      that is the classic province of the investment adviser and tax adviser, not the lending bank;

(3)      the role of HW as financial adviser was highlighted in the Confidential Reports and the Article;

(4)      all of the Claimants were (and are) intelligent and astute in my view and well able to understand the clauses; certainly Mr Carney and Mr Fox had read them;

(5)      there was no time pressure from the perspective of the Bank upon the Claimants to sign the Applications and so there was ample opportunity to read them if they wished; the same goes for the Terms because nothing was binding until signed in front of the Spanish Notary;

(6)      there was in truth no inequality of bargaining power, because all the Claimants had advice available to them but in addition they did not have to enter into this scheme or deal with the Bank at all; much is made of the fact that in this particular scheme there was only one investment available. But it still remains the case that the Claimants did not need to have entered into the scheme;

(7)      if there were in fact any actionable misrepresentations made by the Bank it seems highly likely that they would have been made also (and perhaps in any event) by HW. The Claimants at all material times were likely to have had a separate and more obvious form of recourse for any losses, available to them by taking action against HW. Yet they chose not to do so. The fact that when they eventually decided to issue proceedings in 2016, so much time had elapsed that the only possible cause of action which was not time-barred was an Unfair Relationship claim against the Bank, is not to the point;

(8)      there might have been more difficulty if the alleged representations concerned the terms of the loan itself; but this was not the case;

(9)      in the case of Mr and Mrs Fox they actually took legal advice from a solicitor as well.

357. If these particular clauses were reasonable for the purpose of UCTA, then there is no reason to say that they were nonetheless unfair for the purpose of s140A.

358. I should add that I have not referred to clause 1 (b) in this context; that is because it is arguable that despite the references to representations, being an entire agreement clause (such clauses usually being construed narrowly), it may be apt only to cover previous collateral agreements or promises as opposed to representations. If so, it does not really assist here. But if the position were otherwise then, consistent with the view just expressed, (a) I would hold that it is not an exclusion clause but (b) even if it was it was reasonable and not unfair.

**Unfairness**

359. A number of other terms are set out in Schedule D to the Claimants' closing submissions and which are said themselves to be unfair.

58

360. The first is the "Important Note" statement at the top of the Application. In his Closing Submissions, Mr Yell made the point that this clause does not operate to negate any representations. I agree with that. If so, there is no need to consider unfairness. In any event, it is hard to see why a term or statement which recommends the taking of separate legal or tax advice is unfair and the clause can still play a general role as part of the context, and a piece of evidence, in relation to the general allegation of advisory relationship and tax representations. Clause 1(e) falls into the same category.

361. Clause 4 of the Application is not in fact relied upon by the Bank but in any event, if the Claimants did sign, it is hard to see why it is unfair.

362. The same applies to clause 6. On my findings of fact HW plainly did not act as agent for the Bank and it is beyond doubt that all the Claimants had already appointed HW as their financial adviser. Confirming the non-existence of agency cannot possibly be unfair here.

363. As to the Terms, I have dealt above with clause 8.7. Clause 8.8 is only there to ensure the continuous effect of the clause 8 representations and warranties through to repayment. I do not think this is really material here. Any reliance on clause 8.7 is only relevant for the purpose of a notional negligence or misrepresentation claim based on advice given or representations made prior to the making of the contracts. That is why clause 8.7 would take effect. But if clause 8.8 was relevant, it is hard to see why it is unfair.

364. At paragraph 68 of his Closing Submissions, Mr Yell suggested that the clauses relied upon by the Bank should be regarded as unfair because the Bank did not undertake proper due diligence on the investment performance or tax. However, that rather begs the question as to whether it had a such an obligation vis-a-vis the borrowers. Again, all of this is in reality hypothetical but given that on any view it was not the IFA and HW was, it does not seem to me that any lack of due diligence render the terms unfair.

365. It is also said that clause 1 (g) and clause 8 must be regarded as unfair because it was simply untrue that the Bank was a provider of finance only since it had been engaged in promoting and marketing the scheme. But I have not made any such finding and even if there were some misrepresentations made as part of the Bank's sales pitch, this does not mean that it was acting otherwise than as lender.

366. Paragraph 69 says that none of the clauses relied upon were specifically agreed to at the Cocktail Party or the Lunch. I agree, but that is irrelevant. They formed part of the contracts entered into.

367. Paragraph 65 of the Closing Submissions makes some further general points. First it is said that these were standard terms and there was a huge disparity of bargaining power. I do not accept that; obviously the terms were standard but they were clear and visible and for the most part had been read. I agree that it is unlikely that the Claimants could have negotiated these key clauses away because the whole position of the Bank is that it was not giving advice and that no prior representations should be relied upon. But it is a misnomer to say that there was an inequality of bargaining power, as I have pointed out above. The Claimants were not in a trading relationship with the Bank or buying products where, for example all sale contracts would have had the same terms. And it is simply untrue to say that the Claimants did not have the benefit of legal advice. Mr and Mrs Fox did through Mr Malthouse and Mr and Mrs Carney could have obtained it if they wanted it. And, HW was their nominated IFA.

368. It is then said that the terms are so wide that they would exclude liability for fraudulent misrepresentation. However, that question has not been argued before me and does not arise because the claim in misrepresentation in this (as in other) respects was not put on the basis of fraud or dishonesty although I agree that the essence of certain of the misrepresentation

59

allegations must logically have involved dishonesty. Accordingly, I do not think that an argument based on the width of the clauses can succeed here.

369. The next point is to the effect that the Bank knew that the terms were not consistent with the true position. But that depends on what would have been the findings if I was wrong about the existence of an advisory relationship or misrepresentations. All I would say is that on any view, it cannot possibly be correct that the whole scheme was in fact set up, promoted and controlled by the Bank. It simply was not.

370. So, subject to the point that all of this is in broad terms hypothetical, I would reject the general points as suggesting that these terms were unreasonable or unfair. Accordingly, insofar as it is necessary for the Bank to rely upon them to negative any misrepresentation claim made for the purposes of showing unfairness under s140A, such clauses are effective to do so.

**Conclusion**

371. There is therefore no unfairness here.

### (3) REGULATORY CONSIDERATIONS

372. The Claimants rely upon a number of Codes, sets of principles or similar provisions in support of their case on unfairness. The first point to note is that, as is accepted, the Bank was not in fact governed by any of them because it was not engaging in the relevant activities in the UK. The fact that the Bank is an English company and that Mr Dewsnip is English is not relevant.

373. Mr Yell sought to maintain the significance of these provisions (some of which are very high-level and broad) by asking the Bank's witness to comment on or confirm them. So, for example, Mr Dewsnip said that he would not expect the Bank knowingly to break any of the 11 Principles set out in PRIN 2.1 of the FCA Handbook (which are not in fact actionable in any event). But they do not take the matter any further. So, for example Principle 1 is to act with integrity and Principle 2 is to conduct the firm's business with due care skill and diligence. In my view, these principles were not broken. Others are irrelevant here, for example conflict of interest, relations with the regulators and market conduct. Principle 6 requires the firm to pay "due regard to the interests of its customers and treat them fairly". But the first part of this depends critically on the context and the role of the firm (here as lender not adviser) and the second does not really add to the existing fairness context in terms of the relationship. Principle 9 says that "a firm must take reasonable care to ensure the suitability of its advice and discretionary decisions for any customer who is entitled to rely upon its judgment". But that begs the very question whether the Bank was giving advice or taking discretionary decisions. In my judgment it was not. So these provisions do not assist.

374. The Claimants then rely upon the FCA publication "Treating customers fairly-progress and next steps" from July 2004. This is not a discrete code or set of principles. It is a working document produced by the FCA as part of its ongoing project to promote fairness to customers in certain sectors ("TCF"). See, for example, Chapter 1, Overview, Chapter 4 "Finding from our Pilot Work" and Chapter 5 "our plan". So it is wrong in my view to see it as a normative guide at all. This is illustrated by the provisions relied upon, for example in paragraph 1.6 which is that there will be a "blend of regulatory and market-based solutions to delivering fairness to customers." Or paragraph 1.7 "… We are looking to them to embed the principle of treating customers fairly and their corporate strategy". And similar points can be made about paragraph 3.1 3.2 and, for example, Annex 1, Product Risk Framework at paragraph 6.

375. All the same points can be made about the next version, produced in July 2005. Here, reliance is placed on paragraph 3.34 which states that "… Figure 3.1 below sets out some issues that mortgage lenders and intermediaries might review as they consider what TCF means for their firms…"

376. It is simply a misnomer to suggest that these publications are in any sense part of a "regulatory regime" whether or not breach would lead to a separate claim.

377. The Claimants also rely upon all of "Fairness of Terms in Consumer Contracts-Statement of General Practice" May 2005 from the then FSA. But this document is concerned with standard drafting of variation clauses in consumer contracts. It is completely irrelevant here.

378. As for the Mortgage Code, the only specific paragraph relied upon was that stating that "all lending will be subject to our assessment of your ability to pay. This assessment may include… Taking into account your income and commitments."

379. However, all the Claimants provided information on the Application Forms that gave their present level of surplus income/liquid assets which they believed could service interest payable on an ongoing basis should the need arise. Further financial history and details were provided and set out in the application to the Bank's Credit Committee for approval or otherwise of the loan (see Core Bundle dividers 13 and 32). One needs to add the 100% Capital Guarantee (or something less because of the upfront fees of 8% - see below).

380. Reliance is also placed on the Mortgage Conduct of Business Rules (MCOB). However this is not a case where the Bank recommended a particular product or gave advice about it (on my findings) and so the need to consider suitability under MCOB does not apply. The Bank, for the purpose of MCOB would be seen as a mortgage lender. There would (had the activities been conducted in the UK) still have been a requirement that the account was taken of the customer's ability to repay (see Rule 11.3) but for the reasons given in paragraphs 399-400 below, this was done.

381. It is also suggested, drawing upon TCF, that the Bank was "providing a product which would be distributed by others" and that the material provided for distributors and advisers failed clearly to set out the risks associated with the investment. It is then said (see paragraphs 9 and 10 of the Claimants' Written Closing) that the Bank did not provide written information to HW about the scheme. This is back to front. There was no mis-describing of the Loan, the investment was not the Bank's product and the party described as the adviser in relation to it was HW itself.

382. Other documents relied upon (but not the subject of detailed submissions) are the Codes of Disciplinary Procedures of the Financial Industry Standards Association and the Safe Home Income Plan Code of Conduct. But either the parts relied upon are inapposite or they are at such a high level of generality that they do not add anything. In addition, these documents do not purport to regulate lending in Spain or the sale of investments and the Bank was not a member of the relevant bodies.

383. Overall, the various documents and matters relied upon by the Claimants here do not in my view advance their case on unfairness.

## (4) INVESTMENT PERFORMANCE, SUITABILITY AND AFFORDABILITY

### The Context

384. Even if MCOB had applied, the Bank would only have had an express duty to consider suitability if it had an advisory role or had personally recommended the investment, in my judgment it did not. Nor could Mr Yell point to any other objective basis for saying that the Bank had a duty to consider suitability.

385. Secondly, I have found that there was no specific representation made by the Bank about the performance of the investment.

386. It is however accepted that the question of affordability would arise under MCOB, had it applied to the Bank. As already noted, MCOB does not apply and so there is no formal requirement to consider affordability. However, in case it be thought that a regime similar to MCOB did apply,

the question is then the particular duty upon the Bank. According to Rule 11.3.1, the duty of a lender (as distinct from an adviser like an IFA) is to "take account of the customer's ability to repay".

387. A separate but related point concerns the Bank's reliance upon the back-testing of the Barclays notes in terms of performing over a ten-year period and its own stress-testing. Precisely where that goes to (in the absence of an advisory duty or a specific recommendation as to performance) is unclear. In the end, Mr Yell suggested that the Bank had expressly or impliedly represented that it had a reasonable expectation of the outcome that the investment returns would be at least sufficient to cover repayment of capital (the subject of the 100% guarantee) together with rolled-up interest (being the option chosen by all the Claimants and likely to be chosen by many investors). Or, to put it another way, there was a real prospect of this outcome, not a mere possibility. Implicit in that, according to the Claimants, was the representation that the Bank had researched investment performance sufficiently to be able to reach that view. In that way, the issue of the adequacy or otherwise of the Banks consideration of performance becomes relevant and was opined on by the experts.

**The Experts**

388. The experts had different expertise and qualifications.

389. Mr Nicholls worked in the Life Assurance industry but was also involved in mortgage broking services and importantly here, in the provision of regulatory reviews of investments, pensions and mortgage advice. He also provided past and future business review services. He presently acts as an independent compliance consultant.

390. Mr Green is a Fellow of the Institute of Actuaries and has also been a member of the Society of Investment Analysts and was a founding Associate Member of the Pensions Management Institute. He spent most of his career as an investment manager but the skills required here would encompass the assessment of the suitability of investments in respect of risk profiles and other matters. He has had a very extensive experience of giving expert evidence. He did not have any real experience of advising retail customers on investments.

391. While he was ready to opine on what it was he thought the Bank should or should not have done, Mr Green did not do so from any regulatory perspective and accepted he had no expertise here. Nor was he basing his views on any generally accepted banking practice. That rather limited the weight that could be attached to some of the opinions he expressed for example in relation to what "stress-testing" the Bank should or should not have undertaken. In general terms, I thought that the approach of Mr Nicholls was more considered and analytical. In fact, much of his evidence went unchallenged.

**Projections**

392. I deal first with the expert evidence. There are two aspects to the question of projections (a) the Barclay's Back-testing and (b) the Bank's stress-testing.

*Barclays Back-testing*

393. This is contained in the two Barclays Capital documents from January 2005. As the title suggests, it was based upon the past performance of the underlying funds over the period 1995-2005. It assumes that the product included a 10 year term, a 100% capital guarantee and an upfront fee of 8% and other fees which would approximate to those applicable to Premier's Optima Fund. The conclusion was that the return would have been a gross average of 10.02% PA or 7.48% net of fees. That figure was obviously used as the basis for the "Anticipated Return on Investments" in the Confidential Reports to the Claimants. It was also used in the Bank's stress-testing-see for example the report to the credit committee dated 23 June 2005. The figures used then took into account that something less than 100% of the Loan would actually be invested, as confirmed by Mr Coleman in evidence.

62

394. Mr Nicholls considered the Barclays projections and then did his own projections for a ten-year period going forward notionally from 2004 and 2005 - see paragraphs 82-85 of his report. Those produced an average return of 6.96% for 2004-2014 and 7.10% for 2005 2015.

395. He then, in paragraphs 86-88 set out other data based on different investment market performance. His conclusion was that the Barclays figures were not unduly aggressive or outside the range of projections for investments in comparable sectors. He was not cross-examined on the detail of this. The core point made by Mr Yell was that a ten-year back-testing period was not, or not by itself, appropriate because if one took a five-year period from the past within that 10 year period it would show worse results. Mr Nicholls accepted that but pointed out that if one took the other five years, it would show a better result, and in any event this was in relation to a ten-year product. I think there is force in Mr Nicholls' points. Mr Green did not analyse Mr Nicholls' evidence in any detail but for his part, thought that a net return of 6% or 6.5% was more appropriate, saying that Mr Nicholls' figures seemed a little bit higher than he would go. Overall, I found Mr Nicholls more persuasive here. Insofar as the Bank's reliance on the Barclays data is relevant at all, I think it impossible to say that the Bank was acting unreasonably in using it, having regard to the expert evidence.

396. It is fair to say that in the 23 June 2005 internal paper the Bank stated that in practice they did not anticipate that the performance of the Optima fund would exceed the mortgage interest (taken as 4.25%) by at least 3% per annum. This was in the context of a recommendation for the 3% annual drawdown facility, subject to investment performance. However, as noted above, the representation now alleged is about the return serving the interest repayments not a further 3% drawdown. And it was proposed (and built into the Loan terms) that the drawdown of up to 3% per year could not be taken in a year where the investment performance did not allow for it. So this does not take the matter much further.

*The Bank's Stress-testing*

397. As already noted, the Bank assumed an interest rate going forwards of an average of 4.25% PA. Mr Nicholls thought that was reasonable and in the end Mr Green did not really disagree.

398. Examples of the stress testing have been set out at paragraph 131 above. Although they came in for much criticism, it is difficult to see why, because their purpose was to show that from the Bank's specific perspective, even in various downside cases, for example a fall in property values and/or a crash in the investment in its tenth year, there would still be enough by way of collateral to ensure that the Bank would be fully repaid. This would be so even if the 3% drawdown was taken for most years, together with the 5% capital at the beginning of the period. This exercise was all about showing that in a worst-case scenario the Bank was adequately secured. I fail to see how this is relevant to the supposed representation referred to in paragraph 387 above. Indeed, in the end, Mr Green was unable to say that there was any principle of banking practice dictating precisely what sort of stress-testing should be carried out by a bank in the position of this one.

**Affordability**

399. Mr Yell's key point here was that while the Bank did (and could) rely upon the financial information provided by HW to go into the loan application form in relation to income and assets of the Claimants, what was missing was expenditure, without which one could not know how much of the stated income and other assets were available to pay interest. Mr Green made the same point.

400. Mr Nicholls accepted that lenders would normally wish to see expenditure but questioned its importance here when the expectation was that interest would not be paid during the currency of the Loan but rather rolled up to the end. And for the reason he gave in paragraphs 52-57 and 59 of his report, in the context of MCOB, it would have been reasonable for the Bank to rely upon

63

the information contained in the application forms as procured for it from the Claimants by the IFA. I agree with that conclusion.

**Suitability**

401.    This does not in fact arise (see above). I would only note that Mr Green accepted that here, it all depended on individual clients' requirements and their ability to service the loan and he could not say that the Product was generally unsuitable.

402.    Mr Green also suggested that because there was no further information available it made the product unsuitable without more. I do not accept that.

403.    Finally, it was suggested that the investments (whether with Premier or Aspecta) were in any event unsuitable *per se* because they are described in the literature as being for "experienced investors". Mr Coleman did not accept that this meant they were high risk but otherwise said he was not an expert. Mr Nicholls explained that they would have been described thus because they contained certain features for example they could potentially involve derivatives or notional investments or be geared, and were therefore more complex and more difficult for the average investor to understand. But this did not mean they were necessarily higher risk. In fact from what he had seen, Mr Nicholls did not think they were geared or based on notional investments. I do not think there is anything in this point.

**Conclusion**

404.    Accordingly, there was no unfairness in these respects.

## LACK OF INFORMATION ABOUT ASPECTA INCLUDING ITS FEES

405.    Both under the Premier and the Aspecta schemes, the investment providers would charge an 8% fee. This needs to be explained in a little more detail. In both cases, 4% would go to HW and the other 4% to Premier.   This was presumably because Aspecta was in some sense "piggy-backing" on the Premier scheme. In addition, Aspecta would take a 0.5% fee for itself and there would then be a yearly management charge of 0.5%. For technical reasons the full 10 years' worth of such fees had to be provided for in cash at the outset i.e. 5%. This is why there are references to the Aspecta fee being 8.5%. But it is not as if Aspecta was (in contradistinction to Premier) taking an 8% fee, or even a 4% fee for itself. Premier also charged a management fee, taken quarterly, at 1.5% pa.

406.    As to timing, in the case of Premier this was said to be amortised over five years. In the case of Aspecta it was taken up front at once.

407.    On the assumption that Premier's 8% was actually invested in the underlying Notes and then taken out over five years, Mr Nicholls prepared a set of spreadsheets and graphs to show the respective outcomes of the two funds over 10 years.

408.    At the end of the 10 year term, the different consequences of the two forms of fee payment were not very significant. See the detailed spreadsheets at pages 38-39 of Mr Nicholls' report showing a difference in the return required to cover the value of the Loan at maturity (to cover interest fees etc) being (as between Premier and Aspecta, on different assumptions). I take by way of example, the position in relation to Mr and Mrs Carney:

    (1)    No cash-drawdown and pay interest: 1.72% as against 1.81%;

    (2)    No cash-drawdown and roll up interest: 5.81% as against 5.99%;

    (3)    5% drawdown and pay interest: 2.48% as against 2.53%;

    (4)    5% drawdown and roll up interest: 6.58% as against 6.71%.

409. There was a similar position for Mr and Mrs Fox. Thus, by the end of the 10 year term the difference in available funds from the investment would broadly speaking have levelled out, as can be seen from the red and blue lines on the graphs at pages 46-47 of Mr Nicholls report. He said that the difference in outcome was small and that only a marginal higher rate was necessary.

410. In fact, the position was more nuanced than that. This is because, although the 8% fee taken by Premier was amortised and appeared to be within the underlying Notes until payment, this was not quite accurate. In the Scheme Particulars dated 24 March 2005 applicable to the Premier investment, it is stated at page 12 that:

> "For the purposes of calculating the net asset value of a Sub- Fund marketing and sales fees brackets including introductory fees paid to introducers by the Promoter) of up to 8% of sums available to be invested in Notes will be amortised over a period of five years. The cost of marketing and sales fees is deducted from the sums available to be invested in Notes prior to the purchase of Notes."

411. As this point emerged only during trial, Mr Nicholls did a revised set of calculations served on 29 January. On this basis, the required Premier percentages changed somewhat (Aspecta remaining the same of course) as follows:

(1)        No cash-drawdown and pay interest: 1.74% as against 1.81%;

(2)        No cash-drawdown and roll up interest: 5.92% as against 5.99%;

(3)        5% drawdown and pay interest: 2.46% as against 2.53%;

(4)        5% drawdown and roll up interest: 6.64% as against 6.71%.

412. It will be seen that the difference between the two funds is narrowed in all cases except where there has been a 5% drawdown and interest was paid. That scenario did not apply to any of the Claimants. Either way the difference was not significant.

413. Mr Nicholls confirmed the above in his evidence, and the position was summarised by Mr Hanke at paragraphs 298-299 of his written closing submissions, which were not the subject of specific challenge by Mr Yell thereafter.

414. One is entitled to assume, in my view, that the investment would run its course and part of the reason why the Claimants appeared originally to object so much to the 8% fee was because they seem to have thought (wrongly) that it was all going to Aspecta, whereas (and as with Premier), Premier would get 4%, HW would get 4% and then there was the 0.5% charge for Aspecta.

415. Because of the differing fee structure, it is correct that the 100% minimum guarantee which is given by Barclays specifically in relation to the underlying Notes acquired would differ somewhat in its actual effect between Premier and Aspecta. In both cases, there were in fact certain fees charged at the beginning which therefore were not invested in the Notes. See Mr Nicholls' spreadsheets. The effective percentage minimum capital guarantee would be less under the Aspecta fund - but not by much. It should be noted that the guarantee was in fact the higher of 100% of the nominal value of the unit of the Notes, 108.695% of the highest level of the "portfolio index" of the unit for the period until the Closing Date or the level of the portfolio index on the maturity date – so there was the potential for the guarantee to compensate to some extent for any deduction from the sums to be invested in the Notes, of fees etc.

416. All of this is a far cry from the suggestions made by the Claimants that the Aspecta fund was in fact substantially different from the Premier fund. It was not.

417. It is correct that Mr Dewsnip knew at all material times that the Aspecta fee was upfront although he did not specifically draw this to the attention of the Claimants. But in my view, he had no duty to do so. He did not himself deal with fees other than the Bank's. HW was responsible for advising the Claimants as to all the applicable fees. I have already held that the Bank did not make any particular representation here. On the other hand, it appears as if HW

65

may have misrepresented the position in the Confidential Reports. Mrs Carney accepted that if HW's reference to investing 100% of the loan was incorrect, she would have expected HW to correct it.

418. Precisely when HW first became aware cannot be ascertained since there has been no evidence from it. But to judge from the email from Mr Dewsnip dated 18 October 2005 at F4/934 (ie before any of the Claimants had entered the scheme) HW was aware of the charging structure by then. And even if HW was not aware of the upfront fee until 3 March 2006 (see Mr Eves' letter to Aspecta at F5/1332) at least on the Claimant's case, HW never told Mr and Mrs Carney before they entered into the loan agreement on 13 March. However, according to Mr Carney, when he got the Aspecta terms from HW which would have shown the upfront fee, Mr Morgan said simply that there had been an "error" which could not have been true because Aspecta had already claimed the upfront fee. In my view, it is highly unlikely that HW did not in fact know about the Aspecta fee structure at the outset, and it certainly had the means to find out. By his email to Mr Coutanche dated 6 April 2006, Bradley Cook of Aspecta said that its fee structure had been made available to all concerned (which must include HW) at the outset. HW knew who Mr Cook was and it seems had spoken to him previously – see the email from Mr Vincenzo of Aspecta to Mr Eves dated 8 March 2006 and in an email dated 2 August 2005, Mr Coutanche suggests that Mr Eves should run a query about the 0.5% wrapper past "Bradley".

419. When they applied for the Aspecta investment the Claimants signed a written declaration that they had read all of Aspecta special conditions although they did not in fact receive a copy until May and June 2006 respectively. Otherwise it was plain from the documents signed by the Claimants that they were entering into an investment issued or managed by Aspecta, and all of this was explained to Mr and Mrs Carney in the Confidential Report dated 28 September 2005.

420. It is difficult to accept that any lack of information about the Aspecta fee (even if the Bank was responsible) could have affected the Claimants 'desire to invest. Had an accurate side-by-side comparison been made between the Premier and the Aspecta fee structures I do not accept that the Claimants would have been prepared to accept the Premier but not the Aspecta scheme.

## ABSENCE OF RISK WARNINGS

421. There is some suggestion that even if there was no positive misrepresentation by the Bank, it failed to warn the Claimants of certain risks for example that the investment returns may be insufficient to cover the interest. But as noted in the section on Investment Performance, it would not have been unreasonable at the time to suppose that interest would be covered. And since the Bank owed the Claimants no advisory duty this was not a matter for it anyway – as opposed to HW. Nor do I consider that in this case a duty here (eg to provide full information along "mezzanine" lines). In this particular case, the matters militating against the advisory duty would equally compel the rejection of this alternative duty which in any event was not really part of the Claimants' case.

422. Equally, the Bank was under no duty to conduct particular performance testing on behalf of the Claimants. The fact that it conducted certain testing for its own purposes makes no difference.

423. In addition, Mr Fox originally said in his witness statement that he did not realise that the minimum guarantee only applied at maturity ie after 10 years but in evidence he accepted that he knew this. This was plain from the Optima 2 Fund Sales Brochure which he received in July 2005 containing full details of the guarantee.

424. So this element does not establish any unfairness.

## OTHER MATTERS

### Non-disclosure of the 10 year term of the Loan

425.    There was some suggestion that Mr and Mrs Carney did not appreciate that the term of the Loan was 10 years and not 5 years. But the Application Form made this clear and they accepted in evidence they were aware of it when signing before the notary.

### Drawdowns

426.    It was also suggested that the Claimants had been encouraged by the Bank to make the optional drawdowns – there was no actual evidence of this however, and no reason why the Bank would have done so as opposed to highlighting the existence of these options.

### Threatened possession action

427.    At paragraph 86 of the Amended Particulars of Claim it is alleged that when the Claimants complained about the disastrous performance of the investments, the Bank "repeatedly threatened to seek possession of" Mr and Mrs Fox's home. This suggestion was not repeated in their witness statements. When I checked whether this allegation (denied by Mr Coleman) was still maintained, Mr Yell did not pursue it. Had the Bank, as creditor, chosen to exercise its legal rights thus far, that could not amount in the usual case to unfairness anyway. As it happens, the Bank offered standstill agreements under which it would not take any enforcement action and would allow an interest-free period, some flexibility on repayment and a contribution towards the Claimants' exit costs. That offer was not taken up.

## CONCLUSION

428.    Having considered all the alleged aspects of unfairness, and the circumstances generally, including the particular circumstances of the Claimants, I conclude that the Bank has clearly satisfied the burden of showing that there was no unfair relationship here. Accordingly, these claims must fail.

429.    I realise that this decision will be disappointing to the Claimants who have invested very substantial time in their claims, quite apart from the costs. The litigation will undoubtedly have been a great strain upon them. But I have endeavoured to explain, at some length, why, despite their belief that the Bank should compensate them, there is in fact and in law no liability to do so.

430.    I am extremely grateful to both Counsel for their excellent oral and written submissions and for their assistance during the trial.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 1. - Introduction[1]

### Definition

### 17-01

The modern development of the tort of deceit (sometimes called simply "fraud") dates from *Pasley v Freeman*[2] in 1789. There, the defendant falsely represented to the claimant that a third party was creditworthy when he knew he was not; the claimant suffered loss as a result of extending credit to him. The claimant was held to have an action.[3] The tort involves a perfectly general principle: where a defendant makes a false representation, knowing it to be untrue, or being reckless as to whether it is true, and intends that the claimant should act in reliance on it, then in so far as the latter does so and suffers loss[4] the defendant is liable.[5] Although most cases concern claimants duped into entering into commercial transactions, deceit extends well beyond this.[6] Where appropriate it can even encompass fraudulently obtaining a court judgment.[7] Each aspect of the tort is discussed in detail below.

### Deceit and other liability for misrepresentation

### 17-02

⚠ Damages may, of course, be awarded for a misrepresentation even if it is not fraudulent. If a representation is a term of a contract, damages are available if it is false without even proof of fault: again, since the decision of the House of Lords in *Hedley Byrne & Co Ltd v Heller & Partners Ltd*,[8] it has been clear that misrepresentation can give rise to liability in the tort of negligence at common law, at least where there is something that can be construed as an acceptance of responsibility for its truth. In addition, under the Misrepresentation Act 1967 s.2(1), a person who induces another to contract with him by misrepresentation is liable unless he proves he was not at fault. Very often a claimant is much better advised to sue on one of these bases, given that "fraud must be distinctly alleged and as distinctly proved",[9] ⚠ and that there exist strict rules about when a lawyer is entitled to plead it on his client's behalf.[10] In addition, the defendant's liability insurance may exclude liability for fraud; the defendant in an action for deceit (but not in one for negligence) may on principle demand trial by jury[11]; and while summary judgment is available in fraud cases[12] it is not readily given. However, there may be advantages to suing for fraud. There is no need to show a special relationship or undertaking of responsibility (in contrast to *Hedley Byrne* liability)[13]; damages may not be reduced for contributory negligence[14] and may on occasion be more generous than elsewhere[15]; and s.32(1)(a) of the Limitation Act 1980 provides a more generous limitation regime, effectively preventing time from running at all until the claimant discovers the fraud[16] or could with reasonable diligence have discovered it.[17]

### Limits on the ambit of liability

### 17-03

⚠ In a few cases liability in deceit is curtailed for public policy reasons. For example, privilege in court proceedings extends as much to deceit as to any other liability.[18] ⚠ In addition, it has been held that public policy limits on damages for the cost of bringing up a healthy child apply as much in deceit as elsewhere,[19] and that as between married parties in the course of divorce, claims in deceit for paternity fraud may be pre-empted by the provisions of the Matrimonial Causes Act 1973 on financial adjustment.[20] But these exceptions are narrow. Thus the courts have declined to introduce any general qualification of liability in respect of statements made within the family,[21] and the House of Lords have emphatically

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

held that it is no defence that the defendant told lies merely in his capacity as the servant or agent of someone else.[22]

## Standard of proof in deceit claims

### 17-04

Despite early sporadic suggestions to the contrary,[23] the Court of Appeal made it clear in *Hornal v Neuberger Products Ltd*[24] that allegations of fraud need only be proved to civil standard of preponderance of probability and no more. Nevertheless, even if the standard is the civil standard, in practice more convincing evidence will often be required to establish fraud than other types of allegation.[25] The reason is the straightforward one given by Lord Nicholls in a later case: "When assessing the probabilities the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence. …"[26] Nevertheless, there is no bar in a suitable case to the grant of summary judgment against a defendant if the evidence is sufficiently overwhelming.[27] On a similar basis, the Court of Appeal will not hold a defendant guilty of fraud contrary to the view of the trial judge unless it is completely satisfied that the latter was wrong. Doubts, even grave doubts, on the correctness of the judge's finding will be insufficient to persuade an appellate court to reverse it.[28]

---

1. J. Murphy, "Misleading appearances in the tort of deceit" [2016] C.L.J. 301.

2. *(1789) 3 T.R. 51.*

3. Though note that today the representation, being one as to credit, would have to be in writing: Statute of Frauds Amendment Act 1828. See para.17-55 onwards.

4. Damage is of the gist of the action; see *Smith v Chadwick (1884) 9 App. Cas. 187, 190* (Lord Blackburn).

5. See, e.g. *Derry v Peek (1889) 14 App. Cas. 337, 374* (Lord Herschell); *Standard Chartered Bank v Pakistan National Shipping Corp [1998] 1 Lloyd's Rep. 684, 704* (Cresswell J); *AIC Ltd v ITS Testing Services (UK) Ltd [2006] EWCA Civ 1601; [2007] 1 Lloyd's Rep. 555* at [251] (Rix LJ); *Parna v G & S Properties Ltd [1971] S.C.R. 306, 316* (Spence J); *McBride v Christie's Australia Pty Ltd [2014] NSWSC 1729* at [335].

6. For a more esoteric application see *A v Att-Gen [2018] NZHC 986; [2018] 3 N.Z.L.R. 439* (police search after presenting fake warrant: liability for loss caused). Another is paternity fraud: e.g. *P v B (Paternity: Damages for Deceit) [2001] 1 F.L.R. 1041* (action by cohabitee against partner for deceiving him that child was his and causing him to pay for its upkeep); see too *A v B [2007] EWHC 1246 (QB); [2007] 2 F.L.R. 1051.*

7. The judgment has, however, first to be overturned. For an example, see *Gentry v Miller [2016] EWCA Civ 141; [2016] 1 W.L.R. 2696*; and its sequel, *UK Insurance Ltd v Gentry [2018] EWHC 37 (QB)* (recovery in respect of insurance fraud arising out of bogus collision).

8. *[1964] A.C. 465.* Liability for negligent misstatements is dealt with in para.7-104 onwards.

9. ⚠ See *Davy v Garrett [1877] 7 Ch. D. 473* at 489, per Thesiger LJ. See also *Gardner Neptune Shipping v Occidental [1990] 1 Lloyd's Rep. 330* (on which, R. Hooley, "Fraud and the Misrepresentation Act 1967" (1991) 107 L.Q.R. 31; *Haringey LBC v Hines [2010] EWCA Civ 1111; [2011] H.L.R. 6*, especially at [39]. On the pleading requirements see *Boyse (International) Ltd v Natwest Markets Plc [2020] EWHC 1264 (Ch)* at [35]–[37]; and the useful discussion in *Kasem v University College London Hospitals NHS Foundation Trust [2021] EWHC 136 (QB)* at [34]–[54].

10. "The pleading of fraud or deceit is a serious step, with significance and reputational ramifications going well beyond the pleading of a claim in negligence": Sales LJ in *Playboy Club London Ltd v Banca Nazionale Del Lavoro SpA (No 2) [2018] EWCA Civ 2025* at [46]; see too *Mason v Clarke [1955] A.C. 778, 794* (Viscount Simonds). It is unethical for a member of the Bar to allege fraud without clear instructions and reasonably credible evidence: Bar Standards Board Handbook 4.3, Code of Conduct, Rule C9.c. But note that this evidence need not necessarily be admissible in court: thus in the wasted costs decision in *Medcalf v Mardell [2002] UKHL 27; [2003] 1 A.C. 120* the House of Lords declined to castigate as improper the pleading of fraud on the basis of documents subject to legal professional privilege.

11. Senior Courts Act 1981 s.69; on which, see *Barclays Bank Ltd v Cole [1967] 2 Q.B. 738*; and cf. *Stafford Winfield & Cook Partners v Winfield [1981] 1 W.L.R. 458.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

12. For examples, see *Cheshire Building Society v Dunlop Haywards (DHL) Ltd [2008] EWHC 51 (Comm); [2008] P.N.L.R. 19*; and *Ticketus LLP v Whyte [2013] EWHC 4069 (Ch)*. For a discussion of the point of principle see the Canadian decision in *Hryniak v Mauldin 2014 SCC 7; (2014) 366 D.L.R. (4th) 641*.

13. For a discussion of this see para.7-104 onwards.

14. See para.17-52.

15. See paras 17-48 to 17-50 (on causation and remoteness respectively).

16. Note that the word "fraud" in s.32(1) of the Limitation Act 1980 is not confined to deceit or dishonesty in the sense in which it is used in this chapter: *Beaman v ARTS Ltd [1949] 1 K.B. 550*; *Kitchen v RAF Association [1958] 1 W.L.R. 563*. But this does not affect the point in the text.

17. Millett LJ explained the subsection in *Paragon Finance Plc v Thakerar & Co [1999] 1 All E.R. 400, 418*, saying that claimants "must establish that they could not have discovered the fraud without exceptional measures which they could not reasonably have been expected to take". See too *Biggs v Sotnicks (A Firm) [2002] EWCA Civ 272; [2002] Lloyd's Rep. P.N. 331*.

18. ⚠ *Walsh v Staines [2008] EWCA Civ 1324; [2009] C.P. Rep. 16*. But the immunity is strictly limited. So the mere fact that a payment has been embodied in a consent order is no bar to proceedings in deceit to recover it: *Zurich Insurance Co Plc v Hayward [2011] EWCA Civ 641; [2011] C.P. Rep. 39* (insurance payout to person now alleged to have been malingering; appealed on other grounds, [2016] UKSC 48; [2017] A.C. 142), and (it seems) *Kasem v University College London Hospitals NHS Foundation Trust [2021] EWHC 136 (QB)* (claim to recover payment made under a CPR 36 offer). In *Smart v Forensic Science Service Ltd [2013] EWCA Civ 783; [2013] P.N.L.R. 32* the Court of Appeal refused to strike out a deceit claim by a criminal defendant against a laboratory said to have deliberately falsified evidence against him: sed quaere.

19. See the paternity fraud case of *A v B [2007] EWHC 1246 (QB); [2007] 2 F.L.R. 1051* at [61]–[63].

20. So held in *FRB v DCA [2019] EWHC 2816 (Fam); [2020] 1 F.C.R. 371*.

21. See *P v B (Paternity: Damages for Deceit) [2001] 1 F.L.R. 1041* (action by cohabitee against girlfriend for duping him into thinking a child was his and hence paying for its upkeep); and the similar *A v B [2007] EWHC 1246 (QB); [2007] 2 F.L.R. 1051*; and *AXB v BXA [2018] EWHC 588 (QB)* (claim based on lie that defendant pregnant by claimant). The existence of liability, it was said, would not tend to subvert intimate relationships, particularly since a claimant was unlikely to sue while the relationship was still on foot. But this is not uncontroversial: in *Magill v Magill [2006] HCA 51; (2006) 81 A.L.J.R. 254* a majority in the High Court of Australia (Gummow, Kirby, Crennan, and Hayne JJ) seems to have thought that the tort of deceit should have little or no part to play in interspousal relations; and in *PP v DD 2017 ONCA 180; (2017) 409 D.L.R. (4th) 691* the Ontario Court of Appeal regarded this as a reason to strike out a claim for deceit where a girlfriend, having falsely assured the plaintiff she was using contraception, fell pregnant by him. See generally N. Wikeley & L. Young, "Secrets and lies: no deceit down under for paternity fraud" (2008) 20 Child & Fam. L.Q. 81.

22. *Standard Chartered Bank v Pakistan National Shipping Corp (No.2) [2002] UKHL 43; [2003] 1 A.C. 959* (on which, see Parker [2003] L.M.C.L.Q. 1); *Nitron Group BV (In Liquidation) v Barington Alliance LLP [2020] EWHC 1244 (Comm)*. But there may be some incidental protection for a mere mouthpiece in this connection: see *GE Commercial Finance Ltd v Gee [2005] EWHC 2056 (QB); [2006] 1 Lloyd's Rep. 337*, referred to below at para.17-21 fn.122.

23. e.g. *Thurtell v Beaumont (1823) 1 Bing. 339*.

24. *[1957] 1 Q.B. 247*; followed in *Bromley v Att Gen [1968] N.Z.L.R. 75*. See too *Otkritie International Investment Management Ltd v Urumov [2014] EWHC 191 (Comm)* at [84]–[91] (Eder J).

25. See *Smith New Court Securities Ltd v Citibank NA [1997] A.C. 254, 274* (Lord Steyn); and *Dadourian Group International Inc v Simms [2009] EWCA Civ 169; [2009] 1 Lloyd's Rep. 601* at [32] (Arden LJ).

26. See *Re H (Minors) [1996] A.C. 563, 586–587*; as explained in *Re S-B (Children) [2009] UKSC 17; [2010] A.C. 678* at [13]–[18] (Lady Hale); and *UK Insurance Ltd v Gentry [2018] EWHC 37 (QB)* at [19]–[21] (Teare J).

27. *Cheshire Building Society v Dunlop Haywards (DHL) Ltd [2008] EWHC 51 (Comm); [2008] P.N.L.R. 19* (complicity in mortgage fraud inferred from eightfold overvaluation coupled with evidence of bribery).

28. *Gross v Lewis Hillman Ltd [1970] Ch. 445*.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement
## Chapter 17 - Deceit
## Section 2. - Requirements
## (a) - Representation

### Misrepresentation or misleading conduct required for liability

### 17-05

To found an action in deceit the claimant must show a misrepresentation of present fact or law (or, at the very least, something done which was aimed at inducing action on the basis of false information).[29] However, a representation may be either express or implied from conduct[30]; furthermore, adopting the representation of a third party can be sufficient.[31] Where an issue arises as to whether a representation is true or not, the court normally looks to the reasonable meaning of what the defendant said[32]; indeed, this is often decisive.[33] Nevertheless, in strict law the issue in a deceit case is the meaning the representee was intended to put on what was said, even if this differs from the literal meaning of the words used:

"If a person makes a representation of that which is true, if he intends that the party to whom the representation is made should not believe it to be true, that is a false representation."[34]

Conversely, if a statement is in terms untrue, but is not intended to be interpreted in its literal sense, it cannot be charged as a deceit.[35]

### Misrepresentation and non-disclosure

### 17-06

The general rule is that a positive act or representation is required: "mere silence, however morally wrong, will not support an action of deceit".[36] However, there are, as might be expected, a number of qualifications to this principle which greatly reduce its effect.[37]

### Half-truths

### 17-07

A half-truth or fragmentary statement may amount to deceit if it is suggestive of a falsehood and intended so to be[38]: for example, where a defendant relays the favourable portion of a surveyor's report but omits the less encouraging part[39]; or where a joint venturer, knowing of a low valuation of the project, procures the provision of a much higher one and sends the latter but not the former to an investor.[40] As Lord Cairns stated in *Peek v Gurney*,[41] "there must … be some active misstatement of fact, or, in all events, such a partial and fragmentary statement of fact, as that the withholding of that which is not stated makes that which is stated absolutely false".[42] Thus in that case a share prospectus was held deceptive when it mentioned a price supposedly payable for a business by the promoters, but said nothing of other collateral agreements which effectively meant the promoters would not in fact pay a penny for it. So too a statement of the profits of a business to an investor will readily carry the implication that those profits were bona fide and honestly earned.[43] A helpful test has been said to be "whether a reasonable representee would naturally assume that the true state of facts did not exist and that, had it existed, he would in all the circumstances necessarily have been informed of it."[44] However, it should be noted that what amounts to a half-truth for these purposes is highly fact-sensitive. Thus a literally true answer to a very specific question may exonerate the defendant even though the latter knows further facts that alter matters drastically and would have been revealed had a wider question been asked.[45]

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

## Active conduct or concealment

### 17-08

Active non-verbal conduct can amount to misrepresentation, and hence deceit, just as much as words can.[46] So, for instance, pledging goods knowing one has no title to them is deceit,[47] as is ordering goods on credit for someone known to be insolvent[48] or presenting company accounts to a buyer in the knowledge that they have been doctored.[49] No doubt the same would apply to an agent knowingly contracting without authority to do so. Indeed, it seems that in a suitable case the mere doing of business with another may in itself carry a representation that the business is bona fide and in accordance with established practice.[50] Another straightforward example is positive steps taken to conceal defects in something being sold (as against merely keeping silent about them). So in *Gordon v Selico Ltd*,[51] the Court of Appeal awarded damages for deceit where a defendant fraudulently arranged to cover up infestations of dry rot in a flat before letting it. Similarly, in the antique case of *Schneider v Heath*[52] a seller of a ship was held liable when he deliberately floated it so as to hide sub-waterline defects when the buyer came to inspect it.

## Duty to speak

### 17-09

In certain cases, notably where there is a fiduciary relation between the parties, there may be a duty to reveal information so that (for example) non-disclosure will make any resulting transaction voidable. It now seems accepted that in such cases non-disclosure may equally be capable of amounting to fraud at common law. Thus in *Conlon v Simms*[53] a solicitor who in partnership negotiations failed to mention a number of shady dealings in which he had previously been involved was held liable in deceit to his co-partner. However, while this exception seems established in the case of fiduciary relations,[54] its extent to other situations is not entirely clear. Logically it should equally apply to contracts such as commercial insurance, where there may be a duty to speak under Pt 2 of the Insurance Act 2015.[55] But it seems clear that it does not, since Sch.1 to the 2015 Act gives an exhaustive list of remedies for non-disclosure that does not include damages.[56]

## Other qualifications

### 17-10

Four other qualifications are worth mentioning. First, statements of belief or opinion generally carry an implication that the belief or opinion is reasonably held.[57] It follows that a defendant who affirms a belief while failing to disclose information in his possession indicating it is not reasonably held is guilty of a misrepresentation, and may (if a suitable state of mind is shown) be guilty of deceit. Secondly, a defendant who has made a true statement is bound to correct it if, though true when made, it is later to his knowledge falsified by events. This is dealt with below.[58] Thirdly, a person may be liable in deceit as a joint tortfeasor if he is a knowing and active party to a scheme to defraud, even if he has not himself said anything and the actual representation has been made by someone else.[59] Fourthly, it is sometimes suggested that there is a duty to disclose, and hence that non-disclosure may amount to deceit, where the parties are dealing with a dangerous chattel (though this is more doubtful). This is discussed below.[60]

## Misrepresentation: promises and statements of intention

### 17-11

A representation as to the future will not as such found liability in deceit.[61] Nor will a broken promise, as such.[62] However, the limits of this principle must be borne in mind. It is clearly established that a representation of present intention, whether the intention be that of the representor or of a third party,[63] is a sufficient representation of an existing fact to form the foundation of an action for deceit.[64] "The state of a man's mind", said Bowen LJ, "is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

it is as much a fact as anything else."[65] Therefore, in *Edgington v Fitzmaurice*,[66] it was held that a prospectus was deceptive when it contained false statements of what the company intended to do with investors' money once it got it.[67] Again, where a defendant obtains property against a promise to pay an annuity, he will be liable in deceit if in fact he intends to pay it only if and to the extent that it suits him to do so.[68]

### 17-12

Moreover, a statement as to the future will often imply a statement as to present intention; as Lord Herschell put it, "that which is in form a promise may be in another aspect a representation".[69] Thus a promisor generally represents by implication that he has at the moment of making the promise the intention of fulfilling the obligations that he is undertaking; and if it can be shown that no such intention existed in his mind at that moment, he is guilty of a misrepresentation.[70] Nevertheless, this principle cannot be taken too far. The mere fact that the intention which was represented to exist was not eventually carried into effect is little or no evidence of the original non-existence of the intention. The representor may have subsequently changed his mind[71]; and in such a case there is no misrepresentation at all. Furthermore, it should be noted that there is an exception where parties are in negotiation over price, in which case a misstatement as to the highest price which the one party has the intention to give, or the lowest price which the other has the intention to accept, will not afford a cause of action.[72] The law permits the seller some latitude in exaggerating the value of his goods and so the purchaser is not bound to disclose the highest price he chooses to give, but is "at liberty to do that as a purchaser which every seller in this town does every day, who tells every falsehood he can to induce a buyer to purchase".[73]

## Misrepresentation: statements of opinion

### 17-13

⚠ A mere statement that one thinks a given state of affairs exists is not a statement that it does in fact exist[74]: it follows that it cannot engender liability in deceit on that basis.[75] However, this is not a very important limitation in practice. A statement of opinion is invariably regarded as incorporating an assertion that the maker does actually hold that opinion[76] ⚠; hence the expression of an opinion not honestly entertained and intended to be acted upon amounts to fraud.[77] And the same goes for projections as to the future: if a defendant says he expects an event to take place when he does not, he makes an untrue statement of fact.[78] The only obstacle in the way of maintaining an action for a false representation on this basis lies in the difficulty of proving what the defendant's real opinion was,[79] and in the difficulty of distinguishing a representation of the existence of an opinion from the representation of the existence of a fact on which that opinion is based.

### 17-14

Furthermore, at least where the facts are not equally well known to both sides, then a statement of opinion by one who knows the facts best will often carry with it a further implication of fact, namely that the representor by expressing that opinion impliedly states that he believes that facts exist which reasonably justify it.[80] If he does not actually believe in such facts, it follows that he will be liable in deceit.[81] In such a case, the test as to whether a statement of opinion involves such a further implied representation will involve a consideration of the meaning which is reasonably conveyed to the representee. The material facts of the transaction, the knowledge of the respective parties, their relative positions, the words of the representation and the actual condition of the subject-matter are all relevant to this issue.[82]

## Misrepresentation: statements of law

### 17-15

Throughout the nineteenth and twentieth centuries, propositions of law tended to be regarded as inherently non-factual.[83] Hence statements of law were treated as statements of opinion at most,

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

demonstrable as false only by proof that the representor did not in fact entertain that view of the law which he expressed.[84] However, the distinction between factual and legal statements was difficult to draw at the best of times,[85] and has now been discredited elsewhere in the law.[86] It is therefore submitted that in the law of deceit misstatements of law now fall to be treated on a similar footing to misstatements of fact,[87] though given the uncertainty inherent in case law development and statutory interpretation, proof that a defendant knowingly misrepresented the law is likely in practice to be hard to come by.

## Mere puffs

### 17-16

There is no misrepresentation in the case of mere exaggerated praise by a vendor of his wares; he is entitled to assume that his statement will be construed as mere puffing. But though a vendor may entertain "sanguine expectations" of the advantages to be derived from his goods, and may employ "high colouring and even exaggeration" in his description of them, he must make no misstatement of any material facts or circumstances.[88]

## Misrepresentation: dangerous and defective chattels

### 17-17

There is no doubt that a seller[89] of goods who states that they are sound when he knows they are not is liable to the buyer or anyone else who relies on his statement and suffers loss. So in the old case of *Langridge v Levy*[90] the seller of a shotgun who told the buyer that it was safe when he knew it was not was held liable in deceit to the buyer's son who relied on the assertion and was injured when the firearm exploded. In *Langridge's* case, however, there was it seems a positive representation by the defendant.[91] What is the position where there is no such representation, but merely a sale or circulation of a chattel known to be defective? It has been suggested that anyone who sells a chattel he knows is likely to cause injury is potentially liable in fraud.[92] But this, it is suggested, is highly doubtful. In *Ward v Hobbs*[93] a farmer sold pigs that, to his knowledge, were diseased and which duly infected the buyer's own herd. Bramwell B clearly thought that the farmer was not liable in deceit in the absence of a positive representation over and above the marketing of the pigs.[94] Of course, it may be possible in some cases to construct a representation: if a car were sold without an engine, the seller might well be guilty of a misstatement in describing it as a car at all. But such cases aside, it is submitted that if there is to be liability for selling dangerous or defective goods, it is better regarded as liability in negligence[95] rather than in the tort of deceit.[96]

## Continuing representations

### 17-18

The tort of deceit is complete only when the representation is acted upon.[97] Where there is an interval between the time when the representation is made and the time when it is acted on, and the representation relates to an existing state of things, the representation is deemed to be repeated throughout the interval. Hence if it is false to the maker's knowledge at the time when it is relied on there will be a deceit at that time.[98] It also follows that if, during the time between the making of the representation and the claimant acting upon it,[99] the defendant discovers it to be false or circumstances change to his knowledge so that it is now untrue, liability may be incurred.[100] Again, in *Briess v Woolley*[101] a managing director fraudulently made a false representation to induce the sale of a business before his appointment as agent of the shareholders to negotiate the sale. Some time after his appointment as agent, the sale was effected as a result of the previous false representation. The shareholders were held liable for the fraud of the managing director as their agent; the representation was a continuing representation which they (through him) had fraudulently failed to correct after his appointment. However, this is not an invariable rule: it only applies to statements intended to be continuing representations. Whereas this inference will be readily drawn if the representation seeks to induce the claimant to enter into some transaction,[102] in other cases it may not be.[103]

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

—

29. For example, the deceit may be practised, not on a person, but on a machine such as a computer: *Renault UK Ltd v Fleetpro Technical Services [2007] EWHC 2541 (QB); [2008] Bus. L.R. D17* at [122]. In *IG Index Plc v Colley [2013] EWHC 478 (QB)* at [746]–[763] Stadlen J held defendants liable for fraud where, aided by a dishonest employee, they placed false bets with a spread-betting company; in addition, he explicitly stated that there was no requirement for any misrepresentation at all. But this is problematical, since if it is true it is not clear where the boundaries of fraud fall to be drawn. Furthermore, it must be arguable that there was at least an implicit (and untrue) representation there by the defendants that the bets placed by them represented bona fide transactions.

30. See para.17-06 onwards. See too *Whyfe v Michael Cullen & Partners [1993] E.G.C.S. 193* (business lease very obscurely worded, with rent inevitably uneconomic and surrender an inevitability: Court of Appeal refuse to strike out action by lessees for deceit on basis that lease deliberately dressed up to look unremarkable when in fact not).

31. *Bradford Third Equitable Benefit Building Society v Borders [1941] 2 All E.R. 204, 211* (Lord Maugham). (In fact fraud was held not established on the facts of the case.) In *Libyan Investment Authority v King [2020] EWHC 440 (Ch)* at [123]–[126] it was said that if a vendor of an interest in a joint property venture procured from valuers a valuation he knew might well be misleading, which was then sent to an investor, he would be guilty of deceit.

32. *Barley v Muir [2018] EWHC 619 (QB)* at [177] (Soole J). This may of course depend on context: see *Copthall Ltd v Scorched Earth Services Ltd [2017] EWHC 1341 (QB)* at [36]–[47] (representation that $1.4 million advanced by third party to business in which claimant asked to invest; clear from previous negotiations that this did not mean a pure cash injection).

33. *Property Alliance Group Ltd v Royal Bank of Scotland Plc [2018] EWCA Civ 355; [2018] 1 W.L.R. 3529*, esp. at [89]–[96], [101], [111] (meaning of "hedge" in financial context). Again, apparently imprecise words may be deceptive if it is clear that a reasonable representee would understand them in a particular way. See, e.g. *Burki v Seventy Thirty Ltd [2018] EWHC 2151 (QB)* (statement that dating agency had a "substantial" number of unattached available men held false, and actionable in deceit, when in fact it had at best 100).

34. See Alderson B in *Moens v Heyworth (1842) 10 M. & W. 147* at 158.

35. See para.17-25.

36. See Lord Maugham in *Bradford Third Equitable Benefit Building Society v Borders [1941] 2 All E.R. 205, 211*. See also *Peek v Gurney (1873) L.R. 6 H.L. 377, 403* (Lord Cairns); *Arkwright v Newbold (1881) 17 Ch. D. 301, 318* (James LJ); and *J D Wetherspoon Plc v Van de Berg & Co Ltd [2007] EWHC 1044 (Ch); [2007] P.N.L.R. 28* at [17] (Lewison J).

37. Not surprisingly, the principle itself is controversial. In *Wood v Balfour [2011] NSWCA 382; (2011) 15 B.P.R. 29,773* a case of the sale of a house with hidden defects, a majority of the New South Wales Court of Appeal seemingly abandoned the need for a positive representation: see Giles JA at [6] (with whom Meagher JA agreed). Macfarlan JA at [50] suggested that the act of marketing a house of itself could count as a representation that there were no defects of which the seller knew, which (one suspects) in practice comes to much the same thing. In the event no guilty knowledge was proved in the seller, so the point was, as matters turned out, moot.

38. cf. *Mentmore Manufacturing Co Ltd v Fomento (Sterling Area) Ltd (1955) 72 R.P.C. 157*; also *William Sindell Plc v Cambridgeshire CC [1994] 1 W.L.R. 1016* (statement that vendor not aware of a defect in title carried implied representation that it had taken reasonable steps to ascertain whether any existed). It has, indeed, been said that in practice the line between misrepresentation and non-disclosure is often imperceptible: see *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd [1995] 1 A.C. 501, 549* (Lord Mustill).

39. The example is James LJ's: see *Arkwright v Newbold (1881) L.R. 17 Ch. D. 301, 318*. So too with a glowing reference to an art dealer's "impeccable reputation" that glosses over unresolved allegations by the Getty Museum of passing off fake works (*Mellor v Partridge [2013] EWCA Civ 477*); and an apparently independent recommendation of a tradesman not mentioning a close relationship with the recommender which makes it far from independent (*Sear v Kingfisher Builders (a firm) (No.3) [2013] EWHC 21 (TCC)*, especially at [6]–[7]).

40. See *Libyan Investment Authority v King [2020] EWHC 440 (Ch)* at [127].

41. *(1873) L.R. 6 H.L. 377*.

42. *(1873) L.R. 6 H.L. 377* at 403. See too Lord Steyn in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254, 274* ("a cocktail of truth, falsity and evasion is a more powerful instrument of deception than undiluted falsehood").

43. *Bennett Gould & Partners Ltd v O'Sullivan [2018] EWHC 2450 (QB)* at [91]. Presenting a loan proposal based on the EURIBOR rates index is similarly a representation that the lender is not itself fraudulently manipulating the index (though it does not imply that someone else is not doing so): *Marme Inversiones 2007 SL v NatWest Markets Plc [2019] EWHC 366 (Comm)* at [142].

44. *Geest Plc v Fyffes Plc [1999] 1 All ER (Comm) 672, 683* (Colman J): approved in *Property Alliance Group Ltd v Royal Bank of Scotland Plc [2016] EWHC 3342 (Ch)*, which was affirmed by the CA: *[2018] EWCA Civ 355; [2018] 1 W.L.R. 3529* at [130].

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

45. *Thorp v Abbotts [2015] EWHC 2142 (Ch)* (vendors of very bourgeois house asked whether they had had communications or discussions affecting their property: negative answer justified, even though major development was planned on a *nearby* property and vendors had talked to neighbours about it and attended protest meetings).

46. See the old criminal case of *R. v Barnard (1837) 7 C. & P. 784* (buyer donned university garb to which not entitled and thus induced seller to give him credit: held, rightly convicted of obtaining by false pretences). A more modern instance (in a claim brought under s.2(1) of the Misrepresentation Act 1967) is *Spice Girls Ltd v Aprilia World Service BV [2002] EWCA Civ 15; [2002] E.M.L.R. 27* (representation by conduct: participating jointly in the filming of advertisements for the claimant constituted a representation that pop group did not contemplate breaking up during the term of the advertising contract).

47. See *Advanced Industrial Technology Corp Ltd v Bond Street Jewellers Ltd [2006] EWCA Civ 923*; also *FundingSecure Ltd v Green [2019] EWHC 208 (Ch)*. See too the Canadian decision in *HSBC Bank Canada v Lourenco 2012 ABQB 380; (2012) Alta. L.R. (5th) 1*.

48. *Contex Drouzhba Ltd v Wiseman [2007] EWCA Civ 1201; [2008] B.C.C. 301* (though complications may arise under the Statute of Frauds Amendment Act 1828: see para.17-55).

49. *Man Nützfahrzeuge AG v Freightliner Ltd [2005] EWHC 2347 (Comm)*, esp. at [79] onwards. The point was not argued on appeal at *[2007] EWCA Civ 910; [2008] P.N.L.R. 6*.

50. *Lindsay v O'Loughnane [2010] EWHC 529 (QB); [2012] B.C.C. 153* (controller of foreign exchange dealers booked deals knowing that, contrary to previous practice and business ethics, clients' sums not segregated but used immediately to pay pressing creditors; liable for deceit when dealers collapsed owing claimant over £500,000). Flaux J referred specifically to an implicit representation that the company was trading "properly and legitimately": see [100]–[119]). On the other hand, since charges for work done are often the subject of negotiation, the mere submission of an invoice is not necessarily a representation that the sum claimed is actually owing: see *Browne (J) Construction Co Ltd v Chapman Construction Services Ltd [2016] EWHC 152 (QB); (2016) 165 Con. L.R. 175* at [70].

51. *(1986) 18 H.L.R. 219*.

52. *(1813) 3 Camp 506*. cf. *Reynell v Sprye (1852) 1 De G.M. & G. 660*; *Walters v Morgan (1861) 3 De G.F. & J. 718* at 723; and see too *Abel v McDonald (1964) 45 D.L.R. (2d) 198*.

53. *[2006] EWHC 401 (Ch); [2006] 2 All E.R. 1024*. This aspect of the case was upheld by the Court of Appeal, though the appeal was allowed on other grounds (see *[2006] EWCA Civ 1749; [2008] 1 W.L.R. 484; [2007] 3 All E.R. 802*). See too *JD Wetherspoon Plc v Van De Berg & Co Ltd [2007] EWHC 1044 (Ch); [2007] P.N.L.R. 28* (property acquisition agents, as fiduciaries, bound to inform principals of covert arrangements to divert real estate profits to their own: failure to do so capable of amounting to tortious deceit).

54. It was applied by Teare J in the company law context in *JSC BTA Bank v Ablyazov [2013] EWHC 510 (Comm)*, where a senior bank officer, by failing to disclose his interest in a number of companies, procured the bank to make irrecoverable loans to them; see especially at [170].

55. Note that this only applies to commercial insurance. There has been no positive duty of disclosure in consumer insurance since the Consumer Insurance (Disclosure and Representations) Act 2012 came into force.

56. The same was the case at common law: *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd [1990] 1 Q.B. 665, 770* onwards (the point was not decided in the House of Lords: see *Banque Financière de la Cité SA v Westgate Insurance Co Ltd [1991] 2 A.C. 249*). This might still be relevant where it is the insurer who fails to make disclosure, since the Act only applies to disclosure by the assured and leaves the common law of uberrima fides in place as regards the insurer.

57. See para.17-13.

58. See para.17-18.

59. *Dadourian Group International Inc v Simms [2009] EWCA Civ 169; [2009] 1 Lloyd's Rep. 601* at [72]–[94].

60. See para.17-17.

61. e.g. *Montpellier Estates Ltd v Leeds City Council [2013] EWHC 166 (QB)* (local authority's statements as to intent to develop land). See too the criminal cases of *R. v Sunair Holidays Ltd [1973] 1 W.L.R. 1105*; and *British Airways Board v Taylor [1976] 1 W.L.R. 13* (prosecutions for "double-booking" failed: statement that customers would be accommodated in the future not as such statements of fact, the requirement of a false statement under the relevant consumer protection legislation being the same as that in deceit).

62. See *Beckett v Cohen [1972] 1 W.L.R. 1593*; and *R. v Sunair Holidays Ltd [1973] 1 W.L.R. 1105* for a full discussion of the distinction between an implied statement of present fact which may form a promise and the breaking of a promise relating to future facts or conduct.

63. *R. v Gordon (1889) 23 Q.B.D. 354* at 360, per Wills J; *Kettlewell v Refuge Assurance Co [1908] 1 K.B. 545 (affirmed [1909] A.C. 243)*; and cf. *DPP v Ray [1974] A.C. 370* (on "obtaining by deception" under the now-repealed Theft Act 1968 s.15).

64. *Edgington v Fitzmaurice (1885) 29 Ch. D. 459*.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

65. *(1885) 29 Ch. D. 459, 483.*

66. *(1885) 29 Ch. D. 459, 483.*

67. The prospectus said the money was wanted for further investment in the business: in fact it was needed to pay off existing debts. See too *Al Khudairi v Abbey Brokers Ltd [2010] EWHC 1486 (Ch); [2010] P.N.L.R. 32*, especially at [124]–[126] (Newey J) (claimants' money deposited with company, misused and lost: fraudulent statements by company controller as to how he intended to handle claimants' money held to amount to deceit, thus allowing personal claim against controller on company's insolvency). Another example is *Khakshouri v Jimenez [2017] EWHC 3392 (QB)* (representation of intent not to sell asset unless with the benefit of a collateral land deal).

68. *Watts v Watts [2014] EWHC 3056 (Ch); [2014] W.T.L.R. 1781*, esp. at [15].

69. See *Clydesdale Bank Ltd v Paton [1896] A.C. 381* at 394. Thus where a person orders goods on credit he states not only that he will pay for them but also that he intends to do so.

70. *Re Shackleton (1875) L.R. 10 Ch. 446*; *Re Eastgate [1905] 1 K.B. 465*. See too *East v Maurer [1991] 1 W.L.R. 461* (seller of business said he would not compete when he had every intention of doing so: accepted, liable in deceit).

71. As in *Jordan v Money (1854) 5 H.L.C. 185*.

72. *Vernon v Keys (1810) 12 East. 632; affirmed (1812) 4 Taunt. 488*. No doubt a similar principle applies to negotiations over other terms.

73. per Mansfield CJ in *Vernon v Keys (1812) 4 Taunt. 488* at 493. This quotation must be read in its context relating to the price the purchaser was prepared to give. As an exception it must not be carried too far: see *Haygarth v Wearing (1871) L.R. 12 Eq. 320*; and *Armstrong v Strain [1951] 1 T.L.R. 856, 860 (Devlin J (affirmed, [1952] 1 K.B. 232))*. cf. *Smith New Court Securities Ltd v Citibank NA [1997] A.C. 254* (false statement that third party had offered a given sum for securities accepted as sufficient to found liability).

74. See the contract case of *Bisset v Wilkinson [1927] A.C. 177* (vendor's statement of opinion as to capacity of farm: even though wrong, no misrepresentation allowing rescission of contract).

75. Indeed, it is possible to qualify possible liability by characterising what would otherwise be a statement as a mere unverified assertion of belief: see *Raiffeisen Zentralbank Österreich AG v Royal Bank of Scotland Plc [2010] EWHC 1392 (Comm); [2011] 1 Lloyd's Rep 123* at [86] (Christopher Clarke J); and also *Cassa di Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd [2011] EWHC 484 (Comm); [2011] 1 C.L.C. 701* at [222] (Hamblen J). But this will not, it is suggested, exonerate the representor if he actually knows the suggestion to be untrue: see below.

76. ⚠ "A representation of fact may be inherent in a statement of opinion and at any rate the existence of the opinion in the person stating it is a question of fact." (Lord Merrivale in *Bisset v Wilkinson [1927] A.C. 177* at 182). See too Devlin J in *Armstrong v Strain [1951] 1 T.L.R. 856* at 860 *(affirmed [1952] 1 K.B. 232)*; and Lord Evershed MR in *Brown v Raphael [1958] Ch. 636* at 641. See too *SK Shipping Europe Plc v Capital VLCC 3 Corp [2020] EWHC 3448 (Comm)* at [113] (Foxton J).

77. See, e.g. *Commercial Banking Co of Sydney Ltd v RH Brown & Co (1972) 126 C.L.R. 337* (opinion conveyed by bank as to client's financial standing not honestly held); also *Anderson v Pacific Insurance Co (1872) L.R. 7 C. & P. 65, 69* (Willes J); also *Khambay v Nijhar (t/a Gravitas Consulting) [2015] EWHC 190 (QB)* at [76]; and *Vald. Nielsen Holding A/S, Newwatch Ltd v Baldorino [2019] EWHC 1926 (Comm)* at [133] (both approving the statement of the law in this paragraph). Hence characterising a statement as a mere assertion of belief will still not protect the maker if he does not in fact believe it to be true.

78. See *Karberg's Case [1892] 3 Ch. 1, 11*.

79. See, e.g. *Peek v Gurney (1873) L.R. 6 H.L. 377*, 404.

80. *Barings Plc (In Liquidation) v Coopers & Lybrand (A Firm) [2002] EWHC 461 (Ch); [2002] P.N.L.R. 39* at [48]–[52]; *BSkyB Ltd v HP Enterprise Services UK Ltd [2010] EWHC 86 (TCC); [2010] B.L.R. 267; 129 Con. L.R. 147* (statement by contractor that it was capable of handling project when it knew it had no reasonable grounds for making it). See too the contract cases of *Smith v Land & House Property Corp (1885) 28 Ch. D. 7, 15* (Bowen LJ); and *Brown v Raphael [1958] Ch. 1636* (both concerned with the right to rescind, where the same requirement applies of a representation of fact, though not of a guilty state of mind). This paragraph was cited with approval in *Vald. Nielsen Holding A/S, Newwatch Ltd v Baldorino [2019] EWHC 1926 (Comm)* at [134].

81. *Barings Plc (In Liquidation) v Coopers & Lybrand (A Firm) [2002] EWHC 461 (Ch); [2002] P.N.L.R. 39* at [48]–[52]. In fact the representor there, a banking executive who signed a representation to accountants that there was nothing untoward, had the necessary bona fide belief and therefore there was no liability.

82. *Bisset v Wilkinson [1927] A.C. 183*; *Smith v Chadwick (1884) 9 App. Cas. 187*; *Brown v Raphael [1958] Ch. 1636*; *Jaffray v Society of Lloyds [2002] EWCA Civ 1101* at [58].

83. Thus a contract could not be rescinded on the basis of a misrepresentation or mistake of law (*Eaglesfield v Londonderry (Marquis) (1876-77) 4 Ch. D. 693*) (though there were suggestions that fraudulent statements of law might be on a different

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

footing (*West London Commercial Bank v Kitson (1884) 13 Q.B.D. 360, 362–363*)); nor was money thought to be recoverable if paid by mistake of law rather than fact (e.g. *Bilbie v Lumley (1802) 2 East 469*).

84. See *Beattie v Ebury (Lord) (1872) L.R. 7 Ch. 777* at 802, per Mellish LJ.

85. See the convoluted, and hardly informative, example given by Jessel MR in *Eaglesfield v Londonderry (Marquis) (1876-77) 4 Ch. D. 693* at 702-703 (statement that a woman is married may be factual or legal according to the circumstances). Statements as to the legal effect of a document could be remarkably awkward in this connection. Compare *West London Commercial Bank v Kitson (1884) 13 Q.B.D. 360* (whether Act of Parliament gave power to directors to sign for company matter of fact) with *Eaglesfield v Londonderry (Marquis) (1876-77) 4 Ch. D. 693* (ranking of share issues inter se matter of law).

86. The leading case, *Kleinwort Benson Ltd v Lincoln City Council [1999] 2 A.C. 349*, reversed previous authorities and decided that money paid by mistake of law could be recovered on the same basis as if the mistake had been factual. *Pankhania v Hackney LBC [2002] EWHC 2441 (Ch); [2002] N.P.C. 123* then decided that statements of law were misrepresentations under the Misrepresentation Act 1967. See too *Brennan v Bolt Burdon [2004] EWCA Civ 1017; [2005] Q.B. 303* (legal mistakes as capable of impugning a contract as factual ones).

87. Even, it would seem, where the law is unexpectedly changed with retrospective effect by legal decision, as happened in *Kleinwort Benson Ltd v Lincoln City Council [1999] 2 A.C. 34*, above. But proof of a guilty state of mind in such a case. so as to establish liability in deceit, would be well-nigh impossible.

88. See Lord Chelmsford in *Central Ry Co of Venezuela v Kisch (1857) L.R. 2 H.L. 99* at 113. It is suggested that the "mere puffs" principle is largely an outgrowth of the rule that statements of opinion are not as such statements of fact.

89. Doubtless the same principle applies to a lender or a person letting out goods on hire or otherwise making them available.

90. *(1837) 2 M. & W. 519*. cf. *Dobell v Stevens (1825) 3 B. & C. 623*; and the American *Patterson v Landsberg (1905) 7 F. 675*.

91. See *(1837) 2 M. & W. 519* at 530, per Parke B. Admittedly, on the facts the evidence seems scanty: see the comments of Lord Atkin on *Langridge's* case in *Donoghue v Stevenson [1932] A.C. 562* at 587–588.

92. "Knowledge of a dangerous defect in a product may provide a foundation for a case of fraud against a person who makes or circulates a dangerous product without warning of the danger of physical damage known to him."—*Hamble Fisheries Ltd v L Gardner & Sons Ltd [1999] 2 Lloyd's Rep. 1, 9* (Mummery LJ). cf. *Bodger v Nichols (1873) 28 L.T. 441*.

93. *(1877) 3 Q.B.D. 150*. See too *Keates v Cadogan (1851) 10 C.B. 591* at 600 (no liability in respect of known defects in real property: disponor must show "aggressive deceit").

94. See *(1877) 3 Q.B.D. 150* at 157. The House of Lords upheld the decision on the basis that the pigs had been expressly sold unwarranted, leaving open whether Bramwell B's wide statement was correct: *(1878) 4 App. Cas. 13*. See too *Baglehole v Walters (1811) 3 Camp. 154* (sale of ship "with all faults": seller not liable unless he used artifice to conceal the faults from buyer); *Hurley v Dyke [1979] R.T.R. 265*, esp. at 303.

95. Or, where appropriate, under s.14 of the Sale of Goods Act 1979, ss.9 and 10 of the Consumer Rights Act 2015, or the strict liability provisions of the Consumer Protection Act 1987.

96. Compare the cases concerned with the liability of bailors, which have normally been put on the basis of negligence rather than the specific tort of deceit: e.g. *Blakemore v Bristol etc Ry (1858) 8 E. & B. 1035* at 1051. Similarly with donors: *Coughlin v Gillison [1889] 1 Q.B. 145*; *MacCarthy v Young (1861) 6 H. & N. 329*. It is instructive to note that a more recent case similar to *Ward v Hobbs (1877) 3 Q.B.D. 150*, involving the sale of a car known to be dangerous, was regarded by the House of Lords as essentially turning on negligence liability: *Hurley v Dyke [1979] R.T.R. 265*.

97. See *Briess v Woolley [1954] A.C. 333* at 353, per Lord Tucker; *Northern Bank Finance Ltd v Charlton [1979] I.R. 149, 166* (Finlay P).

98. *Briess v Woolley [1954] A.C. 333* at 353-354, per Lord Tucker; *DPP v Ray [1974] A.C. 370*. Conversely, if a statement known to be false when made becomes true before it is acted on there will be no liability: see *Ship v Crosskill (1870) L.R. 10 Eq. 73*; and *Briess v Woolley [1954] A.C. 333* at 353.

99. A time that can be remarkably delayed. In the Australian decision in *McBride v Christie's Australia Pty Ltd [2014] NSWSC 1729* a painting was auctioned on terms that if it was found to be non-genuine within five years, the sale could be undone by the purchaser. Auctioneers made innocent representations as to its authenticity before the auction; shortly after the sale they discovered the truth but said nothing. They were held liable in deceit, the reliance lying in the fact that the buyers had thus been prevented from cancelling the sale.

100. e.g. *Slough Estates Plc v Welwyn-Hatfield DC [1996] 2 P.L.R. 50* (statement of intent originally true: defendant guilty of deceit when changed mind but did not tell claimant). See too *Fitzroy Robinson Ltd v Mentmore Towers Ltd [2009] EWHC 1552 (TCC); [2009] B.L.R. 505* (statement by architects that particular partner would manage project: liable in deceit when he resigned and firm did not tell client); *Concept Oil Services Ltd v EN-GIN Group LLP [2013] EWHC 1897 (Comm)*, especially at [48] (Flaux J); also *Jones v Dumbrell [1981] V.R. 199*. cf. the contractual misrepresentation case of *With v O'Flanagan [1936] Ch. 575*; and also *Spice Girls Ltd v Aprilia World Service BV [2002] EWCA Civ 15; [2002] E.M.L.R. 27* at [51] (Morritt VC) (a case decided under the Misrepresentation Act 1967, but still in point).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

101. *[1954] A.C. 333.*

102. As, for example, in *Inter Export LLC v Townley [2018] EWCA Civ 2068*; see esp. at [30]–[32] (representation by director that buyer had funds to pay for commodity).

103. *Bank of Tokyo-Mitsubishi UFJ Ltd v Baskan Gida Sanayi VE Pazarlama AS [2009] EWHC 1276 (Ch); [2010] Bus. L.R. D1* (bank's statement about person it later discovered to be fraudster not continuing).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 2. - Requirements

## (b) - State of mind

## (i) - The belief of the defendant

### The state of mind necessary for liability in deceit

### 17-19

Although the decision in *Pasley v Freeman*[104] established the existence of a tort based on fraud, it did not make entirely clear what state of mind was required in the defendant in order to establish it. The leading case on this point is the later decision of the House of Lords in *Derry v Peek*.[105] There, Lord Herschell laid down the essentials of fraud in the following propositions:

> "First, in order to sustain an action of deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (i) knowingly, (ii) without belief in its truth, or (iii) recklessly, careless[106] whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement from being fraudulent, there must, I think, always be an honest belief in its truth."[107]

It follows from this that a statement honestly believed to be true, however implausible it may be, is not capable of amounting to fraud.[108] Thus in *Niru Battery Manufacturing Co v Milestone Trading Ltd*[109] a bank presented a letter of credit to a buyer for payment, despite the fact that it was obvious to any reasonable person that no payment was due under it since the goods had never been shipped. But this fact was not in the mind of the relevant bank officer when he arranged the presentation: it followed that, however casual or naïve he might have been, no claim lay in deceit. Similarly, in *Derry v Peek*[110] itself a company prospectus stated that the company had certain parliamentary powers which in fact it did not possess. Shareholders who had bought shares on the faith of the statement in the prospectus sued the promoters in deceit when the company went into liquidation. Their action failed: it had not been proved that the directors lacked honest belief in what they had said.[111] Nevertheless, although the unreasonableness of the grounds of the belief will not of itself support an action for deceit, it will of course be evidence from which fraud may be inferred. As Lord Herschell has pointed out, there must be many cases:

> "where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the court that it was not really entertained, and that the representation was a fraudulent one."[112]

### Motive irrelevant

### 17-20

It should be noted that if the requisite degree of knowledge or recklessness is shown, the defendant's motive in making the representation is irrelevant: "If fraud be established it is immaterial that there was no intention to cheat or injure the person to whom the false statement was made."[113] The fact that the representor was not actually dishonest,[114] or acted with the aim of facilitating a bona fide business transaction,[115] is beside the point (though of course lack of dishonest intent may be powerful evidence of a bona fide belief in the truth of the facts asserted by the defendant[116]).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

## Absence of belief in truth; recklessness

**17-21**

If the defendant knows his statement to be untrue he will be responsible for any loss suffered as a result.[117] Little more need be said on this point. However, liability goes further than this. Even if the party making the representation may have had no knowledge of its falsehood, he will still be responsible if he had no belief in its truth and made it, "not caring whether it was true or false".[118] As Lord Herschell put it:

> "Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it knows, yet at least that he believes it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true."[119]

This principle can have wide-ranging consequences. For example, it means that a seller who says a property is in good condition without having taken steps to check,[120] or an indolent surveyor who provides production-line valuations of numerous properties without bothering to appraise each individually,[121] may be liable in deceit. On the other hand, there are limitations to it. A defendant who is a mere mouthpiece or ministerial employee may well make a statement on behalf of his employer without any personal belief whatever as to its truth or otherwise. Although theoretically this might be said to amount to recklessness, it might be thought unjust to hold him liable in the absence of personal dishonesty, and there is some authority that in such a case he may have a defence.[122]

## Timing: defendant forgetting facts once known

**17-22**

Since the tort of deceit is committed at the time the claimant relies on the defendant's false statement, it is not enough to show that the defendant once knew facts contrary to the representation made by him, if at the time of making it he had honestly forgotten them. In an action of deceit it is essential that the defendant should be without honest belief in the truth of his statement at the time of making it[123] (though no doubt when it can be shown that the defendant has at one time known facts inconsistent with the truth of his statement, this will be strong evidence that he knew such facts at the time of making the statement).

## Timing: defendant's later knowledge

**17-23**

In the converse case, where the defendant does not acquire knowledge of the untruth of his statement until after it has been made, but becomes aware of it before the claimant has acted upon it, it follows from general principle that he is bound to communicate the truth and will be answerable in damages if he does not.[124]

## Timing: statement becoming untrue ex post facto

**17-24**

It may be that a statement was in fact true at the time when made, but before being acted upon by the party to whom it was made had been rendered untrue by reason of later events. In such a case, then if the defendant was aware of those events he may be liable in deceit.[125]

## Ambiguous representations

**17-25**

Where a statement is capable of being understood in more than one sense, it is essential to liability in deceit that the party making the statement should have intended it to be understood in its untrue sense, or at the very least that he should have deliberately used the ambiguity for the purpose of deceiving the claimant.[126] Even though the more natural and reasonable interpretation of the statement is that

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

put upon it by the claimant, and though on that interpretation it is untrue to the knowledge of the defendant, that will not suffice if the defendant did not intend it to be so understood.[127] Thus in *Akerhielm v De Mare*[128] a buyer of shares who had relied on an ambiguous statement in a company prospectus failed in his action in deceit once it was shown that the defendants had honestly believed the statement to be true in the sense in which they had intended it to be read. Even if the claimant's interpretation was a proper one, they had not shown the requisite knowledge of falsity in the defendants. On the other hand, if the defendant alleges that he understood his statement in a way that a reasonable person would not have understood it, then as a matter of evidence this may well weigh with the court in deciding whether he honestly understood it in that sense.[129]

---

104. *(1789) 3 T.R. 51.*

105. *(1889) 14 App. Cas. 337.*

106. In the sense of not caring.

107. *(1889) 14 App. Cas. 337* at 376. See too Rix LJ in *AIC Ltd v ITS Testing Services (UK) Ltd [2006] EWCA Civ 1601; [2007] 1 All E.R. (Comm) 667* at [256]–[259].

108. An attempt to argue that there could in addition be deceit liability where, even in the absence of knowledge or recklessness, conduct was such that any reasonable and honest person would regard it as dishonest, as held in a different context in *Ivey v Genting Casinos UK Ltd [2017] UKSC 67; [2018] A.C. 391*; was rightly rebuffed in *Glossop Cartons & Print Ltd v Contact (Print & Packaging) Ltd [2019] EWHC 2314 (Ch)* at [48]–[49].

109. *[2003] EWCA Civ 1446; [2004] Q.B. 985; upholding [2002] EWHC 1425 (Comm); [2002] 2 All E.R. (Comm) 705.* See too *Uzinterimpex JSC v Standard Bank Plc [2008] EWCA Civ 819; [2008] 2 Lloyd's Rep. 456* (allegedly abusive demand by buyer on advance payment guarantee: no liability in deceit since on the evidence buyer did not in fact believe that conditions of guarantee were not satisfied).

110. *(1889) 14 App. Cas. 337.*

111. *(1889) 14 App. Cas. 337, 376* (Lord Herschell). See too *Angus v Clifford [1891] 2 Ch. 449* to the same effect. Note, however, that directors in the position of the defendants in *Derry v Peek* are under a statutory liability which does include negligence: see Financial Services and Markets Act 2000 s.90, re-enacting the Directors' Liability Act 1890, and para.17-57.

112. See *Derry v Peek (1889) 14 App. Cas. 337* at 376; also *Gross v Lewis Hillman [1970] Ch. 445* at 465, per Harman LJ

113. *Bradford Third Benefit Building Society v Borders [1941] 2 All E.R. 205, 211* (Viscount Maugham); also *Polhill v Walter (1832) 3 B. & Ad. 114*; *Derry v Peek (1889) 14 App. Cas. 337, 365* (Lord Herschell); *Watts v Spence [1976] Ch. 165, 176* (Graham J); and *Ludsin Overseas Ltd v Eco3 Capital Ltd [2013] EWCA Civ 413* at [77]–[78] (Jackson LJ).

114. "It is not necessary that the maker of the statement was 'dishonest' as that word is used in the criminal law. The relevant intention is that the false statement shall be acted upon by a person to whom it is addressed."—*Standard Chartered Bank v Pakistan National Shipping Corp (No.2) [2000] 1 Lloyd's Rep. 218* at 224, per Evans LJ.

115. See *Standard Chartered Bank v Pakistan National Shipping Corp (No.2) [2000] 1 Lloyd's Rep. 218*, esp. at 224 (date of presentation of letter of credit falsified to speed up business deal: presenter still guilty of deceit. The case was reversed on other grounds at *[2002] UKHL 43; [2003] 1 A.C. 959*). A similar type of case is *Shinhan Bank Ltd v Sea Containers Ltd [2000] 2 Lloyd's Rep. 406* (buyer signing receipts for undelivered goods to accommodate seller, knowing seller would then use them to obtain bank finance: buyer liable to bank for deceit); and see too *Brown Jenkinson and Co Ltd v Percy Dalton (London) Ltd [1957] 2 Q.B. 631* (agreement to issue clean bills of lading for damaged goods deceitful and hence promise to indemnify shipowner for liability ineffective), and also *Ansbacher (Henry) & Co Ltd v Brinks Stern (A Firm) [1998] P.N.L.R. 221*.

116. *Barings Plc v Coopers & Lybrand (No.5) [2002] EWHC 461 (Ch); [2002] P.N.L.R. 39.*

117. *Pasley v Freeman (1789) 3 T.R. 51.* This was the first case in which fraud was held to give a cause of action between persons not parties to a contract.

118. See *Joliffe v Baker (1883) 11 Q.B.D. 255* at 275, per Smith J.

119. per Lord Herschell in *Derry v Peek (1889) 14 App. Cas. 337* at 368; see also *(1889) 14 App. Cas. 337* at 361. See too *AIC Ltd v ITS Testing Services (UK) Ltd [2005] EWHC 2122 (Comm); [2006] 1 Lloyd's Rep. 1* (defendants test cargo of petrol for quality and send results to buyers: when told of doubts as to correctness of results, repeat "we stand by that test" despite having no idea whether correct or not: held, liable to buyers in deceit). The decision was reversed by the Court of Appeal on the facts (see *AIC Ltd v ITS Testing Services (UK) Ltd [2006] EWCA Civ 1601; [2007] 1 All E.R. (Comm) 667*), but it is submitted that the principle remains.

120. *Francis v Knapper [2016] EWHC 3093 (QB)* at [60].

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.