121. As happened in *Mortgage Express Ltd v Countrywide Surveyors Ltd [2016] EWHC 224 (Ch).*

122. See *GE Commercial Finance Ltd v Gee [2005] EWHC 2056 (QB); [2006] 1 Lloyd's Rep. 337* (junior employee relayed fraudulent employer's falsehoods to factoring company: despite lack of direct knowledge of, or positive belief in, the truth of what he was saying, Tugendhat J thought, obiter, that "open to question" whether liable: see *[2005] EWHC 2056 (QB); [2006] 1 Lloyd's Rep. 337* at [105]).

123. See *Derry v Peek (1889) 14 App. Cas. 337, 343* (Lord Halsbury); *Angus v Clifford [1891] 2 Ch. 449, 471*; *Bradford Third Benefit Building Society v Borders [1941] 2 All E.R. 205, 220* (Lord Wright); *Armstrong v Strain [1951] 1 T.L.R. 856, 870–871 (per Devlin J; affirmed [1952] 1 K.B. 232).*

124. See (obiter) per Lord Blackburn in *Brownlie v Campbell (1880) 5 App. Cas. 925, 950*; cf. *Briess v Woolley [1954] A.C. 333.* In *Ansbacher (Henry) & Co Ltd v Brinks Stern (A Firm) [1998] P.N.L.R. 221*, the point was raised but it became unnecessary to decide it, though the court would have found it difficult to accept that the defendant continued to hold the honest belief he claimed to have had.

125. *Incledon v Watson (1862) 2 F. & F. 841*; *With v O'Flanagan [1936] Ch. 575, 584*; *Bradford Third Benefit Building Society v Borders [1941] 2 All E.R. 205* at 220, per Lord Wright. This includes the case where a misrepresentation is made by one agent and it is another agent who fails to correct it: *Marme Inversiones 2007 SL v NatWest Markets Plc [2019] EWHC 366 (Comm)* at [260]–[261]. See R. Bigwood, "Pre-Contractual Misrepresentation and the Limits of the Principle in With v O'Flanagan" [2005] C.L.J. 94; and compare the reasoning in *Briess v Woolley [1954] A.C. 333* (see para.17-18) on continuing representations.

126. See now *Whyfe v Michael Cullen & Partners [1993] E.G.C.S. 193.* Similarly, if the alleged deceit is contained in answers to a questionnaire which is itself ambiguous: *Cheltenham BC v Laird [2009] EWHC 1253 (QB); [2009] I.R.L.R. 621* at [174].

127. *Hallows v Fernie (1868) L.R. 3 Ch. App. 467, 476–477*; *Arkwright v Newbold (1881) 17 Ch. D. 301; (1884) 9 App. Cas. 187* at 201, per Lord Blackburn; *Low v Bouverie [1891] 3 Ch. 82, 101–106*; *Aaron's Reefs Ltd v Twiss [1896] A.C. 273, 282*; *Akerhielm v De Mare [1959] A.C. 789* at 805–806; also *Gross v Lewis Hillman Ltd [1970] Ch. 445.*

128. *[1959] A.C. 789.* The case was applied by the Court of Appeal in *Ansbacher v Brinks Stern [1998] P.N.L.R. 221.* See also *Foster v Action Aviation Ltd [2014] EWCA Civ 1368* and *Leni Gas & Oil Investments Ltd v Malta Oil Pty Ltd [2014] EWHC 893 (Comm)* at [5]–[9] (Males J).

129. *[1959] A.C. 789* at 805.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 2. - Requirements

## (b) - State of mind

## (ii) - State of mind: vicarious liability

### Vicarious liability of employer[130]

### 17-26

There is no doubt that a blameless employer may be vicariously liable for a deceit committed by a dishonest employee in the course of his employment,[131] in the same way as he can be liable for any other deliberate tort.[132] The events must of course be capable of giving rise to vicarious liability,[133] and in general the normal rules of vicarious liability apply.[134] However, there are two important limitations on the employer's potential liability in this connection. First, it has to be shown that the employee in the course of his employment not only acted dishonestly, but actually committed the principal act amounting to the tort of deceit. The point was neatly illustrated by *Crédit Lyonnais Nederland NV v Export Credits Guarantee Department*.[135] As part of a scheme to induce a bank to buy forged bills of exchange relating to bogus export transactions, a fraudster obtained certain guarantees from the defendants, which he had suborned X, a dishonest employee of theirs, to authorise on their behalf. The bank sued the defendants in deceit, arguing (correctly) that the employee was liable to them as an accessory of the fraudster, and that in issuing the guarantees to aid the fraudster he had acted within the scope of his employment. The House of Lords nevertheless held that the action failed. The essential elements of the tort of deceit had been committed by the fraudster and not by X, and the mere fact that X had abetted a tort in the course of his employment did not make the defendants liable for it as his employers.

### 17-27

Secondly, the rule that an act may be done in the course of employment even if entirely unauthorised[136] is modified in the case of deceit. An employer will be vicariously liable for a statement made by his employee only if the employee had actual or ostensible authority to make it.[137] So in *Armagas Ltd v Mundogas SA*[138] an employee of the defendant shipping company, while negotiating on their behalf but without their authority, defrauded the claimants into thinking that the defendants were contracting to charter a ship for three years. The claimant's action for breach of contract having failed because the employee had no authority to contract on their behalf, the House of Lords held that their action in deceit on the basis of vicarious liability for their employee's deception was equally doomed: absent authority to make representations, there could be no liability in tort for unauthorised statements. It is, moreover, now clear that despite the relaxation elsewhere of the rules of vicarious liability in cases such as *Various Claimants v Institute of the Brothers of the Christian Schools*[139] and *Cox v Ministry of Justice*,[140] the requirement of authority in order to give rise to vicarious liability remains the law.[141]

### Knowledge and agency: the fraudulent agent

### 17-28

A principal is liable for torts committed by his agent acting within his authority.[142] It follows that where an agent makes a representation he knows to be false, and it was within his actual or ostensible authority to make that representation, the principal will be liable even if personally entirely innocent.[143] The innocent principal will equally be liable where the fraudulent agent passes on the representation indirectly, for example through another (innocent) agent of the same principal,[144] or for that matter by giving it to the principal himself who then in good faith transmits it to the claimant.[145] However, if he is himself an

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

intended victim of the fraud he will not be vicariously liable to other victims of that fraud.[146] Furthermore, there is a pragmatic qualification to the rules of vicarious liability where the victim of the fraud himself owed a duty of care to the employer to detect the precise fraud in issue. An example is where a dishonest employee tells lies to a company auditor or stockbroker in order to hide his own fraud. In such a case, the defendant when sued for negligence by the company cannot cancel out his liability by bringing a cross-claim for deceit[147]: the duty to unmask the fraud takes precedence over liability in deceit.[148]

## Knowledge and agency: other cases

### 17-29

The previous paragraph deals with the fraudulent agent of a blameless principal. We now turn to the converse situation, namely where the agent who makes the representation believes it to be true but the principal knows facts which show that it is not. If the principal expressly authorises his agent to make a statement which he himself knows to be false, he is of course liable[149] (indeed, if the agent knows of the falsity as well, he will himself be a joint tortfeasor[150]). Equally, there will be fraud on the part of the principal if he deliberately employs an agent, from whom he conceals facts in the expectation that as a result of his ignorance the latter will give false information to some third party.[151] However, to render the principal liable in an action of deceit in such a case, it must it seems be proved that there was a fraudulent state of mind on his part[152]: that is, that he intended the claimant to be misled or at the very least was indifferent as to whether he might be. Where a false representation has been made innocently by an agent acting within his authority, the mere fact that the principal knows the facts which render the representation false will not make the latter liable if he has not expressly authorised the representation or deliberately concealed facts from the agent with a view to the claimant being misled.[153]
So in *Armstrong v Strain*[154] estate agents with general authority to make representations about a house on their books innocently told a purchaser that it was sound when, as the owner knew, it was not. The Court of Appeal upheld a finding that the owner was not liable to the purchaser in deceit.

## Partners

### 17-30

Under s.10 of the Partnership Act 1890, partners are liable for wrongful acts committed by any one of their number while "acting in the ordinary course of the business of the firm". This liability may of course include cases of fraud committed by a partner, provided the act of the errant partner is so closely connected to the business of the firm as to be within his actual or apparent authority, as where a partner in an accountancy firm forges share transfers and then fraudulently confirms their genuineness to stockbrokers.[155] But the limits of this liability should be noted: if no reasonable person would think the transaction was part of the firm's ordinary business, then the firm will not be liable.[156] Furthermore, the same restriction applies here as with vicarious liability: all the acts of the partner which were necessary to make him liable in deceit must have been committed in the course of the firm's business.[157] It should be noted, however, that partners will not be liable on this basis unless the partner making the statement himself had the requisite degree of knowledge. Although s.16 of the Partnership Act 1890 supposedly attributes all partners' knowledge to the firm, it has been held that this does not render the firm liable in deceit merely because one partner innocently makes a statement that another partner knows to be false.[158]

---

130. See Ch.6, for vicarious liability generally.

131. e.g. *Lloyd v Grace, Smith and Co* [1912] A.C. 716 (solicitor's clerk defrauding client); *Barings Plc (In Liquidation) v Coopers & Lybrand (Issues Re Liability)* [2003] EWHC 1319 (Ch); [2003] P.N.L.R. 34 (lies told by unauthorised traders to company's auditors to cover up their trail: held, employers liable on principle to auditors on basis of vicarious liability). cf. *Barwick v English Joint Stock Bank* (1867) L.R. 2 Ex. 259, 265, per Willes J. Equally it does not matter for these purposes that the fraud was as much against the employer as the claimant: cf. *Kwei Tek Chao v British Traders & Shippers Ltd* [1954] 2 Q.B. 459, 470 (per Devlin J).

132. See, e.g. *Morris v Martin* [1966] 1 Q.B. 716 (conversion by theft). For what amounts to "course of employment" in this connection, see generally *Lister v Hesley Hall Ltd* [2001] UKHL 22; [2002] 1 A.C. 215 and para.6-29 onwards.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

133. See, e.g. *Frederick v Positive Solutions (Financial Services) Ltd [2018] EWCA Civ 431* (financial adviser persuaded claimants to remortgage homes to invest in fraudulent scheme of his own and submitted fraudulent mortgage applications through web portal of defendants, with whom associated; no liability in defendants, since they had done no more than provide the opportunity for the fraud, and in any case fraudster's activity had been a "recognisably independent business" from the defendants' and thus outside the scope of any employment).

134. For example, as to seconded servants: see the Scots decision in *Royal Bank of Scotland Plc v Bannerman Johnstone MacLay [2005] CSIH 39; 2005 1 S.C. 437; [2005] P.N.L.R. 43* (accountant seconded to company by firm tells lies to its bankers: arguable that still employed by firm and hence latter liable). Similarly, a representor may act for two people at the same time. See *Man Nützfahrzeuge AG v Freightliner Ltd [2005] EWHC 2347 (Comm)*, esp. at [92] et seq. (financial manager of company presents falsified accounts to potential buyer of company: acting for both company and seller). The point was not argued on appeal: *[2007] EWCA Civ 910; [2008] P.N.L.R. 6*.

135. *[2000] 1 A.C. 486*.

136. e.g. *Limpus v London General Omnibus Co (1862) 1 H. & C. 862*.

137. See *Lloyd v Grace, Smith & Co [1912] A.C. 716*, esp. at 736 (Lord Macnaghten); *Armagas Ltd v Mundogas SA [1986] A.C. 717*, below. For a case of actual authority giving rise to liability see *Khakshouri v Jimenez [2017] EWHC 3392 (QB)*, esp. at [124]–[125] (one director giving other director carte blanche to negotiate on his behalf for loan to a struggling Charlton Athletic FC).

138. *[1986] A.C. 717*.

139. *[2012] UKSC 56; [2013] 2 A.C. 1*.

140. *[2016] UKSC 10; [2016] A.C. 660*.

141. See *Winter v Hockley Mint Ltd [2018] EWCA Civ 2480; [2019] 1 W.L.R. 1617*. See too dicta of Flaux LJ in *Frederick v Positive Solutions (Financial Services) Ltd [2018] EWCA Civ 431* at [77]. Suggestions to the contrary in *Group Seven Ltd v Notable Services LLC [2019] EWCA Civ 614; [2019] 3 W.L.R. 1011* at [145] should, it is suggested with respect, be regarded as doubtful.

142. See *Bowstead & Reynolds on Agency, 21st edn (2017), para.8-177* onwards.

143. *Briess v Woolley [1954] A.C. 333*; cf. *Pearson v Dublin Corp [1907] A.C. 351* (semble) and *Anglo-Scottish Beet Sugar Corp Ltd v Spalding Urban DC [1937] 2 K.B. 607* at 621. If the principal is not innocent, he will of course be liable with the agent as a joint tortfeasor.

144. *London County Properties v Berkeley Property Co [1936] 2 All E.R. 1039 CA*, as interpreted by the Court of Appeal in *Armstrong v Strain [1952] 1 K.B. 232*; cf. *Anglo-Scottish Beet Sugar Corp v Spalding Urban DC [1937] 2 K.B. 607*.

145. *Pearson & Son Ltd v Dublin Corp [1907] A.C. 351*; *Anglo-Scottish Beet Sugar Corp v Spalding Urban DC [1937] 2 K.B. 607, 619–620*.

146. See *Kwei Tek Chao v British Traders and Shippers Ltd [1954] 2 Q.B. 459* (forwarding agents acting for sellers of goods produce falsified bills of lading; sellers innocently present bills to buyers; sellers not liable for acts of forwarding agents). cf. *Bradford Third Benefit Building Society v Borders [1941] 2 All E.R. 205, 223, 226* (Lords Wright and Porter).

147. *Singularis Holdings Ltd (In Liquidation) v Daiwa Capital Markets Europe Ltd [2019] UKSC 50; [2019] 3 W.L.R. 997*; see too *Barings Plc (In Liquidation) v Coopers & Lybrand (A Firm) (Issues Re Liability) [2003] EWHC 1319 (Ch); [2003] P.N.L.R. 34*, esp. at [728].

148. See the *Barings* case *[2003] EWHC 1319 (Ch); [2003] P.N.L.R. 34* at [740]. The other argument used in the case, that the cause of the auditor's liability was its own negligence rather than the deceit of the employee, is difficult to accept: not only is it question-begging, but if true it would prevent the auditor suing the fraudulent employee himself, which presumably was not the intention.

149. e.g. *London County Freehold Properties Ltd v Berkeley Property Co Ltd [1936] 2 All E.R. 1039*, as interpreted in *Armstrong v Strain [1952] 1 K.B. 232* (seller of investment properties knowingly arms agents with false information as to state of rent roll for transmission to buyers: liable in deceit).

150. It was once doubted whether an agent who knowingly lied on the orders of a guilty principal was personally liable at all: but this heresy was scotched by the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corp (No.2) [2002] UKHL 43; [2003] 1 A.C. 959* (and see too *International Media Advertising Ltd v Ministry of Culture and Tourism of the Republic of Turkey [2018] EWHC 3285 (QB)* at [275]–[283]). On the *Standard Chartered* case see B. Parker, "Fraudulent Bills of Lading and Bankers' Commercial Credits" [2003] L.M.C.L.Q. 1).

151. See *Standard Chartered Bank Ltd v Pakistan National Shipping Corp (No.2) [2000] 1 Lloyd's Rep. 218*, esp. at 225 (bank gave stale letter of credit to agent for presentation knowing agent would present it to issuing bank who did not know it was stale: bank guilty of fraud). See too *Cornfoot v Fowke (1840) 6 M. & W. 358* at 373, per Parke B; *Ludgater v Love (1881) 44 L.T. 694*; *Armstrong v Strain [1951] 1 T.L.R. 856* at 861. cf. *Bradford Third Benefit Building Society v Borders [1941] 2 All E.R. 205, 220* (Lord Wright).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

152. The claimant must "bring home fraud to the principal": *Cornfoot v Fowke (1840) 6 M & W 358* at 370, per Rolfe B.

153. *Armstrong v Strain [1952] 1 K.B. 232*; *Cornfoot v Fowke (1840) 6 M. & W. 358*; *Gordon Hill Trust Ltd v Segall [1941] 2 All E.R. 379*.

154. *[1952] 1 K.B. 232*; see too *Greenridge Luton One Ltd v Kempton Investments Ltd [2016] EWHC 91 (Ch)* at [77]–[79] (Newey J); and cf. *Awaroa v Commercial Securities Ltd [1976] 1 N.Z.L.R. 19*.

155. *McHugh v Kerr [2003] EWHC 2985 (Ch)*; see too *Goldberg v Miltiadous [2010] EWHC 450 (QB)* (accountancy firm liable for partner who duped investor into sinking money in dubious Cyprus real estate); and the Australian decision in *Crouch & Lyndon (A Firm) v IPG Finance Australia Pty Ltd [2013] QCA 220; [2014] P.N.L.R. 3* (setting up bogus mortgage loans). cf. *Dubai Aluminium Co Ltd v Salaam [2002] UKHL 48; [2003] 2 A.C. 366* (similar principles with regard to dishonest breach of fiduciary duty). So too under the Limited Liability Partnerships Act 2000 s.6.

156. *Coughlan (JJ) Ltd v Ruparelia [2003] EWCA Civ 1057; [2004] P.N.L.R. 4* (solicitor, supposedly acting in his capacity as partner, dishonestly puffs a fraudulent investment scheme promising implausible returns of 6,000 per cent per year: no liability, since cannot be said that "viewed fairly and properly, it is the kind of transaction which forms part of the ordinary business of a solicitor").

157. *Dubai Aluminium Co Ltd v Salaam [2002] UKHL 48; [2003] 2 A.C. 366* (actually concerning dishonest breach of fiduciary duty, but still in point).

158. See the Scots decision in *Zurich GSG Ltd v Gray & Kellas [2007] CSOH 91; 2007 S.L.T. 917; [2008] P.N.L.R. 1*.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 2. - Requirements

## (c) - Representation intended to be acted on by the claimant

## Representation must be intended to be acted on by claimant

### 17-31

⚠ In order to give a cause of action in deceit, not only must the statement complained of be untrue to the defendant's knowledge, but it must in addition be made with intent to deceive the claimant: with intent, that is to say, that it shall be acted upon by him.[159] It seems that intent, for these purposes, includes not only the case where the defendant actually desires the claimant to rely on what he says, but also where he appreciates that in the absence of some unforeseen intervention he will actually do so.[160] But if intent of one or other kind is not shown, then the claimant will fail. So where the defendant, a director of an oil company, untruly stated to a broker that the company had received no news of a major find, intending by this untruth to protect the company's interests and not to induce shareholders to sell their holdings, it was held that no action for fraud lay at the suit of a shareholder.[161] ⚠ However, provided the defendant intended the claimant to act on the representation, it is immaterial whether he intended him so to act in the precise way in which he did.[162]

## Representation not made to claimant directly

### 17-32

A representation made to the claimant directly causes no problems; so too with a statement made to someone known to be acting as agent for the claimant.[163] But a representation made to a third party with intent that it be passed on to the claimant to be acted on by him will equally suffice.[164] Thus in *Swift v Winterbotham*[165] a claimant who gave credit on the basis of a fraudulent banker's reference successfully sued the bank in deceit even though the reference had been sent not to him but to his own bank; similarly, in *OMV Petrom SA v Glencore International AG*[166] buyers of oil successfully recovered against dishonest traders who misdescribed their wares to a commission agent knowing full well that the latter would pass on the information. All that is required for these purposes is that the representation be intended, in one way or another, to reach the claimant in order to induce him to act on it.[167] Nor is it even necessary that the defendant know precisely who the statement is intended for, provided he intends it to be relied on by someone in the claimant's position[168]: thus in another banker's reference case a bank was held liable when it sent a fraudulent reference to another bank for the benefit of a customer of whose identity it was entirely unaware.[169] Indeed, in one case it was even held that an action for deceit could be based on a newspaper advertisement, provided the claimant showed that he was one of the class of persons at whom it was directed.[170]

### 17-33

Nevertheless, it must be shown that there was an actual intention to deceive the claimant in question, whether individually or by reference to a class to which he belongs; it will not be enough merely to show that the misstatement is reasonably calculated to deceive him. Thus the House of Lords in *Peek v Gurney*[171] held that promoters of a company, who issued a fraudulent prospectus as a prospectus and as nothing more, were not liable for so doing to persons who, not being original allottees of the company's shares, purchased their shares in the market; the reason being that the promoters had no object in making the false statements except to get the shares taken up; they had no intent to influence market dealings.[172] Again, in *Gross v Lewis Hillman Ltd*[173] sellers of commercial property made certain misrepresentations to the buyers about it: the buyers agreed to purchase it, but then assigned the

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

benefit of the contract to the claimants. The claimants' claim in deceit failed: even if the representations had been fraudulent (which they had not) they had been made to the buyers and the claimants could not sue in respect of them.

## 17-34

It is obviously a question of fact whether in a particular case a person was intended to rely on a false statement. In practice, however, the test is often whether it was in the defendant's interest that he should do so. So where persons spread a false rumour for the purpose of raising the price of certain stock, they were not liable in damages to those who dealt with other persons on the faith of such rumour being true,[174] there being no intention to deceive any persons other than those who dealt with the defendants themselves, given the defendants had nothing to gain unless the investors dealt with themselves.[175]

---

159. *Peek v Gurney (1873) L.R. 6 H.L. at 377*, 411–413 (Lord Cairns); *Bradford Third Benefit Building Society v Borders [1941] 2 All E.R. 205*, 211; *Kitcher v Fordham [1955] 2 Lloyd's Rep. 705*, 707.

160. *Shinhan Bank Ltd v Sea Containers Ltd [2000] 2 Lloyd's Rep. 406* (buyer signing receipts for undelivered goods knowing seller would use then to obtain bank finance: liable to bank in deceit when seller collapsed). This criterion of "intent" is borrowed from criminal law: see *R. v Woollin [1999] 1 A.C. 82*. The passage at this footnote was approved in *Zagora Management Ltd v Zurich Insurance Plc [2019] EWHC 140 (TCC); (2019) 182 Con. L.R. 180* at [743]–[745].

161. ⚠ *Tackey v McBain [1912] A.C. 186*. See too *Goose v Wilson Sandford & Co (No.2) [2001] Lloyd's Rep. P.N. 189*. More recently, see *Zagora Management Ltd v Zurich Insurance Plc [2019] EWHC 140 (TCC); (2019) 182 Con. L.R. 180* (producer of fraudulent building regulations certificate for apartment block did not intend reliance by later buyer of freehold); also *SK Shipping Europe Plc v Capital VLCC 3 Corp [2020] EWHC 3448 (Comm)* at [113] (Foxton J).

162. *Goose v Wilson Sandford & Co (No.2) [2001] Lloyd's Rep. P.N. 189*.

163. *OMV Petrom SA v Glencore International AG [2015] EWHC 666 (Comm)* (oil traders deliberately misdescribed oil to commission agent for the buyer) (not argued on appeal at *[2016] EWCA Civ 778; [2017] 3 All E.R. 157*).

164. "Every man must be held responsible for the consequences of a false representation made by him to another, upon which a third person acts, and so acting is damnified, provided it appear that such false representation was made with the intent that it should be acted upon by such third person in the manner that occasions the injury or loss" (Page Wood V-C in *Barry v Croskey (1861) 2 J. & H. 1, 23*). This case was approved by Lord Cairns in *Peek v Gurney (1873) 6 H.L. 377* at 412. And see also *Brown Jenkinson & Co Ltd v Percy Dalton (London) Ltd [1957] 2 Q.B. 621, 631* (Morris LJ); and *Libyan Investment Authority v King [2020] EWHC 440 (Ch)* at [123] (misleading valuation of joint venture given to intermediary who passed it on to investor).

165. *(1873) L.R. 8 Q.B. 244* (appealed on other grounds, L.R. 9 Q.B. 301). A similar banker's reference case is *Commercial Banking of Sydney v RH Brown & Co (1972) 126 C.L.R. 337*. See also *Langridge v Levy (1837) 2 M. & W. 519; 4 M. & W. 337* (untrue statement to buyer that shotgun was sound relayed to buyer's son, who was injured using it: son successfully recovered in deceit); *Pilmore v Hood (1838) 5 Bing. N.C. 97* (false representations made to X regarding sale of business. P knew X passed on to P; D sold to P without correcting); *Renault UK Ltd v Fleetpro Technical Services Ltd [2007] EWHC 2541 (QB); [2008] Bus. L.R. D17* (vehicle purchasers falsely told dealers they were entitled to importers' fleet discount: potentially liable to importers for deceit (though action failed for other reasons)).

166. *[2015] EWHC 666 (Comm)* (point not argued on appeal at *[2016] EWCA Civ 778; [2017] 3 All E.R. 157*).

167. "In order to enable a person injured by a false representation to sue for damages, it is not necessary that the representation should be made to the plaintiff directly; it is sufficient if the representation is made to a third person to be communicated to the plaintiff, or to be communicated to a class of persons of whom the plaintiff is one, or even if it is made to the public generally, with a view to its being acted on, and the plaintiff as one of the public acts on it and suffers damage thereby." (Quain J in *Swift v Winterbotham (1873) L.R. 8 Q.B. 244* at 253, cited with approval by Blackburn J in *Richardson v Silvester (1873) L.R. 9 Q.B. 34* at 36). See also *Pilmore v Hood (1838) 5 Bing. N.C. 97* (D made false representations made to X regarding business knowing X would repeat them to P; liable when sold to P without correcting); *Schenk v Cook [2017] EWHC 144 (QB)* esp. at [84] (similar). See too *Barry v Croskey (1861) 2 J. & H. 1*, 23; *Brown Jenkinson & Co Ltd v Percy Dalton (London) Ltd [1957] 2 Q.B. 621*.

168. See Cresswell J in *Standard Chartered Bank v Pakistan National Shipping Corp (No.2) [1998] 1 Lloyd's Rep. 684* at 696: enough that claimant "within the class of persons within their contemplation as likely to be deceived".

169. *Commercial Banking Co of Sydney v RH Brown & Co (1972) 126 C.L.R. at 337*. cf. *Brown Jenkinson & Co Ltd v Percy Dalton (London) Ltd [1957] 2 Q.B. 621* (carrier who knowingly issued false bills of lading liable to consignees in deceit, since he intended them to be relied on by any number of consignees, bankers and indorsees).

170. *Richardson v Silvester (1873) L.R. 9 Q.B. 34* (false advertisement that farm for sale: would-be buyer can recover wasted expenses).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

171. *(1873) L.R. 6 H.L. 377.* See too *Tackey v McBain [1912] A.C. 186* (untrue denial of major find by oil company made to protect company's interests generally, not to influence market: no liability to shareholder who sold on faith of it); and also *Wetherspoon (JD) Plc v Van De Berg & Co Ltd [2007] EWHC 1044; [2007] P.N.L.R. 28*; *Group Seven Ltd v Nasir [2017] EWHC 2466 (Ch); [2018] P.N.L.R. 6* at [516]–[521] (Morgan J) (varied on appeal on other grounds: *Group Seven Ltd v Notable Services LLC [2019] EWCA Civ 614; [2020] Ch. 129*).

172. cf. *Andrews v Mockford [1896] 1 Q.B. 372*, where there was an intent to boost the shares in the market generally, and hence a purchaser in that market successfully sued.

173. *[1970] Ch. 445.*

174. See *Barry v Croskey (1861) 2 J. & H. 1* at 18, per Page Wood VC; also *Peek v Gurney (1873) L.R. 6 H.L. 377* at 412, per Lord Cairns.

175. Note in *Langridge v Levy (1837) 2 M. & W. 519; 4 M. & W. 337*, the defendant having sold a gun to the claimant's father for the use of himself and his son and sold it as sound and secure when he knew it to be unsafe, was held liable in an action of deceit to the claimant, who was wounded by the bursting of the gun. There, the court upheld the verdict expressly upon the ground that the declaration contained an averment that the gun was sold for the use of the purchaser and his son. Lord Atkin in *Donoghue v Stevenson [1932] A.C. 562* at 587–588 referring to this case said: "User by the plaintiff was one of the acts contemplated by the fraudulent defendant." The case can hardly be regarded as having decided any principle of general application.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.
## Consolidated Mainwork Incorporating First Supplement
## Chapter 17 - Deceit
## Section 2. - Requirements
## (d) - Claimant must have been influenced by the misrepresentation

### The claimant must have been influenced by the misrepresentation[176]

### 17-35

⚠ To entitle a claimant to succeed in an action in deceit, he must show that he[177] acted (or in a suitable case refrained from acting[178]) in reliance on the defendant's misrepresentation.[179] ⚠ If he would have done the same thing even in the absence of it, he will fail.[180] What is relevant here is what the claimant would have done had no representation at all been made. In particular, if the making of the representation in fact influenced the claimant, it is not open to the defendant[181] to argue that the claimant might have acted in the same way had the representation been true.[182] It seems clear that the claimant must have acted himself to his detriment. If his loss results, not from his own reliance, but from that of third parties, the defendant may be liable for torts of unlawful interference with trade,[183] passing off or malicious falsehood, or even negligence[184]; but he will not be liable in deceit.[185]

### Joint inducement suffices

### 17-36

Although the claimant must show that he was induced to act as he did by the misrepresentation, it need not have been the sole cause. Provided it substantially contributed to deceiving him, that will be enough.[186] If the claimant's mind was partly influenced by the defendant's misstatements the defendant will not be any the less liable because the claimant was also partly influenced by a mistake of his own.[187] In such cases, moreover, the claimant has the benefit of a presumption that he was influenced at least to some extent by the deceptive statement.[188]

### 17-37

This is particularly significant where a claim is paid or settled, often for commercial reasons, despite suspicions that it might be fraudulent. Thus in *Hayward v Zurich Insurance Co Plc*[189] insurers were held able to rescind a personal injury settlement for fraud (and potentially recoup any payments made) even though they had suspected deceit all along.[190] But the limits of this must be noted. It has been held that if the claimant not only suspects, but actually knows, that what he hears is false, this pre-empts the matter. Here he cannot sue, for the simple reason that he was never taken in and hence cannot have been induced.[191]

### Ambiguity

### 17-38

An ambiguous statement, true in one sense but not in another, may be fraudulent if intended to be read in its untrue connotation.[192] Nevertheless, in such a case the claimant must of course show that he acted upon it in the sense in which it is false. In *Arkwright v Newbold*,[193] Cotton LJ said:

> "In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement, according to the construction put on it by the court, is false, when the plaintiff does not venture to swear that he understood the statement in the sense which the court puts on it."

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

## Carelessness of claimant in not discovering the untruth no defence

### 17-39

A person to whom a misrepresentation is made is not deceived if he actually knows the truth.[194] But it is no answer to an action for deceit that the claimant might have discovered the falsity by the exercise of ordinary care: it does not lie in the mouth of a liar to argue that the claimant was foolish to take him at his word.[195] Thus, where a vendor of a public house was sued in deceit for misrepresenting the takings of the business, it was held to be no defence that the vendor's books were in the house at the time and would have disclosed the truth had the claimant chosen to look at them.[196] Nor can the representor escape liability on the ground that knowledge of the truth must be imputed to the representee; as, for example where the representee's agent knew the true facts.[197]

## Reliance and materiality

### 17-40

Since the reasonableness of the claimant's reliance is not relevant to liability in deceit, it is submitted that it equally follows that the materiality or otherwise of the defendant's statement is out of account. All that is required is reliance: once this is shown the fraudulent defendant should not be permitted to argue that what he said would not have induced a reasonable person to so act.[198]

---

176. This formulation of the law was specifically approved by Lord Clarke in *Hayward v Zurich Insurance Co Plc [2016] UKSC 48; [2017] A.C. 142* at [26].

177. Or a machine, such as a computer, under his control: see *Renault UK Ltd v Fleetpro Technical Services [2007] EWHC 2541 (QB); [2008] Bus. L.R. D17* at [122] (defendants causing to be inserted into computer orders for cars with a fleet discount to which they knew they were not entitled).

178. An example of inaction as reliance can be seen in *McBride v Christie's Australia Pty Ltd [2014] NSWSC 1729* (fraud by auctioneer after sale, with the result that the buyer did not take steps, as he was entitled to do, to annul the transaction: held, deceit lay).

179. ⚠️ See, e.g. *Holmes v Jones (1907) 4 C.L.R. 1692*; see too *Zagora Management Ltd v Zurich Insurance Plc [2019] EWHC 140 (TCC); (2019) 182 Con. L.R. 180*. The statement in this paragraph was approved by Lewison J in *Mellor v Partridge [2013] EWCA Civ 477* at [20]. In *Marme Inversiones 2007 SL v Natwest Markets Plc [2019] EWHC 366 (Comm)* at [286] Picken J said, obiter, that a showing of reliance required proof that the representee had "given some contemporaneous conscious thought to the fact that some representations were being impliedly made". In *Leeds City Council v Barclays Bank Plc [2021] EWHC 363 (Comm)* Cockerill J accepted this as correct and struck out a claim to rescind a loan contract, and to claim damages for deceit, on the basis of an implied representation by the lenders that no dishonest manipulation of LIBOR had taken place. In the absence of any awareness that a representation had been made, the claim had to fail. Although this was a very carefully-crafted judgment from a commercial judge deserving of the greatest respect, such a requirement seems problematical, if only because it is difficult to reconcile with cases such as *Schneider v Heath (1813) 3 Camp. 506*; and *Gordon v Selico Ltd (1986) 18 H.L.R. 219*, where liability in deceit arose from acts intended precisely to hide the fact that any representation was being made. It is submitted that the point should be regarded as remaining open.

180. e.g. *Smith v Chadwick (1883–84) 9 App. Cas. 187*; *Nash v Calthorpe [1905] 2 Ch. 237* (company prospectus cases: claimants failed to prove reliance); *Francis v Knapper [2016] EWHC 3093 (QB)* (sale of holiday park: buyer would have purchased anyway).

181. Oddly enough, it seems that there is nothing to prevent the claimant advancing as evidence of reliance an argument that he would have acted differently had the representation been true: see *Parabola Investments Ltd v Browallia CAL Ltd [2009] EWHC 901 (Comm); [2009] 2 All E.R. (Comm) 589* at [105], per Flaux J (accepted on appeal: *[2010] EWCA Civ 486; [2011] Q.B. 477*).

182. See *Downs v Chappell [1997] 1 W.L.R. 426* at 433; *Bank of Tokyo-Mitsubishi UFJ Ltd v Baskan Gida Sanayi VE Pazarlama AS [2009] EWHC 1276 (Ch); [2010] Bus. L.R. D1* at [1005]; *OMV Petrom SA v Glencore International AG [2016] EWCA Civ 778; [2017] 3 All E.R. 157* (Romanian state oil buyer deceived on an industrial scale with regard to what oil it was buying: nothing to the point, even if true, that it was so desperate for oil it would have bought in any case). Note, however, that the point was left studiedly open by Males J in *Leni Gas & Oil Investments Ltd v Malta Oil Pty Ltd [2014] EWHC 893 (Comm)* at [20].

183. In *National Phonograph Co v Edison-Bell [1908] 1 Ch. 335*, lies told to third parties in order to gain an economic advantage at the expense of the claimant were held to be unlawful means, though no action in deceit could have been brought by the third parties, who themselves were not harmed. *National Phonograph* has been accepted as correct on this point in *OBG Ltd v Allan [2007] UKHL 21; [2008] 1 A.C. 1* at [49].

The icon ⚠️ indicates a paragraph or footnote that contains consolidated text from the supplement.

184. cf. *Ministry of Housing v Sharp [1970] 2 Q.B. 223* (negligent statement by registrar to purchaser of house causing incumbrancer to lose charge).

185. See the Australian decision in *Larkins v Chelmer Holdings Ltd [1965] Qd. R. 68* (architect misrepresented that work not completed; money as a result withheld from builder; no action in deceit). See generally J. Murphy, "Misleading appearances in the tort of deceit" [2016] C.L.J. 301.

186. *Parabola Investments Ltd v Browallia CAL Ltd [2009] EWHC 901 (Comm); [2009] 2 All E.R. (Comm) 589* (unsuccessfully appealed on other grounds, *[2010] EWCA Civ 486; [2011] Q.B. 477*); *Leni Gas & Oil Investments Ltd v Malta Oil Pty Ltd [2014] EWHC 893* (Comm) at [16] (Males J). See too *Australian Steel & Mining Corp Pty Ltd v Corben [1974] 2 N.S.W.L.R. 202*; *Paul & Vincent v O'Reilly (1913) 49 Ir. L.T. 89*. cf. the negligent misrepresentation case of *JEB Fasteners Ltd v Marks Bloom & Co [1983] 1 All E.R. 583* at 589, per Stephenson LJ; *Khakshouri v Jimenez [2017] EWHC 3392 (QB)* at [20] (Green J); *BV Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises, Inc [2019] EWCA Civ 596; [2019] 3 W.L.R. 1113* at [26]–[43]; and the very significant compromise case of *Hayward v Zurich Insurance Co Plc [2016] UKSC 48; [2017] A.C. 142* referred to below.

187. See *Edgington v Fitzmaurice (1885) 29 Ch. 459* at 483, per Bowen LJ; also *Peek v Derry (1887) 37 Ch. D. 541*. cf. *Tatton v Wade (1856) 18 C.B. 371*.

188. See *Dadourian Group International Inc v Simms [2009] EWCA Civ 169; [2009] 1 Lloyd's Rep. 601* at [95]–[108]; following dicta in *Goose v Wilson Sandford & Co (No.2) [2001] Lloyd's Rep. P.N. 189* at 200–201; *OMV Petrom SA v Glencore International AG [2015] EWHC 666 (Comm)* at [133]–[158] (Flaux J); *Hayward v Zurich Insurance Co Plc [2016] UKSC 48; [2017] A.C. 142* at [36]. For a case where the presumption was held rebutted on the facts, see *Yukos Hydrocarbons Investments v Georgiades [2020] EWHC 173 (Comm)*.

189. *[2016] UKSC 48; [2017] A.C. 142*.

190. On the Hayward case see K. Lindeman, "Unravelling settlements made with 'eyes wide open'" (2017) 36 C.J.Q. 273; R. Lee, "Proof of Inducement in the Law on Misrepresentation" (2017) L.M.C.L.Q. 151; and E. Bant, "Unravelling Fraud in the Wake of Hayward v Zurich Insurance" [2019] L.M.C.L.Q. 91.

191. See *Holyoake v Candy [2017] EWHC 3397 (Ch)* especially at [386]–[395] (Nugee J).

192. See para.17-25.

193. *(1881) 17 Ch. D. 301* at 325.

194. *Renault UK Ltd v Fleetpro Technical Services [2007] EWHC 2541 (QB); [2008] Bus. L.R. D17* at [130]. Note, however, that the mere fact that some other agent of the claimant knew of the untruth will not negative liability: see ibid. at [124], following dicta of Scrutton J in *Wells v Smith [1914] 3 K.B. 722*.

195. See Lord Chelmsford in *Venezuela Central Ry v Kisch (1857) L.R. 2 H.L. 99* at 120; see also *Whyfe v Michael Cullen & Partners [1993] E.G.C.S. 193* and *Commission for the New Towns v Cooper (Great Britain) Ltd [1995] Ch. 259 CA* (party to a contract can be bound by its induced mistake). Nor is the Law Reform (Contributory Negligence) Act 1945 available here to reduce the damages: see para.17-52.

196. *Dobell v Stevens (1825) 3 B. & C. 623*; and see *Pilmore v Hood (1838) 5 Bing. N.C. 97*. cf. too the contract case of *Redgrave v Hurd (1881) 20 Ch. D. 1*; and *Buxton v Birches Time Share Resort Ltd [1991] 2 N.Z.L.R. 641 NZCA*.

197. *Wells v Smith [1914] 3 K.B. 722*. See, however, *Strover v Harrington [1988] Ch. 390*, where the agents were purchaser's solicitors who by implication had actual authority to receive all relevant information on their client's behalf. *Wells v Smith* was distinguished as a case where the claimant's agent himself was a party to the defendant's fraud. Sed quaere.

198. Compare the contract decision in *Museprime Properties Ltd v Adhill Properties Ltd (1990) 61 P. & C.R. 111*.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 3. - Damages[199]

## Proof of damage

### 17-41

Deceit is not actionable per se: damage, in other words, is of the gist of the action.[200] Moreover, it is up to the claimant to prove his loss.[201] Nevertheless, there is authority that where a claimant proves that he has been deceived into expending money the burden shifts to the defendant if he wishes to argue that the expenditure did not in fact amount to a loss to the claimant.[202]

## Types of loss recoverable

### 17-42

The damage recovered in deceit cases is normally pecuniary loss: but it may take the form of personal injury, loss of property, real inconvenience or discomfort, or substantial mental distress.[203]

## Measure of damages

### 17-43

The measure of damages in deceit is the loss directly flowing from the claimant's reliance on the defendant's statement[204]; that is, generally speaking, the sum that will put him in the same position as if he had not relied on it.[205] Credit must of course be given for any gains made by the claimant,[206] though to qualify for deduction such gains must be both tangible and relatively permanent.[207]

## Position if representation true irrelevant

### 17-44

⚠ Since the claimant's entitlement is to be put in the position he would have occupied had he not relied on the defendant's representation, it follows that no account is taken of what his position would have been had that representation been true.[208] ⚠ It follows that if the claimant is duped into buying an asset, he is generally entitled to recover the difference between the price paid and the market value of the property he received in exchange, and not the difference between the market value and the amount the defendant said the property was worth.[209] ⚠ Thus in *Doyle v Olby (Ironmongers) Ltd*,[210] ⚠ where the claimant was deceived into buying a run-down and infructuous business, an award of the latter sum was overturned by the Court of Appeal. Again, if the claimant is deceived into entering into a transaction by a statement as to the gains to be made from it, he can recover only the amount he loses as a result of relying on the representation and not the profit the defendant said he would make. So in *East v Maurer*,[211] ⚠ where the seller of a business fraudulently overstated the profits available, the Court of Appeal reversed a judgment at first instance awarding the buyer the amount of those extra profits.[212] ⚠ (Conversely, a seller deceived into delivering goods by a representation that payment is forthcoming recovers the entire market value of those goods without reference to the price).[213] ⚠

### 17-45

However, the loss flowing from reliance on the defendant's representation may, in an exceptional case, approximate to restoring his position had the statement been true. Thus in *BHP Billiton Petroleum Ltd v Dalmine SpA*[214] quality control employees of a subcontractor supplying pipes for an offshore oil project certified pipes as sound which they knew to be substandard. In due course the pipes leaked. The project owner sued the subcontractor in deceit. It was accepted that it was entitled to be put in the position it

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

would have occupied had the pipes in fact been up to standard: the reason being that, had the subcontractor's employees not mis-certified the pipes concerned, they would have been rejected and sound pipes supplied in their stead without further charge.

## Claims for would-be profits

### 17-46

Although the "reliance measure" outlined above precludes the recovery of stated profits as such, this does not necessarily mean that the claimant is limited to out-of-pocket losses, or that all claims reflecting lost profits are precluded. Suppose a claimant is deceived into entering into a transaction by a fraudulent statement as to the profits to be made, and can show in addition that if he had not relied on the defendant's statement he would have made some other gainful investment (or for that matter would have laid his money out at interest). In such a case it is clear that he can recover the would-be profits or interest, as the case may be, that he would have made from that other investment.[215] Indeed, an action may lie for deceit even in respect of a transaction which turned out highly gainful for the claimant, if by reason of the deceit he was prevented from investing his money elsewhere so as to turn an even greater profit.[216] It goes without saying that if the claimant's prospects of making those alternative profits would have depended on the hypothetical action of some third party, then recovery will be reckoned on the basis of the loss of a chance.[217]

## Timing

### 17-47

Prima facie damages in deceit are reckoned as at the time of reliance on the representation.[218] Thus where an asset is bought as a result of the defendant's fraud damages are generally the difference between price and value at the time of purchase,[219] without reference to the fact that the value has since risen[220] or fallen,[221] or that the ultimate profit made by a corporate buyer from a misdescribed commodity has not been appreciably reduced.[222] However, this is not a "strict and inflexible rule",[223] and on occasion some other date has been taken. First, where the claimant is effectively "locked in" to a transaction, or where, acting reasonably, he can only be expected to escape from it some time later, then damages will generally be reckoned as at that later time so as to allow the claimant to claim any extra losses suffered as a result.[224] Thus in *Doyle v Olby (Ironmongers) Ltd*,[225] a person tricked into buying a failing business recovered the difference between what he paid for it and the sum for which he later (and reasonably) disposed of it. Again, in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd*[226] stockjobbers were induced by fraud into buying a block of shares which later collapsed in value owing to a previously undiscovered fraud against the company. It was held by the House of Lords that they only had to credit the reduced amount they later received on resale: they could not have been expected to sell earlier. Put another way, it can be said that where the fraud still has an effect after discovery, so that the subsequent losses cannot be said to result from a positive decision of the claimant, those losses are recoverable.[227] Secondly, where an asset purchased by the claimant later drops in price as a result of the correction of a false market created by the defendant himself, then not surprisingly damages are reckoned by reference to the later, lower, price.[228] Where an asset is alleged to have been sold at an undervalue as a result of a deceit practised by the buyer, the starting-point is that the claimant recovers the market value of the asset less the price received: it has been said, however, that account should be taken in such a case of the fact that the asset might have been sold for less than its full value.[229]

## Causation

### 17-48

The claimant in deceit must, of course, show that his loss results from the defendant's misrepresentation[230] (though it should be noted that rules of causation are often manipulated in favour of deceit claimants[231]). The better position is that the claimant is not limited to such losses as are suffered in connection with the falsity of the representation, but can recover all losses directly resulting.[232] So if

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

a buyer is deceived into buying bonds which he then chooses to retain as a business decision, and those bonds later decline in value, he cannot recover in respect of the subsequent decline: this is due to his own commercial choice, not to the original deceit.[233] Similarly, while there is some authority that a defendant who deceives the claimant into entering a business transaction is liable without reference to whether the claimant might otherwise have invested his money in some other unprofitable scheme,[234] this attitude is difficult to defend. If the claimant can increase his recovery by showing he would have invested his money profitably, by parity of reasoning the defendant ought to be able to reduce his exposure by showing that, but for his deceit, the claimant would have lost it in any case.[235]

## Consequential losses

### 17-49

Damages in deceit are at large and in principle are available to compensate the claimant for all his damage, including consequential losses.[236] Any damage directly flowing from the fraudulent inducement may be recovered[237] unless it is caused by the claimant behaving completely without prudence or common sense.[238] Thus in *Hornal v Neuberger Products Ltd*[239] a buyer recovered for seven weeks' downtime on a machine tool he had been defrauded into buying; and in *Archer v Brown*,[240] a person swindled into paying for shares he never received recovered interest on the money borrowed to finance the transaction.[241] A person deceived into buying real estate recovered stamp duty paid and maintenance costs on the property he did not want[242]; and a claimant bankrupted as a result of being defrauded recovered for the associated losses.[243] There is equally no bar to recovery in respect of property damage or personal injury: thus in an old case the seller of a shotgun falsely stated to be sound was liable for injury suffered when it exploded,[244] and on a similar basis the deceitful vendor of a plague-infested cow was held liable to the buyer for the loss of his herd which the beast infected.[245] Non-pecuniary damage is, it seems, recoverable for matters such as distress[246] or inconvenience.[247]

## Remoteness

### 17-50

The claimant in deceit is entitled to recover all damage directly flowing from the defendant's tort.[248] In particular there is no requirement that the losses be foreseeable: "it does not lie in the mouth of the fraudulent person to say that they could not reasonably have been foreseen."[249] Thus it does not matter that the claimant's loss is increased by some entirely extraneous unanticipated event, such as a sudden downturn in the property market.[250] However, this does not mean that the claimant is under no duty to mitigate his loss in so far as he can reasonably do so. Thus the buyer of a business from a fraudulent seller is bound to extricate himself as soon as he reasonably can by selling it rather than allowing losses to accumulate further.[251]

## Aggravated and exemplary damages[252]

### 17-51

⚠ There is little doubt that aggravated damages may be awarded to compensate the claimant for injury to his feelings arising from a blatant or callous exercise in deceit.[253] As for exemplary damages, since the decision in *Kuddus v Chief Constable of Leicestershire*[254] they are clearly available in principle, at least where the deceit was by a public authority or was calculated to make a profit over and above any damages received,[255] and possibly even where it was not.[256] An instance where they were awarded on this basis was *Axa Insurance UK Plc v Financial Claims Solutions Ltd*,[257] ⚠ involving repeated fraudulent claims against motor insurers. The Court of Appeal awarded £20,000 against the company responsible, and an additional £20,000 against each of the moving spirits behind it.[258]

---

199.    G. Treitel, "Damages for Deceit" (1969) 32 M.L.R. 556; *A. Tettenborn et al., Law of Damages, paras 17.64–17.87*.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

200. See *Smith v Chadwick (1884) 9 App. Cas. 187* at 190, per Lord Blackburn; *Diamond v Bank of London & Montreal Ltd [1979] Q.B. 333* at 349, per Stephenson LJ.

201. *Renault UK Ltd v Fleetpro Technical Services Ltd [2007] EWHC 2541 (QB); [2008] Bus. L.R. D17* (car importers deceived into making price support payments to dealers by false statement that buyers entitled to fleet discount: but in the market conditions prevailing, no proof that cars could have been sold at list price anyway, so no loss suffered).

202. *Parallel Imports (Europe) Ltd v Radivan [2007] EWCA Civ 1373*.

203. See para.17-49.

204. "The defendant is bound to make reparation for all the actual damages directly flowing from the fraudulent inducement."—Lord Denning MR in *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158, 167*. See too *Clark v Urquhart [1930] A.C. 28, 67–68* (per Lord Atkin).

205. See *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158, 167* (Lord Denning MR); *GE Commercial Finance Ltd v Gee [2005] EWHC 2056 (QB); [2006] 1 Lloyd's Rep. 337* at [335], per Tugendhat J.

206. *Smith New Court Securities Ltd v Citibank NA [1997] A.C. 254* at 267, per Lord Browne-Wilkinson. See, e.g. *Komerçni Banka AS v Stone & Rolls Ltd [2002] EWHC 2263 (Comm); [2003] 1 Lloyd's Rep. 383* (bank deceived into paying out on fraudulent letter of credit: credit for fee received for issuing it). The defendant bears the burden of proving such benefits: *Midco Holdings Ltd v Piper [2004] EWCA Civ 476; [2004] N.P.C. 59*; and *Barker v Winter [2018] EWHC 1785 (QB)* at [28].

207. *Barker v Winter [2018] EWHC 1785 (QB)* at [28] (munificent transfers of money obtained from besotted lover: no credit for sensual pleasures of lavish lifestyle derived partly from monies given). In *Burki v Seventy Thirty Ltd [2018] EWHC 2151 (QB)* at [174]–[175] a court went further and suggested that no credit fell to be given for the value of services received: thus a claimant duped into paying for computer dating services recovered her entire membership fee without reference to what she got in return. It is suggested, however, that this must be limited to cases where what was supplied was of little or no value to the claimant. If A dupes B into buying, say, electricity from him at more than the going rate for a year, is it really open to B to sue A for all his money back and get, in effect, a year's free power? One hopes not.

208. ⚠️ See, e.g. *McConnell v Wright [1903] 1 Ch. 546, 554* (Collins MR); *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158, 166* (Lord Denning MR); *East v Maurer [1991] 1 W.L.R. 461, 465* (Beldam LJ); *Smith New Court Securities Ltd v Citibank NA [1997] A.C. 254, 281–282* (Lord Steyn); *Inter Export LLC v Townley [2017] EWHC 530 (Ch)* at [6]–[8] (Proudman J)(upheld on appeal at *[2018] EWCA Civ 2068*). But cf. the suggestion in *Tuke v Hood [2020] EWHC 2843 (Comm)* at [261]–[263], that the court can have regard to whether the claimant would have entered into the same transaction on different terms had the particular misrepresentation not been made. This, it is suggested, is somewhat tendentious. The position in many American jurisdictions is different: e.g. *Midwest Home Distributor, Inc v Domco Industries, Ltd, 585 NW.2d 735* at 738–742 (Iowa 1998).

209. ⚠️ Thus if a defendant fraudulently says the asset is worth £120 when it is in fact worth £90, and the claimant buys it for £110, damages in deceit are £20 and not £30. For statements of this principle, see, e.g. *Pearson v Wheeler (1825) Ry. & M. 303* at 304; *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158* at 166, per Lord Denning MR; *Saunders v Edwards [1987] 1 W.L.R. 1116* at 1121, per Kerr LJ; *Smith New Court Securities Ltd v Citibank NA [1997] A.C. 254* at 281–282, per Lord Steyn. It is suggested that the market value is the price at which the buyer could have sold the goods: cf. *Tuke v Hood [2020] EWHC 2843 (Comm)* at [388].

210. ⚠️ *[1969] 2 Q.B. 158*.

211. ⚠️ *[1991] 1 W.L.R. 461*. See too the negligence case of *Swingcastle Ltd v Alastair Gibson [1991] 2 A.C. 223* (valuers misvalue property for mortgagees: mortgagors insolvent: no recovery for interest that mortgagors should have paid and which would have been recoupable from property if valuation correct).

212. ⚠️ Though it did award the claimant the profits she would have made had she bought another similar business.

213. ⚠️ *Inter Export LLC v Townley [2018] EWCA Civ 2068*, esp. at [58]–[68]; upholding the earlier *Smith Kline & French Laboratories Ltd v Long [1989] 1 W.L.R. 1*.

214. *[2003] EWCA Civ 170; [2003] B.L.R. 271*.

215. See, e.g. *East v Maurer [1991] 1 W.L.R. 461* (purchaser duped into buying business by overstated profits: recovers profits she would have made from alternative business she would have bought); *Parabola Investments Ltd v Browallia Cal Ltd [2010] EWCA Civ 486; [2011] Q.B. 477*. See too *Clef Aquitaine SàrL v Laporte Minerals (Barrow) Ltd [2001] Q.B. 488*; and *4Eng Ltd v Harper [2008] EWHC 915 (Ch); [2009] Ch. 91* (fraudster's victim can claim in respect of chance that he would have made other, highly profitable, investment of money he was swindled out of) (commented on in C. Mitchell, "Loss of chance in deceit" (2009) 125 L.Q.R. 12).

216. See *Clef Aquitaine SarL v Laporte Minerals (Barrow) Ltd [2001] Q.B. 488* (misrepresentation to proposed distributor about prices that he could sell products for: distributorship in fact profitable, but damages for loss of opportunity to negotiate lower prices from manufacturer and make a bigger profit).

The icon ⚠️ indicates a paragraph or footnote that contains consolidated text from the supplement.

217. See *Parabola Investments Ltd v Browallia Cal Ltd [2010] EWCA Civ 486; [2011] Q.B. 477* at [23] (on the basis of the decision in *Allied Maples Group Ltd v Simmons & Simmons [1995] 1 W.L.R. 1602*).

218. See the old cases on buyers of shares misled by optimistic prospectuses, where the claimant was invariably awarded the difference between price and value at the time of purchase: e.g. *Twycross v Grant (1877) 2 C.P.D. 469*; *Peek v Derry (1887) 37 Ch. D. 541* (reversed on other grounds: see *Derry v Peek (1889) 14 App. Cas. 337*); *McConnell v Wright [1903] 1 Ch. 546*. That this was the prima facie measure of damages in deceit was confirmed by Lord Browne-Wilkinson in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254, 267*; and in *Butler-Creagh v Hersham [2011] EWHC 2525 (QB)*. The same goes where the seller complains of a deceit by the buyer causing a sale at an undervalue: *Vald. Nielsen Holding A/S, Newwatch Ltd v Baldorino [2019] EWHC 1926 (Comm)* at [484]–[488].

219. See the cases referred to in the previous note; also *Waddell v Blockey (1879) 4 Q.B.D. 678*; and *Saunders v Edwards [1987] 1 W.L.R. 1116*, a case concerning the purchase of a flat, where the Court of Appeal held that the correct date for the quantification of the claimant's loss was the completion date, that being the date of actual loss.

220. See, e.g. *Great Future International Ltd v Sealand Housing Corp [2002] EWHC 2454 (Ch); The Times, 17 December 2002* (claimant deceived into buying shares: shares rose in value after purchase: no account of later rise in determining damages); *Butler-Creagh v Hersham [2011] EWHC 2525 (QB)* (same with regard to real estate).

221. *Waddell v Blockley (1879) 4 Q.B.D. 678*. See too the example given by Cockburn CJ in *Twycross v Grant (1877) 2 C.P.D. 469* at 544-545: if D dupes C into buying a racehorse which later dies from some unconnected cause, C must credit the value of the horse on purchase and cannot claim the whole price paid and since wasted.

222. *OMV Petrom SA v Glencore International AG [2016] EWCA Civ 778; [2017] 3 All E.R. 157* (misstatement as to technical grade, and hence value, of crude oil supplied: not open to defendant to argue that oil actually supplied was nearly as good for buyer's purposes of refining and onsale).

223. *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254* at 267, per Lord Browne-Wilkinson.

224. See *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254* at 266, per Lord Browne-Wilkinson; *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158*. But it does not seem that the defendant can use this as a means of reducing his liability: see *Great Future International Ltd v Sealand Housing Corp [2002] EWHC 2454 (Ch); The Times, 17 December 2002*, referred to above.

225. *[1969] 2 Q.B. 158*. See too *Downs v Chappell [1997] 1 W.L.R. 426* (a similar case); and *Standard Chartered Bank v Pakistan National Shipping Corp (Assessment of Damages) [2001] EWCA Civ 55; [2001] 1 All E.R. (Comm) 822* (buyers deceived by false bills of lading into accepting substandard bitumen: damages reckoned on later resale price).

226. *[1997] A.C. 254*.

227. *Parabola Investments Ltd v Browallia Cal Ltd [2010] EWCA Civ 486; [2011] Q.B. 477* at [32] onwards. See also *Khakshouri v Jimenez [2017] EWHC 3392 (QB)*.

228. See *Broome v Speak [1903] 1 Ch. 856* (affirmed *Shepheard v Broome [1904] A.C. 342*); *McConnell v Wright [1903] 1 Ch. 546* (both misleading prospectus cases).

229. *Vald. Nielsen Holding A/S, Newwatch Ltd v Baldorino [2019] EWHC 1926 (Comm)* at [544]–[567] (Jacobs J). Sed quaere. It is arguable that such matters should be out of account. If an owner is deceived into selling an asset at an undervalue, should it be open to the defendant to argue that but for his fraud the claimant might have given away the asset to someone else?

230. In a suitable case it was accepted in *4 Eng Ltd v Harper [2008] EWHC 915 (Ch); [2009] Ch. 91* that damages could be recovered for loss of a chance.

231. As admitted by Lord Hoffmann in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254*: see at 280, 285.

232. See the Australian decision in *Copping v ANZ McCaughan Ltd (1997) 67 S.A.S.R. 525, 539*. The apparent contrary suggestion in *Glossop Cartons & Print Ltd v Contact (Print & Packaging) Ltd [2019] EWHC 2314 (Ch)* at [103] that losses due to ordinary commercial risks run by the buyer of property formed an exception to recovery seems, with respect, doubtful.

233. *Waddell v Blockley (1879) 4 Q.B.D. 678*. But if the choice is affected by the misrepresentation, or his choice is constrained by good business reasons, he will recover his whole loss: *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254*.

234. See *Slough Estates Ltd v Welwyn-Hatfield DC [1996] 2 P.L.R. 50* (following dicta by Lord Steyn in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254, 281*), the court declined to follow the contrary decision in *Downs v Chappell [1997] 1 W.L.R. 426* on this point).

235. See *Downs v Chappell [1997] 1 W.L.R. 426*, above; *Yam Seng Pte Ltd v International Trade Corp Ltd [2013] EWHC 111 (QB); [2013] 1 Lloyd's Rep. 526* at [209]–[217] (Leggatt J).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

236. *St Paul Travelers Insurance Co Ltd v Okporuah [2006] EWHC 2107 (Ch)* (would-be buyer of house tells lies to lender as part of mortgage fraud in collaboration with seller: lender's loss later increased when, after loan drawdown, seller fails to give title to house at all: buyer liable for full loss to lender); *Greenridge Luton One Ltd v Kempton Investments Ltd [2016] EWHC 91 (Ch)* (even though contract induced by fraud rescinded before performance, recovery of expenses incurred in and about it). See too *Cemp Properties (UK) Ltd v Dentsply Research and Development Corp [1991] 34 E.G. 62.*

237. An instructive example is *Nationwide Building Society v Dunlop Haywards (DHL) Ltd [2009] EWHC 254 (Comm); [2010] 1 W.L.R. 258* (victim of large mortgage fraud recovered not only net advance, but also would-be interest on the sums lost; managerial and staff time spent in investigation; loss of business and extra borrowing costs caused by the claimants' loss of creditworthiness when the fraud was publicised; the cost of maintaining increased reserves demanded by the regulator; and extra interest that had to be offered to nervous investors). The costs of investigating fraud and fraudster were also recovered in *4Eng Ltd v Harper [2008] EWHC 915 (Ch); [2009] Ch. 91*; and in *Mellor v Partridge [2013] EWCA Civ 477* (see especially at [45]).

238. *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158*; *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd [1997] A.C. 191*; *Royscot Trust Ltd v Rogerson [1991] 2 Q.B. 297.* cf. *NZ Refrigerating Co Ltd v Scott [1969] N.Z.L.R. 30.*

239. *[1957] 1 Q.B. 247.*

240. *[1985] Q.B. 401.*

241. See too *KBC Bank v Industrial Steels (UK) Ltd [2001] 1 Lloyd's Rep. 370* (knowing presentation of false documents to bank under letter of credit: presenter liable inter alia for cost of litigation brought by bank against other banks in the chain before it discovered the falsity).

242. *Butler-Creagh v Hersham [2011] EWHC 2525 (QB).*

243. *Kinch v Rosling [2009] EWHC 286 (QB).*

244. *Langridge v Levy (1837) 2 M. & W. 519; 4 M. & W. 337.* See too *Burrows v Rhodes [1899] 1 Q.B. 816*; *Banks v Cox [2002] EWHC 2166 (QB)* (buyer swindled into buying unprofitable nursing-home recovers for depressive illness caused thereby).

245. *Mullett v Mason (1866) L.R. 1 C. & P. 559.* So also with damage to the thing fraudulently sold: see *Nicholls v Taylor [1939] V.L.R. 119* (car damaged when tyre fraudulently misrepresented as new burst).

246. £500 was given for distress in *Saunders v Edwards [1987] 1 W.L.R. 1116*; and also in *Shelley v Paddock [1979] Q.B. 120 (affirmed [1980] Q.B. 348)*; and again in *Burki v Seventy Thirty Ltd [2018] EWHC 2151 (QB)* (lovelorn lady duped into joining computer dating club: see esp. at [175]–[181]). See too *Shaw v Sequence (UK) Ltd [2004] EWHC 3249 (QB); [2004] All E.R. (D) 232 (Nov)* (annoyance of clients deceived by their estate agent: £1,000 basic award plus £1,500 aggravated damages); *Kinch v Rosling [2009] EWHC 286 (QB)* (£10,000 for distress of victim bankrupted owing to fraud); and the colourful Canadian decision in *Beaulne v Ricketts (1979) 96 D.L.R. (3d) 550* (claimant deceived into bigamous marriage). But one Canadian decision goes the other way: in *PP v DD [2017] ONCA 180; (2017) 409 D.L.R. (4th) 69* a boyfriend failed to recover for distress at his girlfriend's falling pregnant following false statements as to her use of contraceptives.

247. *Mafo v Adams [1970] 1 Q.B. 548* (loss of benefit of a regulated tenancy).

248. See *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158* at 168, per Winn LJ; *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254* at 284, per Lord Steyn. See para.17-49.

249. *Doyle v Olby (Ironmongers) Ltd [1969] 2 Q.B. 158, 167* (per Lord Denning MR). See too *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254, 264–267* (Lord Browne-Wilkinson), 281 (Lord Steyn); *Nationwide Building Society v Dunlop Haywards (DHL) Ltd [2009] EWHC 254 (Comm); [2010] 1 W.L.R. 258* at [12].

250. *Slough Estates Ltd v Welwyn-Hatfield DC [1996] 2 P.L.R. 50* (claimant bought into commercial development: defendant liable for increased loss due to property meltdown).

251. *Downs v Chappell [1997] 1 W.L.R. 426* (duped buyer of business only recovered losses up to time he ought to have sold on); see too *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd [1997] A.C. 254* at 266, per Lord Browne-Wilkinson.

252. See generally para.27-134 onwards.

253. *Archer v Brown [1985] Q.B. 401.* See also *Mafo v Adams [1970] 1 Q.B. 548* at 558; *Saunders v Edwards [1987] 1 W.L.R. 1116*; *Shaw v Sequence (UK) Ltd [2004] EWHC 3249 (QB); [2004] All E.R. (D) 232 (Nov)* (deceit by estate agent: damages of £1,000 for vexation increased to £2,500 for over-contentious attitude and non-apology). In *Barker v Winter [2018] EWHC 1785 (QB)* at [28], where a lover duped his partner out of large sums, aggravated damages were refused because the lover suffered from a condition making him pathologically addicted to obtaining and spending money. Sed quaere. With respect this seems remarkably generous to the defendant, and more appropriate to criminal than civil proceedings.

254. *[2001] UKHL 29; [2002] 2 A.C. 122*: see para.27-143.

255. i.e. Lord Devlin's categories in *Rookes v Barnard [1964] A.C. 1129*; see para.27-136 onwards. For an example of an award of punitive damages for a deceit aimed at profit, see *Hassan v Cooper [2015] EWHC 540 (QB); [2015] R.T.R. 26* (attempt to

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

make a fraudulent claim arising out of a genuine car accident: award against the claims agents responsible related to the amount which they had attempted to extract from the defendant's insurers; smaller award against individual claimant).

256. Lord Nicholls in *Kuddus v Chief Constable of Leicestershire [2001] UKHL 29; [2002] 2 A.C. 122* at [66] doubted whether the "type of action" limitations that had previously constrained exemplary damages claims continued to survive. It remains to be seen whether this suggestion is followed.

257. ⚠️ *[2018] EWCA Civ 1330; [2019] R.T.R. 1*. This was approved by Jacobs J in *Tuke v Hood [2020] EWHC 2843 (Comm)* at [186]–[191].

258. The requirement that the tort be committed with a view to gains outstripping losses the court held satisfied, perhaps surprisingly, by the fact that the defendants had hoped—vainly—not to be caught and hence to keep their gains for themselves. Although this proposition can pray in aid a dictum of Lord Hailsham in *Broome v Cassell [1972] A.C. 1027, 1079* ("It is not necessary that the defendant calculates that the plaintiff's damages if he sues to judgment will be smaller than the defendant's profit"), it is nevertheless potentially far-reaching in that it opens up the prospect of an award of punitive damages in the case of almost any deliberate tort committed in the hope of lucre.

The icon ⚠️ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 4. - Defences

### Contributory negligence and deceit

### 17-52

It is now clear that damages for deceit, which were never subject to any defence of contributory negligence at common law,[259] equally cannot be reduced under the Law Reform (Contributory Negligence) Act 1945.[260]

### Exclusion of liability by contract or notice

### 17-53

It is now clear that at common law a person cannot as a matter of public policy rely on a contract or notice to exclude liability for his own fraud.[261] But this absolute prohibition, it seems, applies only where the person seeking to protect is himself complicit in the fraudulent conduct. Thus there is no objection on principle to a suitably-worded clause excluding liability in respect of the fraud of an agent or employee for whose acts a person would otherwise be liable.[262] On the other hand, such a clause is, of course, subject to the usual statutory limitations on exemption clauses.[263] Furthermore, there is a very strong presumption that exception clauses do not cover fraud,[264] and very specific wording is likely to be required in order to overcome it.[265]

### Public policy defences to deceit liability

### 17-54

Public policy usually demands that nobody be permitted to found an action on an illegal act.[266] So if the claimant suffers loss as a result of dealings with the defendant which are intrinsically illegal, he will not normally be able to recover damages for that loss even though his loss resulted from fraudulent misrepresentations made by the defendant.[267] However, as this is an issue of public policy, the nature and true quality of the illegality are important.[268] The mere fact that the deceit arose in connection with a contract itself unenforceable for illegality will not suffice.[269] Thus in *Saunders v Edwards*,[270] an action for fraudulent misrepresentation concerning the sale of a flat, it was established that both purchaser and vendor had grossly inflated the price of the fixtures to reduce the incidence of stamp duty. However, as the claimant purchaser was not seeking to sue on the contract,[271] the court allowed him to sue in deceit,[272] the claimant having an "unassailable" claim for damages.[273] In order to make out a defence based on public policy, the defendant must establish that the claimant's conduct is so clearly reprehensible as to justify its condemnation by the court and that the conduct is so much part of the claim against the defendant as to justify refusing any remedy to the claimant.[274] This can be difficult to show.[275] Thus in *Standard Chartered Bank Plc v Pakistan National Shipping Corp (No.2)*[276] a confirming bank induced to pay a letter of credit by presentation of falsified bills of lading successfully claimed from the presenters despite the fact that it had itself presented the documents to the issuing bank at a time when it knew the credit was stale.

---

259.    See Mummery J's analysis of the common law position in *Alliance & Leicester Building Society v Edgestop Ltd [1993] 1 W.L.R. 1462* at 1474.

260.    The point was put beyond doubt in *Standard Chartered Bank v Pakistan National Shipping Corp (Nos 2 and 4) [2002] UKHL 43; [2003] 1 A.C. 959*. See too the earlier decisions in *Alliance & Leicester Building Society v Edgestop Ltd [1993] 1 W.L.R.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

*1462*; and *Corporación Nacional del Cobre de Chile v Sogemin Metals Ltd [1997] 1 W.L.R. 1396.* The exclusion of contributory negligence as a partial defence is criticised in J. Murphy, "Misleading appearances in the tort of deceit" [2016] C.L.J. 301.

261. "There is no doubt that a party cannot contract that he shall not be liable for his own fraud."—Lord Hoffmann in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank [2003] UKHL 6; [2003] 2 Lloyd's Rep. 61* at [76]. See too Lord Bingham at [16]; also *Pearson & Son Ltd v Dublin Corp [1907] A.C. 351* at 353–354, per Lord Loreburn; at 356, per Lord Halsbury. Equally ineffective in this respect is an entire agreement clause (*Bonhams 1793 Ltd v Cavazzoni [2014] EWHC 682 (QB)* at [11] (Cooke J); following *FoodCo UK LLP v Henry Boot Developments Ltd [2010] EWHC 358*), a non-reliance clause (*Property Alliance Group Ltd v Royal Bank of Scotland Plc [2016] EWHC 3342 (Ch)* at [230]–[231] (Asplin J) (affirmed without reference to the point at *[2018] EWCA Civ 355; [2018] 1 W.L.R. 3529*), or a statement that information in fact known to be false is being transmitted by the defendant merely as the mouthpiece of another (*Francis v Knapper [2016] EWHC 3093 (QB)* at [16]–[20] (Andrew Baker J)).

262. See the judgment of the Court of Appeal in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank [2001] EWCA Civ 1250; [2001] 2 Lloyd's Rep. 483* at [109]. The House of Lords left the point open (*[2003] UKHL 6; [2003] 2 Lloyd's Rep. 61*), though Lord Scott seemingly agreed with the Court of Appeal (*[2003] UKHL 6* at [122]). In *Frans Maas (UK) Ltd v Samsung Electronics (UK) Ltd [2004] EWHC 1502 (Comm); [2004] 2 Lloyd's Rep. 251* Gross J was prepared to uphold a clause protecting an employer from liability for dishonest conduct by his employees; although that case involved theft, by parity of reasoning the principle presumably applies to deceit too.

263. In particular the Misrepresentation Act 1967 s.3; the Unfair Contract Terms Act 1977; and the Consumer Rights Act 2015.

264. They were held not to do so in *Pearson & Son Ltd v Dublin Corp [1907] A.C. 351*; and *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank [2003] UKHL 6; [2003] 2 Lloyd's Rep. 61*.

265. "[I]t is in my opinion plain beyond argument that if a party to a written contract seeks to exclude the ordinary consequences of fraudulent or dishonest misrepresentation or deceit by his agent, acting as such, inducing the making of the contract, such intention must be expressed in clear and unmistakable terms on the face of the contract."—Lord Bingham in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank [2003] UKHL 6; [2003] 2 Lloyd's Rep. 61* at [16].

266. *Holman v Johnson (1775) 1 Cowp. 341* at 343; *Thackwell v Barclays Bank [1986] 1 All E.R. 676.*

267. The text here was approved by Gross J in *Colin Buchanan & Partners Ltd v Marcus de Berg [2003] EWHC 839 (QB)* at [112] (where, however, the defence was not made out on the facts).

268. See generally *Patel v Mirza [2016] UKSC 42; [2017] A.C. 467.*

269. e.g. *Dott v Brickwell (1906) 23 T.L.R. 61* (unlicensed moneylender could not sue for repayment of loan but could sue borrower in fraud for deceiving him into lending). See too *The Siben (No.2) [1996] 1 Lloyd's Rep. 35.*

270. *[1987] 1 W.L.R. 1116.*

271. Whether he could have done so was left open by Kerr LJ: see *[1987] 1 W.L.R. 116* at 125.

272. The vendor had lied that the flat he was selling included a roof terrace. A fortiori, when a claimant is fraudulently induced to enter into an illegal transaction by the defendants, and is unaware of the illegal nature of the transaction: *Shelley v Paddock [1980] Q.B. 348*; see also *Dott v Brickwell (1906) 23 T.L.R. 61.*

273. See the discussion of *Saunders v Edwards* by Lord Goff in *Tinsley v Milligan [1994] 1 A.C. 340* at 360. In that case, Lord Browne-Wilkinson and Lord Goff disapproved of the "public conscience" test formulated in *Saunders* (whereby the court would have regard to the extent to which the public conscience would be affronted by recognising rights acquired by illegal transactions) but thought the actual decision to be correct.

274. See the judgment of Cresswell J in *Standard Chartered Bank v Pakistan National Shipping Corp (No.2) [1998] 1 Lloyd's Rep. 684* at 705–6, upheld by Evans LJ on appeal as summarising the law "impeccably" (see *[2000] 1 Lloyd's Rep. 218* at 226).

275. Indeed, it seems that in no English case has the ex turpi causa defence been successfully raised in an action for deceit.

276. *[2000] 1 Lloyd's Rep. 218 (appealed on other grounds: [2002] UKHL 43; [2003] 1 A.C. 959).*

The icon 🔔 indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement
## Chapter 17 - Deceit
## Section 5. - Misrepresentation as to Credit of Third Persons

### The Statute of Frauds Amendment Act 1828

### 17-55

Under s.6 of the Statute of Frauds Amendment Act 1828[277]:

> "No action shall be brought whereby to charge any person upon or by reason of any representation or assurance made or given concerning or relating to the character, conduct, credit, ability, trade, or dealings of any other person, to the intent or purpose that such other person may obtain credit, money, or goods upon, unless such representation or assurance be made in writing, signed by the party to be charged therewith."

Despite the generality of its wording, it has been held that the Act applies to fraudulent misrepresentations only, and not to actions in contract[278] or for negligent misrepresentation.[279]

### 17-56

A representation as to credit is essentially one which relates to the ability of a person effectually to perform and satisfy the engagement of a pecuniary nature into which he has proposed to enter and upon the faith of which he is to obtain money, credit or goods.[280] A bank's assurance that brokers offering to sell sugar were respectable and reliable has been held to come within the Act in as far as it concerned the reliability of the brokers, but not otherwise[281]; similarly, a statement by a bank to a person requested to sign accommodation bills that the person primarily liable is fit to be accommodated is also covered.[282] However, the limits of the section, which tends to be narrowly construed,[283] must be noted. It only applies to cases where the subject of the representation seeks to obtain actual money or goods on credit: the obtaining of credit in abstracto, for example by postponing the calling-in of an existing debt, is not enough.[284] Again, it is doubtful whether it extends beyond representations as to the debtor's own creditworthiness so as to cover, for example, statements about his financial or managerial competence,[285] or about the value of property to be offered by him as security for a loan.[286] Where the representor is an individual, it has been held that the signature must be that of the defendant personally[287] in order to satisfy the Act: his agent's signature, even if authorised, will not suffice.[288] As regards companies, however, the position is different. Despite some earlier authority to the contrary,[289] the Court of Appeal in *UBAF Ltd v European American Banking Corp*[290] has made it clear that the signature of any duly authorised agent of the company satisfies the requirements of the 1828 Act.

---

277.  Alternatively known as Lord Tenterden's Act. For a useful analysis, see T. Henderson, "Section 6 of Lord Tenterden's Act: the unexpected shield against fraud" (2016) 11 J.I.B.F.L. 667.

278.  *Banbury v Bank of Montreal [1918] A.C. 626*.

279.  *WB Anderson & Sons Ltd v Rhodes (Liverpool) Ltd [1967] 2 All E.R. 850; [1967] C.L.J. 155*. But the Court of Appeal in *UBAF Ltd v European American Banking Corp [1984] Q.B. 713* accepted that s.6 of the 1828 Act did apply to a claim brought under s.2(1) of the Misrepresentation Act 1967.

280.  See *Lyde v Barnard (1836) 1 M & W. 101* at 119, per Lord Abinger. The deceit involved in ordering goods on credit on behalf of someone known to be insolvent is within the Act: see *Contex Drouzhba Ltd v Wiseman [2007] EWCA Civ 1201; [2008] B.C.C. 301* (though there the requirement of writing was satisfied, the defendant having signed on behalf of the company).

281.  *Diamond v Bank of London & Montreal Ltd [1979] Q.B. 333*.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

282. *Clydesdale Bank Ltd v Paton [1896] A.C. 381* (decided under the Scottish equivalent of the 1828 Act s.6 of the Mercantile Law (Scotland) Amendment Act 1856).

283. For the obvious reason that, if held applicable, it provides an unattractive shield for undeserving fraudsters.

284. *Roder UK Ltd v West [2011] EWCA Civ 1126; [2012] Q.B. 752* (oral assurances by officers of company that debt would be paid in due course; no bar on deceit claim when debtor later collapsed).

285. *Lindsay v O'Loughnane [2010] EWHC 529 (QB); [2012] B.C.C. 153* (fraudulent statement by the controller of a company in difficulties that certain funds in fact misappropriated had been mislaid not within Act).

286. In *Lyde v Barnard (1836) 1 M. & W. 101* the Court of Exchequer divided equally on the issue (the case concerned false statements as to property offered as security by an embarrassed aristocratic borrower). But it is difficult to see such statements as concerning the "character, conduct, credit, ability, trade, or dealings" of the would-be debtor; and it is submitted that the better view is that they are not caught by the Act.

287. On emails in this context, see *Lindsay v O'Loughnane [2010] EWHC 529 (QB); [2012] B.C.C. 153* at [95] (Flaux J) (automatically-generated electronic signature suffices, as does signature typed by writer: but not mere presence of sender's name and details in header).

288. *Swift v Jewsbury (1874) L.R. 9 Q.B. 301.*

289. *Hirst v West Riding Union Banking Co [1901] 2 K.B. 560.*

290. *[1984] Q.B. 713.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement
## Chapter 17 - Deceit
## Section 6. - Statutory Liability for Misstatements in a Prospectus

### Company prospectuses: statutory liability of directors and others

### 17-57

The law governing compensation for false or misleading particulars contained in a company prospectus is now largely contained in the Financial Services and Markets Act 2000. Section 90(1) of that Act renders the persons responsible for any listing particulars liable to pay compensation to anyone who has acquired any of the securities in question and has suffered loss in respect of them as a result of any untrue or misleading statement in the particulars. It should be noted that the grounds on which this liability can arise cover negligent misstatements as well as deceitful ones, the burden of proof as to lack of negligence lying on the defendant.[291] It should also be noted that the remedies in the 2000 Act are cumulative with those existing at common law.[292]

---

291. Financial Services and Markets Act 2000 Sch.10 para.1.

292. Financial Services and Markets Act 2000 s.90(6).

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

# Clerk & Lindsell on Torts 23rd Ed.

## Consolidated Mainwork Incorporating First Supplement

## Chapter 17 - Deceit

## Section 7. - The Action for Fraud Arising out of Bribery

### Fraud and bribery

### 17-58

⚠️ When an agent is bribed to persuade his principal to enter into a transaction on terms disadvantageous to the latter, he may of course make himself liable in deceit: for example, if he untruthfully tells his principal that the terms are the best that can be obtained. But even if he does not, and merely deals on the principal's behalf, this event itself gives rise to a tortious liability[293] ⚠️ in both himself and the briber to the principal for loss suffered by the latter.[294] ⚠️ This head of claim is somewhat confusingly known as "fraud",[295] ⚠️ and shares some,[296] ⚠️ though not all,[297] ⚠️ of the elements of the tort of deceit.[298] ⚠️

### 17-59

The measure of damages under this head is the loss actually suffered by the principal.[299] There is a strong, though not conclusive,[300] presumption that the amount of the bribe represents a loss to the principal, on the pragmatic basis that he would otherwise have benefited from it by way of discount or otherwise.[301] In addition the principal can claim any further losses he may have suffered.[302] As with deceit properly so called, contributory negligence is no defence.[303] In addition to being liable in damages, both the errant agent and, it seems, the briber himself are liable to pay over the amount of the bribe to the principal[304] on the basis that they are regarded as having been unjustly enriched by the amount of it.[305] But the claims for damages and for recoupment of the amount of the bribe are alternative: the principal must elect which to exercise.[306]

---

293. ⚠️ There is a parallel compensatory claim in equity against the agent for breaking his fiduciary duty, and against the briber for helping him break it (see *Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 A.C. 378*). But in *Fyffes Group Ltd v Templeman [2000] 2 Lloyd's Rep. 643* at 660 Toulson J pointed out that the measure of damages was the same under either head (save possibly for the availability of compound interest in an equitable claim).

294. ⚠️ Examples are numerous. See, e.g. *Salford Corp v Lever [1891] 1 Q.B. 168 CA*; *Grant v Gold Exploration and Development Syndicate Ltd [1900] 1 Q.B. 233*; *Hovendon & Sons v Millhoff (1900) 83 L.T. 41*; *Arab Monetary Fund v Hashim [1993] 1 Lloyd's Rep. 543* (employer paid contractor the full amount due under a contract which was induced by a bribe paid to the employer's agent: employer entitled to recover amount of the bribe from contractor on the basis that contractor received a greater sum than what was the true price). The bribe need not, of course, be in the nature of an out-and-out or capital benefit: the provision of (for example) a leased car at less than full market cost equally suffices. See *Kings Security Systems Ltd v King [2021] EWHC 325 (Ch)*, esp at [150]–[154].

295. ⚠️ "Bribery is … a specialist variety of fraud": HH Judge Pelling in *Chancery Client Partners Ltd v MRC 957 Ltd [2016] EWHC 2142 (Ch); [2016] Lloyd's Rep. F.C. 578* at [23]. See too, for similar statements, *Conway v Prince Eze [2019] EWCA Civ 88* at [106]; and *Motortrak Ltd v FCA Australia Pty Ltd (No 2) [2018] EWHC 1464 (Comm)* at [15] (Moulder J). The benefit must come from a third party and must be a net benefit to the agent, though this is not normally hard to prove: see *Kings Security Systems Ltd v King [2021] EWHC 325 (Ch)* at [145]–[154] (car ostensibly leased for full market rental, but certain extra risks taken by provider: provision of car a bribe).

296. ⚠️ For example, the exacting standard of proof (see *Fyffes Group Ltd v Templeman [2000] 2 Lloyd's Rep. 643* at 656), and the inapplicability of contributory negligence (see below).

297. ⚠️ For example, an employer can be vicariously liable under this head even for an act that was not within his employee's actual or ostensible authority, thus marking off this head of liability from deceit proper.

298. ⚠️ "[T]he claim based on bribery is not a species of deceit but a special form of fraud where there is no representation made to the principal of the agent let alone reliance."—Steel J in *Petrotrade Inc v Smith [2000] 1 Lloyd's Rep. 486* at 490. For a

The icon ⚠️ indicates a paragraph or footnote that contains consolidated text from the supplement.

useful summary of the ingredients of the cause of action, see *Otkritie International Investment Management Ltd v Urumov [2014] EWHC 191 (Comm)* at [66]–[73] (Eder J). On the other hand, a dishonest agent may also commit deceit by lying to his principal, in which case he is liable in the ordinary way: see, e.g. *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd [1979] A.C. 374*; and *Daraydan Holdings Ltd v Solland International Ltd [2004] EWHC 622 (Ch); [2005] Ch. 119*.

299. See *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd [1979] A.C. 374* at 381. If none, for example if the attempt to bribe is unsuccessful, there is therefore no liability: *Chancery Client Partners Ltd v MRC 957 Ltd [2016] EWHC 2142 (Ch); [2016] Lloyd's Rep. F.C. 578*.

300. *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd [1979] A.C. 374* at 383, per Lord Diplock. The statements in *Novoship (UK) Ltd v Mikhaylyuk [2012] EWHC 3586 (Comm)* at [108]; and *Motortrak Ltd v FCA Australia Pty Ltd [2018] EWHC 990 (Comm)* at [134]–[136] that there is an "irrebuttable" presumption of loss in the amount of the bribe should, it is suggested, be taken with some scepticism.

301. *Industries & General Mortgage Co Ltd v Lewis [1949] 2 All E.R. 573*; *Petrotrade Inc v Smith [2000] 1 Lloyd's Rep. 486*; *Fyffes Group Ltd v Templeman [2000] 2 Lloyd's Rep. 643*.

302. For example, if he can show a specific way in which the agreement negotiated by the corrupt agent is less advantageous to him than a contract negotiated at arm's length. See, e.g. *Fyffes Group Ltd v Templeman [2000] 2 Lloyd's Rep. 643*.

303. *Corporación National del Cobre de Chile v Sogemin Metals Ltd [1997] 1 W.L.R. 1396*.

304. Agent: see, e.g. *Boston Deep Sea Fishing Co v Ansell (1888) 39 Ch. D. 339* and Briber: see *Fyffes Group Ltd v Templeman [2000] 2 Lloyd's Rep. 643*.

305. The agent because he should not have taken the bribe in the first place: the briber because he presumably gained at least to the extent of the bribe.

306. *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd [1979] A.C. 374*; see A. Tettenborn, "Bribery, Corruption and Restitution-The Strange Case of Mr Mahesan" (1979) 95 L.Q.R. 68; and C. Needham, "Recovering the Profits of Bribery" (1979) 95 L.Q.R. 532.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

Neutral Citation Number: [2010] EWHC 358 (Ch)

Case No: HC08C03188

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 03/03/2010

**Before** :

**MR JUSTICE LEWISON**

**Between :**

**(1) FoodCo Uk LLP (t/a Muffin Break)**
**(2) Caskade Caterers Limited (t/a KFC)**
**(3) Panesar Enterprise Limited (t/a Burger King )**
**(4) The Interchange Organization Limited**
**(5) Game Grid Limited**
**(6) Eat Limited**                                    **Claimants**

**- and -**

**Henry Boot Developments Limited**                   **Defendant**

**Mr David Matthias QC and Mr Wayne Beglan** (instructed by **Sherrards Solicitors**) for the
**Claimants**
**Mr Tim Dutton** (instructed by **Maples Teasdale Solicitors**) for the **Defendant**

Hearing dates: 2nd- 5th, 8th-12th and 15th-17th February 2010

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE LEWISON

**The Hon Mr Justice Lewison:**

Introduction ................................................................................................................2
Approach to the evidence .............................................................................................2
MSAs ...........................................................................................................................3
The Site .......................................................................................................................7
The Marketing Material .............................................................................................14
The blue signs agreement ..........................................................................................16
The legal pack ...........................................................................................................31
The agreement for lease ............................................................................................31
Mr Richard Mills .......................................................................................................32
Caskade/KFC ............................................................................................................33
Game Grid .................................................................................................................36
Foodco/Muffin Break ................................................................................................39
EAT ...........................................................................................................................42
Interchange ...............................................................................................................45
Panesar/Burger King .................................................................................................46
Signage ......................................................................................................................49
The Non-reliance Clause ...........................................................................................50
The pleaded misrepresentations .................................................................................54
   Generic representations ........................................................................................54
The subjective element .............................................................................................56
Foretelling the future ................................................................................................59
Continuing representations and the duty to correct ...................................................63
Passing on information ..............................................................................................66
What representations were made by the brochures and their supply? .........................66
   MSA ....................................................................................................................66
   Footfall ................................................................................................................67
   Tourist information and travel booking service ....................................................67
   Live departure information ...................................................................................67
   Dwell Times .........................................................................................................67
   Motorway signage ...............................................................................................67
   The supply of the brochures .................................................................................68
What representations were made by the Roger Tym report and its supply? .................68
Other generic representations ....................................................................................69
   Coach hub and interchange .................................................................................69
   CPSE enquiries and replies ..................................................................................69
Additional representations made to individual tenants ...............................................69
Were any of the representations fraudulently made? ..................................................71
   Brochure 1 ...........................................................................................................71
   Brochure 2 ...........................................................................................................72
   Brochure 3 ...........................................................................................................76
   The Roger Tym & Partners report ........................................................................77
   Oral representations about the coach interchange ................................................77
   CPSE enquiries and replies ..................................................................................77
   KFC .....................................................................................................................78
   Game Grid ...........................................................................................................78
   Muffin Break ........................................................................................................79
   EAT .....................................................................................................................79
   Interchange ..........................................................................................................80

Burger King ........................................................................................................................80
A duty to correct?..............................................................................................................80
Result ..................................................................................................................................81

**Introduction**

1.      Junction 11 of the M20 is towards its southern end. It lies some two miles from the Channel Tunnel and five miles from the Port of Dover. In January 2008 Henry Boot Developments Ltd opened a new facility called "Stop 24" accessible from a roundabout just off the junction. Its principal components were a petrol filling station; and an amenity building housing both retail and catering units let to a number of different tenants. Henry Boot's marketing material (and a report on which the marketing material was based) had predicted 88,000 visitors a week on opening. The prediction proved wildly optimistic. Actual visitor numbers barely reached a tenth of the predicted number. What had gone wrong? And is Henry Boot liable for what has turned out to be a commercial disaster for many of the tenants? The claimants are all tenants who entered into agreements for lease. Some but not all of them completed their leases. Many of them went into occupation and some have since given up, while others remain trading. They say that they were tricked into entering the agreements for lease on the basis of misrepresentations made by Henry Boot. In essence, the important misrepresentations upon which the claim is based are alleged misrepresentations about the extent of motorway signage that would be provided for the site; misrepresentations about the likely number of visitors to the site, and misrepresentations about the facilities that the site would offer. They say that Henry Boot made the misrepresentations fraudulently; but if that is wrong, they say that the misrepresentations were made without reasonable grounds for believing that they were true. For reasons that I will explain, I have concluded that the only claim that the tenants are entitled to advance is the claim based on fraudulent misrepresentation; and that that claim fails.

2.      Mr David Matthias QC and Mr Wayne Beglan appeared for the claimants; and Mr Tim Dutton for Henry Boot. At a late stage of the trial it was agreed that I would decide questions of liability only, leaving questions of remedy (rescission or damages) to be dealt with later, if I found that liability was established.

**Approach to the evidence**

3.      The burden of proof lies on the tenants to establish their case. They must persuade me that it is more probable than not that Henry Boot made fraudulent misrepresentations. Although the standard of proof is the same in every civil case, where fraud is alleged cogent evidence is needed to prove it, because the evidence must overcome the inherent improbability that people act dishonestly rather than carelessly. On the other hand inherent probabilities must be assessed in the light of the actual circumstances of the case: *In re B* [2009] AC 11.

4.      Although some of the representations on which the tenants rely were made in writing, in all cases they allege that these representations were confirmed, expanded, or supplemented by oral representations. These oral representations were made in conversations and at meetings of which there is scant record. In approaching the

evidence I have tended to place weight on contemporaneous documents and documents which came into existence before the problems emerged. In assessing the recollections of witnesses, it is also important to avoid the benefit of hindsight. I must try to assess what people did, said and thought at the time. In that connection I have borne in mind the words of Lord Pearce in his dissenting speech in *Onassis v Vergottis* [1968] 2 Lloyd's Rep. 403, 431:

> "Credibility involves wider problems than mere "demeanour" which is mostly concerned with whether the witness appears to be telling the truth as he now believes it to be. Credibility covers the following problems. First, is the witness a truthful or untruthful person? Secondly, is he, though a truthful person, telling something less than the truth on this issue, or, though an untruthful person, telling the truth on this issue? Thirdly, though he is a truthful person telling the truth as he sees it, did he register the intentions of the conversation correctly and, if so, has his memory correctly retained them? Also, has his recollection been subsequently altered by unconscious bias or wishful thinking or by overmuch discussion of it with others? Witnesses, especially those who are emotional, who think that they are morally in the right, tend very easily and unconsciously to conjure up a legal right that did not exist. It is a truism, often used in accident cases, that with every day that passes the memory becomes fainter and the imagination becomes more active. For that reason a witness, however honest, rarely persuades a Judge that his present recollection is preferable to that which was taken down in writing immediately after the accident occurred. Therefore, contemporary documents are always of the utmost importance. and lastly, although the honest witness believes he heard or saw this or that, is it so improbable that it is on balance more likely that he was mistaken? On this point it is essential that the balance of probability is put correctly into the scales in weighing the credibility of a witness, and motive is one aspect of probability. All these problems compendiously are entailed when a Judge assesses the credibility of a witness; they are all part of one judicial process and in the process contemporary documents and admitted or incontrovertible facts and probabilities must play their proper part."

5. None of the witnesses had a good recollection of precisely what was said by them or to them in the course of meetings or telephone conversations. Some were clearly reconstructing what, with hindsight, they thought must have happened. I do not, however, consider that any of the witnesses I heard were deliberately giving untruthful evidence. All were doing their honest best.

**MSAs**

6. At the heart of the tenants' complaint is the fact that Henry Boot described the facility as a "Motorway Service Area" or MSA. It is therefore necessary to consider the evidence relating to MSAs in general. Henry Boot's expert on this topic, Mr Peter

3

Dixon, gave an account of the development of MSAs within the national motorway network. The tenants' expert, Mr Paul Mew, did not disagree with Mr Dixon's historical account. When the first stretch of motorway was opened in this country in 1959 the first MSA at Newport Pagnell opened at the same time. In those days the Department of Transport itself identified sites for MSAs and acquired the land, using compulsory powers where necessary. They were then offered to the market by competitive tender on long leases. Thus the government in effect controlled the number, location, and permitted activities at individual MSAs. This conformed to the general policy that the provision of service facilities was one of the few exceptions to the general principle that there should be no direct access to motorways from individual developments. Part of the same policy required that developments with direct access from a motorway should not become destinations in their own right.

7.   The procurement method changed in 1992. The responsibility for identifying and bringing forward sites for MSAs passed to the private sector. The planning process was relied on to select those which ultimately went forward for development. Over the years the Department of Transport had come to recognise that it was not enough simply to provide basic facilities (parking refuelling and toilets) at MSAs. Motorists needed to be encouraged to stop and break their journeys. So the basic facilities of MSAs became augmented by catering facilities and shops. The role of the Department of Transport in the planning process was essentially that of consultee; although it retained the power to direct the refusal of planning applications on technical highway grounds only.

8.   One result of the changes was that the mechanism by which the Department of Transport controlled the activities at an MSA was through the making of a Traffic Signs Agreement ("TSA"). The operator of an MSA does not have the legal right to erect signs on the highway. So the Secretary of State must consent. Under a TSA the Secretary of State agrees to erect signs on the motorway giving warning to motorists of the existence of the MSA and directional signs at the appropriate junction or slip road. These signs have been referred to as "blue signs" or "blue signage" because that is the standard colour for all road signs on motorways. I will return to the nature and number of signs in due course, because it was the subject of some disagreement between the experts. The TSA requires the operator to pay for the erection of these signs. The TSA also imposes terms on the MSA operator about the facilities that he must provide and the hours and types of trade that he can carry on. If the MSA operator is in breach of the terms of a TSA the Secretary of State can remove the signs which in most cases would spell commercial death for an MSA. The experts agreed that a TSA only deals with signs in the immediate vicinity (up to two miles away) of the MSA in question. The Highways Agency has a discretion to provide additional signs. Additional distance or remote signing is paid for by the Highways Agency itself. It does not, therefore, need to be covered by a TSA.

9.   In July 1998 the Roads Minister, Lord Whitty, made an important policy announcement. The announcement was embodied in HA 269. The main thrust of the new policy was to reduce the distance between MSAs thus giving motorists greater opportunity to break their journeys. But for the first time the policy said something about the size and nature of MSAs. The document stated that in future the Government would not approve and would not allow signing from the motorway to

4

any MSA which, in addition to the compulsory MSA facilities provided anything beyond:

- A lodge which might provide overnight accommodation and a meeting room for up to fifteen people, but not a bar, restaurants, function rooms or more extensive conference facilities
- A shop or shops catering for those using the motorway and with a total floor area not exceeding 5,000 sq ft;
- A modest games area not exceeding 1,000 sq ft.

10. This policy remained in force until 2008, and thus was the applicable policy during the course of the events with which I am concerned.

11. The Highways Agency has a published policy about signs for MSAs. The policy in force at the relevant time was contained in Annex J to Circular Roads 4/94. The relevant paragraphs of Annex J are as follows:

> "Distance to the Next Service Area
>
> 3. This sign (diagram 2918) replaces diagram 915 and is extended by the permitted variants described below. It cannot include the MSA operator's name. It should be used after every motorway junction unless the presence of other signs or the close proximity of the next junction would make the siting of the sign difficult. It should normally follow the route confirmatory sign…. A permitted variant allows the inclusion of MSAs on other motorway routes where the turn-offs for those routes are reached before the next service area…. No more than three service areas should be indicated on a sign.
>
> 1 Mile Advance Direction sign
>
> 4. This sign (diagram 2917) … includes the distance to the next two service areas and names the operators.
>
> ½ Mile Advance Direction Sign
>
> 5. This sign (diagram 2919) now includes provision of a headerboard to be added to the sign in the house style of the service area operator should the operator so desire. … This sign should also include the name of the service area to help driver recognition.
>
> 6. Diagram 2919 shows symbols representing the full range of services available which should be used as appropriate. The first row of symbols must always be shown as they are standard services available at all MSAs; the symbols on the second row should be included as appropriate for the optional services provided.
>
> MSAs at Motorway Junctions

5

> 8. Where a MSA is located at a motorway junction and the same slip roads are being used by non-service traffic, special arrangements should be followed to avoid a conflict between the MSA signs and the standard ADSs on the approach to the junction. In these circumstances the MSA "1 mile" sign (diagram 2917) should be located at two miles out from the junction and then the normal "½ mile" sign (diagram 2919) sited at 1 ½ miles (with the distances on both signs changed accordingly). At the junction nose the word "Services" should be added below the route number on the existing nose-exit sign."

12.   In paragraph 2.1 of his report Mr Dixon said:

> "There is no statutory or other legal definition of an MSA although the term is used widely and with varying degrees of precision in a number of contexts and from a number of perspectives, including those of operators and retailers, the travelling public and professionals of various kinds involved in motorway and roadside services industry."

13.   Mr Mew agreed with this summary, although in view of the policy statement he added the qualification that an MSA with more than 5,000 square feet of retail and catering facilities would cease to be an MSA for the purposes of obtaining full motorway signage provided by the Highways Agency. He accepted, however, that such an MSA would remain an MSA, even though it was one that would no longer be signed as such by the Highways Agency.

14.   In the jargon, there are broadly two types of MSA: an "on-line" MSA and an "off-line" MSA. An on-line MSA is one that is accessible directly by a slip road on the motorway itself. An off-line MSA is one that is accessible only by leaving the motorway; and is typically accessed by a roundabout. The site with which I am concerned was to be an off-line MSA.

15.   A question that arises often (or perhaps invariably) in the planning process of an MSA is how many vehicles are likely to use the facility. Traffic planners and consultants are well versed in how to estimate this. The starting point is to estimate the total traffic flow along the stretch of motorway in question. There are published data which enable this to be done, and these data may be supplemented by bespoke traffic counts. The next stage is to estimate how many of those vehicles are likely to leave the motorway in order to use the facilities of an MSA. This is called the "turn in rate". Mr Mew produced some data about different turn in rates at different MSAs. In the case of on-line MSAs the turn in rate varied from 4.2 per cent to 25.1 per cent (with an average of 13.19 per cent); and in the case of off-line MSAs it varied from 3 per cent to 11 per cent (with an average of 7.37 per cent). Mr Dixon agreed that it was received wisdom among traffic consultants that the turn in rate for an on-line MSA would be greater than the turn in rate for an off-line MSA. He thought that Mr Mew's averages were about right; although he pointed out that there were huge variations. He thought that the averages for the off-line MSAs were dragged down by some off-line MSAs suffering from what he called the "M 25 effect"; and although he knew of no

6

published data he was aware of one off-line MSA that had achieved a turn in rate of 15 per cent.

**The Site**

16.    I deal next with the history of the particular site in question. The Department of Transport itself had identified the site as a potential MSA in 1987. The site was shown as an MSA in the Shepway District Local Plan and the Local Plan Review. In 1993 the Shepway District Council granted outline planning permission for its development as a motorway service area. The owner of the site at the time was Saltwood MSA Ltd. That permission was renewed on 27 August 1998. The development was again described as "the construction of a Motorway Services Area".

17.    The development site was a large one. It extended to about 19 acres. There was to be a petrol filling station and an amenity building. The amenity building was to have a floor area of over 75,000 square feet and a lettable retail and food area of over 42,000 square feet. As is obvious, the floor area to be devoted to retail and catering exceeded by far the limit set by the 1998 statement. Although the Highways Agency had the power to direct the refusal of planning permission, it did not do so, even though the renewal of the outline planning permission just post-dated Lord Whitty's policy announcement. The Highways Agency subsequently said that this application had slipped through the net.

18.    The original planning permission was accompanied by a section 106 agreement and by a TSA dated 5 December 1996. That TSA was due to expire in March 1999. The section 106 agreement required the developer to offer a lease of a unit to the local authority for use as a tourist information centre. The permitted uses included the sale of tickets for cross-Channel crossings, trains, buses and entertainments. The lease was to be rent free for the first ten years.

19.    Saltwood SMA Ltd was looking for a development partner. Thornfield Properties Ltd was a potential partner. Ms Karen Hawes worked for Thornfield at the time; and she became involved with the site. She was introduced to it by Mr Neil Grice, an estate agent who was employed by Gooch Wagstaff at the time. This was her first experience of a projected MSA, and his too. Thornfield decided to retain Mr Grice to assist in marketing. In December 1999 Ms Hawes instructed a firm of planners and development economists called Roger Tym & Partners. Ms Hawes thought that they were experts in traffic and footfall predictions. They had already produced a report in February 1996 for a previous developer estimating the likely number of visitors to the site; and Ms Hawes wanted an updated footfall. Roger Tym & Partners produced an updated report in February 2000.

20.    The estimated visitor numbers are calculated in a number of steps. The first step is to estimate the number of vehicles passing the site in question. The second step is to estimate the turn in rate. The turn in rate is applied to the estimated number of vehicles passing the site. This gives the number of vehicles estimated to turn in. The third step is to estimate the average number of occupants of each vehicle turning in. The average number of occupants of each vehicle is multiplied by the estimated number of vehicles turning in to give the estimated number of visitors.

7

21.    Roger Tym & Partners estimated that there would be a passing daily traffic flow of 37,000 vehicles in 1999 increasing to 46,000 by 2010; a turn in rate of 15 per cent and an average occupancy of 1.96 persons per vehicle. On this basis they estimated visitor numbers at 4.67 million per year increasing to 5.5 million by 2010. The turn in rate of 15 per cent used in the 2000 report was one percentage point higher than the turn in rate that they had used in their 1996 report. In her witness statement Ms Hawes said that she had no reason to doubt Roger Tym & Partners' figures, which were fairly consistent with their earlier report. Later in the story, and in connection with a quite different report, Mr Hawes received a letter from Mr Grice. The letter included the passage:

> "… whilst we have pushed the turning rate at Stop 24 via Roger Tym to 15% I believe that we could justify that due to the unique nature of Stop 24."

22.    Based on this letter, Mr Matthias suggested to both Ms Hawes and Mr Grice that they had improperly influenced the turn in rate adopted by Roger Tym in the 2000 report. Ms Hawes and Mr Grice both denied this. Ms Hawes stressed that it would not have been in Thornfield's interest to falsify figures, since the figures provided by Roger Tym & Partners underpinned all its own financial appraisals. She also pointed out that the professional reputation of Roger Tym & Partners would be ruined if clients could influence what they report. She said that at no time had she instructed or asked Roger Tym & Partners to alter the percentage they put in a report. She did accept, however, that she and her team provided Roger Tym & Partners with information about the scheme and how they were marketing it, leaving it to them to decide what information to include in their report. Mr Grice also denied having influenced Roger Tym & Partners. He had neither met nor spoken to anyone at Roger Tym & Partners; and at the time of the Roger Tym & Partners report he had no knowledge of turn in rates. As he put it in his oral evidence he would not have known what to push it to. I accept the evidence of both Mr Hawes and Mr Grice on this point.

23.    Thornfield entered into a conditional contract to buy the site for £6 million. Saltwood SMA Ltd also renewed the TSA, entering into a new one on 21 July 2000. The renewal took place without any difficulty. This TSA gave consent to the erection of approved signs on the motorway. There was to be one sign a mile and a half before the junction on the coast-bound carriageway; and one sign a mile and a half before the junction on the London-bound carriageway. In addition on each carriageway there was to be a sign at the slip road at the junction itself. On each of the four signs the site was described as "Stanford Services"; and the signs that were to be a mile and a half out in each direction were to contain pictorial representations of the services on offer (e.g. a teacup; a crossed knife and fork; a petrol pump and so on). The slip road signs simply bore the legend "Stanford Services".

24.    However, by mid-2001 Thornfield's interest in the site waned. By this time Ms Hawes had gone to work for Henry Boot; and she introduced them to the site. An initial offer made in July 2001 petered out; but in January 2002 Saltwood SMA Ltd and Henry Boot renewed contact. Ms Hawes, on behalf of Henry Boot expressed interest in the site; and the board considered it in April 2002. Ms Hawes knew that the site had the benefit of a TSA. Her understanding was that the signs depicted in the TSA were those that were guaranteed, and that any additional signs were a matter of subsequent negotiation with the Highways Agency. During 2002 Ms Hawes, aided by

8

a professional team, reviewed the scheme. This resulted in a redesign. The area of the proposed amenity building was reduced to 48,000 square feet, and the retail and restaurant space to 32,000 square feet. A 60-80 bed hotel was included in the scheme. Henry Boot also decided to pursue the idea of a coach interchange, which was an idea that Thornfield had had. By December 2002 Ms Hawes was in a position to prepare a report for the board, in which she recommended buying an option to take a long lease of the site. Her report said:

> "This proposal is unusual in that at the time the planning and highway consents were granted it had permission for the largest element of retail on an MSA in the UK.
>
> The scheme would be a hybrid of retail and MSA. The whole concept for this particular MSA is different to most in that terms had previously been agreed with P & O Stena Line to operate a coach park on the site, whereby the drivers/coaches swap over from left hand drive. This process is usually 20/25 minutes and thus their passengers would shop or eat at the facilities.
>
> Discussions were also held with Channel Tunnel and the Ferry Operators to have check in desks and LCD displays of train/ferry times and any delays to the timetable. The object of this is to encourage people to arrive early with a view to checking in, then either shopping or eating whilst they wait for their train or ferry.
>
> …
>
> Consequently this scheme is envisaged as a destination in its own right."

25.    Although the report to the board referred to a coach park where drivers swap passengers from left hand drive vehicles to right hand drive vehicles, this was a mistake. There is no such swap-over. Ms Hawes said that she found out about this when she began to talk directly to coach operators. Rather, the idea of a coach interchange was a point at which coaches would arrive from different starting points, and transfer passengers into coaches going to different destinations. Thus a coach would leave, say, Manchester with passengers bound for Paris and Brussels; and another would leave, say, Birmingham with passengers for the same destinations. At the interchange all those passengers bound for Paris would board one coach and all those bound for Brussels would board another. The coach operators would also take the opportunity to clean the coaches and empty the on-board toilets. Ms Hawes could not pinpoint the date at which she was disabused of her error, but said it was an early stage. However, confusion about the precise mechanics of a coach interchange (and in particular whether there was a left-hand/right-hand drive swap-over) persisted almost to the end of the story.

26.    In July 2003 Shepway District Council approved reserved matters under the outline planning permission. Over the summer Ms Hawes and her team began the process of selecting letting agents. The idea was to achieve a measure of pre-lettings before

exercising any option to buy the site. The agent eventually chosen for the retail and catering element of the development was Mr Grice. By this time he was at Nelson Bakewell, although he moved on again later in the story. Mr Grice was assisted at that time by Mr Richard Mills, who also figures later in the story. The team decided to commission a report from specialist retail business consultants. The consultants would need an updated report on likely visitor numbers; so in November 2003 Mr Daniel Howson, a surveyor who had recently joined Henry Boot, asked Roger Tym & Partners to quote. This was Mr Howson's first encounter with an MSA. As mentioned, Roger Tym & Partners had produced two earlier reports for previous owners. Their quote was successful and on 31 March 2004 Mr Howson on behalf of Henry Boot asked them to prepare an updated report. In his covering letter he said:

> "In order to assist you I have enclosed a copy of the Planning Permission for the scheme with the approved plans. As discussed the scheme is different from that usually associated with Motorway Service Areas in that we are attempting to create a facility to act as a "departure lounge" for those using either the Channel Tunnel Rail Link of the ferry port at Dover.
>
> In the past there have also been discussions with various coach operators regarding the possibility of creating a coach interchange for cross channel travellers. Whilst these discussions took place some time ago this is obviously an area which we will be exploring now that we have exchanged contracts on the site."

27. The partner in charge at Roger Tym & Partners was Mr Quinsee. Mr Howson recalls that Mr Quinsee asked him in general terms whether the site would have blue signage; and Mr Howson confirmed that it would. Mr Quinsee did not ask for, and was not sent, a copy of any of the TSAs.

28. In the meantime on 1 March 2004 Henry Boot resolved to enter into the option agreement to buy a long lease of the site; and the option was completed on 5 March. The price payable for the lease would be £1 million (as opposed to the £6 million that Thornfield had agreed) and the option price was £50,000. The option was exercisable for one year, with a further option to extend it if certain conditions were fulfilled.

29. On 16 April 2004 Mr Grice sent a memo to Mr Howson in preparation for a marketing meeting. In the memo he said that it was essential that Henry Boot and its advisers "portray an air of total confidence concerning the site and be fully equipped to answer the likely scepticism concerning this site." Turning to the marketing materials that would be needed he said that the following (among other things) would be essential:

> "Comprehensive data regarding traffic flow numbers on motorway, turning rates, customer numbers, profiling of customers (i.e. ABC's, age profile), projections for growth year on year, nature of customer (business, pleasure, local)"

30. He also set out notes on a strategy for approaching coach operators "regarding possible use of the [site] as a transfer point or as a stop off point also"; and referred to

10

the advantages of installing live data about Channel crossings giving customers the comfort of knowing that they can keep an eye on crossing times. The marketing meeting took place on 20 April. Among those present were Ms Hawes, Mr Howson and Mr Grice. The marketing meetings were held regularly, and Mr Howson and Mr Grice attended them all. Ms Hawes attended most of them. Mr Thompson (a director of Saltwood MSA Ltd, the legal owner of the site) reported that the wording of the blue signs agreement had been agreed, as had the location of the signs. Although no name for the scheme had yet been agreed, Mr Thompson was asked to approach the Highways Agency in order to get the blue signs agreement signed off, with the name to be inserted later. A list of contacts with coach companies and ferry operators was to be provided, and meetings with them were to be set up over the next two weeks. By the time of the next meeting on 27 April meetings had been arranged with Hoverspeed, and Henry Boot were awaiting a response from P & O, Stena Line and Shearings (the coach operator).

31.    Mr Matthias fastened on that part of Mr Grice's memorandum which referred to "an air of total confidence" and used it as the basis for a suggestion that Henry Boot and its agents would say whatever was necessary (whether true or not) to clinch a deal. As will become clear, I reject this suggestion, as did all the witnesses to whom it was put.

32.    Roger Tym & Partners circulated a draft report at the beginning of May. They also provided a note highlighting some differences between this report and their earlier reports. The daily forecast of visitors had declined from the earlier report in 2000. This was partly because traffic had not grown as much as forecast, and average car occupancy figures had also decreased.  They added:

> "Coach traffic in 2003 was significantly lower than calculated in 1999. Both Eurotunnel and Port of Dover statistics show a decline in the number of coaches, cars and passengers since 1999. The decline in coach traffic may be in part attributable to the rise of low-cost airlines in recent years; the closure of cross-channel crossings at Folkestone; and the abolition of duty free status for goods. The decline in coach traffic has meant that not only is coach traffic low for 2003, but also that no growth is forecast in our 2004 report, with a consequent impact on traffic projection figures."

33.    However, as between the two reports the turn in rate that Roger Tym & Partners had used had remained constant. Mr Howson asked the team for comments by the middle of the month. He sent a consolidated list of comments from the team to Mr Quinsee on 13 May. Among his queries were queries relating to the turn in rate for both cars and coaches.  Referring to paragraph 3.11 of the draft he said:

> "… the paragraph assumes that Saltwood MSA will achieve a "slightly higher than average turn in rate". However, paragraph 3.13 refers to a 15% turn in rate which is twice the average. These references need to be tied in to ensure consistency throughout the report."

34.    Mr Matthias suggested to both Ms Hawes and Mr Howson that this showed that they both knew that 7.5 per cent was the average turn in rate for an off-line MSA. They

11

both denied this knowledge; and I accept their denial. Mr Howson was doing no more than pointing out what appeared to him (erroneously) to be an internal inconsistency in the report. In any event, Mr Howson's comment did not invite Mr Quinsee to adopt the higher figure: merely to ensure consistency. In his letter Mr Howson also pointed out that the draft report assumed that turn in rates would remain constant until 2016. He said that he would argue that what was required at that state was an "optimistic but realistic approach to represent the fact that turn in rates were likely to increase as the MSA begins to grow in reputation." Lastly he drew attention to the turn in rate for coaches which, at 8 per cent, he said seemed low, especially "if we set up the coach interchange". However, within a few days he notified Mr Quinsee that the coach operator to whom Henry Boot had been talking (Wallace Arnold in Manchester) did not require a coach interchange, so that passage should remain as drafted.

35.    A revised draft was produced on 25 May. Mr Howson again queried the turn in rate. Again he wanted to argue that the turn in rate would increase as the site became better known. He suggested that this might be done as a hypothetical illustration. Roger Tym & Partners did not alter the turn in rate they had chosen; but they did include the hypothetical illustration. Roger Tym & Partners' final report was produced at the beginning of June 2004.  The introduction to the report said in paragraph 1.6:

> "Every care has been taken to ensure the reliability of the assessment, which is presented in good faith. However, the calculation is based on a number of assumptions and data inputs from various sources and it should be borne in mind that the final outcome is a "best estimate"."

36.    The salient points made in that report were as follows:

i)    Stop 24 "will be a unique Motorway Service Area (MSA)". It would be ideally located to cater for traffic in the rapidly growing cross-channel market and would provide high quality facilities of a type normally associated with airport departure lounges or railway termini.

ii)    The methodology was that I have already described: viz.

   a)    Step 1: calculate traffic volumes passing the site;

   b)    Step 2: apply a turn in rate;

   c)    Step 3: apply an average vehicle occupancy to the number of vehicles turning in.

iii)    This section of the report also listed the data sources that Roger Tym & Partners had used. These included Eurotunnel traffic counts, Port of Dover statistical summaries, Highways Agency data on MSA usage and MSA operator data regarding usage and turn in rates.

iv)    In undertaking the assessment Roger Tym & Partners were "guided by evidence from other MSAs, particularly regarding turn-in rates". However, since every MSA is different meaningful comparisons are difficult.

12

v)  The volume of traffic passing the site was calculated using as the starting point actual figures obtained on behalf of Kent County Council. Roger Tym & Partners said that substantial traffic growth could be expected on the M20; partly because the role of the M20 as the key link to the Channel ports was expected to continue to grow, and partly because of the Government's plans to develop 200,000 houses in the south east. It referred specifically to "the growth in cross-Channel traffic that has taken place over the last decade" and stated that "cross-Channel traffic is expected to continue to grow". The report assumed a growth rate of the mid-point between central and high growth national forecasts. Based on these data, and after subtracting coaches and HGVs, the report estimated the daily number of cars passing the site as 39,246 in 2003, rising to 41.404 in 2006, 44,846 in 2011 and 48,359 in 2016.

vi)  The report noted that a DETR traffic flow model had predicted a turn in rate of 15 per cent at MSAs based on an average 30 mile interval between service areas. Following deregulation and the provision of MSAs at shorter intervals, the DETR expected turn in rates to fall linearly according to the reduction in interval. The report pointed out that the nearest alternative MSA on the M20 was at Maidstone, 25 miles away; and said that for traffic leaving the channel ports Stop 24 would be the first comprehensive service area in the UK. The nature of the development would be substantially more attractive to passing traffic than a conventional MSA. Taking these factors into account, the report estimated a turn in rate of at least 15 per cent. It further predicted that as public awareness of Stop 24 increased, the turn in rate would rise, although the rise was not quantified. Applying the 15 per cent turn in rate to the estimated vehicle numbers passing the site gave 5,887 vehicles per day visiting the site in 2003; rising to 6,211 in 2006, 6,727 in 2011 and 7,254 in 2016.

vii)  The report went on to consider occupancy levels. The National Travel Survey indicated that average occupancy of vehicles is lowest for business trips (1.2 occupants per vehicle), higher for private leisure trips (1.8) and highest for holiday trips (2.1). Based on this the report calculated an average occupancy of 1.85 occupants per vehicle; but it also said that "our occupancy figures are a conservative underestimate given that many journeys on the M20 are long-distance holiday-orientated trips." Based on this estimate the report estimated the daily number of visitors to Stop 24 as 10,861 in 2003; rising to 11,458 in 2006, 12,411 in 2011 and 13,384 in 2016. These figures equate to approximately 4.3 million visitors per annum in 2003; rising to 4.5 million in 2006, 4.9 million in 2011and 5.2 million in 2016.

viii)  It went on to say that visitation rates to amenity facilities at MSAs varied with approximately 45 per cent of visitors using catering facilities and 35 to 40 per cent using retail elements. However, it said that Stop 24 could be expected to secure higher levels of usage given the high quality of the scheme and the wide range of retail and other service uses that would be available.

ix)  The report went onto consider the estimated number of coach passengers who would visit Stop 24. It pointed out that both Eurotunnel and the Port of Dover had experienced a "slight decline" in coach traffic over the previous 2-3 years, but that traffic was picking up. It did not assume any growth in traffic for the purposes of the report.  It assumed a turn in rate of 8 per cent for coaches.

13

Using the same methodology, the estimate was a constant daily number of 1,069 visitors for all the years I have mentioned.

x)     The report finally presented "for the purposes of illustration only" numbers calculated on a rising turn-in rate. The figures given for 2003 and 2006 remained unchanged, but the figure for 2011 rose to 16,363 visitors per day (equivalent to approximately 5.9 million per annum).

37.    One of the uses that Henry Boot made of the Roger Tym & Partners report was to commission another report from Fripp Sandeman & Partners, who are retail consultants. Their report was produced at the end of June 2004. This report was primarily intended for internal use by Henry Boot, in order to decide upon an appropriate tenant mix and rental values. Fripp Sandeman used the Roger Tym & Partners report as their basis for the calculation of visitor numbers. Another use that Henry Boot made of the Roger Tym & Partners report was to commission a report from an acoustic consultant, to which I refer later.

**The Marketing Material**

38.    With the aid of the Roger Tym & Partners report Henry Boot prepared a number of brochures to help its marketing. The first brochure ("Brochure 1") was produced some time in the summer of 2004. Although (unlike subsequent brochures) it was A3 rather than A4, it was a relatively crude affair. The bullet points from Brochure 1 were:

i)     The site was described as "Stop 24 MSA".

ii)    Under the heading "Planning" it said that "Detailed Planning Consent has been granted for the scheme".

iii)   The scheme details included "Travel booking facilities/Tourist Information Centre".

iv)    Under the heading "Key Facts" it stated that "Once built the amenity block will be the largest on an MSA site in the UK…. The MSA is predicted to have circa 4.5 million visitors following opening rising to circa 6 million after five years".

39.    Brochure 1 contained no disclaimer of liability for representations.

40.    The second brochure ("Brochure 2") was dated November 2005. It opened with the following bullet points:

- Largest Motorway Service Area in the UK – three times larger than standard MSA
- First/last MSA to/from Continental Europe
- 5 minutes drive from Channel Tunnel Terminal and 15 minutes drive from Port of Dover
- Opening Spring 2007
- Estimated visitor numbers on opening 4.6m per annum/88,000 per week

41.    It added later:

14

- Live departure information for all cross channel services
- Increased dwell times

42. The final page of the brochure contained a disclaimer (in very small print) in the following terms:

> "Misrepresentation Act 1967. Messrs Ashwell Rogers, Gooch Cunliffe Whale and Henry Boot Developments for themselves and for the lessor(s) of the property whose agents they are, give notice that 1. These particulars do not constitute any part of an offer or contract. 2. None of the statements contained in these particulars are to be relied on as statements or representations of fact. 3. Any intending lessee must satisfy himself by inspection or otherwise as the correctness of each of the statements contained in these particulars. 4. The lessor(s) do not make or give and neither Ashwell Rogers, Gooch Cunliffe Whale and Henry Boot Developments nor any person in their employment has any authority to make or give any representation or warranty whatsoever in relation to this property."

43. It also added that all statistical data was provided by Fripp Sandeman and/or Roger Tym & Partners. However, Mr Dutton did not rely on the terms of the disclaimer (perhaps because it was in such small print), so I say no more about it.

44. There was a subsequent version of this brochure, but the differences are not significant for present purposes. Finally Henry Boot produced a third brochure ("Brochure 3") dated September 2007, which differed in some respects from the second. The opening bullet points now read:

- Unique Port waiting and departure terminal facility
- First/last MSA to/from Continental Europe
- 5 minutes drive from Channel Tunnel Terminal and 15 minutes drive from Port of Dover
- Opening late 2007
- Estimated visitor numbers on opening 4.6m per annum/88,000 per week

45. It added:

- Motorway signage encourages M20 traffic to stop at this facility
- Departure information for all cross channel services
- Increased dwell times

46. Prospective tenants were also supplied with a copy of the Roger Tym & Partners final report if they asked to see it.

47. On 7 May 2004 Mr Grice was sent a number of documents. These included copies of the outline and detailed planning permissions and the then current blue signs agreement.

15

**The blue signs agreement**

48. As mentioned, there had already been two TSAs concluded with the Secretary of State: one in 1996 and another in 2000. Each of those agreements allowed the erection of blue signs on the motorway. I have already described them. The 2000 agreement was due to expire, so a new one was needed. Mr Thompson of Saltwood MSA Ltd informed Mr Howson and Ms Hawes on 29 March 2004 that the wording had been agreed with the Highways Agency; and that the only outstanding issue was what the MSA was going to be called. This was more formally reported to a marketing meeting on 20 April 2004, and minuted. The only perceived niggle was that the draft agreement prohibited the sale of alcohol on the site. The meeting then discussed the name to be given to the MSA and "Stop 24" was provisionally agreed. At the following marketing meeting on 27 April it was agreed that the TSA should be signed with a "dummy name" which could be changed later. At some time during the summer the name "Stop 24" was confirmed.

49. Blue signage was discussed at the marketing meeting on 24 August 2004. A new plan had been received for incorporation into the draft agreement. It was noted that the plan did not denote the required changes to the signage at junctions 8 and 12; and Mr Thompson was asked to amend the application. Following the meeting Mr Thompson reported that the plan for the site did not need to show the changes to be made to the longer distance signs, as they would be dealt with separately with the Highways Agency. In consequence the application did not need to be amended.

50. In October 2004 Henry Boot received an offer from Shell for a long lease of the petrol filling station that was to form part of the development. Although the premium offered was slightly below the bottom of the range that Henry Boot had been expecting, they were encouraged that an experienced operator had faith in the scheme. Shell had been provided with Roger Tym & Partners' report, and had expressed no reservations about it.

51. On 11 October 2004 Mr Howson wrote to Mr Thompson. In the course of his letter he said that he was in detailed negotiations with various operators for all elements of the MSA and that "the issue of the Blue Signs Agreement has been raised by several parties to the extent that it is our opinion that it would be prudent to effect a signing off of the Agreement in order to add certainty to this element of the project." He asked for the negotiations with the Highways Agency to be concluded as soon as possible so that copies of the signed agreement could be made available to prospective tenants as and when requested. At the marketing meeting on 9 December 2004 Mr Thompson reported that revised drawings had gone to the Highways Agency and that he had received a new rent charge deed which was acceptable subject to a few minor amendments. He was chasing the Highways Agency to sign both the rent charge deed and the traffic signs agreement.

52. In November Mr Howson met a coach repairer based in Hythe, called Buzzlines, who were interested in facilities at the site. Mr Howson recorded in his letter of 26 November that Mr Busbridge of Buzzlines had given him "detailed insight … into the coach industry and its relationship with the various cross channel services".

53. On 16 December 2004 Henry Boot received a better offer for the petrol filling station from Swayfields Ltd. Swayfields were experienced operators of petrol filling stations

16

at MSAs of which they had seven at the time. They, too, had been provided with a copy of the Roger Tym & Partners' report. Their offer was £2.3 million for a long lease, which was much higher than Shell's previous offer. They expressed no reservations about the Roger Tym & Partners' report, and indeed their offer exceeded the highest valuation that Henry Boot had received, which was itself based on the Roger Tym & Partners report.

54. On 23 December 2004 Michelmores, who were the Highways Agency's solicitors, wrote a letter to Saltwood MSA Ltd's solicitors in which they said:

> "The Highways Agency's current policy on MSAs is that there may not be any more than 5,000 $^2$ feet of retail space at the site. My Clients have information that the latest planning consent obtained by your Clients provides for over 17,000 $^2$ feet retail space, and if that should prove to be correct then signing will not be granted.
>
> I am instructed that the Highways Agency are currently considering the position and until they are fully satisfied that their policy requirements are being met, they will not agree signing."

55. The letter went on to say that there would be no decision until after the New Year. Early in the New Year Ms Hawes passed on the information that although the Highways Agency were no longer prepared to sign the blue signs agreement, they might consider a minister signing it. She said that:

> "we have always been sceptical as to how Saltwood had achieved a Blue Signage Agreement with such a large element of retail, they have had a draft Agreement out with the Highways Agency for a number of years, being fully aware of the size of MSA being proposed….
>
> …bearing in mind we have a planning consent, could you please advise what the legal position is i.e. can Highways refuse Blue Signage in which case the consent is useless."

56. Henry Boot would now take over the negotiations with the Highways Agency. The problem was mentioned at the marketing meeting on 14 January 2005. Ms Hawes reported that the "ODPM would have to sign off the Agreement".

57. A meeting with the Highways Agency had been arranged for 28 January 2005. Mr Howson prepared a briefing note in anticipation of the meeting. The meeting took place as arranged. Ms Hawes and Mr Howson were present for Henry Boot together with Mr Thompson; and Mr Askew and Mr Seldon for the Highways Agency. Someone at the Highways Agency made a note of the meeting. Mr Askew of the Highways Agency is recorded as having said that "the site could not be developed as an MSA but could perhaps be signed as a reception area for the ferry terminal." He also said that the Agency's Signs Branch would collaborate with colleagues in the DfT "to produce an acceptable sign and it would then have to be approved at senior level, since it would set a precedent." He said that the site could only be given signing

17

as a non-MSA but added that "although the site would have a different name no changes would be needed to the plans". He returned to the point later in the meeting and is recorded as having said that "The site can only be given signing as a non-MSA". Ms Hawes said in evidence that Mr Seldon did most of the talking, although the note suggests that he was completely silent. Ms Hawes also said that the note did not give a fair representation of the meeting, which was much more accommodating than the note might suggest, and which did not record the evident embarrassment that the Highways Agency felt about the situation. To a large extent her evidence is borne out by her contemporaneous e-mail to Mr Stack at the local authority who had asked how the meeting had gone. Ms Hawes' reply on 3 February was:

> "extremely well. "Off the record" they are embarrassed about the whole thing, as they had to acknowledge that for some years the Highways Agency have been in discussion with us and have never raised the issue and had been treating matters as a normal extension to the previously signed Agreement. Accordingly they are seeking to assist us in resolving the issue without creating a precedent. They are looking at us being a special case because of our relationship with the Port and the Dover Port Authority are supporting us with a letter to the Highways, so whilst we are not over this hurdle yet, it is looking promising."

58.    Mr Howson's evidence was that what came across at the meeting was that everyone agreed that the site was to all intents and purposes and MSA, but that to save face and not to create a precedent for other service areas round the country some sort of different categorisation of the service area might have to be found. It was largely a semantic distinction to avoid creating a precedent. That this was a semantic distinction is in fact borne out by the comment in the note of the meeting that although the site would have a different name, "no changes will be needed to the plans". In other words Henry Boot had every reason to suppose that apart from a change of name everything else would remain the same. To a large extent Mr Howson's perception is also echoed by an internal e-mail that Mr Askew wrote later in the story (and which was obtained by means of a request under the Freedom of Information Act). That e-mail, dated 28 September 2007, includes the following:

> "… we entered into discussions with Henry Boot saying that their facility would not be signed *but actually looking for a get out.*
>
> Fortunately this was rapidly provided….
>
> [What Henry Boot told them about the site] provided the basis for a face-saving solution…
>
> We don't like the arrangement but it was the only way to get all parties out of a sticky situation….
>
> The Minister, DfT and ourselves all agreed that this is a unique site… On that basis no other site of this nature will be signed." (Emphasis added)

18

59.    I find that the meeting was far more constructive than the Highways Agency's note suggests, and that the note only recorded its position "on the record". The meeting was reported to the marketing meeting on 2 February on the basis that the Highways Agency had "totally reneged on" their previous position.

60.    Toward the end of January 2005 Ms Hawes prepared another report for the board of Henry Boot. She pointed out that the option agreement would expire on 4 March 2005, although it was capable of extension on payment of a further option fee of £75,000. However, in order to be in a position to extend the option, it would be necessary for Henry Boot to carry out site and soil surveys, which were estimated to cost £30,000-odd. Accordingly Mr Hawes was seeking board approval to additional expenditure of £105,000-odd bringing total expenditure to date to £217,000. In the body of her report she discussed the question of blue signs. She told the board that renewal of the previous blue signs agreement was proving difficult. She said:

> "Whilst historically this site had a blue signs consent, the renewal had proved difficult due to the interference of the landowner who objected to the hotel consent. We could have a signed agreement if we were to reduce the retail element in the scheme to comply with the current standards on retail for an MSA, which is 15,000 sq ft.
>
> We currently have planning consent for 17,219 sq ft of retail and with the revised scheme this is slightly reduced to 15,673 sq ft.
>
> Accordingly there is no uncertainty that we will secure a Blue Signs Agreement, it is just for what square footage of retail. At present we are pursuing the route of seeking Agreement to the larger square Footage that requires the Agreement to be signed off by a Minister and are encouraged by the Highways Agency approach to date.
>
> If we were unable to secure consent for the larger scheme, then the landowner would not be in a position to meet one of the conditions of the Agreement for Lease, [if we were to exercise our Option], and thus there would be no point in exercising the Option and we would at that stage renegotiate the purchase price, to take into account the smaller scheme."

61.    She also told the board that Dover Port Authority and Hoverspeed were supporting their proposals to provide real time link screens showing departure and arrival times; and that this would encourage longer dwell times.

62.    On 3 February 2005 Ms Hawes sent an e-mail to Motion Consultants, who had previously carried out a survey of the junction capacity for Henry Boot. She said that they were looking to put a case to the Highways Agency to secure a blue signs agreement; and that part of that case was that they would be providing a facility for the Port of Dover. One of the questions raised by the Highways Agency was how many people use the port and "how we could gauge how many of them may turn in to use our facility." She added:

19

> "I appreciate that this is outside your normal remit for traffic data, however, if you feel it is something you could assist us on, I shall be grateful to hear from you."

63. There was no reply to this e-mail, so I infer that Motion Consultants did not think that they were able to help. Ms Hawes thought that that was the position too. In addition, Henry Boot set about enlisting the help of the local authority, the local MP and the Port of Dover. The strategy was to persuade the Highways Agency that Stop 24 was a special case and would not set a damaging precedent. Henry Boot also tried to capitalise on the Highways Agency's embarrassment that the planning application had slipped through the net and that it had entered into two previous blue signs agreements. Mr Howson had been in contact with the Port of Dover about the possibility of supplying live departure information. His first contact had been made back in November 2004. In pursuing that possibility he had arranged to meet Mr Bill Fawcus, the General Manager, Property and Planning, of the Dover Harbour Board on 2 February. The meeting was positive; and Mr Fawcus expressed a desire to help. Following the meeting, Mr Howson sent a Mr Fawcus a copy of the Roger Tym & Partners report in which he had expressed interest. He in turn had supplied Mr Howson with volumes of traffic passing through the port. In fact these data were publicly available. Having read the report Mr Fawcus wrote to Mr Howson on 4 February 2005. Having made the point that the Harbour Board were happy to support any facility that enriched the experience of passengers travelling through the port, he continued:

> "However, there are assumptions in the Roger Tym Visitor Numbers which do give me concern and while I have no wish to dampen your enthusiasm, I believe that it would only be fair to share this concern. You will see from the traffic figures which I sent you that both car and coach traffic have been falling over recent years. As mentioned in my e-mail, our expectation is that this decline will continue for a few years before commencing a gradual increase round about 2010-2015 for cars. Coach traffic on the other hand is likely to continue to decline since it is this sector which has been most hit by the "glamour" of budget airlines. The same considerations apply to the Channel Tunnel and so the substantial growth predicted by Roger Tym and Partners would only be available from a growth in local traffic.
>
> Therein lies my biggest concern since the location is so close to the destination/origin for most users of this road, thus the factor applicable to 30 mile intervals is probably inappropriate with the 15 mile interval likely to be more relevant. Given that there are catering/retail facilities at both the tunnel and the port it is likely that much of the traffic heading for these will continue to the destinations when they are so close. On the other hand, those coming into the country will have had plenty of opportunity for retail/catering therapy in Calais or aboard the ferries.

20

> Given that the cross-Channel travellers are likely to provide a high proportion of customers, in view of earlier comments I would suggest that the figures given in 3.16 are very optimistic. I mentioned to you that 75% of the Port of Dover traffic uses the M20. That equates to about 5,000 cars per day. About the same number can be expected to be using the tunnel which provides a total of 10,000 cross-Channel cars per day, half of which will be going out and the other half returning. If these were the only likely candidates for this service area then Roger Tym's predictions in 3.16 would equate to 62% leaving the M20 to visit the site in 2006 and probably over 70% in 2016."

64. On the same day Mr Howson instructed Mr Peter Dixon to help progress matters with the Highways Agency. In his letter of instruction Mr Howson said that it was Henry Boot's objective "to secure an agreement for the erection of Blue Signage for our proposed facility which must include symbols which depict the various elements of the scheme e.g. the Petrol Filling Station". Among the documents he sent to Mr Dixon was a copy of the Roger Tym & Partners report. Mr Howson responded to Mr Fawcus by e-mail on 8 February. He stressed the special nature of Stop 24 which was intended to be a new type of MSA more akin to an airport departure lounge. On the question of visitor numbers he said that he understood that Mr Fawcus' opinion differed from that of Roger Tym & Partners and added:

> "While we appreciate the concern which conflicting statistics can cause, we feel that the viability of our scheme has been proven by the level of tenant interest and the quality of these tenants, all of whom are major covenants and will have conducted their own due diligence into the project."

65. He pointed out that Henry Boot were seeking the support of the Port of Dover if it believed that Stop 24 would assist the Port in providing a stop off point for travellers going to and from Europe. Mr Fawcus replied by e-mail on the following day. He reiterated his view that cross-Channel traffic was in decline and said that "it would be dangerous to rely on RTP's figures if your project is to target cross-Channel traffic." He continued:

> "The next point is that any passengers coming into the country from France will have no need to stop so soon and may be expected to press on towards their destination. That removes half this market segment. On the other hand, those that are going out have the opportunity to obtain refreshment at the tunnel or the port and aboard the ferries so there is only limited prospect of their choosing to break their journey when they are so close to these destinations. Accordingly, Roger Tym's factor of 7.5% based on 15 mile intervals is probably the best that might be expected. If you apply this to the 10,000 cars using the A20 to and from the Tunnel and the Port of Dover last year, half would coming into the country, leaving 5,000 x 7.5% = 375 cars to turn into the MSA. This is less than 7% of the figure projected in the report!

21

> Another significant flaw in your assumptions is in respect of potential dwell time of cross-Channel travellers. The tunnel and the ports are unlike most airports in that their customers have a very limited number of destinations but a very frequent number of services. Consequently there is no real imperative to arrive hours in advance of the travel time. Both the port and the tunnel offer three or more crossings per hour and the response which you have quoted from Hoverspeed that anybody trying to book in more than two hours ahead is turned away is totally exceptional and unusual. For most days in the year, at least 90% of passengers who arrive an hour early will travel on an earlier crossing. Conversely those who arrive late will not usually have long to wait for the next sailing."

66. On 15 February Mr Howson sent copies of his correspondence with Mr Fawcus to Mr Thompson. Mr Fawcus' communications gave Ms Hawes and her team pause for thought. They discussed what Mr Fawcus had said, which they took seriously. Ms Hawes, Mr Howson and Mr Thompson were involved in these discussions, and Ms Hawes probably talked to someone at Henry Boot's head office as well. They considered whether Mr Fawcus was an independent expert and concluded that he was neither. They thought that Mr Fawcus was pursuing his own agenda. He was concentrating on the Port of Dover only, which had recently opened a new passenger amenity facility, and was therefore heading off competition. They thought that part of the decline in traffic at Port was explained by competition from Eurotunnel, whose customers they would be serving. They noted an increase in freight traffic, and thought that this would be beneficial to the scheme which would provide showering and changing facilities for lorry drivers. Mr Fawcus had also not taken into account the wider considerations that Roger Tym & Partners had, such as the traffic which used the motorway but which was not heading to or from the Channel; and some of the points that he made (such as the distance of the MSA from the tunnel and the port) must already have been taken into account by Roger Tym & Partners. Nor had he provided the statistics on which his views were based. They also thought that Mr Fawcus had missed the point that what Henry Boot intended to provide was not just a motorway service area, but something special and out of the ordinary. Ms Hawes' view was that proximity to the port and the tunnel was a bonus, because people arrived early having allowed extra time for their travel arrangements. Mr Howson (accompanied by Mr Grice) had made a number of cross-Channel trips to see what facilities were on offer, and he had concluded that they were very limited. Stop 24 would be far superior. Hoverspeed in particular did not have the facilities to accommodate passengers who arrived more than two hours before their departure time; and early arrivals would have to go somewhere. They also thought that Mr Fawcus was a lone voice. Of all the people who had seen the Roger Tym & Partners report, including two highly experienced petrol filling station operators (who would have carried out their own due diligence and made their own traffic forecasts), he was the only one to have raised any concern. They concluded that the Roger Tym & Partners report remained reliable. They did not consider whether to place Mr Fawcus' communications before Roger Tym & Partners. As far as they were concerned, there was no need to. Mr Grice also recalled that Mr Howson raised Mr Fawcus' concerns with him. Mr Grice had been told by Mr Andrew Long of Swayfields that he had made his own projections which had led up to Swayfields' offer, and in the light of

22

that he, too, thought that Mr Fawcus' concerns were misconceived. In his oral evidence he made the point (which he thought had been made at the time) that although the site was close to cross-Channel travellers' destination in domestic terms, for many of those travellers it would be at the mid-point of their journey because they would have further to drive on the other side of the Channel.

67.     Mr Dixon set out his initial thoughts about signage in a letter dated 18 February. He pointed out that the Secretary of State had considerable discretion about the signage that he was able to authorise. He drew attention to the many opportunities that the Highways Agency had had to object to the scheme, none of which it had taken up. He gave examples of other facilities which had non-standard signage. His overall conclusion was that it would be better to use a number of arguments, together with the long planning history and previous TSA history to persuade the Highways Agency to grant a conventional TSA than it would be to try and persuade them to treat Saltwood MSA as a distinctive, non-MSA, special case. In the course of his letter he said:

> "You sent me a report by Roger Tym & Partners seeking to justify a higher usage rate at Saltwood MSA because of its unique status. Nevertheless the passing flows on M 20 are low by motorway standards and Highways Agency would probably accept that one factor that has precluded the implementation of an MSA at Saltwood before now has been concern over viability."

68.     On 28 February 2005 the Highways Agency put forward a proposal. The proposal was that the standard advance sign be changed from "Puddleworth Services" (the dummy name used in the standard diagram referred to in Annex J) to "Ports waiting area and services" and that the sign should not have a header board naming the operator of the site. In other words the proposed sign would not identify either the named location of the site or its operator. The words "Stop 24" would not appear on the sign. On 10 March Ms Hawes wrote to Mr Thompson saying that Henry Boot intended to agree to this proposal, but she added that they would ensure that the TSA would include the scheme on "the usual advance warning notice sign for Services". Mr Thompson appears to have raised no objection and Ms Hawes wrote to the Highways Agency on 14 March 2005 agreeing to the proposal. In her letter she said that "the people we have discussed it with have not made an objection" to the proposed wording; and she also asked for confirmation that the services would still be included in the advance warning signs for services. In her cross-examination Ms Hawes explained that among the people she had discussed it with was Andrew Long of Swayfields, who were to operate the petrol filling station. Swayfields were experienced operators of petrol filling stations at MSAs. They concluded that the real relevance of the blue sign boards was what was on them. What the motorist wanted to know was whether he could get petrol, whether he could stay overnight; whether there were refreshments and whether there were toilets. Those symbols were on the proposed sign, together with the word services. Mr Long's view was that the lack of a header board was not important. So they thought that the proposed signs would be acceptable.

69.     However, on 1 April 2005 Mr Seldon of the Highways Agency raised a concern that if the sign read "Port Waiting Area" people might think that they had to stop on the way to the port. The new proposal was that the sign should read "Port Early Arrivals and Services". This would be emphasised through the additional use of additional advance

23

signs stating "Limited parking at port Early arrivals leave at J 11". Mr Seldon also said that the DfT signs branch were still thinking about including the services on the advance warning signs for services, and said that they would get back to him. Ms Hawes' immediate response was that the revised wording was better.

70.    A meeting of the letting committee on 19 April 2005 minuted Mr Howson's report that Henry Boot were working towards an agreement with the Highways Agency. Draft documents to give effect to the agreement were circulated in late April 2005. Clause 4.1 of the draft required the developer to pay for erecting the signs to be shown on an attached drawing "and any consequential changes to other associated advance direction signs indicating the presence of and distance to the Waiting Area". Ms Hawes sent the Highways Agency designs for the proposed signs in early May, but they did not meet the Highways Agency's approval. There was also a query about the location of the signs. Ms Hawes was understandably upset that the Highways Agency appeared to be going back on what had been agreed. She set out her position in a letter of 17 May. The Highways Agency replied on 20 May. Among the points they made was that after 2000 discussions took place "that changed the definition of the site, so permitting the location to be signed from the highway despite the fact that it contains far more retail space [than] we permit for MSA "candidates" to be signed from the highway. This will require the production of a non-standard sign." They urged Ms Hawes to accept the design.

71.    On 3 May Mr Howson had a conversation (which he confirmed by e-mail the following day) with Mr Quinsee. He asked whether it would be possible to update the visitor number estimate. Mr Quinsee's immediate response was that he could not be sure that there were updated traffic count data.  His assistant, Ms Beech, looked through the Roger Tym & Partners report to see "what data sources" could be updated. Mr Quinsee passed on her message to Mr Howson, saying:

>    "Essentially it may be possible to do an update but it could easily give you the wrong answer.
>
>    I suggest that if the data is available it is ordered and we review it. Cost about £250 ex VAT including the data and our time to look at it. If it looks like we can produce an answer that at least gives a figure that is no lower than before we can do a fuller update …"

72.    This suggestion was not pursued. Also in May 2005 Mr Grice and Mr Howson met Eurotunnel. They were told that there was a need for coach companies to have interchange facilities in the area as passengers from a number of coaches converge onto one coach to go on to France. Mr Grice's recollection was that they were also told at that meeting that there was a need for coaches to change from left hand to right hand drive and vice versa when they were either about to head off for the continent or arriving from the continent.

73.    By the time of the letting meeting on 26 May the paperwork was agreed and the final detail on signage design was being resolved. That meeting was informed that there had been a good meeting with Eurotunnel at which the Stop 24 scheme had been presented. The minutes record:

24

> "Eurotunnel received this very well commenting that they perceive Stop 24 will enjoy longer "dwell-times" and thus did not see the site as "competition".
>
> They commented that HB should review the Coach parking arrangements as they experience a significant number of coaches parking at their facility at any one time."

74. The meeting was also told that Mr Howson was pursuing negotiations with Buzzline having regard to Eurotunnel's comments about coach parking.

75. The Highways Agency put forward a detailed proposal on 31 May, which was copied to Ms Hawes. The proposal extended to the alteration of two signs on the M26 and 11 new signs on the M20. There would be advance signs at junctions 8 and 10 (coastbound), two signs prior to junction 11(coastbound), two signs at the junction itself; one advance sign at junction 12 (London bound), two signs prior to junction 11 (London bound) and two signs at the junction itself (London bound). The advance sign at junction 8 (where the Maidstone MSA was located) would be to diagram 2917, which shows the distance to the next two service areas. Junction 10 (the junction before Stop 24) is some 10 miles away. Mr Seldon's response on 1 June was that the TSA itself would only deal with four signs, and that Henry Boot were anxious to sign it off as soon as possible. He noted also that Ms Hawes was aware that "arrangements will need to be made in respect of other signs". On 5 July 2005 Mr Seldon commented on the current designs. The text of the sign was now to read "Services and early port arrivals". He also commented on the location of the signs, but the details of that do not matter. On 19 July Ms Hawes sent him a revised plan. In September Mr Howson received some updated figures on forecast traffic flow from Motion Consultants. They were broadly in line with Roger Tym & Partners' forecast; although they suggested that the parking provision for coaches and heavy goods vehicles was inadequate.

76. At the marketing meeting on 20 September 2005 Mr Howson reported that:

> "… he was looking at the merits of creating a coach interchange facility on the adjoining land for which Henry Boot have an option agreement. It was noted that the current coach interchange offer at the channel tunnel is extremely poor and there appeared to be demand from various operators to operate a facility at Stop 24."

77. On 23 September 2005 Saltwood MSA Ltd entered into a new Traffic Signs Agreement with the Secretary of State for Transport. It recited that the Secretary of State as highway authority had authorised the erection of signs within the highway boundary; and that the Secretary of State as landowner agreed to grant a licence for the erection of those signs on the terms of the agreement. The agreement was non-assignable (except to a group company). As in the draft, clause 4.1 of the completed agreement said that the developer would pay the cost of erecting the signs "and any consequential changes to other advanced direction signs indicating the presence of and distance to the Waiting Area". Among the terms on which consent was granted were the following:

25

i) The operator was required to provide 24 hours a day uninterrupted free parking, free toilets, petrol and diesel for sale; a free picnic area, and free facilities for providing and displaying information about channel crossings;

ii) The operator was prohibited from selling alcohol on site, and had to use reasonable endeavours to prevent the consumption of alcohol on site;

iii) The operator had to provide access for emergency and repair vehicles.

78. Attached to the agreement was a plan showing the appearance, number and location of the permitted signs. The number and location of the signs was the same as in the previous Traffic Signs Agreement. There was to be one sign a mile and a half before the junction on the coast-bound carriageway; and one sign a mile and a half before the junction on the London-bound carriageway. In addition on each carriageway there was to be a sign at the slip road at the junction itself. The name of the site was no longer included. Instead, the signs read "Services and port early arrivals". On the signs one and a half miles out in each direction there were to be pictorial representations of the services on offer (with the addition of a bed signifying hotel facilities in addition to the symbols that had been shown on the previous signs). As in the previous agreement the signs were blue. Thus the number and locations of the signs had remained unchanged. What had changed was the description of the site.

79. On 10 October Mr Grice met representatives of Eurotunnel. Eurotunnel were interested in having representation at the site. Mr Grice recorded in his letter to Eurotunnel of 18 October:

> "Also we did discuss and agree that it was mutually beneficial to have good quality live time information being fed from Eurotunnel to our facility and to this end I would be grateful if you would confirm who would deal with this on behalf of Eurotunnel in order that discussions at the relevant time can commence."

80. The TSA was reported to Henry Boot's professional team meeting on 22 November 2005. Ms Hawes said that the site now had a TSA but added that "the signage will refer to the development as Services and Port Early Arrivals and not as a Motorway Service Area to avoid setting a precedent for future MSA's."

81. In February 2006 Saltwood MSA Ltd applied to the Highways Agency for consent to assign the TSA to Henry Boot. Consent was granted in the following month. At the marketing meeting on 24 February 2006 it was agreed that an IT consultant (Mr Bill Ives) was to be appointed to take over negotiations with Eurotunnel and the Port of Dover about real time information. Mr Howson also reported that coach operators were still interested in the additional four acres of land and that he was in continuing discussions with them. The marketing meeting on 21 March 2006 was informed that Mr Ives had met both Eurotunnel and the Port of Dover. The IT department at Eurotunnel was willing to help and there was a good positive response. Getting information from the Port of Dover was likely to be more difficult, because they did not themselves collect it from ferry operators. One idea under discussion was the creation of a consolidated sailing schedule giving information to the public about scheduled sailing times, together with information about journey times. Another idea

26

(not reported to the meeting but mentioned in Mr Howson's letter to Ms Lawther at the Port of Dover) was to display a radar image of vessels in the Channel. The same meeting was informed that Buzzline were about to make an offer and that other coach operators were keen to talk about having transfer facilities on site. Mr Howson was examining the possibilities.

82.     In April 2006 Henry Boot exercised their option to take a long lease of the site. It was Henry Boot's intention at that time to make a start on site in June 2006. Also in April 2006 Ms Hawes was in communication with Shepway DC about the tourist information centre. She asked whether they still wanted a unit. Shepway's position, communicated in an e-mail of 7 April, was that there was no change from the position in the section 106 agreement and that they were investigating potential occupiers. Ms Hawes followed this up on 9 April. In her e-mail to Shepway of that date she said:

> "At present we have a bespoke unit designed for the tourist information centre, and you will appreciate that we do not want to build it and it sits empty. Accordingly, we wish to know ASAP not by the time the property is built."

83.     On 6 June 2006 Mr Howson instructed an acoustic consultant, Mr Sim of Applied Acoustic Design. In order to assist him Mr Howson e-mailed him a copy of the Roger Tym & Partners report, adding in his covering e-mail:

> "You will note that the report contains a paragraph referring to a "High Turn In" scenario. Please ignore this paragraph which was inserted purely for marketing purposes. I have also put a call out to our Highways Consultant who has done some previous studies on the motorway junction to see if there is any further information which would be of use to you."

84.     By the time of the marketing meeting on 8 June a draft lease of the tourist information centre had been sent to Shepway. Under the terms of the section 106 agreement this gave Shepway six months within which to decide whether to take up the lease or not. Henry Boot's construction timetable had now slipped, with a start on site envisaged for July.

85.     On 7 July 2006 Shepway responded to the draft lease of the tourist information centre. They explained that the prohibition on assignment or subletting could be a sticking point, because the council itself no longer had a tourist information function. In the second week of July 2006 Ms Hawes and Mr Howson had a meeting with Mr Kayenbrink, the Director of Port Development at the Port of Dover. Mr Fawcus was also present at that meeting. The purpose of the meeting was to discuss the provision of real time information, although passing reference was made to Mr Fawcus' views on the likely visitor numbers. Mr Kayenbrink seemed keen to help; and was prepared to assist in examining the possibilities.

86.     At some time in the summer of 2006 Henry Boot commissioned a marketing report from CACI Ltd. This report (dated August 2006) considered (among other things) likely visitor numbers. It predicted a weekly total of over 90,000 visitors based on an average daily flow rate of 50,941 vehicles and a turn in rate of 26 per cent. The turn in rate was calculated from the average turn in rate of top performing MSAs. Henry

27

Boot were not pleased with the result. Almost immediately Mr Grice wrote to Ms Hawes to say (among other things):

> "I believe that we should obtain from CACI a breakdown of how they arrived at the turn in rate of 26%. As you know the average turn in rate for a motorway service area is between 7% and 8%? Previously Fripps and Roger Tym worked on 15%. Potentially I believe this figure could, if we cannot back it up, prove quite damaging."

87. Mr Howson left Henry Boot in the first week of September 2006.

88. In a letter of 11 September 2006 Mr Grice complained that CACI had in effect guessed at turn in rates and occupancy levels which "could be leaving my client Henry Boot totally exposed, should we have used this report, to at best ridicule and at worst risking the credibility of the scheme". On 16 November 2006 Mr Grice reported to Ms Hawes. He said that his main concern was that CACI had:

> "… somewhat arbitrarily chosen 26% as the turn in rate which is staggeringly excessive bearing in mind that the current turn in rate is between 7% and 8% and whilst we have pushed the turn in rate at Stop24 via Roger Tym to 15% I believe that we could justify this due to the unique nature of Stop 24.26% however is almost certainly going to lead to this report being ridiculed."

89. Another of his concerns was that CACI were using an occupancy rate of one person per vehicle. Mr Grice's explanation in evidence of his reference to "the current turn in rate" of 7 per cent to 8 per cent is that it was information that he had been given by Mr Long of Swayfields (who was by then one of his clients) and that it applied to Swayfields' service areas which were not on motorways. The particular service station that Mr Grice knew about in 2006 was one at Cambridge. It was within 2 miles of two other service stations and Mr Grice's explanation in evidence was that a turn in rate of 7 or 8 per cent at that service station was consistent with Roger Tym's forecast of 15 per cent. That explanation was in my judgment an *ex post facto* rationalisation. However, it is difficult to come to a clear conclusion about what Mr Grice did mean. He cannot have meant that the "current" turn in rate for Stop 24 was 7 or 8 per cent, because it had not yet been built. Nor can he have meant that 7 or 8 per cent was the "current" turn in rate for MSAs generally, because it was not. It was not suggested to him that at that time he was alive to the distinction in turn in rates between off-line and on-line MSAs, which might have been one explanation; but in any event I do not consider that Mr Grice's experience would have enabled him to make that distinction (which Roger Tym & Partners had not). It remains a puzzle; but it is not a puzzle which, in my judgment, leads to any inference that Mr Grice was being dishonest.

90. In the interim Ms Hawes had led a presentation to tenants in the last week of September 2006 at the offices of Henry Boot's consulting engineers. Mr Hughes of EAT was present among others. The presentation was largely about technical building details. Ms Hawes recalls that the question of live departure information came up; and that she told the tenants that although that was Henry Boot's aspiration, they had not yet resolved it and had appointed an IT consultant to explore the question. Mr Hughes

28

also said that the question of blue signs came up. Ms Hawes agreed. Her evidence was that she gave a slide presentation which included pictures of the blue signs which, by then, had been included in the TSA that was distributed to tenants in the legal pack. Ms Hawes also said that there would be additional signs which would be agreed with the Highways Agency. I accept Ms Hawes' evidence.

91. Ms Hawes left Henry Boot in November 2006, having decided to set up her own consultancy. She prepared leaving notes, which were used by her successor, Mr Adrian Schofield. In addition to the notes, she also discussed the project with Mr Schofield in a short handover period. In her leaving notes, she said that the land was split into phases of which "Phase I is the 15 acres for the Motorway Services Area (MSA) and Phase II is the additional 4 acres." She summarised the legal documents, stating (in bold face type) that "the TSA sometimes referred to as the Blue Signs Agreement is the most important of all".

92. Discussions had also continued with the Highways Agency about signage. Mr Mackenzie, in the Highways Agency's local office in Dorking, told Mr Schofield that advanced static signs would have to be covered in a section 278 agreement. In fact he was wrong about that. In an e-mail of 15 January 2007 Mr Schofield asked Mr Mackenzie whom to speak to about "network signage" by which he meant "the information signs you see on the motorway network that give information on the next 3/4 service stations coming up – operator details and mileage – often near motorway interchanges." Clearly, he said, "we would like this type of signage for this site – at the junction of the M20 and M25 and at intervals on the M20". He was referred to InterRoute. However, on 24 January 2007 the Highways Agency wrote to Mr Schofield to tell him that advance signage could not be approved, because the site did not conform to national standards for motorway services and the Secretary of State approved the construction under special circumstances, which were reflected in the restrictions on signage. This appeared to be a complete volte face from the Highways' Agency's previous indication in their letter of 31 May 2005 which had indicated a willingness to provide 13 advance signs. Mr Schofield protested by e-mail, pointing out that the Highways Agency had never said that advance signage would not be permitted. This led the Highways Agency to revise its position. They said in an e-mail of 31 January 2007 that in fact advance signage had been agreed after all, and followed that by an e-mail of 1 February 2007 that an additional advance sign would also be permitted.

93. On 7 February 2007 Mr Grice wrote to Mr Schofield recommending that the undeveloped land at the rear of the site be earmarked for parking and a coach interchange. He recommended that "we should begin to commence work on the coach interchange". On 5 July 2007 Mr Grice wrote to Mr Schofield again. In his letter he said:

> "As you are aware, over the period that we have been marketing the development we have been informing retailers (verbally) that we are endeavouring to build a coach interchange on site that will be used by the majority or possibly all of the coach companies currently servicing both the ferries and Eurotunnel.

> The intention is that coaches which are coming in from different parts of the UK will use the site to decant into coaches going across the Channel. As such we will need to be liaising with various coach companies and coach drivers associations and such like to encourage coach drivers to use our facility rather than those either at the port or Eurotunnel or indeed Maidstone."

94. He added that Mr Howson had had numerous discussions with Eurotunnel who "are very keen for use to take over this job as they themselves have numerous problems in accommodating coach transfers at the current time."

95. At a meeting on 14 August 2007 Mr Schofield reported that the live time departure information would be nothing more than the timetables for both the ferries and Eurostar. It was agreed that that would be acceptable in the first instance, but that this information should be improved upon if at all possible.

96. On 28 August 2007 Henry Boot and the Secretary of State entered into a section 278 agreement. This agreement contained more detailed working drawings of the signage that had been agreed in the TSA, together with additional signs that were to be provided at the roundabouts immediately off the motorway. At Mr Schofield's request the agreement also recorded that additional signs provided on the M 20 London bound between junctions 13 and 12 and on the M 20 coast bound between junctions 7 and 8 would be provided by the Highways Agency. This was not as much as had been indicated in the Highways Agency's letter of 31 May 2005, but it was the best that Mr Schofield could do. He has continued his efforts to persuade the Highways Agency to install additional advance signage; but so far to no avail.

97. On 5 November 2007 Mr Grice wrote to Ms Farmer of Parry's International Tours Ltd, as part of his campaign about the coach interchange. In his letter he said:

> "At the current time we are finalising how we will operate the proposed coach interchange, although it is the intention to offer our facility up to coach operators to allow them to transfer from a number of coaches into a single coach or to transfer from right to left hand drive or also as a general meeting point for customers."

98. This seems to me to show that as late as November 2007 Mr Grice still thought that a left-hand/right-hand drive swap-over was something that was of interest to coach operators.

99. On 14 January 2008 Henry Boot granted a lease of the tourist information centre to Shepway DC. The term of the lease was 10 years from 19 December 2007; and the permitted use was use as a tourist information centre.

100. After a number of delays in the construction period the site eventually opened in January 2008. It has proved a commercial failure. Visitor numbers are a small fraction of those that the Roger Tym & Partners report predicted. It has not proved possible to have real time departure information on site. Although there are coaches that use the site as an interchange, this business has built up slowly. Some of the tenants are

30

running at a loss, barely turning over enough to pay their staff wages. Others have left the site, or have not taken up occupation at all.

**The legal pack**

101.    Henry Boot's solicitors, Denton Wilde Sapte, prepared a legal pack which was sent to all the tenants before contracts were exchanged. The legal pack included (among other things) the planning permissions and a copy of the Traffic Signs Agreement. At first the TSA included in the legal pack was the second TSA (entered into in 2000); but after 23 September 2005, when the third TSA was entered into, it included that one in substitution for the second one. The legal pack also included general pre-contract enquiries (CPSE.1 and CPSE.3) and replies to those enquiries in a standard form. The questions and answers included:

> "Q: In relation to any agreements affecting the Property that have been entered into with any planning, highway or other public authority or utilities provider… confirm that there are no breaches of any of their terms
>
> A: None as far as the Seller is aware.
>
> Q: Are you required to enter into any agreement or obligation with any planning, highway or other public authority or utilities provider?
>
> A: The Seller is required under the above s. 106 agreement to enter into a Roads Agreement with Kent County Council for the adoption of the access road prior to commencing development.
>
> Q: Are you aware of any breach of, alleged breach of or any claim under any statutory requirements or bye-laws affecting the Property …
>
> A: The Seller has received no notice of any breach
>
> Q: Except as disclosed in replies to CPSE.1 please give details of … any disputes or complaints relating to the property or to the Development
>
> A: There are none so far as the Seller is aware but the Seller has made no particular enquiries into this matter."

**The agreement for lease**

102.    Each of the claimants entered into an agreement for lease. Each agreement for lease contained a clause in the following terms:

> "This Agreement constitutes the entire agreement between the parties hereto and the Tenant acknowledges that it is entering into this Agreement on the basis of the terms hereof and not in reliance upon any representation or warranty whatsoever

31

whether written or oral expressed or implied made by or on behalf of [Henry Boot] (save for written replies given by [Henry Boot's] solicitors to the enquiries raised by the Tenant's solicitors)"

103.    Depending on the timing of entry into the agreement for lease Henry Boot is sometimes described as "Owner and Developer" and sometimes as "Landlord"; but the substance of the clause is not affected.

**Mr Richard Mills**

104.    Mr Richard Mills of Douglas Stevens & Co. was neither an agent nor a sub-agent for Henry Boot. He knew Mr Grice from previous agencies he had worked for; and indeed had himself been involved in the project to create an MSA on the site. He had discussions with Mr Grice about the project in the summer of 2004. Mr Grice (and Henry Boot) knew that Mr Mills would seek to find tenants for whom he would act as agent in introducing them to the site and agreeing terms on their behalf. On 13 July 2004 Mr Mills e-mailed Mr Grice to ask for information so that he could start introducing it to a few retailers and get retained. He was provided with a copy of Brochure 1 and the Roger Tym & Partners report, which Henry Boot expected he would pass on to potential tenants. Mr Mills read the Roger Tym & Partners report carefully, so that he could speak to it if anyone asked him questions about it. He appreciated that the views expressed in the report were those of Roger Tym & Partners. With the aid of these materials, in July 2004 Mr Mills composed a standard form of letter or e-mail which he used to solicit instructions from potential tenants.

105.    Mr Mills' standard text largely repeated the information that was contained in the brochure. However, there was one important difference. Whereas the brochure had said "Detailed Planning Consent has been granted for the scheme", Mr Mills' e-mail said that "Detailed planning consent has been granted for the scheme *which also includes "Blue" Signage*" (Emphasis added). Mr Mills had assumed that the grant of planning permission meant that there would be blue signage which came with the designation of the development as a motorway service area. But he was also told by Mr Grice that there would be blue signage; although he accepted that he and Mr Grice never discussed the extent of the blue signage. Mr Mills was hoping that the proper blue signage would be in place as a result of the developer carrying out a full and comprehensive development which was supposed to be trading as an MSA. He expected the largest MSA in the UK to have better if not more comprehensive signs that in any other area. But he was also aware at the time that there would be some signage negotiation with some authority (although he did not know which one). It was a matter that he expected solicitors to pick up as part of their due diligence. Mr Mills was also told by Mr Grice that the site would be open for trading 24 hours a day. He understood this to mean that the WCs would be open, the petrol filling station would be open, and that as far as the tenants were concerned it would depend on what they agreed in their leases.

106.    Mr Mills' standard letter (but not his e-mail) also said that:

"… the site will also be the interchange for all coach services where drivers swap from right hand to left hand drive coaches for [their] onward journey."

32

107. Mr Mills said that this information came from Mr Grice. He did not think that the coach hub interchange had been fully sorted out; but he was given the impression that Henry Boot was in negotiation and progressing matters. In other words, Henry Boot were talking to operators and that everything would be in place by the time the site opened. He did not, however, say that Mr Grice told him that expressly. Mr Grice's evidence was that he would have told Mr Mills that it was Henry Boot's intention to encourage coach operators to use the site as a coach interchange and that Henry Boot were expecting longer dwell times. There is little difference between them. I find that what Mr Grice said was probably less tentative than his evidence suggests, but that what he told Mr Mills was much less definite than what Mr Mills put in his standard letter. Mr Mills, after all, was also trying to sell the development in the hope of persuading intending tenants to retain him.

**Caskade/KFC**

108. Caskade Caterers Ltd is one of the largest sub-franchisees of the Kentucky Fried Chicken brand in the south east. It operates 24 KFC outlets. The national franchisee is Kentucky Fried Chicken (Great Britain) Ltd which trades under the name Yum! Restaurants International. During 2004 Yum was approached by Mr Mills. He hoped to acquire a retainer from Yum for introducing them to the site. On 19 July 2004 he sent an e-mail in his standard form to Mr Thomas of Yum setting out his understanding of the development. Mr Thomas passed this on to Mr Robert Budge, the finance director of Caskade. Shortly afterwards Mr Budge received a copy of brochure 1 and a copy of the Roger Tym & Partners report. As far as he was concerned, these were the important documents.

109. Mr Budge understood that the grant of detailed planning permission included the normal signage that went with an MSA. Based on his experience as a regular user of motorways (but on nothing else) he assumed that this would mean that there would be regular signs at intervals advertising the existence of the MSA. He expected both signs at and close to the actual MSA and also long distance signing. On 3 September 2004 Mr Mills sent Mr Thomas a copy of the Roger Tym & Partners report. He passed it (or a copy of it) to Mr Budge.

110. At some point in the late summer or early autumn of 2004 Mr Budge met Mr Mills to go through the documents. Among the documents they went through was the Roger Tym & Partners report. Mr Budge was hazy about the precise chronology. But Mr Mills placed the meeting in October 2004; and Mr Budge agreed in cross-examination that that could well be right. According to Mr Budge's account of the meeting Mr Mills told him that this was going to be a very prestigious motorway service area; that all necessary approvals had been obtained in terms of putting up the blue signage and that it was a very exciting development. Mr Mills also told him that Henry Boot were talking in terms of at least 4.5 million visitors coming through the site in the first year. Mr Budge read through the Roger Tym & Partners report. He was impressed by it. He knew Roger Tym & Partners as traffic and planning consultants, and the report appeared to him to be professionally put together. Mr Budge was confident in terms of the statistical analysis of traffic flows on the motorway, because the report specified the sources from which the figures had been taken; and that information is available to KFC. He looked very closely at the turn in rate both for cars and coaches, where he had to rely on an expert's opinion; and thought that it was a very useful and important piece of information. It was critical to the decision whether to invest.

33

111.   On 13 October Mr Mills e-mailed Mr Grice asking for more information on the "swapping of LHD to RHD movements of coaches and lorries" and for a split of vehicle movements going north and south, because KFC expected better sales from vehicles travelling south. He did not get an answer.

112.   Mr Budge also made some calculations based on the performance of a KFC outlet at an MSA in Baldock on the A1(M). Yum supplied him with traffic flow figures for that location (30,000 vehicles a day) and the gross turnover of the outlet (£15,000 a week). They did not supply a turn in rate. But on the basis of that information Mr Budge was able to get a feel for how an MSA would work. Given that the figures supplied by Henry Boot indicated that 88,000 vehicles a week would turn into the site, he was confident that Caskade would achieve at least £15,000 a week of gross revenue.

113.   Any KFC outlet in the UK has to be approved by Yum; so Mr Budge made a presentation to the board of Yum. Mr Budge's analysis and calculations based on the Roger Tym & Partners report were an important part of that presentation. So also were his calculations based on the figures for Baldock, where he said that the turn in rate was 50 per cent. He also told the board that there was to be a coach interchange at the site, but that there were no data on the flow of passengers who would change from left hand drive coaches to right hand drive coaches. Mr Budge did not think that Henry Boot had entered into any formal agreement with coach operators. He said in evidence that the coach interchange was an additional bonus point, but that the critical factors were the traffic flow and turn in rate. The board of Yum gave its approval to the site, and Mr Budge continued to negotiate with Henry Boot through the agency of Mr Mills. He himself did not have direct contact with Henry Boot or their agents.

114.   In February 2005, following board approval, Mr Budge was asked by Mr Stokes of Yum to take up the question of signage with Henry Boot through Mr Mills. Mr Stokes' e-mail said:

> "… you only have to look at the examples we have at Welcome Break-EG Fleet M3 to see how powerful good signage can be – although as an independent they may be looking at more muted operator signs? They should wish for a big brand like KFC to lure in custom? ... Can we ask Henry Boot where they are proposing signs first etc and then go with "deal" requests?"

115.   Although Mr Mills' witness statement gave the impression that blue signage was under discussion, he accepted in cross-examination that what was discussed was signage on the site itself (e.g. a totem sign advertising the retailers on the site) rather than blue signage on the motorway itself. This evidence is consistent with the contemporaneous e-mails. I find, therefore, that the question of blue signage was not something that Caskade or Mr Mills raised directly at that time with Henry Boot or its agents.

116.   The negotiations resulted in the agreement of heads of terms in December 2004. Denton Wilde Sapte sent Caskade's solicitors the legal pack in January 2005; and this was followed by the exchange of agreements for lease on 5 July 2005. Caskade's solicitors do not appear to have raised any questions or to have proposed any amendments of substance to the travelling drafts of the agreement for lease or the

34

lease itself. Mr Budge accepted that he did sign the agreement; that he read it before signing it and that it contained an entire agreement and non-reliance clause. He also accepted that that clause was agreed by Caskade's solicitors; and that they took instructions from him before agreeing it. An important part of his cross-examination went like this:

> "MR DUTTON:  But you accept you signed up on terms that contained an express acknowledgment which identified the precise representations you relied upon, 16.7, you accept you signed that?
>
> A.  I do, yes.
>
> Q.  And you would accept presumably, therefore, that what you said there was true.  It was true, wasn't it?  You weren't relying on anything accept the documents that are referred to in 16.7, were you?
>
> A.  No.
>
> Q.  Is that a "yes" no or a "no" no?
>
> A.  That's a "yes" no.
>
> MR JUSTICE LEWISON:  Are you accepting, Mr Budge, that you did not rely on anything apart from the written replies given by --
>
> A.  I am.
>
> MR JUSTICE LEWISON:  You are accepting that?
>
> A.  I am."

117.    Mr Budge confirmed this in re-examination:

> "MR MATTHIAS: Just assuming that you signed an agreement for a lease containing a term like this, as you look at it now, is it correct?
>
> A.  When you say is it correct ...
>
> Q.  Does it tell the truth?  Does that clause tell the truth?
>
> A.  Yes."

118.    In the light of this evidence it is impossible to find that Mr Budge (and hence Caskade) relied on any of the pleaded misrepresentations, apart from those contained in the formal replies to enquiries before contract.

35

**Game Grid**

119.    Game Grid runs mixed use amusement areas, principally in airports. An amusement centre has a mix of video games, soft gaming (such as fruit machines) and other types of game. It caters for both children and adults. Game Grid has positioned itself at the up-market end of the amusement centre business. The director at the time, who was the effective decision maker, was Mr Andy Price. Mr Price had a habit of annotating letters with points that he discussed over the phone. He received details of "Stop 24 MSA" from Mr Grice on 15 December 2004. They included a copy of Brochure 1. Mr Price was excited by the opportunity to break into the MSA market, which he saw as a natural fit with Game Grid's airport operations. He had been looking at MSAs for a number of years, but opportunities were difficult to come by. He telephoned Mr Grice soon afterwards. Following the discussion Mr Price made an outline offer to take a lease of a unit by e-mail on 21 December 2004. There was at least one meeting shortly afterwards between Mr Price and Mr Grice. Mr Grice wrote on 4 January 2005 outlining the terms on which Henry Boot would be prepared to let a unit to Game Grid. Another telephone discussion between Mr Price and Mr Grice took place. Mr Price made a note of questions that he wanted to raise with Mr Grice. It read:

> "No planning yet.
>
> Why stop because Eurotunnel only 2 junctions ahead… Why fill up there. Cheaper in France. Why biggest service stat in GB on a road going nowhere."

120.    Mr Grice's answer to the first was that planning was very much in hand. In response to the remaining questions he said that the facility was attracting a lot of interest from retailers, and that people would use the facility like an airport departure lounge before they went off to take their boat or train. Mr Price noted these answers on his copy of the letter setting out the heads of terms. However, in his oral evidence he was less certain that he had raised these questions with Mr Grice; and less clear about what answers he might have been given. However I find that his annotations do reflect the answers that Mr Grice gave him; and that that the evidence in his witness statement is correct. Mr Price made more notes of that discussion on his copy of the letter. Among the points he noted were:

> "toilet access 24 hr
>
> Blues sign 2 m + 10 m will know next one there after Maidstone
>
> Dover, Ferry Port Eurotunnel, Folkestone out & back"

121.    This significance of the first of these points is that Mr Price says he was told that the site would be open 24 hours a day. He was familiar with 24 hour trading from his operations in airports, and the facility was to be called "Stop 24". He was also told that it was anticipated that the food outlets would be open from 6 a.m. to midnight and the retail outlets from 7 a.m. to 8 p.m. This was important to him because he thought that he would be able to trade for 24 hours a day; and because an amusement centre is likely to do better business once the retail outlets have closed for the evening. The significance of the second point is that Mr Price says that he was told that there would

36

be blue signs 2 miles and 10 miles from the site. This can only have applied to signs on the coast bound carriageway, because the site was less than 10 miles from the sea. There would be an additional sign before the Maidstone services, so that a driver from London would see three signs in all. Mr Price knew that good signage was critical to the success of and MSA and he knew that it was difficult to get permission for signage from the Highways Agency. He said in his oral evidence that the blue signage is the definition of an MSA and that that is what gives it credibility and what makes people stop. He accepted, however, that he and Mr Grice did not discuss the precise wording or symbols that the signs would bear. But Mr Price took it that the blue signage would be what, in his mind, was generic signage that every motorist would understand. The significance of the third point is that Mr Price says that he was told that there would be signage for the site at the ferry port in Dover, at Eurotunnel and in Folkestone both for outgoing travellers and for incoming travellers. Signage at the ferry port itself or at Eurotunnel could not, of course, have been standard motorway signage. Mr Grice had no specific recollection of the conversation. But he was adamant that although he would have told Mr Price that the development would have blue signs, he did not tell Mr Price that there would be blue signs at any specific location. He knew that there would be blue signs, but had no idea where they would go. The fact remains, however, that Mr Price made his note. I am driven to the conclusion that something was said about the location of the signs and that the distances and locations that Mr Price noted were mentioned. To this extent I reject Mr Grice's evidence. However, that said, I do not believe that Mr Grice would have said more than that that was where he expected the signs would be.

122.    Mr Price instructed solicitors on 12 January 2005 following another meeting with Mr Grice on the same day. Although Mr Price could not recall the details of that meeting, his evidence was that Mr Grice told him that the site would be a major MSA, that signage was going to be in place and that the foot fall would be in excess of 4.5 million people a year. Mr Grice said that they had commissioned research which showed that the foot fall would be in this region. He produced a copy of the Roger Tym & Partners report, which Mr Price read. Mr Price understood that this was a report prepared by Roger Tym & Partners, commissioned by Henry Boot; and that it was Roger Tym & Partners' independent report on what they considered to be the likely turn in to an MSA. Mr Price was familiar with forecasts from his operations in airports, and used them to make his business calculations. He said in his witness statement that when Mr Grice gave him the Roger Tym & Partners report he knew that Mr Price would be relying on it, and that he did in fact rely on it. But, curiously, at one point in the course of his oral evidence he said that he did not think that he was entitled to rely on it. I think that this was a moment of confusion in his evidence. Nevertheless he thought that he was going to get the footfall that Roger Tym & Partners had predicted as the turn in for an MSA. Mr Price was also told by Mr Grice that there were going to be airport style screens with departure information on them. Mr Price said that the picture of such screens in the brochure prompted his question on this topic. This, too, was a moment of confusion; because the only brochure that Mr Price had at the time was Brochure 1, which contained no pictures. Screens were particularly relevant to Mr Price, because Game Grid were airport operators and understood the significance of dwell times and the operational usefulness of travellers knowing the status of their chosen travel, whether that is ferry or train or plane. Although Mr Price did not use the precise phrase in his witness statement, he said in his oral evidence that he was sure that Mr Grice spoke of "real-time" travel

information. Mr Grice agreed that he mentioned real time travel information as an aspiration. Mr Grice also told Mr Price that there would be a lot of coaches coming to the site, which again Mr Price regarded as significant. Mr Price thought that the coach hub was something to do with left-hand and right-hand drives. However, Mr Price understood that Henry Boot had ambitions for this; and that this is what they were seeking to achieve. He thought that they would almost certainly attract the coaches because of the location of the site, and had no reason to doubt that would happen. He was not given to understand that any agreements or arrangements were actually in place.

123. Mr Grice sent another copy of the heads of terms to Game Grid's solicitors on 20 January and on the following day Mr Price confirmed that they were acceptable. The heads of terms said nothing about 24 hour trading or blue signs. But they were headed "STOP 24 MSA". The description of the site as an MSA was what mattered to Mr Price. The fact that it was to be an MSA was what, in his mind, gave it credibility.

124. Mr Price was very pleased to have been offered the opportunity in a motorway service area and took the view that issues such as governmental permissions and signage were down to the developer; they were not his problem.

125. On 31 January 2005 Denton Wilde Sapte sent Game Grid's solicitors a copy of the legal pack, which at that time included the second TSA. In due course, following the usual conveyancing procedures, agreements for lease were exchanged on 10 August 2005. Although Mr Price had general conversations with Mr Grice between the agreement of heads of terms and the exchange of agreements for lease, none were of significance for present purposes. Some attention must have been given in the course of the conveyancing to the entire agreement and non-reliance clause in the agreement, because it differs from the standard form of clause in the other agreements for lease. In the case of Game Grid the relevant part of the clause reads:

> "the Tenant acknowledges that it is entering into this Agreement on the basis of the terms hereof and not in reliance upon any representation or warranty whatsoever whether written or oral expressed or implied made by or on behalf of [Henry Boot] (save for written replies given by [Henry Boot's] solicitors to the enquiries raised by the Tenant's solicitors) *and the documents produced to the tenant's solicitors prior to the date of this agreement*." (additions emphasised)

126. Mr Price himself was the signatory of the agreement for lease. However, he either did not read, or (if he did) did not understand the significance of, this clause. No particular reliance was placed on any identified document produced to Game Grid's solicitors.

127. Mr Price also recalled being given a copy of Brochure 2, although he could not remember whether that was before or after exchange of contracts. Since Brochure 2 is dated November 2005, and exchange took place in August 2005, it must have been afterwards. Subsequently he was also given a copy of Brochure 3.

38

**Foodco/Muffin Break**

128. Foodco UK LLP is the UK arm of an Australian company trading as Muffin Break. The managing director and decision maker at the time was Mr Michael Arbuckle. He too used the services of Mr Mills as Foodco's agent. Mr Mills told him about the development in May 2005. Mr Mills e-mailed Mr Arbuckle on 11 May attaching a layout plan. The e-mail was not his standard text. There was no mention of a coach interchange. Mr Mills said in his e-mail that "the site does occupy an excellent location to service existing traffic on the M20 but also to become effectively a departure terminal for both the Port of Dover ferries and the Eurotunnel itself". He subsequently supplied Mr Arbuckle with the first of the brochures that Henry Boot had prepared. In June 2005 he also provided Mr Arbuckle with a copy of the Roger Tym & Partners report, which Mr Arbuckle reviewed carefully. Mr Arbuckle's view of the report was that it was an expert's opinion that Henry Boot had supplied and that they were using it to help them market. He took the reference in the brochure to the prediction of visitor numbers to be a reference to the Roger Tym & Partners report.

129. Mr Arbuckle was interested in the site, which presented Muffin Break with an opportunity to break into transportation hubs. A meeting was set up with Henry Boot in London for 13 July 2005. Mr Arbuckle and his operations manager Mr Jeremy Regan attended on behalf of Muffin Break. They were accompanied by Mr Mills. Mr Grice and Mr Howson were there for Henry Boot and Ms Hawes popped in for a time. The main purpose of the meeting was for Muffin Break to make a presentation about its own business, since it was relatively unknown at that time, and they needed to persuade Henry Boot that they would be a suitable tenant. The meeting lasted an hour or so. After the presentation, which took about 20 or 25 minutes, there was a general discussion. Mr Grice referred to the Roger Tym & Partners report and to its prediction of 88,000 vehicles. Mr Arbuckle accepted in cross-examination that Mr Grice did not say that Henry Boot had additional information to that which was contained in the report. He understood Mr Grice to be referring to the Roger Tym & Partners report. Mr Regan also understood that when Mr Grice and Mr Howson referred to footfall numbers, they were referring to the numbers contained in the Roger Tym & Partners report. Mr Howson agreed that the Roger Tym & Partners report was referred to and that he and Mr Grice depicted it as an independent consultants' report which they stood by. Mr Arbuckle's evidence was that Mr Grice and Mr Howson told him at the meeting that the site would be used as a coach hub where coaches travelling to Europe would meet their counterparts from Europe and swap passengers from left hand drive to right hand drive coaches; and he understood that this was a "done deal". Mr Regan had a similar understanding. Mr Grice and Mr Howson indicated to them at the meeting that there would be a coach interchange at Stop 24 motorway services and that there would be an increased dwell time by those passengers as they swapped over coaches from left-hand drive to right-hand drive. Mr Regan's impression was that this was a statement of fact about what was going to happen at the site. Mr Mills also said in his witness statement that Mr Howson said at the meeting that the foot-flow would be supported by the development being a coach hub for the transfer of left-hand and right-hand drive coaches. He was also told that there would be a fair amount of consolidation.

130. The use of the site as a coach hub and the consequential increased dwell times for passengers changing coaches was important to Mr Arbuckle; and influenced his

39

choice of unit. He deliberately chose a unit between the area allocated on the plan as the coach park and the public toilets within the amenity building. Mr Arbuckle's evidence was that Mr Grice told him that everything was in place, including critical elements like blue signage. He and Mr Howson told Mr Arbuckle that everything had been approved by the authorities. They referred him to services along the M6 and to the Cambridge services. They told him that signage would be along the lines of a typical motorway service area such as Cambridge. Mr Arbuckle came away from the meeting believing that the site would have what he described as "proper blue signage". In his witness statement he described his state of mind as follows:

> "… my expectation and belief was that the signage would be in accordance with standard motorway signage with standard wording, normally denoting the name of the service operator and some of the facilities, including the word "*services*". I fully expected there to be signage some way down the motorway, warning drivers that there was going to be a motorway service area between 10-20 miles away or thereabouts, in accordance with normal signage on motorways."

131.    Mr Regan went to the meeting with a pre-conceived idea that an MSA had a certain amount of blue signage; and he thought that what was to be the biggest MSA in the UK would have the same signage as the MSAs that Mr Grice and Mr Howson recommended them to look at. As far as he was concerned blue signage was part and parcel of an MSA. He accepted, however, that he did not know how many signs there would be, where they would be located or what they would say; and he also accepted that blue signage did not feature with any prominence at the meeting. Mr Howson denied that Mr Arbuckle had been told that blue signage was in place. He and Mr Grice knew that it was not in place, because Henry Boot had not yet signed a TSA. His evidence was that Mr Grice may well have said that they would get a blue signs agreement because at that time the TSA had been substantially agreed. Mr Grice also denied that he said that everything was in place including blue signage. I accept Mr Grice's and Mr Howson's evidence. As the latter cogently pointed out, it would have been extremely foolish to tell an easily exposed lie, since Mr Arbuckle could have asked to see the agreement. Moreover since no tenant would be contractually bound unconditionally unless and until a TSA was in place, there would have been no point in telling such a lie. I find, therefore, that Muffin Break were told that Henry Boot would get approval for blue signage; not that any agreement for signage was actually in place. This tallies with a note of a meeting held three months earlier and made by the agents of EAT (see below).

132.    Mr Howson and Mr Grice agreed that they suggested that Mr Arbuckle should visit the MSA at Cambridge. But they did not suggest that he should visit it to see what the signage would be. For one thing the Cambridge service area was not on a motorway: it was on the A 14. In addition signage at Cambridge is not a fully blue sign but a blue insert in a green sign of the kind erected on A roads. Rather they suggested that he visit that service area to see what a modern MSA would look like. This seems to me to be borne out by a note that Mr Arbuckle made of the meeting. Although the note was not contemporaneous (having been made shortly after the unit opened in January 2008) it was a note purporting to record the important things discussed at the meeting. It records that it was suggested that he visit Cambridge services and that Stop 24

40

would be bigger and better though similar to Cambridge services. Blue signs are not mentioned at all. But his note does say:

> "Stop 24 was going to be a hub for coaches. European and British coaches would use Stop 24 as a hub while the luggage was swapped from left hand to right hand drive, travellers would have a dwell time of 30-40 minutes and use stop 24 toilets and services… Coaches from different cities in the UK would also meet there and consolidate before going on to Europe. Customers would have to wait inside."

133. Mr Howson's evidence was that he did not tell Mr Arbuckle that the site would be used as an interchange for a swap from left hand to right hand drive. By the time he joined Henry Boot it was known that this swap-over did not in fact take place. His understanding was that the coach interchange would operate as a consolidation place in the way that Mr Arbuckle's note secondly described. He said that if Mr Grice had mentioned the right hand/left hand swap-over, he would have corrected him. Mr Grice accepted that he may well have told tenants that there would be a left-hand drive/right-hand drive swap-over but not at this particular meeting. His evidence was that he did not recall exactly what he did say at the meeting, but he too said that if he had mentioned the right hand/left hand swap-over in Mr Howson's presence, Mr Howson would have corrected him. Since he recalled no such correction, he deduced that he cannot have said what Mr Arbuckle recorded in his note. Clearly this is reconstruction rather than recollection. Mr Dutton warned me against placing much weight on Mr Arbuckle's note, bearing in mind that it was written two and a half years after the meeting; and as the dispute between the parties was beginning. I have had regard to that warning. But it does not seem to me that Mr Arbuckle would have entirely made up what is in his note. Moreover, Mr Arbuckle raised the question in an e-mail to Mr Mills of 6 February 2007 (before any dispute arose) in which he said:

> "Listen I spoke to someone at Stop 24 and asked him to clarify the position of the coaches which will stop there and transfer to left hand or right hand drive. He said I didn't know what I was talking about and where did I get that from. I said from the bloke at Henry Boot and you. Do you know if this is happening?"

134. In addition, the meeting with Muffin Break was only two months after the meeting that Mr Grice and Mr Howson had had with Eurotunnel when, according to Mr Grice, they were told about the need for a left-hand/right-hand drive swap-over. I bear in mind also that as late as 5 November 2007 when writing to Ms Farmer, Mr Grice was still under the impression that a left/right swap-over was something that coach operators might be interested in. In my judgment both Mr Grice and Mr Howson were confused about the precise mechanics of the intended coach interchange; and I find that a left/right swap-over was mentioned at the meeting. I find that Mr Grice mentioned it; and that Mr Howson did not correct him. However, I also find that what was said was not that there would *definitely* be a coach interchange (of any description); but that this was Henry Boot's plan. This accords not only with the evidence of Mr Howson and Mr Grice, but, more importantly, both with the way in which Mr Grice's words were recorded in a contemporaneous note made of a meeting he had with EAT three months earlier (see below); and also with the way in which Mr

41

Grice described what he had been telling tenants in his letter to Mr Schofield of 5 July 2007. Since that letter was written before this dispute arose (and was intended for internal consumption only), I give it considerable weight.

135. Mr Arbuckle followed up the suggestion that he visit Cambridge services. He noted that there was blue signage, including a sign some 10 miles from the service area. That is what he expected at Stop 24. He accepted in cross-examination, however, that he did not know how many signs there would be at Stop 24; or where they would be located (although they would be located on the motorway); or what they would say (except that they would have the word "services" and pictorial representations of the facilities on offer). Moreover, if he expected the signage at Stop 24 to be equivalent to the signage for Cambridge, he could not have expected full motorway signage because, as mentioned, the signage for Cambridge was a blue insert in a green sign.

136. Heads of terms were agreed with Muffin Break on 27 July 2005. The agreed rent was £48,000 per annum with a turnover rent if the turnover exceeded £480,000 per annum. On 29 July Denton Wilde Sapte sent Muffin Break's solicitors, Hill Dickinson, a copy of the legal pack, which at that time included the second TSA. Mr Howson confirmed by e-mail on 8 August that contracts would be exchanged by 5 September 2005. Mr Arbuckle agreed that that travelling draft of both the lease and the agreement for lease went back and forth in the usual way, and that he gave instructions to Hill Dickinson. He expected his solicitors to check matters such as signage. The agreement for lease was not in the event exchanged until 19 October 2005, although Mr Arbuckle may have signed the engrossment anything up to a month beforehand. By the time that the lease was exchanged the third TSA had been entered into. There is no evidence about whether or not Denton Wilde Sapte supplied a copy of that TSA to Muffin Break's solicitors, although I would be surprised if they did not.

137. The agreement for lease that Mr Arbuckle signed contained the standard entire agreement and non-reliance clause, but Mr Arbuckle said that in his case the acknowledgment of non-reliance on representations was not true.

**EAT**

138. EAT Ltd had been looking to break into MSAs airports and railway stations for some time. They secured an outlet at Gatwick Airport in August 2004. Mr Niall Macarthur, the founder and managing director of EAT, explained that the attraction to EAT of MSAs, airports and railway stations is that they have a very high volume of guaranteed footfall, which is generated by the official status of the site as part of travellers' travel arrangements. He emphasised that his perception was that the footfall is the result of the official MSA designation of the site with associated MSA signage up and down the motorway, so that motorists would know from a great distance what services were available to them. In April 2005 EAT were introduced to Stop 24 by Mr Ward Griffiths, a chartered surveyor who is EAT's retained agent. It was his first encounter with an MSA. He sent Brochure 1 to Mr Colin Hughes, who was EAT's retail director at the time. Mr Hughes was interested on the basis both of what Mr Griffiths had told him and the brochure, and he attended a briefing meeting at Henry Boot's London offices on 7 April 2005. Mr Hughes was accompanied by Mr Griffiths and the latter's assistant, Mr McAdden, who made a note of the meeting. Both his manuscript notes and his file note have survived. Mr Grice made the presentation for Henry Boot. Mr Hughes said in his witness statement that he

42

understood from the brochure that "everything was approved" and in his oral evidence that he understood that the reference in the brochure to the grant of planning permission meant that there was consent both for the scheme and also the signage; but if that was his understanding it was contradicted by what he was told at the presentation. He also said in his witness statement that someone raised the question of blue signage and that Ms Hawes said that "everything was in hand with the relevant agencies, and that permission had been granted". However, according to the notes made by Mr McAdden they were told in the course of the presentation that the site was being built but that highways approval was needed and was awaited. Neither note mentions blue signage. In my judgment Mr Hughes is mistaken in his recollection. It was made clear at the meeting that highways approval had not yet been obtained. No one said that approval for blue signage had already been granted. Mr Hughes said in his witness statement that he was told that the site "would be" used as a coach interchange point with some kind of feeder operation. The contemporaneous notes are more tentative. The manuscript note referred to a 4 acre part of the site as a "potential coach pick [up] drop off point" and the file note says that:

> "Port of Dover, which currently operates a coach stopping area, has indicated that the four acre site to the extreme west of the site could be used in the future as a coaching terminal."

139.  Again I consider that Mr Hughes is mistaken in his recollection. The meeting was told that there was potential for a coach interchange, but they were not told that it would definitely happen. Mr Hughes had read in the brochure that the MSA was predicted to have 4.5 million visitors per annum; but there was no information about how that number had been calculated. He did not believe it. At the meeting they were told that "[i]t is estimated that there will be 12,000 visitors a day". They were also told that departure times for Channel crossings would be displayed. Mr Hughes and Mr Griffiths recall that these were to be "real time" displays, although the notes do not record that specifically. They were also told that there would be a ticket office selling ferry and train tickets and an information centre.

140.  Mr Hughes could not recall whether the Roger Tym & Partners report was handed out at the presentation itself, but if it was not he received a copy within a few months. He read it. It looked very comprehensive and led him to believe that there would be good footfall coming into the MSA. He noticed the name of Henry Boot on the front cover of the report and took it that it was a joint report by Roger Tym & Partners and Henry Boot. However, the body of the report makes it clear that Roger Tym & Partners were instructed by Henry Boot and that they were a consultancy specialising in development, planning and property market research. I do not accept that Mr Hughes thought that this was a joint report rather than one commissioned by Henry Boot.

141.  Mr Hughes also gave evidence about other things that Ms Hawes told him at the meeting. However, I am satisfied that the only meeting at which both Ms Hawes and Mr Hughes were present was a meeting that took place in the autumn of 2006, after the agreement for lease had been signed and exchanged. Mr Hughes has mistakenly conflated two meetings that took place over a year apart.

142.  EAT were interested, and the negotiations were conducted by Mr Griffiths on their behalf. The negotiations were fairly protracted, not least because of difficulties over the turnover rent. During the course of the negotiations Mr Griffiths and Mr Hughes

43

received Brochure 2. That must have been in or after November 2005. At some stage both the Roger Tym & Partners report and the brochures were passed to Mr Macarthur. He read both. He was particularly impressed by the Roger Tym & Partners report which he thought was based on expert analysis. He had seen reports of this kind before, in relation to predicted passenger numbers at airports, although this was his first encounter with an MSA. He saw that the report had taken fairly standard MSA data (traffic flows, turn in rates and vehicle occupancy) from existing MSAs and applied them to the new MSA. He thought that the report had come up with a "pretty solid basis" for the likely footfall, even though it had not been built. All in all he thought that the report was robust. He understood that the conclusions expressed in the report were Roger Tym & Partners' conclusions, although he deduced that Henry Boot agreed with them. He understood that the report was the verification for the statement of predicted visitor numbers in the brochures. He did not think that Henry Boot had undertaken any additional work to verify the figures. Also during the course of the negotiations Mr Griffiths met or talked to Ms Hawes on a number of occasions. These conversations were mainly about the rent rather than about the proposed development itself. But Ms Hawes did not mention to Mr Griffiths any of the problems that Henry Boot were encountering with the Highways Agency. Mr Griffiths also had discussions with Mr Grice. The topic of blue signage was mentioned. In his witness statement Mr Griffiths did not suggest that Mr Grice said anything specific about blue signage. Rather his point was that Mr Grice did not tell him that the Highways Agency would not allow what he called "normal" blue signage with "normal wording" that conformed to "normal standards for MSAs". However, in his oral evidence he said that he had asked whether there would be distant signage and that Mr Grice told him that there would be. He accepted, however, that he was not told how many signs there would be or what they would say; although it was a fair assumption that they would say "Services". He agreed also that precise distances were not mentioned. But Mr Griffiths was given every encouragement to believe that the Highways Agency would approve blue signage. He understood that the traffic signage that the Highways Agency approves may differ from one site to another and that it is within their domain to decide. Mr Hughes also agreed that Mr Grice said little more about blue signage than that the site would benefit from blue signage and that an agreement was close to completion. He agreed that Mr Grice did not refer to particular distances, nor to a typical package of blue signs.

143.   After several iterations heads of terms were agreed on 8 August 2005. Mr Macarthur saw them and noticed specifically that they were headed "Saltwood MSA". EAT instructed solicitors at about that time. On 1 September Denton Wilde Sapte sent EAT's solicitors a copy of the legal pack which still included the second TSA. Mr Hughes was the point of contact at EAT. The solicitors took instructions from him, which he usually gave over the telephone. Mr Hughes did not recall seeing any replies to inquiries before contract; and although EAT's solicitors produced a lengthy report on title, Mr Hughes did not read it all. However, Mr Macarthur did. He noted particularly that the report on title stated that the site had planning permission as an MSA. At some point before exchange Denton Wilde Sapte must have sent EAT's solicitors a copy of the third TSA, because the report on title prepared for EAT referred to the third TSA that had been entered into on 23 September 2005; and Mr Macarthur was aware of that too, although he did not inspect the agreement itself. The take-home message that he had from the report on title was that "it is an MSA and everything can proceed". EAT finally decided to proceed on about 21 December

44

2005. The board were provided with a location summary, which was a repetition of the points made in Brochure 2. They were also provided with a financial appraisal, which had taken Roger Tym & Partners' estimate of visitor numbers as its starting point. One of the points that was critical to the board's decision was that Stop 24 was to be an MSA. This was a key part of EAT's strategy for expansion. Mr Macarthur said that at the time of the decision EAT did not know about the precise role of the Highways Agency, but that EAT knew through Henry Boot, their agents and EAT's own lawyers that the site was to be an MSA. The agreement for lease was signed on the following day. The decision was formally ratified at the board meeting in January 2006.

144.    Mr Hughes was asked what was his understanding of an MSA. The relevant passage is:

> "Q. …You had your idea about what an MSA was, presumably?
>
> A. Well, yes.
>
> Q. Would it be fair to say it's a service area next to a motorway that includes facilities, toilets, food, fuel, shops, other conveniences -- that's the first part of it -- and, secondly, it is a service advice area that has some sort of blue signage and takes people off the motorway to use those facilities. Those are the two elements of what an MSA is?
>
> A. That's a fair assumption. Yes, I would agree with that.
>
> Q. There is no other magic in whether something is an MSA, is there? As long as you have those two things, you are happy, are you not?
>
> A. Other than passing traffic."

**Interchange**

145.    The Interchange Organisation Ltd is in the business of currency exchange. Its chairman and managing director is Mr John Harrison, who is also a qualified solicitor. However, the director who dealt with the early negotiations was Mr Hussien Radwan. Mr Grice approached him in April or May 2006, and sent him a copy of Brochure 2, which he thought was impressive. Mr Radwan met Mr Grice three or four times. One meeting took place on 24 May. Mr Radwan recalls that Mr Grice told him that the numbers were looking good and that Henry Boot had had reports done by an independent company which showed that over 4.5 million people would go into the site each year. This echoed what Mr Radwan had seen in the brochure. In his oral evidence he said that he took this as "a true fact"; and was very reluctant to accept that it was a prediction. Mr Radwan asked Mr Grice about signage, and the latter said that everything would be in place. Mr Radwan agreed that Mr Grice did not tell him that everything was in place. He understood that there were still things to be done. Mr Radwan understood that there would be blue signage north and south of the site, but he and Mr Grice did not discuss how many signs there would be or what they were

45

going to say. Mr Grice told him that there would be signage at the port of Dover and at the tunnel. Mr Grice also told him that there were "big plans" to make the site into a coach hub. Mr Radwan agreed that Mr Grice did not tell him that any agreements about the coach hub were in place. Mr Radwan did not ask for, and was not given, a copy of the Roger Tym & Partners report.

146.    At some stage in the late spring Mr Radwan passed the brochure to Mr Harrison. He read it and thought that what it described was an exciting opportunity. He also spoke to Mr Grice who seemed very bullish about the scheme. In addition he and Mr Radwan discussed the information that they had been given. They understood that the figure of 88,000 visitors a week was based on research that someone had undertaken. Neither of them asked for or read the Roger Tym & Partners report.

147.    Heads of Terms were agreed on 20 September 2006. Since Mr Harrison was a qualified solicitor, he did the conveyancing on behalf of Interchange. Denton Wilde Sapte sent him the legal pack, which included the third TSA that had been made on 23 September 2005. Mr Harrison looked at it. He also recalled the drawings and sketches showing what signs had been agreed. Although there was no reference in the legal pack to any other signs, it never occurred to Mr Harrison that there would not be other signs as well. But he did not ask about other signs. Mr Harrison saw and read the entire agreement and non-reliance clause, and he took the decision to sign the agreement as it stood. The agreement for lease was signed in March 2007.

**Panesar/Burger King**

148.    Mr Sukhi Panesar was the owner of Panesar Enterprises Ltd at the time of the events in issue. He had recently returned from Canada where he had been a Burger King franchisee; and he was looking for a Burger King franchise in England within an hour's drive from home. Mr Grice had contacted Mr Kevin Frost at Burger King's head office about a number of sites, including the one with which I am concerned. Mr Frost did not want the site as one which the company itself would operate, but thought it was suitable for a franchisee. He passed the details to Mr Panesar together with information about other sites. Mr Panesar went to look at the site towards the end of May 2006 and thought that it would be a busy one. He knew at that time that there was a predicted footfall of 88,000 visitors per week, and on seeing the site he could understand why that would be the case.

149.    Mr Panesar had a copy of Brochure 2 which he probably obtained from Mr Frost, although his account of how it was sent to him (by e-mail) must be inaccurate. In the first place Mr Frost had a hard copy only; and there is no suggestion that he scanned it into a format that could have been sent by e-mail. Second, there is no e-mail from Mr Frost to Mr Panesar which attaches the brochure. Mr Frost also supplied him with some financial information about the performance of Burger King outlets on MSAs up and down the country. Burger King have an established methodology for estimating the potential of a site, although it does not involve Burger King itself in estimating visitor numbers. Mr Frost's estimate of the potential of this site took the Roger Tym & Partners report's prediction of visitor numbers as its starting point. Mr Panesar made a second visit to the site accompanied by his family (including his sister-in-law who was his business partner).

46

150. Mr Panesar decided to go ahead with a lease at the site. Between May and October 2006 he had conversations with Mr Grice (whom he never met face to face). In his witness statement Mr Panesar said:

"… I had negotiations with Neil Grice who confirmed to me what Kevin Frost had said: this was to be a motorway service area, and it was going to be one of the biggest and best in Europe. He confirmed that the foot-flow figures looked very impressive, and he also indicated to me that this was going to be a major hub for coaches to interchange from left-hand to right-hand drive and vice versa, as coaches made their way to and from the Continent. He told me that it was going to be a consolidation hub for coaches, so that four or five coach companies from the UK with passengers going on to a destination in Europe would converge at about the same time, and then all the passengers would swap onto one or two left-hand drive coaches for their onward journey. Mr Grice made the point of saying to me that, in the process, there was going to be an extended dwell time and the passengers would use the amenity centre."

151. Mr Panesar's oral evidence was that he was told by Mr Grice that the coach hub was "more or less in place"; and he took it that the deal was "more or less done and dusted". This evidence and the quoted passage from Mr Panesar's witness statement were not specifically put to Mr Grice in cross-examination. But there is no reason to doubt that he talked about the coach hub in the same way that he had done with other tenants. By the same token there is no reason to suppose that Mr Grice told Mr Panesar any more than he told other tenants: namely that the creation of a coach hub was one of Henry Boot's plans. This would tally with what Mr Radwan recalls being told by Mr Grice at about the same time. Mr Panesar's oral evidence, even if taken at face value, does not suggest that Mr Grice told him that agreements with coach operators were actually in place.

152. Mr Panesar's evidence was that Brochure 2 was the principal document on which he relied. He could not remember whether he had been offered a copy of the Roger Tym & Partners report; but if he had he had not taken up the offer. He had not read any of the legal documentation before he signed it. Mr Panesar was particularly impressed with that part of the brochure that stated:

"Estimated visitor numbers on opening 4.6m per annum/88,000 per week."

153. He did not accept in his oral evidence that this was a prediction (although I was unable to understand why not). He thought that Henry Boot must have done something to "back those numbers up"; and thought at the time that they must have consulted an outside expert, or that they had used their own in house expert. Mr Panesar said in his evidence that he was subsequently supplied with Brochure 1. This is unlikely given that Brochure 2 was plainly the more recent brochure and he already had that. But whether he received Brochure 1 or not, he was clear that Brochure 2 was the one upon which he relied. Brochure 2 described the site as a motorway service area and although it said nothing about signage Mr Panesar took it that a motorway

47

service area comes with signage. The signage that he had in mind was some 10 or 12 signs at intervals of up to 30 miles away, including a sign at the preceding MSA so that a motorist could decide whether to stop there or to go on to the next one. He also took it that since Henry Boot were going to spend many millions of pounds on the development they were going to have the rest of the ingredients with it.

154. Although this did not appear in his witness statement Mr Panesar said in his oral evidence that Mr Grice told him that Stop 24 would look similar to a Welcome Break, Moto or Road Chef; and that whatever signage you see on those three would be the signage for Stop 24. He was not, however, told how many signs there would be nor where they would be located. This allegation was not put to Mr Grice either.

155. Mr Panesar proved a difficult person with whom to negotiate. He seemed to change his mind about what was acceptable. Mr Grice displayed some signs of exasperation. In an effort to put pressure on Mr Panesar to agree terms he sent him an e-mail on 16 November in which he said:

> "The development will be [one of] the best food retailing opportunities in the UK. You would have been unopposed with an exclusivity on burger sale serving 4.5 million people a year with guaranteed growth. We are taking interest from a wide range of food offers and as such can pick and choose our food offer."

156. This pressure worked; and heads of terms were agreed towards the end of November 2006, whereupon solicitors on both sides were instructed. On about 27 November Mr Panesar's solicitors received the legal pack which by that time included the third TSA which had been entered into in September 2005 and which included the plan on which the agreed blue signage was depicted.

157. On 16 March 2007, in response to some queries that Mr Panesar had raised on the telephone, Mr Grice sent him an e-mail in which he said that:

> "The coach interchange is still being worked upon".

158. Mr Panesar had a meeting with Mr Schofield in May 2007. His evidence was that Mr Schofield told him that the site was to be a motorway service area; that there was going to be an interchange hub for coaches from all over Europe and the UK and that they were setting aside 4 to 5 acres for that purpose. He said that the footfall was going to be in the region of 4.5 million people per year. Mr Schofield said that they were really looking forward to developing the site, and that it was going to be the biggest and best motorway service area in the country. Mr Schofield did not agree the details of Mr Panesar's evidence. He agreed that he told Mr Panesar that the development was an MSA, because in his view that is what it was (and is). His evidence was that he told Mr Panesar that there was going to be a coach facility at the centre and one of uses for it was a coach interchange. This was in essence the parking area for coaches with was then under construction, rather than the 4 or 5 acres at the rear of the site. That is the way in which Mr Schofield understood a coach interchange to work; and that is in fact how Shearings currently operate their coach interchange at the site. I prefer Mr Schofield's evidence. As I have said, I think that Mr Panesar was not strong on the precise details of what happened, and in my judgment this is one of

48

the occasions on which he has become confused. Mr Panesar also said that Mr Schofield had told him that 80 per cent of the development was let; and that they had signed Marks & Spencer. Again Mr Schofield denied having said that. I accept Mr Schofield's evidence that they talked about the development in more general terms; and that although he might have told Mr Panesar that they were hoping to attract Marks & Spencer, he did not say that they had signed up.

159.    Panesar Enterprises Ltd entered into an agreement for lease on 14 June 2007. Mr Panesar signed it on the company's behalf, but he did not read the agreement or the draft lease.

**Signage**

160.    I have already set out the Highways' Agency's published policy at the relevant time. This policy leaves a good deal to the discretion of the Highways Agency. It is also not entirely straightforward to apply. In his report Mr Mew prepared plans showing what he said would have been the signs relating to Stop 24 if it had been signed as an MSA. The plan contained a number of errors in purporting to apply Annex J. For instance Mr Mew said that there would have been a sign on the M25. But the sign was such that it bore the names of four service area (whereas the limit under Annex J was three) and it showed the distance to the next but two service area (which was Stop 24) , whereas the policy allowed a sign only to the next but one. In one case Mr Mew had depicted a sign which showed the distance to the next two service areas (including Stop 24) but was unable to explain why that particular sign showed two distances, whereas the preceding and following signs showed only one. It is true, as Mr Mew pointed out, that there ware more advance signs between the junction of the M20 and M26 on the one hand, and Maidstone services on the other than there are between Maidstone services and Stop 24. But simply to make that point overlooks the fact that there are more junctions on the first stretch of the M 20 than there are on the other. I regret that I did not consider that Mr Mew prepared a balanced report, and the imbalance was compounded by his omission to include on his plan of existing signs some signs that were in place and which did relate to Stop 24; and his omission to point out that at least one sign was more favourable to Stop 24 than a rigid application of Annex J would have suggested.

161.    On the other hand I found Mr Dixon to be an impressive witness. Where his opinion diverges from Mr Mew's I prefer his. Mr Dixon's view was that there was a wide variety in signage provided for an MSA, particularly in relation to advance tactical signage. He considered that there was little difference between the signage relating to Stop 24 and signage provided for a number of MSAs. There were, however, two exceptions to this:

    i)      Mr Dixon would have expected that there would have been a reference to Stop 24 (and the distance to it) on the advance distance sign at junction 8 immediately before Maidstone MSA in the coast-bound direction and

    ii)     Mr Dixon would have expected operator branding in the form of header boards on the ½ mile sign and slip road signs at Stop 24.

162.    I accept Mr Dixon's evidence. It is also the case that, in addition to the differences that Mr Dixon identified, the signs for Stop 24 also carry the words "Port early arrivals" which are unique to this site.

**The Non-reliance Clause**

163.    Each of the claimants entered into an agreement for lease. For convenience I repeat the relevant clause:

> "This Agreement constitutes the entire agreement between the parties hereto and the Tenant acknowledges that it is entering into this Agreement on the basis of the terms hereof and not in reliance upon any representation or warranty whatsoever whether written or oral expressed or implied made by or on behalf of [Henry Boot] (save for written replies given by [Henry Boot's] solicitors to the enquiries raised by the Tenant's solicitors)"

164.    Depending on the timing of entry into the agreement for lease Henry Boot is sometimes described as "Owner and Developer" and sometimes as "Landlord"; but the substance of the clause is not affected. I have already referred to the variation in the clause in Game Grid's agreement; but nothing turns on that.

165.    There are two components to this clause: the entire agreement clause and the non-reliance clause. Each has different effect and legal consequences. The purpose of an "entire agreement" clause is to denude what would otherwise constitute a collateral warranty of legal effect: *Inntrepreneur Pub Co v East Crown Ltd* [2000] 2 Lloyd's Rep 611, 614. No doubt for that reason at the start of his closing address Mr Matthias abandoned the pleaded case that the representations took effect as contractual warranties.

166.    The second component of the clause is the non-reliance clause. Precisely what statements are covered by a non-reliance clause is a question of construction of the clause. But this is subject to the important principles that, as a matter of public policy, a contracting party cannot exclude liability for his own fraud; and that if he wishes to exclude liability for the fraud of his agent he must do so in clear and unmistakable terms on the face of the contract: *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 2 Lloyd's Rep 61. The clause in the present case contains no clear words acknowledging non-reliance on fraudulent misrepresentations.

167.    In my judgment, therefore, the clause covers innocent and negligent misrepresentations, but not fraudulent ones.

168.    What then is the legal effect of such a clause? In *Peekay Intermark Ltd v Australia and New Zealand Banking Group Ltd* [2006] 2 Lloyd's Rep. 511 Moore-Bick LJ said:

> "56 There is no reason in principle why parties to a contract should not agree that a certain state of affairs should form the basis for the transaction, whether it be the case or not. For example, it may be desirable to settle a disagreement as to an existing state of affairs in order to establish a clear basis for the

50

contract itself and its subsequent performance. Where parties express an agreement of that kind in a contractual document neither can subsequently deny the existence of the facts and matters upon which they have agreed, at least so far as concerns those aspects of their relationship to which the agreement was directed. The contract itself gives rise to an estoppel: see *Colchester Borough Council v Smith* [1991] Ch 448, affirmed on appeal [1992] Ch 421.

57 It is common to include in certain kinds of contracts an express acknowledgment by each of the parties that they have not been induced to enter the contract by any representations other than those contained in the contract itself. The effectiveness of a clause of that kind may be challenged on the grounds that the contract as a whole, including the clause in question, can be avoided if in fact one or other party was induced to enter into it by misrepresentation. However, I can see no reason in principle why it should not be possible for parties to an agreement to give up any right to assert that they were induced to enter into it by misrepresentation, provided that they make their intention clear, or why a clause of that kind, if properly drafted, should not give rise to a contractual estoppel of the kind recognised in *Colchester Borough Council v Smith*. However, that particular question does not arise in this case. A clause of that kind may (depending on its terms) also be capable of giving rise to an estoppel by representation if the necessary elements can be established: see *E A Grimstead & Son Ltd v McGarrigan* (CA) 27 October 1999, unreported."

169. In this passage Moore-Bick LJ envisages two types of estoppel: an estoppel by contract and an estoppel by representation. In *Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* [2008] 2 Lloyd's Rep 581 Aikens J confirmed that this was so. He said:

"I am quite satisfied, having looked at the cases, that the two forms of "estoppel" are different. I am also satisfied that Mr McPherson is correct in submitting that if he can rely on "contractual estoppel" as analysed in the *Peekay* case, he does not need to rely on an "evidential estoppel"."

170. The relevant difference between the two, for present purposes, is that in the case of a contractual estoppel the party relying on the clause does not need to prove that he believed the truth of the acknowledgment of non-reliance.

171. Mr Matthias submitted that in relation to some types of clause it was permissible to rely on an estoppel by contract, whereas in other types of clause the only possible type of estoppel was an estoppel by representation. Those where an estoppel by contract was permissible were clauses which state words to the effect that there have been no representations. But where the clause was itself a representation about what a party entering into a contract had (or had not) relied on, only an estoppel by representation (or evidential estoppel) would do. There is no trace of this distinction in the judgment

51

of Moore-Bick LJ in *Peekay*. On the contrary, he thought that a non-reliance clause could give rise to both an evidential estoppel and also an estoppel by contract. Indeed the clause under consideration in *Peekay* was itself a representation that one party had read and understood the terms of a disclosure statement. Nor is Mr Matthias' submission borne out by subsequent cases in which judges have considered the effect of *Peekay*. In *Bottin International Investments v Venson* [2006] EWHC 3112 (Ch) Blackburne J held that a contractual estoppel arose out of a clause which stated that a buyer had not relied on the seller's representations, except to the extent stated in the contract. In *Donegal International Ltd v Zambia* [2007] 1 Lloyd's Rep. 397 Andrew Smith J held that a contractual estoppel arose out of a clause that stated that one party had not relied on any statement made by the other party other than those set out n the contract. In *JP Morgan Chase Bank v Springwell Navigation Corporation* [2008] EWHC 1186 (Comm) Gloster J, after a full review of the authorities including the ones I have mentioned, concluded that a contractual estoppel arose out of a clause that stated that Springwell had not relied on the bank in making its decision to acquire certain investments. In addition to the case law, I can see no reason of principle that would support Mr Matthias' distinction. Accordingly, I reject the supposed distinction and hold that, subject to any statutory control, the effect of the non-reliance clause in the present case is that the tenants are precluded from raising any claim for non-fraudulent misrepresentation except in so far as the claim arises out of written replies given by Henry Boot's solicitors to the tenant's solicitors.

172.    That leads on to the question whether a clause of this kind falls within section 8 of the Unfair Contract Terms Act 1977; and, if so, whether it satisfies the test of reasonableness. In *Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* Aikens J held that in principle such a clause did fall within section 8 would therefore have to satisfy the test of reasonableness. On the facts of the particular case, the contract fell outside the scope of the Unfair Contract Terms Act because it was an international supply contract. His conclusion that in principle such a clause fell within section 8 was not challenged on appeal; and his conclusion that the particular contract was an international supply contract was upheld: [2010] Q.B. 86. While reserving his right to challenge this in a higher court, Mr Dutton was content to accept that the non-reliance clause in this case had to satisfy the test of reasonableness.

173.    The statutory test of reasonableness is contained in section 11 (1) of the Unfair Contact Terms Act, which states:

> "In relation to a contract term, the requirement of reasonableness for the purposes of this Part of this Act, section 3 of the Misrepresentation Act 1967 and section 3 of the Misrepresentation Act (Northern Ireland) 1967 is that the term shall have been a fair and reasonable one to be included having regard to the circumstances which were, or ought reasonably to have been, known to or in the contemplation of the parties when the contract was made."

174.    Mr Matthias made submissions based on the application of the guidelines contained in Schedule 2 to the Act.  Schedule 2 is introduced by section 11 (2) of the Act which requires the court to have regard in particular to those guidelines in determining whether a contract term satisfied the test of reasonableness. However, this is expressly limited to the "purposes of section 6 or 7" of the Act, neither of which applies in the

52

present case. Nevertheless the jurisprudence regards the considerations in Schedule 2 as relevant even if the question is at large. I have therefore had regard to them.

175.    The purpose of a non-reliance clause is not in doubt. In *EA Grimstead & Son Ltd v. McGarrigan* (unreported, October 27, 1999) Chadwick LJ said:

> "There are, as it seems to me, at least two good reasons why the courts should not refuse to give effect to an acknowledgement of non-reliance in a commercial contract between experienced parties of equal bargaining power— a fortiori , where those parties have the benefit of professional advice. First, it is reasonable to assume that the parties desire commercial certainty. They want to order their affairs on the basis that the bargain between them can be found within the document which they have signed. They want to avoid the uncertainty of litigation based on allegations as to the content of oral discussions at pre-contractual meetings. Second, it is reasonable to assume that the price to be paid reflects the commercial risk which each party—or, more usually, the purchaser—is willing to accept. The risk is determined, in part at least, by the warranties which the vendor is prepared to give. The tighter the warranties, the less the risk and (in principle, at least) the greater the price the vendor will require and which the purchaser will be prepared to pay. It is legitimate, and commercially desirable, that both parties should be able to measure the risk, and agree the price, on the basis of the warranties which have been given and accepted."

176.    In *Quest for Finance Ltd v Maxfield* [2007] 2 CLC 706 Teare J took a similar view.

177.    I have no doubt that the non-reliance clause in the present case satisfies the requirement of reasonableness. I say that for the following reasons:

i)    The aspiration of certainty is a reasonable one for the parties to adopt. In most cases it will have the effect of avoiding a twelve day trial such as this one.

ii)    There was no substantial imbalance of bargaining power between the parties. Each of the tenants was a commercial and substantial concern. Although that may not have been wholly true in the case of Panesar Enterprises, it had the assistance of Burger King, which is.

iii)    Each of the tenants was advised by solicitors (except in the case of Interchange, where Mr Harrison, who is himself an experienced solicitor, chose to handle the conveyancing).

iv)    The term itself was open to negotiation, as is demonstrated by the case of Game Grid.

v)    Perhaps most importantly, the clause expressly permitted reliance on any reply given by the Henry Boot's solicitors to the tenant's solicitors. If, therefore, something of importance had been stated in the course of negotiations upon

53

which the intending tenant wished to rely, its solicitors had only to ask Henry Boot's solicitors for an answer to a question. That would have revealed whether Henry Boot was prepared to formalise the statement so that the tenant could rely on it or whether the tenant would have to undertake its own due diligence.

178. It follows, in my judgment, that the tenants can only succeed if they demonstrate that Henry Boot made fraudulent misrepresentations.

**The pleaded misrepresentations**

179. Given that the live claim is a claim of fraudulent misrepresentation, I must decide the case on the basis of the pleaded representations. As Lord Millett explained in *Three Rivers District Council v The Governor and Company of the Bank of England No 3* [2003] 2 AC 1:

> "It is well established that fraud or dishonesty … must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence: … This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do so."

> "As I have said, the defendant is entitled to know the case he has to meet. But since dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. At trial the court will not normally allow proof of primary facts which have not been pleaded, and will not do so in a case of fraud. It is not open to the court to infer dishonesty from facts which have not been pleaded, or from facts which have been pleaded but are consistent with honesty. There must be some fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved."

*Generic representations*

180. The representations on which the tenants rely are extensively pleaded in the Re-Re-Amended Particulars of Claim. They fall into two categories. The first are generic representations made to all intending tenants in the brochures and other documents provided to them. I think that I can summarise the key generic representations alleged to have been made in the brochures as follows:

   i)      Each of the Brochures represented that the development "was an MSA. This representation carried with it the representation that the development would be treated as an MSA by the planning and highway authorities and would have signage equivalent to that typically associated with an MSA and/or by

54

implication that Henry Boot had an honest belief and reasonable grounds for believing that the development would be treated as an MSA by the planning and highway authorities and would have signage equivalent to that typically associated with an MSA".

ii)    Each of the Brochures represented that the "expected footfall at the site was circa 4.5 million visitors (c. 88,000 per week) from opening; and/or by implication that Henry Boot had an honest belief and reasonable grounds for believing that the expected footfall at the site was circa 4.5 million visitors (c. 88,000 per week)."

iii)    Brochure 1 represented that there would be a travel booking service and tourist information centre within the development and/or by implication that Henry Boot had an honest belief and reasonable grounds for believing that the development would include a travel booking service and tourist information centre.

iv)    Brochure 2 represented that the site would have live departure information for all cross-channel services and/or by implication that (i) Henry Boot had an honest belief and reasonable grounds for believing that the development would have live departure information for all cross-channel services and (ii) that Henry Boot was able to provide through agreements or arrangements with relevant third parties such live departure information for all cross-channel services.

v)    Brochures 2 and 3 represented that the site would have dwell times significantly above those typically associated with an MSA; and/or by implication that Henry Boot had an honest belief and reasonable grounds for believing that the site would have dwell times significantly above those typically associated with an MSA.

vi)    Brochure 3 represented that the site would benefit from motorway signage and/or by implication that such signage would be equivalent to that typically associated with an MSA and/or that Henry Boot had an honest belief and reasonable grounds for believing that such signage would be equivalent to that typically associated with an MSA.

181.    It is then alleged that by providing the brochures Henry Boot impliedly represented that it was not possessed of any knowledge or information that might reasonably be supposed to call into question the reliability or accuracy of any of the representations made in the brochures; and that this implied representation was a continuing representation.

182.    The Re-Re-Amended Particulars of Claim then set out extracts from the Roger Tym & Partners report. They go on to allege that "by the Report" Henry Boot made a number of representations. The next allegation is that "by providing" the report:

i)    Henry Boot impliedly represented that it had an honest belief and reasonable grounds for believing that the report was reliable as a cautious and conservative estimate of the visitor numbers to be expected at the development and

ii)    Henry Boot impliedly represented that it was not possessed of any knowledge or information that might reasonably be supposed to call into question the reliability of the report as a cautious and conservative estimate of the visitor numbers to be expected at the development.

183.    These implied representations are alleged to be continuing representations.

184.    The Re-Re-Amended Particulars of Claim next allege that Henry Boot and its agent Mr Grice orally represented that the development would be used as a coach hub for interchange/switchover between coaches with left hand drive and right hand drive and that dwell times for coach passengers would be significantly greater as a result; and by implication (i) that Henry Boot had an honest belief and reasonable grounds for believing that to be the case and/or (ii) that Henry Boot was able through agreements or arrangements with relevant third parties to establish such a coach hub.

185.    The last set of generic representations are those contained in replies to CPSEs. These are pleaded as follows:

i)    That there was no requirement to enter into an agreement affecting the development in relation to the provision of signage beyond the agreements referred to in those documents.

ii)    That so far as Henry Boot was aware there were no breaches of any of the terms of agreement with the Highways Authority.

iii)    That so far as Henry Boot were aware there were no breaches, alleged breaches or any claims under statutory requirements affecting the development.

iv)    That so far as Henry Boot were aware there were no disputes or complaints relating to the property or the development.

**The subjective element**

186.    Normally, when the court is called upon to decide the meaning of an utterance, it determines that meaning objectively. The question is what meaning would the utterance convey to a reasonable person with the background knowledge of the audience to whom the utterance was addressed? However, where the issue is whether the utterance was fraudulently made, the question is a different one.

187.    In *Akerhielm v de Mare* [1959] A.C. 789 Lord Jenkins said:

> "The question is not whether the defendant in any given case honestly believed the representation to be true in the sense assigned to it by the court on an objective consideration of its truth or falsity, but whether he honestly believed the representation to be true in the sense in which he understood it albeit erroneously when it was made."

188.    The subjective state of mind of the representor is also crucial in deciding whether a representation was fraudulently made. The leading authority on that question is *Derry v Peek* (1889) L.R. 14 App. Cas. 337. The facts are worth considering, because they

bear a resemblance to the complaints in the present case. A private Act incorporating a tramway company provided that the carriages might be moved by animal power, and, with the consent of the Board of Trade, by steam power. The directors issued a prospectus containing a statement that by their private Act the company had the right to use steam power instead of horses. The prospectus omitted to say that the Board of Trade's consent would be required. The plaintiff took shares on the faith of the unqualified statement. The Board of Trade subsequently refused their consent to the use of steam power and the company was wound up. The House of Lords held that no fraudulent misrepresentation has been proved. Lord Bramwell said (p. 347):

> "The alleged untrue statement is that, "The company has the right to use steam or mechanical power instead of horses," and that a saving would be thereby effected. Now, this is certainly untrue, because it is stated as an absolute right, when in truth it was conditional on the approval of the Board of Trade, and the sanction or consent of two local boards; and a conditional right is not the same as an absolute right. It is also certain that the defendants knew what the truth was, and therefore knew that what they said was untrue. But it does not follow that the statement was fraudulently made. There are various kinds of untruth. There is an absolute untruth, an untruth in itself, that no addition or qualification can make true; as, if a man says a thing he saw was black, when it was white, as he remembers and knows. So, as to knowing the truth. A man may know it, and yet it may not be present to his mind at the moment of speaking; or, if the fact is present to his mind, it may not occur to him to be of any use to mention it. For example, suppose a man was asked whether a writing was necessary in a contract for the making and purchase of goods, he might well say "Yes," without adding that payment on receipt of the goods, or part, would suffice. He might well think that the question he was asked was whether a contract for goods to be made required a writing like a contract for goods in existence. If he was writing on the subject he would, of course, state the exception or qualification."

189.    Lord Herschell summarised his conclusion as follows (p. 374):

> "I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth. And this probably covers the whole ground, for one who knowingly

57

> alleges that which is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made."

190. In the course of his discussion of the authorities he emphasised that it was not enough to establish a lack of reasonable grounds for a belief to prove dishonesty; although a lack of reasonable grounds for a belief may be evidence from which an inference can be drawn that there was in fact no honest belief. As he put it (p. 360):

> "To make a statement careless whether it be true or false, and therefore without any real belief in its truth, appears to me to be an essentially different thing from making, through want of care, a false statement, which is nevertheless honestly believed to be true. And it is surely conceivable that a man may believe that what he states is the fact, though he has been so wanting in care that the Court may think that there were no sufficient grounds to warrant his belief."

191. Likewise he said (p. 374):

> "… I cannot assent to the doctrine that a false statement made through carelessness, and which ought to have been known to be untrue, of itself renders the person who makes it liable to an action for deceit. This does not seem to me by any means necessarily to amount to fraud, without which the action will not, in my opinion, lie."

192. A deliberate failure to inquire may also amount to fraud. As Lord Herschell put it (p. 375):

> "At the same time I desire to say distinctly that when a false statement has been made the questions whether there were reasonable grounds for believing it, and what were the means of knowledge in the possession of the person making it, are most weighty matters for consideration. The ground upon which an alleged belief was founded is a most important test of its reality. I can conceive many cases where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the Court that it was not really entertained, and that the representation was a fraudulent one. So, too, although means of knowledge are, as was pointed out by Lord Blackburn in *Brownlie v. Campbell*, a very different thing from knowledge, if I thought that a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false."

58

**Foretelling the future**

193.   Outside the realms of mythology and literature, no one can foretell the future. Even in those realms the prophecies of the Oracle of Delphi were always ambiguous, Cassandra was never believed, and the prophecies of the witches in Macbeth were downright obscure. The law has thus been wary of imposing liability for statements about the future. As Mellish LJ said in *Beattie v Lord Ebury* (1871-72) L.R. 7 Ch. App. 777, 804:

> "Of course, a representation that something will be done in the future cannot either be true or false at the moment it is made, and although you may call it a representation, if it is anything, it is a contract or promise."

194.   Similarly, in *Tudor Grange Holdings Ltd v Citibank NA* [1992] Ch 53, 67 Browne-Wilkinson V-C said:

> "A representation as to future conduct has no effect unless it constitutes a contract."

195.   In the light of this principle (and in the light of his abandonment of the argument based on collateral contract) Mr Matthias abandoned reliance on the simple allegations that Henry Boot falsely represented that the development "would have" certain attributes.

196.   Although a bare prediction does not attract legal consequences, a statement about the future may implicitly contain a statement about the present. But as with all cases in which the court is asked to imply terms, the court must be cautious.  As Lord Wilberforce observed in *British Airways Board v Taylor* [1976] 1 W.L.R. 13, 17:

> "My Lords, the distinction in law between a promise as to future action, which may be broken or kept, and a statement as to existing fact, which may be true or false, is clear enough. There may be inherent in a promise an implied statement as to a fact, and where this is really the case, the court can attach appropriate consequences to any falsity in, or recklessness in the making of, that statement. Everyone is familiar with the proposition that a statement of intention may itself be a statement of fact and so capable of being true or false. But this proposition should not be used as a general solvent to transform the one type of assurance with another: the distinction is a real one and requires to be respected, particularly where the effect of treating an assurance as a statement is to attract criminal consequences, as in the present case."

197.   Where verbal misrepresentation is alleged, the starting point is plainly the words that were actually used. If it is alleged that the words that were actually used meant more than they literally said, we pass into the area of implication. In this respect a verbal representation is no different from any other utterance. The question is: what meaning would the words convey to a reasonable person with the background knowledge of the audience to whom the utterance is addressed? This is a question to be judged

59

objectively. If the court is to conclude that an express statement also carries with it an implied addition, this can only be because that is what the express statement actually means (compare *Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988, discussing the implication of contractual terms). This will be heavily dependant on the context in which the statement is made; so generalisations are dangerous. For the same reason it is dangerous to transpose a representation held to have been made on the particular facts of one case into the facts of another.

198.   It would not, I think, be difficult to say that in most cases a prediction about the future (particularly in the context of contractual negotiations) would necessarily be understood as implicitly representing that the maker of the prediction had an honest belief in it. The existence (or otherwise) or a belief is a present fact at the moment that the prediction is uttered. If, therefore, the maker of the prediction does not have an honest belief in the prediction at the time when he makes it, he will have made a false representation of fact. In other cases, further implications may be appropriate. It may be that the representation would necessarily be understood as meaning that the prediction is based on reasonable grounds; or that the maker of the prediction has the present intention to do what he can to make it come true.

199.   In a case of fraudulent misrepresentation, however, it is necessary to go further. It is not enough that, objectively viewed, a prediction would be understood by the representee as implicitly representing that the maker of the prediction had reasonable grounds for making the prediction. It is also necessary to show that the representor understood the representation in that sense.

200.   In *Spice Girls Ltd v Aprilia World Service BV* [2002] E.M.L.R. 27 Spice Girls and Aprilia entered into heads of agreement in March 1998. The agreement was for the promotion of a range of motor cycles. Spice Girls Ltd was a company ultimately owned by the Spice Girls themselves, who then consisted of five members, all of whom were to promote the motorcycles. Geri Halliwell (one of the Spice Girls) informed the other four members of the Spice Girls in March 1998 that she intended to leave the Spice Girls in September of that year, but this information was kept from Aprilia. On 30 March a fax was sent on behalf of Spice Girls Ltd reiterating their commitment to the project. On 6 May 1998 the parties entered into a formal contract which described the Spice Girls as "currently consisting" of five named members, including Geri Halliwell. The Court of Appeal said:

> "29 We consider that the fax of March 30, 1998 contained express representations by SGL as to the commitment of each of the Spice Girls to the future implementation of all the terms of the heads of agreement as subsequently incorporated into the formal agreement to be concluded between SGL and Aprilia. That statement was untrue because SGL knew that the term of the agreement for which provision was made in the heads of agreement was 12 months and that there was a risk that Ms Halliwell would leave after only six of them. The fact that SGL did not know of the terms of the fax and the fact that KLP did know of the risk are not material to the question whether the fax contained a misrepresentation. *The unqualified assurance as to the commitment of each Spice Girl to the entire commercial sponsorship described in the heads of agreement*

60

> *contained within it the implied representation that SGL did not know of any matter which might falsify the assurance.* That was a representation of fact and it was false." (Emphasis added)

201.    Mr Matthias relied heavily on the sentence I have italicised. It is worthy of note that that case was not one of fraudulent misrepresentation. Thus the relevant meaning of the representation was the objective meaning and not the subjective meaning that the representor understood. It is also worth pointing out that the implied representation for which Aprilia contended was narrower than the quoted passage. The pleaded representation was that:

> "SGL did not know and had no reasonable grounds to believe at or before the time of entry into the agreement that any of the Spice Girls *had an existing declared intention to leave* the group during the minimum term of the Agreement." (Emphasis added)

202.    In later passages in its judgment the Court of Appeal said:

> "… the fax of March 30, 1998 was sent by Mr Pettett in the light of the information given to him by Ms Halliwell and the tour manager at Arnhem on March 27, 1998. For the reasons we have already explained (paragraph 27 above) we do not agree with the judge's narrow construction of that document. In our view it was an express assurance that each Spice Girl was fully committed to all the matters contained in the heads of agreement and in the draft agreement then circulating for the full term of 12 months. There is implicit in such assurance *the representation for which AWS contends.* That representation was false when made because of the declaration of intention made by Ms Halliwell on March 9, 1998 and never qualified or withdrawn." (§ 57, emphasis added)

> "No doubt the phrase "currently comprising" points primarily to the present (whether at the time of the draft or as of the imminent time when the Agreement was executed) and in that limited sense was true. But to our minds, in the context of the surrounding circumstances, it was concerned with an agreement which would continue into the future, in much the same sense as the conduct of SGL in approving the promotional material or of the Spice Girls in participating in the commercial shoot, in each case, for future use. In these two latter senses there was implicit in the representation derived from the conduct of SGL in circulating the draft agreement with the phrase "currently comprising" *the representation for which AWS contends.* It follows that, in that context, to say that the Spice Girls currently comprised the five named individuals without going on to say that one of them was going to leave within the period of the Agreement was false when made. What was omitted rendered that which was actually stated false or misleading in the context in which it was made." (§ 59, emphasis added)

61

203. The passage on which Mr Matthias relied went beyond the pleaded case, was not necessary to the decision, and is more narrowly formulated in later passages of the judgment. I do not therefore consider that this decision of the Court of Appeal can be taken as having laid down as a proposition of law that a person who makes a statement about the future necessarily implies that he does not know of "any matter" which "might" falsify the statement. As the Court of Appeal held in *Jaffray v Society of Lloyds* [2002] EWCA Civ 1101 (§ 59)

> "In each case it is necessary to ask the question identified above, namely what would the reasonable person in the position of the representee understand by the words used in the document. In our opinion there is no rule of law that any particular statement carries with it any particular implication. All depends upon the particular statement in its particular context."

204. The second case on which Mr Matthias placed great emphasis was the decision of Coulson J in *Fitzroy Robinson Ltd v Mentmore Towers Ltd* [2009] EWHC 1552 (TCC). The representation alleged was that a certain Mr Blake would be involved in two architectural projects. Coulson J undertook a comprehensive analysis of the law, which I need not repeat. He rightly distinguished between actionable representations on the one hand, and predictions or statements of future intent on the other. After a detailed examination of the facts he found that there had been repeated representations that Mr Blake would be involved in the projects. In fact Mr Blake had resigned. He said (§ 160):

> "That was not a statement of future intent. It was a representation of fact, as to the services and personnel that FRL would provide to the Defendants. It was indistinguishable from the actionable representation in the *Spice Girls* case."

205. Coulson J does not spell out exactly what existing fact was represented. A statement that something "will be" provided is, on the face of it, a statement about the future. But his reference to the *Spice Girls* case seems to me to show that he must have treated the statement as implicitly representing that the representor knew of no fact that would falsify the prediction. Again, I do not consider that Coulson J was purporting to lay down any general principle of law.

206. Mr Matthias also relied on the well known decision of the Court of Appeal in *Esso Petroleum Co Ltd v Mardon* [1976] Q.B. 801. Esso estimated the throughput of petrol at a filling station as 200,000 gallons a year. However, because of planning restrictions the filling station was built "back to front", with the result that the pumps and forecourt had to be built at the back of the site rather than fronting the street. This made the forecast unreliable. Nevertheless they repeated it to Mr Mardon, an intending tenant, who took a lease of the filling station on the strength of that erroneous estimate. Esso were held liable in damages. However, the basis on which Esso were held liable was not on the basis of a misrepresentation. The Court of Appeal held that Esso warranted that the forecast had been made with reasonable skill and care and were in breach of that warranty. In the present case, however, the claim based on collateral warranty has been abandoned in the face of the entire agreement clause. The second basis on which Esso were held liable was on the basis of a

negligent misstatement. This head of liability is founded on the establishment of a duty of care on the part of one contracting party to another. Such a duty may be held to arise where one party has special knowledge or skill. That is not alleged against Henry Boot in the present case. In my judgment, therefore, *Esso Petroleum Co Ltd v Mardon* does not advance the tenants' case. Mr Mathias also referred me to *Fallon v Shell (UK) Ltd* (unreported 17 November 1999), a decision of Mr Richard Mawrey QC. Mr Fallon entered into a franchise agreement with Shell. Shell had given him a projection of the profitability of the filling station. Mr Mawrey held that anyone reading the forecast would have assumed that it had been produced as a result of an exercise which had involved information available to Shell through its other sites and through its experience. As things turned out the forecast was wildly optimistic. Mr Mawrey said:

> "It seems to me that the case of *Esso Petroleum v Mardon* [1976] QB 801 has been for the last quarter of a century perfectly good authority for the proposition that in a situation .. a forecast of probable sales potential of a filling station can be a representation which, if negligent or fraudulent, is capable of sounding in damages."

207.    Put in that way, I do not agree. As I have said, *Esso Petroleum Co Ltd v Mardon* was not a case of misrepresentation, but a case of negligent misstatement. The other cases to which I have referred show that while a forecast may carry with it an implicit representation about a present fact (e.g. that the forecaster believes the forecast or that he has taken reasonable care in making it) it is that implicit representation about a present fact rather than the forecast itself that constitutes the actionable representation.

### Continuing representations and the duty to correct

208.    It is well settled that a representation made in the course of negotiations may be treated as a continuing representation. The authoritative source of the principle in modern times is *With v O'Flanagan* [1936] Ch. 575. In that case negotiations were entered into for the sale of a medical practice, and the vendor then represented to the purchasers that the takings of the practice were at the rate of £2000 per annum. The contract was signed some months later but by that date the circumstances had changed, as the practice had fallen off owing to the illness of the vendor. The change of circumstances was not disclosed to the purchasers, and when they took possession on that date they found that the practice was almost non-existent. The Court of Appeal held that the representation about the takings of the practice was a continuing representation. Since the purchaser had not been told of the change in takings before the contract was entered into, he was not bound by the contract. Lord Wright MR expressed his conclusion thus:

> "I think that the change in circumstances ought to have been communicated to the plaintiffs before they were allowed to close the transaction."

209.    This, he said is based upon the duty to communicate the change of circumstances. However, as seen from the way in which he expressed his ultimate conclusion, the duty is a duty to communicate before the transaction is closed.

63

210.    Romer LJ said:

> "If A with a view to inducing B to enter into a contract makes a representation as to a material fact, then if at a later date and before the contract is actually entered into, owing to a change of circumstances, the representation then made would to the knowledge of A be untrue and B subsequently enters into the contract in ignorance of that change of circumstances and relying upon that representation, A cannot hold B to the bargain."

211.    Romer LJ does not put it on the basis of any positive duty; but on the removal of a defence (i.e. that the representation was true at the time that it was made). In the *Spice Girls* case, the Court of Appeal applied both formulations of the principle. Whether (at least in the case of non-fraudulent representations) the duty can be modified by the inclusion of a non-reliance clause in the contract (and if so to what extent) was not explored at trial, and does not arise in this case.

212.    The reason I have dealt with *With v O'Flanagan* in this way is that, in my judgment, there is no duty to keep the counterparty constantly updated, still less to keep him informed about the ins and outs of negotiations with third parties. The duty is to communicate a change of circumstance which the representor knows has falsified a previous representation where the falsity exists at the date when the contract is concluded. What matters is the state of affairs at the date when the contract is concluded, and the representation is acted upon. As Lord Tucker put it in *Briess v Woolley* [1954] A.C. 333 (p. 353):

> "If false when made but true when acted upon there is no misrepresentation."

213.    The cases that have discussed the duty to communicate a change of circumstance have done so on the basis that the representor *knows* that a previous representation has been falsified. This is, in my judgment, consistent with the general approach to the state of mind necessary for a misrepresentation to be fraudulent. In Cartwright on *Misrepresentation Mistake and Non-Disclosure* the author states (§ 5.17):

> "In such cases the question is whether the representor can be shown to be fraudulent by the time of the contract. For this to be established, the representee will have to show not only that the representee knew of the relevant change (he had discovered the change in the facts or he has discovered that he has already made a false statement) but also that his knowledge is sufficient to make him fraudulent: he must realise the significance of the change for the statement he has already made."

214.    I agree with this. Although no authority is cited in support of the statement, it seems to me to be at least consistent with the statement of Lord Wright MR in *With v O'Flanagan* (p. 584):

> "The learned Lord goes on to say that would be fraud, though nowadays the Court is more reluctant to use the word "fraud"

64

and would not generally use the word "fraud" in that connection because the failure to disclose, though wrong and a breach of duty, may be due to inadvertence or a failure to realise that the duty rests upon the party who has made the representation not to leave the other party under an error when the representation has become falsified by a change of circumstances."

215. It is also consistent with the tentative view of the High Court of Australia in *Krakowski v Eurolynx Properties Ltd* (1995) 183 CLR 563, § 36.

216. Where a representation once made is falsified by subsequent events, such that the representor is under a duty to communicate the change of circumstances before the transaction is closed, the question then arises: to whom must the communication be made? *Strover v Harrington* [1988] Ch. 390 was a tale of an extraordinary chapter of accidents in the sale of a dwelling house. The vendors' selling agents made a misrepresentation in the sale particulars that there was main drainage. The vendors' selling agents subsequently specifically informed the purchasers' solicitors that that statement was an error and that there was not main drainage. Unfortunately the purchasers' solicitors did not inform the purchasers of that fact. They did not inform them either immediately or at any time thereafter. The purchasers, in ignorance of the fact that their solicitors had been told that there was not main drainage decided in to go ahead with the purchase. Browne-Wilkinson V-C held that a claim in misrepresentation failed. For present purposes what is important is the passage in his judgment in which he said:

> "In this, as in all other normal conveyancing transactions, after there has been a subject to contract agreement the parties hand the matter over to their solicitors who become the normal channel for communication between vendor and purchaser in all matters relating to that transaction. In so doing, in my judgment the parties impliedly give actual authority to those solicitors to receive on their behalf all relevant information from the other party relating to that transaction. The solicitors are under an obligation to communicate that relevant information to their own clients. At the very least, the solicitors are held out as having ostensible authority to receive such information. Whether there be express or ostensible authority, the purchaser is in my judgment estopped from denying that he received the information relating to the transaction which has been communicated to his solicitors acting in the same transaction. In my judgment, such knowledge should be imputed to the principal. If that were not to be so, the consequences to which I have previously referred would follow."

217. It followed therefore that the purchasers were treated as having been told of the falsity of the original representation and the judge held that if they had actually known of that, they would not have contracted. Applying that principle to the present case, a communication of the true position to the tenants' solicitors is to be treated as a communication to the tenants themselves.

65

**Passing on information**

218.   If, in the course of negotiations, a person passes on information which has been supplied to him, he may simply pass it on as information, or he may adopt it as his own statement of fact. If he passes it on merely as information, he may be guilty of a misrepresentation if he does not fairly set out the information (e.g. where he passes on parts of a surveyor's report but omits qualifications to the surveyor's opinion). But otherwise he does not adopt it as his own. He may also make implicit representations by passing on the information. Thus where the audited accounts of a company were passed to potential buyers of the company, there was an implied representation by the person who passed on the accounts that the accounts had been prepared honestly; and that he was not aware of anything that prevented them from giving a true and fair view of the company's financial position: *MAN Nutzfahrzeuge AG v Freightliner Ltd* [2005] EWHC 2347 (Comm) (§ 79). Again, it all depends on context: there is no absolute rule of law.

**What representations were made by the brochures and their supply?**

*MSA*

219.   The critical pleaded representation is that by describing the site as an MSA Henry Boot represented that it had an honest belief and reasonable grounds for believing that it would be treated as an MSA by the planning and highway authorities; and that it would have signage equivalent to that typically associated with an MSA. In fact Brochure 1 expressly represented that the development had detailed planning permission; but this representation is not relied on. If there is an *express* representation that planning permission has been granted, I can see no reason for supposing that any reader would understand the description of the site as an MSA as carrying an *implied* representation to the same effect. Moreover, that express representation was true. The real thrust of the pleaded representation was not that the site had planning permission; but that by calling it an MSA Henry Boot represented (on reasonable grounds) that it would have signage typically associated with an MSA.

220.   In my judgment the nomenclature will not bear that weight. First, as the experts agreed the term "MSA" has no defined meaning. Second, many of the witnesses derived an expectation of signage not from the fact that the development was called an MSA, but from an erroneous assumption that they made that the grant of planning permission carried with it an entitlement to erect signs on the motorway. These witnesses included Mr Mills, Mr Budge, Mr Regan and Mr Hughes. Third, each of the tenants gave evidence to the effect that the topic of signage was discussed with Henry Boot or its agents. If the mere nomenclature had conveyed the meaning that there would be blue signage of a particular quantity or type, there would have been no need to discuss it. Fourth, there is no such thing as "signage typically associated" with an MSA. As the evidence shows different tenants had widely different expectations of what blue signage would or might be provided. None of them was familiar with Annex J and nor, for that matter, were Henry Boot.

221.   Even if I had been persuaded that the mere description of the site as an MSA carried with it an implicit representation about signage of a particular quantity or type, I would not have been persuaded that Henry Boot (or its agents) understood the nomenclature in that sense.

66

*Footfall*

222.   The express representations were that the development "is predicted" to have 4.5 million visitors following opening (Brochure 1) and that "estimated" visitors numbers on opening would be 4.6 million (Brochures 2 and 3). These predictions and estimates were understood by all concerned to be those contained in the Roger Tym report. I accept that Henry Boot implicitly represented that it honestly believed those predictions or estimates as predictions or estimates; and that it had reasonable grounds for doing so.

*Tourist information and travel booking service*

223.   I accept that by Brochure 1 Henry Boot represented that it had an honest belief that the development would include a tourist information and travel booking service, and that it had reasonable grounds for doing so. Neither Brochure 2 nor Brochure 3 contained this representation.

*Live departure information*

224.   I accept that by Brochure 2 Henry Boot represented that it had an honest belief that the development would include live departure information and that it had reasonable grounds for that belief. I do not accept that the representation would have been understood as meaning that Henry Boot already had agreements or arrangements in place. Everyone knew that the development had yet to be built, and everyone knew that it had not been fully let. There is no reason to suppose that anyone understood that agreements with operators of cross-channel services had already been put in place at such an early stage in the life of the project. Even if I had been persuaded that the representation bore that meaning, I would not have been persuaded that Henry Boot (or its agents) understood it in that sense. This representation was not contained in Brochure 1; and Brochure 3 referred only to "departure information", without the inclusion of the adjective "live".

*Dwell Times*

225.   The express representations contained in Brochures 2 and 3 were "increased dwell times". Although no comparator was expressly stated, I accept that this would have been understood as meaning that dwell times would be greater than dwell times at other MSAs. That, of course, is a prediction rather than a statement of an existing fact. But I accept that Henry Boot implicitly represented that it had an honest belief that dwell times would be greater than at other MSAs; and that it had reasonable grounds for that belief.

*Motorway signage*

226.   The express representation, contained only in Brochure 3, was "Motorway signage encourages M 20 traffic to stop at this facility". Brochure 3 was produced in September 2007, some two years after the entry into the TSA. The TSA was supplied to all intending tenants in the legal pack. The TSA itself included a depiction of the agreed signage. Against that background, I do not accept that the express representation carried with it an implied representation that signage would be equivalent to that typically associated with an MSA. The representation was literally

67

true but was made in very vague terms. Anyone who wanted to know the details would have looked at the additional information supplied, namely the TSA. In addition, I do not consider that there is a package of signage "typically" associated with an MSA. Even if I had been persuaded that this representation carried the meaning alleged, I would not have been persuaded that Henry Boot (or its agents) understood it in that sense.

*The supply of the brochures*

227.   The allegation is that in addition to what the brochures themselves said, there was an additional representation made by the (wordless) act of supplying the brochure to a person interested in the development. The additional representation is that by supplying the brochures, Henry Boot implicitly represented that it was not possessed of "any knowledge or information that might reasonably be supposed to call into question" the reliability or accuracy of what was said in the brochures; and that this was a continuing representation. I do not agree. First, this alleged representation goes much further than any duty imposed by *With v O'Flanagan*, or any implied representation found to exist in other cases. It does not merely allege that Henry Boot knew nothing that *falsified* what the brochures said; it alleges that Henry Boot knew nothing that "called into question" the reliability of what was said. Second, if, as I have accepted, Henry Boot implicitly represented that it believed the express representations made in the brochure and did so on reasonable grounds, there is no reason to suppose that the mere handing over of the brochure containing those representations would have carried any additional meaning. Third, a reasonable recipient of Brochure 2 would necessarily have understood that it superseded Brochure 1; and a reasonable recipient of Brochure 3 that it superseded Brochure 2.

## What representations were made by the Roger Tym report and its supply?

228.   It is first alleged that by the report itself Henry Boot made representations. I reject this allegation. It is plain from the report itself that it is Roger Tym & Partners' own report. Although it is true that Henry Boot's name appears on the front cover of the report, paragraph 1.3 of the report states clearly that Roger Tym & Partners were "instructed in March 2004 by Henry Boot … to undertake this assessment". Henry Boot always presented the report as the report of independent experts and not as its own document. I do not consider that the report itself contained any representations by Henry Boot. Henry Boot did not, in my judgment, adopt the Roger Tym & Partners report as its own.

229.   By supplying the report to interested persons I consider that Henry Boot implicitly represented that this was a report on which they themselves were relying; and that they believed that it was a competent and independent report that had been prepared by an expert. I accept also that Henry Boot implicitly represented that it honestly believed the predictions or estimates contained in the report as predictions or estimates. I accept that these representations were continuing representations. I do not accept that the supply of the Roger Tym & Partners report carried with it any further implicit representations.

68

**Other generic representations**

*Coach hub and interchange*

230. Representations about the coach hub/interchange are pleaded both generically and specifically in relation to the various claimants. My findings in summary are:

   i)     In his preliminary discussions with Mr Mills, Mr Grice gave the impression that Henry Boot intended to create a coach hub or interchange where there would be a swap over between left hand drive and right hand drive coaches, and gave the impression that this intention was being progressed. I am not able to make a finding as to the precise words used.

   ii)    Mr Mills told his potential clients that there "would be" a coach interchange, which was more definite than anything that Mr Grice had told him.

   iii)   In January 2005 Mr Grice told Mr Price of Game Grid that there would be a lot of coaches arriving at the site. He told Mr Price that Henry Boot had ambitions for a coach interchange; but did not say either that it would definitely happen or that any agreement or arrangement was in place.

   iv)    In April 2005 Mr Grice told Mr Hughes of EAT and Mr Griffiths that part of the site could be used as a potential coach terminal, but said nothing about left hand/right hand drive coaches.

   v)     In July 2005 Mr Grice told Mr Arbuckle and Mr Regan that it was Henry Boot's plan to create a coach interchange which would be used for a swap-over between left hand drive and right hand drive coaches.

   vi)    In May 2006 Mr Grice told Mr Radwan of Interchange that Henry Boot had "big plans" for a coach interchange; but he did not say that any agreement or arrangement was in place.

   vii)   In the summer of 2006 Mr Grice told Mr Panesar that Henry Boot had plans for a coach interchange; but he did not say that any agreement or arrangement was in place.

*CPSE enquiries and replies*

231. I find that Henry Boot made the pleaded representations.

**Additional representations made to individual tenants**

232. In addition to the generic representations, the Re-re-Amended Particulars of Claim allege that certain additional representations were made to individual tenants. I summarise those which add to the generic representations.

233. *KFC: the allegations*. Mr Mills told KFC that all the necessary regulatory approvals had been obtained. He said that the site would be open 24 hours a day and that it would be used as a hub for coach switchovers and that dwell times would be extended accordingly. Henry Boot is liable for the representations made by Mr Mills because he

69

was passing on information supplied to him by Henry Boot in circumstances where it was obvious he would pass on that information to prospective tenants.

234.  *KFC*: *my findings*. The representations made to KFC were all made indirectly, through information supplied by Mr Mills. His source was Mr Grice. I find that Mr Grice did not tell Mr Mills that all necessary regulatory approvals had been obtained. This was something that Mr Mills assumed from the grant of planning permission. I find that Mr Grice gave Mr Mills the impression that Henry Boot intended to create a coach hub or interchange where there would be a swap over between left hand drive and right hand drive coaches, and gave the impression that this intention was being progressed. I find that Mr Grice told Mr Mills that the WCs and petrol filling station would be open 24 hours a day, and that as far as tenants were concerned it would depend on the terms of their leases.

235.  *Game Grid: the allegations*. Mr Grice told Mr Price that the development was an MSA and had all the necessary permissions in place including those relating to signage. When pressed on the expected footfall Mr Grice said that Henry Boot had commissioned research which supported the footfall figures. He told Mr Price that the development would be the main place that people would want to come to before using Eurotunnel or the Port of Dover. He emphasised the presence of the coach hub and the airport style information screens that he said were to be provided at the development. On about 10 August 2005 Mr Price had a conversation with Mr Howson. Mr Howson confirmed that the development would be an MSA and that they were expecting a very significant footfall in excess of 4 million people a year.

236.  *Game Grid*: *my findings*. I find that Mr Grice did not tell Mr Price that permissions relating to signage were in place. I find, however, that he told Mr Price that he expected that there would be blue signs 10 miles and 2 miles from the site, and one at Maidstone, although not what the signs would say. I find that Mr Grice told Mr Price that Henry Boot had commissioned research which showed what the expected footfall would be; and that this research was contained in the Roger Tym & Partners report. I find that Mr Grice told Mr Price that Henry Boot intended to provide real time departure information, but that he did not say that this was definite or that any arrangement or agreement was in place. I find that Mr Grice told Mr Price that Henry Boot had ambitions for a coach interchange, but that he did not say that any agreements or arrangements were in place.

237.  *Muffin Break: the allegations*. At the meeting on 13 July 2005 Henry Boot represented that the development had all necessary regulatory approval and represented that the development would be a hub for coach switchovers and that dwell times would be extended accordingly.

238.  *Muffin Break*: *my findings*. I find that Mr Arbuckle was not told that all necessary regulatory approvals were in place. I find that Mr Grice did say that Henry Boot were planning a coach interchange where there would be a left-hand/right-hand drive swap-over; but that it was not said to be definite.

239.  *EAT: the allegations*. In a sequence of meetings Henry Boot represented to EAT that the development would be an MSA site; that the development would have signage typically associated with an MSA and that the relevant agencies had substantially agreed the position in relation to signage; that the footfall figures were based on the

70

Roger Tym & Partners report and that the development would benefit from real time information screens leading to increased dwell times at the development.

240. *EAT: my findings*. I find that Henry Boot represented that the site would be an MSA. I find that neither Henry Boot nor Mr Grice represented that the site would have signage typically associated with an MSA; nor that the relevant agencies had agreed or substantially agreed the signage. I find that Mr Grice represented that the footfall figures were based on the Roger Tym & Partners report. I find that Mr Grice told Mr Hughes or Mr Griffiths that Henry Boot intended to provide real time departure information, but that he did not say that this was definite or that any arrangement or agreement was in place.

241. *Interchange: the allegations*. Mr Grice represented to Mr Harrison that the development would be open 24 hours a day, seven days a week; and that there would be plenty of coaches stopping at the development both travelling to the continent and back.

242. *Interchange*: *my findings*. I find that Mr Grice represented to Mr Radwan (rather than to Mr Harrison) that Henry Boot had big plans for a coach interchange; and that the WCs and petrol filing station would be open 24 hours a day.

243. *Burger King: the allegations*. Mr Panesar was told by Mr Grice that the development would be a major hub for the interchange of coaches and that the dwell times would be extended accordingly. In early June 2007 Mr Panesar met Mr Schofield who told him that the development already had commitments for 80 per cent of the units; that there would be a coach interchange and that 4-5 acres had been set aside for that purpose.

244. *Burger King*: *my findings*. I find that Mr Grice told Mr Panesar that it was Henry Boot's intention to create a coach interchange. I find that Mr Schofield did not tell Mr Panesar that 80 per cent of the units had been let; nor did he tell him that 4-5 acres had been set aside for use as a coach interchange.

**Were any of the representations fraudulently made?**

*Brochure 1*

245. The key representations in Brochure 1 (produced in the summer of 2004) were:

   i)    The development would be an MSA.

   ii)   The development was predicted to have 4.5 million visitors; that Henry Boot believed that prediction and that it had reasonable grounds for doing so.

   iii)  Henry Boot had an honest belief that the development would include a tourist information and travel booking service and that it had reasonable grounds for doing so.

246. In my judgment none of those representations was false when made. The first express representation was true in the sense that the development would provide services for travellers on the motorway; and the planning permission described it as a motorway service area. I have rejected the submission that the mere description of the site as an

MSA carried with it an implicit representation about the quantity or type of blue signage. But even if, objectively, the description did carry that implication, I do not consider that Henry Boot understood it in that sense. Moreover, the Henry Boot witnesses all said (in my judgment truthfully) that they believed that the development was (and is) an MSA. It is also the case that at the time Henry Boot believed that the TSA would be renewed (as indeed it was). Since the TSA is the means by which an MSA is regulated, the belief was a reasonable one.

247.    The second express representation was literally true because the prediction did exist on the shape of the Roger Tym & Partners report. Henry Boot did believe the prediction. It had reasonable grounds for that belief because the report had been prepared by an apparently competent professional and, as everyone agreed, it read very well.

248.    The third representation was also true. Henry Boot did believe that there would be a tourist information and travel booking service, because the section 106 agreement required such a facility to be offered to the local authority. There was no reason to suppose that, having insisted on the term of the section 106 agreement, the local authority would not take up its entitlement. Thus Henry Boot had reasonable grounds for its belief. In fact Henry Boot constructed a unit for use as a tourist information centre; and Shepway did take up the lease in January 2008.

*Brochure 2*

249.    The key representations in Brochure 2 (produced in November 2005) were:

i)      The development would be an MSA.

ii)     Estimated visitor numbers on opening would be 4.6 million; that Henry Boot believed that estimate and that it had reasonable grounds for doing so;

iii)    Henry Boot had an honest belief that the development would include live departure information and that it had reasonable grounds for that belief.

iv)     Henry Boot had an honest belief that dwell times would be greater than at other MSAs; and that it had reasonable grounds for that belief.

250.    I have already dealt with the first representation. By the time of Brochure 2 the TSA had been signed. That imposed on the operator of the development the same obligations as would apply to any MSA (plus the additional obligation to provide departure information). This reinforced Henry Boot's belief that the development would be an MSA. The second express representation was again literally true, because the estimate was contained in the Roger Tym & Partners report. Mr Matthias disclaimed any suggestion that Henry Boot did not in fact believe the estimate. The nub of the complaint is that by November 2005 Henry Boot had no reasonable grounds for believing the estimate and did not care whether it was true or false. This, in turn is based on two assertions:

i)      In the light of the observations that Mr Fawcus had made in the early part of 2005 Henry Boot deliberately abstained from consulting Roger Tym &

72

Partners (or any other consultant) for fear that they would be told that the Roger Tym & Partners report was unreliable and

ii)    In the light of the fact that the Highways Agency had refused to sign the site as an MSA, Henry Boot knew that it had no reasonable grounds for continuing to believe that the Roger Tym & Partners report was reliable.

251.    I have already noted that Mr Matthias disclaimed the allegation that Henry Boot did not believe in the truth of the representations. It might be thought that this concession was fundamentally inconsistent with a charge of fraud. However, Mr Matthias did submit that Henry Boot did not care whether the representations were true or false. If that is established then it does amount to a lack of any honest belief in the truth of the representations. I stress again that the mere fact that a person holds a belief that is not based on reasonable grounds is not fraud; although it may be evidence of fraud.

252.    The first charge that Mr Matthias levelled against Henry Boot was that in the light of Mr Fawcus' comments Henry Boot (through Ms Hawes and Mr Howson) did not care whether the Roger Tym & Partners report continued to be a reliable estimate of visitor numbers. Both of them denied that that was the case. The evidence about this included the following passage of Ms Hawes' cross-examination:

"Q.  I would suggest that whatever faith you may or may not have had in Roger Tym's report prior to these communications with Mr Fawcus, after these communications with Mr Fawcus, as I have said, you could have had no genuine belief that Roger Tym was correct, yet you left his report in the hands of your tenants and you didn't care whether it was right or wrong.  That is the truth, isn't it?

A.  No, it is not the truth, and we are just going round in circles because you are just repeating the same thing over and over again and I am repeating the same answers back to you. It was fundamental that we got this right because this was a long-term investment for a major company and if I had no belief in it, I would not have made the recommendations that I did to my board, which is that we would do a turnover rent.  I do believe it is the first turnover rents that Henry Boot have ever done, let alone that I had been involved in, therefore if we had no faith in our own information, we would not have agreed to do turnover rents. Also, you have to remember at this stage Henry Boot Developments had only invested something like £50,000 in the option agreement.  Their future investment was going to be over £10 million for the billed cost, I think. Why would we, if we had invested £50,000 and thought "No, actually this information isn't correct", why would we continue to further invest in the scheme?  It doesn't make sense."

253.    I found this answer compelling and I accept it. Mr Matthias laid heavy stress on the e-mail from Mr Quinsee in May 2005 in which he referred to the possibility that an update of visitor numbers "could easily give you the wrong answer". He suggested that the fact that Henry Boot did not follow this up showed that Henry Boot

73

deliberately refrained from seeking an update for fear of what it would reveal. Both of Ms Hawes and Mr Howson denied that that was the case. Although that is one possible reading of the interchange, I do not read it that way. What was in issue was data about the traffic flow; not the turn in rate. No one has suggested that the estimate of traffic flow in the Roger Tym & Partners report was inaccurate. The complaint is about the turn in rate. I do not, therefore, consider that this interchange supports the charge of a deliberate refusal to seek advice for fear of what it would reveal. I accept the denials of Ms Hawes and Mr Howson.  I am satisfied that both Ms Hawes and Mr Howson continued to believe in the reliability of the Roger Tym & Partners report. I am also satisfied that they did not deliberately refrain from taking advice for fear of what they might be told.

254. There are some further points about the Roger Tym & Partners report which I should make at this stage. As mentioned, Henry Boot exercised their option to take a long lease in April 2006. The Roger Tym & Partners report underpinned that decision. If Henry Boot had not continued to believe that the report was reliable, the option would not have been exercised; or, at least would not have been exercised without taking further advice. In addition in June 2006 Henry Boot commissioned an acoustic report. Once again the Roger Tym & Partners report provided the basis for that report. The fact that Henry Boot itself continued to rely on the report strongly corroborates the evidence of Ms Hawes and Mr Howson.

255. In his first report Mr Mew offered an assessment of the Roger Tym & Partners report. He pointed out, correctly, that the report was based on forecast traffic flows on the M20, turn in rates for motorway service areas and the likely number of occupants per vehicle. He added that at the time of the forecasts Roger Tym & Partners would have been working under the impression that the site would be recognised and signed as a full MSA. He said that signage was important and that if Roger Tym & Partners' impression was falsified, Henry Boot should have gone back to them. However, it is, in my judgment, important to consider what Mr Mew did not say:

i) He did not criticise Roger Tym & Partners for failing to distinguish between turn in rates for on-line MSAs and off-line MSAs;

ii) He did not criticise Roger Tym & Partners for having failed properly to consider whether the proximity of the site to the destination or starting point of cross-Channel travellers would have significantly reduced the turn in rate;

iii) He did not criticise Roger Tym & Partners for adopting a turn in rate of 15 per cent on the assumptions that Mr Mew thought they had made about signage;

iv) He did not mention Mr Fawcus' observations at all. This may be because he did not have access to the full case papers. But the point is that the matters that Mr Fawcus commented on (which did not include signage) did not jump out at Mr Mew. If they did not jump out at him, it is difficult to say that they jumped out (or even that they should have jumped out) at Henry Boot.

256. It is also worthy of note that Henry Boot sent the Roger Tym & Partners report to Mr Dixon in February 2005. He plainly read it because he referred to it in his letter of 18 February. He did not raise any question about its reliability.

257. As part of the planning process concerned with the application for planning permission for a hotel to be built on the site, Henry Boot commissioned a survey of the capacity of the junction to receive traffic (including increased traffic likely to be generated by the proposed development). The report was prepared by Motion Consultants, who provided detailed data. Mr Mew suggested that it would have been a straightforward exercise for Henry Boot to have analysed that report and compared it with the Roger Tym & Partners report. If that exercise had been done, it would have revealed that whereas Roger Tym & Partners had used a turn in rate of 15 per cent, extrapolation from the data presented by Motion Consultants would have revealed a turn in rate of 7.5 per cent. Mr Mew's exercise involved a number of conversions of Roger Tym & Partners' data into data compatible with the Motion Consultants' report. This involved the use of Highways Agency M20 traffic counts, as well as private information derived from traffic surveys carried out by Mr Mew's practice at other MSAs on other motorways for which there is no published data. Mr Dixon agreed that a traffic consultant could have carried out this exercise; but he did not consider that a non-expert could have. I agree with Mr Dixon. It is quite unreal to suggest that a non-expert development surveyor would have thought of carrying out this exercise, let alone known how to do it. Indeed in the course of his cross-examination of Mr Howson Mr Matthias disclaimed any suggestion that Mr Howson himself could have carried out the exercise.

258. It is important to stress that the case against Henry Boot is one of fraud. As the case law makes clear an absence of reasonable belief is not itself fraud. Thus even if I were to conclude that it was unreasonable for Henry Boot to continue to rely on the Roger Tym & Partners report (or to rely on it without asking Roger Tym & Partners to comment on Mr Fawcus' observations), that would not amount to fraud. In my judgment it has not been established that Henry Boot ceased to have an honest belief in the reliability of the Roger Tym & Partners report. Nor has it been established that Henry Boot deliberately refrained from taking further advice for fear of what that might reveal.

259. So far as the Highways Agency was concerned the position as at November 2005 was this. The TSA had been signed in September 2005. The TSA showed in detail where the near signs were going to be and what they looked like. The signs showed the proposed wording and the symbols that would be depicted. They did not show header boards displaying the name of the operator; but otherwise they were blue signs. So far as more remote signs were concerned, the latest proposal at the date of the brochure was that of the Highways Agency of 31 May 2005 which proposed 11 new signs on the M 20. In that state of affairs, I cannot accept that Henry Boot either did realise (or should have realised) that the proposed signage would in any way invalidate the Roger Tym & Partners report. Mr Dixon said in his report:

> "4.41 Given that the 2005 TSA is a "conventional" TSA in almost every respect and that the number location and type of signs allowed under it are essentially the same as those allowed under the earlier 2000 TSA (save in respect of header boards), [Henry Boot] as a company which is not specialist in the development of MSAs would not necessarily have regarded the content of the 2005 TSA as materially different to what had been originally anticipated."

75

260.    I agree; and I find that Henry Boot did not realise that the content of the 2005 TSA was materially different to the signage allowed in the 2000 TSA.

261.    The position about real time departure information as at November 2005 was as follows. Henry Boot were pursuing the question of real time departure information with the Port of Dover, and had been doing so since January. The Port seemed keen on the idea. There was also a meeting with Eurotunnel in October 2005, at which Eurotunnel also expressed a wish to have real time departure information. As at November 2005, there was no reason to believe that there was any insuperable hurdle to the provision of real time departure information. In my judgment, therefore, at November 2005 Henry Boot had an honest belief that real time departure information would be provided and had reasonable grounds for that belief.

262.    The position about increased dwell times as at November 2005 was as follows. Henry Boot believed that the development would provide superior facilities to those on offer either at the Port of Dover or the Channel Tunnel; not to mention other MSAs. They honestly believed that would lead to enhanced dwell times. The meeting that they had had with Eurotunnel in October 2005 confirmed them in that belief, because Eurotunnel also expressed the view that Stop 24 would enjoy longer dwell times. I conclude that as at November 2005 Henry Boot had the honest belief that there would be increased dwell times at Stop 24 and that they did so on reasonable grounds. In addition no evidence was led about dwell times achieved at Stop 24 by those visitors who do come; and no evidence was led about dwell times at other MSAs. It has not therefore been shown that the prediction about dwell times has turned out to be wrong.

*Brochure 3*

263.    The key representations made in Brochure 3 (produced in September 2007) were:

    i)      The development would be an MSA.

    ii)     Estimated visitor numbers on opening would be 4.6 million; that Henry Boot believed that estimate and that it had reasonable grounds for doing so;

    iii)    Henry Boot had an honest belief that dwell times would be greater than at other MSAs; and that it had reasonable grounds for that belief.

    iv)     Motorway signage encourages M 20 traffic to stop at the facility.

264.    The first three of these representations were the same as those that had been contained in Brochure 2. What had changed in the intervening time? The main change was that the Highways Agency had changed its position on advance signage. It was no longer prepared to provide the 11 signs that had been mentioned in its letter of 31 May 2005. The additional signs referred to in the section 278 agreement were all that it was prepared to agree. Mr Schofield, however, was hopeful of persuading the Agency to agree more, but so far he has had no success. However, no one at Henry Boot had revisited the reliability of the Roger Tym & Partners report in the light of this change of stance. It had not crossed anyone's mind to do so. This is not, therefore, a case of a deliberate decision to refrain from enquiry. At worst it was careless. Carelessness does not support a charge of fraud. The fourth representation was literally true,

because by the time of Brochure 3 the TSA was in place and the Highways Agency had agreed to provide additional signs under the section 278 agreement. The representation is vague in its details, and the details of the TSA were made available to the tenants in the legal pack. I do not consider that these representations were fraudulently made.

*The Roger Tym & Partners report*

265.    In the light of my findings thus far I find that Henry Boot continued to have an honest belief in the reliability of the Roger Tym & Partners report; that Henry Boot continued to rely on it in fact; and that it believed the predictions contained in it. In those circumstances the supply of the Roger Tym & Partners report was not a fraudulent misrepresentation.

*Oral representations about the coach interchange*

266.    The representations that Mr Grice made about the coach interchange fall into two categories. First there are the representations that Henry Boot had "ambitions", a "plan" or "plans" or "big plans" for a coach interchange. In my judgment these representations were true. Henry Boot did have plans for a coach interchange and have been pursuing those plans. Second there are the representations that "there would be a lot of coaches" or that part of the site "could be used" as a coach terminal. To the extent that they are statements about the future, they are not, in my judgment, actionable representations. To the extent that they are statements about Henry Boot's present intention they are true for the same reason that the first category of representations was true. Moreover, I find that Mr Grice had an honest belief in what he was telling the tenants, with the result that he was not fraudulent.

*CPSE enquiries and replies*

267.    The representations made by the CPSE replies were:

i)      That there was no requirement to enter into an agreement affecting the development in relation to the provision of signage beyond the agreements referred to in those documents.

ii)     That so far as Henry Boot was aware there were no breaches of any of the terms of agreement with the Highways Authority.

iii)    That so far as Henry Boot were aware there were no breaches, alleged breaches or any claims under statutory requirements affecting the development.

iv)     That so far as Henry Boot were aware there were no disputes or complaints relating to the property or the development.

268.    So far as the first of these representations is concerned the Re-Re-Amended Particulars of Claim do not specify what additional agreement was *required* to be made in relation to signage. Further Information provided by the tenants suggested that there was a requirement to enter into an agreement with the Highways Agency in relation to remote signage. No one has been able to identify such a requirement.

77

Indeed I understood that it was common ground between the experts that remote signage is provided by and at the expense of the Highways Agency in accordance with Annex J (as modified by their discretionary powers). This representation was therefore true.

269. The second representation relates to breaches of the terms of agreements with the Highways Agency. The only agreement that Henry Boot made with the Highways agency is the TSA. The allegation of falsity is that the signage permitted by the TSA differs from the signage that would have been permitted "in relation to an MSA". But this is not an allegation of actual breach of the terms of an agreement. Rather it is a complaint about the terms of the agreement themselves. No breach (or alleged breach) of the TSA has been identified. This representation was therefore true.

270. The third representation relates to breaches of statutory requirements. The falsity alleged is that the signage (and in particular remote signage) does not correspond to that which is permitted by Annex J. However, in my judgment Annex J is not a "statutory requirement" as contemplated by the reply to the inquiry. Indeed the Further Information itself, which identifies the tenants' complaint, describes Annex J as "guidance" rather than as a requirement. Nor, for good measure, is Annex J "statutory".

271. The fourth representation relates to disputes or complaints. The Further Information states that the dispute referred to is the dispute with the Highways Agency about the TSA and remote signage. In my judgment it is a mischaracterisation of the intercourse between Henry Boot and the Highways Agency to call it a "dispute". The Highways Agency took a view about what they would permit. Henry Boot accepted that view and worked with the Agency to find a solution. That solution was the signage permitted by the TSA. So far as remote signage was concerned, that was always a matter for the Highways Agency's discretion. Although there was a volte face on their part at the beginning of January 2007 Henry Boot did not contest the decision, but attempted to negotiate as much remote signage as it could. To my mind that cannot be called a dispute. But even if, objectively speaking, that could be called a dispute, it was not suggested to Henry Boot's witnesses that they understood that they were in "dispute" with the Highways Agency; and I do not believe that they thought they were. In my judgment either the representation was true or, if it was not, it was not a fraudulent misrepresentation.

*KFC*

272. Since Mr Budge accepted unequivocally that the non-reliance clause in the contract was true as a matter of fact, any oral representations made to KFC have no legal effect, because KFC did not rely on them. However, I record that the only relevant representation that Mr Grice made to Mr Mills (which he passed on to KFC) was that the WCs and petrol filling station would be open 24 hours a day. This was true, and was a requirement of the TSA.

*Game Grid*

273. Mr Grice told Mr Price that he expected that there would be blue signs 10 miles and 2 miles from the site, and one at Maidstone, although not what the signs would say. This is not a pleaded representation, but I will deal with it anyway. It was made at the

78