beginning of January 2005, long before the Highways Agency became difficult about remote signage; and indeed before the Highways Agency had said that special signs would be required. Indeed Mr Thompson had reported to the marketing meeting in August 2004 that there was no need for the TSA to deal with signage at junction 8 (i.e. at Maidstone MSA) which would be dealt with later. I am unable to find that, in those circumstances, Mr Grice had no honest belief in his expectation. Game Grid contracted in August 2005. At that date the proposal from the Highways Agency that was on the table was for 11 signs on the M 20. That proposal included proposals for signs 2 miles and 10 miles away, and a sign at Maidstone MSA which would indicate the distance to Stop 24. Accordingly, at the date of Game Grid's contract, an expectation that signs would be provided in the manner in which Mr Grice had told Mr Price they would be would have been a reasonable expectation. At the date of the contract, therefore, the representation was true.

274.   Mr Grice told Mr Price that Henry Boot had commissioned research which showed what the expected footfall would be; and that this research was contained in the Roger Tym & Partners report. This representation was true. In so far as it carried any implicit representation that Mr Grice and/or Henry Boot had an honest belief in the reliability of the report, that was also true.

275.   Mr Grice told Mr Price that Henry Boot intended to provide real time departure information. This was Henry Boot's intention so I find that this representation was true.

276.   Mr Grice told Mr Price that Henry Boot had ambitions for a coach interchange. This representation was also true.

*Muffin Break*

277.   Mr Grice told Muffin Break that Henry Boot were planning a coach interchange where there would be a left-hand/right-hand drive swap-over. It was true that Henry Boot were planning a coach interchange. It was not true that there would be a left-hand/right-hand drive changeover. However, Mr Grice's statement to this effect was a result of confusion in his mind. Bearing in mind that he had been told some two months earlier by Eurotunnel that there was a need for a left-hand/right-hand drive changeover, I find that he had an honest belief in what he said. To the extent that the representation was one of present fact, rather than a prediction, I find that it was not fraudulently made.

*EAT*

278.   Henry Boot represented that the site would be an MSA. Henry Boot had an honest belief in this representation and therefore it was not fraudulently made.

279.   Mr Grice represented that the footfall figures were based on the Roger Tym & Partners report. This representation was true.

280.   Mr Grice told Mr Hughes or Mr Griffiths that Henry Boot intended to provide real time departure information. This representation was also true.

*Interchange*

281.    Mr Grice represented to Mr Radwan that Henry Boot had big plans for a coach interchange. This representation was true.

282.    He also represented that the WCs and petrol filing station would be open 24 hours a day. This representation was also true.

*Burger King*

283.    Mr Grice told Mr Panesar that it was Henry Boot's intention to create a coach interchange. This representation was true.

**A duty to correct?**

284.    In my judgment a duty to correct would only arise if Henry Boot knew that previous representations that it had made had become false; or did not care whether previous representations had become false. The two matters which the tenants say should have given rise to a duty to correct are the receipt by Henry Boot of Mr Fawcus' observations on the Roger Tym & Partners report and the statement by the Highways Agency that the development would not be signed as an MSA.

285.    So far as Mr Fawcus' observations are concerned, I have already found that Henry Boot continued to believe that the Roger Tym & Partners report was a reliable report, and that they themselves acted on it. In those circumstances, putting the tenants' case at its highest, I consider that no duty to correct would have arisen unless Henry Boot knew that it no longer had reasonable grounds for so regarding the report; or did not care whether it continued to have reasonable grounds for so regarding it. This is not the same question as asking whether, objectively, Henry Boot continued to have reasonable grounds for continuing to regard the Roger Tym & Partners report as reliable. In my judgment it did not cross the mind of Henry Boot (either through Ms Hawes or Mr Howson) that their continued reliance on the Roger Tym & Partners report was unreasonable. On the contrary, in my judgment they continued to believe (rightly or wrongly) that it was reasonable to continue to rely on that report.

286.    I do not therefore consider that a duty to correct arose.

287.    So far as the Highways Agency is concerned, in my judgment the tenants are reading too much into the Highways Agency's initially stated position. From the time that the problem first surfaced both the Agency and Henry Boot were working towards an agreed solution. The agreed solution was, in the first instance, the TSA made in September 2005. Henry Boot disclosed the TSA to all intending tenants through the legal pack sent to their solicitors. By this time solicitors would have been the normal channel of communication. With the exception of Mr Harrison, none of the tenants looked at the TSA. But communication of the true position to the tenants' solicitors counts as communication to them.

288.    The only exception to this is, I think, Game Grid which entered into its agreement for lease on 10 August 2005, before the TSA had been completed. I have already found that Mr Grice told Mr Price that he expected that there would be signs 10 and 2 miles from the site, and another sign at Maidstone. In fact there are signs 22 miles and 2

80

miles from the site (on the coast bound carriageway); but there is no sign at Maidstone. But the lack of a sign at Maidstone (and the precise distance from the site of the advance sign) could not have become apparent to Henry Boot until the Highways Agency withdrew the proposal it had made in May 2005; and that did not happen until January 2007. By this time Game Grid were already contractually committed. Accordingly, on the facts of this case, I do not consider that Henry Boot had a duty to correct the representation before the contract was concluded.

289.    In addition I do not consider that, with that exception, Henry Boot knew that they had represented that there would be any particular number of blue signs, any particular locations of blue signs; or that the blue signs would take any particular form. Consequently, I do not consider that there ever came a time when it can be said that Henry Boot knew that it had made a representation that had become false.

290.    There are three final comments that I wish to make. First, with the benefit of hindsight it would have been prudent for Henry Boot to have asked Roger Tym & Partners to revise their forecasts in the light of Mr Fawcus' observations and the final terms of the TSA. It is, however, impossible to say whether Roger Tym & Partners would have changed their view and, if so, to what extent. But that does not amount to dishonesty on Henry Boot's part which is the essence of a claim in fraudulent misrepresentation. Second, it is (to me at least) surprising that no one on either side has asked Roger Tym & Partners for an explanation of why their forecast was so wildly out. Third, although the tenants have been the victims of a wildly optimistic forecast of visitor numbers, so too have Henry Boot. They have paid a considerable sum of money to acquire the site and build it out; and it is valued in their books at a considerable loss.

**Result**

291.    However, for the reasons I have given, in my judgment the claim of fraudulent misrepresentation fails.

Classics Series

# Gower

# Principles of Modern Company Law

## Eleventh Edition

### Paul L. Davies QC (Hon), FBA

*Allen & Overy Professor of Corporate Law Emeritus*
*Senior Research Fellow*
*Commercial Law Centre*
*Harris Manchester College*
*University of Oxford*

### Sarah Worthington, DBE, QC (Hon), FBA

*Downing Professor of the Laws of England*
*University of Cambridge*

### Christopher Hare

*Travers Smith Associate Professor of Corporate and Commercial Law*
*University of Oxford*
*Tutorial Fellow*
*Somerville College*

with a contribution from

### Professor Eva Micheler

*London School of Economics and Political Science*
*Ao Universitätsprofessor*
*Wirtschaftsuniversität Wien*

THOMSON REUTERS

## Compensation for misleading statements to the market

The most obvious basis for a private claim for compensation is where an issuer is required to make a disclosure to the market but fails to disclose at all, delays disclosure in circumstances where it is not legitimate to do so or makes a misleading disclosure, and the action or inaction has consequences for the price of the shares. Assuming full disclosure would have moved the price of the security, those who bought or sold shares[100] during the period before the emergence of the truth might have a claim for the difference between the actual price paid and the price the securities would have had if the disclosure obligations had been complied with.[101] The EU instruments actually say rather little about private actions for compensation. The TD stated, but only in relation to its periodic reporting requirements, that Member States "shall ensure that their laws, regulations and administrative provisions on liability apply to the issuers, the administrative, management or supervisory bodies of the issuer or the persons responsible within the issuers".[102] The reference to the "laws" of the Member States means that they had to enable private litigants to sue on the basis of their domestic civil liability rules, but the TD did not require any particular alteration to the domestic liability regime. Moreover, the TD gave the Member States a choice in relation to the defendants against whom the liability could be asserted. Furthermore, this provision on civil liability in the TD did not apply to the disclosure of major shareholdings under that Directive. Nor is there any equivalent to it in MAR, i.e. in relation to episodic disclosures and disclosure of interests by directors and others. Member States are thus had considerable freedom in fashioning civil liability rules.

27-021

After extensive policy debate, the UK introduced an explicit liability regime (in Sch.10A to FSMA 2000) but imposing liability on issuers only and then only for intentional or reckless statements. The statutory liability applies to information notified or communicated to the market by issuers through a PIP[103] or other recognised communication service.[104] It thus embraces communications to the market by issuers of information communicated to them by PDMR or major vote-holders and to the market-moving episodic disclosures required by MAR as well as to the issuer disclosures required by the TD. However, the issuer

---

[99] There is, however, some overlap. See para.27-024.

[100] Whether buyers or sellers would sue would depend on the direction of the price movement had the information been disclosed.

[101] There are also issues of causation here. If I buy at an artificially high price (because the issuer has concealed adverse information) but sell before the truth emerges, I have suffered no loss. If I sell at an artificially low price (because the issuer has concealed positive information), it can be argued that I have suffered a loss only if the price was the main motivation for my sale (rather than some personal financial emergency)

in her favour immediately following upon the disposition in favour of John Boosey, the interest of Amelia Elizabeth Boosey might not properly be held to have depended upon the contingency; but I find in the ulterior part of this will the following disposition, "Likewise, I will and bequest to my nephew, Samuel John Boosey, my brother, John Boosey's son, if not further family, the other half."

This disposition cannot, I think, upon the sound construction of this will, and having regard to the authorities which were referred to, be held to be governed by the words of contingency so far as Samuel John Boosey is concerned; and if it is not so governed as to him, I think that neither can the disposition in favour of Amelia Elizabeth Boosey be so governed, for the two dispositions are connected together and form part of one scheme, and there is upon the face of the will an evident preference in favour of Amelia Elizabeth Boosey.

My opinion, therefore, is, that the declaration contained in this decree must be altered, and that it must be declared that the interest of Amelia Elizabeth Boosey and Samuel John Boosey did not depend upon the con-[126]-tingency of the sisters, or one of them, surviving the testatrix; but this declaration, so far as Samuel John Boosey is concerned, must be without prejudice to any question as to the validity of the disposition in his favour in any other respect.

THE LORD JUSTICE KNIGHT BRUCE concurred.

[126]   JENNINGS *v.* BROUGHTON.   Before the Lords Justices.   *Dec.* 8, 9, 10, 20, 21, 1853; *March* 30, 1854.

[S. C. 17 Beav. 234; 23 L. J. Ch. 999.  See *Aberamon Iron Works* v. *Wickens*, 1868, L. R. 5 Eq. 506; *Smith* v. *Chadwick*, 1882, 20 Ch. D. 67.]

Misrepresentations, to constitute sufficient grounds for setting aside a purchase, must be material, as being of such a nature as, if true, to add to the value, must not be evidently merely conjectural statements, and must be made without a belief in their truth or without reasonable grounds for such a belief.

Where advertisements for the sale of shares in a mine had been issued containing unfounded statements, but the purchaser had not relied upon them, and had had opportunities of judging of their accuracy: Held, that he was not entitled by reason of them to have the contract rescinded.

In suits to rescind contracts for fraud, particularly where the subject is of variable value, it is the duty of the Plaintiff to put forward his complaint at the earliest possible period.

This was an appeal from a decision of the Master of the Rolls. The case is reported below, in the 17th Volume of Mr. Beavan's Reports, page 234. The facts appear sufficiently from that report and the judgments.

Mr. Willcock, Mr. W. M. James, and Mr. W. H. Harrison, were for the Appellant.

Mr. Roundell Palmer, Mr. Kenyon, and Mr. Giffard, for the Respondents.

Mr. Willcock, in reply.

[127] The following cases were cited—*Harvey* v. *Young* (Yelv. 20); *Ekins* v. *Tresham* (1 Lev. 102); *Lysney* v. *Selby* (2 Ld. Raym. 1118; 1 Salk. 211; S. C. nom. *Risney* v. *Selby*); *Pawson* v. *Watson* (Cowp. 785); *Pasley* v. *Freeman* (3 T. R. 51); *Schneider* v. *Heath* (3 Campb. 506); *Edwards* v. *M'Leay* (2 Swanst. 287; Sir G. Coop. 308); *Attwood* v. *Small* (6 Cl. & Fin. 232; Younge, 460); *Cornfoot* v. *Fowke* (6 M. & W. 358); *Wilson* v. *Fuller* (3 Q. B. 68); *Wilde* v. *Gibson* (1 H. of L. Ca. 605; Sir E. Sugden on Law of Prop. 614); *Reynell* v. *Sprye* (1 De G. M. & G. 691); *Gerhard* v. *Bates* (2 Ell. & Bl. 476); *Gordon* v. *Gordon* (3 Swanst. 400); *Budd* v. *Fairmaner* (8 Bing. 52); *Burrows* v. *Lock* (10 Ves. 470); *Bayly* v. *Merrel* (Cro. Jac. 386); *Lowndes* v. *Lane* (2 Cox, 363); *Dyer* v. *Hargrave* (10 Ves. 505); *Bree* v. *Holbech* (Doug. 655); *Haycraft* v. *Creasy* (2 East, 92); *Parkinson* v. *Lee* (2 East, 314); *Legge* v. *Croker* (1 B. & B. 506); *Foster* v. *Charles* (7 Bing. 106); *Freeman* v. *Baker* (5 B. & Ad. 797); *Wilson* v. *Short* (6 Hare, 366); and the following passages from the Digest and Codex:—"Ipse (Labeo) sic definiit dolum malum esse omnem calliditatem fallaciam

5 DE G. M. & G. 128.       JENNINGS *v.* BROUGHTON                        819

machinationem, ad circumveniendum, fallendum, decipiendum alterum, adhibitam. Labeonis definitio vera est (Dig. lib. iv. tit. iii. s. i.)." "Fraudis interpretatio semper in jure civili, non ex eventu duntaxat, sed ex consilio quoque desideratur (Dig. lib. l. tit. xvii. s. lxxix.)." "Dolum ex indiciis perspicuis probari convenit (Cod. lib. ii. tit. xxi. s. 6)." "Quod venditor, ut commendet, dicit sic habendum, quasi neque dictum neque promissum est (Dig. lib. iv. tit. iii. s. xxxvii.)."

Judgment reserved.

[128] *March* 30.   THE LORD JUSTICE KNIGHT BRUCE.

This cause (which, produced in the principality of Wales, is not without some marks of its domicil of origin) was instituted in the year 1851, for setting aside certain sales, made to the Plaintiff, and obtaining accordingly a return of his purchase-money, with interest ; the ground of the relief prayed being certain alleged misrepresentations of fact, which he states to have been made to him by the Defendants, the vendors, or under their authority and direction. The Defendants, resisting the demand, put in answers not favourable to the Plaintiff's case, which were replied to, and much evidence, oral and documentary, was adduced on either side. The cause thus constructed, was heard at sufficient length before His Honour the Master of the Rolls, who, in June last, after time taken to consider of his judgment, dismissed the bill with costs. The appeal from this decision—an appeal debated by six learned counsel during many days, not at less length nor with less minuteness before us than were bestowed on the matter at the Rolls—we are now to dispose of.

It appears, that in the year 1850, the Defendants, having obtained a grant or lease from Lord Powis, dated the 20th of August in that year (by which the right of mining within a tract of mountain land, called Craig y Mwyn, in Montgomeryshire, containing veins of lead ore, the main or sole object of pursuit and attention, was demised to the Defendants for twenty-one years from the 24th of June 1850), proceeded to the formation of a company for working under the grant, to consist of themselves and others, who might be induced to take shares in the undertaking. This plan having been carried into operation, various persons, including the Plaintiff, did take shares. The shares were 1600 in the whole, [129] but many were retained by the Defendants. The Plaintiff, at different times, between the commencement of October 1850 and the end of January 1851, bought 719 shares, that is to say, 714 directly of the Defendants for considerable sums of money, and five of a person who had acquired them from the Defendants. These 719 shares the Plaintiff alleges that he was induced to purchase by means of untrue statement of facts materially bearing upon the condition and value of the property, which he says were made to him individually and particularly, and also as one of the public, by the Defendants and, under their authority, by Mr. Bell Williams, an agent of theirs—made (the Plaintiff says) in part orally, but contained also (he asserts) in a report of Mr. Bell Williams, which, in fact, was promulgated in August 1850—another report of that gentleman which, in fact, was promulgated in October 1850—and certain advertisements that, in fact, appeared in a periodical publication, called "The Mining Journal," in the same October and September also of that year.

And here I may pause for the purpose of mentioning that the Plaintiff is a barrister, who, called to the Bar before the year 1850, was in that year between thirty and thirty-five years of age, and his letters of December 1850, as well as other circumstances in proof, shew to my apprehension plainly that he is a person whose intelligence and capacity are above or certainly not below mediocrity, and that, throughout the years 1850 and 1851, he was (to use a familiar phrase) very well able to take care of himself. The Defendants (who inhabit the frontier of England and North Wales) call themselves or are called esquires, and have, I dare say, as good a title to that designation as the majority of those who use it.

[130] It appears that the Plaintiff, in September 1850, made one visit of inspection to the mine, and on the 1st of November following another (some of his shares having been taken after and some before that day), and, whether well informed or unlearned in geology, mineralogy or mining, it was through his own choice if he did not—but I think it a just inference from the evidence that he did—on each of those occasions fully inspect and fully examine the mine, so far as physically possible ; and it must, on the evidence, as I consider, be taken that, on both occasions, he saw there whatever with or without the aid of lamp or candle was an object of sight. [After

820                    JENNINGS *v.* BROUGHTON                    5 DE G. M. & G. 131.

adverting to the evidence on the subject of this inspection, his Lordship said]—I am not surprised that the Master of the Rolls should not have been satisfied that the Plaintiff, in making any one of his purchases, relied upon any information beyond that which he derived by means merely of his own inspection of the mine. And I consider it a view of his case rather favourable than unjust to him to represent and treat the validity and success or the weakness and failure of his title to a decree as depending on these three questions:

First, in the statements or representations concerning the mine that were published or made by the Defendants and Mr. Bell Williams, or by any one or more of them, or in any one of those statements or representations, was there any untrue assertion material in its nature, that is to say, which, taken as true, added substantially to the value or promise of the mine, and was not evidently conjectural merely?

In the second place, if so, was any such untrue assertion published or made without a belief in its truth by the person or persons publishing or making it?

[131] And thirdly, if not, was the belief entertained without fair or reasonable ground?

Before proceeding however, to the consideration of these questions it is necessary to exclude from them, and from the controversy altogether, every assertion (if there was any) which the visible state of the mine, at the time of either of the Plaintiff's two inspections of it contradicted. The Defendants, whether admitting or denying any misrepresentation, are entitled to the application and protection of the principles on which *Dyer* v. *Hargrave* (10 Ves. 505) was decided by Sir W. Grant. It makes no difference in substance for the present purpose, at least in the Plaintiff's favour, that *Dyer* v. *Hargrave* was a case of specific performance and this a rescinding bill. I desire to be understood as at once giving my opinion against the Plaintiff with regard to every "object of sense" which on either visit to the mine he may, as an educated man of ordinary intelligence, having the use of his eyes, his mind on the alert and his interest awakened, be reasonably taken (whether much or little of a workman or a philosopher) to have observed; and nothing that I shall say is to be received or interpreted as extending to any such matter.

Now, supposing the first of the three questions to be answered adversely to the Plaintiff, I need not say that his case wholly fails; but, supposing it to be answered in his favour, I conceive that, if the other two ought to be answered in favour of the Defendants, the case of the Plaintiff also fails altogether; and, unless various witnesses in the cause on the part of the Defendants ought to be considered as perjured or very greatly in error as to matters of alleged fact, the Plain-[132]-tiff's case, viewed as I have just been mentioning, does fail entirely. [After a minute examination of the evidence, his Lordship said:]—As to the first, then, of the three questions, I acknowledge that I entertain doubt; but it is upon the Plaintiff that the burden of the proof rests. As to the second and third, however, I am satisfied that, upon the materials before the Court, his case ought to be treated as without foundation. I must therefore hold one of two things to be right—either that the bill should stand dismissed, or that there should be an oral examination of witnesses in open Court before ourselves. Between these two I have hesitated; but my opinion, ultimately formed, is, that the bill should stand dismissed—not because of the great (I had almost said, considering the nature, while not forgetting the domicile, of this cause, the prodigious) amount of the time of the Court of Chancery, that at the Rolls and and here, has been consumed by the present litigation—but because the Plaintiff, if his alleged case or any substantial part of it is well founded in merits, can obtain redress by an action, in which he may recover just damages; and because the controversy is such in local origin, is such in kind, is dependent mainly on the credit of such witnesses, and is so likely to be usefully assisted by a special jury (if not of Montgomeryshire) of Shropshire, by a view, and by the experience of a Judge accustomed to circuit business, that, supposing the dispute one that ought not here and now to end, an action seems to me the course by which justice may most probably be attained by the Plaintiff, if he has not already attained it.

I think that the order dismissing the bill with costs must be affirmed; but I have no objection to add a declaration, not I believe asked at the Rolls, that the dismissal is without prejudice to an action. With regard [133] to the costs of the appeal, I think that the Defendants should only take the deposit.

THE LORD JUSTICE TURNER.  This bill is filed for the purpose of rescinding two several purchases made by the Plaintiff from the Defendants of 250 and 464 shares in a mining company, formed for working some mines or supposed mines in a tract of land called Craig y Mwyn, and of having the purchase-money for the shares, and several sums of money paid for calls upon them, refunded by the Defendants to the Plaintiff.

The tract of land called Craig y Mwyn is of large extent, and is situate in a mineral district.  It appears to have been worked by different persons at different times for many years anterior to the year 1843.  In the month of April 1843 the Defendant Bibby, who was a general shopkeeper in the neighbourhood, obtained a licence to work it, and he associated with him, in the undertaking, the Defendant Robert Broughton, who was a surgeon.  The Defendant, R. N. Broughton, who is a woolstapler, afterwards joined in the undertaking in the year 1845.  The licence, originally granted to the Defendant Bibby, was for a year only, but it was renewed annually up to the year 1850, when a lease, dated the 20th of August 1850, was granted to all the Defendants for a term of twenty-one years, at a royalty of 1-10th, with the usual powers and subject to the usual covenants contained in mining leases. Upon the lease being granted, the Defendants determined to form a company for carrying on the works, dividing the concern into 1600 shares, on which they ultimately fixed the price of £8 per share.  The company was formed on the 12th of October 1850, on which day the Plaintiff became the purchaser of the 250 shares, and he afterwards purchased the 464 shares **[134]** early in the following month of November.  Several calls have been made upon the shares to the amount in the whole of £1, 6s. per share.  This bill, which was filed in October 1851, rests upon the ground that the Plaintiff was induced to purchase these shares by false and fraudulent representations, made by or by the authority of the Defendants; and the bill alleges that the Plaintiff first began to suspect the fraud which had been practised upon him in the month of March 1851, and that his suspicions were afterwards confirmed by inquiries made in the months of April and May in that year.

The representations impeached by the bill are, for the most part, contained in the following documents :—A report of Bell Williams (a surveyor who was employed by the Defendants to inspect the mines), dated the 10th of August 1850 ; an advertisement in the *Mining Journal* of the 31st of August 1850 ; another advertisement inserted weekly in the same journal from the 7th of September to the 5th of October 1850 ; another report of Bell Williams, dated the 1st of October 1850, and a third advertisement in the *Mining Journal* of the 19th of October 1850.

To the report of the 10th of August 1850, it was in the first place objected that it purports to be made upon a view of the mine taken by Bell Williams, whereas the evidence shews that it was, for the most part, founded upon communications made to him by the Defendant Bibby ; and if the report had been descriptive of the future prospects of the mine, I think there would have been some weight in this objection, for then it might perhaps have been justly said that the Plaintiff was entitled to trust, and did trust, to the competency and absence of bias of the person by whom those prospects were described ; but this report seems to me to be de-**[135]**-scriptive merely of things either past or present ; and if therefore it be true in fact, I do not see how it can be material from whom the description emanated.  If it be untrue in fact, it is of course open to impeachment upon that ground, without reference to the question from whom the description contained in it proceeded.  It was further objected to this report, that it speaks of things as then existing which clearly did not exist at the time—that it refers to the present time what wholly belonged to the past ; and this observation was particularly applied to the description given by the report of the Level No. 1.  It was said that the word "yielding" in this description imported "then yielding ;" but credit must be given to persons who purchase property upon the faith of written statements for something more than a mere cursory glance at the statements, on the faith of which they purchase ; and a very slight examination of this statement proves that it could not be intended to refer to what was then going on.

[His Lordship adverted to portions of the document leading to this conclusion, and then compared its statements with various portions of the evidence ; and with respect to the statements as to Level No. 1, his Lordship expressed his opinion that.

these were borne out by the evidence. His Lordship then proceeded as follows : ]—There is, however, a part of the description of this level which certainly is not borne out by the evidence. It is that part which describes the lode cut through and shewing the body of solid ore to be resting on the vein, three feet wide, largely intermixed with lumps of ore and calamine, and continuing to maintain the same width and characteristics to the extent of the [present workings, being seventeen yards further. I find no evidence to warrant this statement. That there were lumps of ore in this level is, I think, proved ; but I see no proof of there having been any calamine, and no proof of the lode **[136]** continuing to maintain the same width and characteristics for the seventeen yards which are mentioned. Bell Williams indeed, in his evidence, states that the driving of the seventeen yards had not laid open or exposed any part of the vein, and that his conclusion as to the lode continuing to maintain the same width and characteristics for that distance was founded only on the fair wall which the side of the vein presented. But to say that these statements in the report were not well founded is one thing : to say that the Plaintiff was deceived by those statements, or was induced by them to purchase these shares, is another thing. Looking at the character which the Plaintiff gives of himself, and which is given of him by his witnesses, I think it impossible to believe that he could have been at all induced to purchase these shares by the statement of there being lumps of calamine in this level. And, with respect to the lode continuing to maintain the same width and characteristics, the Plaintiff was twice at the mine, once before he purchased any shares, and the second time in the interval between his two purchases ; and, however ignorant he may be of mining, he must at least have been capable of seeing whether the vein had or had not been laid open behind the point where the solid ore was presented to his view. If it had, he must have known what were its characteristics. If (as was the fact) it had not, he must have known that this statement could only be matter of speculation, and not of certainty.

[After adverting to the part of the report relating to the Level No. 2, and to the ore found upon the surface, which his Lordship considered also to be abundantly proved, his Lordship continued : ]—I have gone thus fully through this report, because I consider it to be the keystone of the case. If these parties had contemplated fraud, I think distinct *indicia* of it would have appeared in this report. Looking at the evidence **[137]** before us, I do not find any such *indicia*. My examination of the report of the evidence has led me to the conclusion at which the mining engineers examined on the part of the Defendant have arrived—that this report was a *bonâ fide* report, and, with the exception of the passage to which I have adverted, a fair report. I do not think that there was any fraudulent intention in the insertion of that passage, but whether there was or not, I am of opinion that under the circumstances of this case the Plaintiff cannot found any title to relief upon the ground of that statement.

The next document is the advertisement of the 31st of August 1850. This advertisement is a mere summary of the report, and brings forward no new statement, except the statement that there are already thirty tons of ore at the surface. It appears, however, by the evidence, that this ore was then in bulk, and that the quantity of lead therefore could only be arrived at by estimate, and the Plaintiff himself was afterwards present at a meeting on the 12th of October 1850, at which the quantity of ore on the bank was discussed. The Defendant Bibby desired that it should be stated at a low rather than a high estimate ; and it was set down accordingly at twenty tons, the understanding of all parties being, that it was only from guess that the quantity could be spoken of. It is hardly necessary to say, that this evidence wholly displaces any title in the Plaintiff to relief upon the ground of this statement.

The documents next in order are the advertisements in the *Mining Journal* from the 7th of September to the 5th of October 1850. These advertisements contain statements which, in my judgment, are not supported by the evidence, and ought not to have been made. I refer particularly to the statements as to three lead-bearing **[138]** veins being then worked, and as to the fifty tons of ore on the bank. If therefore these documents had been the only documents, and the Plaintiff had relied upon these documents alone, I am very much disposed to think he would have been entitled to the relief prayed by this bill. But how does the case really stand in

this respect? The Plaintiff, before he took any shares, had before him not merely these advertisements, but also Bell Williams' report (to which I have already referred), and his further report, to which I shall next refer; and he states in his evidence, that it was upon these reports he mainly relied. He was fully competent to judge of the difference between the statements in the reports and in these advertisements, and he relies upon the former in preference to the latter. There is also the conversation as to the ore on the bank, to which I have already adverted. Again, he himself admits in his evidence, that on both occasions when he visited the mines before he purchased any shares, and in the interval between his purchases he went through the Levels Nos. 3 and 4, where the lead-bearing veins described in these advertisements as being then worked were intersected, and it is clear from the evidence of Edward Hampson, that he was no inattentive observer of what was going on.

These facts taken alone would, I think, be sufficient to shew, that the Plaintiff did not rely upon the advertisements. But the case by no means rests here. On the 1st of November 1850, we find him in conversation with Evans, who, being then about to purchase shares, asks his opinion as to the mine, and his answer is, that, judging from its appearance, there was a strong probability of its proving a profitable mine. And again, later in the same month, he visits at Mr. Evans's house, exhibits the map, and points out and explains the levels of the mine, and, being asked his opinion as to whether there **[139]** was plenty of ore, replies that he has no doubt there was abundance, but that his only fear was, lest the value of the lead should be depreciated. Putting together these facts and other facts which appear in the case, much as I disapprove these advertisements, I cannot justify to myself the belief that the Plaintiff in any manner relied or acted upon them. [After commenting on the other representations made, and the evidence as to their accuracy, and saying that his Lordship did not consider the case carried further by them, his Lordship said:]— There are, however, one or two other points in the case to which I will shortly refer. I think it clear upon the evidence, that these Defendants, if they had thought proper to do so, might have sold many more shares in the mine, and sold them at a premium; and that the fact of their not having done so is strong evidence of *bonâ fides* on their part. I think, also, that in cases of alleged fraud, and particularly in cases of fraud affecting property of this nature, it is the duty of anyone complaining of the fraud to put forward his complaint at the earliest possible period.

Now, the first sale of the lead of the company took place in December 1850. The quantity then sold certainly did not correspond with the prospects held out by the reports and advertisements. Yet the Plaintiff made no complaint; and, on the contrary, at the meeting in January, refused to sell any shares even at a considerable premium. If the relief prayed by this bill be granted, how are the Defendants to be compensated for the loss which they may have sustained by not having been placed in a position to sell to other persons who might have been well content to abide the risk, from which the Plaintiff desires to shrink? I think further, that it sufficiently appears that the Plaintiff purchased these shares with the full knowledge that he was **[140]** embarking in a speculative concern, and the intention to do so. In proof of this I may refer, amongst other evidence, to the Plaintiff's letters of the 1st and 2d April 1851. The true state of the case seems to me to be, that the Plaintiff was incited by the prospect of large gains, and acted too hastily, perhaps, on his own judgment.

And, finally, I think that although it is the undoubted duty of this Court to relieve persons who have been deceived by false representations, it is equally the duty of this Court to be careful that, in its anxiety to correct frauds, it does not enable persons who have joined with others in speculations to convert their speculations into certainties at the expense of those with whom they have joined. This, in my opinion, would be the effect of giving the Plaintiff the relief which he asks, and, I think, therefore, that this bill has been properly dismissed.

I have felt some doubt about the costs; but the case put forward by the Plaintiff is one of fraud, and I think a very strong case ought to be made out to warrant a Court of Appeal in interfering with the discretion of a Judge in the matter of costs. Upon the whole, I do not feel strongly enough to propose any alteration of the decree in this respect. I think the justice of the case will be met by dismissing the appeal upon the terms which have been suggested. It must be dismissed accordingly.

A                                   House of Lords

## *In re* B (Children) (Care Proceedings: Standard of Proof )
## (CAFCASS intervening)

### [2008] UKHL 35

B   2008  May 19, 20;                            Lord Hoffmann, Lord Scott of Foscote,
         June 11            Lord Rodger of Earlsferry, Lord Walker of Gestingthorpe,
                                            Baroness Hale of Richmond

*Children — Care proceedings — Threshold conditions — Allegations of sexual and*
*   physical abuse of older stepchildren by father — Whether threshold condition*
*   that younger children likely to suffer significant harm satisfied — Whether*
C  *necessary for court to be satisfied that more likely than not that children likely to*
*   suffer significant harm — Judge's duty — Whether standard of proof balance of*
*   probabilities — Whether necessary for same judge to hear entire proceedings —*
*   Children Act 1989 (c 41), s 31(2)*

The husband and wife lived in the family home with their children, N, a girl aged
nine, and A, a boy aged six, and the wife's children of a previous marriage, S, a boy
D  aged 17, and R, a girl aged 16. In 2006 the husband left. He subsequently applied,
with the support of the local authority, for residence orders in respect of N and A.
Instead, the district judge made interim care orders in respect of R as well as N and A,
on the basis of a plan to remove them from the wife and place them with the husband
at his parents' home. While they were being removed from the wife's home R alleged
that the husband had sexually abused her and had also physically assaulted both her
and S. The husband denied the allegations. R was initially placed with foster carers
E  and then returned to the wife. N and A were initially placed with the husband's
parents and were subsequently moved to foster carers. The care proceedings were
transferred to the High Court and a fact-finding hearing took place to ascertain
whether the threshold criteria under section 31(2) of the Children Act 1989[1] for the
making of a care order were satisfied. The judge could not find that it was "more
likely than not" that R was telling the truth in making the allegations, nor could he
find that it was "more likely than not" that the husband was telling the truth when
denying the allegations. In those circumstances the judge found that the sexual abuse
F  allegations could not form any part of the findings made in satisfaction of the
threshold test and ordered that the basis for instruction of expert witnesses and the
basis for the final welfare hearing would be that R had not been sexually abused by
the husband. The judge also recused himself from the case although he had not been
invited to do so by any of the parties. The Court of Appeal dismissed the children's
appeal by their guardian on the ground that it was bound by House of Lords
authority to do so.
G      On the children's appeal—
       *Held*, dismissing the appeal, (1) that the threshold conditions in section 31(2) of
the Children Act 1989 were intended to protect children and their parents from
unjustified intervention by the state, and if the courts were allowed to make decisions
about the allocation of parental responsibility on the basis of unproven allegations
and unsubstantiated suspicions that would deny them their essential role in
protecting children and their families from such intervention; that the court had first
H  to be satisfied that the alleged significant harm to a child or likelihood of such harm
existed and, if so satisfied, then to decide what outcome would be best for the child;
that since care proceedings were of a civil nature, intended not to punish or deter but
to protect a child from harm, and since the consequences for the child of a wrong

    [1] Children Act 1989, s 31(2): see post, para 22.

decision were equally serious either way, the standard of proof applicable in finding   A
the facts necessary to establish the threshold under section 31(2) or the welfare
considerations in section 1 of the 1989 Act was neither more nor less than the simple
balance of probabilities, irrespective of the seriousness of the allegations or of the
consequences, and inherent probabilities were simply to be taken into account, where
relevant, in deciding where the truth lay (post, paras 1, 3–4, 13, 15–16, 17, 18, 19,
54, 59, 61, 64, 69–73).

Dictum of Dame Elizabeth Butler-Sloss P in *In re U (A Child) (Department for*   B
*Education and Skills intervening)* [2005] Fam 134, para 13, CA approved.

*In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563, HL(E)
explained.

*R v Secretary of State for the Home Department, Ex p Khawaja* [1984] AC 74,
HL(E), *In re M and R (Minors) (Sexual Abuse: Expert Evidence)* [1996] 4 All
ER 239, CA, *Lancashire County Council v B* [2000] 2 AC 147, HL(E) and *In re
O (Minors) (Care: Preliminary Hearing)* [2004] 1 AC 523, HL(E) considered.   C

Dicta of Lord Bingham of Cornhill CJ in *B v Chief Constable of Avon and
Somerset Constabulary* [2001] 1 WLR 340, paras 30, 31, DC and of Lord Steyn in
*R (McCann) v Crown Court at Manchester* [2003] 1 AC 787, para 37, HL(E) not
applied.

(2) That care proceedings were not a two-stage process and the same factual
issues were often relevant to questions as to whether the section 31(2) threshold had
been crossed and if so what was best for the child; that where the hearing was split the   D
finding of facts at the fact-finding hearing was merely part of the whole process of
trying the case and once it was done the case was part heard and the trial should
resume before the same judge; that it was the judge's duty to make findings as to
whether it was more likely than not that events alleged had or had not taken place,
assisted if necessary by the burden of proof, and he was not allowed to sit on the
fence; that there had been no grounds on which judge should have recused himself
from the case; and that, accordingly, it would be sent back for the judge to complete   E
the hearing and for experts to be instructed (post, paras 1–2, 16, 17, 18, 19, 32, 61,
74–76, 80, 81–82).

Observations as to the terms of the letter of instruction to experts (post, paras 1,
16, 17, 18, 19, 80).

Decision of the Court of Appeal [2008] EWCA Civ 282 affirmed.

The following cases are referred to in the opinions of the Committee:   F

*A v United Kingdom* (1998) 27 EHRR 611
*B v Chief Constable of Avon and Somerset Constabulary* [2001] 1 WLR 340; [2001]
    1 All ER 562, DC
*Bater v Bater* [1951] P 35; [1950] 2 All ER 458, CA
*Davis v Davis* [1950] P 125; [1950] 1 All ER 40, CA
*ET (Serious Injuries: Standard of Proof), In re (Note)* [2003] 2 FLR 1205
*H (Minors) (Sexual Abuse: Standard of Proof), In re* [1996] AC 563; [1996] 2 WLR 8;   G
    [1996] 1 All ER 1, HL(E)
*Hornal v Neuberger Products Ltd* [1957] 1 QB 247; [1956] 3 WLR 1034; [1956]
    3 All ER 970, CA
*K and T v Finland* (2000) 31 EHRR 484
*Kutzner v Germany* (2002) 35 EHRR 653
*Lancashire County Council v B* [2000] 2 AC 147; [2000] 2 WLR 590; [2000] 2 All
    ER 97, HL(E)   H
*M and R (Minors) (Sexual Abuse: Expert Evidence), In re* [1996] 4 All ER 239;
    [1996] 2 FLR 195, CA
*O (Minors) (Care: Preliminary Hearing), In re* [2003] UKHL 18; [2004] 1 AC 523;
    [2003] 2 WLR 1075; [2003] 2 All ER 305, HL(E)
*Osman v United Kingdom* (1998) 29 EHRR 245

*P (Sexual Abuse: Standard of Proof ), In re* [1996] 2 FLR 333, CA
*Pierce v Society of Sisters* (1925) 268 US 510
*Practice Direction (Public Law Proceedings: Case Management)* [2008] 1 WLR 1040
*R v Cannings* [2004] EWCA Crim 1; [2004] 1 WLR 2607; [2004] 1 All ER 725, CA
*R v Secretary of State for the Home Department, Ex p Khawaja* [1984] AC 74; [1983] 2 WLR 321; [1983] 1 All ER 765, HL(E)
*R (McCann) v Crown Court at Manchester* [2002] UKHL 39; [2003] 1 AC 787; [2002] 3 WLR 1313; [2002] 4 All ER 593, HL(E)
*S (Care Proceedings: Split Hearing), In re* [1996] 2 FLR 773
*Scozzari and Giunta v Italy* (2000) 35 EHRR 243
*U (A Child) (Department for Education and Skills intervening), In re* [2004] EWCA Civ 567; [2005] Fam 134; [2004] 3 WLR 753, CA
*Z v United Kingdom* (2001) 34 EHRR 97

The following additional cases were cited in argument:

*Karanakaran v Secretary of State for the Home Department* [2000] 3 All ER 449, CA
*Pretty v United Kingdom* (2002) 35 EHRR 1
*R (Sivakumar) v Secretary of State for the Home Department* [2003] UKHL 14; [2003] 1 WLR 840; [2003] 2 All ER 1097, HL(E)

**APPEAL** from the Court of Appeal

By permission of the Court of Appeal (Thorpe, Wilson and Black LJJ) granted on 29 January 2008, the children R, N and A, through their guardian appealed from an order of the Court of Appeal [2008] EWCA Civ 282 dismissing, on the ground that it was bound by House of Lords authority so to do, the guardian's appeal by permission of Charles J from his decision [2007] EWHC 2688 (Fam) on 11 December 2007 in care proceedings in respect of the children that the assessments by expert witnesses, the assessment and management of risk and the final welfare hearing in respect of the children be carried out on the basis that R had not been sexually abused by the husband, B, and therefore there was no risk that a child in the care of the husband would be sexually abused by him.

The facts are stated in the speech of Baroness Hale of Richmond.

*Stephen Cobb QC* and *Stuart Fuller* (instructed by *Stantons, Gravesend*) for the children, N and A.

The issue is whether a judicial finding that there is a likelihood or real possibility that a child was abused in the past can form the basis of a finding of a possibility of abuse to a child in the future. The binary approach which is implicit in our law is not appropriate here. There is a distinction between a fact and a suspicion. When a court is deciding whether there is a real possibility of future harm it must find support for its decision in the evidence. A real possibility must be based on fact and must not be fanciful. Unproved allegations cannot be the basis for the second limb of section 31 of the Children Act 1989. [Reference was made to *Lancashire County Council v B* [2000] 2 AC 147; *In re H (Minors) (Sexual Abuse: Standard of Proof )* [1996] AC 563; *In re O (Minors) (Care: Preliminary Hearing)* [2004] 1 AC 523 and *In re M and R (Minors) (Sexual Abuse: Expert Evidence)* [1996] 4 All ER 239.]

Family proceedings are inquisitorial even though at the threshold stage they have an adversarial element. The court should be able to use its

investigative powers to consider the best interests of the child at the welfare   A
stage, including the consideration of unproved facts in relation to risk.
In child cases and care proceedings the court should be more receptive
to judicial findings where there is a lingering doubt even though they are
not conclusive findings. Where the court is uncertain but there is a real
possibility of a child having been abused, that should be taken into account.
Family cases should not be seen as having binary conclusions. Where very   B
serious harm to a child is envisaged the proof required will have to be
commensurate. A judicial conclusion, based on evidence and facts found to
a civil standard, that there is a real possibility of a child having been abused
in the past can properly lead to a finding of "likelihood" of harm in the
context of section 31(2)(a) of the 1989 Act. [Reference was made to
*Karanakaran v Secretary of State for the Home Department* [2000] 3 All
ER 449 and *R (Sivakumar) v Secretary of State for the Home Department*   C
[2003] 1 WLR 840.]

The judge had plainly been influenced by the Human Rights Act 1998.
Under article 8 of the Convention for the Protection of Human Rights and
Fundamental Freedoms an overly high threshold violates the parents' rights.
It also raises the question whether it violates children's rights under article 3
by failing to take the child's safety into account.
  D

*Marianna Hildyard QC*, *Helen Mountfield* and *Isabelle Watson*
(instructed by *Church Bruce, Gravesend*) for the husband.

This appeal challenges for the third time one of the principal protections
given to families against state intervention in the upbringing of children
when allegations of abuse or neglect are made, namely that facts relied on as
giving rise to the alleged risk to the child have to be proved on a balance
of probabilities. If they are not, the court cannot make a final care or   E
supervision order.

The principles of the Children Act 1989 are that it is in the best interests
of children, wherever possible, to be brought up by their own parents; that
where parents experience difficulty in bringing up their children, the state
should, in the first instance, seek to collaborate with them to help them do
so, and that state intervention should only occur where a court is satisfied   F
that the children are suffering harm, or are at risk of suffering harm in the
future. Compulsory state intervention is a measure of last resort.

To be able to act on suspicion instead of proved facts is not in the best
interests of the child. That approach should be rejected and *In re H (Minors)
(Sexual Abuse: Standard of Proof)* [1996] AC 563; *In re O (Minors) (Care:
Preliminary Hearing)* [2004] 1 AC 523 and *In re M and R (Minors) (Sexual
Abuse: Expert Evidence)* [1996] 4 All ER 239 followed. Any change in the   G
interpretation of section 31(2)(a) of the Children Act 1989 should be dealt
with by Parliament. To allow a "real possibility" test would effectively
remove any significant hurdle to permanent intervention, including removal,
and would place the burden of proof on the carers. The Human Rights Act
1998, which was in force at the time of *In re O (Minors)* but not at the time
*In re H (Minors)* and *In re M and R (Minors)* were decided, if anything,
strengthens the conclusion in these three cases, because of the emphasis on   H
protecting family life which derives from article 8, and only permitting state
intervention when there is a proper basis to do so.

In *In re O (Minors)*, the House of Lords, with a duty to consider the
impact of the Convention, rightly reaffirmed the approach adopted in

A *In re H (Minors)*. Positive obligations under article 3 of the Convention, relied upon by the appellants to suggest a different result, could not do so, since the extent of them must be read compatibly with article 8, which is the governing article of the Convention in this field. Multiple routes into local authority care existed before the Children Act 1989, specifically the various statutory routes in family proceedings via matrimonial causes, guardianship, custodianship and adoption, wardship, criminal proceedings and

B proceedings under the Children and Young Persons Act 1969. In wardship proceedings the test was whether exceptional circumstances justified care orders. The threshold condition in section 31(2) is an absolute precondition: no final care or supervision order can be made unless the precondition is met. When considering which order to make, once the threshold is established, the court can have regard to all the circumstances. In so far as the

C circumstances include harm or risk of harm, section 1(3)(e) requires the court to have regard only to proven harm, or a risk which can be inferred from proven facts.

   The structure of the Act requires this two-stage protection to families because the court should only be considering a permanent state intervention when harm or risk of harm is established. It is not disputed that the burden of proving that the threshold is met rests on the person applying for

D the order: see Lord Nicholls of Birkenhead in *In re H (Minors)* [1996] AC 563, 586A. The legislature could have allowed final compulsory state intervention without the imposition of a threshold such as section 31(2) at all, in which case when faced with an application for a care or supervision order the court would have gone straight to the guidance given in section 1 of the 1989 Act. In such circumstances the entire application would have

E been subject to the principle that the child's welfare was the paramount consideration. The irresistible inference is that the threshold in section 31 should provide some hurdle to surmount, which would not otherwise be there, in order to provide protection against wrongful intervention; to focus in on the fact that it is proven harm or proven risk of harm in the future which is the essential precondition to intervention; and to give effect to the principles of intervention as described above. It is important to compare

F four other sections of the 1989 Act where a lower standard of proof is applied, namely in relation to section 43(1)(a) child assessment orders; section 47(1)(b) child protection investigations; section 44(1)(a) emergency protection orders; and section 38 interim care orders.

   This lower standard of proof reflects the essentially temporary nature of intervention under these provisions, as opposed to the more enduring

G intervention under final orders. The standard of proof for permanent intervention must be one which involves the court accepting that the facts relied on as establishing the past harm, or from which an inference of future harm can be drawn are, in the language of Lord Nicholls in *In re H (Minors)* [1996] AC 563, 586A, "affirmatively established to the satisfaction of the court". In relation to the cogency issue, the court will bear in mind—how much and to what extent depends on the individual case in question—that

H the more serious the allegation the stronger the evidence should be. Lord Nicholls's analysis at p 586E–F in which he makes clear that built into the balance of probabilities is a "generous degree of flexibility" is obviously correct, and does not elevate these comments to principles of law or a legally prescribed formula for applying the test of a balance of probabilities.

There is one single balance of probabilities test. Points such as that made by Lord Nicholls are no more than a statement of sensible ways of applying the test. The inherent probability or improbability of an event is itself a matter to be taken into account: see p 586G.

Judges and justices have found it perfectly possible to apply the test over a very considerable period of time and in relation to an exhaustive range of cases. The uncertain perpetrator cases are quite different. There is no dispute that the child has suffered harm, or is at risk of suffering harm because of proven harm (e g, injuries) to the subject child or a sibling or other child with whom the subject child is cared for. In the other category of case, such as the instant case, there is a dispute about whether the child has suffered significant harm (i e, sexual abuse) at all. It is important to bear in mind that the local authority is performing a fundamentally different function from the courts. The legislature has decided that the courts must find the facts from which current or future harm can be proved and that is a very different function from that of the local authority.

*Jo Delahunty QC* and *Alison Grief* (instructed by *CAFCASS*) for the Children and Family Court Advisory and Support Service ("CAFCASS") as intervener.

The will of Parliament as set out in section 31(2)(a) of the 1989 Act is clear and unambiguous and has been properly interpreted in *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563. A reduction in the standard of proof to a "real possibility" test reverts to the law as it operated within wardship and subverts the purpose of the 1989 Act. Any such change should be properly considered, debated and agreed by Parliament. The development of a "real possibility" test in relation to possible perpetrators is to be distinguished from the establishment of the threshold criteria under section 31(2)(a) because in such cases the harm has already been established.

The appeal is misconceived in that it fails properly to define the distinction between the investigative powers of the local authority and the final determination of the case by the court. The appropriate standard of proof is the balance of probabilities simpliciter. The dicta of Lord Nicholls in *In re H* regarding the inherent improbability of very serious allegations have had the unintended effect of elevating the standard of proof, or the perception of it, and should no longer be followed. There is confusion in this area of the law and the House of Lords is invited to dispel that confusion.

The introduction of the Human Rights Act 1998 does not of itself warrant a reduction in the standard of proof. The deployment by the United Kingdom, through the courts, of an appropriate standard of proof in relation to state intervention in family life meets the United Kingdom's obligations under the Human Rights Act 1998.

*Cobb QC*, in reply, referred to *B v Chief Constable of Avon and Somerset Constabulary* [2001] 1 WLR 340; *R (McCann) v Crown Court at Manchester* [2003] 1 AC 787 and *In re ET (Serious Injuries: Standard of Proof) (Note)* [2003] 2 FLR 1205.

Their Lordships took time for consideration.

[2009] 1 AC                                    In re B (Children) (HL(E))
                                               Lord Hoffmann

11 June 2008. **LORD HOFFMANN**

1    My Lords, I have had the advantage of reading in draft the speech to be delivered by my noble and learned friend, Baroness Hale of Richmond, and I am in complete agreement with her reasoning, analysis of the authorities and conclusions. I add some observations on the standard of proof only to underline, without in any way qualifying, what she has said.

2    If a legal rule requires a fact to be proved (a "fact in issue"), a judge or jury must decide whether or not it happened. There is no room for a finding that it might have happened. The law operates a binary system in which the only values are zero and one. The fact either happened or it did not. If the tribunal is left in doubt, the doubt is resolved by a rule that one party or the other carries the burden of proof. If the party who bears the burden of proof fails to discharge it, a value of zero is returned and the fact is treated as not having happened. If he does discharge it, a value of one is returned and the fact is treated as having happened.

3    The effect of the decision of the House in *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563 is that section 31(2)(a) of the Children Act 1989 requires any facts used as the basis of a prediction that a child is "likely to suffer significant harm" to be proved to have happened. Every such fact is to be treated as a fact in issue. The majority of the House rejected the analogy with facts which merely form part of the material from which a fact in issue may be inferred, which need not each be proved to have happened. There is of course no conceptual reason for rejecting this analogy, which in the context of some predictions (such as Lord Browne-Wilkinson's example of air raid warnings) might be prudent and appropriate. But the House decided that it was inappropriate for the purposes of section 31(2)(a). It is this rule which the House reaffirms today.

4    The question which appears to have given rise to some practical difficulty is the standard of proof in such cases, that is to say, the degree of persuasion which the tribunal must feel before it decides that the fact in issue did happen. *In re H* makes it clear that it must apply the ordinary civil standard of proof. It must be satisfied that the occurrence of the fact in question was more likely than not.

5    Some confusion has however been caused by dicta which suggest that the standard of proof may vary with the gravity of the misconduct alleged or even the seriousness of the consequences for the person concerned. The cases in which such statements have been made fall into three categories. First, there are cases in which the court has for one purpose classified the proceedings as civil (for example, for the purposes of article 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms) but nevertheless thought that, because of the serious consequences of the proceedings, the criminal standard of proof or something like it should be applied. Secondly, there are cases in which it has been observed that when some event is inherently improbable, strong evidence may be needed to persuade a tribunal that it more probably happened than not. Thirdly, there are cases in which judges are simply confused about whether they are talking about the standard of proof or about the role of inherent probabilities in deciding whether the burden of proving a fact to a given standard has been discharged.

6    A case in the first category was *R v Secretary of State for the Home Department, Ex p Khawaja* [1984] AC 74 which concerned the summary

removal of an immigrant on the ground that he had obtained leave to enter    A
by fraud or deception. These were civil proceedings and Lord Scarman, who
dealt with this point most fully, was reluctant to say that the criminal
standard of proof should apply: see p 112. Instead, he said:

> "I have come to the conclusion that the choice between the two
> standards is not one of any great moment. It is largely a matter of words.
> There is no need to import into this branch of the civil law the formula    B
> used for the guidance of juries in criminal cases. The civil standard as
> interpreted and applied by the civil courts will meet the ends of justice."

7    He then cited *Bater v Bater* [1951] P 35 in which the Court of Appeal
managed to rule that although it was a misdirection for a judge in
matrimonial proceedings to say that the criminal standard of proof applied
to allegations of cruelty (*Davis v Davis* [1950] P 125) it was correct to say    C
that they had to be proved beyond reasonable doubt. Lord Scarman then
referred to *Hornal v Neuberger Products Ltd* [1957] 1 QB 247, which was a
case in the second category, and went on, at p 113:

> "My Lords, I would adopt as appropriate to cases of restraint put by
> the executive upon the liberty of the individual the civil standard flexibly
> applied in the way set forth in the cases cited . . . It is not necessary to    D
> import into the civil proceedings of judicial review the formula devised by
> judges for the guidance of juries in criminal cases. Liberty is at stake: that
> is, as the court recognised in *Bater v Bater* [1951] P 35 and in *Hornal v
> Neuberger Products Ltd* [1957] 1 QB 247 a grave matter. The reviewing
> court will therefore require to be satisfied that the facts which are
> required for the justification of the restraint put upon liberty do exist.
> The flexibility of the civil standard of proof suffices to ensure that the    E
> court will require the high degree of probability which is appropriate to
> what is at stake."

8    Another case in the first category is *B v Chief Constable of Avon and
Somerset Constabulary* [2001] 1 WLR 340, which concerned a "sex offender
order" under section 2 of the Crime and Disorder Act 1998. Justices may
make such an order if it is proved that a person is a sex offender and has    F
acted in such a way as to give reasonable cause to believe that an order is
necessary to protect the public from serious harm. The order may impose
restrictions upon the person's freedom of movement and activity. Lord
Bingham of Cornhill CJ said, at pp 353–354, that the proceedings were civil
in domestic law and for the purposes of the Convention but—

> "the civil standard of proof does not invariably mean a bare balance of    G
> probability, and does not mean so in the present case. The civil standard
> is a flexible standard to be applied with greater or lesser strictness
> according to the seriousness of what has to be proved and the
> implications of proving those matters: *Bater v Bater* [1951] P 35; *Hornal
> v Neuberger Products Ltd* [1957] 1 QB 247 and *R v Secretary of State for
> the Home Department, Ex p Khawaja* [1984] AC 74 . . . In a serious case    H
> such as the present, the difference between the two standards is, in truth,
> largely illusory. I have no doubt that, in deciding whether the condition
> in section 2(1)(a) is fulfilled, a magistrates' court should apply a
> civil standard of proof which will for all practical purposes be
> indistinguishable from the criminal standard."

9   A similar point arose in *R (McCann) v Crown Court at Manchester* [2003] 1 AC 787, which concerned an anti-social behaviour order under section 1 of the 1998 Act. The House held that the proceedings were civil for the purposes of article 6 of the Convention. On the standard of proof, however, Lord Steyn said, at para 37:

"... I agree that, given the seriousness of matters involved, at least some reference to the heightened civil standard would usually be necessary: *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563, 586D–H, per Lord Nicholls of Birkenhead. For essentially practical reasons, the Recorder of Manchester decided to apply the criminal standard. The Court of Appeal said that would usually be the right course to adopt. Lord Bingham of Cornhill has observed that the heightened civil standard and the criminal standard are virtually indistinguishable. I do not disagree with any of these views. But in my view pragmatism dictates that the task of magistrates should be made more straightforward by ruling that they must in all cases under section 1 apply the criminal standard."

10   The leading case in the second category was, until *In re H* [1996] AC 563 the decision of the Court of Appeal in *Hornal v Neuberger Products Ltd* [1957] 1 QB 247. The question there was the appropriate standard of proof of an allegation of fraud in civil proceedings. In a frequently cited passage, Morris LJ said, at p 266, that it was the normal standard for civil proceedings; proof on a balance of probability. But the gravity of an allegation of fraud was something which should be taken into account in deciding whether the burden had been discharged:

"Though no court and no jury would give less careful attention to issues lacking gravity than to those marked by it, the very elements of gravity become a part of the whole range of circumstances which have to be weighed in the scale when deciding as to the balance of probabilities."

11   It was this notion of having regard to inherent probabilities which Lord Nicholls of Birkenhead attempted to capture in *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563, 586:

"The balance of probability standard means that a court is satisfied an event occurred if the court considers that, on the evidence, the occurrence of the event was more likely than not. When assessing the probabilities the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence. Deliberate physical injury is usually less likely than accidental physical injury. A stepfather is usually less likely to have repeatedly raped and had non-consensual oral sex with his under age stepdaughter than on some occasion to have lost his temper and slapped her. Built into the preponderance of probability standard is a generous degree of flexibility in respect of the seriousness of the allegation. Although the result is much the same, this does not mean that where a serious allegation is in issue the standard of proof required is higher. It means only that the inherent probability or improbability of an event is

itself a matter to be taken into account when weighing the probabilities   A
and deciding whether, on balance, the event occurred.   The more
improbable the event, the stronger must be the evidence that it did
occur before, on the balance of probability, its occurrence will be
established."

12   The degree of confusion which is possible on this issue is exemplified
by the fact that despite the painstaking clarity with which Lord Nicholls   B
explained that having regard to inherent probabilities did not mean that
"where a serious allegation is in issue the standard of proof required is
higher", Lord Steyn in *R (McCann) v Crown Court at Manchester* [2003]
1 AC 787, 812 cited this very passage as authority for the existence of a
"heightened civil standard".   This appears to have resulted in submissions
that the Family Division should also apply a "heightened civil standard",   C
equivalent to the criminal standard ("in serious cases such as the present the
difference between the two standards is, in truth, largely illusory", per Lord
Bingham CJ in *B v Chief Constable of Avon and Somerset Constabulary*
[2001] 1 WLR 340, 354), in local authority applications for care orders.
Dame Elizabeth Butler-Sloss P restored clarity and certainty in *In re
U (A Child) (Department for Education and Skills intervening)* [2005]
Fam 134, 143–144:   D

   "We understand that in many applications for care orders counsel are
   now submitting that the correct approach to the standard of proof is to
   treat the distinction between criminal and civil standards as 'largely
   illusory'.   In our judgment this approach is mistaken.   The standard
   of proof to be applied in Children Act 1989 cases is the balance of
   probabilities and the approach to these difficult cases was laid down by   E
   Lord Nicholls in *In re H (Minors) (Sexual Abuse: Standard of Proof)*
   [1996] AC 563.   That test has not been varied nor adjusted by the dicta of
   Lord Bingham of Cornhill CJ or Lord Steyn who were considering
   applications made under a different statute.   There would appear to be no
   good reason to leap across a division, on the one hand, between crime and
   preventative measures taken to restrain defendants for the benefit of the   F
   community and, on the other hand, wholly different considerations of
   child protection and child welfare nor to apply the reasoning in *McCann's*
   case [2003] 1 AC 787 to public, or indeed to private, law cases concerning
   children.   The strict rules of evidence applicable in a criminal trial which
   is adversarial in nature is to be contrasted with the partly inquisitorial
   approach of the court dealing with children cases in which the rules of
   evidence are considerably relaxed.   In our judgment therefore . . . the   G
   principles set out by Lord Nicholls should continue to be followed by the
   judiciary trying family cases and by magistrates sitting in the family
   proceedings courts."

13   My Lords, I would invite your Lordships fully to approve these
observations.   I think that the time has come to say, once and for all, that
there is only one civil standard of proof and that is proof that the fact in issue   H
more probably occurred than not.   I do not intend to disapprove any of the
cases in what I have called the first category, but I agree with the observation
of Lord Steyn in *McCann's* case, at p 812, that clarity would be greatly
enhanced if the courts said simply that although the proceedings were civil,

the nature of the particular issue involved made it appropriate to apply the criminal standard.

14   Finally, I should say something about the notion of inherent probabilities. Lord Nicholls said, in the passage I have already quoted, that—

"the court will have in mind as a factor, *to whatever extent is appropriate in the particular case*, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability."

15   I wish to lay some stress upon the words I have italicised. Lord Nicholls was not laying down any rule of law. There is only one rule of law, namely that the occurrence of the fact in issue must be proved to have been more probable than not. Common sense, not law, requires that in deciding this question, regard should be had, to whatever extent appropriate, to inherent probabilities. If a child alleges sexual abuse by a parent, it is common sense to start with the assumption that most parents do not abuse their children. But this assumption may be swiftly dispelled by other compelling evidence of the relationship between parent and child or parent and other children. It would be absurd to suggest that the tribunal must in all cases assume that serious conduct is unlikely to have occurred. In many cases, the other evidence will show that it was all too likely. If, for example, it is clear that a child was assaulted by one or other of two people, it would make no sense to start one's reasoning by saying that assaulting children is a serious matter and therefore neither of them is likely to have done so. The fact is that one of them did and the question for the tribunal is simply whether it is more probable that one rather than the other was the perpetrator.

16   For the reasons given by Baroness Hale of Richmond, I would make the order she proposes.

**LORD SCOTT OF FOSCOTE**

17   My Lords, I have had the advantage of reading in draft the opinion prepared by my noble and learned friend, Baroness Hale of Richmond. Having done so I find myself wholly convinced by her analysis of the legal issues and the conclusions she has reached, and convinced also that any attempt by me to add anything of my own would no more than muddy the waters that she has left so admirably limpid. For the reasons she has given I too would dismiss this appeal.

**LORD RODGER OF EARLSFERRY**

18   My Lords, I have had the privilege of considering the speeches of my noble and learned friends, Lord Hoffmann and Baroness Hale of Richmond, in draft. For the reasons which they give, I too would dismiss the appeal and make the order which Baroness Hale proposes.

**LORD WALKER OF GESTINGTHORPE**

19   My Lords, I have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Hoffmann and Baroness Hale of Richmond. I am in complete agreement with them, and I would make the order that Baroness Hale proposes.

**BARONESS HALE OF RICHMOND**                                        A

20   My Lords, taking a child away from her family is a momentous step, not only for her, but for her whole family, and for the local authority which does so. In a totalitarian society, uniformity and conformity are valued. Hence the totalitarian state tries to separate the child from her family and mould her to its own design. Families in all their subversive variety are the breeding ground of diversity and individuality. In a free and democratic society we value diversity and individuality. Hence the family is given special protection in all the modern human rights instruments including the European Convention for the Protection of Human Rights and Fundamental Freedoms (article 8), the International Covenant on Civil and Political Rights (article 23) and throughout the United Nations Convention on the Rights of the Child. As McReynolds J famously said in *Pierce v Society of Sisters* (1925) 268 US 510, 535 "The child is not the mere creature of the state".

21   That is why the *Review of Child Care Law* (Department of Health and Social Security, 1985)) and the White Paper, *The Law on Child Care and Family Services* (1987) (Cm 62), which led up to the Children Act 1989, rejected the suggestion that a child could be taken from her family whenever it would be better for her than not doing so. As the Review put it, at para 2.13, "Only where their children are put at unacceptable risk should it be possible compulsorily to intervene. Once such a risk of harm has been shown, however, [the child's] interests must clearly predominate".

22   The principle of "unacceptable risk of harm" is easy enough to state but difficult to put into statutory language. The draft Children Bill annexed to the Law Commission's Report on its *Review of Child Law, Guardianship and Custody* (1988) (Law Com No 172) required that "the child concerned has suffered significant harm, or that there is a real risk of his suffering such harm": clause 12(2)(a). This was refined in the Bill presented to Parliament and eventually emerged in the so-called "threshold criteria" in section 31(2) of the Children Act 1989:

> "A court may only make a care order or a supervision order if it is satisfied— (a) that the child concerned is suffering, or is likely to suffer, significant harm; and (b) that the harm, or likelihood of harm, is attributable to— (i) the care given to the child, or likely to be given to him if the order were not made, not being what it would be reasonable to expect a parent to give to him; or (ii) the child's being beyond parental control."

This case is about the meaning of the words "is likely to suffer significant harm". How is the court to be satisfied of such a likelihood? This is a prediction from existing facts, often from a multitude of such facts, about what has happened in the past, about the characters and personalities of the people involved, about the things which they have said and done, and so on. But do those facts have to be proved in the usual way, on the balance of probabilities? Or is it sufficient that there is a "real possibility" that they took place, even if the judge is unable to say that it is more likely than not that they did?

23   That issue was authoritatively determined in favour of the former solution by a majority of this House in *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563. It was reaffirmed in two later decisions:

see *Lancashire County Council v B* [2000] 2 AC 147 and *In re O (Minors) (Care: Preliminary Hearing)* [2004] 1 AC 523. The latter also supported, albeit obiter, the Court of Appeal decision in *In re M and R (Minors) (Sexual Abuse: Expert Evidence)* [1996] 4 All ER 239. There, the Court of Appeal had applied the same approach to the words "and harm which he has suffered or is at risk of suffering", a factor which, under section 1(3)(e) of the 1989 Act the court has to take into account when deciding what order, if any, will be best for the child.

24   In this case, the children's guardian, with the support of the local authority and the children's mother, seeks to overturn the decision in *In re H* and overrule *In re M and R*, in favour of a "real possibility" test. The children's father, with the support of the interveners, the Children and Family Court Advisory and Support Service ("CAFCASS"), seeks to uphold the present law.

*The factual background*

25   As the case is still continuing, the least said about the factual background the better. It concerns the future of two children, a nine-year-old girl, N, and a six-year-old boy, A. Their parents are Mr and Mrs B, who began their relationship in 1996 and married in 1999. Mrs B has two children by her previous marriage, a 16-year-old girl, R, and a 17-year-old boy, S. They all lived together until April 2006, when Mr B left the family home, although he later visited from time to time.

26   Social services and the police became involved with the family shortly afterwards. N's school became concerned about her possibly sexualised behaviour. In July 2006, Mrs B undoubtedly assaulted S in the street. Following that S left the family home and has not returned. Mrs B threatened to allege that S had sexually assaulted N if he persisted in an assault charge against her. Mrs B and R then both made false allegations of sexual abuse and assault against S. The police and social services began their inquiries.

27   Those inquiries were still continuing on 30 October 2006, when Mr B applied, with the support of the local authority, for residence orders in respect of N and A. Instead, the district judge made interim care orders in respect of R as well as N and A, on the basis of a plan to remove them all from Mrs B and place them with Mr B at his parents' home. However, while they were being removed from home that evening, R alleged that Mr B had sexually abused her and had also assaulted her and S with a belt. R was placed with foster carers and has since returned to her mother's care. N and A were placed with Mr B's parents and Mr B moved out. In September 2007 they were moved to foster carers, where they remain.

28   The care proceedings were transferred to the High Court. A fact finding hearing took place before Charles J over 29 days in June and July 2007. As is now the practice, the local authority set out a statement of the basis upon which it was alleged that the section 31(2) criteria were met. The parents made a number of concessions but there remained a number of matters in dispute, amongst them R's allegations of sexual abuse against Mr B. No one is now persisting in the suggestion that S had sexually abused N or anyone else.

29   On 19 October 2007, Charles J handed down a judgment [2007] EWHC 2395 (Fam) comprising 347 substantive paragraphs and eight

schedules, totalling 159 pages in all.  He made detailed findings of physical    A
and emotional abuse supporting his overall conclusion, at para 48, that:

> "The combination of the physical and verbal violence, abuse and
> relationships within the household and the antagonism both between
> members of the household, and them and persons outside it, had the
> result that the children were being brought up in a fraught household in
> which they had no realistic prospect of being able to develop as young    B
> children, and then as teenagers, into adults against a background of
> emotional and physical stability or in which balanced and reasonable
> approaches were taken to the events of every day life."

Important components in that conclusion were his findings, at para 133,
about Mrs B's aggressive and bullying behaviour in her dealings with the
children's schools and others and the existence of an "allegation culture"    C
within the family for which Mrs B was primarily responsible:

> "the family have an allegation culture in which all four of Mrs B, Mr B,
> S and R have made and supported allegations that are simply untrue, or
> allegations that are so exaggerated and misrepresented that they become
> untrue, to promote a campaign against others or to get back at them."

                                                                              D
30    However, despite an elaborate and meticulous analysis of all the
evidence, the learned judge was unable to make a finding about the alleged
sexual abuse of R by Mr B.  Instead he concluded, at para 339, that:

> "(i) I cannot make a properly founded and reasoned conclusion that it
> is more likely than not that R was sexually abused by Mr B as she alleges
> or substantially as she alleges, and thus that she is telling the truth,
> (ii) I cannot make a properly founded and reasoned conclusion that it is    E
> more likely than not that R was not sexually abused by Mr B, and thus
> that Mr B is telling the truth, (iii) my answer to the question which of the
> above two possibilities (and thus which of Mr B and R is telling the truth)
> is more likely, would be a guess because I cannot even answer that
> question by attributing and giving weight to the competing arguments on
> a properly founded and reasoned basis, and (iv) on an approach founded    F
> on evidence and reasoning, and not on suspicion and/or concern, I am
> unable to conclude that there is no real possibility that Mr B sexually
> abused R as she asserts or substantially as she asserts and I have therefore
> concluded that there is a real possibility that he did."

31    My Lords, if the judiciary in this country regularly found themselves
in this state of mind, our civil and family justice systems would rapidly grind    G
to a halt.  In this country we do not require documentary proof.  We rely
heavily on oral evidence, especially from those who were present when the
alleged events took place.  Day after day, up and down the country, on issues
large and small, judges are making up their minds whom to believe.  They
are guided by many things, including the inherent probabilities, any
contemporaneous documentation or records, any circumstantial evidence
tending to support one account rather than the other, and their overall    H
impression of the characters and motivations of the witnesses.  The task is a
difficult one.  It must be performed without prejudice and preconceived
ideas.  But it is the task which we are paid to perform to the best of our
ability.

32   In our legal system, if a judge finds it more likely than not that something did take place, then it is treated as having taken place. If he finds it more likely than not that it did not take place, then it is treated as not having taken place. He is not allowed to sit on the fence. He has to find for one side or the other. Sometimes the burden of proof will come to his rescue: the party with the burden of showing that something took place will not have satisfied him that it did. But generally speaking a judge is able to make up his mind where the truth lies without needing to rely upon the burden of proof.

33   The judge's findings in this case were expressed in such a way as squarely to raise the issue of principle. Is it possible to be satisfied that a child is likely to suffer a particular kind of harm in the future when the basis for suggesting this is that there is a "real possibility" that another child has suffered the same kind of harm in the past? There are, of course, many degrees of possibility—from a 50/50 chance that it happened down to an infinitesimal chance that it did. In this case, the judge seems to have concluded that there was a "real possibility" because he could not conclude that there was none.

34   Having set the case up in such a way as to raise the issue of principle, the judge further elaborated upon the problem as he saw it in Schedule A to his principal judgment, which was handed down with a further judgment containing a draft letter of instruction to the experts who were to conduct assessments of the parents and the family for the next stage in the proceedings on 11 December 2007. He had indicated that he considered the case suitable for a "leapfrog" appeal to this House but Mr B did not agree to this. Accordingly Charles J gave leave to appeal to the Court of Appeal. The Court of Appeal, being bound on the authorities to dismiss the guardian's appeal, gave leave to appeal to this House.

*The authorities*

35   In *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563 the facts were unusually simple. The mother had four daughters, two by her husband and two by R, the man with whom she was now living. The eldest daughter alleged that R had been sexually abusing her for some years. The local authority brought care proceedings in respect of the three younger children, relying solely on these allegations as proof of the likelihood of similar harm to them. The judge was not satisfied that the allegations were true, although there was a real possibility that they were. He dismissed the local authority's applications.

36   The local authority's appeal to this House established three quite separate propositions. The first, on which all five of their Lordships were agreed, was that the words "is likely to suffer significant harm" did not mean that such harm had to be more likely than not to happen in the future: it was enough if its happening was a real possibility, a "possibility that cannot sensibly be ignored having regard to the nature and gravity of the feared harm in the particular case": Lord Nicholls of Birkenhead, at p 585.

37   The second, on which all were also agreed, was that the standard of proof of facts in issue was the balance of probabilities; but there was a difference between the ways in which that standard was expressed, on the one hand by Lord Nicholls with the majority, and on the other hand by Lord Lloyd of Berwick. That issue has not only led to considerable confusion in

the past but is also the source of some of the perceived difficulties with the   *A*
present law.  Miss Jo Delahunty QC, on behalf of CAFCASS, has made an
eloquent plea to us to clarify it for the future.

38   The third issue, on which Lord Nicholls, with whom Lord Goff of
Chieveley and Lord Mustill agreed, took one view and Lord Browne-
Wilkinson and Lord Lloyd took another, was the issue which is raised in this
case.  Lord Nicholls's conclusion was that a conclusion as to future risk had   *B*
to be based on facts: "In my view these unresolved judicial doubts and
suspicions can no more form the basis of a conclusion that the second
threshold condition in section 31(2)(a) has been established than they can
form the basis that the first has been established": p 589E.  He gave several
reasons for arriving at that conclusion.  He pointed to the distinction
between interlocutory relief, which can be granted on the basis of a good
arguable case without resolving disputed questions of fact, and a trial, in   *C*
which "the court normally has to resolve disputed issues of relevant fact
before it can reach its conclusion on the issue it has to decide": p 589F.
"A decision by a court on the likelihood of a future happening must be
founded on a basis of present facts and the inferences fairly to be drawn
therefrom": p 590A.  For the first limb of section 31(2)(a), "There must be
facts, proved to the court's satisfaction if disputed, on which the court can
properly conclude that the child is suffering harm": p 590C.  "Similarly with   *D*
the second limb: there must be facts from which the court can properly
conclude there is a real possibility that the child will suffer harm in the
future": p 590C.

39   He found several indications in the Act that this, the ordinary
approach, was to be applied.  First, when dealing with investigations and
child assessment orders, the Act uses the term "reasonable cause to suspect"   *E*
(sections 47(1)(b) and 43(1)(a)), and when dealing with emergency
protection orders, police protection and interim care orders, it uses the term
"reasonable cause to believe" (sections 44(1)(a), 46(1) and 38(2)), that the
child is suffering or likely to suffer significant harm.  This is the sensible
approach to child protection before the stage of a final order is reached.  But
the language of section 31(2) is different: the court must be "satisfied . . .
that the child . . . is suffering, or is likely to suffer, significant harm . . ."   *F*
"This is the language of proof, not suspicion . . . however reasonably
based": p 590H.

40   Second, the second threshold condition, likelihood of harm, is
"cheek by jowl" with the first, that the child is suffering harm.  If the
evidence of maltreatment is not sufficient to establish that the child is
suffering harm, "It would be odd if, in respect of the selfsame non-proven
allegations, the self-same insufficient evidence could none the less be   *G*
regarded as a sufficient factual basis for satisfying the court there is a real
possibility of harm to the child in the future": p 591B.

41   Third, if this were the case, it "would effectively reverse the burden
of proof in an important respect".  Once apparently credible evidence of
misconduct had been given, those against whom the allegations were made
would have to disprove them.   *H*

"Otherwise it would be open to a court to hold that, although the
misconduct has not been proved, it has not been disproved and there is a
real possibility that the misconduct did occur . . . I do not believe
Parliament intended that section 31(2) should work in this way": p 591.

42    This is, of course, exactly what the judge found in our case and exactly what the children's guardian says should be enough to cross the threshold. One reason for this is the alleged inconsistency between the approach taken in *In re H* and the approach taken by the House in the two later cases. In each of them, it was clear that the children involved had suffered significant harm but it was not clear who had been the perpetrator. The point arose in particularly striking circumstances in *Lancashire County Council v B* [2000] 2 AC 147. A seven-month-old baby, A, lived with her parents but was cared for by a child minder during working hours. She suffered very significant harm as a result of violent shaking on at least two occasions. The local authority brought care proceedings, not only in respect of child A, but also in respect of the childminder's son, B, who was a month older than the injured child. The possible perpetrators, as found by the judge, were A's mother and father or the childminder, B's mother (he was able to exonerate B's father). But the injuries could have happened in either household; he could not say in which or who was the likely perpetrator.

43    The judge dismissed the applications relating to each child. He could not be satisfied that harm suffered by child A was attributable to a lack of reasonable care on the part of the parent against whom the order was sought, nor could he be satisfied of the likelihood of future harm to child B attributable to a lack of reasonable care by his mother. The Court of Appeal held that the judge was plainly right in relation to child B. There was no evidence that he had been harmed in any way. It had not been proved that his mother was responsible for A's injuries and that was the only basis for suggesting that there was any risk of harm to B in the future. *In re H* [1996] AC 563 applied. Child A, on the other hand, had undoubtedly been harmed. This was not an accident. It was attributable to a lack of proper care. It was not necessary, in order to establish the criterion in section 31(2)(b)(i) (see para 22 above), to show who was responsible for that lack. The local authority's appeal was allowed in relation to her. The parents' appeal to the House of Lords was dismissed.

44    The question was whether the "care given to the child", which had been found to be deficient, meant the care given to the child by her parents or other primary carers, as argued on behalf of the parents, or whether it meant the care given by anyone who plays a part in the care arrangements for the child, as argued by the local authority and the child's guardian. Lord Nicholls found both extremes produced unacceptable results. He favoured a middle course, at p 166:

"The phrase 'care given to the child' refers primarily to the care given to the child by a parent or parents or other primary carers. That is the norm . . . Different considerations from the norm apply in a case of shared caring where the care given by one or other of the carers is proved to have been deficient, with the child suffering harm in consequence, but the court is unable to identify which of the carers provided the deficient care. In such a case the phrase 'care given to the child' is apt to embrace not merely the care given by the parents or other primary carers; it is apt to embrace the care given by any of the carers."

45    He recognised that this construction meant that the conditions might be satisfied when there was no more than a possibility that the parents were

responsible and that parents who might be wholly innocent would face the    A
possibility of losing their child. But to hold otherwise, at p 165,

"would mean that the child's future health, or even her life, would have
to be hazarded on the chance that, after all, the non-parental carer rather
than one of the parents inflicted the injuries. Self-evidently, to proceed in
such a way when a child is proved to have suffered serious injury on more
than one occasion could be dangerously irresponsible."                       B

46   The more common version of this dilemma, however, is not where a
child's care is shared between two households, but where it is shared
between two parents. If the child suffers harm, and the judge cannot decide
which parent was responsible, the threshold criteria are met. But how is the
court to approach the next stage in the proceedings, the stage of deciding
what order, if any, will be in the best interests of the child?  In *In re*    C
*O (Minors) (Care: Preliminary Hearing)* [2004] 1 AC 523, the Court of
Appeal in one case had held that the judge had to proceed on the basis that
the child had not been harmed by the mother and that she did not present a
risk of harm to that or another child; in the other, a differently constituted
Court of Appeal had held that as the mother had not been exonerated, the
judge could not disregard the risk that she might present.                    D
47   Lord Nicholls (with whom Lord Hoffmann, Lord Millett, Lord Scott
of Foscote and Lord Walker of Gestingthorpe simply agreed) preferred the
latter view, at paras 27–28:

"27. . . . Quite simply, it would be grotesque if such a case had to
proceed at the welfare stage on the footing that, because neither parent,
considered individually, has been proved to be the perpetrator, therefore    E
the child is not at risk from either of them. This would be grotesque
because it would mean the court would proceed on the footing that
neither parent represents a risk even though one or other of them was the
perpetrator of the harm in question.
"28. . . . The preferable interpretation of the legislation is that in such
cases the court is able to proceed at the welfare stage on the footing that    F
each of the possible perpetrators is, indeed, just that: a possible
perpetrator."

48   However, no doubt was cast on the conclusions reached in *In re H*
[1996] AC 563. Lord Nicholls went on to consider how unproven
allegations of harm should be treated at the "welfare stage" in care
proceedings. Once the threshold in section 31(2) has been crossed, the court   G
is required to apply the welfare principle in section 1(1) of the 1989 Act:

"When a court determines any question with respect to— (a) the
upbringing of a child; or (b) the administration of a child's property or the
application of any income arising from it, the child's welfare shall be
the court's paramount consideration."

The court is also required to have regard, in particular, to the "checklist" of    H
factors set out in section 1(3) of the Act. These include, along with such
obvious matters as the wishes and feelings of the child, and the capacities of
the adults around her to meet her needs, in section 1(3)(e), "any harm which
he has suffered or is at risk of suffering".

49  Is section 1(3)(e) to be interpreted and applied differently from section 31(2)(a)?  Can a court conclude that there is a risk of the child suffering a particular kind of harm even though the allegations said to give rise to such a risk cannot be proved?  The question did not arise directly in *In re O* [2004] 1 AC 523, but Lord Nicholls said, at para 38:

"On balance, I consider that to have regard at the welfare stage to allegations of harm rejected at the threshold stage would have the effect of depriving the child and the family of the protection intended to be afforded by the threshold criteria.  Accordingly, at the welfare stage in this type of case the court should proceed on the footing that the unproven allegations are no more than that."

50  This accorded with the approach of the Court of Appeal in *In re M and R (Minors) (Sexual Abuse: Expert Evidence)* [1996] 4 All ER 239. There, the judge was satisfied that the threshold was crossed on the basis that the children had suffered emotional abuse and were likely to do so in future. He was not, however, satisfied that sexual abuse had also occurred, although there was a real possibility that it had.  The local authority contended that he should have taken this into account under section 1(3)(e) when assessing the welfare of the children.  Butler-Sloss LJ, giving the judgment of the court, rejected their submissions, at pp 246–247:

"They amount to the assertion that under section 1 the welfare of the child dictates that the court should act on suspicion or doubts, rather than facts.  To our mind the welfare of the child dictates the exact opposite . . . If there is a dispute as to whether the child has suffered or is at risk of suffering harm, the task of the judge, when considering whether to make any order, whether it be a care or supervision order under section 31 or a section 8 order (residence, contact and other orders with respect to children), must be to resolve that dispute . . . The question is how such a dispute is to be resolved.  To our minds there can be only one answer to this question, namely the same answer as given by the majority in *In re H*. The court must reach a conclusion based on facts, not on suspicion or mere doubts . . . [Counsel's] point was that if there is a real possibility of harm in the past, then it must follow (if nothing is done) that there is a risk of harm in the future.  To our minds, however, this proposition contains a non sequitur.  The fact that there might have been harm in the past does not establish the risk of harm in the future.  The very highest it can be put is that what might possibly have happened in the past means that there may possibly be a risk of the same thing happening in the future. Section 1(3)(e), however, does not deal with what *might* possibly have happened or what future risk there *may* possibly be.  It speaks in terms of what *has* happened or what *is* at risk of happening.  Thus, what the court must do (when the matter is in issue) is to decide whether the evidence establishes the harm or the risk of harm."

51  *In re M and R* was a care case but, in a private law dispute between mother and father over contact, the Court of Appeal had a month earlier (and in the knowledge the judgment in *In re M and R* was pending) pointed to the judge's "fundamental error" in exercising his discretion as to the future on the basis of a finding that there was "a substantial risk" that abuse

had occurred in the past.  In *In re P (Sexual Abuse: Standard of Proof)*   A
[1996] 2 FLR 333, 343 Wall J commented that:

> "It has also had the effect, in the instant case, of producing the worst of
> all worlds.  The father remains under a cloud.  Abuse is not proved on the
> balance of probabilities, but he remains effectively branded an abuser: as
> the judge himself said, 'at the very lowest he will remain under suspicion
> until his daughters are old enough to be able to cope with any risk of   B
> abuse themselves'.  Furthermore, the mother's beliefs are reinforced.  It
> thus becomes impossible for the parties and the children to put the issue
> of sexual abuse behind them.  The end result is highly unsatisfactory."

52   The children's guardian also invites us to overrule the Court of
Appeal's decision in *In re M and R*, so that, the threshold having been
crossed on other grounds, the judge will be able to take into account at the   C
welfare stage the unproven allegations of sexual abuse against Mr B.

*This appeal*

53   Mr Stephen Cobb QC, on behalf of the children's guardian who
represents N and A, invites us to depart from *In re H* [1996] AC 563 and to
overrule *In re M and R* [1996] 4 All ER 239 principally on the ground that,   D
in combination with *Lancashire County Council v B* [2000] 2 AC 147 and
*In re O* [2004] 1 AC 523, they produce illogical results.  If a parent can be
deprived of her child, or a child deprived of her mother, on the basis of a real
possibility that she may have been the perpetrator of the harm suffered by
the child, why should not such a real possibility that harm has been suffered
in the past be the basis of a finding that it is likely that such harm will be
suffered in the future?  The artificiality of proceeding on the basis that such   E
harm did not happen at all, when there is a real possibility that it did, is just
as irresponsible and dangerous as proceeding on the basis that neither parent
was the perpetrator, rejected by this House in *In re O*.

54   My Lords, I would unhesitatingly decline that invitation.  The
reasons given by Lord Nicholls for adopting the approach which he did in
*In re H* remain thoroughly convincing.  The threshold is there to protect   F
both the children and their parents from unjustified intervention in their
lives.  It would provide no protection at all if it could be established on the
basis of unsubstantiated suspicions: that is, where a judge cannot say that
there is no real possibility that abuse took place, so concludes that there is a
real possibility that it did.  In other words, the alleged perpetrator would
have to prove that it did not.  Mr Cobb accepts that it must be proved on the
balance of probabilities that a child "is suffering" significant harm.  But   G
nevertheless he argues that those same allegations, which could not be
proved for that purpose, could be the basis of a finding of likelihood of
future harm.  If that were so, there would have been no need for the first limb
of section 31(2)(a) at all.  Parliament must be presumed to have inserted it
for a purpose.  Furthermore, the Act draws a clear distinction between the
threshold to be crossed before the court may make a final care or supervision
order and the threshold for making preliminary and interim orders.  If   H
Parliament had intended that a mere suspicion that a child had suffered harm
could form the basis for making a final order, it would have used the same
terminology of "reasonable grounds to suspect" or "reasonable grounds to
believe" as it uses elsewhere in the Act.  Instead, as Butler-Sloss LJ pointed

A  out in *In re M and R* [1996] 4 All ER 239, it speaks of what the child *is* suffering or *is likely* to suffer.

55    My Lords, it is rare for the facts to be as stark as they were in *In re H* [1996] AC 563. There are usually many facts from which an inference that a child is likely to suffer harm in the future can be drawn. In *In re H* it appears that there was nothing, other than the allegations of sexual abuse made by

B  the oldest child, from which it would have been possible to draw the inference that the other children were likely to suffer such harm. In the air-raid example used by Lord Browne-Wilkinson in *In re H*, it would have been difficult to conclude that an air raid was likely from nothing more than that five unidentified planes had been seen in the skies overhead. But the country was at war. Air raids were frequent. The fact that there had been raids in the past would make it possible to draw the inference that there

C  would be raids in the future. The only question was when.

56    But in a case such as this, as indicated by Butler-Sloss LJ in *In re M and R* [1996] 4 All ER 239, the "risk" is not an actual risk to the child but a risk that the judge has got it wrong. We are all fallible human beings, very capable of getting things wrong. But until it has been shown that we have, it has not been shown that the child is in fact at any risk at all.

D  57    It is also important to keep separate the roles of the courts and the local authorities in the protection of children from harm. Where a local authority have reasonable cause to suspect that a child in their area is suffering or likely to suffer significant harm, they must make the inquiries necessary to enable them to decide whether they should take any action to protect the child and if so what: 1989 Act, section 47(1). This is done by way of a core assessment, conducted in accordance with the *Framework for*

E  *the Assessment of Children in Need and Their Families* (Department of Health, 2000). This is

>    "an in-depth assessment which addresses the central or most important aspects of the needs of a child and the capacity of his or her parents or caregivers to respond appropriately to those needs within the wider

F  family and community context": para 3.11.

As such, it will clearly range far wider than the threshold criteria. It will form "a central part of the evidence supporting any application that the local authority may make for a care or supervision order": Department for Children, Schools and Families, *Children Act 1989, Guidance and Regulations*, vol 1, Court Orders (2008), para 3.17. It will also form the

G  basis for the plan for the future care of the child which the local authority must put before the court under section 31A of the 1989 Act (inserted by section 121(2) of the Adoption and Children Act 2002): ibid, para 3.18.

58    The local authority make the application for a care or supervision order under section 31(1) and the local authority will be responsible for carrying out any order which the court may make. The task of the court is to hear the evidence put forward on behalf of all the parties to the case and to

H  decide, first, whether the threshold criteria are met and, second, what order if any will be best for the child. While the local authority may well take preliminary or preventive action based upon reasonable suspicions or beliefs, it is the court's task when authorising permanent intervention in the legal relationship between parent and child to decide whether those

suspicions are well founded.  As the *Review of Child Care Law* (1985) put it,    A
at para 2.20

> "One of our guiding principles has been that the court should be able
> to determine major issues such as the transfer of parental rights and duties
> where there is or may be a dispute between parents and local authorities,
> while the management of the case should be the responsibility of the local
> authority."                                                                    B

59    To allow the courts to make decisions about the allocation of
parental responsibility for children on the basis of unproven allegations and
unsubstantiated suspicions would be to deny them their essential role in
protecting both children and their families from the intervention of the state,
however well intentioned that intervention may be.  It is to confuse the role
of the local authority, in assessing and managing risk, in planning for the    C
child, and deciding what action to initiate, with the role of the court in
deciding where the truth lies and what the legal consequences should be.
I do not underestimate the difficulty of deciding where the truth lies but that
is what the courts are for.

60    I am fortified in that conclusion by two things.  The first is that
CAFCASS does not support the guardian's stance in this appeal.  CAFCASS
is the body responsible for safeguarding the interests of children in the family
courts.  It appoints the individual guardians.  If CAFCASS thought that the
decision in *In re H* [1996] AC 563 was causing serious difficulties and
jeopardising the welfare of our most vulnerable children, no doubt it would
have said so.  The second is that Parliament has recently had the opportunity
of reviewing the 1989 Act in the light of the inquiry into the tragic death of
Victoria Climbié: *The Victoria Climbié Inquiry, Report of an Inquiry by*    E
*Lord Laming* (2003) (Cm 5730).  Children's services have been thoroughly
reorganised by the Children Act 2004, but no change has been made to the
Act's substantive provisions.

61    The decisions in *In re H, Lancashire County Council v B* [2000]
2 AC 147, and *In re O* [2004] 1 AC 523 fit together as a coherent whole.  The
court must first be satisfied that the harm or likelihood of harm exists.  Once
that is established, as it was in both the *Lancashire* and *In re O* cases, the
court has to decide what outcome will be best for the child.  It is very much
easier to decide upon a solution if the relative responsibility of the child's
carers for the harm which she or another child has suffered can also be
established.  But the court cannot shut its eyes to the undoubted harm which
has been suffered simply because it does not know who was responsible.  The
real answers to the dilemma posed by those cases lie elsewhere—first, in a    G
proper approach to the standard of proof, and second, in ensuring that the
same judge hears the whole case.  Split hearings are one thing; split judging is
quite another.

*The standard of proof*

62    All of their Lordships in *In re H* [1996] AC 563 were clear that there    H
was one standard of proof, the balance of probabilities.  But Lord Nicholls
went on to say, at p 586:

> "The balance of probability standard means that a court is satisfied an
> event occurred if the court considers that, on the evidence, the occurrence

A   of the event was more likely than not.  When assessing the probabilities
    the court will have in mind as a factor, *to whatever extent is appropriate
    in the particular case*, that the more serious the allegation the less likely it
    is that the event occurred and, hence, the stronger should be the evidence
    before the court concludes that the allegation is established on the balance
    of probability.  Fraud is usually less likely than negligence.  Deliberate
    physical injury is *usually* less likely than accidental physical injury.
B   A stepfather is *usually* less likely to have repeatedly raped and had
    non-consensual oral sex with his under age stepdaughter than on some
    occasion to have lost his temper and slapped her.   Built into the
    preponderance of probability standard is a generous degree of flexibility
    in respect of the seriousness of the allegation.  Although the result is much
    the same, this does not mean that where a serious allegation is in issue the
C   standard of proof required is higher.  It means only that the inherent
    probability or improbability of an event is itself a matter to be taken into
    account when weighing the probabilities and deciding whether, on
    balance, the event occurred.  The more improbable the event, the stronger
    must be the evidence that it did occur . . . Ungoed-Thomas J expressed
    this neatly in *In re Dellow's Will Trusts* [1964] 1 WLR 451, 455: 'The
    more serious the allegation the more cogent is the evidence required to
D   overcome the unlikelihood of what is alleged and thus to prove it.' "
    (Emphasis added.)

    If he had stopped there, perhaps there would have been no difficulty,
    provided that lawyers and courts paid attention to the whole passage,
    including the words which I have italicised, rather than extracting a single
E   phrase.  But he went on, at pp 586–587:

        "This substantially accords with the approach adopted in authorities
    such as the well known judgment of Morris LJ in *Hornal v Neuberger
    Products Ltd* [1957] 1 QB 247, 266.  This approach also provides a
    means by which the balance of probability standard can accommodate
    one's instinctive feeling that even in civil proceedings a court should be
    more sure before finding serious allegations proved than when deciding
F   less serious or trivial matters."

    "More sure" may be read as suggesting a higher standard than the simple
    preponderance of probabilities.
        63   Lord Lloyd, at pp 577–578 on the other hand, took a more
    straightforward line:

G       "In my view the standard of proof under [section 31(2)] ought to be
    the simple balance of probability however serious the allegations
    involved . . . mainly because section 31(2) provides only the threshold
    criteria for making a care order . . . if the threshold criteria are not met,
    the local authority can do nothing, however grave the anticipated injury
    to the child, or however serious the apprehended consequences.  This
    seems to me to be a strong argument in favour of making the threshold
H   lower rather than higher.  It would be a bizarre result if the more serious
    the anticipated injury, whether physical or sexual, the more difficult it
    became for the local authority to satisfy the initial burden of proof, and
    thereby ultimately, if the welfare test is satisfied, secure protection for the
    child . . .   There remains the question whether anything should be said

about the cogency of the evidence needed to 'tip the balance'. For my part
I do not find those words helpful, since they are little more than a
statement of the obvious; and there is a danger that the repeated use of the
words will harden into a formula, which, like other formulas (especially
those based on a metaphor) may lead to misunderstanding."

64    My Lords, Lord Lloyd's prediction proved only too correct. Lord
Nicholls's nuanced explanation left room for the nostrum, "the more serious
the allegation, the more cogent the evidence needed to prove it", to take hold
and be repeated time and time again in fact-finding hearings in care
proceedings: see, for example, the argument of counsel for the local
authority in *In re U (A Child) (Department for Education and Skills
intervening)* [2005] Fam 134, 137. It is time for us to loosen its grip and give
it its quietus.

65    Indeed, later events made matters worse. In *B v Chief Constable of
the Avon and Somerset Constabulary* [2001] 1 WLR 340 the issue was the
standard of proof to be applied when finding the facts needed to make a sex
offender order under section 2 of the Crime and Disorder Act 1998. The
Court of Appeal held that these were civil proceedings, but Lord Bingham of
Cornhill CJ said about the standard of proof, at paras 30–31:

"30. It should, however, be clearly recognised, as the justices did
expressly recognise, that the civil standard of proof does not invariably
mean a bare balance of probability, and does not so mean in the present
case. The civil standard is a flexible standard to be applied with greater or
lesser strictness according to the seriousness of what has to be proved and
the implications of proving those matters: see *Bater v Bater* [1951] P 35,
*Hornal v Neuberger Products Ltd* [1957] 1 QB 247, and *R v Secretary of
State for the Home Department, Ex p Khawaja* [1984] AC 74.

"31. In a serious case such as the present the difference between the
two standards is, in truth, largely illusory . . ."

66    *In re H* [1996] AC 563 was neither referred to nor cited in that case,
but of course the link could be made through the references to *Hornal v
Neuberger Products Ltd* [1957] 1 QB 247. However, *In re H* was cited in
*R (McCann) v Crown Court at Manchester* [2003] 1 AC 787. One issue was
the standard of proof in finding the facts needed to make an anti-social
behaviour order under section 1 of the Crime and Disorder Act 1998. Lord
Steyn said, at para 37:

"Having concluded that the relevant proceedings are civil, in principle
it follows that the standard of proof ordinarily applicable in civil
proceedings, namely the balance of probabilities, should apply.
However, I agree that, given the seriousness of matters involved, at least
some reference to the heightened civil standard would usually be
necessary: see *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996]
AC 563, 586D–H, per Lord Nicholls of Birkenhead . . . Lord Bingham of
Cornhill has observed that the heightened civil standard and the criminal
standard are virtually indistinguishable. I do not disagree with any of
those views."

The House went on to hold that in anti-social behaviour order proceedings
the court should apply the criminal standard of proof.

A    67   The link with *In re H* having been made, it is not surprising that judges should think that the same "heightened" standard should also apply in care proceedings. In *In re ET (Serious Injuries: Standard of Proof) (Note)* [2003] 2 FLR 1205 Bodey J directed himself that, in applying the civil standard and "the *In re H* cogency test", he would have well in mind the dicta in *B v Chief Constable of Avon and Somerset Constabulary* [2001] 1 WLR 340 and *R (McCann) v Crown Court at Manchester* [2003] 1 AC 787. So, if he found any facts it would be, at para 6, "on the basis that, in this very serious case, the difference between the civil and criminal standards of proof is 'largely illusory' ". And who, in the light of the passages quoted above, can blame him?

B

68   Fortunately for care proceedings, the status quo was restored by the Court of Appeal in *In re U (A Child) (Department for Education and Skills intervening)* [2005] Fam 134. The issue was the approach to be taken to medical evidence in care proceedings following the decision of the Court of Appeal (Criminal Division) in *R v Cannings* [2004] 1 WLR 2607. Dame Elizabeth Butler-Sloss P, giving the judgment of the court, said [2005] Fam 134, para 13:

C

D    "We understand that in many applications for care orders counsel are now submitting that the correct approach to the standard of proof is to treat the distinction between criminal and civil standards as 'largely illusory'. In our judgment this approach is mistaken. The standard of proof to be applied in Children Act 1989 cases is the balance of probabilities and the approach to these difficult cases was laid down by Lord Nicholls in *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563. That test has not been varied nor adjusted by the dicta of Lord Bingham of Cornhill CJ or Lord Steyn who were considering applications made under a different statute. There would appear to be no good reason to leap across a division, on the one hand, between crime and preventative measures taken to restrain defendants for the benefit of the community and, on the other hand, wholly different considerations of child protection and child welfare . . ."

E

F

69   My Lords, I entirely agree. There are some proceedings, though civil in form, whose nature is such that it is appropriate to apply the criminal standard of proof. Divorce proceedings in the olden days of the matrimonial "offence" may have been another example: see *Bater v Bater* [1951] P 35. But care proceedings are not of that nature. They are not there to punish or to deter anyone. The consequences of breaking a care order are not penal. Care proceedings are there to protect a child from harm. The consequences for the child of getting it wrong are equally serious either way.

G

70   My Lords, for that reason I would go further and announce loud and clear that the standard of proof in finding the facts necessary to establish the threshold under section 31(2) or the welfare considerations in section 1 of the 1989 Act is the simple balance of probabilities, neither more nor less. Neither the seriousness of the allegation nor the seriousness of the consequences should make any difference to the standard of proof to be applied in determining the facts. The inherent probabilities are simply something to be taken into account, where relevant, in deciding where the truth lies.

H

71    As to the seriousness of the consequences, they are serious either    A
way.  A child may find her relationship with her family seriously disrupted;
or she may find herself still at risk of suffering serious harm.  A parent may
find his relationship with his child seriously disrupted; or he may find himself
still at liberty to maltreat this or other children in the future.

72    As to the seriousness of the allegation, there is no logical or necessary
connection between seriousness and probability.  Some seriously harmful
behaviour, such as murder, is sufficiently rare to be inherently improbable in    B
most circumstances.  Even then there are circumstances, such as a body with
its throat cut and no weapon to hand, where it is not at all improbable.
Other seriously harmful behaviour, such as alcohol or drug abuse, is
regrettably all too common and not at all improbable.  Nor are serious
allegations made in a vacuum.  Consider the famous example of the animal
seen in Regent's Park.  If it is seen outside the zoo on a stretch of greensward    C
regularly used for walking dogs, then of course it is more likely to be a dog
than a lion.  If it is seen in the zoo next to the lions' enclosure when the door
is open, then it may well be more likely to be a lion than a dog.

73    In the context of care proceedings, this point applies with particular
force to the identification of the perpetrator.  It may be unlikely that any
person looking after a baby would take him by the wrist and swing him    D
against the wall, causing multiple fractures and other injuries.  But once the
evidence is clear that that is indeed what has happened to the child, it ceases
to be improbable.  Someone looking after the child at the relevant time must
have done it.  The inherent improbability of the event has no relevance to
deciding who that was.  The simple balance of probabilities test should be
applied.
                                                                               E

*Split hearings*

74    Care proceedings are not a two stage process.  The court does have
two questions to ask.  Has the threshold been crossed?  If so, what will be
best for the child?  But there are many cases in which a court has two or more
questions to ask in the course of a single hearing.  The same factual issues are
often relevant to each question.  Or some factual disputes may be relevant to    F
the threshold while others are relevant to the welfare checklist: it may be
clear, for example, that a child has suffered an injury while in the care of the
mother, but whether the father or stepfather has a drink problem and has
been beating the mother up is extremely relevant to the long term welfare of
the child.

75    The purpose of splitting the hearing is not to split the two questions    G
which the court must answer.  It is to separate out those factual issues which
are capable of swift resolution so that the welfare professionals have a firm
foundation of fact upon which to base their assessments of family
relationships and parenting ability: see *In re S (Care Proceedings: Split
Hearing)* [1996] 2 FLR 773.  A fact finding hearing is merely one of the case
management possibilities contemplated by the new Public Law Outline.  It is
not a necessary precondition for the core professional assessment, which the    H
Public Law Outline now expects should normally be done before the
proceedings even begin: *Practice Direction (Public Law Proceedings: Case
Management)* [2008] 1 WLR 1040, para 9.2, pre-proceedings checklist and
flowchart.  There is no point in splitting the issues if the facts cannot be

A determined relatively quickly, still less if it is unlikely to result in clear cut findings to help the professionals in their work.

76    But the finding of those facts is merely part of the whole process of trying the case. It is not a separate exercise. And once it is done the case is part heard. The trial should not resume before a different judge, any more than any other part heard case should do so. In the particular context of care proceedings, where the character and personalities of the parties are

B important components in any decision, it makes no sense at all for one judge to spend days listening to them give evidence on one issue and for another judge to spend more days listening to them give evidence on another. This is not only a wasteful duplication of effort. Much useful information is likely to fall between the gaps. How can a judge who has not heard the parents give their evidence about how the child's injuries occurred begin to assess the

C risk of letting them care for the child again? The experts may make their assessments, but in the end it is for the judge to make the decision on all the evidence before him. How can he properly do that when he has heard only half of it?

*Human rights*

D 77    Children have both the right to life under article 2, and the right not to be subjected to torture or inhuman or degrading treatment or punishment under article 3, of the European Convention on Human Rights. States are required to take measures to protect them, principally in form of effective deterrence through the criminal law (*A v United Kingdom* (1998) 27 EHRR 611) but also through taking steps to remove them from an abusive situation about which the authorities knew or ought to have known: *Z v United*

E *Kingdom* (2001) 34 EHRR 97. But there is nothing in those cases to suggest that the authorities are failing in their duty to protect children from inhuman or degrading treatment because they are unable permanently to remove children from their families on the basis of unproven allegations. Deterrence through the criminal law depends upon proof to the criminal standard. The duty to take positive protective steps depends upon the authorities having

F reasonable notice of the risk: see *Osman v United Kingdom* (1998) 29 EHRR 245. In *Osman's* case the police knew of the threats to kill; in *Z's* case 34 EHRR 3 the local authority were well aware of the long history of neglect and abuse. For a risk to be "real" it has to be founded on real facts not unproven speculations.

78    Children also have the right to respect for their family lives under article 8 of the Convention. This is, of course, a qualified right. Interference

G by the authorities is justified if it is "necessary in a democratic society" in order to protect the child's own rights, which in this context include the right to be protected from harm. But there has to be a "pressing social need" for the interference, the reasons for it have to be "relevant and sufficient", and the interference itself has to be proportionate to the need: see, for example, *K and T v Finland* (2000) 31 EHRR 484; *Scozzari and Giunta v Italy* (2000) 35 EHRR 243 and *Kutzner v Germany* (2002) 35 EHRR 653. It is difficult

H to see how the reasons for taking a child away from her family for the indefinite future can be "relevant and sufficient" if they rely upon unproven allegations as the only basis for inferring that the child is at risk of harm.

79    For my part, therefore, I see no reason to revise the existing law in the light of the Human Rights Act 1998.

*Conclusion*                                                                    A

80   I would therefore dismiss this appeal. However, two consequential points arise. Part of the judge's order in preparation for the next part of the hearing was a draft letter of instruction to the experts. This was designed to point up the problems with the present law as the judge saw them. The parties are all content with the much simpler draft proposed by CAFCASS for cases such as this:                                                                    B

> "The court has considered the allegations of [type of harm] made against [name(s) of alleged abuser(s)] and has concluded that the court is not satisfied that they are more likely than not to be true. In those circumstances the fact that those allegations were made remains part of the factual matrix of the family history and the ramifications of their having been made may well be relevant to your assessment. However, given that the court was not satisfied that the allegations were true, they cannot form the basis for asserting that there is a current risk of the same type of harm occurring in the future."

C

This would certainly seem a more appropriate form of words than that chosen by the judge for use in the present case and may well be suitable for use generally.                                                                    D

81   The second point is that, although not invited to do so by any of the parties, the judge recused himself from the case. His concern was that he had deliberately instigated this test to the existing law and others might perceive that he would find it difficult put out of his mind his view that the "real possibility" ought to be taken into account at the welfare stage. However, all judges are from time to time required to apply legal principles with which they have intellectual difficulty. The problem which the judge saw in this   E case will arise in any other care case in which allegations are made but not found on the balance of probabilities to be true. If the judge is not fitted to try this case, it might be said that he is not fit to try any case in which the same problem could arise, and that would be absurd. For all the reasons given earlier, the same judge should hear the whole case. Indeed, this case is a good illustration, for any subsequent judge might well have difficulty in extracting the really important findings from such a long and complicated   F judgment on the factual issues.

82   I would therefore send the case back for the experts to be instructed and the judge to complete his hearing of the case in the light of the judgments in this House. As with so many family cases, it is likely that things have moved on since these proceedings were begun. The problems which loomed so large in the past may have receded while others have reared their heads.   G In family life, as in family proceedings, nothing stands completely still.

*Appeal dismissed.*
*Case remitted to trial judge for*
*completion of hearing.*

S H
                                                                               H

# 5.370 Disclosure of inside information

Palmer's Company Law
Volume 1
Part 5 - Capital Issues
Chapter 5.3
Transparency Obligations
Section H. Liability for Misleading Statements
Responsibility for misleading statements in information provided further to the
transparency rules

## Disclosure of inside information

[*Reviewed: May 2021*]

In implementing the now repealed Market Abuse Directive, the FCA Handbook has introduced Disclosure Rules, as part of the "Disclosure Rules and Transparency Rules" block of the Handbook.[1] The Market Abuse Regulation now governs the EU roots of this area of the law, as onshored into UK law.

## Inside information in DTR

[*Reviewed: May 2021*]

There is a code within DTR relating to the use of inside information and, in particular, the circumstances in which inside information must be made public. The purpose of these provisions is "to promote prompt and fair disclosure of relevant information to the market" and to "give guidance on aspects relating to disclosure of such information, including the circumstances allowing delayed disclosure".[2] The policy is for inside information to be made public as soon as possible. On the one hand, there is a preference for making information public[3]; on the other hand there may be circumstances relating to the solvency of the issuer, national security, or the integrity of the market which might necessitate a delay in disclosing that information. The issuer is required to create arrangements for the containment of inside information within the issuer until publication is appropriate.[4] The Market Abuse regime of the FCA is significant in this context, as well as insider dealing in the criminal law under the Criminal Justice Act 1993.[5]

The FCA guidance as to the circumstances in which information will be "inside information" for this purpose is whether it would be "likely to have a significant effect on the price of financial instruments".[6] This is something which will differ depending on the issue and on the issuer, recent developments and market sentiment about the issuer, and the likelihood of

Case 1:20-cv-10041-PKC    Document 105-6    Filed 08/24/21    Page 41 of 104

5.367 The purpose of s.90A of the Financial Services and..., UKBC-PALMERS...

# 5.367 The purpose of s.90A of the Financial Services and Markets Act 2000

Palmer's Company Law
Volume 1
Part 5 - Capital Issues
Chapter 5.3
Transparency Obligations
Section H. Liability for Misleading Statements
Responsibility for misleading statements in information provided further to the transparency rules

## The purpose of s.90A of the Financial Services and Markets Act 2000

[*Reviewed: May 2021*]

Section 90A of the Financial Services and Markets Act 2000 allocates responsibility for misleading statements in information provided further to the transparency rules. By way of comparison, s.90 provides that "[a]ny person responsible for listing particulars [or a prospectus] is liable to pay compensation" to anyone who has acquired securities and suffered loss as a result due to untrue or misleading statements in the prospectus or as a result of an omission from that prospectus. This provision interacts with the general obligation of full disclosure in listing particulars and prospectuses under s.80 or 87A respectively. The new s.90A provides for a duty for the issuer of securities:

"to pay compensation to persons who have suffered loss as a result of—

> (a)a misleading statement or dishonest omission in certain published information relating to the securities, or

> (b)a dishonest delay in publishing such information."[1]

Therefore, compensation to be paid in relation to misleading statements contained in, or in relation to dishonest omissions from, the annual financial reports, the half-yearly financial reports, or interim management statements which are required to be published by arts 4, 5 and 6 of the Transparency Obligations Directive respectively. Whereas s.90 relates specifically to prospectuses prepared relating to the offer of securities to the public, the purpose of s.90A is to ensure the application of the same liability to the activities of people responsible for the continuing transparency obligations thereafter.

Under the FCA Handbook, an issuer is further required to "take all reasonable care to ensure that any information it notifies" to a regulator "is not misleading, false or deceptive and does not omit anything likely to affect the import of the information".[2] This obligation is a creature of the FCA

© 2021 Thomson Reuters.

Case 1:20-cv-10041-PKC    Document 105-6    Filed 08/24/21    Page 42 of 104

5.367 The purpose of s.90A of the Financial Services and..., UKBC-PALMERS...

regulations although it could also be considered to be a re-phrasing of the s.90A head of liability in the language of a positive obligation.

## The persons who are liable under s.90A

[*Reviewed: May 2021*]

The issuer of securities will be liable to "pay compensation" to any person who[3]:

"(a)acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and

(b)suffers loss in respect of the securities as a result of—

(i)any untrue or misleading statement in that published information, or

(ii)the omission from that published information any matter required to be included in it."[4]

There is one important caveat to the issuer's liability, however. As provided in s.90A(4)[5]: "The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading. "

Therefore, the basis of liability is predicated, first, on the making of an untrue or misleading statement and, secondly, also the requisite knowledge of someone discharging managerial responsibilities within the issuer.

### Footnotes

1    As amended by the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010 (SI 2010/1192) reg.2(2).
2    DTR 1A.3.2R.
3    Financial Services and Markets Act 2000 Sch.10A para.3(1).
4    Financial Services and Markets Act 2000 s.90A(3).
5    Financial Services and Markets Act 2000 Sch.10A para.3(2).

**End of Document**                                    © 2021 Sweet & Maxwell

"(4)If the FCA finds that an applicable provision has been infringed, it may require the market operator to prohibit trading in the securities on the regulated market in question."

Section 89L(6) then provides for a similar power, mutatis mutandis, to s.89K immediately above in relation to product intervention rules and so forth.

5.360    The FCA has a power to prohibit trading in particular securities on a trading facility under s.87LA of the Financial Services and Markets Act 2000.[3] It is provided that:

"(2)If—

(a)the FCA has reasonable grounds for suspecting that an applicable provision has been infringed, and

(b)the securities have not yet been traded on the trading facility in question, the FCA may require the person who proposes to trade the securities to suspend taking any action to implement the proposal for a period not exceeding 10 working days. "

Therefore, trading in securities may be suspended by order of the FCA. By contrast, if the securities have been traded then subs.(3) applies in the following terms:

"(a)the FCA has reasonable grounds for suspecting that an applicable provision has been infringed, and

(b)the securities have been traded on the trading facility in question, the FCA may require the operator of the facility to suspend trading in the securities for a period not exceeding 10 working days. "

The applicable provisions are provisions of Pt 6 of the Financial Services and Markets Act 2000, or of the FCA prospectus rules, or of the Prospectus Regulation. Alternatively, as with the two preceding provisions, there is a third power for the FCA:

(4)If the FCA finds that an applicable provision has been infringed, it may require the operator of the trading facility in question to prohibit trading in the securities on that facility.

Therefore, the FCA has the power to direct suspension of the securities.

5.361    Provision for the public censure of issuers is made in s.89M(1) of the Financial Services and Markets Act 2000. If the FCA "finds that" an issuer of transferable securities, a person offering transferable securities to the public, or a person requesting admission of securities to trading on a regulated market either 'is failing or has failed to comply with his obligations under an applicable provisions' (of Pt 6 of the Financial Services and Markets Act 2000, the prospectus rules or the Prospectus Regulation) then the FCA "may publish a statement to that effect".[4]

5.362    If trading in an issuer's securities is suspended, then people discharging managerial responsibilities must continue to comply with the disclosure requirements of DTR.[5] A sanction or a financial penalty can be imposed on such people by the FCA.[6] The example given in DTR of such a suspension is where an announcement is not made as required by the Market Abuse Regulation which could affect the interests of investors or the smooth operation of the market.[7]

5.363

© 2021 Thomson Reuters.

Before taking action against an issuer, the FCA must have "reasonable grounds" for believing that there has been an infringement of a transparency obligation by an issuer.[8] There are then three possible courses of action open to the FCA. First, the FCA may (but is not required to) suspend trading in the securities for a period not exceeding ten days. Secondly, the FCA may prohibit trading in those securities. Thirdly, the FCA may "make a request" to the operator of the market on which those securities are traded to suspend trading for a period not exceeding ten days or to prohibit trading in those securities. Before taking action against a voteholder, the FCA must have "reasonable grounds" for believing that there has been an infringement of a transparency obligation by a voteholder.[9] There are then two possible courses of action open to the FCA. First, the FCA may prohibit trading in those securities; or, secondly, the FCA may "make a request" to the operator of the market on which those securities are traded to prohibit trading in those securities. There is, however, a power to prohibit trading in securities in general.[10]

The procedure is set out in s.89M of the Financial Services and Markets Act 2000, requiring notice in the appropriate form. Under s.89N, a person to whom a notice is given under s.89M may refer the matter to the Markets Tribunal.

The FCA may apply to the court for it to make a "voting rights suspension order" in respect of "a person who is a voteholder in relation to shares in a particular company which are admitted to trading on a regulated market and identified in the application".[11] As Financial Services and Markets Act 2000 provides, "a voting rights suspension order is an order which suspends the person's exercise of voting rights attaching to the shares to which the order relates".[12]

## Footnotes

1    This provision was changed markedly in the final stages of the bill's passage through Parliament. Previously it had read so as to discriminate between issuers within and without the UK. This may have breached principles of EU law. Now most of the references to that jurisdiction have been removed.

2    The effect of the Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019 (SI 2019/707), as amended, is, on "IP completion day" from the EU (assuming these regulations are passed through Parliament), that references to EU legislation would be removed and powers in relation to that legislation would be passed to the FCA as the relevant UK financial regulator.

3    As inserted by the Financial Services and Markets Act 2000 (Prospectus) Regulations 2019 (SI 2019/1043) regs 1(1) and 20 (with reg.40).

4    Financial Services and Markets Act 2000 s.87M(1).

5    DTR 1.4.2G.

6    DTR 1.5.3G.

7    DTR 1.4.4G.

© 2021 Thomson Reuters.

8    Financial Services and Markets Act 2000 s.89L(2).

9    Financial Services and Markets Act 2000 s.89L(3).

10   Financial Services and Markets Act 2000 s.89L(4). While the statute does not make this clear, the particular transparency obligation which needs to have been breached may need to be stipulated as such in the transparency rules. Therefore, it is in the FSA transparency obligations that we shall see a division between suspension or prohibition of trading with a time period and discontinuances without such a limit.

11   Financial Services and Markets Act 2000 s.89NA(1).

12   Financial Services and Markets Act 2000 s.89NA(2).

---

**End of Document**                          © 2021 Sweet & Maxwell

501

1 A.C.                        Reg. v. Clegg (H.L.(N.I.))              Lord Lloyd of Berwick

A    guilty of murder, and not manslaughter. It follows that the appeal must
     be dismissed.

         LORD NICHOLLS OF BIRKENHEAD.   My Lords, I agree that, for the
     reasons given in the speech of my noble and learned friend, Lord Lloyd
     of Berwick, this appeal should be dismissed.

B                                              *Appeal dismissed.*
                                              *Certified question answered*
                                                  *as indicated.*

         Solicitors: *Bassra Solicitors, Bradford; Director of Public Prosecutions*
     *for Northern Ireland, Belfast.*

C
                                                              M. G.

D

                                 [HOUSE OF LORDS]

     PAN ATLANTIC INSURANCE CO. LTD.
E        AND ANOTHER .      .      .      .      .      .      .      . APPELLANTS
                                      AND
     PINE TOP INSURANCE CO. LTD.         .      .      .      . RESPONDENTS

     1994   Feb. 14, 15, 16, 17, 21, 22;       Lord Templeman, Lord Goff of Chieveley,
            March 21;                          Lord Mustill, Lord Slynn of Hadley and
            July 25                            Lord Lloyd of Berwick
F

     *Insurance—Reinsurance—Non-disclosure—Reinsurance renewal—Plain-*
          *tiffs failing to disclose additional losses for previous year—Whether*
          *"material circumstance"—Effect on mind of prudent insurer—*
          *Avoidance of contract—Whether insurer induced by non-disclosure*
          *to enter into policy—Marine Insurance Act 1906 (6 Edw. 7, c. 41),*
          *ss. 17, 18(1)(2), 20(1)(2)*

G           Between 1977 and 1982, the plaintiffs wrote a quantity of
     direct American liability insurance, much of it being "long-tail"
     business in which a long period of time might elapse before claims
     matured. In relation to the years 1977 to 1979, the plaintiffs'
     casualty account was reinsured with other insurers for excess of
     loss above a certain figure. For the 1980 policy year, the
     defendants became reinsurers in respect of that cover, and they
H    subsequently renewed the reinsurance for 1981 and 1982. Disputes
     arose in respect of all three years, and the plaintiffs obtained
     judgment in proceedings against the defendants in respect of the
     1980 and 1981 reinsurance contracts. In 1987, they commenced
     proceedings on the 1982 contract to recover paid and outstanding

502

A

claims as at 31 December 1986 and for declarations that the contract was valid. By their points of defence, the defendants sought to avoid the plaintiffs' claims on the ground of non-disclosure of loss statistics for the underwriting years 1977 to 1979 and consequent misrepresentation of the risk. By subsequent amendment, they also sought to avoid the plaintiffs' claims on the ground of non-disclosure in respect of the 1980 and 1981 underwriting years. The judge rejected their defence based on non-disclosure of the statistics for 1977 to 1979 and held that an inaccuracy in the 1980 statistics was not material, but upheld the defendants' defence based on non-disclosure of the losses for 1981. It was common ground that the true losses for 1981 had been U.S.$468,168 as against disclosed losses of U.S.$235,768; that the plaintiffs had had information about those additional losses before the slip had been signed on 13 January 1982; and that those losses had not been disclosed. The judge held that the additional losses for 1981 had been material to the contract and should have been disclosed and that, accordingly, the defendants were entitled to avoid the 1982 contract. The Court of Appeal dismissed an appeal by the plaintiffs.

B

C

On appeal by the plaintiffs:—

*Held,* dismissing the appeal, (1) (Lord Templeman and Lord Lloyd of Berwick dissenting) that under section 18 of the Marine Insurance Act 1906,[1] which was applicable by analogy in a non-marine case, a "material circumstance" was one that would have an effect on the mind of the prudent insurer in estimating the risk and it was not necessary that it should have a decisive effect on his acceptance of the risk or on the amount of premium demanded (post, pp. 517D–E, 530H–531A, D, 532E–F, 541D–E, 550C, 551H–552A).

D

(2) That before an underwriter could avoid a contract for non-disclosure of a material circumstance he had to show that he had actually been induced by the non-disclosure to enter into the policy on the relevant terms (post, pp. 516E, 549D, 550A–B, C–D, 552A–B, 571D–G).

E

*Berger v. Pollock* [1973] 2 Lloyd's Rep. 442 approved.

*Container Transport International Inc. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1984] 1 Lloyd's Rep. 476, C.A. overruled in part.

F

(3) That the additional losses for 1981 had been a material circumstance that ought to have been disclosed and the judge's conclusion that the defendants were entitled to avoid the contract should stand (post, pp. 515H–516A, 518C, 551A–B, F–G, 552B, 573G–574B).

Decision of the Court of Appeal [1993] 1 Lloyd's Rep. 496 affirmed.

G

The following cases are referred to in their Lordships' opinions:

*Anderson v. Fitzgerald* (1853) 4 H.L.Cas. 484, H.L.(I.)

*Banque Keyser Ullmann S.A. v. Skandia (U.K.) Insurance Co. Ltd.* [1990] 1 Q.B. 665; [1989] 3 W.L.R. 25; [1989] 2 All E.R. 952, C.A.; [1991] 2 A.C. 249; [1990] 3 W.L.R. 364; [1990] 2 All E.R. 947, H.L.(E.)

*Barclay Holdings (Australia) Pty. Ltd. v. British National Insurance Co. Ltd.* (1987) 8 N.S.W.L.R. 514

H

[1] Marine Insurance Act 1906, s. 17: see post, p. 518D–E.
S. 18(1)(2): see post, p. 518E–F.
S. 20(1)(2): see post, pp. 518F–G.

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))

*Berger v. Pollock* [1973] 2 Lloyd's Rep. 442

*Blackburn, Low & Co. v. Vigors* (1886) 17 Q.B.D. 553, C.A.; (1887) 12 App.Cas. 531, H.L.(E.)

*Cantiere Meccanico Brindisino v. Janson* [1912] 3 K.B. 452, C.A.

*Carter v. Boehm* (1766) 3 Burr. 1905

*Commonwealth Insurance Co. of Vancouver v. Groupe Sprinks S.A.* [1983] 1 Lloyd's Rep. 67

*Container Transport International Inc. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1982] 2 Lloyd's Rep. 178; [1984] 1 Lloyd's Rep. 476, C.A.

*Flinn v. Headlam* (1829) 9 B. & C. 693

*Ionides v. Pender* (1874) L.R. 9 Q.B. 531

*Kennedy v. Panama, New Zealand and Australian Royal Mail Co. Ltd.* (1867) L.R. 2 Q.B. 580

*Mackender v. Feldia A.G.* [1967] 2 Q.B. 590; [1967] 2 W.L.R. 119; [1966] 3 All E.R. 847, C.A.

*March Cabaret Club & Casino Ltd. v. London Assurance* [1975] 1 Lloyd's Rep. 169

*Marene Knitting Mills Pty. Ltd. v. Greater Pacific General Insurance Ltd.* [1976] 2 Lloyd's Rep. 631, P.C.

*Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228

*Merchants' and Manufacturers' Insurance Co. Ltd. v. Hunt* [1941] 1 K.B. 295; [1941] 1 All E.R. 123, C.A.

*Mutual Life Insurance Co. of New York v. Ontario Metal Products Co. Ltd.* [1925] A.C. 344, P.C.

*Pickersgill (William) & Sons Ltd. v. London and Provincial Marine and General Insurance Co. Ltd.* [1912] 3 K.B. 614

*Rivaz v. Gerussi Brothers & Co.* (1880) 6 Q.B.D. 222, C.A.

*Redgrave v. Hurd* (1881) 20 Ch.D. 1, C.A.

*Seaman v. Fonereau* (1743) 2 Str. 1183

*Shiloh Spinners Ltd. v. Harding* [1973] A.C. 691; [1973] 2 W.L.R. 28; [1973] 1 All E.R. 90, H.L.(E.)

*Smith v. Chadwick* (1884) 9 App.Cas. 187, H.L.(E.)

*Southern Cross Assurance Co. Ltd. v. Australian Provincial Assurance Association Ltd.* (1939) 39 S.R.(N.S.W.) 174

*Stribley v. Imperial Marine Insurance Co.* (1876) 1 Q.B.D. 507, D.C.

*Tate & Sons v. Hyslop* (1885) 15 Q.B.D. 368, C.A.

*Traill v. Baring* (1864) 4 De G.J. & S. 318; 4 Giff. 485

*Visscherij Maatschappij Nieuw Onderneming v. Scottish Metropolitan Assurance Co. Ltd.* (1921) 27 Com.Cas. 198, C.A.

*Zurich General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53; [1942] 1 All E.R. 529, C.A.

The following additional cases were cited in argument:

*Anderson v. Pacific Fire and Marine Insurance Co.* (1872) L.R. 7 C.P. 65

*Associated Oil Carriers Ltd. v. Union Insurance Society of Canton Ltd.* [1917] 2 K.B. 184

*Babatsikos v. Car Owners' Mutual Insurance Co. Ltd.* [1970] 2 Lloyd's Rep. 314

*Bates v. Hewitt* (1867) L.R. 2 Q.B. 595

*Becker v. Marshall* (1922) 12 Ll.L.R. 413, C.A.

*Bridges v. Hunter* (1813) 1 M. & S. 15

*Clason v. Smith* (1811) 3 Wash.C.C. 156

*Dunn v. Ocean Accident & Guarantee Corporation Ltd.* (1933) 45 Ll.L.R. 276; 47 Ll.L.R. 129, C.A.

*Elton v. Larkins* (1832) 5 C. & P. 385

504

*Gauvremont v. Prudential Insurance Co. of America* [1941] S.C.R. 139          A

*Glicksman v. Lancashire and General Assurance Co. Ltd.* [1927] A.C. 139,
     H.L.(E.)

*Godfrey v. Britannic Assurance Co. Ltd.* [1963] 2 Lloyd's Rep. 515

*Greenhill v. Federal Insurance Co. Ltd.* [1927] 1 K.B. 65, C.A.

*Hamilton & Co. v. Eagle, Star & British Dominions Insurance Co. Ltd.* (1924)
     19 Ll.L.R. 242

*Harrower v. Hutchinson* (1870) L.R. 5 Q.B. 584          B

*Highlands Insurance Co. v. Continental Insurance Co. (Note)* [1987] 1 Lloyd's
     Rep. 109

*Hooper v. Royal London General Insurance Co. Ltd.*, 1993 S.L.T. 679

*Joel v. Law Union and Crown Insurance Co.* [1908] 2 K.B. 863, C.A.

*Laing v. Union Marine Insurance Co.* (1895) 1 Com.Cas. 11

*Lambert v. Co-operative Insurance Society Ltd.* [1975] 2 Lloyd's Rep. 485,
     C.A.

*London General Omnibus Co. Ltd. v. Holloway* [1912] 2 K.B. 72, C.A.          C

*Lynch v. Dunsford* (1811) 14 East 494

*M'Cartney v. Laverty*, 1968 S.C. 207

*Marshall and Scottish Employers' Liability and General Insurance Co. Ltd.,
     In re an arbitration between* (1901) 85 L.T. 757

*Merchants' and Manufacturers' Insurance Co. Ltd. v. Davies* [1938] 1 K.B. 196;
     [1937] 2 All E.R. 767, C.A.

*Morrison v. Universal Marine Insurance Co.* (1873) L.R. 8 Ex. 197          D

*Mutual and Federal Insurance Co. Ltd. v. Oudtschoorn Municipality*, 1985
     (1) S.A. 419

*Rickards v. Murdock* (1830) 10 B. & C. 527

*Scottish Shire Line Ltd. v. London and Provincial Marine and General Insurance
     Co. Ltd.* [1912] 3 K.B. 51

*Shanly v. Allied Traders' Insurance Co. Ltd.* (1925) 21 Ll.L.R. 195

*Sibbald v. Hill* (1814) 2 Dow 263, H.L.(Sc.)          E

*Sun Mutual Insurance Co. v. Ocean Insurance Co.* (1882) 107 U.S. 485

*Western Australian Insurance Co. Ltd. v. Dayton* (1924) 35 C.L.R. 355

APPEAL from the Court of Appeal.

This was an appeal by the plaintiffs, Pan Atlantic Insurance Co. Ltd.
(on its own behalf and on behalf of all members of the Pan Atlantic
Group Reinsurance Syndicate and/or the Pan Atlantic Reinsurance Group          F
in 1982) and Republic Insurance Co. (body corporate) (on its own behalf
and on behalf of all members of the Pan Atlantic Group Reinsurance
Syndicate and/or the Pan Atlantic Reinsurance Group in 1982), by leave
of the House of Lords from the judgment of the Court of Appeal
(Sir Donald Nicholls V.-C., Farquharson and Steyn L.JJ.) [1993] 1 Lloyd's
Rep. 496 given on 3 March 1993 refusing an application by the plaintiffs          G
for leave to amend their notice of appeal and to re-re-re-re-amend their
points of reply in the action and dismissing the plaintiffs' appeal from the
judgment of Waller J. [1992] 1 Lloyd's Rep. 101 given on 25 March 1991
by which he dismissed the plaintiffs' claims in their action against the
defendants, Pine Top Insurance Co. Ltd.

The Court of Appeal refused the plaintiffs' application for leave to
appeal to the House of Lords from their judgment, but on 19 July 1993          H
the Appeal Committee of the House of Lords (Lord Templeman, Lord
Jauncey of Tullichettle and Lord Mustill) allowed a petition by the
plaintiffs for leave.

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))

A      The facts are stated in the opinions of Lord Mustill and Lord Lloyd of Berwick.


       *Michael Beloff Q.C., Steven Berry* and *Sarah Moore* for the plaintiffs. For the purpose of the general law of non-marine insurance, a circumstance that is not disclosed or is misrepresented is material if it is a circumstance that (i) would have caused a prudent and reasonable underwriter to reject the risk or accept the risk on different terms had he known the circumstance (the "different decision" test) *and* (ii) if known to the particular underwriter would *actually* have induced *him* to make a different decision (the "actual influence" test). The relevant impact is, therefore, that on both the prudent underwriter and the actual underwriter, and the circumstance must be one that would lead to a different final assessment. The contrary decision in *Container Transport International Inc. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1984] 1 Lloyd's Rep. 476 ("the C.T.I. case") either applies only to marine cases or is wrong. For criticisms of the *C.T.I.* case, see Henry Brooke Q.C., "Materiality in insurance contracts" [1985] L.M.C.L.Q. 437; Adrian Hamilton Q.C., "Avoidance of liability on the grounds of misrepresentation and non-disclosure, or, the rise and rise of avoidable reinsurance," Insurance and Reinsurance Law, September 1985, p. 131; Anthony Diamond Q.C., "The law of marine insurance—has it a future?" [1986] L.M.C.L.Q. 25; David St. L. Kelly, "Recent Developments in relation to Inducement in Non-disclosure and misrepresentation" (1988) 1 Ins.L.J. 30; Dr. Malcolm Clarke, "Failure to Disclose and Failure to Legislate: is it Material?—II" [1988] J.B.L. 298; *Clarke, The Law of Insurance Contracts* (1989), pp. 452–456; Steyn J., "The Role of Good Faith and Fair Dealing in Contract Law: A Hairshirt Philosophy?" [1991] Denning L.J. 131, 138–140; Howard N. Bennett, "The Duty to Disclose in Insurance Law" (1993) 109 L.Q.R. 513; Mark Humphries, "Duties of disclosure and the prudent underwriter," Tolley's Insurance Law & Practice, Summer 1992, p. 48; Peter Rogan, "Uberimma Fides—Lord of Misrule?" (1992) 1 Global Reinsurance 215 and P. J. H. Rogan, "The Prudent Underwriter—Time for Change" (1992) 79 B.I.L.A.J. 7. The position under the Marine Insurance Act 1906 is not different, but, if it is, it does not affect the position in non-marine cases. The burden of proof is on the underwriter to show materiality by satisfying the two tests. In so far as *Redgrave v. Hurd* (1881) 20 Ch.D. 1 departs from this basic principle of English law it was wrongly decided: see *Spencer Bower and Turner, Actionable Misrepresentation,* 3rd ed. (1974), pp. 154–155. [Reference was made to *Smith v. Chadwick* (1884) 9 App.Cas. 187, 196.] No similar onus probandi should be imposed on a party who makes an inadvertent disclosure not calculated to induce the other to enter into the contract. The court in assessing materiality should not assume that the prudent underwriter had accepted the risk on the terms accepted by the actual underwriter before going on to consider the materiality of the undisclosed or misrepresented circumstance. The insurer should not be allowed to rely on matters that were irrelevant to him although they might have been relevant to a more sensible person.

506

A

It is a fundamental principle that contracts should be binding. Rights to avoid contracts are exceptions to this principle: see *Clarke, The Law of Insurance Contracts,* p. 456. The relevant exception for present purposes is that a contract should be avoidable if the consent of one of the parties was vitiated by imposition by the other party. This is necessarily limited by the principle that the imposition must be such as would vitiate the consent of the hypothetical reasonable contracting party. There must be an objective element to the test so that contracting parties can rely on contracts that were made without objectively apparent imposition even if the other party was subjectively (because of some idiosyncrasy) imposed upon. This equitable exception on the ground of imposition is the origin of the modern right to avoid all contracts for misrepresentation: see *Banque Keyser Ullmann S.A. v. Skandia (U.K.) Insurance Co. Ltd.* [1990] 1 Q.B. 665 and *Merchants' and Manufacturers' Insurance Co. Ltd. v. Hunt* [1941] 1 K.B. 295. Insurance contracts differ from other contracts in that the assured can be expected to have all of the information in respect of the risk and the insurer can be expected to have none. This justifies a duty of good faith, leading to a positive duty of disclosure, in insurance contracts: see *Carter v. Boehm* (1766) 3 Burr. 1905. The basis of avoidance is that the risk run is in fact different from what the insurer understood it to be and therefore the insurer has been prejudiced by the non-disclosure because he was not able properly to estimate the risk. The principle remains that the contract of insurance should be avoidable for non-disclosure only if obtained by objective imposition.

B

C

D

The fears of Lloyd J. in the *C.T.I.* case as to the impracticality of the "impact on decision-making" test are justified. Any summary is going to be incomplete and, left on its own, bound to be open to criticism with the advantage of hindsight. For the issue of avoidance to arise, there will have been heavy losses. Hindsight will often be able to detect trends and facts that could not have been observed or considered significant contemporaneously. On the basis that the attitude of the actual underwriter is irrelevant, one cannot have recourse to what he thought important. The reinsurer merely has to find a prudent underwriter, looking at his leisure through the mass of statistics produced on discovery, who finds some material that is not reflected in the summary and to which he could have wished to direct his mind in assessing the risk. The experienced reinsurer has no need of protection. Inducement of the particular insurer was originally required. That left the insured at the risk of an insurer who acted unreasonably. To avoid that risk, the Court of Queen's Bench in *Ionides v. Pender* (1874) L.R. 9 Q.B. 531 added an additional requirement: a non-disclosure was only material if it would have been as relevant to a prudent underwriter as it was to an actual underwriter. [Reference was made to *Seaman v. Fonereau* (1743) 2 Str. 1183; *Rickards v. Murdock* (1830) 10 B. & C. 527, 540–541; *Elton v. Larkins* (1832) 5 C. & P. 385, 392; *Harrower v. Hutchinson* (1870) L.R. 5 Q.B. 584, 590 and Henry Brooke Q.C. "Materiality in insurance contracts" [1985] L.M.C.L.Q. 437, 439–440.] For the distinction between the objective test of materiality and the subjective test of inducement, see *Tate & Sons v. Hyslop* (1885) 15 Q.B.D. 368, 379. [Reference was also made to *Elton v. Larkins,* 5 C. & P. 385, 392; *Traill v. Baring* (1864) 4 De G.J. & S. 318, 326, 330;

E

F

G

H

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))

A  *Commonwealth Insurance Co. of Vancouver v. Groupe Sprinks S.A.* [1983] 1 Lloyd's Rep. 67, 78 and *Arnould on Marine Insurance,* 8th ed. (1909), vol. I, pp. 693–696, sections 554–555; *Arnould, Law of Marine Insurance and Average,* 16th ed. (1981), vol. II, pp. 439, 462–465, paras. 582, 611.]

The authorities in the period from *Ionides v. Pender* to 1906 support rather than detract from the "different decision" test: see *Stribley v. Imperial Marine Insurance Co.* (1876) 1 Q.B.D. 507, 512, 514, 514–515.

B  [Reference was also made to *Laing v. Union Marine Insurance Co.* (1895) 1 Com.Cas. 11, 17–18.]

As to section 18(2) of the Act of 1906, "judgment" primarily, if not exclusively, means the actual decision, as opposed to the decision-making process, and "influence" means changing the decision from what it would otherwise be. Of seven meanings of "judgment" given in the *Oxford*

C  *English Dictionary,* only one refers to the decision-making process.

As regards authorities after 1906, the weight of authority also supports the different decision test: see *London General Omnibus Co. Ltd. v. Holloway* [1912] 2 K.B. 72, 77; *Cantiere Meccanico Brindisino v. Janson* [1912] 3 K.B. 452, 467; *Shanly v. Allied Traders' Insurance Co. Ltd.* (1925) 21 Ll.L.R. 195, 197; *Mutual Life Insurance Co. of New York v. Ontario*

D  *Metal Products Co. Ltd.* [1925] A.C. 344, 351–352; *Southern Cross Assurance Co. Ltd. v. Australian Provincial Assurance Association Ltd.* (1939) 39 S.R. (N.S.W.) 174, 187–188; *Gauvremont v. Prudential Insurance Co. of America* [1941] S.C.R. 139, 157; *Zurich General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53, 58, 60 and *Commonwealth Insurance Co. of Vancouver v. Groupe Sprinks S.A.* [1983] 1 Lloyd's Rep. 67. [Reference was also made to *Welford and Otter-Barry,*

E  *The Law Relating to Fire Insurance,* 4th ed. (1948), p. 140, note (k); *Traill v. Baring* (1864) 4 De G.J. & S. 318, 326, 329; 4 Giff. 485, 490; *Rivaz v. Gerussi Brothers & Co.* (1880) 6 Q.B.D. 222, 227, 229; *Tate & Sons v. Hyslop,* 15 Q.B.D. 368, 376, 378, 379; *Scottish Shire Line Ltd. v. London and Provincial Marine and General Insurance Co. Ltd.* [1912] 3 K.B. 51, 70–71; *Glicksman v. Lancashire and General Assurance Co. Ltd.*

F  [1927] A.C. 139, 143; *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228, 238; *Marene Knitting Mills Pty. Ltd. v. Greater Pacific General Insurance Ltd.* [1976] 2 Lloyd's Rep. 631, 642; *Sun Mutual Insurance Co. v. Ocean Insurance Co.* (1882) 107 U.S. 485, 510; *M'Cartney v. Laverty,* 1968 S.C. 207, 213; *Hooper v. Royal London General Insurance Co. Ltd.,* 1993 S.L.T. 679, 684, 688, 689, 692; *Western Australian Insurance Co. Ltd. v. Dayton* (1924) 35 C.L.R. 355; *Barclay Holdings (Australia) Pty. Ltd.*

G  *v. British National Insurance Co. Ltd.* (1987) 8 N.S.W.L.R. 514, 515, 517, 517–519; A. T. Scotford, "Chipping Away at *C.T.I. v. Oceanus*" [1988] L.M.C.L.Q. 30; and *Mutual and Federal Insurance Co. Ltd. v. Oudtschoorn Municipality,* 1985 (1) S.A. 419, 444.]

The actual influence test is consistent with the language and policy of the Act. The Act does not compel an approach in which, in the absence

H  of waiver, the assured must perform a duty of disclosure judged only by reference to the prudent insurer and irrespective of circumstances affecting the actual insurer. Section 18(2) should not be interpreted as an exhaustive definition of the grounds for avoidance by reason of non-disclosure: see

508

*Berger v. Pollock* [1973] 2 Lloyd's Rep. 442, 463 and *Visscherij Maatschappij Nieuw Onderneming v. Scottish Metropolitan Assurance Co. Ltd.* (1921) 27 Com.Cas. 198, 212, 215. The authorities directly against the actual influence test rely only on an obiter dictum of MacKinnon L.J. in *Zurich General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53, 60. They should be overruled.

A

If the effect of the Act of 1906 is that, in marine cases, there is now a right to avoid notwithstanding that the actual insurer was not influenced by the non-disclosure or misrepresentation, that effect must be limited to marine cases. It is apparent from section 2 that the Act was intended to be not a codification of the common law of insurance but rather a codification of the common law of marine insurance. Further, it was not perceived as a codification of the common law of insurance by contemporaneous authorities: see *Joel v. Law Union and Crown Insurance Co.* [1908] 2 K.B. 863, 884. Marine insurance is in general treated differently from non-marine insurance. In non-marine cases there was originally no right to avoid or terminate the contract except for fraudulent misrepresentation: see *Anderson v. Fitzgerald* (1853) 4 H.L.Cas. 484, 504. In marine cases, by contrast, a right to "avoid" or terminate the contract for innocent misrepresentation arose by way of an implied condition of the contract that no material facts had been misrepresented: see *Blackburn, Low & Co. v. Vigors* (1886) 17 Q.B.D. 553, 561–562, 578, 583. The positions were assimilated after the Judicature Acts but the different history illustrates the different considerations arising in different types of insurance.

B

C

D

The authorities prior to the Act of 1906 required *the* insurer to have been induced by the non-disclosure. *Lambert v. Co-operative Insurance Society Ltd.* [1975] 2 Lloyd's Rep. 485, which held that the definition of "materiality" in non-marine insurance was the same as that in marine insurance, was wrong because, when it was decided, "materiality" had a narrower meaning and inducement was a necessary condition of the right to avoid: see *Mutual Life Insurance Co. of New York v. Ontario Metal Products Co. Ltd.* [1925] A.C. 344. Following the *C.T.I.* case, the law became too favourable to the insurer in respect of the right to avoid for material non-disclosure or misrepresentation, and the result of defining materiality in the same way for both marine and non-marine insurance in cases subsequent to that decision would be to exacerbate that imbalance and injustice. *Lambert* should, therefore, be overruled on this point. [Reference was made to *Chalmers and Owen, Digest of the Law of Marine Insurance,* 1st ed. (1901), pp. 22–23; 2nd ed. (1903), pp. 24–25; footnote 3 to article 20(1); *Arnould on the Law of Marine Insurance,* 6th ed. (1887) vol. 1, pp. 519, 526, 548; *Halsbury's Laws of England,* 1st ed., vol. 17 (1911), p. 414, para. 809; 2nd ed., vol. 18 (1935), p. 408, para. 586 and *Arnould,* 8th ed. (1909), pp. 693–696, sections 554–555, pp. 729–730, section 590.]

E

F

G

The Court of Appeal were wrong to hold that undisclosed information may be material even though the information actually disclosed was such that no prudent underwriter would have accepted the risk. If the prudent underwriter would not have accepted the risk in any event, then any information could not have had any relevant effect on his judgment; still

H

509

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))

A  less could it be said that he would have reached a different decision if the additional information had been disclosed.

As to the "errors and omissions clause" (article XV of the treaty), there is no reason in principle why parties should not include a clause that deprives an insurer or reinsurer of the right to avoid for inadvertent material non-disclosure or misrepresentation. Article XV is on its wording such a clause.

B  *Adrian Hamilton Q.C., Timothy Saloman Q.C.* and *Simon Picken* for the defendants. The bedrock principle that has informed the law of insurance and reinsurance, whether marine or non-marine, for over 200 years is that contracts are based on the utmost good faith: see *Carter v. Boehm,* 3 Burr. 1905. That this principle is mutual has long been clear but was recently confirmed in *Banque Keyser Ullman S.A. v. Skandia (U.K.)*
C  *Insurance Co. Ltd.* [1991] 2 A.C. 249.

The law of materiality has three main features. (i) The yardstick of the "materiality" of a circumstance that has not been disclosed, or has been misrepresented, prior to the conclusion of the contract of insurance is the notional influence on the judgment of a prudent underwriter. It is not the actual influence on the judgment of the actual underwriter. Parliament so declared in sections 18 and 20 of the Act of 1906. (ii) In order to be
D  "material," the non-disclosed or misrepresented circumstance must be one that, if disclosed or properly represented, the prudent insurer would want to take into account when reaching his decision whether or not to accept the risk and, if so, on what terms. (iii) The consequence of material non-disclosure or misrepresentation prior to the conclusion of a contract of insurance or reinsurance is that the insurer may avoid the contract. These
E  principles were correctly upheld in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 and are supported by relevant legislation and an overwhelming body of consistent, and eminent, judicial authority. Fulfilment of the duty of disclosure does not depend on nice judgments by the broker as to the minimum disclosure he can get away with. Otherwise, the "utmost good faith" principle would be eroded, and against such erosion the courts have consistently set their face: see *Bates v. Hewitt* (1867) L.R. 2 Q.B. 595,
F  604–611; *Becker v. Marshall* (1922) 12 Ll.R.R. 413; *Greenhill v. Federal Insurance Co. Ltd.* [1927] 1 K.B. 65, 72, 76, 85–86; the *C.T.I.* case, pp. 490–492, 496, 510–511, 529 and *Redgrave v. Hurd,* 20 Ch.D. 1, 13, 22–23. The relevant inquiry is as to whether the relevant facts were fairly disclosed at the time when the insurance was underwritten.

It has never been the law of insurance that the insurer's right of
G  avoidance for non-disclosure or misrepresentation is dependent on proof that the insurer's mind was affected or that the insurer's final decision would have been different. The rationale of the insurer's statutory right of avoidance is: (a) the uberrimae fidei nature of a contract of insurance, deriving from the speculative nature of the contract and the law's odium of unequal information in such contracts (see *Carter v. Boehm,* 3 Burr. 1905, 1909–1910; *Park, A System of the Law of Marine Insurances,* 7th ed.
H  (1817) vol. 1, pp. 283, 287 and *Greenhill v. Federal Insurance Co. Ltd.* [1927] 1 K.B. 65, 76–77 and, perhaps, (b) an implied condition of the contract that unless the facts substantially correspond with those represented the insurer will not be liable on the policy (see *Park,* p. 291

510

and *Phillips, A Treatise on the Law of Insurance*, 5th ed. (1867), vol. I,   A
pp. 278–279). This rationale underlies section 20(1) of the Act of 1906.
Reason, and the practicalities of proof, are against a proposition that the
representee must show what his conduct would have been if the risk had
been presented to him differently, such conduct being essentially
speculative: see *Traill v. Baring*, 4 De G.J. & S. 318, 330.

*Arnould on Marine Insurance*, 6th ed., vol. I, p. 548 does not support
the plaintiffs: there is no suggestion that inducement is necessary.   B
[Reference was also made to *Chalmers and Owen, Digest of the Law of
Marine Insurance,* 1st ed., p. 22.] *Flinn v. Headlam* (1829) 9 B. & C. 693
does not assist at all. The relevant principles are too well rooted for an
additional requirement, namely that of inducement, to be put in except by
legislation. [Reference was made to *Zurich General Accident and Liability
Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53; *Cantiere Meccanico*   C
*Brindisino v. Janson* [1912] 3 K.B. 452, 459–460, footnoted to *Arnould,*
16th ed., vol. 2, pp. 462–465, para. 611; *Arnould,* 6th ed., vol. I, pp. 513–
514, 532–533; 7th ed. (1901) vol. I, p. 694 and 8th ed., vol. I, pp. 694–696,
section 555.]

Neither the law nor reason or principle supports any distinction or
difference between the test for avoidance for non-disclosure in cases of
non-marine insurance from that applicable in marine insurance cases.   D
Where Parliaments (English and Commonwealth) have desired to impose,
in specific contexts, a different test for avoidance, they have done so by
enacting terms different from those of section 18 of the Act of 1906: see
section 10(3) and (5) of the Road Traffic Act 1934; section 156 of the
Ontario Insurance Act 1914; *Mutual Life Insurance Co. of New York v.
Ontario Metal Products Co. Ltd.* [1925] A.C. 344 and *Marene Knitting*   E
*Mills Pty. Ltd. v. Greater Pacific General Insurance Ltd.* [1976] 2 Lloyd's
Rep. 631, 642. [Reference was made to *Seaman v. Fonereau*, 2 Str. 1183;
*Lynch v. Dunsford* (1811) 14 East 494, 497–498; *Rickards v. Murdock*, 10
B. & C. 527; *Elton v. Larkins*, 5 C. & P. 385; *Bates v. Hewitt*, L.R. 2 Q.B.
595, 608; *Harrower v. Hutchinson*, L.R. 5 Q.B. 584; *Ionides v. Pender*, L.R.
9 Q.B. 531, 537–539; *Parsons on Marine Insurance* (1868), vol. I, pp. 494–
495; *Stribley v. Imperial Marine Insurance Co.*, 1 Q.B.D. 507, 512, 514;   F
*Rivaz v. Gerussi Brothers & Co.*, 6 Q.B.D. 222, 227, 229; *Phillips,
A Treatise on the Law of Insurance*, 5th ed., vol. I, p. 277; *Chalmers and
Owen, Digest of the Law of Marine Insurance,* 1st ed., p. 22; 2nd ed., pp. 24–
25; *Morrison v. Universal Marine Insurance Co.* (1873) L.R. 8 Ex. 197; *Laing
v. Union Marine Insurance Co.,* 1 Com.Cas. 11; *In re an arbitration between
Marshall and Scottish Employers' Liability and General Insurance Co. Ltd.*   G
(1901) 85 L.T. 757, 758; *London General Omnibus Co. Ltd. v. Holloway*
[1912] 2 K.B. 73, 85–86; *Scottish Shire Line Ltd. v. London and Provincial
Marine and General Insurance Co. Ltd.* [1912] 3 K.B. 51, 70; *Cantiere
Meccanico Brindisino v. Janson* [1912] 3 K.B. 452; *Associated Oil Carriers
Ltd. v. Union Insurance Society of Canton Ltd.* [1917] 2 K.B. 184, 191;
*Hamilton & Co. v. Eagle, Star & British Dominions Insurance Co. Ltd.* (1924)
19 Ll.L.R. 242; *Mutual Life Insurance Co. of New York v. Ontario Metal*   H
*Products Co. Ltd.* [1925] A.C. 344, 345, 350–352; *Glicksman v. Lancashire
and General Assurance Co. Ltd.* [1927] A.C. 139; *Dunn v. Ocean Accident &
Guarantee Corporation Ltd.* (1933) 45 Ll.L.R. 276; 47 Ll.L.R.

129; *Merchants' and Manufacturers' Insurance Co. Ltd. v. Davies* [1938] 1 K.B. 196; *Godfrey v. Britannic Assurance Co. Ltd.* [1963] 2 Lloyd's Rep. 515, 528–529; *Babatsikos v. Car Owners' Mutual Insurance Co. Ltd.* [1970] 2 Lloyd's Rep. 314, 325; *Barclay Holdings (Australia) Pty. Ltd. v. British National Insurance Co. Ltd.*, 8 N.S.W.L.R. 514, 517; *M'Cartney v. Laverty,* 1968 S.C. 207; *Berger v. Pollock* [1973] 2 Lloyd's Rep. 442; *Highlands Insurance Co. v. Continental Insurance Co. (Note)* [1987] 1 Lloyd's Rep. 109, 113–114, 117 and *Banque Keyser Ullmann S.A. v. Skandia (U.K.) Insurance Co. Ltd.* [1990] 1 Q.B. 665, 777–778.] Wherever the test is formulated in *Tate & Sons v. Hyslop,* 15 Q.B.D. 368, 371, 375–377, 379, 381, it is a "consideration" or "take into account" test. *Chalmers' Digest,* sections 18(1)(2) and 20(1)(2), reflects the authorities cited: see also the directions to the jury in *Bridges v. Hunter* (1813) 1 M. & S. 15, 16, 18–19. The duty is to disclose all facts that might influence a reasonable insurer in making his judgment. It is a strict liability: it does not matter that it is an accidental omission that does not affect the result. There is nothing in the authorities to show that there is an extra requirement that the actual underwriter must have been induced. The test was correctly stated in *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228, 239A–C and approved by Lord Fraser of Tullybelton in *Marene Knitting Mills Pty. Ltd. v. Greater Pacific General Assurance Ltd.* [1976] 2 Lloyd's Rep. 631, 642. The plaintiffs' contention that the test is the impact on the actual underwriter and/or the impact on both the actual underwriter and the prudent underwriter is inconsistent with the terms of sections 18 and 20 of the Act of 1906. Either the Act codified the law or it contained a correct summary of it. Any change in the law is, accordingly, for Parliament alone. Yet impetus for legislative change has focused on the different issue of the all-or-nothing remedy of avoidance conferred by sections 18(1) and 20(1) of the Act of 1906 and not on the prudent underwriter test: see the judgment of Sir Donald Nicholls V.-C. and Law Commission Report No. 104, "Insurance Law: Non-Disclosure and Breach of Warranty" (1980) (Cmnd. 8064), Part IV, paras. 4.4–4.17 (the proportionality principle); paras. 4.24–4.28 (consequences of breach), cf. paras. 4.43–4.53 (duty of disclosure). It is no more appropriate to change or subvert the "prudent insurer" test than the "prudent insured" test applicable to the insured's right of avoidance. The duty of utmost good faith lying on the insurer, deriving from the obligation uberrimae fidei that falls on both parties, extends "to disclosing all facts known to him which are material either to the nature of the risk sought to be covered or [to] the recoverability of a claim under the policy which a prudent insured would take into account in deciding whether or not to place the risk for which he seeks cover with that insurer:" see the *Banque Keyser Ullmann* case [1990] 1 Q.B. 665, 769F–772G; [1991] 2 A.C. 249, 268F–H, 281G–282A. Yet changing the relevant law as expressed in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 in the manner sought by the plaintiffs would introduce a novel and irrational distinction between the test for avoidance by the insurer and the test for avoidance by the insured, a distinction dependent solely on who (the insured or the insurer) is seeking to avoid.

The law, as it has developed since 1766 (*Carter v. Boehm*), is clear to the effect that the "materiality" of a circumstance does not require the

512

risk itself to be changed or affected provided that the non-disclosed, or   A
misrepresented, circumstance "induced a confidence, without which the
[underwriter] would not have acted:" *Sibbald v. Hill* (1814) 2 Dow 263,
267. The argument that a circumstance, in order to be material, must be
such as would add to the risk was revived in *Rivaz v. Gerussi Brothers &*
*Co.* on the back of supportive statements in *Duer, Law and Practice of*
*Marine Insurance,* vol. II (1846), pp. 388 and 518, but was firmly rejected
by the Court of Appeal. It would be far-fetched and impracticable if the   B
law were to impose an inquiry as to what the prudent insurer's "final
decision" would have been on the basis of the totality of circumstances
before the actual insurer. Such an inquiry would be far too complex: see
the *C.T.I.* case [1984] 1 Lloyd's Rep. 476, 511, 529. [Reference was made
to *Spencer Bower, The Law relating to Actionable Non-Disclosure,* 1st ed.
(1915), pp. 11–12, 16–17, paras. 24, 30–32; 2nd ed. (1990), pp. 32–37,   C
45–48, paras. 3.07, 3.08, 3.09, 3.14.] The *C.T.I.* case did not represent any
change in the law: see Dr. Malcolm Clarke, "Insurance Contracts and
Non-Disclosure" [1993] L.M.C.L.Q. 297.

As to whether, if the prudent underwriter would not have written the
risk on the terms on which it was written by the actual underwriter on the
basis of the facts actually disclosed, that precludes further information not
disclosed being treated as material (see *per* Steyn L.J. [1993] 1 Lloyd's   D
Rep. 496, 506), the plaintiffs' proposition whereby, if there were
"sufficient" material facts known to the actual underwriter to justify a
prudent underwriter declining the risk, then a further undisclosed fact
(which would otherwise have been material) cannot be material is illogical,
contrary to the law and (as Steyn L.J. held) contrary to good sense. As a
matter of logic, there is no pecking order in undisclosed material   E
information such that the law only recognises "sufficient" material
information to justify a prudent insurer's decision to decline the risk and
ignores other undisclosed circumstances, however material. Indeed, there
is no natural or logical method by which a prudent insurer (or the courts)
may extrapolate, and treat as relevant, one piece of "material" undisclosed
information while excluding others. Logic dictates that every material
circumstance be taken into account and that none be subjected to an   F
arbitrary process of de-selection. The law follows logic, because the law
and section 18(1) of the Act of 1906 are clear in requiring that the assured
disclose to the insurer every material circumstance known to him, failing
which the insurer may avoid the contract. Not only does the law and good
sense require the materiality of every particular undisclosed circumstance
to be considered; so too does the principle of the utmost good faith   G
(section 17 of the Act of 1906). The disclosure to which the plaintiffs'
proposition would lend encouragement is selective disclosure inconsistent
with the principle stated.

As to whether, if the relevant impact, or a relevant impact, is that on
the prudent underwriter, and the prudent underwriter would not on the
information that was actually disclosed have written the risk at all or on
anything like the terms offered, the court must, when assessing the   H
materiality of the circumstance, assume that the prudent underwriter had
indeed accepted the risk on the terms accepted by the actual underwriter,
the materiality of each particular undisclosed circumstance must be

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))

A    assessed for its notional effect, if any, on the judgment of a prudent underwriter. On the evidence, the non-disclosed additional losses in the short record were material in themselves, independently of the materiality of the long record. There is no evidence that this insurance would not have been written at all: it would have been written on different terms.

Beloff Q.C. in reply. As a matter of language, if one proffers information one discloses it. "Disclose" means to put at the underwriter's

B    disposal: see Bates v. Hewitt, L.R. 2 Q.B. 595, 605. The idea of disclosure does not incorporate the idea that the profferee actually accepts, copies or reads the information. The point of disclosure in insurance is to make the information available so that the underwriter can make of it what he will. It is his decision what to read. At the minimum, the long record was proffered.

C    If the first test propounded by Carter v. Boehm, 3 Burr. 1905 and the Latin summary, at p. 1910 ("is in his interest to know") is reflected in the notion of "need to know," the question posed: why does an underwriter need to know something that would not make him (if it were known) reach a decision different from that which he would reach without it? It is no answer to say: it is for the underwriter to assess the significance of the non-disclosed information. Such answer misses the point. The different

D    decision test does not, in contradiction of the case law (see, e.g., Bates v. Hewitt) make the assured the arbiter of materiality. It makes the prudent insurer the arbiter of materiality and then asks, separately, what is material vis-à-vis him. Nor is it conclusive that the obligation is imposed on the assured at the time when the contract is made. Whether or not he would assess or produce what the underwriter would consider is likely to alter

E    his decision to enter into the policy and on what terms; he should only be vulnerable to avoidance if his assessment or production leads him to omit matters that would have that consequence. As to policy, the draconian nature of the remedy requires the most stringent test (if the language of the Act of 1906 permits). [Reference was made to Dr. Malcolm Clarke, "Insurance Contracts and Non-Disclosure" [1993] L.M.C.L.Q. 297, 298, 299; Clason v. Smith (1811) 3 Wash.C.C. 156; Chalmers and Owen,

F    Digest of the Law of Marine Insurance, 2nd ed., pp. 24–25, s. 18(1) and Arnould on Marine Insurance, 6th ed., vol. I, p. 548.]

As to actual inducement, the Court of Appeal in Cantiere Meccanico Brindisino v. Janson [1912] 3 K.B. 452 did not expressly approve Scrutton J.'s ruling and decided the appeal on the basis that there had been no misrepresentation at all: see pp. 461–462. Principle tells in favour

G    of the actual inducement test. It is common ground that actual inducement is a prerequisite for avoidance of an ordinary contract for even fraudulent misrepresentation. It would be peculiar if such a prerequisite were not required for such avoidance of an insurance contract for even non-fraudulent misrepresentation, a fortiori for non-disclosure. The defendants argue that the absence of such requirement stems from the special nature of the contract of insurance as one of uberrima fides. But the by-product

H    of the uberrimae fidei nature of the insurance contract is the obligation, not attendant on other ordinary contracts, to make disclosure of material matters. There is no reason to ascribe to it any further effect than that. Why even under a contract uberrimae fidei should a party be able to

514

A

avoid for a misrepresentation or non-disclosure that ex hypothesi was immaterial *to him*?

Nor does history provide a justification for the defendants' argument. It appears common ground that the concept of the reasonable underwriter was introduced into jurisprudence in *Ionides v. Pender*, L.R. 9 Q.B. 531 in order to protect the assured against the idiosyncratic underwriter. To achieve that end substitution, as distinct from addition, is not required. Before *Ionides,* materiality was tested against the actual underwriter. No plausible explanation has been given as to why introduction of the reasonable underwriter test should necessarily, or did, extrude the actual underwriter from the overall equation: see D. St. L. Kelly (1988) 1 Ins.L.J. 30, 31–35.

B

*Ionides v. Pender,* at pp. 537–538, suggests that the test of actual inducement remains, but in any event its subsistence was not in issue in that case. Works of high authority support the actual inducement test: *Arnould, A Treatise on the Law of Marine Insurance and Average,* 2nd ed. (1857), vol. I, pp. 541, 565–567, 584–585; Arthur Cohen K.C. in *Halsbury's Laws of England,* 1st ed., vol. 17, p. 414, note (*p*), *Arnould,* 6th ed., vol. I, pp. 513–514, 519–520 (especially), note 1, pp. 520, 548; *Arnould,* 8th ed., vol. I, p. 662, note (*b*); pp. 640–643; pp. 693–694, sections 554–555, notes (*x*), (*z*); p. 729, section 590; *Arnould,* 16th ed. (1981), p. 438, para. 580, pp. 462–465, para. 611, p. 475, para. 627; *Flinn v. Headlam,* 9 B. & C. 693; *Duer, The Law and Practice of Marine Insurance,* vol. II, pp. 389 et seq.; *Parsons, A Treatise on the Law of Marine Insurance and General Average* (1868), vol. 1, p. 495 and *Clason v. Smith. Spencer Bower, Turner & Sutton, Actionable Non-Disclosure,* 2nd ed. (1990), pp. 11–12, 16–17 must be discarded on this point. As regards the 6th edition of *Arnould,* the defendants have not referred the House of Lords to the important parts on which Chalmers relied in his *Digest.* Section 17, 1st ed., p. 21, note 4, refers to pp. 513 and 548. Section 18(1), p. 22, note 3 refers to p. 548, which deals with non-disclosure, and requires (Chalmers) influence on the actual underwriter and requires that influence to be decisive. Section 20(1), p. 26, note 5, refers to pp. 519–520, which deal with misrepresentation, and *directly* to a dictum of Willes J. in *Anderson v. Pacific Fire and Marine Insurance Co.* (1872) L.R. 7 C.P. 65, 68, quoted by *Arnould,* 6th ed., vol. I, p. 520, note 1. In other words, again, by reference to the dictum of Willes J. directly and via the *Arnould* footnote, Chalmers requires influence on the actual underwriter and requires the influence to be decisive. The non-disclosure and misrepresentation tests are the same under the Act of 1906.

C

D

E

F

G

Their Lordships took time for consideration.

25 July. LORD TEMPLEMAN.   My Lords, I have read the speech to be delivered by my noble and learned friend, Lord Lloyd of Berwick, and I agree with his reasons and his conclusions.

H

Prior to the judgments of the Court of Appeal in *Container Transport International Inc. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1984] 1 Lloyd's Rep. 476 ("the *C.T.I.* case") the duty of disclosure imposed by the common law and statute seems to have been well defined

1 A.C.        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))   Lord Templeman

in principle, albeit that the application of principle to individual facts produces familiar conflicts of expert evidence which the court must resolve. When insurance is under negotiation, the underwriter must decide whether to accept the proffered risk and if so on what terms. In particular, the underwriter must decide the amount of the premium which he considers an appropriate consideration for the risk accepted. If a material fact is undisclosed by the insured, the insurer may avoid the insurance contract. An undisclosed fact is material if disclosure would have affected the acceptance of the risk or the rate of premium. Materiality must be judged by the reactions of a prudent insurer, otherwise the actual underwriter could, after the risk has matured, convince himself and the court that he would have rejected the risk or increased the premium if full disclosure had been made in the course of the negotiations. It must be assumed that, failing disclosure, the prudent insurer would have been willing to accept the risk at the premium actually negotiated. The question then is whether full disclosure would have caused the prudent insurer to resile from the negotiations or increase the premium.

The authorities cited in the speech of Lord Lloyd and the citations of other authorities by counsel establish the common law rule which was embodied in section 18 of the Marine Insurance Act 1906 in these terms:

"(2) Every circumstance is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk."

In my opinion "the judgment of a prudent insurer" cannot be said to be "influenced" by a circumstance which, if disclosed, would not have affected acceptance of the risk or the amount of the premium. On behalf of the underwriters, Mr. Hamilton submitted that a circumstance was material if a prudent insurer would have "wanted to know" or would have "taken into account" that circumstance even though it would have made no difference to his acceptance of the risk or the amount of premium. If this is the result of the judgments of the Court of Appeal in the *C.T.I.* case then I must disapprove of that case. If accepted, this submission would give carte blanche to the avoidance of insurance contracts on vague grounds of non-disclosure supported by vague evidence even though disclosure would not have made any difference. If an expert says, "If I had known I would not have accepted the risk or I would have demanded a higher premium," his evidence can be evaluated against other insurances accepted by him and against other insurances accepted by other insurers. But if the expert says, "I would have wanted to know but the knowledge would not have made any difference" then there are no objective or rational grounds upon which this statement of belief can be tested. The law is already sufficiently tender to insurers who seek to avoid contracts for innocent non-disclosure and it is not unfair to require insurers to show that they have suffered as a result of non-disclosure. Of course they suffer if the risk matures but that is the risk accepted by every insurer.

In the present case the insured failed to disclose that the claims received in respect of the 1981 insurance amounted to U.S.$468,168 and not U.S.$235,768. No juggling with figures can obscure the clear indication, found by the judge, that the true 1981 figures were more

516

Lord Templeman   Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          [1995]

alarming than the disclosed figures and would have caused the prudent
insurer in 1982 to reject the risk or increase the premium; the insurer is
therefore entitled to avoid the policy.

I would dismiss this appeal.

LORD GOFF OF CHIEVELEY.   My Lords, I have had the opportunity of
reading in draft the speeches prepared by my noble and learned friends,
Lord Mustill and Lord Lloyd of Berwick. Like them, I, too, would
dismiss the appeal.

Underlying the appeal before your Lordships' House have been two
questions of principle, of great importance to the law of insurance. The
first relates to the test of materiality in cases of non-disclosure, which in
the law of marine insurance is to be found in section 18(2) of the Marine
Insurance Act 1906. There it is provided that:

"Every circumstance is material which would influence the
judgment of a prudent insurer in fixing the premium, or determining
whether he will take the risk."

Here the question for your Lordships is whether, as the appellant plaintiffs
("Pan Atlantic") have contended, it must be shown that full and accurate
disclosure would have led the prudent insurer either to reject the risk or
at least to have accepted it on more onerous terms. This has been called
the "decisive influence test." The second question is whether, for an
insurer to be entitled to avoid a policy for misrepresentation or non-
disclosure, it is enough that the misrepresentation or non-disclosure was
material, or whether in addition it must, as Pan Atlantic have contended,
have induced the making of the policy on the relevant terms. This has
been called the "actual inducement test."

I turn first to the second of these questions. Like both of my noble
and learned friends, I have come to the conclusion that, on this question,
Mr. Beloff's submission on behalf of Pan Atlantic should be accepted; in
other words, I accept that the actual inducement test accurately represents
the law. I do so for the reasons given by my noble and learned friend,
Lord Mustill. Like him, and for the reasons he gives, I conclude that
there is to be implied in the Act of 1906 a requirement that a material
misrepresentation will only entitle the insurer to avoid the policy if it
induced the making of the contract; and that a similar conclusion must
be reached in the case of a material non-disclosure. This conclusion is, as
I understand it, consistent with the opinion expressed by my noble and
learned friend, Lord Lloyd, that Parliament, by enacting the law as it did
in section 20 of the Act of 1906, must have intended to codify the common
law on materiality without touching the common law on inducement.

I turn next to the first question, which is whether the decisive influence
test is the appropriate test for deciding whether a fact which has not been
disclosed is a material fact. Here there is a difference of opinion between
my two noble and learned friends, Lord Lloyd accepting the decisive
influence test and Lord Mustill rejecting it.

On this point, I respectfully prefer the reasoning of Lord Mustill. I do
so for the following reasons.

First it seems to me, as it does to Lord Mustill, that the words in
section 18(2) "would influence the judgment of a prudent insurer in . . .

determining whether he will take the risk" denote no more than an effect on the mind of the insurer in weighing up the risk. The subsection does not require that the circumstance in question should have a decisive influence on the judgment of the insurer; and I, for my part, can see no basis for reading this requirement into the subsection.

Second, in agreement with my noble and learned friend, and with both Parker and Stephenson L.JJ. in the *C.T.I.* case (*Container Transport International Inc. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1984] 1 Lloyd's Rep. 476, 511–512, 526–527), it seems to me that the decisive influence test faces insuperable practical difficulties, because it ignores the fact that it is the duty of the assured to disclose every material circumstance which is known to him, with the result that the question of materiality has to be considered by the assured before he enters into the contract. At that time, it is not unreasonable to expect that an assured who is aware of, and understands, his duty of disclosure should be able to identify those circumstances, within his knowledge, which would have an impact on the mind of the insurer when considering whether to accept the risk and, if so, on what terms he should do so; but it appears to me to be unrealistic to expect him to be able to identify a particular circumstance which would have a decisive effect. Likewise it seems to me, in agreement with Parker L.J., that an inquiry after the event as to whether the judgment of a prudent insurer would have been decisively influenced by the relevant circumstance, if disclosed, would in many cases be impracticable, because this must in the nature of things depend upon the reactions of the particular underwriter.

For these reasons in particular, and for the other reasons given by my noble and learned friend, Lord Mustill, I would reject the decisive influence test. I do not propose myself to review the authorities, or to examine the learned writings, on this subject. This is because I find myself to be in complete agreement with the analysis of my noble and learned friend. In particular I am, like him, convinced that the origin of the test of *influence* on the judgment is to be found in the writings of learned authors on the subject, which show no indication of the decisive influence test for which Pan Atlantic now contend—indeed the indications are to the contrary. In the end, as it seems to me, your Lordships are at liberty to give to the definition of materiality in section 18(2), and indeed to that in section 20(2), an interpretation which accords with the natural and ordinary meaning of the words used, the underlying obligation of good faith and the practicalities of the situation—all of which are, in my opinion, inconsistent with the decisive influence test.

I wish to add that there is, to my mind, danger in considering the two questions now before your Lordships in watertight compartments because, as I see it, the conclusion that actual inducement by the actual underwriter is necessary before he can avoid the contract for non-disclosure has an impact upon the question of materiality. If actual inducement is not required, materiality becomes all important, because it is the sole requirement for entitling the insurer to avoid the contract on the ground of non-disclosure. It was, I believe, because it was thought, in the *C.T.I.* case and subsequently, that actual inducement was not required, that critics of the decision in that case promoted the idea that the test of

518

Lord Goff
of Chieveley          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          [1995]

materiality should be hardened into the decisive influence test by introducing into the concept of materiality something in the nature of inducement, though attributing it not to the actual underwriter but to the hypothetical prudent insurer. But once it is recognised that actual inducement of the actual underwriter is required, the pressure to take any such step disappears, and the idea of introducing any such requirement into the concept of materiality can be perceived to be not merely unnecessary but inappropriate. The result is that, as I have said, the definition of materiality in section 18(2) of the Act can be given its natural and ordinary meaning which, for the reasons I have given, is also the sensible meaning.

In the result, I wish to express my agreement with the conclusions expressed in the last two paragraphs of part IV, and the two short propositions set out at the end of part V, of my noble and learned friend's speech; but, for the reasons given by him, I would dismiss the appeal.

LORD MUSTILL.    My Lords, the two short questions upon which this appeal depends should, after more than 200 years of history, be capable of a ready answer. The controversy which they have aroused shows that they are not. Although the issues arise under a policy of non-marine insurance it is convenient to state them by reference to the Marine Insurance Act 1906 since it has been accepted in argument, and is indeed laid down in several authorities, that in relevant respects the common law relating to the two types of insurance is the same, and that the Act embodies a partial codification of the common law.

The relevant sections of the Act read:

"17. A contract of marine insurance is a contract based upon the utmost good faith, and, if the utmost good faith be not observed by either party, the contract may be avoided by the other party.

"18(1) Subject to the provisions of this section, the assured must disclose to the insurer, before the contract is concluded, every material circumstance which is known to the assured, and the assured is deemed to know every circumstance which, in the ordinary course of business, ought to be known by him. If the assured fails to make such disclosure, the insurer may avoid the contract. (2) Every circumstance is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk."

"20(1) Every material representation made by the assured or his agent to the insurer during the negotiations for the contract, and before the contract is concluded, must be true. If it be untrue the insurer may avoid the contract. (2) A representation is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk."

"91(2) The rules of the common law including the law merchant, save in so far as they are inconsistent with the express provisions of this Act, shall continue to apply to contracts of marine insurance."

I. *The history in outline*

The questions arise in this way. Between 1977 and 1982 Pan Atlantic Insurance Co. Ltd. (hereafter "Pan Atlantic") wrote a quantity of direct

American liability insurance. Much of this was "long-tail" business, in which a long period of time may elapse before claims mature. More recent experience has shown that such business can involve the insurer in disastrous losses. The present case is no exception. The disputes arise under a contract of reinsurance relative to the policy year 1982 made between Pan Atlantic and Pine Top Insurance Co. Ltd. ("Pine Top"). In relation to the years 1977 to 1979 Pan Atlantic's casualty account had been reinsured with other insurers for excess of loss above a certain figure. Pine Top became the reinsurer in respect of this cover for the 1980 policy year and later renewed for two subsequent years. Disputes subsequently arose in relation to all three years. Judgment was given in favour of Pan Atlantic in an action brought under the first two treaties. An appeal by Pine Top was dismissed and the position as regards 1980 and 1981 is no longer in suit. The present appeal is concerned only with the claim under the treaty for the year 1982.

The broking history of this treaty was summarised by Steyn L.J., in one of the judgments now under appeal, as follows [1993] 1 Lloyd's Rep. 496, 499–500:

"The broker who acted on behalf of Pan Atlantic was Mr. Robinson of Butcher Robinson and Staples Ltd. The underwriter was Mr. O'Keefe. On 22 or 23 December 1981 Mr. O'Keefe gave a quotation. On 13 January 1982 Mr. O'Keefe signed the slip on behalf of Pine Top. Pine Top took a line of 50 per cent. on the slip. Guildhall Insurance Co. Ltd. signed for the remaining 50 per cent. Guildhall never sought to avoid their liability under the 1982 treaty and therefore drops out of the picture.

"The structure of the renewal for 1982 must be briefly explained. For the 1981 year the rate of premium was 10 per cent. When it came to the renewal for 1982 Pan Atlantic wanted the rate reduced to $7\frac{1}{2}$ per cent. That could only be done by introducing an aggregate deductible of U.S.$225,000. That was the way in which the slip was then written and signed.

"The main features of the slip were as follows. First, it covered the liability of the reinsured under: 'all policies and/or contracts and/or binders of insurance and for reinsurance . . . allocated to their so-called casualty account . . .' Secondly, the treaty was to pay U.S.$75,000 excess of U.S.$25,000 each and every loss on an ultimate net loss basis. Thirdly, it provided for an aggregate deductible of U.S.$225,000. Fourthly, the rate of premium was $7\frac{1}{2}$ per cent. The slip is, of course, in commercial terms the primary evidence of the bargain struck between the broker and underwriter. In the usual way treaty wording was prepared by clerical staff long after the contract was made. It was agreed on 29 October 1992. . . . Article XV reads as follows: 'It is hereby declared and agreed that any inadvertent delays, omissions or errors made in connection with this reinsurance shall not be held to relieve either of the parties hereto from any liability which would have attached to them hereunder if such delay, omission or error had not been made, provided rectification be made upon discovery, and it is further agreed that in all things coming

within the scope of this reinsurance the reinsurer shall share to the    A
extent of their interest the fortunes of the reinsured.'

"The basis of Pine Top's purported avoidance of the reinsurance contract for 1982 was the presentation made by Mr. Robinson to Mr. O'Keefe. The undisputed evidence was that Mr. Robinson was an experienced and respected broker. Mr. O'Keefe was an underwriter with some four years' experience. They knew one another. They had    B
negotiated the 1981 contract. Mr. Robinson and Mr. O'Keefe met on 22 or 23 December 1981 and again on 13 January 1982 when Mr. O'Keefe signed the slip. The discussions covered the reduced premium and the introduction of the aggregate deductible. There was some discussion of the loss record, and on 13 January 1982 Mr. Robinson said to Mr. O'Keefe that he had done 'a quick update' and there was little movement in the figures. Mr. Robinson had    C
available for Mr. O'Keefe's inspection two documents, respectively called the short record and the long record. The short record contained only the record for the years 1980 and 1981. The long record contained the record for the 1977 to 1979 period when Pine Top was not on risk as well as the record for the 1980 and 1981 years when Pine Top was reinsurer. The record for the 1977 to 1979 period    D
was so bad that it was eventually common ground at the trial that no prudent underwriter would have signed the slip for 1982 on the terms which Mr. O'Keefe accepted. A major issue at the trial was whether there was a fair presentation in respect of the loss record for the 1977/78 and 1979 underwriting years. The judge found that, although to Mr. O'Keefe's knowledge, both the short record and the long record were available for inspection, Mr. Robinson presented the risk    E
in a way which diverted Mr. O'Keefe's attention from examining the loss records for the underwriting years 1977/78 and 1979. The loss record for 1980 and 1981 was undoubtedly disclosed. But the disclosed record was incomplete."—The minor inaccuracy as regards 1980 need not be explored.—"There was, however . . . a more important inaccuracy in respect of the loss record for 1981. As    F
against the disclosed losses of U.S.$235,768 for the underwriting year 1981 it is common ground that the true losses for 1981 were U.S.$468,168. It was common ground that Pan Atlantic had information about these additional losses available before the slip was signed on 13 January 1982 and that the additional losses were not disclosed."    G

Within a few years it became plain that the treaty thus broked was incurring disastrous losses. As with the two earlier years Pine Top repudiated liability. Pan Atlantic commenced proceedings, and by its defence Pine Top sought to avoid the treaty on the ground of non-disclosure of the 1977 to 1979 loss record and related misrepresentations. In January 1991, less than four weeks before the start of the trial, Pine    H
Top amended to add a defence that the 1980 to 1981 loss record as disclosed was incomplete and that this constituted a further material misrepresentation or non-disclosure.

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Mustill

A    At the conclusion of the trial Waller J. [1992] 1 Lloyd's Rep. 101 gave judgment in favour of Pine Top. He rejected the ground of defence originally relied on, holding that a prudent underwriter would have wanted to check the record for 1977 to 1979 because with long-tail insurance, where the claims record is slow to develop, the history for the older years is a much more reliable guide than the results for recent years; but that the broker had a summary of the 1977–79 years available, which B    itself was perfectly fair, and which the underwriter, if he was doing his job, knowing it was the most material information, decided not to examine. The judge did however uphold the defence based on the understatement of the losses for the year 1981. The Court of Appeal (Sir Donald Nicholls V.-C., Farquharson and Steyn L.JJ.) dismissed an appeal by Pan Atlantic, expressing regret at being compelled to take that C    course.

II. *The questions of law*

On these facts two questions of law arise for decision. 1. Where sections 18(2) and 20(2) of the Act relate the test of materiality to a circumstance "which would influence the judgment of a prudent underwriter in fixing the premium, or determining whether he will take D    the risk," must it be shown that full and accurate disclosure would have led the prudent underwriter to a different decision on accepting or rating the risk; or is a lesser standard of impact on the mind of the prudent underwriter sufficient; and, if so, what is that lesser standard? 2. Is the establishment of a material misrepresentation or non-disclosure sufficient to enable the underwriter to avoid the policy; or is it also necessary that E    the misrepresentation or non-disclosure has induced the making of the policy, either at all or on the terms on which it was made? If the latter, where lies the burden of proof?

A further question was raised in argument concerning the effect of article XV of the treaty. This has no bearing on the fundamental issues just stated, and I will leave it aside for the time being.

Before summarising the views expressed on these issues in the courts F    below I must describe the previous decision of the Court of Appeal in *Container Transport International Inc. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1984] 1 Lloyds Rep. 476 (hereafter "the *C.T.I.* case"). Unlike the present, this was a case of marine insurance and therefore directly governed by the Act. The facts are of no present concern; once again, the dispute arose in relation to allegations that the G    previous claims record and insurance history had not been properly disclosed during the broking of a reinsurance treaty. At the trial the judge (Lloyd J.) [1982] 2 Lloyd's Rep. 178, 187–188 expressed his opinion on the law as follows:

"In general I would say that underwriters ought only to succeed on a defence of non-disclosure if they can satisfy the court by evidence or otherwise that a prudent insurer, if he had known the fact in H    question, would have declined the risk altogether or charged a higher premium. It seems to me that this should be the general rule, if only because the defence under section 18 is capable of working such great hardship on the assured. Take a case where the fact is known to the

522

Lord Mustill        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))        [1995]

assured, but not the materiality of the fact. Suppose that the prudent    A
insurer, if he had known the fact, would have accepted the risk, but
charged a small additional premium; suppose further that there is a
substantial claim under the policy. In other jurisdictions, the assured
could enforce the claim, by tendering the additional premium. But
not so in England. The fairness of the English rule is not at once
obvious and hardly seems to reflect the duty of utmost good faith
under section 17 which, be it noted, is owed both ways. Why, if the    B
insurer would have accepted the risk in any event, albeit at an
increased premium, should he be able to avoid the claim altogether?
Since the English law is so favourable to the underwriter in this
respect, the least that should normally be expected of the underwriter
is to show that a prudent insurer would have charged an increased
rate. But the language of section 18 goes wider than that. It is the    C
*judgment* of the prudent insurer which has to be influenced, not the
rate; and I can imagine cases where the prudent insurer could say:
'Yes, this would have affected my judgment; but I would nevertheless
have charged the same rate because of counterbalancing factors.'
Such cases, though rare, would, I think, come within the definition of
materiality; but even in such cases the defendant must prove that the    D
judgment of the prudent insurer would in fact have been affected, not
that it might have been affected. It can never be enough for the
prudent insurer to say 'Yes, I would have liked to know this or that
fact, so that I could have made up my mind what to do about it.'"

In the Court of Appeal three extensive judgments were delivered. It is
impossible to compress these in a manner which does them justice and    E
I will therefore do no more than quote some of the most important
passages. First, Kerr L.J., at pp. 491–492:

"The judge in effect equates 'judgment' with 'final decision,' as though
the wording of these provisions had been 'would induce a prudent
underwriter to fix a different premium or to decline the risk.' Thus,
he said, at p. 187: 'In general I would say that underwriters ought    F
only to succeed on a defence of non-disclosure if they can satisfy the
court by evidence or otherwise that a prudent insurer, if he had
known the fact in question, would have declined the risk altogether
or charged a higher premium.' And at p. 188 he said: 'some
"difference of action" is required in order to establish materiality.
The mind of the reasonable insurer must have been influenced *so as*    G
to induce him to refuse the risk or alter the premium.' Finally in this
context, he said, at p. 189: 'normally, at any rate, insurers must show
that the result would have been affected. Moral hazard cases, to
which I shall have to refer later, may be an exception.'
    "This interpretation differs crucially from what I have always
understood to be the law and from the interpretation which [an expert
witness] adopted in much of his evidence. [The witness] interpreted    H
section 18(2) in the sense that 'judgment' referred to the assessment
or evaluation of the risk. Apart from other passages in his evidence,
this appears from the following extract at the beginning. He had

made a written report stating his views on all the allegations of non-disclosure, which was treated as part of his evidence. He was then referred to section 18(2), and there was the following exchange between him and counsel: '[Q] In what sense do you use the word material in your report? [A] In that sense. In the sense that the facts must have an influence on the underwriting judgment.' In my view this is the correct approach . . ."

A little later, Kerr L.J. said:

"The word 'influenced' means that the disclosure is one which would have had an impact on the formalities of his opinion and on his decision making process in relation to the matters covered by section 18(2). . . . evidence to support the materiality of the undisclosed circumstance, from this point of view, is therefore often given by an independent expert witness whose evidence has to be assessed by the court long after the event. He, or the actual insurer, or both, may then be asked: 'What would have been your reaction if you had known of this undisclosed fact?' Both would in my view give relevant evidence on materiality if they replied: 'I would then have regarded the risk in a different light. I would have taken this circumstance into account. As a first step I might have asked some questions before making up my mind about the risk. What my final decision would have been, I cannot now say for certain. I might have declined the risk altogether, or increased the premium, or altered the terms in some other way.' And it would make no difference if the witness went on: 'I might even have taken a chance, or given credit for the frankness of the disclosure, by writing the risk as I did. But I should obviously have been told about this fact before being asked to make up my mind.'"

Finally, after detailed consideration of various reported cases Kerr L.J. expressed his opinion thus, at pp. 496–497:

"It follows that when sections 17 to 20 of the Act are read together, one way of formulating the test as to the duty of disclosure and representation to cases such as the present, in the context of Mr. Fleetwood's presentation first to Mr. Bragg and then to Mr. Lee, is simply to ask oneself: 'Having regard to all the circumstances known or deemed to be known to the insured and to his broker, and ignoring those which are expressly excepted from the duty of disclosure, was the presentation in summary form to the underwriter a fair and substantially accurate presentation of the risk proposed for insurance, so that a prudent insurer could form a proper judgment—either on the presentation alone or by asking questions if he was sufficiently put on inquiry and wanted to know further details—whether or not to accept the proposal, and, if so, on what terms?' This is not an onerous duty for brokers to discharge in practice."

These passages all relate to the first of the questions posed for consideration in the present appeal. As to the second question, in a previous decision at first instance, *Berger v. Pollock* [1973] 2 Lloyd's Rep. 442, 463, Kerr J. had stated the principles in a way which suggested

that the insurer could avoid the policy only if he had in fact been
influenced by the misrepresentation or non-disclosure. In the *C.T.I.*
case, after more extensive citation of the authorities, particularly *Zurich
General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942]
2 K.B. 53, Kerr L.J. concluded [1984] Lloyd's Rep. 476, 495 that he had
been wrong in *Berger v. Pollock* and that it was not necessary to prove
that the mind of the actual insurer had been affected.

The next judgment, that of Parker L.J., began with the second question
and concluded, at p. 510, after a review of the authorities, including in
particular *Marene Knitting Mills Pty. Ltd. v. Greater Pacific General
Insurance Ltd.* [1976] 2 Lloyd's Rep. 631, and an examination of the
wording of the Act, that there was no requirement that the particular
insurer should have been induced to take the risk or charge a lower
premium than he would otherwise have done. On the first question
Parker L.J. said, at pp. 510–511:

"A circumstance which increases the risk would, as it seems to
me, clearly influence the judgment of a prudent insurer. It would be
one amongst perhaps many factors exerting an influence, be it great
or small, upon his judgment towards declining the risk, or charging a
higher rather than a lower premium, or inserting some protective
condition in the policy. In the same way a circumstance which
diminishes the risk would be one amongst perhaps many factors
exerting an influence the other way, albeit disclosure of circumstances
which diminish the risk is excused under section 18(3)*(a)*. The
decision whether to take the risk and if so at what premium, must in
each case be a matter of the prudent insurer exercising his judgment
upon some factors influencing that judgment one way and some
factors influencing it another. Whether the influence of a circumstance
which increases the risk would or would not be great enough to cause
a prudent insurer to decline the risk or move from one level of
premium to another must inevitably vary as between prudent insurers.
Whether it would or not, if it is a circumstance 'bearing' on the risk
*(Parsons, A Treatise on the Law of Marine Insurance and General
Average (1868),* vol. I. p. 495) or having a 'tendency' towards
declining the risk or raising the premium *(Phillips, A Treatise on the
Law of Insurance,* 5th ed. (1867), vol. I, sections 531, 571, 676), it
appears to me that it would influence the judgment of the prudent
insurer *in fixing* the premium or *in determining* whether to take the
risk.

"Indeed no other construction appears to me to accord with either
common sense or practical reality. The test submitted on behalf of
the respondents [plaintiffs] would involve the court in the task,
perhaps years after the event, of endeavouring to ascertain what a
prudent underwriter would have done, first in the light of the
circumstances actually disclosed by the assured, and secondly, on the
hypothesis that, in addition to those circumstances, the undisclosed
circumstance had been disclosed. Such a task is on its face
impractical. Five experienced and prudent underwriters might be
called. At stage 1, one might say he would not have taken the risk
even on the facts disclosed; the other four might all have taken the

525

risk but at different premiums. At stage 2 the four remaining might all say 'we regard the fact as significantly increasing the risk' but one might say 'not, but by the narrowest margin, sufficiently to demand a change in premium, but it would call for a change in the policy wording,' one 'sufficiently to put up the premium,' and the last, 'sufficiently to decline the risk.' Furthermore the one who would not have taken the risk in the first place might say that he would, had the additional fact been disclosed, have regarded it as an additional reason for declining the risk. In such circumstances what is the court to do? It cannot, as it seems to me, choose one prudent underwriter rather than another. The very choice of a prudent underwriter as the yardstick in my view indicates that the test intended was one which could sensibly be answered in relation to prudent underwriters in general. It is possible to say that prudent underwriters in general would consider a particular circumstance as bearing on the risk and exercising an influence on their judgment towards declining the risk or loading the premium. It is not possible to say, save in extreme cases, that prudent underwriters in general would have *acted* differently, because there is no absolute standard by which they would have acted in the first place or as to the precise weight they would give to the undisclosed circumstance."

The third member of the court, Stephenson L.J., concluded as follows after a comprehensive analysis of the authorities, at pp. 526–527:

"What is naturally meant by a circumstance 'which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk?' There is a danger in dissecting a phrase into its component parts, taking it word by word, and asking what each word means. Does 'would' mean 'probably would' or 'possibly might?' Does 'influence' mean 'alter?' Does 'judgment' mean 'judging,' the formation of opinion, or 'judgment,' the final decision? The judge may have been asked to decide between 'would' and 'might;' we are asked to decide between the decision making process of judging and the decision itself. If I did only that, I would feel more strongly the force of what I take to be the judge's opinion that a circumstance taken into account by a prudent insurer in the process of considering the risk offered and the premium and the terms required, but disregarded in the conclusion to accept the risk at a particular premium and on particular terms, is not a circumstance which could properly be said to influence the judgment of an insurer, prudent or imprudent. But two considerations prevent me from adopting his construction of the words.

"The first, stressed by my brethren, is the practical difficulty, if not impossibility, of deciding what factors would affect the result of a hypothetical prudent insurer's consideration of a risk, whether to accept it and on what terms; whereas there is no great difficulty in answering the question whether any particular factor would be one which he would want to know and take into consideration in determining whether to accept a risk and on what terms, without having to decide whether he would ultimately disregard it altogether

526

Lord Mustill        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))        [1995]

or give it much or little weight. The second consideration is the overriding duty of utmost good faith imposed by section 17. That duty seems to require full disclosure and full disclosure seems to require disclosure of everything material to the prudent underwriter's estimate of the character and degree of the risk; and how can that be limited to what can affirmatively be found to be a circumstance which would in fact alter a hypothetical insurer's decision? Provided that there is some information which a prudent insurer would obviously want to know, or which a credible expert swears he would want to know, in considering an offer of a risk, that is a material circumstance which the greatest good faith and the rule against concealment require the assured or his agent to disclose, subject to the qualifications which the knowledge and conduct of the insurer or his agent may put upon the assured's duty."

And later, at p. 529:

"I conclude from the language of the subsections in their context and from the authorities that everything is material to which a prudent insurer, if he were in the proposed insurer's place, would wish to direct his mind in the course of considering the proposed insurance with a view to deciding whether to take it up and on what terms, including premium. His mind would, I think, be influenced in the process of judging whether to do so, either temporarily where he can say that he would ultimately have reached the same decision without it, or permanently where it would have led him to reach a different decision. The difficulties of discriminating between those considered facts which influence and those which do not is well illustrated *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1983] 1 All E.R. 583, and I do not think that these subsections require an insured to do so. He is only to be trusted by the proposed insurer if he discloses everything a prudent insurer would want to consider before fixing the premium or determining to take the risk."

Turning to the present case both the trial judge and the Court of Appeal were bound by the *C.T.I.* case and therefore had no reason to explore the principles at length. The trial judge [1992] 1 Lloyd's Rep. 101, 103 directed himself that the law laid down in the *C.T.I.* case was as follows:

"any circumstance is material, i.e. is one which would influence the judgment of a prudent insurer in fixing the premium or determining whether he will take the risk, if it is a circumstance which: 'would have had an impact on the formation of his opinion and on his decision making process.' That is to say 'judgment' was equal to 'formation of opinion' rather than the 'final decision.' The case also made clear that the test in relation to non-disclosure or misrepresentation was influence on the judgment of a 'prudent insurer' and that thus the right to avoid did not depend on whether the particular insurer was influenced as a fact in relation to determining the premium he charged or in his decision whether or not to take the risk."

In the Court of Appeal [1993] 1 Lloyd's Rep. 496 we find the court striving, through the medium of the principal judgment delivered by Steyn L.J., to find a workable understanding of the ratio of the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 which was consistent not only with the rejection of decisive influence as the test for materiality but also with the rejection of any requirement of influence on the actions of the individual underwriter. It may well be that but for this second constraint the court might have felt more free in its ruling on materiality. At all events this is what Steyn L.J. proposed, at pp. 505–506:

> "Having rejected the 'decisive influence' construction, it seems to me that there were at least two feasible alternative solutions to be considered in [the *C.T.I.* case]. The first solution was that a fact is material if a prudent insurer would have wished to be aware of it in reaching his decision. The second solution involves taking account of the fact that avoidance for non-disclosure is the remedy provided by law because the risk presented is different from the true risk. But for the non-disclosure the prudent underwriter would have appreciated that it was a different and increased risk. Approaching the matter in this way it is possible to say that the test is whether a prudent underwriter, if he had known the undisclosed facts, would have regarded the risk as increased beyond what was disclosed on the actual presentation. . . .
> "In my view we are free to choose between the two solutions. As between the two alternative solutions, I unhesitatingly choose the second solution. In other words, I would rule that, as the law now stands, the question is whether the prudent insurer would view the undisclosed material as probably tending to increase the risk. That does not mean that it is necessary to prove that the underwriter would have taken a different decision about the acceptance of the risk. After all, there may be many commercial reasons for still writing the risk on the same terms. But if the concept of 'influence' is interpreted in accordance with the second solution, it seems to me that it is easier to fit the *C.T.I.* . . . decision within the framework of our insurance law and it results in a somewhat fairer and more balanced principle of materiality as between insured and insurer. And the difficulties which this decision has caused in practice will be considerably ameliorated."

In a brief concurring judgment, with whose sentiments Steyn L.J. agreed, Sir Donald Nicholls V.-C. expressed his unease at the consequence to which inadvertent non-disclosure had led in this case, for the result was that the reinsurer had avoided all liability for his own bad bargain and, moreover, had done so even though full disclosure would have resulted, not in his declining to take the risk, but only in an increased premium. Justice and fairness would suggest that when the inadvertent non-disclosure came to light what was required was an adjustment in the premium or, perhaps, in the amount of cover. But those were not options available under English law. The remedy was all or nothing. In the opinion of the Vice-Chancellor the present case was an unhappy example

of a case where, in the absence of a discretion, the law did not produce a     A
satisfactory result. Farquharson L.J. agreed with both judgments.

III. *Criticisms of the C.T.I. case*

In substance this is an appeal against the decision in the *C.T.I.* case.
In his judgment [1973] 1 Lloyd's Rep. 496, 505, Steyn L.J. said quite
bluntly that *C.T.I.* had proved to be a remarkably unpopular decision not     B
only in the legal profession but also in the insurance markets. Whether
this generalisation about the markets is correct I cannot judge, but the
books and articles produced in argument all adopt a critical stance.
Nevertheless, although the unanimous disapprobation of the *C.T.I.* case is
striking, equally striking is the lack of unanimity about what exactly is
wrong with it. Space does not permit a full discussion of the diverse
criticisms. The following appear to be the principal complaints.               C

(1) The law is too harsh, for it deprives the assured of a recovery for
a genuine loss by perils insured against even if the misrepresentation or
non-disclosure had no bearing on the risk which brought about the loss.
There is practical force in this objection, but it is not consistent with
general principle, for the vice of misrepresentation and non-disclosure is
not that after the event the underwriter has suffered from having taken on     D
a parcel of risks one of which led to a loss, but that a breach of the duty
of good faith has led the underwriter to approach the proposal on a false
basis. This distinction need not be explored here, for it has long been
established that the absence of a connection between the misrepresentation
or non-disclosure and the peril which caused the loss is no ground for
depriving the underwriter of the right to avoid (for an early decision see
*Seaman v. Fonereau* (1743) 2 Str. 1183); and this is nowadays an             E
inevitable consequence of sections 18 and 20 of the Act. The Court of
Appeal in the *C.T.I.* case could not have ruled otherwise even if invited to
do so, which it was not.

(2) The law is too harsh, for it deprives the assured of the whole of his
recovery even if full and accurate disclosure would have done no more
than cause the actual underwriter, or the hypothetical prudent underwriter,
to insist on one rate of premium rather than another. The inflexibility of     F
an "all-or-nothing" rule has been present to the minds of all the courts
which have heard these two cases, as the judgments of Kerr L.J. and
Sir Donald Nicholls V.-C. clearly demonstrate. It has been fully ventilated
before your Lordships, and I acknowledge the attractions of a solution
which involves an element of "proportionality." Whether such a solution
would be practicable outside the field of consumer insurance is debatable:     G
as witness the adverse conclusion of the Law Commission of England and
Wales in Report, Insurance Law: Non-Disclosure and Breach of Warranty
(1980) (Law Com. No. 104) (Cmnd. 8064). It need not, however, be
debated here. As early as 1808 it was stated in *Marshall, A Treatise on
the Law of Insurance*, 2nd ed., vol. I, p. 463: "Nor can the insured, by
tendering any increase of premium, require the insurer to confirm the
contract;" and there has never subsequently been any suggestion that an        H
intermediate solution of this kind was the common law. Moreover, the
words of the Act are plainly inconsistent with any such rule. It may be
that the question of a statutory change is due for reconsideration in the

A    light of the last 20 years' experience, but this is not an area in which the courts have any freedom of choice.

(3) The law fails to take account of whether a reasonable person seeking insurance would appreciate that a particular circumstance was material and ought to be disclosed. Again, there is force in this submission, at least as regards those consumer cases where there is an imbalance of expertise and experience between the proposer and the

B    insurer. The position is however quite different in a case like the present where the considerations which weighed heavily with Kirby P. in *Barclay Holdings (Australia) Pty. Ltd. v. British National Insurance Co. Ltd.* (1987) 8 N.S.W.L.R. 514 are wholly absent. The assured here was an insurance company acting through an experienced broker. The performance of the latter in the episode of the long record shows that

C    these were no shorn lambs who needed the winds of the common law rule to be tempered. The broker knew very well what he was doing, and took care about how he did it. But this is beside the point. The House has not been, and could not be, invited to introduce a wholly new doctrine, hinging upon what was, or could have been, or should have been, in the mind of the proposer. In the field of marine insurance this would require

D    a fundamental amendment of the Act, and in commercial insurance as a whole such a wholesale change to a central and long-established first principle of insurance law could not have been made by the Court of Appeal in the *C.T.I.* case any more than it can now be made by this House.

(4) The doctrine of the *C.T.I.* case demands more of the assured than is feasible in modern trading conditions. This is the kind of criticism

E    which it is hard for a court, and particularly for an appellate court, to assess. I would, however, make the following brief comments upon it. First, I believe that a substantial part of the criticisms, to the effect that the broker in order to play safe will be forced to disclose hundreds of documents which are of no real interest to the insurer and which impede that speedy placing of risks which is such a positive feature of the London

F    market, are based on an interpretation of Kerr L.J.'s pronouncements in the *C.T.I.* case which is wider than the Lord Justice intended. Secondly, although the physical bulk of placing material is likely in modern times to have been swollen by photocopies, electronically transmitted documents and computer printouts there will, I believe, be many cases where the core of material of which good faith demands the disclosure is relatively small and easy to identify. The present case is a good example. Finally, some

G    of the critics come close to saying that the central obligation of good faith and its embodiment in the Act are out of date in modern conditions. This was not an option open to the court in the *C.T.I.* case, or to any other court. Undoubtedly, commercial law must be responsive to changes in commercial practices if it is not to founder, and established principles must be applied sensitively in new situations. Thus, once the court has

H    reached a conclusion on the true content of the obligations created by the Act, in the light of any relevant previous decisions, it must translate them into practice by reference to conditions prevailing, not in 1906, but at the time when the risk was written. But it was not for the Court of Appeal,

530

Lord Mustill        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))        [1995]

any more than it is for this House, to alter the meaning of the statute. **A**
Only Parliament can do that.

(5) The effect of the *C.T.I.* case has been to deter overseas interests
from placing risks in the London market. Again, it is not possible to
judge the factual accuracy of this complaint. The comment is however
obvious that if overseas interests take business elsewhere because English
law insists that they and their brokers make fair presentations in good
faith this may be business which the London market can well do without; **B**
and there is no need to emphasise at the present time the dangers of
judging the success of an insurance market by volume alone. Moreover,
whilst I accept that if that good quality business is being driven away
there is reason to look carefully at whether the rules are being properly
applied, if the rules established by Act of Parliament are having a
deleterious economic effect it is for Parliament, not the courts, to change **C**
them.

Thus far, I have summarised and briefly discussed various of the
criticisms to show that, although they have not been overlooked, they do
not point towards a solution of the problems now before the House. The
literature does however also develop in considerable detail a number of
other groups of criticism which are directly in point.

(6) The Court of Appeal in the *C.T.I.* case set the standard of **D**
materiality too low. The law ought to be that a circumstance is material
only if its disclosure would *decisively* have influenced the mind of the
prudent underwriter: if it would have made all the difference to whether
he wrote the risk, and if so at what premium. Alternatively, even if a
circumstance can be material without being decisive, the law ought to
require a greater potential effect on the mind of the hypothetical **E**
underwriter than was acknowledged in the *C.T.I.* case.

(7) The decision in the *C.T.I.* case that a defence of misrepresentation
or non-disclosure can succeed even if the actual underwriter's mind was
unaffected is contrary to common sense and justice. Moreover, the rule is
not correct in principle, since (1) the juristic basis of the underwriter's
ability to disclaim the policy is that the misrepresentation or non-
disclosure vitiates the consent necessary for a binding contract, and **F**
consent cannot be vitiated if the underwriter would have made the same
contract even if the circumstance in question had been properly disclosed;
and (2) to dispense with the requirement for inducement of the contract is
inconsistent with the general law on misrepresentation.

(8) If the actual underwriter would not have been influenced by the
information it cannot have been material, and hence the assured was **G**
under no duty to disclose it.

(9) The court in the *C.T.I.* case failed to appreciate the importance of
*Ionides v. Pender* (1874) L.R. 9 Q.B. 531, and associated cases.

All of these criticisms were developed in the argument for the plaintiffs
on the present appeal, to which I now turn.

IV. *Materiality*                                                              **H**

This part of the case depends on the words "which would influence the
judgment of a prudent insurer in fixing the premium, or determining
whether he will take the risk."

The main thrust of the argument for Pan Atlantic is that this expression calls for the disclosure only of such circumstances as would, if disclosed to the hypothetical prudent underwriter, have caused him to decline the risk or charge an increased premium. I am unable to accept this argument.

In the first place I cannot find the suggested meaning in the words of the Act. This is a short point of interpretation, and does not yield to long discussion. For my part I entirely accept that part of the argument for Pan Atlantic which fastens on the word "would" and contrasts it with words such as "might." I agree that this word looks to a consequence which, within the area of uncertainty created by the civil standard of proof, is definite rather than speculative. But this is only part of the inquiry. The next step is to decide what kind of effect the disclosure would have. This is defined by the expression "influence the judgment of a prudent insurer." The legislature might here have said "*decisively* influence," or "*conclusively* influence," or "determine the decision," or all sorts of similar expressions, in which case Pan Atlantic's argument would be right. But the legislature has not done this, and has instead left the word "influence" unadorned. It therefore bears its ordinary meaning, which is not, as it seems to me, the one for which Pan Atlantic contends. "Influence the judgment" is not the same as "change the mind." Furthermore, if the argument is pursued via a purely verbal analysis, it should be observed that the expression used is "influence the judgment of a prudent insurer in . . . determining *whether* he will take the risk." To my mind, this expression clearly denotes an effect on the thought processes of the insurer in weighing up the risk, quite different from words which might have been used but were not, such as "influencing the insurer *to take* the risk."

My Lords, this conclusion accords with what I regard as the practicalities. Looking at the matter through the eyes of a court, called upon to rule after the event on whether an undisclosed circumstance was material, the proposition that "influence" means "decisively influence" takes as its point of reference a hypothetical underwriter personifying the generality of those who know their job and perform it carefully, without exceptional timidity or boldness; it assumes that this underwriter has had before him all the material which was before the actual underwriter; it also assumes that after weighing up the conflicting factors which enter into a decision of this kind the hypothetical underwriter has decided that the balance comes down in favour of writing the risk on the terms on which it was actually written; and then on these assumptions requires a firm conclusion on whether or not the undisclosed facts would (not might) have tipped the balance the other way and caused him to reach a different decision. Even looking at the matter after the event, this exercise presents great difficulties, for the reasons given by Parker L.J. in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 in the passage quoted above, at pp. 510–511. But the point is that it is not the court after the event, but the prospective assured and his broker before the event, at whom the test is aimed; it is they who have to decide, before the underwriter has agreed to write the risk, what material they must disclose. I am bound to say that in all but the most obvious cases the "decisive influence" test faces them with an almost impossible task. How can they tell whether the

proper disclosure would turn the scale? By contrast, if all that they have    A
to consider is whether the materials are such that a prudent underwriter
would take them into account, the test is perfectly workable.

Furthermore, the argument for Pan Atlantic demands an assumption
that the prudent underwriter would have written the risk at the premium
actually agreed on the basis of the disclosure which was actually made.
Yet this assumption is impossible if the actual underwriter, through    B
laziness, incompetence or a simple error of judgment, has made a bargain
which no prudent underwriter would have made, full disclosure or no full
disclosure. This absurdity does not arise if the duty of disclosure embraces
all materials which would enter into the making of the hypothetical
decision, since this does not require the bargain actually made to be taken
as the starting point.

There is also a logical difficulty, not addressed in argument. When an    C
underwriter seeks to avoid a policy for non-disclosure and the dispute
comes to court, the arguments will naturally focus on the particular item
of information which has been withheld; and, if the argument for Pan
Atlantic is right, on the question whether if it had been disclosed it would
have made all the difference to the hypothetical underwriter. It is natural
that in an inquiry thus conducted ex post facto little regard will be paid
to the other items of information which should have been disclosed and    D
were actually disclosed. As already noticed however this forensic exercise
misses the point of the duty to act in good faith, which calls for a decision
in the real commercial world about *everything* which ought to be disclosed.
If there are (say) six items of information bearing on the risk, it will in
many cases be easy to say that all of them ought to be disclosed. Yet if
the narrower interpretation advanced by Pan Atlantic is right, it would be    E
necessary for the assured and the broker to decide in advance whether any
of them would in itself be enough to turn the scale, and the answer might
logically be that none of them were. This answer would be absurd.

Accordingly, treating the matter simply as one of statutory
interpretation I would feel little hesitation in rejecting the test of decisive
influence. Since however the opposing view has been persuasively
advanced, the study must be widened to see what light is shed by decisions    F
and writings before and after 1906.

I will begin with an argument which, if correct, leads directly to a
solution, without the need for close scrutiny of the language used in
judgments delivered before 1906. In its simplest form the argument is as
follows. During the early development of the law the courts were
concerned to assess the impact of the non-disclosure on the mind of the    G
actual underwriter, and to ask: If the circumstance in question had been
disclosed to the actual underwriter would his decision have been different?
Later, when in cases such as *Ionides v. Pender*, L.R. 9 Q.B. 531 it was
recognised that the test should relate to the reaction of the hypothetical
prudent underwriter rather than the actual underwriter, there was no
reason why the required degree of impact on the underwriter's mind
should have been changed; and it was not changed. The question is still    H
whether, on balance of probabilities, it is shown that a prudent underwriter
in the position of the actual underwriter would have acted differently if
the circumstance had been disclosed.

Whilst this argument has the attraction of simplicity, I believe it to be unsound, for more than one reason. In the first place it founds upon an equation between materiality and actual effect which was absent even from the earlier law. This is most clearly seen in regard to misrepresentations. I must return later to the relationship between misrepresentation in marine insurance law and misrepresentation in the general law of contract, but the texts and the relevant cases leave no room for doubt that whereas if the representation inducing a contract was either fraudulent or a "warranty" of the contract its falsehood would invariably give a right to avoid an innocent misrepresentation inducing the contract would give the underwriter a right to avoid only if it was material. Proof of actual effect was not necessarily proof of materiality.

The long-standing controversy about whether the converse proposition might also be true—whether a material misrepresentation or non-disclosure would vitiate the policy even if it had no effect on the mind of the actual underwriter—also speaks against the argument now being considered. Judge Duer (*Duer, The Law and Practice of Marine Insurance*, vol. II (1846), pp. 680 et seq.) and Professor Parsons (*Parsons, A Treatise on the Law of Marine Insurance and General Average*, vol. I, pp. 367–369) believed that it would, whilst Joseph Arnould and Willard Phillips tended to the opposite view: see *Arnould, A Treatise on the Law of Marine Insurance and Average*, 2nd ed. (1857), vol. I, p. 541 and *Phillips, A Treatise on the Law of Insurance*, 5th ed. (1867) vol. I, p. 371. I must consider this question at a later stage, but for the present it is not the merits of the controversy which matter but its existence; for it would have been meaningless if a decisive influence on the actual underwriter was equivalent to materiality.

Another pointer to the distinction between materiality and effect is found in the list of exceptions contained in section 18(3) of the Act. These exceptions were recognised by Lord Mansfield in *Carter v. Boehm* (1766) 3 Burr. 1905 and were therefore well established by the time of *Ionides v. Pender*. It is convenient to state them in the form in which they now appear in the Act:

> "18(3) In the absence of inquiry the following circumstances need not be disclosed, namely:—(*a*) any circumstance which diminishes the risk; (*b*) any circumstance which is known or presumed to be known to the insurer. The insurer is presumed to know matters of common notoriety or knowledge, and matters which an insurer in the ordinary course of his business, as such, ought to know; (*c*) any circumstance as to which information is waived by the insurer; (*d*) any circumstance which it is superfluous to disclose by reason of any express or implied warranty."

The significance of these exceptions is that they were not written back by Lord Mansfield into his definition of materiality, but were aimed at the duty of disclosure and the consequences of failing to perform it. This is what one would expect. The materiality or otherwise of a circumstance should be a constant; and the subjective characteristics, actions and knowledge of the individual underwriter should be relevant only to the

534

fairness of holding him to the bargain if something objectively material is not disclosed.    A

The next objection to the argument is that it first posits a former state of the law where the effect on the decision of the actual underwriter was the only test, the concepts of the hypothetical underwriter and the influence upon his judgment being unknown; and goes on to assert that the innovation of *Ionides v. Pender*, L.R. 9 Q.B. 531 was to substitute these concepts as the decisive test. The first stage of this argument is, I believe, historically unsound, as will appear from the early works of reference quoted hereafter. Leaving this altogether aside, I cannot find any support for the second stage in *Ionides v. Pender* itself. The facts of the case were simple. Commissions and other ancillary interests in goods were insured by the plaintiffs under a marine voyage policy at greatly excessive values. The vessel sank in circumstances which gave rise to suspicion. At the trial the jury was unable to reach a conclusion on whether the ship was cast away and whether the overvaluations were fraudulent, but did find that it was material to the underwriter to know of the overvaluation and that the fact of it was concealed. On these facts the sole issue was whether the non-disclosure was material. This was the culmination of a long-standing controversy about the nature of the "risk" to which the duty of disclosure was related. Was the duty of disclosure confined, as *Duer* had argued, at p. 390, to those facts which affected the intrinsic nature of the risks—i.e. those which affected the probability that the subject matter would be lost or damaged by a peril insured against? Or were *Phillips* and *Arnould* right to say that "risk" should be given a wider meaning so that the duty extended to anything which would probably influence the insurer's ultimate decision, including what later came to be called the "moral hazard?" The Court of Queen's Bench decided in favour of the latter view. This was certainly very important, but the decision was concerned with the *kind* of risk which was the subject of the duty to disclose, and not with either the standard imposed by the duty or the identity of the person by reference to whom the extent of the duty was to be ascertained; and there is nothing in either the texts or the decisions cited in argument which bore on these questions at all. The nearest that can be found in the entire report is the following passage from the judgment of the court, delivered by Blackburn J., at p. 539:    F

> "We agree that it would be too much to put on the assured the duty of disclosing everything which might influence the mind of an underwriter. Business could hardly be carried on if this was required. But the rule laid down in [*Parsons, A Treatise on the Law of Marine Insurance and General Average,* vol. I], p. 495, that all should be disclosed which would affect the judgment of a rational underwriter governing himself by the principles and calculations on which underwriters do in practice act, seems to us a sound one."    G

As I read this passage its purpose was the following. The law postulated by *Duer* was comparatively simple to apply. One simply looked at the intrinsic nature of the perils insured against and inquired whether they were enhanced by the non-disclosure. This was a question which was capable of reasonably objective ascertainment. The problem    H

A    with the wider test, preferred by *Parsons* and in the event by the court itself, was that if the duty of disclosure was widened to include all the additional matters which might influence what an underwriter might think or do the duty would be at the same time impractically wide and impossible of ascertainment. The court therefore answered *Duer's* objection by emphasising that it was matters which might influence the mind not of "an underwriter" (Blackburn J.'s words) but of a hypothetical

B    reasonable underwriter, whose standards of materiality would be at once bounded and possible to fix. This qualification was an essential part of the court's decision on the controversy which was the only issue before it, but I cannot find anything to suggest that the court thereby intended to set the whole law of disclosure off in an entirely new direction. Nor indeed does it appear that this is how the case was viewed after the event, for in

C    the 5th edition of *Arnould* (1877), published only three years later with the high authority of Mr. David Maclachlan, the very few references to *Ionides v. Pender*, L.R. 9 Q.B. 531 give no hint that in the respects material to the present appeal anything at all remarkable had been decided.

For these reasons I would reject *Ionides v. Pender* as the key to the problem, and must look elsewhere to see whether there is anything to suggest that the interpretation which I have proposed is wrong. Since the

D    controversy relates to the interpretation of an Act designed to reflect the existing common law inquiry will naturally begin with the decisions of the courts before 1906. With one crucial exception, nothing would be gained by rehearsal of the score of authorities through which the House was taken with great care during argument, for although it is possible to find expressions in the various judgments which support one or another

E    of the conflicting interpretations, examination shows that in none of them did it make any difference which formula was used. Either the case was not about the extent of the duty at all, or the outcome would have been the same however the test was described. Accordingly, without intending disrespect to the diligent arguments or to the judgments in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476, where importance was attached to a number of the older authorities, I shall not occupy space by analysing them, and will

F    pass immediately to *Carter v. Boehm*, 3 Burr. 1905, which not only contained the first and most extended exposition of the doctrine but was also the starting-point for the opinions of the notable scholars in England and the United States whose treatment of the subject has had such a powerful influence on the development of the law. Lord Mansfield said, at pp. 1909–1911:

G        "First. Insurance is a contract upon speculation. The special facts, upon which the contingent chance is to be computed, lie most commonly in the knowledge of the insured only: the underwriter trusts to his representation, and proceeds upon confidence that he does not keep back any circumstance in his knowledge, to mislead the underwriter into a belief that the circumstance does not exist, and to induce him to estimate the risqué, as if it did not exist. The

H        keeping back such circumstance is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention; yet still the underwriter is deceived, and the policy is void; because the risqué run is really different from

the risqué understood and intended to be run, at the time of the A
agreement. The policy would equally be void, against the underwriter,
if he concealed; as, if he insured a ship on her voyage, which he
privately knew to be arrived: and an action would lie to recover the
premium. The governing principle is applicable to all contracts and
dealings. Good faith forbids either party, by concealing what he
privately knows, to draw the other into a bargain, from his ignorance B
of that fact, and his believing the contrary. But either party may be
innocently silent, as to grounds open to both, to exercise their
judgment upon. Aliud est celare; aliud, tacere; neque enim id est
celare quicquid reticeas; sed cum quod tu scias, id ignorare
emolumenti tui causa velis eos, quorum intersit id scire. This
definition of concealment, restrained to the efficient motives and
precise subject of any contract, will generally hold to make it void, in C
favour of the party misled by his ignorance of the thing concealed. . . .
Men argue differently, from natural phenomena, and political
appearances: they have different capacities, different degrees of
knowledge, and different intelligence. But the means of information
and judging are open to both: each professes to act from his own
skill and sagacity; and therefore neither needs to communicate to the D
other. The reason of the rule which obliges parties to disclose, is to
prevent fraud, and to encourage good faith. It is adapted to such
facts as vary the nature of the contract; which one privately knows,
and the other is ignorant of, and has no reason to suspect. The
question therefore must always be 'whether there was, under all the
circumstances at the time the policy was underwritten, a fair
representation; or a concealment; fraudulent, if designed; or, though E
not designed, varying materially the object of the policy, and changing
the risqué understood to be run.'"

Whilst it is true that this decision has been criticised on the facts, and
that the wide general contractual duty of good faith which Lord Mansfield
propounded has long since ceased to hold sway, the courts have never F
been deflected from the high standard of duty prescribed in his judgment.
The assured is not to keep anything back which goes to the computation
of the "contingent chance," for otherwise there is no "fair representation,"
and the underwriter is led to approach the "risk understood to be run" on
a false basis. Such is the principle on which insurance law has been
developed and insurance contracts have been made for more than 200 G
years and I would do nothing to dilute it now. I can see no room within
it for a more lenient test expressed solely by reference to the decisive
effect which the circumstance would have on the mind of the prudent
underwriter.
It may however fairly be objected that it is not sufficient to take Lord
Mansfield's statement and apply it to the facts of the individual case, for
directly in the case of marine insurance, and indirectly in the present H
instance, the court must give effect to the words of the Act; and Lord
Mansfield's formulation did not use the word "influence" or refer to the
prudent underwriter. How did these features enter the law?

I A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Mustill

As regards the test of influence on the mind I feel little doubt that the origins lay in the writers of the texts. These were a far more potent source of general principle than the scattered decisions of the courts; Sir Mackenzie Chalmers' Digest *(Chalmers and Owen, A Digest of the Law relating to Marine Insurance,* 1st ed. (1901); 2nd ed. (1903)) shows that, as one would expect, the draftsman of the Act had them fully in mind; and so of course did Blackburn J. when he expressed the test in slightly different terms *(Ionides v. Pender,* L.R. 9 Q.B. 531, 539). (It may be noted that the word "influence" does not appear in *Ionides v. Pender.*) As early as 1808 we find in *Marshall, A Treatise on the Law of Insurance,* 2nd ed., vol. I, p. 467:

"Every fact and circumstance, which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy at all, or at what premium he will underwrite it, is material."

We see the word "influence" employed by *Parsons, A Treatise on Maritime Law* (1859), vol. II, p. 155:

"the question as to the materiality of a representation, is not whether the fact stated actually did or possibly could affect the risk, but whether it would naturally tend to influence the insurer in his estimate of the risk."

A very similar formulation appears in *Phillips, A Treatise on the Law of Insurance,* 5th ed., vol. I, p. 274: "tending to influence [the underwriter's] estimate of the character and degree of the risk to be insured against." The word also appears repeatedly in *Arnould, A Treatise on the Law of Marine Insurance and Average,* 2nd ed., pp. 565–568. In the 6th edition of the same work (1887), edited by Mr. Maclachlan, we find at p. 518 a reference to "facts 'tending to induce the underwriter more readily to assume the risk by diminishing the estimate he would otherwise have formed of it'" followed by the statement that "Facts, the statement of which may reasonably be presumed likely to have such an influence on the judgment of the underwriter are called 'material facts'." In *Duer, The Law and Practice of Marine Insurance,* vol. II, we find at p. 382 that the materiality of facts is expressed in terms of "their probable influence on the estimated value of the risks."

These references to the influence of the misrepresented or undisclosed fact on the mind of the underwriter are significant, not so much because they demonstrate what could safely have been assumed, namely that sections 18 and 20 of the Act reflected a well-established understanding of the law, but because the same authors who were content to speak of influence also expressed the test in ways which bear closely upon the present issue. Thus, as shown by the passages quoted (and there are others which I need not set out), they employed the qualifying words "tending to," which to my mind are quite inconsistent with a hard-edged criterion expressed in terms of a decisive influence on the working of the underwriter's mind. Elsewhere in these works the authors used expressions other than "influence the mind" to explain the principle, plainly without any notion that they were saying something essentially different, and again

the terminology cannot be reconciled with the narrower view of the duty    A
to disclose. According to *Parsons, A Treatise on Maritime Law*, the
material fact must be such that it would "naturally and reasonably enter
into the estimate of the risk, or the reasons for or against entering into
the contract of insurance;" and the whole object of the rules as to
representation, misrepresentation and concealment is "to enable the
insurers to judge accurately of the risk they undertake" (pp. 173, 174). So
also *Duer* speaks, at p. 390, of facts which a prudent and experienced    B
underwriter would deem it proper to consider; *Arnould*, 6th ed., pp. 514
and 518, also refers to the underwriter's estimate of the risk.

My Lords, these and similar passages do not conclusively establish
that the test of decisive effect is unsound, for the discussions in the books
are long, and short turns of phrase cannot safely be plucked out of
context. Nevertheless, I can see nothing in them to suggest that before    C
1906 materiality was understood as extending only to such circumstances
as would definitely have changed the underwriter's mind; and they furnish
substantial support for the view that the duty of disclosure extended to all
matters which would have been taken into account by the underwriter
when assessing the risk (i.e. the "speculation") which he was consenting
to assume. This is in my opinion what the Act was intending to convey,
and what it actually says.    D

Before coming to the cases decided after 1906 I should mention *Rivaz
v. Gerussi Brothers & Co.* (1880) 6 Q.B.D. 222, which was relied on to
suggest that a test expressed in terms of the underwriter's assessment of
the risk is contrary to authority. I disagree. As clearly appears from the
argument for the defendants (reported at pp. 225–226) the case was
concerned with the same controversy between the views of *Duer* and    E
*Parsons* on whether the duty of disclosure extended beyond matters
directly affecting the probability of a loss by perils insured against, as had
previously been resolved in favour of the wider view in *Ionides v. Pender*,
L.R. 9 Q.B. 531. That the word "risk" must be understood in the wider
sense is now beyond dispute, but this has no bearing on the principle
which I derive from the authoritative texts, and indeed from both the
letter and the spirit of *Carter v. Boehm*, 3 Burr. 1905, that it is the    F
relevance to the underwriter's intellectual process when assessing the risk
which determines the scope of disclosure.

I pause for a moment to consider the other conspicuous feature of the
earlier law, namely the presence in the equation of the hypothetical
prudent underwriter. Just when and how this feature was added cannot
be deduced from the materials now available, but it is at least as old as    G
1823 (see *Marshall, A Treatise on the Law of Insurance*, 2nd ed., vol. I,
p. 467), and may well be much older. It is a fair assumption that at least
one reason must have been that the principles stated by Lord Mansfield
required fair dealing, and it would have been unfair to the assured to
require disclosure of matters which a reasonable underwriter would not
have taken into account. It is possible that another reason was that until
the Evidence Act 1851 (14 & 15 Vict. c. 99) a party to a suit could not    H
give evidence on his own behalf, so that the actual underwriter could not
testify on either materiality or causation, and any decision on the latter
would have to proceed by assuming that the underwriter was reasonable

A  and asking what effect the information would have had on a reasonable underwriter in his situation. It is unnecessary to pursue this aspect further, and I mention it only to show that the argument based on *Ionides v. Pender*, L.R. 9 Q.B. 531 cannot be sound, since it posits a change in the law which (if it was a change at all) had occurred several decades before.

Returning to the standard of materiality, I pass to the decisions after 1906, of which by far the most important is *Mutual Life Insurance Co. of New York v. Ontario Metal Products Co. Ltd.* [1925] A.C. 344. A life assured had answered questions in a proposal form in a manner which was not strictly accurate. The policy was governed by the Ontario Insurance Act 1914, sections 156(3) and (4) of which provided:

> "(3) The proposal or application of the assured shall not as against him be deemed a part of or be considered with the contract of insurance except in so far as the court may determine that it contains a material misrepresentation by which the insurer was induced to enter into the contract. (4) No contract shall be avoided by reason of the inaccuracy of any such statement [i.e. in an application for a policy] unless it is material to the contract . . ."

The insurers sought to avoid the policy in reliance on the misstatements in the proposal form. The trial judge found that the misrepresentations were not material. The Judicial Committee of the Privy Council upheld that decision. I must quote from the opinion of the Board, at pp. 350–352, at a little length:

> "The main difference of judicial opinion centres round the question what is the test of materiality? Mignault J. thought that the test is not what the insurers would have done but for the misrepresentation or concealment, but 'what any reasonable man would have considered material to tell them when the questions were put to the insured.' Their Lordships are unable to assent to this definition. It is the insurers who propound the questions stated in the application form, and the materiality or otherwise of a misrepresentation or concealment must be considered in relation to their acceptance of the risk. On the other hand, it was argued that the test of materiality is to be determined by reference to the questions; that the insurance company had by putting the question shown that it was important for them to know whether the proposer had been in the hands of a medical man within five years of his application, and, if so, to have had the opportunity of interviewing such medical man before accepting the risk. The question was therefore, they contended, a material one, and the failure to answer it truthfully avoids the contract. Now if this were the true test to be applied there would be no appreciable difference between a policy of insurance subject to section 156 of the Ontario Insurance Act, and one in the form hitherto usual in the United Kingdom. All of the questions may be presumed to be of importance to the insurer who causes them to be put, and any inaccuracy, however unimportant in the answers, would, in this view, avoid the policy. Suppose, for example, that the insured had consulted a doctor for a headache or a cold on a single occasion and had concealed or forgotten the fact,

could such a concealment be regarded as material to the contract?    A
Faced with a difficulty of this kind, the appellants' [defendant
company's] counsel frankly conceded that materiality must always be
a question of degree, and therefore to be determined by the court,
and suggested that the test was whether, if the fact concealed had
been disclosed, the insurers would have acted differently, either by
declining the risk at the proposed premium or at least by delaying
consideration of its acceptance until they had consulted Dr. Fierheller.    B
If the former proposition were established in the sense that a
reasonable insurer would have so acted, materiality would, their
Lordships think, be established, but not in the latter if the difference
of action would have been delay and delay alone. In their view, it is
a question of fact in each case whether, if the matters concealed or
misrepresented had been truly disclosed, they would, on a fair    C
consideration of the evidence, have influenced a reasonable insurer to
decline the risk or to have stipulated for a higher premium.

    "Applying this test, the evidence which has impressed their
Lordships most is that of Dr. McCullough—a witness adduced by the
appellants and who, as their medical examiner in Toronto, was the
person by whom they would naturally be guided in accepting or
declining the risk. Now Dr. McCullough states that if Dr. Fierheller's    D
name had been mentioned, he would have noted it in the answer to
question 18, but he also emphatically states that if he had known at
the time all that Dr. Fierheller deposed to in evidence, he would still
have sent up the case with a recommendation for acceptance. In
other words, having, as the result of his own examination, passed
Mr. Schuch as a healthy man, his opinion would not have been    E
altered by his prior medical history as now ascertained in great detail.
Dealing with the evidence as a whole the learned trial judge came to
the conclusion that 'if the facts as stated in the evidence of
Dr. Fierheller with relation to the condition of Schuch and his
treatment had been known to the defendant company, it was not at
all probable that they would have refused the premium and the issue
of the policy, nor do I think they would even have required the    F
examination which the officials now think they would have required.'
In this finding their Lordships substantially concur, although they
would have expressed the finding somewhat differently and would
have preferred to say that had the facts concealed been disclosed,
they would not have influenced a reasonable insurer so as to induce
him to refuse the risk or alter the premium. Their Lordships,    G
therefore, concur in the conclusion of the trial judge that the non-
disclosure or misstatement was not material to the contract and
therefore, under the law of Ontario, is not a ground for avoiding it."

    As I read it, in this passage their Lordships were stating the following
propositions. (1) Materiality was not to be judged by reference to the
opinion of a reasonable assured. This had been the common law for very    H
many years. (2) The fact that the insurers had inserted a question in the
proposal form was not ipso facto a demonstration of its materiality.
(3) The fact that if the information had been correctly stated it would

541
1 A.C.        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))    Lord Mustill

A  have caused the insurers to delay in reaching a decision was not in itself enough to make it material. (4) The test was whether the information would have influenced a reasonable insurer to decline the risk or to have stipulated for a higher premium.

Now I must say at once that this decision cannot in my opinion be put aside simply because it arose in the context of a statute which required proof of actual inducement. The discussion in the passage quoted was
B  concerned with materiality, not causation. Here, I must differ from the Court of Appeal in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 and to this extent from Samuels J. in *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228, although the general tenor in the latter case is broadly in accord with my own opinion. This being said, however, I do not consider that the *Mutual Life Insurance* case establishes Pan Atlantic's
C  argument. The dispute centred on the first three propositions which I have summarised. Once the insurers' contentions on these were rejected the outcome of the case was inevitable, and the Board had no occasion, when stating the general law on materiality, to examine the quite narrow distinction which this House is now considering, and which had no relevance to the decision of the appeal before the Board. I would make the same comment about other expressions of the test for materiality in
D  cases decided since 1906. None of the disputes from which they sprang made it necessary for the court to distinguish between the various interpretations of the test so minutely examined in the arguments before the House.

In these circumstances I consider that the House is free to interpret sections 18(2) and 20(2) in the way proposed, and to give them a reading
E  which reflects not only the words actually used but also the insistence on fair dealing and equal bargaining which has imbued this branch of the law from the beginning. In reaching this conclusion I have concentrated on the Act, notwithstanding that it does not apply directly to the present dispute, because the principles have been largely developed in relation to marine insurance. It is, however, accepted that the laws applying to the two types of policy is in the relevant respects the same, and once it is
F  established that sections 17 to 20 of the Act correctly embody the common law of marine insurance, as in my opinion it is, the problems now facing your Lordships may be addressed simply by applying the words of the Act. When at a later stage examining the facts of the present dispute I will go straight to the language of sections 18(1) and 20(2).

G  V. *Inducement*

I turn to the second question which concerns the need, or otherwise, for a causal connection between the misrepresentation or non-disclosure and the making of the contract of insurance. According to sections 17, 18(1) and 20(1) if good faith is not observed, proper disclosure is not made or material facts are misrepresented, the other party, or in the case of sections 18 and 20 the insurer, "may avoid the contract." There is no
H  mention of a connection between the wrongful dealing and the writing of the risk. But for this feature I doubt whether it would nowadays occur to anyone that it would be possible for the underwriter to escape liability even if the matter complained of had no effect on his processes of thought.

Take the case of misrepresentation. In the general law it is beyond doubt that even a fraudulent misrepresentation must be shown to have induced the contract before the promisor has a right to avoid, although the task of proof may be made more easy by a presumption of inducement. The case of innocent misrepresentation should surely be a fortiori, and yet it is urged that so long as the representation is material no inducement need be shown. True, the inequalities of knowledge between assured and underwriter have led to the creation of a special duty to make accurate disclosure of sufficient facts to restore the balance and remedy the injustice of holding the underwriter to a speculation which he had been unable fairly to assess; but this consideration cannot in logic or justice require courts to go further and declare the contract to be vitiated when the underwriter, having paid no attention to the matters not properly stated and disclosed, has suffered no injustice thereby. How then does it happen that the Act seems to contemplate that once a material misrepresentation or non-disclosure is established the underwriter has an invariable right to avoid?

One possibility, suggested by Mr. D. St. L. Kelly (1988) 1 Ins.L.J. 30, 33–34, developing an interesting thesis centred on *Ionides v. Pender,* L.R. 9 Q.B. 531, is that the omission of an express requirement of inducement was due to an oversight by the draftsman. With respect, this is a proposition which I could not accept unless forced to do so by want of any other explanation. Sir Mackenzie Chalmers was a most learned and careful scholar. Throughout the prolonged struggle to get successive Marine Insurance Bills through Parliament the drafts had been closely scrutinised and revised by persons of great knowledge and experience: see the foreword to *Chalmers and Owen, A Digest of the Law relating to Marine Insurance,* 1st ed. It would be most surprising if an elementary proposition of marine insurance law had simply slipped through the net, and the fact that it did not is borne out by the fact that the concluding sentences of sections 18(1) and 20(1) did not appear in the 1894 version of the Bill. Attention must have been directly focused on the connection between misrepresentation and non-disclosure on the one hand and the right to avoid on the other and it seems impossible that a need for inducement, if such was the common law at the time, could simply have been forgotten.

In these circumstances there appear to be three reasons why the Act may have taken the form which it did. First, the common law did not require inducement and was correctly reproduced by the Act. Second, the common law did require inducement but the promoters of the Act wished the law to be changed and Parliament did change it. Third, the common law did require inducement and the Act, properly understood, is to the same effect. To make a choice we must look behind the Act to the developing history of marine insurance law. For this, once again, particular regard must be paid to the scholarly writings. The older cases have practically nothing useful to say on the matter, very possibly because what *Duer, The Law and Practice of Marine Insurance,* vol. II, p. 566, para. 10, called "the known prudence of underwriters" would make it comparatively rare for an underwriter to ignore a material consideration. I should add that until the modern change in the climate of business it

543

would have been even more unusual for insurers to risk having it said in public proceedings that they were at the same time careless enough to ignore something which a prudent underwriter would have taken into account and anxious enough to avoid paying a claim to rely on a breach of duty which had done them no harm.

A fact which at once captures attention is the existence, almost from the outset, of a controversy about the need for inducement. I have already given references to the conflicting views of the 19th century scholars. To modern eyes the controversy is puzzling. The doctrine that a contract of marine insurance is uberrimae fidei had been firmly established for decades. How could there still be any doubt as to a point which, although rarely arising in practice, was of fundamental theoretical importance, the more so given that it is nowadays a truism that an innocent misrepresentation will lead to rescission?

My Lords, I believe that the key to the problem is provided by *MacGillivray and Parkington on Insurance Law,* 8th ed. (1988), pp. 231–232, para. 577, where it is pointed out that at common law an innocent misrepresentation did not affect the validity of the contract or afford a defence to an action upon it, unless there was a total failure of consideration. This proposition was asserted as late as 1867 in the judgment of the Court of Queen's Bench delivered by Blackburn J. in *Kennedy v. Panama, New Zealand and Australian Royal Mail Co. Ltd.* (1867) L.R. 2 Q.B. 580. Thus, in the field of life insurance, which was governed by the common law, the law on misrepresentation took a shape which was quite unrecognisable from what it is today: see, for example, the difficult case of *Anderson v. Fitzgerald* (1853) 4 H.L.Cas. 484. It was not until, after the Judicature Acts, the equitable doctrines governing rescission for misrepresentation had infiltrated the general law of contract that a route to the protection of the underwriter in non-marine cases became apparent.

It was against this background that the doctrine of good faith in relation to marine insurance was enunciated and developed. Originally, Lord Mansfield had proceeded in *Carter v. Boehm,* 3 Burr. 1905 on the basis of a general doctrine of good faith applicable to all contracts, and this doctrine was propounded by Park J. in his influential early work on insurance, *A System of the Law of Marine Insurances,* 1st ed. (1787); 2nd ed. (1790). This general principle did not prevail, but marine insurance continued to be treated as an exceptional case in which non-disclosure and misrepresentation would ordinarily vitiate the contract even though they would not have had that effect at common law. What was never clearly spelt out was how this result was achieved. Various theories were advanced: that the policy failed for want of agreement on the subject matter; that non-disclosure was constructive fraud; and that contracts of marine insurance were subject to an implied condition precedent that there had been full and accurate disclosure. (See for example *Arnould, A Treatise on the Law of Marine Insurance and Average,* 2nd ed., vol. I, p. 548; *Phillips, A Treatise on the Law of Insurance,* 5th ed., vol. I, pp. 278–279; *Parsons, A Treatise on Maritime Law,* vol. II, p. 153; *Kent, Commentaries on American Law,* 1st ed. (1828); 14th ed. (1896), vol. III,

544

p. 282; and *Duer, The Law and Practice of Marine Insurance,* vol. II, p. 380.

This uncertainty led to differences of opinion on more than one topic. Conspicuous examples were the questions whether the contract was rendered void ab initio or merely voidable, and the mechanism whereby the validity of the contract was compromised. To a great extent the source of the power to avoid has been made academic by the creation of the statutory power under the Act, but the controversy has still not been resolved: see, for example, the line of cases beginning with *Blackburn, Low & Co. v. Vigors* (1886) 17 Q.B.D. 553 and (1887) 12 App.Cas. 531, 539 and continuing through *William Pickersgill & Sons Ltd. v. London and Provincial Marine and General Insurance Co. Ltd.* [1912] 3 K.B. 615 and *Merchants' and Manufacturers' Insurance Co. Ltd. v. Hunt* [1941] 1 K.B. 295, 312, 318 to *Mackender v. Feldia A.G.* [1967] 2 Q.B. 590, *March Cabaret Club & Casino Ltd. v. London Assurance* [1975] 1 Lloyds Rep. 169 and *Banque Keyser Ullmann S.A. v. Skandia (U.K.) Insurance Co. Ltd.* [1990] 1 Q.B. 665. A valuable recent study of the authorities is contained in *Clarke, The Law of Insurance Contracts,* 2nd ed. (1994), pp. 549–551, para. 23–1A. Since the reasons why misrepresentation or non-disclosure vitiated the contract must have had at least some bearing on the need for proof of inducement, if the present task had been to reconstruct the common law as it stood in 1873 just before the decision in *Ionides v. Pender,* L.R. 9 Q.B. 531, some taxing problems would have required solution. Particular scrutiny would have been required of the observations of Turner L.J. in *Traill v. Baring* (1864) 4 De G.J. & S. 318, 330. But there is no need for this, since the problem is to ascertain the law which formed the basis of the partial codification contained in *Chalmers and Owen, A Digest of the Law relating to Marine Insurance* and reproduced with some modifications in the Act. This law had by 1906 become a fusion of the common law and equity. What one would expect to find, as regards misrepresentation, is that the newly available equitable remedy should be applied in the field of insurance, in the same way as in the law of contract at large. In my opinion this is just what one does find. It will be recalled that the predecessors in the *Digest* of what were to become sections 18(1) and 20(1) of the Act did not contain any explicit reference to the avoidance of the policy. What the *Digest* did contain, however, was article 93(2), 2nd ed., p. 132, in the following terms:

> "The rules of the common law, including the law merchant, save in so far as they are inconsistent with the express provisions of this Digest, *and in particular the rules relating to the effect of fraud, illegality, misrepresentation, and mistake, apply to contracts of marine insurance."* (Emphasis added.)

This passage is supported by a note "as to fraud and misrepresentation, see *Leake on Contracts*, 3rd ed. (1892), pp. 291, 330 . . ." The passage in *Leake* thus called up stipulates, as regards fraud, that the party is entitled to avoid by showing that he was induced to agree by the fraud of the other party. Furthermore, in his note to article 17 of the *Digest* Chalmers wrote that "the ordinary rules of law as to voidable contracts apply to insurance." (*Digest*, 1st ed., p. 22; 2nd ed., p. 24).

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Mustill

A    Subsequently, when Parliament passed the Act, the addition of the new sentences in paragraphs 18(1) and 20(1) was accompanied by the omission of the words in article 91(2) which I have underlined, but the remainder of article 91(2) was unchanged. Precisely why these alterations were made is now a matter of speculation, but at all events I see no room to doubt that in the minds of those who prepared the statute the ordinary rules of law were to apply. The note to article 17 survived into Chalmers's work

B    when it mutated into a commentary on the new Act *(Chalmers and Owen, The Marine Insurance Act 1906,* 1st ed. (1907); 2nd ed. (1913)) and there is no trace in the commentary of any suggestion that Parliament had deliberately changed the law.

At this stage I pause to note that the footnote 4 to article 17 of the *Digest* called up pp. 513–514 of the 6th edition of *Arnould, A Treatise on*

C    *the Law of Marine Insurance* (1887), where it was stated that the contract is vitiated (or "void," as *Arnould* put it) wherever misrepresentation or concealment "has entered into the making of it." This is a hint, although probably no more, that the editor was contemplating a need for actual inducement.

Similarly, when one turns to the contemporary texts, to see whether any change in the relevant law was perceived after the Act, a comparison

D    may first be made between the 7th and 8th editions of *Arnould* (of 1901 and 1909 respectively), where the editors deal with misrepresentations of material facts. In the former, we find, at p. 641:

"555. Even where the representation is of material facts, yet, if it satisfactorily appears that it did not influence the judgment of the underwriter, its falsity will be held not to avoid the policy."

E
For this proposition the editors cited *Flinn v. Headlam* (1829) 9 B. & C. 693 and appended the following note:

"*Phillips (A Treatise on the Law of Insurance,* 5th ed. vol. I, s. 681, pp. 371–372) is of opinion that the assured cannot be allowed to prove that a material misrepresentation did not influence the

F    underwriter. The editors submit that the rule stated by *Arnould* is correct, although the evidence in *Flinn v. Headlam* may not have justified its application. In equity it is clear that even a fraudulent misrepresentation gives no right to rescind a contract, when it has not influenced the party to whom it was made."

G    In the next edition the same passages appeared, but with the following addition to the note:

"The Marine Insurance Act, however, if the language used in section 20, subsection 1, is construed literally, supports *Phillips's* view. Such a construction involves an anomalous state of the law. For it is clear that, apart from marine insurance, even a fraudulent misrepresentation

H    gives no right to rescind a contract, when it has not influenced the party to whom it was made."

Turning to the title "Insurance" in *Halsbury's Laws of England,* 1st ed., vol. 17 (1911), a text carrying the very high authority of Mr. Arthur

Cohen K.C., we find that the author first states as a general proposition, at p. 404:

> "789. A contract of marine insurance, like any other contract, is voidable on the ground of fraud, and any fraudulent misrepresentation made in order to induce the underwriter to enter into the contract entitles him to avoid the policy, unless it is proved, either that he knew the true state of facts at the time of contracting, or that he did not rely on the misrepresentation."

Later, in a footnote, at p. 414, to a passage dealing with the innocent misrepresentation of a material fact, the author says:

> "(*p*) It is submitted that it is rightly argued in *Arnould on Marine Insurance*, 8th ed. (1909), vol. I, section 536 (pp. 674–675), that as a fraudulent representation will not avoid the contract (see p. 404, ante) if it did not influence the mind of the contracting party, this must a fortiori be true of an innocent misrepresentation."

No reference is made to the point on the literal construction of section 20(1) which had concerned the editors of the 6th edition of *Arnould.*

Next, I turn to a series of decisions after the passing of the Act. The first is *Cantiere Meccanico Brindisino v. Janson* [1912] 2 K.B. 112. This raised questions of misdescription and non-disclosure. In his judgment on appeal [1912] 3 K.B. 452, 460 Vaughan Williams L.J. relates that the trial judge had pointed out that

> "it is sufficient to avoid the contract if the statement was in fact made, and it was untrue, and that it is not necessary that the underwriter should have relied on it . . ."

Yet the report of the judgment of Scrutton J. [1912] 2 K.B. 112 omits any discussion of representation, and as reported at (1912) 106 L.T. 678, 680 the judge said only: "The defendants have not satisfied me that the alleged misrepresentation was made . . ." It therefore appears that, whatever exactly may have been said at the trial, it was obiter.

The next case was *Visscherij Maatschappij Nieuw Onderneming v. Scottish Metropolitan Assurance Co. Ltd.* (1921) 27 Com.Cas. 198. A vessel sank in suspicious circumstances whilst greatly overinsured. The trial judge found that the vessel had been cast away and also held that the overvaluation was a material fact which the owners had wrongfully failed to disclose. The Court of Appeal upheld his decision on the first issue, but doubted the conclusion on non-disclosure given the sparseness of the evidence. As Scrutton L.J. observed, as at pp. 215–216:

> "The underwriters have not taken the course, which in my view should always be followed, of coming into the box and saying what they knew, and what it was material that they did not know, and how it influenced them."

Whilst anything said by Scrutton L.J., particularly on a commercial matter, must always command the greatest respect, I do not find that these dicta take the matter very much further forward. Nor am I able to derive help from *Mutual Life Insurance Co. of New York v. Ontario Metal*

*Products Co. Ltd.* [1925] A.C. 344, since this turned on an express provision in the Ontario Insurance Act 1914 to the effect that:

"The proposals or application of the assured shall not as against him be deemed a part of or considered with the contract of insurance except in so far as the court may determine that it contains a material misrepresentation by which the insurer was induced to enter into the contract" (section 156(3)).

Next, there is *Zurich General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53. This arose under the Road Traffic Act 1934 which enabled third parties to recover from insurers the amount of any judgment obtained in respect of a liability covered by a policy. The scheme of the Act was that the insurer's right to avoid was preserved as against the third party if, in an action commenced within a given time, the insurers procured a declaration that the policy had been "obtained" by the non-disclosure of a material fact or by a representation of fact which was false in some material particular. The circumstances of the case were that the insured had obtained a motor vehicle policy with the plaintiffs after completing a proposal form in which he stated that he had driven regularly and continuously during the past 12 months and had driven cars for three years. An accident caused the death of the third party's husband. The insurers brought an action against the third party amongst others claiming to avoid the policy, relying on an allegation that the facts represented in the proposal were untrue and that the insured had failed to disclose that the driver had failed a driving test. The action failed. For present purposes three passages from the judgments of the Court of Appeal are material:

"The evidence entirely fails to convince me that the insurers, had they known of the failure to pass the test, would have declined to issue a policy on precisely the same terms as those on which they did issue the policy in question:" *per* Lord Greene M.R., at p. 58.

Another passage conveys the same idea, at p. 59:

"Under the general law of insurance an insurer can avoid a policy if he proves that there has been misrepresentation or concealment of a material fact by the assured. What is material is that which would influence the mind of a prudent insurer in deciding whether to accept the risk or fix the premium, and if this be proved it is not necessary further to prove that the mind of the actual insurer was so affected. In other words, the assured could not rebut the claim to avoid the policy because of a material representation by a plea that the particular insurer concerned was so stupid, ignorant, or reckless, that he could not exercise the judgment of a prudent insurer and was in fact unaffected by anything the assured had represented or concealed. But under the provisions of the Road Traffic Act 1934, I think this general rule of insurance law is modified. The section requires the insurer to establish that the policy was 'obtained' by non-disclosure or misrepresentation. In such a case as this, therefore, I think the plaintiff must establish two propositions: (1) that the matter relied on was 'material' in the sense that the mind of a prudent insurer would

548

be affected by it, and (2) that in fact their underwriter's mind was so affected, and the policy was thereby obtained:" *per* MacKinnon L.J., at p. 60.

"[After holding that the fact not disclosed was immaterial.] I am convinced . . . that had the fact been disclosed the assured would have got exactly the same policy that was issued in this case and, consequently, that it was not obtained by non-disclosure of a material fact:" *per* Goddard L.J., at p. 65.

No authority was cited for the observations of MacKinnon L.J. on what the position would have been in the absence of the express statutory requirement that the policy had been obtained by the non-disclosure, and the passage is plainly obiter.

Finally, there is *Marene Knitting Mills Pty. Ltd. v. Greater Pacific General Insurance Ltd.* [1976] 2 Lloyd's Rep. 631. This was concerned solely with the question whether the fact that the predecessor in business of the assured had suffered a series of fires was a material consideration which should have been disclosed. In the course of an opinion delivered by Lord Fraser of Tullybelton upholding the decision that this fact was material the Judicial Committee of the Privy Council took note that the trial judge had directed himself by reference to a passage from the judgment of Samuels J. in *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228, 239:

"Accordingly, I do not think that it is generally open to examine what the insurer would in fact have done had he had the information not disclosed. The question is whether that information would have been relevant to the exercise of the insurer's option to accept or reject the insurance proposed. It seems to me that the test of materiality is this: a fact is material if it would have reasonably affected the mind of a prudent insurer in determining whether he will accept the insurance, and if so, at what premium and on what conditions."

In my opinion this citation is no assistance here, for Lord Fraser immediately went on to say that so far as materiality was concerned it was unnecessary to pursue a possible difference from the test applied in *Mutual Life Insurance Co. of New York v. Ontario Metal Products Co. Ltd.* [1925] A.C. 344, since the earlier fires were obviously material whichever test was applied; and as regards the full sentence of the passage quoted there was no occasion to consider whether it was correct, since materiality and not causation was the sole suspect of the appeal.

My Lords, in my judgment little or nothing can be gleaned from the 20th century cases to indicate a solution to the problem of causation. Before stating my own opinion on this problem there are two more points to be made.

First, one suggested explanation for the absence from section 20 of any requirement that the misrepresentation shall have induced the contract is that any such requirement had been swept away 30 years before in *Ionides v. Pender*, L.R. 9 Q.B. 531. Consistently with the views already expressed I am unable to accept this, and I should add that even if the effect of *Ionides v. Pender* had been to make the influence on the hypothetical underwriter the benchmark of materiality I am unable to see

A  why this should not have left behind such requirements of actual causation as had previously formed part of the common law. However, as I have said, although *Ionides v. Pender* was an important case it did not in my opinion have the effect contended for.

Secondly, it has been suggested that the absence from the Act of any reference to causation stems from a disciplinary element in the law of marine insurance. The concept is that persons seeking insurance and their

B  brokers cannot be relied upon to perform their duties spontaneously; that the criterion of whether or not the misrepresentation or non-disclosure induced the contract would make it too easy for the assured to say that the breach of duty made no difference; and that accordingly the law prescribes voidability as an automatic consequence of a breach by way of sanction for the enforcement of full and accurate disclosure. For my part,

C  although I think it possible to detect traces of this doctrine in the earlier writings I can see nothing to support it in later sources; and I would unhesitatingly reject any suggestion that it should now be made part of the law. The existing rules, coupled with a presumption of inducement, are already stern enough, and to enable an underwriter to escape liability when he has suffered no harm would be positively unjust, and contrary to the spirit of mutual good faith recognised by section 17, the more so since

D  non-disclosure will in a substantial proportion of cases be the result of an innocent mistake.

For these reasons I conclude that there is to be implied in the Act of 1906 a qualification that a material misrepresentation will not entitle the underwriter to avoid the policy unless the misrepresentation induced the making of the contract, using "induced" in the sense in which it is used in

E  the general law of contract. This proposition is concerned only with *material* misrepresentations. On the view which I have formed of the present facts the effect of an immaterial misrepresentation does not arise and I say nothing about it.

There remain two problems of real substance. The first is whether the conclusion just expressed can be transferred to the case of wrongful non-disclosure. It must be accepted at once that the route via section 91(2) of

F  the Act and the general common law which leads to a solution for misrepresentation is not available here, since there was and is no general common law of non-disclosure. Nor does the complex interaction between fraud and materiality, which makes the old insurance law on misrepresentation so hard to decipher, exist in respect of non-disclosure. Nevertheless if one looks at the problem in the round, and asks whether

G  it is a tolerable result that the Act accommodates in section 20(1) a requirement that the misrepresentation shall have induced the contract, and yet no such requirement can be accommodated in section 18(1), the answer must surely be that it is not—the more so since in practice the line between misrepresentation and non-disclosure is often imperceptible. If the Act, which did not set out to be a complete codification of existing law, will yield to qualification in one case surely it must in common sense

H  do so in the other. If this requires the making of new law, so be it. There is no subversion here of established precedent. It is only in recent years that the problem has been squarely faced. Facing it now, I believe that to do justice a need for inducement can and should be implied into the Act.

550
Lord Mustill        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))        [1995]

In forming this conclusion I have taken into account the contrary opinions expressed in *Spencer Bower, Turner & Sutton, The Law relating to Actionable Non-Disclosure*, 2nd ed. (1990), para 3.09, p. 36. Whilst attaching great weight to any proposition from this source, I believe that both principle and justice require the conclusion which I have expressed.

Accordingly, I consider that the instinct of Kerr J. in *Berger v. Pollock* [1973] 2 Lloyd's Rep. 442, was right, and that the adoption of the contrary view by the Court of Appeal in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 should not now be upheld.

Finally, there is the question whether this conclusion holds good for non-marine insurance. The problems raised by the wording of sections 18(1) and 20(1) do not here arise. The general considerations are however the same, and I feel no doubt that they should lead to the same conclusion.

Before embarking on this long analysis I suggested that the questions in issue were short. I propose the following short answers. (1) A circumstance may be material even though a full and accurate disclosure of it would not in itself have had a decisive effect on the prudent underwriter's decision whether to accept the risk and if so at what premium. But, (2) if the misrepresentation or non-disclosure of a material fact did not in fact induce the making of the contract (in the sense in which that expression is used in the general law of misrepresentation) the underwriter is not entitled to rely on it as a ground for avoiding the contract.

These propositions do not go as far as several critics of the *C.T.I.* case would wish, but they maintain the integrity of the principle that insurance requires the utmost good faith, whilst avoiding the consequences, to my mind unacceptable, of upholding Pine Top's arguments in full.

VI. *The facts*

Although the underlying facts are of great importance to the parties they have no general significance and have already been investigated in both the courts below. Although they were explored in much detail, I may take them quite shortly.

As regards the first presentation by the broker, if I correctly understand the findings of the trial judge the broker had in his possession the long record; he knew that it contained materials which showed a bad claims experience; he let the underwriter know that he had it with him; he hoped that the underwriter would not ask to see it, and conducted himself in such a way as to reduce the likelihood that in fact the underwriter would do so; in the event the underwriter did not ask to see it, with the result that he accepted the risk in ignorance of facts which the broker himself, who had taken the trouble to divert attention from them, must himself have thought were significant. Notwithstanding that the trial judge held that there was no material non-disclosure, and that the Court of Appeal saw no reason to interfere, I would have wished to look very closely at this course of events, if the appeal had turned on this question alone; for the conduct of the broker scarcely seems redolent of the *utmost* good faith required by section 17, or of the fair representation on which Lord Mansfield in *Carter v. Boehm,* 3 Burr. 1905, 1911 insisted. The point is however of no practical importance, since quite apart from the question

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Mustill

of causation it seems to me that an argument of waiver would be unanswerable. I am therefore content, in company with the Court of Appeal, to leave the decision of the trial judge undisturbed.

As to the second presentation by the broker I have had the opportunity to read in draft the speech to be delivered by my noble and learned friend, Lord Lloyd of Berwick. Although the test of materiality which he applies is not the same as the one which I myself would prefer I so entirely concur in his opinion that the misrepresentation was material and in his reasons for arriving at that conclusion that it would be pointless to cover the same ground again. I will add one brief rider. Differing from the *C.T.I.* case and hence from the principle which the Court of Appeal was bound to apply in the present case I have concluded that it is an answer to a defence of misrepresentation and non-disclosure that the act or omission complained of had no effect on the decision of the actual underwriter. As a matter of common sense however even where the underwriter is shown to have been careless in other respects the assured will have an uphill task in persuading the court that the withholding or misstatement of circumstances satisfying the test of materiality has made no difference. There is ample material both in the general law and in the specialist works on insurance to suggest that there is a presumption in favour of a causative effect. It is not necessary for present purposes to give the proposition this formal label, or to explore it in detail. For present purposes it is sufficient to say, in company with my noble and learned friend, that on the facts of this particular case the position as regards causation is so clear that the appeal can be decided in favour of the indemnitors without the need for remittal to the trial judge.

VII. *Inadvertent omissions*

Pan Atlantic maintains that the non-disclosures relied upon by Pine Top were inadvertent and therefore excused by the opening words of article XV. Notwithstanding the energetic argument of Mr. Beloff I am quite satisfied that article XV is inapt for this purpose. The matter is thoroughly discussed by Steyn L.J. who has said all that is necessary on the matter.

VIII. *Conclusion*

For these reasons, although I differ in certain important respects from the view of the law which the Court of Appeal was constrained to apply I would dismiss the appeal. In conclusion I wish to acknowledge the painstaking research which founded the arguments addressed on appeal, and in particular the deployment of modern academic and other writings. Throughout its long history the law of marine insurance has owed as much to commentators as to the courts, and although the views of these writers are not fully reflected here, I have taken them carefully into account.

LORD SLYNN OF HADLEY.   My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Mustill. I agree with him that the "decisive influence" test is to be rejected and

552

that a circumstance may be material for the purposes of an insurance    A
contract (whether marine or non-marine) even though had it been fully
and accurately disclosed it would not have had a decisive effect on the
prudent underwriter's decision whether to accept the risk and if so at what
premium, but that an underwriter who is not induced by the
misrepresentation or non-disclosure of a material fact to make the contract
cannot rely on the misrepresentation or non-disclosure to avoid the    B
contract.

I also agree that no sufficient reason has been shown for interfering
with the trial judge's findings of fact. I, too, would dismiss the appeal.


LORD LLOYD OF BERWICK.    My Lords, in these proceedings Pan
Atlantic Insurance Co. Ltd. and others ("Pan Atlantic") claim payment
under a contract of reinsurance dated 29 October 1982. The reinsurers    C
are Pine Top Insurance Co. Ltd. now in liquidation ("Pine Top"). The
defence is non-disclosure and misrepresentation. This appeal provides
your Lordships with the opportunity to consider the correctness of the
decision of the Court of Appeal in *Container Transport International Inc.
v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1984]
1 Lloyd's Rep. 476 ("the *C.T.I.* case").    D

Pan Atlantic's business included the insurance of liability risks, mostly
in the United States. The business was classic "long-tail" business; that is
to say, claims took a long time to be advised, and still longer to be settled.
The history starts with the years 1977 to 1979, during which, as will be
seen, very serious losses were incurred by Pan Atlantic. But Pine Top
were not affected by these losses, since they were not then party to the
reinsurance. They came on risk for the first time in 1980. The underwriter    E
who accepted the risk on behalf of Pine Top for that year was Mr. Oliver.
For the following year, 1981, the risk was accepted by Mr. Neil O'Keefe.
The contract was renewed for 1982, with Pine Top taking 50 per cent. of
the risk. There were two meetings between Mr. O'Keefe and
Mr. Robinson, of Messrs. Butcher, Robinson & Staples Ltd., the brokers,
during which terms were negotiated. The first of these meetings was on
22 or 23 December 1981, and the second on 13 January 1982, when    F
Mr. O'Keefe signed the slip. I will return to those meetings when I come
to consider the facts in greater detail.

For a considerable time after the inception of the 1982 contract, Pine
Top continued to pay reinsurance claims covering the three years for
which they were on risk, namely, 1980, 1981 and 1982. Then in 1985 they
ceased paying altogether. Pan Atlantic recovered judgment under R.S.C.,    G
Ord. 14 in respect of sums due for 1980 and 1981. In March 1987 they
commenced these proceedings in respect of the 1982 year. The defence
was served in May 1987. The only non-disclosure or misrepresentation
alleged at that stage related to the 1977–79 years, in which, as I have said,
very serious losses were incurred. The experts were agreed that these early
years gave the best indication of how the business was likely to develop.
By contrast, the later years were described by the judge as having very    H
little relevance.

Pine Top's case was that Mr. O'Keefe was never shown the figures for
1977 to 1979. If he had been, there would have been a copy of the record

1 A.C.                 Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))           Lord Lloyd
                                                                                         of Berwick

on his file. Pan Atlantic's case was that Mr. Robinson took the figures with him to both meetings with Mr. O'Keefe, and that they were available on the table for his inspection. Waller J. [1992] 1 Lloyd's Rep. 101, 106 accepted Mr. Robinson's evidence. He found that there was a "perfectly fair presentation" of the years in question. His finding was upheld in the Court of Appeal. I will say at once that, despite Mr. Hamilton's arguments to the contrary, I can see no basis on which the House could possibly disturb that finding.

A few weeks before the case came on for trial, Pine Top amended their defence to add certain further allegations of non-disclosure and misrepresentation in relation to 1980 and 1981. So far as 1980 is concerned, it was common ground that Pan Atlantic had failed to disclose a claim of U.S.$25,000. But as it was also common ground that that non-disclosure was "trivial" in the context of disclosed claims of U.S.$406,277, your Lordships are not directly concerned with the 1980 year. The dispute thus centres on 1981. Pine Top's case is that there were two additional claims in respect of that year which had already been advised, but which were not disclosed to Mr. O'Keefe. The figure disclosed was U.S.$235,768. It should have been U.S.$468,168. Pan Atlantic concede, and have conceded ever since the service of the amended defence, that there was inadvertent non-disclosure in respect of these two claims. It is not suggested that the non-disclosure was deliberate. The issue is whether the admitted non-disclosure entitles Pine Top to avoid the contract. Waller J., applying the test laid down by the Court of Appeal in the *C.T.I.* case, as he was obliged to do, held that the non-disclosure was material. The Court of Appeal, applying a different test, reached the same conclusion. The question which now arises for the first time in your Lordships' House is what is the correct test to apply for avoidance by an insurer of a contract of insurance or reinsurance on the ground of non-disclosure.

Mr. Beloff, on behalf of Pan Atlantic, submits that the insurer must show (1) that a prudent insurer, if he had known of the undisclosed fact, would either have declined the risk altogether or charged an increased premium, and (2) that the actual insurer would himself have declined the risk or charged an increased premium. Mr. Hamilton, on behalf of Pine Top, submits that it is sufficient that the fact is one which a prudent insurer would have "wanted to know" or would have "taken into account," even though it would have made no difference to him in the result. According to Mr. Hamilton, the impact on the actual insurer is irrelevant.

Waller J. adopted Mr. Hamilton's test even though, as he himself said, he felt some unease in doing so. Why, he asked, at p. 14, should the failure to disclose the two additional claims in the 1981 year entitle Pine Top to avoid all liability "when their underwriter appears simply not to have been concerned to look at or take account of the most material part of the record in considering this risk," that is to say, the figures for 1977 to 1979? The Court of Appeal [1993] 1 Lloyd's Rep. 496 rejected Mr. Hamilton's test, but did not adopt Mr. Beloff's. The leading judgment was given by Steyn L.J. The test which he proposed was whether a prudent underwriter would regard the undisclosed fact as

554

tending to increase the risk. If so the insurer might avoid, whether or not  A
he would have declined the risk or charged an increased premium.
Farquharson L.J. agreed. Sir Donald Nicholls V.-C. also agreed, but like
the judge felt uneasy at the outcome. In his view, justice and fairness
required that in a case of inadvertent non-disclosure, such as the present,
it ought to be possible for the court to adjust the premium, or perhaps
restrict the cover. But this, as he pointed out, is not an option available  B
under English law. In the absence of some express provision in the
contract, English courts are bound to adopt an all-or-nothing approach.
There have been various proposals for reform, which have so far come to
nothing. In the meantime, Sir Donald Nicholls V.-C., at p. 508, regarded
the present case as "an unhappy example of a case where . . . the law
manifestly does not produce a satisfactory result."

Pan Atlantic now appeal from the decision of the Court of Appeal.  C
Pine Top seek to support the decision on the alternative ground, decided
against them below, that there was non-disclosure of the 1977 to 1979
record.

I will start by considering the two halves of Mr. Beloff's argument.
But first it is convenient to mention certain preliminary matters, by way
of clearing the ground. These were largely non-contentious. The *C.T.I.*
case [1984] 1 Lloyd's Rep. 476 was a case of marine insurance. In the  D
present case your Lordships are concerned with non-marine insurance. It
is not suggested that there is any relevant difference between the two. The
law of marine insurance is, of course, codified by the Marine Insurance
Act 1906. Section 18(1) and (2) provides:

> "(1) Subject to the provisions of this section, the assured must
> disclose to the insurer, before the contract is concluded, every material  E
> circumstance which is known to the assured, and the assured is
> deemed to know every circumstance which, in the ordinary course of
> business, ought to be known by him. If the assured fails to make
> such disclosure, the insurer may avoid the contract. (2) Every
> circumstance is material which would influence the judgment of a
> prudent insurer in fixing premium, or determining whether he will  F
> take the risk."

The Act of 1906 did not change the law. It restated the common law as
to non-disclosure or "concealment" as it had first been laid down by Lord
Mansfield in *Carter v. Boehm*, 3 Burr. 1905 (itself a case of non-marine
insurance) and as it was developed in a number of marine and non-marine
cases throughout the 19th century. It would have been possible for non-  G
marine insurance to have diverged since the passing of the Act of 1906.
But it was not suggested that this had happened.

Secondly, the duty to disclose every material circumstance known to
the assured before a contract of insurance is concluded (section 18 of the
Act of 1906) is closely linked with the duty to ensure that every material
representation is true (section 20). Both are illustrations or consequences
of the rule, set out in section 17, that a contract of insurance is a contract  H
of utmost good faith. In practice, non-disclosure and misrepresentation
are often joined as defences in the same pleading. They were joined in the
*C.T.I.* case and so they are here. Often, as here, the alleged

1 A.C.          *Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))*          Lord Lloyd
of Berwick

A    misrepresentation adds nothing. It is but the converse of the non-disclosure ("impliedly represented that [the proffered] information . . . gave a true and fair picture"). It would be unsatisfactory to reach a different conclusion on the same facts depending on which way the case is put.

Thirdly, whereas the right to avoid for non-disclosure is peculiar to contracts of utmost good faith, the right to avoid for misrepresentation is B    part of the general law of contract. The reason for the special rule relating to non-disclosure in insurance contracts is that in the usual case it is the assured alone who knows "the special facts, upon which the contingent chance is to be computed:" see *Carter v. Boehm*, *per* Lord Mansfield, at p. 1909. The purpose of the rule is to rectify that imbalance. But in the case of misrepresentation there is no need to differentiate between a C    contract of insurance and any other contract. There is no reason to put the insurer in a more favourable position than other contracting parties, and no justification for doing so. The ordinary law suffices.

Lastly, the duty of disclosure operates both ways. Although, in the usual case, it is the assured who knows everything, and the insurer who knows nothing, there may be special facts within the knowledge of the D    insurer which it is his duty to disclose, as where (to take the example given by Lord Mansfield in *Carter v. Boehm*) the insurer knows at the time of entering into the contract that the vessel has already arrived. Thus the obligation of utmost good faith is reciprocal: see *Banque Keyser Ullmann S.A. v. Skandia (U.K.) Insurance Co. Ltd.* [1991] 2 A.C. 249, *per* Lord Bridge of Harwich, at p. 268, and Lord Jauncey of Tullichettle, at E    p. 281. Nor is the obligation of good faith limited to one of disclosure. As Lord Mansfield warned in *Carter v. Boehm*, at p. 1918, there may be circumstances in which an insurer, by asserting a right to avoid for non-disclosure, would himself be guilty of want of utmost good faith.

*The prudent insurer*

F    I have already mentioned the three possible tests which were canvassed in argument before your Lordships. Before discussing them, it is appropriate to quote certain passages from the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 on which Mr. Hamilton strongly relied.

The leading judgment was given by Kerr L.J. After referring to section 18(1) and (2), Kerr L.J. said, at p. 492:

G        "The word 'judgment'—to quote the *Oxford English Dictionary* to which we were referred—is used in the sense of 'the formation of an opinion.' To prove the materiality of an undisclosed circumstance, the insurer must satisfy the court on a balance of probability—by evidence or from the nature of the undisclosed circumstance itself— that the judgment, in this sense, of a prudent insurer would have been H        influenced if the circumstance in question had been disclosed. The word 'influenced' means that the disclosure is one which would have had an impact on the formation of his opinion and on his decision-making process in relation to the matters covered by section 18(2)."

A little later he said:

> "[The prudent insurer] is in a hypothetical position, and evidence to
> support the materiality of the undisclosed circumstance, from this
> point of view, is therefore often given by an independent expert
> witness whose evidence has to be assessed by the court long after the
> event. He, or the actual insurer, or both, may then be asked: 'What
> would have been your reaction if you had known of this undisclosed
> fact?' Both would in my view give relevant evidence on materiality if
> they replied: 'I would then have regarded the risk in a different light.
> I would have taken this circumstance into account. As a first step I
> might have asked some questions before making up my mind about
> the risk. What my final decision would have been, I cannot now say
> for certain. I might have declined the risk altogether, or increased
> the premium, or altered the terms in some other way.' And it would
> make no difference if the witness went on: 'I might even have taken a
> chance, or given credit for the frankness of the disclosure, by writing
> the risk as I did. But I should obviously have been told about this
> fact before being asked to make up my mind.'"

Parker L.J., at p. 507, accepted the proposition advanced by
Mr. Waller that an insurer is entitled to avoid a contract under
section 18(1) if there was undisclosed before the conclusion of the contract
any circumstance which a prudent insurer would take into account when
reaching his decision whether to take the risk or what premium to charge
and that the position of the particular insurer is irrelevant.

Stephenson L.J. said, at p. 527:

> "Provided that there is some information which a prudent insurer
> would obviously want to know, or which a credible expert swears he
> would want to know, in considering an offer of a risk, that is a
> material circumstance which the greatest good faith and the rule
> against concealment require the assured or his agent to disclose . . ."

Later, he said, at p. 529:

> "I conclude from the language of the subsections [sections 18(2)
> and 20(2) of the Act of 1906] in their context and from the authorities
> that everything is material to which a prudent insurer, if he were in
> the proposed insurer's place, would wish to direct his mind in the
> course of considering the proposed insurance with a view to deciding
> whether to take it up and on what terms, including premium. His
> mind would, I think, be influenced in the process of judging whether
> to do so, either temporarily where he can say that he would ultimately
> have reached the same decision without it, or permanently where it
> would have led him to reach a different decision."

Mr. Beloff's criticism of the *C.T.I.* test can be encapsulated in a series
of rhetorical questions. If the prudent insurer, knowing of the undisclosed
fact, would have accepted the risk at the same premium and on the same
terms, what right has the actual insurer to complain? What injustice has
he suffered? If the risk run is different from the risk understood or
intended to be run, then, as Lord Mansfield made plain in *Carter v.*

557

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Lloyd
of Berwick

A    *Boehm*, 3 Burr. 1905, the insurer can avoid; and rightly so. But if the prudent insurer would have accepted the risk at the same premium and on the same terms, it must be because, so far as he is concerned, the risk is the same risk. How, as a matter of ordinary language, can a circumstance be described as material when it would not have mattered to the prudent insurer whether the circumstance was disclosed or not? It is obvious that the insurer cannot be required to disclose every circumstance,

B    however remotely related to the assessment of the risk. Why then should he be required to disclose a circumstance which would not in fact have made any difference? How in those circumstances could it be said that the actual insurer's consent had been vitiated? And if not, on what other juristic basis could he claim the right to avoid the contract?

    Mr. Hamilton's answer to this line of criticism was that it is the insurer

C    who is entitled to decide whether to accept the risk or not, and if so at what premium. So it is for the assured to disclose *everything* which the insurer would want to know, or would take into account, in reaching that decision.

    I do not find this answer satisfactory, not because, as is sometimes said, it makes the insurer judge in his own cause, but rather because it

D    blurs the edges of the prudent insurer test. The purpose of the test, as will be seen when I come to the authorities, and in particular *Ionides v. Pender*, L.R. 9 Q.B. 531, was to establish an objective test of materiality, not dependent on the actual insurer's own subjective views. The test should therefore be clear and simple. A test which depends on what a prudent insurer would have done satisfies this requirement. But a test

E    which depends, not on what a prudent insurer would have done, but on what he would have wanted to know, or taken into account, in deciding what to do, involves an unnecessary step. It introduces a complication which is not only undesirable in itself but is also, in the case of inadvertent non-disclosure, capable of producing great injustice.

    In the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 Stephenson and Parker L.JJ.

F    attached great importance to the difficulty, as they saw it, of applying the test proposed by Mr. Beloff. Indeed it was one of the two factors which Stephenson L.J. regarded as decisive. He said, at pp. 526–527:

    "two considerations prevent me from adopting [the judge's] construction of the words. The first, stressed by my brethren, is the practical difficulty, if not impossibility, of deciding what factors

G    would affect the result of a hypothetical prudent insurer's consideration of a risk, whether to accept it and on what terms; whereas there is no great difficulty in answering the question whether any particular factor would be one which he would want to know and take into consideration in determining whether to accept a risk and on what terms, without having to decide whether he would

H    ultimately disregard it altogether or give it much or little weight."

With great respect, I take exactly the opposite view. What the prudent insurer would have wanted to know is as nebulous and ill-defined as the

558

alternative is precise and clear-cut. Parker L.J. made the same point at      A
greater length, at pp. 510–511:

> "The test submitted on behalf of the respondents [plaintiffs] would
> involve the court in the task, perhaps years after the event, of
> endeavouring to ascertain what a prudent underwriter would have
> done, first in the light of the circumstances actually disclosed by the
> assured, and secondly, on the hypothesis that, in addition to those      B
> circumstances, the undisclosed circumstance had been disclosed. Such
> a task is on its face impractical. Five experienced and prudent
> underwriters might be called. At stage 1, one might say he would not
> have taken the risk even on the facts disclosed; the other four might
> all have taken the risk but at different premiums. At stage 2 the four
> remaining might all say 'we regard the fact as significantly increasing
> the risk' but one might say 'not, but by the narrowest margin,      C
> sufficiently to demand a change in premium, but it would call for a
> change in the policy wording,' one 'sufficiently to put up the
> premium,' and the last, 'sufficiently to decline the risk.' Furthermore,
> the one who would not have taken the risk in the first place might
> say that he would, had the additional fact been disclosed, have
> regarded it as an additional reason for declining the risk. In such      D
> circumstances what is the court to do? It cannot, as it seems to me,
> choose one prudent underwriter rather than another. The very choice
> of a prudent underwriter as the yardstick in my view indicates that
> the test intended was one which could sensibly be answered in relation
> to prudent underwriters in general. It is possible to say that prudent
> underwriters in general would consider a particular circumstance as
> bearing on the risk and exercising an influence on their judgment      E
> towards declining the risk or loading the premium. It is not possible
> to say, save in extreme cases, that prudent underwriters in general
> would have *acted* differently, because there is no absolute standard
> by which they would have acted in the first place or as to the precise
> weight they would give to the undisclosed circumstance."

I am unable to accept the reasoning in this paragraph. Five experienced      F
and prudent underwriters are just as likely—in my view more likely—to
disagree about what they would want to know as about what they would
have done. If it were always possible to say what a prudent underwriter
would or would not want to know, as Parker L.J. seems to have thought,
it is surprising that so many contested cases of non-disclosure have come
before the courts since the *C.T.I.* case was decided.      G
     In truth, wherever the line is drawn, there will always be expert
witnesses prepared to give evidence on either side; it is then always for the
court to decide what evidence to accept, as in every other case of
conflicting expert testimony. I see no great practical difficulty on that
score. On the contrary, the certainty and practicality of Mr. Beloff's test
are among its strengths.
     That brings me to the central question. What does section 18(2) of      H
the Act of 1906 mean? In particular, what is meant by the words "would
influence the judgment of a prudent insurer?" If I ask myself what the
phrase as a whole means, I would answer that it points to something more

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Lloyd
of Berwick

A  than what the prudent insurer would want to know, or take into account. At the very least it points to what the prudent insurer would perceive as increasing, or tending to increase, the risk. On this aspect of the case I agree entirely with the powerful analysis of Steyn L.J. in the Court of Appeal [1993] 1 Lloyd's Rep. 496. He said of the *C.T.I.* case, at p. 505:

B      "Having rejected the 'decisive influence' construction, it seems to me there were at least two feasible alternative solutions to be considered in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476. The first solution was that a fact is material if a prudent insurer would have wished to be aware of it in reaching his decision. The second solution involves taking account of the fact that avoidance for non-disclosure is the remedy provided by law because the risk presented is different from the true risk. But for the non-disclosure the prudent insurer

C      would have appreciated that it was a different and increased risk."

Having set the scene in that way, Steyn L.J. unhesitatingly rejected the first solution and chose the second. In other words he rejected the test proposed by Mr. Hamilton. Whether, if he had been free to do so, he would have chosen the test proposed by Mr. Beloff we shall never know. But it matters not. The reasons given by Steyn L.J. for rejecting the first

D  solution and preferring the second are based largely on the judgment of Lord Mansfield in *Carter v. Boehm*, 3 Burr. 1905. I would adopt those reasons, and will not repeat them. I would only add that the increased risk theory of materiality fits in neatly with the specific provision of section 18(3)(*a*) that the assured need *not* disclose a circumstance by which the risk is diminished.

E      If I analyse the phrase word by word, I reach the same conclusion, but I am carried one stage further. The ordinary meaning of "influence" is to affect or alter. "Judgment" is a word with a number of different meanings, so it is not possible to identify *the* ordinary meaning in the abstract. In a legal or quasi-legal context it is often used in the sense of a decision or determination, as in "the judgment of Solomon" or "the judgment of Paris," or the formal judgment of a court of law. Kerr L.J. in the *C.T.I.*

F  case [1984] 1 Lloyd's Rep. 476, 492 considered that it meant not the decision itself, but what he called the decision-making process. I accept that the word may bear that meaning. But it is not the primary meaning given in the *Oxford English Dictionary*, as Kerr L.J.'s judgment may suggest, and I see no reason to give it that meaning in the present context.

      In a commercial context "judgment" is often used in the sense of

G  "assessment." A market assessment means a judgment as to what the market is going to do, not the process by which a stockbroker arrives at that judgment. That is, in my opinion, the sense in which the word is used in section 18(2) of the Act of 1906. Parker L.J. in the *C.T.I.* case, at p. 510, attached importance to the words *"in fixing"* the premium and "*in . . . determining*" whether to take the risk. But I do not regard these words as pointing to a decision-making process, rather than the decision

H  itself.

      Finally, there is the word "would." Kerr L.J. in the *C.T.I.* case, at p. 492, in a passage already quoted refers to things which the insurer *might* have done if he had been told of the undisclosed fact. In my