560

A

judgment it is never enough to show that a prudent insurer might have declined the risk or charged an increased premium. It is necessary to show that he would have done.

My provisional conclusion, before coming to the authorities, is that Mr. Beloff succeeds on the first half of his argument, and that in order to avoid a contract for non-disclosure it must be shown that a prudent insurer, if he had known of the undisclosed fact, would either have declined the risk altogether, or charged an increased premium. This goes further than Steyn L.J. in the Court of Appeal, but not by much. For in all ordinary cases where the prudent insurer would have perceived an increase in the risk, he would presumably charge an increased premium. There might be special circumstances in which the *actual* insurer would decide, for his own reasons, to incur an increased risk at the same premium. But this consideration should not affect the objective application of the prudent insurer test. My reasons for preferring Mr. Beloff's test are that it does full justice to the language of section 18 of the Act of 1906. It is well-defined, and easily applied. It does something to mitigate the harshness of the all-or-nothing approach which disfigures this branch of the law, and it is consistent with the reasons given by the Court of Appeal for rejecting the test proposed by Mr. Hamilton.

B

C

In the course of his judgment [1993] 1 Lloyd's Rep. 496, 504, Steyn L.J. said that the *C.T.I.* case had proved to be a remarkably unpopular decision not only in the legal profession but also in the insurance markets. I have no reason to doubt that view. It certainly seems to accord with the many articles and publications to which we were referred, some of which are mentioned by Steyn L.J. in his judgment, and all of which, without exception, are critical of the *C.T.I.* decision. Steyn L.J.'s judgment in this case, with its decisive rejection of the "want to know" or "take into account" approach, has come far to meet these criticisms. Your Lordships are free to go a little further. If, instead, we were to accept Mr. Hamilton's argument, we would be reverting to the position as it was before the decision in the court below. I suspect that this would cause widespread regret.

D

E

F

*The authorities prior to 1906*

A very large number of cases were cited on both sides. Mr. Beloff submitted that they did not help greatly one way or the other, since the precise point seems never to have arisen and the result would in each case have been the same whichever test had been applied. In these circumstances the language cited by judges, however eminent, is of little assistance. I agree with this submission. I only mention the cases at all because they were regarded as helpful by the Court of Appeal in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476.

G

The first case cited by Kerr L.J. was *Carter v. Boehm*, 3 Burr. 1905. In my opinion, that case provides strong support for the increased risk test favoured by the court below, and indirectly for the test proposed by Mr. Beloff. It provides no support at all for the "take into account" or "want to know" approach.

H

Next I mention *Ionides v. Pender*, L.R. 9 Q.B. 531. This case is important because, as appears from Sir Mackenzie Chalmers's *A Digest of*

A    *the Law relating to Marine Insurance*, 1st ed., p. 22; 2nd ed. (1903), p. 25, it was the foundation of section 18 of the Act of 1906.

The case concerned a policy on goods, which were grossly overvalued. The vessel was lost in circumstances which suggested that she might have been scuttled. To a claim on the policy, the defence was non-disclosure of the excessive valuation. It was argued for the plaintiffs (see at p. 538) that the excessive valuation was extraneous. It had no direct bearing on

B    the risks insured, such as perils of the sea. They cited *Duer, The Law and Practice of Marine Insurance*, vol. II, p. 388 (see at pp. 537–538). But Blackburn J., giving the judgment of the court, at p. 539, preferred the rule laid down in *Parsons, A Treatise on the Law of Marine Insurance*, vol. I, p. 495, that all should be disclosed which would affect the judgment of a rational underwriter. In other words, materiality is not limited, as

C    *Duer* thought, to the risks "considered in their own nature." It covers also what we would now call the moral hazard. The defendants called underwriters in support of their case. They said that the overvaluation was a material fact. One class of underwriters regarded the risk as "speculative," and would have declined it altogether. Another class would have added 25 to 30 per cent. to the usual premium. It will be noted that the evidence related to what the underwriters would have done, not what

D    they would have wanted to know, in order to arrive at a decision. So the facts of the case reinforce Mr. Beloff's argument. So does the judgment. Blackburn J. said, at p. 539:

> "We agree that it would be too much to put on the assured the duty of disclosing everything which might influence the mind of an underwriter. Business could hardly be carried on if this was required."

E
Two years later, Blackburn J. had to consider a similar point in *Stribley v. Imperial Marine Insurance Co.* (1876) 1 Q.B.D. 507. The action was on a policy taken out on 27 February 1874. On 21 January the owner had received a letter from the master, dated 9 January, that the vessel had been delayed by bad weather, and that he would write again before sailing. That was the last which the owners heard. The defence was that the letter

F    ought to have been disclosed. The jury found in favour of the plaintiffs, but the court ordered a new trial. There are observations in the judgments of Lush J. and Quain J. which are helpful to Mr. Hamilton. But Blackburn J. said, at p. 512:

> "The question was, whether this letter, and the time which had elapsed since it was received, ought to have been communicated to
G    > the underwriter. I think the test is, whether a fair and reasonable underwriter, looking at this letter and the circumstances under which it was received, would say, 'I think this is a speculative risk, which I will either decline to take, or, if I do take, it shall be at a greater premium than is usual.'"

H    Once again, there is no hint in Blackburn J.'s judgment that the test depends on what the fair and reasonable underwriter would want to know. It depends on what he would have done.

The next case was *Rivaz v. Gerussi Brothers & Co.* (1880) 6 Q.B.D. 222. There is a lengthy citation from the decision in the judgment of

562

A

Parker L.J. in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476, 507. The facts were that the defendants, who were merchants, had systematically and fraudulently undervalued shipments of fruit from Greece on certain open policies, with the result that those policies were in truth all but exhausted. It was held that the plaintiff, who underwrote two later policies to follow the earlier policies, was entitled to avoid for non-disclosure.

B

The point in the case was exactly the same as the point in *Ionides v. Pender*, L.R. 9 Q.B. 531. It was argued that the non-disclosure did not affect the insured risks in the narrow sense. Once again the defendants relied on *Duer, The Law and Practice of Marine Insurance*, vol. II, p. 390. But Brett L.J. pointed out in the course of argument, at p. 226, that the rule laid down by *Duer* had not been accepted by Lord Blackburn. On the facts, the non-disclosure was obviously material, first, because the later policies would be called on sooner than the plaintiff had been led to expect, and, secondly, because the undervaluation of the earlier policies was fraudulent. In the latter respect, it is another example of what we would now call "the moral hazard."

C

*Tate & Sons v. Hyslop* (1885) 15 Q.B.D. 368 illustrates better than any other case to which we were referred the dangers of taking general statements out of context. The plaintiffs insured a consignment of sugar in course of carriage to their refinery at Silvertown, including all risks of transshipment into lighters. The sugar was damaged while lying in lighters on the Thames. It was the practice of underwriters in such cases to exercise their right of subrogation against the lightermen. The lightermen found that the liabilities so imposed on them were onerous. So in April 1882 an association of Thames lightermen published a notice that they would no longer accept liability as common carriers, but only for the negligence or wilful acts of their servants. The underwriters at Lloyd's responded at once. They passed a resolution by which, if the lighterage was to be subject to the new terms, the premium would be increased by up to 2s. 6d. per cent. The plaintiffs had an arrangement with one of the lightermen whereby his liability as common carrier was excluded. They failed to disclose this arrangement when placing the insurance. The jury found that the non-disclosure was material. The Court of Appeal refused to disturb the verdict.

D

E

F

The judgment of Brett M.R. is of particular interest. He held that if the only effect of the arrangement was to minimise the underwriters' right of salvage, that is to say, the right of recourse against the lighterman, that would *not* be a material fact. But here the non-disclosure was material because the underwriters had made known to the market that they would charge an increased premium if the liability of the lighterman was limited.

G

> "The authorities show that the materiality is not as to the risk, but as to whether it would influence the underwriters in entering upon the insurance or the terms on which they would insure." (p. 376.)

So far from supporting the views expressed by the Court of Appeal in the *C.T.I.* case, *Tate & Sons v. Hyslop* is, if anything, a case the other way. The verdict of the jury was upheld because there was evidence that underwriters would in fact have charged an increased premium if the arrangement had been disclosed. The case is thus in direct line with

H

563

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Lloyd
of Berwick

A   *Ionides v. Pender* and *Rivaz v. Gerussi Brothers & Co.* All three cases establish that materiality is not limited to the insured risks, in the narrow sense, as *Duer* thought; but covers everything which would influence or affect the mind of underwriters, so as to decline the business, or increase the premium.

Finally, the Court of Appeal in the *C.T.I.* case [1984] 1 Lloyd's Rep. 476 attached importance to *Traill v. Baring*, 4 De G.J. & S. 318.
B   The case is a well known authority for the proposition that a representation which is true when made must be corrected if, before the contract is concluded, it becomes untrue to the knowledge of the representor. So far as I know, it has never been mentioned in connection with non-disclosure until it was relied on by Samuels J. in *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228, 239 and cited by Mr. Hutchinson in his
C   argument in *Commonwealth Insurance Co. of Vancouver v. Groupe Sprinks S.A.* [1983] 1 Lloyd's Rep. 67 (see at p. 78). It is true that there is a passage in Turner L.J.'s judgment which supports Mr. Hamilton's argument. But the passage in question is at odds with the judgment of Knight Bruce L.J. who said, at p. 326:

> "It appears to me, I repeat, that the plaintiffs are entitled to assert, and to be believed in asserting, that they would not have acted as
D   > they have done if they had known, as they ought to have been informed by the society represented by the defendants of, the real facts."

In these circumstances I attach little weight to the isolated observation of Turner L.J.

Returning now to the mainstream of authority leading up to the
E   passage of the Act of 1906, I can find little if anything to support Mr. Hamilton's construction of section 18(1) and (2). On the contrary, the evidence in two of the cases, *Ionides v. Pender*, L.R. 9 Q.B. 531 and *Tate & Sons v. Hyslop*, 15 Q.B.D. 368, was plainly directed to what underwriters would have done, rather than to what they would have wanted to know; and the emphasis in these cases, as well as *Rivaz v.*
F   *Gerussi Brothers & Co.*, was on repudiating the restricted view expressed by *Duer, The Law and Practice of Marine Insurance*, vol. II, pp. 388–390, in preference to the wider view expressed by *Parsons, A Treatise on the Law of Marine Insurance*, vol. I, p. 495 and *Phillips, A Treatise on the Law of Insurance*, 5th ed., vol. I, s. 531, p. 277. It is this wider view which is reproduced in the Act of 1906. There is nothing in *Parsons* or *Phillips* which suggests that materiality extends to what insurers would have
G   "taken into account" or "wanted to know," even though it would have made no difference to the result.

*The authorities since 1906*

The leading authority on the meaning of "material" since the passing of the Act of 1906 is *Mutual Life Insurance Co. of New York v. Ontario*
H   *Metal Products Co. Ltd.* [1925] A.C. 344. The case was one of life insurance. The headnote reads:

> "When statements made by an insured person upon his application
> for a policy of life insurance are not made the basis of the contract

Lord Lloyd
of Berwick          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          [1995]

but are to be treated merely as representations, an inaccurate
statement is material so as to vitiate the policy if the matters
concealed or misrepresented, had they been truly disclosed, would
have influenced a reasonable insurer to decline the risk, or to have
stipulated for a higher premium; it is not sufficient that they would
merely have caused delay in issuing the policy while further inquiries
were being made."

Kerr L.J. in the C.T.I. case, at p. 495, regarded the decision as being
"no authority for present purposes" because it depended on the
particular provisions of the Ontario Insurance Act 1914. Parker L.J. and
Stephenson L.J. took the same view. I am unable to agree.

Section 156 of the Act of 1914 provided:

"(3) The proposals or application of the assured shall not as
against him be deemed a part of or considered with the contract of
insurance except in so far as the court may determine that it contains
a material misrepresentation by which the insurer was induced to
enter into the contract. (4) No contract shall be avoided by reason
of the inaccuracy of any such statement unless it is material to the
contract. . . . (6) The question of materiality in any contract of
insurance shall be a question of fact for the jury or for the court if
there is no jury."

Kerr L.J. seems to have thought that, because the Ontario statute required
proof of inducement, the case did not help on materiality. But the
reasoning of Lord Salvesen, tendering the advice of a strong Board, shows
that this is not so. Materiality, as a separate consideration, lies at the
heart of the case.

A policy was taken out on the life of the deceased. One of the
questions in the proposal form was whether he had seen a doctor within
the last five years. It was found that the answer to this question was
inaccurate. The deceased had been seen by a Dr. Fierheller. The question
then arose whether this non-disclosure was material. The test of
materiality suggested by the insurers, at p. 351, was

"whether, if the fact concealed had been disclosed, the insurers would
have acted differently, either by declining the risk at the proposed
premium or at least by delaying consideration of its acceptance until
they had consulted Dr. Fierheller."

The Board accepted the first half of this proposition, but rejected the
second, at pp. 351–352:

"If the former proposition were established in the sense that a
reasonable insurer would have so acted, materiality would, their
Lordships think, be established, but not in the latter if the difference
of action would have been delay and delay alone. In their view, it is
a question of fact in each case whether, if the matters concealed or
misrepresented had been truly disclosed, they would, on a fair
consideration of the evidence, have influenced a reasonable insurer to
decline the risk or to have stipulated for a higher premium."

The Board was thus deciding that something which the insurers would
have wanted to know, or taken into account, and which might have led

1 A.C.          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          Lord Lloyd
                                                                                   of Berwick

A    on to further inquiries, with consequential delay, is not by itself material, unless it would have led to a different result.

The Board then went on to apply the test which they had just laid down, at p. 352:

B    "Dealing with the evidence as a whole the learned trial judge came to the conclusion that 'if the facts as stated in the evidence of Dr. Fierheller with relation to the condition of [the deceased] and his treatment had been known to the defendant company, it was not at all probable that they would have refused the premium and the issue of the policy, nor do I think they would even have required the examination which the officials now think they would have required.' In this finding their Lordships substantially concur, although they would have expressed the finding somewhat differently and would

C    have preferred to say that had the facts concealed being disclosed, they would not have influenced a reasonable insurer so as to induce him to refuse the risk or alter the premium. Their Lordships, therefore, concur in the conclusion of the trial judge that the non-disclosure or misstatement was not material to the contract and therefore, under the law of Ontario, is not a ground for avoiding it."

D    In my opinion, the *Mutual Life Insurance Co.* case remains the leading authority on the application of the prudent insurer test, and the meaning of materiality in English law. It was so treated by Lord Greene M.R. in *Zurich General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53, 58, by Jordan C.J. in *Southern Cross Assurance Co. Ltd. v. Australian Provincial Assurance Association Ltd.* (1939) 39 S.R. (N.S.W.)

E    174, 187–188 and in the current edition of *Spencer Bower, Turner & Sutton, The Law relating to Actionable Non-Disclosure,* 2nd ed., p. 32. It cannot be relegated into the background or treated as turning solely on the provisions of the Ontario statute. If that be right, then it provides strong support for Mr. Beloff's argument.

Only three other cases need be mentioned. The first is *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228. I find the case confusing, since

F    Samuels J. does not always distinguish clearly between the proper application of the prudent insurer test, and the separate question whether the insurer must prove actual inducement. The test of materiality which he proposes, at p. 239, is:

"It seems to me that the test of materiality is this: a fact is material if it would have reasonably affected the mind of a prudent

G    insurer in determining whether he will accept the insurance, and if so, at what premium and on what conditions."

To this test, there could be no possible objection, except that it is hardly very helpful since it merely restates section 18 of the Act of 1906 in almost identical language. But in so far as Samuels J. treated the *Mutual Life Insurance Co.* case as depending on the Ontario statute, I would

H    respectfully disagree.

In *Marene Knitting Mills Pty. Ltd. v. Greater Pacific General Insurance Ltd.* [1976] 2 Lloyd's Rep. 631, Yeldham J. applied the test stated by Samuels J. When the case reached the Privy Council, it was argued that

566

the test was inconsistent with the *Mutual Life Insurance Co.* case. Lord    A
Fraser of Tullybelton did not find it necessary to deal with the point, since
the undisclosed facts were obviously material, "whatever may be the
precise words in which the test of materiality is formulated" (p. 642).
Indeed the facts of the case—a policy of fire insurance in which the
plaintiffs had failed to disclose two previous fires at different premises—
afford a good example of the need for, and application of, the prudent
insurer test. As already mentioned, Samuels J.'s formulation of the    B
prudent insurer test is unexceptionable. The only problem in the case is
that in the previous paragraph Samuels J. had rejected any need for the
insurer to show actual inducement. It is in that respect, and in that
respect alone, that there is any conflict with the *Mutual Life Insurance*
case. I return to that aspect of the case when I deal with the second half
of Mr. Beloff's argument.    C

Finally, I should mention *Barclay Holdings (Australia) Pty. Ltd. v.
British National Insurance Co. Ltd.*, 8 N.S.W.L.R. 514, in which the Court
of Appeal of New South Wales declined to follow the *C.T.I.* case [1984]
1 Lloyd's Rep. 476. Glass J.A. described it, at p. 523, as sounding "a
discordant note." Kirby P. said, at p. 519:

> "As expressed by Samuels J. in *Mayne Nickless Ltd. v. Pegler* the    D
> issue is not whether the insurer would have been interested in the
> information or would have liked to have had it in order to consider
> it. It is whether the insurer, acting reasonably, would have been
> affected in deciding the critical questions mentioned. Such a test is
> to be preferred to one which affords the insurer the privilege of
> insisting upon the disclosure of any material whatsoever that could
> have had an impact on the formation of the insurer's opinion and on    E
> its decision making process, even though, in the end, such information
> was not critical to or determinative of the conclusions finally
> reached: . . . ."

I have not attempted to deal with more than a few of the many cases
cited. I mention them only because the Court of Appeal in the *C.T.I.*
case regarded them as important in establishing what Kerr L.J., at p. 492,    F
had "always understood to be the law." My own view is that they do not
help greatly one way or the other; but on balance are in favour of
Mr. Beloff's argument. For reasons mentioned earlier, I regard that
argument as compelling.

Since writing the above, I have had the opportunity of reading in draft
the speech of my noble and learned friend, Lord Mustill. He attaches
great weight to the view of the 19th century textbook writers, as does my    G
noble and learned friend, Lord Goff. I have not examined these writings
myself, since they were not mentioned in argument, save in passing, by
Mr. Hamilton or Mr. Beloff.

*The actual insurer*
                                                                            H
I now turn to the second half of Mr. Beloff's argument, which I can
deal with more shortly.

In *Berger v. Pollock* [1973] 2 Lloyd's Rep. 442, Kerr J. con-
sidered at length the question whether an insurer can avoid a

1 A.C.        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))        Lord Lloyd
of Berwick

A   policy for misrepresentation or non-disclosure without his going into the witness box to say how he would himself have been affected. Relying especially on the judgment of Scrutton L.J. in *Visscherij Maatschappij Nieuw Onderneming v. Scottish Metropolitan Assurance Co. Ltd.*, 27 Com.Cas. 198, he answered that question in the negative. It should be the practice, he said, at p. 463, to call the underwriter concerned "in all doubtful cases even if an independent underwriter or broker is

B   called as well."

> "Otherwise one could in theory reach the absurd position where the court might be satisfied that the insurer in question would in fact not have been so influenced but that other prudent insurers would have been. It would then be a very odd result if the defendant insurer could nevertheless avoid the policy. I do not think that this is the
> C   correct interpretation of section 18 despite the generality of the language used in subsection (2)."

Twelve years later in the *C.T.I.* case, Kerr L.J. was persuaded to change his mind. He said, at p. 495, that he had been wrong in his reasoning in *Berger v. Pollock*, perhaps because he had not been referred to the judgment of MacKinnon L.J. in *Zurich General Accident and Liability
D   Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53. Kerr L.J. held that any effect on the mind of the actual insurer was irrelevant, and the other members of the court agreed.

Mr. Beloff submits that Kerr L.J. was right the first time, and that it would indeed be absurd, as Kerr L.J. then thought, to allow an insurer to avoid for non-disclosure when the undisclosed fact would, ex hypothesi, have made no difference to him. It was common ground that in the
E   ordinary law of contract a party seeking to avoid for misrepresentation must show that he was induced to enter into the contract by the misrepresentation. Why then, asks Mr. Beloff, should the law be more favourable to an insurer seeking to avoid a contract of insurance? Why should utmost good faith require the assured to disclose a fact which the actual insurer would not recognise as material?
F   Mr. Hamilton conceded that until the middle of the 19th century the test, whatever it may have been, required an impact on the mind of the actual insurer. The prudent insurer did not emerge until *Ionides v. Pender*, L.R. 9 Q.B. 531. Mr. Hamilton argued that the effect of *Ionides v. Pender* was to substitute the prudent insurer for the actual insurer, and that the actual insurer thereafter disappeared from the scene. I can find no support
G   for this theory in Blackburn J.'s language. It is true that Blackburn J. refers, at p. 539, to "a rational underwriter." But this was by way of addition, not substitution. It was because the issue was whether the evidence of the underwriters called by the defendants in that case was properly left to the jury, that is to say, evidence that underwriters do in practice charge an increased premium or decline altogether, if the overvaluation is so great as to make the risk speculative. It was held that
H   this was a rational practice and that the question was therefore properly left to the jury.

If proof of inducement were no longer required, following the decision in *Ionides v. Pender*, it would be impossible to explain Brett L.J.'s citation

568

Lord Lloyd
of Berwick          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          [1995]

six years later in *Rivaz v. Gerussi Brothers & Co.*, 6 Q.B.D. 222, 229 of    A
section 531 of *Phillips, A Treatise on the Law of Insurance*, 5th ed., p. 277,
where the author says:

> "Concealment in insurance is where, in reference to a negotiation
> therefor, one party suppresses, or neglects to communicate to the
> other, a material fact, which, if communicated, *would tend directly to
> prevent the other from entering into the contract, or to induce him to*    B
> *demand terms more favourable to himself;* . . ."

It is interesting to note that Parker L.J. emphasised the words in italics in
the above quotation from *Phillips* in his judgment in the *C.T.I.* case, at
p. 508, but did not draw what would seem to be the inevitable conclusion.

Successive editions of *Arnould, A Treatise on the Law of Marine
Insurance and Average* support Mr. Beloff's argument. Thus in the second    C
edition, dated 1857, vol. I, we find at p. 584:

> "208. Concealment, in the law of insurance, is the suppression of
> a material fact within the knowledge of the assured which the
> underwriter has not the means of knowing, or is not presumed to
> know; by a *material fact* is meant, one which, if communicated to the
> underwriter, would induce him either to refuse the insurance
> altogether, or not to effect it except at a higher premium."    D

This was, of course, before *Ionides v. Pender*. But there is a similar
passage in the 6th edition, dated 1887, vol. I, p. 548:

> "A material fact in this connection is one which, if communicated
> to the other of the parties, would induce him either to refrain
> altogether from the contract, or not to enter into it on the same    E
> terms."

The editor of the 6th edition was Mr. David Maclachlan. He has always
been regarded as a writer of great authority. Clearly it did not occur to
Mr. Maclachlan that *Ionides v. Pender* had made any great change in the
law, with the result that inducement was no longer necessary.

In the current edition (16th ed. (1981), vol. 2, p. 475, para. 627) we    F
find:

> "A material fact is one which is likely, if communicated to the other
> of the parties, to induce him either to refrain altogether from the
> contract or not to enter into it except on more favourable terms.
> Defined in these terms, the principle is equally applicable to the
> assured and the underwriter. The contract is one uberrimae fidei,
> and on the plainest principles of equity such a contract which one    G
> party has thus been induced to enter upon from his ignorance of the
> thing not disclosed may not be enforced against him by the other
> who has failed to disclose it."

The editors return to the same point at p. 489, para. 641:

> "Even though a circumstance may be material, in the sense that it
> would influence a prudent insurer, if the underwriter concerned would    H
> not have been influenced by that circumstance if disclosed, he cannot
> rely on the non-disclosure to avoid the policy" (citing *Berger v.
> Pollock* [1973] 2 Lloyd's Rep. 442).

1 A.C.        Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))        Lord Lloyd
of Berwick

A        Turning to misrepresentation, the distinction between materiality and inducement, and the need to prove both, is even more clearly stated. Thus in the 8th edition, dated 1909, we find, at p. 694:

"555. Even where the representation is of material facts, yet, if it satisfactorily appears that it did not influence the judgment of the underwriter, its falsity will be held not to avoid the policy."

B        In footnote (z), at pp. 694–695, the editors draw attention to the then recently enacted section 20 of the Act of 1906. It is pointed out that on a literal construction of section 20 inducement is not required. But such a construction would involve

C        "an anomalous state of the law. For it is clear that, apart from marine insurance, even a fraudulent misrepresentation gives no right to rescind a contract, when it has not influenced the party to whom it ' was made."

This footnote is reproduced in substantially the same terms in the current (16th) edition of *Arnould*, at p. 463.

        Arnould's view of the law was expressly approved and adopted by Mr. Arthur Cohen K.C., another eminent authority in this branch of the law, in *Halsbury's Laws of England*, 1st ed., vol. 17, para. 809, p. 414. Furthermore, Sir Mackenzie Chalmers in his *Digest (Chalmers and Owen, A Digest of the Law relating to Marine Insurance*, 1st ed., p. 22, s. 18(1), n. 3; 2nd ed., p. 25, s. 18(1), n. 1) refers to the passage which I have already quoted from the 6th edition of *Arnould*, at p. 548, as the foundation for clause 18(1) of the Marine Insurance Bill

E        (H.L., 1894–99).

        I turn now to the main authorities in favour of Mr. Hamilton's contention that any impact on the mind of the actual insurer is irrelevant. The first is *Cantiere Meccanico Brindisino v. Janson* [1912] 3 K.B. 452, where Vaughan Williams L.J., at p. 460, quoted Scrutton J. at first instance [1912] 2 K.B. 112 as having said that it was sufficient to avoid a contract of insurance that a material representation was untrue, and that

F        it was not necessary that the underwriter should have relied upon it. The second is *Zurich General Accident and Liability Insurance Co. Ltd. v. Morrison* [1942] 2 K.B. 53 where MacKinnon L.J. said, at p. 60:

"What is material is that which would influence the mind of a prudent insurer in deciding whether to accept the risk or fix the premium, and if this be proved it is not necessary further to prove that the mind of

G        the actual insurer was so affected. In other words, the assured could not rebut the claim to avoid the policy because of a material representation by a plea that the particular insurer concerned was so stupid, ignorant, or reckless, that he could not exercise the judgment of a prudent insurer and was in fact unaffected by anything the assured had represented or concealed."

H        The latter observation is cited as authority for a statement to the same effect in the current edition of *Spencer Bower, Turner & Sutton, The Law relating to Actionable Non-Disclosure*, 2nd ed., p. 37. In the first edition (1915), para. 32, p. 17 Mr. Spencer Bower cited the judgment of

Lord Lloyd
of Berwick          Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))          [1995]

Turner L.J. in *Traill v. Baring*, 4 De G.J. & S. 318, 330 for the proposition that it is enough to show that disclosure would have given the insurer pause. I have already expressed my reservations about *Traill v. Baring* in this connection. But in any event, it was decided 10 years before *Ionides v. Pender*, L.R. 9 Q.B. 531, so it cannot provide support for the radical change said to have been brought about by the latter case.

In *Mayne Nickless Ltd. v. Pegler* [1974] 1 N.S.W.L.R. 228 Samuels J. said, at p. 239: "Accordingly, I do not think that it is generally open to examine what the insurer would in fact have done had he had the information not disclosed." But it is far from clear whether Samuels J. was here referring to the prudent insurer or the actual insurer; I suspect the former. If so, I have already given my reasons for disagreeing. Finally, Mr. Hamilton referred us to the passage in Sir George Jessel M.R.'s judgment in *Redgrave v. Hurd* (1881) 20 Ch.D. 1, 21, where it is said that inducement can be inferred from proven materiality, as a matter of law. Despite receiving the "embarrassing imprimatur" of so eminent a judge—I quote from *Spencer Bower and Turner, The Law of Actionable Misrepresentation*, 3rd ed. (1974), p. 154—this heresy has long since been exploded by, among others, Lord Blackburn in *Smith v. Chadwick* (1884) 9 App.Cas. 187, 196.

That brings me to the language of section 18 of the Act of 1906 itself. Mr. Hamilton relies strongly, as was to be expected, on the last sentence of section 18(1) which provides: "If the assured fails to make such disclosure, the insurer may avoid the contract." He points out that there is nothing in section 18 which requires the insurers to prove inducement. Nor, he says, can such a requirement be implied. According to the language of section 18(1) it is sufficient for the insurer to prove the materiality of the undisclosed fact. That was clearly the view of MacKinnon L.J. in the *Zurich General Accident* case and of Scrutton J. in *Cantiere Meccanico Brindisino v. Janson.*

This is a formidable argument. But there is a stronger argument the other way. It was common ground that section 18 was based on *Ionides v. Pender*. If *Ionides v. Pender* had brought about a substitution of the prudent insurer for the actual insurer, and if the actual insurer had thereafter "dropped out," as Mr. Hamilton argued, then it would be natural to read section 18 of the Act of 1906 in the manner for which Mr. Hamilton contended. But for reasons already mentioned *Ionides v. Pender* brought about no such change. This is one of those rare cases when it is permissible to look at the pre-existing law as an aid to the construction of a codifying statute. Of course it would have been open to Parliament to go beyond the common law. But this does not appear to have been the draftsman's intention, since the sentence on which Mr. Hamilton relies was omitted altogether from clause 16 of the Marine Insurance Bill as originally introduced in the House of Lords in 1894, a clause which in all other respects is identical to section 18.

Nor does the original Bill contain the second sentence in what was to become section 20. In the case of a misrepresentation in the ordinary law of contract it has always been necessary for the party seeking to avoid the contract to show that he relied on the misrepresentation. It seems most unlikely that Parliament, by enacting the second sentence of section 20,

A  intended to exclude this rule of common law for no apparent reason. It is much more likely that the intention was to codify the common law on materiality, without touching the common law on inducement. This is consistent with the comment on section 17 in *Chalmers and Owen, A Digest of the Law relating to Marine Insurance*, 1st ed., p. 22; 2nd ed., p. 24:

B        "The contract is often said to be rendered void by concealment or misrepresentation, but it is clear that it is only voidable at the option of the party prejudiced, and that the ordinary rules of law as to voidable contracts apply to insurance."

There is no presumption that a codifying Act covers the *whole* of the relevant common law: see *Shiloh Spinners Ltd. v. Harding* [1973] A.C. 691,
C  724–725, *per* Lord Wilberforce. In any event, section 91(2) of the Act preserves the common law save in so far as it is inconsistent with the express provisions of the Act. The short answer to Mr. Hamilton's argument is therefore that section 18 does not exclude inducement. It is dealing with a different subject matter altogether.

    As for what MacKinnon L.J. said in the *Zurich General Accident* case [1942] 2 K.B. 53, 60, it is reassuring to notice that his observations were
D  obiter, and not reflected in the judgments of Lord Greene M.R. and Goddard L.J. It is sometimes forgotten that Lord Goddard's knowledge of insurance law was almost as great as that of MacKinnon L.J.

    I conclude that what Kerr L.J. said in *Berger v. Pollock* [1973] 2 Lloyd's Rep. 442, 463 was a correct statement of the law, and that his second thoughts in the *C.T.I.* case [1984] Lloyd's Rep. 476, 495 were
E  erroneous. It follows that Mr. Beloff is entitled to succeed on the second half of his argument, as well as the first.

    If your Lordships accept this conclusion, the position will be as follows. Whenever an insurer seeks to avoid a contract of insurance or reinsurance on the ground of misrepresentation or non-disclosure, there will be two separate but closely related questions: (1) Did the misrepresentation or non-disclosure induce the actual insurer to enter into
F  the contract on those terms? (2) Would the prudent insurer have entered into the contract on the same terms if he had known of the misrepresentation or non-disclosure immediately before the contract was concluded? If both questions are answered in favour of the insurer, he will be entitled to avoid the contract, but not otherwise.

    The evidence of the insurer himself will normally be required to satisfy the court on the first question. The evidence of an independent broker or
G  underwriter will normally be required to satisfy the court on the second question. This produces a uniform and workable solution, which has the further advantage, as I see it, of according with good commercial common sense. It follows that the *C.T.I.* case was wrongly decided, and should be overruled.

H  *Facts*

    I come at long last to the facts. Mr. Hamilton argued that Waller J. [1992] 1 Lloyd's Rep. 101 should have found that Mr. Robinson failed to disclose the figures for 1977 to 1979. It was common ground that these

572

figures were material. Indeed, the experts were agreed that they gave a much better indication of the business than the figures for 1980 and 1981. Mr. Hamilton's difficulty is that the judge found as a fact, at p. 106, that the figures were available for Mr. O'Keefe to look at, and that they were "a perfectly fair presentation" of the years in question. It was no part of Mr. Robinson's duty to compel Mr. O'Keefe to look at the figures if he did not wish to do so. Mr. Hamilton relied on the comment that Mr. Robinson had broked the risk in a way which was designed to concentrate Mr. O'Keefe's mind on the later years, and that, in so doing, he had successfully taken Mr. O'Keefe's "eye ... off the ball" (*per* Waller J., at p. 114). But there was never any suggestion of bad faith on the part of Mr. Robinson; and the comments on which Mr. Hamilton relied cannot undermine the judge's finding that the presentation was perfectly fair. This was the view of the Court of Appeal. It is sufficient to say that I agree.

Turning to 1981, it was common ground that Pan Atlantic failed to disclose the two additional claims which had already been advised before Mr. O'Keefe signed the slip on 13 January 1982. The question is whether that non-disclosure was material. Mr. Beloff mounted an elaborate attack on the judge's finding in that respect. It occupies some 25 pages of the appellants' printed case. The attack had three prongs: (1) Since the judge applied the wrong test of materiality, his findings do not help one way or the other. (2) The losses disclosed for the years 1977 to 1979 were so bad that they eclipsed the two undisclosed 1981 claims. No prudent insurer would have accepted the risk on any terms, so the undisclosed claims would have made no difference. (3) The findings made by the judge, when applying the prudent insurer test which he favoured, were in any event vitiated by two errors of fact.

It is convenient to deal first with the factual errors. The judge assumed that the undisclosed claims fell in the fourth quarter of 1981, and that there had therefore been a very rapid acceleration of claims in that quarter from U.S.$235,768 at the end of the third quarter to U.S.$468,168 at the end of the fourth quarter. In truth, over three-quarters of the two undisclosed claims fell, not in the fourth quarter, but in the second and third quarters. So there was not the rapid acceleration in the fourth quarter which the judge assumed.

Secondly, both the judge and the Court of Appeal attached importance to tables which the judge himself prepared showing the development of loss ratios over the years 1980–82. In particular the 1980 year showed a loss ratio of 15 per cent. at 8 December 1980, whereas the 1981 year showed a loss ratio of 30 per cent. at 30 September 1981. The tables thus appeared to show a doubling of the loss ratio for the 1981 year at 12 months' maturity.

But, as Mr. Beloff pointed out, the tables are not comparing like with like. If one takes year-end figures, the loss ratio for the 1980 year at 31 December 1980 was not 15 per cent. but 48 per cent., and the loss ratio for the 1981 year at an equivalent maturity was 58·8 per cent. Moreover, the judge seems to have made certain assumptions as to the premium figures for the years in question, which may well not be accurate. If the premiums are corrected, then the ratio for the 1980 year becomes 59·8 per

A   cent. and the ratio for the 1981 year drops to 45 per cent. or perhaps 54·4 per cent., in which case the 1981 year was showing an *improvement* on the 1980 year. None of this was explored in evidence. Mr. Beloff's criticism is that in attempting to draw any conclusion from the tables of loss ratios the judge was engaged on a frolic of his own.

I agree with Mr. Beloff that the tables do not, on the face of them, compare like with like. But the judge was fully alive to this point. Indeed,
B   it reinforced his conclusion as to the materiality of the 1981 non-disclosure that the "dramatic rise" in the fourth quarter occurred not in one year only but in two years running.

As for the rise in the fourth quarter of 1981, I accept that it was not quite so "dramatic" as the judge thought. But I do not accept that this vitiates the judge's conclusion. The fact remains that the figure disclosed
C   by Mr. Robinson was U.S.\$235,768, whereas it should have been U.S.\$469,168. The judge was entitled to regard the difference as material, on the test which he applied, whether the undisclosed claims fell in the fourth quarter as he thought, or in earlier quarters. Indeed it might be thought that the earlier the claims were advised the more serious the outlook became. On any view, the judge was entitled to regard a loss ratio of 58·8 per cent. at the end of the first year of what was expected to
D   be long-tail business as very high indeed, and something which a prudent insurer would want to know about or take into account. It follows that it would not be right to disturb the judge's finding on the test which he applied, and the Court of Appeal were right to take that view.

The problem remains that the judge did not apply the right test. What follows? Mr. Beloff argues that it was for Pine Top to obtain the
E   necessary findings on the basis of whatever test should turn out to be right. Since they did not obtain such findings, their defence must fail.

Whether or not this argument is theoretically correct, I regard its application on the facts of the present case as artificial, impractical and unfair. I take that view for two reasons. The first is that the Court of Appeal, applying the increased risk test, found that the non-disclosure of the two additional 1981 claims was material. For reasons already
F   mentioned, there is little or no practical distinction between the increased risk test, advocated by the Court of Appeal, and the test which I believe to be correct. Secondly, Pan Atlantic made a specific written request for a finding that "an objective prudent reinsurer would not have come to any different final decision if the [additional] losses had been disclosed and included in the loss statistics." But the judge made no such finding,
G   presumably because, in his view, it was not justified on the evidence. In those circumstances I would be unwilling to decide the case against Pine Top on the ground that they have failed to discharge the burden of proof. Nor would I regard it as appropriate to remit the case to the judge for a further hearing, so long after the event.

So it comes to this: that although the judge applied the wrong test in law, as he was obliged to do in the light of the *C.T.I.* case [1984]
H   1 Lloyd's Rep. 476, his conclusion on the facts must be accepted.

The same applies to his finding [1992] 1 Lloyd's Rep. 101, 113 that the non-disclosure "might well have influenced" the actual insurer, Mr. O'Keefe. Mr. Beloff argued that this falls short of proof of

574

Lord Lloyd
of Berwick    Pan Atlantic Insurance Ltd. v. Pine Top Ltd. (H.L.(E.))    [1995]

inducement. He may be right. But once again Pan Atlantic had asked    A
for a finding that Mr. O'Keefe would not have taken the additional claims
into account "in his decision." Once again the judge declined to make
that finding.

The second prong of Mr. Beloff's three-pronged attack, which raises a
novel and teasing philosophical question, does not call for separate
consideration.

The overall result is that the appellants win on the law but lose on the    B
facts. It follows that I would dismiss the appeal. I recognise that this
result may be less than satisfying to the plaintiffs. But even if the case
had gone back to the judge, and they had won on the facts, it might well
have proved a Pyrrhic victory.

*Appeal dismissed.*    C
*Plaintiffs to pay three-quarters of*
    *defendants' costs in House of Lords,*
    *amount to be certified by Clerk of*
    *Parliament if not agreed.*

Solicitors: *Ince & Co.; Alsop Wilkinson.*
    D
M. G.

E

F

G

H

END OF VOLUME 1 OF APPEAL CASES FOR 1995

477
[2011] QB                    Parabola Investments Ltd v Browallia Cal Ltd (CA)

A                                    Court of Appeal

## Parabola Investments Ltd and another *v* Browallia Cal Ltd (formerly Union Cal Ltd) and others

### [2010] EWCA Civ 486

B    2010  March 10, 11, 12;                              Mummery, Toulson, Rimer LJJ
          May 5

*Damages — Deceit — Measure of damages — Claimant trading stocks and shares through defendant stockbrokers — Trading resulting in disastrous losses concealed by defendant falsely representing to claimant that trading profitable — Claimant's investment fund much depleted before fraud discovered — Claimant*
C    *thereafter trading profitably with reduced fund — Claimant bringing action in deceit — Whether entitled to damages for lost opportunity to trade with unreduced fund during period from discovery of fraud up to date of trial — Whether discovery of fraud marking cut-off point for damages claim*

The second claimant was a special purpose vehicle company, beneficially owned by G and set up by him for the purpose of trading in stocks, shares and derivatives.
D    The second defendant was a financial institution which carried out stockbroking activities. Between July 2001 and March 2002 G through the second claimant traded principally with the second defendant. Except during that period G had made substantial profits trading in market makers; however, he was encouraged by the third defendant, a senior futures broker employed by the second defendant, to trade in contracts for differences through the Stock Exchange Electronic Trading Service. He was induced to continue that course of trading by the third defendant's false assurances that it was profitable. In fact it was making disastrous losses. The third
E    defendant also lied to G, and thereby to the second claimant, as to how much was in the account. By the time the deception was discovered, in February 2002, the second claimant had lost in the region of £3·2m. Thereafter G traded profitably in market maker stocks again, albeit with a much depleted fund. The second claimant brought a claim in deceit against the defendants. The judge held that the second claimant was entitled to recover the capital loss of the amount by which the trading fund had been depleted as a consequence of the fraud and a sum reflecting the lost opportunity to
F    trade with the full fund for that period, and also awarded damages for loss of investment opportunity between March 2002 and the date of trial on the basis that, notwithstanding its successful trading during that period, the second claimant had continued to suffer from the adverse effects of the fraud since its trading had been conducted with much smaller resources.
      On the defendants' appeal against the finding that the second claimant was entitled to recover damages for loss of investment opportunity after the discovery of
G    the fraud—
      *Held*, dismissing the appeal, that where a claimant was able to demonstrate, on the balance of probabilities, that it was still suffering from the adverse effects of a fraud at the date of trial and had still not made the profits from its business which it would have made had the fraud not occurred, damages should be assessed as at the date of trial and those lost profits were recoverable as damages for the entire period until trial; that, therefore, the discovery of the fraud did not provide a cut-off point
H    terminating the second claimant's claim for damages in respect of its loss of investment opportunity resulting from the third defendant's fraud for which the second defendant was vicariously liable; and that, accordingly, the judge in applying the fundamental compensatory principle had been correct to hold that the second claimant was entitled to recover damages in respect of such loss until the date of trial ( post, paras 28–29, 60, 61, 62).

478
**Parabola Investments Ltd v Browallia Cal Ltd (CA)** [2011] QB

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25, HL(Sc), *Esso Petroleum*   A
*Co Ltd v Mardon* [1976] QB 801, CA, *Smith New Court Securities Ltd v Scrimgeour*
*Vickers (Asset Management) Ltd* [1997] AC 254, HL(E) and *Sempra Metals Ltd*
*(formerly Metallgesellschaft Ltd) v Inland Revenue Comrs* [2008] AC 561, HL(E)
applied.

*Per curiam.* Where a claim is made for loss of use of money on an alternative
investment after the discovery of the fraud, a fair measurement of the loss might in
some cases be the cost of replenishing the depleted fund by borrowing the necessary   B
funds to make the investment, if that possibility were reasonably open to the claimant
( post, paras 58, 61, 62).

Decision of Flaux J [2009] EWHC 901 (Comm); (Note) [2009] 2 All ER (Comm)
589 affirmed.

The following cases are referred to in the judgment of Toulson LJ:

*Allied Maples Group Ltd v Simmons & Simmons* [1995] 1 WLR 1602; [1995] 4 All   C
    ER 907, CA
*Chaplin v Hicks* [1911] 2 KB 786, CA
*County Personnel (Employment Agency) Ltd v Alan R Pulver & Co* [1987] 1 WLR
    916; [1987] 1 All ER 289, CA
*Davies v Powell Duffryn Associated Collieries Ltd* [1942] AC 601; [1942] 1 All ER
    657, HL(E)
*Davies v Taylor* [1974] AC 207; [1972] 3 WLR 801; [1972] 3 All ER 836, HL(E)   D
*Doyle v Olby (Ironmongers) Ltd* [1969] 2 QB 158; [1969] 2 WLR 673; [1969] 2 All
    ER 119, CA
*East v Maurer* [1991] 1 WLR 461; [1991] 2 All ER 733, CA
*Esso Petroleum Co Ltd v Mardon* [1976] QB 801; [1976] 2 WLR 583; [1976] 2 All
    ER 5; [1976] 2 Lloyd's Rep 305, CA
*4 Eng Ltd v Harper* [2008] EWHC 915 (Ch); [2009] Ch 91; [2008] 3 WLR 892;
    [2008] Bus LR 1698   E
*Gregg v Scott* [2005] UKHL 2; [2005] 2 AC 176; [2005] 2 WLR 268; [2005] 4 All ER
    812, HL(E)
*Hungerfords v Walker* (1989) 171 CLR 125
*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25, HL(Sc)
*London, Chatham and Dover Railway Co v South Eastern Railway Co* [1893] AC
    429, HL(E)
*Page v Newman* (1829) 9 B & C 378   F
*Sempra Metals Ltd (formerly Metallgesellschaft Ltd) v Inland Revenue Comrs* [2007]
    UKHL 34; [2008] AC 561; [2007] 3 WLR 354; [2008] Bus LR 49; [2007] 4 All
    ER 657, HL(E)
*Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd*
    [1997] AC 254; [1996] 3 WLR 1051; [1996] 4 All ER 769, HL(E)

The following additional cases were cited in argument:   G

*Biggin & Co Ltd v Permanite Ltd (Berry Wiggins & Co Ltd, Third Parties)* [1951]
    1 KB 422; [1950] 2 All ER 859
*Clef Aquitaine SARL v Laporte Materials (Barrow) Ltd* [2001] QB 488; [2000]
    3 WLR 1760; [2000] 3 All ER 493, CA
*Downs v Chappell* [1997] 1 WLR 426; [1996] 3 All ER 344, CA
*Front Ace, Owners of the Ship v Owners of the Ship Vicky 1* [2008] EWCA Civ 101;
    [2008] 2 All ER (Comm) 42; [2008] 2 Lloyd's Rep 45, CA   H
*KRM Construction Ltd v British Columbia Railway Co* (1981) 18 CLR 159
*Keydon Estates Ltd v Eversheds LLP* [2005] EWHC 972 (Ch); [2005] PNLR 817
*Mason Construction Ltd (VK) v Bank of Nova Scotia* [1985] 1 SCR 271
*President of India v Lips Maritime Corpn* [1988] AC 395; [1987] 3 WLR 572; [1987]
    3 All ER 110; [1987] 2 Lloyd's Rep 311, HL(E)

*Ratcliffe v Evans* [1892] 2 QB 524, CA
*Royscot Trust Ltd v Rogerson* [1991] 2 QB 297; [1991] 3 WLR 57; [1991] 3 All ER 294, CA
*Slough Estates plc v Welwyn Hatfield District Council* [1996] 2 EGLR 219
*Sprung v Royal Insurance (UK) Ltd* [1999] 1 Lloyd's Rep IR 111, CA
*United Motor Finance Co v Addison & Co Ltd* [1937] 1 All ER 425, PC

**APPEAL** from Flaux J

By a claim form the claimants, Parabola Investments Ltd and Aria Investments Ltd (formerly Tangent Investment Ltd), which had been set up by Rajesh Gill for the special purpose of trading in stocks, shares and derivatives, claimed damages in, inter alia, deceit against the defendants, Browallia Cal Ltd (formerly Union Cal Ltd), MF Global UK Ltd (formerly Man Financial Ltd) and Matthew Bomford, in respect of trading carried out between July 2001 and February 2002 by the claimants through the first and second defendants respectively on the advice of the third defendant who during that period had been employed as senior futures broker first by the first defendant and then by the second defendant. The claims against the first and third defendants in respect of the period when the latter had been employed by the former were settled. The second claimant alleged against the second and third defendants, primarily, that, over a period of eight months until February 2002, the third defendant had fraudulently misrepresented to Mr Gill and thereby to the second claimant on a daily basis that the trading conducted by Mr Gill was profitable and had also made a series of fraudulent misrepresentations as to the amount of funds in the second claimant's account with the second defendant, and sought, inter alia, damages for (1) the loss of the amount by which the trading fund had been depleted by the fraud; (2) the loss of profits which it would have made on investment in alternative trades during the actual period when it was being defrauded; and (3) loss of investment opportunity between March 2002 (after the fraud had been discovered) and the date of trial caused by the depletion of is trading fund. By a judgment dated 6 May 2009 Flaux J awarded damages for all three heads of loss.

By an appellant's notice issued on 16 June 2009 and pursuant to permission granted by the judge the second and third defendants appealed on the grounds, inter alia, that the judge had been wrong as a matter of law to award damages for the loss caused by the fraud between March 2002 and the date of trial; but that, rather, for that period the judge should simply have awarded interest on such losses as the second claimant had suffered during the period of the fraud. The second and third defendants renewed their application for permission to appeal against the judge's quantification of the second claimant's loss of profits both during and after the period of the fraud.

The facts are stated in the judgment of Toulson LJ.

*Ali Malek QC*, *Jeffrey Chapman QC* and *Adam Kramer* (instructed by *Legal First*) for the second and third defendants.

The basic measure in deceit restores the claimant to the position the claimant would have been in if no false representation had been made: see *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254.

Although damages for consequential losses are recoverable in deceit and negligent misstatement, they are not awarded for the period after the fraud:

*East v Maurer* [1991] 1 WLR 461 and *VK Mason Construction Ltd v Bank*   A
*of Nova Scotia* [1985] 1 SCR 271.  The policy of the law should be to
compensate for the loss of profits and lost alternative opportunities only
during the period of fraud or of any transaction the claimant is locked into by
the fraud.  The cause of action in deceit is complete at the date upon which
the claimant is freed from the deceit, at which date the defendant ceases to
infringe the rights of the claimant and the only cause of the loss is a failure to   B
pay damages promptly, for which failure no damages can be awarded: see
*President of India v Lips Maritime Corpn* [1988] AC 395.  Thereafter, the
claimant's only loss is the loss of interest on the loss already suffered.

Generally to allow the claimant to look at the position he would have
been in at trial would be inconsistent with the refusal of the law to allow
defendants to argue that but for the fraud the claimant would have suffered
the loss anyway: see *United Motor Finance Co v Addison & Co Ltd* [1937]   C
1 All ER 425; *Royscot Trust Ltd v Rogerson* [1991] 2 QB 297; *Slough
Estates plc v Welwyn Hatfield District Council* [1996] 2 EGLR 219 and
*Downs v Chappell* [1997] 1 WLR 426.

The appropriate standard of proof is on the balance of probabilities not
loss of a chance, as the result depends upon claimant's hypothetical conduct:
*Davies v Taylor* [1974] AC 207; *Gregg v Scott* [2005] 2 AC 176 and *Allied*   D
*Maples Group Ltd v Simmons & Simmons* [1995] WLR 1602.  The claimant
must prove a sum which, at the least, he would on the balance of probabilities
have recovered: *Owners of the Ship Front Ace v Owners of the Ship Vicky 1*
[2008] 2 Lloyd's Rep 45 and *KRM Construction Ltd v British Columbia
Railway Co* (1981) 18 CLR 159.  [Reference was made to *Biggin & Co Ltd v
Permanite Ltd (Berry Wiggins & Co Ltd, Third Parties)* [1951] 1 KB 422;
*Esso Petroleum Co Ltd v Mardon* [1976] QB 801; *Sempra Metals Ltd*   E
*(formerly Metallgesellschaft Ltd) v Inland Revenue Comrs* [2008] AC 561;
*Sprung v Royal Insurance (UK) Ltd* [1999] 1 Lloyd's Rep IR 111 and *Clef
Aquitaine SARL v Laporte Materials (Barrow) Ltd* [2001] QB 488.]

*Neil Kitchener QC* and *Steven Elliott* (instructed by *Gordon Dadds*) for
the claimant.

The starting point is that the victim of a fraud is to be compensated for the   F
injury he would not have suffered absent the fraud: see *Livingstone v
Rawyards Coal Co* (1880) 5 App Cas 25 and *Smith New Court Securities
Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254.

Where a claimant has been defrauded out of a trading fund which he
cannot replace, in quantifying damages the court ought to take account of all
profits which it is proven would have been earned with the money down to   G
the date of a judgment restoring funds to him: see *Sempra Metals Ltd v
Inland Revenue Comrs* [2008] AC 561; *East v Maurer* [1991] 1 WLR 461; 4
*Eng Ltd v Harper* [2009] Ch 91 and *Keydon Estates Ltd v Eversheds LLP*
[2005] PNLR 817.  There is no justification for assessing damages at the date
on which the fraud was discovered where the victim continued to be out of
his money so that losses of profit continued to accrue.

No reliance is placed on loss of chance principles.  The judge found on a   H
balance of probabilities that profits would have been made.  In quantifying
those profits he was entitled to take all factors into account and make an
assessment: *Davies v Taylor* [1974] AC 207 and *Gregg v Scott* [2005]
2 AC 176.  The damages are not too speculative but are clearly proved.

481

A    The damages do not relate to a loss suffered by reason of the defendant's failure to pay damages; the decision of the majority in *Hungerfords v Walker* (1989) 171 CLR 225 also represents the law in England on this point. [Reference was also made to *Clef Aquitaine SARL v Laporte Materials (Barrow) Ltd* [2001] QB 488; *Esso Petroleum Co Ltd v Mardon* [1976] QB 801; *Biggin & Co Ltd v Permanite Ltd* [1951] 1 KB 422 and *Ratcliffe v*

B    *Evans* [1892] 2 QB 524.]

The court took time for consideration.

5 May 2010. The following judgments were handed down.

**TOULSON LJ**

C    *Introduction*

1    This appeal raises a question of law about the recoverability of damages in deceit for loss suffered, after the discovery of the fraud, through loss of the availability of the funds of which the victim was defrauded.

2    The second defendant ("Man") and third defendant ("Mr Bomford") appeal against a judgment in favour of the second claimant ("Tangent")

D    delivered by Flaux J on 6 May 2009 [2009] EWHC 901 (Comm); (Note) [2009] 2 All ER (Comm) 589. The judgment followed a trial which took place over 17 days in March and April 2009.

3    At the beginning of the trial, liability and quantum were both in dispute. On the tenth day, leading counsel who represented the appellants at the trial (but not on the appeal) admitted the allegations of fraud made

E    against Mr Bomford. The admission followed what the judge described, at para 6, as

"a disastrous three days in the witness box for Mr Bomford, during which he was exposed not just as a fraudster throughout the relationship between Tangent and Man but also as a persistent and inveterate liar in almost everything he said . . ."

F    Inducement remained in issue at the trial, but there is no appeal against the judgment on liability.

4    The judge gave permission to appeal on the question whether Tangent could recover damages for loss of the profits which he found that it would otherwise have made, after the period of the fraud, from use of the funds of which it had been defrauded. He refused permission to appeal on issues of

G    quantification of Tangent's loss of profits, both during and after the period of the fraud, and the appellants have renewed their application for permission to appeal on those issues.

*The facts*

5    The facts are fully set out in Flaux J's impressive judgment [2009]

H    EWHC 901. For present purposes they can be summarised more briefly. Man is a well established financial institution, trading on the London Stock Exchange and other world markets. Mr Bomford was employed at the relevant time by Man as a senior futures broker. Tangent was a company set up by Mr Rajesh Gill for the purpose of trading in stocks, shares and

derivatives.  The judge described him in the opening paragraph of his    A
judgment as follows:

> ". . . Mr Gill who is still only in his mid 30s is regarded by those who
> have dealt with him as one of the most successful traders in certain types
> of stocks and shares and their derivative products on world markets.
> Over the period of more than ten years since he left university, other than
> in one period, Mr Gill has consistently made profits from his trading,    B
> whether in bull or bear markets, sometimes extraordinarily good profits
> despite the state of the world markets.  The exception was the period
> when he was trading primarily through the second defendant between
> July 2001 and February 2002, throughout which time he was the victim
> of the systematic fraud with which this case is concerned.  At that time,
> Mr Gill was still in his late 20s but had already been very successful in his    C
> trading."

6    Tangent's relationship with Man lasted from 1 July 2001 to 7 March
2002, although active trading ceased soon after 13 February 2002.  Except
during that period of trading, the bulk of Mr Gill's trading was in market
makers, principally those listed on the FTSE 350 Index.  During the Man
period the bulk of Mr Gill's trading was in contracts for differences
("CFDs"), particularly through the Stock Exchange Electronic Trading    D
Service ("SETS").  He had not traded in SETS before, but he was encouraged
to do so by Mr Bomford.  Because of the volume and speed of the trades,
substantial commissions for Man were generated, which would in turn mean
that Mr Bomford would receive generous bonuses.  Mr Gill was induced to
continue this course of trading by Mr Bomford's repeated false assurances
that the trading was profitable, whereas the judge found that "in truth it was    E
disastrously loss-making from an early stage".  Mr Bomford also on several
occasions lied to Mr Gill about how much was in his account.  On
26 October 2001 he gave Mr Gill a figure of approximately £9·27m, when
the true figure was about £2·8m and had been declining rapidly for several
months.  No other Man employee was involved in the fraud.  Matters came
to light on 13 February 2002.  On that day Mr Bomford was away from the
office.  Another employee of Man informed Mr Gill that the open positions    F
on his account were such that there would be a margin call and that the
amount in the account was £817,000.  Mr Gill was at first unable to believe
what he was being told, because by then he had been led by Mr Bomford to
believe that he had over £10m in his account, but the truth was out.

*The heads of loss*    G

7    It was agreed at the trial that the difference between the size of
Tangent's fund for investment at the beginning and at the end of the Man
period was £3,222,000.  On the premise that Tangent established liability,
the appellants did not dispute that it would be entitled to recover that sum
with interest.  Tangent, however, claimed to have suffered considerably
greater loss than would be satisfied by an award of interest, first, from its lost
opportunity to have traded with the fund as it would otherwise have done    H
during the Man period (referred to during the appeal as "stage 1"), and
secondly, from its lost opportunities for trading during the period from the
termination of its relationship with Man until the trial ("stage 2") resulting
from the depletion of its trading fund.

8    As to those claims, the judge made the following broad findings [2009] 2 All ER (Comm) 589, paras 183–184:

"183. In the present case, had it not been for the fraud perpetrated on it in the Man period by Mr Bomford, Tangent would have had a fund of £4·25m at the end of June 2001 with which to trade CFDs, instead of which it had only the depleted fund of £521,644 in March 2002. On a balance of probabilities, I am satisfied that had the fraud not occurred, Tangent through Mr Gill would have gone on conducting its business of trading primarily in market makers throughout the Man period and thereafter and that business trading would have been profitable overall. To the extent that some individual trades conducted would have been loss-making, that is no reason to conclude that the trading overall is too speculative for loss of profits to be recoverable. The fact that losses would have been suffered on individual trades is catered for in the average percentage trading profit figures, on the basis of which the claim is presented, to which I turn in the next section of the judgment.

"184. I am also quite satisfied that, since Tangent has yet to recoup that fund of £4·25m which it should have had (and which was effectively stolen from it), notwithstanding the successful trading conducted with much smaller resources, Tangent has continued to suffer from the adverse effects of the fraud. In a very real sense, Tangent has been 'locked in' to a much depleted trading business, a disadvantageous situation, as a consequence of the fraud throughout the period since June 2001. The fact that it cannot (because of the nature of the business which has been damaged) identify a specific alternative transaction, is neither here nor there and should not affect the recoverability of damages for loss of profits."

*The judge's assessment of quantum*

9    In addition to the evidence of Mr Gill, whom the judge described, at para 9, as "an essentially truthful witness", and Mr Bomford, whose evidence was worthless, both sides called expert witnesses on investment brokerage and trading, namely Mr Jeffrey Plowman for Tangent and Mr Philip Jones for the appellants, and forensic chartered accountants, namely Mr Humphrey Creed for Tangent and Mr Gervase McGregor for the appellants.

10    As to stage 1, the judge accepted Tangent's estimate that during the Man period it would have made profits at a rate of 50% per annum (reduced pro rata to allow for the fact that the Man period was only eight months). This approximated to Mr Gill's average profit percentage over the six years prior to the Man period, omitting the year of the dot com boom in which Mr Gill made a profit of over 1,000%. It also approximated to Mr Gill's rate of profit over several years after the Man period. For part of the pre-Man period Mr Gill had been a client of Mr Plowman, who described him as the best trader that he had ever come across in 40 years of broking experience. He considered that 50% per annum was a conservative estimate of the level of profits that he would have expected Mr Gill to make during stage 1 and that there was nothing in the market conditions during that period which would have led him to conclude otherwise. No rival estimate was put forward by Mr Jones. The appellants' case was that the matter was altogether too speculative for the judge to be able to make any reasonable estimate of the profit which Tangent would have made during the relevant period.

11   The judge concluded, at para 188:                                    A

"... I agree that the figure of 50% is appropriately conservative as an annual percentage of profit which could have been earned to 31 March 2002. It is pitched at a level which takes sufficient account of the inherent risks in any trading, such as that certain trades would probably have been loss-making."

B

As a result the judge awarded approximately £1·6m for lost profits during stage 1.

12   As to stage 2, Tangent's claim was that it would have made profits on what should have been its trading fund, but for Mr Bomford's fraud, in the same ratio as the trading profits which it made on its depleted fund, subject to two qualifications. The first was that Mr Gill gave evidence that he would have applied any funds in excess of £5m on other investments in India.   C
Tangent called expert evidence from an Indian valuer and Indian chartered accountant about the value of those potential investments, but the judge formed the view that the claim for loss of profits on those investments was too speculative to be recoverable. In the face of the judge's indication of his view, Mr Kitchener QC for Tangent did not ultimately pursue that part of its claim. Secondly, there were two years in respect of which Tangent for   D
particular reasons did not contend that it would have made the same level of profit on a larger trading fund as it made on its smaller trading fund.

13   Mr Plowman's evidence was that he considered it "reasonable to suppose that if Mr Gill had a larger trading fund he would have made additional profits in proportion to the increase in the size of the capital he traded". In cross-examination Mr Plowman agreed that placing more   E
money on a market maker might move the market in a different way than investing a smaller amount, and that one could not necessarily tell what the effect of the difference would be, because it would be a different transaction, but he said that he did not see why overall Mr Gill should not have achieved the same profit ratio investing with a larger amount of money over a wider variety of stocks, and that arguably he could have used the greater opportunities of a larger fund to achieve a higher profit ratio.   F

14   Mr Jones gave no evidence on the subject. Mr McGregor challenged the proposition that Mr Gill's share trading profit percentages during stage 2 could be extrapolated and applied to a hypothetical larger pool of funds.

15   Mr Kitchener submitted that Mr McGregor's evidence on this was inadmissible since he was not a broking expert. The judge said, at para 170: "It is perhaps somewhat extreme to say that his evidence was inadmissible. I would prefer to say that it was of no real weight and of little assistance to   G
the court." By contrast, the judge "found Mr Plowman a careful and impressive expert witness": para 13.

16   As with stage 1, the appellants did not contend for an alternative loss of profit calculation. They submitted that the entire claim was too speculative to allow any reasonable assessment.

17   The judge found [2009] 2 All ER (Comm) 589, para 172:   H

"On the basis of Mr Plowman's evidence and the other evidence as to Mr Gill's success at trading other than in the Man period, it seems to me that, on a balance of probabilities, with a larger fund available, Mr Gill would have traded just as successfully as he did in the years after the Man

A    period with a depleted fund and would have made profits with at least the
same percentage of profits annually as he in fact made."

And, at para 192:

"Thus, as I see it, these projections for loss of profits are being put
forward on a cautious and conservative basis. I accept Mr Kitchener's
submission that they represent a minimum amount that, on a balance of

B    probabilities, Mr Gill would have earned with greater trading capital
than he in fact had because of the fraud."

18    The projected figures ended at 31 March 2008. For the period from
that date until judgment Tangent claimed simple interest. The judge's
assessment of lost profits during stage 2 until 31 March 2008 came to
approximately £12·15m, to which was added interest for the period until

C    trial of approximately £340,000, producing a total loss of profit figure for
stage 2 of approximately £12·5m. If the judge had rejected the claim for lost
profits during stage 2 and had instead awarded simple interest during that
period at base plus 3·25%, the figure would have been approximately £2·6m,
i e less by approximately £9·9m.

19    Taking all the heads of claim, the judge's total award including
D    interest amounted to approximately £19·3m. If he had approached the lost
profit claims as the appellants contend that he should, and had awarded
simple interest at base plus 3·25% on the amount by which Tangent's trading
fund was depleted during the Man period, the total figure would have been
approximately £5·1m.

E    *The judge's assessment of quantum: grounds of challenge*

20    Mr Malek QC attacked the judge's award of lost profits during stage
1 on the ground that the case that a specific amount of profits would have
been earned at that stage was unproven, and accordingly only interest
should have been awarded. He submitted that Mr Gill gave insufficient
explanation of how he would have traded during that period and that
Mr Plowman's evidence supporting the claim was unreasoned. He

F    submitted that the 50% figure was plucked out of the air, was unjustified,
and was on its face a phenomenal rate of return for real world stock market
trading. In the absence of an explicit rationale, the award could not stand.

21    Mr Malek's attack on the judge's award of damages for lost profits
at stage 2 was similar. He submitted that Mr Gill gave no adequate
explanation of how he would have invested a larger trading fund at that

G    stage. The fact that Tangent claimed a lower profit percentage in two years
than the actual profit achieved with a smaller fund involved a recognition
that for those years (particularly the year ended 31 March 2008, in which
Tangent's actual net rate of profit was 877%) its actual profit ratio could not
be regarded as a reliable indicator of the profit which it would have made on
a larger fund. This demonstrated the arbitrary nature of choosing to
extrapolate from actual profit figures on the depleted fund in the other years.

H    Mr Malek also took specific examples from particular years to illustrate
what he submitted was the improbability that Tangent would have made
the claimed profit on a hypothetical larger fund. He submitted that
Mr Plowman's evidence contained a "vacuum of reasoning" to support his
general conclusion that it was "reasonable to suppose" that the hypothetical

profits at stage 2 could be scaled up from Mr Gill's actual profits on a lower     A
fund.  He also submitted that in any event Mr Plowman's conclusion that
this was "reasonable to suppose" fell significantly short of expressing an
opinion that Tangent was likely to have achieved the claimed level of profits
on a balance of probability.

*The judge's assessment of quantum: discussion and conclusion*                     B

22   There is a central flaw in the appellants' submissions.  Some claims
for consequential loss are capable of being established with precision (for
example, expenses incurred prior to the date of trial).  Other forms of
consequential loss are not capable of similarly precise calculation because
they involve the attempted measurement of things which would or might
have happened (or might not have happened) but for the defendant's
wrongful conduct, as distinct from things which have happened.  In such a    C
situation the law does not require a claimant to perform the impossible, nor
does it apply the balance of probability test to the measurement of the loss.

23   The claimant has first to establish an actionable head of loss.  This
may in some circumstances consist of the loss of a chance, for example,
*Chaplin v Hicks* [1911] 2 KB 786 and *Allied Maples Group Ltd v Simmons
& Simmons* [1995] 1 WLR 1602, but we are not concerned with that    D
situation in the present case, because the judge found that, but for
Mr Bomford's fraud, on a balance of probability Tangent would have traded
profitably at stage 1, and would have traded more profitably with a larger
fund at stage 2.  The next task is to quantify the loss.  Where that involves a
hypothetical exercise, the court does not apply the same balance of
probability approach as it would to the proof of past facts.  Rather, it
estimates the loss by making the best attempt it can to evaluate the chances,    E
great or small (unless those chances amount to no more than remote
speculation), taking all significant factors into account: see *Davies v Taylor*
[1974] AC 207, 212, per Lord Reid, and *Gregg v Scott* [2005] 2 AC 176,
para 17, per Lord Nicholls of Birkenhead, and paras 67–69, per Lord
Hoffmann.

24   The appellants' submission, for example, that "the case that a    F
specific amount of profits would have been earned in stage 1 was unproven"
is therefore misdirected.  It is true that by the nature of things the judge could
not find as a fact that the amount of lost profits at stage 1 was more likely
than not to have been the specific figure which he awarded, but that is not to
the point.  The judge had to make a reasonable assessment and different
judges might come to different assessments without being unreasonable.  An
appellate court will therefore be slow to interfere with the judge's    G
assessment.  As Lord Wright said in *Davies v Powell Duffryn Associated
Collieries Ltd* [1942] AC 601, 616–617:

"An appellate court is always reluctant to interfere with a finding of the
trial judge on any question of fact, but it is particularly reluctant to
interfere with a finding on damages which differs from an ordinary
finding of fact in that it is generally much more a matter of speculation    H
and estimate.  No doubt, this statement is truer in respect of some cases
than of others . . . It is difficult to lay down any precise rule which will
cover all cases, but . . . the court, before it interferes with an award of
damages, should be satisfied that the judge has acted on a wrong principle

A    of law, or has misapprehended the facts, or has for these or other reasons made a wholly erroneous estimate of the damage suffered."

25    The appellants' broking expert, Mr Jones, regarded Mr Gill in his report as little more than a gambler, whose trading in market makers was always a 50:50 bet and whose success before and after the Man period was essentially a matter of luck. In his oral evidence he resiled to some extent
B    from that position, and the judge preferred Mr Plowman's opinion that Mr Gill's success was not a pure matter of luck but was due to his astuteness. The judge was entitled to reach that conclusion. No method of assessment could be perfect, but the method of measurement accepted by the judge as a basis for estimating the lost profits was rational and supported by the opinion of an expert who impressed him. I am not persuaded that it was manifestly excessive. I would therefore refuse permission to appeal against
C    the judge's quantification of Tangent's lost profits.

*Recoverability of damages for loss of investment opportunity after discovery of the fraud: the judge's reasons*

26    On the basis that the judge was not wrong to assess the lost profits as he did, the appellants accept (for reasons explained below) that the lost
D    profits during stage 1 were recoverable as a matter of law; but they dispute the recoverability as a matter of law of the lost profits during stage 2, and on this point they were given permission to appeal by the judge.

27    The judge explained his reasons for holding that loss of profits after discovery of the fraud were recoverable at paras 125–137 and 167–184 of the judgment [2009] EWHC 901. They are set out with admirable clarity but I summarise them briefly. He began with the principle set out in
E    *Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25, 39 that the object of compensatory damages is to put the injured party, as nearly as possible, in the position that he would have been in if he had not sustained the wrong for which he was being compensated. He cited *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254 for the principles applicable in assessing damages for fraud. Relying particularly on
F    the authority of the Court of Appeal decision in *East v Maurer* [1991] 1 WLR 461, approved by the House of Lords in the *Smith New Court* case, he held that damages for loss of profits from an alternative investment were in principle capable of being recovered in an action for deceit.

28    The judge rejected the appellants' argument that the cases which have recognised recoverability of loss of profits in deceit were all cases of "specific alternative transactions which were necessarily profitable". As to
G    this submission he said [2009] 2 All ER (Comm) 589, paras 147–148:

"147. In my judgment, there is no such restrictive principle as that for which Mr Brindle contends. Rather each case depends upon its own facts. Obviously there will be cases where, on the evidence, it is not possible for the claimant to show on a balance of probabilities that any alternative transaction or business would have been profitable. The
H    decision of the Court of Appeal in *Davis v Churchward Brook Haye & Co* (unreported) [1993] CA Transcript No 511 was such a case. However, where, on a balance of probabilities, the court concludes that some profits would have been made from an alternative transaction or transactions, which the claimant would have entered but for the fraud, then the court

can and should award damages for such loss of profits, if necessary    A
discounting the amount recovered to reflect the element of risk (as
appears to have happened in *East v Maurer*).  There is simply no added
requirement before such damages are recoverable that the alternative
transaction(s) be shown to be 'necessarily profitable'.

> "148. Furthermore, the suggestion that, before any damages for loss of
> profits are recoverable in deceit, the claimant must have identified a
> specific alternative transaction into which he would have entered had it    B
> not been for the fraudulent misrepresentation(s), is also contrary to the
> decision of the majority of the Court of Appeal in *Esso Petroleum Co
> Ltd v Mardon* [1976] QB 801."

29   The judge also rejected the appellants' argument that no such loss
could be recovered in respect of the period after the end of the fraud on the
ground that this would amount to a claim for "profits on profits", a head of    C
loss recognised by English law only by an award of interest.  He said, in
para 177:

> "A number of the cases recognise that where the adverse effects of a
> fraudulent misrepresentation continue after the fraud has been
> discovered, then in principle the claimant can recover as damages the    D
> losses he suffers as a consequence of those adverse effects for so long as
> they remain operative, whether loss of profits or additional expenses or
> other losses."

He instanced *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset
Management) Ltd* [1997] AC 254, *Esso Petroleum Co Ltd v Mardon* [1976]
QB 801 and the judgment of David Richards J in *4 Eng Ltd v Harper* [2009]
Ch 91.  He also cited Lord Nicholls's speech in *Sempra Metals Ltd (formerly    E
Metallgesellschaft Ltd) v Inland Revenue Comrs* [2008] AC 561 as authority
that loss of the use of money can sound in damages.

*Recoverability of damages for loss of investment opportunity after discovery
of the fraud: the parties' submissions*                                        F

30   The appellants' submissions may be summarised as follows.
(1) Tangent's loss should have been assessed at the date of Mr Gill's
discovery of the depletion of its trading fund (13 February 2002) or, at latest,
at the date of the termination of Tangent's relationship with Man (7 March
2002).
(2) There is a crucial difference in principle between the damages
recoverable for torts involving infringement of the claimant's property rights    G
and the damages recoverable for deceit or negligent misstatement.
Infringement of property rights may continue to have a direct effect until
trial.  Fraudulent (or negligent) misstatement involves a claimant acting to
his detriment under the inducement of a false belief.  That influence ceases
once the truth becomes known.  There may be circumstances where the
claimant has been induced to change his legal position in a way that cannot
be immediately undone on discovering the truth; and there may be cases    H
where the claimant has lost, once and for all, an opportunity which he would
otherwise have taken of entering into some particular form of alternative
transaction which would have continued beyond the date that he discovered
the truth.  Those are exceptional circumstances in which direct loss may

properly be said to continue after the discovery of the truth, but this case does not fall into such a category.

(3) In this case to allow a claim for damages for loss of profits suffered after the discovery of the fraud would amount in substance to allowing a claim for damages for delay in the payment of damages. To allow such a claim would also be to permit the award of profits on profits, to which there would logically be no end. Moreover, it would potentially apply to every claimant who has suffered monetary loss through deceit or negligent misstatement. The only way that the law allows compensation for loss of use, during stage 2, of the trading fund lost during stage 1 is by way of an award of interest.

(4) To permit Tangent to recover damages for lost profits during stage 2 would create an unjust asymmetry in the law of damages and would encourage speculative claims. The asymmetry would arise because the claimant would have the option of settling for statutory interest on its primary loss (which would require no proof of how the claimant would have used the money) or of seeking damages based on its hypothetical use of the lost fund. This would put every claimant in a position where he would have nothing to lose and all to gain by advancing a case as to how he would otherwise have used the money. This is not only likely to encourage speculative claims but it is wrong in principle. Logically, the claimant's hypothetical use of the money should be regarded in principle either as too remote a factor, or not as too remote a factor, to be taken into account in the overall assessment of damages. It would be unprincipled to take it into account as increasing the assessment of the claimant's overall loss if his use of the money would have been profitable, but not as reducing the overall loss if it would have been unprofitable.

31 Tangent submitted that the judge reached the right result for the right reasons.

*Recoverability of damages for loss of investment opportunity after discovery of the fraud: consideration*

32 The issues about the proper date for the assessment of damages and the nature of the damages recoverable are interlinked. In the *Smith New Court* case [1997] AC 254 the House of Lords considered both the principles governing the damages recoverable in an action in deceit and the date of assessment. The case concerned the acquisition of shares in a well known defence contractor, Ferranti, which the claimants bought in July 1989, in reliance on fraudulent representations made by a representative of the defendant, at a price of $82\frac{1}{4}$p per share. On the open market they would at that time have fetched 78p per share. The claimants bought the shares as a market-making risk with a view to holding them on their books for a comparatively long period. In September 1989 the board of Ferranti discovered that it had been the victim of a major fraud by a former director, and in November it published revised audited accounts showing the effect of the fraud. The shares slumped. Between November 1989 and April 1990 the claimants sold their shares in small parcels at prices between 49p and 30p per share. The Court of Appeal held that damages were to be assessed at the date of the acquisition of the shares by reference to the difference between the price paid and the price which the shares would then have attracted on the open market. The House of Lords held that the claimants

were entitled to recover the difference between the amount which they paid    *A*
to purchase the shares and the amount for which they were resold.  Because
of the nature of the case, the judgments contained a number of statements
about deceit inducing the acquisition of property, but the underlying
principles are wider than that.

33    Starting with the fundamental principle stated in *Livingstone v
Rawyards Coal Co* 5 App Cas 25, the House of Lords rejected the Court of    *B*
Appeal's ruling that as a matter of law the market price at the transaction
date should be taken for the purpose of measuring the claimants' loss, unless
that price had been falsified by the defendant's misrepresentation.  In the
view of the House of Lords, this was an over-rigid approach and would not
have achieved the fundamental compensatory principle, which was to put
the claimants in the same position as if no false representation had been
made to them.  Lord Browne-Wilkinson cited with approval the statement of    *C*
Bingham LJ in *County Personnel (Employment Agency) Ltd v Alan R Pulver
& Co* [1987] 1 WLR 916, 925–926:

> "While the general rule undoubtedly is that damages for tort or breach
> of contract are assessed at the date of the breach . . . this rule also should
> not be mechanistically applied in circumstances where assessment at
> another date may more accurately reflect the overriding compensatory    *D*
> rule."

34    Lord Browne-Wilkinson noted in the *Smith New Court* case [1997]
AC 254, 265 that a defendant's fraud may have an effect continuing after the
transaction is completed, and he referred, at p 266, to instances where

> "the fraud continues to influence the conduct of the plaintiff after the    
> transaction is complete or where the result of the transaction induced by    *E*
> the fraud is to lock the plaintiff into continuing to hold the asset
> acquired."

I take those instances to be illustrative rather than exclusive (as Mr Malek
seeks to regard them).  In similar vein Lord Steyn said, at p 284:

> "There is in truth only one legal measure of assessing damages in an    *F*
> action for deceit: the plaintiff is entitled to recover as damages a sum
> representing the financial loss flowing directly from his alteration of
> position under the inducement of the fraudulent representations of the
> defendants."

35    The House of Lords regarded the loss suffered by the claimants on
the resale of the shares as directly caused by the defendant's fraud, even    *G*
though the substantial collapse of Ferranti's share value was due to the
discovery of a fraud within Ferranti which was itself unrelated to the
defendant's fraudulent misrepresentation, because the claimants could not
have disposed of the shares on the purchase date otherwise than at a loss
and, as Lord Browne-Wilkinson put it, at p 268: "Smith were in a special
sense locked into the shares having bought them for a purpose and at a price    *H*
which precluded them from sensibly disposing of them."  It was not
suggested that the claimants acted unreasonably in retaining the shares for
the time that they did or in realising them in the manner in which they did.

36    As to the scope of the losses which may in principle be recovered in
an action in deceit, the House of Lords approved the decision of the Court of

A    Appeal in *Doyle v Olby (Ironmongers) Ltd* [1969] 2 QB 158 that the claimant is entitled to recover all loss directly caused by the transaction and all consequential loss, provided it is not too remote, and that loss is not to be treated as too remote merely because it was not in the contemplation of the representor. Lord Steyn (with whom Lord Keith of Kinkel and Lord Slynn of Hadley agreed in the *Smith New Court* case [1997] AC 254) gave an example particularly relevant to the present case at p 282, approving the

B    decision of the Court of Appeal in *East v Maurer* [1991] 1 WLR 461:

  "*East v Maurer* shows that an award based on the hypothetical profitable business in which the plaintiff would have engaged but for deceit is permissible: it is classic consequential loss."

37    In *East v Maurer* the claimants were induced to buy a hairdressing

C    salon from the defendants by false representations. After trading unsuccessfully and then discovering that they had been the victims of fraud, the claimants had difficulty in selling the business and eventually did so at a substantial loss. They claimed not only their capital loss, but also loss of profits during the period that they owned the business. The Court of Appeal held that, while they were not entitled to loss of the profits which they might reasonably have expected to make if the defendants' representations had

D    been true (since the action was for deceit and not for breach of a contractual warranty), they were entitled to an award of loss of profits relating to the hypothetical business in which they would have engaged but for the fraud of the defendants.

38    In the light of that authority and its approval by the House of Lords, Mr Malek rightly accepted that loss based on the hypothetical use which the

E    claimant would have made of the funds of which he was defrauded is capable of being recoverable as damages in deceit (i e it is not necessarily too remote), and that Tangent's loss of profit from alternative investment of the fund during stage 1 was not too remote. But he submitted that the judge was wrong to apply *East v Maurer* to stage 2. The issue, in short, is whether the discovery of the fraud provided a cut-off point.

39    Tangent's case on the point is simple. On the judge's findings,

F    Mr Bomford's fraud had a continuing effect on Tangent after the truth had come out. The depletion of its trading fund was a fait accompli, from which it could not extract itself and which had a continuing direct effect on its ability to trade profitably. In the judge's language, it was "locked in" to a disadvantageous situation as a consequence of the fraud perpetrated during the Man the period.

G    40    Mr Malek submitted that "the simplicity of Tangent's approach should not be mistaken for correctness" and that it would lead to "a wide-ranging and alarming alteration to the law".

41    I reject the appellants' argument that the claim for loss of use during stage 2 of the funds lost during stage 1 was in substance a claim for damages for delay in payment of damages. The same point was considered by the High Court of Australia in *Hungerfords v Walker* (1989) 171 CLR 125. The

H    question in the case, identified at the beginning of the judgment of Mason CJ and Wilson J, was whether at common law damages for breach of contract or negligence can include damages (assessed in that case by reference to appropriate interest rates) for loss of use of money lost as a direct consequence of the defendant's breach of contract or negligence.

492
Parabola Investments Ltd v Browallia Cal Ltd (CA)                    [2011] QB
Toulson LJ

42    The claimants carried on a business selling, hiring and servicing    A
television sets and other electronic goods.   The defendants were their
accountants.  As a result of the defendants' negligence, the claimants paid
too much income tax for a number of years.  By the time that this came to
light, their claim for repayment of the overpaid tax in the earlier years was
statute-barred.   The claimants sued the defendants for the amounts not
recoverable and claimed interest or damages for loss of use of the money.
The judge held that the claimants were not entitled to interest under the    B
relevant statutory scheme, but that they were entitled to damages at
common law for loss of use of the overpaid tax up to the date of trial, which
he calculated on the basis that most of it would have been used in the
business.  He measured the loss by reference to an annual interest rate of
10%. The Full Court of the Supreme Court of South Australia increased the
interest rate used as a measure for assessing damages because the business    C
had itself been paying interest on loans at a higher rate.  The High Court
(Dawson J dissenting) dismissed the defendants' appeal.

43    Mason CJ and Wilson J said 171 CLR 125, 144–145 that the loss of
the use of the money paid away could not be classified simply as due to the
late payment of damages.  Brennan and Deane JJ concurring said, at p 152:

"There is, in our view, a critical distinction between an order that    D
interest be paid upon an award of damages and an actual award of
damages which represents compensation for a wrongfully caused loss
of the use of money and which is assessed wholly or partly by reference
to the interest which would have been earned by safe investment of the
money or which was in fact paid upon borrowings which otherwise would
have been unnecessary or retired.  On the one hand, there is no common    E
law power to make an order for the payment of interest to compensate for
the delay in obtaining payment of what the court assesses to be the
appropriate measure of damages for a wrongful act . . . On the other
hand, there is no acceptable reason why the ordinary principles governing
the recovery of common law damages should not, in an appropriate case,
apply to entitle the plaintiff to an actual award of damages as
compensation for a wrongfully and foreseeably caused loss of the use of    F
money . . . In the present case, the breach of the duty of care which the
appellants owed to the respondents caused over payments of tax by the
respondents.  The direct and foreseeable effect of those overpayments was
that specific sums of money (i e the amounts of the overpayments), which
would otherwise have been available to avoid, repay or off-set the costs of
some of the significant borrowings of the respondents' business, were
unavailable to the respondents from the time of the respective    G
overpayments.  The injury sustained by the respondents by reason of the
loss of the use of the amounts of the overpayments was as foreseeably
caused by the breach of the appellants' duty of care as would have been the
case if the appellants had wrongfully deprived the respondents of the use
of their money by locking it in a foolproof safe and withholding the key."

44    Mr Malek accepted, in my view rightly, that the decision of the    H
Australian High Court in the *Hungerfords* case represents the common law,
but he distinguished it on the ground that in that case the money would have
been available to meet a specific need, whereas in the present case it would
have been used to make a succession of one-off unspecified trades.  I do not

follow the distinction on the facts. Hungerfords would have used the money in effect as working capital, as would Tangent in the present case. The distinction which Mr Malek tried to draw between putting money into a business generally and using it for individual business transactions may be clear in some cases, but would be a false distinction in others (since many businesses consist of entering into successive trades and putting money in the business is likely to be indistinguishable from putting it in the trades), and I can see no good reason for trying to introduce it. Practicalities aside, the submission made by Mr Malek sought to narrow the effect of the High Court's decision in a way which does not reflect the reasoning of the majority, and for which I can see no justification as a matter of principle or justice.

45   Flaux J also cited the judgment of David Richards J in *4 Eng Ltd v Harper* [2009] Ch 91 as an instructive precedent. The claimants were induced by false representations to buy the share capital in a company which provided engineering services. Far from being profitable, the company had been systematically bribing employees of its principal customer to make payments to it on inflated or bogus invoices, and it was potentially liable to the customer for a large amount. In due course the defendants were sent to prison for fraud and the company went into liquidation. The judge found that but for the defendants' fraud the claimants would have been able and willing to make an offer for the purchase of a different company, and that there was a high likelihood that they would have succeeded in doing so. He awarded damages which included an assessment of the claimants' loss of likely income and capital profits from the alternative acquisition at the date of trial. One of the arguments advanced by the defendants was that the date for assessment of the loss should not have been later than the date on which the company went into administration, because by then the claimants were freed from the consequences of the defendants' deceit. The judge said, at para 55, that he could follow that submission if on that date the claimants had recovered substantial funds which they could then invest in an alternative acquisition. However, because the company was insolvent and the claimants recovered nothing, they were no more then able to make an alternative acquisition than they had been before it went into administration. The consequences of the defendants' deceit did not stop but continued until trial. In those circumstances, the choice of the date when the company went into administration would be arbitrary and unconnected with the claimants' loss.

46   The decision is a straightforward application of the principles set out in the *Smith New Court* case [1997] AC 254. The appellants did not challenge it but sought to distinguish it. They suggested in their skeleton argument that David Richards J considered the claimants to be locked into the company which they had acquired, since it was insolvent and the claimants recovered nothing, but that does not advance matters. It is another way of stating the point stated more simply by the judge that the consequences of the defendants' deceit did not stop on the company going into administration but continued until trial.

47   Mr Malek also made the point, which he developed in oral argument, that in that case the claimants had a particular alternative investment opportunity which arose during the period of the fraud and the effects of which continued after the discovery of the fraud. So also in the present case Tangent would have had an alternative opportunity of using its

trading fund during stage 1, the hypothetical value of which the judge    A
assessed before reaching his award for the loss suffered at stage 1. The effect
of the fraud continued after stage 1 because Tangent no longer had the
amount by which the fund had been depleted, just as 4 Eng's loss continued
after the company went into administration and then liquidation, because it
no longer had the money which it had invested in the company or anything
in return for it (the shares being worthless). So I am unpersuaded by the
grounds on which Mr Malek sought to distinguish the decisions in    B
*Hungerfords v Walker* 171 CLR 125 and *4 Eng Ltd v Harper* [2009] Ch 91.

48 The argument that there is a critical difference between the
recoverability of damages for loss of use of property resulting from tortious
interference with property rights and loss of use of money resulting from
deceit may have some historical support, but cannot be justified.

49 Mr Malek submitted that the judge [2009] 2 All ER (Comm) 589,    C
para 184 fell into error in describing Tangent's lost fund as having been
"effectively stolen from it". Brennan and Deane JJ used a similar analogy in
the passage cited from *Hungerfords v Walker* 171 CLR 125, 152 (see para 43
above), when they likened the injury sustained by the claimants to that which
they would have suffered "if the appellants had wrongfully deprived the
respondents of the use of their money by locking it in a foolproof safe and    D
withholding the key" (a direct interference with the claimants' property
rights). It would indeed be anomalous if the court were to draw a distinction
between loss of use of money stolen by the defendant and loss of use of
money caused to be paid away by the fraud of the defendant.

50 It is true that in former times judges took a hostile view toward
claims for damages for loss of use of money. In *Page v Newman* (1829)
9 B & C 378 the claimant sued the defendant for repayment of a debt and    E
interest. Lord Tenterden CJ held that the court had no power at common
law to award interest in the absence of a contractual agreement to pay
interest. The decision was followed with reluctance by the House of Lords
in *London, Chatham and Dover Railway Co v South Eastern Railway Co*
[1893] AC 429, where it was held that at common law the court had no
power to award interest by way of damages for breach of contract in failing    F
to make repayment of a debt on time.

51 Over the years the effect of this unsatisfactory judgment was
whittled down in various ways, but it survived in an attenuated form until
the ghost of Lord Tenterden CJ was laid to rest in *Sempra Metals Ltd v
Inland Revenue Comrs* [2008] AC 561. In that case the House of Lords
examined the law of contract and the law of restitution in considering a
question whether the claimant was entitled to interest on repayment of    G
overpaid tax.

52 Lord Nicholls began his examination of the law as follows, at
para 74:

"I start with the broad proposition of English law that as a general rule
a claimant can recover damages for losses caused by a breach of contract
or a tort which satisfy the usual remoteness tests. This broad common    H
law principle is subject to an anomalous, that is, unprincipled, exception
regarding one particular type of loss arising in respect of one particular
type of claim. The exception comprises claims for interest losses by way
of damages for breach of a contract to pay a debt. The general common

law principle does not apply to such claims. Damages are not recoverable in cases falling within this exception."

53   Having noted, at para 51, that "legal rules which are not soundly based resemble proverbial bad pennies: they turn up again and again", he proceeded to examine the way in which the law had developed and concluded, at para 92:

"The common law should sanction injustice no longer. The House should recognise the remnant of the restrictive common law exception for what it is: the unprincipled remnant of an unprincipled rule. The House should erase the remains of this blot on English common law jurisprudence."

54   Mr Malek submitted that the House of Lords was there concerned with the law of contract and restitution, and that Lord Nicholls's observations are irrelevant in the present case. Yes and no. It is true that the House of Lords was concerned with the law of contract and restitution. But it is vain not to recognise the wide general principle stated by Lord Nicholls, at para 74, and to suggest that it does not apply to a claim in tort for damages for loss of use of money which would satisfy the rules of causation, etc.

55   The argument that Flaux J's judgment creates an unprincipled asymmetry in the law is not a correct analysis. Tangent's first head of loss was the amount of its direct loss on trades which it was induced to enter as a result of Mr Bomford's fraud. That head of loss is recoverable regardless of what Tangent would otherwise have done with its trading fund. It would not matter, for example, if Mr Gill would otherwise have given the entire amount to charity. He was entitled to use his money as he chose and to have the fund restored. Interest on that loss would be discretionary, but ordinarily the court would not inquire how the claimant would have used the money. (In the charitable example, an award of interest would enable the claimant to make the same gift grossed up so as to be equivalent to the gift which he would have made but for the fraud.) If the claimant would not have made profitable alternative use of the money, there would be no head of consequential loss for which he would be entitled to compensation. If, on the other hand, he would have made profitable alternative use of the money, then there would be a potential head of consequential loss for which (subject to remoteness, etc) the claimant would be entitled to damages on the normal compensatory principle. There is no asymmetry or injustice in this.

56   As to the submission that Flaux J's judgment, if upheld, will lead to an avalanche of speculative and unmeritorious claims, it is never an attractive argument that a meritorious claim should be denied because of the risk of unmeritorious claims following it. The argument itself is also speculative. We were given no information to suppose that the courts of Australia have been inundated with speculative and unmeritorious claims since the decision of the High Court in the *Hungerfords* case 171 CLR 125. In the *Smith New Court* case [1997] AC 254, 284–285 Lord Steyn considered three limiting principles which, even in a case of deceit, serve to keep wrongdoers' liability within practical and sensible limits—causation, remoteness and the duty to mitigate loss.

57   The present case provides a practical illustration of the operation of the remoteness principle. The judge regarded the Indian investments which

Mr Gill would have made as too uncertain and distant to give rise to a *A* recoverable head of loss. The distinctive feature of the case in relation to his trading on the London Stock Exchange was that he had a remarkable track record both before and after the Man period. Claimants who advance speculative and unmeritorious consequential loss claims face the risk of having to pay the costs of those claims as well as the risk of damaging their credibility more generally.

*B*

58 In relation to Mr Malek's gloomy prognostication about astronomical claims for consequential loss stretching over many years, there may also be saving points which might be made by a defendant in an appropriate case, but were not made in this case. Where a claim is made for loss of use of money on an alternative investment after the discovery of the fraud, a fair measurement of the loss might in some cases be the cost of *C* replenishing the depleted fund, i e the cost of borrowing the necessary funds to make the investment, if that possibility were reasonably open to the claimant. (There would be a parallel between that and the measure claimed and allowed in the *Hungerfords* case 171 CLR 125.) However, the question whether that possibility was reasonably open to Tangent was never explored, and there was no argument at the trial or on the appeal that this would have been a better way of measuring damages for Tangent's loss of *D* investment opportunity at stage 2. The issue of law was whether damages for that loss of investment opportunity were recoverable at all.

59 Mr Malek was critical of the length of time that passed between Tangent learning of the fraud and obtaining judgment. However, it was not argued at the trial that this involved a failure by Tangent to take reasonable steps in mitigation of its loss and that a proportion of its consequential loss *E* should be disallowed on that account. The appellants' conduct of the litigation may not have made that a promising defence, but the point did not arise.

*Conclusion*

60 The appellants have not shown any principled reason why the *F* discovery of the fraud should be taken as a legal cut-off point terminating Tangent's claim for damages in respect of its loss of investment opportunity, resulting from the appellant's fraud. Applying the fundamental compensatory principle, the judge was right to hold for the reasons he did that Tangent was entitled in principle to recover damages in respect of such loss until the trial. Accordingly, I would dismiss this appeal.

*G*

**RIMER LJ**
61 I agree.

**MUMMERY LJ**
62 I also agree.

*H*

*Permission to appeal against quantification of lost profits refused. Appeal dismissed with costs.*

KEN MYDEEN, Barrister

1 W.L.R.

[CHANCERY DIVISION]

*POSSFUND CUSTODIAN TRUSTEE LTD. AND ANOTHER v.
DIAMOND AND OTHERS
McGRIGOR DONALD (A FIRM) (THIRD PARTY)
[Ch. 1992 P. No. 4177]

PARR AND OTHERS v. DIAMOND AND OTHERS
McGRIGOR DONALD (A FIRM) (THIRD PARTY)
[Ch. 1995 P. No. 1919]

1996   March 20, 21, 22, 25, 26;                           Lightman J.
        April 2

*Negligence—Duty of care to whom?—Company prospectus—Prospectus misrepresenting value of company—Shares bought in market after flotation in reliance on prospectus—Whether directors and advisers owing duty to purchasers in aftermarket*

In April 1989 the directors of the eighth defendant, a company which arranged and provided mechanical breakdown insurance for new and used cars, issued a prospectus in connection with the flotation of shares in the company at a substantial premium on the unlisted securities market ("U.S.M."). The plaintiffs in the first action had both subscribed for that issue and bought further shares in the U.S.M. in the period 2 May to 11 July 1992 ("the aftermarket"). The plaintiffs in the second action had also subscribed to the issue and/or acquired shares in the aftermarket. The plaintiffs alleged that the prospectus materially misrepresented the company's financial position by substantially understating its liabilities, and that the shares were in truth valueless. The plaintiffs sought to recover damages for, inter alia, negligence against the directors, auditors and financial advisers of the company in respect of the alleged misrepresentations in the prospectus. After the two actions had been consolidated, the directors, auditors and financial advisers issued summonses for an order under R.S.C., Ord. 18, r. 19 striking out the claims in respect of aftermarket purchases as disclosing no cause of action.

On the hearing of the summonses:—

*Held*, dismissing the applications, that it was arguable that persons responsible for the issue of a modern prospectus owed a duty of care to purchasers in an aftermarket; that whether the defendants were to be taken to have intended to assume such a duty towards any particular plaintiff or class of plaintiffs was in all cases to be objectively established by the plaintiff proving either express communication to him of such intention or that he reasonably relied on the material representation and believed that the representor intended him to act upon it; and that, accordingly, the plaintiffs' claims merited full consideration at trial (post, pp. 1364D–G, 1365A, H–1366A, B–D, F–G, H–1367A).

*Peek v. Gurney* (1873) L.R. 6 H.L. 377, H.L.(E.) distinguished.
*Al-Nakib Investments (Jersey) Ltd. v. Longcroft* [1990] 1 W.L.R. 1390 doubted.

The following cases are referred to in the judgments:

*Al-Nakib Investments (Jersey) Ltd. v. Longcroft* [1990] 1 W.L.R. 1390; [1990] 3 All E.R. 321
*Andrews v. Mockford* [1896] 1 Q.B. 372, C.A.
*Caparo Industries Plc. v. Dickman* [1990] 2 A.C. 605; [1990] 2 W.L.R. 358; [1990] 1 All E.R. 568, H.L.(E.)

1352

Possfund Ltd. v. Diamond (Ch.D.)                    **[1996]**

*Chanel Ltd. v. F.W. Woolworth & Co. Ltd.* [1981] 1 W.L.R. 485; [1981] 1 All   A
E.R. 745, C.A.

*Derry v. Peek* (1889) 14 App.Cas. 337, H.L.(E.)

*Dombey & Son Ltd. v. Playfair Bros.* [1897] 1 Q.B. 368, C.A.

*Galoo Ltd. v. Bright Grahame Murray* [1994] 1 W.L.R. 1360; [1995] 1 All E.R.
16, C.A.

*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465; [1963]
3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)                      B

*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761;
[1994] 3 All E.R. 506, H.L.(E.)

*House of Spring Gardens Ltd. v. Waite* [1991] 1 Q.B. 241; [1990] 3 W.L.R.
347; [1990] 2 All E.R. 990, C.A.

*Morgan Crucible Co. Plc. v. Hill Samuel & Co. Ltd.* [1991] Ch. 295; [1991]
2 W.L.R. 655; [1991] 1 All E.R. 148, C.A.

*Peek v. Gurney* (1873) L.R. 6 H.L. 377, H.L.(E.)

*Scott v. Dixon* (1859) 29 L.J.Ex. 62n.                              C

*Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986]
A.C. 368; [1986] 2 W.L.R. 24; [1986] 1 All E.R. 129, H.L.(E.)


The following additional cases, supplied by the courtesy of counsel, were cited
in argument:

*Bank of Hindustan, China and Japan, In re; Ex parte Croom* (1873) L.R. 16   D
Eq. 417

*Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164; [1951] 1 All E.R. 426,
C.A.

*Deloitte Haskins & Sells v. National Mutual Life Nominees Ltd.* [1993] A.C.
774; [1993] 3 W.L.R. 347; [1993] 2 All E.R. 1015, P.C.

*Downsview Nominees Ltd. v. First City Corporation Ltd.* [1993] A.C. 295;
[1993] 2 W.L.R. 86; [1993] 3 All E.R. 626, P.C.                     E

*Hubbuck & Sons Ltd. v. Wilkinson, Heywood & Clark Ltd.* [1899] 1 Q.B. 86,
C.A.

*Jagwar Holdings Ltd. v. Julian* (1992) 6 N.Z.C.L.C. 68,040

*McKay v. Essex Area Health Authority* [1982] Q.B. 1166; [1982] 2 W.L.R. 890;
[1982] 2 All E.R. 771, C.A.

*McNaughton (James) Paper Group Ltd. v. Hicks Anderson & Co.* [1991]
2 Q.B. 113; [1991] 2 W.L.R. 641; [1991] 1 All E.R. 134, C.A.

*Marc Rich & Co. A.G. v. Bishop Rock Marine Co. Ltd.* [1996] A.C. 211; [1995]   F
3 W.L.R. 227; [1995] 3 All E.R. 307, H.L.(E.)

*Murphy v. Brentwood District Council* [1991] 1 A.C. 398; [1990] 3 W.L.R. 414;
[1990] 2 All E.R. 908, H.L.(E.)

*President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104;
[1984] 3 W.L.R. 10; [1984] 2 All E.R. 773, H.L.(E.)

*Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553

*Smith v. Eric S. Bush* [1990] 1 A.C. 831; [1989] 2 W.L.R. 790; [1989] 2 All   G
E.R. 514, H.L.(E.)

*Spring v. Guardian Assurance Group Plc.* [1995] 2 A.C. 296; [1994] 3 W.L.R.
354; [1994] 3 All E.R. 129, H.L.(E.)

*Thermawear Ltd. v. Linton,* The Times, 20 October 1995; Court of Appeal
(Civil Division) Transcript No. 1175 of 1995, C.A.

*Ultramares Corporation v. Touche* (1931) 255 N.Y. 170

*White v. Jones* [1995] 2 A.C. 207; [1995] 2 W.L.R. 187; [1995] 1 All E.R. 691,   H
H.L.(E.)


SUMMONSES

By summonses respectively dated 6 and 13 December 1995 and
4 March 1996 the seventh, ninth and tenth defendants, George Brian
Phillips, Allied Provincial Corporate Services Ltd. ("A.P.C.S.") and
Arthur Andersen & Co. (a firm) ("A.A."), applied pursuant to R.S.C.,

1 W.L.R.                    Possfund Ltd. v. Diamond (Ch.D.)

Ord. 18, r. 19 to strike out as disclosing no cause of action so much of the statements of claim in consolidated actions by (1) Possfund Custodian Trustee Ltd. and Britel Fund Trustees Ltd. and (2) Irene Maud Parr and 75 other shareholders in the eighth defendant, Diamond Group Holdings Plc. ("Diamond"), a company to which A.P.C.S. were financial advisers and of which Mr. Phillips was formerly a non-executive director and A.A. were auditors, as related to purchases by the plaintiffs of 5p ordinary shares in Diamond, made between 2 May and 11 July 1989 in the Unlisted Securities Market. The third party, McGrigor Donald (a firm), who were solicitors to the placing of shares in Diamond in 1989, and the first to sixth defendant former directors of Diamond, Victor Derek Diamond, Clive Brown Miller, Ian King, Michael John Vernon Houseley, James Kenneth Downes and Robert Barr, did not appear and were not represented. The summonses were heard in chambers but judgment was given by Lightman J. in open court.

The facts are stated in the judgment.

*Robin Potts Q.C.* and *Philip Gillyon* for A.P.C.S.
*Mark Barnes Q.C.* and *Rhodri Davies* for A.A.
*Andrew Thornton* for Mr. Phillips.
*Charles Falconer Q.C.* and *Martin Moore* for the plaintiffs

*Cur. adv. vult.*

2 April.  LIGHTMAN J. handed down the following judgment.

I. *Introduction*

A. *Nature of claims in actions*

The applications before me raise the novel and important question of law whether it is arguable today that those responsible for the issue of a company's prospectus owe a duty of care to subsequent purchasers of that company's shares in the market.

These two actions commenced in 1992 ("the 1992 action") and 1995 ("the 1995 action") by different plaintiffs against the same defendants arise out of a placing of shares in the eighth defendant, Diamond Group Holdings Plc. ("Diamond"), on the Unlisted Securities Market ("the U.S.M.") in April 1989 ("the placing") in respect of which the majority of the plaintiffs were subscribers and out of subsequent purchasers by certain of the plaintiffs of Diamond's shares ("the aftermarket purchasers") on the U.S.M. 5,177,726 ordinary 5p shares in Diamond were placed at 85p per share. The shares placed amounted to 27·51 per cent. of the issued share capital of Diamond, as enlarged by the issue.

Diamond's main business was the provision and arranging of mechanical breakdown insurance for the purchase of new and used cars. On 19 April 1989 Diamond issued a prospectus in connection with the flotation of its shares on the U.S.M. The plaintiffs contend that (1) when subscribing for and purchasing shares in Diamond (shares which in truth were valueless), they relied on (as they were intended to) the prospectus, (2) the prospectus materially misrepresented Diamond's financial position (in the main because it very substantially understated its liabilities by failing to disclose adequately, or at all, Diamond's liability to pay substantial extra premiums to the syndicates at Lloyd's) and (3) the first to seventh defendants (the directors at the time of the placing), the eighth defendant, Diamond, the ninth defendant, Allied Provincial Corporate

1354

Lightman J.          Possfund Ltd. v. Diamond (Ch.D.)                    [1996]

Services Ltd. ("A.P.C.S.") (the financial advisers for the placing), and the      A
tenth defendant, Arthur Andersen ("A.A.") (Diamond's auditors and the
reporting accountants for the placing), in respect both of the placing and
aftermarket purchases owed them duties of care which they broke and
thereby caused the plaintiffs' loss. In both actions the plaintiffs claim:
(1) against all the defendants in respect of the shares subscribed in the
placing statutory compensation under section 67 of the Companies Act
1985; (2) in respect of the shares subscribed in the placing and the          B
aftermarket purchases, common law damages for (a) deceit against the
first four defendants and Diamond, (b) negligence against the first to
ninth defendants in causing or procuring the publication of the prospectus
and (c) negligence against A.A. in respect of their financial report which
they consented to being included in the prospectus.

The plaintiffs define the term "aftermarket" to mean the period after      C
the placing during which the most recent published financial information
relating to Diamond was contained in the prospectus and, as so defined,
the aftermarket in relation to Diamond extended over the period from
2 May to 11 July 1989.

Diamond is in receivership. Judgment in default of defence has been
entered against the second defendant, Mr. Miller, who lives in Florida.
Third party proceedings have been commenced against McGrigor Donald,        D
a firm of solicitors, who were the solicitors to the placing.


B. History of proceedings

In the 1992 action (begun on 1 May 1992) the plaintiffs ("Possfund"
and "Britel") allege that they subscribed for 250,000 shares in the placing
at a total cost of £213,112 and that thereafter they purchased a further      E
670,000 shares by 16 purchases in the market at a total cost of £618,752.
In 1993 A.A. applied by summons to strike out the paragraphs in the
statement of claim containing the allegations against them of a breach of
a common law duty of care in respect of the placing and the aftermarket
purchases on the ground that the statement of claim disclosed no
reasonable cause of action. Argument was, however, confined to the issue      F
whether the claim in respect of aftermarket purchases was maintainable.
The hearing before Harman J. took place on 16 November 1993. At the
preliminary stage, after a hearing lasting about half a day, Harman J.
dismissed the application with costs. In his judgment he expressed "grave
doubts about the soundness of the claims advanced" but stated that he
could not "be satisfied upon this particular application by one of these 10
defendants that substantial savings will be caused" by striking out the       G
paragraphs in question. The critical factor was that the same allegations
were made against A.P.C.S. as against A.A. and A.P.C.S. (plainly with
full knowledge of A.A.'s application) decided not to join in the application,
and, since A.P.C.S. had not joined in the application, whatever its
outcome, the same areas of fact and law would still have to be investigated
at the trial. He rejected an application by A.A. after judgment for an        H
opportunity to join A.P.C.S. and in effect have another chance: A.A. had
already had its bite of the cherry and it was too late.

The 1995 action was commenced on 31 March 1995 (effectively on the
last day before expiration of the statute of limitation). Originally there
were 94 plaintiffs, but there are now (following various amendments) 75
plaintiffs or joint plaintiffs, including three nominee companies (the 12th,
49th and 94th plaintiffs). In brief (1) the total claim in the 1995 action is

1 W.L.R.                    Possfund Ltd. v. Diamond (Ch.D.)                    Lightman J.

for about £935,000, of which about £270,000 relates to aftermarket purchases, and (2) nine plaintiffs, and 11 beneficiaries of nominee plaintiffs, are solely concerned with aftermarket purchases.

Service of proceedings was delayed until July 1995. By letter dated 24 August 1995 the defendants requested particulars, in particular as to which of the plaintiffs made claims in respect of the placing and which in respect of aftermarket purchases, and intimated that an application would be made to strike out all aftermarket claims. These particulars were given on 14 November 1995. A.P.C.S. issued a summons seeking an order under R.S.C., Ord. 18, r. 19 striking out the claims in the two actions in respect of aftermarket purchases as disclosing no cause of action (i.e. bound in law to fail) on 6 December 1995. A.A. followed suit on 13 December 1995, and the seventh defendant, Mr. Phillips (formerly a non-executive director of Diamond), evidently a late convert to this course of action, did likewise on 4 March 1996. At the hearing before me his counsel sensibly only made a fleeting appearance to adopt in advance the arguments of counsel for A.A. and A.P.C.S. For completeness I should add that by order dated 29 August 1995 the two actions were consolidated. The pleadings in the two actions remain separate, but (save to the extent I indicate later) the two statements of claim are practically identical.

## II. *The applications to strike out: the preliminary stage*

### A. *The principles*

The House of Lords in *Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986] A.C. 368 held that there should be two stages on an application to strike out involving (as does the present application) a prolonged and serious argument. There is the preliminary stage, when the court has to decide whether to allow the application to proceed. If the court decides to allow the application to proceed, there is then the substantive stage when the court hears the application on its merits. The preliminary stage operates as a filter designed to ensure that the court's time and the parties' costs are not wasted on inappropriate or oppressive (often lengthy and expensive) applications.

The relevant principles were stated as follows:

"My Lords, if an application to strike out involves a prolonged and serious argument the judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for trial or the burden of the trial itself:" *per* Lord Templeman, at pp. 435–436.

"If on an application to strike out it appears that a prolonged and serious argument will be necessary there must at the least, be a serious risk that the court time, effort and expense devoted to it will be lost since the pleading in question may not be struck out and the whole matter will require to be considered anew at the trial. This consideration, as well as the context in which Ord. 18, r. 19 occurs and the authorities upon it, justifies a general rule that the judge should decline to proceed with the argument unless he not only considers it likely that he may reach the conclusion that the pleading should be struck out, but also is satisfied that striking out will obviate the necessity for a trial or will so substantially cut down or simplify

**Lightman J.**              Possfund Ltd. v. Diamond (Ch.D.)              **[1996]**

the trial as to make the risk of proceeding with the hearing sufficiently    A
worth while:" *per* Lord Mackay of Clashfern at p. 441.

### B. Application of the principles

Mr. Falconer, for the plaintiffs, submitted that at the preliminary stage
the defendants' summonses should be dismissed on four grounds and
accordingly should not proceed to the substantive stage. After full    B
argument I rejected this submission, but indicated that I would give my
reasons in this judgment, which I now do. Mr. Falconer relied on four
grounds, and I shall deal with each in turn.

### (1) Abuse of process

Mr. Falconer contended that to bring a second application to strike    C
out on the same grounds as the earlier application dismissed by
Harman J. was an abuse of process. In the special circumstances of this
case I disagree.

Whilst the doctrine of res judicata may at least ordinarily be
inapplicable in respect of an earlier interlocutory decision (see *Dombey &*
*Son Ltd. v. Playfair Bros.* [1897] 1 Q.B. 368):
D
> "Even in interlocutory matters a party cannot fight over again a battle
> which has already been fought unless there has been some significant
> change of circumstances, or the party has become aware of facts
> which he could not reasonably have known, or found out, in time for
> the first encounters:" *per* Buckley L.J. in *Chanel Ltd. v. F.W.*
> *Woolworth & Co. Ltd.* [1981] 1 W.L.R. 485, 492–493.

E
This principle applies where in the previous battle the substantive issue
between the parties has been decided, and not where on account of some
remedial procedural error or omission the substantive issue has had to be
left undecided, as in *Dombey & Son Ltd. v. Playfair Bros.* [1897] 1 Q.B.
368. The substantive issue was decided by Harman J.; he decided it on the
merits as fought by A.A.; the absence of A.P.C.S. was not a technicality,
but a matter of substance critically affecting the balancing exercise the    F
judge was required to make. This is reflected in the judge's refusal after
judgment to allow a further hearing after efforts had been made to secure
the consent of A.P.C.S. to their joinder in the application. The principle
stated by Buckley L.J. accordingly precluded a fresh application by A.A.
unless one of the stated conditions could be satisfied.

Where one defendant has made an application, e.g. to strike out, and    G
another defendant, to whom a like application on the same ground is
available, deliberately refrains from joining in the application, and the
application is refused, then ordinarily that other defendant will be subject
to a similar bar (consider *House of Spring Gardens Ltd. v. Waite* [1991]
1 Q.B. 241). A.P.C.S., as Mr. Potts (for A.P.C.S.) put it, (and no doubt
Mr. Phillips) made the tactical decision not to join in the application by
A.A.  A.P.C.S. and Mr. Phillips can be in no better position in this    H
regard than A.A. This principle therefore, as it seems to me, precluded a
second application to strike out the 1992 action by A.A., A.P.C.S. or
Mr. Phillips unless one of the stated preconditions for a fresh application
could be satisfied.

After anxious consideration I have however reached the conclusion
that the commencement of the 1995 action and its consolidation with the
1992 action constitute a sufficient change of circumstances. The mere fact

1357

1 W.L.R.          Possfund Ltd. v. Diamond (Ch.D.)          Lightman J.

that a fresh action is brought by a new plaintiff maintaining the same claim is not necessarily sufficient to release a defendant from such a constraint in a previous action. Indeed the circumstances may justify the extension of the constraint to the new action and prevent a striking out claim in both actions. It is likely that justice and convenience will require that the question of law be decided in both actions at the same time and accordingly that there be a joint hearing or no hearing. The decision in each case must be reached on consideration of the facts of that case and with regard to the considerations of justice and convenience. Justice to A.A., A.P.C.S. and Mr. Phillips does require that they be entitled to proceed with the application in the 1995 action because of the substantial value of the claim made and number of the plaintiffs making the claim, each of which claim will require (or at least may require) detailed investigation at trial unless the application succeeds. There would be a substantial objection to the judge deciding the question of law on a striking out application in the 1995 action without at the same time allowing it to be decided at the same time in the 1992 action.

Some reinforcement of this conclusion (if needed) may be found in the fact that Harman J. saw much in the merits of the application before him, and only dismissed it with some obvious regret because of the non-joinder of A.P.C.S., an obstacle not present on the current joint applications by A.A. and A.P.C.S. (together with Mr. Phillips) in both actions. I am not persuaded that there is any countervailing disadvantage to the plaintiffs, save that an adverse decision on the application to strike out is likely to prejudice their negotiating position in any settlement discussions. As regards this factor, I see every reason and advantage in negotiations taking place (if this is possible) on a realistic (and indeed correct) basis as to the prospects of a plaintiff's claims.

(2) *Soundness of the statements of claim*

Mr. Falconer submitted that the court should not harbour any doubts as to the soundness of the statements of claim, on the ground that they are plainly sound. Mr. Potts (for A.P.C.S.) and Mr. Barnes (for A.A.) submitted that the court should not harbour any doubts, for they are plainly unsound. At this stage (since I shall go into this matter in detail later) I shall only say that, for the purposes of applying the principles in the *Williams and Humbert Ltd.* case [1986] A.C. 368, I was in serious doubt as to the soundness of the pleadings as they then stood.

(3) *Saving of costs or simplification of trial*

The observations of Lord Templeman and Lord Mackay were made in the context where there were only two parties to the proceedings, and they did not need to consider whether it was sufficient to justify proceeding to the substantive stage that an application (if successful) would achieve a substantial saving in the costs of one of numerous defendants or simplify and reduce the burdens of the trial for that defendant, even if it did not have any substantial effect on the trial as a whole. Harman J. does appear to have taken the view that it was insufficient: the application before him would plainly have achieved savings and reduced the burdens for A.A. but, since the overall costs and burdens of the trial would not be substantially reduced, he dismissed the application. I understand however that the contrary was not argued. In my view, the court can and should consider the effect of applications (if successful) both on the trial as a

1358

Lightman J.          Possfund Ltd. v. Diamond (Ch.D.)                    [1996]

whole and on the particular defendant making the application, and if the          A
beneficial impact on the particular defendant is substantial, then, that
defendant can satisfy this requirement and the court should not refuse to
proceed to the substantive stage because of the limited effect of the order
(if made) on the trial as a whole.

On the facts of this case, I am amply satisfied that the application (if
successful) will effect substantial savings and reduce the burdens of the
trial for each of A.P.C.S., A.A. and Mr. Phillips. In respect of the          B
aftermarket purchases, these defendants will be saved the need (1) to
examine the relevant plaintiffs' documents revealed on discovery, (2) to
test or investigate their evidence as to reliance or (3) to adduce or test
expert evidence as to the value of the shares at the dates of the various
aftermarket purchases. The application, if successful, will open the way to
negotiations for settlement better informed as to the plaintiffs' prospects          C
at trial as against them (and the other defendants) if (as is at least
possible) the parties want to settle. If necessary I would also have decided
that the applications (if successful) would achieve substantial savings in
respect of the trial as a whole.

(4) *Importance of questions of law*

There is no doubt that the court will consider how far it is appropriate          D
on an application under Ord. 18, r. 19 to decide an important issue of law
which requires detailed and considered examination appropriate to a trial
or a trial of a preliminary issue of law.

In this case, the question whether persons in the position of the
defendants can be under a duty to aftermarket purchasers is by common
consent important, and involves careful consideration of the authorities,          E
But, as will appear later, on the pleadings as they stood when I had to
decide whether to proceed to the substantive stage, the issue whether the
plaintiffs' claim disclosed a cause of action did not appear particularly
difficult, or inappropriate to be dealt with, at this interlocutory stage. This
factor in the circumstances did not appear an objection of any real weight
to proceeding to the substantive stage.
                                                                                   F

III. *The applications to strike out: the substantive stage*

It is common ground for the purposes of these applications that the
plaintiffs' pleadings disclose a cause of action in respect of the placing.
The issue is whether such a cause of action is disclosed in respect of the
aftermarket purchases.

I propose to approach this question in three stages. First I shall          G
consider in outline the common law and statutory schemes providing
protection to investors in respect of prospectuses. Second, I shall examine
the pleadings. Third, I shall look in more detail at the authorities so far
as they provide guidance on the scope of the common law duty of care
owed to investors and in particular whether it is arguable that the tort of
negligence provides the protection pleaded by the plaintiffs.          H

A. *The common law and statutory scheme*

In the 19th century, when the issue of prospectuses first became a
common feature of commercial life, the common law allowed a claim in
damages to the investor who incurred a loss after investing in reliance on
the contents of a false or misleading prospectus (in the absence of a
breach of a fiduciary or contractual duty owed to the investor) only if he

1359

1 W.L.R.                    Possfund Ltd. v. Diamond (Ch.D.)                    Lightman J.

A    could establish the tort of deceit: see *Derry v. Peek* (1889) 14 App.Cas.
337. The prospectus was an invitation issued to the public to subscribe for
shares, and not to purchase shares in the market, and without more the
prospectus could only found liability if relied on for the purpose for which
it was issued, namely making the decision whether to subscribe, and not if
relied on for the purpose of deciding whether or not to make purchases in
the market: see *Peek v. Gurney* (1873) L.R. 6 H.L. 377. The principle was
B    graphically expressed in the expression that the representations contained
within the prospectus were exhausted upon the allotment being completed.

The legislature evidently considered that the common law provided
inadequate protection to placees, and the Directors Liability Act 1890
(53 & 54 Vict. c. 64) provided that (1) directors, promoters and persons
authorising the issue of a prospectus should be liable to pay compensation
C    to all persons who should subscribe for shares on the faith of a prospectus
for the loss or damage they sustained by reason of any untrue statement
in the prospectus, and (2) they should have a statutory defence (in respect
of which the onus should be upon them) that they had reasonable grounds
to believe and did believe that the statement was true or the fair
representation of the views of an expert. No statutory protection was
afforded to aftermarket purchasers.

D    The provisions of the Act of 1890 were brought into the mainstream
of companies legislation in 1908 in the form of section 84 of the
Companies (Consolidation) Act 1908 and re-enacted by section 37 of the
Companies Act 1929, in each case without any material change.

The Companies Act 1948 supplemented the previous statutory
provisions in three relevant respects. First, it provided that it should be
E    unlawful to make an invitation to the public to subscribe for shares
without issuing a prospectus containing certain specified information.
Second, it added experts who consented to the use of their reports in the
prospectus to the class of those liable to persons subscribing on the faith
of a prospectus, and such experts were likewise afforded a statutory
defence if they could prove the existence of reasonable grounds for
believing their statements to be true. Third, section 45(1) introduced the
F    provision (now in section 58 of the Companies Act 1985) whereby
the protection previously afforded to subscribers was extended to cover
the loophole that might otherwise exist where shares were first allotted to
an issuing house for sale to the public. This was done by deeming the
offer for sale to the public to be an offer for subscription and the
purchasers to be subscribers.

G    In 1963 the House of Lords in *Hedley Byrne & Co. Ltd. v. Heller
& Partners Ltd.* [1964] A.C. 465 established that at common law a cause of
action exists enabling the recovery of damages in respect of a negligent
misrepresentation occasioning damage and loss where the necessary
proximity exists between the representor and representee. It is clearly
established (and indeed common ground on these applications) that in a
case such as the present, where the defendants have put a document into
H    more or less general circulation and there is no special relationship alleged
between the plaintiffs and the defendants, foreseeability by the defendants
that the plaintiffs would rely on the prospectus for the purpose of deciding
whether to make aftermarket purchases is not sufficient to impose upon
the defendants a duty of care to the plaintiffs in respect of such purchases:
see *Caparo Industries Plc. v. Dickman* [1990] 2 A.C. 605. The imposition
of a duty of care in such a situation requires a closer relationship between
representor and representee, and its imposition must be fair, just and

1360

Lightman J.                    Possfund Ltd. v. Diamond (Ch.D.)                    [1996]

reasonable. I shall come back to consider whether in this context the    A
existence of an intention on the part of the defendants that investors
should rely on the prospectus for this purpose is sufficient to establish the
necessary proximity, for that is the crux of the present applications.

The Companies Act 1985 (in force at the time of the prospectus) in
sections 56 to 71 re-enacted the provisions of the Act of 1948 (for present
purposes) without any material change. Section 67 contains the provisions
for payment of compensation to placees.                                  B

Following Professor Gower's Review of Investor Protection (1984)
(Cmnd. 9125) there was enacted the Financial Services Act 1986. This Act
drew a sharp distinction between listing particulars (which effectively
replace prospectuses) in respect of shares to be admitted to the Official
List of the Stock Exchange ("listed securities") and prospectuses in respect
of unlisted securities, which include shares to be listed on the U.S.M. Part    C
IV of the Act related to listed securities and Part V to unlisted. Part IV
was brought into force, but Part V never was. In the case of listed
securities, the Act and the listing rules (which the Act required to be
complied with) required listing particulars to be constantly updated in
respect of any information affecting, inter alia, the value of the listed
securities. Section 150(1) gave a remedy against the "persons responsible"
for listing particulars:                                                 D

> "to any person who has acquired any of the securities in question"—
> i.e. the listed securities—"and suffered loss in respect of them as a
> result of any untrue or misleading statement in the [listing] particulars
> or any omission from them of any matter required to be included . . ."

In short, protection was afforded to all purchasers of listed securities    E
(whether placees or aftermarket purchasers) relying on the continuing and
updated representations in the listing particulars and the updates.

In the case of unlisted securities, there is no equivalent statutory
provision for updating the prospectus, but the U.S.M. does in fact require
an undertaking to like effect from a company admitted to the U.S.M.
Section 166(1) provides that persons responsible for a prospectus "shall
be liable to pay compensation to any person who has acquired the    F
securities to which the prospectus relates and suffered loss in respect of
them as a result of any untrue or misleading statement in the
prospectus . . ."

For the purpose of determining the ambit of the duty of care under
the tort of negligence, I have been invited to consider whether section 166
(albeit not brought into force, but later repealed and re-enacted in 1995)
gave a statutory cause of action to aftermarket purchasers. All I shall say    G
is that, as present advised, I do not think that it does. The reference to
the "person who has acquired the securities to which the prospectus
relates," as it seems to me, naturally refers to the placee in respect of the
shares orginally allotted to him.

To complete the legislative history, the Public Offers of Securities
Regulations 1995 (S.I. 1995 No. 1537), made pursuant to the European    H
Community Council Directive (89/298/E.E.C.) (in force on 19 June 1995),
laid down a detailed regime in respect of public offers of securities. Any
public offer must be accompanied by a prospectus to be made available
to the public during the period of the offer, a supplementary prospectus
must be published in the event of any significant change or matter arising
during the period of the offer, and a remedy in respect of misleading
statements in prospectuses for unlisted securities is provided "to any

1361

**1 W.L.R.**                    Possfund Ltd. v. Diamond (Ch.D.)                    Lightman J.

A    person who has acquired the securities to which the prospectus relates."
This provision for compensation is to like effect to that contained in
section 166 and is, I think, likewise limited in operation and scope.

B. *Pleadings*

    Since these applications turn on the sufficiency of the pleadings,
B    I think it right to set out the relevant passages in the pleadings in the two
actions.

(1) *The 1992 action*

    (a) The statement of claim in the 1992 action (so far as material) reads:

    *"Part IV: The purpose of the prospectus*
C        "5.1 The purpose and object of the prospectus was to provide
    information on the company and its subsidiaries to prospective
    placees and provide encouragement to prospective placees to invest in
    the shares of the company by participating in the placing. Prospective
    placees were persons to whom the prospectus was sent (whether
    directly or as a result of an inquiry made by the recipient however
    prompted). The plaintiffs were prospective placees.
D        "5.2 Further and in the alternative, the purpose and object of the
    prospectus was to provide the financial background to the company
    and its subsidiaries on the strength of which or in the context of
    which a market in the shares of the company was established and
    maintained, and, in particular, to induce or encourage the persons
    mentioned in paragraph 5.3 below to purchase shares on the
E    aftermarket, so as to ensure or attempt to ensure a satisfactory
    market in the shares after the commencement of dealings at least
    until further or other financial information was provided to the public
    by or on behalf of the company.
        "5.3 In any event, and for the aforesaid purposes or either of
    them, the persons to whom such information was to be given and
    who were intended to consider and act upon the statements made in
F    the prospectus were prospective placees (as defined in paragraph 5.1
    above) who either: 5.3.2 would purchase further shares in the
    aftermarket notwithstanding that they obtained their desired number
    of shares in the placing, or 5.3.3 would obtain in the placing less than
    the number of shares desired and would purchase further shares in
    the aftermarket, or 5.3.4 would not seek to participate in the placing
G    but would purchase further shares in the aftermarket."

    The plaintiffs then go on to set out the facts and matters relied on in
support of the allegations contained in paragraphs 5.1 and 5.2. It is
sufficient to say that the substance of these particulars amounted to the
following: (1) the advantages of permission being granted to deal with the
shares in the U.S.M. for placees in respect of the marketability of their
H    shares and for Diamond in respect of access to the equity capital markets;
and (2) the references in the prospectus to (a) the future prospects of
Diamond and certain imminent acquisitions, (b) the agreement by the
directors (other than Mr. Phillips), in order to maintain an orderly market
in the shares in Diamond, to restrict for a period the sales of their own
holdings and not to compete with Diamond.
    None of the particulars provided any support for the allegations of
purpose and intent pleaded in paragraphs 5.2 and 5.3. The particulars

1362

Lightman J.                    Possfund Ltd. v. Diamond (Ch.D.)                    [1996]

merely reflect inducements to prospective investors to take up the     A
invitations proffered with the prospectus and communicate the information
required to be provided to such investors to enable an informed decision
to be made whether to do so.

(b) Further and better particulars in the 1992 action were served at the
request of the ninth and tenth defendants. These took the matter no
further.

(c) Voluntary further and better particulars were served supplementing     B
the particulars already given to the tenth defendant. These contained only
one relevant and potentially supportive particular under paragraph 5.2. It
reads as follows:—

> "7(a)(ii) The fact that the purpose set out in paragraph 5.2 of the
> amended statement of claim is acknowledged by those experienced as
> advisers in relation to the flotation of companies as one of the     C
> purposes of a prospectus issued in connection with a placing, the
> other purpose being as set out in paragraph 5.1 of the amended
> statement of claim."

I should add that the defendants have long made discovery in the 1992
action and accordingly there is no scope for that frequently met excuse for
serving inadequate particulars that full particulars cannot be served until     D
after discovery.

## (2) *The 1995 action*

The statement of claim in the 1995 action contains provisions identical
to paragraphs 5.1 and 5.2 in the 1992 action, but paragraph 5.3 is in
different terms. It reads:                                              E

> "In any event, the persons to whom such information was given
> and who were intended to consider and act upon the statements made
> in the prospectus were all or any of the following: (i) members of the
> public (including the Group B plaintiffs); (ii) members of the public
> who were employees of the company or its subsidiaries (including
> Group B plaintiffs); (iii) connected brokers (including those of the     F
> Group A plaintiffs); (iv) stockbrokers and other financial institutions
> and intermediaries (including those of the Group A plaintiffs) who
> would purchase shares."

The plaintiffs then proceed to set out identical particulars to those to
be found in the 1992 statement of claim, but do not incorporate paragraph
7(a)(ii) of the voluntary particulars.                                  G

## (3) *Sufficiency of pleadings*

Leaving aside the voluntary particulars, the particulars relied on (as
I have said) were quite inadequate to establish any properly arguable
or pleadable purpose of the prospectus or intention upon the part of
the defendants to induce aftermarket purchases. The one paragraph in the
voluntary particulars alone went any way in this direction, but (1) the     H
voluntary particulars were relied on only in the claim against A.A. in the
1992 action and were not relied on against the other defendants in the
1992 action or in the 1995 action at all, and (2) paragraph
7(a)(ii) appeared objectionable as close to unintelligible and totally
uncommunicative. Unfortunately no request for particulars was ever made
in respect of these particulars. Perhaps A.A. had abandoned hope of any
sensible clarification.

1 W.L.R.          Possfund Ltd. v. Diamond (Ch.D.)          Lightman J.

When it became apparent from the plaintiffs' submissions that paragraph 7(a)(ii) and the (as yet unrevealed) expert evidence in support intended to be adduced at the trial constituted the whole thrust of their case on the applications before me, of my own motion I directed the plaintiffs to provide full further and better particulars of paragraph 7(a)(ii), and in the exceptional circumstances of this case (in order to show the substance and bona fides of this contention as to which the earlier pleadings left me in some real doubt), I also ordered the plaintiffs to file an affidavit from their expert substantiating their case on this score. Mr. Falconer objected to the order for service of the affidavit: such an order (he said) was quite novel on such an application—it was a procedural innovation. But everything is new once. In future, the same order may be made again if the exceptional circumstances justify it. Such order will then not be novel, but it will be none the better or worse for that. Not only do I possess jurisdiction to make such an order, but I ought to exercise such jurisdiction when (as in this case) justice and convenience so require.

Mr. Falconer after an adjournment provided both the particulars and the affidavit. Put very shortly, his case thus revealed is that, whatever the situation at the time of the decision in *Peek v. Gurney,* L.R. 6 H.L. 377, by 1989 company and commercial practice in respect of prospectuses and market conditions and perceptions had changed and with them the purpose of a prospectus: the established purpose of a prospectus and its contents were no longer confined to inducing investors to become placees, but extended to inducing the public to make aftermarket purchases. A significant factor in this context was the requirement of the Stock Exchange for the entire prospectus to be printed on Extel cards for Extel Statistical Services Ltd. for the purposes of that company making them available to all subscribers and investors who want to look at them. Read in this light and against this background, the intention of the defendants reasonably to be inferred and as reasonably understood by the plaintiffs was to induce the plaintiffs, as well as to accept shares on the allotment, to make aftermarket purchases. The affidavit in support is from Mr. John Herring, a director of Kleinwort Benson Securities Ltd. His affidavit verifies the particulars and is to the effect that in the market today a prospectus is perceived as intended to be acted upon for the purposes of aftermarket purchases and that indeed is the intention of those who prepare and are responsible for them.

Mr. Barnes for A.A. accepted that the particulars did now furnish a sufficiently pleaded case that the purpose of the prospectus and the intention of the defendants was to induce such purchases. Mr. Gillyon for A.P.C.S. objected to the pleadings as still insufficiently particularising the facts relied on in support of the contention. I think that the pleading is sufficient.

The plaintiffs' case, as Mr. Falconer made clear and as is now apparent from the pleadings, is one applicable to any ordinary prospectus today and turns exclusively on expert evidence as to the perception in current practice of the purpose of a prospectus. The defendants know sufficiently the case they have to meet from the particulars, supplemented by the affidavit of Mr. Herring.

C. *Intent and proximity*

The issue before me is accordingly whether it is arguable that persons responsible for a prospectus owe a duty of care to (and may be liable in

1364

Lightman J.                    **Possfund Ltd. v. Diamond (Ch.D.)**                [1996]

damages at the instance of) an aftermarket purchaser if it is established    A
that such purchaser was intended to rely on the prospectus for this
purpose, and in particular whether the necessary proximity exists in such
a situation between those responsible for the prospectus and the purchaser.


(1) *Intention*
                                                                             B
For the purpose of the torts of deceit and negligent misrepresentation,
it is necessary to establish a material misrepresentation intended to
influence, and which did in fact influence, the mind of the representee and
on which the representee reasonably relied.

There has been much argument before me whether the required
intention of the representor should be objectively ascertained, as the       C
intention reasonably to be inferred from his words or action (or inaction),
or whether the subjective intention of the representor to induce is
sufficient. The authorities and textbooks do not provide any clear
guidance. For example in *Halsbury's Laws of England,* 4th ed., vol. 31
(1980), p. 634, para. 1042 it is stated that the intention may be actual or
presumptive; whilst in *Clerk & Lindsell on Torts,* 17th ed. (1995), p. 282,
para. 7-65 it is categorically stated that: "The defendant's intention must   D
be assessed objectively." A footnote makes reference to a dictum of Lord
Goff of Chieveley in *Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C.
145, 181B to the effect that in determining whether a party has "assumed
responsibility" an objective test of intention must be applied.

Whether or not theoretically a subjective intention is sufficient, for all
practical purposes, as it seems to me, the intention must in all cases be     E
objectively established. Such intent is objectively established if the
representor expressly communicates intent to the representee. On the other
hand, where it is not expressly communicated, the representee must
establish that he reasonably relied on the representation and that he
reasonably believed that the representor intended him to act upon it.
Accordingly, if the subjective intention of the representor is not expressly
communicated to him, the existence of a subjective intention alone is         F
insufficient to found an action unless the existence of such an intention on
the part of the representor was reasonably to be inferred by the
representee, i.e. the objective test must be satisfied. If in all cases the
objective test must be satisfied, the subjective (uncommunicated) intention
of the representor adds nothing as a matter of law. As a matter of fact, if
established it may perhaps assist in establishing what reasonable inference
should be drawn from his conduct; and of course it is relevant if the         G
actual state of mind of the representor is in issue (e.g. a fraudulent intent).


(2) *Proximity*

The law has drawn a distinction between representations made to specific    H
persons for specific purposes and representations to the public (or sections
of the public, e.g. investors). In the case of the former, in general it is
sufficient to establish a duty on the part of the representor that he should
reasonably have foreseen that the persons concerned would rely on his
representation for the purposes in question. But in the latter, generally it
is necessary to establish a proximity between the representor and
representee beyond the mere foreseeability of reliance by the representee

**1 W.L.R.**                          Possfund Ltd. v. Diamond (Ch.D.)                          Lightman J.

A   to render it fair, just and reasonable that such a duty be imposed in respect of the representation. As it seems to me, it is at least well arguable that the necessary proximity in such a case is established if the reliance by the members of public for the purpose in question is intended by the representor. Intention, if not sufficient to establish the necessary proximity, is at least a very important factor: see Slade L.J. in *Morgan Crucible Co. Plc. v. Hill Samuel & Co. Ltd.* [1991] Ch. 295, 320B–C. The requirements

B   for imposition of a duty of care of fairness, justice and reasonableness are to a large degree directed to protecting against potential far-reaching foreseen, but unintended, consequences: where the consequences are intended, rarely can the representor on these grounds object to his being held responsible for the deliberate consequences of his words. Some support for this veiw may be found in passages in the judgments of the

C   Court of Appeal in *Morgan Crucible Co. Plc. v. Hill Samuel & Co. Ltd.* and *Galoo Ltd. v. Bright Grahame Murray* [1994] 1 W.L.R. 1360, 1382–1383.

### (3) *Negligence and prospectus*

  In *Peek v. Gurney,* L.R. 6 H.L. 377 the House of Lords held that (at

D   common law) the object of a prospectus was to provide the necessary information to enable an investor to make an informed decision whether to accept the offer thereby made to take up shares on the proposed allotment, but not a decision whether to make aftermarket purchases. The later legislation (including the Acts of 1948 and 1985 which required and regulated the contents of prospectuses) had the same objective. The Act of 1986 recognises a wider object in the case of listing particulars in

E   respect of listed securities: the object includes properly informing aftermarket purchasers and creates a corresponding duty of care. Parliament refrained from so widening the object of a prospectus in unlisted securities. The question before me is whether it is properly arguable that the common law can, in changed market conditions, recognise a duty of care in case of prospectuses for unlisted securities which is substantially equivalent to the duty of care statutorily created in

F   respect of listed securities, but statutorily withheld from unlisted.

  The starting point in determining the ambit of the duty of care in respect of a prospectus is the statutory purpose of the prospectus. In the same way the starting point in determining the ambit of the duty of auditors in respect of their audit and audit report is the limited statutory purpose of that statutory requirement, namely to enable shareholders to

G   exercise their class rights in general meeting in an informed manner: see *Caparo Industries Plc. v. Dickman* [1990] 2 A.C. 605, 629–630. But that is only the beginning: it is not necessarily also the end. It does not necessarily preclude a superadded purpose if a superadded purpose can positively be shown to exist. The burden of establishing such a superadded purpose may be heavy or indeed overwhelming, but whether the burden can or

H   cannot be discharged is a matter for the trial.

  But, the plaintiffs say, the prospectus must be examined in the light of changed market practice and philosophy current at its date of preparation and circulation. The plaintiffs claim that there has developed and been generally recognised an additional purpose, an additional perceived intention on the part of the issuer and other parties to a prospectus, namely to inform and encourage aftermarket purchasers, and that this is the basis for the pleaded purpose attributed by the plaintiffs to the

1366

Lightman J.          **Possfund Ltd. v. Diamond (Ch.D.)**          **[1996]**

A

prospectus. If this is established, then it does seem to me to be at least arguable that a duty of care is assumed and owed to those investors who, as intended, rely on the contents of the prospectus in making such purchases. No doubt the court should think carefully before recognising a duty, in the case of unlisted securities, which has been withheld by the legislature. Though the plaintiffs may find some support in the recurring provision in the legislation that it should not affect any liability which a party may incur apart from the legislation (see e.g. section 160 of the Financial Services Act 1986), I do not think that it provides the complete answer. What is significant is that the courts have since 1873 (before any legislation) recognised a duty of care in case of prospectuses when there is sufficient direct connection between those responsible for the prospectuses and the party acting in reliance (see *Peek v. Gurney,* L.R. 6 H.L. 377), and the plaintiffs' claim may be recognised as merely an application of this established principle in a new factual situation. It is highly questionable whether (as contended for by the defendants) recognition of such a duty involves recognition of a novel category of negligence or a massive extension of a duty of care.

B

C

I can find nothing in the authorities or textbooks which precludes the finding of such a duty and at least some potential support in them.

D

(a) As regards the authorities, in the decisions limiting the duty of care to placees, the only pleaded allegation of the purpose of the issue of the prospectus was the inducement to take up the allotted shares: see e.g. *Peek v. Gurney,* L.R. 6 H.L. 377, 395–396 and *Al-Nakib Investments (Jersey) Ltd. v. Longcroft* [1990] 1 W.L.R. 1390. In *Peek v. Gurney* itself support may be found in the speeches of Lord Chelmsford (at pp. 398–400) and Lord Cairns (at pp. 412–413) for the proposition that the necessary direct connection between issuers and aftermarket purchases may be found where the intention is established that aftermarket purchasers rely on the prospectus. How the intention is manifested, whether by sale of the prospectus to prospective aftermarket puchasers (as in *Scott v. Dixon* (1859) 29 L.J.Ex. 62n.) or by other means (as in *Andrews v. Mockford* [1896] 1 Q.B. 372), surely cannot be crucial. Both these last two cited cases are cases of fraudulent misrepresentation, but it is not self-evident to me that, if the issuers of a prospectus intend investors to rely on it, the issue of proximity should depend on whether the representation was fraudulent or negligent. In the case of fraudulent representations, the authorities cited above do support the proposition that intended reliance is sufficient: see also *Clerk & Lindsell,* 17th ed., pp. 713–714, para. 14.02.

E

F

G

(b) In *Gower's Modern Company Law,* 5th ed. (1992), p. 498, the view is expressed that the holding in *Peek v. Gurney,* L.R. 6 H.L. 377 "that an investor who, in reliance on a false prospectus, bought shares on the market had no remedy . . . seemed outmoded once prospectuses specifically stated that one of their purposes was to lead to admission to listing on the Exchange;" and the hope is expressed "that *Al-Nakib* [1990] 1 W.L.R. 1390, which resurrects it, will be reviewed by a higher court." That passage in this authoritative work supports the view that the plaintiffs' claim as to the purpose of the prospectus and the duty of care owed today in respect of the prospectus—a prospectus which specifically states that, as part of the same exercise as allotment, the facility will be available for shares in Diamond to be dealt with on the U.S.M.—sufficiently merits full consideration at trial.

H

1367

1 W.L.R.                    Possfund Ltd. v. Diamond (Ch.D.)                    Lightman J.

A                                IV. *Conclusion*

I accordingly refuse the defendants the relief which they seek. I cannot however part with this case without expressing my deep indebtedness to all counsel involved who have saved me from worse errors than may be apparent in this judgment.

B                                                                *Order accordingly.*

*Solicitors: Richards Butler, Herbert Smith; Simmons & Simmons; Maxwell Batley.*

[Reported by EDWARD JACKSON ESQ., Barrister]

C

---

D                              [QUEEN'S BENCH DIVISION]

## *CITI-MARCH LTD. AND ANOTHER v. NEPTUNE ORIENT LINES LTD. AND OTHERS

1995   Dec. 8;                                              Colman J.
1996   Jan. 29
E

*Practice—Stay of proceedings—Jurisdiction clause—Claim time-barred in contractual forum—Protective proceedings not issued—Other defendants within jurisdiction—Whether plaintiff acting reasonably in allowing time to expire—Whether leave to issue writ and serve out of jurisdiction to be set aside*
*Ships' Names—Humber Bridge*

F          Cargoes of clothing were shipped in containers from Hong Kong to London under 11 bills of lading issued by the first defendant. The bills of lading were subject to Singapore law and contained Singapore exclusive jurisdiction clauses. After the containers were discharged in England they were taken by the second defendant to the third and fourth defendants' bonded warehouses for customs inspection before being carried to the plaintiffs' premises in London. When the containers were opened
G          some of the clothing was missing. The plaintiffs issued a writ against all four defendants. The second, third and fourth defendants were served in England, but the first defendant could only be served in Singapore, for which leave was given. The 12-month limitation period under the Hague-Visby Rules expired without the plaintiffs issuing protective proceedings in Singapore.
           On the first defendant's application to set aside leave to issue
H          the writ and serve it out of the jurisdiction:—
           *Held*, dismissing the application, that, where a plaintiff failed to issue protective proceedings in the contractual forum, a stay would be ordered or service set aside unless strong cause was shown why the English jurisdiction should be maintained; that where, but for the time bar, there was such strong cause, a stay would not be ordered or service set aside in spite of the plaintiff's conscious decision not to preserve time in the contractual forum, since such conduct could not be said to be unreasonable

# CASES

### DETERMINED BY THE

## CHANCERY DIVISION

#### AND IN

## BANKRUPTCY AND LUNACY

#### AND ON APPEAL THEREFROM IN THE

## COURT OF APPEAL.

REDGRAVE *v.* HURD.

[1880 R. 0703.]

*Misrepresentation—Specific Performance—Rescinding Contract—Damages.*

C. A.
———
1881
FRY, J.
*March* 14, 15.

C. A.
*Nov.* 25, 26, 28.

The Plaintiff, a solicitor, published in the *Law Times* an advertisement headed "Law Partnership," stating that the advertiser, an elderly solicitor of moderate practice, with extensive connections, shortly retiring, and having no successor, would first take as partner an efficient lawyer who would not object to purchase the advertiser's suburban residence, value £1600. The Defendant answered the advertisement, and had an interview with the Plaintiff, at which the latter stated that his business brought in about £300 a year. The Defendant wrote saying that he should like to have some idea of the amount of business done for the last three years, and asking an interview for the purpose. At this interview the Plaintiff produced three summaries shewing a business of not quite £200 a year. The Defendant asked how the difference was made up, and the Plaintiff shewed him a number of papers which he said related to other business not included in the summaries. These papers, which the Defendant did not examine, shewed only a most trifling amount of business, and the gross returns of the business were in fact only about £200 a year. The Defendant shortly afterwards signed an agreement to purchase the house for £1600, and paid a deposit, the Plaintiff refusing to have any reference to the business inserted in the agreement. The Defendant took possession, but finding, as he alleged, that the business was worthless, refused to complete. The Plaintiff brought his action for specific performance. The Defendant put in a defence, in which he disputed the right to specific performance on the ground of misrepresentations as to the business, and by counter-claim claimed on the same ground to have the contract rescinded, and to have damages on the ground of the expenses he had been put to and the loss incurred by giving up his own

2            CHANCERY DIVISION.        [VOL. XX.

C. A.

1881

REDGRAVE
*v.*
HURD.

practice. He did not in his counter-claim specifically state what represen-
tations had been made, nor allege that they were false to the Plaintiff's
knowledge:—

*Held*, by *Fry*, J., that the Defendant having had opportunity afforded
him of ascertaining the truth of the representations made to him as to the
amount of the business, and having to some extent, though carelessly and
inefficiently, inquired into it, must be taken not to have relied on the
representations, and that the Plaintiff was entitled to specific performance.

*Held*, on appeal, that where one person induces another to enter into an
agreement with him by a material representation which is untrue, it is no
defence to an action to rescind the contract that the person to whom the
representation was made had the means of discovering, and might, with
reasonable diligence, have discovered, that it was untrue:

*Held*, further, that it is no defence in such an action that the Defendant
made a cursory and incomplete inquiry into the facts, for that if a material
representation is made to him he must be taken to have entered into the
contract on the faith of it, and in order to take away his right to have the
contract rescinded if it is untrue, it must be shewn either that he had know-
ledge of facts which shewed it to be untrue, or that he stated in terms, or
shewed clearly by his conduct, that he did not rely on the representation:

*Held*, therefore, that the Defendant was entitled to have the contract re-
scinded and the deposit returned, but that as he had not pleaded knowledge
on the part of the Plaintiff that the statements as to the business were
untrue, and had not specifically alleged the statements in his counter-claim,
he could not recover damages.

*Attwood* v. *Small* (1) considered and explained.

IN January, 1880, the Plaintiff, a solicitor of *Birmingham*,
inserted in the *Law Times* the following advertisement :—

" Law Partnership.—An elderly solicitor of moderate practice,
with extensive connections in a very populous town in a midland
county, contemplates shortly retiring, and having no successor
would first take as partner an efficient lawyer and advocate
about forty, who would not object to purchase advertiser's sub-
urban residence, suitable for a family, value £1600, three-fourths
of which might remain on security—no premium for business
and introduction. A large field is here open for an efficient man,
and great advantages for free education of sons. Address *R. J.*,
No. 1919, 10 *Wellington Street, Strand.*"

The Defendant applied by letter to the address indicated, and a
correspondence ensued, the negotiation proceeding on the footing
that the Plaintiff should receive the Defendant as his partner and

(1) 6 Cl. & F. 232.

transfer to him a moiety of his practice and the Plaintiff's lease-hold house for £1600. On the 12th of February the Plaintiff and Defendant had two interviews, at the latter of which the Defendant's wife was present. There was a direct conflict of evidence as to what passed at these interviews, the Plaintiff asserting that he stated the business to bring him in about £200 a year, the Defendant and his wife saying that the Plaintiff stated it to bring in from £300 to £400 a year. The parties were examined orally in Court, and Mr. Justice *Fry* held that greater weight was to be attributed to the evidence of the Defendant and his wife than to that of the Plaintiff, and held that the Plaintiff had either represented his business as bringing in about £300 a year, or from £300 to £400 a year.

On the 14th of February the Defendant wrote to the Plaintiff: "Of course I should duly rely on your promise to do all you could to extend the business among your friends. Still I should be glad to have some idea as to the amount of business done at your office in the past three years and the nature of the nucleus with which we should start. Would you, therefore, be able to give me an hour next Tuesday to go into this matter and settle the terms of partnership?"

On Tuesday, the 17th of February, the parties accordingly had an interview at the Plaintiff's office. The Plaintiff produced to the Defendant three summaries of business done in 1877, 1878, 1879. These summaries shewed gross receipts not quite amounting to £200 in a year. The Defendant asked how the difference was made up, and the Plaintiff shewed him a quantity of letters and papers which he stated to relate to other business which he had done. No books of account were produced, the Plaintiff not having kept any books which shewed the amount of his business, but the Plaintiff shewed the Defendant some letter-books and diaries and a day-book. The Defendant did not examine any of the books, letters, and papers thus produced, but only looked cursorily at them, and ultimately agreed to purchase the house and take a share in the business for £1600. Mr. Justice *Fry* came to the conclusion that if the letters and papers to which the Plaintiff referred had been examined they would only have shewn business to the amount of £5 or £6 a year. The Defendant wished

C. A.
1881
REDGRAVE
*v.*
HURD.

4                    CHANCERY DIVISION.              [VOL. XX.

C. A.
1881

REDGRAVE
v.
HURD.

the written agreement to set out that the £1600 was the consider-
ation for the purchase both of the house and the share in the
practice, but the Plaintiff refused to assent to this, and an agree-
ment was drawn up and signed on the 2nd of March, 1880, by
which the Defendant agreed to purchase the house for £1600, the
practice not being referred to.  The Defendant paid a deposit of
£100, and on the 17th of April, 1880, was let into possession of
the house, and removed thither with his family from *Stroud ;* but
finding, as he alleged, that the practice was utterly worthless, he
gave up possession, and refused to complete the purchase.  The
Plaintiff, in June, 1880, commenced an action for specific perform-
ance of the written agreement to purchase the house.

The Defendant by his statement of defence admitted the signa-
ture of the agreement, but alleged that it was not binding on him
for the reasons thereinafter mentioned.  He then (par. 2) stated
the advertisement, and alleged (par. 3) that the Defendant
entered into correspondence with the Plaintiff with reference to
it, and that it was arranged between them that the Plaintiff
should receive the Defendant as his partner, and transfer to him
a moiety of a moderate law practice which the Plaintiff stated
that he possessed, together with the leasehold house, the Defen-
dant agreeing to pay as consideration for the transfer both of the
share in the practice and of the house the sum of £1600 ; (par. 4)
that the Defendant requested the Plaintiff that the facts stated in
par. 3 should be set out in the written agreement between the
parties in order that it might appear that the payment by the De-
fendant of the £1600 was a consideration for the transfer of the
leasehold house and the share in the law practice, but that the
Plaintiff refused, " and the Defendant, for reasons appearing in
the next paragraph, now alleges that in such refusal the Plaintiff
was actuated by a fraudulent intention."  (5) " Shortly after the
partnership between the Plaintiff and the Defendant had been en-
tered into in pursuance of the agreement thereto, the Defendant
discovered that the said law practice was utterly worthless, and that
the representations made in regard thereto by the Plaintiff were
false ; and the Defendant says that the Plaintiff made such false
representations for the purpose of inducing him, the Defendant,
to enter into the contract for the purchase of the said partner-

ship." The Defendant then proceeded to allege that certain mis-representations had been made to him about the house. He then proceeded: "By way of counter-claim the Defendant relies upon the facts stated in his defence as though they were again repeated, and claims" to have the contract rescinded and the deposit of £100 returned to him, £100 damages for the Defendant's loss and trouble in removing from *Stroud* to *Birmingham*, £200 damages for having given up his practice at *Stroud*, and for further relief.

The Plaintiff by his reply submitted that the agreement for purchase was binding on the Defendant wholly irrespective of any arrangement in reference to the partnership; and that even if that were not so the Plaintiff had always been ready to carry out the agreement for a partnership, and that the allegations as to fraud and misrepresentation were untrue. He denied that the £1600, or any part thereof, was a consideration for the transfer of the share in the law practice. He admitted that he refused to enter into an agreement by which the £1600 should be in part a consideration for the purchase of a share in the law practice, and declined to sell the house for anything less than £1600, but said that it was wholly untrue that in such refusal he was actuated by any fraudulent intention. He denied having made any false representations as to his business.

The action came on for hearing before Mr. Justice *Fry* on the 14th of March, 1881.

*North*, Q.C., and *Yate Lee*, for the Plaintiff:—

The defence is that the contract was induced by misrepresentation. The misrepresentations relied upon ought to be specifically stated in the pleadings: *Cargill* v. *Bower* (1); *Arkwright* v. *Newbold* (2); *New Brunswick and Canada Railway and Land Company* v. *Conybeare* (3); *Western Bank of Scotland* v. *Addie* (4); *Mowatt* v. *Blake* (5). The *Judicature Act* has made no difference in this respect.

[FRY, J.:—I do not think the *Judicature Act* affects such a ques-

(1) 10 Ch. D. 502.            (3) 9 H. L. C. 711.
(2) 17 Ch. D. 301.            (4) Law Rep. 1 H. L., Sc. 145.
                    (5) 31 L. T. 387.

C. A.

1881

REDGRAVE
v.
HURD.

6                           CHANCERY DIVISION.            [VOL. XX.

C. A.
1881
REDGRAVE
*v.*
HURD.

tion as this, because it is only fair play between man and man that the Plaintiff should know what is charged against him.]

*Cookson,* Q.C., and *Ruegg,* for the Defendant :—

If necessary, leave to amend should be given. There has been no surprise, for the representations on which the Defendant relies have been stated in his answers to the Plaintiff's interrogatories : *Hall* v. *Maltby* (1). We wish to introduce an allegation that the Plaintiff represented that the law practice was worth £300 a year, and that this was untrue; and that he represented that the house was built of the best materials, and that he had been offered £1500 for it, and that this was untrue.

[*North* said that he would not oppose the amendment.]

The law practice was the decoy duck. The Defendant's object in removing was to get the business, and the Plaintiff knew this: *Lamare* v. *Dixon* (2); *Myers* v. *Watson* (3).

*North,* in reply, on the claim :—

No misrepresentation was made on which the Defendant had a right to act, or on which he did act, even if the contract for the purchase of the house and the contract for the purchase of the business are to be looked at together. But they were entirely distinct contracts.

*Cookson,* in reply, on the counter-claim :—

Misrepresentations were made on material matters. They were fraudulent, and they induced the contract. There is sufficient ground at any rate for refusing specific performance of the contract : *Cadman* v. *Horner* (4).

FRY, J., after stating the nature of the contract and the Defendant's allegations of misrepresentations made by the Plaintiff, expressed his opinion on the evidence that a representation as to the water supply of the house was not proved to have been false, and that the Defendant's case as to representations made by the

(1) 6 Price, 240.                    (3) 1 Sim. (N.S.) 523.
(2) Law Rep. 6 H. L. 414.            (4) 18 Ves. 10.

Plaintiff about the value of the house had also failed.   His Lord-
ship proceeded :—

I then come to the third and last allegation, which has really
created in my mind the only question in this litigation, that is,
that the Plaintiff, in personal interviews with the Defendant,
repeatedly stated to him that his law practice brought him in
about £300 a year, and that he had a very extensive connection.
That is stated in the original advertisement which led to the
negotiations between the parties, and it appears to me clear that
" connection " used in that sense is contrasted with practice,
because the representation made by the advertisement was that
the Plaintiff was " an elderly solicitor of moderate practice with
extensive connections." According to the evidence of the Plaintiff,
although his practice was very moderate, his connection in and
about *Birmingham* was large, and, therefore, although he had not
many actual clients, he had, as he represented, many potential
clients.

Did the Plaintiff then represent that his practice brought him
in about £300 a year ?   On that question there has been a great
conflict of evidence.   I am bound to say that I attribute greater
weight to the statements of the Defendant and his wife than I
do to the statement of the Plaintiff in that particular, and I think
that I must treat it as proved that such a statement was made on
two occasions by the Plaintiff to the Defendant.

The next inquiry is, was that statement true?   In my judg-
ment it clearly was not true.   I do not believe that the Plaintiff's
business brought him in anything like £300 a year, and in fact
the Plaintiff when he was in the box did not say that it did.

But then there comes, in the second place, this very material
inquiry : Did the Defendant purchase the house and go on with
the negotiations upon the footing and upon the faith of that
representation so made by the Plaintiff?   I have come to the
conclusion that he did not.   I think that the Defendant's letter
of the 14th of February is worthy of all the weight which has
been attributed to it by the Plaintiff's counsel.   The Defendant
in that letter says in effect this: " While relying on your effort to
extend the business among your connection, I feel I should like

C. A.

1881

REDGRAVE
*v.*
HURD.

Fry, J.

C. A.
1881
REDGRAVE
*v.*
HURD.
——
Fry, J.
——

to have some idea as to the amount of business done at your office in the past three years, and the nature of the nucleus with which we should start."

Accordingly the Defendant does, by the Plaintiff's invitation, visit him on the 17th of February and, then and there, there are produced to the Defendant by the Plaintiff the papers which relate respectively to the years 1877, 1878, and 1879, which have been called sometimes bills of costs and sometimes estimates, and they shew, roughly speaking, a gross amount of business done to the extent of about £200 a year. Then the common case of the Plaintiff and the Defendant is that, in answer to an inquiry by the Defendant, the Plaintiff said that there was other business which was not entered in those papers. I cannot attribute much weight to that other business, and for this reason, that, in my judgment, if the Defendant had meant to rely upon this extraneous business, which was not mentioned in the papers, he would have made some inquiry about it. The conclusion to which I come to upon the evidence is, that the books were there before the Defendant, and that, although he did not take the trouble to look into them, he had the opportunity of doing so. In my judgment, if he had intended to rely upon that parol representation of business beyond what appeared in the papers, having the materials before him, he would have made some inquiry into it. But he did nothing of the sort. I think the true result of the evidence is this, that the Defendant thought that, if he could have even such a nucleus of business as those papers disclosed, he could, by the energy and skill which he possessed, make himself a good business in *Birmingham*, and that he was willing to take as the business of the Plaintiff that which was represented in those papers.

There is no allegation that those papers are false, and in my judgment they are not false. Substantially I think they did truly represent the business done, and I think that there was some little, but very little, business beyond what was there represented ; perhaps £5 or £6 a year would cover the additional business.

The Defendant went down for the purpose, as he says, of gaining an idea as to the amount of business done in the office, and ascertaining the nature of the nucleus upon which they would

start.   He had the means of inquiring into it further than he did. He inquired into it to a certain extent, and if he did that carelessly and inefficiently, it is his own fault.   As in *Attwood* v. *Small* (1), those directors and agents of the company, who made ineffectual inquiry into the business which was to be sold to the company, were nevertheless held by their investigation to have bound the company, so here I think that the Defendant, who made a cursory investigation into the position of things on the 17th of February, must be taken to have accepted the statements which were in those papers.

It is very noteworthy that I can find no reference to any distinct reliance by the Defendant on £300 a year at any time from the 17th of February, 1880, down to the answer to interrogatories which was filed in this action on the 2nd of September, 1880, a period of more than six months.   A letter which was written on the 5th of May by the Defendant's solicitor no doubt contains vague and general statements of misrepresentation.   But, if the Defendant had at that time believed in his own mind that he had entered into this bargain upon the footing of a representation that the business would bring him in £300 a year, knowing what he knew on the 5th of May, it is, to my mind, incredible that he would not have said something of the sort.   I think there was a floating and vague notion that representations had been made by the Plaintiff to the Defendant, and that the Defendant really would have had a difficulty in saying in what respect he had been deceived (except in respect of the water supply) on the 5th of May.

I am bound to say that, in my judgment, great care is required in the investigation of these matters, that the Court should not be led astray by thinking that representations have been relied upon when they have not.   Persons who enter into contracts ought to bear in mind that they are entering into important engagements, and that solemn contracts are not lightly to be set aside on the ground of vague representations which really do not operate on the mind of the contracting party.

I hold, therefore, that the Defendant has failed in his defence and in his counter-claim.   I pronounce judgment for the Plaintiff

(1) 6 Cl. & F. 232.

C. A.

1881

REDGRAVE
*v.*
HURD.

Fry, J.

C. A.

1881

REDGRAVE
*v.*
HURD.

C. A.

for the specific performance of this contract, with costs, and I dismiss the counter-claim with costs.

W. L. C.

The Defendant appealed. The appeal came on to be heard on the 25th of November, 1881.

*Cookson*, Q.C., and *Ruegg*, for the Appellant :—

Mr. Justice *Fry* came to the conclusion that the Plaintiff made untrue representations as to his business, but came to the conclusion that the Defendant did not rely on them. His Lordship referred to *Attwood* v. *Small* (1), but in that case there was a real investigation on which the Plaintiffs relied; here there was substantially no investigation: the Defendant took the Plaintiff's word that the papers shewn him on the 17th of February did make up the amount of business he had represented. A man does not lose his right to rescind for false representation on the mere ground that he had materials which would have enabled him to discover the truth if he had investigated them : *Rawlins* v. *Wickham* (2). Even a slight amount of misrepresentation will bar the right to specific performance: *Cadman* v. *Horner* (3). The onus lies on a person who has made false representations to shew clearly that they were not acted on: *Nicol's Case* (4). The agreement to purchase the house cannot be considered apart from the representations as to the business : *Lamare* v. *Dixon* (5) ; and, in fact, the purchase of the house was a mere accessory to the acquisition of a share in the business. The Defendant, therefore, is entitled to be relieved from the contract. The Defendant is on the counter-claim entitled to damages.

[LUSH, L.J. :—You do not state in your pleadings that the Plaintiff knew his representations as to the business to be untrue.]

[JESSEL, M.R. :—If you mean to charge a man with having wilfully made a false statement, you must tell him so. The

(1) 6 Cl. & F. 232.            (3) 18 Ves. 10.
(2) 3 De G. & J. 304.          (4) 3 De G. & J. 387, 439.
                 (5) Law Rep. 6 H. L. 414.

Plaintiff had no complete books, and he may have made his statements from memory without knowing that they were untrue.]

O. A.
1881
REDGRAVE
*v.*
HURD.

*Rigby*, Q.C., and *Yate Lee, contrà :—*

We say that the share in the business was no part of the consideration for the purchase of the house. The Plaintiff said, in substance, I will not bargain with you for the business, it is not worth bargaining about. The sale of the house was the substance of the transaction.

[BAGGALLAY, L.J. :—Do you construe the advertisement as meaning that?]

Yes.

[JESSEL, M.R. :—I do not so read it. Does not the advertisement mean this: I will make over my business to the person who will buy my house? The buying the house is to be the consideration for a share in the business.]

Then as to representations about the business, the letter of the 14th of February could not have been written by a person who had been told that the business brought in £300 or £400 a year.

[JESSEL, M.R. :—I do not see any inconsistency: and if you wish to contradict the Defendant's evidence by his own letter, you were bound to put it into his hands and ask him to explain it.

LUSH, L.J. :—That is certainly the rule.]

The Plaintiff throughout refused to let the partnership be part of the bargain. We claim the benefit of the finding of Mr. Justice *Fry* as a matter of fact that the Defendant did not rely on any representations as to the business. The rule laid down in *Kerr* on Fraud (1) is the rule which we ask the Court to apply here. Under the circumstances, it is not to be inferred that any representation as to the business induced the Defendant to enter into the bargain.

[LUSH, L.J. :—How do you shew that the Defendant ceased to rely on the representations that had been made to him?]

The letter of the 14th of February shews it. The Defendant

(1) Pages 31, 32.

12                    CHANCERY DIVISION.              [VOL. XX.

C. A.

1881

REDGRAVE
*v.*
HURD.

did not rely on the amount of actual business, but on the belief that the Plaintiff could give him a good introduction.

JESSEL, M.R. :—

This is an appeal from a decision of Mr. Justice *Fry,* granting specific performance of a contract by the Defendant to buy a house from the Plaintiff, and dismissing with costs a counter-claim by the Defendant asking to rescind the contract, and also asking for damages on the ground of deceit practised by the Plaintiff in respect to the agreement.

As regards the Defendant's counter-claim, we consider that it fails so far as damages are concerned, because he has not pleaded knowledge on the part of the Plaintiff that the allegations made by the Plaintiff were untrue, nor has he pleaded the allegations themselves in sufficient detail to found an action for deceit. It only remains to consider the claim of the Plaintiff for specific performance, and so much of the counter-claim of the Defendant as asks to have the contract rescinded.

Before going into the details of the case I wish to say something about my view of the law applicable to it, because in the text-books, and even in some observations of noble Lords in the House of Lords, there are remarks which I think, according to the course of modern decisions, are not well founded, and do not accurately state the law. As regards the rescission of a contract, there was no doubt a difference between the rules of Courts of Equity and the rules of Courts of Common Law—a difference which of course has now disappeared by the operation of the *Judicature Act,* which makes the rules of equity prevail. According to the decisions of Courts of Equity it was not necessary, in order to set aside a contract obtained by material false representation, to prove that the party who obtained it knew at the time when the representation was made that it was false. It was put in two ways, either of which was sufficient. One way of putting the case was, " A man is not to be allowed to get a benefit from a statement which he now admits to be false. He is not to be allowed to say, for the purpose of civil jurisdiction, that when he made it he did not know it to be false; he ought to have found that out before he made it." The other way of putting it was this : " Even assuming that moral

fraud must be shewn in order to set aside a contract, you have it
where a man, having obtained a beneficial contract by a statement
which he now knows to be false, insists upon keeping that contract.
To do so is a moral delinquency: no man ought to seek to take
advantage of his own false statements." The rule in equity was
settled, and it does not matter on which of the two grounds it was
rested. As regards the rule of Common Law there is no doubt it
was not quite so wide. There were, indeed, cases in which, even
at Common Law, a contract could be rescinded for misrepresenta-
tion, although it could not be shewn that the person making it
knew the representation to be false. They are variously stated,
but I think, according to the later decisions, the statement must
have been made recklessly and without care, whether it was true
or false, and not with the belief that it was true. But, as I have
said, the doctrine in equity was settled beyond controversy, and it
is enough to refer to the judgment of Lord *Cairns* in the *Reese
River Silver Mining Company* v. *Smith* (1), in which he lays it
down in the way which I have stated.

There is another proposition of law of very great importance
which I think it is necessary for me to state, because, with great
deference to the very learned Judge from whom this appeal comes,
I think it is not quite accurately stated in his judgment. If a
man is induced to enter into a contract by a false representation it
is not a sufficient answer to him to say, "If you had used due
diligence you would have found out that the statement was
untrue. You had the means afforded you of discovering its
falsity, and did not choose to avail yourself of them." I take it
to be a settled doctrine of equity, not only as regards specific
performance but also as regards rescission, that this is not an
answer unless there is such delay as constitutes a defence under the
*Statute of Limitations*. That, of course, is quite a different thing.
Under the statute delay deprives a man of his right to rescind on
the ground of fraud, and the only question to be considered is
from what time the delay is to be reckoned. It had been decided,
and the rule was adopted by the statute, that the delay counts
from the time when by due diligence the fraud might have been
discovered. Nothing can be plainer, I take it, on the authorities

(1) Law Rep. 4 H. L. 64.

C. A.

1881

REDGRAVE
*v.*
HURD.

Jessel, M.R.

14                    CHANCERY DIVISION.              [VOL. XX.

C. A.
1881

REDGRAVE
v.
HURD.

Jessel, M.R.

in equity than that the effect of false representation is not got rid of on the ground that the person to whom it was made has been guilty of negligence. One of the most familiar instances in modern times is where men issue a prospectus in which they make false statements of the contracts made before the formation of a company, and then say that the contracts themselves may be inspected at the offices of the solicitors. It has always been held that those who accepted those false statements as true were not deprived of their remedy merely because they neglected to go and look at the contracts. Another instance with which we are familiar is where a vendor makes a false statement as to the contents of a lease, as, for instance, that it contains no covenant preventing the carrying on of the trade which the purchaser is known by the vendor to be desirous of carrying on upon the property. Although the lease itself might be produced at the sale, or might have been open to the inspection of the purchaser long previously to the sale, it has been repeatedly held that the vendor cannot be allowed to say, " You were not entitled to give credit to my statement." It is not sufficient, therefore, to say that the purchaser had the opportunity of investigating the real state of the case, but did not avail himself of that opportunity. It has been apparently supposed by the learned Judge in the Court below that the case of *Attwood* v. *Small* (1) conflicts with that proposition. He says this : " He inquired into it to a certain extent, and if he did that carelessly and inefficiently it is his own fault. As in *Attwood* v. *Small,* those directors and agents of the company who made ineffectual inquiry into the business which was to be sold to the company were nevertheless held by their investigation to have bound the company, so here, I think, the Defendant who made a cursory investigation into the position of things on the 17th of February must be taken to have accepted the statements which were in those papers." I think that those remarks are inaccurate in law, and are not borne out by the case to which the learned Judge referred. Of course where you have five Lords giving independent reasons, it is very difficult to ascertain with accuracy the ground upon which the House of Lords decided, but I think that in all such cases you must only look at the judgments of the

(1) 6 Cl. & F. 232.

C. A.

1881

REDGRAVE
v.
HURD.

Jessel, M.R.

majority who decided the case, for the reasons to be found in their judgments must be either wholly or to some extent the reasons which guided the House of Lords in coming to their conclusion. I therefore confine myself for this purpose to the opinions of the three Lords who decided the case in favour of the Appellants. The first opinion is that of Earl *Devon*, who had been a Master in Chancery, and although of course his opinion is entitled to great respect, yet I do not attach so much importance to it as I do to that of Lord *Cottenham*. His Lordship says (1): "The question is not as to waiver or acquiescence in fraud, but whether the parties have used that ordinary degree of vigilance and circumspection in order to protect themselves which the law has a right to expect from those who apply for its aid." In that sentence I think he is not quite correct as regards the law, but the ground of his judgment is this: "The whole course of the proceeding from its commencement to its close tends to shew that the purchasers did not rely upon any statements made to them, but resolved to examine and judge for themselves." Now, that is a good ground if borne out by the evidence. It is a different ground from that taken by the other Lords, but it cannot be objected to in point of law.

I now turn to the judgment of Lord Chancellor *Cottenham*, who says (2), "We are now trying two propositions by this evidence, first, whether fraud was practised; and, secondly, whether that which is alleged as fraud, or rather the facts from which fraud is inferred, were not known to the Plaintiffs, or to those by whose conduct and by whose knowledge they must be affected from the very commencement of this transaction. I have satisfied myself that both these propositions are in favour of the Defendant;" that is, he found not only no fraud, but he also found that all the material facts were known before they entered into the contract. "I do not find the fact of fraud made out, although undoubtedly it may be supposed that the bargain was a very good one for Mr. *Attwood*. That is not the matter in question, but that the fraud alleged, which alone can be resorted to for the purpose of supporting the Plaintiff's case, is not made out in fact, and that the circumstances from which that fraud is endeavoured to be inferred

(1) 6 Cl. & F. 344.            (2) 6 Cl. & F. 393.

**16**                        CHANCERY DIVISION.                [VOL. XX.

C. A.
1881

REDGRAVE
*v.*
HURD.

Jessel, M.R.

by the Plaintiffs, are, in my opinion, proved to have been known to them from the beginning." Those are the two grounds of his judgment, and neither of them is anything like the proposition to be found in the judgment of Mr. Justice *Fry*, that if cursory or ineffectual attempts are made by the agents of the person defrauded to discover the real facts he loses his right to complain of the fraud. There is a sentence in Earl *Devon's* judgment to that effect, but not in Lord *Cottenham's*.

The only other judgment which was in favour of the appeal was a very long judgment of Lord *Brougham*, which I shall not read through, but at p. 497 we find his conclusion : " My Lords, when we apply to this case the principles which I stated at the outset, we find the facts are wanting ; we find there is no misrepresentation which gave rise to the contract " (that is, he concurs with Lord *Cottenham* that there is no fraud—that is the first ground). " We find that the purchasers did not rely upon the representation, but said, We will inquire ourselves "—that is the second ground ; it is the same as Lord *Devon's* ground, and also would be a good answer, though it was not taken by Lord *Cottenham*. Then he goes on : " From the 6th of June, 1825, downwards, they constantly proceeded upon the plan of satisfying themselves, first by sending their agents, then by going down themselves, then by inquiring themselves, then even afterwards by sending other agents to inquire, and those agents reporting that the representation was true, and that those parties finding by their own inquiries " (not as Mr. Justice *Fry* puts it, " the imperfect inquiries of agents") " that the agents had reported accurately, and that the representation was corroborated by the result of the inquiry, and that even when their own interest, when everything in the commercial world was down, when shares were falling, when money was not to be had, when they were asking time for a prolongation of the term of payment to Mr. *Attwood*, and when it was their interest to discover a flaw in the contract, they then inquire again and send a new agent to inquire, Mr. *Foster*, an engineer, and they state to him their own opinion to be in favour of Mr. *Attwood's* representations ; and Mr. *Foster*, in answer as late as the 26th of April, less than a month before the bill was put upon the file, reports in favour of Mr. *Attwood's* representa-

tions. Such being the facts, even if no observation arose as to the delay, as to the adoption and affirmance of the contract, purging it of all objections which might be made, and supposing that they had come in time, instead of delaying so many months; then I ask myself this question, In these circumstances have these parties a right to be released from their contract by the interposition of a Court of Equity, according to those principles which I have stated ? When I ask myself that question upon which alone my judgment must turn, I am bound to say No." So that the two grounds taken by Lord *Brougham* are that there was no misrepresentation, and that the purchasers did not rely on the representations. He agreed in one with Lord *Cottenham* and in the other with Lord *Devon*. The three grounds taken by the three noble Lords, one of which grounds was taken by one only of the Lords, and each of the others by two, were that there was no fraud—that there was actual knowledge of the facts before the contract, and that no reliance was placed upon the representation. In no way, as it appears to me, does the decision, or any of the grounds of decision, in *Attwood* v. *Small* (1), support the proposition that it is a good defence to an action for rescission of a contract on the ground of fraud that the man who comes to set aside the contract inquired to a certain extent, but did it carelessly and inefficiently, and would, if he had used reasonable diligence, have discovered the fraud.

As regards the facts of this case, I agree with the conclusions of Mr. Justice *Fry* on every point but one, and my failure to agree with him in that one is the cause of my concurring in reversing his decision. What he finds in effect is that the Defendant *Hurd* was induced to enter into the contract by a material misrepresentation made to him by the Plaintiff *Redgrave*, but he comes to the conclusion that either he did not finally rely upon that representation, or that if he did rely upon it he made an inquiry which, although ineffectual and made, as he says, carelessly and inefficiently, bound him in a Court of Equity, and prevented him from saying that he relied on the representation. I have already dealt with that as a matter of law, and I will deal with it presently as a matter of fact, because I think there was an

(1) 6 Cl. & F. 232.

18                    CHANCERY DIVISION.              [VOL. XX.

C. A.
1881
REDGRAVE
v.
HURD.

Jessel, M.R.

omission to notice a most material fact, or rather, I should say, an omission to give sufficient weight to it, for it is noticed in the judgment which is now appealed from.

Now the facts to my mind are clear, and I am glad to say, with one exception, they are in writing. The Plaintiff *Redgrave* advertised in the *Law Times* for a law partnership. The *Law Times* is not a publication in which people ordinarily advertise for the sale of a house, but is one in which they do advertise for partners in law partnerships. [His Lordship then read the advertisement.] That means this: "There is a moderate practice, I shall not take a premium for it if you will take my house off my hands;" that is, the purchase of the house is the consideration for giving him the partnership in the moderate business. A man issuing such an advertisement cannot be heard to say that he had no business worth mentioning to sell. I agree that his main object was to get rid of the house, and that he had little else to dispose of. It appears on his own evidence that his gross business was £200 a year, what its nett value was I am unable to say, but I should think £10J a year a very high estimate of its nett value. He says by the advertisement that he is elderly and has no successor, which implies that there is a succession to something of some value. He says it is "a moderate practice with extensive connection," which is not a truthful description of a practice such as I have mentioned, a practice which would give £50 a year nett to each of the two partners. We start then with an advertisement containing a misrepresentation, and as far as I can see, of facts within the advertiser's own knowledge, for he does not pretend to say that he did not know that his business had a gross value of only £200 a year; on the contrary, he says in his evidence that he told the Defendant so.

Interviews then took place. The first interview was on the 12th of February. There is a conflict of evidence as to what passed at that interview, and the learned Judge below gave credit to the evidence of *Hurd* and his wife that *Redgrave* stated his practice to be between £300 and £400 a year. Having regard to the advertisement, it is most probable that he did make some such statement, for he had made representations in the advertisement which were inconsistent with its amounting only to £200

a year. But I do not rely on that. The rule of the Court of Appeal is that when there is direct conflicting oral testimony, and the Judge who has seen the witnesses believes one party and disbelieves the other, this Court, not having seen the witnesses, cannot disturb that decision any more than it could disturb the verdict of a jury under similar circumstances. We must, therefore, take it as a fact that *Redgrave* represented to *Hurd* on the 12th of February that his business was worth about £300 a year, or between £300 and £400 a year, it does not matter which.

Another interview took place between the Plaintiff and the Defendant on the 17th of February. Before proceeding to what is said by the learned Judge as to what took place on the 17th of February, I will refer to the observations which he made just before. "Then comes, in the second place, this very material inquiry. Did the Defendant purchase the house and go on with the negotiations upon the footing and upon the faith of that representation so made by the Plaintiff" (that is, the representation made on the 12th of February)? "I have come to the conclusion that he did not. I think that the letter of the 14th of February is worthy of all the weight which has been attributed to it by the Plaintiff's counsel. The Defendant in that letter says this: 'While relying on your effort to extend the business among your connection, I feel I should like to have some idea of the amount of business done at your office during the past three years, and the nature of the nucleus with which we should start.'" Now to my mind that means this: "You have told me you are making between £300 and £400 a year, but I should like to know what is the average of the past three years. What you are making for one year is not sufficient for me." Therefore, the Defendant does not rely exclusively on the statement of the £300 a year because he wants further information, but he does not give up the reliance on the statement. "Accepting your statement that you are making £300 a year, tell me what you made during the last three years." That that is the true meaning of the letter is, I think, shewn by the nature of the documents produced on the 17th of February to the Defendant by the Plaintiff: "The Defendant does, by the Plaintiff's invitation, visit him on the 17th of February, and then and there are produced to the Defendant

C. A.

1881

REDGRAVE
*v.*
HURD.

Jessel, M.R.

· O. A.
: 1881

· REDGRAVE
*v.*
HURD.

· Jessel, M.R.

by the Plaintiff the papers which relate respectively to the years 1877, 1878, and 1879, which have sometimes been called bills of costs, and sometimes called estimates, and they shew, roughly speaking, a gross amount of business done to the extent of about £200 a year. Then the common case of the Plaintiff and the Defendant is that in answer to an inquiry from the Defendant, the Plaintiff said there was other business which was not entered upon those papers." Now that inquiry as I understand it was this, "You were doing £300 a year, you shew in those papers only £200 a year, where is the rest?" And the answer was, "Oh, there is a lot of papers here containing business which will account for the rest." Well, it appears to me, that that being the common case of both parties, it shews that *Hurd*, though still relying on the representation that the business was at least £300 a year, when he found that the papers shewed only a gross £200 a year, wanted to know where the business was that made up the £300 a year, and he is told, " Oh there are a lot of papers there; I have not made out my bills of costs fully, but you will find the business if you look through those papers;" but he did not look through them. The learned Judge continues : "I cannot attribute much weight to that other business, and for this reason, that in my judgment if the Defendant had meant to rely upon this extraneous business, which was not mentioned in the papers, he would have made some inquiry about it." I am sorry to say I differ from every word of that. The Defendant did make an inquiry. All that the Plaintiff had prepared for him were these summaries. He says, "Where is the rest of the business?" "Oh it is in that parcel of papers." How could the Defendant make out bills of costs from the parcel of papers? he could do nothing but rely on the Plaintiff's statement that the parcel of papers did contain the business. Then the learned Judge goes on to say: "According to the conclusion which I come to upon the evidence, the books were there before the Defendant, and although he did not trouble to look into them he had the opportunity of doing so. In my judgment if he had intended to rely upon that parol representation of business beyond that which appeared in the papers, having the materials before him, he would have made some inquiry into it. But he did nothing

of the sort." Now in that respect I am sorry to say that the learned Judge was not correct. There were no books which shewed the business done. The Plaintiff did not keep any such books, and had nothing but his diaries, and some letter books; and therefore, it is a mistake to suppose that there were any books before the Defendant which he could look into to ascertain the correctness of the statements made by the Plaintiff; and the whole foundation of the judgment on this part of the case, even if it had been well founded in law, fails in fact, because the Defendant was not guilty of negligence in not doing that which it was impossible to do, no books being in existence which would shew the amount of business done. Then the learned Judge continues: " He did nothing of the sort: I think the true result of the evidence is this, that the Defendant thought that if he could have even such a nucleus of business as these papers disclosed, he could by the energy and skill which he possessed make himself a good business in *Birmingham*." Then that being so the learned Judge came to the conclusion either that the Defendant did not rely on the statement, or that if he did rely upon it he had shewn such negligence as to deprive him of his title to relief from this Court. As I have already said, the latter proposition is in my opinion not founded in law, and the former part is not founded in fact; I think also it is not founded in law, for when a person makes a material representation to another to induce him to enter into a contract, and the other enters into that contract, it is not sufficient to say that the party to whom the representation is made does not prove that he entered into the contract, relying upon the representation. If it is a material representation calculated to induce him to enter into the contract, it is an inference of law that he was induced by the representation to enter into it, and in order to take away his title to be relieved from the contract on the ground that the representation was untrue, it must be shewn either that he had knowledge of the facts contrary to the representation, or that he stated in terms, or shewed clearly by his conduct, that he did not rely on the representation. If you tell a man, " You may enter into partnership with me, my business is bringing in between £300 and £400 a year," the man who makes that representation must know that it is a material induce-

O. A.

1881

REDGRAVE ·
v.
HURD

Jessel, M.R.

C. A.
1881

REDGRAVE
*v.*
HURD.

Jessel, M.R.

ment to the other to enter into the partnership, and you cannot investigate as to whether it was more or less probable that the inducement would operate on the mind of the party to whom the representation was made. Where you have neither evidence that he knew facts to shew that the statement was untrue, or that he said or did anything to shew that he did not actually rely upon the statement, the inference remains that he did so rely, and the statement being a material statement, its being untrue is a sufficient ground for rescinding the contract. For these reasons I am of opinion that the judgment of the learned Judge must be reversed and the appeal allowed.

As regards the form of the judgment, as the appellant succeeds on the counter-claim, I think it would be safer to make an order both in the action and the counter-claim, rescinding the contract and ordering the deposit to be returned. As I have already said, it is not a case in which damages should be given.

BAGGALLAY, L.J.:—

Upon the hearing of this action, Mr. Justice *Fry* held, as a conclusion of fact, from the evidence before him, that a misrepresentation was made by the Plaintiff to the Defendant as to the amount of his professional business. The learned Judge had the opportunity of hearing and seeing the witnesses, and of observing the manner in which their evidence was given, and it must be a very strong case indeed in which the Court of Appeal, upon a question of fact, entirely depending upon oral testimony, will dissent from the finding of the Court below. Mr. Justice *Fry* also held that the Defendant ought not to be considered as having been influenced by those misrepresentations to enter into the contract, but I am unable to concur in this conclusion. The facts from which that conclusion was drawn were partly proved by oral testimony and partly by written documents. As regards the oral testimony, according to the judgment of Mr. Justice *Fry*, it amounted to this, that opportunities were afforded to the Defendant to ascertain the inaccuracy of the representation made to him, and that to some extent, at least, he had availed himself of those opportunities. The mere fact that a party has the opportunity of investigating and ascertaining whether a representation

VOL. XX.]        CHANCERY DIVISION.                    23

is true or false is not sufficient to deprive him of his right to rely on a misrepresentation as a defence to an action for specific performance.    The person who has made the misrepresentation cannot be heard to say to the party to whom he has made that representation, " You chose to believe me when you might have doubted me, and gone further."    The representation once made relieves the party from an investigation, even if the opportunity is afforded.    I do not mean to say that there may not be certain circumstances of suspicion, which might put a person upon inquiry, and make it his duty to inquire, but under ordinary circumstances, the mere fact that he does not avail himself of the opportunity of testing the accuracy of the representation made to him will not enable the opposing party to succeed on that ground. The case of *Rawlins* v. *Wickham* (1) is a very strong illustration of the application of that principle.    There, a person who had been induced by false representations to enter into a partnership continued in that partnership for four years, and then for the first time discovered the fraud which had been practised upon him.    He was held entitled to relief, though at any time during that period he might have investigated matters for himself.    It is true that in the present case there was some investigation, but it was an investigation of a most cursory character, which could not have enabled the Defendant to ascertain the truth or the falsity of the representation that had been made.    So far, therefore, as the conclusions arrived at by the learned Judge, upon consideration of the oral testimony on that second point are concerned, I am unable to agree with him.

As regards the written testimony, it is all one way : very different considerations apply to a case in which the testimony before the Judge in the Court below is written from those which apply where it is oral, for the Judges of the Court of Appeal have as good an opportunity of judging of the value of written evidence as the Judge before whom the case is originally brought.    I need not enter into any of the details of the circumstances, as they have been treated of by the Master of the Rolls.    The advertisement clearly was addressed to solicitors, and suggested that there was a favourable opening for such a person.    And the correspon-

(1) 3 De G. & J. 304.

C. A.

1881

REDGRAVE
*v.*
HURD.

Baggallay, L.J.

C. A.

1881

REDGRAVE

*v.*

HURD.

———

Baggallay, L.J.

———

dence which passed between the Defendant and the Plaintiff informed the Plaintiff that the Defendant was a gentleman, who was seeking to establish himself in the business of a solicitor in some place to obtain a sufficient business to bring up his family, and particularly, amongst other things, with a view of introducing one of his own sons into the profession. The Plaintiff must have known from this, that the advantages suggested by him in connection with the business which he was about to surrender supplied an influential motive to the Defendant in entering into the contract. It is quite true that the contract actually signed was limited to the purchase of the house, but it is impossible to say that the Defendant was not mainly induced to enter into that contract by the prospect of establishing himself in a remunerative business. On these grounds, I think that the decision of the Court below ought to be reversed.

LUSH, L.J. :—

I entirely agree with my learned Brothers as to the propositions of law applicable to this case which have been laid down by the Master of the Rolls, and as they have been so clearly and pointedly expressed I do not think it at all necessary to repeat them, because I have not myself the least qualification to suggest as to those propositions. And so far they differ from one part of the judgment of the learned Judge in the Court below, in which he appears to hold that where a false representation has been made and papers are handed to the party to whom it is made, from which if he chose he might detect the falsehood, and he does not do so, he is in the same position as if he had done so. I entirely differ from that view, and think what my learned Brother said was the correct view of the law, that where a false representation has been made it lies on the party who makes it, if he wishes to escape its effect in avoiding the contract, to shew that, although he made the false representation the Defendant, the other party, did not rely upon it. The *onus probandi* is on him to shew that the other party waived it, and relied on his own knowledge. Nothing of that kind appears here. On the question of fact, I regret to say, that I cannot follow the learned Judge of the Court below, in the inference he draws from the facts which were before him. After

stating his view of the law, that a party who has the opportunity of looking into the documents is put in the same position as if he had looked into them, the learned Judge goes back to the question of fact. " I think," he says, " the true result of the evidence is this, that the Defendant thought that if he could have even such a nucleus of business as those papers disclosed, he could, by the energy and skill which he possessed, make himself a good business in *Birmingham*, and that he was willing to take as the business of the Plaintiff that which was represented on those papers." Now, it is clear, that the business represented in those papers was a business not exceeding £200 a year in any one of the three years to which those papers referred ; therefore the learned Judge finds as a matter of fact that the Defendant, although the representation had been made, that the business yielded from £300 to £400 a year, was content to buy a business bringing in only £200 a year. Though the learned Judge lays down the proposition of law to which I have referred, he does not decide the case on that ground, but on the inference of fact that, although the representation had been made, the Defendant relied on the future potential business which the Plaintiff held out, gave up all reliance on that representation, and was content to take the business, though only bringing in £200 a year, as one which would suit him. Now I do not find any evidence whatever which justifies that conclusion. The learned Judge goes through the facts shortly, and, after balancing the evidence *pro* and *con.*, considers whether such a representation was originally made that the business yielded £300 a year, and comes to the conclusion that it was, and by that we are bound. [His Lordship then referred at length to the passages from the judgment of *Fry*, J., which had been commented on by the Master of the Rolls.]

The learned Judge goes on to say that it was the common ground of both parties that, in answer to the inquiry from the Defendant, the Plaintiff said that there was other business which was not entered upon those papers, and the Plaintiff himself says in his answers to his interrogatories, speaking of that interview: " I produced the said papers to the Defendant, and stated to him, as the fact was, that the items of business mentioned therein did not represent all the business done for the years 1877, 1878, and

O. A.

1881

REDGRAVE

*v.*

HURD.

Lush, L.J.

26                      CHANCERY DIVISION.                [VOL. XX.

C. A.
1881
REDGRAVE
*v.*
HURD.

Lush, L.J.

1879, but that I had done other items of business which I had not entered in the said bills." So far in my judgment from that sanctioning the idea that the Defendant had agreed to accept what appeared in those papers as representing the amount of business done, it is an actual affirmance by the Plaintiff of his original representation as to the business being £300 a year or between £300 and £400. That being so, I entirely differ from the conclusion which the learned Judge has drawn from those pieces of evidence. On another point, the learned Judge held what I think was perfectly right, that the contract for the house and for the purchase of the business was one entire contract, the one being the inducement to the other, and that the principal subject of that contract between the parties was the partnership which was to end in the sale of the business. The purchase of the house, although the value of the house was much larger than that of the goodwill of the business, was only an accessory to the acquisition of the business, for the Defendant did not want the house near *Birmingham* unless he had a business at *Birmingham*. The misrepresentation as to the business therefore entitles the Defendant to be discharged from his contract for the purchase of the house; but I agree, for the reasons stated by the Master of the Rolls, that he is not entitled to damages.

Solicitor for Plaintiff: *John Holder.*
Solicitor for Defendant: *R. Biale.*

                                                    H. C. J.

A

Supreme Court

# Sharland *v* Sharland

## [2015] UKSC 60

2015  June 8–10;
B        Oct 14

Lord Neuberger of Abbotsbury PSC,
Baroness Hale of Richmond DPSC,
Lord Clarke of Stone-cum-Ebony, Lord Wilson,
Lord Sumption, Lord Reed, Lord Hodge JJSC

*Husband and wife — Financial provision — Disclosure of material facts — Both*
*parties giving evidence about value of assets at hearing to determine financial*
*provision — Parties subsequently agreeing settlement and consent order made —*
C  *Before consent order sealed wife discovering material non-disclosure by husband*
*— Wife applying for consent order not to be sealed and for resumption of*
*financial provision hearing — Judge finding husband had been dishonest and*
*seriously misleading but perfecting consent order because non-disclosure not*
*material since same order would have been made had full disclosure been made at*
*outset — Whether judge erring — Whether consent order to be set aside*

        In the course of divorce proceedings the wife claimed financial provision against
D  the husband, the value and manner of distribution of whose substantial shareholding
in a company was the principal matter of dispute between the parties.  After the
parties had given their evidence they reached an agreement and the hearing was
ended.  The terms of a draft order were settled and approved by the judge.  Before the
order was sealed the wife discovered that, contrary to what the husband had said in
evidence at the hearing, he had had discussions with investment bankers as part of
active preparations for an initial public offering of the company, and that the
E  husband's shareholding was expected to be valued at a sum far in excess of the value
on which he had relied at the hearing.  The wife applied to the court for the consent
order not to be sealed and for the hearing to be resumed.  The judge, having
considered affidavits and relevant documents from the husband, found that his
evidence at the hearing had been dishonest and seriously misleading, but nevertheless
granted the husband's application for the consent order to be perfected on the ground
that the non-disclosure was not material because the consent order was not
F  substantially different from the order which he would have made if there had been
full disclosure at the outset.  The Court of Appeal, by a majority, dismissed the wife's
appeal and held that the judge had asked himself the right question and that any
challenge to the husband's evidence about his plans for the company should have
been made at the hearing.
        On the wife's appeal—
        *Held*, allowing the appeal, (1) that, while it was better that matrimonial claims
G  be settled by agreement rather than by adversarial proceedings so that the family's
financial and emotional resources were not expended on costs and conflict, it was
not possible, because of the public interest in ensuring that proper provision was
made for dependent family members, for the parties' agreement to oust the
jurisdiction of the court to make orders about their financial arrangements; that any
agreement to compromise an ancillary relief application therefore did not give rise
to a contract enforceable in law but the court conducted an independent assessment
H  to enable it to discharge its statutory functions before it granted such an agreement
the force of an order; that in matrimonial cases the binding effect of a settlement
embodied in a consent order therefore stemmed not from the prior agreement of the
parties but from the court's order, and there was always a duty of full and frank
disclosure; that since the court could not make a consent order in matrimonial
proceedings without the valid consent of the parties anything which vitiated a

© 2016 The Incorporated Council of Law Reporting for England and Wales

party's consent might be a good reason for setting such an order aside, although *A* whether the court would do so depended on the nature of the vitiating factor; that misrepresentation or non-disclosure, including innocent non-disclosure, of a material fact which had induced a party to agree to the settlement undermined the basis on which the consent order had been made and, if material to the decision which the court had made at the time, was a vitiating factor which justified setting aside the order; that a party who had practised deception with a view to a particular end, which had been achieved by it, could not be allowed to deny its materiality; *B* that the victim of a misrepresentation which had led her to compromise her claim to financial remedies in a matrimonial case should not be in a worse position than the victim of a fraudulent misrepresentation in an ordinary contract case including a contract to settle a civil claim; and that the court would set aside the consent order in those circumstances, unless the perpetrator of the fraud satisfied the court that, at the time when it had made the consent order, the fraud would not have influenced a reasonable person to agree to it and that, had it known then what it knew now, the *C* court would not have made a significantly different order (post, paras 17, 18 –19, 27–33).

Jenkins v Livesey (formerly Jenkins) [1985] AC 424, HL(E) considered.

(2) That the judge had been wrong to place upon the wife, who was the victim, the burden of showing that the misrepresentation and non-disclosure of the husband's plans for the company had been material to the draft consent order which he had approved; that, since the husband's fraud had undermined the basis on which *D* his shareholding had been valued, it had been material to the wife's agreement since it had affected her ability to address the proportionality of agreeing a discount below her original claim and striking a balance between her present share in the liquid assets and her future share in the value of the husband's shareholding, and was therefore highly material to whether the draft consent order should be perfected; that the general principle that fraud unravelled all was applicable to court orders and so, once the judge had found the husband's evidence to have been dishonest and *E* misleading, the wife had been entitled to reopen the case and to seek to negotiate a new settlement or a rehearing of her claims when all the relevant facts were known, and so the judge should not have made a decision then and there on the evidence before him; and that, accordingly, since the wife had therefore been deprived of a full and fair hearing of her claims, the consent order should not be perfected and the matter should return to the Family Division of the High Court for further directions (post, paras 15, 34–36). *F*

Per curiam. (i) The fact that the order had not been perfected makes no difference since the principles applicable in this sort of case are the same whether or not the order agreed upon by the parties and the court has been sealed (post, para 37).

(ii) There is jurisdiction to entertain an application for material non-disclosure within the matrimonial proceedings since the divorce court has always retained jurisdiction over a marriage even after it has been dissolved. While it is now possible for the court to achieve a clean break between the parties, the issue raised by an *G* application to set aside for fraud, mistake or material non-disclosure is whether it was consistent with the court's statutory duties to do so. An order setting aside a consent order may therefore be sought by way of either an appeal or an application to a first instance judge (post, paras 40, 42).

S v S [2015] 1 WLR 4592 considered.

(iii) The fact that there has been misrepresentation or non-disclosure justifying the setting aside of an order does not mean that the renewed financial remedy *H* proceedings must necessarily start from scratch. Much may remain uncontentious. It may be possible to isolate the issues to which the misrepresentation or non-disclosure relates and deal only with those (post, para 43).

Kingdon v Kingdon [2011] 1 FLR 1409, CA considered.

Decision of the Court of Appeal [2014] EWCA Civ 95; [2014] 2 FLR 89 reversed.

© 2016 The Incorporated Council of Law Reporting for England and Wales

873
[2016] AC                                    Sharland v Sharland (SC(E))

A   The following cases are referred to in the judgment of Baroness Hale of Richmond DPSC:

*de Lasala v de Lasala* [1980] AC 546; [1979] 3 WLR 390; [1979] 2 All ER 1146, PC
*Dietz v Lennig Chemicals Ltd* [1969] 1 AC 170; [1967] 3 WLR 165; [1967] 2 All ER 282, HL(E)
*Gohil v Gohil (No 2)* [2014] EWCA Civ 274; [2015] Fam 89; [2014] 3 WLR 717; [2015] 1 FLR 178, CA; [2015] UKSC 61; [2016] AC 849; [2015] 3 WLR 1085;
B       [2016] 1 All ER 685; [2015] 2 FLR 1289, SC(E)
*Granatino v Radmacher (formerly Granatino)* [2010] UKSC 42; [2011] 1 AC 534; [2010] 3 WLR 1367; [2011] 1 All ER 373; [2010] 2 FLR 1900, SC(E)
*Hyman v Hyman* [1929] AC 601, HL(E)
*Jenkins v Livesey (formerly Jenkins)* [1985] AC 424; [1985] 2 WLR 47; [1985] 1 All ER 106; [1985] 1 FLR 813, HL(E)
C   *Jonesco v Beard* [1930] AC 298, HL(E)
*Kingdon v Kingdon* [2010] EWCA Civ 1251; [2011] 1 FLR 1409, CA
*L (Children) (Preliminary Finding: Power to Reverse), In re* [2013] UKSC 8; [2013] 1 WLR 634; [2013] 2 All ER 294; [2013] 2 FLR 859, SC(E)
*L v L* [2006] EWHC 956 (Fam); [2008] 1 FLR 26
*MacLeod v MacLeod* [2008] UKPC 64; [2010] 1 AC 298; [2009] 3 WLR 437; [2009] 1 All ER 851; [2009] 1 FLR 641, PC
D   *Purcell v FC Trigell Ltd* [1971] 1 QB 358; [1970] 3 WLR 884; [1970] 3 All ER 671, CA
*Robinson v Robinson (Practice Note)* [1982] 1 WLR 786; [1982] 2 All ER 699; 4 FLR 102, CA
*S v S* [2015] EWHC 1005 (Fam); [2015] 1 WLR 4592; [2016] 1 FLR 131
*Smith v Kay* (1859) 7 HL Cas 750, HL(E)
*Tommey v Tommey* [1983] Fam 15; [1982] 3 WLR 909; [1982] 3 All ER 385; 4 FLR 159
E   *Wales v Wadham* [1977] 1 WLR 199; [1977] 1 All ER 125
*Wyatt v Vince (Nos 1 and 2)* [2015] UKSC 14; [2015] 1 WLR 1228; [2015] 2 All ER 755; [2015] 1 FLR 972, SC(E)
*Xydhias v Xydhias* [1999] 2 All ER 386; [1999] 1 FLR 683, CA

The following additional cases were cited in argument:

F   *Bokor-Ingram v Bokor-Ingram* [2009] EWCA Civ 412; [2009] 2 FLR 922, CA
*Greig Middleton & Co Ltd v Denderowicz* [1998] 1 WLR 1164; [1997] 4 All ER 181, CA
*Independent Trustee Services Ltd v GP Noble Trustees Ltd (Morris intervening)* [2012] EWCA Civ 195; [2013] Ch 91; [2012] 3 WLR 597; [2012] 3 All ER 210, CA
*Noble v Owens* [2010] EWCA Civ 224; [2010] 1 WLR 2491; [2010] 3 All ER 830,
G       CA
*Smallman v Smallman* [1972] Fam 25; [1971] 3 WLR 588; [1971] 3 All ER 717, CA
*Soulsbury v Soulsbury* [2007] EWCA Civ 969; [2008] Fam 1; [2008] 2 WLR 834; [2008] 1 FLR 90, CA
*Thwaite v Thwaite* [1982] Fam 1; [1981] 3 WLR 96; [1981] 2 All ER 789, CA

**APPEAL** from the Court of Appeal
H   By a petition the wife, Alison Kate Sharland, sought divorce from her husband, Charles Alan Sharland. She applied in the proceedings for ancillary financial relief. On 13 July 2012, after both parties had given evidence at the hearing of the application before Sir Hugh Bennett, sitting as a judge of the Family Division, the parties reached an agreement and the

© 2016 The Incorporated Council of Law Reporting for England and Wales

hearing terminated.  On 25 July 2012 the judge approved a draft consent   A
order embodying the terms of the agreement.

On 30 August 2012 the wife applied for the order not to be sealed and for a resumption of the hearing.  On 29 April 2013 the judge refused the wife's application and granted the husband's application that the consent order be sealed sub nom *S v S (Non-Disclosure)* [2013] EWHC 991 (Fam); [2013] 2 FLR 1598.

B

The wife appealed.  On 10 February 2014 the Court of Appeal (Moore-Bick and Macur LJJ; Briggs LJ dissenting) [2014] EWCA Civ 95; [2014] 2 FLR 89 dismissed the appeal.

On 24 July 2014 the Supreme Court (Lord Kerr of Tonaghmore, Lord Wilson and Lord Hodge JJSC) granted the wife permission to appeal, pursuant to which she appealed.

The facts are stated in the judgment of Baroness Hale of Richmond   C
DPSC.

*Martin Pointer QC* and *Peter Mitchell* (instructed by *Irwin Mitchell, Manchester*) for the wife.

The fraudulent misrepresentation by the husband was designed to induce the wife to compromise the case on terms which were less favourable to her than they would have been had the truth been known.  The evidence shows that the false representations achieved their objective.  The remedy for demonstrated fraudulent behaviour of that kind is a reversal of the impugned transaction, so that the victim of the fraud is placed in the position in which she had been prior to the transaction.  A person may not keep an advantage which has been obtained by fraud.  A commercial contract obtained by fraud is amenable to repudiation or rescission and a judgment   E
procured by fraud is amenable to being set aside.

D

The husband's argument, apparently accepted by the Court of Appeal, that the capacity to avoid a contract on the ground of established or admitted fraud is lost once the compromise has merged into a court order made in divorce proceedings, cannot be right.  The right to rescind a transaction once fraud has been established applies with equal force to an agreement procured by fraudulent conduct as to a judgment achieved by the   F
presentation of fraudulent evidence.  There is no good reason why an application to rescind an ancillary relief order should be subject to a higher standard of proof or a more onerous test than would be an action in other civil litigation to set aside a settlement or judgment which has been procured by fraud.

In addition to all the usual obligations of a contracting party not to   G
misrepresent, not to exercise undue influence etc, a divorcing spouse in an ancillary relief claim is also subject to additional and positive obligations to give full and frank disclosure of his means and of all facts and matters bearing upon the value, identification and availability of his resources.  The duty is owed to the court and the court cannot lawfully and properly exercise its function without each party giving full and frank disclosure.

Non-disclosure may be effected actively by presenting a false case or   H
passively by failing to reveal relevant facts and circumstances.  If there has been material non-disclosure the order made is vulnerable to being set aside.

The duty to give full and frank disclosure applies with equal force to consent orders as it does to orders made after contested proceedings.

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   A failure by one party to give full and frank disclosure cannot be excused by
a supposed failure on the part of the other party to make inquiries which
might have elicited the undisclosed information.

The judgment at first instance shows that if the full facts had been known
it would have had an impact on the judge.  It is the court's duty to appraise
the proposed settlement and approve it before making an order.  When a
consent order has been made, the agreement of the parties will be the
B   dominant factor in the judge's approval of the settlement.  If the pre-order
settlement was induced by fraud, the approval would also have been induced
by fraud.  The misrepresentation by the husband undermined the transaction
entered into.  If the full facts had been known the judge would have dealt
with the case differently.  The judge had no evidence as to the value of the
husband's business assets.  The Court of Appeal erred in applying its test of
C   materiality to the date when the judgment was set aside, which was nine
months after the agreement and order.  The correct approach was to
consider what different order would have been made at the time of the
original order if the fraudulently suppressed information had been timeously
revealed.  If the husband had revealed his active plans for an IPO of the
business at the time of the trial, the court would either have directed an
D   adjournment of the claim until the position were clearer, or the trial would
have proceeded by taking account of an imminent flotation, or the
settlement would have been made on a different basis.

[Reference was made to *Jenkins v Livesey (formerly Jenkins)* [1985] AC
424; *MacLeod v MacLeod* [2010] 1 AC 298; *Granatino v Radmacher
(formerly Granatino)* [2011] 1 AC 534; *Smallman v Smallman* [1972] Fam
25; *Soulsbury v Soulsbury* [2008] Fam 1; *Thwaite v Thwaite* [1982] Fam 1;
E   *Independent Trustee Services Ltd v GP Noble Trustees Ltd (Morris
intervening)* [2013] Ch 91; *Greig Middleton & Co Ltd v Denderowicz*
[1998] 1 WLR 1164; *Noble v Owens* [2010] 1 WLR 2491 and *Bokor-
Ingram v Bokor-Ingram* [2009] 2 FLR 922.]

The right analysis of this case is that the resources had all been built up
during the marriage and this was a plain case of equal sharing.  Any post-
F   marriage contribution by the husband was matched by the wife's ongoing
and lifetime commitment to their autistic child.  There was no reason in this
case for any departure from equality.  By his non-disclosure the husband
avoided the risk of a 50–50 distribution of the assets.

The floodgates argument should not prevail.  The court should take a
principled approach so a fraudster knows the consequences of
non-disclosure.
G
*Nicholas Francis QC* and *Nicholas Allen* (instructed by *JMW
Solicitors LLP, Manchester*) for the husband.

The court, and not the parties, has control over the final order which is to
be made.  The moment the parties invite the court to approve their agreement
and convert it into an order, the court is obliged by statute to carry out its
discretionary exercise pursuant to section 25 of the Matrimonial Causes Act
H   1973.  No final order can be made absent this section 25 exercise being
carried out.

The judge applied the correct test, namely whether he would have made a
substantially different order if he had known of the information which the
husband had withheld.  As the final hearing judge he was uniquely in a

© 2016 The Incorporated Council of Law Reporting for England and Wales

A

position to determine what order he might have made, with or without the omitted non-disclosure. His judgment was that it made no material difference to the final order which he made.

The origin of the court's order is not in the wife's consent but in the decision of the judge. The wife failed to establish that the judge would have made a substantially differently order from the one he made had the full facts been known and incorrectly concentrated on what she would or might have done if there had been full disclosure. The rationale behind the principle that fraud unravels all is that a person should not retain an advantage obtained by fraud, and so for any argument based on that principle to succeed the wife must demonstrate that the husband would be allowed by his non-disclosure to keep an advantage which he had obtained. The husband's non-disclosure does not unravel the order, which was neither advantageous to him nor disadvantageous to the wife: the compromise arrived at by the parties was a classic one between two positions where the wife contended for beneficial ownership of half the husband's shares and the husband contended for her ownership of none. Since there was no such advantage to the husband there is nothing to unravel

B

C

Whenever non-disclosure is established the innocent party is not automatically entitled to have the order set aside as a matter of right. The non-disclosure must be material to the exercise by the court of its statutory duty such that it would have led to the court having made a substantially different order: see *Jenkins v Livesey (formerly Jenkins)* [1985] AC 424. The wife failed to persuade the judge that he would have made a substantially different order if proper disclosure had taken place. The test of materiality had to be applied not only to July 2012 when the court made its original order but also to April 2013 given the factual position at that time.

D

The rationale for setting aside an order is to allow for the possibility of making a substantially different order. Therefore it would be pointless to set aside an order where the terms will not be changed. Given the judge's conclusions, setting the order aside would lead to the whole process being gone through again before making an order in the same terms.

E

[Reference was made to *de Lasala v de Lasala* [1980] AC 546 and *Granatino v Radmacher (formerly Granatino)* [2011] 1 AC 534.]

F

*Pointer QC* replied

The court took time for consideration.

14 October 2015. **BARONESS HALE OF RICHMOND DPSC** (with whom **LORD NEUBERGER OF ABBOTSBURY PSC, LORD CLARKE OF STONE-CUM-EBONY, LORD WILSON, LORD SUMPTION, LORD REED** and **LORD HODGE JJSC** agreed) handed down the following judgment.

G

1   What is the impact of fraud on a financial settlement which is agreed between a divorcing husband and wife, especially where, as will almost always be the case, that agreement is embodied in a court order? Does "fraud unravel all", as is normally the case when agreements are embodied in court orders, or is there some special magic about orders made in matrimonial proceedings, which means that they are different? This case happens to concern a husband and wife in divorce proceedings, but the same

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

877

A questions would also arise in judicial separation proceedings, and between same-sex partners who are either married or in a civil partnership in divorce, dissolution or separation proceedings. They entail consideration, in particular, of the leading case on non-disclosure in matrimonial financial proceedings, *Jenkins v Livesey (formerly Jenkins)* [1985] AC 424 ("*Livesey*").

B *The facts*

2 The husband and wife (who are not yet divorced) were married in 1993 and separated 17 years later, in 2010, having had three children together. When their financial proceedings were heard, in July 2012, the children were aged 17, 15 and 12. The wife has been the children's primary carer throughout the marriage and she anticipates that she will remain

C responsible for the care of their elder son, who has severe autism, for the rest of her life. Sadly, the parties also cannot agree about matters relating to the future care of their son and so there are also proceedings in the Court of Protection about him.

3 The husband is a computer software entrepreneur. He has developed a very successful software business, AppSense Holdings Ltd, in which he holds a substantial shareholding. The value and manner of distribution

D between them of this shareholding was the principal matter in dispute between the parties. It was not in dispute that, in addition to that shareholding, there were liquid assets of some £17m, of which around £13·8m was in cash, £2m in the parties' three homes, and the balance in other assets and investments.

4 It is only necessary to give a brief outline of the dispute about the

E value of AppSense and the husband's shareholding in it. In early 2011, Goldman Sachs had paid US$70m for a 33·5% share in the company. The wife contended that this valued the company as a whole at around US$255m and the husband's remaining shares at around US$132m. The husband contended that the development of the company was not going according to plan and it was worth far less. Each party instructed a valuation expert. Both valuers approached their task on the basis that there were no plans for

F an Initial Public Offering ("IPO"). The wife's valuer concluded that the company as a whole was worth £88·3m (making the post-tax valuation of the husband's shareholding something between £22·24m and £31·9m). The husband's valuer concluded that the company was worth £60m (valuing the husband's shareholding at something between £6·674m and £8·085m).

5 The case came on for trial before Sir Hugh Bennett in July 2012. The

G wife's case was that all the assets should be divided equally. She should receive 50% of the liquid assets and 50% of the net proceeds of any sale of the AppSense shares, whenever that took place. The husband's case was that the assets should be divided equally, but that the wife should receive the whole of her share from the liquid assets, leaving him with the unencumbered AppSense shares. He also argued that, if his valuer's view of the value of those shares was not accepted, his special contribution would justify a departure

H from the principle of equality. However, under cross-examination, he abandoned this second argument, at least in relation to assets acquired during the marriage.

6 Much of the husband's evidence was about when the value of his shares might be realised. His written evidence was that an exit, although

theoretically possible at any time, was unlikely before three, five or seven      A
years after July 2012. He also gave the impression that various exit
strategies were being contemplated but only when the time was right. In oral
evidence he said that there might be an exit in between three and seven years'
time, but that "One thing is for sure—that there's nothing on the cards
today".

7  After the parties had given their evidence, but before the valuers had      B
given theirs, the parties reached an agreement. The wife would receive over
£10m in cash and property, and 30% of the net proceeds of sale of the
AppSense shares (in the shape of a deferred lump sum), whenever that might
take place. They would also set up a trust for their elder son, into which
each would pay £1m immediately and the husband would pay £4m from the
proceeds of sale of his AppSense shares. The husband would also pay child      C
support for each of the children.

8  On 13 July 2012, this agreement was explained to the judge, who
approved it. A draft consent order was drawn up. Before it was sealed,
however, reports appeared in the press indicating that AppSense was being
actively prepared for an IPO, which was expected to value the company at
between US$750m and US$1000m.

9  The wife immediately invited the judge not to seal the order and      D
applied for the hearing to be resumed. The husband argued that the judge
was functus officio, but the judge rejected that and ordered the husband
to file an affidavit responding to the wife's allegation of material
non-disclosure. He directed a further hearing, which was listed for 15 April
2013. At that hearing he had before him the wife's application for the
hearing to be resumed and the husband's application that the wife show
cause why the order reflecting the agreement should not be sealed. He gave      E
judgment [2013] 2 FLR 1598 on 29 April 2013.

10  The husband's affidavit, filed in January 2013, continued to deny
that there was any imminent prospect of an IPO of AppSense or that he had
misled the court in his evidence. The press reports were mere public
relations "fluff" put out by one or more investment banks. However, the
documents which he exhibited to that affidavit told a very different story. As      F
the judge put it, planning for an IPO in early 2013 had been "in full swing
from January to August 2012" (para 29); by early July 2012 the company
had sent out invitations to various banks inviting them to pitch for the role
of bankers to the IPO; and the husband had been due to and did meet
potential bankers the week after the hearing. The husband had knowingly
misled both of the expert valuers and his evidence at the hearing had been      G
false. It was "absolutely plain" that the husband's evidence about AppSense
had been "seriously misleading": para 29. "When placed against the
documents which he has now disclosed", his evidence "can only be
categorised as dishonest": para 31. The documents exhibited to his affidavit
had not previously been disclosed "because he did not want the wife or the
court to know the true facts. He thus gave dishonest evidence, no doubt in
the hope that this would lessen his exposure to the court's discretionary      H
powers": para 31.  Had the judge known the true facts, it was
"inconceivable" that he would not have regarded them as relevant to the
exercise of his discretion. This was not "some relatively minor matter", in
the words of Lord Brandon of Oakbrook in *Livesey* [1985] AC 424, 445.

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  Why would the husband lay a false trail if what was sought to be suppressed was immaterial: para 33?

*The decisions of the High Court and Court of Appeal*

11  The judge having reached that conclusion, it might have been expected that he would direct that the draft consent order agreed in July 2012 not be sealed and give directions for the case to be heard again. B  Instead, however, he acceded to the husband's application that the order be perfected.

12  His grounds for doing so were, in summary, that had he known the truth about the plans for an IPO in 2012, he would have asked himself "what is the likelihood of an IPO . . . actually happening?" (para 37); he would have progressed the hearing as far as he could and then adjourned to see C  whether an IPO did take place, on what terms, at what value and at what price (para 38); as in fact no IPO had taken place (para 40) and the husband's evidence that no IPO was now contemplated had not been challenged, he was compelled to accept that none was now in prospect (para 41); under the draft order, the wife had "by far the greater share of the liquid assets"; she was to make a smaller contribution to the son's trust; and D  she was to get 30% of the net value of the husband's shares whenever they were realised, although it could be "strongly argued" that the value of the shares "would become less and less of a matrimonial asset in the future"; she took the risk that crystallisation of her entitlement might occur sooner than three years by agreeing to a flat rate of 30% (para 42); and so the order he was now being asked by the husband to make was not substantially different from the order which he would have made had there been full disclosure at E  the outset; hence the non-disclosure was not now material: para 43.

13  The Court of Appeal, by a majority, dismissed the wife's appeal [2014] 2 FLR 89. The leading judgment was given by Moore-Bick LJ. In summary, it was clear from *Livesey* and other cases that the authority of an order made in matrimonial financial remedy proceedings derives from the court's own exercise of its statutory powers under the Matrimonial Causes Act 1973 and not from the consent of the parties. Hence misrepresentation F  that would normally entitle a wife to rescind a contract (and have a consent order in civil proceedings set aside) did not necessarily entitle her to renounce the agreement and resume the proceedings. It was necessary for the wife to satisfy the judge that he should set the order aside: para 18. In *Livesey*, Lord Brandon had said that it would only be in cases where the absence of full and frank disclosure had led to the court making an order G  "substantially different from the order which it would have made if such disclosure had taken place" that a case for setting aside the order could be made good: para 19. So the judge had asked himself the right question: para 21. The sooner the husband was likely to dispose of his shares, the stronger would be the wife's claim to an equal share and the stronger her argument for resuming the hearing. Any challenge to the husband's evidence about his plans for the company ought to have been made at the hearing: H  para 23. Although *Livesey* had not been a case of fraud, "[i]t would be surprising if Lord Brandon had confined his analysis . . . to the relatively uncommon cases of inadvertent non-disclosure": para 20.

14  In her concurring judgment, Macur LJ placed particular emphasis on the wife's failure to cross examine the husband on his affidavit: paras 53, 54.

© 2016 The Incorporated Council of Law Reporting for England and Wales

880
Sharland v Sharland (SC(E))                                          [2016] AC
Baroness Hale of Richmond DPSC

15    In a vigorous dissenting judgment, Briggs LJ explained that the
husband's fraud was material to the agreement and the consent order for
two reasons.  First, it undermined the basis on which his shareholding had
been valued and "therefore the ability of the wife to address the
proportionality of agreeing a discount below her claimed 50% . . . against
the receipt of a larger share of the other family assets".  Secondly, it created a
false basis for the wife to assume that a delayed realisation of the husband's
shareholding might justify a tapered reduction in her share of the proceeds:
para 30.   Once the judge had decided that the husband's fraud had
undermined the parties' agreement and the consent order, that should have
been the end of the matter.  There were three inter-related reasons for this:
para 34.  First, the general principle that "fraud unravels all" is no less
applicable to court orders than to contracts: para 35.   Second, Lord
Brandon's obiter dictum in *Livesey* [1985] AC 424, 445 had been
misinterpreted.   He was drawing a distinction between triviality and
materiality as at the date of the order, not at some later date: para 40.  The
husband should not be allowed to "hold onto an order tainted by material
fraud on his part by rearranging his affairs . . . so as to bring them broadly
into line, but after the event, with the false picture originally portrayed by
him": para 37.  Third, the wife had been deprived of a full hearing of her
claim.  The purpose of the hearing in April 2013 was not to determine her
claim but only to decide whether the order should be set aside and a
rehearing ordered.  Cross-examination of the husband was unnecessary:
para 42. The wife should not have to prove at that stage that she would have
obtained a substantially different order, merely that the non-disclosure had
deprived her of a real prospect of doing better at a full hearing: para 46.
16    The wife now appeals to this court.

*Settling matrimonial claims*

17    It is in everyone's interests that matrimonial claims should be settled
by agreement rather than by an adversarial battle in court.  The financial
resources of the family are not whittled away by the often substantial legal
costs involved.  The emotional resources of the family are not concentrated
on conflict.  The future relationship between the adult parties is not soured,
or further soured, by that conflict.  This is not only good for them but also
for their children, whatever their ages, and for the wider family.  It is for
these reasons that there are processes, both within the procedures of the
Family Court and independent of them, for helping the parties to reach
agreement on the practical consequences of the breakdown of their
relationship.
18    It has long been possible for a married couple to make a binding
agreement about the financial consequences of their present separation.
However, it is not possible for such an agreement to oust the jurisdiction of
the court to make orders about their financial arrangements.  This was a rule
of public policy, because of the public interest in ensuring that proper
provision is made for dependent family members: see *Hyman v Hyman*
[1929] AC 601.  Any doubt about whether this meant that there was no
consideration for the paying party's promise to pay was laid to rest by what
is now section 34(1) of the Matrimonial Causes Act 1973.  This provides
that any provision in a maintenance agreement "purporting to restrict any

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   right to apply to a court for an order containing financial arrangements . . .
    shall be void" but that

> "any other financial arrangements contained in the agreement shall not
> thereby be rendered void or unenforceable and shall, unless they are void
> or unenforceable for any other reason . . . be binding on the parties to the
> agreement".

B   This has since been held to apply to post-nuptial agreements for the
    consequences of a future separation between the parties and (albeit obiter) to
    ante-nuptial agreements: see *MacLeod v MacLeod* [2010] 1 AC 298 and
    *Granatino v Radmacher (formerly Granatino)* [2011] 1 AC 534.
        19   Thus it is impossible for the parties to oust the jurisdiction of the
    court, but the court also possesses powers to achieve finality (a "clean
C   break") in the parties' financial arrangements which the parties cannot
    achieve for themselves. For those reasons, it is now much more common for
    separating or divorcing spouses to negotiate with a view to embodying their
    agreed arrangements in a court order than to make a formal separation
    agreement. If they do this, the fundamental principle is that "an agreement
    to compromise an ancillary relief application does not give rise to a contract
    enforceable in law". Furthermore,
D
> "the court does not either automatically or invariably grant the
> application to give the bargain [the] force of an order. The court conducts
> an independent assessment to enable it to discharge its statutory function
> to make such orders as reflect the criteria listed in section 25 of the
> Matrimonial Causes Act 1973, as amended."

E   See *Xydhias v Xydhias* [1999] 2 All ER 386, 394, per Thorpe LJ.
        20   Although the court still has to exercise its statutory role, it will, of
    course, be heavily influenced by what the parties themselves have agreed.
    Section 33A of the Matrimonial Causes Act 1973, as inserted by section 7 of
    the Matrimonial and Family Proceedings Act 1984, provides that,
    notwithstanding the preceding provisions of Part II of the Act (which deal
    with the court's powers and duties in relation to financial provision and
F   property adjustment), on an application for a consent order, "the court may,
    unless it has reason to think that there are other circumstances into which it
    ought to inquire, make an order in the terms agreed on the basis only of the
    prescribed information furnished with the application" (and see FPR r 9.26).
    This permits the court to make the order in the terms agreed, but does not
    in any way inhibit its power to make further inquiries or to suggest
G   amendments to the parties.
        21   Allied to the court's responsibility to safeguard both the parties' and
    the public interest is the parties' duty to make full and frank disclosure of all
    relevant information to one another and to the court. In *Livesey* [1985] AC
    424, the House of Lords decided two questions. The first was whether the
    parties' duty of full and frank disclosure continued after they had reached
    agreement on their financial arrangements. The facts were that on or about
H   12 August 1982, the parties, who were by then divorced, reached agreement
    that, in return for the husband transferring to the wife his half-share in the
    jointly owned matrimonial home, the wife would surrender all claims for
    financial provision for herself. On 18 August, the wife became engaged to
    marry another man, but did not mention this either to her solicitor or to her

© 2016 The Incorporated Council of Law Reporting for England and Wales

882
Sharland v Sharland (SC(E))                                      [2016] AC
Baroness Hale of Richmond DPSC

former husband. On 19 August, the solicitors issued a joint application for a consent order in the terms agreed and on 2 September the judge made the order. On 22 September, the husband conveyed his half share in the home to the wife. On 24 September, the wife re-married. When he learned of this, the husband applied for leave to appeal out of time against the consent order and for the order to be set aside.

22   Lord Brandon of Oakbrook emphasised, at p 437, that

"unless a court is provided with correct, complete and up-to-date information on the matters to which, under section 25(1), it is required to have regard, it cannot lawfully or properly exercise its discretion in the manner ordained by that subsection."

Hence each party "owes a duty to the court to make full and frank disclosure of all material facts to the other party and the court": p 438. This principle applied just as much to the exchanges of information leading up to a consent order as it did to contested hearings. Hence the wife was under a duty to disclose her engagement before the agreement made was put into effect.

23   The second question was whether, in the light of that, the consent order should be set aside. Lord Brandon quoted (at p 442) with approval the judgment of Templeman LJ in *Robinson v Robinson (Practice Note)* [1982] 1 WLR 786 who said, at pp 786–787, that

"In the Family Division, as has been said many times, this power to set aside final orders is not limited to cases where fraud or mistake can be alleged. It extends, and has always extended, to cases of material non-disclosure . . . the power to set aside arises when there has been fraud, mistake, or material non-disclosure as to the facts *at the time the order was made*." (Emphasis added.)

Lord Brandon concluded [1985] AC 424, 443 that "since the fact which was not disclosed undermined, as it were, the whole basis on which the consent order was agreed, that order should be set aside" and the proceedings remitted to the Family Division of the High Court for rehearing.

24   Having reached that conclusion, Lord Brandon ended, at pp 445–446, with "an emphatic word of warning" which has been much quoted in this case:

"It is not every failure of frank and full disclosure which would justify a court in setting aside an order of the kind concerned in this appeal. On the contrary, it will only be in cases where the absence of full and frank disclosure has led to the court making, either in contested proceedings or by consent, an order which is substantially different from the order which it would have made if such disclosure had taken place that a case for setting aside can possibly be made good. Parties who apply to set aside orders on the ground of failure to disclose some relatively minor matter or matters, the disclosure of which would not have made any substantial difference to the order which the court would have made or approved, are likely to find their applications being summarily dismissed . . ."

25   Lord Keith of Kinkel and Lord Bridge of Harwich simply agreed with Lord Brandon. Lord Scarman, however, expressed his "firm support" for the "emphatic word of warning": orders were not to be set aside on the ground of non-disclosure if the disclosure would not have made any

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   substantial difference to the order which the court would have made: p 430.
Lord Hailsham of Marylebone LC, too, underscored the warning. Consent
orders leading to a clean break were much to be encouraged, and were
therefore "not lightly to be overthrown": p 430.

26   It must be emphasised, however, that *Livesey* was not a case of
fraud. Lord Brandon rejected the suggestion that the wife had made any
misrepresentation to the husband or his solicitors, which had induced him to
B   agree to the order: p 434. Lord Hailsham was also understanding of the
wife's position: "I do not think she was fully aware (though she should have
been) of the vital nature of the information she was withholding . . .": p 430.
It is also worth bearing in mind that, until the case reached the House of
Lords, there was authority for the proposition that the duty to make full and
frank disclosure did not apply where the parties were bargaining at arms'
C   length with the help of their solicitors: see *Wales v Wadham* [1977] 1 WLR
199 and *Tommey v Tommey* [1983] Fam 15, both disapproved on this
point by the House of Lords. This was, therefore, what may now be an
unusual case, where there was neither a misrepresentation nor deliberate
non-disclosure.

27   Family proceedings are different from ordinary civil proceedings in
D   two respects. First, in family proceedings it has been clear, at least since the
Privy Council's decision in *de Lasala v de Lasala* [1980] AC 546, that a
consent order derives its authority from the court and not from the consent
of the parties, whereas in ordinary civil proceedings, a consent order derives
its authority from the contract made between the parties: see, e g, *Purcell v
FC Trigell Ltd* [1971] 1 QB 358, CA. Second, in family proceedings there is
always a duty of full and frank disclosure, whereas in civil proceedings this is
E   not universal.

28   However, *Dietz v Lennig Chemicals Ltd* [1969] 1 AC 170 is an
interesting example of a civil case which has some of the characteristics of a
family case. This was a claim brought against her deceased husband's
employers by the widow, on behalf of her husband's estate and on behalf of
herself and their child under the Fatal Accidents Acts. It was settled for a
F   global sum of £10,000 but, as the child was an infant, the settlement had to
be approved by the court. Between the summons for the court's approval
and the court's approval, the widow remarried. Thus she was no longer a
"widow" as she was described in the title to the action and in the trust deed
giving effect to the settlement. The House of Lords held that the settlement
agreement was not binding without the approval of the court and that the
employers were entitled to have the consent order set aside as their consent
G   had been induced by an innocent misrepresentation that the claimant was a
widow at the date of the order.

*Analysis*

29   It follows that the majority in the Court of Appeal in this case were
correct to say that matrimonial cases were different from ordinary civil cases
H   in that the binding effect of a settlement embodied in a consent order stems
from the court's order and not from the prior agreement of the parties. It
does not, however, follow that the parties' agreement is not a sine qua non of
a consent order. Quite the reverse: the court cannot make a consent order
without the valid consent of the parties. If there is a reason which vitiates a

© 2016 The Incorporated Council of Law Reporting for England and Wales

884
Sharland v Sharland (SC(E))                                    [2016] AC
Baroness Hale of Richmond DPSC

party's consent, then there may also be good reason to set aside the consent    A
order. The only question is whether the court has any choice in the matter.

30    This may well depend on the nature of the vitiating factor. We know
from the *Dietz* case that innocent misrepresentation as to a material fact is a
vitiating factor. The court set aside the order because the misrepresentation
had induced the defendants to agree to the settlement. We know from
*Livesey* [1985] AC 424 that in matrimonial cases innocent non-disclosure of    B
a material fact is a vitiating factor. The court set aside the order because the
undisclosed fact undermined the whole basis on which the order was made.

31    Although not strictly applicable in matrimonial cases, the analogy of
the remedies for misrepresentation and non-disclosure in contract may be
instructive. At common law, the general effect of any misrepresentation,
whether fraudulent, negligent or innocent, or of non-disclosure where there
was a duty to disclose, was to render a contract voidable at the instance of a    C
party who had thereby been induced to enter into it. This has now been
modified by the Misrepresentation Act 1967, which empowers the court to
impose an award of damages in lieu of rescission for negligent or innocent
misrepresentation. This does not, however, apply in cases of fraudulent
misrepresentation, where there is no power to impose an award of damages
in lieu. The victim always has the right to rescind unless one of the general    D
bars to rescission has arisen.

32    There is no need for us to decide in this case whether the
greater flexibility which the court now has in cases of innocent or
negligent misrepresentation in contract should also apply to innocent
or negligent misrepresentation or non-disclosure in consent orders whether in
civil or in family cases. It is clear from *Dietz* and *Livesey* that the
misrepresentation or non-disclosure must be material to the decision that the    E
court made at the time. But this is a case of fraud. It would be extraordinary if
the victim of a fraudulent misrepresentation, which had led her to
compromise her claim to financial remedies in a matrimonial case, were in a
worse position than the victim of a fraudulent misrepresentation in an
ordinary contract case, including a contract to settle a civil claim. As was held
in *Smith v Kay* (1859) 7 HL Cas 750, a party who has practised deception    F
with a view to a particular end, which has been attained by it, cannot be
allowed to deny its materiality. Furthermore, the court is in no position to
protect the victim from the deception, or to conduct its statutory duties
properly, because the court too has been deceived. In my view, Briggs LJ was
correct in the first of the three reasons he gave for setting aside the order.

33    The only exception is where the court is satisfied that, at the time
when it made the consent order, the fraud would not have influenced a    G
reasonable person to agree to it, nor, had it known then what it knows now,
would the court have made a significantly different order, whether or not the
parties had agreed to it. But in my view, the burden of satisfying the court of
that must lie with the perpetrator of the fraud. It was wrong in this case to
place on the victim the burden of showing that it would have made a
difference.

34    In my view, the second and third reasons given by Briggs LJ for    H
setting aside the order flowed from the first. Sir Hugh Bennett had been clear
that the misrepresentation and non-disclosure as to the husband's plans for
the company was highly material to the decision made in July 2012. Indeed,
it could not have been anything else. It had coloured both valuers' approach

© 2016 The Incorporated Council of Law Reporting for England and Wales

to the valuation of the husband's shareholding.  That in turn had coloured the wife's approach to the proportionality of the balance struck between her present share in the liquid assets and her future share in the value of the husband's shareholding.  Sir Hugh may have been right to say, with the benefit of hindsight, that had he known the truth then he would have waited to see what transpired.  But in doing so, he would have had to bear in mind the husband's ability to manipulate the timing and manner of any offer to the public in a way which suited him best.  Be that as it may, it is enough that Sir Hugh would not have made the order he did when he did had the truth been known.

35   It being clear that the order should have been set aside, it is also clear that Sir Hugh should not have gone on to re-make the decision then and there on the basis of the evidence then before him.  The wife was entitled to re-open the case, when she might seek to negotiate a new settlement or a rehearing of her claims when all the relevant facts were known.  Thus, in my view, Briggs LJ was also correct in the third reason that he gave for allowing the appeal.  The wife had been deprived of a full and fair hearing of her claims.  That matter was not before the judge in April 2013.  The application and cross-application before him related to whether or not the order made on 19 July 2012 should be perfected.  There was no need for the wife's counsel to cross-examine the husband, as the documents he had now disclosed revealed that he had deceived the court.

36   It follows that, in my view, this appeal should be allowed; the consent order made on 19 July should not be perfected; and the matter should return to the Family Division of the High Court for further directions.

*Procedural issues*

37   The fact that this order had not yet been perfected makes no difference.  The principles applicable in this sort of case are the same whether or not the order agreed on by the parties and the court has been sealed.

38   However, the fact that the order had not been sealed means that in this particular case the procedural problem about how such challenges to the final order of a court in family proceedings can be brought does not arise.  The trial judge was able to revisit his order: see *In re L (Children) (Preliminary Finding: Power to Reverse)* [2013] 1 WLR 634.  This and other procedural issues do, however, arise in *Gohil v Gohil (No 2)* [2016] AC 849, which was heard at the same time as this case.  In *L v L* [2008] 1 FLR 26, Munby J described this problem as "a procedural quagmire": para 39.  There are three possible routes: (i) a fresh action to set aside the order; (ii) an appeal against the order; or (iii) an application to a judge at first instance in the matrimonial proceedings.  The difference is that permission is required for an appeal, and it may be required long after the time limit for appealing has expired, whereas the other two routes do not require permission.  A further difference is that an appeal is not the most suitable vehicle for hearing evidence and resolving the factual issues which will often, although not invariably, arise on an application to set aside.

39   In *Livesey* [1985] AC 424, the matter was dealt with by way of permission to appeal out of time.  But that was a simple case where the facts were clear.  A fresh action would be the normal route in ordinary civil proceedings to challenge a final judgment on account of fraud: see *Jonesco v Beard* [1930] AC 298.   This route is also available in matrimonial

© 2016 The Incorporated Council of Law Reporting for England and Wales

886
Sharland v Sharland (SC(E))                                        [2016] AC
Baroness Hale of Richmond DPSC

proceedings: see *de Lasala v de Lasala* [1980] AC 546. Indeed, in that case, the Judicial Committee of the Privy Council held that, there being no power to vary the matrimonial financial order which had been made by consent,

> "where a party to an action seeks to challenge, on the ground that it was obtained by fraud or mistake, a judgment or order that finally disposes of the issues raised between the parties, the only ways of doing it that are open to him are by appeal from the judgment or order to a higher court or by bringing a fresh action to set it aside": p 561.

40    However, it has not been clear whether in matrimonial proceedings such a fresh action can be brought by making an application in the matrimonial proceedings themselves or whether an entirely separate application has to be brought. In *Gohil v Gohil (No 2)* [2015] Fam 89, the wife had issued a summons in the matrimonial proceedings rather than a separate application, but the Court of Appeal approached the case as if Moylan J had been hearing a fresh application to set aside for material non-disclosure: para 61. In my view there is jurisdiction to entertain such an application within the matrimonial proceedings. Unlike ordinary civil proceedings, it has always been the case that the divorce court retains jurisdiction over a marriage even after it has been dissolved. While it is now possible for the court to achieve a clean break between the parties, the issue raised by an application to set aside for fraud, mistake or material non-disclosure is whether it was consistent with the court's statutory duties so to do.

41    The most recent survey of the "extensive jurisprudence" in this field is by Sir James Munby in *S v S* [2015] 1 WLR 4592. In that case, the issue was whether an appeal was the *only* route to set aside a consent order made in matrimonial proceedings. He refers to the recent steps to remedy matters, in section 31F of the Matrimonial and Family Proceedings Act 1984 (inserted by section 17 of and Schedule 10 to the Crime and Courts Act 2013), when setting up the Family Court. Section 31F(3) provides that "Every judgment or order of the Family Court is, except as provided by this or any other Act or by rules of court, final and conclusive between the parties" (this provision is derived from the County Courts Act 1984, section 70). But section 31F(6) gives the Family Court power "to vary, suspend, rescind or revive any order made by it". FPR r 4.1(6) provides that "A power of the court under these rules to make an order includes a power to vary or revoke the order". On the face of it, as the editors of *The Family Court Practice 2015* point out (p 1299), this is a very wide power which could cut across some other provisions, for example those prohibiting variation of lump sum and property adjustment orders. Clearly, as Sir James Munby P observed [2015] 1 WLR 4592, para 11 the power, "although general is not unbounded". However, it does give the Family Court power to entertain an application to set aside a final order in financial remedy proceedings on the well-established principles with which we are concerned in this case. In *S v S*, Sir James Munby P held that the statement in paragraph 14.1 of Practice Direction 30A, which supplements the provisions for appeals in FPR Pt 30 that "An appeal is the only way in which a consent order can be challenged" is ultra vires. The Practice Direction could not purport

> "to forbid a litigant to have recourse to a form of remedy long recognised by the common law, let alone to a remedy expressly conferred

© 2016 The Incorporated Council of Law Reporting for England and Wales

A    by both statute (section 31F(6) of the 1984 Act) and rule: FPR r 4.1(6)":
     para 36.

     42    It is clear, therefore, that an application of this sort can be made
either by way of an appeal or by way of an application to a first instance
judge.  There remain difficult issues as to how such an application should be
made, whether within or without the original proceedings, and whether it
B    would be appropriate for the rules or a practice direction to specify criteria
for choosing between an appeal and an application at first instance.
A Working Party of the Family Procedure Rule Committee is currently
considering the whole issue.  In that connection I wholeheartedly endorse
the observations of Lord Wilson JSC in para 18 of his judgment in *Gohil v
Gohil (No 2)* [2016] AC 849.

C    43    Finally, however, it should be emphasised that the fact that there has
been misrepresentation or non-disclosure justifying the setting aside of an
order does not mean that the renewed financial remedy proceedings must
necessarily start from scratch.  Much may remain uncontentious.  It may
be possible to isolate the issues to which the misrepresentation or
non-disclosure relates and deal only with those.  A good example of this is
*Kingdon v Kingdon* [2011] 1 FLR 1409, where all the disclosed assets had
D    been divided equally between the parties but the husband had concealed
some shares which he had later sold at a considerable profit.  The court left
the rest of the order undisturbed but ordered a further lump sum to reflect
the extent of the wife's claim to that profit.  This court recently emphasised
in *Wyatt v Vince (Nos 1 and 2)* [2015] 1 WLR 1228 the need for active case
management of financial remedy proceedings, "which . . . includes promptly
identifying the issues, isolating those which need full investigation and
E    tailoring future procedure accordingly": para 29.  In other words, there is
enormous flexibility to enable the procedure to fit the case.  This applies just
as much to cases of this sort as it does to any other.

     44    For completeness, I should add that we have heard no argument
about the correctness of the judge's view that a tapering award might be
appropriate where what had been a matrimonial asset remained in the hands
F    of one of the parties where it would become "less and less of a matrimonial
asset".  There is obviously room for more than one view on this and so it
would be inappropriate to comment further.

                                        *Appeal allowed.*
                                        *Matter remitted to High Court.*

G                                       SHIRANIKHA HERBERT, Barrister

H

© 2016 The Incorporated Council of Law Reporting for England and Wales



Neutral Citation Number: [2019] EWHC 3096 (Ch)

Case Nos: HC-2014-002092
HC-2014-001010
HC-2014-001387
HC-2014-001388
HC-2014-001389
HC-2015-000103
HC-2015-000105

## IN THE HIGH COURT OF JUSTICE
## CHANCERY DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15/11/2019

**Before**:
## SIR ALASTAIR NORRIS

- - - - - - - - - - - - - - - - - - - -

**Between**:
**JOHN MICHAEL SHARP**                         **Claimants**
**And the other Claimants listed in the GLO Register**
**- and -**
**(1)  SIR MAURICE VICTOR BLANK**              **Defendant**
**(2)  JOHN ERIC DANIELS**
**(3)  TIMOTHY TOOKEY**
**(4)  HELEN WEIR**
**(5)  GEORGE TRUETT TATE**
**(6)  LLOYDS BANKING GROUP PLC**

- - - - - - - - - - - - - - - - - - - -

**Richard Hill QC, Sebastian Isaac, Jack Rivett and Lara Hassell-Hart** (instructed by **Harcus Sinclair UK Limited**) for the **Claimants**
**Helen Davies QC, Tony Singla and Kyle Lawson** (instructed by **Herbert Smith Freehills LLP**) for the **Defendants**

Hearing dates: 17-20, 23-27, 30-31 October 2017; 1-2, 6-9, 13-17,20, 22-23, 27, 29-30 November 2017, 1, 11-15, 18-21 December 2017, 12, 16-19, 22-26, 29-31 January 2018, 1-2, 5-6, 8, 28 February 2018, 1-2 and 5 March 2018

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

**INDEX:**

| | |
|---|---|
| The task in hand | 1 |
| The landscape in broad strokes | 8 |
| The claim in outline. | 29 |
| The legal basis for the claim | 41 |
| The factual witnesses. | 43 |
| The expert witnesses | 59 |
| The facts: the emerging financial crisis before the summer of 2008 | 76 |
| Initial discussions on an acquisition in Summer 2008 | 91 |
| Initial discussions: emerging themes | 101 |
| The sudden turn of events | 127 |
| Assessing the proposed transaction following the Lehman's collapse | 135 |
| The settlement of terms | 157 |
| Due diligence continues | 161 |
| The offer | 164 |
| The Announcement | 184 |
| Key external events following the Announcement | 192 |
| Key internal events following the Announcement and preceding the recapitalisation | 199 |
| Interbank dealings | 200 |
| Due diligence | 254 |
| Government support for Lloyds and HBOS | 275 |
| Knowledge of ELA | 294 |
| The Recapitalisation | 306 |
| The Revised Announcement | 338 |
| Key external events following the Revised Announcement and before 29 October 2008 | 362 |
| Key internal events following the Revised Announcement down to (and just after) the 24 October 2008 Board meeting | 389 |
| The Board Meeting on 24 October 2008 | 416 |
| Events between the Board Meetings of 24 and 29 October 2008. | 434 |
| The Board Meeting of 29 October 2008 | 472 |
| Events of 31 October 2008 | 505 |
| A digression: a Scottish counterbid | 506 |
| The Circular | 513 |
| The "Away-day" | 541 |

**Approved Judgment**

| | |
|---|---|
| Events before the EGM | 547 |
| The Extraordinary General Meeting | 552 |
| The descending gloom | 560 |
| The board meeting of 13 February 2009 | 585 |
| Further capital raising | 595 |
| Two other streams | 605 |
| A retrospective | 608 |
| The recommendation case: the pleaded case | 611 |
| The recommendation case: the law | 617 |
| The recommendation case: key holding | 661 |
| The recommendation case: opinion evidence | 664 |
| The recommendation case: the "irrationality" argument | 671 |
| The recommendation case: absence of value | 679 |
| The recommendation case: inadequate due diligence | 693 |
| The recommendation case: impairments | 699 |
| The recommendation case: funding | 747 |
| The recommendation case: restructuring | 751 |
| The recommendation case: the "standalone" comparator | 761 |
| The recommendation case: a summing up | 764 |
| The disclosure case: main themes | 767 |
| The issue before the shareholders. | 782 |
| The allegations made | 784 |
| The relevant core allegations | 792 |
| A beneficial transaction | 794 |
| The £7bn additional capital requirement | 806 |
| The £10bn net negative capital adjustment | 815 |
| The adequacy of working capital | 836 |
| Funding and the ELA | 844 |
| Material contracts | 862 |
| Restructuring | 877 |
| Federal Reserve funding | 880 |
| Breaches of the sufficient information duty | 886 |
| The consequences of not disclosing ELA or the Lloyds Repo | 891 |
| Causation | 893 |

**Approved Judgment**

| | |
|---|---|
| **Termination** | **894** |
| **Collapse** | **900** |
| **Rejection** | **944** |
| **The result** | **965** |
| **Damages** | **967** |
| **Remoteness** | **970** |
| **Overpayment** | **973** |
| **Diminution** | **981** |

Approved Judgment

## SIR ALASTAIR NORRIS:

### *The task in hand*

1. This is not the outcome of a public enquiry into the reverse takeover by Lloyds TSB Group plc ("Lloyds") of HBOS plc ("HBOS") at the start of the great credit crunch in 2008. It is a judgment following the trial of specific allegations made by a group of Lloyds shareholders (or former shareholders) who seek to make each of five former directors of Lloyds personally liable to pay some £385 million to that group for alleged carelessness or breach of fiduciary duty (or more accurately "equitable" duty). It has not been my task to investigate or to seek to answer all questions that arise from the takeover.

2. Nor am I required to make an overall assessment of whether in the light of a decade of financial tumult, hesitant recovery and historic claims the takeover was ultimately justified. Some shareholders (especially those who, perhaps because they were members of an employees' share scheme as about 98% of employees were, had put all their eggs in one basket) have emphasised that for them it has been a personal financial catastrophe: and so, it has been. That can only elicit sympathy for the small investor. It has provoked amongst some of those who entrusted their entire nest-egg to an investment in Lloyds a level of distress such that it caused one retired clergymen to write to the Chairman of Lloyds and say in as Christian terms as was possible, that the Chairman was a mountebank and a blaggard. Members of Lloyds' management have, on the other hand, emphasised that what has emerged from the turmoil is the largest and best capitalised bank on the High Street, notwithstanding the enormous challenges subsequently presented by at least £18bn-worth (and continuing) of claims arising from PPI miss-selling and other such activities (which activities themselves had produced the high dividends which made shares in Lloyds so attractive to investors like the Claimants before 2008). But even management must (and does) acknowledge that matters did not turn out as intended because the bank faced "things that were unanticipated but which the real world delivered" (as Mr Truett Tate put it during the trial).

3. Knowing what has happened is, of course, a positive disadvantage when trying to assess activities undertaken and assessments made in 2008: and the legal representatives of the Claimants have done their best to avoid the perils of hindsight. But it is right to articulate what the dangers are, and how different is the process of retrospective forensic examination from that of the actual contemporaneous decision-making in the real world.

4. In the courtroom attention is focused upon one element of a complex picture. Emphasis is placed upon particular voices in what was at the time a cacophony competing for attention. Reliance is placed upon a careful selection from amongst those documents that have survived and from amongst the conversations and debates that are noted or recorded (for the unrecorded maybe forgotten or misremembered). Those documents themselves may not disclose the nuances apparent to the contemporary recipient, and are now read and understood in the light of knowledge that the actual recipient lacked at the time. The mere existence of a document frequently does not establish who saw it and in what circumstances so that one cannot tell whether the scrutiny and analysis to which it is subjected by the Court process bears any relationship to how it would have been received and treated at the time. The case management process identifies the issues

5

and excludes all that is irrelevant to those issues, whereas real-life is a confusion of competing considerations amongst which the eventually important considerations lie. Recollections are coloured by this process and by the challenges to that process of recall presented by knowing what eventuated: recollection and reconstruction (to the extent that they can ever be separated) become completely undifferentiated. What might have seemed unimportant at the time emerges as significant once the whole narrative is known, and the knowledge of what did in fact occur exerts a subtle pressure to think that at the time it must have been seen as a real possibility. Changes in culture brought about by the response of the market or of the supervisory authorities to the consequences of unfolding events present particular difficulties for retrospective assessments.

5.      It is becoming customary, in commercial cases where the events in question lie (as the events with which I am concerned do) perhaps a decade in the past, as part of a judicial self-direction to compare the apparent reliability of the documentary record with the apparent fallibility of human memory. Reference is frequently made to cases such as Onassis v Vergottis [1968] 2 Ll.Rep 403 and Gestmin SGPS [2013] EWHC 3560, and to the extra-judicial observations of Lord Bingham on the role of the judge as juror. I have endeavoured to give proper weight to that guidance; but have seen it as my obligation to base my findings on the impression that the entirety of the evidence has made upon me, without putting a pre-determined value on any particular element of it. Sometimes it is not easy to explain.

6.      But the task of making the necessary findings and assessments is one that has routinely to be undertaken. Acknowledging the potential for distortion enables a judge to attempt to compensate appropriately, comforted by the fact that she or he has only to find what probably happened, and only to consider whether the conduct under review was honest according to ordinary standards, or fell within or outside the range of acts or decisions that might have been made or undertaken by reasonable people in the position of the defendants at the time.

7.      In this case the process has resulted in an over-long judgment. Even so it represents a distillation of 3000 pages of written submissions, 45 days' cross-examination, 16 lever-arch files of expert evidence, the relevant parts of 343 lever arch files of documentary material (albeit that large parts of this material were undisturbed) and 20 lever-arch files of authorities. I cannot fully express my admiration for the way this material was prepared and presented, analysed and argued by the respective legal teams (Counsel and solicitors).

## The landscape in broad strokes

8.      The Lloyds TSB Group was formed in 1995 following the merger of Lloyds Bank and TSB Group plc. Strategically it adopted a three phase plan. Phase 1 focused on enhancing the quality of earnings by disposing of or terminating non-core businesses or those which added unnecessary volatility. Phase 2 focussed on accelerating growth by building on customer relationships and improving productivity. Phase 3 was to look for an acquisition that would complement that organic growth.

9.      On 18 September 2008 ("the Announcement Date") the boards of Lloyds and HBOS jointly issued an announcement entitled "Recommended acquisition of HBOS plc by Lloyds TSB Group plc" ("the Announcement") in which they told the market that they

had reached agreement on the terms of an acquisition of HBOS by Lloyds which each board intended unanimously to recommend to their respective shareholders ("the Acquisition"). HBOS shareholders were to receive 0.83 of a Lloyds share for 1 HBOS share. At the date of the Announcement HBOS was drawing upon a number of funding sources, including facilities provided by the Bank of England and by the Federal Reserve in the United States.

10.     The Claimants are 5803 in number (though there may be a duplication of claims by both the legal and the beneficial owner of some holdings). It is said (though this will require examination at a further hearing) that they were at the Announcement Date (and before the Announcement) collectively the holders of 312,732,812 ordinary shares and 447,392 American Depository Receipts ("ADRs") in Lloyds. Precision in relation to the number of Claimants and in relation to the ordinary shares and ADRs held by the Claimants was not achievable at trial: but that does not matter because a picture painted with broad strokes will suffice for the determination of the issues. That is because the Claimants (however many there are and whatever their precise holdings) hold no more than 5% of the shares (or ADRs) in Lloyds in issue at the Announcement Date.

11.     Of the shares held by the Claimants, approximately 13.6% were held by retail investors and 86.4% by institutional shareholders. Of the ADRs held by the Claimants, approximately 20% were held by retail investors and 70% by institutional shareholders. At the trial no distinction was drawn between shareholders and the holders of ADRs and from now on I will simply refer to "shareholders" (though it will be necessary to make a distinction at one point).

12.     At the Announcement Date:

(a)     the Chairman of the Lloyds' board was Sir Victor Blank ("Sir Victor"):

(b)     the Group Chief Executive was Mr Eric Daniels (a board member) ("Mr Daniels");

(c)     the Acting Group Finance Director was Mr Tim Tookey (who did not become a board member until 30 October 2008) ("Mr Tookey");

(d)     the Group Executive Director of the UK Retail Banking Division was Ms Helen Weir (a board member) ("Ms Weir"); and

(e)     the Group Executive Director of the Wholesale and International Banking Division was Mr Truett Tate (a board member) ("Mr Tate").

13.     These are the Defendants to the present claim. The Board Members at the Announcement Date who are *not* being sued are:

(a)     Archie Kane (the Chief Executive Officer of Scottish Widows Bank) ("Mr Kane");

Approved Judgment

(b)     Dr Wolfgang Berndt (a non-executive director) ("Dr Berndt");

(c)     Jan du Plessis (a non-executive director) ("Mr du Plessis");

(d)     Sir Ewan Brown (a non-executive director and a former Chairman of TSB Banking Group plc);

(e)     Philip Green (a non-executive director);

(f)     Sir Julian Horn-Smith (a non-executive director);

(g)     Lord Alexander Leitch (a non-executive director);

(h)     Sir David Manning (a non-executive director); and

(i)     Martin Scicluna (a non-executive director).

They participated in the unanimous recommendation of the Acquisition. Other non-executive directors joined the Board after the Announcement Date and during the acquisition process. Thus, from time to time fresh eyes looked at the Acquisition, but did so without some of the background knowledge and knowing that the existing board had set a particular course.

14.     On 25 September 2008 Lloyds made available a £2.4 billion collateralised interbank facility to HBOS to help it with its immediate funding requirements. A week later (on 2 October 2008) it made an additional such facility of up to £7.5 billion available to HBOS. I will call those two facilities "the Lloyds' Repo".

15.     On 1 October 2008 the Bank of England made a collateralised emergency facility available to HBOS. In the action this was called "emergency liquidity assistance" although it was not generally so called at the time. I will call this facility "ELA".

16.     The context of the Lloyds Repo and of the offer of ELA was the "credit crunch", the great disruption in the funding markets resulting (most immediately) from the collapse of Lehman Brothers that had occurred on 15 September 2008, which brought home to markets that banks might fail and which generated what became unprecedented turbulence in global financial markets. The Bank of England ("BoE" or "the Bank"), HM Treasury ("the Treasury") and the Financial Services Authority ("FSA"), who together tried to maintain the integrity and overall health of UK markets (and were together known as "the Tripartite") determined to restore confidence in the banking sector by providing an unprecedented package of financial support. The announcement came on 8 October 2008. The key elements were (a) measures to provide sufficient short-term liquidity to enable banks to lend in the real economy; and (b) a requirement that banks should strengthen their balance sheets by raising more capital (in which exercise the Treasury would participate) with the object that banks should increase what was known technically as "the Core Tier 1 ratio". This latter element was to be the subject of further discussion with individual banks. The participation of the Government in the recapitalisation process meant that the detailed proposals would need the approval of the European Commission: and that had the potential to require