each participating bank to submit a restructuring plan to address issues arising from the receipt of State aid.

17. There followed (on 12 and 13 October 2008) what was called at trial "the Recapitalisation Weekend". During this weekend (a) the details of the Tripartite recapitalisation scheme emerged (and it appeared that if Lloyds continued as a standalone bank it would be required to raise £7 billion additional capital, and that if the Acquisition proceeded the enlarged Lloyds/HBOS group would be required to raise £17 billion additional capital); and (b) the Lloyds board met to consider whether to proceed with the Acquisition.

18. The outcome of the Recapitalisation Weekend was that the Lloyds board decided unanimously to proceed with the Acquisition, but on revised terms ("the Revised Terms"). First, Lloyds would now raise £5.5 billion of new capital. Of this the Treasury would take £1 billion of preference shares: and the remaining £4.5 billion would be raised by an open offer of new shares at a discount which would be subscribed by the Treasury but with existing Lloyds shareholders having the right to claw-back their proportionate entitlement. The effect of taking Government money was dilutive as regards existing shareholders, and was acknowledged to be so. Second, the effective price paid for each HBOS share was reduced. HBOS shareholders would now receive only 0.605 of a Lloyds share for each 1 HBOS share.

19. Whilst these events were occurring Lloyds was undertaking a due diligence exercise in relation to HBOS's affairs. Part of this work involved assessing what impairments there might be of the HBOS loan book. "Impairment" is the term used to describe current expectations about future events, namely, what lesser performance, then the face of the loan book might suggest, is to be expected because of flaws in the loan quality or because of diminished performance in a recession. (Technically, impairment loss calculations involved the estimation of future cash flows of loans and advances based on (i) observable data at the selected date and (ii) historical loss experience for assets with similar credit risk characteristics, those calculations being undertaken on a portfolio basis). This involved the statistical modelling of the performance of the portfolios on different assumptions (which might or might not eventuate), and then making a judgment about the relevance of the various sets of assumptions in what was anticipated to be "the real world". The principal contributors to this exercise were Patrick Foley (the highly respected Chief Economist at Lloyds) ("Mr Foley"), and Stephen Roughton-Smith (the Deputy Head of Risk and Head of Credit Risk at Lloyds) ("Mr Roughton-Smith").

20. On 29 October 2008, having considered (amongst many other things) the views advanced by Mr Foley and Mr Roughton-Smith the Lloyds board decided unanimously to recommend the Acquisition to Lloyds shareholders on the Revised Terms.

21. On 3 November 2008 Lloyds issued a Shareholder Circular ("the Circular") for the Acquisition, giving notice of a General Meeting on 19 November 2008. The Chairman's letter (signed by Sir Victor) spoke of the compelling opportunity presented by the turbulence in the then-current markets to accelerate Lloyds' strategy and to create the UK's leading financial services group. He encouraged shareholders to compare the proposed enlarged group not with Lloyds as it currently stood, but with a standalone Lloyds as it was likely to be in the future. His letter noted:

**Approved Judgment**

> "Whilst HBOS has been significantly affected by recent challenging marketing conditions, including the deteriorating economic environment which has negatively impacted its funding model, the Lloyds TSB Directors believe that HBOS remains an excellent franchise with the potential to contribute substantial value to the Enlarged Group."

The letter went on to elaborate upon this view, and to provide a level of detail in relation to the anticipated capital position as a result of the Acquisition. It said:

> "Based on a review of non-public information provided by HBOS, Lloyds TSB has made a preliminary assessment that net negative capital adjustments of no more than £10 billion after tax would need to be made to HBOS's financial position for Core Tier 1 capital purposes as a result of the Acquisition. The amount of the capital adjustments takes into account the elimination of the HBOS available for sale ("AFS") reserve at 30 November 2008 and includes the effect of the application of market-based credit spreads at September 2008 to HBOS's portfolio. A comprehensive assessment of the fair values of HBOS's assets will be undertaken following completion of the acquisition, the provisional results of which will be published in Lloyds TSB's 2009 interim report. The actual capital adjustments will reflect the conditions that exist at the Effective Date of the Acquisition."

22.    The letter concluded with the unanimous recommendation of the Lloyds board that Lloyds shareholders should vote in favour of the resolutions to give effect to the Acquisition, and with the information that the Lloyds directors themselves intended so to vote in relation to their own individual holdings (which together amounted to some 1.316 million shares representing 0.02% of the existing issued ordinary shares). Amongst the principal direct holders of shares were Mr Daniels, Sir Victor, Mr Kane, and Dr Berndt.

23.    The Circular described Lloyds' capital ratios as "robust" and its liquidity position as "strong", saying that its wholesale funding maturity profile remained much as it had been 12 months previously and that there were improved signs of stabilisation in global money markets. But it did not contain a "working capital statement". Having referred to the period of unprecedented upheaval and contraction in the global markets for sources of funding, the Circular explained:

> "Due to the severity of this dislocation which has catalysed unprecedented levels of government intervention around the world and extraordinary uncertainty facing the banking industry in the medium term, and the availability of the UK government facilities described above being conditional upon, *inter alia*, the passing of various resolutions including those relating to the Acquisition, the United Kingdom Listing Authority has agreed that a statement regarding the adequacy of working capital for at least the next 12 months should not be required in this document."

10

Approved Judgment

24.    The Circular contained a section dealing, as regards Lloyds, with "Material Contracts" and a section dealing with "Significant Change". In neither section was the Lloyds' Repo mentioned.

25.    The Circular contained (as it was required to do) (i) an interim management statement ("IMS") from HBOS, (ii) certain financial information (including unaudited financial information for the six months ended 30 June 2008 which had been published by HBOS on 31 July 2008) and (iii) a section dealing with "Significant Change" in relation to HBOS. In this last section the Circular stated:

> "…there has been no significant change in the financial or trading position of the HBOS Group since 30 June 2008 the date to which HBOS's last published interim financial information… was prepared."

Neither the Lloyds Repo nor ELA was mentioned.

26.    Between the Announcement and the Circular Lloyds had held press conferences or briefings (in particular on the 18 September 2008, 13 October 2008 and 3 November 2008) ("the Presentations"). Outline responses were prepared by Lloyds' staff for anticipated enquiries from attendees; but in essence the Presentations were explanatory or commentary sessions followed by a time for questions.

27.    On 19 November 2008 the Lloyds shareholders approved the acquisition of HBOS. In general terms (that are sufficient for this case) 52.2% of Lloyds shareholders by value attended the meeting in person or by proxy. Of the votes cast, 96% by value voted in accordance with the directors' recommendation in favour of the Acquisition, and the remaining 4% against the Acquisition. Some of the Claimants voted in accordance with the directors' recommendation and say either that the Lloyds directors should not have recommended as they did, or that the Lloyds directors should have disclosed matters that would have led these Claimants to have voted differently. Other Claimants in fact voted against the recommendation (and against the Acquisition) anyway: and their complaint is that if the directors' recommendation had been different or their disclosure sufficient then other people would have joined these Claimants in voting the Acquisition down (if the EGM would have been held at all in those circumstances).

28.    On 12 December 2008 the HBOS shareholders approved being taken over by Lloyds at an extraordinary general meeting: and on 12 January 2009 the Court of Session in Scotland gave its sanction to the scheme of arrangement under section 899 of the Companies Act 2006 in relation to HBOS by which the HBOS scheme shares were to be cancelled in consideration of the allotment of new Lloyds shares, and the reverse takeover thereby achieved. On 16 January 2009 Lloyds acquired 100% of the HBOS share capital (the scheme shares) and in return issued 7.76 billion new shares in Lloyds. On 19 January the HBOS shares were then delisted and shares in the enlarged group commenced trading.

*The claim in outline.*

29.    By the time of trial a considerable number of issues raised in the statements of case had faded away, and the claim focused on two key claims which (broadly stated) were:

**Approved Judgment**

(a)    The Lloyds directors should not have recommended the Acquisition because it represented a dangerous and value-destroying strategy which involved unacceptably risky decisions ("the recommendation case"):

(b)    the Lloyds directors should have provided further information about Lloyds and about HBOS, in particular about a funding crisis faced by HBOS and the related vulnerability of HBOS's assets ("the disclosure case").

If the directors had either not recommended the Acquisition or had made further disclosures about Lloyds and about HBOS it was said that the shareholders of Lloyds and the market in general would not have been misled as to the true financial circumstances of HBOS or as to the merits of the Acquisition, and the Claimants would have avoided the recapitalisation of the merged entity and the consequential loss in value by dilution of their shareholding. This case was set out in the Re-Amended Particulars of Claim dated 21 December 2016 ("the Claim").

30.    As to the recommendation case the main allegations are that the Lloyds directors could not properly recommend the Acquisition because of the following:

(a)    HBOS shares were overvalued because the market did not know that HBOS was supported by the Federal Reserve and/or ELA, and offering 0.605 Lloyds share for each 1 HBOS share was disproportionately dilutive (paragraph 71(5) of the Claim);

(b)    Lloyds only had to participate in the Tripartite recapitalisation scheme because of its potential exposure to impairments of HBOS's loan portfolios, and the dilution of capital involved was not in the best interests of Lloyds shareholders (paragraph 71(6) of the Claim);

(c)    The Acquisition would mean that Lloyds (even if it participated in the Tripartite recapitalisation scheme) would have to raise more capital in 2009 which would further dilute the holdings of Lloyds' shareholders (paragraph 71(6A) of the Claim);

(d)    Participating in the Tripartite recapitalisation scheme required Lloyds to submit a restructuring plan to address "state aid" concerns, which entailed divestment of assets (paragraph 71(8) of the Claim);

(e)    The FSA's requirement that a standalone Lloyds required additional capital of £7 billion was not justifiable (paragraph 71(6C) and (6D) of the Claim).

31.    As to the disclosure case the main allegations are:

12

(a)    Neither the Announcement nor the announcement of the Revised Terms disclosed that HBOS was in part supported by the Federal Reserve (paragraphs 60 and 71 of the Claim);

(b)    The Lloyds Repo was not a transaction in the ordinary course of business and ought to have been disclosed in the Circular, if not before (paragraphs 32 to 32E, and 71 of the Claim);

(c)    The ELA provided to HBOS ought to have been disclosed in the Circular, if not before (paragraphs 61 and 71 of the Claim);

(d)    The Revised Announcement and the Circular ought to have disclosed that, without the support provided by the Federal Reserve, ELA and the Lloyds repo, HBOS would have been forced to cease trading so that the price of HBOS shares was artificially inflated (paragraph 71 of the Claim);

(e)    It should have been stated in the Circular that the losses suffered by HBOS (and to be suffered by the enlarged group) would mean that further capital would need to be raised in 2009 (resulting in further dilution of the interests of current shareholders (paragraph 71 of the Claim));

(f)    It should have been stated in the Revised Announcement or the Circular that if in the recapitalisation scheme the enlarged group was being required to raised £17bn then a requirement that Lloyds alone was being required to raise £7bn could not be justified (paragraph 71 of the Claim);

(g)    The Circular should not have said that there had been no significant change in the financial or trading position of HBOS since June 2008 (paragraph 78 of the Claim);

(h)    Insofar as disclosures relating to these matters were made they were deliberately ambiguous and "tricky" (paragraph 117 of the Claim);

(i)    At investor presentations on 18 September 2008, 13 October 2008 and 3 November 2008 the Defendants failed to disclose the above matters or made representations about the extent of due diligence (paragraph 95 of the Claim), the robustness of HBOS's capital position (paragraph 98) and about competition issues (paragraphs 101 following) which were untrue.

32.    I must make clear that this is not a complete account of the pleaded case (which, excluding annexures, extends over some 120 pages and 149 paragraphs). But it is

sufficient for the purposes of this judgment in dealing with the matters argued at trial. I should also make plain that although these were the complaints of breach of duty, not all of them were said to be causative of the loss claimed by the Claimants.

33.    The Defendants are charged with negligence (paragraphs 38, 40 and 119 of the Claim) and with breach of "fiduciary duty" (paragraphs 39 and 120 of the Claim). It is not said that any of the Defendants acted in bad faith: although there is a plea that the Defendants "actively misled" the Claimants into believing that Lloyds (if a "standalone" bank) would have to raise £7bn (paragraph 120(6) of the Claim) and the plea that some statements in the Circular were "tricky".

34.    In view of the course of the trial I must note what is said in the Claim about what it is alleged the Defendants should have done. Paragraph 122 of the Claim says that the Defendants should have disclosed to the Lloyds shareholders

> (a)    the existence of the Lloyds Repo and the provision to HBOS of ELA and Federal Reserve support;
>
> (b)    a fair and accurate description of the level of impairments that Lloyds was projecting for HBOS;
>
> (c)    the "fact" that all of the new capital to be raised by Lloyds under the recapitalisation scheme was required to absorb the HBOS projected losses;
>
> (d)    the "fact" that the £7bn required by the Tripartite to be raised by a "standalone" Lloyds was unjustified;
>
> (e)    that the Acquisition was not in their best interests.

35.    Paragraph 123 then pleads that had this level of disclosure been made then it would have been obvious to the financial press, the market and to Lloyds shareholders that to proceed with the Acquisition would result in a grossly disproportionate dilution of the share capital of existing Lloyds shareholders. This realisation would then have had one of two consequences.

36.    The first possibility is that it would have forced the Lloyds' board to pull out of the Acquisition (and from participation in the recapitalisation scheme) either (a) because the transaction would have collapsed as a result of market reaction or (b) because the directors would have had it brought home to them that their own analysis was flawed and they would have cancelled the EGM.

37.    The second possibility is that the disclosure which it is said ought to have been made would have caused the requisite majority by number and value of the Lloyds shareholders to vote against the Acquisition (even if it was still recommended by the board).

38.    In either event, the argument runs, the Acquisition would not have proceeded and the Claimants would not have suffered the losses that they seek to recover in this action.

39.    Those losses are identified in paragraph 147 of the Claim. The Claimants seek as alternatives:

(a)    The loss per share occasioned by the dilution of their pre-Acquisition holdings through (i) over-valuation of the HBOS shares and (ii) participation in the recapitalisation scheme promulgated during the Recapitalisation Weekend: or

(b)    The difference between the value of their pre-Acquisition shareholding and the value of their post-Acquisition shareholding after eliminating any reduction attributable to a general decline in the value of bank shares and any sum which is irrecoverable because of the "reflective loss" principle

40.    The claims therefore focus on the date upon which the Acquisition completed. Whereas the focus on liability questions is upon what did happen and what ought to have happened, whether the claimed losses can be made good involves the creation of counterfactual scenarios i.e. deciding what probably would have happened.

### The legal basis for the claim

41.    The legal case advanced by the Claimants may be summarised in this way:

(a)    in making recommendations and providing disclosure of information the defendant directors voluntarily undertook (in relation to each Claimant) responsibility for (i) correctness of the advice and recommendations; and (ii) the accuracy of all material information provided in respect of the proposed transaction (paragraph 37 of the Claim):

(b)    in advising the Claimants as to the merits of the Acquisition and in providing them with information to make an informed decision, and in permitting transactions to go before the Claimants for approval, the Lloyds directors owed the Claimants a "fiduciary duty" not to mislead them or to conceal material information from them, and to advise them in clear and readily comprehensible terms (paragraph 39 of the Claim):

(c)    in advising the Claimants as to the merits of the Acquisition and in providing them with information to make an informed decision, and in permitting transactions to go before the Claimants for approval, the Lloyds directors owed the Claimants duties in tort (i) to use reasonable care and skill (ii) to ensure that information was complete and did not contain any material omissions (iii) to ensure that any advice would be reasoned and supported by information and (iv) not to mislead the Claimants or to conceal information from them (paragraph 40 of the Claim):

(d)     in providing information to shareholders to enable them to make an informed decision the Lloyds directors owed a fiduciary duty (i) not to mislead the Claimants or to conceal information and (ii) to inform shareholders in clear and readily comprehensible terms.

42.     The Claim contains (in paragraph 44) the plea that the Defendants acted at all times as directors, and therefore as Lloyds agents: and that Lloyds is thus vicariously liable for their acts and omissions. Two points may be made: (i) this is not a direct claim against Lloyds, e.g. because its employees failed properly to investigate the Acquisition and failed to put the necessary materials before the Lloyds board for consideration by them, but a secondary claim dependent on proof that the Defendants are liable *as directors*; and (ii) if the Claimants succeed and Lloyds is vicariously liable the effect will be to transfer value from the present shareholders in Lloyds to a group of shareholders who held shares a decade earlier.

### *The factual witnesses.*

43.     It is a remarkable feature of the case how little evidence the Claimants adduced. The very nature of their case means that it was difficult for them to produce positive evidence of the breaches they alleged (without calling former members of Lloyds' staff, some of whom were critical of the Acquisition) and they were in that regard heavily reliant on cross-examining the Defendants on the basis of disclosed documents. But those parts of their case that did require positive proof (what a Claimant knew, where he or she got the information from (including from sources other than Lloyds), in what way and to what extent reliance was placed on that information, what the decision made actually was and how it had been reached, what the witness would have done if things had been different) were touched upon to varying extents in evidence from only 7 retail investors and 6 institutional investors out of the 5800+ claimants. Of those the retail investor statements of Stembridge, Owen and Scott stand out as models. (I should make clear that a lack of detail in the recollection is absolutely not a matter for criticism).

44.     The Defendants accepted the evidence of the individual retail investors without challenge. But Ms Davies QC cross-examined witnesses representing institutional investors to some considerable effect.

45.     The evidence adduced on behalf of the Defendants was much more extensive. I am seduced neither by its length nor by its dependence upon a documentary structure. I begin with three general observations. The first is that with the passage of 9 years the grasp on detail concerning a fast-moving and intense activity has inevitably slackened. The fact that in the witness box an individual might seem somewhat hapless in the face of detailed questions about particular emails or specific figures in a report, and resort to the (entirely honest) answer that they cannot remember, does not mean that they were not completely on top of the detail during the crucial events themselves: nor does it mean that at trial they are being evasive and slippery. On the other hand, the ability of a witness to answer matters of detail may simply reflect a mastery of the documentary structure.

46.     The second observation is that the times themselves were so extraordinary, and the events themselves so unprecedented, that the broad sense of what happened and the occurrence of individual events are quite likely to be remembered. Moreover, the

consequences of the transaction emerged within a matter of weeks as the economy plunged into the deepest recession for centuries: and those involved began immediately to review the decisions they had just taken, and how and why they had reached the decisions they did. Whilst this may well lead to a retention of the main thrust of an argument I am sceptical that it could lead to an accurate recollection of a precise thought process (unless this is recorded somewhere). This process has continued as the controversy surrounding those decisions has rumbled on. The evidence tendered in the witness box has been shaped by that process of review and justification: and the evidence tendered in the witness statements is in some cases further shaped by knowledge of and interpretation of key contemporaneous documents (though plainly there were many documents that witnesses had not viewed for 9 years). This observation casts no imputation upon the honesty of any witness. No witness concocted anything or told me anything they did not truly believe. Nor does it mean that I regard the evidence of these witnesses as mere commentary upon selected documents which is of itself without value. Certainly not. It fills in undocumented gaps and provides a necessary corrective to applying a 2017/18 understanding to documents generated in 2008.

47.     The third observation is that what can be excluded is any question of collusion in the preparation of evidence, for the respective witness statements of the Defendants (although "lawyered") were prepared in isolation; and moreover, each factual witness called by the defence did not read the statements of other witnesses before tendering their own evidence. Each witness was therefore unprepared for challenges based upon inconsistency or difference in expression between statements.

48.     Sir Victor must, I think, have been a pale shadow of the man who co-authored *Weinberg & Blank on Takeovers and Mergers* whilst a partner in Clifford Turner. Before becoming chairman of Lloyds in May 2006 he had (in consequence of his expertise as a solicitor in public offerings and acquisitions) headed the corporate finance department of the merchant bank Charterhouse Japhet, and in due time had become Chief Executive and Chairman of the Charterhouse Group. When Charterhouse was acquired by the Royal Bank of Scotland he served on the board of RBS (whilst remaining at the Charterhouse Group). He had subsequently become Chairman of the Mirror Group Newspapers and chairman of The Great Universal Stores plc. He was the Chairman of Lloyds from May 2006 until September 2009, when he resigned in view of the decline in the Lloyds share price. But in the witness box he displayed none of the vigour or authority that his expertise and experience would have commanded at the time. Whilst his recollection of detail failed him he retained a clear understanding of the roles of the relevant personnel, and of how he supervised the proper discharge of those roles by exercising oversight, testing and questioning the proposals of the chief executive officer (Mr Daniels) and his team.

49.     Mr Daniels was the Group Chief Executive at the time of the Acquisition, having been appointed in 2003 after a long career at Citibank. He led the formulation and implementation of the strategy of which the Acquisition ultimately formed part. He therefore naturally was an advocate for it, both at the time and in the witness box: this meant that he was at times unnecessarily defensive about some criticism (e.g. his resistance to the idea that the Acquisition was *in any sense* a "rescue package"). But I thought he withstood the challenge presented in cross-examination (that he was "blinkered" and drove through the Acquisition oblivious to or regardless of any element

17

of risk) well: and I do not dismiss his evidence as on that account one-dimensional. But it must necessarily be approached critically: for example, where he says that he did see a particular financial model which is not to be found amongst the surviving documents.

50.     Mr Tookey had been Lloyds' Deputy Group Finance Director since 2006 and was the Acting Group Finance Director at the time of the Acquisition, but was not a board member. He was centrally involved in events, sometimes working long hours under high pressure. Unsurprisingly, sometimes events coalesced in his recollection. He was an extremely well prepared witness who engaged completely with the process of giving evidence (though he tired somewhat towards the end of his seven day cross-examination). I do not confuse confidence in delivery with accuracy of recollection: but I found that his answers provided an insightful, if on occasion defensive, narrative and an instructive commentary on the recorded events, demonstrating that the documents on their own did not present a wholly reliable picture. The very nature of his thorough cross-examination over those days meant that on many occasions he was not telling me what he recollected of events at the time, but in answering those challenges he was advancing arguments justifying positions that were taken at the time using material that was still available. The process of rationalising decisions could not be separated from telling me what he remembered: and if he had purported to tell me that his evidence was based solely upon accurate recollection what was actually in his mind in the seconds after he saw (say) a figure in a briefing paper in October 2008 I would have found that hard to accept. When deciding whether to accept or reject particular points by assessing the coherence of the justification now advanced I have therefore had to bear in mind the very different circumstances in which I am making that assessment.

51.     Mr Tate was at the time of the transaction the Group Executive Director of the Wholesale & International Bank at Lloyds. He had joined Lloyds in 2003 with a depth of experience in corporate banking (including work on the corporate side of investment banking). The wholesale bank at Lloyds included corporate business, the bank's overseas retail business, and the bank's day-to-day liquidity and funding requirements: and Mr Tate had oversight over the various teams which conducted the operations. He was therefore in tune with market conditions and able to assess potential funding difficulties. He was thoroughly cross-examined over three days, during which he gave some confident and clear passages of evidence. He was accused at one point of giving "totally unrealistic" answers: but I thought that the charge was unjustified, and that Mr Tate was an impressive witness who gave considered and nuanced answers and often made sensible acknowledgements and concessions.

52.     Ms Weir held a first class degree in mathematics from Oxford University and an MBA from Stanford Graduate School of Business. She had joined Lloyds in April 2004 from Kingfisher plc (where she had been Group Finance Director): and in April 2008 had been appointed Lloyds Group Executive Director of UK Retail Banking Division. In consequence, given the stressed market conditions pertaining and the market events that were occurring during the course of 2008 her focus was upon Lloyds' retail banking operations (in particular its retail loan portfolios and its deposit base): and her principal concern in any merger would have been to consider the integration of the Lloyds and HBOS retail businesses. So that was the nature of her participation in the negotiations. But she was a full board member, and subject to the obligations of that office. In her position this meant that to the extent that she was not party to the more general aspects of the negotiations her obligation was to report to the full board accurately and frankly

those matters touching her area of executive responsibility and to consider carefully the board papers on other matters. She was totally frank as to her inability to recall which documents went to which meeting and as to her inability (when presented with a document she had not seen for nine years) to explain figures in the witness box: the latter inability was occasioned to a significant degree by the fact that throughout her time in the witness box she was evidently tense and discomfited by the process. I thought her acknowledged limitations for the most part to be genuine, and not a stratagem to avoid difficult questions (save that I did not find her inability to remember much about the Northern Rock affair to be credible).

53.    Mr Kane was at the material time the CEO of Scottish Widows Bank plc (a subsidiary of Lloyds) and the Executive Director of Insurance and Investments for the Lloyds group. His focus was naturally in that sphere of the bank's business and, being based in Edinburgh, he sometimes participated in board meetings by telephone in the course of which he would make notes (some of which survived). These notes were not a verbatim record of what was said, nor were they intended to be a record of the meeting: they were simply matters which Mr Kane considered at that time to be worth jotting down as the discussion flowed. Some care must therefore be taken in interpreting the literal words on the page: having seen him, I felt that I could trust him fairly to assist me in that task. It is unsurprising that whilst he had a recollection of the general shape of events (such as the time pressure to do a deal rather than waiting for everything to fall apart) he no longer recalled much of the detail. He was a reliable witness.

54.    Both Mr du Plessis and Dr Berndt were excellent witnesses: I found the analytical parts of their evidence sharp and insightful, the clarity no doubt deriving from their status as non-executive directors who were at a distance from the mass of operational detail. Mr du Plessis was a chartered accountant and formerly the Group Finance Director of a Swiss-based luxury goods company. He joined the Lloyds' board in 2005 (being at that time the Chairman of British American Tobacco) and became chairman of the Audit Committee. Dr Berndt joined the Lloyds' board in March 2003 having previously held senior executive roles with Proctor and Gamble and being then a non-executive director of Cadbury Ltd and of GfK AG. Because of their roles as non-executive directors of Lloyds they retained a grasp of the strategy behind the Acquisition and the rationale for various of the decisions made, but they have a patchy recollection of matters of detail (even though each had sought to refresh his memory from a selection of contemporaneous documents).

55.    Mr Alexander Pietruska was at the material time Head of Group Strategy and Corporate Development at Lloyds. His attitude in relation to his professional responsibilities was one of caution: and he displayed the same characteristic in relation to his evidence. He was careful and measured, ready to concede possible interpretations of his work rather than immediately to build defensive positions, and to acknowledge that on occasion his memory was at fault (either by way of mis-recollection or by way of a failure to recall why a particular phrase occurred in a document). I thought he was entirely trustworthy.

56.    Mr Jeremy Parr was the corporate partner in Linklaters primarily responsible for the looking after the interest of Lloyds in relation to the Aquisition as its senior relationship partner. He had considerable experience in dealing with high profile M&A work. He provided advice and oversaw the preparation of all relevant documentation. He was reliant for matters of detail on Linklaters' documentary records though in many cases he had not himself drafted the documents themselves but given direction as to their

form and content and then delegated the performance of the task to associates. Amongst those with whom he worked were Mr Barber and Mr Cutting, from both of whom I heard. Mr Parr was a thoughtful and careful witness, and gave a good account of what actually happened and spoke out of a depth of experience as to why matters had happened as they did, in particular in relation to the genesis and contents of the Circular. Mr Cutting gave straightforward evidence, but I felt Mr Barber was unduly defensive, and could have conceded matters relating to the Lloyds Repo more readily. That said, I am clear that he was entirely right to resist the notion that a note of advice prepared within hours of his being instructed was intended to convey his settled and immutable views.

57.   I also received evidence from Mr Short, the Head of Liquidity and Funding Management at Lloyds. He was from that perspective able to give evidence as to the markets in which Lloyds and HBOS actually transacted business, as well as direct evidence about the funding and liquidity workstream which looked at the funding requirements of the Enlarged Group (led by Mr Tate).

58.   Sir Hector Sants ("Mr Sants" as he was at the time) was another who was not the man he must have been when the events themselves were occurring. He had in 2008 been the Chief Executive of the Financial Services Agency, and at the centre of the maelstrom around the Lehman collapse. Before trial there was an issue about whether his state of health would permit him to attend trial for cross examination. An application was made on his behalf that his written evidence be accepted on a "hearsay" basis: one of the grounds of that application was that the relevant events occur occurred nine years ago, that Sir Hector's recollection was not assisted by any contemporaneous notes of his own or any FSA records, that all he could reference were those documents exhibited to the witness statements of other parties, and he did not believe that he had any material recollection over and above the events they recorded. In the event Sir Hector attended the trial and was cross-examined in public on detailed matters. Shortly before he gave his evidence he served a supplemental witness statement, apparently addressing issues that had arisen during the cross-examination of other witnesses. This belied the evidence of his solicitors that Mr Sants was not thought to have any recollection above what was to be found in the documents: but having weighed it carefully at the time and scrutinised it on review I do not consider that this additional material was either fabricated or the product of suggestion, but rather that learning what others said had prompted remembrance.

*The expert witnesses*

59.   Mr Christopher Ellerton shouldered a most enormous burden in this case on behalf of the Claimants: he was in some respects at the limits of his expertise. He was an equity analyst, a banking specialist with experience in company and bank sector related equity research, asset management and corporate finance. When he prepared his reports he was a Senior Equity Research Analyst with Turing Experts Limited. His CV revealed experience in banking research for investment houses and banks from 1985 to 2007 and some (unspecified) involvement *as an analyst* in the flotation of TSB and Abbey National and in the sale of Midland Bank to HSBC. But his CV revealed no main board experience with an enterprise of any size: he had never worked as an investment banker (and his role as an analyst would have kept him isolated from all investment banking and corporate advisory work i.e. from the decision making process). Thus he had not

advised on potential transactions or prepared advice for the board on an intended transaction or modelled an intended transaction or participated in board deliberations.

60.   Mr Ellerton's instructions were to deal with banking and/or central banking practice; with the capital raising abilities and Lloyds and of the Enlarged Group, the materiality to shareholders of the details of the Lloyds and HBOS disclosed capital positions and the probable market reaction if other disclosures had been made. But these areas were not his "bread and butter". Indeed, he was not an expert in the Listing Rules, the Disclosure and Transparency Rules, the Takeover Code or central banking. So he made mistakes. His first report made a crucial error about what is called "the Core Tier 1 ratio" (which I expand upon later). Once the error had been pointed out, his second report corrected it: but it did not revisit the conclusions expressed in the first report to see whether the error affected the conclusions expressed: and he still had not done so when he gave oral evidence, although he did say that he did not believe that his error had affected his fundamental analysis. He then made a further error about what is included in Core Tier 1 capital during the course of the trial.

61.   Mr Ellerton had, in fact, been interviewed by the solicitors for the Defendants on 23 November 2015 as a potential expert witness. The preliminary views he then expressed did not align with the views expressed in his report for the Claimants. For example in relation to market reaction to the disclosure that HBOS was in receipt of ELA (to which I will come) (i) in his interview with the Defendants' solicitors Mr Ellerton expressed the view that had the market known it may have had little impact upon the HBOS share price, being viewed as another funding source for banks suffering difficulties with funding; whereas (ii) in his report for the Claimants Mr Ellerton said (First Report para.6.34) that had there been disclosure of ELA then HBOS's share price would have collapsed. In his oral evidence Mr Ellerton said that it was difficult to have any confidence in estimating how the market would react. I am not accusing Mr Ellerton of "trimming". I am simply pointing out that Mr Ellerton had to face enormously difficult questions at the limits of his (or anyone's) expertise where a slight change in perspective can have a significant impact upon assessment, and that Mr Ellerton's ultimate answer (that one can have little confidence in these assessments) is one with which I have much sympathy. Likewise I have great sympathy for him on those occasions when, under cross-examination, he felt unable to maintain views expressed in his report or where a change in perspective lead to a change in opinion.

62.   Mr Ellerton's key evidence (concerning capital adequacy) was not in fact set out in his reports of 21 March or 3 July 2017 but in a supplementary letter dated 15 September 2017, which arose from the debate he had had with the Defendants' experts. In general I think Mr Ellerton benefitted from a process of challenge to his views and that his oral evidence was in general more reliable than those in his written reports.

63.   Mr Gervase MacGregor was the Claimants' forensic accounting expert and Head of Advisory Services at BDO LLP. He had been a forensic accounting expert since 1994, specialising in damages quantification in "loss of profits" cases. Thus he had never sat on the board of a company taking over another, though he had some familiarity with the Takeover Code. Like Mr Ellerton, he made an error (failing to take into account the proceeds of an HBOS rights issue after 30 June 2008) but did not work through the consequences of correcting it, though he asserted that it made no difference to his opinions.

64.     One of the matters upon which he had been instructed to express an opinion was as to the value of HBOS (a matter that went to both liability and to the assessment of damages). He acknowledged that his reports did not contain any valuation of HBOS: he expressed the opinion that HBOS was "valueless" but made clear that he was not saying that it was worth "zero". That was because he felt unable to put a value on (for example) the synergies arising from the Acquisition even though he thought that the high degree of rigour demanded by the Takeover Code as appropriate to the development of benefit statements had been met: and the reason for that appeared to be that there was a risk that divestment might be required. But it did not strike me as a balanced view to say that a reasonable board of a predator company must treat the target as valueless because there is a doubt over whether the full value of extensive synergies will be obtained.

65.     In terms of technical accounting issues, however, I thought he was sound.

66.     Mr Benkert was instructed by the Claimants to give opinion evidence upon the interaction of Lloyds and of HBOS with various banks and their standard and emergency liquidity provision regimes ("Central Banking Practice"). He was not a central banker but was during 2007 and 2008 Head of Money Markets and Global Funding for Goldman Sachs in which capacity he sat on money market committees at BoE and the ECB. His experience therefore lay in the debt markets, and in particular the short-term (overnight to 1 year) secured and unsecured end; and he had no experience of the Listing Rules. He was a good and reliable witness as to the views of the debt market in relation to a market participant who used SLS or ELA (though I thought unnecessarily resistant to the idea that SLS might be used as a LOLR facility by some banks unable to raise urgently needed funds elsewhere). Although a fair witness (willing to concede where appropriate) I thought him less reliable away from his central expertise.

67.     Mr Torchio was an adjunct professor of finance at the Simon School of Business in the University of Rochester, had authored or co-authored three articles, and for 25 years had been a valuation consultant. He was evidently a very experienced expert witness. He was a purely critical witness: his sole function was to find flaws in the report of Dr Unni (especially in relation to the Lloyds "standalone" valuation) without having to advance any coherent alternative account of his own, which meant that he felt able in making his criticisms to contradict the evidence of other of the *Claimant's* witnesses (e.g. as to the extent of trading in Lloyds shares after the Announcement, or the acceptability of RBS as a comparable). He presented his critique with vigour, principally directed at quantum questions: but his evidence suffered from the limitation that he proceeded (so far as I could see) entirely on the premise that the Acquisition had never been announced ("the unaffected share price"), and upon the assumption that no market events of significance to Lloyds (other than the announcement of the Acquisition) had occurred since 17 September 2008. Thus it seemed to me that in his insistence that if the Acquisition had been abandoned the Lloyds share price would revert to the "undisturbed share price" he did not give sufficient weight to the fact that in the meantime the world had changed for Lloyds.

68.     Prof Schifferes was Professor of Financial Journalism at City University: at the time of the financial crisis he was economics correspondent for BBC News On-line, and he led a BBC team producing a week of programmes on the anniversary of the Lehman collapse. His function was to prepare a report on the probable reaction of the financial

press/media to the disclosure of (i) ELA, (ii) Federal Reserve funding and (iii) the Lloyds Repo; but his report ranged significantly wider. He was not a satisfactory witness. As I shall explain, his methodology was very strange. But of equal significance was his reliability. According to the record of interviews, none of the interviewed journalists had been asked if they knew of a contemporaneous story that Lloyds had lent HBOS £10bn. Prof Schifferes said that each interviewee had been asked that question but it was simply not recorded, because none of them knew about it (even though one interviewee had himself written up the story). He was pressed with the oddity of this but repeatedly stood by his answer. When he returned after the short adjournment he told me that all of that part of the morning evidence had been wrong, and he provided an entirely unconvincing new explanation for the admitted omission to ask the question. I could not be confident about the accuracy of his other answers.

69. The Defendants' expert Mr Paul Sharma was instructed to consider two questions; (i) whether it was reasonable for the Lloyds' directors to consider that a "standalone" Lloyds would have to raise £7bn; and (ii) whether it was reasonable for the Lloyds' directors to think that £17bn of additional capital would enable the Enlarged Group to trade for 12 months without raising additional capital. He addressed these questions from the standpoint of an experienced regulator who had been a director of the FSA (serving as director of Prudential Policy from April 2008- March 2013), and as such had been responsible for formulating the FSA guidance on capital adequacy, liquidity, stress-testing and risk management- though he had no role in the calculation of either the Lloyds or the HBOS capital requirements over the Recapitalisation Weekend. I found him to be a precise, accurate and authoritative witness, though I thought unduly defensive in his reluctance to accept the evident vulnerabilities of HBOS. He was careful to confine himself to considering whether the outcome of the FSA stress-test was plausible (in the context of ascertaining additional capital requirements for Lloyds), and not to attempt to build a model as a basis for the sum required (as to which there was insufficient material). I can rely on his evidence.

70. Mr Trippitt was a sell-side analyst covering UK banks during the period 1994-2015 for a succession of investment houses. In 2008 he was at Oriel Securities, and was actually involved in the events with which this action is concerned. He was instructed to give opinions on the probable market reaction to various hypothetical disclosures assumed to have been made by the Lloyds board in the Circular. His personal involvement did not, he acknowledged, give him any better insight into those events than that of any other publishing analyst (whose reports I have in several volumes); but it did give him a sense of where the balance of views lay. It was instructive to compare the views which he published contemporaneously (in particular he did a "buy" note on 5 December 2008) with the terms of his report. He had a tendency in his evidence to keep repeating the content of that report: the more exotic the alternative assumptions being put to him in cross-examination the more difficult he found it to undertake instant analysis, and the more he resorted to repetition of the considered view expressed in his report. On reflection I think this had more to do with a sense of caution than with a refusal to engage because of a lack of confidence in the views being tested. I am in general able to rely on his views.

71. Prof. Persaud gave opinion evidence on Liquidity and Central Bank Practice. He was during the events in question the Chairman of Intelligence Capital Limited (a leading financial advisory and research firm) and Professor of Commerce at Gresham College,

London. He achieved a position of considerable eminence during and after the financial crisis. His evidence was clear, firm and analytical and well referenced. A key part of it was that emergency liquidity assistance is not dependent upon whether it is sector-wide or bilateral, covert or transparent; and that SLS was a "sub-set" of ELA so that both SLS and ELA were "lender of last resort" facilities (where the bank was providing liquidity which the market would not provide), ELA simply being a bridge to other support schemes. But it seemed to me that the question I would have to address would involve not only technical analysis but also market perception and common understanding. This constituted a limitation on the value of his evidence.

72. Mr John Williams was an investment banker with some 30 years' experience with leading institutions and who had participated in M&A work for banks (including Abbey National's defence of a bid from Lloyds in 2001). He was asked to opine on what was "ordinary course" business and whether it was reasonable for the Lloyds' board to hold certain views: these are ultimately questions for me, but the background material relied upon by Mr Williams as to practice, information and expectation was very useful. Under cross-examination he gave measured responses, and was willing to acknowledge the limitations on his expertise.

73. Mr Deetz was the forensic accountant called by the Defendants. He was the Managing Director of Navigant Consulting having formerly been Managing Director of Strategic Valuation Services for Arthur Anderson. He had experience of valuing large financial institutions for regulatory capital and financial reporting purposes (including the evaluation of loans and the determination of impairments). I thought he was a very good witness (although I was not persuaded by his analysis on every point) giving considered and well reasoned answers to points put in cross-examination.

74. The same may be said of Dr Unni, who was the Managing Director of the Berkley Research Group, and leader of its Securities Practice. He produced a well grounded and tightly argued report which in general stood up well under the scrutiny of cross-examination. There were, however, flaws in his quantum analysis identified by Mr Torchio which weakened the impact of that part of his report.

75. This expert evidence covered some 4750 pages, as experts in one discipline commented upon the evidence of other experts in other disciplines and small market events were subjected to the minutest scrutiny. It is impossible to rule upon every point of difference: nor do I think it necessary to do so. I have focussed on those areas where there is a measure of common ground, and moved from there into those areas where discernible principle might guide me, seeking to avoid those areas where (what I thought) wasm speculation was prominent. Of course, all counterfactuals are "speculative" to some degree: but it is possible to sense (if not always to explain) when the feet leave the ground. In key areas there was no expert evidence.

### The facts: the emerging financial crisis before the summer of 2008

76. Although punctuated by the bursting of the dot-com bubble in 2000 and the Enron debacle in 2001, the two decades before the financial crisis of 2008 were relatively benign periods of stability and low volatility. There were 60 quarters of continuous expansion, a steady rise in property prices (the Halifax House Price Index rose 2.3 times between 2000 and 2007) and strong growth in financial services, all underpinned by stable inflation and low interest rates. In particular the banking sector grew both in

nominal terms and also relative to the size of the UK economy as a whole. As the demand for loans (especially for property-based activities) outstripped the supply of retail deposits the banking sector turned increasingly to the wholesale money markets, offering those markets asset-backed and mortgage-backed securities, holding such securities on their balance sheets, and using such holdings as collateral in repurchase lending ("repos"). In so doing the sector became highly exposed to commercial and residential property. There is little doubt that policymakers, banks and other market participants became increasingly confident about the assumed continuation of this new paradigm, and increasingly complacent in their assessment of risk.

77.     But during the course of 2006 and 2007 the financial markets began to tighten and their health began to deteriorate. A decline in US property values (prompted by 16 consecutive quarter-point interest rate rises) undermined confidence in mortgage-backed and asset-backed securities, with the result that "bid-offer" spreads increased, values reduced and market participants began to question the creditworthiness of other participants. This led to an eventual tightening of the wholesale markets. Failures began to emerge.

78.     In July 2007 two Bear Stearns sub-prime mortgage funds failed; and on 9 August 2007 BNP suspended three investment funds.

79.     Then at 8.30pm on 13 September 2007 the journalist Robert Peston reported on the BBC news website that Northern Rock plc had sought and had received assistance from the Bank of England acting as "lender of last resort". The news item in fact pre-empted an intended formal announcement by Northern Rock as soon as it had concluded such arrangements at 7.00am on 14 September 2007. The formal announcement said that the Chancellor of the Exchequer had authorised the Bank of England "to provide liquidity support against appropriate collateral and at an interest rate premium" in order to address the difficulties that Northern Rock had encountered in accessing longer term funding and the mortgage securitization market.

80.     Northern Rock was an efficient and prudent lender with a good quality asset book. But its retail base (depositors with Northern Rock) did not grow at the same pace as its loan book. So, it adopted a business model which was given the label "originate to distribute" (in contrast to the "originate to hold" model). The loans which it made were not held to maturity ("originate to hold"), but were parcelled up and sold on ("distributed") to investors who purchased bonds secured on the collateral of the relevant parcel of mortgages: a process called "securitisation". The proceeds of the bond issue then became available to fund further loans (which themselves would then be securitised). This process provided about 50% of Northern Rock's funding requirement: and another 25% was raised on the wholesale market on a short (<1 year) or medium (1> year) term basis. Retail deposits supplied most of the remaining funding requirement.

81.     The events of 9 August 2007 caused a sudden shock which dislocated the markets both for Northern Rock's securitised offerings and for its wholesale money needs. "Bid-offer" spreads increased. Interest rates rose. Maturity terms shortened. Northern Rock's liquidity came under pressure (although it was still funding its operations). Accordingly, it sought to make "backstop" arrangements to address the contingency of illiquidity. It was the leak of these intended "backstop" liquidity arrangements that led to a "run": and the impending "run" that in turn led to the necessity of implementing the proposed arrangements immediately. So the "leak" became self-fulfilling.

82. Eventually in order to stop the run the UK Government announced on 17 September 2007 that it was guaranteeing Northern Rock's deposits.

83. What followed was continued tightening of the financial markets and attempts by regulators, governments and central banks around the world to stem the crisis. A brief account of the key individual events up to April 2008 (necessary to provide the context for the transaction with which I am concerned) would include the following:

   i)   Since 2006 the Bank as central bank had operated under a Sterling Monetary Framework which reflected its historically developed twofold role. First, to implement monetary policy (controlling interest rates and inflation): and as part of this function to participate in open market money operations. This participation might take the form of lending to UK banks that were eligible to hold reserves at the Bank against gilts; or of operating what was called "the standing facility" by taking deposits of excess cash from those banks and permitting depositors to borrow cash if there had been a miscalculation of their funding requirement. The second (and separate) function was to ensure the stability of the financial system by ultimately acting as a lender of last resort. The Bank's lending facilities through its open market operations were not frequently used: and on 13 August 2007 BoE had issued a market notice reminding UK banks that these standing facilities were available throughout the day.

   ii)  In response to the events to which I have just referred and in recognition that the existing model was not in fact addressing the need, the Bank (along with central banks globally) began to move from this historic role towards becoming a provider of liquidity, aiming to provide to the market generally liquidity that was sufficient to stabilise the market but not so generous as to undermine the element of "moral hazard" that was an integral part of the global financial model.

   iii) On 19 September 2007 the Bank of England introduced a "Term Auction" facility ("TAF") to assist with liquidity issues in the financial markets by offering to provide funds at longer maturities and against a wider range of collateral than it had hitherto done at a bid rate of 100 basis points over bank rate.

   iv)  Coming as they did alongside the Government guarantee of Northern Rock, the initial auctions were not a success (there were no bids at all in the first four) because of the fear in the sector that any bank using the facility would be "stigmatised" i.e. regarded by the market as "weak" simply because it was using central bank funds.

   v)   Although taking steps to increase liquidity in the market, the Bank did not in Q3 2007 in fact consider that there was a significant risk of any large financial institution failing. As was pointed out in the Plenderleith Report (*"A Review of the Bank of England's Provision of Emergency Liquidity Assistance 2008-2009"* published in October 2012), in the Bank of England Financial Stability Report issue number 22 it considered that the probability and impact of large complex financial institution distress had increased only slightly over its original

assessments in July 2006 and April 2007 (when it regarded severe stress in the medium term as being "remote" with a likelihood close to zero).

vi)   In November 2007 the BoE offered £10bn of liquidity for 5 weeks via open market operations to inject liquidity into the market as the year end approached.

vii)  On 12 December 2007 five central banks around the world (including the BoE and the US Federal Reserve) took coordinated action to inject further liquidity into the global banking system. The Bank increased the funds available under its TAF and enlarged the range of collateral that it would accept.

viii) On 18 December 2007 the Bank of England introduced the new Extended Collateral Long Term Repo operations ("ELTR") extending the range of collateral it would lend against under its three-month long-term repo open market operations. Drawdown here was by way of auction, where banks could bid to borrow cash. Because of the adoption of an auction structure the perception of ELTR as being some sort of emergency funding was eliminated: a bank could bid, but it was not guaranteed to secure the "lot" and so could not rely on it as a last resort.

ix)   Northern Rock was nationalised on 17 February 2008, its shareholders ultimately getting nothing (though that did not become apparent until December 2009, nearly two years later). Parliament passed the Banking (Special Provisions) Act of 2008 to give the Treasury powers to facilitate the orderly resolution of a potentially failing bank.

x)    On 27 February 2008 HBOS announced its 2007 results. In terms of assets the balance sheet disclosed a significant exposure of the order of £41bn to asset-backed commercial paper ("ABCPs") including (a) an exposure of £430 million to sub-prime lending and (b) an exposure of £7bn to what were called "ALT-A" loans (sometimes called "near prime"). As the latter terms suggests, these lay between prime and sub-prime lending. In terms of funding, the balance sheet disclosed (a) that the impact of the events at Northern Rock had led to a flight *to* HBOS which increased its retail deposits by some 10% (b) that there was an increased dependence on wholesale funding and (c) that because of market conditions the maturity profile had shortened, so that 59% of the total wholesale funding requirement of HBOS (or £164bn) was due within one year.

xi)   On 11 March 2008 central banks announced further coordinated action to tackle the crisis, including the Bank of England extending its existing liquidity support operations and extending repo operations, and the US Federal Reserve announcing the Term Securities Lending Facility (under which it would make longer dated loans against a broad range of eligible collateral).

xii)  On 14 March 2008, in response to rumours that Bear Stearns was experiencing liquidity problems, the Federal Reserve Bank of New York announced it was providing liquidity supplies to Bear Stearns and on 16 March 2008 JP Morgan agreed to acquire Bear Stearns.

xiii) The US Federal Reserve ran a programme to enable banks facing liquidity issues to access short term money: originally the term was overnight. The programme

was called "the Discount Window". On the same day that JP Morgan announced it would acquire Bear Stearns, the US Federal Reserve extended the maximum Discount Window term to 90 days and announced the establishment of "the Primary Dealer Credit Facility" (which provided US broker dealers access to overnight liquidity for the first time since The Great Depression).

xiv) On 19 March 2008 the HBOS intra-day share price dropped by 17% (and its market close price by 7%) and its credit default swap ("CDS") spreads widened (both in absolute terms and relative to its peer group). These movements were caused by unsubstantiated rumours that it had asked the Bank of England for emergency funding. The rumours were false. But they (and the reaction to them, even allowing for the influence of algorithmic trading strategies) evidence a perception in the market that HBOS had potential vulnerabilities. It had an above-average dependence on wholesale markets to provide short-term funding for a medium-term loan portfolio. That loan portfolio itself had a concentration on commercial property lending, on "self-certification" mortgages and on "buy-to-let" mortgages: and the market could see that any increase in funding costs would squeeze the net interest margin. That perception led to an increase in the proportion of sell recommendations from analysts. The Claimants' expert Mr Ellerton (relying on a report prepared by Citigroup Global Markets Limited ("Citi") for Lloyds in October 2009) says that the percentage of HBOS "sell" recommendations amongst analysts surveyed rose from 32% in March to 42% in April, and then to 46% in May.

84.    These events demonstrate an increased willingness on the part of central banks to depart from their previous role as "lender of last resort" and to facilitate the provision of liquidity within the financial system generally. They also show an initial reluctance on the part of banks to avail themselves of what was on offer for fear of being "stigmatised", leading to a real endeavour on the part of the BoE to persuade that market that the existence and use of these facilities was part of the "new normal"; but also, a failure on the part of the Bank fully to comprehend what the risks in that "new normal" were. They also show that the steps being taken to facilitate the provision of liquidity were not satisfying the demand created by the tightening of the wholesale markets: and that the debt and equity markets remained nervous on that account.

85.    So as part its policy of increased support measures for the financial system the Bank of England introduced the Special Liquidity Scheme ("SLS") to provide further liquidity to banks, in particular, access to term funding. The SLS was approved by the Bank of England Committee of Non-Executive Directors on 16 April 2008 and by 20 April 2008 all major UK banks had committed to participating in the SLS. The SLS was publicly announced by the Bank of England on 21 April 2008. In establishing it the Committee recorded that it was not intended as a "lender of last resort" facility: its purpose was to prevent a sudden crisis of confidence leading to the interbank market freezing up. What SLS was "intended" to be would not, of course, determine what it became.

86.    I should at this point explain the key features of SLS. It operated as a collateral swap: for a fee bank could swap high-quality mortgage-backed securitised assets created before 31 December 2007 and other high-grade bonds and securities (on which the market had turned its back) for nine-month UK Treasury bills (in which the market would still deal). The swap was for a term of one year, renewable up to 3 years: and this was anticipated to give the markets time to recover or the funded bank time to

diversify its asset base. There was a specified drawdown window: the first lasting until 21 October 2008 (though this was later extended until January 2009). This was to permit the securitisation of eligible *legacy* loans. A bank that availed itself of drawdown by swapping securitised assets for Treasury bills could then use such high-quality sovereign collateral either (i) as part of its regulatory liquidity buffer or (ii) for raising finance in the active repo markets. The reluctance of the wholesale markets to accept mortgage-backed securities was thereby overcome.

87. The potential for "stigma" through use of the SLS facility was overcome (i) by the fact that all major banks committed to participate in the scheme (whether or not they actually needed to avail themselves of it, as opposed to available alternatives): and (ii) by the fact that the extent to which any particular bank used the facility was concealed from the market. The use of the "swap" mechanism meant that the Bank was not obliged to report the transaction on its balance sheet (as would have been the case with a cash transaction). The Bank did not disclose individual uptake in any of its Reports or Bulletins, and it imposed upon participating banks strict confidentiality clauses preventing the giving of any indication whatsoever about any utilisation. It was the recollection of the Claimants' expert Mr Benkert that

> "…the Bank of England was very aware of the demands by the market for transparency but equally aware of the risk of disclosing too much too soon in relation to which banks had accessed the SLS and to what extent, which it believed could cause disturbances in the market for individual banks."

So the market was to be kept in the dark (and to that extent distorted). But in fact there were educated guesses about the main users. However, (as was noted in the "*Review of the Bank of England's Framework for Providing Liquidity to the Banking System*" by Bill Winters published in 2012) the suspects did not appear to suffer stigma as a result.

88. There was a limit set for usage by each bank based on the total value of its eligible assets: and the higher the level of usage relative to the size of the institutional balance sheet the higher the fees charged for the SLS facility. To that extent the terms of a given transaction were particular to that bank on that drawdown.

89. But SLS could not provide a complete solution to the funding shortage for every bank: and longer term solutions had to be found. HBOS had already embarked upon (and on 29 April 2008 announced) a £4bn rights issue at a 45% discount to the market price. A fortnight later on 14 May 2008 Bradford & Bingley did the same with its £300m rights issue: and six weeks after that on 25 June 2008 Barclays announced its own £4.5bn capital raising exercise.

90. Elsewhere in the market consolidation was seen as an appropriate response. On 14 July 2008 Santander announced its purchase of Alliance & Leicester for £13bn. By 8 September 2008 Nationwide Building Society would have acquired the Cheshire Building Society and the Derbyshire Building Society.

*Initial discussions on an acquisition in Summer 2008*

91.    It was in the context of challenges generated by this emerging financial crisis and the varying responses to it that in July 2008 contact was made between Lloyds and HBOS regarding a possible acquisition.

92.    Lloyds had long been looking at potential acquisitions as part of its Phase 3 strategy. Foreign acquisitions proved unattractive because of the difficulty in generating synergies with Lloyd's existing business. Domestic takeovers or mergers of entities with the right "fit" would likely be frustrated by competition issues. A potential merger with Abbey National plc in 2001 had foundered upon that very obstacle, following a reference to the Competition Commission. Shortly after Sir Victor had become chairman in May 2006 he had an informal conversation with Mr Hornby of HBOS (instigated by the latter) which led to some very preliminary exploratory talks at a high level about the potential for a merger. In many respects a combination with HBOS was the most attractive goal for Lloyds: but the very reason that made it attractive also raised the most difficult competition questions. So these talks did not develop on account of the perceived competition obstacle. But the idea remained on the table.

93.    The events of the first half of 2008 afforded a fresh opportunity to approach a takeover or merger between the two entities once again. Lloyds continued to see the desirability of non-organic growth by acquisition to enhance shareholder value. Whilst some shareholders valued the stolidity of Lloyds the Board was aware of pressure from other shareholders to grow the business (as the bank's peers were doing). Some 200 possible targets were considered, and 20 shortlisted for potential further consideration. During June 2008 Lloyds actively investigated acquiring both Dresdner Bank and also Deutsche Postbank: but neither provided sufficient synergy benefits. On the other hand Lloyds regarded the HBOS brands (Halifax, Bank of Scotland, Clerical Medical) and areas of market penetration (HBOS was overweight in areas where Lloyds was underweight) favourably. Noting that by July 2008 HBOS's share price was on a downward trend and stood some 60% lower than at the beginning of the year Sir Victor asked Mr Daniels to approach Mr Hornby again. This chimed with an emerging view in the market, for Mr Daniels himself had been approached by a number of investment bankers (Mr Costa of Lazards amongst others from Rothschilds, UBS, Citi and Merrill Lynch) suggesting such a move. It resulted in some new high-level preliminary meetings during July, in which Mr Daniels, Ms Weir, Mr Tookey and Mr Tate took part, with each side agreeing to instruct their respective legal advisers to prepare a paper on how the competition issues might be addressed.

94.    On 21 July 2008 HBOS announced a 8.29% subscription rate for its £4 billion rights issue announced on 29 April 2008. This was due to a significant degree to the fact that HBOS had the biggest non-institutional shareholder base in the UK, to whom the rights issue was unattractive. So the issue was a "flop" and (after a placing of a further 29.53%) nearly two-thirds of the new shares were left with the underwriters, creating a huge market overhang. That day Sir Victor was sharing a flight back to the UK with the Prime Minister. During a discussion about the economy Sir Victor raised with Gordon Brown Lloyds' interest in acquiring HBOS but observed that such a deal would not realistically be viable if there was to be a reference to the competition authorities. In the then current climate no bank could have lived with 9 months' uncertainty about its future. Gordon Brown said he would discuss the matter with colleagues in government.

95.    On 31 July 2008 HBOS published its interim results for 2008. These announced a profit of £0.8 billion for the first half of 2008, a fall of 72% on the equivalent period in 2007, but ahead of market expectations. Addressing this fall in profits Mr Hornby told analysts that it had been impacted by valuation adjustments and the first sign of increasing impairments largely as a result of asset price deflation in both residential and commercial property (and significant "write-downs" were taken in addition to some that had been disclosed at the time of the rights issue). But he said the underlying performance of the business "remained extremely robust".

96.    Dealing with liquidity, the announcement said:

> "The assets in the liquidity portfolio are treated in two forms. Firstly, assets which we know to be eligible under normal arrangements with the Bank of England, the European Central Bank and the Federal Reserve, which for internal purposes we describe as primary liquidity. Secondly, a substantial pool of high-quality (secondary) liquidity assets that allow us to manage through periods of stress taking into account the likely behaviours of depositors and wholesale markets. The Group routinely uses the repo market as a liquidity management tool and has well established relationships with a wide range of market participants. The Group also has access to the standing facilities at a number of central banks."

The statement also noted the launch during the reporting period of SLS and said: –

> "HBOS has used this facility to provide high-quality liquidity assets".

But in this (and in its use of central bank facilities provided by the BoE, the ECB and the Federal Reserve generally) it was no different from many other banks.

97.    The market reacted by marking HBOS shares 7% *up*. Analysts were split. Some saw the large mortgage book and the concentration of the corporate loan book on property and construction lending as leading to higher levels of default and higher average loss per default, generating impairments that constituted a significant threat to the bank's value. Some saw the bank's structured credit exposure and the large wholesale funding needs as generating serious risk and warranting an underweight position. Others thought that the then-current share price offered a compelling investment case with current and prospective risks already priced into the discount to book value and recommended an overweight position. One put a target price of 430p (as against the then current 290-300p). Some were neutral. For example Deutsche Bank analysts, looking at a current share price of 291p and estimating that to be 0.7x book value, considered the HBOS shares a "hold" and put a target price of 325p notwithstanding the deterioration in credit quality which they observed and the higher levels of default which they anticipated.

98.    These figures and comments would, of course, be available to the Lloyds negotiating team: however, Mr Daniels recalls that Mr Hornby was frank in the course of discussion and confirmed that HBOS was facing funding difficulties i.e. that whilst the present

was as depicted in the Interim Announcement the future was not assured. This did not come as a surprise to Mr Daniels, who knew that the growth in the HBOS loan book far outstripped its savings account base, and had made HBOS particularly dependent upon the wholesale markets for funds. His concerns remain dominated by the competition issues which (even in the light of legal advice he received) seemed insurmountable.

99.     On 5 August 2008 Sir Callum McCarthy (then chairman of the FSA) called Sir Victor to enquire (according to the file note of the conversation)

> ".. What [Lloyds'] position would be either in terms of [its] own inorganic development plans or in terms of what [it] might be prepared to do should there be an emergency."

The question did not identify (but clearly referenced) HBOS. Sir Victor indicated that there were good reasons why Lloyds would look at HBOS. Sir Callum indicated that if Lloyds and HBOS wanted to get together then the FSA would be very supportive and would do all it could to help with regard to competition issues. He went on to say that if there was a further financial crisis then Lloyds was one of the two banks to whom the FSA would turn for help (though he expressed satisfaction with the current funding position of HBOS).

100.    This conversation I think captures the nuanced position of the main players. Lloyds was interested in HBOS for its own good reasons but recognised the reality of the competition obstacle. The Tripartite was satisfied about the present but concerned for the future of HBOS, and would do what was necessary to enable Lloyds to attain its goals (and would if necessary turn to Lloyds for assistance in an emergency, knowing of Lloyds' interest). HBOS could be satisfied with its present position, but knew that its forecasts were vulnerable to further deterioration in the markets, and could see a merger with Lloyds as a solution.

*Initial discussions: emerging themes*

101.    On 6 August 2008 there was a conversation between Mr Pietruska (the Global Head of Group Strategy & Corporate Development at Lloyds) and his opposite number at HBOS to identify areas of particular interest for discussion. They covered a broad range: the impact of the implementation of Basel II upon capital requirements; the impact upon "bancassurance" businesses of impending regulatory changes to the capitalisation of insurance businesses; the combined entity market shares in current and small business accounts, the competition issues likely to arise and the development of mitigating actions; commercial property and construction finance growth; the treasury portfolio and its prospects; litigation (including the potential impact of PPI); where the corporate business was successful, and what impact a downturn might have; strategic questions about the shape of an enlarged group; a high-level look at synergies; a granular look at the P&L account, the balance sheet and impairments; a review of the capital position; a review of the funding position; and regulatory issues. It is not necessary for the purposes of this judgment to elaborate on these. I record them simply to illustrate the number and range of high-level and detailed issues that had to be thought about even in the early stages.

102. Mr Pietruska had been appointed to his role at Lloyds by Mr Daniels in April 2008, as part of Mr Daniels' strategy to improve Lloyds' growth prospects and to take advantage of any opportunities for strategic buyers created by the financial environment. Mr Pietruska himself had performed a similar role at ABN Amro before joining Lloyds: and in that capacity, he had looked at Lloyds itself as a potential takeover target, and had rejected it because of its limited opportunities for organic growth. It might therefore be thought that Mr Pietruska would be predisposed to favour exploiting the opportunity that was now presenting itself. But he characterised his approach as "naturally conservative" (by which he meant that his tendency was to seek first to identify the problems and see if they could be solved, rather than to jump at an opportunity): and when he drafted a presentation for the board (identifying HBOS as "Dover" and Lloyds as "Lion") it was to the effect that, on the basis of what was currently known, a merger between HBOS and Lloyds should not be undertaken.

103. The basis for that provisional view was twofold. First, there were problematic uncertainties about the competition environment. He considered that the circumstances in which a merger might receive clearance did not then exist and regarded the prospect of clearing the competition hurdles as "remote": and he also noted that in any event the cost of actions to remedy competition issues (e.g. disposals) might reduce the apparent headline value creation.

104. Secondly, he considered that the context in which the transaction had to take place involved addressing three separate elements, each of which was a source of significant uncertainty. They were:-

   a) the need for Lloyds to raise possibly £3.7bn of additional capital because of impending changes in the regulatory treatment of "bancassurance" businesses:

   b) the need for HBOS to raise £3.1bn additional capital for the same reason, and an amount (between £0 and £8bn) to offset any write-down of HBOS's assets arising from the fact of the accounting treatment of HBOS assets on a merger under IFRS3 "Fair Value" rules (I will come to these) or from the necessity to make "write-downs" arising in the very circumstances in which the transaction was most likely to obtain competition clearance (viz. HBOS' collapse as a competitive force):

   c) the need significantly to reduce the Lloyds' dividend in order to rebuild capital ratios and maintain support for further growth.

   Mr Pietruska thought that these simultaneous requirements made the deal economics "marginal" when viewed from an EPS perspective (notwithstanding anticipated cost synergies of the order of £1.2 billion and anticipated revenue synergies of approximately £0.8bn); and he considered that no company had tried to accomplish the three identified objectives simultaneously.

105. Having noted the key points in Mr Pietruska's August draft, it worth noting some points of detail.

106. First, Mr Pietruska's core workings assumed an "all share" offer pricing the HBOS shares at approximately 295p. At that level he thought the transaction would be EPS

dilutive until 2012, but noted that the return on investment (on the basis of consensus earnings) would be 13% by 2009 and 20% by 2012. He was concerned not so much with the immediate dilutive effect of the proposed transaction, but rather that any adverse reaction by analysts might provoke a decline in the Lloyds' share price which itself might render the completion of any announced transaction impossible. He felt that if analysts understood that a capital raise of some sort was inevitable because of the "bancassurance" issue then market reaction to a dilutive deal might be moderated. (In relation to this concern Mr Pietruska was later to be assisted by Merrill Lynch whose view, in essence, was that the market would be more receptive than Mr Pietruska feared). The period for which a transaction is forecast to be "dilutive" and how the market might react to a transaction with an immediate dilutive effect were, I think, important insights.

107.    Second, as part of his underlying analysis Mr Pietruska commented upon the exposure of HBOS to several areas of potential asset quality risk (in particular commercial property): as well as noting (see above) the potential impact on capital requirements, Mr Pietruska foresaw a problem in addressing analysts concerns in this area as well.

108.    Third, the provisional view recorded in his draft was that the capital issues (arising from the matters summarised at 104(b) above) might mean that the transaction could not be financed. He suggested

> "Capital is a major problem and paying less does not help materially. Depending on the outcome of the "Fair value" adjustments under IFRS3 there is a possible need to raise substantially above the consideration level to repair ratios and hit target levels of 6%+ Core Tier 1"

109.    It is convenient at this point to provide a commentary on these technical terms relating to capital. The commentary outlines (in sufficient detail for the purposes of this judgment) the essential features of a highly complex system: accuracy is sacrificed in the interests of concision.

110.    Under the Basel Capital Accord published by the Basel Committee on Banking Supervision in 2004 ("Basel II") (and implemented by Lloyds and by HBOS from 1 January 2008) a bank was required to maintain a minimum capital requirement calculated as a proportion of its "risk weighted assets" (or "RWAs"). The "assets" in question were the loans which the bank had made. The "risk" in question was the "credit risk" (i.e. the risk of loss due to the failure of the borrower to meet its obligations). This credit risk for each borrower could either be assessed by an external ratings agency (such as Moody or Standard and Poor's) (which was dubbed the "standardised" approach) or by the bank itself using internal models (which was dubbed the "Internal Ratings Based" or "IRB" approach). In general the standardised approach was more conservative than the IRB approach. The assessed risk was not fixed, but could vary over the life of each loan as available information emerged or the economic environment changed. The raw "weighting" was achieved by multiplying the amount of the loan by the risk-percentage. I describe this as the "raw" weighting because in addition to credit risk a bank had to assess its RWAs overall taking into account (a) "market risk" (the risk of loss due to a change in market prices such as interest rates, which risk could be assessed either on a standardised or an IRB approach) and (b)

"operational risk" (the risk of loss resulting from inadequate internal process or systems or from external events). In this way the RWAs were calculated.

111.   A function of a bank's capital (share capital, disclosed reserves, asset revaluation reserves, general provisions, subordinated debt etc) is to absorb losses. Basel II divides capital into two categories. Tier 1 (which has the greater loss-absorbing capacity) is the primary capital and consists of issued and fully paid ordinary shares, perpetual non-cumulative preference shares, perpetual subordinated debt, other innovative capital of a similar nature and disclosed reserves. All these types of capital are available to the bank for unrestricted and immediate use to cover risks and losses as soon as they appear, and they rank low in the waterfall on a winding-up. Within Tier 1 was a category of "Core Tier 1 capital" viz. that which displayed to the greatest extent the characteristics of permanency, absence of servicing costs and exposure to loss. In essence Core Tier 1 consists of permanent ordinary share capital and disclosed reserves, and excludes all non-perpetual subordinated debt. Tier 2 is the supplementary capital and consists of all other capital, revaluation and similar reserves and provisions (including other subordinated debt). Tier 1 and Tier 2 together constituted the "eligible capital".

112.   Basel II as implemented in the United Kingdom required a bank to have a ratio of eligible capital to RWAs of 8%, and to ensure that at least half of that 8% should be Tier 1 capital (and at least half of that 4% to be Core Tier 1). So 4% Tier 1 capital (and 2% Core Tier 1) was the theoretical absolute minimum. This was referred to as "Pillar 1".

113.   In addition to this minimum, a bank could be required by its regulator as part of that regulator's Supervisory Review Evaluation Process (and also as a result of the internal assessments the bank itself was required to undertake) to maintain additional capital identified in "Individual Capital Guidance". This additional tranche was called "Pillar 2". Its objective was to provide additional resilience in response to stress testing Pillar 1. At the beginning of 2008 the FSA had required Lloyds to have a Tier 1 capital ratio of 4.4% and a Core tier 1 capital ratio of 2.2%. In mid-2008 the FSA used this process to communicate to all large UK retail banks that their expected Core Tier 1 ratio was to rise to 5% (but the FSA had not explained in detail how that ratio was to be calculated).

114.   In addition to the Pillar 1 and Pillar 2 requirements, a bank could set its own internal targets for capital adequacy: and under Basel II a bank was required to disclose how it assessed its risks and determined its ratios (so that comparisons could be drawn in the market). This market discipline was referred to as "Pillar 3". Lloyds did not initially have a formal internal target ratio: but the market expectation in mid-2008 was that the Core Tier 1 ratio would be around 6%.

115.   I think that the first point Mr Pietruska was making in the passage I have quoted above was that any difference between Lloyds and HBOS as regards (i) the profiles of their respective loan portfolios and (ii) the models they adopted in applying the IRB approach might (because of a recalculation of the RWAs) have an impact on the capital requirements under Basel II quite separate from (as was then thought) the impact of the impending "bancassurance" adjustments.

116.   The second point he was making was that acquisition accounting adjustments that fell to be made on a takeover might also have an impact on capital requirements. International Financial Reporting Standard 3 on "Business Combinations" ("IFRS3")

would require Lloyd's to recognise HBOS's identifiable assets, liabilities and contingent liabilities at their "fair value" as at the acquisition date. "Fair value" is the amount for which the asset could be exchanged (or the liability settled) between knowledgeable, willing parties in an arm's length transaction (as opposed to the value at which they were being carried in HBOS's books): any difference between "fair value" and "book value" will require a fair value adjustment ("FVA") to be made.

117.    If the fair value of HBOS's net assets were to be *less* than the price that Lloyds was to pay for them, then the excess value would be treated as "goodwill" (the present value of some future income stream from those assets over and above the value of the assets itself). That "goodwill" would have to be left out of account in calculating capital ratios. If the fair value of HBOS's net assets were to be *more* than the price that Lloyds was to pay for them (so that Lloyds was getting something of a bargain) then that element of bargain was frequently called "negative goodwill". But because vendors do not generally sell assets at below the price upon which knowledgeable parties dealing at arm's length would agree, before booking "negative goodwill" the fair value of the assets in question must be scrutinised and reassessed. But even after that re-assessment it may still be possible to "capture" any remaining element of that negative goodwill.

118.    The point that Mr Pietruska was making was that if it was possible to capture some negative goodwill through acquisition accounting then that would to some extent relieve the pressure to raise new capital to maintain the necessary capital ratios. But his provisional view (as an experienced corporate strategist and not as an accountant who would actually apply the standards to given facts) was that the prospect of capturing all of any "negative goodwill" was remote. So he built a scenario in which if Lloyds acquired HBOS at below book value it was assumed that only half of any negative goodwill would be captured (by which he meant that the "negative goodwill" would be half of the postulated maximum, all of which reduced "negative goodwill" would be captured).

119.    I have simply used Mr Pietruska's draft report as a vehicle for introducing some key concepts and major themes: and having done so I return to the chronology. The report is clearly a draft: and it proceeded on the assumption (never a reality) that Lloyds would pay £14.75bn for HBOS. The evidence does not establish how widely the draft was shared. Mr Tookey and Mr Tate acknowledge seeing it at some point: Mr Daniels denied doing so. But in my view the very broad issues identified by Mr Pietruska (if not the detail or his underlying argument) are likely to have been known to the small team undertaking discussions with their HBOS opposite numbers as they prepared for their meetings. But two qualifications are needed. First, those undertaking the discussions would equally have known of the general views of others as to the opportunities and obstacles that might present themselves: Mr Pietruska's was not the only voice in the room. Second, Mr Pietruska's draft addressed one aspect of the transaction: he himself knew that there were many other aspects – from valuation methodologies to the potential impact of PPI to the market shares of the combined entities to the shape of the future business model - which he had summarised in an email copied to the core team on 6 August 2008 (to which I have already made reference).

120.    Nor was Mr Pietruska alone in having an eye on capital ratios. Mr Tookey as part of his routine work prepared a survey of "Current Capital Considerations" in preparation for a meeting with Mr Daniels on 21 August 2008, reviewing whether the Lloyds' capital position was adequate up to the year end and in the medium term irrespective of any

potential acquisition. He noted that the market expected a Core Tier 1 target of 6%, and that the group needed to be confident that it could deliver that ratio at the year-end during a deteriorating economic environment in which there might be reduced business volumes and increased impairments (and also following any capital adjustments arising out of the impending "bancassurance" insurance consolidation rules). He identified Lloyds' high dividend policy as a potential obstacle to repairing the balance sheet, and posited a "significant cut" in the dividend and a programme of disposals as potential solutions. (A dividend cut was already anticipated by some in the market as soon as Lloyds had published its 2008 half-year results, Merrill Lynch in an analyst's note published in July 2008 anticipating a 46% reduction).

121.    On 1 September 2008 there was a meeting of the Group Executive Committee of Lloyds. This noted amongst other things some confusion in the market perception of Lloyds' capital position. Lloyds had generally appeared better capitalised than its peers. In its half-year figures as at 30 June 2008 Lloyds had reported its Core Tier 1 capital ratio as standing at 6.2%: this was above what the FSA required, but now placed Lloyds firmly "in the pack". I note this because it further demonstrates that capital ratios were constantly under review, and as an illustration of the facts that (although Lloyds did not at that time have a formal internal Core Tier 1 target ratio) the market expectation was that it should be about 6%, and that Lloyds was concerned to manage and address that expectation: this reflected the work Mr Tookey had undertaken in preparation for his meeting with Mr Daniels in the latter part of August.

122.    On 2 September 2008 there was a further preliminary meeting between Lloyds and HBOS to explore a possible acquisition. Mr Daniels had instructed Mr Pietruska to prepare a set of questions for HBOS directing him to the need to hit the right balance between being rigorous on the big risks and accepting that Lloyds would not be able to be as thorough as it would wish on all risks. Those attending for Lloyds were Mr Tookey, Mr Tate, Mr Daniels and Ms Weir. They and their trusted lieutenants had also prepared lists of questions to be put to their opposite numbers. The enquiries were based on publicly available information about HBOS: those attending knew that the amount of non-publicly available information which a competitor bank like HBOS was prepared to disclose about its business and affairs might well be limited. During this meeting Mr Hornby of HBOS shared with Mr Daniels the thought that any deal between Lloyds and HBOS would have to be done "within weeks". Mr Daniels interpreted this as an indication that HBOS was anticipating facing near-term funding pressures.

123.    After this meeting Mr Pietruska prepared a further draft presentation for the board. This presented a more positive investment case (omitting the recommendation against the transaction). It noted that the combined entity would have about 35% of all UK current accounts and 29% of mortgages and a significant market share in virtually all product areas. The draft presentation continued to identify material issues. The first of these remained "competition issues", the commentary now including the observation that

> "… the best prospects for competition clearance would be driven
> by a regulatory view that a transaction was desirable on national
> interest grounds …"

124.    The capital issues remained those which Mr Pietruska had earlier identified though in his draft he now described them in these terms:

"? Capital

- the potential need to raise more than the consideration level
due to the need to rebuild ratios as a result of

-fair value accounting under IFRS3

-the impending CP [ *sc. the "bancassurance" adjustments*]

-Basel II [*sc. the focus on the nature of Core Tier 1 capital*]

? Valuation

- issues around the value of our offer driven by uncertainty around market pricing of Lion [*i.e. Lloyds*] paper against the background of the capital position

? Day-to-day funding where there is a tension between the need to reduce the size of the asset book to maximise funding flexibility and the potential to realise capital losses given current market valuations"

125. The detailed workings in this draft also show that it had been discovered that some of the provisions anticipated in the August draft had already been provided for in HBOS's 2008 half-year figures: but the implications of this reduction in the write-downs potentially required were not worked through in the draft.

126. Meanwhile Merrill Lynch were undertaking similar work (and providing it to Mr Daniels). Their work suggested that HBOS had a value of some £19bn on the assumption that the write-downs and fair value adjustments to be taken into account would be about £4.8bn.

## *The sudden turn of events*

127. The financial crisis began to deepen in early September 2008. On 7 September 2008 "Fannie Mae" and "Freddie Mac" were taken into "conservatorship" by the US Federal Housing Finance Agency. This affected US markets, but was not globally disruptive. Then on 10 September 2008 Lehman Brothers announced losses of $3.9 billion in the 3 months to August 2008. There were crisis talks in New York over the weekend.

128. On Monday 15 September 2008 Lehman Brothers filed for Chapter 11 Bankruptcy in the USA: and Merrill Lynch (widely perceived to be the next potential casualty) was taken over by Bank of America. The former event was hugely disruptive across the globe because it brought home that perhaps there were no institutions that were "too big to fail", and that it could not be assumed that governments would always provide a "bail-out". The "Daily Telegraph" described it as "another heart attack for the money markets incapacitating them for who knows how long this time": and it is right to note that the true extent of the disruption and its aftershocks was not to become apparent for many, many months. The instant reaction was that the wholesale funding markets virtually closed as each market participant viewed each other market participant with deepening suspicion. Term loans would continue relentlessly to mature: but they would only be replaced in the market with "overnight" money that required daily refinancing. Banks, such as HBOS, that were heavily reliant upon the wholesale markets could see

a looming liquidity (not solvency) crisis as the SLS, and similar schemes run by other central banks, became the key providers of term funding. Conscious of this, the Federal Reserve immediately enlarged the range of collateral it would accept within its funding programme bid and provided a massive injection of liquidity. The BoE immediately injected £5bn into the system to provide liquidity and on 17 September 2008 announced an extension of the SLS scheme from its intended close on 21 October 2008 to January 2009 (a remarkable reversal of the position it had adopted when giving evidence to the Treasury Select Committee only days before). The market reacted by marking down HBOS shares by 36% at one point, wiping £5bn off its value: though the shares recovered to end the day at 232.5p (down 18% in a market that had declined 4% overall).

129. On the following day the turmoil continued. Standard & Poors downgraded HBOS' credit rating (because of fears of losses on its mortgage book) to AA-. The FSA issued a statement to say that it was satisfied that HBOS had a strong capital base and confirmed that it considered that HBOS continued to fund itself satisfactorily. But the "short sellers" moved in and HBOS closed the day at 182p (down another 17.5%).

130. This deepening of the financial crisis led to an intensification of discussions between Lloyds and HBOS. Upon the collapse of Lehman Brothers Mr Hornby (of HBOS) and Mr Daniels (of Lloyds) spoke on the phone and agreed that their respective teams should meet again immediately.

131. The board of Citigroup had arranged for a function to be held on the evening of 15 September 2008. Sir Victor was one of the guests, along with Mr Daniels. The Prime Minister, Gordon Brown, was another guest. During the course of the evening Mr Brown informed Sir Victor that the Government would "assist" (by which Sir Victor understood "handle any potential competition issues") if Lloyds wanted to move forwards with a deal to acquire HBOS, but that if Lloyds did wish to purchase HBOS then it would have to do so soon because the Government wanted certainty as regards the future care of HBOS. In Sir Victor's words:

> "I did not feel that he was trying to place any pressure upon Lloyds to proceed with the acquisition if it did not wish to."

132. Later in the evening Sir Victor told Mr Daniels about the conversation. In Mr Daniels's words:

> "This was the moment at which the deal became a realistic possibility."

Mr Daniels left the function and telephoned Mr Hornby to update him on the developments prior to the meeting scheduled for the following day.

133. Early on 16 September 2008 the Lloyds Group Executive Committee (the "Lloyds GEC") was briefed by Mr Daniels on the recent events and the proposed discussions with HBOS; and it gave its support to those discussions. It was the prelude to numerous meetings between Lloyds and HBOS on the 16 and 17 September 2008 (both as teams and in break-out groups examining specific workstreams) seeking to agree terms for a deal and to allow Lloyds to carry out some initial high level due diligence. The Lloyds

team consisted of Mr Daniels, Mr Tookey, Mr Tate, Ms Weir and Mr Kane (advised by Mr Greenburgh, a senior investment banker from Merrill Lynch).

134.   According to Mr Daniels

> "… While at the earlier meeting on 2 September Mr Hornby had been indicating that a deal would have to be done within weeks, there was now a sense that it was an hour-by-hour proposition. While at earlier meetings there had been a sense that the tightening funding markets were placing pressure on HBOS to seek a deal, Mr Hornby indicated, and everyone at the meeting understood, that obtaining funding had a become even more difficult after Lehman Bros went into bankruptcy, creating a more immediate sense of urgency for HBOS to do a deal. Accordingly at this point Mr Hornby was asking us what it would take Lloyds to get the deal done."

But there was also pressure upon Lloyds to act quickly. Further falls in the HBOS share price might generate such a concern about the viability of HBOS such that the HBOS franchise might be permanently damaged to a point where it was no longer worth acquiring, and where it might have a knock-on effect on all banks (including Lloyds). The Prime Minister had also set a fairly tight timeframe within which Government assistance for a takeover by Lloyds might be provided.

### Assessing the proposed transaction following the Lehman's collapse

135.   The competition issue was still seen as a key consideration. On 16 September 2008 Sir Nicholas Macpherson (a senior Treasury civil servant) attended Lloyds and was pressed to give a commitment that the transaction would not be referred to the Competition Commission. He would not give that promise in so many words: but he did say that the Prime Minister's assurance from the previous evening stood, without committing the Government to any particular course of action. The competition issue was to that extent covered.

136.   A further key consideration was the question of liquidity. This was addressed in two contexts. First, there were discussions with the FSA and with the Bank of England as part of an attempt by Lloyds to obtain assurances from the Tripartite that they would provide funding support for HBOS until the completion of any takeover, and for the enlarged group following completion. Discussions were led by Mr Tate (as the Group Executive Director, Wholesale and International Bank since August 2004). He met with Mr Sants (CEO of the FSA) who expressed support for a merger: and he met with Mr Bailey of the BoE (who indicated that HBOS and the enlarged group would have access to Bank-sourced liquidity, but without providing any details of exactly how). The liquidity issue was to that extent covered.

137.   Second, Mr Tate created a small team under the leadership of Mr Ian Firth (Managing Director, Treasury and Financial Markets Trading Division) specifically to address funding issues. This small team would engage with the HBOS team, using both publicly available information and Lloyds' own insights into HBOS's assets and funding requirements (derived from (i) syndicated loans in which both HBOS and Lloyds participated (ii) propositions which Lloyds had rejected but HBOS had accepted (iii)

competitive bids in which Lloyds had lost out to HBOS, and (iv) positions which Lloyds had decided to sell and HBOS had bought). This material would provide a basis for interrogating the HBOS liquidity needs prior to any acquisition and thereafter, and for seeking the provision of such further information as HBOS (as a continuing competitor bank) was prepared to disclose. HBOS was much the larger of the two institutions and its funding needs exceeded £680 billion (as against the £370 billion required by Lloyds). This team began work on 16 September 2008.

138.    Amongst Mr Firth's early thoughts on HBOS was the question of funding after an acquisition. He pointed out that funding counterparties generally (in order not to exceed their own internal limits of lending to individual institutions) would probably mark a lower limit for a combined entity than the sum of the limits marked for separate entities. This, he thought, might present Lloyds with a difficulty: but, on the other hand, he thought that new management might well improve the market's perception of the combined bank above its current perception of HBOS as excessively dependent on the short-term market and as an entity in which the market had lost confidence. The funding issue was thus identified.

139.    A further update was provided to the Lloyds Group Executive Committee early on 17 September 2008 at a meeting attended by Mr Pietruska. The tone of the minute indicates a cautious desire to exploit a window of opportunity:

> "A further fall in the Dover share price that morning underlined
> the urgency of the situation so far as Dover were concerned.
> However competition issues and liquidity issues would need to
> be addressed for an acquisition to proceed."

140.    That meeting was followed by a meeting of the Board of Lloyds (also attended by Mr Pietruska and by Mr Greenburgh of Merrill Lynch). This was the first board meeting to address the potential transaction, and Mr Daniels provided a briefing as to the current position. There was a strand of cross-examination at trial which suggested that the executive team went out of its way "to sell a proposition" to the non-executive members of the board i.e. for the executive team to go beyond presenting a reasoned recommendation for adopting a particular course of action considered to be advantageous to the company, and, through an excess of exuberance, to suppress information relevant to a proper consideration of the proposal. So it is well to let the Minute of this initial meeting speak for itself. After some introductory remarks

> "Mr Daniels then briefed the Board on the background to the
> current position. Since the beginning of the week, discussions
> with Dover had taken on a more urgent tone. The chairman had
> also spoken with the Prime Minister about the possible
> transaction.
>
> Mr Daniels briefed the Board on the outcome of the high level
> due diligence on Dover that had been carried out so far, including
> liquidity, the Treasury portfolio and Dover's capital position. Mr
> Daniels commented on the factors which were being taken into
> account in the price negotiation with Dover, in particular
> Dover's initial wish to secure a price equal to the rights issue
> price. This discussion was ongoing. The Dover share price had

41

been subject to extreme volatility over the past few days so to use the current price is the reference point for a merger negotiation was not considered to be appropriate.

Clarification was required on three principal issues before an acquisition could be announced, namely

(1) Competition issues. The Government is of the view that the merger should proceed in the light of the financial stability issues and was planning to use legislation to bring this about. It remains to be clarified precisely which legislative route would be followed.

(2) Liquidity/funding: comfort would be required about availability the future liquidity from the Bank of England.

(3) Terms: the terms of the transaction required finalisation.

There was also urgency for a transaction to be announced by the following day in order to avoid undue market speculation about the position of a Dover with the risk of a damaging impact on its business; it remains to be seen whether this could be achieved.

The board noted that these were fundamental issues which require satisfactory resolution before a transaction could be supported.

The board also discussed a number of other issues in connection with the proposed acquisition. As regards branding, this requires further discussion but it would be important to maintain many of the existing brands, with a common group holding name…

The board was also briefed on potential negative aspects of the transaction.

As regards capital, the current cost of raising capital made a capital raising plan unattractive for the group. Accordingly, the current plan was to improve the combined group's capital base through divestments and through an adjustment of the dividend although there was regulatory pressure to consider raising new capital."

141. What emerges from this minute is a weighing of the pros and cons. But fairness requires that I should record the strongly positive note struck by Mr Greenburgh, whose views were sought on "investor perception". He said that shareholders would be supportive, given that combination would create value and that UK expansion (as opposed to overseas expansion) would be favourably regarded. His view was that "subject to the short-term market uncertainties" the transaction was a "highly attractive" one for the group to undertake. He said later in the meeting that the transaction "represented a most extraordinary opportunity for the group".

42

142. The Claimants adduced no expert investment banking evidence to suggest that this advice was so far outside the parameters of competent investment banking advice that any recipient of it was bound to appreciate that it was nonsense. But Mr Hill QC did suggest to various of Lloyds' witnesses that the views of Mr Greenburgh should have been discounted by competent directors because they were the views of an investment banker, and investment bankers are only paid (and are handsomely paid) if transactions proceed: so "He would give that advice, wouldn't he?". Of course Mr Greenburgh was not "independent" in the sense that there was absolutely no overlap of interests. But that does not necessarily mean that professional objectivity was absent. Barristers seem to have no difficulty in viewing the advice they tender on the merits of a case as "objective" even though they will only earn fees if the case proceeds. Whilst the ethical training of investment bankers before the credit crunch may not have been nearly as rigorous as that of the Bar it is altogether too cynical to regard investment bankers as being so devoid of integrity as to warrant a discounting of their views. Investment bankers also have personal and corporate reputations to protect. Indeed a board that did *not* seriously consider the advice of an investment banker on a significant takeover (given that it would be required under the Listing Rules to appoint a sponsor in relation to the ensuing circular) would almost certainly be negligent. But that said, Mr Greenburgh's view was only *advice* and it was the responsibility of the board to scrutinize it and weigh it and to make up their own minds.

143. During the course of the meeting Mr Daniels received a telephone call from Mr Sants of the FSA. He was informed (and duly told the Board) that the Government had decided that in the event of a transaction it would issue "a public intervention notice" under the Enterprise Act enabling the Secretary of State to adjudge the competition questions (avoiding a reference to the Competition Commission).

144. Like any "minute" of a meeting the Board Minute contains an outline of the information provided and a record of the decisions made, but does not seek to reproduce the debate that led to those decisions being made on that information. There is no reference, for example, to any contribution from Mr Pietruska: yet he attended and had prepared a Discussion Paper (based on the two earlier drafts to which I have referred).

145. This Discussion Paper is significantly more positive in tone than either of the earlier drafts, highlighting the possibility of creating the U.K.'s leading retail and commercial franchise with diversified funding for the new world of financial services, identifying "a small window of opportunity to pull off this deal, given likely political support and potential interlopers", but emphasising the need during the course of that day "to address the key risks (write-downs and liquidity) and lock-in the key dependencies".

146. Mr Hill QC identified (and put to some of Lloyds' witnesses) at least eight examples of where more positive notes were struck:

> (a)  I have recorded above the way in which in earlier drafts the very positive aspects to the investment case had been balanced by the identification of issues relating to competition, capital, valuation and day-to-day funding. In the paper for the board aspects of the investment case are enlarged upon, but the risks are not placed alongside that positive case. They are there, but in a different context. Sometimes they are included in the general commentary:

43

as in "market volatility makes political support likely to address competition, capital and funding with the tripartite authorities". But most significantly there is a page headed "Key risks & dependencies" (to which I will revert).

(b) The section in the draft referring to the probable need for a rights issue to maintain a Core Tier 1 capital ratio of 5.75% is replaced with a section in which on stated assumptions (about postponement of the "bancassurance" capital adjustments, when synergies would be influential, limiting write-downs to £3.5 billion and allocating them to eligible capital rather than Core Tier 1 capital, and cutting the dividend) there would be no need to raise capital to rebuild ratios. The evidence does not establish that these revised assumptions were imprudent. The postponement of the "bancassurance" capital adjustments was emerging as a possibility. Preliminary work had been undertaken on synergies. As I have noted, it came to be realised that HBOS had already taken some "writedowns" in its interim statement.

(c) Whereas the draft considered maintaining a Core Tier 1 ratio of 5.75% to be "challenging" the paper presented to the board expressed the view that it would be possible to maintain a Core Tier 1 ratio of 5.9%, a change achieved by making adjustments as to when synergies would be influential and by limiting write-downs to £3.5 billion.

(d) The draft used a working figure for "write-downs" of £3.8 billion (being 50% of a potential maximum of £7.6 billion): the paper presented to the board assumed an asset fair value adjustment of £3.5 billion. The HBOS interim statement had already included some write-downs.

(e) The draft suggested that the transaction would be EPS dilutive until 2012: the paper presented to the board suggested that the transaction would be EPS dilutive only in 2009 and 2010. That would follow from the revised synergy and writedown figures.

(f) The draft had contained impairment figures and a narrative suggesting that in relation to HBOS' corporate lending it was to be expected that there would be a significant deterioration in the short term of impaired loans mainly due to asset quality (particularly commercial property and leveraged loans). The paper presented to the board *increased* the impairment figures over the lowest shown in the drafts, clearly demonstrated a significant deterioration of the position in 2008 and 2009, but did not contain the narrative commentary. But it did elsewhere

44

warn of potential asset quality risk, of exposure to commercial real estate, and of exposure to self-certified mortgages.

(g) The draft had contained an estimate of the profit before tax from the corporate lending operations of HBOS for 2008 and 2009, providing maximum, minimum and median figures. The paper presented to the board provided a single figure for each year that was somewhat above the median given in the draft, but noted that those estimates were "significantly below consensus" whilst at the same time warning that profitability was under pressure.

(h) The draft contained an estimate of the profit before tax from international operations of HBOS in 2008 and 2009, again providing maximum, minimum and median figures. It was accompanied by a narrative which commented upon the stagnant or deteriorating profitability in international operations due to expected general market declines in key regions and increased impairment losses. The paper presented to the board provided a single figure for each year that was either around or markedly below the median figures in the draft (thereby emphasising the deteriorating profitability) but replacing the commentary with detailed observations about market participation (consistent with the format used throughout the board paper for each area of business).

147. Mr Hill QC's questions suggested to the witnesses that these changes were the product of a desire on the part of the executive team to "sell a proposition" to the board. He put to them that by comparison with the very first draft produced by Mr Pietruska (that was not widely circulated) the paper presented to the board was lacking a balanced and objective description of the negative sides of the deal.

148. There is, of course, no doubt that the executive team was seeking to solicit approval for a bid. The executive team opined that the deal (i) would create the UK's leading retail and commercial franchise; (ii) create the biggest and best financial institution focussed on retail, commercial and corporate customers in the UK; and (iii) put the enlarged group 11th by market capitalisation in Europe and providing the opportunity for future international growth. It argued that there was a small window of opportunity to pull off the deal, given political support and few potential interlopers, and of avoiding erosion of the franchise value of HBOS.

149. This solicitation of approval does not mean that every change from draft to presentation is to be viewed as a suppression of legitimate doubt. In my view the evolution of a draft in the light of continuing analysis and comment is not in itself surprising: and it was, of course, difficult for any witness to recall at a distance of 9 years what new information, argument or analysis underlay a change in language or layout between a draft produced for internal executive use and a paper prepared for consideration by the board. But Mr

Pietruska (who took responsibility for the work of his team) in my judgment answered the (unpleaded) challenge to his integrity when he said:

> "…..as head of corporate development, my professional obligation is to, in the end, present facts and assessments as I see -- how shall I say? -- justified, because my name is behind it, and, you know, there were -- I can recall at least one instance where Eric Daniels wanted me to present a particular position to the board where I said, "No, that's not what I can put in this piece of paper" -- so not in this one, but another one -- and at that point in time, that paper wasn't discussed in this way. So the bottom line is: if Eric Daniels would have said, "I would like to present the following", and I had disagreed that this was a position that I can defend, I wouldn't have done that."

He fairly assessed the developing position reached by the morning of 17 September 2008 in this way:-

> "This is positioning the acquisition as an attractive opportunity for Lloyds to create shareholder value, with risks around funding and write downs that have been -- and particularly the write downs -- have been incorporated in the model that says: this is in the interests of shareholders because it's going to be accretive."

150.   Mr Pietruska had identified in the paper prepared for the board the unattractive features of the deal (that it was at a significant premium, that write-downs and liquidity represented key risks, that HBOS' assets included high LTV ratio lending, and that the Core Tier 1 ratio would drop to 5.9%)- ; and he included a separate page headed "Key risks & dependencies" (enlarged upon in appendices). It was to these that the Board Minute had referred. The key risks included "liquidity funding risk" (set out in an appendix) "write-downs" (also set out in an appendix) and market reaction affecting the relative share price development of Lloyds and HBOS (which would impact upon the attractiveness of a Lloyds all-share offer). The funding paper clearly warned that although Lloyds was (at the date of the paper) significantly more dependent than HBOS on "overnight" money, over the term of 1 to 12 months HBOS was (even allowing for its much larger balance sheet) very significantly more dependent upon the wholesale markets than Lloyds. The paper specifically advised

> "Highly dependent on wholesale market funding - loan to deposit ratio of 177%; 55% wholesale funded (£266bn 1H08) and 45% retail funded (£219.4bn 1H08)."

The paper commented that capacity existed under the current SLS arrangements and that a modified form of SLS may increase capacity.

151.    The commentary on the Financial Performance noted the risk that HBOS's business model might be value-destroying in the immediate future, that profitability and growth were under pressure and were significantly affected by fair value adjustments on its Treasury assets, and that HBOS was exposed to several areas of potential asset quality risk (identifying commercial real estate, leveraged loans and private equity)

152.    The "Key Dependencies" were identified as being government management of the competition question, the date of implementation of the "bancassurance" capital requirement adjustments, and funding availability through SLS (and any "SLS2"). In that connection, the Tripartite had given assurances to assist on the competition question, and it was becoming apparent that the implementation of the "bancassurance" capital requirements was likely to be postponed (easing short and medium term capital pressures).

153.    I am satisfied that these key risks and key dependencies were discussed by the board. Not only does the decision reflect such a discussion, but the minute itself separately records a discussion (the content of which is not noted) about potential negative aspects of the transaction, and about plans to improve the combined group's capital ratios by divestment and dividend reduction. I am satisfied that the Defendants did not themselves (nor did they procure others to) overstate the opportunities or understate the risks and thereby "sell a proposition" to a gullible board.

154.    Having considered the paper the board resolved that talks should continue and according to Mr Daniels (though the minute does not reflect this) authorised him to continue negotiations for an "all-share" acquisition at a share-equivalent price of up to 275p per HBOS share. This was above the closing price on 17 September 2008, but below what the price had been immediately before the Lehman's collapse.

155.    Meanwhile rumours began to circulate in the market. They are well captured in a note circulated at noon on 17 September 2008 by the team at New Star Asset Management:

> "The FSA stated this morning that it was satisfied that HBOS was a well capitalised bank. However, if the merger stories turn out to be true it is likely that HBOS would have been forced into it as they feared that they could not adequately refinance wholesale funding when they needed to. If the merger does go through without any government money (and this is conjecture – the merger stories are still only stories) this may actually be a positive sign that the market can behave as it is supposed i.e. if a bank gets into trouble it is taken over by a stronger bank. The problem will be if Lloyds walks away or has to be offered tens of billions of pounds of public support to do it (Northern Rock was tiny in comparison to HBOS). In the normal course of business there would also be significant competition issues as well. If the merger is progressed, together the two banks would have 28% of the UK mortgage market, though it is highly likely that for the sake of market stability these problems would be ignored or deferred until later."

156.    It is now known (though could not be known at the time) that the BoE wrote to the Treasury expressing the view that

47

> "..there is an immediate need to secure the future of HBOS in order to preserve the stability of the financial system in the UK and to avoid contagion spreading to other banks and building societies. The best available solution is for the proposed takeover to go ahead with minimum delay….the merger is highly desirable to allay the immediate and substantial risks to the stability of the financial system."

I have no doubt that that perception drove every move which the Government made over the following days in fixing timeframes and in facilitating some outcomes and inhibiting others.

## *The settlement of terms*

157.   The eventual terms negotiated by Mr Daniel's with Mr Hornby were for an "all-share" offer with an exchange ratio of 0.83 Lloyds share per HBOS share (equivalent to 232p per HBOS share, a 60% premium on the HBOS share price at that day's close, but below pre-Lehman levels). No case was run that Lloyds shareholders have lost out because they could have obtained HBOS more cheaply. Their whole case has been that HBOS should not have been acquired at all because it was valueless. Rather, the settlement of the price was used (i) as an illustration of a suggested approach that the Board was simply determined to acquire HBOS irrespective of the price required and equally irrespective of the risks involved; and (ii) to a lesser extent as a magnifier of economic risk in the transaction (because of its impact on EPS and capital). In that context I ought to comment briefly on the price.

158.   A premium over the undisturbed price on a takeover is an absolutely routine (though certainly not inevitable) occurrence. The value of an entire business to a predator will almost as a matter of course exceed the aggregate of the values at which those individual investors who choose to sell are prepared to deal in their respective parcels of shares. The fact that Mr Daniels was probably given the informal "nod" to negotiate up to the 275p indicative price used in Mr Pietruska's presentation (beyond which a transaction would clearly be ruled out) does not mean that the board would necessarily have approved a transaction at that level: the board gave no such indication. The level of premium remained to be examined. The extent of any premium will in part reflect the strength of the desire of the predator to acquire the target (including offering a price that will discourage interlopers): and in part will reflect the strength of the target board's view that the market is fundamentally undervaluing its business. Mr Daniels proposed (and stuck to) 232p per HBOS share. In terms of asset value HBOS was much the bigger bank: but its market capitalisation was about half that of Lloyds. So, even at the premium proposed and eventually negotiated, Lloyds was acquiring the HBOS business at a significant discount to book value (giving considerable margin for impairments and write-downs). It is unsurprising that HBOS should seek a significant premium over the highly volatile daily spot price before agreeing to a transaction that could be recommended to *its* shareholders: but it is equally unsurprising that Mr Daniels should be unwilling to agree to pay the 275p per share which HBOS sought (given that pricing at that level was rejected by HBOS shareholders themselves in the failed rights issue). Nor is it surprising that the view might be taken that a reference point for the "undisturbed" share price was an averaged price prior to the Lehman's collapse (and the speculation which it generated), as to which both the pre-crisis market price of

around 285p and analysts' target prices following the release of HBOS' half year figures provide an indicator.

159. Mr Hill QC suggested that even at the 17 September 2008 spot price the pricing was wholly excessive given that if Lloyds had not made an offer then the Government would probably have nationalised HBOS. But I think all that can be fairly said (viewing matters *as at the time of the meeting*) is that if Lloyds had not made an offer within the timeframe indicated by the Government then it was known that the Government would have had to consider "alternatives". Those alternatives might have included an approach to another suitor: Lloyds was one of two banks that the Tripartite might have approached. They might have included a break-up. They might have included the taking of a majority stake or some other form of nationalisation (but not necessarily one that wiped out the entire equity value of HBOS). But even if nationalisation on "wipeout" terms was a real possibility it is clear that Lloyds was not seeking to compete with others to salvage planks from the wreckage of HBOS. Lloyds wanted the entire ship, even if it was storm tossed and veering towards the rocks, because Lloyds thought the ship could be saved and, with somebody fresh at the helm, could be brought to a safe harbour as a great prize.

160. In short, I do not consider that the price level is an indicator that Mr Daniels, the executive team supporting him or the board which approved a transaction at that level, was determined to effect the acquisition come what may and so did not give full and fair consideration to its viability. I find some support for that view in the evidence of the Claimant's expert Mr Ellerton who, in cross-examination, acknowledged that 232p per share was (at that stage) a not unreasonable price to offer.

### *Due diligence continues*

161. Whilst those negotiations were underway due diligence meetings continued. Some of these took place at the office of Linklaters. In his written evidence Mr Parr expressed the view that Lloyds had not been able to conduct pre-announcement due diligence at a typical level (though in his oral evidence he said there was no absolute norm as to what was an acceptable level and that disclosure can be very limited in the case of listed companies, essentially being confined to confirming that there was nothing material that was not in the public domain). Mr Pietruska in his evidence expressed the view that the due diligence prior to the announcement was satisfactory and was comparable to pre-announcement due diligence that had occurred in other transactions in which he had been involved (in particular referencing the sale of La Salle Bank to Bank of America for $21 billion where the due diligence had been undertaken in 36 hours for a transaction completing two days later).

162. Neither Mr Parr nor Mr Pietruska was giving expert evidence as to the customary level of due diligence prior to the announcement of a bank merger: so their personal experience serves only to illuminate the question whether the due diligence exercise undertaken was so obviously deficient (as would have been apparent to any competent director) as to undermine any decision which took its results into account. On the basis of their personal experience, it was not.

163. Mr Pietruska had prepared and circulated a 9-page due diligence outline directing the attention of the relevant teams to the key questions to be answered. (Mr Tookey had also identified what work needed to be undertaken and the 9-page document seems to

reflect his work also). It was not suggested to Mr Pietruska in cross-examination that this outline was not adequate or had not been adopted. I am satisfied that pursuant to it Lloyds' risk team had engaged with their counterparts to consider both asset quality and potential impairments in relation to HBOS's largest exposures. The general tenor of their report according to Mr Pietruska's unassisted recollection is that in general HBOS had adopted much the same approach as Lloyds in the assessment of asset quality and of impairments but it that it might have been necessary to make further impairment adjustments of "a billion or two here or there". (If that seems somewhat casual it must be recollected that the relevant HBOS assets after existing writedowns exceeded £533bn). Documentary records of this due diligence (not established by the evidence as being available to any meeting on 17 September 2008) provide a more detailed report: I will come back to them.

### *The offer*

164.    This activity culminated in a second Lloyds board meeting on the afternoon of 17 September 2008. It was a meeting of the full board with Sir Victor in the chair (save for Dr Berndt, who was on a plane bound for London, and Sir David Manning). In attendance were Mr Tookey, Mr Pietruska and Mrs Coltman (the company secretary): and the investment bankers (Mr Greenburgh of Merrill Lynch and Mr James from Citi). Again, it is simplest to begin by letting the record speak for itself.

165.    The meeting began with an update from Mr Daniels. The executive directors were then invited to comment on the results of the due diligence meetings held that day.

> "Mrs Weir confirmed that as far as the retail banking division was concerned the acquisition represented in her view a significant value creation opportunity. [HBOS] has a good franchise and position in the market. Mortgage asset quality has been thoroughly explored and impairments were expected to rise, which would consume more capital.
>
> Mr Kane reported on his meeting with the head of [HBOS's] insurance and investments division and confirmed that nothing had been found to give him cause for significant concern. In his view, this was an excellent transaction for the insurance and investments division.
>
> Mr Tate commented on funding and on the wholesale banking division. His meeting had confirmed that there were opportunities for both cost and revenue synergies, although further work was required on impairments. As regards funding, the information received during the course of the day had improved the level of the group's confidence that HBOS could manage its funding. In addition, clarity had been received from the Financial Services Authority and the Bank of England on support for liquidity.
>
> Mr Pietruska was asked to give his views to the board. In his view, the transaction represented the right opportunity for the bank at this time. The group was in a good position to deal with

50

<u>**Approved Judgment**</u>

funding issues, in difficult markets. Concerns about the price and the combined group's capital strength would need to be carefully managed.

Mr Tookey reported on the information from the financial due diligence discussion. Particular areas for concern were the large amount of growth in risk-weighted assets, which needed to be reduced, and capital. On a pro forma basis, the enlarged group would have a 5.5% core tier 1 capital whereas the target at completion should be 6%. Accordingly, a plan would need to be developed to bring the core tier 1 capital within that range.

Mr Daniels explained to the board the need to give certain assurances regarding future availability of loan funding and read the text of an undertaking which it was intended should be included in the offer announcement. The board also noted the position in relation to the competition position and noted that the offer would be conditional on there not being a reference to the Competition Commission and if there were such a reference then the offer will lapse. The Secretary of State was expected to issue a public intervention notice and it had been indicated that the Office of Fair Trading had agreed to a fast track process. "

166. The views of the investment bankers were also sought. Mr Greenburgh confirmed his view that the chance to acquire HBOS "represented a tremendous opportunity for the group to enter into a transformational deal": but he warned that given the market's volatility there was likely to be a variety of views on the transaction. Mr James endorsed that view but stressed that it was important for the market be given (i) a clear message that the management of Lloyds would run the enlarged group (ii) clarity about what was to be done to remedy the capital position and (iii) clarity about any continued dependency on wholesale funding.

167. There followed a discussion which Mr Tate described (I consider probably accurately) as "robust and thorough", and in relation to which Sir Victor observed (again, I consider probably accurately) that each member of the executive team was listened to and questioned. This was a high quality non-executive board addressing a hugely significant transaction in turbulent times. Sir Victor's description of them as "sophisticated and able" and as "men of great strength, great independence and great wisdom….not a "pushover" board…" is in my judgment warranted. The likelihood is that they each brought to bear their respective skills and experience: it is unlikely that to a man their critical faculties deserted them to the extent that they did not even test the executive case at all. (This is, of course, not to prejudge whether, having tested the case, the answer was an obvious "No": nor would it be an answer to any charge that on this occasion the executives misrepresented the true position to the whole board).

168. The recorded view of the non-executive directors is that they "expressed their strong support for the transaction", but expressed concern about the capital position and the need to address this. I will consider further the views of the non-executive directors' (other than Sir Victor) at a later stage in the transaction. For the present I will confine consideration to the views of Sir Victor and of the executive directors (and Lloyds' staff

in attendance who were not board members). What is it likely that they said in discussion? and why did they say it?

169.    In his written evidence Sir Victor explained that in addition to the obvious synergy benefits that the acquisition of HBOS would bring, he considered that there were a number of attractive intangibles – the power of the HBOS brands, the creative and proactive approach of HBOS, its customer spread and the quality of key employees. Whilst I accept this evidence, in my judgment one has to be careful not to overstate the weight that can properly be attributed to these features when weighed in the scale with hard numbers. As to the disadvantages (in particular arising from the HBOS exposure to the commercial property market) Sir Victor considered those to be manageable in the economic climate as it was anticipated at the time. It was put to him (as part of a challenge to his integrity) that he would have found it "awkward" to express any other view in the light of his earlier conversations with the Prime Minister. Sir Victor replied that he would not have found the slightest bit of embarrassment declining the transaction if it had been his view that it should be declined. I accept that answer.

170.    It was put to him that considering the disadvantages to be "manageable" was simply "a leap in the dark", and that had he focused upon the key issue of "impairments" and tested the suggestion that they would amount to only £5bn (£3.5bn of impairments strictly so called and £1.5bn of fair value adjustments on treasury assets) then the real risks of a capital raise as a result of the acquisition (undermining the case for the acquisition being positive for earnings per share) would have been apparent. Sir Victor's answer to these charges was that the acquisition proceeded (as do all acquisitions) on the basis of published information, information that was published to a regulated standard: on the basis of that the board had identified areas of concern (including impairments and the risks to capital noted in the Board Minute) which, at that stage, did not appear to be "highly troubling". He explained:

> "… when you have impairments… they are not losses at the moment you identify them as impairments: they are what you anticipate may be losses over a period of time. And with a quality team, you can often make the position much better than your worst assessment impairment."

According to Sir Victor, "impairments" assumed a greater dimension when the extent of the economic downturn (what he called "the most gigantic financial collapse seen in my lifetime") became apparent in late 2008 or early 2009 when there was a serious decline in commercial real estate prices.

171.    The written evidence of Ms Weir made clear that she was attuned to the obvious attractions of combining the Lloyds and HBOS retail banks with the potential of a merger to deliver significant cost synergies and to generate considerable value. She was supported in her view by a small team led by Mr Kenyon, a senior member of the retail banking team, which assessed the specific retail synergies and benefits of a merger. In addition, over the days preceding 17 September 2008 due diligence work had been undertaken by Mr Dale, the Head of Risk in the retail banking team, aimed at assessing HBOS' mortgage asset quality (in order to determine the potential risks involved in acquiring the retail bank). It was this that informed Ms Weir's comment to the board that there was a risk of rising impairments which could consume more capital. (It is fair to point out that Lloyds itself was facing the same risk in relation to its

business, though the degree of risk was different because of the difference in the nature and quality of the HBOS mortgage book). Nothing in Ms Weir's cross-examination undermined this, or suggested that the positive views she advanced were unsustainably overstated or the identified risks were grossly understated. There was no attack on her integrity.

172. The written evidence of Mr Kane made clear that he understood that a merger between Lloyds and HBOS would bring about substantial cost synergies, principally in the retail and commercial banking area: and within his own area that HBOS seemed to offer certain savings and investment products that appeared to be more successful than those offered by Lloyds. He was therefore supportive of a merger proposal, but aware of the risk that HBOS's assets were concentrated in areas that were more likely to be exposed to and affected by any economic downturn. On 17 September 2008 he had met with his counterpart at HBOS to discuss with her at a high level the key issues in HBOS insurance and investment business; and in particular to satisfy himself that the merger presented an opportunity to create value. Whilst lacking exact recall of what those discussions produced, Mr Kane was confident "that no red flags had been raised". His cross-examination did not undermine the strength of his evidence: it did not suggest that there was anything of concern in the insurance and investment business. Nor did it suggest that (on the basis of material known to Mr Kane) there were questions which ought to have been asked of other executive directors which would have demonstrated deficiencies in their report.

173. I have already examined the evolution of the views of Mr Pietruska in relation to the acquisition. It is necessary to note only two matters in connection with the views he expressed to the board at its second meeting on 17 September 2008. First, he personally felt that the agreed price was "full" and that a lower price might have been achieved. But he correctly identified the real question for the board at that stage as being whether the transaction stacked up at the price that *had* been agreed: so he confined his observations to informing the board that concerns about the price would have to be managed. Secondly, he was cross-examined as to the adequacy of the explanation to this meeting of the due diligence exercise and its outcome. I find that it is likely that he explained to the meeting in outline the process than had been undertaken, communicated his view that it was satisfactory for the purpose of considering whether to announce an acquisition, but warned that further work would need to be undertaken. I find that it is likely that impairments were discussed, that Mr Pietruska is likely to have contributed to that discussion, and that he would have conveyed the view that some further impairments were likely to be required but that they were of a manageable magnitude (even if above the levels discussed at the previous board meeting earlier on 17 September 2008). This would be consistent with his earlier views and their evolution, with the minute of the meeting and with his approach in general.

174. In his written evidence Mr Tate recorded his view that on balance the transaction represented an opportunity for Lloyds to create value for its shareholders: and that the risks of proceeding, in terms of (i) the size of the balance sheet that would need to be funded in difficult market conditions and (ii) the exposure to the economic cycle, were outweighed by the potential rewards. He thought there was a steep discount to book value which would cover all sorts of potential write-downs and impairments. In cross-examination he acknowledged that at the second board meeting of 17 September 2008 there had been no quantification of impairments, nor had there been any updated

analysis which looked again at the underlying economics in the light of the emerging due diligence information: but he stressed that all of this was a work in progress, and underlined his recommendation that more work was required.

175. Mr Tookey's awareness of Lloyds' own capital position (and his provisional view that disposals and a dividend cut would be required even in the absence of an acquisition) I have noted above. It is therefore no surprise that he should have reported to the board at the second meeting on 17 September 2008 that both the growth in RWAs, and capital, were particular areas of concern, and that a plan would be required to bring Core Tier 1 capital to 6% at completion. That plan might be influenced by the level of impairments: and Mr Tookey was cross-examined as to the information provided to the board. His evidence was to the same effect as that later given by Mr Daniels, Mr Pietruska and Mr Tate.

176. Mr Daniels was the CEO who was putting the proposal before the board. It was he who had negotiated the price. There is little doubt that he would have been an advocate for the transaction he had negotiated. But even he commented upon future funding issues (notwithstanding that HBOS had in fact managed to fund itself satisfactorily up to that point, as the FSA had confirmed to the market): and he gave free rein to others to express their own cautionary views. Neither Mr Daniels nor any other member of the executive team presented the opportunity as risk-free or as involving negligible risk. It is clear that this experienced board knew that advocacy of the deal was Mr Daniels' role and that testing his proposition and considering the support for it was their role.

177. At the conclusion of this second meeting the board decided to announce an acquisition, though it wanted additional clarification about liquidity and funding and understood that the executive team would seek to continue the due diligence process. Because of that, the associated Implementation Agreement gave Lloyds a unilateral and penalty-free right to withdraw the offer if in the light of the continuing due diligence material emerged which caused the board to decide that the Acquisition could not be recommended to the shareholders.

178. Picking up on firm market rumours of a merger between Lloyds and HBOS Mr Tadhg Flood of Deutsche Bank contacted Mr Daniels and Mr Pietruska late in the evening of 17 September 2008. He commented that a merger was "a unique strategic opportunity for [Lloyds] with very clear and significant value creation opportunities". But he commented on the deal price ("your shareholders will ask why any value should be paid for an institution that is effectively being rescued") and he struck this cautionary note:

> "The market will focus immediately on the enlarged group's pro forma tier 1 ratio. A likely cut in the dividend, the future emergence of synergies, and plans for potential disposal/RWA reduction are all positives, however the market will want to understand what immediate buffer you will have against future losses (and existing marks that are required in HBOS's book) as we enter a downturn in the UK economy... Shareholders will want to see a clear liquidity plan in place to ensure the enlarged bank can access sufficient liquidity at economic margins to fund existing and future business. While government support will aid liquidity, this is not a permanent solution to liquidity and your

shareholders will want to know how this will be addressed over
time without central bank support…"

I do not think that these insights alerted the executive team to anything of which they
were previously unaware or would have recast the discussion that had occurred at board
level. But equally I do not think this market view was ignored by the Lloyds team as
matters developed.

179.    Also on that evening Mr Daniels attended a meeting with Sir Callum McCarthy and (as
he then was) Mr Mervyn King (then Governor of the Bank of England). Mr King
emphasised the urgency of the HBOS acquisition. Sir Callum and Mr King were
(because of the intense scrutiny of HBOS then being brought to bear by the Tripartite)
probably aware that at the same time as this intense activity around a possible
acquisition, HBOS was borrowing a further $5 billion through the US Federal Reserve
Discount Window. The Claimants have characterised this as "the Government putting
pressure on the Lloyds board to acquire HBOS" and in an eye-catching phrase in
opening described the Lloyds shareholders as having been "mugged". But this is a
caricature of a much more complicated picture.

180.    (As will appear from the letters to which I refer next) the Government desperately
wanted to stabilise the market and to avoid any bank failing in a disorderly fashion; and
it undoubtedly wanted to use market mechanisms (not intervention) to do so if possible.
It was prepared to invite market participants to assess opportunities. It was prepared to
lend every assistance to a market participant who wished to exploit an opportunity. That
was what Lloyds had done. Government assistance (in smoothing away competition
obstacles or in giving comfort as to available funding) enabled Lloyds to do what it
otherwise could not have done (and had conspicuously failed to do over the preceding
5 years and more), namely, expand through inorganic growth. But both the Government
and Lloyds knew in mid-September 2008 that their influence in a panicky global market
was limited, and potential movements in the equity and debt markets imposed severe
time constraints. The Lloyds board knew that it had to operate within those limitations,
and that this might entail taking decisions on available information and within a
timeframe that was less than optimal. In my judgment that is not succumbing to
pressure. The Lloyds board did what it thought best for its shareholders; not what the
Government wanted even though the Lloyds board did not think it for the best. It bears,
and has throughout this case acknowledged, that responsibility.

181.    During the course of the day two letters were written by members of the Tripartite to
the Treasury justifying not referring the proposed bid to the Competition Commission
(a condition of the Lloyds offer). The first was from Mr Sants and said:-

> "The Financial Services Authority considers that the failure to
> allow the proposed merger between [HBOS] and [Lloyds] would
> drastically undermine market confidence and cause significant
> harm to consumers and the UK economy. This harm would, in
> our view, greatly outweigh any adverse competition effects.
> Credit, jobs and output would contract, and there would be
> knock-on effects in financial markets that would weaken the
> capital position of other banks…. [It] would in our view be
> imprudent not to take the necessary measures to allow a soundly
> structured merger to proceed"

55

182.    The second letter was from Sir John Gieve, the Deputy Governor of the BoE and said:-

> "The current situation in financial markets is one of extreme fragility…. The dramatic fall in HBOS share price and adverse movements in other financial market prices for HBOS create an immediate danger to financial stability. There has been heightened deposit activity (both retail and in wholesale financial markets that provide major funding to UK banks) over the last day or so. This activity is increasing further in the light of growing media speculation on the future of HBOS in the view of the bank of England, there is an immediate need to secure the future of HBOS in order to preserve the stability of the financial system in the UK and to avoid contagion spreading to other banks and building societies. The best available solution is for the proposed takeover to go ahead with minimum delay…. Given its size and profile an abrupt failure of HBOS would have a big direct and indirect effect on the wider financial sector and the economy generally at any time. In the current conjuncture it would be very severe and destabilising….. The merger of HBOS with [Lloyds] is the best available means of preventing such contagion in a very limited time available."

183.    The Lloyds executives and board were unaware of this confidential exchange, which had immediately preceded their second meeting. But I have no doubt that the executives were aware of the strength of the Tripartite support.

## The Announcement

184.    On the morning of 18 September 2008 the Lloyds board and the HBOS board jointly issued the Announcement about the takeover of HBOS by Lloyds (the "Acquisition") saying that both boards intended to unanimously recommend the Acquisition to their respective shareholders. The Announcement said that the boards believed that the Acquisition presented a compelling business combination offering substantial benefits to shareholders and to customers. It recited that the board of Lloyds had received financial advice from Merrill Lynch (though the body of the Announcement made clear that that financial advice had itself incorporated the commercial assessment of the Lloyds board) and considered the Acquisition to be in the best interests of Lloyds shareholders. At the same time Lloyds and HBOS entered into an implementation agreement in which they undertook to use reasonable endeavours to implement the Acquisition. Mr Daniels was at pains to tell the market that the merger had been struck on commercial terms and was not merely a government-brokered rescue of HBOS. So was the Chancellor of the Exchequer, Alistair Darling when denying in a Radio 4 interview that day that he had "pushed" Lloyds into the Acquisition whilst acknowledging that he had "helped in every possible way". Whilst some might be cynical about such statements, they are in my view an accurate summary of the respective objectives.

185.    The 38-page Announcement explained the terms of the Acquisition and informed shareholders that existing Lloyds shareholders would own approximately 56% of the enlarged group, which it described as "a compelling business combination". It explained that the final Lloyds dividend would be by way of a scrip issue (not cash)

and that the 2009 dividend would be reduced. It projected cost synergies of £1 billion a year by 2011 by which time there was an anticipated accretion to earnings of 20% per annum. The Announcement said that the pro forma capital ratio of the enlarged group based on the half year figures published on 30 June 2008 would be a Core Tier 1 ratio of 5.9%: but that the target was 6% to 7% which Lloyds expected to achieve during 2010 (but would seek to accelerate by the disposal of non-core assets). The Acquisition was expressed to be conditional upon the transaction not being referred to the Competition Commission. It informed Lloyds shareholders that they would receive the Circular and contained the following paragraph (repeated twice):-

> "[Lloyds] and HBOS strongly advise [Lloyds shareholders] and HBOS Shareholders to read the formal documentation relating to the Acquisition when it becomes available because it will contain important information relating to the Acquisition. Any response in relation to the Acquisition should be made only on the basis of the information contained in the formal documentation relating to the Acquisition."

186.    In addition, the digital version of the Announcement said that it was provided for information purposes only and that

> "[Lloyds] shareholders should seek advice from an independent financial adviser as to the suitability of any action for the individual concerned. Any shareholder action required in connection with the Acquisition will only be set out in documents sent to or made available to shareholders and any decision made by such shareholders should be made solely and only on the basis of information provided in those documents."

187.    Following the Announcement Lloyds and HBOS together held an investor presentation. Sir Victor, of course, extolled the Acquisition as "a unique opportunity to create the largest and best financial services business in the United Kingdom", whilst Mr Daniels trumpeted it as "a fantastic deal". Mr Daniels commented upon the robustness of the capital position, upon the strength of the liquidity position and upon the ability of the combined entity to access wholesale markets (where the strength of Lloyds rating would assist). He expressed the opinion that the transaction would be EPS accretive from mid-2011. Mr Tookey told the meeting that he anticipated being within the target Core Tier 1 capital ratio of 6 to 7% during 2010. It is important to note that both EPS accretion and the attainment of the target Core Tier 1 ratio were from the outset presented as forecast events and not immediate consequences.

188.    There was less positivity about the transaction from HBOS. Challenged as to why HBOS should fall into the hands of Lloyds at a substantial discount to book value in the face of temporary turmoil, Mr Hornby expressed the view that the dislocation in the funding markets was something that was long-term and that given the immense disturbance and competition issues in the current market the acquisition "seemed a decision we had to take". The questioner commented that the merger had not "changed the fundamental underlying dynamics of the funding market" i.e. that the combined entity would still have to address the problems that troubled HBOS. The message received in the room was that HBOS's funding pressures meant that it had no other real option than to be acquired by Lloyds. That was the evidence of Mr Mike Trippitt, one

of the Defendants' experts (who was able to give factual evidence since he attended the presentation and himself asked a question), on which he was cross-examined: that evidence I accept. It is also the tenor of much of the press coverage and analyst comment. It was the broadcast view of the Chancellor of the Exchequer: in a radio interview at just after 8.00am that morning Alistair Darling said "there wasn't much choice in the matter" and "if we hadn't done it the future was very bleak indeed".

189. From that point onwards the market understood that, because of the increasing difficulty of finding wholesale funds to bridge the "funding gap" between deposits taken and loans made, HBOS had no long-term standalone future. That was also the public position taken by Lloyds. So on 15 October 2008 Mr Daniels was reported as telling the "Financial Times" that the dependence of HBOS on wholesale markets meant that "it had no long term future as an independent bank". But what nobody knew was the time horizon: for how long could HBOS have lasted as a functioning independent bank? As a writer put it in the "Daily Telegraph" on 19 September 2008:

> "In the short term HBOS had a bit of wriggle room. But with the money markets shut and no guarantee it would be able to access funding, in the long term it faced administration."

190. The market reaction to the Announcement from the Lloyds perspective may be broadly described in this way:

(a) The reaction of analysts was mixed, review notes with a negative tone being as numerous as those with a neutral or positive tone.

(b) For some the Acquisition was viewed as a strong operational transaction which would deliver considerable shareholder value for Lloyds through cost synergies (which the market predicted would be twice what Lloyds was estimating) and the establishment of market leading positions. But whilst it might be the "deal of the decade" (or as one of the Claimants' own witnesses opined to his clients at the time "the deal of the century") the coming economic downturn posed near-term and medium-term risks.

(c) There were concerns over whether competition issues would remove some of the operational benefits of the transaction.

(d) The price level was questioned by some, given that the Acquisition was seen as a rescue deal. But others assessed it against the HBOS rights issue price and were "outraged" at the price at which HBOS had been sold.

(e) There was concern that the Acquisition of itself did not address the funding issues associated with HBOS (absent any government guarantee about funding) and simply

**Approved Judgment**

transferred the problem to Lloyds. But the combined entity would clearly be "too big to fail".

(f)     There was concern whether Lloyds itself had deep enough pockets to save HBOS.

(g)     There was some concern about how the Core Tier 1 ratio of 5.9% could be strengthened by disposals in a difficult market, and a possible capital raise was anticipated.

(h)     There was a mixed reaction to the dividend proposals, some investors being unhappy at the combination of a "scrip" dividend and a cut dividend, but others understanding the realism of that approach.

(i)     There was in some quarters regret that the proposed deal was "transformational" in the sense that Lloyds would cease to be a relatively liquid, well-capitalised bank with a defensive loan-book and a high dividend yield: and in others the view that the transformation presented a growth opportunity into which investors should buy.

(j)     One commentator said that the Government appeared to have learned its lesson from Northern Rock and that if a deal was to be done than it had better be done quickly.

(k)     The Lloyds share price itself dropped by 15% at the close of trading (though it rebounded the next day).

191.    Of the views to which my attention was drawn I thought the most pithy summation was that expressed by Andrew Thompson of Citigroup to Mr Daniels when commenting on the Announcement:-

> "If you have the nerve or foresight to see that the enlarged group can navigate its immediate issues [HBOS] is a highly attractive option…."

### Key external events following the Announcement

192.    It is best to comment on the key external events following the Announcement under a number of headings.

193.    On the competition front, on 18 September, following the Announcement, Mr John Hutton (then Secretary of State for Business and Enterprise) issued a "public intervention notice" requiring the Office of Fair Trading (the "OFT") to investigate and report on the Acquisition by 24 October 2008, and in doing so to take into account the stability of the UK financial system. The letters from the FSA and the BoE (combined with the Treasury view) had done their work: a reference to the Competition Commission could be ruled out.

194.    On the capital front, Lloyds used the opportunity created by the Announcement to raise £760 million through a rights issue. On 19 September 2008 it announced a placing of 284.4 million new ordinary shares at a price of 270p per share (representing an increase of about 5% in its current issued share capital) - a discount of 13.9% to its close-of-market price. The offer was heavily over-subscribed.

195.    On the liquidity front the BoE continued to pump liquidity into the system in a variety of innovative ways. I have already drawn attention to its extension on 17 September 2008 of SLS as a mainstream source of funding: a total of £185bn was to be drawn by banks under this scheme. On 18 September 2008 BoE took part in coordinated global measures to relieve pressures in the US dollar funding markets by embarking upon direct US dollar repo operations (i.e. itself providing dollar funding to UK banks against eligible collateral) backed by a reciprocal swap arranged with the Federal Reserve. The terms of the US dollar repos were individually settled under a variable rate auction process.  Initially this provided overnight money (because, as a later review by the Bank of England was to record, at this stage money was not being distributed between banks even in the overnight market). Within days the facility was enlarged and was expanded to offer one-week money. Days later the classes of eligible collateral were widened. The enlargement of the classes of eligible collateral was applied also to the Bank's existing Extended Collateral Long Term Repo scheme. The Bank consulted on further extending the range of collateral acceptable in its money market operations, and also upon accepting pledges against asset pools of highly rated corporate loans in unsecuritised form. In short, the Bank was taking unprecedented steps to support the market. It was assuming the role of a mainstream provider of liquidity (operating in effect an alternative wholesale market) and beginning radically to alter the role of a central bank.

196.    On the 7 October 2008 the Chancellor of the Exchequer informed Parliament that the Treasury was willing "to make further resources as necessary" available to maintain financial stability. Then on 8 October 2008 the Treasury informed the world that "the Bank of England [would] take all actions necessary to ensure that the banking system [had] access to sufficient liquidity" and "[would] extend and widen its facilities in whatever way [was] necessary to ensure the stability of the system". It announced the provision of additional liquidity under the SLS scheme (doubling the amount available). It said it would review the size and frequency of its current open market operations "as necessary". It disclosed that it would announce plans for a permanent regime underpinning bank liquidity. It announced bank capital support measures (to which I will come in greater detail) which made available additional Tier 1 capital amounting in the first place to £25bn and stood ready to double it: and alongside this it announced a Credit Guarantee Scheme under which there was a Government guarantee provided for medium-term senior unsecured debt issued by banks (which would itself be eligible collateral for all support schemes). These were extraordinary, momentous steps and amounted now to a radical redefining of the Bank's role.

197.    Mr Henderson, one of the Claimants' witnesses, commented on the government recapitalisation scheme in a contemporaneous letter to his clients in these terms:-

>    "The financial package put forward by the Government is one of the most intelligent schemes that I have seen. The offer to invest £50 billion in the banks' share capital (via preference interest-bearing shares ….) essentially guarantees all the major banks. To

> put this figure into context the current market value of HBOS, RBS Lloyds TSB and Barclays <u>combined</u> is £57.1 billion. In addition they have committed to guarantee £350 billion worth of loans between banks."

198.    On the global financial front there was a rapid deterioration. In the USA Washington Mutual foundered on 25 September 2008 and was acquired by JPMorgan. On 29 September 2008 Bradford & Bingley was nationalised by the Government. In Europe on 30 September 2008 Fortis Bank was rescued by the Belgian, Dutch and Luxemburg governments and Dexia Bank was rescued by the French and Belgian governments. On 3 October 2008 Wachovia Bank was rescued by Wells Fargo in the USA. On 7 October 2008 the Icelandic banking system collapsed and was bailed out by the Icelandic government. On 10 October 2008 the central banks of the G7 nations issued a joint statement in which they recorded their agreement to take decisive action and to use all available tools to support systemically important financial institutions and to prevent their failure. These were clear global messages from central banks that the financial system was secure.

### Key internal events following the Announcement and preceding the recapitalisation

199.    It will aid clarity if I also consider the key internal events thematically rather than purely chronologically, looking at (i) interbank dealings between predator and target (ii) the progress of due diligence (iii) the support of the Tripartite for HBOS and Lloyds and (iv) reviewing the Acquisition. Inevitably the themes intertwine: and I would again make the point that these themes in no way represent the full range (nor even, perhaps, the most substantial part) of the issues being examined in relation to the Acquisition. These themes are simply those that are material to the case presented in this action: there was a multiplicity of other workstreams and areas of attention and action.

### Interbank dealings

200.    First, interbank dealings between Lloyds and HBOS. On 18 September 2008 HBOS approached Lloyds seeking additional access to Lloyds' interbank overnight funding facility. Lloyds agreed to increase the existing unsecured overnight lending facility to HBOS by £1.5 billion to more than £3.0 billion. (To put this in context, according to Mr Short Lloyds itself took up to £35bn from the overnight markets, and had drawings on the overnight market supplied by other banks and central banks of over £12bn on 25 September 2008). A "roll-over" of the HBOS overnight facility was reviewed each day through a process which involved Mr Firth (Managing Director of Trading within Lloyds Corporate Markets) liaising with his counterpart at HBOS, and then submitting the proposed transaction for approval by Mr Cumming (Senior Sanctioning Director), Ms Sergeant (Chief Risk Officer) and Mr Tate. On 19 September 2008 Mr Tate had sought from the FSA approval for the way that Lloyds and HBOS intended to communicate, plan and execute the management of their respective funding positions, and was told (though the FSA declined to record it in writing) that the FSA heartily encouraged such exchanges.

201.    The "roll-over" continued until the time of the Shareholders' Circular. From the outset the decision to entertain the transaction had both commercial ("Lloyds can profit from this counterparty's proposal") and strategic ("We should support HBOS because we are proposing to acquire it") elements. At trial it was not suggested that in relation to the

overnight funding the successive transactions were "skewed" by the proposed Acquisition.

202.   On 22 September 2008 HBOS approached Lloyds with a request for a *secured term* facility. In tight wholesale markets it is entirely understandable that HBOS should look to its intended acquirer as the market participant most likely to look favourably upon a proposed transaction: and the more understandable given that the Announcement itself had had the effect of cutting HBOS' credit lines as funders began to look at their exposure to the enlarged entity (rather than to each of its component parts). Recognising this reality, the FSA supported and encouraged Lloyds to take an engaged role in the joint management of the funding issues. In relation to any such proposal for a secured term facility the Lloyds executive team and board might, as regards the interests of the company, be expected to have in mind both commercial and strategic considerations: but they would need to have clearly in view possibility that the Acquisition might not proceed.

203.   The original proposal by HBOS was that Lloyds should provide it with a facility of £25bn secured by the assignment £25bn-worth of corporate loans made by HBOS (adopting the model that was under consideration by the bank). This was unsurprisingly viewed by the Lloyds team as "a complete non-starter". But what emerged from that request were discussions which were ultimately to lead to the Lloyds Repo.

204.   The discussions had two strands: (i) an overall facility of £10bn for 6 months, and (ii) an immediate advance of £2.8bn for one month. The discussions were neatly captured in an email which Mr Short sent to Mr Parr of Linklaters. He first outlined a prospective facility of £10 billion with a six month tenor secured on marketable debt securities or corporate loan assets valued subject to a 20% "haircut" (i.e. the discount applied to the value of the collateral) and at an interest rate of a then-undetermined premium over LIBOR. Mr Short then explained

> "The transaction is being considered on an arm's length basis, as a market transaction. The final form is not agreed yet, and I believe that [Mr Tate]/[Mr Daniels] will be asked to approve the final version. With respect to timing, [HBOS] have asked if we can be in a position to lend c. £2.8 bn on this basis (or something similar) tomorrow the 24th ."

In cross-examination Mr Short confirmed that from his perspective what was being proposed was an arm's length commercially priced transaction, with obvious implications for Lloyd's own liquidity position.

205.   Part of the context of this request was an outflow of about £20bn in retail and corporate depositors' funds from HBOS during August and September, which had continued after the Announcement. The interconnectedness of the level of retail funding, the availability of wholesale funding and terms on which funding was available was well explained in a letter which one of the Claimants' witnesses (Mr Henderson) wrote to his clients on 10 October 2008 when commenting on the above-mentioned BoE and Treasury support announcements of 8 October 2008 (but to which it is convenient to make reference now). Mr Henderson first explained the significance of the access to government funds that had just been announced, and then continued:-

"It is this latter point that is so important as if we take HBOS as an example for every £1 of deposits they have lent out £1.70. The difference i.e. 70p they borrowed in the market… All was well until interest rates rose… This put pressure on margins then the short sellers appeared and started selling shares they didn't even own, as the share price fell worries over HBOS grew and the market said that this implied more risk and HBOS would have to pay above LIBOR. This further deflated earnings and therefore the share price which then began to make depositors nervous – so they started withdrawing funds, and the £1 deposits became 80p, and the cost of borrowing the extra new 90p (original 70p plus new 20p) rose from 5½% to 9%. This happened not in the space of years, months or weeks but in days, if not hours. So the crisis became tangible. Confidence had gone, and the banks would not lend to each other, let alone us. The government's £350 billion bailout puts the American government's half baked attempts to shame…."

So the outflow of corporate and consumer deposits (short of a "run") had both increased the need for and the cost of replacement funding, and the Announcement had itself reduced what was available to HBOS in the market. Hence the HBOS request to Lloyds.

206. Satisfying the HBOS request (even partially) would have the usual liquidity implications for Lloyds itself, which was (according to Mr Short) providing liquidity to quite a lot of other institutions at this time through interbank transactions similar to that requested by HBOS. What is not clear is whether those other similar transactions shared a particular feature of the full HBOS proposal, namely, that some of the collateral to be offered was not generally pledgeable and could not be "posted out" or proactively used by Lloyds i.e. it could not be match funded. This meant that Lloyds' own funding resources would have to bear the strain of meeting the HBOS request until some other arrangement was put in place.

207. The corporate trading team was alert to the issues which the proposed HBOS transaction raised. Mr Conway communicated to Mr Firth the thought that

".. there needs to be a question asked about how intertwined we become with HBOS before the merger is agreed by shareholders et cetera. It does define how committed we feel to the deal and how much risk we want to take on for our future colleagues…"

Ms Grey communicated to Mr Firth the thought that

"I do not see a level of pricing which would compensate us for adding to the strain of our own funding. HBOS would be nicely "transferring the monkey from there (*sic*) to our shoulders"…"

208. With those thoughts in mind Mr Firth himself identified the questions to be:-

"Can we stomach the increased liquidity risk here…. Consideration of the desire to protect HBOS value as an acquisition….. Consideration of the loan we may wind up owning if the merger is abandoned…"

Having identified those questions he was nonetheless satisfied that the request stood up as an arm's length transaction, if only quality collateral (e.g. Euro- and US-denominated floating rate notes or asset-backed securities, not assigned corporate loans) was taken, if the collateral was reviewed before each drawdown request was considered, if the valuations were subject to a significant "haircut" in line with comparable market transactions, if each transaction could be structured as a repo, and if the interest rate reflected market conditions. On that basis, the risk-adjusted return on capital for Lloyds was predicted to be 200%. (The eventual transaction ultimately yielded a return of £16.5m for Lloyds).

209.    Mr Daniels, Mr Tate and Mr Tookey would have been aware of these views through Mr Firth (even if not copied in on every exchange of e-mail): they were certainly aware of the three questions which Mr Firth had identified. They were not, of course, bound to agree with the views expressed: but they were cognizant of unusual features of the proposal. The transaction immediately agreed (the first part of the Lloyd's Repo) was for an advance (in repo form) of £2.4bn secured by Euro- and US-dollar denominated marketable securities valued at £2.8bn and at a margin of 20bps over one-month LIBOR. (The securities, although marketable, were not eligible collateral under the SLS because of the currency denomination, nor were they eligible collateral under similar schemes operated by the European Central Bank or the Federal Reserve). In the view of Mr Firth at the time this was "in the range of pricing seen elsewhere on other similar style deals", though he acknowledged that his approach had been "to lend in as commercially prudent a manner as possible, not to savage [HBOS] on pricing" in circumstances where there was no directly comparable benchmark.

210.    Mr Hill QC cross-examined Mr Tookey, Mr Daniels, Mr Tate and Mr Short on the basis that this was a "sweetheart" deal in which strategic considerations had overwhelmed commercial considerations to a degree that this transaction of itself could not be regarded as having occurred in the ordinary course of Lloyd's business. But the point was not established.

211.    I find that the £2.4bn first tranche of the Lloyds' Repo itself was a repurchase transaction done on commercial terms that met Mr Firth's profile. A bank is not required to "savage" a counterparty (whether that counterparty is another bank or a retail customer) on pricing: and the fact that it does not do so does not render a deal uncommercial. The nature of the collateral was unusual (not being eligible for repo at certain sources), but the transaction resembled a repo in that the £2.4bn was made available against securitised assets that were themselves capable of being repo'ed.

212.    I hold that the first tranche of the Lloyds Repo was a transaction in the ordinary course of business. It was business conducted on ordinary commercial terms. I have noted above that it was commercial business which also had a strategic objective: enabling HBOS to survive in a form in which Lloyds could acquire it and thereby generate value for Lloyds' shareholders. So its context was certainly unusual (Mr Tate thought it "unique" and acknowledged that in ordinary and normal markets Lloyds would not ordinarily execute such a transaction). But many loan transactions will have unique

64

features which require adjustment to a standard lending template: that of itself does not take the transaction outside the "ordinary course of business" provided that the eventual transaction is on proper commercial terms. In the instant case it cannot be said that the £2.4bn interbank loan was commercial business that would, in the then-state of the market, have been declined but for the desire to achieve the strategic objective. The Claimant's expert Mr Benkert approached the Lloyds Repo on the footing that the first tranche was a "business as usual" conventional repo of marketable securities: and in his evidence the Claimants' expert Mr Ellerton described it as "a £2.4 billion repo facility secured conventionally on securities". There is nothing in the evidence to suggest that Lloyds would not have entered into such a conventional transaction in the ordinary course of business.

213.    As Mr Firth had identified, the desire to preserve HBOS' value as an acquisition was something that had to be recognised. Mr Tate acknowledged that the aim was to structure something that would be commercial, would address volatility in the marketplace and would help Lloyds to get to a successful acquisition. He said:-

> "… Keeping in mind the fences that need to be there, because we are independent companies and we are in the process of coming together, [bearing] in mind all of that I think there is no doubt…. we are trying to work together."

From Mr Daniel's perspective he considered Lloyds

> "… to be part of the solution to see HBOS through to completion, but ….. we had to do it at an arm's length basis in case the deal did not go through…".

Mr Tookey thought that

> ".. HBOS funded to the point of acquisition was in our interests in the context of wanting to put a transaction to our shareholders that we believed would enhance shareholder value….".

Such acknowledgements of the strategic significance of the transaction do not mean that the transaction itself was not made in the ordinary course of business.

214.    Notwithstanding the first tranche of the Lloyds Repo (the £2.4bn repo) HBOS' liquidity difficulties intensified, driving forward the discussions on a larger secured facility. The Lloyds team was only prepared to contemplate lending that satisfied its risk criteria (as it assessed them in the then-current market conditions): the Lloyds team was not prepared to advance whatever was required simply to preserve HBOS as its target. There would therefore always be a question whether HBOS had access to other stable funds.

215.    On 25 September 2008 the Lloyds corporate credit team approved the first tranche of the Lloyds Repo and worked on the proposed additional facility to HBOS. Ms Sergeant expressed to Mr Daniels her concern at "the bits of the jigsaw" that she was seeing, questioning why Lloyds might, as part of the additional facility, lend against apparently illiquid assets (like assigned corporate loans) when HBOS had, as she understood it, securitised assets that could be used in the SLS scheme: and she was concerned about

HBOS exporting its liquidity problems to Lloyds in extraordinarily difficult markets before completion of the Acquisition. Mr Daniels himself understood the point. In truth the position was that HBOS had used (or was in the course of using) all of its SLS-eligible securitised assets and was now seeking to borrow (as it had done in relation to the first tranche of the Lloyds Repo) against other collateral: but nobody in Lloyds was at that time in a position to know that.

216.    Late on 25 September 2008 HBOS indicated to the Lloyds team that it was facing severe difficulty and that there was a concern that HBOS would not be able to continue its operations if further sources of funding were not achieved on an ongoing rolling basis. To that end HBOS and its advisers were preparing a funding plan to show the Bank, embodying an assumed £10bn facility from Lloyds, and making certain assumptions about the ability of HBOS to access the SLS using different collateral from that within the then-current restricted range: but it is apparent from the surviving notes of the contemporary conversations that there was sensitivity about the market knowing of any approach by HBOS to the Bank for support outside the standing facilities and SLS as it then existed, lest this reignite an outflow of corporate and consumer deposits.

217.    Mr Tate participated in the putting together of a funding plan ("the HBOS plan"). In outline, the HBOS plan proposed to the Bank an industry-wide solution to the severe difficulties being experienced by all banks (by pumping in extra liquidity and by extending the classes of eligible collateral under the SLS scheme); and in the alternative, it suggested that (i) Lloyds would create a deal-specific facility of £10bn for HBOS (the Lloyds Repo had not at this stage been agreed) whose term would be defined by the closing of the deal; (ii) the Bank would make an additional £25bn available to HBOS under the SLS scheme; and (iii) the Treasury would make available a back-up facility of up to £60bn to be drawn upon if necessary. The first proposal, of an industry-wide solution, was prescient (in that the BoE was in the course of implementing those very measures): the alternative proposal was not taken up by the Bank, though the seed of the idea that Lloyds should provide a specific facility in addition to normal liquidity facilities and that the Tripartite should help Lloyds to get to a successful completion of the Acquisition (because in doing so it would aid financial stability) was sown.

218.    Meanwhile work continued on the proposed second tranche of the Lloyds Repo. What HBOS could now offer by way of collateral was not some marketable asset-backed security but the benefit of part of its loan book ("raw loans" as they were called in argument). This was a type of security that was being considered by the Bank as acceptable. The benefit of the raw loans could be given to Lloyds by way of assignment by way of mortgage: this would have the disadvantage both that Lloyds would itself have to manage the loan book and that the assignment by way of mortgage would have to be registered (putting the arrangements into the public domain) or would otherwise become void. So HBOS proposed a trust structure under which legal title to the raw loans would remain with HBOS, but HBOS would declare that the benefit of the loans was held upon trust for Lloyds under a repo arrangement as security for the proposed facility. Such an arrangement could be kept confidential.

219.    The condition of the markets was at this time intensely febrile: even coordinated intervention by central banks had not prevented the collapse of another American bank. A desire to avoid the risk of provoking the markets into some uncontrollable action in the light of disclosed funding arrangements of a systemically important bank is entirely

understandable from every perspective. But the executive team at Lloyds still had to judge the merits of the transaction with which they were presented.

220.    On that matter Lloyds sought the advice of Linklaters. Their immediate reaction (based on an internal discussion between relevant specialists) was that the HBOS proposal gave rise to "material concerns about the structure and risks for Lloyds". Those concerns were:-

a)    the fundamental illiquidity of a trust interest in a pool of loans;

b)    the effectiveness of trusts over loans whose terms included a restriction on transfer without the borrower's consent;

c)    the difficulty in obtaining legal title to or the cash flow under the loans in the event of the insolvency of HBOS;

d)    the possibility that the trust arrangement *would* constitute a registrable charge over book debts in any event;

e)    the possible need to get regulatory approval given (i) the size of the proposed transaction (if looked at as a single advance) and (ii) the unusual circumstances.

The Lloyds team needed to address those concerns, to decide whether they or any one of them meant that the proposal had to be rejected, and to consider whether the risks identified in those concerns could be mitigated.

221.    This near instant response by Linklaters was elaborated in a telephone call soon afterwards during which Mr Tookey and Ms Coltman from Lloyds were able to fill in some of the background and Linklaters were able to give what a note of the conversation describes as "preliminary thoughts". Linklaters were told that HBOS had a big funding requirement, and that Lloyds as its potential acquirer was willing to help out and to contribute to a rescue package: hence the proposal it had received. Linklaters in turn went through their concerns. Amongst them were regulatory and disclosure issues. In that connection the note of the conversation records the following:-

> "Class 1 transaction - consideration is 25% of market capitalisation.. difficult to argue in ordinary course of business and would need shareholder approval to enter into deal… Would need to discuss with FSA (which they are) and with UKLA …. Obligation to disclose material contracts under the offer circular on HBOS…. Would need to put it to the board- in excess of normal authorities … [GEC] would need to sign off… Board sign off." [I have expanded some shorthand expressions].

Mr Barber of Linklaters was cross-examined by Mr Hill QC on the footing that this represented Linklaters' final and concluded advice to Lloyds. Mr Barber denied that that was so, given that his firm had only been instructed 2 or 3 hours earlier. He insisted he was identifying issues for further consideration, some of which would have to be resolved before others. In this I think he is right: Linklaters did provide a lengthy memorandum of advice later that weekend.

222.    There is one point in that preliminary advice that I should draw out, relating to the reference to "Class 1". Lloyds was a listed company. The Listing Rules required it to observe the principle that it must "act with integrity toward holders and potential holders of its listed equity securities". As an aspect of that, Chapter 10 of the Listing Rules sets out circumstances in which shareholders have to be notified of transactions to be entered into by a listed company which may change the shareholders' economic interest in the company. Sometimes the shareholders have to be notified and their approval sought ("Class 1"). Sometimes they simply have to be notified ("Class 2"). But the transaction will not be a notifiable transaction within Class 1 if it is of "a revenue nature [made] in the ordinary course of business". So the practical point being made by Linklaters was that if the second tranche of the Lloyds Repo was a Class 1 transaction it could not be entered into unconditionally without shareholder approval: and since that approval would take at least four weeks to obtain (requiring the preparation of a circular and the convening of a meeting) if the second tranche of the Lloyds repo was urgent then the transaction could not be entertained.

223.    That was the immediate question that had to be addressed. There was also a separate (and later) question: that was whether the Lloyds Repo (if entered) would have to be disclosed in the circular sent to shareholders relating to the Acquisition (which was itself undoubtedly a Class 1 transaction), either as a "material contract" or otherwise. In their preliminary advice Linklaters flagged this future question: and in the event prepared a Circular which did not make such disclosure.

224.    It was in the knowledge of these immediate and future questions and with the benefit of that preliminary advice that Lloyds considered the HBOS proposal. On 26 September 2008 the Lloyds team set about mitigating the risks to which Linklaters had referred. Instead of being a single transaction the facility was structured as a line of credit that could be drawn down in tranches each of which had, at the time of drawing, to satisfy the Lloyds risk criteria. There was a review by a team of 25 credit analysts and 2 senior sanctioners of each of the raw loans underlying the collateral that was offered for the initial tranche. A substantial proportion of the offered collateral was rejected. A "haircut" was applied to ensure a substantial valuation margin on the amount advanced (an "over collateralisation" of 133%). The term of each advance was limited to 14 days (not the 6 months sought by HBOS) with no commitment to "rollover": that period was selected so that if Lloyds decided not to renew and if HBOS defaulted on repayment then Lloyds could register its interest as a registrable charge within the 21 days limited for so doing (thereby protecting itself against the risk of that categorisation of the transaction prevailing in an insolvency). Although legal title remained with HBOS, Lloyds was granted a power of attorney enabling it to take specified actions in the event of default. Amongst these was the ability to establish the default market value of the security by selling the underlying loans (though this could not overcome any illiquidity problem). As so structured this was clearly not an "off the shelf" repo transaction: and Mr Parr of Linklaters thought the structure "not great from Lloyds' perspective".

225.    That work was continuing when, on the afternoon of Saturday 27 September 2008, Sir Victor was told by Mr Daniels he had been informed by Mr Hornby that HBOS could no longer access the SLS (for reasons that were not clear) and that, "if the situation were to continue, HBOS might not be able to open on Monday 29 September 2008 and would possibly need to be nationalised."

226.    In his oral evidence Sir Victor described his response to the news in these terms:-

**Approved Judgment**

> "..[HBOS] was having difficulty in accessing the central bank schemes at that time, and that seemed to be the logjam. Given that that was the logjam… I remember well, I walked round the garden three times thinking "What the heck can I do?". It was a bit like looking at two ocean liners about to collide, and you wanted to do something. But I decided on something I'd never done before: just to pick up the phone and see if I could get hold of the Prime Minister and tell him that it looked like a catastrophe was coming.
>
> Q: The catastrophe being that HBOS would run out of funds?
>
> A: That HBOS might not be able to open its doors on Monday morning. And please, you know, let's all bear in mind, the consequences of that for the rest of the UK banking sector would have been colossal. ….
>
> Q: And the gist of that conversation was that you were asking the government to ensure that there was funding available to HBOS?
>
> A: No. I was telling him what the facts were that had been disclosed to me and saying that I thought there was….It seemed to me that there were differences around the terms on… There were concerns, there were delays, there were problems around the terms on which the Bank of England would advance further funds to HBOS. I didn't know the detailed circumstances, but I thought the situation was incredibly serious and he needed to be aware of it."

Sir Victor was pressed with the suggestion that he was effectively asking for ELA to be made available to HBOS. But he denied that saying:-

> "The conversation was not that specific about the type of funding or any detail about the funding. It was simply putting the Prime Minister on notice…. that there was a crisis looming and he needed to be aware of it."

227. The next day on Sunday 28 September there was a Lloyds' board meeting. The course of events and the conclusions reached may be discerned both from the minutes of that meeting and from some handwritten notes made by Mr Kane (subject to the caveat that those notes are not comprehensive, will record those observations made in the course of discussions which interested him or which he thought important from his perspective, and will not necessarily record conclusions).

228. Mr Daniels informed the board that notwithstanding favourable market reaction to central bank proposal of a plan to rescue banks, liquidity had become more of an issue (particularly for HBOS) and had led to a tightening of wholesale funding. From Mr Kane's notes Mr Daniels seems to have linked this tightening to an analysis of liquidity, capital and impairments. HBOS had suffered an outflow of deposits (losing about £17 bn in 10 days). He informed the board that:

> "[HBOS] was working on a funding plan with the Bank of England but had had difficulty in accessing the Bank's special liquidity scheme for reasons which were not entirely clear. In parallel, it had become apparent that HM Treasury were becoming increasingly concerned about issues concerning Bradford & Bingley…. "

Mr Kane's notes suggest that at this point observations were made which he recorded in this way:-

> " 3 alts.
>
> 1. BOE changes collateral requirements
>
> 2. TR - lines available to all banks
>
> 3. one line esp. available to HBOS .. to complete transaction."

229.  It is possible to interpret this last note as meaning that there was some discussion around the possibility that HBOS would be given funding sufficient to enable Lloyds to complete the Acquisition. In his written evidence Mr Kane simply said he could not remember what item 3 meant. But in his oral evidence in chief he explained that these notes occurred in a section dealing with (i) the collapse of Bradford & Bingley disclosed in a telephone conversation with Shriti Vadera (the Minister for Business) that morning, and (ii) with a potential bid by HBOS for some Bradford & Bingley assets. Then in cross-examination he was asked again about the context of the quoted notes:-

> "Q: were you intending also to be describing what you think you were dealing with [in the quoted notes]?
>
> A: No, I think what I've said in my witness statement about that still stands I'm not entirely sure about that. I mean, if – given the changes that I made to the pre-and post bits of those three alternatives, I can only assume that this is some form of funding in relation to the conversation, or perhaps its general funding in relation to what's happening in the marketplace, funding issues. But what I have in my witness statement I still think is appropriate. "

In answer to a question from me he confirmed that the parts of the document before and after the quoted notes were dealing with Bradford & Bingley. I must, from this evidence and from the document itself, try and work out to what the quoted notes refer.

230.  In this part of the meeting two matters were being commented upon. First, HBOS's general funding difficulties. Second, the dire position of Bradford & Bingley, and the Government plan (disclosed in Ms Vadera's conversation) to sell off its branch network to a third party. Mr Kane's surrounding notes indicate that the board was being told that HBOS was being encouraged by the Tripartite to bid for this Bradford & Bingley branch network (probably because the resulting inflow of customer deposits would have eased

Approved Judgment

HBOS' own difficulties). The board minutes crisply record that Mr Daniels "briefed the board on HBOS's possible participation in this arrangement". So I think the "transaction" in respect of which it was possible HBOS would be granted an especial credit line was its bid for the Bradford & Bingley branch network (not its acquisition by Lloyds). I find that at this board meeting there was probably no discussion relating to the grant of emergency assistance to HBOS in relation to its general funding difficulties in order to preserve it for acquisition by Lloyds: on the other hand there is no doubt that the board was aware that it was anticipated that the BoE would provide, in some form, supportive funding to HBOS to enable it to maintain its position in the market.

231.    There was, however, discussion both about Lloyds' participation in a funding plan for HBOS and about whether, and if so in what form, the Acquisition should proceed.

232.    Focussing for the time being on the former, Mr Daniels explained to the board the possible extent of Lloyds participation in providing funding to HBOS but noted that

> " this was subject to a number of legal issues being resolved in particular with a view to ensuring that the group's position was properly secured. "

This was a reference to the second tranche of the Lloyds' Repo.

233.    As to the latter it is convenient to note that Mr Daniels identified four key issues:-

> "1.      Funding and liquidity - [HBOS] needs to resolve its funding difficulties, with assistance from the Bank of England. The bank's funding well but market pressures could eventually have an impact on the bank's own liquidity .
>
> 2.      The interplay between the equity and money markets …. the share prices of banks were under pressure which would have implications for the terms on which the [HBOS] transaction been announced
>
> 3.      The wider impact of the financial crisis on the economic environment …..
>
> 4.      A capital increase required serious consideration. This was what the market expected even though previous announcements by the group had indicated that this was not an immediate requirement ."

I shall return to those topics later. Meanwhile I will focus on the dealings between Lloyds and HBOS.

234.    As this consideration by the board was happening the structure and terms of the proposed second tranche of the Lloyds Repo were being settled. Before an advance could be made Lloyds' internal processes and its commercial requirements had to be addressed.

71

235.     As to commercial requirements, it was at this stage the stance of Mr Tate that (beyond the overnight lending and the £2.4bn first tranche) "we WILL NOT make an incremental penny of this secured facility available until we have a permanent solution COMMITTED by the authorities". In other words, from his perspective Lloyds should look for a commitment from the Tripartite to see any funding plan through and not to leave Lloyds in the lurch.

236.     As to internal process it is evident that the executive team wished to keep knowledge of the proposed arrangement within a restricted circle. The transaction did not therefore go through the normal governance structures and was not considered by two of the usual lower tier committees (being considered only at a higher level). It was, however, considered by the Wholesale & International Banking Division ("W&IB") and by the Legal, Credit, Operational Risk, Compliance and Finance Departments. At the W&IB meeting on 30 September 2008 the minutes record:-

> " W&IBCC did not consider this to be a bankable proposition in the normal course of business for the following reasons (albeit W&IBCC accepted that they may not be in possession of all the facts)
>
> - Existing exposure already exceeds prudential levels in the current market, absent external support.
>
> - There is uncertainty concerning the overall quality of HBOS's book.
>
> - The merger transaction is not consummated and will take months to come to fruition. If it falls away, we could be left in an exposed position.
>
> - Press reports indicate that HBOS's funding shortfall may be significant and could have been exacerbated by the announcement of a merger which would cause the banks to aggregate [Lloyds] and [HBOS] limits before paring them back.
>
> - Any new lending exposes the bank to refinancing risk. "

The "refinancing risk" referred to arose from the fact that Lloyds, even with the drastically shortened tenor of the repo, was providing 14-day money but it would itself be unable to raise that 14-day money in the market (because that market was closed). Lloyds itself would have to rely on overnight money: and that mis-match would breach Lloyds' internal liquidity ratios.

237.     The views recorded in these minutes were incorporated in a paper prepared for consideration by Mr Daniels, Mr Tate, Mr Tookey and Ms Sergeant in connection with sanctioning the extension of credit. The paper included the information that

> "UKLA have confirmed that the transaction is ordinary course and as such avoids the Class Tests. The Panel have confirmed that they have no objection. [Mr Tate] was speaking to the FSA

72

to seek their confirmation that they have no objection. A considered view has been taken that the transaction is not disclosable to the market."

238. The views of the UK Listing Authority had been sought by Mr Ross of Merrill Lynch, and he had communicated the outcome to Mr Barber of Linklaters on 1 October 2008. He in turn conveyed the information to Lloyds in these terms:-

"I gather UKLA have agreed [the Lloyds Repo] is ordinary course as it is a repo (Derek says they did not get into the details of its unusual features but he is confident that UKLA will not go back on this). "

The conversation appears to have been with Mr Teasdale, the Head of Listing at UKLA. From other material it appears that the UKLA considered that the transaction was a revenue one in the ordinary course of business, and the authority was prepared to waive any disclosure and approval requirements connected with the incidence and size of the Lloyds' Repo.

239.  The terms of Mr Barber's report to Lloyds provided a proper basis for Mr Hill QC to suggest to Mr Barber that UKLA may not have been fully apprised of the true nature of the transaction. Mr Barber strongly resisted the suggestion. Given that neither party to the relevant conversation (Ross/Teasdale) was a witness before the court the best I can do is to assess the probabilities.

240. Whether the Lloyds Repo was a Class 1 transaction was a difficult question, the answer to which was fundamental to the whole transaction: if it fell within Class 1 , the transaction could not in practice proceed, and nor could the Acquisition. Under the Listing Rules (in particular Listing Rule 8.3.3) a sponsor to the Acquisition (such as Merrill Lynch) owed a regulatory duty (reflecting in this instance also a legal duty) to exercise due skill and care in giving advice to a client about the interpretation of the Listing Rules. A sponsor would not want to be responsible for getting advice or guidance wrong: there would be every incentive to "lay off" that risk by obtaining a watertight UKLA approval. There would be no incentive to conceal material information from a regulatory authority (particularly one that formed part of a regime that was generally supportive of the transaction and of the Acquisition) if that might produce a challengeable approval. There would be every incentive to tell a generally supportive regulatory authority whatever it said it needed to know before it commented on the guidance that the sponsor intended to give. So the probability is that the UKLA was given as much information as it sought from Lloyds' advisers about the transaction before commenting upon it (which did not descend to the minutiae of the transaction, or the "detail" of the unusual features): so it was not misled as to the circumstances, and so far as the evidence shows the UKLA has never suggested that its categorisation of the Lloyds Repo was given on a mistaken basis. I am glad to reach this conclusion, because I would have been very reluctant to make an implicit finding of deception against a professional man like Mr Ross in his absence and based solely upon inference drawn from the terms of a document he did not write.

241. The evidence of the Defendants was that "the green light" given by the UKLA was not taken to absolve Lloyds from itself considering the class question. The documents suggest that this separate consideration occurred on more than one occasion. But it was

73

certainly done on the evening of 1 October 2008 in a telephone call involving Mr Tookey, Mr Cumming and Ms Coltman, and the Lloyds advisory team (Linklaters, Merrill Lynch and Citi) which focussed on whether the transaction (both the overall arrangement and the first drawdown) needed to be disclosed to the market generally as "insider information".

242. A note of the conversation records that the following material matters were addressed:

a)   The Lloyds Repo would be the largest that Lloyds had done;

b)   The transaction was "unorthodox" being characterised as "a very specialised liquidity support for HBOS";

c)   The transaction was on satisfactory commercial terms as regards both the balance sheet (were HBOS to default or were the Acquisition abandoned) and the profit and loss account (the return adequately reflecting the risk) such that if undertaken with any other counterparty there would be no issue requiring disclosure;

d)   Lloyds had taken into account the fact that the Acquisition might not proceed but remained satisfied with the transaction even in that event;

e)   Although the fact that HBOS was the target of an acquisition by Lloyds had reinforced the motivation to enter the transaction "the key point was that the terms of the transaction were the same as would apply with any other counterparty of a similar credit risk" and Lloyds may well have chosen to enter into the present transaction with a third party on the same terms "for genuine commercial reasons including… contributing to maintaining liquidity in the interbank lending market";

f)   If disclosed, the repo would be likely to be construed by the market as simply confirming Lloyds commitment to its offer for HBOS.

243. It must be accepted that these were honestly held views. They of course underpinned the conclusions (i) that the Lloyds Repo did not fall within Class1 and so (ii) did not require shareholder approval and so (iii) could proceed within a transactional timetable that would enable HBOS to securely fund its operations in the immediate future and so (iv) thereby enable HBOS to remain a worthwhile acquisition target without overt Government intervention. Furthermore, the arrangement afforded the possibility that HBOS might continue in that state (so long as it could continue to offer acceptable collateral). These were very highly desirable conclusions - both for Lloyds and for the Tripartite. So I can understand why Mr Hill QC should suggest to some of the Defendants' witnesses that the participants were "straining" to reach those conclusions (a charge they denied). But the issue is not whether they were conclusions which it was easy to reach, but whether the conclusions ultimately reached were honestly held and tenable by competent executives and competent board members.

244. The sanctioning decision had to be taken by Mr Daniels, Mr Tate, Mr Tookey and Ms Sergeant in the light of this guidance and knowledge. Mr Daniels was in favour of the transaction and considered it to be "ordinary course" in the context of the market conditions prevailing at the end of September if (i) it was on commercial terms that

were acceptable even if the Acquisition did not proceed (which he considered to be a risk); (ii) the collateral was rigorously assessed on each requested drawdown; and (iii) Lloyds' own funding and capital position was not endangered. Mr Daniels was challenged with the proposition that Lloyds would not have entered into the transaction if it was not for the context of the Acquisition. To this he responded:

> "….that's not necessarily clear… We are an interbank lender and this is something that is a normal part of any clearing bank…. We had interbank lines out to virtually every bank in the UK in virtually every one of the major banks across the world. "

The focus of that answer was not necessarily secured term lending and so Mr Hill QC rightly pressed the point, which was answered:

> "Q: You wouldn't have been lending this amount of money under these terms to this institution in the situation it was if it were not for the acquisition ?
>
> A: That's not completely clear … What we had said is that we wanted this to be completely arm's length, so in other words there was no guarantee that this deal was going to go through, so what we wanted to do was to make sure that we insulated Lloyds from that risk, and we would have done the same with any other institution. So it was priced by us, it went through our credit process, and we felt comfortable that, should there ever be a default, that we will be able to collect against it.
>
> Q: But Lloyds would not have chosen to expose itself to amounts of this size, to an institution in the circumstances, or to enter into a facility on these terms, were it not for the acquisition?
>
> A: Again, that is not clear…. Interbank lending is part of what we do – or …..what Lloyds did, and we had other interbank facilities with… virtually every other bank… The facilities were done for varying reasons, but they were all interbank lines… We were desirous of keeping HBOS funded until completion, there is no question about it, but we priced it at a commercial rate, we set the price and we were very happy with the return and, again, it was done on an arm's length basis …. "

245. Mr Tate also was in favour of the transaction, which he considered "unique" but nonetheless in the "ordinary course", albeit that the Acquisition provided a motivation for entering it. It was interbank lending which could have been extended on those or similar terms to another large financial institution which made a similar request.

246. Mr Tookey was also in favour of the transaction, having considered what he called "all of the ordinary factors" as well as

> "…specific factors such as the benefits in maintaining liquidity in interbank lending markets and a maintaining the supply of

> liquidity to HBOS ahead of the shareholder vote on the acquisition."

His evidence was that improving interbank lending conditions was an important objective of the Tripartite, aimed at reducing pressure on more volatile forms of wholesale market funding: but the fiduciary obligations owed by the board to the company meant that a transaction with HBOS consistent with the Tripartite's objectives had still to proceed on entirely commercial terms which could have been offered to another bank.

247.  Ms Sergeant (who until 2003 had been an Executive Director on the Board of the FSA) was the least enamoured with the transaction. She had already expressed disquiet about the first tranche of the Lloyds Repo. She now (on 1 October 2008) informed the other members of the sanctioning committee that she would "probably find it hard to form a positive view about this particular transaction without the wider context" because it seemed to her "to be part of a systemic rescue package". She went on:

> "If this is the case I would want the FSA to explicitly endorse the transaction and all its risks…… If we are under pressure from one part of the tripartite…. to carry out this transaction as part of a wider rescue operation then the FSA should be made fully aware of the risks we are having to take on behalf of [Lloyds] depositors and shareholders and explicitly endorse the transaction. From my reading of the paper they are being asked rather narrow technical questions…. rather than the big question over the appropriateness of the transaction and the risks associated with it both for [Lloyds] and the system as a whole."

I am satisfied that the assumption upon which this request proceeds (that Lloyds was being pressured by the Tripartite to enter the Lloyds Repo or to proceed with the Acquisition) is not well founded. Lloyds was approaching both the Repo and the Acquisition on the footing that each was an opportunity to be exploited for the benefit of the company and in the interests of its shareholders, and in doing so it was exploiting the willingness of the Tripartite to assist with the transactions because they achieved the Tripartite's own stability objectives.

248.  But she was in a sense right to think of the Acquisition and the second tranche of the Lloyds Repo as part of "a systemic rescue package". Despite the weekend worries, HBOS had opened its doors on the 29 and on 30 September 2008, *funding itself in the market*. That market knew that HBOS had no independent future; so for how much longer such funding would remain available was very uncertain. The very request being made of Lloyds by HBOS already evidenced the diminishing availability of other market funds. It was to cope with that decline (and to avoid the systemic threat posed by a disorderly collapse) that the Tripartite was embarking on supportive measures to facilitate the Acquisition. The second tranche of the Lloyds Repo had a function as a bridge to that secure funding. But it was not a loan made to "bail out" HBOS having no commercial or strategic benefit for Lloyds.

249.   In the light of the further information provided to her by Mr Tate, Ms Sergeant was prepared to sanction the Lloyds Repo provided two matters were clear:-

**Approved Judgment**

  a)  The FSA were fully aware, involved and supportive at the very highest levels-: ("I think we should have a final, very clear conversation with Hector Sants which is about the FSA's full understanding of the risks in the deal and the FSA's strong support for the arrangement").

  b)  The Lloyds repo would be the maximum contribution with the BoE providing the rest. (In the event the Lloyds Repo facility was not fully utilised).

250. Mr Tate made contact with the FSA. The result was recorded in a contemporaneous email in these terms:-

> "This is to record the fact that during the course of this morning and prior to extending any funds to HBOS… I spoke with Hector Sants, Clive Adamson and Simon Green. The overall purpose of the conversations was to obtain clear confirmation that each one of them, as individuals and as representatives of the FSA, were aware of the transaction and all of the circumstances surrounding it. Further, that they not only supported our extending the credit, but felt that they were encouraging the action and blessed it on every level (including the fact that it would not require disclosure in any respect, nor shareholder approval et cetera). [I]ndividual comments which might differentiate each would include
>
> Simon Green: confirmed that he… had been involved earlier than we had…. In actually designing the overall proposal, running the funding schedule, working up scenarios et cetera. Indeed, he and Mark accompanied me to visit Andrew Bailey at the Bank of England and "sponsored"/"vouched" for the proposal….
>
> Clive Adamson: all of the above, but added that he had been in direct conversations with the BoE after each of our meetings and felt confident that this was a "united" position on the part of "the authorities"…
>
> Hector Sants: Hector wanted it noted, explicitly and word-for-word, that "he was ABSOLUTELY involved, in every aspect of the transactions, and supported it the detail". He added that they were VERY keen to have the deal go through and, indeed, felt that "EVERYONE" was increasing (*sic*) committed past the point of no return.
>
> I would add to the above 3 that I spoke with Tom Huertas and JJ (head of markets), both in relation to Disclosure and liquidity, and each of them reassured me of the involvement as well. "

251. The Lloyds Repo was then signed off: Mr Andy Cumming (one of the authors of the original cautionary briefing note) also concurred in the sign-off. The total credit line was limited to £10bn available for drawdown in tranches. The first Master Repurchase Agreement was in the sum of £2.5 billion. There were 21 further repos, each subject to

its own scrutiny and assessment and to its own agreement. None of them exceeded £3bn. The peak drawdown under the facility never exceeded £6bn. On each occasion an assessment was made as to how far the Bank of England had got in providing a clear plan for funding (to HBOS or to Lloyds) through to completion of the Acquisition: Lloyds continued to have what Mr Tate described as "live and dynamic discussions" with the BoE about the sustainable solution up to completion. Only after completion of the Acquisition was the rigour relaxed and the interbank funding treated as intra-group lending.

252.    There is no doubt that all parties concerned (including BoE and FSA) viewed the Lloyds Repo as "ordinary course" lending for the purpose of observing Class 1 requirements: in consequence, it was not disclosed either at the time of the extension of the credit line or when the line was drawn upon.

253.    As a footnote (and a point to hold in the back of one's mind during the sections which follow) once the Lloyd's Repo was in place (and in the teeth of Mr Tate's insistence, noted above, that advances under it must be considered in the context of the Bank's commitment to a comprehensive funding plan for HBOS through to the Acquisition completion) the Bank began to link the availability of SLS facilities *to Lloyds* with the availability to HBOS of drawdown under the Lloyds Repo. In particular on the evening of 10 October 2008 (i.e. as the Recapitalisation Weekend opened) the Bank refused to make available SLS facilities to Lloyds, despite Lloyds having "headroom" under its then-current arrangements, unless Lloyds agreed to make funds available to HBOS. Like every other major bank Lloyds depended on the availability of SLS for its own liquidity.

*Due diligence*

254.    Prior to the Announcement some due diligence had been undertaken, based on publicly available information (principally the HBOS interim statement) supplemented by (i) Lloyds' own insights into its competitor and (ii) high level meetings undertaken on 17 September 2008 (which Mr Daniels acknowledged in evidence to be "the beginning of due diligence, not the end of it"). This material the board considered sufficient to justify the Announcement but insufficient to justify a properly founded recommendation to shareholders. For such a recommendation the board needed to assess the quality of HBOS's assets, to judge the risks of a deterioration in the HBOS balance sheet and to consider whether the agreed price for the Acquisition could be recommended to the shareholders. It was therefore anticipated that the due diligence process must continue.

255.    I indicated when dealing with the Announcement that the process of conducting detailed due diligence had already begun, but that it was not clear that the product was available to the board on 17 September 2008. The relevant parts of it are likely to have been available to the area specialists for them to take into account in their respective presentations to the board.

256.    This initial due diligence work had been undertaken by a team from Merrill Lynch. Amongst the matters upon which they commented were the following:-

    a)    the HBOS mortgage book had a higher risk profile than the Lloyds mortgage book (with 12% of the mortgages "self certified");

b)     the corporate lending was conducted according to a very different model (being "transactional" rather than "relationship-based");

c)     the corporate business included taking equity stakes in businesses ("private equity") and entering joint ventures through structured equity/senior debt/mezzanine debt packages;

d)     there was no information on forecast impairment numbers because enquiry on the subject was "dodged" by HBOS personnel, with the result that accounting policies on impairments, which "always look[ed] low" needed to be checked;

e)     there were potential incremental value adjustments on the corporate business of £6.6bn (including fair value adjustments on equity stakes of about £1 billion and on the corporate portfolio of an assumed £2bn).

Although Lloyds had negotiated a price which reflected a substantial discount to book value these remained matters that needed pursuing in the post-Announcement due diligence process. Mr Daniels acknowledged that a "robust due diligence" was important.

257.    To that end Lloyds assembled a team of 26 experienced risk and credit specialists to examine what was disclosed concerning HBOS' mortgage book, corporate book, retail book, treasury assets, international division, private equity and joint ventures (having together a book value as at 30 June 2008 of £533bn and being the assets most exposed to fair value adjustments and impairments).

258.    Mr Roughton-Smith described to Sir Victor in December 2008 the nature of the work undertaken in this due diligence process. In relation to the mortgage book the team applied Lloyds' own methodologies to the £170bn prime book and to the £65bn buy-to-let, self-certified and sub-prime book. In respect of the corporate book it adopted a sampling technique (and in this was assisted by the fact that HBOS had to provide ready access to all of those corporate loans that were being offered as security under the Lloyds Repo): about £30bn out of a total book of £120bn was sampled and the results extrapolated and discussed with the HBOS team. Further work could not be undertaken because of client and commercial confidentiality. In relation to the retail book of consumer loans and overdrafts (current and historic) the work showed that HBOS was performing better than Lloyds itself. In respect of treasury assets, the Lloyds team was provided with detailed asset level data and it reviewed prices on a statistically significant sample of 50% by value. In relation to the international portfolios there was a review of the management information and a series of discussions with local managers to discuss major exposures: this was the limit of what was possible having regard to client and commercial confidentiality. In relation to private equity the team was able to undertake a high-level review of the portfolio and brief reviews of the top six investments (which constituted 54% by value). Again further work was not possible because of client and commercial confidentiality: nor was it considered necessary because the Lloyds team assumed that most of that value would be written off. Work of the same nature was carried out on the joint venture portfolio, concentrating on the most significant packages and all those where Lloyds had its own insight into the joint venture and could therefore compare its work with that undertaken by HBOS.

259.    The results of this process emerged unevenly and over time. Initially HBOS was not cooperative in the disclosure process and it took until about 6 October 2008 before real progress could be made. The process was also affected by the global disintegration that occurred in the latter part of September 2008. Thus when the Lloyds board met on the 28 September 2008 it expressed its concern to ensure that any adverse developments in HBOS should not impact adversely on Lloyds' existing business or its shareholders, and decided that further consideration needed to be given to both capital and funding issues in the light of the outcome of the financial due diligence that was then current. This was, I consider, an appropriately cautious approach.

260.    Below board level and below the level of those who reported to the board some concerns were being expressed about parts of what was being revealed by this process. On 24 September 2008 Graham Taylor (who was the Deputy Director of Group Strategy and Corporate Development) emailed Mr Pietruska to comment upon what was emerging from W&IB regarding the corporate portfolio in the course of the due diligence process. This material had indicated that HBOS's risk appetite was far greater than that of Lloyds; that there was a very large real estate exposure; that the principal joint ventures were the residential construction, hotel and real estate investment fields (including to customers to whom Lloyds itself also lent); it had disclosed the private equity position; and it had suggested incremental fair value adjustments and additional impairments of some £3bn. Mr Taylor commented:-

> "We've set the context for the Financial Review exercise with our Risk people and they understand the need for a commercial approach and balanced judgement. However, it does appear that we will be looking at material adjustments to the level of negative goodwill we will generate and the prospect of further equity raising is real. Perhaps we could discuss because I can foresee a lot of problems here."

He was not alone in thinking that the W&IB material made sobering reading. Further equity raising is, of course, what ultimately proved to be necessary: and "a lot of problems" is what ultimately came to pass.

261.    Because of that there is a temptation to say that this opinion should at the time have been seen as significant and should have been communicated by Mr Pietruska or by someone else directly to the board, and that without the benefit of it the board would receive an inaccurate picture of the outcome of the due diligence. That temptation must be resisted. Mr Taylor's individual view was communicated to Mr Pietruska (on whom the board called for advice) and it no doubt was considered by him and informed the advice that Mr Pietruska gave to the extent he thought right. The material on which Mr Taylor was commenting was itself widely distributed within the core team (including to Mr Roughton-Smith), so other recipients will have evaluated it and taken it into account in their own work and reports to the board. The assessment of fair value losses and impairments was an ongoing work.

262.    Before recording my findings about the product of this work it is necessary to emphasise one feature of the process of assessing fair value losses and impairments. The outcome of the process is intended to provide adjustment figures to apply to current book values in order to produce sensible predicted valuations applicable at selected future points (in the instant case, as at the end of 2008 and, to the extent possible, the end of 2009),

Approved Judgment

for the purpose of using those predicted valuations as an element of planning other actions. Thus an anticipated fair value adjustment or an anticipated impairment may have an impact upon the calculation of RWAs which will in turn have a consequence on the capital required to maintain a regulatory or internal capital ratio. The outcome of the process will therefore reflect both an assessment of the quality of the asset itself and an assumption about the market in which that asset will be performing ("the scenario"). The eventual planned actions will take account both of the estimated fair value adjustments or impairments based on that scenario, and of the probability of the occurrence of the scenario itself.

263. Scenarios and the probability of their occurrence were considered in the context of Lloyds general business risk at a meeting of the Risk Oversight Committee on 6 October 2008. It was chaired in part by Sir Victor and in part by Mr du Plessis, and was attended by Mr Daniels and Ms Sergeant. When considering how things must have appeared at that time it is well to remember that during September 2008 the Treasury's official forecast for GDP *growth* still remained in the range of 1.75% to 2.25% for 2008 and continued to be 2.25%- 2.75% for 2009 (though it was widely expected that these forecasts would be cut.). Neither the length nor the depth of the recession that was to come was anticipated.

264. In contrast to the Treasury, Mr Patrick Foley, the Chief Economist at Lloyds, had already adjusted his planning scenarios. He worked with three economic scenarios.

265. His "base case" assumed that the credit crisis would continue to feed through to the real economy, but would not intensify sharply. Whilst businesses and consumers would react to this slowdown they would not change behaviour sharply enough to cause a recession. House prices would continue to fall through to 2008-2009. GDP growth would fall to 1.6% in 2008 but would grow again in 2009 and by 2010 would be back on its long-term trend.

266. Mr Foley's "credit crunch" (or "1 in 15") scenario assumed that the feed through of the credit crisis into the real economy would intensify sharply with businesses and consumers reacting by becoming increasingly cautious. This would trigger a recession in Q3 2008, though growth would only become negative in 2009. House prices would fall sharply, down 25% during 2008, with a knock-on impact on consumer spending. Business investment would fall by about 5%, and unemployment would rise. Recovery would not begin until 2010.

267. Mr Foley's "1 in 25" scenario assumed that the feed through of the credit crisis into the real economy would intensify sharply with lenders cutting back severely on credit availability in reaction to increasing default rates. Businesses and consumers would become much more cautious GDP would fall by up to 2.5% in 2009 (as compared with 1.4% in 1991). House prices would fall by 30% over 2008-2009, and share prices by a further 30%. Business investment would fall sharply and unemployment would rise to over 7% by 2010. A recovery would not begin until 2012.

268. In his paper for the Risk Committee Mr Foley expressed the view that there was a 40% chance of a "significant downturn" (his "base case"), a 30% chance of a 1990s-style recession (his "1 in 15" or "credit crunch" case), and 10% chance of a deep "1 in 25" recession, though he thought that (depending on market movements) the "base case" and "credit crunch" probabilities might "flip". The Minute of the meeting records that

81

the Risk Oversight Committee itself considered the current economic turmoil to be a "once in 50 (sic) years event". Having regard to the material that was before the Committee and in view of the events which followed I am not satisfied that this Minute records a considered decision as to the basis for future action which was intended to prevail over the view of the Chief Economist (rather than a non-technical observation as to the perceived seriousness of the position). It is convenient at this point to note that Mr Foley's "1 in 15" scenario was more rigorous than mainstream views and his "1 in 25" scenario was severe: the FSA in fact thought it "too severe" and more like a "1 in 60" scenario (and said so during the Recapitalisation Weekend).

269.    Scenarios and the probability of their occurrence were next considered (in the context of Lloyds' general budget and planning assumptions for its banking business) by a meeting of the Group Executive Committee on 7 October 2008. The meeting was chaired by Mr Daniels and included Ms Sergeant (who had both been at the preceding day's Risk Committee meeting). It was attended by Mr Tookey, Mr Pietruska and Mr Foley. Mr Foley had prepared a paper for the meeting setting out the latest iteration of his developing views. He commented that whilst the real economy had developed in line with the "base case", the financial markets had now developed more in line with the "credit crunch" scenario so that there was an increased risk of a recession. He currently (for the purpose of making "deliberately prudent planning assumptions") put the probability of the base case at 35%, that of the "credit crunch" at 35% and that of a "1 in 25" at 15%. The minutes record that

> "The committee agreed in principle to adopt the "credit crunch" scenario, subject to further review should the funding position improve. [Note – the committee received an update from Patrick Foley subsequent to the meeting suggesting changes to the base case scenario to take account of market events]."

270.    The "market events" to which the post-meeting note cryptically refers were the momentous Treasury announcements of 8 October 2008. The "update" to which the post-meeting note refers was an email from Mr Foley giving his first reaction to the Treasury announcement. His view was that the government package went a long way to address the issues of capital and funding which had underlain his assessment of an increased probability of the "credit crunch" scenario: so the probability of its occurrence should have fallen somewhat. He continued:-

> "However, my initial reaction is that this doesn't necessarily put us back on track for the base scenario. That will depend on (1) how the market reacts to the package and (2) how it impacts on confidence in the broader economy…. My initial reaction therefore is that whilst the probability of the credit crunch scenario has fallen, the shape of the base case scenario has also changed to be weaker than it was hitherto, and with lower interest rates. "

Shortly put, Mr Foley was now saying that the base case scenario was more likely than the credit crunch scenario (though what the relative probabilities actually were he did not state), but that the base case scenario itself had weaker elements leading to worse outcomes than he had earlier thought.

271. The Group Executive Committee met the following day to consider this post-meeting note. The Minute records that they

> "agreed to adopt these revisions to the base case scenario instead of the credit crunch scenario adopted the previous day."

The revisions were to the economic assumptions (about consumer spending, household disposable income, business investment, unemployment, inflation, house prices, base rates and so forth): these revised base case assumptions were called "the mid-case scenario". They produced outcomes that were more conservative than the then-current consensus view. It is not apparent to me that the probability of the occurrence of the mid-case scenario was adjusted above 35%. (A reduction in the probability of the credit crunch scenario does not necessarily lead to an increase in the probability of the mid-case scenario since the stated probabilities do not have to add up to 100% because of the existence of other possible outcomes over and above those selected for assessment).

272. Mr Foley confirmed in an email at the end of the day his view that a new base scenario (the "mid-case") was "now the highest probability outcome", and recommended that it form the basis for budgeting and planning: but he noted that the credit crunch scenario remained "a significant downside risk" although no longer the most likely outcome. He did not put percentages on the probabilities. Mr Daniels indicated that he understood that the "mid-case" should also be used in forecasts and for the purposes of dealings with HBOS: Mr Foley did not demur. Accordingly, instruction to use the mid-case scenario for forecasting purposes was disseminated, including to Mr Roughton-Smith of Group Credit Risk.

273. The Group Executive Committee next met on 10 October 2008 (the government having announced the recapitalisation). Such a recapitalisation had clear implications for the Acquisition, and these were the focus of the meeting. But in preparation for it Mr Roughton-Smith (on behalf of himself and Mr Graham Taylor) sent to Mr Tookey (having already advised Sir Victor and Mr Daniels late on the preceding day) a draft report from the Group Risk team on the impairments that were required as at 30 September 2008 (i.e. based on what was already known) and the forecast impairments for the remainder of 2008 and for 2009 prepared on the assumption of a "1 in 15 credit crunch" scenario (not the "mid-case" scenario). In addition, they reported on the fair value adjustments required to treasury assets (such as asset-backed securities, the "Alt-A" securitised loans, senior bank paper etc) in the last quarter of 2008 (but not for 2009, such a forecast being regarded as too speculative to be of value). The figures showed impairments for 2008 to lie in a range of £3.5-£5bn; and for 2009 to lie in a range of £6.5-£10.1bn. The FVAs for 2008 lay in a range of £6.2-£10.4bn. So the total adjustments to the HBOS balance sheet of £693bn on an assumed "1 in 15 scenario" were between £16.2bn and £25.5bn. These were (i) the total impairments required (not additional impairments over and above HBOS' own forecasts and provisions) (ii) provisional (because based on limited work) and (iii) stated at the pre-tax level (and so could be reduced by 28%).

274. These figures must have been considered because the minutes note:-

> "The committee considered a number of issues including… the requirements to carry out further due diligence on [HBOS] particularly in more adverse scenarios than currently being

applied. Particular care would need to be taken to ensure that the acquisition would not expose the group to an unacceptable level of risk, given the anticipated economic downturn. The committee agreed to continue with the acquisition process with a view to establishing whether revised terms could be agreed.. "

Any revised terms were intended to reflect both what had been disclosed in the due diligence process and also the intended Government support for the banking sector in general and HBOS in particular: and to this support I now turn.

*Government support for Lloyds and HBOS*

275.   On 16 September 2008 Mr Bailey of the BoE had assured Mr Tate that the Bank would provide sufficient liquidity to HBOS to enable the Acquisition to proceed, though he had not descended into any detail. He had also indicated that the enlarged group would be likewise supported. (It was this that lay behind Mr Tate's comment, noted above, concerning the circumstances in which advances under the second tranche of the Lloyds Repo might be made). So when Lloyds was considering whether to enter the Lloyds Repo Mr Tate prepared in consultation with his counterpart at HBOS a joint funding proposal. Mr Parr said (and I accept) that it was probable that during the course of these discussions the HBOS team indicated the great funding difficulties which HBOS faced, and their understanding as to the potential availability of additional central bank funding should such be necessary.

276.   A joint funding plan was consistent with the aims both of Lloyds and of the Bank. As Mr Tookey put it:-

> "…getting HBOS funded to the point of acquisition was in our interests in the context of wanting to put a transaction to our shareholders that we believed would enhance shareholder value. It would have been in the… nation's interest, without wishing to be overdramatic about it, because of the state of the market and the funding situation and general confidence in banks at that time. So I think we had a common perspective on these things, but my particular focus was on the ability of Lloyds to fund the enlarged group post completion…"

277.   This joint funding proposal was put to the BoE on 25 September 2008. In outline, it suggested an industry-wide solution to the severe difficulties being experienced by all banks (by pumping in extra liquidity and by extending the classes of eligible collateral under the SLS scheme); and in the alternative, it suggested that (i) Lloyds would create a "deal specific" facility of £10 bn for HBOS (the Lloyds Repo having not at this stage been agreed) (ii) the Bank should make an additional £25bn available to HBOS under the SLS scheme, and (iii) the Treasury should make available a facility of up to £60bn to be drawn upon if necessary. The first proposal was prescient (in that the BoE was in the course of implementing those measures and duly did so): the alternative proposal was not taken up, but the idea of the provision by the Treasury or the Bank of a special facility to assist in the Acquisition (in fulfilment of the indications given by Mr Bailey) was clearly put on the table.

278. That special facility (called at trial "ELA") was provided to HBOS on 1 October 2008. It is now known (though at the time known only to a tightly-knit circle of those directly involved) that on that day (i) the BoE Transactions Committee was informed of "the seriousness of the immediate position of [HBOS]" and that "[HBOS] might not be able to settle its outstanding positions today" and (ii) the Chancellor decided to authorise the grant to HBOS of an initial uncommitted facility of up to £10 billion (available in a succession of collateral swap transactions). The Bank of England Transactions Committee had noted that

> "the Bank would offer Treasury Bills in return for claims on a pool of underlying mortgages. Unfortunately, [HBOS] had not to date managed to complete the securitisation of these assets. In the interim period [HBOS] would declare a trust which would give the bank security in relation to those assets..."

The offering of Treasury bills for use by HBOS in the market differentiated this support from the immediate cash provided to Northern Rock.

279. The Treasury bills offered were from the pool created for use in the SLS scheme. The collateral offered by HBOS was a pool of mortgages that were already in the process of being securitised. The Bank was, in fact, prepared to consider lending against a much wider range of assets, but in the event HBOS was able to offer a total of four mortgage pools which afforded access to sufficient liquidity for its purposes. It was the nature of the collateral offered and of security interest taken (an interest under a trust of the mortgage pool) that took this lending outside the parameters of the SLS. Unsecuritised loans were not eligible in any of the bank's market wide operations - though securitised loans of similar quality were. (Indeed, 70% of the ELA collateral was eventually securitised and accepted into either the SLS or the Long Term Repo scheme). The mechanism of the facility (and the repo documentation itself) mirrored SLS, and the transaction followed a familiar procedure. The collateral was valued and the "haircut" assessed in the same manner as in the Bank's conventional market operations: the "haircut" averaged 48%, but varied with the quality of the underlying loans. (In the event, none of the collateral was ever realised because the ELA was repaid in full). The facility itself was for the term of one month, but each swap within it had a 14 day maturity, with the repo being renewable. The facility was therefore temporary and gave the Bank regular opportunities to review the necessity for and the scale and terms of it. At its largest the facility amounted to £25.4bn (about 4% of HBOS' funding requirement).

280. The chosen structure enabled the Bank to keep the facility covert. Because it took the form of a collateral swap the transaction was "off balance sheet" and so not visible in the Bank's weekly return: and because the Bank's interest arose under a trust and not a charge there was nothing that needed to be registered publicly. It is now known (but could not at that time have been known to those outside a small circle of Treasury and Bank officials) that the extension of ELA to HBOS was not reported to the Court of the Bank of England. The *"Review of the Bank of England's Provision of Emergency Liquidity Assistance"* prepared by Ian Plenderleith in October 2012 judged that the adoption of that course was reasonable given the need for secrecy and given that a number of members of Court of the Bank of England had potential conflicts of interest as a result of positions on the boards of other financial institutions. Neither the initial grant of ELA to HBOS nor its periodic extension was detected by the market or the

press. As the Plenderleith Report observed, since the structure of the ELA was very similar to the structure of SLS, the provision of additional Treasury bills to HBOS, and the use by HBOS in the market of those bills, was indistinguishable from liquidity provided under SLS, and the emergence of the recapitalisation scheme also provided "camouflage" for the operation.

281.   I should note one further point. The Bank could only extend ELA to an institution which it considered was illiquid *but not insolvent*. That was both an internal constraint and an external limitation imposed by European law (for otherwise the extension of the facility would constitute unlawful State aid). The Bank assessed HBOS to be a solvent institution with a temporary liquidity issue. That assessment must have focused upon the position at the time of each extension of support without looking far into the future: for I think it was recognised that HBOS could not survive as "standalone" bank for long. The assessment may have been influenced by a view that the Acquisition would complete and that HBOS would form part of a recapitalised Enlarged Group.

282.   The Government's proposal concerning the capital requirements of UK banks announced on 8 October 2008 was discussed at the meeting of the Lloyds' Group Executive Committee on 10 October 2008. The minutes note:-

> "These proposals presented issues concerning the group's plans for project [HBOS]. Various alternatives were under consideration but the committee needed to consider the impact of a substantial capital raising by [HBOS] on the viability of the acquisition project, since any such capital raising would require the group's consent, as well as the implication of [the Treasury] owning a substantial proportion of [HBOS's] share capital. The committee noted the alternative which was for the group to raise capital under [the Treasury] scheme and continue on a standalone basis. The choice recommended by the committee would be influenced by the price at which an acquisition of [HBOS] could be renegotiated, and the structure of any acquisition. The [HBOS] transaction on the right terms was a highly attractive transaction for shareholders. However, if a satisfactory outcome could not be agreed, then the alternative of continuing as a re-capitalised, stand-alone entity relying on organic growth, was also potentially attractive. "

283.   The application of the Tripartite's general proposals to each particular bank was to be discussed over the weekend following the announcement of the object that they be announced to the market before it re-opened on 13 October 2008. This tight timetable was only announced by the Tripartite early on 10 October 2008 and caused a degree of consternation. Lloyds decided to put in a proactive "bid".

284.   To that end Mr Greenburgh of Merrill Lynch prepared some material for consideration which was circulated (to Mr Pietruska and Mr Taylor amongst others, but not to Mr Tookey, Mr Daniels, Mr Kane or Sir Victor) under the subject heading "Pre-emptive Offering - Alternative Structures". These suggested structures had different starting points as regards the assumed fair value adjustments and excess provisions on the HBOS book that might need to be made, the assumed impairments and adjustments lying at the lower end of the range estimated by Mr Roughton-Smith on the "1 in 15"

scenario. (His latest work had estimated the range of impairments and FVAs for the second half of 2008 to be in the range £9.7bn-£15.4bn and for H208 and 2009 combined to be £16.2-£25.5bn). But, after deducting the assumed cost of new capital to be injected, each gave a negative net value for HBOS (ranging from £4bn to £10bn). The nub of the pro-active proposal was that the Government should nationalise HBOS for a nil consideration, should then inject £15.5bn into HBOS (and £5bn into Lloyds) and that Lloyds should acquire a nationalised HBOS for £15.5bn (i.e. a sum equal to the new capital, giving nothing for HBOS as it stood pre-recapitalisation). Deferred shares were to be issued to the original HBOS shareholders which would be extinguished on a £1 for £1 basis if HBOS incurred losses actually exceeded the estimated impairments and FVA, and otherwise converted into preference shares. Depending on various configurations the Government would end up owning between 66% and 48% of the Enlarged Group.

285.    The points upon which Mr Hill QC dwelt were that in these calculations (i) HBOS was treated as worthless and (ii) it is postulated that an injection of £20.5bn might not be sufficient to absorb all HBOS impairments and FVAs (hence the loss-sharing provided by the deferred shares).

286.    I have already noted that the Group Executive Committee met on 10 October 2008. Sir Victor, Mr Daniels, Ms Sergeant, Mr Tate and Ms Weir were amongst the members present. Mr Tookey, Mr Pietruska and Mr Greenburgh were amongst those in attendance. Mr Kane was a member of the committee who attended by telephone. The Minutes record that

> "the committee considered a number of issues including the
> implications of a potentially large HM Government shareholding
> in the combined group.."

287.    Mr Kane made some notes of what he heard of the meeting: he did not physically attend the meeting and did not have Mr Greenburgh's material. After identifying Mr Tookey, Sir Victor, Mr Daniels and Mr Greenburgh the notes read:-

> "Willing to go forward.
>
> But no value left in HBOS.
>
> Proposal - to go ahead
>
> a)      Nationalise - then we buy for new issuance £15 billion shares
>
> b)      a bad bank - we would pay more for good bank "

It was Mr Kane's evidence that these notes possibly represented the negotiating strategy being developed by the investment bankers, and that he was noting Mr Greenburgh running through a potential set of negotiating tactics. He did not accept that he was noting either his own or somebody else's concluded view that there was no value left in HBOS.

> "I don't think that's what that means. I think what that means is
> in terms of the negotiations at the current price there is no value

> left. So therefore he's probably constructed a set of scenarios from a negotiating point of view whereby the arguments could be taken into the negotiating room by whomsoever, and using those sort of arguments to renegotiate the price. That's what I think he would have been about."

288. I share Mr Kane's view that his notes do not record concluded views reached about the worth of HBOS, which were then omitted from the GEC minutes, but rather the presentation of arguments to be deployed in negotiation, designed to secure a level of Government support and to do so in a way that cut down on due diligence requirements. That is why Mr Greenburgh's analysis focuses on downsides (impairments) and ignores upsides (synergies and brand values); why Mr Tookey was not provided with the paper; and why the GEC continued to consider the Acquisition as a possibility dependent upon "the price at which an acquisition of [HBOS] could be re-negotiated". Mr Daniels also gave strong evidence that there was no discussion about the net value of HBOS being zero. My view that the surviving documents record an argument and not a conclusion is supported in some measure by the evidence of Mr Pietruska, Mr Tate and Ms Weir: though I do not place great weight on that evidence in view of its tentative tone.

289. I do not accept Mr Kane's suggestion that the negotiations in view were with HBOS over the price. I think that the negotiations in view were with the Tripartite as to the extent of the new capital which the Treasury could be induced to introduce so as to de-risk the transaction for Lloyds and cut down on the due diligence required. This interpretation is consistent with a later note ("...need deal with govt. not HBOS…") and accords with the evidence of Mr Daniels, Mr Tate, Ms Weir and Mr Pietruska (though it must be said that none of that evidence is very strong). It is also in line with what happened next.

290. What then happened was that Merrill Lynch prepared and (after review by Mr Wilmot-Sitwell of UBS, who had been co-instructed as investment bankers) submitted to the Tripartite, but without and subject to board approval, an "Indicative Conditional Proposal". This Proposal referenced both events since the Announcement and the identification of further substantial losses within HBOS, and it recorded the belief that HBOS would be greatly enhanced by the application of Lloyds' management approach and risk practices. The Proposal grounded itself upon the assumptions that for the period to the end of 2009 additional impairments and fair value adjustments of £17.5bn were required to HBOS's books, and that the enlarged group should have a Core Tier 1 ratio of 6.5% (rather than the 6% minimum). On that basis it sought (i) an injection of £17bn Core Tier 1 capital into HBOS, coupled with (ii) a loss sharing arrangement under which the Tripartite would bear 80% of any losses in excess of £17.5 billion (subject to a cap of £5bn). Lloyds would issue £4.5bn ordinary shares and £5bn of preferred dividend ordinary shares at a price of 189p per share to acquire HBOS (a total price of some £13.5bn). Lloyds itself would raise additional capital to reflect the increased risk profile resulting from acquiring the HBOS portfolio, namely, by the issue to the Government of £2.5bn of ordinary shares and £2.5bn of preferred dividend ordinary shares. The Proposal stated that in the absence of the Acquisition Lloyds would not propose a capital raise *of this extent* or Government involvement. (In fact, the calculations undertaken by Mr Greenburgh showed that on a "standalone" basis it was possible that Lloyds required £5bn additional capital if it aimed to reach a Core Tier 1 ratio of 7% by 31 December 2008, assuming a "1 in 15" scenario).

291.    The Indicative Conditional Proposal was of course the most favourable package for which Lloyds' negotiating team felt it could ask and could support with reasonable argument: it was one which, if accepted, could be presented in an attractive light to Lloyds' shareholders because it minimised the amount of new capital injected into Lloyds. The Indicative Conditional Proposal does not represent a "red line" below which Lloyds could not justify the Acquisition. Even so, there were voices within Lloyds which felt the Indicative Conditional Proposal itself did not go far enough in providing for anticipated losses within HBOS. It was again Mr Taylor who emailed Mr Pietruska to say that "… at £17bn pre-tax this is less than ½ what we think it could be on the one in 25 scenario…." (an indicator that sufficient work had been undertaken on that more adverse scenario to arrive at that rough figure). The Indicative Conditional Proposal was in any event dismissed by the Government immediately.

292.    It cannot be said that the Merrill Lynch preparatory papers or the terms of the Indicative Conditional Proposal demonstrate a recognition by the individual Defendants (or even an awareness by the individual Defendants of the possibility) that HBOS had no value or that even an injection of £20.5bn of capital into the Enlarged Group would be insufficient to avoid a further capital raise. They were arguing for a result, and marshalled the figures that support the desired result.

293.    Thus Lloyds started the Recapitalisation Weekend knowing that matters would be settled before the market opened on 13 October 2008, and soon learned that its own proposals were not acceptable to the Tripartite.

Knowledge of ELA

294.    Before turning to a consideration of what were intended to be the permanent solutions implemented during the Recapitalisation Weekend I should record my findings concerning the knowledge of the Lloyds directors and executive team about the interim ELA facility extended by the Bank to HBOS. Like SLS the extent and terms of the facility were confidential to the Bank and HBOS: but unlike SLS the very existence of this bilateral facility was kept secret (for reasons which the Plenderleith Report later considered were entirely reasonable having regard to the fragility of the market). However, because of the potential Acquisition and the cooperative approach to the funding of HBOS (where the funding plans developed by HBOS with BoE were shared with Lloyds in order to facilitate drawdowns under the Lloyds Repo), Lloyds was in a position different from the market in general, and some of its personnel knew directly or indirectly of the special facility.

295.    Paragraph 11(a) of the Re-Re-Amended Defence (served on 3 August 2017 and endorsed with a Statement of Truth) contained an admission that "the Director Defendants had knowledge…that…HBOS was accessing ELA from the Bank of England…". However, the witness statements which had by then been served disclose a more complicated position, as emerged at trial.

296.    Mr Tate was aware that HBOS had access to a further funding scheme enabling it to use a wider category of assets as collateral than was eligible under SLS or the LTRO. This scheme was not called (nor did he think of it as) "emergency liquidity assistance". It was referred to as "Project Package" or "Fox", and Mr Tate thought of it as "the BoE secured facility". He first referred to it in an email which he wrote on 6 October 2008 (emphasising that further drawdowns under the Lloyds Repo were dependent upon the

BoE's providing a "clear plan for funding through to completion"). In that context he noted that the BoE was providing extended collateral and enquired whether they were agreeing "that the "secured" facility will make up the difference". From 15 October 2008 Mr Tate received from the HBOS team weekly spreadsheets setting out the short term tactical funding plan, containing details of HBOS' funding requirements and anticipated sources (on a range of different assumptions). Such sheets went also the Mr Bailey at BoE. Alongside SLS and LTR these referred to "Project Package" or "Project Pre-Package" or "BOE Bridge Facilities" as contributing a small element of the overall funding requirement of £681bn. Some of the spreadsheets showed that as at 31 January 2009 there would be no utilisation of such "Package" or "Bridge" sources. Mr Tate was clearly aware that from early October 2008 there was a bilateral special arrangement between the Bank and HBOS to alleviate the latter's funding difficulties.

297. Mr Short also knew about "Project Package" and knew that this was BoE funding provided to HBOS outside the SLS and LTRO schemes: his understanding was that this was because HBOS did not have sufficient collateral eligible for SLS and capable of being securitised within the necessary timescale. So he also was clearly aware that this was a bilateral special arrangement between the Bank and HBOS to alleviate the latter's funding difficulties.

298. In his written evidence Mr Daniels acknowledges being told by somebody that the Bank was providing liquidity to HBOS outside the strict requirements of SLS and that the information should be kept confidential. When cross-examined on this evidence he explained that he thought that the provision was by way of an extension of SLS rather than a separate facility. In his oral evidence (when being questioned about the events of 3 November 2008, to which I will come) he also said that he believed that the board as a whole knew the position.

> "Q: So far as you are aware, were all the board aware of the fact that HBOS was by that stage being kept going by ELA?
>
> A: That, I believe that the board was fully informed of ELA…
> Q: did you consider that the board took into account the fact that HBOS was dependent on ELA when it made its recommendation?
>
> A: I believe so ."

The evidence of other board members contradicted this evidence of Mr Daniels.

299. Mr Tookey became aware in early October that HBOS had received a line of funding outside the strict requirements of SLS, the source of this knowledge being Mr Daniels or Mr Tate: this line was not referred to as "ELA", and the specific framework within which or programme under which the funding was made available did not at the time seem to him to be material.

300. Mr Pietruska acknowledged in his evidence that he was aware that the Bank was granting a bespoke bilateral facility to HBOS: but it did not strike him as "emergency liquidity assistance" either.

> "… ELA was effectively an SLS by another name, where rather than having securitised assets that were eligible collateral, you basically have the underlying assets in non-securitised form to fulfil the same function."

301. Ms Weir could not recall whether she was aware of ELA or not, but thought it was common knowledge that HBOS was making extensive use of all the different funding sources that were available.

302. Sir Victor had become aware on 27 September 2008 of an impending funding crisis at HBOS and he had telephoned Gordon Brown to alert him. In cross-examination it was put to Sir Victor that the gist of the conversation must have been that he wanted the Bank of England to make some individual facility available to HBOS: but he denied this, saying that he was simply putting a very serious concern before the Government without looking at possible solutions, leaving them to the Prime Minister and his advisers. HBOS did open its doors on 29 September and thereafter Sir Victor accepted (i) that he must have known that the situation was unlocked somehow or another and (ii) that it was improbable that Mr Daniels should have kept from Sir Victor (as confidential information) the fact that HBOS was receiving a line of funding outside the strict requirements of SLS. I find that Sir Victor did know that HBOS was accessing a source of liquidity outside SLS.

303. Mr Kane said was not aware of the grant of ELA. Mr du Plessis was under the impression that BoE was providing support to HBOS (as it was in relation to Lloyds and a whole number of other banks): but he could not now recall whether he was aware of anything different in the arrangements between BoE and HBOS. The evidence of Dr Berndt was that he understood HBOS was in an emergency situation and would utilise all sorts of funding made available by central banks, but he did not recall being given a precise breakdown of the exact schemes in fact being used "because in the total scheme of things it is a detail, it is not one of the fundamental questions that have to be asked".

304. This then was the evidence in detail. But the admission in the Defence of knowledge by the Defendant directors of ELA stood unamended throughout the trial.

305. So going into the Recapitalisation Weekend the key members of executive team at Lloyds believed that the main drivers behind the Announcement remained valid, but knew that the financial environment had continue to deteriorate, and that their own due diligence processes had identified the need to make allowance for further impairments or adjustments, estimating the range of those on a "1 in 15" scenario at £16.2-£25.5bn and on a "1 in 25" at something over £34bn. The "1 in 15" scenario had a probability somewhere around 35%, and the "1 in 25" a probability of 15%: but the most likely outcome was anticipated to be a downturn milder than a "1 in 15". They knew that HBOS was in the meantime receiving special Government assistance to overcome liquidity pressures.

The Recapitalisation

306. The purpose of the Recapitalisation Weekend was to enable the Tripartite to give concrete form to the statements of general principle which it had made on 7 and 8 October 2008 and to announce those specifics before the market opened on 13 October 2008. Specifically the Tripartite was seeking to determine how much capital each bank

would require (i) to remain above prescribed minimum capital ratios given the losses and increases in RWAs which were calculated to occur in an assumed stressed scenario of a severe economic downturn and (ii) to continue to lend into the real economy in that assumed stressed scenario. In short, to render the banks "bullet-proof". It was hoped that these measures would restore the markets to normal functioning: and that the resumption of normal market functioning would reduce funding costs. The Tripartite had modelled a scenario in which reduced funding costs enhanced the return on equity enough to eliminate in the medium term the dilutive effect of the new capital issued.

307.    Mr Sants gave some insight into the process in a letter which he wrote on 28 October 2008 describing the key factors as:-

> "1. Ensuring that the amount of capital for each institution would sustain confidence in that institution .
>
> 2. Ensuring that each individual institution would be able to have a sufficient Core Tier 1 capital, even after absorbing losses that might ensue from a severe recession….
>
> To ensure consistency the FSA used a framework which had a number of variables, the most important of which was that, by the end of 2008, each individual institution had to have a total Tier 1 capital of at least 8% and that their Core Tier 1 capital, as defined by the FSA, had to remain above 4% after the stressed scenario and above 6% on the company's central case forecast…
> "

308.    Thus prior to the Recapitalisation Weekend the FSA's Executive Committee agreed the macroeconomic assumptions (reflecting a severe but plausible global economic slowdown modelled over 5 years) which would be used in the common stress testing exercise ("the Stress Assumptions"). Then the regulatory capital experts within the FSA together with each bank's FSA supervisor would apply the Stress Assumptions to that individual bank's balance sheet supplemented by the material gathered by the bank's FSA supervisor in the course of the continual monitoring of its liquidity and capital position under its Supervisory Review Evaluation Process (what Mr Sants called "the data we had in the building"). The FSA was later to refer to this as "weightings tailored to …specific institutions". The outcome was not the product of a mathematical calculation but included an element of judgment. The outcome was then shared with each bank. It was intended that each bank should then have the opportunity to proffer updated balance sheet data (and the FSA would decide whether it was appropriate to incorporate it in its modelling). Once the amount of the new capital to be raised had been determined there would necessarily follow discussion as to how it could be raised (by management action such as disposals or a reduction in the RWAs, by accessing the market, or by using the Treasury programme).

309.    The amount of capital to be raised by a "standalone" Lloyds was determined to be £7bn.

310.    In his oral evidence Mr Sants accepted that the FSA could not insist on an arbitrary "new capital" requirement, saying

> "We could choose to apply an amount of capital as long as the process to arrive that amount was justifiable and rational. That could include a judgemental element in relation to market confidence if we chose to. So it is not a mathematical calculation: it is a mixed mix of maths and judgement."

He went on to explain that the Stress Assumptions were not debatable by the banks:-

> "[T]here was a set of macroeconomic assumptions put in the stress test i.e. housing would go down X percent. Those were not debatable by the banks because they were the scenario that we, the FSA, supported by the authorities, had chosen to apply. They're not a forecast as to what was going to happen to the United Kingdom economy; it was a choice of the stress that we were going to apply… But that stress obviously is then applied to the bank's balance sheet, and we were, in the circumstances we were in, seeking to continuously monitor the liquidity and capital position of the bank. So the supervisors did have data on the state of a bank's balance sheet, as it were, in the building… and therefore once they had been given the parameters by the executive committee, they then applied that stress to the data they had in the building."

311. But some areas were up for discussion:-

> "[I]f a bank wanted to offer a more up-to-date data or say that we somehow or other – if we had made an actual arithmetical mistake – it's relatively unlikely, but it's possible; these are very very complicated models to work through, everybody was doing it in a very stressed environment. So if a bank had either fresh data or felt we applied our stress incorrectly to their data, then they could inform us of that, and it was the decision of the FSA whether to accept that new data or that perspective or not."

312. The proposal for the recapitalisation of Lloyds emerged in this way. It had been part of Lloyds' planning that (even absent the Acquisition) it needed additional capital, though it was initially anticipated by Mr Tookey that this could be raised through management action. When the Announcement was made there was a view in the market that, because of possible provisions for impairments and FVAs Lloyds would need to embark on a capital raising exercise. A note from Credit Suisse on 25 September 2008 put the suggested amount at £10bn: one from Deutsche Bank the same day put it at £4.5bn. As the Indicative Conditional Proposal acknowledged the Lloyds executive team also accepted that whether or not the Acquisition proceeded a capital raise was required (though they thought it could be argued that more was required if the Acquisition proceeded than if Lloyds remained a "standalone" bank). So following the Government announcements of 7 and 8 October 2008 and before the start of the Recapitalisation Weekend the Lloyds team (Mr Daniels, Mr Tate, Mr Tookey and Ms Sergeant) met with the BoE and the FSA and discussed a provisional estimate that Lloyds would need about £5bn additional capital and the combined entity about £17.5bn additional capital (though which entity was to take what portion remained to be determined). In the light of those preliminary discussions the Lloyds team considered the internal preparatory

paper put together by Mr Greenburgh, and formulated and then prepared and submitted the Indicative Conditional Proposal. This was rejected at about 4.30pm on 11 October 2008. The Tripartite was not prepared to let Lloyds take over HBOS (as entirely recapitalised with Government money) and at the same time waive all competition considerations.

313.    At 5.00pm on 11 October 2008 Mr Fennell (the Head of the Major Retail Groups Division at the FSA) sent to Mr Gilbe (Head of Capital at Lloyds Group Corporate Treasury) a document called "The aggregate stress summary" which contained the stress assumptions and the calculated stress figures being used for Lloyds. It would not assist clarity were I to set out the Stress Assumptions (which consist of percentages and acronyms). Nor are the calculated figures resulting from the application of the Stress Assumptions illuminating, because there are no workings to show the underlying figures derived from Lloyds balance sheet or from "the data within the building" to which those Stress Assumptions were applied and which resulted in the calculated figure. But the result was that it appeared that in the scenario contemplated by the Stress Assumptions Lloyds needed to raise additional Core Tier 1 capital as a "standalone" bank sufficient to cover £6.494bn of adverse adjustments (of which £3.56bn resulted from losses, impairments and valuation adjustments, and £2.934 resulted from increased RWAs).

314.    Mr Hill QC submitted (in my judgment, correctly) that of itself this document does not conclusively demonstrate the need to raise *additional* capital of £7bn: the document might show "raw figures" which would then need translation into capital adjustments. But the "aggregate stress summary" is the only document available within the proceedings relating to the calculation of the capital requirement for a "standalone" Lloyds. If there was some other element in the calculation then no surviving document records it. It is common ground between the experts that it is not possible to "reverse engineer" the process to identify the figures on which the FSA must have been working to reach the required capital raise.

315.    The "aggregate stress summary" was seen at the time as highly significant; Mr Roughton-Smith was tasked with putting together a team seeking to understand and analyse the FSA numbers, whilst Mr Tookey contacted the Lloyds' Supervisory Team at the FSA seeking further information and offering to participate in a detailed discussion. Neither resulted in any additional light being thrown on the requirement. In the course of his calls (and later in e-mails) Mr Tookey told the FSA that Lloyds own "capital needs" assessment indicated that "standalone" Lloyds needed to raise only £3bn additional capital to ensure a Core Tier 1 ratio of 7% at the year-end in 2009 on a "1 in 15" credit crunch scenario. (The £3bn may understate the requirement because the supporting spreadsheet showed that this figure assumed no dividend in 2009 which was the equivalent of adding another £1bn to capital). In the evening of Saturday 11 October 2008 at the request of the FSA Mr Roughton-Smith sent to Mr Fennell some figures derived from his own modelling on the "Q3 MTP stress test". It is now not clear what this "stress" was: it may have been the Lloyds "credit crunch"/"1 in 15" scenario, or a slightly more negative version of it. Nor is it clear how it related to the FSA's severe downturn (or "worst shock") scenario: although it does appear (i) that the FSA "worst shock" approach assumed the simultaneous occurrence of all adverse events (and then added a further margin), whereas the Lloyds' modelling took account of events emerging over time; and (ii) that the FSA "worst shock" made more severe

94

assumptions in the specific areas of residential and commercial property markets, assuming a 50% "peak to trough" fall whereas Lloyds modelled a 32% fall. At all events the figures were at variance with those produced by the FSA on its scenario, with some differences arising from the tax treatment of impairments and losses, which reduced the FSA's £7bn requirement to about £4.5bn.

316. Neither Mr Roughton-Smith's efforts nor Mr Tookey's efforts yielded fruit. On the morning of Sunday 12 October 2008 Mr Sants telephoned Mr Daniels and told him that Lloyds had to raise £7bn in additional capital as a "standalone" bank, and that the capital requirement for the Enlarged Group would be an additional £17bn of which Lloyds would be required to raise £5.5bn and HBOS £11.5bn. If HBOS remained a standalone bank then it required £12bn. Mr Daniels described these requirements as "a completely different order of magnitude than what we expected". £7bn was equal to 60% of Lloyds' entire market capitalisation at the Friday closing share price. The numbers were indeed at first glance odd. Given the size and nature of Lloyds' asset base and the much larger, higher risk profile HBOS book, it was curious that Lloyds had to raise £7bn but HBOS only £12bn as "stand-alone" banks; and further that introducing the HBOS high-risk book into the Enlarged Group actually reduced the amount of capital required from Lloyds.

317. Of course, simple comparisons such as that might well be misleading. The variance may, for example, depend upon differing views taken by the respective FSA Supervisory Teams as to the level of provisions already made by the respective banks; or the extent to which the consequence of an internal ratings-based approach to valuing RWAs differed from a standardised approach in a stressed scenario; or how the incremental impact of a severe recession in which all stresses occurred simultaneously (as opposed to the economic model currently used for a particular bank) differed; or upon how the proportion of business exposed to a general vulnerability to a downturn in the UK economy (as opposed to the proportion of business exposed to calculable risks arising from specific lending structures) produced different requirements; or the impact of any insurance business element; or whether it was thought that Lloyds' management techniques would reduce anticipated losses on the HBOS book in the scenario of an enlarged group. The Defendants' expert Mr Sharma noted, for example, that from publically available information it could be demonstrated that Lloyds had a much higher proportion of "credit risk RWAs" to total RWAs than its peer group: of course he could not say that that feature *did* affect the additional capital required, and I do not find that any of the possible factors advanced in evidence (some of which I have listed above) were actually in play in the assessment of the Lloyds capital requirement. We cannot now know because it is impossible to derive the requirement for £7bn from the document that survives (and there is no equivalent material relating to the requirements for the Enlarged Group or for a "standalone" HBOS).

318. The nuanced position of Mr Sharma (from whose expert report I have drawn most of the possibilities outlined above) was summed up in this way:-

> "Q: The gist of your evidence, as I think you've just said, is that
> there are various possible factors which mean it's possible (but
> no more than that) that the stress test gives this outcome where
> the less risky bank (Lloyds) is required to have more capital than
> the more risky bank (HBOS)?

A; Yes, I would have characterised it as plausible rather than merely possible.

Q: We have been through the possible factors or explanations that you identify, and none of them are likely, are they, to explain why Lloyds should have a higher "standalone" requirement than HBOS?

A: In my view, when I look at the totality of the explanations that I provided… they to me make the outcome of the stress tests entirely plausible. I can't go the stage further and say that I can take my explanations and use them to build an actual model for Lloyds and HBOS, and prove or disprove as a result of that. "

319. Mr Sharma went on to say that he had examined all of the inconsistencies suggested by the Claimants and all of the other potential inconsistencies that occurred to him, but was unable to conclude that they were in fact truly inconsistencies and had therefore concluded that the £7bn capital requirement for Lloyds was in fact probably consistent with a £12bn capital requirement for HBOS and a £17bn capital requirement for the Enlarged Group. I do not need to (and do not) follow Mr Sharma to this positive conclusion. It is sufficient to find that is clear (i) that the impact of stress tests embodying common macro-economic assumptions may have very different outcomes when applied to individual banks; but (ii) that the outcome in the case of Lloyds was open to challenge and merited discussion.

320. Mr Daniels recalls seeking an explanation, but being told that the figures were not up for discussion. His written evidence records:-

"I then told [Mr Sants] that I wanted to talk to him about reducing both the Lloyds standalone capital number and the Enlarged Group's capital number, as we could potentially raise capital either through certain disposals or through other sources. He told me that there was no time to have these discussions because the FSA wanted an announcement to be made about the recapitalisation of Lloyds and HBOS before the markets opened the next day. If we wanted continuing access to SLS, we had to proceed in accordance with the FSA's instructions, and we could then discuss any issues later after the recapitalisation announcement was made."

Mr Sants confirmed this both in his written and in his oral evidence. Mr Daniels did not challenge the FSA's maths (as is common ground he could not simply on the basis of Mr Fennell's stress template). Accordingly, Mr Sants explained in his supplemental statement:

"…what I was saying was that the way the capital was to be raised was discussable… Whether or not that capital was going to be raised from the market, by share issuance, whether it was going to be raised by government money or whether it was going to be raised by disposals was discussable. So the methodology of raising was discussable and the way the FSA would assess

whether the plan being put forward was feasible would obviously be exercising judgement. So my role here was to engage in those conversations around the methodology of the capital raising…. The amount of money had been calculated: I was open to discussion as to how that money was being raised… The amount of capital… that the standalone Lloyds at that time had to raise was not discussable. What was discussable was how it was being raised, and therefore whether all of it had to be raised as external capital from shareholders...”

321.    Mr Hill QC tested Mr Sants many times on this passage of his evidence. But his answers were consistent.

"Q: Well, you were open, weren't you, to discussing the amount of capital injection actually required?

A: No. Sorry. I think you misunderstood what I just said. Were you clear what I just said? I said the amount of money had been calculated; I was open to discussion as to how that money was being raised. ”

Again:

"All I can tell you is what I've told you now a number of times: that unless they pointed out to us inaccuracies in our calculation, the amount of capital that… the standalone Lloyds at that time had to raise was not discussable. What was discussable was how it was being raised, and therefore whether all of it had to be raised as external capital from shareholders. That is the way it was.”

Again:

"… [So far] as I was concerned, he could engage with me either to point out factual inaccuracies by the team, in which case obviously as the chief executive I had responsibility to engage with that – he did not do that – or he could engage with me around the questions of judgement which were principally focused on how the capital was to be raised. I was certainly taking responsibility for those questions of judgement…. He may well have chosen… to continue to want to return to some earlier questions, but that doesn't mean I was in any [way] open to returning to those earlier questions.”

322.    I accept this evidence as capturing the FSA's attitude during the recapitalisation weekend. I can see no purpose in Mr Sants insisting in evidence that he and the FSA were more inflexible and less open to reviewing their decisions than in truth they were, particularly where their original decision is not evidenced by any document setting out the reasoning that led them to their stated view.

323.  Mr Hill QC also put to Mr Daniels that the £7bn capital requirement was itself negotiable (not merely *how* that £7bn should be raised).

> "Q: If in that discussion on a standalone basis it had become apparent there was no good justification for the FSA 7 billion figure, then obviously your discussions were likely to be more fruitful, weren't they, in negotiating the amount of capital?
>
> A: That… We had no expectation. I was hopeful but to say that we had an expectation of their being fruitful - I think that would be overegging the case."

324.  The premise of the question (that it would become apparent that there was no good justification for the £7bn figure) is not one that can be established on the evidence. It is understandable why the capitalisation for the Enlarged Group should be lower than the aggregate of the capital required for two stand-alone entities: because of (i) synergies (ii) the application of the superior Lloyds' management techniques to the HBOS book (iii) the beneficial effect of Lloyds credit rating (iv) the elimination of the "credit risk" element of RWAs on what would become intra-group loans (where the counter-party risk no longer existed): and (v) the simple timing point that the peak capital requirement for Lloyds would not occur at the same time as the peak capital requirement for HBOS (which straightforward aggregation assumes).

325.  What is not so readily understandable on the information available is (i) why the absence of the synergies available to Lloyds as a component part of the enlarged group and the persistence of the "credit risk" element of RWAs leads to a "standalone requirement" so significantly in excess of that required as part of the Enlarged Group: and (ii) why (in the absence of knowing the precise scenarios used in the modelling) there is an evident disparity between Lloyds' internal assessment of capital required and that estimated by the FSA.

326.  On bare figures (based on data available on 15 October 2008) Lloyds had a pre-recapitalisation Tier 1 ratio of 8.6% (the same as HBOS and lower than most of its peer group). With a £7bn capital injection it would have had a Tier 1 ratio of 13% (the joint highest of its peer group) and (if the new capital was raised as planned through ordinary and preference shares) a Core Tier 1 ratio of 8.5% (compared with 6.4% as part of the Enlarged Group and the 6.8% Core Tier 1 ratio of an HBOS recapitalised with an additional £12bn). One must exercise considerable caution about comparing Lloyds with its peer group, because (i) there was no common agreement as to what precisely "Core Tier 1 capital" was and different banks assessed it differently and (ii) Lloyds' undertaking the Acquisition meant that its accounting treatment would differ from that of its peers. But on a more limited comparison one could certainly say that since the quality of the Lloyds asset book was higher than that of the HBOS asset book (and might therefore be less vulnerable in deteriorating conditions) one might in a general sense have expected the recapitalisation requirement of Lloyds to be proportionately lower than that for HBOS: but at £7bn it was not.

327.  However, one cannot conclude from those considerations that in mid-to-late October 2008 it could be demonstrated by Lloyds that the FSA requirement of £7bn for Lloyds was arbitrary or irrational such as to compel an immediate concession of a significant reduction. (That of course is the question: not whether months later in judicial review

proceedings irrationality could be established, as the Claimants plead in paragraph 107(10) in their Re-Amended Particulars of Claim). With the benefit of knowing things about HBOS that were not known to Lloyds at the time (e.g. that HBOS was under-recognising impairments or not correctly assessing its RWAs) and with the benefit of knowing what in the event happened (e.g. the true extent of HBOS' losses in the actual recession that occurred) it is possible to demonstrate that the relationship between the capital requirement for HBOS and that for Lloyds was disproportionate. But that disproportion might be because the assessment of the capital requirement for HBOS was flawed as being too low. What Lloyds would have had to persuade the FSA of during the Recapitalisation Weekend was that on the FSA stress scenario the Lloyds requirement was too high.

328.   As Mr Hill QC submitted there was some material available. The requirement to raise an additional £7bn entailed Lloyds having a higher capital ratio than any other UK bank, with a Core Tier 1 ratio of 8.5%. (as compared with 6.8% for a standalone HBOS). This was surprising given that Lloyds had a more conservative lending policy (and a higher quality book that was probably less vulnerable to deteriorating conditions) that ought to have been reflected in a lower capitalisation requirement if a consistent stress testing framework was applied across all banks. It was also surprising given that the market seemed to have more confidence in Lloyds than in HBOS. That was reflected in the fact that the Lloyds' Credit Default Swap ("CDS") spread was at the material time significantly narrower than that of HBOS. Of course, pursuing these general themes would also have compelled analysis of Mr Greenburgh's negotiating suggestion of £5.5bn additional capital for a "standalone" Lloyds adopted in the paper underlying the Indicative Conditional Proposal, of the £3bn/£4bn requirement suggested by Mr Tookey (and felt to be right by Mr Daniels), and of the figures produced by Mr Roughton-Smith in response to Mr Fennell's schedule. But it is not possible to compare what underlay those figures with what underlay the FSA calculations given the loss of documentary records. No expert now knows what model was run by the FSA and no back-calculation can be made.

329.   It is essential to remember that the Lloyds' management had only hours to undertake *any* analysis of competing recapitalisation requirements, not the days that have been available in preparing and deploying evidence for a five-month trial; hours that had to be allocated amongst the competing demands of the Recapitalisation Weekend. In my judgment it cannot now be shown (nor could it then have been shown) that the FSA's £7bn recapitalisation requirement was so obviously arbitrary that over the course of the Recapitalisation Weekend the Tripartite would have been compelled there and then to reduce its requirement.

330.    But if one accepts the premise of the question (that it would become apparent that there was no good justification for the £7bn figure), then Mr Daniels' evidence was unclear. At times he maintained that he understood that the *amount* of the capital to be raised was non-negotiable but the *manner* in which it was to be raised was discussable. At others he appeared to accept (in relation to Lloyds) that " if the deal were not to go forward.... we would have had to negotiate both the level and the terms of capital". Again (in re-examination about whether the HBOS (*sic*) capital requirements were "hard and fast")

> ".. We were given two sets of numbers by Mr Sants, we were
> each given the combined numbers and then each given  an

> individual capital number. Now, once we had said that we were going ahead, the combined numbers were the ones that were germane. If we were not to go ahead, we were informed that, and we hadn't taken the government underwriting, both the amount of the capital raise and the ability to access the government capital would have to be negotiated, so those were not guaranteed."

These answers appear to acknowledge the possibility that in some circumstances the eventual capital requirement for a "standalone" Lloyds might be negotiable; and to suggest that sum might not be £7bn and might not be eligible for Treasury support. This requires examination.

331. Sir Victor was informed of these events. On the Sunday afternoon Sir Victor, Mr Daniels, Mr Tookey and Mr Greenburgh went to the Treasury and there met the Financial Services Secretary, Lord Myners and Sir Tom Scholar. Mr Tookey's notes record "L 5+2 Tripartite decision" and "we need to raise it"; and later "standalone 5+2 – 30% dilutive". I read these as shorthand references to the requirement to raise £5bn of conventional Tier 1 capital and £2bn in innovative preferred shares. The notes also seem to record a comment that the lower capital requirement for the Enlarged Group results from account being taken of synergies. There is no note of Lord Myners indicating that the requirement to raise £7bn was "discussable". But Mr Daniels does recall asking Lord Myners about the potential to raise capital from disposals or other sources in order to reduce the amount of capital that would have to be taken from the Government, both on a "standalone" basis and as part of the Enlarged Group. It is his recollection that Lord Myners responded that there was no time to discuss such proposals then but that they could be discussed after the announcement of the recapitalisation.

332. The context of many of the questions put to and answers given by Mr Daniels in cross-examination and re-examination related not simply to the events of 12 October 2008 but embraced events down to the issue of the Circular. Focussing on 12 October 2008 itself, I am clear in my mind that it was not possible, by mounting any such challenge, to reduce the £7bn requirement by discussion on that day, however strongly the views of Mr Daniels or Mr Tookey differed from those of the Tripartite as to what Lloyds needed. The true position is that £7bn is the sum upon which the Tripartite had settled and which Lloyds had to accept if Lloyds was to be included in the market announcement the following morning as receiving Government support. The true position was accurately summarised by Mr Tookey in an email sent at 3:14 PM on 12 October 2008:

> "Update on the deal and on the terms being IMPOSED on us which effectively force us to do it.."

333. The prospect of discussing *how* that figure *could* be raised (as between management action and fresh capital, and as between accessing the market and issuing preference shares to the Government) was on the table during the Recapitalisation Weekend. But there was no real prospect of discussing *whether* that figure *should* be raised. The negotiating position of the Tripartite was that the sum had been decided upon. On the Lloyd' side, Mr Daniels wanted to raise the issue: both because he thought £7bn would over-capitalise a "standalone" Lloyds compared to its peers, and because he did not like

the proposed terms of the preference shares to be taken by the Government and wanted to cut them down. But the Tripartite would not engage: and the best that could be hoped for was that it might engage to some degree after the market announcement.

334.    What would a careful thinker (given time and space during the Recapitalisation Weekend) have made of the prospect of future negotiation with the Tripartite about the capital raising exercise? If Lloyds then and there accepted the required £7bn capital raise then the Government would always have stood by its commitment to contribute. But if (after participating in the recapitalisation announcement) Lloyds tried to renegotiate that requirement then there would be very significant doubt about the extent to which the Government would engage with process of reducing that £7bn.

335.    In my view that engagement would depend upon the point in time at which the issue of Lloyds' "standalone" capital was raised. There is, I think, a real difference between Lloyds seeking to renegotiate the size of the proposed alternative "standalone" capital raise immediately after the public announcement and in the context of a continuing potential merger on the one hand, and re-assessing the size of the "standalone" capital raise at some later point in the context of the merger having been abandoned. In the former case, the attitude of the Tripartite would almost certainly have been "We stick by what we said unless you can show an error" because the Government wanted to foster the merger and to cut off alternatives. In the latter case, because the proposed merger appears to be off the table (itself a very disruptive event for the banking system as a whole with a threat of contagion for Lloyds and other banks) and because the Government is going to have to find a different solution for HBOS, the attitude of the Tripartite to an attempt by Lloyds to renegotiate its "standalone requirement" would probably have been have been: "How much you have to raise – be it more or less than £7bn– and the extent to which you can look to us to take some of the new capital on the original terms will have to be renegotiated: you cannot assume that what we said on 13 October holds good now because things have changed". As Mr Sants put it, when once again tested on the point:-

>     "I am absolutely clear that what I've just said in the witness statement is exactly the same as what I've just said to you…. But I've made it clear, quite clearly, that we react to changing circumstances, we engage in a continuous supervisory approach, and if circumstances had changed, we would have always looked again."

336.    So the effective choice that had to be made during the Recapitalisation Weekend was between (i) accepting the Tripartite's recapitalisation proposals (both as regards a "standalone" Lloyds and the Enlarged Group) and hoping to negotiate modifications later; and (ii) standing aside from the recapitalisation process, explaining to the market that Lloyds itself thought it was stronger than its regulators did and so would not be complying with its regulators' requests, and taking the risk of looking to a market (which knew that Lloyds was not meeting its regulatory requirements) to provide the amount of capital which Lloyds itself acknowledged was needed. Looking to the market was indeed a risk: as Mr Daniels put it in cross-examination:-

>     "The markets were difficult at that point…We didn't think they would always stay closed. We were hopeful…if we were able to get a reasonable capital requirement , that we could raise some

> or all of the money in the markets. But at that particular moment
> the markets were closed."

337. Making the choice between accepting the Tripartite's recapitalisation proposals and standing aside from that process could not be divorced from a decision on the Acquisition.

*The Revised Announcement*

338. From shortly after the original Announcement the rapidly deteriorating financial situation had led to the tentative exploration of the idea of renegotiating the terms of the Acquisition. On 26 September 2008 a meeting took place at the Bank of England to discuss the Acquisition. In his written evidence Mr Daniels says that he spoke to Mr King about renegotiating the deal if market conditions continued to deteriorate, though he found Mr King to be resistant. Mr Tate stated in his evidence that he considered by that time that the terms of the Acquisition needed revising but that Mr Hornby of HBOS was also resistant to a renegotiation. The Lloyds team certainly did not have a blind commitment to carrying into effect the terms of the Announcement: HBOS probably did.

339. At the beginning of October 2008 the market began to speculate whether the Acquisition would proceed: but towards the end of the first week it began to settle down with an expectation that matters would proceed. Then came the Government announcements of 7 and 8 October 2008.

340. These announcements clearly made a reconsideration of the Acquisition imperative and inevitable: and the product of the due diligence gave Lloyds the material to do so. On 11 October 2008 following the rejection of the Indicative Conditional Proposal made to the Treasury work began in Lloyds on drafting a press release stating that Lloyds was walking away from the Acquisition (because "it was not possible to proceed with a transaction that would both recognise the UK Government's full investment in HBOS and be in the interests of Lloyds shareholders") and that Lloyds would seek additional "standalone" capital of £3bn: and an internal email from Mr Tookey at 09.14am on 12 October 2008 (the Sunday) suggested the Acquisition could go either way.

341. During 12 October 2008 at the same time as negotiating with the Tripartite, Lloyds was both negotiating with HBOS and assessing the impact of the recapitalisation proposals upon the Acquisition.

342. The negotiations with HBOS were undertaken within the tight timeframe set by the Tripartite, namely that decisions whether to accept the Government's recapitalisation proposals and whether to proceed with the Acquisition had to be reached by the evening of 12 October 2008 so that the market announcement relating to *all* banks could be made when the market opened on 13 October 2008. They were conducted on the Lloyds' side by Mr Daniels and by Mr Greenburgh in "face-to-face" and "breakout" sessions (with reference back to Mr Tookey). HBOS was looking for a price per share of about £1.60p. But as part of the recapitalisation package it had had to offer new shares to the Government at £1.11p. The Lloyds team went into the negotiation armed with the work that had been done by Mr Roughton-Smith on impairments, with Mr Foley's views on the economic outlook and with their own recent experience of the cost of capital: and (it appears) with the aim of securing the agreement of HBOS to a

102

takeover at £1.11p per share. This HBOS would not agree. One of Mr Tookey's contemporaneous notes records a report that HBOS was "astonished" that Lloyds should offer below the Friday closing price. There followed a lengthy and tense negotiation. The outcome was an "in principle" agreement on a revised ratio of 0.59 Lloyds share per one HBOS share. This was intended to represent the close of market prices of the respective shares on Friday, 10 October 2008, but with a 10% haircut applied to the HBOS price i.e. the same as the Government price. In broad terms this represented a reduction in the price that Lloyds was paying from approximately 60% of the HBOS book value to about 30% of the HBOS book value, reflecting a discount of approximately £14bn for potential after-tax fair value adjustments and write-downs (which Mr Roughton-Smith had estimated at £9.7-15.4bn for 2008).

343.    The assessment of the impact of the recapitalisation upon the Acquisition was undertaken by UBS. A number of documents have survived, and their form and structure reflect the rapidity of their preparation: they seek to model such things as the Core Tier 1 ratio, the RWAs, the EPS impact and the return on equity on a number of different assumptions and in the light of evolving figures for Q3 forecasts and reviewed writedowns (resulting from overnight work continuing into Sunday morning).

344.    A board meeting was convened for 7.00pm on Sunday 12 October 2008. At this time negotiations with the Tripartite over the recapitalisation were very well advanced, although matters of detail remained to be settled: in particular, the initially indicated £17.5bn additional capital for the combined entity was being reduced to £17bn. All of the Lloyds directors (save Mr du Plessis) were present in person or by telephone. Of the Lloyds' non-director executive team Mr Tookey, Mr Pietruska and Ms Sergeant were in attendance: as were the advisers Mr Greenburgh of Merrill Lynch and Mr Willmot-Sitwell of UBS. The purpose of the meeting was to enable the executive team to "walk" the board through the events of the Recapitalisation Weekend and to obtain a decision upon what was to be announced to the market twelve hours later .

345.    It is well to begin with the Minutes of the meeting. The Minutes record that Mr Daniels began with an update to the board of the events following the government announcements of 7 and 8 October 2008. He made clear that participation in the Government "rescue programme" was not mandatory, but that in order to continue to have access to the Government guarantee for medium term funding it was necessary for a bank to be able to establish that it was "well capitalised". Discussions with the Tripartite as to what "well capitalised" meant for Lloyds itself had revealed that for Lloyds "the final view of the Bank of England had been that £7 billion of additional capital was needed by the bank". He noted that the Bank was "becoming increasingly reluctant to fund HBOS". (A surviving handwritten note of the meeting made by Mr Kane records that the Bank was looking to Lloyds to fund HBOS to completion of any acquisition). The Minute is not expressed in sufficiently full terms to treat this as notice to the board that HBOS was in receipt of some specific and entirely discretionary line of funding (such as ELA). Mr Daniels disclosed that the Tripartite was supportive of an enlarged group with a combined capital injection of £17.5 billion. Taking that into account he told the Board that a revised proposal had been put to HBOS based on a share exchange ratio of 0.59 Lloyds share for each HBOS share. He explained that if accepted this would result in the Government owning approximately 40% of the Enlarged Group (assuming Lloyds shareholders did not themselves take up any of the new capital).

346.    Mr Daniels went on to deal with the terms upon which the additional capital would be available (dealing with the coupon on the preference shares, the restriction on dividends, the restriction on bonuses for directors, and nomination rights to the board). It seems clear from the significance accorded to issues like restrictions on dividends and on directors' bonuses (and from the fact that they formed part of the subsequent board discussion) that nobody present was contemplating a looming recession of such depth and length that dividends and bonuses would be an irrelevance. At the conclusion of his update he is recorded as saying:-

> "It was clear that HM Government would take steps to recapitalise the banks in order to make them "bullet-proof". The amount of capital to be raised by the group, whether stand-alone or enlarged, was not negotiable. The only choice was whether to raise the capital as equity or Preference Shares. Capital in these amounts was not available from other sources and the Government was demanding announcement by the following day. [Lloyds] could either decide to proceed with the acquisition of [HBOS] (assuming the board of [HBOS] agreed the revised terms) and raise capital jointly with [HBOS] for a total of £17.5 billion or to proceed without the acquisition of [HBOS] and raise capital of £7 billion. "

347.    The board was then advised by Mr Greenburgh, whose reported views are as follows:-

> "…it would not be possible for the bank to access the government's guarantee in respect of medium term funding without a capital raising of this size but it would prove to be very dilutive. In comparison the acquisition of [HBOS], compared to the stand-alone position, whilst also dilutive was enhancing when the synergies were taken into account. The new terms proposed to [HBOS] had also contributed to a de-risking of the transaction. Whilst therefore, there was value destruction inherent in the capital raising required by HM Government the acquisition of HBOS was far less destructive of value and offered the potential to create value as a result of the transaction… [T]here was currently no market for the issue of bank preference shares and he was of the view that it would also not be possible to raise £5 billion in equity capital particularly when the other issues currently being undertaken by banks were taken into account. Consequently, the bank's only access to share capital at the current time was through the government's scheme and the better way to access that capital was by accessing it as part of the [HBOS] transaction."

It is possible to make out from some contemporaneous handwritten notes made by Mr Tookey at this meeting which have survived that Mr Greenburgh provided the meeting with figures. A recapitalisation of a standalone bank by means of the issue of £5bn of Tier 1 capital and £2bn of preference shares would be about 30% EPS dilutive. If the HBOS deal was done and the new capital taken then by 2011 (i.e. year 3) the transaction could be 20% EPS accretive.

<u>**Approved Judgment**</u>

348.    The board was then advised by Mr Wilmot-Sitwell. His recorded views are as follows:-

> "There was a very clear choice for the board to take between the stand-alone capital raising and a combination. He endorsed Mr Greenburgh's view that the combination was less destructive of value in terms of shareholder dilution. In his opinion the board should decide on a strategy that had the best long-term benefits with a view to achieving the most rapid exit strategy for HM Government in relation to its shareholding. Mr Wilmot-Sitwell advised that he was reasonably confident that it should be possible through a process of clawback to reduce HM Government's shareholding as well as by means of a share placing in due course. In his opinion, therefore a combination with HBOS was the more attractive of the two alternatives although he acknowledged that the steps being imposed on the banking sector were very Draconian."

349.    The board then embarked upon discussion: part-way through it (and before any decision had been taken) Mr Daniels left. The terms of the Minute enable some of the topics covered in that discussion to be discerned. First, the board looked at the progress of due diligence and was satisfied that it was now proceeding more smoothly. Second, the board looked at impairments and noted that the due diligence had been reviewed on a "1 in 15" basis but had not been stressed on a "1 in 25" basis, so that there was a risk of higher impairments should that scenario be relevant. Mr Daniels said (and I consider it probable) that that brief note records the occurrence of a discussion but does not attempt to summarise its extent or content. It is not possible to identify what papers were tabled at the meeting but given that the board looked at "impairments" it seems to me inherently probable that they had available to them in some form the impairment figures produced by Group Risk in the range £16.2-£25.5 bn, but knew them to be provisional and subject to work that was even then being undertaken on further data. Third, the board considered the impact upon the Lloyds' franchise of the Government becoming a major shareholder. Fourth, the board compared the alternative proposals.

350.    Neither the official minutes nor the surviving handwritten notes of Mr Tookey and of Mr Kane give any real insight into the nature or depth of the discussion of the alternatives. Looking at the inherent probabilities it seems to me that it is likely that it was robust, but acknowledged that the proposal had a history. At the meeting on 26 September 2008 the board had adopted a cautious approach and had not evidenced any desire to proceed headlong with the proposed transaction. There was now the new element of enforced recapitalisation: and the amount of additional capital that the Tripartite was requiring a standalone Lloyds to raise was above the expectation of the executive team and greater than anything that had previously been put before the board. Moreover, the terms upon which capital would be made available to the combined entity were in some respects stringent. Further, the market had deteriorated since the Announcement to the extent that the original deal no longer stacked up. It is unlikely that this highly experienced board decided to plunge ahead with the acquisition of HBOS, carried away by the prospect of a "once-in-a-lifetime deal", without testing whether the strategy of growth by acquisition could survive the Tripartite's requirement for the "bullet-proofing" of the banks.

351.    That estimate of the probabilities is supported by the evidence of those actually involved. It is not realistic to expect any detailed recollection of the course of the debate. But it is entirely credible that the participants should have a recollection of the sense of this crisis meeting. Mr Daniels (who was not present for all of the meeting) recalls a wide ranging discussion in which the board members generally participated, with a number of good questions being asked. When cross-examined about the brevity of the note concerning impairments in a "1 in 25" scenario and invited to accept that there was no attempt to discuss or factor in or identify or analyse the consequences of those risks he said: "That is absolutely a conclusion I do not agree with". That was the tenor of his response to other similar questions. But he readily acknowledged that because the relevant information was recent and the situation complex and developing, any analysis presented to the Board could not be thorough: in another passage of cross-examination he said of the emerging material that he had the benefit of calculations, albeit not as thorough as they eventually ended up undertaking, but enough to provide "a pretty good indicator". Mr Tate (who participated by telephone) thought the Board conducted a robust and considered examination of the relative attractions of the courses open.

352.    Mr Kane recalls that notwithstanding the pressure put on Lloyds by the Tripartite to reach a decision that evening the Board carefully reconsidered the Acquisition to see if it still made commercial sense: and he felt that if HBOS did not renegotiate a sensible price (based on a discount to the Friday closing price) then Lloyds would have considered walking away. He thought that the board pondered the various inputs. Dr Berndt thought that the directors had remained firmly focused on ensuring that the proposed acquisition was appropriately scrutinised from all angles. Mr Pietruska recalls the agitation of the board at learning of the Tripartite's requirement of a £7bn capital injection into a standalone Lloyds, and the collective intake of breath as the investment bankers were asked whether Lloyds could raise that sum without Government aid. There is no question but that this is the honest recollection of each of them: they are not lying. I have of course had to consider whether it represents a collective self-delusion: this is what they ought to have done and so each of them believes it is what they actually did. But having seen them (and having seen some of them cross-examined at very considerable length) I do not believe this to be so. Their evidence is supportive of what I regard as the inherent probability.

353.    But whilst expressing the view that the Board was not bedazzled by the possibility of transformational change and was not determined to proceed headlong (but rather questioned what course ought to be taken), it is right to observe that the board was not starting afresh with a blank sheet of paper. It had a long-established strategy to grow the business, and to do so by acquisition: and it had already expressed a desire to acquire HBOS.

354.    I am sure Mr Tookey is right in his recollection that

> "…the general tone of the discussion was, I would accept, one of a desire to continue with the transaction, recognising that it was substantially or materially – whatever the right word might be – de-risked from the actions that the government were taking over the week-end, and likely to be benefitting from the significant insight that the regulator would have had as to the way that the target business would perform in a stress."

106

I am equally sure that Mr Pietruska captured the essence of the choice facing the board when he described it as a choice between (i) "boring old Lloyds" with the same strategic vulnerabilities or (ii) the enlargement of the business to achieve a 30% market share and the benefit of synergies; but in each case with (to differing degrees) shareholder dilution and substantial Government ownership.

355.    At the conclusion of the discussion (and in the absence of Mr Daniels) the board endorsed the continuation of discussions regarding a combination with HBOS and noted that the steps would be taken to secure the best available terms in relation to capital raising. They authorised a committee (consisting of Mr Daniels and any two other directors) to do whatever was necessary in relation to the offer for HBOS, the issue and admission of ordinary or preference shares, the making of announcements and the convening of meetings and the settling of any relevant documents.

356.    In the early hours of the morning of Monday 13 October 2008 shortly before the market opened Mr Hornby of HBOS telephoned Mr Daniels to point out that there was a difference over the application of one of the calculations and that the correct exchange ratio was 0.605 of the Lloyds share for each HBOS share. Mr Daniels accepted the point. It was not suggested at trial that this was a significant change in the grand scheme of things.

357.    There was another change effected in the early hours of Monday morning. Mr Tookey gave evidence that at about 4.00am on Monday 13 October 2008 he was telephoned by the Bank's legal advisers who informed him that the Bank required (effectively as a condition of continued support) the removal of the "material adverse change" clause which the initial acquisition agreement had contained, and which empowered the Lloyds' board to withdraw from the Acquisition without penalty in defined circumstances. The choice as he saw it was whether to acquiesce in the change or whether to attempt to reconvene a board meeting at 5.00am. The advantage to the Bank was that the change cut off one exit route from the transaction (into which the Tripartite was increasingly anxious to tie Lloyds). The consequence for Lloyds was (i) that in the perception of the market the change would signal a reduction in the risk of the transaction not proceeding, and so reduce the share price volatility which that risk generated; (ii) it left unaffected the power of the shareholders to reject the Acquisition should any materially adverse changes actually occur (though, I would observe, it did leave Lloyds exposed to material adverse change after shareholder approval but before completion); and (iii) co-operation with the Bank reduced the risk of the Bank restricting Lloyds' access to SLS or to guaranteed funding or reducing its assistance to HBOS. Putting on one side for the moment Mr Tookey's analysis of the pros and cons of the change, taking the evidence as a whole I do not think this account is wholly accurate.

358.    Mr Daniels also gave evidence that late on Sunday or early on Monday *he* was contacted by a Treasury representative requiring the removal of the "material adverse change" clause in order to reduce the risk of the deal not proceeding, a proposal which he discussed with Mr Tookey, and also with Sir Victor and Mr Parr before acceding to it. This strikes me as a more probable account of the actual events (and accords with the recollection of Sir Victor, though not of Mr Parr): however, I consider it probable that Mr Tookey's analysis of what drove the request and what drove the acceptance is entirely correct. The evidence of Mr Parr (which I accept) was that in terms of the transaction itself (as opposed to signals and levers) the alteration was not of great

practical consequence, MAC clauses not being regarded as especially commercially valuable since the circumstances in which the Takeover Panel will permit them to be activated are extremely limited.

359. When the market opened on 13 October 2008 Lloyds made its announcement ("the Revised Announcement"). The Acquisition would proceed but with 0.605 Lloyds share for each HBOS share. There would be a recapitalisation of the Enlarged Group of £17bn. Lloyds would be raising £5.5bn of new capital: £4.5bn of ordinary shares would be taken by the Government at £173.3p per share (an 8.5% discount) subject to clawback by existing Lloyds shareholders, together with £1bn of preferred shares. The Revised Announcement explained that Lloyds had had discussions with the Treasury on the additional capital that the Government required Lloyds to have if it was to retain access to Government-backed provision of liquidity. HBOS was to raise £11.5bn (split as to £8.5bn in ordinary shares and £3bn in preferred shares). The commercial logic behind the takeover was explained again: and a number of indications were given about the shape and objectives of the Enlarged Group. The Revised Announcement explained that the Acquisition was conditional upon the absence of any reference to the Competition Commission, the passing of the necessary resolutions at an EGM of Lloyds' shareholders, and the requisite approvals from HBOS.

360. It is not possible to ascertain from movements in the relative share prices of Lloyds and HBOS what the market thought of the Acquisition following the Revised Announcement because of the heavy overlay of the recapitalisation itself. First, the effect of the recapitalisation was that Lloyds (in common with those other banks who submitted to the Government directive to cease dividend payments in order to fund lending to SMEs and other businesses) had ceased to be an "income" stock, resulting in the emergence of sellers. Second, the terms of the announcement by the Government gave the impression that Lloyds was to be ranked alongside HBOS and RBS, whereas the Lloyds' team had understood that they would be clearly differentiated. So Lloyds had to embark on a communications offensive to re-assure investors.

361. Reflecting on the events of the Recapitalisation Weekend (and writing on 16 October 2008) Mr Tate expressed his own view to the market in these terms:-

> " The vision was to combine two of the strongest franchises in the UK to create a powerful platform which would provide greater breadth of choices to the consumer and would create value for shareholders, employees and customers alike. Why? Fundamentally, we share a customer/relationship focus we have complementary footprints (we tend to have smaller shares of markets where they have largest shares and vice versa) and we have some of the most desirable and trusted brands in the country…. We have gained access to approximately 20,000,000 customers and, combined with our own passion and expertise in cross selling, we should open up this opportunity as never before….. There has been much noise around the fact that their profits were derived from an unsustainable business model and that might be the case… if nothing was changed! The fact is that we have the opportunity to marry so many of their strengths with our prudence, our disciplines and our culture and, while the shape will be altered, we have no doubt that the profit

> opportunity more than merits the investment. We have looked closely at the value of their assets and, without question, there will be adjustments…. But a combination of the cost of the acquisition to us and the steps that we can take going forward… make us confident that the economics more than a work."

### *Key external events following the Revised Announcement and before 29 October 2008*

362.    I will again look at events thematically rather than attempt a comprehensive chronological account. I begin with competition issues.

363.    On the domestic front on 24 October 2008 the OFT issued its report on the Acquisition and on the same day legislation was introduced giving the Secretary of State for Business, Enterprise and Regulatory Reform the power to not refer a proposed transaction to the Competition Commission if it would be in the public interest not to do so in order to ensure the stability of the UK financial system. The legislation was passed. On 31 October 2008 Lord Mandelson (who had become the Secretary of State for Business, Enterprise and Regulatory Reform on 3 October 2008) decided not to refer the Acquisition to the Competition Commission. In doing so he relied on a submission from the BoE that a failure of HBOS risked contagion of other financial institutions, the re-emergence of a loss of confidence, and significant negative consequences for the UK economy overall. He also received and took into account advice from the FSA that temporary public ownership would not cure the structural weaknesses in HBOS' balance sheet, whereas a merger would provide a sustainable medium term future for HBOS: by this the FSA meant that through a change of management and the introduction of Lloyds' expertise there would arise an opportunity to revise, reform and refocus the HBOS business model. Domestic competition issues were therefore overcome in the way envisaged since the possibility of the Acquisition was first canvassed.

364.    But there was also an EU aspect, generated by the Government support for the financial system announced on 8 October 2008 and given shape over the Recapitalisation Weekend. On 11 October 2008 the European Commission was notified of the UK Government's proposed support measures, though there is no suggestion in the evidence that anyone in the Lloyds team was aware of that. However, the thought did occur to Mr Parr of Linklaters on the Saturday of the Recapitalisation Weekend (11 October 2008) that the proposed Government recapitalisation might be regarded as State aid, and would therefore raise issues of European competition law. The evidence establishes that he raised the possibility in discussion and that Slaughter & May (legal advisers to the Treasury) gave oral comfort that State aid issues were being addressed by the Government. This is reflected in the terms of the Revised Announcement which indicated that EU requirements in relation to state aid issues would be met by a restriction upon the growth in balance sheet volumes.

365.    Late in the evening of 22 October 2008 Linklaters submitted to the Lloyds team a memorandum of advice. In essence it said that everyone was in uncharted waters, and that in the absence of precedents the EC was seeking to approach the recapitalisation plan as something of a hybrid between state aid to remedy a serious disturbance in a

Approved Judgment

member state and state aid to facilitate rescue and restructuring. The memorandum said:-

> "Having spoken to Slaughter & May who act for the Government on this, it seems that neither HMG nor the EC has a clear or detailed picture of what the restructuring plan would look like in this case. Further, it is particularly unclear whether EC appreciated that by the time the six months were up the LTSB/HBOS merger would have completed and so a single or merged plan would be submitted. The Slaughter's view was that the plan would show how recipients were planning to wean themselves off the guarantees and seeking to exit structurally loss-making businesses… It will also need to cover the likely duration of the Government stake and plans for redeeming/otherwise dealing with the prefs. More generally though Slaughters are clearly not expecting this to be too controversial."

366. The message that the Lloyds' team received was that its plans for the integration of the HBOS business (including the elimination or reduction of loss-making activities) and for the redemption of the preference shares would probably suffice as a restructuring plan. But after about a week it became apparent that in order to satisfy the EC the Government might require a more formal restructuring plan (possibly requiring a downsizing of the Enlarged Group). Such a move would tend to negate the synergy benefits of the Acquisition. So by 23 October 2008 Mr Daniels was recommending the Board to send a clear message to the political establishment that any intervention to restrain or break up the Enlarged Group was unnecessary and would frustrate the achievement of the public interest benefits of the merger (so as to influence the direction of travel, which was far from clear). The inchoate risk of restructuring could be mitigated by adopting a relatively conservative approach to the estimation of such prospective benefits: and this was done. Although at a stretch the synergies might amount to £2.4bn Lloyds generally said that they would "exceed £1bn". (The slant of this litigation has meant that there has been little consideration of synergies: but it is important to appreciate that when a figure is put upon anticipated synergies the figure is an annualised one. In total Lloyds anticipated synergies of between £5bn - £8bn).

367. In fact, the signal from the Government was that a downsizing of the Enlarged Group was not a significant risk. When considering the question of a reference to the Competition Commission the Secretary of State had a power (under s. 43(4)(b) of the Enterprise Act 2002) to require Lloyds and/or HBOS to give undertakings as to restructuring in order to address or mitigate anticipated competition concerns. Notably he did not do so. I take this as an indicator that the Secretary of State did not at that point anticipate that any significant divestment programme would be required to address the competition consequences of any state aid issues.

368. Just to tie off this theme, that signal from the Government was later affirmed. Lloyds had been pressing for some written record of the Government view, and this was provided in a letter from the Treasury on 31 October 2008 in these terms:-

> "The Commission has already approved the overall recapitalisation scheme, and has indicated that it will work

expeditiously to scrutinise individual restructuring plans. It has also indicated that ….. in scrutinising plans it will take into account whether banks' difficulties are due to the present extreme situation in the financial market rather than a structural solvency issue linked to their particular business model or investment strategy. The key requirement for a successful application will be a plan that demonstrates a clear path to an exit from state aid. Central to that will be adequate capital and liquidity, and future profitability. You indicated to us that your plan would meet these requirements and we have undertaken to work constructively with you to secure Commission approval."

369. The second theme I want to take up relates to capital. Following the Revised Announcement discussions continued with the FSA focused upon the capital requirements of the Enlarged Group. Mr Daniels records in a report to Sir Victor on 17 October 2008 Mr Sants' acknowledgement that there had not really been any discussions over the Recapitalisation Weekend regarding an adjustment to the amount of capital that the Enlarged Group should carry, and that the FSA had not had the opportunity to consider available managerial actions which might be factored into the analysis. These, Mr Sants is recorded as saying, were "absolutely discussable" and that he would be flexible. In cross-examination Mr Daniels accepted that if the capital requirements for the combined group were "discussable" then so also must have been the capital requirements for a "standalone Lloyds" (insofar as that remained a relevant comparator).

370. The strategic objective of the Lloyds' team was to reduce the size of (or eliminate) the issue of £1bn Preferred Shares, which were expensive (with a 12% coupon) and disruptive (because they were one of the reasons why dividends on ordinary shares were blocked). The campaign plan was to produce proposed managerial actions in a sum equal to the proposed issue of Preferred Shares, and to suggest to the Government that the existence of plans for the former obviated the need for the latter.

371. Mr Daniels took the view that the capital raising requirements put upon Lloyds during the Recapitalisation Weekend were not remotely fair, and he (with the assistance of Mr Tookey) set about trying to achieve a reduction so that the eventual circular to shareholders could announce a lower requirement. He pursued the matter with the FSA. On 16 October 2008 Mr Sants said that he would not re-open the historical discussion of the Recapitalisation Weekend, but he invited Mr Daniels to come forward with a series of management actions to reduce the capital requirement of the Enlarged Group. The same day the supervisory team for Lloyds at the FSA told Mr Tookey that no new capital numbers would be agreed at that time, but that a process of "understanding" could begin.

372. The following day (17 October 2008) Mr Tookey and his team (with the assistance of UBS) nevertheless set about showing how management action could reduce the need for some extra capital. They expressed the view that the Recapitalisation Weekend had run to a very compressed timetable which had left them with the feeling that they had not been able fully to explain their capital position, the conservative nature of their forecast and the robustness of their marks. Their presentation to the FSA sought to

demonstrate that the preference shares were not required (and indeed in some respects had adverse consequences), and that only £13bn (not £17bn) was required as additional capital for the Enlarged Group. On that footing Lloyds was predicted to have a Core Tier 1 ratio of 8.2% in 2009 on its central case, and 6.6% on a pessimistic case. The Lloyds team stated that they wanted to put in the proposed Circular a lower figure for additional capital than that presently required.

373.    Mr Daniels repeated this line in a telephone conversation with Mr Sants on 22 October 2008 (the speaking notes for which survive) in the course of which he appealed for a swift solution to the discussions which the teams from FSA and from Lloyds were having. In these discussions the additional capital requirements of the Enlarged Group "got more airtime" as Mr Daniels put it, because that was the publically announced plan. However, it is not the case that all mention of the "standalone" alternative for Lloyds was entirely overlooked (and there is documentary reference to it, in particular the Lloyds' presentation worked out the comparative Core Tier 1 ratio for a "standalone" Lloyds on the basis of £5.5bn capital contribution which eliminated the preference shares). But since the objective of the campaign was to secure a lower capital requirement for announcement in the shareholder circular I do not consider that there was any concentrated attempt to renegotiate the capital requirements of a "standalone" Lloyds. However, any such a discussion would inevitably have covered substantial parts of the same territory, in particular whether anticipated managerial actions, in this case relating to Lloyds alone, should be taken to reduce capital requirements.

374.    On 23 October 2008 Mr Daniels wrote to Mr Sants with a plan to dispose of five identified assets by the second half of 2009, setting out the benefit to Tier 1 capital of so doing. He continued:-

> "The disposals and the risk reduction measures set out above would, if all achieved, significantly change our capital and risk profile and provide some £2.6 billion of relief at core Tier 1 capital level against the FSA's severe stress scenario. We did not have time to discuss these matters during the weekend capital discussions nearly 2 weeks ago but reflecting on our commitment to the above points, I believe that I am being entirely reasonable in asking for a reduction of £2 billion in the amount of share capital that the government are requiring us to take."

This letter was the subject of telephone conversations between FSA officials and Mr Tookey. Mr Tookey urged that the FSA's modelling had not sufficiently factored in existing balance sheet impairment provisions so that any further reduction in the estimate of Lloyds' present capital position (at which the FSA was hinting) would be resisted: and he pressed the case for account to be taken of planned disposals. In the course of that conversation the FSA made clear that on their stress assumptions the Core Tier 1 ratio of the Enlarged Group under the present recapitalisation plan was projected to be 4.6% at the end of 2008. That was, of course, above the 4% minimum in extreme stress which the FSA required: but a reduction of £2bn in the proposed recapitalisation would have put that at risk.

375.    At the same time UBS and Merrill Lynch prepared a proposal to the Treasury with the same objective, namely, a £2bn reduction in the requirement for new preference shares

as a result of management commitment on disposals and potential actions in respect of debt restructuring.

376. Neither approach was successful. The determination of the appropriate level of capital was the responsibility of the FSA. On 24 October 2008 the FSA team made clear its expectations on capital. Banks had to meet a 6% Core Tier 1 ratio and an 8% Total Tier 1 ratio on their base case. If a bank were to fall below the 6% ratio then the FSA would expect that bank to discuss the reasons for this and to agree an appropriate course of action to restore the ratio to 6% within an appropriate timescale. In an extreme stress scenario a 4% Core Tier 1 ratio would be acceptable, but that was the minimum amount necessary to give the FSA comfort that a bank would survive a deep recession. The FSA considered that with a capital addition of £17bn the Enlarged Group would have a Core Tier 1 ratio of 4.6% in a deep recession. If this view prevailed then the elimination of the preference shares was not achievable.

377. Mr Sants then wrote on 28 October 2008 recording his view of what had happened and his view of the way forward. By way of explanation of the stress test he wrote:-

> " The underlying assumptions utilised in the stressed test were of a standard type, but the overall weightings were, of course, tailored to the specific institution. To ensure consistency the FSA used a framework which had a number of variables, the most important of which was that, by the end of 2008, each individual institution had to have a total Tier 1 Capital of at least 8% and that their Core Tier 1 Capital, as defined by the FSA, had to remain above 4% after the stressed scenario and above 6% on the company's central case forecast… It is important to recognise that this approach has been adopted in the context of implementing the Tripartite support package. This included access to Government support through the Credit Guarantee Scheme, and the level of capital required for that was determined by a thorough and consistent application across institutions of the framework described above. It should not be presumed that this represents the FSA's view of the appropriate long-term capital framework for deposit taking institutions."

He then put on record (with the specific and expressed intention of "avoiding confusion") the FSA's view of what that meant for Lloyds (as part of the Enlarged Group and as a "standalone" entity). For a "standalone" Lloyds: £7bn consisting of £5bn ordinary shares and £2bn preferred shares. For the Enlarged Group: £17bn of which £4.5bn ordinary shares and £1bn preference shares would be "allocated" to Lloyds.

378. As to the request to reduce the immediate capital requirement in the light of planned future disposals, Mr Sants formally responded:-

> "In principle, I agree it would be reasonable for the FSA to take into account such a course of action. However, given the uncertainty in the current market conditions of executing the disposal strategy, and of possible valuations, I believe it is more appropriate to consider the option of the subsequent disposals

> paying back an element of the capital programme rather than modifying the agreed level of capital at the outset…. May I also stress that if the HBOS merger were not to occur, our capital requirement of £7 billion from Lloyds TSB alone made up of £5 billion of equity and £2 billion of Tier 1 instruments remains unchanged."

379.  That is in my judgment an accurate and authoritative summary of the FSA's internal view during and following the Recapitalisation Weekend. It was consistent with the messages that the FSA had been sending in the course of telephone conversations between its team and the Lloyds team since the Recapitalisation Weekend, so that whilst the Lloyds' team was disappointed by the formal response, it was not surprised by it.

380.  It is here appropriate to expand a little upon the 4%/6%/8% capital adequacy test points identified by the FSA, and to make two points.

381.  First, the FSA statements of this test might be read as communicating that for the duration of a period of extreme stress a 4% Core Tier 1 ratio would be regarded as acceptable; or they might be read as communicating that at the commencement of a period of extreme stress a 4% Core Tier 1 ratio would be acceptable but that during the period of extreme stress the bank would be expected to agree an appropriate timetable to restore the Core Tier 1 ratio to 6%. In my judgment the former is essentially the correct understanding of the requirement (though some nuance is required). Outside circumstances of extreme stress a bank was required to maintain a minimum Core Tier 1 ratio of 6%: if for idiosyncratic reasons it fell below that ratio then it had to agree with the FSA an appropriate timetable to restore the "buffer" over the 4% absolute minimum. In a general climate of extreme stress (as applied to an individual bank) a 4% Core Tier 1 ratio for that bank was acceptable to the FSA as sufficient to enable the bank both to withstand the challenging economic conditions and to enable that bank to continue to lend on normal commercial criteria. The ability of that bank to continue to lend was a necessary palliative in an economically distressed scenario: as the stress eased or as the bank accommodated continued lending during the stressed circumstances then the level should be restored to 6%.

382.  This rationale emerges from an FSA statement on its approach to regulatory capital made in in January 2009 and was explained in the evidence of Mr Sharma. Of course, "base case" "downside" and "extreme stress" are not states defined by brightline boundaries, and (provided that continued lending was not jeopardised) I think it is fair to assume that the FSA would regard 4% as an interim state and would look to the restoration over time of the "buffer" provided by the 6% Core Tier 1 ratio. Mr Daniels captured this in his evidence in cross-examination:-

> "…the FSA had published in their 8/6/4 was that in times of extremis that they would be able to look to the 4% as a floor as opposed to the 6% and, no, that wasn't meant to be a permanent state, but it is requiring a plan. Now, the length of that plan and the time it would take to implement it left very much the discretion of the FSA.."

In my judgment he also correctly understood the potential impact that the level of regulatory capital would have upon funding:-

> "Q: As we agreed yesterday, once you are down to 4% you are even facing funding issues ?
>
> A:…. It depends entirely on the circumstances. We are speculating here.
>
> Q: Well, that evidence you accepted yesterday.
>
> A: That, if a single institution were notably an outlier in the crowd of banks, then perhaps you could speculate that. But if the entire market has no access to liquidity, the entire market has been impacted by the procyclical nature of the capital requirements and then I think the market will take that into consideration. But again we are speculating."

383. Second, the evidence of Mr Sants was absolutely clear that "the most important number as we saw it at the time …was the stressed number"; and again that "the one we were most focused on was the 4% stressed".

384. To return to the narrative, even after the FSA's formal response Lloyds continued to seek permission from the FSA to say to its shareholders that, if the Acquisition did not proceed, then a "standalone" Lloyds might have to raise £5.5 bn (i.e. the same as its allocated share of the additional capital for the Enlarged Group) but that discussions were continuing. The purpose of this was to head off any potential public concern as to Lloyds' standing arising from the requirement that Lloyds had to raise more additional capital as a "standalone" bank than it did as a component part of the Enlarged Group. But the FSA declined to respond to the suggestion, and its formal position was that £7bn had to be raised by a "standalone" Lloyds.

385. The third theme I want to take up in relation to external events is liquidity. It is now known (but could not have been known to Lloyds at the time) that as at the Recapitalisation Weekend HBOS had drawn down to the limit of its bilateral facility with the BoE. Following the Recapitalisation Weekend there was some improvement in money market conditions, but the markets had not returned to normal functioning. So on 20 October 2008 the Bank announced a modification to its standing facilities and the immediate introduction of a Discount Window Facility ("DWF"). One of the modifications to the standing facilities was that the Bank ceased publication of various data about the use of its standing facilities and about which banks had signed up for access: the market was therefore deprived of this information flow in the interests of stability. The DWF enabled UK banks to obtain either cash or gilt-edged stock in exchange for certain assets not otherwise acceptable as collateral under other liquidity schemes, and then to use those gilts in the market or in the BoE open market operations. However, the purpose of the DWF was to provide liquidity insurance for (an extendable) period of 30 days: it was not intended for banks facing fundamental problems of solvency or viability.

386.   The fourth theme I wish to comment upon is the overall Government strategy. I have commented upon this in relation to the period following the Announcement. Following the Recapitalisation Weekend and the Revised Announcement the Bank confirmed to HMT:

> "Notwithstanding these interventions it remains the view of the Bank of England that the proposed takeover should proceed without delay. Now, as in mid-September, we see risks to UK financial stability in the event of a failed transaction. Foremost amongst these is the risk of leaving HBOS without a credible long term strategy and the associated loss of confidence amongst depositors and market counterparties that would be likely to emerge. Both could seriously undermine confidence in the consistency and effectiveness in the authorities' recent interventions which have been key to re-establishing confidence in and the stability of the UK banking sector."

I am in no doubt that the view of the Tripartite was that that all necessary support should be given to Lloyds and to HBOS to ensure that the Acquisition completed because this was seen as a key component of the plan to restore order: but because of the perceived benefits to Lloyds of acquiring HBOS Lloyds was not to be given a "free ride" but was expected to share some of the risk.

387.   Of course the Board of Lloyds (and the market in general) were unaware of these confidential communications between the Bank and the Treasury. But it is important for a present understanding of the contemporary events and for a consideration of possible alternative courses of action that this was the Government approach to the needs of the financial system: and equally important to reiterate that this approach did not mean that the Tripartite forced or pressured Lloyds to take over HBOS. Lloyds was throughout a willing and able acquirer.

### Key internal events following the Revised Announcement down to (and just after) the 24 October 2008 Board meeting

388.   I will retain the thematic (rather than strictly chronological) approach looking at (i) dealings between Lloyds and HBOS; (ii) the progress of due diligence; (iii) liquidity; (iv) consideration of working capital; and (v) progressing the Acquisition (reviewing its terms and preparing the documents). In some instances it makes for a more coherent narrative if I do not stop at 24 October 2008.

389.   As to interbank dealing, Lloyds continued to provide facilities to HBOS under the Lloyds Repo. The total facilities used never exceeded £6bn at any one time: but the ceiling was never lowered from £10bn. Each drawdown was the subject of separate consideration and each collateral package separately assessed.

390.   For the purposes both of considering the grant of facilities under the Lloyds Repo and of gaining a thorough understanding of the funding needs of the Enlarged Group Mr Short (as Head of Liquidity and Funding Management) required and obtained access to the HBOS funding data. This included the provision by HBOS of spreadsheets showing actual funding flows and collateral utilisation and projections in differing scenarios. As I have recorded above, this showed a line of funding provided by the BoE outside the

SLS scheme secured on collateral that was not eligible for SLS, this line of funding being referred to as "Project Fox" or "Project Package". The "ELA" label was not applied, but from the associated e-mail traffic it could be gathered that collateral moved from "Project Fox" to SLS, so that "Project Fox" in part operated as a bridging facility. These schedules also showed that "Project Fox" funding would be repaid at (or immediately after) completion of the Acquisition. The spreadsheets also showed use of Federal Reserve funding (but this related to only about 2% of the HBOS wholesale funding requirement).

391. I turn to consider due diligence. I will look first at the ground work that was done, and then at the economic context as it was viewed at the time this due diligence work was being done. Even as the Board was meeting on 12 October 2008 Mr Roughton-Smith was preparing an updated version of his analysis of the HBOS impairments and fair value adjustments to take into account the latest disclosures by HBOS (satisfactory access to HBOS' records having only been obtained on 6 October). This was put to a meeting of the GEC on 14 October 2008.

392. The earlier version of Mr Roughton-Smith's H208/2009 impairment report (placed before the GEC on 10 October, used in the Indicative Conditional Proposal and before the Board on 12 October 2008) had estimated an impairment range of £16.2 to £25.5bn on the assumption of a "credit crunch" (or "1 in 15") scenario. Further work now enabled Mr Roughton-Smith to *narrow* that to a range of £15-£21bn. The disclosure of the HBOS forecast for the third quarter (made during the negotiations over the Recapitalisation Weekend) also enabled him to compare HBOS' own impairment analysis with that of the Lloyds' team. The HBOS assessments were all below the bottom of the Lloyds range, but in part the margin was attributable to the use of different valuation approaches to the fair value adjustments. Mr Roughton-Smith signed off his impairment analysis of the retail and corporate books and of the international portfolio on the "credit crunch" scenario. His assessment was

> "To achieve material improvements in our impairment analysis would require several weeks of intensive work at a much more granular asset by asset level. Given the acquisition timescale, we do not believe this additional work would be worthwhile at this stage."

The work on the corporate portfolio did not, however, cease: some further analysis together with modelling a "1 in 25" scenario continued alongside work on the HBOS treasury assets.

393. Mr Roughton-Smith's key findings at that stage were as follows:-

> "(i) [HBOS'] corporate portfolio is highly concentrated in relatively risky counterparties. We have reviewed most of their top 200 corporate exposures: these total c.£30bn yet only two are FTSE 100 companies or overseas companies of similar size. Instead the largest exposures are predominantly FTSE 350 companies, private companies or special-purpose vehicles, many with a property component. However the size of these exposures is similar to those Lloyds would have to FTSE 100 companies.

> This unusual distribution makes impairments highly cyclical and volatile.
>
> (ii) In many of the larger deals [HBOS] are in several layers e.g. senior debt, mezzanine and equity; the latter two components are inherently more volatile and are correlated with senior debt.
>
> (iii) We believe the property related exposure is larger than the classification analysis in the published accounts would suggest. The concentration in property will also increase the cyclicality of impairments.
>
> (iv) [HBOS] has large self certified and [buy-to-let] mortgage portfolios. Whilst we have been able to model the forecast impairments, it is more difficult to estimate the cyclicality of these portfolios will exhibit in a severe downturn (e.g. our 1 in 25 recession scenario)."

394. The Lloyds Group Strategy and Corporate Development team then took Mr Roughton-Smith's latest work and the latest available HBOS forecasts and on 17 October 2008 reached the view that allowance would have to be made for write-downs and FVAs of £3.1bn (on a realistic case) and £10bn (on a pessimistic case) *over and above what HBOS were contemplating* (which was at that time £8.4bn). This estimate they provided to Mr Tookey.

395. At about the same time a different group within Lloyds (the Credit Risk Oversight team in W&IB Division) was considering the adequacy of the internal stress testing of *Lloyds' own business*. They put together a draft "View on FSA Stress Test" which embodied their view that "we are heading for a severe downturn/recession" and modelled a "1 in 25" event. Their "View" combined both the construction and modelling of a scenario and a forecast of an outcome:-

> "The bank's internal 1 in 25 stress (based on the original Q3 MTP) forecasts an impairment level of £1,313m (excluding market dislocation) in 2009, which is Risk's realistic view of the likely impairment level (excluding market dislocation) in 2009."

This draft document was not sent to Mr Tookey (or, so far as I can see, circulated to the senior management team). To get to that level of management it would have to have been considered and approved by Group Risk. It was deployed at trial by Mr Hill QC as a basis for suggesting that the *HBOS* impairment assessment ought also to have been approached on the footing that a "1 in 25" recession was the realistic probability. I do not accept that. Whilst I accept that the Credit Risk Oversight team and, indeed, Group Risk itself would not only calculate outcomes of assumed stress scenarios but would to a degree express a view about the likelihood of the occurrchiwence of that stress scenario, economic forecasting was not its province. The Board was entitled to act on the views of Lloyds' Chief Economist who had himself at an early stage drawn a distinction between prudent planning assumptions and realistic forecasting. On 7 October 2008 Mr Foley (having advised the Group Executive Committee upon the probabilities the various available scenarios for planning and budgeting purposes) had emailed the Group Executive Committee, saying:-

"The "credit crunch" scenario is just one of several scenarios, and has a probability of less than 50% and equal to the old "base case" scenario. *Hence, whilst it might be very prudent to budget and plan on such a scenario, I wonder whether we have to use it as a basis for the Prospectus – which should I assume be based on what we think is the most likely outcome rather than a deliberately prudent planning assumption.* An alternative might be to use (for the Prospectus) an average of the old base case scenario and the credit crunch scenarios. This average will be close to the current consensus forecast. This would also avoid a potential problem with HBOS wish to use a mild downturn scenario and we are using a more severe one ." (Emphasis supplied).

396.    On the 23 October 2008 Mr Daniels (with the assistance of Mr Pietruska) prepared a memorandum dealing in some detail with the potential impairments disclosed by the due diligence, and containing a yet further analysis. Noting that at the time of Announcement Lloyds had only been able to conduct "a high level due diligence exercise" which had resulted in estimated FVAs and writedown requirements of £3.5bn on top of HBOS' own estimates, Mr Daniels now reported that detailed due diligence had led to a revised estimate for the net negative capital adjustment on completion of £3.1bn to £10bn (in a credit crunch) on top of the HBOS forecast (which was the figure that had been reached by the Group Strategy and Corporate Development team). But so as to set those figures in context Mr Daniels also reported that after the Revised Announcement Lloyds was only paying 30% of HBOS' book value (which he underestimated at £21bn instead of its actual £25bn): the suggestion was that the price being paid afforded sufficient headroom for the impact on capital of impairments and FVAs.

397.    How (if at all) do the figures in this memorandum relate to the work of Mr Roughton-Smith? This was explained by Mr Pietruska in his written evidence and by Mr Daniels in his oral evidence (and is referred to in a 17 October 2008 update of the Group Strategy and Corporate Development document prepared for Mr Tookey). The short point is that the interaction between impairments and net negative capital adjustments is tenuous because they are different approaches to the valuation exercise. The former adopts a "bottom-up" analysis of individual samples. The latter applies adjustment factors (derived from movements in interest rates or credit spreads) across a portfolio. Thus Mr Roughton-Smith's writedown/FVA adjustment of £15-£21bn was (in unvarnished form) *one* of the inputs into a calculation of the anticipated net negative capital adjustment, which calculation included comparative valuation approaches (using interest rates and credit default swap rates), potential crystallised loss on Available for Sale ("AFS") assets, HBOS' own impairment forecast, adjustments for different valuation methodologies ("mark-to-model" in place of "mark-to-market") and an assumed ability to write off losses against tax. So an increase in impairments does not automatically lead to a corresponding increase in the figure for net negative capital adjustment. There is nothing in the documentary evidence itself to suggest that the figures deployed in the memorandum resulted from a conscious manipulation or juggling of the figures to reduce the impact of impairments, and Mr Roughton-Smith's

raw impairment estimates appear on the face of the document from which the memorandum figures derive.

398.    It was this memorandum that was placed before the Board for its meeting on 24 October 2008 and to which Mr Daniels spoke at that meeting.

399.    It is now necessary to consider the context in which this due diligence work was being undertaken i.e. perceptions about the course of the economy. The effect of the Recapitalisation Weekend (the recapitalisation of banks, the provision of additional liquidity to the market and the required commitment of those taking Government funding to maintain lending in the mortgage market and to SMEs) had to be factored into Mr Foley's economic forecasts for the purpose of planning the conduct of the Enlarged Group's business.

400.    His initial work (following immediately upon the Recapitalisation Weekend) was to construct a new "mid-case scenario", less optimistic than the then-current "base case" but less aggressive than the then-current "credit crunch" scenario. This was intended to reflect the recent government actions on capital and funding which together were intended to alleviate the credit crunch. The scenario was prepared for planning purposes, to support a refocusing of the planning and budget strategy upon capital affordability and funding sustainability. The assumptions in the "mid-case" postulated a dip in H208 and 2009, but an increasingly strong recovery through 2010 and the years following. The dip was not severe: GDP was assumed to grow 1% in 2008 and to fall 0.5% in 2009. House prices were assumed to fall 16% in 2008 and a further 10% in 2009. The GDP assumptions made by Mr Foley were more testing than the consensus view of a substantial body of a prominent financial and economic forecasters as that time, including the BoE and the Treasury. Mr Foley recognised it was unclear to what extent the real economy would react to the government initiatives and also to what extent the stronger capital and funding positions would support credit growth. So he thought that whilst the mid-case scenario was "now the highest probability outcome", the "credit crunch" scenario remained a distinct possibility (though with a lower probability than before). Mr Foley incorporated this "mid-case" scenario into a presentation intended to be placed before the GEC in draft and subsequently before the board. Mr Foley attended the meeting of the GEC on 14 October 2008 on the item of business called "November board meeting preparation" and it is probable that he put before the meeting his draft presentation in its then state (so that his views on the economic outlook for planning purposes were communicated to Mr Daniels, Mr Tate, Ms Weir, Ms Sergeant, Mr Tookey and Mr Pietruska).

401.    The following day Mr Foley, in an email to the GEC, tentatively modified his views in the light of further analysis, moving the probabilities back towards the "credit crunch" scenario: but he did not alter his formal advice. Thus the Chief Economist's advice to the GEC (of which key board members would have been aware) was that a "mid-case scenario" (a tough "base case") was the most likely outcome: but with the caveat that a "1 in 15" could not be discounted.

402.    Having dealt with the economic outlook as it appeared in mid-October 2008 I turn to consider views on prospective liquidity issues. Late in the evening of 12 October 2008 Mr Short and a team at Lloyds prepared a Powerpoint presentation drawing together the Lloyds' perspective on the funding position of the Enlarged Group. Inevitably this contained speculative elements, in particular the extent to which the Government