initiatives announced on 7 and 8 October 2008 (and being given concrete form at the very time the presentation was prepared) would succeed in achieving their objectives. Further it was based on HBOS' known cash requirement. Setting the target of a £20bn overnight funding requirement the work identified that (assuming a "base case" scenario) the target figure would be breached in October and November 2008, but would be met thereafter until December 2011 (when current SLS funding would mature, assuming there was no equivalent replacement). In the meantime there was a significant refinancing risk, because the funding plan was dependent on access to Government funding (the newly extended SLS, the newly announced guaranteed loan facility and the opening up of the market generally). The forecast was prepared too late for presentation at the Board meeting: but its contents were communicated to Mr Tate and to Mr Tookey (and thus could inform their actions over the night of 12/13 October 2008).

403.    The Powerpoint presentation remained a work under review, and was constantly updated in order that it could be presented to a board meeting intended to be convened for 24 October 2008.

404.    I turn to consider working capital. Lloyds retained its auditors, PricewaterhouseCoopers ("PwC"), to tender advice in relation to the working capital requirements of the Enlarged Group. Their letter of engagement (eventually dated 31 October 2008) required them to prepare a working capital report both on Lloyds and on the Enlarged Group to be addressed to the directors, the joint sponsors and the bookrunner. Amongst the inputs would be Lloyds' management's projections prepared down to 31 March 2010, and cash flow projections and the working capital requirements of HBOS prepared by its auditors KPMG (whose report on HBOS would be addressed to PwC amongst others). PwC would then conduct a review of the systems and controls of Lloyds and of the Enlarged group in the management of liquidity risk and regulatory capital, including a review of the regulatory capital requirements on a base case and stressed scenarios. As to those, it would be for the addressees of the report to form their own opinions on the reasonableness of the assumptions, but PwC undertook to report if any material assumption was in their view unrealistic.

405.    At the outset of their work PwC received Mr Short's initial Powerpoint presentation relating to funding requirements. PwC's strong recommendation was that Lloyds seek written confirmation of the oral indications given on behalf of the Tripartite that adequate funding would be available to the Enlarged Group. I think the point of the advice was to ensure that it was clear that Government funding would be available in some form not only to secure the completion of the Acquisition but also during the period that it was thought had to be covered by a working capital statement.

406.    On 16 October 2008 the possibility arose that a formal working capital statement in the customary form might not be required for the upcoming Circular. But according to advice received from Merrill Lynch (who conveyed the news) the proposed revised statement

> "…would still require the same level of diligence to produce this
> statement as for a traditional working capital statement, but…is
> much less onerous on management to sign off."

So the proposed revised wording did not affect the work being undertaken by PwC or the view of Mr Tate and Mr Tookey that the Board would need to be satisfied as to the capital requirements of the Enlarged Group following the Acquisition. Nor did the potential absence of a formal Working Capital statement affect the view of the sponsors. In my judgment the position was accurately summarised in an e-mail which the Lloyds Group Corporate Treasury sent to the FSA supervisory team on 24 October 2008:

> "…whether or not the UKLA requires the statement, neither our board nor the sponsors would wish to enter into the transaction without satisfying itself, through their own review and that of the reporting accountants, as to the adequacy of resources.."

In my view the analysis of working capital requirements was undertaken to the same standard as if a working capital statement was to be included in the Circular – as indeed appeared likely until the last moment.

407.   I turn to the preparation of the documents. The Circular was bound to comply with a number of highly technical requirements. For that reason, of course, its preparation was in the hands of the specialists – the investment bankers took the lead on the preparation of the Chairman's letter, and the specialist team at Linklaters assumed responsibility for the preparation of the rest of the Circular.

408.   Various drafts of the proposed Circular were submitted to the UKLA for supervision and comment. In responding the UKLA made clear

> "we are examining the document primarily from a UKLA standpoint and that it should not be assumed that our comments will necessarily cover all aspects of FSA regulation. … It should not be assumed that lack of comment implies approval or agreement from other FSA areas."

409.   Listing Rule 13.3.1(3) required the Circular to contain all the information necessary to allow the shareholders to make a properly informed decision. This was specifically drawn to the attention of Linklaters by the UKLA, who noted it and confirmed that it was so.

410.   Listing Rules 13.5.6 to 13.5.9 required all financial information not extracted without material adjustment from audited accounts of HBOS to be appropriately sourced and adequately explained. Linklaters amended their drafts to secure that this was so.

411.   The UKLA considered a draft of the Chairman's Letter to be included in the Circular and commented:-

> "Please ensure that the document is clear with regards to the position that the company would be in should the shareholders vote down the proposals. We would expect for example the company would need to indicate a further fundraising if necessary, expand on possible discussions and positions with regards to Treasury involvement and indicate where possible the potential consequences for shareholders of any alternative proposals i.e. perhaps no longer being pre-emptive."

In relation to a later passage the UKLA commented:-

> ".. please make it explicitly clear within the document that the various proposals are conditional and that the fundraising will not continue if the acquisition is not approved."

412.    Partly in response to this, and partly because of internal decisions independently made, those preparing the Circular decided that it was necessary to incorporate the effect of Mr Sants's letter of 28 October 2008 confirming that a standalone Lloyds would be required to raise a total of £7bn additional capital. The UKLA later required the addition of words indicating the difficulty of raising those additional funds in the public markets.

413.    It was a requirement of Listing Rule 13.4.1.2 and its associated annexes (reflecting the then-current guidance from the Committee of European Securities Regulators) that the necessary shareholder circular seeking approval of the transaction should contain a working capital statement by the Lloyds' directors, prepared on the footing that the Acquisition completed. Ordinarily a working capital statement will address whether (looking forward for a minimum period of 12 months) a company's anticipated cash requirements can be satisfied from its available facilities. But working capital statements for trading banks pose difficulties because fundamentally their business model is in part to borrow "short" (customer deposits) and lend "long" (mortgages and corporate term loans). So such working capital statements tend to focus on the processes and controls which the bank employs to manage liquidity and monitor its regulatory capital requirements. The sponsors would then have to comply with Listing Rule 8.4.2(5) and only submit the circular to the FSA if, following due and careful enquiry they were of the opinion that the directors had a reasonable basis for making the required working capital statement.

414.    On 16 October 2008 the UKLA let it be known that the FSA might, in the current financial crisis, waive the requirement of a working capital statement for a small number of UK banks. But the evidence was clear that the fact that the UKLA might be (and was in the event) prepared to waive the requirement of the customary Working Capital Statement in the Circular was not seen by the Lloyds' internal team (in particular Mr Tate and Mr Tookey) as relieving the Board of it obligations to consider and to be satisfied as to the working capital requirements of the Enlarged Group.

### The Board Meeting on 24 October 2008

415.    On the morning of 24 October 2008 the Lloyds board met to assess the current position and to prepare for the decisions that would have to be taken in the immediate future. Of the Director Defendants Sir Victor, Mr Daniels, Mr Tate and Ms Weir were present. Mr Tookey (who was still not yet a director) was in attendance, as was Ms Sergeant (the Chief Risk Director to whom Mr Roughton-Smith reported) and Mr Parr (from Linklaters). Mr Roughton-Smith was not in attendance. A great range of business was before the meeting: amongst the items which I will not address for the purposes of this case (but which did require consideration by the Board) were:-

(a)    discussions with a sovereign wealth fund investor;

(b)    discussions with the First Minister of Scotland in relation to Scottish issues;

(c)      detailed issues relating to synergies and their verification (on which there were sundry reports and analyses from different sources, both internal and external);

(d)      papers on financial reporting procedures;

(e)      timetables;

(f)      drafts of Acquisition documents;

(g)      conflicts of interest; and

(h)      another unrelated project being undertaken by Lloyds.

416. Before turning to the matters addressed at the Board meeting which are material to the Claimants' case, I must add one brief comment on synergies. The nature of the case advanced has meant that at trial attention focused on the downside risks of the Acquisition: no equal attention was paid to the perceived benefits. The board meeting on 24 October 2008 was the first opportunity that the board had had to look in detail at the benefits. The anticipated synergies referred to at the time of the Announcement where of the order of £1bn. Further work now identified a range of £1.9-£2.6bn, but the proposal before the board was to include a deliberately conservative estimate of only £1.5 billion in the intended circular. Some 250 people had been engaged in this work, including a team from Deloittes (who thought the process undertaken by Lloyds was thorough and of high quality). The work of this team was cross-checked by PwC in order to verify its suitability for inclusion in the Circular. The outcome of the work on synergies arising from the integration of the two businesses (whatever form the board decided that should take) was a key part of the Acquisition, because Lloyds was not simply buying assets (book value less write downs and FVAs) but also the business opportunities afforded by the HBOS brands, and the contribution they would make to the income of the Enlarged Group (which would feed through to the EPS enhancements) partly through synergies.

417. Turning to the matters material to the Claimants' case, the primary record consists of the Minutes of the meeting. But there is a secondary record in the form of some surviving handwritten notes made by Mr Tookey.

418. The first issue addressed was the current state of the transaction. This was covered by Mr Daniels, utilising the memorandum that had been prepared by himself and Mr Pietruska, which had concluded with a final version dated the 23 October 2008. I have already considered and noted how it dealt it suggested capital adjustment of £3.1bn-£10bn (instead of the originally estimated £3.5bn) over and above HBOS existing provisions (and how the work on impairments by Mr Roughton-Smith fed into the commentary). I want to pick up on three other items in the 7-page memorandum, which assist in assessing its likely impact on the directors.

419. First, the overall view given:-

> "The revised offer is financially an attractive proposition for [Lloyds] shareholders, since it results in as (*sic*) significant de-risking of the HBOS acquisition. The original transaction paid

> 60% of book value to reflect the uncertain downside risk, the revised transaction pays only 30% of book value and discounts approximately £14 billion for potential after-tax fair value adjustments and write-downs. Furthermore while the transaction is less accretive than previously, it still leads to a significant EPS uplift for [Lloyds] shareholders. "

A table then showed that the 2011 EPS accretion had originally been forecast to be 22.3% but was now forecast to be 19.8%. The table also showed that whereas the share of the Enlarged Group taken by Lloyds shareholders had originally been assessed at 56%, following the recapitalisation weekend it would now be 37%.

420.    Second, in a section concerned with the communication of key messages to stakeholders was a summary of why it was thought HBOS remained a great deal. Part of it read as follows:-

> "HBOS has a fantastic franchise with a huge long-term value, particularly in savings and mortgages…However, HBOS has a challenged business model with major short-term issues (wholesale funding, non-conforming loans etc)…[Lloyds] has a clear plan to work through the short-term issues and integrate HBOS and deliver synergies… [Lloyds] has the management team and credibility to deliver… [Lloyds] has a hugely experienced leadership team and they saw the value and understood the problems and how to fix them… Lloyds has reviewed the HBOS portfolio and is satisfied that it understands and can manage the issues and achieve a high return on investment…".

421.    Third, in a section relating to messages to the political establishment there was an item suggesting that intervention to restrain or break up Lloyds was unnecessary and would delay or frustrate achievement of the public interest benefits of the merger. Included in it was the following:-

> "The bank has to submit a restructuring proposal. This requirement was never flagged nor agreed to. It could potentially require a breakup or significant downsizing of the combined institution and negates the merger benefits that are required by shareholders in order to subscribe to the clawback."

This outlined for the board an emerging risk and proposed a public stance to minimise it. The adoption of that stance was necessary in order to keep the Government to the position that it had signalled to the Lloyds' senior management, namely that essentially the Government had the matter of state aid in hand and that Lloyds' intended integration and disposal plans would probably suffice.

422.    It is apparent from Mr Tookey's note that Mr Daniels did not simply repeat the memorandum. For example, he told the Board that there was "growing heat" over the conditions attached to the capital injection, over "taking over HBOS" and about "why not go it alone?". This warned the Board that their provisionally favoured course was not free from controversy. He told them that the Tripartite had set the Lloyds' capital

requirement at £7bn and £5.5bn which was "[a] clear push towards [the] HBOS deal". He told them that Lloyds objected to the capital setting methodology and wanted changes, one of which was an immediate £2bn reduction in the amount to be raised (because management action and proposed disposals had not been taken into account). This warned the Board of potential pressures to adhere to their provisionally favoured course.

423.    Although there was no pleaded case that, in breach of his duties as director, Mr Daniels, in the preparation and presentation of this memorandum negligently or deliberately misled the Board as to the risks inherent in the Acquisition, this was the undertone of Mr Hill QC's cross-examination. Mr Hill QC suggested that the reference in the memorandum to the impact of fair value adjustments and write-downs upon capital as being of the order of £3.1bn-£10bn was misleading because Mr Roughton-Smith's figure for fair value adjustments and write-downs was £15-£21bn. Mr Daniels responded that one cannot not simply apply anticipated impairments to the figure for negative goodwill at completion: it was necessary to assess the impact of impairments on capital, taking into account existing provisions, tax recoveries and so forth. Mr Hill QC suggested that the board was not aware of the range of Mr Roughton-Smith's figures. Mr Daniels responded that he could not be sure that at that stage all of the board had seen Mr Roughton-Smith's latest schedule: but that he believed the board was aware of the range of figures. (As well as Mr Daniels the other participating directors who had certainly seen in full the latest Roughton-Smith figures were Mr Kane, Mr Tate and Ms Weir). Mr Hill QC suggested that the figure of £3.1bn-£10bn was not fairly compared with the earlier forecast of £3.5bn. Mr Daniels responded that the figures were comparable since each of them was a figure over and above existing HBOS provisions. Mr Hill QC challenged the way that the memorandum dealt with the EPS uplift. Mr Daniels responded that a financially aware board (such as Lloyds') would understand that *any* recapitalisation would involve a dilution, and that the point being made was (given the new requirement to take additional capital) to compare the dilution involved in the recapitalisation of a "standalone" Lloyds with the dilution involved in the recapitalisation of an enlarged group with beneficial synergies (and to note that synergy benefits were deferred). Mr Hill QC suggested that the memorandum failed to draw out that the requirement to take £7bn was "discussable". But Mr Tookey's note shows that the board was told of the challenge to the FSA's methodology, and of what seemed to be the desire of the Tripartite to give a clear steer in favour of the Acquisition. (Mr Daniels was insistent that although the capital requirement of the Enlarged Group "got more airtime" the capital requirement of a "standalone" Lloyds was not overlooked). Mr Hill QC characterised the memorandum as a "sales pitch", and not a fair and objective analysis of the transaction and its attendant risks. Mr Daniels begged to differ.

424.    I was not persuaded that the terms of the memorandum or Mr Daniels' presentation of it at the board meeting on 24 October 2008 misrepresented the transaction to the board. Viewed in isolation the memorandum is undoubtedly an endorsement of the policy recommended by management and hitherto adopted (with caution) by the board, and it is being considered at a meeting where the positive aspects of the transaction (the anticipated synergies) feature prominently. But, as Mr Daniels said, the memorandum (to the criticism of which he responded well) has to be read along with the body of work that accompanied the board papers and has to be seen in the context of other meetings: and it is clear from Mr Tookey's record that the contentious aspects of the Acquisition

were placed before the board by Mr Daniels. It was a consistent theme of the directors who gave evidence that it was not right to measure each meeting in isolation: and that aspects of the Acquisition adumbrated in one meeting were carried forward to the next without the necessity for repetition at each subsequent meeting. I accept that evidence. I do not think that Mr Daniels presented a "sales pitch": and I do not think that the directors fell for any "sales pitch".

425.    One particular criticism made of Mr Daniels was that both in his board memorandum of 23 October 2008 and in his presentation to the board on 24 October 2008 Mr Daniels took it as read that a "standalone" Lloyds would have to raise £7bn additional capital and did not tell the board that there was a real possibility of reducing this (which would undermine his analysis that a "standalone" Lloyds would face an EPS dilution of 31.7%). I do not think that Mr Daniels misread the situation in presenting matters on 24 October 2008: and the FSA's view was to become clear over the next few days.

426.    The next issue addressed was the draft transactional documentation that was before the meeting. Mr Parr dealt with that item. As the minute records:-

> "It was noted that the circumstances of this transaction are unusual as the company circular will contain substantial information about HBOS to enable the company shareholders to decide on the merits of the transaction. The directors would have to take responsibility for the entirety of the class 1 circular and therefore a key issue for them is to ensure that the contents of it are correct, complete and accurate not only as regards the group but also in respect of HBOS and the enlarged group. Mr Parr explained that it is possible for the directors to minimise the potential for liability arising and to avail themselves of the defences should liability arise by conducting an appropriate legal and financial due diligence exercise…. The main way to address this issue is to seek to ensure that the due diligence processes are completed as far as possible in advance of the publication of the circular and the results reflected in the circular. Efforts continue to be made to obtain to obtain some direct comfort for the directors from the HBOS directors in connection with the Lloyds TSB circular. However, the fact that HBOS will be publishing an interim management statement on the day both the Lloyds TSB and HBOS circulars are published, a draft of which Lloyds TSB will be able to review (and the final version of which will also be reviewed by Lloyds TSB) should give the board further comfort in relation to the HBOS information in the Lloyds circular. "

I have no reason to doubt that this is a faithful record of the advice tendered by Mr Parr. It guided the board as to the extent to which they could properly make statements about HBOS.

427.    Mr Parr also gave advice as to third-party comfort that would be available to the Lloyds' directors in relation to the contents of the Circular. This had been the subject of a note prepared by Linklaters and circulated to the Board in advance of the meeting. That note recorded that HBOS had prepared a prospectus for its rights issue launched on 29 April

2008 and that in relation to that document both UK and US legal teams had been able to state that nothing in the due diligence process for it had led them to believe that that prospectus contained any untrue statement of a material fact or omitted to state a material fact: and that in relation to matters since the prospectus date Linklaters had (together with Allen & Overy as solicitors for HBOS, and Freshfields as solicitors for the sponsor banks) attended meetings between the Lloyds and HBOS due diligence teams. Telling the directors about this level of professional scrutiny was intended to inform the Board as to the extent that they could properly rely on the accuracy of material produced by the due diligence process.

428.    A third area of work addressed was that of working capital requirements. The minute of the meeting records:-

> "Mr Tookey explained the briefing slides produced by Group Corporate Treasury on the enlarged group's Working Capital and Regulatory Capital position and the work being undertaken by management and PwC to support the working capital statement that the directors would be required to give in the circular."

These briefing slides had been prepared by Mr Gilbe and Mr Short: they were therefore the work of senior Lloyds personnel.

429.    The presentation began with a summary which explained that the key dependencies for a successful funding programme included the sustained recovery of the money and capital markets, access to SLS and access to the government guaranteed debt issuance. It emphasised that confidence in the funding strategy of the Enlarged Group depended on certainty of access to government capital and guaranteed facilities in order to provide a bridging mechanism that would allow an orderly refinancing in the public markets. It then commented:-

> "The refinancing model indicates that if markets return to even moderate health, the combined entity will have manageable funding exposure
>
> <u>However</u>
>
> If at any stage the markets collapse to the chronic state recently experienced, the combined entity will not survive without access to additional central bank/government supported funding"

430.    Accompanying tables indicated that if the identified sources of government funding were utilised then a "pinch point" would occur in the second half of 2011 when that government funding matured, with the Core Tier 1 ratio falling to just above 5% on a highly pessimistic basis. The presentation indicated that further work was under way and that it would be updated: so I will return to an updated version of this paper later. In addition to this crisp presentation there was a 145-page draft report on working capital prepared by PwC: since their work was not complete PwC was not prepared to accept responsibility for it in its then form. But it identified the sort of working capital statement that it was anticipated the Board would have to sign off, namely:

Approved Judgment

> "Lloyds believes that, despite the current financial turmoil,
> taking into account all of these sources of capital and liquidity,
> the Enlarged Group has adequate resources to support its
> business activities over at least the next 12 months."

I am satisfied that, whether or not the Circular might ultimately contain a working capital statement it was against that standard that the directors measured the Acquisition.

431.    The draft report produced by PwC was the outcome of close liaison between PwC and the Lloyds Group Risk team (i.e. senior Lloyds personnel). Although based on HBOS estimates those estimates themselves had been adjusted in the light of Lloyds' own work, and were then cross-checked against Lloyds' internal work. On 21 October 2008 PwC had received from the Group Risk team Mr Roughton-Smith's impairment estimates on the "1 in 15" scenario (maximum £21 bn) and a preliminary view on the "1 in 25" which was then being modelled. PwC was undoubtedly aware of that ongoing work, and incorporated it. The relationship between Mr Roughton-Smith's work and PwC's work was addressed. The Lloyds' Group Risk team suggested that their work

> "…which is looking at the economic position rather than a point
> in time valuation now, would be substantially covered by the
> credit spread adjustments."

PwC was specifically asked to address whether this assumption was reasonable. The following day Ms Sergeant of Lloyds met with PwC. I have seen no note of that meeting but it would be extraordinary if the highly attuned Ms Sergeant and a competent PwC did not discuss these issues further, particularly since both she and PwC would be attending the 24 October 2008 board meeting.

432.    The point of drawing attention to these matters is to underline that when these matters came later to be discussed, preparatory work had already been put before the board. That indeed was the principal objective of the board meeting on 24 October 2008

### Events between the Board Meetings of 24 and 29 October 2008.

433.    I will retain a thematic approach and look first at continued due diligence.

434.    Mr Roughton-Smith had continued his due diligence work, with a team of 26 of Lloyds' most experienced risk and middle office professionals with specific expertise in HBOS' principal business areas. This included work to comply with a US standard shortly referred to as "the 10b-5 process". In the light of this work he was able to update his report in the evening of 28 October 2008. He identified his starting point for forecasting HBOS's H2 2008 and 2009 impairments as a high level risk-based review of the entire balance sheet using only publicly available information: he thereby indicated that attention had focussed upon where the perceived risks were most material. He had taken a "1 in 15" "credit crunch" mild recession as the base case, but had subsequently undertaken a high-level estimate of a "1 in 25" "deep recession" scenario. After the latest work undertaken down to 27 October 2008 Mr Roughton-Smith presented a revised assessment of the reduction in net values to December 2009 (resulting from the impairment and fair value analysis) of £16.9bn-£22.3bn in a "1 in 15" scenario (a modification of his earlier range of £15bn-£21bn). The increase in the bottom of the

**Approved Judgment**

range was attributable to a reassessment of the concentration in joint venture property exposures. (These were, once again, the total adjustments required: if one was looking for the figure for impairments under Lloyds' methodology additional to those forecast by HBOS the revised range was £8.5bn-£13.9bn). Of these figures Mr Roughton-Smith said:-

> " We believe our revised impairments forecast range is robust, with the range resulting from inherent uncertainties which would not be reduced materially by further asset level analysis. "

435.    It is right to record   that he expanded upon that general comment in relation to particular asset classes.

(a)     In relation to the corporate book he explained the sampling methodology used and explained that to achieve a significant improvement in the robustness of the analysis it would be necessary to undertake a detailed examination of a statistically significant sample of individual loan files and to conduct detailed discussions with HBOS's credit officers: but he considered that the inherent uncertainties in the economic environment meant that even such work would be unlikely to narrow materially the impairment range.

(b)     In relation to treasury assets (bonds) he explained the methodology of reviewing prices on a statistically significant sample, and noted that £2bn of the adjustment was attributable to the Lloyds' use of "mark-to-market" valuations in place of the "mark-to-model" basis approved by HBOS' auditors. In the version of his report tabled on 29 October 2008 he said that further work would not produce more precise or accurate results. For the purposes of his impairment analysis he adopted the conservative Lloyds approach (rather than the approach adopted by HBOS's auditors, KPMG).

(c)     In relation to the international portfolios he explained that there had been a review of portfolio level management information with HBOS' international portfolio manager, and conversations with senior managers in Australia and Ireland, that greater comfort could only be obtained by a "deal level" review of transaction files using credit officers with expertise in local markets and local valuers conducting revaluations of sample properties, a resource-heavy course likely to encounter resistance from HBOS: the work undertaken had not led to an increase in the impairment forecast.

(d)     In relation to private equity and joint venture investments he explained that the team had undertaken "portfolio level" analysis using HBOS's management information,

and had conducted brief reviews of the top six investments and of the higher risk investments: he considered that a more in-depth review would make the impairment calculations more robust but would not materially alter the forecast range.

436. Mr Roughton-Smith's consideration of the additional impact on HBOS of an assumed "1 in 25" "deep recession" occurring in 2009 led him to the view that there would be additional impairments for H2 2008 and 2009 in the range of £3.75-£6.5bn.This would bring the total assessed reduction in net values as at December 2009 within a range of £20.65bn-£28.8bn (Looking only at 2009 with these adjustments the HBOS impairments for 2009 using the "1 in 25" scenario came to £10.25bn-£16.6bn). Looking at H2 2008 and 2009 the reduction in estimated net asset values at December 2009 (i.e. the additional adjustment over and above HBOS' own forecasts) would be in the range £12.25-£20.4bn. (These were gross figures without any tax adjustment). He considered that the relative impact of a "1 in 25" deep recession on HBOS would be greater than upon Lloyds because of the size of the HBOS specialist mortgage book, corporate concentration in relatively risky counterparties and exposures to private equity and joint ventures.

437. During the period in which Mr Roughton-Smith and his team were preparing the revised impairments report on the "1 in 15" and "1 in 25" basis there was frequent contact between the Lloyds Group Risk team and PwC as the latter worked on the material with which they had been provided: the e-mail trail and circulating drafts indicate that PwC was undertaking a verification and cross-checking process, and notes on the working capital model confirm that PwC specifically considered the prudence of the adjustments they were making when compared with the impairment figures and fair value losses produced by Mr Roughton-Smith on 14 October 2008. The Lloyds team working alongside PwC on the preparation and testing of the capital model were also conducting a cross-checking exercise: they concluded (as at 4.30pm on 27 October 2008) that the impairments suggested by Group Risk were adequately covered by the credit spread adjustment and that the fair value adjustment was prudent.

438. Mr Roughton-Smith's revised impairments report was sent to the Lloyds' advisers (Citi, Merrill Lynch, UBS and Linklaters) and to Mr Tookey and Ms Sergeant at 9:26pm on 28 October 2008. Its existence and conclusions were therefore known: but there was very limited opportunity for the writers of other reports to consider its ramifications for their own work. It appears from the documents that Mr Tookey (rather than Ms Sergeant) assumed the responsibility for presenting Mr Roughton-Smith's revised report to the forthcoming board meeting: but she was in attendance at the board meeting.

439. Linklaters also updated their memorandum of advice to the Board (though it remained in draft until the Board meeting itself). Amongst the matters covered was the financial due diligence on HBOS conducted by Lloyds. Here Linklaters advised:-

> "In the UK, there is no set threshold of due diligence which will guarantee compliance with the relevant obligations... Accordingly acceptable due diligence procedures will vary from case to case depending on the circumstances..... As [Lloyds] is acquiring HBOS, [Lloyds] rightly feels the need to carry out

131

additional financial due diligence on HBOS. In the context of a UK public takeover, as this is, it is usual for the acquirer only to get limited access to the target's personnel, books and records. However in the current circumstances, partly because [Lloyds] has to produce a prospectus covering the enlarged group, [Lloyds] has been able to gain more access than might normally be the case. "

After a reference to Mr Roughton-Smith's work (in terms which he specifically approved) the Linklater's memorandum continued:-

"In conducting this work and producing the paper, we understand that [Lloyds] has taken a risk-based approach to the due diligence exercise, namely focusing on the areas where material risks are most likely to arise and therefore where investigation should be targeted. In the context of a public takeover where access is necessarily limited, this is appropriate. [We understand that the placing agents (Citi, Merrill Lynch and UBS) have reviewed the work conducted and the paper produced and have confirmed that they consider the level of due diligence conducted to be reasonable in the circumstances.] [To be updated at board meeting]."

Although I have inserted "[Lloyds]" in that citation, the other text in square brackets is as in the original. This advice was reiterated at the end of the memorandum in the same format and in these terms:-

"In Linklaters' view, the legal due diligence conducted is customary and adequate under the circumstances. [We understand that the placing agents feel that the financial due diligence conducted by Lloyds is also adequate]… Linklaters, Freshfields and Allen and Overy will not be able to deliver their 10b-5 disclosure letters unless they feel that the material issues discovered in due diligence have been adequately reflected in the prospectus and that no material issues are omitted."

Once again, the square brackets are in the original.

440.    The memorandum also gave advice about the role of directors in relation to due diligence in these terms;-

"[Lloyds'] executive directors may be involved in the management due diligence sessions referred to above but in any case, as all the [Lloyds] directors have responsibility for the prospectus, all the [Lloyds] directors will be expected to read the prospectus and input and comment as appropriate to ensure it is complete, correct and accurate as far as they are concerned. Notwithstanding the above, it is appropriate that the directors delegate the task of due diligence to appropriate people in their organisation and their counsel; they need to ensure in doing so, however, that they are comfortable that an adequate

132

investigation has been conducted and that material areas of risk
have been adequately explored and reported on."

441. It is now necessary to set the outcome of this due diligence in context. The due diligence process enabled the measure of impairments to be assessed in various assumed scenarios. But as a basis for action it would be wise to assess the likelihood of the occurrence of any of those scenarios: this was the role of Mr Foley. By 7 October 2008 Mr Foley was articulating the understanding that the shareholder circular and the prospectus relating to the open offer "should, I assume, be based on what we think is the most likely outcome rather than a deliberately prudent planning assumption". In advising the GEC for planning purposes he told them at that time that the combined adjusted base case (or "mid-case") and "1 in 15" recession scenarios had a probability of 70% (each having a 35% probability) and that the prospect of a "1 in 25" recession was 15%. His further work during the remainder of October did not lead him to advise GEC or the board of any change to that. By 28 October 2008 he had prepared a paper showing that the UK economy had entered a recession, but (as he was to confirm at the "awayday") he adhered to the view that the "mid-case" scenario represented the most likely outcome. Thus Mr Roughton-Smith's "1 in 15" scenario (if treated as a base case for risk assessment purposes) was a prudent and cautious one.

442. I turn to the liquidity issue. Here, Lloyds itself managed to access up to £30bn in overnight funds during this period (outside the limit which management considered optimal in normal circumstances but well below what management considered to be Lloyds' maximum capacity). It had drawn on SLS funding to the extent of £14bn and had begun to draw upon Government guaranteed funding. It appears from the PwC work that the Government had indicated that up to £110bn would be available to Lloyds through the SLS and Long Term Repo facilities and that £75bn would be available to Lloyds through guaranteed debt issuance.

443. HBOS was also using the like facilities. Because Lloyds had extended both overnight and significant term facilities to HBOS, Lloyds was able to obtain detailed information about HBOS' funding requirements on a daily basis. These were the spreadsheets to which I have referred and which on close reading disclosed that HBOS (though fully funded until completion) was drawing on a special facility of some sort outside SLS.

444. I turn to "working capital". The preparation for the 29 October 2008 Board meeting included continued development of working capital reports for the Enlarged Group. The first of those reports was the Group Corporate Treasury presentation that had been put before the board on 24 October 2008. This set out in a prominent place the terms of the proposed statement to be made in the circular in the place of the customary working capital statement. It told the directors that notwithstanding the absence of the requirement for a formal working capital statement

> "… the directors of [Lloyds], who would normally be required
> to make a public statement confirming the expected adequacy of
> working capital, would be clearly remiss in allowing a
> transaction to proceed if there were grounds for doubting its
> adequacy."

It then explained the work that had been undertaken, including a review of HBOS projections to align them in respect of accounting policies, economic assumptions and

fair value adjustments. As to that review of HBOS material the authors advised the board that the report's assumptions on corporate insolvencies were more conservative than those of HBOS, and that for the purposes of capital protection the report had made a conservative estimate of the adjustments that needed to be made to FVAs. The outcome of that was that the Group Corporate Treasury felt that the net adjustment that needed to be made to the Core Tier 1 capital ratio in respect of FVA's was £10bn negative in the pessimistic scenario and £8bn negative in the cautious case. The conclusion of the executive summary noted that

> "[a] critical factor is the extent to which reliance can be placed on the various statements made by HM Treasury."

445.    The report informed the directors of the scenarios that had been constructed for the purposes of analysis. The pessimistic scenario combined the Lloyds "1 in 25" and the HBOS worst-modelled "stagflation" scenario (a scenario approved by the FSA as appropriate to HBOS) and modified that combination for further sensitivity to corporate insolvencies and high FVAs i.e. Lloyds senior personnel had treated some HBOS figures as being on the optimistic side and had adjusted them to show a worse picture. Even on that scenario it was predicted that the Core Tier 1 ratio would remain above 5% compared with a 4% FSA "extreme stress" target. The report concluded:-

> "The board is asked to note that based on our work, reviewed and reported on by PwC, we believe the Enlarged Group has sufficient working capital for at least the next year."

446.    So I turn to consider the work of PwC. On 28 October 2008 PwC had presented a further draft working capital report for the Enlarged Group (and a separate appendix in respect of a "standalone" Lloyds including liquidity and capital projections). This drew on a memorandum (then in draft) from HBOS as to its working capital provision and a draft report prepared by KPMG (HBOS' auditors) on the HBOS working capital position. To these latter documents I will come later.

447.    The PwC report began by drawing attention to the fact that the proposed alternative statement about capital was in a substance an unqualified working capital statement; and in view of management's assessment that if at any stage markets were to revert to the chronic state recently experienced, then the Enlarged Group would need access to additional central bank or government supported funding, it was critical to the directors' assessment, in making the working capital statement, that they were satisfied that such additional funding would be available if and when required. In their final advice to the Board PwC put it this way:-

> "The Directors will…need to be satisfied that they have appropriate evidence of central bank/governments' intentions in relation to this funding based upon their discussions with the bank of England and H M Treasury"

448.    Mr Tate had already set about obtaining that satisfaction from the Treasury and the BoE. He caused to be prepared a draft letter (to be signed by the Bank) confirming the existence of sufficient facilities under ordinary programmes (SLS, LTR, DWF and guaranteed issuance) to support the anticipated (itemised) needs of the Enlarged Group. But the draft also referred to the possibility that (notwithstanding the recent

Government action) the markets might return to their state of chronic seizure so that the Enlarged Group's access to market funds would be cut off at a "pinch point" some three years in the future. In that event, the letter noted, the Enlarged Group would need access to additional Government funds outside the ordinary programmes and to an extent beyond its anticipated needs. The draft letter sought an assurance that the Government would give an unlimited commitment to make available whatever funds were necessary. Mr Tate acknowledged in his correspondence with PwC that it was "a bold shot to seek an unlimited commitment".

449.    On 24 October 2008 Mr Tate had a meeting with Mr Bailey of the Bank to discuss the terms of any commitment. Mr Bailey was willing to confirm the existence of sufficient facilities within the ordinary programmes for the anticipated needs of the Enlarged Group, to say so in writing, and to help in obtaining the like written assurance from the Treasury. But unsurprisingly he was unwilling to give a written commitment, open-ended in time and unlimited in amount, as to the availability of additional funds some three years hence. PwC appear to have understood the sensitivities around the Bank committing to give a blank cheque to the Enlarged Group, but asked Mr Tate to explore with the Bank whether it would clarify what it had meant when it said publicly that it would "take all actions necessary to ensure that the banking system has access to sufficient liquidity" and that it would "extend and widen its facilities in whatever way [was] necessary to ensure the stability of the system". The question was a fair one, given that the scenario postulated by PwC (a chronic seizure of the markets) was a systemic one, not one that affected the Enlarged Group alone.

450.    The response of the Bank in the continuing discussions was to increase the funding under its ordinary programmes the availability of which it was prepared to confirm (so reducing the degree of reliance of the Enlarged Group upon market funds) to £110bn (against an anticipated requirement of £96bn for the Enlarged Group), but to hold back on Lloyds' request for written confirmation that the Bank would make available *any* necessary funds in periods of extreme market stress. The Lloyds' team had provided the Bank with the detailed workings of the funding plan for the Enlarged Group (including on a pessimistic scenario): accordingly the intended written commitment already covered a "downside" case, so the request was for an open commitment to be made to Lloyds as a specific institution in times of systemic stress.

451.    On 28 October 2008 there was a further meeting with an Executive Director of the Bank ("PT"). A representative of the team preparing the PwC working capital report was in attendance. A revised draft of the letter that Lloyds was intending to send to the BoE seeking the requisite confirmations had been prepared the preceding day: its terms still sought some open-ended assurance over support in circumstances of extreme systemic stress. At the meeting the response of the Bank was

    a)    to confirm the availability of the Government funds sought by Lloyds (even on the pessimistic scenario):

    b)    to explain that "the tenor of facilities and amounts would be flexed according to perceived market needs" and that "the mechanism was there to extend them if conditions worsened":

    c)    to decline to go any further.

The note of the meeting records:-

> "PT said that there were no guarantees for individual institutions but "speaking as a citizen" he would expect PwC to take comfort from the public statements by the Government that they would continue to support the banking system. As he had explained…the Bank of England facilities were designed to be adjustable to address market conditions. They were however not there to address solvency issues in a particular institution as the Tripartite Authorities had other powers/tools to deal with this."

452.   A board meeting on 29 October 2008 would therefore have had to work on the basis that the Bank had confirmed the availability of Government funds to the maximum anticipated need of the Enlarged Group, but had not promised to go beyond its general public statements as regards "doing whatever was necessary" by making a specific written commitment to Lloyds (though it had given a "nod and a wink").

453.   In the event on 31 October 2008 the Bank expressed its commitment in these terms:-

> "We are content that you have presented to the Bank a funding plan for the merged Lloyds-HBOS which is satisfactory and provides sufficient comfort that the funding will be viable . In view of that we are content that the merged bank will have access to the Special Liquidity Scheme up to 20% of its Eligible Liabilities (as calculated by the Bank, in line with the published methodology). I also confirm that the merged entity will have access to the Bank's facilities and operations conducted under the Bank's Sterling Monetary Framework provided it continues to meet eligibility criteria for such operations as published by the Bank of England."

This was formally confirmed in a letter dated 3 November 2008. Mr Tate's assessment of the text was that whilst it was not exactly what Lloyds had been looking for

> " …it is damn good and I "think" that it is the only letter like this that they are providing!"

So Lloyds was being singled out by the BoE for assurance as to funding. In his letter of thanks to the Lloyds' team he said he was "ecstatic" at the outcome.

454.   The draft PwC working capital report then addressed the assumptions being made in it. Before examining the assumptions themselves I would observe that insofar as they related to HBOS, the grounding for the assumptions had been provided by HBOS, was being reviewed by KPMG, had been analysed by Lloyds and had been scrutinised by PwC in consultation with Mr Tookey and with the Lloyds Group Corporate Treasury department to ensure a consistency of approach when compared with the outputs from Mr Roughton-Smith's work.

455. The PwC report was based on Lloyds' own figures for the anticipated capital requirements of Lloyds, and on HBOS' figures (but subject to adjustments made by Lloyds) for the anticipated capital requirements of HBOS. Amongst the assumptions being made was that adjustments would be required to the fair value of HBOS assets as at the date of acquisition, which were expected to result in substantial reductions to the carrying value of those assets, thereby reducing Core Tier 1 capital. The assumed adjustments were £8.7bn negative on a base case and £10.3bn negative on a downside scenario (these being the amounts estimated by HBOS as adjusted by Lloyds, drawn from the work of the Group Corporate Treasury). In its own estimates HBOS had already factored in impairments of £8.4bn on its base case and £11.3bn on its pessimistic "stagflation" scenario, so PwC was being asked to adopt a manifestly cautious approach. The working capital report noted that the Lloyds risk team had reviewed these estimates "in mid October", had compared the results against their own analysis and considered the estimates to be prudent. (In fact the documents show the review process continuing until 28 October 2008).

456. On these cautious assumptions the PwC working capital model showed that (taking into account the £17bn proceeds of the recapitalisation) on the base case scenario the Core Tier 1 ratio of the Enlarged Group would remain above 6% at all times, and on the pessimistic case it would remain above 5.1%. (thus providing a 1.1% buffer over the absolute minimum). The pessimistic case was aligned with stressed circumstances in which the FSA would accept a reduction on the Core Tier 1 ratio to 4%, but (depending on the duration of the stress and the ability of the Enlarged Group to continue to lend commercially) would expect the restoration of the "buffer" by means of an appropriate plan.

457. At trial an issue arose as to whether the PwC calculations in the draft of 28 October 2008 took into account the latest impairment figures that had been produced by Mr Roughton-Smith. It is not a pleaded Particular of negligence that the board of Lloyds relied on the Working Capital report of PwC when they knew or ought to have known that it did not incorporate all of Mr Roughton-Smith's work: so the issue only arose in the course of the trial itself and fell to be addressed on the material then available (which did not include PwC's working papers on the matter, save insofar as individual cells in the surviving spreadsheets could be accessed).

458. The witness evidence presented a confused picture. Mr Tookey was of the view that the PwC report did not include Mr Roughton-Smith's last impairment figures (in the sense that they had been modelled and analysed), but he thought it inconceivable that PwC would not have seen the figures. Mr Daniels was clear that Group Risk's work had been used to cross-check the adequacy of the net negative capital adjustment and thought that PwC had incorporated Mr Roughton-Smith's latest figures (but the only document he could identify as supporting that belief proved not to do so). Mr Tate thought that Mr Roughton-Smith's figures had not been incorporated "line by line" but had been used as an input into an assessment of probabilities. Dr Berndt thought that the capital adjustment had been checked for "plausibility" but could not recall how. Mr Williams (the Defendants' expert) said that he had seen material that reconciled Mr Roughton-Smith's figures with the PwC modelling but was unable to identify it. None of this material is really reliable.

459.  But on the available material I find as follows:-

a) The PwC working capital report incorporated and modelled Mr Roughton-Smith's impairment figures as at 14 October 2008 (as appears from cells behind the spreadsheet).

b) The drafts of the PwC Working Capital report are consistent in their reference to ongoing work being undertaken on impairments and FVAs. It is unlikely that PwC would choose totally to ignore the output of that known continuing work.

c) The PwC report assessed fair value adjustments of £10.3bn based on figures derived from HBOS as reviewed by KPMG and adjusted (in relation to corporate insolvencies) by Lloyds.

d) The detailed notes on the working copy of the PwC capital model show that there was a specific cross-referencing to the impairments analysis undertaken by Mr Roughton-Smith on 14 October 2008 and note a decision that the PwC adjustments already took sufficient account of them.

e) The potential adjustments to be made to HBOS's figures were the subject of consideration by Lloyds Group Risk (including Mr Roughton-Smith) and Lloyds Group Corporate Treasury and of conversation with PwC right down to 28 October 2008 (with updated figures being provided at 10:26am and corrected by PwC at 11:47am that day). Both PwC personnel and Mr Roughton-Smith were on the circulation list. The object of that consideration was to ensure consistency between the Lloyds approach and the HBOS approach to their respective impairment and FVA figures.

f) Notwithstanding that process, the PwC draft Working Capital report of 28 October 2008 as placed before the Board probably did not include a specific modelling of the figures that Mr Roughton-Smith reported upon in the late evening of 28 October 2008 resulting from his work on 27 October 2008 (because the PwC draft appears to have been circulated before Mr Roughton-Smith's late report and continued to state that it used HBOS impairment forecasts modified by Lloyds). The specific modelling would have included impairments on the base case up to £21bn (the figure adopted in the impairments report of 14 October 2008 and the subject of subsequent contact). Thus it would only be any increase over those figures that was not formally modelled.

g) However, because Mr Roughton-Smith was undertaking the "10b-5 work" on 27 October 2008 and because (i) PwC participated in some of this work and (ii) PwC were in any event in conversation with Lloyds throughout this period about the capital model, it is likely that there was a flow of information about Mr Roughton-Smith's impairment work that continually fed into the cross-checking process.

h) PwC continued to work on the draft Working Capital report and sent their latest version to Mr Tookey and to the Lloyds Group Corporate Treasury team (but not to the Board) at 1:57am on 29 October 2008. This

138

version of the draft noted that the Enlarged Group downside forecasts were based on aggregating the two group's separate downside forecasts with a sensitivity analysis overlaid, and that Lloyds considered the most damaging scenario to be a "1 in 25" recession. The significance of the impact of a "1 in 25" recession was therefore noted on the face of the report, and it was the subject of a separate section entitled "The key differences in downside assumptions are around fair value estimates" which explained how the FVA of £10.3bn had been reached. There was a 95 page Addendum containing 9 appendices. Appendix 8 set out in spreadsheet form the capital models for the Enlarged Group on the base case (i.e. "1 in 15") and "1 in 25" scenarios.

i)    Mr Roughton-Smith's full report was tabled at the board meeting on 29 October 2008; although its figures were not modelled in the 1:57am version of their report PwC would probably have been aware of the full report during the course of that day (since they knew the ongoing work was being done and may be taken, as competent accountants, to have enquired as to its outcome - given the recognition of the significance of "downside scenarios" on the face of their draft report).

j)    PwC continued to work on the Working Capital statement and in the revised version produced (probably on 30 October 2008) did not make any significant alterations as regards further adjustments to the "stagflation" scenario (as is apparent from the schedule of amendments which accompanied the updated draft) and so as to the sufficiency of the modelled capital requirement.

k)    PwC's final report did not depart significantly from its draft, and in particular did not explicitly address any additional impact of Mr Roughton-Smith's final adjustments to the range of "1 in 25" impairments upon the capital model. It simply noted that "further evaluation of potential fair value adjustments giving rise to a reduction in Core Tier 1 capital is likely to be required". This probably reflects a position in which the existing PwC models had not been reworked to incorporate the final "1 in 25" figures, but in which PwC (which had worked alongside Mr Roughton-Smith whilst he was preparing his last impairment report) knew the outcome and remained content with the tenor of their advice.

l)    In particular I think PwC must have considered whether in the light of Mr Roughton-Smith's latest work the "buffer" built into the capital model remained sufficient: it is highly improbable that they would have signed off their report having observed further work being done but without having any idea what figures that further work produced.

m)   Mr Roughton-Smith's figures were shared with UBS, with Merrill and with Citi (as sponsor banks). As sponsor banks they had the obligation (both under the Listing Rules and under their letters of engagement) to review the working capital report. Mr Roughton-Smith's figures were provided to enable them to do so. It is therefore very unlikely that data

would have been provided to the reviewers but not provided to the authors, being entirely kept from PwC.

460.    The PwC report therefore did not in its modelling incorporate the final Lloyds internal work: but it did not suggest that its own conclusions were incompatible with that work.

461.    In relation to regulatory capital the PwC report recorded the following (itself a re-statement of a position outlined to Mr Tookey on 17 October 2008 by the FSA):-

> "The FSA confirmed (in meeting held on 24 October 2008 attended by [Lloyds] PwC and the FSA) that it now expects banks to meet a 6% Core Tier 1 ratio and an 8% Total Tier 1 ratio. If a bank were to fall below the 6% ratio, the FSA would expect the bank to discuss the reasons for this and to agree an appropriate course of action to restore the ratio to 6% within an appropriate timetable.
>
> The FSA also confirmed that in extreme stress, a 4% Core Tier 1 ratio would be acceptable to them. The 4% is considered the minimum amount necessary to give FSA comfort that a bank would survive a deep recession."

The PwC report advised that regulatory capital was critical for market perceptions of the Enlarged Group and warned that the Core Tier 1 ratio would be below the target 6% ratio in a "downside" scenario, dropping to 5.1% at the end of 2008. It advised that (based on discussions with the regulator) the FSA was likely to expect the Enlarged Group to demonstrate a capital plan and any remedial action to restore ratios to 6% within an appropriate timescale. Whilst commenting on a "downside" scenario it did not specifically address the "extreme stress" scenario (in which a 4% Core Tier 1 ratio would be acceptable). But the analysis of the Defendants' experts Mr Deetz and Mr Williams (which seems to me to be sound) was that total impairments of £26.8bn (pre-tax) would be needed before the 4% Core Tier 1 ratio was breached (thereby rendering the raising of additional capital potentially necessary). This was also the view of Mr Tookey at the time.

462.    The PwC work also addressed the key sensitivities to the assumptions upon which those projections were based. It indicated that a further reduction in attributable profits of about £6.9bn (post-tax) more than the losses and impairments already included in the "downside" or "pessimistic" scenario would have to be incurred without management action before the Core Tier 1 minimum of 4% was breached. It is not clear on the evidence what figure for "impairments" in the "downside" scenario was taken in that calculation. The report warned that there was a residual risk (unquantified) that the economic assumptions might get worse than those predicted in the downturn forecast.

463.    The losses and impairments assessed in the downside scenario included (alongside Lloyds' own estimates of its own forecasts) Lloyds' own fair value adjustments to HBOS' net assets estimated by HBOS management with advice from KPMG. PwC's report informed the directors that these estimates had been compared by the Lloyds' risk team against their own analysis and were not considered to be imprudent but that

Approved Judgment

> "..a detailed exercise to assess the likelihood of further impairments or other adjustments.... has not yet been performed."

464. The material produced by HBOS itself was a 70-page draft memorandum concerning its working capital position. After dealing with its governance and monitoring models (the focus of a working capital statement by a bank), HBOS then set out its divisional funding preceding a section entitled "Adequacy of Financial Resources". This latter section made clear that "HBOS is very dependent on..the UK Government and Bank of England to facilitate funding and liquidity…". Drawing on a Funding Plan submitted to the HBOS board in October 2008 the memorandum noted a continued attrition to customer deposits before an anticipated recovery to pre-September 2008-crisis levels in March 2010, and, in consequence, the significant reliance being placed on "various UK Government supported funding arrangements". These were simply described as "BoE Facilities", "Government Guaranteed Funding" and "Central bank Repo": there was no separate identification of the ELA component. The HBOS memorandum set out a table showing an FSA-compliant Core Tier 1 ratio predicted to be 5.7% in December 2008 and 5.4% in June 2009 on a base case and 5.3% on a stress case. The commentary was that

> "…even in very severe scenario target capital ratios would be met, other than the Core Tier 1 in the stagflation plus other stresses scenario and in this case Core Tier 1 would still be above the minimum FSA requirements."

465. The conclusion of the report to the HBOS Board was expressed in these terms:-

> "Events have moved on at pace during September and October 2008. As a result of these developments, in addition to our existing sources of capital and liquidity HM Treasury announced on 8th October a package of measures to increase the availability of capital and liquidity to UK banks and subsequently announced, on 13th October, that HBOS capital resources specifically would be increased by a total of £11.5bn. We also continue to access BoE facilities and have started to issue off new term funding programs under the Government guarantee. The end result of these initiatives is that our capital plans look robust and our funding liquidity position is also improved though clearly dependent on continuing Government and BoE support throughout the period under review… Taking into account all these sources of capital and liquidity and based on the results of management's review of working capital requirements the Board is requested to conclude that HBOS has sufficient working capital for its present requirements. Assuming that the Board is satisfied that the above conclusion can be reached the Board is requested to approve submission of this assessment of working capital to the Directors of Lloyds TSB group plc."

466. Key parts of this work were carried over into a document prepared by Mr Ellis for the HBOS board dealing with "Working Capital Statements in  Shareholder

Communications". After noting the intended recapitalisation this summarised the position for the HBOS board thus:-

> "Applying our sustained stagflation assumptions with a range of other potential (but unlikely) charges would still produce a Core Tier 1 ratio above 5%. From a working capital perspective the injections will therefore satisfy the objective of taking any issues or concerns over capital ratio out of the equation for the foreseeable future."

That statement was to be approved by the HBOS Audit Committee and then by the HBOS board for transmission to the Lloyds board.

467.  As to the KPMG work, at the request of PwC KPMG prepared for the Lloyds board a commentary on the Working Capital Memorandum prepared by HBOS concerning both funding and regulatory capital (and analysing the assumptions behind and the outputs from the forecasts). It approached the task by treating HBOS as a component part of the Enlarged Group (for the purpose of examining available capital) but did not otherwise consider the impact of the Acquisition.

468.  The report conveyed a number of clear messages. First, that the wholesale markets upon which HBOS depended for funding were difficult, and that its funding model assumed the availability of BoE facilities and the Government's bank funding and liquidity schemes. Second, the degree of dependence on such funding could be affected by abnormal withdrawals of deposits (over which HBOS did not have complete control). Third, that capital sensitivity was driven by losses (which reduced capital resources) and by the effect that a worsening economic climate had upon RWAs (which increased capital requirements): but that

> "[u]nder both the base case and the stagflation scenario, HBOS remains within FSA capital limits, albeit only just under the stagflation scenario. However, after the proposed share issue under the Government's scheme, the capital ratios under all scenarios remain at at least 6.5% which is above the 5% minimum required by the FSA."

Fourth, on the assumption that the recapitalisation was completed the management forecast was that HBOS would have sufficient capital to allow the Core Tier 1 ratio withstand a severe economic downturn. Fifth, that there was a possibility that the immediate economic future would be worse than the assumed severe economic downturn given that most economists were now predicting a recession, that the main impact of such an event would be on forecast capital requirements, but quantification was impossible. Last, that whilst the scope of KPMG's work was simply to comment on the funding and working capital projections prepared by HBOS and the assumptions which underlay them, the usual production processes and governance and review procedures had been observed by HBOS management.

469.  The sizeable file of documents prepared for board members for 29 October 2008 also included a draft of the KPMG engagement letter, a draft comfort letter addressed to the Lloyds' directors on the sufficiency of HBOS' working capital, a comfort letter from

HBOS as to the accuracy of information about HBOS, and a letter from KPMG confirming the "no significant change" statement to be included in the Circular.

470. All of this material had been prepared to enable the Lloyds board to reach a decision on the Acquisition, and it is its cumulative effect that one must have in mind before alighting upon particular phrases or figures.

### *The Board Meeting of 29 October 2008*

471. The board meeting of 29 October 2008 was clearly an extremely important one, because the board was being invited to "press the button" on the Acquisition (subject to a meeting of a committee of the Board pencilled in for 31 October 2008). Those attending would have known that there was an "awayday" planned for shortly after publication of the Circular at which the Medium Term Plan for the Enlarged Group was to be discussed and decided, including a review of the liquidity profile of the Enlarged Group and of regulatory capital adequacy. This compression of events (each addressing aspects of the purpose and consequences of the Acqusition) means that there is a risk that the Court cannot confidently ascertain what were the decisive arguments or what were the compelling convictions on 29 October 2008 (as opposed to later). But this risk is countered by the fact that the participants were called upon to reflect upon why they did what they did so soon after the events themselves that for some participants the memory will have acquired a vivid (if not immutable) form. The documents are of little assistance in this regard because they record the decisions made but not the way in which the decisions were reached.

472. Each of the Directors (Mr Tookey was still not a director) had squarely to address whether they could conscientiously be part of a unanimous body of opinion recommending the Acquisition to the shareholders: because both the draft Chairman's Letter and the draft Circular contained such a recommendation. Mr Tookey knew that he was due to be appointed a director on 31 October 2008 and would be a director at a time when the Chairman's letter and the Circular were published: so he knew that he had at 31 October 2008 to address the same issue. Each director also knew that he or she would be required to confirm that the best of his or her knowledge and belief (having taken all reasonable care to ensure that such was the case) the information contained in the Circular was in accordance with the facts and did not omit anything likely to affect the import of such information.

473. The meeting had to consider some three dozen documents (some of very considerable length and others of some complexity and density) relating to the Acquisition alongside six or seven other items of business. Dr Berndt and two other directors participated by telephone: all other directors were present. In attendance (amongst others) was Mr Tookey (still not a board member), Ms Sergeant (Chief Risk Director) and Mr Parr. It is the evidence of Mr Tookey (supported in hesitant terms by Mr Tate and in general terms by Mr du Plessis) that Mr Roughton-Smith was also in attendance though his attendance is not recorded on the signed minutes and there is no record of him saying anything.

474. In the ordinary course a judge might be inclined simply to accept the contemporaneous documentary record (signed by the Chairman as accurate) in preference to individual recollection at a distance of nine years. But in the instant case the issue is more difficult.

475. First, Mr Tookey gave specific evidence both in writing and orally as to Mr Roughton-Smith's contribution at the Board meeting, on which he was not challenged (though he was challenged on Mr Roughton-Smith's attendance at the meeting on 24 October 2008 and accepted that his recollection may be at fault if the signed Minutes did not record Mr Roughton-Smith's attendance). Mr Tate's hesitant recollection was not challenged: and nor was the evidence of Mr du Plessis that Mr Roughton-Smith presented his paper.

476. Second, Mr Roughton-Smith's report tabled at the Board Meeting was actually dated 29 October 2008. The idea that he should have participated in the part of the meeting (by physical or phone attendance) to enable the directors to digest the late product of his workings is entirely credible. Mr Daniels was also clear in his evidence that there was a "rigorous and full-bodied" discussion around Mr Roughton-Smith's paper including a wide ranging discussion regarding what could have an impact upon the capital requirements.

477. Upon consideration of all the evidence I consider that Mr Roughton-Smith probably did *not* attend the board meeting on 29 October 2008 and that Messrs Tookey, Tate and du Plessis are mistaken in their recollection. The compression of events makes such a mistake understandable. Ms Sergeant (who otherwise bore the executive burden of risk issues and to whom Mr Roughton-Smith reported) is likely to have required the attendance of Mr Roughton-Smith to be recorded in the Minutes if he was there: and the absence of such a record is on analysis significant. Further, if Mr Roughton-Smith had attended and there had been a rigorous and full-bodied discussion of impairments in his presence I would have expected it either to have generated some further traces in the documents or to have produced answers (particularly relating to the severity of his assumptions) that lodged in the memory of the participants at the meeting. But the only contribution from Mr Roughton-Smith that is recalled is one relating to the accuracy of his impairment and fair value estimates and any potential improvement to be gained from further work (a matter covered in the tabled report anyway).

478. The position in which the Board found itself was therefore that there was a late-tabled paper from Mr Roughton-Smith containing some specific figures not previously placed before the board (estimating impairments below his original figure but above his last revised figure) and a draft working capital report from PwC which took account (under the ordinary flow of information) of the trend of due diligence work being undertaken by Mr Roughton-Smith and his team but which did not explicitly bring his late-tabled figures into the text of the report. It was no part of the Claimants' case that consideration of this item of business should have been adjourned for further consideration. It was accepted that the Board had to make a decision and to do so on the basis of the material with which the Lloyds' management had provided it. The case advanced was that no reasonably competent board could, on the basis of that material, have decided as the Lloyds board did decide.

479. At the board meeting the first item of business (after receipt of updating reports) was a consideration of the HBOS IMS due for release on the 3 November 2008 and which was to be incorporated in the Circular (and to be the subject of a letter of comfort from HBOS as to its factual content). The evidence establishes that this was not simply "nodded through" but was the subject of serious consideration. The evidence of Mr Tookey was that the content and tone of the HBOS IMS was scrutinised and that the Lloyds board requested certain changes. The changes are exemplified by one passage (there are others).

480.    In the "Outlook" section the draft stated:-

> "While the credit environment will remain challenging, HBOS's existing strong capital position, to be further enhanced by the injection of capital and liquidity facilitated by the UK Government, leaves the Group well positioned."

In the IMS incorporated into the Circular this becomes:-

> "While the credit environment will remain challenging, HBOS's robust capital position, to be further enhanced by the injection of capital and liquidity facilitated by the UK Government, reinforces the group to meet such challenges."

481.    The evidence of some Lloyds witnesses (Mr Tookey, Mr Tate, Dr Berndt and Mr Williams) was that in the analyst's lexicon "strong" denotes a better position than "robust" so that Lloyd's was signalling a watering down of the HBOS assessment: even if that is so, I doubt that any ordinary retail investor who read the Circular would pick up the nuance. It may well have been that the Lloyds board was simply seeking to align the HBOS IMS with the language used in its own material. But what I draw from the event is

(a)    that the Lloyds board was anxious not to "oversell" the proposition to its shareholder base;

(b)    that the Lloyds board sensed a potential for the HBOS executive team and its advisers to overstate the strength of HBOS.

482.    The meeting then considered (in their then-current forms):-

(a)    the Lloyds IMS;

(b)    the Circular;

(c)    the Chairman's Letter as prepared substantially by the sponsor banks (UBS, Citigroup and Merrill Lynch);

(d)    the list of Risk Factors;

(e)    advice from Linklaters on due diligence;

(f)    Mr Roughton-Smith's work on HBOS impairments;

(g)    PwC's work on the sufficiency of working capital for the Enlarged Group;

(h)    a summary of the HBOS Working Capital Report

(i)    the Working Capital Report on HBOS prepared by KPMG;

(j)      the text of the letter to be sought from BoE;

(k)      various "comfort" letters.

The board Minutes also record the taking of various formal steps (including the establishment of a Transaction Committee): but they do not record the content of discussions, save briefly in relation to the HBOS IMS, the Chairman's Letter and the Risk Factors. Consideration of the note about impairments and a discussion about the contents of the Circular are specifically noted (but without elaboration). The absence of a record does not indicate that there was no discussion.

483.    All of the basic components of the Acquisition had already been considered (most recently on 24 October 2008), and this meeting was "document heavy". This Board meeting could have simply been formal. But I am confident (based on the general history of the matter, the character of those directors I have seen and the tenor of the documents themselves - with their sundry detailed statements of opinion and of advice to which each director was expected to "sign up") that there was further discussion at the board meeting about the merits of the Acquisition, and not simply a perusal of the text of proffered documents. As to the content of that discussion, the evidence is scant.

484.    Sir Victor acknowledged gaps in his memory and his written evidence speaks only in hesitant terms about the board meetings on 24 and 29 October 2008. But in cross-examination he confirmed that the board (i) did see and consider Mr Roughton-Smith's impairments report tabled on 29 October 2008 (ii) regarded his "1 in 15" scenario as his base case and the "1 in 25" as his stress case (iii) understood that the working and regulatory capital figures that were put before the board had been compiled with knowledge of Mr Roughton-Smith's figures but had not been built up with those figures specifically included (iv) treated Mr Roughton-Smith's figures as a type of sensitivity analysis in relation to the figures produced by HBOS and its auditors. However, he was not sure if there was any specific analysis done factoring in Mr Roughton-Smith's last impairment estimates (though he expressed himself "astonished" if it was not done at some point).

485.    The written evidence of Mr Daniels is clearly shaped by the form and contents of the Board minutes: it was in cross-examination that he spoke of the "rigorous" discussion of Mr Roughton-Smith's impairment note. But one can gain a sense of his thinking from the evidence which he gave to the Treasury Select committee in early February 2009. He considered the Acquisition to be a "prudent" one, albeit one that would be "painful" in the short term. Looking beyond the potential short-term risks Mr Daniels considered the Acquisition to be "strategically …very good" and that the Enlarged Group would have a leading market share in a large number of markets and one which ultimately (probably by 2011) would sustain a 19.8% increase in EPS (compared to proceeding on a 'stand-alone' basis and having to raise £7bn the additional capital).

486.    On this last point (concerning the £7bn additional capital requirement) Mr Daniels did give a somewhat puzzling answer to a question from the Treasury Select Committee in 2009:-

" Q: Do you think you would still have had to take government money, irrespective of whether you had taken [over] HBOS or not?

> A: No, we would not have had to have taken government money had we not bought HBOS."

The silent assumption in that answer is that the Government had *not* (as an alternative to the HBOS takeover) required a "standalone" Lloyds to recapitalise with an additional £7 billion: and it further assumes that such new capital as Lloyds had in any event to raise could have been raised in the market (notwithstanding the advice of investment bankers that the market had no appetite for new bank equity). This is the tenor of Mr Daniels' evidence on the subject. In his written evidence he explained that it was indeed his personal view that Lloyds was well capitalised and not in need of Government money: but that the Tripartite had altered the rules about what "well capitalised" meant. The bare answer to the Select Committee does not convey that message and (in my view) does not square with the realities of the Recapitalisation Weekend. I do not see how Lloyds could realistically have resisted submitting to the Tripartite's requirements over the Recapitalisation Weekend and I do not see how (if they did submit) they could realistically have avoided taking Government money (or why Lloyds would have wanted to, given the relatively attractive terms upon which it was available when compared with likely deep discount the market would have required).

487. The written evidence of Ms Weir also established that Mr Roughton-Smith's latest impairment figures were discussed at the 29 October 2008 board meeting. Her recollection is that within her own field or speciality she and her team were comfortable with HBOS's estimated impairments in respect of the retail bank: and I have no doubt that that influenced her approach to other impairment estimates. She had no actual recollection of the meeting. But her present belief as to what she would then have thought about those other estimates is (i) that it would be inappropriate to use internal estimates based on less than full access to HBOS's books coupled with an assumed downside scenario as a basis for commenting on HBOS's impairment figures as signed off by HBOS's management and tested by its auditors; and (ii) that it would not be appropriate to attempt to put Mr Roughton-Smith's figures into the HBOS "stagflation" model because of the need for internally consistent assumptions (particularly in relation to RWAs). She asserted that the function of Mr Roughton-Smith's impairments estimates was to assess how significant the risk would be in a potential downside scenario: "a piece of information to be thoughtful about as part of the overall review of the acquisition".

488. In his written evidence Mr Tate (as I think, mistakenly) thought that the latest impairment figures were *presented* by Mr Roughton-Smith himself at the meeting on 29 October 2008: but his evidence contained no recollection of the content of any such presentation (beyond what was in the document itself). He made the points that (i) the impairments analysis was performed at the time when Lloyds was taking a conservative view of the HBOS portfolio and (ii) as an experienced banker he did not think that the Enlarged Group would actually realise all of those impairments as actual losses if the Enlarged Group continued to hold the portfolio of assets until such time as asset prices recovered (and in oral evidence he gave a specific example). In cross-examination he acknowledged that the board did need to understand the impact of impairments upon capital, and that he could not recall an "on-paper" analysis of capital requirements in the light of Mr Roughton-Smith's latest impairment figures: but he made two points. First, that he would not recommend a capital level to cover a low probability event at the extremity of a range, and that he had never seen a modelling of the most extreme

positions. Second, that "factoring in" an input does not necessarily mean taking it as a "driving number", so that (on his evaluation of the severity of the assumptions made by Mr Roughton-Smith) he factored in his range but did not find it as compelling as to be realistic.

489.    Those are the defendants who were directors at the time of the meeting. It is useful to look briefly at the evidence of directors at the time of the meeting who are *not* defendants to the action.

490.    Mr Kane has no handwritten notes of this meeting to assist his recollection as to whether there was anything in particular at the meeting on 29 October 2008 that persuaded him to support the Acquisition. For his own particular area of responsibility the due diligence returns had been favourable and he regarded the Acquisition as excellent for insurance and investments (as in the event it proved to be). In relation to the broader business it is likely that he stood by his belief that the perceived advantages flowing from the Acquisition outweighed the perceived risks. The advantages he saw were principally (i) the strategic value of HBOS as creating market share for the Enlarged Group, making it No.1 in current accounts, mortgages, savings accounts, personal loans credit cards and household insurance and No.3 in commercial and corporate loans (ii) the creation of synergies which in the near term (2 or 3 years) produced cost savings and (iii) access to HBOS' successful savings and investment products. The risks he saw were (i) taking on HBOS assets that were exposed to and likely to be affected by an economic downturn (with the consequences that that entailed) and (ii) dealing with HBOS' liquidity and funding pressures. As to those, his evidence was that the board tried to make "a probable realistic set of assumptions given a base case and then a stress case": and where those cases did not produce a single answer:-

> "So there is a wide range of outcomes, and what you do is you tend to distil these down into the most probable. So you don't take the extreme ends of the outcomes."

491.    The general view of Mr du Plessis was that Lloyds was a mature, established bank but with limited organic growth prospects, so that the Acquisition would address the strategic challenges it faced by creating a very strong organisation with a significant market share in multiple areas and substantial market and cost synergies after completion. He recognised that there were risks for Lloyds in proceeding with the Acquisition, and that the economic circumstances in which the deal was being proposed were unusual: but he considered that it was those very circumstances which provided Lloyds with an opportunity to do a transaction that would not have been possible in more normal circumstances. Overall he considered the Acquisition to be a relatively low risk way of creating significant value for Lloyds shareholders.

492.    By "relatively low risk" he meant that he measured the "downside" risks against the "upside" opportunity: and did so knowing that HBOS had a large risky balance sheet and that Lloyds had a comparatively small balance sheet with which to address those risks and exploit those opportunities. By "creating significant value for shareholders" he was not attaching particular significance to EPS accretion but rather looked to the creation of a valuable business. He may be taken to have maintained that approach at the board meeting on 29 October 2008.

493.    Mr du Plessis had no direct independent recollection of that board meeting, save that there was a discussion of Mr Roughton Smith's work. But asked to assume that at the meeting Mr Roughton-Smith's latest valuation was available but that the meeting did not have any other presentation or analysis which showed the impact of his impairment figures Mr du Plessis responded:-

> "I hesitate because one must see a correlation - it's not easy for me as an outsider to say what the correlation should be between the risk work …. done by the Chief Risk Officer in terms of impairment and how that impacts necessarily on the modelling work that is done in a different context by the valuation team…. Should it have been taken into consideration somehow? I guess, yes. But it's hard for me to say how that should have been reflected in the modelling work."

Later he said:-

> "[A]s an ex-finance person and as a business manager, I have seen countless financial projections and scenarios in my life, over and over and over again, and one thing I've learnt, you cannot pick one variable, stick it in a model and… you run a grave risk of coming up with the wrong answers. Modelling needs to be done by people who understand all the variables that in a coherent manner interplay one with the other… I can't say much more than that. I don't think it was possible for us as a board to take that one piece of work and specifically insist that that is somehow reflected in the model."

494.    Dr Berndt was another who took the view that the Acquisition presented a once-in-a-lifetime opportunity for Lloyds to achieve its long-held strategic aim, but whose evidence noted that the board did not get carried away with the possibility of the deal, recognising that it was not without risk. The nature of that risk was explored with him in cross examination. The view he took was (i) that as a board they had to arrive at a balanced and understandable position for the company and its prospects and not a position based on the worst-case scenario (ii) that the extreme ends of the "1 in 15" and "1 in 25" scenario ranges had single digit probabilities (by which he meant that in his view the last £3bn of the upper end of the "1 in 25" scenario had about a 3% probability) (iii) that whilst he put those values on, he did not know that other directors did (because he could not remember the specifics of a discussion) though he knew that they all ended up at the same general position, namely, that "downside" risks were manageable. He said:-

> "When I say the 3% is a "downside", that doesn't mean that that gets ignored… You look at it and you will ask yourself: Will that sink the ship before I get the long-term benefits? And the answer to that was: "No"…"

495.    He was later pressed with the point that the events which actually occurred in late 2008 fell within the scope of Mr Roughton-Smith's "1 in 25" scenario, to which Dr Berndt responded:-

> "A: So you're absolutely right, but it has I think almost no bearing on whether, at the time the decision was made and the proposal was made to the shareholders, whether….anybody could know about that and use it in order to come to a fair and balanced proposition on the position of the company and the prospects.
>
> Q: Well, they could know about it, couldn't they, because all you needed to do was to look at the figures Mr Roughton-Smith was generating at a "1 in 25"?
>
> A: No but the probability of those numbers, based on the world we were in in September and October was so low that they shouldn't be the basis of a proposal to shareholders that needs to be, as the corporate governance code [requires], fair and balanced.
>
> Q: Well, it wouldn't be difficult, would it, to produce a piece of analysis which would project the situation something like this?...
>
> A: Right, but what is the basis in reality of that kind of scenario? I mean, you could postulate all kinds of hypotheses, but the realities in which we were operating, the information we had available at the time, made the proposal we advanced the right thing to do."

496.    He summarised his position in this way:-

> "…we went into it with our eyes open…we went into it knowing that there [were] downsides that at the time were not the most likely scenario, but there were downsides, and that the economy has shifted dramatically during the last two quarters into a position where the downsides became the reality, and not what was at the time the expectation….."

497.    I have noted the evidence of the directors who are Defendants, and of the directors who are not Defendants. All this evidence is (save where I have indicated otherwise) reliable. I should now consider the evidence of the key executive team member who was not (at the time of the board meeting on 29 October 2008) a director, namely, Mr Tookey.

498.    I have already observed that in my judgment he had taken responsibility for presenting Mr Roughton-Smith's late paper to the board meeting, and that he probably did so in the absence of Mr Roughton-Smith himself: certainly Mr Roughton-Smith's report was considered, as the Minutes record. I have accepted evidence that there was a robust discussion about the paper. Mr Tookey's evidence about that discussion is sparse: but it is apparent from the documents that there was a flurry of late activity and also that Mr Tookey held certain views. A presentation of Mr Roughton-Smith's work would very probably have referred to these activities and related these views.

499.    I am confident that in the course of that discussion Mr Tookey would have (i) stressed the degree of confidence that Mr Roughton-Smith had that further work would not lead

to tighter ranges (not only as noted in the memorandum itself but also as conveyed in a remark Mr Roughton-Smith passed to the effect that even with twice as many people and twice the time he could not have made better assessments); (ii) reinforced that with the confirmatory opinions given to Mr Tookey by others in the Credit Risk team; (iii) informed the board that the net negative capital adjustment figure at completion estimated at £10bn had throughout been the subject of a cross-check between the HBOS calculations and Mr Roughton-Smith's impairments and fair value analysis and were broadly consistent; (iv) informed the board that Mr Greenburgh had suggested that a lower figure of £5.2-£9.6bn might be adopted in the Circular but that Mr Tookey had adhered to the more conservative £10bn figure; (v) drawn attention to the fact that the PwC Report showed that on a pessimistic scenario the prospective Core Tier 1 ratio might fall as low as 5.1%, that this represented a buffer of 1.1% over the minimum acceptable Core Tier 1 ratio of 4%, that this "buffer" was the equivalent of £9.6bn of additional impairments (pre-tax) or a total of £26.8bn, and that in his view even the upper extremity of Mr Roughton-Smith's estimates fell within this "buffer". (This last item was clearly his belief: the Claimants' experts Mr Ellerton and Mr McGregor say the belief was incorrect, whilst the Defendants' experts Mr Williams and Mr Deetz say it was correct. What matters for present purposes is the existence of the belief and its communication to the board, not its correctness).

500.     As to this last item his written evidence was in these terms:-

> "Applying the more conservative 1 in 25 year recession scenario, Mr Roughton-Smith and his team forecast impairments of between £14.5 billion and £21.9 billion (again including the reported £1.3 billion of HBOS impairments for the first half of 2008). The top end of the range fell comfortably below the £26.8 billion of impairments which the PwC Working Capital Report indicated would be incurred before the 4% Core Tier 1 capital ratio would be reached. "

I do not doubt that that is what he told the board.

501.     Further, I consider it likely that reference would have been made by Mr Tookey to the Memorandum which Mr Daniels had prepared on the economics of the deal for the board meeting on 24 October 2008 (to which the Minutes of the meeting on 29 October 2008 refer back). In addition I think it probable that at some point Mr Tookey made reference in outline to Mr Foley's views about the immediate prospects for the economy as a whole (which Mr Tookey had received the preceding day but which he had decided not to circulate before the "awayday"). In essence, this view was that a "1 in 25" recession was improbable.

502.     Finally, I would note that whatever discussion did take place on 29 October 2008 concerning Mr Roughton-Smith's latest impairment figures took place in the presence of Ms Sergeant (to whom Mr Roughton-Smith reported) and Mr Scicluna (who was the Chair of the Risk Committee). If either had felt at all uncomfortable with the presentation of Mr Roughton-Smith's views they would have spoken, particularly because (according to an e-mail which Ms Sergeant was to send to Mr Roughton-Smith in January 2009) she had made it very clear to the board on several occasions that the review of the HBOS figures had been conducted on the "1 in 15" basis and that if events turned into a "1 in 25" scenario then "things could get much worse".

151

503.   At the conclusion of the meeting the directors approved the Circular (subject to final drafting amendments) and resolved to issue it and to make the recommendation it contained. So the Acquisition was approved.

## *Events of 31 October 2008*

504.   The final form of the documents was approved at a Board Committee meeting on 31 October 2008. As to the contents of the Circular:-

   a)   PwC confirmed that the pro-forma financial information had been properly compiled consistently with Lloyds' accounting policies;

   b)   PwC confirmed that for the purpose of presenting consolidated financial information the unadjusted financial information of HBOS had been correctly extracted and correctly adjusted to present it on a basis consistent with Lloyds' accounting policies;

   c)   Linklaters confirmed that they were not aware that any requirements of the Listing Rules had not been satisfied or that any matters required to be disclosed under the Listing Rules, the Prospectus Rules or the Financial Services and Markets Act 2000 ("FSMA") had not been adequately disclosed (but that this did not amount to positive confirmation that all such requirements had been satisfied);

   d)   KPMG confirmed to the sponsor banks that they had disclosed everything material to be disclosed;

   e)   KPMG confirmed to Lloyds and to the sponsor banks that (amongst other things) the impairment figures and negative FVAs for 2007, the value of its liquidity portfolio of marketable assets and the amount and nature of its wholesale funding requirements accorded with the audited consolidated statutory financial statements, and that the figures for June 2008 accorded with the condensed consolidated HBOS half-year statement;

   f)   KPMG confirmed to Lloyds and to the sponsor banks that save as disclosed in the Circular (which set out the current trading, trends and prospects of HBOS) there had been no significant change in the financial or trading position of HBOS since June 2008 ("change in financial position" being a change in total assets, customer accounts, total or subordinated liabilities or shareholders' equity: and "change in trading position" including impairment losses on loans and advances compared with the corresponding period in the preceding year) – but warned that procedures undertaken in relation to changes since 30 September 2008 had been limited in essence to enquiry of HBOS staff whether a Schedule prepared as at that date remained representative;

   g)   UBS, Merrill Lynch, Citigroup and Lazards gave their consent to the inclusion of their respective names in the Circular and (in compliance with rule 8.4.13R(3) of the Listing Rules) confirmed to the FSA that they

were not aware of any matters that ought to be disclosed in the Circular but were not so disclosed.

### *A digression: a Scottish counterbid*

505. At the end of October 2008 there occurred an (ultimately unsuccessful) attempt by two groups of Scottish businessmen (the Burt/Mathewson and Spowart interventions) to "spike" the Lloyds bid and to keep HBOS (or some part of it) as an independent Scotland-based entity. Its relevance to the issues before me is that the attempt generated some material upon which Mr Hill QC relied (i) in support of his argument that there was flexibility in the Government's views on recapitalisation (and that the requirement upon Lloyds to raise £7 billion as a stand-alone entity was not set in stone); (ii) as undermining what I consider was the general (but not universal) view that HBOS had no independent future; and (iii) in suggesting that it generated confounding "noise" which distracted attention from a story relating to a "leak" of the existence of the Lloyds Repo.

506. Before turning to the detail of that I would note that the event generated an amusing and perceptive article by Peter McMahon in "The Scotsman" on 30 October 2008. He noted that proponents of a rival Scottish bid could not be written off:

> "[I]t would be deeply unfair to categorise someone of the calibre and pedigree of Jim Spowart as some kind of misty-eyed kilt-wearing extra from the Brigadoon School of Management and Business studies ."

But McMahon pondered why there was so little support for the proposal for a rival bid across Scottish boardrooms in general:

> "…. There are many who think they are letting their brave hearts rule their cool heads…. To put it at its most brutal, the argument is this: that HBOS is the dead parrot of banks. They claim that, in effect, HBOS is no more; it has ceased to be; it has expired, it has gone to meet its maker. You know the rest…"

He proceeded to comment on the prospects in the current economic climate for the areas of business on which HBOS focused, and the possibility of further nasty write-downs. He added:-

> "There is a further argument that all of the component parts of HBOS are now so heavily integrated that it would be impossible – or certainly very costly – to disaggregate them… The conclusion, from those who take this view, is that the takeover by Lloyds is the only game in town…"

507. I cite this article partly for the light relief it provides in an otherwise turgid factual account, and partly because it captures perfectly my own view (i) that it was only a minority who thought that Lloyds was buying a viable standalone bank; and (ii) that there was a good rationale for buying the whole rather than trying to pick off parts.

508.    I should say that a survey of the press coverage of the Scottish interventions does not suggest to me that they squeezed out the Lloyds Repo story or its significance. For example a Newsnight Scotland broadcast on 10 November covered the Spowart intervention, challenged the idea that the nationalisation of HBOS was really the only serious alternative to the Acquisition (not a Scottish intervention) and that Lloyds' was the "only deal on the table", raised the issue of the Lloyds Repo and asked whether this surely meant that HBOS was weaker than everybody thought. A fair dissection and canvass of the key issues. The "Daily Telegraph" set the Burt/Mathiewson intervention in a well delineated context which included questions about the Lloyds Repo, whether Lloyds had agreed to take extra financing really destined for HBOS after the merger and the Government's willingness to nationalise HBOS.

509.    But the real point of the digression is to refer to the text of the two letters which the Chancellor of the Exchequer wrote in the context of the rival bid. Taking the more general (written to the Chairman of the Treasury Select committee) the text stated:-

> "If for any reason the merger between HBOS and Lloyds TSB does not go ahead, the FSA would need to reassess both banks to determine the extent to which each would need to recapitalise."

Mr Hill QC suggested that this was an indication that, notwithstanding the comments of Mr Sants of the FSA but days earlier that the £7bn requirement for a standalone Lloyds was fixed, in truth the figure remained negotiable.

510.    In my judgment this is not a true interpretation of the Chancellor's letter. What I believe the Chancellor was saying was that in the event that the Acquisition collapsed (which would itself be a disruptive event) then it could not be assumed that the current proposed level of recapitalisation would continue to be regarded as sufficient nor could it be assumed that the manner and level of Government participation in any recapitalisation would remain the same. The FSA, having made its assessment of the needs of Lloyds and of HBOS as "stand-alone" banks in current circumstances, would need to make a reassessment in those changed circumstances. My judgment is that the Government was careful to cultivate the element of uncertainty about what would happen to each component part of the Enlarged Group if the Acquisition did not complete, not least because it was anxious to support the Acquisition as a commercial solution to a problem that it would otherwise have to resolve through executive power. That resolution (what the OFT was to describe in its report on competition issues as "the more realistic counterfactual scenario") was Government intervention to prevent the failure of HBOS by bringing it at least into partial public ownership (if not full public ownership).

511.    The other letter was to Mr Alex Salmond, then the Scottish First Minister. In it the Chancellor explained that when the recapitalisation scheme was triggered the boards of Lloyds and HBOS were minded to merge, and that it was in that expectation that the recapitalisation figures for each bank had been set; but that if for any reason the merger did not go ahead then the FSA would need to reassess *both* banks to determine the extent to which each would need to recapitalise. Once again, I do not think this can be read as an indication that Lloyds might (if it pressed) have been able to negotiate a figure lower than £7bn. The Chancellor was clearly warning Scottish interests that neither the HBOS share of the recapitalisation of the merged bank nor its provisional

requirement as a "standalone" bank would stand in the light of a failed merger: but that is all.

*The Circular*

512. The text of the Circular (and the figures and other details it contained) had been compiled under the supervision of Linklaters with material provided by members of the Lloyds specialist departments, reviewed by PwC, approved by the investment banks and scrutinised line-by-line by UKLA. As to the investment banks, each had confirmed to the FSA that nothing required to be disclosed under the Listing Rules had been omitted. As regards material deriving from HBOS there were letters of comfort from HBOS itself and from its auditors KPMG. But as the comfort letters made clear the ultimate responsibility for the contents of the Circular was left with the Lloyds Board.

513. As at the date of the Circular Lloyds was paying 108.4p for each HBOS share (a total of £5.9bn): and the Government had priced its underwriting of new HBOS shares under its recapitalisation arrangement at 113.6p. One analyst (Glass Lewis) calculated the effective implied premium being paid by Lloyds as less than 10%.

514. The Circular itself consists of 289 pages of closely typed text and tables, the purpose and significance of which is not always readily apparent. Although formally addressed to individual shareholders, much of it would be impenetrable to that audience: the individual shareholder was likely to focus on the Chairman's Letter and to leave much of what followed to the analysts.

515. After explaining the strategic background to the proposed merger ("a compelling opportunity to accelerate [Lloyds'] strategy and create the U.K.'s leading financial services group") and the Government's specific and comprehensive measures to ensure the stability of the UK financial system Sir Victor's letter continued thus:-

> "The [Lloyds] directors believe that [Lloyds'] and HBOS's participation in the Proposed Government Funding provides the capital necessary to complete the Acquisition in a timely fashion, with certainty and on terms that the [Lloyds'] Directors believe are the best available to [Lloyds] and HBOS in current market conditions.
>
> When combined with the new capital being raised by HBOS, the Proposed Government Funding is designed to provide the Enlarged Group with the capital strength and the funding capabilities to meet the short term challenges that current markets present and support the longer-term creation of shareholder value….. The [Lloyds] Directors believe that the combination of [Lloyds] and HBOS, including the required capital raising by both companies, is in the best interests of the Company and [Lloyds] Shareholders as a whole. The [Lloyds] Board believes the turbulence in current markets has presented a unique opportunity to pursue the Acquisition, and unanimously recommend that [Lloyds] Shareholders vote in favour of the Acquisition and the Resolutions associated with the Proposed Government Funding.

Approved Judgment

> In considering the merits of the Acquisition, the [Lloyds] Directors have been mindful that the landscape of the UK banking industry has shifted materially in recent months. The [Lloyds] Directors do not believe it is appropriate to compare the Enlarged Group, including the impact of the Proposed Government Funding, with [Lloyds] as it currently stands but rather compare the Enlarged Group against the position [Lloyds] would be likely to be in should the Acquisition not become Effective.
>
> If the Acquisition and Placing and Open Offer do not complete, HM Treasury has stated that it would expect [Lloyds] to take appropriate action to strengthen its capital position. The FSA has advised [Lloyds] that if the Acquisition were not to occur, it would require [Lloyds] to raise £7 billion of additional capital, made up of £5 billion of Core Tier 1 equity and £2 billion of Tier 1 instruments. Whilst [Lloyds] would be able to seek to raise such additional new capital in the public markets, there can be no certainty that [Lloyds] would be able to successfully raise such capital or as to the terms on which such capital could be raised, including the terms of any participation by HM Treasury in any such capital raising, or as to whether any such fundraising would be on a pre-emptive basis .
>
> The [Lloyds] Directors believe that the Enlarged Group would be more competitive and will have significantly greater opportunities to create sustainable shareholder value than Lloyds would on a standalone basis in what is now a materially more challenging market environment."

516. The Chairman's Letter returned the rationale for the Acquisition partway through. It described HBOS as having been "significantly affected by recent challenging market conditions", noting that the deteriorating economic environment had "negatively impacted its funding model". But it communicated the belief of the Lloyds Directors that HBOS remained "an excellent franchise with the potential to contribute substantial value to the Enlarged Group". After explaining the grounds for the belief in that potential the letter continued:-

> "The [Lloyds] directors believe that the Enlarged Group will also be more competitive and significantly better placed to create shareholder value in a rapidly evolving UK banking industry than [Lloyds] would on a standalone basis, primarily given the Enlarged Group's greater size and market presence. The Proposed Government Funding is designed to provide the Enlarged Group with significant capital strength and funding capabilities to meet the short-term challenges current markets present and support the longer-term prospects to create shareholder value."

**Approved Judgment**

517. Part II of the Circular set out, over 17 pages, the risks and uncertainties considered to be material to the performance of the Enlarged Group. I need mention only seven.

518. Risk factor 1.1 was a generic warning about the inherent risks arising from economic conditions and the difficulties that lay in the way of predicting and guarding against such risks amid a global financial crisis. It contained this warning:-

> "Lloyds has not yet been able to assess fully the level of fair value adjustments of the assets of the HBOS Group to be acquired in the Acquisition or other aspects of the HBOS business. If the fair valuation of the assets of the HBOS Group is materially less than anticipated, this could have a material and adverse impact on the financial condition and prospects of the Enlarged Group. "

519. Risk factor 1.3 noted that market conditions had resulted (and may in the future further result) in negative adjustments being made to the estimated fair value of the financial assets that Lloyds would acquire as part of the Acquisition (compared to their book value as at 30 June 2008, being the figures required to be used in the Circular). The consequences were said to be "a material adverse effect on operating results, financial conditions or prospects". There was a warning that, given the material deterioration in the value of financial assets since 30 June 2008 and the market outlook for the near future, the fair valuation of HBOS's assets would differ from the book value as at 30 June 2008. The Chairman's letter had already explained that, based on a review of non-public information provided by HBOS, Lloyds had made a preliminary assessment that net negative capital adjustments of no more than £10 billion after tax would need to be made to HBOS's financial position for Core Tier 1 capital purposes as a result of the Acquisition.

520. Risk factor 1.5 drew attention to the inherent risks concerning liquidity, particularly if current market conditions continued to reduce the availability of traditional sources of funding or the access to wholesale money markets became more limited (which might affect the ability of the Enlarged Group to meet its financial obligations as they fell due). In relation to HBOS it said:-

> "The HBOS Group has a funding profile that involves the need to refinance a significantly higher level of loan assets than that of [Lloyds]. Accordingly, the Enlarged Group's funding profile will involve a higher refinancing risk than for [Lloyds] on a standalone basis…. These risks can be exacerbated by many enterprise-specific factors, including an overreliance on a particular source of funding (including, for example, securitisations, covered bonds and short-term and overnight money markets), and changes in credit ratings, or market wide phenomena such as market dislocation and major disasters. There is also a risk that corporate and institutional counterparties may look to reduce aggregate credit exposures to the Enlarged Group…… In order to continue to meet their funding obligations and to maintain or grow their businesses generally [Lloyds] relies and the Enlarged Group will rely, on customer savings and transmission balances, as well as ongoing access to the

wholesale lending markets and the Bank of England liquidity facilities and the UK Government's guarantee scheme …"

521.    A later passage commented on the steps the Government had taken to ease the crisis in liquidity, and added:-

> "[Lloyds] expects that the Enlarged Group will substantially rely for the foreseeable future on the continued availability of Bank of England liquidity facilities as well as HM Treasury's guarantee scheme for short and medium term debt issuance. If the Bank of England liquidity facility, HM Treasury's guarantee scheme or other sources of short-term funding are not available after that period, [Lloyds] or the Enlarged Group could face serious liquidity constraints, which would have a material adverse impact on its solvency."

522.    Risk factor 1.6 addressed the risk of insufficient capital resources to meet regulatory thresholds, warning:-

> "In addition to the impact of net negative capital adjustments, the Enlarged Group's Core Tier 1 ratio will be directly impacted by any shortfall in forecasted after-tax profit (which could result, most notably, from greater than anticipated asset impairments and adverse volatility relating to the issuance business). "

523.    Risk factor 2.1 addressed the possibility that the Acquisition did not proceed. Its headline said:-

> "**In that case, [Lloyds] will be required to raise additional capital in an alternative manner. There is no certainty that it will be able to do so on acceptable terms or at all.**"

The supporting text said:-

> "The FSA has advised [Lloyds] that if the Acquisition were not to occur, it would require Lloyd's to raise £7 billion of additional capital, made up of £5 billion of Core Tier 1 equity and £2 billion of Tier 1 instruments. There can be no certainty that [Lloyds] would be able successfully to raise such capital or as to the terms on which such capital could be raised, including the terms of any participation by HM Treasury in any such capital raising and whether or not such capital raising would be on a pre-emptive basis. Thus, if the conditions to the Acquisition are not satisfied… [Lloyds] will be required to renegotiate the terms of either the Acquisition or the Placing and Open Offer or both with HM Treasury and the HBOS Group, and may be required to seek alternative means of raising funding. There can be no assurance as to whether [Lloyds] would be successful in raising alternative capital or as to the timetable or terms of an alternative capital raising or as to whether any such capital raising would be on a pre-emptive basis. If [Lloyds] is unable to find alternative

158

> sources of capital and sufficiently raise its capital… it may need to access HM Treasury's recapitalisation fund, if such fund is available."

The subject matter of this risk factor (what would happen if the Acquisition did not proceed) had been inserted at the request of the UKLA which then approved wording prepared by Lloyds' advisers.

524.   Risk factor 3.3 warned then-current shareholders in Lloyds that their proportionate ownership and voting interest in Lloyds would be reduced if they did not exercise their pre-emption rights under the Open Offer. Risk factor 3.5 warned of the risk of further dilution in these terms:-

> "Further to the proposed issues of Open Offer Shares and Consideration Shares [Lloyds] has no current plans for an offering of [Lloyds] shares. However, it is possible that [Lloyds] may decide to offer additional [Lloyds] shares in the future either to raise capital or for other purposes. An additional offering… could have an adverse effect on the market price of [Lloyds] shares as a whole."

525.   Finally, risk factor 1.14 addressed some of the consequences of accepting a Government capital injection, drawing attention to the undertakings that Lloyds had been required to give to avoid objections being taken to state aid. In part these related to sustaining particular areas of business (supporting mortgage lending and loans to SMEs); in part they related to levels of remuneration for senior management; in part they related to the obligation to submit a restructuring plan. The Circular warned that the content of some of the undertakings remained unclear and "could have a materially adverse effect" on operations.

526.   The Circular then set out the terms of the Acquisition, the terms of the proposed share offering, the terms attaching to the Government recapitalisation, information on Lloyds, information on HBOS, historical financial information, a pro forma net asset statement of the Enlarged Group and the HBOS IMS. In a section entitled "Additional Information" (by which time the reader would have traversed 246 pages) there were observations about "Capital Resources and Liquidity". These summarised the response of governments and central banks to the "turbulent conditions" experienced by global financial markets during the course of that year, but warned that there was no guarantee that they would succeed. The passage continued

> "… Despite the relatively advantageous situation enjoyed by the Enlarged Group uncertainty facing the markets is such that management believe that no institution is immune from the effects of an extended closure of the wholesale markets without the support of the central bank and government. It is likely that in this context the Enlarged Group will continue to draw on the Special Liquidity Scheme and will take advantage of the guaranteed funding provided by HM Treasury…. The Enlarged Group is eligible to participate in [the Government guarantee

159

scheme for senior funding, the extended Long-term Repo facility and the new Discount Window facility] and will use these tools as appropriate in future liquidity and funding management, particularly in an environment as currently experienced."

It then explained that because of the extraordinary uncertainty facing the banking industry and the availability of Government facilities the UKLA had agreed that a working capital statement for the next 12 months would not be required.

527.    It is necessary to refer to 3 other items of Additional Information contained in of the Circular:

(a)    The Lloyds directors accepted responsibility for the information contained in the Circular and said that to the best of the knowledge and belief of the Board (which had taken all reasonable care to ensure that such was the case) the information contained in the Circular was in accordance with the facts and did not omit anything likely to affect the import of such information.

(b)    The Permanent Secretary to HM Treasury accepted responsibility for the information contained in the Circular relating to HM Treasury (including statements of expectation or intention), and confirmed that the information in the Circular for which he was responsible was in accordance with the facts and did not omit anything likely to affect the import of that information.

(c)    There was confirmation that (with specified exceptions) there had been no significant change in the financial or trading position of either Lloyds or HBOS since 30 June 2008 (the date to which the last published interim financial information had been prepared). The specified exceptions drew attention to the fact that in the nine months to the end of September 2008 the profitability of HBOS had been impacted by higher impairments and negative fair value adjustments to the Treasury portfolio (and quantified them).

528.    The Circular stated in plain and prominent terms:-

> "**The Lloyds TSB Board unanimously recommends that Lloyds TSB Shareholders vote in favour of the Resolutions to be put to the Lloyds TSB General Meeting as they intend to do in relation to their own individual shareholdings which amount in total to 1.316,034 Lloyds TSB Shares, representing approximately 0.02 per cent of the existing issued ordinary share capital of Lloyds TSB.**"

529.    The issue of the Circular was followed on the same day by an investor presentation by Sir Victor, Mr Daniels and Mr Tookey (the "3 November 2008 Investor Presentation"). This was supported by a slide presentation which both stated that the directors of Lloyds accepted responsibility for the information it contained and had taken reasonable care to ensure its accuracy, and also warned that no reliance should be placed on it and that Lloyds' shareholders should rely on the Circular.

530.    The 3 November 2008 Investor Presentation utilised a prepared script and prepared answers to anticipated questions. Mr Daniels spoke to the clear long-term value of the deal ("a compelling transaction") but noted near-term concerns in relation to capital, funding and impairments. As to the last he said that Lloyds had spent "some 5100 days on due diligence and synergy analysis" and felt that they had "fair valued the HBOS portfolios well". Mr Tookey spoke of the challenging market conditions but said that the bank had started to see some signs of stabilisation in global money markets, comfortably securing 3- and 6- month funding and successfully issuing a £400 million 10-year bond. Turning to the HBOS IMS he noted that HBOS impairments had continued to grow: a topic to which he returned in the context of capital issues.

> "When I initially announced the transaction I mentioned that we had only done limited due diligence, generally focused on our key areas of concern. Since that time, we have been able to conduct a thorough set of reviews; and as each review has been completed we have been able to get significantly more comfortable with the range of likely outcome in terms of the potential adjustments to capital. As this work has progressed, we have been able to narrow the range of possible outcomes quite significantly, and this now sits comfortably within our initial range."

Developing that he said:-

> "There will need to be some capital adjustments on acquisition of HBOS, which we believe will be no more than £10 billion. These adjustments include the deductions from the capital base of the enlarged group for HBOS's AFS reserves, and our estimate of the net fair value adjustments affecting capital that arise from the application of standard acquisition accounting principles. This has been assessed by applying market-based credit spreads to their various portfolios and the results have been carefully cross checked to the outcome of the thorough asset reviews, which we have just discussed. This gives us significant comfort….."

531.    The reaction of analysts to the Acquisition as outlined in the Circular and the presentation was mixed, with an even spread between critical, neutral and supportive. Attention tended to focus on the HBOS IMS, describing the situation as "bad, but will get worse" or as "highlighting a broken franchise that can no longer stand on its own" or as showing HBOS "very badly beaten up as a standalone". The probable inability of HBOS to continue as an independent entity (should the Lloyds takeover fail) was a strong theme, with some form of nationalisation mooted as the probable outcome. Some commentators characterised the Acquisition as a rescue by Lloyds of HBOS from the

brink of insolvency (underwritten by a Government guarantee to waive competition issues). Several commented on the disclosure that there had been outflows of corporate and retail deposits in September and early October (prior to the Government "bailout"): the very fact of disclosure by HBOS showed that these were significant, but the absence of any measure left the market guessing exactly how significant.

532. The most important of the analyst reports was that prepared by RiskMetrics. It is appropriate to deal with it at this point, although in terms of narrative it falls naturally into the next section. In his written evidence Mr Ellerton (called by the Claimants) was inclined to dismiss the work of RiskMetrics as "a single research paper". In cross-examination he conceded that this under-estimated its significance: and he was right to do so. As cross-examination of some of the Claimants (and disclosure by the Claimants) established:-

(a) Some institutional shareholders in Lloyds had formal policies in place under which their shareholdings would be voted in accordance with the RiskMetrics recommendation unless the investment decision-maker decided otherwise (an unusual occurrence). An example of such an institution is NFU Mutual Insurance Society Ltd ("NFU") which owned or managed about 0.4% of Lloyds' shares. (It is the fourth largest of the Claimants). According to Mr Glover the "vast majority" of NFU votes were cast under the RiskMetrics "default" policy. (In addition, where NFU voted against a management recommendation that had to be explained in an annual report).

(b) Some institutional shareholders in Lloyds went further and in effect determined the exercise of the voting power automatically according to the view of RiskMetrics. An example is the voting policy of the Russell Investments Group (which is the third largest of the Claimants): the proxy administrator was directed in relation to mergers and acquisitions to vote *for* the merger unless Risk Metrics recommended against: and if for some reason the relevant merger had to be judged on a case-by-case basis then the proxy administrator was directed to vote *for* the merger if both management and RiskMetrics recommended it.

533. There is no suggestion that these institutional investors were atypical: indeed other of the Claimants (Northern Trust Corporation, CPP Investment Board) adopted the same approach. So this put the RiskMetrics' work (as Mr Ellerton put it) "in a different category to other analysts' reports".

534. The RiskMetrics analysis began with an attempt to understand the strategic rationale for the merger and to identify what the deal was bringing to Lloyds. First, cost synergies: these, subject to challenges, were viewed as "a net positive for the deal". Second, market dominance: this, setting improved margin spreads and higher fees

against a potential resurrection of the competition issues (currently being avoided) was regarded as "slightly positive for the merger". Third, funding: RiskMetrics advised:-

> "We believe funding is the most clear negative issue in this transaction, as Lloyds can't dilute the problem easily when incorporating HBOS into its balance sheet. In the end, though, the Treasury won't let the combined entity down in the future given its size, and the issue would be the cost to pay for the mismatch [between loans and deposits]."

Fourth, capital: here RiskMetrics took the view that a "standalone" Lloyds would have to raise £7bn capital, either from the government or exclusively from private investors (the latter being an open question). It had advised:-

> "In the end, the clear advantage of the merger vs the stand-alone option for Lloyds is that it is saving its shareholders a 5% dilution of its common stock, plus saving dividends on an additional £1 billion in preferred stock due to the FSA assessment of its capital needs. Lloyds could still raise capital from the government if that is less expensive, an alternative that also allows private investors to participate in the deal. We recognise though the uncertainty shareholders would face until such capital raising is done if the merger doesn't go through. Overall, the capital issues seems to favour the merger. "

535.    After considering asset mix and size ("does not contribute to lower risk"), state influence ("don't have strong views on whether the merger leads to worse alternative versus the stand-alone option") and dividend policy ("a short to medium term concern") the conclusion reached was this:-

> "Lloyds is exposing itself to a balance sheet that doubles its own, with lower asset quality and a wholesale funding gap under adverse market conditions, while gaining in terms of synergies and market dominance. We believe that the UK government will stand behind the combined institution, and the same could be said of other big banks and a standalone Lloyds; this makes the funding issue a controllable one, albeit at a cost. The transaction also diminishes uncertainty on the terms for a capital injection, something that a standalone Lloyds would still have to face and that has the potential to dilute shareholders even further. On balance, we find that the combination of arguments makes a reasonable strategic rationale for the acquisition."

536.    RiskMetrics then undertook a deal evaluation, and reached this conclusion:-

> "This transaction is more of a rescue than a normal acquisition. We are trying to assess value under binary conditions, where failure to meet wholesale debt maturities or a deposit run-off would eliminate all value immediately. HBOS was down a path to nationalisation, according to market commentators and the governor of the Bank of England… Whilst some may argue that

**Approved Judgment**

the price/book ratio looks attractive at first glance, it seems that HBOS shares would go lower without the support from the merger. However, the merger presented itself with the capital injection, and Lloyds had to make the decision on the overall package. Valuation is slightly above that of similar transactions. But in any case, *we believe this is a deal where valuation takes a secondary consideration versus the strategic opportunities/challenges involved*." (Emphasis added).

537.    The recommendation of RiskMetrics was expressed in these terms:-

"The high level of uncertainty in the market raises many caveats to any analysis. We believe the merger adds challenges, but at the same time eliminates uncertainties in terms of capital in an environment where other banks are being severely punished. As such, we recommend shareholders vote FOR the acquisition."

538.    RiskMetrics also produced an EGM Report containing specific advice as to voting on each resolution to be put to the Meeting. It too recommended a vote in favour of the Acquisition, but noted that the recommendation raised "governance issues" which clients might wish to examine. These governance issues related to the inability of Lloyds to pay a dividend whilst the Government's Preference Shares were outstanding, to the presence of two new independent directors post-acquisition to reflect but not to represent the Government's substantial shareholding (raising questions about commercial independence) and to the Risk Factors identified in the Circular. RiskMetrics advised that it had considered these issue and expressed the view

"We consider that the company has adequately dealt with any potential governance issues in respect of diltution to existing shareholders, the conditions put on the proposed Government funding and risks and opportunities posed by the acquisition of HBOS."

539.    The work of RiskMetrics is also useful in identifying who were the major shareholders in Lloyds and to extent to which institutions had holdings in both Lloyds and HBOS. The top five shareholders in Lloyds (according to the last available public filings) were

- Barclays Global Investors (UK) Ltd:          4.7%

- Legal & General Investment Management Ltd    4.43%

- State Street  Global Advisors (UK) Ltd       2.98%

- AXA investment Managers UK Ltd               2.22%

- Scottish Widows Investment Partnership Ltd   2.17%

Barclays Global was the third largest investor in HBOS (with 4.54%). Legal & General was the second largest investor in HBOS (with 4.68%). State Street was the fifth largest investor in HBOS (with 2.62%). Scottish Widows was the fifteenth

largest investor in HBOS (with 1.25%). The 10 largest institutional shareholders in Lloyds (holding 27% of the bank) together owned 38% of HBOS.

### The "Away-day"

540. With the Circular launched and the recommendation on the Acquisition made the Board convened on 6 November 2008 to receive a report on the reaction to the Circular and to consider (amongst other business) strategy and the medium term plan. As to the reaction to the Circular Mr Daniels reported that institutions were broadly supportive, but that their views were coloured by their relative holdings in Lloyds and in HBOS; that individual investors were less supportive, being more concerned with the risk presented by HBOS and by the dividend "block"; that rating agencies were undertaking a review for possible downgrade; and that analysts were broadly supportive (because of the potential benefits from synergies and market position) but had concerns about the UK economy. The agenda items relating to strategy and the medium term plan involved consideration of papers presented by Mr Foley and by Mr Tookey.

541. Although the attendance record suggests that Mr Foley attended only in relation to the issue of a bond programme the body of the Minutes (which I treat as more reliable) and the Agenda record him presenting his paper (for 45 minutes) and as "commenting on the possible length and depth of the downturn" and on "the implications for the business of the group". The terms of the Minutes themselves ("the directors questioned the use of mid-case assumptions and discussed whether the 1:25 scenario represented a more likely outcome") and the terms of Mr Tookey's notes of the meeting ("more scenarios, contingency plans. What do scenarios mean for the [businesses] and what changes do they make = 1:25") show that the board were not mere passive recipients of information but raised challenges.

542. Mr Foley began by analysing what he considered to be the cause of the present crisis and then conducted a comparative analysis of previous recessions. He stood by the analysis that he had undertaken in early October 2008, that a base case (that is, the "new base case") had a 35% probability, a mild recession also a 35% probability, and a "1 in 25" a 15% probability. When challenged he maintained the view that the "mid-case scenario" remained "the most likely outcome". By "mid-case" Mr Foley meant the mid-point on the spectrum between the "new base case" ("significant downturn") and the "credit crunch" scenario ("1 in 15" recession). That was the approach being adopted by Mr Tookey for his medium term plan. Notwithstanding that affirmation the Board asked for further work to be done on different scenarios.

543. It is important to emphasise that there can be no criticism of Mr Foley as regards this assessment of the position and prospects as at the end of October 2008. Mr Foley was (justly) a very highly respected economist, conservative in approach and thorough in analysis. He could not know, as he made his presentation, that the economy stood on the brink of a "1 in 60" or possibly a "1 in 200" recession. His forecasts as to the course of the recession were more conservative than those currently being adopted by BoE, the Treasury and the IMF. As Prof Gary Gorton of the Yale Business School wrote in his Introduction to "Misunderstanding Financial Crises: Why We Don't See Them Coming" (OUP 2012)

> "Many saw a crisis looming, but what no-one saw was the size of it, that it would be a global systemic crisis."

In his first report (paragraph 8.12) Mr Ellerton made the point (which I think is a fair one) that economists' forecasts tend to be lagging indicators. Events happen. There follows a period of analysis. Forecasts are then prepared. But between the events and the intellectual reaction to them markets are already moving, further events are occurring. Mr Foley could not escape that reality. On the other hand, there is no evidence to suggest that every competent director would interpret economic predictions as "lagging forecasts".

544.  I would, whilst making clear that Mr Foley's assessment of the position at the end of October 2008 is not to be criticised, specifically and in the clearest terms exonerate Mr Foley of the charge made against him by the Claimants in open Court that "a certain amount of politics or strategy went into Mr Foley's thinking". I am clear that he gave to the board on each occasion what he thought was the most accurate forecast, and did so with independence and with professional integrity.

545.  Mr Tookey had alerted the Board of his intention to discuss in some detail the liquidity profile of the Enlarged Group and the sources of finance (including SLS), and also regulatory capital adequacy (particularly in the context of paying off the preference shares). It is difficult to discern from the surviving slide presentation exactly what was said. But the thrust seems to have been that Lloyds itself had made impairment provisioning in accordance with the views of Ms Sergeant and Mr Roughton-Smith, that the HBOS plan for the same period used similar assumptions, that "fair value adjustments will protect group income from further HBOS impairments beyond their plan". Mr Tookey's notes indicate that he spoke (or intended to speak) about "fair value" issues (alongside which he had written "Be very careful"). The topics covered (or to be covered) were the issue of "unwind" and the impact of Mr Roughton-Smith's views. Certainly the board would have needed an explanation that FVAs assessed as at the date of completion would have an immediate impact upon capital (subject to adjustment as events unfolded) whereas forecast impairments would not impact upon capital until the impairments were recognised as losses.

## *Events before the EGM*

546.  On 9 November 2008 an article was published in the "Sunday Times" under the headline "Lloyds TSB's secret £10bn loan to HBOS". The article stated that Lloyds was secretly providing financial support to HBOS through £10 billion loan facility, but it did not develop the story. It instead moved on to a proposal by two Scottish businessmen (rivals to the Spowart bid that I have referred to above) that HBOS should kept independent with additional capital provided by the government because they felt that HBOS shareholders were getting a raw deal. (There were, incidentally, rumours of interest from Bank of China and the Spanish bank BBVA). The "Daily Telegraph" picked up the "Lloyds' loan" story on 10 November 2008, reporting that analysts considered that £10bn was a small figure compared to HBOS's balance sheet of some £700bn but a very large loan for a normal transaction in the interbank market. The Scottish bidders asked the FSA to investigate. Robert Peston at the BBC added his confirmation to the story, writing:-

> "I thought that the disclosure by the Sunday Times that [Lloyds] has lent £10bn to HBOS was highly significant (and, for the avoidance of doubt, Lloyds has lent its prey this tidy sum)"

He surmised that Lloyds had only been allowed to make the loan because the FSA believed the takeover by Lloyds to be beneficial. He described this as "extraordinary support" and a demonstration that the authorities did not believe that HBOS had a viable long-term business model. The story was taken up by other publications and media and I am satisfied must have received wide circulation amongst the institutional investment community and interested retail investors.

547.    Although there was some comment that the Lloyds' facility to HBOS had not been mentioned in the Circular the point was not explored and the story subsided. Mr Hill QC fairly pointed out that this was in part because the Lloyds' news management machine swung into action. This promoted the view that there was no £10bn "loan" (an accurate statement since that was the ceiling on a particular facility and one which had never been fully drawn), that as part of "ordinary course" Lloyds provided interbank funds of various maturities, and that Lloyds was very comfortable that the Circular made appropriate disclosure of everything required. Whether this was (as Mr Hill QC charged) an attempt to dampen public attention or was (as Mr Parr preferred) a proper response to press speculation in the light of the Disclosure and Transparency Rules matters not. The fact is that the strong story had no statistically significant impact on the Lloyds or the HBOS share price.

548.    On 14 November 2008 HBOS published its circular to its shareholders (the "HBOS Circular") recommending them to vote in favour of the Acquisition. It made no secret of the doubts attending HBOS' access to funding or of what faced HBOS shareholders if the Acquisition did not proceed:-

> "There can be no certainty as to the sources of capital if the Resolutions are not passed. The HBOS Directors would expect the UK Government to take appropriate action consistent with the policy objectives set out in HM Treasury's announcement of 8 October 2008 on Financial Support to the Banking Industry, which are to ensure the stability of the banking system, and to protect ordinary savers, depositors, businesses and borrowers. Such action may include the issuance to HM Treasury of HBOS Shares on a basis which could be more dilutive to HBOS shareholders than the Placing and Open Offer and the issuance to HM Treasury of other securities on terms less economically advantageous and more restrictive than the HMT Preference Shares or the loss of independent or private sector status for HBOS."

This sent a clear message about the doubtful prospects for the long term viability of HBOS. The market understood it. Indeed the market consensus was that given its liquidity and capital needs HBOS simply was not viable as an independent entity with no external intervention. The question was one of timescale. The HBOS Circular revealed nothing new to the Lloyds' board. No commentator suggested that the situation disclosed in the HBOS Circular was materially different from what had been revealed in the Lloyds' Circular.

549.    Lloyds and HBOS both published their prospectuses on 18 November 2008. Lloyds published its prospectus in respect of the proposed placing and open offer of 2,596,653,203 open offer shares at 173.3 pence per share (the "Lloyds Prospectus").

HBOS published its prospectus in respect of the proposed placing and open offer of 7,482,394,366 open offer shares at 113.6 pence per share (the "HBOS Prospectus").

550.    The Lloyds Prospectus provided no additional material information over and above that disclosed in the Circular. The HBOS Prospectus is interesting in relation to its treatment of the HBOS funding needs. As regards those the HBOS Prospectus first described the global announcements of tools for the provision of liquidity to banks and how they had become an important feature of liquidity management solutions for banks and then said:-

> "There can be no assurance that these global measures will succeed in improving the funding and liquidity of the markets in which the major UK banks, including HBOS, operate. There is a range of different central bank funding arrangements in which HBOS is eligible to participate, both within the United Kingdom and overseas. As with many other banks, HBOS makes use of a number of these arrangements to assist with its funding and liquidity management. The general purpose of such arrangements is to allow a bank to pledge or enter into a repurchase agreement in respect of collateral for varying periods of time in exchange for Treasury Bills or cash funding. The HBOS Group expects that it will substantially rely for the foreseeable future on the continued availability of these government-sponsored arrangements, including central bank liquidity facilities such as those offered by the Bank of England as well as HM Treasury's guarantee scheme for short and medium term debt issuance. "

## *The Extraordinary General Meeting*

551.    On 19 November 2008 Lloyds held its EGM to vote on the Resolutions set out in the Circular. Sir Victor was in the chair. Mr Daniels, Mr Tookey, Ms Weir and Mr Tate (the Defendant Directors) were on the panel. So was Mr Kane (an executive director who is not a Defendant). Of the non-executive directors Lord Leith, Sir David Manning, Mr Scicluna, Mr Brown, Dr Berndt Mr Green and Mr du Plessis were also on the platform. The meeting provided an opportunity for the board to address shareholders and for shareholders to question the board.

552.    In his address Sir Victor underscored the strategic significance of the Acquisition with its intention to create the leading financial services company in the United Kingdom, the need to raise additional capital at the behest of the Government, the necessity to do so by the issue of preference shares to the government (which was a lower risk and lower cost option compared with an attempt to use public markets), and an intention to achieve the repurchase of the preference shares during 2009 so as to enable the Enlarged Group to resume the payment of cash dividends. Mr Daniels spoke to the terms of action and told the meeting that based on the recent closing share price Lloyds was acquiring HBOS for approximately £4.9bn.

553. The second question from the floor asked the board to explain why it was in the interests of Lloyds' shareholders to take over "a very large failed bank": the later questioner addressing the same issue referred to HBOS as "a terminally diseased company". The reply was that the merger was the fulfilment of a long-standing ambition and would produce a stronger bank better able to create value for shareholders over the medium and long term. The third question from the floor asked about taking on the HBOS corporate lending portfolio. Mr Daniels replied that Lloyds was underweight in that area and that the Enlarged Group would have about the right exposure. He said:-

> "Very clearly we have done an awful lot of due diligence. We have spent over 5000 days looking at the synergies and examining the portfolio quality. We think that the series of fair value adjustments that we have taken reflects the value of the HBOS portfolio and we feel that the impairments going forward are manageable."

554. One shareholder described the Acquisition as a deal

> "…cooked up at a cocktail party, in collusion with a Prime Minister who was prepared to set aside a national law, a competition law, that had been designed for the common good…."

concluding with the observation that "most of us in fact think this deal stinks": which drew applause. Sir Victor addressed the factual inaccuracies embedded in the question. Another shareholder addressed the new capital requirements for a standalone Lloyds suggesting that the figure of £7 billion appeared to have been plucked out of thin air. Sir Victor replied by stating that that was the figure that the FSA had determined was appropriate, and that satisfying the government was a prerequisite for access to some government funding. A later questioner returned to the topic, asking why Lloyds had to raise £7bn as a "standalone" bank but only £5.5bn as part of the Enlarged Group, and why that £7bn was greater in proportion than the additional capital required by a stand-alone HBOS, and what steps the Lloyds board had taken to investigate raising additional capital on the market. Sir Victor responded that those were the figures required by the government, but if the £7 billion was not raised then the bank would not have access to the liquidity funding arrangements that the government has made available, that the view of investment bankers was that it would not be possible to raise the money privately and that if it had been then it would be very expensive.

555. Well into the meeting a shareholder asked about the media report of a Lloyds loan of £10 billion to HBOS, enquiring why it had not been highlighted to shareholders. Sir Victor responded by saying that loans between banks were part of everyday business, the lending always being on commercial terms, and were not disclosed as they were ordinary course of business lending.

556. Another shareholder characterised the Acquisition as "a takeover too far" and enquired what would happen "if the united group goes belly up in two years". Mr Daniels identified three concerns during the next two years. First, would capital be all right? Second what about funding? Third would impairments (loan losses) be worse, could they be handled? And in these terms:-

> "so we spent over 5000 man days, that is an incredible amount of effort. I don't think that there were many acquisitions in fact have had the luxury of having that much effort dedicated to it. And what we basically feel is that while those threats are very real and they should be concerns that we feel we can address them, we feel that we can manage them through the couple of years. I think we feel very strongly that the longer term outcome of being able to create the leading financial services organisation in the UK is very worthwhile. The synergies are very real and we think those three things that were worried about which are legitimate concerns that we can manage and we can do on an informed basis having spent the amount of time on diligence that was necessary."

557.  After some rousingly critical speeches from the floor the Resolutions were put to the vote. On the Resolution to approve the Acquisition the total votes cast were 3,116,962,477. Of those 2,999,725,191 (95.98%) were cast in favour. The votes against were 125,237,286 (4.02%). Just to relate those figures to the present claim, it is thought (on the evidence one cannot form a reliable view because of potential double counting of legal and beneficial ownership) that the Claimants hold 312,732,812 shares. It is not clear how many of the Claimants attended the EGM. It is clear that some of the Claimants did so and did vote against the resolution (and so are already included in the 4.02% mentioned above): and that others attended and abstained. But if one takes the position most favourable to the Claimants on each variable and assumes that their holdings (at their maximum) were in their entirety voted against the resolution (as additional votes in opposition) the majority in favour of the Acquisition would have reduced to 82.19%.

558.  The effect of the approval by shareholders of the Acquisition was to bind Lloyds to proceed unless (i) the Acquisition was rejected by HBOS shareholders or (ii) the Scheme of Arrangement, (being the mechanism chosen to effect the merger) was not approved by the Scottish Court. (I should here note that the Claimants had an argument that the Defendant directors should themselves have objected, or should have enabled Lloyds shareholders to object, to the sanction of the scheme). This was a consequence of the removal of the "material adverse change" provision with which I have dealt with above.

### *The descending gloom*

559.  Within days of the Lloyds EGM the storm clouds began to gather.

560.  First, during the course of November 2008 it became apparent that GDP was declining rapidly, and that the recession was developing faster and threatening to go deeper than had been anticipated. This lead to two "inputs" from Lloyds' management.

   a)   On 28 November 2008 Mr Foley produced a fresh paper on "Economic Scenarios for planning [HBOS] funding". This moved the probability of the "mid-case" scenario down to 15% (from 35%), retained the probability of the "credit crunch" "1 in 15" scenario at 35%, but

> increased the probability of a "1 in 25" recession to 20%. So that was a shift in the risk profile. (There was an unallocated probability of 30% but it is not possible from the available material to work out what scenarios this covered: but amongst them may have been a scenario worse than "1 in 25").

> b)  On 10 December 2008 Mr Roughton-Smith sent to Mr Tookey an updated Group Risk analysis. In the light of the material worsening of global macro-economic conditions since the preparation of the 29 October 2008 report (including material foreign exchange movements) Group Risk believed that impairments ought to be considered in the context of a "1 in 25" scenario. This did not alter the level of impairments embedded in the HBOS portfolio as assessed by Mr Roughton-Smith on that scenario: but it had led to HBOS itself to recognise that its forecast for Q4 2008 had significantly understated impairment levels, although not at that point to adjust its 2009 impairments forecast (which Mr Roughton-Smith thought "materially inadequate").

561.    Second, on 5 December 2008 the European Commission issued a new set of guidelines which distinguished between "unsound" and "fundamentally sound" banks in terms of the requirement to submit restructuring proposals. This opened the possibility of adjustment to existing recapitalisation schemes to incentivise lending by fundamentally sound banks to the real economy without restructuring and to require banks in receipt of state aid in consequence of their business model to submit restructuring plans. Mr Daniels discussed these proposals with members of the Tripartite: but in those discussions there was no suggestion that the Enlarged Group would be required to make significant divestments because Lloyds and HBOS had participated in the Government recapitalisation programme.

562.    Third, on 10 December 2008 HBS disclosed to Lloyds an updated impairments forecast prior to its intended release to the market on 12 December 2008. I have noted the response of Mr Roughton-Smith to it. I must now note the response of Mr Tookey, who had to consider the potential impact on regulatory capital.

563.    Mr Tookey advised the board in these terms:-

> "In the circular to shareholders we noted that based upon a preliminary assessment net negative capital adjustments of no more than £10bn after tax would need to be made upon acquisition; we also noted that the actual figure would depend upon market conditions at the date of the acquisition. This figure is principally comprised of an estimate of the fair value adjustments that will be required that have an impact upon regulatory capital. Fair value adjustments represent a point in time assessment of the value of the assets and liabilities and whilst there is some relationship, there is no direct link to future impairment losses. HBOS has undertaken a very limited update review in the last two days of the likely accounting fair value adjustments and they have concluded that the additional impairment losses incurred have had no significant effect upon

the size of the adjustments that we are likely to have to make…
Combining the effects of the extra impairment losses and the
broadly consistent fair value adjustments, however, we do not
currently expect to see a significant impact upon the net negative
capital adjustments the Group is likely to have to make on
acquisition."

When tendering that advice Mr Tookey was of the provisional view that the probable
FVAs at completion would be of the order of £11bn.

564. The view that the latest impairment figures released by HBOS would have no
significant impact upon the anticipated net negative capital adjustment was also that
expressed to shareholders in the Supplementary Prospectus issued by Lloyds (in respect
of its then current Open Offer) on 17 December 2008.

565. Notwithstanding the generally emollient nature of these statements it is plain that before
the content of the HBOS trading statement (to be released on 12 December 2008) was
known there had been a degree of consternation on the Lloyds side as to what might be
the consequences of a really bad update, sufficient for someone to seek the advice of
Mr Parr as to whether Lloyds could withdraw from the Acquisition in that event. His
advice on 11 December 2008 was that it could not: and that even if the "materially
adverse change" clause had remained a term of the Acquisition such a clause would not
have availed Lloyds. But in the event the trading statement did not necessitate action.

566. Fourth, as part of an ongoing conversation with Sir Victor Mr Roughton-Smith updated
him directly on the developing impairments position. His e-mail of 19 December 2008
made two key points. The first was that his own October 2008 figures remained
unchanged whereas the HBOS impairment figures had risen from £1.7bn at the half
year stage to £6bn in their latest trading update. As he put it "[HBOS] have gradually
"smelt the coffee" and now agree with us – after very vociferously disagreeing with us
initially". Looking further out, he stood by his October 2008 figures for anticipated
impairments in 2009 both on a "1 in 15" and a "1 in 25" scenario but observed:-

"However, the macro economic position has deteriorated
materially since October and, especially given the nature of
[HBOS'] portfolio, we believe that the one in 25 year figures are
more appropriate rather than the one in 15 year basis case."

His observation that a deepening recession was hitting HBOS harder than Lloyds was
in line with what Mr Roughton-Smith had been saying at the end of October 2008.

567. There was, however, one countervailing factor emerging. It related to the acquisition
accounting treatment of HBOS' own debt in issuance. On the occasion of an acquisition
the accounting standards (IFRS3 "Business Combinations") require that the assets and
liabilities of the target should be reflected in the consolidated balance sheet as at the
acquisition date at "fair value". "Fair value" is not face value of the debt, but that value
adjusted by reference to movements in interest rates since issue and any movement in
the issuer's credit spread. It may be recalled that a comparison between (i) the price that
the acquirer is paying and (ii) the net fair value of the fair valued assets and the fair
valued liabilities being acquired will produce a figure for "goodwill": and that an ability
to capture "negative goodwill" has a favourable impact on regulatory capital.

568.    When preparing the Circular the Lloyds specialist team thought that there was a "prudential filter" (GENPRU 1.3.9) which required them when conducting the "fair value" process to *exclude* the effect of a reduction in the face value of HBOS' own debt to fair value. But further consideration of the detailed accounting standards (led by UBS but with review by PwC) led to a revision of this view. The Lloyds specialist team came to think that it *was* appropriate to include the effect of a "fair value" adjustment to HBOS' own debt, thereby reducing its face value. This had a favourable effect on regulatory capital: the eventual benefit was about 100bps. When the point was put to the FSA (in January 2009) it agreed : the FSA had no objection to Lloyds "fair valuing" the HBOS debt on completion in calculating the consolidated group regulatory capital ratios. Thenceforth, market deterioration which had the effect of reducing the fair value of the net assets being acquired also had the effect of reducing the fair value of the liabilities of HBOS. The point was neatly put in an Enlarged Group Audit Committee paper of 10 December 2009 (from which I quote to illustrate the point, not to establish the figures):-

> "An extensive exercise has been undertaken to determine the fair value of the assets, liabilities and contingent liabilities of HBOS…. This exercise has concluded that the fair value of the acquired net assets and contingent liabilities of HBOS was £1.2bn greater than their carrying value at 16 January 2009. This seems counterintuitive given the credit risk concerns surrounding the HBOS loan book. However, a £15bn fair value reduction in HBOS's loan books was more than offset by the reduced value of HBOS's own debt in issue (c.£16bn) reflecting increased credit spreads. "

It should, however be observed, that this "fair value" adjustment was not permanent and would "unwind" over time because (unless the debt was bought in at a discount, as about £11bn of "own debt" was) the Enlarged Group would have to pay the debt back *at face value* at maturity.

569.    In broad terms the situation was that the deteriorating macroeconomic position had increased the risks inherent in the Acquisition, but the potential consequences lay within the range of outcomes taken into account when recommending the transaction, and there was the possibility of some unanticipated "headroom" generated by the discovery that any increase in the £10bn net negative capital adjustment might be offset by the ability to "fair value" HBOS' own debt.

570.    On 12 January 2009 the Court of Session approved the HBOS scheme of arrangement. The following day Lloyds issued 2,596,653,203 shares to HM Treasury under the placing and open offer (only 0.5% of the open offer shares being taken up by Lloyds shareholders under the "clawback" provisions): and HBOS also issued new HBOS shares under its placing and open offer. So far as Lloyds was concerned the pre-existing shareholders now owned 69.7% of Lloyds and the Government owned the balance of 30.3%. Then on 15 January 2009 Lloyds and HBOS both issued shares to HM Treasury as part of the recapitalisation scheme.

571.    In preparation for completion Lloyds received from KPMG a letter of comfort which was itself supported by a letter from Mr Ellis of HBOS to KPMG: the effect of Mr Ellis' letter was to confirm an estimate of HBOS impairments for 2008 at £7.98bn. HBOS

also provided an "out-turn status report" and in the course of that estimated the HBOS impairments for 2008 to be £7.25bn. The Acquisition completed on 19 January 2009 with HBOS shares being delisted. On completion the pre-existing Lloyds shareholders now owned 36.5% of the Enlarged Group: the Government owned 43.5% and the former HBOS shareholders 20%.

572.    Completion took place against a background of increasing gloom. That week Citigroup and Bank of America announced bad news. On the morning of 18 January 2009 Mr Daniels was warned by the FSA that a major UK bank would release bad news the following day. On the afternoon of 18 January 2009 the Chancellor informed Mr Daniels that the Government would be releasing unfavourable economic news on the Monday along with further measures to support bank lending in the light of the intensity of the downturn over the preceding two months. Amongst the unfavourable economic news was that the final quarter of 2008 had shown a decline in GDP of 1.5% (the sharpest quarterly contraction for 28 years). HBOS informed UBS and Merrill Lynch that all HBOS lending businesses were under extreme pressure with respect to impairments as the economy continued to deteriorate and at great pace, but stood by its impairment assessment (which as at 10 December 2008 was £7.25bn, and confirmed at that figure in the "out-turn status report" a month later). A few days after giving that indication it revised the estimate upwards to £7.6bn.

573.    In the result, when Mr Tookey came to report to the board on 18 January 2009 what he considered the Core Tier 1 ratio for the Enlarged Group was likely to be post-Acquisition and post-recapitalisation he advised that it was 6.1% (at the bottom end of (but within) the announced target range of 6-7%). Since this was dependent upon the change in the treatment of the HBOS own debt for acquisition accounting purposes it was necessary to make an announcement to the market; and this was done.

574.    It is appropriate at this point briefly to pick up the topic of HBOS funding and liquidity. With the merger with Lloyds assured (having been approved by the both the Lloyds and the HBOS shareholders) and the proceeds of the open offer and the recapitalisation in immediate prospect (and further boosted by the sale of the Bankwest business unit on 19 December 2008), HBOS began paying down the ELA. The process was eased by the fact that HBOS was able to securitise the collateral that supported the ELA into a form acceptable for mainstream SLS. By 16 January 2009 HBOS had repaid all ELA and was reliant on SLS and market funding (including debt issued under the credit guarantee programme).

575.    As had been indicated to Mr Daniels, on 19 January 2009 the Treasury announced its "Government Asset Protection Scheme", explaining that it did so "with the global economic downturn intensifying in the past two months". Because the Enlarged Group did not ultimately avail itself of this facility it is unnecessary to descend to detail: but its rationale was to underpin asset values on the banks' books in order to encourage banks to lend into the real economy. Its importance in the present context is that it a clear indicator that the economic situation was significantly worse than had been anticipated in October and called for an additional response from the Tripartite over and above that provided during the Recapitalisation Weekend, which had been intended to "bullet-proof" UK banks.

576.    Another part of that response was the running of further "stress tests" by the FSA to assess how balance sheets might be impacted by the more severe recession than had

been anticipated during the Recapitalisation Weekend. Obviously these "stress tests" were more severe than those applied in October 2008: the issue was whether the "buffers" applied in October 2008 remained sufficient to absorb the more severe shock, or whether banks should be required to raise more capital. Mr Tookey acknowledged that it was a reasonable prediction that the latter would be the eventual outcome (though in the case of Lloyds this was not actually confirmed until 21 February 2009).

577. The rapidity and the severity of the recession also caused the Lloyds Risk Oversight Committee to advise on 19 January 2009:

> "Our latest view on the economy is that we are effectively now in a 1-in-25 economic scenario with strong similarities to the 1-in-25 stress we have been deploying. "

578. It was in this context that HBOS (which post-Acquisition had a new board) issued a revised impairments forecast on 23 January 2009. The total impairments for 2008 were now estimated to be £9.3bn (in place of the original HBOS estimate of £3.7bn uplifted only a few days before first to £7.25bn and then to £7.6bn). This certainly reflected an acceleration in the anticipated impairments (bringing forward into 2008 impairments that had been anticipated to occur in 2009): but did not of itself indicate an overall increase in impairments. However, there was also an increase in the anticipated impairments for 2009: HBOS now estimated £10.2 bn (in place of an original figure of £4.2bn). As Mr Hill QC emphasised, these increased HBOS figures in fact remained more-or-less within Mr Roughton-Smith's 29 October 2008 range. In an assumed "1 in 15" scenario for 2008 Mr Roughton-Smith had estimated a top-of-the-range figure of between £8bn-£9bn. In an assumed "1 in 15" scenario for 2009 Mr Roughton-Smith had estimated impairments at £6.5bn-£10.1bn, and in an assumed "1 in 25" estimated impairments in the range of £10.25bn-£16.6bn. It is notable that no director is recorded as suggesting that the Acquisition had proceeded on the footing that Mr Roughton-Smith's views had been more benign: which I think tends to confirm that at the board meeting on 29 October 2018 Mr Tookey had conveyed the import of Mr Roughton-Smith's then-current estimates. Lloyds of course had not proceeded on the basis of Mr Roughton-Smith's most pessimistic impairments forecast (because of the low probability of its occurrence), but on the basis of the anticipated net negative capital adjustment of £10bn (informed by but not based on impairment forecasts). So the impact of these revisions upon Lloyds' assumed post-acquisition scenario had to be examined.

579. Mr Tookey did so in a report to the board on 23 January 2009: and Mr Roughton-Smith did so in an e-mail on 26 January 2009.

580. In his report Mr Tookey addressed what he termed "a heavily weakened economic outlook" which drove down anticipated profits significantly below the previous budget. In the case of HBOS the budgeted profit anticipated for 2009 as at October 2008 had been £2.1bn, but was now revised to a net loss of £2.3bn. The revision was attributable to a sharp rise in the HBOS impairments for 2009. This reduction in HBOS' anticipated 2009 profits (because of increased impairments) in fact formed the budgeted loss for the Enlarged Group. The impact of this loss on capital was dramatic. Assuming the least severe of the outcomes in a "1 in 25" scenario the Core Tier 1 capital ratio dropped to 5.2% during 2009 and on the most severe outcome "1 in 25" scenario to 4.1% even

allowing for partial mitigation by means of a FVA "unwind". So Mr Tookey warned the board that it must contemplate:-

> "Significant business critical activities on costs and impairment required over the coming months…Options for capital plan B's need to be evaluated".

581. By "capital plan B's" Mr Tookey was warning the board that management action (to effect disposals or to alter the business model to reduce RWAs, for example) or the raising of additional capital (though not necessarily by a means that would be dilutive to existing shareholders) would need to be considered. Mr Tookey observed in an e-mail to Mr Daniel:-

> "In the week and a bit of proper access good (very good) progress has been made but we don't have a complete picture yet. At the moment every stone being unturned (*sic*) is yielding problems and downsides. The HBOS 2008 numbers are slipping away from us, 2009 is racing away from us, and the fair value work (which I have always said is a rush for mid-Feb) is highly unlikely to save the day…the picture is not good and is deteriorating."

582. Mr Roughton-Smith's e-mail identified the same movements (though his actual figures are different), but he warned that since the economy had deteriorated significantly even since early December further revisions could be anticipated. He considered that the HBOS impairment figures for 2008 had risen from £3.7bn to £9.3bn and that the 2009 impairments had risen from £4.2bn to £10.2bn. He correctly pointed out that the aggregate of these increased figures was within his own October 2008 projected range (and, indeed, in the case of 2009 impairments at the bottom of that range). He emphasised in an e-mail to Ms Sergeant and Mr Tookey a couple of days later that "because of the rapidly deteriorating macroeconomic environment [these] downside risks have increased markedly even since December" and so he expected even these revised HBOS figures to be further amended and to move towards the upper end of his estimated range, which in this e-mail he said was £17.75-£25.9bn, being the total impairments for 2008 (on a "1 in 15") and 2009 (on a "1 in 25" basis).

583. Mr Roughton-Smith obviously continued to reflect on what had changed since his due diligence work in October 2008: and it is at this point convenient to refer to the conclusions that he reached towards the end of February 2009. These were:-

> a) That the last quarter of 2008 had seen a much more rapid deterioration (bringing forward into 2008 impairments anticipated for 2009);

> b) That 2009 itself would *at best* be a "1 in 25" and in some significant areas would be a "1 in 40+" recession;

> c) That post-acquisition access to file level information (not available pre-acquisition for standard M&A reasons of commerciality/client confidentiality) had revealed problems greater than anticipated.

## *The board meeting of 13 February 2009*

584.    A board meeting was scheduled for 13 February 2009. A number of steps were taken in preparation for it. First, Mr Roughton-Smith provided updated impairment figures to Ms Sergeant, who was to attend the meeting. He now assessed the 2008 HBOS impairment figure at £11.6 bn and the 2009 figure at £12.3bn, a total of £23.9bn. The 2008 impairment figure was above his October 2008 estimate: however the combined figure was now at the upper end of his 28 October 2008 range, but still within it.

585.    Second, Mr Tookey prepared a Finance and Capital Update for the Board seeking to explain how and why financial projections had changed. This did not incorporate Mr Roughton-Smith's very latest figures, but presented a picture consistent with them. It took the Board through both the HBOS internal and the Lloyds external assessments of the HBOS impairments, pointing out that the latest HBOS internal 2008 impairments figure on its own (at £9.6bn) now exceeded the Lloyds October estimate. It informed the board that whereas at the time of the Announcement HBOS had a forecast profit before tax of £3.5bn and then on 18 January 2009 had forecast a loss of £5.9bn, now on 13 February 2009 it was anticipating a loss of £10.8bn, a decline driven to a great extent by revised (increased) impairments. He summarised the position for the board in these terms:-

> "- the economy has deteriorated materially - impacting both [Lloyds] and    HBOS results
>
> - The economic deterioration is amplified by market dislocation as market prices have fallen
>
> - HBOS impairments have exceeded our own due diligence estimate based on a 1 in 15 downturn by £1.6bn
>
> - The capital position which will be reported to the market is still within range 6-7% - but benefits from a lower fair value charge as we have included HBOS debt"

586.    There are three observations to make about that. First, as Mr Hill QC noted in cross-examining Mr Tookey, Mr Daniels and Mr du Plessis, whilst it was true that the actual HBOS impairments exceeded the Lloyds due diligence estimate, the Acquisition had been approved not on the basis of the Lloyds due diligence impairment assessment but upon the PwC assessment of the net negative capital adjustment required, which incorporated HBOS' estimates (the Lloyds own due diligence estimates serving only as cross-checks to the resulting conclusion). Second, the "capital position" at completion was now estimated to be 6.41% (and so within the target range). Third, the reference to the "benefit of a lower fair value charge" is a reference to fair valuing of HBOS' own debt: this underpinned the capital ratio at completion but would have an adverse impact on future capital ratios as it unwound.

587.    Having completed his analysis of the current position Mr Tookey moved to predict the 2009 out-turn and to assess its impact on capital ratios. His central assessment was that the capital ratio would fall at the year-end to 5% (i.e. below the target range) even assuming the Enlarged Group set and achieved a targeted reduction in RWAs of £8bn. But on a slide entitled "Risks and Opportunities" Mr Tookey warned that adverse

conditions (in particular further impairments in 2009 over and above those then forecast) might bring the ratio down further. In fact, if the upper end of Mr Roughton-Smith's 2009 "1 in 25" impairment estimate was reached the Core Tier 1 ratio would be reduced to 4.1% (at which level the concern would not be limited to regulatory capital requirements but would extend to liquidity issues): the presentation slide did not so state.

588.   Mr Tookey therefore addressed "capital mitigants", including the conversion of the Government's preference shares, use of the Government Asset Protection Scheme (though he thought successful execution to be uncertain), management of RWAs and capital management (including non-dilutive issuance). But the message he gave the Board was that "significant risks remain and active management was required".

589.   In presenting his report Mr Tookey commented on how the disclosed out-turn related to the due diligence which had been undertaken in October 2008. He expressed the view that the key limiting factor had not been one of time, but of the relatively restricted access to underlying documentation that had been available.

590.   At the board meeting on 13 February 2009 Mr Daniels began by reminding the directors that at the time of the negotiations with HBOS in the autumn of 2008 there had been a significant difference of view in relation to the risk profile of the HBOS business, the state of key portfolios and the likely near term profitability, and that after conducting its due diligence (albeit it with relatively restricted access to underlying documentation) Lloyds had formed a far more pessimistic view than HBOS of its anticipated 2008 out-turn). He related that to the current situation in this way:-

> "Since the 12th December announcement by HBOS it was clear that the likely 2008 HBOS outurn had deteriorated significantly as a result both of general economic conditions and the application of more conservative standards of prudence to the assessment of its banking books (more aligned to historic [Lloyds] standards."

This was a (correct) acknowledgement that the sudden, rapid and deep recession was not the sole reason for the emerging divergence between the anticipated and the actual.

591.   This view was echoed by Mr Tookey who is recorded as explaining:-

> "Compared to the due diligence carried out by the Group the "excess" loss related both to the effect of further market deterioration as well as to the more prudent view of the quality of the HBOS lending books now being taken. In total the anticipated 18 months' experience of impairment **could** still be within the previously anticipated range. But in the 12 months to 31 December 2008 the experience was worse than ([Lloyds] had) expected." (Emphasis in original).

592.   The board then considered and approved a draft trading statement for release to the market (which was done that day). This disclosed an anticipated loss before tax for HBOS of £10bn, explained in these terms:-

> "The key elements of the loss are the £4bn impact of market dislocation and approximately £7bn of impairments in the HBOS corporate division. The market dislocation has been driven by deterioration in asset quality and falling market valuations. The impairments are, principally as a result of applying a more conservative provisioning methodology consistent with that used by [Lloyds], and reflecting the acceleration in the deterioration in the economy, some £1.6bn higher than our expectations when we issued our shareholder circular at the beginning of November last year."

The trading statement confirmed that the Core Tier 1 capital ratio would be within the range of 6-6.5%, but acknowledged that this "include[d] the regulatory capital benefit of the fair-valuing …of HBOS own debt". The full results were promised for 27 February 2009.

593. The market reaction was swift. The market was stunned by the speed and scale of the deterioration at HBOS. Lloyds' shares fell about 30%. Ratings agencies reduced Lloyds' credit rating from Aaa to Aa3 (a notch below what Lloyds had anticipated would probably occur, but still on a par with Barclays). The Government's January 2009 investment of £17.7bn of new capital into the Enlarged Group lost £8.3bn of its value. Press speculation began that a further injection of Government capital would be required to "bail out" the Enlarged Group, possibly amounting to majority public ownership. Unsurprisingly Lloyds shareholders became restive.

## *Further capital raising*

594. Before the announcement of the full results the Lloyds Audit Committee considered the figures and reported on them to a board meeting on 19 February 2009. Mr du Plessis (who chaired the Audit Committee) described it as "one of the worst moments of my professional life".

> "Some of the loans which the Committee were having to assess were structured in a very complex manner and we were required to make judgements about their provisioning against the background of uniquely challenging and rapidly deteriorating economic circumstances, the likes of which I had not come across previously during my years of being a chartered accountant and in corporate and board positions."

Mr Tookey had warned of the worse-than-anticipated outcome for 2008 (and the Audit Committee explored that by extensive questioning of KPMG), but for Mr du Plessis

> "..what was particularly worrying was going through this process and looking ahead to 2009 recognising the impact that the deteriorating conditions could have on the Enlarged Group's position."

595. That issue (amongst others) was addressed by Mr Tookey at the board meeting on 19 February 2009. The meeting itself was satisfied that the Acquisition remained a good long term deal, even though in the short term its revenue generating potential was going

to be eroded by the impairment issues: Mr Daniels felt that the Lloyds risk management skills would reduce the significance of those issues, and that in the meantime the Enlarged Group remained strongly capitalised. Mr Tookey reported that in terms of liquidity and funding the Enlarged Group was funded strongly, and although significantly reliant on the wholesale market (in relation to which conditions were now as tough as immediately post-Lehman) it was successfully taking steps to lengthen the maturity profile of that funding. In terms of capital Mr Tookey reported that the Enlarged Group was operating well ahead of its Individual Capital Guidance and its regulatory minima. He observed that although in a stressed scenario (such as a "1 in 25") the minimum Core Tier 1 ratio could drop to 4% external audiences (such as analysts and rating agencies) would probably have serious concerns at that level which could result in reduced liquidity availability. The present level was 6.3%, but he observed:-

> "It was acknowledged that further stresses could arise, most likely in the areas of impairments and adverse RWA movements. However, there were significant available mitigants to justify confidence that the Core Tier 1 ratio should remain in excess of 5% in the next few years."

Getting this message across to a market in turmoil and rife with speculation was recognised as a challenge.

596.   But a key question for the board was what FVAs fell to be made at completion (for only at that date could they be ascertained) and how these compared to the £10bn predicted in the Circular in the very different economic circumstances of early November 2008. On 23 February 2009 Mr Tookey explained the latest provisional position to the board ("provisional" because the work would extend over months). The overall message was calming. In the Circular the shareholders had been told that net negative capital adjustments of £10bn after tax would be needed to HBOS' financial position. The figure now anticipated (taking into account not only FVAs but also other accounting adjustments such as the elimination of the AFS reserves) was £3.7bn, giving a Core Tier 1 ratio at completion of 6.4%: but this was because the Enlarged Group was going to claim a credit of £11.3bn post tax in respect of HBOS' own debt. The position looking forward was far less reassuring.

597.   In preparation for the release of full-year figures Mr Tookey reported to the board on 26 February 2009 that further revisions to the base case meant that the anticipated year end Core Tier 1 ratio was 5.3% *on the assumption* that the Enlarged Group both participated in the GAPS scheme and converted the Government preference shares into Core Tier 1 "B" shares, and would fall below 4% in a severe (but possible) recession. In other words, further capital was needed. The need was reinforced by the results of the FSA further stress testing, which was much more severe than the October testing: the more severe stressing produced higher hypothetical losses which would require additional capital to absorb them. (It is important again to emphasise that the outcome of the stress test was not a forecast, but simply the result of applying assumptions). However, the need for *some* further capital would have arisen even without the stress tests both because of the severe downturn (which now approached a "1 in 40" rather than a "1 in 25", on its way to becoming a "1 in 60+") and because on detailed examination the HBOS portfolios were in much worse shape than had been thought (the

complex structure of some of the lending giving exposure to the same enterprise at multiple levels). Mr Tookey blamed the FSA: in an e-mail to Mr Tate he wrote:-

> "The FSA didn't understand HBOS, they just didn't get anywhere close to doing so. Had they understood it, the autumn injections would have been much higher, we would have seen that we could only buy it with a majority govt shareholding and we would have walked away from the deal."

(Just as an aside, in November 2015 the PRA and the FCA were to conclude in their report "The failure of HBOS plc" that indeed the FCA senior management had devoted too little attention and resource to supervising HBOS, placed too much trust in senior HBOS personnel and had not adequately monitored the risks facing the bank).

598.    The need for further capital became imperative when in March 2009 the FSA formed the opinion that in its new stress scenario the Enlarged Group's Core Tier 1 ratio fell below 4% and required £24bn-£29bn to restore it to a level acceptable in those circumstances. The Enlarged Group initially proposed to meet this regulatory requirement by conversion of the Government's preference shares and by accessing the GAPS facility (notwithstanding that there would be a significant access fee). It is unnecessary for the purposes of this case to detail the negotiations and sufficient to note the outcome.

599.    On 20 May 2009 the Enlarged group published a prospectus seeking to raise £4bn to redeem the Government's preference shares. To get the issue away it was necessary to offer 10,408,535,000 shares at 38.43p (a significant discount to the then market price of 70.5p per share). HM Treasury participated in this rights issue up to its 43.5% shareholding for an amount of £1.7 billion.

600.    The necessity for this capital raise arose out of the formulation of the FSA's new stress scenarios. Mr Sharma (the Defendants' expert) explained the context:-

> "…the severity of the financial crisis was not foreseen by the Tripartite Authorities in October 2008 and consequently, in the light of the declining economic situation between October 2008 and March 2009, the economic reference points for the stress tests would inevitably have been more severe in March 2009 and those in October 2008…"

Thus what lay behind the raising of additional capital was not covering the "1 in 25" impairments that had been estimated by Mr Roughton-Smith, but meeting tougher stress tests.

601.    Then on 3 November 2009 the Enlarged Group announced a capital restructuring to generate £21bn of Core Tier 1 capital (by a further £13.5bn rights issue and a series of offers to exchange non-Core Tier 1 subordinated instruments for Core Tier 1 notes). To get the rights issue away Lloyds had to offer 36,505,000,000 shares at 37p per share. The Government took up its rights to maintain its 43.5% interest in the Enlarged Group (thereby injecting another £5.9bn). Thus (as the Claimants' Skeleton Argument notes) over the 12 months following completion Lloyd's share capital had "ballooned" from just under 6 billion ordinary shares to almost 64 billion ordinary shares.

Approved Judgment

602.    The November 2009 restructuring was called "Project Seaview". The BoE indicated during the currency of Project Seaview that it intended to disclose to the market the fact that it had afforded ELA to HBOS from 1 October 2008 until 16 January 2009 to a maximum amount of £25.4bn. Mr Tookey sought to dissuade Mr Bailey of the BoE from doing so. Mr Hill QC sought to explore why this might have been, suggesting that it was because even in late 2009 Mr Tookey recognised that knowledge of ELA might make a difference to shareholders and to their perception of the Acquisition and of the Enlarged Group. Mr Tookey responded that he was simply

> "..keen to avoid media speculation about a historic event which actually has nothing to do with the current project…But one cannot control media speculation. The media… have a habit of creating mountains out of molehills, selling stories on the back of speculation, and that…can be unhelpful."

Shortly put, if he could avoid media speculation then naturally it would be prudent to do so. To the same effect was the evidence of Mr Daniels, who spoke of a desire to avoid "superfluous noise".

603.    In the event, when the historic support was disclosed it was widely commented upon in the press; but there was no market reaction and no material impact on the share price.

*Two other streams*

604.    Whilst the further capital raising was in train there were two others streams of activity.

605.    First, the Treasury Select Committee examining the banking crisis took evidence during February 2009: and I have already referred to the evidence of Mr Daniels concerning the need for Lloyds to take Government capital in October 2008. He was also asked about the due diligence undertaken. His response was that Lloyds had put 5000 man days into the effort (a great part of which was done not by Lloyds staff but by accountants and investment bankers). Asked if he had had more time, how many man-hours he would have expected to put in he said:-

> "If we had unlimited access, which is not permitted by law….we probably would have put in somewhere around three to five times as much time as we put in."

This is not in my view an acknowledgment that the due diligence actually carried out was deficient. It is important to note the condition ("If we had unlimited access…."). When (in January 2010) the Select Committee attempted to turn Mr Daniel's words against him and to suggest that he had acknowledged that Lloyds had undertaken only one fifth of the due diligence required Mr Daniels was at pains to point that out:-

> "If you recall, my answer to your question of "Did you do enough due diligence?" was emphatically yes; … we did the maximum that we were permitted to under the law. In an *a posteriori* review by the board, supported by our external advisers… the Board remain[ed] fully satisfied that we did an excellent job on due diligence. You had asked the hypothetical question of, if there were no restrictions, would we have done

more, and I think the answer was yes, of course, but that is a hypothetical question."

606. Second, as I have noted in December 2008 the European Commission had indicated that "fundamentally sound" banks could receive State aid without the need to submit a restructuring proposal. This led to discussions between the Government and the Commission and between the Government and the Enlarged Group about whether a restructuring plan was required. The view of those involved at the time was that Lloyds was a fundamentally sound bank, and that its taking over HBOS and subjecting HBOS to more conservative management was of itself a sufficient avoidance of "moral hazard". So even if a restructuring plan was required the Lloyds' business plan would suffice without significant divestment. But on 25 February 2009 the Commission reversed this policy and announced that the submission of a restructuring plan would be required whenever a bank had received State aid in excess of 2% of its RWAs, the question of whether a bank was or was not "fundamentally sound" going only to the extent of the compensatory measures required. By now the HBOS horrors had emerged, jeopardising the view that Lloyds was "fundamentally sound", and opening up the possibility of divestments being required. This undoubtedly coloured the consideration of the restructuring plan which the Enlarged Group submitted in July 2009. When eventually the Commission announced its decision in November 2009 it was to the effect that Lloyds had to dispose of the TSB franchise.

## A retrospective

607. In January 2010 Mr Roughton-Smith produced a paper entitled "Review of the adequacy of the HBOS due diligence undertaken by [Lloyds] and the accuracy of the resulting 2008/9 impairments forecast". Its central observation is in these terms:-

> "The various HBOS impairments forecasts for aggregate 2008/9 are set out in the table below. These show that, even at 9 February 2009 - after intensive post Day 1 reviews by [Enlarged Group] teams – the due diligence forecast of 29 October 2008 was still remarkably accurate. It is worth noting that the accuracy of our due diligence based forecast (made in the depths of a severe recession) was very substantially greater than other banks forecasts of their own results. The actual HBOS impairments for 2008/9 of £29.6 billion are 14% greater than the £25.9 billion top end of our due diligence forecast range. This is because the recession suffered in 2009 was much deeper than the 1 in 25 year recession we had assumed in October 2008. The Economist magazine has stated (9 January 2010) that the UK recession is the longest and deepest since the Second World War. The recession has exhibited worst or close to worst simultaneous deterioration in many areas of the economy in the post-war period, including equity markets, interbank market, commercial property market and housing market. The recession has hit HBOS particularly hard because of its massive, highly leveraged exposure to commercial real estate both in the UK and overseas (Ireland, US Australia). We therefore consider the current recession to be a one in 60+ year event for HBOS. "

608.    To pick one phrase out of that analysis for special comment, Mr Roughton-Smith drew attention to the "worst simultaneous deterioration". The sense I get from the evidence is that it was the speed of on-set and the all-embracing nature of the recession as much as its depth and length that caught the financial world unawares and generated the difficulties for the Enlarged Group. In October 2008 the IMF forecast that in 2009 UK GDP would dip by 0.1%. Within 6 months it had amended that to -4.1%. In its Pre-Budget Report in November 2008 the Treasury said that growth for 2009 was going to be negative at -0.75% to -1.25%: it was in fact 4.8% negative. As Sir Mervyn King was to acknowledge in the "2012 BBC Today Programme Lecture" even the Bank of England had not imagined the scale of the disaster that would occur when known risks crystallised. When reviewing judgments made in October/November 2008 the subsequent sense of shock at what happened thereafter is vital context.

609.    This has been a long factual account: even so it has focused on only one aspect of the Acquisition. I have ignored the work done on the benefits of the Acquisition, the synergies, the plans for business integration, organisational issues and a mass of other issues on which material was produced for the board to absorb, process and make decisions on. That focus of course already differentiates my account from the contemporary reality. In my factual account I have tried not to "telegraph" the important points that would eventually emerge. But constraints of space mean that I have not wholly succeeded. With that account I can now address the two ways the case is put.

### The recommendation case: the pleaded case

610.    The Claimants allege (in paragraph 37 of the Claim) that the Defendant directors advised the Lloyds shareholders that the Acquisition was in their best interests and voluntarily undertook responsibility for the correctness of that advice. It is pleaded that in so doing the Defendant directors owed a common law duty to the shareholders (including the Claimants) to use reasonable skill and care when providing that advice and information to the Claimants, and to ensure that the advice so provided to the Claimants was reasoned and supported by information available to the directors: see paragraph 40 of the Claim. (Other phrases in the paragraph expand the duty to exercise care into a duty to provide complete information and not to mislead or conceal; but these seem to me duties of a different character from those arising from positive advice and better considered in the context of disclosure obligations).

611.    The duty there pleaded is a duty owed as director, and one owed by each of the Defendants equally without distinction. It is not suggested that any individual Defendant Director (because of particular executive responsibilities or particular skill, knowledge or experience) had a duty of care different in scope or content from that of any other Defendant director which might make that individual Defendant liable in circumstances in which another Defendant would not be liable. The duties of Sir Victor as a non-executive director are not distinguished from those of Mr Daniels as an executive director. The duties of the Defendants are not distinguished from the duties of executive and non-executive directors who are not defendants. The Defendant Directors are treated as a single common body of persons. Paragraph 44 of the Claim pleads that in preparing the Circular (and the Announcement and the Revised Announcement)

> "the Defendants acted at all times in their capacity as directors
> of Lloyds and, therefore, as its agents. It follows that Lloyds is
> vicariously liable for the acts and omissions of the Defendants."

612. The duty pleaded in paragraph 40 of Claim is also a duty owed directly by each director to each individual shareholder. Each of the 5800 Claimants brings his or her own claim.

613. Paragraph 42 of the Claim pleads that the board (including the Defendant Directors) produced the Announcement, the Revised Announcement and the Circular which contained the advice about the Acquisition and the Recapitalisation of Lloyds which they intended would be read, analysed and relied on by Lloyds shareholders. Paragraph 43 pleads that the Defendant Directors also held press conferences and briefings for industry advisers at which information was provided and representations made. But it is not alleged that these press conferences and briefings were occasions for the giving of advice: rather, it is said that these were occasions for the provision of information which was to be the subject of analysis by the financial press, market analysts and Lloyds shareholders.

614. Paragraph 119 of the Claim pleads that the Defendants knew or ought to have known that the Acquisition was not a good deal for the shareholders of Lloyds and would not be in their best interests (for the reasons set out in the Particulars given of that allegation).

615. Paragraph 122 of the Claim then alleges that if the Directors had complied with their duty of care they would have corrected their recommendation so as to advise Lloyds shareholders that the Acquisition and the participation in the Recapitalisation on the terms and in the manner proposed was not in their best interests and was not a good deal for them: or alternatively would have declined to proceed with the Acquisition.

### *The recommendation case: the law*

616. It is a cardinal principle of company law that the duties of directors are owed to the company and not to individual shareholders. It is the company that may bring an action for any breach of duty: if it does not, but an individual shareholder does wish to pursue the company's claim, then the individual shareholder must obtain permission to commence a derivative action on behalf of the company. The directors are therefore not vexed (nor the Courts burdened) by multiple actions by individual shareholders each seeking to prove his or her own formulation of an alleged breach of a duty owed directly to him or her and to establish his or her own individual loss. If (as is argued by the Claimants) the Acquisition was not a good deal and Lloyds paid £6bn for a worthless HBOS through the failure of the directors to exercise the degree of skill and care required of them by s.174 of the Companies Act 2006 ("the 2006 Act") in the performance of the duty imposed on them by s.172 of the 2006 Act to promote the success of the company for the benefit of its members as a whole, then that is something of which Lloyds can complain - either itself or through a shareholder acting on its behalf.

617. There are very limited exceptions to this cardinal principle. One group of exceptions relates to where on the particular facts a special fiduciary relationship arises between the directors and the shareholders sufficient to confer a direct right of action of the shareholder: Mummery LJ considered these in Peskin v Anderson [2000] EWCA Civ

326 at [34] and Nugee J commented upon them in this case in giving judgment on a successful strike-out application: [2015] EWHC 3220 (Ch) at [13]-[15]. This group of exceptions is not relevant here, for no special relationship is pleaded; the case is based on a general duty of a director. Another is where the duty is owed to the company, but the substance of the complaint is an infringement of a shareholder's rights under the articles (which are said to contain an implied term that fiduciary powers vested in the directors will only be exercised in a fiduciary way). That is not the case pleaded here. Another is the "sufficient information" disclosure duty in the context of seeking shareholder approval (which I consider later).

618. In the instant case the Defendants concede that the Director Defendants owed a common law duty to the Claimants to take reasonable care and skill to the extent that in the Circular they made any written statements and/or provided any recommendations in relation to the Acquisition and to participation in the Recapitalisation. I will call this "the conceded duty". The concession is made on the basis that the Circular contained a statement that the individually named directors had taken reasonable care to ensure that "the information contained in [the Circular] is in accordance with the facts and does not omit anything likely to affect the import of such information": and the Defendants do not quibble at the extension of the duty from the exercise of care in relation to the accuracy of "information" to the exercise of care in relation to the foundation for "opinions" expressed: see Mabanga v Ohir Energy plc [2012] EWHC 1589 (QB) at [30]. But the Defendants deny that the conceded duty applies to the Announcement or the Revised Announcement or to any statements made at meetings or in conference calls. I will first focus on the conceded duty within its agreed scope of application, and then turn to the areas of contention.

619. Because the matter proceeded by way of concession it was not subjected to rigorous analysis. But I must set out the matters that underpin my application of the concession. The Defendants submitted, and I accept, that the conceded duty as it applies to the Circular must be consonant with the duty of skill and care which the Defendant Directors undoubtedly owe to the Company in respect of the Acquisition. I do not think that the directors can fulfil their duty to the Company but yet be in breach of the conceded duty to an individual shareholder. As to the duty owed to the company, directors are bound (in compliance with s. 172 of the 2006 Act) to act in the way which they consider in good faith would be most likely to promote the success of the company *for the benefit of its members as a whole,* having regard (amongst other things) to the likely consequences of any decision in the long term.

620. There are two comments on that duty that I would make. First, the reference to the members "as a whole" is important because there will be many sectional interests within the general body of shareholders. Some will hold a share for its dividend yield, others for prospective capital growth; some because the company is stolidly unspectacular, others because it is ripe for reinvigoration; some because they are speculating in the short term, others because their investment horizon is five or more years. Directors must look at the members, and at their common interest in promoting the success of the company, even if the pursuit of that common interest may impact differently upon sectional interests.

621. Second, the Circular is addressed to "shareholders", and it is addressed to those who are on the register of shareholders at that time, because they are the members who will be voting. But when the Circular says that a transaction is "beneficial to shareholders"

it does not necessarily mean that it is beneficial to those who are on the register of shareholders at the record date. The "shareholders" there in contemplation are the continuing general body of shareholders over the forecast period. So, for example, a transaction which is immediately dilutive but is anticipated to be EPS accretive within a forecast period can be recommended as "beneficial". Mr Tookey in his evidence put it this way (when commenting on risk):-

> "….clearly, if you can obtain benefits in the short term then that's terrific, because the short term is more predictable than the long term. But if you can survive a rough patch and come out the other end able to enjoy the benefits of the enlarged group and its franchise, then that's fantastic. "

Thus, the conceded duty is owed to the direct recipients of the Circular (including purchasers of shares after the publication date); but is performed by reference to the interests of the continuing body of shareholders (being those affected by "the likely consequences of the decision in the long term"). The shareholders at the record date will exercise their votes according to their own investment horizon.

622. The discharge of the duty to the company and the performance of the conceded duty required the Defendant Directors, before making a decision and a recommendation, to undertake an analysis of the then current position of Lloyds and of HBOS as its target and to make a prediction about the likely consequences in the long term of any decision they might take about pursuing or rejecting a takeover. Both analysis and prediction involve a process of evaluation and the exercise of judgment. Lord Hatherley LC in The Overend & Gurney Co v Gibb (1871-1872) LR 5 HL 480 at 487 expressed the view that a Court (reviewing such a decision made by the directors) had to ask

> "...were [the directors] cognisant of circumstances of such a character, so plain, so manifest, and so simple of appreciation, that no men with any ordinary degree of prudence, acting on their own behalf, would have entered into such a transaction as they entered into?"

This decision may today be taken as establishing the irreducible objective standard of the reasonable ordinary businessman.

623. Ignoring the controversies which attended some decisions, it may safely be said that later authorities (Re City Equitable Fire Insurance Co [1925] Ch 407, Re D'Jaan of London (1993) BCC 646 and Re Barings [1998] BCC and [1999] 1 BCLC 433 are well known landmark cases) made clear that something more than the standards of the ordinary reasonable businessman may be required by reason of the function performed by the director under scrutiny or because of the general knowledge skill and experience which that director has. As regards the duty of skill and care that a director owes *to the company*, the principles derived from these cases have now been given a statutory basis in s.172 and s.174 of the 2006 Act: and in my judgment that provides the template for the application of any common law duty of care directly owed *to a shareholder* (including the conceded duty). As I have said, any direct duty to an individual shareholder must be consonant with the duty owed to the company.

624.    One must, because of the terms of the 2006 Act, treat a present-day application of earlier authorities with some care. But some of the points of principle they address (if not their application in the decisions themselves) remain valuable. I have found the following of assistance.

625.    First, in Re City Equitable Fire Romer J observed (at p.426) that the functions that a director is required to perform will vary with the size and nature of the company and the way that its internal affairs are organised.

> "The position of director of a company carrying on a small retail business is very different from that of a director of a railway company. The duties of a bank director may differ widely from those of the insurance director, and the due duties of a director of one insurance company may differ from those of the director of another. In one company, for instance, matters may normally be attended to by the manager or other members of staff that in another company are attended to by the directors themselves. The larger the business carried on by the company the more numerous, and the more important, the matters that must of necessity be left to the managers, the accountants and the rest of the staff. The manner in which the work of the company is to be distributed between the board of directors and the staff is in truth a business matter to be decided on business lines… In order therefore to ascertain the duties that a person appointed to the board of an established company undertakes to perform, it is necessary to consider not only the nature of the company's business, but also the manner in which the work of the company is in fact distributed between the directors and the other officials of the company, provided always that this distribution is a reasonable one in the circumstances, and is not inconsistent with any express provisions of the articles of association."

Where the judge is speaking of the "functions" or the "duties" of a director I think he is there speaking both of the tasks which have to be performed and the skills that have to be used in the discharge of those tasks.

626.    Second, having taken as his starting point the standard of the ordinary reasonable businessman identified in Re Overend & Gurney, Romer J (at 427) further observed that a director need not exhibit in the performance of his duties a greater degree of skill and care than may reasonably be expected from a person of his knowledge and experience. In so doing he was not, as I think, saying that something less than an ordinary degree of prudence might in some circumstances be acceptable: he was rather saying that the functions undertaken by the director (themselves affected by the nature of the company of which he was a director) might require something more than the ordinary degree of prudence but could never exceed the degree of skill that might reasonably be expected from a person having the knowledge and experience of the director in question. So the director of a life insurance company does not guarantee that he has the skill of an actuary or a physician, but is expected to have the degree of skill that might reasonably be expected of someone who has undertaken to discharge the functions of a director of a life insurance company. It is in that sense that I think his words must today (in the light of the statutory codification) be read.

627. Third, Romer J observed that a director is not liable for mere errors of judgment (an expression oft-repeated). By this I understand him to mean that where the opinions of reasonably informed and competent directors might differ over, for example, some entrepreneurial decision, the mere fact that a director makes what proves to be clearly the wrong choice does not make him liable for the consequences. When embarking upon a transaction a director does not guarantee or warrant the success of the venture. Risk is an inherent part of any venture (whether it is called "entrepreneurial" or not). A director is called upon (in the light of the material and the time available) to assess and make a judgment upon that risk in determining the future course of the company. Where a director honestly holds the belief that a particular course is in the best interests of the company then a complainant must show that the director's belief is one which no reasonable director in the same circumstances could have entertained.

628. Fourth, Romer J observed that where the exigencies of business mean that some matters are properly left to an official then a director is, in the absence of grounds for concern, justified in trusting that official to perform such duties properly, citing from the speech of Lord Davey in Dovey v Cory [1901] AC 477 at 492:-

> "I think the respondent was bound to give his attention to and exercise his judgment as a man of business on the matters which were brought before the board at the meetings which he attended… But I think he was entitled to rely upon the judgment, information and advice, of the chairman and general manager as to whose integrity, skill and competence he had no reason for suspicion."

With the gloss (i) that today there is a recognised duty to monitor employees upon whom significant reliance is placed and to ensure that there are in place appropriate supervisory and review systems; and (ii) that the reliance must in the particular circumstances be consistent with the discharge of the duty of reasonable skill and care by the director, I consider that the principle holds good.

629. Fifth, the same principle applies to the taking of expert advice. In general, a director who takes and then acts upon expert advice has gone a long way to performing his duties with reasonable skill and care. But the taking and acceptance of advice is not a substitute for the exercise of reasonable skill and care: it is only part of the discharge of that duty.

630. Ms Davies QC cited Green v Walkling [2008] BCC 256 at [37]-[38] as a statement of the principle: and amongst the authorities adduced was an extract from the 3rd edition of Professor Keay's book on *Directors' Duties* in these terms:-

> "8.130 As Professor Brenda Hannigan points out [sc. in her work *Company Law* at 309], the risk involved in permitting directors to rely on professional advice without question is that directors will instruct advisers in all matters and shift the risk of liability. So, a distinction has to be made between reliance that is merited and blind dependence. The bottom line is: was it reasonable, given all of the facts, for the directors to depend totally on the advice of the professional? In answering that question the director and his or her experience and qualifications, as well as

> the kind of company in which the director holds office, are relevant issues to be taken into account….
>
> 8.131 …it would also seem necessary for directors to ask appropriate and timely questions of their advisers rather than just accepting everything they are told without question…Of course it might become an issue in any given case about the kind and depth of the questions asked by the directors…."

I agree.

631. Sixth, in testing whether a director has been negligent the question is not simply what the Court thinks it would be reasonable for the director to have done; rather it is what the evidence before the Court establishes were the courses open to reasonably competent directors (the burden lying on a complainant to establish that the course of which complaint is made is not amongst them). Thus, in Re Brazilian Rubber Plantations and Estates Ltd [1911] 1 Ch 425 Neville J had to consider whether directors acted without reasonable prudence in adopting a contract on the information they possessed and said (at 37)

> "I entirely concur in the view that this must not be tested by considering what the Court itself would think reasonable."

632. In support of this proposition the Defendants cited several cases (Sansom v Metcalfe Hambleton [1998] PNLR 542 at 549; Pantelli Associates Ltd v Corporate City Developments No.2 Ltd [2011] PNLR 12 at [17] and Caribbean Steel Co Ltd v Price Waterhouse [2013] UKPC 18 at [39] and [46]) as authority for the proposition that the Courts should be slow to find that professionals acted negligently without expert evidence on the question. I accept the point. That said, I do not think the Court would have much difficulty in answering the question posed in Overend & Gurney (supra) without the aid of expert evidence, where the degree of negligence is glaring and obvious (as in Roberts v Frohlich [2011] EWHC (Ch) 257, a case of recklessness and wilful blindness rather than a nuanced case of negligence). Nor would it where there is simply no rational basis at all for the act in question.

633. In the instant case the question to be answered is this:-

> "Could a reasonably competent chairman or executive director of a large bank reasonably reach the view (on the available material and within the timeframe required) that the Acquisition was beneficial to Lloyds and its shareholders? Or would any such director so placed of necessity have reached the view that the Acquisition was not beneficial?"

634. I answer that question below. For the present I observe that in framing the test in that way I am quite deliberately characterising the Defendants by reference to the functions they discharged at board level (even though the pleaded case does not itself identify any distinguishing features which placed the chairman or executive directors in a position of advantage over non-executive directors, and not every executive director is named as a defendant). I do so to avoid the risk of pitching the threshold of competence too low: and when I refer to "a reasonably competent director" that is shorthand for "a

reasonably competent director discharging executive or chairmanship functions" (even though the pleaded case does not emphasise these characteristics).

635. Before answering the question I must consider whether the conceded duty ought also to apply to the Announcement and to the Revised Announcement. I am not sure why this matters, since if the Defendant Directors are in breach of duty in relation to the Circular the fact that they were also in breach of a duty arising out of the Announcement or the Revised Announcement would seem to add nothing to the actual loss and damage case pleaded: and if they are not in breach of duty in relation to the recommendation in the Circular, the fact that they had made the same recommendation earlier, albeit at that time (hypothetically) negligently, would seem immaterial on the actual loss and damage case pleaded. The point was argued, so I will address it.

636. For the Claimants Mr Hill QC submits that this is a straightforward application of familiar principles in relation to the recoverability of economic loss. He argued that Court adopts a tripartite approach (each element of which can be used as a cross-check on the other, and which will usually lead to the same answer):

   a) On the application of an objective test, did the Defendant directors assume responsibility towards the Claimants? If so, did the Claimants rely upon that assumption of responsibility?

   b) Applying the threefold test in Caparo Industries v Dickman [1992] AC 605 (i) was loss a foreseeable consequence of the actions of the Defendant directors in relation to the Announcement? (ii) is the relationship between the Claimants and the Defendant directors sufficiently proximate? (iii) is it fair, just and reasonable to impose a duty of care on the Defendant directors towards the Claimants?

   c) Would the imposition of liability upon the Defendant directors for economic loss suffered by the Claimants after the Announcement be no more than a small extension of a situation already covered by authority? Or would finding the existence of a duty of care in such a case effect a significant extension to the law of negligence?

637. Mr Hill QC argued that upon application of those principles it was clear that the Defendant Directors were responsible for assessing the Acquisition and ultimately providing a recommendation to Lloyds shareholders; that they ought to have known that Lloyds shareholders would rely on public statements made by the Lloyds board as to the merits of the Acquisition; that the existence of such a duty was contemplated by Linklaters in advice tendered to the Board on 3 October 2008 about potential liabilities to HBOS shareholders (and liability to Lloyds shareholders was an *a fortiori* case); and that the existence of such a duty was consistent with the regulatory regime (for Rule 19.1 of the City Code - the 8th edition of which applied - provided that each document issued or statement made during the course of an offer must be prepared with the highest standards of care and accuracy and the information given must be adequately and fairly presented). He made the forensic point that until July 2017 the Defendant Directors had admitted the existence of such a duty, but that they then withdrew the admission: however, he did not cite any case close to the facts of the present case which he invited me to say established such a liability and to which the present case would be a small extension.

638.    I do not accept that in relation to the Announcement the Defendant Directors personally owed a common law duty of care to each Lloyds shareholder. Like the relevant tests themselves, my reasons overlap and interact.

639.    First, I do not think the facts objectively disclose any assumption of responsibility. The key concept underpinning company law is that the company is a separate person distinct from its directors. So, an announcement to the market made by a company is not to be treated *ipso facto* as an announcement by its individual directors. The cardinal principle of company law is that directors owe their duties to the company but not (subject to established exceptions) to individual shareholders. The imposition of a direct duty of care owed by each director to each shareholder in relation to the contents of an announcement runs counter to those fundamental principles and requires strong justification. Mr Hill QC cited no case in support of the assertion (in paragraph 276 of the Claimants' Closing) that the imposition of such a duty did not involve any extension to the law of negligence. To my mind, it is a big leap to make directors personally liable for an announcement to the market made by a company (even if that announcement records, as inevitably it will in a takeover context, that the directors believe the deal worth doing). I think that before the Defendant directors are to be treated as having objectively assumed personal responsibility to each recipient of the Announcement for the contents of that Announcement it would be necessary to establish something more than their routine involvement in its production. I have reached this view from a consideration of first principles: but as will be apparent from the language I have used I have clarified my thoughts by re-reading Williams v Natural Life Products [1998] 1 WLR 830.

640.    Second, Ms Davies QC submits, and I accept, that the purpose of the Announcement was not to enable individual directors to provide advice to each Lloyds shareholder about whether they should retain or sell their holding or about whether they should support or vote against a future intended transaction, but for the company to make an announcement to the market in compliance with the regulatory regime. The Announcement expressly said that it had been prepared for the purposes of complying with the Listing Rules, the rules of the London Stock Exchange and the City Code.

641.    The Listing Rules operate under part VI of the Financial Services and Markets Act 2000 ("FSMA"). Listing Rule 10.5.1(1) required Lloyds to issue an announcement to the market about the Acquisition because its shares were traded on the LSE's main market for listed securities. They also required (by LR 10.5.1(2)) Lloyds to send an explanatory circular to Lloyds shareholders: and the Acquisition had to be conditional upon the approval of the Lloyds shareholders in the light of that circular. So, the object of the Announcement itself was not to tender advice to Lloyds shareholders (that being the function of the Circular) but for Lloyds to provide basic information to the market.

642.    The rules of the LSE (as they stood in 2008) required Lloyds to comply with the Listing Rules.

643.    The City Code on Takeovers and Mergers (to which Lloyds was subject) operates under Part 28 of the 2006 Act. Rule 2.2 required Lloyds to make a public announcement of the offer once a firm intention to make an offer was notified to the HBOS board and/or when, following an approach by Lloyds, HBOS was the subject of rumour and speculation. The purpose of such an announcement was to forestall insider trading, to promote the integrity of financial markets and to ensure that shareholders in HBOS in

the same class received equal treatment. So, the Announcement was by Lloyds and HBOS saying that they had reached agreement on the terms of a recommended acquisition, and it set out the then-proposed terms. Rule 19.1 of the Code required the Announcement (as a document issued during the course of the offer) to be prepared with the highest standards of care and accuracy, and for the information given to be adequately and fairly represented. That ensured that the purpose of the announcement to the market (the protection of its integrity) was achieved.

644.    Any breaches of these regulatory duties would not be directly actionable by Lloyds shareholders. In relation to compliance with the City Code the position is covered by sections 955 and 956 of the 2006 Act. In relation to the Listing Rules the position is covered by s.150(1) and s.150(4) of FSMA, the latter Act being the subject of analysis by Teare J in Hall v Cable and Wireless plc [2011] BCC 543.

645.    Mr Hill QC submitted that to say that (i) because the purpose of the Announcement was compliance with a regulatory regime *therefore* (ii) it cannot give rise to a duty of care on the part of the directors, is a *non sequitur*. I agree. But as Oliver Wendell Holmes famously observed (*The Common Law*, 1881) "the life of the law has not been logic; it has been experience". In my view commercial experience tells us that a regulatory announcement by a company providing information to the market at the very outset of a transaction is something distinctly and immediately recognisably different from the personal assumption of responsibility by an individual director for the provision of advice to an individual shareholder about how eventually to respond to the transaction. Whether we identify this difference as a matter of "proximity" (that in a standard market announcement there are no special circumstances such as would create a special relationship between the individual director and the individual shareholder) or of policy (that it is not "fair, just and reasonable" to impose on an individual director the liabilities of an adviser when his or her company has provided information to the market) does not matter.

646.    Mr Hill QC also submitted that if the Announcement was not intended to provide advice by the directors to Lloyds shareholders about how they should exercise proprietary rights attaching to their shares so as to perform their corporate governance function then the Defendants have failed to identify what the purpose was. I do not agree. As I understood the Defendants' case it was that the function of the Announcement was for predator and target (i.e. Lloyds and HBOS) to inform the market generally of the existence of the proposed agreed takeover and of its terms so as to forestall the opportunity to conduct any "insider dealing" in the shares of Lloyds or of HBOS. The offer was plainly endorsed by both boards, and the market was so informed. That is my view of the function of the Announcement. In the light of the information provided in the Announcement some existing Lloyds shareholders might want to sell their shares (as at least one of the Claimants did), others to keep them: others in the market might want to buy Lloyds shares (as the evidence shows some did) or (as others did) HBOS shares. But the Announcement was not advising any of these groups to take any course at that point.

647.    Third, the Announcement could not, on its own terms, reasonably be taken to recommend any course of action to any Lloyds shareholder or (as it was put in the Claimants' Written Opening) "to give a steer to Lloyds shareholders on how they should vote in relation to the Acquisition". It specifically stated that it did not constitute the solicitation of any approval and it contained clear, strong advice to Lloyds

shareholders (i) to read the forthcoming formal documentation relating to the Acquisition when it became available and (ii) to make any response in relation to the Acquisition *only* on the basis of the information contained in that formal documentation. The Announcement cannot therefore be taken as demonstrating an assumption by individual directors of responsibility for the foundation of any recommendations which it is said the Announcement may contain.

648. Mr Hill QC submitted that the terms of the Announcement did not purport to disclaim responsibility for the accuracy or proper basis of statements in the Announcement: and if they did, then the impact of those statements operated subject to the Unfair Contract Terms Act 1977 ("UCTA"), and in particular s.2(2) and s.11(3). I agree with the first proposition: and disagree with the second.

649. In my judgment the statement that the Announcement was not a solicitation (by anybody) for approval of the transaction, and the statement that any response to the proposed transaction about which the Announcement provided information should only be taken on the basis of a forthcoming formal document, were statements about the "basis" on which the information was being provided to the market by Lloyds: and those statements go to the issue of whether it is "fair, just or reasonable" to impose on individual directors a duty of care to individual shareholders.

650. In IFE Fund SA v Goldman Sachs [2006] EWHC 2887 Goldman Sachs supplied market information derived from third parties but said that it should not form the basis of any contract (stating that they did not accept responsibility for its accuracy). Toulson J held (addressing the matter as one of substance and not of form) that in a pre-contractual context such words went to the scope of the representations being made and could not properly be characterised as an attempt to exclude liability for misrepresentation: and that in a tortious context the words could not be taken as excluding liability for negligence, but more fundamentally went to the issue as to whether there was a relationship such as would make it just and reasonable to impose a duty of care at all.

651. In JP Morgan Chase Bank v Springwell Navigation [2008] EWHC 1186 (Comm) Gloster J captured the essence of the distinction: she explained that terms which simply define the basis on which (in that case) services were to be rendered did not fall within the scope of UCTA because they did not exclude a liability for negligence but prevented the obligation arising in the first place. In my judgment that is what the words used in the Announcement (immediately after the summary and before the setting out of the detail of the Announcement) do: they explain that the information provided, including the information that as at the date of the Announcement both boards thought the transaction good for their respective shareholders, was not a solicitation for approval, that such approval would have to be sought, that that would be done in formal document, and that recipients of the formal document should act only on the basis of what it contained.

652. So Mr Hill QC is right when he says the Announcement does not contain any words of disclaimer. That is because it does not purport to "give a steer" to Lloyds shareholders (or to HBOS shareholders or to anybody else) which might create a liability that would have to be disclaimed. But his submission that UCTA applies is wrong: because the relevant words are explaining the "basis" on which the information is provided.

653. Of course, the matter must be looked at as one of substance and not of form. Christopher Clarke J made this clear in Raiffeisen Zentralbank Osterreich AG v Royal Bank of Scotland [2010] EWHC 1392 when he said (at [314]-[315]) that the key question was whether the relevant clause "attempts to rewrite history or parts company with reality":-

> "..to tell the man in the street that the car you are selling him is perfect and then agree that the basis of your contract is that no representations have been made or relied on, may be nothing more than an attempt retrospectively to alter the character and effect of what has gone before, and in substance an attempt to exclude or restrict liability."

654. In my judgment the statements (following the introductory words of the Announcement and preceding the meat of the Announcement) that the Announcement was not a solicitation for approval of the transaction, and that a formal document would be produced upon which alone reliance should be placed, was not an attempt to re-write history nor a parting with reality. This was the first disclosure to the market at large of the outline of an evolving transaction. There is in my judgment absolutely nothing wrong in explaining to market participants (who would include then-current Lloyds shareholders):-

> "This is a summary. Much more is coming. We think you should wait until you get the whole picture before taking action."

655. Fourth, although Mr Hill QC advanced the argument only in relation to Lloyds shareholders it is hard to see upon what basis liability can arise in relation to some only of the addressees of the Announcement. The Announcement was to the market at large: it was not aimed at Lloyds shareholders. If the Announcement functioned as advice and recommendation as to action then it is difficult to see why it was not advice to all addressees, potential purchasers of Lloyds or HBOS shares or current holders of HBOS shares as well as current holders of Lloyds shares. But that would be to create a liability to a large and indeterminate class, a contra-indication to the imposition of a duty.

656. Finally, Ms Davies QC draws attention to the fact that in a similar regulatory regime (concerning "investment-focused" disclosures to the market) section 90A of FSMA provides that an investor who has suffered loss as a result of reliance on misleading published information when buying, selling, or holding securities (other than information in listing particulars) may recover compensation from the company if the directors knew or were reckless as to whether the statement was untrue or misleading or were dishonestly concealing a material fact. There the statutory regime both identifies the circumstances of recovery and also the nature of the conduct that establishes liability. By contrast in what have been called "governance-based disclosures" (see *Gullifer & Payne "Corporate Finance Law" 2nd ed* para. 11.4.1.1) Parliament has not provided for recovery.

657. This is not a strong point: but it suggests a cautious approach to the imposition of liability. In my judgment, in the context of governance-focused and investment-focused regulatory regimes Parliament has decided what should be done and how, and what the consequences of not doing it should be (and upon what basis). Given that regulatory context some caution is therefore required of a Court before (i) recharacterizing the action of making the Announcement (by treating the provision of information as the

giving of advice) so as (ii) to impose upon others (namely, individual directors - and it is difficult to draw here a distinction between the Defendant Directors and other board members - rather than the company) (iii) actionable obligations to some only of the addressees (namely Lloyds shareholders not the market generally). I do not see that the making of a market announcement by the company creates between individual directors and individual shareholders that "special relationship" that is normally required for the imposition of liability.

658.   For these reasons I hold that the individual directors did not tender any advice to any individual Lloyds shareholder, nor did they come under any liability to an individual Lloyds shareholder in respect of statements made in the Announcement. This does not mean that individual directors could with impunity make false or misleading statements to the market. Each director was bound to act honestly and not deceitfully towards the market, and each director owed a duty to Lloyds to exercise reasonable skill and care in deciding what should be released to the market and in what terms.

659.   I take the same view in relation to the Revised Announcement. This announced to the market both the revised terms of the Acquisition and the recapitalisation. It confirmed that "the Board of [Lloyds] intends to recommend that [Lloyds] shareholders vote in favour of the necessary resolutions" and affirmed that "[Lloyds] believes that the acquisition of HBOS will create a compelling business combination offering substantial benefits". It stated (though not as prominently as in the Announcement)

> "[Lloyds] strongly advises [Lloyds shareholders] to read the formal documentation relating to the Acquisition when it becomes available because it will contain important information relating to the Acquisition. Any response in relation to the Acquisition should be made only on the basis of the information contained in the formal documentation relating to the Acquisition. This announcement does not constitute a prospectus or prospectus equivalent document. "

### The recommendation case: key holding

660.   As part of the context of my decision I re-emphasise the need to exclude hindsight, neatly underlined in the following exchange between Mr Hill QC and Sir Victor:-

> "Mr Hill QC: …this is a deal on which, quite simply, shareholders have suffered?
>
> Sir Victor: I think that the question you have to ask is whether this was a deal which, when it was considered at the time, was in the best interests of shareholders. "

661.   If the relevant question is posed, then in my judgment a reasonably competent chairman or executive director of a large bank could reasonably have reached the view at the end of October 2008 that the Acquisition was beneficial to Lloyds shareholders and could reasonably have maintained that view until the shareholders' vote on the Acquisition

taken. I do not think that such a director so placed would of necessity have concluded that the Acquisition ought not to proceed.

662. In framing the test I have laid some emphasis on the executive role of the selected Defendants: but it deserves to be noted that highly regarded and widely experienced senior *non-executive* directors shared the view of Sir Victor and of the named executive directors (not all executive directors being defendants). Ms Davies QC submitted that what the Claimants had to prove was that each of 15 members of the unanimous board took a decision which no reasonably competent director could have taken which she said was "self-evidently an extremely high hurdle". Of course, that is right if no distinction is drawn between executive and non-executive directors: but even if a distinction is drawn the fact that the entire board approved the proposal is a factor of great weight (unless one can point to some specific advantage conferred by an executive role).

## *The recommendation case: opinion evidence*

663. As to the standards to be expected of a reasonably competent executive director in making a recommendation to shareholders the Claimants did not adduce expert evidence from a serving or retired executive director of a large bank or similar enterprise, or from an academic at an established business school to prove accepted practice. Although the heart of this case is about the assessment of risk, they did not seek to establish that there was some commonly adopted procedure for risk assessment (such as according a numeric value to the likelihood of occurrence and to the impact of occurrence and computing a risk factor) which a competent board would have adopted but which the Lloyd's board did not, and which (if adopted) would have demonstrated that the selected course was outside commonly accepted parameters.

664. The Claimants relied upon the evidence of Mr Ellerton, presented from the standpoint of an equity analyst without investment banking or main board acquisition experience in the large enterprise context. Mr Ellerton's report, naturally enough, did not approach matters from the perspective of the reasonably competent executive director. He stated in oral evidence that he had not really been asked to consider the reasonableness of the actions of the Lloyd's board. But he had said in paragraph 9.46 of his first report:-

> "In my opinion, [Lloyds] had the information that it required by 13th October to acknowledge that the acquisition, whatever its strategic attractions, was too risky to be in the best interests of its shareholders."

On his approach to such matters he was cross-examined: first, on his approach in general; second, on his opinion that the transaction was too risky; and third on his opinion that the Lloyds directors were negligent in relying upon figures produced by HBOS.

665. The first passage went thus (with insignificant material omitted):

> "Q: … When you were expressing your views as to the assessment of the acquisition in your reports…. you understand that it wasn't relevant whether you personally disagreed with the

assessment, but the relevant question is whether the assessment was one no reasonable person could have made?

A: Yes ….

Q: So therefore it's relevant at each stage to consider whether or not the view that was taken by the Lloyds directors was a reasonable one?

A: Given all the information that was available to them, yes.

Q: Because you see…. we don't read in your report any acknowledgement of that approach. You, at various points, express views and criticisms, without assessing the question of whether or not the view that was taken by the Lloyds board was one that a director in the position of the Lloyds board could reasonably have taken at the time.

A: Well, I wasn't asked directly to address the operation of the board….

Q: You were seeking to do your best, were you, to put yourself in the position of the Lloyds board at the time the decision was actually being taken, by reference to all the information that was available to the Lloyds board at that time?

A: … I can't honestly say that I wrote my report from the position of the Lloyds board…

Q: … What you did – isn't this right – is look at all the material that is now available and express your personal views as to whether, by reference to the benefit of that information, you personally would have reached a different decision?

A: Yes, but I think that doesn't exclude whether the board would have also …. made a reasonable decision, based on the information that I had, given that they have that information too.

Q: Well, as we've discussed a number of times, with any judgement there is a range of reasonable responses or decisions to be taken, aren't there?

A: There are indeed, yes.

Q: And within that range – it comes back to our sort of fan chart of possibilities – you can have a range of outcomes, all of which are reasonable..?

A: Yes.

Q: And what it doesn't appear from your report that you are seeking to do is to look specifically at the question whether the

Approved Judgment

decisions taken by the Lloyds board were or were not within that range of reasonable decisions?

A: Right…I didn't write my report from the perspective of a fan chart of probabilities or possibilities available to the board. No, I didn't.

Q: …You didn't write your report…by reference to the range of reasonable responses of the board either?

A: No"

666.   The second passage (which directly addressed the recommendation) went thus:

"Q: You've just said that you don't believe the transaction should have been recommended because the risk was too great: yes?

A: Yes.

Q: What I want to understand from you is whether you are seeking to suggest that no reasonable board of directors in the Lloyds board's position could have recommended the transaction to the Lloyds shareholders, bringing us back to this range of views.

A: Are we back to the fan chart?

Q: Yes.

A: You know, I guess we are in the middle of that fan chart.

Q: So it was a reasonable view, but not one you agree with?

A: That's – you know, it was – Yes, I would agree with that. "

667.   In my judgment that was an honest and brave answer, consistent with the qualifications Mr Ellerton felt bound to make on other occasions during his cross-examination to the views expressed in his reports (relating to the original bid price, to market reaction to the disclosure of ELA or of the Lloyds support loan, and to the assessment of the impact of impairments upon regulatory capital ratios). His re-examination did not restore the validity and reliability of his written reports.

668.   The third passage (which addressed the basis on which the Lloyds board had approached the likelihood of maintaining a 6% Core Tier 1 ratio) was in these terms:-

"Q: Just again focusing on the 6% minimum Core Tier 1 ratio for a moment, are you seeking to suggest that it was unreasonable, in the sense of something that no reasonably competent board….of Lloyds could have regarded it as appropriate for the purposes of assessing the 6% to use the combination of the HBOS central forecast, the Lloyds central

199

forecast, which were assessed in the HBOS Working Capital Memorandum to be broadly aligned, subject to the adjustment for corporate insolvencies, and the inclusion of fair value adjustments of £8.7bn……

A: I think we have to go back to the fan chart of reasonable….I think that was close to…the bottom of any reasonable interpretation of what can be done as possible….I think it was at the very bottom end of, you know, the reasonableness spectrum….

Q: But I think it follows from what you've just said that you do accept it was within the reasonableness spectrum?

A: No, I think I am saying it is at the bottom end of any reasonable….it doesn't strike me as a competent decision by the board to have done that"

669. The Claimants have failed to adduce expert evidence establishing that Sir Victor and the Defendant Directors were negligent in recommending the Acquisition to the Lloyds shareholders. The evidence they did adduce pointed in the opposite direction. The Claimants therefore set about seeking to establish that this was not a case of nuanced decision-making, but was well outside any margin of appreciation that might be allowed. It was a case of self-evident irrationality where the circumstances were of such a character, so plain, so manifest that no person with an ordinary degree of prudence would have recommended the Acquisition. The submission was that this was a case in which critical information was not subjected to any proper degree of evaluation, and where the consequences were neither scrutinised nor catered for. On the state of the expert evidence I doubt that this course is open. But since so much effort has been expended and after so many thousands of pages of expert evidence filed and so lengthy a trial it would be unjust to the Claimants not to address it.

## The recommendation case: the "irrationality" argument

670. The argument was powerfully presented. It had six main themes.

671. First, HBOS simply had no value and the notion of a share exchange was wholly mistaken.

672. Second, the transaction was excessively risky for shareholders, but the risks were ignored. The due diligence work undertaken by Lloyds (itself inadequate) had produced impairment estimates which indicated a material capital shortfall for the Enlarged Group on a "1 in 15" basis (at a time when a "1 in 25" scenario was in fact highly realistic). Any capital raise would by destructive to shareholders and wipe out any putative benefits generated by the Acquisition. The Defendant Directors ignored this Lloyds' internal work and instead relied on work produced by HBOS.

673. Third, the risk of a capital raise sat on top of funding risks that assumed that the markets would not revert to their previous frozen state.

674.    Fourth, estimates of future performance were at risk from a potential restructuring plan the extent of which was wholly uncertain but which (it was said) the board acknowledged might require a break-up or significant down-sizing of the Enlarged Group.

675.    Fifth, in deciding upon the course to be adopted the Defendant Directors made the flawed assumption that a £7bn capital raise would be required by a "standalone" Lloyds .

676.    Sixth, the use by HBOS of ELA and the provision of the Lloyds loan were secret and were likely to cause a catastrophic market reaction if revealed.

677.    I will look at each of those elements in turn (save for the last, which I will consider in the context of the disclosure case).

*The recommendation case: absence of value*

678.    In a nutshell, this case was that because HBOS was in receipt of ELA this proved that it was a bust enterprise which (if it continued at all) could only continue on the basis of full nationalisation which would inevitably obliterate all shareholder value. On this analysis the HBOS shareholders had as from 1 October 2008 no negotiating position at all and no reasonably competent Lloyds directors could recommend a takeover that involved any share exchange with them. (A variant of this argument was that HBOS lacked value because of the level of impairments: I consider that in the next section).

679.    In part this case was advanced on the basis of commercial logic ("Receipt of ELA inevitably means a bank is worthless"): in part it was based on the expert evidence of Mr MacGregor.

680.    Quite plainly the Lloyds board did not think that HBOS was worthless. Was there a rational basis for thinking on 3 November 2008 (the date of the Circular) and on 19 November 2008 (the date of the EGM) that it had value?

681.    First, in my view receipt of ELA does not *of itself* render a bank entirely worthless (as the example of RBS demonstrates). I accept that receipt of ELA eventually followed by full nationalisation under the Banking Powers (Special Provisions) Act 2008 might do so, as was ultimately established in relation to Northern Rock in July 2009 when the Court of Appeal decided SRM Global Master Fund LP v Treasury Commissioners [2009] EWCA Civ 788. But even there, before the announcement of that decision I consider that a reasonable director contemplating the possible consequences of a full nationalisation of HBOS might reasonably have held the view that upon nationalisation the government was acquiring assets of significant value to which its advance of ELA had made no contribution and for which it would have to compensate the owners (the shareholders). So reasonable directors, considering an acquisition of HBOS in November 2008 against a backdrop of potential partial or full nationalisation could in my judgment reasonably take the view that the use by HBOS of ELA did not deprive HBOS of *all* value.

682.    The essence of the Claimants' argument was that receipt of ELA demonstrates cashflow insolvency. Insolvency means that HBOS was not a going concern. This means it had only a "breakup value". A "break up" sale would have led to the disposal of

(unattractive) assets on a value destructive basis such that there would have been a deficiency and no value for HBOS shareholders. Between 2008 and 2011 HBOS had impairment losses of £52.8bn (largely on its book as it stood in October 2008) which exceeded the value of its assets at June 2008.

683. I do not accept this argument. Because of the business model of banks ("borrow short, lend long") there will be frequent mismatches which are covered by an injection of liquidity by the central bank: and support systems exist for the purpose of funding banks through periods of illiquidity. Illiquidity is not the same as insolvency. The state of insolvency requires more than illiquidity on a "snap-shot" view. The Tripartite would not have advanced ELA if HBOS was insolvent (as opposed to temporarily illiquid) and it would not have permitted insolvency to occur. It would have met cashflow needs as they arose until such time as HBOS established a permanent and credible basis for future viability, which might have taken the form of a partially nationalised HBOS in which there would have continued to be a body of (diluted) HBOS shareholders (as Mr MacGregor and Mr Williams agree). If for strategic reasons Lloyds wanted HBOS, then Lloyds had to put an offer to such shareholders of more than nothing.

684. Second, in assessing commercial logic one must in my judgment be careful to identify the precise "value" question. We are not here concerned with an abstract and acontextual valuation question: the issue is – did HBOS have value *to Lloyds*? The Claimants' expert Mr MacGregor recognised this when he wrote in his report that "it is possible that HBOS had a value on the Acquisition by [Lloyds] which it did not have on a standalone basis": and confirmed that view in cross-examination. Mr Ellerton for his part regarded it as "obvious" that the transaction could have value for Lloyds even if by some other measure HBOS was worth nothing. That offer had to be put in November 2008, before it could be known that over the next 3 years such a deep recession would occur that impairments on the loan book as it stood in October 2008 would not be covered by the earnings it generated and would wipe out its value.

685. Lloyds was not simply acquiring HBOS' net assets, but an established network of operating branded businesses with their own customer bases operating in areas both consistent with and complementary to Lloyds' own businesses, businesses which in normal times competition restrictions would prevent it acquiring. Such a move (and the attribution of value to these economic benefits) did not lack a rational basis nor was it a glaring and obvious commercial misjudgement. To put it another way, Lloyds shareholders were not being asked to buy HBOS shares: they were being invited to share in the "upside" of an Enlarged Group, and there was a rational basis for thinking that there was an "upside".

686. Third, I am unable to accept the view of Mr MacGregor that the only reasonable assessment of the value of HBOS to Lloyds was that it was worthless. My first reason is that Mr MacGregor acknowledged that he had not actually undertaken a valuation of HBOS, and that his opinion was founded (i) on the proposition that there was insufficient information available to the directors when they decided to proceed on 13 October 2008 and (ii) on the assumption that in the absence of sufficient information the default position was that HBOS was without value. I do not accept the proposition that because some of its elements are difficult to value a business has no value.

687. My second reason is that Mr MacGregor did prepare an illustrative table to support his argument. It began with HBOS's net assets as disclosed in its interim results in June

2008. This was (as Mr MacGregor eventually acknowledged) the wrong starting point. By October 2008 this was out-of-date because the HBOS rights issue was a post-balance sheet event. This net asset disclosure plus the rights issue (plus the capital to be injected over the Recapitalisation Weekend) gave HBOS net assets of £33.6bn. From this Mr MacGregor deducted impairments and FVAs as estimated on 10 October 2008 (rather than impairments and FVA as estimated on, say, 29 October 2008). He did so on a pre-tax basis: PwC (along with the investment banks) worked on a post-tax basis, but Mr MacGregor did not explain why they could not (as competent practitioners) do so and why only his approach was permissible. He also made his deductions on the basis that these impairments and adjustments were certain to occur, rather than by reference to any probability of occurrence. He also assumed that there would be no off-setting income arising during the period over which the impairments arose. He then allowed nothing for the net present value of conservatively estimated synergies of £1.5bn per annum. Lloyds internally was putting the NPV of these synergies at £10bn and the market externally at some £7.5bn-£9bn: and Mr MacGregor acknowledged that if he had undertaken the exercise using his discount rates he would have come out at £8bn-£10bn. Having summarised Mr MacGregor's approach, the short point I want to make is that in order to sustain his opinion that HBOS had no value Mr MacGregor has had to make a number of adverse assumptions or decisions ("adverse" in the sense that they have as their object the reduction in the value of HBOS). But Mr MacGregor gave no evidence that reasonable directors would of necessity have assumed all the worst scenarios and ignored all the benefits: and I can see no reason why they should do so. Indeed, if one amended Mr MacGregor's own table to take into account the fresh capital raised and to allow a low figure for synergies one soon reaches a positive value of £4.1bn.

688.    My third reason is that external valuations made available to the Lloyds board did not suggest that HBOS had no value at all, and on their face those valuations were not so deficient as to be unworthy of consideration (even if individually none was of itself wholly reliable).

689.    UBS produced a valuation on 30 October 2008 (as part of a 60-page model). It relied on the accuracy and completeness of material that was publicly available (including a range of broker estimates) or had been provided by Mr Pietruska and his team (on a "realistic" scenario), or by HBOS (on a "realistic" and a "pessimistic" scenario). The different methodologies produced a wide range of values, largely because in times of stress methodologies which rely on stock prices will diverge from those that do not. But all were positive i.e. HBOS was worth something between £4.6bn (price/tangible book value) and £44.1bn (historical market capitalisation). The wide range of course tells its own story about the reliability of any individual valuation: but the general picture was that HBOS was not valueless. It is the unchallenged personal view of Mr McGregor (for the Claimants) that this extensive UBS model with its multiple inputs and methodologies is not based on sufficient work and analysis to provide a reliable valuation of HBOS: but he cannot and does not say that every director of reasonable competence would have entirely ignored and placed no reliance upon it, for it used entirely conventional valuation methods current within the analyst community.

690.    Furthermore, valuations were also undertaken by Merrill Lynch using different methodologies: these ranged from £15.5bn (price/Core Tier 1 ratio) to £24.5bn (NAV). (As a reality check, and logically not relevant to the assessment which the board had to

make at the time, in its post-Acquisition audited accounts for 2009 Lloyds put a fair value on HBOS on acquisition of just under £19bn).

691.    The Preamble to the Financial Reporting Council's "Combined Code on Corporate Governance" published in June 2008 stated:-

> "Good governance should facilitate efficient, effective and entrepreneurial management that can deliver shareholder value over the longer term."

It continues in its first supporting principle to state:-

> "The board's role is to provide entrepreneurial leadership of the company within a framework of prudent and effective controls which enables risk to be assessed and managed."

These objectives and principles do not require a board necessarily to assume the worst about and to ignore the potential benefits of a given transaction and so to determine the company's course. I agree with Dr Berndt's insightful comment that as a reasonably competent director you do not base your judgment on extremes or on one input, because "the risk management team do not run the business". It is necessary instead to take a fair and balanced view on what you think are the realities, based on probabilities. I think Mr Tate was making the same point when he drew a distinction between taking a figure (such as an impairment estimate) as a "hard number" that "drives" the transaction and treating it as a number that has to be "taken into account" in reaching "a reasonable number taking into account the extremes". I would note that by way of contrast with Mr MacGregor, Mr Ellerton was disposed to accept that there was a whole spectrum of views about what was a reasonable price for HBOS at the time of the Announcement, and that that spectrum included the original offer price. So, it has not been established to my satisfaction that the only fair and balanced view on a proper assessment of the risks in November 2008 was that HBOS had no value at all, such that a share exchange should not have been contemplated.

### The recommendation case: inadequate due diligence

692.    It was common ground that adequate due diligence had to be undertaken (i) in order to assess the quality of HBOS's assets and the risks in deterioration of its balance sheet; (ii) because this was a reverse takeover where the quality of the HBOS balance sheet would have a large effect upon the health of the Enlarged Group even when subjected to the more rigorous Lloyds' management techniques; and (iii) the HBOS assets were by nature particularly vulnerable in a severe economic downturn (because of the higher lending risks HBOS was prepared to run especially in the property and construction sectors of the economy). As one shareholder perceptively noted, Lloyds was acquiring a portfolio of loans it would not itself have made.

693.    Lloyds was able to gain greater access to HBOS's books than would normally be the case. First, because the £10bn facility enabled it to obtain detailed access to any collateral offered on each draw down (albeit that this may not have been representative since the best collateral would have been used in the SLS process). Second, because Lloyds had to prepare a prospectus for the open offer to be made by the Enlarged Group. It was, however, still subject to constraints imposed by the demands of client

confidentiality, competition issues and the need to fit within a takeover timetable. Absent those constraints another four weeks could have been spent on due diligence. As it was, it was conducted with a period from 6 October 2008 to 28 October 2008.

694. It is the Claimants' case that what was done was inadequate, and insufficient to ground a decision by the board. Mr Hill QC submitted that Mr Roughton-Smith, whilst giving figures to the board which he indicated could not be realistically improved without a great deal of intensive and time consuming additional work had (i) informed the board that it *was* possible to improve the due diligence output by undertaking a detailed examination of a statistically significant sample of individual loan files over several weeks with external expertise brought in; and (ii) internally expressed the view (in material not seen by the board) that what was required for greater robustness was a datatape analysis. He submitted that that is what should have been done, and that it was down to the board to negotiate for more access, not simply to accept that constraints of confidentiality, competition and time meant that there were unquantifiable risks to the transaction i.e. that there were limitations but that what had been done was the best in the circumstances.

695. I do not accept this submission. Looking at what was made available to the board, Mr Roughton-Smith's paper of 29 October 2008 was based on what he described as "satisfactory access" albeit "restricted", resulting in a "robust" forecast range. Of the corporate book he said that an attempt to achieve any significant improvement in the forecast range would take several weeks with a large team (assuming HBOS withdrew its confidentiality and competition objections); and that such work would be unlikely to achieve its purpose because of inherent uncertainties in the economic environment and the nature of the HBOS portfolio. Of the retail book, he said that account-level analysis would take weeks and was unlikely to lead to an alteration in the present forecast. Of Treasury assets he said that a statistically significant sample had been analysed and that further work was unlikely to produce more precise results. Of the international portfolio (which included Australian and Irish business) Mr Roughton-Smith acknowledged that a greater level of comfort could be obtained by a deal-level review, but noted that that would raise confidentiality and commerciality concerns: he made no recommendation that further work be undertaken. In relation to the private equity and joint venture portfolios he said that the robustness of the calculations could be improved but that the anticipated output itself would not be materially different because of the existing forecast write-offs. There is nothing in the report itself which signals that Mr Roughton-Smith's team had done what had been asked of them but that the board should not rely on it.

696. Looking at a wider picture, there was no evidence adduced that it was an established practice in bank takeovers to conduct granular asset-level "due diligence" extending over a couple of months. In the absence of such an established practice the Claimants must demonstrate that in this individual case no director of reasonable competence could have accepted the "due diligence" output that was proffered by Mr Roughton-Smith and that every such director, of necessity, would either have sought to extend the takeover timetable or would have withdrawn from the transaction. But there is no evidence (expert or otherwise) to that effect and I am not satisfied that there was only one answer to the dilemma faced by the board. With expense and delay more could have been done, but perhaps to little advantage. But the board was at a point where Mr Roughton-Smith was able to provide "due diligence" output with some confidence, and

where Citi, Merrill Lynch and UBS (having conducted the necessary "10b-5" exercises) were prepared to lend their names to the Circular. The question for the board was: can we take the "due diligence" output into account in trying to form a reasonable judgment? In my view they reasonably did so.

697.    I should address one specific point made. In his expert evidence Mr Ellerton notes that Mr Roughton-Smith's assessment of impairments on the international portfolio for H2 2008 and 2009 was £1.3bn at the top of the range, whereas for 2009 alone the actual impairments came out at £5.3bn (representing 9% of the total international loan book and 25% of the total impairments for 2009): and he comments that the assets that were subject to the lowest level of review proved to be the most toxic of all. This was not a pleaded point. The suggestion that the actual outcome as at December 2009 could have been predicted in October 2008 is a false one. There was no examination of the question whether, if an asset level review had been undertaken in 2008, then an impairment estimate above £1.3bn and closer to £5.3bn would probably have been reached. The point was a distraction.

### The recommendation case: impairments

698.    The key issue here is whether Mr Roughton-Smith's impairment figures prepared on 28 October 2008 and reported to the board meeting on 29 October 2008 manifestly indicated a capital shortfall that would be destructive of value to shareholders.

699.    At trial a dispute emerged about whether Mr Roughton-Smith's 29 October 2008 figures (which were undoubtedly "an estimate") represented the outcome of a stress test or a forecast of what would happen in the real world. When the disaster began to emerge in early 2009 people certainly looked back on the "1 in 15" figures and treated them as if they were and always had been a prediction which was then being fulfilled. This is "confirmation bias" in operation. It does not really help with how the figures were in fact seen or might properly have been seen between 29 October and 3 November 2008.

700.    Mr Roughton-Smith's figures were undoubtedly the product of the application of assumptions (a "credit crunch" slightly worse in nature than that which occurred in the 1990's) to raw material: they were thus the outcome of a "stress test". He was instructed to use a "1 in 15" scenario, which he constructed. He was not instructed to predict the actual impairment outturn making whatever assumptions he wanted. But in practice this "1 in 15" scenario came to represent the central case for assessing the Acquisition (although for budget and planning purposes Lloyds continued to adopt the softer "mid-case" scenario identified at the end of the first week in October 2008). I do not think that this was a matter of conscious choice. I think it was a tacit acceptance that the anticipated trend of events was beginning to align with the sort of assumptions made in the "1 in 15" scenario coupled with caveats beginning to emerge in relation to the "mid-case" scenario (articulated by Mr Foley around 15 October 2008). But the fact that the "1 in 15" came to be treated as the central case when approaching the Acquisition did not mean that it was to be treated as certain to occur or even that it was the probable outcome (though Mr Tate certainly thought that it was the "probable" outcome, and Ms Weir a "reasonable probability"). It remained a "probability" scenario. Account could still properly be taken of the degree of probability of its occurrence: and as to that the board could properly look to Mr Foley, the Chief Economist.

701. With that issue out of the way I can begin with what was common ground between Mr Ellerton (the Claimants' expert) and Mr Williams (the Defendants' expert). This was that if the Lloyds directors had been aware of a significant risk that Lloyds would need to raise more capital within the 12 months following the EGM then this would have been material to the shareholders. Mr William's was of the opinion that if that *was* the view reached by the board then the Circular would have had to explain why such an anticipated capital raise did not form part of the Acquisition proposals being put to the EGM. Plainly it did not: neither the directors nor PwC nor the investment banks thought that there was a significant risk of a further capital raise.

702. Mr Ellerton's view (as expressed in his Second Report) was that the Lloyds board were complacent in their analysis of capital and should have incorporated a high margin of safety into their assessments of capital to counter the possibility (or even probability) of forecasting error (assuming that any error necessarily lay in the direction of over-optimism). He thought that there was "a significant risk" (which he did not quantify) that if the top end of the range of Mr Roughton-Smith's impairments and FVAs on the "1 in 15" scenario was reached then the Core Tier 1 ratio would have been below the bottom of the 6-7% target range which Lloyds had set for the Enlarged Group (possibly at 4.4%): and that if the top end of the range on the "1 in 25" scenario had been reached then the Core Tier 1 ratio of the Enlarged Group would have been as low as 3.4%. In neither event could management action (retention of earnings, disposals, reduction in RWAs etc) have repaired the capital base.

703. This view (expressed in paragraph 37 of Mr Ellerton's letter of 15 September 2017 and ultimately set out as an area of disagreement in the Joint Statement dated 29 September 2017) was based on close analysis of Mr Roughton-Smith's memorandum of 29 October 2008, the UBS "Financial Effects Model" (dated 30 October 2008) and the PwC Working Capital Report (and in particular the working capital model produced by the Lloyds specialist team and PwC working together).

704. By doing some relatively simple maths it could be seen that Mr Roughton-Smith's Memorandum had put the "impairment and FVA" range from £16.9bn (for the low "1 in 15") to £28.8bn (for the high "1 in 25").

705. The PwC report had assumed "fair value adjustments" (i.e. reductions in the carrying value of loans to be acquired) of £8.7bn on a base case and £10.3bn on a downside case (assuming no "unwinds"). On those assumptions (which Mr Ellerton personally thought were optimistic) it had modelled a capital summary for the Enlarged Group (on "base" and "downside" scenarios). The capital summary showed a Core Tier 1 ratio at above 6% for the next 12-month period on a base case, but below 6% (and falling to 5.1%) during the next 12-month period on the downside. In both scenarios there remained a very substantial "buffer" over the 4% minimum Core Tier 1 ratio (which permitted an additional £6.9bn of impairments or FVAs to be taken).

706. Capital adjustments are not the same as impairments: but the figures can be and were here used to provide a rough cross-check. In his letter of 15 September 2017 Mr Ellerton embarked upon a reconciliation (to correct an analysis that he had undertaken in his second report). Drawing figures from the UBS Capital Model and the PwC Working Capital Report, identifying component parts of those figures, attributing some of those figures to separate periods, and adjusting comparisons to cope with pre-tax and post-tax treatments, Mr Ellerton opined that the PwC report failed by some margin to factor

in the last Roughton-Smith figures. He also expressed the view that the assumptions upon which the PwC projections had been based were themselves unrealistic. What Mr Ellerton is doing is taking the "top-down" analysis of PwC and inserting into it the "bottom-up" analysis of the Lloyds risk team (what Mr Tookey called a process of "lift, drop and swap").

707.    One gets a flavour of the analysis from Mr Ellerton's commentary upon that part of the PwC Working Capital Report which addresses the base case (where, in fairness to Mr Ellerton, he has taken the raw figures for his computations from figures in Mr Tookey's witness statement which are extracted from underlying documents):-

> "Moving to the base case, the sum of £14.2 billion is incorporated into the Price Waterhouse forecast. (Note that this is a maximum £14.2 billion since a portion of the FVA unwinds in 2009). This number is broken down as to £4.2 billion for HBOS full year 2008, £4.2 billion for 2009 and £5.8 billion for the impairment component of the FVA…. What I should say here is that the assumption of an unchanged impairment charge in 2009 was completely unrealistic and the scenario is made even more unrealistic and optimistic by the assumption that the £5.8 billion impairment component within the FVA would begin to unwind in 2009. The range identified by Lloyds for HBOS impairments for 2008 and 2009 was £14 billion-£19.4 billion. I get this range by taking the £10.8 billion-£15.4 billion referenced above (i.e. £9.5 billion-£14.1 billion and £1.3 billion for H1 2008 impairments) and adding to £3.2 billion-£4 billion of items reclassified from the FVA analysis. The difference between the top end of the range £19.4 billion and the number actually used in the Price Waterhouse scenario £14.2 billion was £5.2 billion pre-tax, equivalent to £3.74 billion after tax. The £3.74 billion, had it been incorporated into the projections, would have lowered the Core Tier1 ratio by 0.72 percentage points, from the low of 6.1% identified in the Price Waterhouse report base case to 5.38%. At this level I consider that the Enlarged Group would have been required to raise £5.8 billion to bring the Core Tier 1 ratio back up to 6.5% ."

He later went on to record that he would also challenge the underlying tax assumptions. I emphasise that in citing this passage I am simply seeking to convey a flavour of the analysis, not with a view to subjecting the figures to critical deconstruction. But this illustrates the analysis that Mr Ellerton suggests that a reasonably competent director should have undertaken to test the opinions being offered to him or her.

708.    Mr Ellerton concluded:-

> "In my opinion, given a range of £16.9bn to £28.8bn for H2 2008 and 2009 impairments and the information I refer to above in the course of Q&A, analysts would thereafter have been able to make calculations as to what the Core Tier 1 capital of the Enlarged Group was likely to be if the full range of impairments and fair value adjustments were taken into account (which are

> the calculations set out in my spreadsheet). From this analysts
> would have been able to see that the Core Tier 1 range set for the
> Enlarged Group of 6% to 7% was likely to be unachievable either
> on the 1:15 or 1:25 scenario."

709. Mr Williams (the Defendants' expert) was of opinion that Mr Ellerton had undertaken a rather complicated reassessment of the detailed financial analysis work undertaken by Lloyds and its professional advisers at the time. He believed that in doing so Mr Ellerton had made a number of high-level and ambitious assumptions and had distorted the outcome. Thus, in his commentary Mr Ellerton assumed that the Core Tier 1 capital ratio to be maintained by the board was 6.5% (the mid-point of the range announced to the market) rather than 6% (the regulatory threshold). But he conceded that the board might reasonably have looked to the 6% figure when assessing the Acquisition. Further, Mr Ellerton always took the highest figure in a range to be the material outcome and assumed that capital had to maintained at a level to cope with the extreme worst case scenario. Again, Mr Ellerton certainly had distorted the outcome by, for example, assuming that an entire year's impairments fell to be taken in a single month (rather than accruing month by month over the year); and further assuming that the month in which they fell to be taken was the one month in which for other reasons the capital ratio was at its most stretched.

710. This approach I think lay at the heart of his evidence. Faced with a range of impairment values it was Mr William's view that the range should be considered in the context of the merits of the Acquisition as a whole. Mr Ellerton's criticism of that approach was:-

> "...the high end of each range was a possible outcome from the
> same set of macroeconomic assumptions and the important
> judgment was where within that range or those ranges it was
> appropriate to assess the merits of the acquisition. Lloyds' board
> apparently took the view to proceed with an approach that was
> at the low end of the range."

So put, the judgment then turns of the probability of low-end figures versus the probability of high-end figures (not ignoring the possibility that a low probability/high impact event must be factored in).

711. Mr Williams undertook an analysis in which he spread the top end of Mr Roughton-Smith's "1 in 15" range equally across the year and found that the Core Tier 1 ratio dropped only to 5.72% (a margin he thought could be covered by management action and would not necessitate a dilutive capital raise). He gave evidence (which I accept) that in the M&A market in 2009 in which he was a participant there remained a market, not a distressed market, for non-core quality assets in which reasonable prices reflective of pre-crisis levels could be achieved. The Enlarged Group had non-strategic interests in St James's Place, Sainsbury's Bank, Insight, Clerical Medical and Heidelberger Leben (which Mr Tookey thought would raise £2.6bn in tier 1 capital). In closing Ms Davies QC pointed out that actual disposals in the period from 18 September 2008 to 13 February 2009 had on the evidence of the documents made a positive contribution to the Core Tier 1 ratio of 0.36%.

712. But making proper allowance for that, Mr Ellerton may still have a point. Amongst the mass of available material there are to be found figures which can be used to support

Mr Ellerton's opinion: and Mr Williams acknowledged that if the directors had embarked on the same process as Mr Ellerton and reached the same conclusions on those figures then they should not have recommended the Acquisition.

713.   Mr Hill QC demonstrated that if you apply intense focus to the impact of impairments upon regulatory capital requirements (as Lloyds had to do when the catastrophe emerged in early 2009 and Mr Tookey prepared his "capital waterfall") it is possible to find the relevant figures and to undertake the requisite arithmetic to effect a reconciliation of the "top down" and the "bottom up" approaches. Mr Tookey (as did Ms Weir and Dr Berndt) strongly resisted the propriety of lifting figures prepared on one set of assumptions and dropping them into a set of figures prepared on another. I am not convinced by this objection because (i) the assumptions, although different in detail, are meant to reflect overall the same macro-economic scenario; and (ii) the purpose of the exercise is to provide a cross-check and the PwC working capital model had incorporated some material from Mr Roughton-Smith's impairments workings. So, I do not entirely dismiss Mr Ellerton's view based upon this technique.

714.   But the fact that an expert equity analyst who has worked on the papers for upwards of six months and with a particular focus can (at the second attempt and after intense debate with a co-professional) identify an analysis which demonstrates a specific risk which he can characterise as "significant" does not prove that any reasonably competent company director would necessarily have done so during a board meeting at which the figures were produced, or in the short interval before publication of the Circular or in the period before the EGM. That is why Mr Ellerton was quite right to make the concessions he did during cross-examination.

715.   The risk of a capital raise may be summarised in this way. Each of the Defendant directors acknowledged that if the Core Tier 1 ratio dipped below 6% then (i) that would be acceptable only on an interim basis and (ii) the board would have to formulate and submit to the FSA a plan to restore the ratio within an appropriate timeframe. (On reading my notes and studying the transcripts it has become apparent to me that the questions did not frame the scenario within which the Core Tier 1 ratio dipped. Did it fall below 6% in ordinary economic conditions? Or in a "credit crunch"? or in a deep "1 in 25" recession. That affects how long "interim" is and what is the "timeframe"). It was Mr Ellerton's view that even before the regulatory minimum ratios were approached the market would have forced Lloyds to raise more capital. In my judgment this overstates the position. I accept this opinion to the extent that if the market saw or anticipated a downward trend in the Core Tier 1 ratio such that the regulatory threshold (and the bottom end of Lloyds' stated target range) was going to be breached, then in the absence of a clear and coherent management action plan it would not tolerate that position for long but would begin to price in a capital raise. The period of tolerance would be influenced by the attitude of the Tripartite. In a period of real systemic stress the Tripartite was prepared to accept a Core Tier 1 ratio of 4% and would be unlikely to require a restoration of the 2% "buffer" by any means or according to any timescale that increased the stress within the financial system: so the "interim" was variable.

716.   One has to put the hypothetical assessment of that risk in the transaction into the actual context in which the decision fell to be made *by the board*. By referring to "context" I am trying to escape from the artificiality of looking at a single question and a single piece of information as deserving of especial focus and attention amongst the mass of material generated as background for the decision itself. In emphasising "the board" I

am trying to distinguish between what might be done by the individual directors in receipt of reports and what might have been done by the employees of Lloyds, the specialist management teams charged with particular areas of responsibility and with the obligation to prepare reports for the board. In identifying the relevant context I will begin with material addressing the risks in the transaction.

717. First, the Lloyds board had the benefit of the PwC Working Capital Report. PwC plainly understood the regulatory requirements: and they had been party to discussions with the FSA. The scenarios in which those requirements were tested were (i) for Lloyds a "1 in 15" and a "1 in 25" scenario; and (ii) for HBOS a central case and a "stagflation" scenario. A reader of the PwC Report would see it recorded that Lloyds and HBOS had each obtained the agreement of the FSA that each scenario was appropriate. The PwC retainer required PwC to report to the board if any material assumption was unrealistic: and the board could expect PwC to have performed its retainer in that regard and would note the absence of any criticism of the assumptions.

718. The material used in those scenarios derived (i) from Lloyds as regards its "1 in 15" and "1 in 25" scenarios ; and (ii) originally from HBOS in relation to its central and "stagflation" scenarios. Mr Williams (the Defendants' expert) gave evidence (which I see no reason to doubt) that this was a conventional starting point. It was, however, only a starting point. The HBOS material was reviewed by its auditors KPMG. So as Mr Tookey put it in evidence:

> "They're operating under HBOS figures prepared by HBOS management, reviewed by their executive committee, their board, challenged by KPMG, a Big Four accounting firm, the economic conditions set – approved by the regulator, discussed and realigned as to corporate insolvencies…with our own team."

719. As the quotation discloses, the initial outcome was nonetheless thought by the Lloyds specialist team to be optimistic and it was therefore modified by PwC by making a fair value adjustment of £8.7bn post-tax relief (relating to the loan portfolio and the AFS reserve) on the base case and £10.3bn (to incorporate a "mark to market" adjustment) on the "stagflation" scenario. These adjustments and their rationale were set out in the text of the report: a director reading the report would have seen it recorded that Lloyds and HBOS management and economists had compared their respective economic assumptions and made the necessary adjustments. The reader would know that PwC would report upon any unrealistic assumption in that regard also: and would observe that the report did not so state. A competent director would see from the report that the Core Tier 1 ratio was forecast (i) to remain above 6% on the base case throughout the forecast period; (ii) to be below 6% in the stressed downside scenario returning (even in the absence of any management action) to 5.9% by March 2010; and (iii) to maintain a substantial buffer at all times over the 4% Core Tier 1 ratio acceptable in a severe stress (equivalent to further impairments of £6.9bn). Such a director would not ignore the warning that the economic assumptions on which these forecasts were based might worsen so that there was a residual risk of a worse outcome. But there would be nothing on the face of the report itself to suggest to someone lacking Mr Ellerton's skills and experience that PwC and the Lloyds specialist team had failed in some way to adjust fully for any optimism in the underlying HBOS forecasts.

720.    Second, the board had the benefit of Mr Roughton-Smith's latest impairments figures upon which there was a robust discussion in the presence of Ms Sergeant, to whom Mr Roughton-Smith reported and who had been working with PwC on their Working Capital report. There is no suggestion that in the course of that discussion Ms Sergeant (who was cautious, independent, critical of aspects of the transaction and highly-attuned to risk issues) indicated to the board that any assumptions in the PwC report were optimistic or that Mr Roughton-Smith's latest figures invalidated the cross-checking that had hitherto taken place. The board was entitled to place reliance upon the views of Ms Sergeant as they understood them to be. Mr Tookey would have informed the board of his opinion that the latest "1 in 25" figures could be accommodated within the existing net negative capital adjustment and the available "headroom" before the 4% Core Tier 1 ratio was breached. The board was entitled to place reliance upon him and his team. The directors would, of course, know that any drop towards the 4% threshold would mean that a dilutive capital raise was indicated: and they would have to form a view about the likelihood of the occurrence of the downside scenario.

721.    Third, as to macro-economic predictions the directors knew that Mr Foley's central forecast for budgeting and planning purposes was a "mid-case" scenario; and that for the purposes of providing a context for the Acquisition his forecast was that a "1 in 15" or better (e.g. "midcase") scenario had a 70% probability and that a "1 in 25" had a 15-20% probability. It is plain from the course of the "away-day" in early November 2008 that the directors did not regard the 15-20% probability of a "1 in 25" as beyond question and wanted further work done on it for planning purposes: but it provided them with a "ballpark" figure. Mr Ellerton acknowledged that it was not unreasonable for the Lloyds directors to take into account the views of their chief economist in making assumptions about the future performance of the economy though he qualified that by saying:-

> "…I think it would have been reasonable to suggest that they should have incorporated flex within their economic forecasts, given the fact that they were going to take over a bank that was twice [Lloyds] own size, and given their knowledge that that bank had a much more risky loan portfolio that themselves, and given their knowledge that the economy was going to determine, to a large extent, the impairments that HBOS was likely to suffer. *So I personally believe* that it was reasonable for the directors to insist or to incorporate a significant margin for error in terms of forecasts, rather than relying on a spot forecast at a moment in time." [Emphasis supplied].

If Mr Ellerton is only saying that the directors should have paid heed to the warning which the PwC report itself contained, then I agree. If he is saying that the directors should have allowed something beyond that warning and over and above the cautious assumptions embodied in the Lloyds model itself (it will be recalled that the FSA thought Mr Roughton-Smith's "1 in 25" was more like a "1 in 60") exemplified by the upper ranges of Group Risk's figures, then I can understand that to be Mr Ellerton's personal opinion: but I see nothing in the evidence to suggest that every competent director would have taken that view or that such an additional margin was the only rational approach.

722. Indeed, in an attempt to reinforce the point about the caution already built into the Lloyds' assumptions Ms Davies QC put to Mr Ellerton that the "1 in 15" scenario was already conservative compared with consensus forecasts. Mr Ellerton would concede that it was "somewhat worse" than the consensus and was "faintly conservative" but "was reasonable". So, if what was needed was "flex" or a margin for error in the forecasts, the Lloyds approach built that in.

723. Fourth, the Lloyds board received a Working Capital Report on HBOS prepared by KPMG (its auditors) accompanied by a comfort letter as to the sufficiency of working capital. It is, of course, right that KPMG were the auditors to HBOS and were working on figures provided by HBOS. But that does not of itself mean (and the evidence certainly did not establish) that upon that account the figures should be ignored by any competent Lloyds director. This Working Capital Report was part of the "due diligence" package arranged by highly experienced solicitors who had ensured that KPMG acknowledged a direct duty to the Lloyds' board. It was not suggested to any Defendant director that there was something on the face of the KPMG Report which indicated that its contents were suspect or that would have alerted any competent director to the need for further enquiry.

724. Fifth, the Lloyds board received the advice of Citigroup, Merrill Lynch and UBS (with some specialist input from Lazards). Of course, the sponsor banks put their names to the Circular recommending the Acquisition to the Lloyds shareholders (and of itself that could properly weigh with the directors). But the precise point under consideration here is whether every competent director would have appreciated from the terms of the investment banks' advice that there was a significant risk of a dilutive capital raise in the 12 months following the completion of the Acquisition. To expand upon "the terms of the investment banks' advice": given that the advice given by each of the banks did not flag up any such risk, the question is really whether a competent director should have appreciated that the omission of such advice resulted from a deficit in information or analysis or the making of some unrealistic assumption by the banks (such as Mr Ellerton suggests occurred). The investment banks were addressees of PwC's report and were retained to review it. No feature of their work was identified as alerting any competent director to some inadequacy of information, some shortcoming in analysis or the adoption of some unrealistic assumption.

725. Sixth, the Lloyds board knew that the FSA had (only three weeks before) undertaken a deliberately conservative analysis of the additional capital requirements of the Enlarged Group in order to render it "bullet-proof" and had settled on a figure of £17bn which (as part of the recapitalisation process) the Enlarged Group was going to raise. Mr Ellerton was in his written reports disposed to dismiss the FSA as having "no competence or expertise in macroeconomic forecasting"; but in cross-examination he withdrew the assertion. He agreed that the objective of the FSA was to "bullet-proof" HBOS on the "base" case:

> "Q: ..can we agree it would have made no sense at all for the FSA to set a capital level for the enlarged group which would leave the enlarged group with a core tier 1 ratio of less than 6% in the FSA's view as to the most likely development of the economy?
>
> A: Yes, I would agree with that….

Approved Judgment

He was more equivocal in relation to the "downside", though he did acknowledge that £17bn additional capital for the Enlarged Group was the correct outcome of the FSA's stress tests.

726.    What Mr Ellerton maintained was that the FSA stress tests were wrong; that the FSA had made a series of miscalculations when assessing the risk of HBOS; and that the only reasonable approach for the Lloyds board to adopt was to assume a more severe downside impact on HBOS in a severe stress than had the FSA. These "miscalculations" had occurred notwithstanding that the FSA had the benefit of using BoE macro-economic input, had extended supervisory experience of the HBOS balance sheet over many years and had the benefit of a review of its proposals by Credit Suisse on behalf of the Treasury.

727.    His argument appeared to be (i) that exactly what assumptions had been made by the FSA on a "downside" case and how they had applied those assumptions to the HBOS balance sheet were not known; (ii) if there was no evidence to suggest or no reason to think that the FSA view was wrong then it would be reasonable for the directors to accept the sufficiency of the output of the FSA stress test; (iii) Lloyds had done some due diligence (on treasury assets, venture capital and loan portfolios) which showed the quality of the HBOS balance sheet to be risky and exposed in a downturn; (iv) the directors should have regarded this internal work as evidence that the FSA view was wrong.

728.    I do not view this as a tenable position. How the FSA had viewed the quality of the HBOS balance sheet or assessed its degree of exposure in a downturn was not known. The Lloyds internal assessment of parts of the HBOS assets base could not demonstrate shortcomings in that unknown approach. The Lloyds board would have no reason to think that the FSA and the Treasury had got their estimates wrong. It was later to transpire that that those reviewing events in the light of knowledge of what transpired formed the view that the FSA may indeed have fallen short in its work: but there was no way that a bank director of reasonable competence could have known that at the time.

729.    The FSA, which was focussed on the stressed scenario and preserving the 4% threshold, made known its view that an additional £17bn of capital would produce a Core Tier 1 ratio of 4.6% in a deep recession. I cannot see the basis for suggesting that every reasonably competent director would have been compelled to discount this view of what was needed to "bullet-proof" HBOS. I find that it was within the range of reasonable responses of a competent director to take that view into account.

730.    Before summing up I should address one discrete point raised in the Re-Re-Amended Reply. In relation to the capital to be raised by Lloyds as part of the Enlarged Group under the Recapitalisation Weekend programme the Claimants say that the £5.5bn to be raised by Lloyds:

> "..was an amount merely "allocated" to Lloyds and most if not all of which would be required to absorb the losses HBOS was projected to incur."

The evidence adduced to prove this plea is that of Mr MacGregor. He examined where the additional capital raised by the Enlarged Group had been deployed down to the end

214

of 2009 and concluded that it had been almost entirely absorbed by HBOS losses. This does not assist.

731. The question is: what risks anticipated (in the assumed stress scenario) in October 2009 needed to be covered by additional capital? The fact that some risks to Lloyds as part of the Enlarged Group did not eventuate whereas rather greater risks eventuated for HBOS than had been anticipated (so that the resources of the Enlarged Group ended up supporting HBOS not Lloyds) would not prove that the initial allocation was wrong: and certainly could not establish that any director of reasonable competence would see that the Tripartite had manifestly failed to "bullet proof" HBOS (whether as a "standalone" bank or as part of the Enlarged Group). So, something more is required than knowledge of what ultimately happened; that "something more" is lacking. So I can put that point on one side.

732. Looking at the matter generally, Mr Ellerton thought that the directors should have had a greater concern for the protection of their shareholders and a lesser focus on accretion and should have been more sceptical about the assumptions being made. Many might agree with him. But that indicates an error of judgment; it does not establish negligence. The question is not whether many competent directors would have disagreed with the course taken by the Lloyds board: it is whether no reasonably competent director could have shared the view of the Lloyds board, so that their recommendation of the Acquisition to the Lloyds shareholders lay outside the range of responses reasonably open to competent directors.

733. To collect together Mr Ellerton's points, using his words, would every director of reasonable competence have said:-

> "All our advisers have got this wrong. The investment bankers have produced a one-dimensional model, focusing on a narrow range of metrics rather than providing us with a holistic view They have made frankly optimistic, indeed very optimistic, earnings forecasts which are barely consistent with a realistic case, and with an entirely misplaced emphasis on EPS accretion. Furthermore, PwC have produced a Working Capital Report which models a "downturn" scenario that is really more in keeping with a base case. Macro-economic forecasters (including our own Mr Foley) have got it wrong as well: we are at an inflexion point in the economy here. The Tripartite have also got it wrong, because although they think they have "bullet-proofed" all banks they have left us under-capitalised for what is coming. Whatever they all say, we think that things are going to get so bad that there is a real risk we are going to run out of capital appropriate to the forthcoming market conditions and we will be forced into a dilutive capital raise so large that it will destroy any synergy benefits."

The evidence does not establish that an affirmative answer must be given to that question: and pure rationality does not point only in that direction. Making my own assessment I find and hold that neither a chairman nor an executive director of a large bank would have been bound to take that view.

734. They were not required to do again the work which they had retained advisers to undertake. The advice given to them was not obviously irrational. There was nothing in its terms to indicate some manifestly false assumption, some glaring lacuna in its factual foundation, some obvious error of analysis. There was nothing in the terms of the advice which would have compelled every reasonable director to the view that the likely level of impairments over the next twelve months was such that there was so significant a risk of a dilutive capital raise that the Acquisition could not be described as beneficial to the Lloyds shareholders over the forecast period.

735. Before concluding this section I should refer to one other criticism which is intimately connected to the question of a dilutive capital raise but was at times advanced as a separate ground for criticism. This was that the view taken by the board and conveyed to the shareholders was that the Acquisition was recommended as EPS accretive having regard to the projected earnings (enhanced by the synergies) and the projected capital base. The point taken was that a dilutive capital raise would undermine projected EPS accretion.

736. The point is obvious. I have held that it was not unreasonable (in October/November 2008) to work on the basis that a dilutive capital raise was not a significant risk. But I should briefly examine the EPS question. With one caveat, it was common ground between experts that it was reasonable for the Lloyds board to take into account forecast EPS and, indeed, that it was "a critical metric" or "a key focus for assessing the merits of the acquisition" (as the Defendants' own expert evidence stated). The one caveat was that at one point Mr MacGregor seemed to suggest that in October 2008 *no* forecasting operation should have been undertaken. Given that the evidence of Mr Deetz demonstrated that of 245 banking sector analysts' reports in October 2008 85% utilised earnings forecasts I regard that as an untenable view.

737. The criticism of the Claimants' experts was (i) that the forecast EPS was "unreliable" or "speculative"; and (ii) in assessing how accretive the forecast EPS was the directors used the wrong comparator.

738. The first criticism is essentially true of all forecasts in some measure: so what the Claimants need to establish is that the EPS forecasts were so unreliable and so speculative that no reasonably competent director would have given them significant weight. I have already made a general point about that.

739. The forecast EPS figures reported to the board had been prepared by Mr Pietruska's Group Strategy and Corporate Development Team at Lloyds working alongside UBS. UBS created a model that relied upon the reasonableness and achievability of the Teams' figures. The forecasts were prepared on the basis of the "mid-case" scenario which Lloyds was using for its planning and budgeting purposes. The object of the model was to create a realistic scenario and a pessimistic scenario each of which took into account synergies, merger costs and "dis-synergies", impairment charges, FVAs and write-backs. The work continued up until 30 October 2008 with the later figures showing greater EPS accretion than earlier projections.

740. Mr Ellerton is of the opinion that Mr Pietruska's team erred in their forecasts because (i) a comparison between the HBOS earnings forecast in the UBS model and the HBOS earnings forecast in its Group Plan suggests that the impairments figure used in the UBS model is below Mr Roughton-Smith's latest figure for HBOS 2009 impairments on a

"1 in 15" basis; (ii) if you add impairments to forecast underlying profits for 2009 Mr Pietruska's team seems to have forecast underlying profits of £7.002bn whereas the PwC Working Capital report assumes underlying profits of £6.702bn; (iii) the accretion calculation assumes that a fair value "unwind" can be incorporated into the underlying profits whereas "analysts and investors would have backed the fair value unwind out" as non-intrinsic to the calculation of the underlying earnings accretion.

741. These criticisms were made only 1 month before the (delayed) trial in answer to targeted probing of the reasoning in Mr Ellerton's expert report. Even assuming each of the points to be right, the question is whether they would have been apparent to a reasonably competent director undertaking a general consideration of the advice received from the Lloyds' specialists and UBS upon likely EPS accretion. I would answer that question in the negative, on the evidence adduced as to the practice of competent directors, and upon my own assessment.

742. The forecast EPS accretion does not kick in until 2010. Concern over 2009 impairments or the accuracy of 2009 underlying profit forecasts would have no impact upon 2010 EPS unless events in 2009 had compelled a dilutive capital raise: that "broad picture" was what the board had to look at. But in the absence of any amber warnings apparent on the face of the advice a competent director was not obliged to embark upon some deep-drilling exercise into the factual or conceptual basis of the advice, but was entitled to treat it as the product of competent specialist employees properly discharging their functions and of competent advisers discharging the obligations of their retainer.

743. In any event I do not think the criticisms can be (or were in the end) maintained. The forecast earnings were below HBOS' last estimates, and below its actual earnings in the two years preceding the Lehman's crisis. They assumed a downturn and a gradual recovery (though in the event the downturn was much greater and the recovery period much longer than was anticipated in October 2008). Mr MacGregor did not identify any particularly incautious assessment: indeed, he accepted in cross-examination that he had not sought to investigate the reasonableness of the assumptions behind the earnings forecasts. The underlying material did not compel the assumption of a dilutive capital raise. Whilst "fair value unwinds" might have been an issue in the calculation of "cash EPS", such "unwinds" were not relevant to the task on which UBS embarked.

744. I accept the evidence of the Defendants' expert Mr Deetz (which struck me as moderate, balanced and firm under thorough cross-examination):-

> "[The UBS model] presents a realistic case, that realistic case is within the demonstrated earnings capacity of this company historically pre-crisis and it shows a view as to how the crisis is going to turn around and get back to normal. Is that the only view? No, but it's certainly reasonable to look at that view and consider it and that's all I've testified to."

745. There is one other angle briefly to consider. An opinion that a transaction is expected to be "earnings accretive" requires a consideration not only of projected earnings per share but also but also of a comparative measure: the projected earnings are better than some other scenario. The scenario modelled for comparative purposes was a "standalone" Lloyds required to raise additional capital of £7bn. I have explained elsewhere why I consider that to have been an entirely realistic scenario to create. But

I would note that in fact Lloyds did model an alternative scenario in which only additional capital of £5.5bn was required: this model still showed the Acquisition as accretive by 21%.

### The recommendation case: funding

746.    The Lloyds' management team itself had given the board a clear warning that if markets collapsed again to the chronic state which had been recently experienced then the Enlarged Group could not survive without access to additional government funding. The PwC Working Capital Report had warned the board that assessments of reasonable downside scenarios had to be made with considerable caution taking account of the recent extreme stress conditions affecting the wholesale markets. Were these funding risks so significant that the Acquisition was too risky to be embarked upon?

747.    As PwC stated in their report (and as was the case) Lloyds had secured from the Tripartite a promise that (assuming the Enlarged Group had adequate collateral about which there seems no doubt) the Government would make available mainstream funding of £75bn under the debt guarantee scheme and up to £110bn under the mainstream SLS/Long Term Repo scheme. This exceeded by a substantial margin what was required in the "downside" scenarios then in contemplation. The board was also provided with a formal letter from BoE that the funding plan for the Enlarged Group which Lloyds had presented was "viable": that was the objective view of a key regulator.

748.    As to the residual risk, the board had received "off the record" comfort that the Government would continue "to support the banking system". In my view this might reasonably be taken as a signal that the Government would, if the markets returned to virtual closure, do "whatever was necessary". As a matter of logic it seems to me that if the Tripartite had modified the criteria for access to mainstream funding and had extended ELA to HBOS in order to avoid the risk of systemic failure, then it was not going to run the risk of systemic failure by refusing to do the same for the Enlarged Group in what were *ex hypothesi* challenging circumstances arising from the insufficiency of its earlier steps.

749.    If one looks at the forecast funding requirement and the forecast funding availability and the outlook as it appeared in October 2008 and asks:-

> "Are the funding circumstances of such a character, are the risks of inability to fund so manifest that no director of reasonable competence and ordinary prudence could recommend the Acquisition?"

it seems to me that the answer is "No". Funding issues would not compel a reasonable director placed as the Defendant directors were placed to reject the Acquisition. The directors had adequately covered the central risks and got as much as any set of directors could get in relation to the residual risks which (whilst they undoubtedly remained) were as at late October to mid-November 2008 remote.

*The recommendation case: restructuring*

750.    A thumbnail sketch of the board's objective in pursuing the Acquisition was provided by Mr Daniels in these terms:-

> "Lloyds was acquiring more with HBOS than just its net tangible assets less the impairments that we forecast. It was also acquiring substantial synergies in the region of £1.5 billion per annum, as well as significant market share across multiple product areas and existing brand value. All of those factors taken into account meant that Lloyds was not acquiring a net liability in HBOS."

751.    The Claimants make no complaint about the estimate of the synergies. Indeed (i) the market regarded it as an understatement of what was likely to be achievable (ii) the internally produced "stretch" case went up to £2.3bn and (iii) the internally produced "base" case was over £1.8bn-worth of synergies, but Lloyds announced only £1.5bn (leaving "headroom" of at least £300m). The estimate was the product of some 28,000 hours of work by Lloyds and by Deloitte, verified by PwC. It was a modest and well-grounded target. But the Claimants expert Mr MacGregor nonetheless expressed the view that the directors could not have been sure of how much of the value of the synergies would actually be realised for three reasons. First, because of "dis-synergies". Second because of a risk of restructuring. Third, because on a takeover the marriage value of synergies should be shared between predator and target. In my judgment none of these "deficits" would have caused every reasonably competent director to regard the anticipated synergies as so at risk that they should be left out of account in assessing the overall risk-benefit analysis the Acquisition.

752.    First, "dis-synergies". A merger does not produce only benefits. A branch closure can cause a loss of customers, for example. For that reason "dis-synergies" must be estimated. Mr MacGregor acknowledged that the Lloyds estimate was expressed net of revenue dis-synergies: but he expressed the expert opinion that such a "dis-synergies" were frequently understated. In my judgment the point goes nowhere because (i) Mr MacGregor could not point to any area of apparent understatement of "dis-synergies" in the present case (however frequent their occurrence in other cases); (ii) Mr MacGregor made no attempt to analyse whether any potential understatement of the "dis-synergies" was already allowed for in the modesty of the "synergy" target; (iii) Mr MacGregor acknowledged that any difference between the Lloyds' "dis-synergy" estimate and the external advisers' "dis-synergy" estimate was immaterial; and (iv) even the maximum "dis-synergy" estimate of £59 million was itself immaterial in the context of £1.5 billion of anticipated synergies.

753.    Second, restructuring. Mr MacGregor made the perfectly fair point that the value of cost synergies could be undermined if the Enlarged Group were required to make significant divestment as part of any restructuring plan approved by the European Commission. The board was not blind to this risk. It was warned on 24 October 2008 that the requirement to submit a restructuring plan could potentially require a breakup or significant downsizing of the Enlarged Group which might negate some of the merger benefits. The task for the board was (i) to estimate the significance of that risk to the achievement of the cost synergies and (ii) to assess what risk the non-achievement of the cost synergies posed to the benefit of the transaction as a whole.

754.   I find that the Lloyds management and board were given the impression ("reasonable assurances" as Mr Tate put it) by the Tripartite that the takeover itself coupled with the integration plans and the disposal proposals inherent in it would very probably meet any restructuring requirements that might be imposed by the European Commission. The evidence of Ms Weir was particularly clear:-

> "I would not have gone ahead had I felt there to be a significant risk of elimination of the synergies as a result of a restructuring proposal. So the fact that therefore I was happy to support going ahead meant that I didn't. I believed that – and I remember this – the actions that we were taking were, should be considered to be sufficient, and I believe I believed that on the basis of the conversations (I didn't have but others had and reported) with the government."

755.   I further find that this was the tenor of the advice which they received from Linklaters. Immediately after the Recapitalisation Weekend (when State aid was provided to troubled banks) the European Commission had issued its announcement as to the treatment of such aid, drawing a distinction between banks that were "illiquid but otherwise fundamentally sound" and other banks. Linklaters wrestled with what this might mean and what might be required, and sought clarity from Slaughter & May on behalf of the Treasury. Pulling everything together they were able to advise:-

> "Restructuring for the recap scheme is less articulated. It will mean the cessation of loss-making businesses and in all likelihood for HBOS the merger plus synergy plans. Beyond that is currently unclear…."

756.   The Claimants do not seek to say what sort of divestment programme a reasonably competent board should have foreseen, or to quantify what impact such a programme would potentially have had upon the achievement of the anticipated synergies. Their case is simply that mere existence of a risk of some sort of divestment programme should have deflected the board from recommending the transaction to Lloyds shareholders.

757.   In my judgment the evidence does not establish (nor does the logic of events compel the conclusion) that any director of reasonable competence would in November 2008 have assessed the prospect of a divestment and restructuring plan such as that which the European Commission eventually required in November 2009 as a real risk, sufficient to jeopardise the achievement of the objectives of the Acquisition. In my judgment the board did an entirely reasonable thing in assuming that the risk of a significant divestment programme was not sufficient to deflect them from the transaction, but then identifying and articulating the risk in the Circular (as risk factor 1.14).

758.   As a footnote (irrelevant to the foregoing decision, but of interest) the anticipated synergies were comfortably exceeded notwithstanding the unanticipated restructuring.

759.   Third, sharing the "marriage value" of synergies. Mr MacGregor's point was not easy to follow. In his report he argued that since synergies were generated by the combination of predator and target and since all shareholders would share in the

enlarged business it was appropriate to ignore synergies. If this is the approach that should have been adopted by any director of reasonable competence, then it is truly extraordinary that it was not an approach espoused by any of the specialist accountants or investment bankers involved in the transaction at the time or canvassed by any of the analysts who examined and commented upon it. I do not think that there is anything in this point, as in the end Mr MacGregor seemed to accept.

### The recommendation case: the "standalone" comparator

760. The argument of Mr Ellerton and of Mr MacGregor here was one that was deployed in several contexts. The board should not have proceeded on the footing that the alternative to the Acquisition was a "standalone" Lloyds required to raise £7bn additional capital. The true alternative was a "standalone" Lloyds required to raise £1bn or £3bn, or £4bn or £5.5bn additional capital. So in deciding where the balance of advantage lay the Defendant directors negligently used an unduly and impermissibly pessimistic comparator.

761. I regard as untenable the proposition that no director of reasonable competence could have thought that Lloyds would probably need to raise £7bn in additional capital. It was a plainly stated requirement of the FSA to which, in the circumstances, Lloyds was bound to submit during the Recapitalisation Weekend (even though the board could not understand the basis for it and were livid at its imposition). Once the market was informed that this was the regulators' requirement there was a very significant risk that the funding market would react badly to a refusal by Lloyds to comply. Non-compliance was (as Ms Weir put it) "unthinkable".

762. Nothing that happened after the decision to proceed with the Acquisition and before the publication of the Circular affects that view. The requirement to raise £7bn additional capital was confirmed even as the directors were considering the terms of the Circular. An attempt by the directors to convey to the shareholders that perhaps less than £7bn would be acceptable ("at least £5.5bn") was given the cold shoulder by the FSA. The judgment that there was no realistic prospect of persuading the FSA to reduce the assessed figure and that effort was best directed to negotiating how the assessed figure might be raised otherwise than through the issue of preference shares was, in my view, well within the range of judgments that could properly be made by competent directors. How to best use limited time and resources are decisions that have to be made in "real time"; and it will be a rare case in which it is possible to say that every director of reasonable competence would have spent less time pursuing Objective A and more time pursuing Objective B, less time in working out the detail of the strategic decision that had actually been taken and more time in working on a rejected alternative. As Mr Tookey put it:-

> "Our focus was on what it was. It's not practical now to go back
> and try and digest the judgements that we made as to where we
> put the limited time and resources that we had at the time to try
> and secure a deal in the timetable that we wanted to."

Accepting the reality that a "standalone" Lloyds would be required to raise £7bn was a proper basis upon which the construct a comparative scenario.

*The recommendation case: a summing up*

763.    The board (as is evident from the 12 October 2008 board minutes) correctly understood that the choice they faced over the Recapitalisation Weekend was whether to proceed with the Acquisition on revised terms and to accept the capital package of £17.5bn (of which they had to raise £5.5bn), or abandon the Acquisition and proceed as a "standalone" raising £7bn. The clear advice was that raising £5.5bn was less dilutive than raising £7bn. The former course entailed the risks inherent in acquiring HBOS. It cannot be said that the Defendants were ignorant of those risks: for they approved a Circular which set out the risks. It cannot be said that the Defendants chose to ignore the risks when they were presented with them; for the directors plainly considered them. In particular, the board recognised that the transaction was vulnerable to impairment issues. As Mr Daniels put it:

> "What we have to do is to…choose a scenario that we believe is probable and then look at a downside. And if the probability of that downside reaches a significant level, then what we have to do is talk about the risks that are attendant to that."

That is what the directors did; and the complaint must be that they weighed the risks inadequately. The expert evidence does not establish any such inadequacy by reference to the standards to be expected of reasonably competent directors at the time. The evidence of the events themselves does not demonstrate the existence of circumstances of such a character, so plain and so manifest that any competent director of ordinary prudence would be bound to decline to recommend the Acquisition notwithstanding the tenor of the advice received. With the benefit of hindsight one can see a strong case that there was a misjudgement. As Mr Daniels put it:

> "...we knew about the sensitivity but we didn't expect the deterioration to be as rapid or as severe."

But in that inaccurate prediction the individual directors who are Defendants were in the good company of the Lloyds Chief Economist, the Government, the IMF and many others, and the forecast was not careless. As Mr du Plessis said:

> "I still believe that things had changed so much in those months that there is absolutely no way that I could have understood by the end of October or that any reasonable director by the end of October could have imagined the world as it would look months later, by the middle of February."

764.    Now that we know what happened we can see that a (possibly) over-capitalised "standalone" Lloyds with a small market share and a conservative book *might* have weathered that particular storm better than the Enlarged Group. But as Mr Ellerton rightly conceded, and as an examination of the advice received and the circumstances in which it was tendered reveals, the choice actually made by the individual Defendant directors at the time lay within a range of reasonable choices.

765.    Thus, the recommendation case fails.

**Approved Judgment**

### *The disclosure case: main themes*

766.    There are three separate strands to the disclosure case:-

(a)    That the individual Defendant directors are in breach of a common law duty of care that each owed in relation to responses given by directors and management at presentations concerning the Acquisition ("the presentation case"):

(b)    That the individual Defendant directors are in breach of a common law duty of care in relation to misstatements in the Circular ("the misstatement case"): and

(c)    That the individual Defendant directors are in breach of the equitable duty to make sufficient disclosure to shareholders of information material to the decision they were being asked to make ("the sufficient information case").

767.    The foundation of the presentation case is that each of the Defendant Directors owed to each Lloyds shareholder a common law duty to ensure that the information provided to them was complete and did not contain any material omissions. The core duty is pleaded in paragraph 40 of the Claim. It is said to apply in relation to the Announcement, the Revised Announcement, and to presentations made on the 18 September 2008, 13 October 2008 and 3 November 2008. The representations and omissions relied on cover many pages of pleading and are categorised in paragraph 94 of the Claim as relating to the level of due diligence conducted, HBOS's liquidity position, HBOS's capital strength, the value of HBOS, the Lloyds £7 billion capital raise and representations about competition.

768.    I have already addressed (in the context of the recommendation case) whether the individual Defendant Directors owed a duty of care to each Lloyds shareholder in relation to the Announcement and the Revised Announcement. For the reasons I there gave I do not consider that the individual directors owed a duty of care in relation to alleged misstatements or omissions in the Announcement or the Revised Announcement.

769.    In relation to statements made at a presentation I do not consider that the case that an individual director owes each individual shareholder a duty of care (as opposed to an obligation of honesty) in respect of statements made by that director (or in the presence of that director) to journalists or analysts can be, or is, made out. That is so for the following reasons:-

i)    For a director to be personally responsible for a statement made on behalf of the company at a presentation something more is required than that he is a director and made the statement (but no such additional element was pleaded or addressed in cross-examination).

ii)  In the instant case the statement or misstatement was not made to the person to whom the duty was allegedly owed. I do not doubt that there may be some cases in which a statement made to a third party can give the claimant a cause of action. They will be cases in which the maker of the statement has the individual claimant in view and knows that his statement will enable the addressee to discharge some duty to the claimant: an example may be a pharmacologist who tells a doctor about the side-effects of a drug so that the doctor can treat a patient. But that is not this case: I was shown no case close to the present, where the statement is made to a journalist or analyst to assist that recipient in the preparation of freely-written commentary, which might be favourable or unfavourable, but which might be read by an interested public (some of whom would be Lloyds shareholders).

iii)  The Claimants' case relies on the key proposition that each individual director is to be taken to have implicitly approved or adopted every statement made by any other director or member of the management team at a presentation (because at no time did any individual director seek to correct a statement made by any participant). Even if this proposition is confined in its scope to directors who were present on the occasion when the statement is made by Director A, silence on the Part of Director B does not mean implicit approval or adoption of Director A's statement. Director A may have particular knowledge which enables him to make the statement, and Director B's silence may arise out of lack of knowledge. At one point in the presentation on 3rd November 2008 the assembled analysts were told that a total of 5100 man-hours had been spent on "due diligence and synergies"; later in answer to another question there was reference to the 5100 hours spent "on due diligence". Ms Weir probably did not have the knowledge to intervene and say that the hours spent on "due diligence" (strictly defined) appeared to be 1397. Why should she be liable for any degree of inaccuracy in the second reference to 5100 hours?

iv)  Given the careful terms of the Announcement and the Revised Announcement I do not regard the assertion, that statements made at the presentations on 18 September 2008 and 13 October 2008 were intended to be mediated (through commentary) to Lloyds shareholders and relied on by them, to be maintainable. There was the clearest communication that reliance should only be placed on the contents of the Circular read as a whole.

v)  Given the terms of the Circular and its elaboration of the relevant risk factors (and also the assumption of responsibility it contained) I do not consider that statements made at 3rd November 2008 presentation by individual directors could reasonably be taken by any Lloyds shareholder as qualifying or

adding to statements in the Circular, particularly in the light of the warning given on 3rd November 2008.

vi) It has not been demonstrated how the alleged misstatements were translated into the commentary on the Circular, and in particular how the 3rd November 2008 presentation resulted in more favourable commentary than was justified by the terms of the Circular itself. All one knows is that some press coverage was favourable (e.g. "Eric Daniels….looks like he is getting HBOS for a song..." said the Telegraph on 4th November 2008); and some was distinctly unfavourable (e.g. Premier Wealth Management advised Lloyds shareholders on 8th November 2008 to vote against the deal because Lloyds was a strong proposition and HBOS would dilute the offering and strength since it was a mortgage lender with a poor and devaluing book). I was not shown anything of substance in this debate which showed any influential commentator's analysis was significantly altered by anything said at a presentation.

vii) The Claimants evidence does not show that any decision of any shareholder turned on or was significantly influenced by any answer given at any presentation.

770. I acknowledge (as Mr Hill QC pressed) that Rule 19.1 of the City Code provides:-

"Each document or advertisement issued, *or statement made*, during the course of an offer must be prepared with the highest standards of care and accuracy and the information given must be adequately and fairly presented." (Emphasis supplied).

This Rule, of course, does not confer a direct right of action by a shareholder in relation to any alleged breach: s.955 and s.956 Companies Act 2006. But nor does it reflect any existing common law duty actionable at the suit of any individual recipient of the document or hearer of the statement. It is a provision that enables the relevant regulators to take appropriate steps to enforce regulatory discipline.

771. If I had considered that a duty of care was owed in relation to statements made at a presentation I would not have found there to be any breach. In summary, as to the 18 September 2008 and 13 October 2008 presentations it was clear at the time that they were intended to communicate the outline of then-current negotiations and investigations and were based on the then-current state of knowledge of the participants: and it was clear that in order to progress the transaction a Circular containing all relevant information would have to be published. Those presentations did not purport to be full and complete accounts and it is not sensible to seek to identify "omissions" from them e.g. in relation to the HBOS funding arrangements (both generally and as regards interbank arrangements with Lloyds), or in relation to assessing the prospects for HBOS if then-current funding arrangements were to alter.

772. As to alleged "misstatements" there is a general pattern of the Claimants seizing upon particular words, isolating them from their context, and then asserting that they are false. Thus, Mr Daniels said on 18 September 2008

"We have a robust capital and liquidity position. "

The Claimants assert that it was incorrect to say that the capital or liquidity position of HBOS was "robust". But set in their context these words properly understood meant that there was a robust capital position for the Enlarged Group but that even so the Lloyds directors were not satisfied with it and would look to enhance it further. There was no element of misstatement. Nor was there any element of falsity in those statements in which the directors and management expressed favourable views about or confidence in the Acquisition: those views were honestly held and (as I have explored in connection with the "recommendation case") reasonably grounded.

773.    As regards the presentation on 3rd November 2008 if I had considered that a duty of care was owed in relation to statements made at it then I would not have found there to be any breach.

774.    Statements about the excellence of the transaction expressed genuinely held and reasonably grounded views. The Claimants suggest that HBOS was a net liability: they say that the net assets as at 30 June 2008 (according to the HBOS interim statement) were £21.3bn but that the top of Mr Roughton-Smith's impairments and FVAs was £22.3bn so rendering the HBOS shares valueless. But it is clear that the Lloyds board (i) honestly believed HBOS had a value which justified the offer price; (ii) had reasonable grounds for so thinking in that the proposed comparison is too crude (because it does not address the value of HBOS *to Lloyds*, as the Claimants' expert Mr McGregor recognises, since it overlooks the synergies generated by the merger, the brand values gained and the market dominance achieved); and (iii) were supported in their view by Citigroup, Lazard, Merrill Lynch and UBS whose valuations (depending on the methodology adopted) ranged from £8.5bn to £40bn (ignoring extreme outliers).

775.    The Claimants allege that at the November presentation the directors stated that they had accurately "fair valued" the HBOS loan portfolio and had conducted "thorough and detailed assessments" and that these statements were false. These statements were in my judgment true. Of course, it is always the case that given unlimited time and unrestricted access more could be done: but it is undoubtedly the case (i) that the work that was done was undertaken by a high-quality team and was thorough and detailed; (ii)    that (as Mr Roughton-Smith made plain in his final pre-publication report) inherent uncertainties in the data and in the art of prediction meant that it was unlikely that further work could narrow the range of outcomes; and that (iii) that (partly in consequence of the security arrangements relating to the £10bn facility) Linklaters were of the view that the extent of due diligence was greater than might normally have been achieved (a view expressed in a memorandum dated 29 October 2008 which was no doubt much in mind on 3 November 2008). As a summary the statements were correct. The fact that detailed qualification might have been made in relation, for example, to the Australian and Irish business of HBOS, does not render the general statement made untrue.

776.    The Claimants complain about the explanation Mr Tookey gave to an enquiry about the disparity between the need for Lloyds to raise £5.5bn of new capital if the Acquisition proceeded but £7bn of new capital if it did not. The answer identified the absence of synergy benefits in the latter case as a distinguishing feature. The answer that Mr Tookey gave accurately expressed his understanding which was itself based on

discussions over the Recapitalisation Weekend. Mr Tookey was reliant upon the explanation given by the Tripartite, and he faithfully communicated it.

777. The Claimants complain about the response given to the suggestion from an analyst that perhaps £30bn might represent the loss expectation on the HBOS book (above even the highest of Mr Roughton-Smith's figures). Mr Tookey's response had been the HBOS loan book had been fully stressed, and that that "bottom up" analysis compared with a "top down" analysis based on credit spreads, which comparison led the Board to the belief that no more than a £10bn net capital adjustment was required. This was not an answer to the analyst's question about the Lloyds' forward-looking cumulative loss expectation for HBOS. But avoiding a question does not itself constitute concealment of some truth allegedly hidden in the framing of the question: and the actual answer given was a fair and accurate summary of the process undertaken by Lloyds and the conclusion it had reached.

778. I turn to the Circular itself: and I can conveniently deal with the common law duty of care (the "misstatement" case) and the equitable duty of disclosure (the "sufficient information" case) together.

779. The law on which the "misstatement" case is based is not controversial:-

a) The Circular contained a statement that the individually named directors had taken reasonable care to ensure that "the information contained in [the Circular] is in accordance with the facts and does not omit anything likely to affect the import of such information": the Defendant Directors concede that this gives rise to the relevant duty of care.

b) The terms of any express representation must be construed by reference to what a reasonable person would have understood them to mean when placed in the context of the whole document in which they are found: (IFE Fund SA v Goldman Sachs International [2007] 1 Ll. Rep 264 at [50] and Mabanga v Ophir Energy plc [2012] EWHC 1589 (QB) at [27]).

c) The claimant addressee himself or herself must have understood the representation in *that* sense.

d) It is implicit in a statement of belief that the stated belief was honestly held by the representor; and in a statement of opinion by a representor whose knowledge of the matter exceeds that of the addressee it may (depending on the full context) be implicit that the representor has (or believes he has) reasonable grounds for the opinion expressed: Mabanga (supra) at [30].

e) Where a claimant asserts that there was an implicit representation then the Court has to consider what a reasonable person would have understood was being implicitly represented by the words in their context: IFE Fund SA v Goldman Sachs [2007] 1 Ll. Rep 264 at [50].

f) The statement must be false.

227

**Approved Judgment**

    g)    The representor ought reasonably to have known it to be false and so made it carelessly.

    h)    That (as is here conceded in relation to the Circular) the representor should have intended or reasonably foreseen that the statement would be relied upon by the addressee.

    i)    The claimant addressee must in fact have relied upon the statement.

    j)    By doing so the claimant addressee must have suffered loss.

780.    The law on which the "sufficient information" case was grounded was also largely uncontroversial:-

    a)    The shareholders must be given sufficient information to make informed decisions about the proposals to be put to them at shareholders meetings. The authority cited by the Claimants for this proposition (Re RAC Motoring Services Ltd [2000] 1 BCLC 307 at 326) was actually a case about whether the notice of the meeting correctly conveyed the business to be transacted at the meeting; but in deciding that issue Neuberger J drew on wider statements of principle that undoubtedly support the duty asserted. The Defendants concede the existence of this duty.

    b)    The performance of the duty is measured against the requirement of reasonableness or fairness in the circumstances having regard to the interests of the company as a whole; the object being to provide *sufficient* information (not such a surfeit as to obscure the real issue, or so little as to constitute a misrepresentation by omission). That is a summary of a passage from Residues Trading & Treatment v Southern Resources Ltd (1988) 14 ACLR 375 at 377 (cited with approval in the RAC Case). As Hart J put it in CAS Nominees v Nottingham Forest FC [2002] 1 BCLC 613 at [72]:

        "The circular to shareholders must give a fair, candid and reasonable explanation of the purpose for which the meeting is called."

        The Defendants concede the correctness of this.

    c)    The "sufficient information" duty requires the directors to set out fairly and candidly (and, the Defendant Directors concede, in comprehensible terms) matters within their knowledge: the proper performance of the duty does not require the Circular to set out what the responsible directors might have discovered had they initiated reviews or enquiries.

    d)    The Claimants submitted that this meant that the Circular ought necessarily to have included *any* material in the directors' possession which had a bearing on their *own* view of the Acquisition. Mr Hill QC relied on some words of Lord Chelmsford in Central Railway of