Venezuela v Kisch [1867] LR 2 HL 99 concerning a prospectus where (at p.113) the Lord Chancellor said that shareholders must be given the same opportunity of judging everything which had a material bearing on the character of the transaction as the promoters themselves had.

e)   The Defendant Directors did not accept that interpretation: Ms Davies QC's argument (though she did not put it in these precise terms) was that the very formulation of the duty shows that the directors have to exercise judgment about what (out of all they know) to include in the Circular in order to create a commercially informative document that aids comprehension and avoids confusion.

f)   I accept the submission of Ms Davies QC: I hold that fair, candid and reasonable disclosure does not require the complete disclosure of everything which went into the decision-making process of the directors, nor yet every single piece of information that might affect shareholder voting. I have found most helpful the observation of Maugham J in Re Dorman Long & Co Ltd [1934] Ch 635 (a case directly addressing the contents of an explanatory scheme circular) at p.665:-

"The practice being to send out an explanatory circular… it is in my opinion the duty of the Court very carefully to scrutinise the circular when the matters involved are matters of considerable difficulty and doubt. In a case of great complexity it is true that not every relevant fact can be stated. I apprehend that if the circular were to assume such a length as to state all the relevant facts in the [petition] it will be so lengthy as to defeat its own object. It is not saying, however, that the creditors or the members of the class concerned ought not to expect such a statement of the main facts as will enable them to exercise their judgement on the proposed scheme. I am prepared to believe that there are cases where even this is impracticable…"

g)   The source of the duty is equity: see Re Smiths of Smithfield Ltd [2003] BCC 769 at [46]. The consequences of a breach of such a duty will not necessarily be the same as those of a breach of a duty at common law. In general, if an insufficiency of information is established then that will raise this question: "Is there any reasonable ground for supposing that such imperfections as may be found in the Circular have had the result that the majority who have approved the transaction have done so under some misapprehension of the position?" (The formulation of the question draws on the words of Clauson J in Re ICI [1936] Ch 587 at 618). The "sufficient information" duty is directed at testing the validity of the decision of the meeting: a breach of it will normally lead to directions as to the convening of a fresh meeting, not to the generation of claims for compensation by individual shareholders.

229

*The issue before the shareholders.*

781.    Mr Hill QC submitted that the Lloyds shareholders were being invited to buy HBOS as a going concern and therefore any information relevant to its status as a going concern needed to be disclosed. I do not think that that accurately identifies the focus of the Acquisition. The concern of the shareholders was with what HBOS would be as part of the Enlarged Group, not with what it was if left on its own; with how good an ingredient HBOS was in a larger mix, not with what it would be like if left on the shelf. Accordingly, the information that was material to the decision before them related to the impact that the incorporation of HBOS would have upon the Lloyds business. When I speak of "the Lloyds business" I mean (as Sir Victor pointed out in the Chairman's letter) not the Lloyds business as it had been before the Recapitalisation Weekend but the Lloyds operation as it emerged from the Recapitalisation Weekend with the choice of either completing the Acquisition or of pursuing a standalone future.

782.    Mr Williams (the Defendant Directors' investment banking expert) expressed the opinion that Lloyds shareholders needed to be provided with sufficient information to form a decision on whether or not to vote in favour of the transaction that would create the Enlarged Group. I agree. He went on to say:-

> " Therefore, for the board of Lloyds and for the shareholders in Lloyds as they considered how to vote on the acquisition, the precise manner in which HBOS had managed its funding prior to acquisition was not of particular importance. The nature of the basis for the funding of HBOS post acquisition was anticipated to be different: it would be part of an enlarged group, with significant new capital injected. Rather, the critical point – which was well disclosed and discussed in the shareholder documents – was that the board was satisfied that the combined group would be able to fund itself following completion. "

I agree that the basic emphasis of this passage is right: but the question of whether the key duty (to put fairly and candidly before the shareholders the purpose of the meeting) nonetheless required disclosure of a matter perhaps of itself of no particular importance is one that requires careful consideration. Pre-completion funding was not entirely irrelevant. It was at the least an indicator of the sort of risks Lloyds was importing into the funding requirements of the Enlarged Group: and it gave a clue as to how far down the road HBOS had travelled away from viability as an independent "standalone" bank. To put the essential point in picturesque language: if the Lloyds Black Horse was joined by a spavined nag, how well would they work in harness? (I am not suggesting that HBOS was "a spavined nag").

*The allegations made*

783.    There are, I think, seven key allegations in the "misstatement" and "sufficient information" case. The first is that at page 9 of the Circular in the Chairman's Letter Sir Victor said that the Lloyds Directors believed that the combination of Lloyds and HBOS was in the best interests of the company and the Lloyds shareholders as a whole. This may be taken as a sufficient example of a category of individual representations scattered throughout the Circular which express the view that the merger was beneficial, would offer synergies and savings and would contribute to shareholder value.

784.    The second is that on the same page Sir Victor said that the FSA had advised Lloyds that if the Acquisition were not to occur then it would require Lloyds to raise £7 billion of additional capital and that "whilst Lloyds would be able to seek to raise such additional new capital in the public markets, there can be no certainty that [Lloyds] would be able to successfully raise such capital or as to the terms on which such capital could be raised, including the terms of any participation by HM Treasury in any such capital raising". This may be taken as an example of similar statements in the body of the Circular.

785.    The third is that at page 22 of the Chairman's letter it was said that Lloyds had made the preliminary assessment based on June 2008 figures that net negative capital adjustments of no more than £10bn would need to be made to HBOS's financial position for Core Tier 1 capital purposes as a result of the Acquisition, the effect of which would mean that the Enlarged Group would have a Core Tier 1 ratio in excess of 7%. This may be taken as an example of similar statements made elsewhere in the Circular.

786.    The fourth concerns working capital. Page 247 of the Circular contained an explanation that the UKLA had agreed that a statement regarding the adequacy of working capital for the next 12 months was not required. There was however a statement at page 273 that HBOS' "robust capital position….further enhanced by the injection of capital and liquidity facilitated by the UK Government" reinforced the ability of the Enlarged Group to meet challenges. The Claimants say that this was a representation that the £17bn of additional capital to be raised by HBOS would be sufficient to absorb the expected impairments of HBOS and enable the Enlarged Group to trade for 12 months with raising further capital. They say further that it was a representation that the £5.5bn was allocated to Lloyds on the basis of the balance sheet and business requirements of Lloyds rather than to cover the losses that HBOS had suffered and would continue to suffer (see the Claim at para.100(4)).

787.    The fifth is that at page 247 of the Circular the Lloyds' directors asserted that the provision of liquidity and funding support to the banks "currently consists of the Special Liquidity Scheme… and a guarantee on short and medium term debt issuance by HM Treasury". There was no commentary as to how HBOS fitted within this model, and this meant that there was no disclosure that HBOS also currently used ELA.

788.    The sixth is that at pages 254 and 259 of the Circular the Lloyds' directors set out the contracts material to Lloyds and to the HBOS group respectively: but the Circular did not mention the £10 billion loan facility agreement with Lloyds. The Circular in that form was approved by the FSA. The Claimants say that that approval was motivated by a desire on the part of FSA to enable HBOS to avoid formal insolvency and nationalisation (which would have been hugely damaging to the banking industry) by pressurising the Lloyds shareholders into voting in favour of the Acquisition: and that such conduct did not relieve the Defendant Directors of the obligations they owed to the Lloyds shareholders.

789.    The seventh concerns the restructuring plan. The Circular in Risk Factor 1.14 drew attention to the risks presented by the decision of the European Commission of 13 October 2008 concerning State Aid (mediated through recapitalisation schemes) and the threat to competition, and it noted the requirement to submit a restructuring plan within six months. But the Claimants say that this did not disclose the potential impact

Approved Judgment

on the synergy and other merger benefits from which the commercial logic of the deal stemmed.

790.   At page 52 of the Circular the Lloyds board (under the rubric "Other jurisdictions") said that the Circular had been prepared for the purposes of complying with English law, the Listing Rules and the City Code, and that the information disclosed might not be the same if the document had been prepared according to the laws of some other jurisdiction. The Claimants treated this as an express representation that the document *did* comply with English law, the Listing Rules and the City Code. They then sought to identify various breaches of the Listing Rules and the City Code. I do not consider that this endeavour added anything other than needless complexity. My attention was not drawn to any alleged breach of the Rules or the Code that was not otherwise an alleged breach of some duty at law or in equity. The one effect it might have is this. It represents (as the Claimants would have it) that there has been compliance with English law. If there was a breach of the equitable duty to provide sufficient information then that breach would also amount to a breach at common law of this "representation". I do not think this adds anything to the Claimants' case. It does not in any event pass through the "causation" filter identified next. I shall not consider this head further.

## The relevant core allegations

791.   In identifying the core misstatements or insufficiencies I have attempted to distil allegations that are spread over many pages. But it is possible to apply one further filter. Not all of these alleged misstatements or insufficiencies are said to have had operative effect i.e. to have been relied on and/or to have caused loss.

792.   Paragraph 122(1) of the Claim pleads that the Defendant Directors ought (i) to have advised the Lloyds shareholders that the Acquisition was not in their best interests; and (ii) to have disclosed to the Lloyds shareholders HBOS' use of ELA and the Lloyds Repo, the level of HBOS impairments anticipated by Lloyds, the fact that the £7bn additional capital required of a standalone Lloyds could not be justified, and the fact that the additional capital to be raised by Lloyds under the arrangements made over the Recapitalisation Weekend was not required by Lloyds but only to finance anticipated HBOS losses. Paragraph 123 pleads that if these events had occurred then by one route or another the Acquisition would not have proceeded and the losses said to have been occasioned to the Claimants would not have occurred. No other misstatements or deficiencies are said to have had operative effect. I shall therefore concentrate on the paragraph 122 allegations (though in fairness I shall seek to address additional complaints that might be regarded as supportive of the pleaded operative wrong).

## A beneficial transaction

793.   As I have said before in the course of this judgment there is no doubt that the Lloyds board honestly held the unanimous view that the Acquisition was in the interests of Lloyds as a whole and genuinely believed that there were facts which reasonably justified that view: and in my judgment (as I have explained) they in fact had reasonable grounds for holding the view that the Acquisition was likely to be beneficial. Their assessment contained a misjudgement, about the rapidity and depth of the impending recession and about the likelihood of its occurrence. Indeed, at the time some analysts made that very point. When asked to comment on the Circular Adrian Frost of Artemis said that he thought Lloyds were complacent on their economic view, too "middle of

the road" and tending toward a shallow, minor recession. Others also thought that banks generally were too optimistic on the outlook for the economy. But that misjudgement did not involve carelessness. There was a respectable body of opinion, of which Mr Foley was part, which shared the outlook of the Lloyds' board. So the main thrust, that this expression of view involved a misstatement, is not made out.

794.    As part of the presentation of the benefits of the Acquisition the Circular stated (in the Chairman's letter at p.16) that the implementation of costs synergies and other operational efficiencies would deliver pre-tax costs savings greater than £1.5bn by then end of 2011. A figure of £1.9bn was sustainable on the material available, but Mr Tookey spoke only to the lower figure – perhaps out of caution, and perhaps to avoid drawing attention to potential competition issues. The Chairman's letter then said (at p.18) that it was expected that the Acquisition would lead to accretion in Lloyds' "cash earnings per share" of 20%. It explained that "cash earnings per share" excluded write-downs on intangibles and FVAs but did include the benefit of costs synergies. In their statement of case the Claimants criticised this as misleading because the computations leading to the 20% figure in fact did include FVAs: but their witnesses could not maintain the criticism under cross-examination. In his presentation of the Claimants' case Mr Hill QC went further and suggested that the cash EPS figure would in fact be dilutive (rather than accretive): but the comparison he drew was with Lloyds as it was before the Recapitalisation Weekend, not with a "standalone" Lloyds recapitalised by an injection of £7bn additional capital (the comparison actually made in the Circular). So, neither of the points about misstating the EPS enhancement was made out.

795.    The cost synergies estimated by Mr Tookey (and backed up by extensive due diligence work, necessarily time consuming because of the branch-level analysis that had to be undertaken) were real. The value of the synergies would be shared between the population of shareholders as it existed when the costs benefits came through in the course of trading, reflected in earnings per share. But in terms of the net present value of the anticipated synergies the then-current Lloyds shareholders gained 15.2p to 32.9p per share. The suggestion that they benefited from enhanced EPS was sound. The proposition was not oversold to Lloyds shareholders in the Circular.

796.    I digress to make one point about reliance. The complaints about EPS representations are, I think, illustrative of a process that appears to have been undertaken in the preparation of the Claimants' case. What appears to have happened is that a trawl has been undertaken of the 286 pages of the Circular to identify statements which (in isolation and upon one reading) might *in the abstract* be taken to be misleading or insufficient, without any grounding in what anyone actually read (80% of the Claimants did not read the Circular) or in what sense they understood it or to what extent they relied upon it. Thus, of the 5800 Claimants only two say that they paid any attention to the statements about EPS (which in the event were not misstatements at all): and many of the Claimants voted against the Acquisition in any event. The Claimants' evidence does not properly engage with the need to prove reliance.

797.    To fill this evidential gap the Claimants invite the Court to infer that those who did not read the Circular *did* read press and analysts' commentary (which in turn relied on statements in the Circular) and so indirectly relied on the Circular. The difficulty with that approach is that whilst analysts (like institutional shareholders) undoubtedly took into account what was in the Circular, what needs to be demonstrated to establish indirect reliance is that the journalistic or analytic output on which the shareholder

ultimately "relied" was substantially shaped by identified raw material in the Circular and not by journalistic comment. The analyst who says she notes from the Circular anticipated synergies of £1.5bn per year but thinks that this understates the position and would expect to see £2bn per year is not "relying" on statements in the Circular. The journalist who notes anticipated cash EPS accretion of 20% but thinks that the economic outlook is more gloomy than Lloyds acknowledges and that profits will be lower is not "relying" on statements in the Circular. To make good this part of the case the Claimants would have to establish which journalists "relied" upon statements about EPS and which Claimants "relied" on those journalistic reproductions of the EPS statements. I see this as a real difficulty in the way of the "misstatement" case which has not been properly addressed (in the context of EPS or elsewhere).

798.  One further aspect of the representations about the benefits of the deal of which the Claimants make complaint is that the views of the benefits of the transaction were based on inadequate due diligence. If there were deficits in the due diligence undertaken such that any competent board would have seen the need to qualify its recommendation then undoubtedly the Circular ought to have disclosed that.

799.  Mr Daniels had publicly expressed the view that the Lloyds board "felt very good about the purchase" and having done due diligence "we now have much, much better certainty around the HBOS portfolio and feel very good about the deal". When it came to the Circular there were no qualifications as to the extent of due diligence undertaken, which the Claimants say gave false confidence to the recommendation made because (they say) the actual due diligence was riddled with defects and inadequate in the context of the reverse take-over by Lloyds of a much larger enterprise with a significantly higher risk profile.

800.  I do not accept that the evidence establishes that every director of reasonable competence would have adjudged the due diligence undertaken as inadequate or that the "deficiencies" required disclosure in the Circular.

801.  By 14 October 2008 the Group Risk team had completed its work on the retail, corporate and international portfolios to which it had access. It did not say that it was unable to draw any reliable conclusions. It produced a range of values narrower than its earlier estimates and said that further precision could only be achieved by an asset-by-asset review that would require weeks of intensive work that was not considered to be worthwhile. However, Mr Roughton-Smith did thereafter identify further work that could be done within the constraints imposed by competitive considerations and was able to exploit the need for the investment banks to give "10b-5 clearance" (on 27 and 27 October). That led to his paper tabled for the board meeting on 29 October 2008 which I have examined above. One of its objects was to set out for the board the "level of comfort around [its] conclusions". Its terms were not such as to alert any director of reasonable competence not to rely on the specialist work done.

802.  Further, Linklaters advised the board on 29 October 2008 that neither they nor Allen & Overy/Freshfields would be able to give "10b-5" sign-off to satisfy American regulators unless they felt that all material issues discovered on due diligence were adequately reflected in the Circular and the prospectus for a private placing that was occurring at the same time. They evidently did sign off the relevant documents, without any qualification as to the adequacy of due diligence undertaken. It is impossible to say that no director of reasonable competence could have shared that view.

803.     It is right to note that as late as 28 October 2008 UBS was saying to Mr Roughton-Smith that they were concerned at the level of their participation in the due diligence process as they headed towards the meeting at which they would have to sign of the Circular. But this is not relevant to the issue for decision. The board was not aware of e-mail traffic between specialists when undertaking the relevant work; the board received the final product, a report or an endorsement made or given after concerns such as that expressed by UBS had been overcome. There is no doubt that UBS did endorse the Circular.

804.     The expert evidence of Mr Williams in particular (but also less authoritatively of Mr Deetz), confirms from a depth of experience that what was undertaken was in line with the due diligence customarily undertaken, and in some respects exceeded it; though of course what is ultimately required is a matter of judgment in each case. I have noted the evidence of Mr Parr that in fact the circumstances of the present case afforded the opportunity to obtain greater access, and he so reported to the board. The actual judgment made by the Defendant directors about whether to qualify their recommendation therefore seems in line with what might be expected of reasonably competent directors.

### The £7bn additional capital requirement

805.     This was a section of the Circular which the UKLA had specifically required be included. It cannot be denied by the Claimants that the Circular's summary of the Treasury statement and of the advice of the FSA is literally correct. The complaint of the Claimants is twofold. First, that the suggestion that there was an *immutable* requirement for Lloyds to raise £7bn in the event that the Acquisition did not proceed was misleading and did not fairly characterise the choice facing the Lloyds shareholders. Second, that the suggestion that there was some material uncertainty about the ability to raise that sum in the public market was misleading. In each case it is said that the object of the disclosure was to make it appear that the rejection of the board's recommendation was excessively risky.

806.     The first complaint rests upon an analysis of events in which the Defendant Directors (or at least Mr Daniels as a director and Mr Tookey as senior management) are said to know that the £7bn requirement (i) was irrational and unfair and not supported by the Lloyds' balance sheet or exposures; and (ii) was not final and was up for a negotiation that would very likely lead to a reduction.

807.     The second complaint rests upon the proposition that the Lloyds board could have told the Lloyds shareholders that it was certain that £7bn (or any lesser sum) could successfully be raised in the public markets on acceptable terms (and that to the extent it could not, then that the Treasury would participate on predictable and acceptable terms no worse than those currently on offer).

808.     In my judgment neither complaint is justified. In the light of the FSA's letter of 28 October 2008 I do not think that the Circular could have been expressed any differently. In the light of the FSA giving "the cold shoulder" to a suggestion that the reference to £7bn might be replaced by a reference to the need to raise "at least £5.5bn" I do not think that the Circular could properly have said that the £7bn was up for negotiation to a lesser sum in the event that the Acquisition was not approved. I reject the proposition

that the £7bn capital additional capital requirement was not final and was wrongly used as the comparator when assessing the benefits of the Acquisition.

809.   In the light (i) of the advice which the board had received over the Recapitalisation Weekend from Merrill Lynch; and (ii) of the terms of the FSA's letter of 28 October 2008 I do not think that the Circular could properly have said that in the event of the Acquisition not being approved and of Lloyds remaining a "standalone" bank then any additional capital requirement could be raised on the public markets on terms as attractive as those on offer from the Treasury (or that any shortfall would be underwritten by the Treasury on attractive terms).

810.   Such advice would have been adventurous. As to using the public markets, UK banks had in the recent past tapped the market for £25.7bn, and they were again doing so at the time of the Circular (for a further £38bn). This was reflected in the advice which Mr Greenburgh and Mr Wilmot-Sitwell had given to the Lloyds board as to the prospects for a capital-raise. It is unsurprising that in this context Mr Ellerton (the Claimants' expert) acknowledged in cross-examination the difficulty that would have faced a "standalone" Lloyds seeking additional capital in the market. I consider that Sir Victor made an entirely fair point in the Chairman's letter in saying the discount in the market necessarily get a pre-emptive rights issue away would have been of the order of 35%-45%. That was in fact the experience of those who tapped the market. HBOS had had to offer a 45% discount on its rights issue and could not get it away. Material referred to at trial showed that Bradford & Bingley had offered a 55% discount, Standard Chartered a 48.7% discount and HSBC a 47.5% discount.

811.   As to Treasury support, Mr Tookey rightly acknowledged in evidence that it would probably have been available: the Tripartite having gone to great lengths to facilitate the saving of HBOS, it was unlikely to precipitate the failure of Lloyds by withholding capital that could not be obtained in the market but which it had required to be raised. The uncertainty relates to the terms on which it would be available and the degree to which Lloyds would become "nationalised" (which is why the Circular warned that Government capital might not be available on a pre-emptive basis).

812.   The Claimants assert that it is obvious that capital would have been available to a "standalone" Lloyds on the same terms as had been offered on the Recapitalisation Weekend. But that is plainly not the tenor of the FSA's letter to Lloyds of 28 October 2008, nor of the letters which the Chancellor sent to the Chair of the Treasury Select Committee and to Alex Salmond at the end of October and the beginning of November 2008: and the Claimants have not proved that assertion.

813.   This complaint is not made out.

### The £10bn net negative capital adjustment

814.   The Circular contained (in compliance with Listing Rule 13.3.3R) an analysis of the pro forma capital of the Enlarged Group based in part on the capital position of HBOS as at 30 June 2008 (its last published figures). Lloyds thought it right to amend that statement (which was an amalgamation of raw figures from two "standalone" entities) to reflect the consequences of the process of their becoming one entity i.e. acquisition accounting. The book value of the HBOS assets and liabilities shown in the pro forma statement of HBOS's assets and liabilities as at 30 June 2008 would have to be shown

at their fair value in the opening books of the Enlarged Group. So, in order to avoid the market assuming from the pro forma statement that the Enlarged Group would be better capitalised than it would be if the hypothesis were worked through, Lloyds included in the Circular information about likely adjustments ("the net negative capital adjustments") based on material available at 30 September 2008 (but warning that the actual adjustments would only be known at completion). The process of acquisition accounting would have an impact on regulatory capital: so that was why the preliminary adjustment was tied into the pro forma Core Tier 1 ratio.

815. The statements on pp21-22 of the Circular, that Lloyds had made a preliminary assessment that net negative capital adjustments of no more than £10bn after tax would need to be made to HBOS's financial position for Core Tier 1 capital purposes as a result of the Acquisition, were literally correct. They were explained in detail at p.243 of the Circular. The Circular at p.238 explained that the exercise had been undertaken for illustrative purposes and did not represent the Enlarged Group's actual financial position. Mr Ellerton (the Claimants' expert) acknowledged that as such they were not misleading.

816. However, the Claimants say that this voluntary disclosure created a false impression of the extent of the anticipated actual write-downs of HBOS and that the Circular ought to have disclosed Mr Roughton-Smith's impairment estimates (which had not been disclosed in any public document), and that such disclosure would have signalled to the market that the Lloyds' assessment of the HBOS balance sheet was too optimistic ("the impairment disclosure point").

817. The Claimants also say that it was not possible successfully to cross-check the £10bn net negative capital adjustment and the Roughton-Smith impairment figures about which the board knew ("the impairment cross-check point").

818. I agree with the Claimants that the "net negative capital adjustment of £10bn" comes across as a grounded assessment (albeit preliminary), not as a purely hypothetical figure generated for illustrative purposes: a grounded assessment is what it was. Of course, when applied to pro forma figures even a grounded preliminary assessment can only produce an illustration and not a prediction of the "point in time" valuation that will be made at completion: and that is exactly what the Circular warned.

819. But I do not accept the rest of the argument of the Claimants on the impairment disclosure point. First, the capital adjustment exercise ("What will the opening balance sheet look like as at January 2009?") is different from an impairments analysis ("What will be the impact be of anticipated defaults during the course of 2009?"). So bare disclosure of anticipated impairments would not of itself have facilitated a re-assessment of the outcome of the preliminary capital adjustment exercise: a lot more context would have been required - to explain the somewhat tortured relationship between the net negative capital adjustment figure and the impairments figures, to inform the reader of the probability of the occurrence of the impairments disclosed and to explain the macro-economic assumptions underlying the impairment figures i.e. that the Lloyds figures had been prepared on much more pessimistic assumptions than the consensus view on the forthcoming recession.

820. Second, in my view the Directors were under no obligation to include in the Circular Mr Roughton-Smith's views on the impairments that might occur in a "1 in 15" scenario

(£16-9bn-£22.3bn) or in a "1 in 25" scenario (£20.65bn-£28.8bn). These were Lloyds internal figures (albeit produced by a high quality and experienced team) based on partial access to HBOS's books and had not been subject to any process of verification: as Mr Tookey put it, this work "was not done to prospectus standard". By way of contrast HBOS obviously had full access to its own books and they were subject to audit review by KPMG. If information was to be published I do not regard it as unreasonable for that information to consist of the published HBOS Interim Management Statement, signed off by the HBOS management, approved by KPMG and supported by letters of representation to the Lloyds board by the HBOS board and by KPMG, and to reflect work on capital adjustments contributed to by the HBOS specialist team (but modified by Lloyds' specialist team).

821.    Third, so far as was reported to the board the impairment figures did not contradict or undermine the net negative capital adjustment figure included in the Circular. The Lloyds Group Risk team made no such suggestion.

822.    Fourth, my attention was not drawn to any instance of any bank takeover in which the acquirer's internal estimate of the target's impairments had been published: nor yet any instance of any bank releasing *its own* impairment figures to the market in annual or periodic statements. Mr Ellerton himself could think of only one unspecified instance in 1991 when it may have happened. Plainly, there was no market practice to publish internally generated impairment figures. Because the Lloyds takeover was being undertaken in extraordinary conditions I do not regard this absence of market practice to be determinative: but it is a factor of very considerable weight.

823.    Fifth, UBS confirmed to the Lloyds board that they were not aware of any matters not disclosed in the Circular which ought under the Listing Rules to have been disclosed. UBS created its own financial model and knew of Mr Roughton-Smith's last impairment figures; and the Circular itself set out the net negative capital adjustment. A reasonable director could properly take comfort from that; no sponsor bank suggested further disclosure on the issue.

824.    Sixth, the Lloyds shareholders were warned that (even if they were to take the £10bn figure for the net negative capital adjustment as a grounded estimate) changes in the credit quality of borrowers arising from their own behaviour or from systemic risks in the UK or global financial system could reduce the value of the Enlarged Group's assets "and the Enlarged Group's write-downs and allowances for impairment losses". Risk Factor 1.4 went on to draw attention both to the lower rating of the HBOS loan portfolio and its greater exposure to leveraged finance and subordinated loans and to its concentration in the commercial real estate sector so that the corporate lending portfolio (like the mortgage portfolio) was "likely to generate substantial increases in impairment losses which could materially affect the operations, financial condition and prospects of the Enlarged Group". Lloyds shareholders were not being lulled into false sense of security by the reference to the preliminary assessment of the capital adjustment: they were warned of its limitations.

825.    In short, I do not regard the "failure" to publish impairment figures as a negligent misstatement or a deficiency in the provision of sufficient information. It cannot be said that the only course open to a reasonably competent director would be to publish the Roughton-Smith figures. It cannot be said that the "sufficient information" duty could only be discharged by the inclusion of those figures in the Circular.

826. I turn to the "impairment cross-check" point. I will deal with the argument before making what I think is the key point.

827. The argument was located deep in the depths of acquisition accounting. I have explained the need for the amalgamated balance sheets to reflect the process of merger, both by the adjustment of the AFS reserve and the adjustment to fair values. The necessary work was undertaken by senior members of the HBOS team (who alone had access to all of HBOS' books) and was provided to Mr Tookey and the Lloyds Group Accounting Team and to UBS for modelling and to PwC for challenge and review. It included the calculation of fair value adjustments to HBOS assets by reference to credit spreads. The point of detail was whether the adjustment to fair values had as an indirect input HBOS's own view of likely write-downs and impairments for H2 2008 and 2009 as recorded in its books.

828. At some point one would want to do a "ballpark" comparison with the other method of estimation the value of HBOS assets on acquisition i.e. the impairment exercise undertaken by means of a sampling by Lloyds Group Risk of portfolios to assess HBOS impairments in H2 2008 and 2009. It could only be a "ballpark" comparison because the credit spreads assessed by the market would not (in other than a perfect world) match the individual impairments assessed in a particular scenario. The point of detail at issue was: if you are to compare the outcome of the "credit spread" and "portfolio analysis" exercises in an attempt to arrive at a "ballpark" figure for likely adjustments, do you have to deduct HBOS's own disclosed impairments from the Lloyds impairment assessment?

829. The Defendants' expert Mr Deetz thought that you should. He thought that if you did not then you would be comparing apples (Lloyds' view of HBOS's impairments without off-setting HBOS's own existing allowance) to oranges (the portion of the net negative capital adjustments related to the fair valuing of the HBOS loan portfolio). Mr MacGregor could not see the point of such an exercise but thought it wrong. Mr Hill QC cross-examined Mr Deetz on the basis that the Deetz approach did not comply with the requirements of IFRS 3: and in closing submitted that Mr Deetz must have muddled up two separate exercises (forecasting the capital of the Enlarged Group: and applying a capital adjustment to pro forma figures), though his report had clearly distinguished between the two.

830. Whilst I am not wholly persuaded that Mr Deetz's simple deduction is right, I think there is something in his approach. It is true that impairments for H2 2008 and for 2009 would not form part of a balance sheet prepared as at 30 June 2008: but such of them as were then known ought to have been reflected in the credit spreads as at 30 September 2008 that were applied to the balance sheet items. So some form of adjustment was required if there was to be a comparison with an impairments analysis. But I am not at all sure that the crude tool he uses to make that adjustment is appropriate. We are here in the depths of the impact of acquisition accounting.

831. For me the key point is that (as with the impairment disclosure argument) the Claimants are asserting that the Defendant directors made an implied negligent misstatement that as a matter of reality and on the basis of material then available a net negative capital adjustment of no more than £10bn after tax could reasonably be predicted as needing to be made to HBOS's financial position for Core Tier 1 capital purposes as a result of the Acquisition: and that no director of reasonable competence could have made such

a prediction. But that case is not made out by showing that highly qualified experts deep-drilling into acquisition accounting might hold the view that a particular adjustment should or should not have been made.

832. The grounded assessment of a £10bn net negative capital adjustment after tax was a statement of a current expectation about a future event, based on identified material (which excluded post 30 June 2008 trading) and, incidentally, made in a document with a whole section on the value of "forward-looking" statements. Its function was to warn readers of the Circular that the capital position would not be as strong as the unadjusted pro forma statement might suggest. Its function was not to suggest what the capital position after actual adjustments actually would be. The Circular warned that the statement should *not* be taken as a prediction of the Enlarged Group's actual financial position. I do not consider that a reasonable reader of the Circular would have taken it as saying the opposite.

833. The Defendant Directors honestly believed their preliminary assessment to be reasonable: the contrary is not suggested. They plainly believed that they had reasonable grounds for making the assessment, for it was included in a document prepared for them by specialists whom they had retained for the very purpose of ensuring that the Circular was in accordance with English law, the City Code and the Listing Rules (and who had undertaken a thorough statement verification process). They did in fact have reasonable grounds for the belief they expressed. The estimated adjustment had been undertaken by senior HBOS personnel in close liaison with senior members of Lloyds' Group Corporate Treasury and challenged by PwC. Reasonably competent directors could properly rely on them to have done a competent job unless some obvious error was apparent in the figures they produced. The assessment had been cross-checked by PwC for the purposes of their Working Capital Report, including a review of assumptions. The board had been told on 29 October 2008 by Mr Tookey that even the top end of Mr Roughton-Smith's new figures could be accommodated within the working capital figures on which the board had been proceeding (and so the figures that would be reflected in the Circular). If and to the extent that Mr Tookey based that view on an adjustment of the impairment figures to take account of known HBOS impairments then there was a respectable basis for that view (as set out in the evidence of Mr Deetz), even if that was not the only view. As regards the board members, I hold that a reasonably competent director is not expected to deep-drill into acquisition accounting in order to challenge whether a confirmatory "ball-park" comparison has been properly made and whether a preliminary estimate of the net negative capital adjustment could properly be included in the Circular. As Mr Ellerton himself acknowledged in the section of his Second Report dealing with disclosure of impairments:-

> "What emerges very clearly from the Tim Tookey witness statement is that the accounting with respect to fair valuing HBOS's balance sheet was a complex process involving inputs from HBOS and Lloyds and, in the detail relating to accounting standards, was outside the understanding of most market participants at that time (including myself), and even of bank analysts with an accounting qualification."

I agree.

834.    In short, this complaint is not made out.

## *The adequacy of working capital*

835.    It was the Claimants' case in opening that the Circular ought either to have contained a clear or a qualified working capital statement: of course, it did neither because of the waiver granted by UKLA. It was, I think, common ground that Lloyds (in common with every other bank that depended on SLS) could not give an unqualified working capital statement because of the political risk that in the next 12 months the Bank might withdraw or not renew SLS. The focus of the complaint then became the reasons given for the omission of a qualified working capital statement. The application for the waiver founded itself on the proposition that the Enlarged Group (like every other bank) was not immune from the effects of an extended closure of the wholesale markets and so was to some degree dependent upon the availability of support from the BoE: and that such disclosure risked an undue loss of faith in Lloyds and HBOS because, although every other bank was in an identical situation, no other bank was involved in a merger which might require such disclosure.

836.    The Circular itself explained the omission of a working capital statement in this way:-

> "Due to the severity of this dislocation which has catalysed unprecedented levels of government intervention around the world and extraordinary uncertainty facing the banking industry in the medium term, and the availability of the UK government facilities described above being conditional upon, inter-alia, the passing of various resolutions including those relating to the Acquisition, the United Kingdom Listing Authority has agreed that a statement regarding the adequacy of working capital for at least the next 12 months should not be required in this document."

The emphasis here was that the availability of Government funding through the arrangement made at the Recapitalisation Weekend was dependent upon the Acquisition proceeding. Risk Factor 1.5 then drew attention to inherent liquidity risk which could affect the ability of the Enlarged Group to meet financial obligations as they fell due. The Claimants say that this did not provide sufficient information to the Lloyds shareholders and concealed that the Enlarged Group might need central bank support.

837.    In my judgment the disclosure relating to the working capital statement did not amount to a misstatement or demonstrate an insufficiency of information. There are two aspects. The first relates to whether the board could properly take the view that sufficient working capital would be available such that an express warning about the non-availability of working capital needed to be made. The second relates to whether the board should have provided some context around the waiver and alerted the Lloyds shareholders as to the inability to give a clean (or indeed a qualified) working capital statement.

838.    As to the first, the wholesale funding requirement of the Enlarged Group was projected to be £400bn of which £230bn would need to be refinanced within 15 months of the Acquisition completing. The issue for the board was (i) whether the wholesale markets

plus SLS plus guaranteed debt issuance could be relied upon to provide that funding: and (ii) if the wholesale markets returned to their paralysed state and all headroom under the SLS and other schemes had been used then whether the Tripartite would provide additional funding (either as short-term ELA or by relaxing the collateral requirements on other sources). In the light of economic forecasts as to the depth of the coming recession, the clear statement from the Bank as to the availability of at least £185bn under the SLS/LTR and guaranteed issuance streams and the "nod and wink" given by Mr Bailey of the Bank in respect of any shortfall arising in the wholesale market (for no more could realistically be expected) the board could properly take the view that the explanation for the absence of a working capital statement coupled with the elaboration of a risk in Risk Factor 1.5 correctly communicated to shareholders the basis on which they were being invited to make their decision. There *was* a risk attached to the funding plan: but there was every reason to think that if it eventuated the Tripartite would underwrite the Enlarged Group's liquidity.

839.   As to the second, there was clear disclosure of the reliance of the Enlarged Group on central bank funds, and attention clearly drawn in Risk Factors 1.4 and 1.5 to the uncertainties around this. In that context it was unnecessary, in explaining the waiver granted by UKLA, to say that it had been granted because a "clean" working capital statement could not have been given. Indeed, that would have defeated the objective of the waiver. The Circular correctly explained to the Lloyds shareholders that the working capital of the Enlarged Group depended on the injection of Government capital agreed over the Recapitalisation Weekend, which was dependent upon their approving the Acquisition.

840.   I must deal with one "tag-along" allegation. This was that the form of the Circular represented to Lloyds shareholders that the £5.5bn capital to be raised by Lloyds under the Recapitalisation Weekend arrangements related to the balance sheet and business requirements of Lloyds (rather than, it is said, being allocated to Lloyds but in fact destined for use by HBOS). This allegation depends heavily upon an analysis of what actually happened in the recession which actually occurred. In the event little of this additional capital was needed by Lloyds: the great majority was used to absorb losses from the business introduced into the Enlarged Group from HBOS. But, of course, the fact that that was the outcome does not mean that it was the aim.

841.   Over the Recapitalisation Weekend the FSA made plain that its object was to ensure that the amount of capital to be raised by each institution would sustain confidence in that institution in a severe recession: and by agreement between the FSA and the Treasury Lloyds was to raise £5.5bn to absorb losses assumed to be generated by the Lloyds' business in that scenario. Exactly what was that scenario was not known to the Lloyds board and cannot now be reverse engineered. From the material that is available it cannot, in my judgment, be established that every director of reasonable competence would have known that Lloyds really needed *no* additional capital at all in an assumed severe recession and that this £5.5bn was destined for use by HBOS. On the contrary, the evidence demonstrates that even before the collapse of Lehman Brothers consideration was being given by Lloyds senior management to raising additional capital: and after the collapse of Lehman Brothers (and the opportunistic £800m rights issue) there remained a need. On Lloyds' own figures that need might have been £4bn. If the Circular had said that the £5.5bn to be taken under the Recapitalisation Weekend

programme was being taken to cover anticipated losses deriving from HBOS it would not have been accurate.

842. I hold that complaints in this category are not made out.

## *Funding and the ELA*

843. The Circular disclosed that Lloyds relied, and the Enlarged Group would substantially rely for the foreseeable future, on the continued availability of the BoE liquidity facilities as well as HMT's guarantee scheme for short- and medium-term debt issuance. This disclosure (accompanied by the warning in Risk Factor 1.5 both of the inherent possibility of serious liquidity constraints and of the higher funding risk facing the Enlarged Group than a standalone Lloyds faced and the further warning in Risk Factor 1.12 of loss of confidence causing depositor withdrawals) was accurate and sufficient as regards the future of the Enlarged Group. It gave a clear warning that looking forward the Enlarged Group could not rely on the market to meet its funding needs: but that of itself did not put the Enlarged Group in any different position from any of its peers, all of whom relied on the availability of SLS (and some of whom would have failed without SLS). But the Claimants' complaint focuses not on the future but upon history and the present relevance of past events.

844. It is beyond dispute that HBOS was from 1 October 2008 in receipt of the facility which became known as "ELA": and the Defendant directors admit that the Lloyds board knew this to be so (see paragraph 99(b)(2)(iii) of the Re-Re-Amended Defence). This admission was not withdrawn. It will be apparent from my account of the facts that the Lloyds board did not seek specific advice as to their disclosure obligations regarding the existence of ELA, but simply relied on their banking and legal advisers to prepare the Circular in a form compliant with regulatory obligations and the general law. But Linklaters were not informed of the use of ELA by HBOS (probably because the Lloyds board believed that it had to be kept confidential) and therefore gave it no consideration.

845. In the result the Circular, when dealing with the HBOS liquidity risk, simply contained an account of the then-current liquidity management systems at HBOS. That account drew attention to the existence of a liquidity portfolio consisting of mainstream eligible collateral, and a substantial pool of high-quality secondary liquidity assets which, it was said, permitted HBOS to manage through periods of stress taking into account the likely behaviour of depositors and the wholesale markets. In essence the Claimants complain that this was not a candid and fair account because it did not disclose that the only way HBOS had been able to manage through the then-current period of stress was to turn, not to the market, but to the BoE; and to do so outside the mainstream facilities on offer (namely, SLS and the ELTR facility). Accessing ELA enabled HBOS to meet liabilities which it could not immediately meet from its own resources, or from the market, or from the mainstream market-wide central bank liquidity facilities. The Claimants say that the simple disclosure of the use of ELA would have told Lloyds shareholders that HBOS was "funding insolvent" and that would have had a materially adverse impact on the value of HBOS.

846. In response to that argument the Defendants say, first, that what was important to the shareholders was the future i.e. HBOS as a contributor to the Enlarged Group. I agree. But that does not necessarily mean that either its past or its current condition was irrelevant. A fair, candid and reasonable view could properly emphasise the strengths

which HBOS contributed but might still require reference to any material weaknesses it brought.

847.    Second, the Defendants say that the acronym "ELA" (and its rather alarmist full form of "Emergency Liquidity Assistance") were not in current usage in 2008. The expert evidence of Mr Benkert for the Claimants and of Prof Persaud for the Defendants is all but agreed on this point: they agree that the frequency of its use then was not what it was after 2012. Mr Benkert has found a couple of instances of use in 2008, but Prof. Persaud does not accept that they are usages consistent with what we now call "ELA". The point of the Defendants' observation is not about simple labelling: it is about the ready recognition of a distinctive category of stigmatised assistance. Thus, the Defendants submit, Mr Daniels, Mr Tate, Mr Tookey and Mr Short all appeared to regard ELA as a variant of the SLS scheme (Mr Short in evidence called it "SLS lite") under which the collateral that could be offered in return for Treasury bills did not fit the SLS profile but in due course could in most cases be securitized into a compliant form (as 70% of it was); in the meantime ELA offering a temporary "bridge" facility that was immaterially different. On this analysis HBOS was simply accessing a functionally connected additional line of SLS funding.

848.    This difference of view led to an intensely theological debate about the true nature of ELA. Mr Benkert (the Claimants' expert) and Prof Persaud (called by the Defendants) were agreed on the similarities between SLS and ELA. (i) Both were liquidity facilities provided by BoE operating by means of swaps (under which the BoE provided gilts in return for collateral). (ii) The collateral accepted under the ELA was unsecuritised loans of a type similar to those accepted in securitised form for SLS. (iii) The fact and extent of any usage by individual banks was in neither case disclosed by the BoE: disclosure was on an anonymised, aggregated basis with a suitable time lag (scheduled in the case of SLS and individually determined in the case of ELA) and whilst subsequent repo transactions might give a clue who were large scale users of the facilities, no analysis could tell the market whether it was SLS or ELA that had generated the T-bills. (iv) As Mr Benkert and Mr Ellerton both acknowledged, whilst is was true that ELA was a "last resort" facility it was equally true that many banks could not have survived without SLS and that *in that sense* SLS was also the provision of a "last resort" facility. (v) The "haircuts" applied by BoE to the value of the collateral was broadly similar: according to Prof Persaud it was 40% for SLS and 43% for ELA, figures with which Mr Benkert agreed, though he thought ELA simply mimicked SLS because of lack of experience of valuation in an ELA context.

849.    Whilst Prof. Persaud emphasised these similarities Mr Benkert thought that there were marked differences. (i) The key difference (which Mr Hill QC hammered home time and again) was that SLS was a mainstream facility that was permanently available on demand to a range of users, whereas ELA was an idiosyncratic and bilateral arrangement arising out a request for assistance by a systemically important institution. In my own mind I characterised the point he was seeking to make as the difference between HBOS being an applicant for SLS and being a supplicant for ELA. He argued that the making of the request for bespoke assistance (rather than the making of an application for access to an open facility) differentiated the applicant from its peers, and that differentiation ran the risk of attracting "stigma". Hence the great secrecy surrounding the ELA provided by the BoE to HBOS and to RBS. Although the Tripartite had widely publicised its intention to do "whatever was necessary" the BoE

was in no mood to test whether its offers of help had been de-stigmatised: so it kept everything about ELA covert. (ii) The objective of SLS was to unblock the flow of liquidity assistance to the banking sector generally (by camouflaging and de-stigmatising its use): but ELA was institution specific and available only to systemically important institutions. (iii) The collateral provided was, in the case of SLS, securitised loan packages; and in the case of ELA was otherwise ineligible raw loans held through a trust structure. This was an indicator of the urgency with which the assistance was needed (for it could not await the securitisation process). (iv) The interest rate charged upon ELA was in general higher than that charged under SLS (200bps as against an average of 140bps at the time ELA was first granted, though the latter average rose to 178bps) but was not necessarily so (because the rate payable under SLS increased with the proportion of funding that SLS constituted for the applicant bank). It is difficult to know whether this difference resulted simply from a desire on the part of BoE to encourage securitisation and to disincentivise the use of raw loans: or whether a higher ELA rate represented some pricing of increased risk. But in either event the difference was hardly material to the market at large: and I shall leave this difference out of account. (v) SLS was accessible under a standardised process utilising pro-forma documentation whereas ELA only became available upon individualised application and after the Governor of the Bank had sought and received authorisation from the Chancellor. Once granted ELA was managed by a different department within the Bank from that which managed SLS. (vi) The assistance provided under SLS was the provision of 9-month Treasury bills that could be repo-ed with an option to roll-over for up to a maximum of 3 years: whereas ELA provided 14-day money (though again with a roll-over option). So, ELA could not be used to refinance maturing wholesale funding but was subject to frequent review.

850.    The point of this debate was to establish whether ELA was *really* the provision of an idiosyncratic basis of emergency funding to an institution that had nowhere else to go for funds that were immediately required: or whether it was *really* a form of SLS designed to "bridge" the institution whilst it securitised its collateral ready for submission to SLS. My conclusion is that if one has to examine the issue at the technical level at which the debate was conducted then the former is the more accurate characterisation. Mr Benkert said:-

> "… the most crucial difference between the BoE's ELA facility and all other BoE liquidity-providing facilities is that this bilateral ELA was viewed as a rescue operation for an institution at imminent risk of funding insolvency and failure, whereas the other multilateral facilities were seen as preventative of and an insurance against such funding-related failure."

I would omit the words "and failure": but otherwise accept the force of the distinction. SLS might in any given case in fact be used as an LOLR facility, or it might not: ELA always was an LOLR facility.

851.     I put in the qualification "if one has to examine the issue at the technical level" because identifying what ELA "*really*" is does not get one that far. What matters is what ELA would or might have appeared to the market to be at the end of October 2008: and what it "really" was would simply have influenced (not determined) that perception.

852.   Although with perfect integrity the Lloyds witnesses now say that at all times to their present recollection they thought of ELA as a form of SLS, I think that on a careful analysis it would have been seen by an objective observer, a reasonably competent director, in October 2008 as being a single source of short-tenor reviewable funding for HBOS likely to be renewed through to completion, not as a series of "bridging" loans covering proposed parcels of collateral in the course of being securitised. It was in my view properly seen as an addition to (and not a functional aspect of) SLS.

853.   Third, the Defendants say that the true question which the Lloyds shareholders needed to address was whether HBOS could be funded until completion: and how that was achieved was not "material". I agree that this was one of the vital questions. It had arisen at the end of September 2008 when Sir Victor was confronted with the possibility that HBOS might not open its doors; but the problem had then gone away. All Lloyds shareholders would have known that HBOS was vulnerable, for it was that very vulnerability that afforded the opportunity for the Acquisition. Furthermore, Sir Victor had observed to shareholders in the Chairman's Letter that HBOS had been significantly affected by recent challenging market conditions which had negatively affected its funding model. The Circular set out how those vulnerabilities would be addressed once HBOS became part of the Enlarged Group: but the question is whether it was material for the shareholders to know how the vulnerabilities were addressed in the interim. Mr Daniels, Mr Tate, Mr Tookey and Mr Short were all of the view that interim funding was an immaterial consideration. I think the UKLA were probably also of the view that it was immaterial: for I think it likely that the HBOS supervisory team at the FSA must have been aware that HBOS was accessing funds outside the SLS yet the UKLA did not insist upon the Circular reflecting that fact. (There is no documentary evidence to that effect: but it is supported by some of the evidence of Mr Sants, and by the improbability of HBOS concealing from its supervisor how it was meeting its funding needs). However, the "sufficient information" principle requires the Court to subject the Circular to scrutiny, not simply to accept the judgment of those preparing the Circular as to the materiality of information about interim funding. The honestly held views of the participants at the time cannot be determinative.

854.   Fourth, the Defendants submit that the key issue is whether there was some distinct feature of ELA knowledge of which would have provided material information to the Lloyds shareholders that they needed to know in order to make an informed decision about the merits of acquiring HBOS: and they argue that there was not. On their case how HBOS was funded to completion was immaterial. The question for the Lloyds shareholders was: given that HBOS was there, should its business be merged with that of Lloyds? The Claimants, of course, argue that knowledge of ELA would have told Lloyds shareholders that HBOS was a "failed bank" and was "valueless" and so should not be merged with Lloyds because it would weaken Lloyds and excessively dilute shareholder value.

855.   I have found the "materiality" question one of considerable difficulty. Having considered the competing arguments this is my conclusion. I accept that the focus of the shareholders' consideration was HBOS as part of the Enlarged Group: and the Circular was right strongly to emphasise this. The argument which starts and finishes with this point is very powerful. But the giving of focus and direction to the shareholders in the Circular does not mean that only material supportive of the recommended outcome needs to be included. The business of the EGM would be to

Approved Judgment

approve (or to withhold approval from) the recommendation of the board as to the incorporation of HBOS into an Enlarged Group. That involved an assessment of its strengths - what it would contribute to the Enlarged Group that a "standalone" recapitalised Lloyds would lack. But an informed assessment of HBOS would also note its weaknesses, because the extent to which the remedying of those weaknesses would sap the strength of Lloyds within the Enlarged Group might well be a matter of concern to shareholders. A fair, candid and reasonable account of the purpose of the meeting should therefore note (though need not emphasise) those weaknesses. It is a question of balance whether that is done through the enumeration of risk factors, or whether it is done in the course of laying out the proposal itself.

856.    One of the weaknesses of HBOS as matters stood was that it did not have enough collateral available to satisfy its demands for immediate funds using generally available sources (which it may, indeed, have already exhausted). Its then-current position (and one that would continue until the implementation of the Recapitalisation Weekend proposals) was that its needs were being met by the availability to HBOS, as a systemically important institution, of a particular "lender of last resort" facility that was not generally on offer to HBOS's peers, was not used by Lloyds and which would cease to be used on completion. The exact extent of use and the precise features of this facility would not be of concern to a Lloyds shareholder: to provide such detail in a proper context would overwhelm the reader and confuse the issue. But the *existence* of the facility potentially was of concern: not (in my view) because it was an indicator that HBOS was a "failed bank" and was "valueless" (though some shareholders did already view it as such), but because it showed the funding position of HBOS and presented a funding risk that would have to be absorbed by, and managed by, the Enlarged Group. Part of the additional capital raised following the Recapitalisation Weekend would not provide additional strength in the anticipated downturn but would be absorbed in repairing shortfalls that had already occurred. For a fair and candid account of what was before the meeting the existence of the facility that we at trial have referred to as "ELA" ought in my judgment to have been noted.

857.    I should make clear that I do not regard the Lloyds board as having deliberately concealed the HBOS ELA from the Lloyds shareholders. I simply consider that their view of "materiality" was wrong.

858.    I have challenged this assessment by reference to the view given by Mr Parr of Linklaters in evidence, because he was an experienced professional there at the time and attuned to all the subtleties of the situation. He said that if he had been asked whether ELA needed to be disclosed he believes that he would have advised that it did not: but he accepted in cross-examination that if he had known the full details of ELA then the disclosure in the Circular might have looked different in that it might have included some description around ELA. This assessment of the position (of course, not given as an expert but retrospectively as an active participant) confirms my own view.

859.    I would add two footnotes. The first footnote is that, to be clear, my primary holding is that in my view there was a breach of the "sufficient information" duty. It does not follow that in failing to discharge that duty the Defendant directors were necessarily guilty of a negligent misstatement by omission. How to assess the materiality of ELA and whether to refer to existence of the ELA facility was a judgment call. But the problem the Defendant directors face is that the evidence does not disclose any process through which that judgment call was made. The Circular said on p.246:-

247

> "To the best of the knowledge and belief of the [Lloyds] directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information. "

However, the directors had not taken all reasonable care to ensure that the Circular dealt adequately with ELA (about which they admittedly knew): they did not inform Linklaters about it, they did not seek advice and they did not clearly consider the issue. So my secondary holding is that there was a misstatement about the care exercised in relation to how the Circular dealt with ELA.

860.     The second footnote is that Defendant directors did not argue that the degree of secrecy that the Tripartite attached to the extension of ELA (and its estimation of the systemic risk) modified in any way the disclosure duties of the board. This argument remains for another day. It is essential that a central bank be able in appropriate cases to act covertly to maintain the integrity of the financial system. There may well be an argument that directors of a particular company (be that company a quoted company in receipt of ELA, or the predator of such a company) are not obliged, in the discharge of their duties to their particular shareholders, to risk the integrity of the entire financial system within which they operate (including the value of their shareholders' economic interests), and that covert operations of the central bank present circumstances in which it is "impracticable" to present all material to shareholders. Duties are sometimes in conflict, and the conflict may lead to a qualification of the duty.

## *Material contracts*

861.     The focus of the argument here was "the Lloyds Repo", the full £10bn facility that Lloyds granted HBOS. The issue is whether it should have been disclosed in the Circular. I have said above that the first tranche could be regarded as advanced in the ordinary course of business. The second tranche was at the time treated (by Lloyds and by the regulators) as "ordinary course" business and Lloyds was not at the time required to seek shareholder approval for it as a Class 1 transaction. I shall not revisit that treatment in that context. But that does not answer the question posed here by the Claimants: should the Lloyds Repo have been disclosed in the Circular?

862.     It is acknowledged by the Defendant Directors that the fact that UKLA treated tranche 2 of the Lloyds Repo as "ordinary course business" for Class 1 purposes does not determine the question whether the board ought to have disclosed it in the Circular.

863.     The second tranche of the Lloyds Repo had a number of extraordinary features:-

  i)     It was not dependent purely upon ordinary interbank lending considerations. The origins of the Lloyds Repo lay in a proposal that Lloyds should provide a deal-specific facility available until completion of the Acquisition, and to be made available in order to assist in preserving HBOS as a target. This feature was an undercurrent in the entire process. The Defendants acknowledge in their pleaded case that the Acquisition was a factor in the lending decision: and it was clearly a factor of some weight given that the counterparty was in such a financial state that it was

Approved Judgment

vulnerable to a takeover. A desire to preserve the acquisition target was an obvious consideration.

ii)   The actual facility itself was considered only at the highest levels within Lloyds and (at the insistence of the Chief Risk Officer) required explicit sign-off by the FSA senior personnel.

iii)  It is common ground that the very nature of the facility was unusual and that *in normal times* it would not be regarded as a bankable proposition because it lay outside Lloyds' normal risk appetite.

iv)   The security taken (trusts of raw loans) was at the time highly abnormal. It was unsuitable for an ordinary "repo" transaction. It did not confer upon Lloyds ownership of immediately realisable assets, but ownership of a non-marketable beneficial interest in a portfolio of hard-to-value loans that were vulnerable in an insolvency. It lacked that ability to achieve a clean and immediate "close-out" on default which renders the standard "repo" agreement such an attractive commercial tool. It was not acceptable to BoE for the purposes of SLS. In summary, there were very unusual risks inherent in the transaction and whilst some steps were taken to mitigate the risks, the unusual risks themselves remained.

v)    The ability of HBOS to draw on the facility was linked by Lloyds to the degree of support for HBOS being provided by the BoE.

vi)   Its size as an overall facility was significantly larger than any previous repo (the largest of which had been £5bn).

vii)  The Lloyds Repo was made available at a time when wholesale markets were effectively closed and banks were generally seeking to reduce their own funding requirements (rather than increase them to undertake interbank lending to more vulnerable institutions); and it entailed Lloyds breaching its own internal liquidity ratio.

864.  These were extraordinary features. The Claimants also laid stress on the fact that Mr Tate in particular did not want the existence of the Lloyds Repo to be disclosed. He articulated this concern in late September 2008 when he characterised the transaction as "potentially dynamite stuff" and required "radio silence" to be maintained. The Claimant's point is that such an attitude would not have been adopted in relation to "ordinary course" lending. They further relied upon the instant reaction of Linklaters when first informed of the intention to make the Lloyds Repo viz. that on account of its size and the circumstances of its grant it would need to be disclosed.

865.  The argument of the Defendant directors points to a number of indicators. First, at the time of the grant of the facility the UKLA were of opinion that it was a facility extended in "ordinary course". I have held that the UKLA were not deceived into giving that view. Second, the UKLA approved the Circular which made no mention of the Lloyds

Repo (about which it undoubtedly knew). Third, Linklaters, Citigroup and Merrill Lynch all signed off the Circular which did not mention the Lloyds Repo (although they knew of it). In particular Linklaters, which had (as the Claimants have noted) flagged up the need to consider disclosure of the Lloyds Repo in the Circular as a separate issue, must have reached the view (departing from its initial instant view) that disclosure was not required; for the draft Circular made no mention of it and Linklaters did not, when putting the draft Circular before the board, advise the Lloyds board to address the issue. Fourth, HBOS and its advisers did not mention the Lloyds Repo in any of the material which they produced for their shareholders. Although none of these views relieved the Lloyds board of the obligation to consider the matter the Defendant directors say that the alignment of their view with these other views is significant.

866. Those were contemporaneous views. The Defendant directors also say that later expert views chime with them. Mr Ellerton (the Claimants' expert) accepted that an arm's length transaction that would probably have been undertaken with a different counterparty was a material factor in identifying "ordinary course" business. Although Mr Williams (the Defendants' expert) took the same view in his report, I did not, after his cross-examination on the point, feel able to rely on that expression of view since he lacked expertise in the interbank lending market. But I did find of assistance his evidence that, as an investment banker, he could find no instance of any inter-bank loan being disclosed in a circular or prospectus.

867. Further, the Defendant directors say that (whatever weight was given to the desire to preserve HBOS as an acquisition target) (i) the Lloyds Repo was ultimately granted on acceptable arms-length commercial terms, priced in line with similar transactions and with carefully selected sound collateral that met Lloyds' risk criteria; and (ii) it was in the best interest of the Lloyds shareholders that HBOS should be able to fund itself successfully until completion.

868. These submissions are plainly directed to the question whether the Defendant directors were guilty of negligent misstatement by omission. They are not compelling in the context of the "sufficient information" duty. There the question is whether the Court itself considers that, objectively viewed, the document in question gives a fair, candid and reasonable account of the circumstances which will enable an informed decision to be made.

869. In my judgment the existence of the £10bn facility (viewed as a whole) ought to have been disclosed as material which information shareholders could take into account in deciding whether or not to follow the board's unanimous recommendation. I do not say that it should have been disclosed as a "material contract" with all the associated disclosure of terms that is then required. But like ELA, the existence of the arrangement ought to have been disclosed.

870. Whatever the technical view of "ordinary course" business taken at the time of the conclusion of the Lloyds Repo, the question of disclosure in the Circular as a "material contract" or otherwise required separate consideration. The question to be addressed in that context was: was the Lloyds Repo (viewed as an overall facility) a contract about which an investor might reasonably need to be aware in order to make a properly informed assessment of the way in which to exercise his or her voting rights?

871. The fact that the Lloyds Repo could be wrestled into a shape that minimised (though did not eliminate) the risks and produced commercially satisfactory terms does not in my view provide an answer to that question. The fact that the same facility might have been extended to another counterparty does not provide an answer to that question: it shows only that in extraordinary times Lloyds might be prepared to enter two exceptional transactions. The fact that interbank lending was not normally disclosed does not mean that the Lloyds Repo (granted in far from normal circumstances and having a far from normal shape) did not need disclosure.

872. On the other hand, the sheer absolute size of the transaction (significantly beyond anything done before), its size relative to the capital base of Lloyds, its grant at a time of tight markets, the connection between the grant of the facility and the Acquisition itself, the connection between the Lloyds Repo and the provision by the BoE of such additional facilities as would preserve HBOS until completion of the Acquisition, in short, all of the extraordinary features listed above, were strong pointers towards this being a contract about the *existence* of which Lloyds shareholders should know.

873. From the outset the transaction was known to be a high profile one which, if irresponsibly leaked, would be "dynamite". Whether the Lloyds Repo should now be responsibly disclosed had to be examined. The evidence does not show that these matters were actively considered at the time the Circular was finalised: nobody recalls any specific discussion. Rather the evidence shows that the technical view taken at the time of the grant of the Lloyds Repo (that it was "ordinary course" business not regarded as needing shareholder approval) was taken (by Mr Daniels, Mr Tate, Mr Tookey and Linklaters) as presumptively providing an answer to the disclosure question in relation to the Circular, and the only issue addressed (and it was addressed by Linklaters) was whether anything had changed. That was not the right question.

874. I think that a fair, candid and reasonable account of the proposed transaction would have disclosed that HBOS was to a degree dependent on bilateral funding and that (i) if the Acquisition completed then up to £10bn of resources otherwise available to Lloyds to meet its own challenges had already been absorbed by HBOS; and (ii) if the Acquisition did not complete Lloyds had a £10bn exposure to HBOS, a bank that it was common knowledge had an uncertain future. A reasonable disclosure would not have been in alarmist terms: it would not have been in the interests of Lloyds to excite speculation or to trigger panic or to jeopardise a beneficial transaction. But in a 286-page account of the circumstances of the transaction there was room for some disclosure that, in order to ensure that HBOS had (in tight wholesale markets) stable funding until completion Lloyds had provided a facility of up to £10bn, a significant part of which remained undrawn.

875. Once I have found that the issue was not considered I must again hold that there was a misstatement on p.246 of the Circular. The Defendant directors had not taken all reasonable care to ensure that the Circular did not omit anything that was likely to affect the information they did provide. They did not consider whether the Lloyds Repo needed to be disclosed but assumed (without testing or enquiry) that Linklaters had considered the question in the course of drafting the Circular.

*Restructuring*

876. Following the Recapitalisation Weekend the European Commission had announced its obscure proposals for the restructuring of "illiquid but otherwise fundamentally sound banks" that had received State aid. The Enlarged Group probably fell into that category. Exactly what was required by way of restructuring a merged group was unclear: but Mr Daniels was right to note that at one extreme it might require a break-up or significant downsizing that would negate the merger benefits i.e. fail to obtain for Lloyds the market dominance that the Acquisition was designed to secure and to undermine cost synergies that grounded the EPS accretion.

877. However, the signals being sent by the Tripartite were to the effect that the merger itself, with the proposal to exert Lloyds' conservative controls over the HBOS lending book coupled with the planned redemption of the Government preference shares, would probably suffice. It was encapsulated in the Treasury's letter of 31 October 2008 to Mr Daniels referring to conversations that had taken place that week:-

> "The Commission has already approved the overall recapitalisation scheme and has indicated that it will work expeditiously to scrutinise individual restructuring plans…The key requirement for a successful application will be a plan that demonstrates a clear path to an exit from State aid. Central to that will be adequate capital and liquidity and future profitability. You indicated to us that your plan would meet these requirements and we have undertaken to work constructively with you to secure Commission approval."

This re-framed the risk identified by Mr Daniels. In my judgment reasonably competent directors could properly rely on those indications as to the nature of the restructuring risk and as to its potential impact upon the benefits of the Acquisition, could frame the Circular accordingly and could with fairness and candour identify (in Risk Factor 1.14) that the presentation of a restructuring plan could have a materially adverse effect on the operations of the Enlarged Group.

878. This complaint is not made out.

*Federal Reserve funding*

879. The Claimants' pleaded case (and their opening skeleton argument) made complaint that it was material for the Lloyds' shareholders to know the extent to which HBOS was reliant upon Fed funding accessed through the Discount Window Facility (recognised as a "lender of last resort" facility) or the Term Auction Facility (a "de-stigmatised" form of LOLR facility). That is one issue I have felt able to leave out of the narrative or analysis.

880. It is common ground that the Federal Reserve positively encouraged US banks and the US branches of overseas banks to make use of the TAF and the DWF in order to minimise the risk of another bank failure: and that 17 out of the top 25 users of these facilities were overseas banks. These banks had built up dollar assets on their books funded, not by dollar deposits, but by short-term wholesale funds from US money market mutual funds, creating the classic maturity mismatch. To overcome it the

Federal Reserve had to provide liquidity to foreign banks. The use of TAF in particular was enormous with at least $3.8trn being taken by 4,200 borrowers.

881.   HBOS accessed a peak drawing of $17.9bn from the TAF (on 10 September 2008) and of $12bn from the DWF (on 23 October 2008). This represented 2% of HBOS' total liabilities and 5% of its wholesale funding requirement. It is common ground that many UK banks borrowed from the Fed using these facilities over the same period. It is the evidence of Prof Persaud (which I accept) that some such banks borrowed significantly more than HBOS and were more reliant on this funding source. Whereas the average for HBOS was $10.9bn that for Barclays was $12.2bn; whereas the peak for HBOS was $17.9bn that for Barclays was $33.3bn. It is Mr Benkert's evidence that in the period September to December 2008 HBOS's usage of the TAF (as a proportion of the total usage by UK banks) fell.

882.   It is also Mr Benkert's evidence that using the TAF was at that time in the ordinary course of a bank's business i.e. something which did not exhibit unusual characteristics by the standards observed by the markets at that time but does have similar features to other transactions executed between similar parties. He acknowledged that the same could be said of the DWF, although (to give a nuanced answer) it was "less ordinary course" than using the TAF. Mr Benkert plainly did struggle with the conclusion that using DWF was "ordinary course" (although that was the conclusion to which the logic of his position took him): and he continued to struggle with it even though he agreed that the market would not have been surprised to learn that an entity like HBOS with dollar assets on its books had accessed the DWF. It was the opinion of Mr Ellerton (the Claimants' expert equity analyst) that the use by HBOS of the TAF and the DWF schemes could reasonably be regarded as the use of "ordinary course" facilities. Taking that evidence together with that of Mr Benkert (and there is no evidence to the contrary) it is plain that resort to Federal Reserve funding for dollar requirements was nothing remarkable. It was a way of dealing with the need to raise funds for dollar cover (as many banks had to do) before the BoE itself began to offer dollar facilities. It did not differentiate HBOS from other banks. It did not demonstrate that HBOS was a "failed" bank: only that the US public market could not provide dollar cover for dollar liabilities. It was not something to which attention needed to be drawn in the Circular.

883.   Even if Federal Reserve DWF funding needed to be and had been disclosed, I do not consider that it would have had any independent operative effect. The key effects (if any) would have been generated by the disclosures relating to ELA and the Lloyds Repo. Disclosures relating to DWF would at best have provided a mild confirmatory effect.

884.   This complaint is not made out.

### Breaches of the sufficient information duty

885.   The Claimants have, however, established to my satisfaction that there were two breaches of the "sufficient information duty". It is therefore necessary to consider how the duty would properly have been performed and to consider what are the consequences of a failure to perform the duty in that way. Mr Tookey was cross-examined as to what context he said would have been provided for any disclosure as to what the context might have been: but he declined to be drawn into speculation . Mr

253

Hill QC submitted that it was impossible to identify any fair and honest context which would not exacerbate rather than reduce a negative market reaction. I do not agree.

886.    I consider first, the disclosure of ELA. I am clear that, intensely concerned as the Tripartite was to avoid anything that would undermine market confidence and cause significant harm to consumers and to the UK economy, no member of the Tripartite would have sought to prevent the Lloyds directors from discharging what they conceived to be their duty to shareholders. The view of the Tripartite in October 2008 (confirmed to Parliament in November 2009 when the advance of ELA was revealed) was that it was for the Lloyds directors to decide what to disclose.

887.    The information about ELA would have been provided in carefully framed terms. Given the intense concern of the Tripartite to avoid "unforced errors" I consider it probable that the UKLA would not have approved any wording in a Circular which ran the risk of destabilising the market in any degree. The Circular would not have said baldly that the BoE had provided and was providing £X emergency liquidity assistance to HBOS. It might properly have said HBOS relied on SLS, government guaranteed issuance *and other bilateral fully collateralised Bank facilities*. The disclosure would have said that the Lloyds board affirmed the Acquisition because it was satisfied that HBOS was funded until completion and that following completion the Enlarged Group would not need to utilise the bilateral facilities currently available to HBOS. That would have given a candid and fair (but not inflammatory) indication that HBOS was to some degree dependent upon bespoke bilateral arrangements rather than its needs being met by participation in mainstream arrangements.

888.    I consider next the disclosure of the Lloyds Repo. Here, fair, candid and reasonable disclosure would have been achieved by (i) stating that in order to ensure that HBOS had (in tight wholesale markets) stable funding until completion Lloyds had provided a facility of up to £10bn, a significant part of which remained undrawn; and (ii) stating that Lloyds regarded the terms as commercially acceptable, noting the limit on the facility, and the need to sanction and approve the collateral offered at each draw-down. It would not have been necessary in order to comply with the "sufficient information" duty to give details of the Lloyds Repo and the UKLA would not have insisted upon it. Disclosure of the terms of interbank lending was (as Mr Benkert and Mr Trippitt agreed) unprecedented.

889.    There may well have been further context provided: Mr Williams in his expert report at paragraph 277 and following canvassed further possibilities. But all one can say with confidence is that the disclosure, whilst sufficient to notify the shareholders of the existence of the two facilities, would have been carefully calibrated in consultation with the Tripartite and with HBOS (i) so as to minimise the risk of exaggerated speculation and (ii) so as to avoid a disproportionate emphasis on an issue which did not go to the heart of the Director's recommendation (being an arrangement that would not continue beyond completion).

### *The consequences of not disclosing ELA or the Lloyds Repo*

890.    The normal consequence of a breach of the "sufficient information" duty is that the Court will enquire there any reasonable ground for supposing that such imperfections as may be found in the Circular have had the result that the majority who have approved the transaction have done so under some misapprehension of the position with a view

to setting aside the result of the meeting and giving directions for the convening of a fresh meeting. That is not the relief sought by the Claimants. They want damages or equitable compensation: and to recover such they will have to show that the failure to discharge the "sufficient information" duty and the misstatement about the degree of care exercised in preparing the Circular in relation to matters known about but omitted have been causative of loss.

891.    In addressing this part of the case I shall adopt as a working assumption that the same rules as to causation and remoteness of damage apply to both equitable compensation and common-law damages. I do so because that is the basis on which the case has been run on each side.

*Causation*

892.    The essence of the Claimants' case on causation is that if the Lloyds board had recognised that they were bound to make disclosure of the existence of ELA or of the Lloyds Repo then the Acquisition would not have completed because one or more of the following events would probably have occurred, namely:-

a)    The board would have declined to proceed ("Termination"); and/or

b)    The transaction would have collapsed ("Collapse"); and/or

c)    The majority of shareholders would have voted against the transaction ("Rejection").

*Termination*

893.    The causal chain that I have labelled "Termination" can be disposed of shortly. The case has been conducted on the footing that the board knew of the use of ELA and of the Lloyds Repo. The board nonetheless unanimously recommended the Acquisition to shareholders and voted their own shares in accordance with their recommendation to others. Those directors who were asked about the matter (Mr Tookey, Mr Daniels and Mr Tate) confirmed that, if they had been told that disclosure of what they knew of ELA and the Lloyds Repo was required, then they would not on that account have terminated the transaction. Mr Tookey would have given disclosure. Mr Daniels would have thought about the terms of the demands of the regulators. Mr Tate did not know what he would have done. On the evidence the Claimants have not established that the board would have declined to proceed with the transaction.

894.    The likelihood is that the board would have put the disclosure before the shareholders together with their recommendation that the Acquisition be approved. The question of whether the Acquisition was beneficial to shareholders could not logically or properly depend on what the shareholders had to be told of the circumstances of the transaction. The board could not abandon the Acquisition simply to avoid having to comply with their equitable disclosure obligations. They could, of course, have recommended the shareholders not to approve the Acquisition if of the opinion that they could no longer recommend it as beneficial. But (i) that was not the actual view of the board, and the shareholders were entitled to be told of the genuinely held views of the board: and (ii) the board would have been obliged to explain in the Circular why it was departing from

its announced intention (which it could only achieve, in this scenario, by saying that it did not wish to disclose ELA or the Lloyds Repo).

895. A case was argued (though the material facts were not pleaded and the Defendants did not come prepared to meet it) that the Tripartite would have prevented the Lloyds board from disclosing the grant of ELA. As I shall shortly remark, there is no doubt that the Tripartite did want to keep the activities of the Bank (as a central bank) covert. It is also right to observe (as did the *Plenderleith Report* at para.270) that safe disclosure of ELA requires both (i) an assurance that the recipient has found a more permanent and credible basis for future viability without ELA and (ii) confidence that the system as a whole has stabilised sufficiently for it to absorb that information without precipitating a loss of confidence: and whilst the Circular could deal with the first requirement the second requirement posed a thorny problem as at 3 November 2008 (particularly in view of the related concerns surrounding RBS).

896. But I do not regard it as probable that the secrecy could have been successfully enforced had the Lloyds board decided upon disclosure. (i) The Tripartite could not prevent the Lloyds' board discharging what it conceived to be its duty, and whilst undoubtedly it would have influenced the shape of the disclosure into a sufficient but non-inflammatory form, I do not regard it as probable that the Tripartite could successfully have suppressed all mention of ELA (as the Chancellor's statement on 25 November 2009, to the effect that the matter was one for the Lloyds board, acknowledges). (ii) The marginal cost to the Government of pursuing partial nationalisation (by taking £12bn of shares in a "standalone" HBOS, or perhaps more) was relatively small; but the threat to the stability of the financial system by abandoning the merger (instead of issuing the Circular) and substituting partial nationalisation was very considerable. An absolutely key stability measure would be being abandoned. As Mr Mervyn King explained to the Treasury Select Committee in oral evidence on 3 November 2008:-

> "There is no doubt that when we made that recommendation [sc. the merger was a desirable outcome] we were very conscious of the difficulty facing HBOS, the merger was the right way forward, and now that it is there on the table you cannot undo it. It is a merger there, it is going to be a commercial transaction, and we will see what happens. "

897. Coupled with the result of leaving the Government with large stakes in two relatively weak competing clearing banks, I do not think it probable that the Tripartite would have chosen that outcome over a controlled disclosure of ELA in the Circular, given the choice.

898. In my judgment the first causal chain is not established.

*Collapse*

899. The Claimants' pleaded case is that if ELA and the Lloyds Repo had been disclosed to the Lloyds' shareholders then:-

      a)     The price of HBOS shares would have collapsed;

b)     It would have been "obvious" that the share exchange would result in a grossly disproportionate dilution of the Lloyds' shareholders' interest;

c)     The financial press would have written extensively on the "folly" of the Acquisition;

d)     The EGM would have been cancelled;

e)     Lloyds would have withdrawn from the arrangements proposed over the Recapitalisation Weekend.

After some general observations about this case I will look at each of these elements in turn.

900.    I begin by observing that the Tripartite undoubtedly saw a promptly announced and soundly structured takeover of HBOS by Lloyds as the answer to the concerns surrounding HBOS in September 2008 and during the following weeks. That is the basis upon which it supported a waiver of competition concerns and justified the grant of supportive ELA. It would have done whatever it could to support that takeover, though it was not going to give Lloyds a free ride and was going to extract a price for the competition waiver by ensuring that Lloyds bore a share of the risk. The Tripartite strongly preferred a capital contribution to an Enlarged Group over a complete or partial nationalisation of HBOS.

901.    I further note that it is undoubtedly the case that the Tripartite was extremely anxious to avoid disclosure of ELA and went to great lengths to keep it secret: the grant of ELA was kept within the Bank's Transaction Committee and not released to the Court of the BoE or to the Chair of the Treasury Select Committee. The former is perhaps in part explained by the presence on the Court of competitors of HBOS and of Lloyds: but the latter is a straightforward instance of a desire to preserve secrecy for its own sake. It is clear that the Tripartite did so because of the extreme fragility of the markets in which they feared a negative market reaction (from depositors and the debt and equity markets); and because they believed that the risk of disorderly failure of HBOS or of observable distress (and the effect of contagion) was of such magnitude that they did not wish voluntarily to incur it.

902.    However, great as this anxiety was, it had to be balanced by a recognition, evident in confidential papers of the Bank, that the announcement of the Acquisition had already had beneficial effects (it is common ground that it had stabilised the HBOS share price and stemmed the deposit outflow), had taken HBOS out of the firing line, had provided it with a credible long-term strategy and would pose its own risks to financial stability if it failed. Thus, once announced, failure of the merger (or indeed any rumour that the Tripartite no longer supported the merger) would harm financial stability and risk contagion in the same way.

903.    The fact that a risk is foreseen does not mean that it will eventuate. The worst fears may not be realised. The risks apprehended by those involved at the time (who were, of course, highly informed) are naturally an input into any assessment of what might have happened if real events had taken a different course: but that is all. Having identified the distinction between contemporary assessment of the risk and a retrospective analysis of a counterfactual scenario I address the individual issues.

904.    First, is it probable that upon disclosure of ELA and the Lloyds Repo there would have been a collapse of the HBOS share price? It is common ground that the reaction of a share price to the release of information depends upon the significance of the new information assessed in the light of what is already known or suspected. It is also common ground that the disclosure of bilateral central bank assistance says something about a bank's ability to fund itself.

905.    In my view *what* it says can be obscure. ELA (as its very name suggests) addresses a shortage of liquidity. Mr Sants emphasised the point when he said in Edinburgh on 15 October 2008 that the immediate issue for the banks was not their capital and that no-one had run out of capital; the problem was with liquidity. But ELA may convey a wider message. The point is made in "The Review of the Bank of England's Framework for Providing Liquidity to the Banking System" prepared by Bill Winters in October 2012. The following citation deals with why (when issues of underlying solvency and short-term illiquidity are considered) banks are special:-

> "The banking model involves running maturity mismatches, for example between the bank's short-term funding… and long term lending.… This exposes banks to liquidity risk as their borrowings may need to be paid back before they are repaid on their loans. If this risk crystallises, what started out as a liquidity problem can quickly become a solvency or viability problem. Specifically, if creditors of the bank see it as accessing a central bank liquidity facility, they may fear that the bank is insolvent or otherwise non-viable and stop lending the bank additional funds. The blurring of this distinction between liquidity and solvency makes distinguishing liquidity problems and solvency problems very difficult. This may be even more difficult to judge in times of stress. And part of the reason for stigma in central bank facilities is likely to be that the market does not believe central banks are always able and willing to make this distinction. Indeed, the solvency problem may initially manifest itself as a liquidity problem. So the discovery that a firm has used central bank liquidity can be taken as a signal that they are in trouble and may become or already be insolvent.… The link between liquidity and solvency may be self-fulfilling in some circumstances."

906.    I regard that as a fair summary of the *general* risk to which a bank would *normally* be exposed if it became known that it had accessed central bank funds. The Claimants say that it is an accurate summary of what would actually have happened in the present case had it become known that HBOS benefitted from ELA: the link between liquidity and solvency would have been self-fulfilling and the market would have reacted accordingly.

907.    The first reason they advance is because it was what was feared by informed people: not simply a fear about HBOS as an institution but a fear of the creation of a dynamic that would have been detrimental to the stability of the system. Collapse would probably have happened because it was expected to happen. ELA was a stigmatised bilateral facility and the normal consequences of accessing a stigmatised facility were to be expected.

908.    The second reason they advance is that collapse is what had in fact happened in previous cases where ELA had been disclosed. The expert evidence identifies four cases.

a)    In August 2007 it became known that Barclays had made significant use of the BoE overnight facility to the tune of £1.55bn: the cause was entirely technical but it triggered false rumours.

b)    On 13 September 2007 there was the leak of the Bank's intention to provide ELA to Northern Rock. It led to an immediate "run". Although the Bank continued to provide funding the "run" proved terminal and Northern Rock was nationalised about 5 months later.

c)    In March 2008 Bear Stearns was assailed by liquidity rumours which were trenchantly denied by its CEO; two days later J P Morgan provided an emergency loan (itself funded by the US Federal Reserve). Bear Stearns stock halved in value.

d)    In March 2008 HBOS was assailed by liquidity rumours. This led to an 18% decline in its share price and some deposit outflows. Although the true position was rapidly established the incident caused a change in the market perception of HBOS's relative strength.

The Claimants submit that there is no case in which ELA has been disclosed or rumoured that has not been followed by a "run": and no contemporaneous evidence that anybody thought that disclosure would be neutral or positive in effect.

909.    The third reason they advance is that collapse would probably have happened because savers would have withdrawn their deposits (not necessarily because *they* had reassessed HBOS but because of a fear that that is what everyone else was doing) and wholesale funders would not have extended credit. The basis for this is:-

a)    The febrile atmosphere following the Lehman Brothers failure;

b)    The extreme share price volatility that HBOS had suffered in September 2008;

c)    The fact that HBOS had suffered significant deposit outflows in September and early October 2008 (not constituting a "run") when doubts emerged about its financial stability;

d)    The desire (at the time of its grant) to keep the Lloyds Repo undisclosed for fear that it constituted "information that created an exaggerated diminishing of liquidity" (as Mr Tate put it in cross-examination).

At the heart of all these concerns is a fear of triggering a misplaced over-reaction on the part of depositors.

910.    The fourth reason they advance is the expert evidence of Mr Ellerton and of Mr Benkert.

911.    The evidence in chief of Mr Ellerton was that in his opinion disclosure of ELA would have clearly signalled to the market that HBOS was not an independently viable bank,

and that it was clearly "funding insolvent", which would have resulted in a material adverse impact upon the perceived value of HBOS, which he described as a "death spiral". But when pressed in cross-examination he made clear that he was not suggesting that the immediate reaction to the disclosure of ELA would have been an immediate collapse in the HBOS share price; indeed, that he was not suggesting that the most likely outcome was a collapse in the share price. His "nuanced" answer was:-

> "So we're going from: would it have been a collapse? Probably not. That's not the most probable outcome. Would it have had a significantly negative…? Depends on how you view "significantly negative"….Would it have had minus 5%? Minus 10%? I would have thought at least 10% but I could be wrong. It could be anything between plus 15% and minus 15%. It is impossible to put any confidence … on any forecast within that fan chart."

That "nuanced" answer was very much in line with his original view (expressed on much more limited material and after much shorter consideration) to the Defendants' solicitors that had the market known of ELA it would have had little impact because it would have been regarded as simply another funding source for banks having difficulty with funding.

912.    Fairness to Mr Ellerton requires that I also note a further "nuance" to his evidence. He was asked to express a view on the likely share price reaction to disclosure of the Lloyds Repo. He did not think such disclosure would have had a positive effect: it might demonstrate that Lloyds was committed to the transaction, but in a sense that was already known from the offer itself. He agreed that the most likely outcome of its disclosure would not be an *adverse* share price reaction, but added:-

> "Possibly not the most likely outcome; it would depend upon the circumstances of the disclosure. If it was disclosed at the same time that HBOS was receiving ELA, it is part of the ELA package, I think that would have been a likely outcome."

When tested on what "outcome" he was saying was "likely" he agreed that he was not saying that it was probable that the HBOS share price would have "collapsed", or that there would have been an impact on the Lloyds share price or on the Lloyds vote.

913.    It was Mr Benkert's view that the debt market would have reacted negatively to news that HBOS was being supported by ELA. He stated in his first report:-

> "There is a theoretical argument that suggests that if HBOS's use of ELA was disclosed then creditors would have sought comfort from the fact that the repayment of the debt was back-stopped by the central bank. In reality, however, in a market that is full of fear and angst, in my experience and, as was seen at this time, people's reaction is to get to the front of the queue to be repaid if at all possible and withdraw funding as soon as possible. This creates the pro-cyclical vicious cycle that exists in bank liquidity management where there is a perceived or an actual run on a bank. "

914.     It was the same in relation to disclosure of the Lloyds Repo:-

> "Given the highly unusual nature of this transaction, especially the unusual collateral structure and (in my view) the overly generous terms for HBOS, I believe the market would have reacted extremely negatively towards both HBOS and Lloyds had the details become known for example through disclosure in the Circular a recognised news service…… If it was also known… that he before the Bank of England had provided an alarmingly similar funding package to the same borrower it would give rise to some significant concerns that there is a co-ordinated rescue underway… Investors and creditors would in my view have been significantly concerned about such coordinated action especially in the light of the announced acquisition such that they would not have wanted to be part of it."

This evidence (which assumes a particular level of disclosure) of course relates to the anticipated reaction of the debt market, and the plea the Claimants seek to prove is that the price of HBOS *shares* would have collapsed. So it is necessary to consider (i) the likely relationship between the debt and the equity markets; (ii) the extent to which the Government, in order to ease the Acquisition to a conclusion, would have met any funding shortfall (as it continued to do for Northern Rock over the five months preceding the decision to nationalise); (iii) the message this support would have sent to debt market investors or to the equity market; and (iv) how the debt market would have treated the Enlarged Group. Item (i) was the subject of some direct evidence from the Claimants. Item (ii) was addressed in background material and in evidence from the Defendants. Items (iii) and (iv) were not specifically addressed.

915.     As to item (i), the Claimants accept that the equity market would not have reacted in exactly the same way as the debt market. Mr Benkert accepted that whilst the money market would take a negative view, equity analysts might take a different view: he suggested that with technical or complicated schemes there might be telephone exchanges, in which he assumed that the debt market view would prevail over the equity market view (though why that might be was not explored, and neither ELA nor a £10bn interbank facility seems technical or complicated). The Claimants argue that disclosure of ELA and the Lloyds Repo would have shown that HBOS was in a weaker position than other banks, that shareholders would understand that HBOS could not survive as a standalone bank and that they stood to be wiped out absent the Acquisition and that the price to be paid under the Acquisition appeared "excessive".

916.     As to item (ii) the background material discloses that the Government continued to fund Northern Rock for some five months after the leak of its ELA support whilst it sought a solution other than wholesale nationalisation of the institution: and the evidence of Mr Trippitt (the Defendants' expert) was that if there had been a withdrawal of deposits following disclosure in the HBOS Circular then the likely Government response would have been the grant of further funding. This evidence struck me as entirely coherent. Why would the Government trigger the very event it had been so anxious to avoid? Why, having promised to stabilise the system by the provision of sufficient liquidity, would it destabilise it by withholding funds requisite to see HBOS through to acquisition?

917.    Each of the principal reasons advanced by the Claimants depends upon the view that history repeats itself (or will be believed to repeat itself): and that is a very powerful argument. I do not in the end accept it because I think disclosure in the Circular would have presented a number of material differences, and there is evidence pointing the other way.

918.    The first difference is that these events are occurring (i) in a financial system that had learned lessons from Northern Rock by strengthening depositor protection so that 97% of depositors were fully protected; and (ii) after the Lehman Brothers crisis, and the clear signal sent by the Bank on 8 and 10 October 2008 that it would do whatever was necessary to end what was an historically unprecedented shutting down of global markets. I am in no doubt that these measures did (as intended) establish a "new normal" in which the Bank had ceased to act simply through open market operations, the provision of "standing facilities" and as a "lender of last resort" and had become a mainstream provider of liquidity under arrangements (the SLS) that were not transparent to the market (because the amount taken by any individual bank and the circumstances in which it sought to use SLS were not disclosed). These measures did indeed substantially reduce the "ghost run" on HBOS that had happened in September and early October 2008: in other words, the new arrangements influenced not only the technically minded market participants but also the ordinary retail and corporate depositor.

919.    The second difference is that the disclosure would have been controlled not leaked. Much of the apprehension about disclosure (and what drove the desire for secrecy) was a fear of uncontrollable and unpredictable market reaction, such as had followed the BBC leak of the plans for Northern Rock. So there was an understandable desire on the part of Lloyds and of the BoE to avoid "unforced errors". But if disclosure is required then attention can be (and would have been) focused on the manner and terms of disclosure so as to minimise the risk of damaging speculation. This was recognized to have been a possibility in the case of Northern Rock, where the Treasury Select Committee Report of January 2008 expressed the view that there was a reasonable prospect that an official announcement of the BoE support operation would have re-assured depositors, whereas the "leak" caused panic. Of course, one cannot be sure: not every controlled release successfully avoids a markedly negative reaction. But each of the other matters to which I refer is mutually reinforcing.

920.    The third difference is that the disclosure was contextualised. The grant of ELA and the use of the Lloyds Repo were not leaked or made known to the market as unanchored facts inviting speculation. A reader of the Circular would know why the ELA (and the Lloyds Repo) had been granted (to provide stable funding until completion of the Acquisition) and would know that it would not be needed by the Enlarged Group. This would reduce (though I do not consider it would eliminate entirely) the consequences of using stigmatised facilities. Stigma is related to uncertainty. I found helpful Prof Persaud's explanation at para 95 of his First Report:-

> "The economic distinction between risk and uncertainty is very relevant to stigma… Risk as articulated by economist Frank Knight is something that you can put a price on. Uncertainty is something you cannot. Stigma is not that markets believe the risk of an asset has risen to some level and that there is some compensating level of interest rate that could offset this new risk

> and draw funders back, but that there is an increase in uncertainty of future outcomes and investors do not know how to price it, and so they prefer not to have any of it at all. "

In another section he opined:-

> "What matters is whether you have certainty about how the authorities will respond to your need for liquidity… Stigma is made worse if you doubt whether the central bank is going to provide liquidity for an illiquid institution or the government will provide capital for an insolvent institution…"

Here the Circular explained what the outcome would be for HBOS depositors and for providers of credit to HBOS, removing uncertainty. There was no real doubt about the Government's intention both to provide liquidity for illiquid institutions and to subscribe for capital (though the terms of provision were not certain), nor about the Government's support for the Acquisition. If the Lloyds shareholders approved the Acquisition in accordance with the recommendation of the Lloyds board (an element of risk that could be and was constantly priced by the market, reflected in the fact that HBOS shares traded at a discount to the Lloyds offer price) their relationship would become one with the Enlarged Group. The Enlarged Group itself was one that had been scrutinized by the regulators and had been recapitalized by the Tripartite at what might well be (and in the event was) a premium to the market price. There was no need to assume the worst because the long-term future for HBOS had already been mapped out. That is crucial.

921. The fourth difference is that there is available another datum point. There was the leak of the "secret" Lloyds Repo on 9 November 2008, picked up by the Sunday Times, and then by the BBC, the Financial Times, the Daily Telegraph and the Independent and by various analysts and the main subscription services. It is right to note (i) that this "leak" did not precisely replicate the sort of disclosure that would have been contained in the Circular, in particular the very fact of disclosure in the Circular would have indicated that the transaction was one that was thought to need special mention as in some respect out of the ordinary; (ii) that a press story (however well it is said to be founded) is not the same as a statement from Lloyds; and (iii) it was not associated with any disclosure of ELA.

922. This datum point is therefore not completely aligned with the counterfactual disclosure. But Prof. Schifferes and Dr Unni are agreed that the "Sunday Times" story regarding the Lloyds Repo did not lead to significant change in the share price of HBOS (or of Lloyds). Prof. Schifferes thought that this was entirely due to the fact that the story was not confirmed by Lloyds and was not taken seriously. But it was widely reported and taken seriously; it was picked up by analysts. It was not overshadowed by the simultaneous stories relating to the two Scottish interventions (and possible foreign interest): these were not the dominant market drivers, as the Claimants suggested (contrary to the view of their expert). Indeed, the co-incidence of the stories focused attention on the very question: what did HBOS need to survive as an independent bank? In my judgment the muted market reaction does run entirely counter to the thesis that in febrile times the market would seize upon any sign of weakness and punish the institution concerned; and it does tend to favour the argument that measures supportive of a planned restructuring were at least to be viewed as neutral.

923.   The fifth difference is that, unlike the reference cases, by 3 November 2008 there was already a great deal known by the market about HBOS and its liquidity problems. There was an undoubted loss of confidence in HBOS, its Chief Executive had publicly expressed the view that its troubles were not temporary, and there was a widely held view in the market that HBOS did not in reality have an independent future. The assumed disclosures in the Circular recommending the Acquisition would thus have provided important *incremental* information about how far along the journey HBOS was, but the destination (absent the Acquisition) was already anticipated by many. HBOS would (after the Recapitalisation Weekend) have to raise £12bn as a stand-alone bank and it could look only to the Government to provide it i.e. at best partial nationalisation.

924.   It is right to observe that of course not everybody took the view that there was no truly independent future for HBOS: such people held to the view, current amongst a significant body in mid-September 2008, that this was a temporary liquidity problem that would be overcome as soon as the markets were restored - as the Scottish interventions in late October/early November 2008 show. The Claimants make the point if the disclosures would cause a material number of these market participants (who did not currently believe that HBOS had no future as a stand-alone) to re-evaluate then it would cause a material market movement. I acknowledge the theoretical point: but there is no evidence available to make the point of any utility.

925.   As to the direct expert evidence, I have already recorded that of Mr Ellerton. He was not of the view that disclosure of ELA and the Lloyds Repo would have caused a collapse in the HBOS share price. This was also the view of Mr Trippitt. He said that the market would not view these disclosures in isolation but (i) as part of the narrative contained in the whole Circular – the gaining of market share with the benefit of the competition waiver, the anticipated synergies, the expected accretion to earnings; (ii) in the context of a £660bn HBOS balance sheet; (iii) in the light of what was already known about the HBOS vulnerabilities; and (iv) against the background of the "new normal" where the central bank funding played a prominent role. By way of qualification he wrote:-

> " I would accept however that the fact that the funding facilities had to be extended reflected the severity of liquidity conditions at that time, particularly for a bank with HBOS's funding structure . "

Overall, he considered the impact of the disclosures would have been "neutral", because the deterioration in liquidity conditions generally had significantly altered analysts' and investors' perceptions of what was "normal". By "neutral" he did not mean "static" but rather fluctuating within a narrow band of -10% to +10%. His key point was this:-

> "In the eyes of the shareholder, the fact that HBOS was fully funded regardless of the source or the name or what three sets of initials we would like to give it, if it's fully funded it can be valued by the shareholder as such. And that goes right back to the heart of my hypothetical disclosure that if on 3 November the Lloyds shareholders learned that ELA was being utilised, it would be neutral, but actually it would be, as I've said before, an absolute emphatic signal from the Bank of England that it was

prepared to stand behind HBOS to get the acquisition completed."

926. This was also the view of Dr Unni. He thought that, given that the liquidity problems of HBOS were widely discussed, disclosure relating to the use of ELA and the Lloyds Repo "would have conveyed a solution to an existing problem rather than reveal a hidden problem." Although Dr Unni drew on the opinion of one analyst that evidence of support for HBOS from the BoE should lead to a recovery in the HBOS share price, I do not follow Dr Unni so far as to agree that there would have been a positive effect on the HBOS share price: in fairness, he only speculated that it "may have increased the share price".

927. There is some objective evidence that supports this view that disclosure of ELA and the Lloyds Repo would not have a negative effect. In the case of Northern Rock it was plain that it faced an idiosyncratic problem. But even though the grant of ELA was plainly "emergency liquidity assistance" there were those who regarded it as a positive indicator and bought shares: see the account at SRM Global Master Fund [2010] BCC 558 at [3]. Amongst those buyers was the fund which Mr Ellerton himself advised. It was also the evidence of the Governor of the Bank of England that the announcement of ELA for Northern Rock had the immediate effect of reassuring wholesale funders to Northern Rock: though I think that reassurance may have waned as it became increasingly apparent that there was no long term private sector solution to the Northern Rock problem (whereas the Acquisition offer price always afforded a "floor" in the case of HBOS).

928. Further, in the USA, immediately after the collapse of Lehman Brothers both Goldman Sachs and Morgan Stanley obtained permission to convert from being investment banks into being commercial banks, a move widely read as being designed to allow them to access the DWF (otherwise not available to them): this had a positive effect on their respective share prices. In the interests of balance, I should note that access to DWF was not the only benefit of conversion, and I do not seek to press the example so far as to suggest that accessing emergency funding naturally has a positive effect on the share price. All I draw from this example is that knowledge that an institution is accessing emergency funding does not necessarily cause a collapse of the share price.

929. Having reviewed the competing arguments my conclusions are these:-

    a)  If the Circular had contained disclosures of the type I have outlined above concerning ELA and the Lloyds Repo then this would have been clear incremental information (reinforced by the *simultaneous* disclosure of both ELA and the Lloyds Repo).

    b)  The immediate response of the debt market would have been negative. It is not established that the Tripartite would have refused to replace any shortage of deposits or credit occasioned by that negative reaction, and the probability is that sufficient ELA would have been made available. It is almost certain that Tripartite would not have permitted HBOS to fail as an institution because of the debt market's negative response but would have ensured that it remained funded.

265

**Approved Judgment**

c)     For an ELA operation to be successful the Bank must provide enough liquidity to bridge the gap between the initial liquidity shortage and the stable future state. To limit liquidity provision once ELA is underway would risk precipitating the systemic impact which it was the object of ELA to avoid. So from the beginning of October the Bank must have recognised that it would need to provide sufficient liquidity to provide a breathing space until HBOS acquired a permanent and credible basis for future viability.

d)     Whilst it remained an operating bank reliant (to varying degrees) until completion upon bilateral funding, HBOS shares would have continued to be traded; but the discount to the offer price would have widened because of the increased risk that the Acquisition might not be approved by the Lloyds shareholders.

e)     The widening of the discount would have been slight because the increased risk that the transaction would not be approved would be largely confounded by signals that both the Government and Lloyds wished to fund HBOS until completion.

f)     If the discount to the offer price widened and if (as the Claimants argue) the HBOS shareholders themselves thought that the price they would receive on completion of the Acquisition was "excessive" then this would disincline rational HBOS shareholders to sell and incline them to keep their shares and support the Acquisition.

g)     The inherent probabilities confirm the evidence of Mr Ellerton and of Mr Trippitt that the HBOS share price would not have collapsed. There would probably have been a mildly negative reaction: a decline of 10%-15%.

930.    A decline of 10%-15% is well short of a "collapse". The key allegation under this head is therefore not established. If ELA and the Lloyds Repo had been disclosed the HBOS share price would not have "collapsed". But I will briefly address the other pleaded points.

931.    Before doing so I would simply comment that my conclusion that disclosure would not have led to a "collapse" is not inconsistent with my view of the "materiality" of these two issues. What must be provided in a circular is information sufficient to enable an informed decision to be made (rather than simply information sufficient to justify the recommended course). But the fact that the Circular contains material which may not be supportive of the recommendation does not mean that shareholders will seize upon it and say "Well that shows the recommendation must be wrong". The *informed* decision might well be (and I think in this case would have been):-

> "The disclosure of ELA and the Lloyds Repo tells us that HBOS is further down the road to ultimate non-viability than we previously thought. But we agree with your recommendation that it is still worth our acquiring it because of the benefits it will bring us, not least the removal of a competitor."

266

932.   The second pleaded allegation raises this question: is it probable (having regard to the extent of any "collapse") that it would have been obvious that there was a gross dilution of the Lloyds' shareholders' interests? On the evidence I would answer that question in the negative. Any transaction based on a share exchange depends upon the relative share prices. There is no evidence of how the Lloyds' share price would have reacted to the assumed disclosures in the Circular and a 10%-15% decline in the HBOS price. But in any event the transaction was based on the underlying strategic value of HBOS to Lloyds: this was the point made by RiskMetrics in its commentary supporting the deal, where it said that the deal was not value-based by about strategic acquisition. The plea is really an echo of the allegation that HBOS was "valueless": but that is not an argument that the evidence supports.

933.   The third pleaded allegation raises this question: would the financial press have written about the "folly" of the Lloyds deal in the light of the disclosures? This brings focus to bear on the evidence of Prof. Schifferes. He set out to assess the probable response of the financial press to disclosure of ELA, Federal Reserve funding and the Lloyds Repo. He did so by postulating that there was a high probability that these disclosures would have been widely and negatively reported and would have led to a shift in opinion against the merger: and then examined the evidence to see if that hypothesis was *disproved*. If his hypothesis was not disproved, then he regarded the hypothesis as proved. This struck me (and still strikes me) as a very odd methodology with an inbuilt confirmation bias.

934.   I can omit consideration of those parts of his report which established that journalism was a profession, that during the financial crisis financial journalists covered the crisis, that news can and routinely does have a large effect on assets prices, that during the financial crisis there was a marked increase in media attention to banking risk, and that the BBC leak about Northern Rock led to big increase in the media coverage of that bank. I can start with the interviews with journalists.

935.   Prof. Schifferes discovered that 16 of the 17 selected journalists interviewed (they were not a random sample) thought that "disclosure" of ELA and the Lloyds Repo would have been a major story which they would have covered. The finding comes with a "health warning" that:-

> "…journalists could suffer from social desirability bias, where journalists retrospectively judge their actions in a more favourable light."

The health warning is plainly right: and I think deprives the journalists' response of almost all significance. To journalists who know the distressing outcome of the HBOS takeover the question:-

> "If you had been aware at the time of the merger that Lloyds, the Bank of England and the Federal Reserve had been providing £30bn in secret support for HBOS, would you have reported that?"

invites only one response. It is not of any worth.

936.    It is also important to understand what "disclosure" Prof Schifferes was asking the journalists to assume. He was not asking them to assume that the "disclosure" was part of the Circular or in a formal statement explaining what facilities were being provided. He was inviting their reaction to the emergence of the information *in any way*. Thus, their responses do not address the precise circumstances with which I am concerned. An answer to the question:

> "How (if at all) would you have commented upon a disclosure in the Circular that HBOS was accessing a bespoke bilateral facility at BoE pending completion of the Acquisition and had access to a £10bn facility at Lloyds for that same purpose?"

might have been illuminating.

937.    Although Prof Schifferes propounded the hypothesis that the financial press would have reacted negatively to the assumed disclosures and would have shifted sentiment against the merger, the interviews that his assistant conducted did not test that hypothesis.

938.    On the other hand, the Professor's oral evidence did disclose that in the case of Northern Rock the initial Peston "scoop" was withdrawn and "toned down" by the BBC. This does indicate a consciousness on the part of financial journalists of the need not to over-excite markets by sensationalist reporting. I am sure that any reporting of the disclosures in the Circular would not have been alarmist (even if negative). I see no reason to think that press coverage would have departed in tone or content from the range of views actually expressed by analysts and journalists (i) when commenting on the deposit outflows actually disclosed in the HBOS IMS included in the Circular or (ii) when the Lloyds Repo was uncovered. I think the probable tone and content is represented by the Reuters report of the "Sunday Times" story:-

> "The newspaper said the "covert agreement" showed how closely the two were working together ahead of [Lloyds'] agreed acquisition of Britain's biggest home lender and said the scale of support was surprising."

This was a balanced commentary, and a more reliable indicator of press treatment of disclosures than Prof. Schifferes' unproven hypothesis.

939.    I do not accept that the Claimants have proved their plea on this aspect of the case.

940.    The fourth question posed was: would the EGM have been cancelled? This was not a case that was put to any of the Defendant directors. Given that the board believed that the Acquisition was for the benefit of the Lloyds shareholders and recommended it to them, and given that I have found the effect of the assumed disclosures to have been "neutral" (in the sense of being negative to the extent of -10%) I see no basis to suppose that the EGM would have been "cancelled", or (as I think the proper approach would require) that the board would have altered its recommendation. The share price was one thing: the underlying value of the HBOS business to Lloyds was another.

941.    The fifth and final question raised on this part of the case was: would Lloyds have withdrawn from the Recapitalisation Weekend proposals (leaving the pre-recapitalisation shareholdings unaltered)? The short answer to that question is "No".

During the Recapitalisation Weekend the realistic choice facing Lloyds was to proceed with the Acquisition and raise £5.5bn: or to reject the Acquisition and recapitalise with £7bn. Not complying with the Tripartite's view that "bullet-proofing" against a severe recession over a five-year horizon required additional capital was not a realistic option. The Tripartite would have made it as difficult as possible for Lloyds to abandon the Acquisition and to decline to participate in the recapitalisation programme: and the market (parts of which were looking to Lloyds to raise additional capital in any event) would have commented adversely on the adoption of such a course.

942. In the result the second causal chain is not made out either. Since neither "Termination" nor "Collapse" is proven I turn to consider "Rejection".

### Rejection

943. The pleaded case here is that no shareholder (or at least not the requisite majority of shareholders) if "fully and properly informed" would have voted in favour of the Acquisition or of participation in the arrangements made during the Recapitalisation Weekend. The plea that not one shareholder would have voted in line with the unanimous recommendation of the board is unnecessarily ambitious. I shall focus on the "requisite majority".

944. The number of shares voted at the EGM was 3,116,962,477. There is no evidence to suggest that a greater or lesser number would have attended if the Circular had disclosed that HBOS benefitted from ELA or the Lloyds Repo; although the Claimants do have an argument about the attendance to be presumed. Of those attending 96% supported the view of the directors (and of RiskMetrics): they held 2,991,725,191 shares. 125,237,286 shares (4%) voted against the recommendation. The Claimants seek to prove that if the general body of shareholders had been "fully and properly informed" the dissentient 4% would have been joined by 1,433,234,954 votes of other shareholders (46% + 1). What is the evidence for this?

945. Of the 5800 Claimants only 9 say they would have voted differently if the ELA and Lloyds Repo had been disclosed. They held (approximately) 0.37% of the shares. Of those Messrs Bennett, Fenwick, Johnson and Scott were retail investors who gave unchallenged evidence that they would have cast their votes differently. But their shareholdings were minute: perhaps 0.005% of the total shares in Lloyds. The remainder of the witnesses gave evidence on behalf of institutional investors. Real doubt was cast on the accuracy of their evidence that they would have voted against approval by (i) the disclosure of standing instructions to vote in favour of management recommendations; (ii) the disclosure of automatic proxy voting procedures operated by RiskMetrics; (iii) the disclosure of material showing that they already held the view that HBOS was going bust and knew it had borrowed £10bn from Lloyds (notwithstanding the form of the Circular) but voted in favour nonetheless; (iv) the revelation that they had made no serious attempt to reconstruct the circumstances in which the actual decision would have fallen to be made. But I will assume that their evidence is to be accepted.

946. Let it be assumed that the Claimants who have given evidence (and did not in any event vote against the recommendation) would have changed sides and swelled the rank of the dissentients. They total (at a generous estimate) 0.55% of the voting shares. Where is the other 45.5% of the voting shares to come from to create (together with the 4%

269

actual dissentients) the majority against the Acquisition? The evidence of the Claimants does not say. Mr Hill QC simply invited me to infer that the requisite swing would have occurred.

947.    But there is no basis for such an inference. There is, for example no properly structured survey evidence of those who voted in favour of the Acquisition (or of those who did not vote) which might establish some sort of factual basis for the drawing of inferences. There is no evidence adduced from individual really big stakeholders with extensive voting rights to say they would have voted differently. One has the evidence of 13 shareholders. There is no reason to think that the small number of self-selected retail or institutional Claimants is in any way representative. There is one witness who is not a Claimant (Mr Hammond-Chambers of Hansa Trust, who was part of the dissentient minority at the EGM). What reliance can one put upon that one witness to represent the likely views of a statistically significant part of other non-claimant institutions? I think none, given that he voted "No" even on the information he had. In short, there is no material on which to found the inferences that if disclosure had been made the outcome of the vote would have been different.

948.    Such evidence as there is does not point in the direction of the suggested inference. First, the factual evidence of the Claimants itself shows that in general shareholders cast their votes in accordance with the recommendation of the board: on this counterfactual the board is recommending the transaction. This is a manifestation of what Mr Torchio called "the Wall Street walk", which he memorably encapsulated as "shareholders either vote with their hands or they vote with their feet" i.e. they will either vote in favour or they will have sold out already. Second, the factual evidence of the Claimants shows that some shareholders recognize that they simply cannot say how they would have voted in the counterfactual world. Third, the expert evidence adduced by the Claimants (Mr MacGregor and Mr Torchio) established that in general shareholders do not wish to undermine the company's management ("if the management's in favour, its highly likely that it's going to be voted in favour") and will vote in accordance with a recommendation. Fourth, analysts recognised (and advised their clients) of the risk of contagion if shareholders voted against management ("shareholders will recognise that if they block the deal they might start a storm from which Lloyds TSB itself will not be able to shelter"). Fifth, the most prominent shareholder advisers (RiskMetrics and PIRC) were both advising shareholders to vote in favour: the Claimants did not seek to prove that the advice of either body would have been different if ELA and the Lloyds Repo had been disclosed in the Circular (notwithstanding the qualified terms in which the RiskMetrics advice was tendered). All these are contra-indications.

949.    What indirect evidence might support an inference? First, the Claimants acknowledge that it was widely known that HBOS was in difficulties, at the weaker end of the spectrum, and widely viewed as not having an independent future (though they resist the suggestion that this was a consensus view). I have found that the disclosure of "ELA" and the Lloyds Repo would have been significant incremental information which would tell investors more about how far on its journey HBOS was and would have been mildly negative. Would this reaction have swayed a vote? I do not think that if the counterfactual includes the proposition that disclosure would have a mildly negative effect one can infer the overthrow of a majority of 96%. What would weigh with the Lloyds shareholders was the strategic objectives of the Acquisition not the

temporary funding arrangements pending completion. These temporary arrangements did not of themselves clearly signal that the strategic objectives would only be achieved at a cost increased by an unexpectedly deep and long recession.

950. Second, the Claimants say that that only about half the shareholder population actually voted: they submit that the Court should presume that the absent and abstaining other half did not support the proposal as it was revealed, and that if ELA and the Lloyds Repo had been revealed and reinforced the market response assumed in the counterfactual then it may be presumed that a sufficient number would have become active, all of whom would have voted against the proposal. I part company at the first stage. The fact that some people did not vote does not mean they were opposed to the proposition. They may simply have not got around to voting (whatever their view). They may have been content simply to follow the majority (whatever that view was). They might have understood that the management view is generally backed and have gambled that that would again be the case with the vote at the EGM.

951. Third, the Claimants argue (i) that the Court should infer from the 4 retail shareholders who have given evidence and from those retail shareholders who voted against the proposal that all retail shareholders would have been against the proposal if the disclosures had been made; (ii) that the Court should infer from the investment objectives of institutional shareholders that they would have taken a prudent long-term course (and *sub silentio*) that disclosure of the ELA and the Lloyds Repo arrangements pending completion of the Acquisition would have been in conflict with those objectives; and (iii) that on the evidence adduced by the Claimants it can be shown that some who voted in favour of the Acquisition did so hesitantly, so that if incremental information had been issued showing even a slightly worse position than had been previously revealed then retail and institutional investors would have voted against.

952. The tiny sample of retail and institutional investors selected to give evidence in support of the claim simply will not bear the burden of this argument. There is no basis for leaping from the evidence of 15 individuals to the conclusion that 1.4 billion votes would have been cast differently. Many shareholders would have been guided by the (correct) advice of Sir Victor that they should focus on comparing (i) Lloyds as part of the Enlarged Group and (ii) Lloyds, not as it used to be, but as it stood to be after the Recapitalisation Weekend. Many shareholders are likely to have weighed the negative signals sent by temporary central bank support against the strategic advantages and earnings accretion the Board anticipated would accrue. Some may well have gone through the same balancing exercise as the analysts at Rensburg did in early October. Their early and insightful summary suggests that a merger might mean that a well-capitalised bank is dragged down by the HBOS commercial lending, but the discount on book value gave scope for write-downs and (Rensburg suspected but a Lloyds shareholder would know) there is some sort of facility from the BoE to oil the wheels. It suggests that in some ways the deal is very positive: Lloyds gets a huge number of retail customers in a deal that would normally be blocked on competition grounds, and retail customers are more important in a world where wholesale lending has stalled. It observes that the Enlarged Group needed to get through the immediate hitches but on a 2-3-year view Lloyds should emerge strong. In other words, shareholders would focus on Lloyds, not on HBOS.

953. The Defendants raised (as an obstacle to the Claimants' argument about the creation of a majority against the recommendation) the fact that there was significant overlap

between the Lloyds and HBOS registers – an argument based on cross-holdings. The top 100 shareholders in Lloyds included 28 shareholders who collectively held 49.13% of HBOS. The top 20 shareholders in Lloyds held 29% of the shares in HBOS. They, it was suggested, would have voted on a "portfolio" basis, so that if the Claimants were right that the Acquisition was bad for Lloyds but good for HBOS then cross-holders may be presumed to vote their Lloyds shares in favour.

954. The Defendants argued that the right to vote was in essence a right of property which might be exercised by reference to the interests of the owner of the right (subject to some immaterial restraints imposed where in particular situations there is a duty to act *bona fide* in the interest of the company): they cited *Gower: Principles of Modern Company Law* (10th ed) at para 19-4, Pender v Lushington (1887) 6 ChD 70 at 75-76 and Carruth v ICI [1937] AC 707. This provoked the Claimants to respond that to exercise votes attaching to shares partly by reference to your private economic interest in other shares was unlawful, improper and impermissible since it stood to impoverish Lloyds shareholders who did not have such cross-holdings and contravened a general principle that all votes must always be exercised in a way that is *bona fide* in the interest of the company as a whole.

955. I do not intend to spend long on this debate. Assuming (as the Claimants contend) that a shareholder can only *ever* exercise a vote attaching to his share in a way that is *bona fide* in the interest of the company as a whole, whether that test is passed is something that would have to be objectively assessed. The touchstone for that would be whether an honest shareholder might reasonably hold the view that the matter under consideration was beneficial to the company. In the counterfactual scenario under consideration the board has unanimously recommended the Acquisition as beneficial to Lloyds and its shareholders and has done so without negligence. Moreover, each director who holds shares is voting the entirety of his or her shares in accordance with that recommendation. The Claimants would be unable to show that *no* honest and reasonable shareholder could have supported the Acquisition. If a cross-holder voted in favour of the Acquisition it would therefore not necessarily be because he put his private economic interests above the interests of the company as a whole. Thus, even if the Claimants' view of the law is right it does not help them. A cross-holder whose economic interests align with the course unanimously recommended by the board does not oppress a dissentient minority.

956. Nor do I see it necessary to enter into a debate about whether this is a case in which each Claimant has to prove on the balance of probabilities that but for the failure to make the ELA and Lloyds Repo disclosures he or she would have been joined by the requisite number to defeat the board's recommendation: or that he or she has to prove that a chance of doing so has been lost (and compensation adjusted accordingly).

957. The primary position of the Claimants was that they would establish on the balance of probabilities (i) that each Claimant would have voted differently if properly informed and (ii) (by inviting the Court to infer from a demonstrably representative sample of views) that sufficient retail investors and institutional investors would have voted against the proposition in a counterfactual scenario in which the board continued to recommend the transaction. But in the alternative they pleaded that because of breaches of duty by the directors each of the 5800 Claimants has lost the chance that other shareholders would have voted against the Acquisition.

958. The event which caused the loss alleged to have been suffered by each Claimant was the approval of the Acquisition. It was common ground that whether that individual Claimant had suffered loss depended not only upon how he, she or it would have altered their vote in the light of incremental knowledge, but also on how other shareholders would have reacted to that same information. The "loss causing event" would not have happened if enough shareholders had reacted in the same way as the individual claimant. The primary position of both parties was that because the question was how the individual claimant and the other identically placed shareholders would have reacted to the same external input (of incremental information) the outcome was to be determined on the balance of probabilities. "If the material had been released the meeting would have been called off". "If the material had been released the price would have halved". "If the material had been released the motion would have been defeated". The question in each such case is not how the other persons would have reacted to some input from the claimants, such as "Would they have made a bargain?" It is: "how would the body of which I am part have reacted to an outside stimulus?."

959. The Claimants favoured this approach because they said that the Claimants and the general body of shareholders were "a unity" sharing an identity of approach: in so doing they were drawing on language that had been used in Veitch v Avery [2008] PNLR 7, Dayman v Lawrence Graham [2008] EWHC 2036 and The Connaught Income Fund [2016] 2286 (Ch). They did so because they wanted to argue that it may be inferred from the evidence of the very small number of Claimants who say would have voted differently that the evidence of the very large number of shareholders whose votes had to swing to alter the outcome of the meeting would have been to the same effect.

960. To cover off the rejection of this suggested inference the Claimants argue, in line with Allied Maples [1995] 1 WLR 1602 (recently considered in Perry v Raleys [2019] UKSC 5 and Moda International Brands v Gateley [2019] EWHC 1326 (QB)) that whilst each Claimant must prove on the balance of probabilities how they would have reacted to the incremental information, they have only to show a real or substantial chance that the requisite number of other shareholders would have joined them to defeat the proposal. I think such an analysis sits uneasily in the context of company general meetings with their settled remedies for the protection of minority rights and for the correction of inequitable decisions. I think it is the law that a dissentient shareholder is bound by the result of a company meeting unless he can demonstrate that the business before the meeting was not fairly put (so that its outcome must be set aside) or there was oppression of the minority. I do not think it is the law that a dissentient shareholder is bound by the result of the meeting but can nonetheless seek compensation for breach of equitable duty (ultimately from the company) on the footing that he has lost the chance that the meeting might have reached a different view.

961. But let me grant that the analysis is sound. Assume that a defeated shareholder may allege that the directors are in breach of some duty to him and that but for their breach of duty either his proposal had a chance of acceptance by the general meeting or their proposal had a chance of rejection, for the loss of which he must be compensated. In the instant case that chance must be deep into the "speculative" end of the spectrum.

962. This is an action by a collection of individual shareholders. On this analysis each shareholder has to show that there was a real or substantial chance that had the existence of ELA been disclosed and had the existence of the Lloyds Repo been confirmed more than 1.4 billion other votes would have been cast with his own and with the existing

dissentients. Mr Hill QC submits that if the step required of an actor is clearly for his benefit then the Court will have little difficulty in concluding that it would be taken. But the step required here is to vote against the unanimous recommendation of the board made on reasonable grounds (which incorporate their assessment of the future course of events); and the supposed justification for taking that step are the suggested implications to be drawn from temporary funding arrangements. These implications (in essence that the transaction occasioned serious risks to Lloyds itself) were already spelt out in the "Risk Factors": risks arising from general and sector specific threats to the market, a further deterioration in economic conditions, further material negative adjustments to fair values, risks to borrower credit quality which might affect loan recoverability (particularly on the lower-rated HBOS corporate portfolio which was exposed to substantial increases in impairment losses), liquidity risks (especially if the Government were to withdraw liquidity support), the threat to regulatory capital posed by greater than anticipated assets impairments, reductions in Lloyds' credit ratings, all these risks and more were drawn to the attention of Lloyds shareholders. Yet 96% of the voting population supported the decision of management. That is what the expert evidence shows overwhelmingly happens: and it is what the factual evidence shows. The only factual evidence (an analysis of the disclosed voting pattern of NFU Mutual Insurance Society) showed that it voted against a management recommendation in only 0.02% of cases. The evidence of a handful of witnesses as to what they would have done is thus insufficient to establish that there was a real and substantial chance that 1.4 billion others would have joined them.

963.    In my judgment it is not established that on the balance of probabilities that if the ELA and Lloyds Repo disclosures had been made then the Acquisition would not have been approved: nor is it established that there was a real and substantial chance of that outcome occurring. Accordingly the third causal chain is not established.

## *The result*

964.    I am not persuaded that the two failures to provide sufficient information were in fact causative of any loss. The information ought to have been disclosed in the manner I have indicated in order to present a fair, candid and rounded view of the question before the Lloyds shareholders. But if the shareholders had been presented with that information they would not have reached a conclusion other than that which they did in fact reach. Despite the imperfections in the Circular the majority who approved the Acquisition did not do so under some misapprehension of the position. They knew the course recommended unanimously by the board. They knew the risks identified by the board. They knew that the board assessed the chance of advantage as outweighing the risk inherent in the transaction. If it had been disclosed that in making that assessment and recommending the transaction, the board also knew of the grant of ELA to HBOS and the use by HBOS of the Lloyds Repo until completion of the Acquisition that would not have caused a sufficient part of the 96% majority to alter their vote (nor was there any real prospect of that occurring).

965.    In the result both the recommendation and the disclosure cases fail and the claim must be dismissed.

## *Damages*

966. This means that no question of the assessment of loss arises. But I should record that on the evidence before me I would not have awarded damages.

967. The loss that the Claimants seek to recover is either:-

   a) The loss per Lloyds share occasioned by the dilution caused by (i) the acquisition of HBOS at an overvaluation and (ii) participation in the arrangements made over the Recapitalisation Weekend ("the Overpayment Measure"); or

   b) The loss per Lloyds share measured as the difference between the actual value of a share in the Enlarged Group and the assessed value of a share in a standalone Lloyds (adjusted to exclude any general decline in bank shares and any element of reflective loss) (the "Diminution Measure").

968. Although capable of statement in those two sub-paragraphs Mr MacGregor's evidence supported 14 calculations resulting in a range from 74p per share to 207p per share.

## *Remoteness*

969. The Defendants submit that each measure seeks to recover in respect of loss that is too remote, and that no Claimant can establish that the board owed a duty in respect of the kind of loss claimed. As a first step they submit that the disclosures relating to ELA and the Lloyds Repo are the provision of incremental information feeding into an overall assessment of the merits of accepting or rejecting the board's recommendation: and that since the disclosures relate to the provision of information the Defendant directors can only be responsible for the consequences of the information being incomplete. As a second step they submit that the incompleteness of the information about HBOS had no impact on the share price of Lloyds.

970. I would have accepted the Claimants' responsive argument to the first step. They argued and I accept that it is not possible to draw a bright line between the provision of advice and the provision of information. Here the board was bound to provide a recommendation together with all information necessary to enable a decision to be taken: they shaped the information that was provided to the shareholders and guided the decision-making process. If (as on this counterfactual hypothesis is the case) the absence of information about HBOS' use of ELA and the existence of the Lloyds Repo was critical to the decision whether or not to approve the transaction then I would have held that remoteness was not a bar to recovery of loss flowing from the approval of the transaction.

971. As to the second step (if relevant) I note that there is no evidence that the disclosures could have had any adverse impact on the *Lloyds* share price (which is what the quantum claims focus upon). The only suggestion is that if loss is to be assessed at the date of completion Lloyds' share price was in fact at that date *inflated* (see the Claimants' Closing at para.1972ff). I address this below.

*Overpayment*

972.    The argument here is that the non-disclosure of ELA and of the Lloyds Repo artificially inflated the price of an HBOS share so that when the share-for-share exchange occurred under the fixed ratio the Lloyds shareholders gave away more than they gained. The economic value of their shares in the Enlarged Group is different from what it should have been. I would not have awarded any damages on this basis.

973.    First, the Claimants advance this case on the basis that HBOS was valueless to Lloyds. But they adduce no actual "valuation" of HBOS (as is conceded) and I have not accepted the argument that, as a matter of principle, simply because HBOS faced liquidity difficulties it is to be treated as insolvent and subject to wholesale nationalisation that would have wiped out all shareholder value. Second, and I say this with some hesitation, if the directors did cause an overpayment for HBOS then that is a matter for the company to pursue (either directly or through a derivative action). Any individual shareholder seeking to recover that loss by means of some other cause of action would be met by an argument grounded in the principle of "reflective loss".

974.    I would have accepted the argument of Mr Hill QC that the burden lies on the Defendants to demonstrate that the "reflective loss" principle applies. The burden would not appear difficult to discharge. If Lloyds had acquired the HBOS shares for a cash consideration there is no doubt that Lloyds would have had a cause of action against any directors who negligently overpaid: and it would be for current directors or for the shareholders in general meeting (either effectively directing the existing board or by electing a new board) to cause the company to pursue that claim. If neither the directors nor a voting majority of shareholders wanted to pursue the claim, then a group of shareholders could seek to pursue a derivative action. In each case the recoveries would form part of the assets of the company. Does the fact that the consideration was not a cash payment but a new Lloyds share make any difference? Does it mean that individual shareholders can take for themselves what would otherwise have been available to the company and its creditors?

975.    Mr Hill QC submitted that the Australian decision in Pilmer v Duke Group Limited [2001] BCLC 733 demonstrated that it did: and he referred to the analysis of Dr Fidelis Oditah in "Takeovers, shareholders and the meaning of loss" (1996) 112 PQR at 425. Shortly put, the argument is that the predator company acquires the target's assets at no cost to the predator company because the predator company itself has never been entitled to the bundle of rights represented by one of its shares.

976.    The Defendants countered with the argument (based on Osborne v Inspector of Taxes [1942] 1 All ER 634) that when a company issues shares credited as fully paid in return for control of assets it is giving up the right to call for the payment of the par value in cash, and the par value of the new shares is the consideration provided by the predator for the assets taken over.

977.    As a matter of principle I would have favoured the argument of the Defendants and held that to the extent that any diminution in value through dilution of the old Lloyds shares is attributable to an overpayment for HBOS assets it is not recoverable by the Claimants as individual shareholders: I would, however, have recognised that that approach cannot provide a completely satisfactory answer (i) because an enhancement of the assets of the Enlarged Group operates for the benefit of all shareholders (including the overpaid

ex-HBOS shareholders) and (ii) if the measure of overpayment exceeds the par value of the newly issued shares then that excess can only have come from the existing Lloyds shareholders (as the careful formulation of the Claimants' damages claim, which seeks to strip out reflective loss, postulates). But I would have been bound to hold that the evidence did not establish any overpayment, because the Claimants' evidence did not include a valuation and I have rejected the case actually run (that HBOS was worthless).

978.    I should note that both Mr Hill QC and Ms Davies QC addressed reflective loss arguments only in the context of the "diminution" case and on the footing that the Defendant directors were liable for a negligent recommendation: hence the hesitation with which I express this view. But it seems to me as a matter of principle to apply also to the "overpayment" claim.

979.    Finally, I would not have awarded compensation based on dilution arising from the Recapitalisation Weekend. During that weekend the Lloyds board faced a choice each limb of which required Lloyds to undertake an inevitably dilutive capital raise. They could not avoid that choice. There was no prospect of avoiding any capital raise at all.

## *Diminution*

980.    The Claimants' case was quite complicated. In essence it seeks to measure the difference between the value of a share in the Enlarged Group and the assessed value of a share in a "standalone" Lloyds as at the Acquisition date. It does so on the footing that the Claimants succeed in their "negligent recommendation" case). Mr MacGregor first sought to identify "Pre-Acquisition Loss". For this he takes as his starting point the actual Lloyds share price on 17 September 2008 and as his end point the actual Lloyds share price on 15 January 2009 (the day before completion). He then compares that with the hypothetical share price of a "standalone Lloyds" on 15 January 2009, recalibrated from 17 September 2008 by reference to an index of banking stocks. This, of course, assumes that the Announcement had never been made.

981.    This exercise does not enable one to calculate the loss claimable by a Lloyds shareholder if the EGM had rejected the board's recommendation. On the assumption that one divides the loss calculation in the manner suggested, I think one has to look (in relation to the "Rejection" case) to compare the actual price of a Lloyds share at the date of the EGM in the events which actually happened with the hypothetical price of a Lloyds share on that date on the assumption that the EGM had not approved the merger (because of the disclosures) and Lloyds remained "standalone". But it is not possible to undertake that exercise on the evidence.

982.    Mr MacGregor then sought to identify "Post-Acquisition Loss": this is the "loss" caused by the *overvaluation* of the shares in the Enlarged Group following the Acquisition because the market "was not yet….aware of the full extent of HBOS position". The "loss" is caused when this inflation of the Enlarged Group's share price is dissipated by the release to the market of the true position. I have difficulty in seeing that reversion to "true" value is a loss recoverable by an existing holder (as opposed to it being claimed by a purchaser at an inflated price).

983.    Mr MacGregor takes as his starting point the Lloyds share price as at 15 January 2009 which he opines will have been driven primarily by the market's view of the imminent

Enlarged Group (and not by Lloyds as a standalone): I accept that opinion. He says that a "standalone" Lloyds would have been valued differently: I accept that that is possible.

984. Mr MacGregor then suggested three approaches to calculating post acquisition loss. The first is an attempt to calculate as at 15 January 2009 the value of a "standalone" Lloyds share diluted by the issuance involved in the transaction and adjusted for the value added to the Enlarged Group by merging HBOS. The method was not pressed. It is dependent upon there being a valuation of HBOS (which there is not). I would not have awarded damages on this basis.

985. The second is to take as a starting point the price of a "standalone" Lloyds share on 17 September 2008 and as an end point the price of a share in the Enlarged Group as at 26 February 2010 (by which time all information must have been in the market). The starting price of a Lloyds share is then adjusted by reference to a banking index and recalibrated to 26 February 2010. The end price of a share in the Enlarged Group is then adjusted to take account of issuance. The two adjusted prices are compared. The difference between the two is said to constitute the loss. It is said that under this method loss is not being calculated as at 26 February 2010, but rather that events down to that date are being used to illuminate "the true value" (as opposed to the market value) of a share in a "standalone" Lloyds at the completion date.

986. Although this method does not depend on a valuation of HBOS it does commence analysis as at 17 September 2008 (for which on my findings there is no warrant). I would not have awarded damages on that basis.

987. If the Court was to adopt this approach it would have to take as a starting point the price of a share in a "standalone Lloyds" as at 3 November 2008 to be its actual share price at that date (reflecting the proper state of market knowledge at that date). That was more than 50% lower than Mr MacGregor's starting point. From that base it would be necessary to recalibrate the Lloyds share price by reference to a banking index (whose constituent members all have all relevant information in the market reflected in their price), but taking into account the adverse effect of the rejection of the board's recommendation and the systemic shock caused by the failure of the Tripartite's stabilisation strategy; one might then reach a hypothetical "standalone" share price for Lloyds at the Acquisition date. Only if there were clear evidence that in the period 15 January 2008-26 February 2010 some disclosure was made that caused a shift in the share price at the disclosure date would any further adjustment need to be made. The Acquisition date is the date upon which the actual dilution of the Lloyds shares took place and the date from which the Enlarged Group was created. It would then be necessary to establish the date upon which (in this counterfactual world) Lloyds would have raised £7bn: and to establish the terms on which the Tripartite would have offered to take that capital. That recalibrated price could then be compared with the actual price of a Lloyds share on that date. Only then would it be possible to assess "loss". But none of that is possible on the evidence adduced.

988. The third approach was to take the actual share price of a share in the Enlarged Group on 26 February 2010 (by which date it is assumed full disclosure has been given) and then try to work backwards to the Acquisition date, recalibrating that share price by reference to a bank index to see what the price of a "standalone" Lloyds share might have been. This approach suffers from the twin methodological flaws of indexing over a sustained period (where shortcomings in the index become magnified) and in

assuming that any departure from the indexed performance must be attributable to some disclosure; and as a matter of principle I am unconvinced that it is proper to take some distant post-event date and then try to work back towards the assessment date. Critically it includes the actual disclosure on 24 November 2009 of the use by HBOS of ELA, which the market simply took in its stride. So I would not have awarded damages on this basis.

989.    Of necessity the previous paragraphs address damages in general terms, because the individual claimants have not adduced evidence of what Lloyds shares they held at the date of breach, and whether they retained down to the date for the assessment of damages. No Claimant actually proved loss.

990.    I should record (in case it is of any utility) my views on other disputes.

991.    I find Mr MacGregor's UK Banks Index (which is weighted by capitalisation) to be preferable to that constructed by Dr Unni (i) because it includes RBS; (ii) because it employs the methodology adopted by leading index compilers; (iii) when cross-checked against a sample period it has a high correlation with known events. I would not use it to compute mathematically to the nearest 0.01p the loss per share, because there are sensitivities for which allowance might properly be made. But I would have taken it as a good guide.

992.    Amongst the sensitivity adjustments I would have made would have been an allowance for the effect of a rejection of the Lloyds boards' recommendation of the Acquisition. In my judgment that rejection would have had a very significant effect (i) on the market generally (and in particular on bank sector shares) since it would have removed a central plank of the Tripartite's strategy for the restoration of financial stability; and (ii) a particular idiosyncratic effect on Lloyds (whose management would have lost credibility). Accordingly, Mr MacGregor's UK Banks Index would have to be adjusted for this disruptive event; and there would need to be a specific further reduction in Lloyds's hypothetical "standalone price".

993.    As to general contagion I agree with Dr Unni's opinion that a rejection would have triggered a reaction in the sector. It seems to me obvious (given (i) the Tripartite's oft-stated concern to avoid disorder in the affairs of a systemically important institution like HBOS and (ii) the nervousness of the market when the possibility of the Acquisition not completing emerged) that the necessity to abandon the Tripartite's plan and to fall back on a partial nationalisation of HBOS would have effects beyond Lloyds and HBOS themselves. In this connection I have already referred to analyst's comment: I would add the succinct observation of Robert Peston soon after the Announcement:-

> "If [Lloyds'] takeover of HBOS were to collapse, HBOS itself
> would collapse and we'd all be staring into the abyss"

It would have been the unplanned rejection by the Lloyds shareholders of the Government's package (clearance of the merger and a capital contribution) that would have been disruptive, more than the emergency partial nationalisation compelled by the adverse vote (partial nationalisation having always been in the background as less desirable option). I am unsurprised that amongst the various "events analyses" undertaken no real comparable can be found.

994.    On my findings these points do not arise for decision.

254

[1997]

[HOUSE OF LORDS]                                                A

SMITH NEW COURT SECURITIES LTD.    .    .        APPELLANT
                                        CROSS-RESPONDENT

                    AND

CITIBANK N.A.    .    .    .    .    .    .    .        RESPONDENT
                                        CROSS-APPELLANT        B


[On appeal from SMITH NEW COURT SECURITIES LTD. v. SCRIMGEOUR
    VICKERS (ASSET MANAGEMENT) LTD. AND ANOTHER]


1996    June 24, 25, 26, 27;        Lord Browne-Wilkinson, Lord Keith of Kinkel,    C
        July 1, 2, 3;                        Lord Mustill, Lord Slynn of Hadley
        Nov. 21                                        and Lord Steyn


        *Damages—Measure of damages—Misrepresentation—Sale of shares—*
        *Misrepresentation inflating price of shares above market value—*
        *Unconnected fraud later discovered likely to depress price of*
        *shares—Whether court to take account of unconnected fraud in*
        *assessing damages—Whether loss flowing from misrepresentation*    D
        *difference between price paid for shares and market value*
        *disregarding fraud*

                On 21 July 1989 an employee of the second defendant, which
        was acting as broker for the first defendant, made representations,
        subsequently discovered to be false, that in buying shares in a
        public company the plaintiff would be competing with two other    E
        bidders, that he would disclose the competing bids after the
        plaintiff had made its bid and that two other named companies
        had made bids. The plaintiff bought 28,141,424 shares in the
        company at 82¼p each with a view to holding them as a market-
        making risk and selling them when an appropriate opportunity
        arose. By September 1989 it became known that a fraud had been
        perpetrated on the company, which caused a slump in the value
        of its shares. Between 20 November 1989 and 30 April 1990 the    F
        plaintiff sold the shares in small parcels for a total of just over
        £11m. It brought an action against both defendants for damages.
        The judge dismissed the action against the first defendant but
        found that the plaintiff was entitled to recover damages from the
        second defendant equivalent to the difference between the price
        paid and the true value of the shares, which he found to be 44p
        each as at 21 July 1989. The judge found that if there had been
        no misrepresentation the plaintiff would have offered 78p for    G
        each share. The Court of Appeal allowed the second defendant's
        appeal, holding that, although the judge had misdirected himself
        on one aspect of the facts, his decision on liability of the second
        defendant was correct on other grounds. The court concluded
        that the correct measure of damages was the difference between
        the price per share actually paid by the plaintiff of 82¼p and the
        price which, in the absence of misrepresentation, the shares would    H
        have fetched on the open market on 21 July 1989, namely 78p,
        and reduced the damages to £1,196,010.
                On appeal by the plaintiff and cross-appeal by the second
        defendant:—

A.C.                Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))

*Held*, (1) dismissing the cross-appeal, that the second and third representations made by the employee were proved, but not the first; that the judge had found ample evidence for the conclusion that in the absence of those representations the plaintiff would have withdrawn from the transaction; and that, accordingly, the essentials of the tort of deceit were established (post, pp. 260B–C, 268G–269C, G–H, 278A–D).

(2) Allowing the appeal, that where a contract was induced by fraudulent misrepresentation the measure of damages was reparation for all the loss directly caused by entering the transaction, whether or not it was foreseeable, and included consequential loss; that the plaintiff was under a duty to mitigate his loss once he became aware of the fraud and that he had to give credit for any benefit received including, as a general rule, the market value of property acquired at the date of acquisition; but that the general rule as to market value at the date of acquisition would not normally apply where the misrepresentation continued to operate so as to induce the plaintiff to retain the asset, or where the circumstances were such that by reason of the fraud the plaintiff was locked into the property; and that, accordingly, in the circumstances since the plaintiff's loss flowed directly from the acquisition of the shares rather than from their retention and since to require it to give credit for a value of 78p per share as at the date of acquisition would not compensate it for its loss since it could not have sold the shares at that price on that date, the correct measure was the difference between the price paid and the amount subsequently realised on sale (post, pp. 264H–265E, 266H–267C, 268A–D, G–269A, C–D, F–H, 281G–H, 282B–E, 285F–286A).

Dictum of Lord Atkin in *Clark v. Urquhart* [1930] A.C. 28, 68, H.L.(N.I.) and *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158, C.A. applied.

*Twycross v. Grant* (1877) 2 C.P.D. 469, D.C. and C.A.; *Waddell v. Blockey* (1879) 4 Q.B.D. 678, C.A.; *Peek v. Derry* (1887) 37 Ch.D. 541, C.A. and *McConnel v. Wright* [1903] 1 Ch. 546, C.A. considered.

Dicta of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426, 443G, 444B, C.A. disapproved.

Decision of the Court of Appeal [1994] 1 W.L.R. 1271; [1994] 4 All E.R. 225 reversed.

The following cases are referred to in the opinions of their Lordships:

*Arkwright v. Newbold* (1881) 17 Ch.D. 301, Fry J. and C.A.
*Attorney-General of Hong Kong v. Wong Muk Ping* [1987] A.C. 501; [1987] 2 W.L.R. 1033; [1987] 2 All E.R. 488, P.C.
*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Broome v. Speak* [1903] 1 Ch. 586, C.A.
*Cemp Properties (U.K.) Ltd. v. Dentsply Research & Development Corporation* [1991] 2 E.G.L.R. 197, C.A.
*Clark v. Urquhart* [1930] A.C. 28, H.L.(N.I.)
*County Personnel (Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987] 1 W.L.R. 916; [1987] 1 All E.R. 289, C.A.
*Davidson v. Tulloch* (1860) 2 L.T. 97, H.L.(Sc.)
*Dodd Properties (Kent) Ltd. v. Canterbury City Council* [1980] 1 W.L.R. 433; [1980] 1 All E.R. 928, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.

256

*Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158; [1969] 2 W.L.R. 673;  A
    [1969] 2 All E.R. 119, C.A.
*East v. Maurer* [1991] 1 W.L.R. 461; [1991] 2 All E.R. 733, C.A.
*H. (Minors) (Sexual Abuse: Standard of Proof), In re* [1996] A.C. 563; [1996]
    2 W.L.R. 8; [1996] 1 All E.R. 1, H.L.(E.)
*IBL Ltd. v. Coussens* [1991] 2 All E.R. 133, C.A.
*Johnson v. Agnew* [1980] A.C. 367; [1979] 2 W.L.R. 487; [1979] 1 All E.R. 883,
    H.L.(E.)
                                                                       B
*Livingstone v. Rawyards Coal Co.* (1880) 5 App.Cas. 25, H.L.(Sc.)
*McConnel v. Wright* [1903] 1 Ch. 546, C.A.
*Overseas Tankship (U.K.) Ltd. v. Morts Dock & Engineering Co. Ltd. (The
    Wagon Mound)* [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1 All E.R.
    404, P.C.
*Pasley v. Freeman* (1789) 3 Durn. & E. 51
*Peek v. Derry* (1887) 37 Ch.D. 541, C.A.; (1889) 14 App.Cas. 337, H.L.(E.)
*Potts v. Miller* (1940) 64 C.L.R. 282                                                        C
*Royscot Trust Ltd. v. Rogerson* [1991] 2 Q.B. 297; [1991] 3 W.L.R. 57; [1991]
    3 All E.R. 294, C.A.
*Ruxley Electronics and Construction Ltd. v. Forsyth* [1996] A.C. 344; [1995]
    3 W.L.R. 118; [1995] 3 All E.R. 268, H.L.(E.)
*Shepheard v. Broome* [1904] A.C. 342, H.L.(E.)
*Smith Kline & French Laboratories Ltd. v. Long* [1989] 1 W.L.R. 1; [1988]
    3 All E.R. 887, C.A.                                                              D
*Toteff v. Antonas* (1952) 87 C.L.R. 647
*Twycross v. Grant* (1877) 2 C.P.D. 469, D.C. and C.A.
*Waddell v. Blockey* (1879) 4 Q.B.D. 678, C.A.
*Yorkshire Dale Steamship Co. Ltd. v. Ministry of War Transport* [1942] A.C.
    691; [1942] 2 All E.R. 6, H.L.(E.)


The following additional cases were cited in argument:                             E

*Akerhielm v. De Mare* [1959] A.C. 789; [1959] 3 W.L.R. 108; [1959] 3 All E.R.
    485, P.C.
*Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45; [1986] 3 W.L.R. 414;
    [1986] 3 All E.R. 468, C.A.
*Bradford Third Equitable Benefit Building Society v. Borders* [1941] 2 All E.R.
    205, H.L.(E.)
*Clemance v. Hollis* [1987] 2 N.Z.L.R. 471                                              F
*Cornwall Coast Country Club v. Cardgrange Ltd.* [1987] 1 E.G.L.R. 146
*Electricity Supply Nominees Ltd. v. London Clubs Ltd.* [1988] 2 E.G.L.R. 152
*Gould v. Vaggelas* (1985) 157 C.L.R. 215
*Hinchcliffe v. Crabtree* [1972] A.C. 707; [1971] 3 W.L.R. 821; [1971] 3 All E.R.
    967, H.L.(E.)
*Hontestroom, S.S. v. S.S. Sagaporack* [1927] A.C. 37, H.L.(E.)
*Jamal v. Moolla Dawood Sons & Co.* [1916] 1 A.C. 175, P.C.                    G
*Khoo Sit Hoh v. Lim Thean Tong* [1912] A.C. 323, P.C.
*Lynall, decd., In re* [1972] A.C. 680; [1971] 3 W.L.R. 759; [1971] 3 All E.R.
    914, H.L.(E.)
*Montgomerie & Co. Ltd. v. Wallace-James* [1904] A.C. 73, H.L.(Sc.)
*Nautamix B.V. v. Jenkins of Retford Ltd.* [1975] F.S.R. 385
*Onassis and Calogeropoulos v. Vergottis* [1968] 2 Lloyd's Rep. 403, H.L.(E.)
*P. Caland and Freight (Owners of the) v. Glamorgan Steamship Co. Ltd.* [1893]  H
    A.C. 207, H.L.(E.)
*Quinn v. Leathem* [1901] A.C. 495, H.L.(I.)
*Reg. v. Secretary of State for the Home Department, Ex parte Khawaja* [1984]
    A.C. 74; [1983] 2 W.L.R. 321; [1983] 1 All E.R. 765, H.L.(E.)

A      *Reg. v. Wolverhampton Coroner, Ex parte McCurbin* [1990] 1 W.L.R. 719;
          [1990] 2 All E.R. 732, C.A.
       *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
          3 All E.R. 785, H.L.(E.)
       *Watt or Thomas v. Thomas* [1947] A.C. 484; [1947] 1 All E.R. 582, H.L.(Sc.)


B      APPEAL and CROSS-APPEAL from the Court of Appeal.
       This was an appeal by the plaintiff, Smith New Court Securities Ltd.
("Smith"), and a cross-appeal by the second defendant, Citibank N.A.,
pursuant to leave to appeal granted on 8 December 1994 by the Appeal
Committee of the House of Lords (Lord Keith of Kinkel, Lord Browne-
Wilkinson and Lord Lloyd of Berwick) and leave to cross-appeal granted
on 31 January 1995 by the Appeal Committee (Lord Keith of Kinkel,
C      Lord Mustill and Lord Lloyd of Berwick) from a decision dated
17 February 1994 of the Court of Appeal (Nourse, Rose and
Hoffmann L.JJ.). The court allowed an appeal by Citibank from an order
dated 25 March 1992 of Chadwick J. and varied the order by, inter alia,
substituting £1,196,010, for £10,764,005, which were awarded by the judge
to Smith by way of damages.
       In an action by Smith against the first defendant, Scrimgeour Vickers
D      (Asset Management) Ltd., to which Citibank was added as the second
defendant, the judge found, dismissing the action against the first
defendant that Smith was induced to enter into an agreement to buy
certain shares in Ferranti International Signal Plc. by false and fraudulent
representations made by Citibank's representative. The judge, accordingly,
decided that Smith was entitled to recover damages of £10,754,005,
together with interest from Citibank. That sum represented the difference
E      between the price paid by Smith and the true value of the shares at the
date of acquisition.
       The first defendant took no part in the appeals.
       The facts are stated in the opinions of Lord Browne-Wilkinson and
Lord Steyn.


F      *Jonathan Sumption Q.C.* and *Anthony Mann Q.C.* for Citibank. Where
a serious allegation, such as fraud, is made in civil proceedings, the
requirements of the civil standard of proof do not differ materially from
those of the criminal standard: see *Reg. v. Secretary of State for the Home
Department, Ex parte Khawaja* [1984] A.C. 74; *Reg. v. Wolverhampton
Coroner, Ex parte McCurbin* [1990] 1 W.L.R. 719 and *In re H. (Minors)
G      (Sexual Abuse: Standard of Proof)* [1996] A.C. 563, 586–587, *per* Lord
Nicholls of Birkenhead.
       An appellate court ought not to disagree with a judge's assessment of
the credibility of a witness, unless there is some demonstrable error on the
judge's part: see *Khoo Sit Hoh v. Lim Thean Tong* [1912] A.C. 323, 325;
*S.S. Hontestroom v. S.S. Sagaporack* [1927] A.C. 37, 47, *per* Lord Sumner
and *Akerhielm v. De Mare* [1959] A.C. 789, 806.
H      The fact that a judge does not mention some evidence specifically
should not be taken to mean that he did not have it in mind: *Watt or
Thomas v. Thomas* [1947] A.C. 484 and *Onassis and Calogeropoulos v.
Vergottis* [1968] 2 Lloyd's Rep. 403, 431.

*Anthony Grabiner Q.C., Ian Glick Q.C.* and *John McCaughran* for Smith. The court of last resort ought not to disturb concurrent findings of facts made by the courts below unless those findings are clearly erroneous: see *Halsbury's Laws of England,* 4th ed., vol. 10 (1975), pp. 340–341, para. 744; *Owners of the P. Caland and Freight v. Glamorgan Steamship Co. Ltd.* [1893] A.C. 207 and *Montgomerie & Co. Ltd. v. Wallace-James* [1904] A.C. 73.

The appropriate measure of damages is the sum of money which will put the injured party in the same position as he would have been in if he had not sustained the wrong: *Livingstone v. Rawyards Coal Co.* (1880) 5 App.Cas. 25. If there had been no fraud Smith would not have made the agreement and would not have suffered loss. That loss is the difference between the real value of the shares and the price paid by Smith. The real value is the value as at the date of acquisition. Alternatively, Smith is entitled to its realised loss, i.e. to recover the difference between the price it paid and what it sold the shares for. The Court of Appeal's decision will result in a fraudster's charter since a fraudster, for a small price, can save himself or his company large sums of money. If that decision is right *Twycross v. Grant* (1877) 2 C.P.D. 469; *Peek v. Derry* (1887) 37 Ch.D. 541; *Waddell v. Blockey* (1879) 4 Q.B.D. 678 have to be overruled in so far as they establish that the date on which the value has to be assessed is the date of acquisition.

The real value may be different from the market price which, at the time of purchase, may be a mistaken estimate of the value. Where the market has been misled, not by the defendant but by someone else, the market price is no less a mistaken estimate of the value. Economic theory reflected in the market price from time to time is no substitute for a sound rule of law: see *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45, 64. *In re Lynall, decd.* [1972] A.C. 680 is not in point. [Reference was also made to *Hinchcliffe v. Crabtree* [1972] A.C. 707 and *Potts v. Miller* (1940) 64 C.L.R. 282 and *Toteff v. Antonas* (1952) 87 C.L.R. 647.]

All relevant evidence is admissible to prove a contested allegation of fact: see *Peek v. Derry*, 37 Ch.D. 541; *Davidson v. Tulloch* (1860) 2 L.T. 97; *Twycross v. Grant,* 2 C.P.D. 469; *Waddell v. Blockey*, 4 Q.B.D. 678; *Broome v. Speak* [1903] 1 Ch. 586; *Shepheard v. Broome* [1904] A.C. 342 and *Clark v. Urquhart* [1930] A.C. 28.

Damages for fraud and for breach of contract are assessed differently. In the case of fraud the plaintiff is entitled to damages for whatever sum he has lost by the fraud: see *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158, 166–167, 171. As to damages for negligence, see *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. [Reference was also made to *Gould v. Vaggelas* (1985) 157 C.L.R. 215; *Cemp Properties (U.K.) Ltd. v. Dentsply Research & Development Corporation* [1991] 2 E.G.L.R. 197 and *Royscot Trust Ltd. v. Rogerson* [1991] 2 Q.B. 297.]

In other branches of the law the courts have adopted a flexible approach to damages. In assessing damages for breach of contract for the sale of land, there is no absolute rule requiring the value of the land to be assessed as at the date of breach. The court has power to fix such other date as may be appropriate in the circumstances: see *Johnson v. Agnew*

A   [1980] A.C. 367, 400–401. The plaintiff has a duty to mitigate his loss: see *Treitel, The Law of Contract*, 9th ed. (1995), pp. 864–865. The principle of assessment by reference to the time of breach is based on two assumptions: first, that the injured party knows of the breach as soon as it is committed, and second, that he is able, immediately following the breach, to resort to the market so as to mitigate his loss. Where the plaintiff can be said to have assumed to himself the risk of the market

B   falling, he may not recover from the defendant loss occasioned by a fall in the market: see *Jamal v. Moolla Dawood Sons & Co.* [1916] 1 A.C. 175.

*Sumption Q.C.* resuming. In any process of valuation of shares it has to be assumed that there is a willing buyer and a willing seller, that the buyer knows matters which are within the public knowledge, and that the negotiations are conducted at arm's length. The measure of damages in a

C   share dealing is the difference between the price paid by the buyer and the market value of the shares at the date of the transaction. The market value is determined by evidence of the price at which they could have been bought and sold between willing parties: see *Electricity Supply Nominees Ltd. v. London Clubs Ltd.* [1988] 2 E.G.L.R. 152 and *Cornwall Coast Country Club v. Cardgrange Ltd.* [1987] 1 E.G.L.R. 146. Later events are irrelevant. ˙

D   The victim of a fraudulent representation is entitled only to the actual damage directly flowing from the fraud: see *Clark v. Urquhart* [1930] A.C. 28, 68. Prima facie the victim's loss cannot exceed the difference between what he paid and what he received at the time he received it. The assessment of damages as at that date is usually necessary in order to exclude loss caused by extraneous or coincidental factors: see *Waddell v.*

E   *Blockey*, 4 Q.B.D. 678. The date of the transaction is the same as the date of the breach of duty, the breach being incomplete until the misrepresentation is acted on: *Peek v. Derry*, 37 Ch.D. 541, 591–594 and *Twycross v. Grant*, 2 C.P.D. 469, 544–545, 546. *Davidson v. Tulloch*, 2 L.T. 97, a case of a misrepresentation in a prospectus, is not in point. The courts will not allow a defendant to take advantage of his own default. A fair value is the one which is arrived at without the influence of

F   deceit: *Broome v. Speak* [1903] 1 Ch. 586 and *Potts v. Miller* (1940) 64 C.L.R. 282.

Foreseeability does not arise in fraud. The intention to injure negatives all excuses and disposes of any question of remoteness of damage: see *Quinn v. Leathem* [1901] A.C. 495, 536–537; *Nautamix B.V. v. Jenkins of Retford Ltd.* [1975] F.S.R. 385 and *Clemance v. Hollis* [1987] 2 N.Z.L.R.

G   471, 478–479. Consequential damages for fraud are not limited to what was foreseeable: *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158. [Reference was also made to *Target Holdings Ltd. v. Redferns* [1996] A.C. 421.]

Where the defendant's breach of duty is alleged to have caused the plaintiff to suffer loss in relation to property, damages are awarded as at the date of breach of duty. But this rule is displaced in special cases where

H   assessment at another date may more accurately reflect the overriding compensatory rule: see *County Personnel (Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987] 1 W.L.R. 916. If the plaintiff would have suffered loss even where the representation had been the appropriate

conclusion would, ordinarily, be that the loss did not flow from the    A
representation: see *Downs v. Chappell* [1997] 1 W.L.R. 426.

*Grabiner Q.C.,* in reply, referred to *Peek v. Derry* (1889) 14 App.Cas.
337, 374–375 and *Bradford Third Equitable Benefit Building Society v.
Borders* [1941] 2 All E.R. 205, 211.

Their Lordships took time for consideration.                            B

21 November.  LORD BROWNE-WILKINSON.  My Lords, I have had
the advantage of reading in draft the speech to be delivered by my noble
and learned friend, Lord Steyn. As to the issue of liability raised by the
cross-appeal, I agree with his reasoning and conclusions: I would restore
the judge's finding that Smith New Court Securities Ltd. ("Smith") had
established that Citibank N.A. (through Mr. Roberts) fraudulently        C
induced Smith to purchase the Ferranti shares by making the second and
third representations, but not the first representation.

The damages issue which is the subject matter of the appeal raises for
decision for the first time in your Lordships' House the question of the
correct measure of damages where a plaintiff has acquired property in
reliance on a fraudulent misrepresentation made by the defendant. The    D
position in the present case is complicated by the fact that there are two
frauds involved. The first, "Roberts fraud," is the fraudulent representation
made by Mr. Roberts on behalf of Citibank on 21 July 1989 which
induced Smith to buy 28,141,424 Ferranti shares for £23,141,424. The
second, "Guerin fraud," is the fraud practised by Mr. Guerin on Ferranti.
Although the Guerin fraud was committed before 21 July 1989, its
existence was unknown to Citibank, Smith, Ferranti and the market until   E
after that date. Shortly stated the question is who should bear the risk of
the Guerin fraud: Smith (which still held the Ferranti shares when the
Guerin fraud was discovered) or Citibank which by its servant had
fraudulently induced Smith to buy the Ferranti shares.

The relevant facts lie within a comparatively narrow compass. The
judge held that Smith bought the Ferranti shares at $82\frac{1}{4}$p as a market-
making risk, i.e. with a view to holding them on its books over a         F
comparatively long period to be sold on at a later date. He further held
that Smith would not have bought at that price at all apart from the
Roberts fraud. Such a purchase is to be contrasted with a "bought deal"
where the market maker buys the shares with a view to its agency branch
selling them on in smaller parcels to its clients, such sales usually taking
place within a matter of hours. The judge held that, if Smith had been    G
considering a bought deal, it could not have bid more than 78p, at which
price Citibank would not have sold to Smith. From these facts, two points
emerge: first, as a result of the Roberts fraud Smith bought the Ferranti
shares with a view to holding them for a comparatively long period;
second, if Smith had bid on the basis of a bought deal, it would not have
acquired the shares.

The history of the Ferranti shares subsequent to 21 July 1989 was as    H
follows. On 11 August 1989 Ferranti published its annual reports and
accounts for the year ending 31 March 1989 which confirmed the results
stated in a preliminary announcement made on 14 July 1989. On

11 September 1989 the directors of Ferranti announced that information had come to their attention which required a restatement of the 1989 accounts. At their request dealing in Ferranti shares was suspended. On 29 September the chairman of Ferranti wrote to the shareholders telling them that Ferranti had been the victim of a major fraud by Mr. Guerin. Trading in Ferranti shares resumed on 3 October. On 17 November Ferranti published its revised audited accounts which showed that the effect of the Guerin fraud was even worse than had been thought.

Smith had retained all the Ferranti shares which it had bought on 21 July. But from 20 November 1989 onwards Smith began to trickle these shares onto the market and obtained prices ranging from 49p down to 30p. By 30 April 1990 it had sold them all for a total of £11,788,204, i.e. at a loss of £11,353,220. It was not suggested at the trial that Smith's retention of the shares until November 1989 or their subsequent sales were in any way unreasonable.

The judge found that Smith first learned of Mr. Roberts fraud on 5 December 1989 although there was evidence to suggest that by mid-November 1989 Smith was suspicious of the truth of Mr. Roberts's representations. On 2 January 1990 solicitors for Smith wrote to Citibank purporting to rescind the contract for the purchase of the 28m. Ferranti shares. At the trial, the claim to rescind was persisted in until the closing speech for Smith when it was expressly abandoned for reasons not examined before your Lordships. Thereafter the only claim by Smith has been for damages for deceit. Both before the trial judge, Chadwick J., and the Court of Appeal, Nourse, Rose and Hoffmann L.JJ., the argument proceeded on the basis that, where a fraudulent misrepresentation has induced the plaintiff to enter into a contract of purchase, the measure of damages is, in general, the difference between the contract price and the true open market value of the property purchased, *valued as at the date of the contract of purchase*. This was the law as laid down in a series of cases decided at the end of the 19th century, usually in relation to shares purchased in reliance on a fraudulent prospectus: see *Twycross v. Grant* (1877) 2 C.P.D. 469; *Waddell v. Blockey* (1879) 4 Q.B.D. 678; *Peek v. Derry* (1887) 37 Ch.D. 541 and subsequently treated as settled law by the Court of Appeal in *McConnel v. Wright* [1903] 1 Ch. 546. It was common ground that there was one exception to this general rule: where the open market at the transaction date was a false market, in the sense that the price was inflated because of a misrepresentation made to the market generally *by the defendant*, the market value is not decisive: in such circumstances the "true" value as at the transaction date has to be ascertained but with the benefit of hindsight: *McConnel v. Wright*.

Now in the present case the market value of the Ferranti shares at the transaction date (21 July 1989) was inflated, since the existence of the Guerin fraud was then unknown: there was, in one sense, a false market. But that false market was not attributable to the fraud of the defendant, Citibank: the Roberts fraud had no impact on the open market price. The difference between Chadwick J. and the Court of Appeal lay in the fact that Chadwick J. held that there was a latent defect (i.e. the Guerin fraud) in the Ferranti shares and that, even though the false market was not due to the fraud of Citibank, he had to find the "true" value of the Ferranti

262

shares, using hindsight. He accordingly valued the Ferranti shares at what A would have been their open market value had the market known of the Guerin fraud on 21 July 1989. The judge fixed this value at 44p per share giving a total true value of the shares on the transaction date of £12,382,226. He accordingly awarded as damages the difference between the contract price and that figure, i.e. £10,764,005.

The Court of Appeal on the other hand took the view that it was only B legitimate, in the case of quoted shares, to depart from the market price as at the transaction date where that price was falsified *by the defendant's misrepresentation.* In all other cases the market value has to be taken to be the quoted value. The Court of Appeal therefore reduced the damages to £1,196,010, being the difference between the contract price and the value of the shares at 78p a share, being the value at which on 21 July C 1989 Smith itself would have been prepared to buy. The Court of Appeal was conscious that, in so holding, they were throwing the whole risk of catastrophic events onto the innocent purchaser rather than the fraudulent vendor. But they held that such injustice stemmed from the rigidity of two rules (both of which had been common ground before them): first, the denial of rescission where a plaintiff cannot return in specie the very shares which were the subject matter of the fraudulent sale; second, the D rule which requires the damages to be calculated as at the date of sale.

As to the first rule referred to by the Court of Appeal, the reasons why Smith abandoned their claim to rescind were not explored before your Lordships. I will therefore say nothing about the point save that if the current law in fact provides (as the Court of Appeal thought) that there is no right to rescind the contract for the sale of quoted shares once the E specific shares purchased have been sold, the law will need to be closely looked at hereafter. Since in such a case other, identical, shares can be purchased on the market, the defrauded purchaser can offer substantial restitutio in integrum which is normally sufficient.

As to the second rule referred to by the Court of Appeal—the rule requiring damages to be assessed as at the date of the transaction— Mr. Grabiner, for Smith, submitted that the basis on which the F 19th century cases were decided was erroneous and that later decisions show the right approach to the assessment of damages. I agree with those submissions and rather than consider the sterilities of the argument surrounding the 19th century cases proceed at once to consider the more modern law.

As ever in considering damages in tort, the starting point must be to G repeat, yet again, the well known statement of Lord Blackburn in *Livingstone v. Rawyards Coal Co.* (1880) 5 App.Cas. 25, 39:

"I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages you should as nearly as possible get that sum of money which will H put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation."

263

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          Lord Browne-Wilkinson

A    To that statement he added these important words which are less frequently quoted:

"That must be qualified by a great many things which may arise— such, for instance, as by the consideration whether the damage has been maliciously done, or whether it has been done with full knowledge that the person doing it was doing wrong. There could be no doubt that there you would say that everything would be taken into view that would go most against the wilful wrongdoer—many things which you would properly allow in favour of an innocent mistaken trespasser would be disallowed as against a wilful and intentional trespasser on the ground that he must not qualify his own wrong, and various things of that sort."

C    In *Clark v. Urquhart* [1930] A.C. 28, 67–68, Lord Atkin cast doubt on whether the measure of damages laid down in the 19th century cases as summarised in *McConnel v. Wright* [1903] 1 Ch. 546 was correct. He said:

"I find it difficult to suppose that there is any difference in the measure of damages in an action of deceit depending upon the nature of the transaction into which the plaintiff is fraudulently induced to enter. Whether he buys shares or buys sugar, whether he subscribes for shares, or agrees to enter into a partnership, or in any other way alters his position to his detriment, in principle, the measure of damages should be the same, and whether estimated by a jury or a judge. I should have thought it would be based on the actual damage directly flowing from the fraudulent inducement. The formula in *McConnel v. Wright* may be correct or it may be expressed in too rigid terms. I reserve the right to consider it if it should ever be in issue in this House."

In the High Court of Australia, Dixon J. in *Potts v. Miller* (1940) 64 C.L.R. 282, 299–300, whilst loyally applying the old inflexible rule was plainly unhappy with it: see also *Toteff v. Antonas* (1952) 87 C.L.R. 647.

F    The decision which restated the law correctly is *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158. In that case the plaintiff had been induced by the fraudulent misrepresentation of the defendant to buy an ironmonger's business for £4,500 plus stock at a valuation of £5,000. Shortly after the purchase, he discovered the fraud and started the action. But despite this he had to remain in occupation: "he had burned his boats and had to carry on with the business as best he could." After three years, he managed to sell the business for £3,700, but in the meantime he had incurred business debts. Lord Denning M.R., after referring to Lord Atkin's dictum, stated the principle as follows, at p. 167:

"On principle the distinction seems to be this: in contract, the defendant has made a promise and broken it. The object of damages is to put the plaintiff in as good a position, as far as money can do it, as if the promise had been performed. In fraud, the defendant has been guilty of a deliberate wrong by inducing the plaintiff to act to his detriment. The object of damages is to compensate the plaintiff for all the loss he has suffered, so far, again, as money can do it. In contract, the damages are limited to what may reasonably be supposed

to have been in the contemplation of the parties. In fraud, they are   A
not so limited. The defendant is bound to make reparation for all the
actual damages directly flowing from the fraudulent inducement. The
person who has been defrauded is entitled to say: 'I would not have
entered into this bargain at all but for your representation. Owing to
your fraud, I have not only lost all the money I paid you, but, what
is more, I have been put to a large amount of extra expense as well
and suffered this or that extra damages.' All such damages can be   B
recovered: and it does not lie in the mouth of the fraudulent person
to say that they could not reasonably have been foreseen. For
instance, in this very case Mr. Doyle has not only lost the money
which he paid for the business, which he would never have done if
there had been no fraud: he put all that money in and lost it; but also
he has been put to expense and loss in trying to run a business which   C
has turned out to be a disaster for him. He is entitled to damages for
all his loss, subject, of course to giving credit for any benefit that he
has received. There is nothing to be taken off in mitigation: for there
is nothing more that he could have done to reduce his loss. He did
all that he could reasonably be expected to do."

In the same case Winn L.J. said, at p. 168:   D

"It appears to me that in a case where there has been a breach of
warranty of authority, and still more clearly where there has been a
tortious wrong consisting of a fraudulent inducement, the proper
starting point for any court called upon to consider what damages
are recoverable by the defrauded person is to compare his position
before the representation was made to him with his position after it,   E
brought about by that representation, always bearing in mind that no
element in the consequential position can be regarded as attributable
loss and damage if it be too remote a consequence: it would be too
remote not necessarily because it was not contemplated by the
representor, but in any case where the person deceived has not himself
behaved with reasonable prudence, reasonable common sense, or can
in any true sense be said to have been the author of his own   F
misfortune. The damage that he seeks to recover must have flowed
directly from the fraud perpetrated upon him."

The damages awarded by the Court of Appeal in that case were
calculated (admittedly on a rough and ready basis as to the figures) as
follows, at pp. 169–170. The plaintiff was treated as having lost £9,500,
the price paid for the business and stock. Against this, he had to give   G
credit for £3,500, i.e. not for the value of the business at the transaction
date but for the amount he actually received on the resale of the business
three years later. To this £3,500 there were added other benefits which he
had received so as to give a total of £7,000 benefits received to be set
against the sum lost of £9,500, i.e. a balance of loss of £2,500. In addition,
the plaintiff was awarded by way of consequential damages the sum of
£3,000 in respect of liabilities incurred by him in running the business.   H
Thus the total award for direct and consequential damages was £5,500.

   *Doyle v. Olby (Ironmongers) Ltd.* establishes four points. First, that
the measure of damages where a contract has been induced by fraudulent

265

A.C.            Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))    Lord Browne-
                                                                        Wilkinson

A    misrepresentation is reparation for all the actual damage directly flowing
     from (i.e. caused by) entering into the transaction. Second, that in
     assessing such damages it is not an inflexible rule that the plaintiff must
     bring into account the value as at the transaction date of the asset
     acquired: although the point is not adverted to in the judgments, the basis
     on which the damages were computed shows that there can be
     circumstances in which it is proper to require a defendant only to bring
B    into account the actual proceeds of the asset provided that he has acted
     reasonably in retaining it. Third, damages for deceit are not limited to
     those which were reasonably foreseeable. Fourth, the damages recoverable
     can include consequential loss suffered by reason of having acquired the
     asset.
         In my judgment *Doyle v. Olby (Ironmongers) Ltd.* was rightly decided
C    on all these points. It is true, as to the second point, that there were not
     apparently cited to the Court of Appeal the 19th century cases which
     established the "inflexible rule" that the asset acquired has to be valued as
     at the transaction date: the successful appellant was not legally represented.
     But in my judgment the decision on this second point is correct. The old
     "inflexible rule" is both wrong in principle and capable of producing
     manifest injustice. The defendant's fraud may have an effect continuing
D    after the transaction is completed, e.g. if a sale of gold shares was induced
     by a misrepresentation that a new find had been made which was to be
     announced later it would plainly be wrong to assume that the plaintiff
     should have sold the shares before the announcement should have been
     made. Again, the acquisition of the asset may, as in *Doyle v. Olby
     (Ironmongers) Ltd.* itself, lock the purchaser into continuing to hold the
E    asset until he can effect a resale. To say that in such a case the plaintiff
     has obtained the value of the asset as at the transaction date and must
     therefore bring it into account flies in the face of common sense: how can
     he be said to have received such a value if, despite his efforts, he has been
     unable to sell.
         *Doyle v. Olby (Ironmongers) Ltd.* has subsequently been approved and
     followed by the Court of Appeal in *East v. Maurer* [1991] 1 W.L.R. 461
F    and *Downs v. Chappell* [1997] 1 W.L.R. 426. In both cases the plaintiffs
     had purchased a business as a going concern in reliance on the defendant's
     fraudulent misrepresentation. In each case after discovery of the fraud
     they sold the business at a loss and recovered by way of damages the
     difference between the original purchase price and the price eventually
     realised on a resale, i.e. the old date of transaction rule was not applied.
G    In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997]
     A.C. 191 your Lordships treated the measure of damages for fraud as
     being in a special category regulated by the principles of *Doyle v. Olby
     (Ironmongers) Ltd.*
         Turning for a moment away from damages for deceit, the general rule
     in other areas of the law has been that damages are to be assessed as at
     the date the wrong was committed. But recent decisions have emphasised
H    that this is only a general rule: where it is necessary in order adequately
     to compensate the plaintiff for the damage suffered by reason of the
     defendant's wrong a different date of assessment can be selected. Thus in
     the law of contract, the date of breach rule "is not an absolute rule: if to

266

follow it would give rise to injustice, the court has power to fix such other    A
date as may be appropriate in the circumstances:" *per* Lord Wilberforce
in *Johnson v. Agnew* [1980] A.C. 367, 401A. Similar flexibility applies in
assessing damages for conversion (*IBL Ltd. v. Coussens* [1991] 2 All E.R.
133) or for negligence (*Dodd Properties (Kent) Ltd. v. Canterbury City
Council* [1980] 1 W.L.R. 433). As Bingham L.J. said in *County Personnel
(Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987] 1 W.L.R. 916,
925–926:    B

> "While the general rule undoubtedly is that damages for tort or
> breach of contract are assessed at the date of the breach . . . this rule
> also should not be mechanistically applied in circumstances where
> assessment at another date may more accurately reflect the overriding
> compensatory rule."

C

In the light of these authorities the old 19th century cases can no
longer be treated as laying down a strict and inflexible rule. In many cases,
even in deceit, it will be appropriate to value the asset acquired as at the
transaction date if that truly reflects the value of what the plaintiff has
obtained. Thus, if the asset acquired is a readily marketable asset and
there is no special feature (such as a continuing misrepresentation or the
purchaser being locked into a business that he has acquired) the    D
transaction date rule may well produce a fair result. The plaintiff has
acquired the asset and what he does with it thereafter is entirely up to
him, freed from any continuing adverse impact of the defendant's wrongful
act. The transaction date rule has one manifest advantage, namely that it
avoids any question of causation. One of the difficulties of either valuing
the asset at a later date or treating the actual receipt on realisation as    E
being the value obtained is that difficult questions of causation are bound
to arise. In the period between the transaction date and the date of
valuation or resale other factors will have influenced the value or resale
price of the asset. It was the desire to avoid these difficulties of causation
which led to the adoption of the transaction date rule. But in cases where
property has been acquired in reliance on a fraudulent misrepresentation
there are likely to be many cases where the general rule has to be departed    F
from in order to give adequate compensation for the wrong done to the
plaintiff, in particular where the fraud continues to influence the conduct
of the plaintiff after the transaction is complete or where the result of the
transaction induced by fraud is to lock the plaintiff into continuing to
hold the asset acquired.

Finally, it must be emphasised that the principle in *Doyle v. Olby*    G
*(Ironmongers) Ltd.* [1969] 2 Q.B. 158, strict though it is, still requires the
plaintiff to mitigate his loss once he is aware of the fraud. So long as he
is not aware of the fraud, no question of a duty to mitigate can arise. But
once the fraud has been discovered, if the plaintiff is not locked into the
asset and the fraud has ceased to operate on his mind, a failure to take
reasonable steps to sell the property may constitute a failure to mitigate
his loss requiring him to bring the value of the property into account as    H
at the date when he discovered the fraud or shortly thereafter.

In sum, in my judgment the following principles apply in assessing the
damages payable where the plaintiff has been induced by a fraudulent

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          Lord Browne-Wilkinson

misrepresentation to buy property: (1) the defendant is bound to make reparation for all the damage directly flowing from the transaction; (2) although such damage need not have been foreseeable, it must have been directly caused by the transaction; (3) in assessing such damage, the plaintiff is entitled to recover by way of damages the full price paid by him, but he must give credit for any benefits which he has received as a result of the transaction; (4) as a general rule, the benefits received by him include the market value of the property acquired as at the date of acquisition; but such general rule is not to be inflexibly applied where to do so would prevent him obtaining full compensation for the wrong suffered; (5) although the circumstances in which the general rule should not apply cannot be comprehensively stated, it will normally not apply where either (a) the misrepresentation has continued to operate after the date of the acquisition of the asset so as to induce the plaintiff to retain the asset or (b) the circumstances of the case are such that the plaintiff is, by reason of the fraud, locked into the property. (6) In addition, the plaintiff is entitled to recover consequential losses caused by the transaction; (7) the plaintiff must take all reasonable steps to mitigate his loss once he has discovered the fraud.

Before seeking to apply those principles to the present case, there are two points I must make. First, in *Downs v. Chappell* [1997] 1 W.L.R. 426, Hobhouse L.J. having quantified the recoverable damage very much along the lines that I have suggested, sought to cross-check his result by looking to see what the value of the business would have been if the misrepresentations had been true and then comparing that value to the contract price. Whilst Hobhouse L.J. accepted that this was not the correct measure of damages, he was seeking to check that the plaintiff was not being compensated for a general fall in market prices (for which the defendant was not accountable) rather than for the wrong done to him by the defendant. In my view, such a cross-check is not likely to be helpful and is conducive to over-elaboration both in the evidence and in argument. Second, in *Royscot Trust Ltd. v. Rogerson* [1991] 2 Q.B. 297 the *Doyle v. Olby (Ironmongers) Ltd.* measure of damages was adopted in assessing damages for innocent misrepresentation under the Misrepresentation Act 1967. I express no view on the correctness of that decision.

How then do those principles apply in the present case? First, there is no doubt that the total loss incurred by Smith was caused by the Roberts fraud, unless it can be said that Smith's own decision to retain the shares until after the revelation of the Guerin fraud was a causative factor. The Guerin fraud had been committed before Smith acquired the shares on 21 July 1989. Unknown to everybody, on that date the shares were already pregnant with disaster. Accordingly when, pursuant to the Roberts fraud, Smith acquired the Ferranti shares they were induced to purchase a flawed asset. This is not a case of the difficult kind that can arise where the depreciation in the asset acquired between the date of acquisition and the date of realisation may be due to factors affecting the market which have occurred after the date of the defendant's fraud. In the present case the loss was incurred by reason of the purchasing of the shares which were pregnant with the loss and that purchase was caused by the Roberts fraud.

268

Can it then be said that the loss flowed not from Smith's acquisition but from Smith's decision to retain the shares? In my judgment it cannot. The judge found that the shares were acquired as a market-making risk and at a price which Smith would only have paid for an acquisition as a market-making risk. As such, Smith could not dispose of them on 21 July 1989 otherwise than at a loss. Smith were in a special sense locked into the shares having bought them for a purpose and at a price which precluded them from sensibly disposing of them. It was not alleged or found that Smith acted unreasonably in retaining the shares for as long as they did or in realising them in the manner in which they did.

In the circumstances, it would not in my judgment compensate Smith for the actual loss they have suffered (i.e. the difference between the contract price and the resale price eventually realised) if Smith were required to give credit for the shares having a value of 78p on 21 July 1989. Having acquired the shares at $82\frac{1}{4}$p for stock Smith could not commercially have sold on that date at 78p. It is not realistic to treat Smith as having received shares worth 78p each when in fact, in real life, they could not commercially have sold or realised the shares at that price on that date. In my judgment, this is one of those cases where to give full reparation to Smith, the benefit which Smith ought to bring into account to be set against its loss for the total purchase price paid should be the actual resale price achieved by Smith when eventually the shares were sold.

Finally I must mention a point raised by Mr. Sumption, namely, that it is not open to Smith to argue before your Lordships that the damages should be assessed in the manner which I have proposed. On the pleadings, the damages claimed were the difference between the contract price and either the "true" value on 21 July 1989 or their value when the fraud was discovered. Mr. Sumption urged, in addition to the point on the pleadings, that it would be unfair to Citibank to entertain the new argument since, if the point had been pleaded Citibank would itself have pleaded and led evidence of a failure by Smith to mitigate its loss and as to the reasonableness of Smith's conduct.

Although the pleading point is technically correct (and could be cured by amendment) I am not satisfied that Citibank is prejudiced by allowing this point to be argued before your Lordships. In opening his case before the judge, Mr. Grabiner conceded that, in any event, he could not recover more than Smith's actual realised loss. It could therefore have been an issue at the trial, if Citibank had chosen to make it one, whether Smith should have sold earlier or at a better price. Indeed, as I understand it, those matters were investigated in that context at the trial and the judge found that Smith had acted reasonably. In the circumstances, I can see no injustice to Citibank in deciding this case on the new point raised before your Lordships.

For these reasons I would hold that the damages recoverable amount to £11,352,220 being the difference between the contract price and the amount actually realised by Smith on the resale of the shares. However, as there was no appeal by Smith against the judge's assessment of the damages at £10,764,005, Smith's claim must be limited to that latter amount. I would therefore allow the appeal and restore the judge's order.

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))

A    LORD KEITH OF KINKEL. My Lords, for the reasons given in the speeches to be delivered by my noble and learned friends, Lord Browne-Wilkinson and Lord Steyn, which I have read in draft and with which I agree, I would allow the appeal, dismiss the cross-appeal and restore the order of the trial judge as to damages.

B    LORD MUSTILL. My Lords, the speech to be delivered by my noble and learned friend, Lord Steyn, deals with both liability and damages. On the issue of liability I gratefully adopt the analysis of law and fact, and agree that in respect of the second and third occasions it has, but in respect of the first it has not, been established that an actionable mis-representation was made by Citibank N.A. (acting through Mr. Roberts) to Smith New Court Securities Ltd. I also agree that the conclusion C    regarding the first occasion, which differs from that of the Court of Appeal, does not affect the liability of Citibank for having induced Smith to enter into the purchase of Ferranti shares.

On the question of damages I further agree that they should be assessed on the basis of the difference between the contract price and the amount actually realised by Smith on the resale, and would therefore D    allow the appeal and restore the award of the trial judge on damages. On this aspect of the dispute I wish, however, to add a very few words. Notwithstanding the high authority of its source I cannot regard the judgment of Lord Denning M.R. in *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158 as an invariable guide to the assessment of damages for fraudulent misrepresentation. The appeal in that case was not fully argued by counsel. The judgments were not reserved and do not sit very easily E    together. To my mind the propositions which on the argument of the present appeal were sought to be extracted from the decision were painted with too broad a brush to deal accurately with all the problems which may arise. True, the assessment of damages often involves so many unquantifiable contingencies and unverifiable assumptions that in many cases realism demands a rough and ready approach to the facts. True also F    that in a case of fraud there are good reasons for departing in some respect from the ordinary rules: and the irrelevance of foreseeability provides an example. Nevertheless, there are instances where more is required in the way of analysis than can be found in *Doyle v. Olby (Ironmongers) Ltd.*, and this is one. For my part, I would suggest that in the future when faced with situations such as the present courts would do well to be guided by the seven propositions set out by my noble and G    learned friend, Lord Browne-Wilkinson in the latter part of his speech. The fourth and fifth of these are, I believe, amply sufficient to show that the damages awarded by the judge ought to be upheld.

LORD SLYNN OF HADLEY. My Lords, I have had the advantage of reading the text of the speech prepared by my noble and learned friends, H    Lord Browne-Wilkinson and Lord Steyn. I agree that for the reasons they give the appeal of Smith New Court Securities Ltd. should be allowed and that the order of Chadwick J. as to damages be restored and that the cross-appeal on liability should be dismissed.

270

LORD STEYN.   My Lords, there is an appeal and cross-appeal against the judgment of the Court of Appeal dated 17 February 1994 to be considered. The Court of Appeal upheld a judgment dated 25 March 1992 by Chadwick J. so far as he concluded that the plaintiff in an action in the Chancery Division had established actionable fraudulent misrepresentations in respect of the sale of a parcel of shares. Despite the fact that Chadwick J. had come to his conclusions in a witness action the Court of Appeal held that he had misdirected himself on one aspect of the issues of fact on liability. Accordingly the Court of Appeal felt free to consider the case afresh without being rigidly bound by all the judge's findings of fact. In the result the Court of Appeal affirmed the judgment on liability of Chadwick J. on additional grounds. The correctness of the Court of Appeal's decision on liability is the subject matter of the cross-appeal. The arguments on the cross-appeal were addressed to issues of pure fact. Moreover, in material respects the arguments of counsel for the cross-appellant challenged concurrent findings of fact of the trial judge and the Court of Appeal.

By contrast the appeal challenges the decision of the Court of Appeal on a question of principle, namely the correct measure of damages in an action for deceit. The judge adopted a valuation method to assess damages and held that the buyers were entitled to damages in a sum of the order of £10·7m. In arriving at this conclusion the judge took into account a subsequent fall in the value of the shares, which was caused by a pre-existing and unconnected fraud which had been perpetrated on the company concerned. The Court of Appeal ruled that as a matter of law the judge applied the wrong measure of damages, and that the correct measure was the difference between the price paid by the buyer and the price which, absent the misrepresentations, the shares would have fetched on the open market on the acquisition date. It was common ground that on that date the fraud perpetrated by the third party was not known to the market. On this basis the Court of Appeal reduced the damages to which the buyers were entitled to a sum of the order of £1·1m.

My Lords, a detailed review of the testimonial battleground at trial has left me in no doubt that the cross-appeal ought to be dismissed. I will have to explain my reasons for this firm conclusion in some detail. The helpful judgments of Chadwick J. [1992] B.C.L.C. 1104 and the Court of Appeal [1994] 1 W.L.R. 1271 are now reported. It is therefore possible to deal with the cross-appeal on liability somewhat more economically than would otherwise have been the case. I will then turn to the important question of law as to the correct legal measure of damages. I will explain why I think that the appeal should be allowed and that the award of damages made by Chadwick J. should be restored.

### Liability

#### The story of the Ferranti shares

In July 1988 Citibank N.A., a company carrying on business as a bank in London, made available a loan facility of £23m. to Parent Industries Inc., a United States company. As security for the loan Parent charged 28m. shares in Ferranti International Signal Inc. to Citibank.

271

Mr. Guerin, a former director of Ferranti, was the beneficial owner of Parent. Mr. Peck was Mr. Guerin's man at Parent and occupied the position of president. By mid-July 1989 Parent was in default under the loan agreement. Citibank was urgently considering the realisation of the security for its loan. In the phrase often used at the trial it was a "forced sale" situation.

On 21 July 1989 Citibank, acting through the brokers Scrimgeour Vickers (Asset Management) Ltd., sold the 28m. Ferranti shares to Smith New Court Securities Ltd. ("Smith") for about £23m., the price per share being 82p. Mr. Roberts, a senior employee of Citibank and director of Scrimgeour, arranged the sale. In doing so he dealt with Mr. Lewis and Mr. Abrahams, two directors of Smith and market-makers by occupation.

At the trial the case of Smith was that Mr. Roberts induced Smith by fraudulent misrepresentations to buy the Ferranti shares. In order to understand the nature of Smith's case it is necessary to explain the vicissitudes of the value of shares in Ferranti. On 14 July 1989 Ferranti made a preliminary announcement of its financial results for the year ended 31 March 1989. On the basis of that information the market value of the parcel of Ferranti shares was probably of the order of 78p to 82p per share, i.e. a few pence lower than the prices quoted on the Stock Exchange. Ferranti, Citibank and Smith, as well as the individuals acting for these companies, and the market generally, did not know that a massive fraud had been perpetrated on Ferranti. In real terms the market price of the Ferranti shares on 21 July 1989 was a fictitious price. There was a false market in Ferranti shares. The fact of the fraud and its impact on the value of Ferranti shares only became known in September 1989. By a letter of 29 September 1989 together with unaudited group accounts the Chairman of the Board of Ferranti explained to shareholders that the fraud had caused a reduction in the net worth of the Ferranti Group as at 31 March 1989 of approximately £170m. (from £370·8m. to £198·5m.) and a reduction in profit for the year of approximately £18m. (from £29·3m. to £10·9m.). In November 1989 Ferranti published the revised audited accounts for the year ended 31 March 1989. Those accounts confirmed the pessimistic predictions made in late September. In these changed circumstances, and between 20 November 1989 and 30 April 1990, Smith disposed of the Ferranti shares by selling them in the market in relatively small parcels at prices ranging from 49p per share to 30p per share. The difference between the total price paid by Smith and the total of the prices received was £11·3m.

That brings me to the events of 21 July 1989 so far as they are relevant to the alleged fraudulent misrepresentations. In order to render the shape of the case intelligible it will be necessary to give a chronological account of the sequence of events, with the rival contentions of the parties as to the principal disputes interspersed. Shortly before 9.30 a.m. on 21 July 1989 Mr. Roberts asked Mr. Lewis whether Smith would be interested in buying the Ferranti shares. At 9.43 a.m. Mr. Lewis phoned Mr. Roberts. Mr. Abrahams was also a party to the conversation. The discussion lasted 13 minutes. Mr. Lewis confirmed that Smith was interested in purchasing the Ferranti shares. Smith's case was that during the conversation

Lord Steyn        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

Mr. Roberts said that Smith would be in competition with two other bidders interested in buying the Ferranti shares, namely a company in the Citicorp Group and another bidder not in the securities industry. Mr. Roberts identified the first company as Citicorp Scrimgeour Vickers Ltd. ("C.S.V."), a company carrying on business as stockbrokers and market makers in London. This was the first alleged representation. At trial Mr. Roberts said that he went no further than to say that there were at least two other parties interested. There was in fact no bidder for the Ferranti shares from outside the securities industry. The dispute as to what was said in the 9.43 a.m. conversation was a major issue at the trial. What was not in issue was that Mr. Lewis and Mr. Abrahams came to believe that Smith would be in competition for the Ferranti shares with a bidder from outside the securities industry.

Following the 9.43 a.m. conversation, Mr. Abrahams and Mr. Lewis attended a meeting with other employees of Smith to discuss whether Smith should bid for the Ferranti shares and, if so, at what price. Mr. Lewis and Mr. Abrahams told those present at the meeting that Smith would be bidding in competition against C.S.V. and one other bidder from outside the securities industry. The decision taken at the meeting was that Smith should bid 82p per share. The reasoning that led to this decision is of some relevance. The facts are common ground. Smith had a choice. It could have bought the shares as a "bought deal" or as a market-making risk. The first would have involved Smith buying the Ferranti shares and selling them through Smith's agency arm, at a profit, within a matter of hours to institutional clients. In a transaction of the magnitude of buying 28m. shares in Ferranti it would have been normal for Smith to do a bought deal. Instead Smith chose to do a transaction of the second type. This involved buying the shares with a view to holding them as a market-making risk and only selling them as and when the opportunity or opportunities to do so might arise. Smith took the view that the Ferranti shares could not be sold to institutional clients at a price above 80p per share without a recommendation to clients, which Smith's agency arm was not prepared to give. In order to do a bought deal Smith would have had to buy the Ferranti shares at below 80p. If Smith had not believed that it was in competition with a bidder from outside the securities industry, it would have bid for the shares at a price consistent with doing a bought deal at a profit. That price would have been 78p per share. It was agreed that if Smith had bid 78p per share, the bid would not have been accepted by Citibank.

In the presence of Mr. Abrahams, Mr. Lewis telephoned Mr. Roberts at 10.42 a.m. This call lasted about two minutes. It was made some 20 minutes after the conclusion of the pricing meeting. At the trial Mr. Lewis and Mr. Abrahams testified that Mr. Lewis told Mr. Roberts that Smith had decided to bid for the Ferranti shares; that Mr. Lewis asked him to attend at Smith's offices so that Smith could make the bid in person; and that Mr. Lewis asked Mr. Roberts to bring with him the other two bids in sealed envelopes to Smith's offices. Mr. Roberts agreed that Mr. Lewis asked him to come to Smith's offices to hear the bid. But Mr. Roberts denied that anything else was said about bringing the other bids in sealed envelopes.

Mr. Roberts arrived at the offices of Smith shortly after noon. A meeting then took place between Mr. Roberts and three employees of Smith, namely Mr. Lewis, Mr. Abrahams and Mr. Marks. Mr. Marks had been present at the pricing meeting. It is common ground that Mr. Lewis said that Smith would bid 82p per share. Mr. Roberts did not have authority to accept the bid but he said that he would recommend the bid. What is in dispute is the rest of the conversation. Mr. Lewis said that Mr. Roberts said at the start of the meeting that he would disclose the competing bids after Smith had made its bid. This was called the second representation. Mr. Lewis, Mr. Abrahams and Mr. Marks said that after Mr. Lewis made the bid at 82p Mr. Roberts said that Aeritalia (an Italian company) had bid 81p for the shares and C.S.V. had bid 75–77p. This was called the third representation. Mr. Roberts said that he made no mention of bids: he said that he said that Aeritalia and C.S.V. had given indications in the 81p and 75–77p regions. Neither Aeritalia nor C.S.V. had made any bid. It was conceded that if the second and third representations had been made, they would have been fraudulently made.

Mr. Roberts returned to his office and told the decision-makers at Citibank about the bid. While the bid had formally lapsed because it was not immediately accepted Smith remained a willing buyer of the Ferranti shares at 82p per share throughout the afternoon. Shortly after 5 p.m. on the same day the bargain was struck. It was done in a telephone conversation between Mr. Lewis and Mr. Abrahams, on the Smith side, and Mr. Fisher, a director and senior dealer at Scrimgeour. The main reason for the additional ¼p was to establish that the contract was made after trading hours on Friday 21 July, so that it would not have to be reported under Stock Exchange rules until the following business day.

The rest of the story can be taken quite briefly. After the suspension of Ferranti shares in September 1989, Smith started to investigate the circumstances in which it had purchased the Ferranti shares. Smith discovered that Aeritalia had never bid for the Ferranti shares. That discovery led to the institution of the proceedings in January 1990.

*The trial and the judgment of Chadwick J. on liability*

The trial took place between 25 November 1991 and 17 January 1992. The judge gave judgment [1992] B.C.L.C. 1104 on 25 March 1992. He found that in advance of earlier criminal proceedings against Mr. Roberts Serious Fraud Office officials had asked Mr. Lewis and Mr. Abrahams to pool their recollections; that they falsely denied this at the criminal trial; and that in the civil trial they falsely pretended that they had forgotten how their statements came into existence. In the result the judge found that the first representation, which depended exclusively on the evidence of Mr. Lewis and Mr. Abrahams, had not been proved. But, in the light of the totality of the evidence before him, the judge found that Mr. Roberts had made the second and third representations on behalf of Citibank; that those representations were false; and that Smith had been induced to enter into the contract by those fraudulent misrepresentations.

*The appeal and the judgment of the Court of Appeal*

Citibank appealed against the judge's findings on liability. Smith served a respondent's notice which invited the Court of Appeal to uphold the

Lord Steyn        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

judge's conclusions on liability on additional grounds. And that is what    A
the Court of Appeal did. The Court of Appeal [1994] 1 W.L.R. 1271 held
that the judge had misdirected himself in respect of the 9.43 a.m.
conversation by considering the credibility and reliability of Mr. Lewis
and Mr. Abrahams in isolation. After a review of all the evidence the
Court of Appeal found, as a matter of fact, that all three representations
were made and made fraudulently and that they induced Smith to enter
into the contract. In the result the Court of Appeal dismissed Citibank's    B
appeal on liability.

*The submissions for Citibank*

    Counsel for Citibank put in the forefront of his submissions the
undisputed proposition that while as a matter of law fraud only has to be
proved to the civil standard, proof to that standard must necessarily take    C
into account the consideration that the more serious the allegation is, the
greater the proof is needed to persuade a court that it can be satisfied that
the allegation is established. In other words, the very gravity of an
allegation of fraud is a circumstance which has to be weighed in the scale
in deciding as to the balance of probabilities: *In re H. (Minors) (Sexual
Abuse: Standard of Proof)* [1996] A.C. 563, 586C–587F, *per* Lord Nicholls    D
of Birkenhead. But counsel accepted that both Chadwick J. and the Court
of Appeal correctly directed themselves in accordance with this standard.
    Counsel for Citibank reviewed the minutiae of the evidence. He
highlighted undoubted inconsistencies between the accounts of Mr. Lewis
and Mr. Abrahams. He argued that there were improbabilities inherent in
their accounts. But throughout his speech there was the theme that since
Chadwick J. found on proper grounds that Mr. Lewis and Mr. Abrahams    E
had lied it is impossible to sort out in their evidence truth from falsehood.
That is an argument worthy of careful consideration. It has rightly been
said that a cocktail of truth, falsity and evasion is a more powerful
instrument of deception that undiluted falsehood. It is also difficult to
detect. But counsel had to face the fact that on the third representation
Mr. Marks supported the accounts of Mr. Lewis and Mr. Abrahams. And    F
at the trial counsel never challenged the credibility of Mr. Marks. Counsel
for Citibank put the matter quite simply: he said Mr. Marks's evidence
was too thin a thread to bear the weight of an elaborate case of fraud.
Moreover, counsel argued that the Court of Appeal was not entitled to
substitute their view for that of the judge on the first representation. Once
it was accepted that the first representation had not been proved he said
that it was simply impossible to be satisfied that the second and third    G
representations were made. In the broadest outline these were the principal
submissions of counsel for Citibank.

*The approach to an attack on concurrent findings of fact*

    The principle is well settled that where there has been no misdirection
on an issue of fact by the trial judge the presumption is that his conclusion    H
on issues of fact is correct. The Court of Appeal will only reverse the trial
judge on an issue of fact when it is convinced that his view is wrong. In
such a case, if the Court of Appeal is left in doubt as to the correctness of

A.C.          **Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))**          Lord Steyn

A    the conclusion, it will not disturb it. That is the first difficulty in the way of upholding the arguments of counsel for Citibank. But there is an additional obstacle. The Court of Appeal upheld the findings of fact of the trial judge on the actionability of the second and third representations. While the jurisdiction of the House is not in doubt, it is most reluctant to disturb concurrent findings of fact. There are two reasons for this approach. First, the prime function of the House of Lords is to review

B    questions of law of general public importance. That function it cannot properly discharge if it often has to hear appeals on pure fact. This point is underlined by the fact that, despite the economy of presentation of counsel, the hearing on liability lasted more than three days. Secondly, in the case of concurrent findings of fact, the House is confronted with the combined views of the first instance judge and the Court of Appeal.

C    A suggestion that the House can be expected to take a different view on concurrent findings *of fact* generally gives rise to an initial sense of disbelief. Nevertheless, I must examine the merits of the argument of counsel for Citibank.

*The reasons why the concurrent findings are unassailable*

D    It seems to me that there are five principal reasons why the attack on the concurrent findings of fact must fail. First, having found that Mr. Lewis and Mr. Abrahams had lied on a collateral matter, the judge approached their evidence with great caution. Rightly, he rejected the notion that falsity in one thing involves falsity in all. Reviewing their accounts as to the second and third representations against the whole body of evidence he accepted, as he was entitled to do, their accounts.

E    Secondly, the judge was plainly considerably influenced by the fact that on the third representation Mr. Marks in all material respects supported Mr. Lewis and Mr. Abrahams. He accepted the evidence of Mr. Marks. Thirdly, it is not in dispute that between 10 a.m. and 10.30 a.m. on the morning of 21 July 1989, at the pricing meeting, which was attended by Mr. Lewis, Mr. Abrahams and Mr. Marks, Smith fixed their bid at 82p on the footing that they would be bidding in competition with two other

F    bidders, one of whom was from outside the securities industry. This fact strongly supported Smith's case. Fourthly, while disputed by counsel for Citibank, it seems to me inescapable that on Citibank's theory of the case, Mr. Lewis and Mr. Abrahams fabricated the story that they had been told that there were other bidders and the price of the bids several months before the issue of misrepresentation arose. There is the undisputed

G    evidence of Mr. Smith, another employee of Smith, that the account of the rival bids surfaced on 21 July 1989, i.e. the day of the transaction. Given this fact, and Mr. Marks's evidence, the theory of a fabrication is absurd. Fifthly, as against these factors, the judge had to weigh the evidence of Mr. Roberts. The judge rejected Mr. Roberts's evidence. That necessarily involved a finding that Mr. Roberts gave untruthful evidence. The judge was entitled to take this course. Taking into account counsel's

H    submissions I have reviewed the whole of the evidence of Mr. Roberts, given over more than two days. He was a most unimpressive witness. He testified that at the midday meeting he had said that Aeritalia had given an indication (shorthand for saying they were interested parties) at 81p. It

276

Lord Steyn        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

is perfectly clear, however, that Aeritalia was only interested in an option    A
to buy the Ferranti shares for two months. The sale of the shares was,
however, a matter of urgency and both Citibank and Parent, acting
through Mr. Peck, wanted an outright sale. Mr. Roberts said that he had
been told by another Citibank employee that Mr. Peck had said that
Aeritalia might make an outright bid. In Mr. Roberts's own words that
was "a zero possibility" by midday on 21 July 1989. Cumulatively, these
five factors are sufficient in the particular circumstances of this case to    B
demonstrate convincingly that the attack on the concurrent findings of
Chadwick J. and the Court of Appeal must be rejected. In sustaining the
second and third representations as actionable fraudulent misrepresenta-
tions Chadwick J. in my judgment came to a correct conclusion. So far as
the Court of Appeal affirmed the findings of Chadwick J. I am in
respectful agreement with their concurrent views.                              C

*The Court of Appeal's views on the facts*

    It is now necessary to consider the exceptional course taken by the
Court of Appeal regarding the first representation. It will be recollected
that the judge did not find the first representation proved but he did find
the second and third representations proved. The clue to this conclusion    D
is to be found in the following passage in the judgment at first instance
[1992] B.C.L.C. 1104, 1116:

    "it would, in my view, be unsafe to make a finding of dishonesty
    against Mr. Roberts on the unsupported evidence of Mr. Lewis and
    Mr. Abrahams, I approach the examination of the events of 21 July
    1989 on the basis that little, if any, weight can be given to their
    evidence where it is in conflict with that given by Mr. Roberts."      E

The Court of Appeal concluded that the judge erred by not subsequently
reviewing this conclusion in the light of all the evidence. Counsel for
Citibank vigorously challenged the conclusion of the Court of Appeal. It
is necessary to analyse the position on a step by step basis.
    In making findings of credibility and reliability it is unsafe for a trial    F
judge to compartmentalise the case. In *Attorney-General of Hong Kong v.
Wong Muk Ping* [1987] A.C. 501, 510, Lord Bridge of Harwich explained:

    "It is commonplace of judicial experience that a witness who makes a
    poor impression in the witness box may be found at the end of the
    day, when his evidence is considered in the light of all the other
    evidence bearing upon the issue, to have been both truthful and
    accurate. Conversely, the evidence of a witness who at first seemed    G
    impressive and reliable may at the end of the day have to be rejected.
    Such experience suggests that it is dangerous to assess the credibility
    of the evidence given by any witness in isolation from other evidence
    in the case which is capable of throwing light on its reliability; . . ."

In other words, an initial and provisional conclusion that a witness is not    H
credible on a particular point may be falsified when considered against the
possibilities, probabilities and certainties emerging from the whole body
of evidence before the court. That is the error into which the judge fell.
He ought to have reconsidered his understandable unwillingness to act on

the unsupported evidence of Mr. Lewis and Mr. Abrahams in respect of the first representation in the light of the evidence about the pricing meeting, Mr. Marks's account and the inherent probabilities. There is no internal indication in his judgment that he ever did so.

It follows that the Court of Appeal was entitled to conclude that in respect of the first representation the trial judge misdirected himself. That meant that the Court of Appeal was at large to disregard the judge's findings of fact, even though based on credibility. I understood counsel for Citibank at one stage to suggest that this vitiates all the judge's findings of fact and the whole case on fraud collapses. That is quite unrealistic. The impact of a misdirection is not governed by fixed rules. The appropriate course is dictated by considerations of common sense and fairness as well as close attention to the nature of the misdirection and the circumstances of the particular case. Here the Court of Appeal was fully entitled to take the view that the misdirection only vitiated the judge's findings on the first representation. In all other respects the Court of Appeal was entitled to act on the judge's findings so far as they were unaffected by the misdirection.

On the first representation the Court of Appeal was entitled to come to its own conclusion. The principal reasons for the conclusion of the Court of Appeal were spelt out as follows [1994] 1 W.L.R. 1271, 1279:

"Events at the pricing meeting and the making of the second and third representations as found by the judge are all inexplicable unless the first representation had also been made. . . . The judge failed to stand back and consider his finding as to the first representation in the light of his findings as to the second and third. Had he done so, we have little doubt that he would have been driven to conclude, as we do, that the first representation was also made."

In effect the Court of Appeal held that on the first representation the judge should in all the circumstances also have accepted the evidence of Mr. Lewis and Mr. Abrahams, and rejected the evidence of Mr. Roberts. To this extent I respectfully agree with the admittedly exceptional course taken by the Court of Appeal.

That is, however, not the end of the matter. On the first representation, counsel for Citibank was able to demonstrate that, even on an acceptance of the evidence of Mr. Lewis and Mr. Abrahams, there was considerable scope for misunderstanding between the participants in the 9.43 a.m. telephone conversation. In the discussions at 10.42 a.m. and at midday Mr. Lewis and Mr. Abrahams on their evidence (and the evidence of Mr. Marks) unambiguously spoke of actual bids. But Mr. Lewis and Mr. Abrahams were less clear about the discussion at 9.43 a.m.: they both said that Mr. Roberts either spoke of bids or about bids to be made. Counsel for Smith argued that Mr. Roberts impliedly represented that he had bona fide and reasonable grounds for saying that bids would be made that day and that he had no such grounds. There is force in this argument. But on any view that is a far less clear-cut position than existed in respect of the second and third representation. That brings me back to another

passage in the judgment at first instance. The judge said [1992] B.C.L.C.    A
1104, 1129:

> "I am not satisfied that the first representation was made in the earlier
> telephone conversations in the morning of 21 July 1989 in sufficiently
> unequivocal terms for it to form the basis for an action in deceit; . . ."

Making due allowance for the judge's earlier misdirection, I attach weight
to this passage. On balance I, too, am not persuaded that the evidence of    B
Mr. Lewis and Mr. Abrahams established the first representation in clear
enough terms sufficient to justify a finding of deceit. Differing from the
Court of Appeal on the interpretation of the evidence of Mr. Lewis and
Mr. Abrahams, I would hold that in respect of the 9.43 a.m. conversation
an actionable fraudulent misrepresentation has not been established.

*Conclusion on cross-appeal*                                                  C

In my view the conclusion that the actionability of the first
representation has not been established does not affect the outcome of
this appeal. The misrepresentations at the midday meeting on 21 July 1989
induced Smith to enter into the transaction shortly after 5 p.m. on that
day. After all, the trial judge found on ample evidence (including that of
Mr. Marks) that Smith would have withdrawn from the transaction if    D
these misrepresentations had not been made. The Court of Appeal agreed
with this conclusion. So do I. The essentials of the tort of deceit were
established. I would dismiss the cross-appeal on liability.

## Damages

*The issue*                                                                   E

Given the fact that the subsequent dramatic fall in the value of
Ferranti shares was caused by the disclosure of an earlier fraud practised
on Ferranti by a third party the question is whether Smith is entitled to
recover against Citibank the entire loss arising from the fraudulently
induced transaction. Smith submits that the Court of Appeal adopted the
wrong measure. Smith seeks to recover damages calculated on the basis of    F
the price paid less the aggregate of subsequent realisations. Citibank
contends that the loss attributable to the subsequent disclosure of the
fraud by a third party is a misfortune risk and is irrecoverable. Citibank
argues that the Court of Appeal adopted the correct measure.

*Horses and shares*                                                           G

The fraud perpetrated by Mr. Roberts on Smith related to shares
quoted on the Stock Exchange. Undoubtedly, the legal measure of
damages in an action in deceit when applied to transactions in shares may
throw up special problems. It is not simply a matter of the perception of
the market as to the value of the shares. If loss is to be determined by
way of the price paid less a valuation of the shares at a given date, the
determination of the real or true value of the shares, absent the deceit    H
forming the basis of the claim, may give rise to difficult hypothetical
problems. Even more difficult problems arise if it is alleged that for
extrinsic reasons there has been a false market, e.g. because investors have

been misled by widespread false statements about the value of the stock of the company. None of these practical considerations justify the adoption of a special rule in respect of share transactions. The same legal principle must govern sales of shares, goods, a business or land. It is therefore possible to simplify the problem. The example given by Cockburn C.J. in *Twycross v. Grant* (1877) 2 C.P.D. 469 is instructive. He said, at pp. 544–545:

> "If a man buys a horse, as a racehorse, on the false representation that it has won some great race, while in reality it is a horse of very inferior speed, and he pays ten or twenty times as much as the horse is worth, and after the buyer has got the animal home it dies of some latent disease inherent in its system at the time he bought it, he may claim the entire price he gave; the horse was by reason of the latent mischief worthless when he bought; but if it catches some disease and dies, the buyer cannot claim the entire value of the horse, which he is no longer in a condition to restore, but only the difference between the price he gave and the real value at the time he bought."

Counsel for Citibank argued that Cockburn C.J. erred in saying that if the horse had some latent disease at the time of the transaction the buyer may claim the entire price he paid. He argued that in such a case there was no sufficient causal link between the latent disease and the eventual death of the horse. Counsel for Smith argued that the transaction, which was induced by deceit, directly led to the loss of the entire value of the horse. On any view it is clear that, if Cockburn C.J. is right, the law imposes liability in an action for deceit for some consequences that were unforeseen and unforeseeable when the tortfeasor committed the wrong. And if that is right it may tell us something about the correct disposal of the present case.

### The justification for distinguishing between deceit and negligence

That brings me to the question of policy whether there is a justification for differentiating between the extent of liability for civil wrongs depending on where in the sliding scale from strict liability to intentional wrongdoing the particular civil wrong fits in. It may be said that logical symmetry and a policy of not punishing intentional wrongdoers by civil remedies favour a uniform rule. On the other hand, it is a rational and defensible strategy to impose wider liability on an intentional wrongdoer. As *Hart and Honoré, Causation in the Law*, 2nd ed. (1985), p. 304 observed, an innocent plaintiff may, not without reason, call on a morally reprehensible defendant to pay the whole of the loss he caused. The exclusion of heads of loss in the law of negligence, which reflects considerations of legal policy, does not necessarily avail the intentional wrongdoer. Such a policy of imposing more stringent remedies on an intentional wrongdoer serves two purposes. First it serves a deterrent purpose in discouraging fraud. Counsel for Citibank argued that the sole purpose of the law of tort generally, and the tort of deceit in particular, should be to compensate the victims of civil wrongs. That is far too narrow a view. Professor Glanville Williams identified four possible purposes of an action for damages in

Lord Steyn          *Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))*          [1997]

tort: appeasement, justice, deterrence and compensation: see "The Aims    A
of the Law of Tort" (1951) 4 C.L.P. 137. He concluded, at p. 172:

> "Where possible the law seems to like to ride two or three horses at
> once; but occasionally a situation occurs where one must be selected.
> The tendency is then to choose the deterrent purpose for tort of
> intention, the compensatory purpose for other torts."

And in the battle against fraud civil remedies can play a useful and    B
beneficial role. Secondly, as between the fraudster and the innocent party,
moral considerations militate in favour of requiring the fraudster to bear
the risk of misfortunes directly caused by his fraud. I make no apology
for referring to moral considerations. The law and morality are inextricably
interwoven. To a large extent the law is simply formulated and declared
morality. And, as *Oliver Wendell Holmes, The Common Law* (ed. M. De    C
W. Howe), p. 106, observed, the very notion of deceit with its overtones
of wickedness is drawn from the moral world.

*The old cases*

For more than 100 years at least English law has adopted a policy
of imposing more extensive liability on intentional wrongdoers than on    D
merely careless defendants. This policy was trenchantly spelt out by Lord
Blackburn in *Livingstone v. Rawyards Coal Co.* (1880) 5 App.Cas. 25. He
said, at p. 39:

> "There could be no doubt that there you would say that everything
> would be taken into view that would go most against the wilful
> wrongdoer—many things which you would properly allow in favour
> of an innocent mistaken trespasser would be disallowed as against a    E
> wilful and intentional trespasser on the ground that he must not
> qualify his own wrong, and various things of that sort."

Since Victorian times there have been great developments in our law of
obligations. But there has been no retreat from the policy spelt out by
Lord Blackburn. On the other hand, the way in which the law can    F
distinguish between the intentional wrongdoer and a man who caused loss
by a foolish but honest mistake was not worked out clearly in the old
cases. *Pasley v. Freeman* (1789) 3 Durn. & E. 51, decided more than 200
years ago, marks the emergence of the tort of deceit. In cases framed in
deceit the measure of damages was held to involve ascertainment of the
"real" or "face" value of the shares at the time of allotment or purchase:
see *Davidson v. Tullock* (1860) 2 L.T. 97; *Peek v. Derry* (1887) 37 Ch.D.    G
541 (reversed on liability (1889) 14 App.Cas. 337); *Arkwright v. Newbold*
(1880) 17 Ch.D. 301 (reversed on liability (1881) 17 Ch.D. 313); *Broome
v. Speak* [1903] 1 Ch. 586 (affirmed *Shepheard v. Broome* [1904] A.C. 342).
Except for some useful general observations on valuation as a method of
measuring loss, and the explanation of the inquiry into a past hypothetical
event in the sense of the valuation of shares absent the fraud, I do not
think those cases help much. And, except for the obiter dictum of    H
Cockburn C.J. in *Twycross v. Grant*, 2 C.P.D. 469, 544, the earlier cases
do not touch on the problems in the present case. Finally, even in the last
century it was realised that there must be sensible and practical limits to

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          Lord Steyn

A    the heads of loss for which even an intentional wrongdoer can be held liable. Thus in *Twycross v. Grant* Cockburn C.J. said that if the fraudulently misdescribed horse subsequently catches a disease and dies the buyer cannot claim the entire value of the horse. But it took a long time before the precise nature of those limitations were clearly understood and explained.

B
*Doyle v. Olby (Ironmongers) Ltd.*

Eventually, the idea took root that an intentional wrongdoer is not entitled to the benefit of the reasonable foreseeability test of remoteness. He is to be held liable in respect of "the actual damage directly flowing from the fraudulent inducement:" see the obiter dictum of Lord Atkin in C    *Clark v. Urquhart* [1930] A.C. 28, 68: and compare dicta of Dixon J. in *Potts v. Miller* (1940) 64 C.L.R. 282, 298–299, and in *Toteff v. Antonas* (1952) 87 C.L.R. 647, 650. It was, however, not until the decision of the Court of Appeal in *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158 that the governing principles were clearly laid down. By fraudulent misrepresentation the defendant induced the plaintiff to buy a business. D    The trial judge awarded damages to the plaintiff on the basis of a contractual measure of damages, i.e. the cost of making good the representations. The Court of Appeal ruled that this was an error and substituted a higher figure assessed on the basis of the tort measure, i.e. restoration of the status quo ante. Lord Denning M.R. explained, at p. 167:

E        "In contract, the damages are limited to what may reasonably be supposed to have been in the contemplation of the parties. In fraud, they are not so limited. The defendant is bound to make reparation for all the actual damages directly flowing from the fraudulent inducement. The person who has been defrauded is entitled to say: 'I would not have entered into this bargain at all but for your representation. Owing to your fraud, I have not only lost all the F        money I paid you, but, what is more, I have been put to a large amount of extra expense as well and suffered this or that extra damages.' All such damages can be recovered: and it does not lie in the mouth of the fraudulent person to say that they could not reasonably have been foreseen."

G    Winn and Sachs L.JJ. expressed themselves in similar terms.

The logic of the decision in *Doyle v. Olby (Ironmongers) Ltd.* justifies the following propositions. (1) The plaintiff in an action for deceit is not entitled to be compensated in accordance with the contractual measure of damage, i.e. the benefit of the bargain measure. He is not entitled to be protected in respect of his positive interest in the bargain. (2) The plaintiff in an action for deceit is, however, entitled to be compensated in respect H    of his negative interest. The aim is to put the plaintiff into the position he would have been in if no false representation had been made. (3) The practical difference between the two measures was lucidly explained in a contemporary case note on *Doyle v. Olby (Ironmongers) Ltd.:*

282

G. H. Treitel, "Damages for Deceit" (1969) 32 M.L.R. 556, 558–559. The
author said:

> "If the plaintiff's bargain would have been a bad one, even on the
> assumption that the representation was true, he will do best under the
> tortious measure. If, on the assumption that the representation was
> true, his bargain would have been a good one, he will do best under
> the first contractual measure (under which he may recover something
> even if the actual value of what he has recovered is greater than the
> price)."

(4) Concentrating on the tort measure, the remoteness test whether the
loss was reasonably foreseeable had been authoritatively laid down in *The
Wagon Mound* in respect of the tort of negligence a few years before *Doyle
v. Olby (Ironmongers) Ltd.* was decided: *Overseas Tankship (U.K.) Ltd. v.
Morts Dock & Engineering Co. Ltd. (The Wagon Mound)* [1961] A.C. 388.
*Doyle v. Olby (Ironmongers) Ltd.* settled that a wider test applies in an
action for deceit. (5) The dicta in all three judgments, as well as the actual
calculation of damages in *Doyle v. Olby (Ironmongers) Ltd.,* make clear
that the victim of the fraud is entitled to compensation for all the actual
loss directly flowing from the transaction induced by the wrongdoer. That
includes heads of consequential loss. (6) Significantly in the present
context the rule in the previous paragraph is not tied to any process of
valuation at the date of the transaction. It is squarely based on the
overriding compensatory principle, widened in view of the fraud to cover
all direct consequences. The legal measure is to compare the position of
the plaintiff as it was before the fraudulent statement was made to him
with his position as it became as a result of his reliance on the fraudulent
statement.

  *Doyle v. Olby (Ironmongers) Ltd.* was subsequently applied by the
Court of Appeal in two Court of Appeal decisions: *East v. Maurer* [1991]
1 W.L.R. 461 and *Smith Kline & French Laboratories Ltd. v. Long* [1989]
1 W.L.R. 1. *East v. Maurer* is of some significance since it throws light on
a point which arose in argument. Counsel for Citibank argued that in the
case of a fraudulently induced sale of a business, loss of profits is only
recoverable on the basis of the contractual measure and never on the basis
of the tort measure applicable to fraud. This is an oversimplification. The
plaintiff is not entitled to demand that the defendant must pay to him the
profits of the business as represented. On the other hand, *East v. Maurer*
shows that an award based on the hypothetical profitable business in
which the plaintiff would have engaged but for deceit is permissible: it is
classic consequential loss. Turning to the *Smith Kline* case it has been
suggested that the *Doyle v. Olby (Ironmongers) Ltd.* rule was wrongly
applied: *Burrows, Remedies for Torts and Breach of Contract*, 2nd ed.
(1994), pp. 173–174. The correctness of that comment I need not examine.
In my view it is sufficient to say that the principles emerging from *Doyle
v. Olby (Ironmongers) Ltd.* are good law.

*Side-tracking*

  At the risk of being side-tracked I must now refer to two Court of
Appeal decisions which were discussed in argument. In *Royscot Trust Ltd.*

A.C.    **Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))**    Lord Steyn

A   *v. Rogerson* [1991] 2 Q.B. 297 the Court of Appeal held that under section 2(1) of the Misrepresentation Act 1967 damages in respect of an honest but careless representation are to be calculated as if the representation had been made fraudulently. The question is whether the rather loose wording of the statute compels the court to treat a person who was morally innocent as if he was guilty of fraud when it comes to the measure of damages. There has been trenchant academic criticism of

B   the *Royscot* case: see Richard Hooley, "Damages and the Misrepresentation Act 1967" (1991) 107 L.Q.R. 547. Since this point does not directly arise in the present case, I express no concluded view on the correctness of the decision in the *Royscot* case. The second case is the decision of the Court of Appeal in *Downs v. Chappell* [1997] 1 W.L.R. 426. The context is the rule that in an action for deceit the plaintiff is entitled to recover all his

C   loss directly flowing from the fraudulently induced *transaction*. In the case of a negligent misrepresentation the rule is narrower: the recoverable loss does not extend beyond the consequences flowing from the negligent *misrepresentation*: see *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. In *Downs v. Chappell* [1997] 1 W.L.R. 426, Hobhouse L.J. applied this narrower rule to an action for deceit. He enunciated the following "qualification" of the conventional rule, at

D   p. 443:

> "In my judgment, having determined what the plaintiffs have lost as a result of entering into the transaction—their contract with Mr. Chappell—it is still appropriate to ask the question whether that loss can properly be treated as having been caused by the defendants' torts, notwithstanding that the torts caused the plaintiffs to enter into

E   the transaction."

That led Hobhouse L.J., at p. 444, "to compare the loss consequent upon entering into the transaction with what would have been the position had the represented, or supposed, state of affairs actually existed." The correctness of this proposition in a case of deceit was debated at the bar. Counsel for Citibank in whose interest it was to adopt this proposition

F   felt some difficulty in doing so. In my view the orthodox and settled rule that the plaintiff is entitled to all losses directly flowing from the transaction caused by the deceit does not require a revision. In other words, it is not necessary in an action for deceit for the judge, after he had ascertained the loss directly flowing from the victim having entered into the transaction, to embark on a hypothetical reconstruction of what the parties would have agreed had the deceit not occurred. The rule in

G   deceit is justified by the grounds already discussed. I would hold that on this point *Downs v. Chappell* was wrongly decided.

*The date of transaction rule*

   That brings me to the perceived difficulty caused by the date of transaction rule. The Court of Appeal [1994] 1 W.L.R. 1271, 1283G,

H   referred to the rigidity of "the rule in *Waddell v. Blockey* (1879) 4 Q.B.D. 678, which requires the damages to be calculated as at the date of sale." No doubt this view was influenced by the shape of arguments before the Court of Appeal which treated the central issue as being in reality a

valuation exercise. It is right that the normal method of calculating the    A
loss caused by the deceit is the price paid less the real value of the subject
matter of the sale. To the extent that this method is adopted, the selection
of a date of valuation is necessary. And generally the date of the
transaction would be a practical and just date to adopt. But it is not
always so. It is only prima facie the right date. It may be appropriate to
select a later date. That follows from the fact that the valuation method is
only a means of trying to give effect to the overriding compensatory rule:    B
*Potts v. Miller*, 64 C.L.R. 282, 299, *per* Dixon J. and *County Personnel
(Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987] 1 W.L.R. 916,
925–926, *per* Bingham L.J. Moreover, and more importantly, the date of
transaction rule is simply a second order rule applicable only where the
valuation method is employed. If that method is inapposite, the court is
entitled simply to assess the loss flowing directly from the transaction    C
without any reference to the date of transaction or indeed any particular
date. Such a course will be appropriate whenever the overriding
compensatory rule requires it. An example of such a case is to be found
in *Cemp Properties (U.K.) Ltd. v. Dentsply Research & Development
Corporation* [1991] 2 E.G.L.R. 197, 201, *per* Bingham L.J. There is in
truth only one legal measure of assessing damages in an action for deceit:
the plaintiff is entitled to recover as damages a sum representing the    D
financial loss flowing directly from his alteration of position under the
inducement of the fraudulent representations of the defendants.
The analogy of the assessment of damages in a contractual claim on the
basis of cost of cure or difference in value springs to mind. In *Ruxley
Electronics and Construction Ltd. v. Forsyth* [1996] A.C. 344, 360G, Lord
Mustill said: "There are not two alternative measures of damages, as    E
opposite poles, but only one; namely, the loss truly suffered by the
promisee." In an action for deceit the price paid less the valuation at the
transaction date is simply a method of measuring loss which will
satisfactorily solve many cases. It is not a substitute for the single legal
measure: it is an application of it.

*Causation*    F

So far I have discussed in general terms the scope of a fraudster's
liability in accordance with the rule identified with *Doyle v. Olby
(Ironmongers) Ltd.* [1969] 2 Q.B. 158. It is now necessary to consider
separately the three limiting principles which, even in a case of deceit,
serve to keep wrongdoers' liability within practical and sensible limits. The
three concepts are causation, remoteness and mitigation. In practice the    G
inquiries under these headings overlap. But they are distinct legal concepts.
For present purposes causation is the most important. The major issue in
the present case is whether there is a causal link between the fraud and
the loss arising by reason of the pre-existing fraud perpetrated on Ferranti.
How should this matter be approached? The development of a single
satisfactory theory of causation has taxed great academic minds: see *Hart
and Honoré, Causation in the Law* and Honoré, "Necessary and Sufficient    H
Conditions in Tort Law," in *Owen, Philosophical Foundations of Tort Law*,
p. 363. But, as yet, it seems to me that no satisfactory theory capable of
solving the infinite variety of practical problems has been found. Our case

law yields few secure footholds. But it is settled that at any rate in the law of obligations causation is to be categorised as an issue of fact. What has further been established is that the "but for" test, although it often yields the right answer, does not always do so. That has led judges to apply the pragmatic test whether the condition in question was a substantial factor in producing the result. On other occasions judges assert that the guiding criterion is whether in common sense terms there is a sufficient causal connection: see *Yorkshire Dale Steamship Co. Ltd. v. Minister of War Transport* [1942] A.C. 691, 706, *per* Lord Wright. There is no material difference between these two approaches. While acknowledging that this hardly amounts to an intellectually satisfying theory of causation, that is how I must approach the question of causation.

*Remoteness and mitigation*

The second limiting principle is remoteness. I have already discussed the special rule of remoteness developed by the courts in the context of deceit. This requirement is in issue in the present case: if there is a sufficient causal link it must still be shown that the entire loss suffered by Smith is a direct consequence of the fraudulently induced transaction. The third limiting principle is the duty to mitigate. The plaintiff is not entitled to damages in respect of loss which he could reasonably have avoided. This limiting principle has no special features in the context of deceit. There is no issue under this heading and I need say no more about it.

*Taking stock*

It is now necessary to take stock of the case. The distinctive features of the case are (1) that the fraud of Mr. Roberts induced Smith to buy the Ferranti shares, the value of which were already at the date of sale doomed to collapse due to the fraud practised on the company by a third party; and (2) that by reason of the fraud of Mr. Roberts, Smith was induced to buy the shares as a market making risk, i.e. to hold on to the shares for sale at a later stage.

In these circumstances Smith was truly locked into the transaction by reason of the fraud perpetrated on it. And the causative influence of the fraud is not significantly attenuated or diluted by other causative factors acting simultaneously with or subsequent to the fraud. The position would have been different if the loss suffered by Smith arose from a subsequent fraud. That would be a case like the misrepresented horse in Cockburn C.J.'s example in *Twycross v. Grant,* 2 C.P.D. 469, 544–545, where the buyer plainly cannot recover the entire value of the horse if it subsequently catches a disease and dies. In the actual circumstances of this case I am satisfied that there was a sufficient causal link between the fraud and Smith's loss. Moreover, for substantially the same reasons, I would hold that Smith's losses, calculated on the basis of the difference between the price paid and the proceeds of subsequent realisations, flow directly from the fraud. In my view Smith would on this basis be entitled to recover the sum of about £11·3m. Smith merely seeks restoration of the order for payment of £10,764,005 which Chadwick J. made on a different basis. In law Smith are entitled to succeed on this appeal to that extent.

286

Lord Steyn    Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))    [1997]

*Conclusion*    A

I have not lost sight of counsel for Citibank's argument that, given the way the case was pleaded, Smith should not be allowed to succeed on this legal basis. In my view the argument that Citibank was prejudiced is quite unreal. I reject it.

I would allow Smith's appeal on damages and restore the order of Chadwick J.

B

> *Appeal allowed.*
> *Cross-appeal dismissed.*
> *Citibank to pay costs in*
> *Court of Appeal and*
> *House of Lords.*

C

*Solicitors: Wilde Sapte; Ashurst Morris Crisp.*

A. R.

D

---

[HOUSE OF LORDS]

E

O'HARA    .    .    .    .    .    .    .    .    .    APPELLANT

AND

CHIEF CONSTABLE OF THE ROYAL
    ULSTER CONSTABULARY    .    .    .    .    .    RESPONDENTS

1996  Oct. 2;               Lord Goff of Chieveley, Lord Mustill,    F
      Dec. 12                  Lord Steyn, Lord Hoffmann and
                                  Lord Hope of Craighead

> *Arrest—Arrest without warrant—Validity—Police officers briefed on anti-terrorist operation—Constable arresting plaintiff on basis of information then received—Whether constable having reasonable grounds for suspicion so as to justify arrest—Whether information received at briefing sufficient grounds for suspicion—Prevention of Terrorism (Temporary Provisions) Act 1984 (c. 8), s. 12(1)(b)*

G

> The plaintiff was summarily arrested at his home on 28 December 1985 by a detective constable of the Royal Ulster Constabulary under section 12(1) of the Prevention of Terrorism (Temporary Provisions) Act 1984.[1] Apart from information received at a briefing earlier that morning, during which he was told that the plaintiff had been involved in a murder, the constable

H

---

[1] Prevention of Terrorism (Temporary Provisions) Act 1984, s. 12(1)(b): see post, p. 298F–G.

VOL. IX.]                AND PRIVY COUNCIL.                      187

[HOUSE OF LORDS.]

WILLIAM SMITH  .   .   .   .   . APPELLANT;

AND

DAVID CHADWICK, JOHN OLDFIELD
  CHADWICK, EBENEZER ADAMSON,  RESPONDENTS.
  AND EDWIN COLLIER   .   .   .

H. L. (E.)

1884

*Feb.* 18.

*Action of Deceit—Fraudulent Misrepresentation ambiguous in Meaning—Burden of Proof on Plaintiff.*

The prospectus of a company which was being formed to take over iron-works, contained a statement that "the present value of the turnover or output of the entire works is over £1,000,000 sterling per annum."

If that statement meant that the works had actually in one year turned out produce worth at present prices more than a million, or at that rate per year, it was untrue. If it meant only that the works were capable of turning out that amount of produce it was true.

In an action of deceit for fraudulent misrepresentation whereby the plaintiff was induced to take shares he swore in answer to interrogatories that he "understood the meaning" of the statement "to be that which the words obviously conveyed," and at the trial was not asked either in examination or cross-examination what interpretation he had put upon the words:—

*Held*, by the EARL OF SELBORNE L.C. and LORDS BLACKBURN and WATSON, affirming the decision of the Court of Appeal, that the statement taken in connection with the context was ambiguous and capable of the two meanings; that it lay on the plaintiff to prove that he had interpreted the words in the sense in which they were false and had in fact been deceived by them into taking the shares, and that as he had as a matter of fact failed to prove this the action could not be maintained.

*Held*, by LORD BRAMWELL, that the statement was capable only of the meaning in which it was untrue, and that the plaintiff had proved that he had understood it in that sense; but that there was not sufficient evidence that the statement was fraudulent on the part of the defendants, and that the decision of the Court of Appeal should be affirmed on that ground.

APPEAL by the plaintiff from two orders of the Court of Appeal (Jessel M.R. Cotton and Lindley L.JJ.) reversing an order of Fry J. in favour of the plaintiff. All the facts are set out at length in the report of the decisions below (1). The facts

(1) 20 Ch. D. 27.

3        O 2

**188**                        HOUSE OF LORDS                [VOL. IX.

H. L. (E.)   material to this report are stated in the judgment of Lord Black-
1884         burn in this House. All the questions argued below were mentioned
SMITH        by the appellant's counsel on the present appeal, but the only
*v.*         one seriously insisted on was that arising upon the representation
CHADWICK.    as to the turnover or output, and the arguments on the other
             points are therefore omitted.

    1883. Nov. 15, 16, 21. *Romer* Q.C. and *Cozens-Hardy* Q.C.
(*Chadwyck-Healey* with them) for the appellant :—

    The decision of Fry J. was right and the representation as to
the turnover or output would to ordinary men of business mean
that the works had actually produced the amount stated, and
it was so understood by the plaintiff who took shares on the faith
of it. That the statement might have another and less natural
meaning does not exonerate the defendants. The burden lay on
them to shew that the meaning was what they alleged it was.
The defendant's counsel should have asked the plaintiff in cross-
examination what meaning he put upon the representation. It
would not have been admissible for the plaintiff's counsel to ask
him that question in examination in chief. The person who
makes a false representation in order to induce another to act
upon it to his injury makes a primâ facie case against himself
that the misrepresentation is material; and the presumption is
that the person to whom the representation was made and who
acted upon it was in fact deceived by the representation. The
man who makes a false representation, even honestly, is liable if
the other acts upon it : *Redgrave* v. *Hurd* (1) per Jessel M.R.;
*Mathias* v. *Yetts* (2). It is not necessary to shew that the repre-
sentation is false to the knowledge of the defendant if he makes
it without knowing whether it is true or not; *Arkwright* v.
*Newbold* (3) per Cotton L.J.; *Western Bank of Scotland* v.
*Addie* (4). The questions for the House are questions of fact;
in what sense did the plaintiff understand the prospectus? and
was he in fact deceived? The conclusion of Fry J. who saw and
heard the witnesses is the most likely to be right.

(1) 20 Ch. D. 1, 12, 21.            (3) 17 Ch. D. 320.
(2) 46 L. T. (N.S.) 497, 502.       (4) Law Rep. 1 H. L. Sc. 145.

Nov. 22, 23.   *R. T. Reid* Q.C. (Sir *H. Giffard* Q.C. with him) for the respondent Adamson, and *Horace Davey* Q.C. (*Russell Roberts* with him) for the other respondents:—

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

The representation as to the output meant not that the works had produced but that they were capable of producing such a turnover or output: but if not then it was ambiguous, as is manifest from the different interpretations put upon it by the judges below.   If the representation be capable of two senses the plaintiff must shew in which sense he understood it, and that it was false in that sense: *Hallows* v. *Fernie* (1) per Lord Chelmsford; *Arkwright* v. *Newbold*. (2)   The plaintiff nowhere, in pleadings or evidence, alleges in what sense he understood it.   He must also shew that the defendants knew that that sense was false; or made the statement without knowing whether it was true or not.   Legal fraud is not actionable without moral fraud: *Weir* v. *Bell* (3) per Bramwell L.J.; though there are some equity dicta to the contrary: *Eaglesfield* v. *Marquis of Londonderry* (4); *Slim* v. *Croucher* (5).   Probably the difference has arisen from the equity actions being usually for rescission of contract, where moral fraud need not be proved.

[LORD BLACKBURN:—I have often thought that perhaps the discrepancies between expressions of equity and common law judges are greatly owing to the fact that at common law questions of fact are for the jury and it is necessary for the judge to separate them clearly from the questions of law; whereas in equity the judges have to determine both law and fact, and it is sometimes impossible to understand whether their decisions were meant to be inferences of fact or of law.]

As to the respondent Adamson Jessel M.R. was in error in supposing that he penned the circular.

*Romer* Q.C. replied.

The House took time for consideration.

(1) Law Rep. 3 Eq. 520; 3 Ch. 467, 478.
(2) 17 Ch. D. 301, 324.
(3) 3 Ex. D. 238, 243.
(4) 4 Ch. D. 693, 706.
(5) 1 D. F. & J. 518, 524.

H. L. (E.)    1884. Feb. 18.  EARL OF SELBORNE L.C.:—

1884
SMITH
*v.*
CHADWICK.

My Lords, I conceive that in an action of deceit, like the present, it is the duty of the plaintiff to establish two things; first, actual fraud, which is to be judged of by the nature and character of the representations made, considered with reference to the object for which they were made, the knowledge or means of knowledge of the person making them, and the intention which the law justly imputes to every man to produce those consequences which are the natural result of his acts: and, secondly, he must establish that this fraud was an inducing cause to the contract; for which purpose it must be material, and it must have produced in his mind an erroneous belief, influencing his conduct.

All your Lordships are, I believe, agreed in thinking that, of the several representations in this prospectus, by which the appellant alleges himself to have been deceived, only one is material, viz., that as to "the present value of the turnover or output of the entire works" (stated as being "over £1,000,000 sterling per annum"). Of the materiality of that representation there can be no doubt; and if the appellant was justified in understanding, and did understand it, in the sense insisted upon by his counsel at the bar, it was untrue as well as material. If, in the context in which it stands, it could not be honestly intended or reasonably understood in any other sense, I should think that the appellant's case was made out, although he has contented himself with swearing, in his answer to the defendants' interrogatories, that he understood the meaning of the words to be "that which they obviously convey," and has professed to be "unable to express in other words what he understood to be the meaning thereof." If, for instance, the material statement had been that Mr. Grieve was a director, I should have thought such an answer quite sufficient. But it is otherwise, in my opinion, if the words in the context in which they stand may have been honestly intended to bear another sense (in which they would be true), and might reasonably have been so understood by an intelligent man of business, aware of the current prices at that time of bar and plate iron; and if at the time when that answer was given, the appellant had notice that the defendants, who

made the representation, did in fact allege such other sense to be the true one, and the sense which they intended.

The sentence is, beyond question, unhappily expressed; and I think its more natural primâ facie meaning is that which takes the verb "is" literally, as affirming a present fact, and the words "the present value of the turnover or output" as equivalent to "the present value of the present turnover or output." I cannot however consider the words, in the context in which they stand, to be clear or unambiguous. In any point of view I do not think that they sufficiently explain themselves. Some reference, at least, to current prices as a basis of valuation must be implied in them. Even on the appellant's construction, "the turnover or output" is a term requiring some further definition. Does it mean the rate of production then actually going on, if extended over a whole year; or the total production of the past twelve months, estimated at the then present prices; or the actual yearly production on a series or an average of years? If the demonstrative article "this" had preceded the words "turnover or output" (instead of the definite article "the") the sense would clearly be that which the defendants say they intended. After repeatedly considering the words in connection with their context and with the evidence, I think the soundest conclusion is that this sentence was honestly intended to be understood as a statement of the value, at the then current prices, of *that* "turnover or output" of which the works were in the immediately preceding context stated to be "capable;" and that, to an intelligent man of business, who knew what those current prices actually were, and who took the trouble of comparing them with the figures given, they would really convey that meaning. The appellant was an intelligent man of business; and it does not appear to me to be a hypothesis inconsistent with anything to which he has sworn, that he may have had the requisite knowledge, and may have made use of it, and may have himself understood the representation in this sense, and have intended (in that sense) to challenge its truth. He did expressly challenge the truth of part of the representation, in the antecedent context, as to the capacity of the works. That the defendants would offer that explanation of it, he had (to my mind) clear notice, by their answers to his own

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Earl of Selborne,
L.C.

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Earl of Selborne,
L.C.

interrogatories, sworn or filed on the 12th of June, 1877. Having such notice, and afterwards answering the defendants' interrogatories in the way that he did, and not attempting in any other way to prove that he was deceived by the representation, I cannot think that he has satisfied the burden of proof which, under those circumstances, was incumbent upon him. The Court of Appeal have so decided; I cannot say that they were wrong. It ought not to be forgotten that the appellant has sworn in precisely the same way as to *all* the representations which in his pleadings he alleges to be false; as to some of which your Lordships do not accept his construction, and as to others of which it is certain that he was not deceived by, and did not rely on them.

I do not think it necessary to add more; because I agree generally with the view of this case which I know will be explained to your Lordships, in greater detail, by one of my noble and learned friends (Lord Blackburn). My conclusion is, that the appeal ought to be dismissed, with costs.

LORD BLACKBURN :—

My Lords, in this case Fry J., who tried the action, gave judgment for the plaintiff, and ordered and adjudged that the plaintiff should recover £5000 by way of damages, and that the defendants David Chadwick, John Oldfield Chadwick, Ebenezer Adamson, and Edwin Collier should pay the same.

The defendants David and J. O. Chadwick and Edwin Collier appealed, and the defendant Adamson separately appealed. In each case the Court of Appeal, consisting of the late Master of the Rolls (Sir George Jessel) and Cotton and Lindley L.JJ., made an order reversing the judgment and dismissing the action with costs. The appeal to your Lordships is against those two orders.

It is not contended that there is any room for a distinction between the cases. If the order reversing the judgment against one set of defendants is right, the order to reverse the judgment against the other is also right.

The action is brought in the Chancery Division, the indorsement on the writ being that "the plaintiff's claim is for damages sustained by him, by his having been induced to take and pay

for shares in the Blochairn Iron Company (Limited) by the fraudulent misrepresentations of the defendants." . The statement of claim does not depart at all from this, though stating it at more length.

I agree in what is said by Cotton L.J. in *Arkwright* v. *Newbold* (1) : "An action of deceit is a common law action, and must be decided on the same principles, whether it be brought in the Chancery Division or any of the Common Law Divisions ; there being, in my opinion, no such thing as an equitable action for deceit." But though this is, I think, quite accurate, the different mode in which cases are tried makes, I think, a difference in the province of a Court of Appeal, which I wish to notice, for, in the view I take of this case, it is important. Had this action been brought on the old system before a judge and a jury, and the same evidence given as has been given here, the judge would have had to direct the jury, pointing out to them what it was necessary for the plaintiff to prove in order to support his case, and what evidence there was from which an inference of facts sufficient to support the plaintiff's case might be drawn, leaving it to the jury, with proper comment, to draw or to refuse to draw that inference. And if the jury had found for the plaintiff, on a proper application on behalf of the defendant, a Court of Appeal could have inquired whether the proper direction was given, and, if it was, whether the verdict drawing the inference was so unsatisfactory that a new trial should be granted and the opinion of another jury taken. But the Court of Appeal, however strongly convinced that the jury drew the wrong inference, could not find the verdict for the defendant.

Now when the case is, as it was here, tried before a judge both of law and of fact, he draws the inference of fact. If he finds in favour of the defendant, it may be because he thinks the evidence such that, as a matter of law, no inference of what was necessary to support the plaintiff's case could properly be drawn from the evidence before him, or it may be because, though he thinks such an inference might be drawn, he does not, as a matter of fact, draw it. The result would be the same. If he

(1) 17 Ch. D. 320.

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Lord Blackburn.

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Lord Blackburn.

finds in favour of the plaintiff, it must be because he not only
thinks that an inference might be drawn from the evidence, but
that he does draw it.

The Court of Appeal ought to give great weight, but not
undue weight, to the opinion of the judge who tried the cause,
and saw the witnesses and their demeanour. That gives him
considerable advantages over those who only draw their informa-
tion from perusing the notes. But still, though the Court of
Appeal ought not lightly to find against the opinion of the
judge who tried the cause, I think that the Court of Appeal, if
convinced that the inference in favour of the plaintiff ought not
to have been drawn from the evidence, should find the verdict
the other way.

In the present case I think there were four statements by the
defendants, alleged to be fraudulent and to have induced the
plaintiff to buy the shares, on which the finding of the judge
below in favour of the plaintiff was based. Two were disposed
of in the course of the argument. Two remain. One, that
which stated that Mr. Grieve was a director, was, I think, proved
to be untrue to the knowledge of the defendants when they
made it, and any one who took shares, induced by the belief
that Mr. Grieve would not lend his name to a company without
ascertaining that it was a solid one, would, I think, be entitled
to maintain an action of deceit. I can very well believe that
there might be persons in Greenock or elsewhere who would be
influenced by his name to that extent. But the plaintiff in his
evidence on cross-examination says that he had never heard of
Mr. Grieve before, and (Appendix p. 95) on the counsel saying,
" Then I suppose seeing Mr. Grieve's name on the prospectus
had not much effect on you," he said nothing, but we are in-
formed that he shook his head. I suppose that the shorthand
writer whose eyes would be naturally fixed on his pen did not see
this shake of the head. He certainly has not written down that
there was such a shake; but it is plain that the cross-examining
counsel was satisfied with this mute answer; and on re-examina-
tion nothing is said more about Mr. Grieve. I certainly think it
proved that the plaintiff was not induced to take the shares by
this deceit. And I believe all your Lordships agree so far. But

there is a much more difficult question behind, depending upon the confused statement as to the turnover and output, which I would examine more in detail afterwards.

I have come to the conclusion that whatever be the meaning of that statement the plaintiff has *not* sufficiently proved that it did influence him. I do not say that there is no evidence on which a verdict for the plaintiff might be found. I certainly think that, if trying this cause with a jury, I should not be justified in withdrawing it from the jury. I do not even say that a verdict for the plaintiff if found by a jury would be so unsatisfactory that there should be a new trial. But I should have accompanied my direction to the jury with the same observations which I shall hereafter submit to your Lordships as justifying the conclusion to which the Court of Appeal have come and to which I myself come, and to which I ask your Lordships to come; and I think that the jury would, on hearing them, have probably found for the defendants.

Before going further I wish to make some observations; for though I very nearly agree in what is said by the late Master of the Rolls (1), he does not quite state what I conceive to be the law. I do not mean to go through the numerous decisions on the subject of an action of deceit. All those which were decided before the date of the last edition of Smith's Leading Cases are to be found collected in the notes to *Chandelor* v. *Lopus* (2) and *Pasley* v. *Freeman* (3).

In *Pasley* v. *Freeman* (3) Buller J. says: "The foundation of this action is fraud and deceit in the defendant and damage to the plaintiffs. And the question is whether an action thus founded can be sustained in a court of law. Fraud without damage, or damage without fraud, gives no cause of action, but where these two concur an action lies, per Croke J. (4)."

Whatever difficulties there may be as to defining what is fraud and deceit, I think no one will venture to dispute that the plaintiff cannot recover unless he proves damage. In an ordinary action of deceit the plaintiff alleges that false and fraudulent representations were made by the defendant to the plaintiff in

H. L. (E.)

1884

Smith
*v.*
Chadwick.

Lord Blackburn.

(1) 20 Ch. D. 44.
(2) 1 Sm. L. C. 183 (8th ed.).
(3) 2 Sm. L. C. 66, 73, 86 (8th ed.).
(4) 3 Bulst. 95.

196                                    HOUSE OF LORDS                          [VOL. IX.

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Lord Blackburn.

order to induce him, the plaintiff, to act upon them. I think that if he did act upon these representations, he shews damage; if he did not, he shews none. And I think the plaintiff in such a case must not only allege but prove this damage. It is as to what is sufficient proof of this damage that I wish to make my remarks. I do not think it is necessary, in order to prove this, that the plaintiff always should be called as a witness to swear that he acted upon the inducement. At the time when *Pasley* v. *Freeman* (1) was decided, and for many years afterwards, he could not be so called. I think that if it is proved that the defendants with a view to induce the plaintiff to enter into a contract made a statement to the plaintiff of such a nature as would be likely to induce a person to enter into a contract, and it is proved that the plaintiff did enter into the contract, it is a fair inference of fact that he was induced to do so by the statement. In *Redgrave* v. *Hurd* (2) the late Master of the Rolls is reported to have said it was an inference of law. If he really meant this he retracts it in his observations in the present case. I think it not possible to maintain that it is an inference of law. Its weight as evidence must greatly depend upon the degree to which the action of the plaintiff was likely, and on the absence of all other grounds on which the plaintiff might act. I quite agree that being a fair inference of fact it forms evidence proper to be left to a jury as proof that he was so induced. But I do not think that it would be a proper direction to tell a jury that if convinced that there was such a material representation they ought to find that the plaintiff was induced by it, unless one of the things which the late Master of the Rolls specified was proved; nor do I think he meant to say so. I think there are a great many other things which might make it a fair question for the jury whether the evidence on which they might draw the inference was of such weight that they would draw the inference. And whenever that is a matter of doubt I think the tribunal which has to decide the fact should remember that now, and for some years past, the plaintiff can be called as a witness on his own behalf, and that if he is not so called, or being so called does not swear that he was induced, it adds much weight to the

(1) 2 Sm. L. C. 66, 73, 86 (8th ed.).          (2) 20 Ch. D. 21.

doubts whether the inference was a true one. I do not say it is conclusive.

H. L. (E.)

1884

SMITH
v.
CHADWICK.

Lord Blackburn.

The principal facts are not now much in controversy. The defendants were employed by Messrs. Hannay & Co. to assist in getting up a limited company to take over their works, and they were to receive a commission (amounting to some thousands of pounds) if they succeeded in floating such a limited company. They prepared a prospectus, and on the 27th of May 1873 circulated that prospectus with a lithographed letter, which are to be found at page 397 of the appendix. On the 31st of May 1873 the defendants circulated a second letter with what is called an abridged prospectus. These are to be found at page 407 of the appendix.

Pausing here I may say that I do not think it can admit of dispute that the defendants intended by those letters and prospectus to induce those to whom they sent them to apply for shares in the projected limited company. Amongst others they sent them to the plaintiff. He was not a customer or client of the defendants (I do not know that it would have made any difference if he had been), but he was a man of business, who had himself turned his own business into a limited company and had taken shares in other companies, and was quite competent to form an opinion for himself. He was, however, in my opinion entitled to consider the letters and prospectus as amounting to a representation to him that all stated in that prospectus was true. He did a day or two after receiving the second letter and the abridged prospectus apply for 100 shares, expecting, as he says, that he might get 20, but the whole 100 were allotted to him. He paid the calls amounting to £5000, and the limited company having completely failed he lost the whole; and if he is entitled to recover on the ground that he was by fraudulent representations induced to take the shares, he is entitled to recover £5000 as damages.

Nothing that happened after he applied for the shares could have had a share in inducing him to apply for them, and therefore I think that the circular subsequently issued by the defendants can have no bearing on this part of the case, whatever bearing it may have on other questions.

198                          HOUSE OF LORDS                    [VOL. IX.

H. L. (E.)
1884

SMITH
v.
CHADWICK.

Lord Blackburn.

And now, after this perhaps too long preamble, I proceed to state why I think that the finding that the plaintiff was induced to buy the shares by that passage relating to the turnover and output, cannot be supported.    The passage is short, and though it probably is present to the minds of your Lordships, I will for convenience of reference read it once more : " The ironworks are the largest and most important in Scotland and have been equipped in a substantial, complete and permanent manner. They can now produce at the rate of 1500 tons of finished bars and plates per week, or about 75,000 tons per annum.    The rolling mills with some slight alterations will be capable of turning out 90,000 tons of manufactured iron per annum.    The present value of the turnover or output of the entire works is over £1,000,000 per annum."

As early as the 12th of June 1877 the defendants in answer to an interrogatory shewed, in my opinion, what they at that time said was the meaning of this very obscure passage.    They swore as follows :—" The then value of the annual turnover or output of the works is a necessary arithmetical result from the amount of the weekly productiveness of which the particulars are given by the last preceding paragraph taken in connection with the then existing average prices, after allowing reasonable deductions for short working, defects and casualties.    The current price in Glasgow of bars and rails in May 1873 was £13  10s. per ton, of nail rods £15 10s. per ton, of hoops £17 per ton, and of sheets £20 per ton.    Taking a mean of only £15 per ton on 1500 tons per week and allowing only fifty weeks in the year the value of the year's turnover or output would be £1,125,000."

The defendants interrogated the plaintiff, requiring him " as to each and every of the allegations of misrepresentations contained in the statement of claim " to separately and categorically state, first, what he understood to be the meaning of the particular representation ; thirdly, in what respect or respects he now alleges that every or any of the said representations were untrue.    And on the 23rd of January 1878, seven months and more after the defendants' answer which I have read, the plaintiff answers thus : " First, I understood the meaning of such misrepresentations respectively to be that which the words composing them obviously

convey, and I am unable to express in any other words what I understood to be the meaning thereof. Thirdly, I allege that such misrepresentations are untrue in manner and respects appearing in the said statement of claim, and I have nothing to add to or detract from the said statement of claim."

It is said that the plaintiff could not say more than that he understood the words in their natural sense. I think that his legal advisers had notice ever since the 12th of June 1877, if not before, that the defendants contended that the meaning of this obscure phrase was that at the then present prices of bars and plates 75,000 tons would be worth more than a million. So understood the representation was true. This meaning is one at least so plausible that Cotton L.J. thought it the right meaning.

If the statement as to prices at the date of the prospectus had been inserted in it so as to make it read thus: "The current price of bars is now £13 10s. per ton, of plates £15 to £20 per ton, according to their quality, so that, assuming the proportion of bars to plates not to be unreasonably large, the mean price of bars and plates is more than £13 6s. 8d. The present value of the turnover," &c., I think a reasonable man would have probably thought that the meaning was that put upon it in the defendants' answer to the interrogatories, or at least would not have acted, without some further inquiry, on the belief that it meant something else. It is quite true that those prices are not stated on the face of the prospectus; and though the plaintiff, being himself engaged in a branch of the iron trade, was not unlikely to know what those prices were, I do not find it anywhere asserted that he knew them; but it is nowhere, that I can find, asserted that he did not know them.

I cannot myself see what difficulty there could have been in saying in answer to the defendants' interrogatory, " I understand the meaning of the representation as to turnover to be that Messrs. Hannay's works had actually during the past year turned out produce that at present prices would be worth more than a million; and that was untrue, for they never produced half as much." When I say this I mean, of course, if the plaintiff could truly swear to that effect. If he did not so understand it there was, of course, a very good reason for not so swearing.

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Lord Blackburn.

200                    HOUSE OF LORDS                 [VOL. IX.

H. L. (E.)
1884
SMITH
v.
CHADWICK.

Lord Blackburn.

It is true that the answers to interrogatories are prepared by the legal advisers; and the plaintiff, if, at the trial, he had sworn, " I did so understand it," and had been asked, " Then, if so, why did you not say so in January 1878 ?" might have had an excuse by saying, " I swore what was true, and if I should have sworn more, that was my lawyer's fault, not mine." But he never at any time, from first to last, swears anything of the sort, and I think it is impossible now to listen to the suggestion that the counsel for the plaintiff at the trial in November 1881 were taken by surprise at finding that the defendants' counsel still put on this passage the interpretation which had been put upon it in the answer to the interrogatories so long ago as June 1877. If they were sur-prised they had no right to be so. But I think the fair conclu-sion is, that they feared to ask the question in examining the plaintiff in chief, lest he should answer that he did not under-stand the prospectus as meaning that there had been an actual output during the last year, or at least that he would not swear that he was influenced by his belief in that statement. The counsel for the defendants did not choose on cross-examination to risk bringing out of a hostile witness evidence which his own counsel had not brought out in chief. If I am right in the opinion which I have already expressed, that the burthen lay on the plaintiff to prove that he was induced, I think they acted wisely. If the plaintiff had made a primâ facie case which required affirmative proof of an answer from the defendants, I think it would be otherwise.

It will be observed that this opinion is quite irrespective of what the true construction of the prospectus is. I should think that a reasonable man would give much more weight to a state-ment of fact that the actual produce of the works had been so much, than to a statement that their productive power was esti-mated at so much, and therefore that the statement, if understood as Fry J. and Lindley L.J., and I believe some of your Lord-ships think, was material. I should think that a reasonable man reading this prospectus would hardly act on the faith of such an obscure statement without further inquiry. But he might so act. My reason for supporting the judgment of the Court of Appeal is, that I do not think it proved that he did so act. In the case

of the misstatement as to Mr. Grieve being a director, I think it positively proved that he did not.

I may say, though it is not necessary for the decision of the case, that I think, as a matter of law, the motive of the person saying that which he knows not to be true to another with the intention to lead him to act on the faith of the statement is immaterial.  The defendants might honestly believe that the shares were a capital investment, and that they were doing the plaintiff a kindness by tricking him into buying them.  I do not say this is proved, but if it were, if they did trick him into doing so, they are civilly responsible as for a deceit.  And if with intent to lead the plaintiff to act upon it, they put forth a statement which they know may bear two meanings, one of which is false to their knowledge, and thereby the plaintiff putting that meaning on it is misled, I do not think they can escape by saying he ought to have put the other.  If they palter with him in a double sense, it may be that they lie *like* truth ; but I think they lie, and it is a fraud.  Indeed, as a question of casuistry, I am inclined to think the fraud is aggravated by a shabby attempt to get the benefit of a fraud, without incurring the responsibility.  But I do not think there is any case made out against the defendants of that sort.

There is a third possible case, that a man may make a statement which he intended to mean one thing only, but which negligently and stupidly he sends out in such a shape as to bear another meaning, and the plaintiff acts upon that meaning.  On that I need only say that the defendant, in such a case, would have great difficulty in establishing that it was only honest blundering ; but if he did, as for instance, by shewing that his manuscript sent to the printer, contained the word "not," which by some printer's error was omitted in the published prospectus, or that 10,000 was by a printer's error printed 100,000, which escaped notice in revising the proofs, I should say it was not a fraud, though perhaps gross negligence.  But the question whether in such a case there would be any, and if any, what remedy for the party misled, may, I think, safely be left for decision when it arises.  It never has arisen and I think is not likely ever to arise.  It certainly does not arise now.

H. L. (E.)

1884

Smith
*v.*
Chadwick.

Lord Blackburn.

H. L. (E.)  LORD WATSON :—

1884

SMITH
v.
CHADWICK.

My Lords, I am of the same opinion. Shortly after this case was heard at your Lordships' bar I had an opportunity of carefully considering the judgment which has just been delivered by the noble and learned Lord (Lord' Blackburn), and finding in that judgment all the reasons which have led me to think that the decision of the Court of Appeal ought to be upheld, I have not thought it necessary to repeat them.

LORD BRAMWELL :—

My Lords, I am content that your Lordships' judgment should be as indicated by the noble and learned Lords who have spoken, but I am not content with the reasons they have given.

It seems to me that the prospectus is capable of but one meaning. I know, as a matter of fact, that a most able and acute mind has found it capable of a different meaning from that which I think it is alone capable of ; but according to my understanding (which of course I must act upon, although I may have a sort of general distrust of its value) this part of the prospectus —the main matter—that which alone is of any consequence, is capable of but one meaning, namely, that the actual output was over £1,000,000 sterling per annum or over that rate. I quite agree with the noble and learned Earl on the woolsack that it, may mean that the actual output was at that rate, or that it had come to over that figure in a year. But that either it was at the rate of over one million a year, or was in fact over one million a year, seems to me the only meaning that can be attached to that statement in the prospectus.

Now, if that was the meaning of it, that statement was untrue, because there was not an output actually of over a million a year nor one at that rate. Further, I think the plaintiff said that he so understood it. It was unfortunate that he was not more examined or more cross-examined, but I declare the man gave the only answer I could have given if I had been in his situation : "I understood it according to its natural meaning." I do not see what more he could do, and it seems to me impossible to suppose that he was saying " I understood it to mean that,

fifteen times £75,000 came to over one million," because that
he knew perfectly well, as does everybody else; and if his answer
is understood as meaning that, his answer is understood as mean-
ing, "I make no complaint of untruth in it, because it means
this, that £75,000 multiplied by 15 is over one million." It
seems to me, therefore, that the statement was untrue; that it
was understood in the sense in which it was untrue, and con-
sequently that the plaintiff proved all that he could prove, the
only other possible question being one of inference to a certain
extent, namely, was it fraudulent?

Now I confess that upon that matter I have entertained and
do entertain the greatest doubt. Assuming that the statement
means that the actual turnout was over one million a year or
at the rate of over one million a year, and assuming that the
plaintiff so understood it, it nevertheless remains to be con-
sidered whether that was a fraudulent statement on the part of
the defendants. I am not satisfied that it was, and I will shortly
state my reasons. I cannot but think that the defence which has
been made for the defendants is one they would not have made
for themselves if they had been let alone. I think it is their
counsel's defence. The defendants have sworn that they were
told by Hannays, who were respectable people, people to be
trusted, that the actual rate of production was such that it was
over one million a year, and that they believed it, and in addi-
tion to that one of them has given the convincing proof of his
sincerity that he staked £5000 upon it, which he has lost. I
am not satisfied that these men did not believe the statement
to be true. Under these circumstances I am not dissatisfied
that your Lordships should affirm the judgment that has been
given in their favour.

The question here is not whether they should be in any way
punished for most improvident and rash statements (more than
one) in the prospectus, but whether we are satisfied that this
particular statement was a fraudulent as well as what it was to
my mind, an untrue statement. I am not satisfied of that. Let
me not be misunderstood. An untrue statement as to the truth
or falsity of which the man who makes it has no belief is fraudu-
lent; for in making it, he affirms he believes it, which is false.

H. L. (E.)

1884

SMITH
*v.*
CHADWICK.

Lord Bramwell.

H. L. (E.)  I think it is a pity more time was not taken before Mr. Justice
1884      Fry's judgment was reversed, and I confess I should very much
SMITH     have liked if it had been a possible thing to have had this case
v.        tried over again.   I should like to have been present at the trial
CHADWICK.  and to have had an opportunity of putting some questions to the
Lord Bramwell.  witnesses, both the plaintiff's and the defendants', which it seems
to me might very properly and usefully have been put.   But that
is an impossibility.   We must either affirm the judgment or
reverse it, and I am not so satisfied that a fraud has been made
out against these defendants that I wish to reverse it.

*Orders appealed from affirmed ; and appeal
dismissed, with costs.*

*Lords' Journals* 18th February 1884.

Solicitors for appellants : *Darley & Cumberland, for Newstead
& Wilson, Leeds.*

Solicitor for respondent Adamson : *H. T. Chambers.*

Solicitors for the other respondents : *Ashurst, Morris, Crisp
& Co.*

SMITH *v.* KAY [1859]    VII H.L.C., 749

then, if at all, declared his intention that the legacy given by the will should not be paid.

If this be so, the second codicil must be read as applying [749] to a will in which the legacy of £5000 must be considered as revoked, or rather in which an intention to revoke must be presumed. And the question then is, whether the codicil does or does not show an intention on the part of the testator to treat that legacy, which the law would have presumed an intention on his part to revoke by means of the settlement, as a legacy still subsisting, and which he intended to be paid, and whether, therefore, the presumed intention to revoke is not repelled. I confess I find it difficult to put any other interpretation on his words, " whereas I have given £5000 by my will, I give a farther sum of £7000 by this codicil." It seems to me to be the same thing as, " I give £7000 by my codicil in addition to the £5000 given by my will."

Nor does it seem to me that the previous and subsequent codicils are altogether immaterial. The first seems to show that the testator did not consider the advance of £2000 on his daughter's marriage as a satisfaction *pro tanto* of her legacy; and the third that he did not think the advancement for his son Hervey would have that effect with respect to his legacy.

But as the construction to be put upon these instruments, though all important to the parties in this case, involves no general principle of law, and, as having communicated with my noble and learned friends on this subject, I find that they are satisfied that there is not sufficient in this case to repel the presumption of revocation, I do not think it would be useful to pursue the subject farther.

The following Order was made:—That the said decree or decretal order of the Master of the Rolls, of the 24th of July 1856, and the said decree or decretal order of the Lords Justices of the Court of Appeal in Chancery, of the 17th of February 1857, respectively complained of in the [750] said appeal, be, and the same are hereby reversed: and it is hereby declared that only one sum of £5000 was payable under the will and under the settlement, on the marriage of the Respondent Frank George Hopwood. The money paid to the Respondent in respect of the legacy (the money payable under the settlement having been also paid), is ordered to be repaid, with costs, under the decrees reversed; and the cause is remitted to the Court of Chancery to do therein as shall be consistent with this judgment. Lords' Journals, 10th August 1859.

---

GEORGE SMITH,—*Appellant;* WILLIAM KAY,—*Respondent* [March 28, 29, 31. April 1, 4, 8, 11, 12, 14, 1859].

[Mews' Dig. vi. 446; vii. 160, 166, 189, 411. S.C. 30 L.J. Ch. 45; and, below, 21 Beav. 522. Cited on point as to catching bargains (7 H.L.C. 771) in *Aylesford* v. *Morris*, 1873, L.R. 8 Ch. 491.]

*Trustee and Solicitor—Security—Fraud—Misrepresentation—Pleading—Bill—Evidence.*

In a bill to set aside securities the Petitioner alleged that when he executed the securities he " was led by the Defendant to believe, and did in fact believe, that the Defendant had become possessed of the bills for the amount of which such securities were given to him," in a certain manner which was not the true manner; and " under the circumstances aforesaid, the execution of the sureties was obtained by fraud and misrepresentation, or concealment of the real facts ":

Held, that whatever objections might have been raised on demurrer to the sufficiency of this mode of allegation, it was too late after evidence and hearing to raise any.

*Qu.* (by Lord Cranworth) whether under the authority of *Williams* v. *Lord Jersey* (Craig and Phil. 91), such an allegation would not have been sufficient even on demurrer.

When a party has practised a deception with a view to a particular end, which has been attained by it, he cannot be allowed to deny its materiality. The

299

*onus probandi* that the end was not so attained lies on the party who used the deception.

A security given for the payment of a bill, which has existence only through a fraud, cannot be made available by the supposed holder of the bill, though he may be untainted by the fraud to which it [751] owes its origin, but he must rely on the bill alone, and can derive no benefit from the fraudulent security.

If a bill in equity is supported only by the testimony of a single witness, and is positively, clearly, and precisely denied by the Defendant, it will be dismissed: *secus*, if it is corroborated by letters of the Defendant or other sufficient evidence.

Representations inducing a person to enter into a particular contract, though not made at the moment the contract is actually entered into, constitute, if fraudulently made, *dolus dans locum contractui. dub*. Lord Wensleydale.

The jurisdiction of Courts of Equity will be employed to protect infants, and is not confined to cases where there has been an abuse of a strictly fiduciary character. The principle on which relief is given applies to all cases where influence is acquired and abused, and confidence reposed and betrayed. In the former influence is presumed, in the latter its existence must be proved.

Observations on the moral duties of a defrauded person.

This was an Appeal against a Decree of the Master of the Rolls (21 Beav. 522).

Kay was a young man of fortune. Smith was an attorney and solicitor. Kay succeeded under his father's will to a life interest in real estate, amounting to above £6000 a year, and to above £120,000 in the funds. He came of age on the 11th of April 1854. During the last two years of his minority, he had been acquainted with a person named Johnston, and had indulged in habits of reckless extravagance. His immediate wants were supplied by Johnston from the produce of bills which he accepted to the amount of more than £53,000. He believed that these bills had been discounted by various persons through the intervention of Johnston; in fact most of them were in the hands of Johnston. As April 1854 approached, he was advised by that person to buy them up. Johnston, who had previously been introduced by Smith to Adams, introduced Adams to Kay as a person who would buy up the bills if he [752] was made secure of their being paid on Kay coming of age. Kay, on the 1st April 1854, wrote a letter to Adams, on the subject of his getting in the bills, and made a promise to that effect.

Kay was informed that his wishes had been complied with, and that Adams had bought up most of the bills, but that some to the amount of about £12,000 were in the hands of Smith, who had bought them up at the request of Adams, as Adams was alarmed at the idea of being a holder to such a large amount. In this way Smith also was introduced by Johnston to Kay. On the 12th April 1854, the day after Kay became of age, a meeting of these parties took place, no solicitor or friend was there on the part of Kay, but Smith produced some deeds which he had previously prepared, and Kay executed them. Among these were a bond to the amount of £12,594 and an assignment of some life policies, which securities were executed by Kay in favour of Smith. On the 7th November 1854 Kay filed a bill against Smith, setting forth the transactions between himself and Smith, and the persons named Johnston and Adams, and praying that the bond and the securities executed by him, Kay, on the 12th April 1854, ought to stand only for so much money as had been actually paid by Smith for several bills of exchange got in by him, together with interest at five per cent., that an account might be directed, that an injunction might issue to stay an action then brought on these securities, and for farther relief. On this bill proceedings took place in the Court of Chancery. The parties gave evidence before the examiners, and the injunction was granted and was ordered to be continued till the cause should be heard.

On the 13th June 1855, Kay filed an amended bill. This amended bill set forth the circumstances of the dealings between Johnston, Adams, Smith, and Kay, in rela-[753]-tion to the bills of exchange to secure payment of which the bond and securities in question had been given; and paragraph 44 alleged as follows:—" If the Defendant did, in fact, discount and give full consideration for the bills for the amount of which such securities were given to him as aforesaid (which the Plaintiff

300

does not admit to have been the case), still the Plaintiff submits that the Defendant is not entitled, as against the Plaintiff, to the benefit of such securities; for the Plaintiff shows, that when he executed the same, he had not been informed, and he did not know that the Defendant had ever discounted any of the bills accepted by the Plaintiff as aforesaid, and when he executed the said securities he was led by the Defendant to believe, and he did in fact believe, that the Defendant had become possessed of the bills for the amount of which such securities were given to him as aforesaid, in the manner hereinbefore mentioned, pursuant to or in consequence of the application which the Plaintiff made to the said Samuel Adams to take up or get in the said bills." The 46th paragraph was in these terms:—"Under the circumstances aforesaid, the Plaintiff submits that the execution of the securities, so as aforesaid given by him to the Defendant, was obtained by fraud and misrepresentation, or concealment of the real facts, and that the Defendant ought not to have the benefit of such securities against the Plaintiff, and that such securities ought to be delivered up to be cancelled." The prayer of the bill was that the bond and securities might stand for such principal sum only, if any, as Smith actually paid for getting in the bills, with five per cent. interest; that an account might be taken; that if it should appear that Smith did not pay any sum, that the bond and securities might be cancelled; that on payment of whatever should be found due certain policies of assurance should be delivered up; that Smith [754] should be restrained from proceeding at law against him, and for farther relief.

The cause having been heard before the Master of the Rolls, his Honour, on the 29th February 1856, pronounced a decree by which it was declared that the bonds and securities, dated 12th April 1854, were void as against the Respondent; a perpetual injunction against proceeding at law on these securities, or on the bills, was ordered, and it was likewise, by consent, ordered, that Smith should be at liberty to attend the taking of the accounts in the case of *Kay* v. *Johnston* (21 Beav. 536), which was then pending in Chancery, for the purpose of establishing his claims (if any) against such balance (if any) as might be found due from them to Johnston, and Smith was ordered to pay Kay's costs.

This was the decree appealed against.

The Attorney-General (Sir F. Kelly) and Mr. Rolt (Mr. Jessel was with them) for the Appellant:—The Bill is defective. It does not allege a case of fraud and misrepresentation such as to justify the interference of a Court of Equity. The allegation that the Plaintiff was "led to believe" that the Defendant had not discounted the bills, but had purchased them up or got them in from third parties, is too vague to be answered either in pleading or in proof. There is nothing to show that the Appellant was party or privy to the means by which the Respondent was "led to believe," nor are the allegations in the amended bill sufficient to allow proof that the Appellant was party or privy to such means. There is no fraud here alleged or proved in the making of the contract, but to justify the decree there ought to be fraud *dans locum contractui.*

Some of the evidence, consisting of letters, especially one of the 1st of April 1854, from Adams to Kay, was [755] therefore, improperly admitted; but even if properly admitted, it was not sufficient to justify the decree. The Respondent knew all along that the Appellant had originally discounted the bills; but even if he did not, he was not induced by a mistaken belief on that point to execute the securities, there was no reference to that at the time of their execution. Of course he would have executed them if he had known that the Appellant had originally discounted the bills, for then, as in buying them up, the Appellant would be a creditor to the amount advanced. In any view of the case, the Respondent's belief on this matter was immaterial. The Appellant here was not the guardian or the solicitor of the Respondent, and the rules applicable to transactions between such parties must not be applied in this case. And at all events, if in equity the Respondent is entitled to have the securities set aside, it can only be upon payment of what is actually due, with five per cent. interest thereon. Lastly, the decree is erroneous in restraining the Appellant from suing on the bills of exchange, the bill not having contained a prayer to that effect, and there being nothing in the evidence to justify the imposition of such a restraint on the Appellant. They cited *Hicks* v. *Sallitt* (3 De G. M. and Gord. 782), *Bainbridge* v. *Moss* (3 Jur. N.S. 58), *Irving* v. *Kirkpatrick* (7 Bell's Sc. App. Cas.), *The National*

*Exchange Company* v. *Drew* (2 MacQueen's Sc. App. Cas. 103), *Wilde* v. *Gibson* (1 H.L. Cas. 605, 620), *Evans* v. *Bicknell* (6 Ves. 174-183), *Adamson* v. *Evitt* (2 Russ. and Myl. 70), *Harris* v. *Wall* (1 Exch. 122), *Price* v. *Berrington* (3 Macn. and Gord. 486), *Pasley* v. *Freeman* (2 Smith Leading Cas. 62), *Colyer* v. *Finch* (5 H.L. Cas. 905), *Fell* v. *Gwydyr* (1 Si. 63), *Pulsford* v. *Richards* (17 Beav. 87), *Shedden* v. *Patrick* (1 Macq. Sc. App. Cas. 535).

[756] Mr. Roundell Palmer and Mr. Dickinson, for the Respondent.—The bill sufficiently alleges a case of misrepresentation and fraud, and there is no part of the evidence which was improperly admitted, and which does not sustain the charge in the bill. The Appellant knew what representations had been made to the Respondent; he had himself arranged the making of some of them, and he took advantage of the Respondent's belief in those representations, which he himself well knew to be false, in order to obtain these securities. Immediately after the Respondent had attained his full age, and when he had no legal adviser, except the Appellant himself, were these securities obtained. The whole transaction was tainted with fraud, and the Appellant was well aware of its true nature, did not disclose to the Respondent, and thereby obtained an advantage which a Court of Equity will not allow him to retain. It is not merely against guardians and solicitors properly so called, that a Court of Equity will protect infants; such protection will be afforded when other persons older and more capable than themselves have abused the simplicity and confidence of unprotected persons. The cases of *Bridgman* v. *Green* (2 Ves. 627; Wilm. 58), *Hugenuin* v. *Basely* (14 Ves. 273, 284), *Cooke* v. *Lamotte* (15 Beav. 234), *Savery* v. *King* (5 H.L. Cas. 627), *Williams* v. *Lord Jersey* (Cr. and Phil. 91), *Malcolm* v. *Scott* (3 Hare, 39), *McMahon* v. *Burdett* (2 Phill. 127), *Attwood* v. *Small* (6 Clark and F. 232), *Reynell* v. *Sprye* (1 De G. Mac. and Gord. 660), *Chesterfield* v. *Janssen* (2 Ves. 125) were cited.

The Attorney-General replied.

[757] The Lord Chancellor (Lord Chelmsford).—My Lords, this is an appeal from a decree of the Master of the Rolls, declaring that a bond for £12,594, and an indenture of assignment of policies of assurance on the life of the Respondent, executed the day after he came of age, to secure payment to the Appellant of several bills of exchange, accepted by the Respondent during his minority, were void as against the Respondent, on the ground of their having been obtained from him through fraud and misrepresentation.

The objections which have been raised against the decree may be considered under three general heads. *First*, that the bill does not state with sufficient certainty any case of fraud. *Second*, that the misrepresentation which is alleged is immaterial, as it did not give occasion to the securities. *Third*, that if the bill states a case of fraud, the particular fraud alleged is not proved.

Upon the first objection it will be necessary shortly to consider the case which is made by the bill.*

The Appellant has contended before your Lordships, that these statements in the bill amount to no case of fraud against him, and he has cited various authorities to prove that where fraud is the foundation of a bill for relief, it must be clearly and distinctly averred. My Lords, it is unnecessary to consider these cases, because the general principle which they establish is not disputed. And the only question is, whether it is applicable to the present case. Now it must be admitted that the bill might have been framed with more clearness and precision, and that it ought to have pointed more distinctly to the grounds [758] upon which the Appellant's securities were to be impeached. Whether the allegation that "the Plaintiff was led by the Defendant to believe that he had become possessed of the bills for the amount of which such securities were given in the manner before mentioned," which constitutes the whole of the charge against the Defendant, would have been sufficient upon demurrer to the bill, it is unnecessary to determine, for I think that it is much too late for the Appellant now to urge any such objection. He put in his

---

* His lordship stated it fully, but as the judgment of the Master of the Rolls on the facts was unanimously affirmed, this report is confined to the points of law now first presented for consideration.

answer to the bill, and replied to its various allegations; he had the fullest information of the case to be made against him from the Plaintiff's affidavit, and he answered it by his own affidavit, fully and particularly; and it never occurred to him, till he appeared at your Lordships' bar, that he had any pretence for asserting that the case against him was imperfectly stated, or that he was not aware of the specific grounds upon which his securities were to be invalidated. I do not say that this objection would have been successful if it had been made at an earlier stage of the proceedings, but at all events it cannot prevail now, that it is for the first time urged, upon the appeal from the decree.

The bill, therefore, being taken to contain a sufficient statement of a case against Smith, the next objection which he makes is, that the misrepresentation which is alleged, if proved, is immaterial, as it could not have been the cause of the securities being given. And he says that the only point which could vitiate the securities, would be a fraud *dans locum contractui*, that is, such a fraud as occasioned the contract.

The misrepresentation which is alleged against Smith is, that having obtained possession of some of the bills of exchange accepted by Kay, by discounting them with Johnston, he pretended that he had received them from [759] Adams after they were got in by him as represented, and that Kay executed the securities under the false impression thus produced upon his mind. Now it is contended that this representation is wholly immaterial, that it was perfectly indifferent to Kay in what manner Smith became the holder of the bills, provided he gave consideration for them, and that if Kay had been told the whole truth, he would equally have been willing to give the securities. But can it be permitted to a party who has practised a deception, with a view to a particular end, which has been attained by it, to speculate upon what might have been the result if there had been a full communication of the truth? How is it possible to say in what manner the disclosure would have operated upon Kay's mind, that he had been the dupe of a scheme of deception, which up to that moment had been successful in inducing him to believe that Adams had befriended him in taking up the bills, and that Smith had kindly co-operated with him. For my part, I think that the Appellant takes too sanguine a view of probabilities when he assumes that the discovery that Johnston was, after all, the holder of the greater part of the bills, would still have left Kay in the same mind to ratify the transaction, as he was brought into by the misrepresentations which were designedly made to him.

But the Respondent's case hardly wants the aid of the particular misrepresentation imputed to the Appellant, because it appears to me that, if the securities were given entirely in consequence of the fraud of Johnston, either alone or in concert with Adams, although Smith was not an immediate party to the fraud by which they were obtained, he could not, under the circumstances of the case, maintain any right in them, according to the case of *Bridgman* v. *Green* and other similar cases which have been cited in the argument. For I have no difficulty in [760] saying, as to the case supposed by the Attorney-General, of a party, the *bona fide* holder for value of a bill of exchange for whom a security is obtained by the fraud of a third person of which he is himself innocent, that a security of this description, which has existence only through a fraud, cannot be made available by the supposed holder of the bill, however he may be untainted by the fraud to which it owes its origin, and that he must rely upon the bill alone, and can derive no benefit from the fraudulent security.

I therefore pass to the third objection which the Appellant sets up to the decree, viz., that there is no evidence to establish against Smith the particular fraud which is alleged in the Bill. I may notice, in passing, an objection which was made by him, that certain letters which have been used to implicate him in the transactions of Johnston and Adams with Kay, are not set out in the bill so as to give him notice of them. But it is not the office of the bill to do more than to state, with sufficient clearness and precision, the grounds upon which relief is sought in equity; it ought not to show by what evidence the case alleged is to be established.

In considering the evidence it will be unnecessary to depart upon this occasion from the principle which we have been reminded has been long settled in equity, that if the bill is supported by the testimony of a single witness only, and the Defendant, by his answer, positively, clearly, and precisely denies the allegations it contains,