the Court will not make a decree, but will dismiss the bill. This rule is very clearly stated by my noble and learned friend, Lord Cranworth, in *Jordan* v. *Money* (5 H.L. Cas. 185). But a qualification of this rule of evidence equally well [761] established is, that if the testimony of the one witness is corroborated either by the letters of the Defendant, or by other circumstances, that will be sufficient to turn the balance so as to produce preponderating evidence upon which the Court can act. And this corroboration appears to me to be abundantly supplied in the present case.

[His Lordship here proceeded with a most elaborate and minute statement of the facts of the case, and declared his entire concurrence with the judgment of the Master of the Rolls upon them.]

After this long examination of the circumstances of this case, it is almost unnecessary for me to say, that in my judgment the fraud which is charged upon the Appellant is completely established, and that he must suffer all the consequences of having chosen to unite with others in a scheme of deception which, perhaps, it was unnecessary for him to resort to in order to obtain the confirmation of his own transactions. If this had been nothing more than the case of a young man completely under the control and influence of another person, and, acting under that influence, being induced to execute securities for bills which he had accepted during his minority, without any independent legal advice or assistance to enable him to understand and learn his true position, I should have thought it would be incumbent upon those who endeavoured to avail themselves of those securities, to give the clearest and most satisfactory evidence of fair dealing with him before they could be permitted to maintain them. But the present case goes far beyond that. Omitting altogether the mode in which the bills were obtained from Kay, he has been prevailed upon to ratify them, not merely by a concealment of the truth, but by a planned and concerted misrepresentation of the circumstances, contrived and determined upon for the very purpose of entrapping him into the execution of these [762] securities. Whether Smith was privy from the first to Johnston's designs upon Kay, to the encouragement which he gave to his extravagance, and to all the contrivances to entangle and retain him in the net with which Johnston's baneful influence had surrounded him, is not necessary to be determined. But it is to my mind most clearly and completely established that Smith was a consenting and contriving party to a deliberate plan of deception which was practised upon Kay for the purpose of inducing him to give the very securities which are impeached by this suit; that the securities followed upon the misrepresentations, and were induced by them, there being nothing to prove that they would otherwise have been given; and that it would, therefore, be contrary to every principle of equity to allow them to stand.

My Lords, I submit that, under all these circumstances, the decree of the Master of the Rolls ought to be affirmed.

Lord Cranworth.—My Lords, my noble and learned friend has so fully gone into, and I might almost say exhausted, this case, that it is hardly necessary to add anything to what has been already said. I thought it right, however, in a case of such importance, importance in amount, importance in reference to the characters of the parties concerned, and importance in reference to the principles involved, to say a few words, which I shall do, not by again going over the facts of the case, but by stating very shortly a few propositions which I think have been and ought to be, kept in view in deciding this case.

The first objection that was made on the part of the Appellant, or at least one objection which I will deal with first, is an objection to the pleading. It was said that the [763] fraud complained of is not stated in the bill with that precision which the Court requires. Now, my Lords, I should be very loth indeed to throw any doubt upon what was stated, that a court of equity, as well as a court of law, in suits instituted for the purpose of impeaching transactions for fraud, requires that it should be distincly stated what that fraud is, so that the parties who have to meet it may know what the charge is, and therefore what the defence, if they have any, ought to be.

Here the allegation, as pointed out by my noble and learned friend, is, that Kay was led by the Defendant to believe, and did, in fact, believe, that the Defendant had possession of the bills, by means of their having been got in from the persons who had discounted them. Now, undoubtedly, that is rather a vague allegation, not,

SMITH *v.* KAY [1859]    VII H.L.C., 764

however, I must add, in my opinion, so vague as the allegation in the case of *Williams* v. *Lord Jersey* (Craig and Phil. 91), where it was alleged that the Defendant had "encouraged the Plaintiff." Yet, even to that allegation Lord Cottenham thought that a demurrer could not be sustained, but that at the hearing such encouragement must be proved as would entitle the party to relief. My Lords, the propriety of that decision is not now in question before your Lordships. All that I would say upon it is, that I think it is a very formidable authority against the possibility of sustaining a demurrer to this bill upon the allegation of the party having been "led to believe."

I see how it was this allegation came to be put in this vague form, namely, that the facts, upon which the equity in the amended bill is founded, had transpired after the answer to the original bill had been put in. In a great measure, the evidence by which it was supported did not [764] transpire till a long while afterwards. It is very true, that perhaps, in strictness, it would have been better, even a second time, to have amended the bill, and to have stated the charge with a little more precision. But that has become totally immaterial, inasmuch as, from what subsequently followed on the part of the Defendant, it was quite clear that he perfectly well understood what it was that he was charged with, because he showed that he was prepared to answer it. In my opinion, however, acting upon the authority of *Williams* v. *Lord Jersey*, the bill would not have been demurrable if the case had been as originally stated.

With regard to the authorities that have been relied upon to show that it would have been demurrable, they are clearly distinguishable from the present case; one was a Scotch case, but the principle was the same; indeed, the principle must be the same in every system of law in civilized countries. If you charge a person with fraud, you must state in your bill or summons, or whatever it may be, what you mean to charge. In the case of the *National Company* v. *Drew* (2 Macq. Sc. Ap. Cas. 103), it was sought to impeach the validity of certain deeds, and to reduce certain documents which were sought to be impeached, upon the ground that, according to the language of the parties seeking to impeach them, they had been obtained by a "tissue of falsehoods." It was not necessary, if I recollect rightly, to decide that point in this House, because the decision went upon another ground; but I have no hesitation in saying, that upon that case coming before me, when I had the honour of holding the Great Seal, I did lay it down, and I adhere to it still, that a bill, as it is called in this country, or a summons in Scotland, that seeks to set aside or reduce an instrument upon the ground that it has been [765] obtained by a "tissue of falsehoods," would not do without more. How can the Defendant answer such a charge as that? It is quite possible that he may not know what is meant by it.

Then the other case was a case before Vice-Chancellor Wood, of *Bainbridge* v. *Moss* (3 Jur. N.S. 58). It was a case in which there had been immense litigation between the heir at law and certain devisees claiming under the will, a litigation which had extended over a great number of years, and it had been attempted to put an end to that by a deed of compromise between Bainbridge, who asserted the sanity and competency, and Moss, who asserted the insanity and incompetency of the testator to make the will. That deed was executed. A large sum of money was paid upon the footing of the arrangement which had been entered into. And then Bainbridge filed a bill to set it aside, upon the allegation that Moss, who insisted upon the testator or alleged testator being *non compos*, knew that he was sane. The Vice Chancellor held that that will not do. What do you mean by "knowing that he was sane?" Whether a man is or is not of sound mind to dispose of his property is a technical question of fact, not of law. But an allegation that a man knows another to be sane, having been all along alleging that he is not sane, is one which a man is really unable to answer. The Defendant may well say, "You must know what you mean. What do you mean? I insist that he was not sane. You insist that he was sane, and you say that I know he was sane. What did I know that you did not know?" I think, therefore, it is quite clear that that was no sufficient allegation; it admitted no traverse of the fact, and therefore it was altogether demurrable. But here it cannot be said that the [766] allegation is of a nature not to be capable of being understood. The allegation may be loose, but it is perfectly distinct. It is, that "you led me to believe that when I was doing a particular act I was doing

VII H.L.C., 767                    SMITH *v.* KAY [1859]

something different from what you knew I was doing " ; therefore it does not come at all within that class of cases that was referred to in the argument.

I am strongly of opinion, therefore, upon the authority of *Williams* v. *Lord Jersey* [Cr. and Ph. 91], or even independently of that authority, that this bill would not have been demurrable upon that ground, even if the question had been attempted to be raised by demurrer; but to attempt to raise such a question, after the answer to the bill had been given in, and the Defendant has shown distinctly that he perfectly understood the nature of the charge, and after elaborate evidence has been gone into upon it, would be trifling with the Court.    According to the old practice, if a Defendant had, as in the present case, been called upon to answer to the bill, and evidence had been gone into, and he could have shown at the hearing that he was quite taken by surprise, by the production of certain letters or alleged letters or drafts of letters, and other facts being proved against him, of which he had no notice in the bill, the course would have been, which nobody would have controverted, that the Court would have said, This Defendant must have an opportunity of answering this; he has not had an opportunity hitherto, because you have chosen so to frame your pleadings as not to let him know to what point it was that he was to direct his evidence; therefore, before any decree is made giving relief, an inquiry must be directed by a preliminary decree, giving him an opportunity to clear up all those matters which by your bill, as originally framed, you did not give him an opportunity to clear up.    That was the course under the old practice; indeed, I think I [767] recollect cases in which before the hearing, if it had been shown that any particular thing like a letter or a deed, had been sprung by surprise upon the Defendant, the result has been that, upon application made, the publication was postponed to enable the Defendant to examine a witness to explain the particular fact, or in some way or other justice was done under the circumstances of the case.    But now that the course of practice has been altered, that is altogether unnecessary.    The allegations of the bill are supported by verbal testimony, testimony, perhaps, not quite so satisfactory as an examination in Court before the judge who has to decide the cause, but still an examination in what I may call open court, before a presiding officer, and which examination enables the Defendant to know exactly in what manner every allegation in the bill is attempted to be proved; and he has advantages in that which he has not in a trial at law, because, after all that has been done, the matter is adjourned for a fortnight to enable him to meet the case; therefore he cannot possibly be misled.    The principle of the Court is, that everything that is to be charged against the Defendant must be *allegatum* as well as *probatum*.    And the proper mode of alleging is no doubt in the pleading.    And when it has been alleged perfectly in the pleadings, it is, for all practical purposes, *allegatum* as well as *probatum*.    When the witnesses are examined, the Defendant knows perfectly well what he has to answer; in fact he does answer.    And therefore I am of opinion that to listen to that objection now, would be to regard form instead of substance; indeed, it would be proceeding in a mode which the closest analogy to common law would not justify. There are many cases in which, before the law was altered, there might have been a special demurrer, because the allegation was not sufficiently explicit.    Special demurrers are now done [768] away with.    But according to the old practice, you might have specially demurred.    Take this very case; you say you led me to believe. I do not know what you mean by that.    In such a case I suppose a special demurrer would have been allowed; but if the Defendant chooses to plead over, and go to trial, and there is a verdict, that cures any defect of this sort.    And *a multo fortiori* ought it to do so in this proceeding.

I think, therefore, that there is no question at all about the pleadings; they are perfectly accurate and sufficient.    I see exactly how it arose that the allegation was not so distinct as, it probably would have been, if all the materials had been before the counsel in the first instance when the bill was framed.    But there was naturally a wish to avoid any unnecessary delay; and the matter having been stated in such a way as really enabled the party to answer (I say that for the best of all reasons, because in fact he did answer), it would have been a sort of pedantry to amend the bill by adding farther charges in order to introduce (as it were) evidence which had been already furnished by both sides.    Therefore, even supposing that it might have been better to amend the bill, it is utterly immaterial.    The matter is now fully before us

SMITH *v.* KAY [1859]    VII H.L.C., 769

for decision, as regards the substance and not the form.    Those are all the observations which I think it necessary to make upon this point.

[His Lordship here observed on the facts of the case, and declared his entire concurrence with the Lord Chancellor's judgment upon them.]

There is distinct and independent evidence that he was a party to leading this young man to believe that the bill for £41,000 and £12,000, altogether £53,000, were bills that had been got in in pursuance of the suggestion of Johnston, and that the getting them in by means of Adams would be for his benefit.

[769] Then this, a very desperate argument I thought, was urged, that although that may be proved, the allegation is not generally that Smith led Kay to believe that those were the bills got in by Adams, but that the allegation is, that he so led him to believe at the time when he executed the bond at the meeting ; whereas in truth, in the evidence, it is shown that nothing of the sort was then referred to.    My Lords, in order for that argument to have any weight, it must be tested in this way.    Supposing it was distinctly proved, and there was no question at all about it, that the day before they met Smith had distinctly in terms said to him, Do not execute any bond except for bills which are proved to have been got in by me or Adams.    I hold £12,000, and the rest are held by Adams.    Suppose he had distinctly said that, and the allegation was that " at the time Kay executed the bond, Smith led him to believe," is it a credible proposition that the evidence would not support that allegation?    It is a continuing representation.    The representation does not end for ever when the representation is once made; it continues on.    The pleader who drew the bill, or the young man himself, in stating his case, would say, Before I executed the bond I had been led to believe, and I therefore continued to believe, that it was executed pursuant to the arrangement.

Then, another suggestion made on behalf of the Appellant was, that although this was a fraud at the time of the execution of the bond, it was not a fraud which occasioned the execution of the instrument ; not, according to the language of the law, *dans locum contractui.*    My Lords, I am not at all clear that it was not *dans locum contractui.*    Johnston was a man of mature years ; he must have been then 32 years of age, and the young man was then 21.    Johnston had before told him, " These bills are outstanding, they will be presented at your bankers ; it will be much to [770] your interest to have them all got in."    I think it is one proof of the entire ignorance of business of this young man that he did so believe ; that he acted upon that belief. I think it is very doubtful, at least it is not at all clear to me, that he would have given the securities, if this had not been represented to him. But the question is, would he have given the securities if the whole truth had been told to him?    I think even this young man, when called upon to execute the bond, would have started if he had known all that had been going on. But at the same time it is quite unimportant. It does not lie in the mouths of these persons to say what he would have done if they had not concocted the fraud, and if there had never been any deception at all practised.    That is not the question.    The question rather is, what this young man would have done if he had known all that had really taken place.    In my opinion it is very doubtful whether he would have given the securities, for the reason I shall presently state ; but I do not think that is the issue here.    The issue is, not whether the Plaintiff has shown that he would not have executed the securities but for the representation of Smith, but whether Smith has satisfied, or can satisfy us, that the Plaintiff would have executed them without. The *onus probandi* is on Smith in this case, for the reason which I now proceed to state.

In my opinion, although this bill is framed upon the ground of this supposed fraud, the circumstances of the case as now proved make it abundantly clear that this fraud was totally immaterial in order to entitle the Plaintiff to set aside this bond, upon the ordinary principle of the Court, which protects an infant, or any other person, who is, from the relations which have subsisted between him and another person, under the influence, as it is called, of that other.    My Lords, there is, I take it, no branch of the [771] jurisdiction of the Court of Chancery which it is more ready to exercise than that which protects infants and persons in a situation of dependance, as it were, upon others, from being imposed upon by those upon whom they are so dependant.    The familiar cases of the influence of a parent over his child, of a guardian over his ward, of an attorney over his client, are but instances.    The prin-

**VII H.L.C., 772**          SMITH *v.* KAY [1859]

ciple is not confined to those cases, as was well stated by Lord Eldon, in the case of *Gibson* v. *Jeyes* (6 Vesey, 266, 278), in which he says it is "the great rule applying to trustees, attornies, or any one else." Now, what does "any one else mean? It is contended that it applies only to persons who stand in what is called a fiduciary relation. I believe, if the principle is examined, it will be found most frequently applied in such cases, for this simple reason, that the fiduciary relation gives a power of influence: but I could suggest fifty cases of fiduciary relation where the principle will not apply at all. If a man makes me trusteee of an estate, to pay certain secur- ities, and then ultimately to stand possessed of it for him, we deal with one another in purchase, or in any other way, perfectly at arm's length. I have no influence over him because I am his trustee. It is only a particular sort of trusteeship that gives the influence.

Now, looking at this case upon that general principle, can any influence be more direct, more intelligible, and more to be guarded against than that of a sharper like Johnston, who gets hold of a young man of fortune at nineteen years of age, and takes upon himself to supply him with means, pandering to his gross extravagance during his minority, and extorting from him, or at least obtaining from him, for every advance that he has made, a promise that the moment he comes of age it shall all be [772] ratified so as to make the securities good? I think there is no case which can be suggested to which the principle of a court of equity more distinctly applies, and in which it will be more readily exercised, than that of a person obtaining and exercising such influence. We do not want the technical description of his making himself guardian in his own wrong, as it were, over this infant, and then misleading him to give securities, which, if he had been of riper years, he would not have given. The principle of the Court, as has been often remarked, is not confined even to the time whilst the relation subsists. During the minority of the child, or of the ward, of course he can give no valid security. But the Court has said, that after that relationship has terminated, no advantage shall be taken of the child, I think, until the child has either had independent advice, and is acting, therefore, quite free from influence, or till so much time has elapsed that it may be fairly supposed that he thought for him- self, and has consulted any independent adviser whom it may be reasonable that he should consult. In the Court of Chancery, I think, we are obliged to cut the knot as to the question of time, by naming some time. I believe a security given by a person under age is always liable to be impeached as being given under undue influence, unless it can be shown that the infant had professional advice, or unless due pre- cautions have been taken against his acting under undue influence, and, after coming of age, unless a certain time has elapsed; I believe the rule is, that a year must elapse. It is necessary to draw some line, but, of course, if it could be shown that undue influence was exercised after the year, the same principle would apply; but, generally speaking, it is assumed that, after the expiration of a year, the young man would have been in the world and be able to judge for himself.

[773] Now, the application of that principle would certainly enable Kay to set aside anything obtained by Johnston. And, in my opinion, Smith, as regards these ad- vances, cannot stand in the slightest degree in a different position from Johnston; he advanced everything with the knowledge that it was all going to the young man. It did not all go to him; but he says, that he supposed that it was all to go to the young man, and that it was all upon promises from the young man to Johnston that the securities should be ratified when he came of age. I think that the principle that would be applicable to Johnston is just as applicable to Smith; and that upon that ground, if the bill had been framed after all these facts were known, it would have been quite unnecessary to set up the particular fraud, but that everything might have been set aside, even if there had been no suggestion of Adams' getting in the bills, or even of those schemes that were concocted just before the young man attained his age of twenty-one.

I have no other observations to make upon this case except one, which I feel bound to make for the protection in future of this young man. It has been often said that courts of justice have nothing to do with what are called principles of honour, and there is a well-known case in the books, with which those who practise in the courts are very familiar, in which, upon a counsel saying to Lord Thurlow, "Your Lordship must think in point of honour" so and so, Lord Thurlow said, "Upon that ground you

must apply to the person himself; I do not give any opinion upon that subject." I should have abstained from saying anything upon that subject, were it not that the duties of this young man in point of morality and honour have been strongly urged by the counsel for Mr. Smith at the bar; and that having been done, I think I am not stepping beyond the [774] line of my duty when I say that I consider that this young man, upon the strictest principles not only of morality, but of what, if it differs from morality (which perhaps it does not) I shall call the fairest and most honourable dealing and the strictest principles of honour, is not called upon to pay a single farthing, except what, upon an account between himself and Johnston, shall appear to be due, as having come into his pocket, either in money or in money's worth. And if any man ever suggests to him that he is bound otherwise to Mr. Smith, I think he will be advising him contrary to what are not only his interests, but also to what the interests of the public require to be asserted as the grounds on which he ought to act.

Lord Wensleydale.—My Lords, I have very few observations to add after the full and ample discussion which every part of this case has undergone by my noble and learned friend on the woolsack, and my noble and learned friend opposite. I agree in almost every observation which has been made by both of them. There is only one point upon which my mind is not entirely satisfied. I take it to be clear that the statement made by my noble and learned friend opposite as to the power of the Plaintiff to give evidence of all these transactions, under the statement of the case set forth in the bill, is quite satisfactory. The bill ought to have been demurred to if it was not framed in a proper manner, but, that not having been done, it is now too late to raise that objection.

I take it to be unnecessary, also, to discuss the question whether Mr. Kay stood in such a situation either towards Johnston or towards Smith as to require from him a fuller explanation of the case, in order to enable a court of equity [775] to set aside the deeds which had been given upon the ground of moral fraud. I think it unnecessary to discuss that, because it has been most clearly made out, from the statement of my noble and learned frind on the woolsack, that Smith was a party to the fraud. It is a matter which cannot admit of the least doubt, that in a very early part of the transaction between these persons, Smith and Johnston were in league together to practice a fraud upon Kay, so as to induce him to give his ratification after he came of age to an enormous number of bills which had been put in circulation. That is a matter beyond all doubt, and I am sure I should only weaken, if I make any observation upon the subject, the strong and satisfactory observations which have been made by my noble and learned friend on the woolsack. It is a point which does not admit of any doubt.

Therefore I think the deeds must clearly be set aside upon the ground of fraud, provided only one thing is shown, namely that that fraud was the cause of the contract. Now, I take it to be perfectly clear that, in order to set aside a deed on the ground of fraud, there must be moral fraud, and fraud causing the contract, *dolus dans causam contractui;* not necessarily a fraud which is the sole cause of the contract, but a fraud without which the contract never would have been made. This principle has been often laid down, and is, I apprehend, indisputable; and it is admitted in the great case of *Small* v. *Attwood* (6 Clark and Fin. *232*), in different forms of expressions, by most of the noble and learned lords who were concerned in giving judgment in that case. Fraud gives a cause of action if it leads to any sort of damage; it avoids contracts only where it is the [776] ground of the contract, and where, unless it had been employed, the contract would never have been made.

The only part of the case upon which my mind is not entirely satisfied, even after the observations which have been made upon the subject by my two noble and learned friends, is whether this fraudulent conspiracy so entered into by Johnston and Smith was really the cause of these particular securities being given upon the 12th of April 1854. It appears to me that the object of that fraud was different. The object was to induce Kay to accept bills to the amount of upwards of £50,000, which they had obtained from Kay without any valuable consideration. It was to enable them to pocket the money when Kay came of age, as though they had been the real holders of the bills for valuable consideration. Therefore it was represented to Kay that all these bills which had come into the possession of Johnston, or into the possession of his agents, had been out in circulation, and were in the hands of persons who had

VII H.L.C., 777                SMITH *v.* KAY [1859]

given valuable consideration for them. That was the immediate object of that conspiracy, which was no doubt carried out with a great deal of fraud from the beginning to the end of it; but it did not relate to any of the bills of which other persons were already possessed for valuable consideration. With regard to those which any persons had for valuable consideration, not being those which Johnston had, it seemed unnecessary to enter into any conspiracy at all. Therefore, that being the object of the parties, I am not satisfied that it is not to be treated as being confined to that. Looking at the whole case, I feel a doubt in my mind (I say no more than that) whether the fraud of which they are unquestionably guilty, a great moral fraud, which one can hardly characterise in language strong enough, though unquestionably it was the cause of [777] the securities being given to Adams for the benefit of Johnston, I doubt myself whether it is satisfactorily made out that that fraud really led to the giving of the securities to Smith. My mind is not quite satisfied upon that point.

Nor do I entirely concur with my noble and learned friend opposite, that there is any difference in the rule upon this subject, according to whether the deed has been obtained by fraud of such a nature as to avoid the instrument at common law, or whether it has been obtained by improper conduct, which would avoid it in a court of equity. I say no more than that I am not quite satisfied upon that point. But upon every other part of the case I entirely concur in the observations which have been made by my two noble and learned friends. Probably I am wrong in my view of the case as to those two points upon which I have expressed doubts, because both my noble and learned friends, and I believe also my other noble and learned friend opposite, think that this fraud or misconduct, whichever it was, on the part of Smith and Johnston is sufficiently shown to have led to the giving of these securities, and that therefore the securities are void. All that I say is, that I am not entirely satisfied upon that part of the case.

Lord Kingsdown.—My Lords, in this case the facts appear to me so clearly proved, and the rules of the Court of Equity applicable to it are, in my view, so free from all doubt, that I should have thought it was scarcely possible for any counsel, however ingenious, to raise any other question in the cause than whether the pleadings were so framed, and the proceedings in the cause had been such as to enable a Court of Equity to administer to the Plaintiff that relief to which, upon the merits, he was, beyond all controversy entitled.

[778] My Lords, with respect to the observations which have just been made by my noble and learned friend opposite, I confess I am unable to discover upon what ground it is possible to separate the bills in the hands of Smith from the bills in the hands of other persons. The short case is this: that Johnston having acquired unbounded influence over this young man, procures from him acceptances to the amount of £53,000 in consideration for which he advances to him in money, or in money's worth, something less than £23,000, certainly something less than £24,000. And the acceptances thus given are used by Johnston for the purpose of raising money from Smith and from Adams, both those parties being perfectly cognizant of the position in which Johnston stood towards Kay; and although they might not be, and probably were not, acquainted with the details of the fraud practised upon him, and with the scandalous devices and gross frauds by which this young man was induced to give acceptances to twice and more than twice the amount of all that was paid to him, yet they knew perfectly well the position in which Johnston and Kay stood to each other; and they advanced their money to Johnston upon the assurance of Johnston, that when this boy came of age, by his influence these securities, which were mere waste paper during his minority, should, as soon as he came of age, be confirmed and established by him, in utter ignorance of every circumstance which it was important that he should know, in order to give that confirmation the slightest validity.

I quite agree with my noble and learned friend on my right, that it is not the relation of solicitor and client, or of trustee and *cestui que* trust, which constitutes the sole title to relief in these cases, and which imposes upon those who obtain such securities as these, the duty before they obtain their confirmation, of making a free disclosure of [779] every circumstance which it is important that the individual who is called upon for the confirmation, should be apprised of. The principle applies to every case where influence is acquired and abused, where confidence is

SMITH *v.* KAY [1859]    VII H.L.C., 780

reposed and betrayed. The relations with which the Court of Equity most ordinarily deals, are those of trustee and *cestui que* trust, and such like. It applies specially to those cases, for this reason and this reason only, that from those relations the Court presumes confidence put and influence exerted. Whereas in all other cases where those relations do not subsist, the confidence and the influence must be proved extrinsically; but where they are proved extrinsically, the rules of reason and common sense, and the technical rules of a Court of Equity, are just as applicable in the one case as in the other. How then is it possible in such a case as this, that these securities given by Kay can stand for one moment, even supposing that this particular representation upon which the bill is mainly founded, had never been given?

But there is one part of this decree to which my noble and learned friends have not adverted in their observations which has excited some remark during the discussion at the Bar, I mean that part of the decree which directs that an injunction shall issue to restrain Smith from suing upon these bills, which it is said is an improper direction, not asked by the prayer of the bill, and not warranted by the facts stated in it. Now, my Lords, I rather think, upon consideration, that the course which has been taken in this respect is one which must be considered to have been acquiesced in on the part of the Appellant, and which is now first objected to by those who, not having been counsel originally in the case, have now appeared on his behalf at your Lordships' Bar.

The situation in which this case stood was very remark-[780]-able. This young man, having reason to doubt whether he had not been defrauded by misrepresentation and deceit, had filed a bill, I think before the institution of this suit, for the purpose of setting aside these securities on the terms of paying every shilling which had been actually advanced to him, or applied for his benefit, with interest upon the sums so advanced. It is, in my opinion, a great mistake to suppose that the equity of the plaintiffs in that case was founded exclusively or even principally upon the fact that the securities were given during his minority. He would have been equally entitled to relief if the same transactions had taken place within two years after he came of age, instead of two years before, if the same influence had been obtained and abused, and the same confidence reposed and betrayed, as he is under the circumstances which actually occurred. The difference, I apprehend, to be this: that in the former case he would have been entitled to relief only upon the terms of paying what had actually been advanced, whereas no such terms could have been imposed upon him in the case of his infancy, except upon the ground of that assent which he had voluntarily given. It turns out that having made this offer, which I perfectly agree with my noble and learned friend on my right (and I heard with the greatest satisfaction the observations which he made on that subject), was the utmost that could possibly be required from this young man, and having filed this bill, he is told or he believes that, in addition to those monies which Johnston has advanced, Smith has actually paid, in taking up bills by his desire from the hands of third persons, a farther large amount; and he then makes an offer, which I must say, seems to me to go beyond, or at all events to go to the utmost extent of anything that he could be required to do. He says, Whether I have received this or not, if these monies have been *bona fide* [781] paid to *bona fide* holders of these bills, though not a shilling of it has ever been paid to my use, that money I am content to pay; but then, upon my paying what has been actually paid, I desire to have those securities given to me. Well, my Lords, it turns out that that representation, which beyond all doubt had been made by Smith, or with Smith's sanction, is utterly false. There was no such case made out. It turns out upon investigation, that his bills were a portion of those £53,000 bills which Johnston had received from Kay, and upon which Johnston had raised £30,000.

In this situation of things it is clear that the Plaintiff had completely (at least in my opinion) made out the case which he had set up by his bill, and that he was entitled to the relief which he asked; he was entitled to have those securities set aside. He had not asked, and possibly he was not entitled, upon the bill, so standing, to have those bills of exchange or acceptances delivered up. But this suit seems to have come on for hearing at the same time with the suit of *Kay* v. *Johnston*, and in that suit, on the very day on which the decree in this case was made, a decree

was made for the purpose of taking an account of all that had been advanced in the accounts between Johnston and Kay, and of ascertaining whether, upon the balance of those accounts, anything was due from Kay to Johnston.  Now, although Smith had not, in my opinion, the least colour of right to resort to Kay, he had a clear right to resort to Johnston for anything that Johnston was entitled to receive from Kay.  In this suit, as it was constituted, there was no power of giving any such relief.  Johnston was not a party to this bill, but the cause of *Kay* v. *Johnston* was in hearing at the same time, and it was suggested, by the Master of the Rolls apparently, that Smith should be per-[782]-mitted to go in in that suit and establish any claim for the balance which might be found due in that suit between Kay and Johnston.  Now, that was obviously for Smith's advantage, but if he availed himself of that advantage, he could not at the same time sue Kay upon those bills.  And, therefore, it seems to me that these two directions, that he should be at liberty to go in in that suit of *Kay* v. *Johnston*, and, that he should be restrained from suing upon the bills, are correlative parts of the same decree, and that, if the one stands the other is a necessary consequence of it.

From what passed at the hearing, I rather collect, that the counsel in that suit, on behalf of the Defendant, acquiesced, and desired not only to have that liberty to go in, but to be permitted to attend at the taking of the accounts in that suit, for the purpose of having that balance ascertained.  I see that when Mr. Roundell Palmer says, " I think your Honor said that Smith should be at liberty to go in and establish any claim he may be able to make out against Johnston in the suit of *Kay* v. *Johnston*," upon that Mr. Speed, counsel, I believe, for the Appellant, says, " and to attend the taking of the accounts."

This appears to me to have been the only difficulty in the case.  No doubt, if the facts had been known at the time when the original bill was filed against Johnston, Smith would have been made a party to that suit.  Smith and Adams stood in the position in which they were entitled to stand; that is to say, accounts had been taken against Johnston, and anything which was due from Kay to Johnston would have been assets for the purpose of satisfying what was due from Johnston to Smith and Adams, in respect to this transaction; Smith not being a party to that suit, such an order could not be made in his case.  The two causes [783] were for hearing together.  Smith, by going in in that suit, had a full opportunity of attending the examination of all these accounts, and of investigating all these transactions, and of ascertaining what was the real state of the accounts between Johnston and Kay.

That was by no means, as it would appear at the time, a concession without value.  For, observe what had been done.  There had been actually raised out of this young man's estate, and paid into the hands of Johnston, more than the whole amount of all that had been advanced by him to Kay during his minority with interest.  The way in which I put it is this: Johnston had advanced £23,000; that sum was constituted partly of Adams' advances and partly of Smith's advances.  Now, what was the sum which was raised out of this young man's estate, and paid by Smith himself into the hands of Johnston?  Why, £30,000.  More than the whole amount of Adams' and Smith's advances together, and more than the whole amount which Johnston had advanced for him.  Johnston represented that the full amount which he had charged upon these acceptances had been applied for this young man's benefit.  Instead of suing upon his bills, therefore, which in truth were good for nothing, the Defendant takes advantage of the offer which is made to him, and he goes in and avails himself of the liberty to attend at the taking of the accounts to have that balance actually ascertained, with liberty to him to be paid out of anything that was due from Kay to Johnston, the amount of what is due from Johnston to him.  It seems to me, therefore, that the decree is in substance perfectly right.  No objection, in respect of form, appears to have been taken at the hearing of the cause, and, therefore, the decree must be affirmed, and, of course, with costs.

[784] I quite agree with my noble and learned friend as to what it is the duty of judges to do when they hear observations made on the conduct or character of parties which it may be perfectly consistent with the right and duty of counsel to make in their view of the case, but which cannot but occasion the greatest pain to those who are the subjects of them, and who, therefore, I think, are entitled to call upon the Judges who hear those observations, if they think them unfounded, to

express, in the clearest terms, their opinion on the subject. This young man has certainly been extravagant and vicious, but it does not lie in the mouths of those who have practised upon him, and have fostered those vices, to reproach him with them. As far as any imputations have been made against him in the course of the argument, of having withdrawn from the promises which he made during his minority, or from the offers which he made after that minority ceased, in my opinion they are entirely without foundation. He has done all that I think, according to the strictest rules of morality, he could be called upon to do; and I entirely concur with my noble and learned friend on my right in thinking, that anybody who should advise him to do more would be giving him advice which it is not at all desirable that he should follow.

Decree of the Court below affirmed, and appeal dismissed, with costs.—Lords' Journals, 14 April 1859.

---

[785] Sir J. L. GOLDSMID and W. KING,—*Appellants;* JAMES CAZENOVE and Others,—*Respondents* [Aug. 5, 8, 9, 1859].

[Mews' Dig. ii. 755.    S.C. 29 L.J. Bkrcy. 17; 5 Jur. N.S. 1230; 4 W.R. 802.    See now Bankruptcy Act 1883, Sched. II. r. 18; and *Ex parte Banco de Portugal; In re Hooper,* 1879, 11 Ch.D. 320.]

*Bankruptcy—Double Proof—Concordata—Foreign Court.*

The rule which prohibits double proof is not confined to the case where one of two firms consists of only one person, who is also a member of the other firm, but applies likewise to a case where the two firms consist of several persons, some of whom are members of both firms.

*Ex parte Moult* (1 Dea. and Ch. 44; Mont. 321), and *ex parte Hinton* (De Gex, 550) confirmed.

A. and B. were partners in Liverpool; A. B. and C. were partners in Pernambuco. The two firms had dealings with each other. A. B. and C. drew a bill on A. and B., and sold it to persons at Pernambuco, who believed that the partnerships were distinct, but that A. and B. were partners in both. On arrival in Liverpool the bill was accepted by A. and B., but before the time for payment both firms became bankrupt. Under the law of Brazil, the holders of the bill proved against the estate of A. B. and C. at Pernambuco and received a dividend, and then claimed to prove under the English commission:

Held, that they were not entitled to this double proof.

This was an appeal against an order of the Lords Justices, sitting in Bankruptcy, confirming an order of Mr. Commissioner Perry. The case agreed on between the parties set forth the following facts.

Two persons named George Deane and Frederick Youle carried on business at Liverpool under the name of Deane, Youle, and Co. They carried on a separate business at Pernambuco in the Brazils, in connexion with Alfred Phillips Youle; the firm there being also called Deane, Youle, and Co. They had transactions with each other, but the consignments made by the Pernambuco firm to the Liverpool firm exceeded those received from it in value and [786] amount, so that the Pernambuco firm was greatly in advance to the other.

The Pernambuco firm in making purchases of produce to be consigned to the Liverpool firm was accustomed to pay for the same in cash, and to raise the amount required for that purpose by sale at Pernambuco, of bills of exchange drawn by the Pernambuco firm on the Liverpool firm. The Pernambuco firm made its payments in the same manner to other firms, with which it had also business in England.

In 1854 the Brazilian Government wanted to make some payments in England, and purchased of the Pernambuco firm two bills, one for £10,000 the other for £5000, drawn in the following form:

## SMITH *v.* LAND AND HOUSE PROPERTY COR-
## PORATION.

[1882  S.  4469.]

*Vendor and Purchaser—Misrepresentation.*

C. A.

1884

*Oct.* 27.

The Plaintiffs put up an hotel for sale on the 4th of August, 1882, stating in the particulars that it was let to " *F.* (a most desirable tenant), at a rental of £400 for an unexpired term of 27½ years."   The *L. Co.* sent *M.*, their secretary, to inspect the property.   *M.* reported that *F.*, from the business he was doing could hardly pay the rent, and that the town in which it was situate seemed to be in the last stage of decay.   The directors on receiving this report, directed *M.* to bid up to £5000.   *M.* went and bought for £4700.   Before completion, *F.* went into liquidation, and the *L. Co.* refused to complete.   The Plaintiffs sued for specific performance.   It was proved that on the 1st of May, 1882, the Lady Day quarter's rent was wholly unpaid ; that a distress was then threatened, and that *F.* paid £30 on the 6th of May, £40 on the 13th of June, and the remaining £30 shortly before the auction, and that no part of the quarter's rent due at Midsummer had been paid.   The chairman of the company was orally examined, and deposed most positively, that the company would not have bought but for the representation in the particulars that *F.* was a most desirable tenant.   Mr. Justice *Denman* held that there was a material misrepresentation, and that the contract had been entered into in reliance upon it.   His Lordship accordingly dismissed the action, and on a counter-claim by the Defendants, rescinded the contract.

*Held*, on appeal, that the description of *F.*, as a most desirable tenant, was not a mere expression of opinion, but contained an implied assertion that the vendors knew of no facts leading to the conclusion that he was not ; that the circumstances relating to the Lady Day rent shewed that he was not a desirable tenant ; and that there was a misrepresentation :

*Held* also, that, as the positive testimony of the chairman, that but for this representation the company would not have bought, was not shaken on cross-examination, and was believed by the Judge who saw and heard the witness, the Court of Appeal would not disturb the finding that the representation had induced the company to enter into the contract, and that the appeal must be dismissed.

THE Plaintiffs as mortgagees with a power of sale, advertised for sale by auction on the 4th of August, 1882, at the *Auction Mart, London,* a freehold hotel, at *Walton-on-the-Naze,* which in the title-page of the particulars, was described as " now held by a very desirable tenant, Mr. *Frederick Fleck,* for an unexpired term

8                          CHANCERY DIVISION.        [VOL. XXVIII.

C. A.
1884

SMITH
v.
LAND AND
HOUSE
PROPERTY
CORPORATION.

of twenty-eight years, at a rent of £400 per annum." In the body of the particulars, it was stated that " the whole property is let to Mr. *Frederick Fleck* (a most desirable tenant), at a rental of £400 per annum (clear of rates, taxes, insurance, &c.), for an un-expired term of $27\frac{1}{2}$ years, thus offering a first-class investment." The directors of the *Land and House Property Corporation* having become aware that the property was being offered for sale, sent down their secretary to visit it, and report to the next com-mittee.

The secretary, Mr. *M'Lewin*, reported as follows : " On Satur-day, I visited *Walton-on-the-Naze*, with the view of inspecting the *Marine Hotel*. The hotel has been built over forty years, and up to a recent period enjoyed a high reputation as a respectable and thriving hotel. Mr. *Fleck*, the landlord, from the amount of business he is now doing, can scarcely pay the amount of rent with rates and taxes. It seems to be a mystery in the town itself how Mr. *Fleck*, with his eyes open, could have been induced to take the hotel at the present rental. The only thing that I see that can be done with the hotel to make it pay as an invest-ment, would be to make the small theatre into a kind of music-hall, and to convert the billiard-room into a kind of casino. The town itself seems to be in the very last stage of decay from begin-ning to end. The old pier, wrecked on the 18th of January, 1881, has never been replaced. The landslip which occurred on the above occasion, has never been made good."

This report was read at a meeting of the committee on the 1st of August, 1882, at which Alderman *Knight*, afterwards Lord Mayor of *London*, was in the chair. The committee passed a reso-lution instructing the secretary to bid up to £5000. The secre-tary attended at the auction, but did not bid, and the property was bought in, the reserved bidding not having been reached. The secretary immediately afterwards made a proposal to pur-chase by private contract, and an agreement was signed on the same day for purchase, at £4700.

*Fleck*, in September, went into liquidation. The purchasers thereupon, refused to complete, and in October the vendors brought this action for specific performance. The Defendants, by their statement of defence alleged (*inter alia*) that *Fleck* was not

VOL. XXVIII.]        CHANCERY DIVISION.                    9

C. A.

1884

SMITH
v.
LAND AND
HOUSE
PROPERTY
CORPORATION.

a desirable tenant as stated in the particulars, but was quite unable to pay the rent of £400 a year. That such rent was in arrear at the time of the sale. That *Fleck* was insolvent, and shortly afterwards filed his petition for liquidation. The Defendants by counter-claim, claimed a return of the deposit; expenses of investigating the title, and cancellation of the contract, or, in the alternative, compensation for misdescription.

The misrepresentation on which the case turned was as to *Fleck's* character as a tenant. As to this the evidence was as follows: *Fleck* had been tenant from 1880, and there was no evidence as to the payment of his rent prior to January, 1882, when the Plaintiffs gave him notice to pay rent to them. A quarter's rent became due at Lady Day, and it not having been paid, the Plaintiffs on the 1st of May, threatened a distress. *Fleck* then wrote to ask for time. The Plaintiffs replied that the rent could not be allowed to remain over Whitsuntide; and on the 6th of May, *Fleck* paid £30 on account. On the 13th of June he paid £40 more on account, and the balance of £30 was paid some time before August, but on what day did not appear. At the time when the sale took place, the Midsummer rent had been applied for, but no part of it had been paid. *Fleck's* references when he had been accepted as tenant, were shewn to have been very good, and it was deposed to that he was an able manager of an hotel. The description of *Fleck* as a desirable tenant, was inserted by the auctioneer who had been at the place and seen *Fleck*. He said that he considered him a very proper person to be landlord of such an hotel, that he seemed to be in a flourishing condition, and that there were no signs of insolvency about him or his hotel. The auctioneer had prepared the particulars and inserted this description without any instructions on the subject.

As regards the question whether the contract had been entered into in reliance on the statement as to *Fleck's* being a most desirable tenant, Alderman *Knight* was orally examined before Mr. Justice *Denman*, who tried the action. He deposed, that at the meeting when the secretary was directed to bid, the directors had no information about *Fleck's* position, except what was given in the particulars of sale, which were before them and were particularly referred to, especially on the point of the "desirable

C. A.

1884

SMITH

*v.*

LAND AND
HOUSE
PROPERTY
CORPORATION.

tenant." He was asked " was there anything which particularly directed your attention to that?—*A.* Yes, certainly, that was the main security offered to us, it was the most important point of the whole particulars." " *Q.* Will you explain that a little further. Having regard to the secretary's report, did it have much bearing on your mind?—*A.* Most assuredly. The secretary's report as regards the condition of *Walton-on-the-Naze* was of so unsatisfactory a character, that had it not been for the assurance that we had ' a desirable tenant ' and ' a most desirable tenant,' I would not have purchased the property at all." " *Q.* Can you say whether that was the view of the other gentlemen who were present at the board?—*A.* As far as I can say, that was the unanimous opinion of the whole board." . . . " *Q.* Did you at the time know that *Fleck* was on the eve of insolvency?—*A.* At that time we knew nothing but that *Fleck* was described as ' a most desirable tenant." " *Q.* And you trusted to that statement ? —*A.* Assuredly. Had we had a hint that he was at all insolvent, or that there was any difficulty in paying his rent, I should not have bought the property, on account of the report of the bad surroundings."

There was some reference in the evidence to a conversation alleged to have taken place at the sale between the auctioneer and *McLewin*, from which it was to be inferred that the latter understood *Fleck* not to be in solvent circumstances, but whether there was in fact any conversation justifying that inference did not appear. The point is mentioned, as the question whether *McLewin's* knowledge on that subject would have been material is dealt with in the judgments.

Mr. Justice *Denman*, sitting for Mr. Justice *North*, held that there was a material misrepresentation, and that the contract had been entered into on the faith of it. His Lordship therefore dismissed the vendors' action and rescinded the contract. The vendors appealed, and the appeal was heard on the 27th of October, 1884.

*W. W. Karslake*, Q.C., and *Asquith*, for the appeal:—

We say, first, that the statement that *Fleck* was a very desirable tenant was a mere expression of opinion, and one not

C. A.
1884
SMITH
v.
LAND AND
HOUSE
PROPERTY
CORPORATION.

recklessly made. There is evidence that he was a very good manager of an hotel, and there is nothing against him, but that his quarter's rent due at Lady Day was not promptly paid, and that at a bad time of the year. That he became insolvent shortly afterwards cannot affect the case, there being nothing to fix the vendors with notice that he was likely to become so, and the mere fact that he was in arrear for a few weeks for a quarter's rent does not make it improper to call him a desirable tenant. Then the purchasers made inquiries, and must be taken to have acted on what they found out. It is true that Alderman *Knight* deposes that the representation as to *Fleck* was relied upon, but he appears to have relied upon it because he understood it as a guarantee that *Fleck* would go on paying the rent for the remainder of the twenty-eight years, which is a construction that it will not bear.

[BOWEN, L.J.:—Nobody will attempt to put it so high as that. The representation cannot amount to more than a statement that *Fleck* was likely to pay the rent, and I do not think that Alderman *Knight* understood it to mean more.]

The Plaintiffs were justified in saying that. Again, the description is merely one of the flourishing descriptions which auctioneers insert and which do not amount to a statement of any specific fact, but only put a purchaser on inquiry. Thus the describing a house as a substantial and convenient house was held not fatal: *Johnson* v. *Smart* (1), though the house was very much the reverse. So as to the description of a meadow as uncommonly rich water meadow, though it was very ill supplied with water: *Scott* v. *Hanson* (2). So in *Trower* v. *Newcome* (3) a purchaser was held to his bargain, though it was stated that an avoidance of an advowson was likely to occur soon, and the incumbent was only thirty-two. Again, the agent had a discretion how far he would go towards £5000, and he made inquiries for himself. The purchasers therefore cannot be taken to have relied on the representations: *Clapham* v. *Shillito* (4).

[FRY, L.J.:—Was not the agent *functus officio* as regards dis-

(1) 2 Giff. 151.                    (3) 3 Mer. 704.
(2) 1 Sim. 13; 1 Russ. & My. 128.  (4) 7 Beav. 146.

12                              CHANCERY DIVISION.          [VOL. XXVIII.

C. A.

1884

SMITH
*v.*
LAND AND
HOUSE
PROPERTY
CORPORATION.

cretion on the 4th of August?   He had made his report, and was instructed to bid up to £5000.

BOWEN, L.J.:—Is it not a question of fact in each case whether the representation was relied on?

FRY, L.J., referred to *Redgrave* v. *Hurd* (1).]

In that case there was a misrepresentation as to the amount of the profits of the business, a definite mis-statement of a fact within the vendor's own knowledge; here we have nothing but a vague laudatory flourish, which, according to the opinion of Sir *W. Grant* in *Trower* v. *Newcome* (2), goes for nothing.   The report here shews that the secretary made inquiries as to *Fleck's* circumstances, and whatever knowledge he had must be attributed to the directors.

*Davey*, Q.C., and *W. A. Raikes, contrà*, were not called upon.

BAGGALLAY, L.J.:—

On the 4th of May, 1882, the Plaintiffs entered into a contract with the Defendants for the sale to them of certain property described in particulars of sale.   The property had been offered for sale by auction, but no sale was effected, and immediately afterwards this contract was entered into.   The purchasers declined to complete, saying that they had been induced by misrepresentation to enter into the contract.   Early in October, 1882, this action was commenced by the vendors for specific performance.   It was met by a statement of defence, accompanied by a counter-claim for rescission of the contract or compensation. The foundation of the counter-claim is that the property was first described in the particulars as held by *Fleck*, "a very desirable tenant," and then again as "let to Mr. *F. Fleck* (a most desirable tenant, at a rental of £400 per annum, for an unexpired term of twenty-seven and a half years, thus offering a first-class investment."   It is alleged that this was a false representation, for that it was not true that *Fleck* was a "very desirable" or a "most desirable" tenant.   The vendors entered into receipt of the rents in January, 1882.   We have no evidence as to the receipt of rent which accrued before Lady Day, 1882, but as to the quarter's

(1) 20 Ch. D. 1.                    (2) 3 Mer. 704.

VOL. XXVIII.]        CHANCERY DIVISION.                    13

rent which accrued on that day it is in evidence that it was not
paid at once ; that a distress was threatened, but not put in, and
that the tenant paid £30 on the 6th of May, £40 on the 13th of
June, and the balance of £30 some time before August, but at
what precise time it does not appear.  At the date of the auction,
on the 4th of August, the Midsummer rent had been applied for,
but no part of it had been paid.  Under this state of things the
representation in question was made.  It is said that these are
words of course put in by the auctioneer, but I hold it to be the
duty of a vendor to see that the property is not untruly de-
scribed, and I cannot hold him to be excused because a descrip-
tion which the property will not bear has been inserted by the
auctioneer without his instructions.  Nor can the auctioneer
excuse himself for inserting a false representation by saying that
he did not know it to be untrue.  I think that Mr. Justice
*Denman* came to a correct conclusion as to there having been a
material misrepresentation, for the vendors must have known
perfectly well that the tenant did not pay his rent properly, and
they therefore were not justified in describing him as a very
desirable tenant.

We have then to consider whether the representation materially
influenced the Defendants in coming to a conclusion to bid for
the property.   The evidence on this head is all one way.  [His
Lordship read the passages from the evidence of Alderman
*Knight* which are given above.]   This evidence is uncontradicted.
It is true that in a case of this kind it would be very difficult to
find any person who could contradict the evidence, and reliance was
placed on the secretary's report.   [His Lordship read the report.]
I think that the expressions in this report as to *Fleck* from the
amount of business he was doing being hardly able to pay the
rent, only meant to say that, according to the amount of business
at present going on, it was difficult to see how *Fleck* could pay
his rent and taxes out of the profits, and that these expressions
do not at all tend to shew that he was not a desirable tenant, for
he might have means which would enable him to go on paying
the rent till the business improved.  Then Alderman *Knight*
states most positively that having regard to the surroundings he
should not have purchased but for the representation that *Fleck*
was a very desirable tenant.  It must then in my opinion be

C. A.

1884

SMITH
*v.*
LAND AND
HOUSE
PROPERTY
CORPORATION.

Baggallay, L.J.

14                    CHANCERY DIVISION.        [VOL. XXVIII.

C. A.
1884

SMITH
v.
LAND AND
HOUSE
PROPERTY
CORPORATION.

Baggallay, L.J.

considered that the representation was relied on. Now a man who paid his rent so irregularly could not properly be represented as a desirable tenant. After the report had been considered by the directors, the secretary was authorized to attend at the auction and bid up to £5000. The secretary no doubt saw that the biddings were going in such a way that he should have a chance of getting a better bargain by private contract. He did not bid, but immediately after the auction, the property not having been sold, he agreed to purchase for £4700. Some observations were made on a conversation alleged to have taken place between the secretary and the auctioneer, tending to shew that the former knew something to *Fleck's* disadvantage. But the secretary on this occasion was an agent for a particular purpose, being directed to buy the property if he could get it for a sum not exceeding £5000, it was no part of his business to regulate his bidding by what he learnt about the tenant. What he may have heard or said on that occasion, when he was only sent as an agent for the purpose of buying on the best terms he could get not exceeding £5000, cannot be evidence against the directors.

I need not say much as to the cases. In *Scott* v. *Hanson* (1) and *Trower* v. *Newcome* (2), the question was whether there was any misrepresentation or not. In *Trower* v. *Newcome* a living was described as likely to become vacant soon, and a statement was made orally that it would become vacant on the death of a person aged eighty-two. This did not amount to a representation that the incumbent's age was eighty-two. *Redgrave* v. *Hurd* (3) is in favour of the purchasers. On the facts as found in the present case I think that Mr. Justice *Denman* came to a right conclusion.

BOWEN, L.J.:—

I am of the same opinion. The action is by vendors for specific performance, and the purchasers allege that there is in the particulars a misrepresentation which disentitles the Plaintiffs to specific performance. To sustain this defence the Defendants must prove that there was a material misrepresentation, and that they entered into the contract on the faith of the representation.

(1) 1 Sim. 13; 1 Russ. & My. 128.        (2) 3 Mer. 704.
(3) 20 Ch. D. 1.

Was there then a misrepresentation of a specific fact? This partly depends on the question, whether on the construction of the particulars, what they say as to *Fleck* is a representation of a specific fact, a question which the Court of Appeal has the same means of deciding as the Judge in the Court below. Whether the purchasers relied upon it is a question of fact which the Judge of the Court below had better means of deciding than we have, for he saw and heard the witnesses.

In considering whether there was a misrepresentation, I will first deal with the argument that the particulars only contain a statement of opinion about the tenant. It is material to observe that it is often fallaciously assumed that a statement of opinion cannot involve the statement of a fact. In a case where the facts are equally well known to both parties, what one of them says to the other is frequently nothing but an expression of opinion. The statement of such opinion is in a sense a statement of a fact, about the condition of the man's own mind, but only of an irrelevant fact, for it is of no consequence what the opinion is. But if the facts are not equally known to both sides, then a statement of opinion by the one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion. Now a landlord knows the relations between himself and his tenant, other persons either do not know them at all or do not know them equally well, and if the landlord says that he considers that the relations between himself and his tenant are satisfactory, he really avers that the facts peculiarly within his knowledge are such as to render that opinion reasonable. Now are the statements here statements which involve such a representation of material facts? They are statements on a subject as to which *primâ facie* the vendors know everything and the purchasers nothing. The vendors state that the property is let to a most desirable tenant, what does that mean? I agree that it is not a guarantee that the tenant will go on paying his rent, but it is to my mind a guarantee of a different sort, and amounts at least to an assertion that nothing has occurred in the relations between the landlords and the tenant which can be considered to make the tenant an unsatisfactory one. That is an assertion of a specific fact. Was it a true assertion? Having regard to what took place between

C. A.

1884

SMITH
*v.*
LAND AND
HOUSE
PROPERTY
CORPORATION.

Bowen, L.J.

16    CHANCERY DIVISION.    [VOL. XXVIII.

C. A.
1884

SMITH
*v.*
LAND AND
HOUSE
PROPERTY
CORPORATION.

Bowen, L.J.

Lady Day and Midsummer, I think that it was not. On the 25th of March, a quarter's rent became due. On the 1st of May, it was wholly unpaid and a distress was threatened. The tenant wrote to ask for time. The Plaintiffs replied that the rent could not be allowed to remain over Whitsuntide. The tenant paid on the 6th of May £30, on the 13th of June £40, and the remaining £30 shortly before the auction. Now could it at the time of the auction, be said that nothing had occurred to make *Fleck* an undesirable tenant ? In my opinion a tenant who had paid his last quarter's rent by driblets under pressure must be regarded as an undesirable tenant.

Treating this then as a misrepresentation, did it induce the purchasers to buy ? It appears to me that it is in every case a question of fact whether a person is induced to buy by a particular representation. We may obtain valuable hints from reported cases, but none of the cases appear to me to impugn the proposition that the question is one of fact to be decided on the circumstances of each particular case. A representation in the particulars must be taken as made for the purpose of influencing the purchaser's mind. Then did the purchaser rely upon it ? I cannot quite agree with the remark of the late Master of the Rolls in *Redgrave* v. *Hurd* (1), that if a material representation calculated to induce a person to enter into a contract is made to him it is an inference of law that he was induced by the representations to enter into it, and I think that probably his Lordship hardly intended to go so far as that, though there may be strong reason for drawing such an inference as an inference of fact. But here we are not left to inference. The chairman of the company was called and swore in the most distinct and positive way that it did influence him, and that but for the representation he would not have purchased. The Judge was at liberty to disbelieve him, but I see no reason why he was bound so to do. His evidence was not shaken on cross-examination, and the Judge believed him. He uses the very argument that the property had been examined on behalf of the company as strengthening the statement that the company relied on the representation, for he says the report of the secretary was so unfavourable that but for the representation as to the tenant they would not have bought.

(1) 20 Ch. D. 1, 21.

*Redgrave* v. *Hurd* (1) shews that a person who has made a misrepresentation cannot escape by saying, " You had means of information, and if you had been careful you would not have been misled." It was urged that Alderman *Knight* would not have relied on the representation had he not put on it a construction that it will not bear, viz., that it was a guarantee that the tenant would go on paying the rent. I do not think that he understood it so. I think he merely understood it as a representation that, so far as the vendors knew, the tenant was likely to go on paying the rent for the rest of the term. If we had merely to deal with the evidence of Alderman *Knight* on paper, I should not feel quite satisfied that we ought to treat it as satisfactory, but as the Judge who heard and saw him was satisfied, I think that we ought not to differ from his conclusion.

C. A.

1884

SMITH
*v.*
LAND AND
HOUSE
PROPERTY
CORPORATION.

Bowen, L.J.

FRY, L.J. :—

After the full discussion of this case by my learned Brothers I have little to add. The first question is whether the stating *Fleck* to be a very desirable tenant was a misrepresentation. It seems to me that the vendors by describing him as such stated in substance that they knew no fact which shewed him not to be a desirable tenant. The Judge in the Court below has found that they did know facts which shewed him not to be a desirable tenant, and I see no reason to dissent from that conclusion.

The second question is whether the purchasers purchased on the faith of that representation. The learned Judge has found that they did. On that question I feel the same difficulty as Lord Justice *Bowen,* and on the evidence as read before us I should have felt inclined to come to the conclusion that the contract was not induced by that representation; but as Mr. Justice *Denman,* who saw and heard Alderman *Knight,* was satisfied with his evidence, I cannot give my voice for reversing his decision.

Solicitors for Plaintiffs : *R. S. Taylor, Son, & Humbert.*
Solicitors for Defendants : *Smythe & Brettell.*

(1) 20 Ch. D. 1.

H. C. J.



Neutral Citation Number: [2019] EWHC 1926 (Comm)

Case No: CL-2015-000305

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

The Rolls Building,
Fetter Lane,
London, EC4A 1NL

Date: 18/07/2019

**Before** :

**MR JUSTICE JACOBS**

- - - - - - - - - - - - - - - - - - - -

**Between** :

| | | |
|---|---|---|
| (1) **VALD. NIELSEN HOLDING A/S** | | **Claimants** |
| (2) **NEWWATCH LIMITED** | | |
| - and - | | |
| (1) **MR VICTOR BALDORINO** | | **Defendants** |
| (2) **MR RICHARD BENNETT** | | |
| (3) **MR JULIAN MANTELL** | | |

- - - - - - - - - - - - - - - - - - - -

**Michael Booth QC and Christopher Lloyd** (instructed by **Collyer Bristow LLP**) for the
**Claimants**
**Alain Choo-Choy QC and Nicholas Sloboda** (instructed by **Cooke Young & Keidan**) for the
**Defendants**

Hearing dates: $18^{th} – 21^{st}$ March, $25^{th} – 28^{th}$ March, $1^{st} – 4^{th}$ April, 8th-12th April, 15th-17th April,
$8^{th} – 10^{th}$ May 2019.

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE JACOBS

**MR JUSTICE JACOBS:**

| __INDEX__ | __PARAGRAPH__ |
|---|---|
| **A: Introduction** | **1** |
| **B: Factual background and broad chronology of relevant events** | **39** |
| **C: Deceit: the law** | **130** |
| **D: The 20 April e-mail** | **160** |
| **E: The 3 June e-mail** | **226** |
| **E1: The preparation of the Weighted Budget and the information provided to Tenon and LMS.** | **230** |
| **E2: The background to 3 June e-mail** | **253** |
| **E3: The allegation of deceit in relation to 3 June e-mail** | **283** |
| **F: The Defendants' case and evidence: further considerations and conclusions.** | **314** |
| **F1: The Defendants' case as to fraudulent intent.** | **315** |
| **F2: Motive and the Defendants' evidence as to their desire to obtain the maximum price** | **321** |
| **F3: The strike out application** | **337** |
| **F4: Other relevant conduct at the material time** | **359** |
| **F5: Specific arguments advanced by the Defendants** | **362** |
| **F6: Legal responsibility for the deceit** | **372** |
| **F7: Conspiracy** | **387** |
| **G: Inducement** | **391** |
| **H: Causation and Loss** | |
| **H1: The shape of the parties' arguments** | **425** |
| **H2: The facts relevant to the causation and loss arguments** | **437** |
| **H3: The parties' arguments in more detail** | **462** |
| **H4: Analysis and conclusions: legal principles** | **484** |
| **H5: Analysis and conclusions: Causation** | **492** |
| **H6: Analysis and conclusions: quantification** | **541** |
| **I: Fair value of Updata UK** | **568** |

**J: Assignment**

    **J1: The shape of the arguments**                                          **621**

    **J2: The facts**                                                           **631**

    **J3: Danish law**                                                          **658**

    **J4: Analysis and conclusions**                                            **678**

**K: Breach of fiduciary duty**                                                **716**

**L: Conclusion**                                                              **764**

**J: Assignment**

    **J1: The shape of the arguments**                                          **621**

    **J2: The facts**                                                           **631**

    **J3: Danish law**                                                          **658**

    **J4: Analysis and conclusions**                                            **678**

**K: Breach of fiduciary duty**                                                **716**

**L: Conclusion**                                                              **764**

## A: Introduction

*The claims made in the proceedings*

1. This case, involving allegations of fraud, arises out of the sale of a business to its management and private equity investors in July 2009. The courts are familiar with claims made by buyers of businesses against sellers who are alleged to have given the buyers far too rosy a picture of the business being sold. The present case is unusual because it is the converse. The basis of The Claimants' claim is that the business being sold was far more successful than the sellers had been led by the management to believe, and that the sellers were misled into selling at the time when they did, and for the price which they received. The sellers contend that if the true picture had been presented to them, they would not have been willing to sell at that time at the price which was being offered.

2. The business in question was a company called Updata Infrastructure (UK) Ltd ("Updata UK"). This was an English company whose majority shareholder was Updata Europe A/S ("Updata Europe"), which in 2009 owned 60% of its shares. The majority of the shares in Updata Europe were owned by members of the family of its founder, Mr. Peter Johnsen ("Mr. Johnsen"), directly or via a long-established company, the First Claimant ("Vald. Nielsen"). There were two other shareholders in Updata Europe, Mr. Henrik Hildebrandt and Mr. Henrik Bremerskov. A further 12.4% of the shares were held by the Second Claimant, Newwatch Limited ("Newwatch"). This was a Jersey company which was owned by Mr. Johnsen and Mr. Hildebrandt. Updata Europe and Newwatch were referred to at trial as the "European vendors" or "EVs".

3. The three Defendants were the executive management team of Updata UK, and their management buyout ("MBO") was backed by a private equity house called LMS Capital Plc ("LMS"). The sale was successfully completed in July 2009. This was after a bidding process where there was a competing potential purchaser, Mr. Jens Nielsen and interests which he represented. Mr. Nielsen was a former chairman of Updata UK. The final LMS offer was considered more attractive by Updata Europe than the proposals which were forthcoming from Mr. Nielsen, and the sale took place. The entire issued share capital of Updata UK was purchased by a new company, Updata Infrastructure Holdings Limited ("Updata Holdings" or "newco"), in which the Defendants and LMS had significant stakes. For that purpose, a sale and purchase agreement ("SPA"), and various associated documents, were signed on 11 July 2009.

4. The sale price received by Updata Europe for its 60% share was £ 5.244 million. The Claimants contend that the true value of this stake, at the time of the sale, was £ 22 million. The success of the business was such that in March 2014, less than 5 years after the sale, Updata Holdings was sold to Capita IT Services Holdings Ltd. ("Capita") for £ 80 million, and the Defendants together received at least £ 21 million for their shares in that sale. Long before that sale, however, Mr. Johnsen and Mr. Hildebrandt had come to believe that they had been misled in the course of the negotiations for sale in 2009.

5. Vald. Nielsen claims to be the assignee of the rights of Updata Europe to bring claims in fraud and for other remedies against the management who are alleged to have been party to the deception. There is a significant issue in the case as to the validity of the

assignment agreements pursuant to which Vald. Nielsen allege that they acquired the rights of Updata Europe, and the Defendants make allegations of fraud against certain individuals involved in the assignment, including Mr. Johnsen. This allegation of fraud was ultimately the only point relied upon by way of an attack on the validity of the assignment, since other arguments based upon champerty and a "non-assignment" clause in the SPA were abandoned by the Defendants in closing argument. The allegation of fraud focused on the backdating of the assignment documents so as to record a date of 19 November 2010 instead of the actual date of signature which was January 2011.

6.    Newwatch does not bring a claim in fraud, since such claims were struck out by order of Sir Richard Field in 2016. Newwatch cannot claim to have suffered loss by fraud because it was able to roll over its prior investment in Updata UK into an equivalent shareholding in Updata Holdings. This meant that in due course Newwatch was able to benefit from the sale to Capita. However, Newwatch makes various equitable claims based upon the proposition that the Defendants acted in breach of fiduciary duty.

*The witnesses called and the important areas of factual dispute*

7.    The trial occupied 23 days, including just over 18 days of factual and expert evidence. A large number of factual witnesses gave evidence at trial, and the evidence covered the history of Updata Europe and Updata UK over many years in a very considerable amount of detail.

8.    The factual witnesses who gave evidence on behalf of the Claimants were: Mr. Johnsen, Mr. Henrik Hildebrandt, Mr. Flemming Holm and Mr. Jorgen Johnsen, all of whom had been the Danish directors of Updata UK at various times in the period prior to the sale in July 2009. The other factual witnesses were:

   i)    Mr. Jens Nielsen (the former chairman of Updata UK who was interested in purchasing the business in 2009);

   ii)   Mr. Esben Bigaard (whose company purchased Updata Europe in late 2009, and who was a signatory to the assignment documentation);

   iii)  Mr. Mads Birkeland, a dual-qualified Danish lawyer and English solicitor who worked in London for the law firm Corren Troen, and who acted on behalf of Updata Europe and Newwatch in connection with the sale, and subsequently on behalf of Vald. Nielsen in connection with the assignment;

   iv)   Mr. Henrik Bremerskov, who was a 5% shareholder in Updata Europe and worked in Denmark for the Updata group;

   v)    Mr. Thomas Nyegaard, an investment banker by profession, and a shareholder in Updata UK by virtue of having provided some initial funding at the request of Mr. Johnsen who was a childhood friend;

vi)     Mr. Lynge Thang Jorgensen, who was a senior officer within the bank which had extended loan facilities to Updata Europe and its Danish subsidiary; and

vii)    Ms. Tina Kambo (nee Rana), who was in 2009 a junior solicitor at Corren Troen. She assisted Mr. Birkeland with certain administrative but nevertheless important aspects of the transaction. This included the gathering of materials for a data room ("the Data Room") in connection with the bidding process and the eventual sale.

9.     In addition, a number of Civil Evidence Act statements were adduced, most notably a statement given by Mr. Helge Homann prior to his death in 2017. Mr. Homann was a senior partner with KPMG in Denmark, and played various roles in the events leading to the sale. He was responsible for the audit of Updata Europe, but he also provided assistance to Mr. Nielsen in connection with his proposed bid and due diligence work.

10.    On the Defendants' side, the principal factual witnesses were the Defendants themselves. Each of them was cross-examined at considerable length. The only other factual witnesses were:

i)     Mr. Pieter Hooft, who had been responsible for the MBO transaction on behalf of LMS; and

ii)    Mr. Finn Jepsen who had briefly been appointed as "Supervisor" of Updata Europe and whom (the Defendants alleged) was the person that was intended to be deceived by the backdating of the assignment documentation.

11.    At the time of the events leading to the sale, the Defendants had been advised by a firm of corporate financial advisers called Tenon Corporate Finance ("Tenon"). Despite their central role in the relevant events, no witness from Tenon gave a statement or was called to give evidence.

12.    Although the factual evidence was wide-ranging, the important aspects of the that evidence in my view concerned the following areas:

i)     The events, which really began in early 2009, concerning the negotiations and dealings of the parties, and ultimately leading to the sale of Updata UK in July 2009. These are central to the allegations of deceit and conspiracy, and in particular what representations were made, whether they were deliberately false, and whether they induced the sale.

ii)    The factual circumstances, also in 2009, relevant to the parties' arguments on causation, and in particular whether or not Updata Europe would or would not have sold to LMS at the offered price even if false representations had not been made. The facts relevant to this issue included the dealings and relationship between Updata Europe and its bank in the context of Updata Europe's indebtedness to that bank, the general market conditions prevailing at that time (not long after the onset of the global financial crisis in the autumn of 2008), and whether there was a realistic possibility of any sale to an alternative purchaser, such as Mr. Nielsen or his backers.

iii)    The facts relating to the assignment to Vald. Nielsen which was executed in January 2011, and the circumstances which led to it. This sequence of events starts in mid-2010, but the critical period is November 2010 to January 2011.

13.    Accordingly, this judgment deals in some detail with the facts between 2009 and early 2011, and in less detail with the facts outside that period except in so far as those facts cast light on the events in the period 2009 to early 2011.

14.    Although there were a large number of witnesses called, this is not a case whose determination requires the resolution of sharp or significant conflicts between the evidence called by the Claimants on one side and the Defendants on the other. Disputes between these witnesses did exist, for example as to what was said at a meeting on 29 May 2009 in the run-up to an important e-mail sent on 3 June 2009 ("the 3 June e-mail"), and which the Claimants allege to contain fraudulent misrepresentations. Rather, the principal focus of cross-examination on both sides involved examining and exploring what was really known and happening on the other side of the fence, as it were, and which was not known at the time by the EVs on the one hand, or the Defendants on the other.   Thus, in relation to the deceit and conspiracy case, the Claimants sought to cross-examine the Defendants by reference to the picture that was said to emerge from a careful examination of the Defendants' own internal documents; the principal feature of that picture being expected financial results which were far more optimistic than those given to the EVs. Similarly, on the issues of whether any loss had been suffered, the Defendants explored in some detail the circumstances in which Updata Europe found itself, and in particular its indebtedness to its bank. The Defendants did know at the time that there was a significant indebtedness, but they did not know much of the detail of the dealings which were explored in the evidence. Similarly, the assignment issue involved examination of dealings on the Claimants' side of which the Defendants were unaware at the time. It was only as a result of disclosure within these proceedings that the Defendants became aware of materials which, on their case, enabled them to attack the assignment by alleging serious wrongdoing by a large number of individuals, but which ultimately narrowed so as to focus on just three: Mr. Johnsen, Mr. Homann and Mr. Bigaard.  Prior to these proceedings, the Defendants had taken no point on the validity of the assignment: for example, in February 2011 they had each been happy to sign a "Deed of Rectification" to the SPA which identified Vald. Nielsen as assignee, and which provided them with a significant benefit.

15.    Each side therefore sought to contend that the evidence advanced by the witnesses on the opposing side, as to what they were thinking, doing and would have done in other circumstances, should be rejected in the light of the contemporary documents and inherent probabilities.

CL-2015-000305

*General approach to the evidence*

16.    There was no dispute that, in assessing the evidence of the factual witnesses on all issues, I should adopt the approach commended by Robert Goff LJ in *Armagas Ltd v. Mundogas S.A.* (The Ocean Frost), [1985] 1 Lloyd's Rep. 1, 57:

> "Speaking from my own experience, I have found it essential in cases of fraud, when considering the credibility of witnesses, always to test their veracity by reference to the objective facts proved independently of their testimony, in particular by reference to the documents in the case, and also to pay particular regard to their motives and to the overall probabilities. It is frequently very difficult to tell whether a witness is telling the truth or not; and where there is a conflict of evidence such as there was in the present case, reference to the objective facts and documents, to the witnesses' motives, and to the overall probabilities, can be of very great assistance to a Judge in ascertaining the truth."

17.    In the same case, Dunn LJ said (to similar effect):

> "I respectfully agree with Lord Justice Browne when he said in *re F*, [1976] Fam. 238 at p. 259, that in his experience it was difficult to decide from seeing and hearing witnesses whether or not they are speaking the truth at the moment. That has been my own experience as a Judge of first instance. And especially if both principal witnesses show themselves to be unreliable, it is safer for a Judge, before forming a view as to the truth of a particular fact, to look carefully at the probabilities as they emerge from the surrounding circumstances, and to consider the personal motives and interests of the witnesses. As Lord Wright said in *Powell v. Streatham Manor Nursing Home* sup. at p. 267:
>
>> . . . Yet even where the Judge decides on conflicting evidence, it must not be forgotten that there may be cases in which his findings may be falsified, as for instance by some objective fact . . .
>
> and he referred in particular to some conclusive document or documents which constitute positive evidence refuting the oral evidence of the witnesses."

18.    The approach of Robert Goff LJ was approved by the Privy Council in *Grace Shipping v Sharp & Co* [1987] 1 Lloyd's Rep 207 at 215-216:

> "And it is not to be forgotten that, in the present case, the Judge was faced with the task of assessing the evidence of witnesses about telephone conversations which had taken place over five years before. In such a case, memories may very well be unreliable; and it is of crucial importance for the Judge to have regard to the contemporary documents and to the overall probabilities.
>
> …
>
> That observation [i.e. of Robert Goff LJ] is, in their Lordships' opinion, equally apposite in a case where the evidence of the witnesses is likely to be unreliable; and it is to be remembered that in commercial cases, such as the present, there is usually a substantial body of contemporary documentary evidence."

19.   Robert Goff LJ's approach is also reflected in more recent authority such as *Gestmin SGPS SA v Credit Suisse (UK) Ltd* at [2013] EWHC 3560 (Comm) at [15]-[23].

20.   There was therefore no dispute in the present case that my approach should be to consider the objective evidence and in particular the documentary evidence, as well as the inherent probabilities, and to test the accounts of the witnesses against those matters.

21.   In so doing, I bear in mind that the events with which the trial are concerned took place some 10 years ago. It was obvious that a number of witnesses, in particular Mr. Jorgensen from the Bank, had great difficulty remembering those events with any degree of accuracy, given the passage of time and the ageing process. In some cases, too, illness or the effect of retirement from the business world meant that individuals who may have been much sharper 10 years ago were no longer at the top of their game. The Defendants also rightly submitted that the principal witnesses on both sides have much to gain or lose from the present litigation, which has been bitterly fought for many years, and that this will inevitably colour the ability of some of the witnesses to give objective evidence about the relevant events.

*Assessment of the witness evidence: general views*

22.   In assessing the evidence of the various witnesses, I have endeavoured to take into account their evidence as a whole. It does not follow from the fact that the evidence of a witness on a particular issue is to be rejected, or that a witness gave a single bad answer or series of bad answers, that everything that a particular witness has said is to be rejected. The evidence of a witness as to one part of the case may be consistent with the documents or inherent probabilities, whereas his evidence on another area of

the case may be otherwise. Accordingly, where the factual evidence of particular witnesses on a particular topic is important, I address that evidence in more detail below in the context of that topic. However, I start by giving some general observations which are reflected in my fact-findings later in this judgment.

*The Claimants' witnesses*

23.     On the Claimants' side, the principal witness was Mr. Peter Johnsen. He has, quite plainly (and in my view with some justification, for the reasons set out in this judgment) nursed a grievance against the Defendants for a considerable time; in that in 2010, fairly soon after the relevant events leading to the sale, he considered that he had been misled during the course of the negotiations. He has had to struggle to bring this claim to a hearing, facing the need to raise significant funds and also needing to overcome a strike-out application made by the Defendants. He has therefore been living with this case for many years. That said, it did seem to me that he did seek to give fair answers to the questions which he was asked, with as much objectivity as one might expect in the circumstances. For example, he made no attempt to downplay the financial difficulties which confronted Updata Europe, and he gave frank evidence about his unsuccessful attempts to find outside investment in Updata Europe in late 2008 and 2009 and the reasons for that lack of success. I have significant reservations, however, about his evidence as to his knowledge of the circumstances leading to the backdating of the assignment documentation in 2011. But this does not lead me to reject his evidence on other aspects of his case where his evidence is material, in particular the issue of inducement.

24.     Mr. Henrik Hildebrandt has also been living with this case for many years, and is one of its main protagonists together with Mr. Johnsen. He stands to gain significantly in the event that the claim succeeds. Nevertheless, it seemed to me that he sought to give careful and truthful answers to all the questions that he was asked. He gave a disarmingly frank account of the difficulties that would have confronted Updata Europe if it had tried to obtain alternative finance from a different bank in the aftermath of the 2008 financial crisis; evidence which to my mind holed one aspect (albeit not the most important part) of the Claimants' case on causation. I thought that in many ways he was an impressive witness, and consider that his evidence as to how he did react to the information that he was given, and how he would have reacted to other information that he was not given, was generally reliable.

25.     Mr. Flemming Holm is now aged 78, and has been retired for many years after a successful professional career. He was a witness who, in my view, must have lost something of his former sharpness. His recollection of events was not good. But he was undoubtedly seeking to assist the court in the evidence that he gave, even if at times the contemporary documents indicated that it was unlikely to be accurate. He was one of the individuals on the Claimants' side who was involved in the discussions leading to the 3 June e-mail, and it was plain from his evidence (which in material respects was not disputed) that he was both extremely concerned to ensure that both

bidders were operating on a level playing field, and understood and believed, following the 3 June e-mail, that they were.

26.    There were two other former Danish directors of Updata UK who gave evidence. First, there was Mr. Jorgen Johnsen, the father of Peter Johnsen. He was cross-examined only briefly, and no allegation of intention to deceive (in the context of the assignment) was put to him or ultimately pursued. The Defendants did not mount any particular attack on his evidence in their closing submissions. It did not seem to me that his evidence added very much, if anything, to the Claimants' case. But I see no reason to doubt the evidence that he gave.

27.    The other former director was Mr. Jens Nielsen. It was clear from the correspondence that he was held in low regard not only by the Defendants but also by Mr. Nyegaard (whose e-mail at the time referred to Mr. Nielsen as a "dimwit"). He had also fallen out with Mr. Johnsen some time before the sale. He has the prospect of a relatively small financial recovery, in respect of monies unpaid many years ago, if this action were to succeed. But I did not consider that he was a witness whose evidence was in any way motivated by the prospect of such recovery. As a witness, I thought that he sought to assist the court on the relevant facts by giving honest evidence, and that this was generally consistent with the documentation that he was shown in cross-examination. He was rather more impressive as a witness than some of the contemporaneous assessments of him as a businessman would indicate.

28.    Mr. Thomas Nyegaard provided seed capital for Updata UK, and ultimately substantially benefited from the sale to Capita in 2014, although his reward would have been greater if he had been permitted by LMS and the management team to roll over the full amount of his investment at the time of the sale in 2009. He had a good relationship with the Defendants in 2008 and early 2009, assisted them and was very much on their side in relation to the proposed MBO. He maintained a good relationship thereafter, notwithstanding a degree of unhappiness arising from his shareholding being reduced by the sale. He has no financial outcome in the present litigation, but in the light of the facts which have emerged he has a strong and genuine feeling that the Defendants behaved improperly in relation to the sale. I thought that Mr. Nyegaard was a most impressive witness, and at all times he sought to give accurate and truthful answers to the questions asked. In their closing submissions, the Defendants did not make any particular criticism of his evidence. I thought at the time, and still think, that his evidence provided a valuable insight into the relevant events, not least because in many respects Mr. Nyegaard could reasonably be viewed as an independent witness and I did not consider that he had any particular axe to grind.

29.    Mr. Birkeland gave evidence over a number of days, with other factual evidence being interposed. There were times when Mr. Birkeland was somewhat combative and argumentative, with a tendency to wish to support the Claimants' case. This is perhaps not surprising since he was heavily involved on Updata Europe's behalf in

the relevant events in 2009, and on Vald. Nielsen's behalf in relation to the assignment. He had also assisted in the litigation, certainly at the outset. Despite these matters, I considered that generally speaking Mr. Birkeland sought to assist the court by giving his genuine recollection of events. His evidence did not always support Mr. Johnsen. In relation to the deceit case, he gave evidence of the events which led to the 3 June e-mail, and in particular the preceding meeting on 29 May. I discuss this evidence in more detail below, where I accept much of his evidence about what was said at the meeting albeit not everything.

30.    Mr. Bigaard is a lawyer of many years' standing. He was not closely involved in the discussions which led to the assignment documents, which he had very much left to Mr. Homann. He had no obvious interest in the outcome of this litigation. He answered questions in a reasonable way, although his memory of events was somewhat hazy. I address his evidence in more detail in the section (Section J) addressing the assignment. I was not persuaded that he had intended to deceive the supervisor, Mr. Jepsen.

31.    Mr. Bremerskov was a small shareholder in Updata Europe. Neither his witness statement, nor the ensuing cross-examination, seemed to me to add anything material to either party's case. Indeed, his evidence was not referred to in the Claimants' closing, and merited only a brief footnote in the Defendants' closing.

32.    Ms. Tina Kambo (nee Rana) ("Ms. Rana") was the junior solicitor at Corren Troen who carried out work in relation to the Data Room. As part of her work, she was the recipient in July 2009 of a CD. This CD contained an important document: a "Weighted Budget" which had originally been prepared in March 2009. However, neither Ms. Rana nor anyone else on the EVs' side spotted that a potentially important document had been disclosed in the closing stages of the transaction and the EVs never looked at it. These events relating to this CD were central to the argument advanced by the Defendants on a strike out application in 2016 before Sir Richard Field. In particular, the Defendants argued on that occasion that the disclosure of this Weighted Budget meant that the Defendants could not have been dishonest, and that the case was a suitable one for striking out. By the end of the trial, however, it seemed to me that this particular argument had rather evaporated, and rightly so. Ms. Rana's evidence as to her work on the Data Room was not the subject of any significant challenge, and she gave her evidence carefully and well. If her evidence were truly material to any issue, then I would have no difficulty in accepting it. But in the end I did not consider her evidence to be of any particular importance.

*The Defendants*

33.    The Defendants are three intelligent individuals who clearly worked hard to make Updata UK the success that it undoubtedly was. They were each handsomely rewarded by the eventual sale to Capita, receiving around £ 21 million for their shares. In 2009 they were, in my view, very highly motivated to make sure that the LMS bid and the MBO succeeded, and that Mr. Nielsen's bid failed. As Mr. Hooft explained in his evidence when speaking of the position in mid-April 2009, the

Defendants were "very scared of losing control of the business". Contrary to the evidence given by the First Defendant ("Mr. Baldorino") and the Second Defendant ("Mr. Bennett"), they were not at any stage interested at that time in trying to obtain the maximum price either for their own shares or still less for the shares owned by the majority shareholder Updata Europe. They were also highly motivated to remove, or at least significantly dilute, Updata Europe as shareholder; something which is essentially an aspect of their desire for the MBO to succeed. (I address these matters in more detail in Section F below.) Their motivation for the MBO to succeed, and for Mr. Nielsen to fail, was such that they were in my judgment prepared to lie in the two e-mails which are at the heart of the Claimants' case on deceit. I do not consider the responses in those e-mails to be consistent with honest responses to the questions or issues raised, and to which the responses were being given: see Sections D and E below. I am also, for reasons which will be explained in this judgment, unable to accept the Defendants' evidence on many of the critical issues in the case. I also consider that the Defendants' evidence to Sir Richard Field was misleading; in particular in failing to explain to the Court that, as all the Defendants have now said in their evidence, the disclosure of the Weighted Budget to Ms. Rana was accidental and by mistake. Had this been explained, and for reasons also explained in Section F, I consider that the central case advanced to Sir Richard Field (namely that the Defendants could not have been dishonest because they disclosed the Weighted Budget) would have been fatally undermined and indeed would have been unarguable. It will therefore be apparent that I am not willing to accept the evidence of the Defendants on important issues unless corroborated by contemporary documents or other evidence or unless clearly consistent with the inherent probabilities.

34.     Mr. Hooft of LMS was a witness who generally gave reasonable and fair answers to the questions which he was asked. I did consider, however, that he had a tendency to seek to "spin" some of his answers on important questions so as to paint LMS in a good light and justify what, even on the Defendants' expert evidence, was the purchase of Updata Europe's shareholding at a significant undervalue. I was not convinced by his denial that LMS's offer started from the level of the debt and then used the EBITDA figures to justify it, rather than the other way round. It seemed to me that this was the natural reading of the relevant slide in the presentation which LMS gave on 2 April 2009. This slide started by saying that the "Loan face value of £ 5m sets "base level" expectation for 60% stake", and then went on to state that the historical, last 12 months and year to date figures gave "ammunition" for a lower valuation. Mr. Hooft had not, as far as I could see, exhibited or disclosed any of LMS's internal documents relating to the transaction, and it was therefore not possible to test some of Mr. Hooft's assertions – for example as to how the original offer was calculated, whether certain figures for future earnings prepared by Mr. Szpiro were considered too optimistic, and whether LMS had in fact reached close to the maximum amount that they were prepared to pay for the business – against such materials. I do not suggest that Mr. Hooft was other than an honest witness, but bearing in mind the above matters as well as the fact that Mr. Hooft was giving evidence in relation to matters many years ago and without LMS's internal documents in front of him, I treat his evidence with a degree of caution.

35.    Mr. Jepsen gave a short statement and was cross-examined briefly. His evidence was not controversial, since there was no dispute that he was not told about the assignment of Updata Europe at the time it was made. He only learned of it long after his short tenure as supervisor had come to an end.

*Expert evidence*

36.    The expert evidence on Danish law was given by Mr. Jakob Rosing and Ms. Kamilla Krebs for the Claimants, and Ms. Henriette Gernaa and Mr. Peter Carlstedt Nortved for the Defendants. The Claimants' original expert on Danish law was Mr. Jens Rostock-Jensen. Owing to illness, he was unable to give oral evidence, and Mr. Rosing and Ms. Krebs (partners at Mr. Rostock-Jensen's law firm) stepped in at a late stage and, save for some relatively uncontroversial and minor points, adopted what Mr. Rostock-Jensen had said in his prior reports and the joint report. In the end, there was relatively little disagreement between the experts as to the relevant Danish law principles, and I address their evidence in context below.

37.    The experts on valuation were Mr. Doug Hall for the Claimants and Mr. Paul Smethurst for the Defendants. Their disagreements were more substantial. Again, I address their evidence in the appropriate context below.

*Scheme of this judgment*

38.    In the following section of this judgment, I outline the factual background and the broad chronology of the relevant events in Section B. Section C sets out legal principles relating to the tort of deceit. A number of the issues in the case require more detailed treatment and consideration of the facts, and these are addressed in later sections: Section D, which addresses the 20 April e-mail relied upon by the Claimants in support of their case on deceit and conspiracy; Section E, which addresses the 3 June e-mail; Section F, which addresses a number of aspects of the Defendants' evidence and conduct at the time; Section G, which addresses inducement. I then turn to consider the arguments on causation (Section H), the fair value of Updata UK (Section I), assignment (Section J) and breach of fiduciary duty (Section K).

## B: Factual background and broad chronology of relevant events

*The Updata group of companies*

39.    The origins of the group of companies which ultimately included Updata Europe and Updata UK can be traced back to 1996. In that year, Mr. Johnsen, a Danish citizen, founded Updata Danmark A/S. By 1999, the business of that company was the provision of network solutions to local government authorities in Denmark. It enjoyed a measure of success, winning a large proportion of new tenders for local government contracts in Denmark, although by 2009 it owed substantial amounts to its bank. In 2001, Mr. Henrik Hildebrandt joined Updata Denmark as sales director.

40.    In 2003, Mr. Johnsen and Mr. Hildebrandt decided to open an English company to develop a similar business in the UK market. Mr. Johnsen decided to go into business with Mr. Baldorino, who took a 15% share in the company, Updata UK. Mr. Bennett" was Mr. Johnsen's cousin, and Mr. Johnsen offered him a position at Updata UK together with a 7.5% shareholding. Part of the initial funding for Updata UK was provided by Thomas Nyegaard. Mr. Nyegaard provided a £ 100,000 loan and received 5.1% of the shares. Mr. Johnsen's shareholding was initially held through Newwatch, but in 2006 this was changed so that 60% of the shares were held by Updata Europe and 12.4% by Newwatch. Thus, by the time of the sale in 2009, the shares in Updata UK were held as follows:

| Shareholder | No. of shares | Percentage |
|---|---|---|
| Updata Europe | 600,000 | 60% |
| Newwatch | 124,000 | 12.4% |
| Mr. Baldorino | 150,000 | 15% |
| Mr. Bennett | 75,000 | 7.5% |
| Mr. Nyegaard | 51,000 | 5.1% |

41.    Updata Europe, which became the main shareholder in Updata UK, was incorporated by Mr. Johnsen in 2001 and acted as a holding company for the shares in other Updata entities. By early 2007 the shareholders in Updata Europe were Mr. Johnsen, his father Jorgen Johnsen, his mother Kristen Johnsen, Mr. Hildebrandt, Mr. Henrik Bremerskov and Mr. Jens Nielsen. Mr. Nielsen was in due course to play an important part in the events which led to the MBO.

42.    Prior to June 2007, Mr. Nielsen had acted as a director and chairman of Updata UK and Updata Europe. However, in June 2007 Mr. Johnsen took steps to remove Mr. Nielsen from these positions and purchased his 7.5% shareholding, although as matters transpired he defaulted on payment of the full purchase price. By December 2008, Vald. Nielsen had become a shareholder together with the individuals (apart from Mr. Nielsen) identified in the preceding paragraph. Vald. Nielsen was a company which was owned by Jorgen Johnsen and other members of his family, and it (or its subsidiaries) had been the Johnsen family business for nearly 100 years. In due course, it was to become (or purported to become) the assignee of rights of Updata Europe. The assignment was aimed at benefiting the former shareholders of Updata Europe (although not Mr. Bremerskov) who had identified potential claims against the Defendants arising out of the sale in July 2009. By the time that these claims had been identified, these shareholders were no longer the owners of Updata Europe, which had been sold in December 2009 to a company owned by Mr. Esben Bigaard. Mr. Bigaard and his company had no interest in pursuing these potential claims for their own account, and were happy to assign them to Vald. Nielsen. As already outlined, there is a significant issue as to the validity of the assignment as a result of the backdating of the assignment documents. But, unsurprisingly, arguments that the assignment fell foul of English law principles relating to champerty were ultimately abandoned; no doubt in view of the fact that the assignment was intended to benefit the Danish prior shareholders in Updata Europe who had lost out in consequence of the alleged fraud.

43.    In addition to Updata UK, there were a number of other directly or indirectly owned subsidiaries of Updata Europe which played some part in the relevant events. There were a number of Danish companies including Updata Danmark A/S ("Updata

Denmark") and Change Networks ApS, both of which were both wholly owned by Updata Europe. Another Danish company within the group was Cagain Europe ApS in which Updata Europe had a 52% interest. Separate companies were incorporated in Spain and Germany with a view to an expansion into those countries which proved unsuccessful.

*Sparekassen Lolland A/S*

44.    Updata Europe's bank at the material times was Sparekassen Lolland A/S ("the Bank"). This was a regional Danish bank whose CEO was Mr. Lynge Thang Jorgensen.Updata Europe and Updata Denmark had been customers of the Bank for some time prior the events of 2009, and had gradually built up significant debts. By the time of the sale in July 2009, Updata Denmark owed DKK 14-16 million to the Bank, Updata Europe owed DKK 27 million and had guaranteed the debts of Updata Denmark. The total liability was in the region of DKK 41- 43 million. At the time, the DKK:£ exchange rate was around 8.5:1. The total indebtedness to the Bank was therefore around £ 5 million, inclusive of the guarantee of the debts of Updata Denmark. A further DKK 14 million (around £ 1.6 million) was owed to Vald. Nielsen.

45.    The Bank's lending to Updata Europe and Updata Denmark represented some 2% of its loan portfolio and this meant that the group was both an important customer and a significant exposure. By the end of 2008, the Bank was looking to reduce this exposure, not least because of a general desire to reduce exposures in view of the global financial crisis of late 2008. Indeed, the finances of the Bank itself, as with many banks around the world, were under strain as a result of this crisis and in particular because of problems within a subsidiary bank which was heavily exposed to the property market.

*Updata UK's business and management*

46.    Updata UK's business was in the telecommunications sector. It involved the creation of networks for local authorities, using existing infrastructure at a competitive cost. A contract would involve a customer paying an installation fee, and thereafter a periodic (usually quarterly) rental fee. The contracts were medium or long-term and the process of tendering and obtaining a contract was usually long, and could take 12-18 months. The nature of the business was such that Updata UK had, and was looking to obtain, a small number of large, long-term contracts rather than a large number of small contracts.

47.    The management team at Updata UK comprised Mr. Baldorino as Commercial Director, Mr. Bennett as Sales Director, Mr. Mantell as head of finance and Mr. George Cowan (who is not a defendant to these proceedings) who was head of operations. Mr. Baldorino was one of the initial directors of Updata UK. Mr. Bennett was initially the company secretary, and was later appointed as a director. Mr. Mantell had joined in 2004 but was not a director of Updata UK prior to sale.

48.    In addition to Mr. Baldorino and Mr. Bennett, Updata UK's board included a number of Danish directors. Initially these were Mr. Johnsen and Mr. Nielsen. Mr. Nielsen was removed as director in 2007 and Mr. Johnsen resigned as a director in February 2008. Following these changes, the Danish directors in 2009 were Mr. Hildebrandt,

Mr. Holm and Jorgen Johnsen. Mr. Holm was a former partner in Arthur Andersen and became chairman of Updata UK. The three Danish directors were non-executive directors.

*The position in late 2008*

49.    Although the evidence in the case covered in immense detail much of the history of the various Updata companies, it is unnecessary to describe this in detail and the material events can be described by reference to the position in late 2008. However, I will briefly sketch the background which I take from the evidence of Mr. Nyegaard. He was the childhood friend of Mr. Johnsen who had provided around £ 100,000 as start-up capital for Updata UK, in return for 5% of the equity (which subsequently grew to 5.1%). He was an investment banker by profession and took an active interest in Updata UK and developed a close relationship with the UK management team, and specifically Mr. Bennett and Mr. Baldorino. He was called as a witness by the Claimants, and much of his evidence as to the events which led to the buyout was not controversial. As I have indicated, he was a very impressive witness, and had the advantage from my perspective of not having any financial interest in the outcome of the present litigation.

50.    By 2006 and certainly by late 2008, Updata Europe was in an increasingly difficult financial situation due to its indebtedness to its Bank. This debt was exacerbated by the failure of an attempt to expand into Spain. Mr. Johnsen had decided upon this expansion against the advice of Mr. Baldorino, who was half Gibraltarian and knew the market. An attempt to expand into Germany had also been unsuccessful. The precarious nature of the finances of Updata Europe resulted in pressure on Updata UK.

51.    These factors contributed, over the course of several years, to a falling out between Mr. Baldorino and Mr. Bennett on one side, and Mr. Johnsen on the other, and what Mr. Nyegaard described as a general lack of trust between the UK and Danish owners of Updata UK. Mr. Nyegaard said in his witness statement that Mr. Johnsen came to be considered as the "enemy" by the UK management team. Mr. Bennett wrote a lengthy memo to Mr. Holm, in around February 2008, where he referred to the relationship being characterised "by lack of communication and mutual distrust". The memo referred to an accusation that the UK team had provided false, incomplete information to the majority shareholders for their own gain, and it went on to deny that this had ever happened:

> "The information supplied by the UK team has never been manipulated to show a false picture and the figures provided have been the same with which the UK management team have managed the business and are the ones which have kept Lloyds and BDO satisfied with the reporting standards. The UK team bitterly resent accusations to the contrary".

52.    Mr. Johnsen's evidence was that he did not recall ever saying anything to the effect that he mistrusted the UK management, and did not recall Mr. Hildebrandt or his father doing so either. He thought that the accusation, referred to in the memo, had been made by Mr. Nielsen. He agreed, when it was put to him in cross-examination, that from the Updata Europe board's perspective, the UK management had always

behaved professionally, and that as far as he could tell the management had always dealt with Updata Europe in a straightforward manner. Mr. Hildebrandt said that whilst the relationship between the UK management and Updata Europe was not the best, he did not believe (speaking of the position in June 2009) that Updata UK would hold back information, and that he "trusted" them. Mr. Holm said that he personally had good communication with the UK management, but did not think that they were "interested in co-operating with the group". Mr. Bennett said in his evidence that he did not think that Mr. Johnsen "should have had reasons to distrust me".

53.   Overall, the evidence in the case suggested to me that the lack of trust described by Mr. Nyegaard reflected more the attitude of Updata UK towards Updata Europe, rather than vice versa. But nevertheless the Updata Europe board was aware that relations were not the best, and that there was a degree of antipathy on the part of the UK management towards them.

54.   There were various attempts over the years to restructure the group. One plan was to merge Updata Europe and Updata UK, which would have had the effect of enabling Updata Europe to benefit directly from the business and cashflow of Updata UK. This was fiercely resisted by the minority shareholders of Updata UK (i.e. Mr. Baldorino, Mr. Bennett and Mr. Nyegaard). In late 2007, the minority shareholders put forward proposals for the acquisition of shares which would have the effect of reducing Updata Europe's shareholding, but this was rejected by the Danish shareholders.

55.   Mr. Nyegaard described how, during 2008, the situation between Updata UK and Updata Europe was strained and continued to deteriorate, due to the lack of confidence that Mr. Baldorino and Mr. Bennett felt in Updata Europe's expansion plans. The UK management felt that the Danish shareholders were serving their own interests, or those of the various Danish companies, at the expense of Updata UK. These companies were seen as a potential drain on Updata UK, and the time of the UK management was spent in fighting internal battles with the shareholders of Updata Europe.

56.   In late 2008 and early 2009 a further proposal was made to regulate the relationships between the shareholders, but this came to nothing. The failure of this route led the UK management and Mr. Nyegaard to believe that the situation, which they regarded as profoundly unsatisfactory, needed to be resolved by replacing or diluting Updata Europe as the majority shareholder of Updata UK. From the UK management's perspective, the preferred route was a management buyout rather than simply finding a new majority shareholder. Mr. Nyegaard agreed to assist the management team to find a solution that would give them more stability in the day-to-day business of running the company.

57.   In late December 2008 and January 2009, the Defendants had sought advice from Tenon. At that point in time, the Defendants wanted Tenon to assist them in: (i) demonstrating that Updata UK could not afford to pay £50,000 per month to Updata Europe; and (ii) preparing for a possible "pre-pack" administration of Updata UK.

*January – March 2009: Mr. Nielsen's approach*

58.   In late 2008 and early 2009, Updata Europe was under increasing pressure from the Bank to repay or reduce its debts or provide further security. The Bank's role and

attitude at this time, and as the events of 2009 unfolded, are crucial to arguments advanced by the Defendants in relation to reliance, causation and quantum and I will address them in greater detail in that context. There is no dispute, however, that Updata Europe's very difficult financial position was a significant factor in the events leading to the sale of Updata UK.

59. The trigger for a possible MBO of Updata UK was a proposal made on 16 January 2009 by Mr. Jens Nielsen to Mr. Jorgensen of the Bank. The letter was copied to Mr. Helge Homann of KPMG, who were Updata Europe's auditors. Mr. Nielsen indicated that he was prepared to purchase 100% of Updata Europe or 100% of Updata UK. The letter sought an exclusivity period during which he could conduct due diligence. The letter indicated that, subject to due diligence, Mr. Nielsen anticipated placing a bid placing a value of £ 5.0 million on the UK company. That was roughly the level of Updata Europe's debt to the Bank.

60. The Defendants learned of Mr. Nielsen's proposal in early February 2009. Mr. Nielsen's possible purchase of Updata UK was regarded by UK management, for a large variety of reasons, as very undesirable indeed. They did not like Mr. Nielsen and held him in low regard. They were, as Mr. Hooft said, scared of losing control of the company, particularly to someone like Mr. Nielsen. In their evidence at trial, the Defendants explained that they would not have stayed with the business under Mr. Nielsen's control.

61. This unwanted approach led to Mr. Bennett, on 25 February 2009, meeting with Tenon again, this time for the purpose of discussing Tenon's role in finding a backer for either an MBO or a pre-pack administration. An e-mail from Tenon on 26 February referred to the discussion at the meeting which was either to identify funders "prepared to invest £ 4-5 million to facilitate an acquisition from your overseas parent" or alternatively "identifying funders prepared to fund an acquisition out of administration of £ 2-2.5 million". In due course, on 16 March 2009, Tenon were formally engaged by the UK management. A letter of engagement set out Tenon's role and responsibilities. The sequence of events and the terms of engagement are discussed in more detail in Section E below. In the meantime, prior to or around the time of Tenon's formal engagement, the Defendants had meetings with a number of private equity houses in early March 2009 with a view to finding a backer for an MBO. These included meetings on 12 March 2009 with Moore Capital; 17 March 2009 with Inflexion; and with Lloyd's Development Group.

62. Between 16 and 18 March 2009, Mr. Nielsen and Mr. Homann attended Updata UK's offices for the purpose of conducting due diligence. In addition to his role as Updata Europe's auditor, Mr. Homann was providing assistance to Mr. Nielsen in connection with his bid. They sought information about Updata UK's financial forecasts for 2008/09 and 2009/10, as well as copies of all customer contracts. Mr. Nielsen and Mr. Homann received a copy of a presentation headed "Financial Overview". This document ("the Financial Overview") is a critical document in the case. It showed the following:

| (£000) | Budget 2009 | Forecast 2009 | Budget 2010 Worst case | Budget 2010 Middle case | Budget 2010 Best case |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

| Turnover/sales | 11,046 | 10,490 | 6,864 | 7,540 | 15,183 |
|---|---|---|---|---|---|
| Profit before tax | 1,103 | 904 | 154 | 418 | 2,195 |
| EBITDA | 1,695 | 1,496 | 1,129 | 1,393 | 3,348 |

63.    The important figures, on which the arguments in the present case have centred, are those for EBITDA (i.e. Earnings before Interest, Tax, Depreciation and Amortisation). This is the financial metric which is particularly relevant to potential investors in companies, with valuations commonly being based upon a multiplier being applied to EBITDA. The Financial Overview therefore indicated that Updata UK was behind budget for the financial year 2009, which by that stage had run for just over 8 months: the company's financial year ended on 30 June of each year. It also indicated that the company's "Middle Case" for the following year (i.e. the year ending 30 June 2010) would decline; i.e. reduce from EBITDA of £ 1,496,000 to £ 1,393,000, albeit that the "Best Case" would show an improvement to £ 3,348,000.

64.    The concepts of "Worst case", "Middle Case" and "Best Case" were explored in the evidence, and I say something about those concepts at this stage since they are relevant to the figures which I subsequently describe. Mr. Hooft of LMS agreed in evidence that: a "best case is normally on the assumption that everything goes right. Worst case will be everything that can go wrong does and middle case will be realistic." Similarly, Mr. Bennett agreed:

> "Q. Would you agree, therefore, normally when someone has, as it were, best case, middle case and worst case, obviously worst case you're not assuming an asteroid hits the planet or something of that sort, but in realistic terms, you're looking at what realistically the worst case for the worst case; yes? What you would more or less expect as a reasonable outcome being the middle case; yes?
>
> A. Yes.
>
> Q. And then, again, although sometimes best case can be exceeded, but the best case would normally be the realistically best case that it was thought could be achieved?
>
> A. I would agree with that."

65.    Accordingly, the concepts of a "worst case" and a "best case" would not be understood literally, with worst case denoting Armageddon (or as Mr. Booth colourfully put it, an asteroid hitting the planet) and a best case denoting Utopia. Rather, they denote a realistic worst case and a realistic best case. A company's middle case would therefore represent something in between: as Mr. Bennett said what would be "more or less" expected to be achieved.

*March – April 2009: events and the work leading to the LMS offer on 16 April 2009*

66.    Prior to and around the same time as Mr. Nielsen and Mr. Homann were provided with the Financial Overview, the Defendants had started to provide financial information to Tenon for the ultimate purpose of producing an investment memorandum to send out to potential backers of their proposed MBO. There was

evidence that Tenon were provided with the Financial Overview itself, but it is plain that this document was of no significance in relation to the projections which were developed in March and which ultimately were reflected in the investment memorandum.

67.    It is not necessary to describe in detail, at this stage, all the exchanges between the management team and Tenon in March: I address this in more detail in Section E below. For present purposes, the important features of those exchanges can be summarised as follows. The attachment to the e-mail sent by Tenon following the meeting on 25 February was a document headed "Updata Infrastructure – Due Diligence". This referred to "[weighted case] budget for the year to 30 June 2010" and the "[weighted case] projections for the year to 30 June 2010". (The words "[weighted case]" were in square brackets in the document.) The concept of a "weighted" case was that the budget or projection would consider contract opportunities which were available to Updata UK, and give them an appropriate weighting to reflect the likelihood of a successful outcome and the consequent income generation.   This was a concept familiar to Updata UK, and in particular Mr. Baldorino who had developed his own system of weighting which depended upon the stage which a particular proposed project had reached.

68.    As matters progressed in March, Tenon were provided with a number of documents, again as described in more detail in Section E.

69.    The information provided to Tenon included a document setting out detailed information as to projects in the "pipeline". Thus, on 25 March 2009, Mr. Baldorino e-mailed Guy Helman at Tenon with a spreadsheet entitled "Pipeline Breakdown v1". He had shared this document with Mr. Mantell and Mr. Bennett in advance. It showed, in a digestible format: (i) the identity of the contracting counterparty; (ii) the value of each contact; (iii) the prospect (in a column headed "Probability") of the contract being won by Updata UK expressed as a percentage, with a commentary on the stage reached in the negotiations; and (iv) the identity of nine contracts with 100% prospects (i.e. the contracts had been won by Updata UK albeit not yet formalised).

70.    The information also included detailed financial projections, in the form of a "Weighted Budget". These budget documents were authored by Mr. Mantell (as shown on the metadata), and were based on Mr. Baldorino's weighted pipeline. Mr. Mantell circulated a number of versions of a 2009/10 weighted budget on 25 March 2009: see further Section E below. The final version, referred to at trial (and herein) as the "March Weighted Budget" was circulated at 8.50 pm that night. This showed EBITDA figures for the 2009/2010 which were in excess of £ 6 million. The EBITDA figures were not shown as such in the budget documents, but are to be derived by adding back the figure for "depreciation" to the figure for "profit before tax"; the latter figure having originally been calculated after deduction of depreciation. The depreciation figure was £ 1,057,918, and the figure for "Profit before bank expenses" was £ 5,012,270. Using these figures, the EBITDA was £ 6,070 million. An alternative calculation was to add the depreciation figure to the figure for "Profit before exceptional items" (£ 4,981,305). This would produce EBITDA of £ 6,039 million. The relatively small difference between £ 6,070 million and £ 6,039 million was the inclusion of bank charges of £ 31,000.

71. These budget documents contained very detailed workings in relation to each of the contracts which were considered relevant for consideration. Despite being a "weighted budget", the projections were based primarily on contracts which had already been won. Only six contracts were included on a 'weighted' basis, and all of the contracts which Mr. Baldorino had weighted at 100%, in his pipeline document, were included without a discount.

72. On 27 March 2009, Mr. Mantell e-mailed Tenon with a spreadsheet entitled "Budget 2009-2010 (weighted case) (v4)". The material figures had not changed. It showed EBITDA (using the figure for "Profit before exceptional items") for 2009/10 of £ 6.070m based on turnover of £ 19.039m.

73. The information supplied by the Defendants was then incorporated into two documents: the "Tenon Memorandum" and the Tenon Data Pack. These documents were sent to potential backers of the MBO. The Tenon Memorandum ran to 23 pages, and stated at the start that it had been prepared by Tenon "based on information provided by the management of [Updata UK] and has been approved by the management." It provided an upbeat assessment of the company's prospects. It described the business as profitable, highly cash generative and with a significant qualified new business pipeline in excess of £ 70 million. It also provided a description of Updata Europe's indebtedness to the Bank. The relevant paragraphs were in the following terms:

> 3.2 Opportunity
>
> The opportunity is to acquire an established fast growing managed network service provider with long term contractual relationships with local authorities in the UK. The business is profitable, highly cash generative and has a significant qualified new business pipeline in excess of £70m.
>
> Updata Europe owes c£3m to a small Danish Bank ('The Bank') which has taken security over the shareholding in Updata.
>
> The Danish Bank is keen to find an investor into Updata Europe and has been exploring this option although it realises that a sale of their 60% holding in Updata is the most likely exit. The Bank is now actively exploring this exit route.
>
> A private individual invested £1.5m into the Group in 2008 and their debt is held between two tranches of the Bank debt in terms of priority. Any purchaser will need to take this debt into consideration whilst formulating an offer for the business.
>
> Whilst total debt within Updata Europe totals an estimated DKR40m (£5m), it is anticipated that a deal might be possible at slightly below par value, although this will require further discussion and negotiation with the Bank.

74. The reference to "par value" (as Mr. Hooft confirmed in his evidence) meant the amount of the debt.

75. I note in passing that, as described above, the total debt to the Bank was, inclusive of the guarantee of Updata Denmark's debts, around £ 5 million, with an additional £ 1.6 million owed to Vald. Nielsen (the "private individual" referred to in the above passage). It seems, however, that (as the Claimants submitted) this was not appreciated by those on the MBO side at the time. They proceeded on the basis that the Bank was owed around £ 3 million (or DKK 26 million), which was secured by 1st and 3rd ranking charges on the shares, with a further sum of around £ 1.5 million owed to Vald. Nielsen and secured by a 2nd ranking charge sitting in between the Bank's debt. That meant that in order to pay off the Bank's DKK 26m debt in full, any offer would need to cover the sums owed to Vald. Nielsen as well. Nobody on the MBO side appears to have appreciated that the true extent of Updata Europe's liability to the Bank included the sums owed by Updata Denmark to the Bank and guaranteed by Updata Europe.

76. In the section headed "Financials", there was a table which included the following actual and projected results which are material to the issues in the case:

| (£000) | Actual year end 30.06.08 | Forecast year ended 30.06.09 | Weighted forecast for year ended 30.06.10 |
|---|---|---|---|
| Turnover/sales | 5,133 | 11,045 | 19,039 |
| EBITDA | 813 | 1,694 | 6,071 |
| EBIT | 265 | 1,103 | 5,014 |

77. The figures for 2009/10 were explained as follows:

> "The figures for Year Ended 30 June 2010 are weighted proportionately against the probability of securing the contracts. If Updata are successful in securing all of the contracts that they are presently tendering for this will lead to achieving a materially higher value of contracted revenue and EBITDA."

The 2009/10 projection was therefore taken from the March Weighted Budget, described above, prepared at the end of March. The projection was therefore very substantially in excess of both the "middle case" and the "best case" which were set out in the Financial Overview.

78. The Tenon Data Pack was a lengthy document which included: a detailed analysis of the company's performance in the year to date; its anticipated earnings in the year to 30 June 2009; its projected earnings in the year 2009/10; and the status of each of its actual and likely contract wins. The important features of the Tenon Data Pack included the following:

a) It showed forecast EBITDA for 2008/09 of £ 2,479,000 against a budget of £ 1,717,000. Page 23 of the Data Pack gave details of this forecast under the heading "Management expect to outperform the

FY09 budget by £ 0.8m of EBITDA". A similar statement appeared on page 4 of the Data Pack in a box which referred to the "Management Run rate". The text within the box stated: "Based on run rate Performance and known installations, management expect to outperform FY09 Budget".

b)    It showed forecast EBITDA of £ 6.070m for 2009/10: i.e. the same figure contained in the Weighted Budget and the Tenon Memorandum.

c)    It also showed "pro forma EBITDA" for 2009/10 of £ 4.4m. This was based on existing contracts which were set out on page 7 of the Data Pack.

d)    It included a detailed breakdown of the company's turnover and margin on each contract, as well as an analysis (in Appendix 2) of "current contracts" and (in Appendix 3) "new contracts" with weighting information as to the likelihood of new contracts being won.

79.    On 26 March 2009, the Defendants had meetings with three private equity houses (Octopus PE, Epic PE and Hamilton Bradshaw). Since the investment memorandum had not been completed at that point, the Defendants decided to use a pre-existing presentation known as the "Kelso Presentation" as part of their presentation to these potential investors. (This presentation had originally been given to a potential investor, Kelso, in October 2008). At 8.22am on 26 March, Mr. Bennett e-mailed the original Kelso Presentation to Mr. Mantell. At 8.30am Mr. Mantell replied, having amended the final slide on the Kelso Presentation to present the following financial information:

| (£000) | Mgmt. A/Cs 2008 | Budget 2009 | Forecast 2010 |
|---|---|---|---|
| **Turnover/sales** | 5,133 | 11,045 | 19,039 |
| **Profit before tax** | 28 | 1,112 | 4,981 |
| **EBITDA** | 854 | 1,704 | 6,039 |

80.    The 2009/10 figures in the amended Kelso Presentation were those from the March Weighted Budget circulated at 8.50pm on 25 March 2009. This amendment to the Kelso Presentation is of particular significance in the light of what was later said in the e-mail dated 3 June 2009.

81.    On 30 March 2009, Moore Capital followed up on their meeting with Mr. Bennett and Mr. Baldorino by requesting further information. This particular e-mail chain had commenced on 19 March 2009 with Mr. Bich of Moore Capital asking for "Updata's latest financial statements pls (Balance sheet, P&L, Cash flow statement)". Mr. Mantell responded by sending Mr. Bich a document known as the "2009/10 Weighted Budget". This is a shorter version of a revision (immaterial for present purposes) to the March Weighted Budget sent to Tenon on 27 March 2009. It shows:

| (£000) | Budget 2009/10 |
|---|---|
| **Turnover/sales** | 19,039 |

| Profit before tax | 4,981 |
|---|---|
| EBITDA* | 6,039 |

\* As previously indicated, EBITDA is not specifically shown, but it is to be derived by adding together the figure for "Profit before taxation" and "Depreciation".

82.    Following the release of the Tenon Data Pack, on 3 April 2009 the Defendants received a number of offers from potential backers. Nearly all of them were pitched at the same level: roughly £ 5 million for Updata Europe's 60% stake. This reflected the fact that the Tenon Memorandum had presented the "opportunity" as one to acquire at around or below the par value of Updata Europe's debt. It also reflected Tenon's remit, as described in their e-mail of 26 February 2009, to identify "funders prepared to invest £ 4-5 million to facilitate an acquisition from your overseas parent".

83.    LMS appear not to have sent an offer letter but instead presented their offer in a Powerpoint presentation to 2 April 2009. On valuation (and as I have already mentioned in my discussion of Mr. Hooft's evidence) LMS noted that:

- "Loan face value of £5m sets "base level" expectations for 60% stake

- This reflects equity value of £8.3m

- Together with £1.4 million net debt at end of Feb this gives an enterprise value of £9.7 million

- Certainly, Historical, LTM and YTD underperformance compared to budget give ammunition for lower valuation

- However, if outturn numbers will be achieved, the entry price multiple falls to just below 4x EBITDA, a realistic valuation in today's markets…

- …whilst Pro Forma numbers give a flavour of the upside to be gained by Investor / Management if UD UK successfully executes on its plan."

84.    Having considered the various proposals, the Defendants decided to work with LMS. On 14 April 2009, Mr. Bennett, Mr. Baldorino, Mr. Nyegaard, Mr. Hooft and Mr. Jamie Rhodes (of LMS), and Mr. Helman and Mr. Castledine (Tenon) met with Mr. Jorgensen in Denmark. I consider this meeting in more detail below (see Section H).

85.    On 16 April 2009 LMS sent their offer letter by e-mail to Mr. Holm, Mr. Johnsen and Mr. Jorgen Johnsen. The letter was addressed to Mr. Flemming Holm, as chairman of Updata Europe. LMS offered DKK 65 million for the entire issued share capital of Updata UK. The letter explained that this "would value the 60% stake held by Updata

A/S at DKK 39 million". LMS's letter stated that LMS had worked closely with management and advisers; that they had performed their:

> "stage one financial due diligence. This included a review of historical and year to date (YTD) trading results, historical and year to date ("YTD") trading results, historical and current balance sheets positions including analysis of working capital, as well as a review of key contracts."

86. The letter went on to provide an explanation or justification for the level at which they had pitched their offer:

> "From this information we know that YTD February 2009 results are behind plan due to delays on installations and lower than budgeted margins: Sales £6.0 million (budget £8.6 million) and EBITDA £0.8 million (budget £1.3 million). The actual run rate results of the company (12 months to 28th Feb 2009) are as follows: Sales £8.4 million, EBITA £1.5 million and EBIT £0.85 million. In other words, significant progress is still required to achieve budget results for June 2009. However, despite this shortfall, the Company is showing good growth compared to 2008.
>
> In addition, our analysis shows several creditors have gone unpaid (including VAT!) and the true indebtedness of the Company is around £1.4 million. The resulting enterprise value of Updata UK (using an exchange rate of 8.5 DKK/GBP) is £9.1 million.
>
> Therefore our Offer reflects the following valuation multiples:
>
> EBITDA £1.50 million = 6.1x
>
> EBIT £0.85 million = 10.7x
>
> We have taken these factors and the resulting high entry price multiples into account in formulating our Offer. We believe that under LMS ownership, a well financed Updata UK, freed from its current constraints, has good prospects for profitable growth."

*Reaction to the LMS offer and the 20 April e-mail*

87. On the morning of 20 April 2009, at 10.12am, Mr. Holm e-mailed Mr. Hooft to say that Updata Europe had given exclusivity to another party and was interested in getting investment into Updata Europe. That response prompted various communications that morning between LMS, Tenon and the Defendants. These are described in more detail below. In particular, at 10.28am Mr. Bennett e-mailed LMS, Tenon and others to say that "Peter Johnsen is coming to the UK this week with the express intention of raising circa £2m". The Defendants at that stage already knew about Mr. Johnsen's intention to look for investment of around £2 million as a result

of a proposal which Mr. Johnsen had made known as 'Project Eagle'. It was on the morning of 20 April that Mr. Bennett responded, rejecting that proposal.

88. At 9.41am Mr. Johnsen e-mailed Mr. Bennett. The e-mail was written in Danish (which Mr. Bennett spoke), and the subject line was: "Re: Seneste budget". This meant: "Re: Latest budget".

> "Could you forward the latest budgets for Updata UK for 2008/9, 2009/10 and 2010/11. Some adjustments need to [have] been made regarding the changes that are mentioned in the letter from LMS.
>
> Thanks in advance.
>
> PS. I would very much like to use them today if possible"

89. At 3.05pm, Mr. Bennett replied. He did not change the subject line "Re Latest budget". His e-mail response attached 6 pages of February 2009 management accounts and the Financial Overview. The text of his e-mail, which was written in English after the greeting "Hej Pede" was:

> "The numbers used by LMS were taken from the February Management Accounts. The projections used were the same that we presented to Helge Homann and Jens in March. Please see attached. I do not know what adjustments LMS have made internally."

90. This e-mail forms one of the two central planks of the Claimants' case on fraudulent misrepresentation. In summary, the Claimants contend that Mr. Bennett was dishonestly representing that the Financial Overview was the latest budget which Mr. Johnsen had requested, and that this was a document which had been given to LMS. The true position, so the Claimants contend, is that Mr. Bennett knew that the Financial Overview was not the latest budget. The management's real expectation for 2008/2009 was for the higher figures which can be seen in the Tenon memorandum, and their real expectation for 2009/2010 was the higher figures in the March Weighted Budget which was also reflected in the Tenon memorandum. The Defendants deny that the e-mail contained any false representation and deny any intention to mislead. The parties' arguments on this e-mail, and its attachments, were extensive and are addressed in greater detail below: see Section D.

*May 2009 and the establishment of the Data Room*

91. On 6 May 2009, Mr. Nielsen's team met with the Defendants as part of the continuation of Mr. Nielsen's due diligence. The Defendants were reluctant to meet with him. Mr. Baldorino's attitude is apparent from his e-mail to Mr. Nyegaard on 2 May: "Well, as far as I am concerned I don't want to see him. If he has something to say he can put it in writing. Quite frankly whatever he says … we are not prepared to work with him". Nevertheless, they did meet him.

92. On 13 May 2009, Mr. Nielsen sent a "letter of understanding" to Mr. Holm and Mr. Jorgensen. He proposed to arrange for: (i) a capital injection of DKK 52.5 million for

75% of the share capital of Updata Europe (with the money to be used to repay the debts owed by Updata Europe to the Bank and to Vald. Nielsen); and (ii) the purchase of Newwatch's 12.5% interest in Updata UK. The valuations were based on "5.0 x EBITDA for both the Danish and English operations". Mr. Nielsen's letter expressed concern that the Defendants had not answered his questions following his due diligence meeting with them in March. He also noted that the Defendants had produced a "Business Plan" which had not been provided to his team. He said that "this document ought to be made available as it would provide management and staff's clearest picture of UK operations, revenue forecasts and commercial and strategic intelligence."

93.    On 15 May 2009, LMS made a second offer. LMS offered to purchase the entire share capital of Updata UK for DKK 76 million (valuing Updata Europe's 60% interest at DKK 46 million), representing an 18% increase in the price offered on 16 April. LMS explained that they had already done "extensive preliminary due diligence" in conjunction with Tenon and the management, but that final due diligence to completion would be required and this could start immediately. They stated that they would expect to enter into a period of exclusivity upon acceptance of the offer. They also offered the EVs the opportunity for them to "rollover" part of their interests into the new company: Newwatch could roll over its entire 12.4% interest; Updata Europe could retain a 10% interest in the newco.

94.    On 20 and 21 May 2009 Mr. Jorgensen e-mailed Mr. Birkeland recommending that a Data Room be opened as part of the sale process. Mr. Jorgensen asked Mr. Birkeland to pass his e-mail to Updata Europe's Board and interested parties. The e-mail also stated that "if Jens Nielsen wants to access the data room from Tuesday, 26 May 2009, the binding offer shall be submitted no later than Sunday, 24 May 2009." The requirement for a Data Room, and its subsequent establishment, are the important backdrop to the 3 June e-mail. The course of events is described in more detail in Section E below, and what follows here is a broad summary.

95.    In accordance with Mr. Jorgensen's request, a Data Room was established, in relation to Updata UK, at its premises in Reigate. On 22 May 2009, Mr. Birkeland e-mailed Mr. Bennett a draft list of information to be included in the Data Room. The same list was sent to Mr. Hildebrandt at Updata Denmark. It included "any current budget, forecast or business plan (prepared by or for the company or the management)" and "customer contracts". Mr. Bennett forwarded the list to Mr. Mantell.

96.    Both Mr. Nielsen and LMS were informed of the establishment of the Data Room on 22 May 2009. In response, Mr. Nielsen insisted that the Data Room should include:

> "answers to our questions to the UK management, copy of all contracts, pipeline information for UK, copy of all information, written and oral, given to LMS Capital (together with confirmation from UK management that this is the exact information handed over in writing and orally)…"

97.    On 26 May 2009, Mr. Nielsen e-mailed Mr. Jorgensen with: (i) a letter stating that he was working with e-Kong Group Limited (a telecommunications company listed in Hong Kong) on a model involving a cash injection of DKK 60 million into Updata Europe (including the acquisition of Newwatch's shares in Updata UK); and (ii) a

letter from e-Kong expressing their interest in participating in the acquisition of a majority stake in Updata Europe. On 28 May 2009, Mr. Nielsen sent a revised letter of understanding to Mr. Jorgensen (cc'd to Mr. Birkeland and Mr. Homann).

98.  On 28 May 2009, Mr. Birkeland and Mr. Bennett discussed the contents of the Data Room in a telephone call. Mr. Birkeland followed up his call by e-mailing Mr. Bennett a copy of the "draft data room rules".  On the same day, Mr. Birkeland circulated a draft confidentiality agreement and drafts of the Data Room rules to LMS. The same documents were sent to Mr. Nielsen on 29 May. The Data Room was to be open from 1 June 2009 – 12 June 2009; final offers were due by 19 June 2009 (to include a draft share purchase agreement); Updata Europe would decide whether to proceed with any offer by 24 June 2009; and any bidder chosen by Updata Europe would have an exclusivity period until 10 July 2009 to complete the transaction. The "draft data room rules" indicated that:

> "Any sale and purchase agreement relating to the Target [Updata UK] shall provide that the contents of the documents contained in the data room shall be deemed to be disclosed against any warranties contained in the sale and purchase agreement, although no warranty shall be given as to the accuracy of those documents."

99.  On the same day, 28 May 2009, Mr. Nielsen repeated his concerns that the Defendants (and LMS) had access to information which had not been disclosed to his team. He e-mailed Mr. Birkeland to describe what he called the "deficiencies in the process to date" and repeated his concerns about the disparity of available information:

> "Outstanding Due Diligence
>
> I also refer to my e-mail to you, dated 24th May 2009, and repeat my request for information to be included in the DD material:
>
> (a) answers to our questions to the UK management;
>
> (b) copy of all contracts, pipeline information for UK;
>
> (c) copy of all information or disclosure, written or oral, given to LMS Capital, including a copy of a UK management's business plan (together with confirmation from UK management that this is the exact information handed over in writing or orally),
>
> (d) Due Diligence information package for Updata Denmark and Change Networks, concise statement on status of Updata Germany and Spain (ongoing liabilities, contracts etc)."

100.  Mr. Nielsen's concerns were taken seriously by the Bank, Mr. Birkeland and Mr. Holm. Mr. Birkeland e-mailed Mr. Holm to say that "we should follow up on this, and explicitly make sure that this is also complied with".

CL-2015-000305

*29 May meeting and its subsequent correspondence*

101.   On 29 May 2009, Mr. Birkeland had a meeting with Mr. Bennett at Updata UK's offices. There are disputes as to precisely what was said at the meeting, and I deal in more detail below with the meeting and the correspondence which followed. There was no dispute, however, that Mr. Birkeland told Mr. Bennett that both parties had to have equal access to the documents and information provided to Tenon. It was also not disputed that Mr. Birkeland was told by Mr. Bennett that the Defendants would not be putting a copy of the Tenon Memorandum itself into the Data Room.

102.   Following the meeting on 29 May 2009, there were a number of important exchanges which are addressed in more detail in Section E below. They began with an e-mail from Mr. Birkeland to Mr. Bennett at 8.22 pm that night. Mr. Birkeland said that "as discussed we need to include a business plan in the [data] room" and he copied and pasted a series of bullet point information requests made by Mr. Nielsen the previous day. He also asked Mr. Bennett to answer a number of outstanding questions which had been raised by Mr. Nielsen much earlier. Finally Mr. Birkeland said:

> "We will then prepare a statement from Management Team confirming that LMS Capital has not in writing/orally been provided with any factual information etc. which is different from the information included in the data room, hereunder in the business plan, or the responses."

103.   On 29 May 2009, at 21.51, Mr. Bennett forwarded Mr. Birkeland's e-mail to Mr. Hooft of LMS commenting: "a little too much information don't you think?" On 31 May, Mr. Bennett sent Mr. Hooft his draft responses to Mr. Nielsen's bullet points for Mr. Hooft to comment on.

104.   On 1 June 2009, Mr. Mantell on behalf of Mr. Bennett, sent Mr. Holm: (i) a copy of Mr. Birkeland's e-mail with answers to Mr. Nielsen's bullet-point information requests, and (ii) a document known as "JNDD1" (which contained the Defendants' answers to the questions first asked by Mr. Nielsen following his due diligence meetings in March). In the e-mail, Mr. Bennett said that:

> "There is no formal business plan in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB & VB presented in October 2008. This can be updated but is a Power Point presentation and not a descriptive document."

105.   In the meantime, the Defendants considered how to respond to Mr. Birkeland's request for a statement that LMS had not been provided with any factual information which was different from that to be included in the Data Room. Mr. Robert Kidson of Tenon gave the following advice on 2 June 2009:

> "Our advice is that ALL information which you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including any pipeline info) should go in the data room. The report by Tenon since it was commissioned by

> you and is for your benefit does not have to be shown to anyone else however.

> Our view is that to breach the above would expose you to potential problems/even litigation."

*The 3 June e-mail*

106. The second crucial plank of the Claimants' case on fraudulent misrepresentation is an e-mail which was sent by Mr. Bennett to Mr. Birkeland and Mr. Holm in the afternoon of 3 June 2009. The e-mail was copied to Mr. Mantell, and was bcc'd to Mr. Baldorino, Mr. Cowan and Mr. Hooft. The e-mail was in the following terms:

> "Hi Mads and Flemming,

> I apologise for not getting this to you sooner. I came in on Sunday to complete and was convinced I had sent everything, except the presentation, off to you.

> Please find attached answers to JN's & HH's questions from the round off meeting we had in the UK. Where further detail is required please refer to Julian as he has all the detailed paperwork.

> In response to Mads' e-mail earlier today and my subsequent conversation with Flemming, I would like to confirm that there is no business plan, nor has there been for a long time (years). The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum.

> The factual data available to both Tenon at the time and LMS subsequently, does not differ from that information currently in the data room. In fact there is now far more factual data in the Data Room than has ever been supplied to Tenon or LMS in the past. We, as a management team will be available to answer questions, from either party, up until the 19th June when we understand that firm offers have been tabled by both reams. We would of course require some notice, although this is to some extent catered for in Data Room rules.

> If either of you have any questions, concerns or suggestions, please revert back to me or Julian

> Kind regards,

> Richard"

107. In addition to this text, Mr. Bennett had inserted (in red text) responses to the bullet-point information requests which had been made by Mr. Nielsen, and which Mr.

Birkeland had set out in his e-mail of 29 May. In response to the request for a "Concise statement of business plans for the next 3 years, with long term (to 5 years) prospects for Updata DK, Change and Updata UK", Mr. Bennett wrote:

> "There is no formal or informal business plan in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB & VB presented in October 2008. Jens and Helge Homann were given this presentation when they came to the UK in Feb/ March. We have updated this (please see attached) to reflect new business won but please bear in mind that this is a PowerPoint presentation and not a descriptive document."

108.  The e-mail attached a Powerpoint document called "Kelso Presentation Updated May 2009" (the "Updated Kelso Presentation"). On the final page, under the heading "financial projections" the following information was provided:

| (£000) | Man Accs 2008 | Budget 2009 | Best Case forecast 2010 |
|---|---|---|---|
| **Turnover/sales** | 5,133 | 11,045 | 15,183 |
| **Profit before tax** | 28 | 1,112 | 2,195 |
| **EBITDA** | 854 | 1,704 | 3,348 |

109.  The figure of £ 3,348,000 was exactly the same figure as contained in the Financial Overview which had been provided to Mr. Nielsen and Mr. Homann in March, and then sent to Mr. Johnsen as an attachment to the 20 April 2009 e-mail. It was therefore a substantially lower figure than the forecast in the March Weighted Budget and used in the Tenon Memorandum. It was also substantially lower than the figures which Mr. Bennett had previously used, in March 2009, to update the original Kelso presentation.

110.  The Claimants contend that the 3 June e-mail contained a number of fraudulent misrepresentations. Again, the Defendants contend that that there were no such representations or inducement, and they raise various arguments in that context which are addressed separately below.

*June and July 2009*

111.  The Data Room was in due course populated with various documents. Notwithstanding the advice of Tenon, these did not include all of the documents which "you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including any pipeline info)". For example, there was no dispute that the Data Room was not populated with the pipeline document which Mr. Baldorino had prepared in March, and which was then used for the purposes of preparing the March Weighted Budget. The most significant omission, at least until a very late stage in the process, was the March Weighted Budget. This budget, whilst not included in the Data Room, was provided on the 6 July CD, sent to Corren Troen by Mr Mantell. The fact that the Defendants had disclosed the March Weighted Budget was central to various arguments deployed by the Defendants on a summary judgment / strike out application heard by Sir Richard Field in 2016. Those arguments are now principally relevant to issues relating to the Defendants' credibility, since it is no longer

contended that the mistaken disclosure of the Weighted Budget at the very end of the process can realistically provide any answer to the case in fraud. I deal with the relevance of the summary judgment / strike out application, and the Defendants' case presented to Sir Richard Field, in Section F below.

112.    Both LMS (on 4 June 2009 and 9 June 2009) and Mr. Nielsen's team (represented by Mr. Hans Christian Iversen) (on 11 June 2009) visited the Data Room. They sought photocopies of certain documents. Mr. Nielsen received a copy of the Updated Kelso Presentation and "JNDD1" by e-mail on 10 June 2009. Mr. Iversen had a meeting with Mr. Mantell on 11 June 2009 in which they discussed, among other matters, "update on 2009 out turn", "details of budgeting / forecast structure" and "a breakdown of rental and installation revenue". Mr. Iversen's report of the meeting indicates that he was looking at, amongst other things, the figures in the Financial Overview and the EBITDA figure of £ 3,348 million which was in both the Financial Overview and the Updated Kelso Presentation.

113.    The Data Room closed on 12 June 2009.

114.    On 19 June 2009 LMS made its offer to the EVs as well as Mr. Baldorino and Mr. Bennett. LMS provided signed heads of terms, an exclusivity agreement and proof of funds (showing £ 15 million held with HSBC). LMS offered, subject to contract, to purchase the entire company at a value of DKK 76.6 million (£ 8.8m): this was the same figure as they had offered on 15 May 2009. Mr. Bennett, Mr. Baldorino and Mr. Nyegaard would receive shares in the purchasing vehicle instead of cash. The EVs would have the option to roll over part of the consideration by acquiring up to 17.36% in the purchasing vehicle. They would retain the option to acquire shares in the purchasing vehicle for a year after the sale, but at a decreasing percentage every month.

115.    Also on 19 June 2009, e-Kong submitted a letter to the board of Updata Europe. e-Kong said that it was "not in a position to submit any formal offer to Updata Europe and/or Sparlolland on any acquisition of interest in or assets of Updata Europe." The letter noted that e-Kong had received very limited information on Updata Europe and its non-UK subsidiaries "and only until very recently some financial information on Updata UK." e-Kong suggested that it remained interested in a transaction whereby it would acquire 75% of Updata Europe for DKK 52.5 million and Newwatch's interest in Updata UK for DKK 7 million.

116.    On 20 June 2009, Mr. Birkeland produced a 'score sheet' for the two bids. The LMS bid out-scored the e-Kong bid on nearly every point. By contrast, Mr. Holm (and others) preferred the e-Kong bid as introducing a strategic partner at the holding company level.

117.    On 23 June 2009 there was a conference call between Updata Europe's board and e-Kong (including its chairman Mr. Richard Siemens) to discuss e-Kong's proposal. On 24 June 2009, Mr. Birkeland informed LMS that they had been granted exclusivity until 10 July 2009 to complete the transaction.

118.    In the period leading up to the sale, LMS engaged in further financial and commercial due diligence (with the assistance of Tenon, Nabarro (LMS's solicitors) and a firm called AMR International ("AMR")). They also sought to negotiate the finer points of

the sale. The parties' lawyers (Corren Troen for EVs; Nabarro for LMS; Rosenblatt for Mr. Bennett and Mr. Baldorino) worked on the contractual documentation. Some features of the work carried out are relevant to the issues in the case, in particular the dispute between the accounting experts as to the market value of Updata Europe's shareholding at the material time. It is not necessary to describe this work in any detail. However, it is relevant to note that there is no suggestion that the financial and commercial due diligence caused the Defendants, or indeed LMS, to downgrade their expectations as to the future prospects of the business.

119. Thus, by way of illustration, on 29 June 2009 Mr. Szpiro of LMS e-mailed Mr. Bennett (copied to individuals at LMS and Tenon) with a "summary headline P&L for years 2011-2014" (which included figures for 2009 and 2010). Mr. Szpiro explained that he had given some consideration to the "outer year figures as these will ultimately drive value on exit." He explained that his assumptions were conservative and "essentially build on the 2010 figures for "current", "in the Bag" and "Weighted" (as per Julian's model, although there are small differences if trying to reconcile) including further contract wins (called "New") which are not in the pipeline." Mr. Szpiro's spreadsheet showed the following:

| (£000) | Jun-09 | Jun-10 | Jun-11 | June-12 | Jun-13 | June-14 |
|---|---|---|---|---|---|---|
| Turnover/sales | 10,681 | 21,439 | 24,065 | 24,884 | 25,755 | 26,755 |
| Gross profit | 4,911 | 10,842 | 10,127 | 10,425 | 10,774 | 11,174 |
| EBITDA | 1,911 | 7,402 | 6,515 | 6,633 | 6,791 | 6,992 |

120. In order to produce these figures, LMS had received a "weighted budget 2009/10" produced by Mr. Mantell which contained the same figures for the 2009/10 financial year as those used by Mr. Szpiro. Like Mr. Szpiro's figures, Mr. Mantell's budget differentiated between income from "current" contracts, "in the bag" contracts and "weighted" contracts. It showed a net profit for 2009/10 of £ 6.9 million.

121. Tenon's financial due diligence report recorded the following financial information:

| (£000) | Normalised 12 mths to Jun-09 | Run rate at Jun-09 | Proforma run rate at Jun-10 | Projected normalised 12 mths to Jun-10 |
|---|---|---|---|---|
| Turnover/sales | 10,860 | 11,887 | 17,368 | 21,161 |
| Gross profit | 5,190 | 5,814 | 8,207 | 10,562 |
| EBITDA | 2,103 | 3,089 | 5,106 | 7,460 |

122. Tenon noted that there was "a margin for error around the above figures, in aggregate, ought to be within say £0.2 million" (notwithstanding revenue recognition difficulties and other issues).

123. On 1 July 2009, Ms. Rana (the junior solicitor at Corren Troen) called Ms. Elizabeth Moynihan at Nabarro to note that Corren Troen were going to move the Data Room files back from Updata UK's offices in Reigate but did not want to interrupt Nabarro's due diligence. Ms. Rana and Ms. Moynihan spoke by telephone and Ms.

Moynihan said that Nabarro had a CD with all the documents on it. The same day, Ms. Rana requested a copy of the CD from Mr. Mantell. Mr. Mantell posted the CD to Ms. Rana on around 3 July 2009 and it was received by Ms. Rana at Corren Troen on 6 July 2009. The CD included the 2009-10 March Weighted Budget. I conclude below that, as I have been told by all of the Defendants, this disclosure of the March Weighted Budget was accidental on the part of Mr. Mantell. Throughout the course of the events, the Defendants had intended to withhold this important document from the Data Room and had done so. By this time, the transaction was about to complete and Ms. Rana did not appreciate that there was any significance to the March Weighted Budget. No-one at Updata Europe spotted the fact that this disclosure had been made, or saw the March Weighted Budget at that stage.

*The Sale*

124. The sale completed in the early hours of 11 July 2009. Updata Europe "cashed out". It received £ 5,244 million for its 60% interest in the company. Newwatch "rolled over" its interests into the newco, Updata Holdings: it used the nominal consideration payable to them for their shares in Updata UK to subscribe for shares and apply for loan notes in Updata Holdings. Thus, Newwatch acquired: 63,046 "B" shares in Updata Holdings; £ 699,091 "A" loan notes and £ 349,546 "B" loan notes in Updata Holdings; and an option to acquire further shares and loan notes at any point in a period up to July 2010.

*Subsequent events*

125. Updata Europe used its DKK 45.5 million proceeds of sale to repay its DKK 27 million debt to the Bank and its DKK 13 million debt to Vald. Nielsen. This debt arose from funding provided by Mr. Johnsen's family some time previously, when Updata Europe was desperately in need of cash. It also paid certain professional fees due to Corren Troen and others. Updata Europe remained indebted to the Bank pursuant to its guarantee of Updata Denmark's debts (approximately DKK 12 million) and owed other sums to various parties including KPMG and Mr. Nielsen.

126. Despite the sale proceeds from Updata UK, Updata Europe remained in a difficult financial position. There were ultimately unsuccessful negotiations with the Bank and the minority shareholders in Change Networks for further funding to pay off part of the Bank's outstanding debt. The Bank declared Updata Denmark to be in default. On or about 15 December 2009, 95% of the shares in Updata Europe were sold to Bigaard Ejendomme ApS (a company owned by Mr. Esben Bigaard) for DKK 1 million.

127. As a result of financial information which Mr. Johnsen and Mr. Hildebrandt received in the course of 2010, and which indicated that Updata UK was performing very significantly better than the outlook which had been presented to them in 2009, they took advice from English counsel in the spring of 2010 about the possibility of a claim arising from the sale of Updata UK. One difficulty for them was that they no longer owned Updata Europe: they therefore sought advice as to whether or not they could seek an assignment of Updata Europe's rights against the Defendants and others who had been involved in the sale. Eventually, assignment documentation was executed in January 2011 following a sequence of events which it will be necessary to describe in some detail.

128.   Although Mr. Johnsen and Mr. Hildebrandt were contemplating possible litigation by 2010, and although a letter before action was sent in 2013, the present proceedings were not commenced until March 2015. However, this is no reflection on the merits of the claim, and instead was principally a consequence of the need to raise very significant sums of money in order to pursue the present case.

129.   Once the proceedings were commenced, the Defendants issued a strike out application. That application was supported by witness statements from each of Defendants: see further Section F below. Suffice it to say that although Sir Richard Field did strike out certain parts of the claim, he did not strike out the claim in deceit. This is the principal case that has been pursued before me and which I need to resolve, although the Claimants also advance claims for breach of fiduciary duty. In the case of Newwatch, which in substance retained its shareholding and therefore cannot claim to have suffered loss in consequence of deceit, it is the only claim advanced.

## C: Deceit: the law

130.   There was ultimately no significant dispute between the parties as to the legal principles relating to the tort of deceit, albeit that each side emphasised certain features of the principles established in the case-law. The decision of Hamblen J. in *Cassa di Risparmio v Barclays Bank* [2011] EWHC 484 (Comm) ("*Cassa*") paragraphs [210] – [232] contains a valuable statement the relevant general principles, and my summary below is derived in substantial part from that judgment. (In two subsequent decisions, to which the Defendants referred, Hamblen J. restated the principles which he had set out in *Cassa*: see *Standard Chartered Bank v Ceylon Petroleum Corporation* [2011] EWHC 1785 (Comm) and *Brown v InnovatorOne Plc and others* [2012] EWHC 1321 (Comm). But it did not seem to me that these decisions established any additional point of principle.) There has been recent and important consideration of the principles relating to inducement by the Supreme Court in *Hayward v Zurich* [2016] UKSC 48; [2017] A.C. 142 and by the Court of Appeal in *Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises* [2019] EWCA Civ 596.

*The basic requirements*

131.   The tort of deceit requires the claimant to show that: (i) the defendants made false representations to the claimants; (ii) the defendants knew the representations to be false, or had no belief in their truth, or were reckless as to whether they were true or false; (iii) the defendants intended the claimants to rely on the representations; (iv) the claimants did rely on the representations; and (v) as a result the claimants have suffered loss and damage: see e.g. *Hayward* at [58] per Lord Toulson JSC, and *Cassa* para [210].

*Representation*

132.   A representation is a statement of fact made by the representor to the representee on which the representee is intended and entitled to rely as a positive assertion that the fact is true. Determining whether any and if so what representation was made by a statement requires (1) construing the statement in the context in which it was made, and (2) interpreting the statement objectively according to the impact it might be

expected to have on a reasonable representee in the position and with the known characteristics of the actual representee. It is essential in any case of fraud for the dishonest representation to be clearly identified.

133.    In order to be actionable a representation must be as to a matter of fact. A statement of opinion is therefore not in itself actionable. However, as stated in *Clerk & Lindsell* para. 18-13.

> "A statement of opinion is invariably regarded as incorporating an assertion that the maker does actually hold that opinion; hence the expression of an opinion not honestly entertained and intended to be acted upon amounts to fraud. And the same goes for projections as to the future: if a defendant says he expects an event to take place when he does not, he makes an untrue statement of fact. The only obstacle in the way of maintaining an action for a false representation on this basis lies in the difficulty of proving what the defendant's real opinion was, and in the difficulty of distinguishing a representation of the existence of an opinion from the representation of the existence of a fact on which that opinion is based."

134.    In addition, at least where the facts are not equally well known to both sides, a statement of opinion by one who knows the facts best may carry with it a further implication of fact, namely that the representor by expressing that opinion impliedly states that he believes that facts exist which reasonably justify it. In the context of deceit, *Clerk & Lindsell* paragraph 18-14 expresses this in the following terms:

> "Furthermore, at least where the facts are not equally well known to both sides, then a statement of opinion by one who knows the facts best will often carry with it a further implication of fact, namely that the representor by expressing that opinion impliedly states that he believes that facts exist which reasonably justify it. If he does not actually believe in such facts, it follows that he will be liable in deceit. In such a case, the test as to whether a statement of opinion involves such a further implied representation will involve a consideration of the meaning which is reasonably conveyed to the representee. The material facts of the transaction, the knowledge of the respective parties, their relative positions, the words of the representation and the actual condition of the subject-matter are all relevant to this issue."

135.    Silence by itself cannot found a claim in misrepresentation. But an express statement may impliedly represent something. For example, a statement which is literally true may nevertheless involve a misrepresentation because of matters which the representor omits to mention. The old cases about statements made in a company prospectus contain illustrations of this principle: for example, *Oakes v Turquand* (1867) LR 2 HL 325, where Lord Chelmsford said (at 342–3):

> "… it is said that everything that is stated in the prospectus is literally true, and so it is; but the objection to it is, not that it

> does not state the truth as far as it goes, but that it conceals most material facts with which the public ought to have been made acquainted, the very concealment of which gives to the truth which is told the character of falsehood."

136. In relation to implied representations the 'court has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context': per Toulson J in *IFE v Goldman Sachs [2006] EWHC 2887 (Comm); [2007] 1 Lloyd's Rep 264* at para. [50]. That involves considering whether a reasonable representee in the position and with the known characteristics of the actual representee would reasonably have understood that an implied representation was being made and being made substantially in the terms or to the effect alleged. The test for implied representations has recently been reviewed by the Court of Appeal in *Property Alliance Group Ltd v Royal Bank of Scotland PLC* [2018] EWCA Civ 355; [2018] 1 WLR 3259 at paragraphs [122] to [132]. The Court of Appeal approved as "helpful" a formulation of Colman J in a previous decision, namely "whether a reasonable representee would naturally assume that the true state of facts did not exist and that, had it existed, he would in all the circumstances necessarily have been informed of it". But this was not to "water down the requirement that there must be clear words or clear conduct of the representor from which the relevant representation can be implied."

137. In a deceit case it is also necessary that the representor should understand that he is making the implied representation and that it had the misleading sense alleged. A person cannot make a fraudulent statement unless he is aware that he is making that statement. To establish liability in deceit it is necessary "to show that the representor intended his statement to be understood by the representee in the sense in which it was false": per Morritt LJ in *Goose v Wilson Sandford & Co* [2001] Lloyd's Rep PN 189 at para. [41].

138. It is necessary for the statement relied on to have the character of a statement upon which the representee was intended, and entitled, to rely. In some cases, for example, the statement in question may have been accompanied by other statements by way of qualification or explanation which would indicate to a reasonable person that the putative representor was not assuming a responsibility for the accuracy or completeness of the statement or was saying that no reliance can be placed upon it. Thus the representor may qualify what might otherwise have been an outright statement of fact by saying that it is only a statement of belief, that it may not be accurate, that he has not verified its accuracy or completeness, or that it is not to be relied on.

139. The courts have noted that "a cocktail of truth, falsity and evasion is a more powerful instrument of deception than undiluted falsehood. It is also difficult to detect": *Smith New Court Securities v Citibank* [1997] AC 254 at 274 per Lord Steyn.

140. Deliberate ambiguity – where the representor uses language intending to rely on its literal meaning, but hoping that the representee would understand it differently – is often a hall-mark of fraud: *Spencer, Bower & Handley, Actionable Misrepresentation*, 5th Ed. at 4.15 - 4.24 ("Spencer Bower"). At paragraph 4.15, the authors state:

"There is another type of ambiguity when the inference is open that the representor deliberately used ambiguous language intending to rely on its literal meaning, but hoping the representee would understand it differently. The contrast is between ambiguity that appears spontaneous, and that which appears contrived. In the latter case every presumption is made against he who used dubious language."

141. In the case of an ambiguous statement, it is "essential that the representor should have intended the statement to be understood in the sense in which it was understood by the claimant (and of course a sense in which it is untrue) or should have deliberately used the ambiguity for the purpose of deceiving him and succeeded in doing so": per Rix LJ in *The Kriti Palm* [2006] EWCA Civ 1601; [2007] 1 All ER (Comm) 667 at [253].

142. Different statements at different times must frequently be read or construed together in order to understand their combined effect as a representation. At paragraph 4.24 of *Spencer Bower*, the authors state:

"Statements connected by express or implied reference may form a single representation and their combined effect must be considered. This rule applies to statements in one document such as a prospectus, to statements in a number of documents such as a series of letters … This may render the composite representation false, though the components by themselves are true, or render it true, though some of the components, by themselves, are false. The composite representation may also be as false as every part, and every part as false as the whole."

143. Where one person has made a misrepresentation, it is open to him to correct the misstatement prior to the contract and to rely on the correction as a defence to a claim in deceit (effectively on the basis that the misrepresentations cannot have induced the claimant to enter the contract: see below). However, in those circumstances "it is not enough to show that the claimant could have discovered the truth, but that he did discover it." It is not sufficient just to provide documents from which the claimant could work out the truth: the correction must be made fairly and openly: see *Peekay v ANZ Banking Group [2006] EWCA Civ 386;* [2006] 1 CLC 582 at [29]-[40]. The explanation must be "quite clear": *Arnison v Smith* (1889) 41 ChD 348 at 370 per Lord Halsbury.

*Falsity*

144. The representation must be false. A representation may be true without being entirely correct, provided that it is substantially correct and the difference between what is represented and what is actually correct would not have been likely to induce a reasonable person in the position of the claimants to enter into the contracts: *Avon Insurance v Swire Fraser* [2000] Lloyd's Rep IR 535 at [17] per Rix J.

*The mental element*

145. The classic statement of the mental element required to found a claim in deceit remains that of Lord Herschell in *Derry v Peek* (1889) 14 App Cas 337:

> "First, in order to sustain an action of deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement from being fraudulent, there must, I think, always be an honest belief in its truth."

146.    As to recklessness, even if the party making the representation may have had no knowledge of its falsehood, he will still be responsible if he had no belief in its truth and made it, 'not caring whether it was true or false': see *Clerk & Lindsell*, at [18-21]. As Lord Herschell put it *Derry v Peek*, *supra*, at 368 (and 361):

> "Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it knows, yet at least that he believes it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true."

147.    It is not necessary that the maker of the statement was 'dishonest' as that word is used in the criminal law: *Standard Chartered Bank v Pakistan National Shipping Corp (No. 2)* [2000] CLC 133.  Nor is the defendant's motive in making the representation relevant. "If fraud be established it is immaterial that there was no intention to cheat or injure the person to whom the false statement was made": *Clerk & Lindsell*, para. 18-20, quoting *Bradford Third Benefit Building Society v Borders* [1941] 2 All ER 205, 211 per Viscount Maugham. What is required is dishonest knowledge, in the sense of an absence of belief in truth: *The Kriti Palm*, [257] (Rix LJ). It is in that sense that I use the word "dishonest" in this judgment.

148.    The ingredient of dishonesty (in the above sense) must not be watered down into something akin to negligence, however gross: *The Kriti Palm*, [256]. However, the unreasonableness of the grounds of the belief, though not of itself supporting an action for deceit, will be evidence from which fraud may be inferred. As Lord Herschell pointed out in *Derry v Peek* at 376, there must be many cases:

> "where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the court that it was not really entertained, and that the representation was a fraudulent one."

149.    The standard of proof in a case of fraud is the balance of probabilities. Whilst the court of course considers what is alleged when deciding on inherent probability, this is purely an aspect of common sense, not the standard of proof, *In Re B* [2008] UKHL 35; [2009] 1 A.C. 11 at [15] per Lord Hoffmann. There is no necessary logical connection between seriousness of the allegation and the likelihood of its having occurred, nor should the court talk about more serious allegations requiring more

cogent evidence: *In Re B* at [64] and [72] per Baroness Hale. This approach was reaffirmed in *Re S-B* [2009] UKSC 17; [2010] 1 A.C. 678 at [12]-[13].

*Intention*

150.    Actionable fraud involves an intention on the part of the representor to induce the representee to act as he did. The Defendants submitted in their opening submissions, relying upon *Spencer Bower* paragraph 5.05, that the representor must actually intend the representee to be induced to act in the way that he in fact acted. In that paragraph, the authors discuss *Peek v Gurney* (1873) LR 6 HL 377, where a claim by a purchaser of shares on the Stock Exchange failed, because the representations in the prospectus were intended to induce subscriptions rather than purchases in the market. In their closing submissions, the Defendants made the same submission, but this time relying upon paragraph 5-19 of *Cartwright: Misrepresentation, Mistake and Non-Disclosure* 4th Ed.

151.    The nature of this requirement was considered by the Court of Appeal in *Goose v Wilson Sandford*, and subsequently *Mead v Babington* [2007] EWCA Civ 518, [2007] All E.R. (D) 226. As *Cartwright* notes, it is not necessary for the representor to intend to induce the specific action taken by the representee in reliance on the misrepresentation: see *Goose* at [48], where the Court of Appeal held that the "the more normal formulation is that the representor should intend to deceive the representee, with intent, that is to say, that it shall be acted upon by him." In *Mead,* Longmore LJ applied *Goose,* holding that there "was no requirement that the representation had to be intended to be acted on in the manner in which damage resulted to the claimant. It was not the specific action of the claimant which had to be intended: it was only necessary that there should be an intention that the representation should be acted on…"

*Inducement*

152.    A representee must show that he in fact understood the statement in the sense (so far as material) which the court ascribes to it, and that, having that understanding, he relied on it: *Raiffeisen Zentralbank Osterreich v Royal Bank of Scotland* [2010] EWHC 1392 (Comm) at [87]. This requirement is of particular significance in the case of implied representations.

153.    In *BV Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises* [2019] EWCA Civ 596, the court held at [43] that, in a case of deceit

> "there is an evidential presumption of fact (not law) that a representee will have been induced by a fraudulent misrepresentation intended to cause him to enter the contract and that the inference will be "very difficult to rebut" to use the words of Lord Clarke (at [43])."

154.    While the onus of proof is on the representee to prove inducement, he has the benefit of that evidential presumption, and he only needs to show that the misrepresentation was "actively present in his mind" when he made the decision to enter into the transaction (*BV Nederlandse* at [45]). The phrase "actively present in his mind" is

taken from the judgment of Bowen LJ in *Edgington v Fitzmaurice* (1885) 29 Ch. D 459, 483 where he explained the principle as follows:

> "But such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference".

155.    It is sufficient for the misrepresentation to be <u>an</u> inducing cause of the claimant entering into the transaction on the terms that he did. It is not necessary for it to be the sole cause (*Hayward v Zurich* at [33]).

156.    There were differing submissions as to the necessary weight of impact of an inducing representation. The Defendants, relying on *Dadourian v Simms* [2009] EWCA Civ 169; [2009] 1 Lloyd's Rep 601, submitted that the misrepresentation must play a "real and substantial part", albeit not decisive, in inducing the representee to act. The Claimants, relying upon a decision of the High Court of Australia referred to in [33] of *Hayward*, submitted that the representation need only play some part, even if only a minor part, in contributing to the course of action.

157.    As Lord Clarke indicates in [36] of *Hayward*, in the context of his discussion as to what is required to rebut the presumption of inducement, "the authorities in this area are not entirely consistent as to "whether what must be proved is that the misrepresentation played "no part at all" or that it did not play a "determinative part", or that it did not play a "real and substantial part"". This issue was not directly addressed in *BV Nederlandse*, although Longmore LJ did refer to the relevant part of Lord Clarke's judgment: see [42]. The inducement issue in *BV Nederlandse* was determined in the claimant's favour because the representation was "one of the reasons why the representee made the relevant contract": see [49]. It seems to me that this – combined with the statements that "it is very difficult to rebut the presumption" – indicates that it is not appropriate to try to measure the precise weight of a representation where it is one of the reasons why a representee has entered a contract. If the representation is of no real significance, then a court will decline to hold that it was one of the reasons which induced the contract. If, however, it was a matter of significance, the decision will be the other way.

158.    It is no answer to a claim in fraud that the representee could have discovered the falsity of the statement by exercising reasonable care and skill (e.g. by inspecting books or records available to him) *Hayward v Zurich* at [39]. It therefore does not lie in the mouth of a liar to argue that the claimant was foolish to take him at his word: *Clerk & Lindsell* at 18-37. Nor can the representor escape liability (or argue that the representee was not induced by the false statement) simply because the representee's agent (such as his solicitor) is in receipt of the truthful information to correct a previous misrepresentation: *Wells v Smith* [1914] 3 K.B. 722 at 725 per Scrutton J; *Clerk & Lindsell* at 18-37.

*Causation and loss*

159.    In their opening submissions, the Claimants accepted that, if the representee would have acted in the same way even in the absence of the fraud, the claim will fail. The parties' arguments in relation to causation and loss, and the relevant legal principles, are addressed separately in Section H below.

**Section D: The 20 April e-mail**

*The 20 April e-mail*

160.    As described in Section B above, the relevant e-mail exchange was as follows. At 9.41am on 20 April 2009 Mr. Johnsen e-mailed Mr. Bennett. The subject-line was "Re: Latest budget".

> "Could you forward the latest budgets for Updata UK for 2008/9, 2009/10 and 2010/11. Some adjustments need to [have] been made regarding the changes that are mentioned in the letter from LMS.
>
> Thanks in advance.
>
> PS. I would very much like to use them today if possible"

161.    At 3.05pm, Mr. Bennett replied. He attached 6 pages of February 2009 management accounts and the Financial Overview. The text of his e-mail was:

> "The numbers used by LMS were taken from the February Management Accounts. The projections used were the same that we presented to Helge Homann and Jens in March. Please see attached. I do not know what adjustments LMS have made internally."

*Context*

162.    Mr. Johnsen's e-mail that morning was sent some four days after the LMS offer. It expressly referred to the LMS letter, and it is obvious that the LMS letter was part of the context of Mr. Johnsen's e-mail. Mr. Bennett's reply was not sent immediately: it took over 5 hours for him to reply. It is clear, in my judgment, that Mr. Bennett's reply was carefully considered. It was not rushed, and he went to the trouble of removing certain pages from the February 2009 management accounts.

163.    In the meantime, there was some further communication on 20 April which provides further context for Mr. Bennett's reply. Shortly after Mr. Johnsen's e-mail, Mr. Holm e-mailed Mr. Hooft to say that their current objective was to "seek investments into Updata Europe A/S". In other words, Updata Europe's preferred course was not to sell Updata UK, but to seek investment at the parent company level. Mr. Hooft was also informed that Updata Europe had "given full exclusivity to another party" and that they were not at liberty to enter into negotiation until 1 May at the earliest (i.e. 11 days later). The e-mail concluded:

> "Should you wish to enter into a dialogue with us on the above
> mentioned conditions, please feel free to contact us then".

164. This e-mail from Mr. Holm resulted in something of a flurry of e-mail activity that morning. This e-mail activity does not form part of the context relevant to interpreting the 20 April e-mail exchange, because Mr. Johnsen was not aware of it. It is, however, relevant to the state of mind of Mr. Bennett, who was involved in this activity, as well as Mr. Baldorino who was copied in on the correspondence. It is plain that, unsurprisingly, Mr. Bennett and LMS were disappointed by the e-mail from Mr. Holm, and that discussion took place in order to decide tactics on how to respond.

165. Thus, Mr. Hooft passed Mr. Holm's e-mail to Mr. Baldorino and Mr. Bennett, and others at LMS and Tenon, indicating that it would be interesting to know what the terms of the exclusivity were. Mr. Bennett's response to Mr. Hooft, copied to others, was:

> "Interesting … particularly as Peter Johnsen is coming to the
> UK this week with the express intention of raising circa £ 2m.
> It must be a fairly loose exclusivity agreement or perhaps they
> are in breach".

166. An e-mail from Mr. Nyegaard timed at 10.47 am indicated that he and Mr. Bennett had spoken. Mr. Nyegaard's advice was to send Mr. Holm's letter to the Bank's lawyers. Mr. Nyegaard thought that the key was "to stay very close to the bank and have them know all communications surrounding this deal". He added that he saw "only Jens as a potential threat now". In his witness statement, Mr. Nyegaard said that "from this point, I was repeatedly left with the impression that Richard and Vic perceived Mr. Nielsen as a threat to the success of their bid, and even to their livelihoods, if he were to be successful in winning a [bid] and subsequently fire them". I consider that this evidence did fairly reflect the attitude of Mr. Bennett and Mr. Baldorino at that time, and is consistent with, for example, Mr. Hooft's evidence as to the management being scared of losing control of the company.

167. At 11.12 that morning, Mr. Hooft sent an e-mail confirming his discussion with Mr. Bennett as to their approach. This approach included speaking to Niels Sorensen, the Bank's lawyer, and telling him of Mr. Holm's note and forwarding it if he asked for it. The aim was "for the bank to ask to see the exclusivity agreement". Mr. Hooft also proposed sending a note to Newwatch "extending our offer and inviting discussions at 12.4%".

168. Shortly afterwards, Mr. Bennett sent Mr. Sorensen the response from Mr. Holm, commenting that it was "a more negative response than LMS had anticipated in light of the fact that their offer repays all debt within such short time period".

169. In the meantime, Mr. Bennett responded, by e-mail at 10.31 am, to a paper that Mr. Johnsen had prepared and which put forward various proposals known as "Project Eagle". These proposals, which had been made by Mr. Johnsen on 13 April, involved a restructuring of the group, essentially by merging Updata UK into Updata Europe. It would have resulted in Mr. Baldorino and Mr. Bennett becoming minority shareholders in Updata Europe, thereby diluting their interest in Updata UK. The proposals were rejected by Mr. Bennett. Mr. Johnsen's paper had referred to a short-

term finance requirement of DKK 20,000,000; i.e. the figure of circa £ 2 million that Mr. Bennett had said that Mr. Johnsen was coming to the UK to try to raise.

*What, if any, factual representations were made in the 20 April e-mail*

170.    The e-mail itself consisted of four sentences. Yet the arguments (which will be apparent from my discussion below) as to what (if any) factual representations were made were elaborate, particularly on the Defendants' side. On the Claimants' side too there was a considerable degree of over-complication, because paragraph 48 of the Re-Amended Particulars of Claim set out a lengthy series of implied representations derived not simply from the 20 April e-mail, but also subsequent meetings and statements. In opening and closing submissions, and as cross-examination progressed, the Claimants' case became rightly focused on the words which had actually been used in the 20 April e-mail. But it is convenient to start by identifying the terms of the representations pleaded:

> "48. As a matter of construction of and/or implication from the statements made by Mr Mantell and Mr Bennett on behalf of and with the knowledge of Mr Baldorino as set out above, the UK management made the following representations to the European Vendors:
>
> (1)    That UK management had a reasonable basis for believing that figures included in the Financial Overview to be correct;
>
> (2)    That the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position;
>
> (3)    That the figures in the Financial Overview were the only forecasts of Updata UK's financial position for the financial year 2009/2010 which had been prepared by or on behalf of the UK management;
>
> (4)    That all the information which was material and/or relevant to Updata UK's financial position and/or the value of Updata UK had been made available to the European Vendors;
>
> (5)    That there was no other relevant or material information to disclose;
>
> (6)    That the UK management had not provided to LMS and/or Tenon any information which the European Vendors did not also have;
>
> (7)    That the UK management were not aware of the basis upon which LMS had calculated the value of Updata UK;

(8) That no other information which would be included in a business plan was available; and

(9) That all the contracts which Updata UK had won and/or had had renewed had been disclosed to the European Vendors, including the value and duration of each contract".

171. This is a case where express representations were made in a particular e-mail. The question of what representations of fact were made is in my view to be answered by construing that e-mail in the context in which it was made, and interpreting the statements objectively according to the impact that they might be expected to have on a reasonable representee in the position and with the known characteristics of Mr. Johnsen. The e-mail refers to attachments, and in accordance with the principles set out in Section C above it is appropriate to consider the combined effect of the statements in the e-mail and the attachments which were provided.

172. Read in that context, it seems to me that there are a number of clear factual representations, which are material for present purposes.

173. First, the e-mail was a response to a request, in Danish, for the "latest budget for Updata UK for 2008/9, 2009/10 and 2011". The subject matter of the e-mail request, and of the response, was "Latest budget", also in Danish. The evidence of Mr. Johnsen, which was not disputed in this respect, was that the word "budget" in Danish was used synonymously with "forecast" or "projection", and that there was only one word in Danish for it. Mr. Bennett, in response, provided the Financial Overview, which set out the "Forecasts" for 2009 (EBITDA £ 1,496,000) and the best, middle and worst case "Budget" for 2009/2010 (EBITDA £ 1,348,000; £ 1,393,000, and £ 1,129,000). The body of the e-mail refers to "the projections", and then says: "Please see attached". In my view, any reasonable recipient of the e-mail and the attachments would understand that he was receiving the latest budget or forecast for the years in question.

174. This conclusion is reinforced by the following matters. The request was one made by the founder of the business in the context of a possible sale of Updata UK following an offer received only a few days earlier. This is relevant context. There was additional context, known to both Mr. Bennett and Mr. Johnsen, that Mr. Johnsen was looking for an outside investor and was coming to the UK for that purpose. The figures were requested from, and provided by, a senior executive director of Updata UK in response to what was obviously an important request, made by Mr. Johnsen, naturally arising from the circumstances of a possible sale or investment. The projections were presented in the format of a detailed table containing not only a projection for 2008/2009 against the original "Budget", but a series of forecasts for 2009/2010 indicating variation between the best, middle and worst cases.

175. Secondly, the e-mail stated that the numbers used by LMS were taken from the February Management Accounts, and that "the projections used were the same that we presented to Helge Homan and Jens in March". Any reasonable recipient would understand that LMS had been given and used the same information as to projections as had been given to Mr. Homann and Mr. Nielsen in March. Since LMS had made its

offer only 4 days earlier, this served to reinforce the fact that the information provided in the Financial Overview was current.

176.    For the above reasons, there is in my judgment no difficulty at all in concluding that there was a representation in the terms pleaded in paragraph 48 (2) of the Re-Amended Particulars of Claim, namely, that "the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position". Indeed, this is a classic case where, as discussed in *Clerk & Lindsell* paragraph 18-13, a party provides a representation of his opinion as to what will happen in the future, and the law has no difficulty in saying that the opinion must be honestly entertained at the time that it is made. For reasons explained hereafter, I consider that this representation alone is sufficient for the purposes of the Claimants' case based upon deceit in relation to the 20 April e-mail. Nevertheless, I will address the other representations which are set out in paragraph 48 of the Re-Amended Particulars of Claim.

177.    Paragraph 48 (1) of the Re-Amended Particulars of Claim pleads a representation that "the UK management had a reasonable basis for believing the figures included in the Financial Overview to be correct". The formulation of this representation can be criticised because, in the context of a forecast as to what results will be in the future, it is inappropriate to say that the figures are "correct"; at least if "correct" means that what will actually happen in the future. However, the Claimants did not contend that this pleaded representation was to be understood in that rather literal way. Rather, this pleading is intended to reflect the type of representation discussed in paragraph 18-14 of *Clerk & Lindsell;* namely a representation that by expressing an opinion (here as to the future results), the representor impliedly states that he believes that facts exist which reasonably justify it. I consider that in the circumstances of this case – where the senior Updata UK management knew the up-to-date information and where there was an imbalance of information between the management and the representatives of Updata Europe – such a representation was made. Indeed, this is in my view the substance of the representation pleaded if the words "to be correct" were omitted: i.e. a representation that the UK management had a reasonable basis for believing the figures included in the Financial Overview.

178.    Paragraph 48 (3) of the Particulars of Claim pleads that the "figures in the Financial Overview were the only forecasts of Updata UK's financial position for the financial year 2009/2010 which had been prepared by or on behalf of UK management". In so far as this representation goes beyond that pleaded in paragraph 48 (1) and (2), I do not consider that it was made in the 20 April e-mail. That e-mail contained a representation as to what were the latest or current forecasts, and (as discussed below) what projections had been provided to LMS, but did not represent that no other forecasts had ever been prepared in the past.

179.    I also consider that the representations pleaded in paragraphs 48 (4) ("that all the information which was material and/or relevant to Updata UK's financial position and/or the value of Updata UK had been made available to the European Vendors"), 48 (5) ("that there was no other relevant or material information to disclose") and 48 (6) ("that the UK management had not provided to LMS and/or Tenon any information which the European Vendors did not also have") are not made out on the basis of the 20 April e-mail. These are all, in my view, far too broadly expressed and cannot reasonably be derived from the statements made in the 20 April e-mail.

180.    However, that e-mail did state, in response to the request for the latest budget for the years in question, that the "projections used were the same that we presented to Helge Homan and Jens in March". It was common ground that the "projections used" referred to projections used by LMS. The first sentence of the e-mail referred to the "numbers used by LMS". The statement in the second sentence as to the "projections used" is equally to be read by reference to what LMS had used. In context, any reasonable representee would understand that he was being told that these were the projections which had been provided to LMS by Updata UK's management (just as they had been provided to Mr. Homann and Mr. Nielsen) and that these were the projections which had been used, in the sense of being considered or evaluated, by LMS in deciding upon their offer. In my view, this is the objective interpretation of what was said in the second sentence.

181.    Paragraph 48 (7) pleads a representation that the UK management were not aware of the basis upon which LMS had calculated the value of Updata UK. The Claimants sought to derive this representation from the final sentence of the e-mail, although by the end of the trial the Claimants' case as to the meaning of the final sentence had moved significantly away from the pleaded case. I do not consider that Mr. Bennett's statement, in context, was addressing the way in which LMS had calculated their offer. It was addressing a different point, arising from the LMS offer letter and Mr. Johnsen's question.

182.    LMS's offer letter (whose terms are important to the arguments as to the interpretation of Mr. Bennett's e-mail which the Defendants advanced) stated:

> "From this information we know that YTD February 2009 results are behind plan due to delays on installations and lower than budgeted margins: Sales £6.0 million (budget £8.6 million) and EBITDA £0.8 million (budget £1.3 million). The actual run rate results of the company (12 months to 28th Feb 2009) are as follows: Sales £8.4 million, EBITA £1.5 million and EBIT £0.85 million. In other words, significant progress is still required to achieve budget results for June 2009. However, despite this shortfall, the Company is showing good growth compared to 2008.
>
> In addition, our analysis shows several creditors have gone unpaid (including VAT!) and the true indebtedness of the Company is around £1.4 million. The resulting enterprise value of Updata UK (using an exchange rate of 8.5 DKK/GBP) is £9.1 million.
>
> Therefore our Offer reflects the following valuation multiples:
>
> EBITDA £1.50 million = 6.1x
>
> EBIT £0.85 million = 10.7x
>
> We have taken these factors and the resulting high entry price multiples into account in formulating our Offer. We believe that under LMS ownership, a well financed Updata UK, freed

> from its current constraints, has good prospects for profitable growth."

183. I think that it is likely that Mr. Johnsen was thinking that LMS might have made some adjustments to the budgeted figures which they had been given; because they referred to the YTD February 2009 results being behind plan due to delays on installations and lower than budgeted margins. Mr. Johnsen was therefore enquiring as to what adjustments had been made. In the final sentence, Mr. Bennett was replying to indicate that he did not know what adjustments LMS had made internally. I do not consider that this exchange can be read as being a representation as to the way in which LMS had calculated their offer. However, to my mind, the final sentence of the e-mail serves to reinforce my conclusion as to the meaning of the second sentence (see paragraph 180 above); i.e. that Mr. Bennett was referring to the projections which had been provided to LMS by Updata UK's management  and that these were the projections which had been used, in the sense of being considered or evaluated, by LMS in deciding upon their offer. This is because the reference to "adjustments" only makes sense if they are adjustments to figures which have been given to LMS. Mr. Bennett was therefore indicating that LMS might have made some adjustments to the figures which had been given by the UK management, but he did not know what they were.

184. Paragraph 48 (8) is a representation which clearly cannot be derived from the 20 April e-mail. It is dependent upon the events leading to, and statements made in, the 3 June e-mail, as Mr. Booth acknowledged in closing submissions. Similarly, paragraph 48 (9) clearly cannot be derived from the 20 April e-mail.

185. Accordingly, I conclude that the representations which are material to the case advanced by the Claimants, and which can properly be derived from the 20 April e-mail are as follows:

   a)   That the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position.

   b)   That the UK management believed that facts existed which reasonably justified the figures included in the Financial Overview.

   c)   That the projections in the Financial Overview were those which had been provided to LMS by Updata UK's management (just as they had been provided to Mr. Homann and Mr. Nielsen) and that these were the projections which had been used, in the sense of being considered or evaluated, by LMS in deciding upon their offer.

*The Defendants' arguments in greater detail*

186. The Defendants advanced a number of arguments directed at the proposition that the representations relied upon by the Claimants could not be derived from the 20 April e-mail. I accept, as is apparent from the above discussion, that many of the representations pleaded in paragraph 48 of the pleading cannot be derived from the 20 April e-mail alone. However, I now address in more detail the Defendants' arguments as to why the three representations cannot be so derived. I start with what I consider

to be the most important representation, namely that set out in paragraph 48 (2): that the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position. In that regard, the Defendants' argument had a number of themes.

187.    First, Mr. Choo Choy emphasised that the context of Mr. Johnsen's request for information was the LMS offer. Mr. Johnsen accepted in cross-examination that it was the LMS offer letter which had prompted his e-mail. (This is a point which is relevant to inducement, as I shall describe below: see Section G). The substance of Mr. Choo Choy's argument was that Mr. Bennett's response was simply addressing the derivation of the figures in the passage from the LMS offer letter. Thus, the first sentence referred expressly to the "numbers used by LMS". The second sentence, referring to the "projections" used, was only a reference to the column in the Profit and Loss Account headed "Budget 2009", which identified that the Budget for 2009 was £ 1,695,000. The LMS letter referred to progress being required to "achieve budget results for June 2009", and this was the only projection to which Mr. Bennett was referring. The logic of this submission, from which Mr. Choo Choy did not shrink, is that Mr. Bennett was declining to respond to Mr. Johnsen's request for the "latest budget for Updata UK for 2008/9, 2009/10 and 2010/11", and was providing no information at all in response to that request.

188.    I have no hesitation in rejecting this argument. The Financial Overview provided by Mr. Bennett contained not simply the budget figure for 2008/9, but also a "forecast" for that year, and "budget" figures (which were obviously forecasts) for 2009/2010 on a best, middle and worst case basis. Any reasonable reader would understand that Mr. Bennett was indeed responding to the request for the latest budgets, albeit that he did not provide a figure for 2010/2011. In that regard, the conclusion that would naturally be drawn, and which Mr. Johnsen said that he drew, was that Mr. Bennett was responding with the figures that he had, and that the omission of 2010/2011 indicated that he did not have figures for that year. The reference in the e-mail to the "projections" obviously refers, in my judgment, to the forecast for 2008/9 and the forecasts for the following year which were provided. The word "projections" might possibly be said to encompass the figure for the 2008/9 "Budget", although given that the forecast (£ 1,496,000) was substantially behind budget (£ 1,695,000), the "budget" figure in that context would be understood to have been an earlier projection rather than the "latest" figures which were what Mr. Johnsen was asking for. On any view, however, the reference to "projections" in the e-mail was not confined to the earlier budget figure for 2008/9. Had Mr. Bennett's intention been simply to convey information as to that earlier budget, then there was no reason to send the Financial Overview in that form, containing other forecasts.

189.    Had Mr. Bennett simply sent the Financial Overview in response to Mr. Johnsen's e-mail, with the various figures there set out, there could be no doubt that he would have been responding to Mr. Johnsen's request for the latest budget (i.e. forecasts) for those years. There is nothing at all in the words of his 20 April e-mail which suggest that he was not doing so. On the contrary, he was indicating that the attachments were the figures which LMS had used in the context of an offer which had been made only a few days earlier, and they were the same as figures given previously to Mr. Homan and Mr. Nielsen.

190.   Mr. Choo Choy's argument in the present context focused heavily on the word "used" (i.e. the projections used by LMS), when read in conjunction with the relevant section of the LMS offer letter. There was, however, an obvious difficulty (as Mr. Choo Choy's submissions accepted) in identifying any projections "used" in the LMS offer letter itself. The explanation of the offer contained in the relevant part of the LMS letter was not based upon projections at all. Rather, LMS were referring to historic results. They referred to the "YTD February 2009 results": this was a reference to Updata Europe's financial year to date, namely the 8 months from July 2008 to February 2009. LMS also referred to the "actual run rate results of the company (12 months to 28th Feb 2009)": this was a reference to the results from 1 March 2008 to 28 February 2009. Therefore the offer letter did not "use" any forward projections, in the sense of basing the offer on forward projections. The letter did refer to the 2009 budget in the sentence: "significant progress is still required to achieve budget results for June 2009". But I agree with the Claimants that it is an extraordinary interpretation of the 20 April e-mail to treat the reference to the "projections used" as being a cross-reference to this particular reference to the 2009 budget in the LMS letter, whilst ignoring everything else in the Financial Overview. I do not consider that this is how any reasonable reader would understand the e-mail and specifically the reference to "projections used". In context, and as already explained above, I consider that this would have been understood to be a statement that the projections in the Financial Overview had been given to LMS and used, in the sense of being considered or evaluated, by LMS in deciding upon their offer.

191.   There is a further point which is significant in the present context. As further discussed below, the Defendants argued – both in their written opening and written closing – that the reference to the "projections used" was indeed a reference to one of the projections contained in the Financial Overview; namely the figure of £ 1,496 million which was set out as the "Forecast 2009". Their argument was that this was the same "projection" that had been used in the LMS offer letter. As described below, it was only after this argument was revealed to be a bad point that the Defendants sought to suggest that the "projections" could only have been a reference to the budget referred to in the LMS offer letter.

192.   Once it is accepted (as I do accept) that the 20 April e-mail was referring to all of the projections in the Financial Overview, the Defendants then needed to meet the Claimants' argument that (see *Clerk & Lindsell* paragraph 8-13) the forecasts given represented the views which UK management held at that time. The Defendants argued, in substance: that forecasting was uncertain; that any forecasts necessarily involved the use of assumptions; that Mr. Nielsen and Mr. Homann had previously been given not simply the Financial Overview, but also the assumptions upon which it was based; and that nothing could be read into the statements about "best", "middle" and "worst" cases in the Financial Overview beyond the proposition that these were forecasts based on certain specific assumptions.

193.   Again, I have no hesitation in rejecting this argument. I did not think that any of the reasons given by Mr. Choo Choy in the course of his submissions provided any reason for rejecting what I would regard as the obvious conclusion that, by putting forward the projections in the Financial Overview, there was a representation that these were the management's genuine and current forecast. Any forecast or projection in a business context will of course be based upon assumptions. But that does not

negate the representation relied upon as to the genuineness of the forecast given at the time at which it was given.

194. It was also argued that the concepts of "Best case", "Middle case" and "Worst case" are too uncertain to be ascribed any meaning, at least beyond a representation that certain assumptions have been made. I disagree. I have already referred to the evidence of Mr. Hooft and Mr. Bennett in relation to these concepts: see Section B above. I agree with the Claimants that a "best" case would ordinarily be understood to be the realistic "best case", and a worst case understood to be the realistic "worst case". If a range from "worst" to "best" is provided, the reasonable reader would understand that the range encompasses all the reasonable assumptions that could be made at either end of the scale. The "middle" case would be understood as indicating the management's expectation as to where, on that scale, the results were considered to be most likely to land.

195. Accordingly, there is nothing in the Defendants' submissions which persuades me that the paragraph 48 (2) representation should be rejected. I next turn to the representation, based upon paragraph 48 (1), that UK management believed that facts existed which reasonably justified the figures included in the Financial Overview. I should note that in view of my findings below that there was a fraudulent misrepresentation as to the opinions held by the UK management, the paragraph 48 (1) representation is not crucial in this case. Such representations are likely to be more important in cases where the Claimants are unable to prove that opinions put forward were not genuinely held. Nevertheless, apart from the criticism that paragraph 48 (1), with its reference to the figures being "correct", was too broadly pleaded, it did not seem to me that the Defendants had any real answer to the substance of the representation relied upon. Their principal argument was that such a representation, with its reference to "reasonable basis for believing", was in practice an allegation of negligence, and that such a case was not permissible in view of the decision of Sir Richard Field to strike out negligence claims. I disagree. As *Clerk & Lindsell* makes clear, there can in principle be a fraudulent representation by a person expressing an opinion who thereby impliedly states that he believes that facts exist which reasonably justify it. If "he does not actually believe in such facts, it follows that he will be liable in deceit".

196. The third representation, which was in my view made, concerned the provision of the Financial Overview to LMS. The Defendants' arguments in that regard were based on the narrow interpretation which they sought to ascribe to the word "used" in "the projections used". I have already rejected that argument for the reasons set out above.

197. The parties' closing submissions addressed in some detail the statement in the first sentence of the 20 April e-mail: "The numbers used by LMS were taken from the February Management Accounts". It is not necessary to discuss in detail whether this was a misrepresentation, because – as the Defendants rightly pointed out including in brief submissions made in writing subsequent to closing – the various representations pleaded in paragraph 48 did not include an allegation of misrepresentation in relation to this first sentence, and indeed did not appear to be based upon it. It seems to me that the parties' arguments as to the first sentence are therefore relevant only to the credibility of Mr. Bennett (and the other Defendants in so far as they may have known and approved what Mr. Bennett was saying). I shall therefore deal with this point briefly, not least because there are in my view other more significant points

concerning the Defendants' credibility. In my view, it was incorrect for Mr. Bennett to state that the "numbers used by LMS were taken from the February Management Accounts".

198.   The material part of the LMS offer letter referred to two sets of numbers. The first was the result for the year to date (i.e. commencing on 1 July 2008) as at February 2009. The numbers which LMS used (sales £ 6 million against budget of £ 8.6 million and EBITDA of £ 0.8 million against budget of £ 1.3 million) were in fact taken from the Tenon Data Pack. The relevant figures, which LMS rounded, appear on page 5, which is headed: "Management expect to exceed budget for FY09 by £ 0.8m with volatile pipeline reversing YTD trend". It is true to say that the figures for sales of £ 6 million, and EBITDA of £ 0.8 million against budget of £ 1.3 million, can be seen or derived from the information in the pages of the management accounts which Mr. Bennett sent Mr. Johnsen. But the figure of £ 8.6 million was not contained in those numbers (the equivalent figure was £ 8.1 million), and perhaps more importantly there is no documentary or other evidence that LMS were ever given the management accounts sent to Mr. Johnsen.

199.   The second set of numbers, referred to by LMS, were for the "actual run rate results of the company (12 months to 28th February 2009)". These were: Sales £ 8.4 million, EBITDA £ 1.5 million and EBIT £ 0.85 million. These figures were again taken from the Tenon Data Pack, page 4: in a slide headed "Strong historical growth has resulted in increased recurring rental income with future growth visible through a strong pipeline". None of these figures can be seen in the management accounts sent to Mr. Johnsen, although he did not look sufficiently closely at the management accounts to appreciate the point at the time. There are two further matters to note in the present context.

200.   First, the page of the Data Pack which contained the LTM (last 12 months) numbers used by LMS also included the statement, in a box, that: "Based on run rate Performance and known installations, management expect to outperform FY09 Budget". The box referred to a budget for the FY 2009 of £ 1,717,000 and "outturn" of £ 2,479,000. This is relevant to the allegation of falsity which I will address shortly.

201.   Secondly, the figure of £ 1.5 million EBITDA, based on the actual run rate of the company for the last 12 months, was a significant figure in the LMS offer letter. The letter used that EBITDA figure in explaining that the offer reflected a multiple of 6.1 x £ 1.5 million. The Defendants' written closing submissions sought to correlate the figure of £ 1.5 million in the LMS offer letter with the forecast of £ 1.496 million for 2009 which was contained in the Financial Overview. In that written closing, the Defendants submitted as follows in paragraph 42.6:

> "The second sentence stated that *The projections used were the same that we presented to Helge Homan and Jens in March.*" Again, the "*projections used*" can only have meant the projections used in the LMS offer letter. Those were projections for FY09, as Mr Johnsen accepted: [**Day4/25/17-24**]. And the projections used in the LMS offer letter for FY09 were EBITDA of £1.5m, which was the same projection given to Mr Homann, Mr Nielsen (and indeed Tenon) on 23 March

> 2009 in the Financial Overview (and which ended up being
> £0.3m <u>higher</u> than the actual year-end figure)."

202. The Defendants had made a similar point in paragraph 71.1 of their written opening:

> "The LMS offer was based on a multiple of <u>FY09</u> (<u>not FY10</u>)
> forecast EBITDA.   The FY09 EBITDA numbers LMS
> mentioned in their letter were the same (rounded up) as in the
> Financial Overview (of £1.496m), which he attached."

203. This particular argument did not withstand analysis, as Mr. Choo Choy recognised in his oral closing submissions. Whilst it is true that there was a similarity between the figures used in the LMS offer letter (£ 1.5 million), and the forecast for 2009 in the Financial Overview (£1.496 million), the two figures were calculated on a different basis. The £ 1.5 million in the LMS offer letter was not a projection at all, but was an historic figure looking at results to 28 February 2009. The figure of £ 1.496 million in the Financial Overview was a forecast for Updata UK's financial year to the end of June 2009. It was only after this point had been exposed as a bad point that the Defendants sought to argue, in oral closing, that the "projections used" in the 20 April e-mail referred not to the forecast in the Financial Overview for 2008/9, but rather to the budget.

204. The parties' submissions also addressed the final sentence of the e-mail, and I have already rejected the argument that this contained a representation as to the UK management's knowledge of the basis on which LMS had calculated the value of Updata UK. The last sentence does, however, have some relevance to Mr. Bennett's integrity and credibility, as discussed below.

*Falsity*

205. I again have no hesitation in saying that each of the representations made were false.

206. First, the figures in the Financial Overview did not represent the UK management's current forecast of Updata UK's financial position. Their current forecasts (to use the pleaded words, which I consider to be synonymous with the "latest" budgets which Mr. Johnsen had requested) were those contained in the Tenon Memorandum and the Data Pack.

   a) As far as 2008/9 is concerned, the forecast in the Financial Overview was £ 1.496 million. The equivalent figure in the Tenon Memorandum was nearly £ 200,000 higher at £ 1.694 million. The Data Pack contained a higher figure of £ 2.479 million accompanied by statements that the management expected to outperform the budgeted figure of £ 1.717 million and explanations as to why that expectation was held.

   b) As far as 2009/10 is concerned, the current forecast was a figure which could be rounded up to £ 6.071 million (Tenon Memorandum) or rounded down £ 6.070 million (Data Pack). This was based upon the March Weighted Budget: see Section B above. It was many millions of pounds higher than the figures given in the Financial Overview for the

management's "middle" case (£ 1.393 million) and "best" case (£ 3.348 million).

207. Secondly, the figures in the Financial Overview did not represent the UK management's genuine forecast of Updata UK's financial position, at the time that it was given to Mr. Johnsen. By that time, Updata UK's management, in particular Mr. Mantell, had taken a very careful look at the figures in order to decide what numbers could properly be given to prospective investors in order to persuade them to offer to purchase the business. The March Weighted budget, which had been preceded by a number of iterations and eventually gave the figures seen in the Tenon Memorandum and Data Pack, did contain the figures in which the management believed and which represented their genuine forecasts at that time. (In the following Section E, I describe in more detail the process which led to the March Weighted Budget). That was why those figures were given to a large number of potential investors in the market. In so far as the Defendants gave evidence that they did not believe in the figures which were given to the market via the Tenon Memorandum and Data Pack, I regard that evidence as unreliable and reject it. (I deal in more detail below, in Section F, with my assessment of the evidence given by the Defendants). It involves the proposition that Mr. Johnsen was the only party to whom the Defendants gave their genuine opinion as to the prospects for Updata UK, and that neither Tenon nor the other market participants were given the management team's genuine opinion. This is in my view the converse of the factual position.

208. I note in this context that the much higher figures (i.e. higher than the Financial Overview) contained in the Tenon Memorandum and Data Pack were not an aberration, but are consistent with figures which can be seen in various documents produced in the course of the following months in 2009. These included:

   a)   A document entitled "Gross Profit Breakdown v7" prepared by Mr. Mantell on 17 June 2009 for the purposes of meetings with LMS on around that date. This showed EBITDA of £ 5.55 million based only on contracts which were regarded as "in the bag"; i.e. without weighting for those contracts which did not merit this characterisation.

   b)   A budget e-mailed by Mr. Mantell to Tenon on 3 July 2009, again based on "in the bag" contracts. This showed EBITDA of £ 6.2 million.

   c)   Documents e-mailed by Mr. Mantell to Nathalie Simpson of Tenon on 9 July 2009, and which contain similar figures for EBITDA: £ 5.5 million for "in the bag" contracts, and £ 6.2 million if commissions are excluded.

209. Perhaps the most striking such document is the Tenon Due Diligence report. This was dated 10 July 2009, and was prepared by Tenon as part of LMS's due diligence after LMS had been granted exclusivity. It contains various figures whose source was "Management and management analysis, statutory accounts". This included figures for 2008/9: £ 2.103 million (normalized) and £ 3.089 million (run rate). The figure for 2009/10 was £ 7.46 million on a weighted basis. Most significantly, this Tenon Due Diligence report was one of the "Reports" in relation to which the Defendants gave warranties to LMS in a "Subscription and Shareholders' Agreement" dated 11 July 2009 in the following terms:

REPORTS AND INFORMATION

1.1 Each of the Warrantors has read and considered the Reports and

1.1.1 none of the Warrantors materially disagrees with any opinions or expectations expressed in the Reports or considers any such opinion or expectation to be unreasonable or not based on all relevant assumptions;

1.1.2 so far as the Warrantors are aware, the factual information contained in each of the Reports is materially true and accurate; and

1.1.3 so far as the Warrantors are aware, there is no other matter, fact or circumstance which renders any of the factual information or the opinions and expectations in any of the Reports materially misleading.

1.2 All factual information which has been given by or on behalf of the Managers to the Investor or to the solicitors, accountants, consultants, advisors or agents of the Investor in the course of the negotiations leading to this agreement, as set out in the Disclosure Letter and the SPA Disclosure Letter was when given and is at the date of this agreement materially true, accurate and not misleading.

210. Accordingly, it is not the projections contained in the Tenon Memorandum and Data Pack which are an aberration, but rather those contained in the Financial Overview. Since the Defendants were prepared (as they were) to warrant the figures at around the level set out in the Tenon Due Diligence report, the only reasonable conclusion is that such figures (and not the much lower figures in the Financial Overview) represented their genuine views as to the forecast results of Updata UK at the time of sale.

211. Third, since the figures in the Financial Overview did not represent the UK management's genuine and current forecast of Updata UK's financial position, it necessarily follows that the management did not, as at 20 April, believe that facts existed which reasonably justified the figures included in the Financial Overview. The falsity of this representation therefore does not materially add to the falsity of the representation previously discussed.

212. Fourth, the projections in the Financial Overview had not been provided to LMS by Updata UK's management. They had been provided to Tenon (as described in Section

E) but there was no evidence that the Financial Overview or the projections contained therein had ever been provided to LMS. The figures which had gone to LMS, and indeed the rest of the market, were those contained in the Tenon Memorandum and Data Pack. The Financial Overview projections had therefore never been considered or evaluated by LMS.

*Mr. Bennett's state of mind*

213.   There are two separate questions which arise when fraud is alleged: whether the representor intended to make representations in the terms alleged, and whether he made a false statement knowingly, without belief in the truth of the statement made or recklessly in the sense of not caring whether it was true or false. I am satisfied that the Claimants have proved their case in relation to both matters.

214.   Given the terms of the e-mail request, and Mr. Bennett's response, it is obvious in my view that Mr. Bennett intended to make the representations to Mr. Johnsen. Those representations are, in my view the ordinary objective interpretation of the words used in the e-mail; i.e. the way in which the words would be understood by a reasonable recipient in Mr. Johnsen's position. I have addressed and rejected the various different interpretations of the words used which have been advanced in the course of argument on behalf of the Defendants. I do not believe that any of those different interpretations would have occurred to Mr. Bennett at the time. It is certainly possible, at least in theory, for a person to make a written representation without intending the representation to be understood in the manner in which the words would be ordinarily be interpreted. However, the court would then need to be persuaded by credible evidence that the representor did understand the words used in a different sense. There was in my view no such evidence in this case, and indeed the thrust of Mr. Bennett's evidence was not that he had some peculiar interpretation of the words which he was using in his 20 April e-mail, but rather that he genuinely believed in the figures being put forward; or at least genuinely believed in the "best case" figures (because he accepted that the "middle case" figures were particularly pessimistic). I deal with this issue below. But as far as intention to represent is concerned, I have no doubt that Mr. Bennett did intend Mr. Johnsen to understand that the figures provided in the Financial Overview were the management's current figures, and that these were the figures which had been given to LMS and used by them in considering what offer to make. If a senior executive such as Mr. Bennett gives a set of figures to the founder of the business, and a representative of the majority shareholder, he will also know that the figures would be understood to represent the management's genuine views and that there was a proper basis for those figures.

215.   Mr. Bennett's evidence was that he sent his e-mail response without giving it "that much thought. I've got a three-line e-mail. I gave a three-line e-mail back. I – you know, it wasn't something I sat and -- sat and agitated over". I do not accept this evidence. The e-mail from Mr. Johnsen was clearly an important request for information, coming as it did only a few working days after the LMS offer and at a time when Mr. Johnsen was known by Mr. Bennett to be seeking outside investment. It was also unusual, in that the documents referred to at trial did not indicate that Mr. Johnsen was regularly making requests for documentation. Mr. Bennett gave careful thought to how he should respond, because he took the trouble to obtain the management accounts and then to remove certain pages from them.

216. I also have no doubt that Mr. Bennett knew that he was making deliberately false statements to Mr. Johnsen. The reason that he wanted to do this was straightforward. He wanted the LMS bid to succeed, because he perceived this to be in the best interests of himself and the other members of the Updata UK management team. His hope, and the hope of LMS, had been for a sale to be effected at around the level of what they understood to be Updata Europe's debt. It was in fact Mr. Bennett who had drafted the relevant section of the Tenon Memorandum which described the "opportunity" by reference to the debt, and the possibility of acquiring the company for less than the par value of that debt. He knew that LMS had put forward an offer which reflected a valuation multiple of 6.1 applied to EBITDA of £ 1.5 million. There had been disappointment on the very morning of 20 April when Mr. Holm's letter had come in, and the strategy developed that morning was to make contact with the Bank's lawyers in the hope that the Bank would see the full benefits of the offer made which would result in substantial repayment to the Bank. I have no doubt that Mr. Bennett did not want to reveal to Mr. Johnsen the very much more positive outlook (compared to the Financial Overview), both for the current year and for 2009/10. To do so would have potentially very undesirable consequences for the success of the LMS bid. If the management's expectation of EBITDA for 2009/10 of £ 6.070 million were revealed, it would naturally indicate that the price offered by LMS as set out in the LMS letter was an undervalue. That offer reflected an EBITDA of only £ 1.5 million. In addition, the better the expected results, the more likely it would be that the company would attract other investors and higher offers, including from Mr. Nielsen whom was regarded by the Defendants as a most undesirable purchaser. Mr. Bennett knew that Mr. Johnsen was coming to the UK in order to try to raise additional investment, as contemplated by the "Project Eagle" proposal on which Mr. Bennett had commented (and rejected) on the morning of 20 April. Mr. Bennett wanted to do nothing which would encourage a successful result to Mr. Johnsen's efforts. (I return to the evidence relating to the Defendants' motive in Section F below).

217. In addition, if Updata Europe were given to understand that the budget for the current financial year (which ended around 6 weeks after the 20 April e-mail) would likely be outperformed, and that the forecast EBITDA for the following year would be in the region of £ 6 million, this might have impacted on Updata Europe's willingness or need to sell at all; since it would raise the possibility that Updata UK would be sufficiently cash-generative in the near future to enable dividends to be paid and thereby monies repaid to the Bank. The issue of whether Updata UK could or should pay a dividend had been an issue considered in the period prior to the 20 April e-mail, with the Defendants strongly opposed to such payment. Mr. Bennett would have been aware of this potential impact of a good set of forecasts at the time that he sent the 20 April e-mail. Indeed, on 29 April 2009 he sent an e-mail to Mr. Kidson, referring to a statement in Updata Europe's accounts about a dividend payment from Updata UK, and expressing the view that non-payment of the dividend might mean that the Bank "deem this a breach and call in its security". The e-mail as a whole reflects Mr. Bennett's desire that the Bank should make life difficult for Updata Europe. He noted that if a dividend was declared, Updata UK would no longer be a going concern, and "I doubt very much that Spar Lolland would be delighted to see its primary asset declared as "not a going concern". I wonder if that may help them take action." Mr. Castledine's response on 1 May referred to the need to "tread carefully but we are all

CL-2015-000305

aware of the good news to come"; a reference to the very positive expected performance of Updata UK.

218.    It would have been very easy indeed for Mr. Bennett to give a straightforward and honest answer to Mr. Johnsen's request for the latest budget. The figures were readily available, since they had been prepared by Updata UK's management (in particular Mr. Mantell) and had been given to Tenon and used in the Tenon Memorandum and Data Pack. So there was no difficulty in Mr. Bennett identifying what the figures were. But he decided to give the different figures set out in the Financial Overview. He knew that the management's current expectation was for much higher figures, both for 2008/9 and 2009/10. He knew that the management expected the results for 2009/10 to exceed by some considerable margin all of the figures shown in the Financial Overview for that year. He knew that the "middle case" was a very long way from the management's forecasted results. Indeed, he accepted in evidence that the "middle case" figures were "extraordinarily pessimistic", whilst maintaining that at the time that he sent the Financial Overview he was not actually aware of the assumptions on which those figures were based. He had in my view no reason at all to think that LMS had been given the Financial Overview, since he knew that the figures given to all potential investors were much higher. I consider that the response which Mr. Bennett gave was dishonest, in the sense in which dishonesty is required for the purposes of a claim in deceit.

219.    A great deal of the Defendants' argument in this case has depended upon the proposition that the figures which management had given to Tenon were not the figures of Updata UK (the company) but were personal to the management because they had been prepared for the purposes of Tenon's work and hence for the MBO. Hence, it was submitted that there was a valid rationale for not providing the latest figures which had been given to Tenon, and that there can have been no dishonesty on the part of Mr. Bennett or the other Defendants. I reject this argument. I do not consider that this rationale occurred to Mr. Bennett at the time. He was asked:

> Q. Right. So just so I can be clear about this, are you saying that it was specifically in your mind at the time you were replying to Mr Johnsen that you couldn't give him a budget because the latest budget was a budget that belonged to you and the management team and did not belong to the company?
>
> A. That wasn't in my mind. The only thing in my mind was about giving budget, it was to try and answer the question.

220.    Mr. Baldorino was also asked whether, as at 20 April 2009, the thought had "already crystallised within your head and within the heads of your colleagues, namely that you weren't going to give the weighted budget because it was your document". He said that he could not recall whether this is what he was thinking at that stage. There is no contemporaneous evidence which suggests that he was. Indeed, his evidence was that he knew nothing about Mr. Bennett's exchange on 20 April, and Mr. Bennett's response was not discussed with him.

221.    I address this line of argument in more detail in Section F. However, even if (which I do not accept) there had been some belief at that stage that the figures given to Tenon were the management's figures and therefore did not have to be disclosed, it was still necessary for Mr. Bennett to give an answer to the questions which Mr. Johnsen had raised, and to do so honestly. I accept the Claimants' submission that Mr. Johnsen's request for the latest budget presented Mr. Bennett with a choice. He could provide the latest budget figures, which were those which had been given to Tenon. He could provide something else (as he did), but with an explanation that there was a budget prepared for the MBO that was not being provided, and explaining his position in that regard.  Or he could provide something else without any explanation that information was being withheld. The first option risked derailing the MBO, since it would cast doubt on the price which LMS was offering to pay, would potentially assist Mr. Johnsen in raising alternative investment, and potentially have the other impacts described above. The second option risked the latest figures, including the March Weighted Budget, being flushed out by direct requests for its disclosure. Indeed, it is difficult to see how the management could realistically have maintained a position that they were not prepared to provide the latest budgets to the board of Updata UK (where the Danish representatives were in the majority) or to the majority shareholder. Ultimately, the board could have insisted that the management should provide up-to-date figures. The last option involved lying to Mr. Johnsen but improving the prospects of the MBO succeeding. This is the option that Mr. Bennett chose.

222.    It will be apparent from the foregoing, and from my introductory comments in Section A, that I do not consider that Mr. Bennett was a witness upon whose evidence I could place any reliance, certainly unless corroborated by contemporary documentation or other independent evidence or unless clearly consistent with the inherent probabilities. I formed the same opinion as to the evidence of Mr. Baldorino and Mr. Mantell. I expand upon my reasons for this reaching this conclusion in Section F below.

*Express oral representation*

223.    Paragraph 40 of the Re-amended Particulars of Claim alleges that at around the time of the 20 April e-mail, both Mr. Bennett and Mr. Baldorino warned Mr. Johnsen orally that Updata UK was failing to make significant sales and would not meet the 2009 budget. Neither the Claimants' opening or closing contained any reference to any evidence from Mr. Johnsen on this point, and Mr. Bennett could not recall saying this. Mr. Baldorino denied saying this. I do not think that the evidence as to this representation is sufficiently strong to enable me to come to any conclusion, on the balance of probabilities, as to what was said. It seems to me that, in any event, the oral representation adds nothing to the representation made by virtue of the Financial Overview. This showed, contrary to the Defendants' actual expectation, that Updata UK's results would indeed fail to reach its budgeted results for the 2008/9.

*Intention to induce and Inducement*

224.    The Defendants have called into question whether there was any intention on the part of Mr. Bennett, or the Defendants, to induce the EVs to act in any relevant way. This issue is best addressed after considering the evidence relating to the 3 June e-mail, and I address it in Section E below,

225.  The Claimants contended that representations in the 20 April e-mail were an inducing cause of Updata Europe's decision ultimately to enter into the contract on the terms that they did, and relied upon the presumption of inducement. The Defendants contended that this was not the case, and that they had successfully rebutted the presumption of inducement by showing that the 20 April e-mail was not a real and substantial inducing cause. It is again appropriate to address this issue after considering the developments following 20 April, and in conjunction with figures in the Updated Kelso Presentation which were provided on 3 June, not least because the Defendants' argument drew heavily upon those events as negating inducement (Section G below). There are also issues as to whether Mr. Baldorino and Mr. Mantell, who were not copied into the e-mail exchange on 20 April, can be held liable for Mr. Bennett's deceit. I deal with this issue in Section F, in the context of my further consideration of the Defendants' evidence.

**E: The 3 June e-mail**

226.  In order to understand the shape of the arguments in relation to the 3 June e-mail – in particular as to the nature of the representations made, their alleged falsity, and the Defendants' state of mind – it is necessary to explain in more detail two areas of factual background.

227.  The first area relates to the Tenon Memorandum and the interaction of the management team with Tenon which led to that Memorandum. This is important for a number of reasons, including the description in the 3 June e-mail of the dealings with Tenon, which were in the following terms:

> "The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum. "

228.  This is also of importance because of the Defendants' case that there was no fraudulent intent because they genuinely believed that the March Weighted Budget was a document which was proprietary to the management team, and therefore did not have to be disclosed to Updata Europe. To some extent this point was advanced in the context of the 20 April e-mail. But there was no positive evidence from the Defendants that, in the context of the 20 April e-mail, this point was something which motivated the response: see Section D above. However the case that the March Weighted Budget was proprietary to the Defendants featured significantly in the evidence which was given in relation to the 3 June e-mail and indeed generally. Indeed, in his oral evidence, Mr. Mantell went even further, suggesting that the Weighted Budget contained "Tenon's numbers". Thus, when asked about the figures which were included in the Tenon Memorandum, there was the following exchange with Mr. Mantell:

> "No, I helped provide the figures to – to Tenon, but these were Tenon's – Tenon's numbers. They were – Tenon were employed by – by the four of us to create an IM for the business and that's what they did. You're making it sound like I – I created it and did it and that's – that's only partly true."

229.  The second area relates to the background to the 3 June e-mail itself, because of the importance of reading it in the context of the issues which it was addressing, and what the parties had been discussing.

**E1: The preparation of the Weighted Budget and the information provided to Tenon and LMS.**

230.  The provision of figures by the management team to Tenon appears to have started by the time of the meeting between Mr. Bennett and Tenon on 25 February 2009. Mr. Bennett's e-mail sent prior to that meeting indicated that he hoped to provide some "accurate forecasts for Lee [Castledine] and his team". It is not clear what figures were actually provided, but this is not material. What is clear, as Mr. Mantell accepted in evidence, is that the "provision of financial information and answer of information by Tenon had already started by 16 March [2009]." On that day, Mr. Castledine of Tenon e-mailed Mr. Bennett setting out his "analysis of revenue and cash flows by project based on the budget pack". The attachment to the e-mail showed that Tenon were working on a weighted case for sales of £ 16.24 million, and EBITDA of £ 3.799 million.

231.  Tenon were formally engaged on 18 March 2009. Their terms of engagement included the following:

> "**Scope of work**
>
> Our role in the initial phase of this project will be to prepare the necessary information and evaluate the financial information in order to approach potential purchasers and consider a refinancing of the bank debt. Potentially (depending on progress with your discussions with Sparekassen Lolland) this role may extend to the structuring of a transaction.
>
> Our role will be as follows:-
>
> 1. Prepare an information Memorandum with which to approach potential acquirers.
>
> 2. Research, identify and approach potential equity purchasers
>
> 3. Attend meetings with management and prepare any relevant information required by potential purchasers
>
> 4. Identify and approach potential funding banks for a refinancing exercise
>
> 5. Undertake a review of the financial information
>
> 6. Negotiate terms with potential debt and equity providers and approach Sparekassen Lolland on agreeing a transaction."

232.  The terms of engagement therefore contemplate that Tenon's role would include the evaluation of the financial information to be provided by the management, and reviewing it, rather than preparing it in the first instance. This is hardly surprising: it

is the management who know the business, with Tenon being financial advisers who have played no previous part in that business. One therefore would expect that it would be the management which would provide the financial information and that it would be considered by Tenon, who would no doubt wish to be comfortable with the management figures which were going to the market in whatever documentation Tenon produced. In due course, it seems to me that this is what happened, as I shall describe. Ultimately, in the Tenon Memorandum and Data Pack, figures were put forward as reflecting the management's expectation. Clause 3.1 of Tenon's terms and conditions indicated that the management remained responsible for the financial information which they provided:

> "You accept that any model or related documentation supplied by us as part of the provision of Services ("Model") is prepared by us, wholly or in part, in reliance on the assumptions and other information provided by you. You accept and agree that any such Model and its related output do not to any extent substitute for the exercise of professional and business judgment on your part and that of your employees".

233. On 17 and 18 March 2009, Mr. Bennett provided information for the purpose of the information memorandum ("IM") which in due course became the Tenon Memorandum. He provided a body of text, including a section in which he summarised the "opportunity" as one to acquire Updata Europe's shares for the level of the Bank debt, which, for reasons already given, required repayment of monies loaned by Vald Nielsen. He also provided a graphic showing Updata UK's contracts for the purpose of the IM.

234. Tenon were due to go to Updata UK's offices on Monday 23 March 2009. Mr. Castledine e-mailed Mr. Bennett on Friday 20 March, copied to Mr. Baldorino. He said that he had spoken to Tony Nash, who worked for Lloyd's Development Group, one of the prospective partners in the MBO.

> "He asked for certain information in terms of financials which is something to pick up with Julian on Monday no doubt:
>
> – cash flow historically
>
> - what is the management case projections – <u>what do you think you will really do</u>
>
> – p&l and cash flow projections
>
> – balance sheet analysis" (Emphasis supplied)

235. At 3.56 pm on 23 March 2009 Mr. Helman of Tenon e-mailed Mr. Mantell to request a breakdown of some of the financial information that had been given to Tenon. He asked Mr. Mantell to give a breakdown of the "weighted prospects for 09/10 for each customer so I am able to illustrate where the £ 8.7m is coming from". The figure of £ 8.7 million in weighted prospects for 2009/10 was taken from figures which were attached to the e-mail, and which were materially identical to those attached to Mr. Castledine's e-mail of 16 March. So at that point, Tenon were working from

"weighted" figures for FY10 of £ 16.24 million in turnover and £ 3.77 million in EBITDA. At 4.25pm Mr. Helman e-mailed Mr. Mantell to ask him for a summary of the 2005 – 2010 figures. He required "Revenue, Cost of Sales, Overheads and EBIT". At 4.53pm Mr. Mantell replied attaching the "Financial Overview". The "Best case" figure of £ 3.348 million set out in that document was about 10% lower than the EBITDA figure of £ 3.77 million which Tenon had used in their e-mails of 16 and 23 March.

236.    At 5.27pm Mr. Helman replied to Mr. Mantell attaching a table which he needed completing of the key financial information for 2005 – 2010 (which would form part of the Tenon Memorandum). The table, which had no figures included, had the following headings and proposed financial information:

|  | Actual Year Ended 30 June 2005 | Actual Year Ended 30 June 2006 | Actual Year Ended 30 June 2007 | Actual Year Ended 30 June 2008 | Actual Year Ended 30 June 2009 | Actual Year Ended 30 June 2010 |
|---|---|---|---|---|---|---|
| Revenue |  |  |  |  |  |  |
| Expenses: Cost of Sales Overheads |  |  |  |  |  |  |
| EBIT |  |  |  |  |  |  |
| EBIT % |  |  |  |  |  |  |

237.    Thus, it is true to say that Tenon were provided with the figures in the Financial Overview. Equally, however, it is clear that the figures for the 2009/10 year in that Financial Overview were not included in the Tenon Memorandum, or indeed any draft of the Tenon Memorandum. Instead, at around this time or very shortly afterwards, detailed work was beginning on what became the March Weighted Budget, in order to have up-to-date figures for 2009/10 for inclusion in the IM. Whilst the key historic figures in the Tenon Memorandum for the years ending June 2006, June 2007 and June 2008 are materially identical to those in the Financial Overview, the forecast for the years ended 30 June 2009 and 30 June 2010 were materially different. (By way of reminder: for 2009, the EBITDA was £ 1.694 million in the Tenon Memorandum as compared to £ 1.496 million in the Financial Overview. For 2010, the respective figures were £ 1.393 million (middle case) and £ 3.348 million (best case) compared to £ 6.071 million.)

238.    In cross-examination, Mr. Mantell eventually accepted (after an initial reluctance to do so), based on the documents that he was shown, that he knew at the time that Tenon's work on the figures did not start with the Financial Overview. He was right

to do so. He also agreed that it could "well have been" that the intention was to update the figures in the Financial Overview in order to populate the blank table that Tenon had provided. He agreed that it was therefore not simply a question of transposing the figures from the Financial Overview into the blank table. Indeed, I note that even after receiving the Financial Overview on 23 March, Mr. Helman e-mailed Mr. Mantell at 18.28 on 23 March 2009 saying that he would "require historical and forecast figures for IM as we discussed …". Mr. Mantell also agreed "that whatever figures you are going to put in here are figures that you would regard as reasonably reliable". He accepted that this was because he knew that "what Tenon wanted is what you really thought would happen". Again, I consider that this must have been the case.

239.    In the following days, work was carried out on the March Weighted Budget. On 25 March 2009, at 8.50 pm, the "Budget 2009-2010 (weighted case) (v2)" was circulated to both Mr. Bennett and Tenon, under cover of an e-mail from Mr. Mantell. The EBITDA figure which could be calculated from the figures in the Profit and Loss account in that budget was £ 6.039 million (if based upon "Profit before exceptional items") or marginally in excess of £ 6.070 million (if based upon "Profit before bank expenses"). The figure eventually included in the Tenon Memorandum was the latter figure, rounded up to £ 6.071 million.

240.    Earlier in that day, other figures had been produced. At 11.57am on that day, Mr. Mantell circulated a version of the budget which showed turnover of £ 22.2 million and EBITDA of just in excess of £ 8 million. At 13.49 he circulated a further version which showed the same figures. Then, Mr. Mantell received Mr. Baldorino's detailed analysis of the pipeline, which listed and assigned probabilities to each contract (either 100%, 70%, 50%, 30% or 10%). He then created the March Weighted Budget, incorporating and using the substance of Mr. Baldorino's contract information which had been provided that afternoon to both Mr. Mantell and Tenon.

241.    Upon receipt of the March Weighted Budget, Mr. Bennett e-mailed Mr. Castledine that evening (at 9.19 pm) to say that he could not open the attachment, but "sales are circa 19m, ebit £ 4.9m ebitda £ 6m which seems more like it". He was therefore in my view endorsing the figures in the March Weighted Budget. His reference to "seems more like it" may have been a reference to the fact that the higher figures sent earlier that day were (as he said in evidence) not sustainable, or may have been referable to the lower figures which had been contained in the Financial Overview. But what is clear is that Mr. Bennett was comfortable with the reasonableness of the figures contained in the March Weighted Budget. Indeed, I consider that all members of the management team must have been comfortable with those figures, or they could not properly have allowed them to be presented to the market. On 8 April, Mr. Bennett responded to some points of detail made by one potential investor (Lloyd's Development Corporation), saying that: "In summary therefore I do not feel uncomfortable with the figures presented when viewed in their entirety".

242.    There is no documentary evidence indicating that Tenon played any role in the production of the figures in the March Weighted Budget. The e-mail correspondence on 25 March does indicate that Mr. Castledine was, at lunchtime, heading to Updata's offices in Reigate. No witness from Tenon gave evidence in support of the case that the March Weighted Budget was in substance a joint management/ Tenon document. On the afternoon of 25 March 2009, Mr. Castledine raised one particular point, saying that he would "await Julian's figures to confirm". This confirms that the figures being

produced were regarded by Tenon as those of Mr. Mantell (i.e. "Julian's figures") rather than their own. Since Tenon were financial advisers, it is possible that Mr. Mantell may, as he carried out his work which culminated in the March Weighted Budget, have raised some issues with Mr. Castledine, or bounced some ideas off him. However, I see no reason why this would necessarily have happened, given that the UK management knew the business and knew how to prepare budgets with appropriate weighting. But even if there were some interaction between Mr. Mantell and Tenon as Mr. Mantell carried out his work, it would not mean that the March Weighted Budget was in any sense a joint document, as opposed to a document prepared by management and which Tenon would evaluate and review. Indeed, when Mr. Mantell did circulate the March Weighted Budget, he did so under cover of an e-mail sent to Mr. Bennett, and copied to Mr. Castledine and Mr. Helman, saying: "Please find enclosed draft numbers for your review". This is consistent with the March Weighted Budget being a document prepared by Updata UK's management, with Tenon having a review function. Mr. Mantell suggested that Tenon were at times sitting alongside him as he filled in the spreadsheets, but there is no documentary or other corroborative evidence to support this, and for reasons which appear in this judgment I do not consider Mr. Mantell to be a reliable witness.

243. On the following morning (26 March) a number of meetings had been scheduled with some private equity houses: Epic, Endless, Octopus and Hamilton Bradshaw. The first meeting was due to start at 10.30 am. The Tenon Memorandum had obviously not been completed at this point, and Mr. Bennett and Mr. Mantell corresponded early that morning in relation to a Powerpoint presentation. Although Mr. Baldorino said that he couldn't remember whether this Powerpoint had been used on a "roadshow", I consider it likely that this was the document used in the discussions with the potential investors that morning. At 8.22 am, Mr. Bennett e-mailed the original Kelso Presentation to Mr. Mantell. At 8.30 am Mr. Mantell replied, using the subject-line: "Done again". The final slide was headed "Financial Projections". It had a column headed "Forecast 2010", and the figures were revised by Mr. Mantell so as to reflect those contained in the March Weighted Budget which had been sent out on the previous night. The "Forecast 2010" was therefore EBITDA of £ 6.039 million based on turnover of £ 19.039 million and Net Profit of £ 4.981 million. In light of subsequent events and the 3 June e-mail, it is important to note that this figure was presented as the "Forecast", not as the "Best Case".

244. It would appear that Tenon had no substantial issues with the March Weighted Budget which had been sent on the previous evening. There is no documentary record showing any review or comments received. It does appear, however, that there may have been some discussion between Mr. Mantell and Ms. Nathalie Simpson of Tenon on the morning of 27 March. At 10.14 am, Mr. Mantell sent her, copied to Mr. Bennett, a revised budget: "Budget 2009-2010 (weighted case) (v4) xlsx". No changes were made to the relevant figures from which EBITDA is to be calculated. Although it was a "weighted" budget, the projections were based primarily on contracts which had already been won, with only 6 contracts included on a weighted basis.

245. In due course, it was the EBITDA figure of £ 6.071 million, and other material figures from the March Weighted Budget, which were incorporated into relevant part of the table in the Tenon Memorandum.

246.    The Claimants submitted, based upon these documents as explained in the oral evidence at trial, that the March Weighted Budget circulated at 8.50 pm on 25 March 2009: (i) was a company document based on company information; (ii) represented the Defendants' genuine and accurate views of the prospects of the company; (iii) was not an "optimistic sales case"; (iv) was not a Tenon document; and (v) was not based on any particular purchaser coming in, or getting rid of Updata Europe. It seemed to me that all of these submissions were well-founded in the evidence.

247.    *Company document.* The March Weighted Budget was created using a pre-existing company spreadsheet. It was prepared by Updata UK's head of finance, Mr. Mantell, during company time, on a company computer. It was based on company information, in respect of which the Defendants owed confidentiality obligations to the company, about company contracts, company expenses and company pipeline opportunities. It was based on information provided by company directors and employees. In particular, the information about the "in the bag" and "weighted" contracts (including their value and duration) was based on the pipeline circulated by Mr. Baldorino to management and then to Tenon on 25 March. Mr. Bennett accepted in evidence that this pipeline information was part of the company's business and part of the information that it needed to run that business.

248.    *Genuine views and not an optimistic sales case.* I have no doubt that the March Weighted Budget did contain the management's genuine view as to the results for 2009/10. It was a document which was carefully prepared because Tenon and the market needed to know what the management really thought; i.e. what they thought that they would "really do". As Mr. Mantell agreed, whatever figures were going to be included in the blank table in the Tenon memorandum were figures that he would regard as reasonably reliable. It was put to Mr. Baldorino in cross-examination that, in relation to the figures in the Tenon Data Pack, the figures represented the realistic view of management. He agreed.

249.    In so far as the Defendants (particularly Mr. Mantell) sought to suggest that the figures were excessively optimistic, indefensibly high, or pie in the sky, I have no hesitation in rejecting that evidence. The figure of EBITDA in excess of £ 6 million was included in the revised Kelso Presentation Powerpoint prepared on the morning of 26 March as a "forecast", and in my view represented the management's view as to the most likely result for 2009/10; i.e. what they really thought. This is consistent with the fact that the figures which were in this region, or higher, were contained in other documents produced in the course of the summer, and those contained in the Tenon Due Diligence report were ultimately warranted by the Defendants: see Section D above.

250.    *Not a Tenon document.* As previously indicated, and for the reasons given, I do not accept that the March Weighted Budget was in any sense a Tenon document. There is nothing in the documents which indicates that Tenon considered this to be their document. Indeed, as discussed below, there came a time in early June when Tenon were asked what documents had to be provided to the Data Room. Their response was to say: all documents, other than the Tenon Memorandum itself. I reject Mr. Mantell's evidence that the March Weighted Budget numbers were Tenon's figures. I accept that Tenon were likely to have reviewed the figures provided, since that would be an important part of their role as a financial adviser. But there is no evidence that they changed anything. This is perhaps not surprising in view of the fact that the people

who really knew about the business were the management, not Tenon. The contemporaneous e-mails, described above, show Tenon asking management for the figures, not the other way round.

251.    *Not based on a new owner*. There was in my view nothing to indicate that the March Weighted Budget was prepared on the basis of changes which might be made by a hypothetical new owner. Mr. Baldorino agreed that his pipeline projections and percentages were based on the existing position. The Defendants did not identify any assumption or figures which were premised upon new ownership.

252.    The Claimants contend that one of the respects in which the representation made in the 3 June e-mail ("The factual data available to both Tenon at the time and LMS subsequently, does not differ …") was false, at the time of that e-mail, because the March Weighted Budget was provided to Tenon, and was not in the Data Room. It was never deliberately put into the Data Room. But the Claimants also pointed out, correctly, that there were other documents which were supplied to Tenon or LMS in the period before that representation was made, and which also were never put into the Data Room. Mr. Baldorino's pipeline document, circulated on the afternoon of 25 March, was one such document. In addition, on 13 May 2009, Mr. Bennett and Mr. Baldorino met with LMS. Following that meeting, Mr. Mantell e-mailed Mr. Hooft on 15 May with information "as requested". The documents attached to his e-mail contained breakdowns on turnover, installation and rental revenue and margins in respect of the company's FY10 contracts. Mr. Bennett agreed that this was company information and that, if requested, it was "part of all the information you'd expect to provide as part of due diligence to a potential purchaser." Neither the pipeline document, nor the information given to LMS on 15 May, was given to the EVs or included in the Data Room.

**E2: The background to the 3 June e-mail**

253.    The key feature of the background to the 3 June e-mail is, in my view, the need – recognised by all involved in the transaction – for both potential bidders, LMS and Mr. Nielsen, to be treated equally in terms of the information provided to them; a matter of which the Defendants, as well as the EVs, Mr. Nielsen and the Bank, were fully aware.

254.    Between 13 May 2009 and 3 June 2009 Mr. Nielsen emphasised the need for him to have access to the same information as the rival bidder, and complained to EVs and the Bank that LMS had access to more information than he did.

255.    These complaints were taken seriously by both the EVs and the Bank. On 20 May 2009, Mr. Jorgensen wrote to Mr. Birkeland and Mr. Homann, stating that it was "essential that all interested buyers (management at Up-Data and Jens Nielsen via their equity funds respectively) are ensured equal conditions for the transaction".

256.    Mr. Nielsen's e-mail of 24 May to Mr. Birkeland gives a sufficient flavour of his position:

> "Further to our telephone conversation, I confirm my request
> for information to be included in the due diligence material;
> answers to our questions to the UK management, copy of all

> contracts, pipeline information for UK, copy all information, written and oral, given to LMS Capital (together with confirmation from UK management that this is the exact information handed over in writing or orally), and a full Due Diligence information package for Updata Denmark and Change Networks, Updata Germany and Spain."

257. The request was repeated in a subsequent e-mail, which Mr. Birkeland clearly took seriously. On 28 May, he e-mailed Mr. Holm, setting out the requests made, and stating that "we should follow up on this, and explicitly make sure that this is also complied with". The requests made were in the following terms:

> In order to provide us with a proper basis for the next stages, I request from the company a full "Business Plan", covering the following:
>
> - Adequate information on the historical and current financial information from all operations
>
> - The business plans for the next 3 to 5 years for Updata UK, and the combined business of Change and Updata DK.
>
> - What is Updata's current infrastructure and assets,
>
> - Management's opinion on its competitive landscape
>
> - Strength, risk and opportunity,
>
> - Management commitment to the company
>
> - Capex (investments), rollout timeline/ commitments/ requirements
>
> I also refer to my email to you, dated 24[th] May 2009, and repeat my request for information to be included in the due diligence material; answers to our questions to the UK management, copy of all contracts, pipeline information, written and oral, given to LMS capital, including (if any) a copy of UK business plan, (together with confirmation from UK management that this is the exact information handed over in writing or orally), and a full Due Diligence information package for Updata Denmark and Change Networks, Updata German and Spain.
>
> By phone Jens has asked me for:
>
> A description of the market
>
> - Competitors
>
> - Pipeline (we have said that if he were to have a copy, this would be anonymised)

- Investments in networks

- Up to date numbers (the ones we have are as at February)

258.   The Defendants too were alive to the importance of the Data Room containing equal information for both sides.  On 22 May 2009, Mr. Birkeland spoke to Mr. Bennett about establishing a data room. Mr. Birkeland's evidence, which I accept, was that Mr. Bennett said that he would co-operate with that process. Mr. Birkeland then e-mailed Mr. Bennett with a list of documents to include in the Data Room. The list included "any current budget, forecast or business plan (prepared by or for the company or the management)" as well as "All other relevant financial information". Mr. Bennett forwarded Mr. Birkeland's e-mail on to Mr. Mantell on 22 May, commenting that it was quite a lot of work to put together, but that it was "important to get the process under way and we will need this information irrespective of who comes in". Mr. Baldorino said that he was aware that what was required by the list was supposed to go into the Data Room, including the current budgets, forecasts or business plans.

259.   Mr. Bennett's evidence was that there was no discussion between the Defendants, at least at this stage, about the approach to take in relation to the Data Room. In contrast, however, Mr. Nyegaard's evidence was that Mr. Bennett told him "in no uncertain terms that he would ensure that the minimum possible information would be put in the Data Room to reduce the chances of a successful bid by a competing bidder". Mr. Nyegaard said that this conversation took place on 6 May 2009, in the context of a discussion about the likely procedures in relation to the upcoming due diligence process by Mr. Nielsen and what information would be provided to him and his associates. His oral evidence was that he and Mr. Bennett would both have been anticipating a data room process, even though this may not yet have been specified by the Bank. It may be that, ten years on, Mr. Nyegaard is mistaken about the timing of this conversation and that it took place after Mr. Jorgensen's email of 20 May 2009. But I have no hesitation in accepting his evidence that the conversation took place. It is consistent not only with Mr. Bennett's response to the 20 April e-mail, but with what subsequently transpired on 3 June and the Defendants' unwillingness to put key information into the Data Room.

260.   On 29 May 2009, Mr. Birkeland and Mr. Bennett met at Updata UK's offices. Although there was some dispute as to exactly what was said at the meeting, I do not think that any disputes are of any materiality when it comes to considering the ordinary interpretation of the 3 June e-mail or the other issues relating to deceit. It was common ground that, at this meeting, the EVs were told for the first time about the Tenon Memorandum. Mr. Birkeland's evidence, which in this respect was not significantly challenged and I accept, was that the meeting was intended as a discussion regarding how the UK management would populate the Data Room. The parties discussed the need for a business plan and financial information to be included. Mr. Birkeland also mentioned the requests for information which Mr. Nielsen had made, in particular for financial projections, in e-mails that Mr. Nielsen had sent on 24 and 28 May. Mr. Birkeland stressed that the requests had to be addressed as a matter of urgency because Mr. Nielsen had been waiting for this information for some two months by this point. Mr. Bennett accepted, in his third witness statement, that Mr. Birkeland made the point that both bidding parties,

namely LMS and Mr. Nielsen's consortium, should have access to the same information from Updata UK.

261. Mr. Birkeland's evidence was that Mr. Bennett initially claimed that no such business plan or financial projections existed. Mr. Birkeland told Mr. Bennett that he could not imagine that, if UK management had been meeting potential buyers, they had done so without some kind of information memorandum or business plan setting out the financial projections and other financial information about the company. Mr. Bennett then said that they did, in fact, have an information memorandum that had been produced by Tenon, but that it belonged to UK management and had been paid for by them. Again, this aspect of Mr. Birkeland's evidence was not challenged, and I accept it. It was therefore common ground that the Defendants made it clear, at the meeting, that the Tenon Memorandum itself would not be provided.

262. There was, however, as Mr. Bennett accepted in evidence, no reference to any refusal to provide documents other than the Tenon Memorandum. He agreed that he did not say that "he was not going to give certain information which had been given to Tenon". His evidence was that he did not remember referring to the "Tenon suite of documents" at the meeting, and in my judgment he did not. Had he done so, that would have provoked questions as to what comprised this "suite" of documents; a question to which the Defendants gave somewhat different answers in the course of their evidence. Moreover, I do not consider that Mr. Bennett by this time (or by the time that he sent the 3 June e-mail) had in mind any concept of a "Tenon suite of documents". This phrase seems to have first emerged well into the litigation, and was used in Mr. Bennett's third witness statement (paragraph 119) for, as far as I can see, the first time. There is no contemporaneous reference in the documents reference to this concept. Nor do I consider that the other Defendants had this concept in mind in May or June 2009.

263. After the existence of the Tenon Memorandum had emerged in the parties' discussions, and Mr. Bennett had said that he would not provide it, the parties discussed what would be provided. Mr. Birkeland's evidence (which again in this respect was not challenged) was that there was then some discussion about the Kelso Presentation, which Mr. Birkeland knew about and recalled. This was in the nature of a business plan (as Mr. Bennett's 3 June e-mail recognises) and there was some discussion about how this could be updated. Mr. Birkeland's evidence was that he suggested to Mr. Bennett that they should update the Kelso Presentation so as to have the same financial highlights, projections and conclusions as the Tenon Memorandum. He went on to say, in his witness statement, that Mr. Bennett gave an assurance that he would do that, but (as the Defendants fairly pointed out in their written closing) his oral evidence was more equivocal as to whether there was such an assurance. I do not think that this particular dispute, as to whether there was an assurance, is of any consequence. The subsequent correspondence, including the 3 June e-mail itself, indicates that Mr. Bennett did indeed update the Kelso Presentation. It is reasonable to conclude that the idea of doing so was discussed at the 29 May meeting, albeit that it is not possible – particularly given the passage of time – for me to conclude that there was any particular assurance as to exactly how this updating would occur.

264. Mr. Bennett accepted that his understanding as a result of the conversation was "that both parties needed to have equal access to Updata UK's documents and that the

information (i.e. Updata UK's documents) provided to Tenon, which had assisted in the preparation of the Tenon Memorandum, should be in the data room". He said that he agreed to Mr. Birkeland's request on the "basis of this understanding". He said that this was also consistent "with Tenon's advice … that whilst the Tenon Memorandum itself did not have to be provided, all information supplied to Tenon in the course of them preparing the Tenon Memorandum should go in the data room". He went to say, in paragraph 119 of his witness statement, that he believed that it was "well understood at the time that both parties should have access in the data room to the same information belonging to Updata UK, that this did not include the Tenon Memorandum itself but did include information of Updata UK's which had been used to prepare the Tenon Memorandum". It was in this paragraph, however, that he asserted that the same analysis which led to there being no obligation to disclose the Tenon Memorandum also applied both to the March Weighted Budget and the Tenon Data Pack "because these documents also comprised the Tenon suite of documents prepared for the Defendants and George Cowan (as opposed to Updata UK) for the purposes of the management buyout". He accepted however that this was not something which had been discussed with Mr. Birkeland.

265.  Following the meeting, on the evening of 29 May, Mr. Birkeland e-mailed Mr. Bennett. The e-mail was cc'd to Mr. Mantell, Mr. Holm and Ms. Rana, who was dealing with the administrative aspects of the Data Room. Mr. Birkeland set out Mr. Nielsen's bullet point requests for information. He also indicated that he would be asking for written confirmation that there had been equality of provision of "factual information etc.". This was done, as Mr. Birkeland said in evidence, to put the Defendants under pressure and to make it clear how serious it was that there should be equality of information. The e-mail was in the following terms:

> "Thank you for a constructive meeting this afternoon. I will of course inform you and Julian as soon as I know more about when JN's team will arrive. Hopefully, we will not have to meet up at your offices before Monday morning to get the last preparations in place.
>
> As mentioned LMS is expected to arrive Thursday and Friday next week.
>
> As discussed we need to include a business plan in the room. Please find below as agreed an extracted list of the content requested to be included in this business plan:
>
> • Concise statement with adequate appendices (or notes) supporting on information on the historical and current financial information for all operations;
>
> • Concise statement of business plans for the next 3 years, with long term (to 5 years) prospects for Updata DK, Change and Updata UK;
>
> • Concise overview of Updata's current infrastructure and assets;

- Concise statement on management's opinion on its competitive landscape; description of major competitors.

- SWOT analysis, strength, risk and opportunity and threats,

- Overview of capex rollout timeline/ commitment/ requirements to meet 1 to 3 year operations.

As agreed you will contact Flemming tomorrow to discuss in further details the content of the business plan.

We also look forward to receiving you responses to the already put forward by JN's team. I understand that you have the questions. Please let me know if it is otherwise. I suggest that you send your responses to Flemming and I as soon as possible. We will then prepare an appropriate statement from Management Team confirming that LMS Capital has not in writing/orally been provided with any factual information etc. Which is different from the information included in the data room, hereunder in the business plan, or the responses."

266.     Mr. Bennett immediately forwarded Mr. Birkeland's e-mail to Mr. Hooft, with the comment "A little too much information don't you think".

267.     On the following day (30 May 2009), and as contemplated by Mr. Birkeland's e-mail, Mr. Holm spoke to Mr. Bennett. Mr. Holm had been following the prior correspondence concerning the need for equality of information and Mr. Nielsen's complaints. Mr. Holm's evidence about that conversation in his witness statement was as follows:

> "In my conversation with Mr Bennett on Saturday, 30 May 2009, Mr Bennett explained that he did not possess a business plan for Updata UK and did not intend to include the Tenon Memorandum within the documents in the Data Room. We therefore discussed how a business plan could be put together given the time restraints. I told Mr Bennett to include a definition of market segment, sales pipeline, contracts won, imminent contract wins as well as a 3-5 year budget, with key indicators as turnover, installation, rentals and EBITDA. I reiterated the fundamental importance of this information being correct and identical to the information given to LMS, in order that there could be a fair bidding process. "

Counsel confirmed, during Mr. Holm's cross-examination, that there was no challenge to the substance of that evidence.

268.     On the Sunday evening, 31 May 2009, Mr. Bennett sent to Mr. Hooft a draft of his proposed response, and asked for his comments. The draft response reproduced Mr. Birkeland's e-mail, with Mr. Bennett's responses interposed in red. In relation to the request for a concise statement of business plans for the next 3 years, with long term prospects for Change and Updata UK, Mr. Bennett wrote:

> "There is no formal business plan business plan (sic) in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB & VB presented in October 2008. This can be updated but is a PowerPoint presentation and not a descriptive document."

269.   At this point, Mr. Bennett had not actually updated the Kelso Presentation, or at least he did not send it to Mr. Hooft. On the following morning (1 June), Mr. Bennett circulated his proposed responses to Mr. Baldorino, Mr. Mantell and Mr. Cowan. This was obviously done with a view to seeing if they had any comments on those responses. The e-mail attached "JNDD 1". This contained Mr. Bennett's proposed responses, again by interposing his responses into the text, to Mr. Nielsen's earlier outstanding questions. ("JNDD" denoted Jens Nielsen Due Diligence.)

270.   In the afternoon of 1 June 2009, when Mr. Bennett was out of the office, Mr. Mantell on behalf of Mr. Bennett forwarded Mr. Bennett's responses to Mr. Holm. There were no material changes to the draft which Mr. Bennett had circulated to his colleagues that morning, from which I conclude that those colleagues were content with the proposed response. Mr. Holm was therefore told that there was no business plan, but that the presentation to Kelso "*can be updated*".

271.   On the following day, 1 June 2009, Mr. Hooft reported to Tenon that Mr. Birkeland's request for a statement that both sides had equal information was "worrying them". This may explain why, in the draft response sent to Mr. Hooft on the Sunday evening, and the actual response sent by Mr. Mantell on the Monday afternoon (1 June), there was no red text responding to this part of Mr. Birkeland's e-mail. At all events, Mr. Hooft suggested that the Defendants take legal advice on the point by having a word with a friendly lawyer. He asked Tenon whether they had any materials "to make them aware of their rights and responsibilities".

272.   Mr. Kidson of Tenon then advised on this issue. He was a senior person at Tenon: his job title was "Director of Corporate Finance". His advice as to the management team's responsibilities was in my view unequivocal.  Mr. Kidson's e-mail, sent on 2 June, was in the following terms:

> "Richard/ Vic
>
> I know there has been a lot of discussion on what should and should not be provided in the data room and therefore to Jens et al. Our advice is that ALL information which you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including any pipeline info) should go in the data room. The report by Tenon since it was commissioned by you and is for your benefit does not haver [sic] to be shown to anyone else however.
>
> Our view is that a breach of the above would expose you to potential problems/even litigation."

The word "ALL" was capitalised in this e-mail.

273.    Early on the morning of 3 June, Mr. Baldorino raised a specific question with Mr. Kidson, in an e-mail copied to Mr. Bennett. It related to the materials to be provided in the Data Room. The specific question arose from Mr. Baldorino's concern that Mr. Nielsen might have been acting on behalf of a trade buyer, and Updata UK did not know who that trade buyer was. He therefore asked whether the "**detailed** pipeline information" (emphasis in original) needed to be divulged, because there was a possibility that it could be used "against us in a detrimental way". Mr. Baldorino asked for advice because Mr. Kidson was far more experienced "than we are and we don't want to be accused of withholding vital information and taken to court for failing in our duties".

274.    The initial response to Mr. Bennett and Mr. Baldorino came from Mr. Castledine, whose job title was Director of Transaction Services at Tenon. Mr. Castledine indicated that he had had a discussion with Mr. Bennett, and indicated that "really confidential information" might be provided only at a later stage, when exclusivity had been granted to the bidder, but that he had seen such information provided earlier "but only on a confidential basis (e.g. Customer 1, Customer 2 etc etc)". The possibility of anonymising this information was therefore mooted. I accept the Claimants' submission that, on the evidence, there was no discussion with Tenon of withholding the March Weighted Budget, nor any discussion of the concept of a "Tenon suite of documents" which could be withheld from disclosure.

275.    On the following morning, 4 June, Mr. Kidson himself responded to Mr. Baldorino's e-mail of 3 June. The advice was again unequivocal:

> "Our view is that all information given to one bidder (i.e. the MBO team) has to be given to all bidders to provide a level playing field. I don't think there is any way around this. The non-disclosure point is not helpful but is a separate issue".

276.    In the meantime, on 3 June, there had been further important correspondence. Early in the morning, Mr. Nielsen wrote to Mr. Birkeland asking for news "concerning getting the requested material and information regarding Updata UK?" The e-mail shows, in my view, that Mr. Nielsen was particularly interested in the position of Updata UK. In full, it read:

> "Further to your data room preparation, I am writing to ask whether you have any news concerning getting the requested material and information regarding Updata UK? Specifically, but not only, it is vital to get the requested information on pipeline, 3-5 year budgets, and answers to the questions sent to the UK management in connection with the initial due diligence in April.
>
> It goes without saying, that getting this information is required in order for us to conduct a proper due diligence in preparation for a binding offer, and it also defies any logic that we are bidding against UK MBO, where this information is clearly at hand to the management and LMS Capital. This is not only prohibitive to our efforts, but also against the interest of the existing shareholders."

277.    On 3 June 2009 at 10:41am Mr. Birkeland e-mailed Mr. Bennett and Mr. Holm to emphasise again that both parties should have the same information available. He was concerned to ensure that the business plan should be put into the Data Room on the following day, before a planned visit by LMS. Mr. Birkeland said that he was trying his hardest to "ensure, that we avoid at a later date, to what extent did both parties have the same information available". The e-mail was written in Danish, and Mr. Bennett translated it and forwarded it to Mr. Mantell, Mr. Baldorino and Mr. Cowan as well as Mr. Hooft. Mr. Bennett said in evidence that he was aware that "both the bank and the process that was being set up was supposed to ensure equal conditions for all bidders for the business". Mr. Mantell too said that he appreciated the significance of the request for "any current budget, forecast or business plan", and also that the purpose of the Data Room was that there should be an equal exercise so that the bidders had access to the same documentation and information.

278.    By this time (i.e. the morning of 3 June) there were two significant matters which had not yet been addressed. First, the e-mail sent on 1 June had indicated that the Kelso Presentation, which had been used in October 2008, could be updated. But no update had yet been provided. Secondly, there had been no response to the part of Mr. Birkeland's e-mail where he indicated that he would be preparing an "appropriate statement" from the UK management confirming, in effect, equality of information. Mr. Birkeland himself had not yet prepared such a statement.

279.    Both of these matters were then, in my view, addressed in the e-mail sent on 3 June. At 1.06pm Mr. Bennett e-mailed Mr. Birkeland and Mr. Holm. The e-mail was copied to Mr. Mantell, and bcc'd to Mr. Baldorino, Mr. Cowan and Mr. Hooft. The e-mail reattached JNDD1 with Mr. Bennett's interposed answers. It also interposed Mr. Bennett's answers to Mr. Birkeland's e-mail. It also attached the Updated Kelso Presentation. The text of one of the interposed answers was changed to reflect the fact that this updating had occurred, in contrast to the earlier e-mail which indicated that it "can be updated", Mr. Bennett stated:

> "There is no formal or informal business plan in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB and VB presented in October 2008. Jens and Helge Homann were given this presentation when they came to the UK in Feb/March. We have updated this (please see attached) to reflect new business won but please bear in mind that this is a PowerPoint presentation and not a descriptive document".

280.    In addition to incorporating in red his responses to Mr. Birkeland's e-mail, and to JNDD 1, the e-mail had the following substantive text:

> "Hi Mads and Flemming
>
> I apologise for not getting this to you sooner. I came in on Sunday to complete and was convinced I had sent everything, except the presentation, off to you.
>
> Please find attached answers to JN's and HH's questions from the round off meeting we had in the UK. Where further detail is

> required please refer to Julian as he has all the detailed paperwork.
>
> In response to Mads' e-mail earlier today and my subsequent conversation with Flemming, I would like to confirm that there is no business plan, nor has there been for a long time (years). The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum.
>
> The factual data available to both Tenon at the time and LMS subsequently, does not differ from that information currently in the data room. In fact there is now far more factual data in the Data Room than has ever been supplied to Tenon or LMS in the past. We, as a management team will be available to answer questions, from either party, up until the 19th June when we understand that firm offers have to be tabled by both teams. We would of course require some notice, although this is to some extent catered for in the Data Room rules.
>
> If either of you have any questions, concerns or suggestions, please revert back to me or Julian."

281. I agree with the Claimants that this e-mail was clearly intended to be a substitute for the fuller confirmatory statement from all the management that Mr. Birkeland had suggested. But, even if that were wrong, it was clearly intended to provide assurances in response to "Mads e-mail earlier today", where Mr. Birkeland had emphasised the need for equality of information. The importance of that point had been emphasised by Mr. Holm in the conversation between Mr. Bennett and Mr. Holm following Mr. Birkeland's e-mail of 29 May. Mr. Holm thought that this conversation had taken place on Saturday 30 May, and this was not disputed. It appears that there may have been a further conversation on 3 June as well (Mr. Bennett's e-mail refers to "my subsequent conversation with Flemming"), where no doubt the same point was made.

282. On any view, given the history which I have described, this was an important e-mail. I have no doubt that all of the Defendants knew this. Mr. Birkeland's e-mail of 29 May, and the repeated references both in meetings and correspondence to the need for equality of information, had caused concern within the UK management team and had led to the advice given by Tenon. In so far as Mr. Baldorino and Mr. Mantell sought to distance themselves from the figures contained in the Updated Kelso Presentation, I do not accept their evidence. I consider it inherently probable that they would have discussed with Mr. Bennett and agreed exactly what figures were to be given. They knew from the draft e-mail sent to them on the morning of 1 June 2009 that the Kelso Presentation was to be updated, and they knew from the 3 June e-mail itself and its attachment that the figures had been updated and what those figures were.

**E3:    The allegation of deceit in relation to the 3 June email**

283.    Against this background, I turn to consider the ingredients of the tort of deceit in the context of this e-mail.

*What, if any, factual representations were made in the 3 June e-mail?*

284.    Again, since this is a case of express representations, it is appropriate to focus on the language of what was said, and construe what was said objectively according to the impact on a reasonable representee in the position of Mr. Birkeland and Mr. Holm, to whom the e-mail was sent. The Claimants' pleaded case relies upon the representations in paragraph 48 of their pleading (see Section D above) and three further representations set out in Paragraph 52 as follows:

> "By including the Updated Kelso Presentation and the Opportunities Presentation in the Data Room, and by making the statements in Mr. Bennett's e-mail of 3 June 2009 (set out at paragraph 46 above), the UK management represented and/or implicitly represented to the European Vendors that:
>
> (1) UK management has a reasonable basis for believing the figures in the Updated Kelso Presentation to be correct;
>
> (2) That no other more accurate financial information, other than the information including the Updated Kelso Presentation, was available;
>
> (3) The UK management had not provided LMS and/or Tenon any information over and above the information contained in the Data Room."

285.    Again, the Claimants' pleading, in paragraphs 48 and 52, can be fairly criticised as being somewhat over-elaborate. But in my view it is possible to cut through the language of the pleading in order to identify the critical representations. I consider that there are two categories of representation which are material to the case, and which the Claimants have sought to translate into their various pleaded representations. The first relates to the projections that were presented in the Updated Kelso Presentation. The second relates to the express representation concerning equality of information ("The factual data available to both Tenon at the time and LMS subsequently, does not differ from that information currently in the data room. In fact there is now far more factual data in the Data Room than has ever been supplied to Tenon or LMS in the past").

286.    As far as the projections are concerned, the 3 June e-mail stated in terms that the original Kelso Presentation had been updated to reflect new business won. The attachment contains Financial Projections. The material financial projection is the "Best Case Forecast" for 2010 with Turnover £ 15.183 million, Net Profit £ 2.195 million and EBITDA £ 3.348 million. These were, of course, identical to the figures which had been given in the Financial Overview. For essentially the same reasons as set out in the context of the 20 April e-mail, I consider that Mr. Bennett thereby made factual representations that:

i)     This forecast in the Updated Kelso Memorandum represented the UK management's genuine (and current) forecast of Updata UK's financial position; and

ii)     The UK management believed that facts existed which reasonably justified the figures included in the Updated Kelso Presentation.

287.     These projections contained only one "case": i.e. the best case. Since it was identical to the figures given some 6 weeks earlier, it was implicit in this representation that there had been no change to the management's expectations since the time that the Financial Overview had been given. Nothing was therefore done to "correct" the prior representations as to management's "middle case".

288.     As far as equality of information is concerned, the representation was as to the "factual data" that had been provided to both LMS and Tenon. There are two pleaded implied representations which come close to reflecting this representation, namely that set out in paragraph 48 (6) ("that the UK management had not provided to LMS and/or Tenon any information which the European Vendors did not also have") and paragraph 52 (3) ("the UK management had not provided LMS and/or Tenon any information over and above the information contained in the Data Room"). These formulations rightly focus on the information provided by UK management, rather than the information which Tenon may, as a result of work they carried out, have provided to potential investors. The only difficulty with accepting that these implied representations were made is the width of the word "information", bearing in mind that the e-mail itself uses the words "factual data". In theory at least, there might be a distinction between the two concepts, although there is clearly a very considerable degree of overlap.

289.     It seems to me that the real issue here is not how to formulate an implied representation, but simply how to construe what was said in that sentence, against the relevant context. Mr. Choo Choy argued for a narrow interpretation of the words "factual data". His submission was that understood in context, the specific reference to "factual data" meant (and was intended to mean) the raw factual data from the company – not the assumptions and forecasts which the Defendants had prepared with and for Tenon as part of the MBO. He submitted that this was obvious from the fact that it was neither intended nor understood to extend to the Tenon Memorandum, the Weighted Budget, or the Data Pack. As a matter of ordinary construction, the term "factual data" did not cover forecasts or assumptions underlying forecasts as to the future. A forecast is an expression of opinion, not a statement of fact or factual data. The words "factual data" would therefore refer, for example, to the facts surrounding whether a contract had been concluded, what negotiations had taken place, and what stage of the tendering process had been reached. Documents recording judgment calls as to what probability existed of concluding a contract did not contain "raw" factual data.

290.     By contrast, Mr. Booth argued for a wider interpretation. He submitted that there was no reasonable distinction to be drawn between factual and opinion data. He drew attention to evidence given by all of the Defendants that the March Weighted Budget was or contained factual data. Data can come in different forms, but remains data. Management opinions are matters of fact, and a budget prepared by management is a factual document and would have been understood as such. The same is true of a document setting out the pipeline.

291.  I do not consider that, in context, a reasonable representee would have understood the representation made in the limited sense for which Mr. Choo Choy contended. The context of that representation was of course the need, emphasised to Mr. Bennett both by Mr. Birkeland and Mr. Holm, for there to be equality of information. If a budget is prepared by the management, setting out their views and understanding of what contracts there are, how much and when income is going to be received, what expenditure will be incurred in fulfilling those contracts, it would in my view be understood that this budget and the information that it contained was "factual data", even if that data contained an element of prediction as to what would happen in the future.

292.  All of the Defendants in their evidence accepted that the March Weighted Budget was or contained "factual data", and in my view they were right to do so. Mr. Mantell agreed that the March Weighted Budget was "factual data available to Tenon". Mr. Bennett agreed that this weighted budget was "factual information", albeit that it was factual information "which I've already said I wouldn't have provided". Mr. Baldorino agreed that both the March Weighted Budget and his pipeline document "included factual data" and that this was factual data that was not in the Data Room.

293.  I do not consider that any reasonable recipient would have considered that the confirmation that all "factual data" had been made available would have been understood to exclude the budgets or other projections, expressing the management's analysis and views, which had been made available to Tenon. Mr. Bennett agreed that since the March Weighted Budget was not included in the Data Room, the words which he used in his e-mail were a "bit clumsy and incomplete, but not as a lie with an attempt to mislead". He agreed that he should have said that there was information which had been sent to Tenon and to LMS, but which he regarded as private information that shouldn't be disclosed. To my mind, these answers reinforce my conclusion as to how a reasonable recipient would have understood what Mr. Bennett was saying.

294.  It is true, of course, that Mr. Birkeland and Mr. Holm knew that they were not going to be given the Tenon Memorandum. But it does not follow at all, in my view, that because the Tenon Memorandum would almost certainly contain some projections, that the reference to the provision of "factual data" in Mr. Bennett's e-mail should be understood to exclude any data which had an element of futurity about it, such as budgets or projections provided by the management. There is a distinction between: (i) the Tenon Memorandum, which would have been understood to be a Tenon document containing Tenon's views, and (ii) the materials had been provided by management to Tenon so as to enable them to form those views and write their memorandum. The discussions which led to this e-mail had focused on the need for equality of the information given by management to both bidders. There was nothing in Mr. Bennett's e-mail which suggested that equality of information did not extend to materials provided by management which had an element of futurity, such as a recent budget. On the contrary, the prior two sentences of the e-mail ("The information … investment memorandum") conveyed how management had given relatively little by way of written materials to Tenon, with the Tenon Memorandum being based on the PowerPoint and subsequent questions and answers at meetings. This was reinforced by the subsequent statement that there was far more factual data in the Data Room than had ever been supplied to Tenon or LMS in the past.

*Falsity*

295.   Again, I have no hesitation in saying that the representations were false. The representations as to the projections were false for the same reasons that the representations in the 20 April 2009 e-mail were false. The representation as to factual data was false because there was important factual data, as described above, which had been provided to Tenon or LMS and which was not included in the Data Room; specifically, the March Weighted Budget, Mr. Baldorino's pipeline document, and the other information provided to LMS in May 2009.

*The Defendants' state of mind*

296.   I deal with the state of mind of the Defendants collectively, having already held that Mr. Baldorino and Mr. Mantell both knew about what Mr. Bennett proposed to say in his e-mail and what financial information he intended to provide in the Updated Kelso Presentation.

297.   I consider that the Defendants intended to make representations in the terms alleged. The representations concerning the projections follow naturally from the words used in the 3 June e-mail, and the provision of the projections. The representation as to "factual data" is an express representation. None of the Defendants gave any credible alternative explanation to the effect that the e-mail and its attachment were intended to be understood in a different way.

298.   I also have no doubt that the Defendants knew that deliberately false statements were being made to Mr. Holm and Mr. Birkeland. They were made because telling the truth was unpalatable and too risky as far as they were concerned. Revealing the true expectation at that time would put at severe risk any willingness on the part of Updata Europe to contemplate accepting the LMS offer as well as risking offers from Mr. Nielsen which were well in excess of the LMS offer. It seemed to me that (as with the 20 April e-mail) there were a number of dishonest statements in the 3 June e-mail, as described in the following paragraphs. In Section F, I deal with some other points which bear on my unwillingness to accept the Defendants' evidence.

299.   I start with the terms of the description which was given by Mr. Bennett of the process which led to the Tenon memorandum, viz:

> "The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum."

300.   In my judgment, even bearing in mind that this was a summary of what happened leading to the Tenon Memorandum, this was thoroughly misleading. There was no evidence that the Kelso Presentation (which was the PowerPoint attached) had ever in fact been given to Tenon. The Defendants suggested that Mr. Bennett must have intended to refer to the Financial Overview, rather than the Kelso Presentation, and that his response was therefore somewhat confused. But even if Mr. Bennett was intending to refer to Financial Overview, the factual position (as set out in detail above) was that the management had provided Tenon with financial information in

the days indeed weeks before the Financial Overview was given to them. More importantly, however, the description in the 3 June e-mail omits completely the critical part of the process leading to the figures in the Tenon Memorandum: i.e. the careful preparation, by management, of budgets and ultimately the March Weighted Budget which was given to Tenon on the evening of 25 March 2009. The e-mail seeks to convey the impression that the Tenon Memorandum was the result of Tenon's work in considering the PowerPoint and then asking questions of management in meetings. This is not what happened.

301.   Next, I turn to the projection for 2009/10 contained in the Updated Kelso Presentation. The figure of EBITDA £ 3.348 million did not represent management's genuine and current views of the "Best Case" for 2010. There had been no sudden downward shift in management's expectation of EBITDA in excess of £ 6 million, as set out in the March Weighted Budget and subsequently used by Tenon in the Tenon Memorandum and Data Pack. This figure in the March Weighted Budget was, in my view, management's view of the most likely result (i.e. their forecast for the year), and was not a "Best case" forecast.

302.   The manner in which the Kelso presentation came to be updated is also significant in the context of dishonesty. The original Kelso Presentation had in fact already been updated, as described above, on the morning of 26 March 2009. It was updated by Mr. Mantell, so that the final page containing financial projections included the £ 19 million turnover and £ 6 million EBITDA figures from the March Weighted Budget. The reason that it was updated that morning was in order for Mr. Bennett and Mr. Baldorino to make presentations to a number of private equity houses that the management was planning to meet. They therefore knew about the updated figures, as did Mr. Mantell who had done the work.

303.   Accordingly, there was already in existence, in early June 2009, an updated version of the Kelso Presentation which was available to the Defendants. When Mr. Bennett came to do his separate updating prior to sending his e-mail on 3 June, he deliberately and in my view dishonestly altered the existing Kelso Presentation so as to reduce the 2010 figures, and in particular the EBITDA figure of £ 3.348 million EBITDA. He also changed the heading to the column, so that a figure of £ 6 million which was said to be the "Forecast" (i.e. not a "Best Case" forecast) was changed so as to be a "Best Case" forecast of £ 3.348 million.

304.   In cross-examination, Mr. Bennett sought to justify the £ 3.348 million "best case" in the Updated Kelso Presentation. His evidence was that he had performed some sort of calculation in his head by which he took the £ 6.070 million EBITDA in the March Weighted Budget; accounted for the loss of the Hampshire and Dorset Upgrades contracts; determined that the loss of those contracts would result in reduced EBTDA; and then chose to take the "best case" figure from the Financial Overview as being a "fair" figure in the circumstances. I agree with the Claimants that this evidence should be rejected. Indeed, in his closing submissions, Mr. Choo Choy realistically did not seek to support this explanation, acknowledging that Mr. Bennett had simply used the Financial Overview figures, whilst maintaining that Mr. Bennett had been doing his best to assist the court.

305.   In my view, this was a classic case of a witness who, when confronted with a difficult document in the witness box, simply invents an answer which he thinks may support

his case and justify his conduct. If this happens, the witness should not be surprised if a judge concludes, as I do in the case of Mr. Bennett (for this and many other reasons apparent from this judgment), that he is not a witness upon whose evidence reliance can be placed. Indeed, in his witness statement for the strike-out application, Mr. Bennett's evidence was very different. In his second witness statement, Mr. Bennett's evidence was that he did <u>not</u> update the figures, and that he did not represent that the figures were the most recent projections, because it would have been "obvious to [EVs] that the projections contained within the Updated Kelso presentation were essentially the same as the projections they had previously received". In his third witness statement, he says he was not willing to provide the March Weighted Budget so he updated the Kelso Presentation by taking the "best case" from the Financial Overview. Mr. Bennett's evidence at trial is also inconsistent with the fact that, two weeks later, the Defendants produced "in the bag" FY10 EBITDA projections of £ 5.55 million.

306.   Overall, I reached the same conclusion as in relation to the 20 April e-mail. The Defendants had a choice. They could refuse to provide any projections, and give an explanation as to why. Or they could provide the projections which contained the management's current expectation. Or they could lie, which is what Mr. Bennett did.

307.   The representation as to factual data was also deliberately false. Tenon had been given the various weighted budgets as well as Mr. Baldorino's pipeline document. These were crucial documents which led to the Tenon Memorandum. Further financial information had been given to LMS in the course of May 2009, as described above. None of this information was in the Data Room, and the Defendants knew it. They also knew, because Tenon told them in clear terms in early June, that they needed to provide "ALL" the information which had been supplied to Tenon. The Defendants decided to ignore that advice, because it did not suit their commercial interests which lay in ensuring that the LMS bid succeeded, that Updata Europe accepted it, and that Mr. Nielsen and his consortium failed.

*Intention to induce*

308.   I deal here with intention to induce in relation both to the 20 April e-mail and the 3 June e-mail. The relevant legal requirement for intention to induce is that the representor should intend that the representee should act upon the representation. I do not consider that there can be any doubt that this is what the Defendants did intend. The 20 April e-mail was an important e-mail sent in response to a request for the latest information, and it was sent in the context of the offer sent by LMS on 16 April. The 3 June e-mail was an important e-mail sent to both Mr. Holm and Mr. Birkeland. It arose from a chain of correspondence and discussion as to what should go into the Data Room. It followed the Bank's recommendation that there should be a data room, and the complaints and requests made by Mr. Nielsen. I cannot see any basis for a contention that there was no intention that the representee should act on the representations.

309.   The Defendants submitted that it needed to be proved that there was a subjective intention that "Updata Europe would rely on these representations to enter the SPA". I do not consider that, legally, it is necessary for this specific action to be intended: see Section C above. But in any event, these representations were made to Updata Europe for the very reason that a sale of its shares was in the offing, that an offer for