the shares had been made (at the time of the 20 April e-mail), and that (by the time of 3 June e-mail) there was a bidding process which would lead to a sale and purchase agreement. It is irrelevant, in my view (if this is what the Defendants are suggesting) that at this stage there was no draft SPA in existence, or that LMS had yet to be chosen by Updata Europe as the preferred bidder. A false representation made in the course of discussions for a possible contract is actionable even if made at an early stage of the discussions.

310.    The Defendants' real point on intention to induce, as it seemed to me, was that the figures in the Updated Kelso Presentation were directed at Mr. Nielsen and that therefore there was no intention to induce Updata Europe to act. I did not consider that this argument could have any application to the 20 April e-mail, which was sent to Mr. Johnsen prior to the bidding timetable coming into existence. In the context of the 3 June e-mail, however, Mr. Choo Choy's submission was that the Updated Kelso Presentation was really directed at Mr. Nielsen. It was updated in the way that it was because the Defendants did not want to "spoon-feed" Mr. Nielsen. It was for him to do his own work. This argument was also, as I understood it, advanced as a reason why the Defendants had no dishonest intent.

311.    In whatever way the argument is advanced, in my view it is a bad one. I do not accept that any distinction can be drawn, either in relation to the e-mail itself (which was sent to Mr. Holm and Mr. Birkeland), or more generally, between an intention to mislead Mr. Nielsen rather than Updata Europe. There was no practical way in which Updata UK could give up-to-date information and its current forecasts to Updata Europe, without these also becoming available to Mr. Nielsen as well. Similarly, if they were given to Mr. Nielsen, Updata Europe would necessarily see them. Therefore the desire not to "spoon-feed" Mr. Nielsen, and to "make him do his own work", was by definition a desire not to "spoon-feed" Updata Europe as well. If the Defendants were to achieve the sale that they wanted, they needed to direct statements as much to the seller (Updata Europe) as to the bidder with whom they were in competition.

312.    More importantly, it seems to me that in the present context, the use of the word "spoon-feed" is really a euphemism for "mislead". It would been open to the Defendants to say to Mr. Nielsen that they were simply not willing to give him any figures, and that it was for him to do his own work on the data that had been given, and that they were not prepared to give any confirmation to the effect that the bidders had been treated equally. But this is not what the Defendants did. Instead, as part of their reluctance to "spoon-feed" Mr. Nielsen, the Defendants positively gave misleading projections to Updata Europe in the Updated Kelso Presentation. Those projections did not represent the UK management's genuine (and current) forecast of Updata UK's financial position. Nor did the management believe that facts existed which reasonably justified the figures included in the Updated Kelso Presentation. Quite simply, that is fraud and it is no answer to say that this was borne of a desire not to "spoon-feed" another party. A desire not to spoon-feed could lead to a person refusing to give any information and making this clear. But it cannot justify positive false statements.

*Inducement*

313.    I deal separately with inducement in Section H below, where I conclude that the requirement of inducement is satisfied.

## F: The Defendants' case and evidence: further considerations and conclusions.

314.    This section addresses a number of further matters which are relevant to my conclusions as to deceit set out above, and to the Defendants' responsibility for that deceit. I identify other reasons which have led me to conclude that the Defendants' evidence is unreliable. I return to the question of motive, in the context of the evidence of Mr. Baldorino and Mr. Bennett as to whether it was their intention to obtain the highest price on the sale to LMS. I deal with Defendants' case and evidence for the strike-out hearing before Sir Richard Field, where the Claimants' contend that the Defendants sought to mislead the court. I also address a number of other points which were advanced by the Defendants as to why there was no fraudulent intent. Finally, I consider the question of whether Mr. Baldorino and Mr. Mantell – neither of whom sent the 20 April or 3 June e-mails – can be held responsible for Mr. Bennett's misrepresentations, either in deceit or for the tort of conspiracy. I consider these matters in the context of the Defendants' case as to why neither Mr. Bennett, nor the other Defendants, had any fraudulent intent, and I start by identifying the principal points advanced.

### F1: The Defendants' case as to fraudulent intent.

315.    The Defendants' case was that even if false representations were made or intended to be made, there was no intention to deceive. Mr. Baldorino and Mr. Mantell denied any knowledge of the 20 April e-mail from Mr. Bennett: this was Mr. Bennett's document alone. As for the 3 June e-mail, which had been copied to Mr. Mantell and bcc'd to Mr. Baldorino, this was again Mr. Bennett's document. The substance of Mr. Baldorino's evidence was that he had paid little or no attention to the figures in the Updated Kelso Presentation.  Mr. Mantell did not seek to distance himself from those figures in the same way. Indeed, it was Mr. Mantell who placed the Updated Kelso Presentation in the Data Room.

316.    The Defendants accepted that, with hindsight, the Defendants (and Mr. Bennett in particular) might have done things differently or phrased things more precisely. The updating of the Kelso Presentation for Mr Nielsen should probably have been given more thought. But, standing back, the inherent probabilities were irreconcilable with fraudulent intent as opposed (at most) to unreasonableness or incompetence or a view that Mr Nielsen should be doing his own work in assessing the prospects of the company and not be spoon fed the product of the Defendants' work with Tenon for the purposes of their MBO bid. In that context, the Defendants emphasised that:

     a)    They had not set out to do an MBO or oust Updata Europe. On the contrary, it was Mr Nielsen who, with assistance from the Bank, had set matters in motion in January 2009 and it was in response to that that the Defendants started work on an MBO.

     b)    The Claimants were unable to identify any credible dishonest motive for the Ds to have committed fraud in circumstances where LMS would be the principal beneficiary and not them.

     c)    It could not be right to assume that a desire on the Defendants' part to succeed in their MBO bid intrinsically meant that they intended to mislead. It is true that the Defendants no longer wished to have Updata

Europe as majority shareholder, but this was because of a desire to ensure that the business was properly capitalised going forward and no longer controlled by Updata Europe. There was no desire to remove Updata Europe completely.

d)   The suggestion that the Defendants desired to get rid of the European Vendors, and deliberately to withhold information from the Data Room, should be rejected. It was common ground that Updata Europe's representatives never visited the Data Room and that the purpose of the Data Room was for the use of prospective bidders, not for the seller. In any event, this suggested desire was inconsistent with the facts that (a) both European Vendors were offered a roll-over of their investment in Updata UK and (b) Mr. Bennett went out of his way in Spring 2009 to seek to explore a structure whereby Updata Europe would retain 45% of its shares. Those were not the actions of fraudsters desperate to oust the European Vendors.

e)   If the Defendants were fraudsters, then the very last thing they would want was for the European Vendors to remain in the business as significant shareholders, with the ability to discover the "true" performance in FY10. Nevertheless, Newwatch was allowed to roll over its participation in Updata UK into the newco, and in due course Mr. Johnsen came to learn the successful results of the business.

f)   The Financial Overview document was not a dishonest document prepared to deceive. It was prepared in the ordinary course of business of Updata UK. It had been given to Tenon as well as Mr Nielsen and Mr Homann on the same day. If it were a dishonest document, or thought to be incorrect and out of date, why would Mr. Mantell have sent it to Mr. Helman of Tenon on 23 March 2009 in response to a request for 2005-2010 EBIT figures? The Claimants' case theory did not stack up with the inherent probabilities. What is more, Mr. Mantell provided the assumptions underlying each of the FY10 scenarios described in the Financial Overview. These are not the actions of an individual who intends to deceive.

317.   As regards the 3 June e-mail and the Updated Kelso Presentation, the Defendants submitted that the Claimants' case theory again was beset with difficulties:

a)   In advance of sending it, Mr. Bennett specifically asked Tenon for advice. Mr. Kidson said (copying in Mr. Hooft) that the Defendants should provide:

> "ALL information which you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including pipeline info) should go in the data room. The report by Tenon since it was commissioned by you and is for your benefit does not have to be shown to anyone else however"

b) The Defendants understood the Weighted Budget and the Tenon Data Pack to have been essentially the same as the Tenon Memorandum. These were the core of the MBO sales case they had paid Tenon to help them prepare. Tenon's advice was not inconsistent with that, and the Defendants put the most detailed pipeline information in the Data Room in the form of the April "Opportunities" document. Tenon and LMS obviously knew that the March Weighted Budget was not put in the Data Room, since they visited the Data Room a number of times.

c) There was no good reason why Mr. Bennett would ask Tenon for advice on 2 June if he had already been conspiring with Mr. Baldorino and Mr. Mantell to deceive Updata Europe back in March/April, or why he would do so if he was on the verge of sending his 3 June e-mail in implementation of such a conspiracy. Again, the case theory was highly implausible and improbable.

d) The same point arose in relation to LMS. Mr. Bennett specifically asked Mr. Hooft for advice on his response to Mr. Birkeland's queries on Mr. Nielsen's behalf. Moreover, he copied Mr. Hooft into his e-mail to Mr. Birkeland and Mr. Holm. So, the Court should infer, Mr. Hooft did not think there was anything fraudulent with what Mr. Bennett was saying in his e-mail, or with the Updated Kelso Presentation being sent and then put in the Data Room (but not the March Weighted Budget). Mr. Hooft was a plainly honest witness, with an impressive recollection of events. He was clear in his witness statement that he was entirely unaware of any alleged deceit or fraud occurring at the time, and no case of fraud was made against him. It is not realistic to suppose that the Defendants were part of a conspiracy to deceive, but Mr. Hooft was not. That is an incoherent case bearing in mind what Mr. Hooft knew and saw at the time.

318. More generally, the fact that the Claimants do not allege that either Mr. Cowan or LMS were party to the alleged fraud, despite their integral roles in the MBO, is also significant. It is inherently implausible that the Defendants could have perpetrated a fraud without the involvement or knowledge of Mr. Cowan or LMS.

319. Although there was a great deal of cross-examination of the Defendants directed at the proposition that the March Weighted Budget was Updata UK's document, rather than the document of the management team, the precise legal position in that respect was not what mattered. The real issue, in terms of deceit, was the genuineness of the Defendants' belief that the three documents (the Tenon Memorandum, the Tenon Data Pack and the March Weighted Budget) were essentially part of the same type or in the same category; namely documents that the management team had been preparing for the purposes of the MBO. Mr. Choo Choy therefore submitted that it "made complete sense that they would have treated those documents as being for their use". It would therefore have been natural for Mr. Bennett and the other members of the management team to think of the March Weighted Budget as their document, not the company's document or budget; because it was the working document that provided the financial metrics for the Tenon Memorandum and the Data Pack for the purposes of the MBO. It was therefore very easy to see how, from the management's perspective, the March Weighted Budget was honestly thought by them to be their

work product. Therefore when Mr. Bennett received Mr. Johnsen's request for the latest budgets, it is not realistic to think that he would have interpreted this as a request for the March Weighted Budget. He treated the request as being a request for the latest company budget, not for the budget prepared for the MBO.

320.    Mr. Choo Choy's written and oral submissions recognised that the Updated Kelso Presentation was a somewhat difficult document to defend. His oral submissions addressed this document in detail. He submitted that if there had been an intention to deceive, it was very strange that Mr. Bennett used exactly the same numbers as had been given to Mr. Nielsen and Mr. Homan in March. One would have expected him to use slightly different numbers, perhaps slightly higher. Moreover, the same numbers were used for the best case figures in circumstances where the assumptions underlying the original financial overview in March had been fully disclosed. The best case assumptions as to the pipeline in those assumptions did not reflect the additional 2009 contracts identified on the earlier page of the Updated Kelso Presentation. If there had been an intention to deceive, one would not have expected Mr. Bennett to identify the further contracts which had been obtained in 2009. A careful recipient of the document could not have failed to notice the similarity between the figures in the Financial Overview and those in the Updated Kelso Presentation. At the heart of the submission was the proposition that Mr. Bennett's repetition of the best case FY 2010 figures was reflective or consistent with an intention on his part not to give Mr. Nielsen the benefit of the UK management's MBO work and therefore not to "spoonfeed him and do his work for him".

**F2: Motive and the Defendants' evidence as to their desire to obtain the maximum price**

321.    I have already set out (see Section B) the backdrop to the events in early 2009, including how Mr. Johnsen came to be regarded as "the enemy" by the UK management team, and the UK management's lack of trust in Updata Europe. I have also considered the question of motive in Sections D and E above. I accept Mr. Nyegaard's evidence that, during 2008, the situation between Updata UK and Updata Europe was strained and that Mr. Bennett and Mr. Baldorino lacked confidence in Updata Europe; that they thought that the Danish companies were a potential drain on Updata UK; and that there was a need to replace or dilute Updata Europe as majority shareholder.

322.    I have no doubt that the Defendants' preference was for replacement rather than dilution, if that were achievable. This is reflected in an e-mail sent by Mr. Baldorino in July 2009 after the sale: "It is now done with the Danes kicked into touch". In late 2008, Mr. Bennett and Mr. Baldorino had contemplated putting Updata UK into administration as a means of taking control of the company through a pre-pack admininstration. In the event, this idea came to nothing. But the need for positive action was lent a degree of urgency when the Defendants was learned that Mr. Nielsen was making an unwelcome approach to buy the company in early 2009. I consider it clear that, thereafter, the last thing that the UK management wanted was for Mr. Nielsen's bid to succeed. None of the Defendants wanted to work with Mr. Nielsen. Their response was therefore to try to put together an MBO. They spent time and money doing so, and chose an investor (LMS) with whom they could work in the future. It is obvious that the Defendants would have been highly motivated for the MBO to succeed. The Defendants were optimistic as to the future of the business, as reflected in the text of the Tenon Memorandum and the forecasts which were given to

Tenon. They wanted to enjoy its future prosperity. The argument (which I have already addressed) that Mr. Bennett did not want to "spoon feed" Mr. Nielsen, and that Mr. Nielsen had to do his own work, also demonstrates the Defendants motive for their bid to succeed, and for Mr. Nielsen to fail. The Defendants therefore had an obvious motive for misleading both Updata Europe and Mr. Nielsen as to the prospects of the business.

323.    Throughout their evidence, both Mr. Bennett and Mr. Baldorino, but in particular the latter, sought to maintain that in 2009 they wanted to obtain the highest price for the shares in Updata UK. They said that they were shareholders and stood to benefit from a sale, just as Updata Europe did. I was sceptical of this evidence at the time it was given, and after closing submissions I was helpfully provided by the parties with an agreed list of their evidence on this topic. I have reviewed it bearing in mind (as Mr. Choo Choy correctly submitted) the importance of reading a witness's evidence as a whole, and in the context of the question asked. It does seem to me that, fairly read, both Mr. Bennett and Mr. Baldorino did give evidence that they were seeking to maximise the price on the sale.

324.    Thus, Mr. Bennett said that, when preparing the figures for the weighted case, he discussed with Mr. Cowan the need to "get the number as high as possible, we're trying to get investors on board quickly. We're trying to get them to pay the best price and therefore we're going to create an optimistic sales document". When referring to his early discussions with LMS in early April 2009, in the context of a question that the pricing was always intended to be referable to the monies owed to the Bank, he said: "We are the management team wanting the highest price". When asked about the position in mid-April, when the LMS offer was made, there was the following exchange:

> "Q. So in terms of the position as it now stood, as I understand your evidence you're saying that you are trying to get the highest value possible for the purchase price?
>
> A. That's exactly what we were trying to do".

325.    Mr. Baldorino's evidence was to the same effect, indeed more emphatic. He said that he wanted to maximise his 15% share in the business. So it wasn't "selling the shares at a lower price or anything like that". He disputed the suggestion that since he did not want to work for Mr. Nielsen, it was even more important for him to ensure that his bid did not succeed:

> "Not really, because I – if his bid would have been very high or higher, much higher, I would have benefited from it.

326.    When asked about the 20 April e-mail, he denied that this had been sent after discussion with him and Mr. Mantell. He was then asked:

> "Q: And it reflected the fact that you did not want Updata Europe to have any real opportunity to try and make the most of its opportunity to sell its shares for the highest possible price?"

> A: I would have wanted the highest price for those shares, absolutely.
>
> Q: Well, what I suggest to you is you didn't want that but you knew Mr Johnsen wanted that?
>
> A: No, I wanted – I wanted the price to be as high as possible."

327. When asked questions in the context of the Claimants' fiduciary duty case, he said that it was:

> "in my interests to get the highest price possible obtained ….
>
> ….
>
> My interest was probably in line with the European Vendors to sell my share of the business at a highest possible price.
>
> …
>
> I think that we all wanted the highest possible price."

328. Finally, in response to questions from me, he confirmed that his evidence was that he was seeking to maximise the price that could be paid for the Updata shares in the interests of both the management team and the majority shareholder; and that his colleagues in the management team were seeking to do that as well.

329. In my view, all of the evidence of Mr. Bennett and Mr. Baldorino, directed towards the proposition that they wanted to maximise the price, was contrary to the documents and the inherent probabilities. It was unreliable and I reject it. I am inclined to think that it was deliberately untruthful as well, since it is difficult to see how these witnesses could, having seen the documents, have persuaded themselves that they wanted and sought to obtain the highest possible price. But it is not necessary to reach a positive conclusion in that regard. It is possible that these witnesses were to some extent on auto-pilot when answering these questions, responding by reference to what they knew their case was and what their answers ought to be, giving insufficient thought to the answers given. This evidence and my rejection of it is relevant to my overall assessment of the Defendants as witnesses, albeit that I agree with Mr. Choo Choy that one should not draw a general conclusion from just one area where the evidence of a witness is rejected.

330. In relation to the question of whether the Defendants were seeking to maximise the price paid for the shares, the true factual position was in my view as follows. The Defendants, together with Tenon, were certainly seeking to maximise the amount of interest in the opportunity from the private equity houses whom they approached. A considerable amount of work and thought went into the figures which were contained in the March Weighted Budget. There was a considerable degree of optimism amongst the management as to the future results of the business, and this optimism was therefore fairly reflected in the figures which were then given to Tenon and ultimately to the market. This was certainly a way of interesting potential investors. However, when approaching the market, the Defendants were not seeking to

maximise the price. Instead, the relevant section of the Tenon Memorandum, which was drafted by Mr. Bennett, described the opportunity as one to acquire the shares at or below the level of the debt. Similarly, the original approach to Tenon, as reflected in Mr. Castledine's e-mail of 26 February 2009, was to identify funders prepared to invest £ 4-5 million to facilitate an acquisition from Updata Europe.

331.    It is therefore no surprise that when the bids came in from the private equity houses, they were all at or around the level of the debt identified in the Tenon Memorandum. There was no evidence that the Defendants' selection of LMS was thereafter made on the basis of seeking to maximise the price that LMS would pay for the shares, rather than by reference to the private equity house with whom the Defendants preferred to work. Neither Mr. Bennett nor Mr. Baldorino could identify any positive steps that they had taken, apart from approaching a number of private equity houses in the first instance in order to create "competitive tension", to maximise the price. I do not accept that there was any real attempt to create competitive tension. The opportunity was presented as one to acquire the shares at the level of the debt. The hope, no doubt, would be that a number of houses would be attracted by such an opportunity, and would be willing to pitch at that level. The Defendants would then be in the position of being able to pick and choose their preferred investor. That is what in fact happened. There is no evidence that, after the bids came in, the Defendants tried to create competitive tension by encouraging the private equity houses to increase their offers, for example by playing one house off against another.

332.    On 2 April 2009, LMS gave the presentation which I have already described. This noted that the company was "set to gain significant scale: from recent £ 1 million rental [Gross Profit] to £ 4-5 million in near future". The presentation referred to the possibility of using "Historical, LTM [Last 12 months] and YTD underperformance compared with budget [to] give ammunition for lower valuation." There is no evidence of the Defendants challenging LMS as to their proposed use of "ammunition" for a lower valuation. Indeed, following this presentation, it was LMS that was selected as the Defendants' preferred bidder. After LMS had been selected, there is nothing in the documents which evidences attempts by the management to maximise the price payable by LMS. Instead, there are some internal documents showing the management's very real interest in their personal position, including a ratchet mechanism which would increase their shareholding.

333.    On 14 April 2009, there was a meeting at the Bank in Denmark attended by Mr. Jorgensen, the Bank's lawyer Mr. Sorensen, Mr. Bennett and Mr. Baldorino, and representatives of LMS (including Mr. Hooft) and Tenon. The purpose of the meeting was to inform the Bank of the intention of LMS and the UK Management team to buy the shares held by Updata Europe. Mr. Baldorino's contemporary notes of the meeting record: "offer holding co. 60% stake amount same as credit facility": i.e. to offer the same as the outstanding debt. Mr. Bennett and Mr. Baldorino were content with this approach, which was consistent with the opportunity set out in the Tenon Memorandum. Mr. Nyegaard's evidence was that the deal proposed by LMS and the UK Management was deliberately structured so that it exactly covered Updata Europe's debt to the Bank. He said that everyone in the room knew this. I accept that evidence. Mr. Bennett said that he couldn't remember the meeting but it "wouldn't surprise" him if the discussion before the meeting was that the level of the offer was to be pitched by reference to the bank debt. I therefore do not accept Mr Hooft's

evidence in so far he suggested that LMS's first offer was not calculated by reference to the debt, and that his valuation coincidentally matched the debt figure.

334. On 16 April 2009, LMS made its offer. Mr. Bennett and Mr. Baldorino would have appreciated that, based on the figures which they had given Tenon, there was a very strong argument (to put it at its lowest) that an offer based on EBITDA of only £ 1.5 million would substantially undervalue the company. There is no evidence of any attempt by them to point this out either to LMS or to Mr. Johnsen or anyone else on the Updata side. Instead, as previously discussed, the e-mail traffic on the morning of 20 April was aimed at trying to ensure the success of the LMS bid and explaining its benefits to the Bank.

335. There is also an obvious point that can be made against the case that the management were seeking to maximise the price, as Mr. Baldorino accepted at the end of his evidence. Had this been the case, Mr. Nielsen would have been given the same figures as had been given to Tenon. Indeed, there would have been every reason to disclose the Tenon Memorandum and the Data Pack (leaving aside the Weighted Budget) both to Mr. Nielsen and Updata Europe in order to ensure that any buyer paid the highest possible price.

336. The evidence given by Mr. Bennett and Mr. Baldorino on this important issue is one reason why I regard them as unreliable witnesses. But this is not the only reason, and I bear in mind Mr. Mantell did not give evidence along the lines discussed. I therefore now turn to a number of other points of significance.

## F3: The strike out application

*The March Weighted Budget*

337. The Claimants contend that the Defendants deliberately sought to mislead Sir Richard Field on the strike-out application. This was a heavy and important application which, if successful, would have resulted in the dismissal of the claim. The background to this argument is as follows.

338. On 15 February 2016, the Defendants applied to strike out the proceedings in their entirety. The application was supported by the first witness statement of Mr. Bennett ("RB1"). Mr. Bennett was authorised by the other Defendants to tender RB1 on their behalves, and he accepted in evidence that he must have discussed the events of 6- 10 July 2009 (described in more detail below) with them before it was finalised. Following reply evidence from the Claimants, Mr. Bennett submitted a further witness statement ("RB2") in support of the strike out application, and this was also authorised by Mr. Baldorino and Mr. Mantell.

339. A principal focus of RB1 and RB2, and the argument that in due course took place before Sir Richard Field, was the provision of the CD in July 2009 which contained the March Weighted Budget. The essential facts here are that on 1 July 2009, Ms Rana of Coren Troen asked Mr. Mantell for a copy of the CD which had already been provided to Nabarros, who were acting for LMS. On or about 3 July 2009, Mr. Mantell posted the CD (described on his 'to do' list as "Data Room Files"). On 6 July 2009, Corren Troen received the CD. It included a version of the March Weighted Budget. On 8 July 2009, Mr Dempsey of Rosenblatt (acting for the Defendants) asked

Ms Rana to check the draft disclosure letter and also check whether the "'data room materials' are different to the CD of docs the other side have received". On 10 July 2009 at 00:07am, Ms Rana produced an amended index to the disclosure letter which referred, amongst other things, to the "2009-10 budget".

340.  The Claimants rely upon what they contend to be significant differences between the evidence given by the Defendants on the strike-out application in relation to the CD, and the evidence now given at trial. The Defendants' case at the present trial has been, in summary: (i) that they had never intended to provide the March Weighted Budget to Ms. Rana, because it was regarded as part of the "Tenon suite of documents" which were proprietary to them, and (ii) the reason that it was provided to Ms. Rana in July 2009 was because of a mistake by Mr. Mantell. Mr. Mantell's evidence in both his witness statement and his oral evidence was that he did not appreciate, in July 2009, that he had made this mistake. In Mr. Bennett's third witness statement (served in December 2016), he states that he was not, at the time, aware that Mr. Mantell had provided a copy of the March Weighted Budget to Corren Troen. In his oral evidence, he was unclear as to whether he knew of this mistake prior to completion of the sale transaction in July 2009, saying that when he did discover that it had been included he remembered "being quite surprised".

341.  Mr. Booth submitted that one possibility was that the disclosure in July 2009 had been deliberate, because the Defendants could see no way out of providing Corren Troen with the same documents as Nabarro. But this was not at the forefront of his submissions, and I consider it far more likely that the Defendants' evidence on this issue is true; namely that a mistake was made by Mr. Mantell in the final days leading to the close of the transaction, at a time when there was a considerable amount to do. I think that this is far more probable, given the efforts previously made (on 20 April and again 3 June) not to give the EVs the March Weighted Budget. Indeed, the metadata shows that Mr. Mantell printed the March Weighted Budget on 2 June 2009, and I agree with the Claimants that this is likely to have been in anticipation of putting it in the Data Room. A decision must then have been made not to do so. Mr. Mantell in his evidence could not provide any alternative explanation of why he had printed this document on that day.

342.  The Claimants' key point was that, in their evidence for the strike out hearing, the Defendants had given no indication at all that the March Weighted Budget had been disclosed by mistake. Instead, whilst RB1 did not expressly say that there had been deliberate disclosure, that was the clear implication of the case that was advanced both in the witness statement and, based upon that evidence, in counsel's submissions to Sir Richard Field. It was also the way in which Sir Richard Field had understood the case that was being presented to him.

343.  On behalf of the Defendants, Mr. Choo Choy (who, unlike Mr. Booth, had appeared before Sir Richard Field) did not suggest that, fairly read, either RB1 or RB2, or his submissions on that occasion, indicated that the March Weighted Budget had been disclosed by mistake. He submitted, however, that there had been no intention to seek to mislead at all. Mr. Bennett's first statement did not address <u>why</u> the Weighted Budget had been included on the 6 July CD. It made the point that the CD had in fact gone across to Corren Troen. It addressed the case that the Claimants were advancing, namely that the March Weighted Budget had been concealed, and that this was a very unlikely case of deceit. When the draft judgment had become available, the

Defendants' counsel had written to the judge, in a Note, to question the inclusion of a conclusion, in the draft judgment, that it "implicit in Mr. Choo Choy's submissions is an acceptance that the Defendants were aware from 6 July 2009 onwards that the Weighted Budget should be disclosed to the European sellers". Overall, it was submitted that this particular aspect of the strike out hearing could and should have been addressed more clearly. But Mr. Bennett did not seek to mislead, and the matter was raised with Sir Richard Field in the Note.

344.    I consider that the evidential case that was put forward by Mr. Bennett in RB1, and which was supported by Mr. Baldorino and Mr. Mantell, was indeed misleading, as the Claimants submitted. All of the Defendants knew (at least if their evidence on this issue at trial is to be accepted) that the March Weighted Budget had been disclosed by mistake. But neither Mr. Bennett, nor any of the other Defendants, explained this to the court. RB1 clearly implied that there had been deliberate disclosure.

345.    For example, paragraphs 10, 12, and 62 of RB1 all suggest that there was deliberate disclosure:

> "10. What is, I believe, so very remarkable about the Claimants' case is that **it is common ground that we did disclose the 2009/2010 Weighted Budget (which contained the allegedly relevant information) to the European Vendors (through their solicitors)**. It is common ground that we provided this information to the European Vendors' solicitors, alongside the few remaining contracts which had not previously been disclosed because they had not been available, and that we did so nearly a week (on 6 July 2009) before the European Vendors (along with all the other parties) signed the sale agreement on 11 July 2009 (the "**SPA**") (pages 41 to 98) – and in circumstances in which Updata Europe say they were under no time pressure to execute the SPA" (Emphasis in original)
>
> 12. We believe we therefore face a completely fanciful claim. We (three honest individuals with unblemished careers) are alleged to have deliberately and fraudulently concealed the information contained in the 2009/10 Weighted Budget and Tenon Memorandum despite the fact that it is common ground that we in fact did disclose that very information to the European Vendors prior to the sale, and the 2009/10 Weighted Budget was then deliberately included in in the list of disclosed documents under the SPA by the European Vendors' own solicitors. Not only does that make the Claimants' case legally untenable, but I believe it is factually fanciful. It beggars belief that – had we been fraudulent – we would have provided this information to the European Vendors (and the Claimants have never explained how a case of Fraud is consistent with our actions).
>
> 62. But whatever may be the true position on reliance and inducement, it is my understanding and belief that in

circumstances where the information which forms the basis of the Claimants' allegations of non-disclosure and misrepresentation was in fact disclosed to the European Vendors and their legal advisers well in advance of the execution of the SPA, there cannot be sustainable case of non-disclosure or misrepresentation or of any intention on the Defendants' part to conceal or mislead the European Vendors. The claims of fraud and conspiracy set out at paragraphs 83, 87 and 88 of the PoC should therefore be struck out; alternatively Summary Judgment should be entered in the Defendants' favour in relation to those claims.

346.    So too does paragraph 49, where Mr. Bennett stated that "we naturally assumed that they kept their clients informed of all developments". In the context of a witness statement relying upon the disclosure of the March Weighted Budget, this obviously implied that the Defendants assumed at the time that the contents of the March Weighted Budget would be brought to the attention of Updata Europe by Corren Troen. There were other passages, which I need not set out in full, which similarly suggested that the Defendants actively relied upon and considered that Corren Troen would check the documents and bring them to the EVs' attention: see paragraphs 11, 57-58 and 60-61 of RB1.

347.    It seems to me that the proposition that there had been deliberate disclosure was central to the case that was advanced on the strike out application, and that this was how the judge understood the case. At [42] of his judgment, Sir Richard Field summarised Mr. Choo Choy's argument as follows:

> "Mr. Choo Choy QC for the Defendants submitted that the provision to the European Sellers' solicitors, Corren Troen, of the 6 July CD, containing as it did a copy of the Weighted Budget, irrefutably demonstrated that the Defendants were not acting dishonestly at the relevant time in withholding the information it is alleged they fraudulently concealed and accordingly the fraud claim was bound to fail"

348.    Similarly, at [43], the judge records a further submission on behalf of the Defendants that they "would have been in no doubt that Corren Troen would become aware of the Weighted Budget before completion of the SPA".

349.    This summary of the argument reflected submissions made at the hearing. Thus, at the end of the first day of the hearing, Mr. Choo Choy submitted:

> "The idea that all of that was happening whilst we were simultaneously setting out to deceive them is extraordinary. Their case essentially boils down to this, that we have been fraudulently motivated all along, right until early July, then suddenly we're asked for the CD that will reveal the we've been lying and acting fraudulently, and we readily provide it and what's more, we tell their solicitors to check it, and they do check it. So we say that's just fanciful."

350. Following this submission, Sir Richard Field had an important exchange with the Mr Choo Choy in which he asked directly for an explanation of why the March Weighted Budget was produced on 6 July CD but not before. He pointed out that this had not been explained in the Defendants' evidence. Mr. Choo Choy responded to say that he would bear that in mind overnight.

351. On the second day of the hearing, Sir Richard Field again pressed Mr. Choo Choy on why the March Weighted Budget was only disclosed on the 6 July CD and why its relevance was not highlighted when it was put on the CD. He was not told that the March Weighted Budget had only been disclosed by mistake. I emphasise that this is no criticism of Mr. Choo Choy, because he could only base his submissions on the evidence given by the Defendants, and this evidence was only consistent with deliberate disclosure. Towards the end of Mr. Choo Choy's submissions, the judge indicated (and counsel accepted) that there were two points being advanced.

352. The first point was whether the provision of the March Weighted Budget meant there was no misrepresentation, because any such misrepresentation had been corrected on 6 July. The first point was submitted to be an objective question. Counsel accepted that he had not emphasised that particular point in his submissions that morning. In due course the judge rightly rejected it because (see e.g. *Peekay v ANZ Banking Group)* the authorities say that any correction of a false representation must be made fairly and openly.

353. The second point, however, was whether the provision of the March Weighted Budget meant that it was fanciful to say that the Defendants were dishonest. Counsel submitted that the question of dishonest intent was a subjective issue relating to the Defendants' state of mind. It was therefore crucially important, in dealing with that second point, for the court to consider the Defendants' intentions in providing the March Weighted Budget on the 6 July CD. Counsel submitted (at pages 66-67 of the transcript of Day 2):

> "The importance of the distinction between those two points is that in relation to the question of intent it is relevant in my submission that, in the light of the objective communications that took place, it is very hard to see how it could realistically be said that we had reason to believe and did believe that the contents would not in fact be reviewed and appreciated, because unless you can establish that, how will my learned friend credibly challenge the defendants when they say, well, true we had refused to provide the information until then because we thought that that was part of our presentation to the potential investors, but when we were asked for the CD of all that had been provided to LMS we were prepared to give it, and we certainly didn't intend to mislead? How will he credibly challenge that assertion if he is not able to say credibly that we had reason to believe either that the contents would not be reviewed incompetently, and that the point would simply be missed? We say that is at the very least a powerful point."

354. It seems to me that counsel's submission on the second point clearly suggested both deliberate provision of the document and a belief on the part of the Defendants that

the document would be reviewed (as was suggested in the evidence which I have summarised above). It was this submission that was reflected in paragraphs [42] and [43] of the judge's judgment as set out above.

355.    I agree with the Claimants that if the court had been told that the provision of the March Weighted Budget had been a mistake, the complexion of the Defendants' application would have changed completely. Indeed, it is impossible to see how the accidental disclosure of this document could possibly be said to demonstrate irrefutably that the Defendants were not acting dishonestly at the relevant time. Accidental disclosure would be entirely consistent with fraud, and the case which was advanced to Sir Richard Field could not realistically have been made.

356.    I also agree with the Claimants that the Defendants' failure to explain the true position as to accidental disclosure of the March Weighted Budget in their evidence, and their putting forward a case of deliberate disclosure, is a serious matter. It was in my judgment an attempt by the Defendants to mislead the court, and to obtain the ultimate remedy of striking out a claim in consequence. And even if it were too draconian a conclusion to say that there was an attempt to mislead the court, I would nevertheless conclude that the episode indicates that the Defendants are not witnesses on whose evidence the court can rely.

357.    I do not think that the Note sent to Sir Richard Field after the hearing is of any assistance to the Defendants. The Note did not explain that the March Weighted Budget had been disclosed by mistake: this is unsurprising, because there was nothing in the evidence to support such a proposition. The Note simply queried whether Sir Richard Field was correct to regard Mr. Choo Choy's submissions as containing an implicit acceptance of the need to disclose the March Weighted Budget. Given that the case advanced was that there had been deliberate disclosure, with reliance being placed on the Defendants' expectation that the material disclosed would be reviewed, one can well understand the judge's conclusion in the first sentence of [45]: a sentence that he declined to change. But what matters for present purposes, in my view, is not what was implicit in the submissions, but rather what said in the witness evidence and explicitly in the submissions as summarised above.

*Unblemished career of Mr. Mantell*

358.    In the evidence on the strike out application, Mr. Bennett stated in RB1 that the Defendants had "unblemished careers" (paragraph 12) and "unblemished professional business careers" (paragraph 26). Although neither Mr. Bennett nor Mr. Baldorino knew this, Mr. Mantell's business career was not unblemished. In fact, Mr. Mantell had been disqualified as a director in 2014 for a period of four years for conduct which included preparing and signing false VAT returns. This related to a business concerning a bar/restaurant which had nothing to do with Updata UK. Although it was a separate business, Mr. Mantell knew that his career was not unblemished. Nevertheless, Mr. Mantell approved Mr. Bennett's witness statement, which was served around 2 years from the time when the disqualification order was made, and during the time that it was current. Again, I consider that it is a serious matter for the court wrongly to be told on a strike-out application that a person has an unblemished professional career, when that is not the case. Again, it is a matter which I take into account in rejecting the integrity and reliability of Mr. Mantell.

### F4:    Other relevant conduct at the material time

359.    It will be apparent from my conclusions in Section D and E above that I consider that important statements made in both the 20 April and 3 June e-mails were not consistent with honest responses to the questions and issues raised. There is other evidence that, at that time, the Defendants did not want Updata Europe to know the picture of success in the UK and behaved with a lack of integrity towards Updata Europe.

360.    On 16 February 2009, Mr. Mantell sent an e-mail setting out recent "wins" and forecast "wins". The e-mail was sent to Mr. Forsyth at Lloyd's Bank, who were Updata Europe's bankers. He did not, however, copy the e-mail to Mr. Holm, despite copying Mr. Holm into another e-mail sent to Lloyd's the same day. Mr. Baldorino was also cross-examined, effectively in my view, on documents showing that contract wins in 2009 were reported internally at Updata UK, but not externally to Updata Europe.

361.    On 18 March 2009, very shortly after Tenon had been formally engaged, Mr. Mantell sent them a cash flow statement which had been sent to Lloyd's bank (Updata UK's bankers), showing a positive £425,000 year-end balance. The e-mail was copied to Mr. Bennett and Mr. Baldorino. Mr. Mantell e-mailed Mr. Holm on the following day to say that due to the diligence work being carried out that week, "unfortunately I have not had time to produce the weekly cash flow forecast". Again, the e-mail was copied to Mr. Bennett and Mr. Baldorino. I agree with the Claimants that this was transparently dishonest conduct towards Mr. Holm, who was chairman of Updata UK and Updata Europe. Mr. Mantell had no explanation for this conduct in his evidence. To my mind, the obvious explanation is that none of the Defendants wanted Mr. Holm and Updata Europe to know about the very positive cash flow figures which had just been sent to Lloyd's. Mr. Mantell, and the other defendants who saw both e-mails, were happy to mislead Mr. Holm in that regard.

### F5:    Specific arguments advanced by the Defendants

362.    In the course of this judgment I have already addressed many of the specific arguments raised by the Defendants, including my conclusions as to motive, the Defendants' attitude to Updata Europe, the figures in the Updated Kelso Presentation and the "spoon-feeding" of Mr. Nielsen, and the general reliability of the Defendants. I have reviewed the Defendants' arguments as summarised in Section F1 above, and in the light of the evidence as a whole I do not find any of the points made persuasive. I comment briefly on the principal points in so far as they have not already been addressed.

363.    *Roll-over.* It is true that offers were made by LMS to permit the EVs to roll over, to some extent, their shares. The first such offer was made after the 20 April representations were made. But it is right that the 3 June representations were made after LMS had proposed a roll-over. I do not think that the proposed roll-over is inconsistent with dishonest intent. The Defendants wanted the LMS offer to succeed, and their focus was on kicking the Danes into touch. Given that focus, I do not think that they gave any thought to the possible consequences of a roll-over in terms of information that might subsequently become available which might cast doubt on the statements that they were making. It would have required a degree of lateral thinking for the Defendants to apply their minds to a possible chain of events whereby the roll-

over would in due course enable Newwatch (and hence Mr. Johnsen) to obtain financial information about the later performance of the business, and that this would then lead to allegations in relation to statements made in the course of the negotiations leading to sale. I do not think that the Defendants thought this through.

364. *Spring 2009 structure.* Mr. Bennett gave evidence about a possible structure that he explored, which would result in Updata Europe being left with 45 % of the shares. Whilst I accept that this did happen, I do not consider that it assists. Mr. Bennett's idea was in fact unworkable because, as he said, the "debt markets were basically shut". Moreover, I do not consider that this was structure represented what the Defendants hoped and wanted to achieve, which was a successful MBO.

365. *Financial Overview not originally a dishonest document.* I do not consider that this argument assists. The relevant questions in this case concern how matters stood at the time when the relevant representations were made. The fact that there may have been a projection, prepared some time earlier, which represented the UK management's genuine views at that earlier time, does not in my view address the case advanced.

366. Nor do I attach any significance to the fact that the evidence indicates that the assumptions or "backing sheets" underlying the Financial Overview appear to have been given to Mr. Nielsen and Mr. Homann. This was a point emphasised in the Defendants' post-hearing brief written submissions, and was relied upon as negating dishonesty. Mr. Bennett's evidence, however, was that he did not know how the "worst", "middle" and "best" case had been compiled or the assumptions on which those three cases were based. The point that the backing sheets had been provided was one which, as it seemed to me, emerged as a result of careful scrutiny of the documents in the course of the trial. But it was not something which played any part in the thinking of Mr. Bennett, nor any of the other Defendants, at the time. I therefore cannot see that it assists in negating the evidence of dishonesty.

367. *March Weighted Budget was believed to be essentially the same as the Tenon Memorandum.* For reasons already given, I do not believe that the Defendants – either on 20 April or on 3 June – rationalised their approach by reference to the concept of a "Tenon suite of documents" which included the March Weighted Budget. In so far as the Defendants gave evidence to that effect (and there was no such evidence in relation to the 20 April 2009 e-mail), I regard that evidence as unreliable and do not accept it. The Tenon advice was clear cut. The Defendants' rationale for non-production of the Weighted Budget (which Mr. Mantell had printed on 2 June in anticipation of including it in the Data Room) was quite simply that they did not want the EVs or Mr. Nielsen to know the real figures.

368. *Advice sought from Tenon.* I did not see how this assisted the Defendants. Advice was sought from Tenon, but not in relation to the March Weighted Budget or in relation to the concept of a Tenon "suite of documents". The advice received was clear. The Defendants decided to disregard it. The fact that advice was sought is, to my mind, beside the point in these circumstances.

369. *Mr. Hooft.* Mr. Hooft did not see the 20 April e-mail. He did see the 3 June e-mail, which attached the Updated Kelso Presentation. No allegation of fraud was made against Mr. Hooft. Mr. Booth said in opening that the Claimants did not have the material to assert that LMS was party to the fraud. I did not think that this was

surprising. Mr. Hooft's evidence was that by the time of the 3 June e-mail he was focusing on LMS's own analysis rather than the numbers in the Updated Kelso Presentation. Mr. Hooft was not sent, in draft, the proposed wording of the first part of the 3 June e-mail ("Hi Mads and Flemming …. Kind regards, Richard"). Nor was he sent, in advance, the Updated Kelso Presentation. He was not asked to advise on what should be said. He had become aware of the matters which were "worrying" the UK management, and specifically asked Tenon to advise as to the management's responsibilities. Tenon's advice, that ALL information should go into the data room, apart from the "report by Tenon", was copied to Mr. Hooft.

370. Against this background, I did not consider that the absence of an allegation of dishonesty against Mr. Hooft was of any assistance in deciding the state of mind of the Defendants. As Mr. Booth submitted in opening, Mr. Hooft was on the outside, and what he was told or made of the information that he was given was a matter for him. But that could not affect the question of what the Defendants were doing, what they understood and what they intended. I agree that knowledge or participation, or the lack thereof, by any other party does not impact on the key issues in the case.

371. For the same reasons, I do not attach any significance to the absence of an allegation of fraud against Mr. Cowan or Tenon.

**F6:    Legal responsibility for the deceit**

372. The two critical e-mails were sent by Mr. Bennett. There was no dispute that Mr. Bennett would, if deceit be proved, be legally responsible for the deceit. There was, however, an issue as to whether or not Mr. Baldorino and Mr. Mantell could be held responsible for what Mr. Bennett said.

*The Claimants' case*

373. The Claimants' case in their written opening submissions was that the representations were made by and on behalf of all of the Defendants. This case was cross-referenced to their case on unlawful means conspiracy, where the same facts were relied upon. The Claimants contended that the Defendants plainly acted in concert in pursuing the MBO; seeking to dispense with control by the Danish shareholders; and deciding what information was to be provided and what representations made. If any one of the three Defendants had not been party to the conspiracy, the campaign of non-disclosure and misrepresentation would have collapsed. Any one of them could have said "here is the accurate information you have asked for"; any one of them could have said "I'm afraid the figures in the Financial Overview and Updated Kelso Presentation are not accurate"; any one of them could have said "LMS and Tenon have received a lot more information than we have provided to you or to Mr Nielsen"; and any one of them could have sent an e-mail to EVs to notify them of the contract wins in early 2009. They did not do so because they were acting in concert to fraudulently withhold this information from EVs.

374. In the course of his oral opening submissions, Mr. Booth explained that there was little distinction between the case of deceit and unlawful means conspiracy. His primary case was that the Defendants were "operating in tandem and they're operating together and it's inconceivable that a representation is put other than with the agreement and on behalf of the others because they are acting as a trio". The only

situation in which the unlawful means conspiracy argument potentially had an independent life was if, for some reason, there was an issue as regards authority for a particular representation. If that arose, then there would be a more relaxed test for unlawful means conspiracy; since the relevant question would be whether the Defendants were party to a conspiracy to use false information, and it would not be necessary to show who joined at which point. The essential case, however, was that Mr. Bennett was acting on behalf of all of them.

375.    In closing submissions, the Claimants put the case in the same way. As far as the 20 April e-mail was concerned, the Claimants contended that it was more likely than not that all of the Defendants discussed the information to send to Mr. Johnsen in response to his request. If Mr. Johnsen was going to be given information, it was important to all three Defendants that it was not the accurate information from the March Weighted Budget (because that would improve Mr. Johnsen's chances of raising investment and may lead him to think the LMS offer was too low). And Mr. Bennett could not act alone without the significant risk that one of the other Defendants might give Mr. Johnsen the March Weighted Budget. Once they had decided to pursue the MBO, they were acting in concert, and had to do so. Hence, they stuck to the same position in the subsequent litigation.  They were jointly represented because there is no actual/ potential conflict: they all acted together to pursue their desired MBO and the removal of Updata Europe.

376.    As far as concerns the 3 June e-mail, the Claimants submitted that the draft e-mail circulated on 1 June, and then sent later that day, must have been agreed by all the Defendants. This too must have been the case with the 3 June e-mail, which was copied to both Mr. Mantell and Mr. Baldorino. Indeed, the Claimants submitted (in the context of conspiracy) that by the time that the Defendants were preparing the information to give to Tenon, they must have agreed that they were going to use such up to date and true information for their own purposes and exclude the EVs from it. That is what they in fact did. The Claimants relied upon the failure of Mr. Baldorino and Mr. Mantell to disassociate themselves from the 3 June e-mail, and the failure to act upon the clear advice of Tenon regarding disclosure.

377.    It was submitted that it was therefore fanciful to suggest that had Mr. Johnsen only contacted Mr. Baldorino or Mr. Mantell rather than Mr. Bennett, that on 20 April 2009 he would have received truthful information: the whole scheme would never have worked unless they had agreed to restrict that information, and the Defendants had all adhered faithfully to this.

*The Defendants' case*

378.    The Defendants submitted (correctly) that in a multi-defendant case, it was necessary to establish the tort of deceit against all of the Defendants. A person could only be liable in deceit if he himself was fraudulent. They submitted that the only representor was Mr. Bennett. They accepted, based upon *Cartwright* paragraph 5-07, that a person could be treated as having made a representation "if he manifestly approves and adopts a representation made by a third party". But they submitted in closing that there was no plea that Mr. Mantell or Mr. Baldorino manifestly approved or adopted Mr. Bennett's e-mails either, or what manifest matters were relied upon to support any such allegation of approval or adoption.

379.    As for the 20 April e-mail, the Defendants submitted that there was no evidence that either Mr. Mantell or Mr. Baldorino ever manifestly approved or adopted any representation made in the 20 April e-mail. The Defendants relied upon their evidence that they had not done so. They said that there was no evidence to suggest that the Defendants had conspiratorially got their heads together before Mr. Bennett replied to Mr. Johnsen the same day, or that they had involvement in the e-mail exchange.

380.    In relation to the 3 June e-mail, the Defendants submitted that Mr. Mantell and Mr. Baldorino cannot be said to have approved or adopted either the e-mail itself or the Updated Kelso Presentation. Neither of them considered or agreed it (or any drafts of it) in advance. They relied upon their evidence that they had not paid it much attention at the time, and submitted that there was no contemporaneous evidence that they did any of these things.

*Analysis and conclusions*

381.    I did not consider that there was any substance in the Defendants' pleading point. This point was not taken, or at least not taken clearly, in the Defendants' written or oral opening, notwithstanding that Mr. Booth had clearly explained the nature of the case that was being advanced. In any event, paragraphs 48 and 52 of the Re-Amended Particulars of Claim, and indeed the pleading as a whole, make it plain that the representations were alleged to have been made by each of the Defendants or on their behalf.

382.    There was, however, no dispute that the relevant question was whether Mr. Baldorino and Mr. Mantell had manifestly approved and adopted the representation. This expression comes from the judgment of Viscount Maugham in *Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All ER 205, 211. I do not consider that there is any special significance to the word "manifestly": it was used in that case to distinguish "mere silence, however morally wrong". If I am satisfied that the relevant representations were made by Mr. Bennett with the agreement of the other Defendants, then this would be a case of manifest approval and adoption.

383.    I am satisfied that this is the case in relation to both the 20 April and 3 June e-mails, essentially for the reasons given by Mr. Booth as summarised above. The evidence in the case shows that, even before the 20 April e-mail, the Defendants were withholding information from Updata Europe, and that Mr. Mantell was willing positively to mislead Mr. Holm as to existence of a cash-flow statement: see Section F4 above. When Mr. Johnsen's request for information came in on 20 April 2009, it is inherently probable that the response would have been discussed and agreed by Mr. Baldorino and Mr. Mantell with Mr. Bennett. It was an important request, at a very sensitive time; i.e. around the time when the LMS offer had come in, Mr. Holm had indicated that Mr. Nielsen had been given exclusivity, and Mr. Johnsen was seeking outside investment. It was also somewhat unusual for Mr. Johnsen to ask for information. I consider it improbable that Mr. Bennett would not have told the other Defendants about the request, or that he would acted alone in deciding how to respond. This would indeed run the risk that a request might be made by another route (for example, Mr. Holm had a channel of communication with Mr. Mantell), and different information might be provided.

384.    I also have no doubt that both Mr. Baldorino and Mr. Mantell were comfortable with Mr. Bennett providing figures, on 20 April, which were out of date and which did not represent their genuine and current views as to the prospects of the company. This is what Mr. Bennett did, again, when he sent the Updated Kelso Presentation on 3 June. Neither Mr. Baldorino or Mr. Mantell sought to disassociate themselves from this. This was so, notwithstanding that Mr. Mantell had printed a copy of the March Weighted Budget on 2 June, and notwithstanding the advice from Tenon. The provision of out-of-date and low figures on 3 June was therefore of a piece with the provision of out-of-date and low figures on 20 April. Indeed, the figures provided on 3 June were the "Best Case" figures taken from the Financial Overview provided on 20 April.

385.    Furthermore, the e-mail traffic (see Section E above) which had started with Mr. Birkeland's e-mail on Friday 29 May, and which ended with the e-mail of 3 June, involved both Mr. Baldorino and Mr. Mantell – and the 3 June e-mail was copied to both of them. Mr. Baldorino was clearly interested in, indeed worried by, what Mr. Birkeland was asking for. Mr. Mantell had sent out the first response on 1 June. It is overwhelmingly likely that all aspects of Mr. Bennett's response on 3 June were agreed by all of the Defendants.

386.    Accordingly, in my judgment all of the Defendants are responsible in law for the deceit arising from the representations in the 20 April and 3 June e-mails.

**F7:    Conspiracy**

387.    These conclusions also mean that the claim in conspiracy also succeeds, although (as the Defendants' written opening submissions contemplated) it adds nothing to the successful claim in deceit.

388.    The requirements of a claim for unlawful means conspiracy are:

    i)      A combination or understanding between two or more people;

    ii)     An intention to injure the claimant (albeit without the need for it to be the sole or predominant intention);

    iii)    Unlawful acts carried out pursuant to the combination or understanding; and

    iv)     Loss to the claimant suffered as a consequence of those unlawful acts. (see *Kuwait Oil Tanker v Al Bader* [2000] 2 All ER (Comm) 271 at [108]).

389.    Subject to the question of causation of loss (see Section H below), it follows from my previous findings that these requirements are satisfied. The Defendants conspired together to make fraudulent representations to the EVs. Those were unlawful acts carried out pursuant to their combination or understanding. They did so for the ultimate purpose of enriching themselves and removing, if possible, Updata Europe as a shareholder.

390.    It was common ground, however, that issues as to causation and the measure of damages did not differ as between the claims in deceit and unlawful means conspiracy.

## G:    Inducement

*The parties' arguments in relation to the forecasts*

391.    The Claimants relied upon the evidence of Mr. Johnsen and Mr. Hildebrandt in support of their case that the representations made in the 20 April e-mail, and the Updated Kelso Presentation, had induced them to sell to LMS on the terms which they did.

392.    The Defendants argued that these representations played no real or substantial part in inducing the EVs to sell. In his oral closing submissions, Mr. Choo Choy emphasised a number of points. There was no contemporaneous evidence of any reliance being placed either on the 20 April e-mail or on the 3 June e-mail or its attachments. It was not as if the EVs were actively considering the contents of those documents in terms of valuing their shares. There was no analysis of what the figures implied or meant in terms of what was offered. There was no evidence that Mr. Johnsen used the figures which he was given in any tangible way, to try to either assess the acceptability of the LMS offer or try to influence it. That explained why no-one on the Updata Europe side picked up the oddity about the contents of the Updated Kelso Presentation; specifically the fact that one of the slides indicated that new contracts had been won in 2009, but the "best case" figures were nevertheless exactly the same as those in the Financial Overview.

393.    The Defendants submitted that even if the lower figures being shown to Mr. Nielsen in the Updated Kelso Presentation had a causal impact, because higher figures might have led to a higher price being offered, that was not the same thing as the EVs relying on and being induced in any relevant legal way by the representations. This was a case where a sale process was already in train, and the only causal impact of the representations was on the course of the bidding process and the resulting price being offered. But it played no real and substantial part in the decision of the EVs as to whether to transact. Although Mr. Johnsen and others on the Updata Europe Board may have wanted to understand the basis of the offer being made by LMS, that did not mean that they were themselves relying on the information when deciding whether or not to sell; because the decision to sell was "essentially predetermined", and the level of offer ultimately came through the bidding process. At best, therefore, the figures may have been given a cursory glance. The evidence as to what happened to the 3 June e-mail was consistent with this proposition: it was not forwarded either by Mr. Birkeland or Mr. Holm to the other members of the Board, and that is why there was no evidence of any Updata Europe Board discussion or consideration of the contents of the Updated Kelso Presentation.

394.    Ultimately, therefore, there was no real inducement by the forecasts themselves in terms of the ultimate sale, certainly in terms of the decision to sell, which had been essentially preordained or predetermined by the Bank's course of action, or as to the price level.

*Analysis and conclusions*

395.    In my judgment, the representations made in the 20 April 2009 e-mail, and those in the Updated Kelso Presentation, were an inducing cause of Updata Europe entering into the transaction with LMS on the terms that it did. In so far as this is a necessary

legal requirement, I consider that they played a real and substantial part in Updata Europe's decision. In this respect, the Claimants have the benefit of an evidential presumption which is difficult to rebut, and none of the points made by the Defendants has persuaded me to hold that it has been rebutted.

396.    In reaching these conclusions, I have taken into account the contemporaneous documents and the inherent probabilities, as well as the evidence of Mr. Johnsen and Mr. Hildebrandt. I start with the former.

*The contemporaneous documents and inherent probabilities*

397.    The starting point in my view is the 20 April e-mail itself. Mr. Johnsen was seeking out information a matter of days after the LMS offer: the offer had been made on Thursday 16 April and Mr. Johnsen asked for the information on the following Monday morning. The Defendants accepted the obvious fact that Mr. Johnsen was doing this in order to evaluate the LMS proposal. He was clearly doing this because the information requested was highly material within the context of what was happening at that time. Decisions as to whether to sell, and if so at what price, were going to be required by Updata Europe as matters moved forward, within an overall context where Mr. Nielsen was also on the scene and Mr. Johnsen was himself looking for outside investors. Accordingly, this is not a case where a representee is relying upon a chance remark made to him spontaneously in the course of discussions. It is a case where the representee has deliberately sought important information.

398.    For reasons already given, Mr. Bennett appreciated the materiality of the information that had been requested. He answered Mr. Johnsen's e-mail dishonestly because he wanted, and perceived that he needed to, influence the course of the subsequent decision-making by Updata Europe in favour of the MBO. There is therefore nothing inherently improbable in Updata Europe contending that the 20 April e-mail materially influenced their subsequent and ultimate decision-making. That is exactly what Mr. Bennett understood would be the likely impact of providing the false information which he provided.

399.    It is true that there is no documentation showing an internal analysis of the figures by Updata Europe in the context of its subsequent decision-making. But the figures in the Financial Overview were not complex, and they could easily be compared to the figures which were set out in the LMS letter. It is inherently probable, in my view, that having asked specifically for the figures, Mr. Johnsen would have carefully considered what was provided, and discussed them with one or more of his colleagues at Updata Europe, and that this would have happened without internal analyses being prepared. As to the ease of comparison between the figures contained in the LMS offer and the Financial Overview: the LMS offer letter used an EBITDA figure of £ 1.5 million (derived from the February 2009 YTD figures), and this was in the same ballpark as the forecast for 2009 (£ 1,496,000), and rather better than the "Middle Case" forecast for 2009/10 (£ 1,393,000). I have no doubt that this is the conclusion that Mr. Bennett wanted Mr. Johnsen to draw. I shall come to Mr. Johnsen's evidence in that regard in due course.

400.    Furthermore, there is other contemporaneous evidence that, consistent with the inherent probabilities, Updata Europe were indeed considering the financial information provided, and evaluating proposals from LMS in that context. On 20 May

2009, Mr. Birkeland sent an e-mail to Mr. Jorgensen, attaching a copy of the improved offer which LMS had made on 15 May 2009. The letter identified various objectives which Updata Europe was working to achieve including redeeming the current loan facilities with the Bank, redeeming the loan made by Vald. Nielsen, and achieving "maximum upside from the investment in England". The e-mail also stated:

> "We want to ensure that we are fully familiarized with the material upon which LMS has based their valuation. We would therefore ask to receive a copy of it, in order to evaluate their assumptions before we risk closing the door to other offers".

401. When this e-mail was sent, and as the chronology described above indicates, it was Mr. Nielsen who by this time (20 May 2009) was concerned to obtain relevant financial and other information and to be put on an equal footing with his competitor bidder. And it was on that day that Mr. Jorgensen wrote to Mr. Birkeland and Mr. Homann stating that it was "crucial that all interested buyers (the management at Updata UK and Jens Nielsen via their respective capital funds) are ensured equal conditions for the transaction". He went on to recommend that "the data room be opened for both interested parties on the same conditions applicable from Tuesday 26 May 2009". These matters then formed the backdrop to the meeting of 29 May, the 3 June e-mail and the Updated Kelso Presentation.

402. The documentary evidence demonstrates that the Updated Kelso Presentation was e-mailed in the first instance to Mr. Birkeland and Mr. Holm, as an attachment to the 3 June e-mail. The attachment was then forwarded by Mr. Birkeland to Mr. Hildebrandt under cover of an e-mail dated 9 June 2009 in which he said that the "Business Presentation is attached, as agreed, that was updated last in May by UK Management". It is in my view inherently probable that Mr. Hildebrandt would have considered this presentation, and indeed he was cross-examined on the basis that he did. The words of Mr. Birkeland's e-mail "as agreed" suggest that there had been some discussion about it, prior to its being sent to Mr. Hildebrandt. It is also inherently probable that, if Mr. Hildebrandt had seen it, Mr. Johnsen would also have seen it at the same time.

403. As described in Section E above, Mr. Bennett had not sent the Kelso Presentation in the form in which it existed, already amended, as at 3 June; i.e. the form in which it had been updated on 26 March 2009, prior to the meetings on that morning. He went to the trouble of reducing the figure shown for "Best Case" to the same figure as had been shown in the Financial Overview, even though management's expectation at this time was that the results would be some millions of pounds higher. The reason that he did this was for the same reason that he had given false figures on 20 April. He again wanted, and perceived that he needed to, influence the course of the subsequent decision-making by Updata Europe in favour of the MBO. No doubt he also wanted to give false information, as to the management's expectations, to Mr. Nielsen as well. But again, there is therefore nothing inherently improbable in Updata Europe contending that the projections in the Updated Kelso Presentation, which showed that there had been no change in the management's "Best Case", materially influenced their subsequent and ultimate decision-making. Again, that is exactly what Mr. Bennett understood would be the likely impact of providing the false information which he provided.

**MR JUSTICE JACOBS**
**Approved Judgment**

CL-2015-000305

*The witness evidence*

404.    It is against this background that I come to consider the Claimants' witness evidence on this issue. This evidence is relevant to the question of inducement, and the related question as to how Updata Europe understood the representations made.

405.    In his first witness statement (served in March 2016 in the context of the strike-out application), Mr. Johnsen referred to the 20 April e-mail, expresses the view that it was "simply false", and states:

> "At that time, I had no reason to doubt Richard or to think he would have lied to me; or that he would be providing different information to the buy-out team of which he was a member from the information he was providing to Mr. Nielsen. I took the Financial Overview to be UK Management's most accurate projections of Updata UK's future prospects".

He then went on to describe his dealings with the Bank, saying that if he had had:

> "different numbers to show the Bank, the decisions which were made would, I am certain, have been different
> …
> We were having weekly conversations with the Bank about how to address the situation, but we could only deal with things in light of the information which we had at the time, and that information was not optimistic.
> …
>
> With the information that Updata Europe was given by Updata UK, it had no option but to sell its shares, as it was not able to negotiate with the Bank for more time of for another solution… There were two potential bidders interested in the company, and from the information that we had about Updata UK there was no reason to delay its sale as on the forecasts we had it did not appear that a few months would make any difference"

406.    When addressing the work on the sale, he said that at the time that he received the offers from LMS and Mr. Nielsen, he thought that "Updata UK must have been very unsuccessful in winning contracts, and that we had simply been unfortunate in not being able to hold onto the company for long enough."

407.    Mr. Johnsen was cross-examined on the issue of his understanding of what he was told, and more generally as to inducement: see in particular Day 4, pages 26-31, and 51-69. In relation to the 20 April e-mail, his evidence was that he thought that Mr. Bennett was giving "the fullest answer he could give me … I thought he was giving me the best information he had at that moment". Mr. Johnsen said that when he sold, he was not happy but it was the best price that he could get in the circumstances:

> "We had asked for the newest, most up-to-date forecast and budget … from management. We've asked them to show us on what basis the LMS bid was offered. And to the best of our knowledge at the time this was the most correct picture of the business' performance both then and for the future".

408.  He said that, looking at the forecasts, he didn't see a "chance of persuading the Bank to wait longer". He had hoped that the business was worth more, but "we were not able to show it". They were looking at the "middle-case scenario at the time, which we thought would be the management's best guess as to what would happen". He did not attach significance to the figures for the best case, because a best case is not the basis on which anyone would be able to sell a company. In his "humble opinion, a best case scenario is not the starting point of a negotiation with anyone". He had no reason to challenge the LMS valuation. He might have hoped for a multiple of 10, but Mr. Nielsen had mentioned a multiple of 5 and LMS had mentioned 6.1. He had no reason to:

> "argue with that since, when we looked at the 2010 budget, it actually went down, so if we would have argued that we would rather look at the 2010 numbers, then we were asking for a lower bidding price".

409.  His evidence was that although he had not been sent the Updated Kelso Presentation directly in an e-mail, he was shown a hard copy of it. He did not ask any questions because "we went to the financial projections and saw no change, so we did not see that there should be anything of big significance in what is mentioned on the other page". (He was referring to the page where a number of 2009 contracts were shown). There had been no significant change, except that the middle case and worst case had been taken out. He agreed that Updata Europe had not visited the data room. But he said:

> "If, my Lord, we had been told that there would be information that we did not already have, I can assure the court that we would have been there with as many people as we could send".

410.  In re-examination, Mr. Johnsen was asked again about the 20 April e-mail, and said that his understanding was that "these numbers were the best available at the time and these were given to LMS". He understood from the e-mail that Mr. Nielsen had used the projections as well as LMS. He thought that they represented the "up-to-date" numbers, the "true position of the company".

411.  My assessment of Mr. Johnsen's evidence is as follows, as already outlined in Section A. Generally speaking, Mr. Johnsen gave fair and short answers to the questions which he was asked, and his answers were generally consistent with the documentary evidence and the inherent probabilities. As will be apparent below, I have a significant reservation as to one aspect of his evidence in relation to the assignment. I also bear in mind that Mr. Johnsen is the central person behind the present litigation, which in one form or another has been in his mind since 2010, and that his evidence will inevitably be coloured by that. It is also important that some considerable time has passed since the events on which the witnesses were being questioned, with some of the cross-examination taking place on the 10th anniversary of the documents in question. But these matters do not cause me to reject the evidence, as summarised above, as to how Mr. Johnsen understood the information that he was given and how he reacted to it in terms of his decision-making. It seems to me that his evidence in that regard was consistent with the documentary evidence and the inherent probabilities, and I accept it. Indeed, it seems to me Mr. Johnsen was reacting to the statements made to him and information supplied by Mr. Bennett in exactly the way

that Mr. Bennett wanted him to react, so as to accomplish the goal of obtaining Updata Europe's acceptance of the terms offered by LMS. In those circumstances, it would be a surprising conclusion to say that there was no inducement.

412. Mr. Johnsen's evidence was in material respects corroborated by Mr. Hildebrandt. His evidence in his first witness statement did not specifically address the 20 April e-mail and Financial Overview, or the Updated Kelso Presentation. He explained that he was reluctant to sell Updata UK, and that his preferred solution was to get a new investor for Updata Europe. He expressed the view that if Updata Europe had known the true financial position of Updata UK, he had no doubt that Mr. Jorgensen would have been prepared to extend the terms of Updata Europe's loan. He was convinced that if he had been able to provide the information in the March Weighted Budget to Mr. Jorgensen, "it would not have been necessary to sell Updata UK".

413. His evidence in cross-examination and re-examination was focused more directly on the 20 April e-mail, the Financial Overview, and the Updated Kelso Presentation. His evidence in cross-examination was that he had seen the 20 April e-mail and the Financial Overview, which he described as containing a "profit warning" for 2009; in that the forecast was £ 1,496 million against a budget of £ 1,695 million. He said in the following year, "suddenly the EBITDA was down to £ 1.39 something", and that therefore there was no point trying to rely upon that figure in a negotiation:

> "you don't want to go and tell the bidder and say to them, "Please can you look into the year .. to the next year because the figures are lower
>
> …
>
> I'm not totally unhappy with the multiple that was put on, that was 6.1. But if you put it on EBITDA that was less than expected, then of course you get a lower price".

414. He confirmed (indeed accepted) in cross-examination that he had seen the Updated Kelso Presentation in June 2009, because it was sent to him under cover of an e-mail from Mr. Birkeland. He agreed that he would have read that presentation at the time. After it was put to him that he did not think that the Updated Kelso Presentation was "a big issue at the time", there was the following evidence and exchange:

> "A. No, because there didn't seem to be any change in the value of the company which is what the board was looking at at the time. We were only looking at the overall figures to see is there any chance we can change the EBITDA to get a better price on the company? That is what you use – you use a multiple on the EBITDA and if the EBITDA stays the same, you don't have any argument to go out and get a higher price.
>
> Q. Am I right also, Mr Hildebrant, that at that point in time you never approached UK management to try to develop and EBITDA case with them as you had done when – in late 2008 when you were trying to impress Rudersdal and also seeking outside investment?

> A. My Lord, sorry – no, my Lord, I did not do that. In the case in 2008 that was for a specific municipal. In June 2009, I believed of course that we would get the right figures from the UK management. I would not believe that they were holding back information from us. They got their salary and we're on – of course I trusted them."

415. He was asked about the Updated Kelso Presentation in re-examination. His evidence was that "we typically look at the EBITDA figures", and that it is typical to apply a multiple to multiply EBITDA with a factor to give an indication of the value of the company. He saw the best case figure of £ 3.348 million in the Updated Kelso Presentation, and this:

> "led me to say that there had been no change since we saw the financial review in – on 20 April where it was exactly the same figure in that document and what they just have left out here is the middle case and the lower case scenario.
>
> …
>
> … I could not see any changes based on these figures. I would expect it would be exactly as we were told on 20 April. There was no other indication, my Lord."

416. Again, I accept the oral evidence that Mr. Hildebrandt gave on these issues. Mr. Hildebrandt in my view throughout his evidence sought to give careful and honest answers to the questions raised. This was demonstrated when, in the course of cross-examination on Day 6, he explained the very real difficulties that there would have been in finding any other bank prepared to refinance the Bank; an answer which, in my view, made one aspect of the Claimants' case on causation untenable. I appreciate that he too is a major protagonist in this litigation, and that his evidence must therefore be viewed carefully with close regard to his motives. Again, however, it seems to me that his evidence, as to how he understood and reacted to the statements and figures provided by Mr. Bennett and Updata UK, was consistent with the inherent probabilities and the documentary evidence. (I say nothing at this stage on the causation question addressed in Mr. Hildebrandt's witness statement as to how Mr. Jorgensen would have reacted to different information).

417. I therefore accept that Mr. Hildebrandt trusted the figures which he was given, believing that he would "get the right figures". I accept that the figures provided on 20 April, and then in the Updated Kelso Presentation, were considered by Updata Europe when evaluating the offers made by LMS and in their decision as to what to do. I accept that the Updated Kelso Presentation was understood to be showing that there was no improvement on the figures previously provided, and have no doubt that this is precisely what Mr. Bennett wanted Updata Europe to understand. Overall, in the light of the evidence of Mr. Johnsen and Mr. Hildebrandt, I accept that Updata Europe understood from the figures that there was no basis for doing anything other than accepting the LMS offer. They also recognised that they could not realistically challenge it as being at an undervalue, since Updata Europe had no material to indicate that a valuation based on EBITDA of £ 1.5 million (with a multiplier of 6.1 which was reasonable) was inappropriate. I do not accept that there was no

inducement because the course of events was in some way predetermined or pre-ordained. The process leading to sale was a dynamic one, with Updata Europe ultimately having to decide whether or not to accept the LMS offer. The representations were designed to influence Updata Europe's decision-making in that process and ultimately did so.

418.    My conclusions as to inducement are reinforced by the fact that the evidence indicates that as soon as Mr. Johnsen started to receive a reasonable amount of information as to the performance of Updata UK in 2010, his reaction was that he had been misled. Advice was taken from counsel in the Spring of 2010, and steps were then taken in 2010 in connection with the proposed assignment which contemplated the issue of proceedings of the present kind. This is not therefore a case where Mr. Johnsen or Mr. Hildebrandt were reacting with remorse when they learned of the very successful sale to Capita in 2014.

419.    A considerable amount of cross-examination of the Claimants' witnesses, in particular Mr. Johnsen and Mr. Hildebrandt, was directed towards the proposition that they should have asked further questions in the light of the information that had been received. This essential point was relied upon by the Defendants in various different ways and contexts, for example:

   a)    Reliance was placed upon an inference that Mr. Nielsen and Mr. Homann had been given, in March 2009, the assumptions on which the various 2009/10 figures in the Financial Overview had been based. I agree that this reference is consistent with later evidence concerning questions which Mr. Iversen asked when he visited the Data Room. It was submitted that it would have been apparent from those assumptions that the "worst case" numbers were extremely pessimistic, as indeed were the "middle case" numbers, and that Mr. Nielsen and Mr. Homann would have recognised this.

   b)    The 3 June e-mail from Mr. Bennett contained an offer to answer any further questions. No further questions were asked by Mr. Holm, to whom the e-mail was sent.

   c)    One of the slides in the Updated Kelso Presentation, which had indeed been updated in this respect, identified a number of contracts concluded in 2009, albeit without giving any financial details of the size of those contracts or the date when they would be fulfilled so as to impact the company's financial results. Updata Europe asked no questions about those contracts.

   d)    It was obvious that the "best case" figure in the Updated Kelso Presentation was the same as the Financial Overview. Questions should have been asked in view of the implausibility of there being no change in the "best case" since the March figures, particularly bearing in mind the new contracts identified earlier in the presentation.

420.    The Defendants therefore suggested that Updata Europe were not really interested in or did not rely upon the information that they were given. Indeed, the point was developed even further, by reference to Mr. Nielsen's witness statement, where he

said that he did not believe that he had been given the same information as had been given to LMS.

421. I agree with the Claimants' submission that none of these ways of putting the case is of any assistance to the Defendants. It is well established that it is no answer to a claim in fraud that the representee could have discovered the falsity of the statement by exercising reasonable care and skill. I also agree that with the Claimants that it does not lie in the Defendants' mouth to contend that further questions should have been asked in order to elicit the true information in circumstances where: (i) an explicit request for up-to-date information was made on 20 April and Updata Europe was then given false information, and (ii) further false information was given in the Updated Kelso Presentation, which was produced in the context of the Defendants being told of the need for equality of information. Similarly, whilst Mr. Nielsen may well have distrusted the information that he was given by the Defendants, the question is whether or not <u>Updata Europe</u> relied upon the representations that were made. That question is not answered by demonstrating that Mr. Nielsen was suspicious that information was withheld from him, particularly in circumstances where the evidence of both Mr. Johnsen and Mr. Hildebrandt was to the effect that they trusted the UK management to give them the latest figures. Moreover, even if Mr. Nielsen's view were relevant, *Hayward v Zurich* demonstrates that a representee may distrust a representation, but nevertheless be induced by it.

422. Some reliance was placed by the Defendants on evidence from Mr. Holm to the effect that: he could not understand why the figures in the Financial Overview were the same as in the Kelso presentation, which he thought that he had seen in October 2008; that there was something to look into because there were now some new contracts; and that it was left to Mr. Birkeland and others to do this, because Mr. Holm was not in negotiation with LMS at that point and it was not his job to do this. Mr. Holm's evidence in this regard was somewhat confused. He had clearly not seen the £ 3.348 million figure in any prior Kelso Presentation. Nor had he seen the Financial Overview in October 2008 (as he indicated in re-examination). I think that Mr. Holm's evidence as to his reaction to the figures is likely to be mistaken. But in any event, there was nothing in this evidence which leads me to reject the evidence of Mr. Johnsen and Mr. Hildebrandt as to inducement. There was no suggestion that Mr. Holm raised the issue of the figures with them. Moreover, I think that the reliance placed by the Defendants on Mr. Holm's evidence was just another way of putting the argument that the representee could or should have discovered the falsity of the statement by exercising reasonable care and skill. I reject this argument for the reasons already given.

423. I have hitherto focused on inducement in the context of the representations relating to the figures that were provided. There is a further question of inducement in the context of the representation concerning equality of information. I consider that this too was an inducing cause of Updata Europe entering into the transaction, and (in so far as necessary) that it played a real and substantial part in the decision. The background to this representation is described in Section E. The question of equality of information was a matter of considerable importance to the Bank, Mr. Birkeland and Updata Europe, including in particular Mr. Holm who was personally involved in the discussions at the end of May. It was pursued by Mr. Birkeland with a degree of vigour in late May and early June. His e-mails at the end of May 2009 indicate how

important it was to him. Both Mr. Birkeland and Mr. Holm understood, once they had received the 3 June e-mail, that Updata UK's management had given the confirmation which they required. I accept Mr. Holm's evidence in his witness statement that he had "no reason to doubt Mr. Bennett's statement that the information in the Data Room was the same as the information which had been provided to Tenon and LMS, and I proceeded throughout the sale process on the basis that this was correct". Mr. Birkeland's evidence was that when he read the e-mail, he felt that "they would provide all relevant information in the data room. The only thing not being there was of course the information memorandum itself but everything else would be there. That is how I read it". I accept that evidence, which in my view is confirmed by the fact that, although there had been important correspondence and discussion about equality of information prior to the 3 June e-mail, that correspondence and discussion ceases thereafter. There was nothing, in my view, to rebut the presumption of inducement in relation to this representation.

424.    It follows that the Claimants succeed on the issues as to how the representations were understood, and on the issue of inducement in relation to the 20 April e-mail and the Updated Kelso Presentation.

## H:    Causation and Loss

### H1:    The shape of the parties' arguments

425.    Vald. Nielsen, as Updata Europe's assignee, sought damages on alternative bases. Its primary case was that damages should be assessed by reference to the market value of the shares at the date when the sale took place (July 2009). It was at that time that Updata Europe parted with its shares in Updata UK at an undervalue in consequence of the deceit, and applying the principles in *Smith New Court Securities Ltd. v Citibank N.A.* damages should be assessed as at that date, subject only to a possible later alternative date. The Claimants submitted that in a case where the victim had been deprived of his shares as a result of fraud, the court should assume that the shares could have been sold for their true value.

426.    Alternatively, damages were sought by reference to their higher value in 2014 when the sale to Capita took place. This was on the basis, as the Claimants submitted, that "but for the fraud, Updata Europe would have persuaded the Bank to allow it to retain its shares" and would then have sold them to Capita at the price in fact paid by Capita. There were two legal bases which led to the conclusion that the later date was appropriate.

427.    First, *Smith New Court* showed that it was open to the court to use a date other than the date of sale, where that was appropriate on the facts in order to reflect the real loss suffered by the victim of deceit. Secondly, the same result was reached by applying an analysis based on "loss of a chance". The factual reasons for adopting this approach to damages were in essence as follows. Updata Europe did not want to sell its shares in Updata UK in 2009, but was admittedly under some pressure from the Bank to do so in order to reduce its significant indebtedness. If the representations had not been made, Updata Europe would have come to learn of the true success of Updata UK. Updata Europe would then have been able to persuade the Bank that a sale in 2009 was not necessary, or at least there was a real and substantial chance of so doing. This was because of the prospect of obtaining substantial dividends from Updata

UK's very positive cash-flow, and more generally because the Bank would have been able to see how valuable the company was at that time and that it would become even more valuable over time.

428.    The Defendants submitted that, on a proper analysis of the facts, Updata Europe had suffered no loss. The Bank had decided in early 2009 that the indebtedness had to be eliminated or at least very significantly reduced, and therefore that outside investment needed to be found. Updata Europe was under enormous pressure from the Bank, which was calling the shots in relation to how Updata Europe should act. Thus it was the Bank that compelled Updata Europe to deal with Mr. Nielsen in early 2009, and it was the Bank that set up the bidding process once LMS were on the scene in April 2009. Even if there had been no misrepresentations, that bidding process would have played out in the same way and on the same timescale as it did. Updata Europe had no room for manoeuvre, and even if there had been no misrepresentations they would have been in the same position as they ultimately found themselves; i.e. with the same offer from LMS which was made in June 2009, which was far more certain and beneficial than anything that Mr. Nielsen had come up with. If Updata Europe had not itself been willing to accept that offer, then the Bank would have compelled them to do so. Accordingly, no loss was suffered; because Updata Europe would, even if there had been no misrepresentations, have sold to LMS in July 2009 on the same terms.

429.    The Defendants' argument on causation, if accepted, therefore disposed of both ways in which Vald. Nielsen advanced its case for damages. But even if this argument were not accepted in its totality, any claim for damages would be minimal. The Defendants contended that the alternative (2014 Capita) case was unsustainable, because there was no way in which the Bank would have allowed Updata Europe to postpone a sale beyond September 2009. The Bank wanted repayment and hard cash, not promises of jam tomorrow. As far as the primary (2009 "market value") case was concerned, it was not appropriate on the facts of the present case to look at theoretical market value, whatever the experts might have said on that topic. This was a case where the Bank was, in practical terms, forcing a sale; a fact which itself inevitably depresses value. By May 2009, the sale procedures were in place, with two bidders in the frame. There was no real possibility of obtaining a higher price from LMS: Mr Hooft's evidence was that LMS had reached its limit, with the only possibility being a fractional increase. Mr. Nielsen had not been able to show hard cash, and there were other problems which attended his whole approach. In particular he or his consortium were looking to invest in the parent company (Updata Europe), rather than simply buying Updata UK. Updata Europe had not enabled Mr. Nielsen to carry out proper due diligence in relation to Updata Europe, because no data room had been established in Denmark. Accordingly, Mr. Nielsen and his consortium would never have come up with an acceptable offer. These were the only two realistic purchasers in the frame, and there was therefore no prospect of obtaining further monies from them. It was speculative to think that other purchasers, willing to pay market value or any higher price than LMS, might exist; particularly bearing in mind that Mr. Johnsen had spent some considerable time looking for outside investors, but without success.

430.    As far as the law is concerned, it was common ground that the question of causation was a separate legal question from the issue of inducement. Whilst there might be an overlap on the facts relevant to both questions, a favourable answer to the Claimants on inducement did not enable the Claimants to bypass the question of causation. The

Defendants referred to a number of authorities in support of that proposition, including the following passage in *Chitty on Contracts* 33rd edition, paragraph 7-039:

> "It seems to be the normal rule that, where a party has entered a contract after a misrepresentation has been made to him, he will not have a remedy unless he would not have entered the contract (or at least not on the same terms) but for the misrepresentation. Certainly this is the case when the misrepresentee claims damages in tort for negligent misstatement; and it seems also to be required if damages are claimed for fraud."

431. The Defendants also cited the analysis of Doyle CJ in an Australian case, *Copping v ANZ McCaughan Ltd* (1997) 67 SASR 525, 539:

> "It is sufficient if the relevant loss can be said to be caused by the representation, and it is not necessary to show that the loss is attributable to that which made the representation wrongful. In that sense the test is a relatively generous one, in that the misrepresenting party may have thrown upon it risks unrelated to the representation. But there is still the requirement that the loss flow from the representation, and it seems to me impossible to conclude that it does so flow if one concludes that quite apart from the representation the appellant would have entered into a transaction bringing with it the very risk which eventuated in the relevant transaction and which can be seen as the cause of the loss which the appellant seeks to recover. There may be an element of impression in all this."

432. In the light of these authorities, it appeared to be common ground that one relevant factual question on causation was whether Updata Europe could prove that, but for the misrepresentation, it would not have entered into the contract with LMS on the same terms that it did. Where a question arose as to what Updata Europe would or would not have done, it was also common ground that the question was to be resolved on the balance of probabilities.

433. There was, however, disagreement as to whether the principles relating to "loss of a chance" played any part in the causation analysis. Mr. Booth submitted that once this factual question was resolved in his clients' favour, the only remaining question would be the assessment of loss. "Loss of a chance" principles had no role to play in resolving the causation question, which involved looking at the question of whether Updata Europe would, in 2009, have entered into the contract with LMS on the same terms. In the present case, the assessment of loss was straightforward and (subject only to the question of whether loss should be assessed in 2014) simply involved looking at the true or market value of the shareholding at the time of sale. Mr. Booth submitted it was not necessary or appropriate to look beyond the assessment of market value. Cases such as *Parabola Investments Ltd. v Browallia Cal Ltd.* [2010] EWCA Civ 486 and *Vasiliou v Hajigeorgiou* [2010] EWCA Civ 1475 showed that once the causation threshold had been passed, the only remaining matter was to assess loss. The only place where loss of chance had any potential role to play was the alternative (2014) case; since Mr. Booth accepted that Updata Europe's ability to hold

on to their shares after 2009 would have depended upon the Bank's willingness to allow them to do so, and that this was a claim for loss of opportunity.

434.    Mr. Choo Choy accepted in his oral submissions that the question of "whether or not Updata Europe would have done this, that or the other" was a question to be approached on the balance of probabilities. However, he also submitted that on the facts of the present case, loss of a chance came into the causation analysis; in particular, because the Bank (a third party) played a critical part in the chain of causation. Thus, the question of whether Updata Europe would have entered into the contract with LMS on the same terms involved considering the key question of whether the Bank would have forced them to do so. He submitted that, applying the principles in the seminal decision in *Allied Maples v Simmons v Simmons* [1995] 1 W.L.R. 1602, this had to be assessed on the basis of loss of a chance. He submitted that the question of whether there would have been a transaction with LMS was essentially dependent on the actions of the Bank. Where the causal chain relied upon by the Claimant "as a matter of fact involves consideration of what a third party would have done, it is not permissible to approach it otherwise than on the basis of a loss of a chance".

435.    However, on the Defendants' case it was not simply the position of the Bank that was relevant to the question of causation. Mr. Choo Choy submitted that the causal theory in relation to the 2009 case involved consideration of the actions of multiple third parties: not only what the Bank would have done, but also what LMS might have done, or what Mr. Nielsen might have done or what e-Kong might have done. The court therefore requires consideration of the "substantiality" of the chance in relation to the relevant acts of each of those third parties. Relying upon the recent decision of Bryan J in *Assetco PLC v Grant Thornton UK LLP* [2019] EWHC 150, Mr. Choo Choy submitted that the court should apply a mathematical approach of multiplying the probabilities. The Defendants' submission, ultimately, was that there was no real or substantial chance of any offer being made at a higher price than that offered by LMS.

436.    I will now set out my findings as to the factual context in which these arguments arise, before summarising the arguments in greater detail.

### H2:    The facts relevant to the causation and loss arguments

437.    It is not necessary to trace in detail the history of Updata Europe's financial difficulties before 2009. That such difficulties existed was clear on the evidence, and was reflected in the need for Mr. Johnsen to approach his grandmother for a loan in early 2008. She mortgaged her house in order to make a loan to Vald. Nielsen, and the funds were then used to repay some monies owed to the Bank and for which the Bank was pressing at that time. In return, Vald. Nielsen was given a priority interest in Updata Europe's shares in Updata UK. This interest, however, ranked behind the Bank's first priority interest in respect of larger debts which were owed by Updata Europe.

438.    By the middle of 2008 Updata Europe owed around DKK 26 million to the Bank and DKK 14 million to Vald. Nielsen. Updata Europe had also guaranteed Updata Denmark's debts of around DKK 16 million. Mr. Johnsen accepted that Updata Europe was under serious financial pressure in 2008, and that he had been forced to

reach out to family to secure further funding for the group. There appears to have been a general view in late 2008 that Updata Europe required around DKK 25-35 million as a capital injection.

439. On 2 January 2009 Mr. Homann wrote a note to Mr. Jorgensen stating that the group's liquidity need was DKK 10 million. The Bank was not prepared to lend that sum, as Mr. Jorgensen made clear in his evidence. There is no dispute that, by early 2009, Updata Europe had (as Mr. Jorgensen put it) "no money" and did not appear to be able to pay the interest on the Bank's loans. In that context, the Bank was understandably concerned. But Mr. Jorgensen explained that he had no interest in "bankrupting" Updata, since this was not in the Bank's interest. Accordingly, notwithstanding the indebtedness, Mr. Jorgensen did not do so, and did not in fact enforce any of the Bank's rights under its pledges.

440. The reason that Mr. Homann had written the above note to Mr. Jorgensen on 2 January 2009 was that Mr. Homann was finalising Updata Europe's accounts for 2007/8, and the issue arose as to whether or not KPMG could certify Updata Europe as being a going concern. For that purpose, Updata Europe needed the Bank to confirm that it would not immediately demand repayment of the outstanding debt. Mr. Homann also reported Mr. Nielsen's interest in a possible investment or acquisition: he had been "chasing persistently" and wanted exclusivity for a period.

441. Discussions followed between Mr. Homann and Mr. Jorgensen, and an agreement was reached on a way forward, enabling Mr. Homann to sign off on the accounts. This was recorded in an exchange of e-mails on 6 January 2009. Mr. Jorgensen agreed that the Bank's engagement to both Updata Denmark and Updata Europe could be terminated at the earliest on 30 September 2009. But the latter engagement was subject to Updata Europe's obligation to (in translation):

> "…withdraw the maximum interim dividend in the English subsidiary, so the accrued interest from the bank is paid as a minimum, that transport of these dividends is noted in favour of Sparekassen, plus that the efforts with regards to capital injection are intensified".

442. The Bank was to be kept informed of the operation and liquidity of the companies on an ongoing basis, as well as the efforts to supply new capital. Mr. Jorgensen added the following terms to those which Mr. Homann had recorded:

> "Termination will however be possible if the engagement with Sparekassen Lolland A/S is in default – see the provisions in relation to this
>
> When it comes to capital supply, Sparekassen reserves the right to have the deciding influence on investor as well as invested amount."

443. Accordingly, the Bank was at that stage prepared to give Updata Europe some latitude in that, subject to the agreed other terms, Updata Europe had until September before the Bank carried out an earlier threat (as described in Updata Europe's internal documents) to "pull the plug". Accordingly, the Bank did not take an

uncompromising or inflexible attitude at that time, consistent with Mr. Jorgensen's evidence that he did not want to bankrupt Updata. This flexibility became known to Mr. Nyegaard, who reported to Mr. Baldorino and Mr. Bennett on 25 March 2009 that: "from what I understand they have until September before the bank gets serious on them – at least that's the last thing I heard on the matter". In due course, the Bank was to prove to be flexible in relation to the requirement to be paid a dividend. In May 2009, by which time no dividend had been declared, an e-mail from Mr. Birkeland to the Board of Updata Europe records Mr. Jorgensen having agreed to have no objections to the board deciding to postpone the decision as to the declaration of an interim dividend, provided that it was reconsidered in a month's time. By that time, of course, the possibility of a sale of Updata UK or investment in Updata Europe was very much a possibility, with both Mr. Nielsen and LMS on the scene.

444.    I note one other feature of the Bank's decision in early January 2009. As the Defendants pointed out, the Bank was at that stage given quite optimistic forecasts for Updata UK: the equivalent of EBITDA £ 3.379 million for the 2008/2009, and £7.836 million for 2009/2010. Nevertheless, Mr. Jorgensen was, as he confirmed in his evidence, looking to reduce the debt so that the bank had a lower risk, and was only prepared to give an extension until September.

445.    On 6 January 2009, Mr. Homann was able to sign off Updata Europe's accounts. It was a going concern, but the auditor's report noted that there were conditions which governed the company's ability to continue operating. The company's continued operations were "dependent on raising additional financing, on distributing dividends from the English subsidiary and on not terminating business with the company's bankers".

446.    By this time (early January 2009), Mr. Johnsen had himself been looking for outside investors but without success. One such investor was a Mr. Klobucar of a firm called Moore Capital. Mr. Klobucar was a friend of Mr. Nyegaard, who had introduced Mr. Johnsen to him. A meeting had taken place towards the end of 2008. Mr. Johnsen had apparently valued the business at £ 20 million, but Mr. Klobucar had not been interested. His e-mail to Mr. Nyegaard on 20 November 2008, in the midst of the global financial crisis, said that: "There is ZERO cash out there. He won't get a penny, at least not at that valuation".

447.    However, by early January 2009, one potential investor, Mr. Nielsen, was on the scene. Mr. Nielsen sent an expression of interest to Mr. Jorgensen on 16 January 2009. He said that he anticipated placing a bid of £ 5 million for Updata UK, with a possible bid for Updata Europe dependent upon due diligence. He asked Mr. Jorgensen for exclusivity. The bid was addressed to the shareholders of Updata Europe, but was marked for the attention of Mr. Jorgensen at the Bank. It was not actually sent to Updata Europe by Mr. Nielsen; because Mr. Nielsen took the view that the Bank was in a controlling position in relation to the sale, since he understood the shares in Updata UK had been pledged to it.

448.    Mr. Jorgensen did not grant exclusivity himself. He passed Mr. Nielsen's bid to Mr. Holm. Mr. Jorgensen's letter dated 2 February to Mr. Holm expressed dissatisfaction that he had yet to receive an explanation as to how outstanding interest would be paid, and he asked for clarification as to the progress of certain efforts to increase capital. The letter concluded by Mr. Jorgensen expressing his expectation that the Boards of

Updata Europe and Updata Denmark should "commit to the desires of the private equity fund" whom Mr. Jorgensen understood Mr. Nielsen to represent. Mr. Holm forwarded the letter to the other members of the board of Updata Europe, stating that in his opinion "there's nothing else to do but take up initial negotiations with Jens Nielsen". Mr. Johnsen's evidence was that if the Bank told them to talk to Mr. Nielsen they could not in practice refuse; because the Bank's possible next step would be to "require the votes and make it happen anyway". This was a reference to the potential exercise by the Bank of voting rights under the pledge.

449. On 6 March 2009, the Bank wrote to Mr. Nielsen, and to Mr. Medhurst (who was a corporate finance consultant assisting Mr. Nielsen). The letter granted Mr. Nielsen a 5-week period to carry out due diligence and then two further working weeks to finalise his bid. The Defendants submitted that it was significant that it was the Bank which demanded and then gave Mr. Nielsen exclusivity, and that this showed that the Bank was intent on and able to control the sales process and force Updata Europe to bend to its wishes. I agree that it is clear that Mr. Jorgensen wanted Updata Europe to co-operate with Mr. Nielsen with a view to a possible deal. It is also clear that Updata Europe recognised that, as Mr. Holm had put it, there was "nothing else to do". But I do not consider that the correspondence indicates, in so far as this was being suggested, that the Bank was acting unilaterally, or against any express wishes of Updata Europe. The opening paragraph of Mr. Jorgensen's letter stated that both the Bank "and the shareholders of Updata Europe A/S have accepted that a due diligence process can be initiated by you". It would therefore seem that, as one would expect, Mr. Jorgensen had sought and obtained Updata Europe's agreement prior to sending that letter. I did not consider that there was anything in the documents, relating to the course of the bidding process either at that time or subsequently, which showed the Bank overriding the wishes of Updata Europe at any stage in the events leading to the ultimate sale.

450. By mid-April 2009, the Bank was aware of the interest of LMS and the 14 April meeting (to which reference has already been made) took place in Denmark. In the present context, the significance of the meeting is that it is the only meeting which LMS attended with the Bank, and there was nothing at all to indicate that it would be the Bank that would decide whether or not LMS's offer was acceptable. A handwritten note of Mr. Baldorino dated 8 April recorded that: "Bank would push LMS towards the board. Board would then make a yes or no".

451. This is what happened. No deal was made with the Bank at that meeting. LMS and the Defendants understood from that point, if not before, that it was Updata Europe's decision as to whether it was willing to agree terms with LMS. Apart from the meeting on 14 April 2009, LMS had almost no contact with the Bank. Their offer letters were addressed to Updata Europe. The response to their first offer on 20 April 2009 came from Mr. Holm on behalf of the Updata Europe Board. It was this which led to the flurry of activity on the morning of 20 April 2009: see Section D above. LMS's negotiations and discussions were with representatives of Updata Europe (Mr. Johnsen, Mr Holm and Mr. Birkeland), not the Bank. When their first offer was not accepted, they directed their efforts at persuading Updata Europe (and Mr. Johnsen in particular) to look more favourably on their offer. This led to an offer of a "roll-over" for some of the existing shares of Updata Europe and Newwatch, and the offer of co-operation in respect of a product called "Blue" which Mr. Johnsen was keen to

promote. LMS's proposals in those respects were both included in their second offer following discussions with Mr. Johnsen, not with the Bank.

452.    It is also important to note that at no stage did the Bank enforce its pledge over the Updata UK shares. It never in fact exercised voting rights in respect of the Updata UK shares or the Updata Europe shares. Ultimately, if Updata Europe had refused LMS's offer made on 19 June 2009, the Bank could have tried to enforce its pledge over the Updata UK shares, and then sell those shares as mortgagee in possession. But as Mr. Birkeland explained, based on his experience, this is very much a last resort for a bank; not least because it would then have to consolidate the company into its group accounts.

453.    Once both Mr. Nielsen and LMS were on the scene, the Bank did take an interest in the bidding process, albeit after some delay. On 20 May 2009 (the date appearing on the Danish original rather than the English translation in the hearing bundle), which was around a month after the LMS offer, Mr. Jorgensen wrote his e-mail stating that the Bank wanted to take a "more active role" in the possible transfer/ sale of the Updata Group, and expressing concern about some (unspecified) "rather unprofessional action" by management in relation to the execution of the transaction. It was in this e-mail that Mr. Jorgensen said that it was "essential that all interested buyers (management at Up-Data and Jens Nielsen via their equity funds respectively) are ensured equal conditions for the transactions." This e-mail appears to have been prompted in part by complaints which Mr. Nielsen had made (in his "Letter of Understanding" dated 13 May 2009, described in more detail below) concerning problems in obtaining information from UK management. It also reflected an e-mail sent on 18 May 2009 by Mr. Homann to Mr. Jorgensen, to which Mr. Homann attached a memorandum and financial statement. The covering e-mail stated that the value of the group was "significantly improved" but that the cash situation was highly critical. It was "highly essential" to maintain the "cadence for completion of a capital injection or sale of the English shares". The memorandum itself said, similarly:

> "The values of the group are now visible but the handling and speed of implementation reveals the weaknesses in the top management. Therefore the recapitalization must be followed up with changes in the board and management".

454.    It is unsurprising that the Bank was keen to ensure equal access to information, given that Mr Nielsen had made complaints to the effect that information was being withheld from him. Mr Jorgensen's evidence was that he liked Mr Nielsen, and I think that it is clear that, at the time, he did not want to shut him out on the basis of unequal information.

455.    Mr. Jorgensen also "recommended" in that e-mail that a data room be opened for both interested parties on the same conditions. He then set out a proposed timetable, so that Mr. Nielsen (who still had exclusivity at that point) should have to make a binding offer by 24 May 2009, i.e. 6 days away, if he wanted to make use of his exclusivity. The data room for both parties would then open on 26 May.

456.    On 28 May 2009, after expiry of Mr. Nielsen's exclusivity period, Mr. Birkeland wrote to the interested parties setting out the bid timetable. This envisaged that the process would run for approximately 6 weeks. The data room would be open from 1

June to 12 June. Further or final offers would be made no later than 19 June. A final board decision would follow by 24 June. Completion would take place on 10 July.

457. The Defendants submitted that the Bank was trying to push the sale process along as fast as possible in the hope of getting its debts repaid quickly. I consider that this rather overstates the position. It seems to me that by mid-May, Mr. Jorgensen (prompted by Mr. Homann) was concerned to ensure that matters did not drift, and that it was important to introduce a process with deadlines. This would focus the minds of participants and bring matters to a conclusion. Prior to that time, however, the Bank does not seem to have been unduly concerned with the pace of progress. Thus Mr. Nielsen had made his first proposal on 16 January 2009, but was not granted an exclusivity period until 5 March 2009.  Furthermore, if the Bank had wanted its debts repaid quickly, it could have tried to do a quick deal with LMS on 14 April 2009, as LMS and the Defendants were hoping would happen, or after the later LMS offer was made in May. It did not do so.

458. I also agree with the Claimants that the bid timetable laid down at the end of May was not particularly rushed, in circumstances in which both LMS and Mr. Nielsen had already carried out due diligence (LMS referred to their "extensive" due diligence in their letters). As far as the Bank was concerned, there was no need to drag out the timetable. The timetable ensured both parties had equal information and made offers at the same time. It also gave the Board the opportunity to consider rival bids on that basis.

459. The events following the setting of the bid timetable have been sufficiently described in previous Sections: see Section A and Section E. Ultimately, the two proposals made by LMS and Mr. Nielsen/e-Kong were evaluated by Mr. Birkeland in a "scorecard". It was Updata Europe (not the Bank) that decided to accept the LMS bid.

460. During the process leading to acceptance of the offer and the sale transaction, it did not seem to me that Mr. Jorgensen was acting aggressively towards Updata Europe. In so far as he was involved, his focus seems to have been to ensure that matters proceeded smoothly and fairly, and his limited intervention on 20 May 2009 was designed to ensure that that happened.

461. The picture changed somewhat after the transaction had gone through. On 2 September 2009, the Bank gave notice requiring Updata Denmark's overdraft to be repaid immediately, and terminating its commitment if there was no repayment. It seems to me that this is consistent with the agreement made back in January, when the agreed extension of the facility was up until September. Shortly before then, on around 21 August, Mr. Jorgensen had spoken to Mr. Johnsen. The latter reported his conversation to Mr. Bigaard and others. Mr. Jorgensen "was very upset. He called us "a bunch of untrustworthy idiots"". By this time, of course, Updata UK had been sold and the amount realised had been insufficient to repay the Bank entirely. Later in 2009, Mr. Jorgensen commenced legal proceedings against both Updata Europe and Updata Denmark to try to force through a sale to Mr. Bigaard, and he told Updata's shareholders that they should agree to sell to Mr. Bigaard for DKK 1 million or there would be adverse financial consequences.

**H3: The parties' arguments in more detail**

462.    In the course of their arguments, each side emphasised particular features of this factual background and advanced different conclusions both in relation to causation and loss.

*The Claimants' submissions*

463.    The Claimants relied upon the fact that (as I have found) it was Updata Europe which made the decision to accept or reject the LMS offer, not the Bank. The Bank had not enforced its pledge. If Updata Europe had refused to accept an offer that was being made, on the basis that it did not represent the fair value of the business, the Bank would have been entitled to exercise its rights under the pledge. But if the Bank were to do this, it should and would not lead to the proposed sale at an undervalue, because the Bank would have duties in that regard: see *Cuckmere Brick Co v Mutual Finance* [1971] Ch 949 at 966, 968-9 (per Salmon LJ) 977-978 (per Cairns LJ); *Silven Properties v RBS* [2003] EWCA Civ 1409 [2004] 1 WLR 997 (CA) at [19] per Lightman J. In particular, a mortgagee in possession would be required to expose the shares reasonably to the market, and must obtain the proper price or the true market price.

464.    In the present case, the sale went ahead with Updata Europe's agreement, and with Updata Europe being amenable to the sale to LMS. But this was because Updata Europe had been misled as to the figures and had also been given to understand that there had been equality of information in the Data Room process. Had the true picture as to Updata UK's performance and forecast been known, Updata Europe would not have agreed to the LMS final offer, because it would obviously have undervalued the company. Furthermore, had Updata UK been told that LMS had received different information to that which had been given to Mr. Nielsen, both Updata Europe and the Bank would have appreciated that there had not been a fair sale process. For either or both of these reasons, it was unrealistic to imagine that the Bank would have forced Updata UK to sell at the price offered by LMS in June 2009, even assuming that this was the best offer on the table at that time. However, the Claimants also challenged the premise that, had there been no fraud, matters would have played out in the way that they in fact did, so that the best offer on the table in June 2009 was the LMS offer.

465.    In oral submissions, Mr. Booth emphasised that the question of causation had to be considered in the context of the misrepresentations that were made. It would be a "bizarre factual approach" to ignore all the consequences of the fraud, and the impact which that had on the key players, and to say that "it would have made no difference": i.e. that Updata Europe would have sold to LMS at the same price.

466.    The Claimants submitted that if there had been no fraud, Updata Europe would have known in at least April (or earlier) about higher earnings projections. They would therefore come to know about each of the contracts as it was won. There would have been no shortage of interest in Updata UK, including:

        a)      Mr Nielsen and e-Kong (who, as Mr Nielsen explained, had the money to pay a higher price for Updata UK);

b) Trade buyers, including various companies listed in the AMR Report which had been prepared in the context of LMS's final due diligence in late June and July. Mr. Bennett accepted in his evidence that trade buyers would have been interested in Updata UK. (He also explained why he was not interested in a trade sale at that time. He thought that if Updata UK was put up for sale to the trade, other competitors would use that fact to their advantage by arguing to customers that the proposed sale showed the weak financial position of Updata UK's parent, and that therefore customers should not do business with the company);

c) Other private equity houses – since there had been a number of PE houses who had responded positively to the original approach in April 2009, with the UK management ultimately having a choice as to who to select and choosing LMS; and

d) Other interested investors, had there been proper details and marketing.

467. Mr. Booth placed much emphasis on the fact that the reason the fraud took place was that the Defendants were not willing to risk the alternative; i.e. giving true responses in the 20 April 2009 and 3 June e-mails. This was because of the impact that disclosure would have on the attitude of the key players, Updata Europe, Mr. Nielsen and at least to some extent the Bank, which wanted an equal playing-field. The effect of the fraud was therefore to choke off other potential purchasers and put LMS in pole position. The fraud resulted in what was essentially a false market "by making sure that this was not tested by the market".

468. Evidence as to the Bank's attitude in the counter-factual world, where misrepresentations had not been made, was given by Mr. Jorgensen. He was a witness called by the Claimants themselves. But the Claimants submitted that his evidence needed to be treated with considerable caution. Some of his answers were contradictory, and he was – certainly by the time that he was being asked questions about the counter-factual world – very confused about the facts. It was therefore important to look not at individual answers, but at his evidence as a whole and also, as indeed with all witnesses, the contemporary documents and inherent probabilities. They acknowledged that Mr. Jorgensen's evidence was clear, and he repeated a number of times that he did not want to lose LMS as a purchaser: LMS had shown that they had the cash, and he did not want them to walk away. However, they submitted that if it had become known, even at the end of the sale process in July, that the sale process had been unequal and that the shares were undervalued, Mr. Jorgensen's concern not to lose LMS would not have led him to a sale at the LMS price. To do so would likely have constituted a breach of the Bank's duties. It would have exposed the Bank to a serious risk of litigation. Mr. Booth submitted that it would be an extraordinary conclusion to reach on causation; i.e. to conclude that the Bank would have "forced us to sell at that price both as a matter of fact and both having regard to the legal obligations".

469. Furthermore, if the Bank were to enforce a sale in those circumstances, it would have been against the Bank's own commercial interests, given that the LMS proposed price was insufficient to discharge the overall indebtedness of Updata Europe to the Bank, because of its guarantee in favour of Updata Denmark. Obtaining market value was in

the interests both of Updata Europe and the Bank, and there was therefore no reason to suppose that the Bank would have required a sale which would not allow a timescale to obtain a reasonable price. There was no basis for assuming that the Bank would act contrary to its commercial interests and legal duties.

470.    The Claimants emphasised that the Bank was flexible, and was not some far-off faceless institution. Mr. Jorgensen had shown a flexible attitude in January, when it had agreed to extend time (on terms), and again in May, when he agreed to postpone payment of any dividend. Interest had not been paid in 2009, but he did not terminate the facility. The evidence showed that Mr. Jorgensen trusted both Mr. Homann and Mr. Birkeland, relying on them for advice in connection with the sale, and he was also in close contact with Mr. Hildebrandt. If necessary, therefore, the Bank would have given more time, particularly if it had emerged at a late stage that one of the bidders had not been given equal information.

471.    In his oral reply submissions, Mr. Booth submitted that it would contradict all reality to conclude that the figures in the March Weighted Budget, which actually relied on relatively few weighted contracts to reach the EBITDA of just over £ 6 million, would have made no difference to Updata Europe. These figures went to the heart of the company's value and no vendor would have ignored that information and sold to LMS on the existing price regardless. The figures showed likely high cash generation soon, and substantial value within the company. The Defendants must have recognised this, and this was why they made the fraudulent misrepresentations.

472.    In relation to quantification, the Claimants' essential submission was that the normal measure of damages would be the difference between the market price or true value of the asset disposed of in consequence of the fraud, and the price obtained as a result of the operative fraud. Mr. Booth submitted that it would be a very strong thing to say that market value should be interfered with. The Court should not be tempted to say that, because of its debts to the Bank and the pressure it was under to achieve some form of repayment, Updata Europe might not have achieved the full market value for its shares. This would result in an arbitrary reduction of the market value by reference to a factor (creditor pressure) which does not affect the market value at all. That was not an appropriate approach to quantum in the case of fraud.

*The Defendants' submissions*

473.    The Defendants submitted that it was not appropriate to determine loss by reference to the price that would have been paid by a willing buyer and willing seller. Rather, the price should be based on the true likely facts attending a sale in 2009, which includes pressure from the Bank to sell within a limited timescale.

474.    The Defendants also contended that the principles developed in the context of cases concerning loss of a chance were applicable to the present case. Both causation of loss and proof of loss involved reliance upon the acts of third parties. Relying on the recent decision in *Assetco v Grant Thornton* [2019] EWHC 592, they submitted that the claimant had to establish a real or substantial chance of a third party acting in accordance with a claimant's causal theory. Where there were multiple third-party acts in the chain of causation, the claimant needs to establish a real or substantial chance in respect of each third party whose hypothetical actions were necessary in the

relevant causal chain. If there are multiple third-party independent actions, each must be given a percentage chance and these are then multiplied together.

475.    In his oral submissions, Mr. Choo Choy submitted that the question of whether there would have been a transaction with LMS, and the Claimants' overall causal theory, was dependent upon the actions of a number of different third parties. Mr. Choo Choy focused particularly upon the Bank, but also LMS and Mr. Nielsen. Since they were each independent actors, it would be necessary to assess the respective chances of higher bids being received from LMS and Mr. Nielsen, as well as the chance of the Bank allowing an extra period for the sale. The various probabilities would then need to be multiplied together. There were, admittedly, other potential actors: the market was not confined to Mr. Nielsen or LMS. But other potential players could be disregarded, because Mr. Johnsen had previously approached other investors without success.

476.    He also submitted that, in approaching causation, it was necessary to posit what would have happened differently if the deceit had not occurred. In that context, the earliest time that any relevant information would have been available was 20 April. But by that time, the two-horse race was already well on the way. Disclosure of relevant information by 20 April or even late May would not, contrary to the Claimants' submission, have made a huge difference to the process because the structure of the race between LMS and Mr. Nielsen had pretty much been set. Even if there were a chance, at that stage, of Mr. Nielsen and e-Kong improving on their offer, various other questions would arise. These included: what processes would there have been between Mr. Nielsen and his backers in terms of improving his offer; how long would it have taken to get an improved offer; what would the improvement have been; how would LMS have reacted. The Claimants had to posit a credible factual scenario which would lead to the conclusion that they might have been able to either get a higher price for the shares from one of the two potential bidders, or alternatively retain the shares until 2014. In the Defendants' submission, there was no such scenario. In that context, it was necessary to look carefully at the evidence of Mr. Nielsen and Mr. Jorgensen. Overall, however, the Defendants submitted that Updata Europe would have acted in the same way that they did even if they had been given different information. Furthermore, there was no real or substantial chance of Updata Europe and the Bank obtaining a materially better offer in a timescale that would have been consistent with what the Bank wanted.

477.    The Defendants then identified and addressed the position of each of the third parties that formed part of the relevant causal chain.

478.    First, there was the Bank. The Defendants submitted that the Bank was never going to be persuaded (let alone was there a real and substantial chance of it being persuaded) to let Updata Europe keep its shares until 2014 simply by seeing higher forecasts, the March Weighted Budget, the Tenon Memorandum or anything of the sort. The Bank's patience was exhausted, it was under its own pressures, and Updata Europe was in default even of the compromise reached on 6 January 2009. The Bank, having seen higher forecasts at the beginning of 2009, still wanted the Updata Europe debt repaid or substantially reduced immediately. To suppose the Bank might have done otherwise (let alone allowed Updata Europe to keep the shares until 2014 to sell to Capita at the same price) is sheer speculation, when all the evidence is to the contrary. They had reached the end of the road, and wanted to get repaid immediately

479.  In that regard, the Defendants relied upon evidence given by Mr. Jorgensen and more generally upon the following matters:

a)  The Bank's relationship with and approach to Updata Europe was a very difficult one, given the size of Updata Europe's debt and its inability to repay. Over time, the Bank had taken what the Defendants described as an aggressive and interventionist stance. This included demands for payment which had led to Mr. Johnsen obtaining a loan from his grandmother in 2008, and a further demand in late 2008.

b)  Mr. Johnsen had been trying hard in 2008, and failing, to find an external investor in order to placate the Bank. An approach had been made to Kelso in late 2008, and to Mr. Klobucar. But these and other attempts to find an investor had been unsuccessful.

c)  In January 2009, the Bank did receive various forecasts, which showed high EBITDA numbers. But the Bank was not interested in forecasts. Mr. Jorgensen wanted outstanding interest paid, and he wanted the debt reduced or repaid and he wanted that to happen promptly. The Bank also wanted some control over the process of finding an external investor; because (as Mr. Jorgensen agreed in his evidence) the Bank wanted to make sure that, if there was going to be a capital injection, it would have to be an injection which was sufficiently substantial. The reality therefore was that the sale of Updata UK (whether directly or indirectly through shares in Updata Europe) had to happen by the summer of 2009, given Mr. Jorgensen's stance. A sale was inevitable, and Mr. Jorgensen wanted to exercise control and scrutiny over the process. It was therefore no surprise that Mr. Jorgensen ultimately came down heavily in favour of LMS, which was a cash buyer and ready to complete.

d)  The Bank had taken control of the process and was intent on compelling a sale in 2009, as could be seen from the events at the start of the year.

e)  The Bank was itself under considerable pressure, not least as a result of the 2008 global financial crisis. The Updata Europe debt was the largest single exposure to the Bank. The Danish FSA was looking closely at the Bank in May 2009. There was a meeting between Mr. Jorgensen and the FSA at that time, and Mr. Jorgensen told them that a sale process (in relation to Updata Europe) was underway at that time.

f)  The competitive bidding timetable was laid down for a deliberately short period. At the end of that process, LMS had offered cash, and Mr. Nielsen/e-Kong had not done so. Mr. Jorgensen favoured the LMS bid. Whereas LMS had shown that they could pay, e-Kong had not shown that they could pay and as Mr. Jorgensen said, "then I were afraid for that LMS would run away [sic]".

g)  In his evidence, Mr. Jorgensen gave certain answers which suggested (at the Defendants contended) that he was not concerned about the

possible disparity of information given to the two bidders; and also that he did not particularly care whether Updata Europe's shares might be worth more than the LMS's bid.

h) Almost immediately after the sale, in July 2009, the Bank had written to Updata Denmark requiring payment of the outstanding indebtedness within 14 days. The game was then up. Accounts were then blocked in October 2009. This showed the Bank's attitude very clearly.

480. Accordingly, the Defendants submitted that the Bank's stance was always going to be the same, regardless of any causal effect of any alleged deceit. The case based upon the price that a willing buyer or seller would pay was a legal artifice, and was both "unreal and nonsensical". Updata Europe's inability to obtain that price was not caused by any alleged deceit. It was "simply the product of the situation with their history with the Bank" as well as the exceptionally difficult market circumstances in 2009.

481. Secondly, there was LMS. The Defendants submitted that there was no prospect of negotiating a higher price with LMS. They invited the Court to accept Mr. Hooft's evidence that he would not have bid significantly higher: at most he might have gone higher by 1 or 2% (around £ 50,000 - £ 100,000). Mr. Hooft had thought that LMS was under competitive pressure at the time of the bidding, since he did not know what bids would come from Mr. Nielsen/ e-Kong. LMS were incentivised to bid competitively, and their bid fairly reflected all the financial information which they had received. That information was the full information; i.e. no information was withheld from LMS. LMS did not bid on the basis of the projected £ 6 million EBITDA, but on the basis of past results. There was no real or substantial chance that Mr. Hooft would bid significantly higher.

482. Thirdly, there was Mr. Nielsen. He was simply not in a position to bid at all within the Bank's timeframe. He failed to make any firm bid at all, either at the end of his period of exclusivity, or in June 2009 after the data room period. His difficulties had little or nothing to do with the availability of higher forecasts. They included his insistence on bidding for the shares of Updata Europe (rather than Updata UK); his desire for the Defendants to stay in the business, which they were refusing to do (if he was the buyer); problems of due diligence in Denmark; and his inability to find a backer who was willing to come forward with proof of funds. Mr. Nielsen and e-Kong were never close to tabling a proper cash bid.

483. In short, EVs had no real and substantial chance of securing a higher price for their shares, whether from LMS, Mr. Nielsen/e-Kong, or any other third party, over and above the SPA price. This was so particularly bearing in mind the actual offer made by LMS, which included the valuable concession of allowing Newwatch to roll over its existing shareholding and subscribe for further shares within a prescribed timescale; effectively an option to buy 17% of the new company.

### H4:   Analysis and conclusions: legal principles

*General approach in cases of damages for deceit*

484.   *Smith New Court Securities Ltd. v Citibank N.A.* [1997] A.C. 254 is the leading case relating to damages for deceit in the context of contracts of purchase. In that case, the Court of Appeal had proceeded on the basis of the law as laid down in a series of cases at the end of the 19th century, namely that:

> "where a fraudulent misrepresentation has induced the plaintiff to enter into a contract of purchase, the measure of damages is, in general, the difference between the contract price and the true market value of the property purchased, *valued as at the date of the contract of purchase*".

(per Lord Browne Wilkinson at 261, italics in the original)

485.   There was no dispute that this was the general rule, and there is nothing in the decision of the House of Lords which casts doubt upon it. Thus, Lord Steyn said at 284:

> "It is right that the normal method of calculating the loss caused by the deceit is the price paid less the real value of the subject matter of the sale".

486.   The importance of the decision was to make it clear that rule that the relevant date was the date of the contract of purchase was not an inflexible one. A different approach may be required in order to give effect to the general principle that damages should compensate for the loss suffered, and for the generous approach to damages in the case of fraud (in particular as to the recovery of consequential loss) which was stated in *Doyle v Olby (Ironmongers)* [1969] 2 QB 158 (a decision of the Court of Appeal which was approved in *Smith New Court*). Accordingly, there were likely to be many cases where the general rule (i.e. assessing damages by reference to the true value on the transaction date) "has to be departed from in order to give adequate compensation for the wrong done to the plaintiff" (see 266F-G).

487.   *Smith New Court* was a decision involving a claim by a defrauded buyer against the seller. But the same approach should be taken in the less usual case where the buyer has defrauded the seller into selling an asset such as shares. This was, correctly, the approach of Mr David Mackie QC in *Platt v Platt* [1992] 2 BCLC 746, where the judge had applied *Smith New Court* in the context of a claim by the seller. Although the case was unsuccessfully appealed, there was no appeal on this aspect of the judge's decision. It is also the approach taken in an earlier Court of Appeal case *Smith Kline & French Laboratories v Long* [1989] 1 WLR 1 CA. In that case, which did not involve a share of sales and is somewhat far removed from the present facts, the Court of Appeal looked at the market value of drugs which the plaintiff pharmaceutical manufacturer had been fraudulently induced to sell to a purchaser. In so doing, the court drew upon authority in the context of the tort of conversion and other situations where damages are awarded by reference to market value.

488.    Whilst the starting point and general rule for the assessment of damages is the true value of the asset at the date of the transaction, it is not necessarily the end-point. As *Smith New Court* shows, it is possible that a later date may, on particular facts, properly reflect the Claimants' loss more fairly and reasonably than the date of the transaction. In the present case, the Claimants drew upon this principle in support of their alternative claim (a claim also based upon "lost opportunity") that damages should be assessed by reference to the sale in 2014, rather than the sale in 2009.

*Causation and loss of a chance*

489.    Although the general approach to the assessment of damages for fraud was not in dispute, the parties disagreed as to whether this general rule had any application on the facts of the present case. The principal dispute in this context concerned whether, and the extent to which, the principles developed in the case-law concerning "loss of a chance" were applicable. I was referred by the parties to a number of authorities in that area, including some which I have already mentioned: *Allied Maples Group Ltd. v Simmons & Simmons* [1995] 1 WLR 1602; *Vasiliou v Hajigeorgiou* [2010] EWCA Civ 1475; *4 Eng v Harper* [2008] EWHC 915 (Ch), [2009] Ch 91; *Parabola Investments Ltd. v Browallia Cal Ltd.* [2010] EWCA Civ 486*; Law Debenture Trust Corp PLC v Elektrim* [2010] EWCA Civ 1142; *Dennard v PwC* [2010] EWHC 812 (Ch); *AssetCo v Grant Thornton* [2019] EWHC 150 (Comm); and the discussion of loss of a chance in *McGregor on Damages* 20th Edition.

490.    A relatively recent decision of the Court of Appeal (referred to extensively in *AssetCo*) contains a summary and exposition of the relevant principles both in relation to claims based on loss of a chance as well as the assessment of damages where there is uncertainty as to the amount of loss: see the judgment of Floyd LJ in *Wellesley Partners LLP v Withers LLP* [2015] EWCA Civ 1146, paragraphs [94] – [110]. These can be summarised as follows (square-bracketed numbers referring to the paragraphs of that judgment):

a)    The assessment or quantification of damages is an exercise which is different in nature from establishing whether any fact did or did not occur, or even whether any event would, in some hypothetical situation, have occurred. [96]

b)    The assessment of damages may be dependent on the court's view as to whether particular events would have occurred or will occur. Those chances are to be taken account of in the assessment of damages [97]. Where quantification involves a hypothetical exercise, the court does not apply the same balance of probability approach as it would to proof of past facts. Rather it estimates the loss by making the best attempt it can to evaluate the chances, great or small (unless those chances amount to no more than remote speculation) taking all significant factors into account. [102 - 103, citing *Parabola*]. Where the quantification of loss depends upon events which did not happen the judge is left to assess to chances of the alternative scenario he is presented with. This has nothing to do with loss of a chance as such. It is simply the judge making a realistic and reasoned assessment of a variety of circumstances in order to determine what the level of loss has been. [104, citing *Vasiliou*].

c)      Questions of assessment of damages have to be distinguished from questions of causation [98]. The loss of a chance doctrine is primarily directed to issues of causation and needs to be distinguished from the evaluation of factors which go only to quantum. [104, citing *Vasiliou*].

d)      Where a breach of duty consists of an omission, and the question is what the claimant would have done had the breach of duty not occurred, the claimant must prove what he would have done on the balance of probabilities. [99]

e)      Causation of the claimant's loss may depend on the hypothetical action of a third party, either in addition to the claimant himself or independently of him. In such cases, the claimant does not have to prove what the third party would have done on the balance of probabilities. For causation, all the claimant has to show is that the chance is a real or substantial one. Having done so, the claimant must still show, on the balance of probabilities, that the defendant's act has caused the loss of the chance to this effect. Once that has been shown, the valuation of the chance is a question for the quantification or assessment of damages. [99].

491.    It is also apparent from decisions analysed in *Wellesley* that when it comes to the assessment of damages, quantification may be shaped by fact-findings that the court is able to make. Thus, in *The Front Ace* [2008] EWCA Civ 101, there was a fact-finding that the vessel would have been profitably engaged, and also as to the relevant market. This meant that it was not appropriate, in assessing damages, to make any discount for the possibility that the vessel would not have been profitably engaged: see *Wellesley* at [108]. Similarly, in *Vasiliou,* the court's finding that the restaurant would have been a success precluded the argument that a general discount should be made for the possibility of failure: see [24] of Vassilou, cited at [104] of *Wellesley*. But in a case where there is uncertainty as to whether the claimant would find a market for its services, a discount to reflect the possibility of failure is appropriate as part of the evaluation of the relevant chance: see *Wellesley* at [107].

**H5: Analysis and conclusions: Causation**

492.    I start with the question of causation. I consider that the relevant question here is whether, on the facts, there was no loss because Updata Europe would have sold at the LMS price (i.e. on the terms which were ultimately agreed in July 2009) in any event. This was the question identified in paragraph 188 of the Claimants' closing where the Claimants acknowledged that it was open to the Defendants to "show that the fraudulently induced transaction caused no loss because Updata Europe would have sold at the LMS price in any event". It is also the question contemplated by the above passage in *Chitty*: "he will not have a remedy unless he would not have entered the contract (or at least not on the same terms) but for the misrepresentation". The Defendants identified a similar question in paragraph 61 of their written closing:

> "The Claimants, so it is understood, wish to claim as their loss the difference between the price a willing buyer would have paid a willing seller in 2009 and the price LMS in fact paid. But to do so they have to prove that the deceit has caused them that

> particular loss. If it is the case that they would have sold the shares under a distressed sale (to LMS) under pressure from the Bank anyway, then any such 'loss' is not caused by the deceit. It would have occurred irrespective of the alleged deceit."

493. Paragraph 188 of the Claimants' written closing suggested that the Defendants bear the burden of proof on this issue. But Mr. Booth correctly acknowledged in the course of argument that the Claimants had to establish causation.

494. At first sight, the question of whether or not Updata Europe would have sold at the LMS price is an issue to be resolved on the balance of probabilities, and has nothing to do with loss of a chance. This is because it is a question as to (as Mr. Choo Choy put it) "whether or not Updata Europe would have done this, that or the other", which he accepted was to be approached on the balance of probabilities. The Claimants' case was that this issue was indeed to be resolved on the balance of probabilities. It involved looking at the position in July 2009, and doing so on the factual premise that the misrepresentations had not been made.

495. I consider that it is indeed appropriate to resolve this particular causation question by considering the issue on the balance of probabilities. This was the approach of the Court of Appeal in *Sykes v Midland Bank* [1971] 1 Ch 113 (a case referred to in *Allied Maples* and considered by *McGregor on Damages*, paragraph [10-159]. In that case, the plaintiffs' claim for substantial damages failed, because they could not show that, even if properly advised, they probably would not have entered into the relevant contract. Similarly, in *Dennard v PwC* [2010] EWHC 812 (Ch), the claimants' primary case (namely that they would not have proceeded with a contract with Barclays Bank if a different valuation had been given) was addressed by Vos J., and rejected, on the balance of probabilities.

496. In *4 Eng v Harper*, the claimants were the victims of deceit which had led them to purchase a company (E Ltd.). Their case was that if they had not been so deceived, they would have purchased T Ltd. instead. They sought damages by reference to the loss of the chance to earn income and capital profits from T Ltd. The case establishes that loss of a chance principles are potentially applicable in cases of deceit, as well as their more usual application to cases of negligence by solicitors and others. In that case, loss of chance principles came into play because the claimants contended that they would have purchased T Ltd., and a successful purchase of that company depended upon the acts of a third party; i.e. whether or not the owners of T Ltd. would be willing to sell to the claimants. However, the initial question for David Richards J. was whether, on the assumption that the owners of T Ltd. were willing to sell, the plaintiffs would indeed have purchased that company and could have funded the purchase. The judge approached that question on the balance of probabilities: see paragraphs [60] – [80]. The issue was addressed in that way, and without regard to "loss of a chance" principles, even though the plaintiffs' conduct would have been affected by decisions made by third parties; in particular whether the plaintiffs' bankers would have been prepared to provide funding for the purchase (see [69]).

497. The question in that case (would the claimants have been in a position to acquire T Ltd., and would they have sought to do so) is not quite the same as the question in the present case (would the claimants have entered into the contract with LMS in any event). But I do not consider that there is any reason why the approach, namely to

decide the question on the balance of probabilities, after considering all the evidence, should be any different.

498. Finally as far as the authorities are concerned, in *Wellesley*, the initial question was whether the claimants would have opened a New York office, and secondly whether or not it would have obtained business from a particular customer. Floyd LJ said (at [109]) that the Claimants "had, first, to prove that its own actions would have been such as to place itself in a position to obtain that work, and it had to do so on the balance of probabilities". It may well be that the question of whether a party's actions would have placed itself in a position to obtain a benefit will itself depend, at least to some extent, on the actions of third parties. For example, the opening of an office in New York might well require funding from a bank, the agreement of a landlord to let suitable premises, the agreement of staff to work in the office, the granting of visas by the US authorities, and possibly regulatory approvals. However, I do not consider that the involvement of third parties means that loss of a chance principles need to be, or should be applied, when deciding whether or not the claimant would have opened the office. If the claimant cannot show, on the balance of probabilities, that he would have been in a position to open the office, then the claim cannot succeed.

499. In the present case, the Claimants' primary claim is that Updata Europe owned a valuable asset in 2009, and they were misled into selling it, at the price offered by LMS, as a result of the Defendants' fraud. At that time (2009), the Bank had not exercised its security rights, and the decision as to whether or not to sell, and if so on what terms, was a decision for the Board of Updata Europe to take. It is of course true that that decision would be shaped by external considerations, including the positions taken by third parties. In order to decide what decision Updata Europe would have made, in the hypothetical world where there had been no deceit, there would be a range of factors which would be relevant to Updata Europe's decision: whether higher offers had been received from third parties, what pressure there was from the Bank, what pressure there may have been from members of Mr. Johnsen's family. But whilst these external considerations are highly relevant to what Updata Europe's ultimate decision would have been, the ultimate question is whether Updata Europe would have sold at the LMS price in any event. This, in my view is and remains a question to be resolved on the balance of probabilities.

500. The Defendants' argument that the Claimants suffered no loss, because they would have sold at the LMS price in any event, ultimately boiled down to two principal points. The first point was that even if the misrepresentations had not been made, the course of the bidding process would have proceeded as it did, with the result at the end of that process, the LMS bid was the only bid. The second point was that if that were the position, the Bank would have compelled Updata Europe to accept the LMS bid, by making it known that the bid had to be accepted so that repayment of the Bank debt could be made, or ultimately forcing a sale using its powers under its security. In relation to these arguments on causation, it is necessary to consider what consequences would have likely resulted from a situation in which the representations had not been made.

501. On the facts of the present case, I consider that if the representations had not been made, the consequence would necessarily have been that the true figures, representing management's expectation, would have been revealed to Updata Europe, and thence to any other potential purchasers including Mr. Nielsen. The consequence would also

have been that on 3 June, if the figures had not already been revealed, Updata Europe would have been told that the management had given different documentation to LMS to that which had hitherto been given to Mr. Nielsen. In either event, it seems to me that the details underlying the headline numbers – for example the extensive detailed workings in the March Weighted Budget – would have been revealed to Updata Europe, and indeed to other potential purchasers. If one assumes that the misrepresentations had not been made, the corollary therefore would be that the true figures would be revealed; not least because there would then have been no point in the Defendants seeking to try to conceal the detail and because the information would need to go to into the Data Room. And in any event, the detail could easily have been flushed out by, for example, Updata Europe's board asking for the detail, or in response to the questions asked by Mr. Nielsen who throughout was pressing for more information. I also accept Mr. Johnsen's evidence that if he had been given positive information showing substantial values, "we would have been all over it" in terms of asking for the detail. Mr. Choo Choy was therefore correct to approach the case, in terms of causation, by "assuming against [himself] for the moment that the counterfactual should be equated with positive disclosure of the weighted budget"; i.e. on the basis that the true figures would have been revealed.

502.    If the representations had not been made, and in consequence the true figures had been revealed, this would inevitably have had a major impact on the way in which all the relevant parties would have reacted and behaved. In my view, it is wholly unrealistic to suppose that, if the misrepresentations had not been made, matters would have developed in the way that they in fact did, so that the best offer on the table in late June was an offer from LMS in the terms which Updata Europe ultimately accepted. Since it is more likely than not that there would have been a better offer on the table in late June, it follows that Updata Europe would not have sold at the LMS price in any event. My reasons for these conclusions are as follows.

503.    In the context of inducement, Mr. Booth drew attention to a passage from an article by Hon K.R. Handley, 'Causation and Misrepresentation' (2015) 131 LQR 277, 284, quoted with approval in *Hayward v Zurich* at [38] (per Lord Clarke):

> "The representor must have decided to make the misrepresentation because he or she judged that the truth or silence would not, or might not, serve their purposes or serve them so well. In doing so they fashioned an evidentiary weapon against themselves, and the court should not subject the victim to "what if" inquiries which the representor was not prepared to risk at the time."

504.    In the present context of causation, the misrepresentations are also evidentiary weapons against the Defendants. The reason why the representations were made was because the Defendants were not prepared to risk the consequences of telling the truth. They recognised that there was a serious risk of jeopardising the sale to their favoured PE house at the price offered. Updata Europe would then see figures which were highly material to the valuation of Updata Europe, and which would reveal the inadequacy of the LMS original offer based on £ 1.5 million EBITDA, even taking into account the relatively small (18%) increase made by LMS in their May offer.

505.   The true figures also would make the business more attractive to outside investors, including Mr. Nielsen and e-Kong, who would see that Updata UK's business was much more substantial than the figures in the Financial Overview would suggest, and indeed was really taking off.

506.   In addition, if the misrepresentation as to equality of information made on 3 June had not been made, then it would have become known that Mr. Nielsen's previous due diligence work had been conducted on a false basis. It is not difficult to see that Mr. Jorgensen at the Bank, who regarded equality of information to both prospective buyers as essential, would have reacted unfavourably to the way in which Updata UK's management had behaved. But at all events, I have no doubt that he would have taken steps to ensure that Mr. Nielsen, and any other potential bidders, did have the same relevant management information as LMS. Given that the Bank itself, as well as Updata Europe, had a real interest in obtaining the best possible price on the sale, it is not difficult to conclude that, if necessary, the sale timetable could be extended somewhat so as to ensure that all potential purchasers had a fair crack of the whip.

507.   It is of course impossible to say exactly what would have happened, in terms of bidding, if the true figures had been revealed. However, in my view it is improbable in the extreme that Updata Europe would have let matters proceed in the same way as they did in fact proceed. At that time, Mr. Nielsen was using a multiple of 5 x EBITDA, and LMS had used 6.1 (albeit applied to historic results). Updata Europe's Board comprised a number of intelligent people, and it would have been obvious to them that the LMS offer (based on EBITDA of £ 1.5 million) significantly undervalued the company. If this had happened, any discussions between Mr. Johnsen and LMS about the LMS offer of 16 April would have been very different to the discussion which took place on 29 April 2009, and which Mr. Hooft recorded in his note to file of that date. Mr. Hooft's first key point in that note was that there had been a "Very friendly tone". He went on to record his impression that "we were potentially not a million miles apart" and that "[o]verall Peter was very positive".  If the true figures had been revealed, I consider that Mr. Johnsen would have brought home both to LMS and UK management that a deal at the levels proposed by LMS would be unacceptable.

508.   Both LMS and UK management would then have needed to reconsider their positions. I was not persuaded by Mr. Hooft's evidence that LMS had, in May 2009, virtually reached the limit of what LMS were prepared to offer. He was clearly a tough and skilled negotiator, who would have sought to minimise the price paid. But I consider that, if necessary, he would have been prepared to move rather higher. Certainly the figures for maintainable earnings which were produced by one of his team on 29 June 2009 (and which are described in more detail in Section I below) would have justified a significantly higher valuation.

509.   If, however, LMS were not prepared to offer significantly more, the management would have had to approach some of the other PE houses to see whether there was a willingness to make offers which more fairly reflected the value of the company. Hitherto, of course, those houses had been approached on the basis that the opportunity was to acquire Updata UK at or below the level of Bank debt. Had the representations not been made, however, it would have become clear that this option, whilst attractive to a PE house, was not a practical option. It is also important to recognise that the management had a very real desire to have a successful MBO, and

they would themselves have recognised the need for better terms to be offered to Updata Europe, if necessary by foregoing some of their personal advantages in the deal which they had negotiated with LMS. At the same time, Mr. Johnsen would have had detailed numbers which he could show to other potential outside investors. It is also relevant that both the Bank and Mr. Homann were owed money, so that both of them had a very real interest in fair value being received for the business.

510.    I also accept Mr. Nielsen's evidence that the real numbers would have had an impact on his decision-making, and that of his consortium. I deal in more detail with Mr. Nielsen's evidence below. The Defendants sought to rely, in the context of inducement, on Mr. Nielsen's evidence that he did not believe that he had been given the same information as the other bidder. I do not think that this assists the Defendants in the context of the inducement issue, for reasons already given. But in my view it is positively damaging to the Defendants in the context of causation. If the misrepresentations had not been made, this would have led to a factual situation in which Mr. Nielsen and his proposed investor or investors did have the relevant figures on which to work. Instead of being discouraged from bidding as result a lack of information – something which was precisely what the Defendants sought to achieve by their deceit – and suspicion as to lack of equality of treatment, Mr. Nielsen and his proposed investor or investors would have been far better placed to bid. Mr Nielsen explained in evidence that:

> "the information that was in the data room gave us an enormous challenge to extract information that you would normally expect that the management or the ones who were making the business plans would have done all that work already and had made contract per contract an overview of the cash flow projections, the risks involved and so on."

He said that the Updated Kelso Presentation was useless: it contained a single number, which was a "best case" and he was embarrassed sending it to e-Kong because it was no basis on which to make an investment decision. "You can't ask a professional investor or a strategic investor even to make investment decision based on the material which is a one-page financial projection and then a list of names of counties and councils that are favourites or preferred or not sure and 10%". He said that e-Kong were very disappointed in the quality of information received. In my judgment, the position would have been otherwise if the misrepresentations had not been made.

511.    I consider that all of these factors would naturally have had the effect of driving the price offered for the shares towards their true market value rather than the price offered by LMS, which (for reasons discussed in Section I below) was substantially below their true value. Accordingly, I do not accept that, if there had been no misrepresentations, the best offer on the table at the end of June would have been the LMS offer. It seems to me that this is a necessary premise of the Defendants' argument on causation; namely that Updata Europe would have accepted the LMS offer in any event. The argument assumes that the effect of the misrepresentations was to change nothing in terms of how matters would have progressed. In my view, however, if the true position had been known, matters would simply not have progressed as they did. The misrepresentations themselves, for reasons already given, provide an evidentiary weapon, and in my view a powerful evidentiary weapon, in

support of this conclusion. It necessarily follows that the Defendants' case on causation fails.

512. In the light of this conclusion, I regard it as unrealistic to ask "would Updata have accepted the LMS offer in any event" or a similar question: since it assumes that the best offer on the table as at the end of June would have been the LMS offer. Even if that were so, however, it is not probable that Updata Europe would have accepted it. Indeed, I would regard it as highly improbable. In my view, Updata Europe would have made efforts to explain to the Bank that the business was worth far more, and that it was now or shortly would be highly cash generative. Mr. Homann, who had the ear of Mr. Jorgensen, would have supported them in that argument. I do not consider it at all probable that the Bank would have forced a sale at an undervalue there and then. This would, as Mr. Booth submitted, have been contrary to the Bank's own interests and would have exposed the Bank to potential litigation.

513. That said I do not consider that the Bank would have given limitless time for Updata Europe to hold onto its shares, particularly if there were buyers around who were willing to pay for them. The Bank would have insisted that a sale took place as soon as reasonably possible. At the time when the bids came in June, there was still a certain amount of time to go before September; i.e. the date before which (subject to performance of other conditions) the Bank had agreed not to call in the facilities. I bear in mind that the Bank could have taken the point that there had been a failure to perform the other conditions, and therefore could have called in their loan. But I accept Mr. Jorgensen's evidence that the Bank had no interest at that time in bankrupting Updata. I have also already noted that Mr. Jorgensen did not act aggressively in the period between January and June. I consider that (on the present unreal hypothesis that the only offer was that which LMS actually made) faced with arguments from Updata Europe, supported by Mr. Homann, the Bank would likely have shown a degree of flexibility so that fair value for the company could be realised. If they had not already done so, the same factors as identified above would then have driven the price towards their true market value. Again, therefore, I consider that even on this alternative hypothesis, the Defendants' case on causation fails.

514. I consider that the only relevant question on causation, certainly as far as concerns the Claimants' primary case based on the sale in 2009, is that which I have addressed above; i.e. whether the Claimants would have sold to LMS at the LMS price in any event. I do not consider that this part of the claim raises separate issues of causation, which require an *Allied Maples* loss of a chance analysis. The primary claim is in respect of the value of an asset which Updata Europe were induced to sell by fraud. There are indeed questions which arise as to how, on the facts of the present case, Updata Europe's loss is to be quantified, bearing in mind any potential difficulties in realising the full value of the asset. But I consider that these are issues of quantification, not causation and I address them in Section H5 below. However, if I were wrong about that, and, if the relevant question on causation were whether or not there was a real or substantial chance of third parties offering a higher price, or of Updata Europe persuading the Bank that the offer from LMS should not be accepted, I would have answered these questions favourably to the Claimants.

515. In reaching my conclusions on the causation issue, I have taken into account my assessment, as described in more detail below, of the evidence of Mr. Nielsen, Mr.

Jorgensen and the late Mr. Homann (as well as that of Mr. Hooft which I describe elsewhere in this judgment).

*Mr. Nielsen's evidence*

516. I start by setting out the principal features of the chronology concerning Mr. Nielsen's involvement in the bidding process. By January 2009, Mr. Nielsen had expressed an interest in a possible investment or acquisition. By mid-January, he was being assisted in that process by Mr. David Medhurst, who had worked for the Australian banking group Macquarie. Mr. Medhurst was a corporate finance consultant with experience in various aspects of mergers and acquisitions, including deal structuring and valuations. At around that time he had set up in business as David Medhurst International Inc. with a subsidiary called European Equity Partners (Canada). Mr. Nielsen was also being assisted at this time or shortly afterwards by a lawyer, Mrs. Marianne Phillip. He described himself as having a "very strong team" assisting him. Mr. Nielsen had a considerable amount of business experience himself, having worked as a management consultant in information technology and having been involved in the development, sale and purchase of numerous IT and telecoms companies over the years. He had also been chairman of Updata UK from 2002 to 2007, and therefore knew the business well.

517. On 6 March 2009, the Bank wrote to Mr. Nielsen (with the concurrence of Updata Europe) granting a period of exclusivity which would commence on 5 March 2009 and end no later than 10 April, with a further two weeks to finalise his bid. During that time, he went with Mr. Homann and met Mr. Bennett and Mr. Baldorino at Reigate on 18 March. He received a small folder of materials which included the Financial Overview. His evidence was that it was pretty clear from the meeting that management were not keen on his involvement. He had a feeling that they were going to give him the minimum information possible. These impressions were consistent with the evidence, already described, as to the UK management's views. Subsequent to the meeting, on 5 April, Mr. Homann circulated a list of questions, but these were not answered at the time.

518. Mr. Nielsen did not make any bid on 10 April, but there were extensions of time which were granted for his due diligence: on 1 May 2009, Mr. Jorgensen said that he could offer an extension to 12 May 2009, but that on that date there needed to be a written offer. On 6 May 2009, Mr. Nielsen had a second meeting with the UK management, and a detailed note of that meeting was prepared by Mr. Bennett. The meeting was attended by the Defendants and Mr. Cowan for Updata UK, and by Mr. Nielsen, Mr. Medhurst and his colleague Ms. Olga Ojero. Mr. Medhurst explained that the deal was too small for Macquarie itself, but that Macquarie had interests in a number of other funds who had investments in a similar space. He and Ms. Ojero said that they were looking at either a quoted trade buyer or a number of financial buyers, and that ultimately it was up to Mr. Nielsen to decide on the most preferable. They favoured a group wide approach (which I understand to mean buying the whole group), and they felt that a trade buyer was most likely to want to go cross-border. Mr. Medhurst described, but did not identify, the trade buyer that they had in mind: a telecoms company which was not based in Europe, but which had world-wide interests apart from Europe. An important question was whether the investor would be interested in Denmark or not. But "the UK is not in question here". In other words, there was no doubt that any buyer would be interested in the UK. Towards the end of

the meeting, Mr. Bennett was asked whether Updata UK was on target to reach its budget. Mr. Bennett answered "no". (As set out in Section D above, a very different message was being given to the private equity houses who had been approached in early April).

519.   Following that meeting, on 13 May 2009, Mr. Nielsen (on behalf of his company MLL Holding ApS) sent Updata Europe and Mr. Jorgensen a lengthy "Letter of Understanding – Intent to Provide a Binding Offer". The letter was not a binding offer itself, but outlined the framework for an offer. It referred to the fact that questions raised of the UK management, and requests for documents, remained outstanding and unanswered. It also expressed concern that the UK management had authored a business plan which had not been contained in the due diligence binders provided, and that this had been used in meetings with potential equity providers to gain support for their MBO. The letter then set out a number of conditions for incorporation into any binding agreement, including a more detailed due diligence period.

520.   The Letter of Understanding contained certain figures, which indicated that Mr. Nielsen was valuing both the Danish and English operations on the basis of a multiple of 5 x EBITDA. Mr. Nielsen agreed in cross-examination that, for Updata UK, he had been using an EBITDA figure of around £ 1.496 million; i.e. the figure which had been contained in the Financial Overview.

521.   The Letter of Understanding received a negative reaction from the Bank and, a few days later, Updata Europe made a counter-proposal. On 26 May 2009, Mr. Nielsen wrote to the Bank indicating that he would shortly be discussing a revised offer letter with Mr. Medhurst and Mr. Homann as well as e-Kong. This was the first time that e-Kong had been referred to in the correspondence, although it seems clear that this was the investor that Mr. Medhurst had been describing at the 6 May meeting with management. Mr. Nielsen explained in his evidence that e-Kong was a good contact of Mr. Medhurst, who knew them well. In his letter to the Bank, Mr. Nielsen explained that e-Kong was a telecoms holding company, listed on the Hong Kong stock exchange, and that it had been analysing and preparing "this bid for Updata Europe A/S".

522.   On the same day (26 May) e-Kong wrote to Updata Europe, copied to Mr. Birkeland. The letter was sent at Mr. Nielsen's request and was "an indication on our part of an interest in participating in a consortium with Mr. Nielsen for acquiring such majority stake in Updata Europe or its business, assets and undertakings (or part or parts thereof)" upon terms and conditions to be agreed. The letter indicated that access to documents, information, data and people would be required, so that e-Kong could "fully appreciate the business and value of the Subject Assets". Mr. Nielsen's evidence was that this letter was also sent to Mr. Jorgensen.

523.   On the following day (27 May), Mr. Nielsen sent a revised Letter of Understanding. This repeated, to a large extent, his previous letter, but with some modifications. It was not a firm bid.

524.   By around this time, and as described in more detail in Section E, a bid timetable had been laid down and correspondence was developing in relation to equality of information and the provision of materials in the data room. Mr. Nielsen did not

personally visit the data room, but he engaged Mr. Iversen to do so. On 11 June, Mr. Iversen visited, met Mr. Mantell and subsequently prepared a report for Mr. Nielsen.

525.    On 19 June 2009, e-Kong wrote to the Board of Directors of Updata Europe, referring back to their earlier letter. They referred to having carried out a fact-finding exercise over the past weeks, trying to learn more about the opportunity and referred to their discussions with, amongst others, Mr. Jorgensen and Mr. Homann. They indicated that in the light of their "ample experience of founding and developing different telecommunication companies", they could see the market potential of Updata and had "gained interest in applying their expertise and experience again while joining existing shareholders of Updata in building Updata to become another profitable and scalable business". However, they went on to refer to the fact that they had obtained "very limited information, data or knowledge" regarding Updata Europe and its non-UK subsidiaries, and "only until very recently some financial information on Updata UK". They were therefore not in a position to submit a formal offer, but expressed an interest in exploring the possibility of a proposal which they set out in Annexure B to that letter. The annexure included further financial, legal and operational due diligence on Updata Europe and its subsidiaries.

526.    In the context of causation and loss, the material parts of Mr. Nielsen's evidence in his witness statement were as follows. Prior to submitting his first letter of understanding on 15 May 2009, he was dissatisfied with the amount of information received from the UK management. They had been reluctant to give information at the March meeting and had not answered the questions sent on 5 April. He had raised his concerns in his letter of understanding. At the time of that letter, he was already in discussions with e-Kong as a potential investor. He had also had discussions with Macquarie itself, but e-Kong quickly developed as the main contender. e-Kong were a serious investor with a very professional approach: it was a company used to buying other companies and creating infrastructure. e-Kong wanted to acquire the whole group, but it was most interested in Updata UK.

527.    Mr. Nielsen regarded the establishment of the Data Room as a positive step; i.e towards making sure both bids had access to the same information. He also hoped that the involvement of e-Kong, which was a large company, might ensure that the bidding process was conducted fairly. But his hopes were disappointed. Mr. Iversen had indeed attended the Data Room, and seen and reviewed the relevant materials which included answers to Mr. Nielsen's questions and the Updated Kelso Presentation. Mr. Iversen's due diligence report, based on the information made available to him, was "useless". As Mr. Nielsen explained in his evidence, this was a reflection on the quality of the information in the Data Room, not on Mr. Iversen. Mr. Nielsen said that:

> "the information provided in the data room and the UK Management's responses to my specific questions were, frankly, disappointing. It was clear to me that UK Management had not provided me with the information they had given to LMS – there was no way in my view that LMS had just got the Updated Kelso Presentation as the basis for their bid. But I wasn't really in a position to force the information out of them: if they weren't prepared to give it to me I probably couldn't get hold of it."

528. In relation to the 19 June letter from e-Kong, Mr. Nielsen's evidence was that despite the lack of information, e-Kong had nevertheless wanted to progress with further discussions. But the valuation of the company based on the information provided was low. Indeed, Mr. Medhurst could not work out why the LMS bid was so high, given the figures. Mr. Nielsen "simply did not have the backing from e-Kong to match that kind of offer; based on the material I had, I could not justify that kind of price". He then went on to say:

> "[54] I would say that if it had been possible, on the basis of information from Updata UK, to value the company at a higher level, the deal would probably have been even more attractive to e-Kong. They had enough money to meet a higher price and any difficulty that I faced in persuading e-Kong to invest in Updata UK had been because, on the values that Mr. Medhurst and I saw in the company, the project was possibly too small
>
> …
>
> [58] Mr. Medhurst and I were working on the basis of a 5x earnings multiple to value the business. If we had seen that Updata UK's EBITDA for 2009/10 (based on contracts which were already won, or income streams weighted proportionately to win likelihood) was around £ 5 million, that would have had a significant influence on the valuation we would have attributed to the company."

529. Mr. Nielsen was cross-examined for a day. My impression during the course of evidence was that he was honest and fair-minded, and that his evidence was reliable. He had no significant personal interest in the outcome of the litigation, but had come forward because he thought that it was his duty to do so and despite the background of a degree of antipathy or falling out between himself and Mr. Johnsen. He has no business relationship now with Mr. Johnsen or any member of the family. At the time that he gave his evidence, I did not think that the cross-examination caused me to doubt the key features of his written evidence as summarised above.

530. Nevertheless, and as requested by the Defendants, I have reviewed Mr. Nielsen's cross-examination (and brief re-examination) in its entirety, and I remain of the same view in relation to his reliability as a witness. Mr. Nielsen spent a considerable amount of time working on the deal over a 6 month period. He sought to take a professional approach, and was assisted by experienced professionals in the corporate finance world. It is clear from the documentary evidence that he was very keen to see the figures for the Updata UK. I accept his evidence that this was the business that was of most interest to him and to any potential investor. As he explained, the Danish companies were 'distressed' and operated in a much smaller market than the UK. But it "wasn't hard to convince that the UK was a substantial investment opportunity". He recognised the potential of a sale to a strategic trade investor, who could "scale the company much better than … a private equity investment". "The most important thing was to get the UK numbers in place". e-Kong's prime interest was certainly in the UK market, and although they were prepared to look at other markets, they wanted to "grab European foothold and start out with the most interesting market in Europe, being the UK". The problems that he encountered along the road, and which led to his

inability to make a firm bid, were that he "was waiting for information and the answers on key questions", and ultimately that the figures that he was given were based on poor quality information and did not justify a price higher than that which LMS had offered. As he said: "it's not the kind of sufficient information you would normally expect in a transaction of this kind". At the end of his cross-examination, he said that he was very committed, he was very serious; he had a good team with lots of experience "but I did not receive the proper information for the due diligence to come up with a substantial – a substantial or firm offer". I have no doubt that the Defendants saw Mr. Nielsen as a very real threat, and that this explains why in my view they took steps, by making false representations to Updata Europe, to hobble his bid.

*Mr. Jorgensen's evidence*

531.    I did not consider that Mr. Jorgensen's evidence had any real bearing on my conclusion that if the misrepresentations had not been made, matters would not have developed in such a way that the best offer on the table in late June was an offer from LMS in the terms which Updata Europe ultimately accepted. But it did have some bearing on the question of what would have happened if, contrary to my conclusions, matters had proceeded in essentially the same way that they did proceed, so that this was indeed the only offer on the table at that time.

532.    Mr. Jorgensen had retired from the Bank in 2012. I was told at the start of his evidence that he had been in poor health; that this was a personal matter that he did not want to go into further; and that he would indicate if he needed a break at any stage. I told him that if he needed a break apart from the usual ones, he should tell me. Mr. Jorgensen had given a relatively short witness statement in Danish, because he was not fluent in English. He explained at the start of his cross-examination, however, that his understanding of English was better than his ability to speak it, and that he would be happy to listen to the question in English and then to give his answer in Danish with the benefit of translation. As the cross-examination proceeded, however, Mr. Jorgensen in fact tried to give his evidence in English. From time to time, however, both the questions and the answers required translation, and this was carried out by an interpreter. It was perhaps unfortunate that the same interpreter was not present throughout his evidence: one interpreter attended on the first afternoon of his evidence, and then another interpreter (who to my mind seemed somewhat less accomplished) on the second day.

533.    Some criticisms were made by the Claimants, in their written closing argument, as to the process that was followed: the submission being that all questions and answers should have been translated. I did not consider that these criticisms were justified. It seemed to me that Mr. Jorgensen did understand the questions that he was being asked, and that where there appeared to be a misunderstanding or lack of clarity in either question or answer, assistance was provided by the interpreter. That was my impression at the time, and I have re-read the entire transcript of Mr. Jorgensen's evidence and it remains my view.

534.    That said, it did seem to me that there was considerable force in the Claimants' submission that Mr. Jorgensen's evidence needed to be treated with "considerable caution". This was not, I emphasise, because Mr. Jorgensen was in any way seeking to give anything other than truthful evidence. Far from it: the fact that he wanted to

give his evidence in English to the best of his ability was to my mind one indication that he was a witness who was trying to assist the court. I also had no doubt, as I listened to his evidence, that he was seeking to assist as best he could. However, it became clear as his evidence progressed – and in particular on the second afternoon of his evidence by which time he may well have been tiring – that he had a very poor recollection of the relevant events. Indeed, some of his answers towards the end of his evidence were treated with some incredulity by Mr. Choo Choy. Mr. Jorgensen thought that the sale to LMS was a sale of Updata Europe, rather than a sale of Updata UK. He said that he did not know that LMS had been working with the UK management and had been discussing the company with them. He said that he did not recall meeting LMS in April 2009 with the UK management, even though the meeting was referred to in his witness statement, and even though he had referred to the meeting in his oral evidence that morning. ("The first meeting we had with LMS to the close I think one month"). He could not remember the LMS offer letter. When asked whether he knew that the UK management were involved in the bidding process, he said that he did not know (prompting Mr. Choo Choy to say that this was "quite extraordinary"). His evidence that the period between the LMS letter to the close (of the sale) was 1 month was not accurate: the period was in fact close to three months (14 April to 9 July). Mr. Jorgensen could not recall many of the documents that he was shown in cross-examination (perhaps unsurprisingly in view of the passage of time).

535.    Mr. Jorgensen's witness statement addressed the question of how the Bank might or would have acted if different financial information had been presented to the Bank. For example, he expressed that view that if, at the beginning of 2009, he had received "positive forecasts of likely performance of Updata Europe and its subsidiaries, I believe that … it is very likely that I would have been receptive to allowing Updata Europe to continue as before and I would have put the company under less pressure to search for new investors". It seemed to me that this evidence was not sustainable in the light of the evidence that Mr. Jorgensen had in fact received positive forecasts of likely performance in January 2009, particularly in relation to Updata UK, but had nevertheless put Updata Europe under some pressure by virtue of the terms of the agreement with reached with Mr. Homann in January 2009.

536.    Much of Mr. Jorgensen's cross-examination was directed at how he did in fact react to the circumstances as they were understood to be, rather than to the question of how he would have reacted if the circumstances had been different. Indeed, it was only after I had asked counsel as to whether he was challenging the relevant paragraphs of Mr. Jorgensen's witness statement, as to what he would have done in different circumstances, that questions were directed towards that issue. Mr. Jorgensen clearly had difficulty in recalling the events of the time, and in answering questions which were hypothetical. Indeed, the opening sentence of paragraph 31 of his witness statement stated, very fairly, that he could not say with certainty what he would have done differently if there had been information available to him that "confirmed positive forecasts about Updata UK's performance". Similarly, paragraph 36 of his witness statement acknowledges, sensibly in my view, that Mr. Jorgensen would have been less inclined to stop the sale process at a late stage, once LMS had been awarded exclusivity.

537.    Having considered Mr. Jorgensen's evidence as a whole, and against the background described above, I do not consider that I can properly rely upon any particular passage in Mr. Jorgensen's witness statement, or any specific answer in his oral evidence, in relation to how he would have reacted if the facts had been different. Rather, my conclusions as to what would likely have happened, as described above, are based upon what seems to me to be inherently probable in the light of Mr. Jorgensen's attitude as expressed in the contemporaneous documents at the time, and as supplemented by evidence from witnesses who dealt with him, when taken together with a number of consistent themes in Mr. Jorgensen's evidence. In particular, it is in my view clear that Mr. Jorgensen:

    a)    did want to see Updata Europe's debt reduced significantly, albeit not eliminated;

    b)    did show a degree of flexibility in his approach to Updata Europe and Updata Denmark and did not want to bankrupt or liquidate them, but did not have limitless patience;

    c)    was influenced by what he was told by Mr. Homann, as shown by the agreement reached in January, and also in the 20 May e-mail sent out shortly after Mr. Homann's e-mail of 18 May;

    d)    was concerned to ensure equality of treatment as between the bidders;

    e)    was interested in a sale at fair value, and believed at the time (as he said in his evidence) that LMS was paying a fair price;

    f)    would have been very reluctant to stop the sale at a late stage in the process, particularly if there was a risk that a buyer with available cash might then walk away.

*Mr. Homann's evidence*

538.    Mr. Helge Homann died prior to the trial, and therefore his evidence could not be subject to cross-examination. Nevertheless, I considered that his evidence had some value in confirming my conclusions as set out above. As far as Mr. Jorgensen was concerned, Mr. Homann's evidence was in substance that the former was persuadable: "I found it was always possible to persuade Mr. Jorgensen not to accept an offer, so long as we could persuade him that it was not a good offer, and that Updata Europe would continue to service its debt. So long as Updata Europe could show a proper income stream, Mr. Jorgensen might not be happy, but he would be satisfied". He referred in this connection to the agreement reached in January 2009, which was made on the basis of expected receipt of dividends. To my mind, this evidence was consistent with what occurred.

539.    Mr. Homann then went on to describe his involvement with Mr. Nielsen's bid, the due diligence process, and certain work that he carried out using the Financial Overview. He described his frustration at the lack of figures from the UK management, and his involvement in discussions with e-Kong including a conference call on 23 June between various participants (e-Kong, Mr. Nielsen and his team, Mr. Holm and Mr. Birkeland). The problem at this stage was that e-Kong were not in a position to bid on

the basis of the limited information that was available following due diligence. His evidence was that: "… the budget forecast was key in enabling – or preventing – a rival bid from being calculated". He said that with the financial information contained in various documents (including the Weighted Budget), "the proper share price would have been around five times what Mr. Nielsen was able to justify on the basis of the figures that were actually provided to him by Mr. Baldorino and Mr. Bennett". He went on to say:

> "If Mr. Nielsen had seen the Budget Pack, which was not in the Data Room, he would have been able to use all of the detailed information in there for each contract to put together a bid. With this information, I would have been able to persuade the Bank to give us more time".

540.    Again, I consider that Mr. Homann's evidence, albeit not cross-examined upon, is consistent with the inherent probabilities as well as the evidence of Mr. Nielsen himself.

### H6: Analysis and conclusions: quantification

541.    Having resolved the causation issue in favour of the Claimants, the next issue which arises is how to quantify Updata Europe's loss. Mr. Booth submitted that the exercise was a straightforward one. The ordinary measure of loss is the difference between the value of the asset disposed of and the price obtained at the date of the loss: see *Smith New Court* and *Platt*.  He said that in principle (and subject to his argument that the appropriate date of loss was 2014) there was no reason to depart from that approach. It would be inappropriate to apply any discount to reflect the possibility that Updata Europe would not be able to obtain the market value on a sale.

542.    The Defendants' submission was, in essence, that this was an unrealistic approach in circumstances where there was considerable uncertainty as to whether any increased price could in fact be achieved. They argued for a mathematical approach, which involved assessing separately the chances of LMS increasing its offer, Mr. Nielsen increasing his offer, the Bank agreeing to extend time, and factoring in any other contingencies (such as other purchasers making proposals), and then multiplying each of the resulting probabilities. At most, whether on this approach or any other, any increase would have been no more than 5 or 10% above the price which LMS actually paid. Mr. Choo Choy pointed to various matters, including the uncertainty relating to whether Mr. Nielsen/e-Kong would have made an increased offer, and their difficulties in so doing in light of the management's unwillingness to work with Mr. Nielsen. There were other factors militating against Updata Europe's ability to obtain the market price; in particular, the tight timetable, and the fact that any new purchasers would have to carry out due diligence. Any purchaser would also inevitably know about the Bank debt, and would be looking to pay the minimum price possible. It would also be appropriate to take into account the value which LMS gave up by allowing Newwatch to retain its shares and acquire more. Furthermore, any hypothetical outside purchaser would be competing against an incumbent management, which was the worst kind of opposition. All of these matters would have a moderating influence on any possible increased price.

543. In my judgment, the starting point is, again, that this is a case where the Claimants parted with a valuable existing asset which they owned. There was no dispute that a claim for the value of an asset disposed of in consequence of fraud was a recognised head of loss in the context of the tort of deceit, although of course credit needs to be given for the value received. The Claimants have established, on the basis of my findings above, that, if the representations had not been made, they would not have disposed of the asset on the terms which they did, and that the effect of the misrepresentation was that they were presented with a best offer which was lower than would have been the case if the misrepresentations had not been made.

544. I agree with the Claimants that the starting point in the present case ought to be the true value of the asset at the time when the disposal took place; see *Smith New Court Securities Ltd. v Citibank N.A.*

545. In the present case, I do not consider it appropriate to take any date later than the date of sale (or thereabouts in 2009) as the starting point for quantification. I do not consider that 2014 date (as contended for by the Claimants in their alternative case) would be a reasonable date to take. The position in 2009, and in particular July 2009, was that the Bank wanted a reduction in the indebtedness, and I have no doubt that it would not have been amenable to suggestions which would have had the effect of significantly postponing a large capital repayment, even if there were some possibility of dividends being paid and also a possibility of future growth in the value of the company. The evidence showed that the Bank had its own pressures and problems in the aftermath of the financial crisis, albeit I was not persuaded that there was any particular pressure by the Danish FSA in relation to the Updata Europe loans. Whilst I have concluded that there might have been some flexibility in terms of extending the timing of a sale, I consider that this is to be measured in terms of weeks or a few months at most, and not in terms of years. If there was a buyer in 2009 willing and able to buy the company, with funds available, the Bank would not have wanted the buyer to walk away, as Mr. Jorgensen's evidence made clear.

546. Updata Europe would have recognised this reality, including the need to preserve its relationship with the Bank (since Updata Europe including Updata Denmark were still in business) and would have proceeded to a sale. This would also have the benefit of repaying Vald. Nielsen in respect of the monies originally provided by Mr. Johnsen's grandmother. I do not therefore consider that Updata Europe would, in July 2009 (when the sale took place) or September 2009 (when the extension agreed with the Bank ran out) have attempted to obtain an indefinite postponement of a sale of the shares in Updata UK. Nor do I think, on the evidence, that there would have been a real or substantial chance of obtaining the Bank's agreement to such a postponement. In the light of Mr. Hildebrandt's frank evidence, I also do not consider that, in the very difficult banking conditions of late 2008 and 2009, there was any real or substantial chance of Updata Europe finding another Bank willing to refinance. Accordingly, the relevant date for the assessment of loss is July 2009.

547. These conclusions also mean that the Claimants' alternative claim based on the 2014 date – namely a claim based on "loss of a chance" for the lost opportunity of persuading the Bank to postpone a sale – also fails. It is fair to note that Mr. Booth never embraced a claim based on "loss of a chance" with any enthusiasm. His opening submissions contained no reference to loss of a chance, and his primary submission (in a short note produced a few days into the trial, after I had raised the

potential applicability of "loss of a chance" principles) was that this was not a loss of a chance case. I consider that Mr. Booth was correct, including in relation to his case for a 2014 date to assess loss. In accordance with the cases which I have already discussed, the issue of whether or not the Claimants would have decided, and would have been in a position, to postpone sale until 2014 is an issue to be resolved on the balance of probabilities: it concerns what the Claimants would have done. If the Claimants were unable to establish these facts, on a balance of probabilities, then the claim based on a 2014 sale should fail. There is in my view no intermediate case based on the lost opportunity to persuade Mr. Jorgensen – who was not a potential purchaser of the shares – to permit the Claimants to retain their shares.

548.  Accordingly, I return to my starting point for the assessment of loss, namely the value of the asset in 2009. The question is whether that is also the finishing point in the assessment of damages. In my view, even though the true value of the asset at the date of loss is the starting point for assessing loss, it is appropriate to consider all the factual circumstances in deciding whether or not it is appropriate to award damages by reference to the true value of the asset. Mr. Booth was inclined to agree that, in some circumstances at least, an award of damages less than the true value may be appropriate. He gave the example of a vendor who was, for some reason or another, not motivated to try to obtain the true value of an asset, because he was very favourably inclined to a particular purchaser.

549.  However, I do not think that that is the only case in which the facts may result in an award of damages which is different to the true value. The quantification of damages is, even in a case of fraud, compensatory not punitive. There is no authority which in my view compels the conclusion that, in a case of fraud, the court must assume that the shares could have been sold for their true value. There may be various factors which militate against this conclusion; for example: time-pressures on a vendor to sell, a weak bargaining position, a lack of expertise or professional assistance in relation to selling an asset where there is no instantly available market (such as a stock exchange) for the purchase of such assets. It seems to me that it is appropriate, before awarding damages by reference to the true value of the asset, to consider the chances of the relevant event occurring. I consider this to be in accordance with the law as to quantification of loss which is summarised in *Wellesley* and the cases there considered.

550.  Thus, in *Mallett v McMonagle* [1970] AC 166,176, Lord Diplock said:

> "But in assessing damages which depend upon its view as to what will happen in the future or would have happened in the future if something had not happened in the past, the court must make an estimate as to what are the chances that a particular thing will or would have happened and reflect those chances, whether they are more or less than even, in the amount of damages which it awards".

551.  Similarly, in *Vasiliou* at paragraph [25], Patten LJ (with whom the other judges agreed) said:

> "Where the quantification of loss depends upon an assessment of events which did not happen the judge is left to assess the

chances of the alternative scenario he is presented with. This has nothing to do with loss of chance as such. It is simply the judge making a realistic and reasoned assessment of a variety of circumstances in order to determine what the level of loss has been".

552.    Patten LJ then referred to *Parabola,* where Toulson LJ said (in the context of a claim for lost profits):

> "The next task is to quantify the loss. Where that involves a hypothetical exercise, the court does not apply the same balance of probability approach as it would to the proof of past facts. Rather, it estimates the loss by making the best attempt it can to evaluate the chances, great or small (unless those chances amount to no more than remote speculation), taking all significant factors into account".

553.    In the present case, I have found that Updata Europe would not have retained the relevant asset beyond 2009, because there was no real or substantial chance of persuading the Bank to allow them to avoid a sale. The alternative scenario with which I am presented, on the Claimants' case, is therefore that the shares would have been sold in 2009 for their true market value. I have to consider the chances, great or small, of that occurring. This is, as the above passages show, not a "loss of a chance" analysis, but simply the process of quantification of loss taking into account all relevant circumstances.

554.    I do not consider that the possibility of a discount from the true, objectively assessed, value of the shares involves taking, as the Claimants sought to suggest, an "arbitrary" approach. In various cases, the courts have awarded damages based on the reduced chance of realising what might otherwise be regarded as the true value of the asset: see, for example, *First Interstate Bank of California v Cohen Arnold* [1996] CLC 174 (CA), and *Blue Circle Industries Plc v Ministry of Defence* [1999] Ch 289. *McGregor on Damages* paragraph [10-050] specifically treats the latter case as a case of quantification of loss.

555.    However, the Claimants drew attention to the judgment of the Court of Appeal in *Elektrim*. The issue there concerned damages payable for breach of a contract which, if performed, would have required the valuation of shares by two investment bankers and a consequent payment to the claimants. Arden LJ delivering the judgment of the Court of Appeal said [46] that:

> In the present type of case the court has to assess what a banker would have concluded as to the valuation of certain shares. That may not be easy but if something of value has been lost, the court must do its best to estimate that value and should not too readily decide that it is a matter of chance what the true value of something as concrete as a share is likely to be.

556.    I do not, however, consider that the decision in *Elektrim* means that it is never permissible to make an allowance for contingencies surrounding the ability of a party to realise the true value of shares, albeit that care needs to be exercised before doing

so. Ultimately, the question of whether a discount is appropriate depends upon the context in which the issue arises. On the facts of the present case as described above, where the relevant asset was in the course of being sold and there is obvious uncertainty as to what price could be achieved, I consider that it is appropriate to consider the chances of the sale achieving the true value of the asset in question, and if appropriate to apply a discount to reflect uncertainty.

557. However, I do not accept that it is appropriate to address this question by considering each particular contingency on which a sale may have depended, and then multiplying the resulting probabilities together. The authorities reviewed by Bryan J. in *AssetCo* indicate that this may be appropriate in some loss of a chance cases. But for reasons already given, I do not consider that this is a loss of a chance case. In any event, neither *AssetCo*, nor the line of authority considered in that case including the seminal decision in *Allied Maples*, involved the question of how to value the claimant's loss in circumstances where he was deprived of a valuable asset by fraud. As I have indicated, the starting point in such cases is the true value of the asset, but with the possibility of a discount to reflect the chances of realising the true value of that asset in the particular circumstances of the case. I would also in any event have considered the multiplication approach to be inappropriate in any event. The central question is to consider the prospect of a purchaser, whether it be LMS, some other private equity house, Mr. Nielsen, a trade buyer or otherwise, paying the true value for the shares, and doing so within the timescale of a sale by September 2009 or a few weeks or months thereafter. It would in my view be inappropriate to try to assess the percentage chance of any particular purchaser buying the shares, and then multiply together the various percentages. The reason can be illustrated by a simple example. If there was a single potential purchaser where the chance of paying true value was 75%, the damages would be assessed at 75%. But if there were two such purchasers, the damages would, on the multiplication theory, be calculated on the basis of a lower figure, namely 75% x 75%. The larger the number of potential purchasers at 75%, the smaller the damages on the basis of the Defendants' multiplication approach. This counter-intuitive result must in my view be wrong. The reason is that each potential purchaser does not constitute a separate contingency that needs to be considered and evaluated and overcome by Updata Europe in order to obtain the benefit of a sale. In order to obtain a sale at true value, there only needed to be one purchaser. If there was one purchaser who was willing to pay 75% of the true value, the existence of other purchasers who were only willing to pay less would not diminish the amount that could be obtained from the purchaser willing to pay more.

558. I consider that, as in many of the cases involving assessment of damages where there is an element of uncertainty, it is appropriate to take a broad view as to the appropriate discount in the light of the relevant facts. Turning now to the facts, I consider that there should be a material discount from the true value of the asset, but I do not consider that there are any factors which lead me to conclude that this should be a very substantial one. Indeed, it seems to me that there are good reasons for awarding something relatively close to true value.

559. This is a case where the evidence is clear that the majority shareholding in Updata UK was an asset which was actually and potentially attractive to a variety of investors. The initial offering by Tenon to the private equity market quickly resulted in interest from a number of houses. It is true that the offers made were at or around what was

understood to be the level of the Bank debt, but this was an unsurprising and obvious consequence of the "opportunity" having been presented as one to acquire the shareholding at that level. The AMR Report showed that Updata UK would potentially be of interest to trade buyers; i.e. to companies in the technology sector. This is borne out by the interest shown by e-Kong. The management itself was clearly very confident as to the future of the business, and were highly motivated to remove Update Europe and retain (with private equity investment) control of the business. There was another bidder actually on the scene (Mr. Nielsen), with a potential backer and a capable corporate finance adviser. In the context of causation, I have already indicated that, had the representation not been made, these and other factors would have had the effect of driving the price offered towards the true market value of the business. In addition, the expert accounting evidence served to confirm, in my view, the existence of a market of willing buyers for the asset in question. There was no suggestion, for example, that the asset was so specialised that there was only a very limited potential pool of potential purchasers.

560.    I also consider that this conclusion (i.e. that damages should be close to the true value of the asset) is supported, and reinforced, by a point which Mr. Booth emphasised in the course of argument. This is a case of fraud, where what happened was that the Defendants sought deliberately to divert the course of events from that which they would and should have taken if the 20 April and 3 June e-mails had not contained false information. In the context of an asset for sale, that course of events should ordinarily lead to the vendor receiving the fair value of that asset. In those circumstances, I do not consider that the court should look favourably on arguments to the effect that fair value should not be taken as the measure of loss, because there are too many imponderables to know whether fair value would have been received. There are always imponderables. But the Defendants were sufficiently concerned as to how events would transpire that they found it necessary to misrepresent the position. Again in the present context, their misrepresentations form an evidential weapon which should lead the court to be somewhat sceptical in relation to the Defendants' submission that the Claimants would not, if there had been no deceit, have received the true value of their asset.

561.    I have considered the various factors relied upon by the Defendants in support of their case that, ultimately, Updata Europe would have received little more than the amount which LMS paid, and the extent to which it is appropriate the reduce the damages, otherwise assessed on the basis of the true value of the asset, because of these contingencies. The most significant points seem to me to be as follows.

562.    First, the sale was carried out in 2009 under some pressure from the Bank, and in a timescale which (once Mr. Jorgensen sent his e-mail on 20 May 2009) was to some extent dictated by the Bank. There was also the pressure arising from the fact that the January 2009 agreement between the Bank and Updata Europe/ Denmark meant the facilities could be terminated in September. But I do not consider that these factors should result in a very substantial reduction from the true value of the asset. The initial misrepresentation was made on 20 April 2009, when no timetable had been imposed on the bidders and there was still a fair amount of time to September. Even on 3 June, there were still some months before September. The evidence indicated to me that the process leading to a sale, including due diligence, can be accomplished relatively quickly if parties set their minds to it. Furthermore, by the middle of May

2009, if not before, a data room was being contemplated and was then set up; thereby facilitating any due diligence that a potential purchaser would wish to carry out. Accordingly, I did not think that the time-scales involved were such as to require a very substantial discount to the value of the asset because of the pressure to sell.

563.    Secondly, another possible discount arises from the fact that Mr. Johnsen had been trying for some time to raise investment, but had failed to do so. It is also the case, and an important consideration, that Mr. Johnsen's efforts to find a purchaser gave the impression of being somewhat amateur. He did not engage professional advisers (the equivalent of Tenon or Mr. Medhurst), but rather seems to have carried out the work on his own, approaching people whom he knew or to whom he was introduced. These efforts had not been successful. Mr. Johnsen explained that, certainly in a number of cases, this was because he was seeking investment at the parent company level, and the structure of the shareholding made this unattractive. I did not think that such matters were a reflection on the true value of Updata UK, but were a reflection on Mr. Johnsen's ability to obtain full value for Updata Europe's shares.

564.    On the other hand, whilst it is true that Mr. Johnsen had not succeeded in finding investors, the position by mid-April 2009 was that the Defendants had succeeded in finding a number of private equity houses who were potentially interested, and the Defendants were themselves highly motivated to carry out an MBO. So whilst Mr. Johnsen had not successfully found potential investors, the Defendants had done so with the assistance of firm of corporate finance advisers (Tenon) with expertise in this area. Similarly, Mr. Nielsen was using the services of Mr. Medhurst, who was looking (albeit with inadequate and false information as to the projected results of Updata UK) at both the trade market and the private equity market. It is wrong, in my view, simply to focus on Mr. Johnsen's efforts on the "sell" side whilst ignoring the efforts which had been made, and could be made, on the "buy side" as well, where there was strong motivation for a sale and a potential market of buyers had been established. Furthermore, if the misrepresentations had not been made, Mr. Johnsen would have had figures – which had attracted the private equity market – which he could show other potential investors.

565.    Thirdly, there is the position of Newwatch, which was allowed to roll over its shareholding and acquire further shares. Neither expert suggested that this factor affected the true value of Updata Europe's shares. However, it does seem to me that it is a factor which is potentially relevant to the price that would have been obtained upon a sale. Mr. Johnsen would in my view have been attracted to proposals which may have fallen short of the true value of Updata Europe's shares, if they were accompanied by a willingness to allow Newwatch to retain its interest and acquire further shares.

566.    Fourthly, and to an extent related to the previous point, I consider that Mr. Johnsen was in a relatively weak bargaining position. It is a fact that Updata Europe had a substantial indebtedness to the Bank, and was under pressure to sell. Any potential purchaser would not have found it too difficult to find this out, since Updata Europe's most recent accounts referred to its indebtedness.

567.    Taking all the relevant factors into account, I consider that the chances of obtaining the true value of the shares was less than 100%. I assess the appropriate discount to reflect the uncertainty of achieving true value at 25%.

### I:    Fair value of Updata UK

568.    The fair value of the shares in Updata UK as at July 2009 was the subject of expert accountancy evidence from Mr. Doug Hall for the Claimants and Mr. Paul Smethurst for the Defendants. Fair value in this context means the price that would be paid by a willing buyer and willing seller, rather than the price that might be realised in the scenario of a forced sale. Both experts had prepared two detailed written reports, and a very helpful joint report in which the differences between them were identified and the reasons for their respective conclusions were expanded upon.

569.    Both experts were agreed as to the basic principles by which the fair value of shares in a private company such as Updata UK should be ascertained. This involved making an earnings-based assessment by which an estimate of Updata UK's maintainable earnings as at the date of the SPA on 11 July 2009 (such earnings being measured as EBITDA) is first made. A multiplier should then be applied in order to arrive at an estimate of the "Enterprise Value" of the company. That Enterprise Value would then be adjusted, where necessary, for any net debt. Two other adjustments would then be made, so that there were therefore four main components. These were: (i) maintainable earnings, (ii) the multiplier, (iii) a premium for taking control of the company, and (iv) a discount to reflect the fact that the shares were in a private company.

570.    The experts were agreed that, in relation to (iv), the appropriate discount was 33%. They were disagreed on the other three elements, and the respective positions of the experts were as follows:

    a)    Maintainable earnings: £ 7,000,000 (Mr. Hall) or £ 4,500,000 (Mr. Smethurst)

    b)    Multiplier: 6 (Mr. Hall) or 4.98 (Mr. Smethurst);

    c)    Control premium: 35% (Mr. Hall) or 25% (Mr. Smethurst).

571.    These disagreements resulted in an overall difference between the two experts of around £ 20 million. Mr. Hall's figure for the fair value of the equity was therefore £ 37,899,000. Mr. Smethurst's figure was £ 18,666,000. The calculations which produced these figures were set out in their joint report, and are reproduced below:

|  | DH | PS | Difference |
|---|---|---|---|
| Multiplier | 6.00 | 4.98 | 1.03 |
|  | £'000's | £'000's | £'000's |
| EBITDA[A] I | 7,000 | 4,500 | 2,500 |
| mplied total enterprise value [A x multiplier] | 42,000 | 22,388 | 19,613 |

| | | | |
|---|---|---|---|
| Less: Net debt | (100) | (100) | |
| Equity value (minority basis) [B] | 41,000 | 22,288 | 19,613 |
| Plus: control premium 35% or 25% [B x 35% Or 25%] | 14,665 | 5,572 | 9,093 |
| Equity controlling basis [C] | 56,565 | 27,859 | 28,706 |
| Less: Private company discount 33% [C x 33%] | (18,666) | (9,194) | (9,473) |
| **Fair value of equity** | 37,899 | 18,666 | 19,233 |

572.  The above figures represented the experts' views as to the fair value of 100% of the equity. Updata Europe had a 60% shareholding, and therefore the fair value of that shareholding would (on the basis that a premium for control was appropriate) be either £ 22.7 million (Mr. Hall) or £ 11.5 million (Mr. Smethurst); i.e. a difference of around £ 11 million. I considered that it would, on the facts of the present case, be appropriate to include such a premium. This is for the simple reason that Updata Europe had a 60% shareholding in Updata UK, whose sale would result in control of the company being transferred to the purchaser.

573.  The figures for maintainable earnings, multiplier, and control premium, as set out above, generally speaking reflected a figure which was at or close to the mid-point of a range of numbers which each expert initially put forward.

*Forced sale*

574.  It will be apparent from the above figures that there was a significant difference between the fair value of the 60% shareholding, as assessed by the experts, and the consideration received by Updata Europe on the sale to LMS. The amount of that consideration was £ 5,244,798 after taking account of the settlement of an intra group loan of £ 134,312. This was substantially lower than the figure of around £ 11.5 million put forward by Mr. Smethurst.

575.  The explanation for this difference, on Mr. Smethurst's approach, was that the sale which took place in July 2009 was a "forced sale". Mr. Smethurst described the characteristics of a "forced sale" as being either or both of the following: a compulsion to contract (i.e. an unwilling seller or purchaser) and/or a reduced sale period. The accountants were agreed that, in general terms, the price achieved on "forced sale" will be lower than that which might be obtained assuming no forced sale. They were also agreed that it would be for the court to determine if the sale of Updata UK was indeed a "forced sale" and whether, as a result, Updata Europe

suffered any loss. Mr. Smethurst's view was that – whilst acknowledging that it was for the court to determine whether the sale of Updata Europe's shares was a forced sale – if it was determined that it was a forced sale then (as he said in the joint report) "there is no loss as the price achieved was the best that could be obtained in the circumstances". In his first report, he put the matter this way:

> "If the Court determines that this was a forced sale then in my view there is no loss. The amount offered and accepted reflected the circumstances of the sale and what a third party was prepared to part with in order to acquire the shares on offer".

576.   Mr. Hall did not agree that, even if the sale were forced, Updata Europe suffered no loss, "as that rules out any opportunity to have obtained a higher price within the shortened timescale that a forced sale would entail".

577.   I do not accept Mr. Smethurst's view that if this were a forced sale, it follows that Updata Europe suffered no loss. It seems to me that on the facts of the present case, where fraud is alleged, it is essential to address the question:  what would have happened if the fraudulent misrepresentation had not been made? This issue, addressed in detail in Section H above, involves the resolution of factual matters which are for the court to determine, and are not matters for the expert accountants. It is not right to short-circuit the analysis by proceeding (as did Mr. Smethurst) from a starting point - that the sale had characteristics of a forced sale - directly to the conclusion that there was no loss because the best price was obtained. As Mr. Smethurst fairly accepted in cross examination: "If – if there was fraud involved and some people didn't have – and some people didn't have information and others did, then I don't know what would have happened".

578.   It became clear in the course of his evidence that Mr. Smethurst's view, that there was no loss, was reached without factoring in the fact that this was a case in which fraud was alleged. His oral evidence was that, prior to cross-examination, he had not realised that allegations of fraud were being made against the Defendants. Later in his evidence, he accepted that the question of whether or not Updata Europe had suffered a loss would depend upon all the circumstances, including what the effect would have been on the timetable for sale if proper or full information had been provided. He said that if there would have been "some latitude for some other course of action, then that's where one might explore further". His concept of a forced sale was very much a concept of the seller having to sell, and having in practice no or little room for manoeuvre. The extent to which there was room for manoeuvre is a factual question which I have addressed in Section H.

579.   I therefore did not derive any assistance from Mr. Smethurst's view that there had been no loss. Indeed, it seemed to me simply to restate the argument, that Updata Europe would have sold at the LMS price in any event. This is an argument which I have rejected on the facts.

580.   In these circumstances, I did not consider that it was necessary or helpful to answer the question: was this a "forced sale"? If one were to apply Mr. Smethurst's very broad criteria for "forced sale", I would conclude that the sale did have some characteristics of such a sale. In one sense it could be said that there was a

"compulsion to transact", and that Updata Europe was not a willing seller. This was because Updata Europe was clearly under pressure to reduce the debt to the Bank, and it would have preferred to have retained its shares if it could. Had there been no significant debt, Updata Europe would not have been selling. However, the sale did not come about because the Bank actually forced Updata Europe to sell against its wishes, and so there was no "compulsion" in that sense. Indeed, when the bidding process concluded, it was Updata Europe's decision to sell. There was also, again in one sense, a "reduced sale period": in that a timetable was laid down in May 2009 for the bidding process leading ultimately to a sale. But as described in Section H, the overall timetable for the sale was not unduly compressed. Indeed, the whole process, starting from Mr. Nielsen's expression of interest in January, took over 6 months, and nearly 3 months passed between the original LMS offer and the conclusion of the sale process.

581.    Overall, for the reasons given in Section H, I did not consider that this was a case where Updata Europe had no latitude or for manoeuvre at all. I also considered that Mr. Hall was right to say that there was a spectrum of "compulsion", and that there might be different degrees or a spectrum of compulsion. The concept of a "forced sale" therefore involved, as he said, "shades of grey". At one end of a scale, a bank may demand immediate repayment of a loan. At another end of the scale, it may give the company, say, 6 months to sell; i.e. enough time for an orderly sale. So "it depends where you are between those extremes".

582.    My conclusion is therefore that such compulsion as existed in the present case did not lead to the conclusion that Updata Europe suffered no loss. However, in assessing the amount of Updata Europe's loss, and specifically the extent to which Updata Europe would have obtained the fair value of the asset, it is necessary to take into account the pressure from the Bank to sell, and the fact that limitless time to do so was not available. I have sought to reflect these and other factors in my assessment of the loss suffered in the present case by application of a 25% discount from the true value for the reasons given in Section H.

*The LMS offer*

583.    A different line of argument on behalf of the Defendants, but leading to the same conclusion, was that this was a case where the market was tested, and where – in the context of a competitive bidding process – LMS made an offer to buy. The price at which they bought should therefore be treated as the market price or the fair value in the real world. The competitive bidding process started at an early stage. LMS was originally selected as the management's preferred bidder after they had put in a proposal to UK management at the start of April 2009. At that time, LMS knew that they were in competition with other private equity houses. In due course, when LMS made its first offer to Updata Europe in April, its second offer in May, and then repeated that offer in June, LMS was doing so knowing that it was in competition with Mr. Nielsen. Accordingly, whilst the accountants might have their own views as to what was fair value, the best evidence of fair value was the offer which LMS actually made and which was accepted. In this context, the Defendants emphasised that this offer made by LMS was made on the basis of full knowledge of the optimistic management's forecasts, and was not therefore depressed because of a lack of financial information.

584. I do not accept this argument. I agree with the Claimants that it is inappropriate to determine fair value by reference to the price that a single bidder was prepared to offer; particularly in view of the expert evidence which indicates that the LMS offer was at a significant undervalue. There may be a variety of reasons for the price offered by a particular bidder, and which do not reflect on the true value of the asset. For example, the bidder may be interested in the asset, but only if he can acquire it cheaply. He may have internal criteria, such as a targeted internal rate of return, which dictate the level of his offer. The level of his bid may have been dictated by a perception that a bank will pressurise a seller to sell in order to pay off a bank debt.

585. The position is different if, instead of looking at a single bidder, there are a range of bids made by different players in the market. In the present case, that did not happen. There were a number of private equity houses which expressed interest, to Tenon and LMS, in the acquisition in early April. But these expressions of interest were not made to Updata Europe, but rather as part of a potential negotiation with Updata UK's management. Furthermore, these expressions of interest were given in the context of the private equity houses having been told, in the Tenon Memorandum, that the opportunity was to acquire the asset at the level of the bank debt. It is therefore not surprising that their proposals were pitched at around that level.

586. A further argument advanced by the Claimants, in support of their case that the LMS bid was not a guide to fair value, was that LMS had been told that Mr. Nielsen had been given different information as to the expected performance of the company. In that regard, the Claimants relied upon a statement in the initial presentation by LMS on 2 April 2009:

> "Ex UD [Updata] AS chairman [i.e. Mr. Nielsen] possible "fly
> in ointment" and unfriendly party due to Peter Johnson conflict
> 2 yrs ago – also working off unrealistic projections".

587. The Claimants suggested that the "unrealistic projections" were the low projections contained in the Financial Overview. If so, then Mr. Nielsen would not have been perceived as likely to put in a competitive bid; because he was wrongly proceeding on the basis of the low figures. The Defendants, in contrast, suggested that "unrealistic projections" was a reference to the fact that Mr. Nielsen had been given the rather higher figures that had been circulated to Mr. Homann and others towards the end of 2008.

588. I am not prepared to proceed on the basis that LMS knew that Mr. Nielsen was working from the unrealistically low figures in the Financial Overview. As the Defendants correctly pointed out, Mr. Hooft was not cross-examined on this particular passage in the presentation. It remains unclear as to what "unrealistic projections" LMS was referring. In my view, it is at least as likely that LMS was referring to the higher figures which had been in circulation at the end of 2008. If it was a reference to the much lower figures, then it is difficult to see why Mr. Nielsen was a possible "fly in the ointment". Furthermore, no allegation of fraud has been made against LMS, and it seemed to me that an allegation that LMS knew that Mr. Nielsen was working from lower figures would come very close (particularly in the light of the correspondence leading to the 3 June e-mail) to an allegation of fraud against LMS.

589.    A variation on these themes was the reliance placed by the Defendants on the value placed by LMS on the acquired asset at the end of 2009. The value attributed to LMS' 53.3% stake in Updata Infrastructure in its annual report for 2009 was approximately £ 8 million. This implied that the value of 100% of the company as a whole was approximately £ 15 million; an increase of 29% on its acquisition cost. This 2009 valuation to an extent supported the Claimants' case the company was worth more than LMS paid for it, but also supported the Defendants' case that the figures put forward by the accountants were too high. I did not, however, consider that I derived any real assistance from this valuation. There was no information as to how this value, used for the purposes of LMS's annual report, was arrived at, and what criteria were applied. Moreover, I again do not consider that it is appropriate to value the asset, having regard to the expert evidence, by reference to the valuation of LMS alone.

*Approach*

590.    Accordingly, my approach to ascertaining the fair value of the relevant asset is to consider the four principal constituent elements which the experts used in their methodology, and to resolve the three issues on which they were in disagreement. In order to avoid unnecessarily complicating the analysis, I shall express my ultimate conclusions – as did the experts in the table set out above – by reference to a single figure, rather than identifying a range and then a figure at or close to the mid-point.

*Maintainable earnings*

591.    Both experts took as their starting point a figure for the financial year ("FY") 2009-2010 which was contained in a document called "Gross Profit Breakdown v10" which was prepared by Mr. Mantell. This document was last modified on 9 July 2009, shortly before the SPA was signed in the early hours of 11 July 2009, and therefore contains the management's figures on almost the eve of the sale. The EBITDA shown in this document was £ 7,469,000. However, Mr. Hall had identified that this figure wrongly failed to take into account certain overheads or administrative costs totalling £ 809,000. This meant that the figure of £ 7,469,000 should be reduced to £ 6,691,000 for the FY 2009-2010. This figure was somewhat higher than the equivalent FY 2009/2010 figure in the March Weighted Budget (which was £ 6,071,000), and this reflected Updata UK's strong performance since the time when that budget had been prepared. It should also be noted that the figure, whether £ 6,691,000 or £ 6,071,000, represented a very significant increase over the results for the FY 2008/2009 which had ended at the end of June. The company's results for the FY 2008/2009, as set out in due course in restated accounts for that year, were £ 1.869 million. Importantly, however, both experts agreed that the relevant starting point for maintainable earnings was the FY 2009/2010, rather than the "trailing" FY 2008/2009.

592.    Using this starting point of the "Gross Profit Breakdown v.10" prepared in July 2009, Mr. Hall then made an estimate of earnings for the subsequent years to June 2011, 2012 and 2013. He assumed that the company would win 8 new contracts per year in these subsequent years. This compared to 7 new contracts secured in the FY to June 2009, and 14 new contracts secured in the FY to June 2010. His projections for the subsequent years were £ 6.767 million (2011), £ 7.819 million (2012), and £ 9.161 million (2013). The weighted average of these figures, applying a greater weighting to the earlier years, was £ 7.200 million. Mr. Hall rounded this down to £ 7 million; a figure which he considered could reasonably have been assumed by the UK

management of Updata UK at the date of the SPA to be the maintainable earnings of the company. It was this figure of £ 7,000,000 which is contained in the table set out above.

593.   Mr. Smethurst started at the same figure of £ 7.4 million contained in the "Gross Profit Breakdown v.10". But Mr. Smethurst reduced it to a range of £ 4.2 - £ 4.7 million, ultimately a mid-point of £ 4.5 million for maintainable earnings. The reductions from the £ 7.4 million starting point were made for a number of reasons. Mr. Smethurst considered that a willing purchaser would not ascribe any value to contracts which Updata UK had weighted as having a probability of 50% or below. He also reduced the weighting of 90% and 70% probability contracts to 70% and 50% respectively. He also considered a contemporaneous e-mail from Mr. Szpiro of LMS, setting out his views as to maintainable earnings. This e-mail (described in more detail below) showed year-on-year reductions in projected earnings, and Mr. Smethurst applied the same percentage reductions as shown in the LMS e-mail. He also applied a 10-25% reduction in gross profit on rental and installation revenue on the basis of likely public sector cuts. Mr. Smethurst's figure of £ 4.2 million assumed a 25% reduction, and his figure of £ 4.7 million reflected a 10% reduction. His figures also made allowance for the exclusion of overheads/ administrative expenses.

594.   Each expert supported his approach by reference to various factors. Mr. Hall referred to the fact that Updata UK's revenue was not derived from one off sales, with no following rental stream. Rather, its revenue and margins were incremental as it added new contracts, each of which would provide a revenue stream for multiple years and with the good prospect of renewal at the end. Although it was relevant to look at the wider economic and commercial environment when considering the value of Updata UK, including the global financial crisis in late 2008, it was also important to look at the report prepared by AMR in July 2009 as part of due diligence for LMS. This showed that, notwithstanding the crisis, AMR considered that Updata UK's business was likely to prove very successful. AMR reported positively on a revenue forecast of approximately £ 21.4 million for FY 2010, and EBITDA for that year of approximately £ 6.9 million. Mr. Hall drew attention to the forecast of maintainable earnings in the LMS e-mail of 29 June 2009. In his view, this supported a maintainable EBITDA level of approximately £ 7 million at that time.

595.   Mr. Smethurst referred to, and described in some detail, the wider economic and commercial environment. There was a general lack of available finance/ lending from banks to prospective purchasers. This, and the general economic climate, impacted upon the price that purchasers were prepared to pay in connection with corporate acquisitions. The number of corporate transactions was significantly reduced in 2009. The financial crisis also had an impact on the amount which local authorities were prepared to pay. Potential cuts to local authority spending were a matter of concern to Updata UK and a feature of the commercial landscape. Against this background, a prospective purchaser would not be looking at maintainable earnings of £ 7 million for a company which had never achieved EBITDA of anything approaching that level. The figure of £ 7 million represented a multiple of around 3.75 times the earnings achieved in 2009 (£ 1.869 million). It was not credible that a hypothetical purchaser would use this value when considering how much to pay. Given the economic climate, a purchaser would take a more cautious view of contracts with only a limited chance of coming to fruition.  Mr. Smethurst also drew attention, in addition to the

uncertainty and instability caused by the global credit crisis and the threats of cuts in public spending, to question-marks as to the continuity of the existing UK management. Although there were generally positive comments in the AMR report as to Updata UK's prospects, that report was not considering the amount that might be paid as between a willing buyer and seller, and did not contain a figure for maintainable earnings.

596.    It seemed to me that each expert made reasonably arguable points, as summarised above, in support of the views which each put forward. This is not a case where it would be appropriate to prefer the view of one expert against the other. I considered that a prospective purchaser would assess the company's maintainable earnings at some point on the spectrum between the figures which each expert put forward. I consider that the appropriate point would be marginally more towards Mr. Hall's figures than Mr. Smethurst's for the following reasons.

597.    First, I consider that it is helpful to look at the figures for maintainable earnings which were given by Mr. Szpiro of LMS in his e-mail to Mr. Bennett on 29 June 2009. These figures were not in any way influenced by the exigencies of the present litigation. The purpose of preparing figures was explained by Mr. Szpiro at the start of his e-mail as follows:

> "Richard
>
> Please find attached a summary headline P&L for years 2011-2014.
>
> To date we have focused on the 2009 out-turn and 2010 but we also need to give some consideration to the outer year figures as these will ultimately drive value on exit. To this end, it would be helpful if LMS could have a session with Vic, Jules and yourself at some point this week to discuss our broad assumptions. I will be in Reigate tomorrow but I know Pieter in particular would like to be present.
>
> The attached figures are LMS's base/conservative case figures and essentially build on the 2010 figures for "Current", "In the Bag" and "Weighted" (as per Julian's model, although here are small differences if trying to reconcile) by including further contract wins (called "New") which are not in the pipeline".

598.    Mr. Spiro therefore described the figures as "LMS's base/ conservative case figures". They built on figures which Mr. Mantell had provided. Mr. Szpiro made various assumptions as to further contract wins. He described the assumption applied to the "Total Contract Value" of new contract wins as "conservative" and "somewhat harsh". His figures showed wins, but the Total Contract Value was forecast to drop from £ 18.3 million in 2011 to £ 7.3 million in 2014.

599.    The bottom line EBITDA figures, which were contained in the attachment to the e-mail, showed projections of: £ 7.4 million (2010); £ 6.515 million (2011); £ 6.633 million (2012); £ 6.791 million (2013); and £ 6.992 million (2014) see paragraph 119 above. The starting point for these figures, namely £ 7.4 million, was the same figure

as in due course appeared in the July 2009 "Gross Profit Breakdown v.10" which both experts used. It was a figure which both experts agreed was overstated by around £ 800,000 because of the exclusion of overheads/ administrative expenses. It follows that the other figures for projected EBITDA, which assumed a 5% growth in administrative costs, would have been similarly overstated. After making this deduction, it will be seen that the figures for maintainable earnings in the years 2011-2014, as estimated by Mr. Szpiro, were between £ 5.7 million and £ 6.1 million.

600.   Mr. Szpiro did not give evidence at the trial, but Mr. Hooft was asked about this document and said that he remembered it. He disagreed with the proposition that the figures were conservative. In particular, he took issue with the starting figure of £ 7.4 million, and said that LMS had far more detailed figures from Tenon. LMS's view for 2009/2010, he said, was "more in line of 5/6 million, not 7.4". (It will be recalled that the figure in the Tenon Memorandum was just over £ 6 million.) He explained that Mr. Szpiro was seeking to extrapolate into the future from contracts recently won. When asked whether these were "intended to be realistic conservative assumptions as regards what was expected to happen going into the future", Mr. Hooft said that he was just "disputing the word "conservative" because we at LMS did not think for example that 7.4 in 2010 was conservative."

601.   I think that it is more likely than not that, notwithstanding Mr. Hooft's evidence, the figures attached to the e-mail were indeed intended to be conservative, which is what Mr. Szpiro's e-mail says. Because there has been no disclosure of LMS's internal documents in these proceedings, there are no other contemporaneous LMS figures available. Viewed overall, and bearing in mind the error in relation to overheads, I consider that the LMS e-mail is relevant evidence that a willing purchaser would conservatively assess the company's maintainable earnings looking into the future, and beyond FY 2010, as between £ 5.7 million and £ 6.1 million; i.e. a midpoint of £ 5.9 million. This is consistent with Mr. Hooft's evidence that LMS was looking at £5-6 million.

602.   Secondly, I agree with Mr. Hall that the AMR report does provide a valuable contemporaneous insight as to the prospects of the business, again uninfluenced by the exigencies of litigation. I thought that it was contemporaneous evidence that counteracted the suggested negative or at least cautious approach which, according to Mr. Smethurst, would be taken by a prospective purchaser.

603.   Thus, page 7 of the report describes how the company "took off in 2008." The AMR report as a whole serves to explain why the company had succeeded, and gave a very positive view as to its future prospects. In particular, the report contained a fairly detailed analysis of the market, and amongst the headline points were: "Updata is well positioned to renew existing local authority contracts; good growth is possible beyond the pipeline, subject to competition" (page 12); "Respondent interviews indicate a high likelihood of further contract renewals" (page 13); "Updata's pipeline is achievable at the probabilities Updata has assumed" (page 50); "Updata has good potential to add further customers in regions where it is already present, as the marginal cost of serving them is low" (page 18); "Through Logicalis, Updata has won the PSBA, which will act as a springboard for additional Welsh contracts" (page 26); "Updata is a niche player in the local authority and education broadband market; its public sector focus is a relative advantage" (page 48); "High capital costs of an

alternative provider, together with strong performance against KPCs [Key Performance criteria] make contract renewal highly likely" (page 54).

604. Thirdly, I was not persuaded by Mr. Smethurst's discounting of the probabilities which had been assigned to Updata UK's pipeline. It seemed to me that not only Updata UK, but also Tenon, LMS and AMR, considered these probabilities to be reasonable. It is of course true that they were only assessments as to what might happen in the future, and that an assessment of a 10% probability of success by definition meant that there was a 90% chance of failure. However, I thought that a willing purchaser would expect some of the contracts with a 50% or less probability to come to fruition, not least because that is what must have happened historically (since the probabilities were assigned depending upon the stage reached).

605. Fourthly, I thought that Mr. Smethurst's most powerful point was, as Mr. Hall recognised in his evidence, that a figure of £ 7 million is a very considerable step upwards from the amounts which the company had previously made. A purchaser might naturally take a cautious view as to whether this would be maintainable. I agree, and this is one reason why I would not accept Mr. Hall's figure of £ 7 million, and would reduce it to a figure of £ 5.8 million, which is towards the lower end of the range of £ 5.7 – £ 6.1 million to which I have referred. It is true that this is itself a considerable step up on the previous performance of the company, including the performance in FY 2008/9. Nevertheless, it represents a reduction on the figure in the Tenon Memorandum (just over £ 6 million) and a substantial reduction on the FY 2010 figure (correcting for administrative expenses) in the July weighted budget (£ 6.6 million). On the facts of the present case, however, such a step-up is justified. As the AMR report said, the company "took off" in 2008. And to be fair to Mr. Smethurst, his figure of maintainable earnings of £ 4,500,000 does acknowledge a very considerable step up.

606. For these reasons, I consider that a figure of £ 5.8 million is appropriate for maintainable earnings.

*Multiplier*

607. Mr. Hall adopted a multiplier of between 5.0 and 7.0 in his estimate of value, with a midpoint of 6. Mr. Smethurst adopted a multiplier of 4.85 to 5.1, with a midpoint of 4.98. Each expert considered in detail a number of transactions in the market at the relevant time. Argument developed as to the extent to which these transactions were comparable. Mr. Hall accepted that determination of the appropriate multiplier is not an exact science.

608. Here, I consider that it is again valuable to consider the contemporaneous evidence as to multiples, prior to the onset of litigation and the careful analysis carried out by the experts. Mr. Homann described himself as a reconstruction specialist, and he clearly had experience of mergers and acquisitions. In his note to Mr. Jorgensen in January 2009, he used a multiple of 5 times EBITDA. The same multiple of 5 was used by Mr. Nielsen in the various proposals which he made. It is true that LMS used a higher figure of 6.1 in their letter of 16 April 2009. But this was applied to historic results, and was in any event a rationalisation of their offer which was based on repaying the bank, rather than an attempt to calculate the appropriate EBITDA multiple. Mr. Hildebrandt's evidence was that Mr. Nielsen's multiple of 5 was reasonable.

609.   In these circumstances, I consider that a multiple of 5 is appropriate.

*Premium for control*

610.   In Mr. Hall's first report, he expressed the view that a prospective purchaser would pay a premium of between 20% and 50% for control of a company, and that this should  in effect be an additional amount over and above the figure derived by multiplying EBITDA by an appropriate multiple. Mr. Hall chose the midpoint (35%) as being the appropriate premium for control. It was common ground that there should be some addition to reflect the premium for control; because the "multipliers" derived from comparable companies in the market were generally for small parcels of shares, and therefore did not reflect the premium that would be paid for control.

611.   In his first report, Mr. Smethurst identified a number of takeovers in the IT consultancy and data processing sectors in 2009. Mr. Smethurst identified the share price on the day before a takeover offer was made, and the share price which was contained in the takeover offer. The average premium was 22.6%, and the median was 19.8%. He therefore applied a 22% uplift for control.

612.   Mr. Hall's response, in his supplemental report, was that Mr. Smethurst's methodology of comparing the price offered with the price on the previous day was inappropriate, because it assumed that there was no market knowledge whatsoever of the transactions until they actually took place. Mr. Hall therefore looked at data relating to the companies identified by Mr. Smethurst, including in some cases the average share trading price 3 months preceding the date of the initial offer. He considered it reasonable to assume that in at least some of Mr. Smethurst's examples, the target's share price had already increased to reflect a proportion of the control premium. Mr. Hall's approach produced an average control premium of 34.07% and a median of 36.82%. It also resulted in a much narrower range of premiums for control, in contrast to the figures used by Mr. Smethurst which varied from 3% negative to 87% positive.

613.   In his supplemental report, Mr. Smethurst recognised that his previous methodology did not take account of information leakage that might have taken place prior to the day before the offer. He therefore looked at the share price one month prior to the offer. He excluded one takeover (Borland Software Corporation) which he described as an "outlier": in the case of that company, the one-month comparison showed a premium of 188%. Having excluded this outlier, Mr. Smethurst's figure was an average of 26.04% and a median of 23.11%. The midpoint of those two figures was 24.58% which Mr. Smethurst rounded to 25%. If the Borland transaction were to be included, then (on the basis of Mr. Smethurst's figures) the average would be 38.54% (i.e. close to Mr. Hall's figure of 35%) and the median would be 25.13%.

614.   The respective experts then carried out further analysis and expressed further views in their joint report. Mr. Hall considered in more detail a number of companies in Mr. Smethurst's list, and made certain corrections to Mr. Smethurst's calculations. For example, one of the companies (FDM Group Holdings PLC) had announced in June 2009 that it had received an approach. This was some time before one month prior to the offer, and it showed that Mr. Smethurst's bid premium was understated. In the case of another company (Valtech SA), there was a press article which referred to a premium of 43.1% compared to the average trading price of the shares during the

three months preceding the filing of the offer. In the case of Sodifrance, there had been an increase in the company's share price in December 2008, following the signing of a memorandum of understanding. Mr. Smethurst's calculation of the bid premium for that company was, in Mr. Hall's view, understated: since he should have had regard to the share price between 17 November 2008 and 16 December 2008. In the case of Borland (Mr. Smethurst's outlier at 188.46%), Mr. Hall relied upon a press release which referred to a premium of approximately 67% over the average thirty day closing price. Accordingly, this "outlier" should not have been excluded.

615. Having made these and other adjustments, Mr. Hall's figure for the average of the transactions was 38.75%, with a median of 36.12%. If Borland were excluded, the average was 35.93% and the median was 35.63%.

616. Mr. Smethurst's response in the joint report was to carry out further work to try to identify evidence of communication or rumour of a deal for each individual transaction and to consider premium by reference to the share price at that time. He pointed out that Mr. Hall has used a variety of approaches, sometimes looking at a period of 3 months prior to the transaction, and sometimes at other data. Mr. Smethurst's reworked calculation produced an average of 35.75%, and a median of 27.4%, if all the companies were included; i.e. including Borland and Sodifrance where the bid premia were much higher than the rest (87.5% and 89.75% respectively). In Mr. Smethurst's view, however, these companies were outliers. Excluding those companies, the average was 26.15% and the median was 25.71%. The midpoint of the average and median premia was 25.93%; i.e. just above the 25% which Mr. Smethurst had selected. Mr. Smethurst did not, however, exclude a company (RGI SpA) which appeared to be an "outlier" in terms of the low bid premium (2.39%).

617. In my view, reviewing this body of data as a whole, I consider that Mr. Hall's initial assessment of 35% was justified. This was done by Mr. Hall on the basis, without detailed analysis, that bid premia usually fall within the range of 20 – 50%. However, it seemed to me that that broad estimate was ultimately proved to be valid. When considering Mr. Smethurst's final table: of the 13 transactions referred to, 7 fell within this range and one (Carl Lamm) was only just outside it. Furthermore, if all 13 transactions are included, the average was (on Mr. Smethurst's figures) 35.75%. I was not persuaded that it was appropriate, in what seems to me to be a fairly broad-brush exercise, to omit two of the transactions completely on the basis that they were "outliers". I think that it is reasonable to look at all of the data, and on any view to include at least a substantial part of the premium paid for those companies.

618. Furthermore, if those two "outliers" were to be excluded, then so should the low "outlier" (RGI SpA). If this is done, the average moves to 28.52% and the median to 27.4% on Mr. Smethurst's figures. Both of these numbers are higher than Mr. Smethurst's selected figure of 25%. However, the average on Mr. Smethurst's figures for all companies (35.75%) corresponds very closely with the average as calculated by Mr. Hall (38.75%), and I do not attach great significance to the fact that Mr. Hall has sometimes looked at different date ranges in order to derive his average figures.

*Conclusion*

619.   The relevant calculation of the fair value of Updata Europe's 60% shareholding is therefore as follows:

| Multiplier | 5.00 |
|---|---|
| £ 000's | |
| EBITDA [A] | 5,800 |
| Implied Total Enterprise Value ([A] x Multiplier) | 29,000 |
| Less: Net debt | 100 |
| Equity value (minority basis) [B] | 28,900 |
| Plus premium for control (B x 35%) | 10,115 |
| Equity (controlling basis) [C] | 39,015 |
| Less private company discount 33% (C x 33%) | (12,874) |
| Fair value of equity | 26,141 |
| Value of 60% | 15,684.6 |

*Calculation of Damages*

620.   On the basis of my conclusion in Section H, I assess the chances of Updata Europe obtaining fair value for its shareholding at 75%. Accordingly, the loss suffered by Updata Europe (and potentially claimable by Vald. Nielsen as assignee) is £ 11,763,450 (£ 15,694,600 x 75%) less the amounts actually received (£ 5,244,798). I therefore assess damages, subject to the question of assignment, at £ 6,518,652.

**J:     Assignment**

**J1:    The shape of the arguments**

621.   In January 2011, three deeds of assignment were signed by various signatories. These were as follows.

   i)      A "long-form" deed of assignment entered into by Updata Europe as assignor, Vald. Nielsen as assignee, and "other Persons" listed in the Schedule. Those other persons were all (bar one, Mr. Bremerskov) the former shareholders in Updata Europe at the time of the SPA: Vald. Nielsen itself, Mr. Johnsen, Jorgen Johnsen, Kirsten Johnsen and Mr. Hildebrandt. The subject matter of the assignment was "all the Assignor's right, title and interest under and in respect of the Share Purchase Agreement and the Shares". The assignment to Vald. Nielsen was "for and on behalf of" the persons listed in the Schedule. The governing law of this long-form assignment was Danish law.

   ii)     A "medium-form" deed of assignment. The parties and signatories were the same. This assignment was governed by English law.

   iii)    A "short-form" assignment, again with the same signatories and also governed by English law.

622.   Each of these agreements was dated in handwriting, on the front page, "19 November 2010". On the first page of each agreement, the opening words are: "THIS DEED is

dated 19.11 2010 …" Again, the date was handwritten. Each page was also initialled, and on the final page of each document there was a date underneath Mr. Johnsen's initials: "19.11.10".

623. There was no dispute that the various signatories had not signed the documentation on 19 November 2010. The signatures were applied at various dates in the first half of January 2011. The three deeds of assignment had been sent, undated and unsigned, by Mr. Birkeland to Mr. Johnsen on 22 December 2010, and were then sent on to Mr. Homann later that day. They were then sent again by Mr. Johnsen to Mr. Homann on 5 January 2011 under cover of an e-mail described below. They were then signed by three signatories on behalf of Updata Europe: Mr. Bigaard, Mr. Allan Bartroff, and Mr. Kaj Kristiansen. The Claimants suggested that these individuals may have signed in late December or at some date prior to 3 January. But I think it unlikely that they were signed prior to Mr. Johnsen resending the documents on 5 January.

624. Mr. Johnsen then picked up the signed documents from Mr. Homann in Copenhagen on 6 or 7 January. The deeds at that time already had the handwritten date of 19 November: the manuscript date on the cover page was in Mr. Homann's handwriting. Having received them from Mr. Homann, Mr. Johnsen then collected the remaining signatures. The documents were signed by Mr. Jorgen Johnsen on behalf of Vald. Nielsen, and by the other signatories. This signature process was completed by 15 January 2011, and the original documents were then delivered to Mr. Birkeland on Monday 17 January.

625. The Defendants' original pleaded case as to the validity of the assignments started with a relatively narrow argument based on champerty and failure to obtain consent to the assignment in accordance with the terms of the SPA. Following disclosure, the case then expanded very considerably in the re-amended defence, served in January 2017, so as to allege, in substance, deceit against Vald. Nielsen and all the other "Signatories" on the Vald. Nielsen side of the fence (the three members of the Johnsen family, and Mr. Hildebrandt), as well as Mr. Birkeland. In 2018, there was a further amendment to allege deceit on the part of the Updata Europe signatories. There was, however, no pleaded allegation of deceit against Mr. Homann, who died before the further expansion of the pleading in 2018. The pleaded defence on this issue occupied many pages. The deceit related to the backdating of the assignment documents.

626. As the trial and cross-examination progressed, however, it appeared to the Claimants that the Defendants' case was narrowing. In particular, there was no cross-examination of Mr. Jorgen Johnsen, Mr. Hildebrandt, or Mr. Birkeland on the basis that they had acted deceitfully in relation to the assignment documentation. On 23 April 2019, prior to submission of written closings, the Defendants' solicitors wrote in connection with the "obvious narrowing of the Defendants case" and identified the factual points that they would be pursuing in their closing argument concerning alleged wrongful behaviour in connection with the assignment.

> "3. In essence, the Defendants' case is that Mr Bigaard, Mr Homann and Mr Peter Johnsen had actual knowledge that the contracts of assignment were being (and thus intended that they be) backdated to 19 November 2010 for a deceitful purpose – namely, to mislead the Supervisor and/or creditors. Further, and

as Mr Rosing confirmed (day18/160/16 – day18/161/3), assuming Mr Homann and Mr Peter Johnsen were acting as agents with authority to negotiate on behalf of Updata Europe and Vald Nielsen (and the other shareholders of Updata Europe named in the Schedule to the contracts of assignment) respectively as their principals (as the Claimants themselves allege), then their principals (namely, the eventual parties to the contracts of assignment) are treated as having the same knowledge and state of mind as Mr Homann and Mr Peter Johnsen.

4. Further or alternatively, the Defendants will contend that, whether or not Mr Bigaard and/or Mr Peter Johnsen knew of the precise purpose of the backdating (namely, to deceive the Supervisor/creditors) they at least knew (at the time of the back-dating of the contracts) that the contracts were backdated, and that there had been no binding oral agreement on 19 November 2010. On the assumption that at least Mr Homann knew of the deceitful purpose, that is sufficient to invalidate the contracts of assignment, on the alternative basis described by Ms Gernaa (day20/50/12 – day20/51/17)

5. In light of these facts and the provisions of section 5.1.2 of the Danish Act of King Christian V, the Defendants will contend that each of the assignment agreements falls foul of Danish morality/public policy and is therefore invalid or not binding as a matter of Danish law. Likewise, if and in so far as necessary, the Defendant will contend that such agreements are unenforceable as a matter of English law or public policy.

6. Beyond the essential matters set out above, the Defendants will not be seeking primary findings regarding wrongdoing concerning assignment from the Court in closing arguments. That does not, of course, preclude the Defendants from making points relevant to credibility or honesty, or alleging that any of the Claimants' witnesses had an intention to mislead or did not give truthful evidence on matters relevant to those primary findings. "

627. In the course of oral closings, Mr. Choo Choy also confirmed that no case was being pursued in relation to champerty or that there had been a lack of consent to the assignment.

628. In their written closings, the Claimants drew attention to the various changes in the Defendants' case, suggesting that they were scrabbling around in order to know what their case was. I did not think that there was any substance to this line of argument. The Defendants were not party to the discussions which led to the assignment, and had no knowledge of the facts save as they emerged from the documents, witness statements and evidence given at trial. It is not surprising that, as the Defendants' legal team learned more about what had happened, their case narrowed or altered in certain respects.

629. Nor was I impressed with any of the pleading points that were taken in the Claimants' closing argument. It seemed to me that the case was sufficiently pleaded, indeed was pleaded in some considerable detail. It is true that the Defendants' case originally involved allegations of deceit against more individuals on the Vald. Nielsen side than Mr. Johnsen. However, a case was always made against Mr. Johnsen, and I did not consider that the Claimants can reasonably complain that there was no pleaded case that, as a matter of Danish law, Mr. Johnsen's knowledge was to be attributed to Vald. Nielsen. The pleading contains clear allegations against Mr. Johnsen. Since it was Mr. Johnsen who had carried out the negotiations with Mr. Homann, and was the only person on the Vald. Nielsen side who did so, it would ordinarily follow (certainly if English law were being applied) that Mr. Johnsen's knowledge would be attributed to Vald. Nielsen. If it were to be suggested that Danish law produced some different result, then it would be for the Claimants to prove that Danish law as to attribution was different to English law. In the event, Mr. Rosing (the Claimants' Danish law expert) confirmed what might be thought to be the ordinary position in his evidence; namely that where the terms of a contract are negotiated by agents on behalf of their principals, the knowledge of the agent acquired in the course of the negotiation is treated as the knowledge of the principal. He agreed at the conclusion of his evidence that if such agents were to share an intention to deceive a third party through backdating, an agreement negotiated by such an agent would be unenforceable: because the knowledge of the agent would be assumed to be the knowledge of the principal.

630. Accordingly, I consider that the Defendants' case should be addressed on the merits and the facts. The critical factual issue which arose on this defence was whether or not the backdating was for a deceitful purpose, namely to mislead the Supervisor of Updata Europe and/or its creditors, and if so who was party to any deceitful purpose. If there was such a deceitful purpose, then issues arose as to what were its consequences, both under Danish law and under the approach now taken to illegality under English law. The Claimants' case was that there was no deceitful purpose to the backdating, and that in any event no-one on the Claimants' side (and specifically Mr. Johnsen) was aware of this deceitful purpose. They also contended that even if an intention to deceive the Supervisor or creditors could be demonstrated, the assignment remained valid under English law.

**J2:   The facts**

631. In order to address this defence, it is necessary to set out the background facts in more detail. Evidence as to the circumstances in which the three deeds of assignment came to be made was given at trial by Mr. Johnsen, Mr. Bigaard and Mr. Birkeland. Mr. Homann had addressed the assignment in his witness statement signed in October 2016, prior to the expansion of the case to allege deceit against the various signatories on the Vald. Nielsen side. My description of the facts below includes my findings based on the evidence of the various witnesses.

632. In the spring of 2010, Mr. Johnsen and Mr. Hildebrandt were already contemplating bringing proceedings against the Defendants (and possibly others) arising out of the sale transaction and their view that they had been misled. Mr. Birkeland at that time took advice from English counsel, whom I understand to have been Mr. Richard Boulton (now QC) of One Essex Court. One potential difficulty, however, was that it was Updata Europe that had sold its shares under the SPA, and that company had now

been acquired by companies owned by Mr. Bigaard. This led to the idea that there could be an assignment by Updata Europe of its rights to the former owners of Updata Europe who had, on the proposed case, lost out as a result of the conduct which had led to the sale at an alleged undervalue.

633.    In the latter part of 2010, Mr. Johnsen began discussions with Mr. Homann as to a possible assignment. These discussions began in October or November, but prior to the meeting on 19 November described below. Mr. Johnsen explained to Mr. Homann that he considered that Updata UK had been sold at an undervalue, and that he wanted to bring a claim against the UK management to reclaim the loss that he and the other shareholders in Updata Europe had suffered. Mr. Homann was by now working closely with Mr. Bigaard in relation to the business of Updata Europe. As Mr. Homann explained in his written statement, after the sale of Updata Europe to Mr. Bigaard, Mr. Homann continued to work with Updata Europe and he had authority to act on its behalf on various matters.

634.    The possibility of an assignment clearly had its attractions to Mr. Homann. Updata Europe had owed monies to KPMG, and as part of his settlement package upon leaving KPMG, Mr. Homann had taken an assignment of the debt. A successful claim against the UK management could produce funds which would enable this debt to be paid, as well as possibly other unpaid debts of Updata Europe. Equally, there was in practical terms no real downside to Updata Europe, or Mr. Bigaard, from assigning the potential claims. Mr. Bigaard had no interest in pursuing such claims himself: as he said in evidence, the Updata Europe group had many problems which occupied him at that time. The pursuit of a claim against the former management would be potentially expensive, and its prospects would have appeared very uncertain, and in practice it could not be pursued without the assistance of the former shareholders in Updata Europe. Mr. Bigaard could also see some positive advantages to an assignment. If the Johnsens recovered monies, that might encourage them to invest again in Updata Europe. In addition, a recovery might enable some of the debts of Updata Europe to be paid. Mr. Bigaard was happy to leave Mr. Homann to carry out the discussions. He described Mr. Homann as very skilled accountant and also an experienced businessman, and "so I trusted him to make the best agreement for him and the group when he was on his way to negotiate with Mr Johnsen". Mr. Bigaard therefore left things to Mr. Homann and did not follow the detail of the discussions.

635.    Mr. Homann and Mr. Johnsen prepared to meet for further discussion on 19 November. Prior to that meeting, Mr. Johnsen had been in communication with Mr. Birkeland, and there had been discussion of a figure of DKK 2 million that would be paid to Mr. Homann if there were to be an assignment and the proceedings against management succeeded.

636.    Mr. Homann described the discussions and the meeting in paragraphs 38-41 of his witness statement. He said that he had authority to negotiate on behalf of Mr. Bigaard. He described how at the meeting, he and Mr. Johnsen "reached an agreement on the broad terms of what was being assigned by Updata Europe and how that assignment was to be paid for". The agreement he described was that Updata Europe would assign any interests it had under the SPA to the Updata Europe shareholders at the time (i.e. the Johnsen family and Mr. Hildebrandt). In return for the assignment, any compensation or damages that were received would be used to repay certain debts of Updata Europe which had not been paid from the proceeds of the original sale of

Updata UK. Such compensation would be used to repay DKK 1 million in respect of the debt to KPMG which had been assigned to Mr. Homann, and a further DKK 250,000 in respect of other debts. Mr. Johnsen's evidence was, also, that he reached an agreement with Mr. Homann at that meeting. Both Mr. Birkeland and Mr. Hildebrandt, neither of whom attended the meeting, gave evidence that they were told that an agreement had been reached.

637. The Defendants did not dispute that there had been a meeting on 19 November 2010, but they contended that agreement reached was only no more than an agreement in principle rather than a legally binding oral agreement. They contended that this must have been understood by the participants, who would have known and understood that an agreement would have to be documented and signed before it was binding. They also contended that the documents indicated that the parties to the assignments were at that stage considering, or were agreed upon, DKK 2 million as being the sum that would be paid to Mr. Homann, and that it was only at a later stage that this was reduced to DKK 1 million. I will return to these controversial issues below.

638. What is clear is that Mr. Johnsen did speak to Mr. Birkeland that same day, and Mr. Birkeland immediately started working on a draft "Assignment and Name Lending Agreement". The metadata for the first draft of the document shows that the document was created at 19.34 on Friday 19 November 2010. Mr. Birkeland worked on it over the weekend, and it was last modified on the evening of Sunday 21 November at 18.51. He then sent it to Mr. Johnsen at 18.53 on the Sunday evening under cover of an e-mail saying:

> "Let's discuss. I suggest that we get the barrister to read
> through the assignment/ name lending [document]".

639. The draft agreement was between Updata Europe and Vald. Nielsen, and had an English governing law clause. Clause 4 contained a provision allocating compensation realised from the assigned rights of action. The first priority was DKK 2 million "owed by the Assignor to Helge Homann in relation to the fees originally owed by the Assignor to KPMG as per 11 July 2009 (and subsequently assigned to Helge Homann". The second priority was towards the discharge of DKK 250,000 "related to other obligations of the Assignor as per 11 July 2009 (and which remains outstanding)". The balance was to be "paid in full to the Assignee".

640. On 22 November 2010, and before Mr. Birkeland had sent the draft agreement to counsel, Mr. Johnsen e-mailed him with a request from Mr. Bennett. Mr. Bennett was concerned about a tax liability arising out of the way in which the original SPA documentation was drafted. Some £ 500,000 in tax could be saved if the parties entered into a deed of rectification. Mr. Bennett asked Mr. Johnsen to whom he should send "the documentation for agreement on behalf of NewWatch". Mr. Birkeland responded:

> "If new agreements are going to be signed, the EU should
> probably also sign. The question is whether they have contacted
> the EU".

The reference to "EU" was to Updata Europe. The e-mail is relied upon by the Defendants as indicating that Mr. Birkeland did not at that stage consider that there

had been a binding assignment of rights from Updata Europe to Vald. Nielsen. Otherwise, it was argued, Mr. Birkeland would have referred to the need for Vald. Nielsen to sign as assignee, rather than Updata Europe.

641. On 23 November 2010, Mr. Birkeland sent the draft Assignment and Name Lending Agreement to the clerk at One Essex Court, copied to Mr. Boulton. Mr. Birkeland's e-mail stated:

> "As mentioned we have now got an opportunity to have assigned the Rights of Action and/or use the name of the vendor company in a potential action against the management team.
>
> I would be grateful if Richard Boulton could review the agreement before we produce it to the new owners of Updata Europe A/S. Please let me know when you expect that Richard Boulton would be able to revert with his comments.
>
> My clients have not been on the best terms with the new owners of Updata Europe A/S in the past and there is a risk that they will change their mind if the circumstances in Denmark that have made this arrangement possible change. I therefore hope that we can proceed with this agreement as soon as possible".

642. Each side relied upon this e-mail in support of their contention as to whether a binding agreement had or had not been reached. The Claimants referred in particular to the reference to the risk of Updata Europe changing their mind, as indicating that an agreement had been reached and that Mr. Birkeland was concerned to avoid the risk that Updata Europe would change its mind and try to walk away. The Defendants referred to the reference to "<u>opportunity</u> to have assigned" as indicating that what existed was an opportunity, but that nothing firm had been agreed.

643. Mr. Boulton (who was at that time in Singapore) gave some initial advice by e-mail on 25 November, raising a number of queries and issues, including questions of champerty. It is not necessary to describe these in detail. On 30 November, Mr. Birkeland indicated that it would be best to discuss the matter further when Mr. Boulton returned to London. That discussion took place on the evening of 15 December, following which Mr. Birkeland sent through a revised draft. It was at this stage that the documentation changed from being a single agreement to three agreements. Mr. Birkeland explained to Mr. Boulton the idea behind the three agreements in the following terms:

- UK Rights of Action: Assignment subject to English law (where the "consideration" is not specified) which is to be produced to the court;

- DK Rights of Action: Assignment subject to DK law where the Consideration is specified – not to be disclosed to the court.

- UK Assigned of Rights: This does not include "Rights of Action" and may be used e.g. to execute other documents related to Updata on more "amicable terms" without disclosing that we also consider to pursue the "Rights of Action".

644.    Apart from now comprising three agreements, the drafts included other changes to the previous version, including making the "other Persons listed in the Schedule" party to the agreement. This was considered to be a way of addressing possible arguments on champerty.

645.    Mr. Boulton replied on 16 December 2010, with various comments. He stated that he could not advise at this stage on what documents might need to be provided to the English court. "It is possible that the Danish version would need to be produced". He appears, however, to have had no difficulty in principle with the idea that there should be 3 agreements.

646.    By this time (16 December), nearly a month had passed since the 19 November meeting between Mr. Johnsen and Mr. Homann. There had been no further discussions about the assignment between them. None of the drafts had been sent to Mr. Homann for comment. The work on the documentation that was being done was carried out by Mr. Birkeland with the assistance of Mr. Boulton. Mr. Johnsen himself had not, by this stage, commented to Mr. Birkeland on any of the drafts. It seems likely that this was because there was little point doing so whilst the terms of the documentation were still under discussion between Mr. Birkeland and Mr. Boulton. But this changed shortly afterwards.

647.    A meeting was arranged between Mr. Johnsen, Mr. Homann and Mr. Birkeland for the evening of 21 December. Prior to that meeting, probably on the previous day, Mr. Birkeland went through a draft of the agreements with Mr. Johnsen. At this point, the consideration clause still referred to Mr. Homann receiving DKK 2 million. According to Mr. Birkeland, it was at this time that Mr. Johnsen pointed out that Mr. Homann had actually agreed a lower figure, namely DKK 1 million. Mr. Birkeland then amended the draft on 21 December, which he completed at around 1 pm or 2 pm. This was done prior to the meeting with Mr. Homann that evening. Although they were by that time in final form, the drafts were not given to Mr. Homann at that meeting. They were, however (as described above) sent by Mr. Birkeland to Mr. Johnsen, and then to Mr. Homann, on the following day (22 December). These were in the form which Mr. Birkeland had completed prior to the meeting.

648.    Mr. Homann was clearly content with the drafts. He did not raise any points or seek to negotiate. They were in due course signed by Mr. Bigaard and others in early January, as described above.

649.    Prior to signature, however, there had been a significant development. On 3 January 2011, Updata Europe was made the subject of a supervisory order by the Danish bankruptcy court. The court hearing was attended by both Mr. Bigaard and Mr. Homann. A Supervisor, Mr. Finn Jepsen, was appointed over its affairs. This is akin to administration. As a matter of Danish law, as described below, any material contract concluded after that time required the consent of the Supervisor. From that date, it is common ground that Updata Europe was not entitled to enter into material

contracts without the Supervisor's consent. Mr. Jepsen was not asked to and did not consent to the assignment. There was no dispute that the assignment was a material contract.

650. Two days after this appointment, on 5 January 2011, Mr. Johnsen sent an e-mail to Mr. Homann. He enclosed further copies of the agreements which had been sent on 22 December. The e-mail stated:

> "Hi Helge.
>
> Here are the electronic copies of the agreements entered into on the 2nd of October 2010"

651. Mr. Johnsen described this e-mail as very peculiar and he could not explain the reference to 2 October. He also denied knowing about the appointment of Mr. Jepsen at the time. I do not accept this evidence. I have no doubt that Mr. Homann did tell Mr. Johnsen about the appointment of Mr. Jepsen, and that this created a potential problem in relation to the assignment documentation which at that stage had not been signed. There must in my view have then been some discussion about the possibility of backdating the documentation, and Mr. Johnsen in his e-mail was intending to lay the groundwork for backdating; by suggesting that the agreements had been concluded in early October. I also infer that Mr. Homann did not consider this date (2 October 2010) acceptable or justifiable. It may well be that there had been discussions about the possible assignment on or around 2 October, but there was no basis for saying that any agreement had been concluded at that time. So instead it was Mr. Homann who identified the relevant date as 19 November, and this was the date which he inserted at the start of the documents which Mr. Bigaard and others signed.

652. I also was unpersuaded by Mr. Johnsen's evidence that he added the date "19.11.10", to his initials on the final page of the assignments, in order to make it clear that the final signature pages were linked to the assignment documents themselves. This could have been done by simply stapling the signature pages to the rest of the document, and in any event it is difficult to see that there was any room for doubt as to whether the final signature page formed part of the document. I therefore agree with the Defendants that this dating was done as a method of Mr. Johnsen reinforcing the date of 19 November 2010 which appeared at the start of the assignment documentation. Mr. Johnsen's decision to do this was, in my view, indicative of the fact that he had previously been told by Mr. Homann about the appointment of the Supervisor, and that backdating was necessary in order to avoid potential arguments.

653. I should also describe two other developments which are relevant to the parties' arguments in relation to the assignment.

654. First, it will be recalled that on 22 November, Mr. Bennett had raised the need for a deed of rectification. Mr. Birkeland in due course received documentation, and wrote to Mr. Hildebrandt and Mr. Johnsen about it on 4 December 2010. In his e-mail, he said:

> "Please particularly note that Updata EU needs to sign. This may give us the opportunity to be "foresightedly/ preventively critical" and still cooperative".

The first sentence is relied upon by the Defendants in support of its argument that Mr. Birkeland appreciated that there was not yet any concluded assignment: hence his reference to the need for Updata EU (not Vald. Nielsen as assignee) to sign. The second, rather cryptic sentence, referred to the fact that Mr. Birkeland saw the utility of the request for a deed of rectification; since this would provide an opportunity to give notice of the assignment as and when it was signed.

655.    This particular aspect of the story continued as follows. On 22 December, Mr. Birkeland wrote to Mr. Inkester of Nabarro LLP, who was dealing with the proposed deed of rectification on behalf of the new UK company and its shareholders, including the Defendants. Mr. Birkeland said that he had met with Mr. Homann "in relation to some other matters. There may be an opening in relation to UE as well, but it is still too early to tell. I will revert when I have something more concrete in this respect". Mr. Birkeland did not therefore tell Mr. Inkester that there had been an assignment. On 28 January 2011, after the documentation had been signed, Mr. Birkeland wrote to Mr. Inkester commenting on the Deed of Rectification. His e-mail concluded:

> "We should also now have found a solution for the purpose of Updata Europe A/s. As mentioned to you the board of directors in Updata Europe A/S has agreed to and assigned all rights related to the Share Purchase Agreement to Vald. Nielsen Holding A/S (a company owned by Jorgen Johnsen and Kirsten Johnsen) as part of a larger settlement of outstanding matters in Denmark. The assignment also include a power of attorney to sign documents on behalf of Updata Europe A/S if that is more appropriate".

656.    Subsequently, on 14 February 2011, Vald Nielsen signed the Deed of Rectification as assignee of Updata Europe. This Deed of Rectification was beneficial to the Defendants, and the new UK company in which they owned shares, because there was a substantial tax saving. The Defendants did not at that stage seek to investigate or take any point on the validity of the assignment documentation, or even to ask to see it. However, the fact that the Defendants willingly signed the Deed of Rectification, thereby acknowledging Vald. Nielsen as assignee, was no doubt one reason why (belatedly) the Defendants abandoned their argument based upon lack of consent to the assignment.

657.    Secondly, the appointment of Mr. Jepsen as Supervisor lasted a very short time. His appointment was terminated in April 2011, so that Updata Europe then returned to being in control of its own affairs. There has been no suggestion that any creditors of Updata Europe have in fact been prejudiced by the assignment, or by the fact that during his brief period of office Mr. Jepsen did not consent to it.

## J3:    Danish law

658.    Evidence as to Danish law was given by a number of experts. The Claimants' expert was originally Mr. Jens Rostock-Jensen, a partner in Kromann Reumert. His original report addressed contractual issues concerning the Danish law relating to assignments, and his subsequent report addressed bankruptcy/insolvency issues concerning the effect of the appointment of the Supervisor. The Defendants' expert on the contractual issues was Ms. Henrietta Gernaa, a partner in Gorrissen Federspiel. These two experts

then produced a very helpful joint memorandum on the contractual issues. There was in fact very little disagreement between them. The Defendants also served a short expert report from Mr. Peter Nørtved, a senior legal counsel also with Gorrissen Federspiel. This addressed Danish bankruptcy/insolvency law, and gave rise to Mr. Rostock-Jensen's report on that topic.

659.    By the time of the trial, however, Mr. Rostock-Jensen could not, owing to illness, be available to give evidence. His place was taken by two of his partners at Kromann Reumert: Mr. Jakob Rosing, who addressed the contractual issues and Ms. Kamilla Krebs who addressed the bankruptcy/insolvency issues. Those witnesses had considered the previous reports, including the joint report, of Mr. Rostock-Jensen and, subject to some relatively minor qualifications, adopted what he had said. There was rightly no objection to these witnesses substituting for Mr. Rostock-Jensen in this way.

660.    At trial, Mr. Rosing and Ms. Gernaa were both cross-examined, albeit not at great length, but in a manner which assisted in explaining the points made in the written reports. Ms. Krebs and Mr. Nørtved were also cross-examined, but very briefly indeed. I considered that all the experts sought to assist the court on the Danish law issues, and that there was in truth very little material disagreement between them. Furthermore, the narrowing of the Defendants' case as to the invalidity of the assignment – and in particular the fact that reliance was no longer placed upon the fact that consent to the assignment had not been sought in advance – meant that some of the issues addressed by the experts are no longer of importance. The expert evidence on the contractual issues also strayed, perhaps inevitably, into questions as to how a Danish court would approach the factual evidence in a case. Neither side, however, placed significant reliance on this aspect of the Danish law expert evidence, and rightly so. The role of the experts was to identify the relevant principles of Danish law. The determination of how that law applies to the facts of the present case is a matter for the English court. The assessment of the strength or otherwise of the evidence in that regard is also a matter for the English court, applying its own approach to the evidence rather than any particular approach that might be taken by a Danish judge.

*Danish law as to bankruptcy/insolvency*

661.    In order to understand the nature and relevance of the case advanced on the contractual issues, it is appropriate to start by describing the material aspects of the evidence concerning the insolvency issues.

662.    The factual background can be summarised shortly. In the latter half of 2010, a bankruptcy petition against Updata Europe was issued by a company called Krone Kapital A/S. At around the same time, Krone Kapital, Deloitte and acompany called Actelis Networks (Israel) started bankruptcy proceedings against Updata Denmark. A hearing of the petition against Updata Europe took place on 3 January 2011. At that hearing, the Bankruptcy Division of the Danish Maritime and Commercial Court decided to postpone the bankruptcy petition which had been filed against Updata Europe. During the "postponement period", Mr. Jepsen was appointed as Supervisor. In April 2011, however, the postponement period was lifted, and the company returned to normal operations.

663.  The Danish Bankruptcy Act, section 15, provides as follows:

> "The debtor may not enter into transactions of material significance without consent from the appointed supervisor. No debts may be paid, unless in accordance with the order of priority of creditors, or if such payment is necessary to avert loss".

664.  Ms. Krebs, adopting the report of Mr. Jens-Rostock, explained the consequences of a transaction entered into with or without the consent of the supervisor. This evidence was not controversial and was not therefore cross-examined upon:

i)    The requirement for supervisor consent is intended to guard the interests of the creditors.

ii)   If a transaction is entered into with the consent of the appointed supervisor, the counterparty is entitled to preferential payment in a subsequent bankruptcy estate. The consent of the appointed supervisor also has the effect that the transaction is subject to extended protection against avoidance of the transaction in the event of a subsequent bankruptcy.

iii)  The lack of supervisor consent does not, however, automatically render the transaction void or invalid as the authority to act is still with the debtor. A counterparty who has acted in good faith will be able to uphold the transaction.

iv)   One leading scholar has specifically addressed the situation where (as happened with Updata Europe) the debtor regains full authority over his assets, because no actual bankruptcy was declared. In those circumstances, the debtor will be bound by the transaction which had been entered into without consent.

665.  Ms. Krebs therefore expressed the view that the rules on consent from the supervisor were intended to guard the interests of creditors, in the event that the company was insolvent and was subsequently declared bankrupt. But in the event that the postponement period ceased (as happened in April 2011), and the debtor resumed ordinary business and regained full authority over his assets, the interests of creditors were sufficiently protected by the ordinary rules on management liability. According, in a situation where the debtor has resumed business and there is no bankruptcy, there is no basis for claiming that a prior transaction entered into without consent is (simply because of the lack of consent) invalid. The debtor is therefore bound by the transaction. Accordingly, the lack of consent is inconsequential in the event that the debtor resumed his ordinary course of business, as was the case with Updata Europe. As Ms. Krebs summarised the position in paragraph 13 of her report:

> "it is my opinion that a transaction entered into without the consent of a supervisor, would not at a later stage be impeached due to the lack of consent from the supervisor, in the event that the debtor has subsequently resumed his ordinary course of business and is not declared bankrupt".

666.  Since this evidence was uncontroversial, it followed that the Defendants could not rely simply on the lack of supervisor consent as invalidating the assignments. If the

assignments were to be invalidated under Danish law, some different principle would need to be identified so as to achieve that result.

*Contractual principles*

667.    The relevant legal principle relied upon by the Defendants was summarised in the joint report as follows:

> "The experts agree that if an agreement has been backdated with an intent to defraud/deceitful intent, e.g. misleading a third party, the agreement will be invalid".

668.    The situation where there is an intention to defraud or deceive is to be contrasted with a case where there is what might be described as legitimate backdating. Thus, as Ms. Gernaa explained in her report, contracting parties may decide to date a document or an agreement on a day which falls before the document's signature. In her opinion, Danish law would give effect to a backdated agreement:

> "where the purpose of the backdating is to give formal approval to an oral agreement that was in fact entered into on the earlier date on the same terms. However, if the agreement has been backdated with an intent to defraud/deceitful intent, e.g. misleading a third party, the agreement will be invalid".

669.    This passage of Ms. Gernaa's report was then reflected in the joint report, where the experts agreed that "Danish law would give effect to a backdated agreement where the purpose of the backdating is to give formal approval to an oral agreement that was in fact entered into on the earlier date on the same terms".

670.    In his evidence, Mr. Rosing explained that it was not necessary for the prior oral agreement to have contained precisely the same terms as those contained in the subsequent written document, in order for Danish law to give effect to the backdated agreement. In his view, it would "suffice if the main terms of the contract were agreed upon at the earlier date". He illustrated this point by drawing a distinction between terms of the written agreement which fleshed out the earlier oral agreement, and terms of the written agreement which changed it. An example of the former category would be a case where the parties had agreed the main terms orally, but had not given thought to the question of governing law. If the subsequent agreement contained a provision for governing law, Danish law would uphold the backdated agreement (i.e. as taking effect on the backdated date), even though Danish law was not a matter which had featured in the parties' discussions. An example of the latter category would be a case where the parties had agreed on a consideration of DKK 2 million, and had subsequently changed the agreement so as to provide for a consideration of DKK 1 million. In that situation, a main term would have been changed. This aspect of Mr. Rosing's evidence was not substantially disputed by Ms. Gernaa. She agreed in her evidence with the proposition that "as long as you have the main terms of the deal agreed, the fact that there are other things to be fleshed out … doesn't alter the fact that the original oral agreement is binding and then is represented by the later agreement".

671. I considered that this evidence made complete sense. Where an oral agreement is reduced to writing, particularly if lawyers are involved, it is almost inevitable that the drafting process will mean that the final document contains terms which were not the subject of specific discussion. If it were a requirement that an agreement could only be backdated when there was exact precision between the prior oral agreement and the subsequent written agreement, it is doubtful whether any agreements could be backdated.

672. A number of other aspects of the evidence in this regard are of potential relevance.

673. First, if an agreement was backdated in circumstances where there had been a material change to the terms (DKK 2 million to DKK 1 million being an example), this did not in itself mean that the agreement was invalid. Instead, absent an intention to deceive, the agreement would remain a valid agreement; but it would only take effect from the actual date of the agreement, rather than the backdated date. Ms. Gernaa agreed with the proposition that, in this scenario, the agreement would be valid but could only be enforced from the date agreed, rather than the earlier date. Mr. Rosing's evidence was to the same effect: if there was no intention to deceive, then the contract remained valid but would only take effect from the date when it was actually made.

674. Secondly, the reason for the invalidity of an agreement where the backdating was effected in order to deceive is that the enforcement of the agreement would be contrary to Danish public policy. Under the Danish Act of King Christian V, section 5-1-2, contracts are to be observed "if not against the law or virtuousness". A recent (2014) decision of the Danish Supreme Court (Case U 2014.2434 H) illustrates the application of that statute. In that case, C (a contractor) had agreed with A and B, the owners of a property, to carry out construction work. They had agreed that part of the price would be paid without the addition of VAT, with the intention of depriving the public purse of VAT and taxes in connection with the construction. C's action to recover the balance of the price was unsuccessful, even though C had re-calculated the claim so as to include VAT. The Court held that:

> "Under the Danish Act of King Christian V, section 5-1-2, an agreement may, in the circumstances, be invalid if the agreement is contrary to the general perception of morality, even though no other legal standards have been violated. The Supreme Court finds that section 5-1-2 of the Danish Act of King Christian V is applicable when the agreement violates a third party's interest or the interest of the public even though none of the contracting parties wish for the agreement to be set aside".

675. Ms. Gernaa said that the case illustrated the proposition that the question of whether the contract was contrary to public policy was to be judged at the time when the contract was made. Hence, C could not establish his claim even though he had subsequently decided to include VAT. Mr. Rosing, rather tentatively, suggested that a court might look at events subsequent to the making of the contract, in order to decide whether or not public policy should prevent enforcement of the contract. Thus, in the present case, Mr. Rosing suggested that the fact that the Supervisor's appointment had been terminated after 3 months, with Updata Europe resuming full control of its activities, might be relevant. However, I thought that this rather tentative suggestion

could not easily be reconciled with the decision in Case U 2014.2434 H and I preferred Ms. Gernaa's evidence on this point. Accordingly, the question of whether a contract entered into with an intention to deceive third parties is contrary to morality within the meaning of section 5.1.2 is judged as at the date that the contract was entered into, notwithstanding that as a result of subsequent events there ceased to be any need to deceive or that there was no actual deception.

676. Thirdly, the experts addressed the question of when an oral agreement would be binding. They were agreed that both written and oral agreements are valid and binding under Danish law, and that there are no formal requirements as to how an assignment agreement should be established or what terms it must contain. An oral agreement for an assignment is therefore binding in Danish law. However, if the parties have agreed that there is no agreement until the contract is signed, then the prior oral agreement will obviously not be binding. The experts were also agreed that it was necessary for the parties to have agreed on the main terms of the assignment. The main terms of an assignment would be (i) specification of precisely who the parties to the agreement are and (ii) specification of the assigned rights.

677. The experts also addressed what seemed to me to be issues which were not of substantive law, but how a Danish court would approach the evidence in a case where there was a disputed oral agreement. This evidence showed that the existence and terms of an oral agreement are difficult to prove, and that a Danish court generally requires substantial evidence before recognising and enforcing an oral assignment agreement. If the parties are not able to prove that they have reached an agreement regarding the main terms, a Danish court would be reluctant to give effect to such an agreement. Proving an oral agreement in Denmark is therefore difficult, and the courts would likely to assume as a starting point that a significant agreement would not be binding until reduced to writing. Ms. Gernaa said that in a situation where both parties knew that the agreement would be committed to writing at a later stage, the courts would be "reluctant" to say that there was a binding contract prior to the point where the parties actually signed the contract.

## J4:   Analysis and conclusions

678. It is in my view appropriate to consider, separately, the validity of the long-form assignment (governed by Danish law) and the medium-form assignment (governed by English law). The reason that there were these two separate documents was that Mr. Birkeland decided that it was sensible to take a "belt and braces" approach, particularly in view of the question-marks as to possible challenges to the assignment based on champerty that had been raised by Mr. Boulton. Mr. Birkeland's intention was that if for some reason one of the agreements was held to be invalid under its governing law, the other agreement could still be valid under its governing law. I consider that this, too, must have been the intention of the parties to the assignments; since it is the most obvious and an entirely rational explanation of why these two agreements were exercised. There was no suggestion by the Defendants that this was an impermissible approach either under English law or under Danish law. In view of this rationale, arguments which had featured in the Defendants' opening as to the uncertainty of what had been agreed, and difficulties in reconciling the two agreements, were not pursued in closing and were in any event in my view ill-founded.

679.    I focus on these two agreements because I do not consider that the third agreement, the so-called short-form agreement, has any material bearing on the issues. The explanation for that agreement was a concern on the part of Vald. Nielsen that it might not want to tell the Defendants the full detail of the terms of the assignment, in case it alerted them to the proposed litigation. Mr. Choo Choy confirmed that he did not rely on the intention to potentially conceal the full terms of the assignment as "an independent basis for non-enforceability". But he did say that it was relevant, in terms of background, "as to the relevant individuals' willingness to do what they have to do in order effectively pretend that the assignments were fully valid". I did not think that even this limited point had any force. It seems that the idea that it might be problematic to show the Defendants the full terms of the assignment, and that therefore there should be a short-form document, had nothing to do with the case that there was an intention to deceive the Supervisor. It was Mr. Birkeland (against whom the pleaded allegation of deceit in relation to backdating was ultimately not pursued) who drafted the short-form assignment. Furthermore, he took advice from counsel in relation to the three assignments, and counsel did not suggest that there was anything improper in relation to the signature of three agreements, albeit that he made it clear that he was not expressing a view as to what might need to be produced to the court in due course.

*The "long form" agreement governed by Danish law*

680.    The issue here is an issue of fact: was there an intention to deceive the Supervisor on the part of Mr. Bigaard, Mr. Homann and Mr. Johnsen? There is no doubt that the reason that the documents were backdated was because of the appointment of Mr. Jepsen, and therefore a concern to avoid a suggestion that the assignments required his consent. But I did not consider that this fact in itself demonstrated that there was an intention to deceive. I agree with the Claimants that the real question was not whether, applying Danish law, there was a legally binding agreement made on 19 November 2010, but rather whether the parties to the assignments genuinely believed that there had been a binding agreement. If so, there could be no dishonesty in the backdating: if there was a genuine belief that a binding agreement had previously been concluded, the parties' written agreement would have been giving formal approval to an oral agreement entered into an earlier date. On behalf of the Defendants, Mr. Choo Choy rightly accepted that if everybody genuinely thought the agreement had "absolutely been made on 19 November but for some technical reason, as a matter of Danish law, the agreement would not be treated as being made on 19 November, that it would be difficult then to say that they intended to deceive". But he submitted that there was no such genuine belief; because the parties to the assignments appreciated that the deal would only be done when the documentation was drawn up and signed. The Defendants' case in opening was that Mr. Johnsen, and the others on the Vald. Nielsen side, "knew the agreements were <u>misleadingly</u> backdated – misleading because there was no binding oral agreement on 19 November 2010 in the same terms as the three agreements they were signing. Their evidence that there was such an oral agreement is untruthful". By the time of closing, the only allegation along these lines, as far as concerns those on the Vald. Nielsen side, concerned Mr. Johnsen.

681.    It seems to me that the burden of proving that there was an intention to deceive is upon the Defendants. I do not consider that the evidence justifies a finding that any of

the relevant individuals (Mr. Bigaard, Mr. Homann and Mr. Johnsen) had no genuine belief, in early January, that a binding agreement had been concluded on 19 November. Indeed, I think it more likely than not that when they looked back on what had happened, they believed that their written agreement was indeed giving effect to an oral agreement made earlier. In that regard, they did not subject the events to the rigorous scrutiny or legal analysis that would have been necessary if, for example, there had been litigation between the participants as to whether or not a binding agreement had been made at an earlier stage. Instead, they would have formed a broad view based on what had happened.

682.    Thus, there is no doubt that Mr. Homann and Mr. Johnsen did meet on 19 November, and there was indeed a discussion about an assignment. That is clear from the fact that Mr. Birkeland started his work on the documentation that very Friday evening, and had completed a draft by the Sunday. The meeting was between two people, neither of whom were lawyers, who knew each other well. It was not the first discussion between them. I have no reason to doubt the evidence of Mr. Homann, supported by Mr. Bigaard, that Mr. Homann had been given authority to deal with the matter. The discussion was not a difficult one, because (for reasons already given) it was in the interests of Mr. Johnsen as well as Mr. Homann and Updata Europe for there to be an assignment. It is in my view inherently probable that matters were then settled at that meeting, and that both Mr. Johnsen and Mr. Homann left the meeting thinking that they had a deal. This is consistent with the evidence of Mr. Hildebrandt, Mr. Birkeland and Mr. Bigaard as to what they were told at some point after the meeting, namely that there was a deal.

683.    I think it unlikely that either Mr. Johnsen or Mr. Homann gave any real thought on 19 November 2010 to the question of whether or not the agreement was binding as a matter of Danish or any other law. They were, after all, businessmen rather than lawyers. In my view, they would both have understood that the agreement would have to be documented properly. Hence Mr. Birkeland became involved immediately after the meeting. But there is no reason to think that there was any specific agreement between them that nothing was binding unless and until it was signed and documented. If either of them had been asked after the meeting whether or not their agreement was binding, each would probably said that they had done a deal and that they hoped and expected that the other side would not try to back away from what had been agreed, albeit that it remained to be documented.

684.    If one of them did seek to back away (and of course neither of them did), then that might have given rise to a healthy argument as to whether or not he was entitled to do so. I think that if that argument had come before a Danish court, the party who backed away from the agreement would have had the better of the argument; because proving an oral agreement is difficult, particularly in a situation where it was contemplated that the agreement would be reduced to writing. But it seems to me that this conclusion does not assist, or go very far in assisting, the Defendants' argument that there was no genuine belief that there had been a binding agreement. In January 2011, the parties to the assignments were not applying their minds to how a Danish court might resolve a theoretical dispute as to whether or not an agreement had been reached in November 2010. Rather, they were considering how matters stood in the light of the fact that a deal had been made in November, that there had been no dispute, that acceptable documentation had been produced on 22 December and had

been ready for signature since that time. In those circumstances, I do not consider it surprising that the participants took the view that their signature of the documentation was giving effect to their prior agreement.

685.    In that context, I agree with the Claimants that it is a relevant, and indeed rather unusual, feature of the case that there is no evidence of any negotiation subsequent to 19 November meeting. All the drafting was done by Mr. Birkeland. There was some delay in producing a document to Mr. Homann, but this seems to have been attributable to Mr. Boulton's absence from London and the need to address the points which Mr. Boulton raised. When the draft document was in due course given to Mr. Homann on 22 December, he raised no queries about it and it was subsequently signed without amendment by Mr. Bigaard and his colleagues. This seems to me to support the case that the agreement signed did indeed fairly reflect what had been agreed at the 19 November meeting.

686.    The only other opportunity for further negotiation was, as it seems to me, the meeting which took place on 21 December 2010 attended by Mr. Birkeland, Mr. Homann and Mr. Johnsen. But I have no reason to doubt Mr. Birkeland's evidence that this meeting took place in the evening (or perhaps late afternoon), after he had completed the documentation.

687.    I agree with the Defendants that it is puzzling that Mr. Birkeland's first draft (sent on 21 November) recorded a figure of DKK 2 million rather than the DKK 1 million which was only changed in the draft that was finalised on 21 December. Mr. Birkeland supported Mr. Johnsen's evidence as to how the first draft came to refer to DKK 2 million: this was a figure that had been discussed between Mr. Birkeland and Mr. Johnsen prior to the meeting on 19 November as being the figure which Mr. Homann was looking for and which Mr. Johnsen was in principle agreeable; Mr. Johnsen had agreed a figure of DKK 1 million at the 19 November meeting; but when he spoke to Mr. Birkeland after the meeting, he was travelling with Mr. Homann in the same car, and he did not want to refer to the fact that the figure agreed was less than the DKK 2 million that Mr. Johnsen had been contemplating as the payment. The point was not picked up until 20 December when Mr. Birkeland and Mr. Johnsen went through the documents.

688.    I have to say that I was sceptical about this explanation when this evidence was given. However, I do not consider that I can reject it as implausible. The fact is that the documentation which was given to Mr. Homann on 22 December did refer to DKK 1 million: he had never been given any document showing DKK 2 million. If the agreement reached on 19 November had been an agreement for DKK 2 million, then it is difficult to see why Mr. Johnsen would subsequently have sought to reduce it, at a time when he was no doubt keen to finalise the documents, and possibly risk an argument with Mr. Homann; an argument about a comparatively small sum of money which was only ever going to be paid if the litigation was successful. Equally, it is difficult to see why Mr. Homann, if he had already agreed DKK 2 million, would have agreed to reduce it to DKK 1 million rather than sticking to what had previously been agreed. The fact that Mr. Homann then obtained signatures on the assignments, without any challenge to the DKK 1 million, again supports the proposition that the agreements reflected the amount (DKK 1 million) which had previously been agreed. Mr. Birkeland's evidence was that there was no negotiation at the meeting on 21 December about these figures, and I have no reason to reject that evidence.

689.    Against this background of a deal having been reached on 19 November 2010, and acceptable documentation giving effect to that agreement having been produced on 22 December, I think that it would not be right to conclude that – when the decision was made in January to backdate the assignments – any of the three individuals had no genuine belief that a binding agreement had been concluded on 19 November. I think that it is far more likely that each of them considered that there had been a prior binding agreement, that their written agreement was seeking to give effect to what had previously been agreed, and that it was therefore permissible to backdate.

690.    As far as Mr. Bigaard was concerned, he had not participated in the discussions, and had left things to Mr. Homann. His evidence was that he was told by Mr. Homann at some point in November or December that there was a "done deal". This happened prior to Mr. Jepsen's appointment, and therefore it was not something to which Mr. Jepsen needed to give his consent. Mr. Bigaard is a lawyer with over 40 years' experience. He struck me as a very careful man, and I think that he would have hesitated long and hard before agreeing to backdate documentation for the purpose of deceiving Mr. Jepsen. I do not wholly accept the Claimants' submission that he had no motive improperly to backdate documents, and no motive to lie to the court about what had happened. In theory, he may have been motivated to backdate the documents because the assignment was beneficial to Mr. Homann, with whom he worked closely, and potentially beneficial to Updata Europe at least in the long-term. In theory, he could then have lied to the court because he had no option but to justify what he had done, in view of the fact that he had backdated the documents. However, whilst there is a theoretical motivation, I did not think that this is what happened, or what is likely to have happened. I regard it as far more probable that Mr. Bigaard backdated the documents because he thought that they reflected a prior "done deal", and that he considered that it was legitimate to do so.

691.    Similarly, I have no reason to think that Mr. Homann, who was an experienced professional, was intending to act deceitfully. The idea of backdating to 19 November seems to have been his idea. It is his handwriting at the front of the documents, and I infer that he did not think that it was appropriate to backdate to 2 October (the date referred to in Mr. Johnsen's e-mail of 5 January). There was a great deal of evidence about Mr. Homann in the course of the case. He seems to have been held in high regard by many people, including Mr. Jorgensen and Mr. Nielsen. He had worked for KPMG for 37 years, where he was a partner. There was nothing in the evidence that suggested that he lacked integrity. Indeed, as I have previously mentioned, the pleadings themselves do not allege deceit against Mr. Homann, and the case against him seems to have developed at a comparatively late stage. But at all events, I am unable to conclude on the evidence that he intended to deceive Mr. Jepsen. Again, I think it far more probable that Mr. Homann believed that backdating was permissible because the written agreement reflected the agreement reached on 19 November.

692.    As far as Mr. Johnsen is concerned: he signed the documents after they had been signed by Mr. Bigaard, and he received them from Mr. Homann. Given that those individuals considered that backdating was permissible, in my view Mr. Johnsen had no reason to believe and did not believe otherwise.

693.    I also agree with the Claimants that it does not appear that any of these individuals had any qualms or worries about the backdating of the assignment after it had been done. If they had any concerns, it would have been a very simple matter – once Mr.

Jepsen was off the scene in April 2011 – to have executed fresh documentation. The fact that no-one thought that this was necessary is, in my view, an indication that none of these individuals considered that they had acted improperly in backdating the documents.

694.    I do not consider that any of the documents authored by Mr. Birkeland during this period (such as the e-mail to One Essex Court, or the documents concerning the Deed of Rectification) cast doubt on this conclusion. I am ultimately concerned with the state of mind of Mr. Bigaard, Mr. Homann and Mr. Johnsen, against whom the allegation of intention to deceive is made. It is no longer alleged that Mr. Birkeland was party to any intended deception of the Supervisor. I agree that Mr. Birkeland's statements during this period are potentially relevant to the question of whether Mr. Johnsen, with whom Mr. Birkeland was in contact, believed that a binding agreement had been made on 19 November 2010. However, there is no indication that this was an issue which was discussed between Mr. Birkeland and Mr. Johnsen at the time, or to which any thought was even given. This is not surprising. In November and December, it was simply not a live issue. Mr. Birkeland was not giving, and did not need to give, any consideration to the question of whether or not, as a matter of law, a binding agreement had been reached at the 19 November meeting. Rather, he was approaching matters on the basis that what was important was for the agreement to be documented. As Mr. Birkeland said, it would be very hard to prove that there was an agreement, or to act upon it, if it was not documented. He therefore said that he "needed to have a document signed by all parties to confirm the terms that had been agreed between Mr. Homann and Mr. Johnsen". The statements which he made in his e-mails at the time therefore reflected his unsurprising view that it was important to document the assignment, and do not assist in answering the question of whether, when the documents were backdated, Mr. Johnsen (or Mr. Homann or Mr. Bigaard) believed that a binding agreement had previously been made.

695.    Nor did I think that the correspondence between Mr. Birkeland and Mr. Inkester advanced matters from the Defendants' perspective: Mr. Birkeland was dealing with a solicitor who was on the other side, and he would naturally have been rather circumspect in his statements to him prior to having the signed assignment documents in his possession.

696.    Rather more significant, in my view, is the fact that Mr. Birkeland was subsequently given the backdated assignment documents in January, and does not seem to have reacted adversely to the fact that they were backdated. It is true that he did not at that stage know about the appointment of Mr. Jepsen, and that there is no suggestion any longer that Mr. Birkeland acted deceitfully. But he did know that the documents had only been finalised in December, and that there had been backdating. The fact that he did not comment is some indication that he too considered that the documents recorded an agreement which had been reached in November 2010.

697.    A significant amount of time at the trial was spent in exploring other agreements or negotiations which were on-going in Denmark at that time, including for example a settlement agreement between Mr. Johnsen and Mr. Nielsen, a potential loan by Vald. Nielsen to a company called Cagain, and a possible sale of Vald. Nielsen's factory. Mr. Birkeland in his e-mail to Mr. Inkester had referred to the assignment "being part of a larger settlement of outstanding matters in Denmark". I did not consider, however, that the existence of these negotiations supported a case of an intention to

deceive, based on the proposition that the relevant participants knew that there had been no binding agreement in November 2010 for assignment. When Mr. Birkeland started to draft the assignment documentation on 19 November, immediately after the meeting, this was the only material document that he drafted. (He also sent through to Mr. Johnsen, on 21 November, a draft letter of appointment whereby a Mr. Henrik Hansen was to be appointed as an observer on the board of the Newco on behalf of Newwatch. But this has nothing to do with the various ongoing discussions in Denmark). In due course, when the assignment documentation was signed by the various representatives of Updata Europe, there is no indication that it was conditional upon the conclusion of any other contracts. Nor is there any such suggestion in the correspondence with Mr. Boulton.

698.  Mr. Birkeland explained in his second witness statement that there were indeed other agreements entered into and under discussion "around this time". There was discussion of the replacement of an existing loan agreement between Vald. Nielsen and one of Mr. Bigaard's companies, Bigaard Four Holding. A draft of a new loan agreement was circulated in early 2011, but this was not done until 7 February 2011; i.e. a month after Updata Europe had signed the assignment. Accordingly, it cannot be said that the assignment was conditional upon this loan agreement. There was also discussion of another loan agreement involving Cagain Europe and Change Networks. Mr. Birkeland drafted a loan agreement after the 21 December meeting, but in the end he did not believe that this loan was ever made. Again, therefore, the assignment was not conditional upon this loan agreement. The same can be said about a settlement agreement concluded between Mr. Johnsen and Mr. Nielsen. This was made on 31 January 2011, again some time after Updata Europe had signed. Moreover, Mr. Nielsen was not involved in the discussions concerning the assignment, and does not appear to have known about the details of the assignment until very recently. The documents therefore do not support a case that the assignments were conditional upon the conclusion of other agreements, or that the participants knew that there had been no binding agreement in November 2010 because other documents remained to be negotiated and concluded.

699.  The Defendants also relied upon a passage in Updata Europe's annual report for the year 2009/2010, and which was finalised and signed by the Board (Mr. Bigaard, Mr. Bartroff and Mr. Kristiansen) in July 2011. This stated:

> "The company's partially owned subsidiary Updata Infrastructure UK Ltd. was sold during the financial year 2008/9. In connection with this sale consideration is being given to bringing a lawsuit against the management of the subsidiary on the basis of the circumstances surrounding the sale. As is estimated such a step would result in significant costs, the step is carefully considered."

700.  I do not consider that this statement throws any light on the issue which I need to resolve. The position by the time that these accounts were signed off, in July 2011, was that the assignment documentation had been concluded many months previously. Updata Europe itself was not considering bringing a claim; since the claim had been assigned to Vald. Nielsen. In so far as the passage can be read as suggesting that Updata Europe was considering bringing a claim, and might incur costs, it is puzzling if not misleading. It is possible, however, as the Claimants suggested, that: (i) the

language was deliberately phrased in the passive ("… consideration is being given"), because it was the assignee which was giving consideration to the possibility of action; and (ii) the passage was included because there would be some benefit to Updata Europe's creditors if the action were to succeed. However, I do not consider that the passage provides any support for the case on intention to deceive by backdating.

701.   Reliance was also placed upon certain correspondence with Mr. Hildebrandt in early 2011. Prior to signing in January, he sought and received some reassurance from Mr. Birkeland that his economic interest in the claim would be protected. It seems to me that this episode is again of no real assistance in relation to the argument on intention to deceive. I accept that it is unlikely that the 19 November 2010 discussions and agreement between Mr. Johnsen and Mr. Homann had involved the question of whether shareholders such as Mr. Hildebrandt would be party to the agreement. However, Mr. Homann's witness statement indicates that, unsurprisingly, he understood that the purpose of the assignment would be to benefit the former shareholders of Updata Europe, and this would of course include Mr. Hildebrandt and others. Subsequently, the idea emerged – during the drafting process and as a result of Mr. Boulton's advice and concerns about champerty – that the former shareholders should be parties to the assignments, and in due course this is what happened (save for Mr. Bremerskov). But I do not think that, at the time, it would have occurred to Mr. Johnsen or Mr. Homann (or Mr. Bigaard, who was in any event distant from the detail) that this development was a material alteration to what had previously been agreed, or meant that it was improper to backdate the assignment.

702.   Accordingly, since I conclude that the Defendants have failed to prove an intention to deceive on the part of any of the individuals against whom the allegation is made, I consider that the Danish law assignment is valid and binding.

*The medium-form assignment – governed by English law*

703.   This conclusion means that it is unnecessary to consider in detail the arguments as to the validity of the English law assignment. This is because the Defendants' case on illegality in relation to the English law agreement was based on the same illegality as was alleged to render the agreement unenforceable under Danish law: i.e. the case that the agreements were executed and back-dated for the purpose of or with the intention of deceiving the Supervisor and/or the general creditors of Updata Europe and avoiding the need to seek the Supervisor's consent to the assignment. Having rejected the argument based on intention to deceive in the context of Danish law, it follows that the premise of the argument in relation to the English law agreement fails as well.

704.   Even if, however, I had accepted the Defendants' case as to intention to deceive the Supervisor or the general creditors, I do not consider that this would lead to the conclusion that the English law assignment was unenforceable on the grounds of illegality. It was common ground that in relation to illegality under English law, it was appropriate to apply the approach set out in the judgment of Lord Toulson in *Patel v Mirza* [2016] UKSC 42, [2017] A.C.467 at paragraph [120]:

> "The essential rationale of the illegality doctrine is that it would
> be contrary to the public interest to enforce a claim if to do so
> would be harmful to the integrity of the legal system (or,

possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary (a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, (b) to consider any other relevant public policy on which the denial of the claim may have an impact and (c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate."

705.   Applying this approach, I first consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim. Here, the underlying purpose of the prohibition transgressed is, as the Defendants rightly submitted, the deterrence of fraudulent conduct, and in particular conduct which is fraudulent towards (i) a person who has been appointed by the court as the equivalent of an administrator and thereby (ii) the creditors of a company. I agree that there is a powerful public interest in protecting the legal system from claims based on fraudulent documents. The purpose of the prohibition would therefore, all other things being equal, be enhanced by denial of the claim. But in the present case all other things are not equal; because an unusual feature of the present case is that the effect of the Defendants' argument, if successful, would be to produce a result which in practice insulates them from liability for their own fraudulent conduct. Accordingly, the Defendants' invocation of the importance of deterring fraudulent conduct rings hollow in the circumstances of the present case. Accordingly, I hesitate to say that in the context of the present case, the purpose of the prohibition transgressed would be enhanced by denial of the claim. But for present purposes I proceed on the basis that it would, whilst noting that, on any view, the Defendants' own fraudulent conduct is a matter which is relevant to the question of proportionality.

706.   Next, I consider any other relevant public policy on which denial of the claim may have an impact. I agree with the Defendants that, subject to one matter, there is no particular competing public policy which requires the enforcement of the assignment in Vald. Nielsen's favour. The consequence of the non-enforcement of the assignment is that Updata Europe would have throughout have retained its claims against the Defendants, albeit that a time-bar would almost certainly now prevent Updata Europe from enforcing its claims. The one matter is, again, that there is a public policy in favour of making those responsible for fraudulent conduct liable for the consequences of their actions. Again, however, I proceed for present purposes on the basis that this is matter which is relevant to the question of proportionality, rather than the question

of whether there is any other relevant public policy on which denial of the claim may have an impact.

707.    I then turn to the question of whether denial of the claim would be a proportionate response to the illegality, bearing in mind  that punishment is a matter for the criminal courts. It seems to me that denial of the claim, taking into account all the circumstances of the present case, would clearly not be a proportionate response. The particular circumstances of the present case which lead me unhesitatingly to this conclusion are as follows.

708.    First, this is a case where the Defendants have, in accordance with my previous findings, defrauded Updata Europe and (indirectly) the former shareholders of Updata Europe who have the benefit of the assignment (if upheld). It would in my view be grossly unjust if the assignee was to have no remedy, even assuming that there was an intention to deceive the Supervisor and creditors.

709.    Secondly, the Defendants' case as to intention to deceive rests upon the 19 November 2010 dating of the documents, and upon the argument that the parties to the assignments had not – as at that date – reached a binding agreement. Even if that were the case, however, it seems to me to be very clear on the evidence that the parties did reach a clear agreement for an assignment prior to the appointment of the Supervisor. The factual position is that Mr. Birkeland produced the final draft of the assignment documentation on 21 December 2010, and this was prior to the final meeting in Copenhagen between himself, Mr. Homann and Mr. Johnsen on 21 December 2010. The documents were then sent by e-mail on 22 December, and were signed in that form. There is no evidence of any negotiation after that meeting on 21 December. It is also the case that by 21 December, the documents referred to Mr. Homann receiving DKK 1 million (rather than the DKK 2 million referred to in earlier drafts). Accordingly, even if I had accepted the Defendants' argument that the original agreement was DKK 2 million, the reduction had been agreed by 21 December.

710.    A number of points flow from these facts, in the context of proportionality:

    a)    In my view, the documentation could, without any substantial objection, have been backdated to 21 December 2010 (the date of the final meeting), rather than 19 November 2010. Both dates are prior to the appointment of the Supervisor. I consider it would be disproportionate in those circumstances to deny the claim on the basis that the parties to the assignments chose the November date for the documentation rather than the December date.

    b)    Equally, if the documents had been signed promptly by the Updata Europe signatories, again the illegality argument would not run. It is likely that the reason why they were not signed promptly is not because there was any dissatisfaction with the documents or any further negotiation required, but rather because it was the Christmas period and no-one thought that there was any particular urgency.

    c)    This also illustrates what in my view is the highly technical nature of the illegality relied upon by the Defendants in the present case. This is a case where the parties to the assignment had, prior to the appointment

of the Supervisor, reached agreement on all material terms of the proposed assignment. The only problem, if there was a problem, was that the parties had not signed the documentation. True, this opens the way for the Defendants' argument that the agreement reached was not binding unless and until the documents were signed. But it is difficult to see why, even if this were so, it would be proportionate to deny the claim.

711. Thirdly, this is not a case where there can be any argument that the backdating actually caused any prejudice either to the Supervisor or the creditors of Updata Europe. The factual position is that the appointment of the Supervisor was rapidly terminated, in April 2011. The Supervisor never knew of the assignment. No creditors have ever needed to set aside the assignments.

712. Fourthly, and again illustrative of the highly technical nature of the case advanced, it would have been perfectly possible for Updata Europe and Vald. Nielsen and the other signatories to have executed fresh assignment documentation in April 2011 or at any time thereafter. Had this been done, all of the Defendants' arguments would have fallen away. The fact that this was not done indicates that none of the relevant individuals against whom the allegation of intention to deceive is made (Mr. Johnsen, Mr. Homann and Mr. Bigaard) had any qualms or concerns as to the backdating. This reinforces my conclusion that those individuals did not intend to deceive: the fact that no-one bothered to re-execute documentation after April 2011 is strongly suggestive of the fact that everyone thought that it had been legitimately executed in the first place.

713. This leads to a related point. It seems to me that, subsequent to April 2011, the parties to the assignments have conducted themselves on the basis that these were valid and effective. Thus, Mr. Bigaard has clearly been aware of the present proceedings, and indeed has given evidence in support of the Claimants. In these circumstances, the fact that fresh documentation has not been executed, when it could have been, seems rather irrelevant, and is certainly not a reason for denying the claim. All the parties to the assignments therefore treated them as valid and continuing, and could easily have executed fresh documentation if they had wanted to.

714. Fifth, it is in my view a relevant consideration in relation to proportionality that the Defendants themselves have taken advantage of the assignment for their own benefit. They were keen to obtain, for tax reasons, the Deed of Rectification. This was signed by Vald. Nielsen as assignee, and the Defendants were perfectly content with that. It is only now, many years later, and long after the tax benefits have been obtained, that the Defendants have decided to put the assignment under scrutiny.

715. For all these reasons, I consider that denial of the claim would not be a proportionate response to the illegality. The Claimants contended that a further reason for so concluding would be the Defendants attempt to mislead the Court in the strike-out/ summary judgment application. I was not persuaded that the proportionality exercise contemplated by the Supreme Court in *Patel v Mirza* contemplated an examination of a party's behaviour within the context of the litigation. I therefore do not rely upon that particular factor. But if it were relevant, then it would be an additional reason for rejecting the Defendants' case.

## K: Breach of fiduciary duty

*The shape of the arguments*

716. The Claimants contended that each of the Defendants owed them fiduciary duties. The pleaded facts relied upon as giving rise to these duties were set out in paragraph 35 of the Re-Amended Particulars of Claim. Reliance was placed on the "circumstances of the negotiations and sale". The specific circumstances included:

    a) The Defendants' responsibility for the provision of information to bidders in the Data Room, such information being solely in the Defendants' control;

    b) The Defendants' provision of information to the bidders, in particular LMS, in the course of discussions to which the European Vendors were not party;

    c) The Defendants' involvement in assisting LMS in putting together its offer on 16 April 2009; and

    d) The Defendants' use of information available to them as senior employees or directors, and the fact that they knew that the EVs were not privy to that information.

717. The fiduciary duties owed were said to include a duty on the part of the Defendants not to place themselves in a position of conflict without obtaining the EVs fully informed consent. Compliance with that duty put the UK management under a duty:

    a) to disclose to the EVs all material facts and matters relating to the proposed sale of Updata UK;

    b) not to make deliberately misleading statements to the EVs or prospective purchasers on material facts and matters relating to the proposed sale of Updata UK, so that the EVs were not compelled to part with their shares at an undervalue;

    c) not to prefer and promote their own interests at the expense of the EVs

718. These duties were alleged to have been broken by virtue of various matters:

    a) The failure of the UK management to provide the EVs with documents, information and explanations, specifically: (i) the March 2009 Weighted Budget or the information on which it was based; (ii) the Tenon Memorandum and Data Pack, or the information on which it was based; (iii) full details of contracts won or likely to be won; (iv) any other information material to the sale of Updata UK; (v) various other budgets and projections and other financial information prepared in May, June and July 2009;

    b) The making of deliberately misleading statements to the EVs, and also to Mr. Nielsen.

719.  In view of my conclusion that Vald. Nielsen (as assignee of Updata Europe) is entitled to damages for deceit, the claim for breach of fiduciary duty is relevant only to the claim of Newwatch. I did not understand Vald. Nielsen to allege that it could recover an account of profits for breach of fiduciary duty in addition to damages for deceit. (In his closing submissions, Mr. Choo Choy referred to the need to elect between these remedies, and this was not challenged by Mr. Booth). Since Newwatch rolled over its shareholding in Updata UK into the new UK company, Newwatch had no claim for loss caused by deceit and could only advance a claim for breach of fiduciary duty. The object of such claim is to recover an account of profits.

720.  The parties' submissions focused particularly upon the issue of whether or not any fiduciary duty was owed by the Defendants to the Claimants. There were also arguments, albeit to a lesser extent, as to whether or not any such duty was broken, and in particular the extent to which the claims advanced were permissible in the light of the order made by Field J. on the strike-out hearing. That order struck out claims: (i) for breach of fiduciary duty based on non-fraudulent misrepresentation, and (ii) as against Mr. Mantell, for breach of fiduciary duty based on non-fraudulent non-disclosure. There were also arguments as to whether it was appropriate for the court to order an account, particularly in circumstances where the Claimants had not sought to quantify or prove at trial the amounts claimed in consequence of the breach of duty.

*Fiduciary duty: the law*

721.  There is no doubt that the general position is that directors of a company do not, solely by virtue of their office of director, owe fiduciary duties to shareholders. Equally, the case-law establishes that there are circumstances in which such duties can be owed. The relevant principles under English law are to be found in the decision of the Court of Appeal in *Peskin v Anderson & Ors* [2001] BCC 874 and more recently in the judgment of Nugee J. in *Sharp v Blank* [2015] EWHC 3220 (Ch) [2017] BCC 187.

722.  *Peskin* concerned a claim against the committee of the Royal Automobile Club and against its holding company. A number of members had resigned their memberships without knowing of the possibility that there would be changes to the structure of the club and a sale of RAC Motoring Services Ltd., which operated the well-known motoring services business known as the RAC. The Court of Appeal dismissed the ex-members' claims based on various alleged breaches of fiduciary duty, holding that the facts relied upon were insufficient to found a claim for the existence or breach of such duty. The relevant principles were explained by Mummery LJ as follows:

> "[33]. The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable

commercial and financial opportunities , which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.

[34]. These duties may arise in special circumstances which replicate the salient features of well established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted or, depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.

[35] The court has been referred to the valuable and detailed surveys of the authorities, expounding the special circumstances which justify the imposition of fiduciary duties on directors to individual shareholders, in the judgments of *Court of Appeal in New Zealand in Coleman v. Myers [1977] 2 NZLR 225* ( especially pp.323–325,328–330) and of the *Court of Appeal of New South Wales in Brunninghausen v. Glavanics [1999] 46 NSWLR 538* (especially pp. 547–560). In both of those cases fiduciary duties of directors to shareholders were established in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned."

723. More recently, the case-law in England and elsewhere was reviewed by Nugee J. in *Sharp v Blank* [2015] EWHC 3220 (Ch) [2017] BCC 187. Mr. Booth accepted the correctness of Nugee J's analysis. Nugee J. said:

"[12] I take it therefore to be established law, binding on me, that although a director of a company can owe fiduciary duties to the company's shareholders, he does not do so by the mere

fact of being a director, but only where there is on the facts of the particular case a "special relationship" between the director and the shareholders. It seems to me to follow that this special relationship must be something over and above the usual relationship that any director of a company has with its shareholders. It is not enough that the director, as a director, has more knowledge of the company's affairs than the shareholders have: since they direct and control the company's affairs this will almost inevitably be the case. Nor is it enough that the actions of the directors will have the potential to affect the shareholders – again this will always, or almost always, be the case. On the decided cases the sort of relationship that has given rise to a fiduciary duty has been where there has been some personal relationship or particular dealing or transaction between them.

[13] I do not find this surprising. A fiduciary, as explained by Millett LJ in his classic judgment in *Bristol & West Building Society v Mothew [1998] Ch 1* at 18A-F, is someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence. That is why the distinguishing obligation of a fiduciary is the obligation of loyalty: someone who has agreed to act in the interests of another has to put the interests of that other first. But the relationship between directors and shareholders is not in general like that. A director is a fiduciary for his company: by agreeing to act as director, he necessarily agrees to act in the interests of the company. But he does not have, by virtue of his appointment as director, any direct relationship with the shareholders: no doubt the interests of the shareholders and the company are in general aligned but this does not mean that a director has agreed to act for the individual shareholders or has a direct relationship with them – his relationship is with the company. If he is to be held to owe fiduciary duties to the individual shareholders, there must be something unusual in the nature of the relationship which gives rise to it. That no doubt explains why the cases where such a duty has been held to exist mostly concern companies which are small and closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders, from which the directors often stand to benefit personally. The imposition of a fiduciary duty in such circumstances reflects the fact that directors who have a close family or other personal relationship with shareholders, and are entering into transactions with them, may be tempted to exploit that relationship to take unfair advantage of the shareholders for their own benefit."

*Existence of the fiduciary duty: the Claimants' submissions*

724. The Claimants submitted that the circumstances in which fiduciary duties are owed are variable and depend upon the facts of the case. It is possible in "special circumstances" for a director or senior employee to owe fiduciary duties to the shareholders of a company. The existence of the duty was therefore "fact-specific", and almost always involved: relatively small companies where there were certain directors who had the information and certain shareholders who were not in the same position; a situation where there was going to be some type of dealing or disposal, whether a direct purchase or a transaction involving a third party on which the shareholders' rights would be affected; and where there was an imbalance of information.

725. Thus, "special circumstances" included, in particular, the following:

   a) *Transactions for the sale/purchase of shares*: where there is a proposed transaction involving the disposal of the shareholders' shares, and the director is either a purchaser or interested in the purchase, the director will inevitably hold more information about the value of the shares than the shareholder. The fiduciary relationship arises from the particular circumstances of the proposed transaction; the disparity in available information; and the special trust the shareholder must necessarily repose in the director to provide him with material information. The Claimants referred in that connection to a number of Australian and New Zealand cases which were considered in *Sharp v Blank*, and in particular *Crawley v Short* [2009] NSWCA 410, *Coleman v Myers* [1977] 2 NZLR 255; *Brunninghausen v Glavanics* [1999] NSWCA 199; and *Platt v Platt* [1999] BCLC 745.

   b) *Small / family held companies*: many of the cases in which a director has been held to owe fiduciary duties to a shareholder involve small, family-owned companies. But there is no justification for confining cases in which such duties are owed to those in which the company was run as a family enterprise or quasi-partnership (where there is a pre-existing relationship of trust and confidence).

   c) *Vulnerable shareholders*: transactions involving the sale/purchase of shares will put the directors in a special position of power. They will have a special opportunity to exercise the power or discretion to the detriment of the shareholders, such that the shareholders are vulnerable to abuse by directors of their position. The scope for unilateral exercise of a discretion or power to the potential determinant of another who is peculiarly vulnerable to the exercise of the power is a hall-mark of a fiduciary relationship.

726. This was exactly the sort of case where the court should hold that fiduciary duties were owed by the Defendants to the EVs:

   a) Updata UK had only five shareholders. There were close relationships between the executive director/shareholders and EVs. Mr. Bennett was Mr. Johnsen's cousin and Jorgen Johnsen's nephew. Mr. Bennett had

been brought into the company by Mr. Johnsen when he was unemployed in 2003.

b)      The Defendants controlled information in relation to Updata UK. EVs (and the non-executive directors appointed by them) were dependent upon the Defendants for information about Updata UK's financial position and its prospects. EVs necessarily trusted the Defendants to provide accurate information about Updata UK's financial position.

c)      In the context of the proposed sale of EVs' shares in Updata UK, the Defendants controlled the flow of information to: (i) EVs, (ii) the rival bidders (Mr. Nielsen and, by extension, the Data Room) and (iii) their own side (Tenon and LMS). EVs had to (and did) trust the Defendants that the information provided to them, and to Mr. Nielsen, was the same as the information that had been provided to Tenon and LMS.

d)      In the context of the proposed sale, the Defendants made false representations to EVs about Updata UK's performance and projected performance, on which they knew EVs would rely. EVs had no way to check the accuracy of the information provided and took it on trust that it was accurate.

e)      The Defendants' unique access to information about Updata UK put them in a position in which they could prefer their own interests to those of EVs, and take advantage of EVs' particular vulnerability to non-disclosure of financial information in the build up to the sale.

727.    In his oral submissions, Mr. Booth emphasised that the imposition of a fiduciary duty in the present case would not conflict with the fiduciary duties owed by the Defendants to Updata UK. Concerns as to such conflict had been expressed in certain of the authorities, such as the decision in *Percival v Wright* [1902] 2 Ch 421. Whilst in certain situations the imposition of duties on directors vis-a-vis members at "every step of the way" could cause real problems in the running of the company, this was not so in the present case. If the transaction went through, it would make no difference to the company or the way that it was run: it was simply a sale of shares by existing shareholders to, in effect, other existing shareholders and an outside party (LMS).

728.    Here, therefore, there was a specific transaction being carried out for the benefit of the Defendants, and an information deficit between the parties. The Defendants were seeking to remove Updata Europe as main shareholder, and were planning an MBO. If there was going to be an MBO, it was particularly vital that as between those with knowledge on the inside and those with shares on the outside, that there was full and proper disclosure so that those who might be selling their shares were not disadvantaged by what happens. The court should impose a duty in that situation. If a director is going to take advantage of his knowledge to benefit himself, vis-a-vis a shareholder, it is not unreasonable to impose a duty to ensure that he is being full and frank about what the position is. If no fiduciary duty existed in the present case, then it is difficult to conceive of a case where it would be held to exist.

*Existence of the duty: the Defendants' submissions*

729.    The Defendants submitted that there was no basis for holding that a fiduciary duty existed in the present case. There was no relationship of trust, confidence and loyalty, or anything close to it. Neither of the EVs entrusted anything to the Defendants. Indeed, Newwatch was not selling at all, so it was impossible to see how that company was entrusting matters to the Defendants. None of the factors relied upon by the Claimants led to the conclusion that there was a special relationship in the sense described in *Peskin* and *Sharp*. The requirements for a fiduciary duty formulated in these English cases which should be applied, rather than any more expansive approach that may have been taken in the Australian and New Zealand cases. The Defendants' more detailed submissions on these matters are to a large extent reflected in my conclusions below.

*Analysis and conclusions: the authorities*

730.    The authorities, as discussed in *Sharp v Blank,* show that the reason why the directors of a company owe fiduciary duties to the company is that, by virtue of their appointment as directors, they become agents of the company and stewards of its affairs. By contrast, the directors of a company do not, merely by virtue of their office of director, owe fiduciary duties to the shareholders, whether collectively or individually. This is because a company is legally distinct from its members, and the directors' direction and control of the affairs and assets of the company cannot be equated with direction or control of the affairs or assets of the members. The general principle that directors do not owe fiduciary duties to shareholders is also supported by well-established policy considerations, as summarised by Nugee J in *Sharp v Blank* at [9(3)].

731.    It is also the case, however, that directors may be held to owe fiduciary duties to shareholders. This is by way of exception to the general rule. As Nugee J said at [13], there must be something unusual in the nature of the relationship which gives rise to it. In *Peskin*, Mummery LJ (with whom the other members of the Court of Appeal agreed) identified the situation in which fiduciary duties arise as depending upon the existence of "special circumstances which replicate the salient features of well-established categories of fiduciary relationships". Such fiduciary duties generally attach to "a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted, or depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him." (*Peskin* at [34]).

732.    This approach is, as the Defendants correctly submitted, consistent with the classic analysis of fiduciary relationships contained in Millett LJ's speech in *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 18A-F, and cited by Nugee J. in *Sharp* at [13]. A fiduciary is "someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence". The distinguishing obligation of a fiduciary is the obligation of loyalty, including the obligation to put the interests of that other party first.

733.    It is not difficult to see why the courts in England and elsewhere have held that certain relationships between director and shareholder, or between shareholders inter se,

replicate the salient features of well-established categories of fiduciary relationships. *Coleman v Myers* involved an old established private company in which many of the shareholders were relatives, and two directors (a father and son) engineered a takeover, persuading other family members to sell. The New Zealand Court of Appeal did not proceed on the basis that whenever a director purchased shares from a shareholder, a fiduciary duty would arise. Rather, each member of the court referred, in similar but not identical language, to the closeness of the particular relationship which existed in that case, including the trust or confidence that other family members placed in the father and son.

734. Thus, Woodhouse J. said:

> "… the standard of conduct required from a director in relation to dealings with a shareholder will differ depending upon all the surrounding circumstances and the nature of the responsibility which in a real and practical sense the director has assumed towards the shareholder."

735. He went on to identify factors which were relevant to the existence of the duty, and these included:

> "dependence upon information and advice, the existence of a relationship of confidence, the significance of some particular transaction for the parties and, of course, the extent of any positive action taken by or on behalf of the director or directors to promote it".

736. Cooke J referred (at 330) to "the family character of this company; the positions of father and son in the company and the family; their high degree of inside knowledge; and the way in which they went about the take-over and the persuasion of shareholders". He then described how, from its early days, the company had been very much a family one. "For many years [the father] had been its key figure. Inevitably and justifiably the shareholders must have come to repose confidence in him. The son was his natural successor."

737. Similarly, Casey J said (at 371):

> "I have no doubt that in this tightly-held family company, both directors owed a fiduciary duty to the appellants and to the other shareholders. It must have been clear to Mr AD Myers [i.e. the son] particularly that they were reposing trust and confidence in him, from their discussions and the inquiries they made. I have no doubt Sir Kenneth Myers [i.e. the father] was in everyone's eyes the head of the family group and its associated shareholders, whom they respected and trusted to look after their personal interests in the management of the company. … In such a family situation the latter, as managing director, would inevitably have been expected to continue the care and prudence displayed by his father for the welfare of family and associates, notwithstanding the fact that he was bidding for their shares. The evidence points to his recognition

of this in the discussions he willingly held with the appellants about the reasons for his take-over and his plans …"

738.    In *Platt v Platt,* David Mackie QC (sitting as a Deputy Judge of the High Court) found a fiduciary relationship to exist in the context of a company owned by three brothers, where the older brother (who ran the business) approached the other brothers to acquire their "birthright". He considered that the facts of *Coleman v Myers* bore resemblance to those in the case before him.

739.    The decision of the New South Wales Court of Appeal in *Brunninghausen,* upon which the Claimants relied heavily, illustrates that a fiduciary duty can be held to exist even in a case where the shareholder does not actually place trust and confidence in the director. In that case, the plaintiff and defendant were brothers in law, being married to two sisters. They owned shares in a company, but had fallen out. There was, as the judge said, "no relationship of confidence, and indeed all trust had been broken years before and succeeded by hostility at the worst, wariness at the best". Their mother-in-law was keen for them to restore harmony, and therefore there were discussions with a view to a buyout and in due course the defendant acquired the shares of the plaintiff. This was done at a significant undervalue, because the defendant did not reveal the existence of a substantial offer from a prospective purchaser of the company. Neither the judge nor the Court of Appeal considered that the facts were as strong as *Coleman*, but nevertheless a fiduciary duty was held to exist. Handley JA said [54]:

> "If a fiduciary duty exists here it must arise from the bare facts of the relationship. These include the position of the defendant as the sole effective director, the existence of only one other shareholder, their close family association, the intervention of the mother-in-law to secure a family reconciliation, and the exclusive advantage or opportunity which the defendant's position conferred on him to receive any offers to purchase the company's business from third parties".

740.    *Brunninghausen* was referred to in both *Peskin* and *Sharp*, without any suggestion that it was wrongly decided. It is clearly not a case where the plaintiff actually entrusted the care of his property, affairs, transactions or interests to the defendant. But as Mummery LJ said at [34], a fiduciary duty may arise where, depending on all the circumstances, a person is "treated as" having assumed responsibility to act on behalf of another, and the other person may, depending on all the circumstances, "be treated" as having so entrusted his property, affairs etc. to the other person. He described the case (and *Coleman*) as cases where fiduciary duties were established "in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned". Nugee J. in *Sharp* drew attention to the fact that it was a company with only two shareholders, where one had bought the other out.

741.    *Brunninghausen* is perhaps at the outer limit of cases where an English court might be prepared to say that the circumstances replicated the salient features of the well-established categories of fiduciary relationships. But in any event, as will be apparent from my discussion below, the facts of that case are very far removed from those of the present.

742.    The cases make clear that it is not possible to give an exhaustive list of the facts which will give rise to such duties. In a subsequent case in the New South Wales Court of Appeal, *Crawley v Short*, Young JA (delivering the leading judgment) said (at [108]) (quoting from an earlier judgment of his):

> "Without attempting to state an exhaustive list, the duty will arise where the member has expressly or impliedly sought the director's assistance and the director has expressly or impliedly undertaken to act on the member's behalf, where the director occupies a place of influence in the family, of which family the members is also associated. These matters may be exacerbated if associated with other factors".

743.    In a later passage, at [122], he identified the circumstances in which a shareholder or director/ shareholder holds a special position where he may owe a fiduciary duty to another shareholder:

> "Without being an exhaustive list, this will occur where: one shareholder undertakes to act on behalf of another shareholder; where one shareholder is in a position to have special knowledge and knows that another shareholder is relying on her to use that knowledge for the advantage of another shareholder as well as herself; and where the company is in reality a partnership in corporate guise, nowadays termed a quasi partnership."

744.    The authorities also illustrate a number of other relevant matters. The decision in *Sharp* shows that the mere fact that a director has more knowledge than (or indeed exclusive knowledge compared to) the shareholders of the company's affairs, or that the directors' actions have the potential to affect the shareholders, does <u>not</u> amount to "special circumstances" and does not give rise to a "special relationship" between the directors and shareholders. Such features are usual, indeed inevitable, features of the relationship between directors and shareholders of a company, since the directors direct and control the affairs of the company, whereas the shareholders do not: see *Sharp v Blank* at [12]. The existence of such features is therefore not sufficient to establish that the directors have undertaken (or that they have been entrusted by the shareholders) to act for or on behalf of the shareholders in any particular respect.

745.    It also seems clear that the mere fact that a director is purchasing shares from a shareholder is not in itself sufficient to give rise to a fiduciary duty. To hold otherwise would be contrary to the decision in *Percival v Wright*. English law has not yet, in my view, gone down this particular route, although a contrary approach was taken in the first instance decision in *Coleman* and can also be seen in some of the passages in *Brunninghausen*. As far as English law is concerned, even in a situation where a director is purchasing shares from a shareholder, the existence of a fiduciary duty depends upon the existence of special circumstances: see *Re Chez Nico (Restaurants) Ltd.* [1992] BCLC 192, 208 (Browne-Wilkinson VC).

746.    Overall, it seems to me that the circumstances in which a fiduciary duty will usually be held to exist are well-summarised by Nugee J. at [13] of *Sharp*: the cases where such duty has been held to exist mostly concern companies which are small and

closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders.

*Application to the facts*

747.  I consider that the facts of the present case are a long way from the circumstances of other cases where a fiduciary relationship has been held to exist, and that there are no special circumstances in the present case which replicate the established categories of fiduciary relationships. I address in turn each of the principal factual matters relied upon by the Claimants as supporting the existence of the fiduciary duty.

748.  *Closeness of the relationship.* Updata UK was not a closely held family company. There were five shareholders in Updata UK (Updata Europe, Newwatch, Mr. Baldorino, Mr. Bennett and Mr Nyegaard). In turn, Updata Europe had six shareholders (Peter Johnsen, Jørgen Johnsen, Kirsten Johnsen, Henrik Hildebrandt, Vald Nielsen and Henrik Bremerskov). Newwatch had two shareholders (Peter Johnsen and Mr. Hildebrandt). Accordingly, some of the shares were held, directly or indirectly, by members of Mr. Johnsen's family. But many of the shares were not: Mr. Baldorino, Mr. Nyegaard and Mr. Hildebrandt were not family members. Furthermore, neither Mr. Baldorino nor Mr. Mantell (who was not a shareholder in or director of Updata UK) had any family or close personal relationship with either Updata Europe or Newwatch, or any of their shareholders or directors, or any of the shareholders of Updata UK other than Mr. Bennett.

749.  As far as Mr. Bennett was concerned: although he was a cousin of Mr Johnsen and nephew of Jørgen Johnsen and Kirsten Johnsen (Mr Johnsen's mother), there is no evidence that he had a close personal relationship with any of them. Whilst his introduction into Updata UK had come via Mr. Johnsen, this does not establish a close personal relationship. Nor is this a case where, in contrast to the father in *Coleman v Myers*, any of the Johnsen family members looked to Mr. Bennett to protect their interests. The e-mail correspondence in 2009 in relation to Mr. Johnsen's proposed "Project Eagle" was businesslike and relatively formal, rather than communications between friends or friendly relatives. This is unsurprising. As described in Section B above, relations between Mr. Johnsen and Updata UK's management were, certainly by 2008-2009, not the best. The Board of Updata Europe was aware that there was a degree of antipathy on the part of the UK management towards them.

750.  The limited family tie between Mr. Bennett and Mr Johnsen's family therefore had no bearing on the way in which Updata UK was managed. Nor did the EVs look to the UK management for the protection of their interests. Thus, when Mr Johnsen resigned from the Board of Updata UK in February 2008, the EVs appointed three new directors (Jørgen Johnsen, Flemming Holm and Henrik Hildebrandt) in order to protect the interests of the EVs (and those of Vald. Nielsen, which, by then, was not only a shareholder in Updata Europe but also a substantial lender to it). When it came to the possible sale in 2009, Mr. Johnsen and the other board members similarly appreciated that they were the ones who would have to look after their own interests. Mr. Bennett, who was working with LMS, was not going to do that for them. They did not consult with Mr. Bennett, or any of the UK management team, so as to obtain their views as to the LMS offer. The EVs engaged their own legal adviser (Mr.

Birkeland), and no doubt thought that they had sufficient experience and financial acumen to be able to evaluate the LMS proposals.

751.   In summary, there is nothing in the facts which justifies a conclusion either that Mr. Bennett (or any of the Defendants) undertook a responsibility to act on behalf of or for the benefit of the EVs, or that the EVs entrusted the care of their property, affairs, transactions or interests to any of them. Nor, in my view, are there any facts which lead to the conclusion that Mr. Bennett or the other defendants should be treated as having undertaken such a responsibility, or that the EVs should be treated as having entrusted the care of their property etc. to them.

752.   Furthermore, in contrast to some of the cases such as *Coleman*, this is not a case where Mr. Bennett or the other Defendants used their relationship with the shareholders in order to negotiate or push through a sale or other transaction. The origin of the sale to LMS lay in the approach of Mr. Nielsen in early 2009. This caused the Defendants to react by seeking investors for a possible MBO, leading in due course to the selection of LMS. Mr. Baldorino told Mr. Johnsen in an e-mail of 16 April 2009, referring to a conversation on the previous day, that: "we have embarked on facilitating a substantial proposal from LMS Capital". There was, therefore, no approach by the Defendants on their own behalf, and Mr. Johnsen was only told of the forthcoming proposal from LMS on the day before it was made. When the offer was made on 16 April 2009, it was made by LMS in writing. It was not made by the Defendants. The offer contemplated that the transaction would be consummated by an acquisition vehicle, the newco,  which would be financed entirely by LMS and selected management members. This is what in due course happened: the SPA was a sale by all the existing shareholders of Updata UK (including the Defendants themselves) to the new company, Updata Infrastructure Holdings Ltd. In the meantime, there were negotiations between Mr. Johnsen and others with LMS: in particular, a telephone call on 29 April 2009 between Mr. Johnsen and Mr. Hooft, another such call on 4 May 2009, and a meeting between Updata Europe board members and representatives of LMS at Mr. Holm's home on 11 June 2009. The Defendants themselves did not participate in these discussions or negotiations. Accordingly, the ultimate transaction, including the terms on which Newwatch could rollover its shares and acquire further shares, was a consequence of the bidding process and a commercial negotiation between Mr. Johnsen and others and LMS. It was not a consequence of a commercial negotiation between Mr. Johnsen (or others from the EVs) with the Defendants, who had minority interests in the acquiring vehicle.

753.   *EVs' dependence on the Defendants for information about Updata UK's financial position.* I agree with the Claimants that the EVs were dependent upon the Defendants for information about Updata UK's financial position. However, I agree with the Defendants that their control of information relating to Updata UK and the EVs' reliance on the Defendants for such information was a usual incident of all relationships between directors and shareholders. The UK management inevitably had more knowledge of the company's affairs than the shareholders, since they directed and controlled its affairs. There is, therefore, nothing special about this fact, whether alone or taken with the other circumstances, which justifies holding that there was a fiduciary relationship.

754. Again, a contrast is to be drawn between the circumstances of some of the cases where a fiduciary duty has been held to exist, and the present facts. This is not a case where the EVs had no access to Updata UK's business information, other than for example audited accounts. Historically, as described in Mr. Hildebrandt's evidence, both Mr. Johnsen and Mr. Nielsen worked at Updata UK's offices, as did Mr. Hildebrandt both before and after he became a director of Updata UK. They could and did discuss matters with the UK management. Updata UK did provide financial information to Updata Europe; for example, Mr. Holm did receive regular cash flow statements, and he had a channel of communication to Mr. Mantell if he wanted financial information – albeit that Mr. Mantell would invariably want to check with Mr. Bennett before he provided anything. The present case arises not from the fact that the UK management gave no information to the EVs during the time when Updata UK was in business, or because the EVs had no access to financial information. Rather, it arises from statements made in 2009 when requests for information were made, but false answers were given.

755. *Control of the flow of information in the context of the proposed sale.* I do not consider that this adds anything to the previous point. Again, the invocation of the directors' superior knowledge of the business, compared to that of the shareholders, is not a special circumstance. It is the usual feature of the ordinary relationship between directors and shareholders.

756. *The making of false representations.* I have accepted that false representations were made, and that there is therefore liability for deceit. But I do not consider that these facts in themselves, or taken in conjunction with the other matters that I have described, establish the existence of a fiduciary duty. Mummery LJ does refer to various events, including the making of material representations by directors to shareholders, as being capable of constituting special circumstances and generating fiduciary obligations. However, this statement is made in the context of the earlier part of [34] of his judgment, where he identifies the hallmarks of a fiduciary relationship. I do not consider that the relevant passage means that whenever a false statement is made, even in the context of a possible share acquisition by a director from a shareholder, a fiduciary duty arises.

757. *Unique access to information about Updata UK.* I agree with the Defendants that this is no more than a reiteration of the earlier arguments concerning dependence on information, or control over the flow of information.

758. Accordingly, I do not consider that any of the features relied upon by the Claimants, individually or collectively, justifies the conclusion that the Defendants owed fiduciary duties to the Claimants.

759. This means that it is unnecessary to consider in detail the remaining arguments, and I shall only make brief comments about some of them.

760. First, I was not persuaded that any fiduciary duty was owed to the EVs by Mr. Mantell, who was not a director or shareholder. None of the cases cited to me imposed a fiduciary duty towards shareholders on someone who was neither a director or shareholder. Similarly none of the factual circumstances indicated the existence of any such duty on his part.

761.    Secondly, if fiduciary duties were owed, then it seemed to me that my findings as to fraudulent misrepresentation, and the nature of the fraud in the present case, would inevitably mean that those duties were broken. The fraud involved deliberate and fraudulent concealment of the expected results of Updata UK and specifically of the March Weighted Budget, as well as the fact that the UK management had provided different "factual data" to Tenon and LMS. There can be no doubt that claims for breach of fiduciary duty based on fraudulent misrepresentation and fraudulent non-disclosure are permissible in the light of the order of Sir Richad Field.

762.    Thirdly, I did not consider that there was any case management reason which precluded the court from ordering an account. However, I was dubious as to whether it was appropriate, as a matter of discretion, to order an account in circumstances where Newwatch had rolled over its shareholding, had therefore not sold any shares, and had in due course benefited in full from the transaction with LMS which ultimately led to the sale to Capita.

763.    Accordingly, as a result of my decision that fiduciary duties were not owed, the claims based on breach of fiduciary duty fail.

## L:    Conclusion

764.    The claim of Vald. Nielsen for damages for fraud or conspiracy succeeds, and I assess such damages at £ 6,518,652. The Claimants' claims based on breach of fiduciary duty fail and are dismissed. I will hear argument as to consequential matters, including interest and costs.

Supreme Court                                    A

# Zurich Insurance Co plc *v* Hayward

## [2016] UKSC 48

2016  June 16;                              Lord Neuberger of Abbotsbury PSC,
      July 27                                Baroness Hale of Richmond DPSC,   B
                                            Lord Clarke of Stone-cum-Ebony,
                                            Lord Reed, Lord Toulson  JJSC

*Contract — Rescission — Settlement of action — Employee claiming damages
    against employer for injury at work — Employer's insurers suspecting that
    employee exaggerating effect of his injury but entering into settlement agreement
    on basis of inability to prove their suspicions in court — Insurers subsequently*  C
    *receiving proof that employee exaggerated claim so that settlement excessive —
    Insurers bringing action for rescission of settlement agreement — Whether
    sufficient to prove materially false misrepresentation intended to induce and
    inducing representee to act to his detriment — Relevance of representee's belief as
    to truth of representation — Whether employee's material false representation
    inducing insurers to enter into settlement — Whether insurers estopped from
    retrieving amount overpaid under settlement agreement*                          D

The defendant was injured in an accident at work and claimed very substantial
damages against his employer.  The employer's insurers, despite suspecting that the
defendant had exaggerated the extent of his injuries, were unable to find evidence
sufficient to prove their suspicions in court.  They reached an agreement with the
defendant to pay him less than one third of the amount he had claimed, in full and
final settlement of the claim, and a Tomlin order was made to that effect.  The   E
insurers, having subsequently received proof that the defendant had recovered from
his injuries a year before the settlement had been reached, brought an action against
him in deceit claiming, inter alia, to be entitled to rescind the settlement agreement
and to repayment of the sums paid under it.  The judge, having found that the
defendant had exaggerated the effects of his injury, held that the insurers were
entitled to rescind the settlement agreement.  He proceeded to assess the quantum of
damages due to the defendant in his claim against his employer at less than one ninth
of the sum which he had received under the settlement agreement, and ordered the   F
defendant to repay that sum less the amount of the damages assessed.  The Court of
Appeal allowed the defendant's appeal on the grounds, inter alia, that, although the
defendant had misrepresented the extent of his injuries, the insurers had not relied on
that misrepresentation when they had reached the settlement agreement.
    On the insurers' appeal—
    *Held*, allowing the appeal, that in a claim for deceit based upon alleged   G
misrepresentation it had to be shown that the defendant had made a materially false
misrepresentation which had been intended to induce, and had induced, the claimant
to act to his detriment; that, although the claimant's state of mind might be relevant
to the issue of inducement, it was not necessary as a matter of law for the claimant to
prove that he had believed the misrepresentation to be true, and his reasonable belief
as to whether the misrepresentation was true was not a necessary ingredient of the
test of whether inducement had been proved; that, since a representee might settle a   H
claim on the basis that he thought that the judge would believe the misrepresentation,
the fact that the insurers had not wholly believed the defendant did not preclude
them from having been induced to reach the settlement by the defendant's
misrepresentations; that it was sufficient for the defrauded representee to establish
that the fact of the misrepresentation had been a material cause of his entering into

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  the settlement; and that, accordingly, since the questions whether the insurers had in fact been induced by the misrepresentation to enter into the settlement agreement and whether doing so had caused them loss were questions of fact which the judge had been entitled to decide in the insurers' favour, his order would be restored (post, paras 18, 23, 25–26, 32, 36, 37, 40, 44, 47–49, 50, 57, 58, 67, 70–72).

   *Redgrave v Hurd* (1881) 20 Ch D 1, CA and *Smith v Chadwick* (1884) 9 App Cas 187, HL(E) considered.

B  Decision of the Court of Appeal [2015] EWCA Civ 327; [2015] CP Rep 30 reversed.

The following cases are referred to in the judgments:

*Arkwright v Newbold* (1881) 17 Ch D 301, Fry J and CA
*Australian Steel & Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202
C  *BP Exploration Operating Co Ltd v Chevron Shipping Co* [2001] UKHL 50; [2003] 1 AC 197; [2001] 3 WLR 949; [2002] 1 All ER (Comm) 1; [2002] 1 Lloyd's Rep 77, HL(Sc)
*Barton v Armstrong* [1976] AC 104; [1975] 2 WLR 1050; [1975] 2 All ER 465, PC
*Betjemann v Betjemann* [1895] 2 Ch 474, CA
*Briess v Woolley* [1954] AC 333; [1954] 2 WLR 832; [1953] 1 All ER 909, HL(E)
*Downs v Chappell* [1997] 1 WLR 426; [1996] 3 All ER 344, CA
*Edgington v Fitzmaurice* (1885) 29 Ch D 459, Denman J and CA
D  *Gipps v Gipps* [1978] 1 NSWLR 454
*Gould v Vaggelas* (1984) 157 CLR 215
*HIH Casualty and General Insurance Ltd v Chase* [2003] UKHL 6; [2003] 1 All ER (Comm) 349; [2003] 2 Lloyd's Rep 61, HL(E)
*Kyle Bay Ltd (trading as Astons Nightclub) v Underwriters subscribing under Policy No 019057/08/01* [2007] EWCA Civ 57; [2007] 1 CLC 164, CA
*Ladd v Marshall* [1954] 1 WLR 1489; [1954] 3 All ER 745, CA
E  *Lazarus Estates Ltd v Beasley* [1956] 1 QB 702; [1956] 2 WLR 502; [1956] 1 All ER 341, CA
*Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; [1994] 3 WLR 677; [1994] 3 All ER 581; [1994] 2 Lloyd's Rep 427, HL(E)
*Redgrave v Hurd* (1881) 20 Ch D 1, Fry J and CA
*Ross River Ltd v Cambridge City Football Club Ltd* [2007] EWHC 2115 (Ch); [2008] 1 All ER 1004; [2008] 1 All ER (Comm) 1028
F  *Sharland v Sharland* [2015] UKSC 60; [2016] AC 871; [2015] 3 WLR 1070; [2016] 1 All ER 671, SC(E)
*Smith v Chadwick* (1884) 9 App Cas 187, HL(E)
*Smith v Kay* (1859) 7 HL Cas 750, HL(E)
*Sprecher Grier Halberstam LLP v Walsh* [2008] EWCA Civ 1324; [2009] CP Rep 16, CA
*Standard Chartered Bank Ltd v Pakistan National Shipping Corpn Ltd (Nos 2 and 4)*
G  [2002] UKHL 43; [2003] 1 AC 959; [2002] 3 WLR 1547; [2003] 1 All ER 173; [2002] 2 All ER (Comm) 931; [2003] 1 Lloyd's Rep 227; [2003] 1 BCLC 244, HL(E)
*Strover v Harrington* [1988] Ch 390; [1988] 2 WLR 572; [1988] 1 All ER 769
*Summers v Fairclough Homes Ltd* [2012] UKSC 26; [2012] 1 WLR 2004; [2012] 4 All ER 317, SC(E)
*Toubia v Schwenke* [2002] NSWCA 34; 54 NSWLR 46
H  *Zurich Insurance Co plc v Hayward* [2011] EWCA Civ 641; [2011] CP Rep 39, CA

The following additional cases were cited in argument:

*Arnison v Smith* (1889) 41 Ch D 348, Kekewich J and CA
*Attwood v Small* (1838) 6 Cl & Fin 232, HL(E)

© 2017 The Incorporated Council of Law Reporting for England and Wales

*Binder v Alachouzos* [1972] 2 QB 151; [1972] 2 WLR 947; [1972] 2 All ER 189;    A
    [1978] 1 Lloyd's Rep 524, CA
*Law v Law* [1905] 1 Ch 140, Kekewich J and CA

**APPEAL** from the Court of Appeal

By a claim form and particulars of claim issued in February 2009 the claimant insurers, Zurich Insurance Co plc, claimed damages in deceit against the defendant, Colin Hayward. By amendment the insurers claimed    B
in the alternative to be entitled to rescind a settlement agreement which they had reached with the defendant on 3 October 2003, whereby the insurers had agreed to pay the defendant £134,973 in full and final settlement of a claim for damages for personal injuries sustained in an accident at his work place on 9 June 1998, and the repayment of the sums paid under it.

The defendant applied to strike out the claim or for summary judgment in    C
his favour. On 17 March 2010 Deputy District Judge Bosman sitting in Cambridge County Court refused the application. The defendant appealed. On 19 July 2010 Judge Yelton, sitting in Cambridge County Court, allowed the appeal and granted the application. The insurers appealed. On 27 May 2011 the Court of Appeal (Maurice Kay, Smith and Moore-Bick LJJ) [2011] EWCA Civ 641; [2011] CP Rep 39 allowed the appeal and restored the district judge's decision.    D

Following trial of the claim in November 2012 Judge Maloney QC sitting in the Cambridge County Court allowed the claim and the settlement agreement was rescinded. On 6 September 2013 the judge assessed the quantum of damages due in the defendant's action against his employer at £14,720 and, in the insurer's action, ordered the defendant to repay the amount received under the settlement agreement, less £14,720.    E

By an appellant's notice the defendant appealed against the decision to allow the insurers' claim and the order for repayment. On 31 March 2015 the Court of Appeal (Underhill, King and Briggs LJJ) [2015] EWCA Civ 327; [2015] CP Rep 30 allowed the appeal and restored the settlement agreement.

On 28 July 2015 the Supreme Court (Lord Mance, Lord Clarke of Stone-cum-Ebony and Lord Hodge JJSC) granted the insurers permission to    F
appeal, pursuant to which they appealed.

The facts are stated in the judgment of Lord Clarke of Stone-cum-Ebony JSC.

*Patrick Limb QC* and *Jayne Adams QC* (instructed by *DAC Beachcroft Claims Ltd*) for the insurers.    G

The defendant claims that he was fraudulent but not a deceiver and that the insurers were at fault for failing to discover his dishonesty. However the tort of deceit does not necessarily require proof that the representee believed the dishonest representation. Whilst proof of knowledge on the part of the representee is a defence, nothing short of knowledge of the falsity will do since a representee who does not know a representation to be false has been deceived. It is sufficient that the misrepresentation influenced the    H
representee to the extent that it was a material cause of entering into the settlement.

Inducement is concerned with causation and not with the representee's credulity. Although it may be inferred that a representee who believes a

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    misrepresentation has been induced to rely on it, an absence of belief does not mean there was no inducement because what is required for there to be inducement is a causal connection between the misrepresentation and the representee making a decision or undertaking a course of action on the basis of that misrepresentation. Inducement refers to the causative effect of the misrepresentation on the mind of the representee. The focus is on the causative effect of the misrepresentation in terms of what, in the light of the

B    misrepresentation, the representee does or does not do, and not on whether he believed the misrepresentation. The misrepresentation was material if it was actively present in the mind of the representee when he made the settlement.

Had the insurers known the truth they would not have offered the defendant such a large amount in settlement. That amount was almost ten

C    times the true value of the claim. The defendant's misrepresentations operated on the minds of the insurers and made them decide to make the offer which they made.

The onus of proof is on the defendant representor to prove actual knowledge of the true position, rather than on the representee bringing a claim for deceit to disprove knowledge. Mere suspicion does not suffice;

D    knowledge, or at least blind-eye knowledge, of truth needs to be established.

It cannot be said that the insurers had knowledge of facts from which they ought to have realised that the defendant's representations were false, nor did the trial judge so find. Since the insurers did not have knowledge of facts from which they ought to have realised that the defendant's representations were false, they were deceived. As a result of the fraud the insurers were put in a position where they had no choice but to make a settlement.

E    The insurers' suspicions during the original personal injury action, as shown by their having put the defendant under surveillance, does not in law defeat a subsequent claim for deceit. There was fresh evidence which led to fresh allegations and showed the defendant to have been fraudulent. The fact that it subsequently turned out that the insurers' original concerns had been right is not a basis for saying that they were not deceived. There is a

F    substantial difference between suspicion and knowledge. The Tomlin order does not mean that the current proceedings should be stopped.

[Reference was made to *Gould v Vaggelas* (1984) 157 CLR 215; *Edgington v Fitzmaurice* (1885) 29 Ch D 459; *Australian Steel & Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202; *Attwood v Small* (1838) 6 Cl & Fin 232; *Redgrave v Hurd* (1881) 20 Ch D 1; *Gipps v Gipps* [1978] 1 NSWLR 454 and *Law v Law* [1905] 1 Ch 140.]

G    *Guy Sims* (instructed by *Hewitsons LLP*) for the defendant.

In a case where fraud is alleged the representee must have been deceived. Successful deception is an essential part of the tort. In order to set aside a compromise on the basis of fraudulent misrepresentation the representee must show that he was deceived and that he was induced into the settlement because he believed that the misrepresentations were true.

H    The insurers were aware that the defendant was not honest and are therefore in no worse a position than they were at the time of the misrepresentation. The insurers went a long way beyond mere suspicion that the representations made by the defendant were untrue. They not only did not believe those representations but actively disbelieved them,

© 2017 The Incorporated Council of Law Reporting for England and Wales

considered them fraudulent, believed the correct position and analysed it.     *A*
They decided to investigate the defendant's representations and having
investigated they decided to settle, taking into account all the risks of doing
so, because they did not know if the court would accept the true position was
what they believed it to be. They were not surprised at the finding of fact
eventually made since they had considered that to be the true position well
before the compromise was made.
                                                                               *B*
    In the tort of deceit there is a requirement that the representee both
believes and relies on the misrepresentations, so that there is a successful
deception which was only later unmasked. Where the representee conducts
investigations sufficient to uncover facts from which he ought to have
realised that he was being deceived, he does not place the necessary reliance
on the representations.

    [Reference was made to *Edgington v Fitzmaurice* (1885) 29 Ch D 459;    *C*
*Arnison v Smith* (1889) 41 Ch D 348; *Sprecher Grier Halberstam LLP v
Walsh* [2009] CP Rep 16; *Kyle Bay Ltd (trading as Astons Nightclub) v
Underwriters subscribing under Policy No 019057/08/01* [2007] 1 CLC
164; *Gipps v Gipps* [1978] 1 NSWLR 454; *BP Exploration Operating Co
Ltd v Chevron Shipping Co* [2003] 1 AC 197; *Toubia v Schwenke* (2002) 54
NSWLR 46 and *Binder v Alachouzos* [1972] 2 QB 151.]
                                                                               *D*
    *Limb QC* in reply.
    Mistrust on the part of the insurers is not enough to defeat their claim.
*Toubia v Schwenke* (2002) 54 NSWLR 46 does not assist the defendant's
case.

    The court took time for consideration.                                     *E*

    27 July 2016. The following judgments were handed down.

**LORD CLARKE OF STONE-CUM-EBONY JSC** (with whom **LORD
NEUBERGER OF ABBOTSBURY PSC, BARONESS HALE OF
RICHMOND DPSC** and **LORD REED JSC** agreed)
                                                                               *F*
*Introduction*

    1  In April 2012 the Supreme Court considered a case called *Summers v
Fairclough Homes Ltd* [2012] 1 WLR 2004, where the facts were strikingly
similar to those here. In that case, as in this one, the claimant suffered an
injury at work which was caused by the negligence or breach of duty of his
employer. In each case the employer was either held liable (in the *Summers*   *G*
case) or admitted liability (here) as to 80%, the claimant accepting that he was
20% to blame. In each case the claimant dishonestly exaggerated the extent
of the consequences of the injury. In the *Summers* case the claimant originally
claimed damages of over £800,000 but was awarded a total of just over
£88,000 on the basis of the true facts, which came to light after undercover
surveillance evidence showed that his account of the consequences of his
injuries had been grossly and dishonestly exaggerated. In the instant case, the  *H*
claimant, Mr Colin Hayward, claimed £419,316·59 (exclusive of promotion
prospects but discounted for loss of ill health pension). He was ultimately
awarded £14,720 after a trial before Judge Moloney QC ("the judge").
The reason for the reduction was again partly as a result of undercover

© 2017 The Incorporated Council of Law Reporting for England and Wales

Case 1:20-cv-10041-PKC   Document 105-12   Filed 08/24/21   Page 124 of 143

147
[2017] AC                                    Zurich Insurance Co plc v Hayward (SC(E))
                                             Lord Clarke of Stone-cum-Ebony JSC

A  surveillance and other evidence that showed that Mr Hayward's claim had been grossly and dishonestly exaggerated.

2   In the *Summers* case the issue was what remedies were available to the employer and its insurers, whereas in the instant case the issue arises out of a settlement agreement reached between the parties on 3 October 2003, the accident having occurred on 9 June 1998. The agreement was made shortly before the issue of quantum was due to be tried and was incorporated in a Tomlin order. The employer's case was conducted on its behalf by its liability insurer, Zurich Insurance Co plc ("Zurich"), which is the appellant in this appeal. The employer (in practice Zurich) agreed to pay £134,973·11, inclusive of CRU of £22,473·11, in full and final settlement of Mr Hayward's claim.

3   The Tomlin order was in familiar terms as follows:

"BY CONSENT
"IT IS ORDERED THAT
"All further proceedings in this action be stayed, except for the purpose of carrying such terms into effect. Liberty to apply as to carrying such terms into effect."
"THE SCHEDULE
"The claimant accepts in settlement of his cause of action herein the sum of £134,973·11."
"4. Upon payment by the defendant of the several sums and costs before mentioned, they be discharged from any further liability to the claimant in relation to the claim herein."

4   In 2005, Mr Hayward's neighbours, Mr and Mrs Cox, who had lived next door to him since June 2002, approached the employer to say that they believed that his claim to have suffered a serious back injury was dishonest. From their observation of his conduct and activities, they believed that he had recovered in full from his injury at least a year before the settlement. They were referred to Zurich and made full witness statements to that effect.

5   In February 2009 Zurich commenced the present proceedings against Mr Hayward claiming damages for deceit. Zurich pleaded that both written statements made by Mr Hayward or on his behalf, and his statements of case in the particulars of claim and the schedule(s) of loss as to the extent of his injury, as well as his accounts given to the medical experts, constituted fraudulent misrepresentations. Damages were claimed equivalent to the difference between the amount of the settlement and the damages that should have been awarded if he had told the truth. The claim was subsequently amended to claim in the alternative rescission of the settlement agreement and the repayment of the sums paid under it.

6   No point has been taken in reliance upon the fact that the action was brought in the name of Zurich rather than the employer. Mr Hayward applied to strike out the proceedings, or for summary judgment in his favour. He contended that the Tomlin order created an estoppel per rem judicatam and/or by record, alternatively that the action was an abuse of the process because the issue of fraud had been compromised by the settlement. Deputy District Judge Bosman refused to strike out the claim, although he directed Zurich to amend the claim to seek an order that the compromise be set aside rather than an order for damages. Although it was pleaded in the

© 2017 The Incorporated Council of Law Reporting for England and Wales

148
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

original defence to Zurich's claim that Zurich must satisfy the test in *Ladd v Marshall* [1954] 1 WLR 1489, that contention was not ultimately pursued following the hearing before the deputy district judge.  His decision was reversed on appeal by Judge Yelton.

7   Zurich appealed to the Court of Appeal (Maurice Kay, Smith and Moore-Bick LJJ) and the decision of the deputy district judge was unanimously restored [2011] CP Rep 39.  It was held that the settlement gave rise to no estoppel of any kind and that the action was not an abuse of process.  It was further held that the fact that Zurich had alleged deliberate exaggeration prior to the settlement did not preclude them from relying on it subsequently as a ground for rescission.  In the result, the claim proceeded. I note in passing that Moore-Bick LJ said, at para 58:

> "If it is to succeed in its action Zurich will have to persuade the court that it was induced to agree to the settlement by fraud on the part of Mr Hayward, a task that may not prove easy, given the fact that it already knew enough to justify the service of a defence in the terms indicated earlier."

### The trial

8   The trial came before the judge in the Cambridge County Court in November 2012.  He heard evidence for Zurich from Zurich's solicitor (Ms Winterbottom) and its claims manager (Mr Birkenshaw), who were responsible for the conduct of the litigation, from Mr and Mrs Cox and from Mr Sharp, who was the orthopaedic expert instructed on behalf of Zurich. Mr Hayward gave evidence together with three members of his family and also called evidence from Mr Varley, who was the orthopaedic surgeon instructed on his behalf.

9   Mr Hayward denied any suggestion that his condition was anything other than genuine or that there was any element of exaggeration.  He maintained throughout that he was a seriously disabled individual whose disability arose from the original accident and was such that, ever since, he had not been able to work or carry out normal activities of daily living without assistance.  As with the first series of witness statements, Mr Hayward signed the appropriate statements of truth setting out in detail the extent of his disability and presented himself to the medical experts on that basis.

10   Following a four-day trial, the judge found that Mr Hayward had deliberately and dishonestly exaggerated the effects of his injury throughout the court process.  Of Ms Winterbottom and Mr Birkenshaw, the judge said (at para 2.6 of his judgment quoted in full below) both that: "[neither] can be said to have believed the representations complained of to be true" and that

> "[they] may not themselves have believed the representations to be true; but they did believe that they would be put before the court as true, and that there was a real risk that the court would accept them in whole or part and consequently make a larger award than Zurich would otherwise have considered appropriate".

The judge further found that, although Zurich was aware at the time of the settlement of the real possibility of fraud, Mr Hayward had continued his

© 2017 The Incorporated Council of Law Reporting for England and Wales

149
[2017] AC                           Zurich Insurance Co plc v Hayward (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    deliberate misrepresentations even after the disclosure of the 1999 video, and that those continuing misrepresentations influenced Zurich into agreeing a higher level of settlement than it would otherwise have done. The judge therefore set aside the compromise.

11    It followed that the issue of quantum in the original action remained to be tried. That issue was heard on 6 September 2013 and, having found that Mr Hayward had made a full recovery from any continuing physical disability by October 1999, the judge thereafter handed down a judgment awarding Mr Hayward damages in the modest sum of £14,720, which was about 10% of the settlement figure. An order was made in the later action directing him to repay the sum paid under the settlement less that amount, namely £97,780, interest of £34,379.45 and £3,951 adjustment for CRU.

C    *The appeal to the Court of Appeal*

12    Mr Hayward appealed to the Court of Appeal against the decision that the settlement should be set aside but did not appeal against the judge's assessment of quantum or (contingent on whether the settlement was set aside) against the order for re-payment. Moreover, the judge's findings of fact were not challenged. To my mind, as appears below, this is a critical factor in this appeal.

D    13    The appeal was heard by Underhill, Briggs and King LJJ. They agreed that the appeal should be allowed [2015] CP Rep 30. Substantive judgments were given by Underhill and Briggs LJJ. Although King LJ agreed with both judgments, I do not read their reasoning as quite the same.

14    In his para 9 Underhill LJ set out para 2.5 of the judge's judgment, where he said that the judge addressed the issue of reliance and dealt with the law. Para 2.5 is in these terms:

"Lastly, of course, it is necessary that the employer/Zurich should *rely* on the representations and suffer loss as a result. Here an interesting (and apparently unresolved) question of principle arises. In the ordinary case, sale of goods for example, reliance by the purchaser is effectively equivalent to his *belief in the truth* of the statement; if he believes the goods are as represented, he will be relying on the representation (and acting on it by his purchase) and if not, not. In the litigation context the position is different. In such a situation, the party to whom the representation is made is by no means likely to believe it to be true at the pretrials stage. At the very least, statements made in the course of litigation will be viewed with healthy scepticism and weighed against the other material available. Often the other party will not be sure, even then, whether the statement is in fact true, and will mainly concern himself with how likely it is to be accepted by the court. Sometimes (a staged road traffic 'accident' for example) the other party may actually be certain from his own direct knowledge that the statement is a deliberate lie. But even then he and his advisers cannot choose to ignore it; they must still take into account the risk that it will be believed by the judge at trial. This situation is quite different from a proposed purchase, where if in doubt one can simply walk away. For these reasons, it appears to me that the many dicta relied on by CH, to the effect that liability requires that the representation must be believed by the other party, are not

© 2017 The Incorporated Council of Law Reporting for England and Wales

applicable to a case like the present. The formulation adopted by the editors of *Clerk & Lindsell*, 20th ed (2010), para 18-34 fits the case better; 'The claimant must have been *influenced* by the misrepresentation' (my emphasis)."

15 After noting that "CH" was shorthand for Mr Hayward, Underhill LJ set out (also in his para 9), para 2.6 of the judge's judgment as follows:

"I heard the evidence of Ms Winterbottom and Mr Birkinshaw respectively in 2003 Zurich's litigation solicitor and claims handler. Each was aware of the 1999 video and of the real possibility that this was a fraudulent claim. Each was frustrated by the reluctance of 'their' expert, Mr Sharp, to produce a clear supplemental report saying that he now believed CH to have been shamming and to have sustained far less harm than was being claimed. Neither can be said to have believed the representations complained of to be true. But, if the law is as stated at 2.5 above, this does not matter provided the representations *influenced* them in their decision how much to pay CH in settlement. I am in no doubt that they did. They may not themselves have believed the representations to be true; but they did believe that they would be put before the court as true, and that there was a real risk that the court would accept them in whole or part and consequently make a larger award than Zurich would otherwise have considered appropriate. Acting in reliance on *that* belief (which, whether or not CH was truthful or honest, was the belief he and his advisers must have wanted them to form on the basis of the statements) they made the payment into court which led to the Tomlin order settlement."

Underhill LJ then set out the substance of the judge's ultimate conclusions from para 6.6 in these terms:

"although Zurich was aware at the time of the settlement of the real possibility of fraud here, CH had continued his deliberate misrepresentations even after the disclosure of the 1999 video, and those continuing misrepresentations did influence Zurich into agreeing a higher level of settlement than it would otherwise have made."

The judge added:

"The conditions required for setting aside the settlement are therefore made out and I so order."

16 Para 6.6 must be put in its context, which includes paras 6.4 and 6.5. Between paras 6.1 and 6.3 the judge explained why he accepted the evidence of Mr and Mrs Cox as credible. He then said, at paras 6.4–6.5:

"6.4. The choice before me is not the stark one between 'no pain at all' and 'complete disability'. What I have to decide is whether CH's actual level of pain and disability at the time of the representations was materially less than he was representing, and if so whether that misrepresentation was deliberate and dishonest. It is accepted that there was here an injury leading to a measure of pain and disability, at least up to 2002; and Mr Sharp and Mr Varley do not exclude some continuing

© 2017 The Incorporated Council of Law Reporting for England and Wales

151

A     pain (as opposed to disability) in the period after the settlement. That being so, the records of pain management and analgesic drug treatment which gave me concern are not irreconcilable with Zurich's case.

"6.5 There is no special standard of proof for fraud in civil proceedings; the normal test of balance of probability applies, though of course in assessing the probabilities one bears in mind that fraud is an unusual matter. In this case, the evidence, summarised above, that CH
B     was not in fact suffering from the level of pain and disability that he claimed is so strong that it prevails over his innocent explanations. The probability is, and I so find, that CH was experiencing some pain both before and after the settlement, and did want it treated and managed; but at the same time, he also wanted the maximum compensation he could obtain, and to get it he was dishonestly willing to exaggerate his
C     symptoms to the doctors, and to conceal his real level of ability from them and from the world, so as to give the false impression that he was not capable of heavy work when in fact he was. He must have been aware by the time of the 14 October 1999 surveillance video (at the latest) that his physical abilities were considerably greater than he thereafter represented to the doctors and his employers' representatives, and I find that
D     his representations made after that date were knowingly false and misleading."

17    Underhill and Briggs LJJ allowed Mr Hayward's appeal for similar but not identical reasons. They did so essentially because of the state of mind of Zurich (and the employer) when the settlement was made. They rejected the conclusions of principle expressed in para 2.5 of the judge's
E     judgment set out above. The parties to this appeal agreed that the appeal raised two issues. The first was this.

"In order to set aside a compromise on the basis of fraudulent misrepresentation, to show the requisite influence by or reliance on the misrepresentation: a) must the defrauded representee prove that it was induced into settlement because it believed that the misrepresentations
F     were true; or b) does it suffice to establish influence that the fact of the misrepresentations was a material cause of the defrauded representee entering into the settlement?"

The second was this.

"Under what circumstances, if any, does the suspicion by the defendant of exaggeration for financial gain on the part of the claimant preclude
G     unravelling the settlement of that disputed claim when fraud is subsequently established?"

*Discussion*

*Issue 1*

H     18    Subject to one point, the ingredients of a claim for deceit based upon an alleged fraudulent misrepresentation are not in dispute. It must be shown that the defendant made a materially false representation which was intended to, and did, induce the representee to act to its detriment. To my mind it is not necessary, as a matter of law, to prove that the representee believed that the representation was true. In my opinion there is no clear

© 2017 The Incorporated Council of Law Reporting for England and Wales

152
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

authority to the contrary. However, that is not to say that the representee's state of mind may not be relevant to the issue of inducement. Indeed, it may be very relevant. For example, if the representee does not believe that the representation is true, he may have serious difficulty in establishing that he was induced to enter into the contract or that he has suffered loss as a result. The judge makes this point clearly and accurately in the third sentence of para 2.5 of his admirable judgment.

19   He makes a further point in the same paragraph which is of importance in the context of this somewhat unusual case. It is this. A person in the position of the employer or its insurer may have suspicions as to whether the representation is true. It may even be strongly of the view that it is not true. However, the question in a case like this is not what view the employer or its insurer takes but what view the court may take in due course. This is just such a case, as the judge correctly perceived. As he put it, the employer and its advisers must take into account the possibility that Mr Hayward would be believed by the judge at the trial. That is because the views of the judge will determine the amount of damages awarded.

20   In any event this is not a case in which Zurich or the employer knew that Mr Hayward was deliberately exaggerating the seriousness and long term effects of his injuries. We now know that he was thoroughly dishonest from October 1999 and that he continued to make false claims in the witness box at the trial even when the evidence against him was overwhelming. Each case of course depends upon its own facts but it seems to me to be putting the case too high to say, as Briggs LJ does at para 30, that Zurich went so far as to plead that Mr Hayward was fraudulent and to support it by a statement of truth. He says, at para 31:

"In my opinion the true principle is that the equitable remedy of rescission answers the affront to conscience occasioned by holding to a contract a party who has been influenced into making it by being misled or, worse still, defrauded by his counterparty. Thus, once he discovers the truth, he must elect whether to rescind or to proceed with the contract. It must follow that, if he already knows or perceives the truth by the time of the contract, he elects to proceed by entering into it, and cannot later seek rescission merely because he later obtains better evidence of that which he already believed, still less if he merely repents of it. This seems to me to be a fortiori the case where, as here, the misrepresentation consists of a disputed claim in litigation, and the contract settles that claim."

21   To my mind that is to put the position too high in favour of fraudsters in general and Mr Hayward in particular. It is true that in its defence dated 30 October 2001 the employer (no doubt through Zurich) stated that the facts stated in the defence were true. The relevant facts were pleaded in paras 6–7 as follows:

"6. It is admitted that the claimant suffered an injury to his back as a result of the accident. The defendant relies on the medical reports of Mr Sharp dated 11 June 2000, 20 August 2000 and 26 November 2000. The view of the claimant's ongoing physical condition from Mr Bracegirdle relied on by the claimant is not accepted by the defendant. As a result of video surveillance obtained Mr Sharp formed the view that the claimant's disability was not as great as he had described and he was capable of

© 2017 The Incorporated Council of Law Reporting for England and Wales

153
[2017] AC                                    Zurich Insurance Co plc v Hayward (SC(E))
                                              Lord Clarke of Stone-cum-Ebony JSC

working full time even if not with heavy lifting. In view of the claimant's lack of candour in relation to his physical condition it is not possible to accept that his depressive state, as described, has been consistent, is continuing or will continue into the future.

"7. The claimant has exaggerated his difficulties in recovery and current physical condition for financial gain."

22  These pleas show that Zurich was suspicious of Mr Hayward but no very clear allegations were, or could be, made. However, it is not in dispute that Zurich did as much as it reasonably could to investigate the position before the settlement. The evidence was not as good from its point of view as it might have hoped but the fact is that Zurich did not know the extent of Mr Hayward's misrepresentations. The case was settled at a time when the only difference between the experts was the likely duration of future loss. The figure agreed was about half way between the respective opinions of the experts. It was not until the advent of Mr and Mrs Cox that Zurich realised the true position. Hence, as the judge expressly found, the amount of the settlement was very much greater than it would have been but for the fraudulent misrepresentations made by Mr Hayward. The small amount ultimately awarded by the judge, which is not challenged, shows the extent of the dishonest nature of the claim. I am not persuaded that the importance of encouraging settlement, which I entirely agree is considerable, is sufficient to allow Mr Hayward to retain moneys which he only obtained by fraud.

### The authorities

23  I am not persuaded that the authorities lead to any other conclusion. As stated above, the ingredients of the tort of deceit are not in dispute subject to one question, which is whether a claimant alleging deceit must show that he believed the misrepresentation. In my opinion the answer is no.

24  There are many formulations of the relevant principles in the authorities. I take two examples. In *Briess v Woolley* [1954] AC 333, 353 Lord Tucker said:

"The tort of fraudulent misrepresentation is not complete when the representation is made. It becomes complete when the misrepresentation—not having been corrected in the meantime—is acted upon by the representee. Damage giving rise to a claim for damages may not follow or may not result until a later date, but once the misrepresentation is acted upon by the representee the tortious act is complete provided that the representation is false at that date."

To like effect, Lord Mustill said in *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd (No 2)* [1995] 1 AC 501, 542:

"In the general law it is beyond doubt that even a fraudulent misrepresentation must be shown to have induced the contract before the promisor has a right to avoid, although the task of proof may be made more easy by a presumption of inducement."

25  The authorities show that questions of inducement and causation are questions of fact. I would accept the submissions made on behalf of Zurich in support of the proposition that belief is not required as an independent

© 2017 The Incorporated Council of Law Reporting for England and Wales

154
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

ingredient of the tort. It may however be relevant as part of the court's consideration of the questions whether there was inducement and, if so, whether causation has been established.

26   In this regard I agree with the judge when he said at the end of para 2.5 that the statement in *Clerk & Lindsell on Torts*, 20th ed (2010) fits the case better. It simply said "The claimant must have been influenced by the misrepresentation". That is a sub-heading to para 18-34 in the 21st ed (2015). In para 18-35 the editors say that, although the claimant must show that he was induced to act as he did by the misrepresentation, it need not have been the sole cause. It is submitted on behalf of Mr Hayward that the claimant's mind must be at least partly influenced by the defendant's misstatements. In *Edgington v Fitzmaurice* (1885) 29 Ch D 459, 483 Bowen LJ said:

"The real question is, what was the state of the plaintiff's mind, and if his mind was disturbed by the misstatement of the defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference."

I see no conflict between the judge's approach and those conclusions.

27   Mr Hayward relies upon the references in the textbooks and, indeed, in cases like *Edgington v Fitzmaurice* to the requirement that the representation must have impacted upon the representee's mind. To my mind that simply means that the representee must have been induced to act as he did in reliance upon the representation.

28   In Zurich's written case its argument in support of the position that belief in the truth of the representation is not required is summarised as follows:

"(i) Inducement is concerned with causation—not the representee's credulity. Although one may infer that a representee who believes a misrepresentation has been induced to rely on it, an absence of belief does not mean there was no inducement. This is because what is required for there to be inducement is a causal connection between the misrepresentation and the representee making a decision or undertaking a course of action on the basis of that representation. That does not require belief in the misrepresentation itself.

"(ii) Just as belief in the misrepresentation is not required, so also belief in other inducing causes is irrelevant.

"(iii) There is a '*presumption of inducement*', particularly where there is an intention to induce by means of fraud. If the defrauded representee first had to show he *believed* the misrepresentation, there would be little (or no) utility in having the presumption.

"(iv) That presumption should not be rebutted merely because the representee is sceptical. Otherwise, the doubting representee would be placed in a worse position than the gullible or trusting one. Given that misgivings and suspicion might be more likely to arise where there is fraud, it would be perverse for the prospects of redress to be extinguished on account of those very doubts. Of all representees, it may be thought the defrauded representee (whether believing or not) should be the most deserving of protection.

© 2017 The Incorporated Council of Law Reporting for England and Wales

155
[2017] AC                                    Zurich Insurance Co plc v Hayward (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    "(v) There is no duty upon the defrauded representee to exercise 'due diligence' to determine whether there are reasonable grounds to believe the representations made.  Conversely, the fact that the representee does not in fact wholly credit the fraudster and carries out its own investigations does not preclude it from having been induced by those representations.  Qualified belief or disbelief does not rule out inducement, particularly where those investigations were never going to find out the evidence that subsequently came to light.

B    "(vi) Whereas proof that the representee had knowledge (or 'blind eye knowledge') of the falsity suffices, nothing short of that avails the misrepresentor."

29    As to sub-para (i), inducement, I would accept the submission on behalf of Zurich that materiality is evidence of inducement because what is material tends to induce.  As Hutley JA put it in the Court of Appeal of New South Wales, *Gipps v Gipps* [1978] 1 NSWLR 454, 460, "To state that a person is induced by a statement is to affirm a causal relation which is a question of fact, not of law".  See also *Downs v Chappell* [1997] 1 WLR 426, per Hobhouse LJ at p 433.  Moreover, albeit by reference to section 18(2) of the Marine Insurance Act 1905 (6 Edw 7, c 41), in the *Pan Atlantic* case Lord Goff of Chieveley, accepted at p 517C and p 517E respectively that in gauging materiality it suffices if the misrepresentation (or non-disclosure) had "an impact on the mind" or an "influence on the judgment".  In the same case Lord Mustill adopted references to inducement not being established where the misrepresentation (at p 545) "did not influence the judgment", (at p 546) "did not influence the mind" or (at p 551) "had no effect on the decision".

30    In para 6.6 of his judgment (quoted at para 15 above) the judge held that the continuing representations influenced Zurich into agreeing to a higher level of settlement that it would otherwise have done.  The judge was entitled to adopt the proposition in *Clerk & Lindsell* that "the claimant must have been influenced by the misrepresentation".

31    In para 28 of his judgment Briggs LJ said:

"In my judgment the authorities on rescission for misrepresentation speak with one voice.  For a misstatement to be the basis for a claim to rescind a contract, the claimant must have given some credit to its truth, and been induced into making the contract by a perception that it was true rather than false.  Where judges and text-book writers have used the word 'influenced' as the touchstone for reliance they have done so in order to allow for belief in the truth of the misrepresentation to be a contributory rather than sole cause of the representee's entry into the contract: see for example *Clerk & Lindsell on Torts*, 21st ed, para 18-35.  They have not thereby intended to allow in any case where the representee can show that he was influenced into making the contract by the mere making of a representation which he did not believe was true."

32    I would not accept this analysis.  As I see it, the representee's reasonable belief as to whether the misrepresentation is true cannot be a necessary ingredient of the test, because the representee may well settle on the basis that, at any rate in a context such as the present, he thinks that the representation will be believed by the judge.  But it is centrally relevant to the

© 2017 The Incorporated Council of Law Reporting for England and Wales

156
**Zurich Insurance Co plc v Hayward (SC(E))**                    **[2017] AC**
Lord Clarke of Stone-cum-Ebony JSC

question of inducement and causation.  Logically, the representee is more    A
likely to settle for a different reason other than the representation, if his
reasonable belief is that it is false.  One of the extraneous factors in this case,
for example, was the fact that the insurers' expert Mr Sharp had failed to
produce, in their view, a report which set out the extent of the
misrepresentations with sufficient clarity—see para 15 above.

33    As to sub-para (ii), multiple causes, the text books strongly support    B
the proposition that it is sufficient for the misrepresentation to be an
inducing cause and that it is not necessary for it to be the sole cause: see
e g *Chitty on Contracts*, 32nd ed (2015), vol 1, para 7-37.  See also, for
example, *Barton v Armstrong* [1976] AC 104, where Lord Cross, delivering
the majority advice of the Privy Council in a case involving duress by threats
of physical violence, invoked, as an appropriate analogy, the treatment of
contributing causes in fraud cases.  He said, at p 118:                         C

"If it were established that Barton did not allow the representation to
affect his judgment then he could not make it a ground for relief . . .  If on
the other hand Barton relied on the misrepresentation Armstrong could
not have defeated his claim to relief by showing that there were other
more weighty causes which contributed to his decision . . . for in this field
the court does not allow an examination into the relative importance of    D
contributing causes . . ."

Lord Hoffmann made much the same point in *Standard Chartered Bank Ltd
v Pakistan National Shipping Corpn Ltd (Nos 2 and 4)* [2003] 1 AC 959,
para 15:

"if a fraudulent representation is relied upon, in the sense that the    E
claimant would not have parted with his money if he had known that it
was false, it does not matter that he also had some other negligent or
irrational belief about another matter and, but for that belief, would not
have parted with his money either.  The law simply ignores the other
reasons why he paid."

Lord Hoffmann then quoted with approval the part of the advice of Lord    F
Cross quoted above and added, at para 16: "This rule seems to me to be
based upon sound policy."  Finally, reliance is placed upon the decision of
the High Court of Australia in *Gould v Vaggelas* (1984) 157 CLR 215,
which was a case of deceit, where Wilson J said, at p 236:

"The representation need not be the sole inducement in sustaining the
loss.  If it plays some part, even if only a minor part, in contributing to the    G
course of action taken a causal connection will exist."

34    As to sub-para (iii), the "presumption" of inducement, it is not a
presumption of law but an inference of fact.  For example, *Chitty on
Contracts*, 32nd ed, vol 1, put it thus at para 7-040:

"Once it is proved that a false statement was made which is 'material'    H
in the sense that it was likely to induce the contract, and that the
representee entered the contract, it is a fair inference of fact (though not
an inference of law) that he was influenced by the statement, and the
inference is particularly strong where the misrepresentation was
fraudulent."

© 2017 The Incorporated Council of Law Reporting for England and Wales

157
**[2017] AC**                    Zurich Insurance Co plc v Hayward (SC(E))
                                       Lord Clarke of Stone-cum-Ebony JSC

A  **35**  Lord Mustill put it in this way in the *Pan Atlantic* case [1995] 1 AC 501, 551. He said that the representor

"will have an uphill task in persuading the court that the . . . misstatement . . . has made no difference . . . there is a presumption in favour of a causative effect."

B  We were further referred to the decision of Briggs J in a case about fraudulent misrepresentations, namely *Ross River Ltd v Cambridge City Football Club Ltd* [2008] 1 All ER 1004, para 241, where he said:

"First and foremost, in a case where fraudulent material misrepresentations have been deliberately made with a view (as I find) improperly to influence the outcome of the negotiation of the cont[r]act in favour of the maker and his principal, by an experienced player in the relevant market, there is the most powerful inference that the fraudsman achieved his objective, at least to the limited extent required by the law, namely that his fraud was actively in the mind of the recipient when the contract came to be made."

C

See also *Australian Steel & Mining Corpn Pty Ltd v Corben* [1974] D  2 NSWLR 202, 208–209, per Hutley JA.

**36**  As to sub-para (iv), rebutting the presumption of inducement, the authorities are not entirely consistent as to what is required to rebut the presumption. However, it is not strictly necessary to address those differences in this case because, however precisely the test is worded—whether what must be proved is that the misrepresentation played "no part at all" or that it did not play a "determinative part", or that it did not play a "real and E  substantial part" —I would accept the submission made on behalf of Zurich that the presumption is not rebutted on the facts as found in this case. There can be no doubt on the judge's findings of fact that, if Zurich had known the true position as to Mr Hayward's state of recovery, it would not have offered anything like as much as it in fact offered and settled for in October 2003.

**37**  Since the issue was touched on in argument, I would simply say that F  the authorities seem to me to support the conclusion that it is very difficult to rebut the presumption. As it seems to me, the orthodox view is contained in *Sharland v Sharland* [2016] AC 871. In *Smith v Kay* (1859) 7 HL Cas 750, 759 Lord Chelmsford LC asked this question in a rescission case based on an allegation of fraudulent misrepresentation:

"can it be permitted to a party who has practised a deception, with a G  view to a particular end, which has been attained by it, to speculate upon what might have been the result if there had been a full communication of the truth?"

In *Sharland v Sharland* Baroness Hale of Richmond DPSC observed of *Smith v Kay* that it indeed held that a party who has practised deception with a view to a particular end, which has been attained by it, cannot be allowed to H  deny its materiality or that it actually played a causative part in inducement.

**38**  This view is supported by *Downs v Chappell* [1997] 1 WLR 426, 433 where Hobhouse LJ said:

"The judge was wrong to ask how they [the representees] would have acted if they had been told the truth. They were never told the truth.

© 2017 The Incorporated Council of Law Reporting for England and Wales

158
Zurich Insurance Co plc v Hayward (SC(E))                                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

> They were told lies in order to induce them to enter into the contract. The lies were material and successful . . .   The judge should have concluded that the plaintiffs had proved their case on causation . . ."

See also *BP Exploration Operating Co Ltd v Chevron Shipping Co* [2003] 1 AC 197, 244–245, per Lord Millett.  The Hon K R Handley wrote an impressive article entitled "Causation in Misrepresentation" (2015) 131 LQR 277, where he expressed this view, at p 284:

> "The representor must have decided to make the misrepresentation because he or she judged that the truth or silence would not, or might not, serve their purposes or serve them so well.  In doing so they fashioned an evidentiary weapon against themselves, and the court should not subject the victim to 'what if' inquiries which the representor was not prepared to risk at the time."

39   As to sub-para (v), I would accept the submissions made on behalf of Zurich.  In particular I agree that the representee has no duty to be careful, suspicious or diligent in research.  As Rigby LJ put it in *Betjemann v Betjemann* [1895] 2 Ch 474, 482: "What is the duty of a man to inquire?  To whom does he owe that duty?  Certainly not to the person who had committed the concealed fraud."  Here Zurich did as much as it reasonably could to investigate the accuracy and ramifications of Mr Hayward's representations before entering into any settlement.

40   As explained above, the questions whether Zurich was induced to enter into the settlement agreement and whether doing so caused it loss are questions of fact, which were correctly decided in its favour by the judge. I accept the submission that the fact that the representee (Zurich) does not wholly credit the fraudster (Mr Hayward) and carries out its own investigations does not preclude it from having been induced by those representations.  Qualified belief or disbelief does not rule out inducement, particularly where those investigations were never going to find out the evidence that subsequently came to light.  That depended only on the fact that Mr and Mrs Cox subsequently came forward.  Only then did Zurich find out the true position.  As Mr Hayward knew, Zurich was settling on a false basis.

41   I do not think that any of the cases relied upon on behalf of Mr Hayward, or by the Court of Appeal in his favour justifies its decision. They include *Kyle Bay Ltd (trading as Astons Nightclub) v Underwriters Subscribing under Policy No 019057/08/01* [2007] 1 CLC 164.  Underhill LJ stressed, in his analysis in para 24, that Kyle Bay "was not on all fours with the present case", but that it was illustrative of a similar principle.  To my mind it is of no real assistance because it was a case which, as Neuberger LJ observed in *Kyle Bay* at para 42, involved unusual facts and in which the approach of the claimant appeared mystifying.  That is not the position here.

42   As to further cases that were said to establish a requirement of belief, in the Court of Appeal Underhill LJ referred at para 12 to *Sprecher Grier Halberstam LLP v Walsh* [2009] CP Rep 16, para 17, *Arkwright v Newbold* (1881) 17 Ch D 301, 324, and *Strover v Harrington* [1988] Ch 390, 407. However, as Underhill LJ said, none of those cases contains any relevant discussion of a principle to the effect that belief in the representation is required before a settlement such as this can be set aside.

© 2017 The Incorporated Council of Law Reporting for England and Wales

159
[2017] AC                                      Zurich Insurance Co plc v Hayward (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A   **43**  As to sub-para (vi), knowledge of falsity, as I understand it, it is accepted on behalf of Zurich that, where the representee knows that the representation is false, he cannot succeed.  There is some support in the authorities for this view.  So, for example *Chitty on Contracts*, 32nd ed, vol 1, para 7-036 says,

B   "The burden of proving that the claimant had actual knowledge of the truth, and therefore was not deceived by the misrepresentation, lies on the defendant; if established, knowledge on the part of the representee is of course a complete defence, because he is then unable to show that he was misled by the misrepresentation."

*Spencer Bower & Handley on Actionable Misrepresentation*, 5th ed (2014), p 122, para 11.07 says:

C   "A representee cannot be misled by a statement which he knew to be false . . .  The representee's knowledge of the truth must normally be full and complete. Partial and fragmentary information, or mere suspicion, will not do, 'suspicion, doubt and mistrust do not have the same consequence as knowledge'.  A representee who knows that the representation was false to some extent, but acts on it, may establish inducement if the departure from the truth was significantly greater than expected."

D   See also *Gipps v Gipps* [1978] 1 NSWLR 454, 460, per Hutley JA.

**44**  As I said earlier, it cannot fairly be said that Zurich had full knowledge of the facts here.  It follows that it is not necessary to express a final view on the question whether it always follows from the fact that the representee knows that the representation is false that he cannot succeed.  As explained earlier, questions of inducement and causation are questions of fact.  It seems to me that there may be circumstances in which a representee may know that the representation is false but nevertheless may be held to rely upon the misrepresentation as a matter of fact.

E   **45**  This very case could have been such a case.  The judge considered this possibility in para 2.5 of his judgment (quoted at para 14 above), where he said:

F   "At the very least, statements made in the course of litigation will be viewed with healthy scepticism and weighed against the other material available.  Often the other party will not be sure, even then, whether the statement is in fact true and will mainly concern himself with how likely it is to be accepted by the court. *Sometimes (a staged road traffic 'accident' for example) the other party may actually be certain from his own direct knowledge that the statement is a deliberate lie.  But even then he and his advisers cannot choose to ignore it; they must still take into account the risk that it will be believed by the judge at trial.*  This situation is quite different from a proposed purchase, where if in doubt one can simply walk away." (Emphasis added.)

G   

H   It seems to me that in the kind of case which I have put in italics the claimant may well establish inducement on the facts.  This was not however a case in which the judge found that Zurich was certain from its own direct knowledge that Mr Hayward's representations contained deliberate lies.

**46**  Quantum is not in issue.

© 2017 The Incorporated Council of Law Reporting for England and Wales

160
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

*A*

**47**   It follows that I would answer the questions posed by the first issue (and set out in para 17 above) in this way.  I would answer (a) no and (b) yes and would allow the appeal.

*Issue 2*

**48**   The second issue (also set out in para 17 above) is in these terms:

*B*

"Under what circumstances, if any, does the suspicion by the defendant of exaggeration for financial gain on the part of the claimant preclude unravelling the settlement of that disputed claim when fraud is subsequently established?"

The answer seems to me to follow from the answer to the first question.  As I see it, it is difficult to envisage any circumstances in which mere suspicion that a claim was fraudulent would preclude unravelling a settlement when fraud is subsequently established.

*C*

*Conclusion*

**49**   For these reasons I would allow the appeal.

*D*

**LORD   TOULSON   JSC** (with   whom   **LORD   NEUBERGER   OF ABBOTSBURY PSC, BARONESS HALE OF RICHMOND DPSC** and **LORD REED JSC** agreed)

**50**   I agree with the judgment of Lord Clarke of Stone-cum-Ebony JSC. I add this judgment because of the importance of the matter, about which we are differing from the judgment of the Court of Appeal, based on what I respectfully consider to have been an erroneous conclusion drawn from earlier case law.  The issue raised by this appeal is important both as a matter of law and for its practical consequences for insurers and dishonest claimants.  I gratefully adopt Lord Clarke JSC's account of the facts.

*E*

**51**   Bogus or fraudulently inflated personal injury claims are not new. One of the great advocates of the 20th century, Sir Patrick Hastings, recounted vividly in his memoirs, "Cases in Court" (William Heinemann Ltd (1949), pp 4–20), how as a young barrister before World War 1 he built up a practice defending insurance companies against such claims.  Now as then, they present a serious problem.  Personal injury claims usually fall to be met by insurers and the ultimate cost is borne by other policy holders through increased premiums.

*F*

**52**   Insurers may often have grounds for suspicion about a claim but lack the hard evidence necessary to prove fraud.  To pursue an allegation of fraud without strong evidence is risky.  If in such circumstances insurers settle a claim, not in the belief that it is bona fide but in the belief that it is likely to succeed, and if afterwards they discover evidence which proves that the claim was fraudulent, can they bring proceedings to set aside the agreement and recover damages for deceit?  In this case the judge at first instance said yes, but the Court of Appeal said no, because in such circumstances the insurers were not deceived.  The question which court gave the right answer is important, both for insurers and for those who advise personal injury claimants.

*G*

*H*

© 2017 The Incorporated Council of Law Reporting for England and Wales

161

A    *Strike out application*

53    The Court of Appeal [2011] CP Rep 39 rightly rejected
Mr Hayward's application to strike out the action on the ground that the
issue was res judicata or that the action was an abuse of the process of the
court.  The claim had been compromised by an agreement but, as Lord
Bingham of Cornhill emphasised in *HIH Casualty and General Insurance*

B    *Ltd v Chase* [2003] 2 Lloyd's Rep 61, paras 15–16, "fraud is a thing apart"
and "unravels all".  Once proved, "it vitiates judgments, contracts and all
transactions whatsoever": per Denning LJ in *Lazarus Estates Ltd v Beasley*
[1956] 1 QB 702, 712, cited by Lord Bingham.  I refer to this matter because
in his judgment now under review Underhill LJ called into question the
correctness of the Court of Appeal's earlier judgment, and Mr Hayward's

C    arguments on this appeal were similarly flavoured with criticism of it,
although it was not open to him to attack it directly.

*Judgment of the county court*

54    I would like to pay testimony to the judgment of Judge Moloney QC
as a model of clarity and cogency.  Lord Clarke JSC has set out at, paras 14

D    and 15, the judge's self-direction as to the law (para 2.5) and his application
of it to the facts: para 2.6.

*Judgment of the Court of Appeal*

55    Briggs LJ's reasoning was short and direct.  He held that for a
misstatement to be the basis for a claim to rescind a contract, the claimant
must have given some credit to its truth and have been induced into making

E    the contract by a perception that it was true rather than false.  He said that
when judges and textbook writers used the word "influenced" as the
touchstone for reliance, they did so in order to accommodate cases where
belief in the truth of the statement was a contributory rather than the sole
cause of the representee's entry into the contract.

56    Underhill LJ's reasoning was somewhat different but led him to the

F    same place.  His starting point was that when a person enters into a contract
to settle a dispute he knowingly takes the risk of making a payment for a
claim which may be ill-founded, and he pays a sum commensurate with his
assessment of that risk.  But he said that the risk which a settlor must be
taken to have accepted will depend on the circumstances of the case.
A settlor will not normally be taken to have accepted the risk that the

G    claimant's case is not just ill-founded but dishonest.  However, if it is
sufficiently apparent that the settlor intended to settle notwithstanding the
possibility that the claim was fraudulent, he will be held to the settlement.
The fact that the insurers had pleaded that the claim was exaggerated for
financial gain proved their awareness of the possibility of fraud, but they
chose to settle the claim with that awareness, and it was contrary to the
public interest in the settlement of disputes for them to be allowed to set

H    aside the settlement.

57    Underhill LJ was conscious that the logic of this reasoning was that
Mr Hayward's application to strike out the insurers' action ought to have
succeeded, contrary to the Court of Appeal's earlier decision.  He described
it as a "debatable point" whether that decision precluded him from deciding

© 2017 The Incorporated Council of Law Reporting for England and Wales

162
**Zurich Insurance Co plc v Hayward (SC(E))**                    **[2017] AC**
Lord Toulson JSC

the case on the reasoning which he thought should apply, but he considered    A
that it was possible to re-cast his reasoning in a form which was perhaps less
satisfactory, but which avoided conflict with the earlier decision. He held
that although in one sense the misrepresentations operated on the mind of
the insurers, that did not constitute reliance in the relevant sense. In deciding
whether to settle, the insurers formed their own independent judgment
whether the claim was likely to succeed, and there was no "relationship of    B
reliance" of the kind which was required for the insurers' action to succeed.
Ultimately, therefore, he allowed the appeal on substantially the same
ground as Briggs LJ.

*Analysis*

58   To establish the tort of deceit it must be shown that the defendant    C
dishonestly made a material false representation which was intended to, and
did, induce the representee to act to its detriment. The elements essential for
liability can be broken down under three headings: (a) the making of a
materially false representation (the defendant's conduct element); (b) the
defendant's accompanying state of mind (the fault element); and (c) the
impact on the representee (the causation element). Where liability is    D
established, it remains for the claimant to establish (d) the amount of any
resulting loss (the quantum element).

59   In this case there is now no issue as to elements (a), (b) and (d).
Mr Hayward made false and material representations to the insurers as well
as to the court, both directly and through what he told the doctors and his
own legal advisers with a view to it being communicated to insurers and to
the court. He did so dishonestly, with the intention of inducing the insurers    E
to pay compensation to him on a false basis. The judge's assessment of
quantum is not challenged. The issue concerns element (c).

60   In the statement of facts and issues, the parties have identified the
critical issue in these terms: In order to set aside a compromise on the basis of
fraudulent misrepresentation, to show the requisite influence by or reliance
on the misrepresentation, (a) must the defrauded representee prove that it    F
was induced into settlement because it believed that the misrepresentations
were true; or (b) does it suffice to establish influence that the fact of the
misrepresentations was a material cause of the defrauded representee
entering into the settlement?

61   The parties have raised an additional question as to the
circumstances, if any, in which suspicion by a settlor of exaggeration of the    G
claim precludes unravelling the settlement when fraud is subsequently
established; but in so far as the question involves any point of law, it is
enveloped by the first issue.

62   Some torts do not require the claimant to have suffered any
detriment. Trespass is an example. Deceit is not in that category. It is
essential to show that the defendant's false representation caused the
claimant to act to its detriment. It stands to reason that this should be so.    H
The vice of the defendant's conduct consists in dishonestly making a false
representation with the intention of influencing the representee to act on it to
its detriment. If it does not cause the representee to do so, the mischief
against which the tort provides protection will not have occurred.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A A misrepresentation which has no impact on the mind of the representee is no more harmful than an arrow which misses the target.

63 Inducement is a question of fact. In a typical case the only way in which a dishonest representation is likely to influence the representee to act to its detriment will be if the representee is led to believe in its truth. It is therefore not surprising to find statements by judges in such cases
B that the misrepresentee must show that he believed or "relied on" the misrepresentation.

64 *Redgrave v Hurd* (1881) 20 Ch D 1, to which Underhill LJ referred, is an example. The plaintiff, an elderly solicitor wishing to retire, advertised for someone to enter into partnership with him and to buy his house. The defendant responded to the advertisement and negotiations followed, in
C which the plaintiff stated that the practice brought him in about £300 a year. In fact it did not bring in anything like that amount. The parties entered into partnership and into a separate contract for the sale of the house, which made no reference to the business. The defendant paid a deposit and was let into possession. On discovering that the practice was not worth what the plaintiff had said, the defendant gave up possession and refused to complete the purchase. It was therefore a classic case of a purchaser who claimed to
D have entered into the contract in reliance on the truth of a misrepresentation by the seller. The plaintiff sued for specific performance; the defendant counterclaimed for rescission of the contract and damages for deceit. The plaintiff succeeded at first instance before Fry J, who was not satisfied that the defendant had proved that he relied on the misrepresentation. The Court of Appeal upheld the dismissal of the defendant's counterclaim in deceit on
E the ground that he had not sufficiently pleaded or proved dishonesty, but it allowed his appeal on the issue of rescission on the ground that the facts gave rise to an inference that he was induced to enter into the contract by the plaintiff's misrepresentation. Jessel MR said, at p 21:

"If it is a material misrepresentation calculated to induce him to enter into the contract, it is an inference of law that he was induced by the
F representation to enter into it, and in order to take away his title to be relieved from the contract on the ground that the representation was untrue, it must be shown either that he had knowledge of the facts contrary to the representation, or that he stated in terms, or shewed clearly by his conduct, that he did not rely on the representation."

65 *Smith v Chadwick* (1884) 9 App Cas 187 was another case of a
G purchaser who claimed to have entered into the contract in reliance on the truth of a misrepresentation by the seller. The plaintiff claimed damages for deceit through having been induced to buy shares in an iron company by false representations in a prospectus as to the output of the iron works. The House of Lords held that his claim failed because the critical words of the prospectus were ambiguous, and the plaintiff had failed to show that he
H understood them in a sense which was false. Lord Blackburn surmised, at p 200, that the plaintiff's counsel refrained from asking the plaintiff in examination-in-chief how he understood the wording for fear of receiving a damaging answer. The case was cited in the present case for the opening passage in the speech of Lord Selborne LC, at p 190:

© 2017 The Incorporated Council of Law Reporting for England and Wales

"My Lords, I conceive that in an action of deceit, *like the present*, it is the duty of the plaintiff to establish two things; first, actual fraud, which is to be judged by the nature and character of the representations made, considered with reference to the object for which they were made, the knowledge or means of knowledge of the person making them, and the intention which the law justly imputes to every man to produce those consequences which are the natural result of his acts: and, secondly, he must establish that this fraud was an inducing cause to the contract; for which purpose it must be material, and it must have produced in his mind an erroneous belief, influencing his conduct." (Emphasis added.)

66   In the same case Lord Blackburn had pertinent things to say about the fundamental link between fraud and damage in an action for deceit, at p 195:

"In *Pasley v Freeman* (1789) 2 Sm LC 66, 73, 86 (8th ed), Buller J says: 'The foundation of this action is fraud and deceit in the defendant and damage to the plaintiffs. And the question is whether an action thus founded can be sustained in a Court of law. Fraud without damage, or damage without fraud, gives no cause of action, but where these two concur an action lies, per Croke J, 3 Bulst 95.'

"Whatever difficulties there may be as to defining what is fraud and deceit, I think no one will venture to dispute that the plaintiff cannot recover unless he proves damage. In an ordinary action of deceit the plaintiff alleges that false and fraudulent representations were made by the defendant to the plaintiff in order to induce him, the plaintiff, to act upon them. I think that if he did act upon these representations, he shews damage; if he did not, he shews none."

67   So far I have been considering the typical case. But it is possible for a representor to make a false and fraudulent misrepresentation, with the intention of influencing the representee to act on it to its detriment, without the representee necessarily believing it to be true. If the representor succeeds in his object of influencing the representee to act on the representation to its detriment, there will be the concurrence of fraud and deceit in the representor and resulting damage to the representee. In principle, the representee should therefore be entitled to a remedy in deceit.

68   That inducement is a question of fact, necessary to establish causation in all cases but not necessarily in the same way, was recognised and well expressed in the decision of the Court of Appeal of New South Wales in *Gipps v Gipps* [1978] 1 NSWLR 454. A woman sued her former husband for deceit in relation to a property settlement which they had entered into at the time of their divorce. They were joint shareholders in a private company and as part of the settlement the wife transferred her shares to the husband. The shares were valued by an independent accountant, but the husband dishonestly contrived to see that the valuation was a substantial undervaluation. The wife did not trust the husband and suspected that the shares were worth more than the valuation, but she did not know the extent of the undervaluation. It was submitted on the husband's behalf that if a representee knows that a representation is false in a material particular, as a matter of law he or she cannot sue in respect of it. The court rejected that argument.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    **69**    After referring to various authorities, including particularly the passage from the judgment of Jessel MR in *Redgrave v Hurd* set out at para 64 above, Hutley JA said, at p 460:

> "The question whether a person has been induced by a statement made to him to enter into an agreement is, in my opinion, a single issue of fact. No doubt pre-contractual knowledge that the statement made is not
B    wholly true has a very direct bearing on the resolution of this question of fact but it does not of itself necessarily provide the answer. To say that it does is to formulate a different question.
>    "To state that a person is induced by a statement is to affirm a causal relation which is a question of fact, not of law. That being so, it is impossible to apply to any situation a rule which produces a final result.
C    The trial judge or jury have to answer the question: Did the misrepresentation cause the representee to enter into the contract, it being understood that the representation, as was stated in *Australian Steel and Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202, 207, 'was among the factors which induced the contract.' "

**70**    Some assistance may also be had from the judgment of Hobhouse LJ
D    in *Downs v Chappell* [1997] 1 WLR 426, 433, where he said that for a plaintiff to succeed in the tort of deceit of deceit it is necessary for him to prove that (1) the representation was fraudulent, (2) it was material and (3) it induced the plaintiff to act to his detriment. He added that "As regards inducement, this is a question of fact" and that "The word "reliance" used by the judge has a similar meaning but is not the correct criterion."

**71**    I agree with Judge Moloney QC's analysis in para 2.5 of his
E    judgment. The question whether there has been inducement is a question of fact which goes to the issue of causation. The way in which a fraudulent misrepresentation may cause the representee to act to his detriment will depend on the circumstances. He rightly focused on the particular circumstances of the present case. Mr Hayward's deceitful conduct was intended to influence the mind of the insurers, not necessarily by causing
F    them to believe him, but by causing them to value his litigation claim more highly than it was worth if the true facts had been disclosed, because the value of a claim for insurers' purposes is that which the court is likely put on it. He achieved his dishonest purpose and thereby induced them to act to their detriment by paying almost ten times more than they would have paid but for his dishonesty. It does not lie in his mouth in those circumstances to say that they should have taken the case to trial, and it would not accord
G    with justice or public policy for the law to put the insurers in a worse position as regards setting aside the settlement than they would have been in, if the case had proceeded to trial and had been decided in accordance with the corrupted medical evidence as it then was.

**72**    For those reasons, which accord to all intents and purposes with the judgment of Lord Clarke JSC, I too would allow the insurers' appeal and
H    restore the order of Judge Moloney.

*Postscript*

**73**    It was expressly conceded on behalf of the insurers for the purposes of the present appeal that whenever and however a legal claim is settled, a

© 2017 The Incorporated Council of Law Reporting for England and Wales

166
**Zurich Insurance Co plc v Hayward (SC(E))**                                    **[2017] AC**
Lord Toulson JSC

party seeking to set aside the settlement for fraud must prove the fraud by      A
evidence which it could not have obtained by due diligence at the time of the
settlement.  It makes no difference to the outcome of the present case and the
court heard no argument about whether the concession was correct.  Any
opinion on the subject would therefore be obiter, and since the court has not
considered the relevant authorities (including Commonwealth authorities
such as *Toubia v Schwenke* (2002) 54 NSWLR 46) or academic writing, it is
better to say nothing about it.                                                  B

*Appeal allowed.*

S<small>HIRANIKHA</small> H<small>ERBERT</small>, Barrister

C

D

E

F

G

H

© 2017 The Incorporated Council of Law Reporting for England and Wales