UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
CITY OF STERLING HEIGHTS POLICE &
FIRE RETIREMENT SYSTEM, CITY OF
BIRMINGHAM RETIREMENT AND RELIEF
SYSTEM and CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

       Plaintiff,         20-cv-10041 (PKC)

    -against-          OPINION
                  AND ORDER

RECKITT BENCKISER GROUP PLC, RAKESH
KAPOOR, ADRIAN HENNAH, SHAUN
THAXTER and ADRIAN BELLAMY,

       Defendants.
--------------------------------------------------------------x

CASTEL, U.S.D.J.

    This federal securities class action centers on the marketing of a pharmaceutical

drug that has been a useful tool in combating opioid addiction.  Suboxone in Tablet form was

first brought to market by a former subsidiary of defendant Reckitt Benckiser Group PLC

("Reckitt").  By 2009, its sales exceeded $700 million.  With the drug's FDA-granted exclusivity

period set to expire in 2009 and the prospect of generic competition on the horizon, Reckitt's

former subsidiary, then known as Reckitt Benckiser Pharmaceuticals Inc. ("RBP") and now

known as Indivior Inc. ("Indivior"), developed a new means for delivering the drug's active

ingredients.  The new delivery system is a dissolvable Suboxone Film that is placed under the

tongue by the patient.

    As alleged in the Third Amended Complaint ("the Complaint"), merely

introducing Suboxone Film as an alternative to Suboxone in Tablet form would not insulate

Reckitt from generic competition.  So Reckitt allegedly embarked on a campaign to portray Suboxone Tablets as unsafe because of the possibility of their inadvertent consumption by children and abuse by addicts, and touted Suboxone Film as vastly superior in these respects. The Complaint alleges that Reckitt was highly successful in its plan, initially generating about $3 billion in revenue between 2010 and 2014 from sales of Suboxone Film.

Reckitt, according to the Complaint, "engineered a plan to coerce patients and physicians to switch from Tablets to Film under false pretenses" and told investors that Suboxone Film was safer than the Tablets when, in truth and in fact, it was more dangerous. (Compl't ¶¶ 11-12, 113.)  When, on July 24, 2017, Reckitt announced a £318 million charge relating to Department of Justice ("DOJ") and Federal Trade Commission ("FTC") investigations, there was a stock price drop in the 3-5% range.  (Compl't ¶ 275.)  Follow-on announcements and developments allegedly caused even greater drops.  (Compl't ¶¶ 278-79.)

Plaintiffs are public-employee pension plans who assert that they acquired either Reckitt's American Depository Shares ("ADSs") or its ordinary shares at artificially inflated prices and were injured when the market learned the truth about defendants' tactics to boost the sales of Suboxone Film.  Plaintiffs assert that defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  They also assert that the individual defendants are liable as control persons under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  In addition, the City of Pontiac General Employees' Retirement System ("Pontiac"), which purchased shares of Reckitt on the London Stock Exchange (the "LSE"), brings three claims under the laws of England, where Reckitt and many of the individual defendants are located.

Defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., urging that the Complaint does not plausibly allege a claim for relief or allege fraud with the particularity required by Rule 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. They also urge that the Court should stay or dismiss Pontiac's claims arising under English law because they fall within arbitration and forum-selection provisions in Reckitt's articles of association, and, moreover, fail to allege Pontiac's reliance on any misstatement. Thaxter has separately moved to dismiss all claims asserted against him.

As will be explained, the Complaint adequately alleges that certain statements made by defendants Shaun Thaxter and Rakesh Kapoor omitted information that would be material to a reasonable investor. Those statements placed at issue the reasons for the commercial success of Suboxone Film without disclosing the role of the allegedly misleading sales and marketing campaign. The Complaint also raises a strong inference of scienter as to Thaxter and Kapoor. In other respects, the Complaint strains to identify misstatements and omissions that would have been material to a reasonable investor. Many statements quoted in the Complaint are vague expressions of enthusiasm or puffery, or else are so general in nature that a reasonable investor would not consider them to be material, or even to relate to Suboxone Film. But, as will be discussed, the Court concludes that the Complaint has adequately alleged claims under section 10(b) and Rule 10b-5 against Thaxter, Kapoor and Reckitt, and under section 20(a) as to Kapoor.

Regarding Pontiac's claims under English law, the Court concludes that the arbitration and forum-selection provisions cited by defendants apply to disputes over enforcement of Reckitt's articles of association and not to the shareholder claims raised here.

However, because Pontiac does not allege that it knew of any alleged misrepresentation at the time it purchased Reckitt shares, it fails to allege the reliance required to state a claim for relief on Counts III, IV and V.

The Complaint will therefore be dismissed as to defendants Hennah and Bellamy. Defendants' motion to dismiss the Exchange Act claims will be granted in part and denied in part. The claims of Pontiac set forth in Counts III, IV and V will be dismissed.

BACKGROUND.

    A.  <u>Overview of the Parties.</u>

The Court summarizes the Complaint's factual allegations, and, for the purposes of the motion, accepts them as true, drawing all reasonable factual inferences in favor of the plaintiffs as non-movants. <u>See</u> <u>In re Hain Celestial Grp., Inc. Sec. Litig.</u>, 20 F.4th 131, 133 (2d Cir. 2021).

City of Sterling Heights Police & Retirement System ("Sterling Heights") is a pension fund that provides benefits to the police officers and firefighters of Sterling Heights, Michigan. (Compl't ¶ 32.) It purchased ADSs of Reckitt in the United States through the over-the-counter OTC Pinks platform. (Compl't ¶ 34.) City of Birmingham Retirement and Relief System ("Birmingham") is a public pension fund organized for the benefit of current and retired public employees of Birmingham, Alabama. (Compl't ¶ 35.) Birmingham purchased ADSs of Reckitt through an outside financial adviser that bought Reckitt's ordinary shares on the LSE and held them on Reckitt's behalf in a deposit bank. (Compl't ¶¶ 35-37.) Sterling Height and Birmingham assert claims under the Exchange Act on behalf of themselves and a putative class of shareholders who purchased Reckitt's ADSs between July 28, 2014 and April 9, 2019 (the "Relevant Period"). (Compl't ¶¶ 1, 326-33.)

Pontiac is a defined-benefit municipal retirement plan that provides benefits to public employees in Pontiac, Michigan.  (Compl't ¶ 38.)  It purchased ordinary shares of Reckitt on the LSE.  (Compl't ¶ 38 & Ex. C.)  Pontiac brings claims only under the laws of England, and purports to bring claims on behalf of other purchasers of Reckitt's ordinary shares during the Relevant Period.  (Compl't ¶¶ 334-57.)

Reckitt is a consumer-goods and health-products company headquartered in the United Kingdom, with substantial operations in the United States.  (Compl't ¶ 39.)  Reckitt formerly had a wholly owned subsidiary named Reckitt Benckiser Pharmaceuticals Inc. ("RBP"), which was "demerged" from Reckitt in 2014 and became a standalone public company called Indivior Inc. ("Indivior").  (Compl't ¶ 48.)  Although Indivior, as the successor to RBP, is a non-party to this action, plaintiffs' allegations are principally directed toward the actions and statements of the defendants as they related to RBP, which earned a substantial portion of its revenues from the sale of Suboxone products.  (Compl't ¶ 90.)  Plaintiffs characterize RBP as a "one-drug business" centered on Suboxone.  (Compl't ¶ 90.)

Reckitt's ordinary shares trade on the LSE and its ADSs trade on the United States over-the-counter ("OTC") market.  (Compl't ¶¶ 56-57.)  Reckitt sponsors the ADSs, with five ADSs representing one ordinary share.  (Compl't ¶ 57.)  The purchase of an ADS is equivalent to the purchase of the underlying security, which is held in a bank of American Depository Receipts maintained by J.P. Morgan Chase for the benefit of the ADS purchaser. (Compl't ¶¶ 60, 66.)

Four individuals are named as defendants.  Defendant Rakesh Kapoor was CEO and a director of Reckitt from September 2011 until September 2019.  (Compl't ¶ 40.)  Adrian Hennah was Chief Financial Officer of Reckitt from February 2013 until October 2020 and was

on the board of Indivior from 2014 to 2016.  (Compl't ¶ 41.)  Shaun Thaxter was president of

RBP from 2005 to 2009, and in 2009 became its CEO.  (Compl't ¶ 42.)  Thaxter continued as

CEO after RBP "demerged" from Reckitt and was renamed as Indivior, until his resignation on

June 29, 2020.  (Compl't ¶ 42.)  Adrian Bellamy was chairman of Reckitt's board from 2003

until May 2018.  (Compl't ¶ 43.)  The Complaint asserts that the individual defendants are liable

both as direct participants in the acts of alleged fraud and as control persons under section 20(a)

of the Exchange Act.  (Compl't ¶¶ 45-46, 326-33.)

        B.   RBP's Manufacture of Suboxone Tablets and Their
             Classification as an "Orphan Drug."

From 1999 to 2017, approximately 400,000 Americans died from an opioid

overdose.  (Compl't ¶ 90.)  RBP's business focused specifically on products to treat opioid

addiction.  (Compl't ¶ 90.)  For several years, RBP's "overwhelming source of revenue" came

from the manufacture and sale of Suboxone Tablets, a prescription pharmaceutical approved to

treat opioid addiction.  (Compl't ¶ 90.)  The Complaint states that RBP was "a one-drug

business," with Suboxone accounting for between 79 and 82 percent of RBP's revenue between

2010 and 2013.  (Compl't ¶ 90.)  In the United States, Suboxone was responsible for 100 percent

of the profits of RBP and its successor, Indivior, from 2006 to 2019.  (Compl't ¶ 91.)  Suboxone

products were responsible for approximately 20% of Reckitt's overall profits.  (Compl't ¶ 90.)

The key components of Suboxone are an opioid antagonist called naloxone and an

opioid called buprenorphine.  (Compl't ¶ 92.)  Buprenorphine is the only opioid approved for the

treatment of opioid addiction outside of a clinic, and it binds to opioid receptors and reduces

withdrawal symptoms.  (Compl't ¶ 92.)  Naloxone does not have a therapeutic function, and acts

as an abuse deterrent: if a person attempts to administer suboxone through the unapproved

method of crushing it and injecting it, naloxone triggers withdrawal symptoms.  (Compl't ¶ 92.)

Thus, the presence of naloxone seeks to ensure that suboxone is taken orally for intended therapeutic purposes and not crushed and injected by a user. (Compl't ¶ 92.) Both buprenorphine and naloxone were already so-called "legacy drugs" at the time Suboxone was engineered, meaning that they were not covered by patent protections and the standard 20-year term of patent exclusivity. (Compl't ¶ 95.)

On October 8, 2002, the FDA approved RBP's application for the sale of Suboxone Tablets. (Compl't ¶ 93.) The FDA also granted RBP's application for a period of "orphan drug" exclusivity under the Orphan Drug Act, as implemented at 21 C.F.R. § 316. (Compl't ¶ 94.) The designation of orphan drugs is intended to promote the development of drugs that affect a small population and have low prospects of profitability. (Compl't ¶ 94.) The FDA granted Suboxone an orphan-drug exclusivity period from October 8, 2002 through October 8, 2009, based on an expectation that the cost of Suboxone's development was unlikely to be recovered. (Compl't ¶ 94.) During this time, the FDA would not approve generic Suboxone Tablets. (Compl't ¶ 95.)

In the years following its 2002 launch, Suboxone proved far more successful than anticipated by the FDA. (Compl't ¶ 96.) By 2009, Suboxone's annual sales totaled more than $700 million. (Compl't ¶ 96.)

C.  Defendants' Alleged Scheme to Maintain Revenues and Exclusivity by
Baselessly Claiming Safety Benefits of Suboxone Film.

According to the Complaint, Reckitt expected to lose most of its Suboxone revenue in 2009, when the orphan exclusivity period expired and generic competition entered the market. (Compl't ¶ 96.) By 2010, multiple generic applicants had filed Abbreviated New Drug Applications ("ANDAs") in an attempt to show that their products were a generic equivalent to Suboxone Tablets. (Compl't ¶ 96.)

Plaintiffs allege that in 2006 and 2007, Reckitt and RBP began developing a new product called Suboxone Film, which they expected to be patentable and to supplement expected revenue losses caused by generic sales.  (Compl't ¶ 97.)  Plaintiffs allege that Reckitt "fabricated a safety story" that touted Suboxone Film as safer than Tablets because it reduced the risk of accidental pediatric exposure, and that Reckitt made this claim without supporting science or data.  (Compl't ¶ 105.)  In 2006, well before the Film's launch, defendant Thaxter stated that the Film would offer "superior safety" as part of a "generic defence plan."  (Compl't ¶ 106.)  In 2006 and 2007, Reckitt and RBP internally discussed strategies for delaying generic competition, including a proposal to withdraw Tablets from the market following the introduction of Suboxone Film on the false pretext that Tablets had safety and efficacy problems.  (Compl't ¶ 107.)  Plaintiff asserts that defendants then "reverse-engineered a safety issue" without clinical data in order to tout the superiority of the Film.  (Compl't ¶ 109.)

According to the Complaint, the Film and Tablet have similar active ingredients, with no clinically significant differences: both drugs contained buprenorphine and naloxone and were intended to be placed under the tongue until dissolved.  (Compl't ¶¶ 111, 112.)  The Film differed from the Tablet by being thinner, dissolving more rapidly, potentially being absorbed by the body more easily, tasting better, and being dispensed in individual, single-dose foil pouches, as opposed to a medication bottle.  (Compl't ¶ 111.)  According to the Complaint, many of these qualities – higher dosage, rapid absorption, and probability of becoming stuck to the mouth if accidentally ingested – were disadvantages that increased the risks of harm from accidental child exposure and intentional abuse by adults, including a greater ease in concealment and ability to smuggle into a prison.  (Compl't ¶ 113.)  In 2009 and 2010, while still awaiting FDA approval

for the Film, RBP managers drafted marketing plans that emphasized the Film's child-safety advantages and a lower risk of abuse.  (Compl't ¶¶ 116-17.)

On August 21, 2009, the FDA rejected RBP's New Drug Application ("NDA") for Suboxone Film because the application did not include an adequate Risk Evaluation and Mitigation Strategy ("REMS") addressing the FDA's concerns about the risks of misuse, abuse and accidental overdose.  (Compl't ¶ 118.)  The FDA requires a REMS where a drug presents serious safety concerns, and the REMS must demonstrate that its benefits outweigh any risks. (Compl't ¶ 118.)  On October 5, 2009, RBP sent a letter to the FDA asking whether the FDA agreed that the packaging of Suboxone Film would protect against diversion and accidental child exposure.  (Compl't ¶ 119.)  The FDA responded on March 29, 2010, stating that the Suboxone Film could be more dangerous than the Tablet form, that the Film's packaging did not provide meaningful protection against pediatric exposure, and that RBP did not provide data in support of its safety claims.  (Compl't ¶ 123.)

According to the Complaint, personnel at Reckitt and RBP understood at that point that the FDA perceived a lack of substantiation for any claimed safety advantage to Suboxone Film.  (Compl't ¶ 126.)  In internal correspondence, RBP executives and managers summarized the FDA's concerns about the Film, noting, among other things, that the response could "be a bigger issue as it may imply the overall risk/benefit is not favorable for our film (vs tablet)" and that the FDA appeared to look unfavorably on "the ability to make a claim on additional pediatric safety of the film."  (Compl't ¶ 126.)

On November 24, 2009, RBP resubmitted the NDA for Suboxone Film, including a REMS.  (Compl't ¶ 121.)  The FDA approved the NDA, including the REMS, on or about August 30, 2010.  (Compl't ¶ 127.)  The FDA's approval observed that the NDA did not include

new efficacy studies, and that the data submitted in support of the Film's safety was "questionable." (Compl't ¶ 127.) The FDA stated that the overall safety of the Film is "similar" to the existing sublingual Tablets and that RBP's sole safety study "had a number of flaws" in its methods. (Compl't ¶ 127.) The FDA also stated that the Film could not be spat out easily and that it dissolved quickly, meaning that in the event of accidental ingestion by a child, "the filmstrip product could be more hazardous than the tablet." (Compl't ¶ 127.) It concluded that "[t]he overall safety profile of this product is similar to that of the approved sublingual tablets." (Compl't ¶ 127.)

### D. RBP Allegedly Attempts to Delay Generic Competition by Withdrawing Suboxone Tablets and Filing a Citizen Petition to the FDA.

In June 2012, an internal e-mail sent by Reckitt's general counsel advised senior executives and employees, "please do not create any emails or other documents suggesting that we would consider" attempting to delay FDA approval of generic Suboxone, and to emphasize that the Company's actions were guided by consumer safety. (Compl't ¶ 148.) On September 14, 2012, executives of Reckitt caused the preparation of a public relations strategy for discontinuing the Suboxone Tablet, specifically directed toward dispelling a perception that such a move would be intended to blunt generic competition and emphasizing the importance of responsible action by the Company. (Compl't ¶ 153.)

An executive summary of a study prepared by outside contractors concluded that, based on calls to poison-control centers, the rates of unintended pediatric exposure to Suboxone Tablets was 6.25 per 10,000 versus 0.71 per 10,000 for Suboxone Film. (Compl't ¶ 154.) However, the researchers could not determine the "root causes" for the disparity and did not attribute the differences to packaging. (Compl't ¶ 155.) On September 18, Reckitt and RBP sent

a "Notice of Discontinuance" to the FDA, stating that RBP was discontinuing all Suboxone

Tablets due to concerns about pediatric exposure.  (Compl't ¶ 156.)

Then, on September 25, 2012, RBP filed a citizen petition with the FDA,

requesting that the FDA not approve generic Suboxone Tablets out of "safety concerns."

(Compl't ¶ 157 & Docket # 84-1.)  Specifically, it requested that the FDA not approve any NDA

or ANDA for an opioid-addition product containing buprenorphine unless it included a targeted

pediatric-exposure education program and child-resistant packaging.  (See Docket # 84-1.)  The

citizen petition also annexed a revised version of the "executive summary" prepared by

contractors, which edited out language advising that the results should be read with caution and

included new language that described the Film as safer than the Tablets.  (Compl't ¶¶ 158-59.)

That same day, Reckitt posted a press release announcing the discontinuation of Suboxone

Tablets out of safety concerns.  (Compl't ¶ 160.)  In a later e-mail, the lead researcher from one

of the contractors stated that RBP "played us as a pawn and continues to do so," describing RBP

as "playing a Machiavellian game."  (Compl't ¶ 162.)

The FDA responded to the citizen petition on February 22, 2013, concluding that

safety did not require the withdrawal of Suboxone Tablets.  (Compl't ¶ 164.)  It observed that

Reckitt's supporting data was inconclusive and that the close timing between its withdrawal of

Suboxone Tablets and the entry of generic competition "cannot be ignored."  (Compl't ¶ 164.)

The FDA's review of the citizen's petition nevertheless caused a five-month delay in the

approval of generic Tablets, likely resulting in more than $600 million in Suboxone Film sales.

(Compl't ¶ 168.)  In its annual reports published in March 2013 and April 2014, Reckitt

continued to maintain that it voluntarily discontinued the Tablets out of concerns over pediatric

exposure.  (Compl't ¶ 169.)

In its written denial of the citizen petition, the FDA referred Reckitt to the FTC for an investigation of potentially anticompetitive practices. (Compl't ¶ 167.) Concurrent with its rejection of the citizen's petition, the FDA also approved the sale of generic Suboxone Tablets. (Compl't ¶ 168.)

E.   Defendants Orchestrate an Allegedly Fraudulent Marketing Scheme Based on Misrepresentations about Product Safety.

The Complaint alleges that defendants "used coercive and fraudulent tactics" to persuade physicians to prescribe Suboxone Film. (Compl't ¶ 101.) According to the Complaint, persuading patients and physicians to embrace Suboxone Film over generic Tablets was "a top business imperative" for defendants, and that there was urgency in promoting the acceptance of Suboxone Film before generic Tablets entered the market and drew sales from RBP. (Compl't ¶ 104.) Defendants marketed and sold the Film only in the United States, where the patent would be protected until 2023 and pharmacists could not legally substitute generic Tablets if presented with a prescription for the Film. (Compl't ¶ 114.)

After the NDA's approval, defendant Thaxter told Reckitt's officers that it was urgent to convert Tablet sales to Film sales, including a "full blitz" campaign that emphasized pediatric safety and the potential misuse of Tablets. (Compl't ¶ 128.) Plaintiffs assert that defendants proceeded to mislead healthcare providers about the safety of Suboxone Film, and especially emphasized the Film's improved child safety and lower potential for abuse. (Compl't ¶¶ 130-46.)

In internal communications, managers and officers encouraged RBP sales staff to emphasize the safety benefits of Suboxone Film in order to convert patients from Tablets to the Film, "thereby protecting our Net Revenues in the USA." (Compl't ¶¶ 130-32.) At the time, RBP and Reckitt had no reliable studies or data to support their claims that Suboxone Film was

safer than the Tablet on issues of misuse and pediatric safety, but executives and sales staff emphasized these points after concluding that the message was persuasive to physicians. (Compl't ¶¶ 132-33, 135-42.)  Thaxter specifically urged that sales staff should be incentivized to push Film sales only, and the Complaint quotes him as stating that staff had "every possible resource to enable them to generate demand for a scheduled narcotic that is being given away for free to an addicted population."  (Compl't ¶ 134.)

Over the course of 2012, defendants began to carry out a plan to portray Suboxone Tablets as risky and Suboxone Film as the responsible, safety-conscious alternative. (Compl't ¶ 148-49.)  Reckitt and RBP retained outside firms to conduct a study on unintended pediatric exposure to Suboxone Tablets; internal correspondence indicated that defendants hoped the study would conclude that the foil packaging of Suboxone Film limited pediatric exposures. (Compl't ¶ 150.)  Instead, a report issued in August 2012 found that evidence was inconclusive as to packaging safety.  (Compl't ¶ 151.)  Despite the absence of factual support, RBP managers and sales staff informed doctors that fewer children would be at risk of accidental ingestion and death with Suboxone Film than with the Tablets.  (Compl't ¶ 152.)

According to the Complaint, at around this same time, Reckitt and RBP were learning that Suboxone Film actually presented greater risks of pediatric exposure and misuse than the tablet forms.  (Compl't ¶¶ 143-44.)  A contractor reported findings that pediatric exposure and self-administration through injection were more prevalent with the Film than with the Tablet.  (Compl't ¶ 143.)  In 2012, RBP discontinued the practice of collecting negative safety reports from sales staff, fearing that their contents raised compliance risks.  (Compl't ¶ 144.)  In or about 2012 and 2013, RBP managers discussed the proposition that "[u]nder no

circumstances" should the Film's safety benefits be emphasized because such statements were "unsubstantiated."  (Compl't ¶ 145.)

According to the Complaint, however, beginning in September 2012, RBP sent letters addressed to patients and physicians advising them to switch from Suboxone Tablets to Suboxone Film due to safety concerns about the Tablets.  (Compl't ¶ 161.)

A 2019 indictment filed against Indivior (the "Indictment") further detailed aspects of the allegedly fraudulent marketing tactics used to promote Suboxone Film.  United States v. Indivior Inc., et al., 19 Cr. 16 (W.D. Va. Apr. 9, 2019).  The Indictment is referenced and cited throughout the Complaint and is therefore properly considered on this motion to dismiss.  See, e.g., United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021).  In 2009 and 2010, while awaiting FDA approval for the Film, RBP's managers discussed marketing plans that would emphasize the Film as "a more responsible medication from a public health perspective," less abusable and less prone to child exposure, while also asserting that the market for generic Tablets would "jeopardize the entire disease space."  (Indictment ¶ 21.)  No scientific data supported these claims.  (Indictment ¶ 21.)

The Indictment asserts that, beginning in 2006, RBP embarked on a scheme and artifice to defraud by, among other things, distributing materially false and fraudulent marketing materials and inducing prescriptions through false and fraudulent statements.  (Indictment ¶¶ 31-32.)  In 2010, the then-CEO of "Company A" – presumably, Reckitt – emailed RBP's executives and managers stating that the Film was "safer" and encouraging them to convert patients from Tablets to Film in order to protect revenue.  (Indictment ¶ 33.)  The Indictment includes a four-page table of "illustrative statements" made by RBP sales staff during 2010 and 2011, such as a sales representative telling a pharmacist to "hammer away" about abuse risks to doctors

prescribing Suboxone Tablets; telling a doctor to "protect herself, her practice and her medical license" because prescribing Tablets could cause the death of a child; and a "best practices" sales pitch that included sharing "Baby Death articles," warning doctors about the illicit street sales of Tablets and touting a goal to "weed out the drug seekers" by prescribing only the Film. (Indictment ¶ 72.)

Surveys conducted by RBP contractors concluded that Suboxone Film was more likely to be abused through injection and ingested by children than the Tablets. (Indictment ¶¶ 73-74.) RBP managers internally discussed that they should "under no circumstances" make claims about superiority against pediatric exposure, but they made no corrections as to past claims. (Indictment ¶ 75.)

The Indictment describes allegedly misleading statements made in printed marketing materials, beginning in 2010. One statement claimed, "Nearly half of Suboxone Film prescribers surveyed cited 'potential for reduction of abuse and diversion' as a reason to prescribe vs Suboxone Tablet," but in fact only 28% of prescribers cited that reason. (Indictment ¶ 76(d).) Charts that purported to show the risks of pediatric exposure intentionally omitted information that would have shown the risks of abuse and pediatric exposure associated with the Tablets were roughly comparable to the risks of the Film. (Indictment ¶¶ 76(e), (f).) Letters sent in 2012 that were addressed "Dear Patient" and "Dear Healthcare Professional" nevertheless described higher rates of pediatric exposure from Tablets and recommended transitioning to the Film. (Indictment ¶ 87.)

F.   The Alleged Scheme to Obtain Medicaid Coverage in Massachusetts.

The Complaint describes a plan enacted between May 2011 and December 2013 wherein Reckitt, acting through RBP, knowingly misled state Medicaid administrators about the

superior safety of Suboxone Film relative to the Tablets, and specifically a scheme to mislead administrators of MassHealth, the administrator of Medicaid in Massachusetts.  (Compl't ¶¶ 170-97.)  The Complaint describes MassHealth running the nation's largest Medicaid program by volume of addiction-treatment business.  (Compl't ¶ 171.)

As described in the Complaint, beginning in 2012, Thaxter and other RBP executives began receiving data from poison control centers on accidental pediatric exposure from all buprenorphine drugs and retained an outside firm to analyze rates and trends of pediatric exposure.  (Compl't ¶ 175.)  The firm's analysis concluded that in Massachusetts, there were 2.7 exposures per 10,000 units of the Film, 3.3 exposures per 10,000 units of the Tablet, and 1.8 exposures per 10,000 units of non-Suboxone Tablets that contained buprenorphine only.  (Compl't ¶ 178.)  As described in the Complaint, RBP managers manipulated this data to add the incidents of Tablet exposures to a lump figure of 5.1 exposures per 10,000 units, a mathematically inaccurate result that concealed the lower exposure rates of buprenorphine-only Tablets.  (Compl't ¶¶ 179-82.)  In later communications with MassHealth, RBP managers continued to omit data about non-Suboxone Tablets in an effort to portray Suboxone Film as the safest option.  (Compl't ¶¶ 183-85.)  In 2012, MassHealth issued a press release announcing that it would provide Suboxone Film, and a senior official at MassHealth later described the data on accidental exposure as "the pivot point" in leading the agency to adopt the Film.  (Compl't ¶ 185.)  Previously, MassHealth had preferred the Tablets based on their lower cost.  (Compl't ¶ 189.)  In April 2013, an RBP manager stated in a meeting with Company lobbyists that the Massachusetts safety data had since "flipped" and instructed employees not to provide that information to MassHealth.  (Compl't ¶ 186.)

The Complaint also alleges that RBP undertook a secret lobbying campaign to persuade MassHealth to favor administration of Suboxone Film.  (Compl't ¶ 189-91.)  A doctor was employed to write letters to MassHealth administrators and other state officials heralding the Film's safety benefits and criticizing the agency's "selfish lapse in judgment" for not approving coverage of the Film.  (Compl't ¶¶ 192-93.)  MassHealth officials did not know that the letters were coordinated by RBP.  (Compl't ¶¶ 194-95.)  An official stated that "dozens" of other individuals wrote to request MassHealth coverage for Suboxone Film.  (Compl't ¶ 196.)

In December 2015, amid a government investigation of RBP and Indivior, defendants issued a corrective letter to MassHealth.  (Compl't ¶ 187.)  In 2020, defendant Thaxter pleaded guilty to one misdemeanor count of introducing misbranded drugs in interstate commerce in violation of 21 U.S.C. § 331(a) and 333(a)(1), in connection with the alleged misrepresentations made to MassHealth.  United States v. Thaxter, 20 Cr. 24 (W.D. Va.).

### G.   Marketing Directed to Doctors Known to Write Unlawful Prescriptions.

The Complaint alleges that beginning in 2009, defendants identified physicians across the United States who prescribed buprenorphine-containing drugs at rates exceeding federal limits and targeted them to switch their prescriptions from the Tablets to Suboxone Film.  (Compl't ¶ 198.)  Federal law limits both the daily dosage amount and the number of patients any one doctor may prescribe buprenorphine-containing drugs.  (Compl't ¶ 198.)  The Complaint alleges that RBP sales staff provided marketing materials, billing advice and hosted meals for physicians known to exceed these limits.  (Compl't ¶¶ 198, 200.)  Certain physicians were also listed on an RBP patient-referral website where prospective patients could "Locate a Doctor" to seek a Suboxone prescription.  (Compl't ¶ 199.)  According to the Complaint, RBP executives and personnel were aware that certain "rogue" physicians were exceeding federal prescriptions

limits and had previously communicated an intention to stop them from "trafficking" in Suboxone, with 564 physicians specifically known to be the highest-prescribing physicians in the United States.  (Compl't ¶¶ 200-02.)  As characterized in the <u>Indivior</u> Indictment, marketing specifically targeted physicians that RBP knew were "issuing careless, clinically unwarranted opioid prescriptions . . . ."  (Indictment ¶ 102.)

H.  <u>The Financial Success of Suboxone Film.</u>

The Complaint alleges that Suboxone Film proved to be "exceptionally lucrative" to Reckitt.  (Compl't ¶¶ 207-13.)  In mid-2012, the Film accounted for more than 70% of Suboxone prescriptions, and by the time the FDA approved generic Tablets in February 2013, 85% of Suboxone prescriptions were written for the Film instead of the Tablets.  (Compl't ¶ 207.)  Between 2010 and 2014, RBP and Reckitt received approximately $2.9 billion in revenues from sales of the Film.  (Compl't ¶ 208.)  From 2011 to 2013, Reckitt's annual sales for all Suboxone products ranged from approximately $1.22 billion to $1.49 billion.  (Compl't ¶ 210.)

I.  <u>The "Demerger" of RBP from Reckitt.</u>

On December 23, 2014, Reckitt "demerged" RBP, which was renamed Indivior. (Compl't ¶ 214.)  The Complaint describes the "demerger" as a restructuring in which shareholders of Reckitt gained direct control of the new Indivior entity.  (Compl't ¶ 214.) Reckitt shareholders received one Indivior share for each ordinary Reckitt share.  (Compl't ¶ 216.)  The Complaint asserts that this transaction was an attempt to insulate Reckitt from liability while continuing to profit from Suboxone, including through annual $500 million "dividend" payments transferred from Indivior to Reckitt.  (Compl't  ¶ 217.)  Indivior also agreed to indemnify Reckitt for any future liability attributed to RBP.  (Compl't ¶ 218)

J.   Government Investigations and the Eventual Disclosure of Defendants'
     Purported Schemes.

As described in the Complaint, the truth about Suboxone Film and defendants'

tactics first began to emerge on July 24, 2017, when Reckitt announced a £318 million charge

related to DOJ and FTC investigations into RBP.  (Compl't ¶ 275.)  Plaintiffs allege that the

announcement "surprised and disappointed" analysts and led to a 5% drop in the price of Reckitt

ADSs and a 3.3% drop in Reckitt's ordinary shares.  (Compl't ¶¶ 275-76.)  On February 19,

2018, Reckitt announced a £296 million charge due to the investigations, which had expanded to

include the California Department of Insurance.  (Compl't ¶ 278.)  Reckitt's ADSs declined by

more than 10% and its ordinary shares declined by 7.5%.  (Compl't ¶ 278.)

On April 9, 2019, the DOJ filed the 28-count Indictment against Indivior, which

described a long-running scheme involving the marketing and sales of Suboxone Film that

generated more than $3 billion in proceeds.  (Compl't ¶ 279.)  The Indictment included charges

of conspiracy and mail, wire and healthcare fraud.  (Compl't ¶ 279.)  That day, the price of

Reckitt's ADSs declined more than 6% and Reckitt's ordinary shares declined by 6.5%.

(Compl't ¶ 279.)

On July 11, 2019, Reckitt and the DOJ entered into a non-prosecution agreement

that required Reckitt to pay $1.4 billion in penalties.  (Compl't ¶ 280.)  The DOJ called it the

"largest opioid settlement in U.S. history."  (Compl't ¶ 280.)  In a press release, the DOJ

described its conclusions that Reckitt had made false and misleading statements to physicians

and Medicaid officials about the safety and effectiveness of Suboxone Film and fraudulently

delayed the approval of generic suboxone Tablets by falsely asserting that the Tablets presented

safety concerns.  (Compl't ¶ 281.)  Also on July 11, 2019, the FTC filed a complaint against

Reckitt for the monopolization of the Suboxone market, asserting that Reckitt made false and

misleading claims about the safety of lower-cost Tablets in order to divert sales to Suboxone Film.  (Compl't ¶¶ 282-83.)  The FTC asserted that by the time generic Suboxone Tablets entered the market, Suboxone Film had an 85% market share.  (Compl't ¶ 284.)  Reckitt settled the antitrust claim for $50 million.  (Compl't ¶ 282.)

On November 7, 2019, the FDA revoked as improperly granted the initial orphan-drug designation of buprenorphine for the treatment of opioid addiction.  (Compl't ¶ 286.)  The FDA concluded that the original request failed to establish a reasonable expectation that the costs of developing a buprenorphine drug to treat opioid addiction would not be recovered from sales in the United States.  (Compl't ¶ 286.)  The FDA did not conclude that Reckitt's orphan-drug application was fraudulent, but it did conclude that the actions of RBP were consistent with an expectation that Suboxone would be profitable after designation as an orphan drug.  (Compl't ¶ 287.)

On June 30, 2020, defendant Thaxter pleaded guilty to a one-count Information that charged him with the misdemeanor of causing the "misbranded opioid drug Suboxone Film" to be introduced in interstate commerce, in violation of the Food Drug and Cosmetics Act, 21 U.S.C. § 301, et seq.  (Compl't ¶ 288.)  The charge related to Thaxter's participation and oversight in RBP's efforts to obtain coverage from Massachusetts Medicaid authorities for Suboxone Film, including reliance on false and misleading safety statistics and the failure to correct false information for three years.  (Compl't ¶ 288.)  Thaxter was sentenced principally to six months of incarceration, a fine of $100,000 and forfeiture of $500,000.  (Compl't ¶ 288.)

On August 31, 2020, non-party Timothy Baxter, who had the job title of Global Medical Director at RBP, pleaded guilty to a one-count Information nearly identical to Thaxter's.

- 20 -

(Compl't ¶ 289.)  Baxter was sentenced principally to six months of home confinement and a $100,000 fine.  (Compl't ¶ 289.)

On July 24, 2020, Indivior agreed to pay $600 million to resolve criminal and civil liabilities related to Suboxone's marketing.  (Compl't ¶ 290.)  It pleaded guilty to a one-count Information charging it with making false statements related to healthcare matters, in violation of 18 U.S.C. § 1035, specifically that it "knowingly and willfully" made false statements relating to the pediatric safety of Suboxone Film and failed to correct misstatements made to Massachusetts Medicaid authorities.  (Compl't ¶ 290.)  Indivior was sentenced to pay $289 million in criminal penalties.  (Compl't ¶ 290.)  It separately entered into a $300 million civil settlement with the United States and certain individual states and a $10 million civil settlement with the FTC.  (Compl't ¶ 291.)

On November 13, 2020, Reckitt filed a claim in the Commercial Court, High Court of Justice of England and Wales to preserve its right to seek indemnification under the 2014 "demerger" agreement with Indivior.  (Compl't ¶ 293.)  Reckitt sought approximately $1.4 billion from Indivior.  (Compl't ¶ 293.). On January 25, 2021, Indivior agreed to settle Reckitt's claim for $50 million.  (Compl't ¶ 294.)

K.   Overview of Defendants' Alleged Misstatements and Omissions.

The Complaint recites a litany of purported misstatements and omissions uttered by defendants during the period from July 28, 2014 to April 9, 2019.  (Compl't ¶¶ 221-74.)  The Court will discuss the statements in detail below, but broadly summarized, the Complaint alleges that Reckitt's public filings and the statements of individual defendants made during investor-relations calls misstated and omitted material information about the commercial success of Suboxone Film, as well as the reasons for the "demerger" of RBP from Reckitt and RBP's

restructuring as Indivior.  Plaintiffs allege that defendants' statements did not disclose that the strength of sales in Suboxone Film was based on conduct that they characterize as coercive, deceptive and anticompetitive, and that defendants misled investors into believing that the strong sales were based on patient and physician preference, as opposed to an unlawful marketing scheme.

MOTION TO DISMISS STANDARD.

        A. Rule 12(b)(6) Standard.

        To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  A complaint must include non-conclusory factual allegations that "'nudge[ ]'" its claims "'across the line from conceivable to plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570).

        In addition to a complaint's allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

B. <u>The Heightened Pleading Standard of Rule 9(b) and the PSLRA.</u>

 "A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the [PSLRA]." <u>Set Capital LLC v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 75 (2d Cir. 2021).  Under Rule 10b-5, it us unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  "[T]he PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements and omissions . . . of a material fact,' 15 U.S.C. § 78u-4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), <u>id.</u> § 78u-4(b)(2)."  <u>Emp. Ret. Sys. of Gov't of the Virgin Islands v. Blanford</u>, 794 F.3d 297, 305 (2d Cir. 2015).  "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  <u>ATSI</u>, 493 F.3d at 99.  "'[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.'"  <u>Id.</u> (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 336 (2007)).  A complaint "therefore must allege with particularity facts that give rise to 'a strong inference' that [defendants] acted consciously and recklessly in omitting or misrepresenting financial information."  <u>Indiana Pub. Ret. Sys. v. SAIC, Inc.</u>, 818 F.3d 85, 93 (2d Cir. 2016).

Similarly, Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 305 (quoting Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI, 493 F.3d at 99.

"Although pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'" Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., 19 F.4th 145, 150 (2d Cir. 2021) (quoting In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 161 (2d Cir. 2021)). As with any other motion to dismiss, "'[i]n considering a motion to dismiss a 10(b) action, [courts] must accept all factual allegations in the complaint as true and must consider the complaint in its entirety.'" Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

DISCUSSION.

I.      Defendants' Motion to Dismiss Based on the "Truth on the Market"
        Theory Will Be Denied.

Defendants urge that the Complaint fails to plausibly allege an Exchange Act claim because "the market was already aware of the alleged anticompetitive conduct at the time of each challenged statement." (Def. Mem. 7.) Defendants point to public documents described in the Complaint, specifically including Reckitt's NDAs for Suboxone Film, the FDA's responses, RBP's citizen petition challenging the safety of Suboxone Tablets, and its withdrawal from the Suboxone Tablet market. Defendants also cite to the Complaint's allegation that in February 2013, "the FDA referred Reckitt to the FTC to investigate and address Reckitt's anticompetitive business practices." (Compl't ¶ 167.) Thaxter points to the Complaint's excerpt

from Reckitt's 2010 annual report, which stated in part that Reckitt launched Suboxone Film "[t]o mitigate the effects of" competition from generic Suboxone Tablets.  (Compl't ¶ 98; Thaxter Mem. 9 n.9.)

Under the "truth on the market" theory, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000).  "However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."  Id. (quotation marks omitted).  "The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."  Id.; see also Puddu v. 6D Glob. Techs., Inc., 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021) ("At the motion to dismiss stage, the truth-on-the-market defense is a heavy burden . . . .") (Nathan, J.).

Plaintiffs' Exchange Act claims are premised on the purported existence of an extensive, undisclosed scheme that falsely touted the safety benefits of Suboxone Film to patients, physicians and payors while exaggerating or misrepresenting the safety risks of the Tablets.  According to plaintiffs, that scheme was carried out through false statements made to regulators, physicians, patients, and state Medicaid officials.  The scheme was responsible for the commercial success of Suboxone Film, but, according to plaintiffs, artificially inflated the price of Reckitt shares because the market was unaware that the product's sales were due in part to misleading marketing and anticompetitive practices.

The public statements cited by defendants do not warrant dismissal based on a "truth on the market theory."  Statements in the NDA filings and the citizen petition included

alleged misrepresentations that plaintiffs assert were a part of the scheme.  It is true that the

FDA's letter of February 22, 2013, stated that the agency had received multiple public comments

describing Reckitt's citizen petition as "part of a pattern of anticompetitive behavior," but the

agency took no position on the comments, and "referred this matter to the [FTC], which has the

administrative tools and the expertise to investigate and address anticompetitive business

practices."  (Docket # 84-B.)  By summarizing third-party criticisms of Reckitt and referring

them to the FTC, the FDA made no findings as to unlawful activity, and it did not inform the

market of the intentional and wide-ranging scheme described in the Complaint.  Defendants also

publicly denied any wrongdoing and long maintained that Suboxone Film had significant safety

benefits over the Tablets.

      At the pleading stage, defendants have not demonstrated that corrective

information was conveyed to the public in a manner sufficient to render any alleged

misrepresentation immaterial.  Defendants' motion to dismiss based on a truth-on-the-market

theory will be denied.

      II.    The Motion to Dismiss the Exchange Act Claims as Untimely Will Be
Denied.

      Under a similar premise, defendants also move to dismiss the Exchange Act

claims as untimely, urging that a reasonably diligent plaintiff could have discovered defendants'

purported misconduct as early as 2014.  For the reasons largely discussed concerning the truth-

on-the-market defense, the motion to dismiss the claim as untimely will be denied.

      A plaintiff may bring a private action under the Exchange Act "not later than the

earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years

after such violation."  28 U.S.C. § 1658(b).  Defendants rely only upon the two-year limitation

period under section 1658(b)(1).   "[T]he [two-year] limitations period does not begin to run until

the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter – irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." Merck & Co. v. Reynolds, 559 U.S. 633, 653 (2010) (quoting 28 U.S.C. § 1658(b)(1)). "Until the plaintiff has uncovered – or a reasonably diligent plaintiff would have uncovered – enough information about the defendant's knowledge or intent to satisfy [the PSLRA's] pleading standard, he has not 'discovered' the fact of scienter, and the [two-year] statute of limitations cannot begin to run." City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

"The lapse of a limitations period is an affirmative defense that a defendant must plead and prove." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008). A claim may be dismissed as untimely under Rule 12(b)(6) if untimeliness is demonstrated on the face of the complaint, by documents integral thereto, and by matters of which a court may take judicial notice. Id.

The initial complaint in this action was filed on July 15, 2019 in the District of New Jersey. (Docket # 1.) Defendants assert that the Exchange Act claims accrued prior to July 15, 2017, because in 2012 and 2013, "a flood" and "whirlwind" of lawsuits and news reports described some of the information described in the Complaint. Specifically, an antitrust complaint filed on August 15, 2013 alleged that Reckitt engaged in a scheme to delay the market entry of generic Suboxone Tablets. In re: Suboxone Antitrust Litig., MDL No. 2445 (E.D. Pa.). Plaintiffs also point to a November 2013 article in the New York Times describing the FDA's concerns about the pediatric safety of Suboxone Film, and a December 2013 search of RBP's headquarters that was overseen by the U.S. Attorney for the Western District of Virginia and covered in the press. (Perla Dec. Exs. C, D, E.)

A lengthy front-page article in the November 16, 2013 edition of the New York Times detailed the public-health benefits and hazards of Suboxone, in both film and tablet form. Deborah Sontag, "Addiction Treatment with a Dark Side," N.Y. Times, Nov. 16, 2013, at A1.[1] A court may properly take judicial notice of the fact of press coverage on a motion to dismiss. See Staehr, 547 F.3d at 425. Calling Suboxone "the blockbuster drug most people have never heard of," the article described it as a safer and less-stigmatized alternative to the opioid-addiction drug methadone, but also described a lucrative business model where unscrupulous doctors over-prescribed the drug to addicts, and the "potent, durable buzz" felt by recreational users. The article described Suboxone Film as "ideal contraband" for prisoners, who could dissolve its strips in the pages of a Bible and consume the pages, and a recent spike in Suboxone hospitalizations due to pediatric exposure and recreational use. It also reviewed the history of Reckitt's submissions to the FDA, the FDA's rejection of the Film's claimed safety benefits, and Reckitt's ongoing assertions that its safety claims about the Film were backed by research.

The article may have informed a reasonably diligent plaintiff that the asserted safety advantages of Suboxone Film were exaggerated or fabricated, and that the product was well-suited for smuggling and abuse. A reasonably diligent plaintiff would have known from the article that the FDA disagreed with safety claims about the Film, and that Reckitt and RBP had a desire to delay or thwart generic competition. This is some evidence that would have informed a reasonable investor that defendants' statements about patient and physician preferences and the Film's safety advantages were false when made. See Merck, 559 U.S. at 654 (reviewing the record for "specific information suggesting the fraud" to a reasonable plaintiff).

---

[1] Available at https://www.nytimes.com/2013/11/17/health/in-demand-in-clinics-and-on-the-street-bupe-can-be-savior-or-menace.html

At the same time, the article did not reference any individual defendant, and did not discuss the allegedly false and misleading marketing statements that feature heavily in plaintiffs' allegations.  In alleging the defendants' knowledge and intent, the Complaint extensively relies on information disclosed in connection with the 2019 criminal proceedings against Indivior, Thaxter and Baxter, including the contents of internal e-mails and documents.

Whether a reasonably diligent plaintiff could have discovered the facts in support of the Exchange Act claims at some earlier point in time is better decided on a more complete factual record after the close of discovery.  It is possible that a reasonably diligent plaintiff may have understood as early as 2013 that the sales of Suboxone Film were attributable in part to intentionally false statements about the Film's safety, and that an investor would have purchased Reckitt's ADSs with the expectation that the false safety narrative would produce strong sales for the foreseeable future.  An investor armed with such information cannot reasonably claim to have been misled by later statements that attributed the Film's success to its safety profile or mere physician preference.  Indeed, such an investor might have sought to profit from the activities that plaintiffs now complain of as fraudulent and unlawful.  Alternatively, a reasonably diligent plaintiff may have weighed the New York Times article and other available information, and credited defendants' favorable description of the Film's commercial reception and safety profile against countervailing reports.  At the pleading stage, the Court is unable to conclude that a reasonably diligent plaintiff would have discovered the facts constituting a violation at a point in time that would render plaintiffs' claims untimely.

Defendants' motion to dismiss the Complaint as untimely will therefore be denied.

III.   Whether the Complaint Adequately Alleges Material
       <u>Misstatements and Omissions.</u>

A.   <u>The Requirement to Allege a Material Misstatement or Omission.</u>

To state a claim for relief under section 10(b) and Rule 10b-5, a complaint must

allege that a material misstatement or omission caused economic loss in connection with the

purchase or sale of a security.  <u>See</u>, <u>e.g.</u>, <u>Singh v. Cigna Corp.</u>, 918 F.3d 57, 62 (2d Cir. 2019).

An alleged misrepresentation is material if "there is a substantial likelihood that a reasonable

person would consider it important" in deciding whether to buy or sell the stock.  <u>Id.</u> at 63

(quotation marks omitted).  "Such a statement must, in the view of a reasonable investor, have

significantly altered the 'total mix' of information made available."  <u>Id.</u> at 63 (quotation marks

omitted).  "A challenged statement must be 'misleading, evaluated not only by literal truth, but

by context and manner of presentation.'"  <u>IWA Forest Indus. Pension Plan v. Textron Inc.</u>, 14

F.4th 141, 145 (2d Cir. 2021) (quoting <u>Singh</u>, 918 F.3d at 63).  A court should not substitute an

alternative, "benign" explanation for a defendant's statement if the facts described in the

complaint sufficiently allege that a statement was misleading.  <u>Id.</u> at 147.

Many of the Exchange Act claims relate to the omission of material information,

as opposed to an affirmative misstatement of fact.  In contrast to a misstatement, "'an omission is

actionable under the securities laws only when the corporation is subject to a duty to disclose the

omitted facts.'"  <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 361 (2d Cir. 2010)

(quoting <u>In re Time Warner Inc. Securities Litigation</u>, 9 F.3d 259, 267 (2d Cir. 1993)).  Section

10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material

information," but they do require disclosure when it is necessary "'to make . . . statements made,

in the light of the circumstances under which they were made, not misleading.'"  <u>Matrixx</u>

<u>Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 44 (2011) (quoting 17 CFR § 240.10b-5(b)).  "Even

when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014); accord Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) ("Such a duty may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading.") (quotation marks omitted).

In applying section 10(b) and Rule 10b-5, the statements and knowledge of an individual officer or executive are attributed to the corporation in connection with actions that this person causes the corporation to take. See, e.g., Affiliated Ute Citizens v. Utah v. United States, 406 U.S. 128, 154 (1972) (the section 10(b) liability of the company "of course, is coextensive with that of [the individual defendants].");  S.E.C. v. Ballesteros Franco, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003) (noting "the self-evident proposition that a corporation can act only through the actions of natural persons and that the actions of its agents, acting within the scope of their agency, are attributed to the corporation.") (Koeltl, J.) (collecting cases).  The complaint must raise a strong inference that the scienter of the individual defendant can be imputed to the corporate entity, and, "[i]n most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008).

### B. The Complaint Alleges Actionable Omissions as to Certain Statements that Described the Reasons for the Success of Suboxone Film.

The Complaint asserts that defendants made several misstatements about the strong sales and growth prospects of Suboxone Film and RBP, specifically in press releases and analyst calls accompanying financial reports issued in July 2014, October 2014 and February 2015.  According to plaintiffs, defendants' statements that described strong revenue and growth in Suboxone Film sales were false or misleading because Reckitt's results were due at least in

part to an anticompetitive scheme that misled reasonable investors and the public about the health and safety risks of Suboxone Film and Suboxone Tablets. Plaintiffs do not assert that any financial results or sales figures were themselves misstated.

"Courts in this district have held that where a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices." Diehl v. Omega Protein Corp., 339 F. Supp. 3d 153, 165 (S.D.N.Y. 2018) (quotation marks omitted) (collecting cases). "[A]ccurately reported income that is obtained from an unlawful source may not be actionable only on the grounds that the unlawful source is not disclosed. On the other hand, statements that put the source of the revenue at issue may be actionable if they fail to disclose the impropriety of the source." DoubleLine Cap. LP v. Odebrecht Fin., Ltd., 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018) (Woods, J.). For instance, when a company attributed the strong sales of a medical product to its "favorable pricing and volume," it placed at issue the source of its financial success, and the failure to disclose its anticompetitive agreements and its intentional pricing miscalculations were therefore actionable as a material omission. In re Mylan N.V. Sec. Litig., 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) (Oetken, J.).

"The critical consideration for those courts in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether 'the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading.'" In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (quoting In re Marsh & McLennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006)). "The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose." In re Par Pharmaceuticals,

Inc. Sec. Litig., 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (Patterson, J.).  Of course, for a plaintiff

to successfully allege a violation of section 10(b) or Rule 10b-5, the underlying misstatements or

omissions need not relate to conduct that was criminal or unlawful.  In re Hain Celestial Grp., 20

F.4th at 137.  A plaintiff need only allege that the defendant misrepresented or omitted material

information and did so with scienter.  See id.

       Judge Liman has concluded that a plaintiff alleged an actionable omission where a

defendant launched a successful advertising campaign after ignoring the FDA's warning not to

misrepresent the product's risks and efficacy.  Rosi v. Aclaris Therapeutics, Inc., 2021 WL

1177505, at *16 (S.D.N.Y. Mar. 29, 2021).  The defendant was described as a "single drug

company" that depended heavily on marketing to gain acceptance by patients and physicians.  Id.

In an earnings call, defendant's officer had touted the expected effectiveness of the upcoming

marketing campaign.  Id. at *15.  Judge Liman explained:

> Although the initial success and interest of ESKATA "may well
> have been due to" non-[direct-to-consumer] campaign-related
> factors, such as patient and physician satisfaction with the product,
> Plaintiff plausibly alleges "an ordinary investor would be misled by
> the company's failure to disclose," when promoting the marketing
> campaign to investors, "that an additional reason for its success"
> were misrepresentations made about ESKATA in that marketing
> campaign.  . . .  The allegations are equivalent to those courts have
> sustained where a company reports positive sales results without
> disclosing that those results were due, even if in part, to bribery,
> antitrust violations, or some other illegal conduct.

Id. at *16 (quoting DoubleLine Cap. LP, 323 F. Supp. 3d at 444).

       Other decisions also have concluded that a complaint alleged an actionable

omission where defendants' statements about revenue sources did not disclose the role of

unlawful activity.  In Par Pharmaceuticals, Judge Patterson concluded that the complaint

plausibly alleged that the defendant had a duty to disclose its alleged bribery of the FDA when

certain of defendant's public statements could lead a reasonable investor to conclude that the

company had a unique competitive advantage in expediting FDA approvals.  733 F. Supp. at 677-78; see also DoubleLine, 323 F. Supp. 3d at 444 ("While CNO's ability to secure projects that it bid on may very well have been due to its engineering capabilities and experience, decentralized management approach, and access to Brazilian governmental funding, an ordinary investor would be misled by the company's failure to disclose that an additional reason for its success was its illegal bribery scheme."); City of Brockton Ret. Sys. v. Avon Prod., Inc., 2014 WL 4832321, at *18 (S.D.N.Y. Sept. 29, 2014) ("Here, in virtually every financial disclosure during the Class Period, Defendants linked Avon's success (and later, lack of success) to its direct selling efforts in developing markets.  If the success of direct selling was made possible – as Plaintiffs allege – by the bribery of foreign officials, then a reasonable fact finder could conclude that attributing Defendants' success to direct selling without disclosing the bribery scheme was misleading.") (Gardephe, J.).

        The Complaint plausibly alleges that certain statements about the commercial success of Suboxone Film misleadingly omitted material information about the Company's allegedly untruthful and deceptive marketing of the product.  Certain of defendants' statements during the relevant period put at issue the reasons for the Film's strong sales, specifically the statements quoted in paragraphs 230, 250, 252 and 254.  Reckitt CEO Kapoor stated in an analyst call of July 28, 2014 that RBP had "substantial, I would say, near-term cash flows, mainly from its Suboxone Franchise," and stated that RBP had "strong defenses" against "competitive pressure" because of its intellectual property, patient preferences and "pre-op references."  (Compl't ¶ 230.)  Similarly, Reckitt's press release of October 21, 2014 release that accompanied the financial results for the third quarter of 2014 stated, "Whilst there continues to be clear patient and physician preference for Suboxone Film, as we have always said, this

increased competition in the US market place is expected to drive continued pricing pressure, and further share loss in more price sensitive payors." (Compl't ¶ 250.)  The Complaint alleges that this press release was reviewed and approved by the individual defendants and quoted Kapoor at length.  (Compl't ¶ 250.)

Paragraphs 252 and 254 quote statements of defendant Hennah, who was then the CFO of Reckitt, made during an October 21, 2014 analyst call.  During the call, Hennah stated that RBP had approximately 60% of the market share of buprenorphine prescriptions and that "price pressure led to the 9% reduction in constant currency RBP revenue in quarter 3." (Compl't ¶ 252.)  Hennah then stated that there "continues to be very clear patient and physician preference for Suboxone Film." (Compl't ¶ 252.)  In the same call, Hennah stated that "the preference we have, which is very clear among the patients and is very clear among the clinicians, is reaffirmed every day we're out there, is reaffirmed continually in the market data." (Compl't ¶ 254.)

These statements all attributed the Film's market strength to patient and physician preferences, but a reasonable investor would have considered it material to know that sales were driven at least in part by statements, now alleged to be intentional misrepresentations, about the safety benefits of Suboxone Film.  Having chosen to speak about the reasons for the strong sales and competitive advantages of Suboxone Film, Kapoor and Hennah had a duty to disclose the full truth of the reasons behind the product's success, including the marketing campaign that is alleged to have been misleading.

By contrast, the statements quoted in paragraphs 223, 228 and 264 merely recited Suboxone revenues and did not volunteer any reasons for the product's sales success.  Those quantitative statements about past performance did not place at issue management's beliefs as to

the reasons for Suboxone's revenue fluctuations.  The sales and revenues figures themselves are

not alleged to have been inaccurate.  The Complaint therefore does not allege a material

misstatement or omission, and plaintiffs' claims will be dismissed as to these statements.  See

Nadoff v. Duane Reade, Inc., 107 Fed. App'x 250, 252 (2d Cir. 2004) ("Accurate statements

about past performance are self-evidently not actionable under the securities laws . . . .");

DoubleLine Cap. LP, 323 F. Supp. 3d at 442 (accurately reported income is not actionable solely

on the basis that an unlawful source was not disclosed); In re Mylan, 2018 WL 1595985, at *5

(accurate, quantitative statements of income are not themselves actionable).

      The motion to dismiss will therefore be denied as to the statements in paragraphs

230, 250, 252 and 254 but granted as to the statements in paragraphs 223, 228 and 264.

      C.  Defendants' Motion to Dismiss Certain Statements as Non-Actionable
          Opinions or Puffery Will Be Granted in Part and Denied in Part .

      Defendants urge that certain of defendants' purportedly misleading statements

were non-actionable opinions or puffery.  Their motion will be granted in part and denied in part.

       "A reasonable person understands, and takes into account, the difference . . .

between a statement of fact and one of opinion."  Omnicare, Inc. v. Laborers Dist. Council

Const. Indus. Pension Fund, 575 U.S. 175, 187 (2015).  "[O]pinions, though sincerely held and

otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information

whose omission makes the statement misleading to a reasonable investor."  Tongue v. Sanofi,

816 F.3d 199, 210 (2d Cir. 2016).  "The core inquiry is whether the omitted facts would 'conflict

with what a reasonable investor would take from the statement itself.'"  Id. at 210 (quoting

Omnicare, 816 F.3d at 189).  Omnicare raised the hypothetical example where a company

expresses a belief that its conduct was lawful despite making no legal inquiry and knowing that

the federal government had taken the opposite view: because a reasonable listener "likely

expects" that the assertion of lawfulness was based on meaningful legal analysis, the speaker's unsupported opinion could plausibly be alleged as misleading.  575 U.S. at 188-89.

At the same time, a speaker need not disclose all possible doubts or countervailing views, and "whether an omission makes an expression of opinion misleading always depends on context."  Id. at 189-90.  Reasonable investors understand that opinions are drawn from competing facts and would not expect every known fact to align with the opinion of the speaker.  Id. at 190.  "So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."  Id. at 190.  The Supreme Court has accordingly "cautioned against an overly expansive reading" of Omnicare, and proving liability for an opinion-based statement "is no small task for an investor . . . ."  Sanofi, 816 F.3d at 210.  A plaintiff cannot rely on Omnicare to allege "fraud by hindsight" or pursue claims where an opinion is merely irrational or over-optimistic.  See, e.g., Woolgar v. Kingstone Companies, Inc., 477 F. Supp. 3d 193, 224-26 (S.D.N.Y. 2020) (Abrams, J.).

In a similar vein, broad statements of optimism are non-actionable puffery.  Unlike "specific, factual" statements, "vague descriptions [that] offer only generally optimistic opinions" are not actionable under section 10(b) and Rule 10b-5.  In re Synchrony, 988 F.3d at 170.  A speaker engages in puffery when he claims to be "pretty confident" and "pretty positive" about the future, or makes "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices . . . ."  Id.  Such statements "are 'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'"  Id.

- 37 -

(quoting <u>ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 206 (2d Cir. 2009)).

Certain of the statements alleged to be actionable fall comfortably within the category of nonactionable puffery.  As quoted in paragraph 245, Thaxter recited a variety of factors behind the successes of RBP, such as "very talented" employees, relationships with physicians and patients, a "patient-centric focus," strong culture and discipline, and a "very, very, very solid platform."  (Compl't ¶ 245.)  These self-congratulatory remarks conveyed no meaningful information to a reasonable investor and are non-actionable puffery.  Similarly, a statement by Kapoor that touted "growth opportunities" and "a sustainable business" that "can find its true potential" is general and vague and would not be relied upon by a reasonable investor.  (Compl't ¶ 232.)  This statement is also non-actionable puffery.  Statements by Thaxter about a potential international market for Suboxone Film were also general in nature, and reflected his opinion about issues with little relationship to plaintiffs' fraud allegations, including the "normalization and medicalization" of opioid addiction and providing treatment in primary care.  (Compl't ¶ 243.)  The Complaint does not explain how such remarks would have misled a reasonable investor.

Defendants' motion will be denied as to certain other statements.  Paragraphs 235, 237 and 239 consist of lengthy, multi-paragraph excerpts of remarks made by Thaxter that were transcribed from the July 28, 2014 analyst call.  Some of these statements included non-actionable puffery, such as praise for Reckitt's leadership model, a claimed focus on stakeholders and quality treatment, and a desire to please consumers.  However, other portions of these remarks spoke in detail about the sales of Suboxone Film and the reasons for product sales.  Factual statements about market share, presented with explanations for the product's success,

- 38 -

were more than mere puffery or statements of opinion, and placed at issue the reasons for the

Film's success.  Having placed at issue the reason for the Film's strong sales, Thaxter had a duty

to disclose that sales were derived at least in part from allegedly untruthful statements and

anticompetitive conduct.

In the same call, Thaxter stated that, at one point, Suboxone Film had 70% of the

market and RBP's Tablet product had decreased to 15% of the market.  (Compl't ¶ 235.)  He

stated that these figures were due to "the preference of the patient for the film," that patients

"liked it, they preferred it" and that "physicians were observing a superior treatment outcome."

(Compl't ¶ 235.)  Thaxter stated that when RBP withdrew its Suboxone Tablet product,

"everybody" at RBP was "absolutely surprised" by the Film's "resilience" against generic

competition.  (Compl't ¶ 235.)  A reasonable investor would understand Thaxter to be stating

facts about the sales of Suboxone Film and the reasons for the Film's commercial success.  The

Complaint plausibly alleges that a reasonable investor would have considered it material to know

that conversion to the Film was driven, at least in part, by an allegedly misleading marketing

campaign that misrepresented the relative risks of the Tablets and the Film.  Paragraph 235

therefore alleges an actionable omission by Thaxter.

The statement quoted in paragraph 237 similarly includes specific facts about the

Film's growth in market share, and stated that going forward, "the data has already demonstrated

that [the Film] is very clearly the preferred product, not only by patients, not only by physicians,

but also by payers."  (Compl't ¶ 237.)  Again, Thaxter's presentation of factual market data

alongside his explanation for the Film's popularity placed at issue the reasons for its sales

strength, and also presented detail too concrete for the statements to be classified as mere

puffery.  The Complaint adequately alleges that a reasonable investor would have considered it

material that the Film's sales were driven, at least in part, by allegedly misleading marketing that misrepresented the relative risks of the Tablets and the Film.

In paragraph 239, Thaxter is quoted as touting a treatment network of 25,000 physicians and patent protection for the Film extending to 2030. He then explained in some detail that the Film's "resilience" and its "market share performance" demonstrated that the Film was the top choice of patients, physicians and payors. (Compl't ¶ 239.) This statement offered concrete factual detail about the physician network and patent protections of Suboxone Film, accompanied with the unqualified observation that market share and sales "resilience" were attributable to the market's preference. The Complaint plausibly alleges that a reasonable investor would have considered it material that the Film's "resilience" and market share were driven, at least in part, by allegedly misleading marketing and anticompetitive practices.

In paragraph 241, Thaxter is quoted as stating, "Since we've launched each of our products, each product has been designed with the intent of being a lower potential for abuse and misuse than the previous products on the market." He proceeded to describe the Film's affordability to payers and the expectation of continued market growth. (Compl't ¶ 241.) Thaxter urges that this statement is non-actionable puffery because it was "explicitly aspirational." See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014). Yet Thaxter was not describing a forward-looking goal or an aspiration to act with integrity, as was the issue in City of Pontiac. Accepting the Complaint's factual allegations as true, the safety rationales supporting Suboxone Film were devised after the fact, and the Film was designed for the purpose of maintaining a large share of the Suboxone market after the expiration of the Orphan Drug exclusivity period. Thaxter was not making an aspirational statement but, according to the Complaint, a knowingly false historical statement

about the reason for the Film's creation and sale.  Defendants' motion will therefore be denied as to the statement in paragraph 241.

Defendants' motion to dismiss also will be denied as to the statement quoted at paragraph 248, which consists of a shorter excerpt from the same analyst call.  Thaxter stated:

> What I think is important to recognize is that we're not in the business of forcing the market or patients to do anything.  I think that we put the film proposition out there for patients and physicians, and we stated our case as to why we thought it was a better technology.  And it was really the rapid uptake by patients and physicians, as for the preference.

The statement in paragraph 248 is not a generic assertion of customer happiness or preference. A reasonable investor could plausibly be misled by Thaxter's assertion that "we're not in the business of forcing the market or patients to do anything" and that "we stated our case as to why we thought it was a better technology."  Plaintiffs allege that, in truth, sales of Suboxone Film were boosted at least in part by intentional misrepresentations made to patients, physicians, payors and regulators.  The Complaint adequately alleges that by disclaiming an attempt to "forc[e]" the market and attributing Film sales solely to patient preference, Thaxter materially misrepresented the reasons for the strong market position of Suboxone Film.  Defendants' motion will therefore be denied as to the statement in paragraph 248.

The motion to dismiss will therefore be denied as to the statements in paragraphs 235, 237, 239, 241 and 248 but granted as to the statements in paragraphs 232, 243 and 245.

### D.  The Complaint Does Not Allege an Actionable Misstatement or Omission about the RBP "Demerger" and the Restructured Indivior Entity.

The Complaint asserts that defendants made several material misstatements and omissions related to RBP's so-called "demerger" from Reckitt and its restructuring into Indivior. Defendants urge that these statements are not materially false or misleading because they (1)

describe factual details about the transaction, (2) were non-actionable opinions, or (3) were non-actionable puffery.

Because the Complaint does not identify an actionable misstatement or omission concerning the "demerger," the motion to dismiss will be granted as to these claims.

As noted, Reckitt "demerged" RBP on December 23, 2014, at which point the restructured entity was renamed "Indivior."  (Compl't ¶ 214.)  Each Reckitt shareholder received one Indivior share for each ordinary Reckitt share held.  (Compl't ¶ 216.)  The Complaint alleges that the transaction was an attempt to insulate Reckitt from RBP's liabilities while continuing to profit from the Suboxone scheme.  (Compl't ¶ 217.)  According to the Complaint, Indivior's "only real assets" were revenues from Suboxone, and that Indivior agreed to pay Reckitt more than $500 million in dividends.  (Compl't ¶ 217.)  Indivior also agreed to indemnify Reckitt for liability arising out of Indivior's business.  (Compl't ¶ 218.)

According to plaintiffs, defendants materially misrepresented the purpose and consequences of the RBP "demerger."  The statement of Kapoor quoted in paragraph 222 consisted of generic corporate-speak and optimism about Indivior, such as its "potential to deliver significant long term value creation" and its creation of value "as it manages the challenges and seizes the opportunities within the field of addiction."  (Compl't ¶ 222.)  Broad statements about value creation and seizing opportunities are the type of corporate-speak that "offer only generally optimistic opinions" and are non-actionable as puffery.  In re Synchrony, 988 F.3d at 170.  Similarly, Kapoor's statements that "a standalone RBP is the right thing to do" and that RBP had "created a global leadership position" is non-actionable as puffery.[2]  (Compl't ¶ 230.)  So too is Kapoor's statement in Reckitt's annual report for 2014 that Indivior had "the

---

[2] As previously discussed, other statements quoted in paragraph 230 are plausibly alleged to be actionable under the Exchange Act.

potential to deliver significant long-term value to Shareholders." (Compl't ¶ 267.) Such a statement is a vague expression of optimism that a reasonable investor would not consider material. Defendants' motion to dismiss will therefore be granted as to the statements quoted in paragraphs 222, 230 and 267.

The remarks of Thaxter quoted at paragraph 261 are also non-actionable puffery. Thaxter stated in relevant part that the Reckitt executive board hoped "to continue leveraging our unique patient-focused leadership model to expand availability of addiction treatment and improve patient lives across the globe." (Compl't ¶ 261.) This statement is another instance of optimistic sentiment and self-congratulations that imparted no specific and meaningful information to a reasonable investor, and, as puffery, is not actionable.

The Complaint also does not allege an actionable misstatement by Hennah in an October 21, 2014 analyst call. A reasonable investor would not afford weight to Hennah's statement that the "demerger" happened quickly because "we're RB and we like to get on things basically," or the statement that "we want to get on with things, so why wait? It's as simple as that, really." (Compl't ¶ 256.) Hennah employed the circular reasoning that the "demerger" happened quickly because Reckitt prefers it that way. The Complaint does not explain how this statement could have been material to a reasonable investor, and its claim directed toward paragraph 256 will therefore be dismissed.

Plaintiffs' claims directed toward the communication of financial results in connection with the RBP "demerger" also will be dismissed. Paragraph 259 quotes from a press release that recited information about RBP revenue and income, and the Film's market share. The contents of these statements did not place at issue the reasons for the Film's success and there is no assertion that the information quoted in paragraph 259 was inaccurate. Any claim

directed toward paragraph 259 will therefore be dismissed.  See Nadoff, 107 Fed. App'x at 252.

For the same reason, any claim directed toward paragraph 266 will be dismissed.  Paragraph 266

quotes from Reckitt's annual report for 2014, including information about RBP's net income,

revenue growth and operating margins.  Plaintiffs do not allege that these figures were

inaccurate.  Paragraph 266 also states that the board of Reckitt concluded that "a stand-alone

business will be best positioned to create value for Shareholders as it manages the challenges and

seizes the opportunities within the field of addiction."  A reasonable investor would not consider

statements about creating value and seizing opportunities to be material, and such broad remarks

are non-actionable puffery.

Because the Complaint does not identify an actionable misstatement or omission

as to defendants' remarks about the RBP "demerger," defendants' motion to dismiss will be

granted as to these statements.

E.   The Complaint Does Not Allege an Actionable Misstatement or Omission
Regarding Reckitt's Compliance Policies and Internal Controls.

Defendants move to dismiss portions of the Complaint that assert Reckitt

misrepresented or omitted material information pertaining to its compliance programs and

internal controls.  Because the Complaint does not adequately allege a material misstatement or

omission related to compliance or internal controls, the motion to dismiss will be granted as to

these statements.

The Second Circuit has observed that a reasonable investor would not weigh a

generic statement about legal and ethical compliance when deciding whether to buy or sell a

stock.  See Singh, 918 F.3d at 63.  These types of generic statements "cannot, therefore,

constitute 'material misstatements.'"  Id.  Further, "statements in [a] Code of Ethics are a

textbook example of 'puffery'" when they consist of "general declarations about the importance

of acting lawfully and with integrity . . . ."  Id.; see also In re Synchrony, 988 F.3d at 170

("[v]ague positive statements" about risk management strategies and business practices are

puffery).

           Some of the statements identified in the Complaint consist of general statements

and admonitions about the importance of ethical conduct and honesty, including the claim of a

"robust" compliance program, the need to act "even-handedly and honestly" and to observe laws

and regulations.  (Compl't ¶ 225.)  These are generic statements that would not be considered

material by a reasonable investor and are nothing more than puffery.  Singh, 913 F.3d at 63.

Similarly, Thaxter's statement that "[w]e've got compliance" is too general to be material and

imparted no meaningful information to an investor.  (Compl't ¶ 245.)  Any claim directed to the

statements in paragraphs 225 and 245 will be dismissed.

           At paragraph 268, the Complaint excerpts three bullet points published in

Reckitt's annual report for 2014, which described "internal controls over financial reporting."

But plaintiffs' claims are not directed toward Reckitt's financial reporting and the Complaint

does not explain how financial-reporting compliance could relate to any aspect of the Suboxone

Film schemes.  The Complaint also does not describe why the statements concerning these

internal controls were false and misleading or why they would have been material to a

reasonable investor.  Any claim directed toward paragraph 268 will therefore be dismissed.

           Paragraph 269 quotes four lengthy bullet points from the same annual report, this

time relating to Reckitt's "Risk management," "Operating unit controls," "Compliance controls,"

and "Monitoring."  The statements in paragraph 269 are vague and far-removed from the

schemes described in the Complaint.  Some of the statements under the "Risk management"

heading might be understood to tangentially relate to potential future exposure arising from the

Suboxone Film scheme, to the extent that it stated that operating units and the Reckitt board would review "significant risks" that could affect business objectives.  (Compl't ¶ 269.)  Even if a potential future liability arising out of the Suboxone Film schemes were subsumed within the "Risk management" language, the Complaint does not adequately allege why the contents quoted in paragraph 269 would have been material to a reasonable investor or how the investor would have been misled.  Any claim directed toward paragraph 269 will therefore be dismissed.

Because the Complaint does not identify an actionable misstatement or omission as to defendants' remarks about Reckitt's internal controls, defendants' motion to dismiss will be granted as to these statements.

F.   The Complaint's Claim Based on an Alleged Violation of Item 303 Will Be Dismissed.

The Complaint asserts that defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. 229.303 ("Item 303"), by failing to disclose that Reckitt's practices for marketing and selling Suboxone Film subjected the Company to the risk of civil monetary payments and criminal prosecution.  (Compl't ¶¶ 296-300.)  Courts have repeatedly concluded that Regulation S-K does not apply to a foreign corporation such as Reckitt, and the Complaint does not identify a regulatory filing by Reckitt that allegedly failed to comply with Item 303.  The motion to dismiss will therefore be granted as to plaintiffs' allegations regarding Item 303.

Item 303 "imposes specific 'disclosure requirements on companies filing' reports on SEC Forms 10-K and 10-Q."  Indiana Pub. Ret. Sys., 818 F.3d at 94 (quoting Stratte-McClure, 776 F.3d at 101).  This includes "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(3)(ii).  To plausibly allege a violation of Item 303, a plaintiff must identify a trend or uncertainty that "was

already known and existing," and allege that "the trend or uncertainty . . . was reasonably likely to have a material impact" on the registrant's financial condition.  Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011).  "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries."  Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 122 (2d Cir. 2012).  The Second Circuit has identified actionable Item 303 violations when a company is silent about known threats.  See Litwin, 634 F.3d at 718-19 (actionable failure to disclose how national deterioration of the real-estate market could affect registrant's vast real-estate portfolio); Panther Partners, 681 F.3d at 121-22 (actionable failure to disclose known "defect issue" in computer chips that jeopardized the registrant's "relationship with clients who at the time accounted for the vast majority of its revenues."); Indiana Pub. Ret. Sys., 818 F.3d at 95-96 (actionable failure to disclose acts of employee fraud that jeopardized existing and future contracts).

        Judge Nathan has observed that "multiple courts in this Circuit have found [that] 'foreign private issuers are not subject to SEC Regulation S-K.'"  In re Dynagas LNG Partners LP Sec. Litig., 504 F. Supp. 3d 289, 309 (S.D.N.Y. 2020) (quoting In re Top Tankers, Inc. Sec. Litig., 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007) (McMahon, J.)).  Comparable disclosure requirements for foreign corporations such as Reckitt may arise instead under Item 5 of SEC Form 20-F.  See Panther Partners Inc. v. Jianpu Tech. Inc., 2020 WL 5757628, at *7 n.5 (S.D.N.Y. Sept. 27, 2020) (Gardephe, J.).  "'Because omissions are not actionable absent a legal duty to disclose,' any failure by [foreign] defendants to comply with SEC Regulation S-K 'is insufficient to allege securities fraud.'"  Brady v. Top Ships Inc., 2019 WL 3553999, at *12

(E.D.N.Y. Aug. 5, 2019) (Cogan, J.) (quoting <u>Pearlstein v. BlackBerry Ltd.</u>, 93 F. Supp. 3d 233,

245 (S.D.N.Y. 2015) (Griesa, J.)).

       Plaintiffs suggest in their opposition memo that the Court should construe their

Item 303 claim as a claim under Item 5 of SEC Form 20-F.  (Opp. Mem. 22-23.)  But the

Complaint makes no allegations about defendants' duties under Form 20-F and does not assert

that Reckitt was required to make a Form 20-F filing.  The Complaint does not identify a

particular filing that it claims was misleading or deficient because it failed to omit a known trend

or uncertainty.  <u>See</u>, <u>e.g.</u>, <u>Indiana Public Retirement System</u>, 818 F.3d at 95-96 (discussing the

timing of defendants' alleged knowledge of fraud exposure and the dates of specific SEC

filings).  The Complaint's Item 303 claim therefore fails to plead fraud with the particularity

required by the PSLRA and Rule 9(b), and does not even satisfy the notice pleading required

under Rule 8.

       Because the Complaint does not identify a disclosure obligation under

Regulation S-K or Form 20-F, or identify a filing that was purported to be deficient, the claim

directed to Item 303 will be dismissed.

      IV.    The Complaint Adequately Alleges Scienter as to Thaxter, Kapoor and
           <u>Reckitt But Not as to Bellamy and Hennah.</u>

          A.  <u>The Requirement to Raise a Strong Inference of Scienter.</u>

       Defendants also urge that plaintiffs' claims under section 10(b) and Rule 10b-5

should be dismissed because the Complaint does not allege scienter under the PSLRA and Rule

9(b).

       "To establish scienter, 'a complaint may (1) allege facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that

defendants had both motive and opportunity to commit fraud.'"  <u>Set Cap. LLC v. Credit Suisse</u>

Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021) (quoting Rombach v. Chang, 355 F.3d 164, 176 (2d Cir.

2004)).  Courts should "evaluate the sufficiency of a complaint's allegations of scienter

'holistically,' considering 'all of the facts alleged, taken collectively,' rather than 'any individual

allegation, scrutinized in isolation.'" Id. (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551

U.S. 308, 323, 326 (2007)).  In order to raise a strong inference of scienter, "a reasonable person

must deem it cogent and at least as compelling as any opposing inference one could draw from

the facts alleged." Id. (emphasis in original; quoting ATSI, 493 F.3d at 99).  Facts that fall

outside the relevant period can be considered in determining whether a complaint alleges

scienter.  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001) ("Any information

that sheds light on whether class period statements were false or materially misleading is

relevant.").  "While robust, this pleading standard does not involve applying the more probing

test used at the summary judgment or judgment as a matter of law stage of litigation, as the court

is 'unaided by discovery' at the motion to dismiss stage." Employees' Ret. Sys. of Gov't of the

Virgin Islands, 794 F.3d at 306.

        "In order to raise a strong inference of scienter through 'motive and opportunity'

to defraud, Plaintiffs must allege that [the Company] or its officers 'benefitted in some concrete

and personal way from the purported fraud.'" ECA, Loc. 134, 553 F.3d at 198 (quoting Novak

v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000)).  "Motives that are common to most corporate

officers, such as the desire for the corporation to appear profitable and the desire to keep stock

prices high to increase officer compensation, do not constitute 'motive' for purposes of this

inquiry.  Rather, the 'motive' showing is generally met when corporate insiders allegedly make a

misrepresentation in order to sell their own shares at a profit." Id. (citations omitted).

Scienter may also be alleged through strong circumstantial evidence of conscious misbehavior or recklessness.  Set Cap. LLC, 996 F.3d at 78.  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'"  Employees' Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 306 (quoting ECA, Local 134, 553 F.3d at 199).  A complaint raises a strong inference of conscious misbehavior where, for instance, defendants intentionally conceal a large inventory of unsold product while falsely telling investors and auditors that the company was struggling to satisfy customer demand and had no excess inventory.  Id. at 301-02, 306-08; see also Novak, 216 F.3d at 303-04, 311-12 (complaint alleged conscious misbehavior where defendants intentionally inflated the value of "obsolete and nearly worthless" inventory, in violation of company policy).  Similarly, where defendants concealed or misrepresented facts that would have disclosed an existing threat to monthly income and growth prospects, the complaint alleged a "conscious decision" to mislead investors.  Setzer v. Omega Healthcare Invs., Inc., 968 F.3d 204, 215-16 (2d Cir. 2020).

"Conscious recklessness" can be alleged through facts showing a state of mind that approximates actual intent.  See id. at 214-15.  "In securities fraud cases alleging a material omission, our recklessness standard requires that Plaintiffs allege a clear duty to disclose, and further allege facts supporting a strong inference of 'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  Id. at 213 (quoting Stratte-McClure, 776 F.3d at 106).  "In other words, the facts alleged in the Complaint must support the conclusion that [an omission] was at least 'highly unreasonable and . . .

represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Id. at 215 (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009)).  "'[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" Id. (quoting Novak, 216 F.3d at 308).  "Thus, in determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct." Id.

Plaintiffs' theory of scienter is based on conscious misbehavior or recklessness, and not motive and opportunity.  The Complaint asserts that two non-party officers of Reckitt sold large numbers of Reckitt shares in 2009 and 2010 (Compl't ¶¶ 120, 125, 304) but it does not assert that any individual defendant benefited in a concrete and personal way from the alleged fraud.  The transactions of these non-party officers could hypothetically have some bearing when considering the scienter allegations holistically and collectively, see Set Cap. LLC, 996 F.3d at 78, but they do not go toward the motive and opportunity of any defendant.

### B. The Complaint Does Not Raise a Cogent and Compelling Inference of Scienter as to Bellamy.

As an initial matter, the Complaint has failed to allege any actionable misstatement or omission that was made by defendant Bellamy.  For this reason alone, the Complaint is due to be dismissed as to Bellamy.

In addition, the Complaint does not raise a cogent and compelling inference of scienter as to defendant Bellamy.  Bellamy was chairman of Reckitt's board of directors from 2003 to 2018.  (Compl't ¶ 43.)  The Complaint does not allege that Bellamy knew about or

participated in the schemes related to Suboxone Film, including the allegedly misleading FDA filings and marketing tactics.  The allegations as to Bellamy are limited to his roles in signing and certifying public filings and to a remark quoted in a press release describing the RBP "demerger."  (Compl't ¶¶ 227, 259, 270.)  The Complaint does not assert that Bellamy knew or should have known about any material misstatements or omissions contained in those filing, and the allegations specific to Bellamy are thin.

Because the Complaint does not allege scienter as to Bellamy, the Exchange Act claims against him will be dismissed.

### C.   The Complaint Does Not Raise a Cogent and Compelling Inference of Scienter as to Hennah.

Similar to Bellamy, the Complaint does not describe Hennah's knowledge or participation in the marketing and regulatory schemes related to Suboxone Film.  Hennah was Reckitt's CFO from February 2013 to October 2020.  (Compl't ¶ 41.)  As discussed above, the Court has concluded that the Complaint alleged that statements to investors by Hennah that discussed Suboxone Film revenues omitted material information about the Film's marketing scheme.  (Compl't ¶¶ 228, 252.)  But the Complaint does not make allegations of fact as to how Hennah had knowledge of the omitted facts that rendered his statements misleading.  The Complaint does not allege that Hennah received any e-mails or was present at any meeting where executives and employees discussed strategies for the marketing of Suboxone Film.  The limited allegations regarding Hennah do not describe a conscious recklessness approximating intent. See Set Cap. LLC, 996 F.3d at 78.

Because the Complaint does not allege scienter as to Hennah, the Exchange Act claims against him will be dismissed.

D.  The Complaint Raises a Cogent and Compelling Inference of
Thaxter's Scienter.

Thaxter urges that the Complaint fails to raise a strong inference of scienter because it does not assert that he had knowledge of facts that contradicted his public statements. He argues that the Complaint describes a disagreement with the FDA about the relative safety of Suboxone Film, which was known to investors and the public, but that it does not identify actual knowledge on the part of Thaxter that contradicted his public statements.

Viewed holistically and considering the factual allegations collectively, the Complaint raises a strong inference of scienter that is at least as cogent and compelling as any opposing inference.  As described in the Complaint, as far back as 2006, Thaxter began to orchestrate a plan to defend against competition from generic versions of the drug by devising a safety rationale.  (Compl't ¶¶ 106, 108, 122.)  The Complaint plausibly explains why Thaxter and others knew that statements touting the Film's superior safety were unsupported by reliable data, and explains that he nevertheless chose to emphasize product safety because it was a "key driver[]" in physicians' decision making.  (Compl't ¶¶ 126, 128, 133, 139-40.)  The Complaint quotes Thaxter as urging sales staff "to generate demand for a scheduled narcotic that is being given away for free to an addicted population."  (Compl't ¶ 134.)

On June 30, 2020, Thaxter pleaded guilty to one misdemeanor count of introducing a misbranded drug into interstate commerce in violation of 21 U.S.C. §§ 331(a) and 333(a)(1).  United States v. Thaxter, 20 Cr. 24 (W.D. Va.).  The Information that charged him "as a responsible Indivior executive" with failing to prevent or correct misleading statements made to MassHealth administrators about the pediatric safety of Suboxone Film relative to the Tablets.  (Docket # 97-3.)  As described in the Information, Thaxter approved and knew about a plan to persuade MassHealth to cover Suboxone Film by presenting safety data that exaggerated

the risks of pediatric exposure to Suboxone Tablets.  (Id. ¶¶ 19-32.)  At the plea allocution,

Thaxter confirmed that he did not dispute or contest any facts described in the Information.

(Plea Tr. at 23.)

        As previously discussed, the Complaint identifies public statements by Thaxter

wherein he attributed the success of Suboxone Film to patient and physician preferences, and at

one point volunteered that "we're not in the business of forcing the market or patients to do

anything."  (Compl't ¶¶ 235, 237, 239, 241, 248.)  Having chosen to speak about the reasons for

the Film's success, Thaxter then had an obligation to disclose that sales were attributable at least

in part to intentional and long-running misrepresentations about the Film's safety profile.  The

Complaint raises a cogent and compelling inference that the omissions were conscious

misbehavior by Thaxter, who is alleged to have had detailed knowledge and involvement as to

the Film's misleading marketing.  Viewing the allegations holistically, this inference of

conscious misbehavior is more cogent and compelling than the competing inference proposed by

Thaxter, which is that he merely had an honest disagreement with the FDA about safety issues,

and that, like any good executive, he was motivated by a desire to increase product sales.

(Thaxter Mem. at 14-15.)

        The Court therefore concludes that the Complaint has raised a cogent and

compelling inference of scienter as to Thaxter.

        **E.  The Complaint Raises a Cogent and Compelling Inference of Kapoor's**
             **Scienter.**

        Kapoor was CEO of Reckitt from September 2011 until September 2019.

(Compl't ¶ 40.)  As discussed above, the Court concluded that the Complaint adequately alleges

that Kapoor omitted material information when he asserted that RBP was likely to defend its

"global leadership position" from competitive pressure because of its intellectual property,

patient preferences and "pre-op references."  (Compl't ¶ 230.)  A reasonable investor would have considered it material that past and future sales of Suboxone relied in part on purportedly misleading marketing tactics and anticompetitive conduct.

   The scienter allegations as to Kapoor are somewhat thinner than the scienter allegations regarding Thaxter.  As described in the Complaint, Kapoor was one of multiple recipients on a June 21, 2012 e-mail from Reckitt's director of investor relations that referenced "our plans" to withdraw Suboxone Tablets from FDA approval in order to delay generic competition, which prompted a reply from the Company's general counsel that advised, "please do not create emails or any other documents suggesting we would consider" attempting to delay FDA approval.  (Compl't ¶ 148.)  The Complaint also alleges that Kapoor approved the September 2012 submission to the FDA that discontinued Suboxone Tablets based on "increasing concerns regarding pediatric exposure . . . ."  (Compl't ¶¶ 156-57, 160.)  In February 2013, prior to the relevant period, Kapoor stated that "we withdrew the [Suboxone] tablet because we strongly believe that there is an issue of patient safety here . . . ."  (Compl't ¶ 163.)  Also, in e-mails of August 2013, Thaxter and Kapoor discussed that Suboxone Film had a market share approaching 70%, and Kapoor stated, "our US team has done a fantastic job of defending our film share thus far."  (Compl't ¶ 212.)

   Considering the allegations holistically and collectively, the allegations as to Kapoor are sufficient to raise an inference of scienter that is at least as cogent and compelling as any opposing inference.  Set Cap. LLC, 996 F.3d at 78.  The e-mails described in the Complaint suggest that he was aware of the purported plan to devise a false safety rationale in support of promoting Suboxone Film and that he thereafter approved FDA submissions that allegedly were intended to frustrate generic competition.  The e-mails of August 2013 suggest that Kapoor knew

that the allegedly false claims about product safety were proving successful in the marketplace and that he was pleased with the results.

The inference that Kapoor knew about, and was involved in implementing, the scheme to misrepresent the safety benefits of Suboxone Film is at least as cogent and compelling as any opposing inference, such as a good-faith disagreement about the Film's safety benefits, mismanagement or negligence.  By later attributing the strength of the Film's sales to patient and physician preference, but not disclosing the role of a marketing campaign alleged to have been intentionally misleading, Kapoor's statements were at least a product of recklessness approximating intent, if not conscious misbehavior.

The Court therefore concludes that the Complaint alleges scienter as to Kapoor.

F.   The Complaint Raises a Cogent and Compelling Inference of Reckitt's Scienter.

"Where a defendant is a corporation, [the PSLRA] requires pleading facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'"  Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020) (quoting Teamsters Local 445, 531 F.3d at 195).  "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter."  Id.  "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker."  Id.  Scienter may be imputed to the corporation if the allegations point to deliberate acts of fraud, as opposed to an unintentional error caused by mere mismanagement.  Id.

The allegations raise a cogent and compelling inference of scienter against Reckitt.  As discussed, the Complaint raises the inference that Kapoor, then the Company's

CEO, knew about and supported a scheme to misstate the purported safety benefits of Suboxone

Film in order to increase sales revenue.  Although Thaxter was an officer of the subsidiary RBP

and not Reckitt itself, Thaxter participated in investor relations calls alongside top Reckitt

executives.  In weighing allegations of Reckitt's scienter, is also relevant that Kapoor's

immediate predecessor as CEO, non-party Lambertus Becht, was allegedly involved in

formulating the safety narrative advocating for Suboxone Film and urged employees to

emphasize its safety benefits when selling and marketing the Film.  (Compl't ¶¶ 130, 138.)

These allegations adequately raise a cogent and compelling inference of scienter that connects

the allegedly misleading statements to Reckitt itself.

The Court therefore concludes that the Complaint alleges scienter as to Reckitt.

V.      The Complaint Adequately Alleges Loss Causation.

Defendants urge that the Exchange Act claims should be dismissed because the

Complaint does not adequately allege loss causation.  According to defendants, the market was

aware of the information contained in corrective disclosures described in the Complaint and had

incorporated that information into the historical price of Reckitt's ADSs and ordinary shares.

Because the Complaint adequately identifies three corrective disclosures and a

corresponding decline in share price, the motion to dismiss will be denied as to loss causation.

The plaintiff in a securities fraud claim must adequately allege loss causation.

See 15 U.S.C. § 78u-4(b)(4).  "Loss causation 'is the causal link between the alleged misconduct

and the economic harm ultimately suffered by the plaintiff.'"  Lentell v. Merrill Lynch & Co.,

396 F.3d 161, 172 (2d Cir. 2005) (quoting Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.,

Inc., 343 F.3d 189, 197 (2d Cir. 2003)).  "[T]o establish loss causation, a plaintiff must allege

that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,

i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 173 (emphasis in original; alterations, quotation marks and citation omitted).  "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed."  Abramson v. Newlink Genetics Corp., 965 F.3d 165, 179 (2d Cir. 2020) (alterations, quotation marks and citations omitted).

The Complaint alleges that a series of corrective disclosures about the Suboxone Film scheme caused a drop in the price of Reckitt's ADSs and ordinary shares.  As described in the Complaint, on July 24, 2017, Reckitt announced a £318 million charge arising out of DOJ and FTC investigations into Indivior, which resulted in a 5% price drop in Reckitt ADSs and a 3.3% price drop in its ordinary shares.  (Compl't ¶ 275.)  The Complaint quotes analysts who expressed surprise at the charge.  (Compl't ¶ 276.)  On February 19, 2018, Reckitt announced a £296 million charge in connection with the investigations, which resulted in a 10% price drop for Reckitt ADSs and a 7.5% drop for its ordinary shares.  (Compl't ¶ 278.)  On April 9, 2019, the DOJ filed a 28-count criminal indictment against Indivior relating to anticompetitive practices concerning Suboxone Film.  (Compl't ¶ 279.)  The price of Reckitt ADSs dropped by 6% and the price of its ordinary shares dropped by 6.5%.  (Compl't ¶ 279.)

According to defendants, the information disclosed in these announcements was known to the market before July 2017 and incorporated into Reckitt's share price.  Defendants point out that on February 22, 2013, the FDA publicly denied RBP's citizen petition advocating for the withdrawal of Suboxone Tablets and referred RBP to the FTC for potential anticompetitive practices.  (Compl't ¶ 167.)  Reckitt's stock price dropped by 4.2% and its ADS

price dropped by 3.6%.  (Def. Mem. 19.)  Defendants also point out that Reckitt share prices

actually increased on July 11, 2019, when the DOJ announced that Reckitt had agreed to pay

$1.4 billion in criminal and civil penalties related to Suboxone.  (Def. Mem. 19.)

Defendants' arguments are better considered at a later stage of the litigation on a

more complete fact record.  The FDA's denial of the citizen petition facilitated the entry of

generic competition, which may have affected share price.  It is also possible to infer that the

petition's denial raised doubts among investors about the claimed safety benefits of Suboxone

Film and that the referral to the FTC alerted investors to potential anticompetitive conduct.

However, Reckitt and RBP denied wrongdoing at the time, and the effect on Reckitt's share

price is better considered on a more complete record.  See, e.g., Sjunde AP-Fonden v. Goldman

Sachs Grp., Inc., 545 F. Supp. 3d 120, 147-50 (S.D.N.Y. 2021) ("years of news reports" about

potential investigations, prosecutions and fines, all of which later materialized, did not defeat

plaintiffs' allegations of loss causation at the Rule 12(b)(6) stage) (Broderick, J.).  Similarly, any

rise in share price that coincided with the announcement of fines by the DOJ and FTC is more

properly considered on a more complete fact record, and does not go toward the plausibility of

plaintiffs' loss-causation allegations at the Rule 12(b)(6) stage.

At the pleading stage, it is sufficient that the Complaint alleges a relationship

between the public announcement of Reckitt's fines and acts of wrongdoing and a corresponding

decline in share price.  Defendants' motion to dismiss for failure to allege loss causation will be

denied.

VI.   Plaintiffs' Section 20(a) Claim Will Be Dismissed as to Bellamy, Hennah
      and Thaxter.

In a footnote, defendants urge that the claim of section 20(a) control person

liability should be dismissed to the extent that the Complaint fails to allege liability against any

individual defendant pursuant to section 10(b) and Rule 10b-5.  (Def. Mem. at 22 n.24.)  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108.

Because the Complaint does not allege that Bellamy and Hennah were in some meaningful sense culpable participants in any alleged fraud, the section 20(a) claim against them will be dismissed.

Thaxter separately urges that, as an officer of Reckitt's subsidiary RBP, the Complaint fails to allege that he was the control person of any primary violator.  "Controlling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud."  Suez Equity Invs., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001).  "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

The Complaint does not adequately allege that Thaxter was the control person of a primary violator.  The section 20(a) claim states that it is brought against the individual defendants as officers and directors of Reckitt.  (Compl't ¶ 331.)  But Thaxter is not alleged to have been an officer or director of Reckitt, and is identified as the CEO of RBP and Indivior from 2009 to 2020.  (Compl't ¶ 42.)  The Complaint has not tailored its section 20(a) claim to

Thaxter's role at RBP/Indivior, sufficient to describe how he acted as a control person over a primary violator. Thus, while the Complaint has alleged that Thaxter was a primary violator under section 10(b) and Rule 10b-5, it fails to allege his status as a control person.

The section 20(a) claim will therefore be dismissed as to Thaxter.

VII.    Pontiac's Claims Under English Law Will Be Dismissed for Failure to State a Claim.

Counts III through V of the Complaint are brought only by Pontiac and assert claims under the laws of England, where Reckitt and the individual defendants other than Thaxter are located. Pontiac is the only plaintiff who held ordinary shares of Reckitt, which traded on the LSE. Count III asserts that defendants violated English common law by making fraudulent misrepresentations and acting with deceit in published statements required by England's Financial Services and Markets Act (the "FSMA"). (Compl't ¶¶ 334-43.) Count IV asserts a substantive violation of the FSMA. (Compl't ¶¶ 344-51.) Count V asserts negligent misrepresentation and misstatement against all defendants under English common law. (Compl't ¶¶ 352-57.)

Because Pontiac, unlike Sterling Heights and Birmingham, only purchased ordinary shares on the LSE, it does not have a claim under the Exchange Act, but it may have a claim under the laws of England. Notably, Pontiac relies on the same facts alleged in the Complaint to supports its claims under Counts III, IV and V. Thus, if it successfully alleges a claim for relief under English law, the existence of the claim would not likely expand the scope of evidence offered at a joint trial.

A.  Defendants' Motion to Stay Pontiac's Claims
    Pending Arbitration Will Be Denied.

Defendants first urge that Pontiac's claims under England's laws should be stayed in favor of arbitration.  Article 132 of Reckitt's articles of association provides in part that all disputes "between a shareholder in that shareholder's capacity as such and the company and/or its directors arising out of or in connection with these articles or otherwise . . . will be exclusively and finally resolved under the Rules of Arbitration of the International Chamber of Commerce . . . ."  (Perla Dec. Ex. I.)  According to defendants, Pontiac's claims under English law fall within the arbitration clause of Article 132, and, pursuant to the Federal Arbitration Act ("FAA"), should be stayed in favor of arbitration.  See 9 U.S.C. § 3.

Defendants rely on a declaration of Stephen Midwinter QC, an expert in English law, who asserts that Article 132 reflects an agreement between Pontiac and Reckitt to arbitrate Pontiac's claims.  (Docket # 92.)[3]  Midwinter opines that as a purchaser of ordinary shares, Pontiac's claims fall within Article 132.  (Midwinter Dec. ¶ 15.)  He states that language in Article 132 requiring the arbitration of disputes "arising out of or in connection with these articles or otherwise" should be read broadly, and includes tortious conduct unrelated to the text of the articles.  (Midwinter Reply Dec. ¶¶ 11-12.)  Midwinter points to a decision that favored the broad construction of an arbitration agreement entered between "rational businessmen." Fiona Trust & Holding Corp v Privalov, [2007] U.K.H.L. 40, 2007 WL 2944855 ("The construction of an arbitration clause had to start from the assumption that the parties, as rational businessmen, were likely to have intended any dispute arising out of the relationship into which they had entered, or purported to have entered, to be decided by the same tribunal.").  Midwinter

---

[3] Rule 44.1, Fed. R. Civ. P., provides that a "court may consider any relevant material or source, including testimony," when addressing an issue of foreign law.

also cites to a 1915 decision involving the shareholder of a sheep association who sued over his

expulsion, and a 1987 decision that involved a shareholder in a British football league who

claimed "unfair prejudice" within league management.  (Midwinter Dec. ¶¶ 9, 13, 14, citing

Hickman v Kent or Romney Marsh Sheepbreeders' Association [1915] 1 Ch 881 and Fulham

Football Club (1987) Ltd v Richards [2012] Ch 333.)

        Plaintiffs have submitted a responsive declaration from David Lord QC, who is

also an expert in English law.  (Docket # 104.)  Lord states that shareholder claims similar to

Pontiac's and arbitration provisions similar to the one in Article 132 "are by no means unusual"

but that "as far as I am aware, there is no reported English law case in which it has been held that

claims such as the English Law Claims fall within an arbitration agreement in a company's

articles of association."  (Lord Dec. ¶ 36.10.)  Broadly summarized, Lord states that, unlike a

commercial agreement negotiated between two businesses, a corporation's articles of association

arise from statute, and govern certain rights and obligations between the company and its

member shareholders regarding the administration and operations of the company.  (Lord Dec.

¶¶ 19-34.)  A shareholder such as Pontiac acquires its ordinary shares from a third party, and not

directly from Reckitt or its directors, meaning that the purchase of shares did not occur pursuant

to the terms of the articles of association.  (Lord Dec. ¶¶ 36-37.)  Moreover, Lord states, Pontiac

does not seek enforcement of any provision of the articles of association, and the articles of

association do not expressly or impliedly incorporate an arbitration requirement for the types of

claims asserted by Pontiac.  (Lord Dec. ¶ 36.)

        Defendants have not demonstrated that Article 132 requires Pontiac's claims to be

stayed in favor of arbitration.  The Midwinter Declaration relies principally on authorities that

enforced arbitration clauses contained in commercial agreements.  To the extent he identifies

authorities that required arbitration of a shareholder's claims against a corporation, they apparently involved disputes where a member of an association challenged the association's compliance with its own articles or internal procedures – a very different claim than one brought by a shareholder who asserts that it purchased shares at an artificially inflated price in the open market due to defendants' misstatements.  Lord credibly asserts that shareholder claims similar to Pontiac's are not "unusual" in England, and that he is unaware of any authority that has enforced the arbitration of such claims under a provision comparable to Article 132.  (Lord Dec. ¶ 36.10.)  Given the sophistication of both England's financial services industry and its legal system, the absence of such authority is significant, as is the Midwinter Declaration's reliance on authority that arose in circumstances very different from those presented here.

Defendants' motion to stay Pontiac's claims in favor of arbitration will therefore be denied.

## B. Defendants' Motion to Dismiss Pontiac's Claims on *Forum Non Conveniens* Grounds Will Be Denied.

### 1. Defendants Have Not Demonstrated that this Dispute Falls within an Applicable Forum-Selection Clause.

Defendants argue that Pontiac's claims under English law should be dismissed on the basis of forum non conveniens.  "'The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute.'"  Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947)).  District courts have "broad discretion" to apply forum non conveniens, but the analysis must be guided by three steps: first, the court determines the degree of deference afforded to plaintiff's choice of forum; second, it considers whether the proposed alternative form is adequate to adjudicate the dispute;

and third, the court "balances the private and public interests implicated in the choice of forum." Id. (citing Iragorri v. United Techs. Corp., 274 F.3d 65, 73 (2d Cir. 2001)).  In considering the third step, "[t]he public interests include: (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community.  The private interests include: (1) ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive."  Alfadda v. Fenn, 159 F.3d 41, 46 (2d Cir. 1998).

"The defendant bears the burden of proof on all elements of the motion, and great weight is given to the plaintiff's choice of forum."  Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir. 2001).  However, "forum selection clauses require a substantial modification of the forum non conveniens doctrine, whereby the doctrine's usual tilt in favor of the plaintiff's choice of forum gives way to a presumption in favor of the contractually selected forum."  Martinez v. Bloomberg LP, 740 F.3d 211, 218 (2d Cir. 2014).

Defendants raise two separate arguments as to why the Court should dismiss the English law claims on forum non conveniens grounds.  First, they point to language in Article 133(A) of Reckitt's articles of association that contains a forum-selection clause for the courts of England and Wales for proceedings where a court determines that Article 132 "is invalid or unenforceable in relation to that dispute in that jurisdiction . . . ."  Second, they argue that policy considerations counsel that the claims should proceed before a tribunal in England because any future class would likely include a large number of foreign shareholders and because the FSMA is a "new and important" enactment in the United Kingdom that has not yet been extensively interpreted by English courts.

Again, the parties rely principally on the expert declarations of Midwinter and

Lord.  Midwinter states that Article 133 of Reckitt's articles of association acts as "a fallback

position" if the arbitration provision does not apply to the parties' dispute.  (Midwinter Dec. ¶

19.)  Article 133 states in part:

> **133. Exclusive Jurisdiction**
> (A) This article applies to (i) a dispute (which would otherwise
> be subject to Article 132) in any jurisdiction if a court in that
> jurisdiction determines that Article [132] is invalid or
> unenforceable in relation to that dispute in that jurisdiction; any
> (ii) any derivative claim under the legislation.
> (B) For the purposes of this paragraph (A), "court" means any
> court of competent jurisdiction or other competent authority
> including for the avoidance of doubt, a court or authority in any
> jurisdiction which is not a signatory to the New York
> Convention.
> (C) Any proceeding, suit or action:
>> i) between a shareholder in that shareholder's capacity as
>> such and the company and/or is directors arising out of or
>> in connection with these articles or otherwise; . . .
> can only be brought in the courts of England and Wales.

(Midwinter Dec. ¶ 19.)  Midwinter asserts that Article 133 unambiguously requires Pontiac's

claims to proceed in the courts of England or Wales, if those claims are deemed to fall outside

the arbitration provision.

In response, Lord argues that, as a threshold matter, Article 133 governs only in

the event that a plaintiff asserts a derivative claim, or, alternatively where a court has determined

that Article 132 "is invalid or unenforceable in relation to that dispute in that jurisdiction . . . ."

(Lord Dec. ¶ 43.)  He notes that that plaintiffs do not purport to bring derivative claims on behalf

of the Company, and that there also is no dispute as to whether Article 132 is valid or

enforceable – merely whether plaintiffs' claims fall within the language of Article 132.  (Lord

Dec. ¶ 43.1.)  In short, he urges, this is not a dispute "which would otherwise be subject to

Article 132 . . . ."  (Art. 133(A).)  Midwinter's Reply Declaration does not respond to this

argument.  (See Docket # 107.)

        The parties' experts have not pointed to authority that interprets and applies a

venue provision similar to the one at issue here.  However, the argument advanced by Pontiac

through Lord is consistent with the text of the forum-selection provision.  The forum-selection

clause applies to a dispute that "would otherwise be subject to Article 132" in the event that

Article 132 "is invalid or unenforceable . . . ."  The Court has concluded that Pontiac's claims

fall outside of the text of Article 132.  That conclusion does not require the Court to adjudicate

the validity or enforceability of Article 132, and Pontiac's arguments suggest that Article 132 is,

in fact, valid and enforceable, but that its claims merely fall beyond its reach.

        Because Pontiac's claims are not derivative in nature, and because they are not

"otherwise" subject to Article 132 but-for a finding of invalidity or unenforceability, the motion

to dismiss on forum non conveniens grounds will be denied.

        2.   Defendants Have Not Demonstrated that Public Policy Counsels in
            Favor of Dismissal on Forum Non Conveniens Grounds.

        Defendants offer two additional arguments as to why the Court should decline to

exercise jurisdiction on forum non conveniens grounds.  They assert that Pontiac's claims

purport to be brought on behalf of a class of purchasers of Reckitt shares, a large number of

whom are presumably located outside the United States.  They also urge that the FSMA is a

"new and important" enactment in the United Kingdom that has not yet been extensively

interpreted by English courts.

        Aside from pointing to the jurisdiction provision of Article 133, defendants have

not articulated why the Court should not afford deference to Pontiac's choice of forum.  See

Norex, 416 F.3d at 153; Iragorri, 274 F.3d at 70 ("Unless the balance is strongly in favor of the

defendant, the plaintiff's choice of forum should rarely be disturbed.").  At the second step,

which requires the Court to consider whether the proposed alternative forum is adequate to

adjudicate the dispute, defendants have not identified a particular tribunal in England that they

believe should adjudicate Pontiac's claims.  The failure to identify a proposed forum to hear

Pontiac's claims weighs heavily against the motion.

   Defendants rely principally on public policy considerations that they urge counsel

against the exercise of jurisdiction over Pontiac's claims under English law.  Those

considerations include "(1) having local disputes settled locally; (2) avoiding problems of

applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their

community." Alfadda, 159 F.3d at 46.

   Defendants' argument about the possible role of a class of shareholders located

outside the United States is misplaced at the Rule 12(b)(6) stage.  It is true that Pontiac purports

to bring claims on behalf of "all persons who purchased Reckitt ordinary shares during the Class

Period . . . ."  (Compl't ¶ 322.)  No class has been certified, however, and defendants have not

explained why the potential role of inclusion of foreign shareholders in a class weighs against

adjudication in this District, other than to observe that "the vast majority of [Reckitt

shareholders] are undoubtedly foreign."  (Opp. Mem. 24.)  The efficacy and manageability of a

class that may include many foreign shareholders is better addressed in connection with a Rule

23 class certification motion.

   The application of foreign law by a United States court could raise a somewhat

closer question.  See, e.g., Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 76 (2d

Cir. 2003) (affirming dismissal on forum non conveniens ground based in part on the district

court's conclusion that " the overwhelming majority of plaintiffs' claims necessitate the

application of English law . . . .").  Count IV brings a claim against Reckitt under section 90A of

the FSMA, as amended by the Companies Act of 2006 and the FSMA 2000 (Liability of Issuers)

Regulations 2010 (2010/1192), and Schedule 10A of the FSMA.  (Compl't ¶¶ 344-51.)  The

Claim asserts that one or more individual defendants intentionally or recklessly made misleading

statements while discharging managerial responsibilities, and that Pontiac relied on those

misstatements when purchasing or retaining Reckitt shares.  (Compl't ¶¶ 347-48.)  Defendants

urge that the Court should decline to exercise jurisdiction because the FSMA claim asserted in

Count IV has not been extensively interpreted by the courts of England.  (Def. Mem. at 24.)

Midwinter states that section 90A was introduced in 2007 to create a "standalone

and heavily circumscribed remedy" for a person misled by an untrue statement or omission, and

was later moved and amended to become FSMA Schedule 10A.  (Midwinter Dec. ¶ 38.)

Midwinter states that "[i]t is a little-used provision" and that he is unaware of "any reported

decision in which it has been successfully relied on in the 13 years since it was introduced,"

leaving open several unresolved issues about the law.  (Midwinter Dec. ¶ 38.)  His declaration

describes the showings purportedly required to prove liability under section 90A and Schedule

10A, including proof of dishonesty, publication of an untrue statement and reasonable reliance.

(Midwinter Dec. ¶¶ 39-49.)  A responsive declaration submitted by Thomas Lowe QC, another

expert in the laws of England, states that section 90A and Schedule 10A have "a long pedigree"

that dates to 1890, and that more recent revisions were merely intended to incorporate a

European Union transparency directive.  (Lowe Dec. ¶¶ 25-26.)

Neither defendants' memorandum nor the Midwinter Declaration identifies a

novel, unresolved issue raised by Count IV that weighs significantly against the exercise of

jurisdiction and dismissal on grounds of forum non conveniens.  While England has a strong

interest in enforcing its securities laws against an English company, see Pollux, 329 F.3d at 76, the description of the FSMA claim contained in the declarations of Midwinter and Lowe indicate that it would turn on evidence that complements the Exchange Act claims.  Aside from the broad contention that section 90A has not been extensively applied in England's courts, defendants do not point to additional public or private considerations that weigh in favor of declining jurisdiction and dismissing the English law claims on forum non conveniens grounds.  Alfadda, 159 F.3d at 46.

Defendants' motion to dismiss on forum non conveniens grounds will therefore be denied.

## C.  Because the Complaint Does Not Adequately Allege Pontiac's Reliance, the Claims Under English Law Will be Dismissed.

Lastly, defendants move to dismiss Pontiac's claims under English law for failure to state a claim under Rule 12(b)(6).  The parties do not dispute that each of the three claims – asserting fraudulent misrepresentation, negligent misrepresentation and a violation of the FSMA – includes reliance as an element.  (Midwinter Dec. ¶¶ 32, 49, 50; Lowe Dec. ¶¶ 32-35.) Defendants urge that the Complaint fails to allege Pontiac's reliance on any claimed misstatement or omission, whereas Pontiac asserts that its allegations are sufficient to satisfy a broad presumption of reliance under English law.

The Complaint does not allege facts that describe Pontiac's reliance upon – or even awareness of – defendants' alleged misrepresentations.  There is no assertion that England employs a fraud-on-the-market theory that presumes a misrepresentation is incorporated into the price of a publicly traded share.  See generally Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008) ("[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.  The public information is reflected in the

market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.").  And although the Complaint states that Pontiac relied on defendant's misrepresentations, "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.

As summarized in the Midwinter Declaration, in order to establish liability arising out of a defendant's misrepresentation, English law requires a plaintiff to demonstrate that it considered the misrepresentation and that it played a role in plaintiff's decision-making process. (Midwinter Dec. ¶¶ 32(a), 33.)  A court begins with a rebuttable presumption that a plaintiff relied on an actionable misrepresentation made with an intent to deceive but the burden of pleading reliance still remains with a plaintiff.  (Midwinter Dec. ¶ 34.)  Where a plaintiff "gave no thought" to the purported misrepresentations and "did not rely upon them," it does not have an actionable claim directed toward the misrepresentation.  Property Alliance Group Ltd v Royal Bank of Scotland plc, [2016] EWHC 3342 ¶ 419 (Ch 2016).[4]

Pontiac does not dispute that the laws of England require some showing of reliance, but it urges that the standard for pleading reliance is permissive and that a plaintiff need not allege evidence of actual reliance.  (Opp. Mem. 41-44.)  In his declaration, Lowe states that a presumption of reliance arises when "a reasonable person might have been influenced" by the misrepresentation.  (Lowe Dec. ¶ 19(2).)  For instance, if a plaintiff enters into an agreement after hearing a defendant's misrepresentation, "'it is a fair inference of fact that he was induced to do so by the statement.'"  (Lowe Dec. ¶ 19(2), quoting Barton v County Natwest Ltd., 1999 WL 477744 (U.K. Ct. App. Civ. Div. 1999).)[5]

---

[4] Available at https://www.bailii.org/ew/cases/EWHC/Ch/2016/3342.html

[5] Pontiac also points to a law review article that observed that the fraud-on-the-market presumption might originate from authority in 19th Century England, though Pontiac does not urge that the presumption should apply to its

The authorities cited in the Lowe Declaration applied a broad presumption of reliance in circumstances different than the one alleged by Pontiac.  In those cases, a plaintiff who had direct dealings with a defendant pursued a course of action after hearing the alleged misrepresentation.  Barton, 1999 WL 477744 (misrepresentation to guarantors about a real property transaction); BV Nederlandse Industrie van Eiprodukten v. Rembrandt Enterprises Inc., [2019] EWCA Civ 596 (U.K. Ct. App. Civ. Div. 2019) (misrepresentation during negotiation about shipment of egg products) (attached at Docket # 105-3 and -4); Zurich Ins. Co. plc v. Hayward, [2016] UKSC 48, 2016 WL 03947558 (misrepresentation about extent of back injury in negotiating a personal-injury settlement).  It was therefore presumed from the circumstances that the plaintiffs relied upon the misrepresentations and acted accordingly.

But in this case, Pontiac does not assert that it had knowledge of any purported misrepresentation at the time it acquired Reckitt's ordinary shares.  Pontiac states, without elaboration, that it reasonably relied on defendants' purported misstatements and omissions when it acquired the shares (Compl't ¶¶ 340, 343, 348, 354), but the allegations are conclusory and do not, for instance, assert that it examined the contents of Reckitt's public filings or was aware of statements made in investor-relations calls.  Because Pontiac does not allege that it had knowledge of any purported misrepresentation, it cannot plausibly allege that it relied on that misrepresentation.  See Property Alliance Grp., [2016] EWHC 3342 ¶ 419.

The Complaint also suggests that Pontiac's reliance is a matter of inference: "To the extent necessary, it is to be inferred from all the facts and matters set out herein that the aforesaid misrepresentations and omissions (a) were made by Defendants with the intention that Pontiac and the Class rely upon them, and (b) induced Pontiac and the Class to acquire and/or

---

claims.  (Opp. Mem. at 42 & n.60, citing Barbara Black, Fraud on the Market: A Criticism of Dispensing With Reliance Requirements in Certain Open Market Transactions, 62 N.C. L. Rev. 435 (1984).)

retain Reckitt ordinary shares . . . ." (Compl't ¶ 343.)  But Pontiac, as the plaintiff, is in the best

position to know whether it had knowledge of and relied upon a misrepresentation at the time it

purchased Reckitt shares.  Its formulaic and conclusory allegations fail to allege reliance.

Because the Complaint does not describe Pontiac's knowledge of a misstatement

and its reliance on the misstatement when it acquired Reckitt shares, Counts III, IV and V will be

dismissed.

CONCLUSION.

Defendants' motions to dismiss are GRANTED as to (1) all claims against

defendants Bellamy and Hennah, (2) the claims of Pontiac asserted in Counts III, IV and V, and

(3) the claim asserted against Thaxter under section 20(a) of the Exchange Act.

The motion to dismiss the Exchange Act claims is DENIED as to the statements

of Thaxter and Kapoor quoted in paragraphs 230, 235, 237, 239, 241, 248 and 250, which also

are imputed to Reckitt.  It is GRANTED as to the statements quoted in paragraphs 222, 223, 225,

228, 232, 243, 245, 252, 254, 256, 259, 261, 264, 266, 267, 268, 269 and the Item 303 violation

asserted in paragraphs 296 to 300.

The Clerk is respectfully directed to terminate the motions and the related letter-

motions.  (Docket # 89, 94, 95, 102, 109.)  The Clerk is also directed to amend the caption to

reflect that plaintiff Pontiac and defendants Bellamy and Hennah have been dismissed as parties

to this case.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
February 28, 2022

- 73 -