**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:20-cv-10041-PKC <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | **MEMORANDUM OF LAW IN** |
| vs. | ) ) ) | **OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A** |
| RECKITT BENCKISER GROUP PLC, et al., | ) | **FOURTH AMENDED COMPLAINT** |
| Defendants. | ) ) | |

**TABLE OF CONTENTS**

I.    Plaintiffs' Motion for Leave to Amend is Futile ................................................................7

    A.    The Proposed Fourth Amended Complaint Does Not Adequately Plead
Reliance by PSP ..................................................................................................7

        1.    PSP's PSLRA Certification Forecloses Reliance ......................................8

        2.    PSP Otherwise Fails Adequately to Allege Reliance in Accordance with
the MTD Order ...........................................................................................9

    B.    The PFAC Fails Adequately to Allege Additional Elements ...............................11

    C.    The PFAC Allegations Concerning an English Law Class Are Also Futile..........16

II.    The Amendment Would Unduly Prejudice the Defendants .............................................17

III.    Conclusion ....................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Anderson v. Greene*,
2017 WL 3503686 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 774 F. App'x 694
(2d Cir. 2019) .................................................................................................................18, 19

*Berman v. Parco*,
986 F. Supp. 195 (S.D.N.Y. 1997) ...................................................................................17

*Cerni v. J.P. Morgan Securities LLC*,
208 F. Supp. 3d 533 (S.D.N.Y. 2016) ..............................................................................18

*Chen-Oster v. Goldman, Sachs & Co.*,
877 F. Supp. 2d 113 (S.D.N.Y. 2012) ..............................................................................16

*Dougherty v. Town of North Hempstead Board of Zoning Appeals*,
282 F.3d 83 (2d Cir. 2002) ..................................................................................................7

*Foman v. Davis*,
371 U.S. 178 (1962) ..........................................................................................................17

*Golden Budha Corp. v. Canadian Land Co.*,
931 F.2d 196 (2d Cir. 1991) .............................................................................................10

*Hunt v. Enzo Biochem, Inc.*,
530 F. Supp. 2d 580 (S.D.N.Y. 2008) ..............................................................................10

*In re 3COM Securities Litigation*,
761 F.Supp. 1411 (N.D. Cal. 1990) ..................................................................................11

*In re Nokia OYJ (Nokia Corp.) Securities Litigation*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006) ..............................................................................18

*Lewis Family Group Fund LP v. JS Barkats PLLC*,
2018 WL 3579844 (S.D.N.Y. July 25, 2018) ..................................................................19

*Lucente v. IBM Corp.*,
310 F.3d 243 (2d Cir. 2002) ................................................................................................7

*Monahan v. N.Y.C. Dep't of Corrections*,
214 F.3d 275 (2d Cir. 2000) .............................................................................................18

*Nightingale Group, LLC v. CW Capital Management, LLC*,
2012 WL 2674539 (S.D.N.Y. July 5, 2012) ....................................................................17

*PI, Inc. v. Quality Products, Inc.*,
  907 F. Supp. 752 (S.D.N.Y. 1995) ...................................................................................17

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
  329 F.3d 64 (2d Cir. 2003)...............................................................................................15

*Property Alliance Group Ltd v. Royal Bank of Scotland plc*,
  [2016] EWHC 3342 (Ch 2016).....................................................................................7, 10

*Ruotolo v. City of New York*,
  514 F.3d 184 (2d Cir. 2008)..............................................................................................17

*Salzberg v. Sciabacucchi*,
  227 A.3d 102 (Del. 2020) ..................................................................................................15

*Schultz v. Commercial Programming Unlimited Inc.*,
  1992 WL 396434 (S.D.N.Y. Dec. 23, 1992) ....................................................................11

*Sly Magazine, LLC v. Weider Publications LLC*,
  241 F.R.D. 527 (S.D.N.Y. 2007) ......................................................................................18

*SRM Global Master Fund Ltd. Partnership v. Bear Stearns Cos. L.L.C.*,
  829 F.3d 173 (2d Cir. 2016)..............................................................................................11

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
  2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) ............16

*Turtur v. Rothschild Registry Int'l Inc.*,
  1993 WL 338205 (S.D.N.Y. Aug. 27, 1993)....................................................................11

*Vine v. Beneficial Finance Co.*,
  374 F.2d 627 (2d Cir. 1967)..............................................................................................17

## STATUTES, RULES, AND REGULATIONS

9 U.S.C. § 2...............................................................................................................................13

15 U.S.C. § 78u–4(a)(2)(A)(iv) ..................................................................................................6

Fed. R. Civ. P. 15........................................................................................................................6

Fed. R. Civ. P. 23...................................................................................................................3, 20

Fed. R. Civ. P. 23(b)(3)..............................................................................................................16

Individual Practices of Judge P. Kevin Castel, Rule 3(A)(i) .......................................................3

**Introduction**

After several rounds of complaint amendments and extensive motion to dismiss briefing, this Court narrowed this case from a sprawling complaint challenging dozens of statements on behalf of putative classes of both purchasers of Reckitt Group American Depository Receipts ("ADRs") (asserting U.S. law claims) and purchasers of ordinary shares (asserting English law claims), to a narrow dispute concerning two challenged documents and a putative class of ADR purchasers asserting U.S. law claims.  Now, notwithstanding that this case is already three years old and that a schedule has long been in place and discovery is well underway, Plaintiffs try to resurrect the dismissed English law claims by introducing a new putative class plaintiff, Public Service Pensions Board ("PSP"), a Cayman Islands pension that claims to have transacted Reckitt Group ordinary shares.  The Court should deny leave to amend.

*First*, the amendment would be futile because PSP fails to plead reliance.  As this Court has already found, English law does not recognize the fraud on the market presumption of reliance that plays a pivotal role in U.S. securities cases—English law plaintiffs must allege their actual reliance on challenged statements, *i.e.,* that they actually read and relied on the challenged statements and therefore had knowledge of them at the time of purchase.  This Court dismissed the claims of the prior English law plaintiff, City of Pontiac General Employees' Retirement System ("Pontiac"), because it could not plead actual reliance.  PSP's assertion of reliance is even weaker.  PSP's Certification pursuant to the Private Securities Litigation Reform Act ("PSLRA") shows that, after the challenged statements, it spent nearly two years *selling shares* and did not buy an additional share until years later, long after the challenged statements were stale and irrelevant.  This trading pattern is antithetical to a showing of reliance where, as here, Plaintiffs' logic is that asserted misstatements made the company's finances appear unduly rosy.

Moreover, PSP does not allege that it actually read the challenged statements—it asserts only that an unnamed investment manager could have done so in accordance with normal practice.

*Second,* even if PSP can plead its own reliance, its attempt to plead an English law class claim fails, which makes amendment futile. As this Court well knows, securities fraud class certification turns on application of the fraud on the market doctrine which, again, does not exist under English law. It would be inefficient and wasteful to allow PSP to assert class allegations that have no hope of certification.

*Third,* the English law claims suffer from other infirmities that render amendment futile. Section 90A of the U.K. Financial Services and Markets Act 2000 ("FSMA") can only apply to particular kinds of documents, which do not include the documents where the challenged statements appear. The negligent misrepresentation claim requires a duty that does not exist here. The fraud claim requires intent to induce reliance, which PSP does not plead.

*Fourth*, the Court should deny amendment by revisiting its prior declination to order arbitration or dismiss based on *forum non conveniens*. As for arbitration, the plain text of the arbitration clause in Reckitt Group's Articles of Association captures PSP's claim against Reckitt Group. Whether English courts have a history of ordering arbitration under similar circumstances (which appears to have given the Court pause during prior motion to dismiss briefing) is not controlling—PSP chose to sue in the U.S. and thus is subject to the Federal Arbitration Act, which instructs U.S. courts to enforce arbitration agreements in accordance with their terms. With respect to *forum non conveniens*, unlike the prior English law plaintiff (Pontiac, a U.S. resident), PSP is a Cayman Islands resident with no asserted connection to this country. There is no reason why this Court should wade into a dispute between a Cayman

Islands resident holding English ordinary shares and an English company concerning English law.

*Finally*, the amendment would be unduly prejudicial.  At minimum, it would require an unanticipated level of detailed discovery into PSP's asserted reliance when discovery is already ongoing.  Worse, if PSP somehow were permitted to assert a class claim, the entire case schedule would warrant reorganization, imposing a multiple of the already significant costs on Defendants.  Defendants agreed to stage class certification last—including after full merits discovery—based on the understanding that Plaintiffs would seek certification of only a U.S. law class.  Given the obvious weakness of any putative English law class, it would make sense to address class certification of at least those claims as soon as possible.  The alternative (*i.e.,* full merits discovery and experts before certification proceedings) would very likely be wasteful for English class claims that facially lack any hope of meeting the Rule 23 predominance requirement.

Thus, the Court should deny leave to amend.[1]

### Background

Nearly three years ago, on July 17, 2019, Plaintiffs filed the original complaint against Reckitt Benckiser Group PLC ("Reckitt Group"), Rakesh Kapoor, Adrian Hennah, Shaun Thaxter, and Adrian Bellamy.  Dkt. No. 1.  Plaintiffs sued on behalf of all purchasers of Reckitt American Depositary Shares from July 28, 2014 through April 9, 2019.  The complaint alleged claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  On January 16, 2020, Plaintiffs filed an amended complaint adding a purchaser

---

[1] It appears that, under this Court's rules, Plaintiffs were required to file a pre-motion letter before filing a motion.  *See* Individual Practices of Judge P. Kevin Castel, Rule 3(A)(i).  Defendants reserve all rights and file this opposition in an abundance of caution, but will of course follow whatever procedural approach this Court prefers to hear the dispute concerning leave to amend.

of Reckitt ordinary shares, Pontiac, for the sole purpose of asserting new claims on behalf of a purported class of ordinary share purchasers for violations of English common law and Section 90A of the FSMA.

Plaintiffs have since filed two further amended complaints. Dkt. Nos. 68, 82. In advance of Defendants' anticipated motion to dismiss the second amended complaint, Defendants' pre-motion letter alerted Plaintiffs that their English law claims "require actual reliance and do not recognize a presumption akin to 'fraud on the market,' which [Plaintiffs] ha[d] not even tried to allege." Dkt. No. 72 at 12. Plaintiffs requested leave to file a third amended complaint, which Defendants did not oppose, and the Court granted. Dkt. Nos. 76, 77. On March 26, 2021, Plaintiffs filed a third amended complaint, which, among other modifications, added (albeit in insufficient fashion) content relating to the reliance element of their English law claims. Dkt. No. 82. Plaintiffs assured Defendants and the Court that this amendment was their last bite at the reliance apple by confirming, "Plaintiffs do not seek leave to amend the [third amended complaint]." Dkt. No. 87 at 1. On June 25, 2021, Defendants moved to dismiss the third amended complaint on numerous grounds, including the insufficiency of Plaintiffs' reliance allegations. Dkt. Nos. 90, 96.

On February 28, 2022, the Court partially granted the motion. Dkt. No. 113 (the "MTD Order"). In addition to dismissing some individual defendants, the Court dismissed all claims regarding numerous subjects, such that the only challenged statements that remain are: (i) a statement by Rakesh Kapoor (former Reckitt Group CEO) on a July 2014 investor call, (ii) several statements by Shaun Thaxter (former RBP president and Indivior CEO) on the same call, and (iii) a statement from Reckitt Group's October 2014 press release containing its financial results for the third quarter of 2014. *See generally* MTD Order.

- 4 -

Most relevant to this motion to amend, the Court dismissed the English law claims. The Court found Pontiac's reliance was a "matter of inference," despite Pontiac, "as the plaintiff, [being] in the best position to know whether it had knowledge of and relied upon" any purported misrepresentation. MTD Order at 72-73. The Court—noting there was "no assertion that England employs a fraud-on-the-market theory," and persuaded by Stephen Midwinter QC's declaration and the English courts' reasoning in the cases Mr. Midwinter cited[2]—held that because Pontiac "does not assert that it had knowledge of any purported misrepresentation at the time it acquired Reckitt's ordinary shares," it cannot plausibly allege that it relied on that misrepresentation. MTD Order at 70-72 (citing Midwinter Decl. and cases cited therein).

The Court thereafter entered a scheduling order and the parties began discovery, which is underway. Dkt. No. 119. Fact discovery is set to close on January 20, 2023. Dkt. No. 119 at 2. Class certification motions are due by October 28, 2022. Dkt. No. 119 at 4.

Plaintiffs now seek leave to amend for the fourth time to attempt to resurrect their English law claims by adding PSP. The proposed fourth amended complaint ("PFAC") adds the following allegations that purport to address reliance:

> 310. PSP's investment manager purchased Reckitt ordinary shares on behalf of PSP. Unlike many investment managers, PSP's investment manager invests (on its clients' behalf) in only approximately 20-40 different companies at any given time. As a result, PSP's investment manager follows the companies in which it invests very closely, including promptly reading its portfolio companies' investor conference-call transcripts and earnings releases. PSP's investment manager also regularly interacts directly with its portfolio companies' management and as a matter of course, PSP's investment manager's Portfolio Managers read each portfolio company's most recent earnings call transcript before doing so.
>
> 311. On July 28, 2014, Reckitt conducted an investor conference call at 7:45 a.m. GMT. Reckitt's website reflects a pdf transcript of this investor call. https://www.reckitt.com/media/958/rb-transcript-q2-2014.pdf. The properties of

---

[2] Stephen Midwinter is an English law expert who previously submitted a declaration (Dkt. No. 92) ("Midwinter Decl.") that Defendants continue to rely on herein.

this pdf document reflect that it was created on July 28, 2014 at approximately 11:43 a.m. (presumably GMT). Although the Portfolio Manager responsible for PSP's Reckitt transactions in 2014 is no longer employed by PSP's investment manager, PSP's investment manager has confirmed that the Portfolio Manager directly spoke with defendants Kapoor and Hennah on July 28, 2014. Reckitt issued an earnings release on October 21, 2014.

312. PSP's investment manager was transacting shares of Reckitt in July 2014 and November 2014. There is no indication, and no other reason to believe, that the Portfolio Manager deviated from PSP's investment manager's standard practice by failing to read the transcript of Reckitt's earnings call from July 28, 2014 or by failing to read Reckitt's October 21, 2014 earnings release on or about each respective day. Moreover, Suboxone, including the duration of its patent exclusivity, was important to PSP's investment manager's analysis of Reckitt, as it represented a significant portion of Reckitt's revenues. Accordingly, upon information and belief, PSP's investment manager (and by extension PSP) relied on Defendants' July 28, 2014 and October 21, 2014 statements.

PFAC ¶¶ 310-12.

Plaintiffs further assert that class treatment is appropriate because they somehow will be able to establish "on a Class-wide basis through common, circumstantial evidence that Plaintiffs would not have purchased Reckitt Securities but for Defendants' uniform misrepresentations and omissions[.]" PFAC ¶ 289.

PSP also filed a PLSRA Certification (Dkt. No. 124-1) disclosing its class period transactions. *See* 15 U.S.C. § 78u–4(a)(2)(A)(iv). Appendix A hereto is a chronology generated by defense counsel that overlays the transactions disclosed in PSP's Certification with the two challenged statements. It shows that: (i) after the challenged statements, PSP's first transactions were a series of *sales* and (ii) PSP did not make a class period purchase until *nearly two years* after the challenged statements.

## Argument

Under Rule 15, the Court denies leave to amend if the amendment would be futile or unduly prejudicial. Here, both are true.

## I.      Plaintiffs' Motion for Leave to Amend is Futile

An amendment is futile where the proposed amended complaint could not withstand a motion to dismiss. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87-88 (2d Cir. 2002); *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). Here, leave to amend is futile for three independent reasons: (i) PSP's reliance allegations are deficient and, regardless, (ii) the allegations seeking class treatment of PSP's claims are deficient; and (iii) the allegations suffer from other infirmities previously identified by Defendants.

### A.      The Proposed Fourth Amended Complaint Does Not Adequately Plead Reliance by PSP

This Court has already held that the English law claims require actual reliance, *i.e.,* reliance in the traditional sense rather than via a fraud on the market presumption (which does not exist under English law). MTD Order at 4, 72. Thus, this Court dismissed Pontiac's claims because the third amended complaint did not describe Pontiac's knowledge of—much less reliance on—any purported misstatement when it acquired Reckitt Group shares. MTD Order at 4 ("because Pontiac does not allege that it knew of any alleged misrepresentation at the time it purchased Reckitt shares, it fails to allege the reliance required to state a claim for relief on [the English law claims]"); MTD Order at 72-73 ("The Complaint also suggests that Pontiac's reliance is a matter of inference[.] But Pontiac, as the plaintiff, is in the best position to know whether it had knowledge of and relied upon a misrepresentation at the time it purchased Reckitt shares. Its formulaic and conclusory allegations fail to allege reliance"); *see also* Midwinter Decl. ¶ 32(a) (citing *Property All. Grp. Ltd v. Royal Bank of Scotland plc*, [2016] EWHC 3342 ¶ 419 (Ch 2016)). PSP's pleading is even worse—not only is PSP unable to plead actual reliance as this Court required, its PSLRA Certification forecloses reliance.

### 1.    PSP's PSLRA Certification Forecloses Reliance

PSP's PSLRA Certification renders its reliance argument unintelligible.  Appendix A shows the problem, which is as follows.  The statements that survived dismissal were July 28, 2014 and October 21, 2014 announcements of financial results that Plaintiffs allege were false because they did not disclose that such results were due in part to an anticompetitive scheme concerning Suboxone Film.  *See* MTD Order at 31 (describing allegations that survived dismissal).  If these allegations were true (they are not, but accepting them *arguendo*), they would mean that the challenged statements could have caused investors to have an unduly rosy view of Reckitt Group's 2014 financial results.  If PSP had, in turn, promptly bought ordinary shares, there could at least be a coherent discussion of whether the challenged statements induced PSP to purchase inflated shares.

But that is not what happened.  Instead, PSP *sold shares* on 23 occasions between November 13, 2014 and July 31, 2015.  *See* Appendix A.[3]  This contradicts any possibility of reliance.  The essence of the claim here is that the challenged statements, by omitting negative information about Reckitt Group's marketing of Suboxone Film, induced investors to *buy* Reckitt shares.  *See* PFAC ¶¶ 223, 237.  *Selling* stock after the challenged statements— consistently and for nearly two years—shows that PSP could not conceivably have relied on Reckitt painting an overly rosy picture of the reasons for the Film's strong sales.

Moreover, while the fact that PSP sold rather than bought is dispositive, the passage of time before PSP made any purchases further confirms the absence of reliance.  PSP did not buy Reckitt Group shares until July 2016.  *See* Appendix A.  The PFAC makes no attempt to plead

---

[3] The PFAC misleadingly tries to obfuscate that these were sales by alleging only that PSP's investment manager was "transacting" shares.  *See* PFAC ¶ 312.

how a July 2016 purchaser of Reckitt Group ordinary shares could have been relying on earnings announcements from 2014. Any assertion of reliance would be implausible. By July 2016, the allegedly falsely described financial results from 2014 were stale and superseded by numerous subsequent announcements of financial results. Further, Reckitt Group had demerged Reckitt Benckiser Pharmaceuticals in December 2014, *see* PFAC ¶ 214, and thereby exited the Suboxone business. Thus, someone choosing to invest in Reckitt Group in July 2016 would have no reason to assign any relevance to revenue that Reckitt Group had earned years before from a business that was no longer part of Reckitt Group.

Accordingly, PSP has failed to adequately plead that it relied on the challenged statements, and amendment would be futile.

### 2. PSP Otherwise Fails Adequately to Allege Reliance in Accordance with the MTD Order

Putting aside PSP's trading pattern that forecloses reliance, Plaintiffs fail to remedy the defects that the Court identified in dismissing Pontiac's claim. In briefing the motion to dismiss, Defendants laid out the settled law applicable to Plaintiffs' English law claims based on English Common Law and Section 90A of the FSMA. Plaintiffs' English law claims all require the plaintiff to demonstrate that it considered the alleged misrepresentation and that the alleged misrepresentation played a role in the plaintiff's decision-making process in purchasing the security. *See* Midwinter Decl. ¶¶ 32(a), 33. Plaintiffs make "no assertion that England employs a fraud-on-the-market theory," nor does it—the burden of pleading and ultimately proving reliance still remains with the plaintiff. *See* Midwinter Decl. ¶ 34; MTD Order at 70. Defendants then explained, and the Court agreed, that Plaintiffs' allegations regarding reliance fell well short of what English law requires, because the third amended complaint did not describe plaintiff Pontiac's knowledge of—much less reliance on—any purported misstatement

when it acquired Reckitt Group shares.  *See* Midwinter Decl. ¶ 32(a) (citing [2016] EWHC 3342 ¶ 419); MTD Order at 4, 72.

Far from remedying these defects, the PFAC falls even further short of the applicable standards.  The PFAC does not assert that PSP knew about any challenged statement, but instead posits a causal chain requiring numerous inferences:  PSP's investment manager (1) "typically" reads the transcript of earning calls and earnings releases of companies in which it invests; (2) spoke with Mr. Kapoor and Mr. Hennah on the same day as the Reckitt Group's July 28, 2014 earnings call; and (3) therefore likely read Defendants' July 28, 2014 and October 21, 2014 statements.  *See* PFAC ¶¶ 310-12.  Indeed, Plaintiffs make clear they are asking the Court to infer PSP read and relied on the documents central to this case not because of any evidence in support of such a finding, but instead because of a lack of evidence to the contrary.  *See* PFAC ¶ 312 ("There is no indication, and no other reason to believe, that the [PSP employee] deviated from PSP's investment manager's standard practice.").

Plaintiffs' new attenuated reliance theory is, like their prior one with Pontiac, another insufficient "matter of inference," despite PSP's position as best suited "to know whether it had knowledge of and relied upon a misrepresentation at the time it purchased Reckitt shares."  *See* MTD Order at 72-73.  Moreover, without any presumption permitted by fraud on the market, Plaintiffs must plead "actual, direct reliance on the misrepresentation or omission," as they would in a common law fraud case.[4]  *See Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d

---

[4] Federal courts do not apply fraud on the market outside of a securities fraud claim, even if such other claim has a reliance element.  *See, e.g.*, *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 598 (S.D.N.Y. 2008) ("[C]ourts in this Circuit have consistently held that while the 'fraud on the market' theory and the rebuttable presumption of reliance is available to plaintiffs alleging claims under the federal securities laws, it is still not available to those alleging common law fraud. Rather, those plaintiffs must continue to demonstrate direct and actual reliance on the alleged misrepresentations."); *see also, Turtur v. Rothschild Registry Int'l Inc.*, 1993 WL 338205, at *7 (S.D.N.Y. Aug. 27, 1993) ("Because common law fraud claims must be supported by a showing of direct reliance on the misrepresentation or omission, they are distinct from actions brought under the federal securities laws, which 'permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market.' "); *Schultz v.*

196, 202 (2d Cir. 1991).  Plaintiffs cannot meet this high bar.  *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 175, 178 (2d Cir. 2016) (Allegations that plaintiff relied on Defendants' misrepresentations "in deciding whether it should purchase securities" and "whether it should liquidate, retain or increase its investment" in defendant company were insufficient because these allegations did not "specifically plead, as necessary to [plaintiff's] common law fraud claims, that [plaintiff] actually purchased or sold stock, or actually entered into or unwound a swap agreement, in reliance on the defendants' misrepresentations.").

Indeed, even if one were to draw the unwarranted inference that PSP's investment manager read the July 2014 transcript and October 2014 release, that would not constitute reliance.  The challenged statements are isolated lines from those larger documents.  *See* PFAC ¶¶ 223, 226, 228, 230, 232, 235, 237.  PSP makes no attempt to plead that the unidentified investment manager noted or focused on the challenged statements, attached any significance to them, or took any action as a result.  Such pleading would be particularly important to render reliance plausible where as here, the one thing that is clear is the investment manager's next move after the challenged statements was to *sell, not buy*.

Thus, PSP's attempt to plead reliance does not accord with the Court's articulation of the reliance standard in the MTD Order.

**B.      The PFAC Fails Adequately to Allege Additional Elements**

Because the Court dismissed Plaintiffs' English law claims on reliance grounds, it did not

---

*Commercial Programming Unlimited Inc.*, 1992 WL 396434, at *4 (S.D.N.Y. Dec. 23, 1992) (stating that "this Court will not permit [the plaintiff] to circumvent the [reliance] requirement by infusing the fraud on the market theory into his common law fraud action" and dismissing the common law fraud claim); *Cf.*, *In re 3COM Sec. Litig.*, 761 F. Supp. 1411, 1419 (N.D. Cal. 1990) (finding that plaintiff adequately pled a 10b–5 claim, but dismissing common law fraud claim because plaintiff had not adequately pled actual reliance).

consider several other arguments that render the PFAC futile.  Plaintiffs' English common law fraudulent misrepresentation and deceit claim requires Defendants' intention that the Plaintiff would rely on the representation, which Plaintiffs again have not adequately plead.  Midwinter Decl. ¶ 31.  Plaintiffs' FSMA claim requires Defendants to have published information in "a document required to be published by the EU Transparency Directive."  Midwinter Decl. ¶¶ 39(a), 42-44.  Plaintiffs have not plead that the EU Transparency Directive required publication of the July 2014 investor call transcript or the October 2014 earnings release (from which the remaining claims arise).  Lastly, Plaintiffs' English common law negligent misrepresentation and misstatement claim requires a duty of care Defendants did not owe to plaintiff.   Midwinter Decl. ¶¶ 52-59.  Imposing a duty of care in relation to statements made to a broad audience in press releases and conference calls about the company's general performance would impose a broader duty of care "well outside the type of case in which a duty of care has been found to exist to date."  Midwinter Decl. ¶ 57.  These elements remain insufficiently pled in the PFAC for these reasons and those additional reasons set forth in Mr. Midwinter's Declaration, Dkt. No. 92.

Additionally, the Court should revisit Defendants' prior arguments concerning arbitration, the forum selection clause, and *forum non conveniens*.  Dkt. No. 90 at 29-32.  Although Defendants acknowledge that the Court did not accept these arguments previously, the Court should do so now.  For brevity and to avoid repetition, Defendants incorporate by reference their prior briefing, and add the following points:

**Arbitration**:  With respect to the arbitration clause appearing in Article 132 of Reckitt Group's Articles of Association, Defendants respectfully submit that the Court should have ordered Plaintiffs to arbitrate their claims against Reckitt Group based on the plain language of

the Articles of Association.  Article 132 by its terms applies all disputes "between a shareholder in that shareholder's capacity as such and the company."  This case is squarely such a dispute.

As Defendants understand the MTD Order, the Court was given pause because the English law experts did not cite instances in which English courts have ordered arbitration under similar circumstances.  MTD Order at 63-64.  However, as an initial matter, neither of the English law experts cited instances in which an English court declined to order arbitration under similar circumstances, so it could simply be that the issue of whether the claims here are arbitrable is novel (which in turn would strengthen a *forum non conveniens* argument as an English court should be the first to entertain it).  Further, because PSP chose to sue in the U.S., it is subject to the Federal Arbitration Act, which unambiguously renders arbitration clauses enforceable in accordance with their terms.  9 U.S.C. § 2.  Thus, whether English courts applying English policies towards arbitration would order arbitration is beside the point because by suing in this country, PSP subjected itself to the FAA requiring arbitration in accordance with the terms of arbitration agreements.  Therefore, even if PSP had adequately pled its claims—which it has not—the Court should order arbitration of the English law claims against Reckitt Group.

**Forum Selection Clause**:  With respect to the forum selection clause appearing in Article 133 of Reckitt Group's Articles of Association, Defendants respectfully submit that the Court should have found, in accordance with the clause, that an English forum was required. The Court reasoned that the forum selection clause in Article 133 applies only if Article 132 (concerning arbitration, discussed above) is unenforceable, and then reasoned that Article 133 does not apply because the arbitration clause is "valid and enforceable, but [the English claims] merely fall beyond its reach."  MTD Order at 67.  Defendants respectfully ask that the Court reconsider its reasoning.  As noted above, the arbitration clause by its plain terms applies to this

case.  Although they were clever enough to avoid the term "unenforceable," Plaintiffs were in substance arguing that the arbitration clause was unenforceable against them because English courts would not enforce such a clause against a shareholder.  MTD Order at 63-64.  Stated differently, the problem here is not that the arbitration clause fails by its plain meaning to apply—the clause covers disputes between shareholders and the company—the Court chose not to enforce a clause that facially applied.  Unenforceability, in turn, should have triggered the forum selection clause.

**Forum Non Conveniens:**  The Court also should have otherwise accepted Defendants' *forum non conveniens* argument that the English law claims belong in an English court.  MTD Order at 67-70.  Circumstances have changed and the Court should revisit its reasoning.  *First*, the Court previously stated that Defendants' failure to identify a "particular tribunal in England" "weighs heavily" against dismissal.  MTD Order at 68.  Defendants did not identify a particular court because they believed the Article 132 of the Articles of Association already does so, *i.e.*, it states that a plaintiff may proceed in "the courts of England and Wales."  MTD Order at 66 (quoting Article 132).  But, to moot the problem, as just one example from among the courts PSP could choose, the High Court of Justice's Commercial Court in the Queen's Bench would have jurisdiction to hear the dispute.

*Second*, the Court found the potential inclusion of foreign shareholders in a putative class to be "misplaced at the Rule 12(b)(6) stage" because "[n]o class has been certified."  MTD Order at 68.  However, this time the problem is different and more immediate because Pontiac (the prior English law plaintiff) was a U.S. resident (*see* Third Amended Complaint ¶ 38) rendering the prior dispute in some sense local, whereas PSP is a Cayman Island resident with no asserted connection to the United States.  *See* PFAC ¶ 38.  Thus, even absent class certification, the Court

is now being asked to adjudicate a dispute that has no relevance at all to the United States, *i.e.,* a dispute between a Cayman Islands resident and an English company arising under English law relating to a transaction on an English stock exchange.

*Finally,* the Court recognized that the need to interpret foreign law presented a "closer question" vis-a-vis *forum non conveniens* but questioned whether the case involved any novel issues of foreign law.  MTD Order at 68-70.  Respectfully, the Court should not have paused on the issue of whether the case raises novel questions of foreign law—the need to apply foreign law *at all* weighs in favor of dismissal under controlling authority.  *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 76 (2d Cir. 2003) (*forum non conveniens* dismissal affirmed where overwhelming majority of Plaintiffs' claims arose under English law, with no discussion of whether such claims raised novel issues).  Further, to the extent the presence of novel issues is relevant, the briefing to date has already highlighted one: applicability of the arbitration clause.  If Plaintiffs' English law expert is to be believed, English courts have not entertained whether Articles of Association can impose arbitration requirements on shareholders in cases such as this one.[5]  Moreover, while Defendants should not be expected to predict at this early stage all novel legal issues that will arise, it is obvious that PSP will as this case proceeds try to wade into uncharted waters under English law.  There is no fraud on the market doctrine under English law, so any attempt to certify an English law class should be dead on arrival because of the predominance requirement of Rule 23(b)(3).  *See infra* § I.B.  Presumably, Plaintiffs will not lie down and accept that result, and will instead try to make novel use of

---

[5] Analogously, when courts in this country several years ago had to decide whether a Delaware corporation's Certification of Incorporation can include a forum selection clause that binds shareholders to sue only in certain courts, it was a highly novel issue that went to the Delaware Supreme Court.  *See Salzberg v. Sciabacucchi*, 227 A.3d 102 (Del. 2020).  It would have been absurd—and done nothing to advance U.S. law—for an English court to take the lead in resolving that question.  The same logic applies here.

English law to undermine or distort the actual reliance requirement of English law to somehow apply across a class without the need for individualized inquiry.

Thus, the Court should deny the amendment.

### C.    The PFAC Allegations Concerning an English Law Class Are Also Futile

Even if PSP somehow pled reliance with respect to their own securities purchases, their class allegations are futile.  The need to prove actual reliance for each putative class member means Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement.  *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *12 (S.D.N.Y. Aug. 1, 2006) ("[W]hen plaintiffs must individually prove reliance – an element of their Rule 10b-5 material misrepresentation claim – the putative class action fails the predominance requirement."), *aff'd*, 546 F.3d 196 (2d Cir. 2008).  Indeed, the very fact that PSP had to attempt (albeit unsuccessfully) to plead the details of their reliance spotlights the problem.  Were the case to proceed, highly relevant evidence would include whether PSP's unnamed investment manager actually read the documents containing the challenged statements, whether that person attached any significance to the challenged statements, what that person did in response, etc.  Those same individualized questions would arise for every single class member.

PSP will predictably try to punt the problem by arguing that class certification comes later in the case.  However, even at the pleading stage courts do not accept class certification allegations that are deficient as a matter of law.  *See Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (holding sufficiency of class allegations may be determined by a motion to strike where plaintiffs' class allegations fail as matter of law).  This rule makes sense:  if PSP has its way, the parties will spend months' worth of time and vast resources exploring individualized reliance issues relating to PSP and putative class members,

associated expert discovery, and briefing, all to reach the inevitable conclusion that the English law claims are not certifiable.

Thus, even if this court allows PSP to join this case, it should not permit PSP to amend to assert allegations on a class basis.

## II.     The Amendment Would Unduly Prejudice the Defendants

The Supreme Court and Second Circuit have recognized leave to amend is properly denied in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [and] undue prejudice to the opposing party by virtue of the allowance of the amendment[.]'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Denial of leave to amend for undue delay is particularly appropriate when the plaintiff had the information supporting the amendment *before* briefing on the motion to dismiss is completed, but waited to seek leave.  *See PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 764-65 (S.D.N.Y. 1995); *see, e.g.*, *Nightingale Grp., LLC v. CW Cap. Mgmt., LLC*, 2012 WL 2674539, at *11 (S.D.N.Y. July 5, 2012) (denying leave to amend in part because "[c]ourts in this district 'may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay.'") (quoting *Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997)).   In *Vine v. Beneficial Finance Co.*, the Second Circuit found that it was "certainly within the district court's discretion" to deny plaintiff leave to file a second amended complaint, where "one basis for denial of leave to amend was the bad faith of appellant in waiting to see how he would fare on the prior motion to dismiss." 374 F.2d 627, 636-37 (2d Cir. 1967) (district court denied leave to amend on ground that "[t]he new information alleged in the [proposed second amended] complaint was within plaintiff's knowledge before argument of the motion to dismiss the first

amended complaint"); *see also Cerni v. J.P. Morgan Sec. LLC*, 208 F. Supp. 3d 533, 544 (S.D.N.Y. 2016) (finding plaintiff "had the facts relevant to [its proposed amendments] all along," and a "busy district court need not allow itself to be imposed upon by the presentation of theories seriatim" (citation omitted)).

These cases are squarely on point and their reasoning warrants the same results here. Defendants' prior briefing put Plaintiffs on notice of their pleading deficiencies including the need to plead reliance under English law. If they wanted to attempt to insert an English law plaintiff who could make some claim of actual reliance, they could have done so at any time. Instead, they chose to see how they would fare on a motion to dismiss with Pontiac and only now after losing wish to inject PSP. However, Plaintiffs are not permitted to "'hedge their bets' by holding such evidence back in the hopes of having another bite of the proverbial apple." *In re Nokia OYJ (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 409 (S.D.N.Y. 2006).

Further, to determine whether a defendant is unduly prejudiced by an amended complaint, a court must consider whether the proposed amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)). "'Often, as here, the concepts of undue delay and prejudice are interrelated.'" *Anderson v. Greene*, 2017 WL 3503686, at *14 (S.D.N.Y. Aug. 16, 2017) (quoting *Sly Mag., LLC v. Weider Publ'ns LLC*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007)), *aff'd*, 774 F. App'x 694 (2d Cir. 2019). And "the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Id.* (quotation marks and alterations omitted).

Here, prejudice manifests in several ways.  *First*, Defendants would have to "expend additional time and money to defend against the new allegations*," Lewis Family Group Fund LP v. JS Barkats PLLC*, 2018 WL 3579844, at *3 (S.D.N.Y. July 25, 2018), after having already fully briefed a motion to dismiss and/or stay, produced over 40,000 pages in response to Plaintiffs' forty-four requests for production, reviewed roughly 2,000 documents responsive to their own requests for production, and met and conferred with Plaintiffs on multiple occasions to negotiate the parameters of discovery.[6]  Defendants would have to seek additional discovery relating to PSP's reliance in anticipation of a motion to strike Plaintiffs' class allegations as well as other dispositive motions.  The parties are less than two months away from the deadline for substantially completing their document productions.  Dkt. No. 119 at 4.  Courts have recognized that the necessity for additional motion practice, coupled with undue delay in seeking amendment, establishes prejudice; that is also so even when, far from this case's procedural posture, discovery has not commenced.  *See Anderson*, 2017 WL 3503686, at *14-15 (concluding that proposed pre-discovery amendment would prejudice defendant where "Plaintiff has deliberately adopted a 'moving target' approach to his pleadings, necessitating additional motion practice").

*Second*, were PSP to enter this case as a class plaintiff, it would multiply class discovery. For the U.S. securities claims, there is generally little point in taking discovery concerning putative class members because they will rely on the fraud on the market doctrine which, if applicable, renders irrelevant whether they read the challenged disclosures.  For the English law claims, showing that the experiences of putative class members varied will become highly

---

[6] Plaintiffs are incorrect that "[n]o document productions have been made to date."  Dkt. No. 123 at 6.  Defendants made their first production on June 17, 2022.

relevant.  Class discovery would likely prove, for instance, that many putative English law class members did not read the challenged documents at all, others did not believe them, and myriad other permutations.  This is all discovery that would be unnecessary absent amendment.

*Finally,* if the Court were to allow PSP to pursue a class claim, a substantial revision to the scheduling order would be warranted.  Defendants previously agreed to stage class certification late in the case and after full fact and expert discovery in reliance on the proposition that there was only a U.S. law class.  As this court well knows, the issues relevant to class certification of the U.S. claim likely turn on whether the fraud on the market doctrine applies— largely an expert issue.  That landscape changes dramatically with PSP in the case.  As described above, it is highly doubtful that PSP can meet the requirements of Rule 23.  Thus, before expending resources on merits discovery and damage experts relating to English class claims, it will make sense to test whether an English class is viable.  In other words, it will make sense to reorder the schedule to test class certification—at least of the English claims—sooner rather than later, and certainly before the parties expend large sums on the merits of such claims.  Given that Defendants have already substantially relied on the existing schedule—including in prosecuting discovery and selecting and working with their experts—the introduction of English class claims at this juncture would be unduly prejudicial.

 Thus, the Court should also deny the amendment based on undue prejudice.

## III.    Conclusion

Plaintiffs have now had almost three years and six full opportunities to state their case: in their opening complaint, in their subsequent three amended complaints, in their brief in opposition to Defendants' motion to dismiss, and in their proposed fourth amended complaint. Plaintiffs have failed every time to adequately plead their English law claims.  There is no reason to give Plaintiffs yet another chance.  Leave to amend should be denied.

Dated: July 5, 2022                                    Respectfully submitted,


  */s/ Michael G. Bongiorno*                            */s/ Paul A. Straus*

**WILMER CUTLER PICKERING**               **KING & SPALDING LLP**
**HALE AND DORR LLP**                     Israel Dahan
Michael G. Bongiorno                      Richard T. Marooney
7 World Trade Center                      Paul A. Straus
250 Greenwich Street                      1185 Avenue of the Americas
New York, New York 10007                  New York, NY 10036
212/230-8800 (t)                          212/556-2100 (t)
212/230-8888 (f)                          212/556-2222 (f)
michael.bongiorno@wilmerhale.com          idahan@kslaw.com
                                          rmarooney@kslaw.com
Timothy J. Perla                          pstraus@kslaw.com
60 State Street
Boston, MA 02109                          *Counsel for Defendant Shaun Thaxter*
617/526-6000 (t)
617/526-5000 (f)
timothy.perla@wilmerhale.com


Jessica L. Lewis
1 Front Street
Suite 3500
San Francisco, CA 94111
628/235-1002 (t)
628/235-1001 (f)
jessica.lewis@wilmerhale.com


*Counsel for Defendants Reckitt*
*Benckiser Group PLC and*
*Rakesh Kapoor*

**Appendix A – PSP Class Period Purchases and Sales[7]**

| Date | Event |
|---|---|
| 7/28/2014 | Challenged statement (investor call) |
| 10/21/2014 | Challenged statement (earnings release) |
| 11/13/2014 | Sale by PSP |
| 11/14/2014 | Sale by PSP |
| 11/17/2014 | Sale by PSP |
| 11/18/2014 | Sale by PSP |
| 11/19/2014 | Sale by PSP |
| 11/20/2014 | Sale by PSP |
| 11/21/2014 | Sale by PSP |
| 11/24/2014 | Sale by PSP |
| 11/24/2014 | Sale by PSP |
| 11/25/2014 | Sale by PSP |
| 11/26/2014 | Sale by PSP |
| 11/27/2014 | Sale by PSP |
| 11/27/2014 | Sale by PSP |
| 11/28/2014 | Sale by PSP |
| 11/28/2014 | Sale by PSP |
| 11/28/2014 | Sale by PSP |
| 11/28/2014 | Sale by PSP |
| 6/9/2015 | Sale by PSP |
| 7/29/2015 | Sale by PSP |
| 7/30/2015 | Sale by PSP |
| 7/30/2015 | Sale by PSP |
| 7/30/2015 | Sale by PSP |
| 7/31/2015 | Sale by PSP |
| 7/12/2016 | Purchase by PSP |
| 7/19/2017 | Purchase by PSP |
| 10/18/2017 | Purchase by PSP |
| 10/18/2017 | Purchase by PSP |
| 10/18/2017 | Purchase by PSP |
| 10/18/2017 | Purchase by PSP |
| 10/19/2017 | Purchase by PSP |
| 10/19/2017 | Purchase by PSP |
| 10/19/2017 | Purchase by PSP |
| 10/20/2017 | Purchase by PSP |
| 10/20/2017 | Purchase by PSP |
| 1/17/2018 | Purchase by PSP |
| 1/18/2018 | Purchase by PSP |
| 1/18/2018 | Purchase by PSP |
| 1/18/2018 | Purchase by PSP |
| 1/18/2018 | Purchase by PSP |
| 1/19/2018 | Purchase by PSP |
| 1/19/2018 | Purchase by PSP |
| 1/22/2018 | Purchase by PSP |
| 1/22/2018 | Purchase by PSP |
| 1/22/2018 | Purchase by PSP |
| 3/14/2018 | Sale by PSP |
| 6/18/2018 | Purchase by PSP |
| 6/19/2018 | Purchase by PSP |
| 6/19/2018 | Purchase by PSP |
| 6/20/2018 | Purchase by PSP |
| 3/21/2019 | Purchase by PSP |

---

[7] Source: *Certification of Named Plaintiff Pursuant to Federal Securities Laws,* Docket No. 124-1.