UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

CITY OF STERLING HEIGHTS POLICE &  :   Civil Action No. 1:20-cv-10041-PKC
FIRE RETIREMENT SYSTEM, Individually  :
and on Behalf of All Others Similarly Situated, :   <u>CLASS ACTION</u>
           :
         Plaintiff, :   DECLARATION OF ALAN I. ELLMAN IN
           :   SUPPORT OF: (1) PLAINTIFFS' MOTION
   vs. :   FOR FINAL APPROVAL OF CLASS
           :   ACTION SETTLEMENT AND APPROVAL
RECKITT BENCKISER GROUP PLC,  :   OF PLAN OF ALLOCATION; AND
RAKESH KAPOOR, and SHAUN  :   (2) LEAD COUNSEL'S MOTION FOR AN
THAXTER,  :   AWARD OF ATTORNEYS' FEES AND
           :   EXPENSES AND AN AWARD TO LEAD
        Defendants. :   PLAINTIFF PURSUANT TO 15 U.S.C. §78u-
           :   4(a)(4)

————————————————————— x

4873-4815-0631.v1

ALAN I. ELLMAN hereby declares under penalty of perjury as follows:

1.    I am an attorney duly licensed to practice law in the State of New York and am admitted to practice in this Court.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), Lead Counsel for the plaintiffs in the above-captioned action ("Action" or "Litigation").

2.    I respectfully submit this Declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure, in support of: (a) Plaintiffs' motion for final approval of the settlement of this Action; (b) Plaintiffs' motion for approval of the proposed Plan of Allocation;[1] and (c) Lead Counsel's application for an award of attorneys' fees and expenses, including an award to Lead Plaintiff for its time representing the Class.

3.    I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings, and have knowledge of the matters set forth herein based upon my active participation in the Action and the supervision of, or communications with, other individuals who helped prosecute the Action.

4.    The plaintiffs in this Action are Lead Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") and Plaintiff City of Sterling Heights Police & Fire Retirement System ("Sterling Heights") (collectively, "Plaintiffs").  The defendants are Reckitt Benckiser Group plc ("Reckitt" or the "Company"), Rakesh Kapoor, and Shaun Thaxter (collectively, "Defendants," and together with Plaintiffs, the "Parties").  Plaintiffs allege claims against Defendants under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, on behalf of a Class defined as all Persons who purchased or

_____

[1]   Capitalized terms not otherwise defined herein have the same meanings as that ascribed to them in the Stipulation of Settlement (ECF 162) (the "Stipulation").

- 1 -

otherwise acquired Reckitt's American Depositary Shares ("ADSs") during the period from July 28, 2014 through April 9, 2019, inclusive (the "Class Period"), and were damaged thereby.

5. Plaintiffs have entered into a settlement, on behalf of themselves and the other Members of the Class, with Defendants, which provides a recovery of $19,600,000 in cash to resolve this securities class action against all Defendants (the "Settlement"). The Settlement is described in a settlement agreement entered into by all Parties dated March 10, 2023 (the "Stipulation"), and previously filed with the Court. ECF 162.

6. This Declaration sets forth the nature of the claims asserted, the principal proceedings in the Action, the legal services provided by Lead Counsel, the settlement negotiations between the Parties, and also demonstrates why the Settlement and Plan of Allocation are fair, reasonable, adequate and in the best interests of the Class, and why the application for attorneys' fees and expenses is reasonable and should be approved by this Court.

7. The Settlement is fair because, among other things: (i) it was reached with the assistance of a nationally recognized mediator; (ii) it was negotiated at arm's length by highly experienced, determined counsel; (iii) counsel came into the mediation negotiations furnished with a considerable wealth of factual and legal information about the strengths and weaknesses of the case, enabling them to make a precise evaluation of the expected value of continued litigation; (iv) the Settlement was approved by the Parties and, to date, no Class Member has objected and only one opt out has been received; and (v) the Settlement value is excellent: ten times greater than the median recovery for comparable cases, as detailed further below.

8. The application for attorneys' fees in the amount of 27.5% of the Settlement Amount, plus expenses in the amount of $574,923.16, plus interest earned on both, is reasonable in light of Lead Counsel's considerable efforts in creating this substantial benefit on behalf of the Class, and as

4873-4815-0631.v1

recognition for the risks faced and overcome.  The details of these circumstances are set forth in the sections that follow.

## I.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

9.    Prior to 2015, Reckitt maintained a pharmaceutical division called Reckitt Benckiser Pharmaceuticals Inc. ("RBP").[2]  ¶¶48-50.  Virtually all of RBP's U.S. net revenue came from Suboxone Sublingual Tablets ("Tablets"), an orally administered drug that facilitates opioid-addiction treatment by reducing withdrawal symptoms.  ¶¶91-92.  RBP enjoyed exclusivity over Tablets, akin to patent protection, until 2009. ¶¶94-95.  Reckitt predicted it would lose 80% of that revenue to generic competitor drugs at the end of the exclusivity period.  ¶98.

10.    To mitigate the potential impact of generic competition, Reckitt developed Suboxone Sublingual Film ("Film") as a patent-protected replacement for Tablets.  ¶¶97-98.  In so doing, Defendants engaged in an anticompetitive practice known as "product hopping," whereby a company tweaks its product slightly without any actual improvements, and then applies for a new patent with the intent of keeping its market share intact.  ¶110.

11.    When a pharmacist fills a prescription for a branded drug, laws in all 50 states generally allow or require the pharmacist to dispense a therapeutically equivalent, or "AB-rated," generic version of the drug instead of the more expensive branded drug.  ¶¶86-87.  Defendants knew that, due to the different dosage forms, generic Tablets could not be considered AB-rated to Film and, therefore, pharmacists could not legally substitute the less-expensive, generic Tablets when presented with a prescription for Film.  ¶100.

---

[2]    On December 23, 2014, RBP was demerged from Reckitt and became a standalone public entity called Indivior Inc. ("Indivior").  ¶48.  Unless otherwise noted, all "¶___" references are to Plaintiff's Third Amended Complaint.  ECF 82.

- 3 -

12.     But Defendants could only exploit this distinction if they could convince physicians and patients to switch to Film before generic Tablets reached the market. ¶101. Between May 2009 and August 2010, RBP managers drafted marketing plans for Film that included messages that Film was "a more responsible medication from a public health perspective," was a "less divertible/abusable formulation," and had a "lower risk of child exposure" – even though there were no scientific studies to establish these claims. ¶116. In fact, Defendants knew Film might even be *more dangerous* than Tablets. ¶¶123, 127. Nevertheless, RBP instructed its salespeople to raise "diversion and misuse and pediatric safety" in sales presentations to physicians. ¶¶128, 130-146, 204.

13.     In addition to aggressively promoting Film, Reckitt also actively undermined the market for Tablets. On September 18, 2012, Reckitt and RBP sent a "Notice of Discontinuance" of Tablets to the U.S. Food and Drug Administration ("FDA"), stating that the reason for the discontinuance was "increasing concerns regarding pediatric exposure to" Tablets. ¶156. And on September 25, 2012, Reckitt submitted a citizen petition to the FDA asking it not to approve generic versions of Tablets, also due to supposed "safety concerns." ¶157. The FDA was tied up for months considering this frivolous petition, delaying entry of generic Tablets into the market and giving Reckitt more time to convert patients and physicians to Film. ¶13. Eventually, the FDA concluded that the withdrawal of Tablets for safety reasons was unnecessary. ¶164. But by that point, Reckitt had already achieved what it had set out to do: dry up the Tablet market. By the time generic Tablets entered the market in 2013, 85% of Suboxone prescriptions were being written for Film. ¶207.

14.     Reckitt CEO Rakesh Kapoor and RBP/Indivior CEO Shaun Thaxter knew that Film's success was attributable not to any actual superiority over Tablets, but rather to Reckitt's fraudulent marketing campaign. *See, e.g.*, ¶¶108, 122, 126-128, 133-134, 148, 212. Moreover, they were

- 4 -

aware that their scheme engendered the potential for imminent liability. *See* ¶¶16, 217-218. Yet they consistently touted the superiority of Film in press releases and conference calls with investors. For instance, in an analyst call on July 28, 2014, Kapoor misleadingly stated that RBP had "substantial, I would say, near-term cash flows, mainly from its Suboxone franchise," and that RBP had "strong defenses" against "competitive pressure" because of its intellectual property, patient preferences and "pre-op references." ¶230.

15.    During the call, Thaxter misleadingly stated that the market's conversion from Tablets to Film was due to "the preference of the patient for the [F]ilm," that patients "liked it, they preferred it" and that "physicians were observing a superior treatment outcome." ¶235. He added that "the data has already demonstrated that [the Film] is very clearly the preferred product, not only by patients, not only by physicians, but also by payers." ¶237. Thaxter doubled down on this narrative in response to an audience member question, stating that "we're not in the business of forcing the market or patients to do anything. I think that we put the film proposition out there for patients and physicians, and we stated our case as to why we thought it was a better technology." ¶248.

16.    The truth began to emerge on July 24, 2017, when Reckitt announced that it had recorded a £318 million charge related to ongoing U.S. Department of Justice ("DOJ") and Federal Trade Commission ("FTC") investigations into its former RBP operations. ¶275. On this news, the price of Reckitt ADSs fell 5%. *Id.* On February 19, 2018, Reckitt announced that it had recorded an exceptional charge of £296 million due to the investigations, and that the investigation now also involved the California Department of Insurance. ¶278. The price of Reckitt ADSs declined more than 10% on this news. *Id.* On April 9, 2019 (the last day of the Class Period), a grand jury indicted Indivior on charges of healthcare fraud, wire fraud, mail fraud, and conspiracy, in connection with

- 5 -

the marketing and promotion practices, pediatric safety claims, and overprescribing of Film and/or Tablets by certain physicians. ¶279. On this news, the price of Reckitt ADSs declined more than 6%. *Id*.

17. After the Class Period, on July 11, 2019, Reckitt agreed to settle the federal investigations into its marketing and sale of Film for $1.4 billion. ¶280. On June 30, 2020, Thaxter pleaded guilty to an Information charging him with causing "misbranded" Film to be introduced to interstate commerce, and was sentenced later that year to six months in prison. ¶288. On July 24, 2020, Indivior Solutions, a subsidiary of Indivior, pleaded guilty to a similar felony, and was sentenced later that year to pay $289 million in criminal penalties. ¶290. Indivior itself, also on July 24, 2020, entered into civil settlement agreements with the DOJ and FTC, agreeing to pay the United States and certain participating states $300 million to resolve allegations related to its role in the Film scheme. ¶291. In total, the Indivior entities paid a collective $600 million in settlements. ¶290.

## II.    HISTORY OF THE LITIGATION

### A.    Commencement of the Action and Appointment of Lead Plaintiff

18. On July 15, 2019, Sterling Heights filed this class action in the United States District Court for the District of New Jersey. *See* ECF 1. The complaint alleged that Defendants violated §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by deceiving investors about RBP's illegal activities. In addition to Reckitt, Kapoor, and Thaxter, the following were also named as defendants: Adrian Bellamy, who served as the Chairman of the Board of Directors of Reckitt from 2003 until May 2018; and Adrian Hennah, who served as CFO of Reckitt from February 2013 until October 2020, and, for a subset of that timespan, also as a director of Indivior.

- 6 -

19.    No Reckitt investors other than Sterling Heights filed suit alleging federal securities claims.

20.    On September 13, 2019, Birmingham moved, pursuant to the PSLRA, for appointment as Lead Plaintiff.  ECF 20.  Birmingham's motion was granted two weeks later on September 26, 2019.  ECF 28.

## B.    Amended Complaint

21.    Plaintiffs filed the first amended complaint on January 16, 2020.  ECF 37.  In addition to the federal securities claims brought in the initial complaint, the first amended complaint also brought claims under English law (the "English Law Claims").  *See id.* at 2.  The English Law Claims asserted common law fraud and conspiracy to commit fraud, common law negligent misrepresentation and misstatement, and a statutory count pursuant to Section 90A of the U.K. Financial Services and Markets Act 2000 for misrepresentations in reports and statements published in the discharge of managerial responsibilities.  *See id.* at 75-79.  The first amended complaint also joined an additional plaintiff, City of Pontiac General Employees' Retirement System ("Pontiac"), which had purchased Reckitt common stock on the London Stock Exchange and thus had standing to bring the English Law Claims.  *See id.* at 2.

## C.    Motion to Transfer

22.    On March 16, 2020, Defendants moved to transfer the Action to the Southern District of New York.  ECF 43.  Plaintiffs opposed the motion.  ECF 52, 54-2.  While this motion was pending, the Parties agreed to stay motion to dismiss briefing.  Defendants' motion was granted on November 30, 2020, ECF 58, and the case was transferred to this Court.

## D.    Second Amended Complaint

23.    Plaintiffs filed a second amended complaint on January 11, 2021 (the "SAC").  ECF 68.  The amendments focused on certain factual developments that transpired since the first amended

4873-4815-0631.v1

complaint had been filed, including Indivior's settlement with governmental entities and Thaxter's guilty plea.  For instance, in December 2020, Plaintiffs had reached out several times to the court clerk of the U.S. District Court for the Western District of Virginia – where the criminal actions against Indivior, Thaxter, and RBP's former Global Medical Director Timothy Baxter were underway – and requested copies of guilty-plea and sentencing-hearing transcripts.  The court reporter provided the requested transcripts, which Lead Counsel relied upon in drafting the SAC.  Plaintiffs also obtained Baxter's handwritten notes which strongly indicated that any data purporting to show that Film was safer than Tablets were reverse-engineered with the goal of protecting market share in mind.  ECF 68-4.

### E.    Western District of Virginia Intervention

24.    On January 7, 2021, Plaintiffs intervened in the criminal actions against Indivior, Baxter, and Defendant Thaxter that were underway in the Western District of Virginia.  *See United States v. Indivior Solutions Inc.*, No. 1:20-cr-00027, ECF 48; *United States v. Baxter*, No. 1:20-cr-00032, ECF 48; *United States v. Thaxter*, No. 1:20-cr-00024, ECF 96.  The purpose of Plaintiffs' intervention was to move to unseal sentencing memoranda and exhibits that had been filed under seal in those cases.  The information ultimately obtained – details about Defendants' contrived safety story, their coercion of governmental health insurance programs, and more – was integral to the Third Amended Complaint ("TAC"), discussed below.

### F.    First Round of Pre-Motion Letters

25.    On February 25, 2021, Defendants filed a 12-page, single-spaced pre-motion letter summarizing the legal and factual bases for their anticipated motion to dismiss the SAC.  ECF 72, 73.  Among other things, Defendants challenged the Exchange Act claims on the merits (specifically, the elements of falsity, scienter, and loss-causation) as well as under the statute of limitations.  Most of these challenges were derivations of the same premise: the purportedly "insolvable paradox" that

4873-4815-0631.v1

Defendants' "anticompetitive 'scheme' . . . was concealed from investors before *July 2017*, even though the very FDA documents, news articles, and private antitrust lawsuits on which Plaintiffs base their claims were publicly available by *2013*." ECF 72 at 5 (emphasis in original). Defendants also contended that Plaintiffs' claims must be dismissed for failure to establish that their ADS purchases were "domestic transactions" under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). *Id.* at 5 n.7. Lastly, Defendants challenged the English Law Claims on the merits and under a forum-selection clause in an arbitration agreement. *Id.* at 10-13.

26.     Plaintiffs responded on March 10, 2021 with a 17-page, single-spaced letter, countering each contention in turn. ECF 76. With respect to the assertion that Plaintiffs' claims were based on information that had been available long before the Action was filed, Plaintiffs responded that, in fact, the SAC was replete with information that had never been revealed prior to the 2019 Indivior indictment, and that, in any event, Defendants themselves had repeatedly contradicted and downplayed any previously available information. *Id.* at 8-9, 12-13. With respect to the forum-selection clause, Plaintiffs explained that that applied only to rights or obligations "arising out of" Reckitt's articles of association (*i.e.*, the corporate charter), whereas the claims asserted in this Action were "entirely non-contractual, arising out of the common law in tort and UK statute." *Id.* at 15-16.

### G.     Third Amended Complaint

27.     In the same letter, Plaintiffs sought leave to amend the SAC. *Id.* at 14. One of the principal objectives of this amendment was to plead facts regarding Plaintiffs' ADS purchases – *e.g.*, the terms and liabilities under the ADS Deposit Agreement, the placement of purchase orders, the exchange of money, and the locations of Plaintiffs and the depositary bank (JPMorgan) – which would establish that the purchases were "domestic transactions" under *Morrison* and therefore

- 9 -

within the ambit of the Exchange Act. *See id.* at 13-14. Another objective, as noted above, was to add factual allegations to be obtained from the motions to unseal in the Western District of Virginia. *Id.* at 17. Plaintiffs' request to amend was granted on March 11, 2021, ECF 77, and they filed the TAC on March 26, 2021, ECF 82.

28.    The Parties then engaged in a second round of pre-motion letters in anticipation of Defendants' motions to dismiss the TAC. ECF 84, 85, 87. The arguments raised by Defendants were similar to those they had raised in their previous letter. However, Defendants no longer raised *Morrison* in their defenses.

### H.    Two Motions to Dismiss the TAC

29.    The Parties then briefed two motions to dismiss, one submitted by Defendant Shaun Thaxter and the other by all other Defendants. *See* ECF 90, 96, 100, 106, 108.

30.    Defendants put forward a number of arguments. Thaxter, for instance, denied that his "statements concerning patients, physicians, and healthcare payers' preferences for Suboxone Film" were false or misleading. ECF 96 at 9. Rather, he argued that these statements amounted to mere puffery, characterizing some as "generalized explanations that did not offer concrete information" and others as "explicitly aspirational." *Id.* at 10.

31.    The other Defendants further challenged falsity and loss causation on the grounds that RBP's wrongdoing had already come to light prior to the corrective disclosures alleged in the TAC. *See* ECF 90 at 7-8, 18-20. For example, Defendants noted that in 2013 – before the Class Period even began – the FDA had publicly questioned RBP's claims of Film's superiority. *Id.* at 19 (citing TAC ¶¶164-167).

32.    For the same reason, Defendants argued that Plaintiffs' claims were barred by the two-year statute of limitations. The information underlying those claims, Defendants averred, had

4873-4815-0631.v1

already been made accessible in "a flood of litigation, news articles, investigations, and public FDA proceedings" in 2012 and 2013, whereupon the statute of limitations would have begun accruing. *Id.* at 20-21.

33. Defendants also challenged scienter on several grounds. They argued, for instance, that even if RBP was mistaken in disagreeing with the FDA about the superiority of Film over Tablets, the TAC failed to allege that that disagreement was insincere or in bad faith. *Id.* at 14-16. They also argued that even if RBP and its CEO, Thaxter, knew their safety story was false, the TAC failed to connect that knowledge to Reckitt and its executives. *Id.* at 13-14, 16-17.

34. Plaintiffs addressed each argument in turn. With respect to Defendants' "truth-on-the-market" defense, Plaintiffs explained that it failed for at least two independent reasons. First, although investors may have been aware since 2013 of Defendants' "disagreement" with the FDA, investors could not have realized that that disagreement was not remotely in good faith: that it was rooted in a years-long generic-defense scheme dating back to 2006; that it involved the actual falsification of data; and that it comprised a massive, concerted effort to deceive doctors, patients, insurers, and regulators simultaneously. ECF 100 at 13-14. Second, Defendants themselves repeatedly contradicted the FDA's 2013 opinion about Film, "blunt[ing] the intensity and credibility" of that disclosure. *Id.* at 14-15.

35. Along the same lines, Plaintiffs explained that the statute of limitations could not have begun to run in 2013, because the complaints and investigations from that time did not touch upon all of the requisite elements of securities fraud. Specifically, "[w]hile the lawsuits referenced by Defendants alleged anticompetitive misconduct, the plaintiffs there were not required to and did not allege scienter." *Id.* at 34. Absent this required element, investors could not have filed suit.

4873-4815-0631.v1

36.     Plaintiffs responded to the scienter arguments by reiterating that Defendants' generic-defense plan was a long-standing, multifaceted, meticulously executed scheme that predated any purported "studies" by *years* – plainly indicating that RBP's "disagreement" with the FDA was a pretext. *Id.* at 24-25. In addition, Plaintiffs noted suspicious stock sales, prior product-hopping behavior, and other evidence that, "considered holistically and not in isolation," buttressed this conclusion. *Id.* at 24-25, 27-28. Plaintiffs also clarified the link between Reckitt and RBP: "this case is not about executives far-removed from a subsidiary's fraud; the TAC alleges that Reckitt CEOs [Bart] Becht and Kapoor were intimately involved in the fraudulent scheme." *Id.* at 26; *see also id.* at 28 ("In addition, the Individual Defendants and Becht spoke to investors about RBP and Suboxone, so they were obviously knowledgeable about RBP's business.").

**I.      First Mediation**

37.     While the motions to dismiss were pending before this Court, the Parties engaged in a mediation with the Honorable Layn R. Phillips (Ret.) ("Judge Phillips"), a former federal judge and a highly respected mediator.

38.     In advance of the mediation, on October 4, 2021, the Parties submitted to Judge Phillips (and exchanged with each other) mediation statements with detailed descriptions of the evidence and law supporting their claims and defenses. On October 18, 2021, the Parties submitted and exchanged reply mediation statements in further support of their respective positions.

39.     On November 1, 2021, the Parties participated in a full-day mediation session with Judge Phillips via Zoom. During the mediation, Lead Counsel vigorously advocated Plaintiffs' positions regarding liability and damages. Although the Parties made progress, no settlement was reached at the conclusion of the mediation.

4873-4815-0631.v1

**J.      The Motions to Dismiss the TAC Are Denied in Part**

40.      On February 28, 2022, this Court entered an order granting in part and denying in part Defendants' motions to dismiss the TAC. *See* ECF 113. The Court found that various statements by Defendants to investors about Suboxone had "placed at issue" the reasons for Film's success, thereby obliging Defendants to speak the full truth:

> These statements all attributed the Film's market strength to patient and physician preferences, but a reasonable investor would have considered it material to know that sales were driven at least in part by statements, now alleged to be intentional misrepresentations, about the safety benefits of Suboxone Film. Having chosen to speak about the reasons for the strong sales and competitive advantages of Suboxone Film, [Defendants] had a duty to disclose the full truth of the reasons behind the product's success, including the marketing campaign that is alleged to have been misleading.

*Id.* at 35. The English Law Claims brought by Pontiac, however, were dismissed, because the Court found that Pontiac did not adequately allege the element of reliance. *See id.* at 70-73. The Court also dismissed certain of Defendants' alleged misstatements as non-actionable puffery, *see, e.g.*, *id.* at 38, 42-44, and dismissed the TAC entirely with respect to defendants Hennah and Bellamy for failure to plead facts giving rise to a strong inference of scienter, *id.* at 51-52.

**K.      Discovery Directed Toward Defendants**

41.      The case then proceeded into discovery. Throughout March and April 2022, the Parties corresponded and met-and-conferred concerning, *inter alia*, case management, pre-trial scheduling, ESI protocols, confidentiality protocols, and remote deposition protocols. On March 24, 2022, Plaintiffs served requests for the production of documents on Defendants. Defendants served their responses and objections thereto on April 25, 2022. After extensive negotiations, Reckitt produced more than 241,000 pages of documents.

4873-4815-0631.v1

42.    On April 8, 2022, Defendants served requests for the production of documents upon Plaintiffs, and Plaintiffs served their responses and objections thereto on May 9, 2022. Plaintiffs' collective production of documents comprised more than 43,000 pages.

43.    On April 13, 2022, Defendants filed their Answers to the TAC. ECF 116-117.

44.    On April 21, 2022, Plaintiffs served their first set of interrogatories directed to all Defendants. Defendants served initial objections and responses thereto on May 23, 2022 and supplemental responses on August 16, 2022.

45.    On May 13, 2022, the Parties exchanged initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1).

**L.    Third Party Discovery: Subpoenas and Eastern District of Pennsylvania Intervention**

46.    Lead Counsel expended a great deal of time and effort in procuring documents from third parties. Given the duration, complexity and multifaceted nature of Defendants' scheme, even just identifying relevant third parties was labor intensive – let alone subpoenaing them, meeting and conferring with them, and negotiating production and confidentiality protocols. Six non-parties produced documents, as follows:

(a)    Indivior: As described in the TAC, Reckitt demerged RBP on December 23, 2014, leading to its conversion into a standalone entity called Indivior. According to Defendants, the bulk of the relevant documents from the Class Period were no longer under Reckitt's control on account of the demerger. Plaintiffs employed a belt-and-suspenders approach towards obtaining documents from Indivior. First, Plaintiffs issued a subpoena. Then, in the interest of complying with the discovery schedule set forth by the Court, Plaintiffs also moved to unseal documents filed in connection with summary judgment motions in *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation* ("*In re Suboxone*"), No. 2:13-md-02445 (E.D. Pa.), ECF 818, an

- 14 -

antitrust action involving Indivior and other parties involving conduct that related to the claims in this Action.  Indivior thereupon produced the requested documents pursuant to the subpoena. Plaintiffs withdrew their motion to unseal, *In re Suboxone*, ECF 838, and Indivior made a production of more than ***5.1 million pages of documents***.

(b)    Aquestive: In 2006, RBP partnered with another company, Monosol, which held the patent for the dissolving film strip essential to Defendants' product-hopping scheme. Monosol later changed its name to Aquestive.  Lead Counsel obtained 2,073 pages of documents from Aquestive.

(c)    Massachusetts Executive Office of Health and Human Services ("EOHHS"): In 2011 and 2012, Defendants allegedly used fraudulent tactics to persuade EOHHS, Massachusetts' Medicaid program – the largest Medicaid program in the country by volume of addiction-treatment-drug business – to make Film a preferred drug on its formulary.  Lead Counsel obtained 1,417 pages of documents from EOHHS.

(d)    Venebio: Between January 6, 2012 and September 14, 2012, Reckitt and RBP contracted with Venebio, a life sciences consulting firm, to analyze notes of telephone calls to poison control centers regarding unintended pediatric exposure to buprenorphine (an active ingredient in both Tablets and Film).  Defendants allegedly manipulated the reports they were given by Venebio, and used the tampered data in perpetuation of their fraud.  Lead Counsel obtained 32,971 pages of documents from Venebio.

(e)    Researched Abuse, Diversion, and Addiction-Related Surveillance System ("RADARS"): During 2012 and thereafter, RBP contracted with RADARS to analyze data from poison control centers for rates and trends of unintended pediatric exposure.  RBP allegedly abused

- 15 -

and misquoted the RADARS reports to perpetuate its fraud.  Lead Counsel obtained eight pages from RADARS, concerning this information.

(f)     J.P. Morgan: As depository bank for Reckitt ADSs, J.P. Morgan possessed information on ADS turnover, dividend distributions, and similar information relevant for, *inter alia*, an analysis of market efficiency for class certification.  Lead Counsel obtained a spreadsheet from J.P. Morgan.

47.     In total, Plaintiffs and Lead Counsel obtained more than one million documents consisting of almost ***5.5 million pages.***  To facilitate the cost and time-efficient nature of the document review process, all of the documents were placed in an electronic database, known as Relativity, maintained in-house by Robbins Geller for significantly less than an outside vendor would charge.  This database allowed Lead Counsel to more efficiently search for and review documents through the use of search terms, date filters, custodian fields, and other metadata.

**M.     Motion to Amend the TAC**

48.     While discovery was underway, on June 21, 2022 Plaintiffs sought leave to amend the TAC to join a new plaintiff to assert the English Law Claims.  *See* ECF 122.  This motion was still pending when the case settled; Plaintiffs then withdrew the motion.  ECF 154.  The Court deemed the motion withdrawn on January 3, 2023.  ECF 157.

**N.     Class Certification Briefing**

49.     Plaintiffs moved for class certification on October 28, 2022.  ECF 149.  The motion for class certification addressed all of the requirements of Federal Rule of Civil Procedure 23.  The motion also addressed the element of reliance under two independent theories: the "fraud-on-the-market" presumption of reliance endorsed in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014), and the material-omissions

- 16 -

presumption of reliance endorsed in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

50.    In support of this motion, Plaintiffs submitted an expert report from Professor Steven P. Feinstein, Ph.D., CFA.  ECF 150-1.  Professor Feinstein's 60-page report (plus exhibits) explained why all five of the *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and all three of the *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) factors – which courts routinely consider in addressing class certification – were met; detailed the event study he undertook concerning Reckitt ADSs' price movement; and concluded that Reckitt ADSs traded in an efficient market throughout the Class Period.  Professor Feinstein also opined that damages consistent with Plaintiffs' theory of liability could be determined on a class-wide basis.  Lead Counsel spent substantial time consulting with Professor Feinstein on his report.

51.    Defendants filed a notice of non-opposition to Plaintiffs' motion for class certification on December 19, 2022.  ECF 152.  The Court denied the motion without prejudice on January 3, 2023 in light of the Settlement.  ECF 156.

**O.    Experts and Consultants**

52.    As described above, Plaintiffs retained Professor Feinstein to establish market efficiency, and to provide evidence on class-wide damages at class certification.  Professor Feinstein is the founder and president of Crowninshield Financial Research, Inc. and an Associate Professor of Finance at Babson College.  Professor Feinstein has had academic research published in peer-reviewed journals and presented research at professional and academic conferences.  In addition, he has provided numerous expert reports and testimony in class action securities litigations, such as this one, as well as in litigation concerning business solvency and valuation.

4873-4815-0631.v1

53.     In addition, Lead Counsel retained two experts on English law to submit reports in opposition to Defendants' motions to dismiss the TAC:

(a)     David Lord KC[3], an English barrister and King's Counsel, submitted two declarations explaining why, under English law, an arbitration clause in Reckitt's articles of association did not extend to the claims brought by Plaintiffs in this case.  ECF 104, 109-1.

(b)     Thomas Lowe KC, also a barrister and King's Counsel, submitted two declarations explaining the substantive English law of fraudulent misrepresentation, negligent misrepresentation, and Section 90A of the U.K. Financial Services and Markets Act, as relevant to the English Law Claims.  ECF 105, 109-2.

54.     In addition to these testifying experts, Lead Counsel retained the services of three consultants to assist with investigating and proving Plaintiffs' claims and navigating the scientific and economic issues involved in this matter.  During the course of fact discovery, Lead Counsel consulted with the following experts:

(a)     Scott Hakala, Ph.D., CFA, Principal of ValueScope, Inc., provided various econometric analyses to quantify damages.

(b)     Elvin T. Price, Pharm. D., Ph.D., an Associate Professor at the Virginia Commonwealth University School of Pharmacy, was retained to assist Lead Counsel in understanding the pharmacology of Film and Tablets.

(c)     Michael A. Carrier, a Professor at Rutgers University School of Law specializing in antitrust, advised on the economics of Defendants' anticompetitive business scheme.

---

[3]    After the coronation of King Charles III, the designation of Queen's Counsel was changed to King's Counsel ("KC").

- 18 -

55.     The work performed by these experts and consultants provided invaluable insight to Lead Counsel in evaluating the merits of the case and the prospects for settlement.

**P.      Second Mediation and Settlement**

56.     On October 12, 2022, the Parties engaged in a second round of mediation facilitated by Judge Phillips.  In advance of the mediation, on October 3, 2022, the Parties exchanged mediation statements detailing any changes or advances in their positions since their first mediation the year before.

57.     The Parties did not resolve the Litigation on October 12, but continued to negotiate thereafter with the assistance of Judge Phillips.  After two months of good-faith negotiation, with the benefit of substantial briefing as well as a developed factual record, Judge Phillips made a proposal to resolve the case for $19.6 million.  The Parties accepted this proposal on December 20, 2022.

**Q.      Preliminary Approval of the Settlement**

58.     On March 10, 2023, Plaintiffs filed their Unopposed Motion for Preliminary Approval of Class Action Settlement, Certification of the Class, and Approval of Notice to the Class. ECF 160.  In connection therewith, Plaintiffs requested that the Court: (i) preliminarily approve the Settlement; (ii) certify the proposed Class; (iii) approve the form and manner of the settlement notices to Members of the Class; and (iv) schedule a hearing on the final approval of the Settlement, proposed Plan of Allocation and Lead Counsel's application for an award of attorneys' fees and litigation expenses.

59.     On March 16, 2023, the Court granted Plaintiffs' motion for preliminary approval, and issued an order setting the final settlement hearing for July 19, 2023, at 2:00 pm.  ECF 164.

4873-4815-0631.v1

### III.     FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

#### A.     Plaintiffs and Lead Counsel Had an Extensive Understanding of the Facts Before Entering into the Settlement

60.     As set forth above, the terms of the Settlement were negotiated by the Parties at arm's length through adversarial, good-faith negotiations.  The Settlement was reached only after extensive settlement negotiations – including two mediation sessions as well as follow up discussions – with the substantial assistance of Judge Phillips.

61.     Furthermore, as detailed at length above, Lead Counsel had by this point conducted extremely thorough legal and factual research and analysis.  Consequently, Plaintiffs and Lead Counsel entered settlement negotiations with an intimate understanding of the strengths and weaknesses of Plaintiffs' claims, enabling them to confidently evaluate the potential risks and rewards of continued litigation.  Plaintiffs participated in this assessment, and were consulted and kept apprised of the Settlement negotiations.

62.     Lead Counsel has considerable experience with complex federal civil litigation, particularly the litigation of securities class actions.  Lead Counsel believes that its reputation as attorneys who are unafraid to zealously carry a meritorious case through the trial and appellate levels gave it a strong position in engaging in settlement negotiations with Defendants.

#### B.     The Settlement Eliminates the Risks Plaintiffs and the Class Faced

63.     While Lead Counsel believes that all of the claims asserted against Defendants have merit, there were nonetheless serious risks as to whether Plaintiffs would ultimately prevail. Defendants put forward a number of arguments at the motion to dismiss stage concerning falsity, scienter, loss causation, and statute of limitations.  *See supra* §II.H.  Most if not all of these issues would need to be re-litigated at summary judgment, trial, and on appeal.  Losing on even one of

these issues, at any one of these phases of litigation, would most likely result in the Class obtaining nothing at all.

64.     In deciding to settle the Litigation, Plaintiffs and Lead Counsel considered, among other things: (1) the substantial immediate cash benefit to Class Members under the terms of the Stipulation; (2) the possibility of the Class not being certified; (3) the expense involved in preparing for and briefing summary judgment and any future appeals; (4) the possibility of the Court granting summary judgment in Defendants' favor; (5) the likelihood of a "battle of the experts" with respect to falsity, materiality, loss causation and damages; (6) the possibility of losing at trial; and (7) the probability that, even if Plaintiffs won at trial, Defendants would file post-verdict motions and appeals resulting in additional risk to, and even more delay in obtaining, any recovery for the Class.

**C.     The Settlement Amount in the Context of Total Damages Is Excellent**

65.     According to Plaintiffs' in-house damages expert, the maximum recoverable damages in this case would amount to approximately $51.3 million; hence the Settlement constitutes 38% of the total estimated damages.  This is ***ten times*** higher than the 3.8% median settlement as a percentage of losses in cases where recovery damages are estimated between $50 and $99 million. *See* Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review* (NERA Jan. 24, 2023) at 17, Fig. 18.

**D.     The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement**

66.     Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable.  As outlined above, the Settlement is the product of arm's-length negotiations lasting over a year between adversaries with significant experience in securities class action litigation.

4873-4815-0631.v1

67. Lead Counsel strongly believes that the Settlement represents a highly favorable resolution for the Class under the circumstances. As outlined above, the Settlement is fair, reasonable and adequate in all respects, and should be approved by the Court.

68. Furthermore, more than 198,900 copies of the Notice have been mailed to potential Class Members and nominees. As of the date of this Declaration, no objections to the Settlement or the Plan of Allocation have been submitted by a Class Member. Should any objections be timely filed between the date of this Declaration and the final approval hearing, Lead Counsel will address them in a supplemental memorandum.

### E.   Additional Factors Unique to This Case

69. No other investors (other than Plaintiffs) brought suit alleging these claims, suggesting the difficulty Plaintiffs faced on behalf of the Class, even at the onset of the litigation. For example, the initial complaint by Sterling Heights was filed only two weeks before the expiration of the statute of limitations under the Exchange Act. *See, e.g.*, Defs.' Mem. L. Supp. Mot. Dismiss, ECF 90, at 27-29. Similarly, Birmingham's motion for appointment as lead plaintiff was unopposed. *See* ECF 27. Were it not for Plaintiffs' efforts, there was a very real possibility that the Class's claims could have atrophied on procedural grounds.

## IV.   THE PLAN OF ALLOCATION

70. The Net Settlement Fund will be distributed to Class Members substantially in accordance with the Plan of Allocation set forth in the Notice and approved by the Court. The Plan of Allocation provides that individuals will be eligible to participate in the distribution of the Net Settlement Fund only if they have an overall net loss on their transactions in Reckitt ADSs during the Class Period.

71.     For purposes of determining the amount an Authorized Claimant may recover under the Plan, Lead Counsel conferred with its in-house damages expert, and the proposed Plan reflects an assessment of the damages that could reasonably have been recovered by Class Members had Plaintiffs prevailed at trial.  In the unlikely event there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim.  If, however, and as is more likely, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants.  Payment in this manner shall be deemed conclusive against all Authorized Claimants.

## V.     FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

72.     Lead Counsel respectfully requests that the Court award attorneys' fees of 27.5% of the $19,600,000 Settlement Amount, or $5,390,000.  As set forth below, Lead Counsel believes such a fee is reasonable and appropriate in light of the resources expended in prosecuting this Action, the result obtained, and the inherent risk of nonpayment from representing the Class on a contingent basis.[4]

### A.     Labor Invested and Quality of Representation

73.     Lead Counsel has devoted a significant amount of time and resources in the research, investigation, and prosecution of this Litigation.  The Settlement represents a substantial recovery for

---

[4]   The legal authorities supporting the requested fees and expenses are set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Memorandum"), submitted herewith.

the Class, one that is attributable to the diligence, determination, hard work, and reputation of Lead Counsel.

74.     Lead Counsel is among the most experienced securities practitioners in the country. The identification and background of Robbins Geller is included as an exhibit to the separate fee and expense declaration submitted by Robbins Geller ("Fee Declaration").

75.     Lead Counsel's representation of the Class included extensive research prior to drafting the first complaint; amending the complaint three times; opposing Defendants' motions to dismiss; consulting with experts; subpoenaing third parties; intervening in two different federal actions pending in the Western District of Virginia and the Eastern District of Pennsylvania; reviewing and analyzing millions of pages of documents; briefing class certification; drafting three mediation briefs; and preparing for and participating in two full-day mediation sessions.

76.     Lead Counsel's experience and advocacy were required in presenting the strengths of the case during mediation to convince Defendants, their insurers, defense counsel, and the Mediator of the risks Defendants faced from not settling.

77.     The fee request is also reasonable when cross-checked against the lodestar Lead Counsel incurred in prosecuting the Action. Included with Lead Counsel's declaration is a schedule that summarizes the lodestar of the firm's personnel who performed work on the case, as well as expenses incurred by category after having both been reviewed and reduced in the exercise of billing judgment. Lead Counsel has expended more than 9,700 hours in the investigation, prosecution, and resolution of the Action. Lead Counsel's lodestar is $6,161,391.50.

78.     The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work. Defendants were represented by experienced lawyers from Wilmer Cutler Pickering Hale and Dorr LLP and King & Spalding LLP, well-regarded defense firms. Defense

4873-4815-0631.v1

counsel have reputations for vigorous advocacy in the defense of complex cases such as this. The ability of Lead Counsel to obtain a favorable settlement in the face of such quality opposition confirms the excellence of Lead Counsel's representation.

**B.      The Risk, Magnitude, and Complexity of the Litigation**

79.      Lead Counsel undertook this case solely on a contingent-fee basis, assuming a substantial risk that the case would yield no recovery and leave Lead Counsel uncompensated. Class actions under the Exchange Act are especially risky, because, as touched upon above (§III.B), defendants often have numerous arguments available to them at each stage of the litigation – and they need only succeed on one.

80.      Unlike counsel for defendants, who are paid an hourly rate and are reimbursed for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses since this case began. When Lead Counsel undertook to represent Plaintiffs and the Class in this matter, it was with the knowledge that Lead Counsel would spend many hours of hard work against capable defense lawyers with no assurance of ever obtaining any compensation for its efforts. The only way Lead Counsel would be compensated was to achieve a successful result.

81.      There are numerous cases where class counsel, after expenditure of thousands of hours of time and significant monetary costs, have received no compensation whatsoever. Lead Counsel knows from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured.

**VI.      THE REQUESTED EXPENSES ARE FAIR AND REASONABLE**

82.      Lead Counsel seeks expenses in the amount of $574,923.16 in connection with the prosecution of the Litigation. *See* Fee Declaration, submitted herewith.

83.      Lead Counsel submits that the expenses are reasonable and were necessary for the successful prosecution of this Litigation. Lead Counsel was aware that it may not recover any of

- 25 -

4873-4815-0631.v1

these expenses unless and until this Action was successfully resolved against Defendants. Accordingly, Lead Counsel took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Plaintiffs' claims.

84.     The requested expenses reflect routine and typical expenditures incurred in the course of litigation, such as the costs of document processing, expert fees, consultant fees, and mediation fees. Lead Counsel believes these expenses are reasonable and were necessary for the successful prosecution of the Litigation.

## VII.     LEAD PLAINTIFF IS ENTITLED TO AN AWARD PURSUANT TO 15 U.S.C. §78u-4(a)(4) BASED ON ITS REPRESENTATION OF THE CLASS

85.     Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Lead Plaintiff seeks an award for its time spent representing the Class in the amount of $1,500. The amount of time and effort devoted to the Litigation by Birmingham is detailed in the accompanying Declaration of Jay P. Turner.

86.     As discussed in Lead Counsel's accompanying Fee Memorandum and in Birmingham's supporting declaration, Birmingham has been fully committed to pursuing the claims detailed in the TAC on behalf of the Class throughout the duration of this Litigation. These efforts required the representatives of Birmingham to dedicate considerable time and resources to this Litigation that would have otherwise been devoted to their regular employment duties.

87.     As more fully set forth in Lead Counsel's accompanying Fee Memorandum, the efforts expended by Birmingham during the course of this Litigation are precisely the types of activities courts have found adequate to support an award, and fully support the instant request by Birmingham for an award of $1,500.

4873-4815-0631.v1

## VIII.  CONCLUSION

88.     In light of the significant recovery to the Class and the substantial risks of this Litigation, as described above and in the accompanying Fee Memorandum and the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, Plaintiffs and Lead Counsel respectfully submit that the Settlement and Plan should be approved as fair and reasonable.  In addition, as a result of the recovery obtained in the face of substantial risks, including the contingent nature of the fees and the complexity of the case, Plaintiffs and Lead Counsel respectfully submit that the Court should award attorneys' fees in the amount of 27.5% of the Settlement Amount, plus expenses of $574,923.16, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid, plus an award of $1,500 for Birmingham pursuant to 15 U.S.C. §78u-4(a)(4) in connection with its representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 14th day of June, 2023, at Melville, New York.



*s/ Alan I. Ellman*
ALAN I. ELLMAN

4873-4815-0631.v1

<u>CERTIFICATE OF SERVICE</u>

I, ALAN I. ELLMAN, hereby certify that on June 14, 2023, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

s/ *Alan I. Ellman*
ALAN I. ELLMAN